PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § § | |
| Plaintiff, | | Adversary Proceeding No. |
| vs. | | _____ |
| JAMES DONDERO, | | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## COMPLAINT FOR (I) BREACH OF CONTRACT
## AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Mr. James Dondero ("Mr. Dondero" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1.      The Debtor brings this action against Mr. Dondero as a result of Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000 and payable upon the Debtor's demand. Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes) for Mr. Dondero's breach of his obligations under the Notes, and (b) turnover by Mr. Dondero to the Debtor of the foregoing amounts.

## JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.

## CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a)

APP 003

Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities

LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

11.     On December 4, 2019, the Delaware Court entered an order transferring venue

of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to

operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

**A.     The Dondero Notes**

13.     Mr. Dondero, in his personal capacity, is the maker under a series of promissory

notes in favor of the Debtor.

14.     Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in

favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("Dondero's First

Note").  A true and correct copy of Dondero's First Note is attached hereto as **Exhibit 1**.

15.     On August 1, 2018, Mr. Dondero executed a promissory note in favor of the

Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note").  A

true and correct copy of Dondero's Second Note is attached hereto as **Exhibit 2.**

16.     On August 13, 2018, Mr. Dondero executed a promissory note in favor of the

Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and

collectively, with Dondero's First Note and Dondero's Second Note, the "Notes").  A true and

correct copy of Dondero's Third Note is attached hereto as **Exhibit 3.**

17.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The

accrued interest and principal of this Note shall be due and payable on demand of the Payee."

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

18.      Section 4 of each Note provides:

**Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

19.      Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.**      **Mr. Dondero Defaults under Each Note**

20.      By letter dated December 3, 2020, the Debtor made demand on Mr. Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

21.      Despite the Debtor's demand, Mr. Dondero did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

22.      As of December 11, 2020, there was an outstanding principal amount of $3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of $21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

DOCS_NY:41770.7 36027/002

23.     As of December 11, 2020, there was an outstanding principal balance of $2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of $27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

24.     As of December 11, 2020, there was an outstanding principal balance of $2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of $25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

25.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $9,004,013.07.

26.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

27.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

28.     Each Note is a binding and enforceable contract.

29.     Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

30.     Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for Mr. Dondero's breach of his obligations under each of the Notes.

31.     As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07 as of December 11,

2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Turnover by Mr. Dondero Pursuant to 11 U.S.C. § 542(b))

32.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

33.     Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for Mr. Dondero's breach of his obligations under each of the Notes.

34.     Each Note is property of the Debtor's estate, and the amounts due under each Note are matured and payable upon demand.

35.     Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

36.     The Debtor has made demand for the turnover of the amounts due under each Note.

37.     As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

38.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of

payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

DOCS_NY:41770.7 36027/002

APP 008

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

9

# EXHIBIT 1

**EXHIBIT 1**

# PROMISSORY NOTE

$3,825,000                                                        February 2, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Tax Loan</u>. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

     5.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     6.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     7.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 2

**EXHIBIT 2**

APP 013

# PROMISSORY NOTE

$2,500,000                                                                    August 1, 2018

    FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

APP 015

# EXHIBIT 3

**EXHIBIT 3**

# PROMISSORY NOTE

$2,500,000                                                              August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

# EXHIBIT 4

**EXHIBIT 4**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

     Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41660.1 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

APP 021

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
| --- | --- |

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>James Dondero |
| --- | --- |

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, Texas 76102  Tel.: (817) 405-6900 |
| --- | --- |

| PARTY (Check One Box Only)<br>☑ Debtor           ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor         ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor           ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor         ☐ Other<br>☐ Trustee |
| --- | --- |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2: Turnover of estate property pursuant to 11 U.S.C. 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
     actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
     (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
     if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| --- | --- |
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 9,004,013.07 plus interest, fees, and expenses |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>January 22, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § § | _____ |
| NEXPOINT ADVISORS, L.P. | § § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**COMPLAINT FOR (I) BREACH OF CONTRACT
AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant NexPoint Advisors, L.P. ("NPA" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1.     The Debtor brings this action against NPA arising from NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33 and payable in annual installments.  NPA has failed to pay amounts when due under the note, the note is in default, and the amounts due under the note have been accelerated pursuant to the terms of the note.

2.     Through this Complaint, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note) for NPA's breach of its obligations under the Note, and (b) turnover by the NPA to the Debtor of the foregoing amounts.

## JURISDICTION AND VENUE

3.     This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

APP 026

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas and organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

APP 027

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

### A.     The NPA Note

13.     NPA is the maker under a promissory note in favor of the Debtor.

14.     Specifically, on May 31, 2017, NPA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $30,746,812.33 (the "**Note**").  A true and correct copy of the Note is attached hereto as **Exhibit 1**.

15.     Section 2 of the Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

> **2.1     Annual Payment Dates.**   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2     Final Payment Date**.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

16.     Section 3 of the Note provides:

> **Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

APP 028

17.     Section 4 of the Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.    No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

18.     Section 6 of the Note provides:

**Attorneys' Fees**.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.**     **NPA's Default under the Note**

19.     NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

20.     By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").    A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.    The Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.    Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.    The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due underline{immediately}.**

Demand Letter (emphasis in the original).

21.     On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

APP 029

22.     The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "<u>Second Demand Letter</u>"), a true and correct copy of which is attached hereto as **<u>Exhibit 3</u>**, stating:

> [T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due <u>immediately</u>**.

> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

23.     Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

24.     As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

25.     Pursuant to Section 4 of the Note, the Note is in default and is currently due and payable.

**<u>FIRST CLAIM FOR RELIEF</u>**
**(For Breach of Contract)**

26.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

27.     The Note is a binding and enforceable contract.

28.     NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

29.     Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and

6

unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for NPA's breach of its obligations under the Note.

30.     As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03 as of January 15, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
**(Turnover by NPA Pursuant to 11 U.S.C. § 542(b))**

31.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

32.     NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for NPA's breach of its obligations under the Note.

33.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

34.     NPA has not paid the amount due under the Note to the Debtor.

35.     The Debtor has made demand for the turnover of the amount due under the Note.

36.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

37.     The Debtor is entitled to the amount due under the Note.

APP 031

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

APP 032

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

APP 033

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC, | § | |
| | § | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**COMPLAINT FOR (I) BREACH OF CONTRACT**
**AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Highland Capital Management Services, Inc. ("HCMS" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against HCMS as a result of HCMS's defaults under (i) four demand notes in the aggregate principal amount of $900,000 and payable upon the Debtor's demand, and (ii) one term note in the aggregate principal amount of $20,247,628.02 and payable in the event of default, all executed by HCMS in favor of the Debtor.  HCMS has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes) for HCMS's breach of its obligations under the Notes, and (b) turnover by HCMS to the Debtor of the foregoing amounts.

**JURISDICTION AND VENUE**

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7. The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8. Upon information and belief, HCMS is a company with offices located in Dallas, Texas, and is incorporated in the state of Delaware.

## CASE BACKGROUND

9. On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10. On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members: (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

DOCS_NY:42003.3 36027/002

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

**A.      The HCMS Demand Notes**

13.     HCMS is the maker under a series of demand notes in favor of the Debtor.

14.     Specifically, on March 28, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note").  A true and correct copy of HCMS's First Demand Note is attached hereto as **Exhibit 1**.

15.     On June 25, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note").  A true and correct copy of HCMS's Second Demand Note is attached hereto as **Exhibit 2.**

16.     On May 29, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note").  A true and correct copy of HCMS's Third Demand Note is attached hereto as **Exhibit 3**

17.     On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "Demand Notes").  A true and correct copy of HCMS's Fourth Demand Note is attached hereto as **Exhibit 4.**

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

18.     Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**. The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

19.     Section 4 of the Demand Notes provides:

> **Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

20.     Section 6 of the Demand Notes provides:

> **Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.      HCMS's Defaults under Each Demand Note**

21.     By letter dated December 3, 2020, the Debtor made demand on HCMS for payment under the Demand Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**.  The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued interest and principal through and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

22.     Despite the Debtor's demand, HCMS did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020.

23.     As of December 11, 2020, there was an outstanding principal amount of $158,776.59 on HCMS's First Demand Note and accrued but unpaid interest in the amount of $3,257.32, resulting in a total outstanding amount as of that date of $162,033.91.

24.     As of December 11, 2020, there was an outstanding principal balance of $212,403.37 on HCMS's Second Demand Note and accrued but unpaid interest in the amount of $2,999.54, resulting in a total outstanding amount as of that date of $215,402.81.

25.     As of December 11, 2020, there was an outstanding principal balance of $409,586.19 on HCMS's Third Demand Note and accrued but unpaid interest in the amount of $5,256.62, resulting in a total outstanding amount as of that date of $414,842.81.

26.     As of December 11, 2020, there was an outstanding principal balance of $153,564.74 on HCMS's Fourth Demand Note and accrued but unpaid interest in the amount of $1,675.16, resulting in a total outstanding amount as of that date of $155,239.90.

27.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $947,519.43.  Pursuant to Section 4 of each Demand Note, each Note is in default and is currently due and payable.

**C.      The HCMS Term Note**

28.     HCMS is the maker under a term note in favor of the Debtor.

29.     Specifically, on May 31, 2017, HCMS executed a term note in favor of the Debtor, as payee, in the original principal amount of $20,247,628.02 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

30.     Section 2 of the Term Note provides: "**Payment of Principal and Interest**. Principal and interest under this Note shall be due and payable as follows:

    **2.1**    **Annual Payment Dates.**   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

    **2.2**    **Final Payment Date**.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

    31.     Section 3 of the Term Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    32.     Section 4 of the Term Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

    33.     Section 6 of the Term Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.**     **HCMS's Default under the Term Note**

    34.     HCMS failed to make the payment due under the Term Note on December 31,

2020.

35.     By letter dated January 7, 2021, the Debtor made demand on HCMS for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Second Demand Letter provides:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.
>
> **The Note is in default, and payment is due underline immediately.**

Second Demand Letter (emphasis in the original).

36.     As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was $6,757,248.95.

37.     Pursuant to Section 4 of the Term Note, the Term Note is in default and is currently due and payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

38.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

39.     The Notes are binding and enforceable contracts.

40.     HCMS breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

41.     HCMS breached the Term Note by failing to pay all amounts due to the Debtor upon HCMS's default and acceleration.

42.     Pursuant to each Note, the Debtor is entitled to damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued

8

and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMS's breach of its obligations under each of the Notes.

43.      As a direct and proximate cause of HCMS's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $947,519.43 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

44.      As a direct and proximate cause of HCMS's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,757,248.95 as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
**(Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))**

45.      The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

46.      HCMS owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMS's breach of its obligations under each of the Notes.

47.      Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note are matured and payable upon demand.

48.      The Term Note is property of the Debtor's estate and the amounts due under the Term Note are matured and payable upon default and acceleration.

DOCS_NY:42003.3 36027/002

APP 042

49.     The Debtor has made demand for turnover of the amounts due under each of the Notes.

50.     As of the date of filing this Complaint, HCMS has not turned over to the Debtor all or any of the amounts due under each of the Notes.

51.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCMS to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)   Such other and further relief as this Court deems just and proper.

DOCS_NY:42003.3 36027/002

Dated:  January 22, 2021.                **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

11

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § § | |
| Plaintiff, | | Adversary Proceeding No. |
| vs. | | _____ |
| HCRE PARTNERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC, | | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## COMPLAINT FOR (I) BREACH OF CONTRACT
## AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1.      The Debtor brings this action against HCRE as a result of HCRE's defaults under (i) four demand notes in the aggregate principal amount of $4,250,000 and payable upon the Debtor's demand, and (ii) one term note in the aggregate principal amount of $6,059,831.51 payable in the event of default, all executed by HCRE in favor of the Debtor.  HCRE has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes) for HCRE's breach of its obligations under the Notes, and (b) turnover by HCRE to the Debtor of the foregoing amounts.

### JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

2

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, HCRE is a limited liability company with offices located in Dallas, Texas and is organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

### A.     The HCRE Demand Notes

13.     HCRE is the maker under a series of demand notes in favor of the Debtor.

14.     Specifically, on November 27, 2013, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note").  A true and correct copy of HCRE's First Demand Note is attached hereto as **Exhibit 1**.

15.     On October 12, 2017, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note").  A true and correct copy of HCRE's Second Demand Note is attached hereto as **Exhibit 2.**

16.     On October 15, 2018, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note").  A true and correct copy of HCRE's Third Demand Note is attached hereto as **Exhibit 3**

17.     On September 25, 2019, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "Demand Notes").  A true and correct copy of HCRE's Fourth Demand Note is attached hereto as **Exhibit 4.**

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

18.     Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**. The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

19.     Section 4 of the Demand Notes provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

20.     Section 6 of the Demand Notes provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     HCRE's Defaults under Each Demand Note**

21.     By letter dated December 3, 2020, the Debtor made demand on HCRE for payment of the Demand Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**.  The Demand Letter provides:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

22.     Despite the Debtor's demand, HCRE did not pay all or any portion of the amount demanded by the Debtor on December 11, 2020 or at any time thereafter.

5

23.     As of December 11, 2020, there was an outstanding principal amount of $171,542 on HCRE's First Demand Note and accrued but unpaid interest in the amount of $526.10, resulting in a total outstanding amount as of that date of $172,068.10.

24.     As of December 11, 2020, there was an outstanding principal balance of $3,149,919.12 on HCRE's Second Demand Note and accrued but unpaid interest in the amount of $41,423.60, resulting in a total outstanding amount as of that date of $3,191,342.72.

25.     As of December 11, 2020, there was an outstanding principal balance of $874,977.53 on HCRE's Third Demand Note and accrued but unpaid interest in the amount of $10,931.23, resulting in a total outstanding amount as of that date of $885,908.76.

26.     As of December 11, 2020, there was an outstanding principal balance of $750,279.14 on HCRE's Fourth Demand Note and accrued but unpaid interest in the amount of $12,662.24, resulting in a total outstanding amount as of that date of $762,941.38.

27.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $5,012,260.96.

28.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

## C.     **The HCRE Term Note**

29.      HCRE is the maker under a term note in favor of the Debtor.

30.     Specifically, on May 31, 2017, HCRE executed a term note in favor of the Debtor, as payee, in the original principal amount of $6,059,831 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

31.     Section 2 of the Term Note provides: "**Payment of Principal and Interest**. Principal and interest under this Note shall be due and payable as follows:

6

    **2.1**    <u>**Annual Payment Dates.**</u>   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "<u>**Annual Installment**</u>") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

    **2.2**    <u>**Final Payment Date**</u>.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "<u>**Maturity Date**</u>").

    32.    Section 3 of the Term Note provides:

<u>**Prepayment Allowed: Renegotiation Discretionary**</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    33.    Section 4 of the Term Note provides:

<u>**Acceleration Upon Default**</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

    34.    Section 6 of the Term Note provides:

<u>**Attorneys' Fees**</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.**    <u>**HCRE's Default under the Term Note**</u>

    35.    HCRE failed to make the payment due under the Term Note on December 31, 2020.

DOCS_NY:42002.4 36027/002

APP 051

36.    By letter dated January 7, 2021, the Debtor made demand on HCRE for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Demand Letter provides:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,145,466.84; however, interest continues to accrue under the Note.

> **The Term Note is in default, and payment is due immediately.**

Second Demand Letter (emphasis in the original).

37.    Despite the Debtor's demands, HCRE did not pay the amount demanded by the Debtor on January 7, 2021 or at any time thereafter.

38.    As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was $6,145,466.84.

39.    Pursuant to Section 4 of the Term Note, the Note is in default and is currently due and payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

40.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

41.    Each Note is a binding and enforceable contract.

42.    HCRE breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

43.    HCRE breached the Term Note by failing to pay all amounts due to the Debtor upon HCRE's default and acceleration.

8

44.     Pursuant to each Note, the Debtor is entitled to damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCRE's breach of its obligations under each of the Notes.

45.     As a direct and proximate cause of HCRE's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $5,012,260.96 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

46.     As a direct and proximate cause of HCRE's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,145,466.84 as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
**(Turnover by HCRE Pursuant to 11 U.S.C. § 542(b))**

47.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

48.     HCRE owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCRE's breach of its obligations under each of the Notes.

49.     Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note are matured and payable upon demand.

9

50.     The Term Note is property of the Debtor's estate and the amounts due under the Term Note are matured and payable upon default and acceleration.

51.     The Debtor has made demand for turnover of the amounts due under each of the Notes.

52.     As of the date of filing this Complaint, HCRE has not turned over to the Debtor all or any of the amounts due under each of the Notes.

53.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCRE to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)   Such other and further relief as this Court deems just and proper.

DOCS_NY:42002.4 36027/002

Dated:  January 22, 2021.                **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

11

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-3003 |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants James Dondero ("Mr. Dondero"), Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy," and together with Mr. Dondero and Nancy Dondero, "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000, and payable upon the Debtor's demand. Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      After amending his answer and his sworn responses to interrogatories, Mr. Dondero now contends that the Debtor orally agreed to relieve him of his obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  Mr. Dondero further contends that he entered into the Alleged Agreement with his sister, Nancy Dondero, as trustee of Dugaboy, acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement, he controlled the Debtor and was the lifetime beneficiary of Dugaboy.

2

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes.

4.      Nevertheless, the Debtor amends its Complaint for the purpose of adding certain claims and naming additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against Mr. Dondero for breach of his obligations under the notes and for turnover, the Debtor adds alternative claims (a) against Mr. Dondero for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for Mr. Dondero's breach of his obligations under the Notes, (b) turnover by Mr. Dondero to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, Mr. Dondero pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

3

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled the Debtor.

12.      Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

13.      Upon information and belief, Nancy Dondero is Mr. Dondero's sister, and the trustee of Dugaboy.

4

## CASE BACKGROUND

14.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

16.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

17.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

18.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

**A.      The Dondero Notes**

19.     Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:43594.1 36027/002

20.     Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("<u>Dondero's First Note</u>").  A true and correct copy of Dondero's First Note is attached hereto as **<u>Exhibit 1</u>**.

21.     On August 1, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("<u>Dondero's Second Note</u>").  A true and correct copy of Dondero's Second Note is attached hereto as **<u>Exhibit 2.</u>**

22.     On August 13, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("<u>Dondero's Third Note</u>" and collectively, with Dondero's First Note and Dondero's Second Note, the "<u>Notes</u>").  A true and correct copy of Dondero's Third Note is attached hereto as **<u>Exhibit 3.</u>**

23.     Section 2 of each Note provides: "**<u>Payment of Principal and Interest</u>**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

24.     Section 4 of each Note provides:

**<u>Acceleration Upon Default</u>**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

25.     Section 6 of each Note provides:

**<u>Attorneys' Fees</u>**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.**   **Mr. Dondero Defaults Under Each Note**

26.   By letter dated December 3, 2020, the Debtor made demand on Mr. Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued interest and principal through and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

27.   Despite the Debtor's demand, Mr. Dondero did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

28.   As of December 11, 2020, there was an outstanding principal amount of $3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of $21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

29.   As of December 11, 2020, there was an outstanding principal balance of $2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of $27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

30.   As of December 11, 2020, there was an outstanding principal balance of $2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of $25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

31.   Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $9,004,013.07.

32.   Pursuant to Section 4 of each Note, each Note is in default, and is currently due and payable.

DOCS_NY:43594.1 36027/002

**C.    The Debtor Files the Original Complaint**

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for Mr. Dondero's breach of his obligations under the Notes and (ii) turnover by Mr. Dondero for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.    Mr. Dondero's Affirmative Defenses**

34.    On March 16, 2021, Mr. Dondero filed his *Original Answer* [Docket No. 6] (the "Original Answer").  In his Original Answer, Mr. Dondero asserted four affirmative defenses: (i) the Debtor's claims should be barred because it was previously agreed by the Debtor that the Debtor would not collect on the Notes, (ii) waiver, (iii) estoppel, and (iv) failure of consideration. *See id.* ¶¶ 40-43.

35.    On April 6, 2021, Mr. Dondero filed his *Amended Answer* [Docket No. 16] (the "Amended Answer"), asserting three additional affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 40, (ii) The Debtor's claims are barred, in whole or in part, due to setoff, *id.* ¶ 41, and (iii) the Notes are "ambiguous," *id.* ¶ 45.

36.    According to Mr. Dondero, the Alleged Agreement was orally entered into in January or February 2019, and was not memorialized in any documentation.

37.    According to Mr. Dondero, he entered into the Alleged Agreement with his sister, Nancy Dondero, acting in her capacity as the Trustee of Dugaboy, which purportedly held the majority of the Debtor's Class A limited partnership interests.

38.     Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement.

39.     Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

40.     According to Mr. Dondero, he discussed the Alleged Agreement with Nancy Dondero, but (a) no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement, and (b) the Alleged Agreement was not subject to any negotiation.

41.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.      Dugaboy Lacked Authority to Act on Behalf of the Debtor**

42.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 5**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

43.     Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 5**, § 4.2(b).

44.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

45.    Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

## FIRST CLAIM FOR RELIEF
### (Against Mr. Dondero)
### (Breach of Contract)

46.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

47.    Each Note is a binding and enforceable contract.

48.    Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

49.    Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

50.    As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Against Mr. Dondero)
### (Turnover Pursuant to 11 U.S.C. § 542(b))

51.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.    Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until

10

the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

53.    Each Note is property of the Debtor's estate and the amounts due under each Note is matured and payable upon demand.

54.    Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

55.    The Debtor has made demand for the turnover of the amounts due under each Note.

56.    As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

57.    The Debtor is entitled to the turnover of all amounts due under each of the Notes.

### THIRD CLAIM FOR RELIEF
### (Against Mr. Dondero)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

58.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59.    The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement within two years of the Petition Date.

60.    Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

11

(b) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

61.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt Mr. Dondero incurred under the Notes demonstrates a scheme of fraud.

62.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

63.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

**FOURTH CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

64.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

65.     The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

66.     Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

67.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

68.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

DOCS_NY:43594.1 36027/002

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

69.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

70.     A bona fide, actual, present dispute exists between the Debtor and Dugaboy concerning whether Dugaboy was authorized to entered into the Alleged Agreement on the Debtor's behalf.

71.     A judgment declaring the parties' respective rights and obligations will resolve their dispute..

72.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) Dugaboy otherwise had no right  or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

14

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy)
### (Breach of Fiduciary Duty)

73.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

74.     If Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy would owe the Debtor a fiduciary duty.

75.     If Dugaboy had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy breached its fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

76.     Accordingly, the Debtor is entitled to recover from Dugaboy (a) actual damages that the Debtor suffered as a result of its breach of fiduciary duty, and (b) for punitive and exemplary damages.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

77.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

78.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

79.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

80.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

15

81.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)     On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section 548 of the Bankruptcy Code;

(iv)     On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section Tex. Bus. & C. Code § 24.005(a)(1);

(v)     On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business,

transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) Dugaboy otherwise had no right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy, in an amount to be determined at trial, that Debtor suffered as a result of Dugaboy's breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages; and

Such other and further relief as this Court deems just and proper.

DOCS_NY:43594.1 36027/002

Dated:  As of July 13, 2021      PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:43594.1 36027/002

APP 073

# EXHIBIT 1

# PROMISSORY NOTE

$3,825,000                                                      February 2, 2018

    FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.   <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.   <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.   <u>Tax Loan</u>.  This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

    5.   <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    6.   <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    7.   <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8. Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9. Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

# EXHIBIT 2

APP 077

# PROMISSORY NOTE

$2,500,000                                                                        August 1, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.   Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.   Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.   Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.   Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.   Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.   Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

APP 079

# EXHIBIT 3

# PROMISSORY NOTE

$2,500,000                                                            August 13, 2018

      FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

# EXHIBIT 4

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

APP 085

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 5

APP 087

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

# FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

6.2.    Addresses and Notices ........................................................................................................25
6.3.    Titles and Captions.............................................................................................................25
6.4.    Pronouns and Plurals..........................................................................................................25
6.5.    Further Action ....................................................................................................................25
6.6.    Binding Effect ....................................................................................................................25
6.7.    Integration ..........................................................................................................................25
6.8.    Creditors.............................................................................................................................25
6.9.    Waiver ................................................................................................................................25
6.10.   Counterparts .......................................................................................................................25
6.11.   Applicable Law ..................................................................................................................25
6.12.   Invalidity of Provisions .....................................................................................................25
6.13.   Mandatory Arbitration.......................................................................................................26

# FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"),* as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act**.**  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices**.**  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate**.**  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate**.**  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners**.**  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201**.**  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership**.**  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in <u>Section 3.1(c)(i)</u>.

"*Defaulting Partner*" has the meaning set forth in <u>Section 3.1(c)</u>.

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"**Effective Date**" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in <u>Section 3.11(b)</u>.

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in <u>Section 5.3</u>.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; <u>provided</u>, <u>however</u>, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

"***Record Date***" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"***Second Amended Buy-Sell and Redemption Agreement***" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"***Securities***" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"***Securities Act***" means the Securities Act of 1933, as amended, and any successor to such statute.

"***Substitute Limited Partner***" has the meaning set forth in <u>Section 4.6(a)</u>.

"***Transfer***" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"***Treasury Regulations***" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.    Other Definitions**.  All terms used in this Agreement that are not defined in this <u>Article 2</u> have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

## FINANCIAL MATTERS

**3.1.    Capital Contributions**.

(a)    <u>Initial Capital Contributions</u>.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    <u>Additional Capital Contributions</u>.

(i)     The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)    Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)     Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)     Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

APP 097

(ii)     <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.     Allocations of Profits and Losses**.

(a)     <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(b)     <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

(i)     <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(c)      Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.    **Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.    **Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)      Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)      Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)      Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)      Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering <u>Section 3.4(c)</u> or 3.4(d).

(e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    <u>Partner Nonrecourse Deductions</u>.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    <u>Section 481 Adjustments</u>.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

**3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to <u>Section 3.2(c)</u>, and (ii) the allocations pursuant to <u>Sections 3.4</u>.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this <u>Section 3.5</u> shall be made with respect to allocations pursuant to <u>Section 3.4 (g) and (h)</u> only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

**3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this <u>Section 3.6</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7. Capital Accounts.

(a)   Maintenance of Capital Accounts.  The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i)   The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii)   The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)   Negative Capital Accounts.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)   Interest.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)   No Withdrawal.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e)   Loans From Partners.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)   Revaluations.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

**3.8.     Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.     Distributions**.

(a)     <u>General</u>.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)     <u>Priority Distributions</u>.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)     No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "***Tax Distribution***").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)    <u>Payments Not Deemed Distributions</u>.    Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)    <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

3.10.   **Compensation and Reimbursement of General Partner**.

(a)   Compensation.   The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)   Reimbursement for Expenses.   In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

3.11.   **Books, Records, Accounting, and Reports**.

(a)   Records and Accounting.   The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)   Fiscal Year.   The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)   Other Information.   The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)   Distribution Reporting to Class B Limited Partner and Class C Limited Partner.   Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

3.12.   **Tax Matters**.

(a)   Tax Returns.   The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)     Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)     Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)     Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**    In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)     Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership); and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)　　Certificate of Limited Partnership.　The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)　　Reliance by Third Parties.　Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.　Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.　In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.　In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)　　Partnership Funds.　The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.　The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.　The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)  Loans to or from General Partner: Contracts with Affiliates; Joint Ventures.

(i)  The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)  The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)  The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)  Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)  Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)  Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

the "***GP Party***"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

       (i)      <u>Liability of General Partner</u>.

       (i)      Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

       (ii)      The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

       (j)      <u>Reliance by General Partner</u>.

       (i)      The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

       (ii)      The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

       (k)      The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.    Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)    <u>Limitation of Liability</u>.  Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)    <u>Management of Business</u>.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)    <u>Return of Capital</u>.  No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>.  Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)    <u>Default on Priority Distributions</u>.  If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>.  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

**4.3.    Transfer of Partnership Interests**.

(a)    <u>Transfer</u>.  No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

(b)    <u>Transfers by General Partner</u>.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

(c)    <u>Transfers by Limited Partners</u>.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under <u>Section 3.4</u>.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; **_provided, however,_** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4. Issuances of Partnership Interests to New and Existing Partners.

(a) _Issuance of Partnership Interests to New Limited Partners_. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person shall be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b) _Issuance of an Additional Partnership Interest to an Existing Partner_. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5. Withdrawal of General Partner.

(a) _Option_. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**_Departing Partner_**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b) _Conversion_. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6. Admission of Substitute Limited Partners and Successor General Partner.

(a) _Admission of Substitute Limited Partners_. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "**_Substitute Limited Partner_**"),

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

       (b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

       (c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

   **5.1.   Dissolution.**  The Partnership shall be dissolved upon:

       (a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

       (b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

       (c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

5.4.    **Distribution in Kind.**    Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**   Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**   The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

5.5.    **Cancellation of Certificate of Limited Partnership.**    Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

5.6.    **Return of Capital.**    The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

5.7.    **Waiver of Partition.**    Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

6.1.    **Amendments to Agreement.**    The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

     **6.2.**    **Addresses and Notices.** Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

     **6.3.**    **Titles and Captions.** All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement. All Exhibits hereto are incorporated herein by reference.

     **6.4.**    **Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

     **6.5.**    **Further Action.** The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

     **6.6.**    **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

     **6.7.**    **Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

     **6.8.**    **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

     **6.9.**    **Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

     **6.10.**    **Counterparts.** This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

     **6.11.**    **Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

     **6.12.**    **Invalidity of Provisions.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**  In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided</u>, <u>however</u>, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President


LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:   Trustee


**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:   Trustee


**MARK K. OKADA**
_____
Mark K. Okada


*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
        James D. Dondero,
        President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

## EXHIBIT A

| | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

<u>**EXHIBIT B**</u>

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By:    _____
        Name: _____
        Title:  _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>James Dondero, Nancy Dondero, and<br>The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Stinson LLP (for James Dondero and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor       ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor       ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑2 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☑3 13-Recovery of money/property - §548 fraudulent transfer
☑4 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑5 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑1 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") in the above captioned chapter 11 case (the "<u>Bankruptcy Case</u>"), and the plaintiff (the "<u>Plaintiff</u>") in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>") by its undersigned counsel, as and for its amended complaint (the "<u>Complaint</u>") against defendants NexPoint Advisors, L.P. ("<u>NPA</u>"), James Dondero ("<u>Mr. Dondero</u>"), Nancy Dondero ("<u>Ms. Dondero</u>"), and The Dugaboy Investment Trust ("<u>Dugaboy</u>" and together with NPA, Mr. Dondero, and Ms. Dondero, the "<u>Defendants</u>"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      The Debtor brings this action against Defendants in connection with NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33, and payable in annual installments.  NPA has failed to pay amounts when due under the Note (as defined below), the Note is in default, and the amounts due under the Note have been accelerated pursuant to the terms of the Note.

2.      In paragraph 42 of NPA's *First Amended Answer* [Docket No. 34-3], NPA contends that the Debtor orally agreed to relieve it of the obligations under the notes upon fulfillment of "conditions subsequent" (the "<u>Alleged Agreement</u>").  NPA further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of NPA, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "<u>Representative</u>"), acting on behalf of the Debtor.  At the time Mr.

2

Dondero entered into the Alleged Agreement on behalf of NPA, he controlled both NPA and the Debtor and was the lifetime beneficiary of Dugaboy.

3.        Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note.

4.        Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against NPA for breach of its obligations under the Note and for turnover, the Debtor adds alternative claims (a) against NPA for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.        As remedies, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note), for NPA's breach of its obligations under the Note, (b) turnover by NPA to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, NPA pursuant to the Note; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.      Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas, and organized under the laws of the state of Delaware.

12.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled NPA; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.      Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## **CASE BACKGROUND**

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

5

## STATEMENT OF FACTS

**A.**     **The NPA Note**

20.     NPA is the maker under a promissory note in favor of the Debtor.

21.     Specifically, on May 31, 2017, NPA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $30,746, 812.33 (the "<u>Note</u>").  A true and correct copy of the Note is attached hereto as **<u>Exhibit 1</u>**.

22.     Section 2 of the Note provides: "**Payment of Principal and Interest**.

Principal and interest under this Note shall be due and payable as follows:

**2.1**     **<u>Annual Payment Dates</u>.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

**2.2**     **<u>Final Payment Date</u>**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**<u>Maturity Date</u>**").

23.     Section 3 of the Note provides:

**<u>Prepayment Allowed: Renegotiation Discretionary</u>**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

24.     Section 4 of the Note provides:

**<u>Acceleration Upon Default</u>**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

25.     Section 6 of the Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     NPA's Default Under the Note**

26.     NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

27.     By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.  The Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.   Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

28.     On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

29.     The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

[T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due immediately**.

7

> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

30.     Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

31.     As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

32.     Pursuant to Section 4 of the Note, the Note is in default, and is currently due and payable.

## C.     **The Debtor Files the Original Complaint**

33.     On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for NPA's breach of its obligations under the Note and (ii) turnover by NPA for the outstanding amounts under the Note, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

## D.     **NPA's Affirmative Defenses**

34.     On March 1, 2021, NPA filed *Defendant's Original Answer* [Docket No. 6] (the "Original Answer").  In its Original Answer, NPA asserted three affirmative defenses: (i) the claims are barred because the Plaintiff caused NPA to default, (ii) the claims are barred because the Plaintiff caused NPA to delay in making payment, and (iii) waiver and estoppel. *See id.* ¶¶39-41.

35.     On June 9, 2021, NPA filed *Defendant's First Amended Answer* [Docket No. 35-3] (the "Amended Answer"), that asserted a new affirmative defense; namely, that the

Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶42.

36.    According to NPA, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

37.    According to NPA, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

38.    Mr. Dondero controlled both NPA and the Debtor at the time he entered into the Alleged Agreement on behalf of NPA.

39.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

40.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 4**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

41.    Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 4**, § 4.2(b).

42.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

43.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor

## FIRST CLAIM FOR RELIEF
### (Against NPA)

### (For Breach of Contract)

44.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

45.     The Note is a binding and enforceable contract.

46.     NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

47.     Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

48.     As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03, as of January 15, 2021, plus an amount equal to all accrued buy unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Against NPA)
### (Turnover by NPA Pursuant to 11 U.S.C. § 542(b))

49.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

50.     NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of

payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

51.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

52.     NPA has not paid the amount due under the Note to the Debtor.

53.     The Debtor has made demand for the turnover of the amount due under the Note.

54.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

55.     The Debtor is entitled to the amount due under the Note.

### THIRD CLAIM FOR RELIEF
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Debtor made the transfer pursuant to the Alleged Agreement within two years of the Petition Date.

58.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

11

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

59.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt NPA incurred under the Note demonstrates a scheme of fraud.

60.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfer made pursuant to the Alleged Agreement from NPA.

61.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Note.

### FOURTH CLAIM FOR RELIEF
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

64.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

65.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from NPA.

66.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Notes.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

68.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

13

69.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

70.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (Breach of Fiduciary Duty)

71.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

72.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

73.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

74.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

76.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

77.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

78.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

79.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to

15

the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged

16

Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages and

(iii)    Such other and further relief as this Court deems just and proper.

Dated:  As of July 13, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

18

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC, JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST | § | |
| | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>"), and the plaintiff (the "<u>Plaintiff</u>") in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), by its undersigned counsel, as and for its amended complaint (the "<u>Complaint</u>") against defendants Highland Capital Management Services, Inc. ("<u>HCMS</u>"), James Dondero ("<u>Mr. Dondero</u>"), Nancy Dondero ("<u>Ms. Dondero</u>"), and The Dugaboy Investment Trust ("<u>Dugaboy</u>" and together with HCMS, Mr. Dondero, and Ms. Dondero, the "<u>Defendants</u>") alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      The Debtor brings this action against Defendants in connection with HCMS's defaults under (i) four demand notes, in the aggregate principal amount of $900,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $20,247,628.02, and payable in the event of default, all executed by HCMS in favor of the Debtor. HCMS has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      In paragraph 56 of HCMS's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "<u>Alleged Agreement</u>").  HCMS further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of HCMS, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "<u>Representative</u>"),

2

APP 145

acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement on

behalf of HCMS, he controlled both HCMS and the Debtor and was the lifetime beneficiary of

Dugaboy.

3.     Based on its books and records, discovery to date, and other facts, the

Debtor believes that the Alleged Agreement is a fiction created after the commencement of this

Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due

under the Notes.

4.     Nevertheless, the Debtor amends its Complaint to add certain claims and

name additional parties who would be liable to the Debtor if the Alleged Agreement were

determined to exist and be enforceable.  Specifically, in addition to pursuing claims against HCMS

for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims

(a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of

fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c)

against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.     As remedies, the Debtor seeks (a) damages from HCMS in an amount equal

to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all

accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the

Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses,

as provided for in the notes), for HCMS's breach of its obligations under the Notes, (b) turnover

by HCMS to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and

the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit

of, HCMS pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the

Defendants' breach of fiduciary duties or aiding and abetting thereof.

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, HCMS is a company with offices located in Dallas, Texas, and is incorporated in the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## **CASE BACKGROUND**

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:42003.4 36027/002

## STATEMENT OF FACTS

**A.      The HCMS Demand Notes**

20.      HCMS is the maker under a series of demand notes in favor of the Debtor.

21.      Specifically, on March 28, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note").  A true and correct copy of HCMS's First Demand Note is attached hereto as **Exhibit 1**.

22.      On June 25, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note").  A true and correct copy of HCMS's Second Demand Note is attached hereto as **Exhibit 2.**

23.      On May 29, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note").  A true and correct copy of HCMS's Third Demand Note is attached hereto as **Exhibit 3.**

24.      On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "Demand Notes").  A true and correct copy of HCMS's Fourth Demand Note is attached hereto as **Exhibit 4.**

25.      Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

26.      Section 4 of the Demand Notes provide:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and

6

the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

27.    Section 6 of the Demand Notes provide:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.    HCMS's Defaults Under Each Demand Note**

28.    By letter dated December 3, 2020, the Debtor made demand on HCMS for payment under the Demand Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

29.    Despite the Debtor's demand, HCMS did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020.

30.    As of December 11, 2020, there was an outstanding principal amount of $158,776.59 on HCMS's First Demand Note and accrued but unpaid interest in the amount of $3,257.32, resulting in a total outstanding amount as of that date of $162,033.91.

31.    As of December 11, 2020, there was an outstanding principal balance of $212,403.37 on HCMS's Second Demand Note and accrued but unpaid interest in the amount of $2,999.54, resulting in a total outstanding amount as of that date of $215,402.81.

32.     As of December 11, 2020, there was an outstanding principal balance of $409,586.19 on HCMS's Third Demand Note and accrued but unpaid interest in the amount of $5,256.62, resulting in a total outstanding amount as of that date of $414,842.81.

33.     As of December 11, 2020, there was an outstanding principal balance of $153,564.74 on HCMS's Fourth Demand Note and accrued but unpaid interest in the amount of $1,675.16, resulting in a total outstanding amount as of that date of $155,239.90.

34.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $947,519.43.  Pursuant to Section 4 of each Demand Note, each Note is in default, and is currently due and payable.

**C.**      **The HCMS Term Note**

35.     HCMS is the maker under a term note in favor of the Debtor.

36.     Specifically, on May 31, 2017, HCMS executed a term note in favor of the Debtor, as payee, in the original principal amount of $20,247,628.02 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

37.     Section 2 of the Term Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

> **2.1      Annual Payment Dates.**   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2      Final Payment Date**.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

8

38.     Section 3 of the Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

39.     Section 4 of the Term Note provides:

**Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

40.     Section 6 of the Term Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.     HCMS's Default Under the Term Note**

41.     HCMS failed to make the payment due under the Term Note on December 31, 2020.

42.     By letter dated January 7, 2021, the Debtor made demand on HCMS for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Second Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

9

**The Note is in default, and payment is due <u>immediately</u>.**

Second Demand Letter (emphasis in the original).

43.    As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was $6,757,248.95.

44.    Pursuant to Section 4 of the Term Note, the Note is in default, and is currently due and payable.

**E.    <u>The Debtor Files the Original Complaint</u>**

45.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "<u>Original Complaint</u>").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for HCMS's breach of its obligations under the Notes and (ii) turnover by HCMS for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**F.    <u>HCMS's Affirmative Defenses</u>**

46.    On March 13, 2021, HCMS filed *Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint* [Docket No. 6] (the "<u>Original Answer</u>").  In its Original Answer, HCMS asserted four affirmative defenses: (i) the claims are barred in whole or in part under the doctrines of justification or repudiation, (ii) waiver, (iii) estoppel, and (iv) offset and/or setoff (the "<u>Setoff Defense</u>"). *See id.* ¶¶ 53-56.

47.    On June 11, 2021, HCMS filed its *First Amended Answer to Plaintiff's Complaint* [Docket No. 34] (the "<u>Amended Answer</u>"), that omitted the Setoff Defense but asserted two affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes

"upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 56, and (ii) the Notes are "ambiguous," *id.* ¶ 57.

48.    According to HCMS, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

49.    According to HCMS, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

50.    Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement on behalf of HCMS.

51.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**G.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

52.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 8**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

53.    Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 8**, § 4.2(b).

54.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

11

55.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

## **FIRST CLAIM FOR RELIEF**

### **(Against HCMS)**

### **(For Breach of Contract)**

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Notes are binding and enforceable contracts.

58.     HCMS breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

59.     HCMS breached the Term Note by failing to pay all amounts due to the Debtor upon HCMS's default and acceleration.

60.     Pursuant to each Note, the Debtor is entitled to damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Demand Notes.

61.     As a direct and proximate cause of HCMS's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $947,519.43, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

62.     As a direct and proximate cause of HCMS's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,757,248.95, as of January 8, 2021, plus

an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF

### (Against HCMS)

### (Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))

63.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

64.    HCMS owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Notes

65.    Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note is matured and payable upon demand.

66.    The Term Note is property of the Debtor's estate and the amounts due under the Term Note is matured and payable upon default and acceleration.

67.    The Debtor has made demand for turnover of the amounts due under each of the Notes

68.    As of the date of filing this Complaint, HCMS has not turned over to the Debtor all or any of the amounts due under each of the Notes.

69.    The Debtor is entitled to the turnover of all amounts due under each of the Notes.

13

## THIRD CLAIM FOR RELIEF
### (Against HCMS)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

70.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

71.     The Debtor made the transfers pursuant to the Alleged Agreement within two years of the Petition Date.

72.     HCMS entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

73.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt HCMS incurred under the Notes demonstrates a scheme of fraud.

74.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

75.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

### FOURTH CLAIM FOR RELIEF
**(Against HCMS)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

76.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

77.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

78.     Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

15

79.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

80.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

### FIFTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

81.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

82.    A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

83.    A judgment declaring the parties' respective rights and obligations will resolve their dispute.

84.    Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

85.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

86.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

87.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

88.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

89.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

90.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

91.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

92.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

93.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMS to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

18

(iii)     On its Third Claim for Relief, avoidance of the Alleged Agreements and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)     On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)     On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result

19

of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and

exemplary damages; and

(iii)    Such other and further relief as this Court deems just and proper.


Dated:  As of July 13, 2021.            PACHULSKI STANG ZIEHL & JONES LLP
                                        Jeffrey N. Pomerantz (CA Bar No.143717)
                                        Ira D. Kharasch (CA Bar No. 109084)
                                        John A. Morris (NY Bar No. 2405397)
                                        Gregory V. Demo (NY Bar No. 5371992)
                                        Hayley R. Winograd (NY Bar No. 5612569)
                                        10100 Santa Monica Blvd., 13th Floor
                                        Los Angeles, CA 90067
                                        Telephone: (310) 277-6910
                                        Facsimile: (310) 201-0760
                                        E-mail:    jpomerantz@pszjlaw.com
                                                   ikharasch@pszjlaw.com
                                                   jmorris@pszjlaw.com
                                                   gdemo@pszjlaw.com
                                                   hwinograd@pszjlaw.com

                                        -and-

                                        */s/ Zachery Z. Annable*
                                        HAYWARD PLLC
                                        Melissa S. Hayward
                                        Texas Bar No. 24044908
                                        MHayward@HaywardFirm.com
                                        Zachery Z. Annable
                                        Texas Bar No. 24053075
                                        ZAnnable@HaywardFirm.com
                                        10501 N. Central Expy, Ste. 106
                                        Dallas, Texas 75231
                                        Tel: (972) 755-7100
                                        Fax: (972) 755-7110

                                        *Counsel for Highland Capital Management, L.P.*

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007 |
| | § | |
| HCRE PARTERS, LLC (N/K/A/ NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST | § | |
| | | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with HCRE, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1. The Debtor brings this action against Defendants in connection with HCRE's defaults under (i) four demand notes, in the aggregate principal amount of $4,250,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $6,059,831.51, payable in the event of default, all executed by HCRE in favor of the Debtor. HCRE has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2. In paragraph 58 of HCRE's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). HCRE further contends that the Alleged Agreement was entered into between James Dondero and his sister, Nancy Dondero, as representative of a majority of the Class A

2

shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement on behalf of HCRE, he controlled both HCRE and the Debtor and was the lifetime beneficiary of Dugaboy.

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Notes.

4.      Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against HCMS for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims (a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for HCRE's breach of its obligations under the Notes, and (b) turnover by HCRE to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, HCRE pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.      Upon information and belief, HCRE is a limited liability company with offices located in Dallas, Texas, and is organized under the laws of the state of Delaware.

12.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.      Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

### CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members: (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:42002.5 36027/002

## STATEMENT OF FACTS

### A.    The HCRE Demand Notes

20.    HCRE is the maker under a series of demand notes in favor of the Debtor.

21.    Specifically, on November 27, 2013, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note").  A true and correct copy of HCRE's First Demand Note is attached hereto as **Exhibit 1**.

22.    On October 12, 2017, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note").  A true and correct copy of HCRE's Second Demand Note is attached hereto as **Exhibit 2.**

23.    On October 15, 2018, 2017, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note").  A true and correct copy of HCRE's Third Demand Note is attached hereto as **Exhibit 3**

24.    On September 25, 2019, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "Demand Notes").  A true and correct copy of HCRE's Fourth Demand Note is attached hereto as **Exhibit 4.**

25.    Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

26.    Section 4 of the Demand Notes provide:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice

6

of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

27.     Section 6 of the Demand Notes provide:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

## B.     HCRE's Defaults Under Each Demand Note

28.     By letter dated December 3, 2020, the Debtor made demand on HCRE for payment of the Demand Note Repayment Amount by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**.  The Demand Letter provides:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

29.     Despite the Debtor's demand, HCRE did not pay all or any portion of the amount demanded by the Debtor on December 11, 2020, or at any time thereafter.

30.     As of December 11, 2020, there was an outstanding principal amount of $171,542 on HCRE's First Demand Note and accrued but unpaid interest in the amount of $526.10, resulting in a total outstanding amount as of that date of $172,068.10.

7

31.     As of December 11, 2020, there was an outstanding principal balance of $3,149,919.12 on HCRE's Second Demand Note and accrued but unpaid interest in the amount of $41,423.60, resulting in a total outstanding amount as of that date of $3,191,342.72.

32.     As of December 11, 2020, there was an outstanding principal balance of $874,977.53 on HCRE's Third Demand Note and accrued but unpaid interest in the amount of $10,931.23, resulting in a total outstanding amount as of that date of $885,908.76.

33.     As of December 11, 2020, there was an outstanding principal balance of $750,279.14 on HCRE's Fourth Demand Note and accrued but unpaid interest in the amount of $12,662.24, resulting in a total outstanding amount as of that date of $762,941.38.

34.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $5,012,260.96.

35.     Pursuant to Section 4 of each Note, each Note is in default, and is currently due and payable.

**C.    The HCRE Term Note**

36.      HCRE is the maker under a term note in favor of the Debtor.

37.     Specifically, on May 31, 2017, HCRE executed a term note in favor of the Debtor, as payee, in the original principal amount of $6,059,831 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

38.     Section 2 of the Term Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

> **2.1    Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of

8

this Note, commencing on the first such date to occur after the date of execution of this note.

**2.2    Final Payment Date**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

39.    Section 3 of the Term Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

40.    Section 4 of the Term Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

41.    Section 6 of the Term Note provides:

**Attorneys' Fees**.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.    HCRE's Default Under the Term Note**

42.    HCRE failed to make the payment due under the Term Note on December 31, 2020.

43.    By letter dated January 7, 2021, the Debtor made demand on HCRE for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Demand Letter provides:

9

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $6,145,466.84; however, interest continues to accrue under the Note.

**The Term Note is in default, and payment is due <u>immediately</u>.**

Second Demand Letter (emphasis in the original).

44.      Despite the Debtor's demands, HCRE did not pay the amount demanded by the debtor on January 7, 2021, or at any time thereafter.

45.      As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was 6,145,466.84.

46.      Pursuant to Section 4 of the Term Note, the Note is in default, and is currently due and payable.

## E.      **The Debtor Files the Original Complaint**

47.      On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "<u>Original Complaint</u>"). In the Original Complaint, the Debtor brought claims for (i) breach of contract for HCRE's breach of its obligations under the Notes and (ii) turnover by HCRE for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

## F.      **HCRE's Affirmative Defenses**

48.      On March 13, 2021, HCMS filed *Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint* [Docket No. 6] (the "<u>Original Answer</u>"). In its Original Answer, HCMS asserted four affirmative defenses: (i) the claims are barred in whole or in part under the doctrines of justification or repudiation, (ii) waiver, (iii) estoppel, and (iv) offset and/or setoff (the "<u>Setoff Defense</u>"). *See id.* ¶¶ 55-58.

10

49.     On June 11, 2021, HCRE filed its *First Amended Answer to Plaintiff's Complaint* [Docket No. 34] (the "<u>Amended Answer</u>"), that omitted the Setoff Defense but asserted two affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 58, and (ii) the Notes are "ambiguous," *id.* ¶ 59.

50.     According to HCRE, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

51.     According to HCRE, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

52.     Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement on behalf of HCRE.

53.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**G.      Dugaboy Lacked Authority to Act on Behalf of the Debtor**

54.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "<u>Limited Partnership Agreement</u>"), and attached hereto as **Exhibit 8**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

55.     Section 4.2(b) of the Limited Partnership Agreement states:

<u>Management of Business</u>.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

11

**Exhibit 8**, § 4.2(b).

56.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

57.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

### FIRST CLAIM FOR RELIEF
**(Against HCRE)**

**(For Breach of Contract)**

58.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59.     Each Note is a binding and enforceable contract.

60.     HCRE breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

61.     HCRE breached the Term Note by failing to pay all amounts due to the Debtor upon HCRE's default and acceleration.

62.     Pursuant to each Note, the Debtor is entitled to damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCRE's breach of its obligations under each of the Notes.

63.     As a direct and proximate cause of HCRE's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $5,012,260.96, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

64.     As a direct and proximate cause of HCRE's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,145,466.84, as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(Against HCRE)**
**(Turnover by HCRE Pursuant to 11 U.S.C. § 542(b))**

65.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

66.     HCRE owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCRE's breach of its obligations under each of the Notes

67.     Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note is matured and payable upon demand.

68.     The Term Note is property of the Debtor's estate and the amounts due under the Term Note is matured and payable upon default and acceleration.

69.     The Debtor has made demand for turnover of the amounts due under each of the Notes.

70.     As of the date of filing this Complaint, HCRE has not turned over to the Debtor all or any of the amounts due under each of the Notes.

71.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

13

### THIRD CLAIM FOR RELIEF
### (Against HCRE)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

72.　　The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

73.　　The Debtor made the transfers pursuant to the Alleged Agreement within two years of the Petition Date.

74.　　Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, HCRE, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

75.　　The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt HCRE incurred under the Notes demonstrates a scheme of fraud.

76.　　Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCRE.

77.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer thereunder, and (ii) recovering from HCRE an amount equal to all obligations remaining under the Notes.

### FOURTH CLAIM FOR RELIEF
**(Against HCRE)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

78.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

79.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

80.     Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, HCRE, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

15

81.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCRE.

82.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer thereunder, and (ii) recovering from HCRE an amount equal to all obligations remaining under the Notes.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

83.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

84.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

85.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

86.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

16

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (Breach of Fiduciary Duty)

87.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

88.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

89.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

90.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

DOCS_NY:42002.5 36027/002

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

91.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

92.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

93.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

94.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

95.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCRE to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

18

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered

as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for

punitive and exemplary damages; and

(iii)    Such other and further relief as this Court deems just and proper.


Dated:  As of July 13, 2021.              PACHULSKI STANG ZIEHL & JONES LLP
                                          Jeffrey N. Pomerantz (CA Bar No.143717)
                                          Ira D. Kharasch (CA Bar No. 109084)
                                          John A. Morris (NY Bar No. 2405397)
                                          Gregory V. Demo (NY Bar No. 5371992)
                                          Hayley R. Winograd (NY Bar No. 5612569)
                                          10100 Santa Monica Blvd., 13th Floor
                                          Los Angeles, CA 90067
                                          Telephone: (310) 277-6910
                                          Facsimile: (310) 201-0760
                                          E-mail:    jpomerantz@pszjlaw.com
                                                     ikharasch@pszjlaw.com
                                                     jmorris@pszjlaw.com
                                                     gdemo@pszjlaw.com
                                                     hwinograd@pszjlaw.com

                                          -and-

                                          */s/ Zachery Z. Annable*
                                          HAYWARD PLLC
                                          Melissa S. Hayward
                                          Texas Bar No. 24044908
                                          MHayward@HaywardFirm.com
                                          Zachery Z. Annable
                                          Texas Bar No. 24053075
                                          ZAnnable@HaywardFirm.com
                                          10501 N. Central Expy, Ste. 106
                                          Dallas, Texas 75231
                                          Tel: (972) 755-7100
                                          Fax: (972) 755-7110

                                          *Counsel for Highland Capital Management, L.P.*

20

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO AND NANCY DONDERO**

John Y. Bonds, III
State Bar No. 02589100
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| v. | § | **Adversary No. 21-03003-sgj** |
| | § | |
| **JAMES D. DONDERO, NANCY DONDERO,** | § | |
| **AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

# TABLE OF CONTENTS

I.      STATEMENT OF FACTS .............................................................................................. 1

II.     STANDARD OF REVIEW ........................................................................................... 7

III.    ARGUMENT ................................................................................................................ 8

     A.      This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA. ................................................................................. 10

     B.      The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA. ................................................................................ 13

          1.     The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA. ....................................................................................................... 14

          2.     The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA. ....................................................................................................... 15

     C.      The Court Should Stay All Claims Pending Arbitration. ........................................... 19

IV.     CONCLUSION ........................................................................................................... 19

CORE/3522697.0002/169128081

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acis Cap. Mgmt., L.P.*,
 600 B.R. 541 (Bankr. N.D. Tex. 2019) ....................................................................... 10, 14

*Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*,
 870 F. Supp. 2d 441 (S.D. Tex. 2012) ............................................................................. 18

*Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,
 No. A-09-CA-351 LY, 2009 WL 10699390 (W.D. Tex. July 30, 2009) ...................................... 15

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*,
 566 B.R. 815 (W.D. Tex. 2017) ....................................................................................... 15

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
 345 F.3d 347 (5th Cir. 2003) ........................................................................................... 18

*Buell Door Co. v. Architectural Sys., Inc.*,
 No. 3:02-CV-721-AH, 2002 WL 1968223 (N.D. Tex. Aug. 20, 2002) ................................ 10, 11

*In re Cain*,
 585 B.R. 127 (Bankr. S.D. Miss. 2018) ............................................................................. 14

*Coffman v. Provost Umphrey LLP*,
 33 Fed. Appx. 705 (5th Cir. 2002) .................................................................................... 16

*In re Daisytek, Inc.*,
 323 B.R. 180 (N.D. Tex. 2005) ......................................................................................... 14

*Dean Witter Reynolds, Inc. v. Byrd*,
 470 U.S. 213 (1985) .................................................................................................... 8, 9

*In re Divine Ripe, L.L.C.*,
 538 B.R. 300 (Bankr. S.D. Tex. 2015) ............................................................................... 19

*In re Dune Energy, Inc.*,
 575 B.R. 716 (Bankr. W.D. Tex. 2017) .............................................................................. 15

*Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*,
 No. CV H-14-2086, 2015 WL 9302843 (S.D. Tex. Dec. 18, 2015) ....................................... 13

*Elkjer v. Scheef & Stone, L.L.P.*,
 8 F. Supp. 3d 845 (N.D. Tex. 2014) ............................................................................ 8, 11, 16

*First Options of Chicago, Inc. v. Kaplan*,
 514 U.S. 938 (1995) ..................................................................................................... 12

CORE/3522697.0002/169128081

*Fleetwood Enterprises, Inc. v. Gaskamp*,
 280 F.3d 1069 (5th Cir. 2002) ........................................................................................7

*In re Gandy*,
 299 F.3d 489 (5th Cir. 2002) .........................................................................................19

*In re Gaughf*,
 19-50947-KMS, 2020 WL 1271595 (Bankr. S.D. Miss. Mar. 12, 2020) ......................17

*Grant v. Houser*,
 469 Fed. Appx. 310 (5th Cir. 2012) ................................................................................9

*Graves v. BP Am., Inc.*,
 568 F.3d 221 (5th Cir. 2009) ...........................................................................................8

*Grigson v. Creative Artists Agency L.L.C.*,
 210 F.3d 524 (5th Cir. 2000) .........................................................................................18

*Henry v. Cash Biz, LP*,
 551 S.W.3d 111 (Tex. 2018) ........................................................................................8, 9

*Hill v. G E Power Sys., Inc.*,
 282 F.3d 343 (5th Cir. 2002) .........................................................................................18

*I.D.E.A. Corp. v. WC & R Ints., Inc.*,
 545 F. Supp. 2d 600 (W.D. Tex. 2008) .........................................................................11

*Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication Sys., Inc.*,
 No. 17 C 2066, 2017 WL 2720433 (N.D. Ill. June 23, 2017) ......................................15

*James & Jackson, LLC v. Willie Gary, LLC*,
 906 A.2d 76 (Del. 2006) ................................................................................................12

*Kubala v. Supreme Production Services, Inc.*,
 830 F.3d 199 (5th Cir. 2016) .........................................................................................12

*Landis v. N. Am. Co.*,
 299 U.S. 248, 57 S. Ct. 163 (1936) ...............................................................................19

*Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos., Inc.)*,
 325 B.R. 687 (Bankr. D. Del. 2005) ..............................................................................12

*In re McCollum*,
 621 B.R. 655 (Bankr. N.D. Miss. 2020) ........................................................................17

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*,
 708 F.2d 1458 (9th Cir.1983) ........................................................................................11

*Mirant Corp. v. The S. Co.*,
 337 B.R. 107 (N.D. Tex. 2006) ......................................................................................16

CORE/3522697.0002/169128081

*Morphis v. Federal Home Loan Mortgage Corp.*,
No. 3:02–CV–0210–P, 2002 WL 1461930 (N.D.Tex. July 3, 2002) ........................................ 11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ...................................................................................................... 8, 9

*Matter of Nat'l Gypsum Co.*,
118 F.3d 1056 (5th Cir. 1997) ........................................................................................ 13

*Neal v. Hardee's Food Sys., Inc.*,
918 F.2d 34 (5th Cir. 1990) ........................................................................................... 11

*In re OCA, Inc.*,
410 B.R. 443 (E.D. La. 2007) ......................................................................................... 14

*Omni Pinnacle, LLC v. ECC Operating Services. Inc.*,
255 F. App'x 24 (5th Cir. 2007) ...................................................................................... 17

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
139 F.3d 1061 (5th Cir. 1998) .......................................................................................... 9

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*,
297 F.3d 388 (5th Cir. 2002) .......................................................................................... 11

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
687 F.3d 671 (5th Cir. 2012) .......................................................................................... 13

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) ...................................................................................................... 12

*Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re Sedco, Inc.)*,
767 F.2d 1140 (5th Cir. 1985) .......................................................................................... 9

*In re SFD @ Hollywood, LLC*,
414 B.R. 794 (Bankr. S.D. Fla. 2009) .............................................................................. 14

*Sherer v. Green Tree Serv., LLC*,
548 F.3d 379 (5th Cir. 2008) ........................................................................................... 7

*Sunterra Corp. v. Perini Bldg. Co.*,
No. 204CV00784MCEEFB, 2008 WL 11512082 (E.D. Cal. June 12, 2008) ............................ 14

*In re Temecula Valley Bancorp, Inc.*,
523 B.R. 210 (C.D. Cal. 2014) ....................................................................................... 14

*Vallejo v. Garda CL Sw., Inc.*,
948 F. Supp. 2d 720 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014) .......................... 9

*Venture Cotton Coop. v. Freeman*,
435 S.W.3d 222 (Tex. 2014) ............................................................................................ 7

CORE/3522697.0002/169128081

*Webb v. Investacorp, Inc.*,
   89 F.3d 252 (5th Cir. 1996) ..................................................................................................... 15

*Westmoreland v. Sadoux*,
   299 F.3d 462 (5th Cir. 2002) ................................................................................................... 18

*Zimmerli v. Ocwen Loan Servicing, LLC*,
   432 B.R. 238 (Bankr. N.D. Tex. 2010) .................................................................................... 13

**Rules and Statutes**

9 U.S.C. § 3 .................................................................................................................................. 8, 19

9 U.S.C. § 4 .......................................................................................................................................... 8

11 U.S.C. § 105(a) ....................................................................................................................... 6, 15

11 U.S.C. § 542(b) ........................................................................................................................... 5

28 U.S.C. § 157(b) .......................................................................................................................... 14

Fed. R. Bankr. P. 7001 ................................................................................................................. 6, 15

Tex. Bus. & C. Code § 24.005(a)(1) ............................................................................................. 6

CORE/3522697.0002/169128081

## MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

Defendants James D. Dondero, Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy") (the "Defendants") move this Court for an order to stay this adversary proceeding and refer the parties to arbitration, and in further support state the following:

## I.    STATEMENT OF FACTS

1.    On December 24, 2015, Mr. Dondero, on behalf of Strand Advisors, Inc., and Nancy Dondero, on behalf of Dugaboy, executed the Fourth Amended and Restated Agreement (the "LPA") of Limited Partnership of Highland Capital Management, L.P. ("HCM").[1] Section 6.14 of the LPA provides for Mandatory Arbitration in the event of a legal dispute between the parties arising from the agreement ("Arbitration Provision"). Section 6.14 specifically states:

> **6.14. Mandatory Arbitration**. In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.

The Arbitration Provision specifically governs the discovery process for arbitration, the authority of the arbitrators, and the costs of arbitration.[2]

---

[1] The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. Declaration of Michael P Aigen dated August 30, 2021 ("Aigen Dec.) at Ex. 1. The signatories to it are: (1) General Partner, Strand Advisors, Inc., a Delaware corporation by James D. Dondero, President; (2) Limited Partner, The Dugaboy Investment Trust by Nancy M. Dondero, its Trustee; (3) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #1 by Lawrence Tonomura, its Trustee; (4) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #2 by Lawrence Tonomura, its Trustee; (5) Limited Partner, Mark K. Okada; and (6) Limited Partner, Hunter Mountain Investment Trust by John Honis, the President of Beacon Mountain 1 LC, Administrator.

[2] *See* LPA Section 6.14, which states:

---

1

2.      In 2018, Mr. Dondero executed three promissory notes ("Notes") in favor of the Debtor.  The authority to execute promissory notes in favor of the Debtor arises from Article 4 of the LPA because a General Partner has full authority to conduct the business, which includes lending and borrowing money and executing promissory notes.  Article 4 states:

> In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation:
> . . . .
>
> (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation. purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations);
> . . . .
>
> (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.1;
> . . . .
>
> (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations.

---

The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. . . . . Each party shall bear its own attorney's fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement.

3.      In addition, the LPA provides authority for partners to lend money to their Affiliates.

Section 4(e) specifically provides:

> The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine: provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

In addition, Section 3.9(f) of the LPA allows for the partnership to make tax loans to the Founding Partners:

> The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

4.      Debtor demanded payment on the Notes and subsequently filed an adversary proceedings seeking collection, described further below.  One of the affirmative defenses asserted in the adversary proceedings is that Debtor is not entitled to demand payment because, prior to the demands for payment, HCM had agreed that it would not collect the Notes, and that they would be treated as compensation to the Debtor's founder and then-CEO Jim Dondero, if any of certain conditions subsequent were met.[3]  Debtor refers to the agreement as the "Alleged Agreement."  The condition subsequent was the sale of any of HCM's interests in certain portfolio companies (Cornerstone, Trussway and/or MGM) for a greater amount than their cost.[4]

---

[3] *See Defendant James Dondero's Amended Answer* [Ad. No. 21-0300, Dkt. No. 16 at 6 ¶ 40].
[4] Aigen Dec. Ex. 2, May 28, 2021 Remote Deposition of James Dondero Transcript at 212:18-25; 213:1-17.

CORE/3522697.0002/169128081

5.      Under Section 4.1(k) of the LPA, the "salaries or other compensation, if any, of the officers and agents of the Partnership [were to] be fixed from time to time by the General Partner." Additionally, under the LPA, Dugaboy had explicit authorization to approve compensation for Jim Dondero and entities he was affiliated with, and thus bind the Partnership through, LPA in § 3.10(a), which provides in pertinent part:

> (a) <u>Compensation</u>. The General Partner and any *Affiliate* of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

> "*'**Majority Interest**'* means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."  LPA § 2.1, p.4.

> "*'**Class A Limited Partners**'* means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A.</u>"  LPA § 2.1, p.2.[5]

> The Class A shareholders included Strand Advisors, The Dugaboy Investment Trust, Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark and Pamela Okada Family Trust – Exempt Trust #2.[6]  Dugaboy alone comprised 75% of the Class A shareholders,[7]

> Nancy Dondero was the Family Trustee of the Dugaboy Trust,[8] and had the power to act for Dugaboy in this regard.[9]

After the Notes were entered into, Mr. Dondero asked Dugaboy (via Ms. Dondero) to approve an agreement that the Notes would be forgiven as compensation to Mr. Dondero upon the favorable sale of any or all of the portfolio company interests by HCM, and she did.[10]

---

[5] Aigen Dec. Ex. 1, LPA at Exhibit A thereof).  Exhibit A reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.
[6] Aigen Dec. Ex. 1, LPA at Exhibit A thereof.
[7] *See id.*
[8] Aigen Dec. Ex. 3, *Acceptance of Appointment of Family Trustee*, executed by Nancy Marie Dondero on October 13, 2015.
[9] Aigen Dec. Ex. 4, *Trust Agreement Between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees The Dugaboy Investment*, entered November 15, 2010 at Article 5.2.
[10] Aigen Dec Ex. 2, Remote Deposition of James Dondero Transcript at 176-178.

The General Partner entitled to compensation here is Strand Advisors, Inc.  The LPA Preamble states in pertinent part:

> "This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.  LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

> "*'Affiliate'* means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term *'control'* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."  LPA § 2.1, p.2.

> "*'Person'* means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity."  LPA § 2.1, p.5.

It is undisputed that Mr. Dondero was an Affiliate of Strand under the LPA's definition.  Thus, Mr. Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

6.     On January 22, 2021, Highland Capital Management, L.P. ("Debtor" or "Plaintiff" when describing post-petition actions and HCM when describing pre-petition actions) commenced Adversary Proceeding No. 21-03003 against Mr. Dondero, asserting a state law, non-core breach of contract claim ("Count I") and an entirely dependent turnover claim under 11 U.S.C. § 542(b) for the amounts allegedly owed on the Notes ("Count II").

7.     Mr. Dondero answered the adversary complaint, asserting, inter alia, that Debtor's claims should be barred, because prior to the demand for payment HCM agreed it would not collect on the Notes upon fulfillment of conditions subsequent,[11] based upon what the Debtor refers to as the "Alleged Agreement."

8.     On August 23, 2021, the Court entered an order permitting Debtor to file its *Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV)*

---

[11] *Defendant James Dondero's Amended Answer* [Ad. No. 21-03003, Dkt. No. 16].

*Breach of Fiduciary Duty* ("Amended Complaint") asserting additional claims for relief including: Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550 against Mr. Dondero ("Count III"); Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1) against Mr. Dondero ("Count IV"); Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against Dugaboy ("Count V"); Breach of Fiduciary Duty against Dugaboy ("Count VI"); and Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero ("Count VII"). Debtor seeks avoidance of the Alleged Agreement, declaratory relief, and damages. The Parties agreed that the Defendants would answer or otherwise move against the Amended Complaints on or before September 1, 2021.[12] The new claims, under Counts V, VI, and VII are non-core contract claims that arise from the LPA, containing a broad arbitration provision. Further, the Defendants each have critical affirmative defenses for the claims for declaratory relief, breach of fiduciary, and aiding and abetting breach of fiduciary duty, that are rooted in non-core state contract law that also arise from the LPA.

9.       Although Debtor alleges that it "believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes,"[13] there is no doubt that adjudication of the existence and enforceability of the Alleged Agreement affects all of Debtor's claims under Counts V, VI, and VII for declaratory relief, breach of fiduciary duty and breach of fiduciary duty. These claims

---

[12] *See Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* attached as Exhibit C to *Debtor's Unopposed Motion for Leave to Serve and File Amended Complaint* [Adv. No. 21-03003, Dkt. No. 73-2 at Exhibit C] stipulating to August 30, 2021 which has been extended to September 1, 2021 by the parties via email communication.
[13] *Amended Complaint* [Adv. No. 21-03003, Dkt. No. 79 at ¶ 3].

CORE/3522697.0002/169128081

pertain to loans made by the Debtor to its Affiliates and compensation for the Debtor's CEO, all of which are governed by the LPA.[14]

10.    Defendants request the Court order the parties to arbitration on Counts V, VI, and VII, as provided by the pre-petition LPA entered into by the parties, and stay the adversary proceeding pending arbitration.

## II.    STANDARD OF REVIEW

11.    When deciding whether to grant a motion to compel arbitration, the Fifth Circuit has established a two-step analysis for determining whether parties must arbitrate a particular claim or set of claims under the FAA: (A) there must be an enforceable agreement to arbitrate; and (B) the claims must be arbitrable.  *See Sherer v. Green Tree Serv., LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (citations omitted) (stating "First we must ask if the party has agreed to arbitrate the dispute. . . If so, we then ask if any federal statute or policy renders the claims non-arbitrable."); *Venture Cotton Coop. v. Freeman,* 435 S.W.3d 222, 227 (Tex. 2014) ("A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement.").  Once a party seeking to compel arbitration establishes the asserted claims fall within a valid arbitration agreement, the burden shifts, and the party seeking to avoid arbitration must prove an affirmative defense to the provision's enforcement, such as waiver.  *Venture Cotton Coop.*, 435 S.W.3d at 227.

12.    In applying the first portion of the two-step analysis, state contract law determines whether parties entered into a valid agreement to arbitrate a set of claims.  *See, e.g., Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir. 2002) ("This determination is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'" (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  The second part of determining

---

[14] *See generally* Aigen Dec. Ex. 1, LPA Article 4 and Section 3.10.

whether the parties have agreed to arbitrate—the question of whether the dispute comes within the scope of the agreement—"is answered by applying the federal substantive law of arbitrability." *Graves v. BP Am., Inc.*, 568 F.3d 221, 222-23 (5th Cir. 2009) (citations omitted).

13.     Under both Texas and Federal law, "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, (1983); *see also Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d 171, 174 (Tex. 2002). In addition, the Supreme Court has declared that the Federal Arbitration Act, "is a strong congressional declaration of a liberal policy favoring arbitration." *See, e.g., Elkjer v. Scheef & Stone, L.L.P.*, 8 F. Supp. 3d 845, 849 (N.D. Tex. 2014) (collecting cases) ("if a valid agreement to arbitrate does exist, the court must observe the strong federal policy favoring arbitration and resolve all ambiguities in favor of arbitration.").

## III.     **ARGUMENT**

14.     This Court should compel arbitration as to Counts V, VI, and VII of the Amended Adversary Complaint because: (1) The claims under Counts V, VI, and VII comprise disputes involving legal rights or remedies arising from the LPA and are governed by an enforceable, and broadly worded, arbitration provision; (2) Counts V, VI, and VII assert noncore claims, and in the Fifth Circuit courts do not have discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings and should compel arbitration of even core claims if they are not integral to the bankruptcy; and (3) federal and state policy strongly favors arbitration.

15.     The Federal Arbitration Act ("FAA") requires district courts to direct parties to arbitrate issues covered by a valid arbitration agreement. 9 U.S.C. §§ 3, 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "Federal policy strongly favors enforcing

CORE/3522697.0002/169128081

arbitration agreements." *Dean Witter Reynolds*, 470 U.S. at 217; *Moses H. Cone Mem. Hosp*, 460 U.S. at 24. When a party moves to compel arbitration, the FAA requires district courts to order arbitration of arbitrable claims. *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re Sedco, Inc.)*, 767 F.2d 1140, 1147 (5th Cir. 1985). Because of the strong presumption in favor of arbitration, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Vallejo v. Garda CL Sw., Inc.*, 948 F. Supp. 2d 720, 724–25 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014) (citing *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004)); *see also Grant v. Houser*, 469 Fed. Appx. 310, 315 (5th Cir. 2012) (noting the strong presumption in favor of arbitration).

16. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25; *see also Henry*, 551 S.W.3d at 115 (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d at 174). The Fifth Circuit resolves doubts concerning the scope of matter covered by an arbitration provision in favor of referring arbitration. The court states:

> We emphasize that our sole responsibility is to determine whether this dispute is governed by an arbitration clause, not to determine the merits of the dispute. *See Snap–On Tools Corp., v. Mason*, 18 F.3d 1261, 1267 (5th Cir.1994). "We resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration. . . . [A]rbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Neal*, 918 F.2d at 37 (internal citations omitted). *See also AT & T Technologies Inc. v. Communications Workers of America*, 475 U.S. at 643, 650 (1986).

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

CORE/3522697.0002/169128081

**A.** **This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA.**

17.     Debtor's claims asserted in Counts V, VI, and VII arise under the LPA, which contains an enforceable and broadly worded arbitration provision.  The U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, has already interpreted arbitration provisions with identical scope language (and near-identical scope language) to the Arbitration Provision under the LPA, to be valid and binding.  *See In re Acis Cap. Mgmt., L.P.*, 600 B.R. 541, 549-50 (Bankr. N.D. Tex. 2019).[15] Importantly, the court made clear that "it would seem to be beyond peradventure that [the arbitration clause] was, at one time, enforceable between the parties, *with regard to any disputes that arose regarding the agreements*."  *Id.* at 552 (emphasis added); *see also id.* at 557 (emphasis added) ("there were valid arbitration agreements *that applied to all disputes* arising out of the [agreements at issue].").  Accordingly, the court concluded that all claims at issue, including claims for declaratory judgment, fell within the scope of the relevant arbitration clauses.  *See id.* at 558.

18.     The Arbitration Provision here also covers any "unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies *arising from this Agreement*."  LPA, Section 6.14 (emphasis added).  Such broad language is sufficient to reach collateral matters, including the oral agreement between the parties which involves legal rights arising from LPA.[16]  *Buell Door Co.*

---

[15]     The Court's decision provides the relevant arbitration clause language.  The arbitration clause at Section 16(f) of the Sub-Advisory Agreement states:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies *arising from* this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .

*In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 550 (emphasis added).

[16] It is important to note that the particular language "arising from" is significant in determining that the Arbitration Provision here is broad.  The Fifth Circuit and Texas District Courts have specifically determined

*v. Architectural Sys., Inc.*, No. 3:02-CV-721-AH, 2002 WL 1968223, at *6 (N.D. Tex. Aug. 20, 2002) (concluding that the phrase "arising out of" and similar language constitute "broad" arbitration clauses); *see also Elkjer*, 8 F. Supp. at 855 (concluding that the arbitration clause which uses the phrase "arising under or in connection with this [Partnership] Agreement," is "broad [and] capable of expansive reach" to include statutory claims). "Broad arbitration clauses are not limited to claims which literally 'arise under [a] contract,' but rather embrace all disputes between the parties ***having a significant relationship*** to the contract regardless of their label." *Id.* at *4 (citing *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164–65 (5th Cir. 1998) (emphasis added) (internal citations omitted).

19.    In the Fifth Circuit, a "broadly construed arbitration provision may encompass claims arising under a separate agreement." *See, e.g., Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 393–94 (5th Cir. 2002) (holding that an arbitration provision, which covered "any and all claims. . . arising out of or relating to" an agreement, applied to claims arising under a separate agreement); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 38 (5th Cir. 1990) (holding that an arbitration provision encompassing "any and all disputes between [the parties] . . . reach[ed] all aspects of the parties' relationship," including claims arising under a separate agreement); *see also I.D.E.A. Corp. v. WC & R Ints., Inc.*, 545 F. Supp. 2d 600, 606 (W.D. Tex. 2008) (noting a broad arbitration provision

---

that only the phrase "arising under" indicates a narrow arbitration clause, rather than broad. This Court has held:

> upon reviewing the above referenced Fifth Circuit cases, the court concludes that the phrase "arising out of" and similar language constitute "broad" arbitration clauses. *Accord Morphis v. Federal Home Loan Mortgage Corp.*, No. 3:02–CV–0210–P, 2002 WL 1461930, *3–4 (N.D.Tex. July 3, 2002) (provision that "any and all disputes between [the parties]," with no limiting clause constituted a broad clause). On the other hand, the phrase "arising under" indicates a "narrow" arbitration clause. *See Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983) (the term "arising under" is relatively narrow) (citation omitted).

*Buell Door Co.*, 2002 WL 1968223, at *6. Here, the "arising from" language of the Arbitration Provision is similar to "arising of out" and is therefore broad.

may encompass claims arising under a separate agreement).  Accordingly, the Arbitration Provision covers the claims regardless if the arise under the LPA or the separate Notes because the authority to enter into the Notes arises from the LPA which reaches all aspects of the parties' relationship.

20.     Here, the LPA choice of law provision, Section 6.1, provides the "Agreement shall be construed in accordance with and governed by the laws of the state of Delaware. . . ."  As a result, Delaware state contract law determines whether the LPA includes a valid agreement to arbitrate. Delaware arbitration law mirrors federal law in that "public policy of Delaware favors arbitration." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006) (citations omitted).  Even Debtor's rejection of the LPA does not absolve Debtor of its obligation to arbitrate.  It is well established that the "rejection of a contract, or even breach of it, will not void an arbitration clause. . . . Any different conclusion would allow a party to avoid arbitration at will simply by breaching [or rejecting] the contract."  *Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos, Inc.)*, 325 B.R. 687, 693-94 (Bankr. D. Del. 2005) (citations omitted).

21.     Moreover, any question about the scope of the arbitration agreement, including the arbitrability of any particular claim, is for the arbitrator.  Under the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute. . . , so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted).  The Fifth Circuit provides an in-depth explanation of who decides what issues when a contract includes an arbitration provision. *See Kubala v. Supreme Production Services, Inc.*, 830 F.3d 199 (5th Cir. 2016).

CORE/3522697.0002/169128081

22.    Incorporating rules from an arbitration service provider that themselves delegate the question of arbitrability to the arbitrator clearly and unmistakably expresses the parties' intent to leave the question of arbitrability to the arbitrator. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Here, the Arbitration Provision provides that the "arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award." The rules of the American Arbitration Association provide that the arbitrator is to decide questions of arbitrability. AAA Commercial Arbitration Rule 7(a). Because the parties' arbitration delegates decision-making to the arbitrators, where the parties entered an agreement to arbitrate, questions of scope and arbitrability should be left to the arbitrator.

**B.    The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA.**

23.    Under the LPA, the Court must compel arbitration on Counts V, VI, and VII of the Amended Complaint, because all of the claims are non-core claims arising from the rights and obligations under the LPA. Bankruptcy courts have no discretion to refuse to compel the arbitration of non-core matters. *See, e.g., Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*, No. CV H-14-2086, 2015 WL 9302843, at *7 (S.D. Tex. Dec. 18, 2015) (citation omitted) (quoting "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings"). More specifically, under Fifth Circuit precedent, a bankruptcy court only has discretion to refuse to compel arbitration of an arbitrable claim where: (1) "the proceeding derives exclusively from the provisions of the bankruptcy code;" and (2) "arbitration of the proceeding would conflict with the purposes of [the bankruptcy code]." *See Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)*; see also Zimmerli v. Ocwen Loan Servicing, LLC*, 432 B.R. 238, 242 (Bankr. N.D. Tex. 2010). "Importantly, however, '***a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core'***

*bankruptcy proceedings* under 28 U.S.C. § 157(b)." *In re Cain*, 585 B.R. 127, 134–35 (Bankr. S.D. Miss. 2018) (emphasis added) (citation omitted) (stating "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings."); *In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 560 (in the *Acis* case—unlike here—the claims at issue were "an integral part of determining . . . proofs of claim," resulting in the court denying the motion to compel arbitration).

24.    For claims that are "derivative of the pre-petition legal or equitable rights possessed by a debtor" it is beyond dispute that "it is 'universally accepted' that such issues are arbitrable." *In re Cain*, 585 B.R. at 137 (citing *Nat'l Gypsum Co.*, 118 F.3d at 1066, 1069). In other words, for non-core proceedings, a court "must give effect to the terms of any applicable arbitration clauses." *In re Daisytek, Inc.*, 323 B.R. 180, 188 (N.D. Tex. 2005).

## 1.    **The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA.**

25.    Debtor's declaratory relief claim simply seeks declarations concerning the extent of limited partner (including Dugaboy's) authority under the LPA, including authority to enter into the Alleged Agreement on behalf of the Partnership.[17] This is a legal dispute arising from LPA, a pre-petition contract, thus coming within the Arbitration Provision and governed by state contract law. Courts generally agree that claims for declaratory judgment which could also exist outside of bankruptcy are non-core proceedings.[18] *See, e.g., In re OCA, Inc.*, 410 B.R. 443, 450 (E.D. La.

---

[17] *See Amended Complaint* [Adv. No. 21-03003, Dkt. No. 79 at ¶¶ 69–72].

[18] *See also In re Temecula Valley Bancorp, Inc.*, 523 B.R. 210, 222–23 (C.D. Cal. 2014)("That court found a trustee's claim for declaratory relief as to the ownership of similar tax refunds non-core because it was a "dispute between private parties" and arose out of a pre-bankruptcy tax sharing agreement governed by state contract law); *see also In re SFD @ Hollywood, LLC*, 414 B.R. 794, 797 (Bankr. S.D. Fla. 2009)("This proceeding [for declaratory judgment] could also exist outside of bankruptcy. Accordingly, this is a non-core proceeding in which the Court cannot enter a final order, absent consent of the district court and the parties."); *see also Sunterra Corp. v. Perini Bldg. Co.*, No. 204CV00784MCEEFB, 2008 WL 11512082, at *4 (E.D. Cal. June 12, 2008)("The new causes of action--strict liability, negligence, breach of contract, professional negligence, and declaratory relief--would also exist independently of bankruptcy laws and are similarly "non-core" proceedings.").

2007)("That the doctors' claims are for breach of contract, breach of fiduciary duty and declaratory

relief, and are entirely based on state law, supports a finding that they are noncore claims.")

26.    Therefore, the Court lacks discretion to refuse to compel arbitration on Count V

asserting Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against

Dugaboy.  *Webb v. Investacorp, Inc.*, 89 F.3d 252, 260 (5th Cir. 1996) (district court did not abuse

discretion in refusing to consider plaintiffs' request for declaratory relief where order granting

defendant's motion to compel arbitration disposed of same issues raised in declaratory judgment

action); *see also Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,

No. A-09-CA-351 LY, 2009 WL 10699390, at *8 (W.D. Tex. July 30, 2009) (finding action seeking

declaratory relief arbitrable); *see also Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication

Sys., Inc.*, No. 17 C 2066, 2017 WL 2720433, at *4 (N.D. Ill. June 23, 2017) (stating that permitting

a party to obtain declaratory relief from a court when there is a valid arbitration agreement is

"essentially the same relief as that otherwise reserved for the arbitrator. It would make little sense to

include such an expansive loophole in what is otherwise a sweeping arbitration provision.").

### 2.    <u>The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA.</u>

27.    Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding

and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero for entering into

the Alleged Agreement, must be arbitrated because they are non-core claims that arise under the LPA.

It is well established that state law claims, such as breach of fiduciary duty and aiding and abetting

breach of fiduciary duty, are non-core claims.  *See, e.g., In re Dune Energy, Inc.*, 575 B.R. 716, 729

(Bankr. W.D. Tex. 2017) ("Courts within the Fifth Circuit have consistently found that post-

confirmation suits by plan trustees based on state law claims are only within the 'related to' (and not

'core') bankruptcy jurisdiction of a federal court."); *see also Brickley for CryptoMetrics, Inc.*

*Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 829–30 (W.D. Tex. 2017)

(stating post-confirmation claims for breach of fiduciary duty and state law claims are "related to"

claims); *see also Mirant Corp. v. The S. Co.*, 337 B.R. 107, 120 (N.D. Tex. 2006).

28.     The breach of fiduciary duty claims under Count VI and aiding and abetting breach of

fiduciary duty under Count VII are—and by their own terms—premised on Dugaboy's authority to

bind the Debtor under the LPA.[19]   The Debtor challenges whether the LPA affords the right to

Dugaboy to approve such compensation, thus, any evaluation of the breach of fiduciary duty-related

claims must first entail an analysis of the LPA, making construction of the LPA – the agreement

containing the arbitration clause, a predicate to the analysis of the breach of fiduciary duty claims.

Thus, Counts VI and VII involve unresolved legal disputes between the parties—including the Debtor

and   Mr.   Dondero,   Nancy   Dondero,   and   Dugaboy,   who   are   all   parties   and/or

officers/directors/partners/employees/agents/affiliates/representatives   of   a   General   or   Limited

Partner—concerning legal duties to the Partnership that would not exist outside of the LPA.

29.     The Fifth Circuit makes clear that where, as here, the breach of fiduciary duty (or

aiding and abetting fiduciary duty) claim is interwoven with the partnership agreement containing an

arbitration clause, the fiduciary claims will be subject to arbitration.  *See Coffman v. Provost ***

*Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 732 (E.D. Tex. 2001), *aff'd sub nom. Coffman v.*

*Provost Umphrey LLP*, 33 Fed. Appx. 705 (5th Cir. 2002) ("Even if it is conceivable that Plaintiff

could maintain a claim for breach of fiduciary duty without the Partnership Agreements, that alone is

not sufficient grounds for concluding that the claim is not within the scope of the arbitration clause .

---

[19] *See Amended Complaint* [Adv. No. 21-03003, Dkt. No. 79  at  ¶ 75] ("*If Dugaboy had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy breached its fiduciary duty* of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor."); *id.* ¶¶ 78–79 (the Donderos "were aware that Dugaboy would have fiduciary duties to the Debtor *if it acted to bind the Debtor*," and the Donderos "aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly *participating in the authorization of the purported Alleged Agreement*.")

CORE/3522697.0002/169128081

. . the Partnership Agreements will determine whether a fiduciary duty was breached—whether that duty arises from the common law or from the contract itself. . . . For these reasons, the court finds Plaintiff's breach of fiduciary duty claim to be subject to arbitration."); *see also Omni Pinnacle, LLC v. ECC Operating Services. Inc.*, 255 F. App'x 24, 25-26 (5th Cir. 2007) (internal quotation marks omitted) ("A dispute arises out of or relates to a contract if the legal claim underlying the dispute could not be maintained without reference to the contract.").

30.    Because breach of fiduciary duty and aiding and abetting breach of fiduciary duty are non-core state-law claims that could exist outside of bankruptcy, the reviewing court lacks discretion to refuse enforcement of an otherwise-applicable arbitration agreement as to these claims.  *See In re McCollum*, 621 B.R. 655, 659 (Bankr. N.D. Miss. 2020) (finding that breaching its fiduciary duty "is a state law contract claim which arose prepetition, could exist outside the bankruptcy case, and is tangential to the bankruptcy case.  It does not invoke a substantive right created by bankruptcy law and is a non-core claim."); *In re Gaughf*, 19-50947-KMS, 2020 WL 1271595, at *4 (Bankr. S.D. Miss. Mar. 12, 2020) ("Aiding and Abetting Count is non-core.").  Additionally, claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty do not reference the Bankruptcy Code or any right conferred by the Code.  *See In re McCollum*, 621 B.R. at 659.  Therefore, the Court lacks discretion to refuse to compel arbitration on Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero.

31.    That Nancy Dondero is not personally a party to the LPA does not impair her right to enforce the arbitration agreement it contains. Debtor alleges misconduct by her and a signatory to the LPA relating to fiduciary duties Debtor alleges arise out of the LPA.  There are two circumstances under which a nonsignatory can compel arbitration: (1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims

against the nonsignatory; or (2) when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002). Both circumstances are implicated by Debtor's allegations against Nancy Dondero.

32.    First, non-signatories are entitled to invoke an arbitration agreement when the claim against the non-signatory arises from the contract with an arbitration provision. *See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (citing *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000))("[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory."); *see also Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*, 870 F. Supp. 2d 441, 450–51 (S.D. Tex. 2012) (citing *Grigson,* 210 F.3d at 527). Because Debtor charges Nancy Dondero with breaching fiduciary duties (and aiding and abetting breaches of such duties) that arise out of the LPA, she falls precisely within the ambit of cases like *Bridas,* and *Grigson* and *Amegy*.

33.    Second, when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract—here the allegations are made against Nancy Dondero (a non-signatory) and Dugaboy (a signatory) to the LPA—the non-signatory may compel arbitration on the claims. *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 349 (5th Cir. 2002) (affirming that "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory."); *see also Grigson*, 210 F.3d at 526 ("a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff").

**C.**  **The Court Should Stay All Claims Pending Arbitration.**

34.     The claims that the Court refers to arbitration must be stayed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3.  *See In re Gandy*, 299 F.3d 489, 494–95 (5th Cir. 2002) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987) ("A court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement").  Further, bankruptcy courts generally do not have discretion to decline to stay, pending arbitration, proceedings involving non-core matters.  *Id.* at 495.  Accordingly, the Court should stay each of the Debtor's claims against Defendants pending arbitration.

35.     Should the Court not refer arbitration on every claim, in the alterative, the Court should stay the entire adversary proceeding pending arbitration.  Permitting any claims to continue herein, while some or all claims are subject to arbitration would be unnecessarily expensive and duplicative. The Court has the inherent power to grant a discretionary stay of a proceeding pending arbitration when there are issues common to the arbitration and the court proceeding and those issues may be decided by the arbitrator.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166 (1936) (stating that the power to stay proceedings is incidental to power "inherent in every court to control disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see also In re Divine Ripe, L.L.C.*, 538 B.R. 300, 309 (Bankr. S.D. Tex. 2015) (same).

### IV.    CONCLUSION

WHEREFORE, for the reasons above, Defendants respectfully request that this Court compel arbitration on Counts V, VI, and VII, and order a stay of the proceedings pending arbitration.

CORE/3522697.0002/169128081

Dated: September 1, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND
NANCY DONDERO**

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

CORE/3522697.0002/169128081

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

_/s/Deborah Deitsch-Perez_____
Deborah Deitsch-Perez

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO AND
NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR THE DUGABOY INVESTMENT
TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P., JAMES** | § | |
| **DONDERO, NANCY DONDERO, AND THE** | § | |
| **DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

# TABLE OF CONTENTS

I.      STATEMENT OF FACTS ................................................................................................. 1

II.     STANDARD OF REVIEW ............................................................................................. 7

III.    ARGUMENT .................................................................................................................. 8

        A.      This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal
                Rights Arising From the LPA. .................................................................................... 9

        B.      The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-
                Core and Arise Under the LPA. ................................................................................ 13

                1.      The Court Lacks Discretion To Refuse To Compel Arbitration On Count V
                Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising
                From The LPA. ......................................................................................................... 14

                2.      The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And
                VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And
                Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From
                The LPA. ................................................................................................................... 15

        C.      The Court Should Stay All Claims Pending Arbitration. ............................................ 18

IV.     CONCLUSION .............................................................................................................. 19

CORE/3522697.0002/169122632

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acis Cap. Mgmt., L.P.*,
   600 B.R. 541 (Bankr. N.D. Tex. 2019) ................................................................. 10, 13

*Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*,
   870 F. Supp. 2d 441 (S.D. Tex. 2012) ....................................................................... 18

*Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,
   No. A-09-CA-351 LY, 2009 WL 10699390 (W.D. Tex. July 30, 2009) .................... 15

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*,
   566 B.R. 815 (W.D. Tex. 2017) ................................................................................ 15

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   345 F.3d 347 (5th Cir. 2003) .................................................................................... 18

*Buell Door Co. v. Architectural Sys., Inc.*,
   No. 3:02-CV-721-AH, 2002 WL 1968223 (N.D. Tex. Aug. 20, 2002) ................ 10, 11

*In re Cain*,
   585 B.R. 127 (Bankr. S.D. Miss. 2018) ................................................................ 13, 14

*Coffman v. Provost Umphrey LLP*,
   33 Fed. Appx. 705 (5th Cir. 2002) ............................................................................ 16

*In re Daisytek, Inc.*,
   323 B.R. 180 (N.D. Tex. 2005) ................................................................................. 14

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985) .................................................................................................... 8

*In re Divine Ripe, L.L.C.*,
   538 B.R. 300 (Bankr. S.D. Tex. 2015) ...................................................................... 19

*In re Dune Energy, Inc.*,
   575 B.R. 716 (Bankr. W.D. Tex. 2017) ..................................................................... 15

*Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*,
   No. CV H-14-2086, 2015 WL 9302843 (S.D. Tex. Dec. 18, 2015) ........................... 13

*Elkjer v. Scheef & Stone, L.L.P.*,
   8 F. Supp. 3d 845 (N.D. Tex. 2014) ................................................................ 8, 11, 16

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) .................................................................................................. 12

CORE/3522697.0002/169122632

*Fleetwood Enterprises, Inc. v. Gaskamp*,
    280 F.3d 1069 (5th Cir. 2002) ........................................................................... 7

*In re Gandy*,
    299 F.3d 489 (5th Cir. 2002) ..................................................................... 18, 19

*In re Gaughf*,
    19-50947-KMS, 2020 WL 1271595 (Bankr. S.D. Miss. Mar. 12, 2020) .................... 17

*Grant v. Houser*,
    469 Fed. Appx. 310 (5th Cir. 2012) ..................................................................... 9

*Graves v. BP Am., Inc.*,
    568 F.3d 221 (5th Cir. 2009) ............................................................................. 7

*Grigson v. Creative Artists Agency L.L.C.*,
    210 F.3d 524 (5th Cir. 2000) ........................................................................... 18

*Henry v. Cash Biz, LP*,
    551 S.W.3d 111 (Tex. 2018) ......................................................................... 8, 9

*Hill v. G E Power Sys., Inc.*,
    282 F.3d 343 (5th Cir. 2002) ........................................................................... 18

*I.D.E.A. Corp. v. WC & R Ints., Inc.*,
    545 F. Supp. 2d 600 (W.D. Tex. 2008) .............................................................. 11

*Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication Sys., Inc.*,
    No. 17 C 2066, 2017 WL 2720433 (N.D. Ill. June 23, 2017) .................................. 15

*James & Jackson, LLC v. Willie Gary, LLC*,
    906 A.2d 76 (Del. 2006) ................................................................................. 12

*Kubala v. Supreme Production Services, Inc.*,
    830 F.3d 199 (5th Cir. 2016) ........................................................................... 12

*Landis v. N. Am. Co.*,
    299 U.S. 248, 57 S. Ct. 163 (1936) ................................................................... 19

*Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos., Inc.)*,
    325 B.R. 687 (Bankr. D. Del. 2005) .................................................................. 12

*In re McCollum*,
    621 B.R. 655 (Bankr. N.D. Miss. 2020) .............................................................. 17

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*,
    708 F.2d 1458 (9th Cir.1983) .......................................................................... 10

*Mirant Corp. v. The S. Co.*,
    337 B.R. 107 (N.D. Tex. 2006) ........................................................................ 15

iv

*Morphis v. Federal Home Loan Mortgage Corp.*,
    No. 3:02–CV–0210–P, 2002 WL 1461930 (N.D.Tex. July 3, 2002)...........................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) .......................................................................................................................8, 9

*Matter of Nat'l Gypsum Co.*,
    118 F.3d 1056 (5th Cir. 1997).........................................................................................................13

*Neal v. Hardee's Food Sys., Inc.*,
    918 F.2d 34 (5th Cir. 1990).............................................................................................................11

*In re OCA, Inc.*,
    410 B.R. 443 (E.D. La. 2007) .........................................................................................................14

*Omni Pinnacle, LLC v. ECC Operating Services. Inc.*,
    255 F. App'x 24 (5th Cir. 2007) ......................................................................................................16

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
    139 F.3d 1061 (5th Cir. 1998)...........................................................................................................9

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*,
    297 F.3d 388 (5th Cir. 2002)...........................................................................................................11

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
    687 F.3d 671 (5th Cir. 2012)...........................................................................................................12

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ..........................................................................................................................12

*Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re Sedco, Inc.)*,
    767 F.2d 1140 (5th Cir. 1985)...........................................................................................................8

*In re SFD @ Hollywood, LLC*,
    414 B.R. 794 (Bankr. S.D. Fla. 2009)............................................................................................14

*Sherer v. Green Tree Serv., LLC*,
    548 F.3d 379 (5th Cir. 2008).............................................................................................................7

*Sunterra Corp. v. Perini Bldg. Co.*,
    No. 204CV00784MCEEFB, 2008 WL 11512082 (E.D. Cal. June 12, 2008) ..............................14

*In re Temecula Valley Bancorp, Inc.*,
    523 B.R. 210 (C.D. Cal. 2014)........................................................................................................14

*Vallejo v. Garda CL Sw., Inc.*,
    948 F. Supp. 2d 720 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014)............................9

*Venture Cotton Coop. v. Freeman*,
    435 S.W.3d 222 (Tex. 2014).............................................................................................................7

v

*Webb v. Investacorp, Inc.*,
   89 F.3d 252 (5th Cir. 1996) ................................................................................................ 14

*Westmoreland v. Sadoux*,
   299 F.3d 462 (5th Cir. 2002) ............................................................................................... 17

*Zimmerli v. Ocwen Loan Servicing, LLC*,
   432 B.R. 238 (Bankr. N.D. Tex. 2010) ............................................................................... 13

**Rules and Statutes**

9 U.S.C. § 3 ........................................................................................................................... 8, 18

9 U.S.C. § 4 ............................................................................................................................... 8

11 U.S.C. § 105(a) ................................................................................................................. 6, 14

11 U.S.C. § 542(b) ..................................................................................................................... 5

28 U.S.C. § 157(b) ................................................................................................................... 13

AAA Commercial Arbitration Rule 7(a) ................................................................................... 13

Fed. R. Bankr. P. 7001 .......................................................................................................... 6, 14

Tex. Bus. & C. Code § 24.005(a)(1) .......................................................................................... 6

CORE/3522697.0002/169122632

## MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

Defendants James D. Dondero, Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy") (the "Defendants") move this Court for an order to stay this adversary proceeding and refer the parties to arbitration, and in further support state the following:

## I.    STATEMENT OF FACTS

1.    On December 24, 2015, Mr. Dondero, on behalf of Strand Advisors, Inc., and Nancy Dondero, on behalf of Dugaboy, executed the Fourth Amended and Restated Agreement (the "LPA") of Limited Partnership of Highland Capital Management, L.P. ("HCM").[1]  Section 6.14 of the LPA provides for Mandatory Arbitration in the event of a legal dispute between the parties arising from the agreement ("Arbitration Provision").  Section 6.14 specifically states:

> **6.14. Mandatory Arbitration**. In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.

The Arbitration Provision specifically governs the discovery process for arbitration, the authority of the arbitrators, and the costs of arbitration.[2]

---

[1] The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. Declaration of Michael P Aigen dated August 30, 2021 ("Aigen Dec.) at Ex. 1. The signatories to it are: (1) General Partner, Strand Advisors, Inc., a Delaware corporation by James D. Dondero, President; (2) Limited Partner, The Dugaboy Investment Trust by Nancy M. Dondero, its Trustee; (3) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #1 by Lawrence Tonomura, its Trustee; (4) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #2 by Lawrence Tonomura, its Trustee; (5) Limited Partner, Mark K. Okada; and (6) Limited Partner, Hunter Mountain Investment Trust by John Honis, the President of Beacon Mountain 1 LC, Administrator.
[2] *See* LPA Section 6.14, which states:

CORE/3522697.0002/169122632

2.      In May 2017, NexPoint executed a promissory note in favor of the Debtor, as payee,

in the original amount of $30,746,812.33 (the "Note").  The authority to execute promissory note in

favor of the Debtor arises from Article 4 of the LPA because a General Partner has full authority to

conduct the business, which includes lending and borrowing money and executing promissory notes.

Article 4 states:

> In addition to the powers now or hereafter granted to a general partner of a limited
> partnership under applicable law or that are granted to the General Partner under
> any provision of this Agreement, the General Partner shall have full power and
> authority to do all things deemed necessary or desirable by it to conduct the
> business of the Partnership, including, without limitation:
> . . . .
>
> (ii) the performance of any and all acts necessary or appropriate to the operation
> of any business of the Partnership (including, without limitation. purchasing and
> selling any asset, any debt instruments, any equity interests, any commercial paper,
> any note receivables and any other obligations);
> . . . .
>
> (vi) the making of any expenditures, the borrowing of money, the guaranteeing of
> indebtedness and other liabilities, the issuance of evidences of indebtedness, and
> the incurrence of any obligations it deems necessary or advisable for the conduct
> of the activities of the Partnership, including, without limitation, the payment of
> compensation and reimbursement to the General Partner and its Affiliates pursuant
> to Section 3.1;
> . . . .
>
> (vii) the use of the assets of the Partnership (including, without limitation, cash on
> hand) for any Partnership purpose on any terms it sees fit, including, without
> limitation, the financing of operations of the Partnership, the lending of funds to
> other Persons, and the repayment of obligations.

---

The discovery process shall be limited to the following: Each side shall be permitted no more
than (i) two party depositions of six hours each, each deposition to be taken pursuant to the
Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five
interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in
response, the producing party shall not be obligated to produce in excess of 5,000 total pages
of documents, including electronic documents); and (vi) one request for disclosure pursuant
to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this
paragraph, whether to parties or non-parties, shall not be permitted. . . . . Each party shall bear
its own attorney's fees, costs and expenses, including any costs of experts, witnesses and /or
travel, subject to a final arbitration award on who should bear costs and fees. The duty to
arbitrate described above shall survive the termination of this Agreement.

CORE/3522697.0002/169122632

3.      In addition, the LPA provides authority for partners to lend money to their Affiliates.

Section 4(e) specifically provides:

> The General Partner or any Affiliate of the General Partner may lend to the
> Partnership funds needed by the Partnership for such periods of time as the General
> Partner may determine: provided, however, the General Partner or its Affiliate may
> not charge the Partnership interest at a rate greater than the rate (including points
> or other financing charges or fees) that would be charged the Partnership (without
> reference to the General Partner's financial abilities or guaranties) by unrelated
> lenders on comparable loans. The Partnership shall reimburse the General Partner
> or its Affiliate, as the case may be, for any costs incurred by the General Partner
> or that Affiliate in connection with the borrowing of funds obtained by the General
> Partner or that Affiliate and loaned to the Partnership. The Partnership may loan
> funds to the General Partner and any member of the Founding Partner Group at the
> General Partner's sole and exclusive discretion.

In addition, Section 3.9(f) of the LPA allows for the partnership to make tax loans to the Founding
Partners:

> The Partnership shall, upon request of such Founding Partner, make distributions
> to the Founding Partners (or loans, at the election of the General Partner) in an
> amount necessary for each of them to pay their respective federal income tax
> obligations incurred through the effective date of the Third Amended and Restated
> Agreement of Limited Partnership of Highland Capital Management, L.P., the
> predecessor to this Agreement.

4.      Debtor demanded payment on the Note and subsequently filed an adversary

proceedings seeking collection, described further below.  One of the affirmative defenses asserted in

the adversary proceedings is that Debtor is not entitled to demand payment because, prior to the

demands for payment, HCM had agreed that it would not collect the Note, and that they would be

treated as compensation to the Debtor's founder and then-CEO Jim Dondero, if any of certain

conditions subsequent were met.[3]  Debtor refers to the agreement as the "Alleged Agreement."  The

condition subsequent was the sale of any of HCM's interests in certain portfolio companies

(Cornerstone, Trussway and/or MGM) for a greater amount than their cost.[4]

---

[3] *See* Defendant NexPoint's First Amended Answer [Ad. No. 21-03005, Dkt. No. 50 at 6 ¶ 42].
[4] Aigen Dec. Ex. 2, May 28, 2021 Remote Deposition of James Dondero Transcript at 212:18-25; 213:1-17.

5.      Under Section 4.1(k) of the LPA, the "salaries or other compensation, if any, of the officers and agents of the Partnership [were to] be fixed from time to time by the General Partner." Additionally, under the LPA, Dugaboy had explicit authorization to approve compensation for Jim Dondero and entities he was affiliated with, and thus bind the Partnership through, LPA in § 3.10(a), which provides in pertinent part:

> (a) Compensation. The General Partner and any *Affiliate* of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

> "'*Majority Interest'* means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners." LPA § 2.1, p.4.

> "'*Class A Limited Partners'* means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A." LPA § 2.1, p.2.[5]

> The Class A shareholders included Strand Advisors, The Dugaboy Investment Trust, Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark and Pamela Okada Family Trust – Exempt Trust #2.[6] Dugaboy alone comprised 75% of the Class A shareholders,[7]

> Nancy Dondero was the Family Trustee of the Dugaboy Trust,[8] and had the power to act for Dugaboy in this regard.[9]

After the Note was entered into, Mr. Dondero asked Dugaboy (via Ms. Dondero) to approve an agreement that the Note would be forgiven as compensation to Mr. Dondero upon the favorable sale of any or all of the portfolio company interests by HCM, and she did.[10]

---

[5] Aigen Dec. Ex. 1, LPA at Exhibit A thereof). Exhibit A reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.
[6] Aigen Dec. Ex. 1, LPA at Exhibit A thereof.
[7] *See id.*
[8] Aigen Dec. Ex. 3, *Acceptance of Appointment of Family Trustee*, executed by Nancy Marie Dondero on October 13, 2015.
[9] Aigen Dec. Ex. 4, *Trust Agreement Between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees The Dugaboy Investment*, entered November 15, 2010 at Article 5.2.
[10] Aigen Dec Ex. 2, Remote Deposition of James Dondero Transcript at 176-178.

The General Partner entitled to compensation here is Strand Advisors, Inc.  The LPA Preamble

states in pertinent part:

> "This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation
> (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person
> hereinafter admitted as a Limited Partner.  LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

> "*'Affiliate'* means any Person that directly or indirectly controls, is controlled by, or
> is under common control with the Person in question.  As used in this definition, the
> term *'control'* means the possession, directly or indirectly, of the power to direct or
> cause the direction of the management and policies of a Person, whether through
> ownership of voting securities, by contract or otherwise."  LPA § 2.1, p.2.

> "*'Person'* means an individual or a corporation, partnership, trust, estate,
> unincorporated organization, association, or other entity."  LPA § 2.1, p.5.

It is undisputed that Mr. Dondero was an Affiliate of Strand under the LPA's definition.  Thus, Mr.

Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

6.     On January 22, 2021, Highland Capital Management, L.P. ("Debtor" or "Plaintiff"

when describing post-petition actions and HCM when describing pre-petition actions) commenced

Adversary Proceeding No. 21-03005 against NexPoint, asserting a state law, non-core breach of

contract claim ("Count I") and an entirely dependent turnover claim under 11 U.S.C. § 542(b) for the

amounts allegedly owed on the Note ("Count II").

7.     NexPoint answered the adversary complaint, asserting, inter alia, that Debtor's claims

should be barred, because prior to the demand for payment HCM agreed it would not collect on the

Note upon fulfillment of conditions subsequent,[11] based upon what the Debtor refers to as the

"Alleged Agreement."

8.     On August 23, 2021, the Court entered an order permitting Debtor to file its *Amended*

*Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV)*

---

[11] Defendant NexPoint's First Amended Answer [Ad. No. 21-03005, Dkt. No. 50 6 ¶ 42].

*Breach of Fiduciary Duty* ("Amended Complaint") asserting additional claims for relief including: Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550 against Mr. Dondero ("Count III"); Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1) against Mr. Dondero ("Count IV"); Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against Dugaboy ("Count V"); Breach of Fiduciary Duty against Dugaboy ("Count VI"); and Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero ("Count VII"). Debtor seeks avoidance of the Alleged Agreement, declaratory relief, and damages. The Parties agreed that the Defendants would answer or otherwise move against the Amended Complaints on or before September 1, 2021.[12] The new claims, under Counts V, VI, and VII are non-core contract claims that arise from the LPA, containing a broad arbitration provision. Further, Defendants have critical affirmative defenses for the claims for declaratory relief, breach of fiduciary, and aiding and abetting breach of fiduciary duty, that are rooted in non-core state contract law that also arise from the LPA.

      9.     Although Debtor alleges that it "believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note,"[13] there is no doubt that adjudication of the existence and enforceability of the Alleged Agreement affects all of Debtor's claims under Counts V, VI, and VII for declaratory relief, breach of fiduciary duty and breach of fiduciary duty. These claims pertain to loans made by the Debtor to its Affiliates and compensation for the Debtor's CEO, all of which are governed by the LPA.[14]

---

[12] *See Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* attached as Exhibit C to *Debtor's Unopposed Motion for Leave to Serve and File Amended Complaint* [Adv. No. 21-03005, Dkt. No. 55-2 at Exhibit C] stipulating to August 30, 2021 which has been extended to September 1, 2021 by the parties via email communication.
[13] *Amended Complaint* [Adv. No. 21-03005, Dkt. No. 63 at ¶ 3].
[14] *See generally* Aigen Dec. Ex. 1, LPA Article 4 and Section 3.10.

10.     Defendants request the Court order the parties to arbitration on Counts V, VI, and VII, as provided by the pre-petition LPA entered into by the parties, and stay the adversary proceeding pending arbitration.

## II.    <u>STANDARD OF REVIEW</u>

11.     When deciding whether to grant a motion to compel arbitration, the Fifth Circuit has established a two-step analysis for determining whether parties must arbitrate a particular claim or set of claims under the FAA: (A) there must be an enforceable agreement to arbitrate; and (B) the claims must be arbitrable.  *See Sherer v. Green Tree Serv., LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (citations omitted) (stating "First we must ask if the party has agreed to arbitrate the dispute. . . If so, we then ask if any federal statute or policy renders the claims non-arbitrable."); *Venture Cotton Coop. v. Freeman,* 435 S.W.3d 222, 227 (Tex. 2014) ("A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement.").  Once a party seeking to compel arbitration establishes the asserted claims fall within a valid arbitration agreement, the burden shifts, and the party seeking to avoid arbitration must prove an affirmative defense to the provision's enforcement, such as waiver.  *Venture Cotton Coop.*, 435 S.W.3d at 227.

12.     In applying the first portion of the two-step analysis, state contract law determines whether parties entered into a valid agreement to arbitrate a set of claims.  *See, e.g., Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir. 2002) ("This determination is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'" (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  The second part of determining whether the parties have agreed to arbitrate—the question of whether the dispute comes within the scope of the agreement—"is answered by applying the federal substantive law of arbitrability." *Graves v. BP Am., Inc.*, 568 F.3d 221, 222-23 (5th Cir. 2009) (citations omitted).

CORE/3522697.0002/169122632

13.     Under both Texas and Federal law, "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, (1983); *see also Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d 171, 174 (Tex. 2002).  In addition, the Supreme Court has declared that the Federal Arbitration Act, "is a strong congressional declaration of a liberal policy favoring arbitration." *See, e.g., Elkjer v. Scheef & Stone, L.L.P.*, 8 F. Supp. 3d 845, 849 (N.D. Tex. 2014) (collecting cases) ("if a valid agreement to arbitrate does exist, the court must observe the strong federal policy favoring arbitration and resolve all ambiguities in favor of arbitration.").

## III.  <u>ARGUMENT</u>

14.     This Court should compel arbitration as to Counts V, VI, and VII of the Amended Adversary Complaint because: (1) The claims under Counts V, VI, and VII comprise disputes involving legal rights or remedies arising from the LPA and are governed by an enforceable, and broadly worded, arbitration provision; (2) Counts V, VI, and VII assert noncore claims, and in the Fifth Circuit courts do not have discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings and should compel arbitration of even core claims if they are not integral to the bankruptcy; and (3) federal and state policy strongly favors arbitration.

15.     The Federal Arbitration Act ("FAA") requires district courts to direct parties to arbitrate issues covered by a valid arbitration agreement.  9 U.S.C. §§ 3, 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  "Federal policy strongly favors enforcing arbitration agreements." *Dean Witter Reynolds*, 470 U.S. at 217; *Moses H. Cone Mem. Hosp*, 460 U.S. at 24.  When a party moves to compel arbitration, the FAA requires district courts to order arbitration of arbitrable claims. *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re*

CORE/3522697.0002/169122632

*Sedco, Inc.*), 767 F.2d 1140, 1147 (5th Cir. 1985). Because of the strong presumption in favor of arbitration, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Vallejo v. Garda CL Sw., Inc.*, 948 F. Supp. 2d 720, 724–25 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014) (citing *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004)); *see also Grant v. Houser*, 469 Fed. Appx. 310, 315 (5th Cir. 2012) (noting the strong presumption in favor of arbitration).

16.     "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25; *see also Henry*, 551 S.W.3d at 115 (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d at 174). The Fifth Circuit resolves doubts concerning the scope of matter covered by an arbitration provision in favor of referring arbitration.  The court states:

> We emphasize that our sole responsibility is to determine whether this dispute is governed by an arbitration clause, not to determine the merits of the dispute.  *See Snap–On Tools Corp., v. Mason*, 18 F.3d 1261, 1267 (5th Cir.1994). "We resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration. . . . [A]rbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Neal*, 918 F.2d at 37 (internal citations omitted). *See also AT & T Technologies Inc. v. Communications Workers of America*, 475 U.S. at 643, 650 (1986).

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

### A.     This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA.

17.     Debtor's claims asserted in Counts V, VI, and VII arise under the LPA, which contains an enforceable and broadly worded arbitration provision.  The U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, has already interpreted arbitration provisions with identical scope language (and near-identical scope language) to the Arbitration Provision under the LPA, to be valid

and binding.  *See In re Acis Cap. Mgmt., L.P.*, 600 B.R. 541, 549-50 (Bankr. N.D. Tex. 2019).[15]

Importantly, the court made clear that "it would seem to be beyond peradventure that [the arbitration

clause] was, at one time, enforceable between the parties, *with regard to any disputes that arose*

*regarding the agreements*."  *Id.* at 552 (emphasis added); *see also id.* at 557 (emphasis added)

("there were valid arbitration agreements *that applied to all disputes* arising out of the [agreements

at issue].").  Accordingly, the court concluded that all claims at issue, including claims for declaratory

judgment, fell within the scope of the relevant arbitration clauses.  *See id.* at 558.

18.    The Arbitration Provision here also covers any "unresolved legal dispute between the

parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other

representatives that involves legal rights or remedies *arising from this Agreement*."  LPA, Section

6.14 (emphasis added).  Such broad language is sufficient to reach collateral matters, including the

oral agreement between the parties which involves legal rights arising from LPA.[16]  *Buell Door Co.*

---

[15]    The Court's decision provides the relevant arbitration clause language.  The arbitration clause at
Section 16(f) of the Sub-Advisory Agreement states:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective
> officers, directors, partners, employees, agents, affiliates or other representatives that involves legal
> rights or remedies *arising from* this Agreement, the parties agree to submit their dispute to binding
> arbitration under the authority of the Federal Arbitration Act. . . .

*In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 550 (emphasis added).

[16] It is important to note that the particular language "arising from" is significant in determining that the
Arbitration Provision here is broad.  The Fifth Circuit and Texas District Courts have specifically determined
that only the phrase "arising under" indicates a narrow arbitration clause, rather than broad. This Court has
held:

> upon reviewing the above referenced Fifth Circuit cases, the court concludes that the phrase
> "arising out of" and similar language constitute "broad" arbitration clauses. *Accord Morphis
> v. Federal Home Loan Mortgage Corp.*, No. 3:02–CV–0210–P, 2002 WL 1461930, *3–4
> (N.D.Tex. July 3, 2002) (provision that "any and all disputes between [the parties]," with no
> limiting clause constituted a broad clause).  On the other hand, the phrase "arising under"
> indicates a "narrow" arbitration clause.  *See Mediterranean Enterprises, Inc. v. Ssangyong
> Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983) (the term "arising under" is relatively narrow)
> (citation omitted).

---

*v. Architectural Sys., Inc.*, No. 3:02-CV-721-AH, 2002 WL 1968223, at *6 (N.D. Tex. Aug. 20, 2002) (concluding that the phrase "arising out of" and similar language constitute "broad" arbitration clauses); *see also Elkjer*, 8 F. Supp. at 855 (concluding that the arbitration clause which uses the phrase "arising under or in connection with this [Partnership] Agreement," is "broad [and] capable of expansive reach" to include statutory claims). "Broad arbitration clauses are not limited to claims which literally 'arise under [a] contract,' but rather embrace all disputes between the parties ***having a significant relationship*** to the contract regardless of their label." *Id.* at *4 (citing *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164–65 (5th Cir. 1998) (emphasis added) (internal citations omitted).

19.    In the Fifth Circuit, a "broadly construed arbitration provision may encompass claims arising under a separate agreement." *See, e.g., Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 393–94 (5th Cir. 2002) (holding that an arbitration provision, which covered "any and all claims. . . arising out of or relating to" an agreement, applied to claims arising under a separate agreement); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 38 (5th Cir. 1990) (holding that an arbitration provision encompassing "any and all disputes between [the parties] . . . reach[ed] all aspects of the parties' relationship," including claims arising under a separate agreement); *see also I.D.E.A. Corp. v. WC & R Ints., Inc.*, 545 F. Supp. 2d 600, 606 (W.D. Tex. 2008) (noting a broad arbitration provision may encompass claims arising under a separate agreement). Accordingly, the Arbitration Provision covers the claims regardless if the arise under the LPA or the separate Note because the authority to enter into the Note arises from the LPA which reaches all aspects of the parties' relationship.

20.    Here, the LPA choice of law provision, Section 6.1, provides the "Agreement shall be construed in accordance with and governed by the laws of the state of Delaware. . . ."  As a result,

---

*Buell Door Co.*, 2002 WL 1968223, at *6.  Here, the "arising from" language of the Arbitration Provision is similar to "arising of out" and is therefore broad.

Delaware state contract law determines whether the LPA includes a valid agreement to arbitrate. Delaware arbitration law mirrors federal law in that "public policy of Delaware favors arbitration." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006) (citations omitted). Even Debtor's rejection of the LPA does not absolve Debtor of its obligation to arbitrate. It is well established that the "rejection of a contract, or even breach of it, will not void an arbitration clause. . . . Any different conclusion would allow a party to avoid arbitration at will simply by breaching [or rejecting] the contract." *Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos, Inc.)*, 325 B.R. 687, 693-94 (Bankr. D. Del. 2005) (citations omitted).

21.    Moreover, any question about the scope of the arbitration agreement, including the arbitrability of any particular claim, is for the arbitrator. Under the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute. . . , so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted). The Fifth Circuit provides an in-depth explanation of who decides what issues when a contract includes an arbitration provision. *See Kubala v. Supreme Production Services, Inc.*, 830 F.3d 199 (5th Cir. 2016).

22.    Incorporating rules from an arbitration service provider that themselves delegate the question of arbitrability to the arbitrator clearly and unmistakably expresses the parties' intent to leave the question of arbitrability to the arbitrator. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Here, the Arbitration Provision provides that the "arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate,

CORE/3522697.0002/169122632

decide and issue the final award." The rules of the American Arbitration Association provide that the arbitrator is to decide questions of arbitrability. AAA Commercial Arbitration Rule 7(a). Because the parties' arbitration delegates decision-making to the arbitrators, where the parties entered an agreement to arbitrate, questions of scope and arbitrability should be left to the arbitrator.

### B. The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA.

23.     Under the LPA, the Court must compel arbitration on Counts V, VI, and VII of the Amended Complaint, because all of the claims are non-core claims arising from the rights and obligations under the LPA. Bankruptcy courts have no discretion to refuse to compel the arbitration of non-core matters. *See, e.g., Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*, No. CV H-14-2086, 2015 WL 9302843, at *7 (S.D. Tex. Dec. 18, 2015) (citation omitted) (quoting "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings"). More specifically, under Fifth Circuit precedent, a bankruptcy court only has discretion to refuse to compel arbitration of an arbitrable claim where: (1) "the proceeding derives exclusively from the provisions of the bankruptcy code;" and (2) "arbitration of the proceeding would conflict with the purposes of [the bankruptcy code]." *See Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)*; see also Zimmerli v. Ocwen Loan Servicing, LLC*, 432 B.R. 238, 242 (Bankr. N.D. Tex. 2010). "Importantly, however, '***a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings*** under 28 U.S.C. § 157(b)." *In re Cain*, 585 B.R. 127, 134–35 (Bankr. S.D. Miss. 2018) (emphasis added) (citation omitted) (stating "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings."); *In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 560 (in the *Acis* case—unlike here—the claims at issue were "an integral part of determining  . . . proofs of claim," resulting in the court denying the motion to compel arbitration).

CORE/3522697.0002/169122632

24.     For claims that are "derivative of the pre-petition legal or equitable rights possessed by a debtor" it is beyond dispute that "it is 'universally accepted' that such issues are arbitrable." *In re Cain*, 585 B.R. at 137 (citing *Nat'l Gypsum Co.*, 118 F.3d at 1066, 1069).  In other words, for non-core proceedings, a court "must give effect to the terms of any applicable arbitration clauses." *In re Daisytek, Inc.*, 323 B.R. 180, 188 (N.D. Tex. 2005).

### 1.     <u>The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA.</u>

25.     Debtor's declaratory relief claim simply seeks declarations concerning the extent of limited partner (including Dugaboy's) authority under the LPA, including authority to enter into the Alleged Agreement on behalf of the Partnership.[17]  This is a legal dispute arising from LPA, a pre-petition contract, thus coming within the Arbitration Provision and governed by state contract law. Courts generally agree that claims for declaratory judgment which could also exist outside of bankruptcy are non-core proceedings.[18]  *See, e.g., In re OCA, Inc.*, 410 B.R. 443, 450 (E.D. La. 2007)("That the doctors' claims are for breach of contract, breach of fiduciary duty and declaratory relief, and are entirely based on state law, supports a finding that they are noncore claims.")

26.     Therefore, the Court lacks discretion to refuse to compel arbitration on Count V asserting Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against Dugaboy.  *Webb v. Investacorp, Inc.*, 89 F.3d 252, 260 (5th Cir. 1996) (district court did not abuse

---

[17] *See Amended Complaint* [Adv. No. 21-03005, Dkt. No. 63 at ¶¶ 67-70].

[18] *See also In re Temecula Valley Bancorp, Inc.*, 523 B.R. 210, 222–23 (C.D. Cal. 2014)("That court found a trustee's claim for declaratory relief as to the ownership of similar tax refunds non-core because it was a "dispute between private parties" and arose out of a pre-bankruptcy tax sharing agreement governed by state contract law); *see also In re SFD @ Hollywood, LLC*, 414 B.R. 794, 797 (Bankr. S.D. Fla. 2009)("This proceeding [for declaratory judgment] could also exist outside of bankruptcy. Accordingly, this is a non-core proceeding in which the Court cannot enter a final order, absent consent of the district court and the parties."); see also *Sunterra Corp. v. Perini Bldg. Co.*, No. 204CV00784MCEEFB, 2008 WL 11512082, at *4 (E.D. Cal. June 12, 2008)("The new causes of action--strict liability, negligence, breach of contract, professional negligence, and declaratory relief--would also exist independently of bankruptcy laws and are similarly "non-core" proceedings.").

discretion in refusing to consider plaintiffs' request for declaratory relief where order granting

defendant's motion to compel arbitration disposed of same issues raised in declaratory judgment

action); *see also Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,

No. A-09-CA-351 LY, 2009 WL 10699390, at *8 (W.D. Tex. July 30, 2009) (finding action seeking

declaratory relief arbitrable); *see also Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication

Sys., Inc.*, No. 17 C 2066, 2017 WL 2720433, at *4 (N.D. Ill. June 23, 2017) (stating that permitting

a party to obtain declaratory relief from a court when there is a valid arbitration agreement is

"essentially the same relief as that otherwise reserved for the arbitrator. It would make little sense to

include such an expansive loophole in what is otherwise a sweeping arbitration provision.").

### 2. The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA.

27.     Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding

and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero for entering into

the Alleged Agreement, must be arbitrated because they are non-core claims that arise under the LPA.

It is well established that state law claims, such as breach of fiduciary duty and aiding and abetting

breach of fiduciary duty, are non-core claims. *See, e.g., In re Dune Energy, Inc.*, 575 B.R. 716, 729

(Bankr. W.D. Tex. 2017) ("Courts within the Fifth Circuit have consistently found that post-

confirmation suits by plan trustees based on state law claims are only within the 'related to' (and not

'core') bankruptcy jurisdiction of a federal court."); *see also Brickley for CryptoMetrics, Inc.

Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 829–30 (W.D. Tex. 2017)

(stating post-confirmation claims for breach of fiduciary duty and state law claims are "related to"

claims); *see also Mirant Corp. v. The S. Co.*, 337 B.R. 107, 120 (N.D. Tex. 2006).

28.     The breach of fiduciary duty claims under Count VI and aiding and abetting breach of

fiduciary duty under Count VII are—and by their own terms—premised on Dugaboy's authority to

CORE/3522697.0002/169122632

bind the Debtor under the LPA.[19]    The Debtor challenges whether the LPA affords the right to Dugaboy to approve such compensation, thus, any evaluation of the breach of fiduciary duty-related claims must first entail an analysis of the LPA, making construction of the LPA – the agreement containing the arbitration clause, a predicate to the analysis of the breach of fiduciary duty claims. Thus, Counts VI and VII involve unresolved legal disputes between the parties—including the Debtor and Mr. Dondero, Nancy Dondero, and Dugaboy, who are all parties and/or officers/directors/partners/employees/agents/affiliates/representatives of a General or Limited Partner—concerning legal duties to the Partnership that would not exist outside of the LPA.

29.    The Fifth Circuit makes clear that where, as here, the breach of fiduciary duty (or aiding and abetting fiduciary duty) claim is interwoven with the partnership agreement containing an arbitration clause, the fiduciary claims will be subject to arbitration.  *See Coffman v. Provost \* Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 732 (E.D. Tex. 2001), *aff'd sub nom. Coffman v. Provost Umphrey LLP*, 33 Fed. Appx. 705 (5th Cir. 2002) ("Even if it is conceivable that Plaintiff could maintain a claim for breach of fiduciary duty without the Partnership Agreements, that alone is not sufficient grounds for concluding that the claim is not within the scope of the arbitration clause . . . the Partnership Agreements will determine whether a fiduciary duty was breached—whether that duty arises from the common law or from the contract itself. . . . For these reasons, the court finds Plaintiff's breach of fiduciary duty claim to be subject to arbitration."); *see also Omni Pinnacle, LLC v. ECC Operating Services. Inc.*, 255 F. App'x 24, 25-26 (5th Cir. 2007) (internal quotation marks

---

[19] *See Amended Complaint* [Adv. No. 21-03005, Dkt. No. 63 at ¶ 73] ("*If Dugaboy had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy breached its fiduciary duty* of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor."); *id.* ¶¶ 76–77 (the Donderos "were aware that Dugaboy would have fiduciary duties to the Debtor *if it acted to bind the Debtor,*" and the Donderos "aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly *participating in the authorization of the purported Alleged Agreement*.")

omitted) ("A dispute arises out of or relates to a contract if the legal claim underlying the dispute could not be maintained without reference to the contract.").

30.     Because breach of fiduciary duty and aiding and abetting breach of fiduciary duty are non-core state-law claims that could exist outside of bankruptcy, the reviewing court lacks discretion to refuse enforcement of an otherwise-applicable arbitration agreement as to these claims.  *See In re McCollum*, 621 B.R. 655, 659 (Bankr. N.D. Miss. 2020) (finding that breaching its fiduciary duty "is a state law contract claim which arose prepetition, could exist outside the bankruptcy case, and is tangential to the bankruptcy case.  It does not invoke a substantive right created by bankruptcy law and is a non-core claim."); *In re Gaughf*, 19-50947-KMS, 2020 WL 1271595, at *4 (Bankr. S.D. Miss. Mar. 12, 2020) ("Aiding and Abetting Count is non-core.").  Additionally, claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty do not reference the Bankruptcy Code or any right conferred by the Code.  *See In re McCollum*, 621 B.R. at 659.  Therefore, the Court lacks discretion to refuse to compel arbitration on Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero.

31.     That Nancy Dondero is not personally a party to the LPA does not impair her right to enforce the arbitration agreement it contains. Debtor alleges misconduct by her and a signatory to the LPA relating to fiduciary duties Debtor alleges arise out of the LPA.  There are two circumstances under which a nonsignatory can compel arbitration: (1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory; or (2) when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.  *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002).  Both circumstances are implicated by Debtor's allegations against Nancy Dondero.

CORE/3522697.0002/169122632

32.     First, non-signatories are entitled to invoke an arbitration agreement when the claim against the non-signatory arises from the contract with an arbitration provision.  *See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (citing *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000))("[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory."); *see also Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*, 870 F. Supp. 2d 441, 450–51 (S.D. Tex. 2012) (citing *Grigson,* 210 F.3d at 527).  Because Debtor charges Nancy Dondero with breaching fiduciary duties (and aiding and abetting breaches of such duties) that arise out of the LPA, she falls precisely within the ambit of cases like *Bridas,* and *Grigson* and *Amegy*.

33.     Second, when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract—here the allegations are made against Nancy Dondero (a non-signatory) and Dugaboy (a signatory) to the LPA—the non-signatory may compel arbitration on the claims.  *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 349 (5th Cir. 2002) (affirming that "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory."); *see also Grigson*, 210 F.3d at 526 ("a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff").

**C.     The Court Should Stay All Claims Pending Arbitration.**

34.     The claims that the Court refers to arbitration must be stayed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3.  *See In re Gandy*, 299 F.3d 489, 494–95 (5th Cir. 2002) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987) ("A court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement").  Further,

CORE/3522697.0002/169122632

bankruptcy courts generally do not have discretion to decline to stay, pending arbitration, proceedings involving non-core matters. *Id.* at 495. Accordingly, the Court should stay each of the Debtor's claims against Defendants pending arbitration.

35.     Should the Court not refer arbitration on every claim, in the alterative, the Court should stay the entire adversary proceeding pending arbitration. Permitting any claims to continue herein, while some or all claims are subject to arbitration would be unnecessarily expensive and duplicative. The Court has the inherent power to grant a discretionary stay of a proceeding pending arbitration when there are issues common to the arbitration and the court proceeding and those issues may be decided by the arbitrator. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166 (1936) (stating that the power to stay proceedings is incidental to power "inherent in every court to control disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see also In re Divine Ripe, L.L.C.*, 538 B.R. 300, 309 (Bankr. S.D. Tex. 2015) (same).

## IV.     <u>CONCLUSION</u>

WHEREFORE, for the reasons above, Defendants respectfully request that this Court compel arbitration on Counts V, VI, and VII, and order a stay of the proceedings pending arbitration.

CORE/3522697.0002/169122632

Dated: September 1, 2021

Respectfully submitted,

/s/Deborah Deitsch-Perez
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND NANCY DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

CORE/3522697.0002/169122632

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/169122632

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO
AND NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR THE DUGABOY INVESTMENT
TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

# TABLE OF CONTENTS

I.      STATEMENT OF FACTS ............................................................................................ 1

II.     STANDARD OF REVIEW ......................................................................................... 7

III.    ARGUMENT .............................................................................................................. 8

    A.    This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA. .................................................................................... 9

    B.    The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA. ............................................................................... 13

        1.    The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA. .......................................................................................................... 14

        2.    The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA. .......................................................................................................... 15

    C.    The Court Should Stay All Claims Pending Arbitration. ............................................ 19

IV.     CONCLUSION .......................................................................................................... 19

CORE/3522697.0002/169124890

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acis Cap. Mgmt., L.P.*,
   600 B.R. 541 (Bankr. N.D. Tex. 2019) ............................................................................... 10, 13

*Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*,
   870 F. Supp. 2d 441 (S.D. Tex. 2012) ..................................................................................... 18

*Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,
   No. A-09-CA-351 LY, 2009 WL 10699390 (W.D. Tex. July 30, 2009) .................................... 15

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*,
   566 B.R. 815 (W.D. Tex. 2017) ............................................................................................... 15

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   345 F.3d 347 (5th Cir. 2003) ................................................................................................. 18

*Buell Door Co. v. Architectural Sys., Inc.*,
   No. 3:02-CV-721-AH, 2002 WL 1968223 (N.D. Tex. Aug. 20, 2002) .............................. 10, 11

*In re Cain*,
   585 B.R. 127 (Bankr. S.D. Miss. 2018) ............................................................................. 13, 14

*Coffman v. Provost Umphrey LLP*,
   33 Fed. Appx. 705 (5th Cir. 2002) ........................................................................................ 16

*In re Daisytek, Inc.*,
   323 B.R. 180 (N.D. Tex. 2005) .............................................................................................. 14

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985) ................................................................................................................. 8

*In re Divine Ripe, L.L.C.*,
   538 B.R. 300 (Bankr. S.D. Tex. 2015) ................................................................................... 19

*In re Dune Energy, Inc.*,
   575 B.R. 716 (Bankr. W.D. Tex. 2017) .................................................................................. 15

*Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*,
   No. CV H-14-2086, 2015 WL 9302843 (S.D. Tex. Dec. 18, 2015) ........................................ 13

*Elkjer v. Scheef & Stone, L.L.P.*,
   8 F. Supp. 3d 845 (N.D. Tex. 2014) .............................................................................. 8, 11, 16

iii

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ................................................................................................ 12

*Fleetwood Enterprises, Inc. v. Gaskamp*,
   280 F.3d 1069 (5th Cir. 2002) .................................................................................. 7

*In re Gandy*,
   299 F.3d 489 (5th Cir. 2002) ............................................................................. 18, 19

*In re Gaughf*,
   19-50947-KMS, 2020 WL 1271595 (Bankr. S.D. Miss. Mar. 12, 2020) ................... 17

*Grant v. Houser*,
   469 Fed. Appx. 310 (5th Cir. 2012) ......................................................................... 9

*Graves v. BP Am., Inc.*,
   568 F.3d 221 (5th Cir. 2009) .................................................................................... 7

*Grigson v. Creative Artists Agency L.L.C.*,
   210 F.3d 524 (5th Cir. 2000) .................................................................................. 18

*Henry v. Cash Biz, LP*,
   551 S.W.3d 111 (Tex. 2018) ................................................................................. 8, 9

*Hill v. G E Power Sys., Inc.*,
   282 F.3d 343 (5th Cir. 2002) .................................................................................. 18

*I.D.E.A. Corp. v. WC & R Ints., Inc.*,
   545 F. Supp. 2d 600 (W.D. Tex. 2008) ................................................................... 11

*Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication Sys., Inc.*,
   No. 17 C 2066, 2017 WL 2720433 (N.D. Ill. June 23, 2017) .................................. 15

*James & Jackson, LLC v. Willie Gary, LLC*,
   906 A.2d 76 (Del. 2006) ......................................................................................... 12

*Kubala v. Supreme Production Services, Inc.*,
   830 F.3d 199 (5th Cir. 2016) .................................................................................. 12

*Landis v. N. Am. Co.*,
   299 U.S. 248, 57 S. Ct. 163 (1936) ......................................................................... 19

*Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos, Inc.)*,
   325 B.R. 687 (Bankr. D. Del. 2005) ........................................................................ 12

*In re McCollum*,
   621 B.R. 655 (Bankr. N.D. Miss. 2020) .................................................................. 17

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir.1983) .................................................................................. 10

iv

*Mirant Corp. v. The S. Co.*,
    337 B.R. 107 (N.D. Tex. 2006) ............................................................... 15

*Morphis v. Federal Home Loan Mortgage Corp.*,
    No. 3:02–CV–0210–P, 2002 WL 1461930 (N.D.Tex. July 3, 2002) ......................... 10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ...................................................................... 8, 9

*Matter of Nat'l Gypsum Co.*,
    118 F.3d 1056 (5th Cir. 1997) ............................................................ 13

*Neal v. Hardee's Food Sys., Inc.*,
    918 F.2d 34 (5th Cir. 1990) .............................................................. 11

*In re OCA, Inc.*,
    410 B.R. 443 (E.D. La. 2007) ............................................................ 14

*Omni Pinnacle, LLC v. ECC Operating Services. Inc.*,
    255 F. App'x 24 (5th Cir. 2007) ......................................................... 16

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
    139 F.3d 1061 (5th Cir. 1998) ............................................................. 9

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*,
    297 F.3d 388 (5th Cir. 2002) ............................................................ 11

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
    687 F.3d 671 (5th Cir. 2012) ............................................................ 12

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ..................................................................... 12

*Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re Sedco, Inc.)*,
    767 F.2d 1140 (5th Cir. 1985) ............................................................. 8

*In re SFD @ Hollywood, LLC*,
414 B.R. 794 (Bankr. S.D. Fla. 2009) ...................................................... 14

*Sherer v. Green Tree Serv., LLC*,
    548 F.3d 379 (5th Cir. 2008) ............................................................. 7

*Sunterra Corp. v. Perini Bldg. Co.*,
    No. 204CV00784MCEEFB, 2008 WL 11512082 (E.D. Cal. June 12, 2008) .................... 14

*In re Temecula Valley Bancorp, Inc.*,
    523 B.R. 210 (C.D. Cal. 2014) ........................................................... 14

*Vallejo v. Garda CL Sw., Inc.*,
    948 F. Supp. 2d 720 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014) ............. 9

CORE/3522697.0002/169124890

*Venture Cotton Coop. v. Freeman*,
  435 S.W.3d 222 (Tex. 2014) ................................................................................. 7

*Webb v. Investacorp, Inc.*,
  89 F.3d 252 (5th Cir. 1996) ................................................................................. 14

*Westmoreland v. Sadoux*,
  299 F.3d 462 (5th Cir. 2002) ............................................................................... 17

*Zimmerli v. Ocwen Loan Servicing, LLC*,
  432 B.R. 238 (Bankr. N.D. Tex. 2010) .................................................................. 13

**Rules and Statutes**

9 U.S.C. § 3 ............................................................................................................... 8, 18

9 U.S.C. § 4 ................................................................................................................... 8

11 U.S.C. § 105(a) ................................................................................................... 6, 14

11 U.S.C. § 542(b) ........................................................................................................ 5

28 U.S.C. § 157(b) ...................................................................................................... 13

AAA Commercial Arbitration Rule 7(a) ...................................................................... 13

Fed. R. Bankr. P. 7001 ............................................................................................. 6, 14

Tex. Bus. & C. Code § 24.005(a)(1) ............................................................................. 6

CORE/3522697.0002/169124890

## MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

Defendants James D. Dondero, Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy") (the "Defendants") move this Court for an order to stay this adversary proceeding and refer the parties to arbitration, and in further support state the following:

## I.   STATEMENT OF FACTS

1.      On December 24, 2015, Mr. Dondero, on behalf of Strand Advisors, Inc., and Nancy Dondero, on behalf of Dugaboy, executed the Fourth Amended and Restated Agreement (the "LPA") of Limited Partnership of Highland Capital Management, L.P. ("HCM").[1]  Section 6.14 of the LPA provides for Mandatory Arbitration in the event of a legal dispute between the parties arising from the agreement ("Arbitration Provision").  Section 6.14 specifically states:

> **6.14. Mandatory Arbitration**. In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.

The Arbitration Provision specifically governs the discovery process for arbitration, the authority of the arbitrators, and the costs of arbitration.[2]

---

[1] The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. Declaration of Michael P Aigen dated August 30, 2021 ("Aigen Dec.) at Ex. 1. The signatories to it are: (1) General Partner, Strand Advisors, Inc., a Delaware corporation by James D. Dondero, President; (2) Limited Partner, The Dugaboy Investment Trust by Nancy M. Dondero, its Trustee; (3) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #1 by Lawrence Tonomura, its Trustee; (4) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #2 by Lawrence Tonomura, its Trustee; (5) Limited Partner, Mark K. Okada; and (6) Limited Partner, Hunter Mountain Investment Trust by John Honis, the President of Beacon Mountain 1 LC, Administrator.

[2] *See* LPA Section 6.14, which states:

1

2.      In 2018, HCMS executed a series of demand Notes in favor of the Debtor (the

"Notes").  The authority to execute promissory note in favor of the Debtor arises from Article 4 of

the LPA because a General Partner has full authority to conduct the business, which includes lending

and borrowing money and executing promissory notes.  Article 4 states:

> In addition to the powers now or hereafter granted to a general partner of a limited
> partnership under applicable law or that are granted to the General Partner under
> any provision of this Agreement, the General Partner shall have full power and
> authority to do all things deemed necessary or desirable by it to conduct the
> business of the Partnership, including, without limitation:
> . . . .
>
> (ii) the performance of any and all acts necessary or appropriate to the operation
> of any business of the Partnership (including, without limitation. purchasing and
> selling any asset, any debt instruments, any equity interests, any commercial paper,
> any note receivables and any other obligations);
> . . . .
>
> (vi) the making of any expenditures, the borrowing of money, the guaranteeing of
> indebtedness and other liabilities, the issuance of evidences of indebtedness, and
> the incurrence of any obligations it deems necessary or advisable for the conduct
> of the activities of the Partnership, including, without limitation, the payment of
> compensation and reimbursement to the General Partner and its Affiliates pursuant
> to Section 3.1;
> . . . .
>
> (vii) the use of the assets of the Partnership (including, without limitation, cash on
> hand) for any Partnership purpose on any terms it sees fit, including, without
> limitation, the financing of operations of the Partnership, the lending of funds to
> other Persons, and the repayment of obligations.

---

The discovery process shall be limited to the following: Each side shall be permitted no more
than (i) two party depositions of six hours each, each deposition to be taken pursuant to the
Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five
interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in
response, the producing party shall not be obligated to produce in excess of 5,000 total pages
of documents, including electronic documents); and (vi) one request for disclosure pursuant
to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this
paragraph, whether to parties or non-parties, shall not be permitted. . . . . Each party shall bear
its own attorney's fees, costs and expenses, including any costs of experts, witnesses and /or
travel, subject to a final arbitration award on who should bear costs and fees. The duty to
arbitrate described above shall survive the termination of this Agreement.

CORE/3522697.0002/169124890

3.      In addition, the LPA provides authority for partners to lend money to their Affiliates.

Section 4(e) specifically provides:

> The General Partner or any Affiliate of the General Partner may lend to the
> Partnership funds needed by the Partnership for such periods of time as the General
> Partner may determine: provided, however, the General Partner or its Affiliate may
> not charge the Partnership interest at a rate greater than the rate (including points
> or other financing charges or fees) that would be charged the Partnership (without
> reference to the General Partner's financial abilities or guaranties) by unrelated
> lenders on comparable loans. The Partnership shall reimburse the General Partner
> or its Affiliate, as the case may be, for any costs incurred by the General Partner
> or that Affiliate in connection with the borrowing of funds obtained by the General
> Partner or that Affiliate and loaned to the Partnership. The Partnership may loan
> funds to the General Partner and any member of the Founding Partner Group at the
> General Partner's sole and exclusive discretion.

In addition, Section 3.9(f) of the LPA allows for the partnership to make tax loans to the Founding
Partners:

> The Partnership shall, upon request of such Founding Partner, make distributions
> to the Founding Partners (or loans, at the election of the General Partner) in an
> amount necessary for each of them to pay their respective federal income tax
> obligations incurred through the effective date of the Third Amended and Restated
> Agreement of Limited Partnership of Highland Capital Management, L.P., the
> predecessor to this Agreement.

4.      Debtor demanded payment on the Notes and subsequently filed an adversary
proceedings seeking collection, described further below.  One of the affirmative defenses asserted in
the adversary proceedings is that Debtor is not entitled to demand payment because, prior to the
demands for payment, HCM had agreed that it would not collect the Notes, and that they would be
treated as compensation to the Debtor's founder and then-CEO Jim Dondero, if any of certain
conditions subsequent were met.[3]  Debtor refers to the agreement as the "Alleged Agreement."  The
condition subsequent was the sale of any of HCM's interests in certain portfolio companies
(Cornerstone, Trussway and/or MGM) for a greater amount than their cost.[4]

---

[3] *See Highland Capital Management Services, Inc.'s First Amended Answer to Plaintiff's Complaint* [Ad. No.
21-03006, Dkt. No. 34 at 8 ¶ 56].
[4] Aigen Dec. Ex. 2, May 28, 2021 Remote Deposition of James Dondero Transcript at 212: 18-25; 213: 1-17.

5.      Under Section 4.1(k) of the LPA, the "salaries or other compensation, if any, of the officers and agents of the Partnership [were to] be fixed from time to time by the General Partner." Additionally, under the LPA, Dugaboy had explicit authorization to approve compensation for Jim Dondero and entities he was affiliated with, and thus bind the Partnership through, LPA in § 3.10(a), which provides in pertinent part:

> (a) Compensation. The General Partner and any *Affiliate* of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

> "***'Majority Interest'*** means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners." LPA § 2.1, p.4.

> "***'Class A Limited Partners'*** means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A." LPA § 2.1, p.2.[5]

> The Class A shareholders included Strand Advisors, The Dugaboy Investment Trust, Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark and Pamela Okada Family Trust – Exempt Trust #2.[6] Dugaboy alone comprised 75% of the Class A shareholders,[7]

> Nancy Dondero was the Family Trustee of the Dugaboy Trust,[8] and had the power to act for Dugaboy in this regard.[9]

After the Notes were entered into, Mr. Dondero asked Dugaboy (via Ms. Dondero) to approve an agreement that the Notes would be forgiven as compensation to Mr. Dondero upon the favorable sale of any or all of the portfolio company interests by HCM, and she did.[10]

---

[5] Aigen Dec. Ex. 1, LPA at Exhibit A thereof).  Exhibit A reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.

[6] Aigen Dec. Ex. 1, LPA at Exhibit A thereof.

[7] *See id.*

[8] Aigen Dec. Ex. 3, *Acceptance of Appointment of Family Trustee*, executed by Nancy Marie Dondero on October 13, 2015.

[9] Aigen Dec. Ex. 4, *Trust Agreement Between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees The Dugaboy Investment*, entered November 15, 2010 at Article 5.2.

[10] Aigen Dec Ex. 2, Remote Deposition of James Dondero Transcript at 176-178.

The General Partner entitled to compensation here is Strand Advisors, Inc.  The LPA Preamble states in pertinent part:

> "This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.  LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

> "*'Affiliate'* means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term *'control'* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."  LPA § 2.1, p.2.

> "*'Person'* means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity."  LPA § 2.1, p.5.

It is undisputed that Mr. Dondero was an Affiliate of Strand under the LPA's definition.  Thus, Mr. Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

6.    On January 22, 2021, Highland Capital Management, L.P. ("Debtor" or "Plaintiff" when describing post-petition actions and HCM when describing pre-petition actions) commenced Adversary Proceeding No. 21-03006 against HCMS, asserting a state law, non-core breach of contract claim ("Count I") and an entirely dependent turnover claim under 11 U.S.C. § 542(b) for the amounts allegedly owed on the Notes ("Count II").

7.    HCMS answered the adversary complaint, asserting, inter alia, that Debtor's claims should be barred, because prior to the demand for payment HCM agreed it would not collect on the Notes upon fulfillment of conditions subsequent,[11] based upon what the Debtor refers to as the "Alleged Agreement."

8.    On August 23, 2021, the Court entered an order permitting Debtor to file its *Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV)*

---

[11] *Highland Capital Management Services, Inc.'s First Amended Answer to Plaintiff's Complaint* [Ad. No. 21-03006, Dkt. No. 34 at 8 ¶ 56].

*Breach of Fiduciary Duty* ("Amended Complaint") asserting additional claims for relief including: Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550 against Mr. Dondero ("Count III"); Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1) against Mr. Dondero ("Count IV"); Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against Dugaboy ("Count V"); Breach of Fiduciary Duty against Dugaboy ("Count VI"); and Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero ("Count VII").  Debtor seeks avoidance of the Alleged Agreement, declaratory relief, and damages.  The Parties agreed that the Defendants would answer or otherwise move against the Amended Complaints on or before September 1, 2021.[12]  The new claims, under Counts V, VI, and VII are non-core contract claims that arise from the LPA, containing a broad arbitration provision.  Further, the Defendants have critical affirmative defenses for the claims for declaratory relief, breach of fiduciary, and aiding and abetting breach of fiduciary duty, that are rooted in non-core state contract law that also arise from the LPA.

9.    Although Debtor alleges that it "believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes,"[13] there is no doubt that adjudication of the existence and enforceability of the Alleged Agreement affects all of Debtor's claims under Counts V, VI, and VII for declaratory relief, breach of fiduciary duty and breach of fiduciary duty.  These claims pertain to loans made by the Debtor to its Affiliates and compensation for the Debtor's CEO, all of which are governed  by the LPA.[14]

---

[12] *See Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* attached as Exhibit C to *Debtor's Unopposed Motion for Leave to Serve and File Amended Complaint* [Adv. No. 21-03006, Dkt. No. 60-2 at Exhibit C] stipulating to August 30, 2021 which has been extended to September 1, 2021 by the parties via email communication.
[13] *Amended Complaint* [Adv. No. 21-03006, Dkt. No. 68 at ¶ 3].
[14] *See generally* Aigen Dec. Ex. 1, LPA Article 4 and Section 3.10.

10.     Defendants request the Court order the parties to arbitration on Counts V, VI, and VII, as provided by the pre-petition LPA entered into by the parties, and stay the adversary proceeding pending arbitration.

## II.    <u>STANDARD OF REVIEW</u>

11.     When deciding whether to grant a motion to compel arbitration, the Fifth Circuit has established a two-step analysis for determining whether parties must arbitrate a particular claim or set of claims under the FAA: (A) there must be an enforceable agreement to arbitrate; and (B) the claims must be arbitrable.  *See Sherer v. Green Tree Serv., LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (citations omitted) (stating "First we must ask if the party has agreed to arbitrate the dispute. . . If so, we then ask if any federal statute or policy renders the claims non-arbitrable."); *Venture Cotton Coop. v. Freeman,* 435 S.W.3d 222, 227 (Tex. 2014) ("A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement.").  Once a party seeking to compel arbitration establishes the asserted claims fall within a valid arbitration agreement, the burden shifts, and the party seeking to avoid arbitration must prove an affirmative defense to the provision's enforcement, such as waiver.  *Venture Cotton Coop.*, 435 S.W.3d at 227.

12.     In applying the first portion of the two-step analysis, state contract law determines whether parties entered into a valid agreement to arbitrate a set of claims.  *See, e.g., Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir. 2002) ("This determination is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'" (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  The second part of determining whether the parties have agreed to arbitrate—the question of whether the dispute comes within the scope of the agreement—"is answered by applying the federal substantive law of arbitrability." *Graves v. BP Am., Inc.*, 568 F.3d 221, 222-23 (5th Cir. 2009) (citations omitted).

CORE/3522697.0002/169124890

13.     Under both Texas and Federal law, "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, (1983); *see also Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d 171, 174 (Tex. 2002).  In addition, the Supreme Court has declared that the Federal Arbitration Act, "is a strong congressional declaration of a liberal policy favoring arbitration." *See, e.g., Elkjer v. Scheef & Stone, L.L.P.*, 8 F. Supp. 3d 845, 849 (N.D. Tex. 2014) (collecting cases) ("if a valid agreement to arbitrate does exist, the court must observe the strong federal policy favoring arbitration and resolve all ambiguities in favor of arbitration.").

## III.   <u>ARGUMENT</u>

14.     This Court should compel arbitration as to Counts V, VI, and VII of the Amended Adversary Complaint because: (1) The claims under Counts V, VI, and VII comprise disputes involving legal rights or remedies arising from the LPA and are governed by an enforceable, and broadly worded, arbitration provision; (2) Counts V, VI, and VII assert noncore claims, and in the Fifth Circuit courts do not have discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings and should compel arbitration of even core claims if they are not integral to the bankruptcy; and (3) federal and state policy strongly favors arbitration.

15.     The Federal Arbitration Act ("FAA") requires district courts to direct parties to arbitrate issues covered by a valid arbitration agreement.  9 U.S.C. §§ 3, 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).   "Federal policy strongly favors enforcing arbitration agreements." *Dean Witter Reynolds*, 470 U.S. at 217; *Moses H. Cone Mem. Hosp*, 460 U.S. at 24.  When a party moves to compel arbitration, the FAA requires district courts to order arbitration of arbitrable claims. *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re*

CORE/3522697.0002/169124890

*Sedco, Inc.*), 767 F.2d 1140, 1147 (5th Cir. 1985). Because of the strong presumption in favor of arbitration, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Vallejo v. Garda CL Sw., Inc.*, 948 F. Supp. 2d 720, 724–25 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014) (citing *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004)); *see also Grant v. Houser*, 469 Fed. Appx. 310, 315 (5th Cir. 2012) (noting the strong presumption in favor of arbitration).

16.    "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25; *see also Henry*, 551 S.W.3d at 115 (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d at 174). The Fifth Circuit resolves doubts concerning the scope of matter covered by an arbitration provision in favor of referring arbitration.  The court states:

> We emphasize that our sole responsibility is to determine whether this dispute is governed by an arbitration clause, not to determine the merits of the dispute.  *See Snap–On Tools Corp., v. Mason*, 18 F.3d 1261, 1267 (5th Cir.1994). "We resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration. . . . [A]rbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Neal*, 918 F.2d at 37 (internal citations omitted). *See also AT & T Technologies Inc. v. Communications Workers of America*, 475 U.S. at 643, 650 (1986).

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

### A.    This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA.

17.    Debtor's claims asserted in Counts V, VI, and VII arise under the LPA, which contains an enforceable and broadly worded arbitration provision.  The U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, has already interpreted arbitration provisions with identical scope language (and near-identical scope language) to the Arbitration Provision under the LPA, to be valid

CORE/3522697.0002/169124890

and binding.  *See In re Acis Cap. Mgmt., L.P.*, 600 B.R. 541, 549-50 (Bankr. N.D. Tex. 2019).[15]

Importantly, the court made clear that "it would seem to be beyond peradventure that [the arbitration

clause] was, at one time, enforceable between the parties, ***with regard to any disputes that arose***

***regarding the agreements***."  *Id.* at 552 (emphasis added); *see also id.* at 557 (emphasis added)

("there were valid arbitration agreements ***that applied to all disputes*** arising out of the [agreements

at issue].").  Accordingly, the court concluded that all claims at issue, including claims for declaratory

judgment, fell within the scope of the relevant arbitration clauses.  *See id.* at 558.

18.     The Arbitration Provision here also covers any "unresolved legal dispute between the

parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other

representatives that involves legal rights or remedies ***arising from this Agreement***."  LPA, Section

6.14 (emphasis added).  Such broad language is sufficient to reach collateral matters, including the

oral agreement between the parties which involves legal rights arising from LPA.[16]  *Buell Door Co.*

---

[15]     The Court's decision provides the relevant arbitration clause language.  The arbitration clause at
Section 16(f) of the Sub-Advisory Agreement states:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective
> officers, directors, partners, employees, agents, affiliates or other representatives that involves legal
> rights or remedies ***arising from*** this Agreement, the parties agree to submit their dispute to binding
> arbitration under the authority of the Federal Arbitration Act. . . .

*In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 550 (emphasis added).

[16] It is important to note that the particular language "arising from" is significant in determining that the
Arbitration Provision here is broad.  The Fifth Circuit and Texas District Courts have specifically determined
that only the phrase "arising under" indicates a narrow arbitration clause, rather than broad. This Court has
held:

> upon reviewing the above referenced Fifth Circuit cases, the court concludes that the phrase
> "arising out of" and similar language constitute "broad" arbitration clauses. *Accord Morphis
> v. Federal Home Loan Mortgage Corp.*, No. 3:02–CV–0210–P, 2002 WL 1461930, *3–4
> (N.D.Tex. July 3, 2002) (provision that "any and all disputes between [the parties]," with no
> limiting clause constituted a broad clause).  On the other hand, the phrase "arising under"
> indicates a "narrow" arbitration clause.  *See Mediterranean Enterprises, Inc. v. Ssangyong
> Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983) (the term "arising under" is relatively narrow)
> (citation omitted).

CORE/3522697.0002/169124890

*v. Architectural Sys., Inc.*, No. 3:02-CV-721-AH, 2002 WL 1968223, at *6 (N.D. Tex. Aug. 20, 2002) (concluding that the phrase "arising out of" and similar language constitute "broad" arbitration clauses); *see also Elkjer*, 8 F. Supp. at 855 (concluding that the arbitration clause which uses the phrase "arising under or in connection with this [Partnership] Agreement," is "broad [and] capable of expansive reach" to include statutory claims). "Broad arbitration clauses are not limited to claims which literally 'arise under [a] contract,' but rather embrace all disputes between the parties ***having a significant relationship*** to the contract regardless of their label." *Id.* at *4 (citing *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164–65 (5th Cir. 1998) (emphasis added) (internal citations omitted).

19.     In the Fifth Circuit, a "broadly construed arbitration provision may encompass claims arising under a separate agreement." *See, e.g., Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 393–94 (5th Cir. 2002) (holding that an arbitration provision, which covered "any and all claims. . . arising out of or relating to" an agreement, applied to claims arising under a separate agreement); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 38 (5th Cir. 1990) (holding that an arbitration provision encompassing "any and all disputes between [the parties] . . . reach[ed] all aspects of the parties' relationship," including claims arising under a separate agreement); *see also I.D.E.A. Corp. v. WC & R Ints., Inc.*, 545 F. Supp. 2d 600, 606 (W.D. Tex. 2008) (noting a broad arbitration provision may encompass claims arising under a separate agreement). Accordingly, the Arbitration Provision covers all of the claims regardless if the arise under the LPA or the separate Notes because the authority to enter into the Notes arises from the LPA which reaches all aspects of the parties' relationship.

---

*Buell Door Co.*, 2002 WL 1968223, at *6. Here, the "arising from" language of the Arbitration Provision is similar to "arising of out" and is therefore broad.

20.     Here, the LPA choice of law provision, Section 6.1, provides the "Agreement shall be construed in accordance with and governed by the laws of the state of Delaware. . . ."  As a result, Delaware state contract law determines whether the LPA includes a valid agreement to arbitrate. Delaware arbitration law mirrors federal law in that "public policy of Delaware favors arbitration." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006) (citations omitted).  Even Debtor's rejection of the LPA does not absolve Debtor of its obligation to arbitrate.  It is well established that the "rejection of a contract, or even breach of it, will not void an arbitration clause. . . . Any different conclusion would allow a party to avoid arbitration at will simply by breaching [or rejecting] the contract."  *Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos, Inc.)*, 325 B.R. 687, 693-94 (Bankr. D. Del. 2005) (citations omitted).

21.     Moreover, any question about the scope of the arbitration agreement, including the arbitrability of any particular claim, is for the arbitrator.  Under the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute. . . , so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted).  The Fifth Circuit provides an in-depth explanation of who decides what issues when a contract includes an arbitration provision. *See Kubala v. Supreme Production Services, Inc.*, 830 F.3d 199 (5th Cir. 2016).

22.     Incorporating rules from an arbitration service provider that themselves delegate the question of arbitrability to the arbitrator clearly and unmistakably expresses the parties' intent to leave the question of arbitrability to the arbitrator. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012).  Here, the Arbitration Provision provides that the "arbitration

CORE/3522697.0002/169124890

will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award."  The rules of the American Arbitration Association provide that the arbitrator is to decide questions of arbitrability.  AAA Commercial Arbitration Rule 7(a).  Because the parties' arbitration delegates decision-making to the arbitrators, where the parties entered an agreement to arbitrate, questions of scope and arbitrability should be left to the arbitrator.

### B.   The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA.

23.     Under the LPA, the Court must compel arbitration on Counts V, VI, and VII of the Amended Complaint, because all of the claims are non-core claims arising from the rights and obligations under the LPA.  Bankruptcy courts have no discretion to refuse to compel the arbitration of non-core matters.  *See, e.g., Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*, No. CV H-14-2086, 2015 WL 9302843, at *7 (S.D. Tex. Dec. 18, 2015) (citation omitted) (quoting "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings").  More specifically, under Fifth Circuit precedent, a bankruptcy court only has discretion to refuse to compel arbitration of an arbitrable claim where: (1) "the proceeding derives exclusively from the provisions of the bankruptcy code;" and (2) "arbitration of the proceeding would conflict with the purposes of [the bankruptcy code]."  *See Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)*; see also Zimmerli v. Ocwen Loan Servicing, LLC*, 432 B.R. 238, 242 (Bankr. N.D. Tex. 2010).  "Importantly, however, '***a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings*** under 28 U.S.C. § 157(b)."  *In re Cain*, 585 B.R. 127, 134–35 (Bankr. S.D. Miss. 2018) (emphasis added) (citation omitted) (stating "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings.");  *In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 560 (in the *Acis* case—unlike here—the

CORE/3522697.0002/169124890

claims at issue were "an integral part of determining . . . proofs of claim," resulting in the court

denying the motion to compel arbitration).

24.    For claims that are "derivative of the pre-petition legal or equitable rights possessed

by a debtor" it is beyond dispute that "it is 'universally accepted' that such issues are arbitrable." *In*

*re Cain*, 585 B.R. at 137 (citing *Nat'l Gypsum Co.*, 118 F.3d at 1066, 1069).  In other words, for non-

core proceedings, a court "must give effect to the terms of any applicable arbitration clauses." *In re*

*Daisytek, Inc.*, 323 B.R. 180, 188 (N.D. Tex. 2005).

> ### 1.    The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA.

25.    Debtor's declaratory relief claim simply seeks declarations concerning the extent of

limited partner (including Dugaboy's) authority under the LPA, including authority to enter into the

Alleged Agreement on behalf of the Partnership.[17]  This is a legal dispute arising from LPA, a pre-

petition contract, thus coming within the Arbitration Provision and governed by state contract law.

Courts generally agree that claims for declaratory judgment which could also exist outside of

bankruptcy are non-core proceedings.[18]  *See, e.g., In re OCA, Inc.*, 410 B.R. 443, 450 (E.D. La.

2007)("That the doctors' claims are for breach of contract, breach of fiduciary duty and declaratory

relief, and are entirely based on state law, supports a finding that they are noncore claims.")

---

[17] *See Amended Complaint* [Adv. No. 21-03006, Dkt. No. 68 at ¶¶ 81-84].

[18] *See also In re Temecula Valley Bancorp, Inc.*, 523 B.R. 210, 222–23 (C.D. Cal. 2014)("That court found a trustee's claim for declaratory relief as to the ownership of similar tax refunds non-core because it was a "dispute between private parties" and arose out of a pre-bankruptcy tax sharing agreement governed by state contract law); *see also In re SFD @ Hollywood, LLC*, 414 B.R. 794, 797 (Bankr. S.D. Fla. 2009)("This proceeding [for declaratory judgment] could also exist outside of bankruptcy. Accordingly, this is a non-core proceeding in which the Court cannot enter a final order, absent consent of the district court and the parties."); see also *Sunterra Corp. v. Perini Bldg. Co.*, No. 204CV00784MCEEFB, 2008 WL 11512082, at *4 (E.D. Cal. June 12, 2008)("The new causes of action--strict liability, negligence, breach of contract, professional negligence, and declaratory relief--would also exist independently of bankruptcy laws and are similarly "non-core" proceedings.").

26.     Therefore, the Court lacks discretion to refuse to compel arbitration on Count V

asserting Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against

Dugaboy.  *Webb v. Investacorp, Inc.*, 89 F.3d 252, 260 (5th Cir. 1996) (district court did not abuse

discretion in refusing to consider plaintiffs' request for declaratory relief where order granting

defendant's motion to compel arbitration disposed of same issues raised in declaratory judgment

action); *see also Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,

No. A-09-CA-351 LY, 2009 WL 10699390, at *8 (W.D. Tex. July 30, 2009) (finding action seeking

declaratory relief arbitrable); *see also Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication

Sys., Inc.*, No. 17 C 2066, 2017 WL 2720433, at *4 (N.D. Ill. June 23, 2017) (stating that permitting

a party to obtain declaratory relief from a court when there is a valid arbitration agreement is

"essentially the same relief as that otherwise reserved for the arbitrator. It would make little sense to

include such an expansive loophole in what is otherwise a sweeping arbitration provision.").

### **2.     The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA.**

27.     Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding

and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero for entering into

the Alleged Agreement, must be arbitrated because they are non-core claims that arise under the LPA.

It is well established that state law claims, such as breach of fiduciary duty and aiding and abetting

breach of fiduciary duty, are non-core claims.  *See, e.g., In re Dune Energy, Inc.*, 575 B.R. 716, 729

(Bankr. W.D. Tex. 2017) ("Courts within the Fifth Circuit have consistently found that post-

confirmation suits by plan trustees based on state law claims are only within the 'related to' (and not

'core') bankruptcy jurisdiction of a federal court."); *see also Brickley for CryptoMetrics, Inc.

Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 829–30 (W.D. Tex. 2017)

CORE/3522697.0002/169124890

(stating post-confirmation claims for breach of fiduciary duty and state law claims are "related to" claims); *see also Mirant Corp. v. The S. Co.*, 337 B.R. 107, 120 (N.D. Tex. 2006).

28.    The breach of fiduciary duty claims under Count VI and aiding and abetting breach of fiduciary duty under Count VII are—and by their own terms—premised on Dugaboy's authority to bind the Debtor under the LPA.[19]   The Debtor challenges whether the LPA affords the right to Dugaboy to approve such compensation, thus, any evaluation of the breach of fiduciary duty-related claims must first entail an analysis of the LPA, making construction of the LPA – the agreement containing the arbitration clause, a predicate to the analysis of the breach of fiduciary duty claims. Thus, Counts VI and VII involve unresolved legal disputes between the parties—including the Debtor and Mr. Dondero, Nancy Dondero, and Dugaboy, who are all parties and/or officers/directors/partners/employees/agents/affiliates/representatives of a General or Limited Partner—concerning legal duties to the Partnership that would not exist outside of the LPA.

29.    The Fifth Circuit makes clear that where, as here, the breach of fiduciary duty (or aiding and abetting fiduciary duty) claim is interwoven with the partnership agreement containing an arbitration clause, the fiduciary claims will be subject to arbitration.  *See Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 732 (E.D. Tex. 2001), *aff'd sub nom. Coffman v. Provost Umphrey LLP*, 33 Fed. Appx. 705 (5th Cir. 2002) ("Even if it is conceivable that Plaintiff could maintain a claim for breach of fiduciary duty without the Partnership Agreements, that alone is not sufficient grounds for concluding that the claim is not within the scope of the arbitration clause . . . the Partnership Agreements will determine whether a fiduciary duty was breached—whether that

---

[19] *See Amended Complaint* [Adv. No. 21-03006, Dkt. No. 68 at ¶ 87] ("*If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty* of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor."); *id.* ¶¶ 90-91 (the Donderos "were aware that Dugaboy would have fiduciary duties to the Debtor *if it acted to bind the Debtor*," and the Donderos "aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly *participating in the authorization of the purported Alleged Agreement*.")

duty arises from the common law or from the contract itself. . . . For these reasons, the court finds Plaintiff's breach of fiduciary duty claim to be subject to arbitration."); *see also Omni Pinnacle, LLC v. ECC Operating Services. Inc.*, 255 F. App'x 24, 25-26 (5th Cir. 2007) (internal quotation marks omitted) ("A dispute arises out of or relates to a contract if the legal claim underlying the dispute could not be maintained without reference to the contract.").

30.     Because breach of fiduciary duty and aiding and abetting breach of fiduciary duty are non-core state-law claims that could exist outside of bankruptcy, the reviewing court lacks discretion to refuse enforcement of an otherwise-applicable arbitration agreement as to these claims. *See In re McCollum*, 621 B.R. 655, 659 (Bankr. N.D. Miss. 2020) (finding that breaching its fiduciary duty "is a state law contract claim which arose prepetition, could exist outside the bankruptcy case, and is tangential to the bankruptcy case. It does not invoke a substantive right created by bankruptcy law and is a non-core claim."); *In re Gaughf*, 19-50947-KMS, 2020 WL 1271595, at *4 (Bankr. S.D. Miss. Mar. 12, 2020) ("Aiding and Abetting Count is non-core."). Additionally, claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty do not reference the Bankruptcy Code or any right conferred by the Code. *See In re McCollum*, 621 B.R. at 659. Therefore, the Court lacks discretion to refuse to compel arbitration on Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero.

31.     That Nancy Dondero is not personally a party to the LPA does not impair her right to enforce the arbitration agreement it contains. Debtor alleges misconduct by her and a signatory to the LPA relating to fiduciary duties Debtor alleges arise out of the LPA. There are two circumstances under which a nonsignatory can compel arbitration: (1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory; or (2) when the signatory to the contract containing an arbitration clause

CORE/3522697.0002/169124890

raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002). Both circumstances are implicated by Debtor's allegations against Nancy Dondero.

32.    First, non-signatories are entitled to invoke an arbitration agreement when the claim against the non-signatory arises from the contract with an arbitration provision. *See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (citing *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000))("[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory."); *see also Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*, 870 F. Supp. 2d 441, 450–51 (S.D. Tex. 2012) (citing *Grigson,* 210 F.3d at 527). Because Debtor charges Nancy Dondero with breaching fiduciary duties (and aiding and abetting breaches of such duties) that arise out of the LPA, she falls precisely within the ambit of cases like *Bridas,* and *Grigson* and *Amegy.*

33.    Second, when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract—here the allegations are made against Nancy Dondero (a non-signatory) and Dugaboy (a signatory) to the LPA—the non-signatory may compel arbitration on the claims. *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 349 (5th Cir. 2002) (affirming that "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory."); *see also Grigson*, 210 F.3d at 526 ("a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff").

CORE/3522697.0002/169124890

**C.**     **The Court Should Stay All Claims Pending Arbitration.**

34.     The claims that the Court refers to arbitration must be stayed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3.  *See In re Gandy*, 299 F.3d 489, 494–95 (5th Cir. 2002) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987) ("A court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement").  Further, bankruptcy courts generally do not have discretion to decline to stay, pending arbitration, proceedings involving non-core matters.  *Id.* at 495.  Accordingly, the Court should stay each of the Debtor's claims against Defendants pending arbitration.

35.     Should the Court not refer arbitration on every claim, in the alterative, the Court should stay the entire adversary proceeding pending arbitration.  Permitting any claims to continue herein, while some or all claims are subject to arbitration would be unnecessarily expensive and duplicative. The Court has the inherent power to grant a discretionary stay of a proceeding pending arbitration when there are issues common to the arbitration and the court proceeding and those issues may be decided by the arbitrator.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166 (1936) (stating that the power to stay proceedings is incidental to power "inherent in every court to control disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see also In re Divine Ripe, L.L.C.*, 538 B.R. 300, 309 (Bankr. S.D. Tex. 2015) (same).

## IV.     CONCLUSION

WHEREFORE, for the reasons above, Defendants respectfully request that this Court compel arbitration on Counts V, VI, and VII, and order a stay of the proceedings pending arbitration.

CORE/3522697.0002/169124890

Dated: September 1, 2021                    Respectfully submitted,

                                            */s/Deborah Deitsch-Perez*
                                            Deborah Deitsch-Perez
                                            State Bar No. 24036072
                                            Michael P. Aigen
                                            State Bar No. 24012196
                                            STINSON LLP
                                            3102 Oak Lawn Avenue, Suite 777
                                            Dallas, Texas 75219
                                            (214) 560-2201 telephone
                                            (214) 560-2203 facsimile
                                            Email: deborah.deitschperez@stinson.com
                                            Email: michael.aigen@stinson.com

                                            **ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND
                                            NANCY DONDERO**

                                            Douglas S. Draper (La. Bar No. 5073)
                                            Leslie A. Collins (La. Bar No. 14891)
                                            Greta M. Brouphy (La. Bar No. 26216)
                                            HELLER, DRAPER & HORN, L.L.C.
                                            650 Poydras Street, Suite 2500
                                            New Orleans, LA 70130
                                            (504) 299-3300 telephone
                                            (504) 299-3399 facsimile
                                            Email: ddraper@hellerdraper.com
                                            Email: lcollins@hellerdraper.com
                                            Email: gbrouphy@hellerdraper.com

                                            **ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

                                            Daniel P. Elms
                                            State Bar No. 24002049
                                            GREENBERG TRAURIG, LLP
                                            2200 Ross Avenue, Suite 5200
                                            Dallas, Texas 75201
                                            (214) 665-3600 telephone
                                            (214) 665-3601 facsimile
                                            Email: elmsd@gtlaw.com

                                            **ATTORNEYS FOR NANCY DONDERO**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/169124890

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO AND
NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR THE DUGABOY INVESTMENT
TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT** | § | |
| **REAL ESTATE PARTNERS, LLC), JAMES** | § | |
| **DONDERO, NANCY DONDERO, AND** | § | |
| **DUGABOY INVESTMENT TRUST** | § | |
| | § | |
| Defendants. | § | |

CORE/3522697.0002/169126194

APP 265

# TABLE OF CONTENTS

I.    STATEMENT OF FACTS ............................................................................................ 1

II.   STANDARD OF REVIEW ........................................................................................... 7

III.  ARGUMENT ................................................................................................................ 8

    A.   This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA. .................................................................................. 10

    B.   The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA. ................................................................................. 13

        1.   The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA. ........................................................................................................... 14

        2.   The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA. ............................................................................................................... 15

    C.   The Court Should Stay All Claims Pending Arbitration. ............................................ 19

IV.   CONCLUSION .............................................................................................................. 19

CORE/3522697.0002/169126194

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Acis Cap. Mgmt., L.P.*,
    600 B.R. 541 (Bankr. N.D. Tex. 2019) ............................................................... 10, 14

*Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*,
    870 F. Supp. 2d 441 (S.D. Tex. 2012) ...................................................................... 18

*Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,
    No. A-09-CA-351 LY, 2009 WL 10699390 (W.D. Tex. July 30, 2009) ................................... 15

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*,
    566 B.R. 815 (W.D. Tex. 2017) ............................................................................ 16

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    345 F.3d 347 (5th Cir. 2003) .............................................................................. 18

*Buell Door Co. v. Architectural Sys., Inc.*,
    No. 3:02-CV-721-AH, 2002 WL 1968223 (N.D. Tex. Aug. 20, 2002) ............................... 10, 11

*In re Cain*,
    585 B.R. 127 (Bankr. S.D. Miss. 2018) ..................................................................... 14

*Coffman v. Provost Umphrey LLP*,
    33 Fed. Appx. 705 (5th Cir. 2002) ......................................................................... 16

*In re Daisytek, Inc.*,
    323 B.R. 180 (N.D. Tex. 2005) ............................................................................ 14

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) ..................................................................................... 8, 9

*In re Divine Ripe, L.L.C.*,
    538 B.R. 300 (Bankr. S.D. Tex. 2015) ..................................................................... 19

*In re Dune Energy, Inc.*,
    575 B.R. 716 (Bankr. W.D. Tex. 2017) .................................................................... 15

*Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*,
    No. CV H-14-2086, 2015 WL 9302843 (S.D. Tex. Dec. 18, 2015) .................................... 13

*Elkjer v. Scheef & Stone, L.L.P.*,
    8 F. Supp. 3d 845 (N.D. Tex. 2014) ..................................................................... 8, 11

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ..................................................................................... 7, 12

CORE/3522697.0002/169126194

*Fleetwood Enterprises, Inc. v. Gaskamp*,
   280 F.3d 1069 (5th Cir. 2002) ................................................................................. 7

*In re Gandy*,
   299 F.3d 489 (5th Cir. 2002) .................................................................................. 19

*In re Gaughf*,
   19-50947-KMS, 2020 WL 1271595 (Bankr. S.D. Miss. Mar. 12, 2020) .................. 17

*Grant v. Houser*,
   469 Fed. Appx. 310 (5th Cir.2012) ......................................................................... 9

*Graves v. BP Am., Inc.*,
   568 F.3d 221 (5th Cir. 2009) .................................................................................. 8

*Grigson v. Creative Artists Agency L.L.C.*,
   210 F.3d 524 (5th Cir. 2000) ........................................................................... 18, 19

*Henry v. Cash Biz, LP*,
   551 S.W.3d 111 (Tex. 2018) ............................................................................... 8, 9

*Hill v. G E Power Sys., Inc.*,
   282 F.3d 343 (5th Cir. 2002) ................................................................................ 18

*I.D.E.A. Corp. v. WC & R Ints., Inc.*,
   545 F. Supp. 2d 600 (W.D. Tex. 2008) ................................................................ 11

*Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication Sys., Inc.*,
   No. 17 C 2066, 2017 WL 2720433 (N.D. Ill. June 23, 2017) ................................. 15

*James & Jackson, LLC v. Willie Gary, LLC*,
   906 A.2d 76 (Del. 2006) ........................................................................................ 12

*Kubala v. Supreme Production Services, Inc.*,
   830 F.3d 199 (5th Cir. 2016) ................................................................................ 12

*Landis v. N. Am. Co.*,
   299 U.S. 248, 57 S. Ct. 163 (1936) ...................................................................... 19

*Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos., Inc.)*,
   325 B.R. 687 (Bankr. D. Del. 2005) ...................................................................... 12

*In re McCollum*,
   621 B.R. 655 (Bankr. N.D. Miss. 2020) ................................................................ 17

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir.1983) ............................................................................... 11

*Mirant Corp. v. The S. Co.*,
   337 B.R. 107 (N.D. Tex. 2006) ............................................................................. 16

iv

*Morphis v. Federal Home Loan Mortgage Corp.*,
No. 3:02–CV–0210–P, 2002 WL 1461930 (N.D.Tex. July 3, 2002)...........................................11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ....................................................................................................................8, 9

*Matter of Nat'l Gypsum Co.*,
118 F.3d 1056 (5th Cir. 1997)...........................................................................................13, 14

*Neal v. Hardee's Food Sys., Inc.*,
918 F.2d 34 (5th Cir. 1990) ........................................................................................................11

*In re OCA, Inc.*,
410 B.R. 443 (E.D. La. 2007) ...................................................................................................14

*Omni Pinnacle, LLC v. ECC Operating Services. Inc.*,
255 F. App'x 24 (5th Cir. 2007) ..............................................................................................17

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
139 F.3d 1061 (5th Cir. 1998) ...................................................................................................9

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*,
297 F.3d 388 (5th Cir. 2002)....................................................................................................11

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
687 F.3d 671 (5th Cir. 2012) ....................................................................................................13

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) .....................................................................................................................12

*Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re Sedco, Inc.)*,
767 F.2d 1140 (5th Cir.1985)......................................................................................................9

*Sherer v. Green Tree Serv., LLC*,
548 F.3d 379 (5th Cir. 2008)......................................................................................................7

*Sunterra Corp. v. Perini Bldg. Co.*,
No. 204CV00784MCEEFB, 2008 WL 11512082 (E.D. Cal. June 12, 2008) ...........................14

*In re Temecula Valley Bancorp, Inc.*,
523 B.R. 210 (C.D. Cal. 2014)...................................................................................................14

*Vallejo v. Garda CL Sw., Inc.*,
948 F. Supp. 2d 720 (S.D. Tex. 2013), aff'd, 559 F. App'x 417 (5th Cir. 2014)...........................9

*Venture Cotton Coop. v. Freeman*,
435 S.W.3d 222 (Tex. 2014) .......................................................................................................7

*Webb v. Investacorp, Inc.*,
89 F.3d 252 (5th Cir. 1996) ......................................................................................................15

v

*Westmoreland v. Sadoux*,
    299 F.3d 462 (5th Cir. 2002) ............................................................................... 18

*Zimmerli v. Ocwen Loan Servicing, LLC*,
    432 B.R. 238 (Bankr. N.D. Tex. 2010) ............................................................... 13

**Statutes**

9 U.S.C. § 3 ...................................................................................................... 8, 19

9 U.S.C. § 4 .......................................................................................................... 8

11 U.S.C. § 105(a) ........................................................................................... 6, 15

11 U.S.C. § 542(b) ............................................................................................... 5

28 U.S.C. § 157(b) ............................................................................................. 14

Fed. R. Bankr. P. 7001 ................................................................................... 6, 15

AAA Commercial Arbitration Rule 7(a) ............................................................ 13

CORE/3522697.0002/169126194

## MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

Defendants James D. Dondero, Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy") (the "Defendants") move this Court for an order to stay this adversary proceeding and refer the parties to arbitration, and in further support state the following:

## I.    STATEMENT OF FACTS

1.    On December 24, 2015, Mr. Dondero, on behalf of Strand Advisors, Inc., and Nancy Dondero, on behalf of Dugaboy, executed the Fourth Amended and Restated Agreement (the "LPA") of Limited Partnership of Highland Capital Management, L.P. ("HCM").[1]  Section 6.14 of the LPA provides for Mandatory Arbitration in the event of a legal dispute between the parties arising from the agreement ("Arbitration Provision").  Section 6.14 specifically states:

> **6.14. Mandatory Arbitration**. In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.

The Arbitration Provision specifically governs the discovery process for arbitration, the authority of the arbitrators, and the costs of arbitration.[2]

---

[1] The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. Declaration of Michael P Aigen dated August 30, 2021 ("Aigen Dec.") at Ex. 1. The signatories to it are: (1) General Partner, Strand Advisors, Inc., a Delaware corporation by James D. Dondero, President; (2) Limited Partner, The Dugaboy Investment Trust by Nancy M. Dondero, its Trustee; (3) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #1 by Lawrence Tonomura, its Trustee; (4) Limited Partner, The Mark and Pamela Okada Family Trust- Exempt #2 by Lawrence Tonomura, its Trustee; (5) Limited Partner, Mark K. Okada; and (6) Limited Partner, Hunter Mountain Investment Trust by John Honis, the President of Beacon Mountain 1 LC, Administrator.

[2] *See* LPA Section 6.14, which states:

CORE/3522697.0002/169126194

2.       From 2013 to 2017, HCRE executed a series of demand Notes in favor of the Debtor

(the "Notes").  The authority to execute promissory note in favor of the Debtor arises from Article 4

of the LPA because a General Partner has full authority to conduct the business, which includes

lending and borrowing money and executing promissory notes.  Article 4 states:

> In addition to the powers now or hereafter granted to a general partner of a limited
> partnership under applicable law or that are granted to the General Partner under
> any provision of this Agreement, the General Partner shall have full power and
> authority to do all things deemed necessary or desirable by it to conduct the
> business of the Partnership, including, without limitation:
> . . . .
>
> (ii) the performance of any and all acts necessary or appropriate to the operation
> of any business of the Partnership (including, without limitation. purchasing and
> selling any asset, any debt instruments, any equity interests, any commercial paper,
> any note receivables and any other obligations);
> . . . .
>
> (vi) the making of any expenditures, the borrowing of money, the guaranteeing of
> indebtedness and other liabilities, the issuance of evidences of indebtedness, and
> the incurrence of any obligations it deems necessary or advisable for the conduct
> of the activities of the Partnership, including, without limitation, the payment of
> compensation and reimbursement to the General Partner and its Affiliates pursuant
> to Section 3.1;
> . . . .
>
> (vii) the use of the assets of the Partnership (including, without limitation, cash on
> hand) for any Partnership purpose on any terms it sees fit, including, without
> limitation, the financing of operations of the Partnership, the lending of funds to
> other Persons, and the repayment of obligations.

---

The discovery process shall be limited to the following: Each side shall be permitted no more
than (i) two party depositions of six hours each, each deposition to be taken pursuant to the
Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five
interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in
response, the producing party shall not be obligated to produce in excess of 5,000 total pages
of documents, including electronic documents); and (vi) one request for disclosure pursuant
to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this
paragraph, whether to parties or non-parties, shall not be permitted. . . . . Each party shall bear
its own attorney's fees, costs and expenses, including any costs of experts, witnesses and /or
travel, subject to a final arbitration award on who should bear costs and fees. The duty to
arbitrate described above shall survive the termination of this Agreement.

3.      In addition, the LPA provides authority for partners to lend money to their Affiliates.

Section 4(e) specifically provides:

> The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine: provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

In addition, Section 3.9(f) of the LPA allows for the partnership to make tax loans to the Founding Partners:

> The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

4.      Debtor demanded payment on the Notes and subsequently filed an adversary proceedings seeking collection, described further below.  One of the affirmative defenses asserted in the adversary proceedings is that Debtor is not entitled to demand payment because, prior to the demands for payment, HCM had agreed that it would not collect the Notes, and that they would be treated as compensation to the Debtor's founder and then-CEO Jim Dondero, if any of certain conditions subsequent were met.[3]  Debtor refers to the agreement as the "Alleged Agreement."  The condition subsequent was the sale of any of HCM's interests in certain portfolio companies (Cornerstone, Trussway and/or MGM) for a greater amount than their cost.[4]

---

[3] *See NexPoint Real Estate Partner, LLC f/k/a HCRE Partners, LLC's First Amended Answer to Plaintiff's Complaint* [Ad. No. 21-03007, Dkt. No. 34 at 8 ¶ 58].

[4] Aigen Dec. Ex. 2, May 28, 2021 Remote Deposition of James Dondero Transcript at 212: 18-25; 213: 1-17.

5.      Under Section 4.1(k) of the LPA, the "salaries or other compensation, if any, of the officers and agents of the Partnership [were to] be fixed from time to time by the General Partner." Additionally, under the LPA, Dugaboy had explicit authorization to approve compensation for Jim Dondero and entities he was affiliated with, and thus bind the Partnership through, LPA in § 3.10(a), which provides in pertinent part:

> (a) Compensation. The General Partner and any *Affiliate* of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

> "*'Majority Interest'* means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."  LPA § 2.1, p.4.

> "*'Class A Limited Partners'* means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A."  LPA § 2.1, p.2.[5]

> The Class A shareholders included Strand Advisors, The Dugaboy Investment Trust, Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark and Pamela Okada Family Trust – Exempt Trust #2.[6]  Dugaboy alone comprised 75% of the Class A shareholders,[7]

> Nancy Dondero was the Family Trustee of the Dugaboy Trust,[8] and had the power to act for Dugaboy in this regard.[9]

After the Notes were entered into, Mr. Dondero asked Dugaboy (via Ms. Dondero) to approve an agreement that the Notes would be forgiven as compensation to Mr. Dondero upon the favorable sale of any or all of the portfolio company interests by HCM, and she did.[10]

---

[5] Aigen Dec. Ex. 1, LPA at Exhibit A thereof).  Exhibit A reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.
[6] Aigen Dec. Ex. 1, LPA at Exhibit A thereof.
[7] *See id.*
[8] Aigen Dec. Ex. 3, *Acceptance of Appointment of Family Trustee*, executed by Nancy Marie Dondero on October 13, 2015.
[9] Aigen Dec. Ex. 4, *Trust Agreement Between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees The Dugaboy Investment*, entered November 15, 2010 at Article 5.2.
[10] Aigen Dec Ex. 2, Remote Deposition of James Dondero Transcript at 176-178.

The General Partner entitled to compensation here is Strand Advisors, Inc.  The LPA Preamble

states in pertinent part:

> "This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.  LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

> "*'Affiliate'* means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term *'control'* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."  LPA § 2.1, p.2.

> "*'Person'* means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity."  LPA § 2.1, p.5.

It is undisputed that Mr. Dondero was an Affiliate of Strand under the LPA's definition.  Thus, Mr.

Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

6.     On January 22, 2021, Highland Capital Management, L.P. ("Debtor" or "Plaintiff"

when describing post-petition actions and HCM when describing pre-petition actions) commenced

Adversary Proceeding No. 21-03007 against HCRE, asserting a state law, non-core breach of contract

claim ("Count I") and an entirely dependent turnover claim under 11 U.S.C. § 542(b) for the amounts

allegedly owed on the Notes ("Count II").

7.     HCRE answered the adversary complaint, asserting, inter alia, that Debtor's claims

should be barred, because prior to the demand for payment HCM agreed it would not collect on the

Notes upon fulfillment of conditions subsequent,[11] based upon what the Debtor refers to as the

"Alleged Agreement."

---

[11] *NexPoint Real Estate Partner, LLC f/k/a HCRE Partners, LLC's First Amended Answer to Plaintiff's Complaint* [Ad. No. 21-03007, Dkt. No. 34 at 8 ¶ 58].
[11] Aigen Dec. Ex. 2, May 28, 2021 Remote Deposition

8.      On August 23, 2021, the Court entered an order permitting Debtor to file its *Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* ("Amended Complaint") asserting additional claims for relief including: Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550 against Mr. Dondero ("Count III"); Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1) against Mr. Dondero ("Count IV"); Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against Dugaboy ("Count V"); Breach of Fiduciary Duty against Dugaboy ("Count VI"); and Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero ("Count VII").  Debtor seeks avoidance of the Alleged Agreement, declaratory relief, and damages.  The Parties agreed that the Defendants would answer or otherwise move against the Amended Complaints on or before September 1, 2021.[12]  The new claims, under Counts V, VI, and VII are non-core contract claims that arise from the LPA, containing a broad arbitration provision.  Further, the Defendants have critical affirmative defenses for the claims for declaratory relief, breach of fiduciary, and aiding and abetting breach of fiduciary duty, that are rooted in non-core state contract law that also arise from the LPA.

9.      Although Debtor alleges that it "believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes,"[13] there is no doubt that adjudication of the existence and enforceability of the Alleged Agreement affects all of Debtor's claims under Counts V, VI, and VII for declaratory relief, breach of fiduciary duty and breach of fiduciary duty.  These claims

---

[12] *See Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* attached as Exhibit C to *Debtor's Unopposed Motion for Leave to Serve and File Amended Complaint* [Adv. No. 21-03007, Dkt. No. 55-2 at Exhibit C] stipulating to August 30, 2021 which has been extended to September 1, 2021 by the parties via email communication.
[13] *Amended Complaint* [Adv. No. 21-03007, Dkt. No. 63 at ¶ 3].

pertain to loans made by the Debtor to its Affiliates and compensation for the Debtor's CEO, all of which are governed by the LPA.[14]

10.    Defendants requests the Court order the parties to arbitration on Counts V, VI, and VII, as provided by the pre-petition LPA entered into by the parties, and stay the adversary proceeding pending arbitration.

## II.    STANDARD OF REVIEW

11.    When deciding whether to grant a motion to compel arbitration, the Fifth Circuit has established a two-step analysis for determining whether parties must arbitrate a particular claim or set of claims under the FAA: (A) there must be an enforceable agreement to arbitrate; and (B) the claims must be arbitrable.  *See Sherer v. Green Tree Serv., LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (citations omitted) (stating "First we must ask if the party has agreed to arbitrate the dispute. . . If so, we then ask if any federal statute or policy renders the claims non-arbitrable."); *Venture Cotton Coop. v. Freeman,* 435 S.W.3d 222, 227 (Tex. 2014) ("A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement.").  Once a party seeking to compel arbitration establishes the asserted claims fall within a valid arbitration agreement, the burden shifts, and the party seeking to avoid arbitration must prove an affirmative defense to the provision's enforcement, such as waiver.  *Venture Cotton Coop.*, 435 S.W.3d at 227.

12.    In applying the first portion of the two-step analysis, state contract law determines whether parties entered into a valid agreement to arbitrate a set of claims.  *See, e.g., Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir. 2002) ("This determination is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'" (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  The second part of determining

---

[14] *See generally* Aigen Dec. Ex. 1, LPA Article 4 and Section 3.10.

whether the parties have agreed to arbitrate—the question of whether the dispute comes within the scope of the agreement—"is answered by applying the federal substantive law of arbitrability." *Graves v. BP Am., Inc.*, 568 F.3d 221, 222-23 (5th Cir. 2009) (citations omitted).

13.    Under both Texas and Federal law, "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, (1983); *see also Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d 171, 174 (Tex. 2002.  In addition, the Supreme Court has declared that the Federal Arbitration Act, "is a strong congressional declaration of a liberal policy favoring arbitration." *See, e.g., Elkjer v. Scheef & Stone, L.L.P.*, 8 F. Supp. 3d 845, 849 (N.D. Tex. 2014) (collecting cases) ("if a valid agreement to arbitrate does exist, the court must observe the strong federal policy favoring arbitration and resolve all ambiguities in favor of arbitration.").

## III.    **ARGUMENT**

14.    This Court should compel arbitration as to Counts V, VI, and VII of the Amended Adversary Complaint because: (1) The claims under Counts V, VI, and VII comprise disputes involving legal rights or remedies arising from the LPA and are governed by an enforceable, and broadly worded, arbitration provision; (2) Counts V, VI, and VII assert noncore claims, and in the Fifth Circuit courts do not have discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings and should compel arbitration of even core claims if they are not integral to the bankruptcy; and (3) federal and state policy strongly favors arbitration.

15.    The Federal Arbitration Act ("FAA") requires district courts to direct parties to arbitrate issues covered by a valid arbitration agreement.  9 U.S.C. §§ 3, 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  "Federal policy strongly favors enforcing

arbitration agreements." *Dean Witter Reynolds*, 470 U.S. at 217; *Moses H. Cone Mem. Hosp*, 460

U.S. at 24. When a party moves to compel arbitration, the FAA requires district courts to order

arbitration of arbitrable claims. *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (In re

Sedco, Inc.)*, 767 F.2d 1140, 1147 (5th Cir.1985). Because of the strong presumption in favor of

arbitration, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its

invalidity." *Vallejo v. Garda CL Sw., Inc.*, 948 F. Supp. 2d 720, 724–25 (S.D. Tex. 2013), aff'd, 559

F. App'x 417 (5th Cir. 2014) (citing *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297

(5th Cir.2004)); *see also Grant v. Houser*, 469 Fed. Appx. 310, 315 (5th Cir.2012) (noting the strong

presumption in favor of arbitration).

16.    "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration, whether the problem at hand is the construction of the contract language itself or an

allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S.

at 24–25; *see also Henry*, 551 S.W.3d at 115 (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d at 174).

The Fifth Circuit resolves doubts concerning the scope of matter covered by an arbitration provision

in favor of referring arbitration. The court states:

> We emphasize that our sole responsibility is to determine whether this dispute is
> governed by an arbitration clause, not to determine the merits of the dispute. *See
> Snap–On Tools Corp., v. Mason*, 18 F.3d 1261, 1267 (5th Cir.1994). "We resolve
> doubts concerning the scope of coverage of an arbitration clause in favor of arbitration.
> . . . [A]rbitration should not be denied 'unless it can be said with positive assurance
> that an arbitration clause is not susceptible of an interpretation which would cover the
> dispute at issue.'" *Neal*, 918 F.2d at 37 (internal citations omitted). *See also AT & T
> Technologies Inc. v. Communications Workers of America*, 475 U.S. at 643, 650
> (1986).

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

**A.**     **This Dispute is Governed by An Enforceable Arbitration Provision Reaching All Legal Rights Arising From the LPA.**

17.     Debtor's claims asserted in Counts V, VI, and VII arise under the LPA, which contains an enforceable and broadly worded arbitration provision. The U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, has already interpreted arbitration provisions with identical scope language (and near-identical scope language) to the Arbitration Provision under the LPA, to be valid and binding. *See In re Acis Cap. Mgmt., L.P.*, 600 B.R. 541, 549-50 (Bankr. N.D. Tex. 2019).[15] Importantly, the court made clear that "it would seem to be beyond peradventure that [the arbitration clause] was, at one time, enforceable between the parties, *with regard to any disputes that arose regarding the agreements*." *Id.* at 552 (emphasis added); *see also id*. at 557 (emphasis added) ("there were valid arbitration agreements *that applied to all disputes* arising out of the [agreements at issue].")). Accordingly, the court concluded that all claims at issue, including claims for declaratory judgment, fell within the scope of the relevant arbitration clauses. *See id.* at 558.

18.     The Arbitration Provision here also covers any "unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies *arising from this Agreement*." LPA, Section 6.14 (emphasis added). Such broad language is sufficient to reach collateral matters, including the oral agreement between the parties which involves legal rights arising from LPA.[16] *Buell Door Co.*

---

[15]     The Court's decision provides the relevant arbitration clause language. The arbitration clause at Section 16(f) of the Sub-Advisory Agreement states:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies *arising from* this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .

*In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 550 (emphasis added).

[16] It is important to note that the particular language "arising from" is significant in determining that the Arbitration Provision here is broad. The Fifth Circuit and Texas District Courts have specifically determined

*v. Architectural Sys., Inc.*, No. 3:02-CV-721-AH, 2002 WL 1968223, at \*6 (N.D. Tex. Aug. 20, 2002) (concluding that the phrase "arising out of" and similar language constitute "broad" arbitration clauses); *see also Elkjer*, 8 F. Supp. at 855 (concluding that the arbitration clause which uses the phrase "arising under or in connection with this [Partnership] Agreement," is "broad [and] capable of expansive reach" to include statutory claims). "Broad arbitration clauses are not limited to claims which literally 'arise under [a] contract,' but rather embrace all disputes between the parties ***having a significant relationship*** to the contract regardless of their label." *Id.* at \*4 (citing *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164–65 (5th Cir.1998) (emphasis added) (internal citations omitted).

19.     In the Fifth Circuit, a "broadly construed arbitration provision may encompass claims arising under a separate agreement." *See, e.g., Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 393–94 (5th Cir. 2002) (holding that an arbitration provision, which covered "any and all claims. . . arising out of or relating to" an agreement, applied to claims arising under a separate agreement); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 38 (5th Cir. 1990) (holding that an arbitration provision encompassing "any and all disputes between [the parties] . . . reach[ed] all aspects of the parties' relationship," including claims arising under a separate agreement); *see also I.D.E.A. Corp. v. WC & R Ints., Inc.*, 545 F. Supp. 2d 600, 606 (W.D. Tex. 2008) (noting a broad arbitration provision

---

that only the phrase "arising under" indicates a narrow arbitration clause, rather than broad. This Court has held:

> upon reviewing the above referenced Fifth Circuit cases, the court concludes that the phrase "arising out of" and similar language constitute "broad" arbitration clauses. *Accord Morphis v. Federal Home Loan Mortgage Corp.*, No. 3:02–CV–0210–P, 2002 WL 1461930, \*3–4 (N.D.Tex. July 3, 2002) (provision that "any and all disputes between [the parties]," with no limiting clause constituted a broad clause). On the other hand, the phrase "arising under" indicates a "narrow" arbitration clause. *See Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983) (the term "arising under" is relatively narrow) (citation omitted).

*Buell Door Co.*, 2002 WL 1968223, at \*6. Here, the "arising from" language of the Arbitration Provision is similar to "arising of out" and is therefore broad.

may encompass claims arising under a separate agreement).  Accordingly, the Arbitration Provision covers all of the claims regardless if the arise under the LPA or the separate Notes because the authority to enter into the Notes arises from the LPA which reaches all aspects of the parties' relationship.

20.     Here, the LPA choice of law provision, Section 6.1, provides the "Agreement shall be construed in accordance with and governed by the laws of the state of Delaware. . . ."  As a result, Delaware state contract law determines whether the LPA includes a valid agreement to arbitrate.  Delaware arbitration law mirrors federal law in that "public policy of Delaware favors arbitration." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006) (citations omitted).  Even Debtor's rejection of the LPA does not absolve Debtor of its obligation to arbitrate.  It is well established that the "rejection of a contract, or even breach of it, will not void an arbitration clause. . . . Any different conclusion would allow a party to avoid arbitration at will simply by breaching [or rejecting] the contract."  *Madison Foods v. Fleming Cos., Inc. (In re Fleming Cos, Inc.)*, 325 B.R. 687, 693-94 (Bankr. D. Del. 2005) (citations omitted).

21.     Moreover, any question about the scope of the arbitration agreement, including the arbitrability of any particular claim, is for the arbitrator.  Under the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute. . . , so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted).  The Fifth Circuit provides an in-depth explanation of who decides what issues when a contract includes an arbitration provision. *See Kubala v. Supreme Production Services, Inc.*, 830 F.3d 199 (5th Cir. 2016).

22.    Incorporating rules from an arbitration service provider that themselves delegate the question of arbitrability to the arbitrator clearly and unmistakably expresses the parties' intent to leave the question of arbitrability to the arbitrator. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Here, the Arbitration Provision provides that the "arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award." The rules of the American Arbitration Association provide that the arbitrator is to decide questions of arbitrability. AAA Commercial Arbitration Rule 7(a). Because the parties' arbitration delegates decision-making to the arbitrators, where the parties entered an agreement to arbitrate, questions of scope and arbitrability should be left to the arbitrator.

### B.    The Claims Asserted In Counts V, VI, and VII Are Arbitrable Because they Are Non-Core and Arise Under the LPA.

23.    Under the LPA, the Court must compel arbitration on Counts V, VI, and VII of the Amended Complaint, because all of the claims are non-core claims arising from the rights and obligations under the LPA. Bankruptcy courts have no discretion to refuse to compel the arbitration of non-core matters. *See, e.g., Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys., Inc.*, No. CV H-14-2086, 2015 WL 9302843, at *7 (S.D. Tex. Dec. 18, 2015) (citation omitted) (quoting "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings"). More specifically, under Fifth Circuit precedent, a bankruptcy court only has discretion to refuse to compel arbitration of an arbitrable claim where: (1) "the proceeding derives exclusively from the provisions of the bankruptcy code;" and (2) "arbitration of the proceeding would conflict with the purposes of [the bankruptcy code]." *See Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)*; see also Zimmerli v. Ocwen Loan Servicing, LLC*, 432 B.R. 238, 242 (Bankr. N.D. Tex. 2010). "Importantly, however, *'a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core'*

*bankruptcy proceedings* under 28 U.S.C. § 157(b)." *In re Cain*, 585 B.R. 127, 134–35 (Bankr. S.D. Miss. 2018) (emphasis added) (citation omitted) (stating "it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings."); *In re Acis Cap. Mgmt., L.P.*, 600 B.R. at 560 (in the *Acis* case—unlike here—the claims at issue were "an integral part of determining . . . proofs of claim," resulting in the court denying the motion to compel arbitration).

24.    For claims that are "derivative of the pre-petition legal or equitable rights possessed by a debtor" it is beyond dispute that "it is 'universally accepted' that such issues are arbitrable." *In re Cain*, 585 B.R. at 137 (citing *Nat'l Gypsum Co.*, 118 F.3d at 1066, 1069). In other words, for non-core proceedings, a court "must give effect to the terms of any applicable arbitration clauses." *In re Daisytek, Inc.*, 323 B.R. 180, 188 (N.D. Tex. 2005).

## 1.    <u>The Court Lacks Discretion To Refuse To Compel Arbitration On Count V Because Debtor's Proposed Declaratory Relief Claim Is A Non-Core Claim Arising From The LPA.</u>

25.    Debtor's declaratory relief claim simply seeks declarations concerning the extent of limited partner (including Dugaboy's) authority under the LPA, including authority to enter into the Alleged Agreement on behalf of the Partnership.[17] This is a legal dispute arising from LPA, a pre-petition contract, thus coming within the Arbitration Provision and governed by state contract law. Courts generally agree that claims for declaratory judgment which could also exist outside of bankruptcy are non-core proceedings.[18] *See, e.g., In re OCA, Inc.*, 410 B.R. 443, 450 (E.D. La.

---

[17] *See Amended Complaint* [Adv. No. 21-03006, Dkt. No. 63 at ¶¶ 83-86].

[18] *See also In re Temecula Valley Bancorp, Inc.*, 523 B.R. 210, 222–23 (C.D. Cal. 2014)("That court found a trustee's claim for declaratory relief as to the ownership of similar tax refunds non-core because it was a "dispute between private parties" and arose out of a pre-bankruptcy tax sharing agreement governed by state contract law); *see also In re SFD @ Hollywood, LLC*, 414 B.R. 794, 797 (Bankr. S.D. Fla. 2009)("This proceeding [for declaratory judgment] could also exist outside of bankruptcy. Accordingly, this is a non-core proceeding in which the Court cannot enter a final order, absent consent of the district court and the parties."); see also *Sunterra Corp. v. Perini Bldg. Co.*, No. 204CV00784MCEEFB, 2008 WL 11512082, at *4 (E.D. Cal. June 12, 2008)("The new causes of action--strict liability, negligence, breach of contract, professional

2007)("That the doctors' claims are for breach of contract, breach of fiduciary duty and declaratory

relief, and are entirely based on state law, supports a finding that they are noncore claims.")

26.     Therefore, the Court lacks discretion to refuse to compel arbitration on Count V

asserting Declaratory Relief pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001 against

Dugaboy.  *Webb v. Investacorp, Inc.*, 89 F.3d 252, 260 (5th Cir. 1996) (district court did not abuse

discretion in refusing to consider plaintiffs' request for declaratory relief where order granting

defendant's motion to compel arbitration disposed of same issues raised in declaratory judgment

action); *see also Austin Cap. Mgmt., Ltd. v. Bd. of Trustees of Texas Iron Workers' Pension Fund*,

No. A-09-CA-351 LY, 2009 WL 10699390, at *8 (W.D. Tex. July 30, 2009) (finding action seeking

declaratory relief arbitrable); *see also Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication

Sys., Inc.*, No. 17 C 2066, 2017 WL 2720433, at *4 (N.D. Ill. June 23, 2017) (stating that permitting

a party to obtain declaratory relief from a court when there is a valid arbitration agreement is

"essentially the same relief as that otherwise reserved for the arbitrator. It would make little sense to

include such an expansive loophole in what is otherwise a sweeping arbitration provision.").

> ## 2. The Court Lacks Discretion To Refuse To Compel Arbitration On Count VI And VII Because Debtor's Proposed Claims Asserting Breach Of Fiduciary Duty And Aiding And Abetting Breach Of Fiduciary Duty Are Non-Core Claims Arising From The LPA.

27.     Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding

and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero for entering into

the Alleged Agreement, must be arbitrated because they are non-core claims that arise under the LPA.

It is well established that state law claims, such as breach of fiduciary duty and aiding and abetting

breach of fiduciary duty, are non-core claims.  *See, e.g., In re Dune Energy, Inc.*, 575 B.R. 716, 729

(Bankr. W.D. Tex. 2017) ("Courts within the Fifth Circuit have consistently found that post-

---

negligence, and declaratory relief--would also exist independently of bankruptcy laws and are similarly "non-core" proceedings.").

confirmation suits by plan trustees based on state law claims are only within the 'related to' (and not 'core') bankruptcy jurisdiction of a federal court."); *see also Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 829–30 (W.D. Tex. 2017) (stating post-confirmation claims for breach of fiduciary duty and state law claims are "related to" claims); *see also Mirant Corp. v. The S. Co.*, 337 B.R. 107, 120 (N.D. Tex. 2006).

28.    The breach of fiduciary duty claims under Count VI and aiding and abetting breach of fiduciary duty under Count VII are—and by their own terms—premised on Dugaboy's authority to bind the Debtor under the LPA.[19]    The Debtor challenges whether the LPA affords the right to Dugaboy to approve such compensation, thus, any evaluation of the breach of fiduciary duty-related claims must first entail an analysis of the LPA, making construction of the LPA – the agreement containing the arbitration clause, a predicate to the analysis of the breach of fiduciary duty claims. Thus, Counts VI and VII involve unresolved legal disputes between the parties—including the Debtor and Mr. Dondero, Nancy Dondero, and Dugaboy, who are all parties and/or officers/directors/partners/employees/agents/affiliates/representatives of a General or Limited Partner—concerning legal duties to the Partnership that would not exist outside of the LPA.

29.    The Fifth Circuit makes clear that where, as here, the breach of fiduciary duty (or aiding and abetting fiduciary duty) claim is interwoven with the partnership agreement containing an arbitration clause, the fiduciary claims will be subject to arbitration.  *See Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 732 (E.D. Tex. 2001), *aff'd sub nom. Coffman v. Provost Umphrey LLP*, 33 Fed. Appx. 705 (5th Cir. 2002) ("Even if it is conceivable that Plaintiff

---

[19] *See Amended Complaint* [Adv. No. 21-03007, Dkt. No. 63 at ¶ 89] ("*If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty* of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor."); *id.* ¶¶ 92-94 (the Donderos "were aware that Dugaboy would have fiduciary duties to the Debtor *if it acted to bind the Debtor*," and the Donderos "aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly *participating in the authorization of the purported Alleged Agreement*.")

could maintain a claim for breach of fiduciary duty without the Partnership Agreements, that alone is not sufficient grounds for concluding that the claim is not within the scope of the arbitration clause . . . the Partnership Agreements will determine whether a fiduciary duty was breached—whether that duty arises from the common law or from the contract itself. . . . For these reasons, the court finds Plaintiff's breach of fiduciary duty claim to be subject to arbitration."); *see also Omni Pinnacle, LLC v. ECC Operating Services. Inc.*, 255 F. App'x 24, 25-26 (5th Cir. 2007) (internal quotation marks omitted) ("A dispute arises out of or relates to a contract if the legal claim underlying the dispute could not be maintained without reference to the contract.").

30.     Because breach of fiduciary duty and aiding and abetting breach of fiduciary duty are non-core state-law claims that could exist outside of bankruptcy, the reviewing court lacks discretion to refuse enforcement of an otherwise-applicable arbitration agreement as to these claims.  *See In re McCollum*, 621 B.R. 655, 659 (Bankr. N.D. Miss. 2020) (finding that breaching its fiduciary duty "is a state law contract claim which arose prepetition, could exist outside the bankruptcy case, and is tangential to the bankruptcy case.  It does not invoke a substantive right created by bankruptcy law and is a non-core claim."); *In re Gaughf*, 19-50947-KMS, 2020 WL 1271595, at *4 (Bankr. S.D. Miss. Mar. 12, 2020) ("Aiding and Abetting Count is non-core.").  Additionally, claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty do not reference the Bankruptcy Code or any right conferred by the Code.  *See In re McCollum*, 621 B.R. at 659.  Therefore, the Court lacks discretion to refuse to compel arbitration on Count VI asserting Breach of Fiduciary Duty against Dugaboy and Count VII Aiding and Abetting a Breach of Fiduciary Duty against Mr. Dondero and Nancy Dondero.

31.     That Nancy Dondero is not personally a party to the LPA does not impair her right to enforce the arbitration agreement it contains. Debtor alleges misconduct by her and a signatory to the LPA relating to fiduciary duties Debtor alleges arise out of the LPA.  There are two circumstances

under which a nonsignatory can compel arbitration: (1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory; or (2) when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002). Both circumstances are implicated by Debtor's allegations against Nancy Dondero.

32.     First, non-signatories are entitled to invoke an arbitration agreement when the claim against the non-signatory arises from the contract with an arbitration provision. *See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (citing *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000))("[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory."); *see also Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*, 870 F. Supp. 2d 441, 450–51 (S.D. Tex. 2012) (citing *Grigson,* 210 F.3d at 527). Because Debtor charges Nancy Dondero with breaching fiduciary duties (and aiding and abetting breaches of such duties) that arise out of the LPA, she falls precisely within the ambit of cases like *Bridas,* and *Grigson* and *Amegy*.

33.     Second, when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract—here the allegations are made against Nancy Dondero (a non-signatory) and Dugaboy (a signatory) to the LPA—the non-signatory may compel arbitration on the claims. *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 349 (5th Cir. 2002) (affirming that "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.");

*see also Grigson*, 210 F.3d at 526 ("a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff").

**C.**     **The Court Should Stay All Claims Pending Arbitration.**

34.     The claims that the Court refers to arbitration must be stayed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3.  *See In re Gandy*, 299 F.3d 489, 494–95 (5th Cir. 2002) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987) ("A court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement").  Further, bankruptcy courts generally do not have discretion to decline to stay, pending arbitration, proceedings involving non-core matters.  *Id.* at 495.  Accordingly, the Court should stay each of the Debtor's claims against Defendants pending arbitration.

35.     Should the Court not refer arbitration on every claim, in the alterative, the Court should stay the entire adversary proceeding pending arbitration.  Permitting any claims to continue herein, while some or all claims are subject to arbitration would be unnecessarily expensive and duplicative.  The Court has the inherent power to grant a discretionary stay of a proceeding pending arbitration when there are issues common to the arbitration and the court proceeding and those issues may be decided by the arbitrator.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166 (1936) (stating that the power to stay proceedings is incidental to power "inherent in every court to control disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see also In re Divine Ripe, L.L.C.*, 538 B.R. 300, 309 (Bankr. S.D. Tex. 2015) (same).

**IV.     CONCLUSION**

WHEREFORE, for the reasons above, Defendants respectfully request that this Court compel arbitration on Counts V, VI, and VII, and order a stay of the proceedings pending arbitration.

Dated: September 1, 2021

Respectfully submitted,

/s/Deborah Deitsch-Perez
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND
NANCY DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/169126194

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO
AND NANCY DONDERO**

Douglas S. Draper, La. Bar No. 5073
Leslie A. Collins, La. Bar No. 14891
Greta M. Brouphy, La. Bar No. 26216
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR
THE DUGABOY INVESTMENT TRUST**

John Y. Bonds, III
State Bar No. 02589100
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| **v.** | § | **Adversary No. 21-03003-sgj** |
| | § | |
| **JAMES D. DONDERO, NANCY DONDERO,** | § | |
| **AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S
## FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF[1]

---

[1] This Motion to Dismiss is being concurrently filed in Adv. Nos. 21-03003, 21-03007, 21-03006, and 21-03005, Case No. 19-34054-sgj11, as Plaintiff's assertions and Amended Complaints against all Defendants are identical in material respects.

## TABLE OF CONTENTS

**Page**

I.   BACKGROUND ...................................................................................................... 1

    A.   The Bankruptcy and Rejection of Executory Contracts ........................................ 1

    B.   The Limited Partnership Agreement .................................................................... 2

    C.   The Promissory Notes ....................................................................................... 4

    D.   The Adversary Proceedings ................................................................................ 6

II.   STANDARD OF REVIEW .................................................................................... 7

III.   ARGUMENTS AND AUTHORITIES .................................................................... 8

    A.   Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed
        for Two Reasons. ............................................................................................ 8

        1.   Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on
            their Face That There is No Actual Controversy between Parties. ............. 8

        2.   Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon
            an Executory Contract It Rejected. ........................................................... 9

    B.   Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy
        Dondero Fails for Two Reasons. ...................................................................... 13

        1.   Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of
            Exercising Its Right to Approve Compensation. ...................................... 13

        3.   Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty
            Based Upon an Executory Contract It Rejected. ...................................... 16

    C.   Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against
        Jim and Nancy Dondero Fails for Several Reasons. ............................................ 17

        1.   Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of
            Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff.
            ............................................................................................................... 17

        2.   Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because
            Aiding and Abetting Requires More Than One Actor. ............................. 18

        3.   Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and
            Abetting in its Amended Complaint for Either Jim or Nancy Dondero. .. 21

        4.   Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because
            Aiding and Abetting Requires More Than One Single Act. ..................... 23

        5.   Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of
            Fiduciary Duty Claim Based on an Executory Contract It Rejected. ....... 24

IV.   CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
   580 S.W.3d 136 (Tex. 2019), *reh'g denied* (Sept. 6, 2019)...................................24

*In re Alongi*,
   272 B.R. 148 (Bankr. D. Md. 2001) ..............................................................11

*Amaysing Techs. Corp. v. Cyberair Communications, Inc.*,
   2005 WL 578972 (Del. Ch. Mar. 3, 2005).......................................................19

*Ashcroft v. Iqbal*,
   *129 S. Ct. 1937*...................................................................................7

*Matter of Austin Dev. Co*,
   19 F.3d 1077 (5th Cir. 1994) .....................................................................11

*Bell Atlantic Corp v. Twombly*,
   550 U.S. 544 (2007)......................................................................... *passim*

*Bolick v. Alea Group Holdings, Ltd.*,
   278 F. Supp. 2d 278 (D. Conn. 2003).............................................................21

*Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*,
   746 A.2d 842..............................................................................1, 13, 14

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v.*
   *Wachovia Bank of Delaware Nat. Ass'n*,
   CIV. 10-520 JBS KMW, 2011 WL 864421 (D. Del. Mar. 9, 2011) ...............................22, 23

*In re Continental Airlines*,
   981 F.2d 1450 (5th Cir. 1993) ....................................................................11

*Cornell Glasgow, LLC v La Grange Props., LLC*,
   2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ......................................19, 21, 22

*In re Draw Another Circle*,
   602 B.R. 878 (Bankr. D. Del. 2019) ............................................17, 19, 21, 22, 23

*Dunmore v. Chicago Title Ins. Co.*,
   400 S.W.3d 635 (Tex. App. – Dallas 2013, no pet.).........................................15, 16

*Elliott v. Foufas*,
   867 F.2d 877 (5th Cir. 1989) .......................................................................7

ii

*In re Est. of Conaway*,
  2012 WL 524190 (Del. Ch. Feb. 15, 2012) ....................................................13, 14

*In re Estate of Denman*,
  362 S.W.3d 134 (Tex. App. – San Antonio 2011, no pet.).......................................9

*Feeley v. NHAOCG, LLC*,
  62 A.3d 649 (Del. Ch. 2012)................................................................................14

*Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*,
  304 F.3d 476 (5th Cir. 2002) .................................................................................1

*Jones v. Colorado Cas. Ins. Co.*,
  CV 12-1968-PHX-JAT, 2013 WL 4759260 (D. Ariz. Sept. 4, 2013) .....................20

*Keytrade USA, Inc. v. AIN Temouchent M/V*,
  404 F.3d 891 (5th Cir. 2005) ..................................................................................1

*Lauter v. Citgo Petroleum Corp.*,
  CV H-17-2028, 2018 WL 801601 (S.D. Tex. Feb. 8, 2018) .........................9, 11, 12

*Murphey v. Honeycutt*,
  199 S.W.2d 298.......................................................................................................9

*Murphy v. Campbell*,
  964 S.W.2d 265 (Tex. 1997)..................................................................................16

*Muzquiz v. Para Todos, Inc.*,
  624 S.W.3d 263 (Tex. App. – El Paso 2021, pet. filed) ...........................................9

*In re Oracle Corp. Derivative Litig.*,
  CV 2017-0337 WL 3410745 (Del. Ch. June 22, 2020) ..........................................19

*Patton v. Simone*,
  Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) .............18, 19

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005) ..................................................................................7

*In re Rural Metro Corp.*,
  88 A.3d 54 (Del. Ch. 2014)....................................................................................17

*In re Rural Metro Corp. Stocholders Litig.*
  (Del. Ch. 2014) ...............................................................................................17, 18

*Russell-Conaway v. Frederick-Conaway*,
  2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished)..................................13

CORE/3522697.0002/169121218.2

*Strebel v. Wimberly*,
371 S.W.3d 267 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)) ........................14

*Tigani v. Tigani*,
2021 Del. Ch. LEXIS 60, 2021 WL 1197576 (March 30, 2021) ...........................................15

*In re TOCFHBI, Inc.*,
413 B.R. 523 (Bankr. N.D. Tex. 2009)...................................................................................19

*In re USDigital, Inc.*,
443 B.R. 22 (Bankr. D. Del. 2011) ........................................................................................18

*West Fork Advisors LLC v. SunGard Consulting Services, LLC*,
437 S.W.3d 917 (Tex. App.-Dallas 2014) .......................................................................17, 19

*Williams v. Cigna Financial Advisors, Inc.*,
56 F.3d 656 (5th Cir. 1995) ....................................................................................................1

*Young v. Liberty Mut. Group, Inc.*,
CV-12-2302-PHX-JAT, 2013 WL 840618 (D. Ariz. Mar. 6, 2013) ......................................20

## Statutes

11 U.S.C. § 365(a) .........................................................................................................................10

11 U.S.C. § 365(g)(1) ..........................................................................................................10, 11, 12

11 U.S.C. § 365 ..............................................................................................................................10

Del. Code Ann. Tit. 6, § 17-107 ....................................................................................................13

Del. Code Ann. Tit. 6, § 17-303(b)(8)(o) .......................................................................................14

Del. Code Ann. Tit. 6, § 17-1101(d)...............................................................................................13

Del. Code Ann. Tit. 6, § 17-1102 ...................................................................................................12

## Rules

Federal Rule of Civil Procedure 12(b)(6) ............................................................................. passim

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding* "*Rejection*",
   59 U.Colo.L.Rev. 845 (1988) ...............................................................................................11

Restatement (Second) of Torts § 876 (1979)....................................................................17, 18, 19

In the alternative to and contingent upon a denial by the Court of Defendants' Motion to Compel Arbitration (which the Court should not deny), Defendants move to dismiss the Fifth, Sixth, and Seventh Claims for Relief in Plaintiff's Amended Complaint for failure to state claims on which this Court could grant relief under Federal Rule of Civil Procedure 12(b)(6), as incorporated into this adversary proceeding through Rule 7012 of the Federal Rules of Bankruptcy Procedure. In filing this Motion to Dismiss, Defendants do not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration.[2] Defendants show in support as follows:

## I.    BACKGROUND

### A.    The Bankruptcy and Rejection of Executory Contracts

1.    Highland Capital Management, L.P. ("Plaintiff") filed a voluntary Chapter 11 bankruptcy petition ("Bankruptcy Petition") on October 16, 2019 ("Petition Date") in the United States Bankruptcy Court for the District of Delaware, and venue was subsequently transferred to this Court on December 4, 2019.[3] On November 24, 2020, Plaintiff filed its Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan") along with its Disclosure Statement, which the Court approved on November 24, 2020.[4]

2.    On January 11, 2021, Plaintiff filed its Second Notice of Executory Contracts and Unexpired Leases to be Assumed by the Plaintiff [then, Debtor] Pursuant to the Plan (the

---

[2] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).
[3] Order Transferring Venue, Case 19-12239-Css [Doc. 184].
[4] Case No. 19-34054-sgj11 [Doc. 1476]

1

"Assumption Notice").[5]   The Assumption Notice itemized seventy-one (71) executory contracts

to be assumed by the Plaintiff, notably including the Fourth Amended and Restated Agreement of

Limited Partnership of Highland Capital Management, L.P. (the "LPA").   However, on January

21, 2021, the Debtor entered a Withdrawal Notice, rejecting the LPA along with several other

executory contracts,[6] and confirmed on February 1, 2021, that it had withdrawn the LPA from its

list of assumed executory contracts.[7]   On February 22, 2021 (the "Rejection Date"), the Court

confirmed the Plan, causing the rejection of the LPA.[8]

### B.      The Limited Partnership Agreement

3.      James Dondero ("Jim Dondero") is the co-founder of Highland Capital (Plaintiff in

this Adversary Proceeding), and served as its President and CEO until January 9, 2020.[9]   The

Dugaboy Family Trust ("Dugaboy") is one of Debtor's Class A limited partners and holds the

majority of the Debtor's Class A limited partnership interests.   LPA, Exhibit A.   Jim Dondero's

sister Nancy Dondero serves as the Dugaboy Family Trustee.[10]   Jim Dondero is a lifetime

beneficiary of Dugaboy.[11]

4.      Dugaboy's explicit authorization to approve compensation for Jim Dondero - and

thus bind the Partnership - comes specifically from the LPA in § 3.10(a), which provides in

pertinent part:

> (a)   <u>Compensation</u>.      The *General Partner* and any *Affiliate* of the General
> Partner shall receive no compensation from the Partnership for services rendered

---

[5] Case 19-34054-sgj11 [Doc. 1719].
[6] Case 19-34054-sgj11 [Doc. 1791, Schedule A].
[7] Case 19-34054-sgj11 [Doc. 1871].
[8] Case 19-34054-sgj11 [Doc. 1943].
[9] Am. Compl. ¶ 11, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 12, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 12, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 12, Adv. No. 21-03005 [Doc. 63].
[10] Am. Compl. ¶ 13, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 14, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 14, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 14, Adv. No. 21-03005 [Doc. 63].
[11] Am. Compl. ¶ 12, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 13, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 13, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 13, Adv. No. 21-03005 [Doc. 63].

pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

"***'Majority Interest'*** means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners." LPA § 2.1, p.4.

"***'Class A Limited Partners'*** means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A." LPA § 2.1, p.2.

**Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests. LPA, Exhibit A, line 5.[12]

Based on the Compensation provision and definitions, Dugaboy clearly had the right to approve compensation for the General Partner and its Affiliates. The General Partner entitled to compensation here is Strand Advisors, Inc. The LPA Preamble states in pertinent part:

"This [LPA] is entered...by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner. LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

"***'Affiliate'*** means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term ***'control'*** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise." LPA § 2.1, p.2.

"***'Person'*** means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity." LPA § 2.1, p.5.

It is undisputed that Jim Dondero was an Affiliate of Strand under the LPA's definition. It is also undisputed that he controlled Highland Capital Real Estate Partners ("HCRE"), Nexpoint Advisors, L.P. ("Nexpoint"), and Highland Capital Management Services, Inc. ("HCMS").[13]

Thus, Jim Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

---

[12] *See* attached, LPA Exhibit A.
[13] Am. Compl. ¶ 2, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 2, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 2, Adv. No. 21-03005 [Doc. 63].

C.      **The Promissory Notes**

5.      Over the last several years, multiple promissory notes were executed in favor of the

Plaintiff to different entities and individuals, which obligations became subject to potential

forgiveness as compensation for Jim Dondero that, under the LPA, Dugaboy was charged with

approving:

Notes to Jim Dondero (the "Dondero Notes"):

   1.      A note for $3,825,000, executed on February 2, 2018, payable on demand.
   2.      A note for $2,500,000, executed on August 1, 2018, payable on demand.
   3.      A note for $2,500,000, executed on August 13, 2018, payable on demand.[14]

Notes to HCRE (the "HCRE Notes"):

   1.      A note for $100,000, executed on November 27, 2013, payable on demand.
   2.      A note for $2,500,000, executed on October 12, 2017, payable on demand.
   3.      A note for $750,000, executed on October 15, 2018, payable on demand.
   4.      A note for $900,000, executed on September 25, 2019, payable on demand.
   5.      A term note for $6,059,831, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[15]

Notes to HCMS (the "HCMS Notes"):

   1.      A note for $150,000, executed on March 28, 2018, payable on demand.
   2.      A note for $200,000, executed on June 25, 2018, payable on demand.
   3.      A note for $400,000, executed on May 29, 2019, payable on demand.
   4.      A note for $150,000, executed on June 26, 2019, payable on demand.[16]

Note to Nexpoint (the "Nexpoint Note"):

   1.      A term note for $30,746,812.33, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[17]

---

[14] Am. Compl. ¶¶ 20-22, Adv. No. 21-03003, Case No. 19-34054-sgj11 [Doc. 79].
[15] Am. Compl. ¶¶ 21-24, Adv. No. 21-03007, Case No. 19-34054-sgj11 [Doc. 63]; According to its Amended Complaint, Plaintiff alleges in ¶ 63 that it has suffered damages under the note "in the amount of at least $5,012,260.96, as of December 11, 2020," but in ¶ 64 that it has suffered damages "in the amount of at least $6,145,466.84 as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date..."
[16] Am. Compl. ¶¶ 21-24, Adv. No. 21-03006, Case No. 19-34054-sgj11 [Doc. 68].
[17] Am. Compl. ¶ 21, Adv. No. 21-03005, Case No. 19-34054-sgj11 [Doc. 63]; Plaintiff alleges in ¶ 31 that "as of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03," and claims the same amount as damages in ¶ 48.

4

6.      Jim Dondero entered into agreement (the "Subsequent Agreements," or as Plaintiff refers to them, the "Alleged Agreements") with Nancy Dondero (acting for Dugaboy as its Trustee) that Plaintiff would not demand collection of the Notes unless events had occurred that made fulfillment of conditions subsequent impossible.[18]   However, annual term loan payments and annual interest payments on the demand notes were to be (and were) made.[19]

7.      On December 3, 2020, after the bankruptcy Petition Date, Plaintiff demanded payment from Jim Dondero, HCRE, and HCMS on their respective demand notes due by December 11, 2020.[20]   On January 7, 2021, Plaintiff made a demand on the Nexpoint term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $24,471,804.98," and a demand on the HCRE term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $6,145,466.84."[21]   Plaintiff has refused to recognize the Subsequent Agreement, calling it a "fiction."[22]   Other than annual term and interest payments and some voluntary prepayments on the term notes, Defendants have not paid the Notes.[23]

---

[18] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].

[19] *E.g.,* Am. Compl. ¶ 21,27, Adv. No. 21-03005 [Doc. 63], showing the original principal of the note being $30,746,812.33, but Plaintiff only demanding $24,471,804.98 in its demand letter; *E.g.*, Am. Compl. ¶ 37,63,64, Adv. No. 21-03007 [Doc. 63], showing the original principal of the note being $6,059,831, but Plaintiff alleging it was damaged in the amount of at least $5,012,260.96 as of December 11, 2020, but also in the next paragraph inconsistently alleging it was damaged in the amount of at least $6,145,466.84.

[20] Am. Compl. ¶ 26, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 28, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 28, Adv. No. 21-03006 [Doc. 68].

[21] Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63]; Am. Compl. ¶43, Adv. No. 21-03007 [Doc. 63].

[22] Am. Compl. ¶ 3, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 3, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 3, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 3, Adv. No. 21-03005 [Doc. 63].

[23] With respect to the NexPoint term loans, due to a mistake, the 2020 end-of-year payment was late and the notes should be deemed current, Am. Ans. ¶ 40,41, Adv. Pro. 21-03005 [Doc. 50]; Am. Compl. ¶ 28, Adv. No. 21-03005 [Doc. 55-2], acknowledging payment of $1,406,111.92.

CORE/3522697.0002/169121218.2

### D.     The Adversary Proceedings

8.      On January 22, 2021, Plaintiff initiated Adversary Proceedings against Jim Dondero, HCRE, HCMS, and Nexpoint for breach of contract and turnover of property.[24]  On August 17, 2021, Plaintiff filed Amended Complaints against each Defendant alleging additional claims against Jim Dondero and new claims against Dugaboy and Nancy Dondero. Defendants each filed Amended Answers asserting several affirmative defenses, including that the Subsequent Agreements preclude the respective claims.[25]

9.      In the Fifth Claim of each Amended Complaint,[26] Plaintiff asks the Court to declare (a) that limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the LPA, (b) that neither Dugaboy nor Nancy Dondero was  authorized under the LPA to enter into the Subsequent Agreement on behalf of the Partnership, (c) that neither Dugaboy nor Nancy Dondero otherwise had the right or authority to enter into the Subsequent Agreement on behalf of the Partnership, and (d) the Subsequent Agreement is null and void.[27]

10.      In the Sixth Claim of each Amended Complaint,[28] Plaintiff alleges that if Dugaboy, as a limited partner under the LPA, or Nancy Dondero, as the representative of Dugaboy, had the

---

[24] Am. Compl. ¶ 33, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 47, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 45, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 33, Adv. No. 21-03005 [Doc. 63].
[25] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].
[26] Nancy Dondero is a Defendant on Counts V, VI, and VII in Adv. No. 21-03005, Adv. No. 21-3006, and Adv. No. 21-3007.  Nancy Dondero is a Defendant only on Count VII in Adv. No. 21-03003.
[27] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63], Plaintiff alleges against Dugaboy and Nancy Dondero; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].
[28] *See* note 26, *supra*.

6

authority to enter into the Subsequent Agreement on behalf of [Plaintiff], then Dugaboy incurred

a fiduciary duty of care, and breached said duty by entering into the Subsequent Agreement.[29]

11.     In the Seventh Claim of each Amended Complaint, Plaintiff alleges that Jim and

Nancy Dondero were aware that Dugaboy would have fiduciary duties owed to the Plaintiff if

acting to bind the Plaintiff per the authorization in the LPA, and aided and abetted Dugaboy's

breach of its fiduciary duties by knowingly participating in the authorization of the Subsequent

Agreement.[30]

## II.     STANDARD OF REVIEW

12.     An asserted cause of action must be dismissed when the complaint fails to state a

claim. Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), the complaint

must meet two criteria: (1) it must assert a plausible claim, and (2) it must set forth sufficient

factual allegations to support the claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, at 1949-50 (citing *Bell

Atlantic Corp v. Twombly*, 550 U.S. 544 (2007)).  Thus, either a "lack of cognizable legal theory

or the absence of sufficient facts alleged under a cognizable legal theory" requires dismissal.  Id.

The plaintiff must allege specific facts and not conclusory allegations.  *Elliott v. Foufas*, 867 F.2d

877, 881 (5th Cir. 1989).  A court may not strain to find inferences favorable to the plaintiff or

accept conclusory allegations, unwarranted deduction, or legal conclusion.  *R2 Invs. LDC v.

Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

13.     To satisfy *Twombly* and Iqbal, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.*, *Twombly,* at 570.  A

claim has facial plausibility when the plaintiff pleads enough factual content that allows the court

---

[29] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].
[30] Am. Compl. ¶ 79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 93, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 77, Adv. No. 21-03005 [Doc. 63].

to draw the reasonable inference that the defendant is liable under the alleged claim.  *Id*. at 556.

Even if a court decides that the factual allegations are entitled to an assumption of truth, however,

the facts must also "plausibly suggest an entitlement to relief." *Id., Iqbal,* at 1951.

## III.   ARGUMENTS AND AUTHORITIES

### A.   Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed for Two Reasons.

#### 1.   Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on their Face That There is No Actual Controversy between Parties.

14.     Plaintiff's claim presents no "actual controversy" because the provisions of the

LPA clearly allow Dugaboy to bind the Partnership by approving compensation and there is no

controversy that could require a declaration by this Court.

15.     Plaintiff argues that Dugaboy was not authorized to enter into the Subsequent

Agreement regarding Jim Dondero's compensation, nor was it authorized to bind the Partnership.[31]

Plaintiff further attached the LPA as "Exhibit 5" to its Amended Complaints and referenced this

Court to § 4.2, which states:

> Management of Business.     No Limited Partner shall take part in the control
> (within the meaning of the Delaware Act) of the Partnership's business, transact
> any business in the Partnership's name, or have the power to sign documents for or
> otherwise bind the Partnership *other than as specifically set forth in this
> Agreement.*[32] (emphasis added).

16.     Contrary to Plaintiff's argument, the LPA explicitly authorizes Dugaboy as the

Majority Interest to approve compensation for Jim Dondero as previously articulated in this

Motion.  Approving compensation inherently binds the Partnership in that it exchanges money on

behalf of the Partnership for services rendered.  Because it is so expressly provided for in the LPA,

---

[31] *Id.*

[32] Am. Compl. ¶ 43, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 55, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 53, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63].

Plaintiff's contention that Dugaboy could not act to bind the Partnership through compensation agreements amounts to Plaintiff's misinterpretation of the LPA as opposed to an "actual controversy" in need of declaratory relief. This claim is nothing more than Plaintiff's attempt at an end-around to avoid proving the merits of its breach of fiduciary duty claims and essentially asks this Court for an advisory opinion to help Plaintiff do so. Under *Twombly*, Plaintiff's claim for declaratory relief should be dismissed pursuant to Rule 12(b)(6).

### 2. Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon an Executory Contract It Rejected.

17.     There is no authority for "allowing a debtor's estate or a successor-in-interest such as the [creditor's committee or litigation trustee] to pursue claims for post-petition breaches of a rejected contract. Because rejection is an affirmative declaration by the debtor that the estate will not take on the obligations of a prepetition contract made by the debtor, [Plaintiff-Debtor's] rejection of the [LPA] not only relieved the estate of its post-petition performance obligations, but also relieved the estate of its ability to assert claims for post-petition breaches thereof." *Lauter v. Citgo Petroleum Corp.*, CV H-17-2028, 2018 WL 801601, at *15 (S.D. Tex. Feb. 8, 2018). As explained below, as a result, not only does this preclude Debtor's claims for breach of fiduciary duty (see sections B.2., C.5. *infra*), it also precludes Debtor's attempt to obtain declaratory relief.

18.     Plaintiff seeks declaratory relief against Dugaboy and Nancy Dondero to determine if either of them were authorized to enter into the Subsequent Agreement under the LPA.[33] Although most causes of action accrue when an injury results from a wrongful act, a cause of action for declaratory relief differs in that it does not accrue until there is an actual controversy between the parties. *In re Estate of Denman*, 362 S.W.3d 134, 144 (Tex. App. -- San Antonio

---

[33] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

2011, no pet.); *Murphey v. Honeycutt*, 199 S.W.2d 298, 299 (holding that declaratory judgment action accrued in a will construction case at the time when an heir committed an act indicating she was operating against the will, not when the will was executed years prior to the heir's act); *Muzquiz v. Para Todos, Inc.*, 624 S.W.3d 263, 278 (Tex. App. – El Paso 2021, pet. filed) (holding that in a lease dispute, the actual controversy did not arise-- and the claim did not accrue- when the lease was entered into by the parties, but rather when plaintiff challenged the lease terms at a later date).

19.     Here, Plaintiff's declaratory relief claim accrued (if at all) when Jim Dondero asserted the Subsequent Agreement as an affirmative defense.  Plaintiff alleges that the actual controversy here is whether or not Dugaboy or Nancy Dondero had authority to enter into the Subsequent Agreement under the rejected LPA.  Plaintiff specifically pleads that "[a] bona fide, actual, present dispute exists between the [Plaintiff] and Dugaboy concerning whether Dugaboy was authorized to enter into the Alleged Agreement on the [Plaintiff]'s behalf….[and a] judgment declaring the parties' respective rights and obligations will resolve their dispute."[34]  Plaintiff did not allege anywhere in its Original Complaint that a dispute regarding Dugaboy's authority to enter the Subsequent Agreement required declaratory relief.  Only after Defendants filed their Amended Answers did Plaintiff seek such relief in its Amended Complaint.[35]  Therefore, this cause of action for declaratory relief accrued when Plaintiff received Defendant's Amended Answers after the bankruptcy began, as that is when facts came into existence that created an actual controversy under the LPA.

20.     Section 365 of Title 11 of the United States Code (the "Bankruptcy Code") governs the inclusion and exclusion of executory contracts in bankruptcy.  Section 365 vests the power to

---

[34] *Id.*
[35] *Id.*

reject or assume any of the Debtor's executory contracts in the trustee, subject to the court's approval. 11 U.S.C. § 365(a). A debtor's rejection of an executory contract constitutes a breach of such contract immediately before the date of the filing of the [bankruptcy] petition. 11 U.S.C. § 365(g)(1). In this case, Plaintiff's act of rejection resulted in a material breach of the LPA that relates back to October 15, 2019 (the "Breach Date") pursuant to the Bankruptcy Code. *See* 11 U.S.C. § 365(g)(1).

21.    "Rejection is an affirmative declaration that the estate will not take on the obligations of a pre-petition contract made by the debtor" and "places the obligation to perform outside of the bankruptcy administration." *Lauter*, at *13, citing *Matter of Austin Dev. Co*, 19 F.3d 1077, 1082-83 (5th Cir. 1994); *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993). "[R]ejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it." *In re Alongi*, 272 B.R. 148, 153 (Bankr. D. Md. 2001) (citing M. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845 (1988)). As noted above, rejection not only relieves the estate of post-[bankruptcy]petition performance obligations, but also of its ability to assert claims for post-petition breaches thereof. *Lauter,* at *15.

22.    The court in *Lauter* looked to the reasoning of Fifth Circuit opinions examining the effects of plaintiffs rejecting executory contracts under § 365. In *In re Continental*, the court reasoned in part that, under § 365, "An agreement cannot 'exist' for one purpose yet take on a 'nonexistent' quality which works for the advantage of one party or the other" when a debtor-plaintiff sought to avoid paying airline pilots under an executory contract it rejected, attempting to treat the contract as terminated. *Id.* at 1460. Likewise, the court in *Matter of Austin* reasoned that a rejection of a lease under § 365 did not terminate the lease, but moved the rights of the parties

11

affected "outside of the bankruptcy court's realm because after rejection, the debtor's estate is no longer involved in the leasehold transaction." *Id.* at 1083.

23.     Following the Fifth Circuit's application of § 365 in cases such as *In re Continental* and *Matter of Austin*, the court in *Lauter* addressed the impact of a debtor-plaintiff's attempt to pursue post-petition claims against a defendant whose executory contract had been rejected. The court held that just as in any other contract dispute, a prior material breach by a counterparty relieved the aggrieved party of the duty to perform and deprived the breaching party of the ability to make claims for breach after its own breach. *Id.* at *12-13, 15.  After a thorough discussion of § 365, the court ultimately found that the plaintiff lacked standing to pursue claims resulting from a post-petition breach of an executory contract, holding that "the court has not found any authority allowing a debtor's estate . . . to pursue claims for post-petition breaches of a rejected contract." *Id.* at *15.

24.     Here, Plaintiff asks this Court to interpret and, in effect, determine a breach of the same LPA it rejected and breached prior to the bankruptcy petition date.  The LPA was rejected on February 22, 2021 and thus deemed materially breached on October 15, 2019 under § 365(g)(1). Because this cause of action accrued after both rejection and the relation-back breach provision of § 365, Plaintiff's Fifth Claim for declaratory relief amounts to a post-petition claim arising from a rejected executory contract, which the court in *Lauter* held a Debtor lacks standing to assert in a bankruptcy proceeding.  Therefore, this claim should be dismissed pursuant to *Twombly* and Rule 12(b)(6).

**B.    Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy Dondero Fails for Two Reasons.**

    **1.    Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of Exercising Its Right to Approve Compensation.**

25.    Plaintiff alleges that "if Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement…then Dugaboy would owe the [Plaintiff] a fiduciary duty."[36]    The LPA in this case is governed by the Delaware Revised Uniform Limited Partnership Act (the "DRULPA") except as specifically provided for in the LPA.    LPA §§ 1.1,1.2; *see also* Del. Code Ann. Tit. 6, § 17-1102.    The DRULPA allows partnership agreements to expand, restrict, or eliminate fiduciary and other legal or equitable duties, provided it may not eliminate the implied contractual duty of good faith and fair dealing.    Del. Code Ann. Tit. 6, § 17-1101(d).    The DRULPA also specifically permits a partnership agreement to provide the rules for how partners may transact with the partnership.    Del. Code Ann. Tit. 6, § 17-107.

26.    In Delaware, a limited partner does not owe a fiduciary duty as a consequence of exercising a right of the limited partner under the partnership agreement.    *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*, 746 A.2d 842, 864 (Del. Ch. 1999); *In re Est. of Conaway*, 2012 WL 524190, at *3 (Del. Ch. Feb. 15, 2012), *aff'd sub nom. Russell-Conaway v. Frederick-Conaway*, 2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished).

27.    In *Bond Purchase*, a limited partner exercised its right under the limited partnership agreement to obtain records of the owners of the partnership for the purpose of making a tender offer for additional interests in the partnership.    Although the other partners claimed this request for records was a breach of a fiduciary duty, the court held that "in the absence of any provision in the partnership agreement engrafting duties onto [the limited partner]," "[the limited partner]

---

[36] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169121218.2

owes no fiduciary duties," and allowed the limited partner access to the records it sought under the partnership agreement. *Id.* at 864.

28.    In *In re Est. of Conaway*, a limited partner withheld consent to transfer another partner's interest as he was allowed to under the limited partnership agreement.  The receiving party alleged a breach of the non-consenting limited partner's fiduciary duty.  The court held that where the limited partner "merely exercised his contracted-for rights under the terms of the [limited partnership agreement]," the limited partner breached no fiduciary duty, assuming there even was one. *Id.* at *3.

29.    Just as the limited partners in *Bond Purchase* and *In re Est. of Conaway*, Dugaboy was merely exercising its right to approve compensation pursuant to the LPA when it entered into the Subsequent Agreement.  LPA § 3.10(a); § 2.1.  Therefore, Dugaboy owes no fiduciary duty to the Plaintiff as a consequence of simply exercising its right under the LPA.  While a limited partner who takes on an active role in the management of the entity may thereby assume fiduciary duties, *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 662 (Del. Ch. 2012) (citing cases); *Bond Purchase* at 863-64, merely engaging in actions delegated to the limited partner in the partnership agreement does not constitute participating in the control of a business so as to trigger the assumption of fiduciary duties.  Del. Code Ann. Tit. 6, § 17-303(b)(8)(o).

30.    Texas has similarly held that "a limited partner does not participate in the control of the business" by taking certain actions listed in the statutes, and such "actions complained of by the plaintiff did not amount to the types of control that could give rise to a duty to the other limited partners."  *Strebel v. Wimberly,* 371 S.W.3d 267, 280 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)).

31.     Here, Dugaboy did not participate in the control of the business because it was taking actions explicitly extended to it in the LPA by approving compensation under § 3.10(a). LPA § 3.10(a); § 2.1.   Since the LPA explicitly gives Dugaboy the right to approve such compensation, and Dugaboy was not participating in the control of the business, Dugaboy does not owe a fiduciary duty to Plaintiff.   Dugaboy cannot breach a fiduciary duty it does not owe. Further, Nancy Dondero as Trustee owes no fiduciary duty to Plaintiff independently from what Dugaboy owes, as Dugaboy is her principal.   Like Dugaboy, Nancy Dondero cannot breach a fiduciary duty she does not owe.   Under *Twombly*, Plaintiff's claim for breach of fiduciary duty against Dugaboy and Nancy Dondero should be dismissed pursuant to Rule 12(b)(6).

### 2.     Nancy Dondero Owes No Fiduciary Duty to Debtor.

32.     Under Delaware law, a trustee's fiduciary duties of care and loyalty flow to the trust and the beneficiar(ies) of the trust. *Tigani v. Tigani*, 2021 Del. Ch. LEXIS 60, *1, 2021 WL 1197576 (March 30, 2021). A trustee is prohibited from considering her own interests and "all consideration of the interests of third persons." *Id.* at * 38.

33.     Plaintiff claims that if Dugaboy had the authority to enter into the Subsequent Agreement, then Ms. Dondero would then somehow owe a fiduciary duty directly to Plaintiff.   The Amended Complaint does not allege any facts as to why or how such a fiduciary duty would appear, and there is no legal authority to support such a conclusion. As discussed above, not even Dugaboy owed a fiduciary duty to Plaintiff in determining compensation, as Dugaboy was expressly authorized to do under § 3.10(a) of the LPA. Nancy Dondero, individually, is even further removed from owing any duty to Plaintiff, much less a fiduciary duty.   Plaintiff cannot create a legal duty simply by claiming one exists, and its breach of fiduciary duty claim against Nancy Dondero should be dismissed under *Twombly* and Rule 12(b)(6).

### 3. Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty Based Upon an Executory Contract It Rejected.

34.     Plaintiff's Sixth Claim is also barred for the same reasons that discussed in Section A.2 *supra*, and similarly relies on the fact that this cause of action accrued after the LPA was breached on October 15, 2019.  In this case, Plaintiff suffered no legal injury – and no cause of action accrued - until the notes were not paid on demand by December 11, 2020.

35.     Generally, "a cause of action accrues…when facts come into existence that authorize a claimant to seek judicial remedy."  *Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App. – Dallas 2013, no pet.) (citing cases).  "Breach of fiduciary duty claims generally accrue when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act *and* resulting injury."  *Dunmore,* at 641 (emphasis added).  Further, "[t]he general rule governing when a claim accrues…is the 'legal injury rule,' which provides that a claim accrues 'when a wrongful act causes some legal injury, even if that fact of injury is not discovered until later, and even if all damages have not yet occurred.'"  *Id.* (citing *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997)).  "[A] legal injury [is] an injury giving cause of action by reason of its being an invasion of a Plaintiff's right…be the damage however slight."  *Murphy*, at 270.  Although the discussion of when a claim accrues in Texas generally involves application of the discovery rule (which is not applicable to these facts), the concept of "legal injury" is still the cornerstone of an accrual analysis.

36.     Here, Plaintiff alleges that Dugaboy and Nancy Dondero breached a fiduciary duty when it entered into the Subsequent Agreement.[37]  The alleged wrongful act was the Subsequent Agreement itself which Plaintiff alleges breached a fiduciary duty.  However, Plaintiff suffered no

---

[37] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

legal injury from the Subsequent Agreement until Defendant did not pay the Notes when demanded (if it even suffered one at all). The Subsequent Agreement simply made the Notes potentially forgivable upon conditions subsequent, which could not have impacted the alleged value of the Notes until the conditions occurred. As a result, the cause of action did not accrue until December 11, 2020, after the Petition Date. Debtor's rejection of the LPA, the alleged source of the fiduciary duties allegedly breached,[38] therefore bars pursuit of the Plaintiff's Sixth Claim for the same reasons set forth in Section A.2 *supra*.

**C.    Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against Jim and Nancy Dondero Fails for Several Reasons.**

**1.    Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff.**

37.    Plaintiff claims that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by entering into the Subsequent Agreement. However, aiding and abetting is a fundamentally dependent claim that can only succeed if there is a valid underlying breach of fiduciary duty claim. *In re Draw Another Circle*, 602 B.R. 878, 904 (Bankr. D. Del. 2019) (citing Restatement (Second) of Torts § 876 for the proposition "the derivative nature of an aiding and abetting claim will exist only with the success of the breach of fiduciary duty claim"); *West Fork Advisors LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App.-Dallas 2014) (citing Restatement (Second) of Torts § 876(b) (1979)). As previously discussed in Section B.1., Dugaboy did not owe any fiduciary duty to Plaintiff that could have been breached. Therefore, Plaintiff's derivative claim of aiding and abetting against both Jim and Nancy Dondero is legally impossible and should be dismissed under *Twombly* and Rule 12(b)(6).

---

[38] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

### 2. Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because Aiding and Abetting Requires More Than One Actor.

38.    Even if Dugaboy owed and breached a fiduciary duty to Plaintiff (which it did not), it is legally impossible for Nancy Dondero to have aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement as she was acting as Dugaboy in her trustee status.  Because there are limited cases on point, an analysis under the Restatement (Second) of Torts § 876 (1979) is compelling because Delaware courts routinely look to the Restatement to fill lacunae in the law.  *In re Rural Metro Corp.*, 88 A.3d 54, 98 (Del. Ch. 2014), decision clarified on denial of reargument sub nom. *In re Rural Metro Corp. Stocholders Litig.* (Del. Ch. 2014) (applying the Restatement to an aiding and abetting breach of fiduciary duty analysis).  "The Delaware Supreme Court often relies on the Restatement (Second) of Torts."  *Id.* at 98.  Comparison to cases in other jurisdictions construing law similar to Delaware law is also instructive.

39.    The Restatement (Second) § 876 provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with *the other* or pursuant to a common design with him, or (b) knows that *the other's* conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to *the other* in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979), adopted in Delaware by *Patton v. Simone*, Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) (emphasis added).  Under the Restatement (Second), people act "in concert" with each other when they act "in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result." Restatement (Second) of Torts § 876, comment A.  Under the Restatement (Second), Nancy

Dondero could not have conceivably acted "in accordance with an agreement" with herself in her Trustee capacity, as she is a singular individual.

40.     Delaware has not directly addressed the issue of whether one can aid and abet one's self, but it has applied the Restatement (Second) when analyzing aiding and abetting a breach of fiduciary duty claims, which requires a plaintiff to prove: (1) the existence of a fiduciary relationship, (2) breach of the fiduciary's duty, (3) defendant, who is not a fiduciary, knowingly participated in the breach, and (4) damages to the plaintiff as the result of the concerted action of the fiduciary and the non-fiduciary.  *In re USDigital, Inc.*, 443 B.R. 22, 46 (Bankr. D. Del. 2011) (citing elements of aiding and abetting breach of fiduciary duty in Delaware and holding that a director defendant cannot have aided and abetted the same fiduciary duty he allegedly breached in a previous count); *In re Draw,* at 904 (applying Restatement (Second) to the knowing participation element); *Patton,* at *8 (applying Restatement (Second) to aiding and abetting analysis); *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (applying the Restatement (Second) to knowing participation in aiding and abetting analysis and acknowledging that § 876 has been cited with approval in Delaware in ).  Again, because Plaintiff is alleging that Nancy Dondero aided and abetted Dugaboy (which was acting through Nancy Dondero), the requirement of a second actor is not met because Nancy Dondero cannot act in concert with herself.

41.     Analogously, officers and agents cannot aid and abet their principal or each other in the commission of a tort.  *Cornell Glasgow, LLC v La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012); *Amaysing Techs. Corp. v. Cyberair Communications, Inc.*, 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005) ("It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts

of the corporation."). Application of this law to the present circumstances further compels the conclusion that Nancy Dondero cannot aid and abet herself.  Texas also has looked to the Restatement (Second) of Torts § 876 for guidance regarding its aiding and abetting doctrine, which states that "[i]t is settled as the law of [the State of Texas] that where a <u>third party</u> knowingly participates in the breach of duty of a fiduciary, such <u>third party</u> becomes a joint tortfeasor with [that] fiduciary and is liable as such." *In re TOCFHBI, Inc.*, 413 B.R. 523, 534 (Bankr. N.D. Tex. 2009) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d (1942)) (emphasis added, citing elements); *W. Fork Advisors, LLC v. SunGuard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App. – Dallas 2014, pet. denied) (looking to Restatement (Second) regarding aiding and abetting analysis).  Although also having sparse law regarding whether one can aid and abet one's own self, Texas law still requires a third party in order to prove aiding and abetting a breach of fiduciary duty.  For the same reasons mentioned above, Nancy simply cannot aid and abet her own actions as Dugaboy Trustee.

42.     Arizona courts have more directly held that under the Restatement (Second), "when [Plaintiffs] fail to allege [agent] took any actions in [their] individual capacity 'in concert' with the actions giving rise to the breach of fiduciary duty claim against [insurance company], [plaintiff's] aiding and abetting claim against [agent] will be dismissed." *Young v. Liberty Mut. Group, Inc.,* CV-12-2302-PHX-JAT, 2013 WL 840618, at *4 (D. Ariz. Mar. 6, 2013).[39]  In *Young,* the Court reasoned that "…it does not follow that [agent] must have committed the separate tort of aiding and abetting merely because he was the agent through which [insurance company] breached its duty." *Id.* at *4.  The Court dismissed the claim on the agent's 12(b)(6) motion.

---

[39] In *Young,* Plaintiff sued both Liberty Mutual for breach of fiduciary duty, and her personal insurance agent for aiding and abetting said breach.  Because Plaintiff failed to allege [agent] took any actions in his individual capacity "in concert" with the actions giving rise to Plaintiff's claim against Liberty Mutual, the aiding and abetting claim was dismissed upon 12(b)(6) motion.

CORE/3522697.0002/169121218.2

Further, in *Jones v. Colorado Cas. Ins. Co.*, the same Court dismissed a similar claim upon another insurance agent's 12(b)(6) motion, agreeing with the agent's assertion that "one cannot aid and abet one's self." *Jones v. Colorado Cas. Ins. Co.*, CV 12-1968-PHX-JAT, 2013 WL 4759260, at *3 (D. Ariz. Sept. 4, 2013) (dismissing a claim against an insurance agent for aiding and abetting the insurance company's breach of fiduciary duty, determining that in order for there to be harm to a third person, there must be at least two tortfeasors). Just as the insurance agents could not aid and abet themselves as representatives for the insurance companies, Nancy Dondero could not have aided and abetted herself in her capacity as Dugaboy Trustee.

43.    Connecticut takes a similar approach in holding that aiding and abetting means to help or compel *another* to act, and that an alleged tortfeasor cannot aid or abet himself, and doing so would yield "circular results." *Bolick v. Alea Group Holdings, Ltd.,* 278 F. Supp. 2d 278, 282 (D. Conn. 2003) (dismissing aiding and abetting claim).[40] Because Nancy Dondero was acting as Dugaboy in the conduct about which Debtor complains, she is not a "third party" to an act. It is impossible for Nancy Dondero to aid and abet her own self - as most distinctly stated in *Cornell Glasgow, LLC* and *Bolick* - because aiding and abetting requires the concerted action and scienter of more than one person. Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

> **3.    Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and Abetting in its Amended Complaint for Either Jim or Nancy Dondero.**

44.    In addition to the above infirmities, Plaintiff fails to allege the necessary scienter required to show aiding and abetting for both Jim and Nancy Dondero. Delaware courts

---

[40] *Bolick* addressed an employment discrimination case where Plaintiff sued her supervisor for both harassment and aiding and abetting that same harassment. The Court held that to hold the supervisor liable for his wrongful behavior and also aiding and abetting that wrongful behavior is illogical and would yield circular results. Court used dictionary to reference "abettor" as someone who encourages an offender.

acknowledge that an aiding and abetting analysis largely comes down to what constitutes "knowing participation." *In re Draw*, at 904. The aider and abettor must act "knowingly, intentionally, or with reckless indifference…that is, with an illicit state of mind." *Id.* The Plaintiff must allege specific facts that show Defendants had "actual knowledge" that their conduct intentionally aided and abetted a breach, not simply that they "knew or should have known." *Id.* (citing *Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Delaware Nat. Ass'n*, CIV. 10-520 JBS KMW, 2011 WL 864421, at \*5 (D. Del. Mar. 9, 2011)).

45.     In *In re Draw*, a Chapter 11 trustee filed an amended adversary complaint against several members of the company's board of directors, asserting breach of fiduciary duties and aiding and abetting breaches of fiduciary duties. On the defendant's 12(b)(6) motion, the court held that plaintiff's amended complaint failed to allege specific facts showing actual knowledge that [Director] was liable for aiding and abetting, and that plaintiff simply alleged [Director] "knew or should have known" his conduct aided and abetted the breach. *Id.* at 904. The court subsequently dismissed plaintiff's aiding and abetting claims against that particular director.

46.     In *Capitaliza-T*, defendant moved to dismiss plaintiff's amended complaint under Rule 12(b)(6), citing that it did not contain sufficient factual allegations regarding defendant's knowledge of breach of fiduciary duty. The court applied the Delaware rule that "at a minimum, the complaint [must] alleged circumstantial facts suggesting that the defendant had knowledge of the specific principal violation." *Id.* at \*5 (citing *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1256 (D. Del. 1991)). The court held that although plaintiff's amended compliant contained circumstantial allegations against defendant for aiding and abetting, it was not enough to allege

that defendants "had knowledge of the underlying…breach of fiduciary duty" to survive a 12(b)(6) motion. *Capitaliza-T,* at *7.

47.    In this case, Plaintiff simply alleges that "[the Donderos] were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor," and "[t]he Donderos aided and abetted Dugaboy's breach of its fiduciary duties…by knowingly participating in the authorization of the…Alleged Agreement."[41]  In its Amended Complaint, Plaintiff references only factors that could be circumstantial at best when describing it's Third Claim for relief against Jim Dondero, but never clearly articulates the required specific facts that show "actual knowledge" that he was overtly acting to substantially assist Dugaboy in breaching a fiduciary duty as required by *In re Draw* and *Capitaliza-T*.[42]  Further, Plaintiff makes no specific factual allegations against Nancy Dondero, other than she "[was] aware" of Dugaboy's fiduciary duties, and that she aided and abetted the breach.  Neither claims against Jim nor Nancy Dondero rise to the standard of articulation discussed in *In re Draw* and *Capitaliza-T*.  Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

### 4.    Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because Aiding and Abetting Requires More Than One Single Act.

48.    As discussed in Section C.3 *supra*, the test for stating an aiding and abetting claim is stringent and focuses of proof of scienter that a party knew it was aiding another party in committing tortious conduct.  *In re Draw*, at 904.  This would require Plaintiff to show (1) a primary act by Dugaboy (via Nancy) that breached a fiduciary duty (which it cannot), and (2) a

---

[41]Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

[42] Am. Compl. ¶¶ 3,36,38,39,40,41, Adv. No. 21-03003 [Doc. 73-2]; Am. Compl. ¶ 3,50,51,52,53, Adv. No. 21-03007 [Doc. 55-2]; Am. Compl. ¶¶ 3,48,49,50,51, Adv. No. 21-03006 [Doc. 60-2]; Am. Compl. ¶¶ 3,35,36,37,38,39, Adv. No. 21-03005 [Doc. 55-2].

secondary act by each of Jim and Nancy Dondero that shows scienter and knowing participation in subverting a fiduciary duty.

49.    Plaintiff cannot show concerted action here on behalf of Jim or Nancy Dondero, because the only singular act that occurred was Dugaboy approving the compensation under the LPA.  Plaintiff alleges no other separate act by Nancy Dondero that would have been "in concert" with or "knowingly participating" in anything, as she was acting as the Dugaboy Trustee (discussed above in Section C.2.).  Further, Plaintiff shows no other separate act or proof of scienter that Jim Dondero specifically set out to knowingly aid Dugaboy in tortious conduct under *In re Draw*, since Dugaboy engaged in no such conduct.  Therefore, Plaintiff's Seventh Claim fails *Twombly* and must be dismissed under Rule 12(b)(6).

### 5.    Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of Fiduciary Duty Claim Based on an Executory Contract It Rejected.

50.    The analysis here is the same as in Argument III.A.2. and B.2, *supra*.  Plaintiff argues that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement, which Plaintiff alleges may have violated the LPA.[43] A cause of action for a derivative claim such as aiding and abetting shares accrual and limitations periods with the underlying tort of breach of fiduciary duty.  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied*, (Sept. 6, 2019).  "Because a civil conspiracy claim is derivative of an underlying tort, the claim accrues when the underlying tor accrues." *Id*. at 145.  Here, because Plaintiff's aiding and abetting claims derive from the alleged breach of fiduciary duty claim, the claims share accrual dates.

---

[43] Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

51.     Again, Plaintiff was not injured until Jim Dondero did not pay the Notes.  This claim did not accrue until December 11, 2020, and is also predicated on allegations that the Subsequent Agreement violates fiduciary duties arising out of the rejected LPA.  Once again, Plaintiff is attempting to bring a post-petition claim under the LPA it rejected.  Therefore, Plaintiff's Seventh Claim must be dismissed under *Twombly* and Rule 12(b)(6).

## IV.   <u>CONCLUSION</u>

Dugaboy, Jim Dondero, and Nancy Dondero therefore respectfully request this Court dismiss Plaintiff's Fifth, Sixth, and Seventh Amended Claims in its Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

Dated: September 1, 2021                   Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND NANCY DONDERO**

*/s/Clay M. Taylor*
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

CORE/3522697.0002/169121218.2

/s/Douglas S. Draper
Douglas S. Draper, La. Bar No. 5073
Leslie A. Collins, La. Bar No. 14891
Greta M. Brouphy, La. Bar No. 26216
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR DEFENDANT THE DUGABOY INVESTMENT TRUST**


/s Daniel P. Elms
Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR DEFENDANT NANCY DONDERO**

CORE/3522697.0002/169121218.2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of

this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/169121218.2

APP 324

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO
AND NANCY DONDERO**

Douglas S. Draper, La. Bar No. 5073
Leslie A. Collins, La. Bar No. 14891
Greta M. Brouphy, La. Bar No. 26216
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P., JAMES** | § | |
| **DONDERO, NANCY DONDERO, AND THE** | § | |
| **DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S
## FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF[1]

---

[1] This Motion to Dismiss is being concurrently filed in Adv. Nos. 21-03003, 21-03007, 21-03006, and 21-03005, Case No. 19-34054-sgj11, as Plaintiff's assertions and Amended Complaints against all Defendants are identical in material respects.

## <u>TABLE OF CONTENTS</u>

**Page**

I.    BACKGROUND .......................................................................................... 1

    A.    The Bankruptcy and Rejection of Executory Contracts ......................................... 1

    B.    The Limited Partnership Agreement.................................................................. 2

    C.    The Promissory Notes.................................................................................. 4

    D.    The Adversary Proceedings ......................................................................... 6

II.    STANDARD OF REVIEW ........................................................................... 7

III.    ARGUMENTS AND AUTHORITIES.............................................................. 8

    A.    Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed for Two Reasons. ..................................................................................... 8

        1.    Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on their Face That There is No Actual Controversy between Parties.............. 8

        2.    Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon an Executory Contract It Rejected. ........................................... 9

    B.    Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy Dondero Fails for Two Reasons. ........................................................................ 13

        1.    Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of Exercising Its Right to Approve Compensation. ..................................... 13

        2.    Nancy Dondero Owes No Fiduciary Duty to Debtor........................15

        3.    Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty Based Upon an Executory Contract It Rejected. ..................................... 16

    C.    Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against Jim and Nancy Dondero Fails for Several Reasons.............................................. 17

        1.    Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff. .................................................................................... 17

        2.    Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because Aiding and Abetting Requires More Than One Actor........................... 18

        3.    Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and Abetting in its Amended Complaint for Either Jim or Nancy Dondero. .. 21

        4.    Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because Aiding and Abetting Requires More Than One Single Act..................... 23

        5.    Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of Fiduciary Duty Claim Based on an Executory Contract It Rejected. ....... 24

IV.    CONCLUSION.......................................................................................... 25

APP 326

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
  580 S.W.3d 136 (Tex. 2019), *reh'g denied* (Sept. 6, 2019)....................................24

*In re Alongi*,
  272 B.R. 148 (Bankr. D. Md. 2001) ...................................................11

*Amaysing Techs. Corp. v. Cyberair Communications, Inc.*,
  2005 WL 578972 (Del. Ch. Mar. 3, 2005)...........................................19

*Ashcroft v. Iqbal*,
  *129 S. Ct. 1937*.......................................................................7

*Matter of Austin Dev. Co*,
  19 F.3d 1077 (5th Cir. 1994) ..........................................................11

*Bell Atlantic Corp v. Twombly*,
  *550 U.S. 544 (2007)* .......................................................... *passim*

*Bolick v. Alea Group Holdings, Ltd.*,
  278 F. Supp. 2d 278 (D. Conn. 2003).................................................21

*Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*,
  746 A.2d 842...................................................................1, 13, 14

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v.
  Wachovia Bank of Delaware Nat. Ass'n*,
  CIV. 10-520 JBS KMW, 2011 WL 864421 (D. Del. Mar. 9, 2011) ................22, 23

*In re Continental Airlines*,
  981 F.2d 1450 (5th Cir. 1993) ........................................................11

*Cornell Glasgow, LLC v La Grange Props., LLC*,
  2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ....................................19, 21, 22

*In re Draw Another Circle*,
  602 B.R. 878 (Bankr. D. Del. 2019) ...............................................17, 19, 21, 22, 23

*Dunmore v. Chicago Title Ins. Co.*,
  400 S.W.3d 635 (Tex. App. – Dallas 2013, no pet.).................................15, 16

*Elliott v. Foufas*,
  *867 F.2d 877 (5th Cir. 1989)* .........................................................7

ii

*In re Est. of Conaway*,
  2012 WL 524190 (Del. Ch. Feb. 15, 2012) ..................................................13, 14

*In re Estate of Denman*,
  362 S.W.3d 134 (Tex. App. – San Antonio 2011, no pet.).......................................9

*Feeley v. NHAOCG, LLC*,
  62 A.3d 649 (Del. Ch. 2012)...................................................................................14

*Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*,
  304 F.3d 476 (5th Cir. 2002) ....................................................................................1

*Jones v. Colorado Cas. Ins. Co.*,
  CV 12-1968-PHX-JAT, 2013 WL 4759260 (D. Ariz. Sept. 4, 2013) ....................20

*Keytrade USA, Inc. v. AIN Temouchent M/V*,
  404 F.3d 891 (5th Cir. 2005) ....................................................................................1

*Lauter v. Citgo Petroleum Corp.*,
  CV H-17-2028, 2018 WL 801601 (S.D. Tex. Feb. 8, 2018) .........................9, 11, 12

*Murphey v. Honeycutt*,
  199 S.W.2d 298........................................................................................................9

*Murphy v. Campbell*,
  964 S.W.2d 265 (Tex. 1997)....................................................................................16

*Muzquiz v. Para Todos, Inc.*,
  624 S.W.3d 263 (Tex. App. – El Paso 2021, pet. filed) ...........................................9

*In re Oracle Corp. Derivative Litig.*,
  CV 2017-0337 WL 3410745 (Del. Ch. June 22, 2020) ...........................................19

*Patton v. Simone*,
  Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) ............18, 19

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005) ....................................................................................7

*In re Rural Metro Corp.*,
  88 A.3d 54 (Del. Ch. 2014)......................................................................................17

*In re Rural Metro Corp. Stocholders Litig.*
  (Del. Ch. 2014) ..................................................................................................17, 18

*Russell-Conaway v. Frederick-Conaway*,
  2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished)....................................13

CORE/3522697.0002/169121350.1

*Strebel v. Wimberly*,
371 S.W.3d 267 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)) ........................14

*Tigani v. Tigani*,
2021 Del. Ch. LEXIS 60, 2021 WL 1197576 (March 30, 2021) ...........................................15

*In re TOCFHBI, Inc.*,
413 B.R. 523 (Bankr. N.D. Tex. 2009)................................................................................19

*In re USDigital, Inc.*,
443 B.R. 22 (Bankr. D. Del. 2011) .....................................................................................18

*West Fork Advisors LLC v. SunGard Consulting Services, LLC*,
437 S.W.3d 917 (Tex. App.-Dallas 2014) .....................................................................17, 19

*Williams v. Cigna Financial Advisors, Inc.*,
56 F.3d 656 (5th Cir. 1995) ..................................................................................................1

*Young v. Liberty Mut. Group, Inc.*,
CV-12-2302-PHX-JAT, 2013 WL 840618 (D. Ariz. Mar. 6, 2013) ......................................20

**Statutes**

11 U.S.C. § 365(a) .................................................................................................................10

11 U.S.C. § 365(g)(1) ..................................................................................................10, 11, 12

11 U.S.C. § 365 .......................................................................................................................10

Del. Code Ann. Tit. 6, § 17-107 ..............................................................................................13

Del. Code Ann. Tit. 6, § 17-303(b)(8)(o) .................................................................................14

Del. Code Ann. Tit. 6, § 17-1101(d)........................................................................................13

Del. Code Ann. Tit. 6, § 17-1102 ............................................................................................12

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .............................................................................. *passim*

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding
     "Rejection"*, 59 U.Colo.L.Rev. 845 (1988)...........................................................................11

Restatement (Second) of Torts § 876 (1979)...................................................................17, 18, 19

Restatement (Second) of Torts § 876, comment A. Under the Restatement ................................18

v

In the alternative to and contingent upon a denial by the Court of Defendants' Motion to Compel Arbitration (which the Court should not deny), Defendants move to dismiss the Fifth, Sixth, and Seventh Claims for Relief in Plaintiff's Amended Complaint for failure to state claims on which this Court could grant relief under Federal Rule of Civil Procedure 12(b)(6), as incorporated into this adversary proceeding through Rule 7012 of the Federal Rules of Bankruptcy Procedure. In filing this Motion to Dismiss, Defendants do not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration.[2] Defendants show in support as follows:

## I.   BACKGROUND

### A.   The Bankruptcy and Rejection of Executory Contracts

1   Highland Capital Management, L.P. ("Plaintiff") filed a voluntary Chapter 11 bankruptcy petition ("Bankruptcy Petition") on October 16, 2019 ("Petition Date") in the United States Bankruptcy Court for the District of Delaware, and venue was subsequently transferred to this Court on December 4, 2019.[3]  On November 24, 2020, Plaintiff filed its Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan") along with its Disclosure Statement, which the Court approved on November 24, 2020.[4]

2.   On January 11, 2021, Plaintiff filed its Second Notice of Executory Contracts and Unexpired Leases to be Assumed by the Plaintiff [then, Debtor] Pursuant to the Plan (the

---

[2] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).
[3] Order Transferring Venue, Case 19-12239-Css [Doc. 184].
[4] Case No. 19-34054-sgj11 [Doc. 1476].

1

"Assumption Notice").[5]  The Assumption Notice itemized seventy-one (71) executory contracts to be assumed by the Plaintiff, notably including the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA").  However, on January 21, 2021, the Debtor entered a Withdrawal Notice, rejecting the LPA along with several other executory contracts,[6] and confirmed on February 1, 2021, that it had withdrawn the LPA from its list of assumed executory contracts.[7]  On February 22, 2021 (the "Rejection Date"), the Court confirmed the Plan, causing the rejection of the LPA.[8]

### B.    The Limited Partnership Agreement

3.     James Dondero ("Jim Dondero") is the co-founder of Highland Capital (Plaintiff in this Adversary Proceeding), and served as its President and CEO until January 9, 2020.[9]  The Dugaboy Family Trust ("Dugaboy") is one of Debtor's Class A limited partners and holds the majority of the Debtor's Class A limited partnership interests.  LPA, Exhibit A.  Jim Dondero's sister Nancy Dondero serves as the Dugaboy Family Trustee.[10]  Jim Dondero is a lifetime beneficiary of Dugaboy.[11]

4.     Dugaboy's explicit authorization to approve compensation for Jim Dondero - and thus bind the Partnership - comes specifically from the LPA in § 3.10(a), which provides in pertinent part:

> (a)    <u>Compensation</u>.     The *General Partner* and any *Affiliate* of the General
> Partner shall receive no compensation from the Partnership for services rendered

---

[5] Case 19-34054-sgj11 [Doc. 1719].
[6] Case 19-34054-sgj11 [Doc. 1791, Schedule A].
[7] Case 19-34054-sgj11 [Doc. 1871].
[8] Case 19-34054-sgj11 [Doc. 1943].
[9] Am. Compl. ¶ 11, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 12, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 12, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 12, Adv. No. 21-03005 [Doc. 63].
[10] Am. Compl. ¶ 13, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 14, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 14, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 14, Adv. No. 21-03005 [Doc. 63].
[11] Am. Compl. ¶ 12, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 13, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 13, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 13, Adv. No. 21-03005 [Doc. 63].

2

pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

"**'Majority Interest'** means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners." LPA § 2.1, p.4.

"**'Class A Limited Partners'** means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A." LPA § 2.1, p.2.

**Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests. LPA, Exhibit A, line 5.[12]

Based on the Compensation provision and definitions, Dugaboy clearly had the right to approve compensation for the General Partner and its Affiliates. The General Partner entitled to compensation here is Strand Advisors, Inc. The LPA Preamble states in pertinent part:

"This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner. LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

"**'Affiliate'** means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term **'control'** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise." LPA § 2.1, p.2.

"**'Person'** means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity." LPA § 2.1, p.5.

It is undisputed that Jim Dondero was an Affiliate of Strand under the LPA's definition. It is also undisputed that he controlled Highland Capital Real Estate Partners ("HCRE"), Nexpoint Advisors, L.P. ("Nexpoint"), and Highland Capital Management Services, Inc. ("HCMS").[13]

Thus, Jim Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

---

[12] See attached, LPA Exhibit A.
[13] Am. Compl. ¶ 2, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 2, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 2, Adv. No. 21-03005 [Doc. 63].

### C.    The Promissory Notes

5.    Over the last several years, multiple promissory notes were executed in favor of the

Plaintiff to different entities and individuals, which obligations became subject to potential

forgiveness as compensation for Jim Dondero that, under the LPA, Dugaboy was charged with

approving:

Notes to Jim Dondero (the "Dondero Notes"):

    1.    A note for $3,825,000, executed on February 2, 2018, payable on demand.
    2.    A note for $2,500,000, executed on August 1, 2018, payable on demand.
    3.    A note for $2,500,000, executed on August 13, 2018, payable on demand.[14]

Notes to HCRE (the "HCRE Notes"):

    1.    A note for $100,000, executed on November 27, 2013, payable on demand.
    2.    A note for $2,500,000, executed on October 12, 2017, payable on demand.
    3.    A note for $750,000, executed on October 15, 2018, payable on demand.
    4.    A note for $900,000, executed on September 25, 2019, payable on demand.
    5.    A term note for $6,059,831, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[15]

Notes to HCMS (the "HCMS Notes"):

    1.    A note for $150,000, executed on March 28, 2018, payable on demand.
    2.    A note for $200,000, executed on June 25, 2018, payable on demand.
    3.    A note for $400,000, executed on May 29, 2019, payable on demand.
    4.    A note for $150,000, executed on June 26, 2019, payable on demand.[16]

Note to Nexpoint (the "Nexpoint Note"):

    1.    A term note for $30,746,812.33, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[17]

---

[14] Am. Compl. ¶¶ 20-22, Adv. No. 21-03003, Case No. 19-34054-sgj11 [Doc. 79].

[15] Am. Compl. ¶¶ 21-24, Adv. No. 21-03007, Case No. 19-34054-sgj11 [Doc. 63]; According to its Amended Complaint, Plaintiff alleges in ¶ 63 that it has suffered damages under the note "in the amount of at least $5,012,260.96, as of December 11, 2020," but in ¶ 64 that it has suffered damages "in the amount of at least $6,145,466.84 as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date..."

[16] Am. Compl. ¶¶ 21-24, Adv. No. 21-03006, Case No. 19-34054-sgj11 [Doc. 68].

[17] Am. Compl. ¶ 21, Adv. No. 21-03005, Case No. 19-34054-sgj11 [Doc. 63]; Plaintiff alleges in ¶ 31 that "as of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03," and claims the same amount as damages in ¶ 48.

6.      Jim Dondero entered into agreement (the "Subsequent Agreements," or as Plaintiff refers to them, the "Alleged Agreements") with Nancy Dondero (acting for Dugaboy as its Trustee) that Plaintiff would not demand collection of the Notes unless events had occurred that made fulfillment of conditions subsequent impossible.[18]   However, annual term loan payments and annual interest payments on the demand notes were to be (and were) made.[19]

7.      On December 3, 2020, after the bankruptcy Petition Date, Plaintiff demanded payment from Jim Dondero, HCRE, and HCMS on their respective demand notes due by December 11, 2020.[20]   On January 7, 2021, Plaintiff made a demand on the Nexpoint term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $24,471,804.98," and a demand on the HCRE term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $6,145,466.84."[21]   Plaintiff has refused to recognize the Subsequent Agreement, calling it a "fiction."[22]   Other than annual term and interest payments and some voluntary prepayments on the term notes, Defendants have not paid the Notes.[23]

---

[18] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].

[19] *E.g.,* Am. Compl. ¶ 21,27, Adv. No. 21-03005 [Doc. 63], showing the original principal of the note being $30,746,812.33, but Plaintiff only demanding $24,471,804.98 in its demand letter; *E.g.*, Am. Compl. ¶ 37,63,64, Adv. No. 21-03007 [Doc. 63], showing the original principal of the note being $6,059,831, but Plaintiff alleging it was damaged in the amount of at least $5,012,260.96 as of December 11, 2020, but also in the next paragraph inconsistently alleging it was damaged in the amount of at least $6,145,466.84.

[20] Am. Compl. ¶ 26, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 28, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 28, Adv. No. 21-03006 [Doc. 68].

[21] Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63]; Am. Compl. ¶43, Adv. No. 21-03007 [Doc. 63].

[22] Am. Compl. ¶ 3, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 3, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 3, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 3, Adv. No. 21-03005 [Doc. 63].

[23] With respect to the Nexpoint term loans, due to a mistake, the 2020 end-of-year payment was late and the notes should be deemed current, Am. Ans. ¶ 40,41, Adv. Pro. 21-03005 [Doc. 50]; Am. Compl. ¶ 28, Adv. No. 21-03005 [Doc. 55-2], acknowledging payment of $1,406,111.92.

### D.    The Adversary Proceedings

8.    On January 22, 2021, Plaintiff initiated Adversary Proceedings against Jim Dondero, HCRE, HCMS, and Nexpoint for breach of contract and turnover of property.[24]  On August 17, 2021, Plaintiff filed Amended Complaints against each Defendant alleging additional claims against Jim Dondero and new claims against Dugaboy and Nancy Dondero. Defendants each filed Amended Answers asserting several affirmative defenses, including that the Subsequent Agreements preclude the respective claims.[25]

9.    In the Fifth Claim of each Amended Complaint,[26] Plaintiff asks the Court to declare (a) that limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the LPA, (b) that neither Dugaboy nor Nancy Dondero was  authorized under the LPA to enter into the Subsequent Agreement on behalf of the Partnership, (c) that neither Dugaboy nor Nancy Dondero otherwise had the right or authority to enter into the Subsequent Agreement on behalf of the Partnership, and (d) the Subsequent Agreement is null and void.[27]

10.    In the Sixth Claim of each Amended Complaint,[28] Plaintiff alleges that if Dugaboy, as a limited partner under the LPA, or Nancy Dondero, as the representative of Dugaboy, had the

---

[24] Am. Compl. ¶ 33, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 47, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 45, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 33, Adv. No. 21-03005 [Doc. 63].

[25] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].

[26] Nancy Dondero is a Defendant on Counts V, VI, and VII in Adv. No. 21-03005, Adv. No. 21-3006, and Adv. No. 21-3007.  Nancy Dondero is a Defendant only on Count VII in Adv. No. 21-03003.

[27] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63], Plaintiff alleges against Dugaboy and Nancy Dondero; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

[28] *See* note 26, *supra.*

6

authority to enter into the Subsequent Agreement on behalf of [Plaintiff], then Dugaboy incurred

a fiduciary duty of care, and breached said duty by entering into the Subsequent Agreement.[29]

11.    In the Seventh Claim of each Amended Complaint, Plaintiff alleges that Jim and

Nancy Dondero were aware that Dugaboy would have fiduciary duties owed to the Plaintiff if

acting to bind the Plaintiff per the authorization in the LPA, and aided and abetted Dugaboy's

breach of its fiduciary duties by knowingly participating in the authorization of the Subsequent

Agreement.[30]

## II.    STANDARD OF REVIEW

12.    An asserted cause of action must be dismissed when the complaint fails to state a

claim.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), the complaint

must meet two criteria: (1) it must assert a plausible claim, and (2) it must set forth sufficient

factual allegations to support the claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, at 1949-50 (citing *Bell

Atlantic Corp v. Twombly*, 550 U.S. 544 (2007)).  Thus, either a "lack of cognizable legal theory

or the absence of sufficient facts alleged under a cognizable legal theory" requires dismissal.  Id.

The plaintiff must allege specific facts and not conclusory allegations.  *Elliott v. Foufas*, 867 F.2d

877, 881 (5th Cir. 1989).  A court may not strain to find inferences favorable to the plaintiff or

accept conclusory allegations, unwarranted deduction, or legal conclusion.  *R2 Invs. LDC v.

Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

13.    To satisfy *Twombly* and Iqbal, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.*, *Twombly,* at 570.  A

claim has facial plausibility when the plaintiff pleads enough factual content that allows the court

---

[29] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].
[30] Am. Compl. ¶ 79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 93, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 77, Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169121350.1

to draw the reasonable inference that the defendant is liable under the alleged claim. *Id*. at 556.

Even if a court decides that the factual allegations are entitled to an assumption of truth, however,

the facts must also "plausibly suggest an entitlement to relief." *Id., Iqbal,* at 1951.

## III.    ARGUMENTS AND AUTHORITIES

### A.    Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed for Two Reasons.

#### 1.    Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on their Face That There is No Actual Controversy between Parties.

14.     Plaintiff's claim presents no "actual controversy" because the provisions of the

LPA clearly allow Dugaboy to bind the Partnership by approving compensation and there is no

controversy that could require a declaration by this Court.

15.     Plaintiff argues that Dugaboy was not authorized to enter into the Subsequent

Agreement regarding Jim Dondero's compensation, nor was it authorized to bind the Partnership.[31]

Plaintiff further attached the LPA as "Exhibit 5" to its Amended Complaints and referenced this

Court to § 4.2, which states:

> Management of Business.     No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership *other than as specifically set forth in this Agreement*.[32] (emphasis added).

16.     Contrary to Plaintiff's argument, the LPA explicitly authorizes Dugaboy as the

Majority Interest to approve compensation for Jim Dondero as previously articulated in this

Motion.  Approving compensation inherently binds the Partnership in that it exchanges money on

behalf of the Partnership for services rendered.  Because it is so expressly provided for in the LPA,

---

[31] *Id.*
[32] Am. Compl. ¶ 43, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 55, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 53, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63].

Plaintiff's contention that Dugaboy could not act to bind the Partnership through compensation agreements amounts to Plaintiff's misinterpretation of the LPA as opposed to an "actual controversy" in need of declaratory relief.  This claim is nothing more than Plaintiff's attempt at an end-around to avoid proving the merits of its breach of fiduciary duty claims and essentially asks this Court for an advisory opinion to help Plaintiff do so.  Under *Twombly*, Plaintiff's claim for declaratory relief should be dismissed pursuant to Rule 12(b)(6).

### 2.    Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon an Executory Contract It Rejected.

17.    There is no authority for "allowing a debtor's estate or a successor-in-interest such as the [creditor's committee or litigation trustee] to pursue claims for post-petition breaches of a rejected contract. Because rejection is an affirmative declaration by the debtor that the estate will not take on the obligations of a prepetition contract made by the debtor, [Plaintiff-Debtor's] rejection of the [LPA] not only relieved the estate of its post-petition performance obligations, but also relieved the estate of its ability to assert claims for post-petition breaches thereof."  *Lauter v. Citgo Petroleum Corp.*, CV H-17-2028, 2018 WL 801601, at *15 (S.D. Tex. Feb. 8, 2018).  As explained below, as a result, not only does this preclude Debtor's claims for breach of fiduciary duty (see sections B.2., C.5. *infra*), it also precludes Debtor's attempt to obtain declaratory relief.

18.    Plaintiff seeks declaratory relief against Dugaboy and Nancy Dondero to determine if either of them were authorized to enter into the Subsequent Agreement under the LPA.[33] Although most causes of action accrue when an injury results from a wrongful act, a cause of action for declaratory relief differs in that it does not accrue until there is an actual controversy between the parties.  *In re Estate of Denman*, 362 S.W.3d 134, 144 (Tex. App. -- San Antonio

---

[33] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

2011, no pet.); *Murphey v. Honeycutt*, 199 S.W.2d 298, 299 (holding that declaratory judgment action accrued in a will construction case at the time when an heir committed an act indicating she was operating against the will, not when the will was executed years prior to the heir's act); *Muzquiz v. Para Todos, Inc.*, 624 S.W.3d 263, 278 (Tex. App. – El Paso 2021, pet. filed) (holding that in a lease dispute, the actual controversy did not arise-- and the claim did not accrue- when the lease was entered into by the parties, but rather when plaintiff challenged the lease terms at a later date).

19.    Here, Plaintiff's declaratory relief claim accrued (if at all) when Jim Dondero asserted the Subsequent Agreement as an affirmative defense.  Plaintiff alleges that the actual controversy here is whether or not Dugaboy or Nancy Dondero had authority to enter into the Subsequent Agreement under the rejected LPA.  Plaintiff specifically pleads that "[a] bona fide, actual, present dispute exists between the [Plaintiff] and Dugaboy concerning whether Dugaboy was authorized to enter into the Alleged Agreement on the [Plaintiff]'s behalf….[and a] judgment declaring the parties' respective rights and obligations will resolve their dispute."[34]  Plaintiff did not allege anywhere in its Original Complaint that a dispute regarding Dugaboy's authority to enter the Subsequent Agreement required declaratory relief.  Only after Defendants filed their Amended Answers did Plaintiff seek such relief in its Amended Complaint.[35]  Therefore, this cause of action for declaratory relief accrued when Plaintiff received Defendant's Amended Answers after the bankruptcy began, as that is when facts came into existence that created an actual controversy under the LPA.

20.    Section 365 of Title 11 of the United States Code (the "Bankruptcy Code") governs the inclusion and exclusion of executory contracts in bankruptcy.  Section 365 vests the power to

---

[34] *Id.*
[35] *Id.*

reject or assume any of the Debtor's executory contracts in the trustee, subject to the court's approval. 11 U.S.C. § 365(a). A debtor's rejection of an executory contract constitutes a breach of such contract immediately before the date of the filing of the [bankruptcy] petition. 11 U.S.C. § 365(g)(1). In this case, Plaintiff's act of rejection resulted in a material breach of the LPA that relates back to October 15, 2019 (the "Breach Date") pursuant to the Bankruptcy Code. *See* 11 U.S.C. § 365(g)(1).

21.    "Rejection is an affirmative declaration that the estate will not take on the obligations of a pre-petition contract made by the debtor" and "places the obligation to perform outside of the bankruptcy administration." *Lauter*, at *13, citing *Matter of Austin Dev. Co*, 19 F.3d 1077, 1082-83 (5th Cir. 1994); *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993). "[R]ejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it." *In re Alongi*, 272 B.R. 148, 153 (Bankr. D. Md. 2001) (citing M. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845 (1988)). As noted above, rejection not only relieves the estate of post-[bankruptcy]petition performance obligations, but also of its ability to assert claims for post-petition breaches thereof. *Lauter,* at *15.

22.    The court in *Lauter* looked to the reasoning of Fifth Circuit opinions examining the effects of plaintiffs rejecting executory contracts under § 365. In *In re Continental*, the court reasoned in part that, under § 365, "An agreement cannot 'exist' for one purpose yet take on a 'nonexistent' quality which works for the advantage of one party or the other" when a debtor-plaintiff sought to avoid paying airline pilots under an executory contract it rejected, attempting to treat the contract as terminated. *Id.* at 1460. Likewise, the court in *Matter of Austin* reasoned that a rejection of a lease under § 365 did not terminate the lease, but moved the rights of the parties

affected "outside of the bankruptcy court's realm because after rejection, the debtor's estate is no longer involved in the leasehold transaction." *Id.* at 1083.

23.      Following the Fifth Circuit's application of § 365 in cases such as *In re Continental* and *Matter of Austin*, the court in *Lauter* addressed the impact of a debtor-plaintiff's attempt to pursue post-petition claims against a defendant whose executory contract had been rejected. The court held that just as in any other contract dispute, a prior material breach by a counterparty relieved the aggrieved party of the duty to perform and deprived the breaching party of the ability to make claims for breach after its own breach. *Id.* at *12-13, 15.  After a thorough discussion of § 365, the court ultimately found that the plaintiff lacked standing to pursue claims resulting from a post-petition breach of an executory contract, holding that "the court has not found any authority allowing a debtor's estate . . . to pursue claims for post-petition breaches of a rejected contract." *Id.* at *15.

24.      Here, Plaintiff asks this Court to interpret and, in effect, determine a breach of the same LPA it rejected and breached prior to the bankruptcy petition date.  The LPA was rejected on February 22, 2021 and thus deemed materially breached on October 15, 2019 under § 365(g)(1). Because this cause of action accrued after both rejection and the relation-back breach provision of § 365, Plaintiff's Fifth Claim for declaratory relief amounts to a post-petition claim arising from a rejected executory contract, which the court in *Lauter* held a Debtor lacks standing to assert in a bankruptcy proceeding.  Therefore, this claim should be dismissed pursuant to *Twombly* and Rule 12(b)(6).

**B.    Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy Dondero Fails for Two Reasons.**

      **1.    Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of Exercising Its Right to Approve Compensation.**

25.    Plaintiff alleges that "if Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement…then Dugaboy would owe the [Plaintiff] a fiduciary duty."[36]  The LPA in this case is governed by the Delaware Revised Uniform Limited Partnership Act (the "DRULPA") except as specifically provided for in the LPA.  LPA §§ 1.1,1.2; *see also* Del. Code Ann. Tit. 6, § 17-1102.  The DRULPA allows partnership agreements to expand, restrict, or eliminate fiduciary and other legal or equitable duties, provided it may not eliminate the implied contractual duty of good faith and fair dealing.  Del. Code Ann. Tit. 6, § 17-1101(d).  The DRULPA also specifically permits a partnership agreement to provide the rules for how partners may transact with the partnership.  Del. Code Ann. Tit. 6, § 17-107.

26.    In Delaware, a limited partner does not owe a fiduciary duty as a consequence of exercising a right of the limited partner under the partnership agreement.  *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*, 746 A.2d 842, 864 (Del. Ch. 1999); *In re Est. of Conaway*, 2012 WL 524190, at *3 (Del. Ch. Feb. 15, 2012), *aff'd sub nom. Russell-Conaway v. Frederick-Conaway*, 2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished).

27.    In *Bond Purchase*, a limited partner exercised its right under the limited partnership agreement to obtain records of the owners of the partnership for the purpose of making a tender offer for additional interests in the partnership.  Although the other partners claimed this request for records was a breach of a fiduciary duty, the court held that "in the absence of any provision in the partnership agreement engrafting duties onto [the limited partner]," "[the limited partner]

---

[36] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

owes no fiduciary duties," and allowed the limited partner access to the records it sought under the partnership agreement.  *Id.* at 864.

28.     In *In re Est. of Conaway*, a limited partner withheld consent to transfer another partner's interest as he was allowed to under the limited partnership agreement.  The receiving party alleged a breach of the non-consenting limited partner's fiduciary duty.  The court held that where the limited partner "merely exercised his contracted-for rights under the terms of the [limited partnership agreement]," the limited partner breached no fiduciary duty, assuming there even was one.  *Id.* at *3.

29.     Just as the limited partners in *Bond Purchase* and *In re Est. of Conaway*, Dugaboy was merely exercising its right to approve compensation pursuant to the LPA when it entered into the Subsequent Agreement.  LPA § 3.10(a); § 2.1.  Therefore, Dugaboy owes no fiduciary duty to the Plaintiff as a consequence of simply exercising its right under the LPA.  While a limited partner who takes on an active role in the management of the entity may thereby assume fiduciary duties, *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 662 (Del. Ch. 2012) (citing cases); *Bond Purchase* at 863-64, merely engaging in actions delegated to the limited partner in the partnership agreement does not constitute participating in the control of a business so as to trigger the assumption of fiduciary duties.  Del. Code Ann. Tit. 6, § 17-303(b)(8)(o).

30.     Texas has similarly held that "a limited partner does not participate in the control of the business" by taking certain actions listed in the statutes, and such "actions complained of by the plaintiff did not amount to the types of control that could give rise to a duty to the other limited partners."  *Strebel v. Wimberly,* 371 S.W.3d 267, 280 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)).

CORE/3522697.0002/169121350.1

31.     Here, Dugaboy did not participate in the control of the business because it was taking actions explicitly extended to it in the LPA by approving compensation under § 3.10(a). LPA § 3.10(a); § 2.1.  Since the LPA explicitly gives Dugaboy the right to approve such compensation, and Dugaboy was not participating in the control of the business, Dugaboy does not owe a fiduciary duty to Plaintiff.  Dugaboy cannot breach a fiduciary duty it does not owe. Further, Nancy Dondero as Trustee owes no fiduciary duty to Plaintiff independently from what Dugaboy owes, as Dugaboy is her principal.  Like Dugaboy, Nancy Dondero cannot breach a fiduciary duty she does not owe.  Under *Twombly*, Plaintiff's claim for breach of fiduciary duty against Dugaboy and Nancy Dondero should be dismissed pursuant to Rule 12(b)(6).

### 2.    Nancy Dondero Owes No Fiduciary Duty to Debtor.

32.     Under Delaware law, a trustee's fiduciary duties of care and loyalty flow to the trust and the beneficiar(ies) of the trust. *Tigani v. Tigani*, 2021 Del. Ch. LEXIS 60, *1, 2021 WL 1197576 (March 30, 2021). A trustee is prohibited from considering her own interests and "all consideration of the interests of third persons." *Id*. at * 38.

33.     Plaintiff claims that if Dugaboy had the authority to enter into the Subsequent Agreement, then Ms. Dondero would then somehow owe a fiduciary duty directly to Plaintiff.  The Amended Complaint does not allege any facts as to why or how such a fiduciary duty would appear, and there is no legal authority to support such a conclusion. As discussed above, not even Dugaboy owed a fiduciary duty to Plaintiff in determining compensation, as Dugaboy was expressly authorized to do under § 3.10(a) of the LPA. Nancy Dondero, individually, is even further removed from owing any duty to Plaintiff, much less a fiduciary duty.  Plaintiff cannot create a legal duty simply by claiming one exists, and its breach of fiduciary duty claim against Nancy Dondero should be dismissed under *Twombly* and Rule 12(b)(6).

CORE/3522697.0002/169121350.1

### 3. Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty Based Upon an Executory Contract It Rejected.

34.     Plaintiff's Sixth Claim is also barred for the same reasons that discussed in Section A.2 *supra*, and similarly relies on the fact that this cause of action accrued after the LPA was breached on October 15, 2019.  In this case, Plaintiff suffered no legal injury – and no cause of action accrued - until the notes were not paid on demand by December 11, 2020.

35.     Generally, "a cause of action accrues…when facts come into existence that authorize a claimant to seek judicial remedy." *Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App. – Dallas 2013, no pet.) (citing cases).  "Breach of fiduciary duty claims generally accrue when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act *and* resulting injury." *Dunmore,* at 641 (emphasis added).  Further, "[t]he general rule governing when a claim accrues…is the 'legal injury rule,' which provides that a claim accrues 'when a wrongful act causes some legal injury, even if that fact of injury is not discovered until later, and even if all damages have not yet occurred.'" *Id.* (citing *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997)).  "[A] legal injury [is] an injury giving cause of action by reason of its being an invasion of a Plaintiff's right…be the damage however slight." *Murphy*, at 270.  Although the discussion of when a claim accrues in Texas generally involves application of the discovery rule (which is not applicable to these facts), the concept of "legal injury" is still the cornerstone of an accrual analysis.

36.     Here, Plaintiff alleges that Dugaboy and Nancy Dondero breached a fiduciary duty when it entered into the Subsequent Agreement.[37]  The alleged wrongful act was the Subsequent Agreement itself which Plaintiff alleges breached a fiduciary duty.  However, Plaintiff suffered no

---

[37] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

legal injury from the Subsequent Agreement until Defendant did not pay the Notes when demanded (if it even suffered one at all). The Subsequent Agreement simply made the Notes potentially forgivable upon conditions subsequent, which could not have impacted the alleged value of the Notes until the conditions occurred. As a result, the cause of action did not accrue until December 11, 2020, after the Petition Date. Debtor's rejection of the LPA, the alleged source of the fiduciary duties allegedly breached,[38] therefore bars pursuit of the Plaintiff's Sixth Claim for the same reasons set forth in Section A.2 *supra*.

### C. Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against Jim and Nancy Dondero Fails for Several Reasons.

#### 1. Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff.

37.     Plaintiff claims that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by entering into the Subsequent Agreement. However, aiding and abetting is a fundamentally dependent claim that can only succeed if there is a valid underlying breach of fiduciary duty claim. *In re Draw Another Circle*, 602 B.R. 878, 904 (Bankr. D. Del. 2019) (citing Restatement (Second) of Torts § 876 for the proposition "the derivative nature of an aiding and abetting claim will exist only with the success of the breach of fiduciary duty claim"); *West Fork Advisors LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App.-Dallas 2014) (citing Restatement (Second) of Torts § 876(b) (1979)). As previously discussed in Section B.1., Dugaboy did not owe any fiduciary duty to Plaintiff that could have been breached. Therefore, Plaintiff's derivative claim of aiding and abetting against both Jim and Nancy Dondero is legally impossible and should be dismissed under *Twombly* and Rule 12(b)(6).

---

[38] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169121350.1

**2.      Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because Aiding and Abetting Requires More Than One Actor.**

38.      Even if Dugaboy owed and breached a fiduciary duty to Plaintiff (which it did not), it is legally impossible for Nancy Dondero to have aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement as she was acting as Dugaboy in her trustee status.   Because there are limited cases on point, an analysis under the Restatement (Second) of Torts § 876 (1979) is compelling because Delaware courts routinely look to the Restatement to fill lacunae in the law.   *In re Rural Metro Corp.*, 88 A.3d 54, 98 (Del. Ch. 2014), decision clarified on denial of reargument sub nom. *In re Rural Metro Corp. Stocholders Litig.* (Del. Ch. 2014) (applying the Restatement to an aiding and abetting breach of fiduciary duty analysis).   "The Delaware Supreme Court often relies on the Restatement (Second) of Torts."   *Id.* at 98.   Comparison to cases in other jurisdictions construing law similar to Delaware law is also instructive.

39.      The Restatement (Second) § 876 provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with *the other* or pursuant to a common design with him, or (b) knows that *the other's* conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to *the other* in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979), adopted in Delaware by *Patton v. Simone*, Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) (emphasis added).   Under the Restatement (Second), people act "in concert" with each other when they act "in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result." Restatement (Second) of Torts § 876, comment A.   Under the Restatement (Second), Nancy

18

Dondero could not have conceivably acted "in accordance with an agreement" with herself in her Trustee capacity, as she is a singular individual.

40.     Delaware has not directly addressed the issue of whether one can aid and abet one's self, but it has applied the Restatement (Second) when analyzing aiding and abetting a breach of fiduciary duty claims, which requires a plaintiff to prove: (1) the existence of a fiduciary relationship, (2) breach of the fiduciary's duty, (3) defendant, who is not a fiduciary, knowingly participated in the breach, and (4) damages to the plaintiff as the result of the <u>concerted action</u> of the fiduciary and the non-fiduciary.  *In re USDigital, Inc.*, 443 B.R. 22, 46 (Bankr. D. Del. 2011) (citing elements of aiding and abetting breach of fiduciary duty in Delaware and holding that a director defendant cannot have aided and abetted the same fiduciary duty he allegedly breached in a previous count); *In re Draw,* at 904 (applying Restatement (Second) to the knowing participation element); *Patton,* at *8 (applying Restatement (Second) to aiding and abetting analysis); *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (applying the Restatement (Second) to knowing participation in aiding and abetting analysis and acknowledging that § 876 has been cited with approval in Delaware in ).  Again, because Plaintiff is alleging that Nancy Dondero aided and abetted Dugaboy (which was acting through Nancy Dondero), the requirement of a second actor is not met because Nancy Dondero cannot act in concert with herself.

41.     Analogously, officers and agents cannot aid and abet their principal or each other in the commission of a tort.  *Cornell Glasgow, LLC v La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012); *Amaysing Techs. Corp. v. Cyberair Communications, Inc.,* 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005) ("It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts

19

of the corporation."). Application of this law to the present circumstances further compels the conclusion that Nancy Dondero cannot aid and abet herself. Texas also has looked to the Restatement (Second) of Torts § 876 for guidance regarding its aiding and abetting doctrine, which states that "[i]t is settled as the law of [the State of Texas] that where a <u>third party</u> knowingly participates in the breach of duty of a fiduciary, such <u>third party</u> becomes a joint tortfeasor with [that] fiduciary and is liable as such." *In re TOCFHBI, Inc.*, 413 B.R. 523, 534 (Bankr. N.D. Tex. 2009) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d (1942)) (emphasis added, citing elements); *W. Fork Advisors, LLC v. SunGuard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App. – Dallas 2014, pet. denied) (looking to Restatement (Second) regarding aiding and abetting analysis). Although also having sparse law regarding whether one can aid and abet one's own self, Texas law still requires a third party in order to prove aiding and abetting a breach of fiduciary duty. For the same reasons mentioned above, Nancy simply cannot aid and abet her own actions as Dugaboy Trustee.

42.      Arizona courts have more directly held that under the Restatement (Second), "when [Plaintiffs] fail to allege [agent] took any actions in [their] individual capacity 'in concert' with the actions giving rise to the breach of fiduciary duty claim against [insurance company], [plaintiff's] aiding and abetting claim against [agent] will be dismissed." *Young v. Liberty Mut. Group, Inc.*, CV-12-2302-PHX-JAT, 2013 WL 840618, at *4 (D. Ariz. Mar. 6, 2013).[39] In *Young,* the Court reasoned that "…it does not follow that [agent] must have committed the separate tort of aiding and abetting merely because he was the agent through which [insurance company] breached its duty." *Id.* at *4. The Court dismissed the claim on the agent's 12(b)(6) motion.

---

[39] In *Young,* Plaintiff sued both Liberty Mutual for breach of fiduciary duty, and her personal insurance agent for aiding and abetting said breach. Because Plaintiff failed to allege [agent] took any actions in his individual capacity "in concert" with the actions giving rise to Plaintiff's claim against Liberty Mutual, the aiding and abetting claim was dismissed upon 12(b)(6) motion.

Further, in *Jones v. Colorado Cas. Ins. Co.*, the same Court dismissed a similar claim upon another insurance agent's 12(b)(6) motion, agreeing with the agent's assertion that "one cannot aid and abet one's self." *Jones v. Colorado Cas. Ins. Co.*, CV 12-1968-PHX-JAT, 2013 WL 4759260, at *3 (D. Ariz. Sept. 4, 2013) (dismissing a claim against an insurance agent for aiding and abetting the insurance company's breach of fiduciary duty, determining that in order for there to be harm to a third person, there must be at least two tortfeasors).  Just as the insurance agents could not aid and abet themselves as representatives for the insurance companies, Nancy Dondero could not have aided and abetted herself in her capacity as Dugaboy Trustee.

43.    Connecticut takes a similar approach in holding that aiding and abetting means to help or compel *another* to act, and that an alleged tortfeasor cannot aid or abet himself, and doing so would yield "circular results."  *Bolick v. Alea Group Holdings, Ltd.,* 278 F. Supp. 2d 278, 282 (D. Conn. 2003) (dismissing aiding and abetting claim).[40] Because Nancy Dondero was acting as Dugaboy in the conduct about which Debtoer complains, she is not a "third party" to an act. It is impossible for Nancy Dondero to aid and abet her own self - as most distinctly stated in *Cornell Glasgow, LLC* and *Bolick* - because aiding and abetting requires the concerted action and scienter of more than one person.  Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

> ### 3.    Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and Abetting in its Amended Complaint for Either Jim or Nancy Dondero.

44.    In addition to the above infirmities, Plaintiff fails to allege the necessary scienter required to show aiding and abetting for both Jim and Nancy Dondero.   Delaware courts

---

[40] *Bolick* addressed an employment discrimination case where Plaintiff sued her supervisor for both harassment and aiding and abetting that same harassment.  The Court held that to hold the supervisor liable for his wrongful behavior and also aiding and abetting that wrongful behavior is illogical and would yield circular results. Court used dictionary to reference "abettor" as someone who encourages an offender.

acknowledge that an aiding and abetting analysis largely comes down to what constitutes "knowing participation." *In re Draw*, at 904. The aider and abettor must act "knowingly, intentionally, or with reckless indifference…that is, with an illicit state of mind." *Id.* The Plaintiff must allege specific facts that show Defendants had "actual knowledge" that their conduct intentionally aided and abetted a breach, not simply that they "knew or should have known." *Id.* (citing *Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Delaware Nat. Ass'n*, CIV. 10-520 JBS KMW, 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011)).

45.    In *In re Draw*, a Chapter 11 trustee filed an amended adversary complaint against several members of the company's board of directors, asserting breach of fiduciary duties and aiding and abetting breaches of fiduciary duties. On the defendant's 12(b)(6) motion, the court held that plaintiff's amended complaint failed to allege specific facts showing actual knowledge that [Director] was liable for aiding and abetting, and that plaintiff simply alleged [Director] "knew or should have known" his conduct aided and abetted the breach. *Id.* at 904. The court subsequently dismissed plaintiff's aiding and abetting claims against that particular director.

46.    In *Capitaliza-T*, defendant moved to dismiss plaintiff's amended complaint under Rule 12(b)(6), citing that it did not contain sufficient factual allegations regarding defendant's knowledge of breach of fiduciary duty. The court applied the Delaware rule that "at a minimum, the complaint [must] alleged circumstantial facts suggesting that the defendant had knowledge of the specific principal violation." *Id.* at *5 (citing *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1256 (D. Del. 1991)). The court held that although plaintiff's amended compliant contained circumstantial allegations against defendant for aiding and abetting, it was not enough to allege

CORE/3522697.0002/169121350.1

that defendants "had knowledge of the underlying…breach of fiduciary duty" to survive a 12(b)(6) motion. *Capitaliza-T,* at *7.

47.     In this case, Plaintiff simply alleges that "[the Donderos] were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor," and "[t]he Donderos aided and abetted Dugaboy's breach of its fiduciary duties…by knowingly participating in the authorization of the…Alleged Agreement."[41]  In its Amended Complaint, Plaintiff references only factors that could be circumstantial at best when describing it's Third Claim for relief against Jim Dondero, but never clearly articulates the required specific facts that show "actual knowledge" that he was overtly acting to substantially assist Dugaboy in breaching a fiduciary duty as required by *In re Draw* and *Capitaliza-T*.[42]  Further, Plaintiff makes no specific factual allegations against Nancy Dondero, other than she "[was] aware" of Dugaboy's fiduciary duties, and that she aided and abetted the breach.  Neither claims against Jim nor Nancy Dondero rise to the standard of articulation discussed in *In re Draw* and *Capitaliza-T*.  Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

### 4.     Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because Aiding and Abetting Requires More Than One Single Act.

48.     As discussed in Section C.3 *supra*, the test for stating an aiding and abetting claim is stringent and focuses of proof of scienter that a party knew it was aiding another party in committing tortious conduct.   *In re Draw*, at 904.  This would require Plaintiff to show (1) a primary act by Dugaboy (via Nancy) that breached a fiduciary duty (which it cannot), and (2) a

---

[41] Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

[42] Am. Compl. ¶¶ 3,36,38,39,40,41, Adv. No. 21-03003 [Doc. 73-2]; Am. Compl. ¶ 3,50,51,52,53, Adv. No. 21-03007 [Doc. 55-2]; Am. Compl. ¶¶ 3,48,49,50,51, Adv. No. 21-03006 [Doc. 60-2]; Am. Compl. ¶¶ 3,35,36,37,38,39, Adv. No. 21-03005 [Doc. 55-2].

secondary act by each of Jim and Nancy Dondero that shows scienter and knowing participation in subverting a fiduciary duty.

49.    Plaintiff cannot show concerted action here on behalf of Jim or Nancy Dondero, because the only singular act that occurred was Dugaboy approving the compensation under the LPA.  Plaintiff alleges no other separate act by Nancy Dondero that would have been "in concert" with or "knowingly participating" in anything, as she was acting as the Dugaboy Trustee (discussed above in Section C.2.).  Further, Plaintiff shows no other separate act or proof of scienter that Jim Dondero specifically set out to knowingly aid Dugaboy in tortious conduct under *In re Draw*, since Dugaboy engaged in no such conduct.  Therefore, Plaintiff's Seventh Claim fails *Twombly* and must be dismissed under Rule 12(b)(6).

### 5.    Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of Fiduciary Duty Claim Based on an Executory Contract It Rejected.

50.    The analysis here is the same as in Argument III.A.2. and B.2, *supra*.  Plaintiff argues that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement, which Plaintiff alleges may have violated the LPA.[43] A cause of action for a derivative claim such as aiding and abetting shares accrual and limitations periods with the underlying tort of breach of fiduciary duty.  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied*, (Sept. 6, 2019).  "Because a civil conspiracy claim is derivative of an underlying tort, the claim accrues when the underlying tor accrues." *Id*. at 145.  Here, because Plaintiff's aiding and abetting claims derive from the alleged breach of fiduciary duty claim, the claims share accrual dates.

---

[43] Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

51. Again, Plaintiff was not injured until Jim Dondero did not pay the Notes. This claim did not accrue until December 11, 2020, and is also predicated on allegations that the Subsequent Agreement violates fiduciary duties arising out of the rejected LPA. Once again, Plaintiff is attempting to bring a post-petition claim under the LPA it rejected. Therefore, Plaintiff's Seventh Claim must be dismissed under *Twombly* and Rule 12(b)(6).

## IV.    **CONCLUSION**

Dugaboy, Jim Dondero, and Nancy Dondero therefore respectfully request this Court dismiss Plaintiff's Fifth, Sixth, and Seventh Amended Claims in its Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

Dated: September 1, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO
AND NANCY DONDERO**

*/s/Daniel P. Elms*
Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR DEFENDANT NANCY DONDERO**

*/s/Douglas S. Draper*

Douglas S. Draper, La. Bar No. 5073

Leslie A. Collins, La. Bar No. 14891

Greta M. Brouphy, La. Bar No. 26216

Heller, Draper & Horn, L.L.C.

650 Poydras Street, Suite 2500

New Orleans, LA 70130

Telephone: (504) 299-3300

Fax: (504) 299-3399

Email: ddraper@hellerdraper.com

Email: lcollins@hellerdraper.com

Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR DEFENDANT THE DUGABOY INVESTMENT TRUST**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/169121350.1

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO
AND NANCY DONDERO**

Douglas S. Draper, La. Bar No. 5073
Leslie A. Collins, La. Bar No. 14891
Greta M. Brouphy, La. Bar No. 26216
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

### DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S
### FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF[1]

---

[1] This Motion to Dismiss is being concurrently filed in Adv. Nos. 21-03003, 21-03007, 21-03006, and 21-03005, Case No. 19-34054-sgj11, as Plaintiff's assertions and Amended Complaints against all Defendants are identical in material respects.

# **TABLE OF CONTENTS**

**Page**

I.   BACKGROUND ...................................................................................................... 1

   A.   The Bankruptcy and Rejection of Executory Contracts ........................................ 1

   B.   The Limited Partnership Agreement....................................................................... 2

   C.   The Promissory Notes.............................................................................................. 4

   D.   The Adversary Proceedings ..................................................................................... 6

II.   STANDARD OF REVIEW ...................................................................................... 7

III.   ARGUMENTS AND AUTHORITIES..................................................................... 8

   A.   Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed for Two Reasons. .................................................................................................... 8

      1.   Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on their Face That There is No Actual Controversy between Parties. .............. 8

      2.   Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon an Executory Contract It Rejected. ........................................................ 9

   B.   Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy Dondero Fails for Two Reasons. ......................................................................... 13

      1.   Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of Exercising Its Right to Approve Compensation. .................................. 13

      2.   Nancy Dondero Owes No Fiduciary Duty to Debtor............................... 15

      3.   Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty Based Upon an Executory Contract It Rejected…………………………16

   C.   Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against Jim and Nancy Dondero Fails for Several Reasons............................................. 17

      1.   Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff. ................................................................................................................ 17

      2.   Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because Aiding and Abetting Requires More Than One Actor............................. 18

      3.   Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and Abetting in its Amended Complaint for Either Jim or Nancy Dondero. .. 21

      4.   Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because Aiding and Abetting Requires More Than One Single Act. ..................... 23

      5.   Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of Fiduciary Duty Claim Based on an Executory Contract It Rejected. ....... 24

IV.   CONCLUSION...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
  580 S.W.3d 136 (Tex. 2019), *reh'g denied* (Sept. 6, 2019)....................................24

*In re Alongi*,
  272 B.R. 148 (Bankr. D. Md. 2001) ........................................................................11

*Amaysing Techs. Corp. v. Cyberair Communications, Inc.*,
  2005 WL 578972 (Del. Ch. Mar. 3, 2005)...............................................................19

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937.............................................................................................................7

*Matter of Austin Dev. Co*,
  19 F.3d 1077 (5th Cir. 1994) .............................................................................11, 12

*Bell Atlantic Corp v. Twombly*,
  550 U.S. 544 (2007).............................................................................................. *passim*

*Bolick v. Alea Group Holdings, Ltd.*,
  278 F. Supp. 2d 278 (D. Conn. 2003)......................................................................21

*Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*,
  746 A.2d 842........................................................................................................13, 14

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v.*
  *Wachovia Bank of Delaware Nat. Ass'n*,
  CIV. 10-520 JBS KMW, 2011 WL 864421 (D. Del. Mar. 9, 2011) ................22, 23

*In re Continental Airlines*,
  981 F.2d 1450 (5th Cir. 1993) ...........................................................................11, 12

*Cornell Glasgow, LLC v La Grange Props., LLC*,
  2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ...........................................19, 21

*In re Draw Another Circle*,
  602 B.R. 878 (Bankr. D. Del. 2019) ...............................................17, 19, 21, 23, 24

*Dunmore v. Chicago Title Ins. Co.*,
  400 S.W.3d 635 (Tex. App. – Dallas 2013, no pet.)................................................16

*Elliott v. Foufas*,
  867 F.2d 877 (5th Cir. 1989) .....................................................................................7

CORE/3522697.0002/169121609.1

*In re Est. of Conaway*,
   2012 WL 524190 (Del. Ch. Feb. 15, 2012) ....................................................13, 14

*In re Estate of Denman*,
   362 S.W.3d 134 (Tex. App. – San Antonio 2011, no pet.)......................................9

*Feeley v. NHAOCG, LLC*,
   62 A.3d 649 (Del. Ch. 2012)................................................................................14

*Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*,
   304 F.3d 476 (5th Cir. 2002) ..................................................................................1

*Jones v. Colorado Cas. Ins. Co.*,
   CV 12-1968-PHX-JAT, 2013 WL 4759260 (D. Ariz. Sept. 4, 2013) ..............20, 21

*Keytrade USA, Inc. v. AIN Temouchent M/V*,
   404 F.3d 891 (5th Cir. 2005) ..................................................................................1

*Lauter v. Citgo Petroleum Corp.*,
   CV H-17-2028, 2018 WL 801601 (S.D. Tex. Feb. 8, 2018) .........................9, 11, 12

*Murphey v. Honeycutt*,
   199 S.W.2d 298....................................................................................................10

*Murphy v. Campbell*,
   964 S.W.2d 265 (Tex. 1997).................................................................................16

*Muzquiz v. Para Todos, Inc.*,
   624 S.W.3d 263 (Tex. App. – El Paso 2021, pet. filed) ........................................10

*In re Oracle Corp. Derivative Litig.*,
   CV 2017-0337 WL 3410745 (Del. Ch. June 22, 2020) .........................................19

*Patton v. Simone*,
   Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) .............18, 19

*R2 Invs. LDC v. Phillips*,
   *401 F.3d 638 (5th Cir. 2005)* ...................................................................................7

*In re Rural Metro Corp.*,
   88 A.3d 54 (Del. Ch. 2014)...................................................................................17

*In re Rural Metro Corp. Stocholders Litig.*
   (Del. Ch. 2014) ..............................................................................................17, 18

*Russell-Conaway v. Frederick-Conaway*,
   2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished)................................13

CORE/3522697.0002/169121609.1

*Strebel v. Wimberly*,
371 S.W.3d 267 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)) .........................14

*Tigani v. Tigani*,
2021 Del. Ch. LEXIS 60, 2021 WL 1197576 (March 30, 2021) ...........................................15

*In re TOCFHBI, Inc.*,
413 B.R. 523 (Bankr. N.D. Tex. 2009).................................................................................20

*In re USDigital, Inc.*,
443 B.R. 22 (Bankr. D. Del. 2011) ......................................................................................19

*West Fork Advisors LLC v. SunGard Consulting Services, LLC*,
437 S.W.3d 917 (Tex. App.-Dallas 2014) ............................................................................17

*Williams v. Cigna Financial Advisors, Inc.*,
56 F.3d 656 (5th Cir. 1995) ...................................................................................................1

*Young v. Liberty Mut. Group, Inc.*,
CV-12-2302-PHX-JAT, 2013 WL 840618 (D. Ariz. Mar. 6, 2013) .......................................20

**Statutes**

11 U.S.C. § 365(a) ........................................................................................................................11

11 U.S.C. § 365(g)(1) ...............................................................................................................11, 12

11 U.S.C. § 365 ............................................................................................................................10

Del. Code Ann. Tit. 6, § 17-107 ...................................................................................................13

Del. Code Ann. Tit. 6, § 17-303(b)(8)(o) ......................................................................................14

Del. Code Ann. Tit. 6, § 17-1101(d)..............................................................................................13

Del. Code Ann. Tit. 6, § 17-1102 ..................................................................................................13

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .............................................................................. passim

CORE/3522697.0002/169121609.1

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding* "*Rejection*",
    59 U.Colo.L.Rev. 845 (1988) .................................................................................................11

Restatement (Second) of Torts § 876 (1979)..........................................................................17, 18

Restatement (Second) of Torts § 876, comment A ......................................................................18

In the alternative to and contingent upon a denial by the Court of Defendants' Motion to Compel Arbitration (which the Court should not deny), Defendants move to dismiss the Fifth, Sixth, and Seventh Claims for Relief in Plaintiff's Amended Complaint for failure to state claims on which this Court could grant relief under Federal Rule of Civil Procedure 12(b)(6), as incorporated into this adversary proceeding through Rule 7012 of the Federal Rules of Bankruptcy Procedure. In filing this Motion to Dismiss, Defendants do not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration.[2] Defendants show in support as follows:

## I.  BACKGROUND

### A.  The Bankruptcy and Rejection of Executory Contracts

1       Highland Capital Management, L.P. ("Plaintiff") filed a voluntary Chapter 11 bankruptcy petition ("Bankruptcy Petition") on October 16, 2019 ("Petition Date") in the United States Bankruptcy Court for the District of Delaware, and venue was subsequently transferred to this Court on December 4, 2019.[3]  On November 24, 2020, Plaintiff filed its Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan") along with its Disclosure Statement, which the Court approved on November 24, 2020.[4]

2.       On January 11, 2021, Plaintiff filed its Second Notice of Executory Contracts and Unexpired Leases to be Assumed by the Plaintiff [then, Debtor] Pursuant to the Plan (the

---

[2] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).
[3] Order Transferring Venue, Case 19-12239-Css [Doc. 184].
[4] Case No. 19-34054-sgj11 [Doc. 1476]

1

"Assumption Notice").[5]  The Assumption Notice itemized seventy-one (71) executory contracts to be assumed by the Plaintiff, notably including the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA").  However, on January 21, 2021, the Debtor entered a Withdrawal Notice, rejecting the LPA along with several other executory contracts,[6] and confirmed on February 1, 2021, that it had withdrawn the LPA from its list of assumed executory contracts.[7]  On February 22, 2021 (the "Rejection Date"), the Court confirmed the Plan, causing the rejection of the LPA.[8]

### B.   The Limited Partnership Agreement

3.   James Dondero ("Jim Dondero") is the co-founder of Highland Capital (Plaintiff in this Adversary Proceeding), and served as its President and CEO until January 9, 2020.[9]  The Dugaboy Family Trust ("Dugaboy") is one of Debtor's Class A limited partners and holds the majority of the Debtor's Class A limited partnership interests.  LPA, Exhibit A.  Jim Dondero's sister Nancy Dondero serves as the Dugaboy Family Trustee.[10]  Jim Dondero is a lifetime beneficiary of Dugaboy.[11]

4.   Dugaboy's explicit authorization to approve compensation for Jim Dondero - and thus bind the Partnership - comes specifically from the LPA in § 3.10(a), which provides in pertinent part:

(a)   <u>Compensation</u>.     The *General Partner* and any *Affiliate* of the General Partner shall receive no compensation from the Partnership for services rendered

---

[5] Case 19-34054-sgj11 [Doc. 1719].
[6] Case 19-34054-sgj11 [Doc. 1791, Schedule A].
[7] Case 19-34054-sgj11 [Doc. 1871].
[8] Case 19-34054-sgj11 [Doc. 1943].
[9] Am. Compl. ¶ 11, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 12, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 12, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 12, Adv. No. 21-03005 [Doc. 63].
[10] Am. Compl. ¶ 13, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 14, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 14, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 14, Adv. No. 21-03005 [Doc. 63].
[11] Am. Compl. ¶ 12, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 13, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 13, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 13, Adv. No. 21-03005 [Doc. 63].

pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

"**'*Majority Interest*'** means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners." LPA § 2.1, p.4.

"**'*Class A Limited Partners*'** means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>." LPA § 2.1, p.2.

<u>**Exhibit A**</u> reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests. LPA, <u>Exhibit A</u>, line 5.[12]

Based on the Compensation provision and definitions, Dugaboy clearly had the right to approve compensation for the General Partner and its Affiliates. The General Partner entitled to compensation here is Strand Advisors, Inc. The LPA Preamble states in pertinent part:

"This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner. LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

"**'*Affiliate*'** means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term **'*control*'** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise." LPA § 2.1, p.2.

"**'*Person*'** means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity." LPA § 2.1, p.5.

It is undisputed that Jim Dondero was an Affiliate of Strand under the LPA's definition. It is also undisputed that he controlled Highland Capital Real Estate Partners ("HCRE"), Nexpoint Advisors, L.P. ("Nexpoint"), and Highland Capital Management Services, Inc. ("HCMS").[13]

Thus, Jim Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

---

[12] *See* attached, LPA <u>Exhibit A</u>.

[13] Am. Compl. ¶ 2, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 2, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 2, Adv. No. 21-03005 [Doc. 63].

C.       **The Promissory Notes**

5.       Over the last several years, multiple promissory notes were executed in favor of the Plaintiff to different entities and individuals, which obligations became subject to potential forgiveness as compensation for Jim Dondero that, under the LPA, Dugaboy was charged with approving:

Notes to Jim Dondero (the "Dondero Notes"):

1.       A note for $3,825,000, executed on February 2, 2018, payable on demand.
2.       A note for $2,500,000, executed on August 1, 2018, payable on demand.
3.       A note for $2,500,000, executed on August 13, 2018, payable on demand.[14]

Notes to HCRE (the "HCRE Notes"):

1.       A note for $100,000, executed on November 27, 2013, payable on demand.
2.       A note for $2,500,000, executed on October 12, 2017, payable on demand.
3.       A note for $750,000, executed on October 15, 2018, payable on demand.
4.       A note for $900,000, executed on September 25, 2019, payable on demand.
5.       A term note for $6,059,831, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[15]

Notes to HCMS (the "HCMS Notes"):

1.       A note for $150,000, executed on March 28, 2018, payable on demand.
2.       A note for $200,000, executed on June 25, 2018, payable on demand.
3.       A note for $400,000, executed on May 29, 2019, payable on demand.
4.       A note for $150,000, executed on June 26, 2019, payable on demand.[16]

Note to Nexpoint (the "Nexpoint Note"):

1.       A term note for $30,746,812.33, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[17]

---

[14] Am. Compl. ¶¶ 20-22, Adv. No. 21-03003, Case No. 19-34054-sgj11 [Doc. 79].
[15] Am. Compl. ¶¶ 21-24, Adv. No. 21-03007, Case No. 19-34054-sgj11 [Doc. 63]; According to its Amended Complaint, Plaintiff alleges in ¶ 63 that it has suffered damages under the note "in the amount of at least $5,012,260.96, as of December 11, 2020," but in ¶ 64 that it has suffered damages "in the amount of at least $6,145,466.84 as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date..."
[16] Am. Compl. ¶¶ 21-24, Adv. No. 21-03006, Case No. 19-34054-sgj11 [Doc. 68].
[17] Am. Compl. ¶ 21, Adv. No. 21-03005, Case No. 19-34054-sgj11 [Doc. 63]; Plaintiff alleges in ¶ 31 that "as of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03," and claims the same amount as damages in ¶ 48.

6.      Jim Dondero entered into agreement (the "Subsequent Agreements," or as Plaintiff refers to them, the "Alleged Agreements") with Nancy Dondero (acting for Dugaboy as its Trustee) that Plaintiff would not demand collection of the Notes unless events had occurred that made fulfillment of conditions subsequent impossible.[18]   However, annual term loan payments and annual interest payments on the demand notes were to be (and were) made.[19]

7.      On December 3, 2020, after the bankruptcy Petition Date, Plaintiff demanded payment from Jim Dondero, HCRE, and HCMS on their respective demand notes due by December 11, 2020.[20]   On January 7, 2021, Plaintiff made a demand on the Nexpoint term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $24,471,804.98," and a demand on the HCRE term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $6,145,466.84."[21]   Plaintiff has refused to recognize the Subsequent Agreement, calling it a "fiction."[22]   Other than annual term and interest payments and some voluntary prepayments on the term notes, Defendants have not paid the Notes.[23]

---

[18] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].

[19] *E.g.,* Am. Compl. ¶ 21,27, Adv. No. 21-03005 [Doc. 63], showing the original principal of the note being $30,746,812.33, but Plaintiff only demanding $24,471,804.98 in its demand letter; *E.g.*, Am. Compl. ¶ 37,63,64, Adv. No. 21-03007 [Doc. 63], showing the original principal of the note being $6,059,831, but Plaintiff alleging it was damaged in the amount of at least $5,012,260.96 as of December 11, 2020, but also in the next paragraph inconsistently alleging it was damaged in the amount of at least $6,145,466.84.

[20] Am. Compl. ¶ 26, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 28, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 28, Adv. No. 21-03006 [Doc. 68].

[21] Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63]; Am. Compl. ¶43, Adv. No. 21-03007 [Doc. 63].

[22] Am. Compl. ¶ 3, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 3, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 3, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 3, Adv. No. 21-03005 [Doc. 63].

[23] With respect to the Nexpoint term loans, due to a mistake, the 2020 end-of-year payment was late and the notes should be deemed current, Am. Ans. ¶ 40,41, Adv. Pro. 21-03005 [Doc. 50]; Am. Compl. ¶ 28, Adv. No. 21-03005 [Doc. 55-2], acknowledging payment of $1,406,111.92.

### D.      The Adversary Proceedings

8.      On January 22, 2021, Plaintiff initiated Adversary Proceedings against Jim Dondero, HCRE, HCMS, and Nexpoint for breach of contract and turnover of property.[24]  On August 17, 2021, Plaintiff filed Amended Complaints against each Defendant alleging additional claims against Jim Dondero and new claims against Dugaboy and Nancy Dondero. Defendants each filed Amended Answers asserting several affirmative defenses, including that the Subsequent Agreements preclude the respective claims.[25]

9.      In the Fifth Claim of each Amended Complaint,[26] Plaintiff asks the Court to declare (a) that limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the LPA, (b) that neither Dugaboy nor Nancy Dondero was  authorized under the LPA to enter into the Subsequent Agreement on behalf of the Partnership, (c) that neither Dugaboy nor Nancy Dondero otherwise had the right or authority to enter into the Subsequent Agreement on behalf of the Partnership, and (d) the Subsequent Agreement is null and void.[27]

10.      In the Sixth Claim of each Amended Complaint,[28] Plaintiff alleges that if Dugaboy, as a limited partner under the LPA, or Nancy Dondero, as the representative of Dugaboy, had the

---

[24] Am. Compl. ¶ 33, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 47, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 45, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 33, Adv. No. 21-03005 [Doc. 63].
[25] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].
[26] Nancy Dondero is a Defendant on Counts V, VI, and VII in Adv. No. 21-03005, Adv. No. 21-3006, and Adv. No. 21-3007.  Nancy Dondero is a Defendant only on Count VII in Adv. No. 21-03003.
[27] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63], Plaintiff alleges against Dugaboy and Nancy Dondero; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].
[28] *See* note 26, *supra.*

authority to enter into the Subsequent Agreement on behalf of [Plaintiff], then Dugaboy incurred

a fiduciary duty of care, and breached said duty by entering into the Subsequent Agreement.[29]

11.     In the Seventh Claim of each Amended Complaint, Plaintiff alleges that Jim and

Nancy Dondero were aware that Dugaboy would have fiduciary duties owed to the Plaintiff if

acting to bind the Plaintiff per the authorization in the LPA, and aided and abetted Dugaboy's

breach of its fiduciary duties by knowingly participating in the authorization of the Subsequent

Agreement.[30]

## II.     STANDARD OF REVIEW

12.     An asserted cause of action must be dismissed when the complaint fails to state a

claim.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), the complaint

must meet two criteria: (1) it must assert a plausible claim, and (2) it must set forth sufficient

factual allegations to support the claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, at 1949-50 (citing *Bell

Atlantic Corp v. Twombly*, 550 U.S. 544 (2007)).  Thus, either a "lack of cognizable legal theory

or the absence of sufficient facts alleged under a cognizable legal theory" requires dismissal.  Id.

The plaintiff must allege specific facts and not conclusory allegations.  *Elliott v. Foufas*, 867 F.2d

877, 881 (5th Cir. 1989).  A court may not strain to find inferences favorable to the plaintiff or

accept conclusory allegations, unwarranted deduction, or legal conclusion.  *R2 Invs. LDC v.

Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

13.     To satisfy *Twombly* and Iqbal, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.*, *Twombly,* at 570.  A

claim has facial plausibility when the plaintiff pleads enough factual content that allows the court

---

[29] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].
[30] Am. Compl. ¶ 79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 93, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 77, Adv. No. 21-03005 [Doc. 63].

to draw the reasonable inference that the defendant is liable under the alleged claim.  *Id*. at 556.

Even if a court decides that the factual allegations are entitled to an assumption of truth, however,

the facts must also "plausibly suggest an entitlement to relief." *Id., Iqbal,* at 1951.

## III.    ARGUMENTS AND AUTHORITIES

### A.    Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed for Two Reasons.

#### 1.    Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on their Face That There is No Actual Controversy between Parties.

14.    Plaintiff's claim presents no "actual controversy" because the provisions of the

LPA clearly allow Dugaboy to bind the Partnership by approving compensation and there is no

controversy that could require a declaration by this Court.

15.    Plaintiff argues that Dugaboy was not authorized to enter into the Subsequent

Agreement regarding Jim Dondero's compensation, nor was it authorized to bind the Partnership.[31]

Plaintiff further attached the LPA as "Exhibit 5" to its Amended Complaints and referenced this

Court to § 4.2, which states:

> Management of Business.    No Limited Partner shall take part in the control
> (within the meaning of the Delaware Act) of the Partnership's business, transact
> any business in the Partnership's name, or have the power to sign documents for or
> otherwise bind the Partnership *other than as specifically set forth in this
> Agreement*.[32] (emphasis added).

16.    Contrary to Plaintiff's argument, the LPA explicitly authorizes Dugaboy as the

Majority Interest to approve compensation for Jim Dondero as previously articulated in this

Motion.  Approving compensation inherently binds the Partnership in that it exchanges money on

behalf of the Partnership for services rendered.  Because it is so expressly provided for in the LPA,

---

[31] *Id.*

[32] Am. Compl. ¶ 43, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 55, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 53, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63].

Plaintiff's contention that Dugaboy could not act to bind the Partnership through compensation agreements amounts to Plaintiff's misinterpretation of the LPA as opposed to an "actual controversy" in need of declaratory relief.  This claim is nothing more than Plaintiff's attempt at an end-around to avoid proving the merits of its breach of fiduciary duty claims and essentially asks this Court for an advisory opinion to help Plaintiff do so.  Under *Twombly*, Plaintiff's claim for declaratory relief should be dismissed pursuant to Rule 12(b)(6).

> ### 2.    Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon an Executory Contract It Rejected.

17.    There is no authority for "allowing a debtor's estate or a successor-in-interest such as the [creditor's committee or litigation trustee] to pursue claims for post-petition breaches of a rejected contract. Because rejection is an affirmative declaration by the debtor that the estate will not take on the obligations of a prepetition contract made by the debtor, [Plaintiff-Debtor's] rejection of the [LPA] not only relieved the estate of its post-petition performance obligations, but also relieved the estate of its ability to assert claims for post-petition breaches thereof."  *Lauter v. Citgo Petroleum Corp.*, CV H-17-2028, 2018 WL 801601, at *15 (S.D. Tex. Feb. 8, 2018).  As explained below, as a result, not only does this preclude Debtor's claims for breach of fiduciary duty (see sections B.2., C.5. *infra*), it also precludes Debtor's attempt to obtain declaratory relief.

18.    Plaintiff seeks declaratory relief against Dugaboy and Nancy Dondero to determine if either of them were authorized to enter into the Subsequent Agreement under the LPA.[33] Although most causes of action accrue when an injury results from a wrongful act, a cause of action for declaratory relief differs in that it does not accrue until there is an actual controversy between the parties.  *In re Estate of Denman*, 362 S.W.3d 134, 144 (Tex. App. -- San Antonio

---

[33] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

2011, no pet.); *Murphey v. Honeycutt*, 199 S.W.2d 298, 299 (holding that declaratory judgment action accrued in a will construction case at the time when an heir committed an act indicating she was operating against the will, not when the will was executed years prior to the heir's act); *Muzquiz v. Para Todos, Inc.*, 624 S.W.3d 263, 278 (Tex. App. – El Paso 2021, pet. filed) (holding that in a lease dispute, the actual controversy did not arise-- and the claim did not accrue- when the lease was entered into by the parties, but rather when plaintiff challenged the lease terms at a later date).

19.     Here, Plaintiff's declaratory relief claim accrued (if at all) when Jim Dondero asserted the Subsequent Agreement as an affirmative defense. Plaintiff alleges that the actual controversy here is whether or not Dugaboy or Nancy Dondero had authority to enter into the Subsequent Agreement under the rejected LPA. Plaintiff specifically pleads that "[a] bona fide, actual, present dispute exists between the [Plaintiff] and Dugaboy concerning whether Dugaboy was authorized to enter into the Alleged Agreement on the [Plaintiff]'s behalf….[and a] judgment declaring the parties' respective rights and obligations will resolve their dispute."[34] Plaintiff did not allege anywhere in its Original Complaint that a dispute regarding Dugaboy's authority to enter the Subsequent Agreement required declaratory relief. Only after Defendants filed their Amended Answers did Plaintiff seek such relief in its Amended Complaint.[35] Therefore, this cause of action for declaratory relief accrued when Plaintiff received Defendant's Amended Answers after the bankruptcy began, as that is when facts came into existence that created an actual controversy under the LPA.

20.     Section 365 of Title 11 of the United States Code (the "Bankruptcy Code") governs the inclusion and exclusion of executory contracts in bankruptcy. Section 365 vests the power to

---

[34] *Id.*
[35] *Id.*

reject or assume any of the Debtor's executory contracts in the trustee, subject to the court's approval.  11 U.S.C. § 365(a).  A debtor's rejection of an executory contract constitutes a breach of such contract immediately before the date of the filing of the [bankruptcy] petition.  11 U.S.C. § 365(g)(1).  In this case, Plaintiff's act of rejection resulted in a material breach of the LPA that relates back to October 15, 2019 (the "Breach Date") pursuant to the Bankruptcy Code.  *See* 11 U.S.C. § 365(g)(1).

21.    "Rejection is an affirmative declaration that the estate will not take on the obligations of a pre-petition contract made by the debtor" and "places the obligation to perform outside of the bankruptcy administration." *Lauter*, at *13, citing *Matter of Austin Dev. Co*, 19 F.3d 1077, 1082-83 (5th Cir. 1994); *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993). "[R]ejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it." *In re Alongi*, 272 B.R. 148, 153 (Bankr. D. Md. 2001) (citing M. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845 (1988)). As noted above, rejection not only relieves the estate of post-[bankruptcy]petition performance obligations, but also of its ability to assert claims for post-petition breaches thereof. *Lauter,* at *15.

22.    The court in *Lauter* looked to the reasoning of Fifth Circuit opinions examining the effects of plaintiffs rejecting executory contracts under § 365.  In *In re Continental*, the court reasoned in part that, under § 365, "An agreement cannot 'exist' for one purpose yet take on a 'nonexistent' quality which works for the advantage of one party or the other" when a debtor-plaintiff sought to avoid paying airline pilots under an executory contract it rejected, attempting to treat the contract as terminated.  *Id.* at 1460.  Likewise, the court in *Matter of Austin* reasoned that a rejection of a lease under § 365 did not terminate the lease, but moved the rights of the parties

affected "outside of the bankruptcy court's realm because after rejection, the debtor's estate is no longer involved in the leasehold transaction." *Id.* at 1083.

23.    Following the Fifth Circuit's application of § 365 in cases such as *In re Continental* and *Matter of Austin*, the court in *Lauter* addressed the impact of a debtor-plaintiff's attempt to pursue post-petition claims against a defendant whose executory contract had been rejected. The court held that just as in any other contract dispute, a prior material breach by a counterparty relieved the aggrieved party of the duty to perform and deprived the breaching party of the ability to make claims for breach after its own breach. *Id.* at *12-13, 15. After a thorough discussion of § 365, the court ultimately found that the plaintiff lacked standing to pursue claims resulting from a post-petition breach of an executory contract, holding that "the court has not found any authority allowing a debtor's estate . . . to pursue claims for post-petition breaches of a rejected contract." *Id.* at *15.

24.    Here, Plaintiff asks this Court to interpret and, in effect, determine a breach of the same LPA it rejected and breached prior to the bankruptcy petition date. The LPA was rejected on February 22, 2021 and thus deemed materially breached on October 15, 2019 under § 365(g)(1). Because this cause of action accrued after both rejection and the relation-back breach provision of § 365, Plaintiff's Fifth Claim for declaratory relief amounts to a post-petition claim arising from a rejected executory contract, which the court in *Lauter* held a Debtor lacks standing to assert in a bankruptcy proceeding. Therefore, this claim should be dismissed pursuant to *Twombly* and Rule 12(b)(6).

CORE/3522697.0002/169121609.1

### B.   Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy Dondero Fails for Two Reasons.

#### 1.   Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of Exercising Its Right to Approve Compensation.

25.   Plaintiff alleges that "if Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement…then Dugaboy would owe the [Plaintiff] a fiduciary duty."[36]  The LPA in this case is governed by the Delaware Revised Uniform Limited Partnership Act (the "DRULPA") except as specifically provided for in the LPA.  LPA §§ 1.1,1.2; *see also* Del. Code Ann. Tit. 6, § 17-1102.  The DRULPA allows partnership agreements to expand, restrict, or eliminate fiduciary and other legal or equitable duties, provided it may not eliminate the implied contractual duty of good faith and fair dealing.  Del. Code Ann. Tit. 6, § 17-1101(d).  The DRULPA also specifically permits a partnership agreement to provide the rules for how partners may transact with the partnership.  Del. Code Ann. Tit. 6, § 17-107.

26.   In Delaware, a limited partner does not owe a fiduciary duty as a consequence of exercising a right of the limited partner under the partnership agreement.  *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*, 746 A.2d 842, 864 (Del. Ch. 1999); *In re Est. of Conaway*, 2012 WL 524190, at *3 (Del. Ch. Feb. 15, 2012), *aff'd sub nom. Russell-Conaway v. Frederick-Conaway*, 2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished).

27.   In *Bond Purchase*, a limited partner exercised its right under the limited partnership agreement to obtain records of the owners of the partnership for the purpose of making a tender offer for additional interests in the partnership.  Although the other partners claimed this request for records was a breach of a fiduciary duty, the court held that "in the absence of any provision in the partnership agreement engrafting duties onto [the limited partner]," "[the limited partner]

---

[36] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

13

owes no fiduciary duties," and allowed the limited partner access to the records it sought under the partnership agreement. *Id.* at 864.

28.     In *In re Est. of Conaway*, a limited partner withheld consent to transfer another partner's interest as he was allowed to under the limited partnership agreement.  The receiving party alleged a breach of the non-consenting limited partner's fiduciary duty.  The court held that where the limited partner "merely exercised his contracted-for rights under the terms of the [limited partnership agreement]," the limited partner breached no fiduciary duty, assuming there even was one. *Id*. at *3.

29.     Just as the limited partners in *Bond Purchase* and *In re Est. of Conaway*, Dugaboy was merely exercising its right to approve compensation pursuant to the LPA when it entered into the Subsequent Agreement.  LPA § 3.10(a); § 2.1.  Therefore, Dugaboy owes no fiduciary duty to the Plaintiff as a consequence of simply exercising its right under the LPA.  While a limited partner who takes on an active role in the management of the entity may thereby assume fiduciary duties, *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 662 (Del. Ch. 2012) (citing cases); *Bond Purchase* at 863-64, merely engaging in actions delegated to the limited partner in the partnership agreement does not constitute participating in the control of a business so as to trigger the assumption of fiduciary duties.  Del. Code Ann. Tit. 6, § 17-303(b)(8)(o).

30.     Texas has similarly held that "a limited partner does not participate in the control of the business" by taking certain actions listed in the statutes, and such "actions complained of by the plaintiff did not amount to the types of control that could give rise to a duty to the other limited partners." *Strebel v. Wimberly,* 371 S.W.3d 267, 280 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)).

31.     Here, Dugaboy did not participate in the control of the business because it was taking actions explicitly extended to it in the LPA by approving compensation under § 3.10(a). LPA § 3.10(a); § 2.1.  Since the LPA explicitly gives Dugaboy the right to approve such compensation, and Dugaboy was not participating in the control of the business, Dugaboy does not owe a fiduciary duty to Plaintiff.  Dugaboy cannot breach a fiduciary duty it does not owe. Further, Nancy Dondero as Trustee owes no fiduciary duty to Plaintiff independently from what Dugaboy owes, as Dugaboy is her principal.  Like Dugaboy, Nancy Dondero cannot breach a fiduciary duty she does not owe.  Under *Twombly*, Plaintiff's claim for breach of fiduciary duty against Dugaboy and Nancy Dondero should be dismissed pursuant to Rule 12(b)(6).

### 2.    Nancy Dondero Owes No Fiduciary Duty to Debtor.

32.     Under Delaware law, a trustee's fiduciary duties of care and loyalty flow to the trust and the beneficiar(ies) of the trust. *Tigani v. Tigani*, 2021 Del. Ch. LEXIS 60, *1, 2021 WL 1197576 (March 30, 2021). A trustee is prohibited from considering her own interests and "all consideration of the interests of third persons." *Id*. at * 38.

33.     Plaintiff claims that if Dugaboy had the authority to enter into the Subsequent Agreement, then Ms. Dondero would then somehow owe a fiduciary duty directly to Plaintiff.  The Amended Complaint does not allege any facts as to why or how such a fiduciary duty would appear, and there is no legal authority to support such a conclusion. As discussed above, not even Dugaboy owed a fiduciary duty to Plaintiff in determining compensation, as Dugaboy was expressly authorized to do under § 3.10(a) of the LPA. Nancy Dondero, individually, is even further removed from owing any duty to Plaintiff, much less a fiduciary duty.  Plaintiff cannot create a legal duty simply by claiming one exists, and its breach of fiduciary duty claim against Nancy Dondero should be dismissed under *Twombly* and Rule 12(b)(6).

CORE/3522697.0002/169121609.1

3.      **Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty
Based Upon an Executory Contract It Rejected.**

34.     Plaintiff's Sixth Claim is also barred for the same reasons that discussed in Section

A.2 *supra*, and similarly relies on the fact that this cause of action accrued after the LPA was

breached on October 15, 2019.  In this case, Plaintiff suffered no legal injury – and no cause of

action accrued - until the notes were not paid on demand by December 11, 2020.

35.     Generally, "a cause of action accrues…when facts come into existence that

authorize a claimant to seek judicial remedy."  *Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d

635, 640 (Tex. App. – Dallas 2013, no pet.) (citing cases).  "Breach of fiduciary duty claims

generally accrue when the claimant knows or in the exercise of ordinary diligence should know of

the wrongful act *and* resulting injury."  *Dunmore,* at 641 (emphasis added).  Further, "[t]he general

rule governing when a claim accrues…is the 'legal injury rule,' which provides that a claim accrues

'when a wrongful act causes some legal injury, even if that fact of injury is not discovered until

later, and even if all damages have not yet occurred.'"  *Id.* (citing *Murphy v. Campbell*, 964 S.W.2d

265, 270 (Tex. 1997)).  "[A] legal injury [is] an injury giving cause of action by reason of its being

an invasion of a Plaintiff's right…be the damage however slight."  *Murphy*, at 270.  Although the

discussion of when a claim accrues in Texas generally involves application of the discovery rule

(which is not applicable to these facts), the concept of "legal injury" is still the cornerstone of an

accrual analysis.

36.     Here, Plaintiff alleges that Dugaboy and Nancy Dondero breached a fiduciary duty

when it entered into the Subsequent Agreement.[37]  The alleged wrongful act was the Subsequent

Agreement itself which Plaintiff alleges breached a fiduciary duty.  However, Plaintiff suffered no

---

[37] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

legal injury from the Subsequent Agreement until Defendant did not pay the Notes when demanded (if it even suffered one at all). The Subsequent Agreement simply made the Notes potentially forgivable upon conditions subsequent, which could not have impacted the alleged value of the Notes until the conditions occurred. As a result, the cause of action did not accrue until December 11, 2020, after the Petition Date. Debtor's rejection of the LPA, the alleged source of the fiduciary duties allegedly breached,[38] therefore bars pursuit of the Plaintiff's Sixth Claim for the same reasons set forth in Section A.2 *supra*.

### C.    Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against Jim and Nancy Dondero Fails for Several Reasons.

#### 1.    Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff.

37.    Plaintiff claims that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by entering into the Subsequent Agreement. However, aiding and abetting is a fundamentally dependent claim that can only succeed if there is a valid underlying breach of fiduciary duty claim. *In re Draw Another Circle*, 602 B.R. 878, 904 (Bankr. D. Del. 2019) (citing Restatement (Second) of Torts § 876 for the proposition "the derivative nature of an aiding and abetting claim will exist only with the success of the breach of fiduciary duty claim"); *West Fork Advisors LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App.-Dallas 2014) (citing Restatement (Second) of Torts § 876(b) (1979)). As previously discussed in Section B.1., Dugaboy did not owe any fiduciary duty to Plaintiff that could have been breached. Therefore, Plaintiff's derivative claim of aiding and abetting against both Jim and Nancy Dondero is legally impossible and should be dismissed under *Twombly* and Rule 12(b)(6).

---

[38] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

2.    **Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because Aiding and Abetting Requires More Than One Actor.**

38.    Even if Dugaboy owed and breached a fiduciary duty to Plaintiff (which it did not), it is legally impossible for Nancy Dondero to have aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement as she was acting as Dugaboy in her trustee status.  Because there are limited cases on point, an analysis under the Restatement (Second) of Torts § 876 (1979) is compelling because Delaware courts routinely look to the Restatement to fill lacunae in the law.  *In re Rural Metro Corp.*, 88 A.3d 54, 98 (Del. Ch. 2014), decision clarified on denial of reargument sub nom. *In re Rural Metro Corp. Stocholders Litig.* (Del. Ch. 2014) (applying the Restatement to an aiding and abetting breach of fiduciary duty analysis).  "The Delaware Supreme Court often relies on the Restatement (Second) of Torts."  *Id.* at 98.  Comparison to cases in other jurisdictions construing law similar to Delaware law is also instructive.

39.    The Restatement (Second) § 876 provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with *the other* or pursuant to a common design with him, or (b) knows that *the other's* conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to *the other* in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979), adopted in Delaware by *Patton v. Simone*, Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) (emphasis added).  Under the Restatement (Second), people act "in concert" with each other when they act "in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result." Restatement (Second) of Torts § 876, comment A.  Under the Restatement (Second), Nancy

CORE/3522697.0002/169121609.1

Dondero could not have conceivably acted "in accordance with an agreement" with herself in her Trustee capacity, as she is a singular individual.

40.     Delaware has not directly addressed the issue of whether one can aid and abet one's self, but it has applied the Restatement (Second) when analyzing aiding and abetting a breach of fiduciary duty claims, which requires a plaintiff to prove: (1) the existence of a fiduciary relationship, (2) breach of the fiduciary's duty, (3) defendant, who is not a fiduciary, knowingly participated in the breach, and (4) damages to the plaintiff as the result of the concerted action of the fiduciary and the non-fiduciary.  *In re USDigital, Inc.*, 443 B.R. 22, 46 (Bankr. D. Del. 2011) (citing elements of aiding and abetting breach of fiduciary duty in Delaware and holding that a director defendant cannot have aided and abetted the same fiduciary duty he allegedly breached in a previous count); *In re Draw,* at 904 (applying Restatement (Second) to the knowing participation element); *Patton,* at *8 (applying Restatement (Second) to aiding and abetting analysis); *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (applying the Restatement (Second) to knowing participation in aiding and abetting analysis and acknowledging that § 876 has been cited with approval in Delaware in ).  Again, because Plaintiff is alleging that Nancy Dondero aided and abetted Dugaboy (which was acting through Nancy Dondero), the requirement of a second actor is not met because Nancy Dondero cannot act in concert with herself.

41.     Analogously, officers and agents cannot aid and abet their principal or each other in the commission of a tort.  *Cornell Glasgow, LLC v La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012); *Amaysing Techs. Corp. v. Cyberair Communications, Inc.,* 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005) ("It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts

19

of the corporation."). Application of this law to the present circumstances further compels the conclusion that Nancy Dondero cannot aid and abet herself.  Texas also has looked to the Restatement (Second) of Torts § 876 for guidance regarding its aiding and abetting doctrine, which states that "[i]t is settled as the law of [the State of Texas] that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with [that] fiduciary and is liable as such." *In re TOCFHBI, Inc.*, 413 B.R. 523, 534 (Bankr. N.D. Tex. 2009) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d (1942)) (emphasis added, citing elements); *W. Fork Advisors, LLC v. SunGuard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App. – Dallas 2014, pet. denied) (looking to Restatement (Second) regarding aiding and abetting analysis).  Although also having sparse law regarding whether one can aid and abet one's own self, Texas law still requires a third party in order to prove aiding and abetting a breach of fiduciary duty.  For the same reasons mentioned above, Nancy simply cannot aid and abet her own actions as Dugaboy Trustee.

42.     Arizona courts have more directly held that under the Restatement (Second), "when [Plaintiffs] fail to allege [agent] took any actions in [their] individual capacity 'in concert' with the actions giving rise to the breach of fiduciary duty claim against [insurance company], [plaintiff's] aiding and abetting claim against [agent] will be dismissed." *Young v. Liberty Mut. Group, Inc.,* CV-12-2302-PHX-JAT, 2013 WL 840618, at *4 (D. Ariz. Mar. 6, 2013).[39]  In *Young,* the Court reasoned that "…it does not follow that [agent] must have committed the separate tort of aiding and abetting merely because he was the agent through which [insurance company] breached its duty." *Id.* at *4.  The Court dismissed the claim on the agent's 12(b)(6) motion.

---

[39] In *Young,* Plaintiff sued both Liberty Mutual for breach of fiduciary duty, and her personal insurance agent for aiding and abetting said breach.  Because Plaintiff failed to allege [agent] took any actions in his individual capacity "in concert" with the actions giving rise to Plaintiff's claim against Liberty Mutual, the aiding and abetting claim was dismissed upon 12(b)(6) motion.

CORE/3522697.0002/169121609.1

Further, in *Jones v. Colorado Cas. Ins. Co.*, the same Court dismissed a similar claim upon another insurance agent's 12(b)(6) motion, agreeing with the agent's assertion that "one cannot aid and abet one's self." *Jones v. Colorado Cas. Ins. Co.*, CV 12-1968-PHX-JAT, 2013 WL 4759260, at *3 (D. Ariz. Sept. 4, 2013) (dismissing a claim against an insurance agent for aiding and abetting the insurance company's breach of fiduciary duty, determining that in order for there to be harm to a third person, there must be at least two tortfeasors). Just as the insurance agents could not aid and abet themselves as representatives for the insurance companies, Nancy Dondero could not have aided and abetted herself in her capacity as Dugaboy Trustee.

43.     Connecticut takes a similar approach in holding that aiding and abetting means to help or compel *another* to act, and that an alleged tortfeasor cannot aid or abet himself, and doing so would yield "circular results." *Bolick v. Alea Group Holdings, Ltd.*, 278 F. Supp. 2d 278, 282 (D. Conn. 2003) (dismissing aiding and abetting claim).[40] Because Nancy Dondero was acting as Dugaboy in the conduct about which Debtoer complains, she is not a "third party" to an act. It is impossible for Nancy Dondero to aid and abet her own self - as most distinctly stated in *Cornell Glasgow, LLC* and *Bolick* - because aiding and abetting requires the concerted action and scienter of more than one person. Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

>    **3.     Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and Abetting in its Amended Complaint for Either Jim or Nancy Dondero.**

44.     In addition to the above infirmities, Plaintiff fails to allege the necessary scienter required to show aiding and abetting for both Jim and Nancy Dondero. Delaware courts

---

[40] *Bolick* addressed an employment discrimination case where Plaintiff sued her supervisor for both harassment and aiding and abetting that same harassment. The Court held that to hold the supervisor liable for his wrongful behavior and also aiding and abetting that wrongful behavior is illogical and would yield circular results. Court used dictionary to reference "abettor" as someone who encourages an offender.

acknowledge that an aiding and abetting analysis largely comes down to what constitutes "knowing participation." *In re Draw*, at 904. The aider and abettor must act "knowingly, intentionally, or with reckless indifference…that is, with an illicit state of mind." *Id.* The Plaintiff must allege specific facts that show Defendants had "actual knowledge" that their conduct intentionally aided and abetted a breach, not simply that they "knew or should have known." *Id.* (citing *Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Delaware Nat. Ass'n*, CIV. 10-520 JBS KMW, 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011)).

45.    In *In re Draw*, a Chapter 11 trustee filed an amended adversary complaint against several members of the company's board of directors, asserting breach of fiduciary duties and aiding and abetting breaches of fiduciary duties. On the defendant's 12(b)(6) motion, the court held that plaintiff's amended complaint failed to allege specific facts showing actual knowledge that [Director] was liable for aiding and abetting, and that plaintiff simply alleged [Director] "knew or should have known" his conduct aided and abetted the breach. *Id.* at 904. The court subsequently dismissed plaintiff's aiding and abetting claims against that particular director.

46.    In *Capitaliza-T*, defendant moved to dismiss plaintiff's amended complaint under Rule 12(b)(6), citing that it did not contain sufficient factual allegations regarding defendant's knowledge of breach of fiduciary duty. The court applied the Delaware rule that "at a minimum, the complaint [must] alleged circumstantial facts suggesting that the defendant had knowledge of the specific principal violation." *Id.* at *5 (citing *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1256 (D. Del. 1991)). The court held that although plaintiff's amended compliant contained circumstantial allegations against defendant for aiding and abetting, it was not enough to allege

that defendants "had knowledge of the underlying…breach of fiduciary duty" to survive a 12(b)(6) motion. *Capitaliza-T,* at *7.

47.    In this case, Plaintiff simply alleges that "[the Donderos] were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor," and "[t]he Donderos aided and abetted Dugaboy's breach of its fiduciary duties…by knowingly participating in the authorization of the…Alleged Agreement."[41]  In its Amended Complaint, Plaintiff references only factors that could be circumstantial at best when describing it's Third Claim for relief against Jim Dondero, but never clearly articulates the required specific facts that show "actual knowledge" that he was overtly acting to substantially assist Dugaboy in breaching a fiduciary duty as required by *In re Draw* and *Capitaliza-T*.[42]  Further, Plaintiff makes no specific factual allegations against Nancy Dondero, other than she "[was] aware" of Dugaboy's fiduciary duties, and that she aided and abetted the breach.  Neither claims against Jim nor Nancy Dondero rise to the standard of articulation discussed in *In re Draw* and *Capitaliza-T*.  Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

### 4.    Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because Aiding and Abetting Requires More Than One Single Act.

48.    As discussed in Section C.3 *supra*, the test for stating an aiding and abetting claim is stringent and focuses of proof of scienter that a party knew it was aiding another party in committing tortious conduct.  *In re Draw,* at 904.  This would require Plaintiff to show (1) a primary act by Dugaboy (via Nancy) that breached a fiduciary duty (which it cannot), and (2) a

---

[41]Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

[42] Am. Compl. ¶¶ 3,36,38,39,40,41, Adv. No. 21-03003 [Doc. 73-2]; Am. Compl. ¶ 3,50,51,52,53, Adv. No. 21-03007 [Doc. 55-2]; Am. Compl. ¶¶ 3,48,49,50,51, Adv. No. 21-03006 [Doc. 60-2]; Am. Compl. ¶¶ 3,35,36,37,38,39, Adv. No. 21-03005 [Doc. 55-2].

secondary act by each of Jim and Nancy Dondero that shows scienter and knowing participation in subverting a fiduciary duty.

49.     Plaintiff cannot show concerted action here on behalf of Jim or Nancy Dondero, because the only singular act that occurred was Dugaboy approving the compensation under the LPA.  Plaintiff alleges no other separate act by Nancy Dondero that would have been "in concert" with or "knowingly participating" in anything, as she was acting as the Dugaboy Trustee (discussed above in Section C.2.).  Further, Plaintiff shows no other separate act or proof of scienter that Jim Dondero specifically set out to knowingly aid Dugaboy in tortious conduct under *In re Draw*, since Dugaboy engaged in no such conduct.  Therefore, Plaintiff's Seventh Claim fails *Twombly* and must be dismissed under Rule 12(b)(6).

### 5.     Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of Fiduciary Duty Claim Based on an Executory Contract It Rejected.

50.     The analysis here is the same as in Argument III.A.2. and B.2, *supra*.  Plaintiff argues that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement, which Plaintiff alleges may have violated the LPA.[43] A cause of action for a derivative claim such as aiding and abetting shares accrual and limitations periods with the underlying tort of breach of fiduciary duty.  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied*, (Sept. 6, 2019).  "Because a civil conspiracy claim is derivative of an underlying tort, the claim accrues when the underlying tort accrues." *Id*. at 145.  Here, because Plaintiff's aiding and abetting claims derive from the alleged breach of fiduciary duty claim, the claims share accrual dates.

---

[43] Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

51.     Again, Plaintiff was not injured until Jim Dondero did not pay the Notes.  This claim did not accrue until December 11, 2020, and is also predicated on allegations that the Subsequent Agreement violates fiduciary duties arising out of the rejected LPA.  Once again, Plaintiff is attempting to bring a post-petition claim under the LPA it rejected.  Therefore, Plaintiff's Seventh Claim must be dismissed under *Twombly* and Rule 12(b)(6).

## IV.  <u>CONCLUSION</u>

Dugaboy, Jim Dondero, and Nancy Dondero therefore respectfully request this Court dismiss Plaintiff's Fifth, Sixth, and Seventh Amended Claims in its Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

Dated: September 1, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO
AND NANCY DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

CORE/3522697.0002/169121609.1

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of

this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR JAMES DONDERO
AND NANCY DONDERO**

Douglas S. Draper, La. Bar No. 5073
Leslie A. Collins, La. Bar No. 14891
Greta M. Brouphy, La. Bar No. 26216
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST** | § § § § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S
## FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF[1]

---

[1] This Motion to Dismiss is being concurrently filed in Adv. Nos. 21-03003, 21-03007, 21-03006, and 21-03005, Case No. 19-34054-sgj11, as Plaintiff's assertions and Amended Complaints against all Defendants are identical in material respects.

## <u>TABLE OF CONTENTS</u>

**Page**

I.      BACKGROUND ................................................................................................ 1

    A.      The Bankruptcy and Rejection of Executory Contracts ......................................... 1

    B.      The Limited Partnership Agreement.................................................................... 2

    C.      The Promissory Notes...................................................................................... 4

    D.      The Adversary Proceedings .............................................................................. 6

II.     STANDARD OF REVIEW ................................................................................. 7

III.    ARGUMENTS AND AUTHORITIES................................................................. 8

    A.      Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed
        for Two Reasons. ............................................................................................. 8

        1.      Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on
               their Face That There is No Actual Controversy between Parties. ............. 8

        2.      Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon
               an Executory Contract It Rejected. ......................................................... 9

    B.      Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy
        Dondero Fails for Two Reasons. ...................................................................... 13

        1.      Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of
               Exercising Its Right to Approve Compensation. ..................................... 13

        2.      Nancy Dondero Owes No Fiduciary Duty to Debtor............................... 15

        3.      Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty
               Based Upon an Executory Contract It Rejected………………………….16

    C.      Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against
        Jim and Nancy Dondero Fails for Several Reasons............................................. 17

        1.      Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of
               Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff.
               ...................................................................................................... 17

        2.      Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because
               Aiding and Abetting Requires More Than One Actor............................... 18

        3.      Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and
               Abetting in its Amended Complaint for Either Jim or Nancy Dondero. .. 21

        4.      Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because
               Aiding and Abetting Requires More Than One Single Act. ..................... 23

        5.      Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of
               Fiduciary Duty Claim Based on an Executory Contract It Rejected. ....... 24

IV.     CONCLUSION................................................................................................. 25

CORE/3522697.0002/169122085

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
   580 S.W.3d 136 (Tex. 2019), *reh'g denied* (Sept. 6, 2019)....................................24

*In re Alongi*,
   272 B.R. 148 (Bankr. D. Md. 2001) ....................................11

*Amaysing Techs. Corp. v. Cyberair Communications, Inc.*,
   2005 WL 578972 (Del. Ch. Mar. 3, 2005)....................................19

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937....................................7

*Matter of Austin Dev. Co*,
   19 F.3d 1077 (5th Cir. 1994) ....................................11, 12

*Bell Atlantic Corp v. Twombly*,
   550 U.S. 544 (2007)....................................passim

*Bolick v. Alea Group Holdings, Ltd.*,
   278 F. Supp. 2d 278 (D. Conn. 2003)....................................21

*Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*,
   746 A.2d 842....................................13, 14

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v.*
   *Wachovia Bank of Delaware Nat. Ass'n*,
   CIV. 10-520 JBS KMW, 2011 WL 864421 (D. Del. Mar. 9, 2011) ................................22, 23

*In re Continental Airlines*,
   981 F.2d 1450 (5th Cir. 1993) ....................................11, 12

*Cornell Glasgow, LLC v La Grange Props., LLC*,
   2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ....................................19, 21

*In re Draw Another Circle*,
   602 B.R. 878 (Bankr. D. Del. 2019) ....................................17, 19, 21, 23, 24

*Dunmore v. Chicago Title Ins. Co.*,
   400 S.W.3d 635 (Tex. App. – Dallas 2013, no pet.)....................................16

*Elliott v. Foufas*,
   867 F.2d 877 (5th Cir. 1989) ....................................7

*In re Est. of Conaway*,
  2012 WL 524190 (Del. Ch. Feb. 15, 2012) ...................................................................13, 14

*In re Estate of Denman*,
  362 S.W.3d 134 (Tex. App. – San Antonio 2011, no pet.) ......................................................9

*Feeley v. NHAOCG, LLC*,
  62 A.3d 649 (Del. Ch. 2012)...................................................................................................14

*Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*,
  304 F.3d 476 (5th Cir. 2002) ....................................................................................................1

*Jones v. Colorado Cas. Ins. Co.*,
  CV 12-1968-PHX-JAT, 2013 WL 4759260 (D. Ariz. Sept. 4, 2013) ..............................20, 21

*Keytrade USA, Inc. v. AIN Temouchent M/V*,
  404 F.3d 891 (5th Cir. 2005) ....................................................................................................1

*Lauter v. Citgo Petroleum Corp.*,
  CV H-17-2028, 2018 WL 801601 (S.D. Tex. Feb. 8, 2018) ........................................9, 11, 12

*Murphey v. Honeycutt*,
  199 S.W.2d 298.......................................................................................................................10

*Murphy v. Campbell*,
  964 S.W.2d 265 (Tex. 1997)...................................................................................................16

*Muzquiz v. Para Todos, Inc.*,
  624 S.W.3d 263 (Tex. App. – El Paso 2021, pet. filed) .........................................................10

*In re Oracle Corp. Derivative Litig.*,
  CV 2017-0337 WL 3410745 (Del. Ch. June 22, 2020) ..........................................................19

*Patton v. Simone*,
  Civ. A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) ............................18, 19

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005) ....................................................................................................7

*In re Rural Metro Corp.*,
  88 A.3d 54 (Del. Ch. 2014)......................................................................................................17

*In re Rural Metro Corp. Stocholders Litig.*
  (Del. Ch. 2014) ..................................................................................................................17, 18

*Russell-Conaway v. Frederick-Conaway*,
  2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished)...................................................13

iii

*Strebel v. Wimberly*,
371 S.W.3d 267 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at \*23 (Tex. App. Jan. 14, 1999)) .........................14

*Tigani v. Tigani*,
2021 Del. Ch. LEXIS 60, 2021 WL 1197576 (March 30, 2021) ...........................................15

*In re TOCFHBI, Inc.*,
413 B.R. 523 (Bankr. N.D. Tex. 2009)..................................................................................20

*In re USDigital, Inc.*,
443 B.R. 22 (Bankr. D. Del. 2011) ........................................................................................19

*West Fork Advisors LLC v. SunGard Consulting Services, LLC*,
437 S.W.3d 917 (Tex. App.-Dallas 2014) ............................................................................17

*Williams v. Cigna Financial Advisors, Inc.*,
56 F.3d 656 (5th Cir. 1995) ....................................................................................................1

*Young v. Liberty Mut. Group, Inc.*,
CV-12-2302-PHX-JAT, 2013 WL 840618 (D. Ariz. Mar. 6, 2013) .....................................20

**Statutes**

11 U.S.C. § 365(a) .......................................................................................................................11

11 U.S.C. § 365(g)(1) ..............................................................................................................11, 12

11 U.S.C. § 365 .............................................................................................................................10

Del. Code Ann. Tit. 6, § 17-107 ..................................................................................................13

Del. Code Ann. Tit. 6, § 17-303(b)(8)(o) ....................................................................................14

Del. Code Ann. Tit. 6, § 17-1101(d)............................................................................................13

Del. Code Ann. Tit. 6, § 17-1102 ................................................................................................13

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ............................................................................ passim

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding* "*Rejection*",
59 U.Colo.L.Rev. 845 (1988) ................................................................................................11

Restatement (Second) of Torts § 876 (1979) ........................................................................17, 18

Restatement (Second) of Torts § 876, comment A ......................................................................18

CORE/3522697.0002/169122085

In the alternative to and contingent upon a denial by the Court of Defendants' Motion to Compel Arbitration (which the Court should not deny), Defendants move to dismiss the Fifth, Sixth, and Seventh Claims for Relief in Plaintiff's Amended Complaint for failure to state claims on which this Court could grant relief under Federal Rule of Civil Procedure 12(b)(6), as incorporated into this adversary proceeding through Rule 7012 of the Federal Rules of Bankruptcy Procedure. In filing this Motion to Dismiss, Defendants do not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration.[2] Defendants show in support as follows:

# I.     BACKGROUND

##     A.     The Bankruptcy and Rejection of Executory Contracts

1     Highland Capital Management, L.P. ("Plaintiff") filed a voluntary Chapter 11 bankruptcy petition ("Bankruptcy Petition") on October 16, 2019 ("Petition Date") in the United States Bankruptcy Court for the District of Delaware, and venue was subsequently transferred to this Court on December 4, 2019.[3] On November 24, 2020, Plaintiff filed its Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan") along with its Disclosure Statement, which the Court approved on November 24, 2020.[4]

2.     On January 11, 2021, Plaintiff filed its Second Notice of Executory Contracts and Unexpired Leases to be Assumed by the Plaintiff [then, Debtor] Pursuant to the Plan (the

---

[2] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).
[3] Order Transferring Venue, Case 19-12239-Css [Doc. 184].
[4] Case No. 19-34054-sgj11 [Doc. 1476]

CORE/3522697.0002/169122085

"Assumption Notice").[5]  The Assumption Notice itemized seventy-one (71) executory contracts to be assumed by the Plaintiff, notably including the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA").  However, on January 21, 2021, the Debtor entered a Withdrawal Notice, rejecting the LPA along with several other executory contracts,[6] and confirmed on February 1, 2021, that it had withdrawn the LPA from its list of assumed executory contracts.[7]  On February 22, 2021 (the "Rejection Date"), the Court confirmed the Plan, causing the rejection of the LPA.[8]

### B.    The Limited Partnership Agreement

3.    James Dondero ("Jim Dondero") is the co-founder of Highland Capital (Plaintiff in this Adversary Proceeding), and served as its President and CEO until January 9, 2020.[9]  The Dugaboy Family Trust ("Dugaboy") is one of Debtor's Class A limited partners and holds the majority of the Debtor's Class A limited partnership interests.  LPA, Exhibit A.  Jim Dondero's sister Nancy Dondero serves as the Dugaboy Family Trustee.[10]  Jim Dondero is a lifetime beneficiary of Dugaboy.[11]

4.    Dugaboy's explicit authorization to approve compensation for Jim Dondero - and thus bind the Partnership - comes specifically from the LPA in § 3.10(a), which provides in pertinent part:

(a)    <u>Compensation</u>.    The *General Partner* and any *Affiliate* of the General Partner shall receive no compensation from the Partnership for services rendered

---

[5] Case 19-34054-sgj11 [Doc. 1719].
[6] Case 19-34054-sgj11 [Doc. 1791, Schedule A].
[7] Case 19-34054-sgj11 [Doc. 1871].
[8] Case 19-34054-sgj11 [Doc. 1943].
[9] Am. Compl. ¶ 11, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 12, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 12, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 12, Adv. No. 21-03005 [Doc. 63].
[10] Am. Compl. ¶ 13, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 14, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 14, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 14, Adv. No. 21-03005 [Doc. 63].
[11] Am. Compl. ¶ 12, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 13, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 13, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 13, Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169122085

pursuant to this Agreement or any other agreements *unless approved by a Majority Interest;* LPA § 3.10(a) (emphasis added).

The LPA defines relevant actors in the Compensation provision as follows:

"*'Majority Interest'* means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."  LPA § 2.1, p.4.

"*'Class A Limited Partners'* means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A."  LPA § 2.1, p.2.

**Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.  LPA, Exhibit A, line 5.[12]

Based on the Compensation provision and definitions, Dugaboy clearly had the right to approve compensation for the General Partner and its Affiliates.  The General Partner entitled to compensation here is Strand Advisors, Inc.  The LPA Preamble states in pertinent part:

"This [LPA] is entered…by and among Strand Advisors, Inc., a Delaware Corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.  LPA Preamble, p.1.

The LPA goes on to articulate Affiliates (of Strand):

"*'Affiliate'* means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term *'control'* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."  LPA § 2.1, p.2.

"*'Person'* means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity."  LPA § 2.1, p.5.

It is undisputed that Jim Dondero was an Affiliate of Strand under the LPA's definition.  It is also undisputed that he controlled Highland Capital Real Estate Partners ("HCRE"), Nexpoint Advisors, L.P. ("Nexpoint"), and Highland Capital Management Services, Inc. ("HCMS").[13]

Thus, Jim Dondero was entitled to compensation approved by Dugaboy pursuant to the LPA.

---

[12] See attached, LPA Exhibit A.

[13] Am. Compl. ¶ 2, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 2, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 2, Adv. No. 21-03005 [Doc. 63].

### C.     The Promissory Notes

5.      Over the last several years, multiple promissory notes were executed in favor of the

Plaintiff to different entities and individuals, which obligations became subject to potential

forgiveness as compensation for Jim Dondero that, under the LPA, Dugaboy was charged with

approving:

Notes to Jim Dondero (the "Dondero Notes"):

1.     A note for $3,825,000, executed on February 2, 2018, payable on demand.
2.     A note for $2,500,000, executed on August 1, 2018, payable on demand.
3.     A note for $2,500,000, executed on August 13, 2018, payable on demand.[14]

Notes to HCRE (the "HCRE Notes"):

1.     A note for $100,000, executed on November 27, 2013, payable on demand.
2.     A note for $2,500,000, executed on October 12, 2017, payable on demand.
3.     A note for $750,000, executed on October 15, 2018, payable on demand.
4.     A note for $900,000, executed on September 25, 2019, payable on demand.
5.     A term note for $6,059,831, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[15]

Notes to HCMS (the "HCMS Notes"):

1.     A note for $150,000, executed on March 28, 2018, payable on demand.
2.     A note for $200,000, executed on June 25, 2018, payable on demand.
3.     A note for $400,000, executed on May 29, 2019, payable on demand.
4.     A note for $150,000, executed on June 26, 2019, payable on demand.[16]

Note to Nexpoint (the "Nexpoint Note"):

1.     A term note for $30,746,812.33, executed on May 31, 2017, payable in thirty (30) equal annual installment payments, each due on the 31st day of December each calendar year.[17]

---

[14] Am. Compl. ¶¶ 20-22, Adv. No. 21-03003, Case No. 19-34054-sgj11 [Doc. 79].
[15] Am. Compl. ¶¶ 21-24, Adv. No. 21-03007, Case No. 19-34054-sgj11 [Doc. 63]; According to its Amended Complaint, Plaintiff alleges in ¶ 63 that it has suffered damages under the note "in the amount of at least $5,012,260.96, as of December 11, 2020," but in ¶ 64 that it has suffered damages "in the amount of at least $6,145,466.84 as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date..."
[16] Am. Compl. ¶¶ 21-24, Adv. No. 21-03006, Case No. 19-34054-sgj11 [Doc. 68].
[17] Am. Compl. ¶ 21, Adv. No. 21-03005, Case No. 19-34054-sgj11 [Doc. 63]; Plaintiff alleges in ¶ 31 that "as of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03," and claims the same amount as damages in ¶ 48.

CORE/3522697.0002/169122085

6.      Jim Dondero entered into agreement (the "Subsequent Agreements," or as Plaintiff refers to them, the "Alleged Agreements") with Nancy Dondero (acting for Dugaboy as its Trustee) that Plaintiff would not demand collection of the Notes unless events had occurred that made fulfillment of conditions subsequent impossible.[18]  However, annual term loan payments and annual interest payments on the demand notes were to be (and were) made.[19]

7.      On December 3, 2020, after the bankruptcy Petition Date, Plaintiff demanded payment from Jim Dondero, HCRE, and HCMS on their respective demand notes due by December 11, 2020.[20]  On January 7, 2021, Plaintiff made a demand on the Nexpoint term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $24,471,804.98," and a demand on the HCRE term note, claiming that "[t]he amount due and payable on the Note as of January 8, 2021 is $6,145,466.84."[21]  Plaintiff has refused to recognize the Subsequent Agreement, calling it a "fiction."[22]  Other than annual term and interest payments and some voluntary prepayments on the term notes, Defendants have not paid the Notes.[23]

---

[18] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].

[19] *E.g.,* Am. Compl. ¶ 21,27, Adv. No. 21-03005 [Doc. 63], showing the original principal of the note being $30,746,812.33, but Plaintiff only demanding $24,471,804.98 in its demand letter; *E.g.,* Am. Compl. ¶ 37,63,64, Adv. No. 21-03007 [Doc. 63], showing the original principal of the note being $6,059,831, but Plaintiff alleging it was damaged in the amount of at least $5,012,260.96 as of December 11, 2020, but also in the next paragraph inconsistently alleging it was damaged in the amount of at least $6,145,466.84.

[20] Am. Compl. ¶ 26, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 28, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 28, Adv. No. 21-03006 [Doc. 68].

[21] Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63]; Am. Compl. ¶43, Adv. No. 21-03007 [Doc. 63].

[22] Am. Compl. ¶ 3, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 3, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 3, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 3, Adv. No. 21-03005 [Doc. 63].

[23] With respect to the Nexpoint term loans, due to a mistake, the 2020 end-of-year payment was late and the notes should be deemed current, Am. Ans. ¶ 40,41, Adv. Pro. 21-03005 [Doc. 50]; Am. Compl. ¶ 28, Adv. No. 21-03005 [Doc. 55-2], acknowledging payment of $1,406,111.92.

D.    **The Adversary Proceedings**

8.    On January 22, 2021, Plaintiff initiated Adversary Proceedings against Jim Dondero, HCRE, HCMS, and Nexpoint for breach of contract and turnover of property.[24]  On August 17, 2021, Plaintiff filed Amended Complaints against each Defendant alleging additional claims against Jim Dondero and new claims against Dugaboy and Nancy Dondero. Defendants each filed Amended Answers asserting several affirmative defenses, including that the Subsequent Agreements preclude the respective claims.[25]

9.    In the Fifth Claim of each Amended Complaint,[26] Plaintiff asks the Court to declare (a) that limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the LPA, (b) that neither Dugaboy nor Nancy Dondero was  authorized under the LPA to enter into the Subsequent Agreement on behalf of the Partnership, (c) that neither Dugaboy nor Nancy Dondero otherwise had the right or authority to enter into the Subsequent Agreement on behalf of the Partnership, and (d) the Subsequent Agreement is null and void.[27]

10.    In the Sixth Claim of each Amended Complaint,[28] Plaintiff alleges that if Dugaboy, as a limited partner under the LPA, or Nancy Dondero, as the representative of Dugaboy, had the

---

[24] Am. Compl. ¶ 33, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 47, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 45, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 33, Adv. No. 21-03005 [Doc. 63].

[25] Am. Answer ¶ 40, Adv. No. 21-03003 [Doc. 16]; Am. Answer ¶ 58, Adv. No. 21-03007 [Doc. 34]; Am. Answer ¶ 56, Adv. No. 21-03006 [Doc. 34]; Am. Answer ¶ 42, Adv. No. 21-03005 [Doc. 50].

[26] Nancy Dondero is a Defendant on Counts V, VI, and VII in Adv. No. 21-03005, Adv. No. 21-3006, and Adv. No. 21-3007.  Nancy Dondero is a Defendant only on Count VII in Adv. No. 21-03003.

[27] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63], Plaintiff alleges against Dugaboy and Nancy Dondero; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

[28] *See* note 26, *supra*.

authority to enter into the Subsequent Agreement on behalf of [Plaintiff], then Dugaboy incurred

a fiduciary duty of care, and breached said duty by entering into the Subsequent Agreement.[29]

11.     In the Seventh Claim of each Amended Complaint, Plaintiff alleges that Jim and

Nancy Dondero were aware that Dugaboy would have fiduciary duties owed to the Plaintiff if

acting to bind the Plaintiff per the authorization in the LPA, and aided and abetted Dugaboy's

breach of its fiduciary duties by knowingly participating in the authorization of the Subsequent

Agreement.[30]

## II.     STANDARD OF REVIEW

12.     An asserted cause of action must be dismissed when the complaint fails to state a

claim.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), the complaint

must meet two criteria: (1) it must assert a plausible claim, and (2) it must set forth sufficient

factual allegations to support the claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, at 1949-50 (citing *Bell

Atlantic Corp v. Twombly*, 550 U.S. 544 (2007)).  Thus, either a "lack of cognizable legal theory

or the absence of sufficient facts alleged under a cognizable legal theory" requires dismissal.  Id.

The plaintiff must allege specific facts and not conclusory allegations.  *Elliott v. Foufas*, 867 F.2d

877, 881 (5th Cir. 1989).  A court may not strain to find inferences favorable to the plaintiff or

accept conclusory allegations, unwarranted deduction, or legal conclusion.  *R2 Invs. LDC v.

Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

13.     To satisfy *Twombly* and Iqbal, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.*, *Twombly,* at 570.  A

claim has facial plausibility when the plaintiff pleads enough factual content that allows the court

---

[29] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].
[30] Am. Compl. ¶ 79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 93, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 77, Adv. No. 21-03005 [Doc. 63].

to draw the reasonable inference that the defendant is liable under the alleged claim.  *Id*. at 556.

Even if a court decides that the factual allegations are entitled to an assumption of truth, however,

the facts must also "plausibly suggest an entitlement to relief." *Id., Iqbal,* at 1951.

## III.  ARGUMENTS AND AUTHORITIES

### A.  Plaintiff's Fifth Claim for Declaratory Relief Under the LPA Should Be Dismissed for Two Reasons.

#### 1.  Plaintiff's Fifth Claim Fails Because the Terms of the LPA are so Clear on their Face That There is No Actual Controversy between Parties.

14.     Plaintiff's claim presents no "actual controversy" because the provisions of the

LPA clearly allow Dugaboy to bind the Partnership by approving compensation and there is no

controversy that could require a declaration by this Court.

15.     Plaintiff argues that Dugaboy was not authorized to enter into the Subsequent

Agreement regarding Jim Dondero's compensation, nor was it authorized to bind the Partnership.[31]

Plaintiff further attached the LPA as "Exhibit 5" to its Amended Complaints and referenced this

Court to § 4.2, which states:

> Management of Business.     No Limited Partner shall take part in the control
> (within the meaning of the Delaware Act) of the Partnership's business, transact
> any business in the Partnership's name, or have the power to sign documents for or
> otherwise bind the Partnership *other than as specifically set forth in this
> Agreement*.[32] (emphasis added).

16.     Contrary to Plaintiff's argument, the LPA explicitly authorizes Dugaboy as the

Majority Interest to approve compensation for Jim Dondero as previously articulated in this

Motion.  Approving compensation inherently binds the Partnership in that it exchanges money on

behalf of the Partnership for services rendered.  Because it is so expressly provided for in the LPA,

---

[31] *Id.*
[32] Am. Compl. ¶ 43, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 55, Adv. No. 21-03007 [Doc. 63]; Am. Compl.
¶ 53, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 27, Adv. No. 21-03005 [Doc. 63].

Plaintiff's contention that Dugaboy could not act to bind the Partnership through compensation agreements amounts to Plaintiff's misinterpretation of the LPA as opposed to an "actual controversy" in need of declaratory relief.  This claim is nothing more than Plaintiff's attempt at an end-around to avoid proving the merits of its breach of fiduciary duty claims and essentially asks this Court for an advisory opinion to help Plaintiff do so.  Under *Twombly*, Plaintiff's claim for declaratory relief should be dismissed pursuant to Rule 12(b)(6).

### 2.    Debtor Lacks Standing to Assert a Claim for Declaratory Relief Based Upon an Executory Contract It Rejected.

17.    There is no authority for "allowing a debtor's estate or a successor-in-interest such as the [creditor's committee or litigation trustee] to pursue claims for post-petition breaches of a rejected contract. Because rejection is an affirmative declaration by the debtor that the estate will not take on the obligations of a prepetition contract made by the debtor, [Plaintiff-Debtor's] rejection of the [LPA] not only relieved the estate of its post-petition performance obligations, but also relieved the estate of its ability to assert claims for post-petition breaches thereof." *Lauter v. Citgo Petroleum Corp.*, CV H-17-2028, 2018 WL 801601, at *15 (S.D. Tex. Feb. 8, 2018).  As explained below, as a result, not only does this preclude Debtor's claims for breach of fiduciary duty (see sections B.2., C.5. *infra*), it also precludes Debtor's attempt to obtain declaratory relief.

18.    Plaintiff seeks declaratory relief against Dugaboy and Nancy Dondero to determine if either of them were authorized to enter into the Subsequent Agreement under the LPA.[33] Although most causes of action accrue when an injury results from a wrongful act, a cause of action for declaratory relief differs in that it does not accrue until there is an actual controversy between the parties.  *In re Estate of Denman*, 362 S.W.3d 134, 144 (Tex. App. -- San Antonio

---

[33] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

2011, no pet.); *Murphey v. Honeycutt*, 199 S.W.2d 298, 299 (holding that declaratory judgment action accrued in a will construction case at the time when an heir committed an act indicating she was operating against the will, not when the will was executed years prior to the heir's act); *Muzquiz v. Para Todos, Inc.*, 624 S.W.3d 263, 278 (Tex. App. – El Paso 2021, pet. filed) (holding that in a lease dispute, the actual controversy did not arise-- and the claim did not accrue- when the lease was entered into by the parties, but rather when plaintiff challenged the lease terms at a later date).

19.     Here, Plaintiff's declaratory relief claim accrued (if at all) when Jim Dondero asserted the Subsequent Agreement as an affirmative defense.  Plaintiff alleges that the actual controversy here is whether or not Dugaboy or Nancy Dondero had authority to enter into the Subsequent Agreement under the rejected LPA.  Plaintiff specifically pleads that "[a] bona fide, actual, present dispute exists between the [Plaintiff] and Dugaboy concerning whether Dugaboy was authorized to enter into the Alleged Agreement on the [Plaintiff]'s behalf….[and a] judgment declaring the parties' respective rights and obligations will resolve their dispute."[34]  Plaintiff did not allege anywhere in its Original Complaint that a dispute regarding Dugaboy's authority to enter the Subsequent Agreement required declaratory relief.  Only after Defendants filed their Amended Answers did Plaintiff seek such relief in its Amended Complaint.[35]  Therefore, this cause of action for declaratory relief accrued when Plaintiff received Defendant's Amended Answers after the bankruptcy began, as that is when facts came into existence that created an actual controversy under the LPA.

20.     Section 365 of Title 11 of the United States Code (the "Bankruptcy Code") governs the inclusion and exclusion of executory contracts in bankruptcy.  Section 365 vests the power to

---

[34] *Id.*
[35] *Id.*

reject or assume any of the Debtor's executory contracts in the trustee, subject to the court's approval. 11 U.S.C. § 365(a). A debtor's rejection of an executory contract constitutes a breach of such contract immediately before the date of the filing of the [bankruptcy] petition. 11 U.S.C. § 365(g)(1). In this case, Plaintiff's act of rejection resulted in a material breach of the LPA that relates back to October 15, 2019 (the "Breach Date") pursuant to the Bankruptcy Code. *See* 11 U.S.C. § 365(g)(1).

21. "Rejection is an affirmative declaration that the estate will not take on the obligations of a pre-petition contract made by the debtor" and "places the obligation to perform outside of the bankruptcy administration." *Lauter*, at *13, citing *Matter of Austin Dev. Co*, 19 F.3d 1077, 1082-83 (5th Cir. 1994); *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993). "[R]ejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it." *In re Alongi*, 272 B.R. 148, 153 (Bankr. D. Md. 2001) (citing M. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845 (1988)). As noted above, rejection not only relieves the estate of post-[bankruptcy]petition performance obligations, but also of its ability to assert claims for post-petition breaches thereof. *Lauter,* at *15.

22. The court in *Lauter* looked to the reasoning of Fifth Circuit opinions examining the effects of plaintiffs rejecting executory contracts under § 365. In *In re Continental*, the court reasoned in part that, under § 365, "An agreement cannot 'exist' for one purpose yet take on a 'nonexistent' quality which works for the advantage of one party or the other" when a debtor-plaintiff sought to avoid paying airline pilots under an executory contract it rejected, attempting to treat the contract as terminated. *Id.* at 1460. Likewise, the court in *Matter of Austin* reasoned that a rejection of a lease under § 365 did not terminate the lease, but moved the rights of the parties

affected "outside of the bankruptcy court's realm because after rejection, the debtor's estate is no longer involved in the leasehold transaction." *Id.* at 1083.

23.     Following the Fifth Circuit's application of § 365 in cases such as *In re Continental* and *Matter of Austin*, the court in *Lauter* addressed the impact of a debtor-plaintiff's attempt to pursue post-petition claims against a defendant whose executory contract had been rejected. The court held that just as in any other contract dispute, a prior material breach by a counterparty relieved the aggrieved party of the duty to perform and deprived the breaching party of the ability to make claims for breach after its own breach. *Id.* at *12-13, 15. After a thorough discussion of § 365, the court ultimately found that the plaintiff lacked standing to pursue claims resulting from a post-petition breach of an executory contract, holding that "the court has not found any authority allowing a debtor's estate . . . to pursue claims for post-petition breaches of a rejected contract." *Id.* at *15.

24.     Here, Plaintiff asks this Court to interpret and, in effect, determine a breach of the same LPA it rejected and breached prior to the bankruptcy petition date. The LPA was rejected on February 22, 2021 and thus deemed materially breached on October 15, 2019 under § 365(g)(1). Because this cause of action accrued after both rejection and the relation-back breach provision of § 365, Plaintiff's Fifth Claim for declaratory relief amounts to a post-petition claim arising from a rejected executory contract, which the court in *Lauter* held a Debtor lacks standing to assert in a bankruptcy proceeding. Therefore, this claim should be dismissed pursuant to *Twombly* and Rule 12(b)(6).

**B. Plaintiff's Sixth Claim of Breach of Fiduciary Duty Against Dugaboy and Nancy Dondero Fails for Two Reasons.**

**1. Dugaboy Owes No Fiduciary Duty to Plaintiff as a Consequence of Exercising Its Right to Approve Compensation.**

25.     Plaintiff alleges that "if Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement…then Dugaboy would owe the [Plaintiff] a fiduciary duty."[36]   The LPA in this case is governed by the Delaware Revised Uniform Limited Partnership Act (the "DRULPA") except as specifically provided for in the LPA.  LPA §§ 1.1,1.2; *see also* Del. Code Ann. Tit. 6, § 17-1102.  The DRULPA allows partnership agreements to expand, restrict, or eliminate fiduciary and other legal or equitable duties, provided it may not eliminate the implied contractual duty of good faith and fair dealing.  Del. Code Ann. Tit. 6, § 17-1101(d).  The DRULPA also specifically permits a partnership agreement to provide the rules for how partners may transact with the partnership.  Del. Code Ann. Tit. 6, § 17-107.

26.     In Delaware, a limited partner does not owe a fiduciary duty as a consequence of exercising a right of the limited partner under the partnership agreement.  *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*, 746 A.2d 842, 864 (Del. Ch. 1999); *In re Est. of Conaway*, 2012 WL 524190, at *3 (Del. Ch. Feb. 15, 2012), *aff'd sub nom. Russell-Conaway v. Frederick-Conaway*, 2012 WL 4478655, 54 A.3d 257 (Del. 2012) (unpublished).

27.     In *Bond Purchase*, a limited partner exercised its right under the limited partnership agreement to obtain records of the owners of the partnership for the purpose of making a tender offer for additional interests in the partnership.  Although the other partners claimed this request for records was a breach of a fiduciary duty, the court held that "in the absence of any provision in the partnership agreement engrafting duties onto [the limited partner]," "[the limited partner]

---

[36] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169122085

owes no fiduciary duties," and allowed the limited partner access to the records it sought under the partnership agreement. *Id.* at 864.

28.     In *In re Est. of Conaway*, a limited partner withheld consent to transfer another partner's interest as he was allowed to under the limited partnership agreement.  The receiving party alleged a breach of the non-consenting limited partner's fiduciary duty.  The court held that where the limited partner "merely exercised his contracted-for rights under the terms of the [limited partnership agreement]," the limited partner breached no fiduciary duty, assuming there even was one. *Id.* at *3.

29.     Just as the limited partners in *Bond Purchase* and *In re Est. of Conaway*, Dugaboy was merely exercising its right to approve compensation pursuant to the LPA when it entered into the Subsequent Agreement.  LPA § 3.10(a); § 2.1.  Therefore, Dugaboy owes no fiduciary duty to the Plaintiff as a consequence of simply exercising its right under the LPA.  While a limited partner who takes on an active role in the management of the entity may thereby assume fiduciary duties, *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 662 (Del. Ch. 2012) (citing cases); *Bond Purchase* at 863-64, merely engaging in actions delegated to the limited partner in the partnership agreement does not constitute participating in the control of a business so as to trigger the assumption of fiduciary duties.  Del. Code Ann. Tit. 6, § 17-303(b)(8)(o).

30.     Texas has similarly held that "a limited partner does not participate in the control of the business" by taking certain actions listed in the statutes, and such "actions complained of by the plaintiff did not amount to the types of control that could give rise to a duty to the other limited partners."  *Strebel v. Wimberly,* 371 S.W.3d 267, 280 (Tex. App. 2012) (summarizing holding of *AON Properties, Inc. v. Riveraine Corp.*, 1999 WL 12739, at *23 (Tex. App. Jan. 14, 1999)).

31.     Here, Dugaboy did not participate in the control of the business because it was taking actions explicitly extended to it in the LPA by approving compensation under § 3.10(a). LPA § 3.10(a); § 2.1.  Since the LPA explicitly gives Dugaboy the right to approve such compensation, and Dugaboy was not participating in the control of the business, Dugaboy does not owe a fiduciary duty to Plaintiff.  Dugaboy cannot breach a fiduciary duty it does not owe. Further, Nancy Dondero as Trustee owes no fiduciary duty to Plaintiff independently from what Dugaboy owes, as Dugaboy is her principal.  Like Dugaboy, Nancy Dondero cannot breach a fiduciary duty she does not owe.  Under *Twombly*, Plaintiff's claim for breach of fiduciary duty against Dugaboy and Nancy Dondero should be dismissed pursuant to Rule 12(b)(6).

## 2.    Nancy Dondero Owes No Fiduciary Duty to Debtor.

32.     Under Delaware law, a trustee's fiduciary duties of care and loyalty flow to the trust and the beneficiar(ies) of the trust. *Tigani v. Tigani*, 2021 Del. Ch. LEXIS 60, *1, 2021 WL 1197576 (March 30, 2021). A trustee is prohibited from considering her own interests and "all consideration of the interests of third persons." *Id*. at * 38.

33.     Plaintiff claims that if Dugaboy had the authority to enter into the Subsequent Agreement, then Ms. Dondero would then somehow owe a fiduciary duty directly to Plaintiff.  The Amended Complaint does not allege any facts as to why or how such a fiduciary duty would appear, and there is no legal authority to support such a conclusion. As discussed above, not even Dugaboy owed a fiduciary duty to Plaintiff in determining compensation, as Dugaboy was expressly authorized to do under § 3.10(a) of the LPA. Nancy Dondero, individually, is even further removed from owing any duty to Plaintiff, much less a fiduciary duty.  Plaintiff cannot create a legal duty simply by claiming one exists, and its breach of fiduciary duty claim against Nancy Dondero should be dismissed under *Twombly* and Rule 12(b)(6).

CORE/3522697.0002/169122085

### 3. Debtor Lacks Standing to Assert a Claim for Breach of Fiduciary Duty Based Upon an Executory Contract It Rejected.

34.     Plaintiff's Sixth Claim is also barred for the same reasons that discussed in Section A.2 *supra*, and similarly relies on the fact that this cause of action accrued after the LPA was breached on October 15, 2019.  In this case, Plaintiff suffered no legal injury – and no cause of action accrued - until the notes were not paid on demand by December 11, 2020.

35.     Generally, "a cause of action accrues…when facts come into existence that authorize a claimant to seek judicial remedy."  *Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App. – Dallas 2013, no pet.) (citing cases).  "Breach of fiduciary duty claims generally accrue when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act *and* resulting injury."  *Dunmore,* at 641 (emphasis added).  Further, "[t]he general rule governing when a claim accrues…is the 'legal injury rule,' which provides that a claim accrues 'when a wrongful act causes some legal injury, even if that fact of injury is not discovered until later, and even if all damages have not yet occurred.'"  *Id.* (citing *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997)).  "[A] legal injury [is] an injury giving cause of action by reason of its being an invasion of a Plaintiff's right…be the damage however slight."  *Murphy*, at 270.  Although the discussion of when a claim accrues in Texas generally involves application of the discovery rule (which is not applicable to these facts), the concept of "legal injury" is still the cornerstone of an accrual analysis.

36.     Here, Plaintiff alleges that Dugaboy and Nancy Dondero breached a fiduciary duty when it entered into the Subsequent Agreement.[37]  The alleged wrongful act was the Subsequent Agreement itself which Plaintiff alleges breached a fiduciary duty.  However, Plaintiff suffered no

---

[37] Am. Compl. ¶ 75, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 89, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 87, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 73, Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169122085

legal injury from the Subsequent Agreement until Defendant did not pay the Notes when demanded (if it even suffered one at all). The Subsequent Agreement simply made the Notes potentially forgivable upon conditions subsequent, which could not have impacted the alleged value of the Notes until the conditions occurred. As a result, the cause of action did not accrue until December 11, 2020, after the Petition Date. Debtor's rejection of the LPA, the alleged source of the fiduciary duties allegedly breached,[38] therefore bars pursuit of the Plaintiff's Sixth Claim for the same reasons set forth in Section A.2 *supra*.

C. **Plaintiff's Seventh Claim of Aiding and Abetting Breach of Fiduciary Duty against Jim and Nancy Dondero Fails for Several Reasons.**

1. **Neither Jim nor Nancy Dondero could have Aided and Abetted a Breach of Fiduciary Duty because Dugaboy did Not Owe a Fiduciary Duty to Plaintiff.**

37.     Plaintiff claims that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by entering into the Subsequent Agreement. However, aiding and abetting is a fundamentally dependent claim that can only succeed if there is a valid underlying breach of fiduciary duty claim. *In re Draw Another Circle*, 602 B.R. 878, 904 (Bankr. D. Del. 2019) (citing Restatement (Second) of Torts § 876 for the proposition "the derivative nature of an aiding and abetting claim will exist only with the success of the breach of fiduciary duty claim"); *West Fork Advisors LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App.-Dallas 2014) (citing Restatement (Second) of Torts § 876(b) (1979)). As previously discussed in Section B.1., Dugaboy did not owe any fiduciary duty to Plaintiff that could have been breached. Therefore, Plaintiff's derivative claim of aiding and abetting against both Jim and Nancy Dondero is legally impossible and should be dismissed under *Twombly* and Rule 12(b)(6).

---

[38] Am. Compl. ¶ 72(a-d), Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶ 86(a-d), Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶ 84(a-d), Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶ 70(a-d), Adv. No. 21-03005 [Doc. 63].

CORE/3522697.0002/169122085

### 2. Nancy Dondero Cannot Aid and Abet Herself as Dugaboy Trustee Because Aiding and Abetting Requires More Than One Actor.

38.     Even if Dugaboy owed and breached a fiduciary duty to Plaintiff (which it did not),

it is legally impossible for Nancy Dondero to have aided and abetted Dugaboy's alleged breach of

fiduciary duty by authorizing the Subsequent Agreement as she was acting as Dugaboy in her

trustee status.  Because there are limited cases on point, an analysis under the Restatement

(Second) of Torts § 876 (1979) is compelling because Delaware courts routinely look to the

Restatement to fill lacunae in the law.  *In re Rural Metro Corp.*, 88 A.3d 54, 98 (Del. Ch. 2014),

decision clarified on denial of reargument sub nom. *In re Rural Metro Corp. Stocholders Litig.*

(Del. Ch. 2014) (applying the Restatement to an aiding and abetting breach of fiduciary duty

analysis).  "The Delaware Supreme Court often relies on the Restatement (Second) of Torts."  *Id.*

at 98.  Comparison to cases in other jurisdictions construing law similar to Delaware law is also

instructive.

39.     The Restatement (Second) § 876 provides: "For harm resulting to a third person

from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert

with *the other* or pursuant to a common design with him, or (b) knows that *the other's* conduct

constitutes a breach of duty and gives substantial assistance or encouragement to the other so to

conduct himself, or (c) gives substantial assistance to *the other* in accomplishing a tortious result

and his own conduct, separately considered, constitutes a breach of duty to the third person."

Restatement (Second) of Torts § 876 (1979), adopted in Delaware by *Patton v. Simone*, Civ. A.

90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) (emphasis added).  Under the

Restatement (Second), people act "in concert" with each other when they act "in accordance with

an agreement to cooperate in a particular line of conduct or to accomplish a particular result."

Restatement (Second) of Torts § 876, comment A.  Under the Restatement (Second), Nancy

Dondero could not have conceivably acted "in accordance with an agreement" with herself in her Trustee capacity, as she is a singular individual.

40.    Delaware has not directly addressed the issue of whether one can aid and abet one's self, but it has applied the Restatement (Second) when analyzing aiding and abetting a breach of fiduciary duty claims, which requires a plaintiff to prove: (1) the existence of a fiduciary relationship, (2) breach of the fiduciary's duty, (3) defendant, who is not a fiduciary, knowingly participated in the breach, and (4) damages to the plaintiff as the result of the <u>concerted action</u> of the fiduciary and the non-fiduciary.  *In re USDigital, Inc.*, 443 B.R. 22, 46 (Bankr. D. Del. 2011) (citing elements of aiding and abetting breach of fiduciary duty in Delaware and holding that a director defendant cannot have aided and abetted the same fiduciary duty he allegedly breached in a previous count); *In re Draw,* at 904 (applying Restatement (Second) to the knowing participation element); *Patton,* at *8 (applying Restatement (Second) to aiding and abetting analysis); *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (applying the Restatement (Second) to knowing participation in aiding and abetting analysis and acknowledging that § 876 has been cited with approval in Delaware in ).  Again, because Plaintiff is alleging that Nancy Dondero aided and abetted Dugaboy (which was acting through Nancy Dondero), the requirement of a second actor is not met because Nancy Dondero cannot act in concert with herself.

41.    Analogously, officers and agents cannot aid and abet their principal or each other in the commission of a tort.  *Cornell Glasgow, LLC v La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012); *Amaysing Techs. Corp. v. Cyberair Communications, Inc.,* 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005) ("It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts

19

of the corporation."). Application of this law to the present circumstances further compels the conclusion that Nancy Dondero cannot aid and abet herself. Texas also has looked to the Restatement (Second) of Torts § 876 for guidance regarding its aiding and abetting doctrine, which states that "[i]t is settled as the law of [the State of Texas] that where a _third party_ knowingly participates in the breach of duty of a fiduciary, such _third party_ becomes a joint tortfeasor with [that] fiduciary and is liable as such." *In re TOCFHBI, Inc.*, 413 B.R. 523, 534 (Bankr. N.D. Tex. 2009) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d (1942)) (emphasis added, citing elements); *W. Fork Advisors, LLC v. SunGuard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App. – Dallas 2014, pet. denied) (looking to Restatement (Second) regarding aiding and abetting analysis). Although also having sparse law regarding whether one can aid and abet one's own self, Texas law still requires a third party in order to prove aiding and abetting a breach of fiduciary duty. For the same reasons mentioned above, Nancy simply cannot aid and abet her own actions as Dugaboy Trustee.

42.    Arizona courts have more directly held that under the Restatement (Second), "when [Plaintiffs] fail to allege [agent] took any actions in [their] individual capacity 'in concert' with the actions giving rise to the breach of fiduciary duty claim against [insurance company], [plaintiff's] aiding and abetting claim against [agent] will be dismissed." *Young v. Liberty Mut. Group, Inc.,* CV-12-2302-PHX-JAT, 2013 WL 840618, at *4 (D. Ariz. Mar. 6, 2013).[39] In *Young,* the Court reasoned that "…it does not follow that [agent] must have committed the separate tort of aiding and abetting merely because he was the agent through which [insurance company] breached its duty." *Id.* at *4. The Court dismissed the claim on the agent's 12(b)(6) motion.

---

[39] In *Young,* Plaintiff sued both Liberty Mutual for breach of fiduciary duty, and her personal insurance agent for aiding and abetting said breach. Because Plaintiff failed to allege [agent] took any actions in his individual capacity "in concert" with the actions giving rise to Plaintiff's claim against Liberty Mutual, the aiding and abetting claim was dismissed upon 12(b)(6) motion.

CORE/3522697.0002/169122085

Further, in *Jones v. Colorado Cas. Ins. Co.*, the same Court dismissed a similar claim upon another insurance agent's 12(b)(6) motion, agreeing with the agent's assertion that "one cannot aid and abet one's self." *Jones v. Colorado Cas. Ins. Co.*, CV 12-1968-PHX-JAT, 2013 WL 4759260, at *3 (D. Ariz. Sept. 4, 2013) (dismissing a claim against an insurance agent for aiding and abetting the insurance company's breach of fiduciary duty, determining that in order for there to be harm to a third person, there must be at least two tortfeasors). Just as the insurance agents could not aid and abet themselves as representatives for the insurance companies, Nancy Dondero could not have aided and abetted herself in her capacity as Dugaboy Trustee.

43.    Connecticut takes a similar approach in holding that aiding and abetting means to help or compel *another* to act, and that an alleged tortfeasor cannot aid or abet himself, and doing so would yield "circular results." *Bolick v. Alea Group Holdings, Ltd.,* 278 F. Supp. 2d 278, 282 (D. Conn. 2003) (dismissing aiding and abetting claim).[40] Because Nancy Dondero was acting as Dugaboy in the conduct about which Debtor complains, she is not a "third party" to an act. It is impossible for Nancy Dondero to aid and abet her own self - as most distinctly stated in *Cornell Glasgow, LLC* and *Bolick* - because aiding and abetting requires the concerted action and scienter of more than one person. Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

> **3.    Plaintiff does Not Plead the Sufficient Scienter Requirement for Aiding and Abetting in its Amended Complaint for Either Jim or Nancy Dondero.**

44.    In addition to the above infirmities, Plaintiff fails to allege the necessary scienter required to show aiding and abetting for both Jim and Nancy Dondero. Delaware courts

---

[40] *Bolick* addressed an employment discrimination case where Plaintiff sued her supervisor for both harassment and aiding and abetting that same harassment. The Court held that to hold the supervisor liable for his wrongful behavior and also aiding and abetting that wrongful behavior is illogical and would yield circular results. Court used dictionary to reference "abettor" as someone who encourages an offender.

acknowledge that an aiding and abetting analysis largely comes down to what constitutes "knowing participation." *In re Draw*, at 904. The aider and abettor must act "knowingly, intentionally, or with reckless indifference…that is, with an illicit state of mind." *Id.* The Plaintiff must allege specific facts that show Defendants had "actual knowledge" that their conduct intentionally aided and abetted a breach, not simply that they "knew or should have known." *Id.* (citing *Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Delaware Nat. Ass'n*, CIV. 10-520 JBS KMW, 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011)).

45.    In *In re Draw*, a Chapter 11 trustee filed an amended adversary complaint against several members of the company's board of directors, asserting breach of fiduciary duties and aiding and abetting breaches of fiduciary duties. On the defendant's 12(b)(6) motion, the court held that plaintiff's amended complaint failed to allege specific facts showing actual knowledge that [Director] was liable for aiding and abetting, and that plaintiff simply alleged [Director] "knew or should have known" his conduct aided and abetted the breach. *Id.* at 904. The court subsequently dismissed plaintiff's aiding and abetting claims against that particular director.

46.    In *Capitaliza-T*, defendant moved to dismiss plaintiff's amended complaint under Rule 12(b)(6), citing that it did not contain sufficient factual allegations regarding defendant's knowledge of breach of fiduciary duty. The court applied the Delaware rule that "at a minimum, the complaint [must] alleged circumstantial facts suggesting that the defendant had knowledge of the specific principal violation." *Id.* at *5 (citing *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1256 (D. Del. 1991)). The court held that although plaintiff's amended compliant contained circumstantial allegations against defendant for aiding and abetting, it was not enough to allege

that defendants "had knowledge of the underlying…breach of fiduciary duty" to survive a 12(b)(6) motion.  *Capitaliza-T,* at *7.

47.     In this case, Plaintiff simply alleges that "[the Donderos] were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor," and "[t]he Donderos aided and abetted Dugaboy's breach of its fiduciary duties…by knowingly participating in the authorization of the…Alleged Agreement."[41]  In its Amended Complaint, Plaintiff references only factors that could be circumstantial at best when describing it's Third Claim for relief against Jim Dondero, but never clearly articulates the required specific facts that show "actual knowledge" that he was overtly acting to substantially assist Dugaboy in breaching a fiduciary duty as required by *In re Draw* and *Capitaliza-T*.[42]  Further, Plaintiff makes no specific factual allegations against Nancy Dondero, other than she "[was aware" of Dugaboy's fiduciary duties, and that she aided and abetted the breach.  Neither claims against Jim nor Nancy Dondero rise to the standard of articulation discussed in *In re Draw* and *Capitaliza-T*.  Therefore, Plaintiff's Seventh Claim should be dismissed under *Twombly* and Rule 12(b)(6).

### 4.     Neither Jim nor Nancy Dondero are Liable for Aiding and Abetting Because Aiding and Abetting Requires More Than One Single Act.

48.     As discussed in Section C.3 *supra*, the test for stating an aiding and abetting claim is stringent and focuses of proof of scienter that a party knew it was aiding another party in committing tortious conduct.  *In re Draw*, at 904.  This would require Plaintiff to show (1) a primary act by Dugaboy (via Nancy) that breached a fiduciary duty (which it cannot), and (2) a

---

[41] Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

[42] Am. Compl. ¶¶ 3,36,38,39,40,41, Adv. No. 21-03003 [Doc. 73-2]; Am. Compl. ¶ 3,50,51,52,53, Adv. No. 21-03007 [Doc. 55-2]; Am. Compl. ¶¶ 3,48,49,50,51, Adv. No. 21-03006 [Doc. 60-2]; Am. Compl. ¶¶ 3,35,36,37,38,39, Adv. No. 21-03005 [Doc. 55-2].

secondary act by each of Jim and Nancy Dondero that shows scienter and knowing participation in subverting a fiduciary duty.

49.    Plaintiff cannot show concerted action here on behalf of Jim or Nancy Dondero, because the only singular act that occurred was Dugaboy approving the compensation under the LPA.  Plaintiff alleges no other separate act by Nancy Dondero that would have been "in concert" with or "knowingly participating" in anything, as she was acting as the Dugaboy Trustee (discussed above in Section C.2.).  Further, Plaintiff shows no other separate act or proof of scienter that Jim Dondero specifically set out to knowingly aid Dugaboy in tortious conduct under *In re Draw*, since Dugaboy engaged in no such conduct.  Therefore, Plaintiff's Seventh Claim fails *Twombly* and must be dismissed under Rule 12(b)(6).

### 5.    Debtor Lacks Standing to Bring an Aiding and Abetting a Breach of Fiduciary Duty Claim Based on an Executory Contract It Rejected.

50.    The analysis here is the same as in Argument III.A.2. and B.2, *supra*.  Plaintiff argues that Jim and Nancy Dondero aided and abetted Dugaboy's alleged breach of fiduciary duty by authorizing the Subsequent Agreement, which Plaintiff alleges may have violated the LPA.[43] A cause of action for a derivative claim such as aiding and abetting shares accrual and limitations periods with the underlying tort of breach of fiduciary duty.  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied*, (Sept. 6, 2019).  "Because a civil conspiracy claim is derivative of an underlying tort, the claim accrues when the underlying tor accrues." *Id*. at 145.  Here, because Plaintiff's aiding and abetting claims derive from the alleged breach of fiduciary duty claim, the claims share accrual dates.

---

[43] Am. Compl. ¶¶ 78,79, Adv. No. 21-03003 [Doc. 79]; Am. Compl. ¶¶ 92,93, Adv. No. 21-03007 [Doc. 63]; Am. Compl. ¶¶ 90,91, Adv. No. 21-03006 [Doc. 68]; Am. Compl. ¶¶ 71,72, Adv. No. 21-03005 [Doc. 63].

51.     Again, Plaintiff was not injured until Jim Dondero did not pay the Notes.  This claim did not accrue until December 11, 2020, and is also predicated on allegations that the Subsequent Agreement violates fiduciary duties arising out of the rejected LPA.  Once again, Plaintiff is attempting to bring a post-petition claim under the LPA it rejected.  Therefore, Plaintiff's Seventh Claim must be dismissed under *Twombly* and Rule 12(b)(6).

## IV.    CONCLUSION

Dugaboy, Jim Dondero, and Nancy Dondero therefore respectfully request this Court dismiss Plaintiff's Fifth, Sixth, and Seventh Amended Claims in its Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

Dated: September 1, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS JAMES DONDERO AND NANCY DONDERO**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: gbrouphy@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

CORE/3522697.0002/169122085

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of

this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 3, 2021**

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

| | |
|---|---|
| v.<br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>       Defendants. | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>       Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>       Defendants. | Adversary No.: 21-03007-sgj |

## MEMORANDUM OPINION AND ORDER DENYING ARBITRATION REQUEST AND RELATED RELIEF

### I.       Introduction and Background

The four above-referenced adversary proceedings, Adversary Proceeding Nos. 21-3003, 21-3005, 21-3006, and 21-3007, started out as what seemed like simple suits by a Chapter 11 Debtor to collect on large promissory notes owed to it (collectively, the "Note Adversary Proceedings"). The court held a hearing on November 9, 2021 ("Hearing") on various motions filed by certain defendants in the Note Adversary Proceedings. This Memorandum Opinion and Order addresses certain motions to compel arbitration and to stay these Note Adversary Proceedings while arbitration would be proceeding.[1] For the reasons set forth below, the court will not compel arbitration or stay these Note Adversary Proceedings.

The Note Adversary Proceedings were originally brought many months ago by Plaintiff Highland Capital Management L.P., now a reorganized debtor ("Highland" or "Reorganized Debtor"), again, as simple suits on notes—that is, alleging breach of contract and seeking turnover of amounts owed from the various obligors under the notes (the "Note Obligor Defendants"). Each Note Obligor Defendant was closely related to Highland's former president, James Dondero ("Mr. Dondero),[2] and collectively borrowed tens of millions of dollars from Highland prepetition. The

---

[1] Certain defendants herein earlier filed a motion to withdraw the reference in these Note Adversary Proceedings (arguing that the claims were statutory noncore claims or that the bankruptcy court otherwise did not have Constitutional authority to enter final orders). The District Court accepted the bankruptcy court's report and recommendation that the reference should be withdrawn when these Note Adversary Proceedings are trial-ready with the bankruptcy court acting essentially in the position of a magistrate judge for the District Court prior to trial, presiding over all pretrial matters.

[2] In fact, Mr. Dondero personally was an obligor on three notes.

indebtedness was memorialized in a series of demand and term notes. The indebtedness represented by those notes remains unpaid.

The Note Adversary Proceedings morphed, so to speak, when the Note Obligor Defendants defended the Note Adversary Proceedings by alleging that an oral agreement existed such that the underlying notes would be forgiven by Highland as compensation to Highland's former president, Mr. Dondero, if certain conditions subsequent occurred. The oral agreement was allegedly made on behalf of Highland, acting through one of its largest limited partners, Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, on which the trustee is his sister Nancy Dondero ("Ms. Dondero").

When this "oral agreement" defense was articulated, this court granted Highland's request for leave to amend its original complaints in each of the Note Adversary Proceedings to allege alternative theories of liability and add Mr. Dondero,[3] Dugaboy, and Ms. Dondero as additional defendants on new counts—the theories being that, if such an oral agreement was made, it may have given rise other causes of action on the part of the actors involved. Highland amended its complaints in each of the Note Adversary Proceedings, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

Presently before the court are a set of virtually identical motions filed by Mr. Dondero, Dugaboy, and Ms. Dondero in each of the four Note Adversary Proceedings seeking to compel arbitration as to Counts V, VI, and VII of, and stay litigation altogether in, the Note Adversary Proceedings, pending the arbitration of Counts V, VI, and VII (the *Motion to Compel Arbitration and Stay Litigation* [Doc. 85, 66, 74, and 65, respectively, in each sequentially-numbered Note Adversary Proceeding[4], the "Arbitration Motions"). Highland timely filed objections to the motions [Doc. 92, 76, 81, and 77] and replies were filed by Mr. Dondero, Dugaboy and Ms. Dondero [Doc. 107, 88, 93, and 88].[5]

As set forth below, Mr. Dondero, Dugaboy, and Ms. Dondero (hereinafter the "Dondero/Dugaboy Defendants") rely on a mandatory arbitration clause in Highland's Limited Partnership Agreement as the basis for their arbitration request. To be clear, there are no arbitration clauses in the underlying promissory notes. And the Note Obligor Defendants are not seeking arbitration of the breach of contract claims, turnover claims, or fraudulent transfer claims. It is

---

[3] Mr. Dondero was actually already a Note Obligor Defendant in Adv. Proc. No. 21-3003, as he as an obligor on three notes.

[4] All subsequent "Doc." references in this Memorandum Opinion and Order follow this convention.

[5] The court considered these replies despite the lateness of their filing, less than two business days before the Hearing. At the Hearing, Highland noted its displeasure with these replies being filed 37 days after Highland filed its objections but did expressly did not ask the court to strike the replies. The court reminds the parties, as Highland correctly pointed out, that the Local Civil Rules for the Northern District of Texas, and not the Local Bankruptcy Rules, apply to these adversary proceedings in all respects, since the reference to the Bankruptcy Court was withdrawn and this court is conducting all proceedings in the position of a magistrate judge for the District Court. The replies here were required to be filed no later than 14 days following the filing of Highland's objections. *See* Local Civil Rule 7.1(f).

only the Dondero/Dugaboy Defendants seeking arbitration as to Count V (seeking declaratory judgment as to provisions of the Highland limited partnership agreement) and Counts VI and VII (the fiduciary duty claims). The court denies the Arbitration Motions for the reasons stated below.

## II.    The Agreement Containing the Arbitration Clause

First, a word about what is and is not in dispute regarding the Arbitration Motions.  The parties agree that Highland's ***Fourth Amended and Restated Agreement of Limited Partnership*** (the "LPA")[6] contained Section 6.14, a typical mandatory arbitration provision that requires parties to the LPA to arbitrate certain disputes under certain circumstances (the "Arbitration Clause"):

> In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act …

The Arbitration Clause also significantly limited discovery that could occur in arbitration:

> The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.

***The parties further agree that the LPA, as an executory contract, was rejected under 11 U.S.C. § 365 in connection with the court's order confirming Highland's plan of reorganization in February 2021***.

The Dondero/Dugaboy Defendants acknowledge that Counts I–IV of the Amended Complaints (Breach of Contract; Turnover; Fraudulent Transfers under 11 U.S.C. § 548; and Fraudulent Transfers under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act) are not subject to the Arbitration Clause.

The Dondero/Dugaboy Defendants argue in the Arbitration Motions, however, that Counts V, VI, and VII of the Amended Complaints (seeking a declaratory judgment as to provisions of LPA and claiming breach of fiduciary duty and aiding and abetting of breach of fiduciary duty—

---

[6] The LPA was executed by Highland's then-general partner, Strand Advisors, Inc., through the individual James Dondero, who was also then Highland's CEO and Highland's majority limited partner, The Dugaboy Investment Trust, James Dondero's family trust, through its trustee, the individual Nancy Dondero, James Dondero's sister. (Various other limited partners also signed the LPA, but they are not Note Obligor Defendants.) The "oral agreement" defense alleges that The Dugaboy Investment Trust, through Nancy Dondero as trustee, as the holder of a Majority Interest (as defined in the LPA), entered into oral agreements on behalf of Highland with James Dondero to forgive the demand notes at the center of these Note Adversary Proceedings if certain conditions subsequent were met.

4

all counts that, notably, Highland only added after the Note Obligor Defendants articulated their "oral agreement" defense) *are* subject to the Arbitration Clause. Highland counters that: (a) the rejection of the LPA excuses Highland from being forced to submit to mandatory arbitration of Counts V, VI, and VII; (b) the Dondero/Dugaboy Defendants have waived the Arbitration Clause by not invoking it at any earlier point in these Note Adversary Proceedings; and (c) the Dondero/Dugaboy Defendants should be judicially estopped from invoking the Arbitration Clause now. Highland also argues that arbitration of some but not all the counts of the Amended Complaints would be inefficient and wasteful, and that any stay of proceedings in this court would do a disservice to the resolution of the admittedly non-arbitrable issues in Counts I–IV.

## III.   The Significance of the Rejection of the Executory Contract (*i.e.*, the LPA) that Contained the Arbitration Clause

The court acknowledges that there is a wealth of federal case law dictating the strong federal policy undergirding the Federal Arbitration Act ("**FAA**"). *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) (describing the FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements"). The FAA was enacted by Congress in 1925 and became effective in 1926.  It is codified at Title 9 of the United States Code and is predicated upon Congress's exercise of the Commerce Clause powers granted in the Constitution.  The FAA contemplates the judiciary's respect for and enforcement of private parties' agreements to resolve disputes through arbitration. The FAA provides:

> A written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[7]

Thus, arbitration, pursuant to the FAA, is entirely a matter of contract.  And, where a contract contains a provision in which parties agreed to submit future disputes thereunder to arbitration, these provisions should be enforced according to their terms.  Section 4 of the FAA specifically directs a court to order parties to arbitrate upon a request by a party that is entitled to demand arbitration in a written contract.  The courts have often stated that the FAA reflects a liberal federal policy favoring arbitration and requires arbitration agreements to be rigorously enforced according to their terms.[8]

The court also notes that some courts have grappled with whether a bankruptcy court needs to treat an arbitration provision in a contract any "less mandatory" than other courts.  After all, bankruptcy cases are not like other lawsuits; they are multi-faceted, multi-party, and fast-moving. It has often been stated that the underlying purposes of the Bankruptcy Code are to: (a) provide debtors and creditors with orderly and effective administration of bankruptcy estates; and (b) *centralize disputes over debtors' assets and obligations in one forum*.  But there is *no* "bankruptcy exception" to an arbitration agreement *per se*—not in any statute and not according

---

[7] 9 U.S.C. § 2.
[8] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

APP 428

to any court so far.  Some courts have opined or suggested that a bankruptcy court, when presiding over a proceeding involving "non-core" disputes pursuant to 28 U.S.C. § 157(b)—*i.e.,* disputes that are merely related to a bankruptcy case and would have been litigated elsewhere but for the broad nexus created by the debtor's bankruptcy filing—***generally*** must abstain from adjudication and direct the parties to arbitration when presented with an applicable arbitration provision.[9]  But when a bankruptcy court is presented with a "core" dispute—*i.e.,* one which derives from the provisions of the Bankruptcy Code—it *may* be permissible for the bankruptcy court to decline to order arbitration; after determining that "core" disputes are involved, courts tend to employ a framework for analysis derived from a nonbankruptcy Supreme Court case called *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987).  In a nutshell, the *McMahon* Court held that a party seeking to avoid arbitration pursuant to an otherwise applicable agreement must show that Congress—in enacting whatever statute is involved (*i.e.,* the Bankruptcy Code) intended to preclude arbitration and that intent must be deducible from: (1) the statute's text; (2) its legislative history; or (3) "an inherent conflict between arbitration and the statute's underlying purposes."[10]  Thus, courts—after finding "core" disputes are involved—tend to plow down a complicated trail of considering whether there is an "inherent conflict" between arbitration and the Bankruptcy Code in whatever dispute happens to be before the court.

The Fifth Circuit has addressed the topic of enforceability of arbitration clauses in bankruptcy in the cases of *In re Gandy* and *In re Nat'l Gypsum*.[11]  In those cases, the Fifth Circuit instructed that a bankruptcy court may refuse to enforce arbitration clauses and may itself adjudicate a dispute when it finds that: (a) a matter is core or derives from rights under the Bankruptcy Code; ***and*** (b) enforcement of the arbitration provision would irreconcilably conflict with the purposes or goals of the Bankruptcy Code.[12]

While this is all somewhat enlightening, a slightly different argument is presented to this court by Highland in its argument that the bankruptcy court should not compel arbitration.  Highland does not deny the existence of any of the above case law nor the fact that Counts V, VI, and VII involve non-core matters that do not derive from rights under the Bankruptcy Code.  Rather, Highland argues, these Note Adversary Proceedings present a circumstance that very few courts have addressed.  ***The LPA (or at least the Arbitration Clause) was an executory contract that Highland rejected in its confirmed Chapter 11 plan.***  As noted above, no one disputes that the LPA was rejected pursuant to Bankruptcy Code section 365.  The result, argues Highland, is

---

[9] At least one court has suggested that there is a "presumption in favor of arbitration [that] usually trumps the lesser interest of bankruptcy courts in adjudicating non-core proceedings." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006). *But see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 885 F.2d 1149, 1156-1158 (3d Cir. 1989) (determining there is no discretion to deny arbitration in non-core matters). *See also Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 496 (5th Cir. 2002) ("it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings under 28 U.S.C. § 157(b)"); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997) (same).

[10] *McMahon*, 482 U.S. at 227.

[11] *Gandy*, 299 F.3d at 489; *Nat'l Gypsum Co.*, 118 F.3d at 1056.

[12] *In re Nat'l Gypsum Co.*, 118 F.3d at 1068-69.

that Highland is no longer bound by the LPA's provisions that impose *specific performance* obligations on it—provisions such as the Arbitration Clause. A counterparty to a rejected executory contract can merely seek monetary damages, Highland argues, but it cannot force a debtor to *perform* under a rejected executory contract.

Highland's argument finds support in a both lengthy and well-reasoned opinion by District Judge David Godbey of this District — *Janvey v. Alguire*, 2014 U.S. Dist. LEXIS 193394 (N.D. Tex. Jul. 20, 2014), *aff'd on different grounds* at 847 F.3d 231 (5th Cir. 2017), dealing with federal receiverships (in which the court made analogies to the bankruptcy process)—as well as in an old law review article written by renowned University of Texas Law School Professor Jay Westbrook (often considered the modern-day expert on executory contracts in bankruptcy). *See* Jay Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 UNIV. OF MINN. LAW SCHOOL 595 (1983).

The *Janvey* opinion arose in the context of a federal receivership commenced at the request of the Securities and Exchange Commission in response to the massive R. Allen Stanford Ponzi scheme. Ralph S. Janvey was the receiver ("Receiver") who took possession of all receivership assets and records. Pursuant to those powers, the Receiver filed suit against former employees (the "Employee Defendants") who previously worked in various capacities for the Stanford enterprises ("Stanford Entities") and received salary, commissions, bonuses, or later forgiven loans from the Stanford Entities. The Receiver's suit alleged that the Employee Defendants received fraudulent transfers in violation of the Texas Uniform Fraudulent Transfer Act (TUFTA) or, in the alternative, were unjustly enriched at the expense of the creditors of the Receivership Estate. Some of the Employee Defendants filed motions to compel arbitration. According to a later Fifth Circuit opinion, the arbitration agreements were contained in: (1) promissory notes between the Employee Defendants and the company that governed the upfront loan payments that the company awarded to the Employee Defendants when they joined Stanford; (2) the broker-dealer forms that the company submitted to the Financial Industry Regulation Authority (FINRA) when registering the Employee Defendants as brokers; (3) FINRA's internal rules governing disputes between brokers and their employers; and (4) the company's Performance Appreciation Rights plan. The arbitration clauses provided that "any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, bylaws, rules and regulations of the National Association of Securities Dealers (NASD)." *Janvey v. Alguire*, 847 F.3d 231, 237 (5th Cir. 2017).

The issue of whether arbitration was required went back and forth between Judge Godbey and the Fifth Circuit and, ultimately, the precise issue pending before Judge Godbey was whether to deny or grant the motions to compel arbitration based on the question of "whether the Receiver is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities."

Judge Godbey declined to order arbitration because the Receiver had not adopted the arbitration agreements at issue and because arbitration of the Receiver's claims would frustrate a central purpose of federal equity receiverships. Judge Godbey noted that, before a general requirement to arbitrate exists, a party must first be bound to an arbitration agreement — either as a signatory or through a principle of law or equity. Judge Godbey stated that discussions of

possible exceptions to this general requirement to arbitrate, like *McMahon*'s contrary congressional command, ***are only necessary after such an initial determination***. Judge Godbey opined that equity receivers, as non-signatories to an arbitration agreement, can, in fact, be bound to the arbitration agreement to the same extent receivership entities would be bound. But there remained a significant resultant question: whether the Employee Defendants' arbitration agreements were contracts that the Receiver could ***reject***, "an ability that has deep historical roots for both federal equity receivers and bankruptcy trustees and that continues to be an important tool for both."

Applying Professor Vern Countryman's material breach test, Judge Godbey concluded that arbitration agreements must be analyzed as separate executory contracts, based on the nature of the agreement as well as arbitration caselaw regarding severability. Citing Professor Westbrook, he noted that, "'[v]iewed as an independent contractual obligation of the parties, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought.' *Westbrook*, *supra note 26, at 623* (footnote omitted). Furthermore, the appropriate remedy in this circumstance cannot be for the Court to require specific performance by the trustee — *i.e.,* to compel arbitration — because 'injured part[ies] cannot insist on specific performance by the trustee.' *See id. at 619* (collecting cases)." *Janvey*, 2014 U.S. Dist. LEXIS 193394 at *113.

Judge Godbey went on to opine that the Receiver had rejected the arbitration agreement, that the rejection was proper, and that the Receiver was not bound to arbitrate—further noting that if the court required the Receiver to adopt the arbitration agreements, it would greatly burden and deplete the receivership estate. Such a result, weighed in the balance, would be unjust and inequitable.

The Fifth Circuit ultimately affirmed, 847 F.3d 231 (5th Cir. 2017), but applied a different analysis. It determined that the Stanford entity in whose shoes the Receiver had stepped, for purposes of bringing the TUFTA claims (*i.e.,* Stanford International Bank), was not a signatory to the arbitration agreements and was not otherwise bound by them. The Fifth Circuit also determined that, with regard to one Employee Defendant (Giusti) who stood in a unique position (in that there was an arbitration agreement that the Receiver's predecessor was party to and bound), that Giusti waived the right to arbitrate by substantially invoking the judicial process (through the filing of a motion to dismiss, an answer, serving written discovery and answering discovery—which had caused delay and expense. As for Judge Godbey's "broader policy argument" that the federal receivership statutes were at odds with the FAA's mandate in favor of arbitration, noting that these were "important concerns," the Fifth Circuit stated that "we are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court." *Id.* at 245. But the Fifth Circuit did not otherwise address the arguments.

While the *Janvey* case involved a federal receiver, Judge Godbey looked almost entirely to bankruptcy law and to Bankruptcy Code section 365 to reach his ruling. This court finds *Janvey* to be persuasive (and possibly binding) on this court. Moreover, just as a federal receiver is analogous to a bankruptcy trustee, a debtor-in-possession is, of course, statutorily the same as a bankruptcy trustee. *See, e.g.,* 11 U.S.C. § 1107.

8

To be clear, if a bankruptcy trustee rejects an executory contract, the rejection, of course, constitutes a breach of the contract and subjects the estate to a claim for money damages on behalf of the injured party. 11 U.S.C. § 365(g). Significantly, however, *the injured party cannot insist on specific performance by the trustee.* *See* Westbrook, *The Coming Encounter,* at 619 (and numerous cases cited therein). Instead, the injured party is treated as having a prepetition claim for damages arising as if the breach occurred immediately before the filing of the bankruptcy petition. Professor Westbrook notes that the issue then becomes whether such a prepetition claim, including a claim arising from rejection, must be liquidated pursuant to the arbitration clause. *Most jurisprudence in the bankruptcy context dealing with arbitration clauses does not analyze this as a traditional executory contract conundrum.* And yet, to use Professor Westbrook's words, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought. *Id.* at 623. And although "arbitration survives the contract" *as a matter of contract law,* "executory obligations may be avoided by the trustee as a matter of bankruptcy law through the exercise of the trustee's power to reject executory contracts." *Id.* "If specific performance is not available against a trustee, it follows that an arbitration agreement is like any other executory contract which the trustee may reject." *Id.* at 624.

The *Janvey* decision is not the only case to have addressed the effect of rejection on the viability of an arbitration clause within a rejected executory contract. The Dondero/Dugaboy Defendants cite the court to *In re Fleming Companies, Inc.,* 325 B.R. 687 (Bankr. D. Del. 2005), a case from another bankruptcy court that predates *Janvey* by almost a decade, for the proposition that rejection of an executory contract does not prevent a party from invoking an arbitration clause in that contract. With due respect, the court believes the reasoning in *Janvey* to be more persuasive than the bankruptcy court's in *Fleming Cos.* (and *Janvey* is potentially binding precedent on this court). It also bears noting that it was the debtor in *Fleming Cos.,* not the executory contract's counterparty, who was invoking the arbitration clause in the contract the debtor had previously rejected. That distinction is not without significance.

In summary, this court accepts Highland's argument that the LPA was an executory contract duly rejected pursuant to Bankruptcy Code section 365, and that the Arbitration Clause should likewise be considered a separate executory agreement that was rejected. Accordingly, Highland cannot be forced to specifically perform under the Arbitration Clause or the LPA by mandatorily participating in arbitration of Counts V, VI, and VII. The court defers to the compelling reasoning of Judge Godbey in *Janvey* on this point. The court, like Judge Godbey, also finds as a matter of fact that requiring arbitration in this case would impose undue and unwarranted burdens and expenses on the parties to the detriment of Highland's creditors.

## IV.    Waiver

Even if this court is in error in determining that the Arbitration Clause is no longer binding on Highland because it was rejected pursuant to Bankruptcy Code section 365, the court finds as a matter fact that the Dondero/Dugaboy Defendants have waived any right to invoke the Arbitration Clause. The court has taken judicial notice of its own docket, both in these Note Adversary Proceedings and in the administrative Chapter 11 case, and has considered the entire

record of both proceedings, as well as the *Declaration of John A. Morris in Support of Debtor's Objection to Motion to Compel Arbitration and Stay Litigation* [Doc. 94, 78, 83, and 78], and the exhibits annexed thereto, in making the following findings of fact.

The Note Adversary Proceedings were filed in January 2021 (after Highland earlier made demands on the Note Obligor Defendants or otherwise declared events of default). One of the Note Obligor Defendants (Mr. Dondero) timely answered, pleading an affirmative defense that Highland agreed not collect on the underlying notes—but that answer contained nothing more specific than this, nor any mention of arbitration. Amended Answers were later filed by the Note Obligor Defendants, elaborating on and/or adopting the affirmative defense that, through the oral agreement, Highland agreed to forgive the obligations under the notes as compensation to Mr. Dondero "upon fulfillment of conditions precedent." Roughly 90 days after the filing of the Note Adversary Proceedings, the Note Obligor Defendants filed motions to withdraw the reference, which this court spent significant time addressing in making a report and recommendation to the District Court in each Note Adversary Proceeding. No mention of arbitration was made to this court during those proceedings. During a hearing before the court on June 10, 2021, Highland announced its intention to add claims against the Dondero/Dugaboy Defendants for breach of fiduciary duty, yet the issue of arbitration was not raised at that point, or a month later when the Dondero/Dugaboy Defendants received a draft of the Amended Complaint adding Counts V, VI, and VII. Pursuant to the parties' agreement, Highland filed that Amended Complaint on August 27, 2021, as the Dondero/Dugaboy Defendants' "oral agreement" defense became clearer. Only on September 1, 2021, did the Dondero/Dugaboy Defendants file their Arbitration Motions and raise the issue of arbitration under the Arbitration Clause for the first time in these proceedings, more than seven months after the litigation began. At the same time, the Dondero/Dugaboy Defendants also pursued extensive discovery, seeking and obtaining responses to interrogatories and documents requests in scope and number *significantly more than the Arbitration Clause permitted*, all in accordance with pre-trial stipulations the defendants both negotiated with Highland and then asked this court to approve, which the court did.

Although courts in the Fifth Circuit sometimes apply a presumption against waiver of an arbitration right, the right can certainly be waived. [13] "Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party." [14] In this context, prejudice "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.'" [15] A party waives arbitration when it "'engage[s] in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.'" [16]

---

[13] *Williams v. Cigna Fin. Advisors, Inc.,* 56 F.3d 656, 661 (5th Cir. 1995).

[14] *Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 497 (5th Cir. 1986).

[15] *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 327 (5th Cir. 1999) (quoting *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 134 (2d Cir. 1997)).

[16] *Keytrade USA v. Ain Temouchent M/V,* 404 F.3d 891, 897 (5th Cir. 2005) (quoting *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 344 (5th Cir. 2004)). *See also Price v. Drexel Burnham Lambert, Inc.,* 791 F.2d

While every situation is unique, here the court finds that the Dondero/Dugaboy Defendants waived their right (if any still remained) to demand arbitration, due to their multiple answers, their motions to withdraw the reference, extensive discovery that far exceeded what the Arbitration Clause permitted, and complete silence about the possibility of arbitration for more than eight months. Even though Counts V, VI, and VII were not added by Highland until more than seven months after the Note Adversary Proceedings were filed, the Dondero/Dugaboy Defendants had reason to know that their "oral agreement" affirmative defense might implicate the LPA and the Arbitration Clause, and yet they didn't raise the subject of arbitration until many months of litigation activity in the Note Adversary Proceedings had occurred in this court.[17] The resulting delay and expense warrant this court's applying waiver as permitted by the Fifth Circuit authority cited above. This court finds as a matter of fact that the Dondero/Dugaboy Defendants waived the relief they seek in the Arbitration Motions.

## V.      Judicial Estoppel, Waste and Inefficiency

Highland also asked the court: (a) to judicially estop the Dondero/Dugaboy Defendants from arguing entitlement to arbitration in light of prior contradictory positions these defendants took in earlier pleadings and arguments before this court, and (b) to decline to order arbitration because of the waste and inefficiency arbitration would represent for these proceedings. Because the court rules that rejection of the Arbitration Clause precludes Highland's being forced to submit to arbitration, and because the court finds that the Dondero/Dugaboy Defendants waived the relief they sought in the Arbitration Motions, the court need not and does not address Highland's arguments pertaining to judicial estoppel or the practical implications of ordering arbitration.

## VI.     Stay of Counts I–IV

Finally, because the court denies the arbitration requested in the Arbitration Motions, there is no good cause to stay litigation in the entire Note Adversary Proceedings.  Even if the court has erred in its ruling on the Arbitration Motions, there still exists no good cause to stay the Note Adversary Proceeding as to Counts I-IV.  The Dondero/Dugaboy Defendants acknowledge that Counts I-IV are non-arbitrable claims and, moreover, in the event Plaintiff were to prevail on them, it is likely that Plaintiff would not even pursue Counts V–VII. To clarify, if Plaintiff prevails on Counts I and II (*i.e.,* the breach of contract claims and turnover)—which would involve a finding that there was no oral agreement for nonpayment—then all other counts would become moot. And, if the court were to find that there *were* such an agreement, Plaintiff could potentially still prevail on Counts III and IV (the claims that such an agreement would constitute a fraudulent transfer—also non-arbitrabal).  It would seem that only if Plaintiff loses on all of these non-arbitrable claims would it have any interest in pursuing Counts V-VII (*i.e.,* an interest in arguing that the oral agreements amounted to breach of fiduciary duty and aiding and abetting breach of fiduciary duty).

---

1156, 1162 (5th Cir. 1986) (party waived arbitration because it "initiated extensive discovery, answered twice, filed motions to dismiss and for summary judgment, filed and obtained two extensions of pre-trial deadlines, all without demanding arbitration").

[17] The court notes that all Note Obligor Defendants consist of either Mr. Dondero or entities he controls.

The requested stay would also be illogical in this context. The "oral agreement" defense relies on the existence of an oral contract between Highland (via Dugaboy, through its trustee, Ms. Dondero) and Mr. Dondero. The existence of that contract is **not** an arbitrable issue. The implications of that contract's existence are what would potentially be arbitrable. If litigation on Counts I–IV demonstrates that there was no such "oral agreement," then there would be nothing to arbitrate because Counts V–VII would be rendered moot. Staying the litigated determination regarding the existence of the "oral agreement" in favor of arbitrating issues that only arise if there ever were such an agreement strikes the court as backwards. Arbitration should await that determination, not the other way around.

Accordingly, the Dondero/Dugaboy Defendants' requests to stay the Note Adversary Proceedings have no merit and are denied.

### ORDER

For the reasons stated in the above Memorandum Opinion and Order, the Arbitration Motions and Stay Motions related thereto are DENIED.

*### End of Order ###*



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 7, 2021**

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. [1]<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>      Plaintiff.<br><br>v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>      Defendants. | Adversary No. 21-03003-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>      Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>      Defendants. | Adversary No.: 21-03005-sgj |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj |

## ORDER

In Adversary Proceeding Nos. 21-3003, 21-3005, 21-3006, and 21-3007 (collectively, the "**Note Adversary Proceedings**"), before the Court are a set of virtually identical motions [Doc. 82, 68, 72, and 67, respectfully, in each sequentially-numbered Note Adversary Proceeding[2]] (the "**Rule 12(b)(6) Motions**") seeking to dismiss Counts V, VI, and VII of the Amended Complaints. On November 9, 2021, the Court held a hearing (the "**Hearing**") in in connection with the Rule 12(b)(6) Motions, filed by the certain of the defendants in the Note Adversary Proceedings (the "**Note Duty Defendants**"). Plaintiff Highland Capital Management L.P., now a reorganized debtor ("**Highland**" or "**Reorganized Debtor**") timely filed objections to the Rule 12(b)(6) Motions [Doc. 90, 74, 79, and 74] and the Note Obligor Defendants filed replies [Doc. 108, 89, 94, and 89].[3]

With regard to the Note Duty Defendants' Rule 12(b)(6) Motions, the Court must consider the motions while accepting every allegation in the Amended Complaints as true. Doing so, the Court rules that the Plaintiff has articulated plausible claims and has stated claims on which relief could be granted. "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 …." Fed. R. Civ. Proc. 52(a)(3), applicable to the Note Adversary

---

[2] All subsequent "Doc." references in this Order follow this convention.

[3] The Court considered these replies despite the lateness of their filing, less than two business days before the Hearing. At the Hearing, Highland noted its displeasure with the Note Obligor Defendants' having filed their replies 37 days after Highland filed its objections but did expressly did not ask the court to strike the replies. The Court reminds the Note Obligor Defendants, as Highland correctly pointed out, that the Local Civil Rules for the Northern District of Texas, and not the Local Bankruptcy Rules, apply to these adversary proceedings in all respects, since the reference to the Bankruptcy Court was withdrawn and this Court is conducting all proceedings in the position of a magistrate judge for the District Court. The replies here were required to be filed no later than 14 days following the filing of Highland's objections. *See* Local Civil Rule 7.1(f).

Proceedings under Fed. R. Bankr. Proc. 7052. Accordingly, the Court makes no findings of fact or conclusions of law in denying the Rule 12(b)(6) Motions.

For the reasons stated above, the Rule 12(b)(6) Motions are DENIED.

* * * *END OF ORDER* * * *



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 6, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | **CASE NO. 19-34054-SGJ-11** |
| L.P., | § | **(CHAPTER 11)** |
|     DEBTOR. | § | |
| _____ | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| L.P., | § | **ADVERSARY NO. 21-03003** |
|     PLAINTIFF, | § | **(CIV. ACTION #3:21-CV-01010-E)** |
| | § | |
| VS. | § | |
| | § | |
| JAMES DONDERO, | § | |
|     DEFENDANT. | § | |

_____

## REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT: (A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY; AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT

1

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware.  That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019.  A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.  The chapter 11 plan has been appealed by the Defendant in this action, James D. Dondero ("Dondero-Defendant"), and certain parties related to him. The appeal of the plan is now pending before the Fifth Circuit, but no stay pending appeal has been granted.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against Dondero-Defendant, who was Highland's co-founder and former President and Chief Executive Officer.  The Adversary Proceeding pertains to three promissory notes (collectively, the "Notes") executed by Mr. Dondero in favor of the Debtor in 2018. Each of the Notes were demand notes. On December 3, 2020, the Debtor sent Dondero-Defendant a letter demanding payment by December 11, 2020, as allowed under the terms of the notes. Following Dondero-Defendant's failure to pay on the Notes in response to the demand letter, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on these Notes (as well as several other notes of parties related to Dondero-Defendant) as part of its funding to pay creditors.

---

[1] Bankruptcy Case No. 19-34054.

2

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court.   Dondero-Defendant submitted a *Motion and Memorandum of Law in Support to Withdrawal the Reference*[3] (the "Motion") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on May 25, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

## II.    NATURE OF THE ADVERSARY PROCEEDING

### a.   The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[4] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the three Notes were: (i) $3,825,000, executed February 2, 2018, (ii) $2,500,000, executed August 1, 2018, and (iii) $2,500,000, executed August 13, 2018. The Debtor now seeks monetary damages totaling $9,004,013.07, inclusive of accrued but unpaid

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03003, Dkt. 21.
[4] Adversary Case No. 21-03003, Dkt. 1.

interest and cost of collection. Because the Debtor alleges the amounts due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 28, 2021, Dondero-Defendant filed his *Original Answer*[5] on March 16, 2021 before subsequently filing his *Amended Answer*[6] on April 6, 2021.

Dondero-Defendant has three pending proofs of claim in the Bankruptcy Case that are unliquidated, contingent claims. Two other proofs of claim previously filed by Mr. Dondero were withdrawn with prejudice before the commencement of the Adversary Proceeding on December 4, 2020.[7] **Proof of Claim No. 188 was Dondero-Defendant's proof of claim directly relating to the Notes and was one of the two proofs of claim withdrawn with prejudice.**

### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On April 15, 2021, Dondero-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. On May 6, 2021, the Debtor filed its *Response Opposed to Defendant's Motion to Withdraw the Reference*[8] (the "Response Opposed"). On May 21, 2021, Dondero-Defendant filed his *Reply in Support of the Motion to Withdraw the Reference*[9] (the "Reply"). The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on May 25, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

### i. The Movant's Position

---

[5] Adversary Case No. 21-03003, Dkt. 6.
[6] Adversary Case No. 21-03003, Dkt. 16.
[7] *Order Approving Stipulation and Agreed Order Authorizing Withdrawals of Proofs of Claim 138 and 188 Filed by James Dondero*, Bankruptcy Case No. 19-34054, Dkt. 1510.
[8] Adversary Case No. 21-03003, Dkt. 30.
[9] Adversary Case No. 21-03003, Dkt. 44.

Dondero-Defendant argues that the withdrawal of the reference is mandatory for the Debtor's breach of contract count and, alternatively, permissive withdrawal of the reference is proper for both counts.[10]

Dondero-Defendant argues that mandatory withdraw of the reference is required under the precedent of this court.[11] Specifically, he argues that the Notes were, in essence, tax loans that were forgivable and issued in lieu of compensation. Further, forgivable loans as compensation are allegedly used throughout the private equity industry as a tax-efficient form of compensation and any decision made by the bankruptcy court will have resounding consequences on the private equity industry. Thus, the breach of contract claim will allegedly involve a substantial and material consideration of non-Bankruptcy federal law (tax law) that will result in more than a *de minimis* effect on interstate commerce, making withdrawal mandatory.[12]

Alternatively, Dondero-Defendant argues that, if mandatory withdrawal is not required, there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[13]

Further, Dondero-Defendant contends he has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter

---

[10] *See* Adversary Case No. 21-03003, Dkt. 21 at 5-7.

[11] *See In re Nat'l Gypsum Co.*, 145 B.R. 539, 541 (N.D. Tex. 1992) (stating "withdrawal must be granted if it can be established (1) that the proceeding involves a substantial and material question of both Title 11 and non-Bankruptcy Code federal law; (2) that the non-Code federal law has more than a de minimis effect on interstate commerce; and (3) that the motion for withdrawal was timely."); *see also City of Clinton, Ark. v. Pilgrim's Pride Corp.*, No. 4:09-CV-386-Y, 2009 WL 10684933, at *1 (N.D. Tex. Aug. 18, 2009).

[12] Adversary Case No. 21-03003, Dkt. 21 at 5-7.

[13] *Id.* at 7-11.

final orders in the Adversary Proceeding or hold a jury trial. Dondero-Defendant further argues he has withdrawn his only proof of claim relating to the Notes, thus negating any argument he has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

In summary, Dondero-Defendant views mandatory withdrawal of the reference as warranted, because the contract claim will allegedly be substantially based on federal tax law issues, and permissive withdrawal as alternatively proper, because the turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract claim become core.[14]

As far as timing, Dondero-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

ii. *The Debtor-Plaintiff's Position*

The Debtor argues that no basis exists for mandatory withdrawal of the reference because no substantial and material consideration of federal tax law issues will be necessary in this Adversary Proceeding. The Debtor argues that Dondero-Defendant has provided no specificity as to what tax issues would be in play, and mere speculation about tax issues is not enough to justify mandatory withdrawal of the reference.[15] To that point, the Debtor notes that Dondero-Defendant has not pointed to any section of the federal tax code to support a basis for his defenses. The Debtor characterizes the entirety of the Motion as an attempt to forum shop and avoid another hearing in front of the bankruptcy court through assertion of baseless tax defenses.

The Debtor further argues that there is no cause shown for permissive withdrawal because a turnover action under Section 542(b) of the Bankruptcy Code is an inherently core claim. The Notes, as argued, are already property of the bankruptcy estate, as matured and payable on

---

[14] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).
[15] *See In re White Motor Corp.*, 42 B.R. 693, 705-06 (N.D. Ohio 1984).

6

December 11, 2020, and the turnover action only concerns federal bankruptcy law.[16] The Debtor argues that the defenses and disputes raised by Dondero-Defendant do not restrict the Debtor's ability to collect property of the estate under 11 U.S.C. § 542(b).[17]

The Debtor additionally argues that Dondero-Defendant's assertion that he has retained his jury trial rights is wrong, as he has consented to the equitable jurisdiction of the bankruptcy court through the filing of five proofs of claims and asserting setoffs in his defense to the Adversary Proceeding. The Debtor further argues that the filing of Proof of Claim No. 188 (related to the Notes), clearly demonstrated Dondero-Defendant's consent to the jurisdiction and authority of the bankruptcy court to resolve the interconnected claims and setoff defenses he has asserted—thereby directly impacting the claims-allowance process and the restructuring of the debtor-creditor relations. Further, the Debtor argues, in a supplemental filing, that Dondero-Defendants' withdrawing Proof of Claim No. 188 in December 2020 with prejudice does not allow him to withdraw his consent to the jurisdiction of the bankruptcy court.[18] In essence, the Debtor argues that, as soon as Dondero-Defendant filed Proof of Claim No. 188, he had consented to bankruptcy court jurisdiction for any proceeding involving the Notes during the Bankruptcy Case and waived his jury trial rights.

As far as timing, the Debtor argues that, if the court finds permissive withdrawal of the reference is appropriate, the reference should not be withdrawn until after the parties are trial-ready, and all pretrial matters should be handled by the bankruptcy court until such time.

---

[16] *See Tow v. Park Lake Cmtys., LP*, 2018 U.S. Dist. LEXIS 1720, at *3-*5 (S.D. Tex. Jan. 4, 2018); *see also Porretto v. Nelson (In re Porretto)*, 2012 Bankr. LEXIS 4919, at *11-*12 (Bankr. S.D. Tex. Oct. 18, 2012); *see also Romo v. Monetmayor (In re Montemayor)*, 547 B.R. 684, 692 (Bankr. S.D. Tex. 2016) (bankruptcy court had authority under *Stern* to issue a final order in an action brought pursuant to Section 542(b), because an action "to turnover assets belonging to the bankruptcy estate [is] a matter which solely concerns federal bankruptcy law").
[17] *See Tow*, 2018 U.S. Dist. LEXIS 1720, at *3-*5; *see also Shaia v. Taylor (In re Connelly)*, 476 B.R. 223, 230 (Bankr. E.D. Va. 2012).
[18] *Addendum to Plaintiff's Opposition to Defendant's Motion to Withdraw the Reference*, Adversary Case No. 21-03003, Dkt. 31 at 1.

7

### III.   MANDATORY WITHDRAWAL OF THE REFERENCE IS NOT APPLICABLE

Withdrawal of the reference pursuant to 28 U.S.C. § 157(d) provides for the possibility of mandatory withdrawal of the reference from the bankruptcy court: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Under the precedent of this District, in *Nat'l Gypsum Co.* and *Pilgrim's Pride*, mandatory withdrawal of the reference must be granted when: (1) the motion was timely filed; (2) a non-Bankruptcy Code federal law at issue has more than a *de minimis* effect on interstate commerce; and (3) the proceeding involves a substantial and material question of non-Bankruptcy Code federal law.[19]

It has been well established that "mandatory withdrawal is to be applied narrowly" and to "prevent 157(d) from becoming an 'escape hatch.'"[20] Unsubstantiated assertions that non-bankruptcy federal law issues are substantial and material to an adversary proceeding are insufficient to warrant mandatory withdrawal.[21] The bankruptcy court routinely considers tax law issues and, here, Dondero-Defendant has provided no meaningful explanation of the alleged materiality, complexity, and relevance of federal tax issues to the Adversary Proceeding. No relevant portions of the tax laws that will allegedly be implicated are cited, nor is there any explanation of how the issues are beyond the expertise of the bankruptcy court. Thus, Dondero-

---

[19] 145 B.R. at 541; 2009 WL 10684933 at *1.

[20] *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist LEXIS 101134, at *6 (N.D. Tex. Oct. 1, 2009), *adopted in its entirety*, 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

[21] *Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at *21-*23 (D. Me. June 8, 2015) (insufficient basis for mandatory withdrawal where party failed to demonstrate specifically why a court would have to "engage in anything beyond routine application of current law" and the party "tries to kick up some dust to make the relevant analysis seem complicated").

APP 446

Defendant has failed to meet his burden to demonstrate that mandatory withdrawal of the reference is appropriate.

### IV.   THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE PENDING PROOFS OF CLAIM OF DONDERO-DEFENDANT ARE UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[22] Courts in this District have placed an emphasis on the first two factors.[23]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy *proceedings* (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related

---

[22] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[23] See *Mirant*, 337 B.R. at 115-122.

to" a case under Title 11.[24]  Further, those that arise under Title 11 or arise in a Title 11 case are
defined as "core" matters[25] and those that are merely "related to" a Title 11 case are defined as
"noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts
may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in
"noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the
parties) submit proposed findings of fact and conclusions of law to the district court, for that court's
review and issuance of final judgment. This is the statutory framework collectively set forth in 28
U.S.C. § 1334 and 28 U.S.C. § 157.  But while a proceeding may be "core" in nature, under 28
U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final
judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in
evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must
resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. §
157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that
authority on an Article I bankruptcy court is *constitutional* (and this turns on whether "the action
at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance
process").[26]

    With respect to the claims asserted against Dondero-Defendant, it might be argued that both
counts asserted against him are *statutorily* core in nature.[27] While Count 1 is a breach of contract
claim for collection of amounts due under promissory notes—one of the simplest forms of a state
law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28

---

[24] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).
[25] *Stern*, 564 U.S. at 473-474.  Core proceedings include, but are not limited to, 16 different types of matters, including
"counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).
[26] *Stern*, 564 U.S. at 499.
[27] 28 U.S.C. § 157(b)(2)(E), (O).

U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from defaults on pre-petition notes) and would not be resolved through the claims allowance process (***since the only related proof of claim related to the Notes has been withdrawn***). In other words, the resolution of Count 1 is not so inextricably intertwined with the resolution of Dondero-Defendant's still-remaining proofs of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by Dondero-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on a disputed pre-petition promissory note can be viewed as a core claim***. There is a split in authority on this issue. The Debtor cites authority that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the indebtedness is ***disputed***.[28] In contrast, Dondero-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[29]

---

[28] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' .... While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. ... A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[29] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re*

11

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon.*

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[30]   Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## V.    JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[31]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and

---

*Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[30] *Satelco*, 58 B.R. at 789.

[31] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[32] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[33] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[34]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[35] Thus, Dondero-Defendant, by having several *pending* proofs of claims, has consented to the bankruptcy court's equitable jurisdiction and waived his right to a jury trial as to the subject matter of the *pending* proofs of claim.[36] However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, Dondero-Defendant withdrew two of his proofs of claim on December 4, 2020 with prejudice—including Proof of Claim No. 188 which related to the Notes. To be sure, Proof of Claim No. 188, if pending, would have made the claims asserted in the Adversary Proceeding so inextricably intertwined with the equitable process of claims resolution, so as to constitute consent to the equitable jurisdiction of the bankruptcy court. Without a pending proof of claim, the breach of contract claims is precisely the kind of action that would sound in law rather than in equity. By withdrawing his proof of claim

---

[32] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).
[33] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).
[34] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).
[35] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).
[36] *Id.*

13

related to the Notes, Dondero-Defendant withdrew the claim from the claims allowance process of the bankruptcy court and preserved his right to a jury trial on the Notes.[37]

To reiterate, Dondero-Defendant's three remaining proofs of claims are unrelated to the collection on the Notes, and he has not otherwise consented to the jurisdiction of the bankruptcy court for claims related to the Notes. Dondero-Defendant has also withdrawn his affirmative defense of setoff in the Adversary Proceeding. Dondero-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

In summary, Dondero-Defendant's lack of waiver of his jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## VI.    PENDING MATTERS

On May 25, 2021, the bankruptcy court held a status conference with regard to the Motion. At such time, the bankruptcy court approved, in part, *James Dondero's Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint,*[38] and thereafter issued the *Order Granting In Part James Dondero's Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint*[39] (the "Stay Order") on June 4, 2021. The Stay Order dictated that all response deadlines, pre-trial deadlines, and hearing dates would be stayed until July 28, 2021. Discovery under the *Amended Scheduling Order*[40] was to proceed with two changes: (i) the deadline for service of expert disclosures to be changed to May 28, 2021, and (ii) the deadline for

---

[37] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).
[38] Adversary Case No. 21-03003, Dkt. 22.
[39] Adversary Case No. 21-03003, Dkt. 64.
[40] Adversary Case No. 21-03003, Dkt. 18.

completion of expert discovery to be changed to June 14, 2021. At this point, the parties are not trial-ready.

## VII.  RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the withdrawal of Proof of Claim No. 188, relating to the Notes, by Dondero-Defendant on December 4, 2020, which was the only proof of claim inextricably intertwined with the causes of action in the Adversary Proceeding; and (c) the lack of any other consent by Dondero-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

Case 21-03003-sgj    Doc 70    Filed 07/09/21    Entered 07/09/21 23:20:44    Desc Imaged
Case 3:21-cv-00881-X    Document 189 Filed 12/22/23    Page 454 of 1245    PageID 12317
Certificate of Notice    Page 1 of 2

United States Bankruptcy Court

Northern District of Texas

Highland Capital Management, L.P.,

    Plaintiff

Dondero,

    Defendant

Adv. Proc. No. 21-03003-sgj

# CERTIFICATE OF NOTICE

| District/off: 0539-3 | User: mmathews | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Jul 07, 2021 | Form ID: pdf012 | Total Noticed: 1 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Jul 09, 2021:**

| Recip ID | Recipient Name and Address |
|---|---|
| clmagt | + Kurtzman Carson Consultants LLC, Attn: Drake Foster, 222 N. Pacific Coast Highway, Ste. 300, El Segundo, CA 90245-5614 |

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jul 09, 2021

Signature:    /s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on July 7, 2021 at the address(es) listed below:

| Name | Email Address |
|---|---|
| Bryan C. Assink | on behalf of Defendant James Dondero bryan.assink@bondsellis.com |
| Clay M. Taylor | on behalf of Defendant James Dondero clay.taylor@bondsellis.com  krista.hillman@bondsellis.com |
| Deborah Rose Deitsch-Perez | on behalf of Defendant James Dondero deborah.deitschperez@stinson.com patricia.tomasky@stinson.com;kinga.mccoy@stinson.com |
| Juliana Hoffman | on behalf of Creditor Committee Official Committee of Unsecured Creditors jhoffman@sidley.com txfilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com |
| Matthew A. Clemente | on behalf of Creditor Committee Official Committee of Unsecured Creditors mclemente@sidley.com matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwom |

District/off: 0539-3                            User: mmathews                            Page 2 of 2
Date Rcvd: Jul 07, 2021                         Form ID: pdf012                           Total Noticed: 1

ey@sidley.com

Melissa S. Hayward
        on behalf of Plaintiff Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Michael P. Aigen
        on behalf of Defendant James Dondero michael.aigen@stinson.com  stephanie.gratt@stinson.com

Paige Holden Montgomery
        on behalf of Creditor Committee Official Committee of Unsecured Creditors pmontgomery@sidley.com
        txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnoti
ce@sidley.com

Zachery Z. Annable
        on behalf of Plaintiff Highland Capital Management  L.P. zannable@haywardfirm.com


TOTAL: 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| *Plaintiff,* | § § | Civil Action No. 3:21-cv-0881-x |
| v. | § § § | Consolidated with: |
| NEXPOINT ASSET MANAGEMENT, L.P., (F/K/A HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.), et al., | § § § § § § | 3:21-cv-0880-x 3:21-cv-1010-x 3:21-cv-1378-x 3:21-cv-1379-x 3:21-cv-3160-x 3:21-cv-3162-x |
| *Defendants.* | § § § | 3:21-cv-3179-x 3:21-cv-3207-x 3:22-cv-0789-x |

## ORDER ADOPTING REPORT AND RECOMMENDATION
## AND FINAL JUDGMENT

Before the Court is the Bankruptcy Court's Report and Recommendation on Plaintiff Highland Capital Management, L.P.'s ("Highland") motion for partial summary judgment. [Doc. 50]. Having carefully considered (1) Highland's motion and all arguments and evidence admitted into the record in support of the motion, (2) all responses and objections to the motion and all arguments and evidence admitted into the record in support of such responses and objections, and the arguments presented by counsel during the hearing held on April 20, 2022, on the motion, and for the reasons set forth in the Report and Recommendation (the "R&R") filed by the Bankruptcy Court on July 19, 2022, and the Supplement to the R&R filed December 5, 2022, the Court **ACCEPTS** the report and recommendation. The Court

1934054230810000000000000005

APP 456

**OVERRULES** the objections to the report and recommendation and **OVERRULES** the objection to the supplement to the report and recommendation. [Docs. 63, 87].

In accordance with the report and recommendation, the Court **GRANTS** partial summary judgment for Highland and **ENTERS FINAL JUDGMENT** as follows.

**IT IS ORDERED, ADJUDGED, AND DECREED** that Highland recover the following from James Dondero:

1. Dondero will owe Highland $3,873,613.93 in accrued but unpaid principal and interest due under Dondero's First Note[1] (issued on February 2, 2018) as of August 8, 2022, after application of all payments to outstanding principal and interest. As of August 9, 2022, interest will continue to accrue on the First Dondero Note at the rate of $278.50 per day and will increase to $285.91 per day on February 2, 2023.

2. Dondero will owe Highland $2,778,356.23 in accrued but unpaid principal and interest due under Dondero's Second Note (issued on August 1, 2018) as of August 8, 2022, after application of all payments to outstanding principal and interest. As of August 9, 2022, interest will continue to accrue on Dondero's Second Note at the rate of $224.43 per day and will increase to $231.05 per day on August 1, 2023.

3. Dondero will owe Highland $2,778,339.88 in accrued but unpaid principal and interest due under Dondero's Third Note (issued on August 13, 2018) as of August

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the R&R.

APP 457

8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on Dondero's Third Note at the rate of $218.20 per day and will increase to $224.64 per day on August 13, 2022.

4. In addition to the forgoing, and pursuant to the terms of each applicable Note, Dondero shall pay to Highland the amount of $443,074.35, which is his pro rata allocation (based on the ratio of the outstanding principal and interest owed by Dondero to Highland as of August 8, 2022, to the total principal and interest owed by all Note Maker Defendants to Highland as of August 8, 2022) of the total allocable and actual expenses of collection, including attorneys' fees and costs, incurred by Highland.

**IT IS ORDERED, ADJUDGED, AND DECREED** that Highland recover the following from NexPoint Asset Management, L.P. (f/k/a Highland Capital Management Fund Advisors, L.P.) ("NexPoint Asset Management"):

1. NexPoint Asset Management will owe Highland $2,552,628.61 in accrued but unpaid principal and interest due under NexPoint's First Note (issued on May 2, 2019), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on NexPoint's First Note at the rate of $166.08 per day and will increase to $170.05 per day on May 2, 2023.

2. NexPoint Asset Management will owe Highland $5,317,989.86 in accrued but unpaid principal and interest due under NexPoint's Second Note (issued on May 3, 2019), as of August 8, 2022, after application of all payments to outstanding

3

principal and interest.  As of August 9, 2022, interest will continue to accrue on NexPoint's Second Note at the rate of $346.02 per day and will increase to $354.29 per day on May 3, 2023.

3. In addition to the forgoing, and pursuant to the terms of each applicable Note, NexPoint Asset Management shall pay to Highland the amount of $369,793.69, which is its pro rata allocation (based on the ratio of the outstanding principal and interest owed by NexPoint Asset Management to Highland as of August 8, 2022, to the total principal and interest owed by all Note Maker Defendants to Highland as of August 8, 2022) of the total allocable and actual expenses of collection, including attorneys' fees and costs, incurred by Highland.

**IT IS ORDERED, ADJUDGED, AND DECREED** that Highland recover the following from NexPoint Advisors, L.P. ("NexPoint Advisors"):

1. NexPoint Advisors will owe Highland $23,389,882.79 in accrued but unpaid principal and interest due under the NexPoint Term Note (issued on May 31, 2017), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on the NexPoint Term Note at the rate of $3,801.79 per day and will increase to $4,029.90 per day on May 31, 2023.

2. In addition to the forgoing, and pursuant to the terms of each the Note, NexPoint Advisors shall pay to Highland the amount of $1,098,951.89, which is its pro rata allocation (based on the ratio of the outstanding principal and interest owed by NexPoint Advisors to Highland as of August 8, 2022, to the total principal and

APP 459

interest owed by all Note Maker Defendants to Highland as of August 8, 2022) of the total allocable and actual expenses of collection, including attorneys' fees and costs, incurred by Highland.

**IT IS ORDERED, ADJUDGED, AND DECREED** that Highland recover the following from Highland Capital Management Services, Inc. ("HCMS"):

1. HCMS will owe Highland $166,196.60 in accrued but unpaid principal and interest due under HCMS's First Demand Note1 (issued on March 28, 2018), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on HCMS's First Demand Note at the rate of $12.98 per day and will increase to $13.35 per day on March 26, 2023.

2. HCMS will owe Highland $222,917.23 in accrued but unpaid principal and interest due under HCMS's Second Demand Note (issued on June 25, 2018), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on HCMS's Second Demand Note at the rate of $18.56 per day and will increase to $19.13 per day on June 25, 2023.

3. HCMS will owe Highland $425,435.63 in accrued but unpaid principal and interest due under HCMS's Third Demand Note (issued on May 29, 2019), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue under HCMS's Third

5

Demand Note at the rate of $27.73 per day and will increase to $28.39 per day on May 29, 2023.

4. HCMS will owe Highland $159,454.92 in accrued but unpaid principal and interest due under HCMS's Fourth Demand Note (issued on June 26, 2019), as of August 8, 2022, after application of all payments to outstanding principal and interest. As of August 9, 2022, interest will continue to accrue on HCMS's Fourth Demand Note at the rate of $10.32 per day and will increase to $10.57 per day on June 26, 2023.

5. HCMS will owe Highland $6,071,718.32 in accrued but unpaid principal and interest due under the HCMS Term Note (issued on May 31, 2017), as of August 8, 2022, after application of all payments to outstanding principal and interest. As of August 9, 2022, interest will continue to accrue on the HCMS Term Note at the rate of $455.09 per day and will increase to $467.61 per day on May 31, 2023.

6. In addition to the forgoing, and pursuant to the terms of each applicable Note, HCMS shall pay to Highland the amount of $331,036.73, which is its pro rata allocation (based on the ratio of the outstanding principal and interest owed by HCMS to Highland as of August 8, 2022, to the total principal and interest owed by all Note Maker Defendants to Highland as of August 8, 2022) of the total allocable and actual expenses of collection, including attorneys' fees and costs, incurred by Highland.

**IT IS ORDERED, ADJUDGED, AND DECREED** that Highland recover the following from NexPoint Real Estate Partners, LLC (f/k/a HCRE Partners, LLC) ("NexPoint Real Estate"):

1. NexPoint Real Estate will owe Highland $195,476.70 in accrued but unpaid principal and interest due under HCRE's First Demand Note (issued on November 27, 2013), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on HCRE's First Demand Note at the rate of $40.58 per day and will increase to $43.83 per day on November 27, 2022.

2. NexPoint Real Estate will owe Highland $3,551,285.37 in accrued but unpaid principal and interest due under HCRE's Second Demand Note (issued on October 12, 2017), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on HCRE's Second Demand Note at the rate of $730.34 per day and will increase to $788.77 per day on October 12, 2022.

3. NexPoint Real Estate will owe Highland $986,472.32 in accrued but unpaid principal and interest due under HCRE's Third Demand Note (issued on October 15, 2018), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue on HCRE's Third Demand Note at the rate of $203.00 per day and will increase to $219.24 per day on October 15, 2022.

4. NexPoint Real Estate will owe Highland $866,600.77 in accrued but unpaid principal and interest due under HCRE's Fourth Demand Note (issued on September 25, 2019), as of August 8, 2022, after application of all payments to outstanding principal and interest.  As of August 9, 2022, interest will continue to accrue under

HCRE's Fourth Demand Note at the rate of $177.60 per day and will increase to $191.81 per day on September 25, 2022.

5. NexPoint Real Estate will owe Highland $6,196,688.51 in accrued but unpaid principal and interest due under the HCRE Term Note (issued on May 31, 2017), as of August 8, 2022, after application of all payments to outstanding principal and interest. As of August 9, 2022, interest will continue to accrue on the HCRE Term Note at the rate of $1,337.94 per day and will increase to $1,444.98 per day on May 31, 2023.

6. In addition to the forgoing, and pursuant to the terms of each applicable Note, NexPoint Real Estate shall pay to Highland the amount of $554,248.69, which is its pro rata allocation (based on the ratio of the outstanding principal and interest owed by NexPoint Real Estate to Highland as of August 8, 2022, to the total principal and interest owed by all Note Maker Defendants to Highland as of August 8, 2022) of the total allocable and actual expenses of collection, including attorneys' fees and costs, incurred by Highland.

* * * * *

The amounts set forth to be paid in this Final Judgment shall bear interest, pursuant to 28 U.S.C. § 1961, from the date of the entry of this Final Judgment, at a rate of 5.35%. Interest shall be computed daily to the date of payment, except as provided in 28 U.S.C. § 2516(b) and 31 U.S.C. § 1304(b), and shall be compounded annually.

APP 463

**IT IS SO ORDERED,** this 6th day of July, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Civ. Act. No. 3:21-cv-0881-x** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Consolidated with:** |
| | § | **3:21-cv-0880-x** |
| **Reorganized Debtor/Plaintiff,** | § | **3:21-cv-1010-x** |
| | § | **3:21-cv-1378-x** |
| **v.** | § | **3:21-cv-1379-x** |
| | § | **3:21-cv-3160-x** |
| **NEXPOINT ASSET MANAGEMENT, L.P. (f/k/a HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.), et al.,** | § | **3:21-cv-3162-x** |
| | § | **3:21-cv-3179-x** |
| | § | **3:21-cv-3207-x** |
| | | **3:22-cv-0789-x** |
| **Defendants.** | | |

## NOTICE OF APPEAL TO UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Highland Capital Management Services, Inc. ("HCMS"), defendant in Civ. Act. No. 3:22-cv-0881-x (consolidated with the above-captioned matters) and the adversary proceeding styled *Highland Capital Management, L.P. vs. Highland Capital Management Services, Inc., et al.*, Adversary Proceeding No. 21-03006-sgj, appeals to the United States Court of Appeals for the Fifth Circuit from the following orders of the District Court for the Northern District of Texas: (1) the AMENDED FINAL JUDGMENT AGAINST HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. entered in this consolidated case as Dkt. 147 on August 3, 2023, and (2) Electronic Orders Dkt. 129 and Dkt. 131 (clarified by Electronic Order Dkt. 135, entered on July 6, 2023) which denied as moot the Motion for Ruling on Pending Objections (addressing, *inter alia*, an Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines).

1

The parties to the judgment appealed from and the names and addresses of their respective attorneys are as follows:

**Plaintiff Highland Capital Management, L.P.**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
mhayward@haywardfirm.com
Zachery Z. Annable
zannable@haywardfirm.com
10501 N. Central Expressway, Suite 106
Dallas, TX 75231
Telephone: (972) 755-7108
Facsimile: (972) 755-7110

**Defendant Highland Capital Management Services, Inc.**

STINSON LLP
Deborah Rose Deitsch-Perez
deborah.deitsch-perez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

2

APP 466

Dated:  September 1, 2023

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
deborah.deitschperez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
State Bar No. 24012196
STINSON LLP
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
(214) 560-2201 telephone
(214) 560-2203 facsimile
*Attorneys for Defendant Highland Capital Management*
*Services, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties registered to receive electronic notices in this case.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Civ. Act. No. 3:21-cv-0881-x** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | **Consolidated with:** |
| | § | **3:21-cv-0880-x** |
| Reorganized Debtor/Plaintiff, | § | **3:21-cv-1010-x** |
| | § | **3:21-cv-1378-x** |
| **v.** | § | **3:21-cv-1379-x** |
| | § | **3:21-cv-3160-x** |
| **NEXPOINT ASSET MANAGEMENT,** | § | **3:21-cv-3162-x** |
| **L.P. (f/k/a HIGHLAND CAPITAL** | § | **3:21-cv-3179-x** |
| **MANAGEMENT FUND ADVISORS,** | § | **3:21-cv-3207-x** |
| **L.P.), et al.,** | | **3:22-cv-0789-x** |
| | | |
| Defendants. | | |

## NOTICE OF APPEAL TO UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

James Dondero ("Dondero"), defendant in Civ. Act. No. 3:22-cv-0881-x (consolidated with the above-captioned matters) and the adversary proceeding styled *Highland Capital Management, L.P. vs. James Dondero, et al.*, Adversary Proceeding No. 21-03003-sgj, appeals to the United States Court of Appeals for the Fifth Circuit from the following orders of the District Court for the Northern District of Texas: (1) the AMENDED FINAL JUDGMENT AGAINST JAMES DONDERO entered in this consolidated case as Dkt. 148 on August 3, 2023, and (2) Electronic Orders Dkt. 129 and Dkt. 131 (clarified by Electronic Order Dkt. 135, entered on July 6, 2023) which denied as moot the Motion for Ruling on Pending Objections (addressing, *inter alia*, an Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines).

The parties to the judgment appealed from and the names and addresses of their respective attorneys are as follows:

**Plaintiff Highland Capital Management, L.P.**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
mhayward@haywardfirm.com
Zachery Z. Annable
zannable@haywardfirm.com
10501 N. Central Expressway, Suite 106
Dallas, TX 75231
Telephone: (972) 755-7108
Facsimile: (972) 755-7110

**Defendant James Dondero**

STINSON LLP
Deborah Rose Deitsch-Perez
deborah.deitsch-perez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

3522697.0002/184062984.1

APP 469

Dated: September 1, 2023

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
deborah.deitschperez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
State Bar No. 24012196
STINSON LLP
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Attorneys for Defendant James Dondero*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties registered to receive electronic notices in this case.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

3

APP 470

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Civ. Act. No. 3:21-cv-0881-x** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Consolidated with:** |
| | § | **3:21-cv-0880-x** |
| Reorganized Debtor/Plaintiff, | § | **3:21-cv-1010-x** |
| | § | **3:21-cv-1378-x** |
| v. | § | **3:21-cv-1379-x** |
| | § | **3:21-cv-3160-x** |
| **NEXPOINT ASSET MANAGEMENT,** | § | **3:21-cv-3162-x** |
| **L.P. (f/k/a HIGHLAND CAPITAL** | § | **3:21-cv-3179-x** |
| **MANAGEMENT FUND ADVISORS,** | § | **3:21-cv-3207-x** |
| **L.P.), et al.,** | | **3:22-cv-0789-x** |
| | | |
| Defendants. | | |

## NOTICE OF APPEAL TO UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NexPoint Real Estate Partners, LLC (f/k/a HCRE Partners, LLC) ("HCRE"),

defendant in Civ. Act. No. 3:22-cv-0881-x (consolidated with the above-captioned matters)

and the adversary proceeding styled *Highland Capital Management, L.P. vs. HCRE Partners,*

*LLC (n/k/a NexPoint Real Estate Partners, LLC, et al.*, Adversary Proceeding No. 21-03007-

sgj, appeals to the United States Court of Appeals for the Fifth Circuit from the following

orders of the District Court for the Northern District of Texas: (1) the AMENDED FINAL

JUDGMENT AGAINST NEXPOINT REAL ESTATE PARTNERS, LLC (f/k/a HCRE

PARTNERS, LLC) entered in this consolidated case as Dkt. 146 on August 3, 2023, and (2)

Electronic Orders Dkt. 129 and Dkt. 131 (clarified by Electronic Order Dkt. 135, entered on

July 6, 2023) which denied as moot the Motion for Ruling on Pending Objections (addressing,

*inter alia*, an Objection to Order Denying Motions to Extend Expert Disclosure and Discovery

Deadlines).

The parties to the judgment appealed from and the names and addresses of their respective attorneys are as follows:

**Plaintiff Highland Capital Management, L.P.**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
mhayward@haywardfirm.com
Zachery Z. Annable
zannable@haywardfirm.com
10501 N. Central Expressway, Suite 106
Dallas, TX 75231
Telephone: (972) 755-7108
Facsimile: (972) 755-7110

**Defendant NexPoint Real Estate Partners, LLC (f/k/a HCRE Partners, LLC)**

STINSON LLP
Deborah Rose Deitsch-Perez
deborah.deitsch-perez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

Dated:  September 1, 2023

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
deborah.deitschperez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
State Bar No. 24012196
STINSON LLP
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Attorneys for Defendant NexPoint Real Estate Partners, LLC (f/k/a HCRE Partners, LLC)*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties registered to receive electronic notices in this case.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

3522697.0002/184062971.1

APP 473

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Civ. Act. No. 3:21-cv-0881-x** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | **Consolidated with:** |
| | § | **3:21-cv-0880-x** |
| **Reorganized Debtor/Plaintiff,** | § | **3:21-cv-1010-x** |
| | § | **3:21-cv-1378-x** |
| **v.** | § | **3:21-cv-1379-x** |
| | § | **3:21-cv-3160-x** |
| **NEXPOINT ASSET MANAGEMENT,** | § | **3:21-cv-3162-x** |
| **L.P. (f/k/a HIGHLAND CAPITAL** | § | **3:21-cv-3179-x** |
| **MANAGEMENT FUND ADVISORS,** | § | **3:21-cv-3207-x** |
| **L.P.), et al.,** | | **3:22-cv-0789-x** |
| | | |
| **Defendants.** | | |

## NOTICE OF APPEAL TO UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NexPoint Advisors L.P. ("NPA"), defendant in Civ. Act. No. 3:22-cv-0881-x (consolidated with the above-captioned matters) and the adversary proceeding styled *Highland Capital Management, L.P. vs. NexPoint Advisors, L.P., et al.*, Adversary Proceeding No. 21-03005-sgj, appeals to the United States Court of Appeals for the Fifth Circuit from the following orders of the District Court for the Northern District of Texas: (1) the AMENDED FINAL JUDGMENT AGAINST NEXPOINT ADVISORS L.P. entered in this consolidated case as Dkt. 145 on August 3, 2023, and (2) Electronic Orders Dkt. 129 and Dkt. 131 (clarified by Electronic Order Dkt. 135, entered on July 6, 2023) which denied as moot the Motion for Ruling on Pending Objections (addressing, *inter alia*, an Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines).

The parties to the judgment appealed from and the names and addresses of their respective attorneys are as follows:

1

**Plaintiff Highland Capital Management, L.P.**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
mhayward@haywardfirm.com
Zachery Z. Annable
zannable@haywardfirm.com
10501 N. Central Expressway, Suite 106
Dallas, TX 75231
Telephone: (972) 755-7108
Facsimile: (972) 755-7110

**Defendant NexPoint Advisors, L.P.**

STINSON LLP
Deborah Rose Deitsch-Perez
deborah.deitsch-perez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina
drukavina@munsch.com
Julian P. Vasek
jvasek@munsch.com
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile

3522697.0002/184062967.4

APP 475

Dated:

September 1, 2023

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
deborah.deitschperez@stinson.com
Michael P. Aigen
michael.aigen@stinson.com
State Bar No. 24012196
STINSON LLP
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Attorneys for Defendant NexPoint Advisors, L.P.*

*/s/ Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

*Attorneys for Defendant NexPoint Advisors, L.P.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties registered to receive electronic notices in this case.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

3522697.0002/184062967.4

APP 476



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.      entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.      set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c.      set January 5, 2021, at 5:00 p.m. prevailing Central Time,  as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d.      initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.      reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f.      reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g.      reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

DOCS_SF:104487.21 36027/002

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.   reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.   reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.    reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.    conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.    heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.    considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

DOCS_SF:104487.21 36027/002

APP 481

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.      **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.      **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for and/or control numerous non-debtor entities in the complex Highland enterprise.

5. **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned: (a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general partner.

6. **The Highland Enterprise.** Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these assets are managed by the Debtor pursuant to shared services agreements with certain affiliated entities, including other affiliated registered investment advisors. In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7.      **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8.      **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

The Debtor also did not suffer any type of catastrophic business calamity.  In fact, the Debtor filed

for Chapter 11 protection six months before the onset of the COVID-19 pandemic.  Rather, the

Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation

claims that it faced—many of which had finally become liquidated (or were about to become

liquidated) after a decade or more of contentious litigation in multiple forums all over the world.

The Committee in this case has referred to the Debtor—under its former chief executive, Mr.

Dondero—as a "serial litigator."  The Bankruptcy Court agrees with that description. By way of

example, the members of the Committee (and their history of litigation with the Debtor and others

in the Highland complex) are as follows:

a.   **The Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer</u>
<u>Committee</u>")**.  This Committee member obtained an arbitration award against the
Debtor in the amount of $190,824,557, inclusive of interest, approximately five
months before the Petition Date, from a panel of the American Arbitration
Association. It was on the verge of having that award confirmed by the Delaware
Chancery Court immediately prior to the Petition Date, after years of disputes that
started in late 2008 (and included legal proceedings in Bermuda).  This creditor's
claim was settled during this Chapter 11 Case in the amount of approximately
$137,696,610 (subject to other adjustments and details not relevant for this
purpose).

b.   **Acis Capital Management, L.P., and Acis Capital Management GP, LLC
("<u>Acis</u>")**.  Acis was formerly in the Highland complex of companies, but was not
affiliated with Highland as of the Petition Date.  This Committee member and its
now-owner, Joshua Terry, were involved in litigation with the Debtor dating back
to 2016.  Acis was forced by Mr. Terry (who was a former Highland portfolio
manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for
the Northern District of Texas, Dallas Division before the Bankruptcy Court in
2018, after Mr. Terry obtained an approximately $8 million arbitration award and
judgment against Acis.  Mr. Terry ultimately was awarded the equity ownership of
Acis by the Bankruptcy Court in the Acis bankruptcy case.  Acis subsequently
asserted a multi-million dollar claim against Highland in the Bankruptcy Court for
Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry.
The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

9

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.    **UBS Securities LLC and UBS AG London Branch ("UBS").**    UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.    **Meta-E Discovery ("Meta-E").**    Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9.    **Other Key Creditor Constituents.**    In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

10

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure.** Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12.     **Post-Petition Corporate Governance Settlement with Committee.**  After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

13.   **Appointment of Independent Directors.**   As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).  The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.  Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address).  The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.    **Conditions Required by Independent Directors.**  Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case.  The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically.  Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland.  The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority.  This gatekeeper provision was also

14

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved.  They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court.  As noted previously, they completely changed the trajectory of this case.

       15.    **Not Your Garden Variety Mediators.**  And still another reason why this was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

DOCS_SF:104487.21 36027/002

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas.  As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation.  And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim).  The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16.    **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**.  Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court.  Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons.  Originally, there were over a dozen objections filed to the Plan.  The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below.  The only objectors to the Plan left at the time of the Confirmation Hearing

16

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.   *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.   *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c.   A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.   *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.   *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.   **Questionability of Good Faith as to Outstanding Confirmation Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

17

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections.  In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors.  Mr. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan.  As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring.  The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.    **Remote Interest of Outstanding Confirmation Objectors.**  To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately.  First, Mr. Dondero has a pending objection to the Plan.  Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture).  Mr. Dondero owns no equity in the Debtor directly.  Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor.  Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good").  The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor.  *See* Disclosure Statement at 7, n.3.  The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero.  Get Good

18

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief.  Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated.  Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863.  The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888].  At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years.  Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero.  Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero

owned and/or controlled these entities.  Finally, various NexBank entities objected to the Plan.

The Bankruptcy Court does not believe they have liquidated claims against the Debtor.  Mr.

Dondero appears to be in control of these entities as well.

      19.    **Background Regarding Dondero Objecting Parties.**  To be clear, the

Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in

opposition to confirmation, even though their economic interests in the Debtor appear to be

extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the

Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In

the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary

injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in

specific ways that were supported by evidence.  Around the time that this all came to light and the

Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company

phone, which he had been asked to turn in to Highland, mysteriously went missing.  The

Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy

Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to

confirmation of the Plan.

      20.    **Other Confirmation Objections.**  Other than the objections filed by Mr.

Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the

*United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of*

*Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a.  *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b.  *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c.  *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d.  *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e.  *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f.  *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21.    **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25.    **Plan Supplement Documents.**    Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.    The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26.    **Retained Causes of Action Adequately Preserved.**    The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27.    **Plan Modifications Are Non-Material.**    In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications.  Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan. Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data.  The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

24

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.    **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.    **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims. Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8. Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims). The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor. Class 8 Creditors

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36.    **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37.    **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

28

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests.  The Plan satisfies

sections 1122 and 1123(a)(1) of the Bankruptcy Code.

> 39.    **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).**  Article III
of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured

Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6

(PTO Claims) are Unimpaired under the Plan.  Thus, the requirement of section 1123(a)(2) of the

Bankruptcy Code is satisfied.

> 40.    **Specification of Treatment of Impaired Classes (11 U.S.C. §
1123(a)(3)).**  Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7

(Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class

10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests)

as Impaired and specifies the treatment of Claims and Equity Interests in such Classes.  Thus, the

requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

> 41.    **No Discrimination (11 U.S.C. § 1123(a)(4)).**  The Plan provides for the
same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class

unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment

of such Claim or Equity Interest.  The Plan satisfies this requirement because Holders of Allowed

Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders

of Allowed Claims or Equity Interests within such holder's respective class, subject only to the

voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the

terms of the Plan.  Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

42.     **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the

Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the

establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor;

and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are

included in the Plan Supplements.

a.     **The Claimant Trust.**  The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b.     **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.   The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

      c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action.  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests).  Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan.  Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents.  Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

44.    **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).**  Article IV
of the Plan provides for the Claimant Trust to be governed and administered by the Claimant
Trustee.  The Claimant Trust, the management of the Reorganized Debtor, and the management
and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by
the Claimant Trust Oversight Board.  The Claimant Trust Oversight Board will consist of:  (1) Eric
Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis;
(3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E
Discovery; and (5) David Pauker.   Four of the members of the Claimant Trust Oversight
Committee are the holders of several of the largest Claims against the Debtor and/or are current
members of the Committee.  Each of these creditors has actively participated in the Debtor's case,
both through their fiduciary roles as Committee members and in their individual capacities as
creditors.  They are therefore intimately familiar with the Debtor, its business, and assets.  The
fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested
restructuring advisor and turnaround manager with more than 25 years of experience advising
public and private companies and their investors, and he has substantial experience overseeing,
advising or investigating troubled companies in the financial services industry and has advised or
managed such companies on behalf of boards or directors, court-appointed trustees, examiners and
special masters, government agencies, and private investor parties.  The members of the Claimant
Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive
payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45.     **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will

serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted

above, Mr. Seery has served as an Independent Board member since January 2020, and as the

Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive

management and restructuring experience, as evidenced from his curriculum vitae which is part of

the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's

organizational structure, business, and assets, as well as how Claims will be treated under the Plan.

Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment

post-emergence as the Claimant Trustee.   Mr. Seery, upon consultation with the Committee,

testified that he intends to employ approximately 10 of the Debtor's employees to enable him to

manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets,

instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that

the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by

a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall

initially be paid $150,000 per month for services rendered after the Effective Date as Claimant

Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses

and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight

Board within forty-five (45) days after the Effective Date.   The Bankruptcy Court has also

reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and

has substantial experience in bankruptcy litigation matters, particularly with respect to his prior

experience as a litigation trustee for several litigation trusts, as set forth on the record of the

Confirmation Hearing and in the Confirmation Brief.  Mr. Kirschner shall be paid $40,000 per

month for the first three months and $20,000 per month thereafter, plus a success fee related to

litigation recoveries.  The Committee and the Debtor had arm's lengths negotiations regarding the

post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the

selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight

Committee are in the best interests of the Debtor's economic stakeholders.  Section 1123(a)(7) of

the Bankruptcy Code is satisfied.

46.     **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the

applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and

1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order

governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure

Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in

connection with this Chapter 11 Case.

47.     **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure**

**Statement Order.**  Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered

the Disclosure Statement Order.  In accordance with the Disclosure Statement Order and evidenced

by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation

Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7,

8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan;

and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not

entitled to vote on the Plan pursuant to the Disclosure Statement Order.  The Disclosure Statement

Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity

Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan,

and the deadlines for voting on and objecting to the Plan.  The Debtor and KCC each complied

with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying

sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and

Publication.  The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides

that the same disclosure statement must be transmitted to each holder of a claim or interest in a

particular class.  The Debtor caused the same Disclosure Statement to be transmitted to all holders

of Claims and Equity Interests entitled to vote on the Plan.  The Debtor has complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order.  The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain

Dondero Related Entities that the changes made to certain assumptions and projections from the

Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation

Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the

Plan.  The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to

the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections.

Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the

changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial

Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.       The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.       Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.       While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.       On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation.  As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.       On August 12, 2020, the Debtor filed its *Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero.  The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.       The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020.  The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.       Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.       Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

49. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**
Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims. The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50. **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto. For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider. The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy. Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51. **No Rate Changes (11 U.S.C. § 1129(a)(6)).** The Plan does not provide for any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

52.   **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**   The "best interests"

test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity

Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date

of the Plan, that is not less than the amount that such Holder would so receive or retain if the

Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor

filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its

advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,

in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor

provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,

including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed

the Amended Liquidation Analysis/Financial Projections.   The Amended Liquidation

Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,

and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the

Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued

at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in

market conditions and other factors; (3) expected revenues and expenses arising in connection with

the Debtor's continued management of the CLOs pursuant to management agreements that the

Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding

two or three employees to assist in the management of the CLOs, the Debtor also increased

modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and

professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities:

NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC

(n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class

7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b)

Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on

account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors

are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court

finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive

under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation

based on Mr. Seery's testimony, including the following credible reasons he posited, among

others:

  a.  The nature of the Debtor's assets is complex. Certain assets relate to complicated
      real estate structures and private equity investments in operating businesses. Mr.
      Seery's extensive experience with the Debtor during the thirteen months since his
      appointment as an Independent Director and later Chief Executive Officer and
      Chief Restructuring Officer, provides him with a substantial learning curve in
      connection with the disposition of the Debtor's assets and are reasonably expected
      to result in him being able to realize tens of millions of dollars more value than
      would a chapter 7 trustee.

  b.  Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's
      business under chapter 7 of the Bankruptcy Code and hire the necessary personnel
      with the relevant knowledge and experience to assist him or her in selling the
      Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's
      assets in a forced sale liquidation which would generate substantially less value for
      the Debtor's creditors than the asset monetization plan contemplated by the Plan.

  c.  A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals
      to assist in its efforts to monetize assets, resulting in delays, increased expenses,
      and reduced asset yields for the chapter 7 estate.

    d.    The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

    e.    The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.  **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.  **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**   Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).**   Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the

Claimant Trust Agreement.  Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57.    **Payment of Fees (11 U.S.C. § 1129(a)(12)).**  All fees payable under 28

U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article

XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-

Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United

States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor

or the dismissal or conversion of the Chapter 11 Case.

58.    **Retiree Benefits.**  The Plan provides for the assumption of the Pension Plan

(to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the

Bankruptcy Code).  Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to

the extent applicable.

59.    **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).**  Sections

1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic

support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii)

is not a nonprofit corporation (section 1129(a)(16)).

60.    **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. §**
**1129(b)).**  The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11,

which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

44

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

    a.    <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

    b.    <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

61.    **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.    **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.    **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.    **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.    **Discharge (11 U.S.C. § 1141(d)(3)**).  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

in the same manner as the Debtor did prior to Plan confirmation, which includes the management of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the Plan projects that it will take approximately two years to monetize the Debtor's assets for fair value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be monetizing their assets, there is no specified time frame by which this process must conclude.  Mr. Seery's credible testimony demonstrates that the Debtor will continue to engage in business after consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.     **Retention of Jurisdiction.**   The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the Bankruptcy Code to the maximum extent under applicable law.

67.     **Additional Plan Provisions (11 U.S.C. § 1123(b)).**   The Plan's provisions are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.     **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**  The Debtor has exercised reasonable business judgment with respect to the rejection of the Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No. 1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

47

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts").  With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8]  Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.     **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).**  All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70.     **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).**  The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.     **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.   Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.   Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.   The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.   The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.   The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

49

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.   The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

      72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").   As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.     **Existing Exculpation of Independent Directors.**  The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

51

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

> 74.    **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

> a.    First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain
> parties other than a creditors' committee and its members is that section 524(e) of
> the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
> Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all
> exculpations under the Bankruptcy Code and the court in such case specifically
> approved the exculpations of a creditors' committee and its members on the
> grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
> implies committee members have qualified immunity for actions within the scope
> of their duties…. [I]f members of the committee can be sued by persons unhappy
> with the committee's performance during the case or unhappy with the outcome of
> the case, it will be extremely difficult to find members to serve on an official
> committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
> Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]).  *Pacific Lumber's*
> rationale for permitted exculpation of creditors' committees and their members
> (which was clearly policy-based and based on a creditors' committee qualified
> immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
> and their disinterestedness and importance in chapter 11 cases) does not preclude
> exculpation to other parties in a particular chapter 11 case that perform similar roles
> to a creditors' committee and its members.  The Independent Directors, and by
> extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.      Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumbe*r, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

75.    **Injunction.**   Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").   The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.   In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.   Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.   The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.   The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."   The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.   The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.   Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").   The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.   Thereafter, if the Bankruptcy Court determines that the action is

54

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action.  The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan.  The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77.    **Factual Support for Gatekeeper Provision.**  The facts supporting the need for the Gatekeeper Provision are as follows.  As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade.  Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor.  During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor.  Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

55

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

      78.    **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79. **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("<u>AON</u>"), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision. Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017). Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80.     **Statutory Authority to Approve Gatekeeper Provision.**     The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a).   The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881).  The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue

Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81.     **Jurisdiction to Implement Gatekeeper Provision.**  The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge

Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005).  Based upon the rationale of the Fifth Circuit in *Villegas

v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.*  The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82.     **Resolution of Objections of Scott Ellington and Isaac Leventon**.  Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a.     Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b.     Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c.     The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.    The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.    Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.    Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.     The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h.     Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.     Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.     The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.     For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.     **Confirmation of the Plan.** The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral

part of this Confirmation Order.[11]

      **B.**      **Findings of Fact and Conclusions of Law**.  The findings of fact and the

conclusions of law set forth in this Confirmation Order and on the record of the Confirmation

Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule

7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and

conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to

confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that

any of the following constitutes findings of fact or conclusions of law, they are adopted as such.

To the extent any findings of fact or conclusions of law set forth in this Confirmation Order

(including any findings of fact or conclusions of law announced by the Bankruptcy Court at the

Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and

is adopted as such.

      **C.**      **Objections**.  Any resolution or disposition of objections to confirmation of

the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation

Hearing is hereby incorporated by reference.  All objections and all reservations of rights

pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are

overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

      **D.**      **Plan Supplements and Plan Modifications.**  The filing with the

Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

E.      **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

F.      **Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code
with respect to the Reorganized Debtor Assets.

**G.     Effectiveness of All Actions.**    All actions contemplated by the Plan,
including all actions in connection with the Claimant Trust Agreement, the Senior Employee
Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited
Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are
authorized to be taken on, prior to, or after the Effective Date, as applicable, under this
Confirmation Order, without further application to or order of the Bankruptcy Court, or further
action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and
with the effect that such actions had been taken by unanimous action of such parties.

**H.     Restructuring Transactions.**    The Debtor or Reorganized Debtor, as
applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan,
including, without limitation, the entry into and consummation of the transactions contemplated
by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents,
the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust
Agreement, and the other Plan Documents, and may take any actions as may be necessary or
appropriate to effect a corporate restructuring of its business or a corporate restructuring of the
overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan.
Any transfers of assets or equity interests effected or any obligations incurred through the
Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent
conveyances or fraudulent transfers or otherwise be subject to avoidance.

I.  **Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J.  **Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

K.    **Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

66

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

L.    **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

M.    **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

APP 543

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

        **N.**     **Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

        **O.**     **Objections to Claims**.  The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

        **P.**     **Assumption of Contracts and Leases.**  Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan.  Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to any of the

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

      **Q.**    **Rejection of Contracts and Leases.**  Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan.  To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

      **R.**    **Assumption of Issuer Executory Contracts.**  On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a cumulative amount of $525,000 (the "Cure Amount") as follows:

    a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

    b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.**  Effective as of the Confirmation Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

       **T.**    **Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.  Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

  **U.**  **Authorization to Consummate.**  The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan.  The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

  **V.**  **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

must be filed no **later than sixty (60) days after the Effective Date**.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court.  The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows.  The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval.  From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

        **W.**      **Release, Exculpation, Discharge, and Injunction Provisions.  The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

        **X.**      **Discharge of Claims and Termination of Interests.**  To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against

the Debtor or any of its Assets or properties, and regardless of whether any property will have been

distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except

as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date,

the Debtor and its Estate will be deemed discharged and released under and to the fullest extent

provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code

from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not

limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the

kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

      **Y.**    **Exculpation.**   Subject in all respects to Article XII.D of the Plan, to the

maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each

Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage,

demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after

the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter

11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation

of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including

the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation

of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be

issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan

Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any

negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.** **Releases by the Debtor.** On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person. Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

**AA.    Injunction.    Upon entry of this Confirmation Order, all Enjoined**

**Parties are and shall be permanently enjoined, on and after the Effective Date, from taking**

**any actions to interfere with the implementation or consummation of the Plan.    Except as**

**expressly provided in the Plan, this Confirmation Order, or a separate order of the**

**Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after**

**the Effective Date, with respect to any Claims and Equity Interests, from directly or**

**indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or**

**other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative**

**or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,**

**levying, attaching (including any prejudgment attachment), collecting, or otherwise**

**recovering, enforcing, or attempting to recover or enforce, by any manner or means, any**

**judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)**

**creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or**

**encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any**

**right of setoff, directly or indirectly, against any obligation due to the Debtor or against**

**property or interests in property of the Debtor, except to the limited extent permitted under**

**Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

in any place whatsoever, that does not conform to or comply with the provisions of the Plan.
The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply
to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding
paragraph against any successors of the Debtor, including, but not limited to, the
Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective
property and interests in property.  Subject in all respects to Article XII.D of the Plan, no
Enjoined Party may commence or pursue a claim or cause of action of any kind against any
Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation
of the Plan, the administration of the Plan or property to be distributed under the Plan, the
wind down of the business of the Debtor or Reorganized Debtor, the administration of the
Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the
foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing,
that such claim or cause of action represents a colorable claim of any kind, including, but
not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross
negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to
bring such claim or cause of action against any such Protected Party; *provided, however*, the
foregoing will not apply to a claim or cause of action against Strand or against any Employee
other than with respect to actions taken, respectively, by Strand or by such Employee from
the date of appointment of the Independent Directors through the Effective Date.  The
Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or
cause of action is colorable and, only to the extent legally permissible and as provided for in

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

BB.    **Duration of Injunction and Stays.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

CC.    **Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

DD.    **No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

       **EE.**   **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF. **Cancellation of Notes, Certificates and Instruments.** Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

GG.    **Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

HH.    **Post-Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

II.    **Applicable Nonbankruptcy Law.**    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

JJ.    **Governmental Approvals Not Required.**    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

KK.    **Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

LL.    **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

MM.    **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

NN.     **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.     **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.     **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.     **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

83

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

    a.    The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

    b.    The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

**RR.** **Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

a. Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b. The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c. Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d. The Senior Employees' Objection is deemed withdrawn.

**SS.** **No Release of Claims Against Senior Employee Claimants**. For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released

Party" under the Plan.

**TT.** **Resolution of Objection of Internal Revenue Service.**  Notwithstanding

any other provision or term of the Plan or Confirmation Order, the following Default Provision

shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its

claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU. **IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

87

VV. **CLO Holdco, Ltd. Settlement** Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement"). In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

WW. **Retention of Jurisdiction.** The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

XX. **Payment of Statutory Fees; Filing of Quarterly Reports.** All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date. The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

YY. **Dissolution of the Committee.** On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust.  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

      **ZZ.**    **Miscellaneous.**  After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

### ###END OF ORDER###

DOCS_SF:104487.21 36027/002

APP 566

## Exhibit A

**Fifth Amended Plan (as Modified)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND**
**CAPITAL MANAGEMENT, L.P. (AS MODIFIED)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms ............................................................................ 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ........................................................ 16

    B.    Professional Fee Claims ................................................................ 17

    C.    Priority Tax Claims ..................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ............................................................ 18

    A.    Summary ................................................................................ 18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ......................................................................... 18

    C.    Elimination of Vacant Classes ......................................................... 19

    D.    Impaired/Voting Classes ................................................................ 19

    E.    Unimpaired/Non-Voting Classes ....................................................... 19

    F.    Impaired/Non-Voting Classes .......................................................... 19

    G.    Cramdown ............................................................................... 19

    H.    Classification and Treatment of Claims and Equity Interests ...................... 19

    I.    Special Provision Governing Unimpaired Claims .................................... 24

    J.    Subordinated Claims .................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ............................ 24

    A.    Summary ................................................................................ 24

    B.    The Claimant Trust ..................................................................... 25

        1.    Creation and Governance of the Claimant Trust and Litigation Sub-Trust .......................................................................... 25

        2.    Claimant Trust Oversight Committee ............................................ 26

APP 569

**Page**

3. Purpose of the Claimant Trust. ...............................................................27

4. Purpose of the Litigation Sub-Trust. ......................................................27

5. Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6. Compensation and Duties of Trustees. ...................................................29

7. Cooperation of Debtor and Reorganized Debtor. ...................................29

8. United States Federal Income Tax Treatment of the Claimant Trust. ......................................................................................................29

9. Tax Reporting. .......................................................................................30

10. Claimant Trust Assets. ..........................................................................30

11. Claimant Trust Expenses. ......................................................................31

12. Trust Distributions to Claimant Trust Beneficiaries. ............................31

13. Cash Investments. .................................................................................31

14. Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C. The Reorganized Debtor ...................................................................................32

1. Corporate Existence ..............................................................................32

2. Cancellation of Equity Interests and Release ........................................32

3. Issuance of New Partnership Interests ...................................................32

4. Management of the Reorganized Debtor ................................................33

5. Vesting of Assets in the Reorganized Debtor ........................................33

6. Purpose of the Reorganized Debtor .......................................................33

7. Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ..................................................33

D. Company Action ..............................................................................................34

E. Release of Liens, Claims and Equity Interests ..................................................35

F. Cancellation of Notes, Certificates and Instruments ..........................................35

APP 570

**Page**

    G.      Cancellation of Existing Instruments Governing Security Interests ...................35

    H.      Control Provisions ........................................................................35

    I.       Treatment of Vacant Classes .........................................................36

    J.      Plan Documents ...........................................................................36

    K.      Highland Capital Management, L.P. Retirement Plan and Trust .....................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
           LEASES .......................................................................................37

    A.      Assumption, Assignment, or Rejection of Executory Contracts and
         Unexpired Leases ........................................................................37

    B.      Claims Based on Rejection of Executory Contracts or Unexpired
         Leases ........................................................................................38

    C.      Cure of Defaults for Assumed or Assigned Executory Contracts and
         Unexpired Leases ........................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................39

    A.      Dates of Distributions ..................................................................39

    B.      Distribution Agent .......................................................................39

    C.      Cash Distributions .......................................................................40

    D.      Disputed Claims Reserve .............................................................40

    E.      Distributions from the Disputed Claims Reserve ................................40

    F.      Rounding of Payments .................................................................40

    G.      *De Minimis* Distribution ..............................................................41

    H.      Distributions on Account of Allowed Claims.....................................41

    I.       General Distribution Procedures .....................................................41

    J.      Address for Delivery of Distributions..............................................41

    K.      Undeliverable Distributions and Unclaimed Property .........................41

    L.      Withholding Taxes.......................................................................42

M.      Setoffs ..................................................................................................... 42

N.      Surrender of Cancelled Instruments or Securities ............................................ 42

O.      Lost, Stolen, Mutilated or Destroyed Securities ................................................ 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS ................................................ 43

A.      Filing of Proofs of Claim ..................................................................................... 43

B.      Disputed Claims ................................................................................................... 43

C.      Procedures Regarding Disputed Claims or Disputed Equity Interests .............. 43

D.      Allowance of Claims and Equity Interests........................................................... 44

        1.      Allowance of Claims................................................................................. 44

        2.      Estimation ................................................................................................ 44

        3.      Disallowance of Claims ........................................................................... 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN .................................................... 45

A.      Conditions Precedent to the Effective Date ....................................................... 45

B.      Waiver of Conditions ........................................................................................... 46

C.      Dissolution of the Committee .............................................................................. 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................ 47

A.      General................................................................................................................. 47

B.      Discharge of Claims............................................................................................. 47

C.      Exculpation .......................................................................................................... 47

D.      Releases by the Debtor........................................................................................ 48

E.      Preservation of Rights of Action.......................................................................... 49

        1.      Maintenance of Causes of Action ........................................................... 49

        2.      Preservation of All Causes of Action Not Expressly Settled or
                Released .................................................................................................. 49

APP 572

**Page**

F.      Injunction ...................................................................................................... 50

G.      Duration of Injunctions and Stays.................................................................. 51

H.      Continuance of January 9 Order .................................................................... 51

**ARTICLE X. BINDING NATURE OF PLAN** ........................................................................ 51

**ARTICLE XI. RETENTION OF JURISDICTION** .................................................................. 52

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ............................................................... 54

A.      Payment of Statutory Fees and Filing of Reports ............................................ 54

B.      Modification of Plan ......................................................................................... 54

C.      Revocation of Plan ............................................................................................ 54

D.      Obligations Not Changed .................................................................................. 55

E.      Entire Agreement .............................................................................................. 55

F.      Closing of Chapter 11 Case .............................................................................. 55

G.      Successors and Assigns..................................................................................... 55

H.      Reservation of Rights ........................................................................................ 55

I.      Further Assurances ............................................................................................ 56

J.      Severability ....................................................................................................... 56

K.      Service of Documents ....................................................................................... 56

L.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
        the Bankruptcy Code......................................................................................... 57

M.      Governing Law .................................................................................................. 58

N.      Tax Reporting and Compliance ........................................................................ 58

O.      Exhibits and Schedules ..................................................................................... 58

P.      Controlling Document ...................................................................................... 58

APP 573

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.    Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

2

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.    "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.    "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.    "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.    "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24.     "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.     "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.     "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.     "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.     "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.     "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.     "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42.     "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43.     "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44.     "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved.  As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45.     "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46.     "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47.     "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48.     "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49.     "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50.     "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be:  (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

62.    "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.    "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.    "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69.     "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.     "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.     "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.     "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.     "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.     "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

11

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.     "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.     "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.     "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.     "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.     "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.     "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.     "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.     "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.     "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

APP 585

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

13

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.     Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**   **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**   **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C.    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D.    **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E.    **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F.    **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G.    **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.    **Classification and Treatment of Claims and Equity Interests**

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

19

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

APP 593

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. _Class 7 – Convenience Claims_

- _Classification_:  Class 7 consists of the Convenience Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- _Impairment and Voting_:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. _Class 8 – General Unsecured Claims_

- _Classification_:  Class 8 consists of the General Unsecured Claims.

- _Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

APP 595

9.  *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

APP 596

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I. <u>Special Provision Governing Unimpaired Claims</u>

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J. <u>Subordinated Claims</u>

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## <u>MEANS FOR IMPLEMENTATION OF THIS PLAN</u>

## A. <u>Summary</u>

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

1.    _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets.  The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust.  Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims.  The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee.  The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement.  The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust.  Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement.  After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement.  The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution.  Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3. *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4. *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5. *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)      the payment of the Claimant Trust Expenses;

(ii)      the payment of other reasonable expenses of the Claimant Trust;

(iii)      the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)      the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)      litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)      the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)      the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)      the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)      the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)      the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.      _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.      _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.      _United States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

       9.     *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

       10.     *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.    *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.    *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

31

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.    **The Reorganized Debtor**

### 1.    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date.  Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order.  Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.      Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person.  On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

E.      **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F.      **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G.      **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H.      **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

## I.    <u>Treatment of Vacant Classes</u>

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    <u>Plan Documents</u>

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.    <u>Highland Capital Management, L.P. Retirement Plan and Trust</u>

The Highland Capital Management, L.P. Retirement Plan And Trust ("<u>Pension Plan</u>") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "<u>IRC</u>"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

### B.        Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date.  Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

### C.        Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

C.     **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

D.     **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

E.     **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

F.     **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

APP 613

**G.** *De Minimis* **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.** **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.** **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.** **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.** **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.     Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.     Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.     Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

APP 615

**O.**  **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.**  **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**  **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**  **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

43

**D.**    **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

A.      **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

45

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however, the* foregoing

APP 620

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

### E.   Preservation of Rights of Action

#### 1.   *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

#### 2.   *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.      Injunction**

     **Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

     **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

     **The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

     **Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

G.      **Duration of Injunctions and Stays**

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

H.      **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


**ARTICLE X.
BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

APP 624

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

52

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**

**A.**    **Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.   The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**B.**    **Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.**    **Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

54

D.      **Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

E.      **Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

F.      **Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

G.      **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.      **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.     **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.     **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.     **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

## L.   **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

APP 630

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.      Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.      Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.      Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.      Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

APP 631

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
    James P. Seery, Jr.
    Chief Executive Officer and Chief Restructuring
    Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**<u>Exhibit B</u>**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

APP 633

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19.  Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20.  Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21.  Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22.  Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23.  Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24.  Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25.  Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26.  Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27.  Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28.  Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29.  Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30.  Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31.  Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32.  Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33.  Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34.  Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35.  Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust
and the Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## MOTION FOR LEAVE TO FILE PROCEEDING

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MOTION FOR LEAVE TO FILE PROCEEDING ........................................................ 1

SUMMARY AND STATEMENT OF FACTS ............................................................... 1

ARGUMENT .................................................................................................................. 8

    A.    The Gatekeeper Provision. ........................................................................... 8

    B.    The Gatekeeper Provision Is Satisfied Because Movants Were Directed to Raise Valuation Issues through an Adversary Proceeding ..................................... 8

    C.    The Valuation Proceeding Sets Forth a Colorable Claim. ............................ 9

## MOTION FOR LEAVE TO FILE PROCEEDING

Movants The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment

Trust ("Hunter Mountain" and collectively with Dugaboy, "Movants") file this Motion for Leave

to File Proceeding.

## SUMMARY AND STATEMENT OF FACTS[1]

1.      Movants file this Motion for Leave to File Proceeding (the "Motion for Leave") out

of an abundance of caution in light of the gatekeeper injunction (the "Gatekeeper Provision")

contained in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as

Modified) ("Plan") confirmed by order of this Court on February 22, 2021, § AA & Ex. A, Article

IX.F [Dkt. No.1950].   Specifically, Movants seek an order from the Court finding that the

Gatekeeper Provision is inapplicable to the proposed proceeding (the "Valuation Proceeding") to

be commenced by Movants in this Court, or that the requisite standard is met.

2.      The Valuation Proceeding largely seeks the same relief previously sought by

Movants through motion practice.   In particular, the Valuation Proceeding seeks information

regarding the value of the estate, including the assets and liabilities of the Highland Claimant Trust

(the "Claimant Trust") and related determinations by the Court.   On December 6, 2022, the Court

ordered Movants to seek the relief previously sought by motion practice through an adversary

proceeding [Dkt. No. 3645].   As a result, Movants are required to name Highland Capital

Management, L.P. ("HCMLP" or "Debtor") and the Highland Claimant Trust (the "Claimant

Trust") as defendants in the Valuation Proceeding, notwithstanding that what Movants are really

---

[1] Movants incorporate the facts alleged in their proposed Complaint To (I) Compel Disclosures About The Assets Of The Highland Claimant Trust And (II) Determine (A) Relative Value Of Those Assets, And (B) Nature Of Plaintiffs' Interests In The Claimant Tru[st ("Proposed Complaint" or "Valuation Complaint"), annexed hereto as Exhibit A.

seeking is information from HCMLP and the Claimant Trust.   Under the circumstances, Movants believe their Valuation Proceeding should fall outside of the Gatekeeper Provision.

3.      However, if the Court determines that the Gatekeeper Provision applies to the Valuation Proceeding, Movants seek an order determining that the Valuation Proceeding presents a "colorable claim" within the meaning of the Gatekeeper Provision and should be allowed.

4.      As holders of Contingent Claimant Trust Interests[2] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Movants need to file the Valuation Proceeding in an effort to obtain information about the assets and liabilities of the Claimant Trust established to liquidate the assets of the HCMLP bankruptcy estate.

5.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that, even with inflated claims and below market sales of assets, cash available is likely more than enough to pay class 8 and class 9 creditors 100 cents on the dollar.  Accordingly, Movants and the entire estate would benefit from a close evaluation of current assets and liabilities.  Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation.   That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or nothing for the owners that built the company.

6.      While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity.  As this

---

[2] Capitalized terms not defined have the meanings set forth herein.  If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Dkt. No. 1808].

2

Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity.  In some cases, the protection is in the form of an equity committee; here, a prompt valuation of the estate would serve the same purpose and is needed.

7.       As set forth in greater detail in the annexed complaint ("Valuation Complaint"), upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Movants.  Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery who would then be inclined to approve inflated compensation when the hidden but true value of the estate's assets was realized.  Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

8.       Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full.  Because of the lack of transparency to date, unless Movants are allowed to proceed, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

9.      On the petition date, the estate had over $550 million in assets, with far less in non-disputed non-contingent liabilities.

10.     By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[3]

11.     On information and belief, the value of the assets in the estate as of June 1, 2022, was as follows:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | **Low** | **High** |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |
| Affiliate Notes[4] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[3] Additional detail in the Valuation Complaint and its exhibits.
[4] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

12.    By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

13.    On information and belied, Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded with a reorganization plan to the many settlement offers from Mr. Dondero, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

14.    Instead, it appears that Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court." Making the transactions particularly suspect is the fact that the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years' hence.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

15.    On information and belief, Mr. Seery provided such information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

5

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million

in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating

business in the hands of its equity owners.

16.     Specifically, Mr. Seery could and should have investigated seeking sufficient funds

from equity to pay all claims and return the estate to the equity holders.  This was an obvious path

because the estate had assets sufficient to support a line of credit for $59 million, as Mr. Seery

eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were

sold, much of the massive administrative costs run up by the estate would never have been

incurred.  One such avoided cost would be the post effective date litigation now pursued by Marc

S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge

over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained

from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the

cost of the Kirschner litigation).  But buying in the claims to resolve the bankruptcy and enabling

equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme

contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the

hands of grateful business colleagues who received outsized rewards for the claims they were

steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item

cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is

transparency.

17.     But worse still, even with all of the manipulation that appears to have occurred,

Movants believe that the combination of cash and other assets held by the Claimant Trust in its

own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

6

unnecessary litigation would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest, now.

18.     In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Movants and others, even though the only beneficiaries of any recovery from such litigation would be Movants in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity of any meaningful recovery.

19.     Based upon the restrictions imposed on Movants including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Movants have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Movants become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Movants are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

20.     Movants are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

CORE/3522697.0002/179160551.9

## ARGUMENT

**A.      The Gatekeeper Provision.**

21.      The Debtor's Plan includes a Gatekeeper Provision, limiting how claims can be asserted against Protected Parties (Plan, § AA & Ex. A, Article IX.F), such as the reorganized Debtor and the Claimant Trust.  Plan Ex. A, Article I.B, ¶ 105.

22.      Under the Debtor's Plan confirmed by this Court, an "Enjoined Party" may not:

[C]ommence or pursue a claim or cause of action of any kind against any Protected Party that arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind . . . against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party.

Plan, § AA & Ex. A, Article IX.F.

23.      The Plan defines the term "Enjoined Party" to include "all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor", "any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared", and any "Related Entity." Plan Ex. A, Article I.B, ¶ 56. The Plan expressly defines "Related Entity" to include Dugaboy and Hunter Mountain.  *Id.*, § B, ¶ 110. Accordingly, each of Movants is an "Enjoined Party."  The question thus arises whether Movants must seek Court permission prior to instituting the annexed Valuation Proceeding.

**B.      The Gatekeeper Provision Is Satisfied Because Movants Were Directed to Raise Valuation Issues through an Adversary Proceeding**

24.      Movants previously sought by way of contested matter to obtain the relief sought in the Valuation Proceeding [Dkt. Nos. 3382, 3467, and 3533]. Debtor objected, asserting both that that the relief asserted was unwarranted and that it could only be obtained in an adversary proceeding [Dkt No. 3465]. The Court ruled that Movants must pursue an adversary proceeding.

8

Given that the Court has already ordered Movants to proceed in this fashion, the Court has already

served its gatekeeper function and this motion is unnecessary [Dkt. No. 3645].

25.     However, Movants conferenced the issue with Debtor, and Debtor was only willing

to stipulate that no gatekeeper motion was needed if Movants sought exactly the same relief as had

been sought in the motion.  Because the relief sought is better defined now, and to avoid further

delay, in an excess of caution, Movants bring this motion. After filing, Movants will attempt to

negotiate a resolution of this motion so that the Court can proceed directly to the merits.

**C.     The Valuation Proceeding Sets Forth a Colorable Claim.**

26.     Movants present colorable claims that should be authorized to proceed.

27.     The Plan does not define what constitutes a "colorable claim of any kind."  Nor

does the Bankruptcy Code define the term.   The case law construing the requirement for

"colorable" claims clearly provides that the requisite showing is a relatively low threshold to

satisfy, requiring Movants to prove "there is a possibility of success." *See Spring Svc. Tex., Inc.*

*v. McConnell (In re McConnell)*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989).

28.     The Fifth Circuit has stated that "the colorable claim standard is met if the [movant]

has asserted claims for relief that on appropriate proof would allow a recovery.  Courts have

determined that a court need not conduct an evidentiary hearing, but must ensure that the claims

do not lack any merit whatsoever." *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233,

248 (5th Cir. 1988).  The Court therefore need not be satisfied that there is an evidentiary basis for

the claims to be asserted but instead should allow the claims if they appear to have some merit.

29.     Other federal circuit courts have reached similar conclusions regarding the standard

to be applied.  For example, the Eighth Circuit held that "creditors' claims are colorable if they

would survive a motion to dismiss." *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008);

*accord In Re Foster*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), *aff'd* 602 Fed. Appx. 356 (8th Cir.

2015) (per curiam).  The Sixth Circuit has adopted a similar test requiring that the court look only to the face of the complaint to determine if claims are colorable.  *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995).

30.     Other federal courts have adopted roughly the same standard—*i.e.*, a claim is colorable if it is merely "plausible" and thus could survive a motion to dismiss.  *See In re America's Hobby Center, Inc.*, 223 B.R. 275, 282 (S.D.N.Y 1998); *see also, e.g., In re GI Holdings*, 313 B.R. at 631 (court must decide whether the committee has asserted "claims for relief that on appropriate proof would support a recovery"); *Official Comm. v. Austin Fin. Serv. (In re KDI Holdings)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999) (observing that the inquiry into whether a claim is colorable is similar to that undertaken on a motion to dismiss for failure to state a claim); *In re iPCS, Inc.*, 297 B.R. 283, 291-92 (Bankr. N.D. Ga. 2003) (same).

31.     In addition, in the non-bankruptcy context, the District Court for this district has explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff must have an 'arguable claim' and not that the plaintiff must be able to succeed on that claim."  *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002).

32.     This Court's analysis of whether the Valuation Proceeding sets forth a colorable claim is not a determination of whether the Court finds there is enough evidence presented.  Rather, if on the face of the Valuation Complaint, there appears a plausible claim, then the Valuation Proceeding presents a colorable claim, and this Motion must be granted to allow Movants to file their Valuation Complaint.

33.     In the First Claim for Relief of the Valuation Complaint, Movants seek disclosures of Claimant Trust Assets and request an accounting.  An equitable accounting is proper "when the facts and accounts presented are so complex that adequate relief may not be obtained at law."

*Gooden v. Mackie*, No. 4:19-CV-02948, 2020 WL 714291 (S.D. Tex. Jan. 23 2020) (quoting *McLaughlin v. Wells Fargo Bank, N.A.*, No. 4:12-CV-02658, 2013 WL 5231486, at \*6 (S.D. Tex. Sep. 13, 2013); *Bates Energy Oil & Gas v. Complete Oilfeld Servs.*, 361 F. Supp. 3d 633, 663 (W.D. Tex. 2019) (finding an equitable accounting claim was sufficiently stated when was a party was less than forthcoming in providing information and the available information was insufficient to determine what was done with a party's money); *Phillips v. Estate of Poulin*, No. 03-05-00099-CV, 2007 WL 2980179, at \*3 (Tex. App.-Austin, Oct. 12, 2007, no pet.) (finding that an accounting order was appropriate where the facts are complex and when the plaintiff could not obtain adequate relief through standard discovery); *Southwest Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.-San Antonio 1994, writ denied) (finding that an accounting was necessary in order to determine the identity of the property or the amount of money owed to a party).

34.     The requested disclosures and accounting are necessary due to the lack of transparency surrounding the assets and liabilities of the Claimant Trust.  The Court has retained jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan.  *See* Plan, Article XI.  As set forth above and in the Valuation Complaint, Movants have concerns that those provisions are not being appropriately followed, and efforts to obtain the information necessary to confirm otherwise has been unavailable through discovery. As a result of the restrictions imposed on Movants, including Movants' inability, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Movants have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Movants become Claimant Trust Beneficiaries.  Because Movants are in the dark regarding

11

the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought. Movants are unable to protect their own interests without an equitable accounting. Therefore, the First Claim for Relief sets forth a colorable claim.

35.     The Second Claim for Relief of the Valuation Complaint sets forth Movants' request for a declaratory judgment regarding the value of Claimant Trust Assets compared to the bankruptcy estate obligations. When considering whether a valid declaratory judgment claim exists, a court must engage in a three-step inquiry. *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). The court must ask (1) whether an actual controversy exists between the parties, (2) whether the court has the authority to grant such declaratory relief; and (3) whether the court should exercise its "discretion to decide or dismiss a declaratory judgment action." *Id*; *see also In re Fieldwood Energy LLC,* No. 20-33948, 2021 WL 4839321, at \*4 (Bankr. S.D. Tex. Oct. 15 2021) (seeking declaratory judgment regarding interpretation of a Plan and whether certain claims were discharged); *In re Think3, Inc.,* 529 B.R. 147, 206-07 (Bankr. W.D. Tex. 2015) (sufficient actual controversy to bring a declaratory judgment action to assist with an early and prompt adjudication of claims and to promote judicial and party economy).

36.     In this case, there can be no serious doubt that an actual controversy exists between the parties with respect to the relief sought, as the Debtor has already opposed the relief sought in the Valuation Complaint.  Additionally, there is no dispute that the Court has the inherent power to grant the relief sought in the Proposed Complaint.  Further, the third element is satisfied because this determination is important to the implementation of the Plan and distributions to Holders of Allowed Claims and Allowed Equity Interests.  If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at

recovering value for HCMLP's estate are not necessary to pay creditors in full. As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close. In addition, such a determination by the Court could allow for a settlement that would cover the spread between current assets and obligations before that gap is further widened by the professional fees incurred by the Claimant Trust. Therefore, the Second Claim for Relief pleads a colorable claim.

37.   Finally, in the Third Claim for Relief of the Valuation Complaint, Movants request a declaratory judgment and determination regarding the nature of their interests. As with the Second Claim for Relief, there is no serious dispute that an actual controversy exists between the parties and that the Court has the power to grant the relief requested. Additionally, the third element is satisfied because, in particular, in the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient to pay all Allowable Claims indefeasibly, Movants seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries. To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement. However, the requested determination would further assist parties in interest, such as Movants, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement. Therefore, the Third Claim for Relief pleads a colorable claim.

38.   The equitable relief sought in the Valuation Proceeding certainly meets any iteration of the standard for what constitutes "a colorable claim of any kind." Instead of using the

information governing provisions of the Claimant Trust as a shield, HCMLP and the Claimant Trust are using them as a sword to enable continued litigation that ultimately provides no benefit to Claimant Trust Beneficiaries or Movants as holders of Contingent Claimant Trust Interests.

39.     As set forth above, the Valuation Complaint seeks disclosure of information and an accounting that are related to the administration of the Plan and property to be distributed under the Plan, but not otherwise available to Movants.  The Valuation Complaint also requests declaratory judgments within the Court's jurisdiction and relevant to the furtherance of the Bankruptcy Case.  These claims are colorable, and this Motion for Leave should be granted.

WHEREFORE, Movants request the entry of an order i) granting this Motion for Leave; ii) determining that the Gatekeeping Provision is satisfied as applied to the Valuation Proceeding; and iii) authorizing Movants to file the Valuation Complaint.

Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust and the Hunter Mountain Investment Trust*

14

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on February 5, 2023, Louis M. Phillips conferenced with counsel for Defendants, John Morris, regarding this motion. Counsel for Defendants was willing to stipulate that no gatekeeper motion was needed if Movants sought exactly the same relief as had been sought in their prior motion addressing these issues.  Because the relief sought is better defined now, and to avoid further delay, in an excess of caution, Movants bring this motion. After filing, Movants will attempt to negotiate a resolution of this motion so that the Court can proceed directly to the merits.

*/s/Deborah Deitsch-Perez*

Deborah Deitsch-Perez

CORE/3522697.0002/179160551.9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 6, 2023, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

16

APP 655

# EXHIBIT A

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs the Dugaboy Investment Trust and the
Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| DUGABOY INVESTMENT TRUST and | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | _____ |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| HIGHLAND CLAIMANT TRUST, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT TO (I) COMPEL DISCLOSURES
## ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND
## (II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND
## (B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST

CORE/3522697.0002/178862860.17

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("Hunter Mountain" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against defendants Highland Capital Management, L.P. ("HCMLP" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCMLP, the "Defendants"), seeking: (1) disclosures about and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of those assets; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.      As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCMLP bankruptcy estate.

2.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that even with inflated claims and below market sales of assets, cash available is more than enough to pay class 8 and class 9 creditors in full. Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities. Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation. That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or

---

[1] Capitalized terms not defined have the meanings set forth herein. If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

nothing for the owners that built the company. While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity. As this Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity. In some cases, the protection is in the form of an equity committee; here a prompt valuation of the estate is needed.

3.    Upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Plaintiffs. Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery, who he knew would approve his inflated compensation when the hidden but true value of the estate's assets were realized. Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

4.    Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full. Because of the lack of transparency to date, unless the relief sought herein is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

5.    By demonizing the estate equity holders, withholding information, and manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the potential for a grave miscarriage of justice.  The estate had over $550 million in assets on the petition date, with far less in non-disputed non-contingent liabilities.

6.    By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[2]

7.    On information and belief, the value of the assets in the estate as of 6/1/22 was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | Low | High |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
|    Highland Select Equity | $55.00 | | |
|    Highland MultiStrat Credit Fund | $51.44 | | |
|    MGM Shares | $26.00 | | |
|    Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
|    Highland CLO Funding, LTD | | $37.50 | $37.50 |
|    Korea Fund | | $18.00 | $18.00 |
|    SE Multifamily | | $11.98 | $12.10 |
|    Affiliate Notes[3] | | $50.00 | $60.00 |
|    Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022, annexed hereto as Exhibits 1, 2, and 3, as is further detail about claims buyers.
[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

8.     By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

9.     Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded to the over the many settlement offers from Mr. Dondero with a reorganization (as opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

10.     Instead, Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."   These transactions are particularly suspect because the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years later.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

11.     On information and belief, Mr. Seery provided that information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million

in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating

business in the hands of its equity owners.

12.     Specifically, Mr. Seery could and should have investigated seeking sufficient funds

from equity to pay all claims and return the estate to the equity holders.  This was an obvious path

because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery

eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were

sold, much of the massive administrative costs run up by the estate would never have been

incurred.  One such avoided cost would be the post-effective date litigation now pursued by Mr.

Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge

over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained

from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the

cost of the Kirschner litigation).    But buying the claims to resolve the bankruptcy and enabling

equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme

contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the

hands of grateful business colleagues who received outsized rewards for the claims they were

steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item

cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is

transparency.

13.     But worse still, even with all of the manipulation that appears to have occurred,

Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its

own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

6

unnecessary litigation, would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

14.     In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery.

15.     Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

16.     In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

## JURISDICTION AND VENUE

17. This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

18. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

19. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

20. In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

## THE PARTIES

21. Dugaboy is a trust formed under the laws of Delaware.

22. Hunter Mountain is a trust formed under the laws of Delaware.

23. HCMLP is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

24. The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

25. On October 16, 2019 (the "Petition Date"), HCMLP, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

26. At the time of its chapter 11 filing, HCMLP had approximately $550 million in assets and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. [Dkt. No. 1943, ¶ 8]. HCMLP's reason for seeking

bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million. Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

27.     At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCMLP and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCMLP and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCMLP management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

28.     To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCMLP's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCMLP during its bankruptcy.  The three board members were:

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

    a.   James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);

    b.   John Dubel – (who was selected by Committee member UBS); and

    c.   Former Judge Russell Nelms – (who was selected by the Debtor).

29.     The Bankruptcy Court almost immediately let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by Judge Nelms, suggesting he was bamboozled because he was under management's spell.  Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about  . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

30.     At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121] In retrospect, this avoided scrutiny of the case by professionals

who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case. This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

31.    Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

32.    None of that happened. Almost immediately, Mr. Seery emerged as the de facto leader of the Independent Board. On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate. [Dkt. No. 854]. And although Mr. Seery publicly represented that he intended to restructure and preserve HCMLP's business, privately he was engineering a much different plan.

33.    Indeed, Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control. For example, initially Mr. Seery reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team." He also testified: "My experience with our employees has been excellent. The response when we want to get something done, when I want to get something done, has been first-rate. The skill level is extremely high."

34.    Yet despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the

CORE/3522697.0002/178862860.17

plan process, ultimately Mr. Seery fired most of those employees. It was clear that Mr. Seery was firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of challenging Mr. Seery, lest they too be fired.

35. From the start, and before there was much litigation to speak of, the Court regularly referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious litigant. This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero a "transparently" vexatious litigant based pleadings she had only heard about from parties opposing Dondero and admittedly had not read herself. Ironically, the first time Mr. Dondero was labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits initiated by the Debtor and had commented in proposed settlements in the case, but had not himself initiated any actions in the case. Thereafter, though, the Debtor and its professionals repeated the mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing information about the estate with them.

36. In addition to the Debtor's mistreatment of employees, under the control of the Independent Board, most of the ordinary checks and balances that the hallmark of bankruptcy were ignored. Despite providing regular and robust financial information to the Committee, the Debtor inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including Plaintiffs, in the dark about the value of the estate and the mix of assets it held. Amplifying the lack of transparency, Mr. Seery further engineered transactions to hide the real value of the estate.

37. For example, he authorized the Debtor to settle the claims of HabourVest (which claims had initially been valued at $0) for $80 million, in order to acquire HarborVest's interest in Highland CLO Funding, Ltd. ("HCLOF"), gain HarborVest's vote in favor of its Plan, and hide

the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary. This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $40 million at the time and over $60 million 90 days later when the MGM sale was announced.

38.    At the same time, Mr. Seery and the Independent Board deliberately shut out equity holders from any discussion surrounding the plan of reorganization or HCMLP's efforts to emerge from bankruptcy as a going concern. Indeed, as noted above, Mr. Seery failed to meaningfully respond to the many proposals made by residual equity holders to resolve the estate and never encouraged any dialogue between creditors and equity holders. These failures only contributed to the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly undermined an efficient exit from bankruptcy.

39.    Worse still, while knowing that HCMLP had sufficient resources to emerge from bankruptcy as a going concern (and, on information and belief, while knowing that the estate was solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that contemplated HCMLP's continued post-confirmation existence. Instead, and inexplicably, the very first plan proposed contemplated liquidation of the company, as did all subsequent plans.

40.    While secretly engineering the total destruction of HCMLP, Mr. Seery also privately settled multiple proofs of claim against the estate at inflated levels that were unreasonable multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and vehement objection to many of the claims as baseless. But instead of litigating those objections in a manner that would have exposed the true value of the claims, on information and belief, Mr. Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values. That is, the inflated values softened up claims sellers to be willing to sell. Had the Debtor instead

fought the inflated proofs of claim in open court, it could have settled the claims for closer to true value and ensured that the estate had sufficient resources to pay them.

41.     It is also no coincidence that virtually all original proofs of claim were sold to buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

42.     That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate.  It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense.  In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic.  Given the sophistication of the claims-buyers, their purchases of claims at prices that exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

43.     And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know).  In October 2022, $250 million was paid to Class 8 holders.  That is about 85% of the inflated proofs of claim and $90 million more than plan projections.  On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come.  On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million.

44.     At the same time, the Claimant Trust has made no distributions to Contingent
Claimant Trust Interest holders and has argued in various proceedings that no such distributions
are likely.  No wonder. The cost of holding open the estate, including unnecessary litigation costs,
appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such
distributions can occur, even though it can now be projected that the litigation is not needed to pay
creditors.  *See* Docket No. 3410-1.

45.     It is worth noting that it appears that virtually all of the claims trades brokered on
behalf of Committee members seem to have occurred while those entities remained on the
Committee.  Yet at the outset of their service, Committee members were instructed by the United
States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised
that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while
they are committee members absent an order of the Court."  Thus, the claims trades violated
Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other
Debtor professionals, to the detriment of creditors and residual equity holders.

46.     The sales of claims were not the only transactions shrouded in secrecy.  As further
detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding,
no data room, and without inviting equity (which may have at one time had the knowledge to make
the highest bid) to participate in the sales process.  Indeed, on occasion assets were sold for
amounts less that Mr. Dondero's written offers. This exacerbated the harms caused by the lack of
transparency characterized by the Court's indifference to the Debtor's complete failure to abide its
Rule 2015 disclosure obligations.

47.     In short, the lack of transparency combined with at least the appearance of bias, if
not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to

manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that could have been resolved with money left over for equity but for that manipulation.

## STATEMENT OF FACTS

### A.    Plaintiffs Hold Contingent Claimant Trust Interests

48.    As of the Petition Date, HCMLP had three classes of limited partnership interests (Class A, Class B, and Class C). *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

49.    The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCMLP's general partner. The Class B and C interests were held by Hunter Mountain. *Id.*

50.    In the aggregate, HCMLP's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

51.    On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

52.    In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9. *See* Plan, Article III, ¶ H(8) and (9).

53.    In the Plan, HCMLP classified Hunter Mountain's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest. *See* Plan, Article III, ¶ H(10) and (11).

16

54.    According to the Plan, Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.  *See* Plan, Article I, ¶44.

55.    In the Confirmation Order, the Court found that the Plan properly separately classified those equity interests because they represent different types of equity security interests in HCMLP and different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended (the "Limited Partnership Agreement").  Confirmation Order, ¶36; Limited Partnership Agreement, §3.9 (Liquidation Preference).

56.    The Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy.  In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCMLP and therefore "technically" had standing to object to the Plan. *See* Confirmation Order, ¶¶ 17-18.

57.    Based on the Debtor's financial projections at the time of confirmation, however, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id*., ¶ 17 ("the remoteness of their economic interests is noteworthy").

58.    The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCMLP became the Reorganized Debtor (as defined in the Plan) on the Effective Date.  *See* Notice of Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700].

59.    The Plan created the Claimant Trust, which was established for the benefit of Claimant Trust Beneficiaries, which is defined to mean:

the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed

> Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1(h).

60.     Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

61.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

62.     In its Post Confirmation Quarterly Report for the Third Quarter of 2022 [Docket No. 3582], Debtor stated that it distributed $255,201,228 to holders of general unsecured claims, which is 64% of the total allowed general unsecured claims of $387,485,568.  This amount is far greater than was anticipated at the time of confirmation of the Plan.

**B.     Debtor Has Failed To Disclose Claimant Trust Asse**ts

63.     Upon information and belief, the value of the estate as held in the Claimant Trust has changed markedly since Plan confirmation.  Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

64.     The estate is solvent and has always been solvent.  Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.

65.     As noted above, by June of 2022, starting with $125 million in cash, the estate liquidated other assets of over $416 million, building a cash war chest of over $541 million. Thus, with the remaining less-liquid assets, the total value of the estate's assets as of June 2022 was over $688 million.

66.     Contrasting those assets with the claims against the estate demonstrates that further collection of assets was (and is) unnecessary.

67.     As set forth above, while the inflated face amount of the claims was $365 million, those claims were sold for about $150 million. The estate therefore easily had the resources to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

68.     Instead, Mr. Seery liquidated estate assets at less-than-optimal prices, without competitive process, without including residual equity holders, and in all cases required strict non-disclosure agreements from the buyers to prevent any information flowing to the public, the residual equity, or the Court. This uncharacteristic secrecy enabled Mr. Seery and the professionals to maintain the delicate balance of keeping just enough assets to pay professionals and incentive fees but still maintain the pretense that further litigation was needed.

69.     Each effort by Plaintiffs, Mr. Dondero and related companies to obtain information to attempt to stop the continued looting has been vigorously opposed, and ultimately rejected by an apparently biased Court. Plaintiffs were unable to force the Debtor to provide the most basic of reports, including Rule 2015 statements, and Plaintiffs' efforts to obtain even the most basic details regarding asset sales and professional fees have all been denied. Rather, such details are in the hands of a select few, such as the Oversight Board of the Claimant Trust.

70.     The Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust

Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate. *See* Plan, ¶Art. IV(B)(9).

71.    But no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests, even though Plaintiffs, as contingent beneficiaries of a Delaware statutory trust, are entitled to financial information relating to the trust.

C.    **Plaintiffs Are Kirschner Adversary Proceeding Defendants**

72.    On October 15, 2021, Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust, commenced the Kirschner Adversary Proceeding against twenty-three defendants, including Plaintiffs, alleging various causes of action. *See Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. James Dondero*, *et al.*, Adv. Pro. No. 21-03076-sgj, Adv. Proc. No. 21-03076, Docket No. 1 (as amended by Docket No. 158).

73.    The Litigation Sub-Trust was established within the Claimant Trust as a wholly owned subsidiary of the Claimant Trust for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, with any proceeds therefrom to be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries. *See* Plan, Article IV, ¶ (B)(4).

74.    Any recovery from the Kirschner Adversary Proceeding will be distributed to Claimant Trust Beneficiaries.

75.    Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

76.    The Litigation Sub-Trust is pursuing claims against Plaintiffs in the Kirschner Adversary Proceeding, which, if they become Claimant Trust Beneficiaries, would be the

20

recipients of distributions of such recovery (less the cost of litigation).  Therefore, Plaintiffs need the requested information in order to properly analyze and evaluate the claims asserted against them in the Kirschner Adversary Proceeding and to determine whether those claims have any validity.

## FIRST CLAIM FOR RELIEF
### (Disclosures of Claimant Trust Assets and Request for Accounting)

77.    Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

78.    Due to the lack of transparency into the assets of the Claimant Trust, Plaintiffs are unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust Interests.

79.    Certain information about the Claimant Trust Assets has already been provided to others, including Claimant Trust Beneficiaries and the Oversight Board for the Claimant Trust.

80.    Information about the Claimant Trust Assets would help Plaintiffs evaluate whether settlement of the Kirschner Adversary Proceeding is feasible, which would further the administration of the bankruptcy estate, benefitting all parties in interest.

81.    This Court specifically retained jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan.  *See* Plan, Article XI.

82.    The Plan provides that distributions to Allowed Equity Interests will be accomplished through the Claimant Trust and Contingent Claimant Trust Interests.  *See* Plan Article III, (H)(10) and (11).

83.    The Defendants should be compelled to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets, and its liabilities.

CORE/3522697.0002/178862860.17

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment Regarding Value of Claimant Trust Assets)

84.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

85.     Once Defendants are compelled to provide information about the Claimant Trust assets, Plaintiffs seek a determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations.

86.     If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at recovering value for HCMLP's estate are not necessary to pay creditors in full.  As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close.

87.     In addition, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Mr. Kirschner, and Hayward & Associates—are continuing to incur millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or could be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.  Fees for Pachulski range from $460 an hour for associates to $1,265 per hour for partners, and fees for Quinn Emanuel lawyers range from $830 an hour for first year associate to over $2100 per hour for senior partners.  At these rates, depletion of the estate will occur rapidly.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment and Determination Regarding Nature of Plaintiff's Interests)

88.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

89.     In the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid, Plaintiffs seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries.[6]

90.     Such a declaration and a determination by the Court would further assist parties in interest, such as Plaintiffs, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement.

WHEREFORE, Plaintiffs pray for judgment as follows:

(i)      On the First Claim for Relief, Plaintiffs seek an order compelling Defendants to disclose the assets currently held in the Claimant Trust; and

(ii)     On the Second Claim for Relief, Plaintiffs seek a determination of the relative value of those assets in comparison to the claims of the Claimant Trust Beneficiaries; and

(iii)    On the Third Claim for Relief, Plaintiffs seek a determination that the conditions are such that all current Claimant Trust Beneficiaries could be paid in full, with such payment causing Plaintiffs' Contingent Claimant Trust Interests to vest into Claimant Trust Interests; and

---

[6] To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement.

(iv)     Such other and further relief as this Court deems just and proper.

Dated: February __, 2023

Respectfully submitted,

**STINSON LLP**

*Draft*_____
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for the Dugaboy Investment Trust*
*and the Hunter Mountain Investment Trust*

# EXHIBIT A-1

# HELLER, DRAPER & HORN, L.L.C.
## *A T T O R N E Y S  A T  L A W*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA  70130-6103
TELEPHONE: (504) 299-3300  FAX: (504) 299-3399

Douglas S. Draper
Direct Dial: (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

> **Re:**  *Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11*

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers. Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

October 5, 2021
Page 2

  I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

  From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

  Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

## 1. The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports

  Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

  Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

{00376610-1}

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

{00376610-1}

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget.  In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement.  Judge Jernigan held a hearing on the motion on June 10, 2021.  Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing.  Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective.  I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor.  The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

## 2. There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries.  In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets.  The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level.  During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities.  Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity.  In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6]  The Debtor's motion to settle the

---

below the Debtor.  *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF").  A dispute later arose between HarbourVest

{00376610-1}

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]   Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information.   Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3. The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court.  On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.  The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses.  In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level.  Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out."  Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise).   These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.  While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat").  Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9]  That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute.  Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims.  In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10]  If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor.  The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11]  It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12]  This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.   Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases.  Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions.  Several parties have appealed this issue to the Fifth Circuit.

## 4.    The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information.  The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely.  But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup").  The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill").  As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

{00376610-1}

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

19 *See* Appendix, pp. A-25, A-28.

20 *See* Appendix, pp. A-2; A-62 – A-69.

October 5, 2021
Page 9

committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

{00376610-1}

October 5, 2021
Page 10

> In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a)   The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)   Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)   The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d)   The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers  and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e)   The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f)   There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

{00376610-1}

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming. Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer. If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties. The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim. The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members. At the very least, there is enough credible evidence to warrant an investigation. It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent. The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders. A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate. In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

# EXHIBIT A-2



**MUNSCH HARDT**
DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530
Nan.r.Eitel@usdoj.gov

      Re:     Highland Capital Management, L.P. Bankruptcy Case
             Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

**BACKGROUND**

**Highland Capital Management and its Founder, James Dondero**

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### In Highland's Bankruptcy, the Regulatory Framework Is Ignored

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).
[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Case 19-34054-sgj11   Doc 3662   Filed 02/06/23   Entered 02/06/23 15:55:45   Desc
Case 3:21-cv-00881-X   Document 186   Filed 12/16/23   Page 262 of 466   699 of 1245   PageID 12562

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

## Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining □2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See* "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

Ms. Nan R. Eitel
November 3, 2021
Page 9

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts*."[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here.  In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|----------|---------------|----------------|--------------------|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.

[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

APP 703

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] *See* Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1) If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 14

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)   If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization.  Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] See Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.

[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.

[30] Dkt. 854, ¶ 4 & Exh. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. See 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] See Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; see Appendix, p. A-57.
[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____
       Davor Rukavina, Esq.

DR:pdm

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ................................................................................................... 3

Seery Jan. 29, 2021 Testimony .................................................................................................. 15

Sale of Assets of Affiliates or Controlled Entities ....................................................................... 24

20 Largest Unsecured Creditors ................................................................................................ 25

Timeline of Relevant Events ..................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ................................................... 27

Updated Liquidation Analysis (Feb. 1, 2021) .............................................................................. 28

Summary of Debtor's January 31, 2021 Monthly Operating Report .............................................. 29

Value of HarbourVest Claim ...................................................................................................... 30

Estate Value as of August 1, 2021 (in millions) .......................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ............................................................. 32

UBS Settlement [Doc. 2200-1] .................................................................................................. 45

Hellman & Friedman Seeded Farallon Capital Management .......................................................... 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ................................................... 63

Farallon was a Significant Borrower for Lehman ......................................................................... 65

Mr. Seery Represented Stonehill While at Sidley ........................................................................ 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............ 67

Investor Communication to Highland Crusader Funds Stakeholders ............................................... 70

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers

Provided initial seed capital

Lehman Bros.

River Birch Cap.

One of the largest note holders

Toys 'R Us BK

Hellman & Friedman

Part owner from 2007 to 2020

Creditor

Global Head Fixed Income Loans [1999 – 2009]

Pres. and Senior Invest. Officer [2013 – 2017]

Toys 'R Us Steering Committee

One of the largest note holders

John Motulsky

Law school classmates

Joseph Nesler

Farallon Cap. Mgmt.

Jim Seery Debtor's CEO and CRO

Stonehill Cap. Mgmt.

Founding Partner

Longtime General Counsel

Partner and Head of NY BK Section [2009 – 2013]

Acquired Redeemer and Crusader Claims

Grosvenor Cap. Mgmt.

Blockbuster Steering Committee Member

Acquired a portion of UBS Claims

Redeemer Committee of the Crusader

committee Member (owning 90%)

Blockbuster BK Steering Committee

Counsel to Steering Committee (Jim Seery)

Sidley & Austin

Counsel to UCC (Matt Clemente)

HCMLP Creditors Committee

Committee Member

Per Farallon executives, Mr. Seery assisted Farallon in the pursuit of claims in the Lehman Bankruptcy.

Acquired Acis Claim

Acis Cap. Mgmt.

UBS

Acquired a portion of UBS Claims

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon?  Has it been adequately disclosed to the Court and investors?

**Page A-2**

APP 713

Debtor Protocols [Doc. 466-1]

I.    **Definitions**

    A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

    B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

    C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

    D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

    E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

    F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

    G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

    H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K. "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

   a) Stage 1 and Stage 2: ordinary course determined by the CRO.

   b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

   a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b) Stage 3:

   (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

    a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.     **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.     **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.     **Covered Entities**: See <u>**Schedule A**</u> hereto. <u>**Schedule A**</u> includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.     **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

    a)     <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

    b)     <u>Stage 3</u>: ordinary course determined by the Debtor.

2.     Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    <u>Stage 3</u>:

     (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.    **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages):

a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

> Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

> b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

> c)   The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.   **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.   Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Page A-8

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.   Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.  Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.    Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**X.** **Representations and Warranties**

  A. The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

  B. The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

  C. The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

**Schedule B**

**Related Entities Listing (other than natural persons)**

APP 724

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

```
                                                                  Page 1
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   ------------------------------)

 5   In Re:                  Chapter 11

 6   HIGHLAND CAPITAL        Case No.

 7   MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9        Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14            January 29, 2021

15            10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

**Page 2**

```
 1              January 29, 2021
 2               9:00 a.m. EST
 3
 4        Remote Deposition of JAMES P.
 5   SEERY, JR., held via Zoom
 6   conference, before Debra Stevens,
 7   RPR/CRR and a Notary Public of the
 8   State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   REMOTE APPEARANCES:
 2
 3   Heller, Draper, Hayden, Patrick, & Horn
 4   Attorneys for The Dugaboy Investment
 5   Trust and The Get Good Trust
 6        650 Poydras Street
 7        New Orleans, Louisiana 70130
 8
 9
10   BY:    DOUGLAS DRAPER, ESQ
11
12
13   PACHULSKI STANG ZIEHL & JONES
14   For the Debtor and the Witness Herein
15        780 Third Avenue
16        New York, New York 10017
17   BY:    JOHN MORRIS, ESQ.
18         JEFFREY POMERANTZ, ESQ.
19         GREGORY DEMO, ESQ.
20         IRA KHARASCH, ESQ.
21
22
23
24             (Continued)
25
```

**Page 4**

```
 1   REMOTE APPEARANCES:  (Continued)
 2
 3   LATHAM & WATKINS
 4   Attorneys for UBS
 5        885 Third Avenue
 6        New York, New York 10022
 7   BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9   JENNER & BLOCK
10   Attorneys for Redeemer Committee of
11   Highland Crusader Fund
12        919 Third Avenue
13        New York, New York 10022
14   BY:    MARC B. HANKIN, ESQ.
15
16   SIDLEY AUSTIN
17   Attorneys for Creditors' Committee
18        2021 McKinney Avenue
19        Dallas, Texas 75201
20   BY:    PENNY REID, ESQ.
21         MATTHEW CLEMENTE, ESQ.
22         PAIGE MONTGOMERY, ESQ.
23
24             (Continued)
25
```

**Page 5**

```
 1   REMOTE APPEARANCES:  (Continued)
 2   KING & SPALDING
 3   Attorneys for Highland CLO Funding, Ltd.
 4        500 West 2nd Street
 5        Austin, Texas 78701
 6   BY:    REBECCA MATSUMURA, ESQ.
 7
 8   K&L GATES
 9   Attorneys for Highland Capital Management
10   Fund Advisors, L.P., et al.:
11        4350 Lassiter at North Hills
12        Avenue
13        Raleigh, North Carolina 27609
14   BY:    EMILY MATHER, ESQ.
15
16   MUNSCH HARDT KOPF & HARR
17   Attorneys for Defendants Highland Capital
18   Management Fund Advisors, LP; NexPoint
19   Advisors, LP; Highland Income Fund;
20   NexPoint Strategic Opportunities Fund and
21   NexPoint Capital, Inc.:
22        500 N. Akard Street
23        Dallas, Texas 75201-6659
24   BY:  DAVOR RUKAVINA, ESQ.
25             (Continued)
```

**Page A-16**

Page 6

```
 1   REMOTE APPEARANCES (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6           420 Throckmorton Street
 7
 8           Fort Worth, Texas 76102
 9   BY:   CLAY TAYLOR, ESQ.
10         JOHN BONDS, ESQ.
11         BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16           1900 North Pearl Street
17
18           Dallas, Texas 75201
19   BY:   MICHELLE HARTMANN, ESQ.
20         DEBRA DANDEREAU, ESQ.
21
22
23
24               (Continued)
25
```

Page 7

```
 1   REMOTE APPEARANCES: (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7           100 Throckmorton Street
 8             Fort Worth, Texas 76102
 9   BY:   LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15           700 N. Pearl Street
16             Dallas, Texas 75201
17   BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
 1
 2        E X A M I N A T I O N S
 3   WITNESS                        PAGE
 4   JAMES SEERY
 5     By Mr. Draper            9
 6     By Mr. Taylor           75
 7     By Mr. Rukavina        165
 8     By Mr. Draper          217
 9
           E X H I B I T S
10   SEERY DYD
     EXHIBIT    DESCRIPTION        PAGE
11
     Exhibit 1    January 2021 Material    11
12
     Exhibit 2    Disclosure Statement     14
13
     Exhibit 3    Notice of Deposition     74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                    PAGE
17   Subsidiary ledger showing note    22
     component versus hard asset
18   component
19   Amount of D&O coverage for       131
     trustees
20
     Line item for D&O insurance      133
21
22        MARKED FOR RULING
            PAGE   LINE
23           85     20
24
25
```

Page 9

```
 1
 2        COURT REPORTER:  My name is
 3   Debra Stevens, court reporter for TSG
 4   Reporting and notary public of the
 5   State of New York.  Due to the
 6   severity of the COVID-19 pandemic and
 7   following the practice of social
 8   distancing, I will not be in the same
 9   room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14        Whereupon,
15        J A M E S   S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20        Q.   Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

**Page A-17**

Page 14

```
1              J. SEERY
2     the screen, please?
3     A.    Page what?
4     Q.    I think it is page 174.
5     A.    Of the PDF or of the document?
6     Q.    Of the disclosure statement that
7  was filed.  It is up on the screen right
8  now.
9          COURT REPORTER:  Do you intend
10    this as another exhibit for today's
11    deposition?
12         MR. DRAPER:  We'll mark this
13    Exhibit 2.
14         (So marked for identification as
15    Seery Exhibit 2.)
16    Q.    If you look to the recovery to
17 Class 8 creditors in the November 2020
18 disclosure statement was a recovery of
19 87.44 percent?
20    A.    That actually says the percent
21 distribution to general unsecured
22 creditors was 87.44 percent.  Yes.
23    Q.    And in the new document that was
24 filed, given to us yesterday, the recovery
25 is 62.5 percent?
```

Page 15

```
1              J. SEERY
2     A.    It says the percent distribution
3  to general unsecured creditors is
4  62.14 percent.
5     Q.    Have you communicated the
6  reduced recovery to anybody prior to the
7  date -- to yesterday?
8          MR. MORRIS:  Objection to the
9          form of the question.
10    A.    I believe generally, yes.  I
11 don't know if we have a specific number,
12 but generally yes.
13    Q.    And would that be members of the
14 Creditors' Committee who you gave that
15 information to?
16    A.    Yes.
17    Q.    Did you give it to anybody other
18 than members of the Creditors' Committee?
19    A.    Yes.
20    Q.    Who?
21    A.    HarbourVest.
22    Q.    And when was that?
23    A.    Within the last two months.
24    Q.    You did not feel the need to
25 communicate the change in recovery to
```

Page 16

```
1              J. SEERY
2  anybody else?
3     A.    I said Mr. Doherty.
4     Q.    In looking at the two elements,
5  and what I have asked you to look at is
6  the claims pool.  If you look at the
7  November disclosure statement, if you look
8  down Class 8, unsecured claims?
9     A.    Yes.
10    Q.    You have 176,000 roughly?
11    A.    Million.
12    Q.    176 million.  I am sorry.  And
13 the number in the new document is 313
14 million?
15    A.    Correct.
16    Q.    What accounts for the
17 difference?
18    A.    An increase in claims.
19    Q.    When did those increases occur?
20 Were they yesterday?  A month ago?  Two
21 months ago?
22    A.    Over the last couple months.
23    Q.    So in fact over the last couple
24 months you knew in fact that the recovery
25 in the November disclosure statement was
```

Page 17

```
1              J. SEERY
2  not accurate?
3     A.    Yes.  We secretly disclosed it
4  to the Bankruptcy Court in open court
5  hearings.
6     Q.    But you never did bother to
7  calculate the reduced recovery; you just
8  increased --
9          (Reporter interruption.)
10    Q.    You just advised as to the
11 increased claims pool.  Correct?
12         MR. MORRIS:  Objection to the
13         form of the question.
14    A.    I don't understand your
15 question.
16    Q.    What I am trying to get at is,
17 as you increase the claims pool, the
18 recovery reduces.  Correct?
19    A.    No.  That is not how a fraction
20 works.
21    Q.    Well, if the denominator
22 increases, doesn't the recovery ultimately
23 decrease if --
24    A.    No.
25    Q.    -- if the numerator stays the
```

**Page A-18**

Page 26

1           J. SEERY
2  were amended without consideration a few
3  years ago.  So, for our purposes we didn't
4  make the assumption, which I am sure will
5  happen, a fraudulent conveyance claim on
6  those notes, that a fraudulent conveyance
7  action would be brought.  We just assumed
8  that we'd have to discount the notes
9  heavily to sell them because nobody would
10 respect the ability of the counterparties
11 to fairly pay.
12      Q.    And the same discount was
13 applied in the liquidation analysis to
14 those notes?
15      A.    Yes.
16      Q.    Now --
17      A.    The difference -- there would be
18 a difference, though, because they would
19 pay for a while because they wouldn't want
20 to accelerate them.  So there would be
21 some collections on the notes for P and I.
22      Q.    But in fact as of January you
23 have accelerated those notes?
24      A.    Just one of them, I believe.
25      Q.    Which note was that?

Page 27

1           J. SEERY
2      A.    NexPoint, I said.  They
3  defaulted on the note and we accelerated
4  it.
5      Q.    So there is no need to file a
6  fraudulent conveyance suit with respect to
7  that note.  Correct, Mr. Seery?
8          MR. MORRIS:  Objection to the
9      form of the question.
10     A.    Disagree.  Since it was likely
11 intentional fraud, there may be other
12 recoveries on it.  But to collect on the
13 note, no.
14     Q.    My question was with respect to
15 that note.  Since you have accelerated it,
16 you don't need to deal with the issue of
17 when it's due?
18         MR. MORRIS:  Objection to the
19     form of the question.
20     A.    That wasn't your question.  But
21 to that question, yes, I don't need to
22 deal with when it's due.
23     Q.    Let me go over certain assets.
24 I am not going to ask you for the
25 valuation of them but I am going to ask

Page 28

1           J. SEERY
2  you whether they are included in the asset
3  portion of your $257 million number, all
4  right?  Mr. Morris didn't want me to go
5  into specific asset value, and I don't
6  intend to do that.
7          The first question I have for
8  you is, the equity in Trustway Highland
9  Holdings, is that included in the
10 $257 million number?
11     A.    There is no such entity.
12     Q.    Then I will do it in a different
13 way.  In connection with the sale of the
14 hard assets, what assets are included in
15 there specifically?
16     A.    Off the top of my head -- it is
17 all of the assets, but it includes
18 Trustway Holdings and all the value that
19 flows up from Trustway Holdings.  It
20 includes Targa and all the value that
21 flows up from Targa.  It includes CCS
22 Medical and all the value that would flow
23 to the Debtor from CCS Medical.  It
24 includes Cornerstone and all the value
25 that would flow from Cornerstone.  It

Page 29

1           J. SEERY
2  includes any other securities and all the
3  value that would flow from Cornerstone.
4  It includes HCLOF and all the value that
5  would flow up from HCLOF.  It includes
6  Korea and all the value that would flow up
7  from Korea.
8          There may be others off the top
9  of my head.  I don't recall them.  I don't
10 have a list in front of me.
11     Q.    Now, with respect to those
12 assets, have you started the sale process
13 of those assets?
14     A.    No.  Well, each asset is
15 different.  So, the answer is, with
16 respect to any securities, we do seek to
17 sell those regularly and we do seek to
18 monetize those assets where we can
19 depending on whether there is a
20 restriction or not and whether there is
21 liquidity in the market.
22         With respect to the PE assets or
23 the companies I described -- Targa, CCS,
24 Cornerstone, JHT -- we have not --
25 Trustway.  We have not sought to sell

**Page A-19**

Page 38

```
 1                  J. SEERY
 2     A.    I don't recall the specific
 3  limitation on the trust.  But if there was
 4  a reason to hold on to the asset, if there
 5  is a limitation, we can seek an extension.
 6     Q.    Let me ask a question.  With
 7  respect to these businesses, the Debtor
 8  merely owns an equity interest in them.
 9  Correct?
10     A.    Which business?
11     Q.    The ones you have identified as
12  operating businesses earlier?
13     A.    It depends on the business.
14     Q.    Well, let me -- again, let's try
15  to be specific.  With respect to SSP, it
16  was your position that you did not need to
17  get court approval for the sale.  Correct?
18     A.    That's correct.
19     Q.    Which one of the operating
20  businesses that are here, that you have
21  identified, do you need court authority
22  for a sale?
23           MR. MORRIS:  Objection to the
24     form of the question.
25     A.    Each of the businesses will be a
```

Page 39

```
 1                  J. SEERY
 2  different analysis that we'll undertake
 3  with bankruptcy counsel to determine what
 4  we would need depending on when it is
 5  going to happen and what the restrictions
 6  either under the code are or under the
 7  plan.
 8     Q.    Is there anything that would
 9  stop you from selling these businesses if
10  the Chapter 11 went on for a year or two
11  years?
12           MR. MORRIS:  Objection to form
13     of the question.
14     A.    Is there anything that would
15  stop me?  We'd have to follow the
16  strictures of the code and the protocols,
17  but there would be no prohibition -- let
18  me finish, please.
19           There would be no prohibition
20  that I am aware of.
21     Q.    Now, in connection with your
22  differential between the liquidation of
23  what I will call the operating businesses
24  under the liquidation analysis and the
25  plan analysis, who arrived at the discount
```

Page 40

```
 1                  J. SEERY
 2  or determined the discount that has been
 3  placed between the two, plan analysis
 4  versus liquidation analysis?
 5           MR. MORRIS:  Objection to form
 6     of the question.
 7     A.    To which document are you
 8  referring?
 9     Q.    Both the June -- the January and
10  the November analysis has a different
11  estimated proceeds for monetization for
12  the plan analysis versus the liquidation
13  analysis.  Do you see that?
14     A.    Yes.
15     Q.    And there is a note under there.
16  "Assumes Chapter 7 trustee will not be
17  able to achieve the same sales proceeds as
18  Claimant trustee."
19     A.    I see that, yes.
20     Q.    Do you see that note?
21     A.    Yes.
22     Q.    Who arrived at that discount?
23     A.    I did.
24     Q.    What percentage did you use?
25     A.    Depended on the asset.  Each one
```

Page 41

```
 1                  J. SEERY
 2  is different.
 3     Q.    Is the discount a function of
 4  capability of a trustee versus your
 5  capability, or is the discount a function
 6  of timing?
 7           MR. MORRIS:  Objection to form.
 8     A.    It could be a combination.
 9     Q.    So, let's -- let me walk through
10  this.  Your plan analysis has an
11  assumption that everything is sold by
12  December 2022.  Correct?
13     A.    Correct.
14     Q.    And the valuations that you have
15  used here for the monetization assume a
16  sale between -- a sale prior to December
17  of 2022.  Correct?
18     A.    Sorry.  I don't quite understand
19  your question.
20     Q.    The 257 number, and then let's
21  take out the notes.  Let's use the 210
22  number.
23           MR. MORRIS:  Can we put the
24     document back on the screen, please?
25     Sorry, Douglas, to interrupt, but it
```

**Page A-20**

Page 42

J. SEERY

1  would be helpful.
2      MR. DRAPER:  That is fine, John.
3      (Pause.)
4      MR. MORRIS:  Thank you very
5  much.
6      Q.    Mr. Seery, do you see the 257?
7      A.    In the one from yesterday?
8      Q.    Yes.
9      A.    Second line, 257,941.  Yes.
10     Q.    That assumes a monetization of
11 all assets by December of 2022?
12     A.    Correct.
13     Q.    And so everything has been sold
14 by that time; correct?
15     A.    Yes.
16     Q.    So, what I am trying to get at
17 is, there is both the capability between
18 you and a trustee, and then the second
19 issue is timing.  So, what discount was
20 put on for timing, Mr. Seery, between when
21 a trustee would sell it versus when you
22 would sell it?
23     MR. MORRIS:  Objection.
24     Q.    What is the percentage you

Page 43

J. SEERY

1  applied?
2      A.    Each of the assets is different.
3      Q.    Is there a general discount that
4  you used?
5      A.    Not a general discount, no.  We
6  looked at each individual asset and went
7  through and made an assessment.
8      Q.    Did you apply a discount for
9  your capability versus the capability of a
10 trustee?
11     A.    No.
12     Q.    So a trustee would be as capable
13 as you are in monetizing these assets?
14     MR. MORRIS:  Objection to the
15     form of the question.
16     Q.    Excuse me?  The answer is?
17     A.    The answer is maybe.
18     Q.    Couldn't a trustee hire somebody
19 as capable as you are?
20     MR. MORRIS:  Objection to the
21     form of the question.
22     A.    Perhaps.
23     Q.    Sir, that is a yes or no
24 question.  Could the trustee hire somebody

Page 44

J. SEERY

1  as capable as you are?
2      MR. MORRIS:  Objection to the
3     form of the question.
4      A.    I don't know.
5      Q.    Is there anybody as capable as
6  you are?
7      MR. MORRIS:  Objection to the
8     form of the question.
9      A.    Certainly.
10     Q.    And they could be hired.
11 Correct?
12     A.    Perhaps.  I don't know.
13     Q.    And if you go back to the
14 November 2020 liquidation analysis versus
15 plan analysis, it is also the same note
16 about that a trustee would bring less, and
17 there is the same sort of discount between
18 the estimated proceeds under the plan and
19 under the liquidation analysis.
20     MR. MORRIS:  If that is a
21     question, I object.
22     Q.    Is that correct, Mr. Seery,
23 looking at the document?
24     A.    There are discounts, yes.

Page 45

J. SEERY

1      Q.    Again, the discounts are applied
2  for timing and capability?
3      A.    Yes.
4      Q.    Now, in looking at the November
5  plan analysis number of $190 million and
6  the January number of $257 million, that
7  accounts for the increase between the two
8  dates?  What assets specifically?
9      A.    There are a number of assets.
10 Firstly, the HCLOF assets are added.
11     Q.    How much are those?
12     A.    Approximately 22 and a half
13 million dollars.
14     Q.    Okay.
15     A.    Secondly, there is a significant
16 increase in the value of certain of the
17 assets over this time period.
18     Q.    Which assets, Mr. Seery?
19     A.    There are a number.  They
20 include MGM stock, they include Trustway,
21 they include Targa.
22     Q.    And what is the percentage
23 increase from November to January,
24 November of 2020 to January of 2021?



Page 46

J. SEERY

1
2      A.    Do you mean what is the
3  percentage increase from 190 to 257?
4      Q.    No.  You just identified three
5  assets.  MGM stock, we can go look at the
6  exchange and figure out what the price
7  increase is; correct?
8      A.    No.
9      Q.    Why not?  Is the MGM stock
10  publicly traded?
11      A.    Yes.  It doesn't trade on --
12      Q.    Excuse me?
13      A.    It doesn't trade on an exchange.
14      Q.    Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17      A.    There is a semipublic market;
18  yes.
19      Q.    So it is a number that is
20  readily available between the two dates?
21      A.    It's available.
22      Q.    Now, you identified Targa and
23  Trustway.  Correct?
24      A.    Yes.
25      Q.    Those are not readily available

Page 47

J. SEERY

1
2  markets; correct?
3      A.    No.
4      Q.    Those are operating businesses?
5      A.    Correct.
6      Q.    Who provided the valuation for
7  the November 2020 liquidation analysis?
8      A.    We use a combination of the
9  value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12      Q.    And the adjustment was up or
13  down?
14      A.    When?
15      Q.    For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19      MR. MORRIS:  Objection to form
20  of the question.
21      A.    I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.

Page 48

J. SEERY

1
2      Q.    And if I understand what you
3  just said, it is that the Houlihan Lokey
4  valuation for those two businesses showed
5  a significant increase between November of
6  2020 and January of 2021?
7      MR. MORRIS:  Objection to form
8  of the question.
9      A.    I didn't say that.
10      Q.    I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18      A.    I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23      Q.    So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 28th

Page 49

J. SEERY

1
2  of 2021, the magnitude being roughly 60
3  some odd million dollars.  Correct?
4      A.    Correct.
5      Q.    We can account for $22 million
6  of it easily, right?
7      MR. MORRIS:  Objection to form.
8      A.    Correct.
9      Q.    That is the HarbourVest
10  settlement, so that leaves roughly
11  $40 million unaccounted for?
12      MR. MORRIS:  Objection to the
13  form of the question if that is a
14  question.  It is accounted for.
15      Q.    What makes up that difference,
16  Mr. Seery?
17      A.    A change in the plan value of
18  the assets.
19      Q.    Okay.  Which assets?  Let's sort
20  of go back to where we were.
21      A.    There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up

Page 50

J. SEERY

1  J. SEERY
2  for one.  On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7       Q.    Let me look at some numbers
8  again.  In the liquidation analysis in
9  November of 2020, the liquidation value is
10 $149 million.  Correct?
11      A.    Yes.
12      Q.    And in the liquidation analysis
13 in January of 2021, you have $191 million?
14      A.    Yes.
15      Q.    You see that number.  So there
16 is $51 million there, right?
17      A.    No.
18      Q.    What is the difference between
19 191 and -- sorry.  My math may be a little
20 off.  What is the difference between the
21 two numbers, Mr. Seery?
22      A.    Your math is off.
23      Q.    Sorry.  It is 41 million?
24      A.    Correct.
25      Q.    $22 million of that is the

Page 51

J. SEERY

1  J. SEERY
2  HarbourVest settlement, right?
3       A.    I believe that's correct.
4       Q.    Is that fair, Mr. Seery?
5       A.    I believe that is correct, yes.
6       Q.    And part of that differential
7  are publicly traded or ascertainable
8  securities.  Correct?
9       A.    Yes.
10      Q.    And basically you can get, or
11 under the plan analysis or trustee
12 analysis, if it is a marketable security
13 or where there is a market, the
14 liquidation number should be the same for
15 both.  Is that fair?
16      A.    No.
17      Q.    And why not?
18      A.    We might have a different price
19 target for a particular security than the
20 current trading value.
21      Q.    I understand that, but I mean
22 that is based upon the capability of the
23 person making the decision as to when to
24 sell.  Correct?
25           MR. MORRIS:  Objection to form

Page 52

J. SEERY

1  J. SEERY
2  of the question.
3       Q.    Mr. Seery, yes or no?
4       A.    I said no.
5       Q.    What is that based on, then?
6       A.    The person's ability to assess
7  the market and timing.
8       Q.    Okay.  And again, couldn't a
9  trustee hire somebody as capable as you to
10 both, A, assess the market and, B, make a
11 determination as to when to sell?
12           MR. MORRIS:  Objection to form
13 of the question.
14      A.    I suppose a trustee could.
15      Q.    And there are better people or
16 people equally or better than you at
17 assessing a market.  Correct?
18      A.    Yes.
19           MR. MORRIS:  Objection to form
20 of the question.
21      Q.    So, again, let's go back to
22 that.  We have accounted for, out of
23 $41 million where the liquidation analysis
24 increases between the two dates,
25 $22 million of it.  That leaves

Page 53

J. SEERY

1  J. SEERY
2  $18 million.  How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5       A.    I don't know off the top of my
6  head the percentages.
7       Q.    All right.  The same question
8  for the plan analysis where you have the
9  differential between the November number
10 and the January number.  How much of it is
11 marketable securities versus an operating
12 business?
13      A.    I don't recall off the top of my
14 head.
15           MR. DRAPER:  Let me take a
16 few-minute break.  Can we take a
17 ten-minute break here?
18           THE WITNESS:  Sure.
19           (Recess.)
20 BY MR. DRAPER:
21      Q.    Mr. Seery, what I am going to
22 show you and what I would ask you to look
23 at is in the note E, in the statement of
24 assumptions for the November 2020
25 disclosure statement.  It discusses fixed

**Page A-23**

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate.  We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

**Page A-24**

### 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

**Page A-25**

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

**Page A-26**

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

**Page A-27**

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

**Page A-28**

### Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

**Page A-29**

[Value of HarbourVest Claim](#)





## Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**Page A-32**

Case 19-34054-sgj11 Doc 3662 Filed 02/06/23 Entered 02/06/23 15:55:45 Desc
Case 3:21-cv-00881-X Document 1 Page 337 of 1245 PageID 12607

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20 Entered 12/23/20 22:25:24 Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

2

## RELEVANT BACKGROUND

### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

### B.    Overview of HarbourVest's Claims

10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.    **Summary of HarbourVest's Factual Allegations**

14.    At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

**Page A-36**

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof.  The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC.  *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case").  The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee").  A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.     The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.     On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.     The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.     HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.     Settlement Discussions**

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.     Summary of Settlement Terms

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36. There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37. First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38. The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors.  Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length.  The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario."  Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

**Page A-43**

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the

form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such

other relief as is just and proper.

Dated:  December 23, 2020.            **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com


-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

**Page A-44**

# <u>Exhibit 1</u>
## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**Page A-46**

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

**EXECUTION VERSION**

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**A G R E E M E N T**

1.    **Settlement of Claims.** In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

**EXECUTION VERSION**

(b)  Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)  Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

**EXECUTION VERSION**

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of \$3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

          (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.     Definitions.

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.     Releases.

**(a)     UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b) **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

**4.      No Third Party Beneficiaries**.   Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

**5.      UBS Covenant Not to Sue.**  Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.      **Agreement Subject to Bankruptcy Court Approval.**

(a)      The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.      **Representations and Warranties**.

(a)      Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)      Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)      Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

Page A-55

**EXECUTION VERSION**

**8.**    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.**    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.**    **Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
            Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

**11.** **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.** **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.** **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.** **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.** **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**16.** **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____
Name: _____
Its: _____

**STRAND ADVISORS, INC.**

By: _____
Name: _____
Its: _____

Page A-59

17

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

15

Page A-60

‑.

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**



SFChronicle/SFGate/Liz Hafalia



Robert Holmgren



no caption

## Hellman & Friedman Owned a Portion of Grosvenor until 2020



# Grosvenor Capital Management

In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)     INFO@HF.COM (MAILTO:INFO@HF.COM)     LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)     BACK

GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)     TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)

PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)

KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)     (HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-&-FRIEDMAN)

©2021 HELLMAN & FRIEDMAN LLC



CORNER OFFICE

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

Julie Segal

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

**Page A-64**

APP 775

### Farallon was a Significant Borrower for Lehman

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million |
| | JP Morgan: $200 million |



**Transaction Overview**

♦ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

♦ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

**Lehman Brothers Role**

♦ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

♦ Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

**Sponsorship Overview**

♦ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**                                       32

Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                              :

In re:                         :    Chapter 11
                              :

BLOCKBUSTER INC., *et al.*,     :    Case No. 10-14997 (BRL)
                              :

               Debtors.    :    (Jointly Administered)
                              :

----------------------------------------------------------------- X

## THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.       The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

**Page A-66**

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!



https://www.linkedin.com/in/josephnesler/



**Joseph H. Nesler** (He/Him)
General Counsel

**Experience**

**General Counsel**
Dalpha Capital Management, LLC
Aug 2020 – Jul 2021 · 1 yr

**Of Counsel**
Winston & Strawn LLP
Sep 2018 – Jul 2020 · 1 yr 11 mos
Greater Chicago Area

**Principal**
The Law Offices of Joseph H. Nesler, LLC
Feb 2016 – Aug 2018 · 2 yrs 7 mos

**Grosvenor Capital Management, L.P.**
11 yrs 9 mos

Independent Consultant to Grosvenor Capital Management, L.P.
May 2015 – Dec 2015 · 8 mos
Chicago, Illinois

**General Counsel**
Apr 2004 – Apr 2015 · 11 yrs 1 mo
Chicago, Illinois

Managing Director, General Counsel and Chief Compliance Officer (April 2004 – April 2015)

<u>Investor Communication to Highland Crusader Funds Stakeholders</u>



**Alvarez & Marsal
Management, LLC** 2029 Cei
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

**Page A-70**

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director

# EXHIBIT A-3



**MUNSCH HARDT**

DALLAS / HOUSTON / AUSTIN

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

May 11, 2022

Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

Dear Ms. Eitel:

By way of follow-up to the letter Douglas Draper sent to your offices on October 4, 2021 and my letter dated November 3, 2021, I write to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor"). Those abuses, as detailed in our prior letters, include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to line the pockets of Debtor management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of stakeholders and third-party investors in Debtor-managed funds and in violation of investors' due process rights and various fiduciary duties and duties of candor to the Bankruptcy Court and all constituents. In particular, I write this letter to further detail:

1.      Actions and omissions by the Debtor that have but a single apparent purpose: to spend the assets of the Highland estate to enrich those currently managing the estate at the expense of the business owners (the equity). Currently, the Highland estate has more than enough assets to pay 100% of the allowed creditors' claims. But doing so would deprive the current steward, Jim Seery, as well as his professional cohorts, the opportunity to reap tens, if not hundreds of millions of dollars, in fees. This motivation explains the acts and omissions described below—all designed to prop up a façade that the post-confirmation bankruptcy machinations are necessary, and to avoid any scrutiny of that façade, and to foreclose any investigation into a contrary thesis.

2.      The Debtor's intentional understatement of the value of the estate for personal gain, the gain of professionals, and the gain of affiliated or related secondary claims-buyers.

3.      The failure to adhere to fiduciary duties to maximize the value of estate assets and failure to contest baseless proofs of claim to enable Highland to emerge from bankruptcy as a going concern and to preserve value for all stakeholders.

4.      The gross misuse of estate assets by the Debtor and Debtor professionals in pursuing baseless and stale claims against former insiders of the Debtor when the current value of the estate (over

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 2

$650 million with the recent completion of the MGM sale, which includes over $200 million in cash)
greatly exceeds the estate's general unsecured claims ($410 million).

     5.     The failure of the Debtor's CRO and CEO, Jim Seery, to adhere to his fiduciary duty to
maximize the value of the estate. As evidenced by the chart below, all general unsecured claims could
have been resolved using $163 million of debtor cash and other liquidity. Instead, proofs of claim were
inflated and sold to Stonehill Capital Management ("Stonehill") and Farallon Capital Management
("Farallon"), which are both affiliates of Grosvenor (the largest investor in the Crusader Funds, which
became the largest creditor in the bankruptcy). Mr. Seery has a long-standing relationship with
Grosvenor and was appointed to the Independent Board (the board charged with managing the Debtor's
estate) by the Redeemer Committee of the Crusader Funds, on which Grosvenor held five of nine seats.

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0 ($65.0 net of other assets) |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 to $163.0** |

     As highlighted in the prior letters to your office and as further detailed herein, this is the type of
systemic abuse of process that is something lawmakers and the Executive Office of the U.S. Trustee (the
"EOUST") should be concerned about. Accordingly, we urge the EOUST to exercise its "broad
administrative, regulatory, and litigation/enforcement authorities . . . to promote the integrity and
efficiency of the bankruptcy system for the benefit of all stakeholders–debtors, creditors, and the public."[1]
Specifically, we believe it would be appropriate for the EOUST to undertake an investigation to confirm
the current value of the estate and to ensure that the claims currently being pursued by the Debtor are
intended to benefit creditors of the estate, and not just to further enrich Debtor professionals and Debtor
management.

**BACKGROUND**

**The Players**

James Dondero – co-founder of Highland in 1993. Mr. Dondero is chiefly responsible for ensuring that
Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other
areas, including real estate, private equity, and alternative investments. Mr. Dondero is a dedicated
philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy.
He currently serves as a member of the Executive Board of the Southern Methodist University Cox
School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential
Center.

---

[1] https://www.justice.gov/ust.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 3

<u>Highland</u> – Highland Capital Management, L.P., the Debtor. Highland is an SEC-registered investment advisor co-founded by James Dondero in 1993. Prior to its bankruptcy, Highland served as adviser to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

<u>Strand</u> – Strand Advisors, Inc., a Delaware corporation. The general partner of Highland.

<u>The Independent Board</u> – the managing board installed after Highland's bankruptcy filing. To avoid a protracted dispute, and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by three independent directors of Strand, who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. Pursuant to an agreement with the Creditors' Committee that was approved by the Bankruptcy Court, Mr. Dondero, UBS, and the Redeemer Committee each were permitted to choose one director. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James P. Seery, Jr.[2]

<u>Creditors' Committee</u> – On October 29, 2019, the bankruptcy court appointed the Official Committee of Unsecured Creditors, which consisted of: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).

<u>James P. Seery, Jr.</u> – a member of the Independent Board, and the Chief Executive Officer, and Chief Restructuring Officer of the Debtor. Beginning in March 2020, Mr. Seery ran day-to-day operations and negotiations with the Creditors' Committee, investors, and employees in return for compensation of $150,000 per month and generous incentives and stands to earn millions more for administering the Debtor's post-confirmation liquidation. Judge Nelms and John Dubel remained on the Independent Board, receiving weekly updates and modest compensation.

<u>Acis</u> – Acis Capital Management, L.P., a former affiliate of Highland. Acis is currently owned and controlled by Josh Terry, a former employee of Highland. Acis (Joshua Terry) was a member of Highland's Creditors' Committee.

<u>UBS</u> – UBS Securities LLC and UBS AG London Branch, collectively. UBS asserted claims against Highland arising out of a default on a 2008 warehouse lending facility (to which Highland was neither a party nor a guarantor). Highland had paid UBS twice for full releases of claims UBS asserted against Highland – approximately $110 million in 2008 and an additional $70.5 million via settlement with Barclays, the Crusader Funds, and Credit Strategies in June 2015. UBS was a member of the Creditors' Committee and appointed John Dubel to the Independent Board.

---

[2] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 4

HarbourVest – HarbourVest Partners, LLC. HarbourVest is a private equity fund of funds and one of the largest private equity investment managers globally. HarbourVest has approximately $75 billion in assets under management. HabourVest has deep ties with Grosvenor and has jointly with Grosvenor sponsored 59 LBO transactions in the last two years.

The Crusader Funds – a group of Highland-managed funds formed between 2000 and 2002. During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their full investment plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been paid when made. Subsequently, when disputes regarding management of the Crusader Funds' liquidation arose, the Redeemer Committee instituted an arbitration against Highland, resulting in an arbitration award against Highland of approximately $190 million. Nonetheless, due to offsets and double-counting, the Debtor initially estimated the value of the Redeemer arbitration award at $105 million to $110 million. In a 9019 settlement with the Debtor, the Crusader Funds ultimately received allowed claims of $137 million, plus $17 million of sundry claims and retention of an interest in Cornerstone Healthcare Group, Inc., an acute-health-care company, valued at over $50 million. Notably, UBS objected to the Crusader Funds' 9019 settlement, arguing that the Redeemer arbitration award was actually worth much less— between $74 and $128 million. The Crusader Funds sold their allowed claims to Stonehill, in which Grosvenor is the largest investor. This sale to an affiliated fund without approval of other investors in the fund is a violation of the Investment Advisers Act of 1940.

The Redeemer Committee – The Redeemer Committee of the Highland Crusader Funds was a group of investors in the Crusader Funds that oversaw the liquidation of the funds. The Redeemer Committee was comprised of nine members. Grosvenor held five seats. Concord held one seat.

Grosvenor – GCM Grosvenor is a global alternative asset management firm with over $59 billion in assets under management. Grosvenor has one of the largest operations in the Cayman Islands, with more than half of their assets under management originating through its Cayman operations. Unlike most firms operating in the Cayman Islands, Grosvenor has its own corporate and fiduciary services firm. This structure provides an additional layer of opacity to anonymous corporations from the British Virgin Islands (which includes significant Russian assets), Hong Kong (which includes significant Chinese assets), and Panama (which includes significant South American assets). As a registered investment adviser, Grosvenor must adhere to know-your-customer regulations, must report suspicious activities, and must not facilitate non-compliance or opacity. In 2020, Michael Saks and other insiders distributed all of Grosvenor's assets to shareholders and sold the firm to a SPAC originated by Cantor Fitzgerald.[3] In 2020, the equity market valued asset managers and financial-services firms at decade-high valuations. It makes little sense that Grosvenor would use the highly dilutive SPAC process (as opposed to engaging

---

[3] See https://www.wsj.com/articles/gcm-grosvenor-to-merge-with-cantor-fitzgerald-spac-11596456900. The Securities and Exchange Commission recently released a rule proposal that is focused on enhancing disclosure requirements around special purpose acquisition companies, including additional disclosures about SPAC sponsors, conflicts of interest and sources of dilution, business combination transactions between SPACs and private operating companies, and fairness of these transactions. See https://www.pionline.com/regulation/sec-proposes-enhanced-spac-disclosure-rule.

Ms. Nan R. Eitel
May 11, 2022
Page 5

in a traditional IPO or other strategic-sale alternatives) unless such a structure was employed to avoid the diligence and management-liability tail inherent in more traditional processes.

<u>Farallon</u> – Farallon Capital Management, L.L.C.  Farallon is a hedge fund that manages capital on behalf of institutions and individuals and was previously the largest hedge fund in the world.  Farallon has approximately $27 billion in assets under management.  Grosvenor is a significant investor in Farallon.  Grosvenor and Farallon are further linked by Hellman & Friedman, LLC, an American private equity firm.  Hellman & Friedman owned a stake in Grosvenor from 2007 until it went public in 2020 and seeded Farallon's initial capital.

<u>Muck</u> – Muck Holdings, LLC.  Muck is owned and controlled by Farallon.  Together with Jessup Holdings, LLC (described below)), Muck acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

<u>Stonehill</u> – Stonehill Capital Management, LLC.  Stonehill provides portfolio management for pooled investment vehicles.  It has approximately $3 billion in assets under management, which  we have reason to believe includes approximately $1 billion from Grosvenor.

<u>Jessup</u> – Jessup Holdings, LLC.  Jessup is owned and controlled by Stonehill.  Together with Muck (Farallon), Stonehill acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

<u>Marc Kirschner/Teneo</u> - The Debtor retained Marc Kirschner to pursue over $1 billion in claims against former insiders and affiliates of the Debtor despite the significant solvency of the estate ($650 million in assets versus $410 million in claims).  Kirschner's bankruptcy restructuring firm was purchased by Teneo (which also purchased the restructuring practice of KPMG).  Teneo is sponsored by LetterOne, a London-based private equity firm owned by Mikhail Fridman, a Russian oligarch.  Fridman is also the primary investor in Concord Management, LLC ("<u>Concord</u>"), which held a position on the Redeemer Committee.  During the resolution of a 2018 arbitration involving a Debtor-managed fund, the Highland Credit Strategies Fund, evidence emerged demonstrating that Concord was operating as an unregistered investment adviser of Russian money from Alfa-Bank, Russia's largest privately held bank and a key part of Fridman's Alfa Group Consortium.  –That money that was funneled into BVI-domiciled shell companies into the Cayman Islands, then into various hedge funds and private equity funds in the U.S.  Evidence of these activities was presented by the Debtor to Grosvenor, and the Debtor asked to have Concord removed from the Redeemer Committee.  Concord was never removed.  Concord is a large investor in Grosvenor.  Grosvenor, in turn, is a large investor in Stonehill and Farallon.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved investors in the Crusader Funds.  As explained above, a group of Crusader Funds investors sued after the funds' manager temporarily suspended redemptions during the financial crisis.  That dispute resolved with the formation of the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors'

Ms. Nan R. Eitel
May 11, 2022
Page 6

receiving a return of their investments plus a profit, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite the successful liquidation of the Crusader Funds, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement.  The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

In view of the expected arbitration award and believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[4]

On October 29, 2019, the Bankruptcy Court appointed the Creditors' Committee.  At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court.  By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.  The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[5]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

**Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate**

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of Strand.  To avoid a protracted dispute and to

---

[4] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

[5] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 7

facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by the Independent Board.[6]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the independent directors, Mr. Seery. Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[7] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[8]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[9] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of

---

[6] Frank Waterhouse and Scott Ellington, Highland employees, remained as officers of Strand, Chief Financial Officer and General Counsel, respectively.

[7] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[8] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[9] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

Ms. Nan R. Eitel
May 11, 2022
Page 8

creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[10] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate. This becomes all the more important when a debtor or an estate holds substantial assets through non-debtor subsidiaries or vehicles, as is the case here; hence, the purpose of Rule 2015.3.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored, and neither the Bankruptcy Court nor the U.S. Trustee's Office did anything to ensure compliance. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below. Additionally, the lack of proper and accurate information and intentional hiding of material information led creditors to vote for the Debtor's plan and the Bankruptcy Court to confirm that plan which, we believe, would not have happened had the Debtor complied with its fiduciary and reporting duties.

As Mr. Draper and I have already highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[11] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-

---

[10] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[11] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

Ms. Nan R. Eitel
May 11, 2022
Page 9

value determinations.[12] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

Despite these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements adopted by the EOUST and historical rules mandating transparency.[13]

Because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**The Lack of Transparency Permitted the Debtor to Quietly Sell Assets Without Observing Best Practices**

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of Portola Pharma shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year).

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to the debtor (20% less than Mr. Dondero received in funds he managed).

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or

---

[12] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[13] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

4862-7970-5887v.1 019717.00004

Case 19-34054-sgj11   Doc 3662   Filed 02/06/23   Entered 02/06/23 15:55:45   Desc
Case 3:21-cv-00881-X   Document 109-1 Filed 12/16/23 Page 156 of 1245   PageID 12656
Main Document   Page 156 of 166   Page 793 of 1245   PageID 12656

Ms. Nan R. Eitel
May 11, 2022
Page 10

outside stakeholders, resulting in a loss to the estate of over $10 million versus cost and $20 million versus fair market value.

- The Debtor "sold" interests in certain investments commonly referred to as PetroCap without engaging in a public sale process and without exploring any other method of liquidating the asset.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors. Equally as troubling, for certain similar sale transactions the Debtor *did* seek Bankruptcy Court approval, thus acknowledging that such approval was necessary or, at a minimum, that disclosures regarding non-estate asset sales are required.

**The Lack of Transparency Permitted the "Inner Circle" to Manipulate the Estate for Personal Gain**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic because the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months in the wake of the global pandemic. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 million impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). A Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity— information that was critical in evaluating the worth of claims against the estate or future investments into it.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time financial information with respect to the affairs of non-Debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. The Debtor's "inner circle" – the Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) – had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

*Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate*

Mr. Seery's compensation package encouraged, and the lack of transparency permitted, manipulation of the estate and settlement of creditors' claims at inflated amounts.

Ms. Nan R. Eitel
May 11, 2022
Page 11

Upon his initial appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[14]

When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he his compensation package was handsomely improved. His base salary, which was on the verge of dropping to $30,000 per month, was increased *retroactively* back to March 15, 2020, to $150,000 per month. Additionally, his employment agreement contemplated a discretionary "Restructuring Fee"[15] that would be calculated in one of two ways:

(1)    If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)    If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and was intended to provide a powerful economic incentive for Mr. Seery to steer Highland through the Chapter 11 case and emerge from bankruptcy as a going concern.

Despite the structure of his compensation package, Mr. Seery saw greater value in aligning himself with creditors and the Creditors' Committee. To that end, he publicly alienated and maligned Mr. Dondero, and he found willing allies in the Creditors' Committee. The posturing also paved the way for Mr. Seery to bestow upon the hold-out creditors exorbitant settlements at the expense of equity and earn his Restructuring Fee. In fact, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee (both members of the Creditors' Committee),[16] leaving only the HarbourVest and UBS (also a member of the Creditors' Committee) claims to resolve. In other words, Mr. Seery had curried favor with two of the four members of the Creditors' Committee who would ultimately approve his Restructuring Fee and future compensation following plan consummation.

Ultimately, the confirmed Plan appointed Mr. Seery as the Claimant Trustee, which continued his compensation of $150,000 per month (termed his "Base Salary") and provided that the Oversight Board and Mr. Seery would negotiate additional "go-forward" compensation, including a "success fee" and severance pay.[17] Mr. Seery's success fee presumably is (or will be) based on whether his liquidation of

---

[14] *See* Dkt. 339, ¶ 3.
[15] *See* Dkt. 854, Ex. 1.
[16] *See* Dkt. 864, p. 8, l. 24 – p. 9, l. 8.
[17] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
May 11, 2022
Page 12

the estate outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy but also to ensure that he eventually receives a large "success fee" and severance payment. In fact, during a deposition taken on October 21, 2021, Mr. Seery testified that he expected to make "a few million dollars a year" for each year during the years that he will take to liquidate the Debtor, although we estimate that, based on the estate's nearly $650 million value today, Mr. Seery's success fee could approximate $50 million.

### Mr. Seery Enters into Inflated Settlements

Even before his appointment as CEO and CRO of the Debtor, Mr. Seery had effectively seized control of the Debtor as its *de facto* chief executive officer.[18] Thus, while he was in the process of negotiating his compensation agreement, he was simultaneously negotiating settlements with the remaining creditors to ensure he earned his Restructuring Fee, even if he did so at inflated amounts. One transaction that highlights this is the settlement with the Crusader Funds and the Redeemer Committee.

In connection with Mr. Seery's appointment as CEO and CRO, the Debtor announced that it had reached an agreement in principle with the Crusader Funds and the Redeemer Committee. Even **UBS**, one of the members of the Creditors' Committee, thought the settlement was inflated. In its objection to the Debtor's 9019 motion, UBS stated:[19]

> The Redeemer Claim is based on an Arbitration Award that required the Debtor, inter alia, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) in exchange for all of Crusader's shares in Cornerstone. Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation. As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

> Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer. The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement. Depending on the valuation of the Cornerstone shares, the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

---

[18] *See* Dkt. 864, p. 6, l. 18 – 22.
[19] *See* Dkt. 1190, p. 6 – 7.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 13

In the meantime, other general unsecured creditors of the Debtor will receive a much lower percentage recovery than they would if those assets were instead transferred to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among the Debtor's creditors. The Proposed Settlement is only in the best interests of Redeemer and, as such, it should be rejected.

****** 

[3] The potential range of value attributable to the Cornerstone shares is significant because, according to the Debtor's liquidation analysis, the Debtor expects to have only $195 million total in value to distribute, and only $161 million to distribute to general unsecured creditors under its proposed plan.  See Liquidation Analysis [Dkt. No. 1173-1]; First Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1079].

UBS was right.  Mr. Seery agreed to a settlement that substantially overpaid the Redeemer Committee, and UBS only agreed to withdraw its objection and appeal of the Redeemer Committee's settlement when the Debtor bestowed upon UBS its own lavish settlement.[20]

It is worth noting that the Redeemer Committee ultimately sold its bankruptcy claim for $78 million in cash, but the sale excluded, and the Crusader Funds retained, its investment in Cornerstone Healthcare Group Holding Inc. and certain non-cash consideration.[21]  At the end of the day, the Crusader Funds and the Redeemer Committee cashed out of their bankruptcy claims for total consideration at the very least of $135 million, meaning they received 105% of the highest estimate (according to UBS) of the net amount of their arbitration award.[22]

### The Inner Circle Doesn't Object to Inflated Settlements

Following the Bankruptcy Court's approval of settlements with Acis/Josh Terry and the Crusader Funds/the Redeemer Committee, Mr. Seery turned his attention to the two remaining critical holdouts: HarbourVest and UBS.  HarbourVest, a private equity fund-of-funds with approximately $75 billion under management, had invested pre-bankruptcy $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO

---

[20] See Dkt 2199.  Under the terms of the UBS Settlement, UBS received a Class 8 claim in the amount of $65 million, a Class 9 claim in the amount of $60 million, a payment in cash of $18.5 million from a non-Debtor fund managed by the Debtor, and the Debtor's agreement to assist UBS in pursuing other claims against former Debtor affiliates related to a default on a credit facility during the Global Financial Crisis.  Importantly, over the course of the preceding 11 years, UBS had already received payments totaling $180 million in connection with this dispute, and just prior to bankruptcy, UBS and the Debtor had reached a settlement in principle in which the Debtor would pay UBS just $7 million and $10 million in future business.

[21] See Exh. B.

[22] The estimation of a total recovery of $135 million includes attributing $48 million to the retained Cornerstone investment.  The $48 million valuation equated to a ~45% interest in Cornerstone, which was valued pre-pandemic at approximately $107 million.  Following COVID, Cornerstone's long-term acute care facilities flourished.  Additionally, Cornerstone held a direct investment of over 800,000 shares in MGM, which was held on its books at approximately $72 per share.  The per-share closing price on the sale of MGM to Amazon exceeded $164, which would have increased the company's valuation (irrespective of the post-COVID growth) by more than $70 million, bring Crusader Funds' windfall to more than $205 million.

Ms. Nan R. Eitel
May 11, 2022
Page 14

Funding, Ltd. ("HCLOF").  A charitable fund called the Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ~2.00% was held by Highland and certain of its employees.

Before Highland filed bankruptcy, a dispute arose between HarbourVest and Highland in which HarbourVest claimed it was duped into making the investment into HCLOF because Highland allegedly failed to disclose facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry, which would result in HCLOF's incurring legal fees and costs).  HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.  In Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that the Debtor and Debtor's counsel initially argued was absurd. Indeed, Debtor management valued HarbourVest's claims at $0, which was consistently reflected in the Debtor's publicly-filed financial statements up through and including its December 2020 Monthly Operating Report.[23]  Nevertheless, as one of the final creditor claims to be resolved, Mr. Seery ultimately agreed to give HabourVest a $45 million Class 8 claim and a $35 million Class 9 claim.[24]  At that time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive 71.32% payout on their claims, and Class 9 creditors could expect 0.00%.  Thus, HarbourVest's total $80 million in allowed claims would result in HarbourVest receiving $32 million in cash.[25]  The cash consideration was offset by HarbourVest's agreement to convey its interest in HCLOF to the Debtor (or its designee) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million.  In other words, from the outside looking in, the Debtor agreed to pay $9.5 million for a spurious claim.

Oddly enough, no creditors (other than former insiders) objected.  What the inner circle presumably knew was that the settlement was actually a windfall for the Debtor.  As we have previously detailed, the $22.5 million valuation of HCLOF that the Debtor utilized in seeking approval of the settlement was based upon September 2020 figures when the economy was still reeling from the pandemic.  The value of that investment rebounded rapidly, particularly because of the pending MGM sale to Amazon that was disclosed to the Debtor but not the public (i.e., material non-public information).  We have subsequently learned that the actual value of the HCLOF at the time the Bankruptcy Court approved the HarbourVest settlement was at least $44 million—a value that Mr. Seery would have known but that was not disclosed to the Court or the public.

Likewise, there were no objections to the UBS settlement, which is puzzling.  As detailed in the Debtor's 64-page objection to the UBS proof of claim and the Redeemer Committee's 431-page objection to the UBS proof of claim, UBS's claims against the Debtor were razor thin and largely foreclosed by res judicata and a settlement and release executed in connection with the June 2015 settlement.  Moreover, the publicly available information indicated that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16,

---

[23] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.

[24] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

[25] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $27 million.

Ms. Nan R. Eitel
May 11, 2022
Page 15

2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021);[26]

- Allowed claims against the estate increased by $236 million from December 2020 to January 2021, with Class 8 claims ballooning $74 million in December to $267 million in January;

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for Class 8 Claims decreased from 87.44% to 71.32% in just a matter of months.

The Liquidation Analysis estimated total assets remaining for distribution to general unsecured claims to be $195 million, with general unsecured claims totaling $273 million. By the time the UBS settlement was presented to the court for approval, the allowed Class 8 Claims had increased to $309,345,000, reducing the distribution to Class 8 creditors to 62.99%. Surely significant creditors like the Redeemer Committee—whose projected distribution dropped from $119,527,515 when it voted for the Plan to $86,105,194 with the HarbourVest and UBS claims included—should have taken notice.

**Mr. Seery Stacks the Oversight Board**

As previously disclosed, we believe Mr. Seery facilitated the sale of the four largest claims in the estate to Farallon and Stonehill. Based upon conversations with representatives of Farallon, Mr. Seery contacted them directly to encourage their acquisition of claims in the bankruptcy estate.[27] We believe Mr. Seery did so by disclosing the true value of the estate versus what was publicly disclosed in court filings, demonstrating that there was substantial upside to the claims as compared to what was included in the Plan Analysis. For example, publicly available information at the time Farallon and Stonehill acquired the UBS claim indicated the purchase would have made no economic sense: the publicly disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Farallon and Stonehill would have lost money on the claim acquisition. We can only conclude Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), which based upon accurately disclosed financial statements would indicate they were likely to recover close to 100% on both Class 8 and Class 9 claims.

As set forth in the previous letters, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers Farallon, through Muck, and Stonehill, through Jessup. The four claims purchased by Farallon and Stonehill comprise the largest four claims in the Highland bankruptcy by a substantial margin, collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[26] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473].
[27] We believe Mr. Seery made similar calls to representatives of Stonehill. We are informed and believe that Mr. Seery has long-standing relationships with both Farallon and Stonehill.

Ms. Nan R. Eitel
May 11, 2022
Page 16

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,696,610** | **$95,000,000** | |

From the information we have been able to gather, it appears that Stonehill and Farallon purchased these claims for the following amounts:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[28] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 - $165.0** |

As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) are overseeing the liquidation of the reorganized Debtor. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth below, we estimate that the estate today is worth nearly $650 million and has approximately $200 million in cash, which could result in Mr. Seery's receipt of a performance bonus approximating $50 million. Thus, it is a warranted and logical deduction that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. As set forth in previous letters, there are three primary reasons to believe this:

- The scant publicly available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that was actually publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims; and

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

For example, consider the sale of the Crusader Funds' claims, which we *know* was sold for $78 million. Based upon the publicly available information at the time of the acquisition, the expected distribution would have been $86 million. Surely a sophisticated hedge fund would not invest $78 million in a particularly contentious bankruptcy if it believed its maximum return was $86 million years later.

---

[28] Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 17

Ultimately, the Plan, Mr. Seery's compensation package, and the lack of transparency to everyone other than the Debtor, its management, and the Creditors' Committee permitted Debtor management and the Creditors' Committee to support grossly inflated claims (at the expense of residual stakeholders) in a grossly understated estate, which facilitated the sales of those claims to a small group of investors with significant ties to Debtor management. In doing so, Mr. Seery installed on the Reorganized Debtor's Oversight Board friendly faces who stand to make $370 million on ~$150 million investment. And Mr. Seery's plan has already worked. Notably, while the confirmed Plan was characterized by the Debtor as a monetization plan,[29] the newly installed Oversight Board supported, and the Court approved, paying Mr. Seery the much more lucrative Case Resolution Fee, netting Mr. Seery $1.5 million more than he was entitled to receive under his employment agreement.

In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

| | Value as of Aug. 2021 | | March 2022 High Estimate updated for MGM closing |
|---|---|---|---|
| Asset | Low | High | |
| Cash as of 4/25/22 | $17.9 | $17.9 | |
| Targa Sale | $37.0 | $37.0 | |
| 8/1 CLO Flows | $10.0 | $10.0 | |
| Uchi Bldg. Sale | $9.0 | $9.0 | |
| Siepe Sale | $3.5 | $3.5 | |
| PetroCap Sale | $3.2 | $3.2 | |
| Park West Sale | $3.5 | $3.5 | |
| HCLOF trapped cash | $25.0 | $25.0 | |
| **Total Cash** | **$105.6** | **$105.6** | **$200** |
| Trussway | $180.0 | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 | $25.0 |
| HCLOF | $40.0 | $40.0 | $20.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 | $30.0 |
| MGM (direct ownership) | $32.0 | $32.0 | $0.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 | $30.0 |
| Korea Fund | $18.0 | $18.0 | $20.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 | $70.0 |
| Other | $2.0 | $10.0 | $10.0 |

---

[29] See Dkt. 194., p.5.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 18

| Highland Restoration Capital Partners | | | |
|---|---|---|---|
| **TOTAL** | **$472.6** | **$598.6** | **$645.0** |

## The Bankruptcy Professionals are Draining the Estate

Yet another troubling aspect of the Highland bankruptcy has been the rate at which Debtor professionals have drained the Estate, largely through invented, unnecessary, and greatly overstaffed and overworked offensive litigation.  The sums expended between case filing and the effective date of the Plan (the "Effective Date") are staggering:

| **Professional** | **Fees** | **Expenses** |
|---|---|---|
| Hunton Andrews Kurth | $1,147,059.42 | $2,747.84 |
| FTI Consulting, Inc. | $6,176,551.20 | $39,122.91 |
| Teneo Capital, LLC | $1,221,468.75 | $6,257.07 |
| Marc Kirschner | $137,096.77 | |
| Sidley Austin LLP | $13,134,805.20 | $211,841.25 |
| Pachulski Stang Ziehl & Jones | $23,978,627.25 | $334,232.95 |
| Mercer (US) Inc. | $202,317.65 | $2,449.37 |
| Deloitte Tax LLP | $553,412.60 | |
| Development Specialists, Inc. | $5,562,531.12 | $206,609.54 |
| James Seery[30] | $5,100,000.00 | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| Wilmer Cutler Pickering Hale & Dorr LLP | $2,645,729.72 | $5,207.53 |
| Kurtzman Carson Consultants LLC | $2,054,716.00 | |
| Foley & Lardner LLP | $629,088.00 | |
| Casey Olsen Cayman Limited | $280,264.00 | |
| ASW Law Limited | $4,976.00 | |
| Houlihan Lokey Financial Advisors, Inc. | $766,397.00 | |
| Berger Harris, LLP | | |
| Hayward PLLC | $825,629.50 | $46,482.92 |
| | **$64,420,670.18** | **$854,951.38** |
| **Total Fees and Expenses** | | **$65,275,621.56** |

"The [bankruptcy] estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 872 (Bankr. N.D. Ill. 1989).

---

[30] This amount includes Mr. Seery's success fee, which was paid a month following the Effective Date.

Ms. Nan R. Eitel
May 11, 2022
Page 19

The rate at which Debtor professionals have drained the estate is in stark contrast to the treatment of the employees who stayed with the Debtor (without a key employee retention plan or key employee incentive program) on the promise they would be made whole for prepetition deferred compensation that had not yet vested, only to be stiffed and summarily terminated. Even worse, some of these employees have been targeted by the litigation sub-trust for acts they took in the course and scope of their employment.

Following the Effective Date, siphoning of estate assets continues. Mr. Seery still receives base compensation of $150,000 per month, and he expects to receive compensation of at least "a few million dollars a year" according to his own deposition testimony. In addition, his retention was conditioned upon receiving a to-be-negotiated success fee and severance payment (notably, none of which is disclosed publicly).

Likewise, Teneo Capital, LLC was retained as the litigation adviser. For its services post-Effective Date, it is compensated $20,000 per month for Mr. Kirschner as trustee for the Litigation Subtrust, plus the regularly hourly fees of any additional Teneo personnel, plus a "Litigation Recovery Fee." The Litigation Recovery Fee is equal to 1.5% of Net Litigation Proceeds up to $100 million and 2.0% of Net Litigation Proceeds above. Interestingly, although "Net Litigation Proceeds" is defined as gross litigation proceeds less certain fees incurred in pursing the litigation, net proceeds are not reduced by Mr. Kirschner's monthly fee, contingency fees charged by any other professionals, or litigation funding financing. Moreover, Teneo is given credit for any litigation recoveries regardless of whether those recoveries stem from actions commenced by the litigation trustee. The Debtor has not disclosed, and is not required to disclose, the terms upon which any professionals have been engaged following the Effective Date, including Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Litigation Subtrust. Based upon pre-Effective Date monthly expenses, the number of lawyers that attend various matters on behalf of the Debtor,[31] and the addition of Quinn Emanuel Urquhart & Sullivan, LLP and Teneo, we believe the Debtor could be spending as much as $5-$7 million per month.

The Reorganized Debtor and the Highland Claimant Trust recently filed heavily redacted, quarterly post-confirmation reports.[32] Of note, the Reorganized Debtor disclosed that it has disbursed $81,983,611 since the Effective Date but disclosed that it has only paid $47,793 in priority claims and $6,918,473 in general unsecured claims, while still estimating a total recovery to general unsecured claims of $205,144,544. The Highland Claimant Trust disclosed that it has disbursed an additional $7,152,331 since the Effective Date.

## CONCLUSION

The Highland bankruptcy is an extreme example of the abuses that can occur if the federal bench, federal government appointees, and federal lawmakers do not police federal bankruptcy proceedings by

---

[31] In connection with a recent two-day trial on an administrative claim, the Debtor was represented by John Morris ($1,245.00 per hour), Greg Demo ($950 per hour), and Hayley Winograd ($695 per hour), and was assisted by paralegal La Asia Canty ($460 per hour). The Debtor's local counsel, Zachery Annable ($300 per hour), was also present, and Jeffrey Pomerantz ($1,295 per hour) observed the trial via WebEx. Despite the army of lawyers, Mr. Morris handled virtually the entire proceeding, with Ms. Winograd examining only two small witnesses. Messrs. Pomerantz, Demo, and Annable played no active role in the proceedings.

[32] Dkt 3325 and 3326.

Ms. Nan R. Eitel
May 11, 2022
Page 20

permitting debtors-in-possession to hide material information, violate duties of transparency and candor, and manipulate information and transactions to benefit disclosed and undisclosed insiders or "friends" of insiders. Bankruptcy should not be an avenue for opportunistic venturers to prey upon companies to the detriment of third-party stakeholders and the bankruptcy estate. We therefore encourage your office to investigate the problems inherent in the Highland bankruptcy. At a minimum, we ask that the EOUST seek orders from the Bankruptcy Court compelling the Debtor to undertake the following actions:

1. turn over all financial reports that should have been disclosed during the pendency of the bankruptcy, including 2015.3 reports;

2. provide a detailed disclosure of the assets Reorganized Debtor;

3. provide a copy of the executed Claimant Trust Agreement, which should already have been disclosed;

4. disclose all solvency analyses prepared by the Debtor; and

5. provide copies of all agreements for the engagement of Debtor professionals post-confirmation, including the terms of Mr. Seery's success fee and severance agreement, compensation agreements for personnel of the Reorganized Debtor, and the fee arrangement with Quinn Emanuel Urquhart & Sullivan, LLP.

Sincerely,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.

DR:

4862-7970-5887v.1 019717.00004

# EXHIBIT A

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs the Dugaboy Investment Trust and the
Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| | § | |
| DUGABOY INVESTMENT TRUST and | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | _____ |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| HIGHLAND CLAIMANT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT TO (I) COMPEL DISCLOSURES
## ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND
## (II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND
## (B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST

CORE/3522697.0002/178862860.17

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("Hunter Mountain" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against defendants Highland Capital Management, L.P. ("HCMLP" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCMLP, the "Defendants"), seeking:  (1) disclosures about and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of those assets; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.      As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCMLP bankruptcy estate.

2.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that even with inflated claims and below market sales of assets, cash available is more than enough to pay class 8 and class 9 creditors in full.  Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities.  Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation.   That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or

---

[1] Capitalized terms not defined have the meanings set forth herein.  If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

CORE/3522697.0002/178862860.17

nothing for the owners that built the company.  While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity.  As this Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity.  In some cases, the protection is in the form of an equity committee; here a prompt valuation of the estate is needed.

3.  Upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Plaintiffs.  Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery, who he knew would approve his inflated compensation when the hidden but true value of the estate's assets were realized.  Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

4.  Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full.  Because of the lack of transparency to date, unless the relief sought herein is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

5.    By demonizing the estate equity holders, withholding information, and manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the potential for a grave miscarriage of justice.  The estate had over $550 million in assets on the petition date, with far less in non-disputed non-contingent liabilities.

6.    By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[2]

7.    On information and belief, the value of the assets in the estate as of 6/1/22 was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | **Low** | **High** |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
|    Highland Select Equity | $55.00 | | |
|    Highland MultiStrat Credit Fund | $51.44 | | |
|    MGM Shares | $26.00 | | |
|    Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
|    Remaining Assets | | | |
|    Highland CLO Funding, LTD | | $37.50 | $37.50 |
|    Korea Fund | | $18.00 | $18.00 |
|    SE Multifamily | | $11.98 | $12.10 |
|    Affiliate Notes[3] | | $50.00 | $60.00 |
|    Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022, annexed hereto as Exhibits 1, 2, and 3, as is further detail about claims buyers.
[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

8.      By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

9.      Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded to the over the many settlement offers from Mr. Dondero with a reorganization (as opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

10.      Instead, Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."    These transactions are particularly suspect because the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years later.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

11.      On information and belief, Mr. Seery provided that information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

CORE/3522697.0002/178862860.17

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

12.     Specifically, Mr. Seery could and should have investigated seeking sufficient funds from equity to pay all claims and return the estate to the equity holders.  This was an obvious path because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were sold, much of the massive administrative costs run up by the estate would never have been incurred.  One such avoided cost would be the post-effective date litigation now pursued by Mr. Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the cost of the Kirschner litigation).    But buying the claims to resolve the bankruptcy and enabling equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the hands of grateful business colleagues who received outsized rewards for the claims they were steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is transparency.

13.     But worse still, even with all of the manipulation that appears to have occurred, Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

CORE/3522697.0002/178862860.17

unnecessary litigation, would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

14. In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery.

15. Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

16. In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

CORE/3522697.0002/178862860.17

## JURISDICTION AND VENUE

17. This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

18. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

19. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

20. In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

## THE PARTIES

21. Dugaboy is a trust formed under the laws of Delaware.

22. Hunter Mountain is a trust formed under the laws of Delaware.

23. HCMLP is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

24. The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

25. On October 16, 2019 (the "Petition Date"), HCMLP, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

26. At the time of its chapter 11 filing, HCMLP had approximately $550 million in assets and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. [Dkt. No. 1943, ¶ 8]. HCMLP's reason for seeking

PLICATE OF EXHIBITS ATTACHED TO THE MOTION FOR LEAVE (Main Document) Page 306276 Page 10 of

bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million. Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

27.     At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCMLP and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCMLP and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCMLP management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

28.     To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCMLP's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCMLP during its bankruptcy.  The three board members were:

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

PLICATE OF CASE 19-34054-sgj11 DOCUMENT FOR LEAVE (Main Document) Page 366277 Page 11 of

a. James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);

b. John Dubel – (who was selected by Committee member UBS); and

c. Former Judge Russell Nelms – (who was selected by the Debtor).

29.    The Bankruptcy Court almost immediately let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by Judge Nelms, suggesting he was bamboozled because he was under management's spell.  Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about  . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

30.    At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121] In retrospect, this avoided scrutiny of the case by professionals

who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case. This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

31. Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

32. None of that happened. Almost immediately, Mr. Seery emerged as the de facto leader of the Independent Board. On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate. [Dkt. No. 854]. And although Mr. Seery publicly represented that he intended to restructure and preserve HCMLP's business, privately he was engineering a much different plan.

33. Indeed, Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control. For example, initially Mr. Seery reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team." He also testified: "My experience with our employees has been excellent. The response when we want to get something done, when I want to get something done, has been first-rate. The skill level is extremely high."

34. Yet despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the

CORE/3522697.0002/178862860.17

plan process, ultimately Mr. Seery fired most of those employees.  It was clear that Mr. Seery was firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of challenging Mr. Seery, lest they too be fired.

35.     From the start, and before there was much litigation to speak of, the Court regularly referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious litigant.  This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero a "transparently" vexatious litigant based pleadings she had only heard about from parties opposing Dondero and admittedly had not read herself.   Ironically, the first time Mr. Dondero was labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits initiated by the Debtor and had commented in proposed settlements in the case, but had not himself initiated any actions in the case.  Thereafter, though, the Debtor and its professionals repeated the mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing information about the estate with them.

36.     In addition to the Debtor's mistreatment of employees, under the control of the Independent Board, most of the ordinary checks and balances that the hallmark of bankruptcy were ignored.  Despite providing regular and robust financial information to the Committee, the Debtor inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including Plaintiffs, in the dark about the value of the estate and the mix of assets it held.    Amplifying the lack of transparency, Mr. Seery further engineered transactions to hide the real value of the estate.

37.     For example, he authorized the Debtor to settle the claims of HabourVest (which claims had initially been valued at $0) for $80 million, in order to acquire HarborVest's interest in Highland CLO Funding, Ltd. ("HCLOF"), gain HarborVest's vote in favor of its Plan, and hide

CORE/3522697.0002/178862860.17

the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary.  This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $40 million at the time and over $60 million 90 days later when the MGM sale was announced.

38.     At the same time, Mr. Seery and the Independent Board deliberately shut out equity holders from any discussion surrounding the plan of reorganization or HCMLP's efforts to emerge from bankruptcy as a going concern.  Indeed, as noted above, Mr. Seery failed to meaningfully respond to the many proposals made by residual equity holders to resolve the estate and never encouraged any dialogue between creditors and equity holders.  These failures only contributed to the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly undermined an efficient exit from bankruptcy.

39.     Worse still, while knowing that HCMLP had sufficient resources to emerge from bankruptcy as a going concern (and, on information and belief, while knowing that the estate was solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that contemplated HCMLP's continued post-confirmation existence.  Instead, and inexplicably, the very first plan proposed contemplated liquidation of the company, as did all subsequent plans.

40.     While secretly engineering the total destruction of HCMLP, Mr. Seery also privately settled multiple proofs of claim against the estate at inflated levels that were unreasonable multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and vehement objection to many of the claims as baseless.  But instead of litigating those objections in a manner that would have exposed the true value of the claims, on information and belief, Mr. Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values. That is, the inflated values softened up claims sellers to be willing to sell. Had the Debtor instead

CORE/3522697.0002/178862860.17

fought the inflated proofs of claim in open court, it could have settled the claims for closer to true value and ensured that the estate had sufficient resources to pay them.

41.    It is also no coincidence that virtually all original proofs of claim were sold to buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

42.    That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate.  It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense.  In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic.  Given the sophistication of the claims-buyers, their purchases of claims at prices that exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

43.    And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know).  In October 2022, $250 million was paid to Class 8 holders.  That is about 85% of the inflated proofs of claim and $90 million more than plan projections.  On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come.  On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million.

CORE/3522697.0002/178862860.17

44.     At the same time, the Claimant Trust has made no distributions to Contingent Claimant Trust Interest holders and has argued in various proceedings that no such distributions are likely.  No wonder. The cost of holding open the estate, including unnecessary litigation costs, appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such distributions can occur, even though it can now be projected that the litigation is not needed to pay creditors.  *See* Docket No. 3410-1.

45.     It is worth noting that it appears that virtually all of the claims trades brokered on behalf of Committee members seem to have occurred while those entities remained on the Committee.  Yet at the outset of their service, Committee members were instructed by the United States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."  Thus, the claims trades violated Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other Debtor professionals, to the detriment of creditors and residual equity holders.

46.     The sales of claims were not the only transactions shrouded in secrecy.  As further detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding, no data room, and without inviting equity (which may have at one time had the knowledge to make the highest bid) to participate in the sales process.  Indeed, on occasion assets were sold for amounts less that Mr. Dondero's written offers. This exacerbated the harms caused by the lack of transparency characterized by the Court's indifference to the Debtor's complete failure to abide its Rule 2015 disclosure obligations.

47.     In short, the lack of transparency combined with at least the appearance of bias, if not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to

manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that could have been resolved with money left over for equity but for that manipulation.

## STATEMENT OF FACTS

### A.    Plaintiffs Hold Contingent Claimant Trust Interests

48.    As of the Petition Date, HCMLP had three classes of limited partnership interests (Class A, Class B, and Class C).  *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

49.    The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCMLP's general partner.  The Class B and C interests were held by Hunter Mountain.  *Id.*

50.    In the aggregate, HCMLP's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

51.    On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

52.    In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9.  *See* Plan, Article III, ¶ H(8) and (9).

53.    In the Plan, HCMLP classified Hunter Mountain's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest.  *See* Plan, Article III, ¶ H(10) and (11).

54.     According to the Plan, Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.  *See* Plan, Article I, ¶44.

55.     In the Confirmation Order, the Court found that the Plan properly separately classified those equity interests because they represent different types of equity security interests in HCMLP and different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended (the "Limited Partnership Agreement").  Confirmation Order, ¶36; Limited Partnership Agreement, §3.9 (Liquidation Preference).

56.     The Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy.  In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCMLP and therefore "technically" had standing to object to the Plan. *See* Confirmation Order, ¶¶ 17-18.

57.     Based on the Debtor's financial projections at the time of confirmation, however, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

58.     The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCMLP became the Reorganized Debtor (as defined in the Plan) on the Effective Date.  *See* Notice of Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700].

59.     The Plan created the Claimant Trust, which was established for the benefit of Claimant Trust Beneficiaries, which is defined to mean:

the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed

Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1(h).

60.     Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

61.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

62.     In its Post Confirmation Quarterly Report for the Third Quarter of 2022 [Docket No. 3582], Debtor stated that it distributed $255,201,228 to holders of general unsecured claims, which is 64% of the total allowed general unsecured claims of $387,485,568.  This amount is far greater than was anticipated at the time of confirmation of the Plan.

**B.     Debtor Has Failed To Disclose Claimant Trust Asse**ts

63.     Upon information and belief, the value of the estate as held in the Claimant Trust has changed markedly since Plan confirmation.  Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

64.     The estate is solvent and has always been solvent.  Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.

65. As noted above, by June of 2022, starting with $125 million in cash, the estate liquidated other assets of over $416 million, building a cash war chest of over $541 million. Thus, with the remaining less-liquid assets, the total value of the estate's assets as of June 2022 was over $688 million.

66. Contrasting those assets with the claims against the estate demonstrates that further collection of assets was (and is) unnecessary.

67. As set forth above, while the inflated face amount of the claims was $365 million, those claims were sold for about $150 million. The estate therefore easily had the resources to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

68. Instead, Mr. Seery liquidated estate assets at less-than-optimal prices, without competitive process, without including residual equity holders, and in all cases required strict non-disclosure agreements from the buyers to prevent any information flowing to the public, the residual equity, or the Court. This uncharacteristic secrecy enabled Mr. Seery and the professionals to maintain the delicate balance of keeping just enough assets to pay professionals and incentive fees but still maintain the pretense that further litigation was needed.

69. Each effort by Plaintiffs, Mr. Dondero and related companies to obtain information to attempt to stop the continued looting has been vigorously opposed, and ultimately rejected by an apparently biased Court. Plaintiffs were unable to force the Debtor to provide the most basic of reports, including Rule 2015 statements, and Plaintiffs' efforts to obtain even the most basic details regarding asset sales and professional fees have all been denied. Rather, such details are in the hands of a select few, such as the Oversight Board of the Claimant Trust.

70. The Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust

Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate.  *See* Plan, ¶Art. IV(B)(9).

71.    But no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests, even though Plaintiffs, as contingent beneficiaries of a Delaware statutory trust, are entitled to financial information relating to the trust.

**C.    Plaintiffs Are Kirschner Adversary Proceeding Defendants**

72.    On October 15, 2021, Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust, commenced the Kirschner Adversary Proceeding against twenty-three defendants, including Plaintiffs, alleging various causes of action.  *See Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. James Dondero*, et al., Adv. Pro. No. 21-03076-sgj, Adv. Proc. No. 21-03076, Docket No. 1 (as amended by Docket No. 158).

73.    The Litigation Sub-Trust was established within the Claimant Trust as a wholly owned subsidiary of the Claimant Trust for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, with any proceeds therefrom to be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries.  *See* Plan, Article IV, ¶ (B)(4).

74.    Any recovery from the Kirschner Adversary Proceeding will be distributed to Claimant Trust Beneficiaries.

75.    Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

76.    The Litigation Sub-Trust is pursuing claims against Plaintiffs in the Kirschner Adversary Proceeding, which, if they become Claimant Trust Beneficiaries, would be the

CORE/3522697.0002/178862860.17

recipients of distributions of such recovery (less the cost of litigation). Therefore, Plaintiffs need the requested information in order to properly analyze and evaluate the claims asserted against them in the Kirschner Adversary Proceeding and to determine whether those claims have any validity.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(Disclosures of Claimant Trust Assets and Request for Accounting)**

77.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

78.     Due to the lack of transparency into the assets of the Claimant Trust, Plaintiffs are unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust Interests.

79.     Certain information about the Claimant Trust Assets has already been provided to others, including Claimant Trust Beneficiaries and the Oversight Board for the Claimant Trust.

80.     Information about the Claimant Trust Assets would help Plaintiffs evaluate whether settlement of the Kirschner Adversary Proceeding is feasible, which would further the administration of the bankruptcy estate, benefitting all parties in interest.

81.     This Court specifically retained jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan. *See* Plan, Article XI.

82.     The Plan provides that distributions to Allowed Equity Interests will be accomplished through the Claimant Trust and Contingent Claimant Trust Interests. *See* Plan Article III, (H)(10) and (11).

83.     The Defendants should be compelled to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets, and its liabilities.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment Regarding Value of Claimant Trust Assets)

84.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

85.     Once Defendants are compelled to provide information about the Claimant Trust assets, Plaintiffs seek a determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations.

86.     If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at recovering value for HCMLP's estate are not necessary to pay creditors in full.  As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close.

87.     In addition, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Mr. Kirschner, and Hayward & Associates—are continuing to incur millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or could be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.  Fees for Pachulski range from $460 an hour for associates to $1,265 per hour for partners, and fees for Quinn Emanuel lawyers range from $830 an hour for first year associate to over $2100 per hour for senior partners.  At these rates, depletion of the estate will occur rapidly.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment and Determination Regarding Nature of Plaintiff's Interests)

88.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

CORE/3522697.0002/178862860.17

APP 826

89. In the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid, Plaintiffs seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries.[6]

90. Such a declaration and a determination by the Court would further assist parties in interest, such as Plaintiffs, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement.

WHEREFORE, Plaintiffs pray for judgment as follows:

(i) On the First Claim for Relief, Plaintiffs seek an order compelling Defendants to disclose the assets currently held in the Claimant Trust; and

(ii) On the Second Claim for Relief, Plaintiffs seek a determination of the relative value of those assets in comparison to the claims of the Claimant Trust Beneficiaries; and

(iii) On the Third Claim for Relief, Plaintiffs seek a determination that the conditions are such that all current Claimant Trust Beneficiaries could be paid in full, with such payment causing Plaintiffs' Contingent Claimant Trust Interests to vest into Claimant Trust Interests; and

---

[6] To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement.

(iv)    Such other and further relief as this Court deems just and proper.

Dated: February __, 2023

Respectfully submitted,

**STINSON LLP**

*Draft*_____
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for the Dugaboy Investment Trust
and the Hunter Mountain Investment Trust*

CORE/3522697.0002/178862860.17

# EXHIBIT A-1

# HELLER, DRAPER & HORN, L.L.C.

### *A T T O R N E Y S  A T  L A W*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA  70130-6103
TELEPHONE: (504) 299-3300  FAX: (504) 299-3399

Douglas S. Draper
Direct Dial:  (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

   **Re:   *Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11***

Dear Nan,

   The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers. Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

   By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

{00376610-1}

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

1.     **The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports**

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

{00376610-1}

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires."  *See*
http://justice.gov/ust/chapter-11-information  (citing  11  U.S.C.  §  1106(a)(1),  1107(a)).    And
Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession
shall file periodic financial reports of the value, operations, and profitability of each entity that is
not a publicly traded corporation or a debtor in a case under title 11, and in which the estate
holds  a  substantial  or  controlling  interest."    This  rule  requires  the  trustee  or  debtor  in
possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and
every six months thereafter until the effective date of a plan of reorganization.  Fed R. Bankr. P.
2015.3(b).  Importantly, the rule does not absolve a debtor from filing reports due prior to the
effective date merely because a plan has become effective.[3]  Notably, the U.S. Trustee has the
duty to ensure that debtors in possession properly and timely file all required reports.  28 U.S.C.
§ 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders
can  fairly  evaluate  the  progress  of  bankruptcy  proceedings,  including  compliance  with  legal
requirements.    In  fact,  11  U.S.C.  §  1102(b)(3)  requires  a  creditors'  committee  to  share
information it receives with those who "hold claims of the kind represented by the committee"
but  are  not  appointed  to  the  committee.    In  the  case  of  the  Highland  bankruptcy,  the
transparency that the EOUST mandates and that creditors' committees are supposed to facilitate
has  been  conspicuously  absent.    I  have  been  involved  in  a  number  of  bankruptcy  cases
representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's
structure here.  In those cases, when asked by third parties (shareholders or potential claims
purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3
reports.  In this case, however, no Rule 2015.3 reports were filed, and financial information that
might  otherwise  be  gleaned  from  the  Bankruptcy  Court  record  is  unavailable  because  a  large
number of documents were filed under seal or heavily redacted.  As a result, the only means to
make an informed decision as to whether to purchase creditor claims and what to pay for those
claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of
the reports required under Bankruptcy Rule 2015.3.  There should have been at least four such
reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings.  The
U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention
of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office.  During the hearing on Plan
confirmation, the Debtor was questioned about the failure to file the reports.  The sole excuse
offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was
that the task "fell through the cracks."[4]  This excuse makes no sense in light of the years of
bankruptcy experience of the Debtor's counsel and financial advisors.  Nor did the Debtor or its
counsel ever attempt to show "cause" to gain exemption from the reporting requirement.  That is
because there was no good reason for the Debtor's failure to file the required reports.  In fact,
although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a
"byzantine empire," the assets of the estate fall into a handful of discrete investments, most of
which have audited financials and/or are required to make monthly or quarterly net-asset-value
or fair-value determinations.[5]    Rather  than  disclose  financial  information  that  was  readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for
cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e]
reporting requirements, or that the information required by subdivision (a) is publicly available."  Fed. R. Bankr.
2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets
"[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

{00376610-1}

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

**2.** **There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates**

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6] The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).
[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

{00376610-1}

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7] Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information. Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3. The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court. On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses. The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses. In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level. Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out." Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so. While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9] That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute. Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims. In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10]  If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor.  The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11]  It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12]  This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.   Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases.  Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions.  Several parties have appealed this issue to the Fifth Circuit.

**4.     The Lack Of Transparency Facilitated Potential Insider Trading**

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information.  The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely.  But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup").  The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill").  As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

{00376610-1}

October 5, 2021

Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing.  In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand.  What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20]  Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009.  While at Lehman, Mr. Seery did a substantial amount of business with Farallon.  After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues.  He left River Birch in October 2017 just before the fund imploded.  In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[19] *See* Appendix, pp. A-25, A-28.

[20] *See* Appendix, pp. A-2; A-62 – A-69.

{00376610-1}

October 5, 2021
Page 9

committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

{00376610-1}

October 5, 2021
Page 10

> In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a)   The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)   Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)   The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d)   The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers  and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e)   The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f)   There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

{00376610-1}

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming.  Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery.  The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer.  If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties.  The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim.  The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members.  At the very least, there is enough credible evidence to warrant an investigation.  It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent.  The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders.  A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate.  In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

# EXHIBIT A-2



Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**<u>Via E-Mail and Federal Express</u>**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530
Nan.r.Eitel@usdoj.gov

   Re: Highland Capital Management, L.P. Bankruptcy Case
     Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

   I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case.  I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests.  I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter.  So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

   I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority.  Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds.  To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders.  Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate.   I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

   The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

### Highland Capital Management and its Founder, James Dondero

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

### Circumstances Precipitating Bankruptcy

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are:  (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### In Highland's Bankruptcy, the Regulatory Framework Is Ignored

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).
[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining □2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See* "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

Ms. Nan R. Eitel
November 3, 2021
Page 9

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here.   In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

PLICATE OF EXHIBITS ATTACHED TO THE MOTION FOR LEAVE (MAIN DOCUMENT) Doc 3662-14 Page 48 of

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| TOTAL: | $269,6969,610 | $95,000,000 | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.
[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] *See* Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1) If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)    If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization. Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

PLICATE OF EXHIBITS ATTACHED TO THE MOTION FOR LEAVE (MAIN DOCUMENT) Doc 3662-1 Page 53 of

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.

[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.

[30] Dkt. 854, ¶ 4 & Exh. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds— i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____
Davor Rukavina, Esq.

DR:pdm

PLICATE OF EXHIBITS ATTACHED TO THE MOTION FOR LEAVE (Main Document) Page 57 of

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ....................................... 2

Debtor Protocols [Doc. 466-1] ................................................................................................................ 3

Seery Jan. 29, 2021 Testimony ............................................................................................................. 15

Sale of Assets of Affiliates or Controlled Entities .............................................................................. 24

20 Largest Unsecured Creditors ........................................................................................................... 25

Timeline of Relevant Events ................................................................................................................. 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ........................................................ 27

Updated Liquidation Analysis (Feb. 1, 2021) ...................................................................................... 28

Summary of Debtor's January 31, 2021 Monthly Operating Report .................................................. 29

Value of HarbourVest Claim ................................................................................................................. 30

Estate Value as of August 1, 2021 (in millions) ................................................................................. 31

HarbourVest Motion to Approve Settlement [Doc. 1625] .................................................................. 32

UBS Settlement [Doc. 2200-1] ............................................................................................................. 45

Hellman & Friedman Seeded Farallon Capital Management ............................................................. 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ....................................................... 63

Farallon was a Significant Borrower for Lehman ................................................................................ 65

Mr. Seery Represented Stonehill While at Sidley ............................................................................... 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders .................................................. 70



Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?

Page A-2

Debtor Protocols [Doc. 466-1]

I.    **Definitions**

A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities on **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

**Page A-3**

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.    "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.    "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.    "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.  **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.    **Covered Entities**: N/A (See entities above).

B.    **Operating Requirements**

    1.   Ordinary Course Transactions do not require Court approval (All Stages).

        a)   Stage 1 and Stage 2:  ordinary course determined by the CRO.

        b)   Stage 3: ordinary course determined by the Debtor.

    2.   Related Entity Transactions

        a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)   Stage 3:

            (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

**Page A-4**

             (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

      3.    Third Party Transactions (All Stages)

          a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

          b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

          c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

    C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**     **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

    B.    **Operating Requirements**

      1.    Ordinary Course Transactions do not require Court approval (All Stages).

          a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

          b)    Stage 3: ordinary course determined by the Debtor.

      2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a)   <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   <u>Stage 3</u>:

   (1)   Transactions with Related Entities greater than \$1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   (2)   Transactions with Related Entities greater than \$2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.   Third Party Transactions (All Stages)

a)   Except as set forth in (b) and (c) below, Transactions in excess of \$2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV. **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B. **Operating Requirements**

    1. Ordinary Course Transactions do not require Court approval (All Stages).

        a) Stage 1 and Stage 2: ordinary course determined by the CRO.

        b) Stage 3: ordinary course determined by the Debtor.

    2. Related Entity Transactions

        a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b) Stage 3:

           (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

           (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3. Third Party Transactions (All Stages):

        a) Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**Page A-7**

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

**V.   Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**Page A-8**

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.    Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.    Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.    Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**Page A-9**

**X.**     **Representations and Warranties**

    A.     The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.     The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.     The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

**Page A-10**

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

**Page A-11**

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

**Page A-12**

**Schedule B**

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

```
                                                        Page 1
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   -----------------------------)

 5   In Re:                  Chapter 11

 6   HIGHLAND CAPITAL        Case No.

 7   MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9        Debtor

10   -----------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

Page 2

```
1              January 29, 2021
2              9:00 a.m. EST
3
4         Remote Deposition of JAMES P.
5    SEERY, JR., held via Zoom
6    conference, before Debra Stevens,
7    RPR/CRR and a Notary Public of the
8    State of New York.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    REMOTE APPEARANCES:
2
3    Heller, Draper, Hayden, Patrick, & Horn
4    Attorneys for The Dugaboy Investment
5    Trust and The Get Good Trust
6         650 Poydras Street
7         New Orleans, Louisiana 70130
8
9
10   BY:    DOUGLAS DRAPER, ESQ
11
12
13   PACHULSKI STANG ZIEHL & JONES
14   For the Debtor and the Witness Herein
15         780 Third Avenue
16         New York, New York 10017
17   BY:    JOHN MORRIS, ESQ.
18         JEFFREY POMERANTZ, ESQ.
19         GREGORY DEMO, ESQ.
20         IRA KHARASCH, ESQ.
21
22
23
24              (Continued)
25
```

Page 4

```
1    REMOTE APPEARANCES:  (Continued)
2
3    LATHAM & WATKINS
4    Attorneys for UBS
5         885 Third Avenue
6         New York, New York 10022
7    BY:    SHANNON McLAUGHLIN, ESQ.
8
9    JENNER & BLOCK
10   Attorneys for Redeemer Committee of
11   Highland Crusader Fund
12         919 Third Avenue
13         New York, New York 10022
14   BY:    MARC B. HANKIN, ESQ.
15
16   SIDLEY AUSTIN
17   Attorneys for Creditors' Committee
18         2021 McKinney Avenue
19         Dallas, Texas 75201
20   BY:    PENNY REID, ESQ.
21         MATTHEW CLEMENTE, ESQ.
22         PAIGE MONTGOMERY, ESQ.
23
24              (Continued)
25
```

Page 5

```
1    REMOTE APPEARANCES:  (Continued)
2    KING & SPALDING
3    Attorneys for Highland CLO Funding, Ltd.
4         500 West 2nd Street
5         Austin, Texas 78701
6    BY:    REBECCA MATSUMURA, ESQ.
7
8    K&L GATES
9    Attorneys for Highland Capital Management
10   Fund Advisors, L.P., et al.:
11         4350 Lassiter at North Hills
12         Avenue
13         Raleigh, North Carolina 27609
14   BY:    EMILY MATHER, ESQ.
15
16   MUNSCH HARDT KOPF & HARR
17   Attorneys for Defendants Highland Capital
18   Management Fund Advisors, LP; NexPoint
19   Advisors, LP; Highland Income Fund;
20   NexPoint Strategic Opportunities Fund and
21   NexPoint Capital, Inc.:
22         500 N. Akard Street
23         Dallas, Texas 75201-6659
24   BY:  DAVOR RUKAVINA, ESQ.
25              (Continued)
```

**Page A-16**

Page 6

```
1   REMOTE APPEARANCES (Continued)
2
3   BONDS ELLIS EPPICH SCHAFER JONES
4   Attorneys for James Dondero,
5   Party-in-Interest
6          420 Throckmorton Street
7
8          Fort Worth, Texas 76102
9   BY:   CLAY TAYLOR, ESQ.
10         JOHN BONDS, ESQ.
11         BRYAN ASSINK, ESQ.
12
13
14  BAKER McKENZIE
15  Attorneys for Senior Employees
16         1900 North Pearl Street
17
18         Dallas, Texas 75201
19  BY:   MICHELLE HARTMANN, ESQ.
20         DEBRA DANDEREAU, ESQ.
21
22
23
24                 (Continued)
25
```

Page 7

```
1   REMOTE APPEARANCES: (Continued)
2
3   WICK PHILLIPS
4   Attorneys for NexPoint Real Estate
5   Partners, NexPoint Real Estate Entities
6   and NexBank
7          100 Throckmorton Street
8           Fort Worth, Texas 76102
9   BY:   LAUREN DRAWHORN, ESQ.
10
11  ROSS & SMITH
12  Attorneys for Senior Employees, Scott
13  Ellington, Isaac Leventon, Thomas Surgent,
14  Frank Waterhouse
15         700 N. Pearl Street
16         Dallas, Texas 75201
17  BY:   FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
1
2        E X A M I N A T I O N S
3   WITNESS                          PAGE
4   JAMES SEERY
5    By Mr. Draper                    9
6    By Mr. Taylor                   75
7    By Mr. Rukavina                165
8    By Mr. Draper                  217
9          E X H I B I T S
10  SEERY DYD
    EXHIBIT     DESCRIPTION          PAGE
11
    Exhibit 1   January 2021 Material  11
12
    Exhibit 2   Disclosure Statement   14
13
    Exhibit 3   Notice of Deposition   74
14
15
    INFORMATION/PRODUCTION REQUESTS
16  DESCRIPTION                      PAGE
17  Subsidiary ledger showing note    22
    component versus hard asset
18  component
19  Amount of D&O coverage for       131
    trustees
20
    Line item for D&O insurance      133
21
22           MARKED FOR RULING
             PAGE   LINE
23            85     20
24
25
```

Page 9

```
1
2        COURT REPORTER:  My name is
3   Debra Stevens, court reporter for TSG
4   Reporting and notary public of the
5   State of New York.  Due to the
6   severity of the COVID-19 pandemic and
7   following the practice of social
8   distancing, I will not be in the same
9   room with the witness but will report
10  this deposition remotely and will
11  swear the witness in remotely.  If any
12  party has any objection, please so
13  state before we proceed.
14         Whereupon,
15       J A M E S   S E E R Y,
16  having been first duly sworn/affirmed,
17  was examined and testified as follows:
18  EXAMINATION BY
19  MR. DRAPER:
20     Q.   Mr. Seery, my name is Douglas
21  Draper, representing the Dugaboy Trust.  I
22  have series of questions today in
23  connection with the 30(b) Notice that we
24  filed.  The first question I have for you,
25  have you seen the Notice of Deposition
```

**Page A-17**

**Page 14**

```
1              J. SEERY
2     the screen, please?
3     A.    Page what?
4     Q.    I think it is page 174.
5     A.    Of the PDF or of the document?
6     Q.    Of the disclosure statement that
7  was filed.  It is up on the screen right
8  now.
9           COURT REPORTER:  Do you intend
10    this as another exhibit for today's
11    deposition?
12          MR. DRAPER:  We'll mark this
13    Exhibit 2.
14          (So marked for identification as
15    Seery Exhibit 2.)
16    Q.    If you look to the recovery to
17 Class 8 creditors in the November 2020
18 disclosure statement was a recovery of
19 87.44 percent?
20    A.    That actually says the percent
21 distribution to general unsecured
22 creditors was 87.44 percent.  Yes.
23    Q.    And in the new document that was
24 filed, given to us yesterday, the recovery
25 is 62.5 percent?
```

**Page 15**

```
1              J. SEERY
2     A.    It says the percent distribution
3  to general unsecured creditors is
4  62.14 percent.
5     Q.    Have you communicated the
6  reduced recovery to anybody prior to the
7  date -- to yesterday?
8           MR. MORRIS:  Objection to the
9     form of the question.
10    A.    I believe generally, yes.  I
11 don't know if we have a specific number,
12 but generally yes.
13    Q.    And would that be members of the
14 Creditors' Committee who you gave that
15 information to?
16    A.    Yes.
17    Q.    Did you give it to anybody other
18 than members of the Creditors' Committee?
19    A.    Yes.
20    Q.    Who?
21    A.    HarbourVest.
22    Q.    And when was that?
23    A.    Within the last two months.
24    Q.    You did not feel the need to
25 communicate the change in recovery to
```

**Page 16**

```
1              J. SEERY
2  anybody else?
3     A.    I said Mr. Doherty.
4     Q.    In looking at the two elements,
5  and what I have asked you to look at is
6  the claims pool.  If you look at the
7  November disclosure statement, if you look
8  down Class 8, unsecured claims?
9     A.    Yes.
10    Q.    You have 176,000 roughly?
11    A.    Million.
12    Q.    176 million.  I am sorry.  And
13 the number in the new document is 313
14 million?
15    A.    Correct.
16    Q.    What accounts for the
17 difference?
18    A.    An increase in claims.
19    Q.    When did those increases occur?
20 Were they yesterday?  A month ago?  Two
21 months ago?
22    A.    Over the last couple months.
23    Q.    So in fact over the last couple
24 months you knew in fact that the recovery
25 in the November disclosure statement was
```

**Page 17**

```
1              J. SEERY
2  not accurate?
3     A.    Yes.  We secretly disclosed it
4  to the Bankruptcy Court in open court
5  hearings.
6     Q.    But you never did bother to
7  calculate the reduced recovery; you just
8  increased --
9           (Reporter interruption.)
10    Q.    You just advised as to the
11 increased claims pool.  Correct?
12          MR. MORRIS:  Objection to the
13    form of the question.
14    A.    I don't understand your
15 question.
16    Q.    What I am trying to get at is,
17 as you increase the claims pool, the
18 recovery reduces.  Correct?
19    A.    No.  That is not how a fraction
20 works.
21    Q.    Well, if the denominator
22 increases, doesn't the recovery ultimately
23 decrease if --
24    A.    No.
25    Q.    -- if the numerator stays the
```

**Page A-18**

Page 26

```
1              J. SEERY
2   were amended without consideration a few
3   years ago.  So, for our purposes we didn't
4   make the assumption, which I am sure will
5   happen, a fraudulent conveyance claim on
6   those notes, that a fraudulent conveyance
7   action would be brought.  We just assumed
8   that we'd have to discount the notes
9   heavily to sell them because nobody would
10  respect the ability of the counterparties
11  to fairly pay.
12       Q.    And the same discount was
13  applied in the liquidation analysis to
14  those notes?
15       A.    Yes.
16       Q.    Now --
17       A.    The difference -- there would be
18  a difference, though, because they would
19  pay for a while because they wouldn't want
20  to accelerate them.  So there would be
21  some collections on the notes for P and I.
22       Q.    But in fact as of January you
23  have accelerated those notes?
24       A.    Just one of them, I believe.
25       Q.    Which note was that?
```

Page 27

```
1              J. SEERY
2       A.    NexPoint, I said.  They
3   defaulted on the note and we accelerated
4   it.
5       Q.    So there is no need to file a
6   fraudulent conveyance suit with respect to
7   that note.  Correct, Mr. Seery?
8         MR. MORRIS:  Objection to the
9       form of the question.
10      A.    Disagree.  Since it was likely
11  intentional fraud, there may be other
12  recoveries on it.  But to collect on the
13  note, no.
14      Q.    My question was with respect to
15  that note.  Since you have accelerated it,
16  you don't need to deal with the issue of
17  when it's due?
18        MR. MORRIS:  Objection to the
19      form of the question.
20      A.    That wasn't your question.  But
21  to that question, yes, I don't need to
22  deal with when it's due.
23      Q.    Let me go over certain assets.
24  I am not going to ask you for the
25  valuation of them but I am going to ask
```

Page 28

```
1              J. SEERY
2   you whether they are included in the asset
3   portion of your $257 million number, all
4   right?  Mr. Morris didn't want me to go
5   into specific asset value, and I don't
6   intend to do that.
7         The first question I have for
8   you is, the equity in Trustway Highland
9   Holdings, is that included in the
10  $257 million number?
11      A.    There is no such entity.
12      Q.    Then I will do it in a different
13  way.  In connection with the sale of the
14  hard assets, what assets are included in
15  there specifically?
16      A.    Off the top of my head -- it is
17  all of the assets, but it includes
18  Trustway Holdings and all the value that
19  flows up from Trustway Holdings.  It
20  includes Targa and all the value that
21  flows up from Targa.  It includes CCS
22  Medical and all the value that would flow
23  to the Debtor from CCS Medical.  It
24  includes Cornerstone and all the value
25  that would flow from Cornerstone.  It
```

Page 29

```
1              J. SEERY
2   includes any other securities and all the
3   value that would flow from Cornerstone.
4   It includes HCLOF and all the value that
5   would flow up from HCLOF.  It includes
6   Korea and all the value that would flow up
7   from Korea.
8         There may be others off the top
9   of my head.  I don't recall them.  I don't
10  have a list in front of me.
11      Q.    Now, with respect to those
12  assets, have you started the sale process
13  of those assets?
14      A.    No.  Well, each asset is
15  different.  So, the answer is, with
16  respect to any securities, we do seek to
17  sell those regularly and we do seek to
18  monetize those assets where we can
19  depending on whether there is a
20  restriction or not and whether there is
21  liquidity in the market.
22        With respect to the PE assets or
23  the companies I described -- Targa, CCS,
24  Cornerstone, JHT -- we have not --
25  Trustway.  We have not sought to sell
```



**Page 38**

1          J. SEERY
2     A.   I don't recall the specific
3 limitation on the trust.  But if there was
4 a reason to hold on to the asset, if there
5 is a limitation, we can seek an extension.
6     Q.   Let me ask a question.  With
7 respect to these businesses, the Debtor
8 merely owns an equity interest in them.
9 Correct?
10     A.   Which business?
11     Q.   The ones you have identified as
12 operating businesses earlier?
13     A.   It depends on the business.
14     Q.   Well, let me -- again, let's try
15 to be specific.  With respect to SSP, it
16 was your position that you did not need to
17 get court approval for the sale.  Correct?
18     A.   That's correct.
19     Q.   Which one of the operating
20 businesses that are here, that you have
21 identified, do you need court authority
22 for a sale?
23          MR. MORRIS:  Objection to the
24     form of the question.
25     A.   Each of the businesses will be a

**Page 39**

1          J. SEERY
2 different analysis that we'll undertake
3 with bankruptcy counsel to determine what
4 we would need depending on when it is
5 going to happen and what the restrictions
6 either under the code are or under the
7 plan.
8     Q.   Is there anything that would
9 stop you from selling these businesses if
10 the Chapter 11 went on for a year or two
11 years?
12          MR. MORRIS:  Objection to form
13     of the question.
14     A.   Is there anything that would
15 stop me?  We'd have to follow the
16 strictures of the code and the protocols,
17 but there would be no prohibition -- let
18 me finish, please.
19          There would be no prohibition
20 that I am aware of.
21     Q.   Now, in connection with your
22 differential between the liquidation of
23 what I will call the operating businesses
24 under the liquidation analysis and the
25 plan analysis, who arrived at the discount

**Page 40**

1          J. SEERY
2 or determined the discount that has been
3 placed between the two, plan analysis
4 versus liquidation analysis?
5          MR. MORRIS:  Objection to form
6     of the question.
7     A.   To which document are you
8 referring?
9     Q.   Both the June -- the January and
10 the November analysis has a different
11 estimated proceeds for monetization for
12 the plan analysis versus the liquidation
13 analysis.  Do you see that?
14     A.   Yes.
15     Q.   And there is a note under there.
16 "Assumes Chapter 7 trustee will not be
17 able to achieve the same sales proceeds as
18 Claimant trustee."
19     A.   I see that, yes.
20     Q.   Do you see that note?
21     A.   Yes.
22     Q.   Who arrived at that discount?
23     A.   I did.
24     Q.   What percentage did you use?
25     A.   Depended on the asset.  Each one

**Page 41**

1          J. SEERY
2 is different.
3     Q.   Is the discount a function of
4 capability of a trustee versus your
5 capability, or is the discount a function
6 of timing?
7          MR. MORRIS:  Objection to form.
8     A.   It could be a combination.
9     Q.   So, let's -- let me walk through
10 this.  Your plan analysis has an
11 assumption that everything is sold by
12 December 2022.  Correct?
13     A.   Correct.
14     Q.   And the valuations that you have
15 used here for the monetization assume a
16 sale between -- a sale prior to December
17 of 2022.  Correct?
18     A.   Sorry.  I don't quite understand
19 your question.
20     Q.   The 257 number, and then let's
21 take out the notes.  Let's use the 210
22 number.
23          MR. MORRIS:  Can we put the
24     document back on the screen, please?
25     Sorry, Douglas, to interrupt, but it

**Page A-20**

Page 42

```
1              J. SEERY
2   would be helpful.
3        MR. DRAPER:  That is fine, John.
4        (Pause.)
5        MR. MORRIS:  Thank you very
6   much.
7        Q.    Mr. Seery, do you see the 257?
8        A.    In the one from yesterday?
9        Q.    Yes.
10       A.    Second line, 257,941.  Yes.
11       Q.    That assumes a monetization of
12   all assets by December of 2022?
13       A.    Correct.
14       Q.    And so everything has been sold
15   by that time; correct?
16       A.    Yes.
17       Q.    So, what I am trying to get at
18   is, there is both the capability between
19   you and a trustee, and then the second
20   issue is timing.  So, what discount was
21   put on for timing, Mr. Seery, between when
22   a trustee would sell it versus when you
23   would sell it?
24       MR. MORRIS:  Objection.
25       Q.    What is the percentage you
```

Page 43

```
1              J. SEERY
2   applied?
3        A.    Each of the assets is different.
4        Q.    Is there a general discount that
5   you used?
6        A.    Not a general discount, no.  We
7   looked at each individual asset and went
8   through and made an assessment.
9        Q.    Did you apply a discount for
10   your capability versus the capability of a
11   trustee?
12       A.    No.
13       Q.    So a trustee would be as capable
14   as you are in monetizing these assets?
15       MR. MORRIS:  Objection to the
16   form of the question.
17       Q.    Excuse me?  The answer is?
18       A.    The answer is maybe.
19       Q.    Couldn't a trustee hire somebody
20   as capable as you are?
21       MR. MORRIS:  Objection to the
22   form of the question.
23       A.    Perhaps.
24       Q.    Sir, that is a yes or no
25   question.  Could the trustee hire somebody
```

Page 44

```
1              J. SEERY
2   as capable as you are?
3        MR. MORRIS:  Objection to the
4   form of the question.
5        A.    I don't know.
6        Q.    Is there anybody as capable as
7   you are?
8        MR. MORRIS:  Objection to the
9   form of the question.
10       A.    Certainly.
11       Q.    And they could be hired.
12   Correct?
13       A.    Perhaps.  I don't know.
14       Q.    And if you go back to the
15   November 2020 liquidation analysis versus
16   plan analysis, it is also the same note
17   about that a trustee would bring less, and
18   there is the same sort of discount between
19   the estimated proceeds under the plan and
20   under the liquidation analysis.
21       MR. MORRIS:  If that is a
22   question, I object.
23       Q.    Is that correct, Mr. Seery,
24   looking at the document?
25       A.    There are discounts, yes.
```

Page 45

```
1              J. SEERY
2        Q.    Again, the discounts are applied
3   for timing and capability?
4        A.    Yes.
5        Q.    Now, in looking at the November
6   plan analysis number of $190 million and
7   the January number of $257 million, what
8   accounts for the increase between the two
9   dates?  What assets specifically?
10       A.    There are a number of assets.
11   Firstly, the HCLOF assets are added.
12       Q.    How much are those?
13       A.    Approximately 22 and a half
14   million dollars.
15       Q.    Okay.
16       A.    Secondly, there is a significant
17   increase in the value of certain of the
18   assets over this time period.
19       Q.    Which assets, Mr. Seery?
20       A.    There are a number.  They
21   include MGM stock, they include Trustway,
22   they include Targa.
23       Q.    And what is the percentage
24   increase from November to January,
25   November of 2020 to January of 2021?
```



Page 46

1              J. SEERY
2      A.    Do you mean what is the
3  percentage increase from 190 to 257?
4      Q.    No.  You just identified three
5  assets.  MGM stock, we can go look at the
6  exchange and figure out what the price
7  increase is; correct?
8      A.    No.
9      Q.    Why not?  Is the MGM stock
10  publicly traded?
11      A.    Yes.  It doesn't trade on --
12      Q.    Excuse me?
13      A.    It doesn't trade on an exchange.
14      Q.    Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17      A.    There is a semipublic market;
18  yes.
19      Q.    So it is a number that is
20  readily available between the two dates?
21      A.    It's available.
22      Q.    Now, you identified Targa and
23  Trustway.  Correct?
24      A.    Yes.
25      Q.    Those are not readily available

Page 47

1              J. SEERY
2  markets; correct?
3      A.    No.
4      Q.    Those are operating businesses?
5      A.    Correct.
6      Q.    Who provided the valuation for
7  the November 2020 liquidation analysis?
8      A.    We use a combination of the
9  value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12      Q.    And the adjustment was up or
13  down?
14      A.    When?
15      Q.    For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19          MR. MORRIS:  Objection to form
20      of the question.
21      A.    I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.

Page 48

1              J. SEERY
2      Q.    And if I understand what you
3  just said, it is that the Houlihan Lokey
4  valuation for those two businesses showed
5  a significant increase between November of
6  2020 and January of 2021?
7          MR. MORRIS:  Objection to form
8      of the question.
9      A.    I didn't say that.
10      Q.    I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18      A.    I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23      Q.    So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 28th

Page 49

1              J. SEERY
2  of 2021, the magnitude being roughly 60
3  some odd million dollars.  Correct?
4      A.    Correct.
5      Q.    We can account for $22 million
6  of it easily, right?
7          MR. MORRIS:  Objection to form.
8      A.    Correct.
9      Q.    That is the HarbourVest
10  settlement, so that leaves roughly
11  $40 million unaccounted for?
12          MR. MORRIS:  Objection to the
13      form of the question if that is a
14      question.  It is accounted for.
15      Q.    What makes up that difference,
16  Mr. Seery?
17      A.    A change in the plan value of
18  the assets.
19      Q.    Okay.  Which assets?  Let's sort
20  of go back to where we were.
21      A.    There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up

Page 50

```
1              J. SEERY
2  for one.  On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7      Q.    Let me look at some numbers
8  again.  In the liquidation analysis in
9  November of 2020, the liquidation value is
10 $149 million.  Correct?
11     A.    Yes.
12     Q.    And in the liquidation analysis
13 in January of 2021, you have $191 million?
14     A.    Yes.
15     Q.    You see that number.  So there
16 is $51 million there, right?
17     A.    No.
18     Q.    What is the difference between
19 191 and -- sorry.  My math may be a little
20 off.  What is the difference between the
21 two numbers, Mr. Seery?
22     A.    Your math is off.
23     Q.    Sorry.  It is 41 million?
24     A.    Correct.
25     Q.    $22 million of that is the
```

Page 51

```
1              J. SEERY
2  HarbourVest settlement, right?
3      A.    I believe that's correct.
4      Q.    Is that fair, Mr. Seery?
5      A.    I believe that is correct, yes.
6      Q.    And part of that differential
7  are publicly traded or ascertainable
8  securities.  Correct?
9      A.    Yes.
10     Q.    And basically you can get, or
11 under the plan analysis or trustee
12 analysis, if it is a marketable security
13 or where there is a market, the
14 liquidation number should be the same for
15 both.  Is that fair?
16     A.    No.
17     Q.    And why not?
18     A.    We might have a different price
19 target for a particular security than the
20 current trading value.
21     Q.    I understand that, but I mean
22 that is based upon the capability of the
23 person making the decision as to when to
24 sell.  Correct?
25         MR. MORRIS:  Objection to form
```

Page 52

```
1              J. SEERY
2  of the question.
3      Q.    Mr. Seery, yes or no?
4      A.    I said no.
5      Q.    What is that based on, then?
6      A.    The person's ability to assess
7  the market and timing.
8      Q.    Okay.  And again, couldn't a
9  trustee hire somebody as capable as you to
10 both, A, assess the market and, B, make a
11 determination as to when to sell?
12         MR. MORRIS:  Objection to form
13 of the question.
14     A.    I suppose a trustee could.
15     Q.    And there are better people or
16 people equally or better than you at
17 assessing a market.  Correct?
18     A.    Yes.
19         MR. MORRIS:  Objection to form
20 of the question.
21     Q.    So, again, let's go back to
22 that.  We have accounted for, out of
23 $41 million where the liquidation analysis
24 increases between the two dates,
25 $22 million of it.  That leaves
```

Page 53

```
1              J. SEERY
2  $18 million.  How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5      A.    I don't know off the top of my
6  head the percentages.
7      Q.    All right.  The same question
8  for the plan analysis where you have the
9  differential between the November number
10 and the January number.  How much of it is
11 marketable securities versus an operating
12 business?
13     A.    I don't recall off the top of my
14 head.
15         MR. DRAPER:  Let me take a
16 few-minute break.  Can we take a
17 ten-minute break here?
18         THE WITNESS:  Sure.
19         (Recess.)
20 BY MR. DRAPER:
21     Q.    Mr. Seery, what I am going to
22 show you and what I would ask you to look
23 at is in the note E, in the statement of
24 assumptions for the November 2020
25 disclosure statement.  It discusses fixed
```

Page A-23

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
| --- | --- |
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate.  We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

**Page A-24**

[20 Largest Unsecured Creditors](#)

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

**Page A-26**

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
| | | |
| Less: Claims paid in full | | |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

**Page A-27**

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

**Page A-28**

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable |  | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
|  |  |  |  |
| **Liabilities and Partners' Capital** |  |  |  |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable |  | $900,000 | $3,010,000 |
| Secured debt |  |  |  |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees |  | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Value of HarbourVest Claim





DUPLICATE OF EXHIBITS ATTACHED TO THE MOTION FOR LEAVE (Main Document) Filed 02/06/23

### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
| --- | --- | --- |
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A. Procedural Background

3.     On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.     On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.     In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.     On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

## B. Overview of HarbourVest's Claims

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.      **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19. Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20. After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21. On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.     The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.     On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.     The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.     HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

## E.     Settlement Discussions

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.     Summary of Settlement Terms

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## **BASIS FOR RELIEF REQUESTED**

33. Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement. Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34. Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35. In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.    There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.    First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.    The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.    Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.    Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.    No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

**Page A-43**

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UBS Settlement [Doc. 2200-1]

# <u>Exhibit 1</u>

## Settlement Agreement

Case 19-34054-sgj11   Doc 3662-1   Filed 02/06/23   Entered 02/06/23 15:55:45   Desc
DUPLICATE OF EXHIBITS ATTACHED TO THE MONITOR'S FIRST INTERIM FEE APPLICATION (Part 1 of 2) Page 102 of
Exhibits Attached to the Monitor Rule 2016 (Part 1 Document) Page 13662768

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

**EXECUTION VERSION**

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**A G R E E M E N T**

1.    **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

EXECUTION VERSION

(b)   Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)   Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

         (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

**EXECUTION VERSION**

(ii)    The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)    As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)    On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)    On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor.  For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

**2.**    **Definitions.**

(a)    "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)    "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)    "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)    "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

**3.**    **Releases.**

(a)    **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

**EXECUTION VERSION**

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

        (b)    **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

**4.**     **No Third Party Beneficiaries**.     Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

**5.**     **UBS Covenant Not to Sue.**  Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

### 6. Agreement Subject to Bankruptcy Court Approval.

(a) The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

### 7. Representations and Warranties.

(a) Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b) Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c) Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

**8.** **No Admission of Liability.** The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice.** Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

**Page A-56**

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
                Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

11.     **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

12.     **Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

13.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

14.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

15.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document.  Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

12

**Page A-57**

17

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**    **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____ James P. Seery, Jr. _____
Its: _____ Authorized Signatory _____

HIGHLAND MULTI STRATEGY CREDIT
FUND, L.P. (f/k/a Highland Credit
Opportunities CDO, L.P.)

By: _____
Name: _____ James P. Seery, Jr. _____
Its: _____ Authorized Signatory _____

HIGHLAND CREDIT OPPORTUNITIES CDO,
Ltd.

By: _____
Name: _____ James P. Seery, Jr. _____
Its: _____ Authorized Signatory _____

HIGHLAND CREDIT OPPORTUNITIES CDO
ASSET HOLDINGS, L.P.

By: _____
Name: _____ James P. Seery, Jr. _____
Its: _____ Authorized Signatory _____

STRAND ADVISORS, INC.

By: _____
Name: _____ James P. Seery, Jr. _____
Its: _____ Authorized Signatory _____

Page A-59

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

15

Page A-60

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

**Page A-61**

### Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**


SFChronicle/SFGate/Liz Hafalia


Robert Holmgren


no caption

https://hf.com/warren-hellman/                                                    1/2

**Hellman & Friedman Owned a Portion of Grosvenor until 2020**

 **GROSVENOR**

## Grosvenor Capital Management

In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)    INFO@HF.COM (MAILTO:INFO@HF.COM)    LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)    BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)    TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
                                                        (HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-
                                                        &-
                                                        FRIEDMAN)

©2021 HELLMAN & FRIEDMAN LLC

Page A-63



**Julie Segal**

CORNER OFFICE

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

[Farallon was a Significant Borrower for Lehman]

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and <mark>Farallon Capital Management</mark>**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |



### Transaction Overview

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between <mark>Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon")</mark> secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. <mark>The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.</mark>

◆ <mark>Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield.</mark> The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**                 32

**Page A-65**

## Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
           :
In re:           :    Chapter 11
           :
BLOCKBUSTER INC., *et al.*,     :    Case No. 10-14997 (BRL)
           :
          Debtors.    :    (Jointly Administered)
           :
-------------------------------------------------------------- X

### THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

    1.    The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

**Page A-66**

[Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates](#)



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!

**Page A-67**



https://www.linkedin.com/in/josephnesler/



APP 928

## Investor Communication to Highland Crusader Funds Stakeholders



Alvarez & Marsal
Management, LLC 2029 Cei
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

**Page A-70**

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC


By: _____

Steven Varner
Managing Director

# EXHIBIT A-3

APP 931



**MUNSCH**
**HARDT**

DALLAS / HOUSTON / AUSTIN

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

May 11, 2022

Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

Dear Ms. Eitel:

By way of follow-up to the letter Douglas Draper sent to your offices on October 4, 2021 and my letter dated November 3, 2021, I write to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor"). Those abuses, as detailed in our prior letters, include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to line the pockets of Debtor management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of stakeholders and third-party investors in Debtor-managed funds and in violation of investors' due process rights and various fiduciary duties and duties of candor to the Bankruptcy Court and all constituents. In particular, I write this letter to further detail:

1.    Actions and omissions by the Debtor that have but a single apparent purpose: to spend the assets of the Highland estate to enrich those currently managing the estate at the expense of the business owners (the equity). Currently, the Highland estate has more than enough assets to pay 100% of the allowed creditors' claims. But doing so would deprive the current steward, Jim Seery, as well as his professional cohorts, the opportunity to reap tens, if not hundreds of millions of dollars, in fees. This motivation explains the acts and omissions described below—all designed to prop up a façade that the post-confirmation bankruptcy machinations are necessary, and to avoid any scrutiny of that façade, and to foreclose any investigation into a contrary thesis.

2.    The Debtor's intentional understatement of the value of the estate for personal gain, the gain of professionals, and the gain of affiliated or related secondary claims-buyers.

3.    The failure to adhere to fiduciary duties to maximize the value of estate assets and failure to contest baseless proofs of claim to enable Highland to emerge from bankruptcy as a going concern and to preserve value for all stakeholders.

4.    The gross misuse of estate assets by the Debtor and Debtor professionals in pursuing baseless and stale claims against former insiders of the Debtor when the current value of the estate (over

4862-7970-5887v.1 019717.00004

APP 932

Ms. Nan R. Eitel
May 11, 2022
Page 2

$650 million with the recent completion of the MGM sale, which includes over $200 million in cash)
greatly exceeds the estate's general unsecured claims ($410 million).

5.      The failure of the Debtor's CRO and CEO, Jim Seery, to adhere to his fiduciary duty to
maximize the value of the estate.  As evidenced by the chart below, all general unsecured claims could
have been resolved using $163 million of debtor cash and other liquidity.  Instead, proofs of claim were
inflated and sold to Stonehill Capital Management ("Stonehill") and Farallon Capital Management
("Farallon"), which are both affiliates of Grosvenor (the largest investor in the Crusader Funds, which
became the largest creditor in the bankruptcy).  Mr. Seery has a long-standing relationship with
Grosvenor and was appointed to the Independent Board (the board charged with managing the Debtor's
estate) by the Redeemer Committee of the Crusader Funds, on which Grosvenor held five of nine seats.

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0 ($65.0 net of other assets) |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| TOTAL | $270.0 | $95.0 | | $150.0 to $163.0 |

As highlighted in the prior letters to your office and as further detailed herein, this is the type of
systemic abuse of process that is something lawmakers and the Executive Office of the U.S. Trustee (the
"EOUST") should be concerned about.  Accordingly, we urge the EOUST to exercise its "broad
administrative, regulatory, and litigation/enforcement authorities . . . to promote the integrity and
efficiency of the bankruptcy system for the benefit of all stakeholders–debtors, creditors, and the public."[1]
Specifically, we believe it would be appropriate for the EOUST to undertake an investigation to confirm
the current value of the estate and to ensure that the claims currently being pursued by the Debtor are
intended to benefit creditors of the estate, and not just to further enrich Debtor professionals and Debtor
management.

**BACKGROUND**

**The Players**

James Dondero – co-founder of Highland in 1993.  Mr. Dondero is chiefly responsible for ensuring that
Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other
areas, including real estate, private equity, and alternative investments.  Mr. Dondero is a dedicated
philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy.
He currently serves as a member of the Executive Board of the Southern Methodist University Cox
School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential
Center.

---

[1] https://www.justice.gov/ust.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 3

<u>Highland</u> – Highland Capital Management, L.P., the Debtor. Highland is an SEC-registered investment advisor co-founded by James Dondero in 1993. Prior to its bankruptcy, Highland served as adviser to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

<u>Strand</u> – Strand Advisors, Inc., a Delaware corporation. The general partner of Highland.

<u>The Independent Board</u> – the managing board installed after Highland's bankruptcy filing. To avoid a protracted dispute, and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by three independent directors of Strand, who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. Pursuant to an agreement with the Creditors' Committee that was approved by the Bankruptcy Court, Mr. Dondero, UBS, and the Redeemer Committee each were permitted to choose one director. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James P. Seery, Jr.[2]

<u>Creditors' Committee</u> – On October 29, 2019, the bankruptcy court appointed the Official Committee of Unsecured Creditors, which consisted of: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).

<u>James P. Seery, Jr.</u> – a member of the Independent Board, and the Chief Executive Officer, and Chief Restructuring Officer of the Debtor. Beginning in March 2020, Mr. Seery ran day-to-day operations and negotiations with the Creditors' Committee, investors, and employees in return for compensation of $150,000 per month and generous incentives and stands to earn millions more for administering the Debtor's post-confirmation liquidation. Judge Nelms and John Dubel remained on the Independent Board, receiving weekly updates and modest compensation.

<u>Acis</u> – Acis Capital Management, L.P., a former affiliate of Highland. Acis is currently owned and controlled by Josh Terry, a former employee of Highland. Acis (Joshua Terry) was a member of Highland's Creditors' Committee.

<u>UBS</u> – UBS Securities LLC and UBS AG London Branch, collectively. UBS asserted claims against Highland arising out of a default on a 2008 warehouse lending facility (to which Highland was neither a party nor a guarantor). Highland had paid UBS twice for full releases of claims UBS asserted against Highland – approximately $110 million in 2008 and an additional $70.5 million via settlement with Barclays, the Crusader Funds, and Credit Strategies in June 2015. UBS was a member of the Creditors' Committee and appointed John Dubel to the Independent Board.

---

[2] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
May 11, 2022
Page 4

HarbourVest – HarbourVest Partners, LLC. HarbourVest is a private equity fund of funds and one of the largest private equity investment managers globally. HarbourVest has approximately $75 billion in assets under management. HabourVest has deep ties with Grosvenor and has jointly with Grosvenor sponsored 59 LBO transactions in the last two years.

The Crusader Funds – a group of Highland-managed funds formed between 2000 and 2002. During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their full investment plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been paid when made. Subsequently, when disputes regarding management of the Crusader Funds' liquidation arose, the Redeemer Committee instituted an arbitration against Highland, resulting in an arbitration award against Highland of approximately $190 million. Nonetheless, due to offsets and double-counting, the Debtor initially estimated the value of the Redeemer arbitration award at $105 million to $110 million. In a 9019 settlement with the Debtor, the Crusader Funds ultimately received allowed claims of $137 million, plus $17 million of sundry claims and retention of an interest in Cornerstone Healthcare Group, Inc., an acute-health-care company, valued at over $50 million. Notably, UBS objected to the Crusader Funds' 9019 settlement, arguing that the Redeemer arbitration award was actually worth much less— between $74 and $128 million. The Crusader Funds sold their allowed claims to Stonehill, in which Grosvenor is the largest investor. This sale to an affiliated fund without approval of other investors in the fund is a violation of the Investment Advisers Act of 1940.

The Redeemer Committee – The Redeemer Committee of the Highland Crusader Funds was a group of investors in the Crusader Funds that oversaw the liquidation of the funds. The Redeemer Committee was comprised of nine members. Grosvenor held five seats. Concord held one seat.

Grosvenor – GCM Grosvenor is a global alternative asset management firm with over $59 billion in assets under management. Grosvenor has one of the largest operations in the Cayman Islands, with more than half of their assets under management originating through its Cayman operations. Unlike most firms operating in the Cayman Islands, Grosvenor has its own corporate and fiduciary services firm. This structure provides an additional layer of opacity to anonymous corporations from the British Virgin Islands (which includes significant Russian assets), Hong Kong (which includes significant Chinese assets), and Panama (which includes significant South American assets). As a registered investment adviser, Grosvenor must adhere to know-your-customer regulations, must report suspicious activities, and must not facilitate non-compliance or opacity. In 2020, Michael Saks and other insiders distributed all of Grosvenor's assets to shareholders and sold the firm to a SPAC originated by Cantor Fitzgerald.[3] In 2020, the equity market valued asset managers and financial-services firms at decade-high valuations. It makes little sense that Grosvenor would use the highly dilutive SPAC process (as opposed to engaging

---

[3] See https://www.wsj.com/articles/gcm-grosvenor-to-merge-with-cantor-fitzgerald-spac-11596456900. The Securities and Exchange Commission recently released a rule proposal that is focused on enhancing disclosure requirements around special purpose acquisition companies, including additional disclosures about SPAC sponsors, conflicts of interest and sources of dilution, business combination transactions between SPACs and private operating companies, and fairness of these transactions. See https://www.pionline.com/regulation/sec-proposes-enhanced-spac-disclosure-rule.

Ms. Nan R. Eitel
May 11, 2022
Page 5

in a traditional IPO or other strategic-sale alternatives) unless such a structure was employed to avoid the diligence and management-liability tail inherent in more traditional processes.

<u>Farallon</u> – Farallon Capital Management, L.L.C. Farallon is a hedge fund that manages capital on behalf of institutions and individuals and was previously the largest hedge fund in the world. Farallon has approximately $27 billion in assets under management. Grosvenor is a significant investor in Farallon. Grosvenor and Farallon are further linked by Hellman & Friedman, LLC, an American private equity firm. Hellman & Friedman owned a stake in Grosvenor from 2007 until it went public in 2020 and seeded Farallon's initial capital.

<u>Muck</u> – Muck Holdings, LLC. Muck is owned and controlled by Farallon. Together with Jessup Holdings, LLC (described below)), Muck acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

<u>Stonehill</u> – Stonehill Capital Management, LLC. Stonehill provides portfolio management for pooled investment vehicles. It has approximately $3 billion in assets under management, which we have reason to believe includes approximately $1 billion from Grosvenor.

<u>Jessup</u> – Jessup Holdings, LLC. Jessup is owned and controlled by Stonehill. Together with Muck (Farallon), Stonehill acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

<u>Marc Kirschner/Teneo</u> - The Debtor retained Marc Kirschner to pursue over $1 billion in claims against former insiders and affiliates of the Debtor despite the significant solvency of the estate ($650 million in assets versus $410 million in claims). Kirschner's bankruptcy restructuring firm was purchased by Teneo (which also purchased the restructuring practice of KPMG). Teneo is sponsored by LetterOne, a London-based private equity firm owned by Mikhail Fridman, a Russian oligarch. Fridman is also the primary investor in Concord Management, LLC ("<u>Concord</u>"), which held a position on the Redeemer Committee. During the resolution of a 2018 arbitration involving a Debtor-managed fund, the Highland Credit Strategies Fund, evidence emerged demonstrating that Concord was operating as an unregistered investment adviser of Russian money from Alfa-Bank, Russia's largest privately held bank and a key part of Fridman's Alfa Group Consortium. –That money that was funneled into BVI-domiciled shell companies into the Cayman Islands, then into various hedge funds and private equity funds in the U.S. Evidence of these activities was presented by the Debtor to Grosvenor, and the Debtor asked to have Concord removed from the Redeemer Committee. Concord was never removed. Concord is a large investor in Grosvenor. Grosvenor, in turn, is a large investor in Stonehill and Farallon.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds— like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved investors in the Crusader Funds. As explained above, a group of Crusader Funds investors sued after the funds' manager temporarily suspended redemptions during the financial crisis. That dispute resolved with the formation of the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors'

APP 936

Ms. Nan R. Eitel
May 11, 2022
Page 6

receiving a return of their investments plus a profit, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite the successful liquidation of the Crusader Funds, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

In view of the expected arbitration award and believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[4]

On October 29, 2019, the Bankruptcy Court appointed the Creditors' Committee. At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[5]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

#### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of Strand. To avoid a protracted dispute and to

---

[4] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

[5] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

Ms. Nan R. Eitel
May 11, 2022
Page 7

facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by the Independent Board.[6]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the independent directors, Mr. Seery. Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[7] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[8]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[9] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

*The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of

---

[6] Frank Waterhouse and Scott Ellington, Highland employees, remained as officers of Strand, Chief Financial Officer and General Counsel, respectively.

[7] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[8] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[9] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

Ms. Nan R. Eitel
May 11, 2022
Page 8

creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[10] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate. This becomes all the more important when a debtor or an estate holds substantial assets through non-debtor subsidiaries or vehicles, as is the case here; hence, the purpose of Rule 2015.3.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored, and neither the Bankruptcy Court nor the U.S. Trustee's Office did anything to ensure compliance. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below. Additionally, the lack of proper and accurate information and intentional hiding of material information led creditors to vote for the Debtor's plan and the Bankruptcy Court to confirm that plan which, we believe, would not have happened had the Debtor complied with its fiduciary and reporting duties.

As Mr. Draper and I have already highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[11] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-

---

[10] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[11] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

Ms. Nan R. Eitel
May 11, 2022
Page 9

value determinations.[12] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

Despite these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements adopted by the EOUST and historical rules mandating transparency.[13]

Because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**The Lack of Transparency Permitted the Debtor to Quietly Sell Assets Without Observing Best Practices**

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of Portola Pharma shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year).

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to the debtor (20% less than Mr. Dondero received in funds he managed).

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or

---

[12] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[13] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
May 11, 2022
Page 10

outside stakeholders, resulting in a loss to the estate of over $10 million versus cost and $20 million versus fair market value.

- The Debtor "sold" interests in certain investments commonly referred to as PetroCap without engaging in a public sale process and without exploring any other method of liquidating the asset.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors. Equally as troubling, for certain similar sale transactions the Debtor *did* seek Bankruptcy Court approval, thus acknowledging that such approval was necessary or, at a minimum, that disclosures regarding non-estate asset sales are required.

**The Lack of Transparency Permitted the "Inner Circle" to Manipulate the Estate for Personal Gain**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic because the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months in the wake of the global pandemic. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 million impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). A Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time financial information with respect to the affairs of non-Debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. The Debtor's "inner circle" – the Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) – had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

*Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate*

Mr. Seery's compensation package encouraged, and the lack of transparency permitted, manipulation of the estate and settlement of creditors' claims at inflated amounts.

Ms. Nan R. Eitel
May 11, 2022
Page 11

Upon his initial appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[14]

When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he his compensation package was handsomely improved. His base salary, which was on the verge of dropping to $30,000 per month, was increased *retroactively* back to March 15, 2020, to $150,000 per month. Additionally, his employment agreement contemplated a discretionary "Restructuring Fee"[15] that would be calculated in one of two ways:

(1)     If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)     If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and was intended to provide a powerful economic incentive for Mr. Seery to steer Highland through the Chapter 11 case and emerge from bankruptcy as a going concern.

Despite the structure of his compensation package, Mr. Seery saw greater value in aligning himself with creditors and the Creditors' Committee. To that end, he publicly alienated and maligned Mr. Dondero, and he found willing allies in the Creditors' Committee. The posturing also paved the way for Mr. Seery to bestow upon the hold-out creditors exorbitant settlements at the expense of equity and earn his Restructuring Fee. In fact, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee (both members of the Creditors' Committee),[16] leaving only the HarbourVest and UBS (also a member of the Creditors' Committee) claims to resolve. In other words, Mr. Seery had curried favor with two of the four members of the Creditors' Committee who would ultimately approve his Restructuring Fee and future compensation following plan consummation.

Ultimately, the confirmed Plan appointed Mr. Seery as the Claimant Trustee, which continued his compensation of $150,000 per month (termed his "Base Salary") and provided that the Oversight Board and Mr. Seery would negotiate additional "go-forward" compensation, including a "success fee" and severance pay.[17] Mr. Seery's success fee presumably is (or will be) based on whether his liquidation of

---

[14] *See* Dkt. 339, ¶ 3.
[15] *See* Dkt. 854, Ex. 1.
[16] *See* Dkt. 864, p. 8, l. 24 – p. 9, l. 8.
[17] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
May 11, 2022
Page 12

the estate outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy but also to ensure that he eventually receives a large "success fee" and severance payment. In fact, during a deposition taken on October 21, 2021, Mr. Seery testified that he expected to make "a few million dollars a year" for each year during the years that he will take to liquidate the Debtor, although we estimate that, based on the estate's nearly $650 million value today, Mr. Seery's success fee could approximate $50 million.

### *Mr. Seery Enters into Inflated Settlements*

Even before his appointment as CEO and CRO of the Debtor, Mr. Seery had effectively seized control of the Debtor as its *de facto* chief executive officer.[18] Thus, while he was in the process of negotiating his compensation agreement, he was simultaneously negotiating settlements with the remaining creditors to ensure he earned his Restructuring Fee, even if he did so at inflated amounts. One transaction that highlights this is the settlement with the Crusader Funds and the Redeemer Committee.

In connection with Mr. Seery's appointment as CEO and CRO, the Debtor announced that it had reached an agreement in principle with the Crusader Funds and the Redeemer Committee. Even **UBS**, one of the members of the Creditors' Committee, thought the settlement was inflated. In its objection to the Debtor's 9019 motion, UBS stated:[19]

> The Redeemer Claim is based on an Arbitration Award that required the Debtor, inter alia, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) in exchange for all of Crusader's shares in Cornerstone. Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation. As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

> Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer. The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement. Depending on the valuation of the Cornerstone shares, the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

---

[18] *See* Dkt. 864, p. 6, l. 18 – 22.
[19] *See* Dkt. 1190, p. 6 – 7.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 13

In the meantime, other general unsecured creditors of the Debtor will receive a much lower percentage recovery than they would if those assets were instead transferred to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among the Debtor's creditors. The Proposed Settlement is only in the best interests of Redeemer and, as such, it should be rejected.

\*\*\*\*\*\*

[3] The potential range of value attributable to the Cornerstone shares is significant because, according to the Debtor's liquidation analysis, the Debtor expects to have only $195 million total in value to distribute, and only $161 million to distribute to general unsecured creditors under its proposed plan. See Liquidation Analysis [Dkt. No. 1173-1]; First Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1079].

UBS was right. Mr. Seery agreed to a settlement that substantially overpaid the Redeemer Committee, and UBS only agreed to withdraw its objection and appeal of the Redeemer Committee's settlement when the Debtor bestowed upon UBS its own lavish settlement.[20]

It is worth noting that the Redeemer Committee ultimately sold its bankruptcy claim for $78 million in cash, but the sale excluded, and the Crusader Funds retained, its investment in Cornerstone Healthcare Group Holding Inc. and certain non-cash consideration.[21] At the end of the day, the Crusader Funds and the Redeemer Committee cashed out of their bankruptcy claims for total consideration at the very least of $135 million, meaning they received 105% of the highest estimate (according to UBS) of the net amount of their arbitration award.[22]

### The Inner Circle Doesn't Object to Inflated Settlements

Following the Bankruptcy Court's approval of settlements with Acis/Josh Terry and the Crusader Funds/the Redeemer Committee, Mr. Seery turned his attention to the two remaining critical holdouts: HarbourVest and UBS. HarbourVest, a private equity fund-of-funds with approximately $75 billion under management, had invested pre-bankruptcy $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO

---

[20] See Dkt 2199. Under the terms of the UBS Settlement, UBS received a Class 8 claim in the amount of $65 million, a Class 9 claim in the amount of $60 million, a payment in cash of $18.5 million from a non-Debtor fund managed by the Debtor, and the Debtor's agreement to assist UBS in pursuing other claims against former Debtor affiliates related to a default on a credit facility during the Global Financial Crisis. Importantly, over the course of the preceding 11 years, UBS had already received payments totaling $180 million in connection with this dispute, and just prior to bankruptcy, UBS and the Debtor had reached a settlement in principle in which the Debtor would pay UBS just $7 million and $10 million in future business.

[21] See Exh. B.

[22] The estimation of a total recovery of $135 million includes attributing $48 million to the retained Cornerstone investment. The $48 million valuation equated to a ~45% interest in Cornerstone, which was valued pre-pandemic at approximately $107 million. Following COVID, Cornerstone's long-term acute care facilities flourished. Additionally, Cornerstone held a direct investment of over 800,000 shares in MGM, which was held on its books at approximately $72 per share. The per-share closing price on the sale of MGM to Amazon exceeded $164, which would have increased the company's valuation (irrespective of the post-COVID growth) by more than $70 million, bring Crusader Funds' windfall to more than $205 million.

Ms. Nan R. Eitel
May 11, 2022
Page 14

Funding, Ltd. ("HCLOF").  A charitable fund called the Charitable DAF Fund, L.P. ("DAF") held
49.02% member interests in HCLOF, and the remaining ~2.00% was held by Highland and certain of its
employees.

Before Highland filed bankruptcy, a dispute arose between HarbourVest and Highland in which
HarbourVest claimed it was duped into making the investment into HCLOF because Highland allegedly
failed to disclose facts relating to the investment (namely, that Highland was engaged in ongoing
litigation with former employee, Josh Terry, which would result in HCLOF's incurring legal fees and
costs).  HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15
million in legal fees and costs.  In Highland's bankruptcy, however, HarbourVest filed a proof of claim
alleging that it was due over $300 million in damages in the dispute, a claim that the Debtor and Debtor's
counsel initially argued was absurd. Indeed, Debtor management valued HarbourVest's claims at $0,
which was consistently reflected in the Debtor's publicly-filed financial statements up through and
including its December 2020 Monthly Operating Report.[23]  Nevertheless, as one of the final creditor
claims to be resolved, Mr. Seery ultimately agreed to give HabourVest a $45 million Class 8 claim and a
$35 million Class 9 claim.[24]  At that time, the Debtor's public disclosures reflected that Class 8 creditors
could expect to receive 71.32% payout on their claims, and Class 9 creditors could expect 0.00%.  Thus,
HarbourVest's total $80 million in allowed claims would result in HarbourVest receiving $32 million in
cash.[25]  The cash consideration was offset by HarbourVest's agreement to convey its interest in HCLOF
to the Debtor (or its designee) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in
support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was
$22.5 million.  In other words, from the outside looking in, the Debtor agreed to pay $9.5 million for a
spurious claim.

Oddly enough, no creditors (other than former insiders) objected.  What the inner circle
presumably knew was that the settlement was actually a windfall for the Debtor.  As we have previously
detailed, the $22.5 million valuation of HCLOF that the Debtor utilized in seeking approval of the
settlement was based upon September 2020 figures when the economy was still reeling from the
pandemic.  The value of that investment rebounded rapidly, particularly because of the pending MGM
sale to Amazon that was disclosed to the Debtor but not the public (i.e., material non-public information).
We have subsequently learned that the actual value of the HCLOF at the time the Bankruptcy Court
approved the HarbourVest settlement was at least $44 million—a value that Mr. Seery would have known
but that was not disclosed to the Court or the public.

Likewise, there were no objections to the UBS settlement, which is puzzling.  As detailed in the
Debtor's 64-page objection to the UBS proof of claim and the Redeemer Committee's 431-page objection
to the UBS proof of claim, UBS's claims against the Debtor were razor thin and largely foreclosed by res
judicata and a settlement and release executed in connection with the June 2015 settlement.  Moreover,
the publicly available information indicated that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16,

---

[23] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[24] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[25] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital
Management—an SEC-registered investment advisor—for approximately $27 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 15

2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021);[26]

- Allowed claims against the estate increased by $236 million from December 2020 to January 2021, with Class 8 claims ballooning $74 million in December to $267 million in January;

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for Class 8 Claims decreased from 87.44% to 71.32% in just a matter of months.

The Liquidation Analysis estimated total assets remaining for distribution to general unsecured claims to be $195 million, with general unsecured claims totaling $273 million. By the time the UBS settlement was presented to the court for approval, the allowed Class 8 Claims had increased to $309,345,000, reducing the distribution to Class 8 creditors to 62.99%. Surely significant creditors like the Redeemer Committee—whose projected distribution dropped from $119,527,515 when it voted for the Plan to $86,105,194 with the HarbourVest and UBS claims included—should have taken notice.

**Mr. Seery Stacks the Oversight Board**

As previously disclosed, we believe Mr. Seery facilitated the sale of the four largest claims in the estate to Farallon and Stonehill. Based upon conversations with representatives of Farallon, Mr. Seery contacted them directly to encourage their acquisition of claims in the bankruptcy estate.[27] We believe Mr. Seery did so by disclosing the true value of the estate versus what was publicly disclosed in court filings, demonstrating that there was substantial upside to the claims as compared to what was included in the Plan Analysis. For example, publicly available information at the time Farallon and Stonehill acquired the UBS claim indicated the purchase would have made no economic sense: the publicly disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Farallon and Stonehill would have lost money on the claim acquisition. We can only conclude Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), which based upon accurately disclosed financial statements would indicate they were likely to recover close to 100% on both Class 8 and Class 9 claims.

As set forth in the previous letters, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers Farallon, through Muck, and Stonehill, through Jessup. The four claims purchased by Farallon and Stonehill comprise the largest four claims in the Highland bankruptcy by a substantial margin, collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[26] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473].

[27] We believe Mr. Seery made similar calls to representatives of Stonehill. We are informed and believe that Mr. Seery has long-standing relationships with both Farallon and Stonehill.

Ms. Nan R. Eitel
May 11, 2022
Page 16

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,696,610** | **$95,000,000** | |

From the information we have been able to gather, it appears that Stonehill and Farallon purchased these claims for the following amounts:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[28] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 - $165.0** |

As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) are overseeing the liquidation of the reorganized Debtor. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth below, we estimate that the estate today is worth nearly $650 million and has approximately $200 million in cash, which could result in Mr. Seery's receipt of a performance bonus approximating $50 million. Thus, it is a warranted and logical deduction that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. As set forth in previous letters, there are three primary reasons to believe this:

- The scant publicly available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that was actually publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims; and

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

For example, consider the sale of the Crusader Funds' claims, which we *know* was sold for $78 million. Based upon the publicly available information at the time of the acquisition, the expected distribution would have been $86 million. Surely a sophisticated hedge fund would not invest $78 million in a particularly contentious bankruptcy if it believed its maximum return was $86 million years later.

---

[28] Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 17

Ultimately, the Plan, Mr. Seery's compensation package, and the lack of transparency to everyone other than the Debtor, its management, and the Creditors' Committee permitted Debtor management and the Creditors' Committee to support grossly inflated claims (at the expense of residual stakeholders) in a grossly understated estate, which facilitated the sales of those claims to a small group of investors with significant ties to Debtor management.  In doing so, Mr. Seery installed on the Reorganized Debtor's Oversight Board friendly faces who stand to make $370 million on ~$150 million investment.  And Mr. Seery's plan has already worked.  Notably, while the confirmed Plan was characterized by the Debtor as a monetization plan,[29] the newly installed Oversight Board supported, and the Court approved, paying Mr. Seery the much more lucrative Case Resolution Fee, netting Mr. Seery $1.5 million more than he was entitled to receive under his employment agreement.

In a transparent bankruptcy proceeding, we question whether any of this could have happened.  What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

| | Value as of Aug. 2021 | | March 2022 High Estimate updated for MGM closing |
|---|---|---|---|
| **Asset** | **Low** | **High** | |
| Cash as of 4/25/22 | $17.9 | $17.9 | |
| Targa Sale | $37.0 | $37.0 | |
| 8/1 CLO Flows | $10.0 | $10.0 | |
| Uchi Bldg. Sale | $9.0 | $9.0 | |
| Siepe Sale | $3.5 | $3.5 | |
| PetroCap Sale | $3.2 | $3.2 | |
| Park West Sale | $3.5 | $3.5 | |
| HCLOF trapped cash | $25.0 | $25.0 | |
| **Total Cash** | **$105.6** | **$105.6** | **$200** |
| Trussway | $180.0 | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 | $25.0 |
| HCLOF | $40.0 | $40.0 | $20.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 | $30.0 |
| MGM (direct ownership) | $32.0 | $32.0 | $0.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 | $30.0 |
| Korea Fund | $18.0 | $18.0 | $20.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 | $70.0 |
| Other | $2.0 | $10.0 | $10.0 |

---

[29] See Dkt. 194., p.5.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 18

| Highland Restoration Capital Partners | | | |
|---|---|---|---|
| **TOTAL** | **$472.6** | **$598.6** | **$645.0** |

## The Bankruptcy Professionals are Draining the Estate

Yet another troubling aspect of the Highland bankruptcy has been the rate at which Debtor professionals have drained the Estate, largely through invented, unnecessary, and greatly overstaffed and overworked offensive litigation. The sums expended between case filing and the effective date of the Plan (the "Effective Date") are staggering:

| Professional | Fees | Expenses |
|---|---|---|
| Hunton Andrews Kurth | $1,147,059.42 | $2,747.84 |
| FTI Consulting, Inc. | $6,176,551.20 | $39,122.91 |
| Teneo Capital, LLC | $1,221,468.75 | $6,257.07 |
| Marc Kirschner | $137,096.77 | |
| Sidley Austin LLP | $13,134,805.20 | $211,841.25 |
| Pachulski Stang Ziehl & Jones | $23,978,627.25 | $334,232.95 |
| Mercer (US) Inc. | $202,317.65 | $2,449.37 |
| Deloitte Tax LLP | $553,412.60 | |
| Development Specialists, Inc. | $5,562,531.12 | $206,609.54 |
| James Seery[30] | $5,100,000.00 | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| Wilmer Cutler Pickering Hale & Dorr LLP | $2,645,729.72 | $5,207.53 |
| Kurtzman Carson Consultants LLC | $2,054,716.00 | |
| Foley & Lardner LLP | $629,088.00 | |
| Casey Olsen Cayman Limited | $280,264.00 | |
| ASW Law Limited | $4,976.00 | |
| Houlihan Lokey Financial Advisors, Inc. | $766,397.00 | |
| Berger Harris, LLP | | |
| Hayward PLLC | $825,629.50 | $46,482.92 |
| | **$64,420,670.18** | **$854,951.38** |
| **Total Fees and Expenses** | | **$65,275,621.56** |

"The [bankruptcy] estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 872 (Bankr. N.D. Ill. 1989).

---

[30] This amount includes Mr. Seery's success fee, which was paid a month following the Effective Date.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 19

The rate at which Debtor professionals have drained the estate is in stark contrast to the treatment of the employees who stayed with the Debtor (without a key employee retention plan or key employee incentive program) on the promise they would be made whole for prepetition deferred compensation that had not yet vested, only to be stiffed and summarily terminated. Even worse, some of these employees have been targeted by the litigation sub-trust for acts they took in the course and scope of their employment.

Following the Effective Date, siphoning of estate assets continues. Mr. Seery still receives base compensation of $150,000 per month, and he expects to receive compensation of at least "a few million dollars a year" according to his own deposition testimony. In addition, his retention was conditioned upon receiving a to-be-negotiated success fee and severance payment (notably, none of which is disclosed publicly).

Likewise, Teneo Capital, LLC was retained as the litigation adviser. For its services post-Effective Date, it is compensated $20,000 per month for Mr. Kirschner as trustee for the Litigation Subtrust, plus the regularly hourly fees of any additional Teneo personnel, plus a "Litigation Recovery Fee." The Litigation Recovery Fee is equal to 1.5% of Net Litigation Proceeds up to $100 million and 2.0% of Net Litigation Proceeds above. Interestingly, although "Net Litigation Proceeds" is defined as gross litigation proceeds less certain fees incurred in pursing the litigation, net proceeds are not reduced by Mr. Kirschner's monthly fee, contingency fees charged by any other professionals, or litigation funding financing. Moreover, Teneo is given credit for any litigation recoveries regardless of whether those recoveries stem from actions commenced by the litigation trustee. The Debtor has not disclosed, and is not required to disclose, the terms upon which any professionals have been engaged following the Effective Date, including Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Litigation Subtrust. Based upon pre-Effective Date monthly expenses, the number of lawyers that attend various matters on behalf of the Debtor,[31] and the addition of Quinn Emanuel Urquhart & Sullivan, LLP and Teneo, we believe the Debtor could be spending as much as $5-$7 million per month.

The Reorganized Debtor and the Highland Claimant Trust recently filed heavily redacted, quarterly post-confirmation reports.[32] Of note, the Reorganized Debtor disclosed that it has disbursed $81,983,611 since the Effective Date but disclosed that it has only paid $47,793 in priority claims and $6,918,473 in general unsecured claims, while still estimating a total recovery to general unsecured claims of $205,144,544. The Highland Claimant Trust disclosed that it has disbursed an additional $7,152,331 since the Effective Date.

## CONCLUSION

The Highland bankruptcy is an extreme example of the abuses that can occur if the federal bench, federal government appointees, and federal lawmakers do not police federal bankruptcy proceedings by

---

[31] In connection with a recent two-day trial on an administrative claim, the Debtor was represented by John Morris ($1,245.00 per hour), Greg Demo ($950 per hour), and Hayley Winograd ($695 per hour), and was assisted by paralegal La Asia Canty ($460 per hour). The Debtor's local counsel, Zachery Annable ($300 per hour), was also present, and Jeffrey Pomerantz ($1,295 per hour) observed the trial via WebEx. Despite the army of lawyers, Mr. Morris handled virtually the entire proceeding, with Ms. Winograd examining only two small witnesses. Messrs. Pomerantz, Demo, and Annable played no active role in the proceedings.

[32] Dkt 3325 and 3326.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 20

permitting debtors-in-possession to hide material information, violate duties of transparency and candor, and manipulate information and transactions to benefit disclosed and undisclosed insiders or "friends" of insiders. Bankruptcy should not be an avenue for opportunistic venturers to prey upon companies to the detriment of third-party stakeholders and the bankruptcy estate. We therefore encourage your office to investigate the problems inherent in the Highland bankruptcy. At a minimum, we ask that the EOUST seek orders from the Bankruptcy Court compelling the Debtor to undertake the following actions:

1.  turn over all financial reports that should have been disclosed during the pendency of the bankruptcy, including 2015.3 reports;

2.  provide a detailed disclosure of the assets Reorganized Debtor;

3.  provide a copy of the executed Claimant Trust Agreement, which should already have been disclosed;

4.  disclose all solvency analyses prepared by the Debtor; and

5.  provide copies of all agreements for the engagement of Debtor professionals post-confirmation, including the terms of Mr. Seery's success fee and severance agreement, compensation agreements for personnel of the Reorganized Debtor, and the fee arrangement with Quinn Emanuel Urquhart & Sullivan, LLP.

Sincerely,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.

DR:

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs The Dugaboy Investment Trust and the*
*Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| | § |
| Reorganized Debtor. | § |
| | § |
| DUGABOY INVESTMENT TRUST and | § |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § |
| | § |
| Plaintiffs, | § Adversary Proceeding No. |
| | § _____ |
| vs. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § |
| HIGHLAND CLAIMANT TRUST, | § |
| | § |
| Defendants. | § |

## COMPLAINT TO (I) COMPEL DISCLOSURES
## ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND
## (II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND
## (B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("HMIT" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against Defendants Highland Capital Management, L.P. ("HCM" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCM, the "Defendants"), seeking:  (1) disclosures about all distributions and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of the assets and liabilities; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.     As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCM bankruptcy estate.

2.     Defendants' October 21, 2022, January 24, 2023, and April 21, 2023 post-confirmation reports show that even with inflated claims and below-market sales of assets, cash available – if not squandered in self-serving litigation – is more than enough to pay class 8 and class 9 creditors in full.  With more than $100 million in assets left to monetize (not even counting related party notes), and almost $550,000 in assets already monetized, even after burning through more than $100 million in professional fees, there is and was more than enough money to pay the inflated $387 million in creditor claims the Debtor allowed.  These numbers compel the question

---

[1] Capitalized terms not defined have the meanings set forth herein.  If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

CORE/3524155.0004/178862860.20

– "What was all of this for, other than to justify outsize fees and bonuses for the professionals involved?" See paragraphs 17-18 below. And despite repeated and increasingly specific requests, the Debtor has never provided granular enough information to specifically identify all of the monies raised and where all the money has gone, including another hundred million dollars that appears to be unaccounted. *Id*.

3.      Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities. Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those crisis period values*, along with overstated liabilities, to justify continued litigation. That litigation has served to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate (along with incentive fees), leaving little or nothing for the owners that built the company.

4.      Significantly, Kirschner seems to concede the merits of Plaintiffs' position. After Plaintiffs began seeking the relief sought herein (originally by way of motion), Kirschner himself sought a stay of the massive litigation he instituted to evaluate whether the estate actually needed to collect additional funds. Plaintiffs and other defendants in that litigation agreed to the stay but could not convince the Debtor to provide the kind of fulsome disclosure that would allow Plaintiffs to evaluate for themselves the status of the estate, which secrecy continues to leave Plaintiffs with suspicions that prevent an overall resolution of the bankruptcy with no further need for indemnification reserves. Rather, Debtor continues to provide summary information that is not sufficient to enable Plaintiffs to determine the amounts of money being spent on administration and litigation, and not sufficient to determine whether if all litigation ceased, the estate could pay all creditors with money to spare for equity. Plaintiffs are especially concerned because the

CORE/3524155.0004/178862860.20

information they have gleaned suggests inappropriate self-dealing that undermines confidence in the Debtor's financial reporting, making the relief sought herein all the more important.

5.     While grave harm has already been done by the Defendants' excessive litigation and unnecessary secrecy, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity.  As this Court observed in *In re ADPT DFW Holdings*, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity.  In some cases, the protection is in the form of an equity committee; here a prompt valuation of the estate is needed.

6.     Upon information and belief, during the pendency of HCM's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Plaintiffs.  Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities that had undisclosed business relationships with Mr. Seery; entities that Mr. Seery knew would approve inflated compensation to him when the hidden but true value of the estate's assets were realized.  Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

7.     Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders such as Plaintiffs by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders

4

have been paid in full.  Because of the lack of transparency to date, unless the relief sought herein is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

8.    By demonizing the estate equity holders, withholding information, and manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the potential for a grave miscarriage of justice and at this time it appears their underhanded plan is succeeding.

9.    By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, perhaps as much as $75 million below market price.[2] As detailed below, total pre-confirmation professional fees are now over $100 million.

10.    On information and belief, the value of the assets in the estate as of June 1, 2022 was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | **Low** | **High** |
| Cash as of Feb 1, 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022.

CORE/3524155.0004/178862860.20

| | | | $50.00 | $60.00 |
|---|---|---|---|---|
| Affiliate Notes[3] | | | | |
| Other (Misc. and legal) | | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | | **$663.72** | **$688.84** |

11.     By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| **Creditor** | **Class 8** | **Class 9** | **Beneficiary** | **Purchase Price** |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

12.     Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded to the many settlement offers from Mr. Dondero with a reorganization (as opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

13.     Instead, Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court." These transactions are particularly suspect because, depending on the claim, the claims buyers paid amounts only fractionally higher, equivalent to, or, in some cases, less than the value the Plan estimated would be paid three years later.  Sophisticated claims buyers responsible to investors of their own would

---

[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale and/or have other defenses, but litigation continues over that also.

not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

14.    On information and belief, Mr. Seery provided such information to claims buyers, rather than buying the claims in to the estate for the roughly $150 million for which they were sold. By May 2021, when the claims transfers were announced to the Court, the estate had over $100 million in cash and access to additional liquidity that could have been used to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

15.    Specifically, Mr. Seery could and should have investigated seeking sufficient funds from equity to pay all claims and return the estate to the equity holders.  This was an obvious path because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were sold, much of the massive administrative costs run up by the estate would never have been incurred because the larger amounts would not have been needed.  One such avoided cost would be the post-effective date litigation pursued by Mr. Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charged over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained from other cases because there has been no disclosure in the HCM bankruptcy of the cost of the Kirschner litigation). However, buying the claims to resolve the bankruptcy and enabling equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme contained: placing the decision on his incentive bonus, perhaps as much as $30 million or more, in the hands of grateful business colleagues who received outsized rewards for the claims they were steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item cloaked in secrecy, contrary to the general rule that the

hallmark of the bankruptcy process is transparency. These circumstance show why Plaintiffs are right to be concerned and why it is critical that transparency be achieved.

16.     But worse still, even with all of the manipulation that appears to have occurred, Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by unnecessary litigation, would still be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

17.     Set forth below is Plaintiffs' best estimate of the assets of the estate. Plaintiffs have been seeking information to enable to them to confirm the accuracy of their estimates, but the Debtor has refused to provide the necessary information to do so. Indeed, after the last quarterly report, in which Debtor provided some but not all of the information Plaintiffs were seeking, Plaintiffs sent a revised list, more precisely targeting the remaining information sought. Because Debtor failed to respond, it remained necessary to file this adversary proceeding.

18.     This is Plaintiffs' best estimate of the assets of the Highland estate and its cash flows. It is obvious that even if off by a significant percent, no further litigation to collect assets for the estate is needed to pay creditors. Moreover, the ample solvency of the estate was or should have been obvious to the estate professionals for quite some time, making the substantial cash burn in the estate utterly unconscionable.

| | Assets | | Amount | Backup |
|---|---|---|---|---|
| | **HCMLP Assets to be Monetized**[1] | | | |
| | **As of 3/31/23 (Est.)** | | | |
| | | | | |
| | Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF") | | $      25,000,000 | Debtor Pleading (re ACIS) Dkt 1235 Filed 08/18/21 p.3n.10 ($25 m); 3/31/23 DAF Multi-Strat Statement ($19.5 m est); more value in the 1.0 CLOS (Brentwood – 17%;Gleneagles – 1%;Grayson – 5%;Greenbriar-23%;Liberty-18%;Rockwall-15%) |

8

| | | | |
|---|---|---|---|
| Highland Multi Strategy Credit Fund, L.P. ("MS") | | 30,817,992 | ADV 3/31/23 (rev 4/24/2023) |
| Highland Restoration Capital Partners Master LP & Highland Restoration Capital Partners, L.P. ("RCP") | | 24,192,773 | ADV 3/31/23 (rev 4/24/2023) |
| Stonebridge-Highland Healthcare Private Equity Fund ( "Korea Fund") | | 5,701,330 | ADV 3/31/23 (rev 4/24/2023) |
| SE Multifamily Holdings LLC ("SE Multifamily") | | 12,400,000 | Communications with Debtor that apparently values it higher |
| Other | | 5,000,000 | Other investments on the post-confirmation report |
| | | | |
| **Assets as of 3/31/21 (Est.)**[1] | | $    103,112,095 | |
| | | | |
| **HCMLP Monetizations & Management Fees (est.)** | **Sale date if known** | | |
| **10/31/19 - 3/31/23 (Est.)** | | | |
| | | | |
| Targa | October ?, 2021 | $    37,500,000 | Uptick from COVID; market communications |
| Trussway | Sept. 1, 2022 | 180,000,000 | 90% of sales price 200MM, net of debt; need confirmation |
| Cornerstone | Jan. 23, 2023 | 132,500,000 | Assume 53% of sales price obtained because: HCM owns about 50% of RCP and  60% of Crusader (and assume increase in value of MGM within Cornerstone should have been enough to offset its debt) Sale announced May 12, 2022 |
| SSP | Month/date/2020 | 18,000,000 | Market communications |
| MGM Direct | Mar. 17, 2022 | 25,000,000 | @ $145, **sale announced May 2021** |
| Petrocap | Aug. 10, 2021 | 2,684,886 | Dkt, 2537, sale motion |
| Uchi | Aug. 6, 2021 | 9,750,000 | Dkt 2687, sale order |
| Jefferies Account & DRIP | | 60,000,000 | FV form 206, net of debt, but NXRT moved from $40-$80ish; don't know when monetized, so number could be low |
| Terrell (raw land) | | 500,000 | FV Form 206 |
| Mgmt Fees/Dist/Fund loan repayments (est.) | | 30,000,000 | 3 years mgmt fees, misc distributions in MS/RCP/Korea, loan paybacks |
| Siepe | | 3,500,000 | Market communications |
| HCLOF | | 35,000,000 | Calculated based on DAF distributions |
| | | | |
| **Total Monetizations & Cash Flows (Est.)** | | $    534,434,886 | |
| **Total Assets as of 3/31/23 & Prior Monetizations & Management Fees** | | $    637,546,981 | |

9

| Cash Roll | | | |
|---|---|---|---|
| **10/31/19 - 3/31/23 (Est.)** | | | |
| | | | |
| Cash as of 10/31/2019 | | $        2,286,000 | |
| Monetizations & Cash Flows (10/31/19 - 3/31/23) | | 534,434,886 | |
| Less: Cash on Hand as of 3/31/23 | | (57,000,000) | ADV 3/31/23 |
| | | | |
| Fees, Distributions & Other Receipts (10/31/19 - 3/31/23)[2] | | $      479,720,886 | |
| | | | |
| Administrative Fees Paid | | $      100,781,537 | Dkt 3756 filed on 4/21/23 ($33,005,136 for Professional fees (bk); $7,604,472 for Professional fees (nonbk); $60,171,929 for all prof fees and exp (Debtor & UCC). Note: this appears to "Preconfirmation." What are the post confirmation amounts?) |
| Cumulative Payments to Creditors | | 276,709,651 | Dkt 3756 - Unsecured, priority, secured and admin. |
| Other Unknown Payments or ? | | 102,229,698 | The $102 million is calculated by subtracting cumulative payments to creditors and known pre conf prof fees and costs from the $479 million determined above. Where are these funds; what were they used for? |
| Fees & Distributions Paid (10/31/19 - 3/31/23) | | $      479,720,886 | |
| | | | |
| [1]*Does not include approximately $70MM in affiliate notes* | | | |
| [2]*Includes $100MM of fees paid during bankruptcy* | | | |

19.     In short, it appears that the professionals representing HCM, the Claimant Trust, and the Litigation Sub-Trust have been litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery. Even with the stay of

the Kirschner litigation, the Debtor continues to pursue litigation, such as its vexatious litigant motion, and presumably opposing this litigation, that unnecessarily depletes the estate.

20.      Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

21.      In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

## JURISDICTION AND VENUE

22.      This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

23.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

24.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

25.      In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

## THE PARTIES

26.     Dugaboy is a trust formed under the laws of Delaware.

27.     HMIT is a trust formed under the laws of Delaware.

28.     HCM is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

29.     The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

30.     On October 16, 2019 (the "Petition Date"), HCM, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

31.     At the time of its chapter 11 filing, HCM had approximately $400 million in assets (ultimately monetized for much more as a result of market events, such as the sale of HCM's portfolio companies for substantial profits, as was always planned by Mr. Dondero) and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  [Dkt. No. 1943, ¶ 8].  HCM's reason for seeking bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million.  Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

CORE/3524155.0004/178862860.20

32.     At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCM and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCM and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCM management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

33.     To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCM's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCM during its bankruptcy.  The three board members were:

a.  James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);
b.  John Dubel – (who was selected by Committee member UBS); and
c.  Former Judge Russell Nelms – (who was selected by the Debtor).

34.     The Bankruptcy Court almost immediately and then repeatedly let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by

---

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

Judge Nelms, suggesting he was bamboozled because he was under management's spell. Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about  . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

35.    At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121.]   In retrospect, this avoided scrutiny of the case by professionals who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case.  This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

36.    Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only

because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

37.    None of that happened.  Almost immediately, Mr. Seery emerged as the *de facto* leader of the Independent Board.  On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate.  [Dkt. No. 854].  And although Mr. Seery publicly represented that he intended to restructure and preserve HCM's business, privately he was engineering a much different plan.

38.    Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control.  For example, Mr. Seery initially reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team."  He also testified: "My experience with our employees has been excellent.  The response when we want to get something done, when I want to get something done, has been first-rate.  The skill level is extremely high."

39.    Yet, despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the plan process, ultimately Mr. Seery fired most of those employees.  It was clear that Mr. Seery was firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of challenging Mr. Seery, lest they too be fired.

40.    From the start, and before there was much litigation to speak of, the Court regularly referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious

CORE/3524155.0004/178862860.20

litigant.  This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero a "transparently" vexatious litigant based on pleadings she had only heard about from parties opposing Dondero and admittedly had not read herself.   Ironically, the first time Mr. Dondero was labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits initiated by the Debtor and had commented on proposed settlements in the case, but had not himself initiated any actions in the case.  Thereafter, though, the Debtor and its professionals repeated the mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing information about the estate with them.

41.    In addition to the Debtor's mistreatment of employees, under the control of the Independent Board, most of the ordinary checks and balances that are the hallmark of bankruptcy were ignored.  Despite providing regular and robust financial information to the Committee, the Debtor inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including Plaintiffs, in the dark about the value of the estate and the mix of assets it held, bought or sold.   Amplifying the lack of transparency, Mr. Seery further engineered transactions that also served to hide the real value of the estate.

42.    For example, he authorized the Debtor to settle the claims of HarbourVest (which claims had initially been valued at $0) for $80 million, in order to acquire HarbourVest's interest in Highland CLO Funding, Ltd. ("HCLOF"), gain HarbourVest's vote in favor of its Plan, and hide the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary.  This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $34.1 million at the time, about $40 million when the settlement was consummated, and over $55 million 90 days later when the MGM sale was announced.

CORE/3524155.0004/178862860.20

43.     At the same time, Mr. Seery and the Independent Board deliberately shut out equity holders from any discussion surrounding the plan of reorganization or HCM's efforts to emerge from bankruptcy as a going concern.  Indeed, as noted above, Mr. Seery failed to meaningfully respond to the many proposals made by residual equity holders to resolve the estate and never encouraged any dialogue between creditors and equity holders.  These failures only contributed to the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly undermined an efficient exit from bankruptcy.

44.     Worse still, while knowing that HCM had sufficient resources to emerge from bankruptcy as a going concern (and, on information and belief, while knowing that the estate was solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that contemplated HCM's continued post-confirmation existence.  Instead, and inexplicably, the very first plan proposed contemplated liquidation of the company, as did all subsequent plans.

45.     While secretly engineering the total destruction of HCM, Mr. Seery also privately settled multiple proofs of claim against the estate at inflated levels that were unreasonable multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and vehement objection to many of the claims as baseless.  But instead of litigating those objections in a manner that would have exposed the true value of the claims, on information and belief, Mr. Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values. That is, the inflated values softened up claims sellers to induce them to sell. Had the Debtor instead fought the inflated proofs of claim in open court, it could have settled the claims for closer to true value and ensured that the estate had sufficient resources to pay them.

46.     It is also no coincidence that virtually all original proofs of claim were sold to buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (a

17

company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

47. That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate. It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense. In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic. Dkt. 2949. Given the sophistication of the claims-buyers, their purchases of claims at prices that in some cases exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

48. And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know). In October 2022, $250 million was paid to Class 8 holders. That is about 85% of the inflated proofs of claim and $90 million more than plan projections. On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come. On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million or more, while engineering the estate to prevent equity holders from objecting or even knowing.

49. At the same time, the Claimant Trust has made no distributions to Contingent Claimant Trust Interest holders and has argued in various proceedings that no such distributions are likely. No wonder. The cost of holding open the estate, including unnecessary litigation costs,

appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such distributions can occur, even though it can now be projected that the litigation is not needed to pay creditors.  *See* Docket No. 3410-1.

50.    It is worth noting that it appears that virtually all of the claims trades brokered on behalf of Committee members seem to have occurred while those entities remained on the Committee.  Yet at the outset of their service, Committee members were instructed by the United States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."  Thus, the claims trades violated Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other Debtor professionals, to the detriment of creditors and residual equity holders.

51.    The sales of claims were not the only transactions shrouded in secrecy.  As further detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding, no data room, and without inviting equity (which may have at one time had the knowledge to make the highest bid) to participate in the sales process.  Indeed, on occasion assets were sold for amounts less than Mr. Dondero's written offers. This exacerbated the harms caused by the lack of transparency characterized by the Court's indifference to the Debtor's complete failure to abide by its Rule 2015 disclosure obligations.

52.    In short, the lack of transparency combined with at least the appearance of bias, if not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that, but for that manipulation, could have been resolved with money left over for equity.

CORE/3524155.0004/178862860.20

## STATEMENT OF FACTS

**A.  Plaintiffs Hold Contingent Claimant Trust Interests**

53.       As of the Petition Date, HCM had three classes of limited partnership interests (Class A, Class B, and Class C).  *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

54.       The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCM's general partner.  The Class B and C interests were held by HMIT.  *Id.*

55.       In the aggregate, HCM's limited partnership interests were held: (a) 99.5% by HMIT; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

56.       On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

57.       In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9.  *See* Plan, Article III, ¶ H(8) and (9).

58.       In the Plan, HCM classified HMIT's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest.  *See* Plan, Article III, ¶ H(10) and (11).

59.       According to the Plan, Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.  *See* Plan, Article I, ¶44.

60.       In the Confirmation Order, the Court found that the Plan properly separately classified those equity interests because they represent different types of equity security interests in HCM and

different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended (the "Limited Partnership Agreement"). Confirmation Order, ¶36; Limited Partnership Agreement, §3.9 (Liquidation Preference).

61.     The Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy. In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCM and therefore "technically" had standing to object to the Plan. *See* Confirmation Order, ¶¶ 17-18.

62.     Based on the Debtor's financial projections at the time of confirmation, however, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

63.     The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCM became the Reorganized Debtor (as defined in the Plan) on the Effective Date. *See* Notice of Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700].

64.     The Plan created the Claimant Trust, which was established for the benefit of Claimant Trust Beneficiaries, which is defined to mean:

> the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1(h).

21

65.     Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

66.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

67.     The Post Confirmation Quarterly Reports for the First Quarter of 2023 [Docket No. 3756 and 3757], show distributions of $270,205,592 to holders of general unsecured claims, which is 68% of the total allowed general unsecured claims of $397,485,568.  This amount is far greater than was anticipated at the time of confirmation of the Plan.  About $277 million has been distributed to creditors when secured, priority and administrative creditors are also considered.

**B.     Debtor Has Failed To Disclose Claimant Trust Asse**ts

68.     Upon information and belief, the value of the estate, as held in the Claimant Trust, has changed markedly since Plan confirmation.  Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

69.     The estate is solvent and has always been solvent.  Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.

70.     As noted above, by June of 2022, starting with $125 million in cash, the estate liquidated other assets of over $416 million, building a cash war chest of over $541 million.  Thus, with the remaining less-liquid assets, the total value of the estate's assets as of June 2022 was over $600 million, excluding related party notes.

71.     Contrasting those assets with the claims against the estate demonstrates that further collection of assets was (and is) unnecessary.

72.     As set forth above, while the inflated face amount of the claims sold was $365 million, the sale price was about $150 million.  The estate therefore easily had the resources to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

73.     Instead, Mr. Seery liquidated estate assets at less-than-optimal prices, without competitive process, without including residual equity holders, and in all cases required strict non-disclosure agreements from the buyers to prevent any information flowing to the public, the residual equity, or the Court. This uncharacteristic secrecy enabled Mr. Seery and the professionals to maintain the delicate balance of keeping just enough assets to pay professionals and incentive fees but still maintain the pretense that further litigation was needed.

74.     Each effort by Plaintiffs, Mr. Dondero and related companies to obtain information to assess whether interference was necessary to stop the continued looting has been vigorously opposed, and ultimately rejected by an apparently biased Court.  Plaintiffs were unable to cause the Debtor to provide the most basic of reports, including Rule 2015 statements, and Plaintiffs' efforts to obtain even the most basic details regarding asset sales and professional fees have all been denied.  Rather, such details are in the hands of a select few, such as the Oversight Board of the Claimant Trust.

75.     The Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate.  *See* Plan, ¶Art. IV(B)(9).

76.     But no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests, even though Plaintiffs, as contingent beneficiaries of a Delaware statutory trust, are entitled to financial information relating to the trust.

## C.      Plaintiffs Are Kirschner Adversary Proceeding Defendants

77.     On October 15, 2021, Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust, commenced the Kirschner Adversary Proceeding against twenty-three defendants, including Plaintiffs, alleging various causes of action.  *See Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. James Dondero*, *et al.*, Adv. Pro. No. 21-03076-sgj, Adv. Proc. No. 21-03076, Docket No. 1 (as amended by Docket No. 158).

78.     The Litigation Sub-Trust was established within the Claimant Trust as a wholly owned subsidiary of the Claimant Trust for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, with any proceeds therefrom to be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries.  *See* Plan, Article IV, ¶ (B)(4).

79.     Any recovery from the Kirschner Adversary Proceeding will be distributed to Claimant Trust Beneficiaries.

80.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

81.     The Litigation Sub-Trust is pursuing claims against Plaintiffs in the Kirschner Adversary Proceeding, which, if they become Claimant Trust Beneficiaries, would be the recipients of distributions of such recovery (less the cost of litigation).  Therefore, Plaintiffs require the requested information in order to properly analyze and evaluate the claims asserted against

24

them in the Kirschner Adversary Proceeding and to determine whether those claims have any validity.

## **FIRST CLAIM FOR RELIEF**
### **(Disclosures of Claimant Trust Assets and Request for Accounting)**

82.    Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

83.    Due to the lack of transparency into the assets of the Claimant Trust, Plaintiffs are unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust Interests.

84.    Certain information about the Claimant Trust Assets has already been provided to others, including Claimant Trust Beneficiaries and the Oversight Board for the Claimant Trust.

85.    Information about the Claimant Trust Assets would help Plaintiffs evaluate whether settlement of the Kirschner Adversary Proceeding and other proceedings is feasible, which would further the administration of the bankruptcy estate, benefitting all parties in interest.

86.    This Court specifically retained jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan.  *See* Plan, Article XI.

87.    The Plan provides that distributions to Allowed Equity Interests will be accomplished through the Claimant Trust and Contingent Claimant Trust Interests.  *See* Plan Article III, (H)(10) and (11).

88.    The Defendants should be compelled to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets, and details of all transactions that have occurred since the wall of silence was erected, and all liabilities.

## SECOND CLAIM FOR RELIEF
**(Declaratory Judgment Regarding Value of Claimant Trust Assets)**

89.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

90.     Once Defendants are compelled to provide information about the Claimant Trust assets, Plaintiffs seek a determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations.

91.     If the value of the Claimant Trust assets exceeds the obligations of the estate, then several pending adversary proceedings aimed at recovering value for HCM's estate can be justly deemed unnecessary to pay creditors in full.  As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close, ultimately stopping the bloodshed.

92.     In addition, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Mr. Kirschner, and Hayward & Associates—are continuing to incur and receive millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or could be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.  Fees for Pachulski range from $460 an hour for associates to $1,265 per hour for partners, and fees for Quinn Emanuel lawyers range from $830 an hour for first year associate to over $2100 per hour for senior partners.  At these rates, depletion of the estate will occur rapidly.

CORE/3524155.0004/178862860.20

### THIRD CLAIM FOR RELIEF
**(Declaratory Judgment and Determination Regarding Nature of Plaintiff's Interests)**

93.    Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

94.    In the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid, Plaintiffs seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries.[6]

95.    Such a declaration and a determination by the Court would further assist parties in interest, such as Plaintiffs, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement.

WHEREFORE, Plaintiffs pray for judgment as follows:

(i)    On the First Claim for Relief, Plaintiffs seek an order compelling Defendants to disclose the assets currently held in the Claimant Trust, transactions completed that affect the Claimant Trust directly or indirectly, and all liabilities of the Claimant Trust;; and

(ii)    On the Second Claim for Relief, Plaintiffs seek a determination of the relative value of those assets in comparison to the claims of the Claimant Trust Beneficiaries; and

(iii)    On the Third Claim for Relief, Plaintiffs seek a determination that the conditions are such that all current Claimant Trust Beneficiaries could be paid in full, with

---

[6] To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement.

CORE/3524155.0004/178862860.20

such payment causing Plaintiffs' Contingent Claimant Trust Interests to vest into

Claimant Trust Interests; and

(iv)    Such other and further relief as this Court deems just and proper.

Dated: May 10, 2023

Respectfully submitted,

**STINSON LLP**

*Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust*
*and the Hunter Mountain Investment Trust*

CORE/3524155.0004/178862860.20

SIDLEY AUSTIN LLP
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Matthew A. Clemente (admitted pro hac vice)
Dennis M. Twomey (admitted pro hac vice)
Alyssa Russell (admitted pro hac vice)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) | |
| | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN ORDER AUTHORIZING THE EXAMINATION OF RULE 2004 PARTIES PURSUANT TO <u>RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Highland Capital

Management, L.P., the above-captioned debtor ("<u>HCMLP</u>" or the "<u>Debtor</u>") files this motion (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210729000000000001

"Motion") pursuant to sections 105 and 1103 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 2004-1 of the Local Bankruptcy Rules for the Northern District of Texas (the "Local Rules") for entry of an order, substantially in the form annexed hereto as Exhibit 1, authorizing and directing discovery relating to the topics listed in Section V of this Motion (the "Examination Topics") from the corresponding parties listed in that Section (collectively, the "Rule 2004 Parties").[2]   In support of this Motion, the Committee respectfully states as follows:

## I.    PRELIMINARY STATEMENT[3]

1.    Highland's corporate structure is exceedingly, and likely intentionally, complex. The information that has been gleaned from the Debtor's books and records and public court proceedings indicates that the Debtor's founder, James Dondero,[4] created an elaborate web of approximately 2,000 business entities,[5] through which he was able to siphon value away from certain entities into new entities that he directly or indirectly owned.[6]   Notwithstanding the considerable information that has been revealed about Dondero's international shell games, the Committee has limited knowledge of the Highland corporate structure, the economic relationships

---

[2]   In support of this Motion, the Committee submits the *Declaration of Marc S. Kirschner in Support of the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (the "Kirschner Declaration").  Attached hereto and incorporated herein as Exhibit 15.

[3]   Capitalized terms not defined in the Preliminary Statement are defined herein.

[4]    To the extent any of the Rule 2004 Parties overlap with any defendants in the *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al,* Adversary No. 20-03195, the Committee and the Litigation Advisor have attempted to craft requests that will not touch upon topics properly reserved for discovery through the adversary proceeding.

[5]    *See, e.g.*, *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 119 (Bankr. N.D. Tex. 2018) ("Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from : collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.").

[6]   *See* Kirschner Decl. ¶ 7.

APP 981

and entanglements between the entities and individuals within that structure, and the intercompany arrangements and transactions that have redistributed value therein. What is known, however, is that Dondero sits at the center of this byzantine web, which he created and continues to use to conceal assets and evade creditors.[7]

2.       In recognition of how elaborate and opaque the corporate scheme Dondero has created is, on June 18, 2021, the Court issued the Order Requiring Disclosures, which ordered that nine categories of Non-Debtor Dondero-Related Entities (as defined in the Order) who had appeared and argued in this chapter 11 case disclose basic identifying information about themselves.[8] This Rule 2004 Motion expands on the Order Requiring Disclosures in three ways. *First*, it seeks additional information from the Non-Debtor Dondero-Related Entities. *Second*, it seeks examination of entities and individuals who are not currently active in this Chapter 11 Case (and therefore are not covered by the Order) but whose activities may have had a negative impact on the Debtor. *Third*, it seeks additional information about certain non-debtor assets and conduct that also may have harmed the Debtor.

3.       The Committee requests authority to issue subpoenas for documentary and oral discovery in order to determine, among other things, whether conduct that was purportedly undertaken by or on behalf of the Debtor, the Non-Debtor Dondero-Related Entities, and other Dondero affiliates, gives rise to claims for breach of fiduciary duties, aiding and abetting breach of fiduciary duty, fraudulent transfer, veil-piercing, usurpation of corporate opportunity, fraud, conspiracy, or other causes of action. Specifically, the Committee intends to investigate additional facts and circumstances surrounding the events underlying the Acis Proof of Claim, the

---

[7]   *See generally In re Acis Capital Mgmt.*, 584 B.R. 115.

[8]   *See* Order Requiring Disclosures, dated June 17, 2021 (Docket No. 2460).

3

HarbourVest Proofs of Claim, the UBS Proofs of Claim, and the Redeemer And Crusader Proofs of Claim—each of which exposed the Debtor to tens or hundreds of millions of dollars of potential liability and ultimately resulted in the Debtor entering into a substantial monetary settlement. In addition, the Committee requests authority to pursue targeted discovery from key non-debtor entities within the Highland web, including the Non-Debtor Dondero Related Entities, the Individual Highland Parties, the Highland Charities And Trusts, and other affiliated entities. This discovery will further the Committee's understanding of the motives and effect of the complex corporate web created by Dondero, including whether value was transferred from (or opportunities were diverted away from) the Debtor through unlawful schemes. Finally, as discussed herein, the Committee requests authorization to investigate other topics which may give rise to Estate causes of action.

4.     The Committee brings this Motion to protect the unsecured creditors' rights to properly investigate the extent and amount of potential causes of action against the Debtor and its Related Entities. If permitted, the Committee's investigation will involve a detailed review and assessment of conduct that may have harmed the Debtor's estate and diminished the assets available to the Debtor's creditors. It is important that the Committee, and the successor in interest to the applicable Estate Claims, the litigation sub-trust (the "Litigation Sub-Trust"), to be created under the Debtor's plan of reorganization, obtain a full factual understanding of the magnitude of losses suffered and the seriousness of suspected misconduct. Proceeding under Bankruptcy Rule 2004 permits the Committee to conduct its investigation in an expeditious, efficient, and cost-effective way, which is especially important given the fast-approaching end of the two-year tolling of statutes of limitations for many potential claims.

5. The Committee, appointed to represent the interests of unsecured claimants in this bankruptcy, under the leadership of the Litigation Advisor, is leading the investigation of these potential causes of action pending the effective date of the Debtor's confirmed plan or reorganization and creation of the Litigation Sub-Trust. Upon effectiveness of the Plan, the investigation will be transferred to the Litigation Sub-Trust. The Debtor's corporate structure and the complicated and frequent transfers among Related Entities require the Committee to seek discovery from the Rule 2004 Parties, which consist of individuals and non-debtor entities that are likely to have information relating to the potential causes of action.[9] Given the interconnectedness of the Highland corporate web, even conduct by and between non-debtor entities may bear on the Committee's and Litigation Sub-Trust's ability to pursue claims premised on fraud, conspiracy, alter ego, veil piercing, successor liability, civil RICO, substantive consolidation, de facto merger, de facto partnership, and/or related theories.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[9] As this Court has observed, "there are at least hundreds of entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which were **not** subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. .. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them …. This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities, but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands." *See* Order Requiring Disclosures, dated June 17, 2021 (Docket No. 2460).

7.    The bases for the relief requested herein are section 105(a) and 1103 of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and Rule 45 of the Federal Rules of Civil Procedure, made applicable to this proceeding pursuant to Rule 9016 of the Bankruptcy Rules.

### III.    PROCEDURAL BACKGROUND

8.    On October 16, 2019, the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its businesses and manage its properties and assets as debtor in possession.

9.    On October 29, 2019, the Office of the United States Trustee held a meeting to appoint the Committee pursuant to section 1102 of the Bankruptcy Code.  At its formation, the Committee consisted of the following four members: (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"); (b) Meta-E Discovery; (c) UBS Securities LLC and UBS AG London Branch (together, "UBS"); and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (together, "Acis").  Acis and Redeemer resigned from the Committee effective as of April 15, 2021 and April 30, 2021, respectively.  The Committee therefore currently consists of Meta-E Discovery and UBS.

10.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].

11.    On January 9, 2020, the Court approved the *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket. No. 28], approving a settlement between the Debtor and the Committee concerning, among other things, governance of the Debtor and the pursuit of claims held by the Debtor.  The approved settlement was embodied in a term sheet filed on the docket [Docket No. 354] (the "Term Sheet").  Pursuant to the Term

APP 985

Sheet, the Committee was granted standing to pursue the "Estate Claims," defined as "any and all estate claims and causes of action against Dondero, Mark Okada, other insiders of the Debtor, and each of the Related Entities, including promissory notes held by any of the foregoing."[10]

12.     On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943, at 61] (the "Confirmation Order").

13.     Upon the Effective Date of the Plan,[11] the Claimant Trust will be issued new Limited Partnership Interests in the Debtor and assume management of the Debtor and the Litigation Sub-Trust will be created. (Plan at 26.) The Litigation Sub-Trust, created for the benefit of the holders of claims and interests in the Debtor, will be vested with certain claims and causes of action of the Debtor, including the Estate Claims. Pursuant to the Plan, Marc S. Kirschner, the Trustee for the Litigation Sub-Trust (the "Litigation Trustee") will be tasked with, among other things, investigation and monetization of the causes of action under the Plan.

14.     On March 1, 2021, the Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA," and with HCMFA, the "Advisors") filed a notice of appeal of the order confirming the Plan to the United States District Court of the Northern

---

[10]    *See* Term Sheet at 4; *see also Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified)* (Docket No. 1875), Exhibit DD (Schedule of Retained Causes of Action) (setting forth non-exclusive list of causes of action transferred to the Litigation Sub-Trust) (Docket No. 1875-3).

[11]    "Effective Date" means the Business Day that the Plan becomes effective as provided in ARTICLE VIII of the Plan.

APP 986

District of Texas (the "Confirmation Appeal") [Docket No. 1957].[12] On April 1, 2021, the Advisors filed the *Motion for Stay Pending Appeal* Civ. Act. No. 3:21-cv-00538-N, [Docket No. 3] and The Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good") filed the *Motion for Stay Pending Appeal*, Civ. A. No. 3:21-cv-00550-L, [Docket No. 6] with the District Court for the Northern District of Texas, both seeking a stay of the effectiveness of the Plan pending resolution of the Confirmation Appeal. On June 2, 2021, the Fifth Circuit Court of Appeals granted the requests of, *inter alia*, the Advisors, Dugaboy, and Get Good for leave to file a direct appeal under 28 U.S.C. § 128(d). On June 21, 2021, the Fifth Circuit denied the appellants' motion for a stay pending appeal of the Debtor's confirmed plan. (Docket No. 21-10449). The Confirmation Appeal remains pending.

15. Because the effective date of the Plan and formation of the Litigation Sub-Trust has been delayed, on May 14, 2021, the Committee filed its *Application for Order Pursuant to Section 1103 of the Bankruptcy Code Authorizing the Employment and Retention of Teneo Capital, LLC as Litigation Advisor to the Official Committee of Unsecured Creditors Effective April 15, 2021* [Docket No. 2306] to retain and employ Teneo Capital, LLC ("Teneo" or the "Ligation Advisor") pursuant to sections 328(a) and 1103(a) of the Bankruptcy Code, effective April 15, 2021, to perform litigation advisory services for the Committee in this chapter 11 case. On June 10, 2021, the Court approved the application for retention of the Litigation Advisor [Docket No. 2443].

16. On June 18, 2021, the Court issued an Order Requiring Disclosures *sua sponte* pursuant to Section 105 of the Bankruptcy Code and the Court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who have moved for relief in this case. The

---

[12] Likewise, on May 3, 2021, Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. filed a notice of appeal of the order confirming the Plan. [Docket No. 1966].

Order Requiring Disclosures required that the following eight categories of sets of "Non-Debtor Dondero-Related Entities" provide certain information clarifying their party-in-interest status or standing:

- James D. Dondero;

- Dugaboy and Get Good;

- HCMFA and NPA;

- Highland Funds I and its series Highland Healthcare Opportunities Fund; Highland/iBoxx Senior Loan ETF; Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund; Highland Funds II and its series Highland Small-Cap Equity Fund; Highland Socially Responsible Equity Fund; Highland Fixed Income Fund; Highland Total Return Fund; NexPoint Capital, Inc.; NexPoint Strategic Opportunities Fund; Highland Income Fund; Highland Global Allocation Fund; and NexPoint Real Estate Strategies Fund;

- Charitable DAF Holdco, Ltd. ("DAF Holdco"); Charitable DAF Fund, LP ("DAF"), Highland Dallas Foundation, Inc. ("Highland Dallas Foundation");

- CLO Holdco, Ltd.;

- NexPoint Real Estate Finance, Inc.; NexPoint Real Estate Capital, LLC; NexPoint Residential Trust, Inc.; NexPoint Hospitality Trust; NexPoint Real Estate Partners, LLC; NexPoint Multifamily Capital Trust, Inc.; VineBrook Homes Trust, Inc.; NexPoint Real Estate Advisors, L.P.; NexPoint Real Estate Advisors II, L.P.; NexPoint Real Estate Advisors III, L.P.; NexPoint Real Estate Advisors IV, L.P.; NexPoint Real Estate Advisors V, L.P.; NexPoint Real Estate Advisors VI, L.P.; NexPoint Real Estate Advisors VII, L.P.; NexPoint Real Estate Advisors VIII, L.P.; and any funds advised by any of the foregoing and any of their subsidiaries (together with the Advisors, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, and NexPoint Real Estate Strategies Fund, the ("NexPoint Entities"); and

- Highland Capital Management Services, Inc.[13]

---

[13] The Court noted that it had omitted three other entities from the Order Requiring Disclosures—Highland Funding (as defined herein); Hunter Mountain Investment Trust; and NexBank—because they were no longer active in the case. *See* Order Requiring Disclosures.

17.     The Committee is continuing its investigation into the potential causes of action to ensure the potential claims are investigated and pursued in a timely and efficient manner. This Motion is brought as part of that investigation.

## IV.     RELIEF REQUESTED

18.     By this Motion, the Committee respectfully requests the entry of an order, substantially in the form of the proposed order attached hereto as Exhibit 1, authorizing the Committee to issue subpoenas for the production of documents from, and for depositions of, the relevant Rule 2004 Parties relating to the Examination Topics.

## V.     EXAMINATION TOPICS

### A.     Potential Breach of Fiduciary Duty Claims

19.     The Committee seeks to investigate whether any individual or entity who owed fiduciary duties to the Debtor may have breached those fiduciary duties by elevating the interests of Dondero and/or others over the interests of the Debtor. Strand Advisors, Inc. ("Strand") is a Delaware corporation that is the General Partner of the Debtor, which is a Delaware limited partnership. Strand was owned entirely by Dondero, and prior to the Court's January 2020 Corporate Governance Order,[14] Dondero was an officer and director of both the Debtor and Strand. Strand's Secretary was Scott Ellington and its Treasurer was Frank Waterhouse. Ellington was also General Counsel, Chief Legal Officer, and Partner of the Debtor, and Isaac Leventon was the Debtor's Assistant General Counsel.

20.     Strand and Dondero (and potentially others) each owed fiduciary duties to the Debtor under Delaware law. There is reason to believe that one or more of them may have breached their fiduciary duties by siphoning value away from the Debtor in order to harm its

---

[14]   *See* Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operation in the Ordinary Course (Docket No. 339) (the "Corporate Governance Order").

creditors. Such conduct would fit within a pattern that is familiar to this Court. As the Court remarked in its post-trial opinion in *In re Acis Capital Management, L.P.*, 584 B.R. 115, 131 (Bankr. N.D. Tex. 2018), "[t]he one thing that the court was wholly convinced of was that conflicts of interest among Highland and the [Acis Debtors] abound, and no one is looking out for the interests of the [Acis Debtors] as a fiduciary should." Here, too, Dondero controlled both the Debtor and Strand, as well as many of their affiliates and key contractual counterparties. Moreover, as discussed throughout this motion, evidence suggests that similar conflicts of interest may abound, and that Dondero has, directly or through entities he controls, put his own personal interests ahead of the interests of the Debtor. The Committee intends to investigate the extent to which Ellington, Waterhouse, Leventon, or others implemented or otherwise participated in Dondero's schemes, and/or whether other individuals and entities aided and abetted those fiduciary breaches.

21. In the last year, the Debtor has entered into the four settlements described below. Collectively, these settlements obligated the Debtor on over $350 million in allowed claims, and required the Debtor to incur millions of dollars in defense fees and costs. Investigation is warranted to determine whether the Debtor's fiduciaries breached their duties in connection with these matters, in ways that harmed all unsecured creditors of the Debtor (in addition to the claimants who filed the respective proofs of claim).

### 1. The Acis Proof of Claim

22. In connection with contentious litigation over the two Acis proofs of claim (the "Acis Proofs of Claim"),[15] Acis received a $23 million allowed claim against the Debtor.[16] In

---

[15] *See* Proofs of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC, dated Dec. 31, 2019 (Claim No. 23), Proof of Claim of Acis Capital Management, L.P., dated April 8, 2020 (Claim No. 159).

[16] *See* Debtor's Motion for Entry of an Order Approving Settlement with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and

addition, the Debtor was required to pay Joshua Terry—the former employee who commenced the Acis involuntary bankruptcy proceedings after Dondero "denuded" Acis to frustrate Terry's judgment collection efforts—$880,000 plus interest.[17]

23.     As this Court is well aware, the Acis bankruptcy cases were highly contentious. At Dondero's direction, the Debtor and Highland CLO Funding, Ltd. ("Highland Funding") sued the chapter 11 trustee, prompting a countersuit to recover allegedly fraudulent transfers and to stop the Debtor (which continued for a time to manage Acis) from taking actions that the trustee alleged were harmful to Acis and the collateralized loan obligations that it managed. That adversary complaint formed the basis of the 34-count Acis Proof of Claim.

24.     A full investigation of the conduct forming the basis for the Acis Proof of Claim is required to determine whether the Acis Proof of Claim was the result of any fiduciary's breach of its duties to the Debtor, which resulted in harm to all general unsecured creditors. Likewise, an investigation will shed light on whether the extensive legal fees that the Debtor was forced to incur were incurred for its own benefit, or instead as part of a larger plan designed to protect Dondero's personal assets. Such an investigation will require a full accounting of the facts and circumstances underlying the Acis Proof of Claim, including documents that are not currently in the Debtor's possession. Thus, the Committee requests authority to conduct examinations into non-debtor entities and individuals within the Highland web who were involved in events relating to the Acis Proof of Claim (the "Acis Dispute Parties").[18]

---

(C) Acis Capital Management, L.P. (Claim No. 159), and Authorizing Actions Consistent Therewith. (Docket No. 1087).

[17]  *See id.*; *see also* Proof of Claim of Joshua Terry, dated April 8, 2020 (Claim No. 156) (the "Terry Proof of Claim").

[18]  The Acis Dispute Parties are: Dondero; Highland CLO Management Ltd. ("Highland Management"); Highland CLO Holdings, Ltd. ("Highland Holdings"); Jean Paul Sevilla; and Mark Okada. Highland Management and Highland Holdings were each defendants (along with the Debtor) in Acis' Second Amended Complaint that formed the basis

25.     In addition, the Committee intends to examine the fraudulent transfers alleged in the Acis Proof of Claim, in order to determine whether they lead to any colorable estate causes of action and/or suggest a pattern or practice of unlawful conduct within the Highland web that supports other theories of recovery.

### 2.     The Harbourvest Proofs of Claim

26.     On November 15, 2017, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, the HarbourVest Entities" or "HarbourVest") obtained a 49% interest in Highland Funding for $80 million (the "Highland Funding Investment").  Highland Funding is one of the Debtor's managed vehicles.  Acis was the portfolio manager for Highland Funding, and Acis subcontracted its functions to the Debtor.

27.     On April 8, 2020, the HarbourVest Entities filed proofs of claim (Claim Nos. 143, 147, 149, 150, and 154) (the "HarbourVest Proofs of Claim") against the Debtor arising from the Highland Funding Investment.[19]  HarbourVest alleged it was fraudulently induced into entering into the Highland Funding Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor:  (1) failed to disclose that it never intended to pay the $8 million arbitration award obtained by Terry; (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing Terry from collecting on his arbitration award and misrepresented the reasons for changing the portfolio manager for Highland Funding immediately prior to HarbourVest's Highland Funding Investment; (3)

---

for the Acis Proof of Claim.  The roles of the Acis Dispute Parties are set forth in, *inter alia*, the addenda to the Acis Proofs of Claim and Terry Proof of Claim, which are incorporated herein by reference.

[19]   The HarbourVest Proofs of Claim are incorporated herein by reference.

indicated that the dispute with Terry would not impact investment activities; and (4) expressed confidence in the ability of Highland Funding to reset or redeem the CLOs under its control.

28.    HarbourVest sought to rescind its Highland Funding Investment and alleged damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").  Pursuant to the parties' settlement, HarbourVest agreed to transfer its interest in Highland Funding to a new entity designated by the Debtor, and HarbourVest received a $45 million general unsecured allowed claim and a $35 million subordinated general unsecured allowed claim.[20]

29.    The Committee intends to examine the nature of HarbourVest's claims to determine whether the conduct articulated in the HarbourVest Proofs of Claim, the resulting payments the Debtor was required to make in satisfaction of HarbourVest's claims, and/or the legal expenses incurred in connection with HarbourVest's claims give rise to breach of fiduciary duty claims and/or related causes of action as a result of harm to all general unsecured creditors.  Indeed, it is likely that the facts underlying HarbourVest's allegations concerning fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, and securities and RICO violations will aid the Committee and Litigation Trustee in identifying Estate causes of action against the Debtor's own fiduciaries.  Such an investigation will require a full accounting of the facts and circumstances underlying the HarbourVest Proofs of Claim, including documents that are not currently in the Debtor's

---

[20]    *See* Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, dated Dec. 23, 2020 (Docket No. 1625); *see also* Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, dated Jan. 21, 2021 (Docket No. 1788).

possession. To that end, the Committee seeks authority to conduct examinations into certain individuals with knowledge of the transactions and conduct related to the HarbourVest Proofs of Claim (the "HarbourVest Dispute Parties").[21]

### 3. The UBS Proofs of Claim

30. In February 2009, UBS filed an action in the Supreme Court of the State of New York alleging that Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Funds") owed over $500 million to UBS under certain contracts. UBS then commenced a second action against the Debtor for breach of the implied covenant of good faith and fair dealing and fraudulent conveyance, among other causes of action. UBS also amended its complaint to add Highland Financial Partners, L.P. ("HFP") and other entities as defendants. HFP wholly owns SOHC and UBS alleged that HFP was the alter ego of SOHC and was therefore liable for SOHC's misconduct.

31. The court bifurcated the trial into two phases—Phase I to decide UBS's breach of contract claims against the Funds and the Debtor's counterclaims against UBS, and Phase II to decide all remaining claims, including those against the Debtor. After a 13-day "Phase I" trial in July 2018, the court entered judgment in UBS's favor, finding the Funds liable to UBS for over $530 million and SOHC liable to UBS for over $509 million.

32. The Debtor filed for bankruptcy before the Phase II trial commenced. UBS filed proofs of claim (Claim Nos. 190, 191) (the "UBS Proofs of Claim") asserting unsecured claims against the Debtor for damages resulting from (i) the Debtor's breach of the implied covenant of good faith and fair dealing for its efforts to impair UBS's contractual right to collect from the

---

[21] These parties include Dondero, Ellington, Leventon, Okada, and Mark Patrick, who acted as tax counsel for the Debtor, was often involved in the creation of entities and structuring of transactions, and therefore likely possesses relevant knowledge.

Funds, and (ii) the Debtor's role in directing fraudulent conveyances that occurred after the commencement of the UBS litigation, as well as for further damages, prejudgment interest, and attorneys' fees. Specifically, UBS claimed that the Debtor devised and executed a strategy to interfere with UBS's contractual right to recovery and prevented the Funds (and HFP) from turning over any of their assets to UBS in satisfaction of their debt. Furthermore, UBS alleged that in March 2009, the Debtor orchestrated the transfer of approximately $233 million in assets away from the Funds and out of UBS's reach. The claims further alleged that the Debtor improperly prevented the Funds from turning over any other assets held by the Funds (or HFP) after the March 2009 transfers. However, UBS lacked sufficient information about those assets and the circumstances of their disposition to quantify the damages resulting from the Debtor's alleged breach.

33.     Also, on March 29, 2021, UBS filed an adversary proceeding against the Debtor alleging that, since at least August 2017, the Debtor, acting under the direction of Dondero, Ellington, Leventon, and other former Debtor employees, was fraudulently transferring ownership of all or substantially all of the Funds' hundreds of millions of dollars' worth of assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity owned and controlled by Dondero and Ellington,[22] for a fraction of the supposed face value of the assets.[23] UBS alleged that these assets may have consisted of (i) a redemption interest (the "Sentinel Redemption") in Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat") and (ii) assets held by CDO Fund related to Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen

---

[22]   Dondero is believed to own 70% of Sentinel and Ellington indirectly owns the remaining 30% through a series of complicated intermediate holding and operating companies. *See Debtors' Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* (Dkt. 2199).

[23]   *See* Original Complaint For Injunctive Relief, dated March 29, 2021 (Adv. Pro. No. 21-03020 at Dkt. 1).

Loan Funding Ltd., Eastland CLO Ltd., Grayson CLO Ltd., Valhalla CLO Ltd., and Governance Re, Ltd., including cash payments related to those assets (collectively, the "CDO Fund Assets"). Moreover, UBS alleged that it is possible that Sentinel and/or its transferees continued to receive cash payments from accounts the Debtor owns or controls pursuant to certain interests underlying the potential fraudulent transfers.

34.     As a result of these allegations, the Debtor was forced to enter into a substantial settlement with UBS, including (i) a single general unsecured claim in the amount of $65 million; (ii) a single subordinated unsecured claim of $60 million; and (iii) a payment of $18.5 million to UBS by Multi-Strat, a non-debtor fund managed by the Debtor that is a co-defendant in the state court litigation.[24]  Moreover, the Debtor is required to incur additional costs in connection with assisting UBS's in its collection efforts against the Funds.

35.     The Committee seeks Rule 2004 discovery from Governance Re, Ltd., Sentinel, Sentinel Re Holdings, Ltd., SAS Asset Recovery, Ltd., SAS Holdings SPV Ltd., SAS Litigation Management, L.P., SAS Loan Services Ltd., Dondero, Ellington, Leventon, and Mark Patrick (the "UBS Dispute Parties")[25] to investigate the circumstances of these transfers and whether they give rise to causes of action, including but not limited to fraudulent conveyance and breach of fiduciary duty claims to redress harm to all general unsecured creditors.  In addition to incurring $125

---

[24]  *See* Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith, dated April 15, 2021 (Docket No. 2199); *see also* Order Approving Debtor's Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith, dated May 27, 2021 (Docket No. 2389).

[25]  It is the Committee's understanding that SAS Asset Recovery, Ltd., SAS Holdings SPV Ltd., SAS Litigation Management, L.P., and SAS Loan Services Ltd. were likely involved in the conduct giving rise to the UBS Settlement, and have otherwise been involved in transactions involving the Debtor and/or its affiliated entities. *See In re: Highland Capital Management, L.P. and CLO Holdco, Ltd.*, No. 19-34054-sgj-11, Hr. Tr. dated May 21, 2021, at 60:22-25, 61:1-19. Because of Dondero, Ellington, and Leventon's authority over the Debtor and the entities encompassed within the UBS Dispute Parties, the Committee also seeks discovery from these individuals.  As noted above, it is also the Committee's understanding that Patrick, who acted as tax counsel for the Debtor, was often involved in the creation of entities and structuring of transactions, and therefore likely has relevant information related to the UBS Proofs of Claim and the settlements.

APP 996

million in claims in connection with this settlement, the Debtor has also incurred substantial legal fees and expenses as a result of this litigation. These fees, too, may give rise to breach of fiduciary duty claims, if, for example, the conduct giving rise to the litigation and/or the decision to engage in protracted litigation were made to shield assets for Dondero's and/or others' benefit, to the detriment of the Debtor.

### 4. The Redeemer And Crusader Proofs of Claim

36. Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") were formed between 2000 and 2002. In October 2008, the Debtor commenced wind-down proceedings on behalf of the Crusader Funds, and the "Redeemer Committee" was formed pursuant to a plan and scheme of arrangement adopted in 2011 to resolve disputes arising in connection with the Crusader Funds' wind-down proceedings.

37. The Debtor served as investment manager for the Crusader Funds until August 2016, when it was terminated by the Redeemer Committee. The Redeemer Committee commenced an arbitration against the Debtor, in which it asserted various claims against the Debtor in connection with its role as the investment manager for the Crusader Funds. In 2019, the arbitration panel issued an award that included gross damages of $136.8 million and total damages (including interest) of $190.8 million. The Debtor filed for bankruptcy protection on the day of oral arguments on the Redeemer Committee's motion to enforce the arbitration award in Delaware Chancery Court.

38. On April 3, 2020, the Crusader Funds filed a claim in the amount of $23.5 million (Claim No. 72) (the "Crusader Proof of Claim"), and on April 6, 2020, the Redeemer Committee filed a proof of claim in the amount of $190.8 million (Claim No. 81) (the "Redeemer Proof of Claim"). Both claims included post-petition interest, attorneys' fees, and other costs and expenses.

Furthermore, the Crusader Proof of Claim sought the disgorgement of all management, distribution, and deferred fees paid to the Debtor based on the "faithless servant" doctrine. According to the Crusader Funds, under the faithless servant doctrine, the Debtor forfeited any right that it had to compensation for services rendered to the Crusader Funds, from the date of its first disloyal act onward.

39.    Pursuant to the terms of a settlement approved by the Court on October 23, 2020, the Redeemer Committee's claim was allowed in the amount of $136.7 million, and the Crusader Funds' claim was allowed in the amount of $50,000.[26]   The Committee requests Rule 2004 discovery from individuals that may have information relating to the conduct giving rise to these payment obligations (the "Redeemer And Crusader Dispute Parties")[27] to investigate whether some or all of these claims—including but not limited to claims seeking to disgorge management and distribution fees from the Debtor and incurrence of legal expenses—arise out of any fiduciary's breach of duties to the Debtor which harmed all general unsecured creditors.  Such an investigation will require a full accounting of the facts and circumstances underlying the Redeemer Proof of Claim and Crusader Proof of Claim, including documents and information that is not currently in the Debtor's possession that are sought by this Motion.

---

[26]   *See* Debtor's Motion for Entry of an Order Approving Settlements with (A) The Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) The Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith, dated Sept. 23, 2020 (Docket No. 1089); *see also* Order Approving Debtor's Settlement with (A) The Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) The Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith, dated Oct. 23, 2020 (Docket No. 1273).

[27]   The Redeemer and Crusader Dispute Parties are Dondero, Okada, Ellington, Leventon and Patrick.  These individuals likely have documents, information, and knowledge of the conduct giving rise to the payment obligations set forth in the Redeemer Proof of Claim and the Crusader Proof of claim, given their roles at the Debtor during the applicable time period.

## B.      Individual Highland Parties

40.      Although, Dondero may be the primary architect of the Highland web, he has not

acted alone.  The Committee is aware, based on public filings and documents that they have

reviewed to date, that the Debtor may have been harmed by the actions of certain former Highland

employees and other individuals, including Ellington, Leventon, Waterhouse, Patrick, Okada,

Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello,

Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio,

Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt,

Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani (the "Individual Highland Parties").[28]

Although the Debtor has a subset of these employees' documents and electronic communications

on its server, the Committee moves under Rule 2004 to compel the Individual Highland Parties to

produce information related to the Debtor that is not currently in the Debtor's or Committee's

possession.

---

[28]   These individual parties are likely to have relevant information due to their roles and affiliations with the Debtor
or its principals.  Grant Scott is a personal friend of Dondero and has served as trustee for various trusts related to the
Debtor, like Dugaboy and Get Good.  Mary Jalonick was the president and chief executive officer of The Dallas
Foundation.  Katie Irving, Jean Paul Sevilla, and Matt DiOrio are former employees of the Debtor who the Committee
understands have been involved in transactions of interest, including conduct leading to the UBS Settlement. John
Honis appears to control many of the entities involved in the Hunter Mountain Transaction. Nancy Dondero is
Dondero's sister, and acts (or has acted) as trustee for various trusts related to the Debtor, including Dugaboy and Get
Good.  The Committee also understands that Melissa Schroth is a former executive accountant of the Debtor, who
was often involved in transactions involving the Debtor and affiliated entities. Tara Loiben was Dondero's executive
assistant.  Trey Parker is a former partner of the Debtor and was likely involved in many transactions involving the
Debtor discussed herein, especially given his role as co-chief investment officer.  Dana Scott Breault is a close
confidant of Dondero and has worked as a property manager for the Debtor's affiliate NexBank Realty.    The
Committee understands that Gianna Cerullo also has ties to Dondero, the Debtor, and the Debtor's affiliates, including
involvement in a lawsuit where Cerullo was the owner of property of which Get Good was the landlord.   Dilip
Massand, Maslow (Ellington's sister), and Kamlani have been involved in various transactions with the Debtor and
its affiliates, as detailed more fully herein.  Lauren Thedford and Stephanie Vitiello were both a part of the Debtor's
legal team.  Upon information and belief, Jason Post was the former chief compliance officer for the Debtor, and
Cyrus Eftekhari was also a part of this team, and therefore they both likely have relevant information regarding certain
transactions and conduct.  Upon information and belief, Eric Holt also acted (or acts) as chief compliance officer of
NexPoint Securities, Inc.  It is the Committee's understanding that Rothstein is the former IT director at the Debtor,
who currently provides IT services to the Debtor pursuant to a shared service agreement. Therefore, the Committee
seeks discovery from these individuals given these roles with the Debtor and/or its affiliates, as well as their potential
involvement in transactions and conduct of interest.

41. Throughout these cases, individuals affiliated with the Debtor have been engaged in efforts to defy court orders, withhold discoverable information and/or destroy evidence,[29] and may have participated in schemes to conceal assets and insulate the Debtor and other related entities from judgments or clawback actions.[30] Indeed, this Court recently held Dondero in civil contempt for violating a temporary restraining order by destroying evidence (including his cell phone), trespassing on Debtor property after being evicted, interfering with the Debtor's trading of CLO assets, encouraging certain Nex Entities (described below) to make demands and threats against the Debtor regarding the trading of CLO assets, communicating with Ellington and Leventon before they were terminated by the Debtor, and interfering with the Debtor's obligation to produce certain documents requested by the Committee.[31]

42. Under these extraordinary circumstances, the Committee must take additional steps to obtain and preserve potentially relevant information, including information that is currently stored on individuals' personal devices. As such, the Committee seeks targeted discovery on topics that may be reflected in communications sent from the Individual Highland Parties' personal email accounts and information contained on the Individual Highland Parties' personal devices.

---

[29] *See, e.g.*, Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO, dated June 7, 2021 (Case No. 20-3190-SGJ) (Docket No. 190) (the "Sanctions Order").

[30] *See, e.g.*, *In re Acis Capital Mgmt.*, 584 B.R. at 148-49 ("[T]his court has heard ample evidence showing that the Alleged [Acis Debtors], with the aid of [Debtor HCMLP], were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day."); *See* Original Complaint For Injunctive Relief, dated March 29, 2021 (Adv. Pro. No. 21-03020 at Dkt. 1) (alleging that "[i]t has recently come to light that the Debtor, at the direction and with the involvement of numerous former employees, including James Dondero, Scott Ellington, Isaac Leventon, JP Sevilla, and Matt DiOrio, fraudulently transferred hundreds of millions of dollars of assets away from funds currently or previously controlled, owned, and/or managed by the Debtor to an entity jointly owned by Dondero and Ellington, in anticipation of the judgment that UBS obtained against those funds in New York state court."; *see generally* Nothing Can Stop This Hedge Fund Soap Opera, by Amanda Cantreall, dated Apr. 2, 2020, *available at* https://www.institutionalinvestor.com/article/b1l0wrph2lc0j6/Nothing-Can-Stop-This-Hedge-Fund-Soap-Opera.

[31] *See* Sanctions Order. (Docket No. 190)

43. Additionally, between 2015 and the Petition Date, Dondero received a number of large round-dollar payments from the Debtor which total approximately $20 million. Many of these payments are described in the Debtor's internal books and records as "equity distributions." To date, the Committee has not identified an explanation for these payments. Moreover, there is reason to doubt that any of these payments were actually "equity distributions," because they appear to have been made at times when Dondero purported to have held no limited partnership interests in the Debtor.[32] Because there is no explanation for the payments, it is also unclear whether the payments were appropriately made by the Debtor, as opposed to some other entity. The Committee seeks Rule 2004 discovery from Dondero regarding the purposes of these payments to determine, among other things, whether some or all of these payments constitute fraudulent transfers. The Committee also seeks Rule 2004 discovery from the Individual Highland Parties related to any similar payments from the Debtor.

### C. Highland Charities and Trusts

44. Interspersed within the Highland web are a number of entities that may exist for purportedly charitable purposes, including but not limited to Charitable DAF Fund, L.P.; Charitable DAF GP, LLC; Charitable DAF HoldCo, Ltd.; Dallas Foundation; Empower Dallas Foundation; Greater Kansas City Community Foundation; Highland Capital Management, L.P. Charitable Fund; Highland Dallas Foundation; Highland Kansas City Foundation, Inc.; Highland Santa Barbara Foundation, Inc.; The Santa Barbara Foundation; and the Okada Family Foundation;[33] as well as numerous trusts, including Dugaboy Investment Trust; the Dondero Family Dynasty Trust; the Fouray's Trust; The Dondero Insurance Rabbi Trust; The Get Good

---

[32] Kirschner Decl. ¶ 27.

[33] Also of interest is the Community Foundation of North Texas Inc., which appears to be distinct from the Highland web of entities.

Trust; The Get Good Non-Exempt Trust No. 1; The Get Good Non-Exempt Trust No. 2; the Get Better Trust; the Canis Minor Trust; The Mark & Pamela Okada Family Trust – Exempt Trust (MAP #1); The Mark & Pamela Okada Family Trust – Exempt Trust (MAP #2); The Okada Insurance Rabbi Trust; and The SLHC Trust, (collectively, the "Highland Charities And Trusts").[34]

45.     The relationship of these Highland Charities and Trusts to the Debtor is unclear at this time, but there appear to have been tens of millions of dollars of distributions of funds from the Debtor to certain of the Highland Charities and Trusts, either directly or indirectly, that need to be assessed for their propriety and reasonableness.[35]

46.     The Committee intends to pursue Rule 2004 examinations of the Highland Charities And Trusts, Dondero, and Scott[36] in order to determine, among other things, (i) whether the Debtor was harmed by these intricate schemes; (ii) the extent of any harm; (iii) whether any Individual Highland Parties or Strand breached their fiduciary duties to the Debtor by engaging in transactions with the Highland Charities And Trusts; (iv) the purposes and motivations for creating the Highland Charities And Trusts; (v) the actual uses of Debtor assets that were transferred to the Highland Charities And Trusts; (vi) whether the Highland Charities And Trusts operated as legitimate independent entities or, conversely, were simply vehicles for Dondero to advance an elaborate shell game and generate fees for himself and other fiduciaries of the Debtor; and (vii) whether any Individual Highland Parties were unjustly enriched via the transactions between the

---

[34] Kirschner Decl. ¶ 8.

[35] Kirschner Decl. ¶ 9.

[36] As mentioned above, during relevant time periods, Scott was the trustee and/or a director of various Highland Charities and Trusts, including Dugaboy and Get Good. Scott was also a close personal friend of Dondero.

Highland Charities And Trusts, on the one hand, and the Debtor or any of its alter egos, on the other hand.

### D. Transactions Between the Debtor and Its Affiliates

47.     As noted above, the information that has been gleaned from the Debtor's books and records and public court proceedings to date indicates that there are a number of transactions between or among the Debtor, its affiliates, and other entities affiliated with current or former Debtor employees.  For the reasons previously discussed, the Committee does not believe that the information currently available to it is sufficient to assess the potential causes of action that could arise from those relationships and transactions.

48.     As such, the Committee's Rule 2004 Examinations will seek information from the Rule 2004 Parties about any transfers, transactions, or agreements between the Debtor, on one hand, and the Rule 2004 Parties, on the other hand.  These transfers must be reviewed for, among other things, the reasonableness of exchanged value and adherence to applicable fund governing documents and investment guidelines.  Moreover, the Committee seeks information relating to any subsequent distributions or transactions made by the Rule 2004 Parties, who may have entered into additional transactions with other Highland entities, as part of intricate efforts to shield assets and evade creditors.

### E. The Nex Entities

49.     There are also a number of "Nex" entities that appear to be financially intertwined with the Debtor and Dondero.[37]  For example, the Advisors are registered investment advisors, and

---

[37]  NexBank Capital, Inc., NexBank SSB, NexBank Title, Inc., and NexBank Securities, Inc. (together, "NexBank") are financial services companies that appear to be closely affiliated with Dondero. According to NexBank's website, Dondero is the Chairman of the Board of Directors of NexBank Capital, Inc.  Mark Okada is a NexBank SSB director. NexBank SSB is indirectly owned by Dondero and Okada.  It also appears to have been the bank-of-choice for Dondero and the entities that he controls.  *See* First Day Declaration of Frank Waterhouse, dated Oct. 16, 2019, at ¶ 50.

NexPoint services shared services agreements for entities within Highland's corporate structure. Dondero is President of both of the Advisors and has ownership interests in both entities. Dondero is also the founder and principal of NexPoint. The Advisors separately manage three funds (the "NexPoint/HCMFA Funds").[38] The Advisors and these NexPoint/HCMFA Funds own, among other things, equity interests in certain pooled collateralized loan obligation vehicles that are managed by the Debtor. The Debtor manages these CLO vehicles pursuant to contracts to which neither the Advisors nor the NexPoint/HCMFA Funds are parties. In addition, the Debtor and its affiliates appear to have invested substantial amounts in these NexPoint/HCMFA Funds over time.[39]

50.     The relationships between the Nex Entities and the Debtor are opaque. However, the Debtor has performed certain services on behalf of certain Nex Entities, and at the same time, certain Nex Entities have performed services as an investment advisor and CLO manager. Dondero's common control over these entities, management of these entities under a common corporate structure using Debtor resources and oversight and his well-documented practice of creating new entities to succeed to the rights and obligations of indebted entities create the suspicion that Dondero may be using the Nex Entities to usurp the Debtor's existing or future business relationships. A full investigation is needed to determine whether that has occurred, and if so, whether it gives rise to any estate causes of action.[40]

---

[38] The NexPoint Entities and the NexPoint/HCMFA Funds are collectively referred to as the "Nex Entities." The Committee seeks documents from and an examination of John Holt, as he likely has relevant knowledge. The Committee also seeks documents and examinations of Dondero and Okada due to their ownership interests and/or roles with NexPoint.

[39] Kirschner Decl. ¶ 10.

[40] *See* Kirschner Decl. ¶ 11.

APP 1004

F. **The Hunter Mountain Transaction.**

51. The Committee, based on its investigation to date, has discovered that Hunter Mountain was involved in an unusual transaction with the Debtor in December 2015, whereby Hunter Mountain purchased a majority of the Debtor's limited partnership interests in exchange for $16.3 million in cash and $143.7 million in notes. The transaction occurred in two phases: in the first the Debtor itself granted certain limited partnership interests to Hunter Mountain in exchange for a small amount of cash and a large note receivable that was "contributed" by Hunter Mountain to the Debtor. In the second phase, the Class A Limited Partners[41] sold certain limited partnership interests to Hunter Mountain in exchange for a small amount of cash and a note receivable issued to each of the Class A Limited Partners.[42]

52. Based on the investigation to date, Hunter Mountain appears to be a shell company, the only assets of which are its Limited Partnership interests in the Debtor. Upon information and belief, Hunter Mountain is 100% owned and controlled by Beacon Mountain. It appears that the only asset of Beacon Mountain is its ownership of Hunter Mountain and Beacon Mountain is, itself, owned and controlled by Rand Fund. Upon information and belief, Rand PE Fund I, LP ("Rand Fund I") is 99% owned and controlled by Atlas IDF LP, and Rand Advisors manages both Rand Fund I and Atlas IDF LP. Atlas IDF GP is the general partner of Atlas IDF LP. Each of Rand Fund I, Atlas IDF GP, Atlas IDF LP, and Rand Advisors[43] appears to have been managed

---

[41] The Class A Limited Partners consisted of Dugaboy the Mark & Pamela Okada Family Trust – Exempt Trust 1, The Mark & Pamela Okada Family Trust – Exempt Trust 2, and Okada, individually.

[42] Kirschner Decl. ¶ 12.

[43] Rand Fund I, Atlas IDF GP, Atlas IDF, LP, and Rand Advisors all appeared in these proceedings to contest the Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor (Filed by Creditor Committee Official Committee of Unsecured Creditors) [Dkt. No. 808], citing concerns regarding the confidentiality of information shared pursuant to a Shared Services Agreement between them and the Debtor. See Reply to a) Unsecured Creditors' Committee's Emergency Motion to Compel Production by Debtor (Dkt. No. 808) ("Motion to Compel") and b) Debtor's Motion For Entry of (I) a Protective Order, or, in the Alternative, (II) an Order

and controlled by John Honis, a former employee of the Debtor who also served on the Board of Trustees of the Debtor's affiliated registered investment companies as well as on the boards of portfolio companies for investment funds operated by the Debtor.[44] Substantially all of the non-voting, non-control limited partner interests in the Debtor were owned by Hunter Mountain.[45]

53.    It is clear that the Hunter Mountain Transaction was not negotiated at arms' length and that the transfer resulted in only a $7 million cash infusion to the Debtor and the addition of a large note payable by yet another affiliate. What is not clear from the Committee's investigation of the Hunter Mountain Transaction to date is whether the Debtor received reasonably equivalent value in exchange for the transfer of its limited partnership interests, or what, if any, value was stripped away from the Debtor and its creditors as a result of the Hunter Mountain Transaction.[46] It is also unclear whether the Class A Interest Owners benefitted from the Hunter Mountain Transaction at the Debtor's expense. Finally, as majority limited partnership interest holders in the Debtor, the Hunter Mountain Investment Trust appears to have received distributions in excess of $30 million from the Debtor, which need to be assessed for reasonableness and propriety.

54.    The examination of the Hunter Mountain Transaction Parties[47] is therefore essential and necessary to the Committee's investigation of potential claims and causes of action. Further,

---

Directing the Debtor to Comply with Certain Discovery Demands Tendered by the Official Committee of Unsecured Creditors, Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034 (Dkt. No. 810). [Docket No. 837].

[44]  *See* Kirschner Decl. ¶ 13.

[45]  *See* Debtor's October 16, 2019 Form Adv Part 2A.

[46] *See* Kirschner Decl. ¶ 14.

[47]  The "Hunter Mountain Transaction Parties" include Hunter Mountain Investment Trust ("Hunter Mountain"), Beacon Mountain, LLC ("Beacon Mountain"), Atlas IDF, GP, LLC ("Atlas IDF GP"), Atlas IDF, LP ("Atlas IDF, LP"), Rand Fund I, Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund Management LLC ("Rand Fund Management"), Dugaboy, Strand, Crown Global Life Insurance Ltd. Bermuda, Empower Dallas Foundation, The Mark & Pamela Okada Family Trust – Exempt Trust 1, The Mark & Pamela Okada Family Trust – Exempt Trust 2, the Okada Family Foundation, Honis, Dolomiti, LLC, Hakusan, LLC, Sali Multi Series Fund, LLC, Sali Fund Partners, LLC, Sali Fund Management, LLC, Okada, Dondero, Ellington, Leventon, and Patrick. It is the Committee's understanding that Patrick was involved in the creation of Hunter Mountain and the structuring of the transaction, and therefore likely possesses relevant knowledge. The Committee also seeks discovery from Dondero and Okada related

given Hunter Mountain's majority limited partnership ownership in the Debtor, these examinations are essential to potentially uncovering further potential causes of actions and to gain a better understanding of the Debtor's financial condition and the Debtor's relationship and dealings with Hunter Mountain and its parent and affiliated entities.

### G. Governance Re "Insurance"

55.     As the Court is aware from other motion practice and hearings, the Debtor was "self-insured" for its directors and officers ("D&O") coverage.[48]  This self-insurance was issued by a Bermuda "captive" insurance company, Governance Re Ltd. ("Governance Re").  The named insured was an entity known as Highland D&O Trust, the ownership and legal status of which is unclear.

56.     Based upon review to date, there are a number of unusual aspects to the relationship between the Debtor and Governance Re.  First, the Debtor is a beneficiary of the D&O policy issued to Highland D&O Trust, but other Related Entities and numerous purportedly unaffiliated entities also appear to have been beneficiaries under the same policy.  It is unclear why the Debtor may have been paying insurance premiums for the benefit of unaffiliated entities. Second, upon information and belief, Governance Re is part of a corporate structure that ultimately rolls up to either Dondero individually or an entity owned or controlled by Dondero.  The nature of the relationship between Governance Re, Dondero, and the Debtor is currently unknown, as is the amount of any benefits conveyed to Dondero or others by virtue of this relationship. Third, the financial transactions between or among Governance Re, the Debtor, the Related Entities, and the

---

to this transaction due to their prior limited partnership interests in the Debtor that were sold to Hunter Mountain (whether directly or indirectly held) and from Ellington and Leventon due to their roles at the Debtor and likely involvement in the Hunter Mountain Transaction.

[48] *See In re: Highland Capital Management, L.P.*, No. 19-34054-sgj-11, Hr. Tr. dated July 19, 2021, at 34:16-23.

numerous other Dondero affiliates appear to be complicated and littered with notes, loans, or other indebtedness. It is unclear at this time whether any of those financial transactions were made to the Debtor's detriment. As a result, the Committee seeks Rule 2004 discovery regarding the relationships of those unaffiliated entities, and the basis for their inclusion in insurance coverage that was paid for by the Debtor,[49] including the relationship between Governance Re and Dondero or entities that Dondero owns or controls, and the financial relationship between Governance Re and the Debtor, the Related Entities, or any other Dondero-affiliated entity.[50] The Committee intends to use this discovery to assess whether there have been any breaches of fiduciary duty, improper transfers of funds to off-shore accounts intended to shelter those funds from judgments, or other conduct giving rise to claims or causes of action.

### H. Transactions Involving Entities Owned or Controlled by Debtor Employees

57. The Committee seeks to understand the relationship between and among the Debtor and entities that are owned or controlled by employees or agents of the Debtor. The Debtor has a long list of "vendors" in its books and records—a number of which appear to have been owned, controlled, and/or managed by Debtor employees. It is currently unclear whether these intercompany relationships were properly disclosed, or if their interactions with the Debtor give rise to potential causes of action.[51]

---

[49] The Committee intends to seek discovery from Governance Re, Highland D&O Trust, Conyers Trust Company, Dondero, Waterhouse, Patrick, and Okada. Dondero, Waterhouse, Patrick, and Okada likely have knowledge related to the relationships of the unaffiliated entities and the basis for their inclusion in insurance coverage that was paid for by the Debtor given their prior roles at the Debtor. Conyers appears to be the trustee of the Highland D&O Trust.

[50] Kirschner Decl. ¶¶ 15-19.

[51] Kirschner Decl. ¶ 20.

1.    **Tall Pine Entities**

58.    Shortly after these proceedings were commenced, in early 2020, Ellington appears to have formed entities called Tall Pine Group, LLC ("Tall Pine") and Sunshine Coast Development, LLC ("Sunshine"). In March 2021, Tall Pine entered into an agreement called a "Services Agreement" to provide services to NexBank SSB, Charitable DAF Fund, L.P., HCMFA, and NPA that are similar or identical to the services provided by the Debtor under its shared services agreements for these same entities. Upon information and belief, the existence of this agreement was concealed from the independent board of the Debtor and was only recently discovered.[52]

59.    Upon information and belief, Tall Pine may have then sub-contracted with entities affiliated with other current or former Debtor employees (all of whom were employed by the Debtor at the time) to provide those services. As a result, the Committee seeks Rule 2004 discovery from each of the Tall Pine Entities[53] relating to the Services Agreement, the nature of the services provided, the relationships between or among the Tall Pine Entities, and the Tall Pine Entities' relationships with the Debtor and current or former Debtor employees.[54] The Committee seeks to determine whether the Tall Pine Entities were created or used in a manner that gives rise

---

[52]    Kirschner Decl. ¶ 21.

[53]    The "Tall Pine Entities" include Tall Pine, Sunshine, FHTC Consulting LLC, Prive Enterprises, L.P., Prive Enterprises GP, LLC, Prive Solutions LLC, Prive Lending, LLC, Prive Leasing, LLC, Prive Investment Trust, Prive Motorsports, LLC, Prive Entertainment, LLC, Prive Products, LLC, Prive Residential, LLC, Prive Designs, LLC, Clairmont Holdings, LLC, Charitable DAF Fund, L.P., Charitable DAF GP, Charitable DAF Holdco, Ltd., HCMFA, and NPA. The Committee also intends to seek discovery from Dondero, Ellington, Leventon, Holt and Patrick. It is the Committee's understanding that Tall Pine, Sunshine, FHTC Consulting, the Prive entities, and Clairmont Holdings are entities created by Debtor employees and that those entities may have been used in a manner that could give rise to various causes of action on behalf of the Debtor. Moreover, Charitable DAF Fund, L.P., Charitable DAF GP, Charitable DAF Holdco, Ltd., HCMFA, and NPA have been involved in transactions with these Tall Pine Entities that may have usurped opportunities from the Debtor. It is also the Committee's understanding, upon information and belief, that Holt has relevant knowledge due to his involvement in the negotiation of the Services Agreement.

[54]    Kirschner Decl. ¶¶ 21-22.

to causes of action for breach of fiduciary duty, usurpation of corporate opportunity, fraudulent transfer, tortious interference, or similar claims.

### 2. E-Discovery Vendors

60. Former Debtor employees Leventon and Ellington may have participated in the creation of a series of companies intended to provide outsourced legal services to the Debtor and Related Entities during the course of their employment by the Debtor. These companies also appear to have involved Debtor consultants, including Ellington's sister and Massand (as discussed below).[55] As in-house attorneys for the Debtor who provided legal services to the Related Entities pursuant to shared services agreements, Leventon and Ellington's possible ownership of entities doing business with the Debtor or Related Entities may give rise to potential causes of action depending upon the circumstances involved. The Committee seeks Rule 2004 discovery of the E-Discovery Vendor Parties[56] to determine whether the Debtor employees and consultants breached duties owed to the Debtor in connection with these business activities, and to investigate transfers made to these entities by the Debtor and/or Related Entities or other companies owned or controlled by Dondero.

### I. Consultants

61. Based on the review of the Debtors business records to date, there are also several "consultants" that may have had relationships with the Debtor that could give rise to causes of

---

[55]  Kirschner Decl. ¶¶ 23-24.

[56]  The "E-Discovery Vendor Parties" include Blackland Group LLC, Blackland Legal Solutions, LLC, Blackland Information Security, LLC, Blackland Associates, LLC, BMZ Discovery Services LLC, Ironwood Legal Solutions, Massand Capital, LLC, Lullwater Park, LLC, Zumasaa Ventures, LLC, SAS Asset Recovery Ltd., SAS Holdings SPV Ltd., SAS Litigation Management, L.P., SAS Loan Services Ltd., Dondero, Ellington, Leventon, Massand, Maslow, and Kamlani. Discovery is sought from these entities based on information suggesting that these entities were involved in the provision of e-discovery or document review services. The individuals included among the E-Discovery Vendor Parties are included for the same reason.

action. The Committee also seeks Rule 2004 discovery into the relationship between the Debtor and certain of its consultants, as set forth below.

### 1. Massand Capital, LLC

62. Massand Capital, LLC appears to be a consulting firm owned by Massand. Massand had a longstanding business relationship with the Debtor, pursuant to which Massand consulted with the Debtor and was assigned tasks only by "the Highland Chairman and General Counsel"—who, at the time, were Dondero and Ellington, respectively. Massand received approximately $600,000 per year annually from 2014 to the Petition Date. Based on information known at this time, it is unclear whether Massand provided material services to the Debtor over the course of this engagement. At this time, it appears that Massand may have performed work primarily for the benefit of entities owned or controlled by Dondero or Ellington or other Individual Highland Parties.[57] The Committee seeks discovery of the nature of the services provided by Massand to the Debtor, Related Entities, and/or other entities owned or controlled by Dondero or Ellington individually, in order to assess these relationships, the services provided, and whether the Debtor was harmed as a part of this engagement.[58]

### 2. Brazilian Entities

63. As is typical within the Highland web of companies, the structure of entities in Brazil is highly complex. It appears that there were two separate "families" of entities in Brazil— one whose ultimate parent was the Debtor, and one whose ultimate parent was Dondero (through

---

[57] Kirschner Decl. ¶ 25.

[58] The Committee intends to seek discovery from the "Massand Capital Parties," which includes Massand Capital, LLC, SAS Asset Recovery, Ltd., SAS Holdings SPV Ltd., SAS Litigation Management, L.P., SAS Loan Services Ltd., Blackland Group LLC, Blackland Legal Solutions, LLC, Blackland Information Security, LLC, Blackland Associates, LLC, Dondero, Ellington, Leventon, and Massand. Leventon is included as a recipient of this discovery due to his role in the legal department at the Debtor and his close working relationship with Ellington and Dondero. The entities are included in the Massand Capital Parties by virtue of their apparent connection to Massand and any services he may have provided as a consultant.

Dugaboy). Upon information and belief, Dondero caused funds owed by the "family" of Brazil entities attributable to him (through Dugaboy) to be paid by the Debtor instead of by Dugaboy. Similarly, there are three consultancies in Brazil that received payments from the Debtor or Debtor affiliates over time, and their connections to Dondero and his related entities is unclear.[59] From the review to date, it is also unclear what, if any, services these "consultants" may have provided to the Debtor. The Committee seeks Rule 2004 discovery regarding the nature of the relationships between and among these Brazilian Rule 2004 Targets,[60] their roles within the Highland web, their relationship to Dondero and/or his affiliates (including but not limited to Dugaboy), and the purpose for payments made by the Debtor, in order to assess whether they give rise to claims for fraudulent transfers, breaches of fiduciary duties, or other causes of action.

### J. Document Requests and Examination Topics

64. In order to fulfill its duty to investigate potential claims, the Committee seeks authority to require the Rule 2004 Parties to provide documents and testimony concerning the Examination Topics. Forms of Proposed Requests for Production for the Rule 2004 Parties are attached as follows:[61]

- **Exhibit 2:** Request for Production of Documents to the Acis Dispute Parties

- **Exhibit 3:** Request for Production of Documents to the HarbourVest Dispute Parties

- **Exhibit 4:** Request for Production of Documents to UBS Dispute Parties

---

[59] Kirschner Decl. ¶ 26.

[60] The "Brazilian Rule 2004 Targets" include Dondero, Schroth, Waterhouse, Patrick, Dugaboy, Brasilinvest Investimentos e Participacoes Ltda, HBI Consultoria Empresarial, LTDA, Highland Capital Management, AG, and Brasilinvest Empreendimentos e Participacoes S/A. The Committee and the Litigation Advisor believe these persons/entities may possess relevant data based on their review to date.

[61] If the Motion is granted, the Committee intends to serve the intended recipients with Requests for Production that are identical or substantially similar to the forms attached as exhibits hereto, as well as conduct potential depositions of the intended recipients related to the topics described in this Motion and the Requests for Production as may be appropriate.

APP 1012

- **Exhibit 5:** Request for Production of Documents to the Redeemer And Crusader Parties

- **Exhibit 6:** Request for Production of Documents to the Individual Highland Parties

- **Exhibit 7:** Request for Production of Documents to the Highland Charities and Trusts

- **Exhibit 8:** Request for Production of Documents to the Nex Entities

- **Exhibit 9:** Request for Production of Documents to the Hunter Mountain Transaction Parties

- **Exhibit 10:** Request for Production of Documents to Governance Re Parties

- **Exhibit 11:** Request for Production of Documents to Tall Pine Entities

- **Exhibit 12:** Request for Production of Documents to E-Discovery Vendor Parties

- **Exhibit 13:** Request for Production of Documents to Massand Capital Parties

- **Exhibit 14:** Request for Production of Documents to the Brazilian Entities

65.     Disclosure on these examination topics solely from the Debtor is insufficient because the matters at issue are complex and important, and involve suspicions of misconduct that may hinder voluntary and full disclosure by knowledgeable persons and entities currently affiliated with the Debtor. The examination will seek information that is not currently in the Debtor's possession. Examination of the Rule 2004 Parties therefore increases the Committee's likelihood of obtaining a full factual understanding of the Examination Topics and the relationship and course of dealings between the Debtor and Rule 2004 Parties. Moreover, a significant number of the Debtor's former employees that were involved in events relating to the Examination Topics have since left the company, further complicating the examination process. Given the nature of the matters at issue, it is critical to Committee's investigation into potential causes of action that there be discovery of non-debtor individuals and entities.

## VI.  BASIS FOR RELIEF

66.  The Committee is a fiduciary for all unsecured creditors.  Thus, the Committee is granted broad statutory powers to, among other things, "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the case or the formulation of a plan."  11 U.S.C. § 1103(c)(2).  To permit the Committee to exercise its investigative powers, Bankruptcy Rule 2004 provides for the examination of debtors and related third parties.  *See* Fed. R. Bankr. P. 2004(b).  Indeed, Rule 2004 is the "basic discovery device in bankruptcy cases."  *In re Correra*, 589 B.R. 76, 108 (Bankr. N.D. Tex. 2018) (Jernigan, J.).

67.  "The scope of a Rule 2004 examination is 'unfettered and broad.'" *Id.* at 108-09 (citations omitted); *see also In re Great Lakes Comnet, Inc.*, 558 B.R. 194, 196 (Bankr. W.D. Mich. 2016) ("Without question, the scope of any examination under Fed. R. Bankr. 2004 is extremely broad.").  Discovery under Bankruptcy Rule 2004 includes within its scope, *inter alia*, any matter that may relate to the property and assets of the estate; the financial condition of the debtor; and any matter that may affect the administration of a debtor's estate.  *See* Fed. R. Bankr. R. 2004(b).  Therefore, Bankruptcy Rule 2004 permits "a broad investigation into the financial affairs of the debtor for the purpose of the discovery of assets of the estate and the exposure of fraudulent conduct."  *In re Correra*, 589 B.R. at 108.

68.  Given the broad purpose and effect of Bankruptcy Rule 2004, courts routinely permit the examination of third parties who have had dealings with the Debtor.  *See, e.g., id.* ("[t]hird parties are subject to examination pursuant to Rule 2004 if they have knowledge of the debtor's affairs");  *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("Any third party who has a relationship with a debtor may be subject to a Rule 2004 investigation.")*.*

69.  Bankruptcy Rule 2004 plainly permits the discovery the Committee seeks herein. The Requests and the Examination Topics are intended to provide a more complete picture of the

specific conduct of the Debtor, the Debtor's principals, and the Rule 2004 Parties, and will provide the requisite facts needed to determine whether any potential causes of action exist and should be pursued. With the requested discovery, the Committee can investigate the Estate's rights, claims, and remedies in connection with the Examination Topics.

70.     Indeed, the discovery sought by the Committee "is *prima facie* consistent with the [Bankruptcy] Rule's above-stated purpose of allowing the Committee to obtain information necessary to determine whether claims beneficial to the estate[] exist and whether to pursue such claims." *In re Recoton*, 307 B.R. at 756 (granting the creditors committee's Rule 2004 motion to examine debtor's former officers and directors); *see also In re Great Lakes Comnet*, 558 B.R. at 197 (granting the creditors committee's Rule 2004 motion to examine a company to which the debtors had made payments, noting that "[t]he Committee, acting as the *de facto* estate representative, [wa]s seeking to understand the facts giving rise to the transactions by and among the Debtors, [the company], and possibly third parties in advance of any adversary proceeding").

71.     Importantly, permitting the requested discovery now is necessary to the Committee's investigation and pursuit of potential estate claims. An order authorizing the requested discovery will ensure a more fulsome factual investigation in order to maximize recovery for the Estate. *See In re Mirant Corp.*, 326 B.R. 354, (Bankr. N.D. Tex. 2005) (granting creditors committee's Rule 2004 motion to examine the debtor's corporate parent, noting that "[d]iscovery now, not later, may be critical to ensure that no viable cause of action is lost").

72.     Moreover, Rule 2004 discovery is proper post-confirmation where the Trustee is carrying out his duties under the Plan. *See In re Alliance Consulting Grp., LLC*, 588 B.R. 169, 185 (Bankr. S.D. Miss. 2018) (post-confirmation, court will maintain jurisdiction of "matters pertaining to the implementation or execution of the plan") (quoting *In re Craig's Stores of Tex.,*

*Inc.*, 266 F.3d 388, 390 (5th Cir. 2001)), *aff'd*, 596 B.R. 851 (S.D. Miss. 2019); *see also In re Daisytek, Inc.*, 323 B.R. 180 (N.D. Tex. 2005) (holding that bankruptcy court possessed jurisdiction to authorize post-confirmation Rule 2004 discovery "[b]ecause the claims the Trustee intends to prosecute deal with Daisytek's prepetition relationship with the entities in question [and] the Plan contemplates the prosecution of the claims and the distribution of Daisytek's share of any recovery to creditors under the Plan, and the prosecution of the claims will thus impact compliance with, or completion of, the Plan"); *see UBS Securities, LLC, et. al. v. Highland Capital Management, L.P.*, Adv. Pro. No. 213020-SGJ, Hr. Tr. dated June 24, 2021, at 60:10-25 (THE COURT:  [N]owhere in [Rule] 2004 is there a reference to it has to be aimed towards maximizing assets. … [I]t can relate to acts of the debtor, financial condition of the debtor, conduct, property. I mean, it's pretty broad.  And I've looked at this before, and I don't think it's limited to pre-confirmation.").[62]

73.    For the reasons set forth herein, an investigation into the Examination Topics is necessary and appropriate here.  The requested discovery will provide the Committee with the information needed to evaluate the potential estate claims that it or the Litigation Sub Trust could pursue to benefit the Debtor's creditors.

## VII.    CONCLUSION AND REQUESTED RELIEF

WHEREFORE, for these reasons, the Committee respectfully requests that the Court enter an order pursuant to Rule 2004 requiring the production of documents in a form that is substantially similar to Exhibits 2 through 14, authorizing the examination of the applicable Rule 2004 Parties, and granting such other and further relief as the Court deems just and proper.

---

[62]    Here, the Committee seeks to obtain information through a Rule 2004 examination to investigate the potential causes of action and the relationship between the Debtor and the Rule 2004 Parties.

Dated: July 29, 2021                        Respectfully submitted,
           Dallas, Texas

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for the Official Committee of*
*Unsecured Creditors*

APP 1017

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that that, between July 21, 2021 and July 28, 2021, the undersigned counsel for the Official Committee of Unsecured Creditors conferred with counsel for the Rule 2004 Parties of whom the Official Committee of Unsecured Creditors is aware regarding the relief requested in this Motion.

**Counsel for the following parties does not object to the relief sought herein:**

1. Hunter Mountain Investment Trust
2. Atlas IDF, LP
3. Rand PE Fund I, LP
4. Rand Advisors
5. John Honis[63]
6. The Debtor

**Counsel for the following parties objects to the relief sought herein:**

7. Mark Patrick
8. Highland Dallas Foundation

**Counsel for the following parties had not yet determined whether to object to the relief sought herein at the time the Motion was filed:**

9. James Dondero
10. Isaac Leventon
11. Scott Ellington
12. Frank Waterhouse
13. Jean Paul Sevilla
14. Grant Scott
15. NexPoint Advisors, L.P.
16. Highland Capital Management Fund Advisors, L.P.
17. NexPoint Strategic Opportunities Fund
18. NexPoint Real Estate Finance, Inc.
19. NexPoint Real Estate Capital, LLC
20. NexPoint Residential Trust, Inc.
21. NexPoint Hospitality Trust
22. NexPoint Real Estate Partners, LLC
23. NexPoint Multifamily Capital Trust, Inc.
24. NexPoint Real Estate Advisors, L.P.

---

[63] Counsel for the entities numbered 1-5 indicated they do not oppose the concept of 2004 examinations, but reserve the right to object to scope, time frame for production and for examinations under oath, as well as the right to lodge standard objections not questioning the Committee's ability to seek 2004 examinations.

APP 1018

25. NexPoint Real Estate Advisors II, L.P.
26. NexPoint Real Estate Advisors III, L.P.
27. NexPoint Real Estate Advisors IV, L.P.
28. NexPoint Real Estate Advisors V, L.P.
29. NexPoint Real Estate Advisors VI, L.P.
30. NexPoint Real Estate Advisors VII, L.P.
31. NexPoint Real Estate Advisors VIII, L.P.
32. VineBrook Homes Trust, Inc.
33. The Dugaboy Investment Trust
34. The Get Good Trust
35. The U.S. Trustee

/s/ *Chandler Rognes*
Chandler Rognes
*Counsel For the Official*
*Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on July 29, 2021. For those Rule 2004 Parties who, to the Official Committee of Unsecured Creditors' knowledge, are unrepresented, the Official Committee of Unsecured Creditors shall serve the Motion in a manner provided by Bankruptcy Rule 7004 and will subsequently file certificates of service evidencing such service.

/s/ *Chandler Rognes*
Chandler Rognes
*Counsel For the Official*
*Committee of Unsecured Creditors*

APP 1019

**EXHIBIT 1**
**Proposed Order**

270872071v.1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., [1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) ) ) | |

**ORDER GRANTING THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN ORDER AUTHORIZING THE EXAMINATION OF RULE 2004 PARTIES PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Upon the consideration of the *Motion of the Official Committee of Unsecured Creditors*

*and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties*

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

270872071v.1

*Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (the "<u>Motion</u>"), it is hereby

**ORDERED** that:

      1.     The Rule 2004 Motion[2] is **GRANTED** as set forth herein.

      2.     The Rule 2004 Parties are directed to produce documents, communications, and other materials responsive to the Requests substantially in the forms attached as Exhibits 2 through 14 to the Motion no later than twenty-one (21) days after service thereof.

      3.     The Committee is authorized, pursuant to Bankruptcy Rule 9016, to issue subpoenas for the Requests and attendance for the oral examinations on the Examination Topics as may be necessary.

      4.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # # End of Order # # #

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

270872071v.1

**EXHIBIT 2**

**Requests for Production of Documents to the Acis Dispute Parties**

APP 1023

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

**REQUESTS FOR PRODUCTION OF DOCUMENTS TO
ACIS DISPUTE PARTIES**

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the Committee (the "Litigation Advisor"), hereby serves the following requests for production of documents or categories of documents to Highland CLO Holdings, Ltd., Highland CLO Management, Ltd., Mark Okada, Jean Paul Sevilla, and James Dondero to be produced to the Committee in accordance with the Definitions and Instructions below ("Request(s)").

**DEFINITIONS**

1.      "Acis" means Acis Capital Management, L.P. and Acis Capital Management GP, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

2.  "<u>Acis Bankruptcy</u>" means the title 7 involuntary bankruptcy petitions for Acis filed by Terry on January 30, 2018, styled as *In re: Acis Capital Management, LP*, No. 18–30264–SGJ–7 (Jan. 30, 2018) and *In re: Acis Capital Management GP, L.L.C.*, No. 18–30265–SGJ–7 (Jan. 30, 2018).

3.  "<u>Acis Proof of Claim</u>" means Proof of Claim Number 23 filed by Acis on December 31, 2019 for which Acis received a $23 million allowed claim against the Debtor.

4.  "<u>Communication(s)</u>" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

5.  "<u>Concerning</u>" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

6.  "<u>Debtor</u>" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7. "<u>Document(s)</u>" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

8. "<u>Dondero</u>" means James Dondero and all entities under his control.

9. "<u>HCLOF</u>" means Highland CLO Funding, Ltd., formerly known as Acis Loan Funding, Ltd., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

10. "<u>HCLOH</u>" means Highland CLO Holdings, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

11. "<u>HCLOM</u>" means Highland CLO Management, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

APP 1026

and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

12. "<u>Highland Advisor</u>" means Highland HCF Advisor, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

13. "<u>Identify</u>" means to state, to the extent known (or, if not know, to so state,) the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

14. "<u>Individual Highland Parties</u>" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

15. "<u>Note</u>" means any promissory note or other debt instrument.

16. "<u>Okada</u>" means Mark Okada and any entities under his direct or indirect control.

17. "<u>Petition Date</u>" means October 16, 2019.

18. "<u>Related Entity</u>" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Inc., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's*

*Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Grant Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

19. "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

20. "Sevilla" means Jean Paul Sevilla and any entities under his direct or indirect control.

21. "Terry" means Joshua Terry, former employee of the Debtor.

22. "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## INSTRUCTIONS

1. Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

APP 1028

Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.      The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.      You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's

complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Document request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9. Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive. With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10. With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1. Any and all Documents or Communications produced by any party in the Acis Bankruptcy.

2. Any and all Documents or Communications relating to the relationship between You, the Debtor, HCLOF, HCLOH, HCLOM, Highland Advisor, and/or Acis, including any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any of You, the Debtor, and/or Acis.

3. Any and all Documents or Communications relating to the level of control exercised by the Debtor, Acis, HCLOF, HCLOH, HCLOM, Highland Advisor, or a Related Entity over You, if any.

4. Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of HCLOF, HCLOH, HCLOM, Highland Advisor, and/or Acis, including, without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating

agreements, partnership agreements, and any business, tax, or other purpose or motivation for their creation.

5. Any and all Documents or Communications reflecting or relating to any transaction, transfer, payment, distribution, donation, or the remittance of anything of value between or among any of You, the Debtor, Acis, HCLOF, HCLOH, HCLOM, Highland Advisor, or another Related Entity, other than in connection with the CLO Holdco Transaction, including, without limitation, the business purpose for the transaction, transfer, payment, distribution, donations, or remittance of anything of value and the negotiations of the terms of the transfer, payment, distribution, donations, or remittance of anything of value.

6. Any and all Documents or Communications relating to the value of any assets or liabilities involved in any transaction, transfer, payment, distribution, donations, or remittance of anything of value described in Request 5, including without limitation any valuations, fairness opinions, or neutral third-party assessments of the transactions.

7. Any and all Documents or Communications relating to any tax implications to Acis, the Debtor, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity related to any transaction, transfer, payment, distribution, donation, or the remittance of anything of value described in Request 5.

8. Any and all Documents or Communications relating to the relationship between or among Dondero, HCLOF, HCLOH, HCLOM, Highland Advisor, and Acis, including, without limitation, any title or position held by Dondero at Acis, and compensation or payments received by Dondero, directly or indirectly, from HCLOF, HCLOH, HCLOM, Highland Advisor, and Acis or the Debtor, or received by Dondero, directly or indirectly, from the Debtor related to the title or

position held at any of HCLOF, HCLOH, HCLOM, Highland Advisor, and Acis or the Debtor, and the time periods such titles or positions were held.

9.      Any and all Documents or Communications related to the relationship between or among Okada, HCLOF, HCLOH, HCLOM, Highland Advisor, and Acis, including, without limitation, any title or position held by Okada at Acis, and compensation or payments received by Okada, directly or indirectly, from HCLOF, HCLOH, HCLOM, Highland Advisor, and Acis or the Debtor, or received by Okada, directly or indirectly, from the Debtor related to the title or position held at any of HCLOF, HCLOH, HCLOM, Highland Advisor, and Acis or the Debtor, and the time periods such titles or positions were held.

10.      Any and all Documents or Communications relating to the relationship between or among the Debtor and HCLOF, HCLOH, HCLOM, Highland Advisor, or Acis, including, without limitation, any compensation or payment made by the Debtor to any HCLOF, HCLOH, HCLOM, Highland Advisor, or Acis employees, including any bonus payments.

11.      Any and all Documents or Communications related to Dondero, Okada, Sevilla, or any other current or former employee of the Debtor's involvement with the Acis Bankruptcy, Acis Proof of Claim, and any other arbitration or litigation involving the Debtor and Acis.

12.      Any and all Documents or Communications relating to the Acis Bankruptcy, including, without limitation, any and all Documents or Communications relating to any adversary proceeding that occurred during the Acis Bankruptcy, the facts and circumstances that precipitated the Acis Bankruptcy, and subsequent actions or transfers of assets, liabilities, or Notes by You, the Debtor, Acis, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity that resulted in value leaving the Debtor.

13.      Any and all Documents or Communications relating to the Acis Proof of Claim.

14.    Any and all Documents or Communications relating to the involvement of Dondero, or any Debtor employee, agent, or consultant, including without limitation any Individual Highland Party, or any employee, agent, or consultant of any Related Entity in any of the actions or transactions giving rise to the claims held by Acis.

15.    Any and all Documents or Communications reflecting the persons or entities involved in the decision making for the actions or transactions giving rise to the claims held by Acis.

16.    Any and all Documents or Communications relating to the fiduciary duties of Dondero, Okada, or any Debtor or Related Entity's employee, agent, or consultant  involved in any of the acts, omissions, or transactions set forth in the Acis Proof of Claim.

17.    Any and all Documents or Communications relating to any Note or other obligation between or among the Debtor, Acis, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity, other than in connection with the CLO Holdco Transaction, including, without limitation, any and all Documents or Communications related to the value received or value given for any such Note.

18.    Any and all Documents or Communications relating to any Note  or other payment obligation between or among Acis and the Debtor, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity, other than in connection with the CLO Holdco Transaction, including, without limitation, any and all Documents or Communications related to the value received or value given for any such Note.

19.    Any and all Documents or Communications relating to the determination of and any basis or purposes for the principal amounts, interest rates, and payment schedules of any Note or obligation described in Requests 17 and 18 including, without limitation, the negotiations

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21   Entered 07/29/21 02:08:51   Page 16 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1035 of 1245   PageID 12898
200

related to the terms of the Note and any valuation, fairness opinion, or neutral third-party assessment of the terms of the Note.

20.    Any and all Documents or Communications relating to any payments or distributions made or received pursuant to the terms of any Note or obligation described in Requests 17 and 18.

21.    Any and all Documents or Communications relating to any agreement or contract entered into by You and the Debtor, Acis, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity in regards to any  Note or obligation referenced in Requests 17 and 18, including, without limitation, any guaranty agreements related to any Note or obligation.

22.    Any and all Documents or Communications relating to litigation or arbitration arising out of the Acis Bankruptcy, involving or between Acis, the Debtor, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity, including, without limitation, any and all Documents or Communications relating to objections or appeals of the Acis Bankruptcy plan, or the transfer of ownership of any assets, liabilities, or Notes following any such litigation or arbitration.

23.    Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Acis, HCLOF, HCLOH, HCLOM, Highland Advisor, or any Related Entity, including without limitation, codes of conduct, board packets or other materials shared with members, officers, directors, or shareholders.

24.    Any and all Documents or Communications relating to Your policy or practice for document retention.

**EXHIBIT 3**
**Requests for Production of Documents to the HarbourVest Dispute Parties**

1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | ) <br> ) <br> ) Chapter 11 <br> ) <br> HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] ) Case No. 19-34054-sgj11 <br> ) <br> Debtor. ) |

**REQUESTS FOR PRODUCTION OF DOCUMENTS TO
THE HARBOURVEST DISPUTE PARTIES**

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents to James Dondero, Scott Ellington, Isaac Leventon, Mark

Okada, and Mark Patrick to be produced to the Committee in accordance with the Definitions and

Instructions below ("Request(s)").

**DEFINITIONS**

1.      "Communication(s)" means any written or oral communication of any kind or

character, including, by way of example and without limitation, e-mails, instant messages, text

messages, voicemail or voice messages, audio recordings, personal conversations, telephone

conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

2. "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

3. "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4. "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

5.      "Dondero" means James Dondero and all entities under his direct or indirect control.

6.      "HarbourVest Entities" means HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HarbourVest Dover Street IX Investment L.P. HarbourVest Partners L.P., HarbourVest Skew Base AIF L.P., HV International VIII Secondary L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7.      "HarbourVest Proofs of Claims" means Claim Numbers 143, 147, 149, 150, and 154 filed by HarbourVest in the above-captioned bankruptcy.

8.      "HCLOF" means Highland CLO Funding, Ltd., formerly known as Acis Loan Funding, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

9.      "HCLOF Investment" means the November 15, 2017 transaction whereby HarbourVest obtained a 49% interest in HCLOF for $80 million.

10.     "HCLOF Party(ies)" means HCLOF and HCF Advisor.

11.     "HCF Advisor" means Highland HCF Advisor, Ltd. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

12.     "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

13.     "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

14.     "Petition Date" means October 16, 2019.

15.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

16.     "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A

request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

17. "Terry" means Joshua Terry, former employee of the Debtor.

18. "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **INSTRUCTIONS**

1. Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2. The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3. You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

APP 1041

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 23 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1042 of 1245   PageID 12905
200

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195,  [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero relating to the CLO Holdco Transaction.  If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion,

the objecting party shall identify the nature of the privilege (including work product) that is being

claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked.

In addition, the objecting party shall provide the following information with respect to any

Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general

subject matter of the Document; (iii) the date of the Document; (iv) such other information as is

sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the

author of the Document, the addressees of the Document, and any other recipients shown in the

Document, and, where not apparent, the relationship of the author, addresses, and recipients to

each other.

8. In the event that a requested Document has been lost, destroyed, discarded and/or

otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer;

(ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or

appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

authorizing destruction or other disposition; (viii) the Document request or requests to which the

Document is responsive.

9. Produce all responsive Documents as they are kept in the usual course of business,

or organize and label them to correspond with the request to which they are responsive. With

respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to

the extent that the requested metadata exits and can be extracted using standard processing tools.

10. With respect to ESI, the producing party shall confer with the Committee to develop

parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1. Any and all Documents or Communications relating to the formation, ownership

(whether direct, indirect, beneficial or other), and management of any HCLOF Party, including

without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, tax, or other purpose or motivation for their creation.

2. Any and all Documents or Communications relating to the HCLOF Investment.

3. Any and all Documents or communications relating to the involvement of You, Dondero, any Individual Highland Party, or any other current or former employee of the Debtor or any Related Entity with the HCLOF Investment.

4. Any and all Documents or Communications relating to the settlement of the HarbourVest Proofs of Claim between the Debtor and any HarbourVest Entity.

5. Any and all Documents or Communications relating to the involvement of You, Dondero, or any employee of the Debtor or a Related Entity, including without limitation, any Individual Highland Parties, in any of the actions, conduct, or transactions giving rise to the HarbourVest Proofs of Claim, including without limitation, any alleged omissions or misrepresentations made by Dondero or such employees related to the HCLOF Investment.

6. Any and all Documents or Communications relating to the conduct alleged in the HarbourVest Proofs of Claim, including without limitation, the conduct and circumstances supporting the HarbourVest Entities' claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, violations of state securities laws, and violations of the Racketeer Influenced Corrupt Organization Act.

7. Any and all Documents or Communications relating to the HarbourVest Entities' claims that the Debtor failed to disclose that it never intended to pay its $8 million arbitration award obtained by Terry.

8.      Any and all Documents or Communications relating to due diligence provided to or described to any of the HarbourVest Entities by You in connection with to the HCLOF Investment.

9.      Any and all Documents or Communications relating to the Debtor's reasons for changing the portfolio manager for HCLOF immediately before the HCLOF Investment.

10.      Any and all Documents or Communications relating to the HarbourVest Entities' claim that the Debtor indicated the dispute with Terry would not impact investment activities.

11.      Any and all Documents or Communications relating to the HarbourVest Entities' claim that the Debtor expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations under its control.

12.      Any and all Documents or Communications relating to the relationship between or among (1) any of the HCLOF Parties and (2) the Debtor or any Related Entity, including without limitation any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving HCLOF and the Debtor.

13.      Any and all Documents or Communications relating to shared employees, agents, or consultants between or among (1) any of the HCLOF Parties and (2) the Debtor or any Related Entity, including without limitation, any compensation or payments made, including any bonus payments or payments to affiliated entities or family members of such employees.

**EXHIBIT 4**

**Requests for Production of Documents to the UBS Dispute Parties**

APP 1046

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |

## REQUESTS FOR PRODUCTION OF DOCUMENTS TO
## THE UBS DISPUTE PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the Committee (the "Litigation Advisor"), hereby serves the following requests for production of documents or categories of documents to Sentinel Reinsurance, Ltd., Sentinel Re Holdings, Ltd., SAS Asset Recovery Ltd., SAS Holdings SPV Ltd., SAS Litigation Management, L.P., SAS Loan Services Ltd., Governance Re, Ltd., James Dondero, Scott Ellington, Isaac Leventon, and Mark Patrick to be produced to the Committee in accordance with the Definitions and Instructions below ("Request(s)").

### DEFINITIONS

1.     "CDO Fund Assets" means assets held by Highland CDO Opportunity Master Fund, L.P. related to Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd., Eastland CLO Ltd., Grayson CLO Ltd., Valhalla CLO Ltd., and Governance Re.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

2.     "<u>Communication(s)</u>" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

3.     "<u>Concerning</u>" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

4.     "<u>Debtor</u>" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5.     "<u>Document(s)</u>" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data

APP 1048

compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

6. "Dondero" means James Dondero and all entities under his control.

7. "Ellington" means Scott Ellington and all entities under his control.

8. "Governance Re" means Governance Re, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

9. "Funds" means collectively the Highland CDO Opportunity Master Fund, L.P. and Highland Special Opportunities Holding Company.

10. "HFP" means Highland Financial Partners, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

11. "Identify" means to state, to the extent known (or, if not know, to so state,) the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

12. "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein,

and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

13.     "Multi-Strat" means Highland Multi Strategy Credit Fund, L.P. (formerly known as Highland Credit Opportunities CDO), and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

14.     "Note" means promissory note, demand note, payment obligation, or any other debt instrument.

15.     "Okada" means Mark Okada and any entities under his direct or indirect control.

16.     "Patrick" means Mark Patrick and all entities under his control.

17.     "Petition Date" means October 16, 2019.

18.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Inc., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of the Debtor's *Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Grant Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

19.     "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests.  A

5

request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

20.    "SAS Entity(ies)" means SAS Asset Recovery Ltd., SAS Holdings, SAS Litigation Management, and SAS Loan Services.

21.    "SAS Holdings" means SAS Holdings SPV Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

22.    "SAS Litigation Management" means SAS Litigation Management, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

23.    "SAS Loan Services" means SAS Loan Services Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

24.    "Sentinel" means Sentinel Reinsurance, Ltd., Sentinel Re Holdings, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

25.    "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

26. "UBS Dispute Parties" means collectively Highland Multi Strategy Credit Fund, L.P. (formerly known as Highland Credit Opportunities CDO), Highland Special Opportunities Holding Company, Highland CDO Opportunity Master Fund, L.P., the CDO Fund Assets, Sentinel, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

27. "UBS Litigation" means the actions filed by UBS in the Supreme Court of the State of New York in February 2009.

28. "UBS Proofs of Claim" means proofs of claims No. 190 and 191 filed in the above-captioned bankruptcy case by UBS.

29. "UBS Settlement" means the settlement entered into by the Debtor and UBS that included (i) a single general unsecured claim in the amount of $65 million; (ii) a single subordinated unsecured claim of $60 million; and (iii) a payment of $18.5 million to UBS by Multi-Strat.

30. "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **INSTRUCTIONS**

1. Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these

Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.     The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.     You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.     If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.     These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's

complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Document request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.      With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## DOCUMENTS REQUESTED

1.      Any and all Documents or Communications produced by any party in the UBS Litigation.

2.      Any and all Documents or Communications relating to the conduct alleged in or giving rise to the UBS Proofs of Claim, including, without limitation, the conduct and circumstances relating to UBS's claims against the Debtor for breach of the implied covenant of good faith and fair dealing and the Debtor's role in directing fraudulent conveyances that occurred after the commencement of the UBS Litigation in February 2009.

3.      Any and all Documents or Communications relating to the conduct giving rise to the UBS Settlement between UBS and the Debtor, including, without limitation, the conduct and circumstances relating to UBS's claims that the Debtor has been fraudulently transferring ownership of all or substantially all of the Funds' assets to Sentinel for less than face value of the assets that consisted of a redemption interest in Multi-Strat and the CDO Fund Assets and any involvement in such conduct by any SAS Entity.

4.      Any and all Documents or Communications relating to UBS's claims that the
Debtor devised and executed a strategy to interfere with UBS's contractual right to recovery and
prevented the Funds and HFP from turning over any of their assets to UBS in satisfaction of their
debt.

5.      Any and all Documents or Communications relating to the transfer of
approximately $233 million in assets away from the Funds in March, 2009.

6.      Any and all Documents or Communications relating to UBS's claims that the
Debtor improperly prevented the Funds from turning over any other assets held by the Funds or
HFP to UBS after the March, 2009 transfers.

7.      Any and all Documents or Communications relating to the relationship between
You, the Debtor, any other UBS Dispute Parties, and/or any Related Entity, excluding Dondero,
including without limitation, any shared service agreement, advisory agreement, sub-advisory
agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other
contract or arrangement of any kind involving You, the Debtor, the UBS Dispute Parties, and/or
any Related Entity.

8.      Any and all Documents or Communications relating to the level of control
exercised by the Debtor, Dondero, any other UBS Dispute Parties, or any Related Entity over You,
if any.

9.      Any and all Documents or Communications relating to the formation, ownership
(whether direct, indirect, beneficial, or other), and management of any of the UBS Dispute Parties,
including, without limitation, governance documents, corporate formation documents, certificates
of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements,
and any business, tax, or other purpose or motivation for their creation.

10. Any and all Documents or Communications relating to the owners, beneficial or legal, of Sentinel through to ultimate parent entity or person.

11. Any and all Documents or Communications relating to the owners, beneficial or legal, of SAS through to ultimate parent entity or person.

12. Any and all Documents or Communications reflecting or relating to any transaction, transfer, payment, distribution, donation, or the remittance of anything of value between or among any of You, the Debtor, UBS, any other UBS Dispute Parties, or any Related Entity, other than in connection with the CLO Holdco Transaction, including, without limitation, the business purpose for the transaction, transfer, payment, distribution, donation, or the remittance of anything of value and the negotiations of the terms of the transaction, transfer, payment, distribution, donation, or the remittance of anything of value.

13. Any and all Documents or Communications relating to the value of any assets or liabilities involved in any transaction, transfer, payment, distribution, donation, or the remittance of anything of value described in Request 12, including without limitation any fairness opinions or neutral third-party assessments.

14. Any and all Documents or Communications relating to any tax implications to You, the Debtor, the UBS Dispute Parties, or any Related Entity related to any transaction, transfer, payment, distribution, donation, or the remittance of anything of value described in Request 12.

15. Any and all Documents or Communications relating to the relationship between or among Dondero and any UBS Dispute Parties, including, without limitation, any ownership, direct or indirect, of any of the UBS Dispute Parties, any title, ownership, or position held by Dondero at any of the UBS Dispute Parties, any compensation or payments received by Dondero, directly or indirectly, from the UBS Dispute Parties, or received by Dondero, directly or indirectly, from

the Debtor related to any such title or position at any of the UBS Dispute Parties, and the time periods such titles or positions were held.

16.    Any and all Documents or Communications relating to the relationship between or among Okada and the UBS Dispute Parties, including, without limitation, any ownership, directly or indirectly, of any of the UBS Dispute Parties, any title, ownership, or position held by Okada at any of the UBS Dispute Parties, any compensation or payments received by Okada, directly or indirectly, from the UBS Dispute Parties, or received by Okada, directly or indirectly, from the Debtor related to any such title or position at any of the UBS Dispute Parties, and the time periods such titles or positions were held.

17.    Any and all Documents or Communications relating to the relationship of the Debtor and the UBS Dispute Parties, including, without limitation, any compensation or payment made by the Debtor to any UBS Dispute Party employees, including without limitation, any bonus payments.

18.    Any and all Documents or Communications relating to the involvement of Dondero, Ellington, Leventon, Patrick, or any Debtor employee, agent, or consultant, including without limitation any Individual Highland Party, or any employee, agent, or consultant of any Related Entity in any of the actions or transactions giving rise to the UBS Litigation, UBS Proofs of Claim, or the UBS Settlement.

19.    Any and all Documents or Communications reflecting the persons or entities involved in the decision making for the actions or transactions giving rise to the UBS Proofs of Claim or the UBS Settlement.

20.    Any and all Documents or Communications relating to the fiduciary duties of Dondero, Okada, or any Debtor or Related Entity's employee, agent, or consultant, including

without limitation, any Individual Highland Party, involved in any of the acts, omissions, or transactions set forth in or giving rise to the UBS Proofs of Claim or the UBS Settlement.

21.      Any and all Documents or Communications relating to any Note or other payment obligation between or among You, the Debtor, any UBS Dispute Party, any Individual Highland Party, and any Related Entity, other than in connection with the CLO Holdco Transaction, including without limitation, any and all Documents or Communications related to the value received or value given for any such Note.

22.      Any and all Documents or Communications relating to the determination of and any basis or purposes for the principal amounts, interest rates, and payment schedules of any Note or obligation described in Request 21, including without limitation, the negotiations related to the terms of the Notes and any valuation, fairness opinion, or neutral third-party assessment of the terms of the Note.

23.      Any and all Documents or Communications relating to any payments or distributions made or received pursuant to the terms of any Note or obligation described in Request 21.

24.      Any and all Documents or Communications relating to any agreement or contract entered into by You, the Debtor, any UBS Dispute Party, any Individual Highland Party, and/or any Related Entity in regards to any Note or obligation referenced in Request 21, including without limitation, any guaranty agreements related to any Note or obligation.

25.      Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of any UBS Dispute Party, including without limitation, codes of conduct, board packets or other materials shared with members, officers, directors, or shareholders.

26.     Any and all Documents or Communications relating to Your policy or practice for document retention.

27.     Any and all Documents or Communications relating to Sentinel's and/or any SAS Entity's financial records, including without limitation any accounting books and records, accounting and audit work papers, valuation documents, fund governance and organizational documents, and business plans and financial documents.

**EXHIBIT 5**
**Requests for Production of Documents to the Redeemer and Crusader Dispute Parties**

APP 1061

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) ) | Case No. 19-34054-sgj11 |
| Debtor. | ) ) | |

## REQUESTS FOR PRODUCTION OF DOCUMENTS TO
## THE REDEEMER AND CRUSADER DISPUTE PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents James Dondero, Mark Okada, Scott Ellington, Isaac

Leventon, and Mark Patrick to be produced to the Committee in accordance with the Definitions

and Instructions below ("Request(s)").

## DEFINITIONS

1.      "Communication(s)" means any written or oral communication of any kind or

character, including, by way of example and without limitation, e-mails, instant messages, text

messages, voicemail or voice messages, audio recordings, personal conversations, telephone

conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

APP 1062

of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

2. "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

3. "Crusader Funds" means collectively Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd. any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4. "Crusader Proof of Claim" means the Proof of Claim filed in the above-captioned bankruptcy case by the Crusader Funds (Claim No. 72).

5. "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

6. "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts,

analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters
(sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape
recordings, other mechanical records, transcripts or logs of any such recordings, and all other data
compilations from which information can be obtained. The term "Document(s)" is intended to be
at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules
of Civil Procedure.

7.      "Dondero" means James Dondero and all entities under his direct or indirect
control.

8.      "Identify" means to state, to the extent known (or, if not know, to so state), the (i)
type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s),
addressee(s), and recipient(s).

9.      "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac
Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick,
Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis,
Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben,
Dilip Massand, Marcia Ellington Maslow,  Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein,
and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of
Dondero.

10.      "Okada" means Mark Okada and any entities under his direct or indirect control.

11.      "Patrick" means Mark Patrick and any entities under his direct or indirect control.

12.      "Petition Date" means October 16, 2019.

13.      "Redeemer and Crusader Dispute Parties" means the Crusader Funds and the
Redeemer Committee.

4

14. "<u>Redeemer Committee</u>" means the Redeemer Committee of Highland Crusader Fund.

15. "<u>Redeemer Proof of Claim</u>" means the Proof of Claim filed by the Redeemer Committee (Claim No. 81) in the above-captioned bankruptcy case.

16. "<u>Redeemer Settlement</u>" means the settlement approved by the Court on October 23, 2020, where the Redeemer Committee's claim was allowed for $136.7 million.

17. "<u>Related Entity</u>" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

18. "<u>Relating to</u>" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

19. "<u>You</u>" or "<u>Your</u>" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 47 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1066 of 1245   PageID 12929
200

affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **INSTRUCTIONS**

1.      Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.      The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.      You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the

Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland

Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust,

whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good

Nonexempt Trust in exchange for participation interests and stock options that ultimately were

transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's

complaint brought in the adversary proceeding captioned *Official Committee of Unsecured

Creditors v. CLO Holdco, Ltd. et. al,* Adversary No. 20-03195,  [Docket No. 6] (the "CLO Holdco

Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero

relating to the CLO Holdco Transaction.  If Documents or Communications are withheld from

production because they relate to the CLO Holdco Transaction, the Committee requests that You

so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity

all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any

Document and a Document called for by these Requests is withheld on the basis of such assertion,

the objecting party shall identify the nature of the privilege (including work product) that is being

claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked.

In addition, the objecting party shall provide the following information with respect to any

Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general

subject matter of the Document; (iii) the date of the Document; (iv) such other information as is

sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the

author of the Document, the addressees of the Document, and any other recipients shown in the

Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.     With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1.      Any and all Documents or Communications produced by any party in any litigation or arbitration giving rise to the Redeemer Proof of Claim, the Crusader Proof of Claim, or the Redeemer Settlement.

2.      Any and all Documents or Communications reflecting or relating to any transaction, transfer, payment, distribution, donation, or the remittance of anything of value between or among (1) You, (2) the Debtor or any Related Entity, and (3) any Redeemer and Crusader Dispute Party, including, without limitation, the business purpose for the transaction, the negotiations of the terms of the transaction, transfer, payment, distribution, donation, or the remittance of anything of value, and the value of any asset or liabilities involved in any such

8

transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction, transfer, payment, distribution, donation, or the remittance of anything of value.

3.      Any and all Documents or Communications relating to any tax implications to You, the Debtor, or any Related Entity related to any transaction, transfer, payment, distribution, donation, or the remittance of anything of value described in Request 2.

4.      Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any combination of the Debtor or any Related Entity and any Redeemer and Crusader Dispute Party, including without limitation the business purpose for any such agreement and the negotiation of the terms of any such agreement.

5.      Any and all Documents or Communications relating to the conduct giving rise to the Redeemer Settlement between the Redeemer Committee, the Crusader Funds, and the Debtor.

6.      Any and all Documents or Communications relating to the involvement of Dondero, or any Debtor employee, agent, or consultant, including without limitation any Individual Highland Party or any employee, agent, or consultant of any Related Entity in any of the actions or transactions giving rise to Crusader Proof of Claim, the Redeemer Proof of Claim, or the Redeemer Settlement.

7.      Any and all Documents or Communications reflecting the persons or entities involved in the decision making for the actions or transactions giving rise to the Crusader Proof of Claim, the Redeemer Proof of Claim, or the Redeemer Settlement.

8.      Any and all Documents or Communications relating to the fiduciary relationships of Dondero or any Debtor employee, including without limitation any Individual Highland Party,

involved in any of the acts, omissions, or transactions giving rise to the Crusader Proof of Claim, the Redeemer Proof of Claim, or the Redeemer Settlement.

9.      Any and all Documents or Communications relating to litigation or arbitration arising out of the Debtor's management of the Crusader Funds' investments involving or between the Debtor, the Redeemer Committee, and the Crusader Funds, including, without limitation, any and all Documents or Communications relating to the termination of the Debtor as investment manager of the Crusader Funds in 2016 and any management, distribution, or deferred fees paid to the Debtor by the Redeemer Committee or Crusader Funds.

10.     Any and all Documents or Communications relating to the facts and circumstances giving rise to the Debtor filing the above-captioned bankruptcy case on the day of oral arguments on the Redeemer Committee's motion to enforce its arbitration award against the Debtor in Delaware Chancery Court.

**EXHIBIT 6**
**Requests for Production of Documents to the Individual Highland Parties**

APP 1071

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

## REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE INDIVIDUAL HIGHLAND PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the Committee (the "Litigation Advisor"), hereby serves the following requests for production of documents or categories of documents to James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani to be produced to the Committee in accordance with the Definitions and Instructions below ("Request(s)").

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## DEFINITIONS

1.     "Acis Dispute Parties" means Acis Capital Management, L.P., Acis Capital Management GP, LLP, Acis Loan Funding, Ltd., Highland CLO Funding, Ltd., Highland CLO Holdings, Ltd., Highland CLO Management, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

2.     "Atlas" means Atlas IDF GP, LLC together with Atlas IDF, LP, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

3.     "Blackland" means Blackland Group LLC, Blackland Legal Solutions, LLC, Blackland Information Security, LLC, Blackland Associates, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4.     "BMZ" means BMZ Discovery Services LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5.     "CDO Fund Assets" means assets held by Highland CDO Opportunity Master Fund, L.P. related to Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding, Eastland CLO Ltd., Grayson CLO Ltd., Valhalla CLO Ltd., and Governance Re.

6. "Clairmont" means Clairmont Holdings, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7. "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

8. "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

9. "Conyers" means Conyers Trust Services, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

10. "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees,

representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

11. "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

12. "Dondero" means James Dondero and all entities under his direct or indirect control.

13. "Ellington" means Scott Ellington and all entities under his direct or indirect control.

14. "FHTC" means FHTC Consulting, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

15. "Get Good" means the Get Good Trust, the Get Good Nonexempt Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors,

attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

16.    "<u>Governance Re</u>" means Governance Re, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

17.    "<u>HarbourVest Entities</u>" means HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HarbourVest Dover Street IX Investment L.P. HarbourVest Partners L.P., HarbourVest Skew Base AIF L.P., HV International VIII Secondary L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

18.    "<u>Highland Charity(ies) and Trust(s)</u>" means Charitable DAF Fund, L.P., Charitable DAF GP, Charitable DAF Holdco, Ltd., Community Foundation of North Texas Inc., Dallas Foundation, The Dondero Insurance Rabbi Trust, The Dugaboy Investment Trust, the Dondero Family Dynasty Trust, the Fourays Trust, Empower Dallas Foundation, Get Good, the Get Good Nonexempt Trust No. 1 (formerly known as the Get Better Trust), the Get Good Nonexempt Trust No. 2 (formerly known as the Canis Minor Trust), the Get Better Trust, the Canis Minor Trust, the Greater Kansas City Community Foundation, Highland Capital Management L.P. Charitable Fund, Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., Highland Santa Barbara Foundation, Inc., Okada Family Foundation, Inc., The Mark & Pamela Okada Family Trust – Exempt Trust #1, The Mark & Pamela Okada Family Trust – Exempt Trust #2, The Okada Insurance Rabbi Trust, SLHC Trust, and any direct or indirect predecessors or successors in

interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

19. "Highland D&O Trust" means Highland D&O Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

20. "Hunter Mountain Transaction Parties" means Hunter Mountain Investment Trust, Beacon Mountain, LLC, Atlas, Rand PE Fund, I, L.P., Rand Advisors, LLC, Rand PE Fund Management, LLC, The Dugaboy Investment Trust ("Dugaboy"), Strand Advisors, Inc., Empower Dallas Foundation, The Mark & Pamela Okada Family Trust – Exempt Trust #1, The Mark & Pamela Okada Family Trust – Exempt Trust #2, Okada Family Foundation, Inc., Crown Global Life Insurance Ltd., John Honis, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

21. "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

22. "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben,

Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any former Debtor employees acting at the direction of Dondero, and all entities under his/her direct or indirect control.

23. "Ironwood" means Ironwood Legal Solutions, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

24. "Leventon" means Isaac Leventon and all entities under his direct or indirect control.

25. "Maslow" means Marcia Ellington Maslow and all entities under her direct or indirect control.

26. "Massand" means Dilip Massand and all entities under his direct or indirect control.

27. "Massand Capital" means Massand Capital, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

28. "Nancy Dondero" means Nancy Dondero, sister of Dondero, and all entities under her direct or indirect control.

29. "Nex Entities" or "Nex Entity" means Highland Capital Management Fund Advisors, L.P., NexBank Capital, Inc., NexBank, SSB, NexBank Securities, Inc., NexBank Title, Inc., NexPoint Advisors, L.P., the NexPoint Entities, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,

APP 1078

trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

30.     "NexPoint Entities" means NexPoint Real Estate Finance, Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., NexAnnuity Holdings, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

31.     "Okada" means Mark Okada and any entities under his direct or indirect control.

32.     "Petition Date" means October 16, 2019.

33.     "Prive" means Prive Solutions LLC, Prive Lending LLC, Prive Leasing LLC, Prive Enterprises GP, LLC, Prive Investment Trust, Prive Enterprises, L.P., Prive Motorsports, LLC, Prive Entertainment, LLC, Prive Products, LLC, Prive Residential, LLC, and Prive Designs, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

34.     "Redeemer and Crusader Dispute Parties" means Highland Offshore Partners L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund, L.P., Highland Crusader Fund II, Ltd.,

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21 Entered 07/29/21 02:08:51 Page 61 of
Case 3:21-cv-00881-X Document 169 Filed 02/15/23 Page 1080 of 1245 PageID 12943
200

the Redeemer Committee of Highland Crusader Fund, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

35. "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of the Debtor's *Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Grant Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

36. "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

37. "SAS Asset Recovery" means SAS Asset Recovery Ltd. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

38. "SAS Holdings" means SAS Holdings SPV Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

39. "SAS Litigation" means SAS Litigation Management, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

40. "SAS Loan Services" means SAS Loan Services Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

41. "Scott" means Grant Scott and all entities under his direct or indirect control.

42. "Sentinel" means Sentinel Reinsurance, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

43. "Sentinel Holdings" means Sentinel Holdings Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

44. "Sevilla" means Jean Paul Sevilla and all entities under his direct or indirect control.

APP 1081

45.     "Skyview" means Skyview Group, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

46.     "SS Holdings" means SS Holdings Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

47.     "Tall Pine" means Tall Pine Group, LLC, Sunshine Coast Development, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

48.     "UBS Dispute Parties" means collectively Highland Multi Strategy Credit Fund, L.P. (formerly known as Highland Credit Opportunities CDO), Highland Special Opportunities Holding Company, Highland CDO Opportunity Master Fund, L.P., the CDO Fund Assets, Sentinel, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

49.     "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders,

members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

50.    "Zumasaa" means Zumasaa Ventures LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **INSTRUCTIONS**

1.    Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.    The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.    You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.  For avoidance of doubt, You are requested to produce all responsive Documents stored on any personal email accounts and electronic devices within Your possession, custody, and control, including without limitation any cell phones, desktop computers, laptop computers, tablet devices, and any other form of electronic device.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero or Scott, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., Dugaboy, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al,* Adversary No. 20-03195,  [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero or Scott relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion,

the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.    In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.    Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.    With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

**<u>DOCUMENTS REQUESTED OF ALL INDIVIDUAL HIGHLAND PARTIES EXCEPT DONDERO AND SCOTT</u>**

APP 1085

1.      Any and all Documents or Communications among, between, or including You and any external auditor related to any transaction, donation, transfer, payments, distributions, or the remittance of anything of value between or among You and any employee, representative, counsel, agent or consultant of the Debtor, any Acis Dispute Party, any HarbourVest Entity, any Highland Charity and Trust, any Hunter Mountain Transaction Party, any Nex Entity, any Redeemer and Crusader Dispute Party, any UBS Dispute Party, and/or any other Related Entity.

2.      Any and all Documents or Communications relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among You, the Debtor, any Highland Charity and Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity.

3.      Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, or other contract or arrangement of any kind involving any combination of You and any employee, representative, counsel, agent or consultant of the Debtor, any Highland Charity and Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity, including without limitation the business purpose for any such agreement and the negotiation of the terms of any such agreement.

4.      Any and all Documents or Communications relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among any of You, the Debtor, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity, including without limitation the business purpose for any such transaction, the negotiation of the terms of any such transaction, and

the value of any assets or liabilities involved in any such transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction.

5.      Any and all Documents or Communications relating to any tax implications to You, the Debtor, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity related to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

6.      Any and all Documents or Communications relating to the transfer, allocation, or assignment of responsibilities pursuant to any shared services agreements, advisory agreements, sub-advisory agreements, or management agreements between or among the Debtor, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity, including any negotiations related to such transfer, allocation, or assignment and the factors considered when determining which entity would service any such agreements.

7.      Any and all Documents or Communications relating to any transfer from the Debtor or any Related Entity to any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity of the Debtor's management of assets pursuant to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, or other contract or arrangement of any kind, including, without limitation, the business purpose for such transfer and negotiations related to such transfer.

8.      Any and all Documents or Communications shared between or among You and any other Individual Highland Party.

17

9.      Any and all Documents or Communications reflecting any relationship between or among You, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, any Individual Highland Party, and/or any other Related Entity, including without limitation any title or position held, any compensation or payments received, directly or indirectly, and the time periods such titles or positions were held or compensation or payments were made.

10.      Any and all Documents or Communications relating to the professional relationship between or among (1) Dondero, (2) You or any other Individual Highland Party, (3) or any entity with which those Individual Highland Parties may be affiliated, including without limitation any compensation, payment, or bonus payment directed by Dondero to be paid to You or any other Individual Highland Party for any services, actions, transactions, or any other form of work outside the scope of employment at the Debtor.

11.      Any and all Documents or Communications reflecting any professional relationship between or among Okada and You, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, any Individual Highland Party, and/or any other Related Entity, including without limitation any title or position held by Okada, any compensation or payments received by Okada, directly or indirectly, and the time periods such titles or positions were held or compensation or payments were made.

12.      Any and all Documents or Communications relating to compensation or payments of any kind by the Debtor to You, any Individual Highland Party, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any UBS Dispute Party, and/or any other Related Entity's employee, representative, counsel, agent or consultant, including without limitation any bonus payments, salary, or payments characterized as "equity" distributions.

13.     Any and all Documents or Communications relating to the Individual Highland Parties' actions or conduct regarding preservation of Documents and Communications relevant to any litigation, arbitration, mediation, or any other form of legal dispute between or among You, the Debtor, any Acis Dispute Party, any HarbourVest Entity, any Highland Charity or Trust, any Hunter Mountain Transaction Party, any Nex Entity, any Redeemer and Crusader Dispute Party, any UBS Dispute Party, and/or any other Related Entity.

14.     Any and all Documents or Communications relating to any board positions held by You or any Individual Highland Party, including without limitation any board fees paid to you, the Debtor, and/or any Related Entity and/or the allocation of any such payment between You, the Debtor, and/or any Related Entity.

15.     Any and all Documents or Communications reflecting Your current employer(s).

16.     Any and all Documents or Communications related to or reflecting Your interactions or relationship with any of Skyview, SAS Holdings, SAS Loan Services, SAS Asset Recovery, SAS Litigation, Sentinel Holdings, Sentinel, SS Holdings, Governance Re, Highland D&O Trust, or Conyers.

17.     Any and all Documents or Communications related to Brasilinvest Empreendimentos e Participacoes S/A's provision of services to the Debtor.

18.     Any and all Documents or Communications relating to Your policy or practice for document retention.

19.     Any and all Documents or Communications relating to usernames, passwords, access keys, encryption keys, or any other form of accessing protected, secured, or encrypted data maintained by the Debtor and any Related Entity or on the Debtor's servers.

20.    Any and all Documents or Communications relating to data, or information—physical or electronic—belonging to, maintained, or created by You, the Debtor, any Related Entity, or any Individual Highland Parties related to the Debtor or any Related Entity that You or any Individual Highland Party erased, destroyed, removed, wiped, edited, modified, and/or moved or transferred from its proper place or location. This Request includes but is not limited to, erasing, removing, or modifying data on cellphones, computers, laptops, email accounts, or servers, or by accessing and modifying through systems such as SMARSH, whether on Your own initiative or at the direction of any Individual Highland Party and/or Related Entity from the Petition Date until now.

21.    Any and all Documents or Communications relating to Your financial records, including without limitation, Your tax returns.

22.    Any and all Documents or Communications relating to any insurance claims made by You or on your behalf to Governance Re, including, but not limited to any insurance proceeds received.

### DOCUMENTS REQUESTED FROM DONDERO, ELLINGTON, LEVENTON, MASSAND, MASLOW, AND KAMLANI[3]

23.    Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, charitable, tax or other purpose or motivation for their creation.

---

[3] In addition to Requests 1-20.

24.     Any and all Documents or Communications relating to the relationship of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa to You, the Debtor, any Individual Highland Party, and/or any other Related Entity, including without limitation, any ownership, direct or indirect, of any of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa, any title, ownership, or position held by You or any other Individual Highland Party at Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa, any compensation or payments received by You or any other Individual Highland Party, directly or indirectly, from Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa, and the time periods such titles or positions were held or compensation or payments were made.

25.     Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payments, distributions, or the remittance of anything of value between or among any of You, the Debtor, Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, any other Individual Highland Party, and/or any other Related Entity, including without limitation  the business purpose for any such transaction, the negotiation of the terms of any such transaction, and the value of any assets or liabilities involved in any such transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction.

26.     Any and all Documents or Communications relating to the tax implications to You, the Debtor, Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, any other Individual Highland Party, and/or any other Related Entity of any transaction described in Request 25.

27.     Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, or other

APP 1091

contract or arrangement of any kind involving any combination (directly or indirectly) of You, the Debtor, Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, any other Individual Highland Party, and/or any Related Entity, including without limitation the business purpose for any such agreement and the negotiation of the terms of any such agreement.

28.     Any and all Documents or Communications relating to the transfer, allocation, or assignment of the responsibilities pursuant to any shared services agreements, advisory agreements, sub-advisory agreements, or management agreements between or among any of You, the Debtor, Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, any other Individual Highland Party, and/or any Related Entity, including without limitation any negotiations related to such transfer, allocation, or assignment and the factors considered when determining which entity or persons would service any such agreements.

29.     Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa, including without limitation, codes of conduct, policies, board packets, or other materials shared with members, officers, directors, or shareholders.

30.     Any and all Documents or Communications reflecting compensation for consulting or other fees paid to Blackland, BMZ, Lullwater, Massand Capital, Ironwood, and/or Zumasaa by Debtor or any Related Entity, including without limitation documents such as invoices, wire transfer confirmations, bank statements, receipts, checks, or other similar items.

31.     Any and all Documents or Communications involving You and anyone using the email address suffixes: sasmgt.com, the1991group.com, blacklandassociates.com, or zumaasaa.com.

32.     Any and all Documents or Communications relating, referring to, or reflecting the relationship between or among Blackland, Massand, Kamlani, Ellington, Leventon, Sevilla, Matt DiOrio or any other current or former employee of the Debtor, including without limitation any documents reflecting any email addresses for any of the above with a blacklandassociates.com suffix.

33.     Any and all Documents or Communications relating, referring to, or reflecting the relationship of any current or former employee of the Debtor with any of SAS Asset Recovery, SAS Loan Services, SAS Holdings, or SAS Litigation, including without limitation any documents reflecting any email addresses used by any current or former employee of the Debtor or any of Nancy Dondero, Lauren Garza, Dilip Massand, Tabor Pittman, or Marsha Ellington Maslow with an sasmgt.com suffix.

34.     Any and all Documents or Communications reflecting the nature of services provided to the Debtor or any Related Entity by any of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, or Zumasaa.

**DOCUMENTS REQUESTED FROM DONDERO, ELLINGTON, AND LEVENTON[4]**

35.     Any and all Documents or Communications relating to the formation, ownership, beneficiaries, and management of Tall Pine, FHTC, Clairmont, and/or Prive, including without limitation, governance documents and any business, charitable, tax or other purpose or motivation for the creation of Tall Pine, FHTC, Clairmont, and/or Prive.

36.     Any and all Documents or Communications relating to the relationship of Tall Pine, FHTC, Clairmont, and/or Prive to You, the Debtor, any Individual Highland Party, and/or any other Related Entity, including without limitation, any ownership, direct or indirect, of any of Tall

---

[4] In addition to Requests 1-20.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21   Entered 07/29/21 02:08:51   Page 75 of
Case 3:21-cv-00881-X   Document 169   Filed 12/15/23   Page 1094 of 1245   PageID 12957
200

Pine, FHTC, Clairmont, and/or Prive, any title, ownership, or position held by You or any other Individual Highland Party at Tall Pine, FTHC, Clairmont, and/or Prive, any compensation or payments received by You or any other Individual Highland Party, directly or indirectly, from Tall Pine, FHTC, Clairmont, and/or Prive, and the time periods such titles or positions were held or compensation or payments were made.

37.      Any and all Documents or Communication relating to any transaction, donation, transfer, payments, distributions, or the remittance of anything of value between or among any of You, the Debtor, Tall Pine, FHTC, Clairmont, Prive, any other Individual Highland Party, and/or any other Related Entity, including without limitation the business purpose for any such transaction, the negotiation of the terms of any such transaction, and the value of any assets or liabilities involved in any such transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction.

38.      Any and all Documents or Communications relating to the tax implications to You, the Debtor, Tall Pine, FHTC, Clairmont, Prive, any other Individual Highland Party, and/or any other Related Entity of any transaction, transaction, donation, transfer, payments, distributions, or the remittance of anything of value described in Request 37.

39.      Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, or other contract or arrangement of any kind involving any combination (directly or indirectly) of You, the Debtor, Tall Pine, FHTC, Clairmont, Prive, any other Individual Highland Party, and/or any Related Entity, including without limitation the business purpose for any such agreement and the negotiation of the terms of any such agreement.

40.     Any and all Documents or Communications relating to the transfer, allocation, or assignment of the responsibilities pursuant to any shared services agreements, advisory agreements, sub-advisory agreements, or management agreements between or among any of You, the Debtor, Tall Pine, FHTC, Clairmont, Prive, any other Individual Highland Party, and/or any Related Entity, including without limitation any negotiations related to such transfer, allocation, or assignment and the factors considered when determining which entity or persons would service any such agreements.

41.     Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Tall Pine, FHTC, Clairmont, and/or Prive, including without limitation, codes of conduct, policies, board packets, or other materials shared with members, officers, directors, or shareholders.

42.     Any and all Documents or Communications reflecting the nature of services provided to the Debtor or any Related Entity by any of Tall Pine, FHTC, Clairmont, and/or Prive.

43.     Any and all Documents or Communications reflecting the nature of services provided to Tall Pine by any of FHTC, Clairmont, and/or Prive.

APP 1095

**EXHIBIT 7**
**Requests for Production of Documents to the Highland Charities and Trusts**

APP 1096

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) )  Chapter 11 ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) )  Case No. 19-34054-sgj11 ) |
| Debtor. | ) |

### REQUESTS FOR PRODUCTION OF DOCUMENTS TO
### THE HIGHLAND CHARITIES AND TRUSTS

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents to Charitable DAF Fund, L.P.; Charitable DAF GP, LLC;

Charitable DAF HoldCo, Ltd.; Community Foundation of North Texas Inc.; Dallas Foundation;

The Dugaboy Investment Trust; the Dondero Family Dynasty Trust; the Fouray's Trust; Empower

Dallas Foundation; Greater Kansas City Community Foundation; Highland Capital Management,

L.P. Charitable Fund; Highland Dallas Foundation; Highland Kansas City Foundation, Inc.; The

Santa Barbara Foundation; Highland Santa Barbara Foundation, Inc.; Okada Family Foundation;

The Dondero Insurance Rabbi Trust; The Get Good Trust; The Get Good Non-Exempt Trust No.

1; The Get Good Non-Exempt Trust No. 2; the Get Better Trust; the Canis Minor Trust; The Mark

& Pamela Okada Family Trust – Exempt Trust #1; The Mark & Pamela Okada Family Trust –

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Exempt Trust #2; The Okada Insurance Rabbi Trust; The SLHC Trust, James Dondero, and Grant James Scott III to be produced to the Committee in accordance with the Definitions and Instructions below ("Request(s)").

## DEFINITIONS

1. "Adversary Defendants" means Dondero, Scott, Charitable DAF Fund, Charitable DAF Holdco, CLO Holdco, Ltd., Highland Dallas Foundation, Dugaboy, and Get Good.

2. "Charitable DAF Fund" means Charitable DAF Fund, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

3. "Charitable DAF GP" means Charitable DAF GP, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4. "Charitable DAF Holdco" means Charitable DAF Holdco, Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5. "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals

of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

6. "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

7. "Dallas Foundation" means the Dallas Foundation, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

8. "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

9. "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data

APP 1099

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 81 of
Case 3:21-cv-00881-X   Document 169   Filed 12/15/23   Page 1100 of 1245   PageID 12963
200

compilations from which information can be obtained.  The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

10.    "Dondero" means James Dondero and all entities under his direct or indirect control.

11.    "Dugaboy" means The Dugaboy Investment Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

12.    "Get Good" means the Get Good Trust, the Get Good Nonexempt Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

13.    "Highland Charity(ies) and Trust(s)" means Charitable DAF Fund, L.P., Charitable DAF GP, Charitable DAF Holdco, Ltd., Community Foundation of North Texas Inc., Dallas Foundation, The Dondero Insurance Rabbi Trust, The Dugaboy Investment Trust, the Dondero Family Dynasty Trust, the Fourays Trust, Empower Dallas Foundation, Get Good, the Get Good Nonexempt Trust No. 1 (formerly known as the Get Better Trust), the Get Good Nonexempt Trust No. 2 (formerly known as the Canis Minor Trust), the Get Better Trust, the Canis Minor Trust, the Greater Kansas City Community Foundation, Highland Capital Management L.P. Charitable Fund, Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., Highland Santa Barbara Foundation, Inc., Okada Family Foundation, Inc., The Mark & Pamela Okada Family

5

Trust – Exempt Trust #1, The Mark & Pamela Okada Family Trust – Exempt Trust #2, The Okada Insurance Rabbi Trust, SLHC Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

14.     "Highland Dallas Foundation" means Highland Dallas Foundation, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

15.     "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

16.     "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as former Debtor employees acting at the direction of Dondero.

17.     "Okada" means Mark Okada and any entities under his direct or indirect control.

18.     "Petition Date" means October 16, 2019.

19.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank

Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

20.     "<u>Relating to</u>" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests.  A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

21.     "<u>Scott</u>" means Grant James Scott III, the former trustee of Dugaboy, Get Good, Get Good NET 1, and Get Good NET 2.

22.     "<u>You</u>" or "<u>Your</u>" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## <u>INSTRUCTIONS</u>

1.     Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.      The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.      You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to the Adversary Defendants, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Charitable DAF Fund, Highland Dallas Foundation, Dugaboy, and Get Good, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official*

*Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al* Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from the Adversary Defendants relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, *e.g.* letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

9

authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.      With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1.      Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of any Highland Charity and Trust, other than the Adversary Defendants, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, trust agreements, and any business, charitable, tax or other purpose or motivation for their creation.

2.      Any and all Documents or Communications relating to the financial status of any Highland Charity and Trust, other than the Adversary Defendants, including but not limited to financial statements, balance sheets, statements of cash flows, owner's equity calculations, investment summaries, valuations, reports, or memoranda from auditors or financial consultants, or account summaries.

3.      Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any combination of the Debtor or any Related Entity and any Highland Charity and Trust, other

than in connection with the CLO Holdco Transaction, including without limitation the business

purpose for any such agreement and the negotiation of the terms of any such agreement.

4.      Any and all Documents or Communications relating to any transaction, donation,

transfer, payment, distribution, or the remittance of anything of value between or among any of

the Debtor, any Highland Charity and Trust, or any Related Entity, other than the CLO Holdco

Transaction, including without limitation the amount, the date, and any bases or purpose and the

negotiation of the terms of any such transaction.

5.      Any and all Documents or Communications relating to the value of any assets or

liabilities involved in any transaction, donation, transfer, payment, distribution, or the remittance

of anything of value described in Request 4, including without limitation any valuations, fairness

opinions, or neutral third-party assessments of the transactions.

6.      Any and all Documents or Communications relating to any tax implications to You,

the Debtor, any Related Entity, or any other Highland Charity and Trust related to any transaction,

donation, transfer, payment, distribution, or the remittance of anything of value described in

Request 4.

7.      Any and all Documents or Communications relating to the involvement of Dondero

or any Individual Highland Party in any transaction, donation, transfer, payment, distribution, or

the remittance of anything of value described in Request 4.

8.      Any and all Documents or Communications relating to the source of funds used by

the Debtor, any Related Entity, or any Highland Charity and Trust in any transaction, donation,

transfer, payment, distribution, or the remittance of anything of value described in Request 4.

9.      Any and all Documents or Communications relating to Debtor assets that were

transferred, directly, or via intermediary entities, to any Highland Charity and Trust, other than in

connection with the CLO Holdco Transaction, including without limitation, whether the assets were used for a charitable purpose or were subsequently transferred out of the Highland Charity and Trust, and the business, charitable, or tax purpose for any purpose or further transfer.

10. Any and all Documents or Communications relating to the relationship between or among the Debtor or any Related Entity and any Highland Charity and Trust, other than the Adversary Defendants, including without limitation, any title or position held by any former or current Debtor employee (including all Individual Highland Parties) at any Highland Charity and Trust and any transfers, compensation, or payment made by the Debtor to any Highland Charity and Trust's employees, including without limitation any bonus payments.

11. Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value from any Highland Charity and Trust, other than in connection with the CLO Holdco Transaction, whether for philanthropic or other purposes.

12. Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value to any Highland Charity and Trust, other than in connection with the CLO Holdco Transaction, whether for philanthropic or other purposes.

13. Any and all Documents or Communications relating to the relationship between or among Dondero and any Highland Charity and Trust, other than the Adversary Defendants, including without limitation, any title or position held by Dondero at any Highland Charity and Trust and any transfers, compensation, or payments received by Dondero, directly or indirectly, from the Highland Charities and Trusts or the Debtor.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21   Entered 07/29/21 02:08:51   Page 89 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1108 of 1245   PageID 12971
202

14.     Any and all Documents or Communications related to the identity of the beneficiaries or settlors of any Highland Charity and Trust, other than the Adversary Defendants in connection with the CLO Holdco Transaction, including any transfers, compensation, or payment made to those beneficiaries.

15.     Any and all Documents or Communications relating to the relationship between or among Scott and any Highland Charity and Trust, other than the Adversary Defendants in connection with the CLO Holdco Transaction, including without limitation, any title or position held by Scott at any Highland Charity and Trust and any transfer, compensation, or payments received by Scott, directly or indirectly, from the Highland Charities and Trusts or the Debtor.

16.     Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of any Highland Charity and Trust, other than the Adversary Defendants, including without limitation, codes of conduct, policies, board packets, or other materials shared with members, officers, directors, trustees, or shareholders, if any.

17.     Any and all Documents or Communications relating to Your policy or practice for document retention.

**DOCUMENT REQUESTS DIRECTED TO THE GET BETTER TRUST[3]**

18.     Any and all Documents or Communications relating to Your trustees, grantors, settlors, or beneficiaries, including without limitation, the circumstances surrounding any changes to the person(s) serving in those roles over time.

---

[3] In addition to Requests 1-17.

**EXHIBIT 8**
**Requests for Production of Documents to the Nex Entities**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) ) | Case No. 19-34054-sgj11 |
| Debtor. | ) ) |  |

## <u>REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE NEX ENTITIES</u>

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "<u>Committee</u>"), along with Teneo Capital LLC, in its capacity as litigation advisor to the Committee (the "<u>Litigation Advisor</u>"), hereby serves the following requests for production of documents or categories of documents to NexPoint Advisors, L.P., NexPoint Strategic Opportunities Fund, NexPoint Advisors GP, LLC, Highland Capital Management Fund Advisors L.P., NexPoint Real Estate Finance, Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., NexAnnuity Holdings, Inc., John Holt, Mark Okada, and James Dondero to be produced to the Committee in accordance with the Definitions and Instructions below ("<u>Request(s)</u>").

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## **DEFINITIONS**

1.     "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

2.     "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests.  A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

3.     "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4.     "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape

recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

5. "Dondero" means James Dondero and all entities under his direct or indirect control.

6. "HCMFA" means Highland Capital Management Fund Advisors, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7. "Holt" means John Holt, president and chief executive officer of NexBank Capital, Inc.

8. "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

9. "NexBank" means NexBank Capital, Inc., NexBank, SSB, NexBank Securities, Inc., NexBank Title, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

10. "NexPoint" means NexPoint Advisors, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,

directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities

acting or purporting to act on behalf of any of the foregoing.

11.  "NexPoint Entities" means NexPoint Real Estate Finance, Inc., NexPoint Real

Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real

Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc.,

NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate

Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P.,

NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real

Estate Advisors VIII, L.P., NexPoint Strategic Opportunities Fund, NexAnnuity Holdings, Inc.,

and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates

of any of them, and any and all officers, trustees, directors, employees, representatives, agents,

advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any

of the foregoing.

12.  "Nex Entities" or "Nex Entity" means HCMFA, NexBank, NexPoint, and the

NexPoint Entities.

13.  "Okada" means Mark Okada and any entities under his direct or indirect control.

14.  "Petition Date" means October 16, 2019.

15.  "Related Entity" means any current or former insider of the Debtor, the Dugaboy

Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank

Capital, Strand Advisors XVI, Inc., HCMFA, NexAnnuity Holdings, Inc., the entities listed on

Annex 1 attached to Exhibit DD of the Debtor's Notice of Filing of Plan Supplement to the Fifth

Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket

No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of

Dondero, Okada, Grant Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

16. "<u>Relating to</u>" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

17. "<u>You</u>" or "<u>Your</u>" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## <u>INSTRUCTIONS</u>

1. Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2. The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

3.      You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state. Accordingly, You should respond to each and every Request herein. If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10. With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1. Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any combination of the Debtor or any Related Entity and any Nex Entity, including without limitation the business purpose for any such agreement and the negotiation of the terms of any such agreement.

2. Any and all Documents or Communications relating to any transaction, donation, transfer, payments, distributions, or the remittance of anything of value between or among the Debtor, any Related Entity, and any Nex Entity, including without limitation the business purpose for any such transaction, the negotiation of the terms of any such transaction, and the value of any assets or liabilities involved in any such transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction.

3. Any and all Documents or Communications relating to the tax implications to any Nex Entity, the Debtor, or any Related Entity of any transaction, donation, transfer, payments, distributions, or the remittance of anything of value described in Requests 1 and 2.

4. Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of any Nex Entity, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, tax, or other purpose or motivation for their creation.

9

5.      Any and all Documents or Communications relating to the transfer, allocation, or assignment of the responsibilities pursuant to any shared services agreement, advisory agreement, sub-advisory agreement, or management agreement between or among the Debtor, any Related Entity, or any Nex Entity, including any negotiations related to such transfer, allocation, or assignment and the factors considered when determining which entity would service any such agreements.

6.      Any and all Documents or Communications relating to any shared services agreement, advisory agreement, sub-advisory agreement, or management agreement between or among any Nex Entity and any Related Entity.

7.      Any and all Documents or Communications relating to any transfer from the Debtor or any Related Entity to any Nex Entity of the Debtor's management of assets pursuant to any shared services agreement, advisory agreement, sub-advisory agreement, management agreement, or other contract or arrangement of any kind, including, but not limited to, the business purpose for such transfer and negotiations related to such transfer.

8.      Any and all Documents or Communications relating to the relationship of Dondero and the Nex Entities, including without limitation, any ownership, direct or indirect, of any of the Nex Entities, any title, ownership, or position held by Dondero at any of the Nex Entities, any compensation received by Dondero from any Nex Entity, and the relevant time periods for each.

9.      Any and all Documents or Communications relating to the relationship of Okada and the Nex Entities, including without limitation, any ownership, direct or indirect, of any of the Nex Entities, any title, ownership, or position held by Okada at any of the Nex Entities, any compensation received by Okada from any Nex Entity, and the relevant time periods for each.

10.     Any and all Documents or Communications relating to the relationship between or among the Debtor and any the Nex Entities or any of their affiliates.

11.     Any and all Documents or Communications relating to compensation by the Debtor of any Nex Entity employees or any company managed, controlled, owned, or otherwise benefiting any Nex Entity employees, including without limitation any bonus payments.

12.     Any and all Documents or Communications relating to any title or position held by Holt at the Debtor, any Related Entity, or any Nex Entity or any affiliate thereof, including without limitation any compensation received by Holt from the Debtor, any Related Entity, or any Nex Entity or any affiliate thereof, and the relevant time period for each.

13.     Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of any Nex Entity, including without limitation, codes of conduct, board packets or other materials shared with members, officers, directors, or shareholders.

14.     Any and all Documents or Communications relating to Your policy or practice for document retention.

15.     Any and all Documents or Communications relating to any Nex Entity's financial records, including without limitation any accounting books and records, accounting and audit work papers, valuation documents, fund governance and organizational documents, and business plans and financial documents, reflecting transactions or financial dealings with the Debtor or any Related Entity.

**EXHIBIT 9**

**Requests for Production of Documents to the Hunter Mountain Transaction Parties**

APP 1120

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | ) ) ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) Case No. 19-34054-sgj11 |
| Debtor. | ) ) |

**REQUESTS FOR PRODUCTION OF DOCUMENTS TO
HUNTER MOUNTAIN TRANSACTION PARTIES**

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents to Hunter Mountain Investment Trust, Beacon Mountain,

LLC, Atlas IDF, GP, LLC, Atlas IDF, LP, Rand PE Fund I, LP, Rand Advisors, LLC, Rand PE

Fund Management LLC, The Dugaboy Investment Trust, Strand Advisors Inc., Empower Dallas

Foundation, The Mark & Pamela Okada Family Trust – Exempt Trust 1, The Mark & Pamela

Okada Family Trust – Exempt Trust 2, The Okada Family Foundation, Crown Global Life

Insurance Ltd. Bermuda, James Dondero, Mark Okada, Scott Ellington, Isaac Leventon, Mark

Patrick, John Honis, Dolomiti, LLC, Hakusan, LLC, Sali Multi Series Fund, LLC, Sali Fund

Partners, LLC, and Sali Fund Management, LLC to be produced to the Committee in accordance

with the Definitions and Instructions below ("Request(s)").

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## **DEFINITIONS**

1.  "<u>Atlas</u>" means Atlas IDF GP together with Atlas IDF, LP.

2.  "<u>Atlas IDF GP</u>" means Atlas IDF GP, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

3.  "<u>Atlas IDF, LP</u>" means Atlas IDF, LP, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4.  "<u>Beacon Mountain</u>" means Beacon Mountain, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5.  "<u>Buy-Sell Agreement</u>" means the Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Debtor and its Limited Partners, as may have been amended, supplemented or restated.

6.  "<u>Communication(s)</u>" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals

of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

7. "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

8. "Contribution Agreement" means the Contribution Agreement between the Debtor and Hunter Mountain, dated as of December 21, 2015.

9. "Crown Global" means Crown Global Life Insurance Ltd., Bermuda and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

10. "Dallas Foundation" means the Dallas Foundation, and any and all officers, directors, trustees, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

11. "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

12. "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21   Entered 07/29/21 02:08:51   Page 105 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1124 of 1245   PageID 12987
200

produced or reproduced, of any type or description, regardless of origin or location, including
without limitation, all Electronically Stored Information, Communications, records, tables, charts,
analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters
(sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape
recordings, other mechanical records, transcripts or logs of any such recordings, and all other data
compilations from which information can be obtained.  The term "Document(s)" is intended to be
at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules
of Civil Procedure.

13.     "<u>Dolomiti</u>" means Dolomiti, LLC, and any direct or indirect predecessors or
successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,
trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons
and entities acting or purporting to act on behalf of any of the foregoing.

14.     "<u>Dondero</u>" means James Dondero and all entities under his control, including
without limitation Dugaboy.

15.     "<u>Dugaboy</u>" means the Dugaboy Investment Trust, any direct or indirect
predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any
and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all
other persons and entities acting or purporting to act on behalf of any of the foregoing.

16.     "<u>Ellington</u>" means Scott Ellington and all entities under his control.

17.     "<u>Empower</u>" means Empower Dallas Foundation, created in February 2015 as a tier
one supporting organization to the Dallas Foundation, and any direct or indirect predecessors or
successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,

directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

18. "Guaranty Agreements" means the various guaranty agreements executed by Rand Fund I as part of the Hunter Mountain Transaction, including without limitation, the guaranty agreement between Hunter Mountain, the Debtor, and Rand Fund dated December 21, 2015; the guaranty agreement between Hunter Mountain, Okada Family Trust 1, and Rand Fund dated December 24, 2015; the guaranty agreement between Hunter Mountain, Okada Family Trust 2, and Rand Fund dated December 24, 2015; the guaranty agreement between Hunter Mountain, Okada, and Rand Fund dated December 24, 2015; and the guaranty agreement between Hunter Mountain, Dugaboy, and Rand Fund dated December 24, 2015.

19. "Hakusan" means Hakusan, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

20. "Honis" means John Honis, who as of December 2015 was the sole member of Atlas IDF GP, and the sole member of Rand PE Fund Management, LLC, among other entities with which he is involved.

21. "Hunter Mountain" means Hunter Mountain Investment Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing, and Crown Global.

22. "Hunter Mountain Transaction" means the transactions between Debtor and Hunter Mountain on December 21, 2015, whereby Hunter Mountain entered into a Contribution Agreement with Debtor to receive 55% of the limited partnership interest in Debtor, and on December 24, 2015, whereby Hunter Mountain entered into a Purchase Agreement and received an additional 44.5% limited partnership interest in the Debtor by cash purchase and notes payable to the Limited Partners.

23. "Hunter Mountain Transaction Parties" means Hunter Mountain, Beacon Mountain, Atlas, Rand Fund, Rand Advisors, Rand Fund Management, Strand, Empower, Okada Family Trust 1, Okada Family Trust 2, Okada Family Foundation, Crown Global, and Honis.

24. "Identify" means to state, to the extent known (or, if not know, to so state,) the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

25. "Leventon" means Isaac Leventon and all entities under his control.

26. "Limited Partner" or "Limited Partners" means the limited partners in the Debtor prior to the Hunter Mountain Transaction, including Mark Okada, Okada Family Trust 1, Okada Family Trust 2, and Dugaboy.

27. "Okada" means Mark Okada and any entities under his control, including without limitation, Okada Family Trust 1 and Okada Family Trust 2.

28. "Okada Family Foundation" means the Okada Family Foundation, Inc., created in February 2015 as a tier one supporting organization to the Dallas Foundation, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7

29. "<u>Okada Family Trust 1</u>" means The Mark and Pamela Okada Family Trust – Exempt Trust #1, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

30. "<u>Okada Family Trust 2</u>" means Mark and Pamela Okada Family Trust – Exempt Trust #2, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

31. "<u>Partner Capital Accounts</u>" means those accounts referenced in Article 3.7 of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., or the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

32. "<u>Patrick</u>" means Mark Patrick and all entities under his control.

33. "<u>Petition Date</u>" means October 16, 2019.

34. "<u>Purchase Agreement</u>" means the Partnership Interest Purchase Agreement among Dugaboy, Okada Family Trust 1, Okada Family Trust 2, Okada, and Hunter Mountain dated as of December 24, 2015.

35. "<u>Rand Advisors</u>" means Rand Advisors, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

36.    "Rand Fund" means Rand PE Fund, I, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

37.    "Rand Fund Management" means Rand PE Fund Management, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

38.    "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain, NexBank Capital, Inc., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of the *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Grant Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

39.    "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

40. "<u>Sali Fund Management</u>" means Sali Fund Management LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

41. "<u>Sali Fund Partners</u>" means Sali Fund Partners, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

42. "<u>Sali Multi Series</u>" means Sali Multi Series Fund, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

43. "<u>Strand</u>" means Strand Advisors Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

44. "<u>You</u>" or "<u>Your</u>" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## <u>INSTRUCTIONS</u>

1. Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these

Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.      The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.      You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero or Dugaboy, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., Dugaboy, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the

adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero and Dugaboy relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Document request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.     Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.     With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1.     Any and all Documents or Communications relating to the Hunter Mountain Transaction, including without limitation, the following:

a.   any and all Documents or Communications relating to the creation of Hunter Mountain or Beacon Mountain,

b.   any bases or purposes for the Hunter Mountain Transaction,

c.   the valuation of the Debtor's limited partnership interests or any collateral involved in the Hunter Mountain Transaction, whether conducted  at the time of the Hunter Mountain Transaction or thereafter, including the methodologies used and the identity of those performing the valuation, and

d.   the source of funds used by Hunter Mountain to purchase the Debtor's limited partnership interests as part of the Hunter Mountain Transaction.

2.     Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of Hunter Mountain, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, and/or partnership

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21 Entered 07/29/21 02:08:51 Page 114 of
Case 3:21-cv-00881-X Document 169 Filed 02/15/23 Page 1133 of 1245 PageID 12996
200

agreements for Hunter Mountain, Beacon Mountain, Rand Fund, Rand Fund Management, Atlas IDF, LP, Atlas IDF GP, Rand Advisors, Dolomiti, Hakusan, Sali Multi Series, Sali Fund Partners, Sali Fund Management, or Crown Global, and any business, tax, or other purpose or motivation for their creation.

3.      Any and all Documents or Communications related to Jim Dondero, Mark Okada, John Honis, or any other current or former employee of the Debtor's involvement with the Hunter Mountain Transaction.

4.      Any and all Documents or Communications relating to the formation, beneficiaries, and management of the Dallas Foundation, Empower, Okada Family Foundation, Okada Family Trust 1, or Okada Family Trust 2.

5.      Any and all Documents or Communications relating to the negotiations of the terms of the Hunter Mountain Transaction, including without limitation, the negotiations of the terms of the Contribution Agreement or the Purchase Agreement, and the notes payable executed by Hunter Mountain to the Debtor, to the Limited Partners, or any Related Entity as part of the Hunter Mountain Transaction.

6.      Documents or Communications reflecting all of Your sources of revenue and all expenditures. For Dondero and Dugaboy, this Request is limited to sources of revenue and all expenditures for 2015 and January through June of 2016.

7.      Any and all Documents or Communications relating to the relationship between or among Dondero and the Hunter Mountain Transaction Parties (excluding Dugaboy) including, without limitation, any ownership, direct or indirect, of any of the Hunter Mountain Transaction Parties, any title, ownership or position held by Dondero at any of the Hunter Mountain Transaction Parties and compensation or payments received by Dondero, directly or indirectly,

from the Hunter Mountain Transaction Parties or the Debtor related to the title or position held, and the time periods such titles or positions were held.

8. Any and all Documents or Communications relating to the relationship between or among Okada and the Hunter Mountain Transaction Parties (excluding Dugaboy), including, without limitation, any ownership, direct or indirect, of any of the Hunter Mountain Transaction Parties, any title, ownership, or position held by Okada at any of the Hunter Mountain Transaction Parties and compensation or payments received by Okada, directly or indirectly, from the Hunter Mountain Transaction Parties or the Debtor related to the title or position held, and the time periods such titles or positions were held.

9. Any and all Documents or Communications relating to the relationship of the Debtor and the Hunter Mountain Transaction Parties, including, without limitation, any compensation or payment made by the Debtor to any Hunter Mountain Transaction Party's employees, including any bonus payments.

10. Any and all Documents or Communications relating to or reflecting the relationship between Crown Global and Atlas.

11. Any and all Documents or Communications relating to or reflecting the relationship between Sali Multi Series and Atlas.

12. Any and all Documents or Communications relating to or reflecting the relationship between Sali Fund Management and Rand Advisors.

13. Any and all Documents or Communications relating to or reflecting the relationship(s) between or among Dolomiti, Hakusan, and Rand Fund.

14. Any and all Documents or Communications relating to the determination of and any basis or purposes for the principal amounts, interest rates, and payment schedules of the notes

payable from Hunter Mountain to the Debtor, to the Limited Partners, or to any Related Entity as part of the Hunter Mountain Transaction.

15. Any and all Documents or Communications related to the determination and calculation of any distributions (regardless of currency or categorization) from the Debtor to Hunter Mountain, any Limited Partner, Beacon Mountain, Rand Fund, Rand Fund Management, Rand Advisors, Atlas IDF, LP, Atlas IDF GP, Crown Global, Strand, Honis, The Dallas Foundation, Empower, Okada Family Foundation, Dolomiti, Hakusan, Sali Multi Series, Sali Fund Partners, Sali Fund Management, or any Related Entity including without limitation, distributions of equity or for tax purposes. For Dugaboy, this Request is limited to the time period of January 1, 2015 to June 30, 2016.

16. Any and all Documents or Communications related to the purpose of the revisions to the governing partnership terms for the Debtor reflected in the Second Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., or the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

17. Any and all Documents or Communications relating to the Buy-Sell Agreement.

18. Any and all Documents or Communications relating to the Partner Capital Accounts of the Debtor, including but not limited to any impact of the Hunter Mountain Transaction on those accounts and the ownership of those accounts.

19. Any and all Documents or Communications relating to any transfer of the limited partnership interest in the Debtor that Hunter Mountain received as part of the Hunter Mountain Transaction, including without limitation, the negotiations relating to the terms of any such

16

transfers, the value received by Hunter Mountain as part of any such transfer, and any basis or purposes of any such transfer.

20. Any and all of Your audited or unaudited financial statements for the year ended December 31, 2014 through present, excluding audited or unaudited financial statements for Dugaboy or Dondero.

21. Any and all Documents or Communications related to the value or valuation of Class B or Class C interests of Debtor obtained by Hunter Mountain in the Hunter Mountain Transaction.

22. Any and all fairness opinions or other neutral third-party assessments of the Hunter Mountain Transaction.

23. Any and all Documents or Communications related to mark price or market values, or other similar measures, as applied to any of the Debtor, Hunter Mountain, Beacon Mountain, Rand Fund, Atlas, Rand Advisors, Rand Fund Management, or Crown Global at the time of the Hunter Mountain Transaction.

24. Any and all Documents or Communications related to any shared service agreements, advisory agreements, sub-advisory agreements, management agreement, buy-sell agreement, note, loan, payment obligation, or other contracts or arrangements of any kind involving any combination of the Debtor, Strand, Dondero, Honis, the Limited Partners, Hunter Mountain, Beacon Mountain, Rand Fund, Rand Advisors, Rand Fund Management, Hakusan, Dolomiti, Atlas, Crown Global, Sali Multi Series, Sali Fund Partners, Sali Fund Management, and/or any Related Entity except those related to the CLO Holdco Transaction.

25. Any and all Documents or Communications relating to the Guaranty Agreements.

26.     Any and all Documents or Communications relating to any participation agreements or subscription agreements between Atlas IDF, LP and Crown Global or Rand Fund, including without limitation, participation and subscription agreements, insurance policies, private placement memoranda, any basis or purposes for the agreements, and negotiations relating to the terms of the agreements.

27.     Any and all Documents or Communications related to any policy issued by Crown Global to Empower, the Dallas Foundation, or the Okada Family Foundation.

28.     Any and all Documents or Communications relating to valuation of collateral concerning any debt owed to the Debtor or any Related Entity by Hunter Mountain or any debt owed to Hunter Mountain by the Debtor or any Related Entity.

29.     Any and all Documents or Communications relating to payments, distributions, whether in cash or payment in kind, or the remittance of anything of value between or among any of the Debtor, Hunter Mountain, any Limited Partner, Beacon Mountain, Rand Fund, Rand Fund Management, Rand Advisors, Atlas IDF, LP, Atlas IDF GP, Crown Global, Strand, Honis, the Dallas Foundation, Empower, Okada Family Foundation, Dolomiti, Hakusan, Sali Multi Series, Sali Fund Partners, Sali Fund Management, or any Related Entity from 2014 to present, including without limitation, the amount of the payments, distributions, or value, the date of the transfers, and any basis or purposes for the transfers.   For the avoidance of doubt, Documents or Communications relating to CLO Holdco Transaction are excluded from this Request.

30.     Any and all Documents or Communications relating to any title or position held or compensation received by Honis in any entity or transaction involving the Debtor (or any of its affiliates), Hunter Mountain, any Limited Partner, Beacon Mountain, Rand Fund, Rand Fund Management, Rand Advisors, Atlas IDF, LP, Atlas IDF GP, Crown Global, Strand, the Dallas

Foundation, Empower, Okada Family Foundation, Dolomiti, Hakusan, Sali Multi Series, Sali Fund Partners, Sali Fund Management, or any Related Entity including without limitation, Honis's role as the sole member of Atlas IDF GP, as sole member of Rand Fund Management, and as administrator of Hunter Mountain.

31.    Any and all Documents or Communications relating to any tax treatment, any tax benefits and/or any tax planning process of Hunter Mountain, Dondero, any of the Limited Partners, or any Related Entity in connection with the Hunter Mountain Transaction.

32.    Your tax returns, excluding the tax returns of Dugaboy and/or Dondero.

33.    Your bank statements, including without limitation, Hunter Mountain's December 2015 bank statement for the BBVA Compass account, number 6733775430, excluding the bank statements of Dugaboy and/or Dondero.

34.    Any and all Documents or Communications relating to Your  policy or practice for document retention.

**EXHIBIT 10**
**Requests for Production of Documents to the Governance Re Parties**

APP 1139

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 121 of
Case 3:21-cv-00881-X   Document 169   Filed 12/15/23   Page 1140 of 1245   PageID 13003
200

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) <br> ) <br> ) Chapter 11 <br> ) <br> HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] ) Case No. 19-34054-sgj11 <br> ) <br> Debtor. ) |

### REQUESTS FOR PRODUCTION OF DOCUMENTS TO
### GOVERNANCE RE PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents to Governance Re Ltd., Highland D&O Trust, Conyers

Trust Company, James Dondero, Frank Waterhouse, Mark Patrick, and Mark Okada to be

produced to the Committee in accordance with the Definitions and Instructions below

("Request(s)").

### DEFINITIONS

1.      "Communication(s)" means any written or oral communication of any kind or

character, including, by way of example and without limitation, e-mails, instant messages, text

messages, voicemail or voice messages, audio recordings, personal conversations, telephone

conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

APP 1140

of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

2. "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

3. "Conyers Trust" means Conyers Trust Services, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4. "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5. "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data

3

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 123 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1142 of 1245   PageID 13005
200

compilations from which information can be obtained.  The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

6.        "Dondero" means James Dondero and all entities under his direct or indirect control.

7.         "Governance Re" means Governance Re Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

8.        "HDOIT" means Highland D&O Insurance Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

9.        "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

10.        "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow,  Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

11.    "Okada" means Mark Okada and any entities under his direct or indirect control.

12.    "Patrick" means Mark Patrick and any entities under his direct or indirect control.

13.    "Petition Date" means October 16, 2019.

14.    "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

15.    "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests.  A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

16.    "Waterhouse" means Frank Waterhouse and all entities under his direct or indirect control.

17.    "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders,

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

members, employees, representatives, agents, advisors attorneys, and all other persons and entities

acting or purporting to act on behalf of any of the foregoing.

## **<u>INSTRUCTIONS</u>**

1.    Unless otherwise indicated, all Documents shall be produced for the relevant time

period, which shall be the five years before the Petition Date until the date of service of these

Requests, including any Documents having an earlier origin, if in use during the relevant time

period.

2.    The obligation to produce Documents responsive to these Requests shall be

continuing in nature, and a producing party is required promptly to produce any Documents

requested herein that it locates or obtains after responding to these Requests, up to the conclusion

of the above-captioned Chapter 11 Cases.

3.    You are requested to produce not only those Documents in Your physical

possession, but also those documents within Your custody and control, including without

limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or

consultants and any other person or entity acting on Your behalf.

4.    If You have no Documents responsive to a particular Request, or if for some other

reason You are unable to produce responsive Documents, Your response to that Request should

specifically so state. Accordingly, You should respond to each and every Request herein. If You

have certain Documents that are responsive to a Request, but believe that additional Documents

not now available to You would also be responsive, You should provide the Documents You now

have and specifically state when the remainder of the Documents will be provided.

5.    These Requests, only to the extent they are directed to Dondero, should be read to

exclude documents relating specifically to the transactions on December 28, 2016 between the

Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland

Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al,* Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero relating to the CLO Holdco Transaction. If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.     Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.     Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.      With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1.      Any and all Documents or Communications relating to the formation, ownership, (whether direct, indirect, beneficial, or other), and management of Governance Re and HDOIT, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, trust agreements, and any business, charitable, tax or other purpose or motivation for their creation.

2.      Any and all Documents or Communications relating to any Governance Re insurance policy for which premiums were or are paid by the Debtor or any Related Entity, including without limitation any negotiations relating to the terms of any such policy and the bases or purpose for such policy and the Debtor or any Related Entity's premium payments.

3.      Any and all Documents or Communications relating to the identity of any person or entity that was insured pursuant to any Governance Re insurance policy for which premiums were paid by the Debtor or any Related Entity.

4.      Any and all Documents or Communications relating to the amount and timing of any premium payments for Governance Re insurance policies made by the Debtor or any Related Entity.

5.      Any and all Documents or Communications relating to any distributions made on any Governance Re insurance policy for which premiums were paid by the Debtor or any Related Entity, including without limitation, the recipient of the distributions.

6.      Any and all Documents or Communications relating to any indebtedness for which any Governance Re insurance policy paid for by the Debtor or any Related Entity was used as collateral.

7.      Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Governance Re and HDOIT, including without limitation, codes of conduct, policies, board packets, or other materials shared with members, officers, directors, shareholders, or trustees, if any.

8.      Any and all Documents or Communications relating to the financial status of Governance Re and HDOIT, including but not limited to financial statements, balance sheets, statements of cash flows, owner's equity calculations, investment summaries, valuations, reports, or memoranda from auditors or financial consultants, or account summaries.

9.      Any and all Documents or Communications relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among any of You, the Debtor, Governance Re, HDOIT, or any Related Entity, other than in connection with the

CLO Holdco Transaction, including without limitation the amount, the date, and any bases or purpose and the negotiation of the terms of any such transaction.

10.   Any and all Documents or Communications relating to the value of any assets or liabilities involved in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 9, including without limitation any valuations, fairness opinions, or neutral third-party assessments of the transactions.

11.   Any and all Documents or Communications relating to any tax implications to You, the Debtor, any Related Entity, Governance Re, or HDOIT related to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 9.

12.   Any and all Documents or Communications relating to the involvement of Dondero or any Individual Highland Party in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 9.

13.   Any and all Documents or Communications relating to the source of funds used by the Debtor, any Related Entity, Governance Re, HDOIT in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 9.

14.   Any and all Documents or Communications relating to the relationship between or among Governance Re and the Debtor or any Related Entity, including without limitation, any ownership, direct or indirect, of Governance Re, any title, ownership, or position held by any former or current Debtor employee (including all Individual Highland Parties) at Governance Re, and any transfers, compensation, or payment made by the Debtor or any Related Entity to any Governance Re employees, including without limitation, any bonus payments.

15.   Any and all Documents or Communications relating to any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, note, loan,

payment obligation, or other contract or arrangement of any kind involving any combination of (1) Governance Re and (2) the Debtor, any Related Entity, or any Individual Highland Party.

16.     Any and all Documents or Communications relating to the relationship between Governance Re and HDOIT, including any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, or other contract or arrangement of any kind involving Governance Re and HDOIT.

17.     Any and all Documents or Communications relating to the relationship between (1) the Debtor or any Related Entity and (2) HDOIT, including any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, or other contract or arrangement of any kind involving the Debtor or any Related Entity and HDOIT, any title or position held by any former or current Debtor employee (including all Individual Highland Parties) at HDOIT, and any transfers, compensation, or payment made by the Debtor or any Related Entity to any HDOIT employees, including without limitation, any bonus payments.

18.     Any and all Documents or Communications relating to the relationship between or among Dondero, Waterhouse, Patrick, or Okada and Governance Re, including without limitation, any ownership, direct or indirect, of Governance Re, any title, ownership, or position held by Dondero, Waterhouse, Patrick, or Okada at Governance Re, and any transfers, compensation, or payments received by Dondero, Waterhouse, Patrick, or Okada, directly or indirectly, from Governance Re.

19.     Any and all Documents or Communications relating to the relationship between or among (1) Dondero, Waterhouse, Patrick, or Okada and (2) HDOIT, including without limitation, any ownership, direct or indirect, of HDOIT, any title, ownership, or position held by Dondero,

Waterhouse, Patrick, or Okada at HDOIT and any transfers, compensation, or payments received by Dondero, Waterhouse, Patrick, or Okada, directly or indirectly, from HDOIT or the Debtor.

20.    Any and all Documents or Communications relating to the relationship between or among Conyers Trust and Governance Re, the Debtor, and/or any Related Entity, including without limitation, Conyers Trust's role as trustee of HDOIT, any ownership (beneficial, direct, or indirect) of any current or former Debtor employee (including all Individual Highland Parties) of Conyers Trust, any title, ownership, or position held by any former or current Debtor employee (including all Individual Highland Parties) at Conyers Trust, and any transfers, compensation, or payment made by the Debtor or any Related Entity to any Conyers Trust employees, including without limitation, any bonus payments.

21.    Any and all Documents or Communications relating to the Debtor's role as investment manager of Governance Re.

22.    Any and all Documents or Communications relating to Your policy or practice for document retention.

**EXHIBIT 11**
**Requests for Production of Documents to the Tall Pine Parties**

APP 1151

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

## REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE TALL PINE PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the Committee (the "Litigation Advisor"), hereby serves the following requests for production of documents or categories of documents to Tall Pine Group, LLC, Sunshine Coast Development, LLC, FHTC Consulting, LLC, Prive Enterprises, L.P., Prive Enterprises GP, LLC, Prive Solutions LLC, Prive Lending, LLC, Prive Leasing, LLC, Prive Investment Trust, Prive Motorsports, LLC, Prive Entertainment, LLC, Prive Products, LLC, Prive Residential, LLC, Prive Designs, LLC, Clairmont Holdings, LLC, Charitable DAF Fund, L.P., Charitable DAF GP, Charitable DAF Holdco, Ltd., Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., James Dondero, Scott Ellington, Isaac Leventon, John Holt, and Mark Patrick.

## DEFINITIONS

1. "Charitable DAF Fund" means Charitable DAF Fund, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them,

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21   Entered 07/29/21 02:08:51   Page 134 of
Case 3:21-cv-00881-X   Document 169   Filed 02/15/23   Page 1153 of 1245   PageID 13016
200

and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all

other persons and entities acting or purporting to act on behalf of any of the foregoing.

2.      "Charitable DAF GP" means Charitable DAF GP, and any direct or indirect

predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other

persons and entities acting or purporting to act on behalf of any of the foregoing.

3.      "Charitable DAF Holdco" means Charitable DAF Holdco, Ltd., Charitable DAF

Holdco, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries

or affiliates of any of them, and any and all officers, directors, employees, representatives, agents,

advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any

of the foregoing.

4.      "Clairmont Holding" means Clairmont Holdings, LLC, and any direct or indirect

predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

and all officers, directors, employees, representatives, agents, advisors attorneys, and all other

persons and entities acting or purporting to act on behalf of any of the foregoing.

5.      "Communication(s)" means any written or oral communication of any kind or

character, including, by way of example and without limitation, e-mails, instant messages, text

messages, voicemail or voice messages, audio recordings, personal conversations, telephone

conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals

of Documents, whether such communication was sent, received, or created, in final or in draft, and

all Documents concerning or memorializing such written or oral communications.

6.      "Concerning" means consisting of, reflecting, referring to, regarding, related to,

involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection

with (whether to support or rebut) the subject matter designated in any of these Requests.  A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

7.       "DAF Entities" means collectively Charitable DAF Fund, Charitable DAF GP, and Charitable DAF Holdco, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

8.       "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

9.       "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained.  The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

10. "<u>Dondero</u>" means James Dondero and all entities under his direct or indirect control.

11. "<u>Ellington</u>" means Scott Ellington and all entities under his direct or indirect control.

12. "<u>FHTC Consulting</u>" means FHTC Consulting, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

13. "<u>HCMFA</u>" means Highland Capital Management Fund Advisors, LP, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

14. "<u>Holt</u>" means John Holt and all entities under his direct or indirect control.

15. "<u>Identify</u>" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

16. "<u>Individual Highland Parties</u>" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 137 of
Case 3:21-cv-00881-X   Document 169   Filed 12/15/23   Page 1156 of 1245   PageID 13019
200

17.      "Leventon" means Isaac Leventon and all entities under his direct or indirect control.

18.      "NexBank" means NexBank Capital, Inc., NexBank, SSB, NexBank Securities, Inc., NexBank Title, Inc. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

19.      "NexBank Capital" means NexBank Capital, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

20.      "NexBank Title" means NexBank Title, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

21.      "NexBank Securities" means NexBank Securities, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

22.      "NexBank SSB" means NexBank, SSB, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

23.    "Nex Entities" or "Nex Entity" means HCMFA, NexBank, NexPoint, and the NexPoint Entities.

24.    "NexPoint" means NexPoint Advisors, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

25.    "NexPoint Entities" means NexPoint Real Estate Finance, Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., NexAnnuity Holdings, Inc., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

26.    "Patrick" means Mark Patrick and all entities under his direct or indirect control.

27.    "Petition Date" means October 16, 2019.

28.    "Prive Entity(ies)" means Prive Solutions LLC, Prive Lending LLC, Prive Leasing LLC, Prive Enterprises GP, LLC, Prive Investment Trust, Prive Enterprises, L.P., Prive Motorsports, LLC, Prive Entertainment, LLC, Prive Products, LLC, Prive Residential, LLC, and Prive Designs, LLC , and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees,

representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

29.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., HCMFA, NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of the Debtor's *Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Grant Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

30.     "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

31.     "Services Agreement" means the services agreement by and among Tall Pine, NexBank, Charitable DAF Holdco and/or Charitable DAF Fund, NexPoint Advisors, and HCMFA.

32.     "Sunshine Coastal" means Sunshine Coast Development, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them,

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

33.    "Tall Pine" means Tall Pine Group, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

34.    "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **INSTRUCTIONS**

1.    Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be from January 1, 2019 until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.    The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.    You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero, Charitable DAF Holdco, or Charitable DAF Fund, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Charitable DAF Fund, Highland Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al* Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero, Charitable DAF Holdco, or Charitable DAF Fund relating to the CLO Holdco Transaction.  If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7. Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8. In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9. Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive. With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10. With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

### DOCUMENTS REQUESTED

1.      Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, beneficial, or other), and management of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, or Clairmont Holding, including without limitation, governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, charitable, tax or other purpose or motivation for their creation.

2.      Any and all Documents or Communications relating to the relationship between the Debtor or any Related Entity and any of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding, including without limitation, any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, note, loan, payment obligation, or any other contract or arrangement of any kind, any ownership, title, or position of any former or current Debtor employee (including all Individual Highland Parties), any transfers, compensation, or payment made by the Debtor or Related Entities to any of their employees, including without limitation, any bonus payments.  For avoidance of doubt, this Request requires production of Documents and Communications relating to any shared service agreement, advisory agreement, sub-advisory agreement, management agreement, note, loan, payment obligation, or any other contract or arrangement of any kind between or among any of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding and any Nex Entities or DAF Entities.

3.      Any and all Documents or Communications relating to the relationship between or among any of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding, Dondero, Leventon, and/or Ellington, including without limitation, any ownership,

control, title or position held, any transfers, compensation, or payments received, and the time period such positions were held and any compensation or payments were received.

4.    Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among Tall Pine and the Debtor or any Related Entity, including any Nex Entities or DAF Entities, including without limitation the amount, the date, and any bases or purpose and the negotiation of the transaction, donation, transfer, payment, distribution, or the remittance of anything of value.

5.    Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among Tall Pine and Dondero, Leventon, Ellington, or any Individual Highland Party, and/or any entity directly or indirectly owned or controlled by Dondero, Leventon, or Ellington, or any Individual Highland Party and including without limitation the amount, the date, and any bases or purpose and the negotiation of the transaction, donation, transfer, payment, distribution, or the remittance of anything of value.

6.    Any and all Documents or Communications relating to the value of any assets or liabilities involved in any transaction, donation, transfer, payment, distribution, or remittance of anything of value described in Requests 4 and 5, including without limitation any valuations, fairness opinions, or neutral third-party assessments.

7.    Any and all Documents or Communications relating to any tax implications to You, the Debtor, any Related Entity, Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding relating to any transaction, donation, transfer, payment, distribution, or remittance of anything of value described in Requests 4 and 5.

8.      Any and all Documents or Communications relating to the involvement of Dondero, Leventon, Ellington, or any other Debtor employee, agent, or consultant, including without limitation any Individual Highland Party or any employee, agent, or consultant of any Related Entity in any transaction, donation, transfer, payment, distribution, or remittance of anything of value described in Requests 4 and 5.

9.      Any and all Documents or Communications relating to the source of funds used by the Debtor, any Related Entity, Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding in any transaction donation, transfer, payment, distribution, or remittance of anything of value described in Requests 4 and 5.

10.     Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding, including without limitation, codes of conduct, policies, board packets, or other materials shared with members, officers, directors, shareholders, if any.

11.     Any and all Documents or Communications reflecting compensation or fees paid to any of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding by the Debtor or any Related Entity, including without limitation documents such as invoices, wire transfer confirmations, bank statements, receipts, checks, or other similar items.

12.     Any and all Documents or Communications reflecting the nature of services provided to the Debtor or any Related Entity by any of Tall Pine, Sunshine Coast, FHTC Consulting, the Prive Entities, and/or Clairmont Holding.

13.     Any and all Documents or Communications relating to any payments received by Tall Pine pursuant to the Services Agreement, including without limitation, any payments related

to services provided by Tall Pine or others in connection with the Services Agreement, the identity of the payor(s) and recipients, and the dates and amounts of any such payments.

14.     Any and all Documents or Communications relating to any payments sent by Tall Pine to any other person or entity within 30 days after receipt of any funds from any party to the Services Agreement, including without limitation any services provided to Tall Pine or others in connection with the Services Agreement, the identity of the payor(s) and recipients, and the dates and amounts of any such payments.

15.     Any and all Documents or Communications relating to Your policy or practice for document retention.

**EXHIBIT 12**
**Requests for Production of Documents to the E-Discovery Vendor Parties**

1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
|  | ) |
| Debtor. | ) |

**REQUESTS FOR PRODUCTION OF DOCUMENTS TO**
**THE E-DISCOVERY VENDOR PARTIES**

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the Committee (the "Litigation Advisor"), hereby serves the following requests for production of documents or categories of documents to Blackland Group LLC, Blackland Legal Solutions, LLC, Blackland Information Security, LLC, Blackland Associates, LLC, BMZ Discovery Services LLC, Ironwood Legal Solutions, Massand Capital, LLC, Lullwater Park, LLC, Zumasaa Ventures, LLC, SAS Asset Recovery Ltd., SAS Holdings SPV Ltd., SAS Litigation Management, L.P., SAS Loan Services Ltd., James Dondero, Scott Ellington, Isaac Leventon, Dilip Massand, Marcia Ellington Maslow, and Sanjay Kamlani to be produced to the Committee in accordance with the Definitions and Instructions below ("Request(s)").

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21 Entered 07/29/21 02:08:51 Page 149 of
Case 3:21-cv-00881-X Document 169 Filed 02/15/23 Page 1168 of 1245 PageID 13031
200

## DEFINITIONS

1.  "Blackland" means Blackland Group LLC, Blackland Legal Solutions, LLC, Blackland Information Security, LLC, Blackland Associates, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

2.  "BMZ" means BMZ Discovery Services LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

3.  "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

4.  "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

5.  "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents,

subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

6. "<u>Document(s)</u>" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

7. "<u>Dondero</u>" means James Dondero and all entities under his direct or indirect control.

8. "<u>Ellington</u>" means Scott Ellington and all entities under his direct or indirect control.

9. "<u>Identify</u>" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

10. "<u>Individual Highland Parties</u>" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis,

4

Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow,  Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

11.     "Ironwood" means Ironwood Legal Solutions, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

12.     "Kamlani" means Sanjay Kamlani and all entities under his direct or indirect control.

13.     "Leventon" means Isaac Leventon and all entities under his direct or indirect control.

14.     "Lullwater" means Lullwater Park, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

15.     "Maslow" means Marcia Ellington Maslow and all entities under her direct or indirect control.

16.     "Massand" means Dilip Massand and all entities under his direct or indirect control.

17.     "Massand Capital" means Massand Capital, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

18.     "Petition Date" means October 16, 2019.

19.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy

Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank

Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, LP,

NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of the Debtor's

*Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly

owned, controlled or operated for the benefit of Dondero, Okada, Grant Scott, John Honis, any

current or former employee of the Debtor, or any of the foregoing persons or entities.

20.     "Relating to" means consisting of, reflecting, referring to, regarding, concerning,

involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention

with (whether to support or to rebut) the subject matter designated in any of these Requests.  A

request for Documents "relating to"[2] a specified subject matter always shall include

Communications, notes and memoranda (whenever prepared) relating to the subject matter of the

request.

21.     "SAS Entity(ies)" means SAS Asset Recovery Ltd., SAS Holdings SPV Ltd., SAS

Litigation Management, L.P., SAS Loan Services Ltd., and any direct or indirect predecessors or

successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,

directors, employees, representatives, agents, advisors attorneys, and all other persons and entities

acting or purporting to act on behalf of any of the foregoing.

22.     "Zumasaa" means Zumasaa Ventures LLC, and any direct or indirect predecessors

or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **<u>INSTRUCTIONS</u>**

1.      Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.      The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.      You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21 Entered 07/29/21 02:08:51 Page 154 of
Case 3:21-cv-00881-X Document 169 Filed 02/15/23 Page 1173 of 1245 PageID 13036
200

Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust,

whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good

Nonexempt Trust in exchange for participation interests and stock options that ultimately were

transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's

complaint brought in the adversary proceeding captioned *Official Committee of Unsecured

Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195, [Docket No. 6] (the "CLO Holdco

Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero

relating to the CLO Holdco Transaction. If Documents or Communications are withheld from

production because they relate to the CLO Holdco Transaction, the Committee requests that You

so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity

all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any

Document and a Document called for by these Requests is withheld on the basis of such assertion,

the objecting party shall identify the nature of the privilege (including work product) that is being

claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked.

In addition, the objecting party shall provide the following information with respect to any

Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general

subject matter of the Document; (iii) the date of the Document; (iv) such other information as is

sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the

author of the Document, the addressees of the Document, and any other recipients shown in the

Document, and, where not apparent, the relationship of the author, addresses, and recipients to

each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.  With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.      With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## DOCUMENTS REQUESTED

1.      Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, or beneficial), and management of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including without limitation governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, tax, or other purpose or motivation for their creation.

2.      Any and all Documents or Communications relating to the relationship between or among any of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity.

3.      Any and all Documents or Communications relating to the relationship of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity to the

Debtor, any Individual Highland Party, and/or any Related Entity, including without limitation any consulting agreement, shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving (1) You, (2) any of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, any SAS Entity, or any Individual Highland Party, and (3) the Debtor or any Related Entity, including without limitation the business purpose for any such agreement, the negotiation of the terms of any such agreement, and any compensation or payment made by the Debtor to any Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, or any SAS Entity employees, including any bonus payments.

4.       Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among (1) You, (2) any of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, any SAS Entity, or any Individual Highland Party, and (3) the Debtor or any Related Entity, including without limitation, the amount of the transaction, donation, transfer, payment, distribution, or value, the date of the event, any bases or purposes for the event, the negotiation of the terms of the event, and the value of any asset or liabilities involved in any such transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction.

5.       Any and all Documents or Communications relating to any tax implications to You, the Debtor, any Individual Highland Party, Blackland, BMZ, Lullwater, Ironwood, Massand Capital, Zumasaa, any SAS Entity, and/or any Related Entity related to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21 Entered 07/29/21 02:08:51 Page 157 of
Case 3:21-cv-00881-X Document 169 Filed 02/15/23 Page 1176 of 1245 PageID 13039
200

6.     Any and all Documents or Communications relating to the involvement of Dondero, Ellington, Leventon, or any Debtor employee, agent, or consultant, including without limitation, any Individual Highland Party, or any employee, agent, or consultant of any Related Entity in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

7.     Any and all Documents or Communications relating to the source of funds used by You, the Debtor, Blackland, BMZ, Lullwater, Ironwood, Massand Capital, Zumasaa, or any Related Entity, in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

8.     Any and all Documents or Communications relating to the relationship between or among (1) Dondero and (2) any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect, of any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any title, ownership, or position held at any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any compensation or payments received, directly or indirectly, from Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, and the time periods such titles or positions were held compensation or payments were made or received.

9.     Any and all Documents or Communications relating to the relationship between or among (1) Leventon and (2) any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect, of any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any title, ownership, or position held at any of Blackland Legal, BMZ, Lullwater,

Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any compensation or payments received, directly or indirectly, from any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, and the time periods such titles or positions were held compensation or payments were made or received.

10.     Any and all Documents or Communications relating to the relationship between or among (1) Ellington and (2) any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect, of any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any title, ownership, or position held at any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any compensation or payments received, directly or indirectly, from Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, and the time periods such titles or positions were held compensation or payments were made or received.

11.     Any and all Documents or Communications relating to the ownership of or the relationship between or among (1) Massand and (2) any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including, without limitation, any title or position held, any compensation or payments received, directly or indirectly, and the time periods such titles or positions were held compensation or payments were made.

12.     Any and all Documents or Communications relating to the relationship between or among (1) Maslow and (2) any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect, of any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any title, ownership, or position held, at any of Blackland Legal, BMZ, Lullwater,

Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any compensation or payments received, directly or indirectly, from any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, and the time periods such titles or positions were held compensation or payments were made or received.

13. Any and all Documents or Communications relating to the ownership of or the relationship between or among (1) Kamlani and (2) any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect, of any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any title, ownership, or position held, at any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, any compensation or payments received, directly or indirectly, from any of Blackland Legal, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity and the time periods such titles or positions were held compensation or payments were made or received.

14. Any and all Documents or Communications relating to the professional relationship between or among Dondero, Ellington, Leventon, Massand, Maslow, and/or Kamlani.

15. Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa, and/or any SAS Entity, including without limitation, codes of conduct, policies, board packets, or other materials shared with members, officers, directors, or shareholders.

16. Any and all Documents or Communications involving You and anyone using the email address suffixes: sasmgt.com, the1991group.com, blacklandassociates.com, or zumaasaa.com.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 160 of
Case 3:21-cv-00881-X   Document 169   Filed 12/15/23   Page 1179 of 1245   PageID 13042
200

17.    Any and all Documents or Communications reflecting the nature of services provided to the Debtor or any Related Entity by any of Blackland, BMZ, Lullwater, Massand Capital, Ironwood, Zumasaa or any SAS Entity.

18.    Any and all Documents or Communications relating to Your policy or practice for document retention.

**EXHIBIT 13**
**Requests for Production of Documents to the Massand Capital Parties**

1

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 162 of
Case 3:21-cv-00881-X    Document 169    Filed 12/15/23    Page 1181 of 1245    PageID 13044
202

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Debtor. | )<br>)<br>) Chapter 11<br>)<br>) Case No. 19-34054-sgj11<br>)<br>) |

### REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE
### MASSAND CAPITAL PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents to Massand Capital, LLC, SAS Asset Recovery Ltd., SAS

Holdings SPV Ltd., SAS Litigation Management, L.P., SAS Loan Services Ltd., Blackland Group

LLC, Blackland Legal Solutions, LLC, Blackland Information Security, LLC, Blackland

Associates, LLC, James Dondero, Scott Ellington, Isaac Leventon, and Dilip Massand.

### DEFINITIONS

1.    "Blackland" means Blackland Group LLC, Blackland Legal Solutions, LLC,

Blackland Information Security, LLC, Blackland Associates, LLC and any direct or indirect

predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

2. "<u>Communication(s)</u>" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

3. "<u>Concerning</u>" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

4. "<u>Debtor</u>" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5. "<u>Document(s)</u>" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters

3

(sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained.  The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

6.      "Dondero" means James Dondero and all entities under his direct or indirect control.

7.      "Ellington" means Scott Ellington and all entities under his direct or indirect control.

8.      "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

9.      "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow,  Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani, as well as any other former Debtor employees acting at the direction of Dondero.

10.      "Leventon" means Isaac Leventon and all entities under his direct or indirect control.

11.      "Massand" means Dilip Massand and all entities under his direct or indirect control.

12.     "Massand Capital" means Massand Capital, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

13.     "Petition Date" means October 16, 2019.

14.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

15.     "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests.  A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

16.     "SAS Asset Recovery" means SAS Asset Recovery Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

17. "SAS Entity(ies)" means SAS Asset Recovery Ltd., SAS Holdings, SAS Litigation Management, and SAS Loan Services.

18. "SAS Holdings" means SAS Holdings SPV Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

19. "SAS Litigation Management" means SAS Litigation Management, L.P., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

20. "SAS Loan Services" means SAS Loan Services Ltd., and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

21. "You" or "Your" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **INSTRUCTIONS**

1. Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these

6

Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2. The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3. You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4. If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state. Accordingly, You should respond to each and every Request herein. If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5. These Requests, only to the extent they are directed to Dondero, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., the Dugaboy Investment Trust, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's

complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195,  [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero relating to the CLO Holdco Transaction.  If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.    Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.    Where a claim of privilege is asserted in objecting to the production of any Document and a Document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked. In addition, the objecting party shall provide the following information with respect to any Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general subject matter of the Document; (iii) the date of the Document; (iv) such other information as is sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the author of the Document, the addressees of the Document, and any other recipients shown in the Document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.    In the event that a requested Document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

authorizing destruction or other disposition; (viii) the Document request or requests to which the Document is responsive.

9.       Produce all responsive Documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive. With respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to the extent that the requested metadata exits and can be extracted using standard processing tools.

10.       With respect to ESI, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive Documents.

## **DOCUMENTS REQUESTED**

1.       Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, or beneficial), and management of Massand Capital, any SAS Entity, or Blackland, including without limitation governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, tax, or other purpose or motivation for their creation.

2.       Any and all Documents or Communications relating to the relationship between or among (1) the Debtor or any Related Entity and (2) any of Massand Capital, Blackland, and/or any SAS Entity, including without limitation any consulting agreement, shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind, any ownership, title, or position of any former or current Debtor employee (including all Individual Highland Parties), and any transfers, compensation, or payment made by the Debtor or Related Entities to any of their employees, including without limitation, any bonus payments.

3.       Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value

9

between or among any of (1) You, (2) any of Massand Capital, any SAS Entity, Blackland, and (3) the Debtor or any Related Entity, including without limitation, the amount, the date, and any bases or purpose and the negotiation of the transaction, donation, transfer, payment, distribution, or the remittance of anything of value.

4.      Any and all Documents or Communications relating to the value of any asset or liabilities involved in any such transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 3, including without limitation, any fairness opinions or neutral third-party assessments.

5.      Any and all Documents or Communications relating to any tax implications to You, the Debtor, Massand Capital, any SAS Entity, Blackland, Dondero, Ellington, Leventon, Massand, any Individual Highland Party, and/or any Related Entity related to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 3.

6.      Any and all Documents or Communications relating to the involvement of Dondero, Leventon, Ellington, Massand, or any Debtor employee, agent, or consultant, including without limitation, any Individual Highland Party, or any employee, agent, or consultant of any Related Entity in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 3.

7.      Any and all Documents or Communications relating to the source of funds used by You, the Debtor, Massand Capital, Blackland, any SAS Entity, and/or any Related Entity in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 3.

8.      Any and all Documents or Communications reflecting compensation for consulting or other fees paid to Massand Capital, Blackland, and/or any SAS Entity by the Debtor or any

10

Related Entity, including without limitation documents such as invoices, wire transfer confirmations, bank statements, receipts, checks, or other similar items.

9.     Any and all Documents or Communications reflecting the nature of services provided to the Debtor or any Related Entity by any of Massand Capital, Massand, Blackland, or any SAS Entity.

10.     Any and all Documents or Communications related to direction or guidance provided to Massand by Ellington or Dondero regarding Massand's provision of services to the Debtor.

11.     Any and all Documents or Communications related to payments made by the Debtor to Massand Capital or Massand individually.

12.     Any and all Documents or Communications relating to the relationship between or among Dondero and Massand Capital, Blackland, and/or any SAS Entity, including, without limitation, any title or position held by Dondero at Massand Capital, Blackland, or any SAS Entity, any compensation or payments received by Dondero, directly or indirectly, from Massand Capital, Blackland, or any SAS Entity, or received by Dondero, directly or indirectly, from the Debtor or any Related Entity related to the title or position held at any of Massand Capital, Blackland, or any SAS Entity, and the time periods such titles or positions were held.

13.     Any and all Documents or Communications relating to the relationship between or among Ellington and Massand Capital, Blackland, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect, of any of Massand Capital, Blackland, and/or any SAS Entity, any title or position held by Ellington at any of Massand Capital, Blackland, or any SAS Entity, any compensation or payments received by Ellington, directly or indirectly, from Massand Capital, Blackland, or any SAS Entity, or received by Ellington, directly or indirectly,

from the Debtor or any Related Entity related to the title or position held at any of Massand Capital, Blackland, or any SAS Entity, and the time periods such titles or positions were held and compensation or payments were received.

14.     Any and all Documents or Communications relating to the relationship between or among Leventon and Massand Capital, Blackland, and/or any SAS Entity, including, without limitation, any ownership, direct or indirect of any of Massand Capital, Blackland, and/or any SAS Entity, any title or position held by Leventon at any of Massand Capital, Blackland, or any SAS Entity, any compensation or payments received by Leventon, directly or indirectly, from any of Massand Capital, Blackland, or any SAS Entity, or received by Leventon, directly or indirectly, from the Debtor or any Related Entity related to the title or position held at any of Massand Capital, Blackland, or any SAS Entity, and the time periods such titles or positions were held and compensation or payments were received.

15.     Any and all Documents or Communications relating to the relationship between or among Massand and Massand Capital, Blackland, any SAS Entity, the Debtor, or any Related Entity, including, without limitation, any ownership, direct or indirect, of any of Massand Capital, Blackland, any SAS Entity, the Debtor, or any Related Entity, any title or position held by Massand at any of Massand Capital, Blackland, any SAS Entity, the Debtor, or any Related Entity, any compensation or payments received by Massand, directly or indirectly, from any of Massand Capital, Blackland, any SAS Entity, the Debtor, or any Related Entity, and the time periods such titles or positions were held and compensation or payments were received.

16.     Any and all Documents or Communications relating to the professional relationship between or among (1) Massand and (2) Dondero, Ellington, Leventon, and/or any other Individual Highland Party.

17.    Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Massand Capital, Blackland, or any SAS Entity, including without limitation, codes of conduct, board packets or other materials shared with members, officers, directors, or shareholders.

18.    Any and all Documents or Communications involving You and any of the email address suffixes: sasmgt.com, the 1991group.com, blacklandassociates.com, or zumaasaa.com.

19.    Any and all Documents or Communications relating to Your policy or practice for document retention.

**EXHIBIT 14**
**Requests for Production of Documents to the Brazilian Entities Parties**

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21 Entered 07/29/21 02:08:51 Page 175 of
Case 3:21-cv-00881-X Document 169 Filed 02/15/23 Page 1194 of 1245 PageID 13057
200

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. |  |

## REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE
## BRAZILIAN ENTITIES PARTIES

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case

(the "Committee"), along with Teneo Capital LLC, in its capacity as litigation advisor to the

Committee (the "Litigation Advisor"), hereby serves the following requests for production of

documents or categories of documents to James Dondero, Melissa Schroth, Frank Waterhouse,

Mark Patrick, the Dugaboy Investment Trust, Highland Brasilinvest Gestora de Recursos, Ltda,

Highland Capital Brasil Gestora de Recursos, Ltda, Brasilinvest Investimentos e Participacoes

Ltda, HBI Consultoria Empresarial, LTDA, Highland Capital Management, AG, and Brasilinvest

Empreendimentos e Participacoes S/A to be produced to the Committee in accordance with the

Definitions and Instructions below ("Request(s)").

## DEFINITIONS

1. "Brasil Investimentos" means Brasilinvest Investimentos e Participacoes Ltda, and

any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

APP 1194

any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

2.      "Brasilinvest Empreendimentos" means Brasilinvest Empreendimentos e Participacoes S/A, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

3.       "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

4.      "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests.  A request for Documents "concerning" a specified subject matter always shall include Communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

5.      "Debtor" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees,

3

representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

6.    "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained.  The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

7.    "Dondero" means James Dondero and all entities under his direct or indirect control.

8.    "Dugaboy" means The Dugaboy Investment Trust, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

9.    "HBI" means HBI Consultoria Empresarial, LTDA, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4

10.     "Highland AG" means Highland Capital Management, AG, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

11.     "Identify" means to state, to the extent known (or, if not know, to so state), the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author(s), addressee(s), and recipient(s).

12.     "Individual Highland Parties" means James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, Mark Patrick, Mark Okada, John Holt, Grant Scott, Mary Jalonick, Katie Irving, Jean Paul Sevilla, Lauren Thedford, Stephanie Vitiello, Trey Parker, John Honis, Nancy Dondero, Dana Scott Breault, Gianna Cerullo, Matt DiOrio, Melissa Schroth, Tara Loiben, Dilip Massand, Marcia Ellington Maslow, Jason Post, Eric Holt, Cyrus Eftekhari, Jason Rothstein, and Sanjay Kamlani and all other former Debtor employees acting at the direction of Dondero.

13.     "Patrick" means Mark Patrick and all entities under his direct or indirect control.

14.     "Petition Date" means October 16, 2019.

15.     "Related Entity" means any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, NexBank Capital, Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on Annex 1 attached to Exhibit DD of *the Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1875], and any entity directly or indirectly owned, controlled or operated for the benefit of Dondero, Okada, Scott, John Honis, any current or former employee of the Debtor, or any of the foregoing persons or entities.

5

16.     "<u>Relating to</u>" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests.  A request for Documents "relating to"[2] a specified subject matter always shall include Communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

17.     "<u>You</u>" or "<u>Your</u>" means the entity or person responding to these Requests, and, if an entity, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of any such entity, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

## **<u>INSTRUCTIONS</u>**

1.     Unless otherwise indicated, all Documents shall be produced for the relevant time period, which shall be the five years before the Petition Date until the date of service of these Requests, including any Documents having an earlier origin, if in use during the relevant time period.

2.     The obligation to produce Documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any Documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

3.     You are requested to produce not only those Documents in Your physical possession, but also those documents within Your custody and control, including without

---

[2] For clarity, the phrase "relating to" shall have the meaning ascribed herein this section regardless of whether such phrase is capitalized.

Case 19-34054-sgj11 Doc 2620-1 Filed 07/29/21    Entered 07/29/21 02:08:51    Page 180 of
Case 3:21-cv-00881-X    Document 169    Filed 02/15/23    Page 1199 of 1245    PageID 13062
200

limitation, Documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

4.      If You have no Documents responsive to a particular Request, or if for some other reason You are unable to produce responsive Documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain Documents that are responsive to a Request, but believe that additional Documents not now available to You would also be responsive, You should provide the Documents You now have and specifically state when the remainder of the Documents will be provided.

5.      These Requests, only to the extent they are directed to Dondero or Dugaboy, should be read to exclude documents relating specifically to the transactions on December 28, 2016 between the Debtor, CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., Dugaboy, and the Get Good Nonexempt Trust, whereby the Debtor received a 97.6835% interest in a promissory note held by the Get Good Nonexempt Trust in exchange for participation interests and stock options that ultimately were transferred to CLO Holdco, Ltd., as set forth in detail in paragraphs 30-60 the Committee's complaint brought in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. CLO Holdco, Ltd. et. al*, Adversary No. 20-03195,  [Docket No. 6] (the "CLO Holdco Transaction"). For avoidance of doubt, the Committee is not seeking discovery from Dondero or Dugaboy relating to the CLO Holdco Transaction.  If Documents or Communications are withheld from production because they relate to the CLO Holdco Transaction, the Committee requests that You so indicate in any responses to these Requests.

6.      Where an objection is made to any Request, the objection shall state with specificity all grounds for the objection.

7.      Where a claim of privilege is asserted in objecting to the production of any

Document and a Document called for by these Requests is withheld on the basis of such assertion,

the objecting party shall identify the nature of the privilege (including work product) that is being

claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked.

In addition, the objecting party shall provide the following information with respect to any

Document so withheld: (i) the type of Document, e.g. letter or memorandum; (ii) the general

subject matter of the Document; (iii) the date of the Document; (iv) such other information as is

sufficient to identify the Document for a subpoena duces tecum, including, where appropriate, the

author of the Document, the addressees of the Document, and any other recipients shown in the

Document, and, where not apparent, the relationship of the author, addresses, and recipients to

each other.

8.      In the event that a requested Document has been lost, destroyed, discarded and/or

otherwise disposed of; You will identify the Document by identifying: (i) its author or preparer;

(ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or

appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person

authorizing destruction or other disposition; (viii) the Document request or requests to which the

Document is responsive.

9.      Produce all responsive Documents as they are kept in the usual course of business,

or organize and label them to correspond with the request to which they are responsive.  With

respect to Electronically Stored Information ("ESI"), corresponding metadata shall be produced to

the extent that the requested metadata exits and can be extracted using standard processing tools.

10.     With respect to ESI, the producing party shall confer with the Committee to develop

parameters, including custodians and search terms, to identify responsive Documents.

## DOCUMENTS REQUESTED

1.     Any and all Documents or Communications relating to the formation, ownership (whether direct, indirect, or beneficial), and management of Brasilinvest Investimentos, Brasilinvest Empreendimentos, HBI, or Highland AG, including without limitation governance documents, corporate formation documents, certificates of incorporation, bylaws, shareholder agreements, operating agreements, partnership agreements, and any business, tax, or other purpose or motivation for their creation.

2.     Any and all Documents or Communications relating to the relationship between or among (1) the Debtor or any other Related Entity and (2) Brasilinvest Investimentos and/or Brasilinvest Empreendimentos, including without limitation, any consulting agreement, shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any combination of the Debtor or any Related Entity and Brasilinvest Investimentos and/or  Brasilinvest Empreendimentos, including without limitation, the business purpose for any such agreement, the negotiation of the terms of any such agreement, and any compensation or payment made by the Debtor or any Related Entity to any Brasilinvest Investimentos or Brasilinvest Empreendimentos employees, including any bonus payments.

3.     Any and all Documents or Communications relating to the relationship between or among Dugaboy and Brasilinvest Investimentos and/or Brasilinvest Empreendimentos, including without limitation, any consulting agreement, shared services agreement, advisory agreement, sub-advisory agreement, management agreement, buy-sell agreement, note, loan, payment obligation, or other contract or arrangement of any kind involving any combination of the Dugaboy and Brasilinvest Investimentos and/or  Brasilinvest Empreendimentos, including without limitation,

the business purpose for any such agreement, the negotiation of the terms of any such agreement, and any compensation or payment made by Dugaboy to any Brasilinvest Investimentos or Brasilinvest Empreendimentos employees, including any bonus payments.

4. Any and all Documents or Communications reflecting or relating to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value between or among any of (1) You, the Debtor, Dugaboy, or any Related Entity, and (2) Brasilinvest Investimentos, and/or Brasilinvest Empreendimentos, including without limitation, the amount of the transaction, donation, transfer, payment, distribution, or value, the date of the event, any bases or purposes for the event, the negotiation of the terms of the event, and the value of any asset or liabilities involved in any such transaction, including without limitation any fairness opinions or neutral third-party assessments of the transaction.

5. Any and all Documents or Communications relating to any tax implications to You, the Debtor, Dugaboy, any Related Entity, Brasilinvest Investimentos, and/or Brasilinvest Empreendimentos related to any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

6. Any and all Documents or Communications relating to the involvement of Dondero or any Debtor employee, agent, or consultant, including without limitation, any Individual Highland Party, or any employee, agent, or consultant of any Related Entity in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

7. Any and all Documents or Communications relating to the source of funds used by You, the Debtor, Dugaboy, any Related Entity, Brasilinvest Investimentos, and/or Brasilinvest

Empreendimentos in any transaction, donation, transfer, payment, distribution, or the remittance of anything of value described in Request 4.

8.      Any and all Documents or Communications relating to the relationship between or among Dondero and Brasilinvest Investimentos and/or Brasilinvest Empreendimentos, including, without limitation, any ownership, direct or indirect, of Brasilinvest Investimentos or Brasilinvest Empreendimentos, any title, ownership, or position held by Dondero at Brasilinvest Investimentos or Brasilinvest Empreendimentos, any compensation or payments received by Dondero, directly or indirectly, from Brasilinvest Investimentos or Brasilinvest Empreendimentos, or received by Dondero, directly or indirectly, from the Debtor related to the title or position held at any of Brasilinvest Investimentos or Brasilinvest Empreendimentos, and the time periods such titles or positions were held.

9.      Any and all Documents or Communications relating to the relationship between or among any Individual Highland Party and Brasilinvest Investimentos and/or Brasilinvest Empreendimentos, including without limitation, any ownership, direct or indirect, of Brasilinvest Investimentos or Brasilinvest Empreendimentos, any title, ownership, or position held by any Individual Highland Party at Brasilinvest Investimentos or Brasilinvest Empreendimentos, any compensation or payments received by any Individual Highland Party, directly or indirectly, from Brasilinvest Investimentos or Brasilinvest Empreendimentos, or received by any Individual Highland Party, directly or indirectly, from the Debtor related to the title or position held at Brasilinvest Investimentos or Brasilinvest Empreendimentos, and the time periods such titles or positions were held.

10.     Any and all Documents or Communications related to any transaction between or among Highland AG, Highland Brasilinvest Gestora de Recursos Ltda, and Brasilinvest Investimentos, including without limitation the sources of any funds involved therein.

11.     Any and all Documents or Communications relating to any minutes, resolutions, written consents, or other materials related to the governance of Brasilinvest Investimentos or Brasilinvest Empreendimentos,, including without limitation, codes of conduct, policies, board packets or other materials shared with members, officers, directors, or shareholders.

12.     Any and all Documents or Communications relating to Brasilinvest Investimentos's or Brasilinvest Empreendimentos's provision of services to the Debtor, Dugaboy, or any Related Entity.

13.     Any and all Documents or Communications reflecting payment, whether in cash or payment in kind, by the Debtor of any expenses relating to Brasilinvest Investimentos or Brasilinvest Empreendimentos.

14.     Any and all Documents or Communications relating to Your policy or practice for document retention.

**EXHIBIT 15**
**Marc S. Kirschner Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054 (SGJ) |
| Debtor. | |

### DECLARATION OF MARC S. KIRSCHNER IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN ORDER AUTHORIZING THE EXAMINATION OF RULE 2004 PARTIES PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Pursuant to 28 U.S.C. Section 1746, Marc S. Kirschner declares as follows:[2]

1. I am a Senior Managing Director at Teneo Capital, LLC ("Teneo"), which has been retained to serve as the litigation advisor (the "Litigation Advisor") to the Official Committee of Unsecured Creditors (the "Committee") of Highland Capital Management, L.P., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"). Teneo's appointment was authorized by the *Order Pursuant to Section 1103 of the Bankruptcy Code Authorizing the Employment and Retention of Teneo Capital, LLC as Litigation Advisors to the Official Committee of Unsecured Creditors Effective April 15, 2021* [Dkt. No. 2443].

---

1 The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

2   Capitalized terms not defined in this Declaration have the meaning ascribed to them in the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, filed contemporaneously herewith.

2. I am in all respects competent to make this declaration, which I submit for all permissible purposes in support of the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, filed contemporaneously herewith (the "Motion"). The information set forth herein is based on the investigation that has been conducted by Teneo since April 15, 2021, and Teneo's review of public documents and documents received from the Debtor and from the Committee.  As set forth herein and in the Motion, Teneo's investigation has identified categories of information that the Committee requires in order to assess the viability of potential estate causes of action.

## **Personal Background**

3. My firm and I have a wealth of experience in providing litigation support, investigation and advisory services in restructurings and reorganizations and enjoy an excellent reputation for services it has rendered in chapter 11 cases on behalf of debtors, creditors, and trusts throughout the United States.  I have decades of experience as a bankruptcy and restructuring lawyer, distressed debt investor, financial advisor and fiduciary.  I founded and led for 15 years the bankruptcy department in the New York office of the global law firm, Jones Day, until my retirement from private practice of law.  Thereafter, I was appointed by SDNY Bankruptcy Judge Robert Drain as Chapter 11 Trustee of Refeo Capital Markets, a global securities and derivatives dealer, which was one of the largest cases ever for which a Chapter 11 Trustee was appointed and continued post confirmation as Litigation Trustee for two trusts formed under Refeo's Plan.  I am recognized as a leading authority in pursuing billion dollar fraudulent

Page 2

conveyance and other claims on behalf of litigation trusts, and am currently serving as Litigation Trustee for Tribune Litigation Trust and Millennium Health Litigation Trusts in Delaware and the 9 West Litigation Trust in New York. I also served as Litigation Trustee for the SNTL (Superior National Insurance Group) Litigation Trust in Los Angeles, the Yellowstone Mountain Club Litigation Trust in Montana and the Le-Natures Litigation Trust in the Western District of Pennsylvania. I am a Fellow of the American College of Bankruptcy. The Court has previously reviewed my curriculum vitae and concluded that I have "substantial experience in bankruptcy litigation matters, particularly with respect to [my] prior experience as a litigation trustee for several litigation trusts as set forth on the record of the Confirmation Hearing and in the Confirmation Brief." [Docket No. 1943 at ¶ 45].

### Estate Claims and Causes of Action

4. On January 9, 2020, the Court approved a settlement between the Debtor and the Committee concerning, among other things, governance of the Debtor and the pursuit of claims held by the Debtor. As part of the settlement, the Committee was granted standing to investigate and pursue the Causes of Action (as defined below) that will eventually vest in the Litigation Trust.

5. On February 22, 2021 [Docket No. 1943], the Court confirmed the Debtor's Plan. Upon the effective date of the Plan, a Litigation Sub-Trust, created for the benefit of the holders of claims and interests in the Debtor, will be vested with certain claims and causes of action of the Debtor (the "Causes of Action").

6. In accordance with Teneo's appointment as Litigation Advisor and my future role as Trustee of Litigation Sub-Trust, I am tasked with, among other things, investigation

Page 3

and monetization of the Causes of Action.  In furtherance of these investigations, I, along with the Committee, require critical information to determine whether conduct that was purportedly undertaken by or on behalf of the Debtor, the Non-Debtor Dondero-Related Entities, and other Dondero affiliates, give rise to Estate Causes of Action.

## Topics Necessitating Rule 2004 Discovery

### Atypical Transactions

7.  I believe that substantial harm may have been caused to the Debtor through atypical transactions amongst the Debtor and its Related Entities pre-petition.  The information that has been gleaned from the Debtor's books and records and public court proceedings to date indicates that the Debtor's founder, James Dondero, created an elaborate web of approximately 2,000 business entities that may have siphoned value away from certain entities (typically, when his own direct or indirect equity in those entities was out-of-the-money or its value was threatened) into new entities that he directly or indirectly owned.  Although the Committee has been able to glean certain information from the Debtor's own books and records, the Committee is not able to confirm the completeness or the veracity of the Debtor's own accounts and seeks to compel the Debtor's former officers and employees to produce information not on the Debtor's servers.  Likewise, the books and records of certain funds that were managed and controlled by the Debtor appear to be controlled by third parties, rather than by the Debtor itself.  Finally, as set forth above, even where the Debtor may possess records itself, the conduct of the Debtor's former officers and employees raises questions about whether the Debtor's information has been manipulated or otherwise compromised.

Page 4

**Charities and Trust Discovery**

8. Interspersed within the Highland web are a number of entities that may exist for purportedly charitable purposes, including Charitable DAF Fund, L.P.; Charitable DAF GP, LLC; Charitable DAF HoldCo, Ltd.; Dallas Foundation; Empower Dallas Foundation; Greater Kansas City Community Foundation; Highland Capital Management, L.P. Charitable Fund; Highland Dallas Foundation; Highland Kansas City Foundation, Inc.; Highland Santa Barbara Foundation, Inc.; and the Okada Family Foundation; as well as numerous trusts, including Dugaboy Investment Trust; the Dondero Family Dynasty Trust; the Fouray's Trust; Highland Capital Management L.P. Retirement Plan and Trust; The Dondero Insurance Rabbi Trust; The Get Good Trust; The Get Good Non-Exempt Trust No. 1; The Get Good Non-Exempt Trust No. 2; the Get Better Trust; the Canis Minor Trust; The Mark & Pamela Okada Family Trust – Exempt Trust (MAP #1); The Mark & Pamela Okada Family Trust – Exempt Trust (MAP #2); The Okada Insurance Rabbi Trust; and The SLHC Trust, (collectively, the "Highland Charities And Trusts").[3]

9. The relationship of these Highland Charities and Trusts to the Debtor is unclear at this time, but there appear to have been tens of millions of dollars of distributions of funds from the Debtor to certain of the Highland Charities and Trusts that need to be assessed for their propriety and reasonableness.

---

3 Also of interest is the Community Foundation of North Texas Inc., which appears to be distinct from the Highland web of entities.

Page 5

**The Nex Entities**

10. NexBank Capital, Inc., NexBank SSB, NexBank Title, Inc., and NexBank Securities, Inc. (together, "NexBank") are financial services companies.  The Advisors (Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.) are registered investment advisors, and one or more NexPoint Entities[4] provide services pursuant to shared service agreements for entities within Highland's corporate structure.  Dondero is President of both of the Advisors and has ownership interests in both entities.  The Advisors separately manage three funds (the "NexPoint/HCMFA Funds").  The Advisors and these NexPoint/HCMFA Funds own, among other things, equity interests in certain pooled collateralized loan obligation vehicles that were managed by the Debtor.  The Debtor managed these CLO vehicles pursuant to contracts to which neither the Advisors nor the NexPoint/HCMFA Funds are parties.  In addition, the Debtor and its affiliates appear to have invested substantial amounts in these NexPoint/HCMFA Funds over time.

11. The relationships between the Nex Entities and the Debtor are opaque.  However, the Debtor has performed certain services on behalf of certain Nex Entities, and at the same time, certain Nex Entities have performed services as an investment advisor and CLO manager.  Because of the close business ties among the Debtor and the Nex Entities, and the numerous interrelationships and transfers of assets back and forth among the parties, discovery is needed to assess the propriety of those relationships and transfers.

---

4 As defined in the Motion.

Page 6

**The Hunter Mountain Transaction**

12. Based on the investigation to date, it appears that Hunter Mountain was involved in an unusual transaction with the Debtor in December 2015, whereby Hunter Mountain purchased a majority of the Debtor's limited partnership interests.  This transaction was accomplished in two steps: first, by contributing a $63 million  note payable and $7 million of cash to the Debtor in exchange for 55% of the Debtor's Class B limited partnership interests (the "Contribution"); and second, by making a series of notes payable totaling $83.7 million and combined $9.3 million in cash to the Debtor's then-four Class A limited partners (comprised of the Dugaboy Investment Trust, Mark Okada, The Mark & Pamela Okada Family Trust – Exempt Trust (MAP #1), and The Mark & Pamela Okada Family Trust – Exempt Trust (MAP #2))  in exchange for a 44.5% Class C limited partnership interest in the Debtor (the "Purchase" and together with the Contribution, the "Hunter Mountain Transaction").  This resulted in Hunter Mountain effectively owning a 99.5% limited partnership interest in the Debtor in exchange for $16.3 million in cash and $143.7 million in notes.

13. Based on the investigation to date, Hunter Mountain appears to be a shell company, the only assets of which are the Class B and Class C Limited Partnership interests in the Debtor.  Upon information and belief, Hunter Mountain is 100% owned and controlled by Beacon Mountain.  It appears that the only asset of Beacon Mountain is its ownership of Hunter Mountain and Beacon Mountain is, itself, owned and controlled by Rand Fund I.  Upon information and belief, Rand Fund I is 99% owned and controlled by Atlas IDF LP, and Rand Advisors manages both Rand Fund I and Atlas IDF LP.  It appears that Atlas IDF GP is the general partner of Atlas IDF LP.  Each of

Page 7

Rand Fund I, Atlas IDF GP, Atlas IDF LP, and Rand Advisors appears to have been managed and controlled by John Honis, a former employee of the Debtor who also served on the Board of Trustees of Debtor's affiliated registered investment companies as well as on the boards of portfolio companies for investment funds operated by the Debtor.

14. It is unclear whether the Debtor received reasonably equivalent value in the Hunter Mountain Transaction, or what, if any, value was effectively stripped away from the Debtor and its creditors as a result of the Hunter Mountain Transaction. It is also unclear whether the Class A Interest Owners benefitted from the Hunter Mountain Transaction at the Debtor's expense. As a result, the Committee seeks Rule 2004 discovery regarding these topics.

**"Insurance" Coverage**

15. The Debtor was previously "self-insured" for its directors and officers ("D&O") coverage. This self-insurance was issued by a Bermuda "captive" insurance company, Governance Re Ltd. ("Governance Re"). The named insured was an entity known as Highland D&O Trust, the ownership and legal status of which is unclear at this time. Based upon review to date, there are a number of unusual aspects to the relationship between the Debtor and Governance Re.

16. First, the Debtor is a beneficiary of the D&O policy issued to Highland D&O Trust, but other Related Entities and numerous purportedly unaffiliated entities also appear to have been beneficiaries under the same policy. It is unclear why the Debtor may have been paying insurance premiums for the benefit of unaffiliated entities.

Page 8

17. Second, upon information and belief, Governance Re is part of a corporate structure that ultimately rolls up to either Dondero individually or an entity owned or controlled by Dondero.  The nature of the relationship between Governance Re, Dondero, and the Debtor is currently unknown, as is the amount of any benefits conveyed to Dondero or others by virtue of this relationship.

18. Third, the financial transactions between or among Governance Re, the Debtor, the Related Entities, and the numerous other Dondero affiliates appear to be complicated and littered with notes, loans, or other indebtedness.  It is unclear at this time whether any of those financial transactions were made to the Debtor's detriment.

19. As a result, discovery is required to understand the relationship between and among these entities and whether those interactions give rise to Causes of Action.

**Transactions with Entities Affiliated with Debtor Employees**

20. The Debtor has a long list of "vendors" in its books and records—a number of which appear to have been owned, controlled, and/or managed by former Debtor employees. It is currently unclear whether these relationships were properly disclosed, or if their interactions with the Debtor give rise to potential Causes of Action.  As a result, discovery is needed to assess the interactions.

21. By way of example, shortly after these proceedings were commenced, in early 2020, Ellington appears to have formed entities called Tall Pine Group, LLC ("Tall Pine") and Sunshine Coast Development, LLC ("Sunshine").  In March 2021, Tall Pine entered into an agreement called a "Services Agreement" to provide services to NexBank SSB, Charitable DAF Fund, L.P., HCMFA, and NPA that are similar or identical to the services provided by the Debtor under its shared services agreements

Page 9

for these same entities.  It is my understanding that the existence of this agreement was concealed from the independent board of the Debtor and was only recently discovered.

22. I understand that Tall Pine may have then sub-contracted with entities affiliated with other current or former Debtor employees (all of whom were employed by the Debtor at the time)  and, as a result, those entities and Debtor employees may have also participated in the acts giving rise to potential Causes of Action related to the Services Agreement.  As a result, the Committee seeks Rule 2004 discovery from each of the Tall Pine Entities (as defined in the Rule 2004 Motion and Brief) relating to the services agreement, the nature of the services provided, the relationships between or among the Tall Pine Entities, and the Tall Pine Entities' relationships with the Debtor and current or former Debtor employees.

23. Similarly, former Debtor employees Leventon and Ellington may have participated in the creation of a series of companies (certain of the E-Discovery Vendor Parties, as defined in the Motion) intended to provide outsourced legal services to the Debtor and Related Entities during the course of their employment by the Debtor.  These companies also appear to have involved Debtor consultants, including Ellington's sister and Dilip Massand.

24. As in-house attorneys for the Debtor who provided legal services to the Related Entities pursuant to shared services agreements, Leventon and Ellington's possible ownership of entities doing business with the Debtor or Related Entities may give rise to potential Causes of Action depending upon the circumstances involved.  At this time, there is limited information related to these business relationships and discovery is needed to assess whether the behavior is actionable.

**Unexplained "Consultancies"**

25. Based on the review of the Debtors business records to date, there are also several "consultants" that may have had relationships with the Debtor that could give rise to Causes of Action. For example, Massand Capital, LLC appears to be a consulting firm owned by Dilip Massand. Massand had a longstanding business relationship with the Debtor, pursuant to which Massand allegedly consulted with the Debtor and was assigned tasks only by "the Highland Chairman and General Counsel"—who, at the time, were Dondero and Ellington, respectively. Massand received approximately $600,000 per year annually from 2014 to the Petition Date. Based on information known at this time, it is unclear whether Massand provided material services to the Debtor over the course of this engagement. At this time, it appears that Massand may have performed work primarily for the benefit of entities owned or controlled by Dondero, Ellington, and/or other Debtor employees. Further discovery is required to assess these relationships, the services provided, and whether the Debtor was harmed as a part of this engagement.

26. Similarly, the structure of Highland entities in Brazil is highly complex. It appears that there were two separate "families" of entities in Brazil—one whose ultimate parent was the Debtor, and one whose ultimate parent was Dondero (through The Dugaboy Investment Trust). Upon information and belief, Dondero caused funds payable by the "family" of entities attributable to him to be paid by the Debtor instead. Similarly, there are three consultancies in Brazil that received payments from the Debtor or Debtor affiliates over time, and their connections to Dondero and his related entities is unclear. From the review to date, it is also unclear what, if any, services these

Page 11

"consultants" may have provided to the Debtor.  As a result, discovery is necessary to assess the propriety of the relationships and payments.

**"Equity Distributions" to Dondero**

27. Between 2015 and the Petition Date, Dondero received a number of large round-dollar payments from the Debtor which total approximately $20 million.  Many of these payments are described in the Debtor's internal books and records as "equity distributions."  To date, the Committee has not identified an explanation for these payments.  Moreover, there is reason to doubt that any of these payments were actually "equity distributions," because they appear to have been made at times when Dondero purported to have held no limited partnership interests in the Debtor. Additional discovery into these large payments is required so that their propriety can be assessed and a determination of whether they give rise to a Cause of Action can be made.

## Conclusion

28. In order to fulfill any fiduciary duties under the Plan and Litigation Sub-Trust Agreements, I believe it is necessary and appropriate to conduct a careful and thorough investigation of the facts and circumstances leading to the substantial harm that may have been caused to the Debtor, which includes moving for the 2004 examinations.

29. I believe that the information sought through the 2004 examinations is critical to determine the scope of viable claims that may exist on behalf of the Litigation Sub-Trust against potential third parties that may be culpable for causing such harm to the Debtor.

Page 12

30. Based on my experience, the relief requested in the Motion is narrowly tailored only to achieve the primary goal of recovering estate assets for the benefit of all unsecured creditors and providing a fulsome recovery to the Litigation Sub-Trust Beneficiaries.

31. I believe that proceeding under Bankruptcy Rule 2004 is a responsible, expeditious and cost-effective tool to enable the Committee and myself, as fiduciary to the Committee and eventually to the Litigation Sub-Trust Beneficiaries, to decide on an appropriate, prudent course of action.

32. Accordingly, I believe that the relief sought in the Motion provides the targeted investigation necessary for me to adequately assess the Causes of Action (and thus fulfill my fiduciary duties as Litigation Sub-Trust Advisor) in a time-efficient and cost-effective manner that minimizes any harm to the reorganized Debtor and its current stakeholders.

*[Remainder of Page Intentionally Left Blank]*

Page 13

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _28th_ day of July, 2021

Marc Kirschner
Senior Managing Director
Teneo Capital, LLC

Page 14

Case 19-34054-sgj11 Doc 2723 Filed 08/16/21 Entered 08/16/21 16:52:38 Page 1 of 15
Docket #2723 Date Filed: 08/16/2021
Case 3:21-cv-00881-X Document 169 Filed 12/15/23 Page 1220 of 1245 PageID 13083

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue,
Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Counsel for Nancy Dondero*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT L.P.,[1] | ) ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

**RESERVATION OF RIGHTS AND LIMITED OBJECTION OF NANCY DONDERO TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN ORDER AUTHORIZING THE EXAMINATION OF RULE 2004 PARTIES PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Nancy Dondero files this reservation of rights and limited objection in response to the

Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of

an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal

Rules of Bankruptcy Procedure (the "Motion") filed by the Official Committee of Unsecured

Creditors (the "Committee") of the above-captioned debtor, Highland Capital Management, L.P.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210816000000000027

APP 1220

(the "Debtor").[2] In support of her reservation of rights and limited objection, Ms. Dondero states as follows:

## I.     BACKGROUND

1.     On October 16, 2019, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.     The Committee was appointed by the United States Trustee on October 29, 2019.[3]

3.     On February 22, 2021, the Court entered the Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief [Docket No. 1943], confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (the "Plan").

4.     On July 29, 2021, the Committee filed the Motion. In the Motion, the Committee seeks to conduct discovery of dozens of parties pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. Ms. Dondero is identified as one of the Rule 2004 Parties[4] in the Motion, and is further categorized as one of twenty-six Individual Highland Parties. The Committee's ostensible justification for the 2004 Requests directed at Ms. Dondero is as follows: "Nancy Dondero is Dondero's sister, and acts (or has acted) as trustee for various trusts related to the Debtor, including Dugaboy and Get Good." Lumping her in with former Highland employees and others substantially more involved in the Debtor's business, the Committee concludes that broad

---

[2]   In addition to asserting the reservation of rights and limited objection presented herein, Ms. Dondero joins in the reservations and objections of similarly situated respondents. Ms. Dondero also agrees with other objectors that there should be a protocol for disclosures that includes any Rule 2004 examinee being given meaningfully in advance of the examination any documents concerning them from the Debtor/Highland server.

[3]   According to the Motion, two of the original members of the Committee have since resigned, leaving the Committee members as Meta-E Discovery and UBS Securities LLC and UBS AG London Branch. Motion, ¶ 9.

[4]   Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

invasive discovery is warranted "given [her unspecified] roles with the Debtor and/or its affiliates, as well as [her] potential involvement in transactions and conduct of interest." Motion p.20 n.28.

5.          On August 6, 2021, the Court entered the Order Granting the Official Committee of Unsecured Creditors' Emergency Motion to Set Briefing Schedule for Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure [Docket No. 2688] (the "Motion Briefing Order").  The Motion Briefing Order set a deadline of August 16, 2021 for any Rule 2004 Responses, and a deadline of August 17, 2021 for any witness and exhibit lists.

6.          On August 11, 2021, the Debtor filed the Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700], providing notice that the Effective Date of the Plan occurred on August 11, 2021.

7.          With the occurrence of the Effective Date the Committee has been dissolved, and the Litigation Sub-Trust has been created.  From the tenor of the Motion it appears that the Trustee of the Litigation Sub-Trust will seek to step into the shoes of the Committee as the movant of the Motion.  Ms. Dondero therefore files this reservation of rights and limited objection to preserve her rights and avoid any issue of waiver of same.

## II.          RESERVATION OF RIGHTS

8.          As an initial matter, Ms. Dondero reserves her rights in connection with the proposed procedure for the examinations sought in the Motion.

9.          A Rule 2004 exam against a party other than a debtor is best viewed as merely a request for the issuance of a subpoena.  Rule 2004(c) provides in part that "[t]he attendance of an

entity for examination and for the production of documents or electronically stored information, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial." Fed. R. Bankr. P. 2004(c).

10.    The efficiency of this procedure is explained in the *In re Sheetz* decision:

> Whether or not the court authorizes a 2004 examination is a matter committed to its discretion.  One reason they are considered ex parte is that, when the motion is correctly used and implemented, orders granting them do not require anything of the other party.  The rule contemplates only that the court may order the examination of any entity.  That entity's cooperation in the examination process is then secured with a subpoena, issued under Rule 45 of the Federal Rules of Civil Procedure.  If the examinee thinks that the subpoena is inappropriate, it may take advantage of the procedures outlined there. This process has the advantage of allowing the court to avoid the appearance of approving any details of the examination, such as when, where, etc.  Only if there is a dispute on such issues does the court need to become involved.  The point here is that unless and until the examinee is subpoenaed in connection with an authorized examination, there is nothing it needs to do and it has precious little to complain about.

*In re Sheetz*, 452 B.R. 746, 748-49 (Bankr. N.D. Ind. 2011) (internal citations omitted).

11.    Here the Committee seeks entry of an order where "[t]he Rule 2004 Parties are directed to produce documents, communications, and other materials responsive to the Requests substantially in the forms attached as Exhibits 2 through 14 to the Motion no later than twenty-one (21) days after service thereof."  Motion, Ex. 1, P. 2.  To the extent that the Motion is an attempt to adjudicate the allowance of an examination as well as the details of that examination, it is improper, because a subpoena served on Ms. Dondero is required first.

12.    Although this Court has in the past permitted a third party Rule 2004 exams authorized only by court order, that situation is distinguishable from a proposed Rule 2004 examination of Ms. Dondero.  In *In re Mirant Corp.*, 326 B.R. 354 (Bankr. N.D. Tex. 2005), the Court authorized Rule 2004 examinations without need for a subpoena.  *Id.* at 357.  However, the

CORE/3522697.0002/168796687.6

Court did so only because counsel for the respondents "agreed that the court's oral direction could serve in lieu of a subpoena." *Id.* In addition, the Court found support for its decision on a finding that the respondents' position as "parties in interest" and creditors who have participated in the case rather than a "true third party target." *Id.*

13.    Ms. Dondero is a third party non-debtor who has not personally been actively involved in this case. She does not consent to submit to examination without a corresponding subpoena. For these reasons, Ms. Dondero is entitled to be properly served with a subpoena to protect herself as well as recover any costs in producing records.

## III.    LIMITED OBJECTION

14.    Ms. Dondero submits this limited objection to the Requests directed at her as defined as one of the Individual Highland Parties. The Committee has not met its burden to show good cause for a Rule 2004 examination of Ms. Dondero in general, much less the broad and invasive discovery sought in the Motion. *In re Express One Int'l*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (movant seeking Rule 2004 exam has the burden of showing good cause for the examination).

15.    The Committee's efforts with the Motion to conduct extensive post-confirmation discovery are similar to the situation faced by the Court in *In re ADPT DFW Holdings LLC*, No. 17-31432 sgj11 (Bankr. N.D. Tex.) (hereafter, "*ADPT DFW*"). In *ADPT DFW*, the Litigation Trustee of the Adeptus Litigation Trust (the "Adeptus Trustee") filed five motions seeking Rule 2004 examinations from a variety of parties, including the reorganized debtors' former officers and directors. [*ADPT DFW*, Docket Nos. 1062–1066]. This Court denied all of the motions. [*ADPT DFW*, Docket Nos. 1198-1199, 1201, 1210-1211].

CORE/3522697.0002/168796687.6

16.     Similar to how here the Trustee of the Litigation Sub-Trust has been vested with certain claims and causes of action of the Debtor, including the Estate Claims, the Adeptus Trustee was given authority to pursue causes of action on behalf of the litigation trust. In an oral ruling at the hearing on the Rule 2004 motions in *ADPT DFW*, the Court explained that the basis for denying the motions was a lack of good cause:

> The Court does not find good cause here to order any of the Rule 2004 exams because of the unique facts that I just cannot ignore. Among those unique facts we have a cooperating reorganized debtor. I think it is undisputed and its counsel, Norton Rose Fulbright, in that they have produced thousands of documents and I'm told are continuing to produce, so that's an important fact here.
>
> Two, we have a roadmap of possible claims and causes of action in the disclosure statement. I mean it's certainly not as fulsome as a complaint and it might not connect every dot, but that's another important factor here.
>
> Three, I have mentioned. We had an unsecured creditors committee and equity committee who were extremely active and had the opportunity and I think did investigate claims and causes of action during the case to a sufficient level where their information sharing with the Liquidating Trustee could enable the drafting of claims and causes of action in a complaint.

*ADPT DFW*, Docket No. 1268, Transcript from Hearing on: The Liquidating Trustee's Rule 2004 discovery motions; issues of subject matter jurisdiction; and the Court's rulings, March 27, 2018 (the "March 27, 2018 Transcript"), Pg. 94 Line 11-Pg. 95, Line 3.

17.     This is another such unique case. First, the Debtor is now reorganized, and even prior to reorganization, the Committee had access to the Debtor's documents in connection with Estate Claims pursuant to the Order Approving Settlement with Official Committee of Unsecured Creditors regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339].

CORE/3522697.0002/168796687.6

18.     Second, Exhibit O of the Plan Supplement contained an Amended Schedule of Retained Causes of Action providing a clear roadmap of possible claims and causes of action. [Docket No. 1811].

19.     Third, the Committee has been extremely active in investigating claims to date. *See e.g.*, Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor [Docket No. 808]; Order on Motion for Clarification of Ruling [DE #914] and the Joinders Thereto [DE ## 915 & 927] [Docket No. 935]; *Declaration of Marc C. Kirschner in Support of the Official Committee of Unsecured Creditors' Motion to Further Extend the Stay of the Adversary Proceeding through October 15, 2021*, filed in Adv. Proc. No. 20-03195, Docket No. 70, ¶ 8 (noting over 1,200 hours spent by forensic and litigation support professionals working as Litigation Advisor to Committee "investigating myriad potential claims and causes of action for the benefit of all unsecured creditors"). Further, even with the dissolution of the Committee itself, that knowledge is not lost. The Trustee to the Litigation Sub-Trust has retained counsel to the Committee, and the Committee members are serving on the Claimant Trust Oversight Committee. As the Court noted in *ADPT DFW*, "I think they should be able to provide a treasure trove of information to connect the dots to the extent that the Litigation Trustee has not connected all the dots yet." March 27, 2018 Transcript, Pg. 96, Lines 1-3.

20.     The Court denied the Rule 2004 Exam motions in *ADPT DFW* for all the same reasons that exist here, stating "[t]he Litigation Trustee I think has information at his fingertips to file complaint or not and then can obviously take discovery pursuant to the Federal Rules of Civil Procedure or if it's state court, the state rules of civil procedure." March 27, 2018 Transcript, Pg. 96, Lines 12-16. *See also, In re Kearney*, 590 B.R. 913 (Bankr. D. N.M. 2018). In *Kearney*, the

Court limited a Rule 2004 examination to documents already produced by the respondent but subject to a protective order, but denied the debtor's request for additional documents, saying:

> On the other hand, the Court does not believe it is necessary or desirable to order ARCO to produce additional documents. The Court concludes that the Debtor already has enough information to evaluate the potential claims. Unlike most Rule 2004 motions seeking pre-litigation discovery, there has already been *both* extensive litigation *and* extensive discovery involving the Debtor and ARCO. While it is always nice to get more information, the Court finds that no more information is needed before the Debtor can evaluate any potential claims against ARCO. On balance, the Court finds and concludes that the burdens on and risks to ARCO of additional production outweigh the potential benefits to the estate.

*Kearney*, 590 B.R. at 925-26. Likewise, the Motion should be denied.

21.     If the Court will not deny the Motion outright, its scope must still be reined in as applied to Ms. Dondero. Several of the Requests set forth in Exhibit 6 of the Motion, Requests for Production of Documents to the Individual Highland Parties are overly broad both on their face, and as a result of the fact that Ms. Dondero is Jim Dondero's sister, resulting in her possession of personal data, having nothing to do with the Debtor's business (such as communications about Mr. Dondero's minor children).

22.     Although the scope of Rule 2004 is wide, examinations must relate either to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge" or "the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan." Fed. R. Bankr. P. 2004(b). *See Snyder v. Society Bank*, 181 B.R. 40 (Bankr. S. D. Tex. 1994) (explaining that the scope of Rule 2004 is not limitless). As noted above, the Committee's purported justification for the 2004 examination is superficial ("Mr. Dondero's

CORE/3522697.0002/168796687.6

sister" and family "trustee") and conclusory ("potential involvement in transactions and conduct of interest").

23. There is no limitation to contain several of the Requests within the scope of the Debtor, its estate, or its affairs.

24. In particular, included within the Requests is a demand for "[a]ny and all Documents or Communications relating to Your financial records, including without limitation, Your tax returns." Motion, Ex. 6, Request 21. A request encompassing the entirety of Ms. Dondero's financial records and related communications for the past seven years[5] is clearly abusive and, despite the Litigation Advisor's assertions to the contrary, is not "narrowly tailored" to the goal of recovering estate assets, as the Committee acknowledges is required. Motion, Ex. 15, Kirschner Decl., ¶ 30. In *In re Yahweh Ctr., Inc.*, 2017 WL 327473 (Bankr. E.D.N.C. Jan. 23, 2017), while allowing broad discovery related to the debtor and its assets, the Court specifically denied requests to two trusts to "Please produce any and all tax returns filed by you, or on your behalf, including any schedules, statements, or attachments thereto, for the years 2010 through present." *Id.* at *4. In doing so, the Court held that the trusts "hold bona fide reasons to refrain from producing documents that affect or pertain to the rights of other, such as the respective beneficiaries of the two trusts, and do not pertain to or affect the Debtor in any manner" and that "the privacy interests of [the trusts] far outweigh the Debtor's right to know the information sought." *Id.*

---

[5] The requested time period for requested documents is also overly broad and should be limited to the prepetition period. With the occurrence of the Effective Date and transfer of the Causes of Action to the Litigation Sub-Trust, the matters pertaining to "consummating a plan" per Rule 2004(b) are constrained to the actions which the Litigation Trustee is authorized to pursue under the Plan. This is a matter of both the scope of Rule 2004 and the Court's remaining jurisdiction over the case. *See Ernst & Young, LLP v. Pritchard (In re Daisytek, Inc.)*, 323 B.R. 180, 185 (N.D. Tex. 2005) (explaining that "[o]nce the debtor's plan has been confirmed, the bankruptcy court's jurisdiction is narrowed. At that point, bankruptcy court jurisdiction 'ceases to exist, other than for matters pertaining to the implementation or execution of the plan.'" (citing *Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001)).

CORE/3522697.0002/168796687.6

25.     In addition, the Requests fail to take into account the personal relationship between Ms. Dondero and at least one of the Individual Highland Parties, her brother James Dondero, by seeking "[a]ny and all Documents or Communications shared between or amount You and any other Individual Highland Party." Motion, Ex. 6, Request 8. Does the Creditors Committee really have any legitimate basis to discover for example, communications about the care of Jim and Nancy Dondero's father or his funeral arrangements, about family medical issues, vacation plans and baby pictures of Ms. Dondero's nieces and nephews (Mr. Dondero's children), among the many personal communications sought by the overreaching language of the 2004 requests?

26.     Ms. Dondero communicated with Mr. Dondero (and any other Highland-related persons) via their email addresses on the Highland server. Therefore, all of the documents sought are already in the possession of the Debtor, which has professionals far better equipped to shift through the data than Ms. Dondero, if for no other reason than they know what they are looking for. If after searching the records to which they already have access there is an actual basis to suggest that Ms. Dondero has particular records that could lead to the identification of debtor assets, they should make such searches and make a targeted Rule 2004 Request. *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (W.D. Pa. 2008) (explaining that a "Rule 2004 examination should not be so broad as to be more disruptive and costly to the party to be examined than beneficial to the creditor"). Being the sister of a former CEO of a debtor and even the Trustee of that CEO's family trust is not in and of itself a legitimate basis for a Rule 2004 examination. *See In re DeShetler*, 453 B.R. 295, 301 (Bankr. S.D. Ohio 2011) (stating that "[t]he use of a 2004 examination is not permitted for matters not related to the financial condition of a **debtor** or a **debtor's estate**." (emphasis added)); *In re Roman Catholic Church of Diocese of Gallup*, 513 B.R.

CORE/3522697.0002/168796687.6

761, 764 (Bankr. D. N.M. 2014) ("The primary purpose of an examination under Rule 2004 is to ascertain the extent and location of the estate's assets.").

27.     Discovery under Rule 2004 is permissive, not obligatory.  *See* Fed. R. Bankr. P. 2004(a) ("On motion of any party in interest, the court *may* order the examination of any entity." (emphasis added)).   "If the cost and disruption to the examinee attendant to a requested examination outweigh the benefits to the examiner, the request should be denied." *Express One Int'l*, 217 B.R.  at 217 (citing *In re Eagle-Picher Industries*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994); *see also Countrywide Home Loans*, 384 B.R. at 393-94 (noting that "while Rule 2004 allows a fishing expedition for some extent, it may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs").

28.     The Requests directed to Ms. Dondero also seek "[a]ny and all Documents or Communications reflecting Your current employer(s)."  Motion, Ex. 6, Request 15.  Ms. Dondero is self-employed and conducts background checks for businesses, such as insurance companies (not including any of the insurance companies mentioned in the 2004 Motion).  These documents are confidential, have nothing to do with Highland, and disclosure of them would put Ms. Dondero's future prospects at risk if she is viewed by those who purchase her services as a disclosure risk.   An obligation to produce documents responsive to this Request would cause significant disruption and harm to Ms. Dondero's business, with no corresponding benefit to the examiner.

29.     While not mentioned in the Motion, it seems likely that the real basis for including Ms. Dondero as a target is because the Debtor is planning to include (and by Tuesday will have included) her as a defendant in various adversary proceedings.  Local Rule 2004-1 provides that "[i]f a contested matter or an adversary proceeding is pending, the adversary discovery rules

(Bankruptcy Rules 7027 - 7036), not Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1, govern discovery pertaining to such contested matter or adversary proceeding." L.B.R. 2004-1(b).[6]

30.     Although Ms. Dondero is not yet a party to an adversary proceeding in this case, her deposition has already been sought in connection with the *Highland Capital Management, L.P. v. James Dondero*, Adv. Proc. No. 21-03003-sgj, and as the Committee likely full knows, she will be a defendant in four adversary proceedings by sometime this week. Counsel for defendants and proposed defendants in those proceedings have already agreed that there should be only one deposition of each party, notwithstanding the number of proceedings. Allowing an additional examination and document request in the guise of a Rule 2004 examination violates both the spirit and the letter of the parties' arrangement.[7]

31.     Likewise, to the extent the Committee seeking an examination of Ms. Dondero due to her status as trustee of Dugaboy, not only are any requests properly directed at Dugaboy, and

---

[6] This is an incorporation into the Local Rules of the "pending proceedings rule." The pending proceedings rule states that "once an actual adversary proceeding has been initiated, 'the discovery devices provided for in Rules 7026 – 7037 . . . apply and Rule 2004 should not be used.'" *In re Kipp*, 86 B.R. 490 (Bankr. W.D. Tex. 1988) (denying use of Rule 2004 motion in adversary proceeding). "[T]he so-called 'pending proceeding rule" does not permit Rule 2004 examinations when proceedings are pending in another forum." *In re MF Global Inc.*, 2013 WL 74580 at *2 (Bankr. SDNY Jan. 8, 2013).

[7] In contrast with the decision in *Mirant* where the Court found that prelitigation discovery "may be critical to ensure that no viable cause of action is lost" various parties have already conducted extensive investigations here, and there is both pending and promised litigation in play. *Mirant*, 326 B.R. at 357. Thus, if there were some more targeted basis to examine Ms. Dondero, the Committee ought to articulate it. The movant has the burden of showing good cause for the discovery it seeks. *See generally, In re Onatah Farms,* 2021 Bankr. LEXIS 1808 at *3-*4 (Bankr. N.D. Ind., Apr. 29, 2021) (finding lack of good cause to grant motion when the proffered basis was vague and essentially parroted language in rule). "[Movant] should have some idea what it is looking for, why it is needed and cannot be found elsewhere, and what might be accomplished once it is obtained. It should share that information with the court so the motion can be evaluated properly." *Id.*

CORE/3522697.0002/168796687.6

not Ms. Dondero as trustee[8], but Dugaboy is also being added as a defendant in the same four adversary proceedings, and is already a defendant in litigation by the Committee.

WHEREFORE, Nancy Dondero respectfully requests that this Court enter an order as follows:

a.    declining to authorize a Rule 2004 examination of Ms. Dondero; and

b.    denying all other relief sought in the Motion.

---

[8] *See Roman Catholic Church of Diocese of Gallup*, 513 B.R. at 766 (explaining that "although it is arguable within the scope of Rule 2004 to discovery information of the Alleged Affiliates in the possession of the [respondent], the Court thinks it is a better practice for the UCC to file Rule 2004 exam motions for each Alleged Affiliate.").

CORE/3522697.0002/168796687.6

Dated: August 16, 2021.

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Nancy Dondero*

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by electronic mail via the Court's ECF filing system on the Debtor, Counsel for the Committee, and all parties authorized to receive electronic notice in this case on August 16, 2021.

<u>/s/*Deborah Deitsch-Perez*</u>
Deborah Deitsch-Perez

CORE/3522697.0002/168796687.6

# Exhibit A

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE


| | |
|---|---|
| In Re: | ) Case No. 17-31432-sgj11 |
| | ) |
| ADPT DFW HOLDINGS LLC, | ) (Jointly filed with In re |
| | )  Adeptus Health Inc., et |
| Debtor. | )  al.) |
| | ) |
| | ) March 27, 2018 |
| | ) Dallas, Texas |

Hearing on:  The Liquidating Trustee's Rule 2004 discovery motions; issues of subject matter jurisdiction; and the Court's rulings.


<u>Appearances</u>:

| | |
|---|---|
| For the Reorganized Debtors: | Elizabeth Nicolle Boydston Esq. John N. Schwartz, Esq. Shivani P. Shah, Esq. Norton Rose Fulbright US LLP 2200 Ross Avenue, Suite 3600 Dallas, Texas  75201 |
| For Former Directors Hosler, Rosenberg, Napolitano, Vender, Taylor, and Mengert: | Omar J. Alaniz, Esq. Amy Heard, Esq. Baker Botts L.L.P. 2001 Ross Avenue, Suite 700 Dallas, Texas  75201 |
| For Creditor Change Healthcare Technology Enhanced Services LLC: | Richard Blum Herzog, Jr. Esq. Nelson Mullins Riley & Scarborough, LLP 201 Seventeenth Street, N.W., Suite 1700 Atlanta, Georgia  30363 |
| For KPMG LLP: | Shari L. Heyen, Esq. Greenberg Traurig LLP 1000 Louisiana, Suite 1700 Houston, Texas  77002 |
| | Karl Dial, Esq. Greenberg Traurig LLP 2200 Ross Avenue, Suite 5200 Dallas, Texas  75201 |

Appearances continued on next page.

2

Appearances continued:

| | |
|---|---|
| For Drivetrain, LLC: | Brandon V. Lewis, Esq.<br>Eric D. Madden, Esq.<br>Reid Collins & Tsai LLP<br>Thanksgiving Tower<br>1601 Elm Street, Suite 4250<br>Dallas, Texas 75201 |
| For the Sterling parties: | Jonathan R. Mureen, Esq.<br>Travis A. McRoberts, Esq.<br>Squire Patton Boggs (US) LLP<br>2000 McKinney Avenue, Suite 1700<br>Dallas, Texas 75201 |
| For Former Officers Hall, Fielding, and Cherrington: | Thaddeus D. Wilson, Esq.<br>King & Spalding LLP<br>1180 Peachtree Street, Northeast<br>Atlanta, Georgia 30309 |
| | Rebecca Matsumura, Esq.<br>King & Spalding LLP<br>500 Second Street, Suite 1800<br>Austin, Texas 78701 |
| For Former Director Steven V. Napolitano: | Deborah D. Williamson, Esq.<br>Dykema Cox Smith<br>Weston Centre<br>112 East Pecan Street, Suite 1800<br>San Antonio, Texas 78205 |
| | Geoff Gannaway, Esq.<br>Beck Redden<br>1221 McKinney Street, Suite 4500<br>Houston, Texas 77010 |

Appearances on the telephone:

| | |
|---|---|
| For Former Officers Hall, Fielding, and Cherrington: | Paul Richard Bessette, Esq.<br>King & Spalding LLP<br>500 West Second Street, Suite 180<br>Austin, Texas 78701 |
| For the Adeptus Litigation Trust: | Peter J. Keane, Esq.<br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware 19801 |
| For Creditor Change Healthcare Technology Enhanced Services, LLC: | David R. Pruett, III, Esq.<br>Lightfoot Franklin & White, LLC<br>400 Twentieth Street North<br>Birmingham, Alabama 35203 |

3

```
Digital Court                    United States Bankruptcy Court
Reporter:                        Northern District of Texas
                                 Dallas Division
                                 Cathy Ecker, Judicial
                                  Support Specialist
                                 1100 Commerce Street, Room 1254
                                 Dallas, Texas  75242
                                 (214) 753-2065, direct; 753-2072, fax
```

```
Certified Electronic
Transcriber:                     Palmer Reporting Services
```

```
             Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.
```

*The Rulings of the Court*                                          93

1          THE COURT:  All right, please be seated.  We have

2    everyone here.  We are going back on the record in ADPT DFW

3    Holdings.

4          I want to compliment all lawyers on very fine

5    arguments both orally and in your pleadings.

6                    <u>THE RULINGS OF THE COURT</u>

7          THE COURT:  With regard to all of these motions to

8    take Rule 2004 discovery, the Court is going to deny them all.

9    First, I will say for everyone's benefit that while it is a very

10   interesting issue, I believe there is subject matter

11   jurisdiction in this post confirmation context to order a Rule

12   2004 examination.  In other words, there isn't a subject matter

13   jurisdiction problem that I rely on in denying the Rule 2004

14   motions.

15         While it is certainly not in my experience the

16   traditional context that we see Rule 2004 discovery sought and

17   while surely subject matter jurisdiction is not limitless to

18   order Rule 2004 discovery post confirmation, I think there must

19   be on occasion bankruptcy subject matter jurisdiction to order

20   Rule 2004 exams post confirmation.  And here I think the reason

21   we do have subject matter jurisdiction is a combination of the

22   facts that, one, we have a disclosure statement that had very

23   fulsome preservation of causes of action and, two, I think the

24   law of the 5th Circuit as expressed in *Craig Stores* and a few of

25   the other cases cited, I think it is met here.  And the law is

*The Rulings of the Court*                                                94

1   that if the outcome of the underlying dispute could conceivably

2   have an impact on the — I think the words are — execution,

3   implementation, or interpretation of a confirmed plan, then

4   there is subject matter jurisdiction.  And so I think here the

5   outcome of any Rule 2004 discovery as well as the underlying

6   claims that might be pursued could bear on the execution and

7   implementation of a confirmed plan, which plan contemplated the

8   Liquidating Trust that would pursue claims and causes of action

9   as appropriate for the prepetition stakeholders.

10          What I rely on, though, in denying the Rule 2004

11  motions is there being no good cause here.  The Court does not

12  find good cause here to order any of the Rule 2004 exams because

13  of the unique facts that I just cannot ignore.  Among those

14  unique facts we have a cooperating reorganized debtor.  I think

15  it is undisputed and its counsel, Norton Rose Fulbright, in that

16  they have produced thousands of documents and I'm told are

17  continuing to produce, so that's an important fact here.

18          Two, we have a roadmap of possible claims and causes

19  of action in the disclosure statement.  I mean it's certainly

20  not as fulsome as a complaint and it might not connect every

21  dot, but that's another important factor here.

22          Three, I have mentioned.  We had an unsecured

23  creditors committee and equity committee who were extremely

24  active and had the opportunity and I think did investigate

25  claims and causes of action during the case to a sufficient

*The Rulings of the Court* 95

1   level where their information sharing with the Liquidating

2   Trustee could enable the drafting of claims and causes of action

3   in a complaint.   And, to be specific, this was a big deal, there

4   was hot negotiation over how the claims and causes of action and

5   waterfall of distributions from the Liquidating Trust would be

6   shared among unsecureds, equity, and Deerfield.

7          I will take judicial notice of the Akin Gump final fee

8   application and Brown Rudnick final fee application.  My law

9   clerk and I checked during the break, Akin Gump billed 1,015

10  hours at a tab of $843,592 for the category general adversary

11  proceedings and litigation matters.   And they gave several

12  examples under that category.   And one of the examples was

13  evaluation and analysis of causes of action to be transferred to

14  the Litigation Trust.

15         Then in the Brown Rudnick final fee app for the Equity

16  Committee, they billed 187 hours at a tab of $117,383 for the

17  category avoidance action analysis and included in the

18  description under that category was analysis of IPO and

19  subsequent offerings, you know claims related to that.

20         As I noted other unique facts here, we have Deerfield,

21  the secured lender and ultimate acquirer under the plan of

22  reorganization as a member of the Oversight Committee that is in

23  existence in connection with the Litigation Trust, as well as

24  Wexford on that Oversight Committee, the largest shareholder who

25  sat on the Equity Committee and of course engaged counsel Brown

*The Rulings of the Court* 96

1  Rudnick. I think they should be able to provide a treasure

2  trove of information to connect the dots to the extent the

3  Litigation Trustee has not connected all the dots yet.

4  And then I mentioned we have two Houlihan valuation

5  reports where, again, they may not give you valuations,

6  Liquidating Trustee at all relevant time periods, but it's

7  certainly when added to the other information you have one would

8  think would get you there without a huge number of 2004 exams

9  being necessary.

10  I have not been told about any looming deadlines for

11  getting complaints on file. There can't be given the age of the

12  case. So for all of these reasons the motions are denied. The

13  Litigation Trustee I think has information at his fingertips to

14  file complaints or not and then can obviously take discovery

15  pursuant to the Federal Rules of Civil Procedure or if it's

16  state court, the state rules of civil procedure.

17  Finally, I will add as to KPMG, I deny the motion for

18  cause, same as everyone else, but for the additional reason that

19  I think the arbitration provisions would appear to apply to most

20  of the potential claims and discovery sought. So that would be

21  an additional reason to deny the motion as to KPMG.

22  All right. Well, I am going to look for several

23  orders. I guess for scriveners, I will defer to: Mr. Wilson

24  and his team for the former officers; Mr. Alaniz and his team as

25  to the former directors; Ms. Heyan and her team as to KPMG; and

*The Rulings of the Court*                                          97

1    — I'm sorry, who am I leaving out in this? — Sterling's counsel.

2    Mr. — is it Mureen?

3              MR. MUREEN:  Mureen.

4              THE COURT:  — Murren for the order on that.  And of

5    course run it by the Litigation Trustee legal team.

6              Are there any questions before we adjourn on this

7    2004 —

8              MR. HERZOG:  Your Honor, will this ruling reflect the

9    2004 request as to change for healthcare as well?

10             THE COURT:  Okay.  Let me make sure I understand that

11   one.  I have to admit when I came in here I was focused on these

12   four major categories of potential deponents.  Are you — is your

13   client — was it a name change?  Were you PST before?

14             MR. HERZOG:  Yes, Your Honor.  That's correct.  We

15   were spun off the proceeding about S&N Corp. (phonetic) and

16   change.  And that —

17             THE COURT:  But it's the same sort of thing.  There

18   were clearly claims and causes of action described in the

19   disclosure statement that might be pursued?

20             MR. HERZOG:  Yes, that's correct.

21             THE COURT:  Okay.  For all the same reasons I deny the

22   motion as to your client as well.  All right.  So you can do the

23   order on that one, counsel, and again run it by Mr. Madden and

24   Mr. Lewis and their team.

25             All right.  If there's nothing else then on that

*The Rulings of the Court*                                                    98

1  issue, all of you are excused who were here only on the 2004

2  motions.  And I will ask Ms. Boydston and Mr. Schwartz to come

3  forward.  And anyone who wants to stay on these claim objection,

4  stipulation matters, et cetera, is certainly welcome to stay.

5  okay.

6            [COUNSEL]:  Thank you, Your Honor.

7            THE COURT:  Thank you.

8      (Comments off the record.)

9            THE COURT:  All right.  I am ready whenever you are.

10 Whoever is going to be the lead on this.

11           MS. BOYDSTON:  Good afternoon, Your Honor.  Liz

12 Boydston, Norton Rose Fulbright, on behalf of the reorganized

13 debtors.

14           I think the one thing that we want to take up first is

15 the joint motion for a protective order.  And that's why we

16 still have some people from the Litigation Trust in the room

17 because it's a joint motion.

18           THE COURT:  Okay.  So remind me what this one is

19 about.

20           MR. LEWIS:  Yes, Your Honor.  Brandon Lewis on behalf

21 of the Litigation Trust.

22           This is a joint motion for a protective order between

23 the trustee and the reorganized debtors, Docket Number 1109.

24 There's been no objection filed to this motion.  The purpose is

25 to give effect to the privilege sharing that's contemplated in

State of California            )
                               )      SS.
County of San Joaquin          )


          I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

          I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

          I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated April 24, 2018