# HMIT Exhibit 1

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERARY PROCEEDING

Hunter Mountain Investment Trust ("HMIT"), Movant, files this Emergency

Motion for Leave to File Verified Adversary Proceeding ("Motion"), both in its individual

capacity and as a derivative action on behalf of the Reorganized Debtor, Highland Capital

Management, L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust

against Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon

[1]

Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr. ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendant Nos. 11-10 are collectively "Respondents" or "Proposed Defendants").

## I.      Good Cause for Expedited Relief

1.      HMIT seeks leave to file an Adversary Proceeding pursuant to the Court's "gatekeeping" orders, as well as the injunction and exculpation provisions in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Doc. 1943), as modified (the "Plan").[1] A copy of HMIT's proposed Verified Adversary Proceeding ("Adversary Proceeding") is attached as Exhibit 1 to this Motion. This Motion is separately supported by objective evidence derived from historical filings in the bankruptcy proceedings,[2] as well as the declarations of James Dondero, dated May 2022 (Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A. McEntire with attached evidence (Ex. 4). [3]

---

[1] The exculpation provisions were recently modified by a decision of the Fifth Circuit. Such provisions apply to James P. Seery, Jr. only and are limited to his capacity as an Independent Director. *Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Unless otherwise referenced, all references to evidence involving documents filed in the Debtor's bankruptcy proceedings (Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)) are cited by "Doc." reference. HMIT asks the Court to take judicial notice of the documents identified by such entries.

[3] The supporting declarations will be cited as Dondero 2022 Dec. (Ex. 2), Dondero 2023 Dec. (Ex. 3), and McEntire Dec. (Ex. 4).

HMIT Appx. 00003

2.      The expedited nature of this Motion is permitted under Fed. R. Bank P. 9006 (c)(1), which authorizes a shortened time for a response and hearing for good cause. For the reasons set forth herein, HMIT has shown good cause and requests that the Court schedule a hearing on this Motion on three (3) days' notice, and that any responses be filed no later than twenty-four hours before the scheduled hearing.[4]

3.      HMIT brings this Motion on behalf of itself and derivatively on behalf of the Reorganized Debtor and the Highland Claimant Trust ("Claimant Trust"), as defined in the Claimant Trust Agreement (Doc. 3521-5) ("CTA").[5] Upon the Plan's Effective Date, Highland Capital Management, LP, as the original Debtor ("Original Debtor"), transferred its assets, including its causes of action, to the Claimant Trust, including the causes of action set forth in the attached Adversary Proceeding. The attached Adversary Proceeding alleges claims which are substantially more than "colorable" based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud,[6] including a fraud upon innocent stakeholders, as well as breaches of fiduciary

---

[4] Expedited action on this Motion is also warranted to hasten Movants' opportunity to file suit, pursue prompt relevant discovery, and reduce the threat of loss of potentially key evidence. Upon information and belief, Seery has been deleting text messages on his personal iPhone via a rolling, automatic deletion setting.

[5] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate.

[6] Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors. Rather, the

**HMIT Appx. 00004**

duties and knowing participation in (or aiding and abetting) breaches of fiduciary duty. The Adversary Proceeding also alleges that the Proposed Defendants did so collectively by falsely representing the value of the Debtor's Estate, failing to timely disclose accurate values of the Debtor's Estate, and trading on material non-public information regarding such values. HMIT also alleges that the Proposed Defendants colluded to manipulate the Debtor's Estate—providing Seery the opportunity to plant close business allies into positions of control to approve Seery's compensation demands following the Effective Date.

4.  Emergency relief is needed because of a fast-approaching date (April 16, 2023) that one or more of the Proposed Defendants *may* argue, depending upon choice of law, constitutes the expiration of the statute of limitations concerning some of the common law claims available to the Claimant Trust, as well as to HMIT.[7] Although HMIT offered to enter tolling agreements from each of the Proposed Defendants, they either rejected HMIT's requests or have not confirmed their willingness to do so, thereby necessitating the expedited nature of this Motion.[8] Because this Motion is subject to the

---

proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement.

[7] The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

[8] HMIT has been diligent in its efforts to investigate the claims described in this Motion, including the filing of a Tex. R. Civ. P. Rule 202 proceeding in January 2023, which was not adjudicated until recently in March 2023. Those proceeding were conducted in the 191st Judicial District Court in Dallas County, Texas, under Cause DC-23-01004. *See* McEntire Dec. Ex. 4 and the attached Ex. 4-A. Farallon and Stonehill defended those proceedings by aggressively arguing, in significant part, that the discovery issues were better undertaken in this Court.[8] The Rule 202 Petition was recently dismissed (**necessarily without prejudice**)

[4]

Court's "gatekeeping" orders and the injunction provisions of the Plan, emergency leave
is required.

5.      This Motion will come as no surprise to the Proposed Defendants. Farallon
and Stonehill were involved in recent pre-suit discovery proceedings under Rule 202 of
the Texas Rules of Civil Procedure relating to the same insider trading allegations
described in this Motion. Muck and Jessup, special purpose entities created and
ostensibly controlled by Farallon and Stonehill, respectively, also were provided notice
of these Rule 202 Proceedings in February 2023.[9] Like this Motion, the Rule 202
Proceedings focused on Muck, Jessup, Farallon, and Stonehill and their wrongful
purchase of large, allowed claims in the Original Debtor's bankruptcy based upon
material non-public information. Seery is also aware of these insider trading allegations
because of a prior written demand.

6.      In light of the Proposed Defendants' apparent refusal to enter tolling
agreements, or their failure to fully affirm their willingness to do so, HMIT is forced to
seek emergency relief from this Court to proceed timely with the proposed Adversary
Proceeding before the expiration of any *arguable* limitations period.[10]

---

on March 8, 2023, ostensibly based on such arguments. However, it is telling that Stonehill and Farallon
admitted during the Rule 202 Proceedings to their "affiliation" with Muck and Jessup and that they bought
the Claims through these entities.

[9] *See* Dec. of Sawnie McEntire, Ex. 4.

[10] HMIT respectfully requests that this Motion be addressed and decided on an expedited basis that
provides HMIT sufficient time to bring the proposed action timely. In the event the Court denies the
requested relief, HMIT respectfully requests prompt notice of the Court's ruling to allow HMIT sufficient

**HMIT Appx. 00006**

## II.      Summary of Claims

7.      HMIT requests leave to commence the proposed Adversary Proceeding, attached as Exhibit 1, seeking redress for breaches of duty owed to HMIT, breaches of duties owed to the Original Debtor's Estate, aiding and abetting breaches of those fiduciary duties, conspiracy, unjust enrichment, and fraud. HMIT also alleges several viable remedies, including (i) imposition of a constructive trust; (ii) equitable disallowance of any unpaid balance on the claims at issue;[11] (iii) disgorgement of ill-gotten profits (received by Farallon, Stonehill, Muck and Jessup) to be restituted to the Claimant Trust; (iv) disgorgement of ill-gotten compensation (received by Seery) to be restituted to the Claimant Trust; (v) declaratory judgment relief; (vi) actual damages; and (vii) punitive damages.

## III.      Standing

8.      **HMIT.** Prior to the Plan's Effective Date, HMIT was the largest equity holder in the Original Debtor and held a 99.5% limited partnership interest. HMIT currently holds a Class 10 Claim as a contingent Claimant Trust Interest under the CTA

---

time to seek, if necessary, appropriate relief in the United States District Court. In order to have a fair opportunity to seek such relief on a timely basis and protect HMIT's rights and the rights of the Reorganized Debtor, HMIT will need to seek such relief on or before Wednesday, April 5, 2023, if this Motion has not been resolved.

[11] In the alternative only, subordination of Muck's and Jessup's General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also consistent with the purposes of the Bankruptcy Code.

(Doc. 3521-5). Upon information and belief, all conditions precedent to HMIT's certification as a vested Claimant Trust Beneficiary would be readily satisfied but for the Defendants' wrongful actions and conduct described in this Motion and the attached Adversary Proceeding.

9.      **Reorganized Debtor.** Although HMIT has standing as a former Class B/C Equity Holder, Class 10 claimant, and now contingent Claimant Trust Interest under the CTA,[12] this Motion separately seeks authorization to prosecute the Adversary Proceeding derivatively on behalf of the Reorganized Debtor and Claimant Trust. All conditions precedent to bringing a derivative action are satisfied.

10.     Fed. R. Civ. P. 23.1 provides the procedural steps for "derivative actions," and applies to this proceeding pursuant to Fed. R. Bank. P. 7023.1. Applying Rule 7023.1, the Proposed Defendants' wrongful conduct occurred, and the improper trades consummated, in the spring and early summer of 2021, before the Effective Date in August 2021. During this period, HMIT was the 99.5% Class B/C limited partner in the original Debtor. As such, HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time, and the other Proposed Defendants aided and abetted breaches of those duties at that time.

---

[12] The last transaction at issue involved Claim 190, the Notice for which was filed on August 9, 2021. (Doc. 2698).

HMIT Appx. 00008

11.     The derivative nature of this proceeding is also appropriate because any demand on Seery would be futile.[13] Seery is the Claimant Trustee under the terms of the CTA. Furthermore, any demand on the Oversight Board to prosecute these claims would be equally futile because Muck and Jessup, both of whom are Proposed Defendants, dominate the Oversight Board.[14]

12.     The "classic example" of a proper derivative action is when a debtor-in-possession is "unable or unwilling to fulfill its obligations" to prosecute an otherwise colorable claim where a conflict of interest exists. *Cooper*, 405 B.R. at 815 (quoting *Louisiana World*, 858 F.2d at 252). Here, because HMIT's proposed Adversary Proceeding includes claims against Seery, Muck, and Jessup, the conflicts of interest are undeniable. Seery is the Trustee of the Claimant Trust Assets under the CTA, and he also serves as the "Estate Representative."[15] Muck and Jessup, as successors to Acis, the Redeemer Committee and UBS, effectively control the Oversight Board, with the responsibility to "monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance . . . ."[16]

---

[13] Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed herein, since the Litigation Trustee serves at the direction of the Oversight Board.

[14] *See* Footnote 8, *infra.* In December 2021, several stakeholders made a demand on the Debtor through James Seery, in his capacity as Trustee to the Claimant Trust, to pursue claims related to these insider trades.

[15] *See* Claimant Trust Agreement (Doc. 3521-5), Sec. 3.11.

[16] *Id.* at Sec. 4.2(a) and (b).

HMIT Appx. 00009

13.     Creditors' committees frequently bring suit on behalf of bankruptcy estates. Yet, it is clear that any ***appropriately designated party*** also may bring derivative claims. *In re Reserve Prod., Inc.*, 232 B.R. 899, 902 (Bankr. E.D. Tex. 1999) (citations omitted); *see In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004). As this Court has held in *In Re Cooper*:

> In Chapter 11 [cases], there is both a textual basis . . . and, frequently, a non-textual, equitable rationale for granting a creditor or creditors committee derivative standing to pursue estate actions (*i.e.*, the equitable rationale coming into play when the debtor-in-possession has a conflict of interest in pursuing an action, such as in the situation of an insider-defendant).

*In re Cooper*, 405 B.R. 801, 803 (Bankr. N.D. Tex. 2009) (also noting that "[c]onflicts of interest are, of course, frequently encountered in Chapter 11, where the metaphor of the 'fox guarding the hen house' is often apropos"); *see also In re McConnell*, 122 B.R. 41, 43-44 (Bankr. S.D. Tex. 1989) ("[I]ndividual creditors can also act in lieu of the trustee or debtor-in-possession . . . ."). Here, the Proposed Defendants are the "*foxes guarding the hen house*," and their conflicts of interest abound.[17] Proceeding in a derivative capacity is necessary, if not critical.

---

[17] *See Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir. 1998) (settlement noteholders purchased Debtors' securities with "the benefit of non-public information acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in [their] own self-interest."), *see also, Wolf v. Weinstein*, 372 U.S. 633, 642, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) ("Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious.").

HMIT Appx. 00010

14.     The proposed Adversary Proceeding also sets forth claims that readily satisfy the Court's threshold standards requiring "colorable" claims, as well as the requirements for a derivative action. This Motion, which is supported by objective evidence contained in historical filings in the bankruptcy proceedings, also incorporates sworn declarations. At the very least, this additional evidence satisfies the Court's threshold requirements of willful misconduct and fraud set forth in the "gatekeeping" orders, as well as the injunction and exculpation provisions in the Plan.[18] This evidence also supports well-pleaded allegations exempted from the scope of the releases included in the Plan.

15.     HMIT is an appropriate party to bring this action on behalf of the Reorganized Debtor and the Claimant Trust. If successful, the Adversary Proceeding will likely recover well over $100 million for the Claimant Trust, thereby enabling the Reorganized Debtor and Claimant Trust to pay off any remaining innocent creditors and make significant distributions to HMIT as a vested Claimant Trust Beneficiary.

16.     As of December 31, 2022, the Claimant Trust had distributed 64.2% of the total $397,485,568 par value of all Class 8 and Class 9 unsecured creditor claims. The

---

[18] HMIT recognizes that it is an "Enjoined Party" under the Plan. The Plan requires a showing, *inter alia*, of bad faith, willful misconduct, or fraud against a "Protected Party." Seery is a "Protected Party" and an "Exculpated Party" in his capacity as an Independent Director. Muck and Jessup *may* be "Protected Parties" as members of the Oversight Committee, but they were not "protected" when they purchased the Claims before the Effective Date. While it is HMIT's position that Farallon and Stonehill do not qualify as "Protected Parties," they are included in this Motion in the interest of judicial economy.

Claims acquired by Muck and Jessup have an allowed par value of $365,000,000. Based on these numbers, the innocent unsecured creditors hold approximately $32 million in allowed claims.[19]

17.    As of December 31, 2022, the Claimant Trust has distributed $255,201,228.[20] On a *pro rata* basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000.

18.    Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary. The benefits to the Reorganized Debtor, the Claimant Trust and innocent stakeholders are undeniable.[21]

19.    Seery and the Oversight Board should be estopped from challenging HMIT's status to bring this derivative action on behalf of the Claimant Trust. Seery, Muck and Jessup have committed fraud, acted in bad faith and have unclean hands, and they should not be allowed to undermine the proposed Adversary Proceeding - which seeks

---

[19] Doc. 3653.

[20] *Id.*

[21] Further, under the present circumstances and time constraints, this Motion should be granted to avoid the prospect of the loss of some of HMIT's and the Claimant Trust's claims and denial of due process.

HMIT Appx. 00012

to rectify significant wrongdoing. To hold otherwise would allow Seery, Muck, Jessup, Stonehill, and Farallon the opportunity to not just "guard the hen house," but to also open the door and take what they want.[22] HMIT seeks a declaratory judgment of its rights, accordingly.

## IV.    The Proposed Defendants

20.    Seery acted in several capacities during relevant times. He served as the Debtor's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"). He also served as member of the Debtor's Independent Board.[23] He currently serves as Claimant Trustee under the CTA and remains the CEO of the Reorganized Debtor.

21.    There is no doubt Seery owed the Original Debtor's Estate, as well as equity, fiduciary duties, including the duty of loyalty and the duty to avoid conflicts of interest. *See In re Xtreme Power Inc.*, 563 B.R. 614, 632-33 (Bankr. W.D. Tex. 2016) (detailing fiduciary duties owed by corporate officers and directors under Delaware law); *Louisiana World*, 858 F.2d at 245-46 (detailing duties owed by debtors-in-possession).[24]

---

[22] "The doctrine of 'unclean hands' provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy ... forfeits his right to have the court hear his claim, regardless of its merit. [T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (citations omitted) (internal quotations omitted for clarity).

[23] Seery is the beneficiary of the Court's "gatekeeping" orders and is an "exculpated" party in his capacity as an Independent Director. He is also a "Protected Party."

[24] The Internal Affairs Doctrine dictates choice of law. Here, the Debtor, Highland Capital Management, was organized under the law of Delaware. As much, Seery's fiduciary duties and claims involving breaches of those duties will be governed by Delaware law.

HMIT Appx. 00013

22.     Farallon and Stonehill are capital management companies which manage hedge funds; they are also Seery's close business allies with a long history of business ventures and close affiliation. Although they were strangers to the Original Debtor's bankruptcy on the petition date, and were not original creditors, they became entangled in this bankruptcy at Seery's invitation and encouragement—and then knowingly participated in the wrongful insider trades at issue. By doing so, Seery was able to plant friendly allies onto the Oversight Board to rubber stamp compensation demands. The proposed Adversary Proceeding alleges that Farallon and Stonehill bargained to receive handsome pay days in exchange.

23.     Muck and Jessup are special purpose entities, admittedly created by Farallon and Stonehill on the eve of the alleged insider trades, and they were used as vehicles to assume ownership of the purchased claims.[25] The record is clear that Muck and Jessup *did not exist* before confirmation of the Plan in February 2021.[26] Now, however, Muck and Jessup serve on the Oversight Board with immense powers under the CTA.[27] When they purchased the claims at issue, Muck and Jessup were *not* acting in their official capacities on the Oversight Committee and, therefore, they were not "Protected Persons" under the Plan.

---

[25] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[26] *See* McEntire Dec., Ex. 4, Ex. 4-D, Ex. 4-E. Muck was created on March 9, 2021 before the Effective Date. Jessup was created on April 8, 2021, before the Effective Date.

[27] *See* Doc. 3521-5, Sec. 4(a) and 4(b).

HMIT Appx. 00014

24.     By trading on the alleged material non-public information, Farallon, Stonehill, Muck, and Jessup became non-statutory "insiders" with duties owed directly to HMIT at a time when HMIT was the largest equity holder.[28] *See S.E.C. v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010) ("The corporate insider is under a duty to 'disclose or abstain'—he must tell the shareholders of his knowledge and intention to trade or abstain from trading altogether."). In this context, there is no credible doubt that Farallon's and Stonehill's dealings with Seery were ***not*** arms-length. Again, Farallon and Stonehill were Seery's past business partners and close allies.[29] By virtue of the insider trades at issue, Farallon and Stonehill acquired control (acting through Muck and Jessup) over the Original Debtor and Reorganized Debtor through Seery's compensation agreement and awards, as well as supervisory powers over the Claimant Trust. This makes Farallon and Stonehill paradigm non-statutory insiders.

25.     HMIT also seeks recovery against John Doe Defendant Nos. 1 through 10.[30] It is clear Farallon and Stonehill refuse to disclose the precise details of their legal

---

[28] Because of their "insider" status, this Court should closely scrutinize the transactions at issue.

[29] Farallon and Stonehill are two capital management firms (similar to HCM) with whom Seery has had substantial business relationships. Also, Seery previously served as legal counsel to Farallon. Seery also has a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. GCM Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

[30] Farallon and Stonehill consummated their trades concealing their actual involvement through Muck and Jessup as shell companies. Farallon's and Stonehill's identities were not discovered until much later after the fact.

relationships with Muck and Jessup. They resisted such discovery in the prior Rule 202 Proceedings in state district court.[31] They also refused to disclose such details in response to a prior inquiry to their counsel.[32] Furthermore, the corporate filings of both Muck and Farallon conspicuously omit the identity of their respective members or managing members.[33] Accordingly, HMIT intends to prosecute claims against John Doe Defendant Nos. 1 -- 10 seeking equitable tolling pending further discovery whether Farallon and Stonehill inserted intermediate corporate layers between themselves and the special purpose entities (Muck and Jessup) they created. *See In re ATP Oil & Gas  Corp.*, No. 12-36187, 2017 WL 2123867, *4 (Bankr. S.D. Tex. May 16, 2017) (lsgur J.); *see also In re IFS Fin. Corp.* No. 02-39553, 2010 WL 4614293, *3 (Bankr. S.D. Tex. No. 2, 2010) ("The identity of the party concealing the fraud is immaterial, the critical factor is whether any of the parties involved concealed property of the estate." "In either case, the trustee must demonstrate that despite exercising diligence, he could not have discovered the identity of the [unnamed] defendants prior to the expiration of the limitations period.") *ATP Oil*, 2017 WL 2123867 at *4. That burden is easily satisfied here.

---

[31] *See* McEntire Dec., Ex. 4.

[32] *See* McEntire Dec., Ex. 4, *see also*, Ex. 4-F.

[33] *See* Ex. 4-D, Ex. 4-E.

HMIT Appx. 00016

## V.   Background

26.     As part of this Court's Governance Order, an independent board of directors—which included Seery as one of the selections of the Unsecured Creditor's Committee—was appointed to the Board of Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors"), the Original Debtor's general partner. Following approval of the Governance Order, the Board then appointed Seery as the Original Debtor's CEO and CRO. [34] Following the Effective Date of the Plan, Seery now serves as Trustee of the Claimant Trust (the Reorganized Debtor's sole post-reorganization limited partner), and continues to serve as the Reorganized Debtor's CEO. [35]

27.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of several settlements prior to the Effective Date, resulting in the following approximate allowed claims (hereinafter "Claims"):[36]

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| (Totals) | $270 mm | $95 mm |

---

[34] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[35] *See* Doc. 1943, Order Approving Plan, p. 34.

[36] Orders Approving Settlements [Doc. 1273, Doc. 1302, Doc. 1788, Doc. 2389].

HMIT Appx. 00017

Each of the settling parties curiously sold their Claims to Farallon or Stonehill (or their affiliated special purpose entities) shortly after they obtained court approval of their settlements. One of these "trades" occurred within just a few weeks before the Effective Date. Farallon and Stonehill coordinated and controlled the purchase of these Claims through Muck and Jessup, and they admitted in open court that Muck and Jessup were created to allow their purchase of the Claims.[37]

28.    HMIT alleges that Seery filed (or caused to be filed) deflated, misleading projections regarding the value of the Debtor's Estate,[38] while inducing unsecured creditors to discount and sell their Claims to Farallon and Stonehill. But as reflected in the attached declarations, it is now known that Seery provided material, non-public information to Farallon. The circumstantial evidence is also clear that both Farallon and Stonehill had access to and used this non-public information in connection with their purchase decisions.

29.    Farallon and Stonehill are registered investment advisors who have their own fiduciary duties to their investors, and they are acutely aware of what these duties entail. Yet, upon information and belief, they collectively invested over $160 million dollars to purchase the Claims in the absence of any publicly available information that

---

[37] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[38] The pessimistic projections were issued as part of the Plan Analysis on February 2, 2021. [Doc. 1875-1]. The Debtor projected 0% return on Class 9 claims and only 71.32% return on Class 8 Claims.

could rationally justify such investments. These "trades" become even more suspect

because, at the time of confirmation, the Plan provided pessimistic projections advising

stakeholders that the Claim holders would never receive full satisfaction:

- From October 2019, when the original Chapter 11 Petition was
  filed, to January 2021, just before the Plan was confirmed, the
  valuation of HCM's assets dropped over $200 million from $566
  million to $328.3 million.[39]

- HCM's Disclosure Statement projected payment of 71.32% of
  Class 8 claims, and 0% of claims in Classes 9-11;[40]

  o This meant that Farallon and Stonehill invested more than
    $103 million in Claims *when the publicly available
    information indicated they would receive $0 in return on
    their investment as Class 9 creditors and substantially less
    than par on their Class 8 Claims*.

- In HCM's Q3 2021 Post-Confirmation Report, HCM reported that
  the amount of Class 8 claims expected to be paid dropped even
  further from 71% *to 54%*;[41]

30.    In the third financial quarter of 2021, just over $6 million of the projected

$205 million available to satisfy general unsecured creditors was disbursed.[42] No

additional distributions were made to the unsecured claimholders until, suddenly, in Q3

2022 almost $250 million was paid toward Class 8 general unsecured claims—**$45 million

more than was *ever* projected**.[43]

---

[39] Doc. 1473, Disclosure Statement, p. 18.

[40] Doc. 1875-1, Plan Supplement, p. 4.

[41] Doc 2949.

[42] Doc 3200.

[43] Doc 3582.

**HMIT Appx. 00019**

31.     According to Highland Capital's Motion for Exit Financing,[44] and a recent motion filed by Dugaboy Investment Trust,[45] there remain **substantial** assets to be monetized for the benefit of the Reorganized Debtor's creditors. Thus, upon information and belief, Stonehill and Farallon, stand to realize significant profits on their wrongful investments. In turn, Stonehill and Farallon will garner (and already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the Claims. Upon information and belief, HMIT also alleges that Seery has received excessive compensation and bonuses approved by Farallon (Muck) and Stonehill (Jessup) as members of the Oversight Board.

32.     As evidenced in the supporting declarations (Exs. 2 and 3):

- Farallon admitted it conducted no due diligence and relied upon Seery in making its multi-million-dollar investment decisions at issue.[46]

- Farallon admitted it was unwilling to sell its stake in these Claims at any price because Seery assured Farallon that the Claims were tremendously valuable.[47]

- Farallon bragged about the value of its investment referencing non-public information regarding Amazon, Inc.'s ("Amazon") interest in acquiring Metro-Goldwyn-Mayer Studios Inc. ("MGM").[48]

---

[44] Doc 2229.

[45] Doc 3382.

[46] *See* Ex. 2, 2022 Dondero Declaration.

[47] *See* Ex. 2, 2022 Dondero Declaration, Ex. 3, 2023 Dondero Declaration.

[48] *See* Ex. 3, 2023 Dondero Declaration.

HMIT Appx. 00020

- Farallon was unwilling to sell its stake in the newly acquired Claims even though publicly available information suggested that Farallon would lose millions of dollars on its investment.[49]

Farallon can offer **no credible explanation** to explain its significant investment, and its refusal to sell at any price, **except** Farallon's access to material non-public information. In essence, Seery became the guarantor of Farallon's significant investment. Farallon admitted as much in its statements to James Dondero.

33.    The same holds true for Stonehill. Given the negative, publicly available information, Stonehill's multi-million-dollar investments make no rational sense unless Stonehill had access to material non-public information.

34.    Fed. R. Bank. P. 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." However, no public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks." [50]

35.    Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, Seery acquired material non-public information regarding Amazon's interest in acquiring MGM.[51] Upon receipt of this material non-public

---

[49] *See* Ex. 3, 2023 Dondero Declaration, *see also* Doc. 1875-1.

[50] Doc. 1905, February 3, 2021, Hearing Transcript, 49:5-21.

[51] *See* Adversary No. 20-3190-sgj11, Doc. 150-1.

information, MGM should have been placed on the Original Debtor's "restricted list," but Seery continued to move forward with deals that involved MGM stock and notes.[52] Because the Original Debtor additionally held direct interests in MGM,[53] the value of MGM was of paramount importance to the value of the estate.

36.     Armed with this and other insider information, Farallon—through Muck—proceeded to invest in the Claims and, acting through Muck, acceded to a powerful position on the Oversight Board to oversee future distributions to Muck and itself. It is no coincidence Seery invited his business allies into these bankruptcy proceedings with promises of great profits. Seery's allies now oversee his compensation.[54]

37.     The Court also should be aware that the Texas States Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation

---

[52] As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM. The HCLOF interest was not to be transferred to the Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements. Doc. 1625, p. 9, n. 5. Doc. 1625.

[53] *See* Doc. 2229, Motion for Exit Financing.

[54] Amazon closed on its acquisition of MGM in March 2022, but the evidence strongly suggests that agreements for the trades already had been reached - while announcement of the trades occurred strategically after the MGM news became public. Now, as a result of their wrongful conduct, Stonehill and Farallon profited significantly on their investments, and they stand to gain substantially more profits.

HMIT Appx. 00022

underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely "colorable."

## VI.   Argument

### A.   HMIT has asserted Colorable Claims against Seery, Stonehill, Farallon, Muck, and Jessup.

38.     Unlike the terms "Enjoined Party," "Protected Party," or "Exculpated Party," the Plan does not define what constitutes a "colorable" claim. Nor does the Bankruptcy Code define the term. However, relevant authorities suggest that a Rule 12(b)(6) standard is an appropriate analogue.

39.     The Fifth Circuit has held that a "colorable" claim standard is met if a [movant], such as HMIT, has asserted claims for relief that, on appropriate proof, would allow a recovery. A court need not and should not conduct an evidentiary hearing but must ensure that the claims do not lack any merit whatsoever. *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 248 (5th Cir. 1988). Stated differently, the Court need not be satisfied there is an evidentiary basis for the asserted claims but instead should allow the claims if they **appear** to have **some** merit.

40.     Other federal appellate courts have reached similar conclusions. For example, the Eighth Circuit holds that "creditors' claims are colorable if they would survive a motion to dismiss." *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008); *accord In Re Foster,* 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), aff'd 602 Fed. Appx. 356 (8th Cir. 2015) (*per curiam*). The Sixth Circuit has adopted a similar test requiring that the court

look ***only*** to the face of the complaint to determine if claims are colorable. *In re The Gibson*

*Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995) (emphasis added).

41.    Although there is a dearth of federal court authorities in Texas, other federal

courts have adopted the same standard—*i.e.*, a claim is colorable if it is "plausible" and

could survive a motion to dismiss. *See In re America's Hobby Center, Inc.*, 223 B.R. 273, 282

(S.D.N.Y 1998). In addition, in the non-bankruptcy context, the District Court for the

Northern District of Texas explained that "[t]he requirement of a 'colorable claim' means

only that the plaintiff must have an '*arguable* claim' and not that the plaintiff must be able

to succeed on that claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*,

207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (Emphasis added).

42.    Thus, in this instance, this Court's gatekeeping inquiry is properly limited

to whether HMIT has stated a plausible claim on the face of the proposed pleadings

involving "bad faith," "willful misconduct," or "fraud." Because the face of the

Adversary Complaint alleges plausible facts, HMIT's Motion is properly granted.

Clearly, the attached Adversary Proceeding would survive a Rule 12(b)(6) challenge.

Furthermore, the supporting declarations and documentary evidence provide additional

support, and the circumstantial evidence proves that Farallon and Stonehill, strangers to

the bankruptcy on the petition date, would not have leaped into these proceedings

without undisclosed assurances of profit.

**HMIT Appx. 00024**

### B. *Fraud*

43.     As set forth in the proposed Adversary Proceeding, HMIT alleges a colorable claim for fraud—both fraud by knowing misrepresentation and fraud by omission of material fact. Here, these allegations of fraud are appropriately governed by Texas law under appropriate choice of law principals.[55]

44.     Seery had a duty to not provide material inside information to his business allies. But, he did so. At the latest, Seery became aware of the potential sale of MGM in December 2020 when he received an email from Jim Dondero.[56] Thus, Seery knew at that time that this potential sale would likely yield significant value to the Original Debtor's Estate. Yet, the financial disclosures associated with the Plan's confirmation, which were provided only a month later, presented an entirely different outlook for both Class 8 and Class 9 unsecured creditors.[57] Seery knew at that time that these pessimistic disclosures were misleading, if not inaccurate.

45.     There is no credible doubt Seery intended that innocent stakeholders would rely upon the pessimistic projections set forth in the Plan Analysis. Indeed, the singular purpose of the Plan Analysis was to advise stakeholders. As such, HMIT alleges that Seery knowingly made misrepresentations with the intention that innocent stakeholders

---

[55] However, Delaware law is substantially similar on the elements of fraud. *See Malinals v. Kramer*, No. CIV.A. CPU 6-11002145, 2012 WL 174958, at 2 (Del. Com. Pl. Jan. 5, 2012)

[56] *See,* Dondero 2022 Dec., Ex. 2-1.

[57] *See* Doc. 1875-1, Plan Analysis, February 1, 2021.

HMIT Appx. 00025

would rely, and that he failed to disclose material information concerning his entanglements with Farallon and Stonehill, as well as the related negotiations that were chock full of conflicts of interest.

46.    On the flip side of this conspiracy coin, Farallon and Stonehill were engaged in negotiations to acquire the Claims at discounted prices; and, they successfully did so. HMIT alleges that their success was based on knowledge that the financial disclosures associated with the Plan Analysis were significantly understated. Otherwise, it would make no financial sense for Farallon and Stonehill to do the deals at issue. Indeed, Farallon admitted that it would not sell the Claims at any price, expressing great confidence in the substantial profits it expected even in the absence of any supporting, publicly available information.[58]

47.    All of the Proposed Defendants had a duty of affirmative disclosure under these circumstances. Seery always had this duty. Muck, Jessup, Farallon, and Stonehill assumed this duty when they became non-statutory "insiders." Thus, all of the Proposed Defendants are liable for conspiring to perpetrate a fraud by omission of material facts.

48.    HMIT also claims that Seery and the other Proposed Defendants failed to disclose material information concerning Seery's involvement in brokering the Claims in exchange for *quid pro quo* assurances of enhanced compensation. Seery's compensation

---

[58] Ex. 3, 2023 Dondero Declaration.

should be disgorged or, alternatively, such compensation constitutes a damage recoverable by the Reorganized Debtor and Claimant Trust as assignees (or transferees) of the Original Debtor's causes of action. This compensation was the product of the alleged self-dealing, breaches of fiduciary duty, and fraud.

### C. Breaches and Aiding and Abetting Breaches of Fiduciary Duties

49.     It is beyond dispute Seery owed fiduciary duties to the Estate. *See Xtreme Power*, 563 B.R. at 632-33 (detailing fiduciary duties owed by corporate officers and directors under Delaware law);[59] *Louisiana World*, 858 F.2d at 245-46 (5th Cir. 1988) (detailing duties owed by debtors-in-possession). Although Seery did not buy the Claims at issue, he stood to profit from these sales because his close business allies would do his bidding after they had acceded to positions of power and control on the Oversight Board. Muck and Jessup were essentially stepping into the shoes of three of the largest unsecured creditors who were already slated to serve on the Oversight Board. Thus, by acquiring their Claims, all of the Proposed Defendants knew that Muck and Jessup would occupy these powerful oversight positions after the Effective Date.

50.     Thus, the alleged conspiracy was successfully implemented before the Effective Date. Farallon and Stonehill now occupy control positions through the shell

---

[59] The *Xtreme* case also notes that "several Delaware courts have recognized that 'directors who are corporate employees lack independence because of their substantial interest in retaining their employment." 563 B.R. at 633-34. Because Muck and Jessup are now in control of Seery's compensation, it follows that Seery is beholden to them, and Seery's disclosure of inside information to Stonehill and Farallon confirms his conflict of interest.

entities (Muck and Jessup) overseeing large compensation packages for Seery. Of course, this control (and the opportunity to control) presented a patent conflict of interest which Seery should have avoided, but instead knowingly created, fostered, and encouraged. HMIT alleges that Seery breached his duty to avoid this conflict or otherwise disclose this conflict and Farallon and Stonehill aided and abetted this breach.

