# HMIT Exhibit 11

HMIT Appx. 01196

1

2                         **REPORTER'S RECORD**

3                          **VOLUME 1 OF 1**

4          **COURT OF APPEALS CAUSE NO. 00-00-00000-CV**

5            **TRIAL COURT CAUSE NO. DC-23-01004-J**

6

IN RE:                          )  IN  THE  DISTRICT COURT
7                                )
                                 )
8   HUNTER MOUNTAIN              )
    INVESTMENT TRUST,            )  OF DALLAS COUNTY, TEXAS
9                                )
                                 )
10       Petitioner.            )  191ST JUDICIAL DISTRICT

11

12

13       **PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

14                     **RULE 202 PETITION**

15                      **which was heard on**

16              **Wednesday, February 22, 2023**

17

18

19          On the 22nd day of February 2023, the following

20   proceedings came on to be heard in the above-entitled

21   and numbered cause before the Honorable Gena Slaughter,

22   Judge Presiding, held in Dallas, Dallas County, Texas,

23   and the following proceedings were had, to wit:

24          Proceedings reported by machine shorthand

25   utilizing computer-assisted realtime transcription.


                    GINA M. UDALL, CSR, RPR
            Official Reporter, 191st District Court
                                          HMIT Appx. 01197

1  <u>APPEARANCES</u>:

2

3  MR. SAWNIE A. McENTIRE           ATTORNEYS FOR PETITIONER
   State Bar No. 13590100          Hunter Mountain
4  PARSONS McENTIRE                Investment Trust
       McCLEARY, PLLC
5  1700 Pacific Avenue
   Suite 4400
6  Dallas, Texas  75201
   Telephone:  (214) 237-4300
7  Facsimile:  (214) 237-4340
   Email:  smcentire@pmmlaw.com

8
   and
9
   MR. ROGER L. McCLEARY
10 State Bar No. 13393700
   PARSONS McENTIRE
11     McCLEARY, PLLC
   One Riverway
12 Suite 1800
   Houston, Texas  77056
13 Telephone:  (713) 960-7315
   Facsimile:  (713) 960-7347
14 Email:  rmccleary@pmmlaw.com

15

16

17 MR. DAVID C. SCHULTE            ATTORNEY FOR RESPONDENTS
   State Bar No. 24037456          Farallon Capital
18 HOLLAND & KNIGHT, LLP           Management, LLC, and
   1722 Routh Street               Stonehill Capital
19 Suite 1500                      Management LLC
   Dallas, Texas  75201
20 Telephone:  (214) 964-9500
   Facsimile:  (214) 964-9501
21 Email:  david.schulte@hklaw.com

22

23

24                    *        *        *

25

1

2

3                    **VOLUME 1 INDEX**

4

5        **PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

6                 **RULE 202 PETITION**

7                **which was heard on**

8             **Wednesday, February 22, 2023**

9

10   **PROCEEDINGS:**                              **Page**  **Vol**

11   Proceedings on the record...................... 8      1

12   Argument by Mr. Sawnie A. McEntire............  9      1

13   Response by Mr. David C. Schulte.............. 37      1

14   Response by Mr. Sawnie A. McEntire............ 65      1

15   Response by Mr. David C. Schulte.............. 73      1

16   Response by Mr. Sawnie A. McEntire............ 76      1

17   The court takes the matter under consideration. 77      1

18   Adjournment................................... 78      1

19   Reporter's Certificate........................ 79      1

20

21

22

23

24

25

| | | | | (Excluded) | |
|---|---|---|---|---|---|
| 1 | **PETITIONER'S EXHIBITS INDEX** | | | | |
| 3 | __Number__ | __Description__ | __Offered__ | __Admitted__ | __Vol__ |
| 5 | P-1 | Declaration of Mark Patrick | 36 | 42 | 1 |
| 7 | P1-A | Claimant Trust Agreement | 36 | 42 | 1 |
| 9 | P1-B | Division of Corporations - Filing | 36 | 42 | 1 |
| 11 | P1-C | Division of Corporations - Filing | 36 | 42 | 1 |
| 13 | P1-D | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| 15 | P1-E | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| 17 | P1-F | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| 19 | P1-G | Order Approving Debtor's Settlement | 36 | 42 | 1 |
| 21 | P1-H | July 6, 2021, Alvarez & Marsal letter to Highland Crusader Funds Stakeholder | 36 / -- | 41 / 42 | 1 / 1 |
| 24 | P1-I | United States Bankruptcy Court Case No. 19-34054 | 36 | 42 | 1 |

1                 **PETITIONER'S EXHIBITS INDEX   continued**

2
                                                      (Excluded)
3    **Number     Description                    Offered Admitted Vol**

4

5    PI-J        Exhibit A                         36      42       1
                 Highland Capital
6                Management, L.P.
                 Disclaimer for
7                Financial Projections

8
     PI-K        United States Bankruptcy          36      42       1
9                Court Case No. 19-34054

10
      P-2        Declaration of                    36      42       1
11               James Dondero

12
     P2-1        Jim Dondero email                 36     (41)      1
13               dated Thursday,
                 December 2020
14

15

16

17

18

19

20

21

22

23

24

25

1              <u>RESPONDENT'S EXHIBITS INDEX</u>

2

                                                (Excluded)
3    <u>Number</u>    <u>Description</u>                    <u>Offered</u> <u>Admitted</u> <u>Vol</u>

4

5    R-1        Cause No. DC-21-09543            41      44        1
                Verified Amended Petition
6

7    R-2        Cause No. DC-21-09543            41      44        1
                Order
8

9    R-3        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
10

11   R-4        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
12

13   R-5        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
14

15   R-6        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
16

17   R-7        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
18

19   R-8        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
20

21   R-9        United States Bankruptcy         41      44        1
                Court Case No. 19-34054
22

23   R-10       United States Bankruptcy         41      44        1
                Court Case No. 19-34054
24

25

```
 1              RESPONDENT'S EXHIBITS INDEX continued

 2
                                              (Excluded)
 3     Number    Description              Offered Admitted Vol

 4

 5     R-11      United States Bankruptcy       41      44        1
                 Court Case No. 19-34054
 6

 7     R-12      United State Bankruptcy        41      44        1
                 Court Case No. 19-12239
 8

 9     R-13      United States Bankruptcy       41      44        1
                 Court Case No. 19-34054
10

11     R-14      United States Bankruptcy       41      44        1
                 Court Case No. 19-34054
12

13     R-15      United States Bankruptcy       41      44        1
                 Court Case No. 19-34054
14

15     R-16      United States Bankruptcy       41      44        1
                 Court Case No. 19-34054
16

17     R-17      United States Bankruptcy       41      44        1
                 Court Case No. 19-34054
18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2

3              THE COURT:  Okay.  Good morning, Counsel.

4              We are here in DC-23-01004, In re:

5    Hunter Mountain Investment Trust.

6              And who is here for the plaintiff?

7              MR. McENTIRE:  For the petitioner,

8    Your Honor, Sawnie McEntire and my partner

9    Roger McCleary.

10             THE COURT:  Okay.  And then for Farallon?

11             MR. SCHULTE:  My name is David Schulte and

12   I represent both of the respondents.  It's Farallon

13   Capital Management, LLC, and Stonehill Capital

14   Management, LLC.

15             THE COURT:  We are here today on a request

16   for a 202 petition.  I know one of the issues is the

17   related suit, but let's just plow into it and we'll

18   go from there.

19             Okay.  Counsel?

20             MR. McENTIRE:  May I approach the bench?

21             THE COURT:  Yes, you may.

22             MR. McENTIRE:  And I've given Mr. Schulte

23   copies of all these materials.

24             In the interest of time, I have all the

25   key pleadings here, which I will give you a copy of.

1              THE COURT:  Thank you.

2              MR. McENTIRE:  And this is the evidentiary

3    submission that we submitted about a week ago.

4              THE COURT:  Right.

5              MR. McENTIRE:  To the extent you are

6    interested, it is cross-referenced by exhibit number

7    to the references in our petition to the docket in the

8    bankruptcy court.

9              THE COURT:  I appreciate that.  Otherwise,

10   I go hunting for stuff.

11             MR. McENTIRE:  This is a PowerPoint.

12             THE COURT:  Okay.

13             MR. McENTIRE:  And, lastly, a proposed

14   order.

15             THE COURT:  Wonderful.

16             MR. McENTIRE:  And Mr. Schulte has copies

17   of it all.

18             THE COURT:  Okay.

19             MR. McENTIRE:  May I proceed, Your Honor?

20             THE COURT:  You may.

21             MR. McENTIRE:  All right.  Your Honor,

22   we are here for leave of court to conduct discovery

23   under Rule 202 to investigate potential claims.

24             The issue before the court is not whether

25   we have an actual claim.

1              THE COURT:  Right.

2              MR. McENTIRE:  We do not even need to

3  state a cause of action.  It is simply the investigation

4  of potential claims.

5              Mr. Mark Patrick is here with us today.

6  He's behind me.  Mr. Patrick is the administrator of

7  Hunter Mountain, which is a Delaware trust.

8              THE COURT:  Okay.

9              MR. McENTIRE:  He is the manager of

10  Rand Advisors, which is also an investment manager

11  of the trust.  And, in effect, for all intents and

12  purposes, Mr. Patrick manages the assets of the trust on

13  a daily basis.

14              THE COURT:  Okay.

15              MR. McENTIRE:  There are potential claims

16  that we're investigating.  And I'll go through some

17  of these because I know opposing counsel has raised

18  standing issues.

19              THE COURT:  Right.

20              MR. McENTIRE:  And I think we can address

21  all those standing issues.

22              Insider trading is in itself a wrong

23  as recognized by courts.  And I'll refer you to the

24  opinions.  We believe there's a breach of fiduciary

25  duties, and that may take a little explanation.

 1                    At the time that Farallon and Stonehill

 2    acquired these claims, through their special purpose

 3    entities Muck and Jessup, they were outsiders.

 4                    THE COURT:  Right.

 5                    MR. McENTIRE:  But by acquiring the

 6    information in the manner in which we believe they did,

 7    they became insiders.  And when they became insiders,

 8    under relevant authorities they owe fiduciary duties.

 9                    And at the time they acquired the claims,

10    my client Hunter Mountain Investment Trust was the

11    99.5 percent interest holder or stakeholder in

12    Highland Capital.

13                    THE COURT:  Right.

14                    MR. McENTIRE:  We also believe a knowing

15    participation of breach of fiduciary duties under

16    another name, aiding and abetting.  But Texas recognizes

17    it as knowing participation.  Unjust enrichment,

18    constructive trust, and tortious interference.

19                    THE COURT:  Okay.

20                    MR. McENTIRE:  Farallon and Stonehill are

21    effectively hedge funds.  And so is Highland Capital.

22                    They were created.  They actually did

23    create Muck and Jessup.  Those are the two entities

24    that actually are titled with the claims.  They

25    acquired it literally days before the transfers.

1             So the reason we're focusing our discovery

2    effort on Farallon and Stonehill, we are confident

3    that any meaningful discovery -- emails, letters,

4    correspondence, document drafts, things of that

5    nature -- probably predated the existence of

6    Muck and Jessup.

7             THE COURT:  Right.

8             MR. McENTIRE:  That's why we're focusing

9    our discovery effort on Farallon and on Stonehill.

10            But, needless to say, Farallon, Stonehill,

11   Muck and Jessup, having all participated in this

12   acquisition, they're all insiders for purposes

13   of assuming fiduciary duties.

14            And as I said, outsiders become insiders

15   under the relevant authority.  And one key case is the

16   Washington Mutual case --

17            THE COURT:  Right.

18            MR. McENTIRE:  -- which we cited in our

19   materials.

20            I would also just let you know, this is

21   not something in total isolation.  We understand we're

22   not privy to the details.  But we understand the Texas

23   State Security Board also has an open investigation that

24   has not been closed.

25            THE COURT:  Okay.

1          MR. McENTIRE:  And that's by way of

2    background.

3          202 allows presuit discovery for a couple

4    of reasons.  And I won't belabor the point.  One is to

5    investigate potential claims.

6          There is no issue of notice or service

7    here.  There's no issue of personal jurisdiction.

8    Farallon and Stonehill made a general appearance.

9          THE COURT:  Right.

10         MR. McENTIRE:  There's no issue concerning

11   subject-matter jurisdiction.  They actually concede that

12   the court has jurisdiction on page 8 of their response.

13         The court's inquiry today is a limited

14   judicial inquiry.  There are really two avenues which

15   I'll explain, but, first, I think the salient avenue

16   is does the benefit of the discovery outweigh the

17   burden.

18         And I think as I will hopefully

19   demonstrate, I think that we clearly do.

20         THE COURT:  Okay.

21         MR. McENTIRE:  The merits of a potential

22   claim, the case law is clear, is not before the court.

23         Much of their brief and their response

24   is devoted to trying to attack the fact that there

25   is no duty or things such as standing.

1              But the reality of it is we are not

2   required to actually prove up a cause of action to

3   this court although I think I can.  In this process,

4   I probably certainly can identify a potential cause of

5   action.  That's not our obligation to carry our burden.

6              There was an issue about timely submission

7   of evidence they raised in a footnote, but I think that

8   was resolved before the court took the bench.

9              THE COURT:  Okay.

10             MR. McENTIRE:  I've handed you a binder

11  with Mr. Mark Patrick's affidavit and Jim Dondero's

12  affidavit.

13             As I understand it, correct me if I'm

14  wrong, you're not objecting to the submission of that

15  evidence.  Is that correct?

16             MR. SCHULTE:  Almost.

17             THE COURT:  Okay.

18             MR. SCHULTE:  Your Honor, I do object

19  to the two declarations that were submitted I believe

20  five days before the hearing.

21             THE COURT:  Okay.

22             MR. SCHULTE:  As Your Honor is aware,

23  Rule 202 contemplates 15 days' notice.  The petition

24  itself was required to be verified.  It was verified

25  and then new substance was added by way of these

1   declarations five days before the hearing.

2               And so we would argue that that has the

3   effect of amending or supplementing the petition within

4   that 15-day notice period.

5               All that said, I don't have any issue with

6   the majority of the documents attached to Mr. Patrick's

7   declaration.

8               THE COURT:  Okay.

9               MR. SCHULTE:  So I do object on the

10  grounds of hearsay and timeliness to the declarations.

11              On Exhibit H to Mr. Patrick's declaration,

12  I object to that document on the grounds of hearsay.

13              THE COURT:  Okay.  Which one?

14              MR. SCHULTE:  Exhibit H to Mr. Patrick's

15  declaration on the basis of hearsay.

16              All the other documents are I believe

17  file-stamped copies of the pleadings filed in the

18  bankruptcy, which I don't have any issue with that.

19              And then the exhibit to Mr. Dondero's

20  declaration is an email that's objected to on the basis

21  of hearsay.  And it hasn't been proven up as a business

22  record or any other way that will get past hearsay.

23              THE COURT:  Okay.

24              MR. SCHULTE:  So those are the limited

25  objections I have to what's in that filing, Your Honor.

 1                      MR. McENTIRE:  And I will address those

 2      objections.  And we're prepared to put Mr. Patrick on

 3      the stand, if necessary.

 4                      I would point out that the case law is

 5      very clear that there's no 15-day rule here.

 6                      THE COURT:  Okay.

 7                      MR. McENTIRE:  We have asked the court

 8      to take judicial notice of all of our evidence in our

 9      petition itself.

10                      The 15 days is the amount of time you have

11      to give notice before the hearing --

12                      THE COURT:  Right.

13                      MR. McENTIRE:  -- but the case law

14      is clear that I can put live testimony on, I can

15      put affidavit testimony on.

16                      THE COURT:  This is an evidentiary

17      hearing.

18                      MR. McENTIRE:  That's correct.

19                      And that includes affidavits.  And

20      affidavits are routinely accepted in these types of

21      proceedings and I have the case law I can cite to the

22      court.

23                      MR. SCHULTE:  Your Honor, in contrast,

24      I think if this were, for example, an injunction

25      hearing, I don't believe that an affidavit would be

1   the substitute in an injunction hearing for live

2   testimony.

3            And so if this is an evidentiary standard,

4   I don't think that these affidavits should come in for

5   the truth of the matter asserted.  The witnesses should

6   testify to the facts that they want to prove up.

7            MR. McENTIRE:  I could give the court a

8   cite.

9            THE COURT:  Okay.

10           MR. McENTIRE:  It's <u>Glassdoor, Inc. versus</u>

11   <u>Andra Group</u>.

12           THE COURT:  What was the name of it?

13           MR. McENTIRE:  <u>Glassdoor, Inc. versus</u>

14   <u>Andra Group</u>.  It is 560 S.W.3d 281.  It specifically

15   addresses the use and relies upon affidavits in the

16   record for purposes of a Rule 202.

17           So, with that said, I will address it in

18   more detail in a moment.  The evidentiary rule, to be

19   clear, is it has to be supported by evidence.  Seven

20   days was the date that I picked because it was well

21   in advance.  It's the standard rule that's used for

22   discovery issues.  It's seven days before a hearing.

23           So I picked it.  He's had it for seven

24   days.  He's never filed any written objections to my

25   evidence.  None.

1           And under the Local Rules I would think

2   he would have objected within three business days.

3   He did not do that, and so I'm a little surprised

4   by the objection.

5           THE COURT:  Okay.

6           MR. McENTIRE:  All right.  We do have

7   copies of all the certified records, but I gave you

8   the agenda on that.  And we talked about the two

9   declarations.

10          So the limited judicial inquiry is the

11  only issue before the district court.  It's whether

12  or not to allow the discovery, not the merits of any

13  claim yea or nay.

14          THE COURT:  Right.

15          MR. McENTIRE:  There's no need for us to

16  even plead a cause of action, although we did.

17          Mr. Schulte goes to great length in

18  his response to take issue with our cause of action,

19  suggesting we had none.  We do.  But we're not even

20  under an obligation to plead it; nevertheless, we did.

21          This is actually a two-part test.  The

22  first part was allowing the petitioner -- in this case,

23  Hunter Mountain -- to take the requested deposition may

24  prevent a failure or delay of justice, or the likely

25  benefit outweighs the burden.  Both apply here.

Argument by Mr. McEntire                    19

1                    These trades took place in April of 2021,

2    three of the four.  The fourth I think took place in the

3    summer.

4                    And our goal is to obtain the discovery

5    in a timely manner so we do not have any argument, valid

6    or invalid, that there's a limitations issue.

7                    THE COURT:  Okay.

8                    MR. McENTIRE:  And so any further delay,

9    such as transferring this to another court or back to

10   the bankruptcy court, which it does not have

11   jurisdiction, would cause tremendous delay.

12                   THE COURT:  Okay.

13                   MR. McENTIRE:  Hunter Mountain, a little

14   bit of background.  It is an investment trust.  When

15   it has money, it participates directly in funding the

16   Dallas Foundation --

17                   THE COURT:  Okay.

18                   MR. McENTIRE:  -- which is a very I think

19   well-respected and recognized charitable foundation.

20                   Certain individuals and pastors from

21   various churches are actually here because Hunter

22   Mountain indirectly, but ultimately, provides a

23   significant source of funding for their outreach

24   programs and their charitable functions and programs.

25                   THE COURT:  Okay.

1              MR. McENTIRE:  The empirical evidence in

2    the documents that are before the court, regardless of

3    what's in the affidavits, just screams that there was

4    no due diligence here.

5              Now, we know in Mr. Dondero's affidavit

6    he had a conversation with representatives of Farallon,

7    which would be admissions against interest.  They're

8    admissions basically against interest that they

9    effectively did no due diligence.

10              Yet we believe, upon information and

11    belief, that they invested over $167 million.  There

12    are two sets of claims.  There's a Class 8 claim and

13    a Class 9 creditor claim.

14              THE COURT:  Right.

15              MR. McENTIRE:  Their expectations at the

16    time that they acquired these claims was that Class 9

17    would get zero recovery.

18              So who spends $167 million when their

19    expectation on return of investment is zero?  Who spends

20    $167 million even in Class 8 when the expected return is

21    just 71 percent and is actually declining?  And I think

22    it's actually admitted in the affidavit that Mr. Dondero

23    provided.

24              So without being hyperbolic or

25    exaggerating, the data that was available publicly

1    was extremely pessimistic and doubtful that there would

2    be any recovery.

3                  We have direct information -- admissions,

4    frankly -- that Farallon had access to non-public

5    material, non-public information.  And that was

6    the fact that MGM Studios was up for sale.

7                  Mr. Dondero was on the board of directors.

8                  THE COURT:  Okay.

9                  MR. McENTIRE:  He communicated, because

10   of his responsibilities, this information to Mr. Seery.

11                 And Mr. Seery, apparently, would have been

12   restricted.  He couldn't use it or distribute it.

13                 THE COURT:  Right.

14                 And I don't know a lot about securities

15   law but, yeah, that would be insider information.

16   Right?

17                 MR. McENTIRE:  Yes.

18                 And it appears from the affidavit that

19   Mr. Dondero submitted that Farallon was aware of the

20   information before the sale closed, before they closed

21   their acquisitions.

22                 And Mr. Dondero asked the question are

23   you willing to even sell your claims and they said no.

24   Or even 30 percent more and they said no.  We're told

25   that they're going to be very valuable.

1            Well, no one else had this information, so

2    we have a problem here that we have two outsiders who

3    are now insiders.  They've acquired potentially very

4    valuable claims with the sale of MGM.

5            They also acquired information concerning

6    the portfolios of these companies over which Highland

7    Capital managed and had ownership interests, so we're

8    talking about having access to information that any

9    other bidder or suitor would not have.

10           So this is how they were divided up.

11   $270 million in Class 8.  Each of the creditors

12   right here are the unsecured creditors who sold.

13   They were the sellers.

14           THE COURT:  Right.

15           MR. McENTIRE:  And these are the claims in

16   the Class 9.

17           So you have $95 million in Class 9 claims

18   that are being acquired when the expectation is that

19   there will be zero return on investment.  You have

20   $270 million where the expectation was extremely

21   low and pessimistic.

22           And here are the documents.  And

23   Mr. Schulte has not objected to these.  This particular

24   document is Exhibit 1-J to Mr. Patrick's affidavit.

25           THE COURT:  Okay.

 1              MR. McENTIRE:  This came out of the plan.

 2  So when the bankruptcy plan was confirmed in February

 3  2021, Farallon, Stonehill, Muck and Jessup, the latter

 4  two weren't even in existence.

 5              THE COURT:  Right.

 6              MR. McENTIRE:  Farallon and Stonehill were

 7  complete strangers to the bankruptcy proceedings, yet

 8  they come in in the wake of this information and

 9  they invest tens if not hundreds of millions of

10  dollars with no apparent due diligence.

11              The situation gets even worse.  And this

12  is Exhibit 1-I to Mr. Patrick's affidavit.  And as

13  I understand, Mr. Schulte does not object to these

14  documents.  It's declining.  And then, suddenly,

15  they're in the money.

16              And at the end of the third quarter last

17  year, they're already making 255 million bucks.  And

18  that's a far cry from the original investment.  This

19  is for both Class 8 and Class 9.

20              So Mr. Patrick states the purpose of

21  this is to seek cancellation.  Another word for it

22  in bankruptcy-ese would be disallowance.  But the

23  cancellation of these claims and disgorgement.

24              If these are ill-gotten gains, regardless

25  of the rubric or the monicker that you place on it --

1  breach of fiduciary duty as insiders, aiding and

2  abetting or knowing participation in fiduciary duties,

3  because a lot of people have fiduciary duties on this

4  stuff.  No matter what you call it, disgorgement is a

5  remedy.

6                Wrongdoers should not be entitled to

7  profit from their wrongdoing.

8                Mr. Schulte makes a big point that we

9  can't prove damages.  Well, first of all, I don't agree

10 with the conclusion.

11                THE COURT:  Right.

12                MR. McENTIRE:  But even if he was right,

13 disgorgement is a proxy for damages.  And we have an

14 entitlement and a right to explore how much they have

15 actually received, when did they receive it.

16                The weathervane is tilting in one

17 direction here, Judge.

18                Clearly, there is a creditor trust

19 agreement.  That's a very important document.  It spells

20 out rights and obligations.  It's part of the plan.

21                There's a waterfall.  And on page 27 of

22 the creditor trust agreement a waterfall is exactly

23 what it suggests.  You have one bucket gets full,

24 you go to the next bucket all the way down.

25                THE COURT:  Class 1 or tier 1.

1               I can't remember the category.  I don't

2     do bankruptcy.  But, yeah, those get paid, then the

3     next level, then the next level.

4               So by the time you get down to

5     level 10, which I think is what Hunter Mountain was,

6     theoretically, there wouldn't have been anything left.

7               MR. McENTIRE:  That's correct.

8               But here, if Class 8 and Class 9 -- and

9     I will say the big elephant in those two classes are

10    Farallon and Stonehill or their special purpose entity

11    bucket Jessup -- they have 95 percent of that category.

12              And suddenly they're not entitled to keep

13    what they've got, and suddenly there's a disallowance,

14    or suddenly a cancellation regardless of the theory

15    or the cause of action -- and we have several avenues

16    here -- a lot of money is going to flow into the

17    coffers of Hunter Mountain, and a lot of money will flow

18    into the Dallas Foundation, and a lot of money will flow

19    into the coffers of charities.

20              So there is standing here.  Standing

21    requires the existence of a duty.  We think we have

22    duties.

23              And a concrete injury.  And if these

24    claims were manipulated, we have a concrete injury

25    and our proxy is disgorgement.

1    We've been deprived of an opportunity to

2    share in category 10 or as we just described it in the

3    waterfall under the creditor trust agreement.

4         THE COURT:  Right.

5         MR. McENTIRE:  Their burden is to show

6    that this discovery has no benefit.  No.  That's my

7    burden to show benefit.  But their burden would be

8    to show that it's overly burdensome to them.

9         And I find that difficult to understand

10   since part of their response is devoted to the fact

11   that, hey, judge in Dallas County, you should turn

12   this over to Judge Jernigan in the bankruptcy court.

13        THE COURT:  Because it's bankruptcy,

14   you know.

15        MR. McENTIRE:  In bankruptcy, that's their

16   invitation.

17        THE COURT:  Right.

18        MR. McENTIRE:  Well, if they're inviting

19   us to go do the discovery in bankruptcy court, it

20   doesn't seem to be that burdensome because it's

21   going to be the same discovery.

22        And, by the way, Judge Jernigan actually

23   does not have jurisdiction over these proceedings.

24   The other earlier proceeding, as you know, they

25   attempted to remove it to her court and it was remanded.

 1   Clearly, she does not have jurisdiction.

 2                  The problem with bankruptcy involved,

 3   in addition, if I wanted to do Rule 2004 discovery like

 4   they're suggesting, that's their invitation.  They would

 5   like you to push us down the road.

 6                  Well, we can't afford to push it down the

 7   road.  Because if they push it down the road, I've got

 8   to go file a motion with Judge Jernigan, get leave to

 9   issue subpoenas.

10                  THE COURT:  Right.

11                  MR. McENTIRE:  They have 14 days to file

12   a motion to quash, then I have to file another motion.

13   And it's 21 days before their response is even filed.

14   And there's another 14 or 15 days before the reply is

15   filed.  We're looking at 60, 70 days.  And that's one

16   of the reasons we selected this procedure.

17                  And, by the way, you hear the phrase forum

18   shopping a lot.  Well, without engaging in the negative

19   inference that that term suggests, a plaintiff, a

20   petitioner, has the right to select its venue for a

21   variety of reasons.

22                  Our venue is the state district courts

23   of Texas because it has an accelerated procedure.  And

24   that's why we're here.

25                  THE COURT:  Right.

 1              MR. McENTIRE:  I've identified the

 2   potential causes of action.  Entities or people that

 3   breach fiduciary duties and receive ill-gotten gains

 4   a constructive trust may be imposed, disgorgement.

 5   Then we do run into bankruptcy concepts.

 6              But it's important to know that some of

 7   these are not bankruptcy.  Some of these are common law.

 8              I suggest to the court, I don't have to

 9   go get Judge Jernigan's permission to sue Farallon or

10   Stonehill for breach of fiduciary duties.  I don't have

11   to get her permission to sue for knowing participation.

12              If I'm actually looking for equitable

13   disallowance, probably, maybe.  But I can do the

14   discovery here and then make that decision whether

15   I need to go back to bankruptcy court.

16              I'm not foolish.  I'm not going to run

17   afoul of Judge Jernigan's orders.  If I have to go back

18   to Judge Jernigan to get permission, I will do it.

19              THE COURT:  Right.  Because only an

20   idiot runs afoul of the bankruptcy court.

21              MR. McENTIRE:  Hopefully, I'm not that.

22              So I clearly understand what both my

23   ethical and lawyer obligations are.  And I'm not

24   going to run afoul of any court orders.

25              But some of these remedies don't require

1   an overview by Judge Jernigan or the bankruptcy court.

2                    THE COURT:  Okay.

3                    MR. McENTIRE:  They have a duty not to

4   commit fraud, whether it's commit fraud against us or

5   commit fraud against the estate.

6                    They have a duty not to interfere with

7   the expectancies that we have as a B/C beneficiary.

8   That's a code name for a former Class 10 creditor.

9                    They have a duty not to trade on inside

10  information, and that's the Washington Mutual case.

11                   And I've just already mentioned that

12  because they were outsiders, they're insiders now.

13                   These are their arguments.  Our evidence

14  is timely.  It's not untimely.  It's not speculative.

15  It's not speculative because the events have already

16  taken place.  I'm not talking about something

17  hypothetical.

18                   THE COURT:  Right.

19                   MR. McENTIRE:  My remedy flows from that.

20                   So we're not projecting that I might have

21  a claim later on.  I have a claim today.  If I have a

22  claim today, I have it today.  I have it and I want to

23  confirm it by this discovery.  Because their wrongdoing

24  has already taken place, it's not hypothetical, it's not

25  futuristic, it's already occurred.

1                When they say they have no duty to us,

2    they're just wrong.  They have duties not to breach

3    fiduciary duties.  We have direct standing I believe to

4    bring a claim in that regard.

5                We have a right to bring direct standing

6    under the Washington Mutual case, which I'll discuss.

7                And we also have a right to bring a

8    derivative action.

9                THE COURT:  Right.

10                MR. McENTIRE:  And I notice that

11    they made a comment about that in their response.

12    But I can sue individually.

13                And I can also bring an action in the

14    alternative as a derivative action for the estate.

15    And these are all valid claims for the estate.

16                THE COURT:  Okay.

17                MR. McENTIRE:  Transfer.  This is not a

18    related case because it's not the litigation.

19                So if you just go to the very first

20    instance and you look at the Local Rule, it talks

21    about litigation and causes of action.

22                THE COURT:  Right.

23                MR. McENTIRE:  We don't have a cause

24    of action.  We're not asserting one in this petition.

25    So this is not a related case that falls within the

1    four corners of the Local Rule.

2                    THE COURT:  Well, I guess the thing

3    is it's still a related case.  Like if you file a 202

4    and then you file a lawsuit, that would be considered

5    related.

6                    I looked at it and you're right.

7    Technically, it's different parties.  I'll just say it's

8    a grey zone at best.

9                    MR. McENTIRE:  That's correct.

10                   This is not a lawsuit in terms of causes

11   of action.  It might be a related case if Mr. Dondero

12   had come in and filed a lawsuit.  That would be a

13   related case.  Mr. Dondero is not involved in this

14   process, other than as a fact witness.

15                   These are all the evidentiary issues

16   that perhaps he's raised.  Live testimony, affidavit

17   testimony is admissible.

18                   The court considered numerous affidavits

19   filed with the court.  And that's as recently as 2017.

20   These are all good cases, good law.

21                   Equitable disallowance.  It's kind of a

22   fuzzy image.  This is a bankruptcy court case, but this

23   is simply to underscore the fact that in addition to

24   my common law remedies there is a very substantial

25   remedy in bankruptcy court.

1           It's not one I necessarily have to pursue,

2  but if I wanted to I could.  But what it does do is it

3  helps to find some duties.

4           And here, the court has the right

5  to disallow a claim on equitable grounds in extreme

6  instances, perhaps very rare, where it is necessary

7  as a remedy.  And they did it in this case.

8           THE COURT:  Okay.

9           MR. McENTIRE:  This is simply an analogy

10  to securities fraud and the 10b-5 statute.

11           Insiders of a corporation are not limited

12  to officers and directors, but may include temporary

13  insiders who have entered into a special confidential

14  relationship in the conduct of the business of the

15  enterprise and are given access to information solely

16  for corporate purposes.

17           Well, what about the MGM stock?  The court

18  finds that the Equity Committee -- so here's the

19  equity -- has stated a colorable claim.  We were

20  99.5 percent equity.

21           The Equity Committee has stated a

22  colorable claim that the settlement noteholders became

23  temporary insiders because they acquired information

24  that was not of public knowledge in connection with

25  their acquisition.

1              And allowed them to participate in

2    negotiations with JPMC -- JPMorgan Chase -- for the

3    shared goal of reaching a settlement.

4              So these were outsiders that suddenly

5    became temporary insiders because of access to inside

6    information.

7              This is not a new concept.  It comes

8    from the United States Supreme Court.  Fiduciaries

9    cannot utilize inside information.

10             THE COURT:  Right.

11             MR. McENTIRE:  And we believe we

12   have enough before the court to support and justify

13   a further investigation that this may have occurred.

14             THE COURT:  Okay.

15             MR. McENTIRE:  Now, not a related case.

16   The Jim Dondero case is actually closed.

17             THE COURT:  Right.

18             MR. McENTIRE:  And I'll be frank with you.

19   In all candor, I never thought this was a possible

20   related case.

21             THE COURT:  I mean, we're talking about

22   the same events, but there are differences, I agree.

23             MR. McENTIRE:  We're talking about one

24   similar event dealing with Farallon.  Other events

25   are different.

```
 1                    THE COURT:  Okay.

 2                    MR. McENTIRE:  So we have different dates.

 3                    THE COURT:  Right.

 4                    MR. McENTIRE:  Different parties on the

 5    petitioner's side, different law firms.

 6                    The only common party is Farallon.

 7    Alvarez & Marsal are not parties to this but Stonehill

 8    is.  Stonehill was not a party to the prior proceedings.

 9                    And the standing is manifest.  With no

10    criticism of Mr. Dondero's lawyer, I searched in his

11    argument where he was articulating standing.

12                    And without going further, I will tell

13    you I think our standing is clear.  We're in the money.

14                    THE COURT:  Okay.

15                    MR. McENTIRE:  We are in the money if

16    there's a disgorgement or a disallowance.

17                    THE COURT:  Okay.

18                    MR. McENTIRE:  We have all types of

19    claims, including insider trading and a creation of

20    fiduciary duties.

21                    Our remedies, as far as I can tell, he

22    didn't identify any.  We have several.  Disgorgement,

23    disallowance, subordination, a variety.  And damages.

24                    So we suggest strongly that it is not a

25    related case.
```

1              And I must tell you, the reference

2    to say send this to bankruptcy court or defer to the

3    bankruptcy court or send us over to Judge Purdy, with

4    all due respect to opposing counsel, it's really just

5    a delay mechanism.

6              And what they're seeking to do through

7    their invective, their criticisms, the references to

8    these other courts, is seeking an opportunity to push us

9    down the road and put us in a bad position potentially

10   and a not enviable position in connection with statute

11   of limitations.

12             Your Honor, we would offer the binder

13   of exhibits that we submitted on February 15, 2022,

14   including the affidavits and all the attached exhibits.

15             I would ask the court to take judicial

16   notice of all the exhibits that we referred to in our

17   petition, which I think is appropriate since we were

18   specifying with particularity what we were requesting

19   the court to take judicial notice of.  And that's the

20   large index, that's the list.

21             THE COURT:  Obviously, I can take

22   judicial notice of any kind of court pleadings,

23   whether they're state or federal.

24             MR. McENTIRE:  That's correct.

25             THE COURT:  That's clear.

 1                    MR. McENTIRE:  We would offer both

 2    affidavits and all the attachments into evidence

 3    at this time.

 4                    THE COURT:  Okay.  Do you have exhibit

 5    numbers for them?

 6                    MR. McENTIRE:  Yes.  It's Exhibit 1 with

 7    attachments.  1-A, 1-B, 1-C, 1-D, 1-E, 1-F and then

 8    Exhibit 1-G, Exhibit 1-H, Exhibit 1-J, Exhibit 1-K.

 9                    Everything in the binder, Your Honor.

10    It's Exhibit 1 and Exhibit 2 with the attachments.

11                    THE COURT:  Okay.

12                    MR. McENTIRE:  I believe they're all

13    identified.  I can put a sticker on them, if you'd like.

14                    THE COURT:  Yeah.  To admit them, it will

15    need a sticker.

16                    So I'm going to hold off on admitting

17    them for just a minute because I do want to hear his

18    objections and then we can go back to it.  So just make

19    sure we do that.

20                    I'm not trying to not admit them, but I do

21    want to let him have his objections.

22                    Okay.  Anything else, Counsel?

23                    MR. McENTIRE:  That's all I have right

24    now, Judge.

25                    THE COURT:  Okay.  Counsel?

 1                    MR. SCHULTE:  Should I start with those

 2    exhibits, Your Honor?

 3                    THE COURT:  Why don't you do that.  That's

 4    probably the easiest way.

 5                    MR. SCHULTE:  In light of the authorities

 6    that Mr. McEntire shared about the affidavits, I'll

 7    withdraw the objections to the affidavits or the

 8    declarations.

 9                    THE COURT:  Okay.

10                    MR. SCHULTE:  I'm taking Mr. McEntire's

11    word that those cases say what he says they say.

12                    THE COURT:  I'll tell you because 202

13    is not a lawsuit, you don't necessarily have a right

14    to cross-examine, et cetera.  So, yeah, affidavits are

15    frequently used on 202s.

16                    MR. SCHULTE:  And that's fine, Your Honor.

17    I'll take Mr. McEntire's word what those cases say.

18                    But I will maintain the objection to

19    Exhibit H -- it's the declaration of Mr. Patrick --

20    on the grounds of hearsay.  That is not a court record

21    or a file-stamped pleading from federal or state court.

22    It's just a letter.  So that's hearsay.  And it hasn't

23    been properly authenticated.

24                    The other issue is the exhibit to

25    Mr. Dondero's declaration.  That's just an email

1    from Mr. Dondero, so I object on the grounds of hearsay.

2                    THE COURT:  Mr. McEntire, what's your

3    response specifically to Exhibit H as attached to

4    the Patrick declaration and then the attachment

5    to the Dondero declaration?

6                    MR. McENTIRE:  Exhibit H to Mr. Patrick's

7    affidavit would be hearsay, but there's an exception

8    that it's not controversial.

9                    THE COURT:  Okay.

10                   MR. McENTIRE:  And there's no indication

11   that there's any challenge of the reliability of the

12   document.

13                   THE COURT:  What is the exhibit?

14   I'm trying to pull it up.  Sorry.

15                   MR. McENTIRE:  It's Exhibit 1-H.  It is

16   a letter from Alvarez & Marsal simply indicating what

17   they paid for the claim.

18                   THE COURT:  Is it the July 6th, 2021,

19   letter?

20                   MR. McENTIRE:  Yes, Your Honor.

21                   THE COURT:  I've got it.

22                   MR. McENTIRE:  And the exhibit to

23   Mr. Dondero's is not being offered for the truth of

24   the matter asserted, just the state of mind of Farallon.

25                   THE COURT:  Okay.

 1              MR. McENTIRE:  He has proved it up
 2   that it's authentic.  It's a true and accurate copy.
 3              And it goes to the state of mind of
 4   Farallon and it goes to the state of mind of Mr. Seery
 5   as well who are basically individuals who are trading on
 6   inside information.
 7              And Mr. Seery would not have known about
 8   the MGM sale but for that email.  And Farallon and
 9   Stonehill would not know about MGM but for Mr. Seery.
10              THE COURT:  Okay.  So the response to
11   hearsay is that it goes to state of mind.
12              MR. McENTIRE:  It goes to state of mind.
13              THE COURT:  Okay, Counsel.  How do you
14   respond to that?
15              MR. SCHULTE:  I'll start with the last
16   one, Your Honor.  I think that's the definition of
17   hearsay, is that you're purporting to establish the
18   state of mind of the parties who are not before the
19   court.
20              It's been emphasized that Mr. Dondero has
21   no relation to HMIT.  And none of the recipients of the
22   email are parties to this proceeding.
23              This purports to establish the state of
24   mind of Mr. Seery, who is not before the court, and the
25   state of mind of Farallon, just based on the say so of

1    Mr. Dondero in this email.  That's hearsay.

2                    And as for the first letter, this is a

3    letter on the letterhead of A&M which, by the way, is

4    one of the parties in the Dondero Rule 202 petition.

5                    And it's not on the letterhead of any of

6    the parties to this case so the letter isn't properly

7    authenticated.

8                    And I'm not aware of the not controversial

9    exception to hearsay.

10                    THE COURT:  Well, there is a thing that

11   talks about if you're admitting something that's just

12   not controverted.  Right?  It's everybody agrees "X"

13   happened.  We're just admitting evidence to have that.

14   So what this basically is is just showing the claim of

15   the funds.

16                    And I guess my question is what's the

17   objection.  Is there an objection to the substance of

18   it?

19                    MR. SCHULTE:  I don't think there's any

20   dispute that Farallon and Stonehill, through their

21   respective special purpose entities, purchased the

22   claims that are at issue here.

23                    And if that's the sole purpose

24   of admitting this letter into evidence, I don't

25   think that's a matter that's genuinely in dispute.

```
 1                    THE COURT:  Okay.
 2                    MR. SCHULTE:  So if that's the only issue
 3   as raised by this letter, I don't know that there's a
 4   dispute there.
 5                    THE COURT:  Right.  Well, that's the whole
 6   thing.
 7                    MR. McENTIRE:  I think we're almost
 8   solving the issue on the fact of how much they paid,
 9   $75 million.
10                    THE COURT:  Okay.  So I will sustain the
11   objection to the email to Mr. Dondero's declaration,
12   Exhibit P 2-1.
13                    I am going to overrule the objection
14   to -- I don't know what the letter is of the attachment.
15                    MR. McENTIRE:  It's Exhibit P 1-H to
16   Mr. Patrick's affidavit.
17                    THE COURT:  Correct.  Sorry.
18                    Okay, Counsel.  If you'll proceed.
19                    MR. SCHULTE:  May I approach the bench,
20   Your Honor?  I have a binder of exhibits also.
21                    THE COURT:  Yes, you may.
22                    MR. SCHULTE:  These have all been
23   marked with exhibit stickers already.  There are tabs
24   for each of the exhibits.  They're marked R1 through 17,
25   I believe.  And "R," of course, stands for Respondents.
```

1            THE COURT:  I take the shortcut of calling

2    everybody "Plaintiff" and "Defendant" just because

3    I'm so used to using that language in court.

4            But I do agree.  It's Petitioner

5    and Respondent.  You're not technically a defendant.

6            Okay.  So, first of all, I'm going to

7    admit Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2,

8    with the sole exception of the email to Mr. Dondero's

9    declaration that I sustained.

10           And then are there objections to the

11   respondent's exhibits?

12           MR. McENTIRE:  Very few.

13           I object to Exhibit No. 1 and

14   Exhibit No. 2 as irrelevant.

15           THE COURT:  What's the objection to 1?

16           MR. McENTIRE:  They're offering the order

17   from Judge Purdy.

18           THE COURT:  Okay.  I can take judicial

19   notice of that.  I mean, it's a court record from

20   Dallas County.  So I don't think that that's

21   particularly relevant.

22           To be bluntly honest, I looked at it last

23   night.  Right?  Because of the issue that there's

24   a related case, I pulled that file too and looked

25   at everything.

1              So I can take judicial notice of that.

2    Whether it's relevant or not, I can look at it.  And,

3    obviously, if it's not relevant, I'll disregard it.

4              MR. McENTIRE:  Fair enough.

5              THE COURT:  I'll overrule that objection.

6              What's next?

7              MR. McENTIRE:  The only other objections

8    are Exhibit 12 and 13.  I just don't know what they

9    are or for what purpose they would be offered.

10             THE COURT:  Okay.  So 12 is a notice of

11   appearance and request for service in the bankruptcy

12   court on behalf of Hunter Mountain Trust.

13             So what's the issue, Counsel?

14             MR. SCHULTE:  Your Honor, these are

15   notices of appearance filed by Hunter Mountain in the

16   bankruptcy court.

17             And the purpose of these notices is simply

18   to show -- and maybe this is not genuinely in dispute --

19   that Hunter Mountain, through its counsel, would have

20   received notice of all the activity that was going on

21   in the bankruptcy court.

22             THE COURT:  It's the same issue I've

23   got with everything that Plaintiff submitted.  It's a

24   bankruptcy pleading.  I can take notice of it.  If it's

25   irrelevant, I'll disregard it.

```
 1                    So I'll overrule that objection.

 2                    And then what's 13?

 3                    MR. McENTIRE:  The same objection.

 4                    THE COURT:  I'll overrule it because

 5   again, I can take judicial notice of those.

 6                    MR. McENTIRE:  No other objections,

 7   Your Honor.

 8                    THE COURT:  So Respondent's Exhibits

 9   1 through 17 are so admitted.

10                    MR. SCHULTE:  May I proceed, Your Honor?

11                    THE COURT:  Yes, you may.

12                    MR. SCHULTE:  HMIT -- Hunter Mountain --

13   races into this court seeking extensive and burdensome

14   presuit discovery about claims trading that took place

15   in the Highland bankruptcy two years ago.

16                    Mr. McEntire has talked about the harm

17   that would result from delay if a different court were

18   to consider this request for presuit discovery.  That is

19   a function of waiting two years after the subject claims

20   transfers to seek relief in this court.

21                    The exact same allegations of claims

22   trading and misconduct by Jim Seery -- those allegations

23   are not on the slides that you looked at.  But those

24   allegations are common in Mr. Dondero's Rule 202

25   petition and this petition.
```

 1                    THE COURT:  Right.  They're common.

 2                    I know you make the allegation that

 3     Dondero is related to Hunter Mountain, but I guess

 4     I don't have any evidence of that.

 5                    Or do you have evidence of that?  Because

 6     otherwise, while it involves some of the same issues in

 7     the sense of the underlying facts, technically Farallon

 8     is the common respondent.

 9                    But there's a different respondent and

10     there's a different petitioner in that case.

11                    MR. SCHULTE:  Yes.  That's true,

12     Your Honor.  And we've said that on information and

13     belief.

14                    THE COURT:  Okay.

15                    MR. SCHULTE:  That's our suspicion.

16                    We believe that to be the case, but

17     I don't have evidence of it.  I didn't hear a denial

18     of it, but, nevertheless, that is where things stand.

19                    But what's important about the case is

20     even if this court and Judge Purdy determined that the

21     cases are not related, what is important is that the

22     same allegations related to this claims trading and the

23     same allegations of inside information being shared by

24     Mr. Seery, those were front and center in the July 2021

25     petition filed by Mr. Dondero.

1              Even if there are other dissimilarities

2    between the cases, those are issues that are common.

3              THE COURT:  Okay.

4              MR. SCHULTE:  And it's important to note

5    that as HMIT has filed this petition, it has glossed

6    over issues of its own standing and the assertion of

7    viable claims that will justify this discovery.

8              Now, I know that HMIT has cited these

9    cases that say, Your Honor, I don't have to state a

10   really specific claim right now.

11             But you do have to articulate some ground

12   for relief, some theory, that would justify the expense

13   and the burden that you're trying to put the respondents

14   to in responding to all this discovery.

15             And this isn't simple discovery.

16   We're talking about deposition topics with I believe

17   29 topics each and 13 sets of really broad discovery

18   requests with a bunch of subcategories.

19             THE COURT:  Right.

20             MR. SCHULTE:  We're not talking about some

21   minimal burden here.  This is an intrusion into entities

22   that are not parties to a lawsuit, but rather this

23   investigation.

24             And HMIT has ignored that there is

25   a specific mechanism in the bankruptcy court that's

1   available to it under federal bankruptcy Rule 2004 and

2   that the substance of HMIT's petition, which is claims

3   trading and bankruptcy, falls squarely within the

4   expertise of Judge Jernigan, the presiding bankruptcy

5   judge.

6               THE COURT:  And I agree.  You could do

7   this in federal court.  But there's a lot of things

8   that can be done in state court or done in federal

9   court.

10              They get to choose the method of getting

11  the information, so why should I say, theoretically,

12  yes, this is a good thing, I should do it, but, hey,

13  send it to bankruptcy.  Why?

14              MR. SCHULTE:  The bankruptcy judge has

15  actually answered that question directly.

16              THE COURT:  Okay.

17              MR. SCHULTE:  It is true, as HMIT

18  has said, the federal bankruptcy court doesn't have

19  jurisdiction over a Rule 202 proceeding.  That's not in

20  dispute.

21              THE COURT:  Right.

22              MR. SCHULTE:  We tried to remove the

23  last case to federal bankruptcy court and it was a state

24  claim.

25              But what the bankruptcy judge pointed out

1  when she remanded the case back to Judge Purdy, who

2  ended up dismissing Dondero's petition, is it pointed

3  out, one, there's this mechanism in bankruptcy where

4  they can do the exact same thing, Rule 2004.

5            And the bankruptcy judge pointed out that

6  it is in the best position to consider Hunter Mountain's

7  request.

8            It pointed out when it remanded the

9  case that it had grave misgivings about doing so.

10  It confirmed that it is in the best position to

11  consider this presuit discovery.

12            THE COURT:  Okay.  This is part of one of

13  the exhibits?

14            MR. SCHULTE:  Yes, Your Honor.  This is

15  in one of the opinions that I included in the binder,

16  a courtesy copy of one of those opinions.

17            THE COURT:  Oh, at the back?

18            MR. SCHULTE:  Yes, Your Honor.

19            THE COURT:  Okay.

20            MR. SCHULTE:  It's 2022 Bankruptcy

21  Lexis 5.

22            THE COURT:  Okay.  I got it.

23            And real quick, for the record,

24  it's <u>Dondero versus Alvarez & Marsal</u>.  It's

25  2022 Bankruptcy Lexis 5.

1              MR. SCHULTE:  Right.

2              And in particular, Your Honor, I'm looking

3    at pages 31 to 32 of that order.

4              THE COURT:  Okay.

5              MR. SCHULTE:  What the judge is pointing

6    out here is it has grave misgivings about remanding the

7    case because it knows a thing or two about the Highland

8    bankruptcy, having presided over the case and all the

9    related litigation for over what's now three years.

10              And it's familiar with the legal

11   and factual issues.  It's familiar with the parties.

12   It's familiar with claims trading in a bankruptcy case,

13   which was the very crux of the Dondero petition.  It's

14   also the crux of this petition by Hunter Mountain.

15              And it observed, the bankruptcy court

16   did, that any case that could be fashioned from the

17   investigation would end up in bankruptcy court anyway

18   because it would be related to the Highland bankruptcy.

19              So you ask a really good question,

20   Your Honor.  Why should I ship it off to the bankruptcy

21   court.  The answer is Judge Jernigan is in a position

22   to efficiently and practically deal with this request

23   because she deals with it all the time and she is

24   intimately familiar with the legal and factual

25   issues and with claims trading.

1            It's not like Hunter Mountain gets poured

2    out if it goes to bankruptcy court.  It has a mechanism

3    to seek the exact same discovery from Judge Jernigan who

4    is very familiar with these very particular issues.

5            Now, Hunter Mountain says, well,

6    bankruptcy court is too time-consuming and cumbersome.

7    It's going to take 60 days to even get this before the

8    bankruptcy court.

9            Well, we're talking about the fact that

10   they've waited two years to file this proceeding related

11   to these claims transfers that took place in 2021.

12           So, again, what HMIT is asking this court

13   to do is inefficient and is impractical.  This court

14   would need to devote a lot of resources to understand

15   what the proper scope of any discovery should be,

16   whether the claims are cognizable.

17           And that's just a tall order, Your Honor.

18   The request is more appropriately dealt with by the

19   bankruptcy judge, according to a proper bankruptcy

20   filing.

21           It's undisputed that while the bankruptcy

22   court doesn't have jurisdiction over a 202 petition,

23   there's no question that it has jurisdiction over a Rule

24   2004 request for discovery, which is the counterpart

25   for this type of discovery in bankruptcy court.

1              THE COURT:  Right.

2              MR. SCHULTE:  The real issue, Your Honor,

3  and this is the part that Hunter Mountain is dancing

4  around, is that Hunter Mountain doesn't want to be

5  in front of Judge Jernigan.

6              Judge Jernigan held Mark Patrick --

7  that is HMIT's principal who verified this petition.

8  She held him along with Dondero and Dondero's counsel

9  and others in civil contempt and sanctioned them nearly

10  $240,000 for trying to join Seery to a lawsuit in

11  violation of Judge Jernigan's gatekeeping orders.

12              HMIT is trying to dodge the bankruptcy

13  court and its scrutiny of what HMIT is doing as this

14  petition also targets Seery and the inside information

15  that he purportedly gave to Farallon and Stonehill.

16              This is forum shopping, plain and simple.

17  And the court should dismiss the petition so that HMIT

18  can seek this discovery in bankruptcy court.

19              Now, I don't want to spend a lot of time

20  on the related case, but I will emphasize just what I've

21  mentioned, which is while some of the parties may be

22  different, we're still talking about the same claims

23  trading activity that took place in 2021 and the same

24  allegations of insider dealing by Seery.

25              And Judge Purdy, on remand, dismissed

1    that petition where some of the same arguments were made

2    about judicial efficiency and that the case should be

3    filed in bankruptcy court.

4                    And it bears noting, by the way, that

5    after Judge Purdy dismissed Dondero's Rule 202 petition,

6    where we had argued that this ought to be in the

7    bankruptcy court, Dondero didn't file in the bankruptcy

8    court, which sort of makes the point that they didn't

9    want to be in front of Judge Jernigan on this either.

10                   Okay.  Now let's turn to the merits,

11   Your Honor.  While Mr. McEntire has gone to great

12   lengths to say we don't have to state claims, he stated

13   five or six on that PowerPoint presentation of claims

14   that he envisions.

15                   But what made it all really crystal clear

16   is in that notice of supplemental evidence, and that

17   includes the declaration of Mr. Patrick, there in

18   paragraphs 15 and 16 it's made clear what Hunter

19   Mountain really wants.

20                   THE COURT:  Okay.

21                   MR. SCHULTE:  What the goal of this

22   discovery is is to invalidate the claims that Farallon

23   and Stonehill's entities purchased.

24                   So let's unpack what it is they purchased.

25                   THE COURT:  Okay.

 1                     MR. SCHULTE:  These are claims that were

 2     not ever held by Hunter Mountain.  These are claims

 3     that were held by Redeemer, Acis, UBS, and HarbourVest.

 4                     THE COURT:  Right.  They were the Class 8

 5     and 9.  Right?

 6                     MR. SCHULTE:  I believe that's correct.

 7                     THE COURT:  Okay.

 8                     MR. SCHULTE:  Those claims were always

 9     superior to whatever it was that Hunter Mountain held.

10                     So Redeemer, Acis, UBS, and HarbourVest

11     held those claims.  The parties in the bankruptcy had

12     the opportunity to file objections to those claims.

13     And they did.

14                     And Seery, on behalf of the debtor,

15     negotiated with Redeemer, Acis, UBS, and HarbourVest

16     and reached settlements that resolved the priority and

17     amounts of those claims.

18                     THE COURT:  Right.

19                     MR. SCHULTE:  And then filed what's

20     referred to -- and I'm sure Your Honor knows this --

21     as a Rule 9019 motion to approve those settlements in

22     the bankruptcy court.

23                     THE COURT:  Actually, I don't.  I've never

24     done bankruptcy but I read it.  I know the general

25     process and I did read it.

1                    MR. SCHULTE:  All right.

2                    THE COURT:  Just FYI, I've never done

3    bankruptcy law.  They've got their own rules.

4                    MR. SCHULTE:  Well, the parties in

5    the bankruptcy had the opportunity to object to those

6    settlements and some did so.

7                    And after evidentiary hearings, the

8    bankruptcy court granted those motions and allowed

9    and approved those claims.

10                   That is really important, Your Honor.

11                   THE COURT:  Okay.

12                   MR. SCHULTE:  That's Exhibits 14 through

13   17 in the binder that I handed you.

14                   And these are the same exhibits that are

15   referenced in Hunter Mountain's petition.  And it bears

16   noting that the U.S. District Court affirmed those

17   orders after appeals were taken.

18                   But the bankruptcy court's approval of

19   the very same claims that Hunter Mountain now seeks to

20   investigate and invalidate is entitled to res judicata.

21                   HMIT can't now second-guess the bankruptcy

22   court's orders approving those very same claims.  That's

23   the effect of the investigation that Hunter Mountain

24   seeks, the invalidation of claims that are already

25   bankruptcy court approved.

```
 1                    And it bears noting that each of those
 2    four orders, Exhibits 14 through 17, provides the
 3    following:  quote, "The court" -- the bankruptcy
 4    court -- "shall retain exclusive jurisdiction to
 5    hear and determine all matters arising from the
 6    implementation of this order."
 7                    This would include HMIT's stated goal
 8    of conducting discovery to try to invalidate these
 9    very claims.
10                    This is yet another reason, Your Honor, to
11    answer your question earlier of why this request for
12    discovery should be posed to the bankruptcy court.
13                    Judge Jernigan, I suspect, would have
14    views on whether her own orders authorizing these claims
15    should be overturned.
16                    Okay.  So HMIT -- Hunter Mountain --
17    alleges that after the bankruptcy court approved these
18    claims, Seery disclosed inside information to Farallon
19    and to Stonehill to encourage them to buy these claims
20    from the original claimants.  Again, UBS, Redeemer,
21    Acis, and HarbourVest.
22                    Farallon, through Muck, which is its
23    special purpose entity, and Stonehill through Jessup,
24    which is Stonehill's special purpose entity, acquired
25    those transferred claims in 2021.
```

1            And there's no magic in bankruptcy court

2   to claims transfers.  It's a contractual matter between

3   the transferors and the transferees.  It's strictly

4   between them.

5            THE COURT:  Okay.

6            MR. SCHULTE:  And there's no bankruptcy

7   court approval that's even required.

8            The transferee, so in this case Muck and

9   Jessup, had simply to file under federal bankruptcy

10  Rule 3001(e) a notice saying these claims were

11  transferred to us.  And they did so.

12            Your Honor, that's Exhibit 6 through 11 in

13  the binder that I handed to you.

14            THE COURT:  Okay.

15            MR. SCHULTE:  The filings evidencing those

16  claims transfers were public.  And Hunter Mountain

17  received the claims transfer notices.

18            And that's the exhibits that we were

19  talking about, Exhibits 12 through 13, where Hunter

20  Mountain's lawyers had appeared in the case before those

21  claims transfer notices were filed.

22            So not surprisingly, Hunter Mountain did

23  not file any objections to those claims transfers.  And

24  that's not surprising because under Rule 3001, the only

25  party that could object to the claims transfers were

1    the transferors themselves.

2                    THE COURT:  Right.

3                    MR. SCHULTE:  Essentially saying, hold on.

4    We didn't transfer these claims.  But of course there's

5    no dispute that the transfers were made.

6                    Here, HMIT was neither the transferor nor

7    the transferee of the claims.  It had no interest in

8    these claims.  It never did.  It didn't before the

9    claims transfers and it didn't after the claims

10   transfers.

11                   The claims originally belonged to

12   Redeemer, Acis, UBS, and HarbourVest, and they were then

13   transferred to Muck and Jessup, which are Farallon's and

14   Stonehill's entities.

15                   THE COURT:  Right.

16                   MR. SCHULTE:  So why does that matter?

17   That matters because these claims were approved by the

18   bankruptcy court.  The claims didn't change or become

19   more valuable after they were transferred.  The only

20   difference is who is holding the claims.

21                   So Hunter Mountain says, hold on.  What

22   we're alleging here is that the claims that Farallon and

23   Stonehill purchased with the benefit of this purported

24   inside information from Mr. Seery, they're secretly

25   worth more than expected.

1                    Those allegations, they're disputed, to be

2     sure.  But let's assume they're true.  That situation

3     has zero impact on Hunter Mountain.

4                    THE COURT:  Okay.

5                    MR. SCHULTE:  And that's because this is a

6     matter that's strictly between the parties to the claims

7     transfers.  Again, Redeemer, Acis, UBS, and HarbourVest

8     on the one hand and Farallon and Stonehill on the other.

9                    And the way we know this is let's

10    pretend that Muck and Jessup didn't buy these claims,

11    Your Honor, and that the claims instead have remained

12    with UBS, HarbourVest, Acis, and whatever the other

13    one I'm forgetting.  The claims wouldn't have been

14    transferred, and they would have remained with those

15    entities.

16                    In that case, the original claimants would

17    have held those claims for longer than they wanted.  And

18    if HMIT is right, then the claims would have ended up

19    being worth more than even they expected.

20                    So why does that matter?  Well, that

21    matters because if that is all true, Hunter Mountain

22    would be in the exact same place today.  Neither better

23    nor worse off, it would be in the exact same place.

24                    Either Farallon and Stonehill's entities

25    are gaining more on these claims than they expected

1    or UBS, HarbourVest, Acis, and Redeemer, they are

2    realizing more on these claims than they expected.

3              But Hunter Mountain never stood to be paid

4    on these claims to which it was a stranger.  These are

5    claims in which Hunter Mountain never had any interest.

6              THE COURT:  So presuming that Hunter

7    Mountain had expressed interest in buying these claims

8    and there was insider trading, you don't think that

9    would be a tortious interference in a potential

10   contract?

11             MR. SCHULTE:  If there was insider trading

12   of the type that Hunter Mountain alleges in this case,

13   it would have no impact on the rights of Hunter

14   Mountain.

15             If that's true, maybe there was a fraud on

16   the bankruptcy court.  The bankruptcy court would surely

17   be interested in that.  Maybe there was a fraud on the

18   transferors.  I mean, maybe UBS, Redeemer, Acis -- why

19   do I always forget the third one? -- and HarbourVest.

20             THE COURT:  Like I said, I had a chart

21   last night of all the names.  Obviously, I haven't been

22   involved in this case up until now, and there's a lot of

23   names.

24             MR. SCHULTE:  Yes.

25             The transferors of the claims might say,

 1   well, wait a minute.  I wish I would have known this

 2   inside information.  I'm the one that was really injured

 3   here.

 4                  Because if there was really meat on this

 5   bone, Your Honor, then the injured parties would be

 6   the transferors of the claims:  Redeemer, Acis, UBS,

 7   and HarbourVest.

 8                  Because the crux of HMIT's petition is

 9   that those entities, the transferors, were duped into

10   selling their claims for too little when the claims were

11   secretly worth more.

12                  Well, if that's true, you would expect

13   that the transferors would be screaming up and down

14   the hallway, saying we didn't get paid enough.

15                  THE COURT:  Right.

16                  MR. SCHULTE:  We are the injured parties

17   here, we are the ones with damages, we want to unwind

18   these claims transfers, or we want to be paid more on

19   these claims transfers.

20                  But the rights of those entities,

21   the transferors, to complain about these allegations

22   doesn't mean that Hunter Mountain can also stand up and

23   say, well, I want to complain too.  Because Hunter

24   Mountain never stood to be paid on these claims.

25                  The question is if somebody was duped,

1    if somebody was injured, if anybody it was the

2    transferors, not Hunter Mountain.  The transferors would

3    be the only real parties in interest that would have

4    been injured by what Hunter Mountain alleges.

5              But it's notable that none of those

6    transferors has filed an objection to these transfers.

7              THE COURT:  Right.

8              MR. SCHULTE:  None of them has filed a

9    Rule 202 proceeding.  None of them has filed a Rule 2004

10   proceeding seeking discovery about inside information

11   that Farallon and Stonehill allegedly had.  It is

12   Hunter Mountain who is an absolute stranger to

13   these claims trading transactions.

14             And so HMIT is trying to inject itself

15   into a transaction to which it was never a party and

16   which it never had any interest.

17             The sellers were entitled to sell those

18   claims to any buyer they wanted to on whatever terms

19   they agreed to.

20             And if there was some information that

21   they didn't have the benefit of that the buyers did,

22   you would expect the transferors, if anyone at all,

23   to be the ones complaining about it.  But that's not

24   what we have here.

25             THE COURT:  Okay.

1              MR. SCHULTE:  All right.  Another note

2    that Hunter Mountain glosses over is duty.

3              So all the claims that were listed on

4    the PowerPoint all require that there must have been

5    some kind of a duty owed by Farallon and Stonehill to

6    Hunter Mountain.  But there's no duty owed to a stranger

7    to a claims trading transaction.

8              Yet again, if anybody were to have a

9    duty owed to it, I guess it would be the transferors

10   of the claims even though that was an arm's length

11   transaction.

12             But it's not a stranger to the transaction

13   and a stranger that has no interest in the claims that

14   we're talking about here.

15             THE COURT:  Okay.

16             MR. SCHULTE:  Nor has Hunter Mountain

17   identified any authority for a private cause of action

18   belonging to Hunter Mountain related to these claims

19   transfers.

20             Hunter Mountain doesn't have the right to

21   assert claims on behalf of other parties.  It only has

22   the right to assert claims on behalf of itself when it

23   has been personally aggrieved.

24             I heard Mr. McEntire say several times

25   during his presentation that Hunter Mountain had a

1   99.5 percent equity interest in Highland Capital.

2                   THE COURT:  Right.

3                   MR. SCHULTE:  I think it's important to

4   point out that that equity interest was completely

5   extinguished by the confirmed plan in the bankruptcy

6   case.

7                   As Your Honor pointed out, we have the

8   waterfall, and Classes 1 through 9 have to be paid in

9   full.  And you know what Classes 8 and 9 are?  General

10  unsecured claims and subordinated claims.

11                  And the only way that Hunter Mountain

12  is ever in the money, as Mr. McEntire was saying, with

13  its Class 10 claim is if Seery, the claimant trustee,

14  certifies that all claims in 1 through 9 are paid in

15  full 100 percent with interest and all indemnity claims

16  are satisfied.

17                  There has been no such certification by

18  Mr. Seery, and there may never be such a certification

19  by Mr. Seery.

20                  THE COURT:  Okay.

21                  MR. SCHULTE:  So that is real important

22  because the idea that Hunter Mountain stands to somehow

23  gain from this transaction is flawed for the reasons

24  we've already talked about.

25                  But it's also flawed because they have

1  what is, at best, a contingent interest.  It's

2  contingent on things that have not yet occurred.  And

3  under the case law, they don't have standing conferred

4  on them in that interest.

5          THE COURT:  Okay.

6          MR. SCHULTE:  So for all those reasons why

7  there is no interest in the claims, no legal damages, no

8  duty owed to it, no private cause of action belonging

9  to it and a hypothetical and contingent interest, HMIT

10  lacks standing to investigate or challenge these claims

11  and claims transfers to which it was not a party and in

12  which it had zero interest.

13          And for any or all of the reasons

14  we've talked about, Your Honor, their petition should be

15  dismissed.  I welcome any questions the court may have.

16          THE COURT:  No.  My head is kind of

17  spinning.  Like I said, I spent all day yesterday

18  reading stuff.  As I said, I will admit I've never

19  practiced bankruptcy law.

20          I mean, my joking statement is I pretty

21  much know enough to not be in contempt of bankruptcy

22  court.  Because I have cases where one of the defendants

23  or one of the parties ends up in bankruptcy court and

24  whether or not I can proceed with my case, et cetera.

25  That's my whole goal is not to be in contempt of court.

 1                    MR. SCHULTE:  That should be the goal, is

 2    to not be in contempt of the bankruptcy court.

 3                    MR. McENTIRE:  May I have just five or ten

 4    minutes?

 5                    THE COURT:  I don't have another hearing,

 6    so we're fine on time.

 7                    MR. McENTIRE:  All right.  In all due

 8    deference to Mr. Schulte, the last 15 minutes of his

 9    argument misstates the law.

10                    THE COURT:  Okay.

11                    MR. McENTIRE:  The Washington Mutual case

12    addresses almost 90 percent of what he just talked

13    about.  Their equity was entitled to bring an action

14    to basically disallow an interest that was acquired by

15    inside information.

16                    Okay.  And so he has not addressed the

17    Washington Mutual case at all.

18                    THE COURT:  Well, okay.  So my question

19    is let's say that the insider trading didn't happen.

20                    I mean, when I was playing with the

21    numbers last night, it doesn't appear that Hunter

22    Mountain, being Class 10, would have gotten anything

23    anyways even if.  Right?

24                    Like I said, I did a lot of reading last

25    night, so I want to make sure I understand.

 1                    MR. McENTIRE:  Fair enough.  I think I can

 2    address that.

 3                    The bottom line is a wrongdoer should

 4    not be entitled to profit from his wrong.  That's

 5    the fundamental premise behind the restatement on

 6    restitution.  That's the fundamental purpose of

 7    the Washington Mutual case.

 8                    You have remedies, including disgorgement,

 9    disallowance or subordination.

10                    THE COURT:  I'm just trying to be devil's

11    advocate because I'm trying to work through this.

12                    So let's say it did happen and the court

13    ordered disgorgement and invalidated these transfers,

14    then the money would just go to the Class 8 and

15    Class 9.  Right?  To Acis, UBS, HarbourVest, etc.

16                    MR. McENTIRE:  No, they would not.

17    Because those claims have already been traded.

18                    THE COURT:  Okay.  Well, that's

19    what I'm saying.

20                    If the court said there was insider

21    trading and to disallow the transfer and ordered

22    disgorgement, theoretically, back to Highland Capital,

23    then the money is there.

24                    Okay.  So then it would just go to Acis

25    and UBS.  Right?

1          MR. McENTIRE:  The remedy here is to

2    subordinate their claims.  HarbourVest, UBS, Acis, and

3    the Redeemer committee have sold their claims.  They can

4    intervene if they want and that's up to them.  If they

5    want to take the position that they were defrauded,

6    that's up to them.

7          THE COURT:  Okay.

8          MR. McENTIRE:  Otherwise, the remedy is to

9    disgorge the proceeds and put them back into the coffers

10   of the bankruptcy court in which case Category 8 and 9

11   would be brimful, overflowing, and flow directly into

12   the coffers in Class 10.

13         And that's the purpose of 15 and 16 in

14   Mr. Patrick's affidavit.

15         THE COURT:  Okay.

16         MR. McENTIRE:  I find it amazing that he

17   refers to Judge Jernigan's orders where he said anything

18   dealing with these claims must come back to me.  I have

19   exclusive jurisdiction.  I recall that argument.

20         THE COURT:  Right.

21         MR. McENTIRE:  Well, she could have

22   accepted the removal of Mr. Dondero in that other

23   proceeding.  She didn't.  She said I don't have

24   jurisdiction over this.  I'm sending it back to

25   the state court.

1          THE COURT:  Okay.  Because it was filed

2  as a 202.  If it had been filed as a Rule 404, then she

3  would have had jurisdiction because you're specifically

4  invoking a state court process.  Right?

5          MR. McENTIRE:  I'm invoking exclusively

6  a state court process because of the benefit it

7  provides.  That is a strategic choice that this

8  petitioner has elected.  It has nothing to do with

9  bankruptcy court, other than bankruptcy court is too

10 slow.

11          All the invective about the prior contempt

12 order has nothing to do with these proceedings.

13 Mr. Dondero is not involved in these proceedings.

14          If HarbourVest and UBS want to intervene

15 in some subsequent lawsuit, they have a right to do so.

16 I can't stop them.

17          But until then, we have stated a cause

18 of action or at least a potential cause of action which

19 is insider trading.  That from an outsider makes them an

20 insider that owes fiduciary duties to the equity.

21          Washington Mutual allowed equity to come

22 in and disallow those claims.  And if those claims are

23 disallowed, the Class 10 is going to be overflowing on

24 the waterfall.  And that's my client.

25          A couple of other things.  Hunter Mountain

1    is not a stranger.  Hunter Mountain was the big elephant

2    in the room until the effective date of the plan.

3                    We held 99.5 percent of the equity stake

4    and when all of these wrongdoings occurred, Hunter

5    Mountain was still the 99.5 percent equity stakeholder.

6                    It's only after the bankruptcy plan had

7    gone effective, after these claims had already been --

8                    THE COURT:  Wait.  The insider trading

9    happened after the bankruptcy had been filed but before

10   the bankruptcy was resolved.

11                   So it's during that process.  Right?

12                   MR. McENTIRE:  You have filing a

13   bankruptcy.  You have a bankruptcy plan.  You have

14   confirmation of the plan, but it doesn't go effective

15   until six months later.

16                   THE COURT:  Right.

17                   MR. McENTIRE:  After the bankruptcy

18   plan was confirmed and they had dismal estimates of

19   recovery -- 71 percent on Class 8, zero percent on

20   Class 9 -- that's when Farallon and Stonehill purchased

21   the claims.

22                   But they purchased the claims at a time

23   before the bankruptcy wasn't effective.  And so the

24   so-called claimant trust agreement had not gone into

25   effect until several months later.

```
1                    THE COURT:  Okay.
2                    MR. McENTIRE:  And during this period of
3    time Hunter Mountain was the very, very largest
4    stakeholder.
5                    THE COURT:  Okay.
6                    MR. McENTIRE:  And so to call it a
7    stranger is just not right and it's not fair because
8    we're anything but a stranger.
9                    They make an argument that Hunter Mountain
10   didn't object to the settlements.  Well, so what?
11   I'm not attacking the underlying settlements.
12   I'm attacking the claims transfers.
13                   And then he says, well, why didn't they
14   object to the claims transfers.  Well, he finally
15   conceded that the claims transfers are not actually
16   subject to a judicial scrutiny by the bankruptcy court.
17                   This court is uniquely qualified to
18   review these claims transfers as is Judge Jernigan.
19   Insider information is insider information as a rose
20   is a rose is a rose.  And any court of law is qualified
21   to determine whether insider information was used.
22                   Judge Jernigan did not say, okay,
23   Farallon, you can buy this claim.  There was no
24   judicial process here.
25                   THE COURT:  Right.  I mean, it's a motion.
```

1   We want to do this, just get approval.

2                   MR. McENTIRE:  They don't even have to get

3   approval.

4                   THE COURT:  Okay.

5                   MR. McENTIRE:  All they have to do is file

6   notice.

7                   THE COURT:  Okay.  File the notice.

8                   MR. McENTIRE:  Judge Jernigan was not

9   involved at all.

10                  We had no reason to object.  All we know

11  there's a claims transfer.  It's not until later that

12  we discover that inside information was used and that's

13  why we're here.

14                  So we didn't object to the original

15  claims.  There was no need to.  The original settlements

16  rather.  There was no need to.  There was no objection

17  to the claims transfers.

18                  There was no mechanism to object, other

19  than what we're doing here today.  This is our

20  objection.  This is our attempt to object.

21                  Because we believe that they have acquired

22  hundreds of millions of dollars of ill-gotten gain and

23  if that is true, not only will Hunter Mountain be

24  benefited tremendously, but other unsecured creditors.

25  They are very few but they will be also benefited.

1                       Frankly, Judge Jernigan may want that to

2    happen.

3                       THE COURT:  Okay.

4                       MR. McENTIRE:  But we're here to get the

5    discovery so I can pull it all together within the next

6    30 days or 40 days.  So I can make decisions before

7    somebody might suggest, hey, well, you should have

8    filed this a little bit earlier.

9                       And so, Judge, that's why we're here,

10   in the interest of time.  And that was my decision.

11   That was my strategic decision to bring it here.

12                      THE COURT:  Right.

13                      MR. McENTIRE:  He says that Rule 3001 is

14   the exclusive remedy.  Only transferors can complain

15   about transferees or vice versa.

16                      THE COURT:  You're not necessarily

17   complaining about the actual transfer.  It's how

18   the transfer came about.

19                      MR. McENTIRE:  That's right.

20                      And to suggest that that is the governing

21   principle that this court should consider is an absolute

22   contradiction to the Washington Mutual case.

23                      Because if fraud is in play, if inside

24   information is in play, then it impacts everyone who

25   is a stakeholder.  Everyone.

1                      THE COURT:  Okay.

2                      MR. McENTIRE:  And we are one of the

3    largest stakeholders in the bankruptcy proceedings,

4    even today.  So that's all I have.

5                      I thank you for your attention,

6    Your Honor.  Clearly, the benefit here is we get to

7    uncover some things that need to be uncovered.  And

8    we'd like to do it so in a timely fashion.

9                      And if we don't have a claim, we don't

10   have a claim.  If we have a claim, then we may file it

11   in a state district court.

12                      And if Judge Jernigan and her gate-keeping

13   orders require us to go there, we'll go there.  I'm not

14   going to run afoul of any rule she has, but we need to

15   get this underway.

16                      THE COURT:  Okay.

17                      MR. SCHULTE:  Your Honor, may I make some

18   rifle-shot responses?

19                      THE COURT:  Yeah.  That's fine.

20                      MR. SCHULTE:  Okay.  Mr. McEntire has said

21   that they are one of the largest stakeholders in the

22   Highland bankruptcy based on this 99.5 percent equity.

23   That equity was extinguished in the fifth amended plan.

24                      That's Exhibit 3 that I handed you,

25   Your Honor.  That plan was filed in January of 2021

1   before any of these claims transfers took place.

2   The equity was extinguished by virtue of the plan.

3               THE COURT:  Okay.

4               MR. SCHULTE:  Mr. McEntire was talking

5   about this Washington Mutual case.  I read the case.

6               But what he said repeatedly, and I think

7   it's really important to listen to what Mr. McEntire

8   said about this case, is that that court allowed the

9   equity to come in and talk about these transfers.

10              Hunter Mountain doesn't have any equity.

11  That equity was extinguished in the plan for reasons

12  I just discussed.  So for being the largest stakeholder,

13  according to Mr. McEntire, in the bankruptcy what does

14  Hunter Mountain have to show for that?  A Class 10.

15              As Your Honor pointed out, a Class 10

16  interest, that is below everybody else.  And that's

17  where they've been relegated.

18              And to answer your question, Your Honor,

19  that you posed to Mr. McEntire that I'm not sure was

20  ever answered, HMIT -- Hunter Mountain -- at Class 10

21  stood to gain nothing when the plan was put together.

22  So the largest stakeholder stood to gain nothing.

23              I've pointed to the language in the

24  court's order about how the court has exclusive

25  jurisdiction.

1                    And Your Honor nailed the answer to the

2     concern raised by Mr. McEntire, which is the bankruptcy

3     court didn't have jurisdiction over a 202 proceeding.

4     But it unquestionably has authority over the

5     counterpart, 2004 in bankruptcy court.

6                    THE COURT:  Right.

7                    MR. SCHULTE:  Finally, I have never argued

8     and if I did say this, I apologize.  I have never argued

9     that Hunter Mountain is somehow a stranger to the

10    bankruptcy.

11                   THE COURT:  Right.  They were obviously

12    involved in the bankruptcy, but they're a stranger to

13    these transfers.

14                   MR. SCHULTE:  Exactly.  They were a

15    stranger to these transactions.  They didn't have any

16    interest in these claims.

17                   They don't stand to gain anything if

18    the claims are either rescinded or if the claims are

19    invalidated or the transfers are invalidated.  They

20    don't stand to get anything because they never had

21    any interest in these claims.

22                   The claims are the claims and either UBS,

23    Redeemer, Acis, and HarbourVest stood to gain more than

24    expected or Farallon and Stonehill stand to gain more

25    than expected.

1                    And if anybody is really injured here,

2     it's not Hunter Mountain.  It's the transferors who

3     were duped into these transfers, according to Hunter

4     Mountain.  And they would be the ones that would have

5     damage and have a claim along the lines of what

6     Hunter Mountain is trying to assert on behalf

7     of all stakeholders.

8                    Your Honor, I have a proposed order, as

9     Mr. McEntire does.

10                    May I bring it up?

11                    THE COURT:  Yes, you may.

12                    Okay, Mr. McEntire.  Anything else?

13                    MR. McENTIRE:  His last few statements are

14     inconsistent with the law, Your Honor.

15                    THE COURT:  Okay.

16                    MR. McENTIRE:  Because the law clearly,

17     clearly indicates that we are a beneficiary.  And

18     that's what the Washington Mutual case stands for.

19                    THE COURT:  Okay.  Wait.  Let me make sure

20     I know which one.

21                    Do you have a cite for that case?

22                    MR. McENTIRE:  Yes, ma'am.  It's in the

23     PowerPoint.

24                    THE COURT:  That's fine.  I just wanted

25     to make sure I could find it.

 1                    MR. McENTIRE:  There's also a Fifth

 2   Circuit case that talks about subordination where

 3   a Class 8 and Class 9 would actually be subordinated,

 4   Your Honor, to our claim.

 5                    So that's another approach to this, is

 6   subordination.

 7                    THE COURT:  Okay.

 8                    MR. McENTIRE:  And that's the In re Mobile

 9   Steel case out of the Fifth Circuit.  I think there's a

10   cite in our brief.

11                    THE COURT:  Okay.

12                    MR. McENTIRE:  I acknowledge that

13   we're now classified with a different name.  We're

14   a B/C limited partner.  And we're, in effect, a Class 10

15   beneficial interest.

16                    But we're there having been a 99.5.  And

17   the lion share of any money, 99.5 percent of any money

18   that overflows into bucket No. 10 is ours.

19                    THE COURT:  Right.

20                    Okay.  I am processing.  Obviously, I need

21   to take this into consideration.  I haven't had a chance

22   to go through Respondent's exhibits.

23                    I've looked through the plaintiff's

24   exhibits, but now I have much more of a focus of what

25   I'm doing.

1                   So I will try to get you all a ruling

2      by the end of next week.  I apologize.  I've got a

3      special setting next week that's going to be kind

4      of crazy, but I will do everything I can.

5                   If you all haven't heard from me by next

6      Friday afternoon, call my coordinator Texxa and tell

7      her to bug me.

8                   MR. McENTIRE:  Thank you for your time.

9                   THE COURT:  You all are excused.  Have

10     a great day.

11

12

13                  (This completes the Reporter's Record,

14                  Petitioner Hunter Mountain Investment

15                  Trust's Rule 202 Petition, which was

16                  heard on Wednesday, February 22, 2023.)

17

18

19

20

21

22

23

24

25

1  STATE  OF  TEXAS  )

2  COUNTY OF DALLAS  )

3          I, Gina M. Udall, Official Court Reporter

4  in and for the 191st District Court of Dallas County,

5  State of Texas, do hereby certify that the above and

6  foregoing contains a true and correct transcription of

7  all portions of evidence and other proceedings requested

8  in writing by counsel for the parties to be included in

9  this volume of the Reporter's Record in the above-styled

10  and numbered cause, all of which occurred in open court

11  and were reported by me.

12          I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, offered by the respective parties.

15          I further certify that the total cost for the

16  preparation of this Reporter's Record is $750.00 and was

17  paid by the attorney for Respondents.

18          WITNESS MY OFFICIAL HAND on this the 1st day of

19  March 2023.

20

21                    /S/   Gina M. Udall
                    Gina M. Udall, Texas CSR  #6807
22                    Certificate Expires: 10-31-2024
                    Official Reporter, 191st District
23                    Court of Dallas County, Texas
                    George Allen Sr. Courts Building
24                    600 Commerce St., 7th Floor
                    Dallas, Texas  75202
25                    Telephone:  (214) 653-7146

## CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **191st JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## <u>DECLARATION OF MARK PATRICK</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to Texas Civil Practice and Remedies Code Section 132.001 and declares as follows:

1. My name is Mark Patrick. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I submit this declaration in support of Petitioner Hunter Mountain Investment Trust's ("HMIT") Verified Rule 202 Petition ("Petition"). I previously reviewed and verified the Petition. I am personally familiar with the numerous documents identified in the Petition which are part of the public record in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. I serve as the Administrator of HMIT. In this capacity, I am the duly authorized person to act on behalf of HMIT. As such, I am familiar with the organizational structure of HMIT and its status both before and during the HCM Bankruptcy Proceedings. Due to my other affiliations with other interested parties in the HCM Bankruptcy Proceedings, I am generally familiar with the docket in the HCM

<div align="center">1</div>

Bankruptcy Proceedings and have attended multiple hearings in the HCM Bankruptcy Proceedings.

4. HMIT is a Delaware statutory trust. It was the largest equity holder in Highland Capital Management, L.P. ("HCM") until the Effective Date of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) (the "Plan"). The Effective Date of the Plan occurred on August 11, 2021. Prior to the Effective Date, HMIT was classified as a Class 10 unsecured creditor. Upon the Effective Date, and pursuant to the Plan, HMIT's Class 10 claim was converted to a "Contingent Trust Interest," as defined in the Claimant Trust Agreement, which was approved by the Bankruptcy Court as part of the Plan. HMIT was the only stakeholder in Class 10. A true and correct copy of the Claimant Trust Agreement is attached as Exhibit A.

5. Following various orders in the HCM Bankruptcy Proceedings, Jim Seery was appointed as a member of the Board of Directors ("Board") of Strand Advisors, Inc., HCM's general partner. Subsequently, the Board appointed Jim Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"). Following the Effective Date of the Plan, Jim Seery continues to serve as the CEO of HCM, but also serves as the Trustee of the Claimant Trust under the terms of a Claimant Trust Agreement which, along with the Plan, identifies the various classes of unsecured creditors, including allowed claims for Class 8, allowed claims for Class 9 and Class 10, as well as the waterfall for potential distributions from the Bankruptcy Estate. Under the Claimant Trust Agreement and the Plan, Unsecured Creditors in Class 8 participate in distributions before Unsecured Creditors in Class 9; Unsecured Creditors in Class 9 participate in distributions before HMIT. The Plan also established an Oversight Committee, which now includes Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup"), over the Claimant Trust.

6. Neither Muck nor Jessup were original creditors in the HCM Bankruptcy Proceedings. Rather, as reflected in public filings, Muck was created on March 9, 2021, and Jessup was created on April 8, 2021, well after the HCM Bankruptcy Proceedings were under way. The HCM Bankruptcy Proceedings began in 2019. True and correct copies of publicly available information with the Delaware Division of Corporations reflecting Muck and Jessup's dates of formation are attached as Exhibits B and C, respectively.

7. Upon information and belief, Muck is a special purpose entity created by Farallon Capital Management LLC ("Farallon"). Upon information and belief, Jessup is a special purpose entity created by Stonehill Capital Management LLC ("Stonehill").

Both Farallon and Stonehill are capital management companies or "hedge funds" operating across the United States and throughout the world.

8. As HCM's CEO and CRO, Jim Seery negotiated and obtained bankruptcy court approval for the settlement of claims with four (4) large unsecured creditors of HCM, three of which served on the Unsecured Creditors Committee in the HCM Bankruptcy Proceedings. These unsecured creditors included: (i) the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM; (ii) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); (iii) HarbourVest[1] and (iv) UBS Securities LLC and UBS AG London Branch (collectively "UBS") (collectively, "Settling Parties"). These settlements are documented in the docket of the HCM Bankruptcy Proceedings at Document Nos. 1273, 1302, 1788, and 2389, respectively, and true and correct copies are attached hereto, respectively, as Exhibits D, E, F, and G (collectively, the "Settlements").

9. As reflected in these Settlements, Exhibits D, E, F, and G, each of the Settling Parties received Class 8 and Class 9 claims, as provided below:

| Exhibit | Creditor | Class 8 | Class 9 | Total |
|---------|----------|---------|---------|-------|
| D | Redeemer | $136.7 mm | $0 mm | $136.7 mm |
| E | Acis | $23 mm | $0 mm | $23 mm |
| F | HarbourVest | $45 mm | $35 mm | $80 mm |
| G | UBS | $65 mm | $60 mm | $125 mm |
| | Total | $269.7 mm | $95 mm | $364.7 mm |

10. Following the Settlements in the HCM Bankruptcy Proceedings, the Settling Parties sold their claims to Muck and Jessup, which, upon information and belief, are the special purpose entities created by Farallon and Stonehill. HMIT was not given an opportunity to bid for these claims. The stated face value or par value of these claims was $364.7 million. To date, these claims represent the vast majority

---

[1] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

3

(over 90%) of all unsecured creditor claims in Class 8 and Class 9 which, according to the Q3 2022 Report, total $397,485,568.00.[2]

11. Stonehill or Jessup acquired the Redeemer claim for $78 million on or about April 30, 2021. A true and correct copy of a letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds reflecting this purchase price is attached as Exhibit H.

12. In addition to the purchase of the claim from the Redeemer Committee as described above, and continuing upon information and belief, Muck and Jessup paid additional tens of millions of dollars to acquire the Class 8 and Class 9 claims held by UBS, HarbourVest and Acis. Upon information and belief, the magnitude of these investments contrasts sharply with the available public information concerning the expected value of Class 8 and Class 9 claims.

13. Attached as Exhibit I is a true and correct copy of HCM's Q3 2021 Post-Confirmation Report ("Q3 Report"). According to this Q3 Report, HCM reported that the Class 8 claims were expected to be paid at 54%. This reflects a drop from approximately 71.32% reflected in Exhibit J, which is a public filing available to Farallon and Stonehill in the HCM Bankruptcy Proceedings. Thus, at the time of the purchases, the publicly available information indicated that the return on investment was substantially less than 100% for Class 8 creditors and 0% for the Class 9 creditors.

14. Despite earlier, much lower financial disclosures provided by the debtor, HCM, concerning expected distributions, almost $250 million was paid in Q3 2022 to Class 8 general unsecured creditors—$45 million *more* than was *ever* projected. A true and accurate copy of the public filing which reflects these distributions is attached as Exhibit K.

15. The discovery which HMIT seeks is reasonably calculated to confirm whether Farallon or Stonehill (via Muck or Jessup) traded and acquired their claims at issue based upon non-public information. If so, HMIT intends to seek cancellation of these claims in their entirety and disgorgement of all distributions which Farallon or Stonehill (via Muck or Jessup) may have received to date. These distributions are estimated to be at least $173 million. This estimate is based upon the relative proportions of: (1) the Class 8 claims owned by Farallon and Stonehill (via Muck and Jessup) to the total amount of general unsecured claims, (2) and the amount

---

[2] This number, $397,485,568 assumes the public disclosure of "allowed" general unsecured claims, includes all Class 8 and Class 9 claims. *See infra,* Exhibit K.

HMIT Appx. 01279

previously distributed to general unsecured claimholders to the total amount of general unsecured claims.

16. Under the terms of the Claimant Trust Agreement, a cancellation of the claims at issue, together with disgorgement, will free more than $222,480,270 of the over $255 million that has been disbursed to date. This approximate sum, after appropriate offsets, will be available to pay HMIT after taking into account any other residual creditors in Class 8 or Class 9. Under this scenario, as the former holder of 99.5% equity in HCM, HMIT stands to receive substantial financial benefit. Based upon my experience in managing litigation, and in reviewing and approving the payment of outside counsel legal services for many years, the benefit to HMIT clearly outweighs any expense burden that may be imposed on Farallon or Stonehill to comply with basic and simple discovery requests.

17. My name is Mark Patrick my date of birth is April 23, 1972, and my address is 6716 Glenhurst Drive, Dallas, Texas 75254, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

5

FURTHER DECLARANT SAYETH NOT.


Executed in Dallas County, State of Texas, on the  14th  day of February 2023.


Mark Patrick

6

*EXECUTION VERSION*

## CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of August 11, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and Wilmington Trust, National Association, a national banking association ("WTNA"), as Delaware trustee (in such capacity hereunder, and not in its individual capacity, the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Docket No. 1875, Exh. B.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

Exhibit

Disputed Claims as set forth herein and in the Plan; and (vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1     Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan. For all purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)     "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)     "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(d)     "Claimant Trust Agreement" means this Agreement.

2

HMIT Appx. 01283

(e)    "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)    "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)    "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)    "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)    "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)    "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)    "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)    "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)    "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

(n)    "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

3

HMIT Appx. 01284

(o)     "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p)     "Delaware Trustee" has the meaning set forth in the introduction hereof.

(q)     "Disability" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r)     "Disinterested Members" has the meaning set forth in Section 4.1 hereof.

(s)     "Disputed Claims Reserve" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [(in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board)] to be sufficient to pay Disputed Claims under the Plan.

(t)     "Employees" means the employees of the Debtor set forth in the Plan Supplement.

(u)     "Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v)     "Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(w)     "Equity Trust Interests" has the meaning given to it in Section 5.1(c) hereof.

(x)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(y)     "General Unsecured Claim Trust Interests" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z)     "GUC Beneficiaries" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa)     "GUC Payment Certification" has the meaning given to it in Section 5.1(c) hereof.

(bb)     "HarbourVest" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

4

HMIT Appx. 01285

(cc)   "<u>Investment Advisers Act</u>" means the Investment Advisers Act of 1940, as amended.

(dd)   "<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended.

(ee)   "<u>Litigation Sub-Trust</u>" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff)   "<u>Litigation Sub-Trust Agreement</u>" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg)   "<u>Litigation Trustee</u>" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh)   "<u>Managed Funds</u>" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii)   "<u>Material Claims</u>" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj)   "<u>Member</u>" means a Person that is member of the Oversight Board.

(kk)   "<u>New GP LLC</u>" means the general partner of the Reorganized Debtor.

(ll)   "<u>Oversight Board</u>" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan. Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

(mm)   "<u>Plan</u>" has the meaning set forth in the Recitals hereof.

(nn)   "<u>Privileges</u>" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to,

HMIT Appx. 01286

attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo)    "PSZJ" means Pachulski Stang Ziehl & Jones LLP.

(pp)    "Redeemer Committee" means the Redeemer Committee of the Highland Crusader Fund.

(qq)    "Registrar" has the meaning given to it in Section 5.3(a) hereof.

(rr)    "Reorganized Debtor Assets" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss)    "Securities Act" means the Securities Act of 1933, as amended.

(tt)    "Subordinated Beneficiaries" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu)    "Subordinated Claim Trust Interests" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv)    "TIA" means the Trust Indenture Act of 1939, as amended.

(ww)    "Trust Interests" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx)    "Trust Register" has the meaning given to it in Section 5.4(b) hereof.

(yy)    "Trustees" means collectively the Claimant Trustee and Delaware Trustee, however, it is expressly understood and agreed that the Delaware Trustee shall have none of the duties or liabilities of the Claimant Trustee.

(zz)    "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa)    "WilmerHale" Wilmer Cutler Pickering Hale & Dorr LLP.

1.2    General Construction.  As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all

HMIT Appx. 01287

cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

     1.3    <u>Incorporation of the Plan</u>. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

<div align="center">

**ARTICLE II.**
**ESTABLISHMENT OF THE CLAIMANT TRUST**

</div>

     2.1    <u>Creation of Name of Trust</u>.

         (a)    The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust." The Claimant Trustee shall be empowered to conduct all business and hold all property constituting the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

         (b)    The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

     2.2    <u>Objectives</u>.

         (a)    The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

         (b)    It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment,

<div align="center">7</div>

HMIT Appx. 01288

make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3     Nature and Purposes of the Claimant Trust.

(a)     The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, provided, however, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

(b)     The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

(i)     to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

(ii)     to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however. that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

8

HMIT Appx. 01289

(iii)   to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

(iv)   to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

(v)   to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

(vi)   to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

(vii)   to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

(viii)   to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

(ix)   to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

2.4   Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust.

(a)   On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement. To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b)   On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement. Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

HMIT Appx. 01290

(c)　　On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved. For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d)　　Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trustee, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee. For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

2.5　　Principal Office. The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:　100 Crescent Court, Suite 1850, Dallas, Texas 75201.

2.6　　Acceptance. The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7　　Further Assurances. The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8　　Incidents of Ownership. The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

DOCS_NY:43843.3 36027/002

HMIT Appx. 01291

# ARTICLE III.
## THE TRUSTEES

3.1    Role. In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2    Authority.

(a)    In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust. The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law. The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)    The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; provided, however, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate. To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)    solely as required by Section 2.4(d), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

DOCS_NY:43843.3 36027/002

HMIT Appx. 01292

(ii)    open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)    as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)    settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)    sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)    upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)    exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)    protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x)    without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi)    retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay,

HMIT Appx. 01293

such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii)   prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii)   prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv)   to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv)   subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

(xvi)   request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii)   take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii)   take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix)   exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx)   evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi)   with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from

13

HMIT Appx. 01294

the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the "Authorized Acts").

(d)     The Claimant Trustee and the Oversight Committee will enter into an agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's authority with respect to certain other assets, including certain portfolio company assets (the "Other Assets").

(e)     The Claimant Trustee has the power and authority to act as trustee of the Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns, is removed, or is otherwise unable to serve for any reason.

3.3     Limitation of Authority.

(a)     Notwithstanding anything herein to the contrary, the Claimant Trust and the Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Claimant Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents or the Confirmation Order.

(b)     Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein, in order to:

(i)     terminate or extend the term of the Claimant Trust;

(ii)     prosecute, litigate, settle or otherwise resolve any of the Material Claims;

(iii)     except otherwise set forth herein, sell or otherwise monetize any assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

(iv)     except for cash distributions made in accordance with the terms of this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with Article IV of the Plan;

(v)     except for any distributions made in accordance with the terms of this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

14

HMIT Appx. 01295

Case 3:21-cv-05881-X Document 172-1 Filed 12/16/22 Page 101 of 968 PageID 15683
Case 19-34054-sgj11 Doc 3523-5 Filed 09/14/22 Entered 09/14/22 14:23:22 Page 16 of

40

(vi)    reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

(vii)    borrow as may be necessary to fund activities of the Claimant Trust;

(viii)    determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

(ix)    invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

(x)    change the compensation of the Claimant Trustee;

(xi)    subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

(xii)    retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and (ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

(c)    [Reserved.]

3.4    _Investment of Cash_. The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; provided, however that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("IRS") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement).

HMIT Appx. 01296

3.5  <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall he final and binding upon any and all Beneficiaries.

3.6  <u>Term of Service</u>.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

3.7  <u>Resignation</u>.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

3.8  <u>Removal</u>.

(a)  The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

(b)  To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9  <u>Appointment of Successor</u>.

(a)  <u>Appointment of Successor</u>.  In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust.  The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the

DOCS_NY:43843.3 36027/002

HMIT Appx. 01297

vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

        (b)    <u>Vesting or Rights in Successor Claimant Trustee</u>.  Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee.  In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

        (c)    <u>Interim Claimant Trustee</u>.  During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "<u>Interim Trustee</u>") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

    3.10    <u>Continuance of Claimant Trust</u>.  The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee.  In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, <u>provided</u> the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust.  The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

    3.11    <u>Claimant Trustee as "Estate Representative"</u>.  The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Claimant

DOCS_NY:43843.3 36027/002

HMIT Appx. 01298

Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; provided that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims. The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12    Books and Records.

(a)    The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)    The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)    The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

DOCS_NY:43843.3 36027/002

HMIT Appx. 01299

3.13   Compensation and Reimbursement; Engagement of Professionals.

(a)   Compensation and Expenses.

(i)   Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

(ii)   Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

(b)   Professionals.

(i)   Engagement of Professionals.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder. The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

(ii)   Fees and Expenses of Professionals.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

3.14   Reliance by Claimant Trustee.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein. The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith. The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith. The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

3.15   Commingling of Claimant Trust Assets.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

DOCS_NY:43843.3 36027/002

HMIT Appx. 01300

3.16    Delaware Trustee.

(a)    The Delaware Trustee shall have the limited power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement, in either case as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee and upon which the Delaware Trustee shall be entitled to conclusively and exclusively rely; provided, however, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law. The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law. Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Claimant Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the Claimant Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Statutory Trust Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to those expressly set forth in this Section 3.16 and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Claimant Trust, the other parties hereto or any beneficiary of the Claimant Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement.

(b)    The Delaware Trustee shall serve until such time as the Claimant Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Claimant Trustee in accordance with the terms hereof. The Delaware Trustee may resign at any time upon the giving of at least thirty (30) days' advance written notice to the Claimant Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Claimant Trustee in accordance with the terms hereof. If the Claimant Trustee does not act within such thirty (30) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(c)    Upon the resignation or removal of the Delaware Trustee, the Claimant Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the

20

HMIT Appx. 01301

outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Delaware Statutory Trust Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Claimant Trustee and any undisputed fees, expenses and indemnity due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Agreement.

(d) The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement. The Claimant Trust shall promptly advance and reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(e) WTNA shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(f) Any corporation or association into which WTNA may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Delaware Trustee is a party, will be and become the successor Delaware Trustee under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## ARTICLE IV.
## THE OVERSIGHT BOARD

4.1    Oversight Board Members. The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "Disinterested Members"). The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker. David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members; provided, however, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-

DOCS_NY:43843.3 36027/002

HMIT Appx. 01302

E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

    4.2    <u>Authority and Responsibilities</u>.

    (a)    The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein. As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.8 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; <u>provided</u>, <u>however</u>, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

    (b)    The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

    (c)    The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

    (d)    Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

    (e)    Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate

DOCS_NY:43843.3 36027/002

HMIT Appx. 01303

in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds. It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

4.3  Fiduciary Duties.  The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; provided, however, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; provided, further, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action.  In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust.  Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

4.4  Meetings of the Oversight Board.  Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly. Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; provided, however, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board).  Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

4.5  Unanimous Written Consent.  Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded.  If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone.  Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

23

HMIT Appx. 01304

4.6    Manner of Acting.

(a)    A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); provided that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum. Except as set otherwise forth herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement. Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof. Any Member participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

(b)    Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment. The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

(c)    Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Trust Interests). A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "Conflicted Member" who shall not be entitled to vote or take part in any action with respect to such matter or issue. In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d)    Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "Committee Member Claim Matter"). A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any

24

HMIT Appx. 01305

Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

      4.7    <u>Tenure of the Members of the Oversight Board</u>. The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article IX hereof. The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.8 below, or removal pursuant to Section 4.9 below.

      4.8    <u>Resignation</u>. A Member of the Oversight Board may resign by giving prior written notice thereof to the Claimant Trustee and other Members. Such resignation shall become effective on the earlier to occur of (i) the day that is 90 days following the delivery of such notice, (ii) the appointment of a successor in accordance with Section 4.10 below, and (iii) such other date as may be agreed to by the Claimant Trustee and the non-resigning Members of the Oversight Board.

      4.9    <u>Removal</u>. A majority of the Oversight Board may remove any Member for Cause or Disability. If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein. Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

      4.10    <u>Appointment of a Successor Member</u>.

          (a)    In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; <u>provided</u>, <u>however,</u> that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; <u>provided</u>, <u>further</u>, that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board. The appointment of a successor Member will be further evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

          (b)    Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act. A successor Member will not be liable personally for any act or omission of a predecessor Member.

          (c)    Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment

DOCS_NY:43843.3 36027/002

HMIT Appx. 01306

under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

4.11 <u>Compensation and Reimbursement of Expenses</u>. Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; <u>provided</u>, <u>however</u>, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member. Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

4.12 <u>Confidentiality</u>. Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("<u>Confidential Trust Information</u>"), except as otherwise required by law. For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "<u>Member Affiliates</u>") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.12.

<div style="text-align:center"><b>ARTICLE V.<br>TRUST INTERESTS</b></div>

5.1 <u>Claimant Trust Interests</u>.

(a) <u>General Unsecured Claim Trust Interests</u>. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "<u>GUC Beneficiaries</u>"). The Claimant Trustee shall allocate to each Holder of an Allowed Class 8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims. The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

(b) <u>Subordinated Claim Trust Interests</u>. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "<u>Subordinated Beneficiaries</u>"). The

DOCS_NY:43843.3 36027/002

HMIT Appx. 01307

Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9. The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests. The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

   (c) <u>Contingent Trust Interests</u>. On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "<u>Equity Holders</u>"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "<u>GUC Payment Certification</u>"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "<u>Equity Trust Interests</u>." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

  5.2 <u>Interests Beneficial Only</u>. The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

  5.3 <u>Transferability of Trust Interests</u>. No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or

HMIT Appx. 01308

reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause the Claimant Trustee to become a public reporting company and/or make periodic reports under the Exchange Act (provided that it is not required to register under the Investment Company Act or register its securities under the Securities Act) to enable such disposition to be made. In the event that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such restrictions upon such disposition and other terms of this Agreement as are deemed necessary or appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

5.4     Registry of Trust Interests.

(a)     Registrar. The Claimant Trustee shall appoint a registrar, which may be the Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests as provided herein. The Registrar, if other than the Claimant Trustee, shall be an institution or person acceptable to the Oversight Board. For its services hereunder, the Registrar, unless it is the Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as a Claimant Trust Expense.

(b)     Trust Register. The Claimant Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the Registrar may prescribe.

(c)     Access to Register by Beneficiaries. The Claimant Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's Trust Interest.

5.5     Exemption from Registration. The Parties hereto intend that the rights of the Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws. The Oversight Board, acting unanimously, and Claimant Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act. The Trust Interests shall not have consent or voting rights or otherwise confer on the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Claimant Trustee under this Agreement.

28

HMIT Appx. 01309

5.6     Absolute Owners. The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7     Effect of Death, Incapacity, or Bankruptcy. The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8     Change of Address. Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address. Such notification shall be effective only upon receipt by the Claimant Trustee. Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9     Standing. No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets. No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10    Limitations on Rights of Claimant Trust Beneficiaries.

        (a)     The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

        (b)     In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; provided, however, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

        (c)     A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed. A request for such bond can be made by the Claimant Trust or by Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

        (d)     Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas. Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

        (e)     The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

DOCS_NY:43843.3 36027/002

HMIT Appx. 01310

## ARTICLE VI.
## DISTRIBUTIONS

6.1    <u>Distributions</u>.

(a)    Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7. Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board. The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

(b)    At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

(c)    All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

6.2    <u>Manner of Payment or Distribution</u>. All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3    <u>Delivery of Distributions</u>. All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records

DOCS_NY:43843.3 36027/002

HMIT Appx. 01311

of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

6.4     <u>Disputed Claims Reserves</u>.  There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.  The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

6.5     <u>Undeliverable Distributions and Unclaimed Property</u>.  All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

6.6     <u>*De Minimis* Distributions</u>.  Distributions with a value of less than $100 will be treated in accordance with the Plan.

6.7     <u>United States Claimant Trustee Fees and Reports</u>.  **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.  After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

<div align="center">

**ARTICLE VII.**
**TAX MATTERS**

</div>

7.1     <u>Tax Treatment and Tax Returns</u>.

(a)     It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.  Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable).  The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b)     The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c)     The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the

<div align="center">31</div>

HMIT Appx. 01312

Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2    Withholding.  The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof.  Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary.  As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

## ARTICLE VIII.
## STANDARD OF CARE AND INDEMNIFICATION

8.1    Standard of Care.  None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence.  The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee,  Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence.  None of the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2    Indemnification.  The Claimant Trustee (including each former Claimant Trustee), WTNA in its individual capacity and as Delaware Trustee, the Oversight Board, and all past and present Members (collectively, in their capacities as such, the "Indemnified Parties") shall be

DOCS_NY:43843.3 36027/002

HMIT Appx. 01313

indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence. If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; provided, however, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm. The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; provided that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, willful misconduct, or gross negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; provided, further, that any such repayment obligation shall be unsecured and interest free. The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties. For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, WTNA in its individual capacity and as Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such. The indemnification provided hereby shall be a Claimant Trust Expense and shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein. The terms of this Section 8.2 shall survive the termination of this Agreement and the resignation or removal of any Indemnified Party.

8.3     No Personal Liability. Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or

HMIT Appx. 01314

otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4     Other Protections.  To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

## ARTICLE IX.
## TERMINATION

9.1     Duration.  The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2     Distributions in Kind.  Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

9.3     Continuance of the Claimant Trustee for Winding Up.  After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall prepare, execute and file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "Termination Date"). If the Delaware Trustee's signature is required for purposes of filing such certificate of cancellation, the Claimant Trustee shall provide the Delaware

34

HMIT Appx. 01315

Trustee with written direction to execute such certificate of cancellation, and the Delaware Trustee shall be entitled to conclusively and exclusively rely upon such written direction without further inquiry. Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4     Termination of Duties.  Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5     No Survival.  The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, provided that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

<div align="center">

**ARTICLE X.**
**AMENDMENTS AND WAIVER**

</div>

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; provided that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement. No amendment or waiver of this Agreement that adversely affects the Delaware Trustee shall be effective unless the Delaware Trustee has consented thereto in writing in its sole and absolute discretion.

<div align="center">

**ARTICLE XI.**
**MISCELLANEOUS**

</div>

11.1     Trust Irrevocable.  Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2     Bankruptcy of Claimant Trust Beneficiaries.  The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

11.3     Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets.  No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4     Agreement for Benefit of Parties Only.  Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in

<div align="center">35</div>

respect of this Agreement. The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

11.5  Notices.  All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

> (a)  If to the Claimant Trustee:

> > Claimant Trustee
> > c/o Highland Capital Management, L.P.
> > 100 Crescent Court, Suite 1850
> > Dallas, Texas 75201

> With a copy to:

> > Pachulski Stang Ziehl & Jones LLP
> > 10100 Santa Monica Blvd, 13th Floor
> > Los Angeles, CA 90067
> > Attn:  Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
> > Ira Kharasch (ikharasch@pszjlaw.com)
> > Gregory Demo (gdemo@pszjlaw.com)

> (b)  If to the Delaware Trustee:

> > Wilmington Trust, National Association
> > 1100 North Market Street
> > Wilmington, DE 19890
> > Attn:  Corporate Trust Administration/David Young
> > Email:  nmarlett@wilmingtontrust.com
> > Phone:  (302) 636-6728
> > Fax:  (302) 636-4145

Notice mailed shall be effective on the date mailed or sent. Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

11.6  Severability.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.7  Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

DOCS_NY:43843.3 36027/002

HMIT Appx. 01317

11.8  Binding Effect, etc.  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the Claimant Trust Beneficiaries, and their respective successors and assigns. Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

11.9  Headings; References.  The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10  Governing Law.  This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11  Consent to Jurisdiction.  Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however,* that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12  Transferee Liabilities.  The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.  In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims.  If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

HMIT Appx. 01318

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By: _____

James P. Seery, Jr.
Chief Executive Officer and
Chief Restructuring Officer

Claimant Trustee

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

38

DOCS_NY:43843.3 36027/002

Wilmington Trust, National Association,
as Delaware Trustee

By: _____

Name: Neumann Marlett

Title: Bank Officer

DOCS_NY:43843.3 36027/002

HMIT Appx. 01320

Delaware.gov                                            Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

| HOME | Entity Details |
|------|----------------|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 5421257 | Incorporation Date / Formation Date: | 3/9/2021 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | **MUCK HOLDINGS, LLC** | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | **CORPORATION SERVICE COMPANY** | | |
|---|---|---|---|
| Address: | **251 LITTLE FALLS DRIVE** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **302-636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.
Would you like ⬤ Status ⬤ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

---

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

Exhibit

# P 1-B

HMIT Appx. 01321

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

Department of State: Division of Corporations

Allowable Characters

| HOME | | Entity Details |
|------|--|----------------|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 5822640 | Incorporation Date / Formation Date: | 4/8/2021 (mm/dd/yyyy) |
|--------------|---------|-------------------------------------|------------------------|
| Entity Name: | **JESSUP HOLDINGS LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| Name: | **VCORP SERVICES, LLC** | | |
|-------|--------------------------|--|--|
| Address: | **108 W. 13TH STREET SUITE 100** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ◯ Status ◯ Status, Tax & History Information

[ Submit ]

[ View Search Results ]            [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

Exhibit

P 1-C

HMIT Appx. 01322



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed October 22, 2020

United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket No. 1089 |

## ORDER APPROVING DEBTOR'S SETTLEMENT WITH (A) THE REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND (CLAIM NO. 72), AND (B) THE HIGHLAND CRUSADER FUNDS (CLAIM NO. 81), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

Upon the *Motion for Entry of an Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1089] (the "Motion")[2] filed by the above-captioned debtor and debtor-in-possession (the "Debtor"); and this

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Exhibit

P 1-D

Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, any and all other documents filed in support of the Motion, and the UBS Objection; and this Court having held an evidentiary hearing October 20, 2020, where it assessed the credibility of the witnesses, considered the evidence admitted into the record, and determined that the legal and factual bases set forth in the Motion and at the hearing on the Motion establish good cause for the relief granted herein; and upon overruling any objections to the Motion; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.     The Motion is **GRANTED** as set forth herein.

2.     The Settlement, attached as **Exhibit 1** to the Morris Declaration, is approved in all respects pursuant to Bankruptcy Rule 9019.

3.     The UBS Objection is overruled in its entirety.

4.     The Debtor and its agents are authorized to take any and all actions necessary or desirable to implement the Settlement without need of further Court approval or notice.

5.     The Court shall retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order

### ### END OF ORDER ###

2

HMIT Appx. 01324



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 27, 2020**

_United States Bankruptcy Judge_

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | Related to Docket Nos. 1087 & 1088 |

**ORDER APPROVING DEBTOR'S SETTLEMENT WITH (A) ACIS CAPITAL
MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP LLC
(CLAIM NO. 23), (B) JOSHUA N. TERRY AND JENNIFER G. TERRY (CLAIM NO.
156), AND (C) ACIS CAPITAL MANAGEMENT, L.P. (CLAIM NO. 159) AND
AUTHORIZING ACTIONS CONSISTENT THEREWITH**

Having considered the _Debtor's Motion for Entry of an Order Approving Settlement with_

_(a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b)_

_Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P._

_(Claim No. 159) and Authorizing Actions Consistent Therewith_ [Docket No. 1087] (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Exhibit



1934054201028000000000004

P 1-E

HMIT Appx. 01325

"Motion"),[2] the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement") to *Declaration of Gregory V. Demo in Support of the Debtor's Motion for Entry of an Order Approving Settlement with (A) Acis Capital Management, L.P. and Acis Capital Management GP, LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and Acis Capital Management, L.P. (Claim No. 159), and Authorizing Actions Consistent Therewith* [Docket No. 1088] (the "Demo Declaration"), and the General Release attached as **Exhibit "2"** (the "Release") to the Demo Declaration filed by the above-captioned debtor and debtor-in-possession (the "Debtor"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement and the Release are fair and equitable; and this Court having, analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to Settlement Agreement and Release, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views; and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

HMIT Appx. 01326

this Court having reviewed the Motion, any and all other documents filed in support of the Motion, including the Debtor's Omnibus Reply filed by the Debtor at Docket No. 1211, and all objections thereto, including the objection filed by James Dondero at Docket No. 1121 (the "Dondero 9019 Objection");[3] and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT:**

1.     The Motion is **GRANTED** as set forth herein.

2.     The Settlement and the Release, attached hereto as **Exhibit 1** and **Exhibit 2** are approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.     The Dondero 9019 Objection and all other objections to the Motion are overruled in their entirety.

4.     All objections to the proofs of claim subject to the Motion[4] are overruled as moot in light of the Court's approval of the Settlement Agreement and Release.

5.     The Debtor, the Debtor's agents, the Acis Parties (as defined by the Release), and all other parties are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement and the Release without need of further Court approval or notice.

---

[3] The objection to the Motion filed by Patrick Hagaman Daugherty at Docket No. 1201 was withdrawn on the record during the hearing on the Motion. The reservations of rights filed by Highland CLO Funding, Ltd., CLO Holdco, Ltd., HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P. and HarbourVest Partners L.P. filed at Docket Nos. 1177, 1191, and 1195 (collectively, the "Reservations") are resolved based on the Debtor's representations on the record, made without objection, that (a) the conditions precedent in Section 1(c) of the Settlement Agreement will not occur and therefore, the Debtor will not, pursuant to the Settlement Agreement, transfer all of its direct and indirect right, title and interest in Highland HCF Advisor, Ltd. to Acis or its nominee, and that (b) none of the parties asserting any of the Reservations are bound by the Release.

[4] The objections include (a) the Debtor's *Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 771]; (b) *James Dondero's Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC; and (II) Joinder in Support of Highland Capital Management, L.P.'s Objection to Proof of Claim of Acis Capital Management L.P. and Acis Capital Management GP, LLC* [Docket No. 827]; and (c) *UBS (I) Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC and (II) Joinder in the Debtor's Objection* [Docket No. 891].

HMIT Appx. 01327

6.     The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

HMIT Appx. 01328

# EXHIBIT 1

HMIT Appx. 01329

# SETTLEMENT AGREEMENT

This Settlement Agreement, including all attachments, (the "Agreement") is entered into as of September 9, 2020, by and among (i) Highland Capital Management, L.P. ("HCMLP"); (ii) Acis Capital Management, L.P. ("Acis LP"); (iii) Acis Capital Management GP LLC ("Acis GP" and together with Acis LP, "Acis"); (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and (v) Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan

Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS**, on August 3, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, Acis Capital Management L.P., and Acis Capital Management GP, LLC (together, the "Mediation Parties"), among others, were directed to mediate their disputes before Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"); and

**WHEREAS**, during the mediation, the Mediators made an economic proposal to resolve the Claims (the "Mediators' Economic Proposal"), and each of the Mediation Parties accepted the Mediators' Economic Proposal; and

**WHEREAS**, the Parties have negotiated and executed that certain General Release, dated as of even date herewith (the "Release"),[1] which, among other things, releases the Acis Released Claims and the HCMLP Released Claims; and

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the Mediators' Economic Proposal and which, when combined with the Release, will fully and finally resolve the Claims; and

**WHEREAS**, this Agreement and the Release attached hereto will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019");

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.     **Settlement of Claims.**  In full and complete satisfaction of the Claims:

    (a)     The proof of claim filed by Acis in the HCMLP Bankruptcy Case on December 31, 2019 [Claim No. 23] will be allowed in the amount of $23,000,000 as a general unsecured claim;

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Release.

1

HMIT Appx. 01330

(b)     On the effective date of a plan of reorganization and confirmed by the Bankruptcy Court, HCMLP will pay in cash to:

(i)     Joshua N. Terry and Jennifer G. Terry $425,000, plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed in the HCMLP Bankruptcy Case by Joshua N. Terry and Jennifer G. Terry on April 8, 2020 [Claim No. 156];

(ii)    Acis LP $97,000, which amount represents the legal fees incurred by Acis LP with respect to *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195-2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP in the HCMLP Bankruptcy Case on April 8, 2020 [Claim No. 159];

(iii)   Joshua N. Terry $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

(c)     On the effective date of a plan of reorganization proposed by HCMLP and confirmed by the Bankruptcy Court, if HMCLP receives written advice of nationally recognized external counsel that it is legally permissible consistent with HCMLP's contractual and legal duties to transfer all of its direct and indirect right, title and interest in Highland HCF Advisor, Ltd. to Acis or its nominee and that doing so would not reasonably subject HCMLP to liability, HCMLP shall transfer all of its right, title and interest in Highland HCF Advisor, Ltd., whether its ownership is direct or indirect, to Acis or its nominee, subject at all times to Acis's right to unilaterally reject the transfer in its sole and absolute discretion;

(d)     Within five (5) days of the Agreement Effective Date, HCMLP shall:

(i)     Move to withdraw, with prejudice, its proof of claim [Claim No. 27] filed in *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018), and its proof of claim [Claim No. 13] filed in *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018);

(ii)    Move to withdraw, with prejudice, Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b) filed in the Acis Bankruptcy Case [Docket No. 772];

(e)     At all times after the execution of this Agreement:

(i)     Only to the extent reasonably necessary to maintain the status quo in the Acis Appeals, the Parties shall cooperate in seeking to abate or otherwise stay the Acis Appeals vis-à-vis the Parties pending the occurrence of the Agreement Effective Date; and

(ii)    HCMLP shall cooperate in good faith to promptly return to Acis all property of Acis that is in HCMLP's possession, custody, or control, including but not limited to e-mail communications.

2

2.    **Releases.**  The Release is (a) attached to this Agreement as **Appendix A**; (b) an integral component of the Mediator's Economic Proposal and (c) incorporated by reference into this Agreement as if fully set forth herein.

3.    **Agreement Subject to Bankruptcy Court Approval.**

(a)    The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the Release by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement and the Release expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order.  The "Agreement Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

(b)    The Parties acknowledge and agree that the terms and conditions of this Agreement are conditioned, in all respects, on the execution of the Release by the Parties and the approval of the Release and this Agreement by the Bankruptcy Court.  If either the Release or this Settlement Agreement are not approved by the Bankruptcy Court for any reason, this Agreement and the Release will be immediately null and void and of no further force and effect.

4.    **Representations and Warranties.**  Subject in all respects to Section 3, each Party represents and warrants to the other Party that such Party is fully authorized to enter into and perform the terms of this Agreement and that, as of the Agreement Effective Date, this Agreement and the Release will be fully binding upon each Party in accordance with their terms.

5.    **No Admission of Liability.**  The Parties acknowledge that there is a bona fide dispute with respect to the Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by HCMLP, the Acis Parties, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the Acis Parties, or any other person.

6.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns, including but not limited to any Chapter 7 trustee appointed for HCMLP.

7.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**Acis**

Acis Capital Management, LP
4514 Cole Avenue
Suite 600
Dallas, Texas 75205

3

US-DOCS\115534291.12

**HMIT Appx. 01332**

Attention: Joshua N. Terry
Email: josh@aciscm.com

with a copy (which shall not constitute notice) to:

ROGGE DUNN GROUP, P.C.
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Attention: Brian P. Shaw
Telephone No.: 214.239.2707
E-mail: shaw@roggedunngroup.com

**Joshua N. Terry and Jennifer G. Terry**

25 Highland Park Village, Suite 100-848
Dallas TX 75205
Attention: Joshua N. Terry
Email: joshuanterry@gmail.com

with a copy (which shall not constitute notice) to:

ROGGE DUNN GROUP, P.C.
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Attention: Brian P. Shaw
Telephone No.: 214.239.2707
E-mail: shaw@roggedunngroup.com

**HCMLP**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910

4

HMIT Appx. 01333

Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

8.    **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

9.    **Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

10.   **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

11.   **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

12.   **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

13.   **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the HCMLP Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this

5

HMIT Appx. 01334

Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

6

HMIT Appx. 01335

**IT IS HEREBY AGREED.**

**ACIS CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _Joshua N. Terry_
Its: _President_

**ACIS CAPITAL MANAGEMENT GP LLC**

By: _____
Name: _Joshua N. Terry_
Its: _President_

**JOSHUA N. TERRY**

By: _____
Name: _Joshua N. Terry_
Its: _Self_

**JENNIFER G. TERRY**

By: _____
Name: _Jennifer G. Terry_
Its: _Self_

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

HMIT Appx. 01336

**IT IS HEREBY AGREED.**

              **ACIS CAPITAL MANAGEMENT, L.P.**

              By: _____
              Name: _____
              Its: _____

              **ACIS CAPITAL MANAGEMENT GP LLC**

              By: _____
              Name: _____
              Its: _____

              **JOSHUA N. TERRY**

              By: _____
              Name: _____
              Its: _____

              **JENNIFER G. TERRY**

              By: _____
              Name: _____
              Its: _____

              **HIGHLAND CAPITAL MANAGEMENT, L.P.**

              By: _____ _(signature)_____
              Name: JAMES P. SEERY, JR.
              Its: CEO/CRO

<div align="center">7</div>

US-DOCS\115534291.12

# EXHIBIT 2

# GENERAL RELEASE

This GENERAL RELEASE (this "Release"), effective on the Effective Date (as defined below), is entered into by and among (i) Highland Capital Management, L.P. ("HCMLP"), (ii) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (collectively, the "Terry Parties"), (iii) Acis Capital Management L.P., and Acis Capital Management GP, LLC (collectively, "Acis") (the Terry Parties and Acis, collectively, the "Acis Parties"), and (iii) those HCMLP Specified Parties (as defined below) who execute this Release (together, the "Parties").

# RECITALS

WHEREAS, the Parties have asserted or may assert claims that are defined in Section 1 below as the "Acis Released Claims" and the "HCMLP Released Claims" (collectively, the "Claims"); and

WHEREAS, on August 3, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Court") entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, Acis Capital Management L.P., and Acis Capital Management GP, LLC (together, the "Mediation Parties"), among others, were directed to mediate their disputes before Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"); and

WHEREAS, during the mediation, the Mediators made an economic proposal to resolve the Claims (the "Mediators' Economic Proposal"), and each of the Mediation Parties accepted the Mediators' Economic Proposal; and

WHEREAS, the Parties desire to enter into a general release of all Claims which, when combined with the Mediators' Economic Proposal, will fully and finally resolve the Claims; and

WHEREAS, except in Section 1.c below, this is a general release, meaning the Parties intend hereby to release any and all Claims which the Parties can release, and the Parties are unaware of any Claims between them which are not being released herein; and

WHEREAS, this Release will be appended or otherwise incorporated into a written settlement agreement (the "Settlement Agreement") that will include the terms of the Mediators' Economic Proposal and will be presented to the Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"), and is only effective upon the Effective Date.

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the promises made herein and in the Mediators' Economic Proposal, the Parties agree to release each other pursuant to and in accordance with the terms and conditions set forth below.

HMIT Appx. 01339

# AGREEMENT

1. <u>Releases</u>.

        a.      Upon the Effective Date, and to the maximum extent permitted by law, and except as set forth in Section 1d below, each of the Acis Parties on behalf of himself, herself, or itself and each of their respective current or former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (A)(i) HCMLP; (ii) Strand; (iii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP and any entity otherwise controlled by HCMLP; and (iv) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP (the foregoing (A)(i) through (A)(iv) the "<u>HCMLP Entities</u>") and (B) with respect to each such HCMLP Entity, such HCMLP Entity's respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the HCMLP Entities, the "<u>HCMLP Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Filed Cases, including the proofs of claim [Claim No. 23; 156; 159] filed by the Acis Parties in the HCMLP Bankruptcy Case and any objections or potential objections to the Plan or the confirmation thereof (collectively, the "<u>Acis Released Claims</u>"). This release is intended to be general. Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties **shall not** include NexPoint Advisors (and any of its subsidiaries), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd.), Highland CLO Funding, Ltd. (and any of its subsidiaries), NexBank, SSB (and any of its subsidiaries), James Dondero, Hunter Mountain Investment Trust (or any trustee acting for the trust), Dugaboy Investment Trust (or any trustee acting for the trust), Grant Scott, David Simek, William Scott, Heather Bestwick, Mark Okada and his family trusts (and the trustees for such trusts in their representative capacities), McKool Smith, PC, Gary Cruciani, Lackey Hershman, LLP, Jamie Welton, or Paul Lackey.

        b.      Upon the Effective Date, and to the maximum extent permitted by law, each HCMLP Released Party hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue the (A) Acis Parties, (B) Acis CLO 2013-1Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., Acis CLO 2015-6 Ltd. (collectively, the "<u>Acis CLOs</u>"), and (C) with respect to each such Acis Party and Acis CLO, to the extent applicable, such Acis Party and Acis CLO, their respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents,

**HMIT Appx. 01340**

affiliates, successors, designees, and assigns (the foregoing (A), (B), and (C), the "Acis Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Filed Cases (collectively, the "HCMLP Released Claims"). This release is intended to be general. Notwithstanding anything contained herein to the contrary, this Section 1.b will not affect any right to payment under any notes, debt, equity, or other security issued by any Acis CLO and held by any HCMLP Released Party.

c.     The HCMLP Released Parties shall also hereby forever, finally, fully, unconditionally, and completely release, relieve, acquit, remise, and exonerate, and covenant never to sue (A) U.S. Bank National Association, Moody's Investor Services, Inc., and Brigade Capital Management, Inc. and (B) with respect to each such DAF Suit Defendant, to the extent applicable, such DAF Suit Defendant, their respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the foregoing (A) and (B), the "DAF Suit Defendants"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, which were or could have been asserted in, in connection with, or with respect to the DAF Lawsuits.  This release is not intended to be general.

d.     Notwithstanding anything herein to the contrary, if (A) any HCMLP Specified Party has not executed this Release on or before the Effective Date or (B) any HCMLP Released Party, including any HCMLP Specified Party, (i) sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten any Acis Released Party on or in connection with any HCMLP Released Claim or any other claim or cause of action arising prior to the date of this Release, (ii) takes any action that, in HCMLP's reasonable judgment, impairs or harms the value of HCMLP, its estate, and its assets; or (iii) in HCMLP's reasonable judgment fails to use commercially reasonable efforts to support confirmation of the Plan and/or the monetization of HCMLP's assets at their maximum value, then (a) such HCMLP Released Party (and only such HCMLP Released Party) will be deemed to have waived (x) the release and all other protections set forth in Section 1a hereof and will have no further rights, duties, or protections under this Release and (y) any releases set forth in the Plan, (b) the Acis Released Parties, as applicable, may, in their discretion, assert any and all Acis Released Claims against such HCMLP Released Party (and only such HCMLP Released Party), and (c) any statutes of limitation or other similar defenses are tolled against such HCMLP Released Party (and only such HCMLP Released Party) from the execution of this Release until ninety (90) days after the Acis Released Parties receive actual written notice of any violation of this Section 1d. For the avoidance of doubt, by signing this Release each of the HCMLP Specified Parties is

HMIT Appx. 01341

acknowledging and agreeing, without limitation, to the terms of this Section 1.d and the tolling agreement set forth herein.

2.    <u>Withdrawal/Dismissal of Filed Cases</u>.  Within five days of the Effective Date, each Acis Released Party and HCMLP Released Party, to the extent applicable, will coordinate to cause the Filed Cases, including any appeals of any Filed Cases, to be dismissed with prejudice as to any Acis Released Party or HCMLP Released Party; *provided, however,* that there is no obligation to dismiss or withdraw the HCMLP Bankruptcy Case.  For the avoidance of doubt, and consistent with this Section, (a) if HMCLP receives written advice of nationally recognized external counsel that it is legally permissible consistent with HCMLP's contractual and legal duties to direct Neutra, Ltd. to move to dismiss all of their appeals arising from the Acis Bankruptcy and that doing so would not reasonably subject HCMLP to liability, HCMLP shall direct Neutra, Ltd. to move to dismiss all of their appeals arising from the Acis Bankruptcy and (b) Acis shall move to dismiss with prejudice its claims against HCMLP asserted in any adversary proceeding in the Acis Bankruptcy Case.  To the extent reasonably necessary to maintain the status quo in the Filed Cases, including any appeals thereof, prior to the Effective Date, each Acis Released Party and HCMLP Released Party shall reasonably cooperate in seeking to abate or otherwise stay the Filed Cases vis-à-vis the Parties.

3.    <u>Representations and Warranties</u>.

a.    Each of the Acis Parties represents and warrants to each of the HCMLP Released Parties and each of the HCMLP Specified Parties who have signed this Release that (a) he, she or it has full authority to release the Acis Released Claims and has not sold, transferred, or assigned any Acis Released Claim to any other person or entity, and that (b) to the best of his, her or its current knowledge, no person or entity other than the Acis Parties has been, is, or will be authorized to bring, pursue, or enforce any Acis Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) any of the Acis Parties.

b.    Each of HCMLP and each HCMLP Specified Party who has signed this Release represents and warrants to each of the Acis Parties that he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity.

c.    Each HCMLP Specified Party and each of HCMLP and Strand represents and warrants to each of the Acis Parties that he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Specified Party, HCMLP, or Strand personally has against any Acis Party.

d.    HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support the Acis Parties' position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will have no obligations to assist the Acis Parties under this Section if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such

HMIT Appx. 01342

assistance would require HCMLP to expend material amounts of time or money. HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Release shall in any way affect the enforceability of this Release vis-à-vis any of the HCMLP Entities. The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

Notwithstanding anything herein to the contrary, the Acis Parties acknowledge and agree that their sole and exclusive remedy for the breach of the foregoing Sections 3b, 3c, and 3d will be that set forth in Section 1.d hereof.

4.    Additional Definitions.

a.    "Acis Bankruptcy Case" means, collectively, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018)

b.    "DAF Lawsuits" means (a) Case No. 1:19-cv-09857-NRB; *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al*, formerly pending in the United States District Court for the Southern District of New York; and (b) Case No. 1:20-cv-01036-LGS; *The Charitable Donor Advised Fund, L.P. and CLO Holdco, Ltd. v. U.S. Bank National Association, et al*, formerly pending in the United States District Court for the Southern District of New York.

c.    "Effective Date" means the date of an order of the Court approving the Settlement Agreement pursuant to a motion filed under Rule 9019.

d.    "Filed Cases" means (a) the HCMLP Bankruptcy Case, (b) *Acis Capital Management, L.P., et al. v. Highland Capital Management, L.P., et al*, Case No. 18-03078 (Bankr. N.D. Tex. 2018); (c) *Motion for Relief from the Automatic Stay to Allow Pursuit of Motion for Order to Show Cause for Violations of the Acis Plan Injunction*, Case No. 19-34054-sgj-11 [Docket No. 593] (Bankr. N.D. Tex. 2020); (d) *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent*, Case No. DC-16-11396, pending in the 162nd District Court of Dallas County Texas; (e) *Acis Capital Management, L.P., et al v. James Dondero, et al.*, Case No. 20-0360 (Bankruptcy N.D. Tex. 2020); (f) *Acis Capital Management, L.P., et al v. Gary Cruciani, et al.*, Case No. DC-20-05534, pending in the 162nd District Court of Dallas County Texas; (g) *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey; and (b) the Acis Bankruptcy Case.

e.    "HCMLP Bankruptcy Case" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex. 2019).

f.    "HCMLP Specified Party" means Scott Ellington, Isaac Leventon, Thomas Surgent, Frank Waterhouse, Jean Paul Sevilla, David Klos, Kristin Hendrix, Timothy Cournoyer, Stephanie Vitiello, Katie Irving, Jon Poglitsch, or Hunter Covitz. For the avoidance of doubt, each HCMLP Specified Party is a HCMLP Released Party.

HMIT Appx. 01343

    g.  "Plan" means the *Plan of Reorganization of Highland Capital Management, L.P.*, filed in the HCMLP Bankruptcy Case [Docket No. 956] as may be amended or restated.

    h.  "Strand" means Strand Advisors, Inc.

  5.  Miscellaneous.

    a.  For the avoidance of doubt, all rights, duties, and obligations of any HCMLP Released Party or Acis Released Party created by this Release or the Settlement Agreement shall survive its execution.

    b.  This Release, together with the Settlement Agreement and any exhibits thereto, contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

    c.  This Release may not be modified other than by a signed writing executed by the Parties.

    d.  The effectiveness of this Release is subject in all respects to entry of an order of the Court approving this Release and the Settlement Agreement and authorizing HCMLP's execution thereof.

    e.  This Release may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument, and shall be effective against a Party upon the Effective Date.

    f.  This Release will be exclusively governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of law principles, and all claims relating to or arising out of this Release, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Texas, excluding Texas's conflicts of law principles. The Court will retain exclusive jurisdiction over all disputes relating to this Release. In any action to enforce this Release, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[SIGNATURE PAGE FOLLOWS]*

HMIT Appx. 01344

**IT IS HEREBY AGREED.**

ACIS CAPITAL MANAGEMENT, L.P.

By: _____
Name: Joshua N. Terry
Its: President

ACIS CAPITAL MANAGEMENT GP LLC

By: _____
Name: Joshua N. Terry
Its: President

JOSHUA N. TERRY

By: _____
Name: Joshua N. Terry
Its: Self

JENNIFER G. TERRY

By: _____
Name: Jennifer G. Terry
Its: Self

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

HMIT Appx. 01345

IT IS HEREBY AGREED.

ACIS CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

ACIS CAPITAL MANAGEMENT GP LLC

By: _____
Name: _____
Its: _____

JOSHUA N. TERRY

By: _____
Name: _____
Its: _____

JENNIFER G. TERRY

By: _____
Name: _____
Its: _____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

HMIT Appx. 01346

**HCMLP SPECIFIED PARTIES**

SCOTT ELLINGTON

_____

ISAAC LEVENTON

_____

THOMAS SURGENT

_____

FRANK WATERHOUSE

_____

JEAN PAUL SEVILLA

_____

DAVID KLOS

_____

KRISTIN HENDRIX

_____

TIMOTHY COURNOYER

_____

STEPHANIE VITIELLO

_____

KATIE IRVING

_____

JON POGLITSCH

_____

**HUNTER COVITZ**

_____

HMIT Appx. 01348



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on _Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith_ [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Exhibit

P 1-F

1934054210121000000000001

HMIT Appx. 01349

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

DOCS_NY:41987.4 36027/002

HMIT Appx. 01351

4.     All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.     The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.     Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.     The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

<div align="center">###End of Order###</div>

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

HMIT Appx. 01352

# EXHIBIT 1

HMIT Appx. 01353

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS,** on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS,** the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

HMIT Appx. 01354

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

(a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

(i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

(ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

(b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

(a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

HMIT Appx. 01355

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.** The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court. The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

US-DOCS\115534291.12

HMIT Appx. 01356

**EXECUTION VERSION**

4.   <u>**Representations and Warranties**</u>.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.   <u>**Plan Support**</u>.

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

HMIT Appx. 01357

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.      **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.      **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.      **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have heen given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

<div align="center">5</div>

**EXECUTION VERSION**

<u>with a copy (which shall not constitute notice) to</u>:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.   The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

<div align="center">6</div>

HMIT Appx. 01359

**EXECUTION VERSION**

     14.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<p align="center">*[Remainder of Page Intentionally Blank]*</p>

<p align="center">7</p>

**HMIT Appx. 01360**

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  /s/ James P. Seery, Jr.

Name: James P. Seery, Jr.

Its:  CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:  /s/ Michael Pugatch

Name: Michael Pugatch

Its:  Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:  /s/ Michael Pugatch

Name: Michael Pugatch

Its:  Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:  /s/ Michael Pugatch

Name: Michael Pugatch

Its:  Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:  /s/ Michael Pugatch

Name: Michael Pugatch

Its:  Managing Director

8

HMIT Appx. 01361

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:   Michael Pugatch
Its:    Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name:   Michael Pugatch
Its:    Managing Director

9

US-DOCS\115534291.12

HMIT Appx. 01362

# Exhibit A

HMIT Appx. 01363

**TRANSFER AGREEMENT**
**FOR ORDINARY SHARES OF**
**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, **THEREFORE**, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

HMIT Appx. 01364

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

2

HMIT Appx. 01365

3. <u>Transferors' Representations and Warranties</u>. Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>. Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

Prior to the Effective Date the Transferee shall procure that:

    c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

3

HMIT Appx. 01366

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement. In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not he deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto. No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

ActiveUS 184668980v.2

HMIT Appx. 01367

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**
By: Highland Capital Management, L.P.
Its: Member


By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer



**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**


By: _____
Name: James P. Seery, Jr.
Title: President



**FUND:**
**Highland CLO Funding, Ltd.**


By: _____
Name:
Title:



*[Additional Signatures on Following Page]*

ActiveUS 184668980v.2

HMIT Appx. 01368

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

| | |
|---|---|
| **HarbourVest Dover Street IX Investment L.P.** | **HV International VIII Secondary L.P.** |
| By: HarbourVest Partners L.P., its Duly Appointed Investment Manager | By:   HIPEP VIII Associates L.P.<br>      Its General Partner |
| By: HarbourVest Partners, LLC | By:   HarbourVest GP LLC<br>      Its General Partner |
| By: _____ | By:   HarbourVest Partners, LLC<br>      Its Managing Member |
| Name: Michael Pugatch | By: _____ |
| Title: Managing Director | Name: Michael Pugatch |
| | Title: Managing Director |

| | |
|---|---|
| **HarbourVest 2017 Global AIF L.P.** | **HarbourVest Skew Base AIF L.P.** |
| By:   HarbourVest Partners (Ireland) Limited<br>Its Alternative Investment Fund Manager | By:   HarbourVest Partners (Ireland) Limited<br>     Its Alternative Investment Fund Manager |
| By:   HarbourVest Partners L.P.<br>Its Duly Appointed Investment Manager | By:   HarbourVest Partners L.P.<br>     Its Duly Appointed Investment Manager |
| By:   HarbourVest Partners, LLC<br>Its General Partner | By:   HarbourVest Partners, LLC<br>     Its General Partner |
| By: _____ | By: _____ |
| Name: Michael Pugatch | Name: Michael Pugatch |
| Title: Managing Director | Title: Managing Director |

6

HMIT Appx. 01369

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member

By:    _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

HMIT Appx. 01370

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

8

HMIT Appx. 01371

Case 19-34054-sgj11 Doc 2389 Filed 05/27/21 Entered 05/27/21 17:30:12 Page 1 of 21
Docket #2389 Date Filed: 05/27/2021
Case 3:21-cv-00881-X Document 172-11 Filed 12/15/23 Page 177 of 968 PageID 13759



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 27, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH UBS SECURITIES LLC AND UBS AG LONDON BRANCH
### AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the Motion; (b) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

*Declaration of Robert J Feinstein in Support of the Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2200] (the "Feinstein Declaration"), and the exhibits annexed thereto including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) the *Limited Preliminary Objection to Debtor's Motion for Entry of an Order Approving Settlement with UBS and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Trusts' Preliminary Objection"), filed by The Dugaboy Investment Trust and the Get Good Trust (collectively the "Trusts"); (e) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Trusts' Supplemental Opposition"), filed by the Trusts; (f) *James Dondero's Objection Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection" and collectively, with the Trusts' Preliminary Objection and the Trusts' Supplemental Opposition, the "Objections"), filed James Dondero; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2308] (the "Debtor's Reply"), filed by the Debtor; (h) UBS's *Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2310]; (i) the testimonial and documentary evidence admitted into evidence during the hearing held on May 21, 2021 (the "Hearing"), including assessing the credibility of the witness; and (j) the arguments made during the Hearing; and this Court having jurisdiction over

DOCS_NY:43249.2 36027/002

HMIT Appx. 01373

this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) that the settlement is the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

> 1.    The Motion is **GRANTED** as set forth herein.
>
> 2.    All objections to the Motion are overruled.
>
> 3.    The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all

respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

HMIT Appx. 01374

4.      The Debtor, UBS, and all other parties are authorized to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

5.      The Court finds that the Debtor, in its capacity as investment manager of Multi-Strat, exercised sound business judgment in causing Multi-Strat to enter into the Settlement Agreement. Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor, in its capacity as investment manager of Multi-Strat, is authorized to cause Multi-Strat to settle the claims UBS has asserted against Multi-Strat in the State Court and otherwise to cause Multi-Strat to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

6.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

DOCS_NY:43249.2 36027/002

**HMIT Appx. 01375**

# **EXHIBIT 1**

HMIT Appx. 01376

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

WHEREAS, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

WHEREAS, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

WHEREAS, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

WHEREAS, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

WHEREAS, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

WHEREAS, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

WHEREAS, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS**, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

WHEREAS, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

WHEREAS, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

WHEREAS, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

WHEREAS, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

WHEREAS, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

WHEREAS, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

WHEREAS, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

WHEREAS, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

EXECUTION VERSION

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.      **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)      The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

HMIT Appx. 01380

**EXECUTION VERSION**

(b)      Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)      Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

        (d)    Redeemer Appeal.

        (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

2.     <u>Definitions.</u>

(a)     "<u>Agreement Effective Date</u>" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "<u>HCMLP Parties</u>" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "<u>Order Date</u>" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "<u>UBS Parties</u>" shall mean UBS Securities LLC and UBS AG London Branch.

3.     <u>Releases.</u>

(a)     **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c) **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4. **No Third Party Beneficiaries**. Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5. **UBS Covenant Not to Sue.** Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, that if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.     **Agreement Subject to Bankruptcy Court Approval.**

(a)     The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.     **Representations and Warranties**.

(a)     Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)     Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)     Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

8. <u>**No Admission of Liability**</u>. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

9. <u>**Successors-in-Interest.**</u> This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

10. <u>**Notice**</u>. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
            Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

     **11.**     **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

     **12.**     **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

     **13.**     **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

     **14.**     **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

     **15.**     **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

HMIT Appx. 01388

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

   **16.**  <u>Governing Law; Venue; Attorneys' Fees and Costs</u>. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<div align="center"><em>[Remainder of Page Intentionally Blank]</em></div>

HMIT Appx. 01389

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

**STRAND ADVISORS, INC.**

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

**UBS SECURITIES LLC**

By: _John Lantz_

Name: John Lantz

Its: Authorized Signatory

By: _Elizabeth P. Kozlowski_

Name: Elizabeth Kozlowski

Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _William Chandler_

Name: William Chandler

Its: Authorized Signatory

By: _Elizabeth P. Kozlowski_

Name: Elizabeth Kozlowski

Its: Authorized Signatory

15

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

16



Alvarez & Marsal CRF
Management, LLC 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC

By: _____
    Steven Varner
    Managing Director

# UNITED STATES BANKRUPTCY COURT

_Northern_ DISTRICT OF _Texas_

Case number 19-34054-sgj11

| | | |
|---|---|---|
| In re: Highland Capital Management, LP | § | Case No.   19-34054 |
| | § | |
| | § | |
| _____ | § | ☐ Jointly Administered |
| Debtor(s) | § | |

## Post-confirmation Report                                          Chapter 11

Quarter Ending Date: 09/30/2021                          Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021                          Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to:  ⦿ Reorganized Debtor

                    ○ Other Authorized Party or Entity: _____

                                                        Name of Authorized Party or Entity

/s/ Zachery Z. Annable                                   Zachery Z. Annable, Hayward PLLC
Signature of Responsible Party                           Printed Name of Responsible Party

10/21/2021
Date

                                                 10501 N. Central Expressway, Suite 106
                                                 Dallas TX 75231
                                                 Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R.
§ 1320.4(a)(2) applies.

Exhibit

P 1-1

HMIT Appx. 01395

Debtor's Name Highland Capital Management, LP                                                      Case No.  19-34054

## Part 1: Summary of Post-confirmation Transfers

|  | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $33,868,509 | $28,496,358 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $0 |
| d. Total transferred (a+b+c) | $33,868,509 | $28,496,358 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor  *Aggregate Total* | | $2,632,365 | $31,771,605 | $6,150,655 | $30,888,237 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Pachulski Stang Ziehl & Jones | Lead Counsel | $2,519,827 | $23,611,818 | $4,843,118 | $22,789,658 |
| ii | Development Specialists, Inc. | Financial Professional | $0 | $5,658,299 | $813,227 | $5,658,299 |
| iii | Kurtzman Carson Consultants | Other | $0 | $1,857,660 | $330,712 | $1,857,660 |
| iv | Hayward & Associates PLLC | Local Counsel | $112,538 | $643,827 | $163,599 | $582,621 |

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor  *Aggregate Total* | | $536,506 | $6,183,667 | $1,032,709 | $5,073,192 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Hunton Andrews Kurth LLP | Other | $520,023 | $1,149,807 | $416,394 | $1,009,864 |
| ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| iii | Deloitte | Financial Professional | $16,482 | $428,361 | $0 | $206,336 |
| iv | Mercer (US) Inc. | Other | $0 | $170,284 | $0 | $170,284 |
| v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $616,315 | $616,315 |
| vi | Wilmer Cutler Pickering Hale a | Other | $0 | $1,389,667 | $0 | $1,389,667 |
| vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| c. | All professional fees and expenses (debtor & committees) | | $4,408,326 | $56,849,059 | $8,572,805 | $54,651,118 |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $15,750 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $691,367 | $691,367 | $5,886,018 | 12% |
| c. Priority claims | $16,498 | $19,683 | $19,683 | $19,683 | 100% |
| d. General unsecured claims | $205,144,544 | $6,168,473 | $6,168,473 | $376,622,019 | 2% |
| e. Equity interests | $0 | $0 | $0 | | |

UST Form 11-PCR (06/07/2021)                                    2

Debtor's Name Highland Capital Management, LP                    Case No. 19-34054

| Part 4: Questionnaire |
|---|

   a. Is this a final report?                                              Yes ◯  No ⦿

       If yes, give date Final Decree was entered:

       If no, give date when the application for Final Decree is anticipated:

   b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?    Yes ⦿  No ◯

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/ rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**<u>I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.</u>**

/s/ James Seery                                         James Seery
Signature of Responsible Party                          Printed Name of Responsible Party

Chief Operating Officer                                 10/21/2021
Title                                                   Date

HMIT Appx. 01397

# EXHIBIT A

**Highland Capital Management, L.P.**
**Disclaimer For Financial Projections**

   This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

   This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

   These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

   Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

   These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

2/1/2021

HMIT Appx. 01399

Case 19-34054-sgj11   Doc 1875-1   Filed 02/01/21   Entered 02/01/21 16:22:31   Desc
Exhibit A   Page 3 of 8

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is March 1, 2021
B. All investment assets are sold by December 31, 2022.
C. All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021
D. Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the
   interim interest income and principal payments are not collected due to prepayment on note
E. Fixed assets currently used in daily operations are sold in June 2021 for $0
F. Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.
G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter
H. Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.
I. Litigation Trustee budget is $6,500,000.
J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.
K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100%
   of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or
   interest of junior priority.
L. Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HM").
M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
   Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets
N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.
O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.
P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):
   o By September 30, 2021 - $50,000,000
   o By March 31, 2022 – additional $50,000,000
   o By June 30, 2022 – additional $25,000,000
   o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.
Q. Assumptions subject to revision based on business decision and performance of the business

2/1/2021

HMIT Appx. 01400

Case 19-34054-sgj11   Doc 1875-1   Filed 02/01/21   Entered 02/01/21 16:22:31   Desc
Exhibit A   Page 4 of 8

**Highland Capital Management, L.P.**
**Plan Analysis Vs. Liquidation Analysis**
**(US $000's)**

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,945 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | | |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | - |
| Subtotal | (27,793) | (17,514) |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

Footnotes:
[1] Assumes chapter 7 Trustee will not be able to achieve some sales proceeds as Claimant Trustee
    Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs
[3] Estimated expenses through final distribution exclude non-cash expenses:
    Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO
[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damages; Liquidation Class 8 includes $2.0 million for estimated rejection damages
[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund
    UBS claim included at $50.0 million.

Notes:
All claim amounts are estimated as of February 1, 2020 and subject to change

2/1/2021

HMIT Appx. 01401

Case 19-34054-sgj11   Doc 1875-1   Filed 02/01/21   Entered 02/01/21 16:22:31   Desc
Exhibit A   Page 5 of 8

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 – Frontier Secured Claim | - | - | - | 5,528 | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 273,219 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Class 9 – Subordinated Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 278,747 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| **TOTAL LIABILITIES** | $ 152,591 | 145,481 | 141,230 | 291,639 | 283,468 | 233,723 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 190,005 | 16,154 | 4,500 | (5,495) | (30,636) | (36,715) | (41,677) | (44,396) | (78,354) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

[1] Class 9 has $60 million of subordinated claims; Debtor anticipates no distributions to Class 9

2/1/2021

**HMIT Appx. 01402**

Case 19-34054-sgj11    Doc 1875-1    Filed 02/01/21    Entered 02/01/21 16:22:31    Desc
Exhibit A    Page 6 of 8

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 591 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,179 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,138 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (156,042) | 326 | (93) | 29 | (155,781) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (172,669) | $ (9,978) | $ (5,433) | $ (4,259) | $ (192,339) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (1,013) | 522 | - | - | (491) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Change in Unrealized Gain/(Loss) of investments | (29,929) | (7,450) | 4,523 | (32,857) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | (13,301) | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| Net Income | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (220,641) |

*Footnotes:*
*[1] Operating expenses include an adjustment in January 2021 to account*
*for expenses that have not been accrued or paid prior to effective date.*
*[2] Other income and expenses of $197.3 million in Q1 2021 includes:*
*   [a] $209.7 million was expensed to record for the increase of*
*      allowed claims.*
*   [b] Income of $11.7 million for the accrued, but unpaid payroll liability related to*
*      the Debtor's deferred bonus programs amount written-off.*

2/1/2021

HMIT Appx. 01403

Case 19-34054-sgj11   Doc 1875-1   Filed 02/01/21   Entered 02/01/21 16:22:31   Desc
Exhibit A   Page 7 of 8

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Forecast —> | | | | | |
| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| **Total revenue** | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| | | | | | | |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| | | | | | | |
| **Income/(loss) From Operations** | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| | | | | | | |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| | | | | | | |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (156,434) |
| | | | | | | |
| **Operating Gain/(Loss)** | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (214,470) |
| | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| **Total Realized and Unrealized Gain/(Loss)** | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| | | | | | | |
| **Net Income** | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (268,359) |

2/1/2021

**HMIT Appx. 01404**

Case 19-34054-sgj11   Doc 1875-1   Filed 02/01/21   Entered 02/01/21 16:22:31   Desc
Exhibit A   Page 8 of 8

*Highland Capital Management, L.P.*
*Cash Flow Indirect*
*(US $000's)*

|  | Forecast ---> | | | | | | | | | |
|  | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (Loss) Income | $ (16,708) $ | (14,453) | $ (173,851) $ | (11,654) $ | (9,996) $ | (25,141) | $ (6,079) $ | (4,961) $ | (2,719) $ | (33,958) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
|  Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
|  Other realized (gain)/ loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,587 |
|  Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
|  Unrealized (gain) / loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
|  (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | 908 |
|  Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (217,998) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,463) |
| | | | | | | | | | | |
| Cash Flow From Investing Activities | | | | | | | | | | |
|  Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
|  Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| | | | | | | | | | | |
| Cash Flow from Financing Activities | | | | | | | | | | |
|  Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
|  Claim reclasses/(paid) | - | - | 278,747 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
|  Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
|  Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 194,580 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) $ | 25,159 | $ (20,719) $ | 29,735 $ | 2,770 $ | 92,303 | $ (54,404) $ | (8,495) $ | (2,870) $ | (69,368) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 $ | 31,047 | $ 10,328 $ | 40,063 $ | 42,833 $ | 135,137 | $ 80,733 $ | 72,238 $ | 69,368 $ | - |

2/1/2021

**HMIT Appx. 01405**

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | | |
|---|---|---|---|
| In re: Highland Capital Management, LP | § | Case No. | 19-34054 |
| | § | | |
| | § | | |
| Debtor(s) | § | ☐ Jointly Administered | |

## Post-confirmation Report

Chapter 11

Quarter Ending Date: 09/30/2022

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ⦿ Reorganized Debtor

○ Other Authorized Party or Entity: _____

Name of Authorized Party or Entity

/s/ Zachery Z. Annable

Signature of Responsible Party

10/21/2022

Date

Zachery Z. Annable, Hayward PLLC

Printed Name of Responsible Party

10501 N. Central Expressway, Suite 106
Dallas TX 75231

Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Exhibit

P 1-K

HMIT Appx. 01406

Debtor's Name Highland Capital Management, LP                                    Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

|  | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $10,725,675 | $94,905,199 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $5,194,652 |
| d. Total transferred (a+b+c) | $10,725,675 | $100,099,851 |

## Part 2: Preconfirmation Professional Fees and Expenses

|  |  |  | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor | *Aggregate Total* | $0 | $33,005,136 | $0 | $33,005,136 |
|  | *Itemized Breakdown by Firm* |  |  |  |  |  |
|  | Firm Name | Role |  |  |  |  |
| i | Pachulski Stang Ziehl & Jones | Lead Counsel | $0 | $24,312,860 | $0 | $24,312,860 |
| ii | Development Specialists, Inc. | Financial Professional | $0 | $5,765,448 | $0 | $5,765,448 |
| iii | Kurtzman Carson Consultants | Other | $0 | $2,054,716 | $0 | $2,054,716 |
| iv | Hayward & Associates PLLC | Local Counsel | $0 | $872,112 | $0 | $872,112 |
| v |  |  |  |  |  |  |
| vi |  |  |  |  |  |  |
| vii |  |  |  |  |  |  |
| viii |  |  |  |  |  |  |
| ix |  |  |  |  |  |  |
| x |  |  |  |  |  |  |
| xi |  |  |  |  |  |  |
| xii |  |  |  |  |  |  |
| xiii |  |  |  |  |  |  |
| xiv |  |  |  |  |  |  |
| xv |  |  |  |  |  |  |
| xvi |  |  |  |  |  |  |
| xvii |  |  |  |  |  |  |
| xviii |  |  |  |  |  |  |
| xix |  |  |  |  |  |  |
| xx |  |  |  |  |  |  |
| xxi |  |  |  |  |  |  |
| xxii |  |  |  |  |  |  |
| xxiii |  |  |  |  |  |  |
| xxiv |  |  |  |  |  |  |
| xxv |  |  |  |  |  |  |
| xxvi |  |  |  |  |  |  |
| xxvii |  |  |  |  |  |  |
| xxviii |  |  |  |  |  |  |
| xxix |  |  |  |  |  |  |

HMIT Appx. 01407

Debtor's Name Highland Capital Management, LP                    Case No.  19-34054

| | | | | |
|---|---|---|---|---|
| xxx | | | | |
| xxxi | | | | |
| xxxii | | | | |
| xxxiii | | | | |
| xxxiv | | | | |
| xxxv | | | | |
| xxxvi | | | | |
| xxxvii | | | | |
| xxxvii | | | | |
| xxxix | | | | |
| xl | | | | |
| xli | | | | |
| xlii | | | | |
| xliii | | | | |
| xliv | | | | |
| xlv | | | | |
| xlvi | | | | |
| xlvii | | | | |
| xlviii | | | | |
| xlix | | | | |
| l | | | | |
| li | | | | |
| lii | | | | |
| liii | | | | |
| liv | | | | |
| lv | | | | |
| lvi | | | | |
| lvii | | | | |
| lviii | | | | |
| lix | | | | |
| lx | | | | |
| lxi | | | | |
| lxii | | | | |
| lxiii | | | | |
| lxiv | | | | |
| lxv | | | | |
| lxvi | | | | |
| lxvii | | | | |
| lxviii | | | | |
| lxix | | | | |
| lxx | | | | |
| lxxi | | | | |

UST Form 11-PCR (12/01/2021)                    3                    **HMIT Appx. 01408**

Debtor's Name Highland Capital Management, LP

Case No.  19-34054

| | lxxii | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | $0 | $7,604,472 | $0 | $7,604,472 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Hunton Andrews Kurth LLP | Other | $0 | $1,149,807 | $0 | $1,149,807 |
| | ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| | iii | Deloitte | Financial Professional | $0 | $553,413 | $0 | $553,413 |
| | iv | Mercer (US) Inc. | Other | $0 | $204,767 | $0 | $204,767 |
| | v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $0 | $1,364,823 |
| | vi | Wilmer Cutler Pickering Hale | Other | $0 | $2,650,937 | $0 | $2,650,937 |

HMIT Appx. 01409

| | | | | | | |
|---|---|---|---|---|---|---|
| vii | Carey Olsen | Other | | $0 | $280,264 | $0 | $280,264 |
| viii | ASW Law | Other | | $0 | $4,976 | $0 | $4,976 |
| ix | Houlihan Lokey Financial Advi | Other | | $0 | $766,397 | $0 | $766,397 |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |
| xxxvii | | | | | | |
| xxxvii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP                                    Case No.  19-34054

| | | | | | |
|---|---|---|---|---|---|
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxviii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxiii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |

UST Form 11-PCR (12/01/2021)                         6                         HMIT Appx. 01411

Debtor's Name Highland Capital Management, LP                                    Case No. 19-34054

| | | | | | | |
|---|---|---|---|---|---|---|
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | $0 | $60,171,929 | $0 | $60,171,929 |

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $1,108,943 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $248,999,332 | $255,201,228 | $397,485,568 | 64% |
| e. Equity interests | $0 | $0 | $0 | | |

**Part 4: Questionnaire**

a. Is this a final report?                                                          Yes ○    No ◉

    If yes, give date Final Decree was entered: _____

    If no, give date when the application for Final Decree is anticipated: _____

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?    Yes ◉    No ○

HMIT Appx. 01412

Debtor's Name Highland Capital Management, LP                              Case No. 19-34054

## Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/ rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**<u>I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.</u>**

/s/ James Seery
_____
Signature of Responsible Party

CEO
_____
Title

James Seery
_____
Printed Name of Responsible Party

10/21/2022
_____
Date

HMIT Appx. 01413

Debtor's Name Highland Capital Management, LP                                    Case No.   19-34054



Page 1



Other Page 1



Page 2 Minus Tables



Bankruptcy Table 1-50

**HMIT Appx. 01414**

Debtor's Name Highland Capital Management, LP    Case No. 19-34054



Bankruptcy Table 51-100



Non-Bankruptcy Table 1-50



Non-Bankruptcy Table 51-100



Part 3, Part 4, Last Page

HMIT Appx. 01415

CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| HUNTER MOUNTAIN | § | |
| INVESTMENT TRUST | § | 191ST JUDICIAL DISTRICT |
| | § | |
| *Petitioner,* | § | |
| | § | DALLAS COUNTY, TEXAS |

## DECLARATION OF JAMES DONDERO

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to Texas Civil Practice & Remedies Code § 132.001 and declares as follows:

1. My name is James Dondero. I am over twenty-one (21) years of age. I am of sound mind and body, and I am competent to make this declaration. The facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I previously served as the Chief Executive Officer ("CEO") of Highland Capital Management, L.P. ("HCM"). Jim Seery succeeded me in this capacity following the entry of various orders in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. My purpose was to alert Mr. Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades. A true and correct copy of this email is attached hereto as Exhibit "1".

Exhibit

P 2

4. In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. They also stated they were particularly optimistic because of the expected sale of MGM.

5. During one of these calls involving Mr. Linn, I asked whether they would sell the claims for 30% more than they had paid. Mr. Linn said no because Mr. Seery said they were worth a lot more. I asked Mr. Linn if he would sell at any price and he said that he was unwilling to do so. I believe these conversations with Farallon were taped by Farallon.

6. My name is James Dondero, my date of birth is June 29, 1962, and my address is 3807 Miramar Ave., Dallas, Texas 75205, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

HMIT Appx. 01417

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the 15th day of February 2023.

_____
JAMES DONDERO

HMIT Appx. 01418

**From:** Jim Dondero <JDondero@highlandcapital.com>
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>,
Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin"
<JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>
**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink
<bryan.assink@bondsellis.com>
**Subject:** Trading restriction re MGM - material non public information
**Date:** Thu, 17 Dec 2020 14:14:39 -0600
**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing
in Data Room. Both continue to express material interest.
Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder
agreement.

Sent from my iPhone

Exhibit

# P 2-1

**HMIT Appx. 01419**

FILED
5/2/2022 9:27 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Martin Reyes DEPUTY

Case 3:21-cv-00881-X   Document 172-11   Filed 12/15/23   Page 225 of 968   PageID 15807

## CAUSE NO. DC-21-09534

| | | |
|---|---|---|
| **IN RE JAMES DONDERO,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Petitioner.* | § | **95th JUDICIAL DISTRICT** |
| | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## <u>VERIFIED AMENDED PETITION TO TAKE DEPOSITION BEFORE SUIT AND SEEK DOCUMENTS</u>

Petitioner James Dondero respectfully requests that this Court order, pursuant to Texas Rule of Civil Procedure 202, the deposition of the corporate representatives and/or employees of Alvarez & Marsal CRF Management, LLC, and of Farallon Capital Management, LLC. Petitioner further requests that the Court order certain limited, yet relevant, documents to be provided under Texas Rule of Civil Procedure 199.2 as set forth in below.

Petitioner would respectfully show the Court that:

## I.

## <u>PARTIES</u>

1.      Petitioner James Dondero ("<u>Petitioner</u>") is an individual resident in Dallas County, Texas, and is impacted by the potential acts and omissions.

2.      Respondent Alvarez & Marsal CRF Management, LLC ("<u>A&M</u>") is a Delaware limited liability company serving as an investment adviser, with offices in Dallas County, Texas, at 2100 Ross Ave., 21st Floor, Dallas, Texas 75201.

3.      Respondent Farallon Capital Management, L.L.C. ("<u>Farallon</u>") is an investment fund located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111, and Respondent Michael Lin is a principal at Farallon.

> **Exhibit**
>
> **R 1**

---

## II.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this matter pursuant to Texas Rule of Civil Procedure 202. The anticipated lawsuit would include common law claims.

5.      The Court has personal jurisdiction over Respondent Alvarez & Marsal because it maintains a regular place of business in Dallas County. Personal jurisdiction is also proper under Tex. Cir. Prac. Rem. Code § 17.003, and under §17.042(1)-(3) because A&M contracted with counterparties, Joshua Terry and Acis Capital Management, L.P., both of whom at the time had their principal place of business in Dallas County, Texas, and because its acts on behalf of the Crusader Funds (as defined below), if they occurred as believed they did, will have been tortious as to Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

6.      The Court has personal jurisdiction over Farallon because it contracted with A&M to purchase claims in the Highland Capital Management, L.P. Chapter 11 bankruptcy ("Highland bankruptcy") upon the recommendation of James Seery, Highland's CEO. Such acts, if shown to have occurred as believed and under the alleged circumstances, will have been tortious as to the Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

7.      Venue is proper in Dallas County, Texas, where venue of the anticipated lawsuit may lie and where the property at issue exists, and where a substantial amount of the acts and omissions underlying the potential suit occurred.

8.      Removal is not proper because there is no basis for federal jurisdiction because a Rule 202 petition does not meet Article III of the United States Constitution's standing requirement.

### III.

### FACTUAL BACKGROUND

9.      This matter arises out of purchase of certain bankruptcy claims in the Highland Bankruptcy.

10.     Petitioner is the founder and former CEO of Highland Capital Management, L.P., currently a bankrupt debtor. He is also an investor in Highland Crusader Fund, Ltd. and several of its companion and affiliated funds (the "Crusader Funds"). Therefore, Petitioner has an interest in seeing to it that A&M properly marketed the claims for proper purposes and for the right price.

11.     Until recently, the Crusader Funds were managed by Highland, and then by A&M when those funds went into liquidation.

12.     Petitioner has an interest in the bankruptcy estate by virtue of his affiliation, and the fact that he is an adviser and/or manager of several trusts who own the equity of the debtor and therefore has an interest in seeing the equity properly protected in bankruptcy.

13.     Shortly after the Highland bankruptcy was filed, the Chapter 11 Trustee issued an invitation to creditors to serve on the unsecured creditors committee (the "UCC").

14.     The Trustee's invitation included a condition: namely, that anyone who served on the committee would have to agree that they would not sell their claims or in any way alienate them (including allowing them to be used as security) without leave of Court. Specifically, the United Trustee's instruction sheet stated:

> Creditors wishing to serve as fiduciaries on any official committee are advised that may not purchase, sell or otherwise trade in or transfer

claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed questionnaire and accepting membership on official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from the committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violation, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.

15.     Upon information and belief, two of the Highland creditors – the Redeemer Committee and the Crusader Fund, who between them owned approximately $191 million in claims in the bankruptcy as well as other assets (the "Crusader Claims") – sold their Claims and assets to Jessup Holdings LLC, a subsidiary of Stonehill Capital Management, LLC. Alvarez and Marsal made this sale, which was in violation of the foregoing order.

16.     Alvarez and Marsal arguably owe fiduciary duties to the funds and funds investors, and may have violated those duties by failing to conduct a sale for proper value, and/or by engaging in other acts that resulted in a sale of assets that was not authorized and/or not allowed by the terms of the funds or by law.

17.     Around the same time, another Highland creditor—Joshua Terry and Acis Capital Management, who have approximately $25 million in claims—also sold their claims to Muck Holdings, LLC, set up by Farallon Capital Management (the "Acis Claims").

18.     And a third creditor, HarbourVest, sold its $80 million worth of claims (the "HarbourVest Claims") to Muck Holding as well.

19.     The above interests are generally referred to hereinafter as the "Claims".

20.     The sales of the Claims were not reported contemporaneously as they were supposed to have been, nor was leave of the bankruptcy court ever sought, much less obtained, for the sales.

---

21.     However, Acis/Terry, and Crusader continued to serve on the UCC for a substantial period of time as if they hadn't sold their claims at all.

22.     As was discovered by the Petitioner, the current CEO of Highland, James Seery, has an age-old connection to Farallon and to Stonehill and, upon information and belief, advised Farallon and Stonehill to purchase the Claims.

23.     On a telephone call between Petitioner and Michael Lin, a representative of Farallon, Mr. Lin informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims.

24.     In other words, Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit.

25.     Mr. Seery's management duties come with a federally-imposed fiduciary duty under the Advisers Act of 1940.

26.     Mr. Seery had much to gain by Farallon holding the claims—namely, his knowledge that Farallon—as a friendly investor—would allow him to remain as CEO while Highland remains bankrupt and get paid (whereas plainly, the selling members of the UCC were ready to move on, thus truncating Seery's supposed gravy train). Mr. Seery's rich compensation package incentivized him to continue the bankruptcy for as long as possible.

27.     However, Mr. Seery is privy to material non-public information (i.e., "Inside Information") of many of the securities that Highland deals in, as well as in the funds that Mr. Seery manages through Highland. One of the assets was a publicly traded security that Highland was an insider of, and therefore, should not have traded (whether directly or indirectly), given its possession of insider information.

---

Petitioner's Amended Verified Petition to Take Deposition Before Suit

28.     Thus, his confidential tip to Farallon to purchase the claims may have violated certain of his duties as a Registered Investment Adviser, federal Securities laws, and his duties to the bankruptcy estate.

29.     Mr. Seery's duties also involve duties to manage the bankruptcy estate in a manner that would expeditiously resolve the bankruptcy. If the Unsecured Creditor Committee members (Acis, HarbourVest, and Redeemer) were indeed interested in selling their claims for less than the notional amount, then that would have been publicized in the required court filing. By failing to file them publicly and seeking court approval, the bankruptcy has been prolonged whilst Farallon seeks to reap a massive windfall return on its investment—a return that Seery apparently promised.

30.     The sale of assets authorized by A&M was not pursuant to normal means, and there is reason to doubt that A&M sought or obtained the highest price for the assets that it sold.

## IV.

## **RELIEF SOUGHT FROM ALVAREZ AND MARSAL**

31.     Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of A&M, on the following topics, and to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

a.      A&M's rights and responsibilities and duties, including, but not limited to, under A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

b.      The solicitation, offer, valuation, marketing, negotiation, and sale of the Highland bankruptcy claims or other assets by A&M on behalf of the Crusader Funds (and/or the Redeemer Committee) to any or all of Farallon, Stonehill Capital Management, LLC, Muck Holdings, LLC, Jessup Holdings, LLC, or any third party;

---

c.   A&M's valuation, and negotiation of the price, of the Claims, its bases therefor, and what it communicated to potential purchasers about the value of the Claims, if anything;

d.   The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to:

i.   Any discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P., the Creditors Committee, Sidley Austin, LLP, and/or F.T.I. Consulting, regarding the Claims, any plans with regards to Highland Capital Management, L.P., the liquidation or the value of the Claims, the likelihood of and quantum of payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation;

ii.   Any discussions with the purchasers of the Claims or other assets to, including, but not limited to, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC or Muck Holdings, LLC, regarding the Claims or other assets, Highland Capital Management, L.P., the value of the Claims, the likely payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation.

32.   As part of the Court's Order, Petitioner requests this Court to require A&M to produce the following documents at their respective depositions:

a.   All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.   A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

c.   Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

d.   Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims;

e.   All documents, agreements, contracts (including any drafts, letters of intent, confidentiality agreements, term sheets) or communications related to same,

relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

f.      Communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC, or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the claims, the liquidation of the Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

g.      Proofs of purchase of the Claims and other assets of the Crusader entities.

## V.

## RELIEF SOUGHT FROM FARALLON CAPITAL MANAGEMENT, L.L.C., MUCK HOLDINGS, LLC AND MICHAEL LIN

33.    Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of Farallon Capital Management, L.L.C. or Muck Holdings, LLC, and to depose Michael Lin, on the following topics, to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

a.      Farallon, Muck Holdings, LLC, and/or Lin's understanding of the value of the Claims, the assets held or controlled by or to be acquired by Highland Capital Management, L.P.., the liquidation value of the Estate of Highland Capital Management, L.P., and/or Claims, how and when the claims were expected to be paid and what the expected percentage payoff was going to be, and the bases for such understanding or belief, and what was communicated to them about the value of the Claims;

b.      The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to, any discussions with sellers of any of the Claims regarding the Claims and the sale/purchase of the Claims, discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P. regarding the Claims and his plans with regards to Highland, the value of the Claims, the likely payout of the Claims, the

pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation, or any disclosures by James Seery or Highland Capital Management, L.P. regarding how the Claims were going to be paid;

c.     Farallon and Michael Lin's awareness of material non-public information regarding Highland Capital Management, L.P. or securities held by Highland Capital Management, L.P.;

d.     Farallon and Michael Lin's relationship with James Seery or Highland Capital Management, L.P. and their knowledge of his role and their ongoing relationship with him.

34.     As part of the Court's Order, Petitioner requests this Court to require Farallon Capital Management, L.L.C., Muck Holdings LLC, and Michael Lin to produce the following documents at their respective depositions:

a.     All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.     Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

c.     Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims.

d.     All agreements, contracts, or other documents (including any drafts, letters of intent, confidentiality agreements, term sheets, or communications related to same) relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

e.     All communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings, LLC or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the Claims, the liquidation of the

Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

  f.  Proofs of purchase of the Claims and other assets of the Crusader entities.

## VI.

## REQUEST FOR HEARING & ORDERS

35.  After service of this Amended Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on the Petition and order the requested relief.

36.  Document discovery is permitted by Rule 199.2. Rule 202.5 states that "depositions authorized by this Rule are governed by the rules applicable to depositions of nonparties in a pending suit. The scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed...." Rule 199.2 governs such actions and "expressly allows a party noticing a deposition to include a request for production of documents or tangible things within the scope of discovery and within the witness's possession, custody, or control." *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App.—Tyler 2018) (holding that district court properly ordered document discovery in Rule 202 action). *See also* Tex. R. Civ. P. 205.1(c) (authorizing party to compel discovery from a nonparty by court order or subpoena, including a request for production served with a deposition notice). *See also City of Dall. v. City of Corsicana*, Nos. 10-14-00090-CV, 10-14-00171-CV, 2015 Tex. App. LEXIS 8753, at *15-16 (Tex. App.—Waco Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition.... Accordingly, the trial court's order is not an abuse of discretion to the extent that it allows Navarro to obtain documents in an oral deposition under rule 199 or a deposition on written questions under rule 200."); *In re Anand*, No. 01-12-01106-CV, 2013 Tex. App. LEXIS 4157, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2013) ("the language of these rules when read together

permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents").

37.     **FOR THESE REASONS**, Petitioner asks the Court to set a date for hearing on this Amended Petition, and after the hearing, to find that the likely benefit of allowing Petitioner to take the requested depositions outweighs the burden or expense of the procedure.  Petitioner further asks the Court to issue an Order authorizing Petitioner to take the oral depositions of the Respondents after proper notice and service at the offices of Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, Texas 75201, within ten (10) days of the Court's Order, or as otherwise agreed to by the parties, and to produce the requested documents prior to said deposition. Petitioner also seeks any further relief to which he may be justly entitled.

Dated:  May 2, 2022                               Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Brad J. Robinson**
Texas Bar No. 24058076
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     bjr@sbaitilaw.com

*Counsel for Petitioner*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on this 2nd day of May, 2022.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

## VERIFICATION

STATE OF TEXAS §

§

DALLAS COUNTY §

Before me, the undersigned Notary Public, on this day personally appeared James Dondero (hereinafter "Affiant"), who is over the age of 21 and of sound mind and body, who being by me duly sworn, on his oath deposed and said that he has read the foregoing Amended Verified Petition to Take Deposition Before Suit, and that the statements of fact therein are within his personal knowledge and are true and correct as stated, Further, Affiant stated that the Affiant has personal knowledge because of Affiant's relationships and interactions as described therein.

James Dondero

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of April, 2022, to certify which witness my hand and official seal.

My commission expires on _____.

Notary Public of the State of Texas

seal



Robin Morrison
My Commission Expires
12/9/2025
Notary ID
133483390

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Kim James on behalf of Mazin Sbaiti
Bar No. 24058096
krj@sbaitilaw.com
Envelope ID: 64114982
Status as of 5/3/2022 2:58 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mazin Sbaiti | | MAS@SbaitiLaw.com | 5/2/2022 9:27:04 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| Kim James | | krj@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Jonathan Bridges | | jeb@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Brad Robinson | | bjr@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Charlotte Casso | | bcc@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |

CAUSE No. DC-21-09534

| | | |
|---|---|---|
| In Re: | § | In the District Court |
| | § | |
| James Dondero, | § | Dallas County, Texas |
| | § | |
| Petitioner. | § | 95th Judicial District |
| | § | |

### ORDER

Came on for consideration the *Verified Amended Petition to Take Deposition Before Suit and Seek Documents* ("Petition") filed by petitioner James Dondero ("Dondero"). The Court, having considered the Petition, the responses filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Alvarez & Marsal CRF Management, LLC ("A&M"), the record, and applicable authorities, and having conducted a hearing on the Petition on June 1, 2022, concludes that Dondero's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that Dondero's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this ___ day of June, 2022.

HONORABLE MONICA PURDY

**Exhibit**

**R 2**

HMIT Appx. 01433

Case 19-34054-sgj11 Doc 1808 Filed 01/22/21 Entered 01/22/21 18:59:39 Page 1 of 66
Case 3:21-cv-00881-X Document 172-11 Filed 12/15/23 Page 239 of 968 PageID 15821
Docket #1808 Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession



Exhibit
R 3

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................ 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ................... 1

    B.    Defined Terms ............................................................................................... 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ..................................................................... 16

    B.    Professional Fee Claims ................................................................................ 17

    C.    Priority Tax Claims ....................................................................................... 18

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ................................................................... 18

    A.    Summary ...................................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ............................................................................................ 19

    C.    Elimination of Vacant Classes ...................................................................... 19

    D.    Impaired/Voting Classes ............................................................................... 19

    E.    Unimpaired/Non-Voting Classes .................................................................. 19

    F.    Impaired/Non-Voting Classes ...................................................................... 19

    G.    Cramdown .................................................................................................... 19

    H.    Classification and Treatment of Claims and Equity Interests ........................... 20

    I.    Special Provision Governing Unimpaired Claims .............................................. 24

    J.    Subordinated Claims ..................................................................................... 25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..................................... 25

    A.    Summary ...................................................................................................... 25

    B.    The Claimant Trust ...................................................................................... 26

    1.    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ............................................................................................ 26

    2.    *Claimant Trust Oversight Committee* ................................................ 27

HMIT Appx. 01435

**Page**

3.    *Purpose of the Claimant Trust.* ...................................................................27

4.    *Purpose of the Litigation Sub-Trust.* .........................................................28

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* ......................28

6.    *Compensation and Duties of Trustees.* .......................................................29

7.    *Cooperation of Debtor and Reorganized Debtor.* ..........................................30

8.    *United States Federal Income Tax Treatment of the Claimant Trust.* ...............30

9.    *Tax Reporting.* ...................................................................................30

10.    *Claimant Trust Assets.* .........................................................................31

11.    *Claimant Trust Expenses.* ......................................................................31

12.    *Trust Distributions to Claimant Trust Beneficiaries.* ....................................31

13.    *Cash Investments.* ...............................................................................31

14.    *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ............................32

C.    The Reorganized Debtor .........................................................................32

1.    *Corporate Existence* ...............................................................................32

2.    *Cancellation of Equity Interests and Release* ................................................33

3.    *Issuance of New Partnership Interests* .......................................................33

4.    *Management of the Reorganized Debtor* .......................................................33

5.    *Vesting of Assets in the Reorganized Debtor* .................................................34

6.    *Purpose of the Reorganized Debtor* .............................................................34

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer
of Reorganized Debtor Assets* ...................................................................34

D.    Company Action .....................................................................................34

E.    Release of Liens, Claims and Equity Interests ................................................35

F.    Cancellation of Notes, Certificates and Instruments ..........................................36

G.    Cancellation of Existing Instruments Governing Security Interests ........................36

**HMIT Appx. 01436**

**Page**

H.      Control Provisions ........................................................................................36

I.      Treatment of Vacant Classes .......................................................................36

J.      Plan Documents ............................................................................................36

K.      Highland Capital Management, L.P. Retirement Plan and Trust .................37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ........................................................................................................37

A.      Assumption, Assignment, or Rejection of Executory Contracts and
        Unexpired Leases .........................................................................................37

B.      Claims Based on Rejection of Executory Contracts or Unexpired
        Leases ...........................................................................................................38

C.      Cure of Defaults for Assumed or Assigned Executory Contracts and
        Unexpired Leases .........................................................................................39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................39

A.      Dates of Distributions ..................................................................................39

B.      Distribution Agent ........................................................................................40

C.      Cash Distributions ........................................................................................41

D.      Disputed Claims Reserve .............................................................................41

E.      Distributions from the Disputed Claims Reserve .........................................41

F.      Rounding of Payments ..................................................................................41

G.      *De Minimis* Distribution ...............................................................................41

H.      Distributions on Account of Allowed Claims ..............................................42

I.      General Distribution Procedures ..................................................................42

J.      Address for Delivery of Distributions ..........................................................42

K.      Undeliverable Distributions and Unclaimed Property ..................................42

L.      Withholding Taxes ........................................................................................43

M.      Setoffs ..........................................................................................................43

HMIT Appx. 01437

**Page**

N.      Surrender of Cancelled Instruments or Securities ...............................43

O.      Lost, Stolen, Mutilated or Destroyed Securities ................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS...........................................44

A.      Filing of Proofs of Claim ...................................................44

B.      Disputed Claims ..........................................................44

C.      Procedures Regarding Disputed Claims or Disputed Equity Interests ..............44

D.      Allowance of Claims and Equity Interests........................................44

1.      *Allowance of Claims* ......................................................45

2.      *Estimation* .............................................................45

3.      *Disallowance of Claims* ...................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ........................................46

A.      Conditions Precedent to the Effective Date ......................................46

B.      Waiver of Conditions .....................................................47

C.      Effect of Non-Occurrence of Conditions to Effectiveness**Error! Bookmark not defined.**

D.      Dissolution of the Committee .............................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................48

A.      General..................................................................48

B.      Discharge of Claims.......................................................48

C.      Exculpation ..............................................................48

D.      Releases by the Debtor.....................................................49

E.      Preservation of Rights of Action.............................................50

1.      *Maintenance of Causes of Action* .........................................50

2.      *Preservation of All Causes of Action Not Expressly Settled or Released*...........50

F.      Injunction ...............................................................51

**HMIT Appx. 01438**

**Page**

G.  Term of Injunctions or Stays...................................................................52

H.  Continuance of January 9 Order ..............................................................52

ARTICLE X. BINDING NATURE OF PLAN .............................................................52

ARTICLE XI. RETENTION OF JURISDICTION .......................................................53

ARTICLE XII. MISCELLANEOUS PROVISIONS .....................................................55

A.  Payment of Statutory Fees and Filing of Reports ...................................55

B.  Modification of Plan ................................................................................55

C.  Revocation of Plan...................................................................................55

D.  Obligations Not Changed.........................................................................56

E.  Entire Agreement .....................................................................................56

F.  Closing of Chapter 11 Case .....................................................................56

G.  Successors and Assigns............................................................................56

H.  Reservation of Rights...............................................................................56

I.  Further Assurances...................................................................................57

J.  Severability ..............................................................................................57

K.  Service of Documents ..............................................................................57

L.  Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
    the Bankruptcy Code................................................................................58

M.  Governing Law .........................................................................................59

N.  Tax Reporting and Compliance ...............................................................59

O.  Exhibits and Schedules ...........................................................................59

P.  Controlling Document ..............................................................................59

HMIT Appx. 01439

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A. Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.   **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.   "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.   "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.   "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.   "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.   "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.   For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.   "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the

2

HMIT Appx. 01441

Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

3

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

HMIT Appx. 01443

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold

Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

6

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or

7

Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

8

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

HMIT Appx. 01448

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

10

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "*Petition Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

11

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

HMIT Appx. 01451

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any

13

damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized

HMIT Appx. 01453

Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

HMIT Appx. 01454

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by the Bankruptcy Court.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.   Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized

HMIT Appx. 01455

Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee

Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.** **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.** **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

HMIT Appx. 01457

**B.**     <u>**Summary of Classification and Treatment of Classified Claims and Equity Interests**</u>

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**     <u>**Elimination of Vacant Classes**</u>

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.**     <u>**Impaired/Voting Classes**</u>

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.**     <u>**Unimpaired/Non-Voting Classes**</u>

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.**     <u>**Impaired/Non-Voting Classes**</u>

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.**     <u>**Cramdown**</u>

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the

HMIT Appx. 01458

Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**  **Classification and Treatment of Claims and Equity Interests**

  *1.*  *Class 1 – Jefferies Secured Claim*

  - *Classification*:  Class 1 consists of the Jefferies Secured Claim.

  - *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

  - *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

  *2.*  *Class 2 – Frontier Secured Claim*

  - *Classification*:  Class 2 consists of the Frontier Secured Claim.

  - *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

  - *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

HMIT Appx. 01459

3. _Class 3 – Other Secured Claims_

- _Classification_: Class 3 consists of the Other Secured Claims.

- _Allowance and Treatment_: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- _Impairment and Voting_: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. _Class 4 – Priority Non-Tax Claims_

- _Classification_: Class 4 consists of the Priority Non-Tax Claims.

- _Allowance and Treatment_: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- _Impairment and Voting_: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. _Class 5 – Retained Employee Claims_

- _Classification_: Class 5 consists of the Retained Employee Claims.

- _Allowance and Treatment_: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

21

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

22

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.    *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

HMIT Appx. 01462

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.  <u>Class 11 – Class A Limited Partnership Interests</u>

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

I.  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

24

**HMIT Appx. 01463**

### J. Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Under section 510 of the Bankruptcy Code, upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

### A. Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be

HMIT Appx. 01464

cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

## B.   The Claimant Trust[2]

1.                  *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

HMIT Appx. 01465

Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and

27

monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.          *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.          *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)          the payment of the Claimant Trust Expenses;

(ii)          the payment of other reasonable expenses of the Claimant Trust;

(iii)          the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)          the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)          the orderly monetization of the Claimant Trust Assets;

(vi)          litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)          the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)          the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)          the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

HMIT Appx. 01467

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i) the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii) the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii) the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6. *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust

HMIT Appx. 01468

Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.        *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.        *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.        *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

HMIT Appx. 01469

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11. *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

HMIT Appx. 01470

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.       *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.    **The Reorganized Debtor**

1.       *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

32

HMIT Appx. 01471

2.        *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

3.        *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.        *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

HMIT Appx. 01472

5. *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in

34

HMIT Appx. 01473

the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

E.    **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of

HMIT Appx. 01474

doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.   Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.   Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.   Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

### I.   Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

### J.   Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

HMIT Appx. 01475

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.      Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

<div align="center">

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

**A.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a

<div align="center">37</div>

contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

## B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed

and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.** **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.** **Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity

39

Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.     Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the

HMIT Appx. 01479

Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C. Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D. Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E. Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F. Rounding of Payments

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

HMIT Appx. 01480

revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

42

**L.**    **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**    **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**    **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**    **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

43

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

</div>

**A.     Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.     Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.     Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

**D.     Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

<div align="center">

44

</div>

1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH**

HMIT Appx. 01484

LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

<div align="center">

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

</div>

**A.    Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding

<div align="center">46</div>

upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B. Waiver of Conditions

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C. Dissolution of the Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's

47

Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

**A.     General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.     Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**C.     Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross

48

negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.  **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

HMIT Appx. 01488

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.      Preservation of Rights of Action**

   *1.      Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

   *2.      Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final

Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F.    <u>Injunction</u>

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or**

51

arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**G.**     **Duration of Injunctions and Stays**

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

**H.**     **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state,

HMIT Appx. 01491

Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or

53

expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such

54

orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.  Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.  Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement

HMIT Appx. 01494

executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

D.    **Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

E.    **Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

F.    **Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

G.    **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.    **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this

HMIT Appx. 01495

Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.      Further Assurances

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.      Severability

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.      Service of Documents

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

HMIT Appx. 01496

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego

HMIT Appx. 01497

the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.    Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.    Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.    Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.    Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

59

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

    James P. Seery, Jr.

    Chief Executive Officer and Chief Restructuring

    Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 1811 Filed 01/22/21    Entered 01/22/21 19:14:23    Page 1 of 4
Docket #1811 Date Filed: 01/22/2021
Case 3:21-cv-00881-X   Document 172-11   Filed 12/15/23   Page 305 of 968   PageID 15887

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

> Exhibit
>
> **R 4**

**DEBTOR'S NOTICE OF FILING OF PLAN SUPPLEMENT TO THE FIFTH
AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
MANAGEMENT, L.P. (WITH TECHNICAL MODIFICATIONS)**

   **PLEASE  TAKE  NOTICE**  that  Highland  Capital  Management,  L.P.,  the  above-

captioned debtor and debtor-in-possession (the "Debtor"), filed the *Debtor's Notice of Filing of*

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054210122000000000016

*Supplement to Third Amended Plan of Reorganization of Highland Capital Management, L.P.*, on November 13, 2020 [Docket No. 1389] (the "Initial Supplement"). The Initial Supplement included Exhibits A-H to the Plan (as defined below).

PLEASE TAKE NOTICE that on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472].

PLEASE TAKE NOTICE that the Debtor filed the *Debtor's Notice of Filing of Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* on December 18, 2020 [Docket No. 1606] (the "Second Supplement"). The Second Supplement included Exhibits I-K to the Plan.

PLEASE TAKE NOTICE that the Debtor filed the *Debtor's Notice of Filing of Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* on January 4, 2021 [Docket No. 1656] (the "Third Supplement"). The Third Supplement included Exhibits L-P to the Plan.

PLEASE TAKE NOTICE that on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as subsequently amended and/or modified, the "Plan").

PLEASE TAKE NOTICE that the Debtor hereby files the documents included herewith as **Exhibits Q-CC** (collectively, the "Fourth Plan Supplement") further supplementing the Plan:

**Exhibit Q**: Amended Schedule of Retained Causes of Action (supersedes Exhibits E and L);

**Exhibit R**: Amended Form of Claimant Trust Agreement (supersedes Exhibits A and M);

**Exhibit S**: Redline of Form of Claimant Trust Agreement (against Exhibit M);

**Exhibit T**: Amended Form of Litigation Trust Agreement (supersedes Exhibits D and O);

**Exhibit U**:   Redline of Form of Litigation Trust Agreement (against Exhibit P)

**Exhibit V**:   Amended Form of Senior Employee Stipulation (supersedes Exhibit H and J);

**Exhibit W**:   Redline of Form of Senior Employee Stipulation (against Exhibit J);

**Exhibit X**:   Schedule of Contracts and Leases to Be Assumed (supersedes Exhibit H and I);

**Exhibit Y**:   Related Entity List;

**Exhibit Z**   Form of Reorganized Limited Partnership Agreement (supersedes Exhibit C);

**Exhibit AA**   Redline of Form of Reorganized Limited Partnership Agreement (against Exhibit C);

**Exhibit BB**   Senior Employee Stipulation (executed by Thomas Surgent);

**Exhibit CC**   Senior Employee Stipulation (executed by Frank Waterhouse); and

**Exhibit DD**   Schedule of Employees (supersedes Exhibit G).

**PLEASE TAKE FURTHER NOTICE** that this *Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)* (the "Notice of Plan Supplement") is being served on parties-in-interest without the Fourth Plan Supplement attached. Any party-in-interest wishing to obtain copies of the Plan or the Fourth Plan Supplement may do so by (i) contacting the Debtor's Solicitation Agent, KCC, at (i) 1-877-573-3984 (toll free) or 1-310-751-1829 (if international) or by email at HighlandInfo@kccllc.com, or (ii) viewing such documents by accessing them online at https://kccllc.net/HCMLP. The documents are also available on the Court's website: www.txnb.uscourts.gov. Please note that a PACER password and login are needed to access documents on the Court's website.

HMIT Appx. 01502

Dated: January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

4

HMIT Appx. 01503

# EXHIBIT Q

HMIT Appx. 01504

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

HMIT Appx. 01505

**Annex 1**

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

CG Works, Inc.

CG Works, Inc. (fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault
James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Four Rivers Co-Invest GP, LLC

Four Rivers Co-Invest, L.P.

FRBH Abbington SM, Inc.

FRBH Abbington, LLC

FRBH Arbors, LLC

FRBH Beechwood SM, Inc.

FRBH Beechwood, LLC

FRBH C1 Residential, LLC

FRBH Courtney Cove SM, Inc.

FRBH Courtney Cove, LLC

FRBH CP, LLC

FRBH Duck Creek, LLC

FRBH Eaglecrest, LLC

FRBH Edgewater JV, LLC

FRBH Edgewater Owner, LLC

FRBH Edgewater SM, Inc.

FRBH JAX-TPA, LLC

FRBH Nashville Residential, LLC

FRBH Regatta Bay, LLC

FRBH Sabal Park SM, Inc.

FRBH Sabal Park, LLC

FRBH Silverbrook, LLC

FRBH Timberglen, LLC

FRBH Willow Grove SM, Inc.

FRBH Willow Grove, LLC

FRBH Woodbridge SM, Inc.

FRBH Woodbridge, LLC

Freedom C1 Residential, LLC

Freedom Duck Creek, LLC

Freedom Edgewater, LLC

Freedom JAX-TPA Residential, LLC

Freedom La Mirage, LLC

Freedom LHV LLC

Freedom Lubbock LLC

Freedom Miramar Apartments, LLC

Freedom Sandstone, LLC

Freedom Willowdale, LLC

Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura

G&E Apartment REIT The Heights at Olde Towne, LLC

G&E Apartment REIT The Myrtles at Olde Towne, LLC

GAF REIT, LLC

GAF Toys Holdco, LLC

Gardens of Denton II, L.P.

Gardens of Denton III, L.P.

Gleneagles CLO, Ltd.

Goverannce RE, Ltd.

Governance Re, Ltd.

Governance, Ltd.

Grant Scott

Grant Scott, Trustee of The SLHC Trust

Grayson CLO, Ltd.

Grayson Investors Corp.

Greater Kansas City Community Foundation (third party)

Greenbriar CLO, Ltd.

Greg Busseyt

Gunwale LLC

Gunwale, LLC

Hakusan, LLC

Hammark Holdings LLC

Hampton Ridge Partners, LLC

Harbourvest Entities

Harko, LLC

Harry Bookey/Pam Bookey (third party)

Haverhill Acquisition Co., LLC

Haygood, LLC

HB 2015 Family LP (third party)

HCBH 11611 Ferguson, LLC

HCBH Buffalo Pointe II, LLC

HCBH Buffalo Pointe III, LLC

HCBH Buffalo Pointe, LLC

HCBH Hampton Woods SM, Inc.

HCBH Hampton Woods, LLC

HCBH Overlook SM, Inc.

HCBH Overlook, LLC

HCBH Rent Investors, LLC

HCMS Falcon GP, LLC

HCMS Falcon, L.P.

HCO Holdings, LLC

HCOF Preferred Holdings, L.P.

HCOF Preferred Holdings, LP

HCOF Preferred Holdings, Ltd.

HCRE 1775 James Ave, LLC

HCRE Addison TRS, LLC

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company, LLC

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov 25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt Descendants' Trust

Mark and Pam Okada Family Trust - Exempt Trust #2

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust - Exempt Trust #2

Mark K. Okada

Mark Okada

Mark Okada and Pam Okada

Mark Okada and Pam Okada, as joint owners

Mark Okada/Pamela Okada

Markham Fine Jewelers, L.P.

Markham Fine Jewelers, LP

Matt McGraner

Meritage Residential Partners, LLC

MGM Studios HoldCo, Ltd.

Michael Rossi

ML CLO XIX Sterling (Cayman), Ltd.

N/A

Nancy Dondero

NCI Apache Trail LLC

NCI Assets Holding Company LLC

NCI Country Club LLC

NCI Fort Worth Land LLC

NCI Front Beach Road LLC

NCI Minerals LLC

NCI Royse City Land LLC

NCI Stewart Creek LLC

NCI Storage, LLC

Neil Labatte

Neutra, Ltd.

New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.

NexBank Capital Trust I

NexBank Capital, Inc.

NexBank Land Advisors, Inc.

NexBank Securities Inc.

NexBank Securities, Inc.

NexBank SSB

NexBank Title, Inc.
(dba NexVantage Title Services)

NexBank, SSB

NexPoint Advisors GP, LLC

NexPoint Advisors, L.P.

NexPoint Capital REIT, LLC

NexPoint Capital, Inc.

NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*

NexPoint CR F/H DST, LLC

NexPoint Credit Strategies Fund

NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*

NexPoint DRIP

NexPoint Energy and Materials Opportunities Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST

NexPoint Flamingo Investment Co, LLC

NexPoint Flamingo Leaseco, LLC

NexPoint Flamingo Manager, LlC

NexPoint Flamingo Property Manager, LlC

NexPoint Healthcare Opportunities Fund

NexPoint Hospitality Trust

NexPoint Hospitality, Inc.

NexPoint Hospitality, LLC

NexPoint Insurance Distributors, LLC

NexPoint Insurance Solutions GP, LLC

NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund

NexPoint Legacy 22, LLC

NexPoint Lincoln Porte Equity, LLC

NexPoint Lincoln Porte Manager, LLC

NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*

NexPoint Multifamily Capital Trust, Inc.

NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership, L.P.

NexPoint Peoria, LLC

NexPoint Polo Glen DST

NexPoint Polo Glen Holdings, LLC

NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities, LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc. *(fka Highland Capital Funds Distributor, Inc.) (fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund *(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund *(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST *(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC *(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

NHT Operating Partnership II, LLC

NHT Operating Partnership, LLC

NHT Salem, LLC

NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment,
LLC *(fka NREA Crossings Ridgewood
Investors, LLC)*

NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC
NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST

NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily, LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)

NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)

NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne
Crossing, LP)

NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC
NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner,
L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC
NREA SE2 Hidden Lake, DST
NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC
NREA SE2 Vista Ridge Manager, LLC
NREA SE2 Vista Ridge, DST
NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC
NREA SE2 West Place Manager, LLC
NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC
NREA SE3 Arboleda Manager, LLC
NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC
NREA SE3 Fairways Manager, LLC
NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC
NREA SE3 Grand Oasis Manager, LLC
NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio Three Manager, LLC
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Two Manager, LLC
NREA Southeast Portfolio Two, DST
NREA Southeast Portfolio Two, LLC
NREA SOV Investors, LLC
NREA Uptown TRS, LLC
NREA VB I LLC
NREA VB II LLC

NREA VB III LLC
NREA VB IV LLC
NREA VB Pledgor I LLC
NREA VB Pledgor I, LLC
NREA VB Pledgor II LLC
NREA VB Pledgor II, LLC
NREA VB Pledgor III LLC
NREA VB Pledgor III, LLC
NREA VB Pledgor IV LLC
NREA VB Pledgor IV, LLC
NREA VB Pledgor V LLC
NREA VB Pledgor V, LLC
NREA VB Pledgor VI LLC
NREA VB Pledgor VI, LLC
NREA VB Pledgor VII LLC
NREA VB Pledgor VII, LLC
NREA VB SM, Inc.
NREA VB V LLC
NREA VB VI LLC
NREA VB VII LLC
NREA Vista Ridge Investment Co, LLC
NREC AR Investors, LLC
NREC BM Investors, LLC
NREC BP Investors, LLC
NREC Latitude Investors, LLC
NREC REIT Sub, Inc.
NREC TRS, Inc.
NREC WW Investors, LLC
NREF OP I Holdco, LLC
NREF OP I SubHoldco, LLC
NREF OP I, L.P.
NREF OP II Holdco, LLC
NREF OP II SubHoldco, LLC
NREF OP II, L.P.
NREF OP IV REIT Sub TRS, LLC
NREF OP IV REIT Sub, LLC
NREF OP IV, L.P.
NREO NW Hospitality Mezz, LLC
NREO NW Hospitality, LLC
NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC

NXRT Abbington, LLC

NXRT Atera II, LLC

NXRT Atera, LLC

NXRT AZ2, LLC

NXRT Barrington Mill, LLC

NXRT Bayberry, LLC

NXRT Bella Solara, LLC

NXRT Bella Vista, LLC

NXRT Bloom, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine LP, LLC

NXRT Brandywine LP, LLC

NXRT Brentwood Owner, LLC

NXRT Brentwood, LLC

NXRT Cedar Pointe Tenant, LLC

NXRT Cedar Pointe, LLC

NXRT Cityview, LLC

NXRT Cornerstone, LLC

NXRT Crestmont, LLC

NXRT Crestmont, LLC

NXRT Enclave, LLC

NXRT Glenview, LLC

NXRT H2 TRS, LLC

NXRT Heritage, LLC

NXRT Hollister TRS LLC

NXRT Hollister, LLC

NXRT LAS 3, LLC

NXRT Master Tenant, LLC

NXRT Nashville Residential, LLC

NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*

NXRT North Dallas 3, LLC

NXRT Old Farm, LLC

NXRT Pembroke Owner, LLC

NXRT Pembroke, LLC

NXRT PHX 3, LLC

NXRT Radbourne Lake, LLC

NXRT Rockledge, LLC

NXRT Sabal Palms, LLC

NXRT SM, Inc.

NXRT Steeplechase, LLC

NXRT Stone Creek, LLC

NXRT Summers Landing GP, LLC

NXRT Summers Landing LP, LLC

NXRT Torreyana, LLC

NXRT Vanderbilt, LLC

NXRT West Place, LLC

NXRTBH AZ2, LLC

NXRTBH Barrington Mill Owner, LLC

NXRTBH Barrington Mill SM, Inc.

NXRTBH Barrington Mill, LLC

NXRTBH Bayberry, LLC

NXRTBH Cityview, LLC

NXRTBH Colonnade, LLC

NXRTBH Cornerstone Owner, LLC

NXRTBH Cornerstone SM, Inc.

NXRTBH Cornerstone, LLC

NXRTBH Dana Point SM, Inc.

NXRTBH Dana Point, LLC

NXRTBH Foothill SM, Inc.

NXRTBH Foothill, LLC

NXRTBH Heatherstone SM, Inc.

NXRTBH Heatherstone, LLC

NXRTBH Hollister Tenant, LLC

NXRTBH Hollister, LLC

NXRTBH Madera SM, Inc.

NXRTBH Madera, LLC

NXRTBH McMillan, LLC

NXRTBH North Dallas 3, LLC

NXRTBH Old Farm II, LLC

NXRTBH Old Farm Tenant, LLC

NXRTBH Old Farm, LLC

NXRTBH Radbourne Lake, LLC

NXRTBH Rockledge, LLC

NXRTBH Sabal Palms, LLC

NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA

NXRTBH Stone Creek, LLC

NXRTBH Vanderbilt, LLC

NXRTBH Versailles SM, Inc.

NXRTBH Versailles, LLC

Oak Holdco, LLC

Oaks CGC, LLC

Okada Family Revocable Trust

Oldenburg, Ltd.

Pam Capital Funding GP Co. Ltd.

Pam Capital Funding, L.P.

PamCo Cayman Ltd.

Park West 1700 Valley View Holdco, LLC

Park West 2021 Valley View Holdco, LLC

Park West Holdco, LLC

Park West Portfolio Holdco, LLC

Participants of Highland 401K Plan

Patrick Willoughby-McCabe

PCMG Trading Partners XXIII, L.P.

PCMG Trading Partners XXIII, LP

PDK Toys Holdco, LLC

Pear Ridge Partners, LLC

Penant Management GP, LLC

Penant Management LP

PensionDanmark Holding A/S

PensionDanmark
Pensionsforsikringsaktieselskab

Peoria Place Development, LLC
(30% cash contributions - profit participation
only)

Perilune Aero Equity Holdings One, LLC

Perilune Aviation LLC

PetroCap Incentive Holdings III. L.P.

PetroCap Incentive Partners II GP, LLC

PetroCap Incentive Partners II, L.P.

PetroCap Incentive Partners III GP, LLC

PetroCap Incentive Partners III, LP

PetroCap Management Company LLC

PetroCap Partners II GP, LLC

PetroCap Partners II, L.P.

PetroCap Partners III GP, LLC

PetroCap Partners III, L.P.

Pharmacy Ventures I, LLC

Pharmacy Ventures II, LLC

Pollack, Ltd.

Powderhorn, LLC

PWM1 Holdings, LLC

PWM1, LLC

RADCO - Bay Meadows, LLLP

RADCO - Bay Park, LLLP

RADCO NREC Bay Meadows Holdings, LLC

RADCO NREC Bay Park Holdings, LLC

Ramarim, LLC

Rand Advisors Series I Insurance Fund

Rand Advisors Series II Insurance Fund

Rand Advisors, LLC

Rand PE Fund I, L.P.

Rand PE Fund I, L.P. - Series 1

Rand PE Fund Management, LLC

Rand PE Holdco, LLC

Realdania

Red River CLO, Ltd.

Red River Investors Corp.

Riverview Partners SC, LLC

Rockwall CDO II Ltd.

Rockwall CDO II, Ltd.

Rockwall CDO, Ltd.

Rockwall Investors Corp.

Rothko, LLC

RTT Bella Solara, LLC

RTT Bloom, LLC

RTT Financial, Inc.

RTT Hollister, LLC

RTT Rockledge, LLC

RTT Torreyana, LLC

SALI Fund Partners, LLC

San Diego County Employees Retirement
Association

Sandstone Pasadena Apartments, LLC

Sandstone Pasadena, LLC

Santa Barbara Foundation (third party)

Saturn Oil & Gas LLC

SBC Master Pension Trust

Scott Matthew Siekielski

SE Battleground Park, LLC

SE Battleground Park, LLC

SE Glenview, LLC

SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C.
*(fka SCG Atlas Governors Green Holdings,
L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC
SE Governors Green REIT, L.L.C.
SE Governors Green REIT, L.L.C.
*(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC
*(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC
SE Gulfstream Isles GP, LLC
SE Gulfstream Isles LP, LLC
SE Gulfstream Isles LP, LLC
SE Heights at Olde Towne, LLC
SE Heights at Olde Towne, LLC
SE Lakes at Renaissance Park GP I, LLC
SE Lakes at Renaissance Park GP II, LLC
SE Lakes at Renaissance Park GP II, LLC
SE Lakes at Renaissance Park LP, LLC
SE Lakes at Renaissance Park LP, LLC
SE Multifamily Holdings LLC
SE Multifamily Holdings, LLC
SE Multifamily REIT Holdings LLC
SE Myrtles at Olde Towne, LLC
SE Myrtles at Olde Towne, LLC
SE Oak Mill I Holdings, LLC
SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC
SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC
SE Oak Mill I, LLC
SE Oak Mill II Holdings, LLC
SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC
SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC
SE Oak Mill II, LLC

SE Quail Landing, LLC
SE River Walk, LLC
SE Riverwalk, LLC
SE SM, Inc.
SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC
SE Stoney Ridge I, LLC
SE Stoney Ridge I, LLC
SE Stoney Ridge II, LLC
SE Stoney Ridge II, LLC
SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC
SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC
SE Victoria Park, LLC
Sentinel Re Holdings, Ltd.
Sentinel Reinsurance Ltd.
SFH1, LLC
SFR WLIF I, LLC
*(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC
*(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC
*(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC
*(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC
*(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I
SFR WLIF, LLC Series II
SFR WLIF, LLC Series III
SH Castle BioSciences, LLC
Small Cap Equity Sub, LLC
Socially Responsible Equity Sub, LLC
SOF Brandywine I Owner, L.P.
SOF Brandywine II Owner, L.P.
SOF-X GS Owner, L.P.
Southfork Cayman Holdings, Ltd.
Southfork CLO, Ltd.

Specialty Financial Products Designated
Activity Company *(fka Specialty Financial
Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private
Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation
only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated
Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust -
Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the
City of New York

The Twentysix Investment Trust
(Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium
Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.

Wake LV Holdings, Ltd.

Walter Holdco GP, LLC

Walter Holdco I, Ltd.

Walter Holdco, L.P.

Warhol, Ltd.

Warren Chang

Westchester CLO, Ltd.

William L. Britain

Wright Ltd.

Wright, Ltd.

Yellow Metal Merchants, Inc.

# EXHIBIT R

HMIT Appx. 01522

Case 19-34054-sgj11 Doc 1811-2 Filed 01/22/21 Entered 01/22/21 19:14:23 Page 2 of 38
Case 3:21-cv-00881-X Document 172-11 Filed 12/15/23 Page 328 of 968 PageID 15910
*DRAFT*

# CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [_____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

# RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____ , 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

(vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1    Certain Definitions.    Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.   For all purposes of this Agreement, the following terms shall have the following meanings:

(a)    "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)    "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)    "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

2

(d)    "Claimant Trust Agreement" means this Agreement.

(e)    "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)    "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)    "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)    "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)    "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)    "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)    "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)    "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)    "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

HMIT Appx. 01525

(n)　"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

(o)　"Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p)　"Delaware Trustee" has the meaning set forth in the introduction hereof.

(q)　"Disability" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r)　"Disinterested Members" has the meaning set forth in Section 4.1 hereof.

(s)　"Disputed Claims Reserve" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [[in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board]] to be sufficient to pay Disputed Claims under the Plan.

(t)　"Employees" means the employees of the Debtor set forth in the Plan Supplement.

(u)　"Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v)　"Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(w)　"Equity Trust Interests" has the meaning given to it in Section 5.1(c) hereof.

(x)　"Exchange Act" means the Securities Exchange Act of 1934, as amended.

(y)　"General Unsecured Claim Trust Interests" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z)　"GUC Beneficiaries" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa)　"GUC Payment Certification" has the meaning given to it in Section 5.1(c) hereof.

4

(bb)  "HarbourVest" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

(cc)  "Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

(dd)  "Investment Company Act" means the Investment Company Act of 1940, as amended.

(ee)  "Litigation Sub-Trust" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff)  "Litigation Sub-Trust Agreement" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg)  "Litigation Trustee" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh)  "Managed Funds" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii)  "Material Claims" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj)  "Member" means a Person that is member of the Oversight Board.

(kk)  "New GP LLC" means the general partner of the Reorganized Debtor.

(ll)  "Oversight Board" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan.  Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

HMIT Appx. 01527

(mm)    "<u>Plan</u>" has the meaning set forth in the Recitals hereof.

(nn)    "<u>Privileges</u>" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; <u>provided</u>, <u>however</u>, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo)    "<u>PSZJ</u>" means Pachulski Stang Ziehl & Jones LLP.

(pp)    "<u>Redeemer Committee</u>" means the Redeemer Committee of the Highland Crusader Fund.

(qq)    "<u>Registrar</u>" has the meaning given to it in Section 5.3(a) hereof.

(rr)    "<u>Reorganized Debtor Assets</u>" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss)    "<u>Securities Act</u>" means the Securities Act of 1933, as amended.

(tt)    "<u>Subordinated Beneficiaries</u>" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu)    "<u>Subordinated Claim Trust Interests</u>" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv)    "<u>TIA</u>" means the Trust Indenture Act of 1939, as amended.

(ww)    "<u>Trust Interests</u>" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx)    "<u>Trust Register</u>" has the meaning given to it in Section 5.3(b) hereof.

(yy)    "<u>Trustees</u>" means collectively the Claimant Trustee and Delaware Trustee.

(zz)    "<u>UBS</u>" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa)    "<u>WilmerHale</u>" Wilmer Cutler Pickering Hale & Dorr LLP.

1.2    <u>General Construction</u>.  As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply.  "Includes" and "including" are not limiting and "or" is not exclusive.  References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement.  Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars.  References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3    <u>Incorporation of the Plan</u>.  The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

<div align="center">

**ARTICLE II.**
**ESTABLISHMENT OF THE CLAIMANT TRUST**

</div>

2.1    <u>Creation of Name of Trust</u>.

(a)    The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust."  The Claimant Trustee shall be empowered to conduct all business and hold all property constituting the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

(b)    The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

**HMIT Appx. 01529**

2.2 <u>Objectives</u>.

(a) The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b) It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3 <u>Nature and Purposes of the Claimant Trust</u>.

(a) The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust,

HMIT Appx. 01530

pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

       (b)    The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

       (i)    to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

       (ii)    to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

       (iii)    to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

       (iv)    to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

       (v)    to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

       (vi)    to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

       (vii)    to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

       (viii)    to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

       (ix)    to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

HMIT Appx. 01531

2.4   <u>Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust</u>.

(a)   On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement.  To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b)   On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement.  Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

(c)   On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved. For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d)   Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trustee, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee.  For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

HMIT Appx. 01532

2.5   <u>Principal Office</u>. The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6   <u>Acceptance</u>. The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7   <u>Further Assurances</u>. The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8   <u>Incidents of Ownership</u>. The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

<div align="center">

**<u>ARTICLE III.</u>**
**<u>THE TRUSTEES</u>**
</div>

3.1   <u>Role</u>. In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2   <u>Authority</u>.

(a)   In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust. The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law. The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)   The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; <u>provided</u>, <u>however</u>, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate. To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or

<div align="center">11</div>

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)     solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)     open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)     as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)     settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)     sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)     upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)     exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)     protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)     obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

HMIT Appx. 01534

officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x) without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi) retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay, such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii) prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii) prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv) to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv) subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

HMIT Appx. 01535

(xvi)   request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii)   take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii)   take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix)   exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx)   evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi)   with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the "Authorized Acts").

(d)   The Claimant Trustee and the Oversight Committee will enter into an agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's authority with respect to certain other assets, including certain portfolio company assets (the "Other Assets").

(e)   The Claimant Trustee has the power and authority to act as trustee of the Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns, is removed, or is otherwise unable to serve for any reason.

3.3   Limitation of Authority.

(a)   Notwithstanding anything herein to the contrary, the Claimant Trust and the Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Claimant Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents or the Confirmation Order.

(b)   Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority

HMIT Appx. 01536

of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein, in order to:

        (i)      terminate or extend the term of the Claimant Trust;

        (ii)     prosecute, litigate, settle or otherwise resolve any of the Material Claims;

        (iii)    except otherwise set forth herein, sell or otherwise monetize any assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

        (iv)    except for cash distributions made in accordance with the terms of this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with Article IV of the Plan;

        (v)     except for any distributions made in accordance with the terms of this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

        (vi)    reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

        (vii)   borrow as may be necessary to fund activities of the Claimant Trust;

        (viii)  determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

        (ix)    invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

        (x)     change the compensation of the Claimant Trustee;

        (xi)    subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

        (xii)   retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and

HMIT Appx. 01537

(ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

        (c)     [Reserved.]

     3.4    <u>Investment of Cash</u>.  The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; <u>provided</u>, <u>however</u> that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("<u>IRS</u>") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement).

     3.5    <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall be final and binding upon any and all Beneficiaries.

     3.6    <u>Term of Service</u>.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

     3.7    <u>Resignation</u>.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

     3.8    <u>Removal</u>.

        (a)     The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she

HMIT Appx. 01538

may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

(b)     To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute. Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9     Appointment of Successor.

(a)     Appointment of Successor. In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board. If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members. If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust. The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

(b)     Vesting or Rights in Successor Claimant Trustee. Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof. The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee. In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

(c)     Interim Claimant Trustee. During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "Interim Trustee") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a). The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder. Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

HMIT Appx. 01539

3.10 <u>Continuance of Claimant Trust</u>. The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee. In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, <u>provided</u> the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust. The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

3.11 <u>Claimant Trustee as "Estate Representative"</u>. The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Claimant Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; <u>provided</u> that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims. The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12 <u>Books and Records</u>.

(a) The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any

HMIT Appx. 01540

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)     The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)     The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13     Compensation and Reimbursement; Engagement of Professionals.

(a)     Compensation and Expenses.

(i)     Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

(ii)     Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

HMIT Appx. 01541

    (b)    <u>Professionals</u>.

        (i)    <u>Engagement of Professionals</u>.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

        (ii)    <u>Fees and Expenses of Professionals</u>.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

    3.14    <u>Reliance by Claimant Trustee</u>.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

    3.15    <u>Commingling of Claimant Trust Assets</u>.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

    3.16    <u>Delaware Trustee</u>.  The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee; <u>provided</u>, <u>however</u>, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as

HMIT Appx. 01542

expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust.

## ARTICLE IV.
## THE OVERSIGHT BOARD

4.1 <u>Oversight Board Members</u>. The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "<u>Disinterested Members</u>"). The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker. David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members; <u>provided</u>, <u>however</u>, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

4.2 <u>Authority and Responsibilities</u>.

(a) The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein. As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.7 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; <u>provided</u>, <u>however</u>, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

(b) The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

(c) The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

HMIT Appx. 01543

(d)      Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action  by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

(e)      Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds.  It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

4.3      Fiduciary Duties.  The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; provided, however, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; provided, further, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action.  In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust.  Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

4.4      Meetings of the Oversight Board.  Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly.  Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; provided, however, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board).  Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the

HMIT Appx. 01544

Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

4.5 <u>Unanimous Written Consent</u>. Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded. If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone. Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

4.6 <u>Manner of Acting</u>.

(a) A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); <u>provided</u> that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum. Except as set forth in Sections 3.3(c), 4.9(a), 5.2, 5.4, 6.1, 9.1, and 10, herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement. Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof. Any Member participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

(b) Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment. The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

(c) Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or

HMIT Appx. 01545

in connection with such matter or issue, other than solely as a holder of Trust Interests). A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "Conflicted Member" who shall not be entitled to vote or take part in any action with respect to such matter or issue. In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d) Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "Committee Member Claim Matter"). A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

4.7    Tenure of the Members of the Oversight Board. The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article X hereof. The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.7 below, or removal pursuant to Section 4.8 below.

4.8    Resignation. A Member of the Oversight Board may resign by giving not less than 90 days prior written notice thereof to the Claimant Trustee and other Members. Such resignation shall become effective on the earlier to occur of (i) the day specified in such notice and (ii) the appointment of a successor in accordance with Section 4.9 below.

4.9    Removal. A majority of the Oversight Board may remove any Member for Cause or Disability. If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein. Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

4.10    Appointment of a Successor Member.

(a) In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; provided, however, that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; provided, further, that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board. The appointment of a successor Member will be further

24

evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

(b) Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act. A successor Member will not be liable personally for any act or omission of a predecessor Member.

(c) Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

4.11    <u>Compensation and Reimbursement of Expenses</u>.    Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; <u>provided</u>, <u>however</u>, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member. Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

4.12    <u>Confidentiality</u>.    Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("<u>Confidential Trust Information</u>"), except as otherwise required by law. For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "<u>Member Affiliates</u>") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.11.

## <u>ARTICLE V.</u>
## <u>TRUST INTERESTS</u>

5.1    <u>Claimant Trust Interests</u>.

HMIT Appx. 01547

(a) General Unsecured Claim Trust Interests. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "GUC Beneficiaries"). The Claimant Trustee shall allocate to each Holder of an Allowed Class 8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims. The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

(b) Subordinated Claim Trust Interests. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "Subordinated Beneficiaries"). The Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9. The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests. The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

(c) Contingent Trust Interests. On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

5.2 Interests Beneficial Only. The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant

HMIT Appx. 01548

Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

5.3     Transferability of Trust Interests. No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause the Claimant Trust to become a public reporting company and/or make periodic reports under the Exchange Act (provided that it is not required to register under the Investment Company Act or register its securities under the Securities Act) to enable such disposition to be made. In the event that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such restrictions upon such disposition and other terms of this Agreement as are deemed necessary or appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

5.4     Registry of Trust Interests.

(a)     Registrar. The Claimant Trustee shall appoint a registrar, which may be the Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests as provided herein. The Registrar, if other than the Claimant Trustee, shall be an institution or person acceptable to the Oversight Board. For its services hereunder, the Registrar, unless it is the Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as a Claimant Trust Expense.

(b)     Trust Register. The Claimant Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the Registrar may prescribe.

(c)     Access to Register by Beneficiaries. The Claimant Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's Trust Interest.

HMIT Appx. 01549

5.5     Exemption from Registration.  The Parties hereto intend that the rights of the Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Claimant Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act.  The Trust Interests shall not have consent or voting rights or otherwise confer on the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Claimant Trustee under this Agreement.

5.6     Absolute Owners.  The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7     Effect of Death, Incapacity, or Bankruptcy.  The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8     Change of Address.  Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Claimant Trustee.  Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9     Standing.  No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets.  No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10    Limitations on Rights of Claimant Trust Beneficiaries.

        (a)     The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

        (b)     In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; provided, however, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

HMIT Appx. 01550

(c)      A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed.  A request for such bond can be made by the Claimant Trust or by Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

(d)      Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas.  Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

(e)      The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

## ARTICLE VI.
## DISTRIBUTIONS

6.1    Distributions.

(a)      Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7.  Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board.  The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

(b)      At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

29

HMIT Appx. 01551

(c)     All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

6.2     <u>Manner of Payment or Distribution</u>.  All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3     <u>Delivery of Distributions</u>.  All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

6.4     <u>Disputed Claims Reserves</u>.  There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.  The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

6.5     <u>Undeliverable Distributions and Unclaimed Property</u>.  All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

6.6     <u>*De Minimis* Distributions</u>.  Distributions with a value of less than $100 will be treated in accordance with the Plan.

6.7     <u>United States Claimant Trustee Fees and Reports</u>.  **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.  After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

## <u>ARTICLE VII.</u>
## <u>TAX MATTERS</u>

7.1     <u>Tax Treatment and Tax Returns</u>.

(a)     It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.  Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes

HMIT Appx. 01552

where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c) The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2 <u>Withholding</u>. The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary. As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

## <u>ARTICLE VIII.</u><br><u>STANDARD OF CARE AND INDEMNIFICATION</u>

8.1 <u>Standard of Care</u>. None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee, Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise

HMIT Appx. 01553

jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence.  None of the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2    <u>Indemnification</u>.    The Claimant Trustee (including each former Claimant Trustee), Delaware Trustee, Oversight Board, and all past and present Members (collectively, in their capacities as such, the "<u>Indemnified Parties</u>") shall be indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence.  If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; <u>provided</u>, <u>however</u>, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm.  The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; <u>provided</u> that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, misconduct, or negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; <u>provided</u>, <u>further</u>, that any such repayment obligation shall be unsecured and interest free.  The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties.

HMIT Appx. 01554

For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such. The indemnification provided hereby shall be a Claimant Trust Expense and shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein.

8.3     <u>No Personal Liability</u>.     Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4     <u>Other Protections</u>.  To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

## ARTICLE IX.
## TERMINATION

9.1     <u>Duration</u>.  The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2     <u>Distributions in Kind</u>.  Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

HMIT Appx. 01555

9.3 <u>Continuance of the Claimant Trustee for Winding Up</u>. After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "<u>Termination Date</u>"). Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4 <u>Termination of Duties</u>. Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5 <u>No Survival</u>. The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, <u>provided</u> that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

<div align="center">

**ARTICLE X.**
**AMENDMENTS AND WAIVER**

</div>

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; <u>provided</u> that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement.

<div align="center">

**ARTICLE XI.**
**MISCELLANEOUS**

</div>

11.1 <u>Trust Irrevocable</u>. Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2 <u>Bankruptcy of Claimant Trust Beneficiaries</u>. The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not

**HMIT Appx. 01556**

permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

11.3 <u>Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets</u>. No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4 <u>Agreement for Benefit of Parties Only</u>. Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in respect of this Agreement. The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

11.5 <u>Notices</u>. All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a) If to the Claimant Trustee:

Claimant Trustee
c/o **[insert contact info for Claimant Trustee]**

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
Ira Kharasch (ikharasch@pszjlaw.com)
Gregory Demo (gdemo@pszjlaw.com)

Notice mailed shall be effective on the date mailed or sent. Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

11.6 <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.7 <u>Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.8 <u>Binding Effect, etc.</u> All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the

HMIT Appx. 01557

Claimant Trust Beneficiaries, and their respective successors and assigns. Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

11.9 <u>Headings; References</u>. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10 <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11 <u>Consent to Jurisdiction</u>. Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12 <u>Transferee Liabilities</u>. The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement. In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims. If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

HMIT Appx. 01558

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By:    _____
       James P. Seery, Jr.
       Chief Executive Officer and
       Chief Restructuring Officer

Claimant Trustee

By:    _____
       James P. Seery, Jr., not individually but
solely in his capacity as the Claimant Trustee

37

# EXHIBIT S

HMIT Appx. 01560

Case 19-34054-sgj11 Doc 1811-3 Filed 01/22/21 Entered 01/22/21 19:14:23 Page 2 of 39
Case 3:21-cv-00881-X Document 172-11 Filed 12/15/23 Page 366 of 968 PageID 15948
*DRAFT*

# CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [_____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and (vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.
[2]   For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1     Certain Definitions.  Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.  For all purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)     "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)     "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(d)     "Claimant Trust Agreement" means this Agreement.

2

(e)     "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)     "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)     "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)     "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)     "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)     "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)     "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)     "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)     "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

3

HMIT Appx. 01563

(n) "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

(o) "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p) "Delaware Trustee" has the meaning set forth in the introduction hereof.

(q) "Disability" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r) "Disinterested Members" has the meaning set forth in Section 4.1 hereof.

(s) "Disputed Claims Reserve" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [(in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board)] to be sufficient to pay Disputed Claims under the Plan.

(t) "Employees" means the employees of the Debtor set forth in the Plan Supplement.

(u) "Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v) "Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(w) "Equity Trust Interests" has the meaning given to it in Section 5.1(c) hereof.

(x) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(y) "General Unsecured Claim Trust Interests" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z) "GUC Beneficiaries" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa) "GUC Payment Certification" has the meaning given to it in Section 5.1(c) hereof.

4

(bb) "HarbourVest" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

(cc) "Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

(dd) "Investment Company Act" means the Investment Company Act of 1940, as amended.

(ee) "Litigation Sub-Trust" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff) "Litigation Sub-Trust Agreement" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg) "Litigation Trustee" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh) "Managed Funds" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii) "Material Claims" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj) "Member" means a Person that is member of the Oversight Board.

(kk) "New GP LLC" means the general partner of the Reorganized Debtor.

(ll) "Oversight Board" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan. Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

5

(mm) "Plan" has the meaning set forth in the Recitals hereof.

(nn) "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo) "PSZJ" means Pachulski Stang Ziehl & Jones LLP.

(pp) "Redeemer Committee" means the Redeemer Committee of the Highland Crusader Fund.

(qq) "Registrar" has the meaning given to it in Section 5.3(a) hereof.

(rr) "Reorganized Debtor Assets" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss) "Securities Act" means the Securities Act of 1933, as amended.

(tt) "Subordinated Beneficiaries" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu) "Subordinated Claim Trust Interests" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv) "TIA" means the Trust Indenture Act of 1939, as amended.

(ww) "Trust Interests" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx) "Trust Register" has the meaning given to it in Section 5.3(b) hereof.

(yy) "Trustees" means collectively the Claimant Trustee and Delaware Trustee.

(zz) "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa) "WilmerHale" Wilmer Cutler Pickering Hale & Dorr LLP.

6

1.2 <u>General Construction</u>. As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3 <u>Incorporation of the Plan</u>. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

<div align="center">

**ARTICLE II.**
**ESTABLISHMENT OF THE CLAIMANT TRUST**

</div>

2.1 <u>Creation of Name of Trust</u>.

(a) The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust." The Claimant Trustee shall be empowered to conduct all business and hold all property constituting the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

(b) The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

HMIT Appx. 01567

2.2     Objectives.

(a)     The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b)     It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3     Nature and Purposes of the Claimant Trust.

(a)     The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, provided, however, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust, pursuant to section

8

1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

      (b)    The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

      (i)    to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

      (ii)    to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

      (iii)    to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

      (iv)    to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

      (v)    to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

      (vi)    to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

      (vii)    to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

      (viii)    to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

      (ix)    to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

9

2.4 <u>Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust</u>.

(a) On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement. To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b) On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement. Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

(c) On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved. For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d) Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trust, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee. For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

HMIT Appx. 01570

2.5     Principal Office.  The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6     Acceptance.  The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7     Further Assurances.  The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8     Incidents of Ownership.  The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

## ARTICLE III.
## THE TRUSTEES

3.1     Role.  In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2     Authority.

(a)     In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.  The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.  The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)     The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; provided, however, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate.  To the extent that

11

any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)     solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)     open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)     as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)     settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)     sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)     upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)     exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)     protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)     obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board

12

solely in their capacities as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x) without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi) retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay, such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii) prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii) prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv) to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv) subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

13

(xvi) request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii) take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii) take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix) exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx) evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi) with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the "Authorized Acts").

(d) The Claimant Trustee and the Oversight Committee will enter into an agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's authority with respect to certain other assets, including certain portfolio company assets (the "Other Assets").

(e) The Claimant Trustee has the power and authority to act as trustee of the Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns, is removed, or is otherwise unable to serve for any reason.

3.3    Limitation of Authority.

(a) Notwithstanding anything herein to the contrary, the Claimant Trust and the Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Claimant Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents or the Confirmation Order.

(b) Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority

14

of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein, in order to:

        (i)      terminate or extend the term of the Claimant Trust;

        (ii)     prosecute, litigate, settle or otherwise resolve any of the Material Claims;

        (iii)    except otherwise set forth herein, sell or otherwise monetize any assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

        (iv)    except for cash distributions made in accordance with the terms of this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with Article IV of the Plan;

        (v)     except for any distributions made in accordance with the terms of this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

        (vi)    reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

        (vii)   borrow as may be necessary to fund activities of the Claimant Trust;

        (viii)  determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

        (ix)    invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

        (x)     change the compensation of the Claimant Trustee;

        (xi)    subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

        (xii)   retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and

15

(ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

        (c)     [Reserved.]

     3.4    <u>Investment of Cash</u>.  The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; <u>provided</u>, <u>however</u> that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("<u>IRS</u>") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement).

     3.5    <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall be final and binding upon any and all Beneficiaries.

     3.6    <u>Term of Service</u>.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

     3.7    <u>Resignation</u>.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

     3.8    <u>Removal</u>.

        (a)    The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she

16

may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

(b)     To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9     Appointment of Successor.

(a)     Appointment of Successor.  In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust.  The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

(b)     Vesting or Rights in Successor Claimant Trustee.  Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee.  In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

(c)     Interim Claimant Trustee.  During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "Interim Trustee") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

17

3.10    <u>Continuance of Claimant Trust</u>.    The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee.    In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, <u>provided</u> the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust. The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

3.11    <u>Claimant Trustee as "Estate Representative"</u>.    The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Claimant Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; <u>provided</u> that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims.    The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order.    All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12    <u>Books and Records</u>.

(a)    The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.    Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein.    Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any

18

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)     The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)     The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)     Compensation and Expenses.

(i)     Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, including any severance, as agreed to by the Claimant Trustee, on the one hand, and the Committee, if agreed upon prior to the Effective Date, or the Oversight Board, if agreed upon on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

(ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

19

    (b)    <u>Professionals</u>.

    (i)    <u>Engagement of Professionals</u>.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

    (ii)    <u>Fees and Expenses of Professionals</u>.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

    3.14    <u>Reliance by Claimant Trustee</u>.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

    3.15    <u>Commingling of Claimant Trust Assets</u>.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

    3.16    <u>Delaware Trustee</u>.  The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee; <u>provided, however,</u> that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as

20

expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust.

## ARTICLE IV.
## THE OVERSIGHT BOARD

4.1 <u>Oversight Board Members</u>. The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "<u>Disinterested Members</u>"). The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker. David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members; <u>provided</u>, <u>however</u>, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

4.2 <u>Authority and Responsibilities</u>.

(a) The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein. As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.7 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; <u>provided</u>, <u>however</u>, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

(b) The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

(c) The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

21

   (d) Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

   (e) Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds. It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

   4.3 <u>Fiduciary Duties</u>. The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; <u>provided</u>, <u>however</u>, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; <u>provided</u>, <u>further</u>, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action. In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust. Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

   4.4 <u>Meetings of the Oversight Board</u>. Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly. Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; <u>provided</u>, <u>however</u>, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board). Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

22

    4.5   <u>Unanimous Written Consent</u>.  Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded.  If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone.  Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

    4.6   <u>Manner of Acting</u>.

    (a)   A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); <u>provided</u> that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum.  Except as set forth in Sections 3.3(c), 4.9(a), 5.2, 5.4, 6.1, 9.1, and 10, herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement.  Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof.  Any Member participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

    (b)   Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

    (c)   Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Trust Interests).  A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "<u>Conflicted Member</u>" who shall not be entitled to vote or take part in any action with respect to

23

such matter or issue.  In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d)     Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "Committee Member Claim Matter").  A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

4.7     Tenure of the Members of the Oversight Board.  The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article X hereof. The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.7 below, or removal pursuant to Section 4.8 below.

4.8     Resignation.  A Member of the Oversight Board may resign by giving not less than 90 days prior written notice thereof to the Claimant Trustee and other Members.  Such resignation shall become effective on the earlier to occur of (i) the day specified in such notice and (ii) the appointment of a successor in accordance with Section 4.9 below.

4.9     Removal.  A majority of the Oversight Board may remove any Member for Cause or Disability.  If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein.  Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

4.10     Appointment of a Successor Member.

(a)     In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; provided, however, that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; provided, further, that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board.  The appointment of a successor Member will be further evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

24

(b)     Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act. A successor Member will not be liable personally for any act or omission of a predecessor Member.

(c)     Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

4.11   <u>Compensation and Reimbursement of Expenses</u>.   Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; <u>provided</u>, <u>however</u>, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member. Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

4.12   <u>Confidentiality</u>.   Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("<u>Confidential Trust Information</u>"), except as otherwise required by law. For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "<u>Member Affiliates</u>") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.11.

<div align="center"><b>ARTICLE V.<br>TRUST INTERESTS</b></div>

5.1   <u>Claimant Trust Interests</u>.

(a)     <u>General Unsecured Claim Trust Interests</u>. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "<u>GUC Beneficiaries</u>"). The Claimant Trustee shall allocate to each Holder of an Allowed Class

25

8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims. The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

(b) <u>Subordinated Claim Trust Interests</u>. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "<u>Subordinated Beneficiaries</u>"). The Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9. The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests. The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

(c) <u>Contingent Trust Interests</u>. On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "<u>Equity Holders</u>"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "<u>GUC Payment Certification</u>"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "<u>Equity Trust Interests</u>." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

5.2 <u>Interests Beneficial Only</u>. The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

26

5.3     Transferability of Trust Interests.  No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause the Claimant Trust to become a public reporting company and/or make periodic reports under the Exchange Act (provided that it is not required to register under the Investment Company Act or register its securities under the Securities Act) to enable such disposition to be made.  In the event that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such restrictions upon such disposition and other terms of this Agreement as are deemed necessary or appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

5.4     Registry of Trust Interests.

(a)     Registrar.  The Claimant Trustee shall appoint a registrar, which may be the Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests as provided herein.  The Registrar, if other than the Claimant Trustee, shall be an institution or person acceptable to the Oversight Board.  For its services hereunder, the Registrar, unless it is the Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as a Claimant Trust Expense.

(b)     Trust Register.  The Claimant Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the Registrar may prescribe.

(c)     Access to Register by Beneficiaries.  The Claimant Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's Trust Interest.

5.5     Exemption from Registration.  The Parties hereto intend that the rights of the Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Claimant Trustee may amend this

27

HMIT Appx. 01587

Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act. The Trust Interests shall not have consent or voting rights or otherwise confer on the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Claimant Trustee under this Agreement.

5.6     Absolute Owners.  The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7     Effect of Death, Incapacity, or Bankruptcy.  The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8     Change of Address.  Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Claimant Trustee.  Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9     Standing.  No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets.  No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10     Limitations on Rights of Claimant Trust Beneficiaries.

(a)     The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

(b)     In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; provided, however, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

(c)     A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed.  A request for such bond can be made by the Claimant Trust or by

28

HMIT Appx. 01588

Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

(d)     Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas. Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

(e)     The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

## ARTICLE VI.
## DISTRIBUTIONS

6.1     Distributions.

(a)     Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7. Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board. The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

(b)     At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

(c)     All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

29

6.2    Manner of Payment or Distribution.  All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3    Delivery of Distributions.  All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

6.4    Disputed Claims Reserves.  There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.  The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

6.5    Undeliverable Distributions and Unclaimed Property.  All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

6.6    *De Minimis* Distributions.  Distributions with a value of less than $100 will be treated in accordance with the Plan.

6.7    United States Claimant Trustee Fees and Reports.  **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.  After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

## ARTICLE VII.
## TAX MATTERS

7.1    Tax Treatment and Tax Returns.

(a)    It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.  Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets

30

for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b)     The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c)     The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2     <u>Withholding</u>.  The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof.  Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary.  As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

## **ARTICLE VIII.**
## **STANDARD OF CARE AND INDEMNIFICATION**

8.1     <u>Standard of Care</u>.  None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee, Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence.  None of

31

the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2     Indemnification.  The Claimant Trustee (including each former Claimant Trustee), Delaware Trustee, Oversight Board, and all past and present Members (collectively, in their capacities as such, the "Indemnified Parties") shall be indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence.  If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; provided, however, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm.   The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; provided that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, misconduct, or negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; provided, further, that any such repayment obligation shall be unsecured and interest free.   The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties.  For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such.  The indemnification provided hereby shall be a Claimant Trust Expense and

HMIT Appx. 01592

shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein.

8.3     No Personal Liability.  Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4     Other Protections.  To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

## ARTICLE IX.
## TERMINATION

9.1     Duration.  The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2     Distributions in Kind.  Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

9.3     Continuance of the Claimant Trustee for Winding Up.  After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been

33

fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "Termination Date"). Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4  **Termination of Duties**. Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5  **No Survival**. The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, provided that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

## ARTICLE X.
## AMENDMENTS AND WAIVER

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; provided that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement.

## ARTICLE XI.
## MISCELLANEOUS

11.1  **Trust Irrevocable**. Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2  **Bankruptcy of Claimant Trust Beneficiaries**. The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

HMIT Appx. 01594

11.3  <u>Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets</u>.  No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4  <u>Agreement for Benefit of Parties Only</u>.  Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in respect of this Agreement.  The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

11.5  <u>Notices</u>.  All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a)  If to the Claimant Trustee:

Claimant Trustee
c/o **[insert contact info for Claimant Trustee]**

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn:  Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
Ira Kharasch (ikharasch@pszjlaw.com)
Gregory Demo (gdemo@pszjlaw.com)

Notice mailed shall be effective on the date mailed or sent.  Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

11.6  <u>Severability</u>.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.7  <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.8  <u>Binding Effect, etc.</u>  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the Claimant Trust Beneficiaries, and their respective successors and assigns.  Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

35

11.9   Headings; References.   The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10   Governing Law.   This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11   Consent to Jurisdiction.   Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement or the Plan, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board, or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12   Transferee Liabilities.   The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.   In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims.   If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

HMIT Appx. 01596

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By: _____
        James P. Seery, Jr.
        Chief Executive Officer and
        Chief Restructuring Officer

Claimant Trustee

By: _____
        James P. Seery, Jr., not individually but
solely in his capacity as the Claimant Trustee

37

HMIT Appx. 01597

Document comparison by Workshare 9.5 on Friday, January 22, 2021 4:38:30 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/41280/9 |
| Description | DOCS_NY-#41280-v9-Highland_-_Claimant_Trust_Agreement |
| Document 2 ID | PowerDocs://DOCS_NY/41280/10 |
| Description | DOCS_NY-#41280-v10-Highland_-_Claimant_Trust_Agreement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 11 |
| Deletions | 5 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 16 |

HMIT Appx. 01598

# EXHIBIT T

HMIT Appx. 01599

*Draft*

## LITIGATION SUB-TRUST AGREEMENT

This Litigation Sub-Trust Agreement, effective as of _____, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among James P. Seery, Jr., as trustee of the Highland Claimant Trust (the "Claimant Trustee"), [____] as Delaware Trustee, and Marc S. Kirschner as trustee (the "Litigation Trustee," and together with the Claimant Trustee and Delaware Trustee, the "Parties") of the Litigation Sub-Trust for the benefit of the Claimant Trust as sole Litigation Sub-Trust Beneficiary.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Litigation Sub-Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Litigation Sub-Trust Assets are hereby to be transferred by the Claimant Trust to the Litigation Sub-Trust (each as defined herein) created and evidenced by this Agreement so that (i) Estate Claims can be investigated, prosecuted, settled, abandoned, resolved, and otherwise monetized as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; (ii) proceeds of Estate Claims can be remitted to the Claimant Trust as Claimant Trust Assets for distribution to the Claimant Trust Beneficiaries (as defined in the Claimant Trust Agreement) in accordance with the Plan and Claimant Trust Agreement; (iii) the Litigation Trustee can investigate, litigate, settle, or otherwise resolve any Filed Claims relating to the Estate Claims, including the Employee Claims; and (iv) administrative services relating to the activities of the Litigation Sub-Trust can be performed by the Litigation Trustee.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Litigation Trustee and the Claimant Trustee have executed this Agreement for the benefit of the Claimant Trust as provided for in the Plan.

TO HAVE AND TO HOLD unto the Litigation Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Litigation Sub-Trust in accordance with Article IX hereof, this Litigation Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Litigation Sub-Trust Assets are to be strictly held and applied by the Litigation Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1    Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.  For all purposes of this Agreement, the following terms shall have the following meanings:

(a)    "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(b)    "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(c)    "Claimant Trust Agreement" means the Claimant Trust Agreement dated [     ], 2021, by and between the Debtor, Claimant Trustee, and Delaware Trustee.

(d)    "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" under the Claimant Trust Agreement and as defined in the Plan, and any successor Claimant Trustee who may be appointed pursuant to the terms of the Claimant Trust Agreement.

(e)    "<u>Claimant Trust</u>" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to the Claimant Trust Agreement.

(f)    "<u>Delaware Statutory Trust Act</u>" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(g)    "<u>Delaware Trustee</u>" has the meaning set forth in the Claimant Trust Agreement.

(h)    "<u>Disability</u>" means as a result of the Litigation Trustee's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Litigation Trustee, the Litigation Trustee has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(i)    "<u>Estate Claims</u>" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [Docket No. 354].

(j)    "<u>Employee</u>" means the employees of the Debtor set forth in the Plan Supplement.

(k)    "<u>Employee Claims</u>" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(l)    "<u>Litigation Sub-Trust</u>" means the sub-trust created pursuant to this Agreement, and in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d).

(m)    "<u>Litigation Sub-Trust Agreement</u>" means this Agreement.

(n)    "<u>Litigation Sub-Trust Assets</u>" means the Estate Claims and the Litigation Sub-Trust Expense Cash Reserve.

(o)    "<u>Litigation Sub-Trust Beneficiary</u>" means the Claimant Trust.

(p)    "<u>Litigation Sub-Trust Expenses</u>" means the costs, expenses, liabilities and obligations incurred by the Litigation Sub-Trust and/or the Litigation Trustee in administering and conducting the affairs of the Litigation Sub-Trust, and otherwise carrying out the terms of the Litigation Sub-Trust and the Plan on behalf of the Litigation Sub-Trust, including without any limitation, any taxes owed by the Litigation Sub-Trust, and the fees and expenses of the Litigation Trustee and professional persons retained by the Litigation Sub-Trust or Litigation Trustee in accordance with Article 3.12(b) of this Agreement.

(q)    "<u>Litigation Sub-Trust Expense Cash Reserve</u>" means $[•] million in Cash to be funded by the Debtor or Reorganized Debtor, as applicable, pursuant to the Plan into a bank account of the Litigation Sub-Trust (or of the Claimant Trust for the benefit of the

HMIT Appx. 01602

Litigation Sub-Trust) on or before the Effective Date for the purpose of paying Litigation Sub-Trust Expenses in accordance herewith.

(r)     "Litigation Trustee" means Marc S. Kirschner as the initial "Litigation Trustee" hereunder and under the Plan, and any successor Litigation Trustee who may be appointed pursuant to the terms of this Agreement.

(s)     "Oversight Board" has the meaning set forth in the Claimant Trust Agreement.

(t)     "Plan" has the meaning set forth in the Recitals hereof.

(u)     "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(v)     "Securities Act" means the Securities Act of 1933, as amended.

(w)     "TIA" means the Trust Indenture Act of 1939, as amended.

(x)     "Trust Interests" means the trust interest(s) to be distributed to the Claimant Trust as the sole Litigation Sub-Trust Beneficiary.

(y)     "Trust Register" has the meaning given to it in Section 5.3(b) hereof.

1.2     General Construction. As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3     Incorporation of the Plan. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

HMIT Appx. 01603

## ARTICLE II.
## ESTABLISHMENT OF THE LITIGATION SUB-TRUST

2.1     Establishment of Sub-Trust.

(a)     The Parties, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish a statutory trust under the Delaware Statutory Trust Act on behalf of the Claimant Trust as the sole Litigation Sub-Trust Beneficiary, which shall be known as the "Highland Litigation Sub-Trust," on the terms set forth herein. The Litigation Trustee may use this name in accordance with the terms and conditions set forth herein as the Litigation Trustee sees fit.

(b)     The Litigation Trustee shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in his capacity as Litigation Trustee, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

2.2     Nature and Purposes of the Litigation Sub-Trust. The Litigation Sub-Trust is organized and established as a trust for the purpose of monetizing the Estate Claims and making distributions to Litigation Sub-Trust Beneficiary in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Litigation Sub-Trust shall serve as a mechanism for investigating, prosecuting, settling, resolving, and otherwise monetizing all Estate Claims and distributing the proceeds of such Estate Claims to the Claimant Trust in a timely fashion in accordance with the Plan, the Confirmation Order, and this Agreement. The Litigation Sub-Trust and Litigation Trustee shall have and retain any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Estate Claim as of the Petition Date. Except as otherwise provided herein, the Litigation Sub-Trust shall have the sole responsibility for the pursuit and settlement of the Estate Claims, and, subject to the terms of the Claimant Trustee Agreement, the sole power and authority to allow or settle and compromise any Claims related to the Estate Claims, including, without limitation, Employee Claims. For the avoidance of doubt, the Litigation Sub-Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).

2.3     Transfer of Assets and Rights to the Litigation Sub-Trust.

(a)     On or as soon as practicable after the Effective Date, the Claimant Trust shall automatically an irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims, Employee Claims, and Privileges. For purposes of the transfer of documents, the Litigation Sub-Trust is an assignee and successor to the Debtor in respect of the Estate Claims and Employee Claims and shall be treated as such in any review of confidentiality restrictions in requested documents. For the avoidance of doubt, following the Effective Date, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

HMIT Appx. 01604

(b)     Until the Litigation Sub-Trust terminates pursuant to the terms hereof, legal title to the Estate Claims shall be vested at all times in the Litigation Sub-Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Estate Claims to be vested in the Litigation Trustee, in which case title shall be deemed to be vested in the Litigation Trustee, solely in his capacity as Litigation Trustee.  For purposes of such jurisdictions, the term Litigation Sub-Trust, as used herein, shall be read to mean the Litigation Trustee.

(c)     In accordance with section 1123(d) of the Bankruptcy Code, the Litigation Trustee may enforce all rights to commence and pursue, as appropriate, any and all Estate Claims after the Effective Date.  No Person or entity may rely on the absence of a specific reference in the Plan to any Estate Claim against them as any indication that the Litigation Trustee will not pursue any and all available Estate Claims or objections against them.  Unless any Estate Claim against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trustee expressly reserves all Estate Claims for later adjudication, and, therefore, no preclusion doctrine including the doctrine of res judicata, collateral, estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Claims upon, after, or as a consequence of the Confirmation Order.

2.4     <u>Principal Office</u>.   The principal office of the Litigation Sub-Trust shall be maintained by the Litigation Trustee at the following address: Goldin Associates, a Teneo Company, 350 Fifth Avenue, New York, New York 10118.

2.5     <u>Acceptance</u>.   The Litigation Trustee accepts the Litigation Sub-Trust imposed by this Agreement and agrees to observe and perform that Litigation Sub-Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.6     <u>Further Assurances</u>.   The Claimant Trustee and any successors thereof will, upon reasonable request of the Litigation Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Litigation Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Litigation Trustee the powers, instruments or funds in trust hereunder.

2.7     <u>Incidents of Ownership</u>.   The Claimant Trust shall be the sole beneficiary of the Litigation Sub-Trust and the Litigation Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

<div align="center">

## <u>ARTICLE III.</u>
## <u>THE LITIGATION TRUSTEE</u>

</div>

3.1     <u>Role</u>.   In furtherance of and consistent with the purpose of the Litigation Sub-Trust, the Plan, and this Agreement, the Litigation Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Litigation Trustee with respect to the Litigation Sub-Trust Assets for the benefit of the Litigation Sub-Trust Beneficiary and maintain, manage, and take action on behalf of the Litigation Sub-Trust.

<div align="center">6</div>

3.2    Authority.

(a)    In connection with the administration of the Litigation Sub-Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee shall, in an expeditious but orderly manner, investigate, prosecute, settle, and otherwise resolve the Estate Claims. The Litigation Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Litigation Sub-Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.

(b)    The Litigation Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement). To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Estate Claims or Employee Claims prior to the Effective Date, on the Effective Date the Litigation Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "Marc Kirschner, not individually but solely as Litigation Trustee for the Highland Litigation Sub-Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Litigation Trustee shall have the power and authority to:

(i)    hold legal title to any and all rights in or arising from the Litigation Sub-Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Sub-Trust (including any proceeds of the Litigation Sub-Trust Assets);

(ii)    perform the duties, exercise the powers, and asserts the rights of a trustee under sections 1123(b)(3)(B) of the Bankruptcy Code with respect to the Litigation Sub-Trust Assets, including the right to assert claims, defenses, offsets, and privileges;

(iii)    subject to any approval of the Oversight Board that may be required under Section 3.3(b), protect and enforce the rights of the Litigation Sub-Trust with respect to any Litigation Sub-Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceeds, or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(iv)    determine and satisfy any and all liabilities created, incurred, or assumed by the Litigation Sub-Trust;

(v)    subject to any approval of the Oversight Board that may be required under Section 3.3(b), investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, all

7

Estate Claims, Employee Claims, or any other Causes of Action in favor of or against the Litigation Sub-Trust;

(vi)  with respect to any Estate Claim, avoid and recover transfers of the Debtor's property as may be permitted by the Bankruptcy Code or applicable state law;

(vii)  subject to applicable law, seek the examination of any Entity or Person with respect to the Estate Claims;

(viii)  make all payments relating to the Litigation Sub-Trust Assets;

(ix)  assess, enforce, release, or waive any privilege or defense on behalf of the Litigation Sub-Trust, the Litigation Sub-Trust Assets, or the Litigation Sub-Trust Beneficiary, if applicable;

(x)  prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax returns, information returns, and other required documents with respect to the Litigation Sub-Trust, and pay taxes properly payable by the Litigation Sub-Trust;

(xi)  if not otherwise covered by insurance coverage obtained by the Claimant Trust, obtain reasonable insurance coverage with respect to any liabilities and obligations of the Litigation Trustee, solely in his capacity as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Litigation Sub-Trust Expense and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Reserve;

(xii)  without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Litigation Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Litigation Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Litigation Trustee shall be Litigation Sub-Trust Expenses and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Cash Reserve;

(xiii)  to the extent applicable, assert, enforce, release, or waive any Privilege or defense on behalf of the Litigation Sub-Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Litigation Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xiv)  take all steps and execute all instruments and documents necessary to effectuate the purpose of the Litigation Sub-Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the

HMIT Appx. 01607

Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder; and

(xv)     exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order (the foregoing subparagraphs (i)-(xv) being collectively, the "Authorized Acts").

(d)     The Litigation Trustee has the power and authority to act as trustee of the Litigation Sub-Trust and perform the Authorized Acts through the date such Litigation Trustee resigns, is removed, or is otherwise unable to serve for any reason.

(e)     Any determinations by the Liquidation Trustee, under the direction of the Oversight Board, with respect to the amount or timing of settlement or other disposition of any Estate Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Litigation Sub-Trust Beneficiary and all other parties of interest following the entry of an order of a court of competent jurisdiction approving such settlement or other disposition to the extent required or obtained.

3.3     Limitation of Authority.

(a)     Notwithstanding anything herein to the contrary, the Litigation Sub-Trust and the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Estate Claims as required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, or (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement.

(b)     Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Litigation Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 of the Claimant Trust Agreement, in order to:

(i)     terminate or extend the term of the Litigation Sub-Trust;

(ii)     commence litigation with respect to any Estate Claims and, if applicable under the terms of the Claimant Trust Agreement, the Employee Claims, including, without limitation, to (x) litigate, resolve, or settle coverage and/or the liability of any insurer under any insurance policy or legal action related thereto, or (y) pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law;

(iii)     settle, dispose of, or abandon any Estate Claims (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Estate Claim);

(iv)     borrow funds as may be necessary to fund litigation or other costs of the Litigation Sub-Trust;

HMIT Appx. 01608

(v) reserve or retain any cash or cash equivalents in the Litigation Sub-Trust Cash Reserve in an amount reasonably necessary to meet claims and contingent liabilities;

(vi) change the compensation of the Litigation Trustee; and

(vii) retain counsel, experts, advisors, or any other professionals.

(c) [Reserved]

3.4 <u>Binding Nature of Actions</u>. All actions taken and determinations made by the Litigation Trustee in accordance with the provisions of this Agreement shall be final and binding upon the Litigation Sub-Trust Beneficiary.

3.5 <u>Term of Service</u>. The Litigation Trustee shall serve as the Litigation Trustee for the duration of the Litigation Sub-Trust, subject to death, resignation or removal.

3.6 <u>Resignation</u>. The Litigation Trustee may resign as trustee of the Litigation Sub-Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation. The Litigation Trustee shall continue to serve as Litigation Trustee after delivery of the Litigation Trustee's resignation until the proposed effective date of such resignation, unless the Litigation Trustee and a [simple majority] of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Litigation Trustee in accordance with Section 3.8 hereof becomes effective.

3.7 <u>Removal</u>.

(a) The Litigation Trustee may be removed by a [simple majority] vote of the Oversight Board for Cause, immediately upon notice thereof, or without Cause, upon [60 days'] prior written notice.

(b) To the extent there is any dispute regarding the removal of a Litigation Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute. Notwithstanding the foregoing, the Litigation Trustee will continue to serve as the Litigation Trustee after his removal until the earlier of (i) the time when a successor Litigation Trustee will become effective in accordance with Section 3.8 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.8 <u>Appointment of Successor</u>.

(a) <u>Appointment of Successor</u>. In the event of a vacancy by reason of the death, Disability, or removal of the Litigation Trustee, or prospective vacancy by reason of resignation, a successor Litigation Trustee shall be selected by a [simple majority] vote of the Oversight Board. If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Litigation Trustee on motion of the Members. If a final decree has been entered closing the Chapter 11 Case, the Litigation Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Litigation

10

Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Litigation Sub-Trust, or the Claimant Trust on behalf of the Litigation Sub-Trust. The successor Litigation Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Litigation Trustee.

(b)     Vesting or Rights in Successor Litigation Trustee.   Every successor Litigation Trustee appointed hereunder shall execute, acknowledge, and deliver to the Litigation Sub-Trust, the Claimant Trustee, the exiting Litigation Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.   The successor Litigation Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Litigation Trustee except that the successor Litigation Trustee shall not be liable for the acts or omissions of the retiring Litigation Trustee.   In no event shall the retiring Litigation Trustee be liable for the acts or omissions of the successor Litigation Trustee.

(c)     Interim Litigation Trustee.   During any period in which there is a vacancy in the position of Litigation Trustee, the Oversight Board shall appoint one of its Members or the Claimant Trustee to serve as the interim Litigation Trustee (the "Interim Trustee") until a successor Litigation Trustee is appointed pursuant to Section 3.8(a).   The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder.   Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board or Claimant Trustee, as applicable, merely by such Person's appointment as Interim Trustee.

3.9     Continuance of Litigation Sub-Trust.   The death, resignation, or removal of the Litigation Trustee shall not operate to terminate the Litigation Sub-Trust created by this Agreement or to revoke any existing agency (other than any agency of the Litigation Trustee as the Litigation Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Litigation Trustee.   In the event of the resignation or removal of the Litigation Trustee, the Litigation Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Litigation Trustee's capacity under this Agreement and the conveyance of the Estate Claims then held by the exiting Litigation Trustee to the successor Litigation Trustee; (ii) deliver to the successor Litigation Trustee all non-privileged documents, instruments, records, and other writings relating to the Litigation Sub-Trust as may be in the possession or under the control of the exiting Litigation Trustee, provided, the exiting Litigation Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Litigation Trustee and the cost of making such copies shall be a Litigation Sub-Trust Expense to be paid by the Litigation Sub-Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Litigation Trustee's obligations and functions by his successor, provided the fees and expenses of such assistance and cooperation shall be paid to the exiting Litigation Trustee by the Litigation Sub-Trust.   The exiting Litigation Trustee shall irrevocably appoint the successor Litigation Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Litigation Trustee is obligated to perform under this Section 3.9.

11

3.10 <u>Litigation Trustee as "Estate Representative"</u>. The Litigation Trustee will be the exclusive trustee of the Litigation Sub-Trust Assets, for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Estate Claims, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement. The Litigation Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Estate Claims, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interests constituting or relating to Estate Claims are preserved and retained and may be enforced by the Litigation Trustee as an Estate Representative.

3.11 <u>Books and Records</u>.

(a) The Litigation Trustee shall maintain, in respect of the Litigation Sub-Trust and the Claimant Trust, books and records pertinent to Estate Claims in its possession and the income of the Litigation Sub-Trust and payment of expenses, liabilities, and claims against or assumed by the Litigation Sub-Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Sub-Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Sub-Trust, or as a condition for managing any payment or distribution out of the Litigation Sub-Trust. Notwithstanding the foregoing, the Litigation Trustee shall to retain such books and records, and for such periods, with respect to any Reorganized Debtor Assets as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

(b) The Litigation Trustee may dispose some or all of the books and records maintained by the Litigation Trustee at the later of (i) such time as the Litigation Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Litigation Sub-Trust, including with respect to the Estate Claims, or (ii) upon the termination and winding up of the Litigation Sub-Trust under Article IX of this Agreement.

3.12 <u>Reports</u>.

(a) <u>Financial and Status Reports</u>. The fiscal year of the Litigation Sub-Trust shall be the calendar year. Within 90 days after the end of each calendar year during the term of the Litigation Sub-Trust, and within 45 days after the end of each calendar quarter during (other than the fourth quarter) the term of the Litigation Sub-Trust and as soon as practicable upon termination of the Litigation Sub-Trust, the Litigation Trustee shall make available upon request to the Oversight Board or Litigation Sub-Trust Beneficiary appearing on its records as of the end of such period or such date of termination, a written report including: (i) unaudited financial statements of the Litigation Sub-Trust for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant

HMIT Appx. 01611

employed by the Litigation Trustee) reflecting the result of such agreed-upon procedures relating to the financial accounting administration of the Litigation Sub-Trust as proposed by the Litigation Trustee; (ii) a summary description of any action taken by the Litigation Sub-Trust that, in the judgment of the Litigation Trustee, materially affects the Litigation Sub-Trust and of which notice has not previously been given to the Oversight Board or Litigation Sub-Trust Beneficiary, <u>provided</u>, that any such description shall not include any privileged or confidential information of the Litigation Trustee; and (iii) a description of the progress of liquidating the Litigation Sub-Trust Assets and making distributions to the Litigation Sub-Trust Beneficiary and any other material information relating to the Litigation Sub-Trust Assets and the administration of the Litigation Sub-Trust deemed appropriate to be disclosed by the Litigation Trustee, which description shall include a written report detailing, among other things, the litigation status of the Estate Claims transferred to the Litigation Sub-Trust, any settlements entered into by the Litigation Sub-Trust with respect to the Estate Claims, the proceeds recovered to date from Estate Claims, and the distributions made by the Litigation Sub-Trust.

(b) <u>Annual Plan and Budget</u>. If instructed by the Oversight Board, the Litigation Trustee shall prepare and submit to the Oversight Board for approval an annual plan and budget in such detail as reasonably requested.

3.13 <u>Compensation and Reimbursement; Engagement of Professionals</u>.

(a) <u>Compensation and Expenses</u>.

(i) <u>Compensation</u>. As compensation for any services rendered by the Litigation Trustee in connection with this Agreement, the Litigation Trustee shall receive initial compensation in a manner and amount as agreed upon by the Committee. Any additional compensation or compensation of a Successor Litigation Trustee shall be determined by the Oversight Board.

(ii) <u>Expense Reimbursements</u>. All reasonable out-of-pocket expenses of the Litigation Trustee in the performance of his or her duties hereunder, shall be reimbursed as Litigation Sub-Trust Expenses paid by the Litigation Sub-Trust.

(b) <u>Professionals</u>.

(i) <u>Engagement of Professionals</u>. The Litigation Trustee shall engage professionals from time to time in conjunction with the services provided hereunder. The Litigation Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

(ii) <u>Fees and Expenses of Professionals</u>. The Litigation Trustee shall pay the reasonable fees and expenses of any retained professionals as Litigation Sub-Trust Expenses.

3.14 <u>Reliance by Litigation Trustee</u>. Except as otherwise provided herein, the Litigation Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Litigation Trustee has no reason to believe to be other

HMIT Appx. 01612

than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Litigation Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein. The Litigation Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Litigation Trustee in accordance therewith. The Litigation Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning Estate Claims, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Litigation Trustee in accordance therewith. The Litigation Sub-Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

      3.15   <u>Commingling of Litigation Sub-Trust Assets</u>. The Litigation Trustee shall not commingle any of the Litigation Sub-Trust Assets with his or her own property or the property of any other Person.

      3.16   [<u>Delaware Trustee</u>. The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Litigation Sub-Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement as may be directed in a writing delivered to the Delaware Trustee by the Litigation Trustee; <u>provided</u>, <u>however</u>, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Litigation Sub-Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law. The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Litigation Sub-Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law. Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Litigation Sub-Trust.]

<div align="center">

**ARTICLE IV.**
**THE OVERSIGHT BOARD**

</div>

The Oversight Board shall be governed by Article IV of the Claimant Trust Agreement.

<div align="center">

**ARTICLE V.**
**TRUST INTERESTS**

</div>

      5.1   <u>Litigation Sub-Trust Interests</u>. On the date hereof, the Litigation Sub-Trust shall issue Trust Interests to the Claimant Trust as the sole Litigation Sub-Trust Beneficiary. The Litigation Sub-Trust Beneficiary shall be entitled to distributions from the Litigation Sub-Trust Assets in accordance with the terms of the Plan and this Agreement.

<div align="center">

14

</div>

5.2 <u>Transferability of Trust Interests</u>. No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected.

5.3 <u>Exemption from Registration</u>. The Parties hereto intend that the rights of the Litigation Sub-Trust Beneficiary arising under this Litigation Sub-Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws. The Oversight Board, acting unanimously, and Litigation Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Litigation Sub-Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act. The Trust Interests shall not have consent or voting rights or otherwise confer on the Litigation Sub-Trust Beneficiary any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Litigation Trustee under this Agreement.

## ARTICLE VI.
## DISTRIBUTIONS

6.1 <u>Distributions</u>. The Litigation Trustee shall distribute Cash proceeds of the Estate Claims to the Claimant Trust within 30 days of receipt of such Cash proceeds, net of any amounts that (a) are reasonably necessary to maintain the value of the Litigation Sub-Trust Assets pending their monetization or other disposition during the term of the Litigation Sub-Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Litigation Sub-Trust Expenses and any other expenses incurred by the Litigation Sub-Trust (including, but not limited to, any taxes imposed on or payable by the Litigation Trustee with respect to the Litigation Sub-Trust Assets), and (c) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Litigation Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses).

6.2 <u>Manner of Payment or Distribution</u>. All distributions made by the Litigation Trustee on behalf of the Litigation Sub-Trust to the Litigation Sub-Trust Beneficiary shall be payable by the Litigation Trustee directly to the Claimant Trust, as sole Litigation Sub-Trust Beneficiary, on the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3 <u>Delivery of Distributions</u>. All distributions under this Agreement to the Claimant Trust shall be made pursuant to wire instructions provided by the Claimant Trustee to the Litigation Trustee.

## ARTICLE VII.
## TAX MATTERS

7.1 <u>Tax Treatment and Tax Returns</u>. It is intended that the Litigation Sub-Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) the sole beneficiary of which is the Claimant Trust. Consistent

HMIT Appx. 01614

with such treatment, it is intended that the transfer of the Litigation Sub Trust Assets from the Claimant Trust to the Litigation Sub Trust will be treated as a non-event for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). Further, because the Claimant Trust is itself intended to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable),it is intended that the beneficiaries of the Claimant Trust will be treated as the grantor of the Litigation Sub-Trust and owner of the Litigation Sub-Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). The Litigation Trustee shall cooperate with the Claimant Trustee in connection with the preparation and filing of any federal income tax returns (and foreign, state, and local income tax returns where applicable) or information statements relating to the Litigation Sub Trust Assets.

7.2     Withholding. The Litigation Trustee may withhold from any amount distributed from the Litigation Sub-Trust to the Litigation Sub-Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the Litigation Sub-Trust Beneficiary. As a condition to receiving any distribution from the Litigation Sub-Trust, the Litigation Trustee may require that the Litigation Sub-Trust Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Litigation Trustee to comply with applicable tax reporting and withholding laws.

## ARTICLE VIII.
## STANDARD OF CARE AND INDEMNIFICATION

8.1     Standard of Care. None of the Litigation Trustee, acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan, the Oversight Board, or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Litigation Sub-Trust or to any Person (including the Litigation Sub-Trust Beneficiary and Claimant Trust Beneficiaries) in connection with the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Litigation Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Litigation Sub-Trust, the Litigation Trustee, or Oversight Board shall not be personally liable to the Litigation Sub-Trust or any other Person in connection with the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence. None of the Litigation Trustee, Oversight Board, or any Member shall be personally liable to the Litigation Sub-Trust or to any Person for the acts or omissions of any employee, agent or professional of the Litigation Sub-Trust or Litigation Trustee, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Litigation

HMIT Appx. 01615

Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Litigation Sub-Trust.

8.2     Indemnification.    The Litigation Trustee (including each former Litigation Trustee), Oversight Board, and all past and present Members (collectively, the "Indemnified Parties") shall be indemnified by the Litigation Sub-Trust against and held harmless by the Litigation Sub-Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Litigation Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence.  If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Litigation Sub-Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Litigation Trustee and/or Oversight Board, as applicable; provided, however, that the failure of an Indemnified Party to promptly notify the Litigation Trustee and/or Oversight Board of an indemnification obligation will not excuse the Litigation Sub-Trust from indemnifying the Indemnified Party unless such delay has caused the Litigation Sub-Trust material harm.  The Litigation Sub-Trust shall periodically advance or otherwise reimburse on demand the Indemnified Party's reasonable legal and other expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and related expenses) incurred in connection therewith as a Litigation Sub-Trust Expense, but the Indemnified Party shall be required to repay promptly to the Litigation Sub-Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, misconduct, or negligence in connection with the affairs of the Litigation Sub-Trust with respect to which such expenses were paid.  The Litigation Sub-Trust shall indemnify and hold harmless the employees, agents and professionals of the Litigation Sub-Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties.  For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Litigation Trustee or Member or the estate of any decedent Litigation Trustee or Member.  The indemnification provided hereby shall be a Litigation Sub-Trust Expense.

8.3     To the extent applicable, the provisions and protections set forth in Article IX of the Plan will apply to the Litigation Sub-Trust, the Litigation Trustee, Oversight Board, and the Members.

## ARTICLE IX.
## TERMINATION

9.1     Duration.    The Litigation Trustee, the Litigation Sub-Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as the Litigation Trustee determines that the Estate Claims is not likely to yield sufficient additional proceeds to justify

HMIT Appx. 01616

further pursuit of such Estate, and all Distributions required to be made by the Litigation Trustee to the Litigation Sub-Trust Beneficiary under the Plan and this Agreement have been made, but in no event shall the Litigation Sub-Trust be dissolved later than [three years] from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Sub-Trust Assets.

9.2    Continuance of the Litigation Trustee for Winding Up.   After dissolution of the Litigation Sub-Trust and for purpose of liquidating and winding up the affairs of the Litigation Sub-Trust, the Litigation Trustee shall continue to act as such until the Litigation Trustee's duties have been fully performed.   Prior to the final distribution of all remaining Litigation Sub-Trust Assets, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Litigation Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Litigation Sub-Trust, until such time as the winding up of the Litigation Sub-Trust is completed.   Upon the dissolution of the Litigation Sub-Trust and completion of the winding up of the assets, liabilities and affairs of the Litigation Sub-Trust pursuant to the Delaware Statutory Trust Act, the Litigation Trustee shall file a certificate of cancellation with the State of Delaware to terminate the Litigation Sub-Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "Termination Date").   Subject in all respects to 3.11, upon the Termination date, the Litigation Trustee shall retain for a period of two (2) years, as a Litigation Sub-Trust Expense, the books, records, and certificated and other documents and files that have been delivered to or created by the Litigation Trustee.   Subject in all respects to Section 3.11, at the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.3    Termination of Duties.   Except as otherwise specifically provided herein, upon the Termination Date of the Litigation Sub-Trust, the Litigation Trustee, the Oversight Board, and its Members shall have no further duties or obligations hereunder.

## ARTICLE X.
## AMENDMENTS AND WAIVER

The Litigation Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions.   This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Litigation Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; provided that the Litigation Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement.

HMIT Appx. 01617

## ARTICLE XI.
## MISCELLANEOUS

11.1 <u>Trust Irrevocable</u>. Except as set forth in this Agreement, establishment of the Litigation Sub-Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Litigation Sub-Trust Beneficiary.

11.2 <u>Litigation Sub-Trust Beneficiary has No Legal Title to Litigation Sub-Trust Assets</u>. The Litigation Sub-Trust Beneficiary shall have no legal title to any part of the Litigation Sub-Trust Assets.

11.3 <u>Agreement for Benefit of Parties Only</u>. Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Litigation Trustee, Oversight Board, and the Litigation Sub-Trust Beneficiary any legal or equitable right, remedy or claim under or in respect of this Agreement. The Litigation Sub-Trust Assets shall be held for the sole and exclusive benefit of the Litigation Sub-Trust Beneficiary.

11.4 <u>Notices</u>. All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

    (a)    If to the Litigation Trustee:

        Marc S. Kirschner
        c/o Goldin Associates LLC, a Teneo Company
        350 Fifth Avenue
        New York, New York 10118

With a copy to:

        **[insert contact for counsel to the Litigation Trustee].**

    (b)    If to the Claimant Trustee:

        Claimant Trustee
        c/o **[insert contact info for Claimant Trustee]**

With a copy to:

        Pachulski Stang Ziehl & Jones LLP
        10100 Santa Monica Blvd, 13th Floor
        Los Angeles, CA 90067
        Attn:   Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
               Ira Kharasch (ikharasch@pszjlaw.com)
               Gregory Demo (gdemo@pszjlaw.com)

HMIT Appx. 01618

Notice mailed shall be effective on the date mailed or sent. Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.4 to the entity to be charged with knowledge of such change.

11.5    <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.6    <u>Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.7    <u>Binding Effect, etc.</u> All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Litigation Sub-Trust, the Litigation Trustee, and the Litigation Sub-Trust Beneficiary, and their respective successors and assigns. Any notice, direction, consent, waiver or other instrument or action by any Litigation Sub-Trust Beneficiary shall bind its successors and assigns.

11.8    <u>Headings; References</u>. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.9    <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.10   <u>Consent to Jurisdiction</u>. Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.11   <u>Transferee Liabilities</u>. The Litigation Sub-Trust shall have no liability for, and the Litigation Sub-Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement. In no event shall the Litigation Trustee or the Litigation Sub-Trust Beneficiary have any personal liability for such claims. If any liability shall be asserted against the Litigation Sub-Trust or the Litigation Trustee as the transferee of the Litigation Sub-Trust Assets on account of any claimed liability of,

HMIT Appx. 01619

through or under the Debtor or Reorganized Debtor, the Litigation Trustee may use such part of the Litigation Sub-Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Litigation Trustee as a Litigation Sub-Trust Expense.

[Remainder of Page Intentionally Blank]

HMIT Appx. 01620

IN WITNESS HEREOF, the parties hereto have caused this Litigation Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Claimant Trustee

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

Litigation Trustee

By: _____

Marc S. Kirschner, not individually but solely in his capacity as the Litigation Trustee

HMIT Appx. 01621

# EXHIBIT U

HMIT Appx. 01622

Case 19-34054-sgj11 Doc 1811-5 Filed 01/22/21 Entered 01/22/21 19:14:23 Page 2 of 23
Case 3:21-cv-00881-X Document 172-11 Filed 12/15/23 Page 428 of 968 PageID 16010
*Draft*

## LITIGATION SUB-TRUST AGREEMENT

This Litigation Sub-Trust Agreement, effective as of _____, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among James P. Seery, Jr., as trustee of the Highland Claimant Trust (the "Claimant Trustee"), [_____] as Delaware Trustee, and Marc S. Kirschner as trustee the "Litigation Trustee," and together with the Claimant Trustee ~~[and Delaware Trustee]~~, the "Parties") of the Litigation Sub-Trust for the benefit of the Claimant Trust as sole Litigation Sub-Trust Beneficiary.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Litigation Sub-Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Litigation Sub-Trust Assets are hereby to be transferred by the Claimant Trust to the Litigation Sub-Trust (each as defined herein) created and evidenced by this Agreement so that (i) Estate Claims can be investigated, prosecuted, settled, abandoned, resolved, and otherwise monetized as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; (ii) proceeds of Estate Claims can be remitted to the Claimant Trust as Claimant Trust Assets for distribution to the Claimant Trust Beneficiaries (as defined in the Claimant Trust Agreement) in accordance with the Plan and Claimant Trust Agreement; (iii) the Litigation Trustee can investigate, litigate, settle, or otherwise resolve any Filed Claims relating to the Estate Claims, including the Employee Claims; and (iv) administrative services relating to the activities of the Litigation Sub-Trust can be performed by the Litigation Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Litigation Trustee and the Claimant Trustee have executed this Agreement for the benefit of the Claimant Trust as provided for in the Plan.

TO HAVE AND TO HOLD unto the Litigation Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Litigation Sub-Trust in accordance with Article IX hereof, this Litigation Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Litigation Sub-Trust Assets are to be strictly held and applied by the Litigation Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1     Certain Definitions.  Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.  For all purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(b)     "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(c)     "Claimant Trust Agreement" means the Claimant Trust Agreement dated [____], 2021, by and between the Debtor, Claimant Trustee, and Delaware Trustee.

(d)     "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" under the Claimant Trust Agreement and as defined in the Plan, and any successor Claimant Trustee who may be appointed pursuant to the terms of the Claimant Trust Agreement.

(e)     "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to the Claimant Trust Agreement.

(f)     "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

2

(g)    "Delaware Trustee" has the meaning set forth in the Claimant Trust Agreement.

(h)    "Disability" means as a result of the Litigation Trustee's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Litigation Trustee, the Litigation Trustee has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(i)    "Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(j)    "Employee" means the employees of the Debtor set forth in the Plan Supplement.

(k)    "Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(l)    "Litigation Sub-Trust" means the sub-trust created pursuant to this Agreement, and in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d).

(m)    "Litigation Sub-Trust Agreement" means this Agreement.

(n)    "Litigation Sub-Trust Assets" means the Estate Claims and the Litigation Sub-Trust Expense Cash Reserve.

(o)    "Litigation Sub-Trust Beneficiary" means the Claimant Trust.

(p)    "Litigation Sub-Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Litigation Sub-Trust and/or the Litigation Trustee in administering and conducting the affairs of the Litigation Sub-Trust, and otherwise carrying out the terms of the Litigation Sub-Trust and the Plan on behalf of the Litigation Sub-Trust, including without any limitation, any taxes owed by the Litigation Sub-Trust, and the fees and expenses of the Litigation Trustee and professional persons retained by the Litigation Sub-Trust or Litigation Trustee in accordance with Article 3.12(b) of this Agreement.

(q)    "Litigation Sub-Trust Expense Cash Reserve" means $[•] million in Cash to be funded by the Debtor or Reorganized Debtor, as applicable, pursuant to the Plan into a bank account of the Litigation Sub-Trust (or of the Claimant Trust for the benefit of the Litigation Sub-Trust) on or before the Effective Date for the purpose of paying Litigation Sub-Trust Expenses in accordance herewith.

(r)    "Litigation Trustee" means Marc S. Kirschner as the initial "Litigation Trustee" hereunder and under the Plan, and any successor Litigation Trustee who may be appointed pursuant to the terms of this Agreement.

3

(s) "Oversight Board" has the meaning set forth in the Claimant Trust Agreement.

(t) "Plan" has the meaning set forth in the Recitals hereof.

(u) "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(v) "Securities Act" means the Securities Act of 1933, as amended.

(w) "TIA" means the Trust Indenture Act of 1939, as amended.

(x) "Trust Interests" means the trust interest(s) to be distributed to the Claimant Trust as the sole Litigation Sub-Trust Beneficiary.

(y) "Trust Register" has the meaning given to it in Section 5.3(b) hereof.

1.2     General Construction. As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3     Incorporation of the Plan. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE II.
## ESTABLISHMENT OF THE LITIGATION SUB-TRUST

2.1     Establishment of Sub-Trust.

(a)     The Parties, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish a statutory trust under the Delaware Statutory Trust Act on behalf of the Claimant Trust as the sole

4

Litigation Sub-Trust Beneficiary, which shall be known as the "Highland Litigation Sub-Trust," on the terms set forth herein. The Litigation Trustee may use this name in accordance with the terms and conditions set forth herein as the Litigation Trustee sees fit.

(b)     The Litigation Trustee shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in his capacity as Litigation Trustee, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

2.2     <u>Nature and Purposes of the Litigation Sub-Trust</u>.  The Litigation Sub-Trust is organized and established as a trust for the purpose of monetizing the Estate Claims and making distributions to Litigation Sub-Trust Beneficiary in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d).  The Litigation Sub-Trust shall serve as a mechanism for investigating, prosecuting, settling, resolving, and otherwise monetizing all Estate Claims and distributing the proceeds of such Estate Claims to the Claimant Trust in a timely fashion in accordance with the Plan, the Confirmation Order, and this Agreement.  The Litigation Sub-Trust and Litigation Trustee shall have and retain any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Estate Claim as of the Petition Date.  Except as otherwise provided herein, the Litigation Sub-Trust shall have the sole responsibility for the pursuit and settlement of the Estate Claims, and, subject to the terms of the Claimant Trustee Agreement, the sole power and authority to allow or settle and compromise any Claims related to the Estate Claims, including, without limitation, Employee Claims.  For the avoidance of doubt, the Litigation Sub-Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).

2.3     <u>Transfer of Assets and Rights to the Litigation Sub-Trust</u>.

(a)     On or as soon as practicable after the Effective Date, the Claimant Trust shall automatically an irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims, Employee Claims, and Privileges.  For purposes of the transfer of documents, the Litigation Sub-Trust is an assignee and successor to the Debtor in respect of the Estate Claims and Employee Claims and shall be treated as such in any review of confidentiality restrictions in requested documents.  For the avoidance of doubt, following the Effective Date, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

(b)     Until the Litigation Sub-Trust terminates pursuant to the terms hereof, legal title to the Estate Claims shall be vested at all times in the Litigation Sub-Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Estate Claims to be vested in the Litigation Trustee, in which case title shall be deemed to be vested in the Litigation Trustee, solely in his capacity as Litigation Trustee.  For purposes of such jurisdictions, the term Litigation Sub-Trust, as used herein, shall be read to mean the Litigation Trustee.

5

(c)     In accordance with section 1123(d) of the Bankruptcy Code, the Litigation Trustee may enforce all rights to commence and pursue, as appropriate, any and all Estate Claims after the Effective Date.  No Person or entity may rely on the absence of a specific reference in the Plan to any Estate Claim against them as any indication that the Litigation Trustee will not pursue any and all available Estate Claims or objections against them.  Unless any Estate Claim against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trustee expressly reserves all Estate Claims for later adjudication, and, therefore, no preclusion doctrine including the doctrine of res judicata, collateral, estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Claims upon, after, or as a consequence of the Confirmation Order.

2.4     <u>Principal Office</u>.  The principal office of the Litigation Sub-Trust shall be maintained by the Litigation Trustee at the following address: Goldin Associates, a Teneo Company, 350 Fifth Avenue, New York, New York 10118.

2.5     <u>Acceptance</u>.  The Litigation Trustee accepts the Litigation Sub-Trust imposed by this Agreement and agrees to observe and perform that Litigation Sub-Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.6     <u>Further Assurances</u>.  The Claimant Trustee and any successors thereof will, upon reasonable request of the Litigation Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Litigation Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Litigation Trustee the powers, instruments or funds in trust hereunder.

2.7     <u>Incidents of Ownership</u>.  The Claimant Trust shall be the sole beneficiary of the Litigation Sub-Trust and the Litigation Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

<div align="center">

**ARTICLE III.**
**THE LITIGATION TRUSTEE**

</div>

3.1     <u>Role</u>.  In furtherance of and consistent with the purpose of the Litigation Sub-Trust, the Plan, and this Agreement, the Litigation Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Litigation Trustee with respect to the Litigation Sub-Trust Assets for the benefit of the Litigation Sub-Trust Beneficiary and maintain, manage, and take action on behalf of the Litigation Sub-Trust.

3.2     <u>Authority</u>.

(a)     In connection with the administration of the Litigation Sub-Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee shall, in an expeditious but orderly manner, investigate, prosecute, settle, and otherwise resolve the Estate Claims.  The Litigation Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement

6

and the provisions of the Plan and the Confirmation Order relating to the Litigation Sub-Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.

(b)     The Litigation Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement). To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Estate Claims or Employee Claims prior to the Effective Date, on the Effective Date the Litigation Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "Marc Kirschner, not individually but solely as Litigation Trustee for the Highland Litigation Sub-Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Litigation Trustee shall have the power and authority to:

(i)     hold legal title to any and all rights in or arising from the Litigation Sub-Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Sub-Trust (including any proceeds of the Litigation Sub-Trust Assets);

(ii)     perform the duties, exercise the powers, and asserts the rights of a trustee under sections 1123(b)(3)(B) of the Bankruptcy Code with respect to the Litigation Sub-Trust Assets, including the right to assert claims, defenses, offsets, and privileges;

(iii)     subject to any approval of the Oversight Board that may be required under Section 3.3(b), protect and enforce the rights of the Litigation Sub-Trust with respect to any Litigation Sub-Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceeds, or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(iv)     determine and satisfy any and all liabilities created, incurred, or assumed by the Litigation Sub-Trust;

(v)     subject to any approval of the Oversight Board that may be required under Section 3.3(b), investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, all Estate Claims, Employee Claims, or any other Causes of Action in favor of or against the Litigation Sub-Trust;

(vi)     with respect to any Estate Claim, avoid and recover transfers of the Debtor's property as may be permitted by the Bankruptcy Code or applicable state law;

(vii)     subject to applicable law, seek the examination of any Entity or Person with respect to the Estate Claims;

7

HMIT Appx. 01629

(viii)   make all payments relating to the Litigation Sub-Trust Assets;

(ix)   assess, enforce, release, or waive any privilege or defense on behalf of the Litigation Sub-Trust, the Litigation Sub-Trust Assets, or the Litigation Sub-Trust Beneficiary, if applicable;

(x)   prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax returns, information returns, and other required documents with respect to the Litigation Sub-Trust, and pay taxes properly payable by the Litigation Sub-Trust;

(xi)   if not otherwise covered by insurance coverage obtained by the Claimant Trust, obtain reasonable insurance coverage with respect to any liabilities and obligations of the Litigation Trustee, solely in his capacity as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Litigation Sub-Trust Expense and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Reserve;

(xii)   without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Litigation Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Litigation Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Litigation Trustee shall be Litigation Sub-Trust Expenses and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Cash Reserve;

(xiii)   to the extent applicable, assert, enforce, release, or waive any Privilege or defense on behalf of the Litigation Sub-Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Litigation Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xiv)   take all steps and execute all instruments and documents necessary to effectuate the purpose of the Litigation Sub-Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder; and

(xv)   exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order (the foregoing subparagraphs (i)-(xv) being collectively, the "Authorized Acts").

8

(d)     The Litigation Trustee has the power and authority to act as trustee of the Litigation Sub-Trust and perform the Authorized Acts through the date such Litigation Trustee resigns, is removed, or is otherwise unable to serve for any reason.

(e)     Any determinations by the Liquidation Trustee, under the direction of the Oversight Board, with respect to the amount or timing of settlement or other disposition of any Estate Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Litigation Sub-Trust Beneficiary and all other parties of interest following the entry of an order of a court of competent jurisdiction approving such settlement or other disposition to the extent required or obtained.

3.3     <u>Limitation of Authority</u>.

(a)     Notwithstanding anything herein to the contrary, the Litigation Sub-Trust and the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Estate Claims as required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, or (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement.

(b)     Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Litigation Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 of the Claimant Trust Agreement, in order to:

(i)      terminate or extend the term of the Litigation Sub-Trust;

(ii)     commence litigation with respect to any Estate Claims and, if applicable under the terms of the Claimant Trust Agreement, the Employee Claims, including, without limitation, to (x) litigate, resolve, or settle coverage and/or the liability of any insurer under any insurance policy or legal action related thereto, or (y) pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law;

(iii)    settle, dispose of, or abandon any Estate Claims (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Estate Claim);

(iv)    borrow funds as may be necessary to fund litigation or other costs of the Litigation Sub-Trust;

(v)     reserve or retain any cash or cash equivalents in the Litigation Sub-Trust Cash Reserve in an amount reasonably necessary to meet claims and contingent liabilities;

(vi)    change the compensation of the Litigation Trustee; and

(vii)   retain counsel, experts, advisors, or any other professionals.

9

(c)     [Reserved]

3.4     <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Litigation Trustee in accordance with the provisions of this Agreement shall be final and binding upon the Litigation Sub-Trust Beneficiary.

3.5     <u>Term of Service</u>.  The Litigation Trustee shall serve as the Litigation Trustee for the duration of the Litigation Sub-Trust, subject to death, resignation or removal.

3.6     <u>Resignation</u>.  The Litigation Trustee may resign as trustee of the Litigation Sub-Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Litigation Trustee shall continue to serve as Litigation Trustee after delivery of the Litigation Trustee's resignation until the proposed effective date of such resignation, unless the Litigation Trustee and a [simple majority] of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Litigation Trustee in accordance with Section 3.8 hereof becomes effective.

3.7     <u>Removal</u>.

(a)     The Litigation Trustee may be removed by a [simple majority] vote of the Oversight Board for Cause, immediately upon notice thereof, or without Cause, upon [60 days'] prior written notice.

(b)     To the extent there is any dispute regarding the removal of a Litigation Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Litigation Trustee will continue to serve as the Litigation Trustee after his removal until the earlier of (i) the time when a successor Litigation Trustee will become effective in accordance with Section 3.8 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.8     <u>Appointment of Successor</u>.

(a)     <u>Appointment of Successor</u>.  In the event of a vacancy by reason of the death, Disability, or removal of the Litigation Trustee, or prospective vacancy by reason of resignation, a successor Litigation Trustee shall be selected by a [simple majority] vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Litigation Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Litigation Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Litigation Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Litigation Sub-Trust, or the Claimant Trust on behalf of the Litigation Sub-Trust. The successor Litigation Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Litigation Trustee.

10

(b)    <u>Vesting or Rights in Successor Litigation Trustee</u>.    Every successor Litigation Trustee appointed hereunder shall execute, acknowledge, and deliver to the Litigation Sub-Trust, the Claimant Trustee, the exiting Litigation Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Litigation Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Litigation Trustee except that the successor Litigation Trustee shall not be liable for the acts or omissions of the retiring Litigation Trustee.  In no event shall the retiring Litigation Trustee be liable for the acts or omissions of the successor Litigation Trustee.

(c)    <u>Interim Litigation Trustee</u>.    During any period in which there is a vacancy in the position of Litigation Trustee, the Oversight Board shall appoint one of its Members or the Claimant Trustee to serve as the interim Litigation Trustee (the "<u>Interim Trustee</u>") until a successor Litigation Trustee is appointed pursuant to Section 3.8(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board or Claimant Trustee, as applicable, merely by such Person's appointment as Interim Trustee.

3.9    <u>Continuance of Litigation Sub-Trust</u>.    The death, resignation, or removal of the Litigation Trustee shall not operate to terminate the Litigation Sub-Trust created by this Agreement or to revoke any existing agency (other than any agency of the Litigation Trustee as the Litigation Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Litigation Trustee.  In the event of the resignation or removal of the Litigation Trustee, the Litigation Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Litigation Trustee's capacity under this Agreement and the conveyance of the Estate Claims then held by the exiting Litigation Trustee to the successor Litigation Trustee; (ii) deliver to the successor Litigation Trustee all non-privileged documents, instruments, records, and other writings relating to the Litigation Sub-Trust as may be in the possession or under the control of the exiting Litigation Trustee, <u>provided</u>, the exiting Litigation Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Litigation Trustee and the cost of making such copies shall be a Litigation Sub-Trust Expense to be paid by the Litigation Sub-Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Litigation Trustee's obligations and functions by his successor, <u>provided</u> the fees and expenses of such assistance and cooperation shall be paid to the exiting Litigation Trustee by the Litigation Sub-Trust.  The exiting Litigation Trustee shall irrevocably appoint the successor Litigation Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Litigation Trustee is obligated to perform under this Section 3.9.

3.10    <u>Litigation Trustee as "Estate Representative"</u>.    The Litigation Trustee will be the exclusive trustee of the Litigation Sub-Trust Assets, for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Estate Claims, with all rights and powers attendant thereto, in addition to all rights and powers granted

11

in the Plan and in this Agreement. The Litigation Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Estate Claims, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interests constituting or relating to Estate Claims are preserved and retained and may be enforced by the Litigation Trustee as an Estate Representative.

       3.11    <u>Books and Records</u>.

          (a)    The Litigation Trustee shall maintain, in respect of the Litigation Sub-Trust and the Claimant Trust, books and records pertinent to Estate Claims in its possession and the income of the Litigation Sub-Trust and payment of expenses, liabilities, and claims against or assumed by the Litigation Sub-Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Sub-Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Sub-Trust, or as a condition for managing any payment or distribution out of the Litigation Sub-Trust. Notwithstanding the foregoing, the Litigation Trustee shall to retain such books and records, and for such periods, with respect to any Reorganized Debtor Assets as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

          (b)    The Litigation Trustee may dispose some or all of the books and records maintained by the Litigation Trustee at the later of (i) such time as the Litigation Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Litigation Sub-Trust, including with respect to the Estate Claims, or (ii) upon the termination and winding up of the Litigation Sub-Trust under Article IX of this Agreement.

       3.12    <u>Reports</u>.

          (a)    <u>Financial and Status Reports</u>. The fiscal year of the Litigation Sub-Trust shall be the calendar year. Within 90 days after the end of each calendar year during the term of the Litigation Sub-Trust, and within 45 days after the end of each calendar quarter during (other than the fourth quarter) the term of the Litigation Sub-Trust and as soon as practicable upon termination of the Litigation Sub-Trust, the Litigation Trustee shall make available upon request to the Oversight Board or Litigation Sub-Trust Beneficiary appearing on its records as of the end of such period or such date of termination, a written report including: (i) unaudited financial statements of the Litigation Sub-Trust for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Trustee) reflecting the result of such agreed-upon procedures relating to the financial accounting administration of the Litigation Sub-Trust as proposed by the Litigation Trustee; (ii) a summary description of any action taken by the Litigation Sub-Trust that, in the judgment of the Litigation Trustee, materially affects the Litigation Sub-Trust and of which notice has not previously been given to the Oversight Board or Litigation Sub-Trust

12

Beneficiary, provided, that any such description shall not include any privileged or confidential information of the Litigation Trustee; and (iii) a description of the progress of liquidating the Litigation Sub-Trust Assets and making distributions to the Litigation Sub-Trust Beneficiary and any other material information relating to the Litigation Sub-Trust Assets and the administration of the Litigation Sub-Trust deemed appropriate to be disclosed by the Litigation Trustee, which description shall include a written report detailing, among other things, the litigation status of the Estate Claims transferred to the Litigation Sub-Trust, any settlements entered into by the Litigation Sub-Trust with respect to the Estate Claims, the proceeds recovered to date from Estate Claims, and the distributions made by the Litigation Sub-Trust.

(b)    Annual Plan and Budget.  If instructed by the Oversight Board, the Litigation Trustee shall prepare and submit to the Oversight Board for approval an annual plan and budget in such detail as reasonably requested.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)    Compensation and Expenses.

(i)    Compensation.  As compensation for any services rendered by the Litigation Trustee in connection with this Agreement, the Litigation Trustee shall receive initial compensation in a manner and amount as agreed upon by the Committee. Any additional compensation or compensation of a Successor Litigation Trustee shall be determined by the Oversight Board.

(ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Litigation Trustee in the performance of his or her duties hereunder, shall be reimbursed as Litigation Sub-Trust Expenses paid by the Litigation Sub-Trust.

(b)    Professionals.

(i)    Engagement of Professionals.  The Litigation Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Litigation Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

(ii)    Fees and Expenses of Professionals.  The Litigation Trustee shall pay the reasonable fees and expenses of any retained professionals as Litigation Sub-Trust Expenses.

3.14    Reliance by Litigation Trustee.  Except as otherwise provided herein, the Litigation Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Litigation Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Litigation Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Litigation Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization

13

and protection in respect of any action taken or not taken by the Litigation Trustee in accordance therewith. The Litigation Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning Estate Claims, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Litigation Trustee in accordance therewith. The Litigation Sub-Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

3.15  <u>Commingling of Litigation Sub-Trust Assets</u>. The Litigation Trustee shall not commingle any of the Litigation Sub-Trust Assets with his or her own property or the property of any other Person.

3.16  [<u>Delaware Trustee</u>. The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Litigation Sub-Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement as may be directed in a writing delivered to the Delaware Trustee by the Litigation Trustee; <u>provided</u>, <u>however</u>, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Litigation Sub-Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law. The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Litigation Sub-Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law. Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Litigation Sub-Trust.]

<div align="center">

**ARTICLE IV.**
**THE OVERSIGHT BOARD**

</div>

The Oversight Board shall be governed by Article IV of the Claimant Trust Agreement.

<div align="center">

**ARTICLE V.**
**TRUST INTERESTS**

</div>

5.1  <u>Litigation Sub-Trust Interests</u>. On the date hereof, the Litigation Sub-Trust shall issue Trust Interests to the Claimant Trust as the sole Litigation Sub-Trust Beneficiary. The Litigation Sub-Trust Beneficiary shall be entitled to distributions from the Litigation Sub-Trust Assets in accordance with the terms of the Plan and this Agreement.

5.2  <u>Transferability of Trust Interests</u>. No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected.

14

5.3    Exemption from Registration.  The Parties hereto intend that the rights of the Litigation Sub-Trust Beneficiary arising under this Litigation Sub-Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Litigation Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Litigation Sub-Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act.  The Trust Interests shall not have consent or voting rights or otherwise confer on the Litigation Sub-Trust Beneficiary any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Litigation Trustee under this Agreement.

## ARTICLE VI.
## DISTRIBUTIONS

6.1    Distributions.  The Litigation Trustee shall distribute Cash proceeds of the Estate Claims to the Claimant Trust within 30 days of receipt of such Cash proceeds, net of any amounts that (a) are reasonably necessary to maintain the value of the Litigation Sub-Trust Assets pending their monetization or other disposition during the term of the Litigation Sub-Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Litigation Sub-Trust Expenses and any other expenses incurred by the Litigation Sub-Trust (including, but not limited to, any taxes imposed on or payable by the Litigation Trustee with respect to the Litigation Sub-Trust Assets), and (c) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Litigation Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses).

6.2    Manner of Payment or Distribution.  All distributions made by the Litigation Trustee on behalf of the Litigation Sub-Trust to the Litigation Sub-Trust Beneficiary shall be payable by the Litigation Trustee directly to the Claimant Trust, as sole Litigation Sub-Trust Beneficiary, on the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3    Delivery of Distributions.  All distributions under this Agreement to the Claimant Trust shall be made pursuant to wire instructions provided by the Claimant Trustee to the Litigation Trustee.

## ARTICLE VII.
## TAX MATTERS

7.1    Tax Treatment and Tax Returns.  It is intended that the Litigation Sub-Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) the sole beneficiary of which is the Claimant Trust.  Consistent with such treatment, it is intended that the transfer of the Litigation Sub Trust Assets from the Claimant Trust to the Litigation Sub Trust will be treated as a non-event for federal income tax purposes (and foreign, state, and local income tax purposes where applicable).  Further, because

15

the Claimant Trust is itself intended to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable),it is intended that the beneficiaries of the Claimant Trust will be treated as the grantor of the Litigation Sub-Trust and owner of the Litigation Sub-Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). The Litigation Trustee shall cooperate with the Claimant Trustee in connection with the preparation and filing of any federal income tax returns (and foreign, state, and local income tax returns where applicable) or information statements relating to the Litigation Sub Trust Assets.

7.2    Withholding. The Litigation Trustee may withhold from any amount distributed from the Litigation Sub-Trust to the Litigation Sub-Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the Litigation Sub-Trust Beneficiary. As a condition to receiving any distribution from the Litigation Sub-Trust, the Litigation Trustee may require that the Litigation Sub-Trust Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Litigation Trustee to comply with applicable tax reporting and withholding laws.

## ARTICLE VIII.
## STANDARD OF CARE AND INDEMNIFICATION

8.1    Standard of Care. None of the Litigation Trustee, acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan, the Oversight Board, or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Litigation Sub-Trust or to any Person (including the Litigation Sub-Trust Beneficiary and Claimant Trust Beneficiaries) in connection with the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Litigation Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Litigation Sub-Trust, the Litigation Trustee, or Oversight Board shall not be personally liable to the Litigation Sub-Trust or any other Person in connection with the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence. None of the Litigation Trustee, Oversight Board, or any Member shall be personally liable to the Litigation Sub-Trust or to any Person for the acts or omissions of any employee, agent or professional of the Litigation Sub-Trust or Litigation Trustee, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Litigation Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Litigation Sub-Trust.

16

8.2 <u>Indemnification</u>. The Litigation Trustee (including each former Litigation Trustee), Oversight Board, and all past and present Members (collectively, the "<u>Indemnified Parties</u>") shall be indemnified by the Litigation Sub-Trust against and held harmless by the Litigation Sub-Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Litigation Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence. If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Litigation Sub-Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Litigation Trustee and/or Oversight Board, as applicable; <u>provided</u>, <u>however</u>, that the failure of an Indemnified Party to promptly notify the Litigation Trustee and/or Oversight Board of an indemnification obligation will not excuse the Litigation Sub-Trust from indemnifying the Indemnified Party unless such delay has caused the Litigation Sub-Trust material harm. The Litigation Sub-Trust shall periodically advance or otherwise reimburse on demand the Indemnified Party's reasonable legal and other expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and related expenses) incurred in connection therewith as a Litigation Sub-Trust Expense, but the Indemnified Party shall be required to repay promptly to the Litigation Sub-Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, misconduct, or negligence in connection with the affairs of the Litigation Sub-Trust with respect to which such expenses were paid. The Litigation Sub-Trust shall indemnify and hold harmless the employees, agents and professionals of the Litigation Sub-Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties. For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Litigation Trustee or Member or the estate of any decedent Litigation Trustee or Member. The indemnification provided hereby shall be a Litigation Sub-Trust Expense.

8.3 To the extent applicable, the provisions and protections set forth in Article IX of the Plan will apply to the Litigation Sub-Trust, the Litigation Trustee, Oversight Board, and the Members.

<div align="center">

**ARTICLE IX.
TERMINATION**

</div>

9.1 <u>Duration</u>. The Litigation Trustee, the Litigation Sub-Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as the Litigation Trustee determines that the Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate, and all Distributions required to be made by the Litigation Trustee to the Litigation Sub-Trust Beneficiary under the Plan and this Agreement have been made, but in no event shall the Litigation Sub-Trust be dissolved later than [three years] from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such

17

third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Sub-Trust Assets.

9.2     <u>Continuance of the Litigation Trustee for Winding Up</u>.  After dissolution of the Litigation Sub-Trust and for purpose of liquidating and winding up the affairs of the Litigation Sub-Trust, the Litigation Trustee shall continue to act as such until the Litigation Trustee's duties have been fully performed.  Prior to the final distribution of all remaining Litigation Sub-Trust Assets, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Litigation Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Litigation Sub-Trust, until such time as the winding up of the Litigation Sub-Trust is completed.  Upon the dissolution of the Litigation Sub-Trust and completion of the winding up of the assets, liabilities and affairs of the Litigation Sub-Trust pursuant to the Delaware Statutory Trust Act, the Litigation Trustee shall file a certificate of cancellation with the State of Delaware to terminate the Litigation Sub-Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "<u>Termination Date</u>").  Subject in all respects to 3.11, upon the Termination date, the Litigation Trustee shall retain for a period of two (2) years, as a Litigation Sub-Trust Expense, the books, records, and certificated and other documents and files that have been delivered to or created by the Litigation Trustee.  Subject in all respects to Section 3.11, at the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.3     <u>Termination of Duties</u>.  Except as otherwise specifically provided herein, upon the Termination Date of the Litigation Sub-Trust, the Litigation Trustee, the Oversight Board, and its Members shall have no further duties or obligations hereunder.

<div align="center">

**ARTICLE X.**
**AMENDMENTS AND WAIVER**
</div>

The Litigation Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions.  This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Litigation Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; <u>provided</u> that the Litigation Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement.

<div align="center">

**ARTICLE XI.**
**MISCELLANEOUS**
</div>

11.1     <u>Trust Irrevocable</u>.  Except as set forth in this Agreement, establishment of the Litigation Sub-Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Litigation Sub-Trust Beneficiary.

18

11.2 <u>Litigation Sub-Trust Beneficiary has No Legal Title to Litigation Sub-Trust Assets</u>. The Litigation Sub-Trust Beneficiary shall have no legal title to any part of the Litigation Sub-Trust Assets.

11.3 <u>Agreement for Benefit of Parties Only</u>. Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Litigation Trustee, Oversight Board, and the Litigation Sub-Trust Beneficiary any legal or equitable right, remedy or claim under or in respect of this Agreement. The Litigation Sub-Trust Assets shall be held for the sole and exclusive benefit of the Litigation Sub-Trust Beneficiary.

11.4 <u>Notices</u>. All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

    (a)    If to the Litigation Trustee:

        Marc S. Kirschner
        c/o Goldin Associates LLC, a Teneo Company
        350 Fifth Avenue
        New York, New York 10118

With a copy to:

        **[insert contact for counsel to the Litigation Trustee].**

    (b)    If to the Claimant Trustee:

        Claimant Trustee
        c/o **[insert contact info for Claimant Trustee]**

With a copy to:

        Pachulski Stang Ziehl & Jones LLP
        10100 Santa Monica Blvd, 13th Floor
        Los Angeles, CA 90067
        Attn: Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
              Ira Kharasch (ikharasch@pszjlaw.com)
              Gregory Demo (gdemo@pszjlaw.com)

Notice mailed shall be effective on the date mailed or sent. Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.4 to the entity to be charged with knowledge of such change.

11.5 <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition

19

or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.6    Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.7    Binding Effect, etc.  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Litigation Sub-Trust, the Litigation Trustee, and the Litigation Sub-Trust Beneficiary, and their respective successors and assigns.  Any notice, direction, consent, waiver or other instrument or action by any Litigation Sub-Trust Beneficiary shall bind its successors and assigns.

11.8    Headings; References.  The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.9    Governing Law.  This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.10   Consent to Jurisdiction.  Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement or the Plan, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board, or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however,* that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.11   Transferee Liabilities.  The Litigation Sub-Trust shall have no liability for, and the Litigation Sub-Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.  In no event shall the Litigation Trustee or the Litigation Sub-Trust Beneficiary have any personal liability for such claims.  If any liability shall be asserted against the Litigation Sub-Trust or the Litigation Trustee as the transferee of the Litigation Sub-Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Litigation Trustee may use such part of the Litigation Sub-Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Litigation Trustee as a Litigation Sub-Trust Expense.

[Remainder of Page Intentionally Blank]

20

IN WITNESS HEREOF, the parties hereto have caused this Litigation Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Claimant Trustee

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

Litigation Trustee

By: _____

Marc S. Kirschner, not individually but solely in his capacity as the Litigation Trustee

21

HMIT Appx. 01643

Document comparison by Workshare 9.5 on Friday, January 22, 2021 4:39:24 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/41525/8 |
| Description | DOCS_NY-#41525-v8-Highland_-_Litigation_Trust_Agreement |
| Document 2 ID | PowerDocs://DOCS_NY/41525/9 |
| Description | DOCS_NY-#41525-v9-Highland_-_Litigation_Trust_Agreement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 6 |
| Deletions | 3 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 9 |

HMIT Appx. 01644

# EXHIBIT V

HMIT Appx. 01645

## SENIOR EMPLOYEE STIPULATION AND TOLLING
## AGREEMENT EXTENDING STATUTES OF LIMITATION

This stipulation (the "Stipulation") is entered into as of [_____], by and between **[EMPLOYEE NAME]** (the "Senior Employee") and Highland Capital Management, L.P. (the "Debtor"). The Debtor and the Senior Employee are individually referred to as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on October 16, 2019, the Debtor filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (the "Chapter 11 Case"):

WHEREAS, on October 29, 2019, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee") in the Chapter 11 Case;

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be further amended or supplemented, the "Plan")[1] [Docket No. 1472]. A hearing to consider confirmation of the Plan is currently scheduled for January 26, 2021.

WHEREAS, prior to and during the course of the Chapter 11 Case, the Senior Employee was employed by the Debtor as its [_____] and in such role provided services to the Debtor;

WHEREAS, (i) certain amounts that were allegedly due to be paid to the Senior Employee for the partial year of 2018 in installments due on February 28, 2020 and August 31, 2020; and (ii) certain amounts that were due to the Senior Employee in respect of the 2017 Deferred Award that vested after three years on May 31, 2020 ((i) and (ii), collectively, the "Bonus Amount") were not paid because of objections raised by the Committee;

WHEREAS, as of the date hereof, the total Bonus Amount through and including the date hereof is $ [_____];

WHEREAS, on [____], the Senior Employee filed a proof of claim [Claim No. [_]] (the "Proof of Claim"), which included a claim for the Bonus Amount;

WHEREAS, as set forth in the Proof of Claim, the Senior Employee may have other Claims against the Debtor in addition to the Bonus Amount (the "Other Employee Claims" and together with the Bonus Amount, the "Senior Employee Claims")[2]:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] For the avoidance of doubt, the "Other Employee Claims" shall include all prepetition and postpetition Claims of

HMIT Appx. 01646

1

WHEREAS, the Committee has alleged that certain causes of action against the Senior Employee may exist, which causes of action have been or will be retained pursuant to the Plan (the "Causes of Action"):

WHEREAS, the Plan provides for the release of certain of the Causes of Action (the "Released Causes of Action") against the Senior Employee as set forth in therein (the "Employee Release"):

WHEREAS, both the Employee Release and the payment of the Bonus Amount (as reduced pursuant to this Agreement) are conditioned on the Senior Employee executing this Stipulation on or prior to the Confirmation Date;

WHEREAS, the Plan provides for the creation of the Claimant Trust and Litigation Sub-Trust and the appointment of the Claimant Trust Oversight Committee (the "CTOC") to oversee such entities;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, each of the Parties stipulates and agrees as follows:

1.  <u>Covenant Not to Sue</u>. In consideration of the Senior Employee's agreement to toll the statutes of limitation with respect to any Causes of Action that can be asserted against him and to waive a portion of the Bonus Amount which would otherwise be part of the Senior Employee Claim, the Debtor and any of its successors or assigns, including the Claimant Trust or the Litigation Sub-Trust (collectively, the "HCMLP Parties"), agree not to initiate or commence any lawsuit, action or proceeding for the purpose of prosecuting any Released Causes of Action against the Senior Employee from the date of this Stipulation until the earlier of (a) thirty calendar days after the Notice Date and (b) the Dissolution Date (each as defined below) (such date, the "Termination Date"). This Stipulation shall expire upon the Termination Date and shall thereafter be of no further force and effect; *provided, however,* that the termination of this Stipulation shall not affect the treatment of the Bonus Amount set forth in Section 5 hereof or in the Plan.

2.  <u>Non-Compliance: Vesting</u>.

    a.  As set forth in the Plan, the Senior Employee acknowledges and agrees that the Employee Release will be deemed null and void and of no force and effect (1) if there is more than one member of the CTOC who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full CTOC) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

        (1) sues, attempts to sue, or threatens or works with or assists

---

the Senior Employee, including paid time off claims, claims (if applicable) for severance amounts under applicable employment agreements, and administrative claims (if applicable) but shall not include the Bonus Amount.

HMIT Appx. 01647

any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

(2)  has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets,

(3)  has violated the confidentiality provisions of Section 4 below, or

(4)  (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (i) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (ii) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing. If such determination under this Section 2a is made, the Claimant Trustee will deliver a notice of non-compliance with the Plan (the "Notice") to the Senior Employee. Such Notice will be effective when deemed delivered pursuant to Section 8.h hereof (the "Notice Date").

b.  Notwithstanding anything herein to the contrary, Employee Release will vest and all Released Causes of Action that may or could be brought against the Senior Employee will be indefeasibly released solely to the extent set forth in Article IX.D of the Plan so long as the Notice Date does not occur on or before the date that the Claimant Trust is dissolved (such date, the "Dissolution Date").

c.  Notwithstanding anything to the contrary in this Stipulation or any other document, Senior Employee expressly reserves the right to take all actions necessary to pursue enforcement and payment of the Other Employee Claims, and such actions shall not violate the terms of this Stipulation; provided, that, for the avoidance of doubt, nothing in this Stipulation shall prejudice the rights of the Debtor, or any of the Debtor's successor in interests under the Plan, to object to or otherwise challenge any Other Employee Claims or limit the Senior Employee's obligations under Section 8 hereof. Additionally, this Agreement does not affect or impair Senior Employee's rights, if any, to seek indemnification from any party, including, without limitation, the Debtor, any HCMLP Parties, or any other affiliates thereof nor does it affect or impair the right of the Debtor, or any of the Debtor's successor in interests under the Plan, to challenge such request.

3.  Tolling of Statutes of Limitation. In consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that the statute of limitations applicable to any Cause of Action is hereby tolled as of, and extended from, the date of this Stipulation through and including the Termination Date (the "Tolling Period"). The Tolling Period shall be excluded from any calculation of any statute of limitations period applicable to any Cause of Action that may be brought by the HCMLP Parties against the Senior Employee. The Senior Employee acknowledges that he will be estopped from arguing that this Stipulation is ineffective to extend the time within which the HCMLP Parties must commence an action to pursue any Cause of Action.

HMIT Appx. 01648

4.    <u>Confidentiality</u>. In further consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that, in addition to existing obligations to maintain all business sensitive information concerning the HCMLP Parties in strictest confidence, each Senior Employee further agrees to keep all discussions, information and observations including, but not limited to, attorney-client privileged or work product information (collectively "<u>Confidential Information</u>") relating to the activities or <u>planned</u> activities of the HCMLP Parties strictly confidential. Each Senior Employee covenants and represents that it will not discuss such Confidential Information with anyone, other than the Senior Employee's personal attorney, the Claimant Trustee, or its respective representatives.

5.    <u>Bonus Amount.</u>

a.    The Senior Employee has agreed to forfeit a percentage of his Bonus Amount in consideration for the Employee Release and acknowledges that such agreement is an integral part of this Stipulation. The Senior Employee hereby agrees that (i) the Bonus Amount will be treated as an Allowed Class 7 (Convenience Claim) under the Plan and, to the extent required, will reduce his Bonus Amount as required to qualify for such treatment, (ii) the Senior Employee will receive the treatment provided to other Allowed Class 7 (Convenience Claims), (iii) the Allowed Class 7 distribution on the Bonus Amount will be further reduced by 5% (the "<u>Reduced Amount</u>"), and (iv) the Reduced Amount will be forever waived and released. Except as set forth herein, nothing herein will prejudice or otherwise impact any Other Employee Claim, or prevent the Senior Employee from prosecuting, pursuing, or enforcing any Other Employee Claim.

b.    For the avoidance of doubt, although the Employee Release can be nullified as set forth in Section 2, any such nullification will have no effect on the treatment of the Senior Employee's Bonus Amount pursuant to this Section 5.

6.    <u>Other Employee Claims</u>.  The Parties acknowledge and agree that the Senior Employee is not entitled to make the Convenience Class Election with respect to the Other Employee Claims.

7.    <u>Effective Date</u>. The Parties acknowledge and agree that this Stipulation and the Parties' obligations hereunder are conditioned in all respects on the approval of the Plan by the Bankruptcy Court and the occurrence of the Effective Date of the Plan. If, for any reason, the Plan is not approved by the Bankruptcy Court or the Effective Date does not occur, this Stipulation will be null and void and of no force and effect.

8.    <u>Plan Support</u>.  The Senior Employee agrees that he will use commercially reasonable efforts to assist the Debtor in confirmation of the Plan, including, without limitation, filing a notice of such Senior Employee's withdrawal from the *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669], and vote, if applicable, the Bonus Amount, the Other Employee Claims, and any other Claims in favor of the Plan.

9.    <u>Miscellaneous</u>.

a.    <u>Counterparts</u>. This Stipulation may be signed in counterparts and

**HMIT Appx. 01649**

such signatures may be delivered by facsimile or other electronic means.

        b.   <u>Binding Effect</u>. This Stipulation shall inure to the benefit of, and be binding upon, any and all successors-in-interests, assigns, and legal representatives, of any Party.

        c.   <u>Authority</u>. Each Party to this Stipulation and each person executing this document on behalf of any Party to this Stipulation warrants and represents that he, she, or it has the power and authority to execute, deliver and perform its obligations under this Stipulation.

        d.   <u>Entire Agreement</u>. This Stipulation sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written and oral agreements and discussions. This Stipulation may only be amended by an agreement in writing signed by the Parties.

        e.   <u>No Waiver and Reservation of Rights</u>. Except as otherwise provided herein, nothing in this Stipulation shall be, or deemed to be, a waiver of any rights, remedies, or privileges of any of the Parties. Except as otherwise provided herein, this Stipulation is without prejudice to any Party's rights, privileges and remedies under applicable law, whether at law or in equity, and each Party hereby reserves all of such rights, privileges and remedies under applicable law.

        f.   <u>No Admission of Liability</u>. The Parties acknowledge that there is a bona fide dispute with respect to the Causes of Action. Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Senior Employee and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Senior Employee.

        g.   <u>No Waiver If Breach</u>. The Parties agree that no breach of any provision hereof can be waived except in writing. The waiver of a breach of any provision hereof shall not be deemed a waiver of any other breach of any provision hereof.

        h.   <u>Notice</u>. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered by email, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be subsequently specified in writing by any Party and delivered to all other Parties pursuant to this Section:

**Senior Employee**

[_____]
[_____]
[_____]
[_____]
Email: [_____]

With a copy to:

**HMIT Appx. 01650**

**Attorneys for Senior Employee**

[_____]
[_____]
[_____]
[_____]
Email: [_____]

**HCMLP**

Highland Capital Management, L.P
[_____]
[_____]
Attention: James P. Seery, Jr.
Telephone No.: [_____]
Email: [_____]

With a copy to:

**Attorneys for HCMLP**

[_____]
[_____]
[_____]
[_____]
Email: [_____]

       i.    Advice of Counsel. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Stipulation; (b) executed this Stipulation upon the advice of such counsel; (c) read this Stipulation, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Stipulation and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

       j.    Severability. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

       k.    Governing Law: Venue. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the jurisdiction of the Bankruptcy Court with respect to any disputes arising from or out of this Agreement.

**HMIT Appx. 01651**

*[Remainder of Page Blank]*

HMIT Appx. 01652

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____

Its: _____

**SENIOR EMPLOYEE**

By: _____

Name: _____

Its: _____

# EXHIBIT W

HMIT Appx. 01654

## SENIOR EMPLOYEE STIPULATION AND TOLLING
## AGREEMENT EXTENDING STATUTES OF LIMITATION

This stipulation (the "Stipulation") is entered into as of [_____], by and between **[EMPLOYEE NAME]** (the "Senior Employee") and Highland Capital Management, L.P. (the "Debtor"). The Debtor and the Senior Employee are individually referred to as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on October 16, 2019, the Debtor filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (the "Chapter 11 Case"):

WHEREAS, on October 29, 2019, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee") in the Chapter 11 Case;

WHEREAS, on November ~~13,~~24, 2020, the Debtor filed the *~~Third~~Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be further amended~~, or~~ supplemented~~, or otherwise modified from time to time~~, the "Plan")~~:~~[1] [Docket No. 1472]. A hearing to consider confirmation of the Plan is currently scheduled for January 26, 2021.

WHEREAS, prior to and during the course of the Chapter 11 Case, the Senior Employee was employed by the Debtor as its [_____] and in such role provided services to the Debtor;

WHEREAS, ~~the Senior Employee is owed for his services~~ (i) certain amounts that were allegedly due to be paid to the Senior Employee for the partial year of 2018 in installments due on February 28, 2020 and August 31, 2020; and (ii) certain amounts that were due to the Senior Employee in respect of the 2017 Deferred Award that vested after three years on May 31, 2020 ((i) and (ii), collectively, the "~~Earned Amounts"):WHEREAS, the Committee objected to the Senior Employee receiving the Earned Amounts during the Chapter 11 Case and the Earned Amounts, although earned, was not paid~~Bonus Amount") were not paid because of objections raised by the Committee;

WHEREAS, as of the date hereof, the total ~~Earned Amounts~~Bonus Amount through and including the date hereof ~~owed to the Senior Employee~~ is $ [_____];

WHEREAS, on [____], the Senior Employee filed a proof of claim [Claim No. [_]] (the "Proof of Claim"), which included a claim for the Bonus Amount;

WHEREAS, as set forth in the Proof of Claim, the Senior Employee may have other ~~prepetition and postpetition~~ Claims against the Debtor in addition to the ~~Earned Amounts~~Bonus Amount (the "Other Employee Claims" and together with the Bonus Amount, the "Senior

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**HMIT Appx. 01655**

Employee Claims")[2]:

WHEREAS, the Committee has alleged that certain causes of action against the Senior Employee may exist, which causes of action have been or will be retained pursuant to the Plan (the "Causes of Action"):

WHEREAS, the Plan provides for the release of such certain of the Causes of Action (the "Released Causes of Action") against the Senior Employee as set forth in therein (the "Employee Release"):

WHEREAS, both the Employee Release is and the payment of the Bonus Amount (as reduced pursuant to this Agreement) are conditioned on the Senior Employee executing this Stipulation on or prior to the Effective Date of the Plan and reducing his Earned Amounts as set forth herein Confirmation Date;

WHEREAS, the Plan provides for the creation of the Claimant Trust and Litigation Sub-Trust and the appointment of the Claimant Trust Oversight Committee (the "CTOC") to oversee such entities;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, each of the Parties stipulates and agrees as follows:

1. <u>Covenant Not to Sue</u>. In consideration of the Senior Employee's agreement to toll the statutes of limitation with respect to any Causes of Action that can be asserted against him and to waive a portion of the Earned Amounts Bonus Amount which would otherwise due to be part of the Senior Employee Claim, the Debtor and any of its successors or assigns, including the Claimant Trust or the Litigation Sub-Trust (collectively, the "HCMLP Parties"), agree not to initiate or commence any lawsuit, action or proceeding for the purpose of prosecuting any Released Causes of Action against the Senior Employee from the date of this Stipulation until the earlier of (a) thirty calendar days after the Notice Date and (b) the Dissolution Date (each as defined below) (such date, the "Termination Date"). This Stipulation shall expire upon the Termination Date and shall thereafter be of no further force and effect; *provided, however,* that the termination of this Stipulation shall not affect the treatment of the Earned Amounts Bonus Amount set forth in Section 5 hereof or in the Plan.

2. <u>Non-Compliance: Vesting</u>.

a. As set forth in the Plan, the Senior Employee acknowledges and agrees that the Employee Release will be deemed null and void and of no force and effect (1) if there is more than one member of the CTOC who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full CTOC) that such Employee (regardless of whether the Employee is then

---

[2] For the avoidance of doubt, the "Other Employee Claims" shall include all prepetition and postpetition Claims of the Senior Employee except for the Earned Amounts, including paid time off claims, claims (if applicable) for severance amounts under applicable employment agreements, and administrative claims (if applicable) but shall not include the Bonus Amount.

currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

(1) sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

(2) has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets,

(3) has violated the confidentiality provisions of Section 4 below, or

(4) (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (i) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (ii) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing. If such determination under this Section 2a is made, the Claimant Trustee will deliver a notice of non-compliance with the Plan (the "<u>Notice</u>") to the Senior Employee. Such Notice will be effective when deemed delivered pursuant to Section 8.h hereof (the "<u>Notice Date</u>").

b. Notwithstanding anything herein to the contrary, Employee Release will vest and all <u>Released </u>Causes of Action that may or could be brought against the Senior Employee will be indefeasibly released solely to the extent set forth in Article IX.D of the Plan so long as the Notice Date does not occur on or before the date that the Claimant Trust is dissolved (such date, the "<u>Dissolution Date</u>").

c. Notwithstanding anything to the contrary in this Stipulation or any other document, Senior Employee expressly reserves the right to take all actions necessary to pursue enforcement and payment of the Other Employee Claims, and such actions shall not violate the terms of this Stipulation; <u>provided</u>, that, for the avoidance of doubt, nothing in this Stipulation shall prejudice the rights of the Debtor, or any of the Debtor's successor in interests under the Plan, to object to or otherwise challenge any Other Employee Claims<u> or limit the Senior Employee's obligations under Section 8 hereof</u>. Additionally, this Agreement does not affect or impair Senior Employee's rights, if any, to seek indemnification from any party, including, without limitation, the Debtor, any HCMLP Parties, or any other affiliates thereof nor does it affect or impair the right of the Debtor, or any of the Debtor's successor in interests under the Plan, to challenge such request.

3. <u>Tolling of Statutes of Limitation</u>. In consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that the statute of ~~limitation~~<u>limitations</u> applicable to any Cause of Action is hereby tolled as of, and extended from, the date of this Stipulation through and including the Termination Date (the "<u>Tolling Period</u>"). The Tolling Period shall be excluded from any calculation of any statute of limitations period applicable to any Cause of Action that may be brought by the HCMLP Parties against the Senior Employee. The Senior Employee acknowledges that he will be estopped from arguing that

this Stipulation is ineffective to extend the time within which the HCMLP Parties must commence an action to pursue any Cause of Action.

4. <u>Confidentiality</u>. In further consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that, in addition to existing obligations to maintain all business sensitive information concerning the HCMLP Parties in strictest confidence, each Senior Employee further agrees to keep all discussions, information and observations including, but not limited to, attorney-client privileged or work product information (collectively "<u>Confidential Information</u>") relating to the activities or <u>planned</u> activities of the HCMLP Parties strictly confidential. Each Senior Employee covenants and represents that it will not discuss such Confidential Information with anyone, other than the Senior Employee's personal attorney, the Claimant Trustee, or its respective representatives.

5. ~~Earned Amounts~~<u>Bonus Amount.</u>

a. The Senior Employee has agreed to forfeit a percentage of his <u>Bonus Amount</u> in consideration for the Employee Release and acknowledges that such agreement is an integral part of this Stipulation. The Senior Employee hereby agrees that (i) the ~~Earned Amounts~~<u>Bonus Amount</u> will be treated as an Allowed Class 7 (Convenience Claim) under the Plan and, to the extent required, will reduce his ~~Earned Amounts~~<u>Bonus Amount</u> as required to qualify for such treatment, (ii) the Senior Employee will receive the treatment provided to other Allowed Class 7 (Convenience Claims), (iii) the ~~Earned Amounts~~<u>Allowed Class 7 distribution on the Bonus Amount</u> will be further reduced by ~~40~~<u>5</u>% (the "<u>Reduced Amount</u>"), and (iv) the Reduced Amount will be forever waived and released. Except as set forth herein, nothing herein will prejudice or otherwise impact any Other Employee Claim, or prevent the Senior Employee from prosecuting, pursuing, or enforcing any Other Employee Claim.

b. For the avoidance of doubt, although the Employee Release can be nullified as set forth in Section 2, any such nullification will have no effect on the treatment of the Senior Employee's ~~Earned Amounts~~<u>Bonus Amount</u> pursuant to this Section 5.

<u>6. Other Employee Claims. The Parties acknowledge and agree that the Senior Employee is not entitled to make the Convenience Class Election with respect to the Other Employee Claims.</u>

<u>7.</u> ~~6.~~<u>Effective Date</u>. The Parties acknowledge and agree that this Stipulation and the Parties' obligations hereunder are conditioned in all respects on the approval of the Plan by the Bankruptcy Court and the occurrence of the Effective Date of the Plan. If, for any reason, the Plan is not approved by the Bankruptcy Court or the Effective Date does not occur, this Stipulation will be null and void and of no force and effect.

<u>8.</u> ~~7.~~<u>Plan Support</u>. The Senior Employee agrees that he will use commercially reasonable efforts to assist the Debtor in confirmation of the Plan~~and vote any~~<u>, including, without limitation, filing a notice of such Senior Employee's withdrawal from the *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669], and vote, if applicable, the Bonus Amount, the Other Employee Claims, and</u>

any other Claims in favor of the Plan.

9. 8. Miscellaneous.

a. Counterparts. This Stipulation may be signed in counterparts and such signatures may be delivered by facsimile or other electronic means.

b. Binding Effect. This Stipulation shall inure to the benefit of, and be binding upon, any and all successors-in-interests, assigns, and legal representatives, of any Party.

c. Authority. Each Party to this Stipulation and each person executing this document on behalf of any Party to this Stipulation warrants and represents that he, she, or it has the power and authority to execute, deliver and perform its obligations under this Stipulation.

d. Entire Agreement. This Stipulation sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written and oral agreements and discussions. This Stipulation may only be amended by an agreement in writing signed by the Parties.

e. No Waiver and Reservation of Rights. Except as otherwise provided herein, nothing in this Stipulation shall be, or deemed to be, a waiver of any rights, remedies, or privileges of any of the Parties. Except as otherwise provided herein, this Stipulation is without prejudice to any Party's rights, privileges and remedies under applicable law, whether at law or in equity, and each Party hereby reserves all of such rights, privileges and remedies under applicable law.

f. No Admission of Liability. The Parties acknowledge that there is a bona fide dispute with respect to the Causes of Action. Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Senior Employee and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Senior Employee.

g. No Waiver If Breach. The Parties agree that no breach of any provision hereof can be waived except in writing. The waiver of a breach of any provision hereof shall not be deemed a waiver of any other breach of any provision hereof.

h. Notice. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered by email, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be subsequently specified in writing by any Party and delivered to all other Parties pursuant to this Section:

**Senior Employee**

[_____]
[_____]
[_____]

[_____]
Email: [_____]

With a copy to:

**Attorneys for Senior Employee**

[_____]
[_____]
[_____]
[_____]
Email: [_____]

**HCMLP**

Highland Capital Management, L.P
[_____]
[_____]
Attention: James P. Seery, Jr.
Telephone No.: [_____]
Email: [_____]

With a copy to:

**Attorneys for HCMLP**

[_____]
[_____]
[_____]
[_____]
Email: [_____]

   i. <u>Advice of Counsel</u>. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Stipulation; (b) executed this Stipulation upon the advice of such counsel; (c) read this Stipulation, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Stipulation and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

   j. <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

        k.     <u>Governing Law: Venue</u>. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the jurisdiction of the Bankruptcy Court with respect to any disputes arising from or out of this Agreement.

*[Remainder of Page Blank]*

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____

Its: _____

**SENIOR EMPLOYEE**

By: _____

Name: _____

Its: _____

Document comparison by Workshare 9.5 on Thursday, January 21, 2021
4:39:21 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/41454/10 |
| Description | DOCS_NY-#41454-v10-Highland_-_Senior_Employee_Stipulation |
| Document 2 ID | PowerDocs://DOCS_NY/41454/18 |
| Description | DOCS_NY-#41454-v18-Highland_-_Senior_Employee_Stipulation |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 44 |
| Deletions | 32 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 76 |

HMIT Appx. 01663

# EXHIBIT X

HMIT Appx. 01664

**Schedule of Contracts and Leases to Be Assumed**

1.  Advisory Services Agreement, dated November 21, 2011, effective June 20, 2011, by and between Carey International, Inc., and Highland Capital Management, L.P.

2.  Amended and Restated Advisory Services Agreement, dated March 4, 2013, by and between Trussway Holdings, Inc., and Highland Capital Management, L.P.

3.  Reference Portfolio Management Agreement, dated March 4, 2004, by and between Highland Capital Management, L.P., and Citibank N.A.

4.  Advisory Services Agreement, dated May 25, 2011, by and between CCS Medical, Inc., and Highland Capital Management, L.P.

5.  Amended and Restated Advisory Services Agreement, dated February 28, 2013, by and between Cornerstone Healthcare Group Holding, Inc., and Highland Capital Management, L.P.

6.  Prime Brokerage Agreement by and between Jefferies LLC and Highland Capital Management, L.P., dated May 24, 2013.

7.  Amended and Restated Shared Services Agreement, dated August 21, 2015, by and between Highland Capital Management, L.P., and Falcon E&P Opportunities GP, LLC.

8.  Amended and Restated Administrative Services Agreement, effective as of August 21, 2015, by and between Highland Capital Management, L.P., and Petrocap Partners II GP, LLC.

9.  Office Lease, between Crescent Investors, L.P., and Highland Capital Management, L.P.

10. Paylocity Corporation Services Agreement, between Highland Capital Management, L.P., and Paylocity Corporation, dated November 19, 2012.

11. Electronic Trading Services Agreement, between SunTrust Robinson Humphrey Inc., and Highland Capital Management, L.P., dated February 6, 2019.

12. Letter Agreement, between FTI Consulting, Inc., and Highland Capital Management, L.P., dated November 19, 2018.

13. Administrative Services Agreement, dated January 1, 2018, between Highland Capital Management, L.P., and Liberty Life Assurance Company of Boston.

14. Electronic Communications: Customer Authorization & Indemnification, between Highland Capital Management, L.P., and The Bank of New York Mellon Corporation, dated August 9, 2016.

15. Letter Agreement, dated August 9, 2016, Electronic Access Terms and Conditions, by and between The Bank of New York Mellon Trust Company, N.A., and Highland Capital Management, L.P.

16. Shared Services Agreement by and between Highland HCF Advisor, Ltd., and Highland Capital Management, L.P., dated effective October 27, 2017.

17. Sub-Advisory Agreement, by and between Highland HCF Advisors, Ltd., and Highland Capital Management, dated effective October 27, 2017.

18. Collateral Management Agreement, dated November 2, 2006, by and between Highland Credit Opportunities CDO Ltd. and Highland Capital Management, L.P.

19. Management Agreement, dated November 15, 2007, between Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master L.P., Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P.

20. Investment Management Agreement, between Highland Capital Multi-Strategy Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

21. Investment Management Agreement, between Highland Capital Multi-Strategy Master Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

22. Management Agreement, dated August 22, 2007, between and among Highland Capital Management, L.P., and Walkers Fund Services Limited, as trustee of Highland Credit Opportunities Japanese Unit Trust.

23. Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P., dated November 1, 2013.

24. Investment Management Agreement, dated March 31, 2015, by and among Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., and Highland Capital Management, L.P.

25. Amended and Restated Investment Management Agreement, dated February 27, 2017, by and among Highland Prometheus Master Fund L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland SunBridge GP, LLC, and Highland Capital Management, L.P.

26. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

27. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

28. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

29. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

30. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

31. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

32. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

33. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

34. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

35. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

36. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

37. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

38. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

39. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

40. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

41. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

42. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

43. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

44. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

45. AT&T Managed Internet Service, between Highland Capital Management, L.P. and AT&T Corp., dated February 24, 2015.

46. ViaWest, Master Service Agreement, dated October 3, 2011, between Highland Capital Management, L.P. and ViaWest

47. Stockholders' Agreement, dated April 15, 2005, by and between American Banknote Corporation and Highland Capital Management, L.P.

48. Stockholders' Agreement and Amendment No. 1, dated January 25, 2011, by and between Carey Holdings, Inc. and Highland Capital Management, L.P.

49. Stockholders' Agreement and Amendment, dated March 24, 2010, by and between Cornerstone Healthcare Group Holding, Inc. and Highland Capital Management, L.P.

50. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

51. Stock Purchase and Sale Agreement and Amendment, dated January 16, 2013, by and between Progenics Pharmaceuticals, Inc. and Highland Capital Management, L.P.

52. Stockholders' Agreement and Amendments, dated October 24, 2008, by and between JHT Holdings, Inc. and Highland Capital Management, L.P.

53. Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated February 25, 2013, by and between Highland Dynamic Income Fund GP, LLC and Highland Capital Management, L.P.

54. Highland Multi-Strategy Fund, L.P. Limited Partnership Agreement, dated July 6, 2006, by and between Highland Multi-Strategy Fund GP, L.P. and Highland Capital Management, L.P.

55. Operating Agreement of HE Capital, LLC (as amended), dated September 27, 2007, by and between ENA Capital, LLC Ellman Management Group, Inc. and Highland Capital Management, L.P.

56. Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund II, LLC, dated February 27, 2007, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

57. Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund, LLC, dated July 19, 2006, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

58. Highland Capital Management, L.P., Limited Liability Company Agreement of Highland Receivables Finance 1, LLC, by and between Highland Capital Management, L.P. and Highland Capital Management, L.P.

59. Agreement of Limited Partnership of Highland Restoration Capital Partners, L.P. and Amendments, dated November 6, 2007, by and between Highland Restoration Capital Partners GP, LLC and Highland Capital Management, L.P.

60. Agreement of Limited Partnership of Highland Select Equity Fund GP, L.P., dated October 2005, by and between Highland Select Equity Fund GP, LLC and Highland Capital Management, L.P.

61. Agreement of Limited Partnership of Penant Management LP, dated December 12, 2012, by and between Penant Management GP, LLC and Highland Capital Management, L.P.

62. Agreement of Limited Partnership of Petrocap Incentive Partners III, LP, dated April 12, 2018, by and between Petrocap Incentive Partners III GP, LLC, Petrocap Incentive Holdings III, LP and Highland Capital Management, L.P.

63. Amended and Restated Agreement of Limited Partnership of Petrocap Partners II, LP, dated October 30, 2014, by and between Petrocap Partners II GP, LLC, Petrocap Incentive Partners II, LP and Highland Capital Management, L.P.

64. Agreement of Limited Partnership of Highland Credit Opportunities CDO GP, L.P., dated December 29, 2005, by and between Highland Credit Opportunities CDO GP, LLC and Highland Capital Management, L.P.

65. Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P., dated November 1, 2014, by and between Highland Multi Strategy Credit Fund GP, L.P. and Highland Capital Management, L.P.

66.    DUO Security, 2 factor authentication, by and between DUO Security and Highland Capital Management, L.P.

67.    GoDaddy Domain Registrations, by and between GoDaddy and Highland Capital Management, L.P.

68.    Highland Loan Fund, Ltd. et al, Investment Management Agreement, dated July 31, 2001, by and between Highland Loan Fund, Ltd. et al and Highland Capital Management, L.P.

69.    E Mailflow Monitoring, by and between Mxtoolbox and Highland Capital Management, L.P.

70.    Cloud single sign on for HR related employee login, by and between Onelogin and Highland Capital Management, L.P.

71.    Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

72.    Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

73.    Order Addenda, dated January 28, 2020, by and between CenturyLink Communications, LLC and Highland Capital Management, L.P.

74.    Service Agreement (as amended), dated April 1, 2005, by and between Intex Solutions, Inc. and Highland Capital Management, L.P.

75.    Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

76.    Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

77.    Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

78.    Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

79.    Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

80.    Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

81.    Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

82.    Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

83. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

84. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

85. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

86. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

87. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

88. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

89. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

90. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

91. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

92. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

93. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

94. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

95. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

96. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

97. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

98. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

99. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

100. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

101. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

102. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

103. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

104. Securities Account Control Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Highland CDO Opportunity Fund, Ltd.; JPMorgan Chase Bank, National Association

105. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

106. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

107. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

108. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

109. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

110. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

111. Extension/Buy-Out Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Citigroup Financial Products Inc.; Citigroup Global Markets Inc.

112. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

113. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

114. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

115.    Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery

116.    Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel

117.    Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms

118.    Colocation Service Order dated October 14, 2019 between Highland Capital Management and Dawn US Holdings, LLC d/b/a Evoque Date Center Solutions

119.    Tradesuite Web Module Services/Agreement between Highland Capital Management and DTCC ITP LLC

DOCS_NY:41790.1 36027/002
DOCS_DE:232636.3 36027/002

HMIT Appx. 01672

# EXHIBIT Y

HMIT Appx. 01673

1. **Debtor**

Highland Capital Management, L.P.

2. **Professionals**

Pachulski Stang Ziehl & Jones LLP
Development Specialists, Inc.
Bradley Sharp
Kurtzman Carson Consultants LLC
Jenner & Block
Morris, Nichols, Arsht & Tunnel LLP
Morrison Cohen LLP
Latham & Watkins LLP
Richards Layton & Finger
Winstead PC
Rogge Dunn Group, PC
Blank Rome LLP
FTI Consulting
Young Conaway Stargatt & Taylor
Reid Collins Tsai
Deloitte
Price Waterhouse Coopers
Maples (Cayman)
Bell Nunnally
Rowlett Hill Collins LLP
Anderson Mori & Tomotsune
Culhane Meadows PLLC
Kim & Chang
Willkie Farr & Gallagher LLP
Wilmer Hale
Carey Olsen
ASW Law
Eric Felton
Morris, Nichols, Arsht & Tunnell LLP
Morrison Cohen LLP
Latham & Watkins LLP
Richards Layton & Finger
Winstead PC
Rogge Dunn Group, PC
Blank Rome LLP

1

**HMIT Appx. 01674**

**3.** **Top 20 Unsecured Creditors**

Acis Capital Management, L.P. and Acis Capital Management GP, LLC
American Arbitration Association
Andrews Kurth LLP
Bates White, LLC
Boies, Schiller & Flexner LLP
CLO Holdco, Ltd.
Connolly Gallagher LLP
Debevoise & Plimpton LLP
DLA Piper LLP (US)
Duff & Phelps, LLC
Foley Gardere
Joshua & Jennifer Terry
Lackey Hershman LLP
McKool Smith, P.C.
Meta-e Discovery LLC
NWCC, LLC
Patrick Daugherty
Redeemer Committee of The Highland Crusader Fund
Reid Collins & Tsai LLP
UBS AG, London Branch and UBS Securities LLC

**4.** **Equity Holders (Direct and Indirect)**

Atlas IDF GP LLC
Beacon Mountain LLC
Hunter Mountain Investment Trust
James Dondero
Mark K. Okada
Strand Advisors, Inc.
The Dugaboy Investment Trust
The Mark and Pamela Okada Family Trust – Exempt Trust #1
The Mark and Pamela Okada Family Trust – Exempt Trust #2

**5.** **Affiliated Parties**

Acis CLO Management GP, LLC
Acis CLO Management Holdings, L.P.
Acis CLO Management Intermediate Holdings I, LLC
Acis CLO Management Intermediate Holdings II, LLC
Acis CLO Management, LLC
Acis CMOA Trust
Advisors Equity Group LLC
Asbury Holdings, LLC
Castle Bio Manager, LLC
De Kooning, Ltd.
Eagle Equity Advisors, LLC
Eames, Ltd.
Gunwale LLC

HMIT Appx. 01675

HCREF-I Holding Corp.
HCREF-XI Holding Corp.
HCREF-XII Holding Corp.
HE Capital Fox Trails, LLC
HE Capital, LLC
HE Mezz Fox Trails, LLC
HE Peoria Place Property, LLC
HE Peoria Place, LLC
HFP CDO Construction Corp.
HFP GP, LLC
Highland Argentina Regional Opportunity Fund GP, LLC
Highland Brasil, LLC
Highland Capital Management (Singapore) Pte Ltd
Highland Capital Management Korea
Highland Capital Management Korea Limited
Highland Capital Management Korea Limited (Relying Advisor)
Highland Capital Multi-Strategy Fund, LP
Highland CDO Holding Company
Highland CDO Opportunity Fund GP, L.P.
Highland CDO Opportunity GP, LLC
Highland CLO Assets Holdings Limited
Highland CLO Holdings Ltd.
Highland CLO Management, Ltd.
Highland Dynamic Income Fund GP, LLC
Highland Employee Retention Assets LLC
Highland ERA Management, LLC
Highland Financial Corp.
Highland Financial Partners, L.P.
Highland Fund Holdings, LLC
Highland HCF Advisor Ltd. (Relying Advisor)
Highland HCF Advisors Ltd.
Highland Latin America Consulting, Ltd
Highland Latin America GP Ltd.
Highland Latin America GP, Ltd.
Highland Latin America LP, Ltd.
Highland Latin America Trust
Highland Multi Strategy Credit Fund GP, L.P.
Highland Multi Strategy Credit Fund, L.P.
Highland Multi Strategy Credit GP, LLC
Highland Multi-Strategy Fund GP, LLC
Highland Multi-Strategy Fund GP, LP
Highland Multi-Strategy Master Fund, L.P.
Highland Multi-Strategy Onshore Master SubFund II, LLC
Highland Multi-Strategy Onshore Master Subfund, LLC
Highland Receivables Finance I, LLC
Highland Restoration Capital Partners GP, LLC
Highland Select Equity GP, LLC
Highland Select Equity Master Fund, L.P.
Highland Special Opportunities Holding Company
Highland SunBridge GP, LLC
Hirst, Ltd.

3

HMIT Appx. 01676

Hockney, Ltd.
Lautner, Ltd.
Maple Avenue Holdings, LLC
Neutra, Ltd.
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions, L.P.
NHT Holdco, LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC
NREA SE2 Hidden Lake Leaseco, LLC
NREA SE2 Hidden Lake Manager, LLC
NREA SE2 Vista Ridge Leaseco, LLC
NREA SE2 Vista Ridge Manager, LLC
NREA SE2 West Place Leaseco, LLC
NREA SE2 West Place Manager, LLC
NREA SE3 Arboleda Leaseco, LLC
NREA SE3 Arboleda Manager, LLC
NREA SE3 Fairways Leaseco, LLC
NREA SE3 Fairways Manager, LLC
NREA SE3 Grand Oasis Leaseco, LLC
NREA SE3 Grand Oasis Manager, LLC
NREA Southeast Portfolio One Manager, LLC
NREA Southeast Portfolio Three Manager, LLC
NREA Southeast Portfolio Two Manager, LLC
Oldenburg, Ltd.
Penant Management LP
Pershing LLC
PetroCap Incentive Partners III, LP
Pollack, Ltd.
SE Battleground Park, LLC
SE Glenview, LLC
SE Governors Green II, LLC
SE Gulfstream Isles GP, LLC
SE Gulfstream Isles LP, LLC
SE Heights at Olde Towne, LLC
SE Lakes at Renaissance Park GP I, LLC
SE Lakes at Renaissance Park GP II, LLC
SE Lakes at Renaissance Park LP, LLC
SE Multifamily Holdings LLC
SE Multifamily REIT Holdings LLC
SE Myrtles at Olde Towne, LLC

4

HMIT Appx. 01677

SE Quail Landing, LLC
SE River Walk, LLC
SE SM, Inc.
SE Stoney Ridge II, LLC
SE Victoria Park, LLC
SH Castle BioSciences, LLC
Starck, Ltd.
The Dondero Insurance Rabbi Trust
The Okada Insurance Rabbi Trust
Tihany, Ltd.
US Gaming SPV, LLC
US Gaming, LLC
Warhol, Ltd.
Wright, Ltd.

## 6.  **Other Parties**

11 Estates Lane, LLC
1110 Waters, LLC
140 Albany, LLC
1525 Dragon, LLC
17720 Dickerson, LLC
1905 Wylie LLC
2006 Milam East Partners GP, LLC
2006 Milam East Partners, L.P.
201 Tarrant Partners, LLC
2014 Corpus Weber Road LLC
2325 Stemmons HoldCo, LLC
2325 Stemmons Hotel Partners, LLC
2325 Stemmons TRS, Inc.
300 Lamar, LLC
3409 Rosedale, LLC
3801 Maplewood, LLC
3801 Shenandoah, L.P.
3820 Goar Park LLC
400 Seaman, LLC
401 Ame, L.P.
4201 Locust, L.P.
4312 Belclaire, LLC
5833 Woodland, L.P.
5906 DeLoache, LLC
5950 DeLoache, LLC
7758 Ronnie, LLC
7759 Ronnie, LLC
AA Shotguns, LLC
Aberdeen Loan Funding, Ltd.
Acis CLO 2017-7 Ltd
Acis CLO Trust
Allenby, LLC
Allisonville RE Holdings, LLC
AM Uptown Hotel, LLC

5

HMIT Appx. 01678

Apex Care, L.P
Ascendant Advisors
Asury Holdings, LLC (fka HCSLR Camelback Investors (Delaware), LLC)
Atlas IDF LP
Atlas IDF, LP
Baylor University
BB Votorantim Highland Infrastructure, LLC
BDC Toys Holdco, LLC
BH Willowdale Manager, LLC
Big Spring Partners, LLC
Bloomdale, LLC
Brentwood CLO, Ltd.
Brentwood Investors Corp.
Bristol Bay Funding Ltd.
C-1 Arbors, Inc.
C-1 Cutter's Point, Inc.
C-1 Eaglecrest, Inc.
C-1 Silverbrook, Inc.
Cabi Holdco GP, LLC
Cabi Holdco I, Ltd.
Cabi Holdco, L.P.
Camelback Residential Investors, LLC (fka Sevilla Residential Partners, LLC)
Camelback Residential Partners, LLC
Capital Real Estate - Latitude, LLC
Castle Bio, LLC
CG Works, Inc. (fka Common Grace Ventures, Inc.)
Claymore Holdings, LLC
Concord Management, LLC
Corbusier, Ltd.
CP Equity Hotel Owner, LLC
CP Equity Land Owner, LLC
CP Equity Owner, LLC
CP Hotel TRS, LLC
CP Land Owner, LLC
CP Tower Owner, LLC
Crossings 2017 LLC
Crown Global Insurance Company
Dallas Cityplace MF SPE Owner LLC
Dallas Lease and Finance, L.P.
DFA/BH Autumn Ridge, LLC
Dolomiti, LLC
DrugCrafters, L.P.
Dugaboy Management, LLC
Dugaboy Project Management GP, LLC
Dustin Norris
Eastland CLO, Ltd.
Eastland Investors Corp.
EDS Legacy Heliport, LLC
EDS Legacy Partners Owner, LLC
EDS Legacy Partners, LLC
Entegra Strat Superholdco, LLC

6

HMIT Appx. 01679

Entegra-FRO Holdco, LLC
Entegra-FRO Superholdco, LLC
Entegra-HOCF Holdco, LLC
Entegra-NHF Holdco, LLC
Entegra-NHF Superholdco, LLC
Entegra-RCP Holdco, LLC
Estates on Maryland Holdco, LLC
Estates on Maryland Owners SM, Inc.
Estates on Maryland Owners, LLC
Estates on Maryland, LLC
Falcon E&P Four Holdings, LLC
Falcon E&P One, LLC
Falcon E&P Opportunities Fund GP LLC
Falcon E&P Opportunities Fund, L.P.
Falcon E&P Opportunities GP, LLC
Falcon E&P Royalty Holdings, LLC
Falcon E&P Six, LLC
Falcon E&P Two, LLC
Falcon Four Midstream, LLC
Falcon Four Upstream, LLC
Falcon Incentive Partners GP, LLC
Falcon Incentive Partners, LP
Falcon Six Midstream, LLC
Fix Asset Management
Flamingo Vegas Holdco, LLC (fka Cabi Holdco, LLC)
Four Rivers Co-Invest, L.P.
Frank Waterhouse
FRBH Abbington SM, Inc.
FRBH Abbington, LLC
FRBH Arbors, LLC
FRBH Beechwood SM, Inc.
FRBH Beechwood, LLC
FRBH C1 Residential, LLC
FRBH Courtney Cove SM, Inc.
FRBH Courtney Cove, LLC
FRBH CP, LLC
FRBH Duck Creek, LLC
FRBH Eaglecrest, LLC
FRBH Edgewater JV, LLC
FRBH Edgewater Owner, LLC
FRBH Edgewater SM, Inc.
FRBH JAX-TPA, LLC
FRBH Nashville Residential, LLC
FRBH Regatta Bay, LLC
FRBH Sabal Park SM, Inc.
FRBH Sabal Park, LLC
FRBH Silverbrook, LLC
FRBH Timberglen, LLC
FRBH Willow Grove SM, Inc.
FRBH Willow Grove, LLC
FRBH Woodbridge SM, Inc.

7

HMIT Appx. 01680

FRBH Woodbridge, LLC
Freedom C1 Residential, LLC
Freedom Duck Creek, LLC
Freedom Edgewater, LLC
Freedom JAX-TPA Residential, LLC
Freedom La Mirage, LLC
Freedom LHV LLC
Freedom Lubbock LLC
Freedom Miramar Apartments, LLC
Freedom Sandstone, LLC
Freedom Willowdale, LLC
FRM Investment Management
Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura
G&E Apartment REIT The Heights at Olde Towne, LLC
G&E Apartment REIT The Myrtles at Olde Towne, LLC
GAF REIT, LLC
GAF Toys Holdco, LLC
Gardens of Denton II, L.P.
Gardens of Denton III, L.P.
Gleneagles CLO, Ltd.
Governance Ltd.
Governance Re, Ltd.
Governance, Ltd.
Grayson CLO, Ltd.
Grayson Investors Corp.
Greenbriar CLO, Ltd.
Grosvenor Capital Management, L.P.
Hakusan, LLC
Hammark Holdings LLC
Hampton Ridge Partners, LLC
Harko, LLC
Haverhill Acquisition Co., LLC
Haygood, LLC
HCBH 11611 Ferguson, LLC
HCBH Buffalo Pointe II, LLC
HCBH Buffalo Pointe III, LLC
HCBH Buffalo Pointe, LLC
HCBH Hampton Woods SM, Inc.
HCBH Hampton Woods, LLC
HCBH Overlook SM, Inc.
HCBH Overlook, LLC
HCBH Rent Investors, LLC
HCF Funds
HCMS Falcon GP, LLC
HCMS Falcon, L.P.
HCO Holdings, LLC
HCOF Preferred Holdings, LP
HCOF Preferred Holdings, Ltd.
HCRE 1775 James Ave, LLC
HCRE Addison TRS, LLC
HCRE Addison, LLC (fka HWS Addison, LLC)

8

HMIT Appx. 01681

HCRE Hotel Partner, LLC (fka HCRE HWS Partner, LLC)
HCRE Las Colinas TRS, LLC
HCRE Las Colinas, LLC (fka HWS Las Colinas, LLC)
HCRE Partners, LLC
HCRE Plano TRS, LLC
HCRE Plano, LLC (fka HWS Plano, LLC)
HCREF-II Holding Corp.
HCREF-III Holding Corp.
HCREF-IV Holding Corp.
HCREF-IX Holding Corp.
HCREF-V Holding Corp.
HCREF-VI Holding Corp.
HCREF-VII Holding Corp.
HCREF-VIII Holding Corp.
HCREF-XIII Holding Corp.
HCREF-XIV Holding Corp.
HCREF-XV Holding Corp.
HCSLR Camelback Investors (Cayman), Ltd.
HCSLR Camelback, LLC
HE 41, LLC
HE Capital 232 Phase I Property, LLC
HE Capital 232 Phase I, LLC
HE Capital Asante, LLC
HE Capital KR, LLC
HE CLO Holdco, LLC
HE Mezz KR, LLC
Heron Pointe Investors, LLC
HFP Asset Funding II, Ltd.
HFP Asset Funding III, Ltd.
HFRO Sub, LLC
Hibiscus HoldCo, LLC
Highland - First Foundation Income Fund
Highland 401(k) Plan
Highland Argentina Regional Opportunity Fund, L.P.
Highland Argentina Regional Opportunity Fund, Ltd.
Highland Argentina Regional Opportunity Master Fund, L.P.
Highland Capital Brasil Gestora de Recursos (fka Highland Brasilinvest Gestora de Recursos, LTDA; fka
HBI Consultoria Empresarial, LTDA)
Highland Capital Insurance Solutions GP LLC
Highland Capital Insurance Solutions LP
Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management
Ltd)
Highland Capital Management Fund Advisors, L.P. (fka Pyxis Capital, L.P.)
Highland Capital Management Latin America, L.P.
Highland Capital Management Latin America, L.P. (Relying Advisor)
Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.
Highland Capital Management Services, Inc.
Highland Capital Management, L.P.
Highland Capital Management, L.P. Charitable Fund
Highland Capital Management, L.P. Retirement Plan and Trust
Highland Capital of New York

DOCS_DE:225885.7 36027/002

HMIT Appx. 01682

Highland Capital of New York, Inc.
Highland Capital Real Estate Fund GP, LLC
Highland Capital Special Allocation, LLC
Highland CDO Opportunity Fund, L.P.
Highland CDO Opportunity Fund, Ltd.
Highland CDO Opportunity Master Fund, L.P.
Highland CDO Trust
Highland CLO 2018-1, Ltd.
Highland CLO Assets Holdings Limited
Highland CLO Funding, Ltd. (fka Acis Loan Funding, Ltd.)
Highland CLO Gaming Holdings, LLC
Highland CLO Management Ltd.
Highland CLO Trust
Highland Credit Opportunities CDO Asset Holdings GP, Ltd.
Highland Credit Opportunities CDO Asset Holdings, L.P.
Highland Credit Opportunities CDO Financing, LLC
Highland Credit Opportunities CDO, Ltd.
Highland Credit Opportunities Holding Corporation
Highland Credit Opportunities Japanese Feeder Sub-Trust
Highland Credit Strategies Fund, L.P.
Highland Credit Strategies Fund, Ltd.
Highland Credit Strategies Holding Corporation
Highland Credit Strategies Master Fund, L.P.
Highland Crusader Fund
Highland Dynamic Income Fund, L.P. (fka Highland Capital Loan Fund, L.P.)
Highland Dynamic Income Fund, Ltd. (fka Highland Loan Fund, Ltd.)
Highland Dynamic Income Master Fund, L.P. (fka Highland Loan Master Fund, L.P.)
Highland Energy Holdings, LLC
Highland Energy MLP Fund (fka Highland Energy and Materials Fund)
Highland eSports Private Equity Fund
Highland Fixed Income Fund
Highland Flexible Income UCITS Fund
Highland Floating Rate Fund
Highland Floating Rate Opportunities Fund (fka Highland Floating Rate Opportunities Fund II)
Highland Fund Holdings, LLC
Highland Funds I
Highland Funds II
Highland Funds III
Highland GAF Chemical Holdings, LLC
Highland General Partner, LP
Highland Global Allocation Fund (fka Highland Global Allocation Fund II)
Highland GP Holdings, LLC
Highland Healthcare Equity Income and Growth Fund
Highland iBoxx Senior Loan ETF
Highland Income Fund (fka Highland Floating Rate Opportunities Fund)
Highland Legacy Limited
Highland LF Chemical Holdings, LLC
Highland Loan Funding V, Ltd.
Highland Long/Short Equity Fund
Highland Long/Short Healthcare Fund
Highland Marcal Holding, Inc.

10

HMIT Appx. 01683

Highland Merger Arbitrage Fund
Highland Multi Strategy Credit Fund, Ltd. (fka Highland Credit Opportunities Fund, Ltd.)
Highland Multi Strategy Credit Fund, Ltd. (fka Highland Credit Opportunities Fund, Ltd.)
Highland Multi-Strategy Fund GP, LLC
Highland Multi-Strategy Fund GP, LP
Highland Multi-Strategy IDF GP, LLC
Highland Opportunistic Credit Fund
Highland Park CDO 1, Ltd.
Highland Premium Energy & Materials Fund
Highland Prometheus Feeder Fund I, L.P.
Highland Prometheus Feeder Fund II, L.P.
Highland Prometheus Master Fund, L.P.
Highland RCP Fund II, L.P.
Highland RCP II GP, LLC
Highland RCP II SLP GP, LLC
Highland RCP II SLP, L.P.
Highland RCP Parallel Fund II, L.P.
Highland Restoration Capital Partners Master, L.P.
Highland Restoration Capital Partners Offshore, L.P.
Highland Restoration Capital Partners, L.P.
Highland Select Equity Fund GP, L.P.
Highland Select Equity Fund, L.P.
Highland Small-Cap Equity Fund
Highland Socially Responsible Equity Fund (fka Highland Premier Growth Equity Fund)
Highland Tax-Exempt Fund
Highland TCI Holding Company, LLC
Highland Total Return Fund
Highland's Roads Land Holding Company, LLC
HMCF PB Investors, LLC
HRT North Atlanta, LLC
HRT Timber Creek, LLC
HRTBH North Atlanta, LLC
HRTBH Timber Creek, LLC
Huber Funding LLC
HWS Investors Holdco, LLC
James Dondero
Jasper CLO, Ltd.
Jewelry Ventures I, LLC
JMIJM, LLC
John Honis
Karisopolis, LLC
Keelhaul LLC
Kuilima Montalban Holdings, LLC
Kuilima Resort Holdco, LLC
KV Cameron Creek Owner, LLC
Lakes at Renaissance Park Apartments Investors, L.P.
Lakeside Lane, LLC
Landmark Battleground Park II, LLC
LAT Battleground Park, LLC
LAT Briley Parkway, LLC
Lauren Thedford

11

HMIT Appx. 01684

Leawood RE Holdings, LLC
Liberty Cayman Holdings, Ltd.
Liberty CLO, Ltd.
Long Short Equity Sub, LLC
Longhorn Credit Funding, LLC
Lurin Real Estate Holdings V, LLC
Mark and Pamela Okada Family Trust - Exempt Descendants' Trust
Mark and Pamela Okada Family Trust - Exempt Trust #2
Mark Okada
Markham Fine Jewelers, L.P.
Meritage Residential Partners, LLC
ML CLO XIX Sterling (Cayman), Ltd.
NCI Assets Holding Company LLC
New Jersey Tissue Company Holdco, LLC (fka Marcal Paper Mills Holding Company, LLC)
NexAnnuity Holdings, Inc.
NexBank Capital Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities, Inc.
NexBank SSB
NexBank Title, Inc. (dba NexVantage Title Services)
NexBank Wealth Advisors
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital Inc.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc. (fka NexPoint Capital, LLC)
NexPoint CR F/H DST, LLC
NexPoint Discount Strategies Fund (fka NexPoint Discount Yield Fund)
NexPoint Energy and Materials Opportunities Fund (fka NexPoint Energy Opportunities Fund)
NexPoint Event-Driven Fund (fkaNexPoint Merger Arbitrage Fund)
NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Funds
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC (fka NREA Lincoln Porte, LLC)
NexPoint Multifamily Capital Trust, Inc. (fka NexPoint Multifamily Realty Trust, Inc., fka Highland
Capital Realty Trust, Inc.)
NexPoint Multifamily Operating Partnership, L.P.
NexPoint Peoria, LLC
NexPoint RE Finance Advisor GP, LLC

HMIT Appx. 01685

NexPoint RE Finance Advisor, L.P.
NexPoint Real Estate Advisors GP, LLC
NexPoint Real Estate Advisors II, L.P.
NexPoint Real Estate Advisors III, L.P.
NexPoint Real Estate Advisors IV, L.P.
NexPoint Real Estate Advisors V, L.P.
NexPoint Real Estate Advisors VI, L.P.
NexPoint Real Estate Advisors VII GP, LLC
NexPoint Real Estate Advisors VII, L.P.
NexPoint Real Estate Advisors VIII, L.P.
NexPoint Real Estate Advisors, L.P.
NexPoint Real Estate Capital, LLC (fka Highland Real Estate Capital, LLC, fka Highland Multifamily
Credit Fund, LLC)
NexPoint Real Estate Finance OP GP, LLC
NexPoint Real Estate Finance Operating Partnership, L.P.
NexPoint Real Estate Finance, Inc.
NexPoint Real Estate Opportunities, LLC (fka Freedom REIT LLC)
NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)
NexPoint Real Estate Strategies Fund
NexPoint Residential Trust Inc.
NexPoint Residential Trust Operating Partnership GP, LLC
NexPoint Residential Trust Operating Partnership, L.P.
NexPoint Securities, Inc. (fka Highland Capital Funds Distributor, Inc.) (fka Pyxis Distributors, Inc.)
NexPoint Strategic Income Fund (fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed
Strategies Fund)
NexPoint Strategic Opportunities Fund (fka NexPoint Credit Strategies Fund)
NexPoint Texas Multifamily Portfolio DST (fka NREA Southeast Portfolio Two, DST)
NexPoint WLIF I Borrower, LLC
NexPoint WLIF II Borrower, LLC
NexPoint WLIF III Borrower, LLC
NexStrat LLC
NexVest, LLC
NexWash LLC
NFRO REIT Sub, LLC
NFRO TRS, LLC
NHF CCD, Inc.
NHT 2325 Stemmons, LLC
NHT Beaverton TRS, LLC (fka NREA Hotel TRS, Inc.)
NHT Beaverton, LLC
NHT Bend TRS, LLC
NHT Bend, LLC
NHT Destin TRS, LLC
NHT Destin, LLC
NHT DFW Portfolio, LLC
NHT Holdings, LLC
NHT Intermediary, LLC
NHT Nashville TRS, LLC
NHT Nashville, LLC
NHT Olympia TRS, LLC
NHT Olympia, LLC
NHT Operating Partnership GP, LLC

13

HMIT Appx. 01686

NHT Operating Partnership II, LLC
NHT Operating Partnership, LLC
NHT Salem, LLC
NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment, LLC (fka NREA Crossings Ridgewood Investors, LLC)
NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC
NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST
NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC

14

HMIT Appx. 01687

NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles, DST (Converted from DK Gateway Andros, LLC)
NREA SE1 Arborwalk, DST (Converted from MAR Arborwalk, LLC)
NREA SE1 Towne Crossing, DST (Converted from Apartment REIT Towne Crossing, LP)
NREA SE1 Walker Ranch, DST (Converted from SOF Walker Ranch Owner, L.P.)
NREA SE2 Hidden Lake, DST (Converted from SOF Hidden Lake SA Owner, L.P.)
NREA SE2 Vista Ridge, DST (Converted from MAR Vista Ridge, L.P.)
NREA SE2 West Place, DST (Converted from Landmark at West Place, LLC)
NREA SE3 Arboleda, DST (Converted from G&E Apartment REIT Arboleda, LLC)
NREA SE3 Fairways, DST (Converted from MAR Fairways, LLC)
NREA SE3 Grand Oasis, DST (Converted from Landmark at Grand Oasis, LP)
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Two, LLC
NREA SOV Investors, LLC
NREA Uptown TRS, LLC
NREA VB I LLC
NREA VB II LLC
NREA VB III LLC
NREA VB IV LLC
NREA VB Pledgor I LLC
NREA VB Pledgor II LLC
NREA VB Pledgor III LLC
NREA VB Pledgor IV LLC
NREA VB Pledgor V LLC
NREA VB Pledgor VI LLC
NREA VB Pledgor VII LLC
NREA VB SM, Inc.
NREA VB V LLC
NREA VB VI LLC
NREA VB VII LLC
NREA Vista Ridge Investment Co, LLC
NREC AR Investors, LLC
NREC Latitude Investors, LLC
NREC REIT Sub, Inc.
NREC TRS, Inc.
NREC WW Investors, LLC
NREF OP I Holdco, LLC
NREF OP I SubHoldco, LLC
NREF OP I, L.P.
NREF OP II Holdco, LLC
NREF OP II SubHoldco, LLC
NREF OP II, L.P.
NREF OP IV REIT Sub TRS, LLC

15

HMIT Appx. 01688

NREF OP IV REIT Sub, LLC
NREF OP IV, L.P.
NREO NW Hospitality Mezz, LLC
NREO NW Hospitality, LLC
NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC
NXRT Abbington, LLC
NXRT Atera II, LLC
NXRT Atera, LLC
NXRT AZ2, LLC
NXRT Barrington Mill, LLC
NXRT Bayberry, LLC
NXRT Bella Solara, LLC
NXRT Bella Vista, LLC
NXRT Bloom, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine LP, LLC
NXRT Brentwood Owner, LLC
NXRT Brentwood, LLC
NXRT Cedar Pointe Tenant, LLC
NXRT Cedar Pointe, LLC
NXRT Cityview, LLC
NXRT Cornerstone, LLC
NXRT Crestmont, LLC
NXRT Enclave, LLC
NXRT Glenview, LLC
NXRT H2 TRS, LLC
NXRT Heritage, LLC
NXRT Hollister TRS LLC
NXRT Hollister, LLC
NXRT LAS 3, LLC
NXRT Master Tenant, LLC
NXRT Nashville Residential, LLC (fka Freedom Nashville Residential, LLC)
NXRT North Dallas 3, LLC
NXRT Old Farm, LLC
NXRT Pembroke Owner, LLC
NXRT Pembroke, LLC
NXRT PHX 3, LLC
NXRT Radbourne Lake, LLC
NXRT Rockledge, LLC
NXRT Sabal Palms, LLC
NXRT SM, Inc.
NXRT Steeplechase, LLC
NXRT Stone Creek, LLC
NXRT Summers Landing GP, LLC
NXRT Summers Landing LP, LLC
NXRT Torreyana, LLC
NXRT Vanderbilt, LLC

DOCS_DE:225885.7 36027/002

HMIT Appx. 01689

NXRT West Place, LLC
NXRTBH AZ2, LLC
NXRTBH Barrington Mill Owner, LLC
NXRTBH Barrington Mill SM, Inc.
NXRTBH Barrington Mill, LLC
NXRTBH Bayberry, LLC
NXRTBH Cityview, LLC
NXRTBH Colonnade, LLC
NXRTBH Cornerstone Owner, LLC
NXRTBH Cornerstone SM, Inc.
NXRTBH Cornerstone, LLC
NXRTBH Dana Point SM, Inc.
NXRTBH Dana Point, LLC
NXRTBH Foothill SM, Inc.
NXRTBH Foothill, LLC
NXRTBH Heatherstone SM, Inc.
NXRTBH Heatherstone, LLC
NXRTBH Hollister Tenant, LLC
NXRTBH Hollister, LLC
NXRTBH Madera SM, Inc.
NXRTBH Madera, LLC
NXRTBH McMillan, LLC
NXRTBH North Dallas 3, LLC
NXRTBH Old Farm II, LLC
NXRTBH Old Farm Tenant, LLC
NXRTBH Old Farm, LLC
NXRTBH Radbourne Lake, LLC
NXRTBH Rockledge, LLC
NXRTBH Sabal Palms, LLC
NXRTBH Steeplechase, LLC (dba Southpoint Reserve at Stoney Creek)-VA
NXRTBH Stone Creek, LLC
NXRTBH Vanderbilt, LLC
NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC
Okada Family Revocable Trust
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
PCMG Trading Partners XXIII, L.P.
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
PensionDanmark Pensionsforsikringsaktieselskab
Perilune Aero Equity Holdings One, LLC
PetroCap Incentive Partners II, L.P.

17

HMIT Appx. 01690

PetroCap Partners II, L.P.
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Powderhorn, LLC
PWM1 Holdings, LLC
PWM1, LLC
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand PE Fund I, L.P.
Rand PE Fund Management LLC
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Hollister, LLC
RTT Rockledge, LLC
Sandstone Pasadena Apartments, LLC
Scott Ellington
SE Governors Green Holdings, L.L.C. (fka SCG Atlas Governors Green Holdings, L.L.C.)
SE Governors Green I, LLC
SE Governors Green REIT, L.L.C. (fka SCG Atlas Governors Green REIT, L.L.C.)
SE Governors Green, LLC (fka SCG Atlas Governors Green, L.L.C.)
SE Oak Mill I Holdings, LLC (fka SCG Atlas Oak Mill I Holdings, L.L.C.)
SE Oak Mill I Owner, LLC (fka SCG Atlas Oak Mill I, L.L.C.)
SE Oak Mill I REIT, LLC (fka SCG Atlas Oak Mill I REIT, L.L.C.)
SE Oak Mill I, LLC
SE Oak Mill II Holdings, LLC (fka SCG Atlas Oak Mill II Holdings, L.L.C.)
SE Oak Mill II Owner, LLC (fka SCG Atlas Oak Mill II, L.L.C.)
SE Oak Mill II REIT, LLC (fka SCG Atlas Oak Mill II REIT, L.L.C.)
SE Oak Mill II, LLC
SE Stoney Ridge Holdings, L.L.C. (fka SCG Atlas Stoney Ridge Holdings, L.L.C.)
SE Stoney Ridge I, LLC
SE Stoney Ridge REIT, L.L.C. (fka SCG Atlas Stoney Ridge REIT, L.L.C.)
SE Stoney Ridge, LLC (fka SCG Atlas Stoney Ridge, L.L.C.)
SFH1, LLC
SFR WLIF I, LLC (fka NexPoint WLIF I, LLC)
SFR WLIF II, LLC (NexPoint WLIF II, LLC)
SFR WLIF III, LLC (NexPoint WLIF III, LLC)
SFR WLIF Manager, LLC (NexPoint WLIF Manager, LLC)
SFR WLIF, LLC (NexPoint WLIF, LLC)
SFR WLIF, LLC Series I
SFR WLIF, LLC Series II
SFR WLIF, LLC Series III
Small Cap Equity Sub, LLC

18

Socially Responsible Equity Sub, LLC
SOF Brandywine I Owner, L.P.
SOF Brandywine II Owner, L.P.
SOF-X GS Owner, L.P.
Southfork Cayman Holdings, Ltd.
Southfork CLO, Ltd.
Specialty Financial Products Designated Activity Company (fka Specialty Financial Products Limited)
Spiritus Life, Inc.
SRL Whisperwod LLC
SRL Whisperwood Member LLC
SRL Whisperwood Venture LLC
SSB Assets LLC
Stonebridge PEF
Stonebridge-Highland Healthcare Private Equity Fund
Strand Advisors III, Inc.
Strand Advisors IV, LLC
Strand Advisors IX, LLC
Strand Advisors V, LLC
Strand Advisors XIII, LLC
Strand Advisors XVI, Inc.
Strand Advisors, Inc.
Stratford CLO, Ltd.
Summers Landing Apartment Investors, L.P.
The Dugaboy Investment Trust
The Get Good Non-Exempt Trust No. 1
The Get Good Non-Exempt Trust No. 2
The Get Good Trust
The Ohio State Life Insurance Company
The Okada Family Foundation, Inc.
The SLHC Trust
Thread 55, LLC
Tranquility Lake Apartments Investors, L.P.
Trey Parker
Tricor Business Outsourcing
Turtle Bay Holdings, LLC
Tuscany Acquisition, LLC
United States Army Air Force Exchange Services
Uptown at Cityplace Condominium Association, Inc.
US Gaming OpCo, LLC
Valhalla CLO, Ltd.
VB GP LLC
VB Holding, LLC
VB One, LLC
VB OP Holdings LLC
VBAnnex C GP, LLC
VBAnnex C Ohio, LLC
VBAnnex C, LP
VineBrook Annex B, L.P.
VineBrook Annex I, L.P.
VineBrook Homes Merger Sub II LLC
VineBrook Homes Merger Sub LLC

19

HMIT Appx. 01692

VineBrook Homes OP GP, LLC
VineBrook Homes Operating Partnership, L.P.
VineBrook Homes Trust, Inc.
VineBrook Partners I, L.P.
VineBrook Partners II, L.P.
VineBrook Properties, LLC
Wake LV Holdings II, Ltd.
Wake LV Holdings, Ltd.
Walter Holdco GP, LLC
Walter Holdco I, Ltd.
Walter Holdco, L.P.
Westchester CLO, Ltd.
Yellow Metal Merchants, Inc.

**7. Taxing and Other Significant Governmental Authorities**

California Franchise Tax Board
Internal Revenue Service
Los Angeles County Tax Collector
Delaware Division of Revenue

**8. Banks and Secured Parties**

BBVA
KeyBank National Association
Jeffries, LLC Prime Brokerage Services
Frontier State Bank

**9. United States Bankruptcy Judges in the District of Delaware**

The Honorable Brendan L. Shannon
The Honorable Christopher S. Sontchi, Chief Judge
The Honorable John T. Dorsey
The Honorable Karen B. Owens
The Honorable Kevin Gross
The Honorable Laurie Selber Silverstein
The Honorable Mary F. Walrath

**10. United States Trustee for the District of Delaware (and Key Staff Members)**

Andrew Vara, Acting US Trustee
Benjamin Hackman, Trial Attorney
Christine Green, Paralegal Specialist
David Buchbinder, Trial Attorney
Diane Giordano, Bankruptcy Analyst
Dion Wynn, Paralegal Specialist
Edith A. Serrano, Paralegal Specialist
Hannah M. McCollum, Trial Attorney
Holly Dice, Auditor (Bankruptcy)

James R. O'Malley, Bankruptcy Analyst
Jane Leamy, Trial Attorney
Jeffrey Heck, Bankruptcy Analyst
Juliet Sarkessian, Trial Attorney
Karen Starr, Bankruptcy Analyst
Linda Casey, Trial Attorney
Linda Richenderfer, Trial Attorney
Lauren Attix, OA Assistant
Michael Panacio, Bankruptcy Analyst
Michael West, Bankruptcy Analyst

Ramona Vinson, Paralegal Specialist          T. Patrick Tinker, Assistant U.S. Trustee
Richard Schepacarter, Trial Attorney         Timothy J. Fox, Jr., Trial Attorney
Shakima L. Dortch, Paralegal Specialist

**11. Clerk of Court and Deputy for the District of Delaware**

Stephen Grant, Chief Deputy Clerk
Una O'Boyle, Clerk of Court

**12. Notice Parties**

Alvarez & Marshal CF Management, LLC
Coleman County TAD
Fannin CAD
Allen ISD
Rockwall CAD
Kaufman County
Tarrant County
Dallas County
Upshur County
Grayson County
Irving ISD
Pension Benefit Guaranty Corporation
Patrick Daugherty
Hunter Mountain Trust
Integrated Financial Associates
BET Investments, II, L.P.
Crescent TC Investors, L.P.
Intertrust Entities
CLO Entities

DOCS_DE:225885.7 36027/002

**HMIT Appx. 01694**

# EXHIBIT Z

HMIT Appx. 01695

**FIFTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

# HIGHLAND CAPITAL MANAGEMENT, L.P.

(A Delaware Limited Partnership)

[                    ], 2021

ActiveUS 181752655

        This FIFTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "***Agreement***") of Highland Capital Management, L.P., (the "***Partnership***"), dated as of [＿＿＿＿＿＿], 2021 and entered into by and among the [*New GP Entity*] as general partner of the Partnership (the "***General Partner***") and the limited partner of the Partnership as set forth on Schedule A hereto (the "***Limited Partner***"), amends and restates in its entirety the Fourth Amended and Restated Agreement of Limited Partnership of the Partnership dated as of December 24, 2015 (as amended to date, the "***Prior Agreement***"), by and among Strand Advisors, Inc. (the "***Prior General Partner***") and the former limited partners of the Partnership who were limited partners of the Partnership (the "***Prior Limited Partners***"). The General Partner and Limited Partners are collectively referred to as the "***Partners***."

        WHEREAS, the Prior Agreement, as amended pursuant to that certain amendment dated [＿＿＿＿＿＿], 2021, provides for the reconstitution and continuation of the Partnership if new limited partners are admitted to the partnership within 90 days after dissolution thereof and such new limited partners consent to the continuation of the Partnership.

        WHEREAS, the Partnership was reorganized pursuant to the Plan of Reorganization of Highland Capital Management, L.P., that was approved by the United States Bankruptcy Court for Northern District of Texas, Dallas Division, on [＿＿＿＿＿＿＿＿] (the "***Plan***").

        WHEREAS, pursuant to the Plan the limited partnership interests of the Prior Limited Partners and the Prior General Partner were canceled on [＿＿＿＿＿＿＿] and new limited partnership interests were issued to the Limited Partner and the General Partner under the Prior Agreement.

        WHEREAS, the General Partner and the Limited Partner wish to ratify the admission to the Partnership of the General Partner and the Limited Partner and to amend and restate the terms of the Partnership as set forth in this Agreement.

        NOW, THEREFORE, in consideration of the agreements and obligations set forth herein, the undersigned hereby agree as follows:

        1.      Continuation.

        (a)      Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (6 *Del.C.* §17-101, *et seq.*), as amended from time to time (the "***Act***"). This Agreement amends, restates, and supersedes the Prior Agreement and all other prior agreements or understandings with respect to the matters covered herein.

        (b)      The Limited Partner, being the sole limited partner of the Partnership, hereby (i) consents to the continuation of the Partnership and (ii) ratifies and approves the appointment of the General Partner as general partner of the Partnership.

        2.      Organizational Matters.

        (a)      *Name; Certificate*.      The name of the Partnership is Highland Capital Management, L.P. The Partnership was organized as a limited partnership pursuant to the Act and

1

HMIT Appx. 01697

filed a Certificate of Limited Partnership (the "**Certificate**") with the Secretary of State of the State of Delaware. Any person authorized to act on behalf of the General Partner or the Partnership may, subject to Section 19 below, cause the Partnership to file such other certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the operation of a limited partnership in accordance with the laws of the State of Delaware and any other jurisdictions in which the Partnership shall conduct business, and to maintain such filings for so long as the Partnership conducts business therein.

(b)    *Offices*.  The name of the resident agent for service of process for the Partnership and the address of the registered office of the Partnership in the State of Delaware is Corporation Services Company, 2023 Centre Road, Wilmington Delaware 19805-1297.  The General Partner may establish places of business of the Partnership within and without the State of Delaware, as and when required by the Partnership's business and in furtherance of its purposes set forth herein, and may appoint (or cause the appointment of) agents for service of process in all jurisdictions in which the Partnership shall conduct business.  The General Partner may from time to time in its sole discretion change the Partnership's places of business, resident agent for service of process, and/or the location of its registered office in Delaware.

3.    <u>Purpose; Powers</u>.  The Partnership is formed for the purpose of engaging in any lawful act or activity for which limited partnerships may be formed under the Act.  Without limiting the foregoing, the general character and purposes of the business of the Partnership are to (a) engage in the business, directly and/or through one or more subsidiaries, of liquidating assets of, and performing investment management and advisory services for, pooled investment vehicles, funds, investment holdings, accounts, and interests therein; and (b) engage in any lawful activities (including, subject to the other provisions of this Agreement, the borrowing of money and the issuance of guarantees of indebtedness of others) directly or indirectly related or incidental thereto and in which  a Delaware limited partnership may lawfully engage.  The Partnership shall have and exercise all of the powers and rights conferred upon limited partnerships formed pursuant to the Act.

4.    <u>Management</u>.

(a)    *Authority of the General Partner*.  The business and affairs of the Partnership shall be managed exclusively by and under the direction of the General Partner, which shall have the right, power and authority to exercise all of the powers of the Partnership except as otherwise provided by law or this Agreement.  Decisions or actions made or approved by the General Partner in accordance with this Agreement shall constitute decisions or actions by the Partnership and shall be binding upon the Partnership and each Limited Partner of the Partnership.  The General Partner may not be removed or replaced by the Limited Partners.  In the event of the withdrawal, resignation or dissolution of the General Partner, a new General Partner shall be designated in writing by a majority in interest of the Limited Partners, who shall provide written notice to the remaining Limited Partners of such designation.

(b)    *Delegation of Powers; Officers*.  Notwithstanding anything to the contrary herein, the General Partner may delegate any or all or any portion of its rights, powers, authority, duties and responsibilities with respect to the management of the Partnership to such officers of the Partnership with such titles as the General Partner may determine ("**Officers**").  The General Partner

ActiveUS 181752655

**HMIT Appx. 01698**

may authorize any such Officers to sign agreements, contracts, instruments, or other documents in the name of and on behalf of the Partnership, and such authority may be general or limited to specific instances. The power and authority of any Officer appointed by the General Partner under this Section 4(b) shall not exceed the power and authority possessed by the General Partner under this Agreement. The Officers shall hold office until their successors are duly appointed or their earlier death, resignation, or removal. Any Officer so appointed may be removed at any time, with or without cause, by the written consent of the General Partner. Any Officer may resign from his or her office upon prior written notice to the Partnership. If any office shall become vacant, a replacement Officer may be appointed by the written consent of the General Partner. Two or more offices may be held by the same person. The initial Officers of the Partnership are set forth on <u>Schedule B</u>.

(c)     *Limited Partners*. No Limited Partner shall have any right to participate in the management of the Partnership as a Limited Partner. Moreover, no Limited Partner shall have any voting rights except with respect to consent to amendments as set forth in Section 19 below, or as otherwise required by the Act.

(d)     *Transactions with Affiliates*. The General Partner or any person controlling, controlled by, or under common control with the General Partner (an "***Affiliate***") may engage in transactions with the Partnership from time to time, including without limitation for lending to or borrowing from the Partnership, engaging in the provision of services to the Partnership, or otherwise engaging in business transactions with the Partnership, provided that such transactions are entered into in good faith. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Act or any other applicable law, rule, or regulation.

5.     <u>Partners</u>.

(a)     *General*. The name, address, and percentage interest ownership interest of the General Partner and each Limited Partner in the Partnership (the "***Percentage Interest***") are set forth on <u>Schedule A</u> hereto. Additional Limited Partners may be admitted to the Partnership, and <u>Schedule A</u> may be amended, only with the written consent of the General Partner (provided, that failure to update <u>Schedule A</u> shall not itself be conclusive of whether consent of the General Partner has been obtained). No Limited Partner shall have the right or power to resign, withdraw or retire from the Partnership, except upon (i) the occurrence of any event described in Section 17-801 of the Act (in which case the Limited Partner(s) with respect to which such event has occurred shall, automatically and with no further action necessary by any person, cease to be a Limited Partner, and shall be deemed to have solely the interest of an assignee (within the meaning of Section 17 of the Act) with respect to such Limited Partner's Limited Partnership Interest), or (ii) with the consent of the General Partner. For the avoidance of doubt, no action may be taken to reduce, directly or indirectly, the Percentage Interest of any Partner without the written consent of such Partner.

3

HMIT Appx. 01699

(b)     *Capital Contributions*.   The Partners may, in their sole discretion, make additional capital contribution to the Partnership if requested by the General Partner.  All capital, whenever contributed, shall be subject in all respects to the risks of the business and subordinate in right of payment to the claims of present or future creditors of the Partnership in accordance with this Agreement.

(c)     *Capital Accounts*.  The Partnership shall maintain a capital account for each Partner in accordance with Section 704(b) and 704(c) of the Internal Revenue Code of 1986, as amended (the "***Code***"), and the principles of the Treasury Regulations promulgated thereunder.

(d)     *Tax Representative*. The General Partner shall serve as the "tax representative" to be the Partnership's designated representative within the meaning of Section 6223 of the Code with sole authority to act on behalf of the Partnership for purposes of subchapter C of Chapter 63 of the Code and any comparable provisions of state or local income tax laws (the "***Tax Representative***").  The Tax Representative is specifically directed and authorized to take whatever steps it deems necessary or desirable to perfect such designation, including, without limitation, filing any forms or documents with the Internal Revenue Service, properly designating a particular individual to act on its behalf of the Tax Representative and taking such other action as may from time to time be required under Treasury Regulations.  The Tax Representative is hereby authorized to and shall perform all duties of a "tax representative" and shall serve as Tax Representative until its resignation or until the designation of its successor, whichever occurs sooner.

6.     <u>Allocation of Income and Losses</u>.

(a)     *Definitions*.  For purposes of this Agreement, "***Income***" and "***Loss***" of the Partnership shall mean the taxable income and loss, respectively, of the Partnership computed with the adjustments set forth in Treasury Regulation under Code Section 704(b) including (A) adjustments pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(g), (B) the inclusion of the amount of any tax-exempt income as an item of income, (C) the inclusion of the amount of any nondeductible, noncapitalizable expense as an item of deduction and (D) the inclusion of the amount of unrealized gain or unrealized loss with respect to an asset of the Partnership as an item of income or gain (as applicable) upon distribution of such asset in kind or as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(f).

(b)     *Allocations Generally*.  The Income and Loss of the Partnership for each fiscal year or other applicable period shall be allocated to and among the Partners in proportion to their respective Percentage Interests.

(c)     *Adjustments*.  Notwithstanding Section 6(b) (but subject to Section 6(c)),

(i)     Items of income or gain for any taxable period shall be allocated to the Partner in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d); and

(ii)     In no event shall any Loss or item of deduction be allocated to a Partner if such allocation would cause or increase a negative balance

ActiveUS 181752655

HMIT Appx. 01700

in such Partner's capital account determined by increasing the Partner's capital account balance by any amount the Partner may be obligated to restore to the Partnership pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) and by decreasing such capital account balance by the amounts specified in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)).

(d)     *Nonrecourse Debt*.  If at any time the Partnership incurs any "nonrecourse debt" (*i.e.*, debt that is treated as nonrecourse for purposes of Treasury Regulation Section 1.1001-2), the following provisions will apply notwithstanding anything to the contrary expressed elsewhere in this Agreement:

(i)     "Nonrecourse deductions" (as defined in Treasury Regulation Sections 1.704-2(b) and (c)) shall be allocated to the Partners in proportion to their respective Percentage Interests.

(ii)    All other allocations relating to such nonrecourse debt shall be allocated in accordance with Treasury Regulation Section 1.704-2; and

(iii)   For purposes of Sections 6(b) and 6(c), each Partner's capital account balance shall be increased by the Partner's share of minimum gain and of partner nonrecourse debt minimum gain (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

(e)     *Deductions, Credits*.  Except as otherwise provided herein or as required by Code Section 704, for federal income tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Partners in the same manner as are Income and Loss.

(f)     *Regulatory Allocations*.  Notwithstanding the provisions of Sections 6(a)-(e) above, allocations of Income and Loss shall be made in the order of priority set forth in Exhibit I to this Agreement.

(g)     *Withholding*.  To the extent that the Partnership is required to withhold and pay over any amounts to any Governmental Authority with respect to Distributions or allocations to any Limited Partner, the amount withheld shall be treated as a Distribution to that Limited Partner pursuant to Sections 4.02, 4.03 or 4.05, as applicable.  In the event of any claimed over-withholding, Limited Partners shall be limited to an action against the applicable jurisdiction and not against the Partnership (unless the Partnership has not yet paid such amounts over to such jurisdiction).  If any amount required to be withheld was not, in fact, actually withheld from one or more Distributions and the Partnership shall have been required to pay such amount to such Governmental Entity, the Partnership may, at its option, (i) require the affected Limited Partner to reimburse the Partnership for such withholding or (ii) reduce any subsequent Distributions to such Limited Partner by the amount of such withholding, in each case plus interest.  Each Limited Partner agrees to furnish the Partnership with such documentation as shall reasonably be requested by the Partnership to assist it in determining the extent of, and in fulfilling, its withholding

ActiveUS 181752655

HMIT Appx. 01701

obligations. Each Limited Partner will indemnify the General Partner and the Partnership against any losses and liabilities (including interest and penalties) related to any withholding obligations with respect to allocations or Distributions made to such Limited Partner by the Partnership.

(h) *Consistent Tax Reporting*. Except as otherwise unanimously agreed to in writing by the Limited Partners, for U.S. federal, state and local income tax purposes, the Limited Partners agree, as a condition to their admission to the Partnership, to report all taxable income, loss and items thereof (including the character and timing of such items) in a manner consistent with the manner in which such taxable income, loss or item thereof is reported by the Partnership on its tax returns and the Schedules K-1 (or any successor form) furnished by the Partnership to the Limited Partners.

7. <u>Distributions</u>. Distributions shall be made from the undistributed profit and loss account to the Partners at the times and in the aggregate amounts determined by the General Partner in its sole discretion; provided, that distributions shall be made to the Partners in accordance with their Percentage Interests. Distributions may be in cash or in kind as determined by the General Partner in its sole discretion. Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not make a distribution to the Limited Partners on account of its interest in the Partnership if such distribution would violate Section 17-607 of the Act or other applicable law.

8. <u>Other Business</u>. The Partners and their affiliates may engage in or possess an interest in other business ventures (unconnected with the Partnership) of every kind and description, independently or with others. The Partnership shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

9. <u>Limited Liability</u>. The debts, obligations, and liabilities of the Partnership, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Partnership and the General Partner. No Limited Partner shall have any liability (personal or otherwise) for any such debt, obligation, or liability of the Partnership solely by reason of acting in such capacity. For the avoidance of doubt, to the extent a Limited Partner is an Officer of the Partnership (regardless of title) and/or has authority to act on behalf of the General Partner of the Partnership, such Limited Partner shall remain a Limited Partner of the Partnership and shall not be subject to any liability (personal or otherwise) for any debt, obligation or liability of the Partnership.

10. <u>Exculpation; Indemnification</u>.

(a) *Exculpation*. Neither the General Partner nor any Covered Person (as defined below) shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts of omissions that do not constitute gross negligence, fraud, or willful misconduct. The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed on it hereunder either directly or by or through its officers, directors, agents, trustees, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(b) *Indemnification*. To the fullest extent permitted by law, subject to Section 10(d) below, the Partnership shall indemnify each Covered Person for any and all losses, claims,

ActiveUS 181752655

HMIT Appx. 01702

demands, costs, damages, liabilities (joint and several), expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which such Covered Person may be involved or threatened to be involved, as a party or otherwise, by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Partnership and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. For the avoidance of doubt, the indemnification under this Section 10(b) shall apply even though at the time of such claim, demand, action, suit or proceeding such person is no longer a Covered Person (except as set forth in Section 10(c)(iii) below). Any indemnity under this Section 10(b) shall be provided out of and only to the extent of the Partnership's assets, and no Limited Partner shall have personal liability on account thereof. For the avoidance of doubt, any indemnification obligations of the Partnership under the Prior Agreement are null and void and are superseded in their entirety by this Section 10.

(c) *Covered Persons*. "***Covered Person***" means each of the following:

(i) the General Partner, and each member, partner, director, officer, and agent thereof,

(ii) each person who is or becomes an Officer of the Partnership on or after the date of this Agreement, and

(iii) each person who is or becomes an employee or agent of the Partnership on or after the date of this Agreement if the General Partner determines in its sole discretion that such employee or agent should be a Covered Person.

"Covered Person" shall *not* include any former officer, former partner, former director, former employee, or former agent of the Partnership or the General Partner (unless such Person is a "Covered Person" as defined in clause (i) or (ii) above on or after the date of this Agreement), *unless* the General Partner in its sole discretion determines that such Person should be a Covered Person.

(d) *Limitations on Indemnification*. Notwithstanding anything to the contrary herein, no indemnification shall be provided for any Covered Person (i) with respect to any action brought by such Covered Person as a plaintiff against the Partnership or another Covered Person, or (ii) for any loss, damage or claim arising from such Covered Person's fraud, gross negligence or willful misconduct (in each case as determined by a final and binding judgment of a court or arbitrator).

(e) *Advancement of Expenses*. Expenses reasonably incurred in defending any claim, action, suit or proceeding of the character described in Section 10(b), to the extent available, shall be advanced by the Partnership prior to the final disposition of such claim, action, suit or proceeding upon receipt of a written undertaking by or on behalf of the recipient to repay all such advances if it is ultimately determined by the General Partner that such Covered Person is not entitled to indemnification pursuant to Section 10(d).

ActiveUS 181752655

HMIT Appx. 01703

(f)     *Third Party Beneficiaries*.  Covered Persons shall be deemed to be third-party beneficiaries solely for purposes of this Section 10.  All rights of any Covered Person under this Section shall inure to the benefit of such Covered Person's heirs and assigns.  Except as expressly provided in this Section 10(f), this Agreement is intended solely for the benefit of the parties hereto and, to the extent allowed by this Agreement, their respective permitted successors and assigns, and this Agreement is not for the benefit of, nor may any provision hereof be enforced by, any other person.

11.     <u>Fiscal Year</u>.  The fiscal year of the Partnership shall end on December 31st of each year.

12.     <u>Transfers of Limited Partner Interests</u>.  No Limited Partner may transfer, in whole or in part, whether by sale, exchange, lease, license, assignment, distribution, gift, transfer or other disposition or alienation in any way, its interest in the Partnership, without the prior consent of the General Partner, which consent may be given or withheld in the sole discretion of the General Partner and may include such terms and conditions as the General Partner shall deem appropriate in its sole discretion.  In addition, it shall be a condition precedent to every transfer of all or any portion of a Limited Partner's interest permitted hereunder, the transferring Limited Partner shall demonstrate to the satisfaction of the General Partner that (i) the proposed transfer will not cause or result in a breach of any violation of law, including U.S. federal or state securities laws, and (ii) that the transfer would not adversely affect the classification of the Partnership as a partnership for U.S. federal tax purposes (including by causing the Partnership to be treated as a "publicly traded partnership" under Section 7704 of the Code), terminate it as a partnership under Code Section 708, or have a substantial adverse effect with respect to U.S. federal income taxes payable by the Partnership.

13.     <u>Dissolution</u>.  The Partnership shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the consent of the General Partner; (ii) at any time there are no Limited Partners of the Partnership, unless the business of the Partnership is continued in a manner permitted by the Act; or (iii) the entry of a decree of judicial dissolution under Section 17-802 of the Act.  Following the foregoing event, the General Partner shall proceed diligently to liquidate the assets of the Partnership in a manner consistent with commercially reasonable business practices.  In the event of dissolution, the Partnership shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Partnership in an orderly manner), and the assets of the Partnership shall be applied in the manner, and in the order of priority, set forth in Section 17-804 of the Act.  Liquidating distributions to the Partners shall be made in in accordance with their Percentage Interests.

14.     <u>Severability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

15.     <u>Counterparts</u>.  This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the same counterpart.

16.     Facsimile Signature Page.  This Agreement may be executed and delivered by the parties hereto by an executed signature page transmitted by facsimile, and any failure to deliver the originally executed signature page shall not affect the validity, legality or enforceability of this Agreement.

17.     Entire Agreement.   This Agreement embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

18.     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without regard to the conflicts of law principles), all rights and remedies being governed by said laws.

19.     Consent to Jurisdiction.  Each of the parties hereto consents and submits to the exclusive jurisdiction of the Bankruptcy Court for the Northern District of Texas, Dallas Division, for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement.

20.     Amendments.  No amendment of this Agreement shall be valid or binding unless such amendment is made with the written consent of the General Partner.  Further, any amendment of this Agreement that reduces the Percentage Interest or economic rights of any Limited Partner in a manner that is disproportionate to other Limited Partners shall require the written consent of the affected Limited Partner.   For the avoidance of doubt, amendment includes any merger, combination or other reorganization or any amendment of the Certificate that has the effect of changing or superseding the terms of this Agreement.

*[Remainder of Page Intentionally Blank]*

ActiveUS 181752655

**HMIT Appx. 01705**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first set forth above.

**GENERAL PARTNER:**

[*NEW GP ENTITY*]


_____

By:
Its:


**LIMITED PARTNER:**

*[CLAIMANT TRUST]*


_____

By:
Its:  Trustee

*[Signature Page to Fifth Amended and  Restated
Agreement of Limited Partnership of Highland Capital Management, L.P.]*

ActiveUS 181752655

**HMIT Appx. 01706**

Schedule A

SCHEDULE OF PARTNERS

==[Date]==, 2021

**General Partner**

| **Name** | **Address** | **Percentage Interest** |
|---|---|---|
| *==[New GP Entity]==* | *==[Insert Address]==* | [1.00]% |

**Limited Partners**

| **Name** | **Address** | **Percentage Interest** |
|---|---|---|
| *==[Claimant Trust]==* | *==[Insert Address]==* | [99.00]% |

*Schedule A*

**HMIT Appx. 01707**

**Schedule B**

### SCHEDULE OF OFFICERS

**[Date]**, 2021

| Name | Officer Title |
|---|---|
| James P. Seery, Jr. | Chief Executive Officer |
| *[Name]* | *[Title]* |
| *[Name]* | *[Title]* |

*Schedule B*

**Exhibit I**

### REGULATORY ALLOCATIONS

(i)        Items of income or gain (computed in accordance with Section 6(a), including the adjustments therein) for any taxable period shall be allocated to the Partners in the manner and to the minimum extent required by the "minimum gain chargeback" provisions of Treasury Regulation Section 1.704-2(f) and Treasury Regulation Section 1.704-2(i)(4).

(ii)        All "nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2(b)(1)) of the Partnership for any year shall be allocated to the Partners in accordance with their respective Percentage Interests; provided, however, that nonrecourse deductions attributable to "partner nonrecourse debt" (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated to the Partners in accordance with the provisions of Treasury Regulation Section 1.704-2(i)(1).

(iii)        Items of income or gain (computed in accordance with Section 6(a), including the adjustments therein) for any taxable period shall be allocated to the Partners in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*).

(iv)        In no event shall Loss of the Partnership be allocated to a Partner if such allocation would cause or increase a negative balance in such Partner's Adjusted Capital Account (determined for purposes of this Exhibit I only, by increasing the Partner's Adjusted Capital Account balance by the amount the Partner is obligated to restore to the Partnership pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(*c*) and decreasing it by the amounts specified in Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*)).

(v)        For tax purposes, except as otherwise provided herein or as required by Code Section 704, all items of income, gain, loss, deduction or credit shall be allocated to the Partners in the same manner as are Income and Loss; provided, however, that if the Book Value of any property of the Partnership differs from its adjusted basis for tax purposes, then items of income, gain, loss, deduction or credit related to such property for tax purposes shall be allocated among the Partners so as to take account of the variation between the adjusted basis of the property for tax purposes and its Book Value in the manner provided for under Code Section 704(c).

(vi)        For purposes hereof, the following terms have the meanings set forth below:

"***Adjusted Capital Account***" means, for each Partner, such Partner's capital account balance increased by such Partner's share of "minimum gain" and of "partner nonrecourse debt minimum gain" (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

"***Book Value***" means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes; provided, however, that (i) the initial Book Value of any asset contributed to the Partnership shall be adjusted to equal its fair market value as determined by the General Partner at the time of its contribution, and (ii) the Book Values of all assets held by the Partnership shall be

*Schedule B*

adjusted to equal their respective fair market values as determined by the General Partner (taking Code Section 7701(g) into account) upon an election by the Partnership to revalue its property in accordance with Regulation Section 1.704-1(b)(2)(iv)(*f*) and upon liquidation of the Partnership. The Book Value of any asset whose Book Value was adjusted pursuant to the preceding sentence shall thereafter be adjusted in accordance with the provisions of Regulation Section 1.704-1(b)(2)(iv)(*g*).

1

**HMIT Appx. 01710**

# EXHIBIT AA

**FIFTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

# HIGHLAND CAPITAL MANAGEMENT, L.P.

(A Delaware Limited Partnership)

 [_____], 2020 2021

HMIT Appx. 01712

This FIFTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "*Agreement*") of Highland Capital Management, L.P., (the "*Partnership*"), dated as of [⬛⬛⬛⬛⬛⬛⬛⬛], ~~2020~~2021 and entered into by and among the [*New GP Entity*] as general partner of the Partnership (the "*General Partner*") and the limited partner of the Partnership as set forth on Schedule A hereto (the "*Limited Partner*"), amends and restates in its entirety the Fourth Amended and Restated Agreement of Limited Partnership of the Partnership dated as of December 24, 2015 (as amended to date, the "*Prior Agreement*"), by and among Strand Advisors, Inc. (the "*Prior General Partner*") and the former limited partners of the Partnership who were limited partners of the Partnership (the "*Prior Limited Partners*").  The General Partner and Limited Partners are collectively referred to as the "*Partners*."

WHEREAS, the Prior Agreement, as amended pursuant to that certain amendment dated [⬛⬛⬛⬛⬛⬛⬛⬛], ~~2020,~~2021, provides for the reconstitution and continuation of the Partnership if new limited partners are admitted to the partnership within 90 days after dissolution thereof and such new limited partners consent to the continuation of the Partnership.

WHEREAS, the Partnership was reorganized pursuant to the Plan of Reorganization of Highland Capital Management, L.P., that was approved by the United States Bankruptcy Court for Northern District of Texas, Dallas Division, on [⬛⬛⬛⬛⬛⬛⬛⬛] (the "*Plan*").

WHEREAS, pursuant to the Plan the limited partnership interests of the Prior Limited Partners and the Prior General Partner were canceled on [⬛⬛⬛⬛⬛⬛⬛⬛] and new limited partnership interests were issued to the Limited Partner and the General Partner under the Prior Agreement.

WHEREAS, the General Partner and the Limited Partner wish to ratify the admission to the Partnership of the General Partner and the Limited Partner and to amend and restate the terms of the Partnership as set forth in this Agreement.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein, the undersigned hereby agree as follows:

1.    Continuation.

(a)    Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (6 *Del.C.* §17-101, *et seq.)*, as amended from time to time (the "*Act*").  This Agreement amends, restates, and supersedes the Prior Agreement and all other prior agreements or understandings with respect to the matters covered herein.

(b)    The Limited Partner, being the sole limited partner of the Partnership, hereby (i) consents to the continuation of the Partnership and (ii) ratifies and approves the appointment of the General Partner as general partner of the Partnership.

2.    Organizational Matters.

(a)    *Name; Certificate*.    The name of the Partnership is Highland Capital Management, L.P.  The Partnership was organized as a limited partnership pursuant to the Act and

ActiveUS 181752655

filed a Certificate of Limited Partnership (the "***Certificate***") with the Secretary of State of the State of Delaware. Any person authorized to act on behalf of the General Partner or the Partnership may, subject to Section 19 below, cause the Partnership to file such other certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the operation of a limited partnership in accordance with the laws of the State of Delaware and any other jurisdictions in which the Partnership shall conduct business, and to maintain such filings for so long as the Partnership conducts business therein.

(b)  *Offices*. The name of the resident agent for service of process for the Partnership and the address of the registered office of the Partnership in the State of Delaware is Corporation Services Company, 2023 Centre Road, Wilmington Delaware 19805-1297. The General Partner may establish places of business of the Partnership within and without the State of Delaware, as and when required by the Partnership's business and in furtherance of its purposes set forth herein, and may appoint (or cause the appointment of) agents for service of process in all jurisdictions in which the Partnership shall conduct business. The General Partner may from time to time in its sole discretion change the Partnership's places of business, resident agent for service of process, and/or the location of its registered office in Delaware.

3.  <u>Purpose; Powers</u>. The Partnership is formed for the purpose of engaging in any lawful act or activity for which limited partnerships may be formed under the Act. Without limiting the foregoing, the general character and purposes of the business of the Partnership are to (a) engage in the business, directly and/or through one or more subsidiaries, of liquidating assets of, and performing investment management and advisory services for, pooled investment vehicles, funds, investment holdings, accounts, and interests therein; and (b) engage in any lawful activities (including, subject to the other provisions of this Agreement, the borrowing of money and the issuance of guarantees of indebtedness of others) directly or indirectly related or incidental thereto and in which a Delaware limited partnership may lawfully engage. The Partnership shall have and exercise all of the powers and rights conferred upon limited partnerships formed pursuant to the Act.

4.  <u>Management</u>.

(a)  *Authority of the General Partner*. The business and affairs of the Partnership shall be managed exclusively by and under the direction of the General Partner, which shall have the right, power and authority to exercise all of the powers of the Partnership except as otherwise provided by law or this Agreement. Decisions or actions made or approved by the General Partner in accordance with this Agreement shall constitute decisions or actions by the Partnership and shall be binding upon the Partnership and each Limited Partner of the Partnership. The General Partner may not be removed or replaced by the Limited Partners. In the event of the withdrawal, resignation or dissolution of the General Partner, a new General Partner shall be designated in writing by a majority in interest of the Limited Partners, who shall provide written notice to the remaining Limited Partners of such designation.

(b)  *Delegation of Powers; Officers*. Notwithstanding anything to the contrary herein, the General Partner may delegate any or all or any portion of its rights, powers, authority, duties and responsibilities with respect to the management of the Partnership to such officers of the Partnership with such titles as the General Partner may determine ("***Officers***"). The General Partner may authorize any such Officers to sign agreements, contracts, instruments, or other documents in

ActiveUS 181752655

the name of and on behalf of the Partnership, and such authority may be general or limited to specific instances. The power and authority of any Officer appointed by the General Partner under this Section 4(b) shall not exceed the power and authority possessed by the General Partner under this Agreement. The Officers shall hold office until their successors are duly appointed or their earlier death, resignation, or removal. Any Officer so appointed may be removed at any time, with or without cause, by the written consent of the General Partner. Any Officer may resign from his or her office upon prior written notice to the Partnership. If any office shall become vacant, a replacement Officer may be appointed by the written consent of the General Partner. Two or more offices may be held by the same person. The initial Officers of the Partnership are set forth on Schedule B.

(c)     *Limited Partners*.  No Limited Partner shall have any right to participate in the management of the Partnership as a Limited Partner.  Moreover, no Limited Partner shall have any voting rights except with respect to consent to amendments as set forth in Section 19 below, or as otherwise required by the Act.

(d)     *Transactions with Affiliates*.  The General Partner or any person controlling, controlled by, or under common control with the General Partner (an "**Affiliate**") may engage in transactions with the Partnership from time to time, including without limitation for lending to or borrowing from the Partnership, engaging in the provision of services to the Partnership, or otherwise engaging in business transactions with the Partnership, provided that such transactions are entered into in good faith.  Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Act or any other applicable law, rule, or regulation.

5.     Partners.

(a)     *General*.  The name, address, and percentage interest ownership interest of the General Partner and each Limited Partner in the Partnership (the "**Percentage Interest**") are set forth on Schedule A hereto.  Additional Limited Partners may be admitted to the Partnership, and Schedule A may be amended, only with the written consent of the General Partner (provided, that failure to update Schedule A shall not itself be conclusive of whether consent of the General Partner has been obtained).  No Limited Partner shall have the right or power to resign, withdraw or retire from the Partnership, except upon (i) the occurrence of any event described in Section 17-801 of the Act (in which case the Limited Partner(s) with respect to which such event has occurred shall, automatically and with no further action necessary by any person, cease to be a Limited Partner, and shall be deemed to have solely the interest of an assignee (within the meaning of Section 17 of the Act) with respect to such Limited Partner's Limited Partnership Interest), or (ii) with the consent of the General Partner.  For the avoidance of doubt, no action may be taken to reduce, directly or indirectly, the Percentage Interest of any Partner without the written consent of such Partner.

(b)     *Capital Contributions*.  The Partners may, in their sole discretion, make additional capital contribution to the Partnership if requested by the General Partner.  All capital,

ActiveUS 181752655

whenever contributed, shall be subject in all respects to the risks of the business and subordinate in right of payment to the claims of present or future creditors of the Partnership in accordance with this Agreement.

(c)    *Capital Accounts*.  The Partnership shall maintain a capital account for each Partner in accordance with Section 704(b) and 704(c) of the Internal Revenue Code of 1986, as amended (the "***Code***"), and the principles of the Treasury Regulations promulgated thereunder.

(d)    *Tax Representative*.  The General Partner shall serve as the "tax representative" to be the Partnership's designated representative within the meaning of Section 6223 of the Code with sole authority to act on behalf of the Partnership for purposes of subchapter C of Chapter 63 of the Code and any comparable provisions of state or local income tax laws (the "***Tax Representative***").  The Tax Representative is specifically directed and authorized to take whatever steps it deems necessary or desirable to perfect such designation, including, without limitation, filing any forms or documents with the Internal Revenue Service, properly designating a particular individual to act on its behalf of the Tax Representative and taking such other action as may from time to time be required under Treasury Regulations.  The Tax Representative is hereby authorized to and shall perform all duties of a "tax representative" and shall serve as Tax Representative until its resignation or until the designation of its successor, whichever occurs sooner.

6.    Allocation of Income and Losses.

(a)    *Definitions*.  For purposes of this Agreement, "***Income***" and "***Loss***" of the Partnership shall mean the taxable income and loss, respectively, of the Partnership computed with the adjustments set forth in Treasury Regulation under Code Section 704(b) including (A) adjustments pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(g), (B) the inclusion of the amount of any tax-exempt income as an item of income, (C) the inclusion of the amount of any nondeductible, noncapitalizable expense as an item of deduction and (D) the inclusion of the amount of unrealized gain or unrealized loss with respect to an asset of the Partnership as an item of income or gain (as applicable) upon distribution of such asset in kind or as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(f).

(b)    *Allocations Generally*.  The Income and Loss of the Partnership for each fiscal year or other applicable period shall be allocated to and among the Partners in proportion to their respective Percentage Interests.

(c)    *Adjustments*.  Notwithstanding Section 6(b) (but subject to Section 6(c)),

(i)    Items of income or gain for any taxable period shall be allocated to the Partner in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d); and

(ii)    In no event shall any Loss or item of deduction be allocated to a Partner if such allocation would cause or increase a negative balance in such Partner's capital account determined by increasing the Partner's capital account balance by any amount the Partner may be

ActiveUS 181752655

obligated to restore to the Partnership pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) and by decreasing such capital account balance by the amounts specified in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)).

(d)     *Nonrecourse Debt*.  If at any time the Partnership incurs any "nonrecourse debt" (*i.e.,* debt that is treated as nonrecourse for purposes of Treasury Regulation Section 1.1001-2), the following provisions will apply notwithstanding anything to the contrary expressed elsewhere in this Agreement:

(i)      "Nonrecourse deductions" (as defined in Treasury Regulation Sections 1.704-2(b) and (c)) shall be allocated to the Partners in proportion to their respective Percentage Interests.

(ii)     All other allocations relating to such nonrecourse debt shall be allocated in accordance with Treasury Regulation Section 1.704-2; and

(iii)    For purposes of Sections 6(b) and 6(c), each Partner's capital account balance shall be increased by the Partner's share of minimum gain and of partner nonrecourse debt minimum gain (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

(e)     *Deductions, Credits*.  Except as otherwise provided herein or as required by Code Section 704, for federal income tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Partners in the same manner as are Income and Loss.

(f)     *Regulatory Allocations*.  Notwithstanding the provisions of Sections 6(a)-(e) above, allocations of Income and Loss shall be made in the order of priority set forth in Exhibit I to this Agreement.

(g)     *Withholding*.  To the extent that the Partnership is required to withhold and pay over any amounts to any Governmental Authority with respect to Distributions or allocations to any Limited Partner, the amount withheld shall be treated as a Distribution to that Limited Partner pursuant to Sections 4.02, 4.03 or 4.05, as applicable.  In the event of any claimed over-withholding, Limited Partners shall be limited to an action against the applicable jurisdiction and not against the Partnership (unless the Partnership has not yet paid such amounts over to such jurisdiction).  If any amount required to be withheld was not, in fact, actually withheld from one or more Distributions and the Partnership shall have been required to pay such amount to such Governmental Entity, the Partnership may, at its option, (i) require the affected Limited Partner to reimburse the Partnership for such withholding or (ii) reduce any subsequent Distributions to such Limited Partner by the amount of such withholding, in each case plus interest.  Each Limited Partner agrees to furnish the Partnership with such documentation as shall reasonably be requested by the Partnership to assist it in determining the extent of, and in fulfilling, its withholding obligations.  Each Limited Partner will indemnify the General Partner and the Partnership against any losses and liabilities (including

ActiveUS 181752655

interest and penalties) related to any withholding obligations with respect to allocations or Distributions made to such Limited Partner by the Partnership.

(h) *Consistent Tax Reporting*. Except as otherwise unanimously agreed to in writing by the Limited Partners, for U.S. federal, state and local income tax purposes, the Limited Partners agree, as a condition to their admission to the Partnership, to report all taxable income, loss and items thereof (including the character and timing of such items) in a manner consistent with the manner in which such taxable income, loss or item thereof is reported by the Partnership on its tax returns and the Schedules K-1 (or any successor form) furnished by the Partnership to the Limited Partners.

7. <u>Distributions</u>. Distributions shall be made from the undistributed profit and loss account to the Partners at the times and in the aggregate amounts determined by the General Partner in its sole discretion; provided, that distributions shall be made to the Partners in accordance with their Percentage Interests. Distributions may be in cash or in kind as determined by the General Partner in its sole discretion. Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not make a distribution to the Limited Partners on account of its interest in the Partnership if such distribution would violate Section 17-607 of the Act or other applicable law.

8. <u>Other Business</u>. The Partners and their affiliates may engage in or possess an interest in other business ventures (unconnected with the Partnership) of every kind and description, independently or with others. The Partnership shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

9. <u>Limited Liability</u>. The debts, obligations, and liabilities of the Partnership, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Partnership and the General Partner. No Limited Partner shall have any liability (personal or otherwise) for any such debt, obligation, or liability of the Partnership solely by reason of acting in such capacity. For the avoidance of doubt, to the extent a Limited Partner is an Officer of the Partnership (regardless of title) and/or has authority to act on behalf of the General Partner of the Partnership, such Limited Partner shall remain a Limited Partner of the Partnership and shall not be subject to any liability (personal or otherwise) for any debt, obligation or liability of the Partnership.

10. <u>Exculpation; Indemnification</u>.

(a) *Exculpation*. Neither the General Partner nor any Covered Person (as defined below) shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts of omissions that do not constitute gross negligence, fraud, or willful misconduct. The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its officers, directors, agents, trustees, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(b) ~~(a) *General*~~ *Indemnification*. To the fullest extent permitted by law, subject to Section 10(~~e~~d) below, the Partnership shall indemnify each Covered Person ~~(as defined below)~~ for any and all losses, claims, demands, costs, damages, liabilities (joint and several), expenses of any

ActiveUS 181752655

nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which such Covered Person may be involved or threatened to be involved, as a party or otherwise, by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Partnership and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. For the avoidance of doubt, the indemnification under this Section 10(ab) shall apply even though at the time of such claim, demand, action, suit or proceeding such person is no longer a Covered Person (except as set forth in Section 10(c)(iii) below). Any indemnity under this Section 10(ab) shall be provided out of and only to the extent of the Partnership's assets, and no Limited Partner shall have personal liability on account thereof. For the avoidance of doubt, any indemnification obligations of the Partnership under the Prior Agreement are null and void and are superseded in their entirety by this Section 10.

     (c)     (b) *Covered Persons*. "**Covered Person**" means each of the following:

     (i)     the General Partner, and each member, partner, director, officer, and agent thereof,

     (ii)     each person who is or becomes an Officer of the Partnership on or after the date hereof of this Agreement, and

     (iii)     each person who is or becomes an employee or agent of the Partnership on or after the date of this Agreement if the General Partner determines in its sole discretion that such employee or agent should be a Covered Person.

     (iii) "Covered Person" shall *not* include any other current or former officer, former partner, former director, former employee, or former agent for of the Partnership or the General Partner, in each case to the extent determined by (unless such Person is a "Covered Person" as defined in clause (i) or (ii) above on or after the date of this Agreement), *unless* the General Partner in its sole discretion determines that such Person should be a Covered Person.

     (d)     (c) *Limitations on Indemnification*. Notwithstanding anything to the contrary herein, no indemnification shall be provided for any Covered Person (i) with respect to any action brought by such Covered Person as a plaintiff against the Partnership or another Covered Person, or (ii) for any loss, damage or claim arising from such Covered Person's fraud, gross negligence or willful misconduct (in each case as determined by a final and binding judgment of a court or arbitrator).

     (e)     (d) *Advancement of Expenses*. Expenses reasonably incurred in defending any claim, action, suit or proceeding of the character described in Section 10(ab), to the extent available, shall be advanced by the Partnership prior to the final disposition of such claim, action, suit or proceeding upon receipt of a written undertaking by or on behalf of the recipient to repay all such advances if it is ultimately determined by the General Partner that such Covered Person is not entitled to indemnification pursuant to Section 10(ed).

ActiveUS 181752655

**HMIT Appx. 01719**

(f) (e) *Third Party Beneficiaries*.  Covered Persons shall be deemed to be third-party beneficiaries solely for purposes of this Section 10.  All rights of any Covered Person under this Section shall inure to the benefit of such Covered Person's heirs and assigns.  Except as expressly provided in this Section 10(f), this Agreement is intended solely for the benefit of the parties hereto and, to the extent allowed by this Agreement, their respective permitted successors and assigns, and this Agreement is not for the benefit of, nor may any provision hereof be enforced by, any other person.

11.  <u>Fiscal Year</u>.  The fiscal year of the Partnership shall end on December 31st of each year.

12.  <u>Transfers of Limited Partner Interests</u>.  No Limited Partner may transfer, in whole or in part, whether by sale, exchange, lease, license, assignment, distribution, gift, transfer or other disposition or alienation in any way, its interest in the Partnership, without the prior consent of the General Partner, which consent may be given or withheld in the sole discretion of the General Partner and may include such terms and conditions as the General Partner shall deem appropriate in its sole discretion.  In addition, it shall be a condition precedent to every transfer of all or any portion of a Limited Partner's interest permitted hereunder, the transferring Limited Partner shall demonstrate to the satisfaction of the General Partner that (i) the proposed transfer will not cause or result in a breach of any violation of law, including U.S. federal or state securities laws, and (ii) that the transfer would not adversely affect the classification of the Partnership as a partnership for U.S. federal tax purposes (including by causing the Partnership to be treated as a "publicly traded partnership" under Section 7704 of the Code), terminate it as a partnership under Code Section 708, or have a substantial adverse effect with respect to U.S. federal income taxes payable by the Partnership.

13.  <u>Dissolution</u>.  The Partnership shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the consent of the General Partner; (ii) at any time there are no Limited Partners of the Partnership, unless the business of the Partnership is continued in a manner permitted by the Act; or (iii) the entry of a decree of judicial dissolution under Section 17-802 of the Act.  Following the foregoing event, the General Partner shall proceed diligently to liquidate the assets of the Partnership in a manner consistent with commercially reasonable business practices.  In the event of dissolution, the Partnership shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Partnership in an orderly manner), and the assets of the Partnership shall be applied in the manner, and in the order of priority, set forth in Section 17-804 of the Act.  Liquidating distributions to the Partners shall be made in in accordance with their Percentage Interests.

14.  <u>Severability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

15.  <u>Counterparts</u>.  This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the same counterpart.

ActiveUS 181752655

16.     <u>Facsimile Signature Page</u>.  This Agreement may be executed and delivered by the parties hereto by an executed signature page transmitted by facsimile, and any failure to deliver the originally executed signature page shall not affect the validity, legality or enforceability of this Agreement.

17.     <u>Entire Agreement</u>.     This Agreement embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

18.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without regard to the conflicts of law principles), all rights and remedies being governed by said laws.

19.     <u>Consent to Jurisdiction.  Each of the parties hereto consents and submits to the exclusive jurisdiction of the Bankruptcy Court for the Northern District of Texas, Dallas Division, for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement.</u>

20.     19.  <u>Amendments</u>.  No amendment of this Agreement shall be valid or binding unless such amendment is made with the written consent of the General Partner.  Further, any amendment of this Agreement that reduces the Percentage Interest or economic rights of any Limited Partner in a manner that is disproportionate to other Limited Partners shall require the written consent of the affected Limited Partner.  For the avoidance of doubt, amendment includes any merger, combination or other reorganization or any amendment of the Certificate that has the effect of changing or superseding the terms of this Agreement.

*[Remainder of Page Intentionally Blank]*

10

HMIT Appx. 01721

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first set forth above.

**GENERAL PARTNER:**

[*NEW GP ENTITY*]

_____

By:
Its:

**LIMITED PARTNER:**

[*CLAIMANT TRUST*]

_____

By:
Its: Trustee

*[Signature Page to Fifth Amended and Restated
Agreement of Limited Partnership of Highland Capital Management, L.P.]*

ActiveUS 181752655

Schedule A

**SCHEDULE OF PARTNERS**

**[Date]**, ~~2020~~2021

**General Partner**

| Name | Address | Percentage Interest |
|:---:|:---:|:---:|
| *[New GP Entity]* | *[Insert Address]* | [1.00]% |

**Limited Partners**

| Name | Address | Percentage Interest |
|:---:|:---:|:---:|
| *[Claimant Trust]* | *[Insert Address]* | [99.00]% |

*Schedule A*

Schedule B

**SCHEDULE OF OFFICERS**

**[Date]**, ~~2020~~2021

| Name | Officer Title |
|------|---------------|
| [James P. Seery, Jr. | [Chief Executive Officer] |
| *[Name]* | *[Title]* |
| *[Name]* | *[Title]* |

*Schedule B*

ActiveUS 181752655

**HMIT Appx. 01724**

<div align="right">**Exhibit I**</div>

## REGULATORY ALLOCATIONS

(i)     Items of income or gain (computed in accordance with Section 6(a), including the adjustments therein) for any taxable period shall be allocated to the Partners in the manner and to the minimum extent required by the "minimum gain chargeback" provisions of Treasury Regulation Section 1.704-2(f) and Treasury Regulation Section 1.704-2(i)(4).

(ii)     All "nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2(b)(1)) of the Partnership for any year shall be allocated to the Partners in accordance with their respective Percentage Interests; provided, however, that nonrecourse deductions attributable to "partner nonrecourse debt" (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated to the Partners in accordance with the provisions of Treasury Regulation Section 1.704-2(i)(1).

(iii)     Items of income or gain (computed in accordance with Section 6(a), including the adjustments therein) for any taxable period shall be allocated to the Partners in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*).

(iv)     In no event shall Loss of the Partnership be allocated to a Partner if such allocation would cause or increase a negative balance in such Partner's Adjusted Capital Account (determined for purposes of this Exhibit I only, by increasing the Partner's Adjusted Capital Account balance by the amount the Partner is obligated to restore to the Partnership pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(*c*) and decreasing it by the amounts specified in Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*)).

(v)     For tax purposes, except as otherwise provided herein or as required by Code Section 704, all items of income, gain, loss, deduction or credit shall be allocated to the Partners in the same manner as are Income and Loss; provided, however, that if the Book Value of any property of the Partnership differs from its adjusted basis for tax purposes, then items of income, gain, loss, deduction or credit related to such property for tax purposes shall be allocated among the Partners so as to take account of the variation between the adjusted basis of the property for tax purposes and its Book Value in the manner provided for under Code Section 704(c).

(vi)     For purposes hereof, the following terms have the meanings set forth below:

"***Adjusted Capital Account***" means, for each Partner, such Partner's capital account balance increased by such Partner's share of "minimum gain" and of "partner nonrecourse debt minimum gain" (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

"***Book Value***" means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes; provided, however, that (i) the initial Book Value of any asset contributed to the Partnership shall be adjusted to equal its fair market value as determined by the General Partner

<div align="center">*Schedule B*</div>

**HMIT Appx. 01725**

at the time of its contribution, and (ii) the Book Values of all assets held by the Partnership shall be adjusted to equal their respective fair market values as determined by the General Partner (taking Code Section 7701(g) into account) upon an election by the Partnership to revalue its property in accordance with Regulation Section 1.704-1(b)(2)(iv)(*f*) and upon liquidation of the Partnership. The Book Value of any asset whose Book Value was adjusted pursuant to the preceding sentence shall thereafter be adjusted in accordance with the provisions of Regulation Section 1.704-1(b)(2)(iv)(*g*).

2

HMIT Appx. 01726

Document comparison by Workshare 9.5 on Friday, January 22, 2021 3:40:54 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/41106/3 |
| Description | DOCS_NY-#41106-v3-Highland_-_5th_A&R_LPA |
| Document 2 ID | PowerDocs://DOCS_NY/41106/6 |
| Description | DOCS_NY-#41106-v6-Highland_-_5th_A&R_LPA |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 38 |
| Deletions | 26 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 64 |

HMIT Appx. 01727

# EXHIBIT BB

HMIT Appx. 01728

## SENIOR EMPLOYEE STIPULATION AND TOLLING
## AGREEMENT EXTENDING STATUTES OF LIMITATION

This stipulation (the "Stipulation") is entered into as of January 20, 2021, by and between Thomas Surgent (the "Senior Employee") and Highland Capital Management, L.P. (the "Debtor"). The Debtor and the Senior Employee are individually referred to as a "Party" and collectively as the "Parties".

### RECITALS

WHEREAS, on October 16, 2019, the Debtor filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (the "Chapter 11 Case"):

WHEREAS, on October 29, 2019, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee") in the Chapter 11 Case;

WHEREAS, On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be further amended or supplemented, the "Plan")[1] [Docket No. 1472]. A hearing to consider confirmation of the Plan is currently scheduled for January 26, 2021.

WHEREAS, prior to and during the course of the Chapter 11 Case, the Senior Employee was employed by the Debtor as its Chief Compliance Officer and in such role provided services to the Debtor;

WHEREAS, (i) certain amounts that were allegedly due to be paid to the Senior Employee for the partial year of 2018 in installments due on February 28, 2020 and August 31, 2020; and (ii) certain amounts that were due to the Senior Employee in respect of the 2017 Deferred Award that vested after three years on May 31, 2020 ((i) and (ii), collectively, the "Bonus Amount") were not paid because of objections raised by the Committee;

WHEREAS, as of the date hereof, the total Bonus Amount through and including the date hereof is $ █████████

WHEREAS, on May 26, 2020, the Senior Employee filed a proof of claim [Claim No. 183] (the "Proof of Claim"), which included a claim for the Bonus Amount;

WHEREAS, as set forth in the Proof of Claim, the Senior Employee may have other Claims against the Debtor in addition to the Bonus Amount (the "Other Employee

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

HMIT Appx. 01729

Claims" and together with the Bonus Amount, the "<u>Senior Employee Claims</u>")[2]:

WHEREAS, the Committee has alleged that certain causes of action against the Senior Employee may exist, which causes of action have been or will be retained pursuant to the Plan (the "<u>Causes of Action</u>"):

WHEREAS, the Plan provides for the release of certain of the Causes of Action (the "<u>Released Causes of Action</u>") against the Senior Employee as set forth in therein (the "<u>Employee Release</u>"):

WHEREAS, both the Employee Release and the payment of the Bonus Amount (as reduced pursuant to this Agreement) are conditioned on the Senior Employee executing this Stipulation on or prior to the Confirmation Date;

WHEREAS, the Plan provides for the creation of the Claimant Trust and Litigation Sub- Trust and the appointment of the Claimant Trust Oversight Committee (the "<u>CTOC</u>") to oversee such entities;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, each of the Parties stipulates and agrees as follows:

1.      <u>Covenant Not to Sue</u>. In consideration of the Senior Employee's agreement to toll the statutes of limitation with respect to any Causes of Action that can be asserted against him and to waive a portion of the Bonus Amount which would otherwise be part of the Senior Employee Claim, the Debtor and any of its successors or assigns, including the Claimant Trust or the Litigation Sub-Trust (collectively, the "<u>HCMLP Parties</u>"), agree not to initiate or commence any lawsuit, action or proceeding for the purpose of prosecuting any Released Causes of Action against the Senior Employee from the date of this Stipulation until the earlier of (a) thirty calendar days after the Notice Date and (b) the Dissolution Date (each as defined below) (such date, the "<u>Termination Date</u>"). This Stipulation shall expire upon the Termination Date and shall thereafter be of no further force and effect; *provided, however,* that the termination of this Stipulation shall not affect the treatment of the Bonus Amount set forth in Section 5 hereof or in the Plan.

2.      <u>Non-Compliance: Vesting</u>.

a.      As set forth in the Plan, the Senior Employee acknowledges and agrees that the Employee Release will be deemed null and void and of no force and effect (1) if there is more than one member of the CTOC who does not represent entities holding a Disputed or Allowed Claim (the "<u>Independent Members</u>"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant

---

[2] For the avoidance of doubt, the "Other Employee Claims" shall include all prepetition and postpetition Claims of the Senior Employee, including paid time off claims, claims (if applicable) for severance amounts under applicable employment agreements, and administrative claims (if applicable), but shall not include the Bonus Amount.

HMIT Appx. 01730

Trustee, determines (in each case after discussing with the full CTOC) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

(1)     sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

(2)     has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets,

(3)     has violated the confidentiality provisions of Section 4 below, or

(4)     (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (i) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (ii) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing. If such determination under this Section 2a is made, the Claimant Trustee will deliver a notice of non-compliance with the Plan (the "Notice") to the Senior Employee. Such Notice will be effective when deemed delivered pursuant to Section 8.h hereof (the "Notice Date").

b.     Notwithstanding anything herein to the contrary, Employee Release will vest and all Released Causes of Action that may or could be brought against the Senior Employee will be indefeasibly released solely to the extent set forth in Article IX.D of the Plan so long as the Notice Date does not occur on or before the date that the Claimant Trust is dissolved (such date, the "Dissolution Date").

c.     Notwithstanding anything to the contrary in this Stipulation or any other document, Senior Employee expressly reserves the right to take all actions necessary to pursue enforcement and payment of the Other Employee Claims, and such actions shall not violate the terms of this Stipulation; provided, that, for the avoidance of doubt, nothing in this Stipulation shall prejudice the rights of the Debtor, or any of the Debtor's successor in interests under the Plan, to object to or otherwise challenge any Other Employee Claims or limit the Senior Employee's obligations under Section 8 hereof. Additionally, this Agreement does not affect or impair Senior Employee's rights, if any, to seek indemnification from any party, including, without limitation, the Debtor, any HCMLP Parties, or any other affiliates thereof nor does it affect or impair the right of the Debtor, or any of the Debtor's successor in interests under the Plan, to challenge such request.

3.     Tolling of Statutes of Limitation. In consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that the statute of limitations applicable to any Cause of Action is hereby tolled as of, and

HMIT Appx. 01731

extended from, the date of this Stipulation through and including the Termination Date (the "Tolling Period"). The Tolling Period shall be excluded from any calculation of any statute of limitations period applicable to any Cause of Action that may be brought by the HCMLP Parties against the Senior Employee. The Senior Employee acknowledges that he will be estopped from arguing that this Stipulation is ineffective to extend the time within which the HCMLP Parties must commence an action to pursue any Cause of Action.

4.    Confidentiality. In further consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that, in addition to existing obligations to maintain all business sensitive information concerning the HCMLP Parties in strictest confidence, each Senior Employee further agrees to keep all discussions, information and observations including, but not limited to, attorney-client privileged or work product information (collectively "Confidential Information") relating to the activities or planned activities of the HCMLP Parties strictly confidential. Each Senior Employee covenants and represents that it will not discuss such Confidential Information with anyone, other than the Senior Employee's personal attorney, the Claimant Trustee, or its respective representatives.

5.    Bonus Amount.

a.    The Senior Employee has agreed to forfeit a percentage of his Bonus Amount in consideration for the Employee Release and acknowledges that such agreement is an integral part of this Stipulation. The Senior Employee hereby agrees that (i) the Bonus Amount will be treated as an Allowed Class 7 (Convenience Claim) under the Plan and, to the extent required, will reduce his Bonus Amount as required to qualify for such treatment, (ii) the Senior Employee will receive the treatment provided to other Allowed Class 7 (Convenience Claims), (iii) the Allowed Class 7 distribution on the Bonus Amount will be further reduced by 5% (the "Reduced Amount"), and (iv) the Reduced Amount will be forever waived and released.  Except as set forth herein, nothing herein will prejudice or otherwise impact any Other Employee Claim, or prevent the Senior Employee from prosecuting, pursuing, or enforcing any Other Employee Claim.

b.    For the avoidance of doubt, although the Employee Release can be nullified as set forth in Section 2, any such nullification will have no effect on the treatment of the Senior Employee's Bonus Amount pursuant to this Section 5.

6.    Other Employee Claims.  The Parties acknowledge and agree that the Senior Employee is not entitled to make the Convenience Class Election with respect to the Other Employee Claims.

7.    Effective Date. The Parties acknowledge and agree that this Stipulation and the Parties' obligations hereunder are conditioned in all respects on the approval of the Plan by the Bankruptcy Court and the occurrence of the Effective Date of the Plan. If, for any reason, the Plan is not approved by the Bankruptcy Court or the Effective Date does not occur, this Stipulation will be null and void and of no force and effect.

HMIT Appx. 01732

8.      Plan Support. The Senior Employee agrees that he will use commercially reasonable efforts to assist the Debtor in confirmation of the Plan, including, without limitation, filing a notice of such Senior Employee's withdrawal from the *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669], and vote, if applicable, the Bonus Amount, the Other Employee Claims, and any other Claims in favor of the Plan.

9.      Miscellaneous.

a.      Counterparts. This Stipulation may be signed in counterparts and such signatures may be delivered by facsimile or other electronic means.

b.      Binding Effect. This Stipulation shall inure to the benefit of, and be binding upon, any and all successors-in-interests, assigns, and legal representatives, of any Party.

c.      Authority. Each Party to this Stipulation and each person executing this document on behalf of any Party to this Stipulation warrants and represents that he, she, or it has the power and authority to execute, deliver and perform its obligations under this Stipulation.

d.      Entire Agreement. This Stipulation sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written and oral agreements and discussions. This Stipulation may only be amended by an agreement in writing signed by the Parties.

e.      No Waiver and Reservation of Rights. Except as otherwise provided herein, nothing in this Stipulation shall be, or deemed to be, a waiver of any rights, remedies, or privileges of any of the Parties. Except as otherwise provided herein, this Stipulation is without prejudice to any Party's rights, privileges and remedies under applicable law, whether at law or in equity, and each Party hereby reserves all of such rights, privileges and remedies under applicable law.

f.      No Admission of Liability. The Parties acknowledge that there is a bona fide dispute with respect to the Causes of Action. Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Senior Employee and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Senior Employee.

g.      No Waiver If Breach. The Parties agree that no breach of any provision hereof can be waived except in writing. The waiver of a breach of any provision hereof shall not be deemed a waiver of any other breach of any provision hereof.

h.      Notice. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered by email, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address

HMIT Appx. 01733

as may be subsequently specified in writing by any Party and delivered to all other Parties pursuant to this Section:

**Senior Employee**

Thomas Surgent



With a copy to:
**Attorneys for Senior Employee**

M. Michelle Hartmann
Baker McKenzie
1900 N. Pearl Street
Suite 1500
Dallas, Texas 75201
Email: michelle.hartmann@bakermckenzie.com

**HCMLP**

Highland Capital Management, L.P
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: (631) 804-2049
Email: jpseeryjr@gmail.com

With a copy to:

**Attorneys for HCMLP**

John A. Morris
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, New York 10017-2024
Telephone No.: (212) 561-7760
Email: jmorris@pszjlaw.com

         i.     Advice of Counsel. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Stipulation; (b) executed this Stipulation upon the advice of such counsel; (c) read this Stipulation, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Stipulation and all the terms and conditions contained herein explained by independent counsel, who has answered

HMIT Appx. 01734

any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

j.      Severability. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

k.      Governing Law: Venue. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the jurisdiction of the Bankruptcy Court with respect to any disputes arising from or out of this Agreement.

*[Remainder of Page Blank]*

7

HMIT Appx. 01735

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

**SENIOR EMPLOYEE**

By: _____
Name: _Thomas Surgent_
Its: _CCO_

8

**HMIT Appx. 01736**

# EXHIBIT CC

HMIT Appx. 01737

## SENIOR EMPLOYEE STIPULATION AND TOLLING
## AGREEMENT EXTENDING STATUTES OF LIMITATION

This stipulation (the "Stipulation") is entered into as of January 20, 2021, by and between Frank Waterhouse (the "Senior Employee") and Highland Capital Management, L.P. (the "Debtor"). The Debtor and the Senior Employee are individually referred to as a "Party" and collectively as the "Parties".

### RECITALS

WHEREAS, on October 16, 2019, the Debtor filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on October 29, 2019, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee") in the Chapter 11 Case;

WHEREAS, On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be further amended or supplemented, the "Plan")[1] [Docket No. 1472]. A hearing to consider confirmation of the Plan is currently scheduled for January 26, 2021.

WHEREAS, prior to and during the course of the Chapter 11 Case, the Senior Employee was employed by the Debtor as its Chief Financial Officer and in such role provided services to the Debtor;

WHEREAS, (i) certain amounts that were allegedly due to be paid to the Senior Employee for the partial year of 2018 in installments due on February 28, 2020 and August 31, 2020; and (ii) certain amounts that were due to the Senior Employee in respect of the 2017 Deferred Award that vested after three years on May 31, 2020 ((i) and (ii), collectively, the "Bonus Amount") were not paid because of objections raised by the Committee;

WHEREAS, as of the date hereof, the total Bonus Amount through and including the date hereof is ███████

WHEREAS, on May 26, 2020, the Senior Employee filed a proof of claim [Claim No. 182] (the "Proof of Claim"), which included a claim for the Bonus Amount;

WHEREAS, as set forth in the Proof of Claim, the Senior Employee may have other Claims against the Debtor in addition to the Bonus Amount (the "Other Employee Claims" and together

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1

with the Bonus Amount, the "Senior Employee Claims")[2]:

WHEREAS, the Committee has alleged that certain causes of action against the Senior Employee may exist, which causes of action have been or will be retained pursuant to the Plan (the "Causes of Action"):

WHEREAS, the Plan provides for the release of certain of the Causes of Action (the "Released Causes of Action") against the Senior Employee as set forth in therein (the "Employee Release"):

WHEREAS, both the Employee Release and the payment of the Bonus Amount (as reduced pursuant to this Agreement) are conditioned on the Senior Employee executing this Stipulation on or prior to the Confirmation Date:

WHEREAS, the Plan provides for the creation of the Claimant Trust and Litigation Sub-Trust and the appointment of the Claimant Trust Oversight Committee (the "CTOC") to oversee such entities:

NOW, THEREFORE, in consideration of the mutual promises set forth herein, each of the Parties stipulates and agrees as follows:

1. Covenant Not to Sue. In consideration of the Senior Employee's agreement to toll the statutes of limitation with respect to any Causes of Action that can be asserted against him and to waive a portion of the Bonus Amount which would otherwise be part of the Senior Employee Claim, the Debtor and any of its successors or assigns, including the Claimant Trust or the Litigation Sub-Trust (collectively, the "HCMLP Parties"), agree not to initiate or commence any lawsuit, action or proceeding for the purpose of prosecuting any Released Causes of Action against the Senior Employee from the date of this Stipulation until the earlier of (a) thirty calendar days after the Notice Date and (b) the Dissolution Date (each as defined below) (such date, the "Termination Date"). This Stipulation shall expire upon the Termination Date and shall thereafter be of no further force and effect: *provided, however*, that the termination of this Stipulation shall not affect the treatment of the Bonus Amount set forth in Section 5 hereof or in the Plan.

2. Non-Compliance: Vesting.

a. As set forth in the Plan, the Senior Employee acknowledges and agrees that the Employee Release will be deemed null and void and of no force and effect (1) if there is more than one member of the CTOC who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full CTOC) that such Employee (regardless of whether the Employee is then

---

[2] For the avoidance of doubt, the "Other Employee Claims" shall include all prepetition and postpetition Claims of the Senior Employee, including paid time off claims, claims (if applicable) for severance amounts under applicable employment agreements, and administrative claims (if applicable), but shall not include the Bonus Amount.

HMIT Appx. 01739

currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

(1) sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

(2) has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets,

(3) has violated the confidentiality provisions of Section 4 below, or

(4) (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (i) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (ii) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing. If such determination under this Section 2a is made, the Claimant Trustee will deliver a notice of non-compliance with the Plan (the "Notice") to the Senior Employee. Such Notice will be effective when deemed delivered pursuant to Section 8.h hereof (the "Notice Date").

b. Notwithstanding anything herein to the contrary, Employee Release will vest and all Released Causes of Action that may or could be brought against the Senior Employee will be indefeasibly released solely to the extent set forth in Article IX.D of the Plan so long as the Notice Date does not occur on or before the date that the Claimant Trust is dissolved (such date, the "Dissolution Date").

c. Notwithstanding anything to the contrary in this Stipulation or any other document, Senior Employee expressly reserves the right to take all actions necessary to pursue enforcement and payment of the Other Employee Claims, and such actions shall not violate the terms of this Stipulation; provided, that, for the avoidance of doubt, nothing in this Stipulation shall prejudice the rights of the Debtor, or any of the Debtor's successor in interests under the Plan, to object to or otherwise challenge any Other Employee Claims or limit the Senior Employee's obligations under Section 8 hereof. Additionally, this Agreement does not affect or impair Senior Employee's rights, if any, to seek indemnification from any party, including, without limitation, the Debtor, any HCMLP Parties, or any other affiliates thereof nor does it affect or impair the right of the Debtor, or any of the Debtor's successor in interests under the Plan, to challenge such request.

3. Tolling of Statutes of Limitation. In consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that the statute of limitations applicable to any Cause of Action is hereby tolled as of, and extended from, the date of this Stipulation through and including the Termination Date (the "Tolling Period"). The Tolling Period shall be excluded from any calculation of any statute of limitations period applicable to any Cause of Action that may be brought by the HCMLP Parties against the Senior Employee. The Senior Employee acknowledges that he will be estopped from arguing that this Stipulation is

3

ineffective to extend the time within which the HCMLP Parties must commence an action to pursue any Cause of Action.

        4.     Confidentiality. In further consideration of the HCMLP Parties' "Covenant Not to Sue" (set forth in Section 1 hereof), the Senior Employee agrees that, in addition to existing obligations to maintain all business sensitive information concerning the HCMLP Parties in strictest confidence, each Senior Employee further agrees to keep all discussions, information and observations including, but not limited to, attorney-client privileged or work product information (collectively "Confidential Information") relating to the activities or planned activities of the HCMLP Parties strictly confidential. Each Senior Employee covenants and represents that it will not discuss such Confidential Information with anyone, other than the Senior Employee's personal attorney, the Claimant Trustee, or its respective representatives.

        5.     Bonus Amount.

        a.     The Senior Employee has agreed to forfeit a percentage of his Bonus Amount in consideration for the Employee Release and acknowledges that such agreement is an integral part of this Stipulation. The Senior Employee hereby agrees that (i) the Bonus Amount will be treated as an Allowed Class 7 (Convenience Claim) under the Plan and, to the extent required, will reduce his Bonus Amount as required to qualify for such treatment, (ii) the Senior Employee will receive the treatment provided to other Allowed Class 7 (Convenience Claims), (iii) the Allowed Class 7 distribution on the Bonus Amount will be further reduced by 5% (the "Reduced Amount"), and (iv) the Reduced Amount will be forever waived and released. Except as set forth herein, nothing herein will prejudice or otherwise impact any Other Employee Claim, or prevent the Senior Employee from prosecuting, pursuing, or enforcing any Other Employee Claim as a Class 8 Claim in accordance with the Plan.

        b.     For the avoidance of doubt, although the Employee Release can be nullified as set forth in Section 2, any such nullification will have no effect on the treatment of the Senior Employee's Bonus Amount pursuant to this Section 5.

        6.     Other Employee Claims. The Parties acknowledge and agree that the Senior Employee is not entitled to make the Convenience Class Election with respect to the Other Employee Claims.

        7.     Effective Date. The Parties acknowledge and agree that this Stipulation and the Parties' obligations hereunder are conditioned in all respects on the approval of the Plan by the Bankruptcy Court and the occurrence of the Effective Date of the Plan. If, for any reason, the Plan is not approved by the Bankruptcy Court or the Effective Date does not occur, this Stipulation will be null and void and of no force and effect.

        8.     Plan Support. The Senior Employee agrees that he will use commercially reasonable efforts to assist the Debtor in confirmation of the Plan, including, without limitation, filing a notice of such Senior Employee's withdrawal from the *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669], and vote, if applicable, the Bonus Amount, the Other Employee Claims, and any other Claims in favor of the Plan.

**HMIT Appx. 01741**

9.    Miscellaneous.

a.    Counterparts. This Stipulation may be signed in counterparts and such signatures may be delivered by facsimile or other electronic means.

b.    Binding Effect. This Stipulation shall inure to the benefit of, and be binding upon, any and all successors-in-interests, assigns, and legal representatives, of any Party.

c.    Authority. Each Party to this Stipulation and each person executing this document on behalf of any Party to this Stipulation warrants and represents that he, she, or it has the power and authority to execute, deliver and perform its obligations under this Stipulation.

d.    Entire Agreement. This Stipulation sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written and oral agreements and discussions. This Stipulation may only be amended by an agreement in writing signed by the Parties.

e.    No Waiver and Reservation of Rights. Except as otherwise provided herein, nothing in this Stipulation shall be, or deemed to be, a waiver of any rights, remedies, or privileges of any of the Parties. Except as otherwise provided herein, this Stipulation is without prejudice to any Party's rights, privileges and remedies under applicable law, whether at law or in equity, and each Party hereby reserves all of such rights, privileges and remedies under applicable law.

f.    No Admission of Liability. The Parties acknowledge that there is a bona fide dispute with respect to the Causes of Action. Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Senior Employee and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Senior Employee.

g.    No Waiver If Breach. The Parties agree that no breach of any provision hereof can be waived except in writing. The waiver of a breach of any provision hereof shall not be deemed a waiver of any other breach of any provision hereof.

h.    Notice. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered by email, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be subsequently specified in writing by any Party and delivered to all other Parties pursuant to this Section:

**Senior Employee**

Frank Waterhouse



HMIT Appx. 01742

With a copy to:

**Attorneys for Senior Employee**

M. Michelle Hartmann
Baker McKenzie
1900 N. Pearl Street
Suite 1500
Dallas, Texas 75201
Email: michelle.hartmann@bakermckenzie.com

**HCMLP**

Highland Capital Management, L.P
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: (631) 804-2049
Email: jpseeryjr@gmail.com

With a copy to:

**Attorneys for HCMLP**

John A. Morris
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, New York 10017-2024
Telephone No.: (212) 561-7760
Email: jmorris@pszjlaw.com

        i.    <u>Advice of Counsel</u>. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Stipulation; (b) executed this Stipulation upon the advice of such counsel; (c) read this Stipulation, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Stipulation and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

        j.    <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

HMIT Appx. 01743

    k.    <u>Governing Law; Venue</u>. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the jurisdiction of the Bankruptcy Court with respect to any disputes arising from or out of this Agreement.

*[Remainder of Page Blank]*

HMIT Appx. 01744

IT IS HEREBY AGREED.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____

Name: _____

Its: _____CEO/CRO_____

SENIOR EMPLOYEE

By: _____

Name: _____FRANK WATERHOUSE_____

Its: _____

8

HMIT Appx. 01745

# EXHIBIT DD

HMIT Appx. 01746

## Released Employees

| Name |
| --- |
| Abayarathna, Sahan |
| Bannon, Lucy |
| Baynard, Paul C. |
| Beispiel, Michael |
| Brewer, Brigid |
| Broaddus, Paul |
| Burns, Nathan |
| Carter, Jerome |
| Chisum, Naomi |
| Clark, Stetson |
| Collins, Brian |
| Cotton, Austin |
| Cournoyer, Timothy |
| Covitz, Hunter |
| Diorio, Matthew |
| Eftekhari, Cyrus |
| Eliason, Hayley |
| Flaherty, Brendan |
| Fox, Sean |
| Goldsmith, Sarah B. |
| Gosserand, William |
| Gray, Matthew |
| Groff, Scott |
| Haltom, Steven |
| Hendrix, Kristin |
| Hoedebeck, Charlie |
| Irving, Mary K. |
| Jain, Bhawika |
| Jeong, Sang K. |
| Jimenez, Sarah |
| Kim, Helen |
| Klos, David |
| Kovelan, Kari J. |
| Leuthner, Andrew |
| Loiben, Tara J. |
| Luu, Joye |
| Mabry, William |
| Mckay, Bradley |
| Mills Iv, James |
| Nikolayev, Yegor |

Owens, David

Park, Jun

Parker, Trey

Patel, Vishal

Patrick, Mark

Poglitsch, Jon

Post, Jason

Rice, Christopher

Richardson, Kellie

Rios, Heriberto

Roeber, Blair A.

Rothstein, Jason

Sachdev, Kunal

Schroth, Melissa

Sevilla, Jean-Paul

Short, Lauren

Staltari, Mauro

Stevens, Kellie

Stewart, Phoebe L.

Stoops, Clifford

Surgent, Thomas *

Swadley, Rick

Thedford, Lauren E.

Thomas, Kristen

Thottichira, Christina

Throckmorton, Michael

Vitiello, Stephanie

Waterhouse, Frank *

Yoo, Han Us


* Senior Employee - Required to execute Senior Employee Stipulation.

HMIT Appx. 01748

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust*
*and the Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Reorganized Debtor. | § |  |
|  | § |  |

## MOTION FOR LEAVE TO FILE PROCEEDING

**Exhibit**

**R 5**



## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MOTION FOR LEAVE TO FILE PROCEEDING..........................................................................1

SUMMARY AND STATEMENT OF FACTS .............................................................................1

ARGUMENT ...............................................................................................................................8

    A.   The Gatekeeper Provision............................................................................................8

    B.   The Gatekeeper Provision Is Satisfied Because Movants Were Directed to Raise
         Valuation Issues through an Adversary Proceeding....................................................8

    C.   The Valuation Proceeding Sets Forth a Colorable Claim...........................................9

## MOTION FOR LEAVE TO FILE PROCEEDING

Movants The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("Hunter Mountain" and collectively with Dugaboy, "Movants") file this Motion for Leave to File Proceeding.

## SUMMARY AND STATEMENT OF FACTS[1]

1.      Movants file this Motion for Leave to File Proceeding (the "Motion for Leave") out of an abundance of caution in light of the gatekeeper injunction (the "Gatekeeper Provision") contained in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) ("Plan") confirmed by order of this Court on February 22, 2021, § AA & Ex. A, Article IX.F [Dkt. No.1950].  Specifically, Movants seek an order from the Court finding that the Gatekeeper Provision is inapplicable to the proposed proceeding (the "Valuation Proceeding") to be commenced by Movants in this Court, or that the requisite standard is met.

2.      The Valuation Proceeding largely seeks the same relief previously sought by Movants through motion practice.  In particular, the Valuation Proceeding seeks information regarding the value of the estate, including the assets and liabilities of the Highland Claimant Trust (the "Claimant Trust") and related determinations by the Court.   On December 6, 2022, the Court ordered Movants to seek the relief previously sought by motion practice through an adversary proceeding [Dkt. No. 3645].  As a result, Movants are required to name Highland Capital Management, L.P. ("HCMLP" or "Debtor") and the Highland Claimant Trust (the "Claimant Trust") as defendants in the Valuation Proceeding, notwithstanding that what Movants are really

---

[1] Movants incorporate the facts alleged in their proposed Complaint To (I) Compel Disclosures About The Assets Of The Highland Claimant Trust And (II) Determine (A) Relative Value Of Those Assets, And (B) Nature Of Plaintiffs' Interests In The Claimant Tru[st ("Proposed Complaint" or "Valuation Complaint"), annexed hereto as Exhibit A.

seeking is information from HCMLP and the Claimant Trust.   Under the circumstances, Movants believe their Valuation Proceeding should fall outside of the Gatekeeper Provision.

3.      However, if the Court determines that the Gatekeeper Provision applies to the Valuation Proceeding, Movants seek an order determining that the Valuation Proceeding presents a "colorable claim" within the meaning of the Gatekeeper Provision and should be allowed.

4.      As holders of Contingent Claimant Trust Interests[2] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Movants need to file the Valuation Proceeding in an effort to obtain information about the assets and liabilities of the Claimant Trust established to liquidate the assets of the HCMLP bankruptcy estate.

5.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that, even with inflated claims and below market sales of assets, cash available is likely more than enough to pay class 8 and class 9 creditors 100 cents on the dollar.   Accordingly, Movants and the entire estate would benefit from a close evaluation of current assets and liabilities.   Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation.   That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or nothing for the owners that built the company.

6.      While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity.   As this

---

[2] Capitalized terms not defined have the meanings set forth herein.  If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Dkt. No. 1808].

Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity. In some cases, the protection is in the form of an equity committee; here, a prompt valuation of the estate would serve the same purpose and is needed.

7.        As set forth in greater detail in the annexed complaint ("Valuation Complaint"), upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Movants. Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery who would then be inclined to approve inflated compensation when the hidden but true value of the estate's assets was realized. Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

8.        Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full. Because of the lack of transparency to date, unless Movants are allowed to proceed, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

3

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

9.    On the petition date, the estate had over $550 million in assets, with far less in non-disputed non-contingent liabilities.

10.    By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[3]

11.    On information and belief, the value of the assets in the estate as of June 1, 2022, was as follows:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | **Low** | **High** |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |
| Affiliate Notes[4] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[3] Additional detail in the Valuation Complaint and its exhibits.
[4] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

12.     By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| **Creditor** | **Class 8** | **Class 9** | **Beneficiary** | **Purchase Price** |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

13.     On information and belied, Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded with a reorganization plan to the many settlement offers from Mr. Dondero, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

14.     Instead, it appears that Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court." Making the transactions particularly suspect is the fact that the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years' hence.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

15.     On information and belief, Mr. Seery provided such information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

HMIT Appx. 01755

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million

in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating

business in the hands of its equity owners.

16.     Specifically, Mr. Seery could and should have investigated seeking sufficient funds

from equity to pay all claims and return the estate to the equity holders.  This was an obvious path

because the estate had assets sufficient to support a line of credit for $59 million, as Mr. Seery

eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were

sold, much of the massive administrative costs run up by the estate would never have been

incurred.  One such avoided cost would be the post effective date litigation now pursued by Marc

S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge

over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained

from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the

cost of the Kirschner litigation).  But buying in the claims to resolve the bankruptcy and enabling

equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme

contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the

hands of grateful business colleagues who received outsized rewards for the claims they were

steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item

cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is

transparency.

17.     But worse still, even with all of the manipulation that appears to have occurred,

Movants believe that the combination of cash and other assets held by the Claimant Trust in its

own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

unnecessary litigation would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest, now.

18.     In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Movants and others, even though the only beneficiaries of any recovery from such litigation would be Movants in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity of any meaningful recovery.

19.     Based upon the restrictions imposed on Movants including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Movants have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Movants become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Movants are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

20.     Movants are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

HMIT Appx. 01757

## ARGUMENT

### A.    The Gatekeeper Provision.

21.    The Debtor's Plan includes a Gatekeeper Provision, limiting how claims can be asserted against Protected Parties (Plan, § AA & Ex. A, Article IX.F), such as the reorganized Debtor and the Claimant Trust.  Plan Ex. A, Article I.B, ¶ 105.

22.    Under the Debtor's Plan confirmed by this Court, an "Enjoined Party" may not:

[C]ommence or pursue a claim or cause of action of any kind against any Protected Party that arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind . . . against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party.

Plan, § AA & Ex. A, Article IX.F.

23.    The Plan defines the term "Enjoined Party" to include "all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor", "any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared", and any "Related Entity." Plan Ex. A, Article I.B, ¶ 56. The Plan expressly defines "Related Entity" to include Dugaboy and Hunter Mountain.  *Id.*, § B, ¶ 110. Accordingly, each of Movants is an "Enjoined Party."  The question thus arises whether Movants must seek Court permission prior to instituting the annexed Valuation Proceeding.

### B.    The Gatekeeper Provision Is Satisfied Because Movants Were Directed to Raise Valuation Issues through an Adversary Proceeding

24.    Movants previously sought by way of contested matter to obtain the relief sought in the Valuation Proceeding [Dkt. Nos. 3382, 3467, and 3533]. Debtor objected, asserting both that that the relief asserted was unwarranted and that it could only be obtained in an adversary proceeding [Dkt No. 3465]. The Court ruled that Movants must pursue an adversary proceeding.

Given that the Court has already ordered Movants to proceed in this fashion, the Court has already

served its gatekeeper function and this motion is unnecessary [Dkt. No. 3645].

25.     However, Movants conferenced the issue with Debtor, and Debtor was only willing

to stipulate that no gatekeeper motion was needed if Movants sought exactly the same relief as had

been sought in the motion.  Because the relief sought is better defined now, and to avoid further

delay, in an excess of caution, Movants bring this motion. After filing, Movants will attempt to

negotiate a resolution of this motion so that the Court can proceed directly to the merits.

**C.     The Valuation Proceeding Sets Forth a Colorable Claim.**

26.     Movants present colorable claims that should be authorized to proceed.

27.     The Plan does not define what constitutes a "colorable claim of any kind."  Nor

does the Bankruptcy Code define the term.   The case law construing the requirement for

"colorable" claims clearly provides that the requisite showing is a relatively low threshold to

satisfy, requiring Movants to prove "there is a possibility of success."  *See Spring Svc. Tex., Inc.*

*v. McConnell (In re McConnell)*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989).

28.     The Fifth Circuit has stated that "the colorable claim standard is met if the [movant]

has asserted claims for relief that on appropriate proof would allow a recovery.  Courts have

determined that a court need not conduct an evidentiary hearing, but must ensure that the claims

do not lack any merit whatsoever."  *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233,

248 (5th Cir. 1988).  The Court therefore need not be satisfied that there is an evidentiary basis for

the claims to be asserted but instead should allow the claims if they appear to have some merit.

29.     Other federal circuit courts have reached similar conclusions regarding the standard

to be applied.  For example, the Eighth Circuit held that "creditors' claims are colorable if they

would survive a motion to dismiss."  *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008);

*accord In Re Foster*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), *aff'd* 602 Fed. Appx. 356 (8th Cir.

9

HMIT Appx. 01759

2015) (per curiam).  The Sixth Circuit has adopted a similar test requiring that the court look only to the face of the complaint to determine if claims are colorable.  *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995).

30.     Other federal courts have adopted roughly the same standard—*i.e.*, a claim is colorable if it is merely "plausible" and thus could survive a motion to dismiss.  *See In re America's Hobby Center, Inc.*, 223 B.R. 275, 282 (S.D.N.Y 1998); *see also, e.g., In re GI Holdings*, 313 B.R. at 631 (court must decide whether the committee has asserted "claims for relief that on appropriate proof would support a recovery"); *Official Comm. v. Austin Fin. Serv. (In re KDI Holdings)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999) (observing that the inquiry into whether a claim is colorable is similar to that undertaken on a motion to dismiss for failure to state a claim); *In re iPCS, Inc.*, 297 B.R. 283, 291-92 (Bankr. N.D. Ga. 2003) (same).

31.     In addition, in the non-bankruptcy context, the District Court for this district has explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff must have an 'arguable claim' and not that the plaintiff must be able to succeed on that claim."  *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002).

32.     This Court's analysis of whether the Valuation Proceeding sets forth a colorable claim is not a determination of whether the Court finds there is enough evidence presented.  Rather, if on the face of the Valuation Complaint, there appears a plausible claim, then the Valuation Proceeding presents a colorable claim, and this Motion must be granted to allow Movants to file their Valuation Complaint.

33.     In the First Claim for Relief of the Valuation Complaint, Movants seek disclosures of Claimant Trust Assets and request an accounting.  An equitable accounting is proper "when the facts and accounts presented are so complex that adequate relief may not be obtained at law."

*Gooden v. Mackie*, No. 4:19-CV-02948, 2020 WL 714291 (S.D. Tex. Jan. 23 2020) (quoting

*McLaughlin v. Wells Fargo Bank, N.A.*, No. 4:12-CV-02658, 2013 WL 5231486, at *6 (S.D. Tex.

Sep. 13, 2013); *Bates Energy Oil & Gas v. Complete Oilfeld Servs.*, 361 F. Supp. 3d 633, 663

(W.D. Tex. 2019) (finding an equitable accounting claim was sufficiently stated when was a party

was less than forthcoming in providing information and the available information was insufficient

to determine what was done with a party's money); *Phillips v. Estate of Poulin*, No. 03-05-00099-

CV, 2007 WL 2980179, at *3 (Tex. App.-Austin, Oct. 12, 2007, no pet.) (finding that an

accounting order was appropriate where the facts are complex and when the plaintiff could not

obtain adequate relief through standard discovery); *Southwest Livestock & Trucking Co. v. Dooley*,

884 S.W.2d 805, 809 (Tex. App.-San Antonio 1994, writ denied) (finding that an accounting was

necessary in order to determine the identity of the property or the amount of money owed to a

party).

34.     The requested disclosures and accounting are necessary due to the lack of

transparency surrounding the assets and liabilities of the Claimant Trust.  The Court has retained

jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished

pursuant to the provisions of the Plan.  *See* Plan, Article XI.  As set forth above and in the Valuation

Complaint, Movants have concerns that those provisions are not being appropriately followed, and

efforts to obtain the information necessary to confirm otherwise has been unavailable through

discovery. As a result of the restrictions imposed on Movants, including Movants' inability, as

holders of Contingent Claimant Trust Interests, to access virtually any financial information related

to the Claimant Trust, Movants have little to no insight into the value of the Claimant Trust assets

versus the Claimant Trust's obligations and no method to independently ascertain those amounts

until Movants become Claimant Trust Beneficiaries.  Because Movants are in the dark regarding

the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought. Movants are unable to protect their own interests without an equitable accounting. Therefore, the First Claim for Relief sets forth a colorable claim.

35.    The Second Claim for Relief of the Valuation Complaint sets forth Movants' request for a declaratory judgment regarding the value of Claimant Trust Assets compared to the bankruptcy estate obligations. When considering whether a valid declaratory judgment claim exists, a court must engage in a three-step inquiry. *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). The court must ask (1) whether an actual controversy exists between the parties, (2) whether the court has the authority to grant such declaratory relief; and (3) whether the court should exercise its "discretion to decide or dismiss a declaratory judgment action." *Id*; *see also In re Fieldwood Energy LLC,* No. 20-33948, 2021 WL 4839321, at *4 (Bankr. S.D. Tex. Oct. 15 2021) (seeking declaratory judgment regarding interpretation of a Plan and whether certain claims were discharged); *In re Think3, Inc.,* 529 B.R. 147, 206-07 (Bankr. W.D. Tex. 2015) (sufficient actual controversy to bring a declaratory judgment action to assist with an early and prompt adjudication of claims and to promote judicial and party economy).

36.    In this case, there can be no serious doubt that an actual controversy exists between the parties with respect to the relief sought, as the Debtor has already opposed the relief sought in the Valuation Complaint.  Additionally, there is no dispute that the Court has the inherent power to grant the relief sought in the Proposed Complaint.  Further, the third element is satisfied because this determination is important to the implementation of the Plan and distributions to Holders of Allowed Claims and Allowed Equity Interests.  If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at

recovering value for HCMLP's estate are not necessary to pay creditors in full. As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close. In addition, such a determination by the Court could allow for a settlement that would cover the spread between current assets and obligations before that gap is further widened by the professional fees incurred by the Claimant Trust. Therefore, the Second Claim for Relief pleads a colorable claim.

37.    Finally, in the Third Claim for Relief of the Valuation Complaint, Movants request a declaratory judgment and determination regarding the nature of their interests. As with the Second Claim for Relief, there is no serious dispute that an actual controversy exists between the parties and that the Court has the power to grant the relief requested. Additionally, the third element is satisfied because, in particular, in the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient to pay all Allowable Claims indefeasibly, Movants seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries. To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement. However, the requested determination would further assist parties in interest, such as Movants, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement. Therefore, the Third Claim for Relief pleads a colorable claim.

38.    The equitable relief sought in the Valuation Proceeding certainly meets any iteration of the standard for what constitutes "a colorable claim of any kind." Instead of using the

information governing provisions of the Claimant Trust as a shield, HCMLP and the Claimant Trust are using them as a sword to enable continued litigation that ultimately provides no benefit to Claimant Trust Beneficiaries or Movants as holders of Contingent Claimant Trust Interests.

39.     As set forth above, the Valuation Complaint seeks disclosure of information and an accounting that are related to the administration of the Plan and property to be distributed under the Plan, but not otherwise available to Movants.  The Valuation Complaint also requests declaratory judgments within the Court's jurisdiction and relevant to the furtherance of the Bankruptcy Case.  These claims are colorable, and this Motion for Leave should be granted.

WHEREFORE, Movants request the entry of an order i) granting this Motion for Leave; ii) determining that the Gatekeeping Provision is satisfied as applied to the Valuation Proceeding; and iii) authorizing Movants to file the Valuation Complaint.

Respectfully submitted,


**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust and the Hunter Mountain Investment Trust*

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that on February 5, 2023, Louis M. Phillips conferenced with counsel for Defendants, John Morris, regarding this motion. Counsel for Defendants was willing to stipulate that no gatekeeper motion was needed if Movants sought exactly the same relief as had been sought in their prior motion addressing these issues. Because the relief sought is better defined now, and to avoid further delay, in an excess of caution, Movants bring this motion. After filing, Movants will attempt to negotiate a resolution of this motion so that the Court can proceed directly to the merits.

*/s/Deborah Deitsch-Perez*

Deborah Deitsch-Perez

CORE/3522697.0002/179160551.9

**HMIT Appx. 01765**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 6, 2023, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/179160551.9

**HMIT Appx. 01766**

# EXHIBIT A

HMIT Appx. 01767

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs the Dugaboy Investment Trust and the*
*Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| DUGABOY INVESTMENT TRUST and | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | _____ |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| HIGHLAND CLAIMANT TRUST, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT TO (I) COMPEL DISCLOSURES
## ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND
## (II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND
## (B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST

HMIT Appx. 01768

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("Hunter Mountain" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against defendants Highland Capital Management, L.P. ("HCMLP" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCMLP, the "Defendants"), seeking: (1) disclosures about and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of those assets; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.      As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCMLP bankruptcy estate.

2.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that even with inflated claims and below market sales of assets, cash available is more than enough to pay class 8 and class 9 creditors in full. Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities. Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation. That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or

---

[1] Capitalized terms not defined have the meanings set forth herein. If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

nothing for the owners that built the company. While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity. As this Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity. In some cases, the protection is in the form of an equity committee; here a prompt valuation of the estate is needed.

3. Upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Plaintiffs. Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery, who he knew would approve his inflated compensation when the hidden but true value of the estate's assets were realized. Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

4. Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full. Because of the lack of transparency to date, unless the relief sought herein is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

5.      By demonizing the estate equity holders, withholding information, and manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the potential for a grave miscarriage of justice.  The estate had over $550 million in assets on the petition date, with far less in non-disputed non-contingent liabilities.

6.      By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[2]

7.      On information and belief, the value of the assets in the estate as of 6/1/22 was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | **Low** | **High** |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |
| Affiliate Notes[3] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022, annexed hereto as Exhibits 1, 2, and 3, as is further detail about claims buyers.
[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

CORE/3522697.0002/178862860.17

**HMIT Appx. 01771**

8.     By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

9.     Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded to the over the many settlement offers from Mr. Dondero with a reorganization (as opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

10.     Instead, Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."   These transactions are particularly suspect because the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years later.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

11.     On information and belief, Mr. Seery provided that information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million

in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating

business in the hands of its equity owners.

12.    Specifically, Mr. Seery could and should have investigated seeking sufficient funds

from equity to pay all claims and return the estate to the equity holders.  This was an obvious path

because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery

eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were

sold, much of the massive administrative costs run up by the estate would never have been

incurred.  One such avoided cost would be the post-effective date litigation now pursued by Mr.

Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge

over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained

from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the

cost of the Kirschner litigation).    But buying the claims to resolve the bankruptcy and enabling

equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme

contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the

hands of grateful business colleagues who received outsized rewards for the claims they were

steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item

cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is

transparency.

13.    But worse still, even with all of the manipulation that appears to have occurred,

Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its

own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

CORE/3522697.0002/178862860.17

**HMIT Appx. 01773**

unnecessary litigation, would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

14.     In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery.

15.     Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

16.     In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

CORE/3522697.0002/178862860.17

**HMIT Appx. 01774**

## JURISDICTION AND VENUE

17.     This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

19.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

20.     In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

## THE PARTIES

21.     Dugaboy is a trust formed under the laws of Delaware.

22.     Hunter Mountain is a trust formed under the laws of Delaware.

23.     HCMLP is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

24.     The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

25.     On October 16, 2019 (the "Petition Date"), HCMLP, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

26.     At the time of its chapter 11 filing, HCMLP had approximately $550 million in assets and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  [Dkt. No. 1943, ¶ 8].  HCMLP's reason for seeking

bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million. Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

27.     At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCMLP and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCMLP and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCMLP management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

28.     To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCMLP's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCMLP during its bankruptcy.  The three board members were:

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

      a.  James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);

      b.  John Dubel – (who was selected by Committee member UBS); and

      c.  Former Judge Russell Nelms – (who was selected by the Debtor).

29.     The Bankruptcy Court almost immediately let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by Judge Nelms, suggesting he was bamboozled because he was under management's spell.  Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

30.     At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121] In retrospect, this avoided scrutiny of the case by professionals

**HMIT Appx. 01777**

who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case. This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

31.    Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

32.    None of that happened. Almost immediately, Mr. Seery emerged as the de facto leader of the Independent Board. On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate. [Dkt. No. 854]. And although Mr. Seery publicly represented that he intended to restructure and preserve HCMLP's business, privately he was engineering a much different plan.

33.    Indeed, Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control. For example, initially Mr. Seery reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team." He also testified: "My experience with our employees has been excellent. The response when we want to get something done, when I want to get something done, has been first-rate. The skill level is extremely high."

34.    Yet despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the

plan process, ultimately Mr. Seery fired most of those employees.  It was clear that Mr. Seery was

firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of

challenging Mr. Seery, lest they too be fired.

35.    From the start, and before there was much litigation to speak of, the Court regularly

referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do

the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious

litigant.  This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero

a "transparently" vexatious litigant based pleadings she had only heard about from parties

opposing Dondero and admittedly had not read herself.   Ironically, the first time Mr. Dondero was

labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits

initiated by the Debtor and had commented in proposed settlements in the case, but had not himself

initiated any actions in the case.  Thereafter, though, the Debtor and its professionals repeated the

mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing

information about the estate with them.

36.    In addition to the Debtor's mistreatment of employees, under the control of the

Independent Board, most of the ordinary checks and balances that the hallmark of bankruptcy were

ignored.  Despite providing regular and robust financial information to the Committee, the Debtor

inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including

Plaintiffs, in the dark about the value of the estate and the mix of assets it held.    Amplifying the

lack of transparency, Mr. Seery further engineered transactions to hide the real value of the estate.

37.    For example, he authorized the Debtor to settle the claims of HabourVest (which

claims had initially been valued at $0) for $80 million, in order to acquire HarborVest's interest in

Highland CLO Funding, Ltd. ("HCLOF"), gain HarborVest's vote in favor of its Plan, and hide

12

the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary.  This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $40 million at the time and over $60 million 90 days later when the MGM sale was announced.

38.     At the same time, Mr. Seery and the Independent Board deliberately shut out equity holders from any discussion surrounding the plan of reorganization or HCMLP's efforts to emerge from bankruptcy as a going concern.  Indeed, as noted above, Mr. Seery failed to meaningfully respond to the many proposals made by residual equity holders to resolve the estate and never encouraged any dialogue between creditors and equity holders.  These failures only contributed to the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly undermined an efficient exit from bankruptcy.

39.     Worse still, while knowing that HCMLP had sufficient resources to emerge from bankruptcy as a going concern (and, on information and belief, while knowing that the estate was solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that contemplated HCMLP's continued post-confirmation existence.  Instead, and inexplicably, the very first plan proposed contemplated liquidation of the company, as did all subsequent plans.

40.     While secretly engineering the total destruction of HCMLP, Mr. Seery also privately settled multiple proofs of claim against the estate at inflated levels that were unreasonable multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and vehement objection to many of the claims as baseless.  But instead of litigating those objections in a manner that would have exposed the true value of the claims, on information and belief, Mr. Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values. That is, the inflated values softened up claims sellers to be willing to sell. Had the Debtor instead

CORE/3522697.0002/178862860.17

HMIT Appx. 01780

fought the inflated proofs of claim in open court, it could have settled the claims for closer to true value and ensured that the estate had sufficient resources to pay them.

41.     It is also no coincidence that virtually all original proofs of claim were sold to buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

42.     That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate.  It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense.  In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic.  Given the sophistication of the claims-buyers, their purchases of claims at prices that exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

43.     And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know).  In October 2022, $250 million was paid to Class 8 holders.  That is about 85% of the inflated proofs of claim and $90 million more than plan projections.  On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come.  On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million.

HMIT Appx. 01781

44.     At the same time, the Claimant Trust has made no distributions to Contingent Claimant Trust Interest holders and has argued in various proceedings that no such distributions are likely.  No wonder. The cost of holding open the estate, including unnecessary litigation costs, appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such distributions can occur, even though it can now be projected that the litigation is not needed to pay creditors.  *See* Docket No. 3410-1.

45.     It is worth noting that it appears that virtually all of the claims trades brokered on behalf of Committee members seem to have occurred while those entities remained on the Committee.  Yet at the outset of their service, Committee members were instructed by the United States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."  Thus, the claims trades violated Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other Debtor professionals, to the detriment of creditors and residual equity holders.

46.     The sales of claims were not the only transactions shrouded in secrecy.  As further detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding, no data room, and without inviting equity (which may have at one time had the knowledge to make the highest bid) to participate in the sales process.  Indeed, on occasion assets were sold for amounts less that Mr. Dondero's written offers. This exacerbated the harms caused by the lack of transparency characterized by the Court's indifference to the Debtor's complete failure to abide its Rule 2015 disclosure obligations.

47.     In short, the lack of transparency combined with at least the appearance of bias, if not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to

manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that could have been resolved with money left over for equity but for that manipulation.

## STATEMENT OF FACTS

### A.    Plaintiffs Hold Contingent Claimant Trust Interests

48.    As of the Petition Date, HCMLP had three classes of limited partnership interests (Class A, Class B, and Class C).  *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

49.    The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCMLP's general partner.  The Class B and C interests were held by Hunter Mountain.  *Id.*

50.    In the aggregate, HCMLP's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

51.    On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

52.    In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9.  *See* Plan, Article III, ¶ H(8) and (9).

53.    In the Plan, HCMLP classified Hunter Mountain's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest.  *See* Plan, Article III, ¶ H(10) and (11).

CORE/3522697.0002/178862860.17

HMIT Appx. 01783

54.     According to the Plan, Contingent Claimant Trust Interests distributed to the Holders
of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests
distributed to the Holders of Class B/C Limited Partnership Interests.  *See* Plan, Article I, ¶44.

55.     In the Confirmation Order, the Court found that the Plan properly separately classified
those equity interests because they represent different types of equity security interests in HCMLP
and different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of
Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended
(the "Limited Partnership Agreement").  Confirmation Order, ¶36; Limited Partnership Agreement,
§3.9 (Liquidation Preference).

56.     The Court overruled objections to the Plan lodged by entities it deemed related to Mr.
Dondero, including Dugaboy.  In doing so, the Court acknowledged that Dugaboy has a residual
ownership interest in HCMLP and therefore "technically" had standing to object to the Plan. *See*
Confirmation Order, ¶¶ 17-18.

57.     Based on the Debtor's financial projections at the time of confirmation, however, the
Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote."
*Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

58.     The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCMLP
became the Reorganized Debtor (as defined in the Plan) on the Effective Date.  *See* Notice of
Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland
Capital Management, L.P. [Docket No. 2700].

59.     The Plan created the Claimant Trust, which was established for the benefit of
Claimant Trust Beneficiaries, which is defined to mean:

> the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated
> Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed

Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1.(h).

60.     Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

61.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

62.     In its Post Confirmation Quarterly Report for the Third Quarter of 2022 [Docket No. 3582], Debtor stated that it distributed $255,201,228 to holders of general unsecured claims, which is 64% of the total allowed general unsecured claims of $387,485,568. This amount is far greater than was anticipated at the time of confirmation of the Plan.

**B.     Debtor Has Failed To Disclose Claimant Trust Asse**ts

63.     Upon information and belief, the value of the estate as held in the Claimant Trust has changed markedly since Plan confirmation. Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

64.     The estate is solvent and has always been solvent. Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.

65.     As noted above, by June of 2022, starting with $125 million in cash, the estate liquidated other assets of over $416 million, building a cash war chest of over $541 million.  Thus, with the remaining less-liquid assets, the total value of the estate's assets as of June 2022 was over $688 million.

66.     Contrasting those assets with the claims against the estate demonstrates that further collection of assets was (and is) unnecessary.

67.     As set forth above, while the inflated face amount of the claims was $365 million, those claims were sold for about $150 million.  The estate therefore easily had the resources to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

68.     Instead, Mr. Seery liquidated estate assets at less-than-optimal prices, without competitive process, without including residual equity holders, and in all cases required strict non-disclosure agreements from the buyers to prevent any information flowing to the public, the residual equity, or the Court. This uncharacteristic secrecy enabled Mr. Seery and the professionals to maintain the delicate balance of keeping just enough assets to pay professionals and incentive fees but still maintain the pretense that further litigation was needed.

69.     Each effort by Plaintiffs, Mr. Dondero and related companies to obtain information to attempt to stop the continued looting has been vigorously opposed, and ultimately rejected by an apparently biased Court.  Plaintiffs were unable to force the Debtor to provide the most basic of reports, including Rule 2015 statements, and Plaintiffs' efforts to obtain even the most basic details regarding asset sales and professional fees have all been denied.  Rather, such details are in the hands of a select few, such as the Oversight Board of the Claimant Trust.

70.     The Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust

Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate. *See* Plan, ¶Art. IV(B)(9).

71.     But no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests, even though Plaintiffs, as contingent beneficiaries of a Delaware statutory trust, are entitled to financial information relating to the trust.

**C.     Plaintiffs Are Kirschner Adversary Proceeding Defendants**

72.     On October 15, 2021, Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust, commenced the Kirschner Adversary Proceeding against twenty-three defendants, including Plaintiffs, alleging various causes of action. *See Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. James Dondero*, *et al.*, Adv. Pro. No. 21-03076-sgj, Adv. Proc. No. 21-03076, Docket No. 1 (as amended by Docket No. 158).

73.     The Litigation Sub-Trust was established within the Claimant Trust as a wholly owned subsidiary of the Claimant Trust for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, with any proceeds therefrom to be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries. *See* Plan, Article IV, ¶ (B)(4).

74.     Any recovery from the Kirschner Adversary Proceeding will be distributed to Claimant Trust Beneficiaries.

75.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

76.     The Litigation Sub-Trust is pursuing claims against Plaintiffs in the Kirschner Adversary Proceeding, which, if they become Claimant Trust Beneficiaries, would be the

recipients of distributions of such recovery (less the cost of litigation). Therefore, Plaintiffs need the requested information in order to properly analyze and evaluate the claims asserted against them in the Kirschner Adversary Proceeding and to determine whether those claims have any validity.

## FIRST CLAIM FOR RELIEF
### (Disclosures of Claimant Trust Assets and Request for Accounting)

77.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

78.     Due to the lack of transparency into the assets of the Claimant Trust, Plaintiffs are unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust Interests.

79.     Certain information about the Claimant Trust Assets has already been provided to others, including Claimant Trust Beneficiaries and the Oversight Board for the Claimant Trust.

80.     Information about the Claimant Trust Assets would help Plaintiffs evaluate whether settlement of the Kirschner Adversary Proceeding is feasible, which would further the administration of the bankruptcy estate, benefitting all parties in interest.

81.     This Court specifically retained jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan. *See* Plan, Article XI.

82.     The Plan provides that distributions to Allowed Equity Interests will be accomplished through the Claimant Trust and Contingent Claimant Trust Interests. *See* Plan Article III, (H)(10) and (11).

83.     The Defendants should be compelled to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets, and its liabilities.

CORE/3522697.0002/178862860.17

HMIT Appx. 01788

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment Regarding Value of Claimant Trust Assets)

84.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

85.     Once Defendants are compelled to provide information about the Claimant Trust assets, Plaintiffs seek a determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations.

86.     If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at recovering value for HCMLP's estate are not necessary to pay creditors in full.  As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close.

87.     In addition, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Mr. Kirschner, and Hayward & Associates—are continuing to incur millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or could be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.  Fees for Pachulski range from $460 an hour for associates to $1,265 per hour for partners, and fees for Quinn Emanuel lawyers range from $830 an hour for first year associate to over $2100 per hour for senior partners.  At these rates, depletion of the estate will occur rapidly.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment and Determination Regarding Nature of Plaintiff's Interests)

88.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

HMIT Appx. 01789

89.     In the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid, Plaintiffs seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries.[6]

90.     Such a declaration and a determination by the Court would further assist parties in interest, such as Plaintiffs, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement.

WHEREFORE, Plaintiffs pray for judgment as follows:

(i)     On the First Claim for Relief, Plaintiffs seek an order compelling Defendants to disclose the assets currently held in the Claimant Trust; and

(ii)    On the Second Claim for Relief, Plaintiffs seek a determination of the relative value of those assets in comparison to the claims of the Claimant Trust Beneficiaries; and

(iii)   On the Third Claim for Relief, Plaintiffs seek a determination that the conditions are such that all current Claimant Trust Beneficiaries could be paid in full, with such payment causing Plaintiffs' Contingent Claimant Trust Interests to vest into Claimant Trust Interests; and

---

[6] To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement.

HMIT Appx. 01790

(iv)    Such other and further relief as this Court deems just and proper.

Dated: February __, 2023

                          Respectfully submitted,

                          **STINSON LLP**

                          *Draft*_____
                          Deborah Deitsch-Perez
                          Texas Bar No. 24036072
                          Michael P. Aigen
                          Texas Bar No. 24012196
                          2200 Ross Avenue, Suite 2900
                          Dallas, Texas 75201
                          Telephone: (214) 560-2201
                          Facsimile: (214) 560-2203
                          Email:  deborah.deitschperez@stinson.com
                          Email:  michael.aigen@stinson.com

                          *Counsel for the Dugaboy Investment Trust*
                          *and the Hunter Mountain Investment Trust*

# EXHIBIT A-1

HMIT Appx. 01792

# HELLER, DRAPER & HORN, L.L.C.
### *ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA  70130-6103
TELEPHONE: (504) 299-3300  FAX: (504) 299-3399

Douglas S. Draper
Direct Dial:  (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

> **Re:**   ***Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11***

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers.  Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

1.     **The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports**

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

_____

[2] *See* Appendix, pp. A-3 - A-14.

{00376610-1}

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

## 2.   There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6]   The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

{00376610-1}

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]   Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information.   Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3.    The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court.  On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.  The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses.  In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level.  Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out."  Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise).   These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.  While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat").  Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9]  That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute.  Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims.  In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

---

{00376610-1}

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10]  If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor.  The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11]  It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12]  This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.    Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases.  Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions.  Several parties have appealed this issue to the Fifth Circuit.

### 4.    The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information.  The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely.  But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup").  The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill").  As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] See Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. See Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] Compare Jan. 31, 2021 Monthly Operating Report [Doc. 2030], with Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. See Appendix, p. A-25. It is also notable that the January 2021

{00376610-1}

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

19 *See* Appendix, pp. A-25, A-28.

20 *See* Appendix, pp. A-2; A-62 – A-69.

HMIT Appx. 01800

October 5, 2021
Page 9

committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

October 5, 2021
Page 10

> In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. ==Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court.  By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.==  The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.  You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline.  The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors.  For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse.  This case warrants such an investigation due to the following:

a)    The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)    Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)    The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d)    The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers  and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e)    The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f)    There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery.  Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement.  Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization.  The Creditors' Committee did not timely respond to these efforts.  It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

{00376610-1}

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming.  Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery.  The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer.  If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties.  The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim.  The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members.  At the very least, there is enough credible evidence to warrant an investigation.  It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent.  The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders.  A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate.  In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

HMIT Appx. 01803

# EXHIBIT A-2

HMIT Appx. 01804



**MUNSCH HARDT**

DALLAS / HOUSTON / AUSTIN

<div align="right">

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

</div>

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530
Nan.r.Eitel@usdoj.gov

      Re:    Highland Capital Management, L.P. Bankruptcy Case
             Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

**Highland Capital Management and its Founder, James Dondero**

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds— like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are:  (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the
Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he
immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of
Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's
appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly
represented that his goal was to restructure the Debtor's business and enable it to emerge as a going
concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's
appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time
its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets
by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court
confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There
are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently
pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

## Transparency Problems Pervade the Bankruptcy Proceedings

### The Regulatory Framework

As you are aware, one of the most important features of federal bankruptcy proceedings is
transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the
receipt, administration, and disposition of all property; provide information concerning the estate and the
estate's administration as parties in interest request; and file periodic reports and summaries of a
debtor's business, including a statement of receipts and disbursements, and such other information as
the United States Trustee or the United States Bankruptcy Court requires." *See*
http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule
of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic
financial reports of the value, operations, and profitability of each entity that is not a publicly traded
corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling
interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor
affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a
plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from
filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the
U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required
reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly
evaluate the progress of bankruptcy proceedings, including compliance with legal requirements.
Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention
of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc
Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As
Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for
cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e]
reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr.
2015.3(d).

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### In Highland's Bankruptcy, the Regulatory Framework Is Ignored

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).
[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

HMIT Appx. 01809

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ☐2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See* "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

Ms. Nan R. Eitel
November 3, 2021
Page 9

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts*."[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here.   In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| TOTAL: | $269,6969,610 | $95,000,000 | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.

[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] *See* Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1) If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 14

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)     If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization.  Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] See Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.

[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.

[30] Dkt. 854, ¶ 4 & Exh. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds— i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

HMIT Appx. 01820

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. See 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] See Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; see Appendix, p. A-57.

[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Ms. Nan R. Eltel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT, KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.

DR:pdm

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ................................................................................................ 3

Seery Jan. 29, 2021 Testimony ............................................................................................... 15

Sale of Assets of Affiliates or Controlled Entities ................................................................. 24

20 Largest Unsecured Creditors .............................................................................................. 25

Timeline of Relevant Events .................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ............................................ 27

Updated Liquidation Analysis (Feb. 1, 2021) ......................................................................... 28

Summary of Debtor's January 31, 2021 Monthly Operating Report ....................................... 29

Value of HarbourVest Claim .................................................................................................... 30

Estate Value as of August 1, 2021 (in millions) ..................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ...................................................... 32

UBS Settlement [Doc. 2200-1] ................................................................................................ 45

Hellman & Friedman Seeded Farallon Capital Management ................................................... 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ............................................ 63

Farallon was a Significant Borrower for Lehman .................................................................... 65

Mr. Seery Represented Stonehill While at Sidley ................................................................... 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders ...................................... 70

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?



## Debtor Protocols [Doc. 466-1]

I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K. "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

   a) Stage 1 and Stage 2:  ordinary course determined by the CRO.

   b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

   a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b) Stage 3:

      (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)    Transactions with Related Entities greater than \$2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.    Third Party Transactions (All Stages)

        a)    Except as set forth in (b) and (c) below, Transactions in excess of \$2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

        a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

        b)    Stage 3: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   Stage 3:

(1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.   Third Party Transactions (All Stages)

a)   Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.   **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

   A.   **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

   B.   **Operating Requirements**

      1.   Ordinary Course Transactions do not require Court approval (All Stages).

         a)   Stage 1 and Stage 2: ordinary course determined by the CRO.

         b)   Stage 3: ordinary course determined by the Debtor.

      2.   Related Entity Transactions

         a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         b)   Stage 3:

            (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

      3.   Third Party Transactions (All Stages):

         a)   Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.    Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.   **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.   Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

### X.    **Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

    8. Highland Socially Responsible Equity Fund

    9. Highland Income Fund

    10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

    11. SE Multifamily, LLC

**Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    1. The Dugaboy Investment Trust

    2. NexPoint Capital LLC

    3. NexPoint Capital, Inc.

    4. Highland IBoxx Senior Loan ETF

    5. Highland Long/Short Equity Fund

    6. Highland Energy MLP Fund

    7. Highland Fixed Income Fund

    8. Highland Total Return Fund

    9. NexPoint Advisors, L.P.

    10. Highland Capital Management Services, Inc.

    11. Highland Capital Management Fund Advisors L.P.

    12. ACIS CLO Management LLC

    13. Governance RE Ltd

    14. PCMG Trading Partners XXIII LP

    15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC

    16. NexPoint Real Estate Advisors II LP

    17. NexPoint Healthcare Opportunities Fund

    18. NexPoint Securities

    19. Highland Diversified Credit Fund

    20. BB Votorantim Highland Infrastructure LLC

    21. ACIS CLO 2017 Ltd.

**Transactions involving Non-Discretionary Accounts**

    1. NexBank SSB Account

    2. Charitable DAF Fund LP

**Schedule B**

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

```
                                                                    Page 1
  1   IN THE UNITED STATES BANKRUPTCY COURT

  2   FOR THE NORTHERN DISTRICT OF TEXAS

  3   DALLAS DIVISION

  4   ------------------------------)

  5   In Re:                  Chapter 11

  6   HIGHLAND CAPITAL         Case No.

  7   MANAGEMENT, LP,          19-34054-SGJ 11

  8

  9        Debtor

 10   ------------------------------------

 11

 12

 13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

 14             January 29, 2021

 15             10:11 a.m. EST

 16

 17

 18

 19

 20

 21

 22

 23
      Reported by:
 24   Debra Stevens, RPR-CRR
      JOB NO. 189212
 25
```

Page 2

1            January 29, 2021
2              9:00 a.m. EST
3
4        Remote Deposition of JAMES P.
5   SEERY, JR., held via Zoom
6   conference, before Debra Stevens,
7   RPR/CRR and a Notary Public of the
8   State of New York.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   REMOTE APPEARANCES:
2
3   Heller, Draper, Hayden, Patrick, & Horn
4   Attorneys for The Dugaboy Investment
5   Trust and The Get Good Trust
6            650 Poydras Street
7            New Orleans, Louisiana 70130
8
9
10  BY:     DOUGLAS DRAPER, ESQ
11
12
13  PACHULSKI STANG ZIEHL & JONES
14  For the Debtor and the Witness Herein
15           780 Third Avenue
16           New York, New York 10017
17  BY:     JOHN MORRIS, ESQ.
18          JEFFREY POMERANTZ, ESQ.
19          GREGORY DEMO, ESQ.
20          IRA KHARASCH, ESQ.
21
22
23
24              (Continued)
25

Page 4

1   REMOTE APPEARANCES:   (Continued)
2
3   LATHAM & WATKINS
4   Attorneys for UBS
5            885 Third Avenue
6            New York, New York 10022
7   BY:     SHANNON McLAUGHLIN, ESQ.
8
9   JENNER & BLOCK
10  Attorneys for Redeemer Committee of
11  Highland Crusader Fund
12           919 Third Avenue
13           New York, New York 10022
14  BY:     MARC B. HANKIN, ESQ.
15
16  SIDLEY AUSTIN
17  Attorneys for Creditors' Committee
18           2021 McKinney Avenue
19           Dallas, Texas 75201
20  BY:     PENNY REID, ESQ.
21          MATTHEW CLEMENTE, ESQ.
22          PAIGE MONTGOMERY, ESQ.
23
24              (Continued)
25

Page 5

1   REMOTE APPEARANCES:   (Continued)
2   KING & SPALDING
3   Attorneys for Highland CLO Funding, Ltd.
4            500 West 2nd Street
5            Austin, Texas 78701
6   BY:     REBECCA MATSUMURA, ESQ.
7
8   K&L GATES
9   Attorneys for Highland Capital Management
10  Fund Advisors, L.P., et al.:
11           4350 Lassiter at North Hills
12           Avenue
13           Raleigh, North Carolina 27609
14  BY:     EMILY MATHER, ESQ.
15
16  MUNSCH HARDT KOPF & HARR
17  Attorneys for Defendants Highland Capital
18  Management Fund Advisors, LP; NexPoint
19  Advisors, LP; Highland Income Fund;
20  NexPoint Strategic Opportunities Fund and
21  NexPoint Capital, Inc.:
22           500 N. Akard Street
23           Dallas, Texas 75201-6659
24  BY:   DAVOR RUKAVINA, ESQ.
25                   (Continued)

Page 6

```
 1   REMOTE APPEARANCES (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6            420 Throckmorton Street
 7
 8            Fort Worth, Texas 76102
 9   BY:   CLAY TAYLOR, ESQ.
10         JOHN BONDS, ESQ.
11         BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16         1900 North Pearl Street
17
18         Dallas, Texas 75201
19   BY:   MICHELLE HARTMANN, ESQ.
20         DEBRA DANDEREAU, ESQ.
21
22
23
24            (Continued)
25
```

Page 7

```
 1   REMOTE APPEARANCES: (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7            100 Throckmorton Street
 8            Fort Worth, Texas 76102
 9   BY:   LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15         700 N. Pearl Street
16         Dallas, Texas 75201
17   BY:   FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
 1
 2        E X A M I N A T I O N S
 3   WITNESS                      PAGE
 4   JAMES SEERY
 5     By Mr. Draper              9
 6     By Mr. Taylor             75
 7     By Mr. Rukavina          165
 8     By Mr. Draper            217
 9
           E X H I B I T S
10   SEERY DYD
     EXHIBIT   DESCRIPTION        PAGE
11
     Exhibit 1   January 2021 Material   11
12
     Exhibit 2   Disclosure Statement    14
13
     Exhibit 3   Notice of Deposition    74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                  PAGE
17   Subsidiary ledger showing note   22
     component versus hard asset
18   component
19   Amount of D&O coverage for      131
     trustees
20
     Line item for D&O insurance     133
21
22        MARKED FOR RULING
           PAGE   LINE
23          85     20
24
25
```

Page 9

```
 1
 2        COURT REPORTER:  My name is
 3   Debra Stevens, court reporter for TSG
 4   Reporting and notary public of the
 5   State of New York.  Due to the
 6   severity of the COVID-19 pandemic and
 7   following the practice of social
 8   distancing, I will not be in the same
 9   room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14        Whereupon,
15        J A M E S   S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20   Q.   Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

Page 14

J. SEERY

1  the screen, please?
2  A.    Page what?
3  Q.    I think it is page 174.
4  A.    Of the PDF or of the document?
5  Q.    Of the disclosure statement that
6  was filed.  It is up on the screen right
7  now.
8       COURT REPORTER:  Do you intend
9  this as another exhibit for today's
10 deposition?
11      MR. DRAPER:  We'll mark this
12 Exhibit 2.
13      (So marked for identification as
14 Seery Exhibit 2.)
15 Q.    If you look to the recovery to
16 Class 8 creditors in the November 2020
17 disclosure statement was a recovery of
18 87.44 percent?
19 A.    That actually says the percent
20 distribution to general unsecured
21 creditors was 87.44 percent.  Yes.
22 Q.    And in the new document that was
23 filed, given to us yesterday, the recovery
24 is 62.5 percent?

Page 15

J. SEERY

1
2  A.    It says the percent distribution
3  to general unsecured creditors is
4  62.14 percent.
5  Q.    Have you communicated the
6  reduced recovery to anybody prior to the
7  date -- to yesterday?
8       MR. MORRIS:  Objection to the
9  form of the question.
10 A.    I believe generally, yes.  I
11 don't know if we have a specific number,
12 but generally yes.
13 Q.    And would that be members of the
14 Creditors' Committee who you gave that
15 information to?
16 A.    Yes.
17 Q.    Did you give it to anybody other
18 than members of the Creditors' Committee?
19 A.    Yes.
20 Q.    Who?
21 A.    HarbourVest.
22 Q.    And when was that?
23 A.    Within the last two months.
24 Q.    You did not feel the need to
25 communicate the change in recovery to

Page 16

J. SEERY

1
2  anybody else?
3  A.    I said Mr. Doherty.
4  Q.    In looking at the two elements,
5  and what I have asked you to look at is
6  the claims pool.  If you look at the
7  November disclosure statement, if you look
8  down Class 8, unsecured claims?
9  A.    Yes.
10 Q.    You have 176,000 roughly?
11 A.    Million.
12 Q.    176 million.  I am sorry.  And
13 the number in the new document is 313
14 million?
15 A.    Correct.
16 Q.    What accounts for the
17 difference?
18 A.    An increase in claims.
19 Q.    When did those increases occur?
20 Were they yesterday?  A month ago?  Two
21 months ago?
22 A.    Over the last couple months.
23 Q.    So in fact over the last couple
24 months you knew in fact that the recovery
25 in the November disclosure statement was

Page 17

J. SEERY

1
2  not accurate?
3  A.    Yes.  We secretly disclosed it
4  to the Bankruptcy Court in open court
5  hearings.
6  Q.    But you never did bother to
7  calculate the reduced recovery; you just
8  increased --
9       (Reporter interruption.)
10 Q.    You just advised as to the
11 increased claims pool.  Correct?
12      MR. MORRIS:  Objection to the
13 form of the question.
14 A.    I don't understand your
15 question.
16 Q.    What I am trying to get at is,
17 as you increase the claims pool, the
18 recovery reduces.  Correct?
19 A.    No.  That is not how a fraction
20 works.
21 Q.    Well, if the denominator
22 increases, doesn't the recovery ultimately
23 decrease if --
24 A.    No.
25 Q.    -- if the numerator stays the

Page 26

J. SEERY

```
1                    J. SEERY
2    were amended without consideration a few
3    years ago.  So, for our purposes we didn't
4    make the assumption, which I am sure will
5    happen, a fraudulent conveyance claim on
6    those notes, that a fraudulent conveyance
7    action would be brought.  We just assumed
8    that we'd have to discount the notes
9    heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12        Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for P and I.
22        Q.    But in fact as of January you
23   have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

Page 27

```
1                    J. SEERY
2        A.    NexPoint, I said.  They
3    defaulted on the note and we accelerated
4    it.
5        Q.    So there is no need to file a
6    fraudulent conveyance suit with respect to
7    that note.  Correct, Mr. Seery?
8         MR. MORRIS:  Objection to the
9         form of the question.
10        A.    Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14        Q.    My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18         MR. MORRIS:  Objection to the
19         form of the question.
20        A.    That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23        Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

Page 28

```
1                    J. SEERY
2    you whether they are included in the asset
3    portion of your $257 million number, all
4    right?  Mr. Morris didn't want me to go
5    into specific asset value, and I don't
6    intend to do that.
7         The first question I have for
8    you is, the equity in Trustway Highland
9    Holdings, is that included in the
10   $257 million number?
11        A.    There is no such entity.
12        Q.    Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16        A.    Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20   includes Targa and all the value that
21   flows up from Targa.  It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

Page 29

```
1                    J. SEERY
2    includes any other securities and all the
3    value that would flow from Cornerstone.
4    It includes HCLOF and all the value that
5    would flow up from HCLOF.  It includes
6    Korea and all the value that would flow up
7    from Korea.
8         There may be others off the top
9    of my head.  I don't recall them.  I don't
10   have a list in front of me.
11        Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14        A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22         With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

**Page 38**

```
1                J. SEERY
2       A.   I don't recall the specific
3  limitation on the trust.  But if there was
4  a reason to hold on to the asset, if there
5  is a limitation, we can seek an extension.
6       Q.   Let me ask a question.  With
7  respect to these businesses, the Debtor
8  merely owns an equity interest in them.
9  Correct?
10      A.   Which business?
11      Q.   The ones you have identified as
12 operating businesses earlier?
13      A.   It depends on the business.
14      Q.   Well, let me -- again, let's try
15 to be specific.  With respect to SSP, it
16 was your position that you did not need to
17 get court approval for the sale.  Correct?
18      A.   That's correct.
19      Q.   Which one of the operating
20 businesses that are here, that you have
21 identified, do you need court authority
22 for a sale?
23           MR. MORRIS:  Objection to the
24      form of the question.
25      A.   Each of the businesses will be a
```

**Page 39**

```
1                J. SEERY
2  different analysis that we'll undertake
3  with bankruptcy counsel to determine what
4  we would need depending on when it is
5  going to happen and what the restrictions
6  either under the code are or under the
7  plan.
8       Q.   Is there anything that would
9  stop you from selling these businesses if
10 the Chapter 11 went on for a year or two
11 years?
12           MR. MORRIS:  Objection to form
13      of the question.
14      A.   Is there anything that would
15 stop me?  We'd have to follow the
16 strictures of the code and the protocols,
17 but there would be no prohibition -- let
18 me finish, please.
19           There would be no prohibition
20 that I am aware of.
21      Q.   Now, in connection with your
22 differential between the liquidation of
23 what I will call the operating businesses
24 under the liquidation analysis and the
25 plan analysis, who arrived at the discount
```

**Page 40**

```
1                J. SEERY
2  or determined the discount that has been
3  placed between the two, plan analysis
4  versus liquidation analysis?
5           MR. MORRIS:  Objection to form
6      of the question.
7      A.    To which document are you
8  referring?
9      Q.    Both the June -- the January and
10 the November analysis has a different
11 estimated proceeds for monetization for
12 the plan analysis versus the liquidation
13 analysis.  Do you see that?
14      A.   Yes.
15      Q.   And there is a note under there.
16 "Assumes Chapter 7 trustee will not be
17 able to achieve the same sales proceeds as
18 Claimant trustee."
19      A.   I see that, yes.
20      Q.   Do you see that note?
21      A.   Yes.
22      Q.   Who arrived at that discount?
23      A.   I did.
24      Q.   What percentage did you use?
25      A.   Depended on the asset.  Each one
```

**Page 41**

```
1                J. SEERY
2  is different.
3      Q.   Is the discount a function of
4  capability of a trustee versus your
5  capability, or is the discount a function
6  of timing?
7           MR. MORRIS:  Objection to form.
8      A.   It could be a combination.
9      Q.   So, let's -- let me walk through
10 this.  Your plan analysis has an
11 assumption that everything is sold by
12 December 2022.  Correct?
13      A.   Correct.
14      Q.   And the valuations that you have
15 used here for the monetization assume a
16 sale between -- a sale prior to December
17 of 2022.  Correct?
18      A.   Sorry.  I don't quite understand
19 your question.
20      Q.   The 257 number, and then let's
21 take out the notes.  Let's use the 210
22 number.
23           MR. MORRIS:  Can we put the
24      document back on the screen, please?
25      Sorry, Douglas, to interrupt, but it
```

Page 42

```
1                    J. SEERY
2       would be helpful.
3            MR. DRAPER:  That is fine, John.
4            (Pause.)
5            MR. MORRIS:  Thank you very
6       much.
7       Q.   Mr. Seery, do you see the 257?
8       A.   In the one from yesterday?
9       Q.   Yes.
10      A.   Second line, 257,941.  Yes.
11      Q.   That assumes a monetization of
12  all assets by December of 2022?
13      A.   Correct.
14      Q.   And so everything has been sold
15  by that time; correct?
16      A.   Yes.
17      Q.   So, what I am trying to get at
18  is, there is both the capability between
19  you and a trustee, and then the second
20  issue is timing.  So, what discount was
21  put on for timing, Mr. Seery, between when
22  a trustee would sell it versus when you
23  would sell it?
24           MR. MORRIS:  Objection.
25      Q.   What is the percentage you
```

Page 43

```
1                    J. SEERY
2   applied?
3       A.   Each of the assets is different.
4       Q.   Is there a general discount that
5   you used?
6       A.   Not a general discount, no.  We
7   looked at each individual asset and went
8   through and made an assessment.
9       Q.   Did you apply a discount for
10  your capability versus the capability of a
11  trustee?
12      A.   No.
13      Q.   So a trustee would be as capable
14  as you are in monetizing these assets?
15           MR. MORRIS:  Objection to the
16      form of the question.
17      Q.   Excuse me?  The answer is?
18      A.   The answer is maybe.
19      Q.   Couldn't a trustee hire somebody
20  as capable as you are?
21           MR. MORRIS:  Objection to the
22      form of the question.
23      A.   Perhaps.
24      Q.   Sir, that is a yes or no
25  question.  Could the trustee hire somebody
```

Page 44

```
1                    J. SEERY
2   as capable as you are?
3            MR. MORRIS:  Objection to the
4       form of the question.
5       A.   I don't know.
6       Q.   Is there anybody as capable as
7   you are?
8            MR. MORRIS:  Objection to the
9       form of the question.
10      A.   Certainly.
11      Q.   And they could be hired.
12  Correct?
13      A.   Perhaps.  I don't know.
14      Q.   And if you go back to the
15  November 2020 liquidation analysis versus
16  plan analysis, it is also the same note
17  about that a trustee would bring less, and
18  there is the same sort of discount between
19  the estimated proceeds under the plan and
20  under the liquidation analysis.
21           MR. MORRIS:  If that is a
22      question, I object.
23      Q.   Is that correct, Mr. Seery,
24  looking at the document?
25      A.   There are discounts, yes.
```

Page 45

```
1                    J. SEERY
2       Q.   Again, the discounts are applied
3   for timing and capability?
4       A.   Yes.
5       Q.   Now, in looking at the November
6   plan analysis number of $190 million and
7   the January number of $257 million, what
8   accounts for the increase between the two
9   dates?  What assets specifically?
10      A.   There are a number of assets.
11  Firstly, the HCLOF assets are added.
12      Q.   How much are those?
13      A.   Approximately 22 and a half
14  million dollars.
15      Q.   Okay.
16      A.   Secondly, there is a significant
17  increase in the value of certain of the
18  assets over this time period.
19      Q.   Which assets, Mr. Seery?
20      A.   There are a number.  They
21  include MGM stock, they include Trustway,
22  they include Targa.
23      Q.   And what is the percentage
24  increase from November to January,
25  November of 2020 to January of 2021?
```

Page 46

```
 1                    J. SEERY
 2      A.    Do you mean what is the
 3  percentage increase from 190 to 257?
 4      Q.    No.  You just identified three
 5  assets.  MGM stock, we can go look at the
 6  exchange and figure out what the price
 7  increase is; correct?
 8      A.    No.
 9      Q.    Why not?  Is the MGM stock
10  publicly traded?
11      A.    Yes.  It doesn't trade on --
12      Q.    Excuse me?
13      A.    It doesn't trade on an exchange.
14      Q.    Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17      A.    There is a semipublic market;
18  yes.
19      Q.    So it is a number that is
20  readily available between the two dates?
21      A.    It's available.
22      Q.    Now, you identified Targa and
23  Trustway.  Correct?
24      A.    Yes.
25      Q.    Those are not readily available
```

Page 47

```
 1                    J. SEERY
 2  markets; correct?
 3      A.    No.
 4      Q.    Those are operating businesses?
 5      A.    Correct.
 6      Q.    Who provided the valuation for
 7  the November 2020 liquidation analysis?
 8      A.    We use a combination of the
 9  value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12      Q.    And the adjustment was up or
13  down?
14      A.    When?
15      Q.    For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19      MR. MORRIS:  Objection to form
20  of the question.
21      A.    I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.
```

Page 48

```
 1                    J. SEERY
 2      Q.    And if I understand what you
 3  just said, it is that the Houlihan Lokey
 4  valuation for those two businesses showed
 5  a significant increase between November of
 6  2020 and January of 2021?
 7      MR. MORRIS:  Objection to form
 8  of the question.
 9      A.    I didn't say that.
10      Q.    I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18      A.    I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23      Q.    So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 28th
```

Page 49

```
 1                    J. SEERY
 2  of 2021, the magnitude being roughly 60
 3  some odd million dollars.  Correct?
 4      A.    Correct.
 5      Q.    We can account for $22 million
 6  of it easily, right?
 7      MR. MORRIS:  Objection to form.
 8      A.    Correct.
 9      Q.    That is the HarbourVest
10  settlement, so that leaves roughly
11  $40 million unaccounted for?
12      MR. MORRIS:  Objection to the
13  form of the question if that is a
14  question.  It is accounted for.
15      Q.    What makes up that difference,
16  Mr. Seery?
17      A.    A change in the plan value of
18  the assets.
19      Q.    Okay.  Which assets?  Let's sort
20  of go back to where we were.
21      A.    There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up
```

Page 50

J. SEERY

1  J. SEERY
2  for one.  On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7       Q.     Let me look at some numbers
8  again.  In the liquidation analysis in
9  November of 2020, the liquidation value is
10 $149 million.  Correct?
11      A.     Yes.
12      Q.     And in the liquidation analysis
13 in January of 2021, you have $191 million?
14      A.     Yes.
15      Q.     You see that number.  So there
16 is $51 million there, right?
17      A.     No.
18      Q.     What is the difference between
19 191 and -- sorry.  My math may be a little
20 off.  What is the difference between the
21 two numbers, Mr. Seery?
22      A.     Your math is off.
23      Q.     Sorry.  It is 41 million?
24      A.     Correct.
25      Q.     $22 million of that is the

Page 51

J. SEERY

1  J. SEERY
2  HarbourVest settlement, right?
3       A.     I believe that's correct.
4       Q.     Is that fair, Mr. Seery?
5       A.     I believe that is correct, yes.
6       Q.     And part of that differential
7  are publicly traded or ascertainable
8  securities.  Correct?
9       A.     Yes.
10      Q.     And basically you can get, or
11 under the plan analysis or trustee
12 analysis, if it is a marketable security
13 or where there is a market, the
14 liquidation number should be the same for
15 both.  Is that fair?
16      A.     No.
17      Q.     And why not?
18      A.     We might have a different price
19 target for a particular security than the
20 current trading value.
21      Q.     I understand that, but I mean
22 that is based upon the capability of the
23 person making the decision as to when to
24 sell.  Correct?
25           MR. MORRIS:  Objection to form

Page 52

J. SEERY

1  J. SEERY
2  of the question.
3       Q.     Mr. Seery, yes or no?
4       A.     I said no.
5       Q.     What is that based on, then?
6       A.     The person's ability to assess
7  the market and timing.
8       Q.     Okay.  And again, couldn't a
9  trustee hire somebody as capable as you to
10 both, A, assess the market and, B, make a
11 determination as to when to sell?
12           MR. MORRIS:  Objection to form
13      of the question.
14      A.     I suppose a trustee could.
15      Q.     And there are better people or
16 people equally or better than you at
17 assessing a market.  Correct?
18      A.     Yes.
19           MR. MORRIS:  Objection to form
20      of the question.
21      Q.     So, again, let's go back to
22 that.  We have accounted for, out of
23 $41 million where the liquidation analysis
24 increases between the two dates,
25 $22 million of it.  That leaves

Page 53

J. SEERY

1  J. SEERY
2  $18 million.  How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5       A.     I don't know off the top of my
6  head the percentages.
7       Q.     All right.  The same question
8  for the plan analysis where you have the
9  differential between the November number
10 and the January number.  How much of it is
11 marketable securities versus an operating
12 business?
13      A.     I don't recall off the top of my
14 head.
15           MR. DRAPER:  Let me take a
16      few-minute break.  Can we take a
17      ten-minute break here?
18           THE WITNESS:  Sure.
19           (Recess.)
20 BY MR. DRAPER:
21      Q.     Mr. Seery, what I am going to
22 show you and what I would ask you to look
23 at is in the note E, in the statement of
24 assumptions for the November 2020
25 disclosure statement.  It discusses fixed

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|-------|-------------|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate.  We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
| | | |
| Less: Claims paid in full | | |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

## Value of HarbourVest Claim





### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 3662   Filed 02/06/23   Entered 02/06/23 15:55:45   Desc
Case 3:21-cv-00881-X   Document 102-11   Filed 03/15/23   Page 660 of 968   PageID 16242

Case 19-34054-sgj11   Doc 1625   Filed 12/23/20   Entered 12/23/20 22:25:24   Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.   Procedural Background

3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.      On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.      In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.      On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

## B.      Overview of HarbourVest's Claims

10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.     **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.      The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.     On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.     The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.     HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.    Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.    On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.    On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.    Settlement Discussions**

28.    In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.    In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.     Summary of Settlement Terms

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

<div align="center">

**BASIS FOR RELIEF REQUESTED**

</div>

33.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

<div align="center">

10

</div>

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36. There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37. First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38. The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39. Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40. Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41. No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

Page A-44
HMIT Appx. 01866

UBS Settlement [Doc. 2200-1]

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21   Entered 04/15/21 14:37:56   Page 1 of 17

# <u>Exhibit 1</u>
## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### RECITALS

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

<div align="right">**EXECUTION VERSION**</div>

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

<div align="center">3</div>

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**A G R E E M E N T**

    **1.**    **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

    (a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

**EXECUTION VERSION**

(b)      Multi-Strat will pay UBS the sum of \$18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)      Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

**EXECUTION VERSION**

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

           (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

**EXECUTION VERSION**

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

**2.     Definitions.**

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

**3.     Releases.**

**(a)     UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

        (b)    **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

**4.      No Third Party Beneficiaries.**     Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

**5.      UBS Covenant Not to Sue.**     Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants") UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

**6.    Agreement Subject to Bankruptcy Court Approval.**

        (a)    The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

**7.    Representations and Warranties.**

        (a)    Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

        (b)    Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

        (c)    Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

<div align="center">10</div>

**8.      No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.      Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.      Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

### HCMLP Parties or the MSCF Parties

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

### UBS

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
          Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
       sarah.tomkowiak@lw.com

     **11.**   **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

     **12.**   **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

     **13.**   **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

     **14.**   **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

     **15.**   **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**     **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____

Name: _____

Its: _____

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Its: _____

17

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its:    Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its:    Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its:    Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its:    Authorized Signatory

15

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

## Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**





SFChronicle/SFGate/Liz Hafalia

Robert Holmgren

no caption

https://hf.com/warren-hellman/

1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

### Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)        INFO@HF.COM (MAILTO:INFO@HF.COM)        LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)        BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)        TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-&-FRIEDMAN)

©2021 HELLMAN & FRIEDMAN LLC



**CORNER OFFICE**

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

Julie Segal

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

Farallon was a Significant Borrower for Lehman

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |



### Transaction Overview

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

◆ Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**                                          32

Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                              :

In re:                              :     Chapter 11
                              :

BLOCKBUSTER INC., *et al.*,       :     Case No. 10-14997 (BRL)
                              :

                 Debtors.     :     (Jointly Administered)
                              :

------------------------------------------------------------ X

## THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.       The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!





**Joseph H. Nesler** (He/Him)
General Counsel

More | Message

# Joseph H. Nesler (He/Him) · 3rd

**Yale Law School**

General Counsel

Winnetka, Illinois, United States ·

Contact info

500+ connections

Message | More

**Open to work**
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations. ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/

**Joseph H. Nesler** (He/Him)
General Counsel

More | Message

Experience

**General Counsel**
Dalpha Capital Management, LLC
Aug 2020 – Jul 2021 · 1 yr

**Of Counsel**
Winston & Strawn LLP
Sep 2018 – Jul 2020 · 1 yr 11 mos
Greater Chicago Area

**Principal**
The Law Offices of Joseph H. Nesler, LLC
Feb 2016 – Aug 2018 · 2 yrs 7 mos

**Grosvenor Capital Management, L.P.**
11 yrs 9 mos

**Independent Consultant to Grosvenor Capital Management, L.P.**
May 2015 – Dec 2015 · 8 mos
Chicago, Illinois

**General Counsel**
Apr 2004 – Apr 2015 · 11 yrs 1 mo
Chicago, Illinois
Managing Director, General Counsel and Chief Compliance Officer (April 2004 – April 2015)

Investor Communication to Highland Crusader Funds Stakeholders



**Alvarez & Marsal**
**Management, LLC** 2029 Cen
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director

4873-5382-0418v.1 019717.00001

# EXHIBIT A-3

HMIT Appx. 01894



# MUNSCH HARDT

DALLAS / HOUSTON / AUSTIN

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

May 11, 2022

Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

Dear Ms. Eitel:

By way of follow-up to the letter Douglas Draper sent to your offices on October 4, 2021 and my letter dated November 3, 2021, I write to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor"). Those abuses, as detailed in our prior letters, include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to line the pockets of Debtor management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of stakeholders and third-party investors in Debtor-managed funds and in violation of investors' due process rights and various fiduciary duties and duties of candor to the Bankruptcy Court and all constituents. In particular, I write this letter to further detail:

1.      Actions and omissions by the Debtor that have but a single apparent purpose: to spend the assets of the Highland estate to enrich those currently managing the estate at the expense of the business owners (the equity). Currently, the Highland estate has more than enough assets to pay 100% of the allowed creditors' claims. But doing so would deprive the current steward, Jim Seery, as well as his professional cohorts, the opportunity to reap tens, if not hundreds of millions of dollars, in fees. This motivation explains the acts and omissions described below—all designed to prop up a façade that the post-confirmation bankruptcy machinations are necessary, and to avoid any scrutiny of that façade, and to foreclose any investigation into a contrary thesis.

2.      The Debtor's intentional understatement of the value of the estate for personal gain, the gain of professionals, and the gain of affiliated or related secondary claims-buyers.

3.      The failure to adhere to fiduciary duties to maximize the value of estate assets and failure to contest baseless proofs of claim to enable Highland to emerge from bankruptcy as a going concern and to preserve value for all stakeholders.

4.      The gross misuse of estate assets by the Debtor and Debtor professionals in pursuing baseless and stale claims against former insiders of the Debtor when the current value of the estate (over

4862-7970-5887v.1 019717.00004

HMIT Appx. 01895

Ms. Nan R. Eitel
May 11, 2022
Page 2

$650 million with the recent completion of the MGM sale, which includes over $200 million in cash)
greatly exceeds the estate's general unsecured claims ($410 million).

     5.     The failure of the Debtor's CRO and CEO, Jim Seery, to adhere to his fiduciary duty to
maximize the value of the estate. As evidenced by the chart below, all general unsecured claims could
have been resolved using $163 million of debtor cash and other liquidity. Instead, proofs of claim were
inflated and sold to Stonehill Capital Management ("Stonehill") and Farallon Capital Management
("Farallon"), which are both affiliates of Grosvenor (the largest investor in the Crusader Funds, which
became the largest creditor in the bankruptcy). Mr. Seery has a long-standing relationship with
Grosvenor and was appointed to the Independent Board (the board charged with managing the Debtor's
estate) by the Redeemer Committee of the Crusader Funds, on which Grosvenor held five of nine seats.

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0 ($65.0 net of other assets) |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 to $163.0** |

     As highlighted in the prior letters to your office and as further detailed herein, this is the type of
systemic abuse of process that is something lawmakers and the Executive Office of the U.S. Trustee (the
"EOUST") should be concerned about. Accordingly, we urge the EOUST to exercise its "broad
administrative, regulatory, and litigation/enforcement authorities . . . to promote the integrity and
efficiency of the bankruptcy system for the benefit of all stakeholders–debtors, creditors, and the public."[1]
Specifically, we believe it would be appropriate for the EOUST to undertake an investigation to confirm
the current value of the estate and to ensure that the claims currently being pursued by the Debtor are
intended to benefit creditors of the estate, and not just to further enrich Debtor professionals and Debtor
management.

<div align="center">

**BACKGROUND**

</div>

**The Players**

James Dondero – co-founder of Highland in 1993. Mr. Dondero is chiefly responsible for ensuring that
Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other
areas, including real estate, private equity, and alternative investments. Mr. Dondero is a dedicated
philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy.
He currently serves as a member of the Executive Board of the Southern Methodist University Cox
School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential
Center.

---

[1] https://www.justice.gov/ust.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 3

Highland – Highland Capital Management, L.P., the Debtor. Highland is an SEC-registered investment advisor co-founded by James Dondero in 1993. Prior to its bankruptcy, Highland served as adviser to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

Strand – Strand Advisors, Inc., a Delaware corporation. The general partner of Highland.

The Independent Board – the managing board installed after Highland's bankruptcy filing. To avoid a protracted dispute, and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by three independent directors of Strand, who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. Pursuant to an agreement with the Creditors' Committee that was approved by the Bankruptcy Court, Mr. Dondero, UBS, and the Redeemer Committee each were permitted to choose one director. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James P. Seery, Jr.[2]

Creditors' Committee – On October 29, 2019, the bankruptcy court appointed the Official Committee of Unsecured Creditors, which consisted of: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).

James P. Seery, Jr. – a member of the Independent Board, and the Chief Executive Officer, and Chief Restructuring Officer of the Debtor. Beginning in March 2020, Mr. Seery ran day-to-day operations and negotiations with the Creditors' Committee, investors, and employees in return for compensation of $150,000 per month and generous incentives and stands to earn millions more for administering the Debtor's post-confirmation liquidation. Judge Nelms and John Dubel remained on the Independent Board, receiving weekly updates and modest compensation.

Acis – Acis Capital Management, L.P., a former affiliate of Highland. Acis is currently owned and controlled by Josh Terry, a former employee of Highland. Acis (Joshua Terry) was a member of Highland's Creditors' Committee.

UBS – UBS Securities LLC and UBS AG London Branch, collectively. UBS asserted claims against Highland arising out of a default on a 2008 warehouse lending facility (to which Highland was neither a party nor a guarantor). Highland had paid UBS twice for full releases of claims UBS asserted against Highland – approximately $110 million in 2008 and an additional $70.5 million via settlement with Barclays, the Crusader Funds, and Credit Strategies in June 2015. UBS was a member of the Creditors' Committee and appointed John Dubel to the Independent Board.

---

[2] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
May 11, 2022
Page 4

HarbourVest – HarbourVest Partners, LLC. HarbourVest is a private equity fund of funds and one of the largest private equity investment managers globally. HarbourVest has approximately $75 billion in assets under management. HabourVest has deep ties with Grosvenor and has jointly with Grosvenor sponsored 59 LBO transactions in the last two years.

The Crusader Funds – a group of Highland-managed funds formed between 2000 and 2002. During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their full investment plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been paid when made. Subsequently, when disputes regarding management of the Crusader Funds' liquidation arose, the Redeemer Committee instituted an arbitration against Highland, resulting in an arbitration award against Highland of approximately $190 million. Nonetheless, due to offsets and double-counting, the Debtor initially estimated the value of the Redeemer arbitration award at $105 million to $110 million. In a 9019 settlement with the Debtor, the Crusader Funds ultimately received allowed claims of $137 million, plus $17 million of sundry claims and retention of an interest in Cornerstone Healthcare Group, Inc., an acute-health-care company, valued at over $50 million. Notably, UBS objected to the Crusader Funds' 9019 settlement, arguing that the Redeemer arbitration award was actually worth much less— between $74 and $128 million. The Crusader Funds sold their allowed claims to Stonehill, in which Grosvenor is the largest investor. This sale to an affiliated fund without approval of other investors in the fund is a violation of the Investment Advisers Act of 1940.

The Redeemer Committee – The Redeemer Committee of the Highland Crusader Funds was a group of investors in the Crusader Funds that oversaw the liquidation of the funds. The Redeemer Committee was comprised of nine members. Grosvenor held five seats. Concord held one seat.

Grosvenor – GCM Grosvenor is a global alternative asset management firm with over $59 billion in assets under management. Grosvenor has one of the largest operations in the Cayman Islands, with more than half of their assets under management originating through its Cayman operations. Unlike most firms operating in the Cayman Islands, Grosvenor has its own corporate and fiduciary services firm. This structure provides an additional layer of opacity to anonymous corporations from the British Virgin Islands (which includes significant Russian assets), Hong Kong (which includes significant Chinese assets), and Panama (which includes significant South American assets). As a registered investment adviser, Grosvenor must adhere to know-your-customer regulations, must report suspicious activities, and must not facilitate non-compliance or opacity. In 2020, Michael Saks and other insiders distributed all of Grosvenor's assets to shareholders and sold the firm to a SPAC originated by Cantor Fitzgerald.[3] In 2020, the equity market valued asset managers and financial-services firms at decade-high valuations. It makes little sense that Grosvenor would use the highly dilutive SPAC process (as opposed to engaging

---

[3] See https://www.wsj.com/articles/gcm-grosvenor-to-merge-with-cantor-fitzgerald-spac-11596456900. The Securities and Exchange Commission recently released a rule proposal that is focused on enhancing disclosure requirements around special purpose acquisition companies, including additional disclosures about SPAC sponsors, conflicts of interest and sources of dilution, business combination transactions between SPACs and private operating companies, and fairness of these transactions. See https://www.pionline.com/regulation/sec-proposes-enhanced-spac-disclosure-rule.

Ms. Nan R. Eitel
May 11, 2022
Page 5

in a traditional IPO or other strategic-sale alternatives) unless such a structure was employed to avoid the diligence and management-liability tail inherent in more traditional processes.

Farallon – Farallon Capital Management, L.L.C.  Farallon is a hedge fund that manages capital on behalf of institutions and individuals and was previously the largest hedge fund in the world.  Farallon has approximately $27 billion in assets under management.  Grosvenor is a significant investor in Farallon.  Grosvenor and Farallon are further linked by Hellman & Friedman, LLC, an American private equity firm.  Hellman & Friedman owned a stake in Grosvenor from 2007 until it went public in 2020 and seeded Farallon's initial capital.

Muck – Muck Holdings, LLC.  Muck is owned and controlled by Farallon.  Together with Jessup Holdings, LLC (described below)), Muck acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Stonehill – Stonehill Capital Management, LLC.  Stonehill provides portfolio management for pooled investment vehicles.  It has approximately $3 billion in assets under management, which  we have reason to believe includes approximately $1 billion from Grosvenor.

Jessup – Jessup Holdings, LLC.  Jessup is owned and controlled by Stonehill.  Together with Muck (Farallon), Stonehill acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Marc Kirschner/Teneo - The Debtor retained Marc Kirschner to pursue over $1 billion in claims against former insiders and affiliates of the Debtor despite the significant solvency of the estate ($650 million in assets versus $410 million in claims).  Kirschner's bankruptcy restructuring firm was purchased by Teneo (which also purchased the restructuring practice of KPMG).  Teneo is sponsored by LetterOne, a London-based private equity firm owned by Mikhail Fridman, a Russian oligarch.  Fridman is also the primary investor in Concord Management, LLC ("Concord"), which held a position on the Redeemer Committee.  During the resolution of a 2018 arbitration involving a Debtor-managed fund, the Highland Credit Strategies Fund, evidence emerged demonstrating that Concord was operating as an unregistered investment adviser of Russian money from Alfa-Bank, Russia's largest privately held bank and a key part of Fridman's Alfa Group Consortium.  –That money that was funneled into BVI-domiciled shell companies into the Cayman Islands, then into various hedge funds and private equity funds in the U.S.  Evidence of these activities was presented by the Debtor to Grosvenor, and the Debtor asked to have Concord removed from the Redeemer Committee.  Concord was never removed.  Concord is a large investor in Grosvenor.  Grosvenor, in turn, is a large investor in Stonehill and Farallon.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved investors in the Crusader Funds.  As explained above, a group of Crusader Funds investors sued after the funds' manager temporarily suspended redemptions during the financial crisis.  That dispute resolved with the formation of the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors'

Ms. Nan R. Eitel
May 11, 2022
Page 6

receiving a return of their investments plus a profit, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite the successful liquidation of the Crusader Funds, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

In view of the expected arbitration award and believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[4]

On October 29, 2019, the Bankruptcy Court appointed the Creditors' Committee. At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[5]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of Strand. To avoid a protracted dispute and to

---

[4] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

[5] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

Ms. Nan R. Eitel
May 11, 2022
Page 7

facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by the Independent Board.[6]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the independent directors, Mr. Seery. Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[7] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[8]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[9] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

*The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of

---

[6] Frank Waterhouse and Scott Ellington, Highland employees, remained as officers of Strand, Chief Financial Officer and General Counsel, respectively.

[7] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[8] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[9] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

Ms. Nan R. Eitel
May 11, 2022
Page 8

creditors and every six months thereafter until the effective date of a plan of reorganization.  Fed R. Bankr. P. 2015.3(b).  Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[10]  Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports.  28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements.  Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor.  Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.  This becomes all the more important when a debtor or an estate holds substantial assets through non-debtor subsidiaries or vehicles, as is the case here; hence, the purpose of Rule 2015.3.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, the Highland bankruptcy offered almost no transparency to stakeholders.  Traditional reporting requirements were ignored, and neither the Bankruptcy Court nor the U.S. Trustee's Office did anything to ensure compliance.  This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.  Additionally, the lack of proper and accurate information and intentional hiding of material information led creditors to vote for the Debtor's plan and the Bankruptcy Court to confirm that plan which, we believe, would not have happened had the Debtor complied with its fiduciary and reporting duties.

As Mr. Draper and I have already highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities.  Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports.  The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[11]  Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement.  That is because there was no good reason for the Debtor's failure to file the required reports.  In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-

---

[10] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).
[11] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

HMIT Appx. 01902

Ms. Nan R. Eitel
May 11, 2022
Page 9

value determinations.[12] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

Despite these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements adopted by the EOUST and historical rules mandating transparency.[13]

Because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**The Lack of Transparency Permitted the Debtor to Quietly Sell Assets Without Observing Best Practices**

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of Portola Pharma shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year).

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to the debtor (20% less than Mr. Dondero received in funds he managed).

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or

---

[12] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[13] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

HMIT Appx. 01903

Ms. Nan R. Eitel
May 11, 2022
Page 10

outside stakeholders, resulting in a loss to the estate of over $10 million versus cost and $20 million versus fair market value.

- The Debtor "sold" interests in certain investments commonly referred to as PetroCap without engaging in a public sale process and without exploring any other method of liquidating the asset.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors. Equally as troubling, for certain similar sale transactions the Debtor *did* seek Bankruptcy Court approval, thus acknowledging that such approval was necessary or, at a minimum, that disclosures regarding non-estate asset sales are required.

**The Lack of Transparency Permitted the "Inner Circle" to Manipulate the Estate for Personal Gain**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic because the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months in the wake of the global pandemic. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 million impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). A Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity— information that was critical in evaluating the worth of claims against the estate or future investments into it.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time financial information with respect to the affairs of non-Debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. The Debtor's "inner circle" – the Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) – had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

*Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate*

Mr. Seery's compensation package encouraged, and the lack of transparency permitted, manipulation of the estate and settlement of creditors' claims at inflated amounts.

Ms. Nan R. Eitel
May 11, 2022
Page 11

Upon his initial appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[14]

When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he his compensation package was handsomely improved. His base salary, which was on the verge of dropping to $30,000 per month, was increased *retroactively* back to March 15, 2020, to $150,000 per month. Additionally, his employment agreement contemplated a discretionary "Restructuring Fee"[15] that would be calculated in one of two ways:

(1)     If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)     If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and was intended to provide a powerful economic incentive for Mr. Seery to steer Highland through the Chapter 11 case and emerge from bankruptcy as a going concern.

Despite the structure of his compensation package, Mr. Seery saw greater value in aligning himself with creditors and the Creditors' Committee. To that end, he publicly alienated and maligned Mr. Dondero, and he found willing allies in the Creditors' Committee. The posturing also paved the way for Mr. Seery to bestow upon the hold-out creditors exorbitant settlements at the expense of equity and earn his Restructuring Fee. In fact, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee (both members of the Creditors' Committee),[16] leaving only the HarbourVest and UBS (also a member of the Creditors' Committee) claims to resolve. In other words, Mr. Seery had curried favor with two of the four members of the Creditors' Committee who would ultimately approve his Restructuring Fee and future compensation following plan consummation.

Ultimately, the confirmed Plan appointed Mr. Seery as the Claimant Trustee, which continued his compensation of $150,000 per month (termed his "Base Salary") and provided that the Oversight Board and Mr. Seery would negotiate additional "go-forward" compensation, including a "success fee" and severance pay.[17] Mr. Seery's success fee presumably is (or will be) based on whether his liquidation of

---

[14] *See* Dkt. 339, ¶ 3.
[15] *See* Dkt. 854, Ex. 1.
[16] *See* Dkt. 864, p. 8, l. 24 – p. 9, l. 8.
[17] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
May 11, 2022
Page 12

the estate outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy but also to ensure that he eventually receives a large "success fee" and severance payment. In fact, during a deposition taken on October 21, 2021, Mr. Seery testified that he expected to make "a few million dollars a year" for each year during the years that he will take to liquidate the Debtor, although we estimate that, based on the estate's nearly $650 million value today, Mr. Seery's success fee could approximate $50 million.

### *Mr. Seery Enters into Inflated Settlements*

Even before his appointment as CEO and CRO of the Debtor, Mr. Seery had effectively seized control of the Debtor as its *de facto* chief executive officer.[18] Thus, while he was in the process of negotiating his compensation agreement, he was simultaneously negotiating settlements with the remaining creditors to ensure he earned his Restructuring Fee, even if he did so at inflated amounts. One transaction that highlights this is the settlement with the Crusader Funds and the Redeemer Committee.

In connection with Mr. Seery's appointment as CEO and CRO, the Debtor announced that it had reached an agreement in principle with the Crusader Funds and the Redeemer Committee. Even **UBS**, one of the members of the Creditors' Committee, thought the settlement was inflated. In its objection to the Debtor's 9019 motion, UBS stated:[19]

> The Redeemer Claim is based on an Arbitration Award that required the Debtor, inter alia, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) in exchange for all of Crusader's shares in Cornerstone. Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation. As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

> Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer. The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement. Depending on the valuation of the Cornerstone shares, the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

---

[18] *See* Dkt. 864, p. 6, l. 18 – 22.
[19] *See* Dkt. 1190, p. 6 – 7.

Ms. Nan R. Eitel
May 11, 2022
Page 13

    In the meantime, other general unsecured creditors of the Debtor will receive a much lower percentage recovery than they would if those assets were instead transferred to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among the Debtor's creditors. The Proposed Settlement is only in the best interests of Redeemer and, as such, it should be rejected.

<center>******</center>

[3] The potential range of value attributable to the Cornerstone shares is significant because, according to the Debtor's liquidation analysis, the Debtor expects to have only $195 million total in value to distribute, and only $161 million to distribute to general unsecured creditors under its proposed plan.  See Liquidation Analysis [Dkt. No. 1173-1]; First Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1079].

    UBS was right.  Mr. Seery agreed to a settlement that substantially overpaid the Redeemer Committee, and UBS only agreed to withdraw its objection and appeal of the Redeemer Committee's settlement when the Debtor bestowed upon UBS its own lavish settlement.[20]

    It is worth noting that the Redeemer Committee ultimately sold its bankruptcy claim for $78 million in cash, but the sale excluded, and the Crusader Funds retained, its investment in Cornerstone Healthcare Group Holding Inc. and certain non-cash consideration.[21]  At the end of the day, the Crusader Funds and the Redeemer Committee cashed out of their bankruptcy claims for total consideration at the very least of $135 million, meaning they received 105% of the highest estimate (according to UBS) of the net amount of their arbitration award.[22]

### The Inner Circle Doesn't Object to Inflated Settlements

    Following the Bankruptcy Court's approval of settlements with Acis/Josh Terry and the Crusader Funds/the Redeemer Committee, Mr. Seery turned his attention to the two remaining critical holdouts: HarbourVest and UBS.  HarbourVest, a private equity fund-of-funds with approximately $75 billion under management, had invested pre-bankruptcy $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO

---

[20] See Dkt 2199.  Under the terms of the UBS Settlement, UBS received a Class 8 claim in the amount of $65 million, a Class 9 claim in the amount of $60 million, a payment in cash of $18.5 million from a non-Debtor fund managed by the Debtor, and the Debtor's agreement to assist UBS in pursuing other claims against former Debtor affiliates related to a default on a credit facility during the Global Financial Crisis.  Importantly, over the course of the preceding 11 years, UBS had already received payments totaling $180 million in connection with this dispute, and just prior to bankruptcy, UBS and the Debtor had reached a settlement in principle in which the Debtor would pay UBS just $7 million and $10 million in future business.
[21] See Exh. B.
[22] The estimation of a total recovery of $135 million includes attributing $48 million to the retained Cornerstone investment. The $48 million valuation equated to a ~45% interest in Cornerstone, which was valued pre-pandemic at approximately $107 million.  Following COVID, Cornerstone's long-term acute care facilities flourished.  Additionally, Cornerstone held a direct investment of over 800,000 shares in MGM, which was held on its books at approximately $72 per share.  The per-share closing price on the sale of MGM to Amazon exceeded $164, which would have increased the company's valuation (irrespective of the post-COVID growth) by more than $70 million, bring Crusader Funds' windfall to more than $205 million.

Ms. Nan R. Eitel
May 11, 2022
Page 14

Funding, Ltd. ("HCLOF"). A charitable fund called the Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ~2.00% was held by Highland and certain of its employees.

Before Highland filed bankruptcy, a dispute arose between HarbourVest and Highland in which HarbourVest claimed it was duped into making the investment into HCLOF because Highland allegedly failed to disclose facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry, which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs. In Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that the Debtor and Debtor's counsel initially argued was absurd. Indeed, Debtor management valued HarbourVest's claims at $0, which was consistently reflected in the Debtor's publicly-filed financial statements up through and including its December 2020 Monthly Operating Report.[23] Nevertheless, as one of the final creditor claims to be resolved, Mr. Seery ultimately agreed to give HabourVest a $45 million Class 8 claim and a $35 million Class 9 claim.[24] At that time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive 71.32% payout on their claims, and Class 9 creditors could expect 0.00%. Thus, HarbourVest's total $80 million in allowed claims would result in HarbourVest receiving $32 million in cash.[25] The cash consideration was offset by HarbourVest's agreement to convey its interest in HCLOF to the Debtor (or its designee) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. In other words, from the outside looking in, the Debtor agreed to pay $9.5 million for a spurious claim.

Oddly enough, no creditors (other than former insiders) objected. What the inner circle presumably knew was that the settlement was actually a windfall for the Debtor. As we have previously detailed, the $22.5 million valuation of HCLOF that the Debtor utilized in seeking approval of the settlement was based upon September 2020 figures when the economy was still reeling from the pandemic. The value of that investment rebounded rapidly, particularly because of the pending MGM sale to Amazon that was disclosed to the Debtor but not the public (i.e., material non-public information). We have subsequently learned that the actual value of the HCLOF at the time the Bankruptcy Court approved the HarbourVest settlement was at least $44 million—a value that Mr. Seery would have known but that was not disclosed to the Court or the public.

Likewise, there were no objections to the UBS settlement, which is puzzling. As detailed in the Debtor's 64-page objection to the UBS proof of claim and the Redeemer Committee's 431-page objection to the UBS proof of claim, UBS's claims against the Debtor were razor thin and largely foreclosed by res judicata and a settlement and release executed in connection with the June 2015 settlement. Moreover, the publicly available information indicated that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16,

---

[23] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.

[24] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

[25] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $27 million.

HMIT Appx. 01908

Ms. Nan R. Eitel
May 11, 2022
Page 15

2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021);[26]

- Allowed claims against the estate increased by $236 million from December 2020 to January 2021, with Class 8 claims ballooning $74 million in December to $267 million in January;

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for Class 8 Claims decreased from 87.44% to 71.32% in just a matter of months.

The Liquidation Analysis estimated total assets remaining for distribution to general unsecured claims to be $195 million, with general unsecured claims totaling $273 million. By the time the UBS settlement was presented to the court for approval, the allowed Class 8 Claims had increased to $309,345,000, reducing the distribution to Class 8 creditors to 62.99%. Surely significant creditors like the Redeemer Committee—whose projected distribution dropped from $119,527,515 when it voted for the Plan to $86,105,194 with the HarbourVest and UBS claims included—should have taken notice.

**Mr. Seery Stacks the Oversight Board**

As previously disclosed, we believe Mr. Seery facilitated the sale of the four largest claims in the estate to Farallon and Stonehill. Based upon conversations with representatives of Farallon, Mr. Seery contacted them directly to encourage their acquisition of claims in the bankruptcy estate.[27] We believe Mr. Seery did so by disclosing the true value of the estate versus what was publicly disclosed in court filings, demonstrating that there was substantial upside to the claims as compared to what was included in the Plan Analysis. For example, publicly available information at the time Farallon and Stonehill acquired the UBS claim indicated the purchase would have made no economic sense: the publicly disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Farallon and Stonehill would have lost money on the claim acquisition. We can only conclude Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), which based upon accurately disclosed financial statements would indicate they were likely to recover close to 100% on both Class 8 and Class 9 claims.

As set forth in the previous letters, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers Farallon, through Muck, and Stonehill, through Jessup. The four claims purchased by Farallon and Stonehill comprise the largest four claims in the Highland bankruptcy by a substantial margin, collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[26] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473].

[27] We believe Mr. Seery made similar calls to representatives of Stonehill. We are informed and believe that Mr. Seery has long-standing relationships with both Farallon and Stonehill.

Ms. Nan R. Eitel
May 11, 2022
Page 16

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,696,610** | **$95,000,000** | |

      From the information we have been able to gather, it appears that Stonehill and Farallon purchased these claims for the following amounts:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[28] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 - $165.0** |

      As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) are overseeing the liquidation of the reorganized Debtor. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth below, we estimate that the estate today is worth nearly $650 million and has approximately $200 million in cash, which could result in Mr. Seery's receipt of a performance bonus approximating $50 million. Thus, it is a warranted and logical deduction that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. As set forth in previous letters, there are three primary reasons to believe this:

- The scant publicly available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that was actually publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims; and

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

For example, consider the sale of the Crusader Funds' claims, which we *know* was sold for $78 million. Based upon the publicly available information at the time of the acquisition, the expected distribution would have been $86 million. Surely a sophisticated hedge fund would not invest $78 million in a particularly contentious bankruptcy if it believed its maximum return was $86 million years later.

---

[28] Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
May 11, 2022
Page 17

Ultimately, the Plan, Mr. Seery's compensation package, and the lack of transparency to everyone other than the Debtor, its management, and the Creditors' Committee permitted Debtor management and the Creditors' Committee to support grossly inflated claims (at the expense of residual stakeholders) in a grossly understated estate, which facilitated the sales of those claims to a small group of investors with significant ties to Debtor management.  In doing so, Mr. Seery installed on the Reorganized Debtor's Oversight Board friendly faces who stand to make $370 million on ~$150 million investment.  And Mr. Seery's plan has already worked.  Notably, while the confirmed Plan was characterized by the Debtor as a monetization plan,[29] the newly installed Oversight Board supported, and the Court approved, paying Mr. Seery the much more lucrative Case Resolution Fee, netting Mr. Seery $1.5 million more than he was entitled to receive under his employment agreement.

In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

| | Value as of Aug. 2021 | | March 2022 High Estimate updated for MGM closing |
|---|---|---|---|
| **Asset** | **Low** | **High** | |
| Cash as of 4/25/22 | $17.9 | $17.9 | |
| Targa Sale | $37.0 | $37.0 | |
| 8/1 CLO Flows | $10.0 | $10.0 | |
| Uchi Bldg. Sale | $9.0 | $9.0 | |
| Siepe Sale | $3.5 | $3.5 | |
| PetroCap Sale | $3.2 | $3.2 | |
| Park West Sale | $3.5 | $3.5 | |
| HCLOF trapped cash | $25.0 | $25.0 | |
| **Total Cash** | **$105.6** | **$105.6** | **$200** |
| Trussway | $180.0 | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 | $25.0 |
| HCLOF | $40.0 | $40.0 | $20.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 | $30.0 |
| MGM (direct ownership) | $32.0 | $32.0 | $0.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 | $30.0 |
| Korea Fund | $18.0 | $18.0 | $20.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 | $70.0 |
| Other | $2.0 | $10.0 | $10.0 |

---

[29] See Dkt. 194., p.5.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 18

| Highland Restoration Capital Partners | | | |
|---|---|---|---|
| **TOTAL** | **$472.6** | **$598.6** | **$645.0** |

## The Bankruptcy Professionals are Draining the Estate

Yet another troubling aspect of the Highland bankruptcy has been the rate at which Debtor professionals have drained the Estate, largely through invented, unnecessary, and greatly overstaffed and overworked offensive litigation.  The sums expended between case filing and the effective date of the Plan (the "Effective Date") are staggering:

| Professional | Fees | Expenses |
|---|---|---|
| Hunton Andrews Kurth | $1,147,059.42 | $2,747.84 |
| FTI Consulting, Inc. | $6,176,551.20 | $39,122.91 |
| Teneo Capital, LLC | $1,221,468.75 | $6,257.07 |
| Marc Kirschner | $137,096.77 | |
| Sidley Austin LLP | $13,134,805.20 | $211,841.25 |
| Pachulski Stang Ziehl & Jones | $23,978,627.25 | $334,232.95 |
| Mercer (US) Inc. | $202,317.65 | $2,449.37 |
| Deloitte Tax LLP | $553,412.60 | |
| Development Specialists, Inc. | $5,562,531.12 | $206,609.54 |
| James Seery[30] | $5,100,000.00 | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| Wilmer Cutler Pickering Hale & Dorr LLP | $2,645,729.72 | $5,207.53 |
| Kurtzman Carson Consultants LLC | $2,054,716.00 | |
| Foley & Lardner LLP | $629,088.00 | |
| Casey Olsen Cayman Limited | $280,264.00 | |
| ASW Law Limited | $4,976.00 | |
| Houlihan Lokey Financial Advisors, Inc. | $766,397.00 | |
| Berger Harris, LLP | | |
| Hayward PLLC | $825,629.50 | $46,482.92 |
| | **$64,420,670.18** | **$854,951.38** |
| **Total Fees and Expenses** | | **$65,275,621.56** |

"The [bankruptcy] estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 872 (Bankr. N.D. Ill. 1989).

---

[30] This amount includes Mr. Seery's success fee, which was paid a month following the Effective Date.

4862-7970-5887v.1 019717.00004

**HMIT Appx. 01912**

Ms. Nan R. Eitel
May 11, 2022
Page 19

The rate at which Debtor professionals have drained the estate is in stark contrast to the treatment of the employees who stayed with the Debtor (without a key employee retention plan or key employee incentive program) on the promise they would be made whole for prepetition deferred compensation that had not yet vested, only to be stiffed and summarily terminated. Even worse, some of these employees have been targeted by the litigation sub-trust for acts they took in the course and scope of their employment.

Following the Effective Date, siphoning of estate assets continues. Mr. Seery still receives base compensation of $150,000 per month, and he expects to receive compensation of at least "a few million dollars a year" according to his own deposition testimony. In addition, his retention was conditioned upon receiving a to-be-negotiated success fee and severance payment (notably, none of which is disclosed publicly).

Likewise, Teneo Capital, LLC was retained as the litigation adviser. For its services post-Effective Date, it is compensated $20,000 per month for Mr. Kirschner as trustee for the Litigation Subtrust, plus the regularly hourly fees of any additional Teneo personnel, plus a "Litigation Recovery Fee." The Litigation Recovery Fee is equal to 1.5% of Net Litigation Proceeds up to $100 million and 2.0% of Net Litigation Proceeds above. Interestingly, although "Net Litigation Proceeds" is defined as gross litigation proceeds less certain fees incurred in pursing the litigation, net proceeds are not reduced by Mr. Kirschner's monthly fee, contingency fees charged by any other professionals, or litigation funding financing. Moreover, Teneo is given credit for any litigation recoveries regardless of whether those recoveries stem from actions commenced by the litigation trustee. The Debtor has not disclosed, and is not required to disclose, the terms upon which any professionals have been engaged following the Effective Date, including Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Litigation Subtrust. Based upon pre-Effective Date monthly expenses, the number of lawyers that attend various matters on behalf of the Debtor,[31] and the addition of Quinn Emanuel Urquhart & Sullivan, LLP and Teneo, we believe the Debtor could be spending as much as $5-$7 million per month.

The Reorganized Debtor and the Highland Claimant Trust recently filed heavily redacted, quarterly post-confirmation reports.[32] Of note, the Reorganized Debtor disclosed that it has disbursed $81,983,611 since the Effective Date but disclosed that it has only paid $47,793 in priority claims and $6,918,473 in general unsecured claims, while still estimating a total recovery to general unsecured claims of $205,144,544. The Highland Claimant Trust disclosed that it has disbursed an additional $7,152,331 since the Effective Date.

## CONCLUSION

The Highland bankruptcy is an extreme example of the abuses that can occur if the federal bench, federal government appointees, and federal lawmakers do not police federal bankruptcy proceedings by

---

[31] In connection with a recent two-day trial on an administrative claim, the Debtor was represented by John Morris ($1,245.00 per hour), Greg Demo ($950 per hour), and Hayley Winograd ($695 per hour), and was assisted by paralegal La Asia Canty ($460 per hour). The Debtor's local counsel, Zachery Annable ($300 per hour), was also present, and Jeffrey Pomerantz ($1,295 per hour) observed the trial via WebEx. Despite the army of lawyers, Mr. Morris handled virtually the entire proceeding, with Ms. Winograd examining only two small witnesses. Messrs. Pomerantz, Demo, and Annable played no active role in the proceedings.
[32] Dkt 3325 and 3326.

HMIT Appx. 01913

Ms. Nan R. Eitel
May 11, 2022
Page 20

permitting debtors-in-possession to hide material information, violate duties of transparency and candor, and manipulate information and transactions to benefit disclosed and undisclosed insiders or "friends" of insiders. Bankruptcy should not be an avenue for opportunistic venturers to prey upon companies to the detriment of third-party stakeholders and the bankruptcy estate. We therefore encourage your office to investigate the problems inherent in the Highland bankruptcy. At a minimum, we ask that the EOUST seek orders from the Bankruptcy Court compelling the Debtor to undertake the following actions:

1. turn over all financial reports that should have been disclosed during the pendency of the bankruptcy, including 2015.3 reports;

2. provide a detailed disclosure of the assets Reorganized Debtor;

3. provide a copy of the executed Claimant Trust Agreement, which should already have been disclosed;

4. disclose all solvency analyses prepared by the Debtor; and

5. provide copies of all agreements for the engagement of Debtor professionals post-confirmation, including the terms of Mr. Seery's success fee and severance agreement, compensation agreements for personnel of the Reorganized Debtor, and the fee arrangement with Quinn Emanuel Urquhart & Sullivan, LLP.

Sincerely,

MUNSCH HARDT KOPF & HARR, P.C.

By:

Davor Rukavina, Esq.

DR:

HMIT Appx. 01914

# EXHIBIT A

HMIT Appx. 01915

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs the Dugaboy Investment Trust and the*
*Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | § §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § §  Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § § |
| DUGABOY INVESTMENT TRUST and HUNTER MOUNTAIN INVESTMENT TRUST, | § § § § |
| Plaintiffs, | §  Adversary Proceeding No. § _____ |
| vs. | § § |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and HIGHLAND CLAIMANT TRUST, | § § § |
| Defendants. | § § |

## COMPLAINT TO (I) COMPEL DISCLOSURES
## ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND
## (II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND
## (B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST

**HMIT Appx. 01916**

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("Hunter Mountain" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against defendants Highland Capital Management, L.P. ("HCMLP" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCMLP, the "Defendants"), seeking:  (1) disclosures about and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of those assets; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.      As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCMLP bankruptcy estate.

2.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that even with inflated claims and below market sales of assets, cash available is more than enough to pay class 8 and class 9 creditors in full.  Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities.  Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation.   That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or

---

[1] Capitalized terms not defined have the meanings set forth herein.  If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

2

nothing for the owners that built the company.  While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity.  As this Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity.  In some cases, the protection is in the form of an equity committee; here a prompt valuation of the estate is needed.

3.     Upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Plaintiffs.  Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery, who he knew would approve his inflated compensation when the hidden but true value of the estate's assets were realized.  Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

4.     Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full.  Because of the lack of transparency to date, unless the relief sought herein is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

CORE/3522697.0002/178862860.17

**HMIT Appx. 01918**

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

5.      By demonizing the estate equity holders, withholding information, and manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the potential for a grave miscarriage of justice.  The estate had over $550 million in assets on the petition date, with far less in non-disputed non-contingent liabilities.

6.      By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[2]

7.      On information and belief, the value of the assets in the estate as of 6/1/22 was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | Low | High |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |
| Affiliate Notes[3] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022, annexed hereto as Exhibits 1, 2, and 3, as is further detail about claims buyers.
[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

HMIT Appx. 01919

8.      By June 2022, Mr. Seery had also engineered settlements making the inflated face
amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

9.      Mr. Seery made no efforts to buy the claims into the estate or resolve the estate
efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never
responded to the over the many settlement offers from Mr. Dondero with a reorganization (as
opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the
amounts paid by the claims buyers.

10.      Instead, Mr. Seery brokered transactions enabling colleagues with long-standing
but undisclosed business relationships to buy the claims without the knowledge or approval of the
Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors
had been notified that "Creditors wishing to serve as fiduciaries on any official committee are
advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor
while they are committee members absent an order of the Court."    These transactions are
particularly suspect because the claims buyers paid amounts equivalent to the value the Plan
estimated would be paid three years later.  Sophisticated buyers would not pay what appeared to
be full price unless they had material non-public information that the claims could and would be
monetized for much more than the public estimates made at the time of Plan confirmation – as
indeed they have been.

11.      On information and belief, Mr. Seery provided that information to claims buyers
rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million

in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating

business in the hands of its equity owners.

12.     Specifically, Mr. Seery could and should have investigated seeking sufficient funds

from equity to pay all claims and return the estate to the equity holders.  This was an obvious path

because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery

eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were

sold, much of the massive administrative costs run up by the estate would never have been

incurred.  One such avoided cost would be the post-effective date litigation now pursued by Mr.

Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge

over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained

from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the

cost of the Kirschner litigation).    But buying the claims to resolve the bankruptcy and enabling

equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme

contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the

hands of grateful business colleagues who received outsized rewards for the claims they were

steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item

cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is

transparency.

13.     But worse still, even with all of the manipulation that appears to have occurred,

Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its

own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

CORE/3522697.0002/178862860.17

unnecessary litigation, would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

14.    In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery.

15.    Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

16.    In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

CORE/3522697.0002/178862860.17

**HMIT Appx. 01922**

## JURISDICTION AND VENUE

17.     This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

19.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

20.     In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

## THE PARTIES

21.     Dugaboy is a trust formed under the laws of Delaware.

22.     Hunter Mountain is a trust formed under the laws of Delaware.

23.     HCMLP is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

24.     The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

25.     On October 16, 2019 (the "Petition Date"), HCMLP, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

26.     At the time of its chapter 11 filing, HCMLP had approximately $550 million in assets and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. [Dkt. No. 1943, ¶ 8]. HCMLP's reason for seeking

bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million. Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

27.     At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCMLP and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCMLP and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCMLP management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

28.     To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCMLP's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCMLP during its bankruptcy.  The three board members were:

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

CORE/3522697.0002/178862860.17

HMIT Appx. 01924

a.  James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);

b.  John Dubel – (who was selected by Committee member UBS); and

c.  Former Judge Russell Nelms – (who was selected by the Debtor).

29.    The Bankruptcy Court almost immediately let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by Judge Nelms, suggesting he was bamboozled because he was under management's spell.  Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about  . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

30.    At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121] In retrospect, this avoided scrutiny of the case by professionals

CORE/3522697.0002/178862860.17

HMIT Appx. 01925

who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case. This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

31.     Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

32.     None of that happened. Almost immediately, Mr. Seery emerged as the de facto leader of the Independent Board. On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate. [Dkt. No. 854]. And although Mr. Seery publicly represented that he intended to restructure and preserve HCMLP's business, privately he was engineering a much different plan.

33.     Indeed, Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control. For example, initially Mr. Seery reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team." He also testified: "My experience with our employees has been excellent. The response when we want to get something done, when I want to get something done, has been first-rate. The skill level is extremely high."

34.     Yet despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the

CORE/3522697.0002/178862860.17

**HMIT Appx. 01926**

plan process, ultimately Mr. Seery fired most of those employees.  It was clear that Mr. Seery was firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of challenging Mr. Seery, lest they too be fired.

35.     From the start, and before there was much litigation to speak of, the Court regularly referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious litigant.  This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero a "transparently" vexatious litigant based pleadings she had only heard about from parties opposing Dondero and admittedly had not read herself.   Ironically, the first time Mr. Dondero was labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits initiated by the Debtor and had commented in proposed settlements in the case, but had not himself initiated any actions in the case.  Thereafter, though, the Debtor and its professionals repeated the mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing information about the estate with them.

36.     In addition to the Debtor's mistreatment of employees, under the control of the Independent Board, most of the ordinary checks and balances that the hallmark of bankruptcy were ignored.  Despite providing regular and robust financial information to the Committee, the Debtor inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including Plaintiffs, in the dark about the value of the estate and the mix of assets it held.   Amplifying the lack of transparency, Mr. Seery further engineered transactions to hide the real value of the estate.

37.     For example, he authorized the Debtor to settle the claims of HabourVest (which claims had initially been valued at $0) for $80 million, in order to acquire HarborVest's interest in Highland CLO Funding, Ltd. ("HCLOF"), gain HarborVest's vote in favor of its Plan, and hide

the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary. This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $40 million at the time and over $60 million 90 days later when the MGM sale was announced.

38.     At the same time, Mr. Seery and the Independent Board deliberately shut out equity holders from any discussion surrounding the plan of reorganization or HCMLP's efforts to emerge from bankruptcy as a going concern. Indeed, as noted above, Mr. Seery failed to meaningfully respond to the many proposals made by residual equity holders to resolve the estate and never encouraged any dialogue between creditors and equity holders. These failures only contributed to the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly undermined an efficient exit from bankruptcy.

39.     Worse still, while knowing that HCMLP had sufficient resources to emerge from bankruptcy as a going concern (and, on information and belief, while knowing that the estate was solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that contemplated HCMLP's continued post-confirmation existence. Instead, and inexplicably, the very first plan proposed contemplated liquidation of the company, as did all subsequent plans.

40.     While secretly engineering the total destruction of HCMLP, Mr. Seery also privately settled multiple proofs of claim against the estate at inflated levels that were unreasonable multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and vehement objection to many of the claims as baseless. But instead of litigating those objections in a manner that would have exposed the true value of the claims, on information and belief, Mr. Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values. That is, the inflated values softened up claims sellers to be willing to sell. Had the Debtor instead

fought the inflated proofs of claim in open court, it could have settled the claims for closer to true value and ensured that the estate had sufficient resources to pay them.

41.    It is also no coincidence that virtually all original proofs of claim were sold to buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

42.    That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate.  It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense.  In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic.  Given the sophistication of the claims-buyers, their purchases of claims at prices that exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

43.    And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know).  In October 2022, $250 million was paid to Class 8 holders.  That is about 85% of the inflated proofs of claim and $90 million more than plan projections.  On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come.  On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million.

HMIT Appx. 01929

44.     At the same time, the Claimant Trust has made no distributions to Contingent
Claimant Trust Interest holders and has argued in various proceedings that no such distributions
are likely.  No wonder. The cost of holding open the estate, including unnecessary litigation costs,
appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such
distributions can occur, even though it can now be projected that the litigation is not needed to pay
creditors.  *See* Docket No. 3410-1.

45.     It is worth noting that it appears that virtually all of the claims trades brokered on
behalf of Committee members seem to have occurred while those entities remained on the
Committee.  Yet at the outset of their service, Committee members were instructed by the United
States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised
that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while
they are committee members absent an order of the Court."  Thus, the claims trades violated
Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other
Debtor professionals, to the detriment of creditors and residual equity holders.

46.     The sales of claims were not the only transactions shrouded in secrecy.  As further
detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding,
no data room, and without inviting equity (which may have at one time had the knowledge to make
the highest bid) to participate in the sales process.  Indeed, on occasion assets were sold for
amounts less that Mr. Dondero's written offers. This exacerbated the harms caused by the lack of
transparency characterized by the Court's indifference to the Debtor's complete failure to abide its
Rule 2015 disclosure obligations.

47.     In short, the lack of transparency combined with at least the appearance of bias, if
not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to

CORE/3522697.0002/178862860.17

**HMIT Appx. 01930**

manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that could have been resolved with money left over for equity but for that manipulation.

## STATEMENT OF FACTS

**A.      Plaintiffs Hold Contingent Claimant Trust Interests**

48.      As of the Petition Date, HCMLP had three classes of limited partnership interests (Class A, Class B, and Class C).  *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

49.      The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCMLP's general partner.  The Class B and C interests were held by Hunter Mountain. *Id.*

50.      In the aggregate, HCMLP's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

51.      On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

52.      In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9.  *See* Plan, Article III, ¶ H(8) and (9).

53.      In the Plan, HCMLP classified Hunter Mountain's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest.  *See* Plan, Article III, ¶ H(10) and (11).

CORE/3522697.0002/178862860.17

**HMIT Appx. 01931**

54.     According to the Plan, Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.  *See* Plan, Article I, ¶44.

55.     In the Confirmation Order, the Court found that the Plan properly separately classified those equity interests because they represent different types of equity security interests in HCMLP and different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended (the "Limited Partnership Agreement").  Confirmation Order, ¶36; Limited Partnership Agreement, §3.9 (Liquidation Preference).

56.     The Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy.  In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCMLP and therefore "technically" had standing to object to the Plan. *See* Confirmation Order, ¶¶ 17-18.

57.     Based on the Debtor's financial projections at the time of confirmation, however, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

58.     The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCMLP became the Reorganized Debtor (as defined in the Plan) on the Effective Date.  *See* Notice of Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700].

59.     The Plan created the Claimant Trust, which was established for the benefit of Claimant Trust Beneficiaries, which is defined to mean:

> the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed

Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1(h).

60.     Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

61.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

62.     In its Post Confirmation Quarterly Report for the Third Quarter of 2022 [Docket No. 3582], Debtor stated that it distributed $255,201,228 to holders of general unsecured claims, which is 64% of the total allowed general unsecured claims of $387,485,568.  This amount is far greater than was anticipated at the time of confirmation of the Plan.

**B.     Debtor Has Failed To Disclose Claimant Trust Asse**ts

63.     Upon information and belief, the value of the estate as held in the Claimant Trust has changed markedly since Plan confirmation.  Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

64.     The estate is solvent and has always been solvent.  Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.

CORE/3522697.0002/178862860.17

**HMIT Appx. 01933**

65.     As noted above, by June of 2022, starting with $125 million in cash, the estate liquidated other assets of over $416 million, building a cash war chest of over $541 million.  Thus, with the remaining less-liquid assets, the total value of the estate's assets as of June 2022 was over $688 million.

66.     Contrasting those assets with the claims against the estate demonstrates that further collection of assets was (and is) unnecessary.

67.     As set forth above, while the inflated face amount of the claims was $365 million, those claims were sold for about $150 million.  The estate therefore easily had the resources to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

68.     Instead, Mr. Seery liquidated estate assets at less-than-optimal prices, without competitive process, without including residual equity holders, and in all cases required strict non-disclosure agreements from the buyers to prevent any information flowing to the public, the residual equity, or the Court. This uncharacteristic secrecy enabled Mr. Seery and the professionals to maintain the delicate balance of keeping just enough assets to pay professionals and incentive fees but still maintain the pretense that further litigation was needed.

69.     Each effort by Plaintiffs, Mr. Dondero and related companies to obtain information to attempt to stop the continued looting has been vigorously opposed, and ultimately rejected by an apparently biased Court.  Plaintiffs were unable to force the Debtor to provide the most basic of reports, including Rule 2015 statements, and Plaintiffs' efforts to obtain even the most basic details regarding asset sales and professional fees have all been denied.  Rather, such details are in the hands of a select few, such as the Oversight Board of the Claimant Trust.

70.     The Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust

CORE/3522697.0002/178862860.17

HMIT Appx. 01934

Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate. *See* Plan, ¶Art. IV(B)(9).

71.    But no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests, even though Plaintiffs, as contingent beneficiaries of a Delaware statutory trust, are entitled to financial information relating to the trust.

**C.    Plaintiffs Are Kirschner Adversary Proceeding Defendants**

72.    On October 15, 2021, Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust, commenced the Kirschner Adversary Proceeding against twenty-three defendants, including Plaintiffs, alleging various causes of action. *See Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. James Dondero*, *et al.*, Adv. Pro. No. 21-03076-sgj, Adv. Proc. No. 21-03076, Docket No. 1 (as amended by Docket No. 158).

73.    The Litigation Sub-Trust was established within the Claimant Trust as a wholly owned subsidiary of the Claimant Trust for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, with any proceeds therefrom to be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries. *See* Plan, Article IV, ¶ (B)(4).

74.    Any recovery from the Kirschner Adversary Proceeding will be distributed to Claimant Trust Beneficiaries.

75.    Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

76.    The Litigation Sub-Trust is pursuing claims against Plaintiffs in the Kirschner Adversary Proceeding, which, if they become Claimant Trust Beneficiaries, would be the

CORE/3522697.0002/178862860.17

recipients of distributions of such recovery (less the cost of litigation).  Therefore, Plaintiffs need

the requested information in order to properly analyze and evaluate the claims asserted against

them in the Kirschner Adversary Proceeding and to determine whether those claims have any

validity.

## FIRST CLAIM FOR RELIEF
### (Disclosures of Claimant Trust Assets and Request for Accounting)

77.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as

though fully set forth herein.

78.     Due to the lack of transparency into the assets of the Claimant Trust, Plaintiffs are

unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust

Interests.

79.     Certain information about the Claimant Trust Assets has already been provided to

others, including Claimant Trust Beneficiaries and the Oversight Board for the Claimant Trust.

80.     Information about the Claimant Trust Assets would help Plaintiffs evaluate whether

settlement of the Kirschner Adversary Proceeding is feasible, which would further the administration

of the bankruptcy estate, benefitting all parties in interest.

81.     This Court specifically retained jurisdiction to ensure that distributions to Holders

of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan.  *See* Plan,

Article XI.

82.     The Plan provides that distributions to Allowed Equity Interests will be

accomplished through the Claimant Trust and Contingent Claimant Trust Interests.  *See* Plan

Article III, (H)(10) and (11).

83.     The Defendants should be compelled to provide information regarding the Claimant

Trust assets, including the amount of cash and the remaining non-cash assets, and its liabilities.

HMIT Appx. 01936

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment Regarding Value of Claimant Trust Assets)**

84.    Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

85.    Once Defendants are compelled to provide information about the Claimant Trust assets, Plaintiffs seek a determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations.

86.    If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at recovering value for HCMLP's estate are not necessary to pay creditors in full.  As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close.

87.    In addition, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Mr. Kirschner, and Hayward & Associates—are continuing to incur millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or could be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.  Fees for Pachulski range from $460 an hour for associates to $1,265 per hour for partners, and fees for Quinn Emanuel lawyers range from $830 an hour for first year associate to over $2100 per hour for senior partners.  At these rates, depletion of the estate will occur rapidly.

**THIRD CLAIM FOR RELIEF**
**(Declaratory Judgment and Determination Regarding Nature of Plaintiff's Interests)**

88.    Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

CORE/3522697.0002/178862860.17

89.     In the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid, Plaintiffs seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries.[6]

90.     Such a declaration and a determination by the Court would further assist parties in interest, such as Plaintiffs, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement.

WHEREFORE, Plaintiffs pray for judgment as follows:

(i)     On the First Claim for Relief, Plaintiffs seek an order compelling Defendants to disclose the assets currently held in the Claimant Trust; and

(ii)    On the Second Claim for Relief, Plaintiffs seek a determination of the relative value of those assets in comparison to the claims of the Claimant Trust Beneficiaries; and

(iii)   On the Third Claim for Relief, Plaintiffs seek a determination that the conditions are such that all current Claimant Trust Beneficiaries could be paid in full, with such payment causing Plaintiffs' Contingent Claimant Trust Interests to vest into Claimant Trust Interests; and

---

[6] To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement.

(iv)     Such other and further relief as this Court deems just and proper.

Dated: February __, 2023

                              Respectfully submitted,


                              **STINSON LLP**

                              *Draft*_____
                              Deborah Deitsch-Perez
                              Texas Bar No. 24036072
                              Michael P. Aigen
                              Texas Bar No. 24012196
                              2200 Ross Avenue, Suite 2900
                              Dallas, Texas 75201
                              Telephone: (214) 560-2201
                              Facsimile: (214) 560-2203
                              Email:  deborah.deitschperez@stinson.com
                              Email:  michael.aigen@stinson.com

                              *Counsel for the Dugaboy Investment Trust*
                              *and the Hunter Mountain Investment Trust*

CORE/3522697.0002/178862860.17

**HMIT Appx. 01939**

# EXHIBIT A-1

HMIT Appx. 01940

# HELLER, DRAPER & HORN, L.L.C.
### *ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA  70130-6103
TELEPHONE: (504) 299-3300   FAX: (504) 299-3399

Douglas S. Draper
Direct Dial:  (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

> **Re:** **Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11**

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers. Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

## 1.    The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

## 2. There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6] The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

Case 19-34054-sgj11    Doc 3662-1    Filed 02/06/23    Entered 02/06/23 15:55:45    Desc
Case 3:21-cv-00881-X    Document 172  Exhibit A  Filed 02/15/23  Page 57 of 148  Page 750 of 968    PageID 16332

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]   Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information.   Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3.    The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court.  On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.  The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses.  In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level.  Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out."  Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise).   These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.  While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat").  Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9]  That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute.  Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims.  In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10]  If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor.  The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11]  It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12]  This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.    Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases.  Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions.  Several parties have appealed this issue to the Fifth Circuit.

### 4.    The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information.  The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely.  But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup").  The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill").  As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

{00376610-1}

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[19] *See* Appendix, pp. A-25, A-28.
[20] *See* Appendix, pp. A-2; A-62 – A-69.

{00376610-1}

October 5, 2021
Page 9

committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and other assets on April 30, 2021, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

{00376610-1}

> In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a)   The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)   Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)   The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d)   The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e)   The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f)   There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming. Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer. If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties. The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim. The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members. At the very least, there is enough credible evidence to warrant an investigation. It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent. The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders. A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate. In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

HMIT Appx. 01951

# EXHIBIT A-2

HMIT Appx. 01952



**MUNSCH**
**HARDT**
DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

<u>Via E-Mail and Federal Express</u>
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530
Nan.r.Eitel@usdoj.gov

   Re: Highland Capital Management, L.P. Bankruptcy Case
     Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

  I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

  I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

  The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

**Highland Capital Management and its Founder, James Dondero**

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are:  (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### In Highland's Bankruptcy, the Regulatory Framework Is Ignored

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).
[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining □2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See* "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here.  In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| TOTAL: | $269,6969,610 | $95,000,000 | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.

[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.
[23] *See* Ex. F.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] See Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a)   The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)   Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)   The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d)   There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1)   If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 14

> "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)   If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization. Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] See Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.

[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.

[30] Dkt. 854, ¶ 4 & Exh. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two
funds managed by the Debtor (collectively referred to as "<u>MultiStrat</u>"). Pursuant to that settlement,
MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First,
Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial
payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor
investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment,
but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made
little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by
"independent legal counsel" in the negotiation of the settlement, a representation that was patently
untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had
economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and
its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement
unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and
exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when
they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat
settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to
resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the
settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of
multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered
investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act
imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part
of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties
means that investment advisors cannot buy securities for their account prior to buying them for a client,
cannot make trades that may result in higher commissions for the advisor or their investment firm, and
cannot trade using material, non-public information. In addition, investment advisors must ensure that
they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from
breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any
registered investment advisor from trading on material, non-public information. The Act also conveys a
private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may
have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that
interest in an SPE designated by the Debtor) without disclosing the true value of the
interest and without first offering it to other investors in the fund;

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch)
at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.
[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent
legal counsel.

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT, KOPF & HARR, P.C.

By: _____
         Davor Rukavina, Esq.

DR:pdm

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ................................................................................................ 3

Seery Jan. 29, 2021 Testimony .............................................................................................. 15

Sale of Assets of Affiliates or Controlled Entities .................................................................. 24

20 Largest Unsecured Creditors ............................................................................................ 25

Timeline of Relevant Events .................................................................................................. 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] .............................................. 27

Updated Liquidation Analysis (Feb. 1, 2021) ......................................................................... 28

Summary of Debtor's January 31, 2021 Monthly Operating Report ........................................ 29

Value of HarbourVest Claim .................................................................................................. 30

Estate Value as of August 1, 2021 (in millions) ..................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ....................................................... 32

UBS Settlement [Doc. 2200-1] .............................................................................................. 45

Hellman & Friedman Seeded Farallon Capital Management ................................................... 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ............................................. 63

Farallon was a Significant Borrower for Lehman .................................................................... 65

Mr. Seery Represented Stonehill While at Sidley ................................................................... 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates .......... 67

Investor Communication to Highland Crusader Funds Stakeholders ....................................... 70

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers



*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?

Debtor Protocols [Doc. 466-1]

I.   **Definitions**

A.   "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.   "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.   "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.   "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.   "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.   "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.   "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.   "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.  "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.  **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

   a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

   b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

   a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)  Stage 3:

      (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)     Transactions with Related Entities greater than \$2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.     Third Party Transactions (All Stages)

        a)     Except as set forth in (b) and (c) below, Transactions in excess of \$2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

  C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

  A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

  B.    **Operating Requirements**

    1.     Ordinary Course Transactions do not require Court approval (All Stages).

        a)     Stage 1 and Stage 2: ordinary course determined by the CRO.

        b)     Stage 3: ordinary course determined by the Debtor.

    2.     Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) Stage 3:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.     **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.     **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.     **Operating Requirements**

        1.     Ordinary Course Transactions do not require Court approval (All Stages).

            a)     Stage 1 and Stage 2: ordinary course determined by the CRO.

            b)     Stage 3: ordinary course determined by the Debtor.

        2.     Related Entity Transactions

            a)     Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            b)     Stage 3:

                (1)     Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

                (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.     Third Party Transactions (All Stages):

            a)     Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.    The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.    Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.    **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VI.     Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

   A.   Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

   B.   Ordinary Course Transactions (All Stages): N/A

   C.   Operating Requirements: N/A

   D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.    Transactions involving Non-Discretionary Accounts**

   A.   Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

   B.   Ordinary Course Transactions (All Stages): N/A

   C.   Operating Requirements: N/A

   D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.   Additional Reporting Requirements – All Stages (to the extent applicable)**

   A.   DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

   B.   The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.     Shared Services**

   A.   The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

   B.   The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

## X.    Representations and Warranties

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

**Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

**Transactions involving Non-Discretionary Accounts**

1. NexBank SSB Account
2. Charitable DAF Fund LP

**<u>Schedule B</u>**

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

```
                                                            Page 1
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   ------------------------------)

 5   In Re:                 Chapter 11

 6   HIGHLAND CAPITAL        Case No.

 7   MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9        Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14             January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

| | | | | |
|---|---|---|---|---|
| | | | | Page 2 |

Page 2

1             January 29, 2021

2                9:00 a.m. EST

3

4         Remote Deposition of JAMES P.

5   SEERY, JR., held via Zoom

6   conference, before Debra Stevens,

7   RPR/CRR and a Notary Public of the

8   State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   REMOTE APPEARANCES:

2

3   Heller, Draper, Hayden, Patrick, & Horn

4   Attorneys for The Dugaboy Investment

5   Trust and The Get Good Trust

6       650 Poydras Street

7       New Orleans, Louisiana 70130

8

9

10   BY:    DOUGLAS DRAPER, ESQ

11

12

13   PACHULSKI STANG ZIEHL & JONES

14   For the Debtor and the Witness Herein

15       780 Third Avenue

16       New York, New York 10017

17   BY:    JOHN MORRIS, ESQ.

18       JEFFREY POMERANTZ, ESQ.

19       GREGORY DEMO, ESQ.

20       IRA KHARASCH, ESQ.

21

22

23

24          (Continued)

25

Page 4

1   REMOTE APPEARANCES: (Continued)

2

3   LATHAM & WATKINS

4   Attorneys for UBS

5       885 Third Avenue

6       New York, New York 10022

7   BY:    SHANNON McLAUGHLIN, ESQ.

8

9   JENNER & BLOCK

10   Attorneys for Redeemer Committee of

11   Highland Crusader Fund

12       919 Third Avenue

13       New York, New York 10022

14   BY:    MARC B. HANKIN, ESQ.

15

16   SIDLEY AUSTIN

17   Attorneys for Creditors' Committee

18       2021 McKinney Avenue

19       Dallas, Texas 75201

20   BY:    PENNY REID, ESQ.

21       MATTHEW CLEMENTE, ESQ.

22       PAIGE MONTGOMERY, ESQ.

23

24          (Continued)

25

Page 5

1   REMOTE APPEARANCES: (Continued)

2

3   KING & SPALDING

4   Attorneys for Highland CLO Funding, Ltd.

5       500 West 2nd Street

6       Austin, Texas 78701

7   BY:    REBECCA MATSUMURA, ESQ.

8

9   K&L GATES

10   Attorneys for Highland Capital Management

11   Fund Advisors, L.P., et al.:

12       4350 Lassiter at North Hills

13       Avenue

14       Raleigh, North Carolina 27609

15   BY:    EMILY MATHER, ESQ.

16

17   MUNSCH HARDT KOPF & HARR

18   Attorneys for Defendants Highland Capital

19   Management Fund Advisors, LP; NexPoint

20   Advisors, LP; Highland Income Fund;

21   NexPoint Strategic Opportunities Fund and

22   NexPoint Capital, Inc.:

23       500 N. Akard Street

24       Dallas, Texas 75201-6659

25   BY:   DAVOR RUKAVINA, ESQ.

                      (Continued)

```
                                                    Page 6                                                        Page 7
 1   REMOTE APPEARANCES (Continued)                   1   REMOTE APPEARANCES: (Continued)

 2                                                    2

 3   BONDS ELLIS EPPICH SCHAFER JONES                 3   WICK PHILLIPS

 4   Attorneys for James Dondero,                     4   Attorneys for NexPoint Real Estate

 5   Party-in-Interest                                5   Partners, NexPoint Real Estate Entities

 6         420 Throckmorton Street                    6   and NexBank

 7                                                    7         100 Throckmorton Street

 8         Fort Worth, Texas 76102                    8         Fort Worth, Texas 76102

 9   BY:   CLAY TAYLOR, ESQ.                           9   BY:   LAUREN DRAWHORN, ESQ.

10         JOHN BONDS, ESQ.                           10

11         BRYAN ASSINK, ESQ.                         11   ROSS & SMITH

12                                                   12   Attorneys for Senior Employees, Scott

13                                                   13   Ellington, Isaac Leventon, Thomas Surgent,

14   BAKER McKENZIE                                  14   Frank Waterhouse

15   Attorneys for Senior Employees                 15         700 N. Pearl Street

16         1900 North Pearl Street                   16         Dallas, Texas 75201

17                                                   17   BY:   FRANCES SMITH, ESQ.

18         Dallas, Texas 75201                       18

19   BY:   MICHELLE HARTMANN, ESQ.                    19

20         DEBRA DANDEREAU, ESQ.                      20

21                                                   21

22                                                   22

23                                                   23

24               (Continued)                         24

25                                                   25
```

```
                                                    Page 8                                                        Page 9
 1                                                    1

 2       E X A M I N A T I O N S                      2         COURT REPORTER:  My name is

 3   WITNESS                      PAGE                3   Debra Stevens, court reporter for TSG

 4   JAMES SEERY                                      4   Reporting and notary public of the

 5    By Mr. Draper              9                    5   State of New York.  Due to the

 6    By Mr. Taylor             75                    6   severity of the COVID-19 pandemic and

 7    By Mr. Rukavina          165                    7   following the practice of social

 8    By Mr. Draper            217                    8   distancing, I will not be in the same

 9       E X H I B I T S                              9   room with the witness but will report

10   SEERY DYD                                       10   this deposition remotely and will

     EXHIBIT    DESCRIPTION          PAGE            11   swear the witness in remotely.  If any

11                                                   12   party has any objection, please so

     Exhibit 1    January 2021 Material    11        13   state before we proceed.

12                                                   14         Whereupon,

     Exhibit 2    Disclosure Statement    14         15       J A M E S   S E E R Y,

13                                                   16   having been first duly sworn/affirmed,

     Exhibit 3    Notice of Deposition    74         17   was examined and testified as follows:

14                                                   18   EXAMINATION BY

15                                                   19   MR. DRAPER:

     INFORMATION/PRODUCTION REQUESTS                 20      Q.   Mr. Seery, my name is Douglas

16   DESCRIPTION                    PAGE             21   Draper, representing the Dugaboy Trust.  I

17   Subsidiary ledger showing note     22           22   have series of questions today in

     component versus hard asset                     23   connection with the 30(b) Notice that we

18   component                                       24   filed.  The first question I have for you,

19   Amount of D&O coverage for        131           25   have you seen the Notice of Deposition

     trustees

20

     Line item for D&O insurance       133

21

22          MARKED FOR RULING

            PAGE    LINE

23           85      20

24

25
```

Page 14

```
1                    J. SEERY
2     the screen, please?
3          A.    Page what?
4          Q.    I think it is page 174.
5          A.    Of the PDF or of the document?
6          Q.    Of the disclosure statement that
7     was filed.  It is up on the screen right
8     now.
9               COURT REPORTER:  Do you intend
10    this as another exhibit for today's
11    deposition?
12              MR. DRAPER:  We'll mark this
13    Exhibit 2.
14              (So marked for identification as
15    Seery Exhibit 2.)
16         Q.    If you look to the recovery to
17    Class 8 creditors in the November 2020
18    disclosure statement was a recovery of
19    87.44 percent?
20         A.    That actually says the percent
21    distribution to general unsecured
22    creditors was 87.44 percent.  Yes.
23         Q.    And in the new document that was
24    filed, given to us yesterday, the recovery
25    is 62.5 percent?
```

Page 15

```
1                    J. SEERY
2          A.    It says the percent distribution
3     to general unsecured creditors is
4     62.14 percent.
5          Q.    Have you communicated the
6     reduced recovery to anybody prior to the
7     date -- to yesterday?
8               MR. MORRIS:  Objection to the
9     form of the question.
10         A.    I believe generally, yes.  I
11    don't know if we have a specific number,
12    but generally yes.
13         Q.    And would that be members of the
14    Creditors' Committee who you gave that
15    information to?
16         A.    Yes.
17         Q.    Did you give it to anybody other
18    than members of the Creditors' Committee?
19         A.    Yes.
20         Q.    Who?
21         A.    HarbourVest.
22         Q.    And when was that?
23         A.    Within the last two months.
24         Q.    You did not feel the need to
25    communicate the change in recovery to
```

Page 16

```
1                    J. SEERY
2     anybody else?
3          A.    I said Mr. Doherty.
4          Q.    In looking at the two elements,
5     and what I have asked you to look at is
6     the claims pool.  If you look at the
7     November disclosure statement, if you look
8     down Class 8, unsecured claims?
9          A.    Yes.
10         Q.    You have 176,000 roughly?
11         A.    Million.
12         Q.    176 million.  I am sorry.  And
13    the number in the new document is 313
14    million?
15         A.    Correct.
16         Q.    What accounts for the
17    difference?
18         A.    An increase in claims.
19         Q.    When did those increases occur?
20    Were they yesterday?  A month ago?  Two
21    months ago?
22         A.    Over the last couple months.
23         Q.    So in fact over the last couple
24    months you knew in fact that the recovery
25    in the November disclosure statement was
```

Page 17

```
1                    J. SEERY
2     not accurate?
3          A.    Yes.  We secretly disclosed it
4     to the Bankruptcy Court in open court
5     hearings.
6          Q.    But you never did bother to
7     calculate the reduced recovery; you just
8     increased --
9               (Reporter interruption.)
10         Q.    You just advised as to the
11    increased claims pool.  Correct?
12              MR. MORRIS:  Objection to the
13    form of the question.
14         A.    I don't understand your
15    question.
16         Q.    What I am trying to get at is,
17    as you increase the claims pool, the
18    recovery reduces.  Correct?
19         A.    No.  That is not how a fraction
20    works.
21         Q.    Well, if the denominator
22    increases, doesn't the recovery ultimately
23    decrease if --
24         A.    No.
25         Q.    -- if the numerator stays the
```

Page 26

```
         J. SEERY
1
2    were amended without consideration a few
3    years ago.  So, for our purposes we didn't
4    make the assumption, which I am sure will
5    happen, a fraudulent conveyance claim on
6    those notes, that a fraudulent conveyance
7    action would be brought.  We just assumed
8    that we'd have to discount the notes
9    heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12        Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for P and I.
22        Q.    But in fact as of January you
23   have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

Page 27

```
         J. SEERY
1
2        A.    NexPoint, I said.  They
3    defaulted on the note and we accelerated
4    it.
5        Q.    So there is no need to file a
6    fraudulent conveyance suit with respect to
7    that note.  Correct, Mr. Seery?
8        MR. MORRIS:  Objection to the
9    form of the question.
10        A.    Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14        Q.    My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18        MR. MORRIS:  Objection to the
19   form of the question.
20        A.    That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23        Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

Page 28

```
         J. SEERY
1
2    you whether they are included in the asset
3    portion of your $257 million number, all
4    right?  Mr. Morris didn't want me to go
5    into specific asset value, and I don't
6    intend to do that.
7        The first question I have for
8    you is, the equity in Trustway Highland
9    Holdings, is that included in the
10   $257 million number?
11        A.    There is no such entity.
12        Q.    Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16        A.    Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20   includes Targa and all the value that
21   flows up from Targa.  It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

Page 29

```
         J. SEERY
1
2    includes any other securities and all the
3    value that would flow from Cornerstone.
4    It includes HCLOF and all the value that
5    would flow up from HCLOF.  It includes
6    Korea and all the value that would flow up
7    from Korea.
8        There may be others off the top
9    of my head.  I don't recall them.  I don't
10   have a list in front of me.
11        Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14        A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22        With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

**Page 38**

1    J. SEERY
2    A.   I don't recall the specific
3  limitation on the trust.  But if there was
4  a reason to hold on to the asset, if there
5  is a limitation, we can seek an extension.
6    Q.   Let me ask a question.  With
7  respect to these businesses, the Debtor
8  merely owns an equity interest in them.
9  Correct?
10    A.   Which business?
11    Q.   The ones you have identified as
12  operating businesses earlier?
13    A.   It depends on the business.
14    Q.   Well, let me -- again, let's try
15  to be specific.  With respect to SSP, it
16  was your position that you did not need to
17  get court approval for the sale.  Correct?
18    A.   That's correct.
19    Q.   Which one of the operating
20  businesses that are here, that you have
21  identified, do you need court authority
22  for a sale?
23    MR. MORRIS:  Objection to the
24  form of the question.
25    A.   Each of the businesses will be a

**Page 39**

1    J. SEERY
2  different analysis that we'll undertake
3  with bankruptcy counsel to determine what
4  we would need depending on when it is
5  going to happen and what the restrictions
6  either under the code are or under the
7  plan.
8    Q.   Is there anything that would
9  stop you from selling these businesses if
10  the Chapter 11 went on for a year or two
11  years?
12    MR. MORRIS:  Objection to form
13  of the question.
14    A.   Is there anything that would
15  stop me?  We'd have to follow the
16  strictures of the code and the protocols,
17  but there would be no prohibition -- let
18  me finish, please.
19    There would be no prohibition
20  that I am aware of.
21    Q.   Now, in connection with your
22  differential between the liquidation of
23  what I will call the operating businesses
24  under the liquidation analysis and the
25  plan analysis, who arrived at the discount

**Page 40**

1    J. SEERY
2  or determined the discount that has been
3  placed between the two, plan analysis
4  versus liquidation analysis?
5    MR. MORRIS:  Objection to form
6  of the question.
7    A.   To which document are you
8  referring?
9    Q.   Both the June -- the January and
10  the November analysis has a different
11  estimated proceeds for monetization for
12  the plan analysis versus the liquidation
13  analysis.  Do you see that?
14    A.   Yes.
15    Q.   And there is a note under there.
16  "Assumes Chapter 7 trustee will not be
17  able to achieve the same sales proceeds as
18  Claimant trustee."
19    A.   I see that, yes.
20    Q.   Do you see that note?
21    A.   Yes.
22    Q.   Who arrived at that discount?
23    A.   I did.
24    Q.   What percentage did you use?
25    A.   Depended on the asset.  Each one

**Page 41**

1    J. SEERY
2  is different.
3    Q.   Is the discount a function of
4  capability of a trustee versus your
5  capability, or is the discount a function
6  of timing?
7    MR. MORRIS:  Objection to form.
8    A.   It could be a combination.
9    Q.   So, let's -- let me walk through
10  this.  Your plan analysis has an
11  assumption that everything is sold by
12  December 2022.  Correct?
13    A.   Correct.
14    Q.   And the valuations that you have
15  used here for the monetization assume a
16  sale between -- a sale prior to December
17  of 2022.  Correct?
18    A.   Sorry.  I don't quite understand
19  your question.
20    Q.   The 257 number, and then let's
21  take out the notes.  Let's use the 210
22  number.
23    MR. MORRIS:  Can we put the
24  document back on the screen, please?
25    Sorry, Douglas, to interrupt, but it

Page 42

| | J. SEERY |
|---|---|
| 1 | |
| 2 | would be helpful. |
| 3 | MR. DRAPER: That is fine, John. |
| 4 | (Pause.) |
| 5 | MR. MORRIS: Thank you very |
| 6 | much. |
| 7 | Q. Mr. Seery, do you see the 257? |
| 8 | A. In the one from yesterday? |
| 9 | Q. Yes. |
| 10 | A. Second line, 257,941. Yes. |
| 11 | Q. That assumes a monetization of |
| 12 | all assets by December of 2022? |
| 13 | A. Correct. |
| 14 | Q. And so everything has been sold |
| 15 | by that time; correct? |
| 16 | A. Yes. |
| 17 | Q. So, what I am trying to get at |
| 18 | is, there is both the capability between |
| 19 | you and a trustee, and then the second |
| 20 | issue is timing. So, what discount was |
| 21 | put on for timing, Mr. Seery, between when |
| 22 | a trustee would sell it versus when you |
| 23 | would sell it? |
| 24 | MR. MORRIS: Objection. |
| 25 | Q. What is the percentage you |

Page 43

| | J. SEERY |
|---|---|
| 1 | |
| 2 | applied? |
| 3 | A. Each of the assets is different. |
| 4 | Q. Is there a general discount that |
| 5 | you used? |
| 6 | A. Not a general discount, no. We |
| 7 | looked at each individual asset and went |
| 8 | through and made an assessment. |
| 9 | Q. Did you apply a discount for |
| 10 | your capability versus the capability of a |
| 11 | trustee? |
| 12 | A. No. |
| 13 | Q. So a trustee would be as capable |
| 14 | as you are in monetizing these assets? |
| 15 | MR. MORRIS: Objection to the |
| 16 | form of the question. |
| 17 | Q. Excuse me? The answer is? |
| 18 | A. The answer is maybe. |
| 19 | Q. Couldn't a trustee hire somebody |
| 20 | as capable as you are? |
| 21 | MR. MORRIS: Objection to the |
| 22 | form of the question. |
| 23 | A. Perhaps. |
| 24 | Q. Sir, that is a yes or no |
| 25 | question. Could the trustee hire somebody |

Page 44

| | J. SEERY |
|---|---|
| 1 | |
| 2 | as capable as you are? |
| 3 | MR. MORRIS: Objection to the |
| 4 | form of the question. |
| 5 | A. I don't know. |
| 6 | Q. Is there anybody as capable as |
| 7 | you are? |
| 8 | MR. MORRIS: Objection to the |
| 9 | form of the question. |
| 10 | A. Certainly. |
| 11 | Q. And they could be hired. |
| 12 | Correct? |
| 13 | A. Perhaps. I don't know. |
| 14 | Q. And if you go back to the |
| 15 | November 2020 liquidation analysis versus |
| 16 | plan analysis, it is also the same note |
| 17 | about that a trustee would bring less, and |
| 18 | there is the same sort of discount between |
| 19 | the estimated proceeds under the plan and |
| 20 | under the liquidation analysis. |
| 21 | MR. MORRIS: If that is a |
| 22 | question, I object. |
| 23 | Q. Is that correct, Mr. Seery, |
| 24 | looking at the document? |
| 25 | A. There are discounts, yes. |

Page 45

| | J. SEERY |
|---|---|
| 1 | |
| 2 | Q. Again, the discounts are applied |
| 3 | for timing and capability? |
| 4 | A. Yes. |
| 5 | Q. Now, in looking at the November |
| 6 | plan analysis number of $190 million and |
| 7 | the January number of $257 million, what |
| 8 | accounts for the increase between the two |
| 9 | dates? What assets specifically? |
| 10 | A. There are a number of assets. |
| 11 | Firstly, the HCLOF assets are added. |
| 12 | Q. How much are those? |
| 13 | A. Approximately 22 and a half |
| 14 | million dollars. |
| 15 | Q. Okay. |
| 16 | A. Secondly, there is a significant |
| 17 | increase in the value of certain of the |
| 18 | assets over this time period. |
| 19 | Q. Which assets, Mr. Seery? |
| 20 | A. There are a number. They |
| 21 | include MGM stock, they include Trustway, |
| 22 | they include Targa. |
| 23 | Q. And what is the percentage |
| 24 | increase from November to January, |
| 25 | November of 2020 to January of 2021? |

**Page 46**

```
 1                    J. SEERY
 2      A.    Do you mean what is the
 3  percentage increase from 190 to 257?
 4      Q.    No.  You just identified three
 5  assets.  MGM stock, we can go look at the
 6  exchange and figure out what the price
 7  increase is; correct?
 8      A.    No.
 9      Q.    Why not?  Is the MGM stock
10  publicly traded?
11      A.    Yes.  It doesn't trade on --
12      Q.    Excuse me?
13      A.    It doesn't trade on an exchange.
14      Q.    Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17      A.    There is a semipublic market;
18  yes.
19      Q.    So it is a number that is
20  readily available between the two dates?
21      A.    It's available.
22      Q.    Now, you identified Targa and
23  Trustway.  Correct?
24      A.    Yes.
25      Q.    Those are not readily available
```

**Page 47**

```
 1                    J. SEERY
 2  markets; correct?
 3      A.    No.
 4      Q.    Those are operating businesses?
 5      A.    Correct.
 6      Q.    Who provided the valuation for
 7  the November 2020 liquidation analysis?
 8      A.    We use a combination of the
 9  value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12      Q.    And the adjustment was up or
13  down?
14      A.    When?
15      Q.    For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19          MR. MORRIS:  Objection to form
20      of the question.
21      A.    I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.
```

**Page 48**

```
 1                    J. SEERY
 2      Q.    And if I understand what you
 3  just said, it is that the Houlihan Lokey
 4  valuation for those two businesses showed
 5  a significant increase between November of
 6  2020 and January of 2021?
 7          MR. MORRIS:  Objection to form
 8      of the question.
 9      A.    I didn't say that.
10      Q.    I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18      A.    I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23      Q.    So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 28th
```

**Page 49**

```
 1                    J. SEERY
 2  of 2021, the magnitude being roughly 60
 3  some odd million dollars.  Correct?
 4      A.    Correct.
 5      Q.    We can account for $22 million
 6  of it easily, right?
 7          MR. MORRIS:  Objection to form.
 8      A.    Correct.
 9      Q.    That is the HarbourVest
10  settlement, so that leaves roughly
11  $40 million unaccounted for?
12          MR. MORRIS:  Objection to the
13      form of the question if that is a
14      question.  It is accounted for.
15      Q.    What makes up that difference,
16  Mr. Seery?
17      A.    A change in the plan value of
18  the assets.
19      Q.    Okay.  Which assets?  Let's sort
20  of go back to where we were.
21      A.    There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up
```

Page 50

J. SEERY

1 
2  for one.  On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7  Q.    Let me look at some numbers
8  again.  In the liquidation analysis in
9  November of 2020, the liquidation value is
10 $149 million.  Correct?
11 A.    Yes.
12 Q.    And in the liquidation analysis
13 in January of 2021, you have $191 million?
14 A.    Yes.
15 Q.    You see that number.  So there
16 is $51 million there, right?
17 A.    No.
18 Q.    What is the difference between
19 191 and -- sorry.  My math may be a little
20 off.  What is the difference between the
21 two numbers, Mr. Seery?
22 A.    Your math is off.
23 Q.    Sorry.  It is 41 million?
24 A.    Correct.
25 Q.    $22 million of that is the

Page 51

J. SEERY

1 
2  HarbourVest settlement, right?
3  A.    I believe that's correct.
4  Q.    Is that fair, Mr. Seery?
5  A.    I believe that is correct, yes.
6  Q.    And part of that differential
7  are publicly traded or ascertainable
8  securities.  Correct?
9  A.    Yes.
10 Q.    And basically you can get, or
11 under the plan analysis or trustee
12 analysis, if it is a marketable security
13 or where there is a market, the
14 liquidation number should be the same for
15 both.  Is that fair?
16 A.    No.
17 Q.    And why not?
18 A.    We might have a different price
19 target for a particular security than the
20 current trading value.
21 Q.    I understand that, but I mean
22 that is based upon the capability of the
23 person making the decision as to when to
24 sell.  Correct?
25       MR. MORRIS:  Objection to form

Page 52

J. SEERY

1 
2  of the question.
3  Q.    Mr. Seery, yes or no?
4  A.    I said no.
5  Q.    What is that based on, then?
6  A.    The person's ability to assess
7  the market and timing.
8  Q.    Okay.  And again, couldn't a
9  trustee hire somebody as capable as you to
10 both, A, assess the market and, B, make a
11 determination as to when to sell?
12       MR. MORRIS:  Objection to form
13 of the question.
14 A.    I suppose a trustee could.
15 Q.    And there are better people or
16 people equally or better than you at
17 assessing a market.  Correct?
18 A.    Yes.
19       MR. MORRIS:  Objection to form
20 of the question.
21 Q.    So, again, let's go back to
22 that.  We have accounted for, out of
23 $41 million where the liquidation analysis
24 increases between the two dates,
25 $22 million of it.  That leaves

Page 53

J. SEERY

1 
2  $18 million.  How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5  A.    I don't know off the top of my
6  head the percentages.
7  Q.    All right.  The same question
8  for the plan analysis where you have the
9  differential between the November number
10 and the January number.  How much of it is
11 marketable securities versus an operating
12 business?
13 A.    I don't recall off the top of my
14 head.
15       MR. DRAPER:  Let me take a
16 few-minute break.  Can we take a
17 ten-minute break here?
18       THE WITNESS:  Sure.
19       (Recess.)
20 BY MR. DRAPER:
21 Q.    Mr. Seery, what I am going to
22 show you and what I would ask you to look
23 at is in the note E, in the statement of
24 assumptions for the November 2020
25 disclosure statement.  It discusses fixed

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate.  We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|---|---|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

Updated Liquidation Analysis (Feb. 1, 2021)[2]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

### Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Value of HarbourVest Claim





### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

### B.    Overview of HarbourVest's Claims

10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

## C.     Summary of HarbourVest's Factual Allegations

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof.  The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC.  *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case").  The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee").  A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim"). Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

### E.     Settlement Discussions

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.     Summary of Settlement Terms

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors.  Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length.  The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario."  Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

UBS Settlement [Doc. 2200-1]

# Exhibit 1

## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1. **Settlement of Claims.** In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)  The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

(b) Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c) Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

**EXECUTION VERSION**

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

          (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

2.     **Definitions.**

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

3.     **Releases.**

(a)     **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

        (b)    **HCMLP Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

       (c)    **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

      **4.**    **No Third Party Beneficiaries**. Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

      **5.**    **UBS Covenant Not to Sue.** Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.    **Agreement Subject to Bankruptcy Court Approval.**

(a)    The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.    **Representations and Warranties**.

(a)    Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)    Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)    Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

EXECUTION VERSION

**8.      No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.      Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.      Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
         Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
      sarah.tomkowiak@lw.com

**11.    Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.    Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.    No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.    Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.    Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document.  Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

12

17

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<div align="center"><em>[Remainder of Page Intentionally Blank]</em></div>

**IT IS HEREBY AGREED.**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

HIGHLAND MULTI STRATEGY CREDIT
FUND, L.P. (f/k/a Highland Credit
Opportunities CDO, L.P.)

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO,
Ltd.

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO
ASSET HOLDINGS, L.P.

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

STRAND ADVISORS, INC.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

EXECUTION VERSION

**UBS SECURITIES LLC**

By: _____
Name: John Lantz
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____
Name: William Chandler
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

15

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

[Hellman & Friedman Seeded Farallon Capital Management](Hellman & Friedman Seeded Farallon Capital Management)

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**



SFChronicle/SFGate/Liz Hafalia


Robert Holmgren


no caption

https://hf.com/warren-hellman/                                                                                    1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

### Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

**www.gcmlp.com (http://www.gcmlp.com)**

CONTACT (HTTPS://HF.COM/CONTACT/)        INFO@HF.COM (MAILTO:INFO@HF.COM)        LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)        BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)        TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-&-FRIEDMAN)

©2021 HELLMAN & FRIEDMAN LLC



**CORNER OFFICE**

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by
Cantor Fitzgerald.

Julie Segal

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a
special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has
$57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return
investments.

"We have long valued having external shareholders and we wanted to preserve the
accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman
and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by
Cantor Fitzgerald, according to an announcement from both companies on Monday. After
the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by
management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which
has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

## Farallon was a Significant Borrower for Lehman

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and <mark>Farallon Capital Management</mark>**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million<br>JP Morgan: $200 million |



### Transaction Overview

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between <mark>Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon")</mark> secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. <mark>The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.</mark>

◆ <mark>Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield.</mark> The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**  32

Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
In re:                                                       :   Chapter 11
                                                             :
BLOCKBUSTER INC., *et al.*,                                  :   Case No. 10-14997 (BRL)
                                                             :
                    Debtors.                                 :   (Jointly Administered)
                                                             :
------------------------------------------------------------ X

## THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!





**Joseph H. Nesler** (He/Him)
General Counsel

More | Message

# Joseph H. Nesler (He/Him) ·

Yale Law School

3rd

General Counsel

Winnetka, Illinois, United States ·

Contact info

500+ connections

Message | More

**Open to work**
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations. ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/

**Joseph H. Nesler** (He/Him)
General Counsel

More | Message

Experience

**General Counsel**
Dalpha Capital Management, LLC
Aug 2020 – Jul 2021 · 1 yr

**Of Counsel**
Winston & Strawn LLP
Sep 2018 – Jul 2020 · 1 yr 11 mos
Greater Chicago Area

**Principal**
The Law Offices of Joseph H. Nesler, LLC
Feb 2016 – Aug 2018 · 2 yrs 7 mos

**Grosvenor Capital Management, L.P.**
11 yrs 9 mos

**Independent Consultant to Grosvenor Capital Management, L.P.**
May 2015 – Dec 2015 · 8 mos
Chicago, Illinois

**General Counsel**
Apr 2004 – Apr 2015 · 11 yrs 1 mo
Chicago, Illinois
Managing Director, General Counsel and Chief Compliance Officer (April 2004 – April 2015)

Investor Communication to Highland Crusader Funds Stakeholders



**Alvarez & Marsal
Management, LLC** 2029 Cen
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC


By: _____

Steven Varner
Managing Director

# EXHIBIT A-3

HMIT Appx. 02042



**MUNSCH HARDT**

DALLAS / HOUSTON / AUSTIN

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

May 11, 2022

Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

Dear Ms. Eitel:

By way of follow-up to the letter Douglas Draper sent to your offices on October 4, 2021 and my letter dated November 3, 2021, I write to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor"). Those abuses, as detailed in our prior letters, include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to line the pockets of Debtor management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of stakeholders and third-party investors in Debtor-managed funds and in violation of investors' due process rights and various fiduciary duties and duties of candor to the Bankruptcy Court and all constituents. In particular, I write this letter to further detail:

1.      Actions and omissions by the Debtor that have but a single apparent purpose: to spend the assets of the Highland estate to enrich those currently managing the estate at the expense of the business owners (the equity). Currently, the Highland estate has more than enough assets to pay 100% of the allowed creditors' claims. But doing so would deprive the current steward, Jim Seery, as well as his professional cohorts, the opportunity to reap tens, if not hundreds of millions of dollars, in fees. This motivation explains the acts and omissions described below—all designed to prop up a façade that the post-confirmation bankruptcy machinations are necessary, and to avoid any scrutiny of that façade, and to foreclose any investigation into a contrary thesis.

2.      The Debtor's intentional understatement of the value of the estate for personal gain, the gain of professionals, and the gain of affiliated or related secondary claims-buyers.

3.      The failure to adhere to fiduciary duties to maximize the value of estate assets and failure to contest baseless proofs of claim to enable Highland to emerge from bankruptcy as a going concern and to preserve value for all stakeholders.

4.      The gross misuse of estate assets by the Debtor and Debtor professionals in pursuing baseless and stale claims against former insiders of the Debtor when the current value of the estate (over

4862-7970-5887v.1 019717.00004

**HMIT Appx. 02043**

Ms. Nan R. Eitel
May 11, 2022
Page 2

$650 million with the recent completion of the MGM sale, which includes over $200 million in cash)
greatly exceeds the estate's general unsecured claims ($410 million).

     5.     The failure of the Debtor's CRO and CEO, Jim Seery, to adhere to his fiduciary duty to
maximize the value of the estate. As evidenced by the chart below, all general unsecured claims could
have been resolved using $163 million of debtor cash and other liquidity. Instead, proofs of claim were
inflated and sold to Stonehill Capital Management ("Stonehill") and Farallon Capital Management
("Farallon"), which are both affiliates of Grosvenor (the largest investor in the Crusader Funds, which
became the largest creditor in the bankruptcy). Mr. Seery has a long-standing relationship with
Grosvenor and was appointed to the Independent Board (the board charged with managing the Debtor's
estate) by the Redeemer Committee of the Crusader Funds, on which Grosvenor held five of nine seats.

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0 ($65.0 net of other assets) |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 to $163.0** |

     As highlighted in the prior letters to your office and as further detailed herein, this is the type of
systemic abuse of process that is something lawmakers and the Executive Office of the U.S. Trustee (the
"EOUST") should be concerned about. Accordingly, we urge the EOUST to exercise its "broad
administrative, regulatory, and litigation/enforcement authorities . . . to promote the integrity and
efficiency of the bankruptcy system for the benefit of all stakeholders–debtors, creditors, and the public."[1]
Specifically, we believe it would be appropriate for the EOUST to undertake an investigation to confirm
the current value of the estate and to ensure that the claims currently being pursued by the Debtor are
intended to benefit creditors of the estate, and not just to further enrich Debtor professionals and Debtor
management.

<div align="center">

**BACKGROUND**

</div>

**The Players**

James Dondero – co-founder of Highland in 1993. Mr. Dondero is chiefly responsible for ensuring that
Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other
areas, including real estate, private equity, and alternative investments. Mr. Dondero is a dedicated
philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy.
He currently serves as a member of the Executive Board of the Southern Methodist University Cox
School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential
Center.

---

[1] https://www.justice.gov/ust.

Ms. Nan R. Eitel
May 11, 2022
Page 3

<u>Highland</u> – Highland Capital Management, L.P., the Debtor.  Highland is an SEC-registered investment advisor co-founded by James Dondero in 1993.  Prior to its bankruptcy, Highland served as adviser to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

<u>Strand</u> – Strand Advisors, Inc., a Delaware corporation.  The general partner of Highland.

<u>The Independent Board</u> – the managing board installed after Highland's bankruptcy filing.  To avoid a protracted dispute, and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by three independent directors of Strand, who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. Pursuant to an agreement with the Creditors' Committee that was approved by the Bankruptcy Court, Mr. Dondero, UBS, and the Redeemer Committee each were permitted to choose one director. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James P. Seery, Jr.[2]

<u>Creditors' Committee</u> – On October 29, 2019, the bankruptcy court appointed the Official Committee of Unsecured Creditors, which consisted of: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).

<u>James P. Seery, Jr.</u> – a member of the Independent Board, and the Chief Executive Officer, and Chief Restructuring Officer of the Debtor.  Beginning in March 2020, Mr. Seery ran day-to-day operations and negotiations with the Creditors' Committee, investors, and employees in return for compensation of $150,000 per month and generous incentives and stands to earn millions more for administering the Debtor's post-confirmation liquidation.  Judge Nelms and John Dubel remained on the Independent Board, receiving weekly updates and modest compensation.

<u>Acis</u> – Acis Capital Management, L.P., a former affiliate of Highland.  Acis is currently owned and controlled by Josh Terry, a former employee of Highland.  Acis (Joshua Terry) was a member of Highland's Creditors' Committee.

<u>UBS</u> – UBS Securities LLC and UBS AG London Branch, collectively.  UBS asserted claims against Highland arising out of a default on a 2008 warehouse lending facility (to which Highland was neither a party nor a guarantor).  Highland had paid UBS twice for full releases of claims UBS asserted against Highland – approximately $110 million in 2008 and an additional $70.5 million via settlement with Barclays, the Crusader Funds, and Credit Strategies in June 2015.  UBS was a member of the Creditors' Committee and appointed John Dubel to the Independent Board.

---

[2] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
May 11, 2022
Page 4

HarbourVest – HarbourVest Partners, LLC. HarbourVest is a private equity fund of funds and one of the largest private equity investment managers globally. HarbourVest has approximately $75 billion in assets under management. HabourVest has deep ties with Grosvenor and has jointly with Grosvenor sponsored 59 LBO transactions in the last two years.

The Crusader Funds – a group of Highland-managed funds formed between 2000 and 2002. During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their full investment plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been paid when made. Subsequently, when disputes regarding management of the Crusader Funds' liquidation arose, the Redeemer Committee instituted an arbitration against Highland, resulting in an arbitration award against Highland of approximately $190 million. Nonetheless, due to offsets and double-counting, the Debtor initially estimated the value of the Redeemer arbitration award at $105 million to $110 million. In a 9019 settlement with the Debtor, the Crusader Funds ultimately received allowed claims of $137 million, plus $17 million of sundry claims and retention of an interest in Cornerstone Healthcare Group, Inc., an acute-health-care company, valued at over $50 million. Notably, UBS objected to the Crusader Funds' 9019 settlement, arguing that the Redeemer arbitration award was actually worth much less— between $74 and $128 million. The Crusader Funds sold their allowed claims to Stonehill, in which Grosvenor is the largest investor. This sale to an affiliated fund without approval of other investors in the fund is a violation of the Investment Advisers Act of 1940.

The Redeemer Committee – The Redeemer Committee of the Highland Crusader Funds was a group of investors in the Crusader Funds that oversaw the liquidation of the funds. The Redeemer Committee was comprised of nine members. Grosvenor held five seats. Concord held one seat.

Grosvenor – GCM Grosvenor is a global alternative asset management firm with over $59 billion in assets under management. Grosvenor has one of the largest operations in the Cayman Islands, with more than half of their assets under management originating through its Cayman operations. Unlike most firms operating in the Cayman Islands, Grosvenor has its own corporate and fiduciary services firm. This structure provides an additional layer of opacity to anonymous corporations from the British Virgin Islands (which includes significant Russian assets), Hong Kong (which includes significant Chinese assets), and Panama (which includes significant South American assets). As a registered investment adviser, Grosvenor must adhere to know-your-customer regulations, must report suspicious activities, and must not facilitate non-compliance or opacity. In 2020, Michael Saks and other insiders distributed all of Grosvenor's assets to shareholders and sold the firm to a SPAC originated by Cantor Fitzgerald.[3] In 2020, the equity market valued asset managers and financial-services firms at decade-high valuations. It makes little sense that Grosvenor would use the highly dilutive SPAC process (as opposed to engaging

---

[3] *See* https://www.wsj.com/articles/gcm-grosvenor-to-merge-with-cantor-fitzgerald-spac-11596456900. The Securities and Exchange Commission recently released a rule proposal that is focused on enhancing disclosure requirements around special purpose acquisition companies, including additional disclosures about SPAC sponsors, conflicts of interest and sources of dilution, business combination transactions between SPACs and private operating companies, and fairness of these transactions. *See* https://www.pionline.com/regulation/sec-proposes-enhanced-spac-disclosure-rule.

Ms. Nan R. Eitel
May 11, 2022
Page 5

in a traditional IPO or other strategic-sale alternatives) unless such a structure was employed to avoid the diligence and management-liability tail inherent in more traditional processes.

Farallon – Farallon Capital Management, L.L.C.  Farallon is a hedge fund that manages capital on behalf of institutions and individuals and was previously the largest hedge fund in the world.  Farallon has approximately $27 billion in assets under management.  Grosvenor is a significant investor in Farallon. Grosvenor and Farallon are further linked by Hellman & Friedman, LLC, an American private equity firm.  Hellman & Friedman owned a stake in Grosvenor from 2007 until it went public in 2020 and seeded Farallon's initial capital.

Muck – Muck Holdings, LLC.  Muck is owned and controlled by Farallon.  Together with Jessup Holdings, LLC (described below)), Muck acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Stonehill – Stonehill Capital Management, LLC.  Stonehill provides portfolio management for pooled investment vehicles.  It has approximately $3 billion in assets under management, which we have reason to believe includes approximately $1 billion from Grosvenor.

Jessup – Jessup Holdings, LLC.  Jessup is owned and controlled by Stonehill.  Together with Muck (Farallon), Stonehill acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Marc Kirschner/Teneo - The Debtor retained Marc Kirschner to pursue over $1 billion in claims against former insiders and affiliates of the Debtor despite the significant solvency of the estate ($650 million in assets versus $410 million in claims).  Kirschner's bankruptcy restructuring firm was purchased by Teneo (which also purchased the restructuring practice of KPMG).  Teneo is sponsored by LetterOne, a London-based private equity firm owned by Mikhail Fridman, a Russian oligarch.  Fridman is also the primary investor in Concord Management, LLC ("Concord"), which held a position on the Redeemer Committee. During the resolution of a 2018 arbitration involving a Debtor-managed fund, the Highland Credit Strategies Fund, evidence emerged demonstrating that Concord was operating as an unregistered investment adviser of Russian money from Alfa-Bank, Russia's largest privately held bank and a key part of Fridman's Alfa Group Consortium.  –That money that was funneled into BVI-domiciled shell companies into the Cayman Islands, then into various hedge funds and private equity funds in the U.S. Evidence of these activities was presented by the Debtor to Grosvenor, and the Debtor asked to have Concord removed from the Redeemer Committee.  Concord was never removed.  Concord is a large investor in Grosvenor.  Grosvenor, in turn, is a large investor in Stonehill and Farallon.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds— like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved investors in the Crusader Funds.  As explained above, a group of Crusader Funds investors sued after the funds' manager temporarily suspended redemptions during the financial crisis.  That dispute resolved with the formation of the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors'

Ms. Nan R. Eitel
May 11, 2022
Page 6

receiving a return of their investments plus a profit, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite the successful liquidation of the Crusader Funds, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement.  The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

In view of the expected arbitration award and believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[4]

On October 29, 2019, the Bankruptcy Court appointed the Creditors' Committee.  At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court.  By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.  The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[5]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

**Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate**

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of Strand.  To avoid a protracted dispute and to

---

[4] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

[5] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

Ms. Nan R. Eitel
May 11, 2022
Page 7

facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by the Independent Board.[6]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the independent directors, Mr. Seery. Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[7] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[8]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[9] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

*The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of

---

[6] Frank Waterhouse and Scott Ellington, Highland employees, remained as officers of Strand, Chief Financial Officer and General Counsel, respectively.

[7] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[8] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[9] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

Ms. Nan R. Eitel
May 11, 2022
Page 8

creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[10] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate. This becomes all the more important when a debtor or an estate holds substantial assets through non-debtor subsidiaries or vehicles, as is the case here; hence, the purpose of Rule 2015.3.

### In Highland's Bankruptcy, the Regulatory Framework Is Ignored

Against this regulatory backdrop, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored, and neither the Bankruptcy Court nor the U.S. Trustee's Office did anything to ensure compliance. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below. Additionally, the lack of proper and accurate information and intentional hiding of material information led creditors to vote for the Debtor's plan and the Bankruptcy Court to confirm that plan which, we believe, would not have happened had the Debtor complied with its fiduciary and reporting duties.

As Mr. Draper and I have already highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[11] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-

---

[10] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[11] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

Ms. Nan R. Eitel
May 11, 2022
Page 9

value determinations.[12] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

Despite these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements adopted by the EOUST and historical rules mandating transparency.[13]

Because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**The Lack of Transparency Permitted the Debtor to Quietly Sell Assets Without Observing Best Practices**

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of Portola Pharma shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year).

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to the debtor (20% less than Mr. Dondero received in funds he managed).

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or

---

[12] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[13] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 10

outside stakeholders, resulting in a loss to the estate of over $10 million versus cost and $20 million versus fair market value.

• The Debtor "sold" interests in certain investments commonly referred to as PetroCap without engaging in a public sale process and without exploring any other method of liquidating the asset.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors. Equally as troubling, for certain similar sale transactions the Debtor *did* seek Bankruptcy Court approval, thus acknowledging that such approval was necessary or, at a minimum, that disclosures regarding non-estate asset sales are required.

**The Lack of Transparency Permitted the "Inner Circle" to Manipulate the Estate for Personal Gain**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic because the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months in the wake of the global pandemic. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 million impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). A Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity— information that was critical in evaluating the worth of claims against the estate or future investments into it.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time financial information with respect to the affairs of non-Debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. The Debtor's "inner circle" – the Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) – had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

*Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate*

Mr. Seery's compensation package encouraged, and the lack of transparency permitted, manipulation of the estate and settlement of creditors' claims at inflated amounts.

Ms. Nan R. Eitel
May 11, 2022
Page 11

     Upon his initial appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[14]

     When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he his compensation package was handsomely improved. His base salary, which was on the verge of dropping to $30,000 per month, was increased ***retroactively*** back to March 15, 2020, to $150,000 per month. Additionally, his employment agreement contemplated a discretionary "Restructuring Fee"[15] that would be calculated in one of two ways:

    (1)    If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

    (2)    If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and was intended to provide a powerful economic incentive for Mr. Seery to steer Highland through the Chapter 11 case and emerge from bankruptcy as a going concern.

     Despite the structure of his compensation package, Mr. Seery saw greater value in aligning himself with creditors and the Creditors' Committee. To that end, he publicly alienated and maligned Mr. Dondero, and he found willing allies in the Creditors' Committee. The posturing also paved the way for Mr. Seery to bestow upon the hold-out creditors exorbitant settlements at the expense of equity and earn his Restructuring Fee. In fact, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee (both members of the Creditors' Committee),[16] leaving only the HarbourVest and UBS (also a member of the Creditors' Committee) claims to resolve. In other words, Mr. Seery had curried favor with two of the four members of the Creditors' Committee who would ultimately approve his Restructuring Fee and future compensation following plan consummation.

     Ultimately, the confirmed Plan appointed Mr. Seery as the Claimant Trustee, which continued his compensation of $150,000 per month (termed his "Base Salary") and provided that the Oversight Board and Mr. Seery would negotiate additional "go-forward" compensation, including a "success fee" and severance pay.[17] Mr. Seery's success fee presumably is (or will be) based on whether his liquidation of

---

[14] *See* Dkt. 339, ¶ 3.
[15] *See* Dkt. 854, Ex. 1.
[16] *See* Dkt. 864, p. 8, l. 24 – p. 9, l. 8.
[17] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
May 11, 2022
Page 12

the estate outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy but also to ensure that he eventually receives a large "success fee" and severance payment.  In fact, during a deposition taken on October 21, 2021, Mr. Seery testified that he expected to make "a few million dollars a year" for each year during the years that he will take to liquidate the Debtor, although we estimate that, based on the estate's nearly $650 million value today, Mr. Seery's success fee could approximate $50 million.

### Mr. Seery Enters into Inflated Settlements

Even before his appointment as CEO and CRO of the Debtor, Mr. Seery had effectively seized control of the Debtor as its *de facto* chief executive officer.[18]  Thus, while he was in the process of negotiating his compensation agreement, he was simultaneously negotiating settlements with the remaining creditors to ensure he earned his Restructuring Fee, even if he did so at inflated amounts.  One transaction that highlights this is the settlement with the Crusader Funds and the Redeemer Committee.

In connection with Mr. Seery's appointment as CEO and CRO, the Debtor announced that it had reached an agreement in principle with the Crusader Funds and the Redeemer Committee.  Even **UBS**, one of the members of the Creditors' Committee, thought the settlement was inflated.  In its objection to the Debtor's 9019 motion, UBS stated:[19]

> The Redeemer Claim is based on an Arbitration Award that required the Debtor, inter alia, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) in exchange for all of Crusader's shares in Cornerstone.  Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation.  As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

> Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer.  The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement.  Depending on the valuation of the Cornerstone shares, the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

---

[18] *See* Dkt. 864, p. 6, l. 18 – 22.
[19] *See* Dkt. 1190, p. 6 – 7.

Ms. Nan R. Eitel
May 11, 2022
Page 13

In the meantime, other general unsecured creditors of the Debtor will receive a
much lower percentage recovery than they would if those assets were instead transferred
to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among
the Debtor's creditors. The Proposed Settlement is only in the best interests of Redeemer
and, as such, it should be rejected.

*******

³ The potential range of value attributable to the Cornerstone shares is
significant because, according to the Debtor's liquidation analysis, the
Debtor expects to have only $195 million total in value to distribute, and
only $161 million to distribute to general unsecured creditors under its
proposed plan. See Liquidation Analysis [Dkt. No. 1173-1]; First
Amended Plan of Reorganization of Highland Capital Management, L.P.
[Dkt. No. 1079].

UBS was right. Mr. Seery agreed to a settlement that substantially overpaid the Redeemer
Committee, and UBS only agreed to withdraw its objection and appeal of the Redeemer Committee's
settlement when the Debtor bestowed upon UBS its own lavish settlement.[20]

It is worth noting that the Redeemer Committee ultimately sold its bankruptcy claim for $78
million in cash, but the sale excluded, and the Crusader Funds retained, its investment in Cornerstone
Healthcare Group Holding Inc. and certain non-cash consideration.[21] At the end of the day, the Crusader
Funds and the Redeemer Committee cashed out of their bankruptcy claims for total consideration at the
very least of $135 million, meaning they received 105% of the highest estimate (according to UBS) of
the net amount of their arbitration award.[22]

### The Inner Circle Doesn't Object to Inflated Settlements

Following the Bankruptcy Court's approval of settlements with Acis/Josh Terry and the Crusader
Funds/the Redeemer Committee, Mr. Seery turned his attention to the two remaining critical holdouts:
HarbourVest and UBS. HarbourVest, a private equity fund-of-funds with approximately $75 billion
under management, had invested pre-bankruptcy $80 million into (and obtained 49.98% of the
outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO

---

[20] See Dkt 2199. Under the terms of the UBS Settlement, UBS received a Class 8 claim in the amount of $65 million, a Class
9 claim in the amount of $60 million, a payment in cash of $18.5 million from a non-Debtor fund managed by the Debtor, and
the Debtor's agreement to assist UBS in pursuing other claims against former Debtor affiliates related to a default on a credit
facility during the Global Financial Crisis. Importantly, over the course of the preceding 11 years, UBS had already received
payments totaling $180 million in connection with this dispute, and just prior to bankruptcy, UBS and the Debtor had reached
a settlement in principle in which the Debtor would pay UBS just $7 million and $10 million in future business.

[21] See Exh. B.

[22] The estimation of a total recovery of $135 million includes attributing $48 million to the retained Cornerstone investment.
The $48 million valuation equated to a ~45% interest in Cornerstone, which was valued pre-pandemic at approximately $107
million. Following COVID, Cornerstone's long-term acute care facilities flourished. Additionally, Cornerstone held a direct
investment of over 800,000 shares in MGM, which was held on its books at approximately $72 per share. The per-share
closing price on the sale of MGM to Amazon exceeded $164, which would have increased the company's valuation
(irrespective of the post-COVID growth) by more than $70 million, bring Crusader Funds' windfall to more than $205 million.

Ms. Nan R. Eitel
May 11, 2022
Page 14

Funding, Ltd. ("HCLOF").  A charitable fund called the Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ~2.00% was held by Highland and certain of its employees.

Before Highland filed bankruptcy, a dispute arose between HarbourVest and Highland in which HarbourVest claimed it was duped into making the investment into HCLOF because Highland allegedly failed to disclose facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry, which would result in HCLOF's incurring legal fees and costs).  HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.  In Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that the Debtor and Debtor's counsel initially argued was absurd. Indeed, Debtor management valued HarbourVest's claims at $0, which was consistently reflected in the Debtor's publicly-filed financial statements up through and including its December 2020 Monthly Operating Report.[23]  Nevertheless, as one of the final creditor claims to be resolved, Mr. Seery ultimately agreed to give HabourVest a $45 million Class 8 claim and a $35 million Class 9 claim.[24]  At that time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive 71.32% payout on their claims, and Class 9 creditors could expect 0.00%.  Thus, HarbourVest's total $80 million in allowed claims would result in HarbourVest receiving $32 million in cash.[25]  The cash consideration was offset by HarbourVest's agreement to convey its interest in HCLOF to the Debtor (or its designee) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million.  In other words, from the outside looking in, the Debtor agreed to pay $9.5 million for a spurious claim.

Oddly enough, no creditors (other than former insiders) objected.  What the inner circle presumably knew was that the settlement was actually a windfall for the Debtor.  As we have previously detailed, the $22.5 million valuation of HCLOF that the Debtor utilized in seeking approval of the settlement was based upon September 2020 figures when the economy was still reeling from the pandemic.  The value of that investment rebounded rapidly, particularly because of the pending MGM sale to Amazon that was disclosed to the Debtor but not the public (i.e., material non-public information).  We have subsequently learned that the actual value of the HCLOF at the time the Bankruptcy Court approved the HarbourVest settlement was at least $44 million—a value that Mr. Seery would have known but that was not disclosed to the Court or the public.

Likewise, there were no objections to the UBS settlement, which is puzzling.  As detailed in the Debtor's 64-page objection to the UBS proof of claim and the Redeemer Committee's 431-page objection to the UBS proof of claim, UBS's claims against the Debtor were razor thin and largely foreclosed by res judicata and a settlement and release executed in connection with the June 2015 settlement.  Moreover, the publicly available information indicated that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16,

---

[23] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[24] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[25] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $27 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 15

> 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021);[26]

- Allowed claims against the estate increased by $236 million from December 2020 to January 2021, with Class 8 claims ballooning $74 million in December to $267 million in January;

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for Class 8 Claims decreased from 87.44% to 71.32% in just a matter of months.

The Liquidation Analysis estimated total assets remaining for distribution to general unsecured claims to be $195 million, with general unsecured claims totaling $273 million. By the time the UBS settlement was presented to the court for approval, the allowed Class 8 Claims had increased to $309,345,000, reducing the distribution to Class 8 creditors to 62.99%. Surely significant creditors like the Redeemer Committee—whose projected distribution dropped from $119,527,515 when it voted for the Plan to $86,105,194 with the HarbourVest and UBS claims included—should have taken notice.

**Mr. Seery Stacks the Oversight Board**

As previously disclosed, we believe Mr. Seery facilitated the sale of the four largest claims in the estate to Farallon and Stonehill. Based upon conversations with representatives of Farallon, Mr. Seery contacted them directly to encourage their acquisition of claims in the bankruptcy estate.[27] We believe Mr. Seery did so by disclosing the true value of the estate versus what was publicly disclosed in court filings, demonstrating that there was substantial upside to the claims as compared to what was included in the Plan Analysis. For example, publicly available information at the time Farallon and Stonehill acquired the UBS claim indicated the purchase would have made no economic sense: the publicly disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Farallon and Stonehill would have lost money on the claim acquisition. We can only conclude Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), which based upon accurately disclosed financial statements would indicate they were likely to recover close to 100% on both Class 8 and Class 9 claims.

As set forth in the previous letters, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers Farallon, through Muck, and Stonehill, through Jessup. The four claims purchased by Farallon and Stonehill comprise the largest four claims in the Highland bankruptcy by a substantial margin, collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[26] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473].
[27] We believe Mr. Seery made similar calls to representatives of Stonehill. We are informed and believe that Mr. Seery has long-standing relationships with both Farallon and Stonehill.

HMIT Appx. 02057

Ms. Nan R. Eitel
May 11, 2022
Page 16

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,696,610** | **$95,000,000** | |

From the information we have been able to gather, it appears that Stonehill and Farallon purchased these claims for the following amounts:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[28] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 - $165.0** |

As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) are overseeing the liquidation of the reorganized Debtor. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth below, we estimate that the estate today is worth nearly $650 million and has approximately $200 million in cash, which could result in Mr. Seery's receipt of a performance bonus approximating $50 million. Thus, it is a warranted and logical deduction that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. As set forth in previous letters, there are three primary reasons to believe this:

- The scant publicly available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that was actually publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims; and

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

For example, consider the sale of the Crusader Funds' claims, which we *know* was sold for $78 million. Based upon the publicly available information at the time of the acquisition, the expected distribution would have been $86 million. Surely a sophisticated hedge fund would not invest $78 million in a particularly contentious bankruptcy if it believed its maximum return was $86 million years later.

---

[28] Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
May 11, 2022
Page 17

Ultimately, the Plan, Mr. Seery's compensation package, and the lack of transparency to everyone other than the Debtor, its management, and the Creditors' Committee permitted Debtor management and the Creditors' Committee to support grossly inflated claims (at the expense of residual stakeholders) in a grossly understated estate, which facilitated the sales of those claims to a small group of investors with significant ties to Debtor management.  In doing so, Mr. Seery installed on the Reorganized Debtor's Oversight Board friendly faces who stand to make $370 million on ~$150 million investment.  And Mr. Seery's plan has already worked.  Notably, while the confirmed Plan was characterized by the Debtor as a monetization plan,[29] the newly installed Oversight Board supported, and the Court approved, paying Mr. Seery the much more lucrative Case Resolution Fee, netting Mr. Seery $1.5 million more than he was entitled to receive under his employment agreement.

In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

| | Value as of Aug. 2021 | | March 2022 High Estimate updated for MGM closing |
|---|---|---|---|
| Asset | Low | High | |
| Cash as of 4/25/22 | $17.9 | $17.9 | |
| Targa Sale | $37.0 | $37.0 | |
| 8/1 CLO Flows | $10.0 | $10.0 | |
| Uchi Bldg. Sale | $9.0 | $9.0 | |
| Siepe Sale | $3.5 | $3.5 | |
| PetroCap Sale | $3.2 | $3.2 | |
| Park West Sale | $3.5 | $3.5 | |
| HCLOF trapped cash | $25.0 | $25.0 | |
| **Total Cash** | **$105.6** | **$105.6** | **$200** |
| Trussway | $180.0 | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 | $25.0 |
| HCLOF | $40.0 | $40.0 | $20.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 | $30.0 |
| MGM (direct ownership) | $32.0 | $32.0 | $0.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 | $30.0 |
| Korea Fund | $18.0 | $18.0 | $20.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 | $70.0 |
| Other | $2.0 | $10.0 | $10.0 |

---

[29] See Dkt. 194., p.5.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 18

| Highland Restoration Capital Partners | | | |
|---|---|---|---|
| **TOTAL** | **$472.6** | **$598.6** | **$645.0** |

## The Bankruptcy Professionals are Draining the Estate

        Yet another troubling aspect of the Highland bankruptcy has been the rate at which Debtor professionals have drained the Estate, largely through invented, unnecessary, and greatly overstaffed and overworked offensive litigation.   The sums expended between case filing and the effective date of the Plan (the "Effective Date") are staggering:

| Professional | Fees | Expenses |
|---|---|---|
| Hunton Andrews Kurth | $1,147,059.42 | $2,747.84 |
| FTI Consulting, Inc. | $6,176,551.20 | $39,122.91 |
| Teneo Capital, LLC | $1,221,468.75 | $6,257.07 |
| Marc Kirschner | $137,096.77 | |
| Sidley Austin LLP | $13,134,805.20 | $211,841.25 |
| Pachulski Stang Ziehl & Jones | $23,978,627.25 | $334,232.95 |
| Mercer (US) Inc. | $202,317.65 | $2,449.37 |
| Deloitte Tax LLP | $553,412.60 | |
| Development Specialists, Inc. | $5,562,531.12 | $206,609.54 |
| James Seery[30] | $5,100,000.00 | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| Wilmer Cutler Pickering Hale & Dorr LLP | $2,645,729.72 | $5,207.53 |
| Kurtzman Carson Consultants LLC | $2,054,716.00 | |
| Foley & Lardner LLP | $629,088.00 | |
| Casey Olsen Cayman Limited | $280,264.00 | |
| ASW Law Limited | $4,976.00 | |
| Houlihan Lokey Financial Advisors, Inc. | $766,397.00 | |
| Berger Harris, LLP | | |
| Hayward PLLC | $825,629.50 | $46,482.92 |
| | **$64,420,670.18** | **$854,951.38** |
| | | |
| **Total Fees and Expenses** | | **$65,275,621.56** |

"The [bankruptcy] estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 872 (Bankr. N.D. Ill. 1989).

---

[30] This amount includes Mr. Seery's success fee, which was paid a month following the Effective Date.

Ms. Nan R. Eitel
May 11, 2022
Page 19

The rate at which Debtor professionals have drained the estate is in stark contrast to the treatment of the employees who stayed with the Debtor (without a key employee retention plan or key employee incentive program) on the promise they would be made whole for prepetition deferred compensation that had not yet vested, only to be stiffed and summarily terminated. Even worse, some of these employees have been targeted by the litigation sub-trust for acts they took in the course and scope of their employment.

Following the Effective Date, siphoning of estate assets continues. Mr. Seery still receives base compensation of $150,000 per month, and he expects to receive compensation of at least "a few million dollars a year" according to his own deposition testimony. In addition, his retention was conditioned upon receiving a to-be-negotiated success fee and severance payment (notably, none of which is disclosed publicly).

Likewise, Teneo Capital, LLC was retained as the litigation adviser. For its services post-Effective Date, it is compensated $20,000 per month for Mr. Kirschner as trustee for the Litigation Subtrust, plus the regularly hourly fees of any additional Teneo personnel, plus a "Litigation Recovery Fee." The Litigation Recovery Fee is equal to 1.5% of Net Litigation Proceeds up to $100 million and 2.0% of Net Litigation Proceeds above. Interestingly, although "Net Litigation Proceeds" is defined as gross litigation proceeds less certain fees incurred in pursing the litigation, net proceeds are not reduced by Mr. Kirschner's monthly fee, contingency fees charged by any other professionals, or litigation funding financing. Moreover, Teneo is given credit for any litigation recoveries regardless of whether those recoveries stem from actions commenced by the litigation trustee. The Debtor has not disclosed, and is not required to disclose, the terms upon which any professionals have been engaged following the Effective Date, including Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Litigation Subtrust. Based upon pre-Effective Date monthly expenses, the number of lawyers that attend various matters on behalf of the Debtor,[31] and the addition of Quinn Emanuel Urquhart & Sullivan, LLP and Teneo, we believe the Debtor could be spending as much as $5-$7 million per month.

The Reorganized Debtor and the Highland Claimant Trust recently filed heavily redacted, quarterly post-confirmation reports.[32] Of note, the Reorganized Debtor disclosed that it has disbursed $81,983,611 since the Effective Date but disclosed that it has only paid $47,793 in priority claims and $6,918,473 in general unsecured claims, while still estimating a total recovery to general unsecured claims of $205,144,544. The Highland Claimant Trust disclosed that it has disbursed an additional $7,152,331 since the Effective Date.

## CONCLUSION

The Highland bankruptcy is an extreme example of the abuses that can occur if the federal bench, federal government appointees, and federal lawmakers do not police federal bankruptcy proceedings by

---

[31] In connection with a recent two-day trial on an administrative claim, the Debtor was represented by John Morris ($1,245.00 per hour), Greg Demo ($950 per hour), and Hayley Winograd ($695 per hour), and was assisted by paralegal La Asia Canty ($460 per hour). The Debtor's local counsel, Zachery Annable ($300 per hour), was also present, and Jeffrey Pomerantz ($1,295 per hour) observed the trial via WebEx. Despite the army of lawyers, Mr. Morris handled virtually the entire proceeding, with Ms. Winograd examining only two small witnesses. Messrs. Pomerantz, Demo, and Annable played no active role in the proceedings.
[32] Dkt 3325 and 3326.

Ms. Nan R. Eitel
May 11, 2022
Page 20

permitting debtors-in-possession to hide material information, violate duties of transparency and candor, and manipulate information and transactions to benefit disclosed and undisclosed insiders or "friends" of insiders. Bankruptcy should not be an avenue for opportunistic venturers to prey upon companies to the detriment of third-party stakeholders and the bankruptcy estate. We therefore encourage your office to investigate the problems inherent in the Highland bankruptcy. At a minimum, we ask that the EOUST seek orders from the Bankruptcy Court compelling the Debtor to undertake the following actions:

1. turn over all financial reports that should have been disclosed during the pendency of the bankruptcy, including 2015.3 reports;

2. provide a detailed disclosure of the assets Reorganized Debtor;

3. provide a copy of the executed Claimant Trust Agreement, which should already have been disclosed;

4. disclose all solvency analyses prepared by the Debtor; and

5. provide copies of all agreements for the engagement of Debtor professionals post-confirmation, including the terms of Mr. Seery's success fee and severance agreement, compensation agreements for personnel of the Reorganized Debtor, and the fee arrangement with Quinn Emanuel Urquhart & Sullivan, LLP.

Sincerely,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.

DR:

HMIT Appx. 02062

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |
| | § | |

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 23 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Muck Holdings LLC**

**Name of Transferor:**

**ACMLP Claim, LLC**

Name and Address where notices to Transferee should be sent:

**Muck Holdings LLC**
c/o Crowell & Moring LLP
Attn: Paul Haskel
590 Madison Avenue
New York, NY 10022

Phone: (212) 530-1823

Name and Address where transferee payments should be sent:

**Same as above**

| | |
|---|---|
| Claim No.: | 23 |
| Amount of Claim: | $23,000,000.00 |
| Date Claim Filed: | December 31, 2019 |

Phone: (212) 530-1823

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____
      Transferee's Agent

Date: April 16, 2021

**Exhibit**

**R 6**

HMIT Appx. 02063

## EVIDENCE OF TRANSFER OF CLAIM

**TO:     THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, ACMLP Claim, LLC ("**Assignor**") has unconditionally and irrevocably transferred and assigned to Muck Holdings LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 23 ("**Claim No. 23**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 23 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 23 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 23. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 23, and all payments or distributions of money or property in respect of Claim No. 23, shall be delivered or made to Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 16th day of April, 2021.

ACMLP Claim, LLC
By: Shorewood GP, LLC, its Manager

By: _____
Name:  Joshua N. Terry
Title:  President

HMIT Appx. 02064

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054-sgj11** |
| **L.P.,** | § | |
| | § | |
| Debtor. | § | |

## <u>NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY</u>

CLAIM NO. 72 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| **Name of Transferee:** | **Name of Transferors:** |
|---|---|
| **Jessup Holdings LLC** | **Redeemer Committee of the Highland Crusader Fund** |

Name and Address where notices to Transferee should be sent:

| | |
|---|---|
| | **Claim no.:**  ___72___ |
| | **Amount of Claim:**  __$137,696,610.00__ |
| | **Date Claim Filed:**  __April 3, 2020__ |

**Jessup Holdings LLC**
c/o Mandel, Katz and Brosnan LLP
Attn: John Mandler
100 Dutch Hill Road, Suite 390
Orangeburg, NY 10962

Phone: (845) 639-7800

Phone: (845) 639-7800

Name and Address where transferee payments should be sent:

**Same as above**

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____        Date: April 30, 2021
       Transferee's Agent

Exhibit
R 7

HMIT Appx 02865

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, the Redeemer Committee of the Highland Crusader Fund ("**Assignor**") has unconditionally and irrevocably transferred and assigned to Jessup Holdings LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 72 ("**Claim No. 72**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 72 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 72 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 72. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 72, and all payments or distributions of money or property in respect of Claim No. 72, will be delivered or made to Assignee.

[Signature Pages Follow]

**HMIT Appx. 02066**

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 30th day of April, 2021.

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Grosvenor Capital Management, L.P.

By: _____

Name:  Burke Montgomery, designated
representative of Grosvenor Capital Management,
L.P.

[Signature Page to Evidence of Transfer of Claim]

**HMIT Appx. 02067**

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Grosvenor Capital Management, L.P.

By: _____

Name:  Brian Zambie, designated representative of
Grosvenor Capital Management, L.P.

**HMIT Appx. 02068**

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Grosvenor Capital Management, L.P.

By: _____

Name:  Tom Rowland, designated representative of
Grosvenor Capital Management, L.P.

[Signature Page to Evidence of Transfer of Claim]

**HMIT Appx. 02069**

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Concord Management, LLC

By: _____

Name:  Brant Behr, designated representative of
Concord Management, LLC

[Signature Page to Evidence of Transfer of Claim]

**HMIT Appx. 02070**

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Baylor University

By: _____

Name:  David Morehead, designated representative
of Baylor University

ATTEST:

**HMIT Appx. 02071**

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Man Solutions Limited

By: _____

Name:  Michael Buerer, designated representative
of Man Solutions Limited

[Signature Page to Evidence of Transfer of Claim]

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Belleville Road Pty Limited

By: _____

Name:  Stuart Robertson, designated representative
of Seattle Fund SPC

[Signature Page to Evidence of Transfer of Claim]

**HMIT Appx. 02073**

**REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND**

Army and Air Force Exchange Service

By: Brad Bingham
Name: Brad Bingham, designated representative of Army and Air Force Exchange Service

[Signature Page to Evidence of Transfer of Claim]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 81 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Jessup Holdings LLC**

**Name of Transferors:**

**Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd.**

Name and Address where notices to Transferee should be sent:

**Jessup Holdings LLC**
c/o Mandel, Katz and Brosnan LLP
Attn: John Mandler
100 Dutch Hill Road, Suite 390
Orangeburg, NY  10962

Phone: (845) 639-7800

| | |
|---|---|
| **Claim no.:** | __81__ |
| **Amount of Claim:** | __$50,000.00__ |
| **Date Claim Filed:** | __April 6, 2020__ |

Phone: (845) 639-7800

Name and Address where transferee payments should be sent:

**Same as above**

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____
Transferee's Agent

Date: April 30, 2021

Exhibit

R 8

HMIT Appx. 02075

# EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd. (collectively, the "**Assignor**") has unconditionally and irrevocably transferred and assigned to Jessup Holdings LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 81 ("**Claim No. 81**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 81 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 81 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 81. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 81, and all payments or distributions of money or property in respect of Claim No. 81, will be delivered or made to Assignee.

*(remainder of page blank)*

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 30th day of April, 2021.

**HIGHLAND CRUSADER OFFSHORE PARTNERS, L.P.**

By:     House Hanover, Its General Partner

By: _____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory

**HIGHLAND CRUSADER FUND, L.P.**

By:     House Hanover, Its General Partner

By: _____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory

**HIGHLAND CRUSADER FUND, LTD.**

By: _____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory

**HIGHLAND CRUSADER FUND II, LTD.**

By: _____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory

[Signature Page to Evidence of Transfer of Claim]

**HMIT Appx. 02077**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NOS. 143, 147, 149, 150, 153, and 154 were filed in this case or deemed filed under 11 U.S.C. § 1111(a).  Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Muck Holdings LLC**

**Name of Transferors:**

**HarbourVest 2017 Global Fund L.P.**
**HarbourVest 2017 Global AIF L.P.**
**HarbourVest Dover Street IX Investment L.P.**
**HV International VIII Secondary L.P.**
**HarbourVest Skew Base AIF L.P.**
**HarbourVest Partners L.P.**

Name and Address where notices to Transferee should be sent:

**Muck Holdings LLC**
c/o Crowell & Moring LLP
Attn: Paul Haskel
590 Madison Avenue
New York, NY 10022

Phone: (212) 530-1823

**Claim Nos.:** 143, 147, 149, 150, 153, and 154 and all associated claims and rights pursuant to the Court's Order at Doc. No. 1788 (Entered 1/21/21)

**Amount of Claims:** **$45,000,000.00 (GUC)**
**$35,000,000.00 (Subor.)**

**Date POCs Filed:** **April 8, 2020**

Phone: (617) 348-3773

Name and Address where transferee payments should be sent:
***Same as above***

*[Signature page follows]*

14

**Exhibit**

**R 9**

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____        Date: April 2?, 2021
Transferee's Agent

HMIT Appx. 02079

## EVIDENCE OF TRANSFER OF CLAIM

**TO:   THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "**Assignors**") have unconditionally and irrevocably transferred and assigned to Muck Holdings LLC ("**Assignee**") all of Assignors' rights, title and interest in, to and under those claims asserted by Assignors in the proofs of claims that were assigned claim numbers 143, 147, 149, 150, 153, and 154 ("**Claim Nos. 143, 147, 149, 150, 153, and 154**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and all associated claims and rights under that certain *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* dated January 20, 2021 [Doc No. 1788] (the "**Order**").

Assignors waive any objection to the transfer of Claim Nos. 143, 147, 149, 150, 153, and 154 as well as the claims and rights under the Order - on the books and records of the Debtor and the Bankruptcy Court, and hereby waive to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law.  Assignors acknowledge and understand, and hereby stipulate, that an order of the Bankruptcy Court may be entered without further notice to Assignors transferring Claim Nos. 143, 147, 149, 150, 153, and 154 as well as all associated claims and rights under the Order to Assignee and recognizing Assignee as the sole owner and holder of Claim Nos. 143, 147, 149, 150, 153, and 154 as well as all associated claims and rights under the Order. Assignors further direct the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court- appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim Nos. 143, 147, 149, 150, 153, and 154, and all payments or distributions of money or property in respect of Claim Nos. 143, 147, 149, 150, 153, and 154 as well as associated claims and rights under the Order, shall be delivered or made to Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 28 day of April, 2021.

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: _____
Name:   Michael Pugatch
Its:        Managing Director

HMIT Appx. 02080

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: _____
Name: <u>Michael Pugatch</u>
Its: <u>Managing Director</u>

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: _____
Name: <u>Michael Pugatch</u>
Its: <u>Managing Director</u>

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: _____
Name: <u>Michael Pugatch</u>
Its: <u>Managing Director</u>

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: _____
Name: <u>Michael Pugatch</u>
Its: <u>Managing Director</u>

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: _____
Name: <u>Michael Pugatch</u>
Its: <u>Managing Director</u>

HMIT Appx. 02081

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | Case No. 19-34054-sgj11 |
| | § | |
| | § | |
| Debtor. | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NOS. 190 and 191 were filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**                          **Name of Transferors:**

**Jessup Holdings LLC**                          **UBS Securities LLC and UBS AG London Branch**

Name and Address where notices to                Claim no.:          __190___
Transferee should be sent:                       Amount of Claim:    _$32,175,000.00
                                                 Date Claim Filed:   _June 26, 2020____

**Jessup Holdings LLC**
c/o Mandel, Katz and Brosnan LLP                 and
Attn: John J. Mandler
100 Dutch Hill Road, Suite 390                   Claim No.           __191___
Orangeburg, NY  10962                            Amount of Claim:    _$18,000,000.00
Phone: (845) 639-7800                            Date Claim Filed:   _June 26, 2020____

Name and Address where transferee
payments should be sent:

**Same as above**

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____                       Date: August 9, 2021
       Transferee's Agent

**Exhibit**

**R 10**

HMIT Appx. 02082

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, UBS Securities LLC ("**UBS Securities**") and UBS AG London Branch ("**UBS AG**" and, together with UBS Securities,  "**Assignor**") have unconditionally and irrevocably transferred and assigned to Jessup Holdings LLC ("**Assignee**"), a portion of Assignor's rights, title and interest in, to and under the claims asserted by Assignor contained in the proofs of claim that was assigned claim numbers 190 and 191 (the "**Transferred Claim**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and allowed pursuant to the Bankruptcy Court's Order dated May 27, 2021 at Docket No. 2389 in the amounts consisting of:  (a) a 49.5% portion of the Class 8 Claim in the amount of $32,175,000.00 (which, with respect to claim number 190, is comprised of the sum of the claim amount of $21,450,000.00 asserted and held by UBS AG and the claim amount of $10,725,000.00 asserted and held by UBS Securities) and (b) a 30% portion of the Class 9 Claim in the amount of $18,000,000.00 (which, with respect to claim number 191, is comprised of the sum of the claim amount of $12,000,000.00 asserted and held by UBS AG and the claim amount of $6,000,000.00 asserted and held by UBS Securities).

Assignor waives any objection to the transfer of the Transferred Claim on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring the Transferred Claim to Assignee and recognizing Assignee as the sole owner and holder of the Transferred Claim. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Transferred Claim, and all payments or distributions of money or property in respect of the Transferred Claim, will be delivered or made to Assignee.

*(remainder of page blank)*

159-990/6476978.1

**HMIT Appx. 02083**

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name:  William W. Chandler
Title:   Managing Director

By: _____
Name:  John Lantz
Title:   Executive Director

**UBS AG LONDON BRANCH**

By: _____
Name:  Jignesh Doshi
Title:   Mananging Director

By: _____
Name:  William W. Chandler
Title:   Managing Director

**ASSIGNEE:**

**JESSUP HOLDINGS LLC**

By: _____
Name:  John J. Mandler
Title:  Authorized Signatory

159-990/6476978.1

**HMIT Appx. 02084**

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name:
Title:

By: _____
Name:
Title:

**UBS AG LONDON BRANCH**

By: _____
Name:
Title:

By: _____
Name:
Title:

**ASSIGNEE:**

**JESSUP HOLDINGS LLC**

By: _____
Name:  John J. Mandler
Title:  Authorized Signatory

159-990/6476978.1

**HMIT Appx. 02085**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NOS. 190 and 191 were filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**                    **Name of Transferors:**

**Muck Holdings LLC**                    **UBS Securities LLC and UBS AG London Branch**

Name and Address where notices to     **Claim no.:**            190
Transferee should be sent:             **Amount of Claim:**      $32,175,000.00
                                       **Date Claim Filed:**     June 26, 2020

**Muck Holdings LLC**
c/o Crowell & Moring LLP
Attn: Paul B. Haskel                   and
590 Madison Avenue
New York, New York 10022               **Claim No.**             191
Phone: (212) 530-1823                  **Amount of Claim:**      $18,000,000.00
                                       **Date Claim Filed:**     June 26, 2020

Name and Address where transferee
payments should be sent:

**Same as above**

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____           Date: August 9, 2021
      Transferee's Agent

Exhibit

**R 11**

**HMIT Appx. 02086**

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

      For value received, the adequacy and sufficiency of which are hereby acknowledged, UBS Securities LLC ("**UBS Securities**") and UBS AG London Branch ("**UBS AG**" and, together with UBS Securities,  "**Assignor**") have unconditionally and irrevocably transferred and assigned to Muck Holdings LLC ("**Assignee**"), a portion of Assignor's rights, title and interest in, to and under the claims asserted by Assignor contained in the proofs of claim that was assigned claim numbers 190 and 191 (the "**Transferred Claim**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and allowed pursuant to the Bankruptcy Court's Order dated May 27, 2021 at Docket No. 2389 in the amounts consisting of:  (a) a 49.5% portion of the Class 8 Claim in the amount of $32,175,000.00 (which, with respect to claim number 190, is comprised of the sum of the claim amount of $21,450,000.00 asserted and held by UBS AG and the claim amount of $10,725,000.00 asserted and held by UBS Securities) and (b) a 30% portion of the Class 9 Claim in the amount of $18,000,000.00 (which, with respect to claim number 191, is comprised of the sum of the claim amount of $12,000,000.00 asserted and held by UBS AG and the claim amount of $6,000,000.00 asserted and held by UBS Securities).

      Assignor waives any objection to the transfer of the Transferred Claim on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring the Transferred Claim to Assignee and recognizing Assignee as the sole owner and holder of the Transferred Claim. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Transferred Claim, and all payments or distributions of money or property in respect of the Transferred Claim, will be delivered or made to Assignee.

*(remainder of page blank)*

159-990/6476979.1

**HMIT Appx. 02087**

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name:  William W. Chandler
Title:   Managing Director

By: _____
Name:  John Lantz
Title:   Executive Director

**UBS AG LONDON BRANCH**

By: _____
Name:  Jignesh Doshi
Title:   Mananging Director

By: _____
Name:  William W. Chandler
Title:   Managing Director

**ASSIGNEE:**

**MUCK HOLDINGS LLC**

By: _____
Name:  Michael Linn
Title:  Authorized Signatory

159-990/6476979.1

**HMIT Appx. 02088**

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name:
Title:

By: _____
Name:
Title:

**UBS AG LONDON BRANCH**

By: _____
Name:
Title:

By: _____
Name:
Title:

**ASSIGNEE:**

**MUCK HOLDINGS LLC**

By: _____
Name:  Michael Linn
Title:  Authorized Signatory

159-990/6476979.1

**HMIT Appx. 02089**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Highland Capital Management, L.P. | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

### NOTICE OF APPEARANCE OF COUNSEL AND
### DEMAND FOR NOTICES AND PAPERS

Please take notice that the undersigned firm of Sullivan Hazeltine Allinson LLC hereby enters its appearance as counsel for the Hunter Mountain Trust ("Hunter") in the above-captioned case, pursuant to section 1109(b) of Title 11 of the United States Code (the "Bankruptcy Code"); and Rule 9010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); such counsel hereby requests, pursuant to Bankruptcy Rules 2002, 3017 and 9007 and sections 342 and 1109(b) of the bankruptcy Code, that hard copies of all notices and pleadings given or filed in the above-captioned case be given and served upon the following persons at the following addresses, telephone and telecopy numbers:

William A. Hazeltine, Esq.
**SULLIVAN · HAZELTINE · ALLINSON** LLC
901 North Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

Please take further notice that pursuant to section 1109(b) of the Bankruptcy Code, the foregoing demand includes not only the notices and papers referred to in the bankruptcy rules and sections of the Bankruptcy Code specified above, but also includes, without limitation, any notice, application, complaint, demand, motion, petition, pleading or request, whether formal or informal,

**Exhibit**

**R 12**

HMT Appx. 02090

written or oral, and whether transmitted or conveyed by mail, delivery, telephone, telegraph, telex, or otherwise filed or made with regard to the above-captioned cases and proceedings therein.

This Notice of Appearance and Demand for Notices and Papers shall not be deemed or construed to be a waiver of (a) Hunter's rights (i) to have final orders in non-core matters and/or matters entitled to adjudication by a judge authorized under Article III of the U.S. Constitution entered only after *de novo* review by a District Court Judge, (ii) to trial by jury in any proceeding so triable in these cases or in any case, controversy, or proceeding related to these cases, and (iii) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, or (b) any other rights, claims, actions, setoffs, or recoupments to which Hunter is or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments Hunter expressly reserves.

Date:   October 30, 2019
        Wilmington, DE                          SULLIVAN · HAZELTINE · ALLINSON LLC


                                                /s/ William A. Hazeltine
                                                William A. Hazeltine (No. 3294)
                                                901 North Market Street, Suite 1300
                                                Wilmington, DE 19801
                                                Tel: (302) 428-8191
                                                Fax: (302) 428-8195
                                                Email: whazeltine@sha-llc.com

                                                *Attorneys for Hunter Mountain Trust*

HMIT Appx. 02091

E. P. Keiffer
Rochelle McCullough, LLP
325 North St. Paul Street, Suite 4500
Dallas, Texas  75201
Telephone:  (214) 580-2525
Facsimile:  (214) 953-0185
Email:  pkeiffer@romclaw.com

COUNSEL FOR HUNTER MOUNTAIN TRUST

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Chapter 11** |
| **L.P.,** | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| | § | |
| **Debtor.** | § | |

### <u>NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS</u>

**COMES NOW**, E. P. Keiffer, of Rochelle McCullough, LLP who files this Notice of

Appearance on behalf of Hunter Mountain Trust ("HMT") pursuant to Rules 2002, 3017, 9007, and

9010 of the Federal Rules of Bankruptcy Procedure, requesting that all notices given or required to

be given in these proceedings and all papers served, or required to be served, in these proceedings,

be served upon the undersigned as follows:

E. P. Keiffer
Rochelle McCullough, LLP
325 North St. Paul Street, Suite 4500
Dallas, Texas  75201
Telephone:  (214) 580-2525
Facsimile:  (214) 953-0185
Email:  pkeiffer@romclaw.com

**PLEASE TAKE FURTHER NOTICE** that this request includes notices and papers

referred to in the Federal Rules of Bankruptcy Procedure and additionally, without limitation,

NOTICE OF APPEARANCE

Exhibit

**R 13**

Page 1 of 2

HMIT Appx. 02092

payments, notices of any application, complaint, demand, hearing, motion, order, pleading, or other request, formal or informal, whether transmitted or conveyed by mail, telephone or otherwise.

HMT additionally request that the Debtor and the Clerk of the Court place the foregoing name and address on any mailing matrix or list of creditors to be prepared or existing in the above-numbered case.

Respectfully submitted by:

*/s/ E. P. Keiffer*
E. P. Keiffer (TX Bar No. 11181700)
ROCHELLE MCCULLOUGH LLP
325 North St. Paul Street, Suite 4500
Dallas, Texas 75201
Telephone:  (214) 580-2525
Facsimile:  (214) 953-0185
Email:  pkeiffer@romclaw.com

**ATTORNEYS FOR HUNTER
MOUNTAIN TRUST**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice of Appearance was served via electronic means pursuant to the Court's ECF noticing system on the 2nd day of January, 2020.

*/s/ E. P. Keiffer*
E. P. Keiffer

HMIT Appx. 02093



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 22, 2020**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket No. 1089 |

> **Exhibit**
> **R 14**

**ORDER APPROVING DEBTOR'S SETTLEMENT WITH (A) THE REDEEMER
COMMITTEE OF THE HIGHLAND CRUSADER FUND (CLAIM NO. 72), AND (B) THE
HIGHLAND CRUSADER FUNDS (CLAIM NO. 81), AND AUTHORIZING ACTIONS
CONSISTENT THEREWITH**

Upon the *Motion for Entry of an Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1089] (the "Motion")[2] filed by the above-captioned debtor and debtor-in-possession (the "Debtor"); and this

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, any and all other documents filed in support of the Motion, and the UBS Objection; and this Court having held an evidentiary hearing October 20, 2020, where it assessed the credibility of the witnesses, considered the evidence admitted into the record, and determined that the legal and factual bases set forth in the Motion and at the hearing on the Motion establish good cause for the relief granted herein; and upon overruling any objections to the Motion; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Settlement, attached as **Exhibit 1** to the Morris Declaration, is approved in all respects pursuant to Bankruptcy Rule 9019.

3.      The UBS Objection is overruled in its entirety.

4.      The Debtor and its agents are authorized to take any and all actions necessary or desirable to implement the Settlement without need of further Court approval or notice.

5.      The Court shall retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order

### END OF ORDER ###

HMIT Appx. 02095



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 27, 2021**

_____
United States Bankruptcy Judge

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**Exhibit**

**R 15**

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH UBS SECURITIES LLC AND UBS AG LONDON BRANCH
### AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

_____

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "<u>Motion</u>"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>"); and this Court having considered (a) the Motion; (b) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

**HMIT Appx. 02096**

*Declaration of Robert J Feinstein in Support of the Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2200] (the "Feinstein Declaration"), and the exhibits annexed thereto including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) the *Limited Preliminary Objection to Debtor's Motion for Entry of an Order Approving Settlement with UBS and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Trusts' Preliminary Objection"), filed by The Dugaboy Investment Trust and the Get Good Trust (collectively the "Trusts"); (e) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Trusts' Supplemental Opposition"), filed by the Trusts; (f) *James Dondero's Objection Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection" and collectively, with the Trusts' Preliminary Objection and the Trusts' Supplemental Opposition, the "Objections"), filed James Dondero; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2308] (the "Debtor's Reply"), filed by the Debtor; (h) UBS's *Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2310]; (i)  the testimonial and documentary evidence admitted into evidence during the hearing held on May 21, 2021 (the "Hearing"), including assessing the credibility of the witness; and (j) the arguments made during the Hearing; and this Court having jurisdiction over

HMIT Appx. 02097

this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this

proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the relief requested in the Motion is in the best interests of the Debtor's

estate, its creditors, and other parties-in-interest; and this Court having found the Settlement

Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record,

(1) the probability of success in litigating the claims subject to the Settlement Agreement, with

due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of

litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on

the wisdom of the compromise, including: (i) the best interests of the creditors, with proper

deference to their reasonable views, and (ii) that the  settlement is the product of arms-length

bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of

the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances

and that no other notice need be provided; and this Court having determined that the legal and

factual bases set forth in the Motion establish good cause for the relief granted herein; and upon

all of the proceedings had before this Court; and after due deliberation and sufficient cause

appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all

respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**HMIT Appx. 02098**

4.    The Debtor, UBS, and all other parties are authorized to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

5.    The Court finds that the Debtor, in its capacity as investment manager of Multi-Strat, exercised sound business judgment in causing Multi-Strat to enter into the Settlement Agreement. Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor, in its capacity as investment manager of Multi-Strat, is authorized to cause Multi-Strat to settle the claims UBS has asserted against Multi-Strat in the State Court and otherwise to cause Multi-Strat to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

6.    The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

4

**HMIT Appx. 02099**

# EXHIBIT 1

HMIT Appx. 02100

EXECUTION VERSION

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

WHEREAS, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

WHEREAS, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

WHEREAS, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

WHEREAS, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

WHEREAS, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

WHEREAS, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

WHEREAS, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

WHEREAS, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

WHEREAS, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

WHEREAS, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

WHEREAS, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

WHEREAS, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

WHEREAS, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

WHEREAS, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

WHEREAS, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

WHEREAS, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

WHEREAS, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

WHEREAS, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

WHEREAS, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

WHEREAS, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

WHEREAS, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.    **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

**EXECUTION VERSION**

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows:  (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

       (d)     Redeemer Appeal.

       (i)     On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

(ii)    The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)    As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)    On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)    On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor.  For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

**2.    Definitions.**

(a)    "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)    "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)    "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)    "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

**3.    Releases.**

**(a)    UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

**EXECUTION VERSION**

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

       (b)     **HCMLP Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c) **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4. **No Third Party Beneficiaries.** Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5. **UBS Covenant Not to Sue.** Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.    **Agreement Subject to Bankruptcy Court Approval.**

(a)    The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.    **Representations and Warranties**.

(a)    Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)    Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)    Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

**8.**      **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.**      **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.**      **Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

**EXECUTION VERSION**

Telephone No.:  212-713-1371
E-mail:  john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention:  Andrew Clubok
               Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.:  202-637-3323
Email: andrew.clubok@lw.com
          sarah.tomkowiak@lw.com

**11.**    **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.**    **Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.**    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.**    **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.**    **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document.  Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

12

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

       16.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

**HMIT Appx. 02113**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:
Name: James P. Seery Jr.
Its: Authorized Signatory

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By:
Name: James P. Seery Jr
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

**STRAND ADVISORS, INC.**

By:
Name: James P. Seery Jr.
Its: Authorized Signatory

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

15

**HMIT Appx. 02115**

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed October 27, 2020

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

**Exhibit**

**R 16**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 1087 & 1088 |

**ORDER APPROVING DEBTOR'S SETTLEMENT WITH (A) ACIS CAPITAL
MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP LLC
(CLAIM NO. 23), (B) JOSHUA N. TERRY AND JENNIFER G. TERRY (CLAIM NO.
156), AND (C) ACIS CAPITAL MANAGEMENT, L.P. (CLAIM NO. 159) AND
AUTHORIZING ACTIONS CONSISTENT THEREWITH**

Having considered the *Debtor's Motion for Entry of an Order Approving Settlement with*

*(a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b)*

*Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P.*

*(Claim No. 159) and Authorizing Actions Consistent Therewith* [Docket No. 1087] (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

"Motion"),[2] the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement") to

*Declaration of Gregory V. Demo in Support of the Debtor's Motion for Entry of an Order*

*Approving Settlement with (A) Acis Capital Management, L.P. and Acis Capital Management*

*GP, LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and Acis*

*Capital Management, L.P. (Claim No. 159), and Authorizing Actions Consistent Therewith*

[Docket No. 1088] (the "Demo Declaration"), and the General Release attached as **Exhibit "2"**

(the "Release") to the Demo Declaration filed by the above-captioned debtor and debtor-in-

possession (the "Debtor"); and this Court having jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to

28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion

in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found

that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors,

and other parties-in-interest; and this Court having found the Settlement Agreement and the

Release are fair and equitable; and this Court having, analyzed, for the reasons stated on the

record, (1) the probability of success in litigating the claims subject to Settlement Agreement and

Release, with due consideration for the uncertainty in fact and law; (2) the complexity and likely

duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other

factors bearing on the wisdom of the compromise, including: (i) the best interests of the

creditors, with proper deference to their reasonable views; and (ii) the extent to which the

settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this

Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the

Motion were appropriate under the circumstances and that no other notice need be provided; and

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

HMIT Appx. 02118

this Court having reviewed the Motion, any and all other documents filed in support of the

Motion, including the Debtor's Omnibus Reply filed by the Debtor at Docket No. 1211, and all

objections thereto, including the objection filed by James Dondero at Docket No. 1121 (the

"Dondero 9019 Objection");[3] and this Court having determined that the legal and factual bases

set forth in the Motion establish good cause for the relief granted herein; and upon all of the

proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Settlement and the Release, attached hereto as **Exhibit 1** and **Exhibit 2** are

approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.      The Dondero 9019 Objection and all other objections to the Motion are overruled

in their entirety.

4.      All objections to the proofs of claim subject to the Motion[4] are overruled as moot

in light of the Court's approval of the Settlement Agreement and Release.

5.      The Debtor, the Debtor's agents, the Acis Parties (as defined by the Release), and

all other parties are authorized to take any and all actions necessary or desirable to implement the

Settlement Agreement and the Release without need of further Court approval or notice.

---

[3] The objection to the Motion filed by Patrick Hagaman Daugherty at Docket No. 1201 was withdrawn on the record during the hearing on the Motion. The reservations of rights filed by Highland CLO Funding, Ltd., CLO Holdco, Ltd., HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P. and HarbourVest Partners L.P. filed at Docket Nos. 1177, 1191, and 1195 (collectively, the "Reservations") are resolved based on the Debtor's representations on the record, made without objection, that (a) the conditions precedent in Section 1(c) of the Settlement Agreement will not occur and therefore, the Debtor will not, pursuant to the Settlement Agreement, transfer all of its direct and indirect right, title and interest in Highland HCF Advisor, Ltd. to Acis or its nominee, and that (b) none of the parties asserting any of the Reservations are bound by the Release.

[4] The objections include (a) the Debtor's *Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 771]; (b) *James Dondero's Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC; and (II) Joinder in Support of Highland Capital Management, L.P.'s Objection to Proof of Claim of Acis Capital Management L.P. and Acis Capital Management GP, LLC* [Docket No. 827]; and (c) *UBS (I) Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC and (II) Joinder in the Debtor's Objection* [Docket No. 891].

HMIT Appx. 02119

6.      The Court shall retain exclusive jurisdiction with respect to all matters arising

from or relating to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

# EXHIBIT 1

# SETTLEMENT AGREEMENT

This Settlement Agreement, including all attachments, (the "<u>Agreement</u>") is entered into as of September 9, 2020, by and among (i) Highland Capital Management, L.P. ("<u>HCMLP</u>"); (ii) Acis Capital Management, L.P. ("<u>Acis LP</u>"); (iii) Acis Capital Management GP LLC ("<u>Acis GP</u>" and together with Acis LP, "<u>Acis</u>"); (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and (v) Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan

Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

# R E C I T A L S

**WHEREAS**, on August 3, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, and Acis Capital Management L.P., and Acis Capital Management GP, LLC (together, the "<u>Mediation Parties</u>"), among others, were directed to mediate their disputes before Retired Judge Allan Gropper and Sylvia Mayer (together, the "<u>Mediators</u>"); and

**WHEREAS**, during the mediation, the Mediators made an economic proposal to resolve the Claims (the "<u>Mediators' Economic Proposal</u>"), and each of the Mediation Parties accepted the Mediators' Economic Proposal; and

**WHEREAS**, the Parties have negotiated and executed that certain General Release, dated as of even date herewith (the "<u>Release</u>"),[1] which, among other things, releases the Acis Released Claims and the HCMLP Released Claims; and

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the Mediators' Economic Proposal and which, when combined with the Release, will fully and finally resolve the Claims; and

**WHEREAS**, this Agreement and the Release attached hereto will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("<u>Rule 9019</u>");

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.     **<u>Settlement of Claims</u>.**  In full and complete satisfaction of the Claims:

(a)     The proof of claim filed by Acis in the HCMLP Bankruptcy Case on December 31, 2019 [Claim No. 23] will be allowed in the amount of $23,000,000 as a general unsecured claim;

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Release.

1

HMIT Appx. 02122

      (b)     On the effective date of a plan of reorganization and confirmed by the Bankruptcy Court, HCMLP will pay in cash to:

      (i)     Joshua N. Terry and Jennifer G. Terry $425,000, plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed in the HCMLP Bankruptcy Case by Joshua N. Terry and Jennifer G. Terry on April 8, 2020 [Claim No. 156];

      (ii)     Acis LP $97,000, which amount represents the legal fees incurred by Acis LP with respect to *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195-2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP in the HCMLP Bankruptcy Case on April 8, 2020 [Claim No. 159];

      (iii)     Joshua N. Terry $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

      (c)     On the effective date of a plan of reorganization proposed by HCMLP and confirmed by the Bankruptcy Court, if HMCLP receives written advice of nationally recognized external counsel that it is legally permissible consistent with HCMLP's contractual and legal duties to transfer all of its direct and indirect right, title and interest in Highland HCF Advisor, Ltd. to Acis or its nominee and that doing so would not reasonably subject HCMLP to liability, HCMLP shall transfer all of its right, title and interest in Highland HCF Advisor, Ltd., whether its ownership is direct or indirect, to Acis or its nominee, subject at all times to Acis's right to unilaterally reject the transfer in its sole and absolute discretion;

      (d)     Within five (5) days of the Agreement Effective Date, HCMLP shall:

      (i)     Move to withdraw, with prejudice, its proof of claim [Claim No. 27] filed in *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018), and its proof of claim [Claim No. 13] filed in *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018);

      (ii)     Move to withdraw, with prejudice, Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b) filed in the Acis Bankruptcy Case [Docket No. 772];

      (e)     At all times after the execution of this Agreement:

      (i)     Only to the extent reasonably necessary to maintain the status quo in the Acis Appeals, the Parties shall cooperate in seeking to abate or otherwise stay the Acis Appeals vis-à-vis the Parties pending the occurrence of the Agreement Effective Date; and

      (ii)     HCMLP shall cooperate in good faith to promptly return to Acis all property of Acis that is in HCMLP's possession, custody, or control, including but not limited to e-mail communications.

<div align="center">2</div>

2.     **Releases.**   The Release is (a) attached to this Agreement as **Appendix A**; (b) an integral component of the Mediator's Economic Proposal and (c) incorporated by reference into this Agreement as if fully set forth herein.

3.     **Agreement Subject to Bankruptcy Court Approval.**

(a)     The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the Release by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement and the Release expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order.   The "Agreement Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

(b)     The Parties acknowledge and agree that the terms and conditions of this Agreement are conditioned, in all respects, on the execution of the Release by the Parties and the approval of the Release and this Agreement by the Bankruptcy Court.  If either the Release or this Settlement Agreement are not approved by the Bankruptcy Court for any reason, this Agreement and the Release will be immediately null and void and of no further force and effect.

4.     **Representations and Warranties.**   Subject in all respects to Section 3, each Party represents and warrants to the other Party that such Party is fully authorized to enter into and perform the terms of this Agreement and that, as of the Agreement Effective Date, this Agreement and the Release will be fully binding upon each Party in accordance with their terms.

5.     **No Admission of Liability.**   The Parties acknowledge that there is a bona fide dispute with respect to the Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by HCMLP, the Acis Parties, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the Acis Parties, or any other person.

6.     **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns, including but not limited to any Chapter 7 trustee appointed for HCMLP.

7.     **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**Acis**

Acis Capital Management, LP
4514 Cole Avenue
Suite 600
Dallas, Texas 75205

3

**HMIT Appx. 02124**

Attention:  Joshua N. Terry
Email: josh@aciscm.com

with a copy (which shall not constitute notice) to:


ROGGE DUNN GROUP, P.C.
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Attention:  Brian P. Shaw
Telephone No.:  214.239.2707
E-mail:  shaw@roggedunngroup.com

**Joshua N. Terry and Jennifer G. Terry**

25 Highland Park Village, Suite 100-848
Dallas TX 75205
Attention:  Joshua N. Terry
Email:  joshuanterry@gmail.com

with a copy (which shall not constitute notice) to:


ROGGE DUNN GROUP, P.C.
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Attention:  Brian P. Shaw
Telephone No.:  214.239.2707
E-mail:  shaw@roggedunngroup.com

**HCMLP**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910

4

Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

8.    **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

9.    **Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

10.    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

11.    **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

12.    **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

13.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the HCMLP Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this

Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

6

**HMIT Appx. 02127**

**IT IS HEREBY AGREED.**

ACIS CAPITAL MANAGEMENT, L.P.

By: _____
Name: ___Joshua N. Terry___
Its: ___President___

ACIS CAPITAL MANAGEMENT GP LLC

By: _____
Name: ___Joshua N. Terry___
Its: ___President___

JOSHUA N. TERRY

By: _____
Name: ___Joshua N. Terry___
Its: ___Self___

JENNIFER G. TERRY

By: _____
Name: ___Jennifer G. Terry___
Its: ___Self___

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

HMIT Appx. 02128

**IT IS HEREBY AGREED.**

ACIS CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

ACIS CAPITAL MANAGEMENT GP LLC

By: _____
Name: _____
Its: _____

JOSHUA N. TERRY

By: _____
Name: _____
Its: _____

JENNIFER G. TERRY

By: _____
Name: _____
Its: _____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

7

# EXHIBIT 2

HMIT Appx. 02130

# GENERAL RELEASE

This GENERAL RELEASE (this "Release"), effective on the Effective Date (as defined below), is entered into by and among (i) Highland Capital Management, L.P. ("HCMLP"), (ii) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (collectively, the "Terry Parties"), (iii) Acis Capital Management L.P., and Acis Capital Management GP, LLC (collectively, "Acis") (the Terry Parties and Acis, collectively, the "Acis Parties"), and (iii) those HCMLP Specified Parties (as defined below) who execute this Release (together, the "Parties").

# RECITALS

WHEREAS, the Parties have asserted or may assert claims that are defined in Section 1 below as the "Acis Released Claims" and the "HCMLP Released Claims" (collectively, the "Claims"); and

WHEREAS, on August 3, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Court") entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, Acis Capital Management L.P., and Acis Capital Management GP, LLC (together, the "Mediation Parties"), among others, were directed to mediate their disputes before Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"); and

WHEREAS, during the mediation, the Mediators made an economic proposal to resolve the Claims (the "Mediators' Economic Proposal"), and each of the Mediation Parties accepted the Mediators' Economic Proposal; and

WHEREAS, the Parties desire to enter into a general release of all Claims which, when combined with the Mediators' Economic Proposal, will fully and finally resolve the Claims; and

WHEREAS, except in Section 1.c below, this is a general release, meaning the Parties intend hereby to release any and all Claims which the Parties can release, and the Parties are unaware of any Claims between them which are not being released herein; and

WHEREAS, this Release will be appended or otherwise incorporated into a written settlement agreement (the "Settlement Agreement") that will include the terms of the Mediators' Economic Proposal and will be presented to the Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"), and is only effective upon the Effective Date.

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the promises made herein and in the Mediators' Economic Proposal, the Parties agree to release each other pursuant to and in accordance with the terms and conditions set forth below.

## AGREEMENT

1. <u>Releases</u>.

      a.    Upon the Effective Date, and to the maximum extent permitted by law, and except as set forth in Section 1d below, each of the Acis Parties on behalf of himself, herself, or itself and each of their respective current or former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (A)(i) HCMLP; (ii) Strand; (iii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP and any entity otherwise controlled by HCMLP; and (iv) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP (the foregoing (A)(i) through (A)(iv) the "<u>HCMLP Entities</u>") and (B) with respect to each such HCMLP Entity, such HCMLP Entity's respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the HCMLP Entities, the "<u>HCMLP Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Filed Cases, including the proofs of claim [Claim No. 23; 156; 159] filed by the Acis Parties in the HCMLP Bankruptcy Case and any objections or potential objections to the Plan or the confirmation thereof (collectively, the "<u>Acis Released Claims</u>"). This release is intended to be general. Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties **shall <u>not</u>** include NexPoint Advisors (and any of its subsidiaries), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd.), Highland CLO Funding, Ltd. (and any of its subsidiaries), NexBank, SSB (and any of its subsidiaries), James Dondero, Hunter Mountain Investment Trust (or any trustee acting for the trust), Dugaboy Investment Trust (or any trustee acting for the trust), Grant Scott, David Simek, William Scott, Heather Bestwick, Mark Okada and his family trusts (and the trustees for such trusts in their representative capacities), McKool Smith, PC, Gary Cruciani, Lackey Hershman, LLP, Jamie Welton, or Paul Lackey.

      b.    Upon the Effective Date, and to the maximum extent permitted by law, each HCMLP Released Party hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue the (A) Acis Parties, (B) Acis CLO 2013-1Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., Acis CLO 2015-6 Ltd. (collectively, the "<u>Acis CLOs</u>"), and (C) with respect to each such Acis Party and Acis CLO, to the extent applicable, such Acis Party and Acis CLO, their respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents,

**HMIT Appx. 02132**

affiliates, successors, designees, and assigns (the foregoing (A), (B), and (C), the "Acis Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Filed Cases (collectively, the "HCMLP Released Claims"). This release is intended to be general. Notwithstanding anything contained herein to the contrary, this Section 1.b will not affect any right to payment under any notes, debt, equity, or other security issued by any Acis CLO and held by any HCMLP Released Party.

c. The HCMLP Released Parties shall also hereby forever, finally, fully, unconditionally, and completely release, relieve, acquit, remise, and exonerate, and covenant never to sue (A) U.S. Bank National Association, Moody's Investor Services, Inc., and Brigade Capital Management, Inc. and (B) with respect to each such DAF Suit Defendant, to the extent applicable, such DAF Suit Defendant, their respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the foregoing (A) and (B), the "DAF Suit Defendants"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, which were or could have been asserted in, in connection with, or with respect to the DAF Lawsuits. This release is not intended to be general.

d. Notwithstanding anything herein to the contrary, if (A) any HCMLP Specified Party has not executed this Release on or before the Effective Date or (B) any HCMLP Released Party, including any HCMLP Specified Party, (i) sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten any Acis Released Party on or in connection with any HCMLP Released Claim or any other claim or cause of action arising prior to the date of this Release, (ii) takes any action that, in HCMLP's reasonable judgment, impairs or harms the value of HCMLP, its estate, and its assets; or (iii) in HCMLP's reasonable judgment fails to use commercially reasonable efforts to support confirmation of the Plan and/or the monetization of HCMLP's assets at their maximum value, then (a) such HCMLP Released Party (and only such HCMLP Released Party) will be deemed to have waived (x) the release and all other protections set forth in Section 1a hereof and will have no further rights, duties, or protections under this Release and (y) any releases set forth in the Plan, (b) the Acis Released Parties, as applicable, may, in their discretion, assert any and all Acis Released Claims against such HCMLP Released Party (and only such HCMLP Released Party), and (c) any statutes of limitation or other similar defenses are tolled against such HCMLP Released Party (and only such HCMLP Released Party) from the execution of this Release until ninety (90) days after the Acis Released Parties receive actual written notice of any violation of this Section 1d. For the avoidance of doubt, by signing this Release each of the HCMLP Specified Parties is

acknowledging and agreeing, without limitation, to the terms of this Section 1.d and the tolling agreement set forth herein.

2.    <u>Withdrawal/Dismissal of Filed Cases</u>.  Within five days of the Effective Date, each Acis Released Party and HCMLP Released Party, to the extent applicable, will coordinate to cause the Filed Cases, including any appeals of any Filed Cases, to be dismissed with prejudice as to any Acis Released Party or HCMLP Released Party; *provided, however,* that there is no obligation to dismiss or withdraw the HCMLP Bankruptcy Case.  For the avoidance of doubt, and consistent with this Section, (a) if HMCLP receives written advice of nationally recognized external counsel that it is legally permissible consistent with HCMLP's contractual and legal duties to direct Neutra, Ltd. to move to dismiss all of their appeals arising from the Acis Bankruptcy and that doing so would not reasonably subject HCMLP to liability, HCMLP shall direct Neutra, Ltd. to move to dismiss all of their appeals arising from the Acis Bankruptcy and (b) Acis shall move to dismiss with prejudice its claims against HCMLP asserted in any adversary proceeding in the Acis Bankruptcy Case.  To the extent reasonably necessary to maintain the status quo in the Filed Cases, including any appeals thereof, prior to the Effective Date, each Acis Released Party and HCMLP Released Party shall reasonably cooperate in seeking to abate or otherwise stay the Filed Cases vis-à-vis the Parties.

3.    <u>Representations and Warranties</u>.

a.    Each of the Acis Parties represents and warrants to each of the HCMLP Released Parties and each of the HCMLP Specified Parties who have signed this Release that (a) he, she or it has full authority to release the Acis Released Claims and has not sold, transferred, or assigned any Acis Released Claim to any other person or entity, and that (b) to the best of his, her or its current knowledge, no person or entity other than the Acis Parties has been, is, or will be authorized to bring, pursue, or enforce any Acis Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) any of the Acis Parties.

b.    Each of HCMLP and each HCMLP Specified Party who has signed this Release represents and warrants to each of the Acis Parties that he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity.

c.    Each HCMLP Specified Party and each of HCMLP and Strand represents and warrants to each of the Acis Parties that he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Specified Party, HCMLP, or Strand personally has against any Acis Party.

d.    HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support the Acis Parties' position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will have no obligations to assist the Acis Parties under this Section if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such

4

assistance would require HCMLP to expend material amounts of time or money. HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Release shall in any way affect the enforceability of this Release vis-à-vis any of the HCMLP Entities. The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

Notwithstanding anything herein to the contrary, the Acis Parties acknowledge and agree that their sole and exclusive remedy for the breach of the foregoing Sections 3b, 3c, and 3d will be that set forth in Section 1.d hereof.

4.    Additional Definitions.

a.    "Acis Bankruptcy Case" means, collectively, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018)

b.    "DAF Lawsuits" means (a) Case No. 1:19-cv-09857-NRB; *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al*, formerly pending in the United States District Court for the Southern District of New York; and (b) Case No. 1:20-cv-01036-LGS; *The Charitable Donor Advised Fund, L.P. and CLO Holdco, Ltd. v. U.S. Bank National Association, et al*, formerly pending in the United States District Court for the Southern District of New York.

c.    "Effective Date" means the date of an order of the Court approving the Settlement Agreement pursuant to a motion filed under Rule 9019.

d.    "Filed Cases" means (a) the HCMLP Bankruptcy Case, (b) *Acis Capital Management, L.P., et al. v. Highland Capital Management, L.P., et al*, Case No. 18-03078 (Bankr. N.D. Tex. 2018); (c) *Motion for Relief from the Automatic Stay to Allow Pursuit of Motion for Order to Show Cause for Violations of the Acis Plan Injunction*, Case No. 19-34054-sgj-11 [Docket No. 593] (Bankr. N.D. Tex. 2020); (d) *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent*, Case No. DC-16-11396, pending in the 162nd District Court of Dallas County Texas; (e) *Acis Capital Management, L.P., et al v. James Dondero, et al.*, Case No. 20-0360 (Bankruptcy N.D. Tex. 2020); (f) *Acis Capital Management, L.P., et al v. Gary Cruciani, et al.*, Case No. DC-20-05534, pending in the 162nd District Court of Dallas County Texas; (g) *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey; and (h) the Acis Bankruptcy Case.

e.    "HCMLP Bankruptcy Case" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex. 2019).

f.    "HCMLP Specified Party" means Scott Ellington, Isaac Leventon, Thomas Surgent, Frank Waterhouse, Jean Paul Sevilla, David Klos, Kristin Hendrix, Timothy Cournoyer, Stephanie Vitiello, Katie Irving, Jon Poglitsch, or Hunter Covitz. For the avoidance of doubt, each HCMLP Specified Party is a HCMLP Released Party.

g.      "<u>Plan</u>" means the *Plan of Reorganization of Highland Capital Management, L.P.*, filed in the HCMLP Bankruptcy Case [Docket No. 956] as may be amended or restated.

h.      "<u>Strand</u>" means Strand Advisors, Inc.

5.      <u>Miscellaneous</u>.

a.      For the avoidance of doubt, all rights, duties, and obligations of any HCMLP Released Party or Acis Released Party created by this Release or the Settlement Agreement shall survive its execution.

b.      This Release, together with the Settlement Agreement and any exhibits thereto, contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

c.      This Release may not be modified other than by a signed writing executed by the Parties.

d.      The effectiveness of this Release is subject in all respects to entry of an order of the Court approving this Release and the Settlement Agreement and authorizing HCMLP's execution thereof.

e.      This Release may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument, and shall be effective against a Party upon the Effective Date.

f.      This Release will be exclusively governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of law principles, and all claims relating to or arising out of this Release, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Texas, excluding Texas's conflicts of law principles. The Court will retain exclusive jurisdiction over all disputes relating to this Release.  In any action to enforce this Release, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[SIGNATURE PAGE FOLLOWS]*

**IT IS HEREBY AGREED.**

**ACIS CAPITAL MANAGEMENT, L.P.**

By:
Name: Joshua N. Terry
Its: President

**ACIS CAPITAL MANAGEMENT GP LLC**

By:
Name: Joshua N. Terry
Its: President

**JOSHUA N. TERRY**

By:
Name: Joshua N. Terry
Its: Self

**JENNIFER G. TERRY**

By:
Name: Jennifer G. Terry
Its: Self

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:
Name:
Its:

HMIT Appx. 02137

**IT IS HEREBY AGREED.**

**ACIS CAPITAL MANAGEMENT, L.P.**

By:    _____
Name: _____
Its:    _____

**ACIS CAPITAL MANAGEMENT GP LLC**

By:    _____
Name: _____
Its:    _____

**JOSHUA N. TERRY**

By:    _____
Name: _____
Its:    _____

**JENNIFER G. TERRY**

By:    _____
Name: _____
Its:    _____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    _____
Name: _James P. Seery, Jr._____
Its:    _CEO/CRO_____

HMIT Appx. 02138

**HCMLP SPECIFIED PARTIES**

SCOTT ELLINGTON

_____

ISAAC LEVENTON

_____

THOMAS SURGENT

_____

FRANK WATERHOUSE

_____

JEAN PAUL SEVILLA

_____

DAVID KLOS

_____

KRISTIN HENDRIX

_____

TIMOTHY COURNOYER

_____

STEPHANIE VITIELLO

_____

KATIE IRVING

_____

JON POGLITSCH

_____

**HUNTER COVITZ**

_____

HMIT Appx. 02140



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**
_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

**Exhibit**

**R 17**

**ORDER APPROVING DEBTOR'S SETTLEMENT
WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

**HMIT Appx. 02141**

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "<u>Morris Declaration</u>"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "<u>Settlement Agreement</u>"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "<u>Dondero Objection</u>"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "<u>Trusts' Objection</u>"), filed by the Dugaboy Investment Trust ("<u>Dugaboy</u>") and Get Good Trust ("<u>Get Good</u>," and together with Dugaboy, the "<u>Trusts</u>"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "<u>CLOH Objection</u>" and collectively, with the Dondero Objection and the Trusts' Objection, the "<u>Objections</u>"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "<u>Debtor's Reply</u>"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "<u>HarbourVest Reply</u>"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "<u>Hearing</u>"), including assessing the credibility of the witnesses; and (j) the

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

Main Document    Page 43 of 23

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

<div align="center">###End of Order###</div>

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

<div align="center">4</div>

# EXHIBIT 1

HMIT Appx. 02145

**EXECUTION VERSION**

### SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

### R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

<div align="center">1</div>

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.    **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.    **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

**EXECUTION VERSION**

4. <u>**Representations and Warranties**</u>.  Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. <u>**Plan Support**</u>.

(a)     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

**HMIT Appx. 02150**

**EXECUTION VERSION**

<u>with a copy (which shall not constitute notice) to</u>:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**EXECUTION VERSION**

     14.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<center>*[Remainder of Page Intentionally Blank]*</center>

<center>7</center>

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:      /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:      CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:      /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch

Name:   Michael Pugatch

Its:     Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:      /s/ Michael Pugatch

Name:   Michael Pugatch

Its:     Managing Director

US-DOCS\115534291.12

HMIT Appx. 02154

# Exhibit A

HMIT Appx. 02155

**TRANSFER AGREEMENT
FOR ORDINARY SHARES OF
HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

HMIT Appx. 02156

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of  the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

**HMIT Appx. 02157**

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.   This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.   This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.   As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.   each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.   the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.   the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.   Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

**HMIT Appx. 02158**

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

HMIT Appx. 02159

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE**:

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member

By: _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer

**PORTFOLIO MANAGER**:

**Highland HCF Advisor, Ltd.**

By: _____

Name:  James P. Seery, Jr.

Title:  President

**FUND**:
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

*[Additional Signatures on Following Page]*

ActiveUS 184668980v.2

**HMIT Appx. 02160**

      IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By:  HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director


**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest Skew Base AIF L.P.**

By:   HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

**HMIT Appx. 02161**

**HarbourVest 2017 Global Fund L.P.**

By:  HarbourVest 2017 Global Associates L.P.
     Its General Partner

By:  HarbourVest GP LLC
     Its General Partner

By:  HarbourVest Partners, LLC
     Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

**HMIT Appx. 02162**

**Exhibit A**

| **Transferee Name** | **Number of Shares** | **Percentage** |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2