# HMIT Exhibit 13

HMIT Appx. 02166

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case N. 19-34054 (SGJ) |
| Debtor. | |

<u>**MOTION FOR DETERMINATION OF THE VALUE OF THE ESTATE AND ASSETS HELD BY THE CLAIMANT TRUST**</u>

## I.  <u>INTRODUCTION</u>

1.      By this Motion, the Dugaboy Investment Trust ("<u>Dugaboy</u>") respectfully seeks a determination by this Court of the current value of the estate and an accounting of the assets currently held the Claimant Trust and available for distribution to creditors, as contemplated by the Fifth Amended Plan of Reorganization, as Amended (the "<u>Plan</u>") of Highland Capital Management, L.P. (the "<u>Debtor</u>" or "<u>HCMLP</u>").  Notably, although the latest quarterly operating report filed by the Reorganized Debtor projects a distribution to creditors totaling $205 million (a scant $11 million more than what the Debtor projected in its Plan Disclosure), Dugaboy has reason to believe that the mix of assets held by the Claimant Trust has changed dramatically since this Court confirmed the Plan and that the estate presently has sufficient cash and other assets with which to pay creditors in full plus interest.  At the same time, the Reorganized Debtor has reported that it has paid to professionals nearly $70 million since the Effective Date of the Plan—an enormous burn for an estate that projects payment of fractionally more to creditors.  And extrapolating from the Reorganized Debtor's most recent financial

HMIT Appx. 02167

reporting, it appears that the estate has reserved or accrued for tens of millions of dollars of additional professional fees.

2. Notably, the Court previously described Dugaboy's interest in the estate as "extremely remote," a finding based solely on a projection as of February 2021. *See* Order dated February 22, 2021, Dkt. 1943 ("Plan Confirmation Order") at ¶ 19; *see also id.*, ¶ 18. That projection was made at an arbitrary point in time (now 16 months ago) and was based on the value of assets then held by the estate, which necessarily fluctuates. But the value of the assets available for distribution to creditors is vastly different today than it was in February of 2021. We know this because certain assets have been liquidated, transforming what were once projections into finite values, and other assets have increased in value. Dugaboy believes that the combination of assets and cash held by the Claimant Trust in its own name and held in various funds, reserve accounts, and subsidiaries—if liquidated—would be sufficient to pay all Claimant Trust Beneficiaries in full with interest or, at the very least, come very close. In other words, based upon reality as opposed to the Debtor's projections 16 months ago, the nature of Dugaboy's interest in the estate—and its standing to seek redress in the bankruptcy proceedings—cannot now be classified as remote.

3. By way of example only, at the time of the Debtor's settlement with HarbourVest, it reported the value of HarbourVest's interest in Highland CLO Funding, Ltd. ("HCLOF") as $22 million. *See* Dkt 1625, p.9 at fn. 5. But based on the research Dugaboy has done, HarbourVest's interest in HCLOF was worth closer to $45 million at the time the Debtor acquired that interest and is worth approximately $75 million today, with the majority of the value held in cash.[1]

---

[1] We know, for example, that HCLOF's interest in the Acis CLOs is worth at least $53 million, of which the Debtor

HMIT Appx. 02168

4.      Dugaboy's interest in the estate is very much real and realizable because there is a potential for significant payment to residual equity holders, and the way in which the estate is managed (including its expenses for such management) could detrimentally affect Dugaboy's financial interests.  Indeed, Dugaboy believes that the estate has ample cash and other assets with which to pay all creditors in full, with interest, and to pay a return to residual equity holders like Dugaboy.  In particular, Dugaboy believes that the Claimant Trustee has sold all but four major assets of the estate, bringing the value of the Claimant Trust to approximately $685 million, including almost $300 million in cash.  In other words, the funds available to pay creditors and equity holders has grown tremendously since Plan confirmation.  This difference in value is important—and underscores the need for this Motion—because, if accurate, it means that professionals representing the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Dugaboy, Hunter Mountain, and others, even though the only beneficiaries of any recovery from such litigation will be Dugaboy and Hunter Mountain. In other words, Dugaboy and Hunter Mountain are essentially footing the bill for huge legal fees so that the Claimant Trust and Litigation Sub-Trust can sue them only to return any recoveries back to them.  Dugaboy has a very significant interest in a determination as to whether sufficient funds currently exist or will exist to pay all creditors in full such that the estate and its professionals can stop incurring professional fees to pursue unnecessary litigation.

5.      Even if the estate does not have sufficient assets at present to pay all allowed claims in full with interest, a determination of the current value of the estate would still benefit all creditors, residual equity holders, and parties-in-interest because such a determination would reveal the spread between the estate's asset value (exclusive of various adversary proceedings,

---

is entitled to 50.62% as a result of the acquisition of the HarbourVest interest, or $26.8 million.  HCLOF also had significant holdings in the Highland CLOs, which held, among other assets, MGM stock.  *See* Dkt. 1235 at ¶¶ 1-2.

including the notes lawsuits and the Kirschner litigation) and the estate's net liabilities to creditors. If all interested parties were able to understand that spread, it could facilitate a settlement that would achieve payment of creditors in full and resolution of all outstanding litigation while preventing the further enormous burn occasioned by legal fees and other costs currently borne by the estate (nearly $70 million since the Effective Date and accruing at a rate of what Dugaboy estimates to be approximately $5-$7 million/month).[2]

6.      Accordingly, this Motion seeks an evidentiary hearing so that the Court may determine the current amount of cash and other assets currently held by the Claimant Trust for distribution to Claimant Trust Beneficiaries (as that term is defined in the Plan). At the very least, disclosure of the assets held by the Claimant Trust may facilitate a meaningful settlement discussion and potentially end the litigation and appellate proceedings currently burdening the estate and resulting in very high legal fees, to the detriment of creditors and residual equity holders.

