# HMIT Exhibit 18

HMIT Appx. 02648

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com
-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P. and the
Highland Claimant Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj |
| Reorganized Debtor. | |

## RESPONSE TO MOTION FOR LEAVE TO FILE PROCEEDING

Highland Capital Management, L.P. ("HCMLP"), the reorganized debtor in the above-referenced bankruptcy case, and the Highland Claimant Trust (the "Trust", and together with HCMLP, "Highland"), by and through their undersigned counsel, hereby submit this response (the "Response") to the *Motion for Leave to File Proceeding* [Docket No. 3662] (the "Motion") filed

1

HMIT Appx. 02649

by The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("HMIT", and together with Dugaboy, the "Movants"). In support of its Response, Highland represents as follows:

**RESPONSE**

1.      On June 30, 2022, Dugaboy filed its *Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust* [Docket No. 3382] (the "Initial Valuation Motion") in which Dugaboy sought a determination of the value of the estate and an accounting of Highland's assets. HMIT joined Dugaboy's Initial Valuation Motion [Docket No. 3467], which Dugaboy subsequently amended to, among other things, request an evidentiary hearing and the disclosure of certain information. *See Supplemental and Amended Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust* [Docket No. 3533] (together with the Initial Valuation Motion, the "Valuation Motion").

2.      In their Valuation Motion, the Movants generally alleged that the information sought would support their allegation that the value of the Claimant Trust's assets exceeds the amount of the Class 8 and Class 9 claims such that—as Contingent Claimant Trust Beneficiaries— they will become "in the money." After briefing and argument, the Court denied the Valuation Motion as procedurally improper, finding, among other things, that the Movants' request for equitable relief could only be obtained in an adversary proceeding. *Order Denying Motion [DE # 3382] and Supplemental Motion [DE #3533] of Dugaboy Investment Trust Due to Procedural Deficiency: Adversary Proceeding Required* [Docket No. 3645] (the "Order").

3.      Two months after the Order was entered, with new counsel,[1] the Movants filed the Motion. However, unlike the Valuation Motion, the Motion and the proposed Complaint do not

---

[1] Douglas Draper has represented Dugaboy throughout Highland's bankruptcy case, including in connection with the Valuation Motion. Louis Phillips has represented HMIT since the spring of 2021, including in connection with the

2

simply seek a determination that Movants are entitled to information from the Claimant Trust under the Claimant Trust Agreement or applicable law. If that is what the Movants actually wanted, the Complaint would be no more than a handful of pages. Instead, in lengthy, rambling pleadings, Movants attempt to portray Dondero as a helpless and tragic victim, betrayed by the bankruptcy process, the judiciary, and a bunch of conniving thieves, led—of course—by the antagonist-in-chief, management of the Claimant Trust and reorganized HCMLP.

4.    Naturally, the Movants ignore that fact that Dondero and those acting in concert with him are serial litigators[2] who have left a trail of destruction in their wake.[3] But more importantly, the Movants' litany of baseless conspiracy theories are irrelevant to the Motion.

5.    The Movants have no legal right to the "valuation" information they purportedly seek; that is exactly why they must seek equitable relief. Stymied by the law, the Movants apparently intend to use their Complaint as a vehicle to spew venom, engage in groundless character assassination, re-litigate matters decided years ago, and seek information that they surely will try to use to commence further litigation that will be subject to the Gatekeeper in the Plan.[4] Accordingly, if Movants want to continue to pursue their request for information, the Court should

---

Valuation Motion. However, neither lawyer represents the Movants in connection with the Motion. Instead, the Stinson firm—James Dondero's long-time, personal counsel—has taken the reins and filed the Motion on behalf of the Movants, thereby re-affirming Dondero's ultimate control of the Movants.

[2] *See generally Highland Capital Management, L.P.'s Memorandum of Law in Support of its Motion to Deem the Dondero Entities Vexatious Litigants*, a copy of which was attached as Exhibit A to *Highland Capital Management, L.P.'s Opposed Motion for Leave to Exceed Page Limit*, Case No. 3:21-cv-00881-X (N.D. Tex.) (the "Vexatious Litigant Motion"). A copy of the Vexatious Litigant Motion is annexed as **Exhibit 1**.

[3] *See, e.g.*, *Special Turnover Petition* filed in *UBS Securities LLC v. Dondero*, Index No. 650744/2023, NYSCEF No. 1 (Sup. Ct. N.Y. County Feb. 8, 2023) (the "UBS Special Petition"). A copy of the UBS Special Petition is annexed as **Exhibit 2**.

[4] In fact, Dondero's vexatiousness is continuing even before the Motion is adjudicated. On Friday afternoon, March 24, Highland was advised that—notwithstanding the dismissal of *two* separate section 202 proceedings in Texas state court—HMIT will file (through yet another lawyer) another baseless Gatekeeper motion in this Court in an attempt to attack management of the Claimant Trust and HCMLP and certain stakeholders.

HMIT Appx. 02651

require the Movants to modify the Complaint to eliminate the *ad hominem* attacks and efforts to re-litigate all that has transpired since the Independent Board's appointment in January 2020. Otherwise, the Complaint will lead to a full-fledged circus.[5]

6.      The proposed Complaint seeks equitable relief in the form of information disclosures, an accounting, and judicial declarations concerning the value of the Claimant Trust and the Movants' interests therein.  Movants seek no damages of any kind, nor do they seek to hold any Protected Party liable for anything. Accordingly, to the limited extent that litigation of the Complaint will concern Movants' entitlement (or lack thereof) to information, Highland does not object to Movants seeking the relief requested in the Motion from this Court on the ground that the Gatekeeper was not intended to apply to equitable requests of this type. And while the Claimant Trust certainly disputes Movants' claims to the equitable relief sought, the Claimant Trust does not believe the Court needs to make a colorability determination in connection therewith.  The merits of Movants' equitable claims will be determined in due course in the adversary proceeding.

7.      In sum, while Highland does not object to the Movants commencing an action in this Court seeking the equitable relief set forth in the draft Complaint attached to the Motion, if the Complaint is not modified as set forth above prior to filing, Highland reserves the right to seek sanctions under Rule 11 (because a substantial number of the allegations will never have any evidentiary support) and to strike under Rule 12(f) (because a substantial number of the allegations are immaterial, impertinent, and scandalous).

---

[5] Dondero's never-disputed threat to "burn the place down" if he did not get his way, and his later, written message to "[be] careful what you do – last warning" hang like pall over this bankruptcy case and serve as a clear warning for more to come, unless appropriately restrained by the courts, regulators, or the Department of Justice.

HMIT Appx. 02652

## CONCLUSION

WHEREFORE, Highland does not object to the filing of a complaint in this Court

requesting the equitable relief described in the draft Complaint (and only such relief), but Highland

specifically reserves the right to seek sanctions under Rule 11 and to strike under Rule 12 if

Movants file their Complaint in its current form.

Dated: March 27, 2023                 **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

5

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Case No. 3:21-cv-00881-X |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., et al., | § § § | (Consolidated with 3:21-cv-00880-X, 3:21-cv-01010-X, 3:21-cv-01378-X, 3:21-cv-01379-X) |
| Defendants. | § § | |

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DEEM THE DONDERO ENTITIES
VEXATIOUS LITIGANTS AND FOR RELATED RELIEF**

DOCS_NY:46677.6 36027/003

**Exhibit 1**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

| | | | |
|---|---|---|---|
| I. | | PRELIMINARY STATEMENT ................................................... | 1 |
| II. | | BACKGROUND ......................................................... | 4 |
| | A. | Highland's Prepetition Culture of Litigation .......................... | 4 |
| | B. | Highland Files Bankruptcy; the Independent Board Is Appointed; Negotiations Commence ............................................. | 6 |
| | C. | Mr. Dondero Interferes with the Estate and Vows to "Burn [Highland] Down" ............................................................. | 8 |
| | D. | Confirmation of Highland's Plan; Approval of the Gatekeeper and Fifth Circuit Affirmance; and Subsequent Litigation ..................... | 9 |
| | E. | The Dondero Entities' Vexatiousness Impeded Highland's Bankruptcy and Continues to This Day ....................................... | 11 |
| | | i    The Dondero Entities File Meritless Claims Against Highland's Estate ............................................................ | 12 |
| | | ii   The Dondero Entities File Meritless Motions in the Bankruptcy Case ............................................................. | 14 |
| | | iii  The Dondero Entities File Meritless Objections in the Bankruptcy Case ............................................................. | 16 |
| | | iv   Highland Litigates to Protect Its Rights and the Bankruptcy Process .......................................................... | 18 |
| | | v    The Dondero Entities Appeal Nearly Every Order ................ | 20 |
| | | vi   The Dondero Entities' Attempt to Evade the Bankruptcy Court ...... | 22 |
| | | vii  The Dondero Entities' Newest Action Restating Their Spurious Claims About Highland .......................................... | 26 |
| III. | | RELIEF REQUESTED .................................................. | 27 |
| IV. | | ARGUMENT .......................................................... | 28 |
| | A. | Courts in the Fifth Circuit Have the Authority to Deem Litigants "Vexatious" and Issue Pre-Filing Injunctions ..................... | 28 |
| | B. | This Court Has Jurisdiction to Deem the Dondero Entities Vexatious and Prohibit Filings in Both This Court and the Bankruptcy Court ......... | 31 |
| | C. | Highland Satisfies the Four-Part Test for Obtaining a Pre-Filing Injunction ...... | 32 |
| | | i    The Dondero Entities Have a History of Vexatious Litigation ............... | 32 |
| | | ii   The Dondero Entities' Litigation Lacks a Good-Faith Basis .................. | 32 |
| | | iii  The Dondero Entities' Litigation Has Created an Enormous Burden on the Court System and Highland ............................ | 33 |

HMIT Appx. 02655

      iv       Alternative Sanctions Are Inadequate to Deter the Conduct ................... 34

V.    CONCLUSION .......................................................................................................... 35

DOCS_NY:46677.6 36027/003

**HMIT Appx. 02656**

## TABLE OF AUTHORITIES

### CASES

*Alliance Riggers & Constructors, Ltd. v. Restrepo*,
  2015 U.S. Dist. LEXIS 29346 (W.D. Tex. Jan. 7, 2015) .................................................. 30

*Baum v. Blue Moon Ventures, LLC*,
  513 F.3d 181 (5th Cir. 2008) ............................................................................ 29, 30, 31

*Bowling v. Willis*,
  2019 U.S. Dist. LEXIS 168602 (E.D. Tex. Aug. 9, 2019), *aff'd* 853 F. App'x.
  983 (5th Cir. 2021)........................................................................................................ 29, 30

*Caroll v. Abide (In re Carroll)*,
  850 F.3d 811 (5th Cir. 2017) ........................................................................... 29, 30, 31

*Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.*,
  2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022)......................................... 22

*Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.*,
  2022 U.S. Dist. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022) ................................... 23

*Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.*,
  643 B.R. 162 (N.D. Tex. 2022)......................................................................................... 24

*Clark v. Mortenson*,
  93 F. App'x. 643 (5th Cir. 2004) ..................................................................... 29, 30, 31

*Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 172351
  (N.D. Tex. Sept. 22, 2022).............................................................................................. 22

*Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re
  Highland Cap. Mgmt., L.P.)*,
  2022 U.S. Dist. LEXIS 15648 (N.D. Tex. Jan. 28, 2022) ................................................ 18

*Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re
  Highland Cap. Mgmt., L.P.)*,
  57 F.4th 494 (5th Cir.2023) .................................................................................. 11, 18, 20

*Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Cap. Mgmt., L.P.)*,
  2021 Bankr. LEXIS 1533 (Bankr. N.D. Tex. Jun. 7, 2021) ................................................ 18

*In re Acis Cap. Mgmt., L.P.*,
  584 B.R. 115 (Bankr. N.D. Tex. 2018).............................................................................. 6

*In re Caroll)*,
  2016 Bankr. LEXIS 937 (Bankr. M.D. La. Mar. 16, 2016) *aff'd* 2016 U.S.
  Dist. LEXIS 100930 (M.D. La. Aug. 2, 2016), *aff'd* 850 F.3d 811 (5th Cir.
  2017).................................................................................................................................... 31

*Marinez v. Wells Fargo Bank, N.A.*,
  2013 U.S. Dist. LEXIS 208591 (W.D. Tex. May 31, 2020) ........................................... 31

*Newby v. Enron Corp.*,
  302 F.3d 295 (5th Cir. 2002) .......................................................................................... 29

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
  Mgmt., L.P.)*,
  48 F.4th 419 (5th Cir. 2022) .................................................................................... 10, 29

*Nix v. Major League Baseball*,
  2022 U.S. Dist. LEXIS 104770 (S.D. Tex. Jun. 13, 2022)........................................ 30, 31

HMIT Appx. 02657

*Schum v. Fortress Value Recovery Fund I LLC*,
2019 U.S. Dist. LEXIS 226679 (N.D. Tex. Dec. 2, 2019), *aff'd* 805 F. App'x.
319 (5th Cir. 2020) ................................................................................ 29, 30, 31, 32

*Silver City v. City of San Antonio*,
2022 U.S. Dist. LEXIS 118643 (W.D. Tex. Jul. 7, 2020) ................................... 31

*Staten v. Harrison Cnty.*,
2021 U.S. App. LEXIS 35747 (5th Cir. Dec. 2, 2021) ................................... 29, 31

*Williams v. McKeithen*,
939 F.2d 1100 (5th Cir. 1991) ......................................................................... 31

## **STATUTES**

11 U.S.C. § 363 .......................................................................................... 14

18 U.S.C. § 3057 .......................................................................................... 8

28 U.S.C. § 157(c)(1) .................................................................................... 31

28 U.S.C. § 158(a) ........................................................................................ 31

28 U.S.C. § 1651 ........................................................................................... 29

28 U.S.C. § 1651(a) ...................................................................................... 28

DOCS_NY:46677.6 36027/003

HMIT Appx. 02658

Highland Capital Management, L.P. ("Highland"), by and through its undersigned counsel,

submits this *Memorandum of Law*[1] in support of its motion (the "Motion") to deem the above-

captioned defendants, their affiliated entities, and any person or entity controlled by or acting in

concert with James Dondero (collectively, the "Dondero Entities")[2] vexatious litigants and to

require them to file a copy of this Court's order in any pending or future litigation or proceeding.

In support of the Motion, Highland states as follows:

## I.     PRELIMINARY STATEMENT[3]

1.      The Dondero Entities—all of which are dominated and controlled by or acting in

concert with Mr. Dondero, Highland's co-founder and ousted Chief Executive Officer—are

engaged in a coordinated litigation strategy spanning more than two years to wear down Highland

and its management and thwart Highland's confirmed Plan. The Dondero Entities have clogged

the dockets of this Court, the Bankruptcy Court, and the Fifth Circuit and have wasted untold

judicial and estate resources. While the Bankruptcy Court approved a Gatekeeper provision as part

of Highland's confirmed Plan, it has proved inadequate to curtail the Dondero Entities' harassing

and abusive litigation. Accordingly, Highland requests that this Court declare the Dondero Entities

vexatious litigants and require them to file a copy of this Court's order finding them vexatious in

any pending or future litigation or proceeding.

---

[1] Highland is concurrently filing its *Appendix in Support of Motion to Deem the Dondero Entities Vexatious Litigants and for Related Relief* (the "Appendix"). Citations to the Appendix are noted as "Ex. #, Appx. #."

[2] "Dondero Entities" refers, collectively, to (a) Mr. Dondero, (b) NexPoint Advisors, L.P. ("NPA"), (c) Highland Capital Management Fund Advisors, L.P., n/k/a NexPoint Asset Management, L.P. ("HCMFA"), (d) HCRE Partners LLC n/k/a NexPoint Real Estate Partners LLC ("HCRE"), (e) Highland Capital Management Services, Inc., (f) Nancy Dondero, and (g) any entity directly or indirectly controlled by, or acting in concert with, Mr. Dondero, including, without limitation, (i) The Charitable DAF Fund, L.P. ("DAF"), (ii) CLO HoldCo, Ltd. ("CLOH"), (iii) The Dugaboy Investment Trust ("Dugaboy"), (iv) Get Good Investment Trust ("Get Good"), (v) Hunter Mountain Investment Trust, (vi) Strand Advisors, Inc., (vii) The Get Good Non-Exempt Trust 1; (viii) The Get Good Non-Exempt Trust 2; and (ix) PCMG Trading Partners XXIII, L.P. ("PCMG").

[3] Capitalized terms in this Preliminary Statement have the meanings given to them below.

DOCS_NY:47125.11 36027/003

HMIT Appx. 02659

2.      Mr. Dondero's "strategy" is not new; he has used litigation as a weapon to harass
and exact revenge against his perceived enemies for years.[4] Prior to its 2019 bankruptcy, Mr.
Dondero fostered a culture of scorched-earth, vindictive litigation at Highland suing anyone who
challenged him or refused to cave to his demands. That culture spawned litigation lasting more
than a decade in courts and arbitration panels in Texas, Delaware, New York, and foreign
jurisdictions like the Cayman Islands, Bermuda, and Guernsey.

3.      But Mr. Dondero's litigation "strategy" caught up with him, and Highland was
forced to seek bankruptcy protection in October 2019. Highland's unsecured creditors Committee
was comprised largely of litigation claimants who were intimately familiar with Mr. Dondero's
tactics. The Committee immediately focused on removing Mr. Dondero from control of Highland.
To avoid appointment of a chapter 11 trustee, Highland, Mr. Dondero, and the Committee entered
into a settlement in January 2020, which removed Mr. Dondero and appointed an Independent
Board to manage and oversee Highland's bankruptcy.

4.      In late 2020, after the Committee rejected Mr. Dondero's global settlement offers
as inadequate—thus blocking Mr. Dondero's efforts to regain control of Highland—he vowed to
"burn down the place" unless they capitulated to his demands. Thereafter, directly and through the
Dondero Entities, Mr. Dondero began interfering with the management of the estate, threatening
Highland employees, challenging actions taken to further Highland's reorganization, commencing
new (and frivolous) litigation against Highland and its management both inside and outside of the

---

[4] Mr. Dondero's proclivity for frivolous litigation is so well known that Highland was unable to obtain cost-effective
insurance because insurance companies refused to insure the risk of Mr. Dondero's vexatiousness, calling it the
"Dondero Exclusion." *See* ¶ 24 *infra*.

HMIT Appx. 02660

Bankruptcy Court, violating Bankruptcy Court orders, filing multiple motions to recuse, and appealing nearly everything resulting in 26 total appeals.[5]

5.       Despite the Dondero Entities' roadblocks, in February 2021, the Bankruptcy Court confirmed Highland's Plan, which included a Gatekeeper provision preventing, in relevant part, the Dondero Entities from suing Highland, its employees, and its management without leave of the Bankruptcy Court. The Fifth Circuit affirmed the Confirmation Order, including the Gatekeeper, in all material respects but remanded solely to limit the parties exculpated by the Plan. On remand, the Dondero Entities blatantly mischaracterized the Fifth Circuit's ruling, wrongly asserting the Fifth Circuit had severely limited the Gatekeeper. The Bankruptcy Court disagreed, but the Dondero Entities are certain to appeal any final order conforming the Plan.

6.       In the meantime, the Dondero Entities continue to harass Highland and hinder performance of the Plan. For example, they have commenced actions in Texas state courts against members of the Claimant Trust Oversight Board seeking information to use to manufacture more spurious claims and have filed letters and complaints with the U.S. Trustee launching broad and baseless attacks against Highland and its management.

7.       Thus, even with the Gatekeeper firmly in place, the Dondero Entities continue to seek ways to avoid its protections and mire the estate in even more litigation. To protect its estate, the bankruptcy process, and the judicial system, Highland asks this Court to enter an order in the form annexed to the Motion as **Exhibit A** complementing the Gatekeeper by declaring the Dondero Entities vexatious litigants and requiring them to file a copy of such order with any court or agency in which an action is currently pending or is subsequently filed.

---

[5] With a few narrow exceptions, these appeals have been rejected and reviewing courts have sometimes been blunt in their characterization. For example, this Court expressed its belief that Mr. Dondero's arguments were intended to "bamboozle" (*see* ¶ 26 *infra*) and the Fifth Circuit described the Dondero Entities' collective objections to confirmation as "blunderbuss" (*see* ¶ 17 *infra*).

**HMIT Appx. 02661**

## II.    BACKGROUND

**A.    Highland's Prepetition Culture of Litigation**

8.    Highland was founded in 1993 by Mr. Dondero and Mark Okada (who resigned pre-bankruptcy) and was controlled by Mr. Dondero as the owner and sole director of its general partner. At its peak, Highland was a global investment adviser managing nearly $40 billion, and, for most of its history, it was successful. Its bankruptcy was not caused by a business calamity. "Rather, [Highland] filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world."[6] For example:

- UBS: UBS Securities LLC and UBS AG, London Branch (collectively, "UBS"), sued two funds controlled by Highland in 2009 in New York state court for breach of contract when they failed to honor margin calls. After discovering Highland—through Mr. Dondero—had orchestrated a series of frauds that rendered the funds judgment-proof, UBS named Highland and others as defendants. In February 2020, a $1 billion-plus judgment was entered against the two Highland funds,[7] which UBS sought to recover from Highland alleging, among other things, alter ego liability.[8] UBS continues to litigate with Mr. Dondero and his proxies.

- Patrick Daugherty: Mr. Daugherty was a Highland employee and limited partner who resigned in 2011. Thereafter, Mr. Dondero, directly and by proxy, began a litigation campaign to deprive Mr. Daugherty of income earned while at Highland. After Mr. Daugherty prevailed against certain affiliated entities, Mr. Dondero again orchestrated a series of fraudulent transfers that

---

[6] *See Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief*, Bankr. Docket No. 1943 ("Confirmation Order") ¶ 8.

[7] Ex. 2, Appx. [ ]; Ex. 3, Appx. [ ].

[8] Ex. 4, Appx. [ ]; Ex. 5, Appx. [ ].

4

left those entities judgment-proof. Mr. Dondero's actions led the Delaware Chancery Court to find "a reasonable basis to believe that a fraud has been perpetrated" and to apply the "crime-fraud exception" to Dondero confederates' assertions of attorney-client privilege.[9] This litigation continues.

- Redeemer Committee: In 2011, a Redeemer Committee was appointed by a Bermudian court to oversee the wind-down of the Highland Crusader Fund because of concerns with Mr. Dondero's management. Disputes arose, and, in 2016, the Redeemer Committee terminated Highland as investment manager and commenced binding arbitration alleging, among other things, that Highland had converted over $30 million, breached its fiduciary duties, and engaged in other misconduct. In March 2019, the arbitration panel (a) rejected Highland's arguments; (b) made highly critical assessments of the credibility of Highland's witnesses; (c) found Highland breached its fiduciary duties and certain agreements and engaged in other wrongful conduct; and (d) awarded the Redeemer Committee more than $190 million.[10]

- Acis: Joshua Terry was a Highland employee and limited partner of a former Highland affiliate, Acis Capital Management, L.P. ("Acis") who was terminated in June 2016. Mr. Terry subsequently obtained an $8 million arbitration award against Acis. Rather than satisfying the award, Mr. Dondero followed his playbook by stripping Acis of assets and taking other vindictive actions against Mr. Terry, including converting Mr. Terry and his wife's retirement account. Unable to collect, Mr. Terry filed an involuntary bankruptcy petition against Acis in the Bankruptcy Court in 2018, resulting in the appointment of a chapter 11 trustee. The bankruptcy was marked by extraordinarily acrimonious litigation,[11] but, ultimately, Acis's

---

[9] Ex. 6, Appx. [  ].

[10] Ex. 7, Appx. [  ]; Ex. 8, Appx. [  ].

[11] *See, e.g., In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115 (Bankr. N.D. Tex. 2018).

confirmed plan transferred ownership of Acis to Mr. Terry.[12] Mr. Dondero's war against Mr.

Terry and Acis continues.[13]

Highland's culture of litigation—of which the foregoing are only examples—ultimately forced

Highland to seek bankruptcy protection.[14]

## B.    Highland Files Bankruptcy; the Independent Board Is Appointed; Negotiations Commence

9.      On October 16, 2019 (the "Petition Date"), Mr. Dondero caused Highland to file a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court

for the District of Delaware (the "Bankruptcy Case"), and Highland's statutory committee of

unsecured creditors (the "Committee") was appointed. Three of the four members of the

Committee—Acis, UBS, and the Redeemer Committee—held claims arising from Highland's

culture of litigation (the last member was an e-discovery vendor).[15]

10.     The Committee immediately moved to transfer the Bankruptcy Case to the U.S.

Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court")—

---

[12] *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019). The Dondero Entities, of course, appealed the Acis confirmation order; their appeals were denied. *See* Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019); Case No. 19-10847 (5th Cir. June 17, 2021).

[13] Immediately after the expiration of the injunction in Acis's plan, Mr. Dondero—through NexPoint Strategic Opportunities Fund ("NSOF")—filed suit against Acis, Mr. Terry, and others in the Southern District of New York alleging they violated their fiduciary obligations to NSOF as an investor in a CLO managed by Acis (and which had been managed by Mr. Dondero prior to the Acis bankruptcy). Civ. Case No. 1:21-cv-04384 (S.D.N.Y. 2021). Mr. Dondero's litigation caused Acis to halt distributions from its managed CLOs thus depriving Highland of approximately $20 million in proceeds. The Southern District of New York dismissed Mr. Dondero's litigation. Undeterred, Mr. Dondero appealed to the Second Circuit (USCA Case No. 22-1912 (2d Cir. 2022)) and re-filed his breach of fiduciary duty claims in New York state court (Index No. 653654/2022 (N.Y. Sup. 2022)).

[14] The direct catalyst for Highland's bankruptcy was the Redeemer Committee's arbitration award. Highland lacked the liquidity to pay the award and was desperate to avoid its public disclosure, which was averted by Highland's filing.

[15] The culture of litigation ran so deep at Highland that Highland's twenty largest unsecured, non-insider creditors included *nineteen* litigation claimants, law firms, and other professionals related to litigation. Bankr. Docket No. 1.

where Acis's bankruptcy was pending—and, on December 2, 2019, Highland's case was transferred.[16]

11.     Soon thereafter, the Committee, with the support of the U.S. Trustee, told Highland it intended to seek appointment of a chapter 11 trustee because it did not believe Mr. Dondero could act as an estate fiduciary based on his history of self-dealing, asset stripping, and other breaches of fiduciary duty. To avoid a trustee, Mr. Dondero and Highland entered into a settlement with the Committee—approved by the Bankruptcy Court in January 2020[17]—that: (a) removed Mr. Dondero from all control positions at Highland; (b) appointed an independent board (the "Independent Board") to manage the bankruptcy; and (c) implemented operating protocols (the "Protocols") that, among other things, (i) generally required Committee approval before most asset sales or transfers, and (ii) prohibited Mr. Dondero and his controlled affiliates from terminating contracts with Highland. Mr. Dondero remained at Highland as an unpaid portfolio manager. The Bankruptcy Court subsequently appointed one of the Independent Board members, James P. Seery, Jr., as Highland's Chief Restructuring Officer and Chief Executive Officer.[18]

12.     The January and July Orders appointing the Independent Board and Mr. Seery, respectively, included gatekeeper provisions intended to protect Highland's fiduciaries from harassing litigation.[19]

---

[16] The Delaware court transferred venue to the Bankruptcy Court because of, among other reasons, its knowledge of and experience with Mr. Dondero and his use of surrogates and proxies to litigate his positions.

[17] Bankr. Docket No. 339 (the "January Order"). "Bankr. Docket" refers to the docket maintained in Case No. 19-34054-sgj11 (Bankr. N.D. Tex.).

[18] Bankr. Docket No. 854 (the "July Order").

[19] *See* January Order ¶ 10 ("No entity may commence or pursue a claim or cause of action of any kind against any Independent Director … without the Bankruptcy Court … specifically authorizing such entity to bring a claim."); July Order ¶ 5 ("No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery … without the Bankruptcy Court … specifically authorizing such entity to bring a claim.").

13.     In August 2020, at the urging of the Bankruptcy Court, Highland, Mr. Dondero, the

Committee, Acis, UBS, and the Redeemer Committee entered mediation with retired bankruptcy

judge Allan Gropper and attorney Sylvia Mayer as mediators in the hope of reaching a global

settlement.[20] The mediation resulted in settlements with the Redeemer Committee, Acis, and,

ultimately, UBS[21] but not a global settlement with Mr. Dondero. Thereafter, Highland and the

Committee began negotiating a plan of reorganization that would monetize Highland's assets and

distribute proceeds to creditors.

**C.     Mr. Dondero Interferes with the Estate and Vows to "Burn [Highland] Down"**

14.     With the Committee refusing to capitulate, and frustrated by his inability to regain

control of Highland, Mr. Dondero told Mr. Seery that he would "burn down the place."[22] True to

his word, Mr. Dondero became an implacable opponent of Highland and the Committee's efforts

to confirm a plan and settle claims, resulting in the Independent Board demanding his resignation.

Mr. Dondero and the Dondero Entities then embarked on a coordinated campaign of destruction:

(a) objecting to virtually every settlement; (b) commencing actions that were either frivolous or

withdrawn on the eve of trial; (c) forcing Highland to sue to collect on over $60 million of simple,

two-page demand and term loans and then asserting fabricated and frivolous defenses to

repayment; (d) interfering with Highland's management of its estate; (e) threatening Highland

---

[20] Bankr. Docket No. 912.

[21] The settlement with UBS was subsequently renegotiated after Highland—then independently managed—uncovered and disclosed a massive fraud in which Mr. Dondero surreptitiously caused two entities against which UBS ultimately procured a billion-dollar judgment to transfer $300 million in face amount of cash and securities to an offshore entity owned and controlled by Mr. Dondero and his general counsel, Scott Ellington, in August 2017. Ex. 8, Appx. [__]. After the details of this transfer were presented to the Bankruptcy Court, the Bankruptcy Court indicated it would review the facts, which it called "damning," and, if warranted, make a criminal referral pursuant to 18 U.S.C. § 3057(a). *Id.*, Appx. [__].

[22] Confirmation Order ¶ 78.

employees and management; and (f) appealing virtually every order. The Bankruptcy Court found the Dondero Entities' litigation was intended to harass.[23]

**D.**     **Confirmation of Highland's Plan; Approval of the Gatekeeper and Fifth Circuit Affirmance; and Subsequent Litigation**

15.     On February 22, 2021, the Bankruptcy Court overruled the Dondero Entities' objections and, with the support of 99.8% of creditors in amount,[24] entered the Confirmation Order, which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*.[25] In the Confirmation Order, the Bankruptcy Court found Mr. Dondero controlled the Dondero Entities and that they were "marching" to his orders.[26]

16.     The confirmed Plan included a "gatekeeper" provision (the "Gatekeeper") prohibiting the Dondero Entities, among others, from bringing claims against Highland, any of the entities created under the Plan, and Highland's management, among others, unless the Bankruptcy Court found the claims "colorable."[27] The Bankruptcy Court found the Gatekeeper was:

> necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan …. Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of

---

[23] Confirmation Order ¶ 77 ("During the last several months, Mr. Dondero and the Dondero Related Entities have harassed [Highland], which has resulted in further substantial, costly, and time-consuming litigation for [Highland].")

[24] Confirmation Order ¶ 3.

[25] Bankr. Docket No. 1808 (the "Plan").

[26] Confirmation Order ¶¶ 16, 19.

[27] Plan, Art. IX.F. The Plan also provided for the creation of the Highland Litigation Sub-Trust and the appointment of Marc Kirschner as litigation trustee. *See generally* Plan, Art. IV.B. Mr. Kirschner, as litigation trustee, subsequently filed suit against Mr. Dondero and a number of Dondero Entities in the Bankruptcy Court. Adv. Proc. No. 21-03051-sgj (Bankr. N.D. Tex.). In response to that suit, the Dondero Entities and the other defendants have given new meaning to the phrase 'scorched earth' by serving over 40 third-party subpoenas on Highland's employees, law firms (including its lead bankruptcy counsel), and financial advisors; claimholders and their individual counsel (both law firms and individual lawyers); the Creditors Committee and its counsel; Oversight Committee Members; vendors; and contract counter-parties (collectively, the "Subpoenas"). The Subpoenas generally seek every document and communication concerning Highland since the beginning of time, are facially improper, and represent a further abuse of the judicial process. See Adv. Proc. No. 21-03051-sgj (Bankr. N.D. Tex.), Docket Nos. 233-307 (except 237) (73 docket entries showing the filing of the Subpoenas, as amended, and service-related documents).

