Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone:  (214) 560-2201
*Counsel for James Dondero, NexPoint Asset
Management, L.P, NexPoint Advisors, L.P., Highland
Capital Management Services, Inc., NexPoint Real Estate
Partners, LLC, and The Dugaboy Investment Trust*

Amy L. Ruhland
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
901 S. MoPac Expressway
Building 1, Suite 300
Austin, TX 78746
Telephone: (650) 623-1401

*Counsel for James Dondero, The Dugaboy Investment
Trust, Strand Advisors, Inc,.and Get Good Trust*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br><br>Plaintiff, §<br><br>v. §<br><br>HIGHLAND CAPITAL MANAGEMENT FUND §<br>ADVISORS, L.P., et al., §<br><br>Defendants. § | Case No. 3:21-cv-00881-X |

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION TO DEEM VARIOUS PARTIES
## VEXATIOUS LITIGANTS AND FOR RELATED RELIEF

# TABLE OF CONTENTS

Page

I.    INTRODUCTION...................................................................................................1

II.   RELEVANT HISTORY ........................................................................................3

    A.   Dondero Ran A Highly Successful Business For Years Prior To Bankruptcy ............3

    B.   Under New Management, HCMLP Turns On Dondero And Pursues A Radically Different Path From The One Originally Contemplated ...........................................7

    C.   Dondero Acted In A Manner He Reasonably Believed Would Protect The Estate And HCMLP's Business................................................................................12

        1.   Pre-Confirmation Actions. .................................................................13

        2.   Post-Confirmation Actions.................................................................15

        3.   Bankruptcy-Related Appeals..............................................................20

    D.   HCMLP's Motion Is Misleading And Wrong In Numerous Other Critical Respects ................................................................................................23

        1.   Dondero Does Not Control Each Targeted Party.............................................23

        2.   HCMLP's Allegations Lack Evidentiary Support and/or Are Contradicted By Evidence. ................................................................................26

III.  HCMLP'S MOTION SHOULD BE DENIED ..........................................................28

    A.   The District Court Lacks Jurisdiction To Give The Relief Sought............................28

    B.   HCMLP Cannot Meet Its Burden To Demonstrate That The Relief Sought Is Warranted...................................................................................32

        1.   Labeling A Party A Vexatious Litigant is Reserved for Cases of Wildly Inappropriate, Unethical, and Sanctionable Behavior........................................32

        2.   The Conduct Alleged Here Does Not Come Close to Justifying a Vexatious Litigant Finding.................................................................................34

    C.   The Injunctive Relief Sought By HCMLP Is Unwarranted And Legally Inappropriate. ...............................................................................39

    2.   The Requested Injunction Is Impermissibly Overbroad and Procedurally Unworkable. ...............................................................................43

IV.   CONCLUSION .................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance Riggers & Constructors, Ltd. v. Restrepo*,
   2015 U.S. Dist. LEXIS 29346 (W.D. Tex. Jan. 7, 2015) ...................................................... 31, 42

*Baum v. Blue Moon Ventures, LLC*,
   513 F.3d 181 (5th Cir. 2008) ................................................................................. 31, 38, 41, 42

*Beverly Found v. Lynch*,
   301 S.W.3d 734 (Tex. App.—Amarillo 2009, no pet.) ............................................................. 23

*Bowling v. Willis*,
   2019 U.S. Dist. LEXIS 168602 (E.D. Tex. Aug. 9, 2019), *aff'd*, 853 F. App'x.
   983 (5th Cir. 2021) ........................................................................................................ 30, 31, 42

*Budri v. Administrative Review Board, United States Department of Labor*,
   858 Fed. App'x 117 (5th Cir. 2021) ......................................................................................... 36

*Burke v. Ocwen Loan Servicing, LLC*,
   CA No. 4:21-CV-2591, 2022 WL 4597975 (S.D. Tex. Aug. 29, 2022) ................................... 35

*In re Caroll*,
   2016 Bankr. LEXIS 937 (Bankr. M.D. La. Mar. 16, 2016), *aff'd*, 2016 U.S. Dist.
   LEXIS 100930 (M.D. La. Aug. 2, 2016), *aff'd*, 850 F.3d 811 (5th Cir. 2017) .............. 33, 34, 35

*Carroll v. Abide (In re Carroll)*,
   850 F.3d 811 (5th Cir. 2017) ..................................................................................... 31, 33, 34, 35, 42

*Charitable DAF Fund, L.P. v. Highland Capital Management, L.P.*,
   Case No. 22-11036 .................................................................................................................. 17

*Clark v. Mortenson*,
   93 F. App'x 643 (5th Cir. 2004) ........................................................................................... 38, 42

*Claymore Holdings, LLC v. Credit Suisse AG, Cayman Islands Branch and Credit
   Suisse Securities (USA), LLC*,
   Cause No. DC-13-07858 ............................................................................................................ 7

*Clinton v. Goldsmith*,
   526 U.S. 529 (1999) ............................................................................................................. 27, 28

*Connor v. Stewart*,
   No. 1:17-CV-827-RP, 2018 WL 4169150 (W.D. Tex. Aug. 30, 2018), *aff'd*, 770
   F. App'x 244 (5th Cir. 2019) ............................................................................................ 30, 33, 41

*Cromer v. Kraft Foods N. Am., Inc.*,
 390 F.3d 812 (4th Cir. 2004).................................................................................................38

*Daugherty v. Highland Capital Mgmt., L.P., et al.*,
 No. 2017-0488-SG (Del. Ch.) ..................................................................................................5

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
 545 U.S. 546 (2005) ...............................................................................................................27

*Farguson v. Mbank Houston, N.A.*,
 808 F.2d 358 (5th Cir. 1986)............................................................................................30, 37

*Harrington v. Purdue Pharma L.P.*,
 No. 23-124 (S.Ct.) ..................................................................................................................20

*Haskell, et al., v. Goldman Sachs & Co., et al.*,
 340 B.R.729 (D. Del. 2006) .....................................................................................................6

*Highland Capital Management, L.P., et al. v. Chesapeake Corp., Seven Seas Petroleum, Inc.*,
 522 F.3d 575 (5thCir. 2008)....................................................................................................6

*Highland Capital Management, L.P., et al. v. Ryder Scott Co. et al.*,
 402 S.W.3d 719 (Tex. App-Houston [1st Dist.] 2012) ............................................................6

*In re Highland Select Equity Fund GP*,
 Cause No. 23-31039 (Bankr. N.D. Tex.), Dkt. 1 ...................................................................17

*Hoffmann v. Dandurand*,
 180 S.W.3d 340 (Tex. App.—Dallas 2005, no pet.).........................................................23, 24

*Holmes v. Motor Home Specialist*,
 No. 3:21-CV-00934-G-BT, 2022 WL 4281015 (N.D. Tex. Aug. 30, 2022) ..........................35

*Hunsinger v. Offer, LLC*,
 No. 3:21-cv-2846-BH, 2022 WL 18143951 (N.D. Tex. Dec. 7, 2022) ...................................41

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
 511 U.S. 375 (1994) ...............................................................................................................28

*Lanotte v. Highland Capital Fund Advisors et. al.*,
 Case 3:18-cv-02360-M (Lynn, J.) ..........................................................................................22

*Lanotte v. Highland Capital Management Fund Advisors, L.P. et al.*,
 No. 20-10649, 2023 WL 2663276 (5th Cir. March 28, 2023) ................................................22

*LV Highland Credit Feeder Fund LLC, et al., v. Highland Credit Strategies Fund, L.P., Highland Capital Management, L.P., et al.*,
 2015 WL 5093236 (Tex. App.-Dallas Aug. 28, 2015)..............................................................6

*Marinez v. Wells Fargo Bank, N.A.*,
　　2013 U.S. Dist. LEXIS 208591 (W.D. Tex. May 31, 2020)......................................................42

*Mary E. Bivins Foundation v. Highland Capital Management L.P., et al.*,
　　451 S.W.3d 104 (Tex. App.-Dallas 2014).....................................................................................6

*Mendoza v. Lynaugh*,
　　989 F.2d 191 (5th Cir. 1993)........................................................................................................35

*Merkle v. Gragg*,
　　CA No. No. SA-19-CV-640-XR, 2020 WL 2611858 (W.D. Tex. May 22, 2020).....................36

*MicCap Media Finance, L.L.C. v. Pathway Data, Inc.*,
　　929 F.3d 310 (5th Cir. 2019)........................................................................................................28

*Moses v. Cantu*,
　　CA No. 4:22-CV-211-SDJ, 2023 WL 2527159 (E.D. Tex. Mar. 15, 2023)..............................36

*Motient Corp. v. James D. Dondero, Highland Capital Management, L.P., et al.*,
　　2006 WL 8437595 (N.D. Tex. Aug. 7, 2006) ................................................................................6

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
　　86 F.3d 464 (5th Cir. 1996)....................................................................................................37, 38

*Newby v. Enron Corp.*,
　　302 F.3d 295 (5th Cir. 2002)...........................................................................................31, 32, 42

*NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P.*,
　　No. 21-10449 (5th Cir.), Doc. No. 516458961 (Sept. 2, 2022) ......................................16, 19, 20

*Nix v. Major League Baseball*,
　　2022 U.S. Dist. LEXIS 104770 (S.D. Tex. Jun. 13, 2022), *aff'd,* 62 F.4th 920
　　(5th Cir. 2023) (Southern District of Texas) ...............................................................................42

*In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico*,
　　MDL 2179, 2021 WL 3400634 (E.D. La. Aug. 8, 2021)............................................................36

*Olmstead v. Hoppe*,
　　No. 5:19-CV-203-H-BR, 2020 WL 1482324 (N.D. Tex. Mar. 27, 2020) ..................................35

*Partain v. City of South Padre Island, Texas*,
　　CA No. B-16-317, 2018 WL 7202486 (S.D. Tex. Dec. 5, 2018) ................................................36

*Patrick Daugherty v. James Dondero et al.*,
　　Appeal No. 60, 2023 (Order dated Oct. 19, 2023) (App. ____ ) ....................................................6

*Patrick Daugherty v. James Dondero et al.*,
　　Case No. 2019-0956-MTZ (Order dated Jan. 27, 2023) (App. ____).......................................1, 6

*Payne v. Anthony Scott Law Firm PLLC*,
  2023 U.S. Dist. LEXIS 89798 (N.D.Tex. May 5, 2023)................................................42

*Redeemer Committee of the Highland Crusader Funds v. Highland Capital Mgmt.,
  L.P.*,
  No. 12533-VCG (Del. Ch.) ..........................................................................................5

*Rohe v. Wells Fargo Bank, N.A.*,
  988 F.3d 1256 (11th Cir. 2021)...............................................................................28, 29

*Schum v. Fortress Value Recovery Fund I LLC*,
  2019 U.S. Dist. LEXIS 226679 (N.D. Tex. Dec. 2, 2019), *aff'd*, 805 F. App'x.
  319 (5th Cir. 2020) .......................................................................................27, 28, 31, 42

*Staten v. Harrison Cnty.*,
  2021 U.S. App. LEXIS 35747 (5th Cir. Dec. 2, 2021) ........................................31, 42

*The Charitable DAF Fund LP, et al. v. Highland Capital Management, LP*,
  2022 WL 4538466 (N.D. Tex. Sep. 28, 2022) .......................................................6, 19

*The Dugaboy Investment Trust v. Highland Capital Management, L.P.*,
  2023 WL 2263022 (5th Cir. Feb. 28, 2023) ..........................................................11, 15

*UBS Sec. LLC & UBS AG London Branch v. Highland Cap. Mgmt., L.P.*,
  No. 21-03020-sgj, Dkt. 184...........................................................................................15

*UBS Securities LLC v. Highland Capital Mgmt., L.P.*,
  Index 650097/2009 (N.Y. Sup. Ct.) ...........................................................................5, 6

*WaveDivision Holdings, LLC v. Highland Capital Management, L.P.*,
  49 A.3d 1168 (Del. 2012).................................................................................................6

*Williams v. McKeithen*,
  939 F.2d 1100 (5th Cir. 1991).......................................................................................43

*Xiaohua Huang v. Huawei Technologies Co. Ltd.*,
  CA No. 2:15-cv-01413-JRG-RSP, CA No. 2:16-cv-00947-JRG-RSP, 2020 WL
  731270 (E.D. Tex. Feb. 12, 2020)..................................................................................35

*Zawislak v. Memorial Hermann Health System*,
  C.A. No. 4:21-CV-3098, 2022 WL 4359231 (S.D. Tex. July 25, 2022) ....................36

**Statutes**

28 U.S.C. 158 ...................................................................................................................27

28 U.S.C. 1331,1332 ........................................................................................................27

28 U.S.C. § 1651(a)..............................................................................................27, 28, 29

Tex. Civ. Prac. Rem. Code. Ann. § 11.054 ...................................................................................... 37

**Other Authorities**

Fed. R. Bankr. P. 2015.3 .................................................................................. 10, 11, 12, 25

## I.    **INTRODUCTION**

At enormous cost to the estate, debtor Highland Capital Management, L.P. ("HCMLP" or the "Debtor") seeks a sweeping order declaring James D. Dondero ("Dondero") and any person or entity seemingly aligned with him (collectively, the "Targeted Parties") "vexatious" and prohibiting the Targeted Parties from commencing any lawsuit or proceeding in any forum anywhere in the world without first jumping through a litany of procedural hoops. The premise of HMCLP's overbroad Motion to Deem the Dondero Entities Vexatious Litigants and for Related Relief [Dkt. 136] and the memorandum of law in support of same [Dkt. 137] (together, the "Motion") is that Dondero is, and always has been, an aggressive litigant who controls and uses various individuals and entities to pursue baseless litigation strategies. But the story spun by HCMLP in its Motion is largely fiction, much of it told without any citation to evidence.

As explained below in greater detail, to the extent that the Targeted Parties have acted at all in HCMLP's bankruptcy proceedings, they have done so on a limited and legitimate basis aimed at preserving and maximizing the estate. They have done so to prevent the fire-sale of assets, to seek transparency (which is typically a hallmark of bankruptcy), and where necessary, to protect their rights to recovery. Notably, the Targeted Parties or their affiliates represent many, and in some cases, the majority, of the investors in funds managed by HCMLP. The Targeted Parties also include the estate's "residual equity" holders (designated the Class 10 and 11 claimholders in HCMLP's plan of reorganization). As a result, the Targeted Parties have a significant interest in ensuring that the estate is managed appropriately and cost-efficiently.

