# Appendix Exhibit 8

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) | **Related to Docket No. 86** |
|  | ) |  |

## OBJECTION OF THE DEBTOR TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO TRANSFER VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

The above-captioned debtor and debtor in possession (the "Debtor") hereby objects to the motion to transfer venue of this case [Docket No. 86] (the "Motion to Transfer") to the Northern District of Texas (the "Texas Bankruptcy Court"), filed by the Official Committee of Unsecured Creditors (the "Committee").

In support of this objection, the Debtor respectfully states as follows:

### Preliminary Statement

1.     The Debtor owns and manages a sophisticated financial services and money management business that has assets and interests all over the world.  The amounts at stake in this case involve hundreds of millions of dollars in terms of asset values and asserted liabilities.  The Debtor's creditors are sophisticated parties who are either represented by highly qualified counsel or are attorneys themselves.  The top 20 unsecured creditors in this case consist almost entirely of litigation claimants and law firms.  There are no "mom and pop" creditors who

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054191206000000000141

would be prejudiced if they were not provided with ready access to a local bankruptcy court.

2.      Further, the Texas Bankruptcy Court has no special familiarity with the Debtor or its current management. The Debtor's restructuring efforts are now led by Bradley Sharp as Chief Restructuring Officer (the "CRO") who has had no prior involvement with either Acis (as defined below) or the Texas Bankruptcy Court with respect to this matter. The Texas Bankruptcy Court also knows little about the Debtor's business or financial affairs, aside from its prior relationship with Acis. The Debtor is no longer affiliated with Acis and, in fact, is directly adverse to Acis, which now asserts various contested litigation claims against the Debtor. Hence, the Committee's opening position that this case should be transferred to the Texas Bankruptcy Court is little more than a litigation ploy. The Committee has decided, based on prior rulings of the Texas Bankruptcy Court in the Acis cases, that such forum would be more advantageous from a litigation perspective *vis-à-vis* the Debtor. That is not an appropriate basis to transfer venue.

3.      The fact that the Debtor is headquartered in Dallas, Texas also does not mean that this case should be transferred there. The Debtor's assets, interests, and contractual entanglements are dispersed throughout this country and the world. As an example, the Debtor has assets under management, including its own proprietary assets and those of its clients, through various related parties in Asia, South America, and Europe. The Debtor has already brought a motion in this case to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68], including those in pending proceedings in Bermuda and the Cayman Islands. The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country. The Debtor's primary brokerage

2

App. 0145

accounts that hold the bulk of the Debtor's liquid and illiquid securities are located in New York City with Jefferies, LLC ("Jefferies"). The Debtor is also the subject of two pending lawsuits in the Delaware Chancery Court, one of which involves claims brought by the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), a member of the Committee. Another member of the Committee, UBS Securities LLC and UBS AG London Branch ("UBS"), has longstanding litigation pending against the Debtor in New York state court (not Texas). Predictably, the Debtor's professionals and those of its creditors are located around the country. Given the amounts at stake in this case and the complexity of the Debtor's assets and liabilities, venue should not be determined by how many miles the Debtor's employees or professionals or those of its creditors are located from the courthouse. All parties reside at various commercial centers around this country and can easily travel wherever necessary in order to handle the important matters in this case.

4. Further, the pendency of the involuntary bankruptcy cases of Acis Capital Management, L.P. and Acis Capital Management GP, LLP (together, "Acis") in Dallas, Texas does not make the Texas Bankruptcy Court a preferable forum for this case. Acis's involuntary cases were commenced by Joshua Terry ("Terry"), who now owns and manages Acis and represents that entity on the Committee. Terry assumed ownership of Acis by virtue of a contested plan of reorganization that was confirmed by the Texas Bankruptcy Court and which is now the subject of a pending appeal.[2] ***The interests of Acis are directly adverse to those of this***

---

[2] Although a stay of the confirmation order was sought, no stay was granted despite the ongoing appeal of that order. The Texas Bankruptcy Court thus has limited ongoing jurisdiction at this juncture.

App. 0146

*estate.*[3] The Debtor and Acis have been, and continue to be, involved in highly contentious litigation, including matters that are the subject of multiple appeals from decisions of the Texas Bankruptcy Court and pending fraudulent transfer claims brought by Acis against the Debtor in the Texas Bankruptcy Court. The Debtor and Acis assert various substantial disputed and unliquidated claims against each other. Further, ***the Debtor's current business is unrelated to Acis***, which is focused on managing certain collateralized loan obligations (or CLOs) in which the Debtor no longer has any direct interest. The Committee also does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case.[4] Aside from the Debtor's prior relationship with Acis, the Texas Bankruptcy Court is not familiar with the Debtor's business and assets or the Debtor's liabilities that need to be restructured in this case. ***The Debtor's restructuring efforts are now managed by an independent and highly qualified CRO*** who has had no prior involvement with Acis or its bankruptcy proceedings. Hence, while it may be in the interests of ***the Acis estate*** for this matter to be transferred to the Texas Bankruptcy Court, it is certainly not in the best interests of ***the Debtor's estate*** or the parties to these proceedings, which is the only thing that matters.