51.     The Original Debtor, as an investment adviser registered with the SEC, is also required to make public disclosures on its Form ADV, the uniform registration form for investment advisers required by the SEC. These Form ADV disclosures, which were in effect at the time of the insider trades at issue, explicitly forbade "any access person from trading either personally or on behalf of others . . . on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party."[60] It now appears these representations were false when made. Seery's alleged conduct also violated, at minimum, the duties Seery owed in his various capacities with the Original Debtor under the Form ADV disclosures.

52.     Although initially strangers to the original bankruptcy, by accepting and using inside information, Farallon and Stonehill became "temporary insiders" and thus owed separate duties to the Estate. *See S.E.C. v. Cuban*, 620 F.3d 551 (5th Cir. 2010) ("[E]ven

---

[60] *See, e.g.,*

https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=77
7026.

HMIT Appx. 00028

an individual who does not qualify as a traditional insider may become a 'temporary insider' if by entering 'into a special confidential relationship in the conduct of the business of the enterprise [they] are given access to information solely for corporate purposes." *In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (finding that equity committee stated colorable claim for equitable disallowance against creditors who "became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization"; vacated in part as a condition of settlement only);[61] *See also, In re Smith*, 415 B.R. 222, 232-33 (Bankr. N.D. Tex. 2009) ("[a]n insider is an entity or person with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.' 'Thus, the term "insider" is viewed to encompass two classes: (1) per se insiders as listed in the Code and (2) extra-statutory insiders that do not deal at arm's length.'" (citations omitted)). Farallon, Stonehill, Muck, and Jessup clearly fall into this latter category.

---

[61] Although the *Washington Mutual* case was subsequently vacated, the Court's intellectual reasoning remains valid because the vacatur was mandated by a mediated settlement, not because the court's logic was flawed or changed, and the court expressly noted that the parties' settlement was conditioned on vacatur. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan*," and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

HMIT Appx. 00029

53.     Because Farallon and Stonehill (acting through Muck and Jessup) now hold the majority of the seats on the Oversight Board, they, along with Seery, exercise control of the reorganization proceedings. At no time were Farallon, Stonehill, or Seery's plans disclosed to the other creditors or equity. In fact, the only inference that can be reasonably drawn is that Farallon and Stonehill brazenly sought to conceal their involvement by establishing shell entities—Muck and Jessup—to nominally hold the Claims and create an opaque barrier to any effort to identify the "*Oz behind the curtain*." Such conduct aligns precisely with the inequitable conduct detailed in *Citicorp* and *Adelphia* (discussed below).

54.     In sum, the proposed Adversary Proceeding sets forth plausible allegations that Stonehill and Farallon were aware of Seery's fiduciary duties. Indeed, as registered investment advisors, both Farallon and Stonehill were acutely aware of Seery's fiduciary obligations, including, without limitation, the duty to act in the best interests of the Original Debtor's Estate and the duty not to engage in insider trading that would benefit Seery, as an insider, and themselves, as non-statutory insiders. By accepting and then acting on material non-public information, Farallon and Stonehill (as well as Muck and Jessup) aided and abetted breaches of these fiduciary duties. By placing themselves in positions to control Seery's compensation, Farallon and Stonehill (acting through Muck and Jessup) induced, encouraged, aided and abetted Seery's self-dealing.

HMIT Appx. 00030

### D. Equitable Disallowance is an Appropriate Remedy

55.     HMIT also seeks equitable disallowance. Although the Fifth Circuit in *Matter of Mobile Steel Co.* generally limited the court's equitable powers to subordination rather than disallowance,[62] the Fifth Circuit **did *not* foreclose** the viability of equitable disallowance as a potential remedy. *See* 563 F.2d 692, 699 n. 10 (5th Cir. 1977). Binding U.S. Supreme Court precedent in *Pepper v. Litton* also permits bankruptcy courts to fashion disallowance remedies. 308 U.S. 295, 304-11 (1939). Bankruptcy Code § 510, which supplies the authority for equitable subordination, was "intended to codify case law, such as *Pepper v. Litton . . . and is not intended to limit the court's power in any way…. Nor does [it] preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances.*" *In re Adelphia Commun. Corp.*, 365 B.R. 24, 71-72 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (emphasis and omissions in original).[63]

56.     The Fifth Circuit's decision in *Mobile Steel* also was premised on the notion that disallowance would not add to the quiver of defenses to fight unfairness because

---

[62] Equitable subordination is an inadequate remedy in this instance.

[63] In *Washington Mutual,* the Court's intellectual reasoning when imposing disallowance is instructive. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan*," and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

HMIT Appx. 00031

creditors "are fully protected by subordination" and "[i]f the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then *surely* the claim is either invalid or the bankrupt possesses a clear defense against it." *Mobile Steel*, 563 F.2d at 699 n. 10 (emphasis added). Importantly, however, the factual scenarios considered in *Mobile Steel* do not exist here.

57.    Here, Muck and Jessup purchased both Class 8 and Class 9 Claims, and they now effectively occupy more than 90% of the entire field of unsecured creditors in these two claimant tiers. Thus, subordination cannot effectively address the current facts where the Original Debtor's CEO and CRO conspired directly with close business allies who acquired the largest unsecured claims to the detriment of other innocent creditors and *former equity*. The reasoning in published cases from other circuits supports this conclusion. *See Adelphia*, 365 B.R. at 71-73; *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir. 1998).

58.    The purpose of equitable subordination is to assure that the wrongdoer does not profit from bad conduct. In the typical case, subordination to other creditors will achieve this deterrence. But, it is clear that the Third Circuit's decision in *Citicorp* was structured to use subordination as just one tool in a larger tool box to make sure "at a minimum, the remedy here should deprive – [the fiduciary] of its profit on the purchase of the notes." *Id* at 991. In *Adelphia*, the Southern District of New York also used equitable

HMIT Appx. 00032

subordination as a remedy to address wrongs of non-insiders who aided and abetted breaches a fiduciary duty by the debtor's management. 365 B.R. at 32.

59.    But subordination cannot adequately address the wrongful conduct at issue. This is because subordination is typically limited to instances where one creditor is subordinated to other creditors, not equity. Here, for all practical purposes, there are only a few other unsecured creditors with relatively small stakes. Therefore, subordination as a weapon of deterrence is neutered.

60.    In sum, by engaging in the alleged wrongful acts, including aiding and abetting Seery's breaches of fiduciary duty, Farallon, Stonehill, Muck, and Jessup should not be rewarded. The Proposed Defendants engaged in alleged conduct which damaged the Original Debtor's estate, including improper agreements to compensate Seery under the terms of the CTA. Equitable disallowance is an appropriate remedy which, when combined with disgorgement of all ill-gotten profits, will deprive the Proposed Defendants of their ill-gotten gains.

### E.  Disgorgement and Unjust Enrichment

61.    The law is clear that disgorgement is an available remedy for breach of fiduciary duty both under Texas Law, see *Kinzbach Tool Co. v. Corbett-Wallace Corporation*, 160 S.W. 2d 509 (Tex. 1942), and under Delaware law, see *Metro Storage International, LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022). Disgorgement is also an appropriate remedy for unjust enrichment under Texas law, *Hunter v. Shell Oil Co.*, 198 F.2d 485 (5th Cir. 1952),

[32]

HMIT Appx. 00033

and under Delaware law, *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 919 A.2d 563 (Del. Ch. 2007).[64]

62.    Likewise, the imposition of a constructive trust is proper for addressing unjust enrichment under both Delaware and Texas law, see *Teacher's Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006) and *Hsin-Chi-Su v. Vantage Drilling Company*, 474 S.W. 3d 384 (Tex. App. – 14th Dist. 2015), pet. denied. The elements of unjust enrichment are: (1) the defendant must have gained a benefit (2) at the expense of plaintiff, (3) and retention of that benefit must be shown to be unjust. *See Restatement (Third) of Restitution and Unjust Enrichment* §321, cmt. e (2011).

63.    Here, the imposition of a constructive trust and disgorgement are clearly appropriate to provide redress for the alleged breaches of fiduciary duty and the knowing participation in (or aiding and abetting) those breaches. Furthermore, the imposition of a constructive trust and disgorgement are appropriate to disgorge the improper benefits that all of the Proposed Defendants received by virtue of collusion and insider trading.

64.    As set forth in the proposed Adversary Proceeding, Seery gained the opportunity to have his compensation demands rubber stamped. The other Defendants gained the opportunity to purchase valuable claims at a discount knowing that

---

[64] It is likely that the Internal Affairs Doctrine will dictate that Delaware choice of law governs the breach of fiduciary duty claims.

HMIT Appx. 00034

pessimistic financial projections were false and that the upside investment potential was great. Retention of the benefits they received would be unjust and inequitable.

65.     Clearly, the Debtor's Estate was damaged by virtue of the claimed conduct. Seery obtained profits and compensation to the detriment of that estate as well as the estate of the Reorganized Debtor, other innocent creditors and HMIT, as former equity and as a contingent Claimant Trust Beneficiary.

### F.  Declaratory Relief

66.     HMIT also seeks declaratory relief pursuant to Fed. R. Bank P. 7001(9). Specifically, HMIT seeks a declaratory judgment that: (a) there is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement; (b) as a general matter, HMIT has standing to bring an action against a trustee even if its interest is considered "contingent;" (c) HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill; (d) HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments; (e) Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of fraudulent conduct, bad faith, willful misconduct, and unclean hands; (f) Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized

Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct, and unclean hands; and (g) all of the Proposed Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct, and unclean hands.

### G. HMIT has Direct Standing.

67.    The Texas Supreme Court recently held that "a partner or other stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization." *Pike v. Texas EMC Mgt., LLC*, 610 S.W.3d 763, 778 (Tex. 2020). In so holding, the Court considered federal law and found that the traditional "incantation that a shareholder may not sue for the corporation's injury" is really a question of capacity, which goes to the merits of a claim, rather than an issue of standing that would impact subject matter jurisdiction. *Id.* at 777 (noting that the 5th Circuit and "[o]ther federal circuits agree that a plaintiff has standing to sue for the lost value of its investment in a corporation"). Because Seery, Muck, Jessup, Stonehill, Farallon's alleged actions devalued HMIT's interest in the Debtor's Estate, including, without limitation, payment of excessive compensation to Seery, HMIT has standing to pursue its common law claims directly. HMIT also has direct standing to seek declaratory relief as set forth in the proposed Adversary Proceeding.

## VII.    Prayer

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave authorizing it to file the Adversary Complaint, attached as Exhibit 1, as an Adversary Proceeding in this United States Bankruptcy Court for the Northern District of Texas, in its own name and as a derivative action on behalf of the Debtor Highland Capital Management, L.P., against Muck Holdings, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, Stonehill Capital Management, LLC, James P. Seery, Jr., and John Doe Defendants Nos. 1 – 10, and further grant HMIT all such other and further relief to which HMIT may be justly entitled.

Dated: March 28, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  _/s/ Sawnie A. McEntire_
         Sawnie A. McEntire
         Texas State Bar No. 13590100
         smcentire@pmmlaw.com
         1700 Pacific Avenue, Suite 4400
         Dallas, Texas 75201
         Telephone: (214) 237-4300
         Facsimile: (214) 237-4340

         Roger L. McCleary
         Texas State Bar No. 13393700
         rmccleary@pmmlaw.com
         One Riverway, Suite 1800
         Houston, Texas 77056

HMIT Appx. 00037

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

***Attorneys for Hunter Mountain
Investment Trust***

## CERTIFICATE OF CONFERENCE

Beginning on March 24, 2023, and also on March 27, 2023, the undersigned counsel conferred either by telephone or via email with all counsel for all Respondents regarding the relief requested in the foregoing Motion, including John A. Morris on behalf of James P. Seery, and Brent McIlwain on behalf of Muck Holdings LLC, Jessup Holdings LLC, Stonehill Capital Management, and Farallon Capital Management.  Mr. Seery is opposed to this Motion. Based upon all communications with Mr. McIlwain, it is reasonably believed his clients are also opposed and we advised him that this recitation would be placed in the certificate of conference.

 */s/ Sawnie A. McEntire*

Sawnie A. McEntire

## CERTIFICATE OF SERVICE

I certify that on the 28th day of March 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire

[37]

HMIT Appx. 00038

# Exhibit 1

HMIT Appx. 00039

**<u>Exhibit 1 to Emergency Motion</u>**

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § § § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | |
| **HUNTER MOUNTAIN INVESTMENT** | § | |
| **TRUST, INDIVIDUALLY, AND ON** | § | |
| **BEHALF OF THE DEBTOR** | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P. AND THE** | § | **Adversary Proceeding No. _____** |
| **HIGHLAND CLAIMANT TRUST** | § | |
| | § | |
| **PLAINTIFFS,** | § | |

**HMIT Appx. 00040**

|                                              | §  |
| **v.**                                       | §  |
|                                              | §  |
| **MUCK HOLDINGS, LLC, JESSUP**               | §  |
| **HOLDINGS, LLC, FARALLON**                  | §  |
| **CAPITAL MANAGEMENT, LLC,**                 | §  |
| **STONEHILL CAPITAL**                        | §  |
| **MANAGEMENT, LLC, JAMES P.**                | §  |
| **SEERY, JR., AND JOHN DOE**                 |    |
| **DEFENDANTS NOS. 1-10**                     |    |
|                                              |    |
| **DEFENDANTS.**                              |    |

## VERIFIED ADVERSARY COMPLAINT

Hunter Mountain Investment Trust ("HMIT") files this Verified Adversary Complaint in its individual capacity and, as a derivative action on behalf of the Reorganized Debtor, Highland Capital Management L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust (collectively "Plaintiffs"), complaining of Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr., ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendants Nos. 1-10 are collectively "Defendants"), and would show:

## I. Introduction

1.    HMIT brings this Verified Adversary Complaint ("Complaint") on behalf of itself, individually, and as a derivative action benefitting the Reorganized Debtor and

**HMIT Appx. 00041**

on behalf of the Highland Claimant Trust ("Claimant Trust"), as defined in the Claimant Trust Agreement (Doc. 3521-5) ("CTA").[1] This derivative action is specifically brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and B. R. Rule 7023.1.  At the time of the transactions at issue, HMIT held a 99.5% limited partnership in Highland Capital Management, LP, the Original Debtor, as described herein. This derivative action is not a collusive effort to confer jurisdiction that the Court would otherwise lack.

2.      Upon the Effective Date, the assets of the bankruptcy estate of Highland Capital Management, L.P., as the Original Debtor (the "Debtor's Estate") were transferred to the Highland Claimant Trust under the terms of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Doc. 1943, Exhibit A] (the "Plan") and as defined in the CTA. These assets include all "causes of action" that the Debtor's Estate had before the Effective Date including, without limitation, the causes of action set forth in this Adversary Proceeding. Furthermore, the Claimant Trust is managed by the Claimant Trustee, Seery. Therefore, any demand upon Seery to prosecute the claims set forth in this Complaint would be futile because Seery is a Defendant. Similarly, the Oversight Board exercises supervision over Seery as Claimant

---

[1] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate. Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed in HMIT's Emergency Motion for Leave (Doc. __).

HMIT Appx. 00042

Trustee, and Muck and Jessup are members of the Oversight Board. Any demand upon Muck and Jessup to prosecute these claims would be equally futile. All conditions precedent to bringing this derivative action have otherwise been satisfied.

3.        This action has become necessary because of Defendants' tortious conduct. This tortious conduct occurred before the Effective Date of the Plan, but its effects have caused damage both before and after the Effective Date. Prior to the Effective Date, HMIT owned 99.5% of the limited partnership interest in the Original Debtor and was the beneficiary of fiduciary duties owed by Seery.

4.        Seery, the Original Debtor's CEO and former Chief Restructuring Officer ("CRO"), wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends, Farallon and Stonehill. He did so by providing material non-public information to them concerning the value of the Original Debtor's Estate that other stakeholders did not know. Farallon and Stonehill, who were otherwise strangers to the bankruptcy proceedings, wrongfully purchased the claims through their special purpose entities, Muck and Jessup, based upon this inside information, and they are now profiting from their misconduct. Seery's dealings with the other Defendants were not arm's length, but instead were covert, undisclosed, and collusive.

5.        Motivated by corporate greed, the other Defendants aided and abetted or, alternatively, knowingly participated in Seery's wrongful conduct. They also breached their own duties as "non-statutory insiders." Because of their long-standing, historical

HMIT Appx. 00043

relationships with Seery, and their use of material non-public information, Farallon, Stonehill, Muck, and Jessup assumed positions of control over the affairs of the Debtor's bankruptcy, including compensation awards to Seery. As such, they became non-statutory insiders.

6.        HMIT was formerly the largest equity holder in the Debtor, holding a 99.5% limited partnership interest. HMIT now holds an Allowed Class 10 Class B/C Limited Partnership Interest and a Contingent Trust Interest under the CTA. Given HMIT's' position as former equity, HMIT's right to recover from the Claimant Trust is junior to the Reorganized Debtor's unsecured creditors, now known as Claimant Trust Beneficiaries. However, the vast majority of the approved unsecured claims superior to HMIT's interest are the claims wrongfully acquired by insider trading and the breaches of duty at issue in this proceeding.

7.        By wrongfully soliciting, fostering, and encouraging the wrongful insider trades, Seery violated his fiduciary duties to the Debtor's Estate, specifically his duty of loyalty and his duty to maximize the value of the Estate with corresponding recovery by legitimate creditors and former equity. Seery was motivated out of self-interest to garner personal benefit (to the detriment of the Debtor's Estate) by strategically benefitting his business allies with non-public information. He then successfully "planted" his allies onto the Oversight Board, which, as a consequence does not act as an independent board in the exercise of its responsibilities. Rather, imbued with powers to oversee Seery's

HMIT Appx. 00044

future compensation, the other Defendants are postured to reward Seery financially regarding Defendants' illicit dealings and, upon information and belief, they have done so.

8.      By receiving and acting upon material non-public information concerning the financial condition of the Debtor's Estate, Stonehill and Farallon, acting individually and through special purpose shell entities they created and controlled, directly or indirectly, are also liable for aiding and abetting Seery's breaches of fiduciary duties. By acquiring the claims at issue, Muck and Jessup, the shell entities created and controlled by Stonehill and Farallon, also became non-statutory insiders owing duties of disclosure which they also breached.

9.      HMIT separately seeks recovery against John Doe Defendant Nos. 1-10. Farallon actively concealed the precise legal relationship between Farallon and Muck. Stonehill actively concealed the precise legal relationship between Stonehill and Jessup. What is known, however, is that Farallon and Stonehill created these special purpose shell entities on the eve of the insider trades to acquire ownership of the claims and to otherwise control the affairs of the Oversight Board. Both Farallon and Stonehill rejected inquiries concerning the exact nature of their relationship with these special purpose entities. Accordingly, HMIT seeks equitable tolling of any statute of limitations concerning claims against unknown business entities that Farallon and Stonehill may have created and inserted as intermediate corporate layers in the transactions at issue.

10.     HMIT seeks to disgorge all Defendants' ill-gotten profits and equitable disallowance of the remaining unpaid balances on the following allowed claims: Claim Nos. 23, 72, 81, 143, 147, 149, 150, 153, 154, 190, and 191 (the "Claims") currently held by Muck and Jessup. Because Defendants received substantial distributions from the Claimant Trust in connection with these Claims, HMIT seeks to disgorge all such distributions above Defendants' initial investment—compelling restitution of such funds to the Claimant Trust for the benefit of innocent creditors and former equity pursuant to the waterfall established under the Plan and the CTA. HMIT also seeks to disgorge Seery's compensation from the date his collusive conduct first occurred. Alternatively, HMIT seeks damages on behalf of the Claimant Trust in an amount equal to all compensation paid to Seery from the onset of his collusive conduct to present.

## II. Jurisdiction and Venue

11.     Pursuant to *Misc. Order No. 33 Order of Reference of Bankruptcy Cases, U.S. District Court for N.D. Texas* (the "Order of Reference"), this Complaint is commenced in the Bankruptcy Court because it is "related to a case under Title 11."  The filing of this Complaint is expressly subject to and without waiver of Plaintiff' rights and ability to seek withdrawal of the reference pursuant to 28 U.S.C. § 157(d), Fed. R. Bankr. P. 5011, and Local Bankruptcy Rule 5011-1. Plaintiffs hereby demand a right to a trial by jury of all claims asserted herein and nothing in this Complaint, nor Plaintiffs' compliance with the Order of Reference, shall be deemed a waiver of this right.

12. This Court has jurisdiction of the subject matter and the parties as a "related to" proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and Articles IX.F, and XI. of the Plan.

13. Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs do **not** consent to the entry of final orders or judgment by the bankruptcy court.

14. Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1408 and 1409, and Articles IX.F, and XI. of the Plan.

### III. Parties

15. HMIT is a Delaware statutory trust that was the largest equity holder in the Original Debtor, holding a 99.5% limited partnership interest. HMIT is also the holder of a Contingent Trust Interest in the Claimant Trust, but should be treated as a vested Claimant Trust Beneficiary due to Defendants' wrongful conduct.

16. Pursuant to the Plan and the CTA, the Claimant Trust holds the assets of the Reorganized Debtor, including the causes of action that accrued to the Original Debtor before the Effective Date. The Claimant Trust is established in accordance with the Delaware Statutory Trust Act and Treasury Regulatory Section 301.7701-4(d).

17. Muck is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Muck has made prior appearances in the Debtor's bankruptcy.

HMIT Appx. 00047

18.    Jessup is a Delaware limited liability company, with its principal office in New York, and may be served with process via its registered agent, Vcorp Services, LLC, at 108 W. 13th Street Suite 100, Wilmington, Delaware 19801. Jessup has made prior appearances in the Debtor's bankruptcy.

19.    Farallon is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Farallon is a capital management company that manages hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Farallon because Farallon's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts requirements and due process considerations.

20.    Stonehill is a Delaware limited liability company, with its principal office in New York, and may be served with process at 320 Park Avenue, 26th Floor, New York, NY 10022. Stonehill is a capital management company managing hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Stonehill because Stonehill's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts and all due process considerations.

21.    Seery is an individual citizen and resident of the State of New York. Mr. Seery may be served with process at 100 Crescent Court, Suite 1805, Dallas, Texas 75201.

HMIT Appx. 00048

22.     John Doe Defendant Nos. 1-10 are currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue.

## IV. Facts

### A.     *Procedural Background*

23.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court,[2] which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.[3]

24.     On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee of the Highland Crusader Fund ("Redeemer"); Acis Capital Management, L.P. and Acis Capital Management GP, LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS")—and an unpaid vendor, Meta-E Discovery.

25.     Following the venue transfer to Texas, on December 27, 2019, the Debtor filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of*

---

[2] Doc. 3. Unless otherwise referenced, all documents referencing "Doc." refer to the docket maintained in Case No. 19-34054-sgj11 (Bankr. N.D. Tex.).

[3] Doc. 1.

HMIT Appx. 00049

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* ("Governance Motion").[4] On January 9, 2020, the Court signed a Governance Order granting the Governance Motion.[5]

26.     As part of the Governance Order, an independent board of directors— which included Seery as one of the selections of the Unsecured Creditors Committee— was appointed to the Board of Directors (the "Board") of Strand, the Original Debtor's general partner. The Board then appointed Seery as the Chief Executive Officer in place of the previous CEO, Mr. James Dondero, as well as the CRO.[6] Seery currently serves as Trustee of the Claimant Trust under the terms of the CTA and the CEO of the Reorganized Debtor.[7]

**B.     *The Targeted Claims***

27.     In his capacity as the Original Debtor's CEO and CRO, Seery negotiated and obtained court approval for settlements with several large unsecured creditors including Redeemer, Acis, UBS, and another major unsecured creditor, HarbourVest (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed Claims:

| Creditor | Class 8 | Class 9 |
|----------|---------|---------|
| Redeemer | $137 mm | $0 mm |

---

[4] Doc. 281.

[5] Doc. 339.

[6] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[7] *See* Doc. 1943, Order Approving Plan, p. 34.

HMIT Appx. 00050

| | | |
|---|---|---|
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

As reflected in these settlements, HarbourVest and UBS owned Class 9 claims in addition to Class 8 Claims. Class 9 Claims were subordinated to Class 8 Claims in the distribution waterfall in the Plan.

28.     Each of the Settling Parties sold their Claims to Farallon and Stonehill (or affiliated special purpose entities) shortly after receiving court approval of the settlements. One of these "trades" took place within just a few weeks before the Plan's Effective Date.[8] All of these trades occurred when HMIT held its 99.5% equity stake in the Debtor. Notice of these trades was first provided in filings in the records of the Original Debtor's bankruptcy proceedings, as follows: Claim No. 23 (Doc. 2211, 2212, and 2215), Claim Nos. 190 and 191 (Doc. 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (Doc. 2263), Claim No. 81 (Doc. 2262), Claim No. 72 (Doc. 2261).

29.     Farallon and Stonehill, both of whom are registered investment advisors that manage hedge funds, have fiduciary duties to their own investors. As such, they are acutely aware of their duties and obligation as fiduciaries. Yet, they both invested many tens of millions of dollars, directly or indirectly, to acquire the Claims in the absence of

---

[8] Docs. 2697, 2698.

HMIT Appx. 00051

any publicly available information that could provide any economic justification for their investment decisions.

30.     Upon information and belief, Stonehill and Farallon collectively invested an estimated $160 million to acquire the Claims with a face amount of $365 million, and they did so in the absence of any meaningful due diligence. Indeed, Farallon has admitted that it conducted no due diligence but relied on Seery's guarantees.

31.     Stonehill and Farallon's investments become even more suspicious because the Plan provided the **only** publicly available information, which, at the time, included pessimistic projections that the Claims would ever receive full payment:

> a. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the projected value of HCM's assets dropped over $200 million from $566 million to $364 million.[9]
>
> b. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11.[10]
>
>> o This meant that Farallon and Stonehill invested more than $163 million in Claims when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims.
>
> c. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% to 54%.

---

[9] Doc. 1473, Disclosure Statement, p. 18.

[10] Doc. 1875-1, Plan Supplement, Ex. A, p. 4.

HMIT Appx. 00052

    d. Despite the stark decline in the value of the estate and in the midst of substantial reductions in the percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively, again, the "<u>Claims</u>") in April and August of 2021 in the combined amount of $163 million.[11]

32.  Upon information and belief, Stonehill, through its special purpose entity, Jessup, acquired the Redeemer Committee's claim for $78 million.[12] Upon information and belief, the $23 million Acis claim[13] was sold to Farallon/Muck for $8 million. Upon information and belief, HarbourVest sold its combined $80 million in claims to Farallon/Muck for $27 million. UBS sold its combined $125 million in claims for $50 million to both Stonehill/Jessup and Farallon/Muck. In the instance of UBS, ***the total projected payout was only $35 million***. Indeed, as part of these transactions, both Farallon and Stonehill purchased Class 9 Claims at a time when the Debtor's Estate projected a zero dollar return on all such Claims.

---

[11] Notices of Transfers [Docs. 2212, 2215, 2261, 2262, 2263, 2215, 2297, 2298]. The Acis claim was transferred on April 16, 2021; the Redeemer, Crusader, and HarbourVest claims were transferred on April 30, 2021; and the UBS claims were transferred on August 9, 2021.

[12] July 6, 2021, letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

[13] Seery/HCM have argued that $10 million of the Acis claim is self-funding.

**HMIT Appx. 00053**

**C.**  *Material Non-Public Information is Disclosed to Seery's Affiliates at Stonehill and Farallon.*

33.    One of the significant assets of the Debtor's Estate was the Debtor's direct and indirect holdings in Metro-Goldwyn-Mayer Studios, Inc. ("MGM").[14]

34.    On December 17, 2020, James Dondero, sent an email to Seery. At that time, Dondero was a member of the MGM board, and the email contained material non-public information regarding Amazon and Apple's interest in acquiring MGM.[15] Of course, any such sale would significantly enhance the value of the Original Debtor's estate.

35.    Upon receipt of this material non-public information, Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in this Court seeking approval of the Original Debtor's settlement with HarbourVest - resulting in a transfer to the Original Debtor of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("HCLOF"), which held substantial MGM debt and equity.[16] Conspicuously, the HCLOF interest was not transferred to the Original Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[17]

---

[14] *See* Doc. 2229, p. 6.

[15] *See* Adversary Case No. 20-3190-sgj11, Doc. 150-1, p. 1674.

[16] Doc. 1625. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM.

[17] Doc. 1625.

HMIT Appx. 00054

36.     Upon information and belief, aware that the Debtor's stake in MGM afforded a new profit center, Seery saw an opportunity to increase his own compensation and enlisted the help of Stonehill and Farallon to extract further value from the Original Debtor's Estate at the expense of other innocent creditors and equity. This *quid pro quo* included, at a minimum, a tacit, if not express, understanding that Seery would be well-compensated.

37.     Until 2009, Seery was the Global Head of Fixed Income Loans at Lehman Brothers[18] where, on information and belief, he conducted substantial business with Farallon. Following the collapse of Lehman Brothers, Seery continued to work with, and indeed represented Farallon as its legal counsel. Seery ultimately joined a hedge fund, River Birch Capital,[19] which, along with Stonehill, served on the creditors committee in other bankruptcy proceedings. GCM Grovesnor, a global asset management firm, held four seats on the Redeemer Committee[20] and, upon information and belief, is a significant investor in Stonehill and Farallon. Grovesnor, through Redeemer, played a large part in appointing Seery as a director of Strand Advisors. Seery was beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farallon.

---

[18] Seery Resume [Doc. 281-2].

[19] *Id*.

[20] Declaration of John A. Morris [Doc. 1090], Ex. 1, pp. 15.

HMIT Appx. 00055

38.     As successful capital management firms, with advisory and fiduciary duties to their own clients, Stonehill and Farallon typically engage in robust due diligence before making significant investments. Yet, in this case, it would have been *impossible* for Stonehill and Farallon to forecast *any* profit at the time of their multi-million-dollar investments given the negative financial information disclosed by the Original Debtor's Estate. Seery, as the CEO, was aware of and involved in approving these negative financial projections. In doing so, Seery intentionally caused the publication of misleading, false information.

39.     Seery shared with Stonehill and Farallon *non-public* information concerning the value of the Original Debtor's Estate which was higher than publicly available information. Thus, the only logical conclusion is that all Defendants knew that the publicly available projections, which accompanied the Plan, were understated, false, and misleading. Otherwise, Farallon, Muck, Stonehill and Jessup would not have made their multi-million-dollar investments. None of the Defendants disclosed their knowledge of the misleading nature of these financial projections when they had a duty to do so. None of the Defendants disclosed the nature of their dealings in acquiring the Claims.

40.     By wrongfully exploiting non-public insider information, Stonehill and Farallon—acting through Muck and Jessup—became the largest holders of unsecured claims in the Debtor's Estate with resulting control over the Oversight Board and a front row seat to the reorganization and distribution of Claimant Trust Assets. As such, they

HMIT Appx. 00056

were given control (through Muck and Jessup) to approve discretionary bonuses and success fees for Seery from these assets.

**D.    *Distributions***

41.    The MGM sale was ultimately consummated in March 2022 for $6.1 billion in cash, plus $2.5 billion in debt that Amazon assumed and immediately repaid.[21]

42.    By the end of Q3 2021, just over $6 million of the projected $205 million available for general unsecured claimants had been disbursed.[22] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[23] Thus, Stonehill (Jessup) and Farallon (Muck) have already received returns that far eclipse their investment. They also stand to make further significant profits on their investments, including payments on Class 9 Claims.

43.    As of December 31, 2022, the Claimant Trust has distributed $255,201,228. On a pro rata basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000.

---

[21] Amazon Q1 2022 10-Q.

[22] Doc. 3200.

[23] Doc. 3582.

HMIT Appx. 00057

44.     Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary.

45.     It is clear Seery facilitated the sale of the Claims to Stonehill (Jessup) and Farallon (Muck) at discounted prices and used misleading financial projections to facilitate these trades. This was part of a larger strategy to install Stonehill (Jessup) and Farallon (Muck), his business allies, onto the Oversight Board where they would oversee lucrative bonuses and other compensation for Seery in exchange for hefty profits they expected to receive.

## V. <u>Causes of Action</u>

### A.     *Count I (against Seery): Breach of Fiduciary Duty*

46.     The allegations in paragraphs 1-45 above are incorporated herein as if set forth verbatim.

47.     As CEO and CRO of a debtor-in-possession, Seery owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate, including, without limitation, the duty of loyalty. Seery also was under a duty to avoid conflicts of interests, but Seery willfully and knowingly engaged in conduct which conflicted with his fiduciary duties—and he did so out of financial self-interest.

HMIT Appx. 00058

48.    By fraudulently providing and/or approving negative projections of the Debtor's Estate when he knew otherwise, Seery willfully and knowingly breached his fiduciary duties.

49.    By misusing and disclosing confidential, material non-public information to Stonehill and Farallon, Seery willfully and knowingly breached his fiduciary duties.

50.    By failing to disclose his role in the inside trades at issue, Seery willfully and knowingly breached his fiduciary duties.

51.    As a result of his willful misconduct, Seery was unfairly advantaged by receiving additional undisclosed compensation and bonuses from the assets of the Debtor's Estate and from the Claimant Trust Assets—to the detriment of other innocent stakeholders, including HMIT, as former equity and a contingent Claimant Trust Beneficiary.

52.    To remedy these breaches, Seery is liable for disgorgement of all compensation he received since his collusion with Farallon and Stonehill first began. Alternatively, Seery should be disgorged of all compensation paid to him under the terms of the CTA since the Effective Date of the Plan in August 2021.

53.    Alternatively, Plaintiffs are entitled to recover damages measured by all ill-gotten compensation which Seery has received since his first collusive conduct began.

HMIT Appx. 00059

B. **Count II (against Stonehill, Farallon, Jessup and Muck): Breaches of Fiduciary Duty and Knowing Participation in Breach of Fiduciary Duty**

54.     The allegations in paragraphs 1-53 above are incorporated herein as if set forth verbatim.

55.     Seery owed fiduciary duties to HMIT and the Debtor's Estate, and he willfully and knowingly breached these duties. Without limiting the foregoing, Seery owed a duty of loyalty which he willfully and knowingly breached. Seery also owed a duty to not engage in self-interested conduct to the detriment of the Debtor's Estate and innocent stakeholders. Seery also willfully and knowingly breached this duty.

56.     Stonehill and Farallon were aware of Seery's fiduciary duties and, by purchasing the Claims and approving bonuses and other compensation for Seery, Stonehill (acting through Jessup) and Farallon (acting through Muck), willfully and knowingly participated in Seery's breaches or, alternatively, willfully aided and abetted such breaches.