## II.      **BACKGROUND**

### A.      **HCMLP Files A Chapter 11 Petition Anticipating A Quick Restructuring And Exit From Bankruptcy**

7.      HCMLP filed its chapter 11 petition in bankruptcy in the United States Bankruptcy Court for the District of Delaware on October 16, 2019. Dkt. 3.[3] The case was transferred over HCMLP's objection to this Court on December 4, 2019. Dkt. 1. As the Court has since acknowledged, at the time HCMLP filed its chapter 11 petition, the company had "relatively insignificant secured indebtedness," "did not have problems with its trade vendors or landlords," and "did not suffer any type of catastrophic business calamity." Order (I)

---

[2] *See* Dkt. 3325, indicating that the Reorganized Debtor has disbursed $76,788,959 since the Effective Date, of which only $6,966,266 has been paid to administrative, secured, priority, and general unsecured claims.
[3] All references to the docket are to the docket entries in the Bankruptcy Court for the Northern District of Texas.

HMIT Appx. 02170

Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief ("Plan Confirmation Order"), Dkt. 1943, ¶ 8. Indeed, at the time of its filing, HCMLP had over $550 million in assets and no outstanding judgment liabilities against it other than the award issued by the American Arbitration Association in favor of the Redeemer Committee of the Crusader Funds.[4] As a result, there was every reason to believe that HCMLP could achieve a quick and orderly restructuring of its judgment debt and emerge from bankruptcy a going concern.

### B. The Debtor and its Management Were Not Required To Disclose Assets and Transactions During Bankruptcy Proceedings

8.     As the Court is aware, a quick exit from bankruptcy did not transpire as anticipated. During the 16 months between the time of HCMLP's bankruptcy filing and the Court's approval of the Plan, the estate's value did not remain static. Nonetheless, the Debtor—with the Court's approval—only provided the public with limited information regarding the mix of assets held by the estate (including at the subsidiary level). The Court likewise granted the Debtor's request to shield from public scrutiny asset sales conducted by the Debtor's management during bankruptcy. For example, the Court authorized the Debtor to place assets that were acquired as part of the Debtor's settlement with HarbourVest into a non-debtor special purpose entity. *See* Dkt. 1788. That placement meant that the true value of the asset, the asset's appreciated value, and its ultimate liquidation were not reported or disclosed to creditors or other interested parties.

9.     The Court also did not require the Debtor to file any Rule 2015.3 reports during the bankruptcy proceedings, notwithstanding that the Debtor did not seek relief from the

---

[4] HCMLP expected to pay the Redeemer Committee approximately $110 million on that award, after offsets and other adjustments.

HMIT Appx. 02171

requirement.[5]  Such reports were especially important here, where the Debtor held most of its assets in subsidiaries.  The Debtor's failure to file the required reports is difficult to understand. Indeed, despite this Court's characterization of HCMLP as a "byzantine complex" (*see* Plan Confirmation Order, ¶ 6), the assets of the estate fall into a handful of discrete investments (less than ten line items), most of which have audited financials and/or were required to make monthly or quarterly net-asset-value or fair-value determinations.[6]  Further, the Debtor provided information regarding these assets' value to the Official Committee for Unsecured Creditors ("UCC") on a weekly basis during the bankruptcy proceedings, and the UCC was able to summarize the so-called "byzantine complex" in two short pages attached to the Debtor's Amended Operating Protocols.   *See* Dkt. 466-1.  Because the same information was not provided in Rule 2015.3 reports, there was no publicly available information regarding the composition of assets and the corresponding liabilities held by the Debtor at the subsidiary level, making it impossible for outside stakeholders and interested parties to fairly evaluate the Debtor's estate.

10.     Following an extended period of non-transparency and vague quarterly reporting in which the Debtor represented that the estate had suffered a loss in value of more than $230 million (*see* Disclosure Statement, Dkt. 1473), Dugaboy filed a motion seeking appointment of an examiner to independently examine the estate, the reasons for its apparent losses, and other

---

[5] As the Court is aware, there is a mechanism for seeking such relief under the Federal Rules of Bankruptcy Procedure.  Specifically, the Court could have granted the Debtor relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available."  Fed. R. Bankr. P. 2015.3(d).  But HCMLP did not seek relief from the requirements under Rule 2015.3(a), nor did it make any "good faith effort" to comply with the Rule.  To the contrary, Mr. Seery publicly represented that the task of filing the required reports simply "fell through the cracks."  *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[6] Indeed, during one deposition, Mr. Seery was able to identify most of HCMLP's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by the Debtor's subsidiaries.  *See* Deposition of James P. Seery, Jr. ("Seery Dep."), attached hereto as Exhibit A, at 22:4-10, 23:1-29:10.

issues relating to estate value. *See generally* Dkt. 1752. Although Dugaboy filed the motion well before the Plan confirmation hearing, the Court set the motion six weeks out on a date well after the confirmation hearing. *See* Dkt. 1832. Thereafter, the Court denied the motion as moot in light of the Plan Confirmation Order, which the Court held stripped it of authority to appoint an examiner. Dkt. 1960.

11.    In connection with the hearing in the Confirmation of the Debtor's Plan, the Debtor offered up a chart (entitled "Plan Analysis v. Liquidation Analysis"), which attempted to reflect both what creditors could receive in a liquidation and that which Creditors could receive under the Plan. But the analysis reflected in that document is problematic for at least two reasons. First, the document was a summary based upon projections.[7] Second, the Debtor refused to disclose subsidiary ledgers that comprised a significant amount of the Debtor's monetization value. But based on that analysis, and the testimony of Mr. Seery at the Plan confirmation hearing—which the Court accepted—the Debtor projected at confirmation that it would realize only $257 million dollars from the "monetization" of its assets by December 31, 2022. Dkt. 1894 (Feb. 2, 2021 Hr'g Tr.) at 120:10-121:3, 122:13-123:2.