DOCS_NY:46677.6 36027/003

the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.[28]

17.     The Dondero Entities appealed the Confirmation Order arguing, among other things, the protections in the Plan, including the Gatekeeper, were overbroad and illegal. On direct appeal, the Fifth Circuit rejected the Dondero Entities' arguments calling their scatter-shot strategy a "bankruptcy-law blunderbuss"[29] and affirmed the Confirmation Order in material part, including the Gatekeeper[30] and the factual findings regarding Mr. Dondero's control of the Dondero Entities.[31] The Fifth Circuit, however, limited the Plan's exculpation provision and remanded "for further proceedings consistent with [its] opinion"[32] and encouraged the courts to find the Dondero Entities vexatious if their harassment continued.[33]

18.     The Dondero Entities immediately petitioned for rehearing effectively requesting that the Fifth Circuit amend its opinion and limit the parties protected by the Gatekeeper so the Dondero Entities could expand their harassment of the estate.[34] The Fifth Circuit granted the petition for rehearing (without even waiting for Highland to respond), but rejected the request for a substantive amendment to the opinion. Instead, the Fifth Circuit simply deleted one sentence leaving the substance of its opinion—and its affirmation of the Gatekeeper—intact.[35]

---

[28] Confirmation Order ¶ 79.

[29] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 432 (5th Cir. 2022).

[30] *Id.* at 435 ("the injunction and gatekeeper are sound"); *see also id.*, at 439 ("We otherwise affirm the inclusion of the injunction and the gatekeeper provision in the Plan.")

[31] *Id..* at 434-35. The Fifth Circuit also affirmed that the January and July Orders were *res judicata*. *Id.* at 438, n.15.

[32] *Id.* at 439-40.

[33] *Id.* at 439, n.19 ("Nothing in this opinion should be construed to hinder the bankruptcy court's power to enjoin and impose sanctions on Dondero and other entities by following the procedures to designate them vexatious litigants.").

[34] Case No. 21-10449, Document 516458961 (Sept. 2, 2022).

[35] *Cf.* Case No. 21-10449, Document 516439341 (5th Cir. Aug. 19, 2022), *with* Case No. 21-10449, Document 516462923 (5th Cir. Sept. 7, 2022). The Fifth Circuit subsequently confirmed it had limited only the exculpation provision. *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 57 F.4th 494, 498 (5th Cir.2023) ("In September 2022, we affirmed the Plan in all respects except one, concluding that the Plan exculpated certain non-debtors beyond the bankruptcy court's authority").

19.     Following remand, Highland filed a motion to conform the Plan to the Fifth Circuit's opinion by limiting the parties receiving exculpation.[36] The Dondero Entities objected, baselessly arguing that the Fifth Circuit had limited the Gatekeeper the same way it limited exculpation.[37] From the bench, the Bankruptcy Court overruled the Dondero Entities' objections, granted Highland's motion, and took the matter under advisement to issue a written opinion.[38] Highland expects the Dondero Entities to appeal the Bankruptcy Court's order when entered and—once again—seek to challenge the Gatekeeper in the Fifth Circuit. Highland believes any appeal will fail; however, the Gatekeeper has not fully stopped the Dondero Entities.[39] Instead, they have tried to evade it in order to further abuse Highland, anyone supporting Highland, and the judicial system.[40] Declaring the Dondero Entities vexatious and requiring them to file a copy of the order approving the Motion is necessary to protect all parties connected to Highland from continued harassment.

### E.     The Dondero Entities' Vexatiousness Impeded Highland's Bankruptcy and Continues to This Day

20.     The Dondero Entities' relentless litigation and related actions during Highland's Bankruptcy Case have created substantial and unnecessary burdens for the estate and the judiciary.

---

[36] Bankr. Docket No. 3503.

[37] Bankr. Docket Nos. 3539, 3551.

[38] Ex. 10, Appx. [    ].

[39] The Dondero Entities are currently mischaracterizing the Fifth Circuit's opinion in a disingenuous attempt to limit the gatekeeper provision in the July Order appointing Mr. Seery. *See Brief for Appellants The Charitable DAF Fund L.P.; CLO HoldCo, Ltd.; Mark Patrick; Sbaiti & Company PLLC; Mazin A. Sbaiti; Jonathan Bridges*, Case No. 22-11036, Document 66 at 53 (5th Cir. Feb. 6, 2023) ("[The Fifth Circuit] refus[ed] to extend … gatekeeping protections to non-debtors including Seery as CEO, even while acknowledging and permitting the *Barton* doctrine and related protections to apply to debtors in possession who stand in the shoes of trustee …. The bankruptcy court, by contrast, did precisely what the Supreme Court now rejects—it expanded a judicially-invented doctrine [*i.e.*, the *Barton* Doctrine] beyond its precedential scope based on its own policy views [by approving the gatekeeper in the July Order].") This statement is plainly wrong. The Fifth Circuit's opinion did not limit the Gatekeeper and expressly declared that the January and July Orders were *res judicata* and not subject to collateral attack. Consistent with their goal to strip away all protections against harassing litigation, the Dondero Entities also, via separate motion, moved to modify the July Order. Bankr. Docket No. 2242.

[40] *See* ¶¶ 27-29 *infra*.

The Dondero Entities (a) filed in the Bankruptcy Court (i) 52 pre-petition claims against the estate; (ii) 80 motions; and (iii) 71 objections, including objections to the UBS, Acis, and Redeemer Committee settlements; (b) forced Highland to commence nine adversary proceedings against the Dondero Entities in order to protect, or collect property of, the estate; (c) appealed 18 Bankruptcy Court orders to this Court and eight orders to the Fifth Circuit; and (d) took other actions to impede Highland's reorganization, including filing fabricated stories with the U.S. Trustee. A more detailed summary of the Dondero Entities' actions is included in the Appendix as **Exhibit 1, Appendix [_]**. Certain of the Dondero Entities' most egregious conduct is summarized below.

21.     The Dondero Entities are the *only* parties currently litigating with Highland. All other parties resolved their claims and causes of action long ago and are awaiting their Plan distributions.

**i      The Dondero Entities File Meritless Claims Against Highland's Estate**

22.     During the Bankruptcy Case, the Dondero Entities filed dozens of claims against the estate every one of which was either withdrawn—after Highland was forced to defend them—or overruled by the Bankruptcy Court (and then, of course, appealed).

- The Dondero Entities' Prepetition Claims: The Dondero Entities filed 52 proofs of claim and then withdrew (or attempted to withdraw) them after Highland was forced to incur the cost of objecting.[41] CLOH publicly and voluntarily reduced its meritless claim to $0.00. Over a year later, Mr. Dondero replaced CLOH's trustee and—with a new titular head—CLOH now seeks

---

[41] Exs. 1-62, Appx. [_]. If former employee claims are counted, 92 proofs of claim were filed. NPA subsequently acquired five additional prepetition claims in early 2021 filed by former Highland employees all of which were subsequently withdrawn. Bankr. Docket Nos. 2044, 2045, 2046, 2047, 2266. In January 2022, NPA acquired a disputed employee claim (Bankr. Docket No. 3146), which was expunged (Bankr. Docket No. 3180). NPA has appealed.

HMIT Appx. 02670

to amend its $0.00 claim to over $2 million.[42] *As of today, none of the Dondero Entities hold a single allowed claim against the estate.*

- <u>NPA's and HCMFA's Administrative Expense Claim</u>: NPA and HCMFA filed an administrative expense claim seeking $14 million for alleged overpayments to Highland under certain shared service and employee-reimbursement agreements during the Bankruptcy Case.[43] After a two-day evidentiary hearing,[44] the Bankruptcy Court found there were no overpayments but that NPA and HCMFA had breached the foregoing agreements at Mr. Dondero's direction and awarded Highland $2.596 million in contract damages.[45] The Dondero Entities appealed.

- <u>CPCM, LLC, Employee Claims</u>: During the bankruptcy, Highland disclosed it was terminating nearly all employees upon Plan confirmation. Because Highland's bonus program did not allow terminated employees to receive bonuses, Highland received approval for a retention plan intended to make employees largely whole.[46] Mr. Dondero, however, as conditions to future employment, demanded former Highland's employees reject Highland's offer and assign their claims to CPCM, LLC—a newly-created entity owned by Highland's former general counsel. After Highland incurred significant costs objecting, CPCM withdrew its' approximately $5.25 million in face amount of (baseless) claims for a nuisance settlement of $100,000, which CPCM was subsequently forced to forfeit in order to settle yet another frivolous claim against the estate.[47]

---

[42] Bankr. Docket Nos. 3177, 3178, 3220, 3223. CLOH's request to amend was denied by the Bankruptcy Court. Bankr. Docket No. 3457. CLOH has appealed.

[43] Ex. 63, Appx. [__].

[44] While testifying, Mr. Dondero made a series of vague threats about future allegations the Dondero Entities were going to bring to the U.S. Trustee. Ex. 64, Appx. [__]. Mr. Dondero's threats at the hearing were consistent with baseless allegations actually made to the U.S. Trustee by two Dondero Entities. *See* ¶ 27 *infra*.

[45] Adv. Proc. No. 21-03010, Docket No. 124 (Bankr. N.D. Tex. Aug. 30, 2022).

[46] Bankr. Docket No. 1849

[47] Bankr. Docket Nos. 3244; 3328 ¶ 5.

DOCS_NY:46677.6 36027/003

**HMIT Appx. 02671**

- HCRE Proof of Claim: HCRE filed a proof of claim alleging all or part of Highland's interest in SE Multifamily LLC (a Dondero-controlled entity) did not belong to Highland but instead belonged to Dondero-controlled HCRE.[48] After Highland learned HCRE's counsel had jointly represented HCRE and Highland in the underlying transactions, Highland was forced to seek disqualification over HCRE's objection.[49] After a six-month delay and the deposition of Highland's witnesses, HCRE abruptly canceled the depositions of Mr. Dondero and Matthew McGraner (a Dondero loyalist and joint-owner of HCRE) and moved to withdraw its claim.[50] At the subsequent hearing, it became clear HCRE's goal was to preserve its claim for future litigation outside of the Bankruptcy Court. The motion to withdraw was denied. During a hearing on the merits, significant evidence was adduced indicating that Mr. Dondero and HCRE lacked a good faith basis for filing the HCRE proof of claim.[51] This matter is *sub judice*.[52]

ii      **The Dondero Entities File Meritless Motions in the Bankruptcy Case**

23.      The Dondero Entities also filed numerous motions attempting to re-assert control over Highland or, failing that, to overwhelm the estate with litigation. The following are illustrative:

- Motion Requiring Notice and Hearing of Asset Sales: Mr. Dondero alleged Highland violated 11 U.S.C. § 363 by selling assets without Bankruptcy Court approval *and* without giving him a

---

[48] Ex. 53, Appx. [__].

[49] Bankr. Docket No. 3106.

[50] Bankr. Docket Nos. 3443, 3487, 3505.

[51] Ex. 65, Appx. [__].

[52] Pursuant to its rights as a member of HCRE, Highland requested copies of SE Multifamily's and records. Mr. Dondero has thus far refused to provide that information. Regrettably, Mr. Dondero's indefensible refusal to comply with his unambiguous contractual obligations will likely necessitate litigation to obtain this basic information.

chance to purchase those assets. Mr. Dondero withdrew his baseless motion after Highland and the Committee incurred significant costs responding and preparing for trial.[53]

- <u>Motion for Temporary Restriction on CLO Sales</u>: After withdrawing the motion to restrict asset sales, five Dondero Entities moved to prevent Highland from causing its managed CLOs to sell assets without the Dondero Entities' approval (the "<u>Restriction Motion</u>").[54] The movants cited no authority and relied solely on Mr. Dondero's disagreement with Highland's business decisions. After an evidentiary hearing, the Bankruptcy Court denied the motion as "almost Rule 11 frivolous."[55]

- <u>Motion to Appoint Examiner</u>: Fifteen months after the Petition Date, and just days before confirmation, Mr. Dondero's family "trusts," Dugaboy and Get Good, moved for the appointment of an examiner,[56] purportedly to assess the claims against the estate (most of which had already settled) and the Dondero Entities' Plan objections.[57]

- <u>Motion to Compel Compliance with Rule 2015.3</u>: Two months post-confirmation and eighteen months after the Petition Date, Dugaboy and Get Good sought to compel Highland to file reports required by Bankruptcy Rule 2015.3.[58] Highland and the Committee objected, arguing the request was untimely, unduly burdensome, and was an attempt to obtain information for the

---

[53] Bankr. Docket No. 1349, 1546, 1551, 1622

[54] Bankr. Docket No. 1522

[55] Ex. 66, Appx. [__].

[56] Bankr. Docket No. 1752.

[57] The Dondero Entities subsequently admitted the motion was filed to delay confirmation, re-litigate settlements, and adjudicate the Dondero Entities' Plan objections in a different forum—completely improper purposes. Bankr. Docket No. 2061 ¶ 37 ("[W]hen the Trusts made the Examiner Motion, they believed that the motion would cause delay or a continuance of the confirmation hearing on the Plan …."); Bankr. Docket No. 3542 at 11 ("The Trustees sought the appointment of an examiner to address … (i) the issues raised … in the Restriction Motion [*i.e.*, a motion denied a month earlier], [and] (ii) various objections to the proposed [Plan] ….")

[58] Bankr. Docket No. 2256.

purpose of manufacturing more litigation claims. The motion was denied as moot. On appeal, the Dondero Entities admitted their goal was to create additional litigation.[59]

- <u>Motions to Recuse</u>: Seventeen months post-petition, the Dondero Entities sought to recuse the Bankruptcy Court. After their motion was denied, they appealed, but this Court held the order was interlocutory. In July 2022, the Dondero Entities defiantly moved the Bankruptcy Court to rule its order was "final" so it could be appealed to this Court and asserted additional allegations of bias. The motion was denied.[60] In September 2022, the Dondero Entities filed their third motion to recuse; that motion was fully briefed and is *sub judice*.[61]

### iii    <u>The Dondero Entities File Meritless Objections in the Bankruptcy Case</u>

24.    In addition to their meritless claims and motions, the Dondero Entities objected to nearly every motion Highland filed in the Bankruptcy Court. The following are some of the more egregious examples:

- <u>Objections to Settlements</u>: In late 2020 and early 2021, Highland settled with holders of the largest litigation claims against the estate—something the Bankruptcy Court called "nothing short of a miracle"—and sought court approval. The Dondero Entities objected to most of the settlements, including those with Acis, UBS, and HarbourVest.[62] Mr. Ellington—Mr. Dondero's long-time general counsel—objected to the settlement with Mr. Daugherty.[63]

---

[59] *See* ¶ 26 *infra*.

[60] At the hearing, the Bankruptcy Court observed that the Dondero Entities were "carpet-bombing us with paper and causing us to expend resources" and asked the Dondero Entities' counsel to "help me to understand why this is not wasting resources in your view and why this isn't just some strategy." Ex. 67, Appx. ☐.

[61] Bankr. Docket Nos. 2061, 2601, 2062, 3470, 3542.

[62] Bankr. Docket Nos. 1177, 1121, 1706, 1697, 1707, 2268, 2268, 2293. HarbourVest refers to a series of affiliated funds that invested in Highland CLO Funding, Ltd. ("<u>HCLOF</u>"), a Guernsey-based investment vehicle. HarbourVest asserted a $300 million-plus claim against Highland, alleging Mr. Dondero and certain former Highland employees fraudulently induced it to invest in HCLOF.

[63] Bankr. Docket No. 3242.

- <u>Objections to Confirmation</u>: Twenty-one of the Dondero Entities filed five separate objections to confirmation. Fifteen funds managed by NPA and HCMFA joined the objections. Certain former Highland employees (most of whom were then working for Mr. Dondero) and Mr. Dondero's Dallas-based bank, NexBank, also separately objected.[64] The Dondero Entities were the only parties pressing objections at confirmation. Their objections were overruled and a number found borderline frivolous.[65] The Dondero Entities appealed to the Fifth Circuit, which affirmed the Confirmation Order in all material respects.

- <u>NPA Fee Objections</u>: NPA objected to the final fee applications of nearly every professional in the Bankruptcy Case and asked the Bankruptcy Court to delay allowing fees and to allow NPA to retain a fee examiner. NPA's motion was denied. NPA appealed to this Court, and, after this Court dismissed the appeal for lack of prudential standing, to the Fifth Circuit.

- <u>Objection to Indemnity Trust Motion</u>: After Highland was unable to procure cost-effective insurance necessary for its reorganization because of Mr. Dondero's reputation in the insurance community—colloquially known as the "Dondero Exclusion"[66]—Highland and the Committee created an indemnity trust effectively to self-insure its indemnification obligations.[67] The Dondero Entities were the only objectors,[68] claiming the trust was somehow a plan modification. The Bankruptcy Court overruled their objections,[69] and the Dondero Entities appealed to this Court and the Fifth Circuit. Neither appeal was successful.[70]

---

[64] Bankr. Docket Nos. 1661, 1667, 1669, 1670, 1673, 1675, 1676.

[65] Confirmation Order ¶ C; Ex. 68, Appx. [__] ("The Court considered [certain of the Dondero Entities' plan objections] to wholly lack merit, and are borderline frivolous, frankly. They do not raise a serious legal question.")

[66] Ex. 69, Appx. [__].

[67] Bankr. Docket No. 2491, 2576, 2577.

[68] Bankr. Docket No. 2563.

[69] Bankr. Docket No. 2599.

[70] *Highland Cap. Mgmt. Fund Advisors v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 U.S. Dist. LEXIS 15648 (N.D. Tex. Jan. 28, 2022); *Highland Cap. Mgmt. Fund Advisors*, 574 F.4th at 496.

DOCS_NY:46677.6 36027/003

**HMIT Appx. 02675**

iv      **Highland Litigates to Protect Its Rights and the Bankruptcy Process**

25.     In addition to the foregoing, Highland was forced to file affirmative litigation to protect itself and to compel the Dondero Entities to comply with Bankruptcy Court orders and simple obligations:

- First TRO and Subsequent Contempt Order: In December 2020, after Mr. Dondero interfered with Highland's exclusive management of the CLOs and threatened Mr. Seery in writing—"Be careful what you do, last warning"—Highland sought and obtained a temporary restraining order ("TRO") preventing Mr. Dondero from, *inter alia*, (a) threatening Highland and its employees and agents; (b) communicating with Highland's employees (with one specified exception); and (c) interfering with Highland's business. Mr. Dondero violated the TRO immediately and was later held in contempt and sanctioned $450,000.[71] The Dondero Entities subsequently appealed.[72]

- Second TRO: Days after the Restriction Motion was dismissed as "frivolous,"[73] certain Dondero Entities sent letters (a) demanding Highland refrain from causing the CLOs to sell assets and (b) threatening to terminate Highland's management agreements with the CLOs (an action prohibited by the Protocols).[74] The Dondero Entities' actions forced Highland to seek and obtain another temporary restraining order to prevent further interference with the estate.[75]

---

[71] *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2021 Bankr. LEXIS 1533 (Bankr. N.D. Tex. Jun. 7, 2021). Mr. Dondero's wrongful (but not contemptuous) conduct included destroying his Highland-issued cell phone resulting in the spoliation of his text messages. *Id.*, at *29-40.

[72] *See* ¶ 26 *infra*.

[73] *See* ¶ 27 *supra*.

[74] Adv. Proc. No. 21-03000-sgj, Docket Nos. 4-6, 4-7, 4-8, 4-9, 4-10, 4-11. The Dondero Entities subsequently admitted their letters were sent to procure denied relief. Bankr. Docket No. 2061 ¶ 27 ("In December of 2020, due to the Court's denial of the Restriction Motion, … [the Dondero Entities sent] correspondence … to reiterate [their] … request, again, that Debtor not liquidate the CLOs; to reserve any rights that the Advisors and the Retail Funds might have against Debtor for failure to maximize the value of the investment as required under the [CLO] Portfolio Management Agreements; and to notify Debtor that the Retail Funds … intended to initiate the procedure to remove Debtor as fund manager of the CLOs.").

[75] Adv. Proc. No. 21-03000-sgj11, Docket Nos. 2, 3, 4, 5, 6, 7, 20, 64, 76 (Bankr. N.D. Tex.).

- <u>Mandatory Injunction</u>: Prior to its bankruptcy, Highland had arrangements to provide middle- and back-office services to certain Dondero Entities. In late 2020, Highland exercised its right and gave notice of its intent to terminate the applicable agreements due to the expected downsizing of its workforce. Before and after formal notice was given, Highland tried to negotiate in good faith a transition plan with the Dondero Entities to prevent their retail funds from going into freefall, which could have negatively impacted Highland. Although all material terms were agreed upon after extensive negotiation, the Dondero Entities refused to sign unless Mr. Dondero regained access to Highland's offices—he had previously been evicted. With a substantial reduction-in-workforce days away, Highland sought an injunction compelling the Dondero Entities to create a transition plan.[76] At the hearing, and presumably to avoid SEC scrutiny, the Dondero Entities disclosed for the first time that they had cobbled together their own transition plan, thus mooting Highland's motion.[77]

- <u>Actions to Collect Demand/Term Notes</u>: Highland loaned certain Dondero Entities more than $60 million in aggregate pursuant to a series of simple, unambiguous two-page demand and term notes. In late 2020, Highland called the demand notes and, in January 2021, following defaults, accelerated the term notes. The Dondero Entities refused to satisfy their obligations and fabricated multiple (and ever-shifting) defenses, including that the notes were (a) compensation structured as a non-repayable note for tax purposes, (b) subject to an undisclosed oral agreement between Mr. Dondero and his sister to forgive the notes under certain conditions, (c) void due to mutual mistake, and (d) executed without proper authority. After discovery, the Bankruptcy Court recommended summary judgment be granted to Highland, finding the

---

[76] Adv. Proc. No. 21-03010-sgj11, Docket No. 2 (Bankr. N.D. Tex. Feb. 17, 2021).
[77] Adv. Proc. No. 21-03010-sgj11, Docket No. 25 (Bankr. N.D. Tex. Feb. 24, 2021); Ex. 70, Appx. [__].

DOCS_NY:46677.6 36027/003

**HMIT Appx. 02677**

Dondero Entities' defenses "farfetched," based on a "complete lack of evidence," and unable to pass the "Straight-Face Test."[78] The Bankruptcy Court assessed Highland's costs against the Dondero Entities as required under the notes. The Dondero Entities objected to each report and recommendation.[79]

- <u>Second Contempt Order</u>: The DAF and CLOH (baselessly) pursued claims against Mr. Seery in this Court (not the Bankruptcy Court)[80] in violation of the "gatekeeper" provisions in the January and July Orders. Following an evidentiary hearing, the Bankruptcy Court held Mr. Dondero, DAF, CLOH, their trustee, and their counsel in contempt.[81] The Dondero Entities subsequently appealed.[82]

**v**     **The Dondero Entities Appeal Nearly Every Order**

26.     Not content to abuse the Bankruptcy Court's jurisdiction, the Dondero Entities have appealed nearly every Bankruptcy Court order to this Court, and, when unsuccessful here, to the Fifth Circuit. Certain examples of the abusive appeals are as follows:

- <u>Appeal of Confirmation Order</u>: The Dondero Entities' appeal of their Plan objections was certified to the Fifth Circuit. The Fifth Circuit (a) affirmed the Gatekeeper and the factual findings concerning Mr. Dondero's control over the Dondero Entities, but (b) limited the parties exculpated by the Plan. The Fifth Circuit also implied that the Dondero Entities should be

---

[78] *Highland Cap. Mgmt., L.P. v. Highland Cap. Mgmt. Fund Advisors, L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 1989 at * 40-41, 46-47, 59-60 (Bankr. N.D. Tex. Jul. 19, 2022); Highland filed a separate suit to collect on two other notes issued by HCMFA. The Bankruptcy Court also recommended summary judgment in favor of Highland in that action. Adv. Proc. No. 21-03082-sgj, Docket No. 73 (Bankr. N.D. Tex. Oct. 12, 2022).

[79] Civil Action No. 3:21-cv-00881-X, Docket Nos. 27-1, 27-4, 27-5, 34, 62, 78, 87, 98, 204, 210 (N.D. Tex.).

[80] *See* ¶ 27 *infra*.

[81] *In re Highland Cap. Mgmt., L.P.*, 2021 Bankr. LEXIS 2074 at *28-29, 40-41 (Bankr. N.D. Tex. Aug. 3, 2021), aff'd 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022) ("The totality of the evidence was clear that Mr. Dondero sparked this fire … Mr. Dondero encouraged [plaintiffs] to do something wrong, and [plaintiffs] basically abdicated responsibility to Mr. Dondero with regard to … executing the litigation strategy.").

[82] *See* ¶ 26 *infra*.

deemed vexatious.[83] The Fifth Circuit remanded to the Bankruptcy Court to conform the Plan. On remand, Highland moved to conform the Plan to limit the exculpated parties as directed by the Fifth Circuit; the Dondero Entities objected.[84] Highland expects the Dondero Entities to appeal any order conforming the Plan and attempt, again, to overturn the Gatekeeper.

- <u>Appeal of TRO and First Contempt Order</u>: Mr. Dondero appealed the TRO prohibiting him from interfering with the estate or colluding with Highland employees, but this Court denied his request for an interlocutory appeal.[85] Mr. Dondero appealed the order holding him in contempt. This Court affirmed the Bankruptcy Court in all respects but one.[86] Mr. Dondero has appealed to the Fifth Circuit.

- <u>Appeal of Settlement Orders</u>: The Dondero Entities appealed the orders approving the settlements with Acis, UBS, and HarbourVest. The appeals of the Acis and HarbourVest settlements were dismissed for lack of prudential standing. The appeal of the UBS settlement was dismissed on the merits, with this Court finding aspects of the appeal were intended to "bamboozle" the Court.[87] The Dondero Entities appealed the HarbourVest and UBS settlements to the Fifth Circuit.

- <u>Appeal of Second Contempt Order</u>: The Dondero Entities appealed the order holding them in contempt for pursuing claims against Mr. Seery in violation of the January and July Orders. This Court (a) found the gatekeeper provisions in the January and July Orders "failed to deter"

---

[83] *See* ¶ 17 *supra*.

[84] *See* ¶ 19 *supra*.

[85] Case No. 3:21-CV-0132-E, Docket No. 9 (N.D. Tex. Feb. 11, 2021). Mr. Dondero also sought a writ of mandamus from the Fifth Circuit, which was dismissed after the matter was consensually resolved. Case No. 21-10219, Document 515867137 (5th Cir. May 18, 2021)

[86] Civ. Action No. 3:21-CV-1590-N, Docket No. 42 (N.D. Tex. Aug. 17, 2022). The parties agreed the Bankruptcy Court's monetary sanction assessing a penalty of $100,000 for each unsuccessful appeal exceeded its authority. The order was otherwise affirmed.

[87] *Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 172351, at *12 (N.D. Tex. Sept. 22, 2022).

the Dondero Entities and the contempt finding was based on "clear and convincing evidence" and (b) affirmed the finding regarding Mr. Dondero's control of DAF and CLOH.[88] The Dondero Entities appealed this Court's order to the Fifth Circuit.

- Appeal of Rule 2015.3 Order: Dugaboy appealed the order denying its motion to compel compliance with Rule 2015.3, admitting it had been filed to gain information for the purpose of manufacturing new litigation claims.[89] This Court dismissed Dugaboy's appeal for lack of prudential standing. Dugaboy appealed to the Fifth Circuit.[90]

- Appeal of Orders on Lack of Standing: The Dondero Entities appealed this Court's orders dismissing their appeals for lack of prudential standing, arguing the "person aggrieved" standard (applied in this Circuit and all other Circuits for decades) must be overturned.[91]

vi    **The Dondero Entities' Attempt to Evade the Bankruptcy Court**

27.     Trying to evade the Bankruptcy Court, the Dondero Entities filed four complaints *in this Court* asserting administrative expense claims against Highland arising from its alleged breach of fiduciary duties to the Dondero Entities during the Bankruptcy Case. The Dondero

---

[88] *Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 175778, at *3, 5-11, 18-21 (N.D. Tex. Sept. 28, 2022).

[89] Case No. 3:21-cv-02268-S, Docket No. 15, pg. 2-3 (N.D. Tex. Jan. 1, 2022) ("That is the point of this appeal [of the order on the 2015.3 reports]: to determine what claims against the estate exist which arose from transactions with non-debtor affiliates—a determination that was foreclosed because of the Bankruptcy Court's Order rendering production of the 2015.3 Reports moot"); *see also* Case No. 3:22-CV-2268-S, Docket No. 21, pg. 5 (N.D. Tex. Aug. 8, 2022) ("Dugaboy's primary contention is that, but for the bankruptcy court's failure to compel Debtor to file retroactive reports regarding its ownership interests in non-debtor subsidiaries as of the bankruptcy petition date, Dugaboy might have used the information in those reports to investigate whether any post-petition claims exist against Debtor's estate by any non-debtor affiliate") (citations omitted).

[90] In its reply to the Fifth Circuit, Dugaboy alleged, without factual support, that Highland's failure to comply with Rule 2015.3 meant Highland's bankruptcy case was a "black box allowing Highland and its professionals to pilfer the estate for tens of million dollars" with the complicity of "the courts." Case No. 22-10831, Document 516578672, at 5 (5th Cir. Dec. 14, 2022). Highland moved to strike Dugaboy's unsupported statements. Although the Fifth Circuit denied the motion, it directed Highland to file a sur-reply, which it did. Case No. 22-10831, Document 39-1 (5th Cir. Jan. 12, 2023); *see also* Case No. 22-10831, Document 40 (5th Cir. Jan. 23, 2023). The matter is *sub judice*.

[91] Case No. 22-10960 (5th Cir. Oct. 5, 2022); Case No. 22-10575 (5th Cir. Jun. 10, 2022); Case No. 22-10831 (5th Cir. Aug. 24, 2022).

22

Entities also baselessly tried to bring indirect actions against the estate in Texas state court and through the U.S. Trustee, which violate the spirit—if not the letter—of the Gatekeeper.

- *Charitable DAF Fund, L.P., et al v. Highland Capital Management, L.P., et al*: The DAF and its subsidiary, CLOH, filed suit in this Court,[92] alleging Highland breached its purported duties by entering into the Bankruptcy Court-approved HarbourVest settlement—notwithstanding that CLOH had objected to the settlement and then, after conducting research and reviewing the arguments, publicly withdrew its objection, stating the objection had no merit.[93] Shortly thereafter, DAF and CLOH sought to add Mr. Seery as a defendant in violation of the January and July Orders.[94] The complaint was referred to the Bankruptcy Court in September 2021 and dismissed based on collateral and judicial estoppel grounds.[95] This Court reversed, in part, and remanded for additional findings.[96] Highland filed its renewed motion to dismiss in October 2022, and, in November 2022 (over a year after the matter was referred to the Bankruptcy Court and litigated), plaintiffs moved to withdraw the reference. The Bankruptcy Court recommended this Court *not* withdraw the reference, finding the motion was untimely and "appears to be forum shopping and an attempt to delay adjudication."[97] The motion to dismiss is under advisement.

---

[92] 3:21-cv-00842-B (N.D. Tex. Apr. 21, 2021).

[93] Ex. 71, Appx. [ ]; Ex. 72, Appx. [ ].

[94] *See* ¶ 25 *supra*.

[95] *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022). .