There have been many reasons to question whether the estate's bankruptcy professionals have managed the estate as they should have. As described herein, throughout HCMLP's bankruptcy, estate professionals consistently portrayed the company as insolvent, despite its financial health at the time of its Chapter 11 filing. This alone was concerning, as were many decisions made by Debtor

management with respect to the handing (and in some cases, the liquidation) of estate assets prior to plan confirmation. In the post-confirmation period, HCMLP finally disclosed that the estate is solvent, has sufficient funds to pay unsecured creditors and administrative claims, and should have approximately $100 million left over for the Class 10 and 11 claimholders.[1] Even with payment of tens of millions in alleged but still unexplained administrative expenses, this would leave approximately $100 million for the Class 10 and 11 Claimholders that are among the Targeted Parties. Thus, it makes sense that many of the disputes involving the Targeted Parties relate to concerns about how HCMLP and its professionals are managing what is in effect, money belonging to several of those Targeted Parties. It is these efforts to preserve the estate that HCMLP's Motion seeks to deter.

Indeed, a theme has emerged: if the Targeted Parties seek to protect their rights by initiating disputes, HCMLP labels those actions "vexatious." If the Targeted Parties attempt to invoke contractual rights or proceed through non-litigation methods, HCMLP sues them and then calls them vexatious. In support of its Motion, HCMLP selectively recounts the pre-bankruptcy litigation history of HCMLP under Dondero's management. But HCMLP's allegation that any and all litigation is evidence of Dondero's alleged "culture of litigation" fails to account for the merits of Dondero's position in each case, who won or lost, or whether HCMLP's investors benefited from the litigation. As set forth herein, a fair consideration of the litigation at issue demonstrates that the Targeted Parties' conduct cannot be characterized as vexatious on this record.

The legal basis for HCMLP's Motion is just as specious.  Not only does this Court lack jurisdiction to decide the Motion, but this case does not present the type of circumstances warranting a vexatious litigant sanction. Instead, the courts reserve that sanction for only the most extraordinary misconduct—most frequently perpetrated by *pro se* litigants unfamiliar with the canons of ethics or

---

[1] Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, (Appendix ("App.") 3146).

rules of court—and even then, courts narrowly tailor the scope of the sanction wherever possible. The sweeping and overbroad injunctive relief requested by HCMLP does not comport with these standards.[2]

Finally, there already are gatekeeping orders in place in connection with the HCMLP bankruptcy. Adding what is essentially a "Super Gatekeeper injunction" is unnecessary, would unduly restrict access to judicial process, and would wreak procedural chaos, as shown by the flow chart attached as Exhibit 1 to the Appendix. No court has ever granted the type of far-reaching relief sought by HCMLP, and this Court should not be the first. HCMLP's Motion should be denied.

## II.   RELEVANT HISTORY

### A.   Dondero Ran A Highly Successful Business For Years Prior To Bankruptcy

It is undisputed that, prior to its bankruptcy and under Dondero's leadership, HCMLP was a highly successful enterprise. *See* Motion ("Mot."), ¶ 7. Founded in 1993 by Dondero and Mark Okada, HCMLP is an SEC-registered investment advisory business that originally focused on investments in the leveraged loan market. *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief ("Confirmation Order"), at ¶ 4 (App. 2061-2062). By the mid-2000s, HCMLP had grown to over 300 employees and expanded its portfolio to other asset classes. At its height, the company had assets under management exceeding $40 billion. Mot., ¶ 7. Notably, HCMLP's pre-bankruptcy business enterprise was comprised of numerous entities, most of which were neither direct nor indirect subsidiaries. Confirmation Order, ¶ 6 (App. 2062-2063). Instead, HCMLP managed its various affiliates and funds through shared services and other contractual agreements, in exchange for fees. *Id.*, ¶¶ 6-7 (App. 2062-2063).

---

[2] See Section III.B.2 *infra*.

It is also undisputed that HCMLP did not seek Chapter 11 protection because of any catastrophic business calamity. *Id.*, ¶ 8 (App. 2063-2065). The company had not defaulted with any large, asset-based secured lender; it had relatively insignificant secured indebtedness; and it did not have problems with trade vendors or landlords. *Id.* But despite its solvency and historical financial success, like many investment firms, HCMLP suffered losses during the 2008 financial crisis, leading to lawsuits by investors. Although the bankruptcy court characterized these pre-petition lawsuits as largely "liquidated (or . . . about to become liquidated)," *see id.*, HCMLP faced only one sizeable judgment prior to bankruptcy—an approximately $190 million arbitration award issued in favor of the self-named "Redeemer Committee of the Highland Crusader Fund" (the "<u>Redeemer Committee</u>").[3] The terms of that award contemplated that it could be reduced to as little as $75 million once the Redeemer Committee returned certain assets to HCMLP.[4] At the time, Highland lacked liquidity to pay the award. Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. at ECF p. 31 (App. 1255). As a result, Dondero (then President and sole director of HCMLP's general partner, Strand Advisors, Inc. ("<u>Strand</u>")) engaged Pachulski Stang Ziehl & Jones LLP ("<u>Pachulski</u>") to negotiate with the Redeemer Committee and to advise regarding HCMLP's options—including the option of a potential restructuring.[5] After consultation with Pachulski, Dondero believed that HCMLP could achieve a quick restructuring of the Redeemer Committee arbitration award in a Delaware-based bankruptcy and emerge as a going concern.[6]  As such, he authorized Pachulski to file a Chapter 11 bankruptcy petition on HCMLP's behalf on October

---

[3] Mot. at ¶ 7.

[4] UBS's Objection to Debtor's Motion for Entry of An Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Fund (Claim No. 81) at ¶ 63 (App. 1131).

[5] 5 The then-CRO, Bradley Sharp, testified early in the bankruptcy case that the plan was to restructure. *See* Dec. 2, 2019 Hr'g Trans. at 18:9-15 (App. 0186).

[6] Motion of James D. Dondero and Strand Advisors, Inc. for Leave to File Adversary Complaint (App. 3363-3415).

CORE/3522697.0002/186038412.28

16, 2019. *See* Voluntary Petition for Highland Capital Management, L.P. (originally filed in Case No. 19-12239 (Bankr. D. Del.)) (App. 0097-0113).

Highland argues (without any evidentiary citation) that prior to bankruptcy, "Dondero fostered a culture of scorched-earth, vindictive litigation at HCMLP, suing anyone who challenged him or refused to cave to his demands." Mot., ¶ 2. That is untrue. In fact, the very examples used by HCMLP tell a different story. In virtually all of the lawsuits mentioned, HCMLP and/or its affiliates were not the aggressors but the *defendants*. *See id.*, ¶ 7; *see also UBS Securities LLC v. Highland Capital Mgmt., L.P.*, Index 650097/2009 (N.Y. Sup. Ct.); *Daugherty v. Highland Capital Mgmt., L.P., et al.*, No. 2017-0488-SG (Del. Ch.); *Redeemer Committee of the Highland Crusader Funds v. Highland Capital Mgmt., L.P.*, No. 12533-VCG (Del. Ch.). HCMLP has acknowledged that at least some of the pre-petition litigation against HCMLP was *meritless*—in other words, HCMLP had every right to vigorously defend itself.

In the case of UBS, for example, two Highland-affiliated funds were guarantors on a failed transaction with UBS Securities LLC and UBS AG, London Branch (together, "<u>UBS</u>") arising out of the 2008 financial crisis.  Unsatisfied with collecting from the guarantors, UBS sought to recover from HCMLP and its affiliates, filing two proofs of claim in bankruptcy equal to the amounts owed by the Highland-affiliated funds. HCMLP vigorously objected to the proofs of claim, accusing UBS of trying to "pin the liability on the Debtor for the past decade." (App. 0795 at ¶ 4). More specifically, HCMLP argued that UBS, "instead of accepting the consequences of its bad business deal, . . .used the litigation process to recut the deal to place liability on the Debtor." *Id.* at ¶ 3. (App. 0794); *see* also Debtor's Reply in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch (App. 1811-1207) (HCMLP characterizing UBS's defense as "as series of ineffectual ducks and dives that only serves to highlight the fallacy of UBS's purported $1 billion claim," (*id.* at ¶1) (App. 1186), UBS's claim is "a desperate

attempt to keep up its charade," (*id.* at ¶2.) (App. 1186-1187), and UBS tries, but fails, to "slide under the *res judicata* bar," (*id.* at ¶4.) (App. 1187))  After settling with Debtor, UBS launched three suits with Debtor's express  cooperation,[7] functionally seeking to make Dondero and his affiliates implied co-guarantors on UBS's bad business deal from 2008.n the case of Acis, HCMLP also launched a forceful objection to proofs of claim filed by Acis Capital Management, L.P. ("Acis") and its limited partner Josh Terry ("Terry"), arguing that the claims derived from "far-flung litigations" initiated by Acis, the only beneficiary of which would be Terry, who sought "a $75 million windfall," in the HCMLP bankruptcy, at the expense of "the Debtor's innocent creditors."  *See* Objection to Proof of Claim of ACIS Capital Management L.P. and ACIS Capital Management GP, LLC at ¶¶ 2-3 (App. 0560-0566). But conveniently, for purposes of its Motion, HCMLP has recharacterized the Acis dispute to place the blame on Dondero.

HCMLP's characterization of the litigation involving Patrick Daugherty ("Daugherty") is even further off the mark. Contrary to what HCMLP now argues, HCMLP told the bankruptcy court that the company "*prevailed* on claims against Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorneys' fees." Debtor's Objection to Patrick Hagaman Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018, at ¶ 6 (App. 1160). Further, "Daugherty lost on all claims [he asserted] against [HCMLP]." *Id.*, ¶ 7. The Motion also states that "this litigation continues," but fails to note that Daugherty's remaining claims against Dondero were dismissed by a Delaware Chancery Court (prior to the filing of the instant Motion),[8] which appeal was later upheld in a one-sentence ruling by the Delaware Supreme Court.[9]

---

[7] Declaration of Robert J. Feinstein in Suppor of Debtot's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG, London Branch and Authorizing Actions Consistent Therewith, at Ex. 1, ¶1(c) (App. 2290-2291). (Debtor's agreement to cooperate in future litigation with UBS against Dondero and his alleged affiliates).

[8] *Patrick Daugherty v. James Dondero et al.*, Case No. 2019-0956-MTZ, (Order dated Jan. 27, 2023) (App. 2694-2714).

[9] *Patrick Daugherty v. James Dondero et al.*, Appeal No. 60, 2023 (Order dated Oct. 19, 2023) (App. 3320).

6

Importantly, in none of these pre-petition cases involving HCMLP did any court suggest that the company, its funds, or Dondero were "vexatious" or that their litigation positions were meritless or frivolous.[10] Likewise, in those lawsuits in which HCMLP actually was the *plaintiff*, no court ever sanctioned the company or found that it was vexatious,[11] and some of those cases resulted in significant judgments benefitting HCMLP's investors.[12] HCMLP's pre-petition policy of standing firm (successfully for the most part) as a defendant, and pressing its claims when necessary as a plaintiff, does not make HCMLP a bad or vexatious actor.

**B.     Under New Management, HCMLP Turns On Dondero And Pursues A Radically Different Path From The One Originally Contemplated**

HCMLP filed its Chapter 11 petition in Delaware, its state of incorporation. The Unsecured Creditors Committee ("UCC")[13] moved to transfer the case to the Northern District of Texas, where the bankruptcy of HCMLP's former affiliate Acis had been filed,[14] arguing the Texas court already had working familiarity with Dondero and his business operations and would be better situated to preside over the case. Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of

---

[10] HCMLP *successfully* defended several other lawsuits in the pre-petition period, again without any court suggesting that the company's litigation tactics were vexatious.  *See LV Highland Credit Feeder Fund LLC, et al., v. Highland Credit Strategies Fund, L.P., Highland Capital Mgmt., L.P., et al.,* 2015 WL 5093236 (Tex. App.–Dallas Aug. 28, 2015);.*Mary E. Bivins Foundation v. Highland Capital Mgmt. L.P., et al.,* 451 S.W.3d 104 (Tex. App.–Dallas 2014); *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.,* 49 A.3d 1168 (Del. 2012); *Haskell, et al., v. Goldman Sachs & Co., et al.,* 340 B.R.729 (D. Del. 2006); *Motient Corp. v. James D. Dondero, Highland Capital Mgmt., L.P., et al.,* 2006 WL 8437595 (N.D. Tex. Aug. 7, 2006).

[11] *Highland Capital Mgmt., L.P., et al. v. Ryder Scott Co. et al.,* 402 S.W.3d 719 (Tex. App–Houston [1st Dist.] 2012); *Highland Crusader Offshore Partners, L.P., Highland Equity Focus Fund, L.P., Highland Capital Mgmt., L.P. and Highland Capital Mgmt. Services, Inc.,* 281 S.W.3d 237 (Tex. App.–Dallas 2009); *Highland Capital Mgmt., L.P., et al. v. Chesapeake Corp., Seven Seas Petroleum, Inc.,* 522 F.3d 575 (5th Cir. 2008).

[12] *Claymore Holdings, LLC v. Credit Suisse AG, Cayman Islands Branch and Credit Suisse Securities (USA), LLC,* Cause No. DC-13-07858 in the 134th Judicial District of Dallas County, Texas, Final Judgment dated Sept. 4, 2015 (App. 0095-0096).

[13] The UCC consisted of Acis, UBS, the Redeemer Committee, and Meta-E Discovery, an eDiscovery vendor used by HCMLP prior to bankruptcy. *See* Notice of Appointment of Committee of Unsecured Creditors (App. 0114-0115).

[14] Specifically, the involuntary Chapter 11 cases of Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (together, "Acis")—two companies formed by Dondero and former HCMLP employee Joshua Terry ("Terry")— are still pending before Judge Stacey G. Jernigan.