5. As the Committee admits, the Debtor is entitled to substantial deference with respect to its choice of forum for its bankruptcy case. This Court is indisputably a legally proper forum given that the Debtor is a Delaware limited partnership. This Court also presents a convenient forum given that the Debtor's assets are so widely dispersed and there has been

---

[3] Terry, in his personal capacity and on behalf of his spouse, also purports to hold an unsecured claim against the Debtor's estate in the amount of $425,000, which the Debtor has designated as contingent, unliquidated, and disputed.

[4] Presumably, senior management personnel of the Debtor have provided all manner of testimony in the various pending litigation matters around the country involving or otherwise implicating the Debtor.

App. 0147

extensive ongoing litigation against the Debtor in the Delaware Chancery Court, including

litigation commenced by the Redeemer Committee, a member of the Committee.  In sum, aside

from the Committee's perceived litigation advantage before the Texas Bankruptcy Court, there is

no credible, let alone valid, basis for this case to be transferred to the Texas Bankruptcy Court

where an adverse proceeding is pending when this Court presents a perfectly appropriate forum

for effectuating a successful reorganization of the Debtor's affairs.  The Debtor therefore urges

this Court to deny the Motion to Transfer filed by the Committee.

## **Background**

### A.      **The Debtor's Bankruptcy Filing**

6.      On October 16, 2019 (the "Petition Date"), the Debtor commenced this

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

factual background regarding the Debtor, including its current and historical business operations

and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Frank*

*Waterhouse in Support of First Day Motions*, which is incorporated herein by reference.

7.      The Debtor continues in the possession of its property and continues to

operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

8.      No trustee or examiner has been appointed in the Debtor's chapter 11

case.

9.      On October 29, 2019, the United States Trustee appointed the Committee,

which consists of four members:  (1) the Redeemer Committee; (2) UBS; (3) Acis; and (4) Meta-

e Discovery.  The Committee is represented by Sidley & Austin, with one of its lead attorneys

based in New York City. Since retaining counsel, the Committee's first order of business was to file the Motion to Transfer.

**B.** **The Debtor's Organizational Structure and Governance**

10.    The Debtor is a Delaware limited partnership. Its limited partnership interests are owned as follows: (a) 99.5% by Hunter Mountain Trust, a Delaware statutory trust based in New York, (b) 0.1866% by Dugaboy Investment Trust, a Delaware trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand Advisors, Inc., a Delaware corporation. In sum, 99.94% of the Debtor's partnership interests are held through Delaware entities. Strand Advisors, Inc. also owns 100% of Debtor's general partnership interest. This Delaware entity, through its principal James Dondero, ultimately controlled the Debtor as of the Petition Date.

11.    There is now new governance in place. On October 29, 2019, the Debtor filed its motion to retain Bradley Sharp as the CRO [Docket No. 75] (the "CRO Motion"). Pursuant to the CRO Motion, the Debtor seeks to retain the CRO with certain independent and exclusive powers and significant restrictions on termination. Specifically, the CRO will have sole authority over claims and transactions involving insiders. The CRO was previously appointed chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired). The CRO Motion is set for hearing on November 19, 2019, the same date as the Motion to Transfer.[5]

---

[5] In an apparent effort to prevent this Court from considering the CRO Motion, the Committee sought to have the Motion to Transfer set for hearing on shortened notice for November 7, but this Court denied that request before the Debtor filed its response.

App. 0149

12.     Also on October 29, 2019, the Debtor filed its motion for approval of certain protocols with respect to ordinary course transactions [Docket No. 77] (the "Protocols Motion").  Pursuant to the Protocols Motion, the Debtor seeks approval of certain protocols to allow the Debtor to conduct ordinary course business in an uninterrupted and transparent manner, both for the benefit of the Debtor's estate and its creditors and for the investors to whom the Debtor provides services.  The Protocols Motion also is set for hearing on November 19.

13.     The CRO Motion and the Protocols Motion are intended to bring independence and clarity to the Debtor's governance structure.  Based on these motions, there should be no doubt that qualified, independent management is in place with the Debtor and will be operating under a specified set of protocols and procedures to ensure that estate assets are properly preserved.

**C.      The Debtor's Business, Assets, and Creditor Relationships are Complex and International in Scope**

14.     The Debtor is a multibillion-dollar global alternative investment manager. The Debtor operates a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams.  The Debtor also provides shared services to its affiliated registered investment advisors.

15.     Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for approximately $2.5 billion of assets under management. Separately, the Debtor provides shared services for approximately $7.5 billion of assets managed

by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.