57.     Stonehill (Jessup) and Farallon (Muck) unfairly received many millions of dollars in profits and fees—and stand to earn even more profits and fees—to the detriment of innocent stakeholders, including HMIT.

58.     Stonehill and Farallon are liable for disgorgement of all profits earned from their purchase of the Claims. In addition, they are liable in damages for excessive compensation paid to Seery as part of the covert *quid pro quo* with Seery.

**C.    Count III (against all Defendants): Fraud by Misrepresentation and Material Nondisclosure**

59.    The allegations in paragraphs 1-58 above are incorporated herein as if set forth verbatim.

60.    Based on Seery's duties as CEO and CRO of a debtor-in-possession, and the other Defendants' duties as non-statutory insiders, Seery, Stonehill (Jessup), and Farallon (Muck) had a duty to disclose Stonehill and Farallon's plans to purchase the Claims, but they deliberately failed to do so. Seery also had a duty to disclose correct financial projections but, rather, misrepresented such values or failed to correct false and misleading projections. These factual misrepresentations and omissions were material.

61.    The withheld financial information was material because it has had an adverse impact on control over the eventual distributions to creditors and former equity, as well as the right to control Seery's compensation. By withholding such information, Seery was able to plant friendly business allies on the Oversight Board to the detriment of innocent stakeholders.

62.    Defendants knew that HMIT and other creditors were ignorant of their plans, and HMIT and other stakeholders did not have an equal opportunity to discover their scheme. HMIT and the other innocent stakeholders justifiably relied on misleading information relating to the value of the Original Debtor's Estate.

HMIT Appx. 00061

63.     By failing to disclose material information, and by making or aiding and abetting material misrepresentations, Seery, Stonehill, Farallon, Muck, and Jessup intended to induce HMIT to take no affirmative action.

64.     HMIT justifiably relied on Seery, Stonehill, Farallon, Muck, and Jessup's nondisclosures and representations, and HMIT was injured as a result and the Debtor's Estate was also injured.

65.     As a result of their frauds, all Defendants should be disgorged of all profits and ill-gotten compensation derived from their fraudulent scheme. Seery is also liable for damages measured by excessive compensation he has received since he first engaged in willful misconduct.

### D.     Count IV (against all Defendants): Conspiracy

66.     The allegations in paragraphs 1-65 above are incorporated herein as if incorporated herein verbatim.

67.     Defendants conspired with each other to unlawfully breach fiduciary duties to HMIT and the Debtor's Estate, to conceal their fraudulent trades, and to interfere with HMIT's entitlement to the residual of the Claimant Trust Asset.

68.     Seery's disclosure of material non-public information to Stonehill and Farallon, and Muck and Jessup's purchase of the Claims, are each overt acts in furtherance of the conspiracy.

69.     HMIT's interest in the residual of the Claimant Trust Assets has been adversely impacted by this conspiracy. The assets have been depleted by virtue of Seery's compensation awards.

### E.     Count V (against Muck and Jessup): Equitable Disallowance

70.     The allegations in paragraphs 1-69 above are incorporated herein as if set forth verbatim.

71.     By purchasing the Claims based on material non-public information, Stonehill and Farallon, through Jessup and Muck, engaged in inequitable conduct.

72.     By earning significant profits on their purchases, Muck and Jessup have been unfairly advantaged to the detriment of the remaining stakeholders, including HMIT.

73.     Given this inequitable conduct, equitable disallowance of Muck's and Jessup's Claims to the extent over and above their initial investment is appropriate and consistent with the purposes of the Bankruptcy Code.

74.     Pleading in the alternative only, subordination of Muck's and Jessup's General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also consistent with the purposes of the Bankruptcy Code.

**F.     Count VI (against all Defendants): Unjust Enrichment and Constructive Trust**

75.     The allegations in paragraphs 1-74 above are incorporated herein as if set forth verbatim.

76.     By acquiring the Claims using material non-public information, Stonehill and Farallon breached a relationship of trust with the Original Debtor's Estate and other innocent stakeholders and were unjustly enriched and gained an undue advantage over other creditors and former equity.

77.     Allowing Stonehill, Farallon, Muck and Jessup to retain their ill-gotten benefits at the expense of other innocent stakeholders and HMIT, as former equity, would be unconscionable.

78.     Stonehill, Farallon, Muck, and Jessup should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment.

79.     The proceeds Stonehill, Farallon, Muck, and Jessup have received from the Claimant Trust are traceable and identifiable. A constructive trust should be imposed on such proceeds to secure the restitution of these improperly retained benefits.

**F.     Count VI (Against all Defendants): Declaratory Relief**

80.     The allegations in paragraphs 1-79 are incorporated herein as if set forth verbatim.

**HMIT Appx. 00064**

81. HMIT seeks declaratory relief. The Court has jurisdiction to provide declaratory judgment relief when there is an actual controversy that has arisen and exists relating to the rights and duties of the parties.

82. Bankruptcy Rule 7001 provides that "a proceeding to recover property or money," may include declaratory relief. *See*, Fed. R. Bank P. 7001(1), (9).

83. The Claimant Trust Agreement is governed under Delaware law. The Claimant Trust Agreement incorporates and is subject to Delaware trust law. HMIT seeks a declaration, as follows:

    a. There is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement;

    b. As a general matter, HMIT has standing to bring an action against a trustee even if its interest is considered contingent;

    c. HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill;

    d. HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments. Alternatively, HMIT's status as a Claimant Trust Beneficiary is fully vested when all of Muck's and Jessup's trust interests are subordinated to the trust interests held by HMIT;

    e. Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of Seery's fraudulent conduct, bad faith, willful misconduct and unclean hands;

f.  Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct and unclean hands;

g.  All Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct and unclean hands.

## VI. <u>Punitive Damages</u>

84.  The allegations in paragraphs 1-74 are incorporated herein as if set forth verbatim.

85.  The Defendants' misconduct was intentional, knowing, willful and fraudulent and in total disregard of the rights of others. An award of punitive damages is appropriate and necessary under the facts of this case.

86.  All conditions precedent to recovery herein have been satisfied.

## VII. <u>Prayer</u>

WHEREFORE, HMIT prays for judgment as follows:

1.  Equitable disallowance of the Claims over and above Muck's and Jessup's original investments (or, alternatively, subordination of their Claimant Trust Interests, as addressed herein);

2.  Disgorgement of all funds distributed from the Claimant Trust to Muck and/or Jessup over and above their original investments;

3.  Disgorgement of compensation paid to Seery in managing or administering the Original and Reorganized Debtor's Estate;

4.  Imposition of a constructive trust;

5.   Declaratory relief as described herein;

6.   An award of actual damages as described herein;

7.   An award of exemplary damages as allowed by law;

8.   Pre- and post-judgment interest; and,

9.   All such other and further relief to which HMIT may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/_____

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

***Attorneys for Hunter Mountain Investment Trust***

28

# Exhibit 2

HMIT Appx. 00068

<div align="center">

CAUSE NO. DC-21-09534

</div>

|  |  |  |
|---|---|---|
| **IN RE JAMES DONDERO,** | § | **IN THE DISTRICT COURT** |
|  | § |  |
| *Petitioner.* | § | **95th JUDICIAL DISTRICT** |
|  | § |  |
|  | § | **DALLAS COUNTY, TEXAS** |

<div align="center">

### DECLARATION OF JAMES DONDERO

</div>

|  |  |
|---|---|
| **COUNTY OF DALLAS** | § |
|  | § |
| **STATE OF TEXAS** | § |

Mr. James Dondero provides this unsworn declaration under TEXAS CIVIL PRACTICE & REMEDIES CODE § 132.001.

1.  My name is James Dondero. I declare under penalty of perjury that I am over the age of 18 and of sound mind and competent to make this declaration.

2.  Earlier this year I retained investigators to look into certain activities involving the respondents in the above-styled case and the related bankruptcy proceedings. Last year, I called Farallon's Michael Lin about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Mr. Seery had testified in court, it made no sense to me that Mr. Lin would think that the claims were worth more than what Mr. Seery testified under oath was the value of the bankruptcy claims.

3.  In addition to my role as equity holder in the Crusader Funds, I have an interest in ensuring that the claims purchased by Respondents are not used as a means to deprive the equity holders of their share of the funds. It has become obvious that despite the fact that the bankrupt estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.

4.  Accordingly, I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee. True and correct copies of the reports, which were created in the ordinary course, and their attachments, are attached hereto as Exhibits A and B. A true and correct copy of the letter I received from Alverez and Marsal is attached as Exhibit C hereto.

---

Declaration of James Dondero                                                                 Page 1

My name is James Dondero, my birthday is on June 29, 1962. My address is 300 Crescent Court, Suite 700, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing testimony is true and correct and is within my personal knowledge.

James Dondero

May 31, 2022

Date

HMIT Appx. 00070

# HELLER, DRAPER & HORN, L.L.C.
### *ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA  70130-6103
TELEPHONE: (504) 299-3300  FAX: (504) 299-3399

Douglas S. Draper
Direct Dial:  (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

Re:    *Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11*

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers.  Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

EXHIBIT

MIT App. 00071

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

1.    **The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports**

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

## 2. There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6] The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]   Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information.   Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

   **3.     The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights**

        In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court.  On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.  The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses.  In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

        As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level.  Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out."  Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise).   These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.  While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

        As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat").  Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9]  That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute.  Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims.  In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10] If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11] It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release. Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases. Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions. Several parties have appealed this issue to the Fifth Circuit.

### 4.    The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely. But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] See Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. See Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] Compare Jan. 31, 2021 Monthly Operating Report [Doc. 2030], with Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. See Appendix, p. A-25. It is also notable that the January 2021

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

19 *See* Appendix, pp. A-25, A-28.

20 *See* Appendix, pp. A-2; A-62 – A-69.

October 5, 2021
Page 9

> committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

{00376610-1}

October 5, 2021
Page 10

> **In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending.** ==Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.== **The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.**

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a)   The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)   Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)   The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d)   The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e)   The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f)   There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming.  Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery.  The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer.  If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties.  The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim.  The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members.  At the very least, there is enough credible evidence to warrant an investigation.  It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent.  The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders.  A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate.   In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

HMIT Appx. 00081

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ........................................................................................................... 3

Seery Jan. 29, 2021 Testimony ........................................................................................................ 15

Sale of Assets of Affiliates or Controlled Entities ........................................................................... 24

20 Largest Unsecured Creditors ...................................................................................................... 25

Timeline of Relevant Events ........................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ...................................................... 27

Updated Liquidation Analysis (Feb. 1, 2021) .................................................................................. 28

Summary of Debtor's January 31, 2021 Monthly Operating Report ................................................ 29

Value of HarbourVest Claim ............................................................................................................ 30

Estate Value as of August 1, 2021 (in millions) .............................................................................. 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ................................................................ 32

UBS Settlement [Doc. 2200-1] ........................................................................................................ 45

Hellman & Friedman Seeded Farallon Capital Management ........................................................... 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ..................................................... 63

Farallon was a Significant Borrower for Lehman ............................................................................. 65

Mr. Seery Represented Stonehill While at Sidley ........................................................................... 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders ................................................ 70

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?



## Debtor Protocols [Doc. 466-1]

I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K. "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

**II. Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

   1. Ordinary Course Transactions do not require Court approval (All Stages).

      a) Stage 1 and Stage 2: ordinary course determined by the CRO.

      b) Stage 3: ordinary course determined by the Debtor.

   2. Related Entity Transactions

      a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b) Stage 3:

         (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.    Third Party Transactions (All Stages)

        a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.    Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

            a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

            b)    Stage 3: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  Stage 3:

(1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages)

a)  Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)  The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.  **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.    **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

            a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

            b)    Stage 3: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

            a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            b)    Stage 3:

                (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

                (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.    Third Party Transactions (All Stages):

            a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V. **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

## X.    Representations and Warranties

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")
11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

**Schedule B**

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

Page 1

```
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   ---------------------------)

 5   In Re:                  Chapter 11

 6   HIGHLAND CAPITAL         Case No.

 7   MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9        Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15               10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

| | Page 2 |
|---|---|
| 1 | January 29, 2021 |
| 2 | 9:00 a.m. EST |
| 3 | |
| 4 | Remote Deposition of JAMES P. |
| 5 | SEERY, JR., held via Zoom |
| 6 | conference, before Debra Stevens, |
| 7 | RPR/CRR and a Notary Public of the |
| 8 | State of New York. |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | REMOTE APPEARANCES: |
| 2 | |
| 3 | Heller, Draper, Hayden, Patrick, & Horn |
| 4 | Attorneys for The Dugaboy Investment |
| 5 | Trust and The Get Good Trust |
| 6 | 650 Poydras Street |
| 7 | New Orleans, Louisiana 70130 |
| 8 | |
| 9 | |
| 10 | BY:    DOUGLAS DRAPER, ESQ |
| 11 | |
| 12 | |
| 13 | PACHULSKI STANG ZIEHL & JONES |
| 14 | For the Debtor and the Witness Herein |
| 15 | 780 Third Avenue |
| 16 | New York, New York 10017 |
| 17 | BY:    JOHN MORRIS, ESQ. |
| 18 | JEFFREY POMERANTZ, ESQ. |
| 19 | GREGORY DEMO, ESQ. |
| 20 | IRA KHARASCH, ESQ. |
| 21 | |
| 22 | |
| 23 | |
| 24 | (Continued) |
| 25 | |

| | Page 4 |
|---|---|
| 1 | REMOTE APPEARANCES:   (Continued) |
| 2 | |
| 3 | LATHAM & WATKINS |
| 4 | Attorneys for UBS |
| 5 | 885 Third Avenue |
| 6 | New York, New York 10022 |
| 7 | BY:    SHANNON McLAUGHLIN, ESQ. |
| 8 | |
| 9 | JENNER & BLOCK |
| 10 | Attorneys for Redeemer Committee of |
| 11 | Highland Crusader Fund |
| 12 | 919 Third Avenue |
| 13 | New York, New York 10022 |
| 14 | BY:    MARC B. HANKIN, ESQ. |
| 15 | |
| 16 | SIDLEY AUSTIN |
| 17 | Attorneys for Creditors' Committee |
| 18 | 2021 McKinney Avenue |
| 19 | Dallas, Texas 75201 |
| 20 | BY:    PENNY REID, ESQ. |
| 21 | MATTHEW CLEMENTE, ESQ. |
| 22 | PAIGE MONTGOMERY, ESQ. |
| 23 | |
| 24 | (Continued) |
| 25 | |

| | Page 5 |
|---|---|
| 1 | REMOTE APPEARANCES:   (Continued) |
| 2 | KING & SPALDING |
| 3 | Attorneys for Highland CLO Funding, Ltd. |
| 4 | 500 West 2nd Street |
| 5 | Austin, Texas 78701 |
| 6 | BY:    REBECCA MATSUMURA, ESQ. |
| 7 | |
| 8 | K&L GATES |
| 9 | Attorneys for Highland Capital Management |
| 10 | Fund Advisors, L.P., et al.: |
| 11 | 4350 Lassiter at North Hills |
| 12 | Avenue |
| 13 | Raleigh, North Carolina 27609 |
| 14 | BY:    EMILY MATHER, ESQ. |
| 15 | |
| 16 | MUNSCH HARDT KOPF & HARR |
| 17 | Attorneys for Defendants Highland Capital |
| 18 | Management Fund Advisors, LP; NexPoint |
| 19 | Advisors, LP; Highland Income Fund; |
| 20 | NexPoint Strategic Opportunities Fund and |
| 21 | NexPoint Capital, Inc.: |
| 22 | 500 N. Akard Street |
| 23 | Dallas, Texas 75201-6659 |
| 24 | BY:  DAVOR RUKAVINA, ESQ. |
| 25 | (Continued) |

```
                                           Page 6
1   REMOTE APPEARANCES (Continued)
2
3   BONDS ELLIS EPPICH SCHAFER JONES
4   Attorneys for James Dondero,
5   Party-in-Interest
6            420 Throckmorton Street
7
8            Fort Worth, Texas 76102
9   BY:   CLAY TAYLOR, ESQ.
10         JOHN BONDS, ESQ.
11         BRYAN ASSINK, ESQ.
12
13
14  BAKER McKENZIE
15  Attorneys for Senior Employees
16          1900 North Pearl Street
17
18          Dallas, Texas 75201
19  BY:   MICHELLE HARTMANN, ESQ.
20        DEBRA DANDEREAU, ESQ.
21
22
23
24                  (Continued)
25
```

```
                                           Page 7
1   REMOTE APPEARANCES: (Continued)
2
3   WICK PHILLIPS
4   Attorneys for NexPoint Real Estate
5   Partners, NexPoint Real Estate Entities
6   and NexBank
7           100 Throckmorton Street
8           Fort Worth, Texas 76102
9   BY:    LAUREN DRAWHORN, ESQ.
10
11  ROSS & SMITH
12  Attorneys for Senior Employees, Scott
13  Ellington, Isaac Leventon, Thomas Surgent,
14  Frank Waterhouse
15          700 N. Pearl Street
16          Dallas, Texas 75201
17  BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

```
                                           Page 8
1
2     E X A M I N A T I O N S
3   WITNESS                         PAGE
4   JAMES SEERY
5     By Mr. Draper                  9
6     By Mr. Taylor                 75
7     By Mr. Rukavina              165
8     By Mr. Draper                217
9        E X H I B I T S
10  SEERY DYD
    EXHIBIT    DESCRIPTION          PAGE
11
    Exhibit 1   January 2021 Material   11
12
    Exhibit 2   Disclosure Statement    14
13
    Exhibit 3   Notice of Deposition    74
14
15
    INFORMATION/PRODUCTION REQUESTS
16  DESCRIPTION                      PAGE
17  Subsidiary ledger showing note    22
    component versus hard asset
18  component
19  Amount of D&O coverage for       131
    trustees
20
    Line item for D&O insurance      133
21
22      MARKED FOR RULING
          PAGE    LINE
23         85      20
24
25
```

```
                                           Page 9
1
2        COURT REPORTER:  My name is
3   Debra Stevens, court reporter for TSG
4   Reporting and notary public of the
5   State of New York.  Due to the
6   severity of the COVID-19 pandemic and
7   following the practice of social
8   distancing, I will not be in the same
9   room with the witness but will report
10  this deposition remotely and will
11  swear the witness in remotely.  If any
12  party has any objection, please so
13  state before we proceed.
14       Whereupon,
15       J A M E S    S E E R Y,
16  having been first duly sworn/affirmed,
17  was examined and testified as follows:
18  EXAMINATION BY
19  MR. DRAPER:
20     Q.   Mr. Seery, my name is Douglas
21  Draper, representing the Dugaboy Trust.  I
22  have series of questions today in
23  connection with the 30(b) Notice that we
24  filed.  The first question I have for you,
25  have you seen the Notice of Deposition
```

**Page 14**

J. SEERY

1
2  the screen, please?
3  A.    Page what?
4  Q.    I think it is page 174.
5  A.    Of the PDF or of the document?
6  Q.    Of the disclosure statement that
7  was filed.  It is up on the screen right
8  now.
9          COURT REPORTER:  Do you intend
10  this as another exhibit for today's
11  deposition?
12         MR. DRAPER:  We'll mark this
13  Exhibit 2.
14         (So marked for identification as
15  Seery Exhibit 2.)
16  Q.    If you look to the recovery to
17  Class 8 creditors in the November 2020
18  disclosure statement was a recovery of
19  87.44 percent?
20  A.    That actually says the percent
21  distribution to general unsecured
22  creditors was 87.44 percent.  Yes.
23  Q.    And in the new document that was
24  filed, given to us yesterday, the recovery
25  is 62.5 percent?

**Page 15**

J. SEERY

1
2  A.    It says the percent distribution
3  to general unsecured creditors is
4  62.14 percent.
5  Q.    Have you communicated the
6  reduced recovery to anybody prior to the
7  date -- to yesterday?
8          MR. MORRIS:  Objection to the
9  form of the question.
10  A.    I believe generally, yes.  I
11  don't know if we have a specific number,
12  but generally yes.
13  Q.    And would that be members of the
14  Creditors' Committee who you gave that
15  information to?
16  A.    Yes.
17  Q.    Did you give it to anybody other
18  than members of the Creditors' Committee?
19  A.    Yes.
20  Q.    Who?
21  A.    HarbourVest.
22  Q.    And when was that?
23  A.    Within the last two months.
24  Q.    You did not feel the need to
25  communicate the change in recovery to

**Page 16**

J. SEERY

1
2  anybody else?
3  A.    I said Mr. Doherty.
4  Q.    In looking at the two elements,
5  and what I have asked you to look at is
6  the claims pool.  If you look at the
7  November disclosure statement, if you look
8  down Class 8, unsecured claims?
9  A.    Yes.
10  Q.    You have 176,000 roughly?
11  A.    Million.
12  Q.    176 million.  I am sorry.  And
13  the number in the new document is 313
14  million?
15  A.    Correct.
16  Q.    What accounts for the
17  difference?
18  A.    An increase in claims.
19  Q.    When did those increases occur?
20  Were they yesterday?  A month ago?  Two
21  months ago?
22  A.    Over the last couple months.
23  Q.    So in fact over the last couple
24  months you knew in fact that the recovery
25  in the November disclosure statement was

**Page 17**

J. SEERY

1
2  not accurate?
3  A.    Yes.  We secretly disclosed it
4  to the Bankruptcy Court in open court
5  hearings.
6  Q.    But you never did bother to
7  calculate the reduced recovery; you just
8  increased --
9          (Reporter interruption.)
10  Q.    You just advised as to the
11  increased claims pool.  Correct?
12         MR. MORRIS:  Objection to the
13  form of the question.
14  A.    I don't understand your
15  question.
16  Q.    What I am trying to get at is,
17  as you increase the claims pool, the
18  recovery reduces.  Correct?
19  A.    No.  That is not how a fraction
20  works.
21  Q.    Well, if the denominator
22  increases, doesn't the recovery ultimately
23  decrease if --
24  A.    No.
25  Q.    -- if the numerator stays the

**Page 26**

```
 1                    J. SEERY
 2    were amended without consideration a few
 3    years ago.  So, for our purposes we didn't
 4    make the assumption, which I am sure will
 5    happen, a fraudulent conveyance claim on
 6    those notes, that a fraudulent conveyance
 7    action would be brought.  We just assumed
 8    that we'd have to discount the notes
 9    heavily to sell them because nobody would
10    respect the ability of the counterparties
11    to fairly pay.
12        Q.    And the same discount was
13    applied in the liquidation analysis to
14    those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18    a difference, though, because they would
19    pay for a while because they wouldn't want
20    to accelerate them.  So there would be
21    some collections on the notes for P and I.
22        Q.    But in fact as of January you
23    have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

**Page 27**

```
 1                    J. SEERY
 2        A.    NexPoint, I said.  They
 3    defaulted on the note and we accelerated
 4    it.
 5        Q.    So there is no need to file a
 6    fraudulent conveyance suit with respect to
 7    that note.  Correct, Mr. Seery?
 8        MR. MORRIS:  Objection to the
 9        form of the question.
10        A.    Disagree.  Since it was likely
11    intentional fraud, there may be other
12    recoveries on it.  But to collect on the
13    note, no.
14        Q.    My question was with respect to
15    that note.  Since you have accelerated it,
16    you don't need to deal with the issue of
17    when it's due?
18        MR. MORRIS:  Objection to the
19        form of the question.
20        A.    That wasn't your question.  But
21    to that question, yes, I don't need to
22    deal with when it's due.
23        Q.    Let me go over certain assets.
24    I am not going to ask you for the
25    valuation of them but I am going to ask
```

**Page 28**

```
 1                    J. SEERY
 2    you whether they are included in the asset
 3    portion of your $257 million number, all
 4    right?  Mr. Morris didn't want me to go
 5    into specific asset value, and I don't
 6    intend to do that.
 7        The first question I have for
 8    you is, the equity in Trustway Highland
 9    Holdings, is that included in the
10    $257 million number?
11        A.    There is no such entity.
12        Q.    Then I will do it in a different
13    way.  In connection with the sale of the
14    hard assets, what assets are included in
15    there specifically?
16        A.    Off the top of my head -- it is
17    all of the assets up, so it is
18    Trustway Holdings and all the value that
19    flows up from Trustway Holdings.  It
20    includes Targa and all the value that
21    flows up from Targa.  It includes CCS
22    Medical and all the value and it is
23    to the Debtor from CCS Medical.  It
24    includes Cornerstone and all the value
25    that would flow from Cornerstone.  It
```

**Page 29**

```
 1                    J. SEERY
 2    includes any other securities and all the
 3    value that would flow from Cornerstone.
 4    It includes HCLOF and all the value that
 5    would flow up from HCLOF.  It includes
 6    the assets and all the value that comes up
 7    from Korea.
 8        There may be others off the top
 9    of my head.  I don't recall them.  I don't
10    have a list in front of me.
11        Q.    Now, with respect to those
12    assets, have you started the sale process
13    of those assets?
14        A.    No.  Well, each asset is
15    different.  So, the answer is, with
16    respect to any securities, we do seek to
17    sell those regularly and we do seek to
18    monetize those assets where we can
19    depending on whether there is a
20    restriction or not and whether there is
21    liquidity in the market.
22        With respect to the PE assets or
23    the companies I described -- Targa, CCS,
24    Cornerstone, JHT -- we have not --
25    Trustway.  We have not sought to sell
```

Page 38

```
 1                     J. SEERY
 2      A.    I don't recall the specific
 3  limitation on the trust.  But if there was
 4  a reason to hold on to the asset, if there
 5  is a limitation, we can seek an extension.
 6      Q.    Let me ask a question.  With
 7  respect to these businesses, the Debtor
 8  merely owns an equity interest in them.
 9  Correct?
10      A.    Which business?
11      Q.    The ones you have identified as
12  operating businesses earlier?
13      A.    It depends on the business.
14      Q.    Well, let me -- again, let's try
15  to be specific.  With respect to SSP, it
16  was your position that you did not need to
17  get court approval for the sale.  Correct?
18      A.    That's correct.
19      Q.    Which one of the operating
20  businesses that are here, that you have
21  identified, do you need court authority
22  for a sale?
23            MR. MORRIS:  Objection to the
24      form of the question.
25      A.
```

Page 39

```
 1                     J. SEERY
 2  different analysis that we'll undertake
 3  with bankruptcy counsel to determine what
 4  we would need depending on when it is
 5
 6      either under the code are or under the
 7      plan.
 8      Q.    Is there anything that would
 9  stop you from selling these businesses if
10  the Chapter 11 went on for a year or two
11  years?
12            MR. MORRIS:  Objection to form
13      of the question.
14      A.    Is there anything that would
15  stop me?  We'd have to follow the
16  strictures of the code and the protocols,
17  but there would be no prohibition -- let
18  me finish, please.
19            There would be no prohibition
20  that I am aware of.
21      Q.    Now, in connection with your
22  differential between the liquidation of
23  what I will call the operating businesses
24  under the liquidation analysis and the
25  plan analysis, who arrived at the discount
```

Page 40

```
 1                     J. SEERY
 2  or determined the discount that has been
 3  placed between the two, plan analysis
 4  versus liquidation analysis?
 5            MR. MORRIS:  Objection to form
 6      of the question.
 7      A.    To which document are you
 8  referring?
 9      Q.    Both the June -- the January and
10  the November analysis has a different
11  estimated proceeds for monetization for
12  the plan analysis versus the liquidation
13  analysis.  Do you see that?
14      A.    Yes.
15      Q.    And there is a note under there.
16  "Assumes Chapter 7 trustee will not be
17  able to achieve the same sales proceeds as
18  Claimant trustee."
19      A.    I see that, yes.
20      Q.    Do you see that note?
21      A.    Yes.
22      Q.    Who arrived at that discount?
23      A.    I did.
24      Q.    What percentage did you use?
25      A.    Depended on the asset.  Each one
```

Page 41

```
 1                     J. SEERY
 2  is different.
 3      Q.    Is the discount a function of
 4  capability of a trustee versus your
 5  capability, or is the discount a function
 6  of timing?
 7            MR. MORRIS:  Objection to form.
 8      A.    It could be a combination.
 9      Q.    So, let's -- let me walk through
10  this.  Your plan analysis has an
11  assumption that everything is sold by
12  December 2022.  Correct?
13      A.    Correct.
14      Q.    And the valuations that you have
15  used here for the monetization assume a
16  sale between -- a sale prior to December
17  of 2022.  Correct?
18      A.    Sorry.  I don't quite understand
19  your question.
20      Q.    The 257 number, and then let's
21  take out the notes.  Let's use the 210
22  number.
23            MR. MORRIS:  Can we put the
24      document back on the screen, please?
25      Sorry, Douglas, to interrupt, but it
```

**Page 42**

| | J. SEERY |
|---|---|
| 1 | |
| 2 | would be helpful. |
| 3 | MR. DRAPER:  That is fine, John. |
| 4 | (Pause.) |
| 5 | MR. MORRIS:  Thank you very |
| 6 | much. |
| 7 | Q.    Mr. Seery, do you see the 257? |
| 8 | A.    In the one from yesterday? |
| 9 | Q.    Yes. |
| 10 | A.    Second line, 257,941.  Yes. |
| 11 | Q.    That assumes a monetization of |
| 12 | all assets by December of 2022? |
| 13 | A.    Correct. |
| 14 | Q.    And so everything has been sold |
| 15 | by that time; correct? |
| 16 | A.    Yes. |
| 17 | Q.    So, what I am trying to get at |
| 18 | is, there is both the capability between |
| 19 | you and a trustee, and then the second |
| 20 | issue is timing.  So, what discount was |
| 21 | put on for timing, Mr. Seery, between when |
| 22 | a trustee would sell it versus when you |
| 23 | would sell it? |
| 24 | MR. MORRIS:  Objection. |
| 25 | Q.    What is the percentage you |

**Page 43**

| | J. SEERY |
|---|---|
| 1 | |
| 2 | applied? |
| 3 | A.    Each of the assets is different. |
| 4 | Q.    Is there a general discount that |
| 5 | you used? |
| 6 | A.    Not a general discount, no.  We |
| 7 | looked at each individual asset and went |
| 8 | through and made an assessment. |
| 9 | Q.    Did you apply a discount for |
| 10 | your capability versus the capability of a |
| 11 | trustee? |
| 12 | A.    No. |
| 13 | Q.    So a trustee would be as capable |
| 14 | as you are in monetizing these assets? |
| 15 | MR. MORRIS:  Objection to the |
| 16 | form of the question. |
| 17 | Q.    Excuse me?  The answer is? |
| 18 | A.    The answer is maybe. |
| 19 | Q.    Couldn't a trustee hire somebody |
| 20 | as capable as you are? |
| 21 | MR. MORRIS:  Objection to the |
| 22 | form of the question. |
| 23 | A.    Perhaps. |
| 24 | Q.    Sir, that is a yes or no |
| 25 | question.  Could the trustee hire somebody |

**Page 44**

| | J. SEERY |
|---|---|
| 1 | |
| 2 | as capable as you are? |
| 3 | MR. MORRIS:  Objection to the |
| 4 | form of the question. |
| 5 | A.    I don't know. |
| 6 | Q.    Is there anybody as capable as |
| 7 | you are? |
| 8 | MR. MORRIS:  Objection to the |
| 9 | form of the question. |
| 10 | A.    Certainly. |
| 11 | Q.    And they could be hired. |
| 12 | Correct? |
| 13 | A.    Perhaps.  I don't know. |
| 14 | Q.    And if you go back to the |
| 15 | November 2020 liquidation analysis versus |
| 16 | plan analysis, it is also the same note |
| 17 | about that a trustee would bring less, and |
| 18 | there is the same sort of discount between |
| 19 | the estimated proceeds under the plan and |
| 20 | under the liquidation analysis. |
| 21 | MR. MORRIS:  If that is a |
| 22 | question, I object. |
| 23 | Q.    Is that correct, Mr. Seery, |
| 24 | looking at the document? |
| 25 | A.    There are discounts, yes. |

**Page 45**

| | J. SEERY |
|---|---|
| 1 | |
| 2 | Q.    Again, the discounts are applied |
| 3 | for timing and capability? |
| 4 | A.    Yes. |
| 5 | Q.    Now, in looking at the November |
| 6 | plan analysis number of $190 million and |
| 7 | the January number of $257 million, what |
| 8 | accounts for the increase between the two |
| 9 | dates?  What assets specifically? |
| 10 | A.    There are a number of assets. |
| 11 | Firstly, the HCLOF assets are added. |
| 12 | Q.    How much are those? |
| 13 | A.    Approximately 22 and a half |
| 14 | million dollars. |
| 15 | Q.    Okay. |
| 16 | A.    Secondly, there is a significant |
| 17 | |
| 18 | assets over this time period. |
| 19 | Q.    Which assets, Mr. Seery? |
| 20 | A.    There are a number.  They |
| 21 | include MGM stock, they include Trustway, |
| 22 | they include Targa. |
| 23 | Q.    And what is the percentage |
| 24 | increase from November to January, |
| 25 | November of 2020 to January of 2021? |



Page 46

```
1                    J. SEERY
2      A.   Do you mean what is the
3  percentage increase from 190 to 257?
4      Q.   No.  You just identified three
5  assets.  MGM stock, we can go look at the
6  exchange and figure out what the price
7  increase is; correct?
8      A.   No.
9      Q.   Why not?  Is the MGM stock
10 publicly traded?
11     A.   Yes.  It doesn't trade on --
12     Q.   Excuse me?
13     A.   It doesn't trade on an exchange.
14     Q.   Is there a public market for the
15 MGM stock that we could calculate the
16 increase?
17     A.   There is a semipublic market;
18 yes.
19     Q.   So it is a number that is
20 readily available between the two dates?
21     A.   It's available.
22     Q.   Now, you identified Targa and
23 Trustway.  Correct?
24     A.   Yes.
25     Q.   Those are not readily available
```

Page 47

```
1                    J. SEERY
2  markets; correct?
3      A.   No.
4      Q.   Those are operating businesses?
5      A.   Correct.
6      Q.
7  the November 2020 liquidation analysis?
8      A.   We use a combination of the
9  value that we get from Houlihan Lokey for
10
11
12     Q.   And the adjustment was up or
13 down?
14     A.   When?
15     Q.
16
17 adjusted it.  Did you adjust it up or did
18 you adjust it down?
19         MR. MORRIS:  Objection to form
20 of the question.
21     A.
22 adjusted it down, and for January we
23 adjusted it down.  I don't recall off the
```

Page 48