12.    It is now close to a year and a half after the Debtor's Plan projections were provided to the Court, and Dugaboy is merely asking for the Court to conduct an evidentiary hearing so that the projections can be judged by the realities of the ongoing liquidation of estate assets and the known increases in asset value. Based on known settlements and other filings reflecting allowed claims, Dugaboy believes that allowed claims to be paid now total at least $400 million. But nobody has disclosed the total other liabilities of the Claimant Trust. Nor do interested stakeholders know how much was drawn on the exit loan approved by this Court,

---

[7] What is more, Seery admitted under oath that, in putting together the projections, the Debtor's management arbitrarily adjusted downward third-party valuations of certain Debtor assets. Seery Dep., Ex. A, at 48:1-50:6.

how much is outstanding on that loan today, and what other payables and contractual liabilities are owed on account of the Claimant Trust and the Litigation Sub-Trust. All of this information is critical to ascertaining what the estate is capable of paying to creditors now or in the near-term and whether a remainder will be left for the residual equity holders.

13.     After confirmation of the Debtor's Plan but before the Plan Effective Date, in light of evolving information relating to the value of the estate, Dugaboy moved to compel the Debtor's compliance with Rule 2015.3. Dkt. 2256. In response, the Debtor argued that compliance with the Rule was too cumbersome, which again, strains credulity for several reasons. First, the Debtor's management, including Mr. Seery, are experienced estate professionals who are accustomed to dealing with complex financial structures. Second, the Debtor, as a registered investment advisor, was required by law to know precisely what assets it had under management. And third the financial information that HCMLP should have disclosed pursuant to Rule 2015.3 was at management's fingertips and indeed was information that management was required to disclose to the UCC on a *weekly basis* pursuant to its Amended Operating Protocols. *See supra* at ¶ 11 & n. 3; Dkt. 466 at p. 3.

14.     The Court set an initial hearing on Dugaboy's Rule 2015.3 motion for June 20, 2021, but thereafter continued the hearing until September 2021 to ensure the hearing occurred after the Effective Date. The Court then denied the motion as moot in light of the intervening effective date of the Plan in August 2021. *See* Dkt. 2812.

### C.     The Bankruptcy Court Approves A Liquidation Plan

15.     The Court ultimately approved a Plan that contemplates the liquidation of HCMLP and an orderly wind-down of operations. *See* Plan Confirmation Order, ¶ 2. In reaching its conclusion that the Plan was in the "best interest" of creditors and other

HMIT Appx. 02174

stakeholders, the Court expressly relied upon the Amended Liquidation Analysis/Financial Projections filed by the Debtor that projected a recovery by Class 7 General Unsecured Creditors of 85% and Class 8 General Unsecured Creditors of 71%. *Id.*, ¶ 52; *see also* Dkt. 1875 at p. 4.

16.     Further, the Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy. In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCMLP and therefore "technically" had standing to object to the Plan. *See* Plan Confirmation Order, ¶¶ 17-18. But based on the Debtor's financial projections at the time of confirmation, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

**D.     The Plan Grants Dugaboy A Springing Interest In The Claimant Trust**

17.     Notably, the Plan expressly contemplates potential payment to Dugaboy and other residual equity holders. Rather than leaving Dugaboy and residual equity holder Hunter Mountain Investment Trust with no interest in the Claimant Trust, the Plan expressly includes residual equity holders in the definition of "Claimant Trust Beneficiaries" as follows:

> "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, **Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests**.

Plan, § B, ¶ 27 (emphasis added). The Plan, in turn, makes clear that Dugaboy is a holder of

Class A Limited Partnership Interests. *Id.*, ¶ 33; *see also id.*, ¶¶ 24-26, 29-31 (describing the assets to be held by the Claimant Trust for the benefit of Claimant Trust Beneficiaries and the manner in which the Claimant Trust is to be operated).

18.     In other words, under the Plan, after all allowed claims are paid in full plus interest, the assets of the trust and any payment from the operation of the Claimant Trust goes to Dugaboy (and Hunter Mountain, as a holder of Class B/C Partnership Interests). *Id.*, ¶¶ 33-36.

**E.      There Is Credible Evidence Demonstrating That The Estate's Value Has Changed**

19.     Since the entry of the Court's Plan Confirmation Order, the Debtor's financial outlook has changed, making the Amended Liquidation Analysis/Financial Projections on which the Court based its Plan Confirmation Order inapplicable.   Indeed, there is every reason to believe that the value of the estate has changed markedly since Plan confirmation.   Not only do many of the assets held by the estate fluctuate in value based on market conditions, but Dugaboy is aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, resulting in increased value to the estate.

20.     Specifically, Dugaboy's information relating to estate value as of June 1, 2022 is as follows:

**Asset Values as of June 1, 2022 (in millions)**

| | | |
|---|---:|---:|
| Cash as of February 1, 2022 | | 125.0 |
| Proceeds from MGM Sale | | 25.0 |
| Proceeds from CLO Distributions | | 37.5 |
| Proceeds from Restoration Liquidation[8] | | |
| MGM Sale | 139.0 | |
| CCS medical | | |
| Sale | 21.0 | |
| Cornerstone (business sale) | 100.0 | |
| Cornerstone (MGM shares) | 48.0 | |
| Total: | 308.0 | |
| HCMLP Interest  16.7% | | 51.4 |
| Proceeds from Multi-Strat Liquidation | | 55.0 |
| | | |
| **Total Cash as of June 1, 2022** | | **293.9** |
| | | |
| **To be Monetized:** | | |
| | | |
| Trussway | | 230.0 |
| Remaining Harbourvest CLOs | | 37.5 |
| Korea Fund | | 18.0 |
| Celtic Litigation* | | 25.0 |
| SE Multifamily* | | 20.0 |
| Affiliate Notes* | | 50.0 |
| Other | | 10.0 |
| | | |
| **Total to be Monetized** | | **390.5** |
| | | |
| **Total Cash and Assets** | | **684.4** |

*Subject to dispute

21.     Likewise, the total value of allowed claims has changed since Plan confirmation. The Debtor and Reorganized Debtor have settled some creditor claims and seen others dismissed, making estimates given during the Plan confirmation hearing obsolete.