[96] *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162 (N.D. Tex. 2022). Although this Court reversed, it did not, in any way, find the Dondero Entities' complaint had merit. Instead, it found the Bankruptcy Court appropriately applied collateral estoppel *sua sponte* and that all elements of collateral estoppel were met except one—"actually litigated"—because a settlement under Rule 9019 has a different legal standard. *Id.*, 643 B.R. at 173. This Court also found the first two elements of judicial estoppel—"inconsistency" and "court's acceptance"—were met but the third element—"inadvertence"—was not assessed and remanded to determine if CLOH's withdrawal of its objection was "inadvertent."

[97] Civ. Act. No. 3:21-0842-B, Docket No. 162 at 14 (N.D. Tex. Feb. 6, 2023); Civ. Act. No. 3:22-02802-S, Docket No. 2 (N.D. Tex. Feb. 6, 2023). The Dondero Entities objected to the Bankruptcy Court's report and recommendation. Civ. Act. No. 3:22-02802-S, Docket No. 3 (N.D. Tex. Feb. 21, 2023).

- *PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*: PCMG, an entity controlled by Mr. Dondero, filed suit in this Court,[98] alleging Highland mismanaged an investment fund during the Bankruptcy Case. PCMG never served its complaint and moved for an *ex parte* stay pending appeal of the Confirmation Order, which was granted. After Highland re-opened the case, this Court referred the complaint to the Bankruptcy Court, and Highland moved to dismiss. PCMG withdrew its complaint shortly before the hearing without explanation.[99]

- *The Dugaboy Investment Trust v. Highland Capital Management, L.P.*: Dugaboy filed suit in this Court,[100] alleging Highland mismanaged the Highland Multi-Strategy Credit Fund, L.P. ("MSCF") by causing it to sell assets during the Bankruptcy Case. Dugaboy did not serve its complaint but withdrew it after Highland discovered it and disclosed that it was duplicative of Dugaboy's proof of claim,[101] which itself was subsequently withdrawn after Highland incurred the cost of objecting.[102]

- *The Charitable DAF Fund, L.P. v. Highland Capital Management, L.P.*: After Dugaboy withdrew its complaint, the DAF filed virtually the same complaint in this Court[103] alleging, again, mismanagement of MSCF. The DAF never served its complaint and moved for an *ex parte* stay, which was granted. After Highland re-opened the case, this Court referred the

---

[98] 3:21-cv-01169-N (N.D. Tex. May 21, 2021).
[99] Adv. Proc. No. 22-03068-sgj, Docket No. 27 (Bankr. N.D. Tex. Aug. 1, 2022).
[100] 3:21-cv-01479-S (N.D. Tex. Jun. 23, 2021).
[101] Ex. 58, Appx. [ ].
[102] Bankr. Docket No. 2965.
[103] 3:21-cv01710-N (N.D. Tex. Jul. 22, 2021).

complaint to the Bankruptcy Court. In August 2022, the Bankruptcy Court dismissed the complaint as a late-filed administrative expense claim.[104] The DAF has appealed.[105]

- <u>Mr. Dondero Seeks Discovery in Texas State Court</u>: In July 2021, Mr. Dondero filed a petition in Texas state court seeking pre-suit discovery from Alvarez & Marsal CRF Management, LLC ("<u>Alvarez</u>"), and Farallon Capital Management, LLC ("<u>Farallon</u>"), alleging that Mr. Seery provided "inside information" to Farallon to assist in the purchase of claims from the Redeemer Committee (represented by Alvarez). Mr. Dondero also sought discovery (again) on the previously adjudicated HarbourVest settlement.[106] The petition clearly targeted Mr. Seery. The petition was removed to the Bankruptcy Court but remanded back to state court.[107] The state court held a hearing on Mr. Dondero's petition and dismissed it the same day.[108]

On January 20, 2023, another Dondero Entity filed another petition in Texas state court for pre-suit discovery against Farallon and Stonehill Capital Management, LLC ("<u>Stonehill</u>"), again baselessly alleging Farallon and Stonehill purchased claims with "inside information" from Mr. Seery, including information related to the HarbourVest settlement, so Mr. Seery, in conspiracy with them, could somehow loot the estate.[109] Again, Mr. Seery was not named but is clearly the target of the pre-suit discovery

---

[104] Adv. Proc. No. 22-03052, Docket No. 42, 43 (Bankr. N.D. Tex. Sept. 30, 2022).

[105] The DAF subsequently dismissed its appeal without explanation. Civ. Action No. 3:22-cv-02280-S, Docket No. 9 (N.D. Tex. Feb. 22, 2023).

[106] Ex. 73, Appx. [ ]; Ex. 74, Appx. [ ].

[107] Despite remanding the action to state court, the Bankruptcy Court noted that Mr. Dondero's petition focused primarily on Mr. Seery despite not naming him directly. Adv. Proc. No. 21-03054-sgj, Docket No. 23 at 6 (Bankr. N.D. Tex. Jan. 4, 2022) ("It appears that Dondero may be seeking discovery as a means to craft a lawsuit against Seery … despite being previously sanctioned, along with related parties, by this court when he attempted to add Seery to a lawsuit … in violation of this court's prior gatekeeping orders …. Disturbingly, Seery again appears to be at the center of Dondero's allegations of wrongful acts, as his name appears nine times in the petition that commenced the Rule 202 Proceeding").

[108] Ex. 75, Appx. [ ].

[109] Ex. 76, Appx. [ ].

- <u>Mr. Dondero Tenders Meritless Complaints to the U.S. Trustee</u>: In late 2021, and again in May 2022, Dugaboy, NPA, and HCMFA sent letters to the Office of U.S. Trustee[110] falsely, baselessly, and maliciously alleging, among other things, that: (a) the Bankruptcy Court ruled for Highland because Highland knowingly misrepresented facts; (b) the Bankruptcy Case lacked transparency because Highland did not file its Rule 2015.3 reports; (c) Highland's settlement with HarbourVest was fraudulent; (d) Highland engaged in asset sales without Bankruptcy Court approval and without offering investors (*i.e.*, Mr. Dondero) the opportunity to purchase the assets; (e) Mr. Seery violated employee rights by not paying the employee claims transferred to CPCM; (f) the Plan impermissibly sought to liquidate a solvent estate against creditor wishes; (g) Mr. Seery engaged in insider trading and used his authority to dominate Highland for his own self-interest; and (h) Mr. Seery conspired with Stonehill and Farallon on the purchase of claims. The U.S. Trustee has not contacted Highland concerning Mr. Dondero's libelous letters.

### vii   The Dondero Entities' Newest Action Restating Their Spurious Claims About Highland

28.     On February 6, 2023, the Dondero Entities filed a motion for leave to file a complaint against Highland seeking information about Highland's current assets, the results of its asset sales, and the amounts distributed to creditors.[111] Highland believes the Dondero Entities' complaint will ultimately be dismissed. The motion, however, is emblematic of the Dondero Entities' unceasing litigation—restating the litany of false statements in their letters to the U.S. Trustee and seeking to re-litigate a multitude of settled issues (*e.g.*, the HarbourVest settlement,

---

[110] Dugaboy sent its letter to the U.S. Trustee on October 5, 2021. NPA and HCMFA sent letters on November 3, 2021, and May 11, 2022. The letters can be found at Bankr. Docket No. 3662-1.
[111] Bankr. Docket No. 3662.

Highland's ability to sell assets without obtaining Mr. Dondero's consent, and Mr. Seery's supposed malfeasance).

29.     The Dondero Entities' conduct—a little over two weeks ago—belies any belief that their litigation crusade is at an end. Instead, it is clear their goal is to file new and ever more frivolous motions and regulatory actions, like the Texas state court actions and letters to the U.S. Trustee, to gin up additional (and baseless) claims against Highland and its management.

### III.     RELIEF REQUESTED

30.     Highland requests an order in the form annexed to the Motion as **Exhibit A** (the "Order") complementing the Gatekeeper by deeming the Dondero Entities "vexatious litigants" and requiring them to file a copy of the Order in any court or tribunal (whether foreign or domestic) or governmental, administrative, or regulatory agency in which (a) a claim, cause of action or complaint of any kind (including, without limitation, appeals and regulatory and administrative actions) (collectively, an "Action") instituted, commenced, or pursued by any Dondero Entity is currently pending (including, for the avoidance of doubt, any Action in the U.S. District Courts and Bankruptcy Courts for the Northern District of Texas, the U.S. Court of Appeals for the Fifth Circuit, the Office of the U.S. Trustee, the U.S. Securities and Exchange Commission, and the Texas State Securities Board) against (i) Highland, the Highland Claimant Trust, the Highland Litigation Sub-Trust, and HCMLP GP LLC (collectively, the "Highland Entities"), (ii) any entity directly or indirectly majority-owned and/or controlled by any Highland Entity, (iii) any entity managed directly or indirectly by any of the Highland Entities, including, without limitation, HCLOF, (iv) each of the Highland Entities' trustees, officers, executives, agents, employees, and professionals, (v) the current and former members of the Oversight Board of the Highland Claimant Trust and their affiliates, including, without limitation, Farallon, Stonehill, Muck Holdings LLC, and Jessup Holdings LLC, (vi) the Independent Board and each of its members (in

DOCS_NY:46677.6 36027/003

**HMIT Appx. 02685**

their official capacities), (vii) the Committee and each of its members (in their official capacities),

(viii) the professionals (and their respective firms) retained by Highland or the Committee during

the Bankruptcy Case, and (ix) any person or entity indemnified by any Highland Entity ((i)-(ix),

collectively the "Covered Parties") arising from or related to (1) the Bankruptcy Case, (2) the

negotiation of the Plan, (3) the wind down of the Highland Entities' business, (4) the administration

of the Plan or property to be distributed under the Plan, (5) the management of the Highland

Entities, (6) property owned directly or indirectly by any Highland Entity, or (7), as applicable,

the transactions in furtherance of the foregoing ((1)-(7), collectively, the "Estate Administration")

or (b) any Dondero Entity institutes, commences, or pursues an Action against any Covered Party

arising from or related to the Estate Administration.

## IV.    ARGUMENT

### A.    Courts in the Fifth Circuit Have the Authority to Deem Litigants "Vexatious" and Issue Pre-Filing Injunctions

31.     The Fifth Circuit has on many occasions affirmed lower court orders declaring

litigants "vexatious" and imposing pre-filing injunctions and other sanctions to prevent abusive

and harassing litigation.[112] In doing so, the Fifth Circuit has repeatedly held that federal courts (a)

have the inherent power to "sanction a party or attorney when necessary to achieve the orderly and

expeditious disposition of [their] docket[s]"[113] and (b) may exercise their power, and the authority

provided by the All Writs Act (28 U.S.C. § 1651(a)), to deem a litigant "vexatious" and to impose

a pre-filing injunction and any other remedy necessary to stop the vexatious conduct if they find

---

[112] *See, e.g., Bowling v. Willis*, 2019 U.S. Dist. LEXIS 168602 (E.D. Tex. Aug. 9, 2019), *aff'd* 853 F. App'x. 983 (5th Cir. 2021); *Staten v. Harrison Cnty.*, 2021 U.S. App. LEXIS 35747 (5th Cir. Dec. 2, 2021); *Schum v. Fortress Value Recovery Fund I LLC*, 2019 U.S. Dist. LEXIS 226679 at *14-15 (N.D. Tex. Dec. 2, 2019), *aff'd* 805 F. App'x. 319 (5th Cir. 2020); *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017); *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181 (5th Cir. 2008); *Clark v. Mortenson*, 93 F. App'x. 643, 645-46 (5th Cir. 2004); *Newby v. Enron Corp.*, 302 F.3d 295 (5th Cir. 2002).

[113] *Caroll*, 850 F.3d at 815.

that the litigant acted in "bad faith."[114] The Fifth Circuit effectively affirmed its prior holdings in September 2022 when it all but encouraged Highland to have the Dondero Entities deemed vexatious.[115]

32.    In the Fifth Circuit, the "traditional standards for injunctive relief, *i.e.* irreparable injury and inadequate remedy at law, do not apply to the issuance of a pre-filing injunction against a vexatious litigant."[116] Instead, courts apply a four-part test to determine whether to impose a pre-filing injunction, analyzing: (a) the party's history of litigation, in particular whether s/he has filed vexatious, harassing, or duplicative lawsuits; (b) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (c) the extent of the burden on the courts and other parties resulting from the party's filings; and (d) the adequacy of alternative sanctions.[117]

33.    In assessing these factors, courts consider affirmative litigation as well as objections, appeals, attempts to re-litigate settled issues, and other actions, including regulatory and defensive actions taken by the vexatious litigant.[118] If relevant, courts may also consider

---

[114] *Id.*; *see also Staten*, 2021 U.S. App. LEXIS 35747 at *7 ("District court have authority to enjoin vexatious litigants under the All Writs Act, 28 U.S.C. § 1651. They also have inherent power to impose pre-filing injunctions to deter vexatious, abusive, and harassing litigation, and they have a constitutional obligation to protect their jurisdiction from conduct that impairs their ability to carry out their Article III functions.")

[115] *NexPoint*, 48 F.4th at 369, n.19 ("Nothing in this opinion should be construed to hinder the bankruptcy court's power to enjoin and impose sanctions on Dondero and other entities by following the procedures to designate them vexatious litigants.").

[116] *Baum*, 513 F.3d at 189 (citations omitted).

[117] *Id.*

[118] *Caroll*, 850 F.3d at 815-16 ("Appellants' suggestion that their conduct was not done in bad faith is belied by their repeated attempts to litigate issues that have been conclusively resolved against them or that they had no standing to assert and by their unsupported and multiple attempts to remove … the trustee."); *Clark*, 93 F. App'x. at 645-46 (finding multiple lawsuits against receiver for breach of fiduciary duty, conspiracy, embezzlement, mail fraud, and RICO violations vexatious); *Caroll*, 2016 U.S. Dist. LEXIS 100930 at *32-33 (M.D. La. Aug. 2, 2016), *aff'd* 850 F.3d 811 (5th Cir. 2017) (finding appeal of bankruptcy court orders and standing that was "entirely 'uncertain'" evidence of vexatiousness); *Schum*, 2019 U.S. Dist. LEXIS 226679 at *14-15 (finding objections and motions, including motion to recuse, and appeal of nearly every order vexatious); *Alliance Riggers & Constructors, Ltd. v. Restrepo*, 2015 U.S. Dist. LEXIS 29346 at *14-15 (W.D. Tex. Jan. 7, 2015) (holding litigant can be vexatious if a defendant or plaintiff if "seeks to halt the judicial process with identical meritless filings").

actions in other courts or outside of court if they threaten the court's jurisdiction or assist in determining bad faith.[119]

34.    The conduct in *Caroll v. Abide* is instructive (and, as discussed herein, less egregious than that of the Dondero Entities). In *Carroll*, after a trustee was appointed to manage the bankruptcy estate, the Carolls immediately began objecting and filing a "legion" of motions to undermine her mandate. The court found the Carolls vexatious, highlighting the following, among others, as examples of vexatious conduct: (a) challenges to, and appeals of, orders authorizing the sale of debtor property, (b) challenging the estate's ownership of property, resulting in findings of contempt, orders to compel, and denial of efforts to stay the proceedings, (c) two motions to remove the trustee, and (d) the filing of a complaint with the U.S. Trustee, not coincidentally, at the same time the Carolls were seeking to thwart bankruptcy sales.[120] Based on the foregoing, the bankruptcy court found the Carolls and their daughters (non-debtors who filed actions at the direction of their parents) "vexatious litigants" and issued a pre-filing injunction.[121]

---

[119] *Bowling*, 2019 U.S. Dist. LEXIS 168602 at *10-14 (upholding pre-filing injunction based on the "totality of the record" where movant filed three federal cases seeking to re-litigate or interfere with her state court divorce proceeding); *Baum*, 513 F.3d at 191 ("The district court could consider Baum's conduct in the state court proceedings in determining whether his conduct before the bankruptcy court was undertaken in bad faith or for an improper motive"); *Nix v. Major League Baseball*, 2022 U.S. Dist. LEXIS 104770 at *15-16, 62 (S.D. Tex. Jun. 13, 2022) (taking judicial notice of actions filed in other courts and an attempt to strong arm a party with threats of litigation); *Schum*, 2019 U.S. Dist. LEXIS 226679 at *15 (considering appeal of FCC approval of bankruptcy sale as evidence of vexatious litigation).

[120] *In re Caroll*, 2016 Bankr. LEXIS 937 at *5-27 (Bankr. M.D. La. Mar. 16, 2016) *aff'd* 2016 U.S. Dist. LEXIS 100930 (M.D. La. Aug. 2, 2016), *aff'd* 850 F.3d 811 (5th Cir. 2017).

[121] *Id.* at *34; *see also Caroll v. Abide*, 2016 U.S. Dist. LEXIS 100930, at *32 (M.D. La. Aug. 2, 2016) ("For years, then, Appellants have appealed well-founded orders issued by the Bankruptcy Court and thusly delayed (or attempted to hinder) specific actions by court or trustee which were authorized by either Code or jurisprudence."); *Caroll*, 850 F.3d at 815-16 ("As both the bankruptcy court and the district court meticulously explained, Appellants have engaged in conduct intended to harass and delay. Appellants' suggestion that their conduct was not done in bad faith is belied by their repeated attempts to litigate issues that have been conclusively resolved against them or that they had no standing to assert and by their unsupported and multiple attempts to remove Abide as the trustee."). The conduct in *Caroll* is consistent with conduct other courts have found to be vexatious. *See, e.g. Clark*, 93 F. App'x. at 645-46; *Schum*, 2019 U.S. Dist. LEXIS 226679, at *14-15.

DOCS_NY:46677.6 36027/003

35.     Finally, and as was done in *Caroll* (and other cases), a court may enjoin or sanction parties in front of the court and those under such parties' control or that act in concert with them[122] and may require that the vexatious litigants file the order deeming them vexatious in any pending or future proceeding.[123]

## B.    This Court Has Jurisdiction to Deem the Dondero Entities Vexatious and Prohibit Filings in Both This Court and the Bankruptcy Court

36.     As discussed in *Schum*, district courts, which sit as courts of review over bankruptcy courts, have the inherent authority to enjoin filings in both the district court *and in the bankruptcy courts*. Orders issued by the Bankruptcy Court are appealed to this Court pursuant to 28 U.S.C. § 158(a). Similarly, this Court—as it is currently doing—is required by 28 U.S.C. § 157(c)(1) to review the Bankruptcy Court's proposed findings of fact and conclusions of law with respect to "non-core" matters and any objections thereto. Accordingly, events in the Bankruptcy Court directly affect this Court's jurisdiction, and this Court may sanction vexatious conduct in the Bankruptcy Court to protect the jurisdiction of both the Bankruptcy Court and this Court.[124]

---

[122] *Caroll*, 2016 Bankr. LEXIS 937, at *34 (prohibiting litigation filed by the vexatious litigants and "anyone acting on their behalf"); *Clark v. Mortenson*, 93 F. App'x. at 654 (prohibiting suits brought "directly and indirectly" by the vexatious litigants); *see also Staten*, 2021 U.S. App. LEXIS 35747, at *6-7 (extending pre-filing injunction to protect certain named parties "and those in privity with them"); *see also Restrepo*, 2015 U.S. Dist. LEXIS 29346 at *15 ("[O]rders made pursuant to the All Writs Act may be directed not only to the immediate parties to a proceeding, but also 'to person who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice.'") (citing *Williams v. McKeithen*, 939 F.2d 1100, 1104 (5th Cir. 1991).

[123] *Baum*, 513 F.3d at 191 ("[T]he Second Circuit … upheld those provisions of the injunction requiring Martin-Trigona to alert state courts of his history of vexatious filings in federal courts."); *Nix*, 2022 U.S. Dist. LEXIS 104770 at *70 ("The court also orders Nix to file a copy of this opinion with any filing that he makes in any other court"); *see also Silver v. City of San Antonio*, 2020 U.S. Dist. LEXIS 118643, at *31-32 (W.D. Tex. Jul. 7, 2020) (requiring vexatious litigant file in any court a notice listing every sanction imposed or sanction warning issued and each order imposing sanctions or issuing a sanctions warning and alert state courts of history of vexatious federal filings); *Marinez v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 208591, at *14 (W.D. Tex. May 31, 2013) ("[P]laintiff will disclose the contents of this order and the outcome of every previously filed suit related to the subject property that was previously filed by her.")

[124] *Schum*, 2019 U.S. Dist. LEXIS 226679 at *12-13 ("[A] court may issue injunctive relief … in aid of its appellate jurisdiction over the bankruptcy court … Appellees seek injunctive relief prohibiting Appellant from making future filings related to [two bankruptcy court proceedings]. Those filings, when decided and if appealed, will affect the Court's future appellate jurisdiction over those bankruptcy proceedings. Accordingly, the Court has the jurisdiction to order the requested relief.").

## C.    Highland Satisfies the Four-Part Test for Obtaining a Pre-Filing Injunction

37.    Based on the Dondero Entities' actions, Highland has established each element of the Fifth Circuit's four-part test for obtaining a pre-filing injunction and related relief.

### i    The Dondero Entities Have a History of Vexatious Litigation

38.    Highland easily meets the first prong—history of litigation. As set forth above, the Dondero Entities' vindictive litigation crusade against Highland has continued unchecked for over two years. The Dondero Entities have objected to everything, filed (and then generally abandoned) baseless claims, pursued claims (including duplicative claims) in other forums to evade the Bankruptcy Court, and appealed every adverse ruling regardless of the merits, the evidence, the standard on appeal, whether they have standing, or whether the appeal is economically rational. The Dondero Entities' conduct—as recently as two weeks ago—shows they have no intent to stop their harassment and remain intent on being "disruptors."[125]

39.    Nor is the Dondero Entities' strategy new; they are still locked in vociferous, decade-long litigation with UBS, Mr. Daugherty, and Mr. Terry and Acis notwithstanding the adverse rulings—and harsh criticisms—issued against them. The Dondero Entities have a long and storied history of vexatious litigation—a history so infamous the insurance industry generally refuses to insure against it.[126]

### ii    The Dondero Entities' Litigation Lacks a Good-Faith Basis

40.    Highland also satisfies the second prong—lack of good faith. The Dondero Entities' relentless litigation is simply the execution of Mr. Dondero's stated plan to "burn down the place"

---

[125] Confirmation Order, ¶ 17 ("[T]he remoteness of [Mr. Dondero and the Dondero Related Entities'] economic interests is noteworthy, and the Bankruptcy Court questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors").

[126] *See* ¶ 24 *supra*.

after he failed to impose his will and re-take control of Highland and his personal threat against Mr. Seery—"Be careful what you do, last warning." The Dondero Entities' actions led the Bankruptcy Court to find their litigation was "designed merely to harass," resulted in two contempt orders and two restraining orders, multiple admonishments (including from this Court), and caused the Fifth Circuit to *sua sponte* suggest deeming the Dondero Entities vexatious. Unrepentant and unrestrained, the Dondero Entities continue to appeal nearly every adverse ruling (including multiple appeals of this Circuit's long-standing precedent on prudential standing), seek information to manufacture more baseless claims, and attempt to re-litigate settled issues in other forums.[127]

41.    The Dondero Entities are the *only* parties litigating with Highland. Every other party has resolved its claims and awaits distributions under the Plan—confirmed with the approval of 99.8% of creditors in amount. The Dondero Entities' conduct in this case (and prior cases) evinces their lack of good faith.

**iii    The Dondero Entities' Litigation Has Created an Enormous Burden on the Court System and Highland**

42.    The third prong of the test—burden on the courts and Highland—is easily met. In the Bankruptcy Court, the Dondero Entities filed 52 prepetition claims (not one of which was ultimately allowed), 80 motions, 71 objections, and forced Highland to file nine adversary proceedings against them. The Dondero Entities appealed nearly every adverse ruling from the Bankruptcy Court to this Court and, when unsuccessful, to the Fifth Circuit, resulting in a total of 26 appeals. The burden created on the court system is enormous. So is the burden on Highland.

---

[127] By way of example, the Dondero Entities challenged the HarbourVest settlement in the Bankruptcy Court and then in this Court. When those efforts proved unsuccessful (and led to a finding of contempt), the Dondero Entities sent letters to the U.S. Trustee and filed pre-suit discovery requests in Texas state courts to challenge the HarbourVest settlement yet again.

DOCS_NY:46677.6 36027/003

Highland has been forced to spend substantial sums litigating with the Dondero Entities and, in fact, had to procure exit financing, in large part, to fund its defense of the Dondero Entities' litigation.[128]

### iv    Alternative Sanctions Are Inadequate to Deter the Conduct

43.    Finally, the Dondero Entities have shown that previous sanctions are inadequate to deter their conduct. The Dondero Entities have been enjoined twice; their violations of Bankruptcy Court orders have led to two contempt findings and monetary sanctions.

44.    In order to protect Highland and its court-appointed management, the Bankruptcy Court issued the January and July Orders and approved the Gatekeeper. The Dondero Entities violated the July Order, and, notwithstanding the Fifth Circuit's affirmance of the Gatekeeper and its finding that the January and July Orders were *res judicata*, the Dondero Entities still seek to evade these protections—objecting to the motion to conform filed in the Bankruptcy Court with the presumed goal of appealing such order to the Fifth Circuit. They even contend the Fifth Circuit *actually limited the Gatekeeper* in an effort to overturn the July Order.[129] The Dondero Entities then sought to enlist the U.S. Trustee and the Texas state courts in their attempts to circumvent the Gatekeeper and attack Mr. Seery and Highland.

45.    The Dondero Entities' motives are painfully clear—find a way to avoid the Gatekeeper in the hope of flooding the courts with additional litigation. Unfortunately, the current sanctions are inadequate to protect the estate.

---

[128] Bankr. Docket Nos. 2229, 2503. The Dondero Entities objected to the exit financing. Bankr. Docket No. 2403, 2467.
[129] *See* n.39 *supra*.

## V.    <u>CONCLUSION</u>

46.    WHEREFORE, Highland respectfully requests that this Court grant the Motion, enter the Order consistent with paragraph 30 *supra*, and grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:46677.6 36027/003

HMIT Appx. 02693

Dated: [_____], 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Tel: (310) 277-6910
Fax:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

/s/ Zachery Z. Annable
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**HMIT Appx. 02694**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| UBS SECURITIES LLC and UBS AG LONDON BRANCH, | |
| Petitioners, | Index No. _____ |
| - against - | **SPECIAL TURNOVER PETITION** |
| JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P., HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY, CLO HOLDCO, LTD., MAINSPRING, LTD., and MONTAGE HOLDINGS, LTD., | **ORAL ARGUMENT REQUESTED** |
| Respondents. | |

Andrew Clubok
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020-1300
Phone:   (212) 906-1200
Email:   andrew.clubok@lw.com

Jason R. Burt*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone:   (202) 637-2200
Email:   jason.burt@lw.com

Kathryn K. George*
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611-3695
Phone:   (312) 876-7700
Email:   kathryn.george@lw.com

*Counsel for Petitioners UBS Securities LLC
and UBS AG London Branch*

---

\*      Motion for admission *pro hac vice* forthcoming.

**Exhibit 2**

# TABLE OF CONTENTS

                                                      **Page**

INTRODUCTION ................................................................................................1

THE PARTIES....................................................................................................2

JURISDICTION AND VENUE ...........................................................................4

LEGAL AUTHORITY FOR RELIEF...................................................................6

FACTS ...............................................................................................................7

I.      Dondero, Ellington, And The Byzantine Structure Of The Highland Capital Management "Complex" ...........................................................................7

II.     The Underlying Action ....................................................................................14

III.    Anticipating Liability, Dondero And Ellington Shuffle Assets To Put Them Beyond UBS's Reach .....................................................................................17

         A.     The 2010 Fraudulent Conveyance From CDO Holding To CLO HoldCo............17
         B.     The 2017 Fraudulent Conveyances To Sentinel ....................................22
                1.     Dondero And Ellington Manufacture The ATE Policy As A Way To Transfer Assets ....................................................................23
                2.     Dondero And Ellington Set And Carry Out The Terms Of The ATE Policy.......................................................................................25
                3.     At All Times, Dondero And Ellington Controlled Sentinel .....................29
                 4.     Dondero And Ellington Try To Conceal The 2017 Sentinel Transfers .......................................................................................30
         C.     The 2019 Fraudulent Conveyance To Sebastian Clarke....................................35

IV.    Dondero And Ellington Use The 2017 Transferred Assets As A Piggy Bank .................37

         A.     The 2019-2021 Voidable Transfers To Dondero And Ellington ...........................37
                 1.     The 2019-2020 Fraudulent Ellington Reimbursements............................38
                 2.     The 2020-2021 Fraudulent "Dividends" To Mainspring And Montage .......................................................................................42
         B.     The 2020 Voidable Transfer To Pay Bonuses In Violation Of The Bankruptcy Court Order .........................................................................44
                 1.     Dondero And Ellington Make Bonus Payments Blocked By The Bankruptcy Court .......................................................................44
                 2.     Ellington And Others Defraud The Bankruptcy Court By Filing Claims Seeking Bonuses Already Procured By Fraud ..............................47

CLAIMS FOR RELIEF ...................................................................................49

i

HMIT Appx. 02696

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 31
RECEIVED NYSCEF: 02/08/2023
Case 3:21-cv-00881-X   Document 182   Filed 03/06/23   Page 50 of 137   PageID 16984
Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit 2   Page 2 of 90

I.   CLAIM I: TURNOVER PREDICATED ON FRAUDULENT AND VOIDABLE
     CONVEYANCES AGAINST CLO HOLDCO, ELLINGTON, MAINSPRING,
     AND MONTAGE (CPLR 5225(b)) ..................................................................49

     A.   New York's Former Fraudulent Conveyance Law (Effective Through
          April 3, 2020) ..............................................................................................49
     B.   The 2010 Fraudulent Conveyance To CLO HoldCo .............................................50
     C.   The Ellington Reimbursements Were Fraudulent Conveyances .........................52
     D.   New York's Current Voidable Transactions Law (Effective April 4, 2020) .........53
     E.   The April 2020 And January 2021 "Dividends" To Mainspring And
          Montage Were Voidable Conveyances ..........................................................54

II.  CLAIM II: TURNOVER PREDICATED ON ALTER EGO LIABILITY
     AGAINST DONDERO, ELLINGTON, AND CDO HOLDING (CPLR 5225(b)) ..........55

     A.   Dondero And Ellington Were Each Alter Egos Of The Judgment Debtors ..........56
          1.   Dondero And Ellington Dominated The Judgment Debtors.....................57
          2.   Dondero And Ellington Used Their Domination Over The
               Judgment Debtors To Defraud And Harm UBS ......................................61
     B.   Dondero And Ellington Were The Alter Egos Of Mainspring And
          Montage, Respectively ..................................................................................62
          1.   Dondero And Ellington Dominated Mainspring And Montage,
               Respectively ..................................................................................62
          2.   Dondero And Ellington Used Their Control Of Mainspring And
               Montage To Defraud UBS ...............................................................63
     C.   CDO Holding Is An Alter Ego Of HFP ........................................................64
          1.   HFP Dominated Its "Asset Repository" CDO Holding ...........................64
          2.   HFP Used Its Domination Over CDO Holding To Defraud UBS ............66

II.  CLAIM III: VIOLATIONS OF THE RACKETEER INFLUENCED AND
     CORRUPT ORGANIZATIONS ACT ("RICO") BY DONDERO AND
     ELLINGTON (18 U.S.C. § 1962(c)) ...........................................................66

     A.   The RICO Enterprise ..................................................................................68
     B.   The Pattern Of Racketeering Activity ..........................................................71
     C.   The Predicate Acts .....................................................................................75
          1.   Wire Fraud In Violation Of 18 U.S.C. § 1343 .........................................75
          2.   Money Laundering In Violation Of 18 U.S.C. § 1956 .............................80
     D.   Summary Of Allegations To Each RICO Defendant ..........................................81
     E.   The Harm To UBS .......................................................................................83

III. CLAIM IV: CONSPIRACY TO VIOLATE RICO BY ELLINGTON (18 U.S.C.
     § 1962(d)) ...............................................................................................84

     REQUESTS FOR RELIEF ...................................................................................85

HMIT Appx. 02697

## INTRODUCTION

1.      Petitioners UBS Securities LLC and UBS AG London Branch (together, "UBS")
bring this proceeding under CPLR Article 52 to enforce more than a billion dollars in related
judgments that UBS obtained after a decade of hard-fought litigation against Highland Capital
Management, L.P. ("HCM") and its affiliates.  *See UBS Secs. LLC v. Highland Cap. Mgmt., L.P.*,
Index No. 650097/2009 (Sup. Ct. N.Y. Cnty.) (the "Underlying Action").  The court bifurcated
the Underlying Action into two phases ("Phase I" and "Phase II") and entered judgment for UBS
in each phase ("Phase I Judgment," "Phase II Judgment," and collectively, the "Judgment").