Texas, ¶ 2 (App. 0118). HCMLP, represented by Pachulski, argued that transfer was "little more than a litigation ploy" based on the UCC's estimation that, "based on prior rulings of the Texas Bankruptcy Court in the Acis cases … such forum would be more advantageous from a litigation perspective." Objection of the Debtor to the Motion of Official Committee of Unsecured Creditors to Transfer Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas, ¶¶ 2, 34 (App. 0145, 0159). As HCMLP further explained, "[t]he Debtor is no longer affiliated with Acis and, in fact, is directly adverse to Acis, which now asserts various contested litigation claims against the Debtor." *Id.*, ¶ 2 (App. 0145). HCMLP and its counsel argued that transfer to Texas would foment additional litigation—something that Dondero sought to *avoid* by seeking restructuring in Delaware, far removed from the fight with Acis. Over HCMLP's objection, on December 4, 2019, the Delaware bankruptcy court granted the UCC's motion to transfer. Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas (App. 0197-01999).

Following the transfer, instead of fighting the UCC, Dondero negotiated and entered into a settlement agreement to address the UCC's concerns over Dondero's management of HCMLP during bankruptcy. That agreement contemplated that Dondero would step down in favor of independent management, while still continuing as a portfolio manager of HCMLP's managed funds. *See* Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course (App. 0229-0329). Importantly, at this point in proceedings, Dondero (who did not have independent counsel) was still in constant consultation with Pachulski regarding the changing management landscape. Based on Pachulski's advice, Dondero resigned as President and sole director of Strand, relinquishing control to a three-member independent board of directors (the "Independent Board").[15]

---

[15] The Independent Board consisted of James P. Seery, Jr. ("Seery"), John S. Dubel, and retired bankruptcy judge Russell Nelms. (App. 0309-0327).

*See id.* at ¶¶ 1-2 (App. 0231-0232); Preliminary Term Sheet (App. 0248-0251). The bankruptcy court approved the settlement agreement between HCMLP and the UCC on January 9, 2020 ("January 9 Order"). Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course (App. 0330-0335).[16]

At that point in the bankruptcy proceedings, Dondero had not taken any position in the case, much less filed any objection or affirmative motion adverse to HCMLP. Indeed, for a period of *over one year* after HCMLP filed its bankruptcy petition, Dondero and the entities he owned and controlled took very little action in the bankruptcy at all.[17] During this same period, various creditors launched numerous objections to actions taken by the Debtor and to positions taken by each other:

- Acis repeatedly objected to the employment of certain professionals by the Debtor and the fees to be paid to those professionals (*see* App. 0133-0142, 0336-0343, 0353-0361, 0381-0393, 0409-0428);

- Various creditors (including Acis, Terry, UBS, and Daugherty) sought relief from or modification of the automatic stay to commence separate disputes, prompting objections from the Debtor and other creditors and requiring months of briefing and evidentiary hearings (*see* App. 0394-0404, 0429-0457, 0491-0520, 051-0528, 0529-0551, 0552-0556, 0987-0995, 1007-1023);

- The UCC objected to the Debtor's employment of various professionals and its distribution of funds to related entities and also engaged in a discovery fight with the Debtor (*see* App. 0171-0176, 0177-0183, 0362-0376, 0657-0674, 0703-0720);

- Creditors objected to each other's proofs of claim and, in at least one instance, a creditor sought summary judgment on another creditor's proof of claim (*see* App. 0829-0856, 0939-0960, 1087-1095); and

---

[16] In addition to appointing the Independent Board, the Court's January 9 Order: (1) required the Court to serve as "gatekeeper" in determining whether any litigation against the Independent Board should proceed, and (2) exculpated the Independent Board from any claims other than those asserting willful misconduct and gross negligence. App. 0333-0334 at ¶ 10. Significantly, the supposedly vexatious Dondero did not object to these provisions.

[17] In the first year after the bankruptcy filing, Dondero filed only four pleadings: a limited response to a motion by Acis for relief from the automatic stay, in which Dondero merely asked that the Court decide the motion before permitting litigation to go forward (App. 0405-0408); an objection to Acis's proof of claim and joinder in HCMLP's similar objection (App. 0557-0622, 0675-0683); a response to the UCC's motion to compel production by HCMLP, in which Dondero notified the Court that certain materials to be produced might be protected by the attorney-client privilege (App. 0684-0693); and a response to HCMLP's motion seeking approval of its settlement with Acis, in which Dondero merely asked the Court to independently review the fairness of the $23 million settlement in view of HCMLP's prior objection that "the Acis Claim be disallowed in its entirety" because "attempted windfalls usually have a fallacious premise, and this one [Acis' claim] is a whopper." *Compare* App. 0560 and 0619 *with* App. 0996-1006.

- Creditors objected to each other's settlements with the Debtor (*see* App. 1096-1138, 1139-1145).

In other words, the Highland bankruptcy was contentious without Dondero's involvement, yet HCMLP has not accused any other creditors or stakeholders of being "vexatious."

But Dondero's complacency was unsustainable. As he took a back seat, the Independent Board began acting in manner that Dondero perceived as harmful. The first blow came on August 12, 2020, when the Debtor filed its initial plan of reorganization and disclosed for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate and wind down HCMLP's businesses. *See* Plan of Reorganization of Highland Capital Management, L.P. (App. 0859-0918). The monetization plan came as a surprise to Dondero, who had been repeatedly assured that HCMLP's bankruptcy management was working on a "pot" plan that would resolve all creditor claims and restructure HCMLP as a going concern. (App. 1985-1986 at 18:1-19:8). A plan calling for the liquidation and winding down of HCMLP's business was particularly surprising because HCMLP had entered bankruptcy a solvent enterprise with sufficient money-producing assets to operate far into the future. (App. 1262, 1265). Dondero also became aware that the Debtor's bankruptcy management was selling assets without allowing Dondero or related entities to bid or advise, resulting in diminished returns for the estate and fund investors. At that point, Dondero raised his concerns with Seery, the Debtor's acting CEO and CRO.[18]

Seery did not appreciate the feedback. On October 9, 2020, he ousted Dondero from his role as an unpaid portfolio manager for HCMLP, later locking him out of HCMLP's offices and cutting him off from the business operations completely. (App. 1987 at 92:12-20). At that point, Dondero began to seek Court intervention. On November 19, 2020, Dondero—represented by bankruptcy

---

[18] *See* Objection to the Debtor's Motion for Entry of an Order (I) Authorizing the Sale of Certain Property and (II) Granting Related Relief (App. 2406-2412); Objection to Motion of the Debtor for Entry of an Order (I) Authorizing the Sale and/or Forfeiture of Certain Limited Partnership Interest and Other Rights and (II) Granting Related Relief (App. 2413-2417)

counsel, including former bankruptcy judge D. Michael Lynn—filed a Motion for Entry of an Order Requiring Notice and a Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business. (App. 1208-1223). Dondero's motion sought notice and a hearing before any sale of Debtor-owned or controlled assets. *Id*. The motion was an effort to increase transparency and maximize the value of the estate—also hoping to prevent the sale of assets outside the regular course of business—in the lead up to plan confirmation. *Id*. In the face of objections, however, and in a further effort to consensually manage the bankruptcy estate, Dondero subsequently withdrew the motion. Notably, at the time, there was no finding by the bankruptcy court or suggestion by the Debtor that the motion was vexatious or frivolous. (App. 1459-1470, 1471-1473).

Dondero and his trusts also took issue with HCMLP's decision to ignore the traditional reporting requirements set forth in Federal Rule of Bankruptcy Procedure 2015.3. That Rule requires a debtor to file "periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." Fed. R. Bankr. P. 2015.3(a).

Notwithstanding this requirement, HCMLP failed to file *any* of the required reports. This was problematic because the company held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries.[19] HCMLP now cites as evidence of vexatiousness the unsuccessful efforts of The Dugaboy Investment Trust (one of two former equity holders) ("Dugaboy") before Judge Jernigan and the appellate courts to require compliance with Rule 2015. But the key reason the courts rejected Dugaboy's efforts was their assumption that Dugaboy had no standing because it was not likely to recover any money in the bankruptcy.[20] Ironically and importantly, that assumption was based on Seery's refusal to disclose the financial condition of the estate. Only when, in July 2023,

---

[19] *See* Feb. 3, 2021 Hr'g Tr. at 49:5-21 (App. 1997); s*ee* Debtor's Opposition to Motion to Compel Compliance With Bankruptcy Rule 2015.3 Filed by Dugaboy Investment Trust and Get Good Trust, Bankr. (App. 2395-2405).

[20] *See The Dugaboy Investment Trust v. Highland Capital Management, L.P*., 2023 WL 2263022 (5th Cir. Feb. 28, 2023).

after much urging by Dondero and others, the bankruptcy court ordered HCMLP to file a balance sheet did it become clear that the estate had enough money to pay all creditors and distribute money to former equity.[21]

In the absence of meaningful transparency and in view of the Debtor's disclosures painting the estate as insolvent, a majority of creditors approved the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (the "Plan"), which called for the liquidation of an otherwise viable business.

**C.     Dondero Acted In A Manner He Reasonably Believed Would Protect The Estate And HCMLP's Business**

Having built HCMLP from the bottom up and managed a successful enterprise for 35 years, Dondero eventually was forced to take a more active role in the bankruptcy in an effort to salvage his company. To put things into perspective, although HCMLP came into bankruptcy a solvent entity, within months of the Independent Board taking over, HCMLP began to report a much different financial picture. HCMLP publicly represented, between the petition date (October 16, 2019) and September 30, 2020, the estate lost $200 million in value, plummeting from $556.5 million to $328 million. *Compare* Monthly Operating Report (App. 2226-2235); *with* Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (App. 1224-1402). At the same time, the total amount of allowed claims increased exponentially (by approximately $100 million) during roughly the same period. As a result, HCMLP's projected recovery for creditors went from 87.44% to just 62.99% in a matter of months. *See* HCM Bk. Dkts. 1473, 1731, 1894, 3662 (App. 1224-1402, 1690-1712, 1990-1993 at 212:22-215:13, 2715-2733). In other words, as HCMLP barreled toward the confirmation hearing, the only publicly available information indicated that the

---

[21] HCM Bk. Dkt. 3955 (Amended Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending September 30, 2023) (App. 3331-3343) and 3956 (Amended Post-Confirmation Report for Highland Claimant Trust for the Quarter Ending September 30, 2023) (App. 3344-3356).

estate, suddenly, was insolvent and incapable of paying creditors in full. By the time the Plan was confirmed, HCMLP was predicting that creditors would receive only $220 million in total recoveries over a multi-year period. HCM Bk. Dkt. 1894 at 126:16-127:3.

### 1. Pre-Confirmation Actions.

Understandably under those circumstances, Dondero began questioning what interim bankruptcy management was doing with the company he built. HCMLP complains that the "Dondero Entities" filed "numerous motions attempting to re-assert control over HCMLP or, failing that, to overwhelm the estate with litigation" and objected to "nearly every motion HCMLP filed in the Bankruptcy Court." Mot. at ¶¶ 24, 25. These contentions are overstatements at best. Prior to Plan confirmation, Dondero filed only *two* affirmative motions—one of which he later withdrew. *See* James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business (App. 1208-1223) (withdrawn, (App. 1471-1473)), James Dondero's Joinder in Support of Motion to Appoint Examiner Pursuant to 11 U.S.C. 1104(C) (App. 1728-1731).

Indeed, Dondero's pre-confirmation participation in the bankruptcy was limited to: (1) responding (but not objecting) to a motion by Acis to lift the automatic stay to sue Dondero (App. 0405-0408), (2) joining in HCMLP's objection to Acis's proof of claim (App. 0675-0683), (3) responding (but not objecting) to the UCC's motion to compel production by HCMLP (a motion to which HCMLP objected) (App. 0684-0693), and (4) responding to HCMLP's motion for approval of a settlement with Acis, in which Dondero merely asked the Court to independently review the fairness of settlement (App. 0996-1006). These actions can hardly be described as "vexatious."

The so-called "Dondero Entities" were similarly restrained during bankruptcy. Most of those entities did not participate in the bankruptcy proceedings at all. Those that did participate did so on an extraordinarily limited basis. For example:

- Dugaboy and HCRE responded (as was required to avoid waiver) to HCMLP's omnibus objections to their proofs of claim (App. 1041-1081, 1146-1156);

- HCMFA and NexPoint, along with various funds, filed a motion asking the bankruptcy court to impose temporary restrictions on the Debtor's ability to initiate the sales of assets held in certain non-debtor investment vehicles in which the Targeted Parties, but not HCMLP, held an economic interest (App. 1432-1458);[22]

- Along with various municipalities (including the City of Dallas), the Internal Revenue Service, the U.S. Trustee, Patrick Daugherty, and various senior employees—HCMFA, NexPoint, Dugaboy, The Get Good Trust ("Get Good"), HCRE, and others collectively filed various objections to the Plan (App. 1482-1518, 1551-1601, 1609-1616, 1617-1629, 1960-1982);

- Dugaboy and Get Good objected to the Debtor's motion seeking approval of the settlement with creditor HarbourVest (App. 1668-1678, 1679-1689);[23]

- Dugaboy and Get Good filed a motion seeking the appointment of an examiner to investigate the reasons for the estate's rapid diminution in value (according to publicly-filed reports) and the basis for any estate claims to be asserted, hoping that an investigation and report by a neutral examiner could prevent costly post-confirmation disputes (App. 1713-1727); and

- NexPoint sought—and received—bankruptcy court permission to file a competing plan of reorganization (App. 1949-1955).

Notably, other than their objections to the Plan, the so-called "Dondero Entities" collectively objected to a single motion by the Debtor—its motion seeking approval of the HarbourVest settlement—and filed *zero* pleadings seeking to "re-assert control of HCMLP." The Targeted Parties

---

[22] Notably, after the bankruptcy court denied the requested relief, the movants did not renew the request and instead lived with the court's decision.