16.     Although the Debtor is headquartered in Dallas, Texas, and most of its employees are based there, the Debtor's affiliates and related entities maintain offices in many international locales, including in Buenos Aires, Rio de Janeiro, Singapore, and Seoul. The Debtor primarily generates revenue from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. These funds have investments all over the world. Specifically, the Debtor has its own proprietary investment assets and those of its clients held through various affiliates in Asia, South America, and Europe.

17.     On October 29, 2019, the Debtor filed a motion to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68] (the "Foreign Representative Motion"), including those in pending proceedings filed by the Redeemer Committee in Bermuda and the Cayman Islands.

18.     The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country. The Debtor has brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid securities. As of the Petition Date, the Debtor owed Jefferies approximately $30 million on account of margin borrowings. The Debtor's other principal secured creditor, Frontier State Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

8

**D.     The Debtor Has Litigation Pending in Delaware Chancery Court and New York**

19.     Aside from Acis, no Committee members are based in Dallas and two of them have litigation pending against the Debtor outside of Texas.  As discussed further below, the Redeemer Committee commenced litigation against the Debtor in the Delaware Chancery Court and UBS commenced litigation against the Debtor in New York state court.  The chairman and the majority of the members of the Redeemer Committee are located in Chicago.  UBS's business representatives are based in or around New York City.  The only trade vendor on the Committee, Meta-e Discovery, is based in Connecticut.  Yet another allegedly substantial creditor of the Debtor, Patrick Daugherty ("Daugherty"), also has litigation pending against the Debtor in Delaware Chancery Court, including a matter that went to trial on October 14, 2019, just prior to the Petition Date, before it was stayed.

20.     *Redeemer Committee Litigation:  Delaware Chancery Court and New York Arbitration.*  The Debtor's bankruptcy filing was precipitated by an arbitration award in favor of the Redeemer Committee (the "Award") initially issued against the Debtor in March 2019 by a panel of the American Arbitration Association based in New York City.  The Debtor was formerly the investment manager for the Highland Crusader Fund (the "Crusader Fund"), which was based in Bermuda and the subject of insolvency proceedings there.  On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor in New York City, and (c) commenced litigation against the Debtor in Delaware Chancery Court.  In September 2018, the Debtor and the Redeemer Committee participated in a multi-day evidentiary hearing in New York City.  In March 2019, following post-trial briefing, the arbitration panel issued its Award

9

App. 0152

finding in favor of the Redeemer Committee on a variety of claims and requiring the Debtor to pay a gross amount of $189 million, subject to certain offsets and deductions.  The Redeemer Committee set a hearing in the Delaware Chancery Court for October 8, 2019, in order to seek entry of a judgment with respect to the Award.  The hearing was subsequently continued to October 16, 2019.  The Debtor filed this case just prior to that hearing.  The Redeemer Committee is represented by Jenner & Block attorneys based in Chicago, Illinois.

21.    *UBS Litigation:  New York State Court.*  The Debtor and UBS are parties to a long-running litigation originally filed by UBS in February 2009 in the New York Supreme Court, County of New York.  At bottom, UBS alleges that the Debtor and certain funds fraudulently induced UBS to restructure a transaction at the expense of UBS and then these parties and other entities fraudulently diverted certain assets to prevent UBS from obtaining a recovery on its claims.  There have been numerous prejudgment motions and appeals in this case.  The claims that remain consist primarily of breach of contract, fraudulent inducement and alter ego claims against certain defendants, a breach of implied covenant of good faith and fair dealing claim against the Debtor, and fraudulent conveyance claims against all defendants.  UBS has asserted damages in excess of $686 million in the litigation, which the Debtor and the other defendants continue to vigorously dispute.  The case was bifurcated, and the contract claims against certain fund defendants as well as the Debtor's counterclaim were addressed at a bench trial in July 2018.  The court has not yet ruled on phase one of the trial.  If the court finds a breach of contract occurred and awards damages against the fund defendants, then the remaining claims will be tried in a second phase of the trial.  While awaiting a decision on phase one, the defendants filed a motion for judgment before trial with respect to the fraudulent transfer claims

based on the fact that UBS is not a creditor of the parties who made the alleged fraudulent transfers. The motion was withdrawn due to its timing without prejudice to defendants' right to refile the motion after a decision has been made on phase one of the trial. UBS is represented by Latham & Watkins attorneys based in Washington, DC.

22.     *Daugherty Litigation: Delaware Chancery Court.* Another allegedly substantial creditor of the Debtor who is not on the Committee, Daugherty, also commenced litigation against the Debtor in Delaware Chancery Court. Daugherty appears on the top 20 list in this case in the amount of $11.7 million, scheduled as contingent, unliquidated, and disputed. Daugherty is a former senior management employee of the Debtor. Among other matters, Daugherty sued the Debtor and certain of its affiliates in Delaware Chancery Court in July 2017 arising from his separation from the Debtor. In June 2018, the Delaware Chancery Court dismissed many of the claims asserted by Daugherty in the litigation. The remaining counts went to trial just prior to the Petition Date and have since been stayed by virtue of the Debtor's bankruptcy filing. Daugherty is represented by Delaware counsel.