```
1                    J. SEERY
2      Q.
3
4  valuation for those two businesses showed
5  a significant increase between November of
6
7         MR. MORRIS:  Objection to form
8  of the question.
9      A.   I didn't say that.
10     Q.   I am trying to account for the
11
12 identified three assets.  You identified
13 MGM stock, which has, I can guess, as you
14
15 Then you identified two others that the
16 valuation is based upon something Houlihan
17 Lokey provided you.  Correct?
18     A.   I gave you three examples.  I
19 never said "readily."  That is your word,
20
21 had a significant change in their
22 valuation.
23     Q.   So let's now go back to the
24 question.  There is an increase in value
```

Page 49

```
1                    J. SEERY
2  of 2021, the magnitude being roughly 60
3  some odd million dollars.  Correct?
4      A.   Correct.
5      Q.   We can account for $22 million
6
7         MR. MORRIS:  Objection to form.
8      A.   Correct.
9      Q.
10 settlement, so that leaves roughly
11
12         MR. MORRIS:  Objection to the
13 form of the question if that is a
14 question.  It is accounted for.
15     Q.   What makes up that difference,
16 Mr. Seery?
17     A.   A change in the plan value of
18 the assets.
19     Q.   Okay.  Which assets?  Let's sort
20
21     A.   There are numerous assets in the
22 plan formulation.  I gave you three
23 examples of the operating businesses.  The
24 securities, I believe, have increased in
```

**Page 50**

J. SEERY

1  
2  for one.  On the operating businesses, we  
3  looked at each of them and made an  
4  assessment based upon where the market is  
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and we  
6  have moved those valuations.  
7      Q.    Let me look at some numbers  
8  again.  In the liquidation analysis in  
9  November of 2020, the liquidation value is  
10  $149 million.  Correct?  
11     A.    Yes.  
12     Q.    And in the liquidation analysis  
13  in January of 2021, you have $191 million?  
14     A.    Yes.  
15     Q.    You see that number.  So there  
16  is $51 million there, right?  
17     A.    No.  
18     Q.    What is the difference between  
19  191 and -- sorry.  My math may be a little  
20  off.  What is the difference between the  
21  two numbers, Mr. Seery?  
22     A.    Your math is off.  
23     Q.    Sorry.  It is 41 million?  
24     A.    Correct.  
25     Q.    $22 million of that is the  

**Page 51**

J. SEERY

1  
2  HarbourVest settlement, right?  
3      A.    I believe that's correct.  
4      Q.    Is that fair, Mr. Seery?  
5      A.    I believe that is correct, yes.  
6      Q.    And part of that differential  
7  are publicly traded or ascertainable  
8  securities.  Correct?  
9      A.    Yes.  
10     Q.    And basically you can get, or  
11  under the plan analysis or trustee  
12  analysis, if it is a marketable security  
13  or where there is a market, the  
14  liquidation number should be the same for  
15  both.  Is that fair?  
16     A.    No.  
17     Q.    And why not?  
18     A.    We might have a different price  
19  target for a particular security than the  
20  current trading value.  
21     Q.    I understand that, but I mean  
22  that is based upon the capability of the  
23  person making the decision as to when to  
24  sell.  Correct?  
25          MR. MORRIS: Objection to form  

**Page 52**

J. SEERY

1  
2  of the question.  
3      Q.    Mr. Seery, yes or no?  
4      A.    I said no.  
5      Q.    What is that based on, then?  
6      A.    The person's ability to assess  
7  the market and timing.  
8      Q.    Okay.  And again, couldn't a  
9  trustee hire somebody as capable as you to  
10  both, A, assess the market and, B, make a  
11  determination as to when to sell?  
12          MR. MORRIS: Objection to form  
13  of the question.  
14     A.    I suppose a trustee could.  
15     Q.    And there are better people or  
16  people equally or better than you at  
17  assessing a market.  Correct?  
18     A.    Yes.  
19          MR. MORRIS: Objection to form  
20  of the question.  
21     Q.    So, again, let's go back to  
22  that.  We have accounted for, out of  
23  $41 million where the liquidation analysis  
24  increases between the two dates,  
25  $22 million of it.  That leaves  

**Page 53**

J. SEERY

1  
2  $18 million.  How much of that is publicly  
3  traded or ascertainable assets versus  
4  operating businesses?  
5      A.    I don't know off the top of my  
6  head the percentages.  
7      Q.    All right.  The same question  
8  for the plan analysis where you have the  
9  differential between the November number  
10  and the January number.  How much of it is  
11  marketable securities versus an operating  
12  business?  
13     A.    I don't recall off the top of my  
14  head.  
15          MR. DRAPER: Let me take a  
16      few-minute break.  Can we take a  
17      ten-minute break here?  
18          THE WITNESS: Sure.  
19          (Recess.)  
20  BY MR. DRAPER:  
21     Q.    Mr. Seery, what I am going to  
22  show you and what I would ask you to look  
23  at is in the note E, in the statement of  
24  assumptions for the November 2020  
25  disclosure statement.  It discusses fixed

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|-------|-------------|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate.  We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable |  | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
|  |  |  |  |
| **Liabilities and Partners' Capital** |  |  |  |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable |  | $900,000 | $3,010,000 |
| Secured debt |  |  |  |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees |  | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

## Value of HarbourVest Claim





### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 3699-2   Filed 03/28/23   Entered 03/28/23 16:02:23   Desc
Case 3:21-cv-00881-X   Document Exhibit 2 Filed Page 473 of 776   Page 114 of 388   PageID 14501

Case 19-34054-sgj11  Doc 1625 Filed 12/23/20   Entered 12/23/20 22:25:24   Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

<div align="center">**RELEVANT BACKGROUND**</div>

**A.    Procedural Background**

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

<div align="center">3</div>

**B.      Overview of HarbourVest's Claims**

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.    **Summary of HarbourVest's Factual Allegations**

14.    At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

D.    **The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

      25.    Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

      26.    On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

      27.    On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.**    **Settlement Discussions**

      28.    In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

      29.    In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

      30.    During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

      31.    After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.    Summary of Settlement Terms

      32.    The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

9

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36. There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37. First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38. The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.    Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.    Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

**NO PRIOR REQUEST**

41.    No previous request for the relief sought herein has been made to this, or any other, Court.

**NOTICE**

42.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

# Exhibit 1

## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## RECITALS

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS**, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

**EXECUTION VERSION**

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**AGREEMENT**

**1.**   **Settlement of Claims.**   In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)   The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

**EXECUTION VERSION**

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including
without limitation the requests listed in **Appendix A** (provided, however, that the provision of
any such documents or access will be subject to the common interest privilege and will not
constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the
Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's
possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance
Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but
not limited to the documents requested in Appendix A, from 2016 to present, and issue a
litigation hold to all individuals deemed reasonably necessary regarding the same; and (x)
otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds
and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law
ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the
date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including,
but not limited to, those fees and expenses for outside consultants and professionals (the
"Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of
$3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from
the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.),
Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other
person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise
out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the
Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS
will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses
incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2)
UBS's receipt and review of invoices and time records (which may be redacted as reasonably
necessary) for outside consultants and professionals in connection with such efforts described in
this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the
Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent
an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any
proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be
obligated to pay the reasonable fees and expenses of the prevailing party; and provided further
that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on
behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation
with UBS, including but not limited to the selection of necessary outside consultants and
professionals to assist in such litigation; and provided further that UBS shall have the right to
approve HCMLP's selection of outside consultants and professionals to assist in any litigation in
which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for
UBS's benefit pursuant to this Section 1(c).

      (d)     Redeemer Appeal.

           (i)     On the Agreement Effective Date, provided that neither the
Redeemer Committee nor any entities acting on its behalf or with any assistance from or
coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion
(as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving
Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim
No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions
Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

<div align="center">6</div>

(ii)    The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)    As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)    On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)    On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.    Definitions.

(a)    "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)    "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)    "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)    "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.    Releases.

**(a)    UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c) **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4. **No Third Party Beneficiaries**. Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5. **UBS Covenant Not to Sue.** Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

**6.    Agreement Subject to Bankruptcy Court Approval.**

(a)    The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

**7.    Representations and Warranties.**

(a)    Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)    Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)    Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

**EXECUTION VERSION**

**8.** **No Admission of Liability.** The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice.** Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

### HCMLP Parties or the MSCF Parties

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

### UBS

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

⊥ʼ

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
            Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
       sarah.tomkowiak@lw.com

   **11.** **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

   **12.** **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

   **13.** **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

   **14.** **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

   **15.** **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

14

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**    **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____
Name: _____
Its: _____

**STRAND ADVISORS, INC.**

By: _____
Name: _____
Its: _____

17

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By:

Name: John Lantz

Its:   Authorized Signatory

By:

Name: Elizabeth Kozlowski

Its:   Authorized Signatory

**UBS AG LONDON BRANCH**

By:

Name: William Chandler

Its:   Authorized Signatory

By:

Name: Elizabeth Kozlowski

Its:   Authorized Signatory

15

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

### Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**



SFChronicle/SFGate/Liz Hafalia


Robert Holmgren


no caption

https://hf.com/warren-hellman/                                                                                    1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

### Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**
Financial Services

**STATUS**
Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)      INFO@HF.COM (MAILTO:INFO@HF.COM)      LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)      BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)      TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
                                                                (HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-
                                                                &-
                                                                FRIEDMAN)
                                         ©2021 HELLMAN & FRIEDMAN LLC



CORNER OFFICE

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

Julie Segal

August 03, 2020



Chicago, Il. (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management ==and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity== as

*Farallon was a Significant Borrower for Lehman*

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and** <mark>Farallon Capital Management</mark>



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million  JP Morgan: $200 million |



### Transaction Overview

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between <mark>Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon")</mark> secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. <mark>The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.</mark>

◆ <mark>Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield.</mark> The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**                                    32

## Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| BLOCKBUSTER INC., *et al.*, | : | Case No. 10-14997 (BRL) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

------------------------------------------------------------- X

### THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1. The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a
party. From the left, Bob Zinn, Dave
Lowenthal, Rory Little, Joe Nesler, Jon
Polonsky (in front of Joe), John Motulsky
and Mark Windfeld-Hansen (behind
bottle!) Motulsky circulated this photo at
the reunion. Thanks John!





**Joseph H. Nesler** (He/Him)
General Counsel

More | Message

# Joseph H. Nesler (He/Him) ·

Yale Law School

3rd
General Counsel
Winnetka, Illinois, United States ·
Contact info

500+ connections

Message | More

**Open to work**
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations. ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/

Joseph H. Nesler (He/Him)
General Counsel

More | Message

Experience

**General Counsel**
Dalpha Capital Management, LLC
Aug 2020 – Jul 2021 · 1 yr

**Of Counsel**
Winston & Strawn LLP
Sep 2018 – Jul 2020 · 1 yr 11 mos
Greater Chicago Area

**Principal**
The Law Offices of Joseph H. Nesler, LLC
Feb 2016 – Aug 2018 · 2 yrs 7 mos

**Grosvenor Capital Management, L.P.**
11 yrs 9 mos

**Independent Consultant to Grosvenor Capital Management, L.P.**
May 2015 – Dec 2015 · 8 mos
Chicago, Illinois

**General Counsel**
Apr 2004 – Apr 2015 · 11 yrs 1 mo
Chicago, Illinois
Managing Director, General Counsel and Chief Compliance Officer (April 2004 – April 2015)

<u>Investor Communication to Highland Crusader Funds Stakeholders</u>



**Alvarez & Marsal**
**Management, LLC** 2029 Cer
Park East Suite 206C
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director



**MUNSCH**
**HARDT**
DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main  214.855.7500
Fax  214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530
Nan.r.Eitel@usdoj.gov

Re:   Highland Capital Management, L.P. Bankruptcy Case
      Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

EXHIBIT

HMIT Appx. 00153
B

Case 19-34054-sgj11   Doc 3699-2   Filed 03/28/23   Entered 03/28/23 16:02:23   Desc
Case 3:21-cv-00881-X   Document 1 Exhibit Exhibit 2 Filed 02/05/23   Page 154 of 388   PageID 14541

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

### Highland Capital Management and its Founder, James Dondero

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

### Circumstances Precipitating Bankruptcy

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are:  (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court.   By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.   The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all
other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed
to obfuscate the operations of the debtor.  Instead, transparency is mandatory so that the debtor is
accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the
benefit of the estate.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those
that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost
no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door
to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the
Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself
or its affiliated entities. Typically, such reports would include information like asset value, income from
financial operations, profits, and losses for each non-publicly traded entity in which the estate has a
substantial or controlling interest.  This was very important here, where the Debtor held the bulk of its
value—hundreds of millions of dollars—in non-debtor subsidiaries.  The Debtor's failure to file the
required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the
U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the
failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief
Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel
ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there
was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and
the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the
estate fall into a handful of discrete investments, most of which have audited financials and/or are
required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than
disclose financial information that was readily available, the Debtor appears to have taken deliberate
and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors'
Committee with robust weekly information regarding transactions involving assets held by the Debtor or
its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in
which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-
to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the
Committee member had real-time financial information with respect to the affairs of non-debtor affiliates,
which is precisely the type of information that should have been disclosed to the public pursuant to Rule
2015.3.  Yet, the fact that the Committee members alone had this information enabled some of them to
trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well.  As
explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without
any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions
as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).
[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and
acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh.
A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Case 19-34054-sjg11   Doc 3699-2   Filed 03/28/23   Entered 03/28/23 16:02:23   Desc
Case 3:21-cv-00881-X   Document 1 Exhibit 2 Exhibit Filed 09/28/23   Page 158 of 388   PageID 14545

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ☐2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See* "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Case 19-34054-sgj11   Doc 3699-2   Filed 03/28/23   Entered 03/28/23 16:02:23   Desc
Case 3:21-cv-00881-X   Document 1 Exhibit 2 Exhibit Filed 02/05/23   Page 159 of 388   PageID 14546

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees are eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

Ms. Nan R. Eitel
November 3, 2021
Page 9

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here. In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.

[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] See Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim.  No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange.The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1) If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)     If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization.  Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] See Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.
[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.
[30] Dkt. 854, ¶ 4 & Exh. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds— i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____
　　　Davor Rukavina, Esq.

DR:pdm

## Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ............................................................................................ 3

Seery Jan. 29, 2021 Testimony .............................................................................................. 15

Sale of Assets of Affiliates or Controlled Entities ................................................................ 24

20 Largest Unsecured Creditors ............................................................................................. 25

Timeline of Relevant Events .................................................................................................. 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ........................................... 27

Updated Liquidation Analysis (Feb. 1, 2021) ........................................................................ 28

Summary of Debtor's January 31, 2021 Monthly Operating Report ...................................... 29

Value of HarbourVest Claim ................................................................................................... 30

Estate Value as of August 1, 2021 (in millions) .................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ..................................................... 32

UBS Settlement [Doc. 2200-1] ............................................................................................... 45

Hellman & Friedman Seeded Farallon Capital Management .................................................. 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ........................................... 63

Farallon was a Significant Borrower for Lehman .................................................................... 65

Mr. Seery Represented Stonehill While at Sidley .................................................................. 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders ...................................... 70

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers



*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?

Debtor Protocols [Doc. 466-1]

I.     **Definitions**

A.     "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.     "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.     "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.     "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.     "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.     "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.     "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.     "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.    "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.    "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.    "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

**II.   Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.   **Covered Entities**: N/A (See entities above).

B.   **Operating Requirements**

    1.    Ordinary Course Transactions do not require Court approval (All Stages).

        a)   Stage 1 and Stage 2:  ordinary course determined by the CRO.

        b)   Stage 3: ordinary course determined by the Debtor.

    2.    Related Entity Transactions

        a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)   Stage 3:

           (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

          (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

   3.    Third Party Transactions (All Stages)

       a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

       b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

       c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

## III.   Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)

A.   **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.   **Operating Requirements**

   1.    Ordinary Course Transactions do not require Court approval (All Stages).

       a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

       b)    Stage 3: ordinary course determined by the Debtor.

   2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

        a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    <u>Stage 3</u>:

            (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

        a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.** **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B. **Operating Requirements**

    1. Ordinary Course Transactions do not require Court approval (All Stages).

        a) Stage 1 and Stage 2: ordinary course determined by the CRO.

        b) Stage 3: ordinary course determined by the Debtor.

    2. Related Entity Transactions

        a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b) Stage 3:

            (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3. Third Party Transactions (All Stages):

        a) Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V. **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

VI.   **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VII.   **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VIII.   **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

IX.   **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

## X.   **Representations and Warranties**

A.   The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.   The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.   The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1.  Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2.  Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1.  Highland Prometheus Master Fund L.P.
2.  NexAnnuity Life Insurance Company
3.  PensionDanmark
4.  Highland Argentina Regional Opportunity Fund
5.  Longhorn A
6.  Longhorn B
7.  Collateralized Loan Obligations
    a)  Rockwall II CDO Ltd.
    b)  Grayson CLO Ltd.
    c)  Eastland CLO Ltd.
    d)  Westchester CLO, Ltd.
    e)  Brentwood CLO Ltd.
    f)  Greenbriar CLO Ltd.
    g)  Highland Park CDO Ltd.
    h)  Liberty CLO Ltd.
    i)  Gleneagles CLO Ltd.
    j)  Stratford CLO Ltd.
    k)  Jasper CLO Ltd.
    l)  Rockwall DCO Ltd.
    m)  Red River CLO Ltd.
    n)  Hi V CLO Ltd.
    o)  Valhalla CLO Ltd.
    p)  Aberdeen CLO Ltd.
    q)  South Fork CLO Ltd.
    r)  Legacy CLO Ltd.
    s)  Pam Capital
    t)  Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1.  Highland Opportunistic Credit Fund
2.  Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3.  NexPoint Real Estate Strategies Fund
4.  Highland Merger Arbitrage Fund
5.  NexPoint Strategic Opportunities Fund
6.  Highland Small Cap Equity Fund
7.  Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

**Schedule B**

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

```
                                                              Page 1
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   ----------------------------)

 5   In Re:                Chapter 11

 6   HIGHLAND CAPITAL        Case No.

 7   MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9        Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14           January 29, 2021

15            10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

| | Page 2 |
|---|---|
| 1 | January 29, 2021 |
| 2 | 9:00 a.m. EST |
| 3 | |
| 4 | Remote Deposition of JAMES P. |
| 5 | SEERY, JR., held via Zoom |
| 6 | conference, before Debra Stevens, |
| 7 | RPR/CRR and a Notary Public of the |
| 8 | State of New York. |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | REMOTE APPEARANCES: |
| 2 | |
| 3 | Heller, Draper, Hayden, Patrick, & Horn |
| 4 | Attorneys for The Dugaboy Investment |
| 5 | Trust and The Get Good Trust |
| 6 | 650 Poydras Street |
| 7 | New Orleans, Louisiana 70130 |
| 8 | |
| 9 | |
| 10 | BY: DOUGLAS DRAPER, ESQ |
| 11 | |
| 12 | |
| 13 | PACHULSKI STANG ZIEHL & JONES |
| 14 | For the Debtor and the Witness Herein |
| 15 | 780 Third Avenue |
| 16 | New York, New York 10017 |
| 17 | BY: JOHN MORRIS, ESQ. |
| 18 | JEFFREY POMERANTZ, ESQ. |
| 19 | GREGORY DEMO, ESQ. |
| 20 | IRA KHARASCH, ESQ. |
| 21 | |
| 22 | |
| 23 | |
| 24 | (Continued) |
| 25 | |

| | Page 4 |
|---|---|
| 1 | REMOTE APPEARANCES: (Continued) |
| 2 | |
| 3 | LATHAM & WATKINS |
| 4 | Attorneys for UBS |
| 5 | 885 Third Avenue |
| 6 | New York, New York 10022 |
| 7 | BY: SHANNON McLAUGHLIN, ESQ. |
| 8 | |
| 9 | JENNER & BLOCK |
| 10 | Attorneys for Redeemer Committee of |
| 11 | Highland Crusader Fund |
| 12 | 919 Third Avenue |
| 13 | New York, New York 10022 |
| 14 | BY: MARC B. HANKIN, ESQ. |
| 15 | |
| 16 | SIDLEY AUSTIN |
| 17 | Attorneys for Creditors' Committee |
| 18 | 2021 McKinney Avenue |
| 19 | Dallas, Texas 75201 |
| 20 | BY: PENNY REID, ESQ. |
| 21 | MATTHEW CLEMENTE, ESQ. |
| 22 | PAIGE MONTGOMERY, ESQ. |
| 23 | |
| 24 | (Continued) |
| 25 | |

| | Page 5 |
|---|---|
| 1 | REMOTE APPEARANCES: (Continued) |
| 2 | KING & SPALDING |
| 3 | Attorneys for Highland CLO Funding, Ltd. |
| 4 | 500 West 2nd Street |
| 5 | Austin, Texas 78701 |
| 6 | BY: REBECCA MATSUMURA, ESQ. |
| 7 | |
| 8 | K&L GATES |
| 9 | Attorneys for Highland Capital Management |
| 10 | Fund Advisors, L.P., et al.: |
| 11 | 4350 Lassiter at North Hills |
| 12 | Avenue |
| 13 | Raleigh, North Carolina 27609 |
| 14 | BY: EMILY MATHER, ESQ. |
| 15 | |
| 16 | MUNSCH HARDT KOPF & HARR |
| 17 | Attorneys for Defendants Highland Capital |
| 18 | Management Fund Advisors, LP; NexPoint |
| 19 | Advisors, LP; Highland Income Fund; |
| 20 | NexPoint Strategic Opportunities Fund and |
| 21 | NexPoint Capital, Inc.: |
| 22 | 500 N. Akard Street |
| 23 | Dallas, Texas 75201-6659 |
| 24 | BY: DAVOR RUKAVINA, ESQ. |
| 25 | (Continued) |

**Page 6**

```
 1   REMOTE APPEARANCES (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6            420 Throckmorton Street
 7
 8            Fort Worth, Texas 76102
 9   BY:   CLAY TAYLOR, ESQ.
10         JOHN BONDS, ESQ.
11         BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16         1900 North Pearl Street
17
18         Dallas, Texas 75201
19   BY:   MICHELLE HARTMANN, ESQ.
20         DEBRA DANDEREAU, ESQ.
21
22
23
24            (Continued)
25
```

**Page 7**

```
 1   REMOTE APPEARANCES: (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7            100 Throckmorton Street
 8            Fort Worth, Texas 76102
 9   BY:   LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15         700 N. Pearl Street
16         Dallas, Texas 75201
17   BY:   FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1
 2        E X A M I N A T I O N S
 3   WITNESS                        PAGE
 4   JAMES SEERY
 5     By Mr. Draper                 9
 6     By Mr. Taylor                75
 7     By Mr. Rukavina             165
 8     By Mr. Draper               217
 9
           E X H I B I T S
10   SEERY DYD
     EXHIBIT    DESCRIPTION         PAGE
11
     Exhibit 1    January 2021 Material    11
12
     Exhibit 2    Disclosure Statement     14
13
     Exhibit 3    Notice of Deposition     74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                    PAGE
17   Subsidiary ledger showing note    22
     component versus hard asset
18   component
19   Amount of D&O coverage for        131
     trustees
20
     Line item for D&O insurance       133
21
22        MARKED FOR RULING
          PAGE    LINE
23         85      20
24
25
```

**Page 9**

```
 1
 2        COURT REPORTER:  My name is
 3   Debra Stevens, court reporter for TSG
 4   Reporting and notary public of the
 5   State of New York.  Due to the
 6   severity of the COVID-19 pandemic and
 7   following the practice of social
 8   distancing, I will not be in the same
 9   room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14        Whereupon,
15        J A M E S   S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20        Q.   Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

Page 14

J. SEERY

1  the screen, please?
2  A.    Page what?
3  Q.    I think it is page 174.
4  A.    Of the PDF or of the document?
5  Q.    Of the disclosure statement that
6  was filed.  It is up on the screen right
7  now.
8        COURT REPORTER:  Do you intend
9  this as another exhibit for today's
10 deposition?
11       MR. DRAPER:  We'll mark this
12 Exhibit 2.
13       (So marked for identification as
14 Seery Exhibit 2.)
15 Q.    If you look to the recovery to
16 Class 8 creditors in the November 2020
17 disclosure statement was a recovery of
18 87.44 percent?
19 A.    That actually says the percent
20 distribution to general unsecured
21 creditors was 87.44 percent.  Yes.
22 Q.    And in the new document that was
23 filed, given to us yesterday, the recovery
24 is 62.5 percent?

Page 15

J. SEERY

1  A.    It says the percent distribution
2  to general unsecured creditors is
3  62.14 percent.
4  Q.    Have you communicated the
5  reduced recovery to anybody prior to the
6  date -- to yesterday?
7        MR. MORRIS:  Objection to the
8  form of the question.
9  A.    I believe generally, yes.  I
10 don't know if we have a specific number,
11 but generally yes.
12 Q.    And would that be members of the
13 Creditors' Committee who you gave that
14 information to?
15 A.    Yes.
16 Q.    Did you give it to anybody other
17 than members of the Creditors' Committee?
18 A.    Yes.
19 Q.    Who?
20 A.    HarbourVest.
21 Q.    And when was that?
22 A.    Within the last two months.
23 Q.    You did not feel the need to
24 communicate the change in recovery to

Page 16

J. SEERY

1  anybody else?
2  A.    I said Mr. Seery.
3  Q.    In looking at the two elements,
4  and what I have asked you to look at is
5  the claims pool.  If you look at the
6  November disclosure statement, if you look
7  down Class 8, unsecured claims?
8  A.    Yes.
9  Q.    You have 176,000 roughly?
10 A.    Million.
11 Q.    176 million.  I am sorry.  And
12 the number in the new document is 313
13 million?
14 A.    Correct.
15 Q.    What accounts for the
16 difference?
17 A.    An increase in claims.
18 Q.    When did those increases occur?
19 Were they yesterday?  A month ago?  Two
20 months ago?
21 A.    Over the last couple months.
22 Q.    So in fact over the last couple
23 months you knew in fact that the recovery
24 in the November disclosure statement was

Page 17

J. SEERY

1  not accurate?
2  A.    Yes.  We secretly disclosed it
3  to the Bankruptcy Court in open court
4  hearings.
5  Q.    But you never did bother to
6  calculate the reduced recovery; you just
7  increased --
8        (Reporter interruption.)
9  Q.    You just advised as to the
10 increased claims pool.  Correct?
11       MR. MORRIS:  Objection to the
12 form of the question.
13 A.    I don't understand your
14 question.
15 Q.    What I am trying to get at is,
16 as you increase the claims pool, the
17 recovery reduces.  Correct?
18 A.    No.  That is not how a fraction
19 works.
20 Q.    Well, if the denominator
21 increases, doesn't the recovery ultimately
22 decrease if --
23 A.    No.
24 Q.    -- if the numerator stays the

Page 26

```
                                    J. SEERY
 1
 2   were amended without consideration a few
 3   years ago.  So, for our purposes we didn't
 4   make the assumption, which I am sure will
 5   happen, a fraudulent conveyance claim on
 6   those notes, that a fraudulent conveyance
 7   action would be brought.  We just assumed
 8   that we'd have to discount the notes
 9   heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12       Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15       A.    Yes.
16       Q.    Now --
17       A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for P and I.
22       Q.    But in fact as of January you
23   have accelerated those notes?
24       A.    Just one of them, I believe.
25       Q.    Which note was that?
```

Page 27

```
                                    J. SEERY
 1
 2       A.    NexPoint, I said.  They
 3   defaulted on the note and we accelerated
 4   it.
 5       Q.    So there is no need to file a
 6   fraudulent conveyance suit with respect to
 7   that note.  Correct, Mr. Seery?
 8            MR. MORRIS:  Objection to the
 9       form of the question.
10       A.    Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14       Q.    My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18            MR. MORRIS:  Objection to the
19       form of the question.
20       A.    That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23       Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

Page 28

```
                                    J. SEERY
 1
 2   you whether they are included in the asset
 3   portion of your $257 million number, all
 4   right?  Mr. Morris didn't want me to go
 5   into specific asset value, and I don't
 6   intend to do that.
 7            The first question I have for
 8   you is, the equity in Trustway Highland
 9   Holdings, is that included in the
10   $257 million number?
11       A.    There is no such entity.
12       Q.    Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16       A.    Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20   includes Targa and all the value that
21   flows up from Targa.  It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

Page 29

```
                                    J. SEERY
 1
 2   includes any other securities and all the
 3   value that would flow from Cornerstone.
 4   It includes HCLOF and all the value that
 5   would flow up from HCLOF.  It includes
 6   Korea and all the value that would flow up
 7   from Korea.
 8            There may be others off the top
 9   of my head.  I don't recall them.  I don't
10   have a list in front of me.
11       Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14       A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22            With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

Page 38

```
1                    J. SEERY
2        A.    I don't recall the specific
3    limitation on the trust.  But if there was
4    a reason to hold on to the asset, if there
5    is a limitation, we can seek an extension.
6        Q.    Let me ask a question.  With
7    respect to these businesses, the Debtor
8    merely owns an equity interest in them.
9    Correct?
10       A.    Which business?
11       Q.    The ones you have identified as
12   operating businesses earlier?
13       A.    It depends on the business.
14       Q.    Well, let me -- again, let's try
15   to be specific.  With respect to SSP, it
16   was your position that you did not need to
17   get court approval for the sale.  Correct?
18       A.    That's correct.
19       Q.    Which one of the operating
20   businesses that are here, that you have
21   identified, do you need court authority
22   for a sale?
23             MR. MORRIS:  Objection to the
24       form of the question.
25       A.
```

Page 39

```
1                    J. SEERY
2    different analysis that we'll undertake
3    with bankruptcy counsel to determine what
4    we would need depending
5    going to happen and what the restrictions
6    either under the code are or un
7    plan.
8        Q.    Is there anything that would
9    stop you from selling these businesses if
10
11   years?
12             MR. MORRIS:  Objection to form
13       of the question.
14       A.    Is there anything that would
15   stop me?  We'd have to follow the
16   strictures of the code and the protocols,
17   but there would be no prohibition -- let
18                , please.
19             There would be no prohibition
20   that I am aware of.
21       Q.    Now, in connection with your
22   differential between the liquidation of
23   what I will call the operating businesses
24   under the liquidation analysis and the
25   plan analysis, who arrived at the discount
```

Page 40

```
1                    J. SEERY
2    or determined the discount that has been
3    placed between the two, plan analysis
4    versus liquidation analysis?
5             MR. MORRIS:  Objection to form
6        of the question.
7        A.    To which document are you
8    referring?
9        Q.    Both the June -- the January and
10   the November analysis has a different
11   estimated proceeds for monetization for
12   the plan analysis versus the liquidation
13   analysis.  Do you see that?
14       A.    Yes.
15       Q.    And there is a note under there.
16   "Assumes Chapter 7 trustee will not be
17   able to achieve the same sales proceeds as
18   Claimant trustee."
19       A.    I see that, yes.
20       Q.    Do you see that note?
21       A.    Yes.
22       Q.    Who arrived at that discount?
23       A.    I did.
24       Q.    What percentage did you use?
25       A.    Depended on the asset.  Each one
```

Page 41

```
1                    J. SEERY
2    is different.
3        Q.    Is the discount a function of
4    capability of a trustee versus your
5    capability, or is the discount a function
6    of timing?
7             MR. MORRIS:  Objection to form.
8        A.    It could be a combination.
9        Q.    So, let's -- let me walk through
10   this.  Your plan analysis has an
11   assumption that everything is sold by
12   December 2022.  Correct?
13       A.    Correct.
14       Q.    And the valuations that you have
15   used here for the monetization assume a
16   sale between -- a sale prior to December
17   of 2022.  Correct?
18       A.    Sorry.  I don't quite understand
19   your question.
20       Q.    The 257 number, and then let's
21   take out the notes.  Let's use the 210
22   number.
23             MR. MORRIS:  Can we put the
24       document back on the screen, please?
25             Sorry, Douglas, to interrupt, but it
```

Page 42

J. SEERY

1
2    would be helpful.
3         MR. DRAPER:  That is fine, John.
4    (Pause.)
5         MR. MORRIS:  Thank you very
6    much.
7         Q.    Mr. Seery, do you see the 257?
8         A.    In the one from yesterday?
9         Q.    Yes.
10        A.    Second line, 257,941.  Yes.
11        Q.    That assumes a monetization of
12   all assets by December of 2022?
13        A.    Correct.
14        Q.    And so everything has been sold
15   by that time; correct?
16        A.    Yes.
17        Q.    So, what I am trying to get at
18   is, there is both the capability between
19   you and a trustee, and then the second
20   issue is timing.  So, what discount was
21   put on for timing, Mr. Seery, between when
22   a trustee would sell it versus when you
23   would sell it?
24        MR. MORRIS:  Objection.
25        Q.    What is the percentage you

Page 43

J. SEERY

1
2    applied?
3         A.    Each of the assets is different.
4         Q.    Is there a general discount that
5    you used?
6         A.    Not a general discount, no.  We
7    looked at each individual asset and went
8    through and made an assessment.
9         Q.    Did you apply a discount for
10   your capability versus the capability of a
11   trustee?
12        A.    No.
13        Q.    So a trustee would be as capable
14   as you are in monetizing these assets?
15        MR. MORRIS:  Objection to the
16   form of the question.
17        Q.    Excuse me?  The answer is?
18        A.    The answer is maybe.
19        Q.    Couldn't a trustee hire somebody
20   as capable as you are?
21        MR. MORRIS:  Objection to the
22   form of the question.
23        A.    Perhaps.
24        Q.    Sir, that is a yes or no
25   question.  Could the trustee hire somebody

Page 44

J. SEERY

1
2    as capable as you are?
3         MR. MORRIS:  Objection to the
4    form of the question.
5         A.    I don't know.
6         Q.    Is there anybody as capable as
7    you are?
8         MR. MORRIS:  Objection to the
9    form of the question.
10        A.    Certainly.
11        Q.    And they could be hired.
12   Correct?
13        A.    Perhaps.  I don't know.
14        Q.    And if you go back to the
15   November 2020 liquidation analysis versus
16   plan analysis, it is also the same note
17   about that a trustee would bring less, and
18   there is the same sort of discount between
19   the estimated proceeds under the plan and
20   under the liquidation analysis.
21        MR. MORRIS:  If that is a
22   question, I object.
23        Q.    Is that correct, Mr. Seery,
24   looking at the document?
25        A.    There are discounts, yes.

Page 45

J. SEERY

1
2         Q.    Again, the discounts are applied
3    for timing and capability?
4         A.    Yes.
5         Q.    Now, in looking at the November
6    plan analysis number of $190 million and
7    the January number of $257 million, what
8    accounts for the increase between the two
9    dates?  What assets specifically?
10        A.    There are a number of assets.
11   Firstly, the HCLOF assets are added.
12        Q.    How much are those?
13        A.    Approximately 22 and a half
14   million dollars.
15        Q.    Okay.
16        A.    Secondly, there is a significant
17   increase in the value of certain of the
18   assets over this time period.
19        Q.    Which assets, Mr. Seery?
20        A.    There are a number.  They
21   include MGM stock, they include Trustway,
22   they include Targa.
23        Q.    And what is the percentage
24   increase from November to January,
25   November of 2020 to January of 2021?