22.     Despite this evidence, the Debtor's most recent sworn financial statement dated March 31, 2022, contains materially unchanged projections. *See* Dkt. 3325. This should raise

---

[8] Restoration documents provide for manager incentive fees, which could increase realizations to the estate.

HMIT Appx. 02177

alarm bells for the Court, particularly because the Debtor's underlying assets naturally fluctuate in value and because the Debtor has engaged in the sale of virtually all major assets since confirmation.

23. Further, the post-confirmation reports filed by the Debtor do not provide any information to creditors regarding the prospect of payment and the expectation of future payment. Specifically, the report for the quarter ending March 31, 2022, reflects that only approximately $6.9 million dollars has been paid to creditors, notwithstanding that the Reorganized Debtor and/or Claimant Trust are holding huge amounts of cash as a result of the asset sales reported above.

### E. Dugaboy's Appellate Rights Are Compromised By Outdated Projections

24. The Court's repeated description of Dugaboy's interest in the estate as "remote" is problematic for other reasons as well. As this Court is aware, Dugaboy has appealed several orders issued by the Court in HCMLP's bankruptcy proceedings, both to the District Court for the Northern District of Texas and the Fifth Circuit Court of Appeals. *See, e.g.*, Case No. 22-10189 (5th Cir.); Case No. 21-90011 (5th Cir.); Case No. 21-cv-01295 (N.D. Tex.); Case No. 21-00546 (N.D. Tex.).

25. At least one of those appeals has been dismissed because the appellate court determined that Dugaboy lacked standing to pursue it. *See, e.g.*, *Highland Capital Mgmt. Fund Advisors, L.P., et al. v. Highland Capital Mgmt., LP*, Case No. 3:21-cv-01895-D (N.D. Tex.), Dkt. 44, at 4. This Court's prior finding that Dugaboy's interest in the bankruptcy proceedings is "remote" and "contingent" no doubt played a role in these dismissals. In particular, the appellate courts have relied upon a Fifth Circuit decision—*In re Coho Energy*—which stands for the proposition that an appellant must possess an economic interest in the outcome of an

HMIT Appx. 02178

appeal that is not remote or contingent at the time the appeal is heard. Under *Coho*, a party that may have had standing at the time of filing its appeal under 11 U.S.C. § 1109 may be subjected to a higher and stricter standard for standing later in the appellate process.

26.     Dugaboy has appealed the dismissal of one of its appeals to the Fifth Circuit Court of Appeals and has raised in its appellate briefing the wisdom and statutory basis for the Court's opinion in *Coho*. In particular, Dugaboy has argued that *Coho's* iteration of standing cannot be correct because the value of estate assets fluctuates during and after bankruptcy, such that the value of interests held by creditors and residual equity holders likewise fluctuates over time. Standing thus cannot be captured at a single point in time but must account for these potential fluctuations and acknowledge that fluctuations can place a particular party "in the money" such that decisions issued in bankruptcy can cause that party harm.

## III.     DUGABOY HAS STANDING IN THESE BANKRUPTCY PROCEEDINGS

27.     The Plan, on its face, gives Dugaboy an interest in the estate. Accordingly, and as this Court has acknowledged (*see* Plan Confirmation Order, ¶ 17), Dugaboy has standing to raise issues affecting the estate and Dugaboy's interest in it, including by filing the present motion seeking disclosure of the current value of assets held by the Claimant Trust. No other Court can hold the valuation hearing requested by Dugaboy.

28.     First, Dugaboy has statutory standing to be heard and to object to actions taken by the Debtor and the Claimant Trustee in these bankruptcy proceedings. Specifically, the Bankruptcy Code gives any "party in interest" the right to participate in a debtor's chapter 11 proceedings. *See* 11 U.S.C. § 1109(b). While neither 11 U.S.C. § 1109(b) nor any other section in the Bankruptcy Code specifically defines the term "party in interest," section 1109(b) provides a non-exclusive list of entities that fall within the meaning of "party in interest" for the

HMIT Appx. 02179

purposes of a chapter 11 proceeding.  *See Kipp Flores Architects, L.L.C. v. Mid-Continent Cas. Co.*, 852 F.3d 405, 413 (5th Cir. 2017).   This non-exclusive list "broadly includes debtors, creditors, trustees, indenture trustees, and equity security holders."  *Id.*   Other courts and authorities have similarly concluded that parties in interest "include not only the debtor, but anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.02 (16th ed. 2020) ("In the context of a chapter 11 case in particular, the term 'party in interest' expressly includes the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee.").

29.     Further, any party in interest may raise and may appear and be heard on any issue in a case under [Chapter 11]."  11 U.S.C. § 1109(b).   Indeed, Section 1109(b) "has been construed to create a broad right of participation in Chapter 11 cases."  *In re Global Indus. Technologies, Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004)).

30.     Second, Dugaboy also has Article III standing to be heard in these bankruptcy proceedings.  As the Supreme Court of the United States recently observed and held, Congress long ago abolished the requirement of a minimum amount in controversy for purposes of establishing related federal question jurisdiction.  *See Uzuegbunam v. Preczewski*, ___ U.S. ___, 141 S. Ct. 792, 802 (2021) ("But Congress abolished the statutory amount-in-controversy requirement for federal question jurisdiction in 1980…And we have never held that one applies as a matter of constitutional law.") (internal citation omitted).  The absence of a minimum amount in controversy requirement under Section 1334 indicates that it should receive a parallel

HMIT Appx. 02180

construction. Indeed, in *Uzuegbunam*, the majority held that nominal damages or compensatory damages of one dollar ($1.00) are sufficient to establish the redressability requirement under Article III.

31.     As the court is aware, there is more than $1 in controversy here. Indeed, depending upon how the estate is managed post-confirmation, Dugaboy stands to recover hundreds of thousands of dollars as a residual equity holder. And regardless of the amount of that recovery, Dugaboy has a very real interest in how the estate is managed by the Reorganized Debtor and the Claimant Trustee because that management will dictate whether and how much Dugaboy receives after payment of all creditors of the estate.