2.      In the Phase I Judgment, the court awarded UBS $1,042,391,031.79 against
Highland Special Opportunities Holding Company ("SOHC") and CDO Opportunity Master Fund,
L.P. ("CDO Fund") collectively,[1] including prejudgment interest and another $257,027.92
accruing daily in post-judgment interest.  *See* Ex. 11, Phase I Judgment, at 2-3 (Feb. 10, 2020).  In
the Phase II Judgment, the court awarded UBS $67,222.00 against CDO Fund; adjudged defendant
Highland Financial Partners, L.P. ("HFP" and with CDO Fund and SOHC, the "Judgment
Debtors") the alter ego of SOHC and liable for SOHC's portion of the Judgment; and awarded
UBS $16,283,331.00 in attorney's fees.  *See* Ex. 24, Phase II Judgment, at 9-10 (Nov. 21, 2022).

3.      After UBS obtained the Phase I Judgment, it discovered that HCM's two former
principals—James Dondero (former President and Chief Executive Officer) and Scott Ellington
(former Chief Legal Officer and General Counsel)—conspired for over a decade to frustrate UBS's
ultimate recovery by systematically draining the Judgment Debtors' assets.  Dondero and Ellington
exercised unfettered control over HCM and numerous other entities—including the Judgment

---

[1]    The Phase I Judgment ordered CDO Fund to pay $531,619,426.24 and SOHC to pay
$510,771,605.55.  Ex. 11, Phase I Judgment, at 2-3.

Debtors—to fraudulently transfer assets away from the Judgment Debtors and other potentially liable entities to enrich themselves at UBS's expense. UBS brings this petition (the "Turnover Petition" or "Petition") to collect on its Judgment and hold accountable Dondero, Ellington, and certain entities they controlled and used as part of their scheme to defraud UBS.

### THE PARTIES

4.     Petitioner UBS Securities LLC is a Delaware limited liability company with its headquarters and principal place of business at 1285 Avenue of the Americas in New York, New York 10019.

5.     Petitioner UBS AG London Branch is a Swiss banking corporation with its principal place of business at 5 Broadgate, London EC2M 2QS, United Kingdom.

6.     Respondent Dondero is an individual who resides at 3807 Miramar Ave, Dallas, TX 75205. Dondero co-founded HCM in 1993 and served as its President and Chief Executive Officer until his removal in 2020.

7.     Respondent Ellington is an individual who resides at 3825 Potomac Ave, Dallas, TX 75205. Ellington was HCM's Chief Legal Officer and General Counsel until his removal in 2021.

8.     Respondent SOHC is a Cayman Islands corporation with its principal office at Walker House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands. UBS has a Judgment against SOHC in the amount of $527,054,936.55, on which $137,839,662.28 of gross post-judgment interest has accrued and $33,366,517.87 of post-judgment interest only has been satisfied. *See* Ex. 11, Phase I Judgment, at 3; Ex. 24, Phase II Judgment, at 9.

9.     Respondent HFP is a Delaware limited partnership with its principal office at 100 Crescent Street, Suite 1850, Dallas, Texas 75201. The Supreme Court of New York has declared HFP to be an alter ego of SOHC and adjudged HFP liable for UBS's judgment against SOHC,

2

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM          INDEX NO. 650744/2023

NYSCEF DOC. NO. 31   Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc   RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X   Document 182   Filed 2/15/23   Page 53 of 137   PageID 16987

presently totaling $631,528,081.35, including post-judgment interest. Ex. 24, Phase II Judgment, at 9.

10.     Respondent CDO Fund is a Bermuda limited partnership with its principal office at 52 Reid Street, Hamilton, Bermuda. UBS has a Judgment against CDO Fund in the amount of $547,969,979.24, on which $143,454,428.88 of gross post-judgment interest has accrued and $52,420,980.58 of post-judgment interest only has been satisfied. Ex. 11, Phase I Judgment, at 2; Ex. 24, Phase II Judgment, at 9. Although an independently managed HCM now controls CDO Fund, Dondero and Ellington controlled CDO Fund at all times relevant to allegations involving CDO Fund in this Turnover Petition.[2]

11.     Respondent Highland CDO Holding Company ("CDO Holding") is a Cayman Islands company with its registered office at Intertrust Corporate Services (Cayman) Limited, One Nexus Way, Camana Bay, Grand Cayman, KY1-9005, Cayman Islands. CDO Holding is a wholly owned subsidiary of HFP.

12.     Respondent CLO HoldCo, Ltd. ("CLO HoldCo"), is a Cayman Islands company with its registered office at Intertrust Corporate Services (Cayman) Limited, One Nexus Way, Camana Bay, Grand Cayman, KY1-9005, Cayman Islands. CLO HoldCo is a wholly owned subsidiary of Charitable DAF Fund, L.P. (the "DAF"), which Dondero indirectly controls and has funded from his personal assets, his family trusts, and HCM.

---

[2]     This Turnover Petition names the Judgment Debtors from the Underlying Action as Respondents because it seeks to pierce the corporate veil against the Judgment Debtors' alter egos. In an action to impose alter ego liability, each alter ego is a necessary party. *Intelligent Prod. Sols., Inc. v. Morstan Gen. Agency, Inc.*, 45 Misc.3d 1225(A), 2014 WL 6883125, at *2 (Sup. Ct. Suffolk Cnty. Dec. 4, 2014) (citing *Mannucci v. Missionary Sisters of Sacred Heart of Jesus*, 94 A.D.3d 471 (1st Dep't 2012)).

HMIT Appx. 02700

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 43
RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X    Document 188-2    Filed 2/15/90    Page 54 of 137   PageID 16988
Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit 2   Page 7 of 90

13.     Respondent Mainspring, Ltd. ("Mainspring"), is a Cayman Islands company with a registered office at P.O. Box 10008 (c/o Services Cayman Limited), Willow House, Cricket Square, Grand Cayman KY1-1001, Cayman Islands.  Dondero is the ultimate beneficial owner of Mainspring.

14.     Respondent Montage Holdings, Ltd. ("Montage"), is a Cayman Islands company which shares Mainspring's registered office address: P.O. Box 10008 (c/o Services Cayman Limited), Willow House, Cricket Square, Grand Cayman KY1-1001, Cayman Islands.  Ellington is the ultimate beneficial owner of Montage.

## JURISDICTION AND VENUE

15.     As a court of general jurisdiction, this Court has subject-matter jurisdiction over this case.  *See* N.Y. Const. art. VI, § 7; Judiciary Law § 140-b.

16.     Venue is proper under CPLR 5221(a)(4) because this is a special proceeding to enforce a judgment entered by the Commercial Division of the Supreme Court of the State of New York, New York County, and there is no county in this state in which any respondent "resides or is regularly employed or has a place for the regular transaction of business in person."  *See* Ex. 24, Phase II Judgment.  CPLR 5221(a)(4) instructs that "if there is no such county," a judgment creditor may bring a judgment-enforcement proceeding in the supreme court in "the county in which the judgment was entered."  That makes this Court the proper forum.

17.     This Court also has personal jurisdiction over all Respondents.

18.     The Court has personal jurisdiction over CDO Fund and SOHC under General Obligations Law § 5-1402 based on the forum-selection clauses in the agreements underpinning the claims in the Underlying Action.  *See* Ex. 92, Cash Warehouse Agreement ¶ 15 (Mar. 14, 2008) (UBS, CDO Fund, and SOHC agreeing to "submit to the exclusive jurisdiction of the federal and New York state courts located in the county of New York, New York in connection with any

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM   INDEX NO. 650744/2023

NYSCEF DOC. NO. 1   Case 3:21-cv-00881-X   Document 188   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc   RECEIVED NYSCEF: 02/08/2023

Exhibit 2   Page 55 of 137   PageID 16989

dispute related to this Agreement or any of the matters contemplated hereby"); Ex. 93, Synthetic

Warehouse Agreement ¶ 15 (Mar. 14, 2008) (same); Ex. 11, Phase I Decision and Order, at 39

(Nov. 14, 2019) (finding CDO Fund and SOHC liable for breaching these two agreements as part

of UBS's Judgment).  These clauses "obviat[e] the need for a separate analysis of the propriety of

exercising personal jurisdiction," *Oak Rock Fin., LLC v. Rodriguez*, 148 A.D.3d 1036, 1038 (2d

Dep't 2017) and remain enforceable and provide personal jurisdiction for "judgment enforcement

claims" even after Judgment on the claims, *Cortlandt St. Recovery Corp. v. Bonderman*, 73 Misc.

3d 1217(A), 2021 WL 5272497, at *7 (Sup. Ct. N.Y. Cnty. 2021), *reargument denied*, 75 Misc.

3d 469, 476-78 (Sup. Ct. N.Y. Cnty. 2022).

19.     For similar reasons, the Court has personal jurisdiction over HFP.  Although not a

signatory to the agreements involved in the Underlying Action, HFP is "bound" by the agreements'

forum-selection clause as "an alter ego of a signatory," SOHC, as the court found in Phase II.

*Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 184

A.D.3d 116, 122 (1st Dep't 2020); Ex. 24, Phase II Judgment, at 5-6.

20.     The Court has personal jurisdiction over Dondero and Ellington because, as

explained below, they are alter egos of the Judgment Debtors.  The Court has personal jurisdiction

over CDO Holding because, as also explained below, it is the alter ego of Judgment Debtor HFP.

21.     The Court also has personal jurisdiction over all Respondents under CPLR

302(a)(2) and (a)(3) as participants in a conspiracy involving tortious acts in New York to frustrate

the judgment of a New York court, which resulted in injury in New York.  As demonstrated below,

all Respondents participated in a scheme to funnel away assets to frustrate UBS's efforts to collect

on a judgment from a New York action.  *See, e.g.*, *Wimbledon Fin. Master Fund, Ltd. v. Bergstein*,

2016 WL 4410881, at *4 (Sup. Ct. N.Y. Cnty. Aug. 19, 2016) (citing cases) (holding that

conspiracy to frustrate New York judgment established personal jurisdiction over participants),

*aff'd*, 147 A.D.3d 644, 645 (1st Dep't 2017).

## LEGAL AUTHORITY FOR RELIEF

22.     UBS brings this special turnover proceeding under CPLR 5225(b) to enforce the

Judgment in its favor.  *See* Ex. 11, Phase I Judgment, at 2-3; Ex. 24, Phase II Judgment at 10-11.

To date, the total amount owed on the Judgment, including statutory post-judgment interest, is

$1,253,939,017.66.

23.     A judgment creditor can bring a special proceeding under CPLR 5225(b) against

any person or entity that (1) possesses or has custody over assets in which the judgment debtor has

an interest; (2) unlawfully received assets from the judgment debtor, or received judgment debtor

assets in which the judgment creditor has a superior interest, or (3) owes or will owe a debt to the

judgment debtor.

24.     The same standards "governing a motion for summary judgment, 'requiring the

court to decide the matter upon the pleadings, papers[,] and admissions to the extent that no triable

issues of fact are raised'" govern a special proceeding.  *Triadou SPV S.A. v. Chetrit*, 2021 WL

3290834, at *9 (Sup. Ct. N.Y. Cnty. Aug. 2, 2021) (quoting *Matter of Gonzalez v City of New

York*, 127 A.D.3d 632, 633 (1st Dep't 2015)).

25.     Although a special proceeding, this action remains a plenary action and allows this

Court to adjudicate all disputes between the parties.  *See, e.g.*, *Cardinal Health 414 LLC v. U.S.

Heartcare Mgmt., Inc.*, 2013 WL 563288, at *3 (Sup. Ct. Suffolk Cnty. Feb. 13, 2013) ("Although

originally a creditor was required to commence a plenary action to achieve this goal, now it can

be accomplished through a special proceeding under CPLR 5225 or 5227." (citing *Siemens &

Halske GmbH v. Gres*, 32 A.D.2d 624, 624 (1st Dep't 1969) (per curiam))); *Matter of WBP Cent.

Assocs., LLC v. DeCola*, 50 A.D.3d 693, 694 (2d Dep't 2008) ("[A] claim to set aside an allegedly

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM    INDEX NO. 650744/2023
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Case 3:21-cv-00881-X    Document 172-12    Page 57 of 137    PageID 16991

fraudulent conveyance of money, assets, or property may be asserted in a special proceeding pursuant to CPLR 5225(b), without first commencing a plenary action . . . .").

**FACTS**

**I.    DONDERO, ELLINGTON, AND THE BYZANTINE STRUCTURE OF THE HIGHLAND CAPITAL MANAGEMENT "COMPLEX"**

26.    Before its bankruptcy, HCM was an investment management firm that managed billions of dollars of assets "through its organizational structure of approximately 2,000 separate business entities." *In re Acis Cap. Mgmt., L.P.*, 2019 WL 417149, at *5 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *aff'd sub nom. In re Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

27.    Dondero co-founded HCM in 1993 and was its majority owner, President, and Chief Executive Officer until his removal in 2020.[3]    *See* Ex. 36, Email from L. Thedford, at HCMUBS000050 (Mar. 1, 2017) (attaching Highland Affiliate Ownership Chart); *see also In re Highland Cap. Mgmt., L.P.*, 2021 WL 2326350, at *1, *21 (Bankr. N.D. Tex. June 7, 2021). Ellington served as HCM's Chief Legal Officer and General Counsel from 2010 until his removal in January 2021. *See In re Highland*, 2021 WL 2326350, at *17; Ex. 116, Ellington Dep. at 55:4-13 (July 29, 2021).    At all times relevant to this Turnover Petition, Ellington operated as one of Dondero's top lieutenants and confidants, often handing many aspects of the business himself.

---

[3]    Dondero resigned from director positions at the Judgment Debtors in 2021.  *See* Ex. 129, Letter from Clay Taylor, at HCMUBS005324 (Apr. 28, 2021) ("[T]his letter shall serve as Mr. Dondero's immediate resignation of the alleged director position(s) at HFP and SOHC and/or any officer positions at those entities."); *see also* Ex. 130, Letter from J. Pomerantz, at HCMUBS005322 (May 7, 2021) (requesting that Dondero also confirm his resignation from Highland CDO Opportunity Fund, Ltd. ("CDO Opportunity Fund"), and its subsidiaries, including CDO Fund).

HMIT Appx. 02704

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 13

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Case 3:21-cv-00881-X    Document 170-12    Filed 11/16/22    Page 58 of 137    PageID 16992

28.     Dondero, with Ellington at his side, for years controlled HCM and its vast web of
funds and other entities under its management and control with unilateral and unfettered discretion.
*See, e.g.*, Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709; Ex. 113, Dondero Dep.
at 48:8-13 (May 10, 2021) (Dondero was the "decision maker" for HFP and its subsidiaries); Ex.
114, Dondero Dep. at 319:20-325:14 (May 12, 2021) (Dondero had the authority to authorize the
sale and assignment of the assets of SOHC, CDO Fund, and related entities); *see also* Ex. 2,
Dudney Report, at 40-41 (Apr. 18, 2013) (expert report from the Underlying Action that concludes
"HCM and its President and majority owner, Mr. Dondero, sit at the top of [the HCM] organization
chart," and "[f]rom this position, Mr. Dondero controlled" HCM and many related entities—
including SOHC, CDO Fund, Highland Financial Corp. ("HFC"), HFP, and CDO Holding); Ex.
2, Dudney Report, at 5 ("Mr. Dondero also served as the sole Director of SOHC and as President
of the ultimate general partner of CDO Fund."); *In re Acis Cap. Mgmt.*, 2019 WL 417149, at *5
(holding that Dondero controlled his many related entities through friends, family members, and
directors-for-hire that the Court described as "nominal figureheads who are paid to act like they
are in charge, while they are not.").

29.     Dondero exercised his control in part through his status as the sole stockholder and
director of Strand Advisors, Inc. ("Strand"), HCM's general partner.  *See* Ex. 117, Ellington Dep.
at 12:4-13:17 (Oct. 19, 2022); Ex. 105, HCM Organizational Chart; *see also generally* Ex. 5, Bk.
Dkt. No. 281-1 (Dec. 12, 2019).  Dondero unilaterally made decisions for HCM, and "through his
controlling stake in HCM, and/or his positions within SOHC, CDO Fund and HFP, Mr. Dondero
was able to control these entities," Ex. 2, Dudney Report, at 41-42, as demonstrated in part by the
below (attached in larger format as Ex. 100, HCM Affiliates Organizational Chart (July 2019)):

HMIT Appx. 02705



*Held individually and/or through interests in related trusts.

30.     Dondero's dominion over HCM and the related web of entities was so extensive
that the bankruptcy court overseeing HCM's reorganization proceeding (the "Bankruptcy Court")
labeled this web the "Non-Debtor Dondero-Related Entities" as "[m]any of these non-Debtor
entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio
manager for many or most of them." *In re Highland*, 2021 WL 2326350, at *3.

31.     Ellington, as an officer of Strand and the Chief Legal Officer of HCM, also
exercised control over the HCM complex. *See* Ex. 117, Ellington Dep. at 21:2-23:16 ███████
████████████████████████████████████████████████████. Dondero
"delegated and entrusted" many decisions related to SOHC, CDO Fund, and related entities to
Ellington, *see* Ex. 113, Dondero Dep. at 215:19-216:11, including signatory authority and
█████████████, *see* Ex. 117, Ellington Dep. at 194:22-196:12; *see also* Ex. 50, Email from S.
Goldsmith, at UBSPROD2630461, -463 (Aug. 31, 2017) (Ellington signs on behalf of CDO Fund

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM    INDEX NO. 650744/2023
NYSCEF DOC. NO. 18                                  RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Case 3:21-cv-00881-X    Document 172-12    Page 1216/20    Page 60 of 137    PageID 16994

to transfer assets); Ex. 53, Email from J. Sevilla, at BC SEN0000767181 (Nov. 20, 2017)

(Ellington signs on behalf of CDO Fund appointing Beecher as representative).[4]

32.      Among their vast web of HCM-linked entities, Dondero and Ellington directed six

to initiate the fraudulent activities at issue in this proceeding (the "Transferors"):

- **CDO Fund**, a Judgment Debtor to UBS and an indirect subsidiary of HCM (and, with SOHC, the "Funds").

- **SOHC**, a Judgment Debtor to UBS and wholly owned subsidiary and alter ego of HFP.

- **HFP**, a Judgment Debtor to UBS as alter ego of SOHC and an indirect subsidiary of HCM.

- **HFC**, a subsidiary of HFP. *See* Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709 (reflecting entity organization); *see also* Ex. 26, Email from J. Blumer, at UBSHCDO-160165 (row 665) (attaching Highland Entity Excel Chart and reflecting Dondero as the sole Director/Manager/Trustee of HFC).

- **CDO Holding**, a wholly owned subsidiary of HFP. *See* Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709 (reflecting entity organization).[5]

- **CDO Opportunity Fund**, which is also an indirect subsidiary of HCM and serves as the "offshore feeder" fund to CDO Fund. *See* Ex. 104, CDO Opportunity Fund Organizational Chart, at UBSPROD5113036.

33.      A testifying expert in the Underlying Action applied New York principles of alter

ego relationships and concluded that "HCM and its President and majority owner, Mr. Dondero,

---

[4]  ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████  *See* Ex. 117,
Ellington Dep. at 119:10-120:15, 140:25-141:12, 192:6-11, 369:8-11.

[5]  Although HFC was listed in the organizational chart as an intermediate parent of CDO Holding just below HFP, *see* Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709, Dondero and Ellington similarly ignored this corporate form as evidenced by their own documented plan to directly strip CDO Holding of its assets in 2010 and again in the 2017 Fraudulent Conveyances defined and described *infra* Section III. *See, e.g.*, Ex. 40, Email from I. Leventon, at HCMUBS005260 (Apr. 19, 2017) (internal document ignoring HFC's intermediate ownership of CDO Holding).

sit at the top of [the HCM] organization chart," and "[f]rom this position, Mr. Dondero controlled"

several HCM-related entities—including the Funds, HFC, HFP, and CDO Holding. Ex. 2, Dudney

Report, at 40. In support, the expert relied upon the following facts and findings:

- Dondero "unilaterally ma[d]e decisions on behalf of HCM," and "through his controlling stake in HCM, and/or his positions within SOHC, CDO Fund and HFP, Mr. Dondero was able to control these entities." Ex. 2, Dudney Report, at 41-42.

- In 2009, Dondero eliminated the requirement that HFP have independent directors and made himself the sole director of HFP and direct decision maker for HFP and its subsidiaries. Ex. 88, Email from H. Kim, at UBSPROD1854773 (Sept. 11, 2020) (attaching HFP board minutes). HFP and its subsidiaries were financially dependent on HCM for their capital needs; indeed, at one point Dondero committed that HCM "would cover up to $12 million of margin calls" for HFP. Ex. 2, Dudney Report, at 49. In general, there was a "lack of separateness between HFP and its subsidiaries and HCM." Ex. 2, Dudney Report, at 49. This alter ego relationship encompassed CDO Holding, which HFP dominated for the benefit of itself and other HCM subsidiaries. Ex. 2, Dudney Report, at 44, 49.

- "Dondero exercised his ability to dominate and control HCM, SOHC, CDO Fund and HFP, amongst other [HCM] [e]ntities," to his own benefit, including to "authorize loans to himself" and facilitate transfers among these entities— "which were not at arm's length or executed in accordance with corporate formalities." Ex. 2, Dudney Report, at 54-56.

34.    The expert's findings track the conduct animating this special proceeding. Dondero

and Ellington ensured the entities they controlled routinely failed to observe corporate formalities

with respect to their personnel, internal systems, and considerable assets. *See, e.g.*, Ex. 117,

Ellington Dep. at 113:5-9 ████████████████████████

████████████████████████████████████████████

*see also* Ex. 26, Email from J. Blumer, at UBSHCDO-160165 (rows 536, 666) (attaching Highland

Entity Excel Chart and reflecting Dondero as CEO and "sole member of 'Monitoring Committee'")

HMIT Appx. 02708

of HFP).[6]  At all times material to UBS's claims in this Petition, these entities functioned as

extensions of one another and ultimately extensions of Dondero and Ellington.



35.      ▮▮▮, the Judgment Debtors, ▮▮▮▮▮▮▮▮ often utilized the same

offices, employees, and internal counsel.  *See, e.g.*, Ex. 121, Leventon Dep. at 27:25-28:15, 31:6-

19 (Oct. 10, 2022) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *id.* at 28:21-

29:3, 31:20-25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮; *see also* Ex. 92, Cash Warehouse Agreement ¶ 9 (Mar. 14, 2008) (listing the same

address for all Judgment Debtors: Two Galleria Tower 13455 Noel Road, Suite 800 Dallas, Texas

75240). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  *See* Ex. 111, DiOrio Dep. at 22:10-23:5.

36.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See, e.g.*, Ex. 111, DiOrio Dep. at 18:3-21:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 119, Irving Dep. at 18:11-15 (Sept. 20, 2022) ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 121, Leventon Dep. at 26:22-29:9

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 121, Leventon Dep.

---

6   *See also, e.g.*, Ex. 116, Ellington Dep. at 61:16-23 (HCM compensated Ellington for his
work on behalf of HCM's affiliates and managed funds); *id.* at 63:20-64:4 (Ellington used an HCM
email address in connection with his work on behalf of HCM's affiliates); Ex. 111, DiOrio Dep.
at 20:22-22:9 (Oct. 3, 2022) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12

at 183:8-18  Ex. 125, Sevilla Dep. at 37:15-23 (Oct. 11, 2022)

37.     HCM employees even performed work for Dondero and Ellington personally as part of their HCM employment, all without separate compensation.

Ex. 111, DiOrio Dep. at 17:23-18:15 (emphasis added); Ex. 111, DiOrio Dep. at 21:25-22:9 (

Below are a few examples:

- Ex. 125, Sevilla Dep. at 30:19-31:10, 31:18-25; Ex. 121, Leventon Dep. at 43:25-44:12.
- Ex. 121, Leventon Dep. at 44:13-25.
- *See* Ex. 128, Vitiello Dep. at 39:7-21 (Sept. 19, 2022).

38.

*See* Ex. 117, Ellington Dep. at 51:2-8

; *see also* Ex. 117, Ellington Dep. at 115:23-116:2

*See* Ex. 117, Ellington Dep. at 113:13-16

13

HMIT Appx. 02710

39. ███████████████████████████████████

████████████████████████████████████████████ Ex.

125, Sevilla Dep. at 35:22-36:25; Ex. 119, Irving Dep. at 18:11-22 ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Ex. 111, DiOrio Dep. at 15:9-

16:8, 18:3-21:1. ██████████████████████████ Ex. 111,

DiOrio Dep. at 15:5-8, 17:4-18:2. ███████████████████

███████████████ Ex. 111, DiOrio Dep. at 18:3-19:16, 52:24-53:7.

40. ██████████████████████████ Ex. 111,

DiOrio Dep. at 90:22-91:1. ███████████████████████

████████████████████████████████████████████████

█████████████████████████████ Ex. 111, DiOrio Dep.

at 89:25-92:1. ████████████████████████████████████

███████████████████████ Ex. 111, DiOrio Dep. at 89:25-90:6,

95:18-96:24. Indeed, after getting fired from HCM, Ellington hired DiOrio to work at Skyview.

Ex. 110, DiOrio Dep. at 12:11-12.

## II.   THE UNDERLYING ACTION

41.    UBS became entangled in Dondero and Ellington's web back in 2007. In 2007 and

2008, UBS agreed to pursue a complex securitization transaction involving collateralized debt

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

NYSCEF DOC. NO. 112

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X   Document 170-12   Filed 12/16/23   Page 65 of 137   PageID 16999

Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit 2   Page 18 of 90

obligations and collateralized loan obligations with HCM, CDO Fund, and SOHC (the "Knox Transaction").[7]

42.     The Funds stood to earn significant fees in connection with this transaction and in exchange agreed to bear 100% of the risk of loss associated with the transaction.  *See* Ex. 11, Phase I Decision and Order, at 12, 17.

43.     In late 2008, amid the global economic recession, the assets suffered steep losses and the Funds breached their contractual obligations to bear 100% of those losses.  *See* Ex. 11, Phase I Judgment, at 2.  UBS thus terminated the agreements in December 2008, at which point the losses on the diminished assets had grown to $519,374,149.  Ex. 11, Phase I Decision and Order, at 26-27.

44.     UBS sued HCM, the Funds, and several other affiliated entities (including HFP) in the New York Supreme Court for breach of contract from the Funds and indemnification from HCM.  *See* Ex. 11, Decision and Order, at 1.

45.     Prior to the court's entry of the Phase I Judgment and the Phase II trial on UBS's remaining claims, HCM filed for bankruptcy, staying the Phase II trial.[8]  In January 2020, an independent board of directors (the "Independent Board") of Strand took over sole authority to oversee HCM's operations, management of its assets, and its bankruptcy proceeding.  *See* Ex. 6, Bk. Dkt. No. 339 (Jan. 9, 2020).

---

[7]     A collateralized loan obligation ("CLO") is a financial structure that acquires and manages a pool of loans or other debt.  The CLO raises money by issuing its own debt tranches, as well as equity, and uses the proceeds of those issuances to obtain loans.  As the borrowers of the underlying loans make payments, the CLO distributes the money to its investors.

[8]     HCM's bankruptcy case was transferred to the United States Bankruptcy Court for the Northern District of Texas under case number 19-bk-34054.

HMIT Appx. 02712

46.     In late 2020, HCM and several of its largest creditors, including UBS, participated in a Bankruptcy Court-ordered mediation.  *See* Ex. 10, Bk. Dkt. No. 912, at 2 (Aug. 3, 2020). During this time, Ellington repeated several misrepresentations to UBS that he had made over the years, including that the Funds were "ghost funds."  *See* Ex. 87, Email from I. Leventon, at UBSPROD1738891 (Aug. 21, 2020) (Ellington misrepresenting that (1) "[m]ost of the employees and custodians" of documents related to the Funds' assets "have not worked for the debtor or related entities in 10+ years," (2) the Funds are "ghost funds" and noting that "UBS is aware of this situation . . . because I have personally discussed it with [Andy Clubok, UBS's counsel] several dozen times," and (3) Ellington and Leventon spent 100+ hours "trying to piece together everything we can" and "all that is available" about the Funds).

47.     Despite long discussions with mediators and months of settlement discussions between the parties, it was only after Dondero and Ellington were removed that HCM and UBS were able to reach an agreement in principle to settle UBS's claims in the bankruptcy.  Then, on or about February 10, 2021, on the eve of the parties signing a settlement agreement, HCM disclosed several fraudulent conveyances that HCM entities (at the direction of Dondero and Ellington) had conducted in concert with Sentinel, a Dondero- and Ellington-affiliated insurance entity based in the Cayman Islands.  *See* Ex. 90, HCM and UBS Settlement Agreement, at 2 (Mar. 30, 2021) (acknowledging disclosure of ATE Policy); Ex. 16, Bk. Dkt. No. 2389, at Exhibit 1, at 2 (May 27, 2021) (order approving settlement).  UBS and HCM renegotiated their settlement, including settlement of UBS's Phase II claims against HCM and certain related entities.

48.     On July 27, 2022, the court issued a Decision and Order on the remaining, unsettled Phase II claims, finding HFP to be an alter ego of SOHC and liable for satisfying the $510,771,605.55 Phase I Judgment against SOHC, plus all statutory interest.  Ex. 23, Phase II

Decision and Order (July 29, 2022). On November 21, 2022, the court issued the Phase II Judgment. Ex. 24, Phase II Judgment.

## III. ANTICIPATING LIABILITY, DONDERO AND ELLINGTON SHUFFLE ASSETS TO PUT THEM BEYOND UBS'S REACH

### A. The 2010 Fraudulent Conveyance From CDO Holding To CLO HoldCo

49. In late October 2010, the parties to the Underlying Action had fully briefed, and the presiding court held a hearing on, HFP's and the Funds' motion to dismiss UBS's claim against HFP as alter ego of SOHC. *See* Ex. 12, Motion to Dismiss Hearing Transcript, 650097/2009 (Oct. 19, 2011). UBS highlighted the many facts animating UBS's allegations that HFP exercised unfettered control over SOHC and used that control to defraud UBS, all facts the court later determined to be true. Ex. 12, Motion to Dismiss Hearing Transcript at 29:24-30:14 (citing the allegations in UBS's complaint that explained the alter ego relationship between HFP and SOHC). Dondero and Ellington saw the writing on the wall and correctly predicted that the court would hold that HFP is the alter ego of SOHC and thus liable for claims under which UBS would seek hundreds of millions of dollars in damages. *See* Ex. 1, Decision and Order Denying Motion to Dismiss, 650097/2009, at 10 (Nov. 3, 2011) (holding that UBS sufficiently pled an alter ego relationship between SOHC and HFP and denying motion to dismiss); *see also* Ex. 23, Phase II Decision and Order, at 9 (holding that HFP is the alter ego of SOHC and liable for the Judgment).

50. The following figure (attached in larger format as Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709), shows the way HCM controlled HFP as the 100% owner of its general partner. It also shows the way HCM was thus able to control HFP's subsidiaries:



51.     Shortly after the hearing, Dondero acted to move HFP's assets out of its structure and therefore ostensibly out of the reach of any future UBS judgment.  On December 23, 2010, CDO Holding transferred substantially *all* of its assets in exchange for cash and a promissory note to CLO HoldCo, an entity created just weeks before (the "2010 Fraudulent Conveyance").  *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS."