[23] HCMLP contends that "[t]he Dondero Entities objected to most of the settlements" between the Debtor and its creditors, "including those with Acis, UBS, and HarbourVest." Mot., ¶ 25. This too is wrong. Both Dondero and CLO Holdco filed responses to the Debtor's motion to approve the Acis settlement, but neither of those parties actually objected to the terms of settlement. In fact, CLO Holdco expressly told the Court that it did "not generally oppose the debtor's settlement of claims and causes of action involving the Acis parties," and Dondero merely asked the Court to independently review the terms of settlement for fairness. *See* App. 1083-1084, ¶ 1; App. 996-1006. Nor did any Dondero Entity object to the UBS settlement. Dugaboy and Get Good filed a limited response to the Debtor's motion to approve the UBS settlement, which expressly stated that they did not object to the settlement but questioned whether the assets of a non-debtor third-party affiliate could or should be used to satisfy that settlement. *See* App. 2387-2388. As mentioned, numerous parties (including Dondero, Dugaboy, Get Good, and CLO Holdco) objected to the HarbourVest settlement on various grounds, including that the settlement was grossly inflated in light of the Debtor's own valuation of the HarbourVest proof of claim at $0. *See* Dkts. 1697, 1706, 1707 (App. 1652-1667, 1668-1678, 1679-1689).

invite this Court's review of these limited filings, which belie any notion that the Targeted Parties attempted to "overwhelm the estate with litigation" during the bankruptcy case.[24]

By contrast, during the pre-confirmation period, HCMLP filed no less than 11 adversary proceedings against Dondero and his affiliates. *See, e.g.*, App. 0919-0938, 0961-0986, 1024-1040, 1416-1431, 1630-1651, 1732-1881, 2009-2026. Patrick Daugherty sought twice to lift the automatic stay to sue Dondero and his affiliates. *See* App. 0987-0995, 1403-1415. Terry, Acis, and UBS likewise sought to continue their litigation against Dondero. *See* App. 0347-0352, 0394-0404, 0429-0457. And HCMLP filed numerous motions seeking sanctions and other injunctive relief against Dondero and others. *See* App. 2355-2364, 2365-2374, 3290-3318, 2439-2450.[25]   Yet nobody has suggested that any of those actions were litigious (which they were) or cost the estate money (which they did).

### 2.      Post-Confirmation Actions.

In the post-confirmation period, a handful of the Targeted Parties have raised issues when they had legitimate concerns.  For example, Dondero's family trust, <u>Dugaboy</u>—one of the holders of  Contingent  Trust Interests that should be "in the money" since the estate is solvent—consistently sought information regarding estate value that until recently had not been made public.  *See* Motion to Compel Compliance with Bankruptcy Rule 2015.3 (App. 2375-2384).  Likewise, Hunter Mountain Investment Trust ("<u>HMIT</u>"), another holder of Contingent Trust Interests, sought leave to sue Seery and two claims-buyers based on significant evidence indicating that insider trading—to the detriment of residual equity—had occurred.  *See* Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding (App. 2734-2949).  And recently, Dugaboy sought to compel the

---

[24] The chart annexed as Debtor's Exhibit A to the Motion is rife with mischaracterizations.  This response identifies the worst of them, but the Targeted Parties stand ready at argument to respond to this Court's questions about any of the items in the chart not specifically addressed.

[25] Although, as the Targeted Parties and their counsel have argued these affirmative motions were utterly unnecessary, incredibly, HCMLP seeks to blame the Targeted Parties for the motions, which the Targeted Parties were forced to fight and then to appeal. Several of those appeals remain pending.

CORE/3522697.0002/186038412.28

imaging of Mr. Seery's iPhone after learning that he had been auto-deleting text messages notwithstanding that he uses his personal cell phone for Highland-related business and was obligated to preserve evidence. The Dugaboy Investment Trust's Motion to Preserve Evidence and Compel Forensic Imaging of James P. Seery, Jr.'s Iphone (App. 3008-3028, 3029-3059).[26]

By contrast, the Debtor filed numerous affirmative motions against the Targeted Parties, sought evidentiary hearings when none were needed, and generally engaged in litigation tactics that were unnecessarily costly to the estate. In one such example, HCMLP participated in a "contested" adversary proceeding filed by UBS against HCMLP seeking to enjoin any "Sentinel Entity" from receiving cash flows from their ownership interests in Debtor-controlled funds. *See* Order and Judgement Granting UBS's Request for a Permanent Injunction Against Highland Capital Management, L.P. (App. 2496-2497). Although the Debtor *contractually agreed to the relief sought* before UBS filed the proceeding, the UBS Adversary resulted in 16 months of litigation, including numerous depositions and written third-party discovery, and culminated, incredibly, in a day-long *evidentiary* hearing on HCMLP's *uncontested* motion to withdraw its answer to the adversary complaint and consent to the relief UBS was seeking. *See* App. 2451-2464, 2465-2470, 2471-2476, 857-858.

In another example, NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("HCRE") (partly owned by Dondero) filed a proof of claim in bankruptcy to which HCMLP objected. *See* Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims (App. 767-790). Thereafter, HCRE made a business decision to abandon pursuit of its proof of claim and sought to withdraw it. Motion to Withdraw Proof of Claim (App. 2484-2493). But HCMLP refused to let the fight stop, objecting to the withdrawal and subsequently insisting on depositions and discovery

---

[26] Notably, most of the Targeted Parties have not participated in the post-confirmation bankruptcy proceedings at all.

CORE/3522697.0002/186038412.28

related to the claim, which the bankruptcy court ordered. *See* Highland Capital Management, L.P.'s Objection to Motion to Withdraw Proof of Claim . (App. 2498-2525, 2631 at ¶¶ 2-3). Thereafter, the Court conducted a day-long trial on the merits of a claim that HCRE no longer wished to pursue. *See* App. 2632-2633. And still HCMLP will not stop. In June 2023 (more than three years after HCRE filed its initial proof of claim), HCMLP filed a motion seeking to deem the claim a "bad faith filing." *See* Highland Capital Management, L.P.'s Motion for (A) Bad Faith Finding and (B) Attorneys' Fees Against NexPoint Real Estate partners LLC (F/K/A HCRE Partners, LLC) in Connection with Proof of Claim 146 (App. 3126-3140). That motion, which remains pending, will require another round of briefing and yet another evidentiary hearing.

In another example, HCMLP filed an adversary proceeding and emergency motion (App. 1999-2008), requiring a full day evidentiary proceeding to grill the Dondero-related advisory companies (the "Advisors") on how HCMLP would transition its business after terminating its shared services agreement with the Advisors. *See* Highland Capital Management, L.P.'s Response and Joinder to Motion to Transfer/Reassign Case (App. 3148-3163). After being informed that the shared services would be terminated, the Advisors made alternate plans but continued to work with HCMLP during the transition to minimize the disruption that inevitably follows from implementing new IT systems, moving to a new office space, and transitioning HCMLP soon-to-be-fired employees to a new company that would provide the shared services previously provided by HCMLP. *See* App. 3148-3163 at 111:18-21; 112:10-16. Nonetheless, HCMLP sued the Advisors to compel the Advisors to explain how they would continue to operate without HCMLP, even though HCMLP lacked any statutory, contractual, or equitable right to do so. . *See generally* App. 1999-2008, 2027-2054. After a full day hearing, the Court dismissed the motion and adversary complaint as moot, acknowledging

that there was no issue, but nonetheless inexplicably chastised the Advisors for wasting the Court's time. . App. 3148-3163 at 230:14-16; 232:7-234:17.[27]

Another example of HCMLP's litigation tactics occurred in the bankruptcies of Highland Select Equity Master Fund, L.P. and Highland Select Equity Fund GP, L.P. (the "Select Debtors"), where HCMLP joined the Select Debtors' efforts (directed by Seery,  the Select Debtors' manager) to transfer the cases to Judge Jernigan.[28] Dugaboy objected to the transfer as improper. Over these objections, HCMLP and the Select Debtors insisted on a hearing despite there being no immediate need for a transfer and despite the conceded inefficiencies of moving the simple very low asset Chapter 7 cases into the morass of the Highland bankruptcy case.[29] At the last minute, however, HCMLP and the Select Debtors withdrew their motions to transfer.  They did so only after (1) they eroded HCMLP's equity cushion and the money available to pay Dugaboy (the sole creditor) by pressing the motions to transfer (complete with numerous $1000+ hourly lawyers at hearings concerning the transfer of cases with collectively only a few hundred thousand dollars of assets), and (2) forced Dugaboy to brief the issues, bring an expert to trial, and prepare for the hearing.[30]

Another example, recognized by the Fifth Circuit during oral argument of the appeal in *Charitable DAF Fund, L.P. v. Highland Capital Management, L.P.,* Case No. 22-11036, occurred when the Debtor instigated a contempt and sanctions proceedings costing the parties hundreds of thousands of dollars and multiple days in court, when it could have simply filed a one-page pleading

---

[27] HCMLP nonetheless blames the Targeted Parties for this exercise as well, speculating nonsensically (and without any evidentiary or other basis) that the so-called Dondero Entities only created a transition plan "to avoid SEC scrutiny." Mot., ¶ 26.

[28] *In re Highland Select Equity Fund GP*, Cause No. 23-31039 (Bankr. N.D. Tex.) (App. 2987-2997); *In re Highland Select Equity Master Fund*, Cause No. 23-31037 (Bankr. N.D. Tex.) (App. 2998-3007, 3148-3163-3164-3179).

[29] *Id.*

[30] Stipulation Withdrawing Motion to Transfer/Reassign Case, Highland Select Bankruptcies (App. 3321-3325, 3326-3330).

18

stating that the proceeding had been filed in the incorrect court (the district court) and requesting the reference to the bankruptcy court be enforced.[31]

Another example occurred when HCMLP, the Highland Claimant Trust and Seery filed a Motion for Order Requiring Scott Byron Ellington and his Counsel to Show Cause Why They Should Not Be Held in Civil Contempt for Violating the Gatekeeper Provision and Gatekeeping Orders (App. 3290-3318). In that motion, HCMLP, among others, sought to hold Scott Ellington, as well as his counsel, The Petit Law Firm and Lynn Pinker Hurst & Schwegmann LLP, in contempt of court for merely seeking discovery related to Seery in a Texas state court stalking case between Ellington and Daugherty. (App. 3290). After insisting on a hearing where approximately 35 lawyers attended and after listening to two hours of opening statements at the hearing, HCMLP abruptly suggested that the dispute should be resolved and withdrew the motion without any contempt findings. Order Denying Motion for an Order Requiring Scott Byron Ellington and His Counsel to Show Cause Why They Should Not Be Held in Contempt for Violating the Gatekeeper Orders (App. 3416-3420.).

Still another example highlights HCMLP engaging in the very same conduct that it calls vexatious. In October, HCMLP filed a complaint and a 2000+ page appendix with the Ontario Securities Commission (the "OSC") challenging actions sought to be taken by NexPoint Hospitality Trust ("NHT"), a hospitality REIT traded on the Canadian stock exchange TSX Venture Exchange (the "TSXV"), which is externally advised by an affiliate of Dondero.[32] Highland owns approximately 2,000,000 unites of NHT, which currently trades on the TSXV at $0.25 USD per unit – a $500,000 position. The actions that HCMLP sought to challenge had been *mandated* by the TSXV, and if NHT hadn't obtained the required shareholder approval, it faced potential delisting. NHT spent hundreds of thousands of dollars preparing for the hearing only to have HCMLP *voluntarily withdraw* its claim

---

[31] *See* https://www.youtube.com/watch?v=wAja9cwxu_U (audio recording of Fifth Circuit oral argument).

[32] Factum of the Respondent (App. 3563-3604)

on the eve of the hearing on the condition that NHT would not seek to recover costs and fees from HCMLP, to which NHT agreed. A week later, HCMLP renewed its efforts by filing a complaint with the TSXV over the very same subject matter.[33]

Additionally, even when the Targeted Parties attempted to avoid or postpone additional litigation, HCMLP and its counsel insisted that litigation proceed rather than agreeing to abate it in an effort to resolve the issues between the parties. Pushing up against a potential statute of limitations, Dondero and Strand recently filed a Motion for Leave to File Adversary Complaint, pursuant to the gatekeeping provision of the Plan (the "Gatekeeper Order"), seeking to file a complaint against HCMLP's law firm, Pachulski, for providing legal advice to Dondero and Strand at a time when it was conflicted from doing so.[34] Prior to filing the Motion for Leave, counsel for Dondero and Strand asked Pachulski to enter into a tolling agreement to avoid initiating the dispute, to preserve the estate's resources, and to reduce animosity.[35] HCMLP and its counsel refused, necessitating the filing of the Motion for Leave to avoid statute of limitations concerns.[36] Needless to say, the cost to the estate of Debtor-sponsored fights, like this one, has been (and continues to be) enormous.

### 3.    Bankruptcy-Related Appeals.

HCMLP also complains that Dondero and others have appealed adverse bankruptcy court rulings to the district court and beyond. Putting aside that the exercise of legitimate appellate rights is not sanctionable,[37] there are several problems with HCMLP's invocation of the examples used.

At the outset, it bears mentioning that HCMLP has consistently challenged the appellate standing of the former equity holders—Dugaboy and HMIT—by arguing that those entities are not

---

[33] January 31, 2023 Letter (App. 3605-3606).

[34] Motion of James D. Dondero and Strand Advisors, Inc. for Leave to File Adversary Complaint (App. 3363-3415)

[35] *Id.* at Ex. B.

[36] *Id.*

[37] Indeed, this Court struck a provision in a bankruptcy court order (sought by HCMLP) that would have fined alleged "Dondero-related" parties $100,000 for seeking to appeal bankruptcy court orders. *The Charitable DAF Fund LP, et al. v. Highland Capital Management, LP,* 2022 WL 4538466 (N.D. Tex. Sep. 28, 2022).

"in the money."[38] But based on the balance sheet filed by HCMLP in July 2023, it appears that management has deliberately manipulated the estate's financial condition and disclosures to avoid paying out unsecured creditors in full so that management can avoid declaring that former equity holders are vested beneficiaries with a right to be paid from the residual bankruptcy estate. In its disclosure, HCMLP sought to render the estate insolvent by making non-balance sheet "adjustments" that reduced the estate's value by $198 million (not including the additional $35 million in off-balance sheet cash).[39] In other words, HCMLP's non-disclosure and then manipulation of estate finances has in part contributed to the Targeted Parties' lack of success on appeal.

In any event, HCMLP's main complaint about post-confirmation appeals relates to appeals of the Plan's gatekeeper and exculpation provisions, but HCMLP glosses over that those appeals were *successful* in part, twice over. In the first appeal, Dondero and several other parties (the "Plan Appellants") sought review of the bankruptcy court's confirmation order, including its gatekeeping, exculpation, and release provisions. The Fifth Circuit Court of Appeals *granted* the relief sought in part, holding that the Plan's exculpation provision impermissibly extended to non-debtor third parties and limiting the scope of the exculpation provision accordingly. *NexPoint Advisors, L.P. v. Highland Capital Management, L.P.,* 48 F.4th 419, 435 (5th Cir. 2022). However, the Fifth Circuit did not similarly limit the scope of the gatekeeping provision, which continued to require would-be litigants to seek bankruptcy court permission before suing the same non-debtor third parties that the Fifth Circuit said were not entitled to exculpation. As a result, the Plan Appellants sought clarification of the Fifth Circuit's order through a petition for rehearing. *See* App. 2526-2566 The Fifth Circuit *granted* that petition and struck a sentence from its original opinion in an effort to give the requested

---

[38] App. 3519-3523, 3458.
[39] Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust (App. 3146).