## E.     **The Debtor's Relationship with Acis and Ongoing Adverse Claims and Litigation**

23.     The Debtor previously provided sub-manager and sub-advisory services to Acis pursuant to certain contractual agreements that were terminated during the course of the Acis bankruptcy in or around August 2018. Since that time, the Debtor has not had, and does not currently have, any direct business dealings with respect to Acis or the CLO assets for which Acis serves as the CLO portfolio manager.[6]

---

[6] The Debtor, through an affiliate, manages a client account that owns a notional value of approximately $150 million in securities issued by Acis CLOs. All of the Debtor's affiliated CLOs are currently in wind-down, meaning that they are not making any new investments.

24. Prior to his termination in June 2016, Terry was one of the Debtor's senior management employees who handled Acis and also had a partnership interest in Acis. After Terry was discovered surreptitiously tape recording internal meetings and conversations with numerous Highland personnel, he was terminated by the Debtor and subsequently asserted claims against Acis that went to arbitration. Terry ultimately obtained an arbitration award against Acis is the approximate amount of $8 million. Notably, although Terry asserted claims against the Debtor and other persons at Highland, the arbitration panel did not find liability against any party besides Acis.

25. Terry commenced involuntary chapter 7 bankruptcy cases against Acis in the Texas Bankruptcy Court in January 2018 on his own behalf. No other creditors joined in the petitions, which Terry asserted was appropriate on the basis that Acis had fewer than 12 creditors. The Debtor is a major prepetition creditor of Acis, owed in excess of $8 million for various contractual services provided to Acis before and after the Acis bankruptcy filings. Acis, the alleged debtor in those matters, objected to the involuntary bankruptcy filings and presented evidence from certain of the Debtor's employees relating to whether the technical requirements for involuntary bankruptcy filings were met. These objections were ultimately overruled by the Texas Bankruptcy Court, which decision remains on appeal. Acis's bankruptcy cases were later converted to chapter 11 and a chapter 11 trustee (Robin Phelan) (the "Acis Trustee") was appointed in May 2018. No Chief Restructuring Officer was ever appointed in the Acis cases, much less a CRO with expanded powers.

26. Subsequently, the Debtor and two of its related, affected parties in interest objected to the confirmation of a chapter 11 plan proposed by the Acis Trustee (and supported by

Terry) for a multitude of reasons, including that certain injunctive provisions were inappropriately targeted at the Debtor and related parties. The Texas Bankruptcy Court ultimately overruled all objections and confirmed the plan in January 2019, which decision remains on appeal. During the course of the Acis bankruptcy cases, the Texas Bankruptcy Court heard no material evidence from the Debtor's employees about the details of its business, assets, or liabilities, aside from its prior involvement with Acis. The Committee does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case. Hence, the Texas Bankruptcy Court has no specialized knowledge with respect to the Debtor generally or the issues that will be relevant in this chapter 11 case.

27.    Pursuant to the Acis Trustee's confirmed chapter 11 plan, Terry is Acis's sole equity holder and controls and manages that entity. The Acis Trustee had previously commenced litigation in the Texas Bankruptcy Court against the Debtor and other parties for breach of contract, breach of fiduciary duties, fraudulent transfers, and conspiracy, and has sought to offset and/or subordinate the Debtor's claims against Acis. In a nutshell, the causes of action in that lawsuit revolve around the hotly contested allegations that the Debtor conspired to strip Acis of its assets at Terry's expense. Through his ownership and control of Acis pursuant to the Acis Trustee's confirmed plan, Terry now controls these claims against the Debtor, which remain at an early stage in the Texas Bankruptcy Court and have been stayed as to the Debtor.[7]

_____

[7] The defendants have filed motions to withdraw the reference as well as motions to dismiss. The Texas Bankruptcy Court held a status conference on the motions to withdraw the reference on September 4, 2019 and was required to submit a "Report and Recommendation" to the United States District Court for the Northern District of Texas. As of the Petition Date, the Texas Bankruptcy Court had not issued its Report and Recommendation. This adversary proceeding is now subject to the automatic stay of 11 U.S.C. §362(a). This proceeding has yet to reach the procedural stage where any of the defendants have had to file their answers.

DOCS_SF:102198.7 36027/002

App. 0156

28.     The respective bankruptcy estates of Acis and the Debtor are adverse to each other.  Acis has claims and pending litigation against the Debtor and the Debtor has outstanding claims against Acis that total no less than $8 million for services rendered.  The various litigation claims of Acis against the Debtor are prepetition claims that have been stayed.

29.     The Committee now seeks to move the Debtor's bankruptcy case to the Texas Bankruptcy Court -- Acis's "home court" -- in order to obtain some perceived litigation advantage.  The Debtor objects to the Motion to Transfer as completely contrary to the interests of this estate.