**Page 46**

```
 1                    J. SEERY
 2        A.    Do you mean what is the
 3   percentage increase from 190 to 257?
 4        Q.    No.  You just identified three
 5   assets.  MGM stock, we can go look at the
 6   exchange and figure out what the price
 7   increase is; correct?
 8        A.    No.
 9        Q.    Why not?  Is the MGM stock
10   publicly traded?
11        A.    Yes.  It doesn't trade on --
12        Q.    Excuse me?
13        A.    It doesn't trade on an exchange.
14        Q.    Is there a public market for the
15   MGM stock that we could calculate the
16   increase?
17        A.    There is a semipublic market;
18   yes.
19        Q.    So it is a number that is
20   readily available between the two dates?
21        A.    It's available.
22        Q.    Now, you identified Targa and
23   Trustway.  Correct?
24        A.    Yes.
25        Q.    Those are not readily available
```

**Page 47**

```
 1                    J. SEERY
 2   markets; correct?
 3        A.    No.
 4        Q.    Those are operating businesses?
 5        A.    Correct.
 6        Q.    Who provided the valuation for
 7   the November 2020 liquidation analysis?
 8        A.    We use a combination of the
 9   value that we get from Houlihan Lokey for
10   mark purposes and then we adjust it for
11   plan purposes.
12        Q.    And the adjustment was up or
13   down?
14        A.    When?
15        Q.    For both November and January.
16   You got a number from Houlihan Lokey.  You
17   adjusted it.  Did you adjust it up or did
18   you adjust it down?
19             MR. MORRIS:  Objection to form
20        of the question.
21        A.    I believe that for November we
22   adjusted it down, and for January we
23   adjusted it down.  I don't recall off the
24   top of my head but I believe both of them
25   were adjusted down.
```

**Page 48**

```
 1                    J. SEERY
 2        Q.    And if I understand what you
 3   just said, it is that the Houlihan Lokey
 4   valuation for those two businesses showed
 5   a significant increase between November of
 6   2020 and January of 2021?
 7             MR. MORRIS:  Objection to form
 8        of the question.
 9        A.    I didn't say that.
10        Q.    I am trying to account for the
11   increase between the two dates, and you
12   identified three assets.  You identified
13   MGM stock, which has, I can guess, as you
14   have said, a readily ascertainable value.
15   Then you identified two others that the
16   valuation is based upon something Houlihan
17   Lokey provided you.  Correct?
18        A.    I gave you three examples.  I
19   never said "readily."  That is your word,
20   not mine.  And I didn't say that Houlihan
21   had a significant change in their
22   valuation.
23        Q.    So let's now go back to the
24   question.  There is an increase in value
25   from November 24th of 2020 to January 20th
```

**Page 49**

```
 1                    J. SEERY
 2   of 2021, the magnitude being roughly 67
 3   some odd million dollars.  Correct?
 4        A.    Correct.
 5        Q.    We can account for $22 million
 6   of it easily, right?
 7             MR. MORRIS:  Objection to form.
 8        A.    Correct.
 9        Q.    That is the Harbinger
10   settlement, so that leaves roughly
11   $45 million unaccounted for?
12             MR. MORRIS:  Objection to the
13        form of the question if that is a
14        question.  It is accounted for.
15        Q.    What makes up that difference,
16   Mr. Seery?
17        A.    A change in the plan value of
18   the assets.
19        Q.    Okay.  Which assets?  Let's not
20   go back to where we were.
21        A.    There are numerous assets in the
22   plan formulation.  I gave you three
23   examples of the operating businesses.  The
24   securities, I believe, have increased in
25   value since the plan, so those would go up
```

Page 50

```
 1                 J. SEERY
 2   for one.  On the operating businesses, we
 3   looked at each of them and made an
 4   assessment based upon where the market is
 5   and what we believe the values are, and we
 6   have moved those valuations.
 7        Q.   Let me look at some numbers
 8   again.  In the liquidation analysis in
 9   November of 2020, the liquidation value is
10   $149 million.  Correct?
11        A.   Yes.
12        Q.   And in the liquidation analysis
13   in January of 2021, you have $191 million?
14        A.   Yes.
15        Q.   You see that number.  So there
16   is $51 million there, right?
17        A.   No.
18        Q.   What is the difference between
19   191 and -- sorry.  My math may be a little
20   off.  What is the difference between the
21   two numbers, Mr. Seery?
22        A.   Your math is off.
23        Q.   Sorry.  It is 41 million?
24        A.   Correct.
25        Q.   $22 million of that is the
```

Page 51

```
 1                 J. SEERY
 2   HarbourVest settlement, right?
 3        A.   I believe that's correct.
 4        Q.   Is that fair, Mr. Seery?
 5        A.   I believe that is correct, yes.
 6        Q.   And part of that differential
 7   are publicly traded or ascertainable
 8   securities.  Correct?
 9        A.   Yes.
10        Q.   And basically you can get, or
11   under the plan analysis or trustee
12   analysis, if it is a marketable security
13   or where there is a market, the
14   liquidation number should be the same for
15   both.  Is that fair?
16        A.   No.
17        Q.   And why not?
18        A.   We might have a different price
19   target for a particular security than the
20   current trading value.
21        Q.   I understand that, but I mean
22   that is based upon the capability of the
23   person making the decision as to when to
24   sell.  Correct?
25             MR. MORRIS:  Objection to form
```

Page 52

```
 1                 J. SEERY
 2   of the question.
 3        Q.   Mr. Seery, yes or no?
 4        A.   I said no.
 5        Q.   What is that based on, then?
 6        A.   The person's ability to assess
 7   the market and timing.
 8        Q.   Okay.  And again, couldn't a
 9   trustee hire somebody as capable as you to
10   both, A, assess the market and, B, make a
11   determination as to when to sell?
12             MR. MORRIS:  Objection to form
13   of the question.
14        A.   I suppose a trustee could.
15        Q.   And there are better people or
16   people equally or better than you at
17   assessing a market.  Correct?
18        A.   Yes.
19             MR. MORRIS:  Objection to form
20   of the question.
21        Q.   So again, let's go back to
22   that.  We have accounted for, out of
23   $41 million where the liquidation analysis
24   increases between the two dates,
25   $22 million of it.  That leaves
```

Page 53

```
 1                 J. SEERY
 2   $18 million.  How much of that is publicly
 3   traded or ascertainable assets versus
 4   operating businesses?
 5        A.   I don't know off the top of my
 6   head the percentages.
 7        Q.   All right.  The same question
 8   for the plan analysis where you have the
 9   differential between the November number
10   and the January number.  How much of it is
11   marketable securities versus an operating
12   business?
13        A.   I don't recall off the top of my
14   head.
15             MR. DRAPER:  Let me take a
16   few-minute break.  Can we take a
17   ten-minute break here?
18             THE WITNESS:  Sure.
19             (Recess.)
20   BY MR. DRAPER:
21        Q.   Mr. Seery, what I am going to
22   show you and what I would ask you to look
23   at is in the note E, in the statement of
24   assumptions for the November 2020
25   disclosure statement.  It discusses fixed
```

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate.  We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
| | | |
| Less: Claims paid in full | | |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

### Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

## Value of HarbourVest Claim





### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3699-2 Filed 03/28/23 Entered 03/28/23 16:02:23 Desc
Case 3:21-cv-00881-X Document 173 Exhibit Filed Exhibit 10 Page 5/26 of 27 Page 203 of 388 PageID 14590

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20 Entered 12/23/20 22:25:24 Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

## B.    Overview of HarbourVest's Claims

10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.    **Summary of HarbourVest's Factual Allegations**

14.    At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.    Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.    After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.    On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

## D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim"). Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.,* Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.     Settlement Discussions**

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.     Summary of Settlement Terms

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

9

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.      Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement. Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.      Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.      In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39. Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40. Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41. No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the

form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such

other relief as is just and proper.

Dated:  December 23, 2020.         **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

UBS Settlement [Doc. 2200-1]

# Exhibit 1

## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## RECITALS

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS,** the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS,** in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

EXECUTION VERSION

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

EXECUTION VERSION

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

**1.**     **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)     The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

**EXECUTION VERSION**

(b)       Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)       Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

Case 19-34054-sgj11   Doc 3699-2   Filed 03/28/23   Entered 03/28/23 16:02:23   Desc
Case 3:21-cv-00881-X   Document 17-1   Exhibit Filed 03/08/24   Page 221 of 388   PageID 14608

**EXECUTION VERSION**


MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

          (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

<div align="center">6</div>

<div align="right">

**Page A-51**
**HMIT Appx. 00221**
</div>

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.     Definitions.

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.     Releases.

(a)     **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

**EXECUTION VERSION**

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

- .

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

**4.**     **No Third Party Beneficiaries**.     Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

**5.**     **UBS Covenant Not to Sue.**  Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

### 6.   **Agreement Subject to Bankruptcy Court Approval.**

(a)   The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

### 7.   **Representations and Warranties.**

(a)   Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)   Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)   Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

**EXECUTION VERSION**

**8.** **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice**. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

᛭

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
sarah.tomkowiak@lw.com

**11.** **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.** **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.** **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.** **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.** **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

12

ʟɪ

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

     **16.**     **Governing Law; Venue; Attorneys' Fees and Costs.** The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:

Name: _James P. Seery, Jr._

Its: _Authorized Signatory_

HIGHLAND MULTI STRATEGY CREDIT
FUND, L.P. (f/k/a Highland Credit
Opportunities CDO, L.P.)

By:

Name: _James P. Seery, Jr_

Its: _Authorized Signatory_

HIGHLAND CREDIT OPPORTUNITIES CDO,
Ltd.

By:

Name: _James P. Seery, Jr_

Its: _Authorized Signatory_

HIGHLAND CREDIT OPPORTUNITIES CDO
ASSET HOLDINGS, L.P.

By:

Name: _James P. Seery, Jr_

Its: _Authorized Signatory_

STRAND ADVISORS, INC.

By:

Name: _James P. Seery, Jr._

Its: _Authorized Signatory_

17

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____
Name: John Lantz
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____
Name: William Chandler
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

15

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

## Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**


SFChronicle/SFGate/Liz Hafalia


Robert Holmgren


no caption

https://hf.com/warren-hellman/

1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

## Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)      INFO@HF.COM (MAILTO:INFO@HF.COM)      LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)      BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)      TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
                                                                                    (HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-
                                                                                    &-
                                                                                    FRIEDMAN)
©2021 HELLMAN & FRIEDMAN LLC

CORNER OFFICE



Julie Segal

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

**Farallon was a Significant Borrower for Lehman**

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |



**Transaction Overview**

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

**Lehman Brothers Role**

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

◆ Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

**Sponsorship Overview**

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**                                    32

## Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BLOCKBUSTER INC., *et al.*, | : | Case No. 10-14997 (BRL) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------- X

### THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!



**Joseph H. Nesler** (He/Him)
General Counsel

More | Message

# Joseph H. Nesler (He/Him) ·

Yale Law School

3rd

General Counsel

Winnetka, Illinois, United States ·

Contact info

500+ connections

Message | More

**Open to work**
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations. ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/

Case 19-34054-sgj11    Doc 3699-2    Filed 03/28/23    Entered 03/28/23 16:02:23    Desc
Case 3:21-cv-00881-X    Document 173-1  Filed 03/23  Page 239 of 388    PageID 14626
Exhibit Exhibit Filed Page 5/23 of 27 e



Joseph H. Nesler (He/Him)
General Counsel

More    🔒 Message

Experience

**General Counsel**
Dalpha Capital Management, LLC
Aug 2020 – Jul 2021 · 1 yr

**Of Counsel**
Winston & Strawn LLP
Sep 2018 – Jul 2020 · 1 yr 11 mos
Greater Chicago Area

**Principal**
The Law Offices of Joseph H. Nesler, LLC
Feb 2016 – Aug 2018 · 2 yrs 7 mos

**Grosvenor Capital Management, L.P.**
11 yrs 9 mos

**Independent Consultant to Grosvenor Capital Management, L.P.**
May 2015 – Dec 2015 · 8 mos
Chicago, Illinois

**General Counsel**
Apr 2004 – Apr 2015 · 11 yrs 1 mo
Chicago, Illinois
Managing Director, General Counsel and Chief Compliance Officer (April 2004 – April 2015)

<u>Investor Communication to Highland Crusader Funds Stakeholders</u>



**Alvarez & Marsal
Management, LLC** 2029 Cer
Park East Suite 206C
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

 As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

 A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

 On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

 The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

 A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director



**Alvarez & Marsal CRF**
**Management, LLC** 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

EXHIBIT
C

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million.  Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021.  Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____
      Steven Varner
      Managing Director

**On investor letterhead, please use the template below to provide Alvarez & Marsal CRF Management, LLC and SEI your updated wire information.**

| Information Needed | Wire Information Input |
|---|---|
| Investor name (as it reads on monthly statements)<br><br>Fund(s) Invested<br><br>Contact Information (Phone No. and Email)<br><br>Updated Wire Information<br>• Beneficiary Bank<br>• Bank Address<br>• Beneficiary (Account) Name<br>• ABA/Routing #<br>• Account #<br>• SWIFT Code<br><br>International Wires<br>• Correspondent Bank<br>• ABA/Routing #<br>• SWIFT Code | |

Signed By: _____     Date: _____

# Exhibit 3

HMIT Appx. 00245

CAUSE NO. DC-23-01004

| IN RE: | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| HUNTER MOUNTAIN | § | |
| INVESTMENT TRUST | § | 191ST JUDICIAL DISTRICT |
| | § | |
| *Petitioner,* | § | |
| | § | DALLAS COUNTY, TEXAS |

<u>DECLARATION OF JAMES DONDERO</u>

STATE OF TEXAS          §
                                    §
COUNTY OF DALLAS    §

The undersigned provides this Declaration pursuant to Texas Civil Practice &

Remedies Code § 132.001 and declares as follows:

1. My name is James Dondero. I am over twenty-one (21) years of age. I am of sound mind and body, and I am competent to make this declaration. The facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I previously served as the Chief Executive Officer ("CEO") of Highland Capital Management, L.P. ("HCM"). Jim Seery succeeded me in this capacity following the entry of various orders in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. My purpose was to alert Mr. Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades. A true and correct copy of this email is attached hereto as Exhibit "1".

4. In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. They also stated they were particularly optimistic because of the expected sale of MGM.

5. During one of these calls involving Mr. Linn, I asked whether they would sell the claims for 30% more than they had paid. Mr. Linn said no because Mr. Seery said they were worth a lot more. I asked Mr. Linn if he would sell at any price and he said that he was unwilling to do so. I believe these conversations with Farallon were taped by Farallon.

6. My name is James Dondero, my date of birth is June 29, 1962, and my address is 3807 Miramar Ave., Dallas, Texas 75205, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the 15th day of February 2023.

_____

JAMES DONDERO

# Exhibit 1

HMIT Appx. 00249

**From:** Jim Dondero <JDondero@highlandcapital.com>
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin" <JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>
**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>
**Subject:** Trading restriction re MGM - material non public information
**Date:** Thu, 17 Dec 2020 14:14:39 -0600
**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.
Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

Sent from my iPhone

# Exhibit 4

HMIT Appx. 00251

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## <u>DECLARATION OF SAWNIE A. MCENTIRE</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to 28 U.S.C. 1746 and declares

as follows:

1. My name is Sawnie A. McEntire. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I am a licensed attorney in good standing with the State Bar of Texas. I am a Director and Shareholder at the firm Parsons McEntire McCleary PLLC. I serve as lead counsel for Hunter Mountain Investment Trust ("HMIT") in these proceedings in regard to the motion described in Paragraph 3 below. I also served as lead counsel for HMIT in Rule 202 Proceedings filed in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004 ("Rule 202 Proceedings").

3. I submit this declaration in support of HMIT's Emergency Motion for Leave to File Adversary Proceeding ("Emergency Motion") to which this Declaration is attached.

1

4. On January 20, 2023, HMIT filed its Verified Rule 202 Petition in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004. **A true and correct copy of HMIT's Verified Rule 202 Petition, with accompanying exhibits, is attached to this declaration as Exhibit 4-A.**

5. HMIT served notice of the Rule 202 Petition and hearing on Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings LLC ("Muck"), and Jessup Holdings LLC ("Jessup") in February 2023. Farallon and Stonehill entered an appearance, responded to the proceedings, and were represented by David Shulte of the law firm of Holland & Knight. Among other things, the Rule 202 Petition sought discovery related to Farallon and Stonehill's due diligence, if any, concerning the sale and transfer of four allowed bankruptcy claims in the above-referenced bankruptcy proceedings from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021.[1]

6. On February 22, 2023, HMIT's Verified Rule 202 Petition was heard by the Honorable Gena Slaughter of the 191st District Court of Dallas County, Texas. **A true and correct copy of the Hearing Transcript of the Rule 202 Proceedings on February 22, 2023, is attached to this declaration as Exhibit 4-B** ("Transcript'). At this hearing, I argued on behalf of HMIT and Mr. Shulte argued on behalf of Farallon and Stonehill. During this hearing, Farallon and Stonehill admitted they acquired the Claims through their respective "special purpose entities," as reflected in the Transcript. Farallon resisted the requested discovery in the state district court.

7. A true and correct copy of a certified copy of Muck's formation papers in the State of Delaware, showing Muck was created on March 9, 2021, is attached to this Declaration as **Exhibit 4-D**. A true and correct copy of a certified copy of Jessup's formation papers in Delaware, showing Jessup was created on April 8, 2021, is attached to this Declaration as **Exhibit 4-E**. Muck and Jessup's corporate formation documents do not identify their respective members or managing members. *See* Exhibit 4-D and 4-E.

8. On March 8, 2023, the state district court denied and dismissed HMIT's Verified Rule 202 Petition. This ruling was necessarily without prejudice. A true and correct copy of the related Order, dated March 8, 2023, is attached to this declaration as **Exhibit 4-C**.

---

[1] *See* Notices of Transfers [Docs. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

9. On March 9, 2023, my law partner, Roger McCleary sent correspondence to Mr. Schulte, as Farallon and Stonehill's counsel, requesting disclosure of the details of their respective legal relationships to Muck and Jessup. Farallon and Stonehill never responded to this inquiry. A true and correct copy of this email correspondence, dated March 9, 2023, is attached to this declaration as **Exhibit 4-F**.

10. I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 27, 2023.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the ___27th___ day of March 2023.

Sawnie A. McEntire

HMIT Appx. 00254

# Exhibit 4-A

HMIT Appx. 00255

FILED
1/20/2023 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

DC-23-01004

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | 191st |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**
**VERIFIED RULE 202 PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, Hunter Mountain Investment Trust ("HMIT"), files this Verified
Petition ("Petition") pursuant to Rule 202 of the Texas Rules of Civil Procedure, seeking
pre-suit discovery from Respondent Farallon Capital Management, LLC ("Farallon") and
Respondent Stonehill Capital Management, LLC ("Stonehill") (collectively
"Respondents"), to allow HMIT to investigate potential claims against Respondents and
other potentially adverse entities, and would respectfully show:

**PARTIES**

1.      HMIT is a Delaware statutory trust that was the largest equity holder in
Highland Capital Management, L.P. ("HCM"), holding a 99.5% limited partnership
interest. HCM filed chapter 11 bankruptcy proceedings in 2019 and, as a result of these

**HMIT Appx. 00256**

proceedings,[1] HMIT held a Class 10 claim which, post-confirmation, was converted to a Contingent Trust Interest in HCM's post-reorganization sole limited partner.

2.      Farallon is a Delaware limited liability company with its principal office in California, which is located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

3.      Stonehill is a Delaware limited liability company with its principal office in New York, which is located at 320 Park Avenue, 26th Floor, New York, NY 10022.

## VENUE AND JURISDICTION

4.      Venue is proper in Dallas County, Texas, because all or substantially all of the events or omissions giving rise to HMIT's potential common law claims occurred in Dallas County, Texas. In the event HMIT elects to proceed with a lawsuit against Farallon and Stonehill, venue of such proceedings will be proper in Dallas County, Texas.

5.      This Court has jurisdiction over the subject matter of this Petition pursuant to Texas Rule of Civil Procedure 202.[2] The amount in controversy of any potential claims against Farallon or Stonehill far exceeds this Court's minimum jurisdictional requirements. Without limitation, HMIT specifically seeks to investigate potentially actionable claims for unjust enrichment, imposition of a constructive trust with

---

[1] These proceedings were initially filed in Delaware but were ultimately transferred to and with venue in the U.S. Bankruptcy Court for the Northern District of Texas.
[2] The discovery relief requested in this Petition does not implicate the HCM bankruptcy court's jurisdiction. Furthermore, this Rule 202 Petition is not subject to removal because there is no amount in actual controversy and there is no cause of action currently asserted.

HMIT Appx. 00257

disgorgement, knowing participation in breaches of fiduciary duty, and tortious interference with business expectancies.

6.     This Court has personal jurisdiction over the Respondents from which discovery is sought because both Farallon and Stonehill are doing business in Texas under Texas law including, without limitation, Tex. Civ. Prac. & Rem. Code §17.042. Consistent with due process, Respondents have established minimum contacts with Texas, and the assertion of personal jurisdiction over Respondents complies with traditional notions of fair play and substantial justice. HMIT's potential claims against Respondents arise from and/or relate to Farallon's and Stonehill's contacts in Texas. Respondents also purposefully availed themselves of the privilege of conducting business activities within Texas, thus invoking the benefits and protections of Texas law.

**SUMMARY**

7.     HMIT seeks to investigate potential claims relating to the sale and transfer of large, unsecured creditors' claims in HCM's bankruptcy to special purpose entities affiliated with and/or controlled by Farallon and Stonehill (the "Claims"). Upon information and belief, Farallon and Stonehill historically had and benefited from close relationships with James Seery ("Seery"), who was serving as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") at the time of the Claims purchases. Furthermore, still upon information and belief, because Farallon and Stonehill acquired or controlled the acquisition of the Claims under highly questionable

HMIT Appx. 00258

circumstances. HMIT seeks to investigate whether Respondents received material non-public information and were involved in insider trading in connection with the acquisition of the Claims.

8.      The pre-suit discovery which HMIT seeks is directly relevant to potential claims, and it is clearly appropriate under Rule 202.1(b). HMIT anticipates the institution of a future lawsuit in which it may be a party due to its status as a stakeholder as former equity in HCM or in its current capacity as a Contingent Trust Interest holder, as well as under applicable statutory and common law principles relating to the rights of trust beneficiaries. In this context, HMIT may seek damages on behalf of itself or, alternatively, in a derivative capacity and without limitation, for damages or disgorgement of monies for the benefit of the bankruptcy estate.

9.      HMIT currently anticipates a potential lawsuit against Farallon and Stonehill as defendants and, as such, Farallon and Stonehill have adverse interests to HMIT in connection with the anticipated lawsuit. The addresses and telephone numbers are as follows: **Farallon Capital Management LLC**, One Maritime Plaza, Suite 2100, San Francisco, CA 94111, Telephone: 415-421-2132; **Stonehill Capital Management**, LLC, 320 Park Avenue, 26th Floor, New York, NY 10022, 212-739-7474 . Additionally, the following parties also may be parties with adverse interests in any potential lawsuit: **Muck Holdings LLC**, c/o Crowell & Moring LLP, Attn: Paul B. Haskel, 590 Madison Avenue, New York, NY 10022, 212-530-1823; **Jessup Holdings LLC**, c/o Mandel, Katz and Brosnan

LLP, Attn: John J. Mandler, 100 Dutch Hill Road, Suite 390, Orangeburg, NY 10962, 845-6339-7800.

## BACKGROUND[3]

### A.    *Procedural Background*

10.    On or about October 16, 2019, HCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.

11.    On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM in the hundreds of millions of dollars; Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS") - and an unpaid vendor, Meta-E Discovery.

12.    Following the venue transfer to Texas on December 27, 2019, HCM filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary*

---

[3] All footnote references to evidence involve documents filed in the HCM bankruptcy proceedings and are cited by "Dkt." reference. HMIT asks the Court to take judicial notice of the documents identified by these docket entries.

HMIT Appx. 00260

*Course* ("HCM's Governance Motion").[4] On January 9, 2020, the Court signed an order

approving HCM's Settlement Motion (the "Governance Order").[5]

13.     As part of the Governance Order, an independent board of directors—

which included Seery as one of the UCC's selections—was appointed to the Board of

Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors") HCM's general

partner. Following the approval of the Governance Order, the Board then appointed

Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer

("CRO") in place of the previous CEO.[6]  Seery currently serves as Trustee of the Claimant

Trust (HCM's sole post-reorganization limited partner) and, upon information and belief,

continues to serve as CEO of HCM following the effective date of the HCM bankruptcy

reorganization plan ("Plan").[7]

**B.     *Seery's Relationships with Stonehill and Farallon***

14.     Farallon and Stonehill are two capital management firms (similar to HCM)

that, upon information belief, have long-standing relationships with Seery. Upon

information and belief, they eventually participated in, directed and/or controlled the

acquisition of hundreds of millions of dollars of unsecured Claims in HCM's bankruptcy

on behalf of funds which they manage. It appears they did so without any meaningful

---

[4] Dkt. 281.
[5] Dkt. 339.
[6] Dkt. 854, Order Approving Retention of Seery as CEO/CRO.
[7] *See* Dkt. 1943, Order Approving Plan, p. 34.

HMIT Appx. 00261

due diligence, much less reasonable due diligence, and *ostensibly* based their investment decisions only on Seery's input.

15.    Upon information and belief, Seery historically has had a substantial business relationship with Farallon and he previously served as legal counsel to Farallon in other matters. Upon information and belief, Seery also has had a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee[8] (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

## C.    *Claims Trading*

16.    Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of settlements with Redeemer, Acis, UBS, and another major creditor, HarbourVest[9] (the "Settlements") (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed claims:[10]

---

[8] Declaration of John A. Morris [Dkt. 1090], Ex. 1, pp. 15.
[9] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.
[10] Orders Approving Settlements [Dkt. 1273, Dkt. 1302, Dkt. 1788, Dkt. 2389].

HMIT Appx. 00262

| Creditor | Class 8 | Class 9 |
|----------|---------|---------|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |

17.     Although these Settlements were achieved after years of hard-fought litigation,[11] each of the Settling Parties *curiously* sold their claims to Farallon or Stonehill (or affiliated special purpose entities) shortly after they obtained court approval of their Settlements. One of these "trades" occurred within just a few weeks before the Plan's Effective Date.[12] Upon information and belief, Farallon and Stonehill coordinated and controlled the purchase of these Claims through special purpose entities, Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup") (collectively "SPEs").[13] Upon information and belief, both of these SPEs were created on the eve of the Claims purchases for the ostensible purpose of taking and holding title to the Claims.

18.     Upon information and belief, Farallon and Stonehill directed and controlled the investment of over $160 million dollars to acquire the Claims in the absence of any publicly available information that could rationally justify this substantial investment. These "trades" are even more surprising because, at the time of the confirmation of HCM's Plan, the Plan provided only pessimistic estimates that these Claims would ever receive full satisfaction:

---

[11] Order Confirming Plan, pp. 9-11.
[12] Dkt. 2697, 2698.
[13] *See* Notice of Removal [Dkt 2696], ¶ 4.

HMIT Appx. 00263

a. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[14]

i. This meant that Farallon and Stonehill invested more than $163 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

b. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from *71% to 54%* (down approximately $328.3 million);[15]

c. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million;[16]

d. Despite the stark decline in the valuation of the HCM bankruptcy estate and reduction in percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021[17] in the combined amount of approximately $163 million; and

e. Upon information and belief:

i. Stonehill, through an SPE, Jessup, acquired the Redeemer Committee's claim for approximately $78 million;[18]

---

[14] Dkt. 1875-1, Plan Supplement, Exh. A, p. 4.

[15] Dkt. 2949.

[16] Dkt 1473, Disclosure Statement, p. 18.

[17] Notices of Transfers [Dkt. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

[18] July 6, 2021 Letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

HMIT Appx. 00264

ii. The $23 million Acis claim[19] was sold to Farallon/Muck for approximately $8 million;

iii. HarbourVest sold its combined approximately $80 million in claims to Farallon/Muck for approximately $27 million; and

iv. UBS sold its combined approximately $125 million in claims for approximately $50 million to both Stonehill/Jessup and Farallon/Muck *at a time when the total projected payout was only approximately $35 million*.

19.     In Q3 2021, just over $6 million of the projected $205 million available to satisfy general unsecured claims was disbursed.[20] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[21] According to HCM's Motion for Exit Financing,[22] and a recent motion filed by Dugaboy Investment Trust,[23] there remain **substantial** assets to be monetized for the benefit of HCM's creditors. Thus, upon information and belief, the funds managed by Stonehill and Farallon stand to realize significant profits on their Claims purchases. In turn, upon information and belief, Stonehill and Farallon will garner (or already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the purchase of the Claims.

---

[19] Seery/HCM have argued that $10 million of the Acis claim is self-funding. Dkt. 1271, Transcript of Hearing on Motions to Compromise Controversy with Acis Capital Management [1087] and the Redeemer Committee of the Highland Crusader Fund [1089], p. 197.

[20] Dkt. 3200.

[21] Dkt. 3582.

[22] Dkt. 2229.

[23] Dkt. 3382.

HMIT Appx. 00265

### D.   *Material Information is Not Disclosed*

20.    Bankruptcy Rule 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." No public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks."[24]

21.    As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction.[25] Approximately 19.1% of HCLOF's assets were comprised of debt and equity in Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). The HCLOF interest was not to be transferred to HCM for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[26]

22.    Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, upon information and belief, it appears that Seery may have acquired material non-public information regarding Amazon's now-consummated interest in acquiring MGM,[27] yet there is no record of Seery's disclosure of such

---

[24] Dkt. 1905, February 3, 2021 Hearing Transcript, 49:5-21.
[25] Dkt. 1625, p. 9, n. 5.
[26] Dkt. 1625.
[27] Dkt. 150-1.

HMIT Appx. 00266

information to the Court, HCM's creditors, or otherwise. Upon the receipt of this material non-public information, HMIT understands, upon information and belief, that MGM was supposed to be placed on HCM's "restricted list," but Seery nonetheless continued to move forward with deals that involved MGM assets.[28]

23.     As HCM additionally held its own direct interest in MGM,[29] the value of MGM was of paramount importance to the value of HCM's bankruptcy estate. HMIT believes, upon information and belief, that Seery conveyed material non-public information regarding MGM to Stonehill and Farallon as inducement to purchase the Claims.

**E.     *Seery's Compensation***

24.     Upon information and belief, a component of Seery's compensation is a "success fee" that depends on the actual liquidation of HCM's bankruptcy estate assets versus the Plan projections. As current holders of the largest claims against the HCM estate, Muck and Jessup, the SPEs apparently created and controlled by Stonehill and Farallon, were installed as two of the three members of an Oversight Board in charge of monitoring the activities of HCM, as the Reorganized Debtor, and the Claimant Trust.[30] Thus, along with a single independent restructuring professional, Farallon and

---

[28] *See* Dkt. 1625, Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, filed December 23, 2020
[29] Motion for Exit Financing.[Dkt.2229]
[30] Dkt. 2801.

HMIT Appx. 00267

Stonehill's affiliates oversee Seery's go-forward compensation, including any "success" fee.[31]

## DISCOVERY REQUESTED

25.     HMIT seeks to investigate whether Farallon and Stonehill received material non-public information in connection with, and as inducement for, the negotiation and sale of the claims to Farallon and Stonehill or its affiliated SPEs. Discovery is necessary to confirm or deny these allegations and expose potential abuses and unjust enrichment.

26.     The requested discovery from Farallon is attached as Exhibit "A", and includes the deposition of one or more of its corporate representatives and the production of documents. The requested discovery from Stonehill is attached as Exhibit "B", and includes the deposition of Stonehill's corporate representative(s) and the production of documents.

27.     Pursuant to Rule 202.2(g), the requested discovery will include matters that will allow HMIT to evaluate and determine, among other things:

    a.   The substance and types of information upon which Stonehill and Farallon relied in making their respective decisions to invest in or acquire the Claims;

    b.   Whether Farallon and Stonehill conducted due diligence, and the substance of any due diligence when evaluating the Claims;

---

[31] Claimant Trust Agreement [Dkt. 1656-2].

c.  The extent to which Farallon and Stonehill controlled the SPEs, Muck and Jessup, in connection with the acquisition of the Claims;

d.  The creation and organizational structure of Farallon, Stonehill, Muck, and Jessup, as well as the purpose of creating Muck and Jessup as SPEs to hold the Claims;

e.  Any internal valuations of Muck or Jessup's net asset value (NAV);

f.  Any external valuation or audits of the NAV attributable to the Claims;

g.  Any documents reflecting expected profits from the purchase of the Claims;

h.  All communications between Farallon and Seery concerning the value and purchase of the Claims;

i.  All communications between Stonehill and Seery concerning the value and purchase of the Claims;

j.  All documents reflecting the expected payout on the Claims;

k.  All communications between Farallon or Stonehill and HarbourVest concerning the purchase of the Claims;

l.  All communications between Farallon or Stonehill and Acis regarding the purchase of the Claims;

m. All communications between Farallon or Stonehill and UBS regarding the purchase of the Claims;

n.  All communications between Farallon or Stonehill and The Redeemer Committee regarding the purchase of the Claims;

o.  All communications between Farallon and Stonehill regarding the purchase of the Claims;

HMIT Appx. 00269

p.  All communications between Farallon and Stonehill and investors in their respective funds regarding purchase of the Claims or valuation of the Claims;

q.  All communications between Seery and Stonehill or Farallon regarding Seery's compensation as the Trustee of the Claimant Trust;

r.  All documents relating to, regarding, or reflecting any agreements between Seery and the Oversight Committee regarding compensation;

s.  All documents reflecting the base fees and performance fees which Stonehill has received or may receive in connection with management of the Claims;

t.  All documents reflecting the base fees and performance fees which Farallon has received or may receive in connection with management of the Claims;

u.  All monies received by and distributed by Muck in connection with the Claims;

v.  All monies received by and distributed by Jessup in connection with the Claims;

w.  All documents reflecting whether Farallon is a co-investor in any fund which holds an interest in Muck; and

x.  All documents reflecting whether Stonehill is a co-investor in any fund which holds an interest in Jessup.