32.     So, whether as a party in interest under 11 U.S.C. § 1109(b) or for purposes of Article III, Dugaboy has the requisite standing.

## IV.     THE COURT SHOULD CONDUCT AN EVIDENTIARY HEARING REGARDING THE VALUE OF THE ESTATE AND THE ASSETS HELD BY THE CLAIMANT TRUST

33.     In addition to issuing a finding that Dugaboy has standing to appear, be heard, and object in these bankruptcy proceedings, the Court should conduct an evidentiary hearing and require disclosure by the Reorganized Debtor and the Claimant Trustee of the value of the estate and all assets held by the Claimant Trust that are available for distribution to creditors and residual equity holders. At a minimum, the hearing would provide valuable information regarding:

- The cash held by the Reorganized Debtor and various entities controlled by the Reorganized Debtor;

- How the cash was acquired and, more specifically, what assets were sold or liquidated;

- How the amounts received for assets sold or liquidated compares to the projections made by the Debtor at the time of Plan confirmation;

HMIT Appx. 02181

- The value of estate assets still held for the benefit of the estate and its creditors, whether held by the Reorganized Debtor or the Claimant Trust;

- The post-confirmation expenses incurred or to be incurred pursuant to contractual obligations by the estate and its professionals;[9]

- The claims that must be paid prior to the interests of Dugaboy and Hunter Mountain springing into existence;

- Expected professional fees, based at a minimum on the post-confirmation engagement letter with Mr. Seery and/or the agreement entered into between the Debtor and Mr. Seery regarding post-confirmation management of the Debtor and Mr. Seery's compensation package to be paid by the estate.

34.     Such a hearing would benefit not only Dugaboy in ascertaining the value of its current interest in the estate but also stands to benefit the estate and its creditors in two core ways.   First, there are currently pending adversary proceedings seeking to recover value for HCMLP's estate, when no such additional value is necessary to pay creditors in full and which could be brought to a swift close, allowing creditors to be paid.   Second, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Marc Kirschner, and Hayward & Associates—are continuing to incur millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or can be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.   If at the hearing the Court finds that the estate is solvent or the spread is minimal, it can order mediation to settle the estate.   Again, a quick resolution of all outstanding proceedings can only benefit the estate and its creditors.

35.     The idea that the estate will incur an additional $20+ million in legal fees and success bonuses when the estate can be finally resolved now should be of concern to the Court.

---

[9] The Debtor's Post-Confirmation Report for the quarter ending March 31, 2022, shows total post-Effective Date disbursements by the estate of approximately $81.9 million.   *See* Dkt. 3325 at p. 2.   The same Report projects additional expenditures of approximately $211 million.

HMIT Appx. 02182

The Court should not encourage a repeat of the WRT case (which incidentally was managed by Golden & Associates and David Pauker, who is a member of the Oversight Board for the Claimant Trust).

36.     Dugaboy is likewise concerned that very few distributions have been made thus far to creditors.  Dugaboy recognizes that the various trust agreements provide great latitude to the Claimant Trustee, but the fact that allowed claims are incurring interest, and it is unknown whether the Claimant Trust is earning a return equal to that being incurred on creditor claims, is another cause for concern and a reason to require the Reorganized Debtor and the Claimant Trust to provide this information at an evidentiary hearing.

## CONCLUSION

WHEREFORE, Dugaboy respectfully requests that the Court enter an order: (i) finding that Dugaboy has standing in these bankruptcy proceedings under 11 U.S.C. § 1109(b) and Article III of the United States Constitution; and (ii) setting an evidentiary hearing to ascertain the assets currently available for distribution to allowed claimants, to determine the current value of those assets, and to determine whether there is a potential for settling the estate now, without further pursuing continued expensive and protracted litigation and without incurring additional enormous professional fees.


Dated: June 30, 2022


Respectfully Submitted,

HMIT Appx. 02183

By: /s/ Douglas S. Draper
Douglas S. Draper
*Admitted Pro Hac Vice*
HELLER, DRAPER & HORN, LLC
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Email: ddraper@hellerdraper.com

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, the undersigned, hereby certify that on June 30th, 2022, a true and correct copy of the above and foregoing was served via the Court's ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case as follows:

- **David G. Adams**    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- **Michael P. Aigen**    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- **Amy K. Anderson**    aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- **Zachery Z. Annable**    zannable@haywardfirm.com
- **Bryan C. Assink**    bryan.assink@bondsellis.com
- **Asif Attarwala**    asif.attarwala@lw.com
- **Joseph E. Bain**    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- **Michael I. Baird**    baird.michael@pbgc.gov, efile@pbgc.gov
- **Sean M. Beach**    bankfilings@ycst.com, sbeach@ycst.com
- **Thomas Daniel Berghman**    tberghman@munsch.com
- **Jason Bernstein**    casey.doherty@dentons.com, dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com
- **Paul Richard Bessette**    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com
- **John Y. Bonds**    john@bondsellis.com
- **Matthew G. Bouslog**    mbouslog@gibsondunn.com, nbrosman@gibsondunn.com
- **Larry R. Boyd**    lboyd@abernathy-law.com, ljameson@abernathy-law.com