52.     CDO Holding was ███████████████████████████████████████ Ex. 121, Leventon Dep. at 32:5-15.  HFP used CDO Holding's assets for whatever HFP and HFP's subsidiaries needed.  Indeed, HFP's former President and Chief Executive Officer (an HCM employee), Todd Travers, admitted that HFP and its subsidiaries did not employ any specific limitations or procedures that governed when one HFP subsidiary could cover the debt of HFP or another subsidiary.  *See* Ex. 127, Travers Dep. at 192:14-193:8 (Apr. 3, 2012) (decisions to cover debts for HFP or its subsidiaries were "all just sort of done on an ad hoc basis as Mr. Dondero

HMIT Appx. 02715

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 13
INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X   Document 178-12   Filed 12/16/20   Page 69 of 137   PageID 17003
Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit   Page 22 of 90

directed"). Dondero—who controlled HFP and therefore CDO Holding—could not even recall if HFP had any policies or procedures in place to determine whether HFP or its subsidiaries would pay its debts. *See* Ex. 112, Dondero Dep. at 431:2-12 (June 11, 2012). HFP's former Chief Operating Officer, Philip Braner, similarly testified that transfers between HFP and its subsidiaries were rarely formally documented as HFP did not have any policies requiring documentation of such transfers. *See* Ex. 108, Braner Dep. at 804:3-20 (Dec. 7, 2011).

53.     For instance, to cover certain SOHC losses in 2008, HFP withdrew about $15 million from CDO Holding. *See* Ex. 2, Dudney Report, at 19; *see also* Ex. 107, Braner Dep. at 323:19-326:11 (Dec. 6, 2011) (Braner approved both the $15 million transfer from CDO Holding to HFP and the later transfer from HFP to SOHC with a one-word email reading "approved").



*See* Ex. 121, Leventon Dep. at 32:5-33:7.

Ex. 121, Leventon Dep. at 32:5-33:7.

54.     Assets moved in the other direction as well. CDO Holding routinely "required cash contributions from HFP in order to make various disbursements." Ex. 2, Dudney Report, at 47. In June 2008, SOHC recorded a dividend of $10.5 million to HFP, which HFP in turn moved to CDO Holding. *Id.* In reality, the cash transfer went directly from SOHC to CDO Holding (and not through HFP). *See id.* at 43. That month, HFP also raised $40 million from other HCM entities and transferred the money to CDO Holding to distribute it. *See id.* at 48. In December 2008, "as part of a single set of instructions to Bank of New York Mellon, SOHC transferred $3.7 million to

HMIT Appx. 02716

HFP, which was then transferred to CDO Hold[ing] and ultimately to James Dondero." *See id.* at 48.

55.     CLO HoldCo, on the other hand, was set up specifically to carry out the 2010 Fraudulent Conveyance.  CLO HoldCo was incorporated on December 13, 2010, ***ten days*** before the 2010 Fraudulent Conveyance, "to hold certain CLO assets" and to "enter[] into an investment transaction [the] next week."  *See* Ex. 28, Email from H. Kim, at UBSHCDO-015354 (Dec. 14, 2010) (attaching CLO HoldCo's Certificate of Incorporation at UBSHCDO-015356); Ex. 29, Email from A. Alvarez, at UBSHCDO-135396, -98 (Dec. 16, 2010). CDO Holding recorded no sales to any other entity in 2010.  *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS."

56.     Dondero controlled CLO HoldCo through its parent, Highland Capital Management Partners Charitable Trust #2, and later, the DAF, which Dondero funded with his own assets and assets from HCM and other sources.  *See* Ex. 71, Email from H. Kim, at UBSPROD2389234, tab "Dissolved Entities," row 429; tab "DAF," row 11 (Sept. 23, 2019) (attaching Legal Entities List); Ex. 18, Bk. Dkt. No. 2660, at 2-3 (Aug. 4, 2021) (CLO HoldCo Contempt Order)]; Ex. 32, Email from M. Okolita, at UBSHCDO-125280 (Dec. 21, 2010) ("Jim [Dondero] will be contributing ~16% of the value [of] the assets . . . .").

57.     To solidify his control, Dondero put an empty suit in charge of CLO HoldCo.  On paper, Grant Scott was CLO HoldCo's director and sole manager.  Ex. 28, Email from H. Kim, at UBSHCDO-015354, -55.  However, as the Bankruptcy Court recently explained when holding CLO HoldCo in contempt for violating court orders, Grant is "a patent lawyer with no experience in finance or running charitable organizations, who was Mr. Dondero's long-time friend, college housemate, and best man at his wedding."  *See* Ex. 18, Bk. Dkt. No. 2660, at 2.  The documentation

HMIT Appx. 02717

underlying the 2010 Fraudulent Conveyance further underscores Dondero's control, as Dondero signed as the "[g]atekeeper" for both CDO Holding and CLO HoldCo on an internal compliance report for the transfer. *See* Ex. 35, Email from C. Chism, at UBSHCDO-212473 (Jan. 5, 2011) (attaching Dec. 21, 2010 Compliance Report).

58.     The 2010 Fraudulent Conveyance was far from an arm's-length transaction, with contemporaneous internal HCM documentation evidencing concern over the lack of independent review and evaluation of the terms of the underlying note.[9]

59.     The justification for the transfer was similarly suspect. One rushed valuation determined the assets to be worth at least $39,638,160.00. *See* Ex. 30, Email from M. Khankin, at UBSHCDO-117919 (Dec. 16, 2010) (attaching Dec. 8, 2010 Highland Valuation Results Letter).[10] Dondero justified transferring the asset portfolio to provide "[l]iquidity" to CDO Holding. Ex. 35, Email from C. Chism, at UBSHCDO-212473 (attaching Dec. 21, 2010 Compliance Report). But CDO Holding received just $6,597,862.00 in cash from the transfer, along with a promissory note for $32,801,593.00 plus interest that would not be payable for *fifteen* years. *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS," row 19 (reflecting that

---

[9]     "It appears that the note from the trust to the CDO Holdi[ng] is **not being** independently valued. I expressed sever [sic] concerns about this being at arms length and told him I had spoken to Clint and Frank AND JIM [Dondero] about this and that it was a requirement and I don't know how you deem a transaction at arms length when you control the terms of the note and no one has reviewed them!???! He expressed concerns that no one had told him this before to which I reiterated I had told everyone about this, including him and Jim [Dondero] and playing ignorant is not helpful and that I had serious doubts as to how this transaction was fair." Ex. 32, Email from M. Okolita, at UBSHCDO-125280 (emphasis in original).

[10]     A subsequent version of this document indicates that the two largest CLOs in the portfolio made returns in Euros. *See* Ex. 34, Email from M. Khankin, at UBSHCDO-056482 (Jan. 3, 2011) (attaching Dec. 8, 2010 Revised Highland Valuation Results Letter). The dollar figure in this petition calculates the value based on the Euro-to-Dollar spot exchange rate from the valuation date, Dec. 8, 2010. *See* European Central Bank, Euro Foreign Exchange Rates (Dec. 8, 2010), https://www.ecb.europa.eu/stats/exchange/eurofxref/shared/pdf/2010/12/20101208.pdf (last accessed Feb. 5, 2023).

HMIT Appx. 02718

between December 31, 2009, and December 31, 2010, CDO Holding added a new intercompany receivable from CLO HoldCo in the amount of $32,801,593.00); *id.* at tab "200.5 CDO CF," row 1478 (showing that on December 23, 2010, CDO Holding recorded a "sale" of "CDO Holding Assets" to CLO HoldCo in exchange for $6,597,862.00).

60.     UBS did not discover the 2010 Fraudulent Conveyance until well after Dondero's and Ellington's removal from HCM.  On February 10, 2021, HCM's bankruptcy counsel sent UBS a copy of the ATE Policy, which included a schedule listing a promissory note from CLO HoldCo to CDO Holding.  And only after that initial disclosure did UBS receive a copy of the actual promissory note and details surrounding the fraudulent nature of the conveyance.

**B.     The 2017 Fraudulent Conveyances To Sentinel**

61.     As the Underlying Action progressed, the defendants' (and, by extension, Dondero's and Ellington's) litigation setbacks continued to mount.  And after summary judgment losses in March 2017, Dondero and Ellington knew an adverse judgment was inevitable.  *See* Ex. 116, Ellington Dep. at 115:13-116:13 (Ellington believed Judgment Debtors would lose, was not surprised by the size of the damages verdict, and had warned Dondero that UBS would likely prevail); Ex. 120, Leventon Dep. at 87:22-88:4 (July 22, 2021) (Leventon advised Dondero and Ellington that Judgment Debtors were likely to be found liable).

62.     Dondero and Ellington also knew that the Transferors held substantial assets—all of which were ultimately under HCM's (and therefore Dondero's and Ellington's) control, and all of which could be used to satisfy an award to UBS.  And as early as April 2017, HCM's Legal Department, at Ellington's direction, prepared an internal document that specifically contemplated the financial and legal risks to HCM, its related entities, and Dondero himself, pending the outcome of the Underlying Action.  *See* Ex. 38, Email from I. Leventon, at HCMUBS005289 (Apr. 12, 2017) (attaching an HCM "Settlement Analysis" which identified risks to Dondero and the HCM-

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 2
INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X    Document 179-12    Filed 01/09/24    Page 73 of 137    PageID 17007
Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Exhibit 12    Page 26 of 90

related entities associated with the Underlying Action, including a $1.2 billion judgment, and analyzed how transferring assets away from the Transferors could obviate these risks).

63.     And so Dondero and Ellington devised and implemented a scheme to move *all* the Judgment Debtors' remaining assets (as well as assets of the other Transferors) that could be subject to the impending judgment to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands-based reinsurance company that Dondero and Ellington ultimately owned (the "2017 Fraudulent Conveyances").  *See* Ex. 68, Email from C. Price, at DISCEN0008408, -8410 (June 20, 2019) (attaching Sentinel Structure Ownership Chart).

1.     Dondero And Ellington Manufacture The ATE Policy As A Way To Transfer Assets

64.     As guise for the 2017 Fraudulent Conveyances, Ellington devised that the Funds and the other Transferors would transfer substantially all their assets (the "2017 Transferred Assets") to Sentinel as "premium" on a so-called "After-The-Event" insurance policy (the "ATE Policy") to the Funds and CDO Holding (together, the "Insureds") for liability in the Underlying Action, under an attendant Asset Purchase Agreement (the "APA").  *See* Ex. 117, Ellington Dep. at 119:10-11; *see also* Ex. 37, Email from S. Vitiello, at UBSPROD4837429 (Apr. 11, 2017) (email between Stephanie Vitiello and Leventon attaching draft ATE Policy presentation "[b]ased on our discussion with Scott [Ellington]"); Ex. 38, Email from I. Leventon, at HCMUBS005295 (attached revised ATE Policy presentation including purchase of "$100m ATE policy from Sentinel" with "ATE premium = all assets in HFP/CDO Fund").  By moving all the 2017 Transferred Assets, Dondero and Ellington could avoid loss of the assets, HCM facing "years of fraudulent transfer claims throughout Highland structure," and "liability to backstop HFP/CDO Fund for up to $1.2b" if UBS won.  Ex. 40, Email from I. Leventon, at HCMUBS005253-54 (Apr.

HMIT Appx. 02720

19, 2017).  The moves also avoided $257 million tax liabilities for HCM, including $50 million for Dondero personally, if HCM happened to win the case.  *Id.*

65.



[11] *See* Ex. 117, Ellington Dep. at 327:2-14, 328:9-329:1; *id.* at 119:10-11 ▮▮▮▮▮▮▮▮▮▮▮; *see also* Ex. 121, Leventon Dep. at 132:3-18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also, e.g.*, Ex. 106, Beecher Dep. at 145:11-19 (Apr. 12, 2022) (that the policy premium would "be satisfied by the transfer of the entire investment portfolios of the [F]unds" was Sevilla's idea).

66.     Sentinel's prior business and financial status at the time of the ATE Policy further evidences the ATE Policy's fraudulent nature.  Sentinel had never issued an after-the-event legal liability policy before it issued one to the Insureds, nor has it issued one since.  *See* Ex. 124, Sevilla Dep. at 138:23-25 (July 21, 2021); Ex. 106, Beecher Dep. at 124:20-125:4.  Before the ATE Policy, Sentinel exclusively wrote director and officer liability policies for Dondero- and Ellington-related entities worth fractions of that of the ATE Policy.  Ex. 124, Sevilla Dep. at 95:9-23; Ex. 49, Email from K. Irving, at HCMUBS001079 (Aug. 16, 2017).  Without the 2017 Transferred Assets, Sentinel would have been unable to pay the full $100 million coverage of the ATE Policy: as of December 2016, Sentinel had only $19,193,823.23 in total assets, $5,886,746.39 of which were cash.  *See* Ex. 49, Email from K. Irving, at HCMUBS001079.

---

[11] Beecher "specialized in setting up and helping to manage captive[]" insurers.  Ex. 106, Beecher Dep. at 19:6-11.  Beecher "helped set up [Sentinel]" and then provided services "consisting of financial statements, preparation, coordination of board meetings, corresponding with the regulators . . . [and] [i]nteracting with the various service providers that Sentinel would engage for audit [and] actuarial" work.  *Id.* at 16:1-18.

2.      Dondero And Ellington Set And Carry Out The Terms Of The ATE Policy

67.     Dondero, Ellington, and their lieutenants unilaterally dictated the substantive terms of the ATE Policy and associated APA, reinforcing the transfers' fraudulent nature and Dondero and Ellington's control over the Judgment Debtors.

68.     *First*, Dondero and Ellington's lieutenants revised the ATE Policy to allow reimbursement of expenses even if the Insureds could not afford to litigate the Underlying Action—a near certainty given that the Insureds transferred substantially all of their assets to purchase the ATE Policy.  *See* Ex. 42, Email from P. Kranz, at BC SEN0000745902 (Aug. 8, 2017) (responding to an email chain in which Sevilla directs Solomon Harris to remove an exclusion that would permit Sentinel to deny coverage to an insured that lacked the funds to litigate its case).

69.     *Second*, Dondero and Ellington's lieutenants carefully tailored the terms of the ATE Policy to enable the Insureds and other related entities to drain the policy limit through reimbursements unrelated to the Underlying Action.  *See* Ex. 42, Email from P. Kranz, at BC SEN0000745902-03 (Sevilla directing Solomon Harris to extend coverage under the Policy to the Insureds' "own costs and expenses," and later broadening that language to the "costs and expenses of the Representative *and other service providers in the normal course*, including related tax, which are incurred during the conduct of the legal action on behalf of the insured" (emphasis added)).

70.     *Third*, when Sentinel's actuary analyzed the ATE under the terms Dondero and Ellington's lieutenants provided, including the coverage limit and premium, the actuary noted that "[e]ven under reasonably optimistic assumptions," Sentinel would lose money on the ATE Policy. Ex. 41, Email from T. Adamczak, at BC SEN0000745987 (June 28, 2017). But this did not deter Dondero, Ellington, or their lieutenants.

HMIT Appx. 02722

71.     *Finally*, to ensure that they would have the authority to push the transaction through on Sentinel's behalf, Dondero and Ellington arranged for their own appointment as sole members of the Sentinel Advisory Board of ITA Trust, the entity with ultimate voting control over Sentinel. Although Sentinel had been operating for five years, Dondero and Ellington's tenure on the Sentinel Advisory Board commenced at the same time Sentinel and the Transferors executed the ATE Policy and APA. *See* Ex. 116, Ellington Dep. at 93:9-10 (Ellington testifying that Sentinel was formed in 2012); Ex. 66, Email from C. Price, at BC SEN0000076075 (Mar. 5, 2019) (attaching Sentinel Board Minutes). As the sole members of the Advisory Board, Dondero and Ellington would "guide the decision making of the Trustee of the ITA Trust in its role as an indirect shareholder in [Sentinel]." *Id.*

72.     While developing the ATE Policy and APA, Sentinel's outside counsel at Solomon Harris questioned the "legal validity" of the contemplated transfer, ***articulating the exact theory of fraud animating UBS's claims here***: that the 2017 Fraudulent Conveyances put the assets "beyond the reach of the plaintiffs in the [Underlying Action] against the [F]unds" and a court could determine "that the 'premium' has to be returned or . . . set aside as some unlawful preference or similar." Ex. 42, Email from P. Kranz, at BC SEN0000745905. This did not dissuade Dondero or Ellington. In August 2017, Dondero executed the ATE Policy and corresponding APA, transferring the 2017 Transferred Assets valued at over $105,647,679.00 to satisfy a $25,000,000 "premium." *See* Ex. 51, Email from I. Leventon (Oct. 26, 2017); Ex. 98, Asset Purchase Agreement (Aug. 7, 2017).[12]

---

[12] The final APA largely mirrors Appendix 1 that was attached to the settlement analysis presentation prepared by Ellington and his team in April 2017 and presented to Dondero. *See* Ex. 39, Email from I. Leventon, at UBSPROD4837680 (Apr. 13, 2022) (attaching Settlement Analysis presentation).

HMIT Appx. 02723

73.     The face value of the transferred cash and promissory notes sent as part of the 2017 Transferred Assets alone were worth nearly twice the ATE Policy premium.  *See* Ex. 98, Email from I. Leventon, at BC SEN0000089127-28 (Schedule A to APA).[13]

74.     In its time managing "[t]housands" of insurance policies, Beecher had never before seen a premium paid in this fashion.  *See* Ex. 106, Beecher Dep. at 180:18-181:5. ██████████

████████████████████████████████████████████████████████████

████████████████████████████  Ex. 111, DiOrio Dep. at 304:16-305:1.

75.     Under the final ATE Policy, Sentinel agreed to indemnify CDO Holding—a non-party to the Underlying Action but alter ego to parties HFP and SOHC—and the Funds for up to a $100 million limit for any adverse judgment or settlement with UBS.  *See* Ex. 51, Email from I. Leventon, at UBSPROD1973056, -70. ████████████████████████████

████████████████████████████████  *see* Ex. 125, Sevilla Dep. at 118:18-120:4, ██████████████████████████████████.  Ex. 121, Leventon Dep. at 32:5-15.

76.     The other three Transferors that contributed their assets—CDO Opportunity Fund, HFC, and HFP—were not insured under the ATE Policy and, as for CDO Opportunity Fund and HFC, were not even party to the Underlying Action.  *Compare* Ex. 98, Asset Purchase Agreement,

---

[13] The 2017 Fraudulent Conveyances included the assignment of three promissory notes.  *See* Ex. 98, Asset Purchase Agreement, at BC SEN000089127-28.  This included the $32,801,593 CLO HoldCo promissory note, originally issued for the 2010 Fraudulent Conveyance.  Ex. 54, Email from L. Thompson (April 6, 2018) (attaching Assignment Agreement Ex. A (CLO HoldCo Promissory Note)).  It also included the assignment of a promissory note from the Dugaboy Investment Trust for $2,399,996, signed by Dondero's sister, Nancy, and a promissory note from Governance Re Ltd. for $2,155,144, signed by Dondero, both originally issued to CDO Fund on August 7, 2017, just days before the 2017 Fraudulent Conveyances.  *See* Ex. 63, Email from I. Leventon, at UBSPROD2309345-47, 43-44 (Nov. 14, 2018) (attaching Dugaboy and Governance Re promissory notes).

HMIT Appx. 02724

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM    INDEX NO. 650744/2023
NYSCEF DOC. NO. ...    RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Case 3:21-cv-00881-X    Document 170-12    Filed 11/16/23    Page 78 of 137    PageID 17012

at BC SEN000089127-28, *with* Ex. 51, Email from I. Leventon, at UBSPROD1983071. These three had nothing to gain from the 2017 Fraudulent Conveyances except to safeguard their assets (ultimately under the control of Dondero and Ellington) from an adverse judgment and alter ego liability in the Underlying Action. *See generally* Ex. 122, Raver Dep. at 111:20-112:7 (May 6, 2021) (the Transferors *lost* money in these transfers).

77.    Dondero, Ellington, and their lieutenants were intimately involved in effecting the 2017 Fraudulent Conveyances from both sides. Ellington got the transaction approved and completed, *see* Ex. 113, Dondero Dep. at 74:9-17, and Dondero signed the ATE Policy on behalf of all the Insureds and the APA on behalf of all Transferors, *see* Ex. 51, Email from I. Leventon, at UBSPROD1983071; Ex. 98, Asset Purchase Agreement, at BC SEN0000089124-25. Dondero even tried to sign a corollary to the APA on behalf of the Transferors *and* Sentinel. *See* Ex. 48, Email from T. Loiben, at HCMUBS000863 (Aug. 14, 2017); Ex. 47, Email from T. Loiben, at HCMUBS000947, (Aug. 14, 2017) (attaching Assignment Agreement signed by Dondero as assignor and assignee). Even when they were not acting directly, Dondero and Ellington directed others at HCM to carry out their plans. *See, e.g.*, Ex. 43, Email from J. Sevilla, at UBSPROD2566503 (Aug. 10, 2017) (replying to an email from H. Kim noting that she had to track down Dondero's signature on behalf of the Judgment Debtors); Ex. 46, Email from D. Willmore, at HCMUBS000563 (Aug. 11, 2017) (confirming to Dondero and Ellington's lieutenants that wires had been initiated "to move all of CDO Fund's cash to Sentinel."). ██

████████████████████████████████████████████████████ Ex. 121, Leventon Dep. at 157:14-158:6, and Irving was instrumental in ensuring that Sentinel received all the assets in satisfaction of the premium payment under the APA, *see* Ex. 118, Irving Dep. at 87:13-18 (Nov. 15, 2021).

28

78.     When asked, Dondero could not be sure who he or Ellington represented in the 2017 Fraudulent Conveyances: Sentinel, the Transferors, or both. *See* Ex. 113, Dondero Dep. at 143:21-144:14 ("And although Scott Ellington coordinated the overall transaction, I don't know if there was somebody separate representing one side or the other or if he represented both [Sentinel and the Insureds].").

### 3.     At All Times, Dondero And Ellington Controlled Sentinel

79.     Dondero and Ellington happily moved assets out of the various HCM-entities because they fully controlled Sentinel and would still have control over and access to the 2017 Transferred Assets.

80.     As noted above, Dondero and Ellington are and have always been the ultimate beneficial owners of Sentinel. ███████████████████████████████████████████
████████████████████████████████ *See* Ex. 115, Dondero Dep. at 18:25-22:19 (Oct. 18, 2022); *see also* Ex. 117, Ellington Dep. at 50:1-16 ████████████████████████████
██████████████████████████. As a reward, even though Ellington did not contribute any capital, ████████████████████████████████████████████████████████████
████████████ Ex. 115, Dondero Dep. at 22:2-12; Ex. 116, Ellington Dep. at 155:17-156:6. Dondero and Ellington "call[ed] the shots" as the ultimate beneficial owners of Sentinel. Ex. 106, Beecher Dep. at 34:16-19.

81.     Ellington was "responsible for managing . . . and monitoring [Sentinel]," Ex. 113, Dondero Dep. at 134:1-4, ████████████████████████████████████████████
███████████████████████████████████████ *See* Ex. 125, Sevilla Dep. at 41:22-25 ██████████████████████████████████████ Ex. 111, DiOrio Dep. at 33:4-24 ██████████████████████████████████████████████ Ex. 119, Irving Dep. at 238:14-23 ██████████████████████████████ Ex.

29

121, Leventon Dep. at 91:13-92:7 . Sentinel had

no separate employees and instead was, until 2021, run exclusively by HCM employees at

Dondero and Ellington's direction.  *See* Ex. 106, Beecher Dep. at 18:10-25; *id.* at 16:22-17:23

(Sevilla, Irving, DiOrio, and Leventon worked on behalf of Sentinel); *see also* Ex. 110, DiOrio

Dep. at 88:25-89:23 (July 23, 2021) (same); Ex. 106, Beecher Dep. at 32:9-22 ("[a]nything

pertaining to the entities within the Sentinel structure . . . would either be communicated by"

Sevilla or select other HCM employees, including DiOrio); Ex. 111, DiOrio Dep. at 115:10-12

*See* Ex. 111, DiOrio Dep. at 212:13-19 .[14]

### 4.   Dondero And Ellington Try To Conceal The 2017 Sentinel Transfers

82.     Dondero and Ellington went to great lengths to cover up the 2017 Fraudulent

Conveyances to Sentinel.

83.     To start, Dondero and Ellington concealed their ownership of Sentinel and the true

purpose of the ATE Policy from everyone except their trusted lieutenants.  *See* Ex. 113, Dondero

Dep. at 167:20-25 (Dondero did not "remember" or "recall" telling anyone at HCM that he was

the majority beneficial holder of Sentinel); Ex. 123, Ringheimer Dep. at 29:14-18 (Apr. 30, 2021)

(HCM employee who helped push through the transfers was aware they were urgent but could not

---

[14]  DiOrio removed the director and pushed forward the dividend in the same breath: "[p]lease
see the attached shareholder resolution removing Dilip Massand from the Sentinel board. I think
we should be good to get the dividend paid out now."  *See* Ex. 83, Email from J. Neveril, at BC
SEN0000770886 (Apr. 24, 2020).

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 11 INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X   Document 170-12   Filed 12/16/23   Page 81 of 137   PageID 17015
Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit 2   Page 34 of 90

recall an explanation for the urgency); Ex. 126, Stoops Dep. at 16:3-20:16 (Apr. 27, 2021) (HCM employee who helped push through the transfers had "very, very limited knowledge" of the ATE Policy but knew that there was urgency to execute the associated transfers); *see also* Ex. 126, Stoops Dep. at 14:5-17:9 (Sevilla told HCM employee who helped push through the transfers that the transfers were necessary because UBS and HCM were in settlement negotiations and UBS required HCM to remit settlement in cash).

84.     Later on in 2018, Sentinel (on behalf of Dondero and Ellington) tried to hide the fraudulent nature of the transfers by ascribing only $68 million in value to the 2017 Transferred Assets, *assets which HCM confirmed were worth $105,647,679.00 less than one year after the transfers.  See* Ex. 69, Email from K. Irving, at UBSPROD2572277 (Aug. 6, 2019) (attaching Sentinel Presentation to CIMA); Ex. 61, Email from R. Swadley, at HCMUBS003792 (Sept. 12, 2018) (attaching Tax Memorandum).  But an auditor for Sentinel noted that even under this value, "Sentinel [w]as . . . overpaid by approximately $15m" for the premium with "no return of overpayment."  Ex. 55, Email from J. Sevilla, at BC SEN0000707457 (June 6, 2018).  This raised "the question 'is this an arms-length transaction'" and would require "a ton of additional disclosures in the audit report."  *Id.*  Dondero, Ellington, and their lieutenants tried to conceal this disparity through retroactive "adjustments" to the ATE Policy terms, all of which underscore the illicit nature of the 2017 Fraudulent Conveyances.

85.     Around June 2018, Sentinel executed the first of two undated endorsements (or amendments) to the ATE Policy, which "adjusted" the premium from $25,000,000 to Sentinel's $68,362,333.62 valuation of the assets.  *See* Ex. 69, Email from K. Irving, at UBSPROD2572277 (attaching Sentinel Presentation to CIMA); Ex. 52, Limited Liability Insurance Policy and Endorsements, at DISCEN0007913 (June 2018).   The post-hoc increase in the ATE Policy

premium did not increase the policy limit or period of coverage—every other aspect of the ATE Policy remained the same.  *See* Ex. 52, Limited Liability Insurance Policy and Endorsements.

86.    Later that same month, Sentinel executed a second endorsement to the ATE Policy, reducing the premium and coverage by $9 million for monies that the Insureds supposedly "prepaid" to "cover risk mitigation costs, which include but are not limited to, legal defense costs." *See* Ex. 69, Email from K. Irving, at UBSPROD2572277 (attaching Sentinel Presentation to CIMA); Ex. 52, Limited Liability Insurance Policy and Endorsements, at DISCEN0007913.

87.    Despite the substantive changes to the ATE Policy resulting from the endorsements, no representative of the Insureds signed either endorsement, and Beecher could not recall whether the Insureds had representation in connection with these amendments.  *See* Ex. 106, Beecher Dep. at 236:7-13.

88.    The fraudulent nature of the ATE Policy and related transfers came to light in March 2019 when the Cayman Island Monetary Authority ("CIMA") conducted onsite inspections of Sentinel.[15]  Because Sentinel's only active policy at the time was the ATE Policy, CIMA focused its assessment on the ATE Policy, the APA, and associated transfers.  CIMA was concerned that "[t]hose charged with . . . governance could not explain the basis upon which the [2017 Transferred Assets] had been valued on or about August 1, 2017 for the purpose of premium settlement," and "they could not explain the reason why the information that was relied on to value the [2017 Transferred Assets] could not be readily provided to the auditors upon request."  Ex. 67, Email from S. Dube, at BC SEN0000078819, -22 (May 6, 2019) (attaching CIMA Sentinel Final

---

[15]    "[CIMA's] Insurance Supervision Division is responsible for the supervision, regulation, and licensing of all insurance companies and insurance brokers, managers and agents through an integrated risk-based supervisory approach while ensuring compliance with regulatory legislation."  Cayman Islands Monetary Auth., "Divisions," https://www.cima.ky/about-division (last accessed Feb. 6, 2023).

HMIT Appx. 02729

Inspection Reports). CIMA similarly found the post hac endorsements troubling, as "[t]hose charged with governance could not explain why the premium was adjusted from US$25 million to US$68.3 million without a commensurate adjustment to the indemnity limit provided or why the initial pricing for the policy was subsequently deemed not sufficient." *Id.* These facts, coupled with the realization that the 2017 Transferred Assets led to a near seven-fold increase in Sentinel's investment portfolio between December 2016 and December 2017, "cast significant doubt on the economic substance and business purpose of the transactions relating to the ATE coverage" that were "at the very least questionable." *Id.*

89. Dondero and Ellington's lieutenants sought to legitimize the ATE Policy by lying to CIMA in claiming that Sentinel's actuary independently determined the ATE Policy's terms — which the actuary denied and the documentary evidence shows is false. *See* Ex. 67, Email from S. Dube, at BC SEN0000078822 (attaching CIMA Sentinel Final Inspection Reports). In reality, the actuary flagged a "huge down-side risk" with "not much to gain" and warned Sentinel that "[e]ven under reasonably optimistic assumptions, Highlands' loss would exceed the projected premium." Ex. 41, Email from T. Adamczak, at BC SEN0000745985-987, -993 (June 28, 2017).[16] CIMA determined as much through its inspection, finding that Sentinel's actuary "was not involved in the determination of premium pricing . . . to any extent at all" and that the actuary's "involvement arose after premium decisions had been finalized by [Sentinel]." Ex. 67, Email from S. Dube, at BC SEN0000078822. CIMA expressed "concern that the management's assertion that the ATE [P]olicy premium of US$25 million was established based on a pricing study conducted by [Sentinel's] actuary contradicts the actuary's position." *Id.* However, nothing came of these

---

[16] This analysis assumed a premium of $20 million and coverage of $80 million—the final ATE Policy maintained the same losing ratio, with a $25 million premium for $100 million in coverage. Ex. 41, Email from T. Adamczak, at BC SEN0000745985-987.

inspections and the fraudulent nature of the 2017 Fraudulent Conveyances and ATE Policy remained hidden.