CORE/3522697.0002/186038412.28

clarification. *See* App. 3421-3454.[40]   In addition, both HCMLP and certain Plan Appellants have cross-appealed the Confirmation Order to the Supreme Court of the United States. In the context of those appeals, the Supreme Court called for the views of the Solicitor General, granted certiorari in a similar case (*Harrington v. Purdue Pharma L.P.*, No. 23-124 (S.Ct.)), and expressly referenced the HCMLP case during oral argument on the *Purdue* appeal.[41]

Unfortunately, the clarified Fifth Circuit opinion did not resolve questions about how the Plan's gatekeeper provision should be applied in light of the limited exculpation provision. As a result, the Plan Appellants sought further appellate review of the bankruptcy court's order conforming the Plan. *See* Petition for Permission to Appeal, Case No. 23-90013, Dkt. No. 2. (App. 2966-2986) HCMLP now argues that the pendency of that further appeal warrants the present Motion, but that makes no sense. Again, there is no basis to argue that the appeal itself is improper, nor is there reason to believe that the pendency of the appeal undermines the Gatekeeper Order that is in place right now. To the contrary, as set forth above, *Dondero and others have continued to adhere to the Gatekeeper Order*. And when the appellate process plays out, Dondero and his affiliates will adhere to whatever the Fifth Circuit decides. Further, if dissatisfaction with a court order is an indication of vexatiousness (which it is not), it bears noting that the Debtor is seeking Supreme Court review of the Fifth Circuit's decision in favor of striking third-party releases.[42]

It is true that some (though by no means all) of the Targeted Parties have pursued appeals of adverse rulings issued by the bankruptcy court. But none of those appeals has been dismissed by the appellate courts as "frivolous," nor has any appellate court suggested that the appeals were pursued

---

[40] HCMLP states in its Motion that the Fifth Circuit "rejected [the Plan Appellants'] request for clarification." Mot., ¶ 18. That is false. The Fifth Circuit's opinion contains no such language. To the contrary, the Court expressly *granted* the petition for rehearing requesting clarification and substituted a new opinion for the original one.

[41] *See Highland Capital Mgmt., L.P. v. NexPoint Advisors, L.P.*, No. 22-631 (S.Ct.); *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P.*, No. 22-669 (S.Ct.);  *Harrington v. Purdue Pharma, L.P.*, No. 23-124 (S.Ct.), Hr'g Tr. dated Dec. 4, 2023 App. 3547 at 37:18-24.

[42] HCMLP's Petition for a Writ of Certiorari, filed January 5, 2023, No. 22-631 (S.Ct.). (App. 2662-2693)

CORE/3522697.0002/186038412.28

for some improper purpose. They were not. In any event, most of those appeals have long since resolved and pose no continuing threat to HCMLP. Those that have not resolved soon will be, and the appealing parties will live with the outcome. And as set forth below in greater detail, this Court does not have the power to enjoin future legitimate appeals by the Targeted Parties, making HCMLP's invocation of this legal background largely irrelevant for purposes of its present Motion.

In short, Dondero and the entities affected have acted primarily to salvage the business enterprise that Dondero built. None of them should be sanctioned for taking those appropriate protective steps.

### D.    HCMLP's Motion Is Misleading And Wrong In Numerous Other Critical Respects

#### 1.    Dondero Does Not Control Each Targeted Party.

One of the core premises of HCMLP's Motion is that this Court can and should declare "vexatious" 20 named individuals and entities—and potentially countless unnamed others—that allegedly are "directly or indirectly controlled by, or acting in concert with, Dondero." *See* Mot. at p.1 n.2; ¶ 32. There are several problems with this approach.

First, as a factual matter, HCMLP proffers no evidence that each of the "Dondero Entities" is owned, controlled by, or "acting in concert with" Dondero. They are not. Of the litany of individuals and entities listed in the Motion, only a handful are owned or controlled by Dondero. Those entities are: (1) Strand Advisors, Inc.—a Delaware corporation and the former general partner of HCMLP whose ownership and control reverted to Dondero after Plan confirmation; (2) NexPoint Advisors, L.P.— a Delaware limited partnership and registered investment advisor owned indirectly in part by Dondero, through his ownership of NexPoint's general partner; (3) Highland Capital Management Fund Advisors, L.P.—a Delaware limited partnership and registered investment advisor owned indirectly only in part by Dondero through his ownership of HCMFA's general partner and partial

ownership of HCMFA's limited partner; (4) Get Good Trust[43]—a Delaware statutory trust for which Dondero is the settlor (i.e., the creator) but not the trustee and whose beneficiaries are Dondero's descendants; (5) The Dugaboy Investment Trust—a Delaware statutory trust of which Dondero is the principal beneficiary, but not Trustee; (6) NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC—a Delaware limited liability corporation owned only in part by Dondero through his ownership interest in Dugaboy; and (7) PCMG Trading Partners XXIII, L.P.—a Delaware limited partnership also owned only in part by Dondero through his limited partnership interest.[44]

The remaining named entities are not currently owned or controlled by Dondero, and many of them have independent boards represented by independent outside counsel who make independent decisions for those entities. The following Targeted Parties are funds with third-party investors and boards whose independence recently was reviewed and acknowledged by the Fifth Circuit: Highland Fixed Income Fund, Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., and NexPoint Diversified Real Estate f/k/a NexPoint Strategic Opportunities Fund.[45] The remaining entities listed are neither owned nor controlled by Dondero:

- The Charitable DAF Fund, L.P. is a Cayman Islands Exempted limited partnership whose sole managing member is Charitable DAF GP, LLC. Although Dondero originally held all membership interests in Charitable DAF GP LLC, he transferred 100% of those interests to Grant Scott in 2012. The DAF entities are charitable and Dondero's relationship to them is solely as someone who (indirectly) contributed funds that are used to make charitable donations to a wide range of worthy causes.[46] Dondero no longer has any control over Charitable DAF GP, LLC. He receives no financial or non-financial benefit from Charitable DAF GP, LLC, other than the personal satisfaction that comes from charitable giving. Grant Scott transferred all of

---

[43] "Get Good Trust" refers to three trusts: Get Good Trust, Get Good Non Exempt Trust 1, and Get Good Non Exempt Trust 2.

[44] App. 143-170

[45] *Lanotte v. Highland Capital Management Fund Advisors, L.P. et al.*, No. 20-10649, 2023 WL 2663276, at *3 (5th Cir. March 28, 2023) ("[N]or did the district court err in concluding a majority of the board of trustees was independent under § 2B.") (*affirming* finding of independence in *Lanotte v. Highland Capital Fund Advisors et. al.*, Case 3:18-cv-02360-M (Lynn, J.) (App. 0477) ("Accordingly, the Court concludes that the Trustee Defendants were all disinterested under the ICA [Investment Companies Act of 1940]….").

[46] For example https://www.dallasfoundation.org/racial-equity-fund/.

CORE/3522697.0002/186038412.28

the membership interest in the GP and the role of managing member to Mark Patrick in 2021.

- CLO HoldCo, Ltd. is a Cayman Islands exempted company wholly owned by Charitable DAF Fund, L.P. CLO HoldCo has two independent directors, Mark Patrick and Paul Murphy. CLO Holdco is represented by independent outside counsel. Dondero exercises no direct or indirect control over CLO HoldCo, Ltd.

- Rand PE Fund I, LP, Series 1 is a Delaware series limited partnership.  Atlas IDF, L.P., a Delaware limited partnership, owns substantially all (99%) of the limited partner interests in Rand PE Fund I, L.P. Atlas IDF is an insurance dedicated fund, and all of its limited partner interests are held by another insurance company.

- Hunter Mountain Investment Trust is a Delaware statutory trust. The sole beneficial owner of HMIT is Beacon Mountain, LLC, and the sole member of Beacon Mountain is Rand PE Fund I, L.P.  Mark Patrick is the Administrator of HMIT.

As for the unidentified individuals and entities that HCMLP seeks to deem "vexatious" and have enjoined, HCMLP offers no detail about how such individuals and entities can or should be identified and no discernable standard by which to judge that such individuals or entities should be deemed "controlled by" or "acting in concert with" Dondero.

HCMLP's effort to lump separate individuals and entities together is also legally problematic. By denominating all these individuals and entities the "Dondero Entities," HCMLP ignores the corporate form of at least 16 entities and asks the Court to disregard the corporate form of any others that HCMLP decides is "acting in concert" with Dondero, without any legal analysis of whether the various corporate entities are (or should be) responsible for the acts of one another. That is impermissible. Indeed public funds must be governed by independent boards.[47]

It is axiomatic that a corporation is a distinct legal entity separate from its owners, shareholders, and subsidiary or parent corporations. *Beverly Found v. Lynch*, 301 S.W.3d 734, n.1 (Tex. App.—Amarillo 2009, no pet.) (noting that even where two distinct entities are used interchangeably throughout the pleading the court will still recognize the corporation as distinct from

---

[47] See Regulation: NYSE Listed Company Manual, 303A.01, Independent Directors (srorules.com).

creators and shareholders). This distinction cannot be ignored unless there is evidence of the use of the corporate form as an unfair device to achieve an inequitable result. *Hoffmann v. Dandurand*, 180 S.W.3d 340, 347 (Tex. App.—Dallas 2005, no pet.). The corporate form may not be ignored unless the corporate fiction is used to perpetrate a fraud, the corporation is organized as a conduit of another corporation, the corporation is used as a means of evading existing legal obligations, to perpetrate a monopoly, or to circumvent a statute, or where the corporate fiction is relied upon as a protection of crime or to justify wrongdoing. *Id*.

HCMLP does not even allege that any of these circumstances are present here. Nor does HCMLP explain how each of the so-called "Dondero Entities" have acted in a manner that justifies lumping them together with Dondero or the companies he actually owns or controls. Because HCMLP has proffered no evidence nor pleaded any legal standard that would allow the actions of any one of the named entities to be attributed to all "Dondero Entities," declaring the entire group "vexatious" is legally impermissible.

### 2. HCMLP's Allegations Lack Evidentiary Support and/or Are Contradicted By Evidence.

HCMLP's Motion is rife with allegations either lacking evidentiary support or flatly contradicted by the evidence. For example, HCMLP claims that the Dondero Entities "have indicated that, if they ever succeed in overturning the Gatekeeper, they will flood the estate with more harassing and meritless litigation." Mot., ¶ 5. The supposed "evidence" supporting this claim is hearing testimony by a member of the Debtor's Independent Board that the Board had trouble getting D&O insurance, supposedly because Dondero is litigious.. *Id*. But HCMLP cites no evidence of any statement actually made by the so-called "Dondero Entities" regarding their intent or litigation strategy if the Gatekeeper Order is overturned. Nor is it plausible that each of the 20-plus named "Dondero Entities" made such a threat, much less does it matter. . Courts do not issue sanctions based on statements of intent; they do so when parties actually file legally baseless, bad faith litigation.

26

In an effort to demonstrate that Dondero uses other entities to litigate his battles, HCMLP alleges that the Delaware bankruptcy court transferred venue of the Highland bankruptcy to the Bankruptcy Court for the Northern District of Texas because of that court's "knowledge of and experience with Dondero and his use of surrogates and proxies to litigate his positions." Mot. at ¶ 10 n.16. This too is false. The order transferring venue is one paragraph long and gives no insight into Judge Sontchi's reasons for ordering the transfer other than "the reasons stated on the record." *See* App. 0196. As for what Judge Sontchi said on the record, his reasons for transferring the case are set forth succinctly in the transcript of the hearing. *See* App. 184-193 at 105:10-110:24 (finding "the real gravitas of this case is in Dallas"). Nowhere in the Judge's statement is "use of surrogates and proxies to litigate [Dondero's] positions" remotely mentioned, much less anything else of negative import for Dondero.

In yet another example, HCMLP points to two supposed admissions by Dugaboy and Get Good that they filed motions in bankruptcy for improper purposes. Notably, both of these examples relate to Targeted Entities seeking clarity on the finances of the HCMLP estate, while HCMLP sought to maintain opacity. First, HCMLP claims that Dugaboy and Get Good "admitted the motion [to appoint an examiner] was filed to delay confirmation, re-litigate settlements, and adjudicate the Dondero Entities' Plan objections in a different forum—completely improper purposes." Mot., ¶ 24 n.56. But as Dugaboy and Get Good explained the last time HCMLP mischaracterized this excerpt (*see* App. 2634-2661 at 10), the very next sentence of the quoted brief explains that Dugaboy and Get Good sought to have the examiner motion heard on an expedited basis to *prevent* delay of the confirmation hearing, which might occur if the motion was heard on an ordinary schedule. *See* App. 2257, ¶ 37. In short, Dugaboy and Get Good's intent was the *opposite* of delay.

Second, HCMLP contends that Dugaboy and Get Good "admitted their goal was to create additional litigation" in seeking an order compelling HCMLP to file Rule 2015.3 reports. Mot., ¶ 24.

27

But the cited quotes contain no such admission. *See id.*, ¶ 24 n.58 & ¶ 27 n.89. Instead, the cited quotes came in the context of Dugaboy's argument about why it had *standing* to pursue its motion to compel production of Rule 2015.3 reports. *See* App. 2430-2431; 2482. A quick review of Dugaboy and Get Good's actual motion reveals that there were many non-litigation related reasons to seek Rule 2015.3 reports, such as breaking the wall of opacity surrounding HCMLP's finances, none of which related to burdening the estate. *See generally* App. 2375-2384.