## Legal Basis for Objection to Motion to Transfer

**A.     The Debtor's Case is Properly Venued in This District Because the Debtor is Organized in the State of Delaware**

30.     The Debtor is a limited partnership formed under the laws of Delaware. Consequently, venue of this case is proper in Delaware as a matter of law under 28 U.S.C. § 1408. *See, e.g., In re Restaurants Acquisition I, LLC*, 2016 Bankr. LEXIS 684, at *6 (Bankr. D. Del. Mar. 4, 2016) ("Because the Debtor is organized under the laws of Delaware, this forum is proper under the statute."); *In re Innovative Communication Co., LLC*, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors.").  The Committee does not (and cannot) challenge this point.

**B.     The Debtor's Choice of Forum in Delaware is Entitled to Substantial Weight and Should Not Be Disturbed**

31.     Given that venue in this District is legally proper, the Debtor's choice of this forum is entitled to great weight. *See, e.g., Restaurants Acquisition*, 2016 Bankr. LEXIS at

14

*7 ("movant bears the burden of demonstrating that the factors strongly weigh in favor of a transfer as courts will generally grant substantial deference to a debtor's choice of forum"); *In re Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988) (same).  Therefore, a court considering a venue transfer motion "should exercise its power to transfer cautiously, and the party moving for the transfer must show by a preponderance of the evidence that the case should be transferred."  *In re Commonwealth Oil Refining Co., Inc. (Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert. denied*, 444 U.S. 1045 (1980) ("*CORCO*") (internal citations omitted); *accord In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. 1187, 1989 (D. Del. 1971) ("This Court should not freely abandon to any other district its duty to determine a matter clearly within its jurisdiction."); *In re Rehoboth Hospitality, LP*, 2011 WL 5024267, at *3 (Bankr. D. Del. 2011) ("The burden of proof is on the moving party requesting transfer.").

32.     These principles apply with even greater force in a case such as this where a Delaware-organized partnership seeks the protection of Delaware courts.  As noted above, over 99% of the Debtor's limited interests and 100% of its general partnership interests are held by Delaware entities.  There is a "fundamental legal tenet that every citizen of a state is entitled to take advantage of the state and federal judicial process available in that state."  *In re PWS Holdings*, 1998 Bankr. LEXIS 549, at *14 (Bankr. D. Del. Apr. 28, 1998).  Further, "Delaware has an interest in protecting the rights of its citizens," and correspondingly, change of venue can only be granted upon a strong showing of equities favoring the transfer.  *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 706 (D. Del. 2001).

DOCS_SF:102198.7 36027/002

33.     Given the strong presumption that a debtor's choice of forum should not be disturbed, courts rarely grant such relief.  In those few cases where venue has been transferred, there was generally some unique compelling factor that justified transfer, such as the debtor's consent, the matter was a single asset real estate case, or there was non-stayed litigation that warranted consolidation of cases before a single court or judge.  None of these factors are present here.

34.     In fact, the various adversary claims pending against the Debtor that currently linger in the Texas Bankruptcy Court weigh strongly ***against*** a transfer of venue there. The claims asserted by Acis against the Debtor are prepetition claims that are stayed.  Whether those claims are ever unstayed, they are clearly adverse to the interests of the Debtor's estate, particularly where Acis is asserting such claims as a basis to offset and/or subordinate the large claims that the Debtor holds against Acis.  Notably, Acis is no longer affiliated with the Debtor. It is merely a litigation claimant.  Yet, the Committee chose to file the Motion to Transfer to the Texas Bankruptcy Court in order to achieve a litigation advantage at the expense of this estate. The Debtor urges the Court to see through this blatant litigation tactic which fails to come close to overcoming the strong presumption in favor of the Debtor's proper choice of venue in Delaware.

## C.     The Convenience of the Parties Weighs in Favor of Retaining Venue in Delaware

35.     When a bankruptcy court is asked to transfer an entire bankruptcy case to another bankruptcy court, it must examine whether the transfer would be (a) in the interest of justice, or (b) the convenience of the parties.  28 U.S.C. § 1412.  In considering the "convenience

16

of the parties," courts have identified six factors, among others, to help guide their discretion.

These six factors are:

    i.   the economic administration of the estate;

    ii.   the location of the assets;

    iii.   the proximity of creditors of every kind to the court;

    iv.   the proximity of the debtor to the court;

    v.   the proximity of the witnesses necessary to the administration of the estate; and

    vi.   the necessity for ancillary administration if liquidation should result.

*See, e.g.*, *CORCO*, 596 F.2d at 1247; *Restaurants Acquisition*, 2016 Bankr. LEXIS at *7 (applying *CORCO* factors); *Innovative*, 358 B.R. at 125 (citing *CORCO* factors and other private and public interests that may be relevant).  As discussed herein, the Committee has failed to meet its "heavy burden of proof . . . to demonstrate that the balance of convenience weighs in [its] favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R. 141, 142 (Bankr. S.D.N.Y. 1982).  Consequently, the Motion to Transfer must be denied.