## BENEFIT OUTWEIGHS THE BURDEN

28.    The beneficial value of the requested discovery greatly outweighs any

conceivable burden that could be placed on the Respondents. The requested information

HMIT Appx. 00270

also should be readily available because the Respondents have been engaged in the bankruptcy proceedings relating to the matters at issue for several years.

29.     The important benefit associated with this requested discovery is also clear – it is reasonably calculated to determine whether the Respondents have unjustly garnered tens of millions of dollars of benefit based upon insider information. If this occurred, the monies received as a result of such conduct are properly subject to a constructive trust and disgorged. This would result in substantial funds available for other creditors, including those creditors in Class 10, which includes HMIT as a beneficiary. This significant benefit, in addition to the value of bringing proper light to the activities of Farallon and Stonehill as discussed in this petition, far outweighs any purported burden associated with requiring Respondents to sit for focused depositions concerning the topics and documents identified in Exhibits A and B.

## REQUEST FOR HEARING AND ORDER

30.     After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on this Petition.

## PRAYER FOR RELIEF

31.     Petitioner Hunter Mountain Investment Trust respectfully requests that the Court issue an order pursuant to Texas Rule of Civil Procedure 202 authorizing HMIT to take a deposition of designated representatives of Farallon Capital Management, LLC and Stonehill Capital Management, LLC. HMIT additionally requests authorization to

**HMIT Appx. 00271**

issue subpoenas duces tecum compelling the production of documents in connection

with the depositions in compliance with Tex. R. Civ. P. 205, and asks that the Court grant

HMIT all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY
PLLC**

By:  _/s/ Sawnie A. McEntire_
Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter
Mountain Investment Trust*

## VERIFICATION

STATE OF TEXAS     §
          §
COUNTY OF DALLAS   §

Before me, the undersigned notary, on this day personally appeared Mark Patrick, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

> "My name is Mark Patrick. I am the Administrator of Hunter Mountain Investment Trust, and I am authorized and capable of making this verification. I have read Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition ("Petition"). The facts as stated in the Petition are true and correct based on my personal knowledge and review of relevant documents in the proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054, in the United States Bankruptcy Court in the Northern District of Texas, Dallas Division ."

         _____

         Mark Patrick

Sworn to and subscribed before me by Mark Patrick on January 20, 2023.

         _____
         Notary Public in and for
         the State of Texas



DEBORAH COLE
Notary ID #134079165
My Commission Expires
November 23, 2026

3116424.1

18

**HMIT Appx. 00273**

EXHIBIT "A"

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

<u>NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC</u>

TO:   Farallon Capital Management, LLC, by and through its attorney of record
_____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205,
Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral
examination under oath of Farallon Capital Management, LLC ("Farallon") on
_____, **2023 at _____ _.m.** before a notary public or other person authorized to
administer a proper oath and will be recorded by stenographic means. The deposition
will take place at _____ before a court reporter and videographer and will
continue from day to day until completed. The deposition may also be recorded by non-
stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Farallon is
requested to designate one or more person(s) most knowledgeable and prepared to testify
on behalf of Farallon concerning the topics identified on Exhibit "1", and to produce the
documents described in Exhibit "2", attached hereto.

**HMIT Appx. 00274**

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain*
*Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on January ___, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

2

EXHIBIT "A"
TO NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

## RULES OF CONSTRUCTION

1.  The terms "all" and "each" shall be construed as all and each.

2.  The terms "all" and "any" shall be construed as all and any.

3.  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.  The use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI*. The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate*. The term "Estate" means HCM's bankruptcy estate.

*Farallon*, *you*, and *your*. The terms "Farallon," "you," and "your" shall mean Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill*. The term "Stonehill" refers to Stonehill Capital Management, LLC.

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

HMIT Appx. 00278

*UBS.* The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

HMIT Appx. 00279

**EXHIBIT "1"**

**TOPIC CATEGORIES**

The witness(es) designated by Farallon to testify on its behalf  is (are) requested to testify concerning the following Topic Categories:

a.  The substance, types, and sources of information Farallon considered in making any decision to invest in any of the Claims on behalf of itself, Muck, and/or any fund with which Farallon is connected;

b.  Whether Farallon conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c.  Any and all communications with James Dondero;

d.  The extent to which Farallon was involved in creating and organizing Muck in connection with the acquisition of any of the Claims;

e.  The organizational structure of Muck (including identification of all members, managing members), as well as the purpose for creating Muck, including, but not limited to, regarding holding title to any of the Claims;

f.  Any internal valuations of Muck's Net Asset Value (NAV), as well as all assets owned by Muck;

g.  Any external valuation or audits of the NAV attributable to any of the Claims;

h.  Any documents reflecting profit forecasts relating to any of the Claims;

i.  All communications between Farallon and Seery relating to  any of the Claims;

HMIT Appx. 00280

j.  All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.  All communications between Farallon and any of the Settling Parties concerning any of the Claims;

l.  Any negotiations between Farallon and any of the Settling Parties concerning any of the Claims;

m.  All communications between Farallon and Stonehill regarding any of the Claims;

n.  All communications between Farallon and any investors in any fund managed by Farallon regarding any of the Claims or valuation of the Claims;

o.  All communications between Seery and Farallon regarding Seery's compensation as Trustee of the Claimant Trust;

p.  All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.  All base fees and performance fees which Farallon has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.  All monies received by Muck in connection with any of the Claims and any distributions made by Muck to any members of Muck relating to such Claims;

s.  Whether Farallon is a co-investor in any fund which holds an interest in Muck or otherwise holds a direct interest in Muck and all documents reflecting the same;

t.  All communications between Farallon and any of the following entities concerning any of the Claims:

       i.  UCC;

HMIT Appx. 00281

    ii.    Highland;

    iii.    Grosvenor;

    iv.    Muck;

    v.    the Oversight Board.

u. The sources of funds used by Muck for the acquisition of any of the Claims;

v. The terms and conditions of any agreements governing the transfers of any of the Claims to Muck;

w. Representations made by Farallon, Muck, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x. Farallon's valuation or evaluation of HCM's Estate;

y. Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z. The appointment of Muck to the Oversight Board;

aa. Farallon's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Muck.

HMIT Appx. 00282

## EXHIBIT "2"

## DOCUMENT REQUESTS

1. Any and all documents created by, prepared for, or received by Farallon concerning any of the following topics:

    a.  the transfer of the Claims;

    b.  negotiation and/or consummation of any agreement regarding the transfer of the Claims;

    c.  valuation of the Claims or the assets underlying the Claims;

    d.  promises and representations made in connection with the transfer of the Claims;

    e.  any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

    f.  consideration for the transfer of the Claims;

    g.  the value of HCM's Estate;

    h.  the projected future value of HCM's Estate;

    i.  past distributions and projected distributions from HCM's Estate;

    j.  compensation earned by or paid to Seery in connection with or relating to the Claims;

    k.  compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l.  any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Farallon, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Stonehill, (vi) Grosvenor or, (vii) the Oversight Board, concerning any of the following topics:

    a.  the transfer of the Claims;

    b.  negotiation and/or consummation of any agreement regarding the transfer of the Claims;

    c.  valuation of the Claims or the assets underlying the Claims;

HMIT Appx. 00283

     d.  promises and representations made in connection with the transfer of the Claims;

     e.  any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

     f.  consideration for the transfer of the Claims;

     g.  the value of HCM's Estate;

     h.  the projected future value of HCM's Estate;

     i.  past distributions and projected distributions from HCM's Estate;

     j.  compensation earned by or paid to Seery in connection with or relating to the Claims;

     k.  compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

     l.  any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3. All correspondence and/or other documents by or between Farallon and/or Muck and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4. Any and all documents reflecting the sources of funding used by Muck to acquire any of the Claims.

5. Organizational and formation documents relating to Muck including, but not limited to, Muck's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6. Company resolutions prepared by or on behalf of Muck approving the acquisition of any of the Claims.

7. Any and all documents reflecting any internal or external audits regarding Muck's NAV.

8. Agreements between Farallon and Muck regarding management, advisory, or other services provided to Muck by Farallon.

9. Any and all documents reviewed by Farallon as part of its evaluation and due diligence regarding any of the Claims.

10. Any documents reflecting any communications with James Dondero;

11. Annual fund audits relating to Muck.

12. Muck's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Farallon in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

**HMIT Appx. 00285**

EXHIBIT "B"

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

<u>**NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC**</u>

TO:    Stonehill Capital Management, LLC, by and through its attorney of record
_____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205,

Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral

examination under oath of Stonehill Capital Management, LLC ("Stonehill") on

_____, **2023 at _____ _.m.** before a notary public or other person authorized to

administer a proper oath and will be recorded by stenographic means. The deposition

will take place at _____ before a court reporter and videographer and will

continue from day to day until completed. The deposition may also be recorded by non-

stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Stonehill is

requested to designate one or more person(s) most knowledgeable and prepared to testify

on behalf of Stonehill concerning the topics identified on Exhibit "1", and to produce the

documents described in Exhibit "2", attached hereto.

**HMIT Appx. 00286**

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain
Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on January \_\_\_, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

**HMIT Appx. 00287**

EXHIBIT "A"
## TO NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

## RULES OF CONSTRUCTION

1. The terms "all" and "each" shall be construed as all and each.

2. The terms "all" and "any" shall be construed as all and any.

3. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4. The use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI*. *The terms "Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate*. The term "Estate" means HCM's bankruptcy estate.

*Farallon.* The term "Farallon," refers to Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees, representatives, attorneys, predecessors, successors,

assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill," "you," and "your."* The terms "Stonehill", "you," and "your" shall mean Stonehill Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to Jessup Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

**HMIT Appx. 00290**

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Stonehill is a general partner or owns an entities' general partner, or anyone else acting on Stonehill's behalf, now or at any time relevant to the response .

*Strand.* The term "Strand" refers to Strand Advisors, Inc.

*UBS.* The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

6

**EXHIBIT "1"**

**TOPIC CATEGORIES**

The witness(es) designated by Stonehill to testify on its behalf is (are) requested to
testify concerning the following Topic Categories:

a.  The substance, types, and sources of information Stonehill
    considered in making any decision to invest in any of the Claims
    on behalf of itself, Jessup, and/or any fund with which Stonehill
    is connected;

b.  Whether Stonehill conducted due diligence, and the substance
    and identification of any due diligence (including associated
    documents), when evaluating any of the Claims;

c.  Any and all communications with James Dondero;

d.  The extent to which Stonehill was involved in creating and
    organizing Jessup in connection with the acquisition of any of the
    Claims;

e.  The organizational structure of Jessup (including identification
    of all members, managing members), as well as the purpose for
    creating Jessup, including, but not limited to, regarding holding
    title to any of the Claims;

f.  Any internal valuations of Jessup's Net Asset Value (NAV), as
    well as all assets owned by Jessup;

g.  Any external valuation or audits of the NAV attributable to any
    of the Claims;

h.  Any documents reflecting profit forecasts relating to any of the
    Claims;

i.  All communications between Stonehill and Seery relating to  any
    of the Claims;

**HMIT Appx. 00292**

j.   All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.   All communications between Stonehill and any of the Settling Parties concerning any of the Claims;

l.   Any negotiations between Stonehill and any of the Settling Parties concerning any of the Claims;

m.   All communications between Stonehill and Farallon regarding any of the Claims;

n.   All communications between Stonehill and any investors in any fund managed by Stonehill regarding any of the Claims or valuation of the Claims;

o.   All communications between Seery and Stonehill regarding Seery's compensation as Trustee of the Claimant Trust;

p.   All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.   All base fees and performance fees which Stonehill has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.   All monies received by Jessup in connection with any of the Claims and any distributions made by Jessup to any members of Jessup relating to such Claims;

s.   Whether Stonehill is a co-investor in any fund which holds an interest in Jessup or otherwise holds a direct interest in Jessup and all documents reflecting the same;

t.   All communications between Stonehill and any of the following entities concerning any of the Claims:

   i.   UCC;

**HMIT Appx. 00293**

    ii.    Highland;

    iii.    Grosvenor;

    iv.    Jessup;

    v.    the Oversight Board.

u. The sources of funds used by Jessup for the acquisition of any of the Claims;

v. The terms and conditions of any agreements governing the transfers of any of the Claims to Jessup;

w. Representations made by Stonehill, Jessup, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x. Stonehill's valuation or evaluation of HCM's Estate;

y. Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z. The appointment of Jessup to the Oversight Board;

aa. Stonehill's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Jessup.

HMIT Appx. 00294

## EXHIBIT "2"

## DOCUMENT REQUESTS

1. Any and all documents created by, prepared for, or received by Stonehill concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

   d. promises and representations made in connection with the transfer of the Claims;

   e. any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

   f. consideration for the transfer of the Claims;

   g. the value of HCM's Estate;

   h. the projected future value of HCM's Estate;

   i. past distributions and projected distributions from HCM's Estate;

   j. compensation earned by or paid to Seery in connection with or relating to the Claims;

   k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

   l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Stonehill, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Farallon, (vi) Grosvenor, or, (vii) the Oversight Board, concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

    d. promises and representations made in connection with the transfer of the Claims;

    e. any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

    f. consideration for the transfer of the Claims;

    g. the value of HCM's Estate;

    h. the projected future value of HCM's Estate;

    i. past distributions and projected distributions from HCM's Estate;

    j. compensation earned by or paid to Seery in connection with or relating to the Claims;

    k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3. All correspondence and/or other documents by or between Stonehill and/or Jessup and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4. Any and all documents reflecting the sources of funding used by Jessup to acquire any of the Claims.

5. Organizational and formation documents relating to Jessup including, but not limited to, Jessup's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6. Company resolutions prepared by or on behalf of Jessup approving the acquisition of any of the Claims.

7. Any and all documents reflecting any internal or external audits regarding Jessup's NAV.

8. Agreements between Stonehill and Jessup regarding management, advisory, or other services provided to Jessup by Stonehill.

9. Any and all documents reviewed by Stonehill as part of its evaluation and due diligence regarding any of the Claims.

10. Any documents reflecting any communications with James Dondero;

11. Annual fund audits relating to Jessup.

11

12. Jessup's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Stonehill in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

HMIT Appx. 00297

# Exhibit 4-B

HMIT Appx. 00298

**REPORTER'S RECORD**

**VOLUME 1 OF 1**

COURT OF APPEALS CAUSE NO. 00-00-00000-CV

TRIAL COURT CAUSE NO. DC-23-01004-J

| | | |
|---|---|---|
| IN RE: | ) | IN  THE  DISTRICT COURT |
| | ) | |
| | ) | |
| HUNTER MOUNTAIN | ) | |
| INVESTMENT TRUST, | ) | OF DALLAS COUNTY, TEXAS |
| | ) | |
| Petitioner. | ) | 191ST JUDICIAL DISTRICT |

**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

**RULE 202 PETITION**

**which was heard on**

**Wednesday, February 22, 2023**

On the 22nd day of February 2023, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gena Slaughter, Judge Presiding, held in Dallas, Dallas County, Texas, and the following proceedings were had, to wit:

Proceedings reported by machine shorthand utilizing computer-assisted realtime transcription.

```
 1   APPEARANCES:

 2

 3   MR. SAWNIE A. McENTIRE            ATTORNEYS FOR PETITIONER
     State Bar No. 13590100           Hunter Mountain
 4   PARSONS McENTIRE                 Investment Trust
         McCLEARY, PLLC
 5   1700 Pacific Avenue
     Suite 4400
 6   Dallas, Texas  75201
     Telephone:  (214) 237-4300
 7   Facsimile:  (214) 237-4340
     Email:  smcentire@pmmlaw.com
 8
     and
 9
     MR. ROGER L. McCLEARY
10   State Bar No. 13393700
     PARSONS McENTIRE
11       McCLEARY, PLLC
     One Riverway
12   Suite 1800
     Houston, Texas  77056
13   Telephone:  (713) 960-7315
     Facsimile:  (713) 960-7347
14   Email:  rmccleary@pmmlaw.com

15

16

17   MR. DAVID C. SCHULTE            ATTORNEY FOR RESPONDENTS
     State Bar No. 24037456          Farallon Capital
18   HOLLAND & KNIGHT, LLP           Management, LLC, and
     1722 Routh Street               Stonehill Capital
19   Suite 1500                      Management LLC
     Dallas, Texas  75201
20   Telephone:  (214) 964-9500
     Facsimile:  (214) 964-9501
21   Email:  david.schulte@hklaw.com

22

23

24                   *        *        *

25
```

1

2

3                         VOLUME 1 INDEX

4

5         PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S

6                      RULE 202 PETITION

7                     which was heard on

8                 Wednesday, February 22, 2023

9

10    PROCEEDINGS:                                    Page   Vol

11    Proceedings on the record..................... 8      1

12    Argument by Mr. Sawnie A. McEntire............ 9      1

13    Response by Mr. David C. Schulte.............. 37     1

14    Response by Mr. Sawnie A. McEntire............ 65     1

15    Response by Mr. David C. Schulte.............. 73     1

16    Response by Mr. Sawnie A. McEntire............ 76     1

17    The court takes the matter under consideration. 77    1

18    Adjournment................................... 78     1

19    Reporter's Certificate........................ 79     1

20

21

22

23

24

25

PETITIONER'S EXHIBITS INDEX

| Number | Description | Offered | (Excluded) Admitted | Vol |
|--------|-------------|---------|---------------------|-----|
| P-1 | Declaration of Mark Patrick | 36 | 42 | 1 |
| P1-A | Claimant Trust Agreement | 36 | 42 | 1 |
| P1-B | Division of Corporations - Filing | 36 | 42 | 1 |
| P1-C | Division of Corporations - Filing | 36 | 42 | 1 |
| P1-D | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| P1-E | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| P1-F | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| P1-G | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| P1-H | July 6, 2021, Alvarez & Marsal letter to Highland Crusader Funds Stakeholder | 36 -- | 41 42 | 1 1 |
| P1-I | United States Bankruptcy Court Case No. 19-34054 | 36 | 42 | 1 |

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

| Number | Description | Offered | (Excluded) Admitted | Vol |
|--------|-------------|---------|---------------------|-----|

1    PETITIONER'S EXHIBITS INDEX   continued

| Number | Description | Offered | (Excluded) Admitted | Vol |
|--------|-------------|---------|---------------------|-----|
| PI-J | Exhibit A Highland Capital Management, L.P. Disclaimer for Financial Projections | 36 | 42 | 1 |
| PI-K | United States Bankruptcy Court Case No. 19-34054 | 36 | 42 | 1 |
| P-2 | Declaration of James Dondero | 36 | 42 | 1 |
| P2-1 | Jim Dondero email dated Thursday, December 2020 | 36 | (41) | 1 |

```
 1              RESPONDENT'S EXHIBITS INDEX

 2
                                        (Excluded)
 3    Number   Description          Offered Admitted Vol

 4

 5    R-1      Cause No. DC-21-09543      41     44      1
               Verified Amended Petition
 6

 7    R-2      Cause No. DC-21-09543      41     44      1
               Order
 8

 9    R-3      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
10

11    R-4      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
12

13    R-5      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
14

15    R-6      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
16

17    R-7      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
18

19    R-8      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
20

21    R-9      United States Bankruptcy  41     44      1
               Court Case No. 19-34054
22

23    R-10     United States Bankruptcy  41     44      1
               Court Case No. 19-34054
24

25
```

1          <u>RESPONDENT'S EXHIBITS INDEX continued</u>

2
                                                 (Excluded)
3     <u>Number</u>     <u>Description</u>                  <u>Offered</u> <u>Admitted</u> <u>Vol</u>

4

5    R-11        United States Bankruptcy         41      44      1
                 Court Case No. 19-34054
6

7    R-12        United State Bankruptcy          41      44      1
                 Court Case No. 19-12239
8

9    R-13        United States Bankruptcy         41      44      1
                 Court Case No. 19-34054
10

11   R-14        United States Bankruptcy         41      44      1
                 Court Case No. 19-34054
12

13   R-15        United States Bankruptcy         41      44      1
                 Court Case No. 19-34054
14

15   R-16        United States Bankruptcy         41      44      1
                 Court Case No. 19-34054
16

17   R-17        United States Bankruptcy         41      44      1
                 Court Case No. 19-34054
18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3               THE COURT:  Okay.  Good morning, Counsel.

 4               We are here in DC-23-01004, In re:

 5    Hunter Mountain Investment Trust.

 6               And who is here for the plaintiff?

 7               MR. McENTIRE:  For the petitioner,

 8    Your Honor, Sawnie McEntire and my partner

 9    Roger McCleary.

10               THE COURT:  Okay.  And then for Farallon?

11               MR. SCHULTE:  My name is David Schulte and

12    I represent both of the respondents.  It's Farallon

13    Capital Management, LLC, and Stonehill Capital

14    Management, LLC.

15               THE COURT:  We are here today on a request

16    for a 202 petition.  I know one of the issues is the

17    related suit, but let's just plow into it and we'll

18    go from there.

19               Okay.  Counsel?

20               MR. McENTIRE:  May I approach the bench?

21               THE COURT:  Yes, you may.

22               MR. McENTIRE:  And I've given Mr. Schulte

23    copies of all these materials.

24               In the interest of time, I have all the

25    key pleadings here, which I will give you a copy of.
```

```
 1                    THE COURT:  Thank you.

 2                    MR. McENTIRE:  And this is the evidentiary

 3   submission that we submitted about a week ago.

 4                    THE COURT:  Right.

 5                    MR. McENTIRE:  To the extent you are

 6   interested, it is cross-referenced by exhibit number

 7   to the references in our petition to the docket in the

 8   bankruptcy court.

 9                    THE COURT:  I appreciate that.  Otherwise,

10   I go hunting for stuff.

11                    MR. McENTIRE:  This is a PowerPoint.

12                    THE COURT:  Okay.

13                    MR. McENTIRE:  And, lastly, a proposed

14   order.

15                    THE COURT:  Wonderful.

16                    MR. McENTIRE:  And Mr. Schulte has copies

17   of it all.

18                    THE COURT:  Okay.

19                    MR. McENTIRE:  May I proceed, Your Honor?

20                    THE COURT:  You may.

21                    MR. McENTIRE:  All right.  Your Honor,

22   we are here for leave of court to conduct discovery

23   under Rule 202 to investigate potential claims.

24                    The issue before the court is not whether

25   we have an actual claim.
```

 1                    THE COURT:  Right.

 2                    MR. McENTIRE:  We do not even need to

 3  state a cause of action.  It is simply the investigation

 4  of potential claims.

 5                    Mr. Mark Patrick is here with us today.

 6  He's behind me.  Mr. Patrick is the administrator of

 7  Hunter Mountain, which is a Delaware trust.

 8                    THE COURT:  Okay.

 9                    MR. McENTIRE:  He is the manager of

10  Rand Advisors, which is also an investment manager

11  of the trust.  And, in effect, for all intents and

12  purposes, Mr. Patrick manages the assets of the trust on

13  a daily basis.

14                    THE COURT:  Okay.

15                    MR. McENTIRE:  There are potential claims

16  that we're investigating.  And I'll go through some

17  of these because I know opposing counsel has raised

18  standing issues.

19                    THE COURT:  Right.

20                    MR. McENTIRE:  And I think we can address

21  all those standing issues.

22                    Insider trading is in itself a wrong

23  as recognized by courts.  And I'll refer you to the

24  opinions.  We believe there's a breach of fiduciary

25  duties, and that may take a little explanation.

 1                    At the time that Farallon and Stonehill

 2     acquired these claims, through their special purpose

 3     entities Muck and Jessup, they were outsiders.

 4                    THE COURT:  Right.

 5                    MR. McENTIRE:  But by acquiring the

 6     information in the manner in which we believe they did,

 7     they became insiders.  And when they became insiders,

 8     under relevant authorities they owe fiduciary duties.

 9                    And at the time they acquired the claims,

10     my client Hunter Mountain Investment Trust was the

11     99.5 percent interest holder or stakeholder in

12     Highland Capital.

13                    THE COURT:  Right.

14                    MR. McENTIRE:  We also believe a knowing

15     participation of breach of fiduciary duties under

16     another name, aiding and abetting.  But Texas recognizes

17     it as knowing participation.  Unjust enrichment,

18     constructive trust, and tortious interference.

19                    THE COURT:  Okay.

20                    MR. McENTIRE:  Farallon and Stonehill are

21     effectively hedge funds.  And so is Highland Capital.

22                    They were created.  They actually did

23     create Muck and Jessup.  Those are the two entities

24     that actually are titled with the claims.  They

25     acquired it literally days before the transfers.

 1              So the reason we're focusing our discovery

 2   effort on Farallon and Stonehill, we are confident

 3   that any meaningful discovery -- emails, letters,

 4   correspondence, document drafts, things of that

 5   nature -- probably predated the existence of

 6   Muck and Jessup.

 7              THE COURT:  Right.

 8              MR. McENTIRE:  That's why we're focusing

 9   our discovery effort on Farallon and on Stonehill.

10              But, needless to say, Farallon, Stonehill,

11   Muck and Jessup, having all participated in this

12   acquisition, they're all insiders for purposes

13   of assuming fiduciary duties.

14              And as I said, outsiders become insiders

15   under the relevant authority.  And one key case is the

16   Washington Mutual case --

17              THE COURT:  Right.

18              MR. McENTIRE:  -- which we cited in our

19   materials.

20              I would also just let you know, this is

21   not something in total isolation.  We understand we're

22   not privy to the details.  But we understand the Texas

23   State Security Board also has an open investigation that

24   has not been closed.

25              THE COURT:  Okay.

 1                    MR. McENTIRE:  And that's by way of

 2    background.

 3                    202 allows presuit discovery for a couple

 4    of reasons.  And I won't belabor the point.  One is to

 5    investigate potential claims.

 6                    There is no issue of notice or service

 7    here.  There's no issue of personal jurisdiction.

 8    Farallon and Stonehill made a general appearance.

 9                    THE COURT:  Right.

10                    MR. McENTIRE:  There's no issue concerning

11    subject-matter jurisdiction.  They actually concede that

12    the court has jurisdiction on page 8 of their response.

13                    The court's inquiry today is a limited

14    judicial inquiry.  There are really two avenues which

15    I'll explain, but, first, I think the salient avenue

16    is does the benefit of the discovery outweigh the

17    burden.

18                    And I think as I will hopefully

19    demonstrate, I think that we clearly do.

20                    THE COURT:  Okay.

21                    MR. McENTIRE:  The merits of a potential

22    claim, the case law is clear, is not before the court.

23                    Much of their brief and their response

24    is devoted to trying to attack the fact that there

25    is no duty or things such as standing.

 1              But the reality of it is we are not

 2    required to actually prove up a cause of action to

 3    this court although I think I can.  In this process,

 4    I probably certainly can identify a potential cause of

 5    action.  That's not our obligation to carry our burden.

 6              There was an issue about timely submission

 7    of evidence they raised in a footnote, but I think that

 8    was resolved before the court took the bench.

 9              THE COURT:  Okay.

10              MR. McENTIRE:  I've handed you a binder

11    with Mr. Mark Patrick's affidavit and Jim Dondero's

12    affidavit.

13              As I understand it, correct me if I'm

14    wrong, you're not objecting to the submission of that

15    evidence.  Is that correct?

16              MR. SCHULTE:  Almost.

17              THE COURT:  Okay.

18              MR. SCHULTE:  Your Honor, I do object

19    to the two declarations that were submitted I believe

20    five days before the hearing.

21              THE COURT:  Okay.

22              MR. SCHULTE:  As Your Honor is aware,

23    Rule 202 contemplates 15 days' notice.  The petition

24    itself was required to be verified.  It was verified

25    and then new substance was added by way of these

1    declarations five days before the hearing.

2                    And so we would argue that that has the

3    effect of amending or supplementing the petition within

4    that 15-day notice period.

5                    All that said, I don't have any issue with

6    the majority of the documents attached to Mr. Patrick's

7    declaration.

8                    THE COURT:  Okay.

9                    MR. SCHULTE:  So I do object on the

10   grounds of hearsay and timeliness to the declarations.

11                   On Exhibit H to Mr. Patrick's declaration,

12   I object to that document on the grounds of hearsay.

13                   THE COURT:  Okay.  Which one?

14                   MR. SCHULTE:  Exhibit H to Mr. Patrick's

15   declaration on the basis of hearsay.

16                   All the other documents are I believe

17   file-stamped copies of the pleadings filed in the

18   bankruptcy, which I don't have any issue with that.

19                   And then the exhibit to Mr. Dondero's

20   declaration is an email that's objected to on the basis

21   of hearsay.  And it hasn't been proven up as a business

22   record or any other way that will get past hearsay.

23                   THE COURT:  Okay.

24                   MR. SCHULTE:  So those are the limited

25   objections I have to what's in that filing, Your Honor.

 1                    MR. McENTIRE:  And I will address those

 2   objections.  And we're prepared to put Mr. Patrick on

 3   the stand, if necessary.

 4                    I would point out that the case law is

 5   very clear that there's no 15-day rule here.

 6                    THE COURT:  Okay.

 7                    MR. McENTIRE:  We have asked the court

 8   to take judicial notice of all of our evidence in our

 9   petition itself.

10                    The 15 days is the amount of time you have

11   to give notice before the hearing --

12                    THE COURT:  Right.

13                    MR. McENTIRE:  -- but the case law

14   is clear that I can put live testimony on, I can

15   put affidavit testimony on.

16                    THE COURT:  This is an evidentiary

17   hearing.

18                    MR. McENTIRE:  That's correct.

19                    And that includes affidavits.  And

20   affidavits are routinely accepted in these types of

21   proceedings and I have the case law I can cite to the

22   court.

23                    MR. SCHULTE:  Your Honor, in contrast,

24   I think if this were, for example, an injunction

25   hearing, I don't believe that an affidavit would be

 1  the substitute in an injunction hearing for live

 2  testimony.

 3              And so if this is an evidentiary standard,

 4  I don't think that these affidavits should come in for

 5  the truth of the matter asserted.  The witnesses should

 6  testify to the facts that they want to prove up.

 7              MR. McENTIRE:  I could give the court a

 8  cite.

 9              THE COURT:  Okay.

10              MR. McENTIRE:  It's <u>Glassdoor, Inc. versus</u>

11  <u>Andra Group</u>.

12              THE COURT:  What was the name of it?

13              MR. McENTIRE:  <u>Glassdoor, Inc. versus</u>

14  <u>Andra Group</u>.  It is 560 S.W.3d 281.  It specifically

15  addresses the use and relies upon affidavits in the

16  record for purposes of a Rule 202.

17              So, with that said, I will address it in

18  more detail in a moment.  The evidentiary rule, to be

19  clear, is it has to be supported by evidence.  Seven

20  days was the date that I picked because it was well

21  in advance.  It's the standard rule that's used for

22  discovery issues.  It's seven days before a hearing.

23              So I picked it.  He's had it for seven

24  days.  He's never filed any written objections to my

25  evidence.  None.

 1                    And under the Local Rules I would think

 2    he would have objected within three business days.

 3    He did not do that, and so I'm a little surprised

 4    by the objection.

 5                    THE COURT:  Okay.

 6                    MR. McENTIRE:  All right.  We do have

 7    copies of all the certified records, but I gave you

 8    the agenda on that.  And we talked about the two

 9    declarations.

10                    So the limited judicial inquiry is the

11    only issue before the district court.  It's whether

12    or not to allow the discovery, not the merits of any

13    claim yea or nay.

14                    THE COURT:  Right.

15                    MR. McENTIRE:  There's no need for us to

16    even plead a cause of action, although we did.

17                    Mr. Schulte goes to great length in

18    his response to take issue with our cause of action,

19    suggesting we had none.  We do.  But we're not even

20    under an obligation to plead it; nevertheless, we did.

21                    This is actually a two-part test.  The

22    first part was allowing the petitioner -- in this case,

23    Hunter Mountain -- to take the requested deposition may

24    prevent a failure or delay of justice, or the likely

25    benefit outweighs the burden.  Both apply here.

1                    These trades took place in April of 2021,

2      three of the four.  The fourth I think took place in the

3      summer.

4                    And our goal is to obtain the discovery

5      in a timely manner so we do not have any argument, valid

6      or invalid, that there's a limitations issue.

7                    THE COURT:  Okay.

8                    MR. McENTIRE:  And so any further delay,

9      such as transferring this to another court or back to

10     the bankruptcy court, which it does not have

11     jurisdiction, would cause tremendous delay.

12                   THE COURT:  Okay.

13                   MR. McENTIRE:  Hunter Mountain, a little

14     bit of background.  It is an investment trust.  When

15     it has money, it participates directly in funding the

16     Dallas Foundation --

17                   THE COURT:  Okay.

18                   MR. McENTIRE:  -- which is a very I think

19     well-respected and recognized charitable foundation.

20                   Certain individuals and pastors from

21     various churches are actually here because Hunter

22     Mountain indirectly, but ultimately, provides a

23     significant source of funding for their outreach

24     programs and their charitable functions and programs.

25                   THE COURT:  Okay.

1              MR. McENTIRE:  The empirical evidence in

2    the documents that are before the court, regardless of

3    what's in the affidavits, just screams that there was

4    no due diligence here.

5              Now, we know in Mr. Dondero's affidavit

6    he had a conversation with representatives of Farallon,

7    which would be admissions against interest.  They're

8    admissions basically against interest that they

9    effectively did no due diligence.

10             Yet we believe, upon information and

11   belief, that they invested over $167 million.  There

12   are two sets of claims.  There's a Class 8 claim and

13   a Class 9 creditor claim.

14             THE COURT:  Right.

15             MR. McENTIRE:  Their expectations at the

16   time that they acquired these claims was that Class 9

17   would get zero recovery.

18             So who spends $167 million when their

19   expectation on return of investment is zero?  Who spends

20   $167 million even in Class 8 when the expected return is

21   just 71 percent and is actually declining?  And I think

22   it's actually admitted in the affidavit that Mr. Dondero

23   provided.

24             So without being hyperbolic or

25   exaggerating, the data that was available publicly

1   was extremely pessimistic and doubtful that there would

2   be any recovery.

3                   We have direct information -- admissions,

4   frankly -- that Farallon had access to non-public

5   material, non-public information.  And that was

6   the fact that MGM Studios was up for sale.

7                   Mr. Dondero was on the board of directors.

8                   THE COURT:  Okay.

9                   MR. McENTIRE:  He communicated, because

10  of his responsibilities, this information to Mr. Seery.

11                  And Mr. Seery, apparently, would have been

12  restricted.  He couldn't use it or distribute it.

13                  THE COURT:  Right.

14                  And I don't know a lot about securities

15  law but, yeah, that would be insider information.

16  Right?

17                  MR. McENTIRE:  Yes.

18                  And it appears from the affidavit that

19  Mr. Dondero submitted that Farallon was aware of the

20  information before the sale closed, before they closed

21  their acquisitions.

22                  And Mr. Dondero asked the question are

23  you willing to even sell your claims and they said no.

24  Or even 30 percent more and they said no.  We're told

25  that they're going to be very valuable.

1          Well, no one else had this information, so

2    we have a problem here that we have two outsiders who

3    are now insiders.  They've acquired potentially very

4    valuable claims with the sale of MGM.

5          They also acquired information concerning

6    the portfolios of these companies over which Highland

7    Capital managed and had ownership interests, so we're

8    talking about having access to information that any

9    other bidder or suitor would not have.

10         So this is how they were divided up.

11   $270 million in Class 8.  Each of the creditors

12   right here are the unsecured creditors who sold.

13   They were the sellers.

14              THE COURT:  Right.

15              MR. McENTIRE:  And these are the claims in

16   the Class 9.

17         So you have $95 million in Class 9 claims

18   that are being acquired when the expectation is that

19   there will be zero return on investment.  You have

20   $270 million where the expectation was extremely

21   low and pessimistic.

22              And here are the documents.  And

23   Mr. Schulte has not objected to these.  This particular

24   document is Exhibit 1-J to Mr. Patrick's affidavit.

25              THE COURT:  Okay.

 1              MR. McENTIRE:  This came out of the plan.

 2    So when the bankruptcy plan was confirmed in February

 3    2021, Farallon, Stonehill, Muck and Jessup, the latter

 4    two weren't even in existence.

 5              THE COURT:  Right.

 6              MR. McENTIRE:  Farallon and Stonehill were

 7    complete strangers to the bankruptcy proceedings, yet

 8    they come in in the wake of this information and

 9    they invest tens if not hundreds of millions of

10    dollars with no apparent due diligence.

11              The situation gets even worse.  And this

12    is Exhibit 1-I to Mr. Patrick's affidavit.  And as

13    I understand, Mr. Schulte does not object to these

14    documents.  It's declining.  And then, suddenly,

15    they're in the money.

16              And at the end of the third quarter last

17    year, they're already making 255 million bucks.  And

18    that's a far cry from the original investment.  This

19    is for both Class 8 and Class 9.

20              So Mr. Patrick states the purpose of

21    this is to seek cancellation.  Another word for it

22    in bankruptcy-ese would be disallowance.  But the

23    cancellation of these claims and disgorgement.

24              If these are ill-gotten gains, regardless

25    of the rubric or the monicker that you place on it --

1    breach of fiduciary duty as insiders, aiding and

2    abetting or knowing participation in fiduciary duties,

3    because a lot of people have fiduciary duties on this

4    stuff.  No matter what you call it, disgorgement is a

5    remedy.

6              Wrongdoers should not be entitled to

7    profit from their wrongdoing.

8              Mr. Schulte makes a big point that we

9    can't prove damages.  Well, first of all, I don't agree

10   with the conclusion.

11             THE COURT:  Right.

12             MR. McENTIRE:  But even if he was right,

13   disgorgement is a proxy for damages.  And we have an

14   entitlement and a right to explore how much they have

15   actually received, when did they receive it.

16             The weathervane is tilting in one

17   direction here, Judge.

18             Clearly, there is a creditor trust

19   agreement.  That's a very important document.  It spells

20   out rights and obligations.  It's part of the plan.

21             There's a waterfall.  And on page 27 of

22   the creditor trust agreement a waterfall is exactly

23   what it suggests.  You have one bucket gets full,

24   you go to the next bucket all the way down.

25             THE COURT:  Class 1 or tier 1.