HMIT Appx. 02184

- **Jonathan E. Bridges** jeb@sbaitilaw.com
- **Jason S. Brookner** jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- **Greta M. Brouphy** gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- **M. David Bryant** dbryant@dykema.com, csmith@dykema.com
- **Candice Marie Carson** Candice.Carson@butlersnow.com
- **Annmarie Antoniette Chiarello** achiarello@winstead.com
- **Shawn M. Christianson** schristianson@buchalter.com, cmcintire@buchalter.com
- **James Robertson Clarke** robbie.clarke@bondsellis.com
- **Matthew A. Clemente** mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- **Megan F. Clontz** mclontz@spencerfane.com, lvargas@spencerfane.com
- **Andrew Clubok** andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com
- **Leslie A. Collins** lcollins@hellerdraper.com
- **John T. Cox** tcox@gibsondunn.com, WCassidy@gibsondunn.com;twesley@gibsondunn.com
- **David Grant Crooks** dcrooks@foxrothschild.com, etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- **Debra A Dandeneau** debra.dandeneau@bakermckenzie.com, blaire.cahn@bakermckenzie.com
- **Deborah Rose Deitsch-Perez** deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- **Gregory V. Demo** gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com
- **Douglas S. Draper** ddraper@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com
- **Lauren Kessler Drawhorn** lkdrawhorn@gmail.com
- **Vickie L. Driver** Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- **Jason Alexander Enright** jenright@winstead.com
- **Robert Joel Feinstein** rfeinstein@pszjlaw.com
- **Charles W. Gameros** bgameros@legaltexas.com, lmilam@legaltexas.com;jrauch@legaltexas.com;wcarvell@legaltexas.com
- **Brian D. Glueckstein** gluecksteinb@sullcrom.com
- **Matthew Gold** courts@argopartners.net
- **Bojan Guzina** bguzina@sidley.com
- **Eric Thomas Haitz** ehaitz@gibsondunn.com, skoller@gibsondunn.com
- **Margaret Michelle Hartmann** michelle.hartmann@bakermckenzie.com

HMIT Appx. 02185

- **Thomas G. Haskins**  thaskins@btlaw.com
- **Melissa S. Hayward**  MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- **Michael Scott Held**  mheld@jw.com, lcrumble@jw.com;kgradney@jw.com
- **Gregory Getty Hesse**  ghesse@huntonak.com, kkirk@huntonak.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- **Juliana Hoffman**  jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- **A. Lee Hogewood**  lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- **Jason Michael Hopkins**  jason.hopkins@dlapiper.com, jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com
- **Warren Horn**  whorn@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- **William R. Howell**  william.howell@bondsellis.com, williamhowell@utexas.edu
- **Kristin H. Jain**  KHJain@JainLaw.com, dskierski@skijain.com
- **John J. Kane**  jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- **Jason Patrick Kathman**  jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- **Edwin Paul Keiffer**  pkeiffer@romclaw.com, bwallace@romclaw.com
- **Susheel Kirpalani**  susheelkirpalani@quinnemanuel.com, dian.gwinnup@haynesboone.com
- **Jordan A. Kroop**  jkroop@pszjlaw.com, tcorrea@pszjlaw.com
- **Jeffrey Kurtzman**  kurtzman@kurtzmansteady.com
- **Phillip L. Lamberson**  plamberson@winstead.com
- **Lisa L. Lambert**  lisa.l.lambert@usdoj.gov
- **Michael Justin Lang**  mlang@cwl.law, nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- **Edward J. Leen**  eleen@mkbllp.com
- **Paul M. Lopez**  bankruptcy@abernathy-law.com
- **Faheem A. Mahmooth**  mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- **Ryan E. Manns**  ryan.manns@nortonrosefulbright.com
- **Brant C. Martin**  brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- **Brent Ryan McIlwain**  brent.mcilwain@hklaw.com, robert.jones@hklaw.com;brian.smith@hklaw.com
- **Thomas M. Melsheimer**  tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- **Paige Holden Montgomery**  pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com
- **J. Seth Moore**  smoore@ctstlaw.com, jsteele@ctstlaw.com
- **John A. Morris**  jmorris@pszjlaw.com
- **Edmon L. Morton**  emorton@ycst.com

HMIT Appx. 02186

- **Holland N. O'Neil** honeil@foley.com, jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- **Rakhee V. Patel** rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- **Charles Martin Persons** cpersons@sidley.com, txefilingnotice@sidley.com;charles-persons-5722@ecf.pacerpro.com
- **Louis M. Phillips** louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- **Mark A. Platt** mplatt@fbtlaw.com, dwilliams@fbtlaw.com,mluna@fbtlaw.com
- **Jeffrey Nathan Pomerantz** jpomerantz@pszjlaw.com
- **Kimberly A. Posin** kim.posin@lw.com, colleen.rico@lw.com
- **Jeff P. Prostok** jprostok@forsheyprostok.com, tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- **Bennett Rawicki** brawicki@gibsondunn.com
- **Linda D. Reece** lreece@pbfcm.com, lreece@ecf.courtdrive.com
- **Penny Packard Reid** preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- **Suzanne K. Rosen** srosen@forsheyprostok.com, tlevario@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- **Michael A. Rosenthal** mrosenthal@gibsondunn.com
- **Davor Rukavina** drukavina@munsch.com
- **Amanda Rush** asrush@jonesday.com
- **Alyssa Russell** alyssa.russell@sidley.com, efilingnotice@sidley.com;alyssa-russell-3063@ecf.pacerpro.com
- **Mazin Ahmad Sbaiti** mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com
- **Thomas C. Scannell** tscannell@foley.com, acordero@foley.com;thomas-scannell-3441@ecf.pacerpro.com
- **Douglas J. Schneller** douglas.schneller@rimonlaw.com
- **Sarah A. Schultz** sschultz@akingump.com, mstamer@akingump.com;afreeman@akingump.com;dkazlow@akingump.com;aqureshi@akingump.com;dkrasa-berstell@akingump.com;bkemp@akingump.com;brenda-kemp-7410@ecf.pacerpro.com
- **Michelle E. Shriro** mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- **Nicole Skolnekovich** nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- **Brian J. Smith** brian.smith@hklaw.com, robert.jones@hklaw.com;brent.mcilwain@hklaw.com
- **Frances Anne Smith** frances.smith@judithwross.com, michael.coulombe@judithwross.com
- **Eric A. Soderlund** eric.soderlund@judithwross.com
- **Martin A. Sosland** martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