90.     After the court entered the Phase I Judgment, Dondero and Ellington continued to make every effort to obscure from UBS the existence of the ATE Policy and the 2017 Fraudulent Conveyances.[17]

91.     During years of settlement negotiations with UBS, UBS made requests for documentation relating to the Funds' assets as of February 2009 and any subsequent transfer or dissipation. *See* Ex. 13, Bk. Dkt. No. 1345, at 10 (Nov. 6, 2020). In response, Dondero, Ellington, and their lieutenants repeatedly lied to UBS, stating such documentation was limited or did not exist, that CDO Fund and SOHC were "ghost funds," that "had no assets left, but if there was a settlement, that Mr. Dondero could come up with funds from some other source to satisfy a relatively small settlement on behalf of those funds." *See, e.g.*, Ex. 87, Email from I. Leventon, at UBSPROD1738891 ("I know that UBS is aware of this situation and I know Andy Clubok knows of this situation because *I have personally discussed it with him several dozen times*. Including as recently as this year.") (emphasis added); Ex. 103, Ellington Subpoena (Mar. 1, 2022); Ex. 116, Ellington Dep. at 83:15-84:24 (Ellington did not disclose the ATE Policy to UBS's counsel or the Bankruptcy Court); Ex. 120, Leventon Dep. at 150:25-152:4, 268:4-20 (Leventon did not disclose the ATE Policy to UBS, the Independent Board, or HCM's bankruptcy counsel).[18]

---

[17]   Indeed, Dondero and Ellington's lieutenants even went as far as to disclaim any knowledge of Sentinel's relationship with HCM. *See, e.g.*, Ex. 89, Email from G. Demo, at UBSPROD3603372 (Feb. 9, 2021) (DiOrio, a director of Sentinel at the time, lies in response to a question from Demo requesting visibility into Sentinel's ownership and purpose, "It is a non-debtor, non-affiliate reinsurance company and I do not know who or how it is owned.").

[18]   Neither did Dondero, █████████, and their lieutenants disclose to the Independent Board that HFP, SOHC, and CDO Fund were insured for up to $100 million under the ATE Policy when representing that they were insolvent. *See* Ex. 117, Ellington Dep. at 133:3-10, 137:15-138:11 ████████████████████████████████████████████████████████ Ex. 124, Sevilla Dep. at

92.     It was only on or about February 10, 2021, after Dondero's and Ellington's removal, that the Independent Board first shared with UBS the existence of the ATE Policy and APA, revealing for the first time the clandestine scheme to frustrate the Judgment and defraud UBS. *See* Ex. 90, HCM and UBS Settlement Agreement, at 2 (acknowledging disclosure of ATE Policy).

### C.     The 2019 Fraudulent Conveyance To Sebastian Clarke

93.     Just a month after the court found the Funds liable in the Underlying Action, Dondero and Ellington, through their lieutenants, sought to drain Sentinel of the remaining 2017 Transferred Assets.

94.     In a single day on December 31, 2019, DiOrio and Sevilla forced through the transfer of $35,201,589 of the 2017 Transferred Assets to Sebastian Clarke—yet another Cayman Island entity Dondero and Ellington owned and controlled.[19]  *See* Ex. 82, Email from M. DiOrio, at BC SEN0000638651 (Mar. 19, 2020) (Sevilla requests that the directors of Sebastian Clarke, John Cullinane and David Egglishaw, "review a matter for approval today" involving a transfer of assets "Sentinel currently marks at zero and which Sentinel would propose to transfer to Sebastian Clarke for minimal consideration"); *id*. at BC SEN0000638650 (DiOrio notes that "[a]ll we need is an email consent to the transfer and we will have it documented later this week"); Ex. 60, Email from J. Venza, at HCMUBS003785 (Sept, 5, 2018) (attaching Offshore Fund Structure Chart) (reflecting Dondero and Ellington's ownership interests in various entities, including Sebastian

---

278:20-279:3 (Sevilla did not disclose the ATE Policy to the Independent Board); Ex. 86, Email from I. Leventon, at UBSPROD1706963 (Aug. 5, 2020) (Leventon did not disclose the ATE Policy when representing that "HFP (the parent of SOHC) and CDO Fund both informed their investors in 2009 that they had zero net asset value," and that, after personally tracking down SOHC's and CDO Fund's assets, "both portfolio assets are illiquid unless the underlying PE positions are sold").

[19]     Sentinel later told UBS that Sebastian Clarke returned the assets.

HMIT Appx. 02732



Clarke); Ex. 111, DiOrio Dep. at 109:22-110:21 ██████████████████

██████████████

95.     In exchange for the assets it sent Sebastian Clarke, Sentinel received just *$3*, even

though the assets included two promissory notes from the 2017 Transferred Assets with a face

value of over $35 million—notes from entities Dondero confirmed had the ability to pay.[20]  *See*

Ex. 99, Asset Transfer Agreement, at UBSPROD020571 (Dec. 31, 2019); Ex. 114, Dondero Dep.

at 333:5-16 (confirming that Dugaboy has the solvency to pay off the Dugaboy promissory note);

Ex. 115, Dondero Dep. at 190:1-6 ████████████████████

███████████

96.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████ Ex. 111, DiOrio

Dep. at 293:1-16.  But, on the face of the $32,800,000 promissory note from CLO HoldCo, no

interest is due until maturity in 2025.  Ex. 54, Email from L. Thompson, at Ex. A (attaching

Assignment Agreement). █████████████████████████████

████████████████████ Ex. 111, DiOrio Dep. at 295:14-

296:21.

---

[20]  Though within his power, Dondero has done nothing to cause these two promissory notes
to be paid to Sentinel.  Dondero is the sole beneficiary of the Dugaboy Investment Trust, and he
has admitted that his sister, the trustee, ███████████████████████████████
Ex. 115, Dondero Dep. at 62:19-63:16; *see also* Ex. 114, Dondero Dep. at 280:7-21. ██████
████████████████████████████████████████████████
██████ Ex. 115, Dondero Dep. at 245:21-246:8, 248:15-21. █████████
*Id.* at
240:22-25.

HMIT Appx. 02733

97.     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████     Ex. 111, DiOrio Dep. at 109:22-110:13.

But only DiOrio deemed these assets "worthless;" Sentinel did not have the assets independently

valued.  Ex. 82, Email from M. DiOrio, at BC SEN0000638649, -51 (DiOrio characterizing the

assets transferred to Sebastian Clarke as "worthless" but admitting that Sentinel did not have the

assets formally valued).  And Beecher had "no way of confirming" the value of the assets because

"Sentinel had no documents" on the assets' value.  Ex. 106, Beecher Dep. at 281:17-282:2.  In

fact, DiOrio only advised Beecher of the transfer months after the agreement's execution.  *See* Ex.

82, Email from M. DiOrio, at BC SEN0000638649 (DiOrio forwarding the agreement to Beecher

on March 19, 2020, "Not sure if I ever sent this to you guys.  Sale of worthless assets agreement").

## IV.     DONDERO AND ELLINGTON USE THE 2017 TRANSFERRED ASSETS AS A PIGGY BANK

98.     Dondero and Ellington exercised their control over Sentinel to enrich themselves

using cash at Sentinel that was originally transferred with, or generated by, the 2017 Transferred

Assets.  This diminished the fraudulently transferred assets at Sentinel, all of which should have

been available to UBS to satisfy the judgment.[21]

### A.     The 2019-2021 Voidable Transfers To Dondero And Ellington

99.     In the months after the November 2019 Phase I Decision and Order, Dondero and

Ellington spent, transferred, and otherwise dissipated the 2017 Transferred Assets.  They did this

in two main ways.

---

[21]   On September 1, 2022, UBS entered into a final settlement agreement with Sentinel, whereby, among other terms, Sentinel agreed to transfer to UBS what remained at Sentinel of the 2017 Transferred Assets, and UBS agreed to count those assets toward satisfaction of the Judgment.  *See* Ex. 25, Partial Satisfaction-Piece for Post-Judgment Interest (Feb. 1, 2023).

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM          INDEX NO. 650744/2023

NYSCEF DOC. NO. 112          Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc          RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X    Document 178-12    Filed 04/16/20    Page 88 of 137    PageID 17022

100.    *First*, Ellington charged the ATE Policy for ludicrous personal expenses, unrelated "business development" expenses meant to develop business for other Dondero- and Ellington-entities, and unrelated litigation funding expenses (collectively, and as set forth *infra* ¶¶ 103-112, the "Fraudulent Ellington Reimbursements").

101.    *Second*, Dondero, Ellington, and their lieutenants arranged for "dividend" transfers from Sentinel to Dondero and Ellington's holding companies, Mainspring and Montage.  *See infra* ¶¶ 113-119.

102.    Each of these transfers was made for no consideration and was purely to transfer the 2017 Transferred Assets parked at Sentinel to Dondero and Ellington and away from UBS.

1.    The 2019-2020 Fraudulent Ellington Reimbursements

103.    Ellington received several direct cash transfers that funded his high-flying party lifestyle and supposed attempts to drum up non-Sentinel business—expenses unrelated to the ATE Policy or to Sentinel at all.

104.    On December 16, 2019, Ellington submitted for reimbursement $21,557.04 in expenses for travel to Los Angeles, New York City, and Chicago.  *See* Ex. 74, Email from M. DiOrio, at BC SEN0000712799 (Dec. 17, 2019).  DiOrio forwarded the expense to Beecher Carlson with instructions to reimburse pursuant to the ATE Policy with no further explanation to justify why they qualified as "risk mitigation" expenses under the ATE Policy.  *Id.*  Beecher made the reimbursement without question.  Ex. 76, Email from CIBC Bank, at BC SEN0000004342-43 (Dec. 20, 2019).

105.    On December 19, 2019, Ellington submitted for reimbursement $318,934.88 in expenses for a single day in Austin and seven days in Las Vegas during December 11-17, 2019, all of which Sentinel reimbursed as "business development."  *See* Ex. 75, Email from T. Adamczak, at BC SEN0000663342 (Dec. 20, 2019) (attaching Ellington Dec. 19 Expense Report).

HMIT Appx. 02735

Among the expenses were $42,324 in charges from a *single night* at Sapphire, a Las Vegas strip club,[22] $97,706.19 at nightclub OMNIA, and $157,855.47 at the Wynn casino and hotel in Las Vegas. Ex. 117, Ellington Dep. at 368:16-373:2; Ex. 75, Email from T. Adamczak, at BC SEN00000663344 (attaching Ellington Dec. 19 Expense Report).

106.    Ellington



Ex. 117, Ellington Dep. at 369:6-18.

*See id.* at 370:15-371:10.

107.    The $150,000+ Ellington spent at the Wynn Hotel was purportedly related to a trial in Lake Las Vegas. Ellington explained

*See* Ex. 117, Ellington Dep. at 373:10-374:15. But according to public court records, Ellington and Sevilla's trial in Lake Las Vegas was in ***August and September*** 2019 for ***HCM***-affiliated entity "LLV Holdco." *See* Ex. 70, Email from J. Sevilla, at UBSPROD2708622 (Sept. 13, 2019) (reflecting Sevilla and Ellington stayed at the Wynn Hotel during a seven-week trial on behalf of LLV Holdco); *see generally* Ex. 3, Docket Excerpts, *LLV Holdco LLC v. James Coyne*, No. A-17-749387 (Jan. 8, 2023) (case docket does not reflect any trial dates during December 2019).

108.    On January 30, 2020, Ellington instructed DiOrio to submit reimbursement requests totaling $78,841.93 for Ellington's personal trips to London and Paris with his girlfriend Stephanie Archer as "Risk Mitigation" expenses under the ATE Policy. Ex. 80, Email from A. Devins (Feb. 6, 2020) (attaching Ellington January Expense Report). For instance, in a December 12, 2019

---

[22]    When Beecher asked questions about the Sapphire expenses, DiOrio simply stated that "this is how [HCM] do[es] business." *See* Ex. 106, Beecher Dep. at 101:7-102:2.

HMIT Appx. 02736

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 13

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Case 3:21-cv-00881-X   Document 170-12   Filed 04/13/23   Page 90 of 137   PageID 17024

email exchange planning for the trip, Archer wrote to Ellington, "I would love to do Christmas Eve Dinner at Claridge's." Ex. 72, Email from S. Ellington, at UBSPROD460936 (Dec. 12, 2019). Sure enough, on December 24, 2019, Ellington recorded a $2,629.26 charge to the ATE Policy for "Risk Mitigation" at Claridge's. Ex. 80, Email from A. Devins, at BC SEN0000727324 (attaching Ellington January 30 Expense Report). Ellington and Archer similarly enjoyed visits to the Park Chinois ($4,155.66) and Sexy Fish restaurants ($716.75), as well as a jaunt to the Four Seasons in Paris ($8,089.44). *Id*. Each of these were billed as "Risk Mitigation" expenses. *Id*. When faced with this damning documentary evidence, Ellington admitted ████████████████████ ████████████████████████████████████ Ex. 117, Ellington Dep. at 365:6-10.

109.    Also in January 2020, Ellington instructed DiOrio to submit reimbursement requests totaling more than $140,000 for a trip to Toronto that lasted less than a week. Ex. 80, Email from A. Devins, at BC SEN0000727325; Ex. 77, Email from M. DiOrio, at BC SEN0000713384-87 (Jan. 2, 2020). But Ellington could not keep his story straight as to why Sentinel should pay the bill. Although Ellington directed DiOrio to expense the $43,353.54 for his private jet travel to Toronto as purely for "work . . . on settlement for the ATE matter," Ex. 77, Email from M. DiOrio, at BC SEN0000713384-87, he also submitted the $97,492.82 he spent while in Toronto for a mix of "risk mitigation" and "business development" expenses. Ex. 80, Email from A. Devins, at BC SEN0000727324, -26 (attaching Ellington January Expense Report).[23]    Despite the conflicting justifications, ██████████████████ ████████████████████ *See* Ex. 117, Ellington Dep. at 366:19-368:11.

---

[23]   Like his other trips, while in Toronto, Ellington spent more than $20,000 at the Shangri-La Hotel and $18,292.60 at Goldie, a nightclub. *See* Ex. 80, Email from A. Devins, at BC SEN0000727325, (attaching Ellington January Expense Report).

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM    INDEX NO. 650744/2023

NYSCEF DOC. NO. Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X    Document 170-12    Filed 12/16/23    Page 91 of 137    PageID 17025

110. Next, on March 12, 2020, Ellington's secretary Sarah Goldsmith submitted a reimbursement request for another London trip costing $273,662.82 for around six days of purported "travel & business meetings related to Sentinel." *See* Ex. 81, Email from A. Damien, at BC SEN0000777547 (Mar. 16, 2020) (attaching Ellington March Expense Report). Those expenses included three $6,000+ airfares for Kristen Leonardelli, Sara Leonardelli, and Julia Masiello—three people who appear to be unaffiliated with Sentinel. *Id.* at BC SEN0000777513-15. And again, on one day in London, Ellington spent $75,914.86 at two restaurants and a night club. *Id.* at BC SEN0000777506.

111. Sentinel reimbursed every single Fraudulent Ellington Reimbursement that Ellington submitted. *See* Ex. 106, Beecher Dep. at 65:19-24. ████████████████████████ ████████████████████████████████████████ *See* Ex. 111, DiOrio Dep. at 264:5-265:1 ███ ████████████████████████████████████████████████ ██████████████████████████████████████ *Id.* at 19:9-16. And as long as Dondero and Ellington said the expenses were appropriate, Sentinel reimbursed them. *See* Ex. 106, Beecher Dep. at 104:22-105:2 (Q . . . [The expense] is . . . appropriate because the UBOs said it was appropriate? . . . A To my knowledge, yes.").

112. Beecher also "had no choice other than to follow the direction of the directors" no matter the expense. *See id.* at 85:11-86:8; *see also* Ex. 80, Email from A. Devins, at BC SEN0000727319 (processing fraudulent Ellington expenses). Beecher understood that even if it had pushed back, it "would have had no choice other" than to follow the instructions of DiOrio and other individuals controlled by Dondero and Ellington. *See* Ex. 106, Beecher Dep. at 85:22-86:5. In the end, Beecher understood Dondero and Ellington "called the shots," and it never pushed back on any Fraudulent Ellington Reimbursement requests even when Beecher internally

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM    INDEX NO. 650744/2023
NYSCEF DOC. NO. 13    Case 3:21-cv-00881-X    Document 170-12    Filed 14/26/23    Page 92 of 137   PageID 17026    RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Exhibit    Page 45 of 90

questioned their legitimacy. *Id.* at 24:13-25:13; Ex. 75, Email from T. Adamczak, at BC SEN0000663342 (confirming that Beecher pushed through an expense despite "question[ing] how much 'business development' is actually being done"); Ex. 79, Email from A. Devins, at BC SEN0000713829 (June 1, 2020) (expensing private jet as a risk mitigation expense but noting internally, "I think it's a little excessive, but who am I to say. . .").

        2.    <u>The 2020-2021 Fraudulent "Dividends" To Mainspring And Montage</u>

113.    From 2020-2021, Dondero and Ellington extracted millions from Sentinel that should have been payable to UBS to satisfy the Phase I Judgment through "dividends" to Mainspring and Montage. At the time, Dondero owned 99.5% of Mainspring and Ellington owned 99% of Montage, *see* Ex. 68, Email from C. Price, at DISCEN0008408, -8410 (attaching Sentinel Structure Ownership Chart). They only revealed their near-complete ownership of Mainspring and Montage—and thus Sentinel—after CIMA regulators warned that the complexity of Sentinel's prior ownership structure "could impede effective regulatory judgment," Ex. 45, Email from A. Devins, at BC SEN0000133653 (Mar. 22, 2018).

114.    On April 24, 2020, Sentinel transferred a total of $6.4 million to Mainspring and Montage, $4,480,000.00 to Mainspring as payment of Dondero's 70% share of the dividend and $1,920,000.00 to Montage as Ellington's 30% share of the dividend. *See* Ex. 101, CIBC Bank Statement, at BC SEN0000598154 (Apr. 30, 2020); Ex. 84, Email from CIBC, at BC SEN0000004334 (Apr. 24, 2020) (attaching wire transfer to Mainspring); Ex. 85, Email from CIBC, at BC SEN0000004242-43 (Apr. 24, 2020) (attaching wire transfer to Montage).

115.    Despite DiOrio's commitment that Sentinel would "not be entertaining any dividend issuance while the ATE policy is active," Ex. 62, Email from J. Arbeit, at DISCSEN0006464-65 (Oct. 3, 2018) (Beecher advising that issuance of dividends to Dondero and Ellington "would decrease the cash position below the amount of the loss reserves"), this dividend

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM INDEX NO. 650744/2023
NYSCEF DOC. NO. 12 RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X Document 178-12 Filed 04/16/24 Page 93 of 137 PageID 17027
Case 19-34054-sgj11 Doc 3692-2 Filed 03/27/23 Entered 03/27/23 10:18:45 Desc
Exhibit Page 46 of 90

payment occurred *after* the court entered the Phase I Judgment. Sentinel's own manager could not explain the basis for this dividend distribution. *See* Ex. 106, Beecher Dep. at 210:3-211:10.

116. 

*See* Ex. 111, DiOrio Dep. at 196:8-197:3.

*Id.* at 195:12-25.

*Id.* at 196:8-21, 238:25-239:12; *see also id.* at 224:20-225:12

117.    On January 12, 2021, a year after the Phase I Judgment, Dondero and Ellington repeated the same play: they moved another $2.5 million to themselves by sending $1,750,000.00 to Mainspring and $750,000.00 to Montage. *See* Ex. 102, CIBC Bank Statement, at BC SEN0000610180 (Jan. 29, 2021). This violated not only Sentinel's commitment against dividend issuance while the ATE Policy was in effect, but also CIMA's policy requiring that it receive notice before a dividend was issued. Ex. 95, CIMA Statement of Guidance, at 4.2.1 (Jan. 2014). When Sentinel finally provided notice of the dividend issuance to CIMA three months later, it obscured the retroactive nature of the request by noticing a future "dividend *to be declared and paid*." Ex. 91, Email from G. Pereira, at BC SEN0000083961 (Apr. 27, 2021).

118.

*See* Ex. 111, DiOrio Dep. at 196:22-197:1. Ultimately, Dondero and Ellington had "the ultimate responsibility of [Sentinel] meeting capital and solvency requirements." Ex. 106, Beecher Dep. at 21:2-22:9, 23:25-24:25.

43

119. ████████████████████████████████████████████.[24] Ex. 117, Ellington Dep. at 126:12-21. ██████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████     *See id.*

**B.**   **The 2020 Voidable Transfer To Pay Bonuses In Violation Of The Bankruptcy Court Order**

    1.   Dondero And Ellington Make Bonus Payments Blocked By The Bankruptcy Court

120.   During its bankruptcy, HCM requested that the Bankruptcy Court allow it to pay all employee bonuses. Ex. 4, Bk. Dkt. No. 177, at 1 (Dec. 4, 2019). The Bankruptcy Court rejected bonus payments to four "statutory insiders": Ellington; Leventon; Frank Waterhouse, former HCM CFO; and Thomas Surgent, former HCM Chief of Compliance, *see* Ex. 7, Bk. Dkt. No. 380, at 2-3 (Jan. 22, 2020) (order approving payment only for "Covered employees"); *see also* Ex. 17, Bk. Dkt. No. 2423, at 118-19 (June 8, 2021) (transcript of Jan. 21, 2020 hearing excluding four "statutory insiders" from the "Covered employees").

121.   ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████     *See* Ex. 117, Ellington Dep. at 60:22-61:8 █████████████████████; *id.* at 216:7-217:11 ████████

████████████; *id.* at 126:12-21 ███████████████████████

██████████████; *id.* at 129:5-24 ██████████████████████

---

   [24]   Ellington disputed ██████████████████████████████████ ██████████████████████ Ex. 117, Ellington Dep. at 125:3-17. At the time of the payments to Dondero and Ellington, Sentinel called them "dividends" and this Petition adopts that term.

HMIT Appx. 02741

■■■■■■■ Ex. 115, Dondero Dep. at 126:7-25, 127:9-18, 128:19-129:15

■■■■■■■

122.   

■■■■■■■ See Ex. 117, Ellington Dep. at 56:21-24, 59:7-60:7, 60:22-61:8, 217:12-24; see also Ex. 120, Leventon Dep. at 29:3-31:11 (conceding Leventon received some of the blocked bonus payments from NexPoint).[30]

---

[25]  **NexBank Capital, Inc.** ("NexBank") is majority owned by Dondero.  See Ex. 100, HCM Affiliate Organizational Chart. ■■■■■■■ See Ex. 117, Ellington Dep. at 56:21-24, 217:12-217:23.

[26]  **NexPoint Advisors, L.P.** ("NexPoint"), with general partner NexPoint Advisors GP, LLC, is 100% owned by Dondero.  See Ex. 100, HCM Affiliate Organizational Chart. ■■■■■■■  See Ex. 117, Ellington Dep. at 217:12-24; id. at 56:19-24.

[27]  **Highland Funds Asset Management, L.P.**, with general partner Strand Advisors XVI, Inc., is 100% owned by James Dondero.  See Ex. 100, HCM Affiliate Organizational Chart (July 2019); see also Ex. 94 Highland Funds Asset Management Relationship, at UBSPROD1824596 (Feb. 18, 2011) (clarifying that Highland Capital Management Fund Advisors, L.P. was formerly known as Highland Funds Asset Management, L.P.).

[28]  ■■■■■■■  See Ex. 117, Ellington Dep. at 215:2-9.

[29]  The **Charitable DAF Fund, L.P.**, is indirectly controlled by Dondero, as described supra ¶¶ 12, 56, and was funded with his own assets, his family trusts, and HCM.  See Ex. 18, Bk. Dkt. No. 2660, at 2 (Aug. 4, 2021) (CLO HoldCo Contempt Order).

[30]  At times, the contributing entities, such as Mainspring and NexPoint, made these payments to or created these consulting agreements directly with entities owned by or affiliated with Surgent, Waterhouse, and Leventon.  See Ex. 19, Bk. Dkt. No. 2856 ¶ 32 (Sept. 21, 2021) (stipulation that Surgent received $750,906.13 from Tall Pine, $1,887,929.00 from Mainspring, and $135,437.00 from NexPoint).

45

123. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 117, Ellington

Dep. at 214:7-18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ *See id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at

59:12-60:2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at 60:10-16, Ellington kept the

amounts that remained after it paid out the other claims.

124. The objective was to create the appearance of legitimate business dealings to conceal Dondero and Ellington's true purpose of funneling cash to senior leaders to thwart the Bankruptcy Court's freeze on bonus payments. But such "consulting agreements" were fraudulent because the "consultants" performed no other work on top of the services already being performed by those individuals as employees of HCM, and in certain instances some of the employees did no work for certain contributing entities. For example, Ellington used distributions from Sentinel to Mainspring to pay Waterhouse's HCM bonus—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 117, Ellington Dep. at 226:1-13.

125. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 54:11-24, 215:21-23, 216:7-15; Ex. 115, Dondero Dep. at 133:13-15. He also worked with Waterhouse, the Chief Financial Officer at HCM for more than decade, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 117, Ellington Dep. at 213:8-215:1; Ex. 20, Bk. Dkt. No 2940 ¶ 1 (Oct. 19, 2021).



HMIT Appx. 02743

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 31

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Case 3:21-cv-00881-X    Document 170-12    Page 97 of 137    PageID 17031

126.    Under these fraudulent consulting agreements, Ellington, Surgent, Waterhouse, and Leventon received[31] roughly $8,638,536.07 in 2020, including about $5,874,203.21 from Mainspring.[32]

- Ellington received $3,074,408.  *See* Ex. 15, Bk. Claim No. 244 (Mar. 23, 2021) (Ellington's amended claim for $3,074,408.16 in bonus payments).

- Surgent received $2,774,272.  Ex. 19, Bk. Dkt. No. 2856 ¶ 32 (Motion for Entry of Order, reflecting Surgent's claim for $2,774,272.13 in bonus payments).

- Waterhouse received $2,102,260.  Ex. 8, Bk. Claim No. 182, at 2 (May 26, 2020) (Waterhouse's claim for $2,102,260.99 in bonus payments).

- Leventon received $687,594.  Ex. 14, Bk. Claim No. 216 Rider 3, at 3 (Mar. 3, 2021) (Leventon's amended claim for $687,594.79 in bonus payments).

2.    Ellington And Others Defraud The Bankruptcy Court By Filing Claims Seeking Bonuses Already Procured By Fraud

127.    Despite having received cash intended to replace the bonuses the Bankruptcy Court denied, Waterhouse, Leventon, Surgent, and Ellington filed proofs of claim that included the amounts already secured through these illicit payments.  Ex. 8, Bk. Claim No. 182 (Waterhouse's claim for $2,102,260.99); Ex. 9, Bk. Claim No. 183 (May 26, 2020) (Surgent's claim for $3,958,628.14); Ex. 14, Bk. Claim No. 216 (Leventon's amended claim for $687,594.79); Ex. 15, Bk. Claim No. 244 (Ellington's amended claim for $3,074,408.16).  After Waterhouse, Leventon,

---

[31]    ███████████████████████████████████████████████████████████████ Ex. 117, Ellington Dep. at 211:5-213:14.

[32]    Upon HCM's discovery of some of the illicit payments, Surgent disclosed the full scheme and revealed that Mainspring had contributed 68% of his total bonus payments.  Ex. 19, Bk. Dkt. No. 2856 ¶ 32.  ████████████████████████████ Ex. 117, Ellington Dep. at 225:11-18.  Thus, about $5,874,203.21 of these illicit bonus payments came through Mainspring from Sentinel.

HMIT Appx. 02744

and Ellington left HCM, each of them joined Skyview Group ("Skyview"),[33] an entity Ellington owns. They assigned their claims to CPCM LLC ("CPCM"), a wholly owned subsidiary of Skyview. *See* Ex. 116, Ellington Dep. at 38:23-45:21; Ex. 120, Leventon Dep. at 56:24-57:2. CPCM ultimately withdrew both Leventon's and Ellington's claims because of objections.

128.    In January 2021, HCM entered into stipulations with Surgent and Waterhouse that ostensibly resolved their claims. The Bankruptcy Court approved the settlement in February 2021. But before any payment could occur, the Independent Board uncovered evidence of the above-described sizable payments from entities owned by Dondero and Ellington and filed a motion to reconsider the stipulation on account of the uncovered fraud. Ex. 19, Bk. Dkt. No. 2856 ¶¶ 26-35; Ex. 20, Bk. Dkt. No. 2940 ¶¶ 24-27. After HCM presented this evidence to the Bankruptcy Court, Surgent agreed to apply payments already received against his claim. Ex. 19, Bk. Dkt. No. 2856 ¶¶ 36-39. CPCM, however, fought the motion, and Waterhouse moved to quash a subpoena sent by HCM as imposing an undue burden on a third party. Ex. 21, Bk. Dkt. No. 3191 ¶ 5. Ultimately, CPCM and Waterhouse agreed to a settlement and withdrew the claim against HCM for bonus amounts. Ex. 22, Bk. Dkt. No. 3317 ¶ 18 (Mar. 24, 2022).

---

[33]    Skyview also hired DiOrio, ▉▉▉▉▉▉▉. *See* Ex. 110, DiOrio Dep. at 12:11-12; Ex. 119, Irving Dep. at 10:2-24; Ex. 128, Vitiello Dep. 64:6-65:4. Skyview has around 30 to 40 employees, "almost all ex-Highland Capital Management employees." Ex. 120, Leventon Dep. at 55:23-56:18. Leventon testified that, at the time, it operated out of the same offices as NexBank and NexPoint, *id.*, entities that Dondero fully controls, *see supra* ¶ 122, nn.25-26.

48

HMIT Appx. 02745

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 31
RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X    Document 172-12    Filed 12/16/23    Page 99 of 137    PageID 17033
Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Exhibit 12    Page 52 of 90

## CLAIMS FOR RELIEF

I.    **CLAIM I: TURNOVER PREDICATED ON FRAUDULENT AND VOIDABLE CONVEYANCES AGAINST CLO HOLDCO, ELLINGTON, MAINSPRING, AND MONTAGE (CPLR 5225(B))**

A.    **New York's Former Fraudulent Conveyance Law (Effective Through April 3, 2020)**

129.    The former version of New York Debtor & Creditor Law ("DCL") § 276[34] sets forth a clear standard for finding and voiding intentional fraudulent conveyances.  It provides, "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, defraud either present or future creditors, is fraudulent as to both present and future creditors." DCL 276 (2019).

130.    Because "fraudulent intent, by its very nature, is rarely susceptible to direct proof," it "must be established by inference from the circumstances surrounding the allegedly fraudulent act."  *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 530 (S.D.N.Y. 2011).

131.    To establish fraudulent intent under the earlier DCL 276, courts look to "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers 'that their presence gives rise to an inference of intent.'"  *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999).

132.    These "badges of fraud" include:

(1) a close relationship between the parties to the transaction,

(2) a secret and hasty transfer not in the usual course of business,

---

[34]    The former version of DCL 276, which was in effect through April 3, 2020, applies to all fraudulent conveyances that occurred through that date.  James Gadsden & Alan Kolod, Supplemental Practice Commentaries, McKinney's Cons Laws of NY, Book 12, Debtor and Creditor Law Ch. 12, Art. 10 (explaining that the amended DCL "became effective on April 4, 2020, and applies to transfers and incurrences effected on or after that date").

49

**HMIT Appx. 02746**

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 82
RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X   Document 262-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit 2   Page 253 of 290   Page 100 of 137   PageID 17034

(3) inadequacy of consideration,

(4) the transferor's knowledge of the creditor's claim and his or her inability to pay it,

(5) the use of dummies or fictitious parties, and

(6) retention of control of the property by the transferor after the conveyance.

*Matter of Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998).

133.    In addition, "when a transfer has been made for no consideration, the courts recognize a rebuttable presumption of insolvency and fraudulent transfer." *Wimbledon Fin. Master Fund, Ltd. v. Wimbledon Fund, SPC*, 2016 WL 7440844, at *4-6 (Sup. Ct. N.Y. Cnty. Dec. 22, 2016) (applying CPLR 5225 turnover principles to DCL 276).

**B.    The 2010 Fraudulent Conveyance To CLO HoldCo**

134.    Paragraphs 1-133 are incorporated by reference as if fully stated here.

135.    On December 23, 2010, CDO Holding transferred its entire portfolio of assets to CLO HoldCo for only a little cash and a note with no principal or interest payments due for fifteen years. *See supra* ¶¶ 51, 59.  Because CDO Holding was an alter ego of HFP, this transfer of assets was made by an entity of which UBS was a current or future creditor.