HCMLP also argues that "[t]he Dondero Entities were the only parties pressing objections at confirmation." Mot., ¶ 25. This too is belied by the bankruptcy record. Among the parties objecting to the Plan were the United States Internal Revenue Service, the United States Trustee, Dallas County, the City of Allen, Allen Independent School District, the City of Richardson, Kaufman County, and certain former employees of HCMLP.   (App. 1474-1481, 1517-1523, 1524-1550, 1602-1608). Indeed, the U.S. Trustee lodged some of the same objections to the Plan that Dondero and his affiliates raised, including that the exculpation provision of the Plan impermissibly exonerated non-debtor third parties. *See* App. 1607-1608.

HCMLP alleges (yet again without citation) that HCRE withdrew its proof of claim (after forcing HCMLP to spend money fighting it) "to preserve the claim for future litigation outside of the Bankruptcy Court." Mot., ¶ 24. Once again, this is false. HCRE repeatedly stated that it was willing to withdraw the claim *with prejudice* and waive any right to appeal. *See* App. 2567-2628 at 7:13-21, 32:22-37:6.  .Eventually, Dondero himself testified to the same effect. *Id.* at 40:8-17. Notwithstanding that testimony given under penalty of perjury, HCMLP continued to insist (as it does now) that HCRE's withdrawal of its proof of claim was designed to facilitate litigation of the same issues in some other form. *Id*. at 47:6-49:9. That argument was and is counter-factual.

III.   **HCMLP'S MOTION SHOULD BE DENIED**

     A.    **The District Court Lacks Jurisdiction To Give The Relief Sought**

HCMLP's decision to file its Motion in this Court in consolidated cases in which the Court is acting in an appellate capacity is strange, to say the least. The consolidated appeals before this Court arise from adversary proceedings initiated by HCMLP in the main bankruptcy case against various individual and entities that allegedly are liable to HCMLP on certain promissory notes (the "Notes Cases").[48] Only a small subgroup of the Targeted Parties is even involved in the Notes Cases.[49] This Court received the Notes Cases on appeal from an order of the bankruptcy court recommending that summary judgment be granted in HCMLP's favor.[50] And this Court has already resolved that appeal. The Notes Cases are now on appeal to the Fifth Circuit.[51]

The Court should deny HCMLP's Motion because the Court lacks jurisdiction to consider it. Under 28 U.S.C. 158, a district court has appellate jurisdiction over final judgments, orders, and decrees of the bankruptcy court, as well as any appeals of interlocutory orders allowed by statute or with leave of court. HCMLP's Motion does not fall into any of these categories. Alternatively, a district court has original jurisdiction over federal question and diversity cases. 28 U.S.C. 1331,1332; *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). But HCMLP's Motion is not an original lawsuit invoking this Court's federal question or diversity jurisdiction either.

In the absence of another statutory basis for jurisdiction, HCMLP argues this Court can exercise jurisdiction to decide the Motion under the All Writs Act. HCMLP is wrong. Under the All Writs Act, a district court may "issue all writs necessary or appropriate in aid of [its] respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). A district court's jurisdiction under the All Writs Act is not limitless, however. *See Clinton v. Goldsmith*, 526 U.S. 529,

---

[48] *See* Adv. No. 21-03003; Adv. 21-03004; Adv. 21-03005; Adv. No. 21-03006; Adv. No. 21-03007; Adv. No. 21-03082.

[49] Specifically, the defendants in the Notes Cases are Dondero, Nancy Dondero, Dugaboy, HCRE, Highland Capital Management Fund Advisors, L.P., Highland Capital Management Services, Inc., NexPoint Advisors, L.P., and NexPoint Asset Management, L.P. *See id.*

[50] The Notes Cases were consolidated for appeal before the Northern District of Texas as Case No. 3:21-cv-00881-X.

[51] *See* Notice of Appeal to United States Court of Appeals for the Fifth Circuit, Dkt. No. 158 (App. 3286-3289).

534–35 (1999). Where a party moves a district court for a pre-filing injunction against a litigant in bankruptcy court, the district court's jurisdiction "is limited to its appellate review of the bankruptcy court." *Schum v. Fortress Value Recovery Fund I LLC*, 2019 WL 7856719, at *4 (N.D. Tex. Dec. 2, 2019), *aff'd sub nom*. *Matter of Renaissance Radio, Inc.,* 805 F. App'x 319 (5th Cir. 2020). The All Writs Act "is not an independent grant of jurisdiction." *Id*. (quoting *Texas v. Real Parties In Interest*, 259 F.3d 387, 392 (5th Cir. 2001)). Thus, where there is no underlying case over which a district court has current jurisdiction, the court may not issue an order under the All Writs Act. *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1259 (11th Cir. 2021) ("[T]his case is not the kind of case in which an order under the [All Writs] Act could properly be issued because there is no underlying proceeding over which the District Court has jurisdiction."); *see also Goldsmith*, at 534–35 (All Writs Act "does not enlarge" a court's jurisdiction).

HCMLP relies on *Schum* to support its jurisdictional argument. But in that case, the district court exercised its jurisdiction under the All Writs Act to declare a litigant vexatious in the context of an *ongoing* appeal before the court. *Schum*, 2019 U.S. Dist. LEXIS 226679, at *4-7. Here, by contrast, HCMLP asks the Court to issue a writ in an appeal that is now concluded. That is a distinction with a difference. It is axiomatic that federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *MicCap Media Finance, L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 313 (5th Cir. 2019). Thus, a federal court may only issue a writ in a case that is active before the court. The appeal of the Notes Cases before this Court is complete, and the cases are now on appeal to the Fifth Circuit. That divests this Court of jurisdiction to act.

The Eleventh Circuit in *Rohe v. Wells Fargo Bank* rejected a similar attempt to invoke the All Writs Act as an independent, non-appellate basis for jurisdiction.[52] In *Rohe*, the court recognized the

---

[52] 988 F.3d 1256, 1264 (11th Cir. 2021).

CORE/3522697.0002/186038412.28

two situations in which All Writs Acts orders were appropriately employed: "(1) . . . in a court's appellate capacity, generally to direct action by another court whose proceedings are subject to appellate review by the court issuing the order; and (2) . . . to directly protect the issuing court's own proceedings and judgments [when it has original jurisdiction]."[53]  In *Rohe,* the movant sought an order from a district court, seeking to employ the "direct, non-appellate use of the Act."[54] Because the movant was not invoking the district court's appellate jurisdiction, the Eleventh Circuit was clear that absent some other independent basis for jurisdiction, "any attempt by the District Court to issue an All Writs Act order directed to the bankruptcy court would be inappropriate because the Act is not meant to serve as 'a substitute for the regular appeals process . . . .'"[55]

The court in *Rohe* ultimately concluded that "[b]ecause the bankruptcy case falls within the purview of the bankruptcy court, which is well-equipped to protect the proceeding"s integrity, the bankruptcy case is not a proceeding on which non-appellate use of the All Writs Act by the District Court could be predicated."[56]

The same reasoning applies here. As in *Rohe*, HCMLP is not invoking this Court's appellate jurisdiction but is seeking to employ the All Writs Act as an independent, non-appellant basis for jurisdiction. That is impermissible, particularly where, as in *Rohe*, the bankruptcy case falls "within the purview of the bankruptcy court," which may "protect the proceeding's integrity" as necessary. This Court lacks jurisdiction to declare any of the "Dondero Entities" a vexatious litigant.

---

[53] *Id.*

[54] *Id*. at 1265.

[55] *Id*. at 1267.

[56] *Id*. at 1268.

31

**B.** **HCMLP Cannot Meet Its Burden To Demonstrate That The Relief Sought Is Warranted**

Although the Court lacks jurisdiction to award the relief sought, HCMLP's Motion also should be denied for multiple additional reasons. As set forth below in greater detail, the facts of this case do not come close to justifying an order saddling more than 20 entities and individuals (and countless other unknown parties) with a "vexatious litigant" label. Nor is the overbroad injunctive relief sought by HCMLP appropriate in any case, much less in the circumstances of this one. Finally, the sanction sought is unwarranted because there already are appropriate safeguards in place, and a new, Super Gatekeeper order would create an unnecessary procedural morass.

**1.** **Labeling A Party A Vexatious Litigant Is Reserved For Cases Of Wildly Inappropriate, Unethical, and Sanctionable Behavior.**

A movant seeking vexatious litigant sanctions faces a very high burden.[57] The courts issue such sanctions only in extraordinary cases. The party moving for sanctions bears the burden "to overcome the presumption that pleadings are filed in good faith." *Bowling v. Willis*, No. 4:18-CV-610-ALM-CAN, 2019 WL 5692189, at *2 (E.D. Tex. Aug. 9, 2019), *report and recommendation adopted sub nom. Bowling v. Dahlheimer*, No. 4:18-CV-610, 2019 WL 4727421 (E.D. Tex. Sept. 27, 2019), *aff'd in part, dismissed in part sub nom. Bowling v. Willis*, 853 F. App'x 983 (5th Cir. 2021). To justify calling a party a vexatious litigant, a court must first make "a specific finding of bad faith." *Connor v. Stewart*, No. 1:17-CV-827-RP, 2018 WL 4169150, at *2 (W.D. Tex. Aug. 30, 2018), *aff'd*, 770 F. App'x 244 (5th Cir. 2019) (quotation omitted).

Moreover, courts have "no desire to deter any litigants from advancing any claim or defense which is arguably supported by existing law, or any reasonably based suggestion for its extension, modification, or reversal." *Farguson v. Mbank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986). As

---

[57] In addition, as discussed below, Movants improperly seek to group all of the so-called Dondero Entities together and fail to prove or even allege that each specific individual and entity engaged in vexatious conduct. *See* Section 0 *infra*.

a result, positions are not frivolous or vexatious by virtue of being unsuccessful, even if a court gives them "short shrift." *Id.* A litigant that vigorously asserts legitimate rights, even if unsuccessful or annoying or an impediment to his adversary, is not vexatious.

In light of these standards, it is not surprising that most cases warranting a vexatious litigant sanction concern *pro se* litigants, rather than parties represented by lawyers who are subject to canons of ethics. Indeed, virtually all of the Fifth Circuit cases cited in the Motion involve *pro se* litigants who engaged in conduct that could not be justified by existing law or a good faith argument for an extension or change in the law. Those cases include: *Bowling v. Willis*, 2019 U.S. Dist. LEXIS 168602 (E.D. Tex. Aug. 9, 2019), *aff'd*, 853 F. App'x. 983 (5th Cir. 2021) (after divorce proceedings, *pro se* plaintiff filed multiple federal lawsuits against her ex-husband, attorneys, judge, clerk, district attorney, and others, all within nine months); *Staten v. Harrison Cnty.*, 2021 U.S. App. LEXIS 35747, at *5-6 (5th Cir. Dec. 2, 2021) (plaintiff settled wrongful death lawsuit and then filed four additional lawsuits, in state and federal court, arising from the death of her husband); *Schum v. Fortress Value Recovery Fund I LLC*, 2019 U.S. Dist. LEXIS 226679 at *14-15 (N.D. Tex. Dec. 2, 2019), *aff'd*, 805 F. App'x. 319 (5th Cir. 2020) (vexatious conduct included: refusing to sign paperwork despite court orders instructing to do so; filing multiple challenges to bankruptcy proceedings that concluded 10 years earlier; and directly communicating with court staff); *Carroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017) (described in detail below); *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181 (5th Cir. 2008) (*pro se* litigants (only one of whom happened to be a lawyer) represented themselves, lied to courts, and brought entirely false cases for fraudulent and extortionate purposes); and *Alliance Riggers & Constructors, Ltd. v. Restrepo*, 2015 U.S. Dist. LEXIS 29346 at *14-15 (W.D. Tex. Jan. 7, 2015) (litigants repeatedly removed suit to federal court, despite being remanded three times) (further described in Dkt. No. 4 of the case (3:14-cv-00408-DCG)).

One of the few exceptions in the Fifth Circuit to the general rule that most vexatious findings are against *pro se* parties is *Newby v. Enron Corp.*, 302 F.3d 295, 303 (5th Cir. 2002). *Newby* concerned a single law firm that filed lawsuits in counties across Texas and made "unjustified and duplicative requests for *ex parte* temporary restraining orders, without notice to lawyers already across the counsel table" and "ignored defendants' attempts to communicate with them and their request for notice." *Id.* at 302-03. The lawyers' conduct was so unethical that they seemed no more knowledgeable about acceptable conduct in litigation than the *pro se* litigants that typically are the subjects of vexatious litigant motions.

As set forth below in greater detail, there is no conduct in this case justifying the extraordinary sanction sought by HCMLP.

**2.      The Conduct Alleged Here Does Not Come Close to Justifying a Vexatious Litigant Finding.**

HCMLP cannot meet its burden to demonstrate that each of the Targeted Parties are "vexatious" such that issuing a sweeping pre-suit injunction against each of them would be appropriate.

Notably, much of HCMLP's Motion is devoted to recounting (and largely mischaracterizing) disputes that have long since been put to rest, through orders of the bankruptcy court, conclusion of the appellate process, or agreed resolution. Nowhere along the way did HCMLP seek the type of sanction it now says must be imposed. At this juncture, there are only a handful of disputes being prosecuted by the Targeted Parties remaining to be resolved, and the more controversial of those are the subject of motions for leave to file suit pursuant to the robust Gatekeeper Order issued by the bankruptcy court as part of HCMLP's confirmed Plan.

More importantly, a holistic review of the record demonstrates that the Targeted Parties— represented by numerous sophisticated outside counsel bound by rules of procedural and professional ethics—have acted appropriately at every step of the way.  To summarize:

34

- Prior to filing its Chapter 11 petition, HCMLP (then under Dondero's leadership) was named as a *defendant* in several lawsuits, many of which HCMLP's current counsel argued were meritless, and HCMLP was largely *successful* in defending pre-petition lawsuits to the benefit of its investors;

- Prior to Plan confirmation, the Targeted Parties acted with restraint to file pleadings in the bankruptcy proceedings only when they had legitimate concerns. Dondero himself filed only *two* affirmative motions—one of which he later withdrew, and raised no objections to any motions filed by HCMLP. Other Targeted Parties filed only a handful of relevant objections and responses as necessary;

- After Plan confirmation, a small sub-group of the Targeted Parties have continued to pursue their legal rights based on legitimate legal concerns, in most instances by invoking the Gatekeeper Order and seeking the bankruptcy court's permission to proceed;

- To the extent the Targeted Parties have pursued appellate rights, they have done so through appropriate channels and have abided by the decisions made by the appellate courts;

These are not the actions of "vexatious" litigants, notwithstanding HCMLP's effort to contort the record to make the facts fit its narrative.