### *i.*   *The Economic Administration of the Estate*

36.    The economic and efficient administration of the estate is the most important factor when considering a motion to transfer venue.  *CORCO*, 596 F.2d at 1247; *In re Caesars Entertainment Operating Co.*, 2015 Bankr. LEXIS 314, at *22 (Bankr. D. Del. Feb. 2, 2015); *In re Industrial Pollution Control, Inc.*, 137 B.R. 176, 182 (Bankr. W.D. Pa. 1992). Despite the importance of this factor, however, the Committee makes little effort to explain why

the economic administration of the estate would be improved if this case was transferred, other than to argue that the Texas Bankruptcy Court heard days of evidence in an unrelated matter of questionable relevance to the chapter 11 proceedings at hand. *See* Motion to Transfer at ¶¶ 11 – 13, 29 – 31. The pendency of the Acis bankruptcy in the Texas Bankruptcy Court should not form a basis for transferring venue for the following six (6) reasons.

37.     First, the Debtor is now managed by the CRO, who is charged with administering the restructuring efforts of the Debtors in this case and has independent authority as to insider claims and insider transactions. Whatever may have been said by the Debtor's management in the context of the Acis bankruptcy is irrelevant to the tasks at hand in this case that will be carried out by the CRO, an independent and highly qualified professional who has had no involvement in the Acis cases.

38.     Second, the evidence presented by the Debtor's employees in the Acis bankruptcy cases is irrelevant to the case at hand. Their testimony generally focused on (a) whether Terry satisfied the legal requirements to file involuntary cases against Acis and (b) the structure of actively managed CLOs. None of this testimony by the Debtor's employees is relevant to the Debtor's present chapter 11 case. Acis was the sole branch of the Debtor's affiliated structure that managed active CLOs. As a result of the confirmed chapter 11 plan in the Acis cases, Acis is no longer part of the Debtor's organizational structure. The Debtor owns no equity in Acis. The Debtor no longer advises or sub-advises any active CLOs. The Debtor only has CLOs that are in liquidation -- monetizing their underlying assets and paying off their remaining investors. While the Texas Bankruptcy Court learned much about the complexities of managing active CLOs, that information is irrelevant to this Debtor.

18

App. 0161

39.     Third, the core issue in the reorganization of Acis was maintaining the cash flows from Acis's managed CLOs.  However, the CLOs currently managed by the Debtor provide just 10% of the Debtor's revenue, and that number will shrink over time as the CLOs liquidate.  The Debtor derives the other 90% of its revenue from managing asset classes that were never implicated in the Acis proceeding, including private equity, mutual funds, open-ended retail funds, hedge funds, and real estate funds.

40.     Fourth, the Committee neither attaches evidence demonstrating what relevant facts the Texas Bankruptcy Court learned about the Debtor, nor explains how any such evidence could possibly implicate an insurmountable "learning curve" for this Court.  *See* Motion to Transfer at ¶31.  The Committee does not attach any of the 700 allegedly relevant exhibits or any of the testimony from the Acis proceeding.  The Committee references three published opinions of the Texas Bankruptcy Court from the Acis proceeding, but provides no reasoning or even citations demonstrating how these opinions evidence the Texas Bankruptcy Court's purportedly extensive knowledge of the Debtor's current structure and management.

41.     Fifth, even assuming it learned anything relevant about the Debtor's corporate structure, the Texas Bankruptcy Court knows little about the details of the Debtor's business, assets, or liabilities, or its restructuring efforts.  To the extent it addressed the Debtor's business, the evidence in the Acis proceeding focused on a CLO business that the Debtor no longer operates nor manages in any way.  The evidence in the Acis proceeding never focused on the Debtor's assets and liabilities.  Even at this early stage of the Debtor's chapter 11 case, this Court is already more familiar with the Debtor than the Texas Bankruptcy Court, which is appropriately charged with overseeing the Acis proceeding and not this one.

19

42.     <u>Sixth</u>, the level of conflicts between the Debtor and Acis make the

economic and fair administration of this case in the Texas Bankruptcy Court highly problematic.

There is a pending adversary proceeding by Acis against the Debtor, which proceeding has been

stayed.  The Committee does not explain how the Texas Bankruptcy Court is supposed to preside

over the Debtor's estate and the pending adversary proceeding in the Acis case concurrently.[8]

Indeed, the only reason for the Committee to seek a transfer of venue to the Texas Bankruptcy

Court in the first place is to obtain some perceived litigation advantage *vis-à-vis* the Debtor's

estate, which is not a proper basis to transfer venue.[9]  Given the substantial adverse interests that

exist between the Debtor and Acis, the Debtor submits that this chapter 11 case can be much

more effectively administered by this Court.