```
1              I can't remember the category.  I don't
2    do bankruptcy.  But, yeah, those get paid, then the
3    next level, then the next level.
4              So by the time you get down to
5    level 10, which I think is what Hunter Mountain was,
6    theoretically, there wouldn't have been anything left.
7              MR. McENTIRE:  That's correct.
8              But here, if Class 8 and Class 9 -- and
9    I will say the big elephant in those two classes are
10   Farallon and Stonehill or their special purpose entity
11   bucket Jessup -- they have 95 percent of that category.
12             And suddenly they're not entitled to keep
13   what they've got, and suddenly there's a disallowance,
14   or suddenly a cancellation regardless of the theory
15   or the cause of action -- and we have several avenues
16   here -- a lot of money is going to flow into the
17   coffers of Hunter Mountain, and a lot of money will flow
18   into the Dallas Foundation, and a lot of money will flow
19   into the coffers of charities.
20             So there is standing here.  Standing
21   requires the existence of a duty.  We think we have
22   duties.
23             And a concrete injury.  And if these
24   claims were manipulated, we have a concrete injury
25   and our proxy is disgorgement.
```

1        We've been deprived of an opportunity to

2   share in category 10 or as we just described it in the

3   waterfall under the creditor trust agreement.

4        THE COURT:  Right.

5        MR. McENTIRE:  Their burden is to show

6   that this discovery has no benefit.  No.  That's my

7   burden to show benefit.  But their burden would be

8   to show that it's overly burdensome to them.

9        And I find that difficult to understand

10  since part of their response is devoted to the fact

11  that, hey, judge in Dallas County, you should turn

12  this over to Judge Jernigan in the bankruptcy court.

13       THE COURT:  Because it's bankruptcy,

14  you know.

15       MR. McENTIRE:  In bankruptcy, that's their

16  invitation.

17       THE COURT:  Right.

18       MR. McENTIRE:  Well, if they're inviting

19  us to go do the discovery in bankruptcy court, it

20  doesn't seem to be that burdensome because it's

21  going to be the same discovery.

22       And, by the way, Judge Jernigan actually

23  does not have jurisdiction over these proceedings.

24  The other earlier proceeding, as you know, they

25  attempted to remove it to her court and it was remanded.

 1   Clearly, she does not have jurisdiction.

 2              The problem with bankruptcy involved,

 3   in addition, if I wanted to do Rule 2004 discovery like

 4   they're suggesting, that's their invitation.  They would

 5   like you to push us down the road.

 6              Well, we can't afford to push it down the

 7   road.  Because if they push it down the road, I've got

 8   to go file a motion with Judge Jernigan, get leave to

 9   issue subpoenas.

10              THE COURT:  Right.

11              MR. McENTIRE:  They have 14 days to file

12   a motion to quash, then I have to file another motion.

13   And it's 21 days before their response is even filed.

14   And there's another 14 or 15 days before the reply is

15   filed.  We're looking at 60, 70 days.  And that's one

16   of the reasons we selected this procedure.

17              And, by the way, you hear the phrase forum

18   shopping a lot.  Well, without engaging in the negative

19   inference that that term suggests, a plaintiff, a

20   petitioner, has the right to select its venue for a

21   variety of reasons.

22              Our venue is the state district courts

23   of Texas because it has an accelerated procedure.  And

24   that's why we're here.

25              THE COURT:  Right.

1              MR. McENTIRE:  I've identified the

2     potential causes of action.  Entities or people that

3     breach fiduciary duties and receive ill-gotten gains

4     a constructive trust may be imposed, disgorgement.

5     Then we do run into bankruptcy concepts.

6              But it's important to know that some of

7     these are not bankruptcy.  Some of these are common law.

8              I suggest to the court, I don't have to

9     go get Judge Jernigan's permission to sue Farallon or

10    Stonehill for breach of fiduciary duties.  I don't have

11    to get her permission to sue for knowing participation.

12             If I'm actually looking for equitable

13    disallowance, probably, maybe.  But I can do the

14    discovery here and then make that decision whether

15    I need to go back to bankruptcy court.

16             I'm not foolish.  I'm not going to run

17    afoul of Judge Jernigan's orders.  If I have to go back

18    to Judge Jernigan to get permission, I will do it.

19             THE COURT:  Right.  Because only an

20    idiot runs afoul of the bankruptcy court.

21             MR. McENTIRE:  Hopefully, I'm not that.

22             So I clearly understand what both my

23    ethical and lawyer obligations are.  And I'm not

24    going to run afoul of any court orders.

25             But some of these remedies don't require

 1    an overview by Judge Jernigan or the bankruptcy court.

 2                    THE COURT:  Okay.

 3                    MR. McENTIRE:  They have a duty not to

 4    commit fraud, whether it's commit fraud against us or

 5    commit fraud against the estate.

 6                    They have a duty not to interfere with

 7    the expectancies that we have as a B/C beneficiary.

 8    That's a code name for a former Class 10 creditor.

 9                    They have a duty not to trade on inside

10    information, and that's the Washington Mutual case.

11                    And I've just already mentioned that

12    because they were outsiders, they're insiders now.

13                    These are their arguments.  Our evidence

14    is timely.  It's not untimely.  It's not speculative.

15    It's not speculative because the events have already

16    taken place.  I'm not talking about something

17    hypothetical.

18                    THE COURT:  Right.

19                    MR. McENTIRE:  My remedy flows from that.

20                    So we're not projecting that I might have

21    a claim later on.  I have a claim today.  If I have a

22    claim today, I have it today.  I have it and I want to

23    confirm it by this discovery.  Because their wrongdoing

24    has already taken place, it's not hypothetical, it's not

25    futuristic, it's already occurred.

 1                  When they say they have no duty to us,

 2      they're just wrong.  They have duties not to breach

 3      fiduciary duties.  We have direct standing I believe to

 4      bring a claim in that regard.

 5                  We have a right to bring direct standing

 6      under the Washington Mutual case, which I'll discuss.

 7                  And we also have a right to bring a

 8      derivative action.

 9                  THE COURT:  Right.

10                  MR. McENTIRE:  And I notice that

11      they made a comment about that in their response.

12      But I can sue individually.

13                  And I can also bring an action in the

14      alternative as a derivative action for the estate.

15      And these are all valid claims for the estate.

16                  THE COURT:  Okay.

17                  MR. McENTIRE:  Transfer.  This is not a

18      related case because it's not the litigation.

19                  So if you just go to the very first

20      instance and you look at the Local Rule, it talks

21      about litigation and causes of action.

22                  THE COURT:  Right.

23                  MR. McENTIRE:  We don't have a cause

24      of action.  We're not asserting one in this petition.

25      So this is not a related case that falls within the

1   four corners of the Local Rule.

2                 THE COURT:  Well, I guess the thing

3   is it's still a related case.  Like if you file a 202

4   and then you file a lawsuit, that would be considered

5   related.

6                 I looked at it and you're right.

7   Technically, it's different parties.  I'll just say it's

8   a grey zone at best.

9                 MR. McENTIRE:  That's correct.

10                This is not a lawsuit in terms of causes

11  of action.  It might be a related case if Mr. Dondero

12  had come in and filed a lawsuit.  That would be a

13  related case.  Mr. Dondero is not involved in this

14  process, other than as a fact witness.

15                These are all the evidentiary issues

16  that perhaps he's raised.  Live testimony, affidavit

17  testimony is admissible.

18                The court considered numerous affidavits

19  filed with the court.  And that's as recently as 2017.

20  These are all good cases, good law.

21                Equitable disallowance.  It's kind of a

22  fuzzy image.  This is a bankruptcy court case, but this

23  is simply to underscore the fact that in addition to

24  my common law remedies there is a very substantial

25  remedy in bankruptcy court.

1          It's not one I necessarily have to pursue,

2   but if I wanted to I could.  But what it does do is it

3   helps to find some duties.

4          And here, the court has the right

5   to disallow a claim on equitable grounds in extreme

6   instances, perhaps very rare, where it is necessary

7   as a remedy.  And they did it in this case.

8          THE COURT:  Okay.

9          MR. McENTIRE:  This is simply an analogy

10   to securities fraud and the 10b-5 statute.

11          Insiders of a corporation are not limited

12   to officers and directors, but may include temporary

13   insiders who have entered into a special confidential

14   relationship in the conduct of the business of the

15   enterprise and are given access to information solely

16   for corporate purposes.

17          Well, what about the MGM stock?  The court

18   finds that the Equity Committee -- so here's the

19   equity -- has stated a colorable claim.  We were

20   99.5 percent equity.

21          The Equity Committee has stated a

22   colorable claim that the settlement noteholders became

23   temporary insiders because they acquired information

24   that was not of public knowledge in connection with

25   their acquisition.

1          And allowed them to participate in

2    negotiations with JPMC -- JPMorgan Chase -- for the

3    shared goal of reaching a settlement.

4          So these were outsiders that suddenly

5    became temporary insiders because of access to inside

6    information.

7          This is not a new concept.  It comes

8    from the United States Supreme Court.  Fiduciaries

9    cannot utilize inside information.

10          THE COURT:  Right.

11          MR. McENTIRE:  And we believe we

12    have enough before the court to support and justify

13    a further investigation that this may have occurred.

14          THE COURT:  Okay.

15          MR. McENTIRE:  Now, not a related case.

16    The Jim Dondero case is actually closed.

17          THE COURT:  Right.

18          MR. McENTIRE:  And I'll be frank with you.

19    In all candor, I never thought this was a possible

20    related case.

21          THE COURT:  I mean, we're talking about

22    the same events, but there are differences, I agree.

23          MR. McENTIRE:  We're talking about one

24    similar event dealing with Farallon.  Other events

25    are different.

1            THE COURT:  Okay.

2            MR. McENTIRE:  So we have different dates.

3            THE COURT:  Right.

4            MR. McENTIRE:  Different parties on the

5    petitioner's side, different law firms.

6            The only common party is Farallon.

7    Alvarez & Marsal are not parties to this but Stonehill

8    is.  Stonehill was not a party to the prior proceedings.

9            And the standing is manifest.  With no

10   criticism of Mr. Dondero's lawyer, I searched in his

11   argument where he was articulating standing.

12           And without going further, I will tell

13   you I think our standing is clear.  We're in the money.

14           THE COURT:  Okay.

15           MR. McENTIRE:  We are in the money if

16   there's a disgorgement or a disallowance.

17           THE COURT:  Okay.

18           MR. McENTIRE:  We have all types of

19   claims, including insider trading and a creation of

20   fiduciary duties.

21           Our remedies, as far as I can tell, he

22   didn't identify any.  We have several.  Disgorgement,

23   disallowance, subordination, a variety.  And damages.

24           So we suggest strongly that it is not a

25   related case.

```
 1                    And I must tell you, the reference

 2   to say send this to bankruptcy court or defer to the

 3   bankruptcy court or send us over to Judge Purdy, with

 4   all due respect to opposing counsel, it's really just

 5   a delay mechanism.

 6                    And what they're seeking to do through

 7   their invective, their criticisms, the references to

 8   these other courts, is seeking an opportunity to push us

 9   down the road and put us in a bad position potentially

10   and a not enviable position in connection with statute

11   of limitations.

12                    Your Honor, we would offer the binder

13   of exhibits that we submitted on February 15, 2022,

14   including the affidavits and all the attached exhibits.

15                    I would ask the court to take judicial

16   notice of all the exhibits that we referred to in our

17   petition, which I think is appropriate since we were

18   specifying with particularity what we were requesting

19   the court to take judicial notice of.  And that's the

20   large index, that's the list.

21                    THE COURT:  Obviously, I can take

22   judicial notice of any kind of court pleadings,

23   whether they're state or federal.

24                    MR. McENTIRE:  That's correct.

25                    THE COURT:  That's clear.
```

```
1              MR. McENTIRE:  We would offer both

2   affidavits and all the attachments into evidence

3   at this time.

4              THE COURT:  Okay.  Do you have exhibit

5   numbers for them?

6              MR. McENTIRE:  Yes.  It's Exhibit 1 with

7   attachments.  1-A, 1-B, 1-C, 1-D, 1-E, 1-F and then

8   Exhibit 1-G, Exhibit 1-H, Exhibit 1-J, Exhibit 1-K.

9              Everything in the binder, Your Honor.

10  It's Exhibit 1 and Exhibit 2 with the attachments.

11             THE COURT:  Okay.

12             MR. McENTIRE:  I believe they're all

13  identified.  I can put a sticker on them, if you'd like.

14             THE COURT:  Yeah.  To admit them, it will

15  need a sticker.

16             So I'm going to hold off on admitting

17  them for just a minute because I do want to hear his

18  objections and then we can go back to it.  So just make

19  sure we do that.

20             I'm not trying to not admit them, but I do

21  want to let him have his objections.

22             Okay.  Anything else, Counsel?

23             MR. McENTIRE:  That's all I have right

24  now, Judge.

25             THE COURT:  Okay.  Counsel?
```

 1                    MR. SCHULTE:  Should I start with those

 2    exhibits, Your Honor?

 3                    THE COURT:  Why don't you do that.  That's

 4    probably the easiest way.

 5                    MR. SCHULTE:  In light of the authorities

 6    that Mr. McEntire shared about the affidavits, I'll

 7    withdraw the objections to the affidavits or the

 8    declarations.

 9                    THE COURT:  Okay.

10                    MR. SCHULTE:  I'm taking Mr. McEntire's

11    word that those cases say what he says they say.

12                    THE COURT:  I'll tell you because 202

13    is not a lawsuit, you don't necessarily have a right

14    to cross-examine, et cetera.  So, yeah, affidavits are

15    frequently used on 202s.

16                    MR. SCHULTE:  And that's fine, Your Honor.

17    I'll take Mr. McEntire's word what those cases say.

18                    But I will maintain the objection to

19    Exhibit H -- it's the declaration of Mr. Patrick --

20    on the grounds of hearsay.  That is not a court record

21    or a file-stamped pleading from federal or state court.

22    It's just a letter.  So that's hearsay.  And it hasn't

23    been properly authenticated.

24                    The other issue is the exhibit to

25    Mr. Dondero's declaration.  That's just an email

 1    from Mr. Dondero, so I object on the grounds of hearsay.

 2              THE COURT:  Mr. McEntire, what's your

 3    response specifically to Exhibit H as attached to

 4    the Patrick declaration and then the attachment

 5    to the Dondero declaration?

 6              MR. McENTIRE:  Exhibit H to Mr. Patrick's

 7    affidavit would be hearsay, but there's an exception

 8    that it's not controversial.

 9              THE COURT:  Okay.

10              MR. McENTIRE:  And there's no indication

11    that there's any challenge of the reliability of the

12    document.

13              THE COURT:  What is the exhibit?

14    I'm trying to pull it up.  Sorry.

15              MR. McENTIRE:  It's Exhibit 1-H.  It is

16    a letter from Alvarez & Marsal simply indicating what

17    they paid for the claim.

18              THE COURT:  Is it the July 6th, 2021,

19    letter?

20              MR. McENTIRE:  Yes, Your Honor.

21              THE COURT:  I've got it.

22              MR. McENTIRE:  And the exhibit to

23    Mr. Dondero's is not being offered for the truth of

24    the matter asserted, just the state of mind of Farallon.

25              THE COURT:  Okay.

```
 1                    MR. McENTIRE:  He has proved it up
 2   that it's authentic.  It's a true and accurate copy.
 3                    And it goes to the state of mind of
 4   Farallon and it goes to the state of mind of Mr. Seery
 5   as well who are basically individuals who are trading on
 6   inside information.
 7                    And Mr. Seery would not have known about
 8   the MGM sale but for that email.  And Farallon and
 9   Stonehill would not know about MGM but for Mr. Seery.
10                    THE COURT:  Okay.  So the response to
11   hearsay is that it goes to state of mind.
12                    MR. McENTIRE:  It goes to state of mind.
13                    THE COURT:  Okay, Counsel.  How do you
14   respond to that?
15                    MR. SCHULTE:  I'll start with the last
16   one, Your Honor.  I think that's the definition of
17   hearsay, is that you're purporting to establish the
18   state of mind of the parties who are not before the
19   court.
20                    It's been emphasized that Mr. Dondero has
21   no relation to HMIT.  And none of the recipients of the
22   email are parties to this proceeding.
23                    This purports to establish the state of
24   mind of Mr. Seery, who is not before the court, and the
25   state of mind of Farallon, just based on the say so of
```

1    Mr. Dondero in this email.  That's hearsay.

2                     And as for the first letter, this is a

3    letter on the letterhead of A&M which, by the way, is

4    one of the parties in the Dondero Rule 202 petition.

5                     And it's not on the letterhead of any of

6    the parties to this case so the letter isn't properly

7    authenticated.

8                     And I'm not aware of the not controversial

9    exception to hearsay.

10                    THE COURT:  Well, there is a thing that

11   talks about if you're admitting something that's just

12   not controverted.  Right?  It's everybody agrees "X"

13   happened.  We're just admitting evidence to have that.

14   So what this basically is is just showing the claim of

15   the funds.

16                    And I guess my question is what's the

17   objection.  Is there an objection to the substance of

18   it?

19                    MR. SCHULTE:  I don't think there's any

20   dispute that Farallon and Stonehill, through their

21   respective special purpose entities, purchased the

22   claims that are at issue here.

23                    And if that's the sole purpose

24   of admitting this letter into evidence, I don't

25   think that's a matter that's genuinely in dispute.

1              THE COURT:  Okay.

2              MR. SCHULTE:  So if that's the only issue

3   as raised by this letter, I don't know that there's a

4   dispute there.

5              THE COURT:  Right.  Well, that's the whole

6   thing.

7              MR. McENTIRE:  I think we're almost

8   solving the issue on the fact of how much they paid,

9   $75 million.

10             THE COURT:  Okay.  So I will sustain the

11  objection to the email to Mr. Dondero's declaration,

12  Exhibit P 2-1.

13             I am going to overrule the objection

14  to -- I don't know what the letter is of the attachment.

15             MR. McENTIRE:  It's Exhibit P 1-H to

16  Mr. Patrick's affidavit.

17             THE COURT:  Correct.  Sorry.

18             Okay, Counsel.  If you'll proceed.

19             MR. SCHULTE:  May I approach the bench,

20  Your Honor?  I have a binder of exhibits also.

21             THE COURT:  Yes, you may.

22             MR. SCHULTE:  These have all been

23  marked with exhibit stickers already.  There are tabs

24  for each of the exhibits.  They're marked R1 through 17,

25  I believe.  And "R," of course, stands for Respondents.

1                  THE COURT:  I take the shortcut of calling

2      everybody "Plaintiff" and "Defendant" just because

3      I'm so used to using that language in court.

4                  But I do agree.  It's Petitioner

5      and Respondent.  You're not technically a defendant.

6                  Okay.  So, first of all, I'm going to

7      admit Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2,

8      with the sole exception of the email to Mr. Dondero's

9      declaration that I sustained.

10                 And then are there objections to the

11     respondent's exhibits?

12                 MR. McENTIRE:  Very few.

13                 I object to Exhibit No. 1 and

14     Exhibit No. 2 as irrelevant.

15                 THE COURT:  What's the objection to 1?

16                 MR. McENTIRE:  They're offering the order

17     from Judge Purdy.

18                 THE COURT:  Okay.  I can take judicial

19     notice of that.  I mean, it's a court record from

20     Dallas County.  So I don't think that that's

21     particularly relevant.

22                 To be bluntly honest, I looked at it last

23     night.  Right?  Because of the issue that there's

24     a related case, I pulled that file too and looked

25     at everything.

```
 1                   So I can take judicial notice of that.
 2      Whether it's relevant or not, I can look at it.  And,
 3      obviously, if it's not relevant, I'll disregard it.
 4                   MR. McENTIRE:  Fair enough.
 5                   THE COURT:  I'll overrule that objection.
 6                   What's next?
 7                   MR. McENTIRE:  The only other objections
 8      are Exhibit 12 and 13.  I just don't know what they
 9      are or for what purpose they would be offered.
10                   THE COURT:  Okay.  So 12 is a notice of
11      appearance and request for service in the bankruptcy
12      court on behalf of Hunter Mountain Trust.
13                   So what's the issue, Counsel?
14                   MR. SCHULTE:  Your Honor, these are
15      notices of appearance filed by Hunter Mountain in the
16      bankruptcy court.
17                   And the purpose of these notices is simply
18      to show -- and maybe this is not genuinely in dispute --
19      that Hunter Mountain, through its counsel, would have
20      received notice of all the activity that was going on
21      in the bankruptcy court.
22                   THE COURT:  It's the same issue I've
23      got with everything that Plaintiff submitted.  It's a
24      bankruptcy pleading.  I can take notice of it.  If it's
25      irrelevant, I'll disregard it.
```

 1                    So I'll overrule that objection.

 2                    And then what's 13?

 3                    MR. McENTIRE:  The same objection.

 4                    THE COURT:  I'll overrule it because

 5    again, I can take judicial notice of those.

 6                    MR. McENTIRE:  No other objections,

 7    Your Honor.

 8                    THE COURT:  So Respondent's Exhibits

 9    1 through 17 are so admitted.

10                    MR. SCHULTE:  May I proceed, Your Honor?

11                    THE COURT:  Yes, you may.

12                    MR. SCHULTE:  HMIT -- Hunter Mountain --

13    races into this court seeking extensive and burdensome

14    presuit discovery about claims trading that took place

15    in the Highland bankruptcy two years ago.

16                    Mr. McEntire has talked about the harm

17    that would result from delay if a different court were

18    to consider this request for presuit discovery.  That is

19    a function of waiting two years after the subject claims

20    transfers to seek relief in this court.

21                    The exact same allegations of claims

22    trading and misconduct by Jim Seery -- those allegations

23    are not on the slides that you looked at.  But those

24    allegations are common in Mr. Dondero's Rule 202

25    petition and this petition.

1              THE COURT:  Right.  They're common.

2              I know you make the allegation that

3    Dondero is related to Hunter Mountain, but I guess

4    I don't have any evidence of that.

5              Or do you have evidence of that?  Because

6    otherwise, while it involves some of the same issues in

7    the sense of the underlying facts, technically Farallon

8    is the common respondent.

9              But there's a different respondent and

10   there's a different petitioner in that case.

11             MR. SCHULTE:  Yes.  That's true,

12   Your Honor.  And we've said that on information and

13   belief.

14             THE COURT:  Okay.

15             MR. SCHULTE:  That's our suspicion.

16             We believe that to be the case, but

17   I don't have evidence of it.  I didn't hear a denial

18   of it, but, nevertheless, that is where things stand.

19             But what's important about the case is

20   even if this court and Judge Purdy determined that the

21   cases are not related, what is important is that the

22   same allegations related to this claims trading and the

23   same allegations of inside information being shared by

24   Mr. Seery, those were front and center in the July 2021

25   petition filed by Mr. Dondero.

 1              Even if there are other dissimilarities

 2    between the cases, those are issues that are common.

 3              THE COURT:  Okay.

 4              MR. SCHULTE:  And it's important to note

 5    that as HMIT has filed this petition, it has glossed

 6    over issues of its own standing and the assertion of

 7    viable claims that will justify this discovery.

 8              Now, I know that HMIT has cited these

 9    cases that say, Your Honor, I don't have to state a

10    really specific claim right now.

11              But you do have to articulate some ground

12    for relief, some theory, that would justify the expense

13    and the burden that you're trying to put the respondents

14    to in responding to all this discovery.

15              And this isn't simple discovery.

16    We're talking about deposition topics with I believe

17    29 topics each and 13 sets of really broad discovery

18    requests with a bunch of subcategories.

19              THE COURT:  Right.

20              MR. SCHULTE:  We're not talking about some

21    minimal burden here.  This is an intrusion into entities

22    that are not parties to a lawsuit, but rather this

23    investigation.

24              And HMIT has ignored that there is

25    a specific mechanism in the bankruptcy court that's

1   available to it under federal bankruptcy Rule 2004 and

2   that the substance of HMIT's petition, which is claims

3   trading and bankruptcy, falls squarely within the

4   expertise of Judge Jernigan, the presiding bankruptcy

5   judge.

6                    THE COURT:  And I agree.  You could do

7   this in federal court.  But there's a lot of things

8   that can be done in state court or done in federal

9   court.

10                   They get to choose the method of getting

11  the information, so why should I say, theoretically,

12  yes, this is a good thing, I should do it, but, hey,

13  send it to bankruptcy.  Why?

14                   MR. SCHULTE:  The bankruptcy judge has

15  actually answered that question directly.

16                   THE COURT:  Okay.

17                   MR. SCHULTE:  It is true, as HMIT

18  has said, the federal bankruptcy court doesn't have

19  jurisdiction over a Rule 202 proceeding.  That's not in

20  dispute.

21                   THE COURT:  Right.

22                   MR. SCHULTE:  We tried to remove the

23  last case to federal bankruptcy court and it was a state

24  claim.

25                   But what the bankruptcy judge pointed out

1   when she remanded the case back to Judge Purdy, who

2   ended up dismissing Dondero's petition, is it pointed

3   out, one, there's this mechanism in bankruptcy where

4   they can do the exact same thing, Rule 2004.

5                   And the bankruptcy judge pointed out that

6   it is in the best position to consider Hunter Mountain's

7   request.

8                   It pointed out when it remanded the

9   case that it had grave misgivings about doing so.

10  It confirmed that it is in the best position to

11  consider this presuit discovery.

12                  THE COURT:  Okay.  This is part of one of

13  the exhibits?

14                  MR. SCHULTE:  Yes, Your Honor.  This is

15  in one of the opinions that I included in the binder,

16  a courtesy copy of one of those opinions.

17                  THE COURT:  Oh, at the back?

18                  MR. SCHULTE:  Yes, Your Honor.

19                  THE COURT:  Okay.

20                  MR. SCHULTE:  It's 2022 Bankruptcy

21  Lexis 5.

22                  THE COURT:  Okay.  I got it.

23                  And real quick, for the record,

24  it's <u>Dondero versus Alvarez & Marsal</u>.  It's

25  2022 Bankruptcy Lexis 5.

 1                    MR. SCHULTE:  Right.

 2                    And in particular, Your Honor, I'm looking

 3     at pages 31 to 32 of that order.

 4                    THE COURT:  Okay.

 5                    MR. SCHULTE:  What the judge is pointing

 6     out here is it has grave misgivings about remanding the

 7     case because it knows a thing or two about the Highland

 8     bankruptcy, having presided over the case and all the

 9     related litigation for over what's now three years.

10                    And it's familiar with the legal

11     and factual issues.  It's familiar with the parties.

12     It's familiar with claims trading in a bankruptcy case,

13     which was the very crux of the Dondero petition.  It's

14     also the crux of this petition by Hunter Mountain.

15                    And it observed, the bankruptcy court

16     did, that any case that could be fashioned from the

17     investigation would end up in bankruptcy court anyway

18     because it would be related to the Highland bankruptcy.

19                    So you ask a really good question,

20     Your Honor.  Why should I ship it off to the bankruptcy

21     court.  The answer is Judge Jernigan is in a position

22     to efficiently and practically deal with this request

23     because she deals with it all the time and she is

24     intimately familiar with the legal and factual

25     issues and with claims trading.

 1                     It's not like Hunter Mountain gets poured

 2    out if it goes to bankruptcy court.  It has a mechanism

 3    to seek the exact same discovery from Judge Jernigan who

 4    is very familiar with these very particular issues.

 5                     Now, Hunter Mountain says, well,

 6    bankruptcy court is too time-consuming and cumbersome.

 7    It's going to take 60 days to even get this before the

 8    bankruptcy court.

 9                     Well, we're talking about the fact that

10    they've waited two years to file this proceeding related

11    to these claims transfers that took place in 2021.

12                     So, again, what HMIT is asking this court

13    to do is inefficient and is impractical.  This court

14    would need to devote a lot of resources to understand

15    what the proper scope of any discovery should be,

16    whether the claims are cognizable.

17                     And that's just a tall order, Your Honor.

18    The request is more appropriately dealt with by the

19    bankruptcy judge, according to a proper bankruptcy

20    filing.

21                     It's undisputed that while the bankruptcy

22    court doesn't have jurisdiction over a 202 petition,

23    there's no question that it has jurisdiction over a Rule

24    2004 request for discovery, which is the counterpart

25    for this type of discovery in bankruptcy court.

 1               THE COURT:  Right.

 2               MR. SCHULTE:  The real issue, Your Honor,

 3    and this is the part that Hunter Mountain is dancing

 4    around, is that Hunter Mountain doesn't want to be

 5    in front of Judge Jernigan.

 6               Judge Jernigan held Mark Patrick --

 7    that is HMIT's principal who verified this petition.

 8    She held him along with Dondero and Dondero's counsel

 9    and others in civil contempt and sanctioned them nearly

10    $240,000 for trying to join Seery to a lawsuit in

11    violation of Judge Jernigan's gatekeeping orders.

12               HMIT is trying to dodge the bankruptcy

13    court and its scrutiny of what HMIT is doing as this

14    petition also targets Seery and the inside information

15    that he purportedly gave to Farallon and Stonehill.

16               This is forum shopping, plain and simple.

17    And the court should dismiss the petition so that HMIT

18    can seek this discovery in bankruptcy court.

19               Now, I don't want to spend a lot of time

20    on the related case, but I will emphasize just what I've

21    mentioned, which is while some of the parties may be

22    different, we're still talking about the same claims

23    trading activity that took place in 2021 and the same

24    allegations of insider dealing by Seery.

25               And Judge Purdy, on remand, dismissed

1  that petition where some of the same arguments were made

2  about judicial efficiency and that the case should be

3  filed in bankruptcy court.

4              And it bears noting, by the way, that

5  after Judge Purdy dismissed Dondero's Rule 202 petition,

6  where we had argued that this ought to be in the

7  bankruptcy court, Dondero didn't file in the bankruptcy

8  court, which sort of makes the point that they didn't

9  want to be in front of Judge Jernigan on this either.

10             Okay.  Now let's turn to the merits,

11 Your Honor.  While Mr. McEntire has gone to great

12 lengths to say we don't have to state claims, he stated

13 five or six on that PowerPoint presentation of claims

14 that he envisions.

15             But what made it all really crystal clear

16 is in that notice of supplemental evidence, and that

17 includes the declaration of Mr. Patrick, there in

18 paragraphs 15 and 16 it's made clear what Hunter

19 Mountain really wants.

20             THE COURT:  Okay.

21             MR. SCHULTE:  What the goal of this

22 discovery is is to invalidate the claims that Farallon

23 and Stonehill's entities purchased.

24             So let's unpack what it is they purchased.

25             THE COURT:  Okay.

1              MR. SCHULTE:  These are claims that were

2    not ever held by Hunter Mountain.  These are claims

3    that were held by Redeemer, Acis, UBS, and HarbourVest.

4              THE COURT:  Right.  They were the Class 8

5    and 9.  Right?

6              MR. SCHULTE:  I believe that's correct.

7              THE COURT:  Okay.

8              MR. SCHULTE:  Those claims were always

9    superior to whatever it was that Hunter Mountain held.

10             So Redeemer, Acis, UBS, and HarbourVest

11   held those claims.  The parties in the bankruptcy had

12   the opportunity to file objections to those claims.

13   And they did.

14             And Seery, on behalf of the debtor,

15   negotiated with Redeemer, Acis, UBS, and HarbourVest

16   and reached settlements that resolved the priority and

17   amounts of those claims.

18             THE COURT:  Right.

19             MR. SCHULTE:  And then filed what's

20   referred to -- and I'm sure Your Honor knows this --

21   as a Rule 9019 motion to approve those settlements in

22   the bankruptcy court.

23             THE COURT:  Actually, I don't.  I've never

24   done bankruptcy but I read it.  I know the general

25   process and I did read it.