HMIT Appx. 02187

- **Laurie A. Spindler**   Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com
- **Jonathan D. Sundheimer**   jsundhimer@btlaw.com
- **Kesha Tanabe**   kesha@tanabelaw.com
- **Clay M. Taylor**   clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- **Cortney C. Thomas**   cort@brownfoxlaw.com, korourke@brownfoxlaw.com
- **Chad D. Timmons**   bankruptcy@abernathy-law.com
- **Alexandre J. Tschumi**   alexandretschumi@quinnemanuel.com
- **Dennis M. Twomey**   dtwomey@sidley.com
- **Basil A. Umari**   BUmari@dykema.com, pelliott@dykema.com
- **United States Trustee**   ustpregion06.da.ecf@usdoj.gov
- **Artoush Varshosaz**   artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- **Julian Preston Vasek**   jvasek@munsch.com
- **Donna K. Webb**   donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- **Jaclyn C. Weissgerber**   bankfilings@ycst.com, jweissgerber@ycst.com
- **Elizabeth Weller**   Dora.Casiano-Perez@lgbs.com, dallas.bankruptcy@lgbs.com
- **Daniel P. Winikka**   danw@ldsrlaw.com, craigs@ldsrlaw.com,dawnw@ldsrlaw.com,lindat@ldsrlaw.com
- **Hayley R. Winograd**   hwinograd@pszjlaw.com
- **Megan Young-John**   myoung-john@porterhedges.com


/s/ Douglas S. Draper
Douglas S. Draper

HMIT Appx. 02188

# EXHIBIT A

HMIT Appx. 02189

1   IN THE UNITED STATES BANKRUPTCY COURT

2   FOR THE NORTHERN DISTRICT OF TEXAS

3   DALLAS DIVISION.

4   ------------------------------)

5   In Re:                    Chapter 11

6   HIGHLAND CAPITAL           Case No.

7   MANAGEMENT, LP,            19-34054-SGJ 11

8

9        Debtor

10  ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14            January 29, 2021

15            10:11 a.m. EST

16

17

18

19

20

21

22

23

24  Reported by:
    Debra Stevens, RPR-CRR
    JOB NO. 189212
25

HMIT Appx. 02190

1                    J. SEERY

2        Q.     Excuse me?

3        A.     I believe it does.

4        Q.     Is there a subsidiary ledger

5    that would tell me what is the note

6    component versus what is the hard asset

7    component?

8        A.     Yes.

9        Q.     Who has that?

10       A.     I do.

11             MR. DRAPER:  Mr. Morris, can I

12        get that document?

13             MR. MORRIS:  I will take it

14        under advisement.

15       Q.     There is also a Dugaboy note in

16    your notes that is to be sold.  Is that

17    Dugaboy note in the $40 million, or is it

18    in the hard asset monetization?

19       A.     I believe it is in the -- it is

20    to be sold, so it is not collected in

21    full.  If they default, then we would

22    accelerate that and collect that in full

23    as well.

24       Q.     That doesn't answer my question

25    unfortunately.  What I am asking you, is

Page 23

```
 1                  J. SEERY
 2   it in the $40 million calculation, or in
 3   the $200 million number?
 4       A.    It doesn't answer your question
 5   because you didn't listen to my prior
 6   answer.  I said that the 40 million
 7   calculation was for stuff that had been
 8   demanded.  I think you represent -- do you
 9   represent Dugaboy?  I don't think we
10   demanded --
11       Q.    I do.  Excuse me?
12       A.    So if it wasn't demanded, it is
13   not in the hard asset calculation; it's in
14   the discounted amount.
15       Q.    Let me try to understand your
16   answer.  What you are telling me, just so
17   we are both clear, is that that Dugaboy
18   note is not in the $40 million; it is in
19   the balance of the 257?  That is a yes or
20   no answer.
21       A.    I didn't take it as a question.
22   It sounded like a statement.  I agree with
23   your statement.
24       Q.    Thank you.  So the answer is
25   yes?
```

HMIT Appx. 02192

```
1                    J. SEERY

2        A.      It wasn't a question.  I agree

3   with your statement; yes.

4        Q.      Thank you.

5                Now, let's go to the

6   November 2020 schedule that we had.  If

7   you see in the line "Estimated proceeds

8   from monetization of assets," you had

9   $190 million under the plan analysis?

10       A.      Yes.

11       Q.      What percentage of that are

12  notes versus hard assets?

13       A.      The demand notes only were

14  included in the proceeds in terms of

15  recovery in full.  I don't quite

16  understand your distinction between hard

17  assets.  There is a lot of intangibles as

18  well as tangibles in the total.

19                But if we are distinguishing

20  between notes and other assets, the demand

21  notes are included in the 190.  The longer

22  dated notes are assumed to be sold.  So,

23  they are included but they are included at

24  a much lower amount.

25       Q.      Okay.  Now how much of the
```

Page 25

```
1                    J. SEERY

2    demand notes in the 190, Mr. Seery?

3        A.    Off the top of my head I don't

4    recall.  It is the Dondero demand notes as

5    well as the HCFMA demand notes, so it

6    should be about 15 to $20 million.

7    Somewhere in that realm.  The same as the

8    other demand notes.

9        Q.    Were the other notes, the

10   $40 million of notes that you referenced

11   in the January document, were they carried

12   at face or at discounted amount in the

13   190?

14       A.    In the 190, the ones that were

15   demand were carried at face.  The ones

16   that were long dated, which really at that

17   point I believe -- the only difference is

18   the $24-and-change-million NexPoint

19   Advisors note was at a discounted amount.

20   The others were at face.

21       Q.    What was the discount that was

22   applied to that note?

23       A.    I don't recall off the top of my

24   head.  It is pretty significant because of

25   the long dated nature of the notes.  They
```