136.    The circumstances surrounding the transaction,  explain the real reason for a trade that otherwise did not make sense. *See supra* ¶ 53.  Indeed, the trade bore many of the quintessential "badges of fraud" that reveal it was a fraudulent conveyance.

137.    ***A Close Relationship Between The Parties To The Transaction:***  CDO Holding and CLO HoldCo were each controlled by Dondero, also the ultimate controlling shareholder of

each of the Judgment Debtors. On an internal compliance report, Dondero signed as the "gatekeeper" for both entities. *See supra* ¶ 57.

138. ***A Secret And Hasty Transfer Not In The Usual Course Of Business:*** Despite Dondero justifying the transfer for "liquidity," CDO Holding transferred substantially *all* of its assets in exchange for consideration that was in large part a note that was not payable for *fifteen years*. There was also no negotiation of any kind; the rushed terms were set based on just a single valuation, prompting concern from an HCM employee. And CDO Holding recorded no sales to any other entity in 2010. *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS." This was not a transfer "in the usual course of business." *See supra* ¶¶ 58-59.

139. In addition, the 2010 Fraudulent Conveyance was "hasty": it was executed just days after CLO HoldCo, the receiving entity, was created in the Cayman Islands for the purpose of receiving these assets. *See supra* ¶¶ 55, 57.

140. ***Inadequacy Of Consideration:*** The inadequacy of the consideration underscores how brazen this transfer was. Rather than receiving nearly $40 million in cash for the CLOs on the open market, CLO HoldCo sold the assets to another Dondero-controlled entity for consideration that was, in large part, a note not payable for fifteen years. *See supra* ¶ 59.

141. ***The Use Of Dummies Or Fictitious Parties:*** Although not a "fictitious" party, CLO HoldCo was set up specifically to carry out *this* fraudulent conveyance. *See supra* ¶ 55.

142. ***Retention Of The Property After The Conveyance:*** Dondero, ultimately controlled CDO Holding (through HFP) and CLO HoldCo. After Dondero personally funded a portion of the consideration for the transfer, Dondero's close ally Grant Scott oversaw the parent structure that housed CDO Holding's former assets at CLO HoldCo. *See supra* ¶¶ 56-57.

HMIT Appx. 02748

143.    The Court should void the 2010 Fraudulent Conveyance, enter judgment against CLO HoldCo for the value of the transferred assets, and award UBS's costs and attorney's fees incurred in connection with this special proceeding.  *See* DCL 276-A (2019).

### C.    The Ellington Reimbursements Were Fraudulent Conveyances

144.    Paragraphs 1-143 are incorporated by reference as if fully stated here.

145.    The hundreds of thousands of dollars that Ellington spent on lavish personal vacations and questionable "business development" expenses were in fact assets to which UBS was entitled based on its status as a creditor—indeed, the largest creditor—of the Judgment Debtors.

146.    The transactions that led to the "reimbursements" occurred in two steps: (i) move the assets from the Judgment Debtors to Sentinel, and then (ii) move the assets from Sentinel to Ellington.

147.    New York's fraudulent conveyance law protects judgment creditors against exactly these kinds of fraudulent conveyances, which used Judgment Debtor assets to pay for the lifestyle expenses of those who controlled those Judgment Debtors.  For these reasons, the badges of fraud are readily apparent from the Fraudulent Ellington Reimbursements.

148.    ***A Close Relationship Between The Parties To The Transaction:***  Ellington did not just have a close relationship to the other parties in the transaction, he created the transaction and controlled it from all sides.  As Dondero's trusted lieutenant, Ellington is the one who proposed moving the assets away from the Transferors and sending them to Sentinel's Cayman Islands accounts—accounts over which Ellington had a 30% stake as one of the ultimate beneficial owners.  *See supra* ¶¶ 78, 80.  Once Dondero and Ellington had the assets tucked away offshore, Ellington was one of the two people who "called the shots" about Sentinel and the use of the assets.  *See supra* ¶ 80. ████████████████████████████████████

■■■■■■■■■■■■■■■■■■■

■■■■■■■■ *See supra* ¶ 81.

149.     *A Secret And Hasty Transfer Not In The Usual Course Of Business:* DiOrio unquestioningly submitted hundreds of thousands of dollars in Ellington's highly questionable charges without receiving from Ellington, or providing to Beecher, *any* legitimate business justification for the massive costs. *See supra* ¶¶ 103-112.

150.     *Inadequacy Of Consideration:* There was no consideration provided for these expenses—Sentinel never got any benefit, a single new client, or a single new dollar, in exchange for the $833,843.05 it provided Ellington in travel, fine dining, and partying reimbursements. *See supra* ¶¶ 103-112.

151.     *The Transferor's Knowledge Of The Creditor's Claim And His Or Her Inability To Pay It:* Ellington and DiOrio knew of UBS's Judgment and understood the 2017 Transferred Assets should go to UBS to pay that Judgment—their own legal advisors at Solomon Harris told them as much. *See supra* ¶ 72. They distributed the assets through the Fraudulent Ellington Reimbursements anyway.

152.     The Court should void the Fraudulent Ellington Reimbursements and award UBS's costs and attorney's fees incurred in connection with this special proceeding. *See* DCL 276-A (2019).

   D.     <u>New York's Current Voidable Transactions Law (Effective April 4, 2020)</u>

153.     On April 4, 2020, New York replaced its former fraudulent conveyance statute. *See* James Gadsden & Alan Kolod, Supplemental Practice Commentaries, McKinney's Cons Laws of NY, Book 12, Debtor and Creditor Law Ch. 12, Art. 10 (explaining that the amended DCL "became effective on April 4, 2020, and applies to transfers and incurrences effected on or after that date").

154.    The newly enacted statute addresses "voidable transactions" instead of "fraudulent conveyances."  Substantively, however, much of the voidable transactions law remains the same. For instance, DCL 273(a)(1) provides that a transfer made by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the debtor made the transfer, if made "with actual intent to hinder, delay or defraud any creditor of the debtor."  DCL 273(a)(1) (2020).

155.    The statute defines "Debtor" to include any "person that is liable on a claim."  DCL 270(f).  The statute provides eleven factors to weigh when determining whether a transaction is voidable (like the badges of fraud that courts consider when reviewing claims under the prior version of DCL 276).  *See* DCL 273.  As relevant here, these factors include, among others, whether: "the transfer or obligation was to an insider;" "the transfer or obligation was disclosed or concealed;" "the debtor removed or concealed assets;" "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;" and "the transfer occurred shortly before or shortly after a substantial debt was incurred."  DCL 273(b).

**E.    The April 2020 And January 2021 "Dividends" To Mainspring And Montage Were Voidable Conveyances**

156.    Paragraphs 1-155 are incorporated by reference as if fully stated here.

157.    Like the Fraudulent Ellington Reimbursements, the multi-million-dollar "dividends" that Dondero and Ellington sent themselves through Sentinel were the final step in the process to move Judgment Debtor assets away from UBS and to themselves.  They are voidable under New York's 2020 Debtor and Creditor Law.

158.    ***The Transfers Were To Insiders:***  Dondero and Ellington "called the shots" at the Judgment Debtors as well as Sentinel, and the payments to Mainspring and Montage were payments to Dondero and Ellington as Sentinel's ultimate beneficial owners.  *See supra* ¶¶ 112,

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM INDEX NO. 650744/2023

NYSCEF DOC. NO. 12    Case 3:21-cv-00881-X    Document 1882    FiledE1h8/bi2    FPag4258.5/290    Page 105 of 137    PageID 17039    RECEIVED NYSCEF: 02/08/2023

114; DCL 273(b)(1); *see also* DCL 270(h)(2)(iii) (defining "Insider" to include "a person in control of the debtor"). Sentinel made the payments even after Sentinel's directors determined the insurer would not pay any dividends while the ATE Policy was active. *See supra* ¶¶ 115-116.

159.    ***The Transfers Were For Insufficient Consideration:***    The 2017 Fraudulent Conveyances from the Judgment Debtors were for insufficient consideration. The 2020 and 2021 transfers from Sentinel to Dondero and Ellington in their capacity as "shareholders" were for no consideration. ██████████████████████████████████

██████████████████████    *See supra* ¶ 116.

160.    ***The April 2020 Transfer Occurred Shortly After A Substantial Debt Was Incurred:***    The court entered the Phase I Judgment shortly before the April 2020 transfers. At the time, Dondero and Ellington understood—because Solomon Harris warned them—that the court may order Sentinel to return all of the 2017 Transferred Assets to UBS in a fraudulent conveyance action like this one. *See supra* ¶ 72; *see also* DCL 273(b)(10).

161.    The Court should void the dividends to Mainspring and Montage and award UBS's costs and attorney's fees incurred in connection with this special proceeding. *See* DCL 276-A (2020).

## II.    CLAIM II: TURNOVER PREDICATED ON ALTER EGO LIABILITY AGAINST DONDERO, ELLINGTON, AND CDO HOLDING (CPLR 5225(B))

162.    Paragraphs 1-161 are incorporated by reference as if fully stated here.

163.    To establish an alter ego claim, a plaintiff must show (i) that the defendant exercised "complete domination of the corporation . . . in respect to the transaction attacked," and (ii) "that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Baby Phat Holding Co. v Kellwood Co.*, 123 A.D.3d 405, 407 (1st Dep't 2014).

164.     The first element—domination or control—can involve many factors, including the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors, and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the allegedly dominated corporation; whether dealings between the parties involved were at arm's length; whether the dominated corporation was treated as independent profit center; and the payment or guaranty of the corporation's debts by the dominating entity.  *See Fantazia Int'l Corp. v CPL Furs N.Y., Inc.*, 67 A.D.3d 511, 512 (1st Dep't 2009).  No one factor is dispositive.  *Id.*

165.     As to the second element—using control to commit a fraud or wrong against the plaintiff—a scheme to render an entity judgment-proof is one of the classic examples justifying alter ego liability.  *See, e.g.*, *Chase Manhattan Bank (N.A.) v. 264 Water St. Assocs.*, 174 A.D.2d 504, 505 (1st Dep't 1991) (allegations that defendants "masterminded a scheme to denude the subsidiary of its assets in order to render it unable to honor its obligations resulting in a loss to plaintiff" held sufficient).

166.     If a defendant or respondent qualifies as an alter ego, it becomes liable for the full amount of the outstanding judgment against its alter ego.  *See* Ex. 24, Phase II Judgment, at 5 ("alter ego liability makes HFP liable for satisfying the judgment against SOHC").

## A.     Dondero And Ellington Were Each Alter Egos Of The Judgment Debtors

167.     Dondero and Ellington exercised complete control over the Judgment Debtors and used that control to defraud UBS.  As a matter of equity, this Court should pierce the corporate veils of HFP, CDO Fund, and SOHC and hold that Dondero and Ellington—as the individuals ultimately responsible for the Judgment Debtors' harm to UBS—are their alter egos and thus personally liable for the Judgment.

HMIT Appx. 02753

1.    <u>Dondero And Ellington Dominated The Judgment Debtors</u>

168.    Applying the factors that New York courts consider when determining whether individuals exercised "complete dominion" over their alter ego to the facts in this Petition confirms that Dondero and Ellington exercised complete dominion over the Judgment Debtors.

169.    ***Disregard Of Corporate Formalities:***   Dondero and Ellington disregarded the corporate formalities of HCM, SOHC, CDO Fund, and HFP to advance their own personal interests.   They facilitated transfers among these entities without even trying to provide the appearance of arm's-length bargaining.  *See supra* ¶¶ 52-57.  During the Underlying Action, a testifying expert detailed the substantial evidence of an alter ego relationship between Dondero and HCM, SOHC, CDO Fund, and HFP since the time of the transaction underpinning the Underlying Action, specifically noting the "lack of separateness" between the entities.  *See supra* ¶ 33.

170.    Through 2017, Dondero and Ellington continued to operate just as they always had done, without any regard for the corporate forms of the Judgment Debtors.  For instance, in the case of the 2017 Fraudulent Conveyances, one of the main benefits of the asset transfers was to help Dondero avoid a potential $50 million personal tax bill.  *See supra* ¶ 64.  At other times, Dondero brazenly authorized loans from the entities to himself.  *See supra* ¶ 33.  Dondero even altered formal control structures to increase his domination: In 2009, Dondero eliminated the requirement that HFP have independent directors and made himself the sole director of HFP—and thus the direct decision maker for HFP and its subsidiaries, including SOHC and CDO Holding.  *See supra* ¶ 33.

171.    Dondero and Ellington also enriched themselves through improper use of HCM employees for any entity they pleased, repeatedly ignoring corporate formalities. ████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████ *See supra* ¶¶ 35-40.

172.    The Judgment Debtors were not separate bona fide entities with distinct corporate ownership and controls—they were part of an overall structure that Dondero and Ellington unilaterally directed.  Dondero was the ultimate decision maker for the Judgment Debtors.  *See supra* ¶¶ 27-30, 32-33.  He did not consult any board before authorizing the sale and assignment of the assets of SOHC, CDO Fund, HFP, and related entities.  *See supra* ¶¶ 28-29.  In fact, many of these entities did not have separate boards of directors or any sort of formal corporate structure.  *See supra* ¶¶ 28, 33, 35.  And Ellington, as Dondero's right-hand man, also exercised unfettered authority over the Judgment Debtors, including signatory authority and ███████████ and settlement efforts.  *See supra* ¶ 31, 36.

173.    Dondero and Ellington repeatedly disregarded corporate formalities by shuffling assets among entities they controlled, including the Judgment Debtors, without formal documentation.  Wholly owned subsidiaries of HFP would often dividend money up to HFP and

████████████████████████████████████████████████████████

*See supra* ¶¶ 52-54.  At times, these transfers also were made without formal documentation.  *See supra* ¶¶ 52-53.  In 2008, with a single word, Dondero and Ellington directed HFP to withdraw about $15 million from CDO Holding before directing the funds to SOHC to cover SOHC's losses.  *See supra* ¶ 53.

174.    Whether orders came from Dondero himself, or his proxy Ellington, the result was the same: protect the collective interests of Dondero, Ellington, and their web of entities, rather than the distinct interests (and responsibilities) of any one entity.  *See supra* ¶¶ 29, 31, 34, 36-40, 49-55, 61-81.

HMIT Appx. 02755

175. **Common Office Space:** Dondero- and Ellington-controlled entities, including the Judgment Debtors, shared common office space and operated out of the same registered addresses, with no separation of the entities. *See supra* ¶ 35. ▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

*See supra* ¶¶ 34-37.

176. **Deliberate Undercapitalization:** Dondero and Ellington deliberately undercapitalized the Judgment Debtors to prevent UBS from collecting on the Judgment. *See supra* ¶¶ 49, 55-78, 93-97. In the wake of the adverse summary judgment rulings, ▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅ Dondero and Ellington ensured that the Judgment Debtors would be judgment proof by effecting the 2017 Fraudulent Conveyances. *See supra* ¶¶ 61-92.

177. **Intermingling Of Funds:** Dondero and Ellington intermingled their funds and those of the entities they controlled. In one instance, Dondero committed HCM's cash to cover HFP's shortfalls in the face of margin calls. *See supra* ¶ 33. Dondero also used his own money to partially fund the consideration CLO HoldCo sent to CDO Holding in the 2010 Fraudulent Conveyance. The testifying expert in the Underlying Action noted many additional examples of "HFP's and its subsidiaries' financial dependence on HCM," which Dondero dominated, controlled, and even funded. *See supra* ¶ 33.

178. After Dondero and Ellington combined all the assets of the Judgment Debtors (and the other Transferors) in Sentinel in 2017, they later withdrew assets for themselves or entities they controlled whenever they saw fit, both as "dividends" and improper "reimbursements." *See supra* ¶¶ 98-119.

HMIT Appx. 02756

179.   ***Overlap In Ownership, Officers, And Directors:***   Dondero and Ellington owned
and controlled the Judgment Debtors.   Dondero co-founded HCM and held the most influential
roles up and down the HCM organizational chart.   Dondero held many titles under the HCM
umbrella and particularly among the Judgment Debtors:   He was HCM's President and Chief
Executive Officer from 1993 until his removal in 2020; chairman of the Board of Directors for
HFP; sole Director for SOHC; and President and ultimate General Partner for CDO Fund until his
resignation in 2021.   *See supra* ¶¶ 6, 27 n.3, 28-29.   Ellington, always at Dondero's side,
implemented Dondero's directives while maintaining discretion to make his own decisions about
the entities.   *See supra* ¶¶ 28, 31, 36, 39-40, 77-78.   The two maintained these roles and their
control over the Judgment Debtors as officers of Strand, HCM's general partner.   *See supra* ¶¶ 29-
31.   Dondero was Strand's sole stockholder.   *See supra* ¶ 29.

180.   ***The Degree Of Discretion Demonstrated By The Allegedly Dominated***
***Corporation:***   Dondero and Ellington were the decision makers for all the entities.   *See supra*
¶¶ 28-34, 36, 52-54, 65, 67, 71, 77.   Dondero, and Ellington as his designee, unilaterally made
decisions for HCM and, through his control of HCM, controlled the Judgment Debtors as well.
*See supra* ¶¶ 28-34, 36, 52-54, 65, 67, 71, 77.   These decisions were not for the benefit of the
individual entities but were all in service of protecting Dondero and Ellington themselves.

181.   ***Whether Dealings Between The Parties Involved Were At Arm's Length:***   The
key dealings at issue in this Turnover Petition, the 2017 Fraudulent Conveyances, were not at
arm's length.   Rather, the Judgment Debtors collectively transferred all of their assets, all with
different valuations, for a shared (and sham) ATE Policy that did not treat them differently based
on their differing contributions to the Policy.   *See supra* ¶¶ 74-76.   The shared contribution—
including by three non-insureds, and the shared coverage (including CDO Holding, a non-party to

HMIT Appx. 02757

the Underlying Action)—evidences that these entities were merely instruments of the broader plan

to move assets out of UBS's reach.  Once they shuffled the 2017 Transferred Assets out of the

Judgment Debtors, Dondero and Ellington appropriated the assets for their own ends, including

through personal withdrawals as dividends and reimbursements for romantic getaways.  *See supra*

¶¶ 98-119.

> 2.    Dondero And Ellington Used Their Domination Over The Judgment
>        Debtors To Defraud And Harm UBS

182.    Dondero's and Ellington's control over the Judgment Debtors enabled them to

orchestrate the fraudulent acts that have directly led to UBS's harm: its difficulty collecting on the

Judgment.

183.    ***Use Of Corporate Funds For Personal Purposes:***  Dondero and Ellington

routinely directed Judgment Debtor funds and assets to Sentinel, and ultimately to Dondero and

Ellington themselves.  *See supra* ¶¶ 61-81, 93-128.  Dondero and Ellington diverted these funds

out of Judgment Debtor hands and into Sentinel's coffers to render the Judgment Debtors judgment

proof and keep the assets in Dondero and Ellington's possession, using the assets for their own

ends and to fund other entities they controlled.  *See supra* ¶¶ 61-81, 93-128.

184.    Ellington, in particular, used Judgment Debtor assets to fund his lavish lifestyle,

including tens of thousands of dollars in luxurious trips to London and Paris for him and his

companions, personal meals with his girlfriend, and to reimburse his outings to bars, night clubs,

and a strip club.  *See supra* ¶¶ 103-110.  None of these reimbursements were for any plausible

business purpose—much less related to the Policy insuring against the Underlying Action—and

instead were strictly for Ellington's personal expenses.  *See supra* ¶¶ 103-112.

185.    Dondero and Ellington also used Judgment Debtors funds in issuing Mainspring

and Montage millions of dollars in "dividends," which they in turn used for their own personal

purposes. *See supra* ¶¶ 113-128 (Ellington confirming he received millions in dividends; Dondero approving the use of his dividends to make fraudulent bonus payments). Like the Ellington reimbursements and original 2017 Fraudulent Conveyances, Dondero and Ellington masterminded the dividends, showing the complete control Dondero and Ellington had over the Judgment Debtors and the later transferees of the Judgment Debtors' assets.

186. Like fraud and breaches of contract the Court identified in the Underlying Action, the 2017 Fraudulent Conveyances that Dondero and Ellington orchestrated from the Judgment Debtors to Sentinel were quintessential abuses of the corporate form at UBS's expense, satisfying the second required element for alter ego liability. The Court should thus pierce the corporate veil and hold Dondero and Ellington liable for the judgment against CDO Fund, SOHC, and HFP.

### B. Dondero And Ellington Were The Alter Egos Of Mainspring And Montage, Respectively

187. As a matter of equity, Dondero should be liable for the debts of Mainspring and Ellington should be liable for the debts of Montage. At the time of the fraudulent conveyances from Sentinel to Mainspring and Montage, Dondero had complete control of Mainspring as its ultimate beneficial owner, and Ellington had complete control of Montage as its ultimate beneficial owner. *See supra* ¶¶ 13-14. In fact, Dondero controls 99.5% of Mainspring's assets and Ellington controls 99% of Montage's assets. *See supra* ¶ 113.

#### 1. Dondero And Ellington Dominated Mainspring And Montage, Respectively

188. Once again applying the same alter ego factors, the evidence confirms that Dondero and Ellington exercised complete dominion over Mainspring and Montage, respectively.

189. ***Intermingling Of Funds:*** Sentinel's "dividend" payments were at the sole discretion of Dondero and Ellington in their personal capacities. *See supra* ¶¶ 113-119. But to pay Dondero's and Ellington's respective dividends, Sentinel transferred money not to them

directly but to Mainspring and Montage. *See supra* ¶¶ 113-119. Even as Beecher facilitated these payments to Mainspring and Montage, it understood that it was in fact paying dividends to Dondero and Ellington. *See supra* ¶¶ 115-118.

190. ***Overlap In Ownership:*** At the time of the fraudulent conveyances from Sentinel to Mainspring and Montage, Dondero had complete control and domination of Mainspring as its ultimate beneficial owner, and Ellington had complete control and domination of Montage as its ultimate beneficial owner. *See supra* ¶¶ 13-14, 116-119. Dondero and Ellington were also the ultimate controllers of the Transferors, who sent the assets to Sentinel, and of Sentinel itself.

191. ***The Degree Of Discretion Demonstrated By The Allegedly Dominated Corporation:*** Neither Mainspring nor Montage demonstrated any discretion. Rather, Dondero and Ellington took the dividend payments that Sentinel deposited and used them for personal purposes unrelated to Mainspring and Montage. They moved the money to other entities they controlled to pay court-blocked bonuses to former *HCM* employees who were never affiliated with Mainspring and even to personally enrich Ellington. *See supra* ¶¶ 120-128. There is no indication that Mainspring or Montage had any operations or purpose other than to receive money for Dondero and Ellington.

2. <u>Dondero And Ellington Used Their Control Of Mainspring And Montage To Defraud UBS</u>

192. Dondero and Ellington used their complete dominion over Mainspring and Montage to take for themselves funds that should have been available to satisfy the Judgment.

193. By ordering the siphoning of millions of dollars in dividends from Sentinel to Mainspring and Montage, Dondero and Ellington ensured that Sentinel would have even fewer Judgment Debtor assets to return to satisfy the Judgment. *See supra* ¶¶ 113-119. Dondero and Ellington forced through these dividend payments over Sentinel's express commitment that it

HMIT Appx. 02760

would "not be entertaining any dividend issuance while the ATE policy is active." *See supra* ¶¶ 113-119. Dondero and Ellington's clear disregard of this commitment illustrates their abuse of their complete control over the entities.

194. Dondero and Ellington abused their control over these dummy entities by secreting assets from the Judgment Debtors and to other entities that Dondero and Ellington owned and controlled all to frustrate any claim UBS had to those funds. *See supra* ¶¶ 51-81, 93-128. The Court should pierce the corporate veil and hold Dondero and Ellington liable for the judgment against CDO Fund, SOHC, and HFP.

### C. CDO Holding Is An Alter Ego Of HFP

195. When it transferred substantially all of its assets to CLO HoldCo in 2010, CDO Holding was an alter ego of Judgment Debtor HFP.

196. CDO Holding's relationship to HFP is in all material respects the same as SOHC's adjudged alter ego relationship to HFP. In its alter ego default judgment in the Underlying Action, the court held that UBS's allegations sufficiently linked SOHC and HFP as alter egos because SOHC "was HFP's instrumentality, had no independence, could not exercise any business discretion, did not have its own offices, officers or employees, and that HFP completely dominated the day-to-day operations of SOHC as well as SOHC's *sister affiliates*." Ex. 24, Phase II Judgment, at 6 (emphasis added). The evidence shows that HFP both dominated CDO Holding and abused its control over CDO Holding to defraud UBS. The Court should reverse-pierce the corporate veil and hold CDO Holding to account for its role as a controlled asset repository for HFP.

#### 1. HFP Dominated Its "Asset Repository" CDO Holding

197. The factors that characterized the HFP and SOHC alter ego relationship also apply to HFP and CDO Holding, one of SOHC's "sister affiliates."

HMIT Appx. 02761

198.    ***Disregard Of Corporate Formalities:***  CDO Holding, under the complete control

and domination of HFP, ███████████████████████████████████████████████

████████████████████████████████████████████████████  *See supra* ¶¶ 52-

55.

199.    ***Intermingling Of Funds:***  In 2017, CDO Holding intermingled its funds and assets

with several other Dondero-controlled entities, including HFP, to pay the premium on the ATE

Policy.  *See supra* ¶¶ 61-78.  The entities that combined their funds to pay the ATE Policy did not

allocate coverage amounts according to contributions; the real goal of the ATE Policy was to move

money from the Judgment Debtors and their potential alter egos to Sentinel, another entity that

Dondero and Ellington owned and controlled.  *See supra* ¶¶ 61-76.  Moreover, CDO Holding was

not a named defendant in the Underlying Action but still was an Insured because it was an alter

ego of defendant HFP, and Dondero and Ellington realized that a court would determine as much.

*See supra* ¶¶ 64, 75.

200.    ***Overlap In Ownership, Officers, And Directors:***   Dondero was ultimately in

charge of HFP and CDO Holding and was the sole director of each.  *See supra* ¶¶ 28-30, 32-33,

62.

201.    ***The Degree Of Discretion Demonstrated By The Allegedly Dominated***

***Corporation:***  There is no evidence that CDO Holding ever demonstrated any discretion.  Just the

opposite, it saw its assets stripped for the benefit of HFP and its other subsidiaries, such as SOHC.

*See supra* ¶¶ 51-53.  These transfers were not arm's-length transactions; ███████████████

████████████████████████████████████████  CDO Holding also lost all of its equity

assets in a single 2010 transfer conducted at the direction of HFP's controller Dondero.  *See supra*

¶¶ 49-51, 55-59.

HMIT Appx. 02762

202. ***The Payment Or Guaranty Of The Corporation's Debts By The Dominating Entity:*** At other times, HFP moved money into CDO Holding to enable CDO Holding to make distributions to other creditor entities or make payments for other of HFP's subsidiaries. *See supra* ¶ 54.

2. <u>HFP Used Its Domination Over CDO Holding To Defraud UBS</u>

203. HFP, alongside its controller Dondero, used its control of CDO Holding to defraud UBS. In 2010, Dondero ordered a transaction to fraudulently move substantially all of CDO Holding's assets to CLO HoldCo. The portfolio was worth nearly $40 million. *See supra* ¶¶ 51, 55-60. In return, CDO Holding received scant cash and a note that was not payable until 2025. *See supra* ¶ 59.

204. The 2010 asset transfer to Dondero-controlled CLO HoldCo, which left CDO Holding and HFP without assets they could have used to satisfy the Judgment, satisfies the second element of an alter ego claim. It was a fraud against UBS that sought to prevent UBS from collecting on any eventual judgment in the underlying action.

205. The Court should thus reverse-pierce the corporate veil to find that CDO Holding was the alter ego of HFP at the time of the 2010 Fraudulent Conveyance and that CDO Holding was and is liable for the HFP's portion of the Judgment.

## II.  CLAIM III: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") BY DONDERO AND ELLINGTON (18 U.S.C. § 1962(C))

206. For the reasons set forth above, Dondero and Ellington each are alter egos of the Judgment Debtors and should be personally liable for the full outstanding amount on the Judgment. If the Court finds for UBS on Claim II, it need not reach Claims III and IV.

207. In the alternative, Dondero and Ellington are liable for treble damages under 18 U.S.C. § 1962(c) for the reasons below.

66

208.     A civil RICO claim is established when there is: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *NRO Bos. LLC v. Yellowstone Cap. LLC*, 72 Misc. 3d 267, 271 (Sup. Ct. Rockland Cnty. 2021) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). A violation of § 1962(c) requires a corresponding criminal violation of the substantive RICO statute through "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly . . . participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(c)). A plaintiff can establish civil damages by showing "that he was 'injured in his business or property by reason of a violation of section 1962.'" *Id.* (emphasis omitted) (quoting 18 U.S.C. § 1964(c)).

209.     Dondero and Ellington are each individuals able to hold a legal or beneficial interest in property and are thus "person[s]" under 18 U.S.C. §§ 1961(3) and 1962(c).

210.     Dondero and Ellington each violated 18 U.S.C. § 1962(c) by leveraging a separate and distinct enterprise that engaged in a pattern of racketeering activity that harmed UBS in violation of 18 U.S.C. § 1964(c).

211.     Dondero and Ellington, acting individually and together in concert, have orchestrated and participated in a continually running scheme dating to at least 2010 and lasting to the present. They have, among other acts, fraudulently transferred assets to individuals and companies in different states and countries in anticipation and frustration of an adverse judgment in the Underlying Action. Dondero and Ellington, through the Enterprise, conducted the predicate

HMIT Appx. 02764

acts of racketeering through interstate wires or other instrumentalities of interstate commerce, including by sending funds to the Cayman Islands and other international destinations.

## A. **The RICO Enterprise**

212. Dondero and Ellington conducted these misrepresentations and frauds through an association-in-fact enterprise that comprised these nine persons and nineteen entities: Dondero and Ellington, together with Leventon, Sevilla, DiOrio, Waterhouse, Irving, Vitiello, and Surgent (the "Associates"); and CDO Fund, SOHC, HFP, HFC, CDO Opportunity Fund, CDO Holding, CLO HoldCo, Sentinel, Sebastian Clarke, Mainspring, Montage, Tall Pine, Sunshine Coast, NexBank, NexPoint, Highland Funds Asset Management, the DAF, Skyview, and CPCM (collectively, "the Enterprise"). The common purpose of the Enterprise was to generate money for its members. *See supra* ¶¶ 49-97.

213. The entities that constituted the Enterprise were owned, directed, or otherwise controlled by Dondero and Ellington, as described in ¶¶ 13, 14, 32, 33, 94, 122, and 147, *supra*, and served these functions in the Enterprise:

- *The Transferors.* The role of CDO Fund, SOHC, HFP, HFC, CDO Opportunity Fund, and CDO Holding, as Judgment Debtors or subsidiaries of HCM and/or Judgment Debtors against whom UBS could foreseeably collect on the Judgment, was to be rendered insolvent and therefore judgment-proof.

- *The Transferees.* The role of CLO HoldCo, Sentinel, Sebastian Clarke, Mainspring, Montage, Tall Pine, and Sunshine Coast (together, "the Transferees") was to receive fraudulently transferred assets from the Transferors or other Transferees and shuffle assets farther away from UBS and to Dondero and Ellington.

- *The Facilitators Of Bonus Payments.* The role of NexBank, NexPoint, Highland Funds Asset Management, the DAF, Mainspring, Sunshine Coast, Tall Pine, Skyview, and CPCM was to make—and cover-up—fraudulent payments to associates Ellington, Leventon, Waterhouse, and Surgent. This scheme diverted about $5.9 million in Judgment Debtor assets.

HMIT Appx. 02765

214.     The Associates were employees at HCM who reported to Dondero or Ellington and who engaged in predicate acts or received the spoils of the predicate acts at Dondero and Ellington's direction.