In addition, notably, HCMLP does not and cannot cite specific evidence of record that *each* of the "Dondero Entities" has engaged in conduct meriting the label "vexatious." To assign that label, this Court would have to make a "specific finding of bad faith" with respect to each of the parties to be sanctioned. *Connor*, 2018 WL 4169150, at *2. The evidence proffered by HCMLP falls well short of supplying the Court with a basis to do so.

HCMLP principally relies on *Carroll v. Abide* to argue that the facts of this case justify the relief sought.[58] That case, involving a *pro se* litigant, involved objectionable behavior that the court described as "fifteen years [of] scheming to retain assets and rebuff creditors through several bankruptcy cases" and "wag[ing] war against creditors and the trustee in several forums for nearly as long," employing a "legion" number of "frivolous filings."[59] The behavior in *Carroll* leading up to

---

[58] *In re Caroll*, 2016 Bankr. LEXIS 937 (Bankr. M.D. La. Mar. 16, 2016), *aff'd*, 2016 U.S. Dist. LEXIS 100930 (M.D. La. Aug. 2, 2016), *aff'd*, 850 F.3d 811 (5th Cir. 2017).

[59] *Id.* at *3.

the vexatious litigant finding included: being sanctioned and held in contempt and then violating that order by failing to obey it, as well as failing to pay the monetary sanctions required by the order;[60] opposing with no basis an effort to sell residential property—an effort that resulted in the filing of nearly 100 pleadings and two unsuccessful appeals; attempting to remove the trustee by lodging "venomous" accusations that were not "susceptible of corroboration," subsequently withdrawing a related appeal, and then filing a second motion making the same arguments;[61] and filing an opposition brief in which the litigants adopted "their preferred style of response" comprised of "unsupported and derogatory statements about the trustee, including accusations that she engaged in 'abuse and vicious behavior,' and boasted that 'the courts always believe her and support her position, she always wins.'"[62] As summarized by the court, the Carrolls spent years making "contrived arguments" and filing "misleading motions and dishonest filings," had a pattern of "filing numerous–usually non-meritorious, often repetitive–motions and other documents to delay or thwart the trustee's efforts," and attempted to remove the trustee through "unscrupulous and deceitful efforts designed solely to harass the trustee to the detriment of the estate's creditors."[63] The bankruptcy court also noted that the Carrolls' "failure to pay in full district court sanctions demonstrates that monetary sanctions alone will not deter them [and that] barring them from further filings is essential to protect the court and other parties from abusive litigation."[64]

While HCMLP parrots the adjectives and adverbs in the *Carroll* case, HCMLP cannot and does not point to any analogous facts, other than the bankruptcy court's limited findings of contempt. The first, and most notable difference: while the *Carroll* litigants sought to *prevent* recoveries to

---

[60] *Id.* at *9-12.

[61] *Id.* at *14-19.

[62] *Id.* at *19.

[63] *Id.* at *28-32.

[64] *Id.* at *34.

CORE/3522697.0002/186038412.28

creditors, the Targeted Parties have no such aim. To the contrary, the Targeted Parties are advocating the payment in full of unsecured creditors and fighting to prevent their equity from being consumed by the estate's professionals.[65]  Second,  in sharp contrast to *Carroll*, the few parties held in contempt in the HCMLP bankruptcy abided by the contempt orders, appealed them, have already been partly successful on appeal, and may yet be entirely successful in the Fifth Circuit. Indeed, the Fifth Circuit panel questioned the Debtor sharply about whether a one of the underlying contempt motions was warranted and why the Debtor could not simply have filed a one-page motion to obtain the same result.[66]

Third, neither *Carroll* nor any of the other cases cited by HCMLP involve a situation where a gatekeeper order already is in place, much less one where it is being followed. Here, the evidence demonstrates that Dondero and his affiliates *have abided by* the Gatekeeper Order and all other orders of the courts involved in the HCMLP bankruptcy.[67] Fourth, and most ironically, the relief granted in *Carroll* is essentially the existing Gatekeeper Order already in place in the HCMLP Plan, not the Super Gatekeeper order that HCMLP now seeks.[68]

---

[65] Non-payment of unsecured creditors is not even a risk in this case. General unsecured creditors already have received 93% of their claims (*see* App. 3338 and App. 2963, Item 2), and there are sufficient assets to day to pay the balance of their claims with interest (*see* App. 3146).

[66] See *supra* note **Error! Bookmark not defined.** and accompanying text. Other cases that better demonstrate the type of sanctionable conduct necessary to be declared a vexatious litigant include: *Mendoza v. Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993) (filing 500+ lawsuits); *Holmes v. Motor Home Specialist*, No. 3:21-CV-00934-G-BT, 2022 WL 4281015, at *6 (N.D. Tex. Aug. 30, 2022), report and recommendation adopted, No. 3:21-CV-0934-G-BT, 2022 WL 4280649 (N.D. Tex. Sept. 15, 2022) (filing numerous actions in various Nevada state and federal courts and often abandoning them); *Olmstead v. Hoppe*, No. 5:19-CV-203-H-BR, 2020 WL 1482324, at *4–5 (N.D. Tex. Mar. 27, 2020) (plaintiff repeatedly and on the record used profanity and threatened the court).

[67] For example, Hunter Mountain filed an Emergency Motion for Leave to File Verified Adversary Proceeding, seeking to file a complaint against Muck Holdings, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, Stonehill Capital Management, LLC, and James Seery. (App. 3060-3125). And James Dondero and Strand Advisors, Inc. similarly filed a Motion for Leave to File Adversary Complaint, seeking leave to file a complaint against Pachulski Stang Ziehl & Jones LLP. (App. 3363-3415)

[68] *Compare In re Carroll*, 2016 Bankr. LEXIS 937 (Bankr. M.D. La. Mar. 16, 2016); *with* Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., App. 1882-1948 at Article IX(F).

Also, importantly, in *Carroll*, and in each of the nine cases relying on the Fifth Circuit's

decision in *Caroll* the vexatious actions were undertaken by *pro se* litigants. Only six (in addition to

*Carroll*) resulted in any sort of pre-suit injunction.[69] Three of those cases involved the litigant filing

between four and nine simultaneous lawsuits arising from the same facts and claims,[70] one case

involved a party that repeatedly removed a case already remanded to state court,[71] one case involved

a party seeking to use the court to fulfill a promise made to him by "Almighty G-d,"[72] and the last

case involved a party using a bankruptcy court to prosecute federal, state, and local officials for

supposed war crimes perpetrated against her.[73] In most cases, the relief imposed was the same as the

---

[69] No sanctions were imposed in *Burke v. Ocwen Loan Servicing, LLC*, CA No. 4:21-CV-2591, 2022 WL 4597975, (S.D. Tex. Aug. 29, 2022) (declining sanctions against *pro se* plaintiffs who had four trial cases, four motions to intervene, and eight appeals all arising out of foreclosure on a single family home); *Xiaohua Huang v. Huawei Technologies Co. Ltd.*, CA No. 2:15-cv-01413-JRG-RSP, CA No. 2:16-cv-00947-JRG-RSP, 2020 WL 731270 (E.D. Tex. Feb. 12, 2020) (declining to impose a pre-suit injunction against *pro se* plaintiff who had lost two consecutive patent infringement lawsuits, and declining to enjoin the plaintiff's lawsuit in another district); *Partain v. City of South Padre Island, Texas*, CA No. B-16-317, 2018 WL 7202486, at *17 (S.D. Tex. Dec. 5, 2018) (declining to impose a pre-suit injunction against *pro se* plaintiff whose failure failed to overcome summary judgment "as the result of misguided legal research rather than a failure to attempt a reasonable inquiry into the law or an intent to harass.").

[70] *Budri v. Administrative Review Board, United States Department of Labor*, 858 Fed. App'x 117 (5th Cir. 2021) (limiting the number of pleadings and requiring proper citation to legal authority and court records for a *pro se* plaintiff that had over 50 motions pending, including six active complaints with identical facts); *Zawislak v. Memorial Hermann Health System*, C.A. No. 4:21-CV-3098, 2022 WL 4359231 (S.D. Tex. July 25, 2022) (requiring *pro se* plaintiff to obtain leave of court before filing a nineth lawsuit relating to a single medical review that occurred 15 years earlier); *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico*, MDL 2179, 2021 WL 3400634 (E.D. La. Aug. 8, 2021) (imposing an injunction that the movant must seek express approval of the Court to file new lawsuits after a lawyer acting *pro se* filed repeated lawsuits based on the same facts instead of appealing prior dismissals).

[71] *Moses v. Cantu*, CA No. 4:22-CV-211-SDJ, 2023 WL 2527159, (E.D. Tex. Mar. 15, 2023) (ordering that *pro se* defendants who had repeatedly removed a case to federal court even after initial remand were prohibited from removing the case again).

[72] *Merkle v. Gragg*, CA No. No. SA-19-CV-640-XR, 2020 WL 2611858 (W.D. Tex. May 22, 2020) (requiring a motion for leave to file any new lawsuit by a *pro se* plaintiff who alleged opposing counsel were "members of a criminal street gang engaged in unlawful debt collection," alleging private causes of action under the Texas Penal Code that did not exist, and claiming "this case will allow Almighty G-d working through the judicial systems, to fulfill one of his promises to [*pro se* plaintiff].")

[73] *In re U.S. Corp. Co.*, CA 20-40375-KKS, 2021 WL 1100078 (Bankr. N.D. Fla. Jan. 22, 2021) (requiring a *pro se* litigant in a bankruptcy court to pre-file all future motions with the court's chambers after she tried to use the bankruptcy court to prosecute "war crimes" by federal, state, and local agencies, their employees, attorneys, judges, and private parties, including a private debtor that she confused with a branch of the United States government).

CORE/3522697.0002/186038412.28

current Gatekeeping Order: requiring leave of court to file additional lawsuits.[74]  None imposed the

Super Gatekeeper order proposed by HCMLP.

Notably, it is common in bankruptcy for parties to contest the motions and proceedings filed

by a debtor, as has been the case in HCMLP's bankruptcy. Creditors, for example, frequently contest

the use of cash collateral, file administrative claims, move to appoint a trustee or dismiss the case,

contest professional fees, contest settlement motions, and more often than not, contest the proposed

plan. While some of these positions may ultimately fail (and often fail, given the deference given to

debtors early in bankruptcy), commonly taken adversarial positions in bankruptcy should not give

rise to a vexatious litigant sanction, so long as the position finds support in existing law or a reasonable

argument for its extension, modification, or reversal. *Farguson*, 808 F.2d at 359. Further, arguing a

legally cognizable defense in adversary proceedings commenced by a debtor, objecting to

confirmation of a debtor's plan and/or other motions in the bankruptcy case, and appealing adverse

rulings cannot and does not constitute vexatious litigation.[75]

### C.   The Injunctive Relief Sought By HCMLP Is Unwarranted And Legally Inappropriate.

Although there is insufficient justification to declare any of the Dondero Entities "vexatious,"

HCMLP also cannot demonstrate that the remedy it seeks (in the form of a sweeping, worldwide pre-

---

[74] *Zawislak*, 2022 WL 4359231 at *3; *In re Deepwater Horizon*, 2021 WL 3400634 at *13; *Merkle*, 2020 WL 2611858 at *8.

[75] While not controlling, it is instructive that Targeted Parties' litigation history, even as described by HCMLP, would not satisfy the criteria of the Texas statute governing vexatious litigants. Under that statute, a court may find a plaintiff vexatious only if the defendant "shows that there is not a reasonable probability that the plaintiff will prevail in the litigation against defendant and that: (1) the plaintiff, in the seven-year period immediately preceding the date the defendant makes the motion under Section 11.051, has commenced, prosecuted, or maintained at least five litigations as a pro se litigant other than in small claims court that have been: (A) finally determined adversely to the plaintiff; (b) permitted to remain pending at least two years without having been brought to trial or hearing; or (c) determined by a trial or appellate court to be frivolous or groundless under state or federal laws or rules of procedure; (2) after a litigation has been finally determined against the plaintiff, the plaintiff repeatedly relitigates or attempts to relitigate, pro se, either: (A) the validity of the determination against the same defendant as to whom the litigation was finally determined; or (B) the cause of action claim, controversy, or any of the issues of fact or law determined or concluded by the final determination against the same defendant as to whom the litigation was finally determined; or (3) the plaintiff has previously been declared to be a vexatious litigant by a state or federal court in an action or proceeding based on the same or substantially similar facts, transition, or occurrence." TEX. CIV. PRAC. REM. CODE. ANN. § 11.054.

suit injunction) is warranted. A pre-suit injunction is a "drastic remedy" that "must be tailored to protect the courts and innocent parties, while preserving the legitimate rights of litigants." *Farguson*, 808 F.2d at 360. Indeed, a court must exercise "great restraint and caution" when exercising its power to sanction. *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) ("The threshold for the use of the inherent power to sanction is high."). For that reason, the Fifth Circuit has cautioned that the power to issue sanctions "may be exercised *only if essential* to preserve the authority of the court and the sanction chosen must employ the *least possible power* adequate to the end proposed." *Id.* (emphases added).

A court may order a pre-filing injunction only "to deter vexatious, abusive, and harassing litigation." *Baum v. Blue Moon Ventures LLC*, 513 F.3d 181, 187 (5th Cir. 2008). Any such order "must be done with restraint and discretion, and should comply with the mandates of due process." *Clark v. Mortenson*, 93 F. App'x 643, 650 (5th Cir. 2004). Before issuing a pre-filing injunction, the Court must weigh *all* of the following factors: "(1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions." *Id.* at 189; *see also Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004) (reversing lower court's prefiling injunction in part because it failed to consider all four factors). Ignoring Fifth Circuit precedent that a prefiling injunction must be necessary based on these four factors and narrowly tailored, HCMLP seeks relief that is legally impermissible and overbroad.