### ii.     *The Location of the Assets*

43.     Although the Debtor's headquarters is located in Dallas, Texas and most

of its employees are based there, the Debtor's assets are widely dispersed all over the world.  The

Debtor has over $2.5 billion of assets under management and receives management and advisory

fees from a multitude of sources around the world.  The Debtor also provides shared services for

approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities,

including other affiliated registered investment advisors.  The Debtor's affiliates and related

parties maintain offices in many international locales, including Buenos Aires, Rio de Janeiro,

---

[8]  *See supra* n. 8.
[9]  As part of this ongoing litigation strategy, Acis has objected to the Debtor retaining Foley & Lardner LLP
("<u>Foley</u>") and Lynn, Pinker, Cox, & Hurst LLP ("<u>Lynn Pinker</u>") as counsel to pursue the Debtor's claims against
Acis and to defend the Debtor and certain of its wholly owned subsidiaries against Acis's claims. *See* Dkt. 116.
Acis's objection to Foley and Lynn Pinker's retention does not even attempt to explain the benefit to the Debtor's
estate of stripping the Debtor of its counsel litigating both affirmative and defensive claims against Acis.  This
highlights the conflict that the Texas Bankruptcy Court would face in handling both the Acis and Highland matters.

Singapore, and Seoul.  And the Debtor has its own proprietary investment assets and those of its clients held through various affiliates in Asia, South America, and Europe.  The Debtor has already filed the Foreign Representative Motion in order to assist the Debtor in managing its various foreign interests.

44.     Similarly, the Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located across the country.  The Debtor has brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid securities.  As of the Petition Date, the Debtor owed Jefferies approximately $30 million on account of margin borrowings.  The Debtor's other principal secured creditor, Frontier State Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date. Relatively speaking, the Debtor has minimal assets in Texas.

45.     Nonetheless, even if most of the Debtor's assets were construed to be located in Texas (which they are not), numerous courts have found that the location of assets is not a significant factor in deciding whether venue should be transferred unless the case involves liquidation as opposed to rehabilitation or is a single asset real estate case. *See Restaurants Acquisition*, 2016 Bankr. LEXIS at *12 ("the location of a company's assets is not as crucial to the analysis where the ultimate goal is rehabilitation rather than liquidation"); *In re Safety-Kleen Corp.*, 2001 Bankr. LEXIS 1296, at *10 (Bankr. D. Del. Aug. 27, 2001) ("location of assets is generally only significant in a single asset real estate case or liquidation"); *see also In re Enron Corp.*, 274 B.R. 327, 348 (Bankr. S.D.N.Y. 2002) ("[W]hile a debtor's location and the location of its assets are often important considerations in single asset real estate cases, these factors take on less importance in a case where a debtor has assets in various locations.").

21

46.     The outcome of this case will not turn on the day-to-day management of the Debtor's assets, but instead will be driven by the Debtor's ability to restructure its balance sheet and maximize the value of its assets, many of which are illiquid.  This Court will be focused on matters such as plan confirmation and governance, which the Debtor proposes to place into the capable hands of the CRO pursuant to the terms of the pending CRO Motion and subject to the guidelines set forth in the Protocols Motion.  Most of the objections to the key issues that will arise in this case will be grounded in the Bankruptcy Code and not based on any particular facts or circumstances unique to the Debtor's assets wherever located.  However, to the extent this Court gives weight to the location of the Debtor's assets, this factor weighs in favor of denying the Motion to Transfer because the Debtor's interests and assets are widely dispersed throughout the country and the world.

### *iii.*     *The Proximity of Creditors of Every Kind*

47.     The Committee spends a substantial portion of the Motion to Transfer evaluating the location of the Debtor's creditors and their professionals, and the relative amount of time that it takes to travel to this Court as compared to the Texas Bankruptcy Court.  This analysis is misguided and irrelevant under the circumstances of this case.  The Debtor does not have thousands of small or unsophisticated creditors who cannot navigate their way to Delaware. The creditors here are generally litigants or attorneys.  They are located in commercial centers all over the country.  The amounts at stake total hundreds of millions of dollars.  It is of no consequence whether a creditor or an attorney is based in Chicago, New York, or Los Angeles. The creditors and professionals involved in this case will travel wherever necessary in order to advocate their respective positions, and Delaware is certainly just as convenient as Dallas.

22

App. 0165

*Caesars*, 2015 Bankr. LEXIS 314, at *23 ("in this day of law firms with multiple offices across the nation, convenient and accessible airports, electronic access to information and court dockets at every lawyer's fingertips, it is fair to say that both this [Delaware Bankruptcy] Court and the Illinois Court are convenient forums for purposes of the *CORCO* analysis.").

48.     Further, one of the Committee members and the Debtor's largest creditor, the Redeemer Committee, has commenced litigation that is pending in the Delaware Chancery Court.  In fact, the main trigger for the Debtor's bankruptcy filing was a hearing set by the Redeemer Committee in the Delaware Chancery Court to obtain a judgment on a $189 million Award.  If Delaware is convenient enough for the Redeemer Committee, it is certainly an appropriate forum for this case.  Daugherty is another allegedly significant creditor of the Debtor who chose to commence litigation in Delaware Chancery Court, which matter commenced trial just prior to the Petition Date.  UBS, another member of the Committee, has litigation pending against the Debtor in New York.