```
 1                    MR. SCHULTE:  All right.

 2                    THE COURT:  Just FYI, I've never done

 3    bankruptcy law.  They've got their own rules.

 4                    MR. SCHULTE:  Well, the parties in

 5    the bankruptcy had the opportunity to object to those

 6    settlements and some did so.

 7                    And after evidentiary hearings, the

 8    bankruptcy court granted those motions and allowed

 9    and approved those claims.

10                    That is really important, Your Honor.

11                    THE COURT:  Okay.

12                    MR. SCHULTE:  That's Exhibits 14 through

13    17 in the binder that I handed you.

14                    And these are the same exhibits that are

15    referenced in Hunter Mountain's petition.  And it bears

16    noting that the U.S. District Court affirmed those

17    orders after appeals were taken.

18                    But the bankruptcy court's approval of

19    the very same claims that Hunter Mountain now seeks to

20    investigate and invalidate is entitled to res judicata.

21                    HMIT can't now second-guess the bankruptcy

22    court's orders approving those very same claims.  That's

23    the effect of the investigation that Hunter Mountain

24    seeks, the invalidation of claims that are already

25    bankruptcy court approved.
```

1    And it bears noting that each of those

2    four orders, Exhibits 14 through 17, provides the

3    following:  quote, "The court" -- the bankruptcy

4    court -- "shall retain exclusive jurisdiction to

5    hear and determine all matters arising from the

6    implementation of this order."

7    This would include HMIT's stated goal

8    of conducting discovery to try to invalidate these

9    very claims.

10    This is yet another reason, Your Honor, to

11    answer your question earlier of why this request for

12    discovery should be posed to the bankruptcy court.

13    Judge Jernigan, I suspect, would have

14    views on whether her own orders authorizing these claims

15    should be overturned.

16    Okay.  So HMIT -- Hunter Mountain --

17    alleges that after the bankruptcy court approved these

18    claims, Seery disclosed inside information to Farallon

19    and to Stonehill to encourage them to buy these claims

20    from the original claimants.  Again, UBS, Redeemer,

21    Acis, and HarbourVest.

22    Farallon, through Muck, which is its

23    special purpose entity, and Stonehill through Jessup,

24    which is Stonehill's special purpose entity, acquired

25    those transferred claims in 2021.

1          And there's no magic in bankruptcy court

2    to claims transfers.  It's a contractual matter between

3    the transferors and the transferees.  It's strictly

4    between them.

5          THE COURT:  Okay.

6          MR. SCHULTE:  And there's no bankruptcy

7    court approval that's even required.

8          The transferee, so in this case Muck and

9    Jessup, had simply to file under federal bankruptcy

10   Rule 3001(e) a notice saying these claims were

11   transferred to us.  And they did so.

12         Your Honor, that's Exhibit 6 through 11 in

13   the binder that I handed to you.

14         THE COURT:  Okay.

15         MR. SCHULTE:  The filings evidencing those

16   claims transfers were public.  And Hunter Mountain

17   received the claims transfer notices.

18         And that's the exhibits that we were

19   talking about, Exhibits 12 through 13, where Hunter

20   Mountain's lawyers had appeared in the case before those

21   claims transfer notices were filed.

22         So not surprisingly, Hunter Mountain did

23   not file any objections to those claims transfers.  And

24   that's not surprising because under Rule 3001, the only

25   party that could object to the claims transfers were

1  the transferors themselves.

2                    THE COURT:  Right.

3                    MR. SCHULTE:  Essentially saying, hold on.

4  We didn't transfer these claims.  But of course there's

5  no dispute that the transfers were made.

6                    Here, HMIT was neither the transferor nor

7  the transferee of the claims.  It had no interest in

8  these claims.  It never did.  It didn't before the

9  claims transfers and it didn't after the claims

10 transfers.

11                    The claims originally belonged to

12 Redeemer, Acis, UBS, and HarbourVest, and they were then

13 transferred to Muck and Jessup, which are Farallon's and

14 Stonehill's entities.

15                    THE COURT:  Right.

16                    MR. SCHULTE:  So why does that matter?

17 That matters because these claims were approved by the

18 bankruptcy court.  The claims didn't change or become

19 more valuable after they were transferred.  The only

20 difference is who is holding the claims.

21                    So Hunter Mountain says, hold on.  What

22 we're alleging here is that the claims that Farallon and

23 Stonehill purchased with the benefit of this purported

24 inside information from Mr. Seery, they're secretly

25 worth more than expected.

1           Those allegations, they're disputed, to be

2    sure.  But let's assume they're true.  That situation

3    has zero impact on Hunter Mountain.

4           THE COURT:  Okay.

5           MR. SCHULTE:  And that's because this is a

6    matter that's strictly between the parties to the claims

7    transfers.  Again, Redeemer, Acis, UBS, and HarbourVest

8    on the one hand and Farallon and Stonehill on the other.

9           And the way we know this is let's

10   pretend that Muck and Jessup didn't buy these claims,

11   Your Honor, and that the claims instead have remained

12   with UBS, HarbourVest, Acis, and whatever the other

13   one I'm forgetting.  The claims wouldn't have been

14   transferred, and they would have remained with those

15   entities.

16          In that case, the original claimants would

17   have held those claims for longer than they wanted.  And

18   if HMIT is right, then the claims would have ended up

19   being worth more than even they expected.

20          So why does that matter?  Well, that

21   matters because if that is all true, Hunter Mountain

22   would be in the exact same place today.  Neither better

23   nor worse off, it would be in the exact same place.

24          Either Farallon and Stonehill's entities

25   are gaining more on these claims than they expected

1  or UBS, HarbourVest, Acis, and Redeemer, they are

2  realizing more on these claims than they expected.

3            But Hunter Mountain never stood to be paid

4  on these claims to which it was a stranger.  These are

5  claims in which Hunter Mountain never had any interest.

6            THE COURT:  So presuming that Hunter

7  Mountain had expressed interest in buying these claims

8  and there was insider trading, you don't think that

9  would be a tortious interference in a potential

10  contract?

11            MR. SCHULTE:  If there was insider trading

12  of the type that Hunter Mountain alleges in this case,

13  it would have no impact on the rights of Hunter

14  Mountain.

15            If that's true, maybe there was a fraud on

16  the bankruptcy court.  The bankruptcy court would surely

17  be interested in that.  Maybe there was a fraud on the

18  transferors.  I mean, maybe UBS, Redeemer, Acis -- why

19  do I always forget the third one? -- and HarbourVest.

20            THE COURT:  Like I said, I had a chart

21  last night of all the names.  Obviously, I haven't been

22  involved in this case up until now, and there's a lot of

23  names.

24            MR. SCHULTE:  Yes.

25            The transferors of the claims might say,

1  well, wait a minute.  I wish I would have known this

2  inside information.  I'm the one that was really injured

3  here.

4            Because if there was really meat on this

5  bone, Your Honor, then the injured parties would be

6  the transferors of the claims:  Redeemer, Acis, UBS,

7  and HarbourVest.

8            Because the crux of HMIT's petition is

9  that those entities, the transferors, were duped into

10  selling their claims for too little when the claims were

11  secretly worth more.

12            Well, if that's true, you would expect

13  that the transferors would be screaming up and down

14  the hallway, saying we didn't get paid enough.

15            THE COURT:  Right.

16            MR. SCHULTE:  We are the injured parties

17  here, we are the ones with damages, we want to unwind

18  these claims transfers, or we want to be paid more on

19  these claims transfers.

20            But the rights of those entities,

21  the transferors, to complain about these allegations

22  doesn't mean that Hunter Mountain can also stand up and

23  say, well, I want to complain too.  Because Hunter

24  Mountain never stood to be paid on these claims.

25            The question is if somebody was duped,

 1    if somebody was injured, if anybody it was the

 2    transferors, not Hunter Mountain.  The transferors would

 3    be the only real parties in interest that would have

 4    been injured by what Hunter Mountain alleges.

 5              But it's notable that none of those

 6    transferors has filed an objection to these transfers.

 7              THE COURT:  Right.

 8              MR. SCHULTE:  None of them has filed a

 9    Rule 202 proceeding.  None of them has filed a Rule 2004

10    proceeding seeking discovery about inside information

11    that Farallon and Stonehill allegedly had.  It is

12    Hunter Mountain who is an absolute stranger to

13    these claims trading transactions.

14              And so HMIT is trying to inject itself

15    into a transaction to which it was never a party and

16    which it never had any interest.

17              The sellers were entitled to sell those

18    claims to any buyer they wanted to on whatever terms

19    they agreed to.

20              And if there was some information that

21    they didn't have the benefit of that the buyers did,

22    you would expect the transferors, if anyone at all,

23    to be the ones complaining about it.  But that's not

24    what we have here.

25              THE COURT:  Okay.

1          MR. SCHULTE:  All right.  Another note

2   that Hunter Mountain glosses over is duty.

3          So all the claims that were listed on

4   the PowerPoint all require that there must have been

5   some kind of a duty owed by Farallon and Stonehill to

6   Hunter Mountain.  But there's no duty owed to a stranger

7   to a claims trading transaction.

8          Yet again, if anybody were to have a

9   duty owed to it, I guess it would be the transferors

10  of the claims even though that was an arm's length

11  transaction.

12          But it's not a stranger to the transaction

13  and a stranger that has no interest in the claims that

14  we're talking about here.

15          THE COURT:  Okay.

16          MR. SCHULTE:  Nor has Hunter Mountain

17  identified any authority for a private cause of action

18  belonging to Hunter Mountain related to these claims

19  transfers.

20          Hunter Mountain doesn't have the right to

21  assert claims on behalf of other parties.  It only has

22  the right to assert claims on behalf of itself when it

23  has been personally aggrieved.

24          I heard Mr. McEntire say several times

25  during his presentation that Hunter Mountain had a

1    99.5 percent equity interest in Highland Capital.

2                    THE COURT:  Right.

3                    MR. SCHULTE:  I think it's important to

4    point out that that equity interest was completely

5    extinguished by the confirmed plan in the bankruptcy

6    case.

7                    As Your Honor pointed out, we have the

8    waterfall, and Classes 1 through 9 have to be paid in

9    full.  And you know what Classes 8 and 9 are?  General

10   unsecured claims and subordinated claims.

11                   And the only way that Hunter Mountain

12   is ever in the money, as Mr. McEntire was saying, with

13   its Class 10 claim is if Seery, the claimant trustee,

14   certifies that all claims in 1 through 9 are paid in

15   full 100 percent with interest and all indemnity claims

16   are satisfied.

17                   There has been no such certification by

18   Mr. Seery, and there may never be such a certification

19   by Mr. Seery.

20                   THE COURT:  Okay.

21                   MR. SCHULTE:  So that is real important

22   because the idea that Hunter Mountain stands to somehow

23   gain from this transaction is flawed for the reasons

24   we've already talked about.

25                   But it's also flawed because they have

1  what is, at best, a contingent interest.  It's

2  contingent on things that have not yet occurred.  And

3  under the case law, they don't have standing conferred

4  on them in that interest.

5                    THE COURT:  Okay.

6                    MR. SCHULTE:  So for all those reasons why

7  there is no interest in the claims, no legal damages, no

8  duty owed to it, no private cause of action belonging

9  to it and a hypothetical and contingent interest, HMIT

10 lacks standing to investigate or challenge these claims

11 and claims transfers to which it was not a party and in

12 which it had zero interest.

13                    And for any or all of the reasons

14 we've talked about, Your Honor, their petition should be

15 dismissed.  I welcome any questions the court may have.

16                    THE COURT:  No.  My head is kind of

17 spinning.  Like I said, I spent all day yesterday

18 reading stuff.  As I said, I will admit I've never

19 practiced bankruptcy law.

20                    I mean, my joking statement is I pretty

21 much know enough to not be in contempt of bankruptcy

22 court.  Because I have cases where one of the defendants

23 or one of the parties ends up in bankruptcy court and

24 whether or not I can proceed with my case, et cetera.

25 That's my whole goal is not to be in contempt of court.

1              MR. SCHULTE:  That should be the goal, is

2   to not be in contempt of the bankruptcy court.

3              MR. McENTIRE:  May I have just five or ten

4   minutes?

5              THE COURT:  I don't have another hearing,

6   so we're fine on time.

7              MR. McENTIRE:  All right.  In all due

8   deference to Mr. Schulte, the last 15 minutes of his

9   argument misstates the law.

10             THE COURT:  Okay.

11             MR. McENTIRE:  The Washington Mutual case

12  addresses almost 90 percent of what he just talked

13  about.  Their equity was entitled to bring an action

14  to basically disallow an interest that was acquired by

15  inside information.

16             Okay.  And so he has not addressed the

17  Washington Mutual case at all.

18             THE COURT:  Well, okay.  So my question

19  is let's say that the insider trading didn't happen.

20             I mean, when I was playing with the

21  numbers last night, it doesn't appear that Hunter

22  Mountain, being Class 10, would have gotten anything

23  anyways even if.  Right?

24             Like I said, I did a lot of reading last

25  night, so I want to make sure I understand.

1              MR. McENTIRE:  Fair enough.  I think I can

2    address that.

3              The bottom line is a wrongdoer should

4    not be entitled to profit from his wrong.  That's

5    the fundamental premise behind the restatement on

6    restitution.  That's the fundamental purpose of

7    the <u>Washington Mutual</u> case.

8              You have remedies, including disgorgement,

9    disallowance or subordination.

10              THE COURT:  I'm just trying to be devil's

11    advocate because I'm trying to work through this.

12              So let's say it did happen and the court

13    ordered disgorgement and invalidated these transfers,

14    then the money would just go to the Class 8 and

15    Class 9.  Right?  To Acis, UBS, HarbourVest, etc.

16              MR. McENTIRE:  No, they would not.

17    Because those claims have already been traded.

18              THE COURT:  Okay.  Well, that's

19    what I'm saying.

20              If the court said there was insider

21    trading and to disallow the transfer and ordered

22    disgorgement, theoretically, back to Highland Capital,

23    then the money is there.

24              Okay.  So then it would just go to Acis

25    and UBS.  Right?

1          MR. McENTIRE:  The remedy here is to

2   subordinate their claims.  HarbourVest, UBS, Acis, and

3   the Redeemer committee have sold their claims.  They can

4   intervene if they want and that's up to them.  If they

5   want to take the position that they were defrauded,

6   that's up to them.

7          THE COURT:  Okay.

8          MR. McENTIRE:  Otherwise, the remedy is to

9   disgorge the proceeds and put them back into the coffers

10  of the bankruptcy court in which case Category 8 and 9

11  would be brimful, overflowing, and flow directly into

12  the coffers in Class 10.

13          And that's the purpose of 15 and 16 in

14  Mr. Patrick's affidavit.

15          THE COURT:  Okay.

16          MR. McENTIRE:  I find it amazing that he

17  refers to Judge Jernigan's orders where he said anything

18  dealing with these claims must come back to me.  I have

19  exclusive jurisdiction.  I recall that argument.

20          THE COURT:  Right.

21          MR. McENTIRE:  Well, she could have

22  accepted the removal of Mr. Dondero in that other

23  proceeding.  She didn't.  She said I don't have

24  jurisdiction over this.  I'm sending it back to

25  the state court.

1              THE COURT:  Okay.  Because it was filed

2    as a 202.  If it had been filed as a Rule 404, then she

3    would have had jurisdiction because you're specifically

4    invoking a state court process.  Right?

5              MR. McENTIRE:  I'm invoking exclusively

6    a state court process because of the benefit it

7    provides.  That is a strategic choice that this

8    petitioner has elected.  It has nothing to do with

9    bankruptcy court, other than bankruptcy court is too

10   slow.

11             All the invective about the prior contempt

12   order has nothing to do with these proceedings.

13   Mr. Dondero is not involved in these proceedings.

14             If HarbourVest and UBS want to intervene

15   in some subsequent lawsuit, they have a right to do so.

16   I can't stop them.

17             But until then, we have stated a cause

18   of action or at least a potential cause of action which

19   is insider trading.  That from an outsider makes them an

20   insider that owes fiduciary duties to the equity.

21             Washington Mutual allowed equity to come

22   in and disallow those claims.  And if those claims are

23   disallowed, the Class 10 is going to be overflowing on

24   the waterfall.  And that's my client.

25             A couple of other things.  Hunter Mountain

 1   is not a stranger.  Hunter Mountain was the big elephant

 2   in the room until the effective date of the plan.

 3              We held 99.5 percent of the equity stake

 4   and when all of these wrongdoings occurred, Hunter

 5   Mountain was still the 99.5 percent equity stakeholder.

 6              It's only after the bankruptcy plan had

 7   gone effective, after these claims had already been --

 8              THE COURT:  Wait.  The insider trading

 9   happened after the bankruptcy had been filed but before

10   the bankruptcy was resolved.

11              So it's during that process.  Right?

12              MR. McENTIRE:  You have filing a

13   bankruptcy.  You have a bankruptcy plan.  You have

14   confirmation of the plan, but it doesn't go effective

15   until six months later.

16              THE COURT:  Right.

17              MR. McENTIRE:  After the bankruptcy

18   plan was confirmed and they had dismal estimates of

19   recovery -- 71 percent on Class 8, zero percent on

20   Class 9 -- that's when Farallon and Stonehill purchased

21   the claims.

22              But they purchased the claims at a time

23   before the bankruptcy wasn't effective.  And so the

24   so-called claimant trust agreement had not gone into

25   effect until several months later.

```
 1                    THE COURT:  Okay.

 2                    MR. McENTIRE:  And during this period of

 3      time Hunter Mountain was the very, very largest

 4      stakeholder.

 5                    THE COURT:  Okay.

 6                    MR. McENTIRE:  And so to call it a

 7      stranger is just not right and it's not fair because

 8      we're anything but a stranger.

 9                    They make an argument that Hunter Mountain

10      didn't object to the settlements.  Well, so what?

11      I'm not attacking the underlying settlements.

12      I'm attacking the claims transfers.

13                    And then he says, well, why didn't they

14      object to the claims transfers.  Well, he finally

15      conceded that the claims transfers are not actually

16      subject to a judicial scrutiny by the bankruptcy court.

17                    This court is uniquely qualified to

18      review these claims transfers as is Judge Jernigan.

19      Insider information is insider information as a rose

20      is a rose is a rose.  And any court of law is qualified

21      to determine whether insider information was used.

22                    Judge Jernigan did not say, okay,

23      Farallon, you can buy this claim.  There was no

24      judicial process here.

25                    THE COURT:  Right.  I mean, it's a motion.
```

 1  We want to do this, just get approval.

 2              MR. McENTIRE:  They don't even have to get

 3  approval.

 4              THE COURT:  Okay.

 5              MR. McENTIRE:  All they have to do is file

 6  notice.

 7              THE COURT:  Okay.  File the notice.

 8              MR. McENTIRE:  Judge Jernigan was not

 9  involved at all.

10              We had no reason to object.  All we know

11  there's a claims transfer.  It's not until later that

12  we discover that inside information was used and that's

13  why we're here.

14              So we didn't object to the original

15  claims.  There was no need to.  The original settlements

16  rather.  There was no need to.  There was no objection

17  to the claims transfers.

18              There was no mechanism to object, other

19  than what we're doing here today.  This is our

20  objection.  This is our attempt to object.

21              Because we believe that they have acquired

22  hundreds of millions of dollars of ill-gotten gain and

23  if that is true, not only will Hunter Mountain be

24  benefited tremendously, but other unsecured creditors.

25  They are very few but they will be also benefited.

 1                    Frankly, Judge Jernigan may want that to

 2   happen.

 3                    THE COURT:  Okay.

 4                    MR. McENTIRE:  But we're here to get the

 5   discovery so I can pull it all together within the next

 6   30 days or 40 days.  So I can make decisions before

 7   somebody might suggest, hey, well, you should have

 8   filed this a little bit earlier.

 9                    And so, Judge, that's why we're here,

10   in the interest of time.  And that was my decision.

11   That was my strategic decision to bring it here.

12                    THE COURT:  Right.

13                    MR. McENTIRE:  He says that Rule 3001 is

14   the exclusive remedy.  Only transferors can complain

15   about transferees or vice versa.

16                    THE COURT:  You're not necessarily

17   complaining about the actual transfer.  It's how

18   the transfer came about.

19                    MR. McENTIRE:  That's right.

20                    And to suggest that that is the governing

21   principle that this court should consider is an absolute

22   contradiction to the Washington Mutual case.

23                    Because if fraud is in play, if inside

24   information is in play, then it impacts everyone who

25   is a stakeholder.  Everyone.

```
1                    THE COURT:  Okay.

2                    MR. McENTIRE:  And we are one of the

3    largest stakeholders in the bankruptcy proceedings,

4    even today.  So that's all I have.

5                    I thank you for your attention,

6    Your Honor.  Clearly, the benefit here is we get to

7    uncover some things that need to be uncovered.  And

8    we'd like to do it so in a timely fashion.

9                    And if we don't have a claim, we don't

10   have a claim.  If we have a claim, then we may file it

11   in a state district court.

12                   And if Judge Jernigan and her gate-keeping

13   orders require us to go there, we'll go there.  I'm not

14   going to run afoul of any rule she has, but we need to

15   get this underway.

16                   THE COURT:  Okay.

17                   MR. SCHULTE:  Your Honor, may I make some

18   rifle-shot responses?

19                   THE COURT:  Yeah.  That's fine.

20                   MR. SCHULTE:  Okay.  Mr. McEntire has said

21   that they are one of the largest stakeholders in the

22   Highland bankruptcy based on this 99.5 percent equity.

23   That equity was extinguished in the fifth amended plan.

24                   That's Exhibit 3 that I handed you,

25   Your Honor.  That plan was filed in January of 2021
```

 1   before any of these claims transfers took place.

 2   The equity was extinguished by virtue of the plan.

 3                  THE COURT:  Okay.

 4                  MR. SCHULTE:  Mr. McEntire was talking

 5   about this Washington Mutual case.  I read the case.

 6                  But what he said repeatedly, and I think

 7   it's really important to listen to what Mr. McEntire

 8   said about this case, is that that court allowed the

 9   equity to come in and talk about these transfers.

10                  Hunter Mountain doesn't have any equity.

11   That equity was extinguished in the plan for reasons

12   I just discussed.  So for being the largest stakeholder,

13   according to Mr. McEntire, in the bankruptcy what does

14   Hunter Mountain have to show for that?  A Class 10.

15                  As Your Honor pointed out, a Class 10

16   interest, that is below everybody else.  And that's

17   where they've been relegated.

18                  And to answer your question, Your Honor,

19   that you posed to Mr. McEntire that I'm not sure was

20   ever answered, HMIT -- Hunter Mountain -- at Class 10

21   stood to gain nothing when the plan was put together.

22   So the largest stakeholder stood to gain nothing.

23                  I've pointed to the language in the

24   court's order about how the court has exclusive

25   jurisdiction.

1            And Your Honor nailed the answer to the

2    concern raised by Mr. McEntire, which is the bankruptcy

3    court didn't have jurisdiction over a 202 proceeding.

4    But it unquestionably has authority over the

5    counterpart, 2004 in bankruptcy court.

6            THE COURT:  Right.

7            MR. SCHULTE:  Finally, I have never argued

8    and if I did say this, I apologize.  I have never argued

9    that Hunter Mountain is somehow a stranger to the

10   bankruptcy.

11           THE COURT:  Right.  They were obviously

12   involved in the bankruptcy, but they're a stranger to

13   these transfers.

14           MR. SCHULTE:  Exactly.  They were a

15   stranger to these transactions.  They didn't have any

16   interest in these claims.

17           They don't stand to gain anything if

18   the claims are either rescinded or if the claims are

19   invalidated or the transfers are invalidated.  They

20   don't stand to get anything because they never had

21   any interest in these claims.

22           The claims are the claims and either UBS,

23   Redeemer, Acis, and HarbourVest stood to gain more than

24   expected or Farallon and Stonehill stand to gain more

25   than expected.

 1                    And if anybody is really injured here,

 2    it's not Hunter Mountain.  It's the transferors who

 3    were duped into these transfers, according to Hunter

 4    Mountain.  And they would be the ones that would have

 5    damage and have a claim along the lines of what

 6    Hunter Mountain is trying to assert on behalf

 7    of all stakeholders.

 8                    Your Honor, I have a proposed order, as

 9    Mr. McEntire does.

10                    May I bring it up?

11                    THE COURT:  Yes, you may.

12                    Okay, Mr. McEntire.  Anything else?

13                    MR. McENTIRE:  His last few statements are

14    inconsistent with the law, Your Honor.

15                    THE COURT:  Okay.

16                    MR. McENTIRE:  Because the law clearly,

17    clearly indicates that we are a beneficiary.  And

18    that's what the Washington Mutual case stands for.

19                    THE COURT:  Okay.  Wait.  Let me make sure

20    I know which one.

21                    Do you have a cite for that case?

22                    MR. McENTIRE:  Yes, ma'am.  It's in the

23    PowerPoint.

24                    THE COURT:  That's fine.  I just wanted

25    to make sure I could find it.

 1                    MR. McENTIRE:  There's also a Fifth

 2   Circuit case that talks about subordination where

 3   a Class 8 and Class 9 would actually be subordinated,

 4   Your Honor, to our claim.

 5                    So that's another approach to this, is

 6   subordination.

 7                    THE COURT:  Okay.

 8                    MR. McENTIRE:  And that's the In re Mobile

 9   Steel case out of the Fifth Circuit.  I think there's a

10   cite in our brief.

11                    THE COURT:  Okay.

12                    MR. McENTIRE:  I acknowledge that

13   we're now classified with a different name.  We're

14   a B/C limited partner.  And we're, in effect, a Class 10

15   beneficial interest.

16                    But we're there having been a 99.5.  And

17   the lion share of any money, 99.5 percent of any money

18   that overflows into bucket No. 10 is ours.

19                    THE COURT:  Right.

20                    Okay.  I am processing.  Obviously, I need

21   to take this into consideration.  I haven't had a chance

22   to go through Respondent's exhibits.

23                    I've looked through the plaintiff's

24   exhibits, but now I have much more of a focus of what

25   I'm doing.

```
 1                    So I will try to get you all a ruling
 2      by the end of next week.  I apologize.  I've got a
 3      special setting next week that's going to be kind
 4      of crazy, but I will do everything I can.
 5                    If you all haven't heard from me by next
 6      Friday afternoon, call my coordinator Texxa and tell
 7      her to bug me.
 8                    MR. McENTIRE:  Thank you for your time.
 9                    THE COURT:  You all are excused.  Have
10      a great day.
11
12
13                    (This completes the Reporter's Record,
14                    Petitioner Hunter Mountain Investment
15                    Trust's Rule 202 Petition, which was
16                    heard on Wednesday, February 22, 2023.)
17
18
19
20
21
22
23
24
25
```

1   STATE  OF  TEXAS  )

2   COUNTY OF DALLAS  )

3           I, Gina M. Udall, Official Court Reporter

4   in and for the 191st District Court of Dallas County,

5   State of Texas, do hereby certify that the above and

6   foregoing contains a true and correct transcription of

7   all portions of evidence and other proceedings requested

8   in writing by counsel for the parties to be included in

9   this volume of the Reporter's Record in the above-styled

10  and numbered cause, all of which occurred in open court

11  and were reported by me.

12          I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, offered by the respective parties.

15          I further certify that the total cost for the

16  preparation of this Reporter's Record is $750.00 and was

17  paid by the attorney for Respondents.

18          WITNESS MY OFFICIAL HAND on this the 1st day of

19  March 2023.

20

21                  ____/S/____Gina M. Udall____
                    Gina M. Udall, Texas CSR  #6807
22                  Certificate Expires: 10-31-2024
                    Official Reporter, 191st District
23                  Court of Dallas County, Texas
                    George Allen Sr. Courts Building
24                  600 Commerce St., 7th Floor
                    Dallas, Texas  75202
25                  Telephone:  (214) 653-7146

# Exhibit 4-C

HMIT Appx. 00378

Cause No. DC-23-01004

| | | |
|---|---|---|
| In Re: | § | In the District Court |
| | § | |
| Hunter Mountain Investment Trust, | § | Dallas County, Texas |
| | § | |
| Petitioner. | § | 191st Judicial District |
| | § | |

## ORDER

Came on for consideration *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* ("Petition") filed by petitioner Hunter Mountain Investment Trust ("HMIT"). The Court, having considered the Petition, the joint verified response in opposition filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"), HMIT's reply, the evidence admitted during the hearing conducted on February 22, 2023, the argument of counsel during that hearing, Farallon's and Stonehill's post-hearing brief, the record, and applicable authorities, concludes that HMIT's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that HMIT's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this _____ day of March, 2023.

_____
Honorable Gena Slaughter

# Exhibit 4-D

HMIT Appx. 00380

State of Delaware
Secretary of State
Division of Corporations
Delivered  09:24 AM 03/09/2021
FILED  09:24 AM 03/09/2021
SR  20210838989  - File Number  5421257

CERTIFICATE OF FORMATION

OF

Muck Holdings, LLC

FIRST:  The name of the limited liability company is:

Muck Holdings, LLC

SECOND:  Its registered office in the State of Delaware is to be located at 251 Little Falls Drive, in the City of Wilmington, Delaware, 19808, and its registered agent at such address is CORPORATION SERVICE COMPANY.

IN WITNESS WHEREOF, the undersigned, being the individual forming the Company, has executed, signed and acknowledged this Certificate of Formation this 9th day of March, 2021.

By: /s/ Hanchang Sohn
Name: Hanchang Sohn
Title:  Authorized Person

HMIT Appx. 00381

# Exhibit 4-E

HMIT Appx. 00382

# CERTIFICATE OF FORMATION

## OF

## Jessup Holdings LLC

**FIRST:**     The name of the limited liability company is Jessup Holdings LLC.

**SECOND:**     The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:**     Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

     **IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation on April 08, 2021.

     */s/Taylor Lolya*
     Taylor Lolya, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:10 PM 04/08/2021
FILED 01:10 PM 04/08/2021
SR 20211222936 - File Number 5822640

**HMIT Appx. 00383**

# Exhibit 4-F

HMIT Appx. 00384

| From: | Roger L. McCleary |
|---|---|
| To: | Schulte, David C (DAL - X59419) |
| Cc: | Sawnie A. McEntire |
| Subject: | HMIT — court's order/HMIT's request for information |
| Date: | Thursday, March 9, 2023 3:46:00 PM |

David,

      Thank you. This ruling denies Hunter Mountain Investment Trust ("HMIT") the investigatory discovery sought from Farallon Capital Management, LLC ("Farallon") and Stonehill Capital Management, LLC ("Stonehill") under Tex. R. Civ. P. 202. Accordingly, HMIT requests that Farallon and Stonehill advise whether they will *voluntarily* provide some or all of the information and documents requested in HMIT's Rule 202 Petition and, if so, under what terms. Please let us know by Tuesday, March 14th, whether Farallon and Stonehill will consider doing so. If so, we are available to discuss this at your earliest convenience.

      In any event, HMIT also requests that Farallon and Stonehill *voluntarily* respond to the following two specific requests, which they can answer in a matter of minutes:

1. A simple description of the legal relationship: a) between Farallon and Muck Holdings, LLC  ("Muck"), and b) between Stonehill and Jessup Holdings, LLC ("Jessup").
2. Whether: a) Farallon is a co-investor in any fund in which Muck holds an interest related to the Claims at issue in the Rule 202 Petition; b) Stonehill is a co-investor in any fund which Jessup holds an interest related to the Claims at issue in the Rule 202 Petition.

We would also appreciate prompt written responses to these two specific requests. To the extent we do not receive written responses to these two requests by close of business on Tuesday, March 14th, this will be taken as Farallon and Stonehill's refusal to provide the requested responses. Similarly, to the extent we do not receive a written confirmation of Farallon and Stonehill's willingness to discuss voluntary production of more of the information and documents requested in HMIT's Rule 202 Petition by then, this will be taken as their refusal to consider doing so.

      Please let us know if you or your clients have any questions about this request. Thank you.

Regards, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmlaw.com

This e-mail message is for the sole use of the intended  recipient(s) and may contain confidential and privileged  information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you

are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Schulte, David C (DAL - X59419) <David.Schulte@hklaw.com>
**Sent:** Wednesday, March 8, 2023 9:08 PM
**To:** Sawnie A. McEntire <smcentire@pmmlaw.com>; Roger L. McCleary <rmccleary@pmmlaw.com>
**Cc:** Timothy J. Miller <tmiller@pmmlaw.com>
**Subject:** [EXTERNAL] HMIT — court's order

Counsel--attached is a copy of the court's order in this case.

Dave

**David C. Schulte** | **Holland & Knight**
Partner
Holland & Knight LLP
1722 Routh St., Suite 1500 | Dallas, TX 75201
Cell 214-274-4141
Phone 214-964-9419
Fax 214-964-9501
david.schulte@hklaw.com | www.hklaw.com

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |

**ORDER GRANTING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY
MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING**

Upon consideration of the *Emergency Motion for Leave to File Adversary Proceeding*

[Dkt. __] (the "Motion") filed by Hunter Mountain Investment Trust ("HMIT"), and having

considered any responses thereto, the Court finds that: (1) the claims alleged in HMIT's Proposed

Adversary Complaint [Dkt. __-1] against James P. Seery ("Seery"), Stonehill Capital

Management, LLC, Farallon Capital Management, LLC, Muck Holdings, LLC, and Jessup

Holdings, LLC (the "Claims") are colorable; (2) any demand on any other persons or entities to

1

prosecute the Claims would be futile; (3) HMIT is an appropriate party to bring the Claims on behalf of the Reorganized Debtor and the Highland Claimant Trust; and (4) HMIT's Motion should be granted.

It is therefore **ORDERED THAT:**

1.    The Motion is GRANTED.

2.    HMIT is granted leave to file its Proposed Adversary Complaint [Dkt. __-1] as an adversary proceeding in this Court.

<div align="center">

**###END OF ORDER###**

</div>

Submitted by:
**Parsons McEntire McCleary PLLC**

/s/ Sawnie A. McEntire_____
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*