HMIT Appx. 02194

Page 26

```
 1                    J. SEERY

 2   were amended without consideration a few

 3   years ago.  So, for our purposes we didn't

 4   make the assumption, which I am sure will

 5   happen, a fraudulent conveyance claim on

 6   those notes, that a fraudulent conveyance

 7   action would be brought.  We just assumed

 8   that we'd have to discount the notes

 9   heavily to sell them because nobody would

10   respect the ability of the counterparties

11   to fairly pay.

12        Q.    And the same discount was

13   applied in the liquidation analysis to

14   those notes?

15        A.    Yes.

16        Q.    Now --

17        A.    The difference -- there would be

18   a difference, though, because they would

19   pay for a while because they wouldn't want

20   to accelerate them.  So there would be

21   some collections on the notes for P and I.

22        Q.    But in fact as of January you

23   have accelerated those notes?

24        A.    Just one of them, I believe.

25        Q.    Which note was that?
```

Page 27

```
 1                    J. SEERY
 2      A.     NexPoint, I said.  They
 3   defaulted on the note and we accelerated
 4   it.
 5      Q.     So there is no need to file a
 6   fraudulent conveyance suit with respect to
 7   that note.  Correct, Mr. Seery?
 8           MR. MORRIS:  Objection to the
 9       form of the question.
10      A.     Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14      Q.     My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18           MR. MORRIS:  Objection to the
19       form of the question.
20      A.     That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23      Q.     Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

HMIT Appx. 02196

```
 1                    J. SEERY

 2    you whether they are included in the asset

 3    portion of your $257 million number, all

 4    right?  Mr. Morris didn't want me to go

 5    into specific asset value, and I don't

 6    intend to do that.

 7              The first question I have for

 8    you is, the equity in Trustway Highland

 9    Holdings, is that included in the

10    $257 million number?

11        A.      There is no such entity.

12        Q.      Then I will do it in a different

13    way.  In connection with the sale of the

14    hard assets, what assets are included in

15    there specifically?

16        A.      Off the top of my head -- it is

17    all of the assets, but it includes

18    Trustway Holdings and all the value that

19    flows up from Trustway Holdings.  It

20    includes Targa and all the value that

21    flows up from Targa.  It includes CCS

22    Medical and all the value that would flow

23    to the Debtor from CCS Medical.  It

24    includes Cornerstone and all the value

25    that would flow from Cornerstone.  It
```

HMIT Appx. 02197

| | |
|---|---|
| 1 | J. SEERY |

2  includes any other securities and all the

3  value that would flow from Cornerstone.

4  It includes HCLOF and all the value that

5  would flow up from HCLOF.  It includes

6  Korea and all the value that would flow up

7  from Korea.

8          There may be others off the top

9  of my head.  I don't recall them.  I don't

10  have a list in front of me.

11     Q.    Now, with respect to those

12  assets, have you started the sale process

13  of those assets?

14     A.    No.  Well, each asset is

15  different.  So, the answer is, with

16  respect to any securities, we do seek to

17  sell those regularly and we do seek to

18  monetize those assets where we can

19  depending on whether there is a

20  restriction or not and whether there is

21  liquidity in the market.

22          With respect to the PE assets or

23  the companies I described -- Targa, CCS,

24  Cornerstone, JHT -- we have not --

25  Trustway.  We have not sought to sell

HMIT Appx. 02198

```
 1                    J. SEERY

 2      Q.     And if I understand what you

 3  just said, it is that the Houlihan Lokey

 4  valuation for those two businesses showed

 5  a significant increase between November of

 6  2020 and January of 2021?

 7              MR. MORRIS:  Objection to form

 8      of the question.

 9      A.     I didn't say that.

10      Q.     I am trying to account for the

11  increase between the two dates, and you

12  identified three assets.  You identified

13  MGM stock, which has, I can guess, as you

14  have said, a readily ascertainable value.

15  Then you identified two others that the

16  valuation is based upon something Houlihan

17  Lokey provided you.  Correct?

18      A.     I gave you three examples.  I

19  never said "readily."  That is your word,

20  not mine.  And I didn't say that Houlihan

21  had a significant change in their

22  valuation.

23      Q.     So let's now go back to the

24  question.  There is an increase in value

25  from November 24th of 2020 to January 28th
```

Page 49

1                 J. SEERY

2    of 2021, the magnitude being roughly 60

3    some odd million dollars.  Correct?

4        A.      Correct.

5        Q.      We can account for $22 million

6    of it easily, right?

7                MR. MORRIS:  Objection to form.

8        A.      Correct.

9        Q.      That is the HarbourVest

10   settlement, so that leaves roughly

11   $40 million unaccounted for?

12               MR. MORRIS:  Objection to the

13           form of the question if that is a

14           question.  It is accounted for.

15       Q.      What makes up that difference,

16   Mr. Seery?

17       A.      A change in the plan value of

18   the assets.

19       Q.      Okay.  Which assets?  Let's sort

20   of go back to where we were.

21       A.      There are numerous assets in the

22   plan formulation.  I gave you three

23   examples of the operating businesses.  The

24   securities, I believe, have increased in

25   value since the plan, so those would go up

HMIT Appx. 02200

1                    J. SEERY

2     for one.  On the operating businesses, we

3     looked at each of them and made an

4     assessment based upon where the market is

5     and what we believe the values are, and we

6     have moved those valuations.

7          Q.    Let me look at some numbers

8     again.  In the liquidation analysis in

9     November of 2020, the liquidation value is

10    $149 million.  Correct?

11         A.    Yes.

12         Q.    And in the liquidation analysis

13    in January of 2021, you have $191 million?

14         A.    Yes.

15         Q.    You see that number.  So there

16    is $51 million there, right?

17         A.    No.

18         Q.    What is the difference between

19    191 and -- sorry.  My math may be a little

20    off.  What is the difference between the

21    two numbers, Mr. Seery?

22         A.    Your math is off.

23         Q.    Sorry.  It is 41 million?

24         A.    Correct.

25         Q.    $22 million of that is the

I hereby certify that the foregoing is a
true copy of the original thereof now in
my office this the _15th_ day of _Februa_
_20 23_ at Dallas, Texas
Clerk, U. S. Bankruptcy Court
Northern District of Texas
By _Lire Dugan_____ Deputy