215.     ████████████████████████████████████████████████

████████████████████████████████   *See supra* ¶ 36.   ████████████████████████

████████████████████████████████████████████████████████████

████   *See supra* ¶ 37.  Leventon worked with Ellington closely in bringing to life Ellington's idea for the ATE Policy to drain substantially all assets from the Transferors.  *See supra* ¶¶ 64-65.  He also ████████████████████████████████████████████████████████

██████████████████████████—for which he was paid his "bonus" of roughly $687,594.00. *See supra* ¶¶ 126-127.  Despite receiving these payments, and to cover his tracks, Leventon lied to the Bankruptcy Court and filed an amended claim.  *See supra* ¶ 127.  After getting fired from HCM, Leventon went to work at Ellington-owned Skyview.  *See id.*

216.     ████████████████████████████████████████████████

*See supra* ¶ 36.   ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████   *See supra* ¶ 37.  Sevilla oversaw the daily management of Sentinel and helped develop the idea that the ATE Policy premium would be satisfied by transferring the entire investment portfolios of the Transferors.  *See supra* ¶ 65.  Sevilla also facilitated the fraudulent conveyance between Sentinel and Sebastian Clarke.  *See supra* ¶ 94.  ████████████████████████████████

████████████████████████████████████████████████   *See*



69

HMIT Appx. 02766

*supra* ¶¶ 125-127.  After getting fired from HCM, Ellington hired Sevilla to work at Skyview.  *See*

*supra* ¶ 127.

217.  ████████████████████████  *See  supra* ¶ 40.  ████████████

████████████████████████████████████████████

████████████████████████████  *See supra* ¶ 40.  ████████████

████████████████████████████████████████████

████████████████████  *See supra* ¶ 39.  After Ellington asked DiOrio to serve as a

director of Sentinel, DiOrio pushed through Ellington's requests for reimbursement of hundreds

of thousands of dollars in personal expenses without question.  *See supra* ¶¶ 111-112.  From his

position as a director of Sentinel, DiOrio also ultimately helped funnel $8,900,000.00 in

"dividends" to Dondero and Ellington.   *See supra* ¶¶ 113-119.  DiOrio also facilitated the

fraudulent conveyance between Sentinel and Sebastian Clarke and falsely characterized the assets

transferred as "worthless."  *See supra* ¶¶ 93-97.  ████████████████████

████████████████  *See supra* ¶ 40.

218.  ***Waterhouse*** served as the Chief Financial Officer of HCM for more than a decade.

*See  supra* ¶ 125.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  *See supra* ¶¶ 120-125.

For his participation in this scheme, Waterhouse received the roughly $2,000,000.00 bonus

blocked by the Bankruptcy Court.  *See supra* ¶ 126.  Despite receiving these payments, and to

cover his tracks, Waterhouse lied to the Bankruptcy Court and filed an amended claim for his

bonus payment.  *See supra* ¶ 127.  ████████████████████████████

████████████  *See supra* ¶ 127.

219.   **Surgent** has been a long-time employee at HCM, serving as Chief Compliance Officer for much of the relevant period.  *See supra* ¶ 120.  According to a stipulation he signed with the Independent Board, Surgent entered into consulting agreements with Mainspring and Tall Pine and, in March and September 2020, received payments through a pass-through entity (Prive Solutions LLC) totaling $2,774,272.13.  *See supra* ¶ 126.  This included $750,906.13 from Tall Pine, $1,887,929.00 from Mainspring, and $135,437.00 from NexPoint.  *See supra* ¶ 122 n.30. Surgent failed to disclose these payments and instead submitted a claim to the Bankruptcy Court seeking, in part, money he had already received.  *See supra* ¶¶ 126-127.

220.



*See supra* ¶ 36.  Irving was instrumental in ensuring that Sentinel received all the assets in satisfaction of the premium payment under the APA.  *See supra* ¶ 77.

*See supra* ¶ 127 n.33.

221.   **Vitiello** worked in the legal department in HCM for seven years, at times reporting to Leventon.

*See supra* ¶ 37.

*See supra* ¶ 64.

*See supra* ¶ 127 n.33.

**B.    The Pattern Of Racketeering Activity**

222.   From at least 2010 to the present, Dondero and Ellington were associated with the Enterprise and conducted or participated, directly or indirectly, in the management and operation of the Enterprise's affairs through a pattern of racketeering activity, including acts of

HMIT Appx. 02768

wire fraud in violation of 18 U.S.C. § 1343 and acts of money laundering in violation of 18 U.S.C. § 1956.

223.    These acts were a pattern of fraudulent transactions intended to facilitate the theft of Judgment Debtor assets using the Associates, misrepresentations, and shell companies to hide their involvement in the schemes.

224.    The predicate acts funneled money ever farther away from UBS.  They centered on these events: (1) the 2010 Fraudulent Conveyance; (2) the 2017 Fraudulent Conveyances; (3) the 2018 fraudulent amendments to the ATE Policy; (4) the 2019 fraudulent conveyance to Sebastian Clarke; (5) the 2019-2020 Fraudulent Ellington Reimbursements; (6) the 2020-2021 fraudulent dividends to Mainspring and Montage; (7) the 2020 fraudulent bonus payments; and (8) misrepresentations to UBS about the solvency of the Judgment Debtors.

225.    ***Horizontal Relatedness.***    Dondero and Ellington conducted the related acts constituting the pattern of racketeering activity for the same purpose: making themselves rich and hiding the assets to which UBS had superior right.  *See supra* ¶¶ 49-72, 82-87, 90-92, 93-97, 103-112, 113-117, 122-126.  The methods of commission are also similar: Dondero and Ellington repeatedly flouted corporate formalities to use the Associates and entities under their control to hide the assets owed to UBS.  For example, Dondero and Ellington failed to observe corporate formalities in moving assets from the Transferors and among the Transferees, *see supra* ¶¶ 55-63, 94, ██████████████████████████████████████████████████████

███████████████████████ *see supra* ¶¶ 36-40, in misrepresenting to regulators the fraudulent nature of the ATE Policy, *see supra* ¶¶ 88-89, in using Sentinel as a piggy bank to reimburse personal expenses and pay out dividends, *see supra* ¶¶ 103-119, and in fraudulently issuing bonus payments blocked by the Bankruptcy Court, *see supra* ¶¶ 120-127.

HMIT Appx. 02769

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM   INDEX NO. 650744/2023
NYSCEF DOC. NO. 17   RECEIVED NYSCEF: 02/08/2023

Case 3:21-cv-00881-X   Document 188-2   Filed 07/15/22   Page 123 of 137   PageID 17057
Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Exhibit 2   Page 76 of 90

226. ***Vertical Relatedness.*** The acts constituting the pattern of racketeering activity related to the Enterprise as a whole: Dondero and Ellington were able to commit the offenses only because of their powerful positions in the Enterprise.

227. As chair and sole member of the Board of Directors for HFP, sole Director for SOHC, and President and ultimate General Partner for CDO Fund, Dondero had specific control over the Judgment Debtors. *See supra* ¶¶ 28-33. As the sole stockholder and sole director of Strand, Dondero had ultimate control over every HCM entity, affiliate, and employee. *See supra* ¶ 29. ████████████████████████████████████████

████████████████████████████████ *See supra* ¶¶ 36-38. Dondero also used his position to authorize fraudulent conveyances, sometimes from all sides: he approved, for example, both the sale and purchase of assets from CDO Holding to CLO HoldCo in 2010. *See supra* ¶¶ 51-57. And he signed the ATE Policy on behalf of all Transferors at the same time ██████████ ████████████████████████ and a member of the ITA Advisory Board overseeing Sentinel. *See supra* ¶¶ 71, 77-78, 80. He also exercised his authority over Sentinel and the other funding entities to authorize their issuance of fraudulent "consulting" payments to associates who had rendered services to HCM. *See supra* ¶¶ 122-126.

228. Ellington also leveraged his position as Dondero's right-hand man in the Enterprise to commit this pattern of racketeering. Ellington's position as General Counsel at HCM, █████ ██████████████████████████████████ uniquely positioned him to implement his idea to drain all Judgment Debtor assets pursuant to the ATE Policy and APA. *See supra* ¶¶ 31, 64, 80. He also used these positions to acquire fraudulent reimbursements and unwarranted dividends. *See supra* ¶¶ 103-119. ████████████████████████████████

HMIT Appx. 02770

████████████████████████████████████████████████████████

██████████████████████████████████████████  *See supra* ¶¶ 122-127.

229.  ***Continuity.***  The pattern of racketeering activity Dondero and Ellington engaged in and conducted has been continuous from at least 2010 to the present.  Dondero and Ellington have completed at least **seven** separate schemes involving predicate acts of wire fraud and money laundering over the course of more than a decade.  *See* Ex. A (table detailing selected acts of wire fraud); Ex. B (table detailing selected acts of money laundering).  Such misconduct satisfies the requirements of closed-ended continuity.

230.  In the alternative, the pattern of racketeering activity committed by Dondero and Ellington is open-ended in that it has no predetermined end date and is continuous, as Dondero and Ellington have shown that their scheme is the regular way of operating and conducting themselves and their ongoing business.  *See supra* ¶¶ 49-72, 82-87, 90-92, 93-97, 103-112, 113-117, 122-126.  Dondero and Ellington used their connections while controlling HCM to move Judgment Debtor assets not only within HCM, but to other entities outside HCM that were also in their control.  *See supra* ¶¶ 113-119.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  *See supra* ¶ 122.

231.  Dondero and Ellington retain positions of power in the Enterprise.  *See supra* ¶¶ 122, 127 n.33.  Ellington employs most of the Associates at Skyview, which at first shared an address with, and still preforms work for, Dondero-affiliated entities NexPoint and NexBank.  *See supra* ¶ 127 n.33.  Thus, there also exists the threat of continuing long-term racketeering activity.

## C.    The Predicate Acts

### 1.    Wire Fraud In Violation Of 18 U.S.C. § 1343

232.    Dondero and Ellington used the Enterprise to transmit communications in interstate commerce by means of wire in violation of 18 U.S.C. § 1343 in furtherance of their scheme to defraud UBS.

233.    UBS incorporates by reference Exhibit A, which sets forth particular uses of wire communications in the U.S. in furtherance of the scheme to defraud, describing which RICO Defendant or individual associated with the Enterprise caused the communication to be wired, when the communication was made, and how it furthered the scheme.  The wire communications described in Exhibit A were made in furtherance of the scheme to defraud UBS.

234.    UBS also incorporates by reference Exhibit B, which sets forth money laundering transactions in furtherance of the scheme to defraud.  Each of these wire transfers was made in furtherance of the scheme to defraud UBS and constitutes another instance of wire fraud.

#### a.    The 2010 Fraudulent Conveyance

235.    On or about December 23, 2010, Dondero, through the Enterprise, violated 18 U.S.C. § 1343 by using interstate wires to fraudulently transfer to CLO HoldCo nearly all the assets from CDO Holding, a subsidiary and alter ego of HFP.  *See supra* ¶¶ 49-60.

236.    This fraudulent conveyance aimed to render CDO Holding judgment-proof and to keep UBS from receiving the money the Judgment Debtors owed in the Underlying Action. Exhibit A lists specific instances of wire fraud undertaken in furtherance of this scheme.

#### b.    The 2017 Fraudulent Conveyances

237.    On or about April 2017, through the Enterprise (including through associates Leventon, Sevilla, DiOrio, Irving, and Vitiello), Dondero and Ellington violated 18 U.S.C. § 1343

HMIT Appx. 02772

by using interstate wires to orchestrate the 2017 Fraudulent Conveyances to render the Transferors judgment proof.

238.    After summary judgment rulings in favor of UBS in the Underlying Action, Dondero and Ellington anticipated an enormous damages verdict. *See supra* ¶ 61. Despite the explicit warning by outside counsel as to the "legal validity" of sending assets "beyond the reach of the plaintiffs in the [Underlying Action] against the [F]unds," *see supra* ¶ 72, Dondero and Ellington drained the 2017 Transferred Assets, valued at over $105,647,679.00, in satisfaction of the ATE Policy's $25,000,000.00 "premium." *See supra* ¶ 72.

239.    The 2017 Fraudulent Conveyances included the use of interstate wires to deceive UBS, Cayman regulators, and HCM employees and other persons facilitating the transfer to believe that the ATE Policy was in good faith instead of a fraudulent sham. *See supra* ¶¶ 68-71. The objective of the transfer was to render the Transferors judgment-proof and to defraud UBS of the more than one billion dollars it was owed. *See supra* ¶ 64. Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

c.    The 2018 Fraudulent Adjustments To The ATE Policy

240.    In or around June 2018, through the Enterprise (including associates DiOrio, Sevilla, and Irving), Dondero and Ellington violated 18 U.S.C. § 1343 by using interstate wires to make fraudulent retroactive "adjustments" to ATE Policy terms and valuations of the 2017 Transferred Assets. *See supra* ¶¶ 82-87.

241.    The objective of the adjustments was to keep the Transferors judgment-proof and to defraud UBS of the millions of dollars the Judgment Debtors owed. *See supra* ¶¶ 90-92. Exhibit A lists specific instances of wire fraud undertaken in furtherance of this scheme.

HMIT Appx. 02773

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

NYSCEF DOC. NO. 42

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11    Doc 3692-2    Filed 03/27/23    Entered 03/27/23 10:18:45    Desc
Case 3:21-cv-00881-X    Document 202-2    Filed 10/10/22    Page 127 of 137    PageID 17061
Exhibit 2    Page 80 of 90

        d.    The 2019 Fraudulent Conveyance To Sebastian Clarke

242.    In or around December 31, 2019, through the Enterprise (including through associates DiOrio and Sevilla), Dondero and Ellington violated 18 U.S.C. § 1343 by using the interstate wires to transfer certain of the 2017 Transferred Assets to Sebastian Clarke for $3 to hide assets from UBS. *See supra* ¶¶ 93-97. Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

        e.    The 2019-2020 Fraudulent Ellington Reimbursements

243.    In or around November 2019 until March 2020, through the Enterprise (including through associate DiOrio), Ellington violated 18 U.S.C. § 1343 by using the interstate wires to defraud UBS by reimbursing his personal entertainment expenses and business expenses unrelated to the UBS litigation or the ATE Policy.

244.    The objective of these reimbursements was to enrich Ellington and to hide assets from UBS that could be used as payment for the Judgment. *See supra* ¶¶ 102-112. Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

        f.    The 2020-2021 Fraudulent "Dividends"

245.    In or around April 2020 and January 2021, through the Enterprise (including through associate DiOrio), Dondero and Ellington violated 18 U.S.C. § 1343 by using interstate wires to defraud UBS by causing Sentinel to issue $8,900,000.00 in dividends to entities owned and controlled by Dondero and Ellington. *See supra* ¶¶ 114, 117.

246.    Sentinel fraudulently issued these distributions upon the request of Ellington, even with the knowledge that Sentinel would need to return all of the 2017 Transferred Assets to the Transferors, because the 2017 Fraudulent Conveyances were fraudulent. *See supra* ¶¶ 113-117. And Sentinel issued the distributions after its directors had set a moratorium on dividend issuance while the ATE Policy was active. *See supra* ¶¶ 115, 117.

HMIT Appx. 02774

247.    The objective of these dividends was to enrich Dondero and Ellington, to hide assets that could be used to pay the Judgment, and to defraud UBS of the millions of dollars owed. *See supra* ¶¶ 113-119.  Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

### g.    The 2020 Fraudulent Bonus Payments

248.    In or around 2021, through the Enterprise (including through associates Leventon, Sevilla, Surgent, and Waterhouse), Dondero and Ellington also violated 18 U.S.C. § 1343 by using interstate wires to defraud UBS by diverting Judgment Debtor assets to Ellington, Waterhouse, Leventon, and Surgent.

249.    In 2020, the Bankruptcy Court blocked HCM from making bonus payments to Waterhouse, Ellington, Leventon, and Surgent.  *See supra* ¶ 120.  Ellington came up with a plan (approved by Dondero) to make these bonus payments to himself and the others by transferring assets from entities in Ellington and Dondero's control.  *See supra* ¶ 120.



250.    ████████████████████████████████████████████████████████ *See supra* ¶ 122.

251.    ████████████████████████████████████████████████ *See supra* ¶ 122.

252.    ████████████████████████████████████████████

**HMIT Appx. 02775**

█████████████████████████████████████████████████  *See supra* ¶¶ 122-123.

Contributions were based not on services rendered but on ability to pay and regulatory limitations. *See supra* ¶¶ 124-125.

253.    As a result of this scheme, Dondero and Ellington diverted approximately $5,874,203.21 of Judgment Debtor assets from Sentinel, through Mainspring, to Ellington, Surgent, Waterhouse, and Leventon.  *See supra* ¶ 126.

254.    Despite having received these payments, Ellington, Surgent, Waterhouse, and Leventon filed proofs of claim seeking those same amounts in bonuses.  *See supra* ¶ 127.  In furtherance of the scheme, Ellington, Waterhouse, and Leventon assigned these claims to CPCM, a wholly owned subsidiary of Skyview, which pursued them on their behalf.

255.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████  *See supra*

¶ 121. Exhibit A lists specific instances of wire fraud in furtherance of this scheme.

        h.    The Misrepresentations About The Solvency Of CDO Fund And HFP

256.    As part of the scheme to defraud UBS, Ellington, through his control of the Enterprise, made false representations to UBS as to the solvency of the Judgment Debtors and their ability to pay the Judgment.  This scheme included the use of interstate wires to deceive UBS and to deprive it of money owed.

257.    In furtherance of this scheme, Ellington repeatedly misrepresented to UBS that some of the Judgment Debtors had been "ghost funds" since 2009 without disclosing that Dondero and Ellington had made them insolvent through the 2010 Fraudulent Conveyance and 2017 Fraudulent Conveyances. *See supra* ¶ 46, 91. Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

HMIT Appx. 02776

### 2. Money Laundering In Violation Of 18 U.S.C. § 1956

258.    Dondero and Ellington have also committed acts of money laundering to carry on and promote illegal activity in violation of 18 U.S.C. § 1956. They knowingly caused the transportation, transmission, and transfer of funds to or from the United States to themselves and other Enterprise associates to promote unlawful activity, including but not limited to the violations of 18 U.S.C. § 1343 alleged above.

259.    Dondero and Ellington engaged in several financial transactions over the course of operating and managing their scheme to defraud UBS, including (i) financial transactions constituting predicate acts of wire fraud and (ii) financial transactions to funnel the proceeds of their scheme between and among themselves and other individuals associated with the Enterprise.

260.    The assets sent from CLO HoldCo to CDO Holding became proceeds of wire fraud at the time of the 2010 Fraudulent Conveyance, because they stemmed from a fraudulent transfer. *See supra* ¶¶ 49-60. Later, Dondero and Ellington engaged in financial transactions involving additional proceeds of wire fraud, including: (1) the 2017 Fraudulent Conveyances; (2) the 2019 fraudulent conveyance to Sebastian Clarke; (3) the 2019-2020 Fraudulent Ellington Reimbursements; (4) the 2020-2021 fraudulent dividends to Mainspring and Montage; and (5) the 2020 fraudulent bonus payments.[35]

---

[35]    Even if every individual transfer did not comprise Judgment Debtor assets, all financial transactions made under the fraudulent bonus scheme in 2020 also involved the proceeds of wire fraud as defined in 18 U.S.C. § 1956(a)(1)(B) because each transaction was part of a set of parallel or dependent transactions in this scheme, at least one of which (the payments made from Mainspring) involved the proceeds of wire fraud. In addition, all were part of a single plan or arrangement concocted by Ellington to pay himself, Leventon, Waterhouse, and Surgent bonuses blocked by the Bankruptcy Court. *See supra* ¶¶ 120-128.

261.     Dondero and Ellington directed these transactions with knowledge that the funds at issue were actually owed to UBS (either pursuant to the contractual breach, court order, or the Judgment).  The funds were therefore the proceeds of wire fraud in violation of 18 U.S.C. § 1343:

- The 2017 Fraudulent Conveyances occurred after it became clear to Dondero and Ellington that the Judgment Debtors would lose in the Underlying Action. *See supra* ¶ 72.

- The 2019 fraudulent conveyance from Sentinel to Sebastian Clarke; the 2019 and 2020 Fraudulent Ellington Reimbursements; the 2020 and 2021 fraudulent dividends from Sentinel to Mainspring and Montage; and the voidable transfers from Mainspring (at times, through Tall Pine) to entities owned by Ellington, Leventon, Waterhouse, and Surgent all took place after the court in the Underlying Action found CDO Fund and SOHC liable to UBS.  *See supra* ¶¶ 93-95, 103-112, 120-122, 113-117.

262.     Dondero and Ellington conducted these financial transactions with the intent to promote and continue their unlawful activities as alleged in this Petition, and designing the financial transactions in whole or part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of their unlawful activities, and to prevent recovery of the proceeds by UBS.  *See supra* ¶¶ 49, 61-63, 93, 98, 103, 113, 120-121.  Had Dondero and Ellington intended to pay the Judgment, then they would have revealed the existence of the ATE Policy when the court issued the Phase I Decision and Order, rather than point to their empty pockets. *See supra* ¶¶ 46-47.

263.     Exhibit B details known money laundering transactions in furtherance of the scheme to defraud.  The twelve money laundering violations listed in the table total more than $130 million.

### D.     Summary Of Allegations To Each RICO Defendant

264.     Dondero and Ellington have both participated in and conducted the affairs of the Enterprise by engaging in multiple predicate acts, as alleged above and summarized immediately

HMIT Appx. 02778

below.  The conduct of each constitutes a pattern of racketeering activity under 18 U.S.C. § 1961(5).

265.    ***Dondero*** has committed many predicate acts, including wire fraud and money laundering.  Dondero, directly or indirectly, used the interstate wires in violation of 18 U.S.C. § 1343 to:

- fraudulently transfer assets rightfully owed to UBS to CLO HoldCo in 2010;

- fraudulently transfer assets rightfully owed to UBS to Sentinel in 2017;

- fraudulently issue amendments to cover up the sham ATE Policy in 2018;

- fraudulently transfer assets rightfully owed to UBS to Sebastian Clarke in 2019;

- fraudulently transfer assets rightfully owed to UBS from Mainspring to Tall Pine and ultimately to Ellington and entities owned by Leventon, Waterhouse, and Surgent as bonus payments from HCM in 2020; and to

- fraudulently transfer assets rightfully owed to UBS to himself and Ellington through the issuance of dividends from Sentinel to Mainspring and Montage (their alter egos) in 2020-2021.

266.    Dondero also engaged in financial transactions involving the known proceeds of wire fraud in violation of 18 U.S.C. § 1956, including:

- the 2017 Fraudulent Conveyances;

- the 2019 fraudulent conveyances to Sebastian Clarke;

- the voidable transfers of about $5.9 million from Mainspring (at times, through Tall Pine) to entities owned by Ellington, Leventon, Waterhouse, and Surgent in 2020; and

- the fraudulent issuance of roughly $9 million in "dividends" to himself and Ellington from Sentinel in 2020-2021.

267.    ***Ellington*** has committed many predicate acts, including wire fraud and money laundering.  Ellington, directly or indirectly, used the interstate wires in violation of 18 U.S.C. § 1343 to:

82

- fraudulently transfer assets rightfully owed to UBS to Sentinel in 2017;

- fraudulently issue amendments to cover up the sham ATE Policy in 2018;

- fraudulently transfer assets rightfully owed to UBS to Sebastian Clarke in 2019;

- fraudulently transfer assets rightfully owed to UBS to himself through personal expense reimbursements in 2019-2020;

- fraudulently transfer assets rightfully owed to UBS from Mainspring to Tall Pine and ultimately to himself and entities owned Leventon, Waterhouse, and Surgent as bonus payments from HCM in 2020;

- fraudulently transfer assets rightfully owed to UBS to himself and Dondero through the issuance of dividends from Sentinel to Mainspring and Montage (their alter egos) in 2020-2021; and to

- fraudulently make repeated misrepresentations to UBS as to the solvency of the Judgment Debtors and their ability to pay on the Judgment.

268.    Ellington also engaged in financial transactions involving the known proceeds of wire fraud in violation of 18 U.S.C. § 1956, including:

- the 2017 Fraudulent Conveyances;

- the 2019 fraudulent conveyances to Sebastian Clarke;

- the fraudulent reimbursements of $833,843.05 for his personal expenses in 2019-2020;

- the voidable transfers of about $5.9 million from Mainspring (at times, through Tall Pine) to entities owned by Ellington, Leventon, Waterhouse, and Surgent in 2020; and

- the fraudulent issuance of roughly $9 million in "dividends" to himself and Dondero from Sentinel in 2020-2021.

**E.    <u>The Harm To UBS</u>**

269.    UBS has suffered substantial injury to its business and property because of, and through, Dondero and Ellington's commission of the enumerated racketeering acts in violation of 18 U.S.C. §§ 1962(c) and 1964(c).

270.    Dondero and Ellington have frustrated UBS's ability to collect virtually any of the more than a $1 billion judgment entered against CDO Fund, SOHC, and HFP.  *See supra* ¶ 98. The looting of the Judgment Debtors and subsequent shuffling of assets continued for more than a decade.  *See supra* ¶¶ 49, 62, 104, 108, 113, 122-123.  As a direct, proximate, and consequential damage of the result of the predicate acts described UBS has suffered: (1) lost-debt damages for the amount that UBS would have been able to collect from the Judgment Debtors but for Dondero and Ellington's wrongful conduct as set forth above; and (2) separate and independent damages in the nature of collection expense damages for the attorney's fees and other expenses incurred by UBS in connection with its enforcement of its Judgment.  *See supra* ¶¶ 48, 98 n.21.

271.    Under 18 U.S.C. § 1964(c), UBS has a right to recover threefold the damages it sustained, and the cost of this suit, including reasonable attorney's fees.

## III.    CLAIM IV: CONSPIRACY TO VIOLATE RICO BY ELLINGTON (18 U.S.C. § 1962(D))

272.    UBS repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth here.

273.    UBS pleads Claim IV in addition to Ellington's direct liability for violating 18 U.S.C. § 1962(c).

274.    Ellington, along with Dondero, willfully conspired, and agreed to conduct and participate, directly or indirectly, in the conduct of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), thereby violating 18 U.S.C. § 1962(d).

275.    Dondero knew of, agreed to, and acted to further the overall objective of the conspiracy by agreeing to and conspiring to use wire communications at the times, places, and circumstances discussed above to transfer assets and valuable rights, titles, and interests from the Judgment Debtors.  *See supra* ¶¶ 49-72, 82-87, 90-92, 93-97, 103-112, 113-117, 122-126.

HMIT Appx. 02781

Case 3:21-cv-00881-X   Document 76-12   Filed 28.5090   Page 135 of 137   PageID 17069

276.     Ellington knew of, agreed to, and acted to further the overall objective of the conspiracy by agreeing to and conspiring to use wire communications at the times, places, and circumstances discussed above to transfer assets and valuable rights, titles, and interests from the Judgment Debtors.  *See supra* ¶¶ 31 n.4, 49-72, 82-87, 90-92, 93-97, 102-112, 113-117, 122-126.

277.     Ellington committed the predicate acts of wire fraud and money laundering and thereby injured UBS in its business and property.

278.     As a result of Ellington's assistance in the conspiracy, Dondero could misappropriate assets that would have otherwise been available to satisfy the Judgment.

279.     As a result of Ellington's involvement in the conspiracy, UBS expended legal costs in attempts to collect its Judgment, which remains unsatisfied.  In addition to its legal costs, UBS has sustained lost-debt damages for the amount that UBS would have been able to collect from the Judgment Debtors but for Ellington's involvement in the conspiracy, including the harm from the fraudulent conveyances and dissipation of assets.  Dondero and Ellington's violations have thus damaged UBS.

280.     Under 18 U.S.C. § 1964(c), UBS has a right to recover threefold the damages it sustained, and the cost of this suit, including reasonable attorney's fees.

## REQUESTS FOR RELIEF

281.     Based on the facts and claims set forth above, UBS seeks the following relief:

i.     Under CPLR 5225(b) and the former DCL 270 *et seq.*, to void the fraudulent conveyances of assets from CDO Holding to CLO HoldCo and from the Judgment Debtors to Ellington through Sentinel, and to enter money judgments against CLO Holdco and Ellington for the full value of the transfers;

ii.     Under CPLR 5225(b) and the current DCL 270 *et seq.*, to void all voidable conveyances from the Judgment Debtors to Mainspring and Montage through Sentinel in 2020 and 2021 and to enter money judgments against Mainspring and Montage for all amounts received in said transfers;

**HMIT Appx. 02782**

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM                INDEX NO. 650744/2023
NYSCEF DOC. NO. 1                                        RECEIVED NYSCEF: 02/08/2023

Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Case 3:21-cv-00881-X   Document 262-2   Filed 09/5290   Page 136 of 137   PageID 17070
Exhibit 2   Page 89 of 90

   iii.      Under CPLR 5225(b), an order that: (a) CDO Holding at all relevant times was the alter ego of HFP, and is thus jointly and severally liable for the Judgment as against HFP and SOHC; (b) Dondero and Ellington at all relevant times were the alter egos of CDO Fund, SOHC, and HFP and are therefore jointly and severally liable for the Judgment; (c) Dondero at all relevant times was the alter ego of Mainspring and is liable for any turnover order and judgment against Mainspring; and (d) Ellington at all relevant times was the alter ego of Montage and is liable for any turnover order and judgment against Mainspring;

   iv.      Under CPLR 6201 *et seq.*, (a) an order of attachment against the Judgment Debtors' assets and/or assets to which UBS has a superior right up to the sum of $631,658,040.11, including statutory interest for the Judgment against SOHC and HFP, and $639,138,543.43, including statutory interest for the Judgment against CDO Fund; and (b) a temporary restraining order against the Respondents as to the transfer of the Judgment Debtors' assets and assets to which UBS has a superior right, including, but not limited to, (i) the assets transferred as part of the 2010 fraudulent conveyance to CLO HoldCo, and (ii) the assets transferred to Ellington, Mainspring, and Montage through Sentinel;

   v.      Under CPLR 6220 and 408, an order requiring Respondents to make disclosure as to any other assets that may be subject to attachment, and permitting UBS to obtain additional, related disclosure as needed;

   vi.      In the alternative to a finding of alter-ego liability under (iii) above and under 18 U.S.C. § 1964(c), an award of threefold lost-debt damages against Dondero and Ellington for the amount that UBS would have been able to collect from the Judgment Debtors but for Dondero and Ellington's wrongful conduct;

   vii.     Under the formerly enacted DCL 276-A, which was in effect at the time of the 2010 Fraudulent Conveyance and Ellington Fraudulent Reimbursement, an award of UBS's costs and attorney's fees incurred in connection with the enforcement of the Judgment as to those transfers, to include costs and fees incurred in UBS's investigation of the facts animating the claims set forth above;

   viii.    Under the newly enacted DCL 276-A, which was in effect at the time of the April 2020 and January 2021 Dividends, an award of UBS's costs and attorney's fees incurred in connection with the enforcement of the Judgment as to those transfers, to include costs and fees incurred in UBS's investigation of the facts animating the claims set forth above;

   ix.     Under 18 U.S.C. § 1964(c), an award of UBS's costs and attorney's fees incurred in connection with UBS's civil RICO claims; and

   x.      Such other relief as the Court deems just and proper.

HMIT Appx. 02783

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 11
RECEIVED NYSCEF: 02/08/2023
Case 19-34054-sgj11   Doc 3692-2   Filed 03/27/23   Entered 03/27/23 10:18:45   Desc
Case 3:21-cv-00881-X   Document 261-2   Filed 09/05/29   Page 137 of 137   PageID 17071
Exhibit 2   Page 90 of 90

Dated:  February 6, 2023
New York, NY

Respectfully submitted,

/s/ Andrew Clubok
Andrew Clubok
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020-1300
Phone:    (212) 906-1200
Email:     andrew.clubok@lw.com

Jason R. Burt*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone:    (202) 637-2200
Email:     jason.burt@lw.com

Kathryn K. George*
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611-3695
Phone:    (312) 876-7700
Email:     kathryn.george@lw.com

*Counsel for Petitioners UBS Securities LLC
and UBS AG London Branch*

---

\*      Motion for admission *pro hac vice* forthcoming.

HMIT Appx. 02784