### 1.   The *Baum* Factors Do Not Justify A Pre-Suit Injunction In This Case.

Consideration of the *Baum* factors demonstrates that the relief requested by HCMLP is unwarranted. As set forth above, there is no basis on this record to label each of the Targeted Parties "vexatious." The vast majority of those parties have filed very few pleadings of any import in the

HCMLP bankruptcy, and those that have taken positions have done so only when the issues were serious and the dispute was legitimate, raised in good faith. Further, to the extent that HCMLP takes issue with the past, past is not present. There is now a Gatekeeper Order in place, and there are only a handful of disputes remaining between the parties. In terms of present disputes, Dugaboy filed a motion seeking leave to file an adversary proceeding seeking information regarding estate value that until recently had not been made public. *See* App. 2715-2733. HMIT sought leave to sue Seery and two claims buyers based on significant evidence indicating that insider trading—to the detriment of residual equity—had occurred. *See* App. 2734-2949. The bankruptcy court denied the relief, and that order is now on appeal. Dugaboy sought to compel the imaging of Mr. Seery's iPhone after learning that he had been auto-deleting text messages notwithstanding that he uses his personal cell phone for Highland-related business. (App. 3008-3028). And out of an abundance of caution in advance of the expiration of a statute of limitations, Dondero and Strand filed a motion seeking leave *under the current Gatekeeper Order* to sue Pachulski for breach of fiduciary duty. None of these actions are duplicative or harassing. And three sought *permission* to proceed pursuant to the Gatekeeper Order in place. These procedurally appropriate motions, through appropriate channels, do not bear the badges of vexatious litigants.

HCMLP also cannot prove that the Targeted Parties acted with a specific intent to harass, as opposed to pursuing litigation for legitimate, good faith reasons. Indeed, as set forth above, the only examples given by HCMLP of bad intent lack evidentiary support (or are refuted by the record). By contrast, as explained, the Targeted Parties have had very good reasons to act when they chose to do so. Typically, those reasons have related to the preservation of assets (, increasing transparency, protecting the residual estate for the benefit of Class 10 and 11 claimholders , and vindicating significant violations of law, including insider trading and breaches of fiduciary duty. And again, the Targeted Parties all have acted through sophisticated outside counsel that understands the rules of law

and professional ethics. Under these circumstances, HCMLP needs more than supposition and conjecture to support its accusations of bad intent.

Third, HCMLP cannot demonstrate that the Targeted Parties have created an unacceptable burden on the courts through their legal filings. As set forth above, although the HCMLP bankruptcy has been contentious, the Targeted Parties have actively pursued only a handful of fights with the Debtor, sought to withdraw from others, and been on the receiving end of many fights instigated by the Debtor.  HCMLP seeks to blame the latter category of fights on the Targeted Parties, arguing it was "forced" to file litigation against them. Mot.at ¶ 42. But there have been several instances where the courts have questioned the legitimacy of that accusation. And in any event, HCMLP points to no case where the *Debtor's* choice to vigorously pursue litigation has resulted in the *target* being sanctioned as vexatious. And again, HCMLP makes no attempt to compare what has happened in this case with other complex and bitterly-fought bankruptcies, or explain why the blame should be placed solely on the Targeted Parties when HCMLP admittedly filed many of these proceedings.[76]

Finally, the fourth factor should preclude the relief HCMLP seeks.  As the HCMLP admits, the confirmed Plan (along with other orders entered by the bankruptcy court in the case) already contain gatekeeping provisions, protecting against the very litigation HCMLP purports to fear. Mot. ¶ 16. HCMLP nonetheless argues that the relief sought in their Motion is necessary because "the Dondero Entities still seek to evade these protections-objecting to the motion to conform filed in the Bankruptcy Court with the presumed goal of appealing such order to the Fifth Circuit," and that somehow this means the Gatekeeper Order is "inadequate to protect the estate." Mot. ¶¶ 44-45. Respectfully, this is nonsense. *If and when* the Fifth Circuit revises the Gatekeeper Order, then it

---

[76] *See, e.g.*, *Highland Capital Mgmt., L.P. v. SE Multifamily Holdings LLC and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), in its capacity as the Manager of SE Multifamily Holdings LLC*, No. 2023-0493 (Del. Ch.) (suing two Dondero-controlled entities to obtain their books and records (App. 3548-3562), but SE Multifamily produced books and records.) (App. 3605-3606).

would not be appropriate for this Court to impose a "Super Gatekeeper" that establishes procedural hurdles in excess of what the Fifth Circuit deems appropriate under the *Barton* Doctrine. In the meantime, the Targeted Parties are doing exactly what aggrieved parties are supposed to do – making a reasoned appeal to a higher court. HCMLP's suggestion that this Court impose a Super Gatekeeper order to usurp the Targeted Parties' appellate rights is unprecedented and should be rejected.

Notably, even the lawsuit for which certain parties were held in contempt was not a suit directly against a protected party—it was a suit acknowledging the gatekeeping orders and seeking permission (albeit from the District Court) to pursue a claim against a protected party. When the Court held that the would-be plaintiffs had brought suit in the wrong venue, they paid the contempt sanction pursuant to a stipulation with a full reservation of rights to appeal, and thereafter appealed. In other words, there already exists the very remedy a vexatious litigant injunction would provide. HCMLP has no sensible explanation for why the existing gatekeeping orders are insufficient for its purposes. Thus, the fourth and final factor in *Baum* (the adequacy of alternatives) dispositively dispatches HCMLP's position:  no further gatekeeping is needed.

### 2. The Requested Injunction Is Impermissibly Overbroad and Procedurally Unworkable.

HCMLP's Motion also should be denied because the proposed pre-suit injunction goes well beyond what is permissible or necessary under Fifth Circuit law. As explained above, "[a] pre-filing injunction must be 'tailored to protect the courts and innocent parties, while preserving the legitimate rights of litigants." *Connor v. Stewart*, No. 1:17-CV-827-RP, 2018 WL 4169150, at *2 (W.D. Tex. Aug. 30, 2018) (citing *Baum v. Blue Moon Ventures*, 513 F.3d 181, 190 (5th Cir. 2008)). "Courts have the duty to impose the *least severe sanction* that is sufficient to deter future conduct." *Hunsinger v. Offer, LLC*, No. 3:21-cv-2846-BH, 2022 WL 18143951, at *8 (N.D. Tex. Dec. 7, 2022), *report and recommendation adopted*, No. 3:21-cv-2846-BH, 2023 WL 122649 (N.D. Tex. Jan. 6, 2023) (emphasis added) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993)).

There is nothing tailored about the injunction HCMLP seeks. Specifically, it seeks the imposition of an injunction that prohibits the Dondero Entities "from pursuing, instituting, or commencing, a claim or cause of action of any kind, including regulatory or administrative actions against [the 'Covered Parties'] arising from or related to the Bankruptcy Case or the management of the Highland Entities or the Highland Entities' property (collectively, the 'Estate Administration') without the [district court's] prior approval after reasonable notice to the Covered Parties and a hearing.…" Mot. ¶ 32. HCMLP also asks the Court to require the Dondero Entities to file a copy of any vexatious litigant order issued by this Court in any court (foreign or domestic, trial or appellate), administrative tribunal, or administrative or regulatory agency, or arbitration proceeding where any pending or future litigation by any Dondero Entity against any Covered Party is filed. *Id.* In other words, HCMLP wants this Court to dictate how the Dondero Entities are treated in any type of future dispute arising out of HCMLP's bankruptcy in any forum anywhere in the world. The Court should reject HCMLP's request for several reasons.

First, this Court does not have the power to preclude the Dondero Parties from seeking legal redress through the higher appellate courts, in foreign jurisdictions, in state courts, or in state agencies. *See Baum*, 513 F.3d at 191-92; *see also Staten*, 2021 U.S. App. LEXIS 35747, at *7 (limiting scope of pre-filing injunction to filings in federal courts located in the state of Mississippi). The Fifth Circuit in *Baum* thus expressly held that the district court abused its discretion in extending a pre-filing injunction to filings in state courts, in state agencies, and in the Fifth Circuit. *Baum*, 513 F.3d at 192 (citing *Sieverding v. Colo. Bar Ass'n*, 469 F.3d 1340, 1344 (10th Cir. 2006)). As the *Baum* court explained, "those courts [or agencies] are capable of taking appropriate action on their own." *Id.* (quoting *Sieverding*, 469 F.3d at 1344). Yet HCMLP's requested injunction would prohibit pursuing, instituting, or commencing, a claim or cause of <u>action of any kind, anywhere</u>. Incredibly, the injunctive relief sought by HCMLP is neither limited by tribunal nor by jurisdictional or territorial

limits. HCMLP cannot point to any authority for such a broad injunction.[77] On its face, HCMLP's requested injunction is overbroad and legally impermissible.

Second, HCMLP's requested relief should be denied because the definition of the "Dondero Entities" subject to the requested injunction makes it all but impossible to identify exactly who would be sanctioned. In addition to over a dozen specifically-identified individuals or entities, "Dondero Entities" is defined to include "any entity directly or indirectly controlled by, or acting in concert with Dondero." Mot. at p. 1. In its zeal to cast as wide a net as possible, HCMLP's desired sanction is virtually limitless as to the parties to be deemed vexatious and enjoined, is not narrowly tailored, and should be denied.

Moreover, as Exhibit A to the Motion demonstrates, no single entity or individual has filed more than a handful of challenges in the bankruptcy proceeding. The only way movants even attempt to paint the so-called "Dondero Entities" as vexatious is to lump them all together. But as set forth above, treating *more than twenty* separate entities and individuals as a single party is legally improper and contrary to fact. Movants ignore the law respecting the corporate form, ignore the separate corporate and governing structure of the entities included, and do not even bother to explain why they can or should all be lumped together.

---

[77] Rather, injunctions are limited to specific proceedings or limited specific courts. E.g., *Alliance Riggers & Constructors, Ltd. v. Restrepo*, 2015 U.S. Dist. LEXIS 29346 (W.D. Tex. Jan. 7, 2015) (specific court action); *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181 (5th Cir. 2008) (certain federal courts in Texas); *Bowling v. Willis*, 2019 U.S. Dist. LEXIS 168602 (E.D. Tex. Aug. 9, 2019), aff'd 853 F. App'x. 983 (5th Cir. 2021) (specific divorce proceeding); *Carroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017) (matter in Middle District of Louisiana Bankruptcy Court); *Clark v. Mortenson*, 93 F. App'x. 643 (5th Cir. 2004)(specific claims against a named receiver, receiver's counsel and debtor); *Marinez v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 208591 (W.D. Tex. May 31, 2020) (related to a specific piece of real property); *Newby v. Enron Corp.*, 302 F.3d 295 (5th Cir. 2002) (particular state court);    *Nix v. Major League Baseball,* 2022 U.S. Dist. LEXIS 104770 (S.D. Tex. Jun. 13, 2022), *aff'd,* 62 F.4th 920 (5th Cir. 2023) (limited to Southern District of Texas)*; Payne v. Anthony Scott Law Firm PLLC,* 2023 U.S. Dist. LEXIS 89798 (N.D.Tex. May 5, 2023) (lawsuits against ex-wife in Northern District of Texas)*; Schum v. Fortress Value Recovery Fund I LLC,* 2019 U.S. Dist. LEXIS 226679 (N.D. Tex. Dec. 2, 2019), aff'd 805 F. App'x. 319 (5th Cir. 2020) (specific bankruptcy proceedings). An injunction against making any prisoner claims against District of Columbia and Louisiana sheriffs was vacated as unduly broad. *Williams v. McKeithen*, 939 F.2d 1100, 1105-06 (5th Cir. 1991).

Finally, HCMLP cannot demonstrate that the requested Super Gatekeeper injunction is the least severe (or even a workable) sanction necessary to deter the alleged conduct at issue. That is because, as the record demonstrates, the current Gatekeeper Order is more than sufficient to protect against future vexatious conduct. By contrast, under HCMLP's unprecedented Super Gatekeeper order, a putative plaintiff would have to: (1) present evidence to this Court that its claim is "plausible" (which presumably would require application of the federal standard of "plausibility" rather than the colorability standard found in the *Barton* doctrine),[78] (2) then prove the claim legally and procedurally sound, (3) then prove that its subjective intent of is not harassment or another improper purpose, which presumably is to be divined by the Court absent any discovery process, and (4) then prove that its factual allegations are "more likely than not," essentially meaning that the plaintiff must win his case with no discovery in a summary proceeding. *After* meeting the aforementioned unique standard found no place in any case or law outside the instant Motion, the plaintiff would have to go to the bankruptcy court to obtain its approval to proceed under the current Gatekeeper Order, pursuant to which that court has ruled that the colorability standard also includes a finding that the court believes the plaintiff's evidence.[79] Assuming there is no interim stop in the district court to appeal the bankruptcy court's ruling, a plaintiff would then have to proceed to *finally* file its complaint, and begin the process of convincing yet a third fact-finder that its allegations were meritorious. The process is the punishment. In essence, the Super Gatekeeper injunction would deprive any litigant, regardless of the merits of their claim, of the right to petition the courts. And that is precisely why no court has ever awarded the type of sanction proposed by HCMLP.

---

[78] Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying HMIT's Emergency Motion for Leave (App. 3180-3285) ("The Proposed Defendants, however, argue that the test for colorability should be more akin to the test applied under the *Barton* doctrine, under which a plaintiff must make a *prima facie case* that a proposed claim against a bankruptcy trustee is 'not without foundation.'" (citing *Barton v. Barbour*, 104 U.S. 126 (1881).

[79] App. 3271.

## IV.    CONCLUSION

The present Motion is one of many costly, unnecessary fights instigated by the Debtor in the context of the underlying bankruptcy proceedings. The Motion was filed in the wrong court, is based on myriad mischaracterizations or falsifications of fact, and asks this Court to order sweeping injunctive relief against parties that have never appeared before this Court and/or have been virtually inactive in the bankruptcy. That is improper.  The Motion should be denied.

STINSON LLP
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Deborah.deitschperez@stinson.com
Michael P. Aigen
Texas State Bar No. 24012196
Michael.aigen@stinson.com
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for James Dondero, NexPoint Asset Management, L.P, NexPoint Advisors, L.P., Highland Capital Management Services, Inc., NexPoint Real Estate Partners, LLC, and The Dugaboy Investment Trust*

REICHMAN   JORGENSEN   LEHMAN   & FELDBERG LLP
Amy L. Ruhland
Texas State Bar No. 24043561
aruhland@reichmanjorgensen.com
901 S. MoPac Expressway
Building 1, Suite 300
Austin, TX 78746
Telephone: (650) 623-1401

*Counsel for James Dondero, Dugaboy Investment Trust, and Strand Advisors, Inc. and Get Good Trust*