49.     The bottom line is that in a case of the size and complexity of this one, involving highly sophisticated and well-represented creditors, there is absolutely no reason to transfer venue on the basis of the proximity of creditors to the Texas Bankruptcy Court.

### iv.  *The Proximity of the Debtor and Witnesses Necessary to the Administration of the Estate*

50.     As discussed in *CORCO*, the Court's consideration of the location of the Debtor should focus on the proximity to the Court of the Debtor's employees and representatives who must appear in court, not with the employees who conduct the day-to-day business activities of the Debtor.  *CORCO*, 596 F.2d at 1248; *see also Restaurants Acquisition*, 2016 Bankr. LEXIS

at *11 ("Courts have noted the inquiry should focus primarily on the location of parties that must appear in court.").

51.     In this case, the CRO is expected to take the lead in managing the Debtor's restructuring efforts and testifying on behalf of the Debtor. The CRO is a highly accomplished and independent professional based in Los Angeles who regularly appears in this Court and was previously chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired). Few Debtor employees should be required to testify in this case on a going forward basis and, even if they were, travel to this Court is easily accomplished and consistent with the many prior trips required of such employees by the Redeemer Committee and Daugherty in choosing to commence litigation in Delaware Chancery Court. The Debtor's bankruptcy counsel also has an office in Delaware and has no need to hire local counsel here, whereas in Dallas, local counsel would need to be retained.

52.     Given what is at stake, the Debtor and its employees, including the CRO, are conveniently located within sufficient proximity of this Court such that this factor does not weigh in favor of a venue transfer to the Texas Bankruptcy Court.

### v.   *The Necessity for Ancillary Administration if Liquidation Should Result*

53.     The final factor relates to the necessity for ancillary administration if liquidation should result. As the courts in *CORCO*, *Enron* and *Fairfield Puerto Rico* recognized, "anticipation of the failure of the [Chapter 11] proceeding is an illogical basis upon which to predicate a transfer." *CORCO*, 596 F.2d at 1248; *see also Enron*, 274 B.R. at 349; *In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191. Indeed, "[t]his factor is often discounted by

courts." *Enron*, 274 B.R. at 343, n. 11. The Debtor's focus in this case is to propose a chapter 11 plan that will maximize value for all constituents, and the Committee offers no factual basis for this Court to contemplate the failure of the Debtor's chapter 11 case. *See In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191. Accordingly, this factor does not favor transfer of venue.

**D.        The Interest of Justice is Not Served By Transferring Venue**

54.        In determining whether a transfer would be "in the interest of justice," the court should consider "whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Enron,* 274 B.R. at 387. These factors have generally been discussed above and support keeping this case in Delaware. Additional concerns that would speak to the "interest of justice" include facts such as the importance of a debtor to the welfare and economic stability of a jurisdiction, and are not present in this case. *See CORCO,* 596 F.2d at 1248 (even though the importance of the debtor, a major supplier of petroleum to Puerto Rico, to the welfare and economic stability of Puerto Rico implicated "interest of justice" considerations, the court determined not to transfer venue to Puerto Rico).

55.        As noted above, venue is legally proper in this Court and the Debtor is entitled to substantial deference as to its choice of forum. But even if the Court considered the interests of justice and the convenience of the parties, there is no legitimate basis to transfer this case to the Texas Bankruptcy Court given the sophistication, complexity, and scope of the Debtors' business, domestic and foreign assets, and creditor constituents, and pendency of creditor actions in the Delaware Chancery Court and New York.

DOCS_SF:102198.7 36027/002

App. 0168

56.     The Texas Bankruptcy Court is also the venue where the unaffiliated and adverse bankruptcy case of Acis has been pending.  Acis has asserted fraudulent transfer and other disputed claims against the Debtor, which claims are all prepetition in nature.  The Debtor, in turn, has contract claims against Acis totaling in excess of $8 million.  The efficient administration of this estate, judicial economy, timeliness, and fairness would not be served by having the Texas Bankruptcy Court adjudicate these countervailing claims and interests.  The interests of justice also would not be served by transferring venue in order for the Committee to realize a tactical litigation advantage before the Texas Bankruptcy Court.

57.     For all these reasons, the Debtor urges this Court to maintain venue of this case in Delaware.

WHEREFORE, the Debtor respectfully requests that this Court enter an order denying the Motion to Transfer and granting such other and further relief as this Court deems appropriate.

DOCS_SF:102198.7 36027/002

App. 0169

Dated:  November 12, 2019        PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
Richard M. Pachulski (CA Bar No. 62337)
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:    rpachulski@pszjlaw.com
           jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           mlitvak@pszjlaw.com
           joneill@pszjlaw.com

*Proposed Counsel for the Debtor
and Debtor in Possession*

DOCS_SF:102198.7 36027/002

App. 0170