# Appendix Exhibit 16

Docket #0281  Date Filed: 12/27/2019

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## MOTION OF THE DEBTOR FOR APPROVAL OF SETTLEMENT
## WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING
## GOVERNANCE OF THE DEBTOR AND
## PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

The above-captioned debtor and debtor in possession (the "Debtor") files this

motion (the "Motion") for the entry of an order (the "Order") approving the terms of a settlement

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



¹⁹³⁴⁰⁵⁴¹⁹¹²²⁷⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰⁶

between the Debtor and the Committee (as defined below) regarding governance of the Debtor

and procedures for operations in the ordinary course of business, as embodied in the term sheet

attached hereto as **Exhibit A** (the "Term Sheet"). In support of this Motion, the Debtor respectfully

represents as follows:

### Preliminary Statement

1.       Following weeks of negotiations, the Debtor and the Committee have

reached a proposed settlement, which contemplates the creation of a new independent board of

directors (the "Independent Directors") at Strand Advisors, Inc. ("Strand"), the Debtor's general

partner and ultimate party in control, and the implementation of certain protocols governing the

operation of the Debtor's business in the ordinary course. The Independent Directors will consist

of the following three highly qualified and independent individuals: James Seery, John Dubel,

and a third director to be selected by or otherwise acceptable to the Committee.[2] Two of the

Independent Directors were chosen by the Committee and the third Independent Director will be

selected by or otherwise acceptable to the Committee. Background information for each of the

Independent Directors is attached hereto as **Exhibit B**.

2.       Pursuant to the Term Sheet, and effective upon entry of the Order, James

Dondero will no longer be a director, officer, managing member, or employee of the Debtor or

Strand and will have no authority, directly or indirectly, to act on the Debtor's behalf. Going

forward, the Independent Directors, through Strand, will have sole and exclusive management and

control of the Debtor. The Independent Directors will have the discretion to appoint an interim

---

[2] The Committee's agreement to the Term Sheet in its entirety is contingent upon the selection of a third Independent Director acceptable to the Committee. In the event the Committee and the Debtor cannot reach an agreement on an acceptable Independent Director to fill the third seat of the Board of Directors, the Term Sheet shall be null and void.

Chief Executive Officer (the "CEO") who will manage the Debtor's day-to-day business operations. Subject to Court approval, the Debtor still intends to retain Development Specialists, Inc. ("DSI") to provide a Chief Restructuring Officer (the "CRO") that will serve at the direction of the Independent Directors (or CEO, if appointed).

3. It bears emphasis that the Independent Directors will not be mere figureheads. The Debtor and the Committee envision that the Independent Directors will be actively involved and intimately familiar with all material aspects of the Debtor's business and restructuring efforts. Moreover, with guidance of the CRO and CEO (if appointed), the Independent Directors will endeavor to prevent any negative influence Mr. Dondero or any of his affiliates or agents may have on the Debtor and its employees. Further, as part of the Term Sheet, the Committee will be granted standing to pursue estate claims against Mr. Dondero and other former insiders of the Debtor who were not employed by the Debtor as of the execution of the Term Sheet. The Committee will also retain the right to move for a chapter 11 trustee.

4. In sum, the Term Sheet resolves months of litigation between the Debtor and the Committee over the Debtor's governance structure and operating protocols, allowing all parties to refocus on a path forward for this chapter 11 case. With the Independent Directors in place, the Debtor can move forward expeditiously, efficiently, and effectively with the substantive aspects of this case and consider any available restructuring options that will maximize value for all constituents. The Debtor therefore urges the Court to approve the Term Sheet and allow the key economic interest holders to proceed with a productive restructuring effort.

DOCS_NY:39973.7 36027/002

App. 0232

**Jurisdiction and Venue**

5.      The United States Bankruptcy Court for the District of Northern District of Texas, Dallas Division (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.      To assist and coordinate the restructuring process, the Debtor retained DSI and Bradley D. Sharp to serve as the CRO on October 7, 2019.  On October 29, 2019, the Debtor filed the *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date* [Docket No. 74] (the "CRO Motion") seeking to formally retain the CRO.  The CRO Motion remains pending, and the Debtor is filing a supplement to the CRO Motion concurrently herewith.

10.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.  On November 12, 2019, the Committee filed an omnibus objection to the CRO Motion, cash management motion, and

DOCS_NY:39973.7 36027/002

App. 0233

motion for approval of ordinary course protocols [Docket No. 130] (the "Committee Objection"),

raising various concerns regarding the Debtor's governance and business practices.

11. On December 4, 2019, the Delaware Court entered an order transferring

venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[3] The Debtor has continued

in the possession of its property and has continued to operate and manage its business as a debtor

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or

examiner has been appointed in this chapter 11 case.

12. On December 23, 2019, the U.S. Trustee filed a motion in this Court to

appoint a chapter 11 trustee for the Debtor [Docket No. 271] (the "Trustee Motion"). Although

the Debtor will be filing a separate response to the Trustee Motion, it suffices to say that the Trustee

Motion (filed without even considering the proposed Term Sheet) completely lacks merit given

the governance changes and other resolutions encompassed in the Term Sheet agreed to by the

Committee, as the representative of the primary economic stakeholders here.

### Terms of the Proposed Settlement

13. Pursuant to the Term Sheet, the Debtor and the Committee have agreed to:

(a) implement certain changes to the Debtor's governance, including the appointment of the

Independent Directors; (b) provide the Committee with additional transparency into the operation

of the Debtor's business; (c) retain the CRO on updated terms; and (d) implement certain protocols

governing the ordinary course business operations of the Debtor. The terms of this agreement are

contained in the Term Sheet.[4] A summary of the Term Sheet is as follows:

---

[3] All docket numbers refer to the docket maintained by this Court.

[4] In the event of any inconsistency between the summary of the Term Sheet contained herein and the Term Sheet, the Term Sheet will govern.

**Independent Directors**

The Debtor's general partner, Strand will appoint the following three (3) Independent Directors: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached to the Term Sheet (the "Governing Documents"), which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

The Independent Directors shall be compensated in a manner to be determined, with an understanding that the source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether a CEO should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also

DOCS_NY:39973.7 36027/002

|                                               | participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
|---|---|
| **Role of Mr. James Dondero** | Upon approval of the Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | Bradley Sharp and DSI shall, subject to approval of the Court, be retained as the CRO to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. Mr. Sharp's and DSI's retention is subject to this Court's approval. The Debtor has filed the CRO Motion, as supplemented as of the date hereof, which requests authority to retain Mr. Sharp and DSI.[5] |
| | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Mark Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "<u>Estate Claims</u>"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached to the Term Sheet, which requirements cannot be modified without the consent of the Committee or Court order (the "<u>Document Production Protocol</u>"). |
| | Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are |

---

[5] For the avoidance of doubt, the Debtor is not seeking retention of the CRO pursuant to this Motion. The Debtor is seeking such relief pursuant to the CRO Motion (as supplemented).

App. 0236

within the Debtor's possession, custody, or control ("Shared Privilege").

With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver.

**Reporting Requirements**

The Debtor shall be subject to and comply with the reporting requirements attached to the Term Sheet, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements").

**Plan Exclusivity**

The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code.

**Operating Protocols**

The Debtor shall comply with the operating protocols attached to the Term Sheet, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order (the "Operating Protocols" and, together with the Reporting Requirements, the "Protocols").

14. By this Motion, the Debtor is seeking the Court's approval of the Term Sheet, the terms contained therein, and the exhibits attached thereto. For the avoidance of doubt, approval of the Term Sheet includes the approval of the following:

DOCS_NY:39973.7 36027/002

App. 0237

- **Independent Directors**: The appointment of James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee as the Independent Directors of Strand, the Debtor's general partner, with power to oversee the operations of the Debtor as set forth in the Term Sheet. Mr. Seery and Mr. Dubel were selected by the Committee, and the Debtor agreed to their appointment as Independent Directors. The Debtor is also seeking approval of the Governing Documents appointing the Independent Directors, to the extent required, and the authority to compensate the Independent Directors either directly from the assets of the Debtor or via the reimbursement of Strand of any compensation paid to the Independent Directors.

- **Document Management and Preservation**: The implementation of the Document Production Protocol, which will govern how the Debtor retains and produces documents and information to the Committee during the pendency of its bankruptcy case. The Debtor is also agreeing to the allow the Committee to access certain documents that are otherwise subject to the Shared Privilege to assist the Debtor in investigating the Estate Claims.

- **Estate Claims**. The Debtor has agreed to grant the Committee standing to pursue any Estate Claims. Estate Claims do not include claims or causes of action against any current employees of the Debtor; however, if any employee ceases to be employed by the Debtor, the Committee will have standing to pursue claims against such former employee.

- **Reporting Requirements and Operating Protocols**: The Debtor has agreed to provide certain reporting to the Committee and to operate under certain protocols, which set forth the parameters of how the Debtor can conduct its business without the requirement of Court approval. The Protocols provide, in certain circumstances, how the CRO and the Independent Directors will oversee the Debtor's operations. The purpose of the Protocols is to allow the Debtor to function in the ordinary course of its business while providing transparency to the Committee.

15. The Debtor believes that appointing the Independent Directors and otherwise effectuating the terms of the Term Sheet is in the best interests of the Debtor, its estate, and its creditors. The Term Sheet will allow the Debtor to proceed with a productive reorganization effort that will maximize value for all constituents. Accordingly, the Debtor seeks approval of the Term Sheet.

## Relief Requested

16. By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rule 9019: (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

9

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; (c) granting the Committee standing to pursue the Estate Claims; and (d) granting related relief.

### **Authority for the Relief Requested**

**A.      Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Enter Into Certain Aspects of the Term Sheet in the Ordinary Course**

17.      Because the Debtor is not settling any claims or causes of action through the Term Sheet or otherwise expending estate resources, the Debtor believes that it has the authority to effectuate the majority of the transactions and compromises set forth in the Term Sheet without Court approval under section 363(c)(1) of the Bankruptcy Code.  Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

18.      An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test."  *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a

hypothetical creditor to a different economic risk than existed when the creditor originally extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry." *Id.* Here, both the vertical test and horizontal test are satisfied.

19.     Under the Term Sheet, the Debtor is seeking authority to (a) appoint the Independent Directors at Strand (a non-debtor entity), (b) have Mr. Dondero removed from his role at the Debtor and Strand; (c) agree to seek the retention of the CRO under a revised engagement letter that provides that the CRO will report to the Independent Directors; (d) grant the Committee standing to pursue the Estate Claims; (e) enter into and implement the Document Production Protocols; (f) grant the Independent Directors the exclusive right to determine whether to waive exclusivity; and (g) enter into and implement the Protocols. Only the compensation of the Independent Directors, the entrance into the Protocols (which provide the Committee with certain right to object to the Debtor engaging in a "Transaction" (as defined in the Protocols) and allow the Debtor to seek a hearing before this Court on an expedited basis), and the grant of standing to the Committee to pursue Estate Claims could be construed as outside of the ordinary course of business. The balance of the terms of the Term Sheet either involve non-debtors[6] or will be the subject of separate motions seeking Court approval at the appropriate time.

## B.     The Court Should Approve the Term Sheet Under Rule 9019 of the Bankruptcy Code

20.     Although the Debtor believes that it has authority to implement the majority of the Term Sheet in the ordinary course of its business under section 363(c), the Debtor is seeking

---

[6] With respect to the Independent Directors, they are being appointed to a new independent board of Strand, the Debtor's general partner, and Strand is not a debtor in this case or subject to this Court's jurisdiction.

DOCS_NY:39973.7 36027/002

this Court's approval of the Term Sheet under section 105 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules out of an abundance of caution. Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section 105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code").

21.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

22.     Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

23.     In making this determination, the United States Court of Appeals for the Fifth Circuit applies a three-party test, "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.*

24.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; Foster Mortg. Corp., 68 F.3d at 918 (citations omitted).

25. Here, the Debtor submits that effectuating the transactions set forth in the Term Sheet satisfies the Fifth Circuit's three-part test. The settlement embodied in the Term Sheet was driven in large part by the Debtor's creditors and has the support of the Committee, which consists of the Debtor's principal creditors. The Term Sheet was negotiated at arm's length, and there was no fraud or collusion in its negotiation. The settlement is also fair and reasonable and in the best interests of the Debtor's estate and also resolves the open disputes regarding the CRO Motion, the *Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver*, as supplemented [Docket Nos. 51 & 259], and *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76].

26. The Debtor and members of the Committee have been entangled in highly contentious litigation that has spanned many years and multiple venues. As evidenced by the brief history of the Debtor's bankruptcy case,[7] that contention and mistrust has carried over into this proceeding and could derail any chance that the Debtor has to successfully reorganize and structure a plan to pay its creditors. The governance and operational changes set forth in the Term Sheet, will provide greater transparency to the Committee and start the process of rebuilding the trust necessary to negotiate a successful resolution of this case. Without the Term Sheet, the Debtor

---

[7] *See, e.g., Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 11], *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas* [Docket No. 85], *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officers, and (III) Precautionary Motion for Approval of Protocol for "Ordinary Course" Transactions* [Docket No. 130], and *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 271].

App. 0243

anticipates that the Committee would move to appoint a chapter 11 trustee and the U.S. Trustee has already done so (without even seeing the Term Sheet). The Debtor will contest such motions because the appointment of a chapter 11 trustee could gravely harm the Debtor's business. The implementation of the Term Sheet will head off any potential issues that could arise, eliminate costly, time consuming and uncertain litigation, and give the Debtor sufficient breathing room to work towards rebuilding trust with its creditor body and allow the Debtor to exit bankruptcy and preserve the value of its business. The Debtor's bankruptcy case has been pending for over two and a half months, and it is time for the parties to put the acrimony that marked the initial stages of this case behind them and to move forward in a productive manner – precisely what the Term Sheet seeks to accomplish.

## C. Consummating the Settlement Agreement is a Sound Exercise of the Debtors' Business Judgment.

27. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex.

2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

28.     The transactions contemplated by the Term Sheet are within the sound business judgment of the Debtor.  The Term Sheet resolves potentially costly and protracted litigation with the Committee over the Debtor's corporate governance and will give the Debtor the breathing room necessary to negotiate and effectuate the terms of a plan acceptable to the Debtor's creditors.  Further, providing standing to the Committee to investigate Estate Claims and the payment of the Independent Directors from the assets of the estate are each necessary components of the Term Sheet.  The Committee would not have agreed to the Term Sheet without the grant of standing to investigate Estate Claims.  Moreover, Strand, a non-debtor, is unable to cover the costs of the Independent Directors.  As such, there is a good business reason for the Debtor's payment of the Independent Directors' compensation: the Term Sheet and the appointment of the Independent Directors would not have been agreed to or possible without that condition.[8]  The foregoing is sufficient grounds to approve the Term Sheet and authorize the Debtor to effectuate the terms of the Term Sheet under Section 363(b)(1).

## No Prior Request

29.     No previous request for the relief sought herein has been made to this, or any other, Court.

---

[8] Further, although the Debtor seeks to reimburse Strand for the cost of the Independent Directors, the Debtor is otherwise obligated to reimburse Strand for any costs or expenses incurred by Strand in its management of the Debtor. *See* Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., § 3.10(b).

## **Notice**

30.     Notice of this Motion shall be given to the following parties or, in lieu

thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of

the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured

parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy

Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or

further notice need be given.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests

that the Court enter an Order, substantially in the form attached hereto as **Exhibit C**, (a) approving

the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of

the Term Sheet, including entering into the Governing Documents and compensating – either

directly or through reimbursement – the Independent Directors; and (c) granting related relief.

DOCS_NY:39973.7 36027/002

App. 0246

Dated: December 27, 2019

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
              ikharasch@pcszjlaw.com
              mlitvak@pszjlaw.com
              gdemo@pszjlaw.com

-and-

*/s/ Melissa S. Hayward*
HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

App. 0247

## Highland Capital Management, L.P.

### Preliminary Term Sheet

*This term sheet ("Term Sheet") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "Chapter 11 Case"), pending in the Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. This Term Sheet shall be subject to approval by the Bankruptcy Court.*

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "Debtor"). <br><br> The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "Committee"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "Independent Directors"): James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement). <br><br> The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

| | |
|---|---|
| | source of funding, whether directly or via reimbursement, will be the Debtor. |
| | As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "<u>CEO</u>") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court. |
| | The Committee shall have regular, direct access to the Independent Directors, <u>provided</u>, <u>however</u> that (1) if the communications include FTI Consulting Inc. ("<u>FTI</u>"), Development Specialists Inc. ("<u>DSI</u>") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("<u>CRO</u>") to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**. |
| | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "<u>Estate Claims</u>"); provided, however, that the term Estate Claims will not |

| | |
|---|---|
| | include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |

| Reservation of Rights | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |
|---|---|

**Exhibit A**

**Debtor's Corporate Governance Documents**

**Exhibit B**

**Amended DSI Retention Letter**

**Exhibit C**

**Document Production Protocol**

*PSZJ Revisions 12/23/19*
*Privileged & Confidential*
*Subject to FRE 408*

**Exhibit D**

**Reporting Requirements**

## WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR

## OF

## STRAND ADVISORS, INC.

[ _____ ]

---

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

**I.   AMENDMENT OF BYLAWS**

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

**II.   ELECTION OF DIRECTORS**

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and _____ to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED**, that James Seery, John Dubel, and _____, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER**, that any officer of the Company is authorized to take any such actions as

Appendix A **Exhibit A**

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

RESOLVED FURTHER, that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

RESOLVED FURTHER, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

RESOLVED FURTHER, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

## III.    STIPULATION WITH THE BANKRUPTCY COURT

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

WHEREAS, the Company is the general partner for HCMLP;

WHEREAS, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

WHEREAS, the Company and the Stockholder wish to enter into a stipulation with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by this resolutions to be re-elected at upon the expiration of his or her term; and (c) upon the death, disability, or resignation of _____, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and acceptable to the Stockholder and the Committee (the "Stipulation");

WHEREAS, for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

WHEREAS, it is in the intent of the parties that the Stipulation will no longer be effective or bind Strand or the Stockholder following the termination of the Bankruptcy Case.

NOW, THEREFORE, BE IT RESOLVED, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

RESOLVED FURTHER, that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**

_____
James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

**First Amendment to Bylaws of**
**Strand Advisors, Inc.**

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.**      Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.**      The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the stockholders, (y) a retired bankruptcy judge and nominated jointly by the stockholders and any official committee of unsecured creditors in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Committee") currently pending in the Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11; or (z) nominated by the Committee and reasonably acceptable to the stockholders.

**3.**      The following shall be added as Section 7 to Article III of the Bylaws:

Section 7. Removal of Directors.  Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the Company has caused this amendment to be signed this [ __ ] day of [ __ ], 20__.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

**INSERT STRAND ADVISORS, INC. LETTERHEAD**

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:** **Strand Advisors, Inc. – Director Agreement**

Dear [_____]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

## 1. APPOINTMENT TO THE BOARD OF DIRECTORS.

a. Title, Term and Responsibilities.

i. Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii. You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding pending in the Northern District of Texas (the "Bankruptcy"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b. Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board and no fewer than fifty percent (50%) of these meetings of the Board in person, and no more than fifty percent (50%) of such meetings by telephone or teleconference. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c. Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d. Information Provided by the Companies. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company, except to the extent that any such access may impair any attorney client privilege to which the Company may be entitled; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows,

properties, financial condition and prospects of the Company that you reasonably request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns. You are under no obligation to update data submitted to you or to review any other information unless specifically requested by the Board to do so.

2.    **COMPENSATION AND BENEFITS.**

a.    Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of $[TBD]. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.    Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.    Invoices; Payment.

i.    In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment will be due to you within 10 business days after receipt of each such invoice, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.    You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.    Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated December 5, 2019, a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.    Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.    **PROPRIETARY INFORMATION OBLIGATIONS.**

a.    Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

b. <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose itto anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

c. <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

### 4. OUTSIDE ACTIVITIES.

a. <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

b. <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

c. <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

### 5. TERMINATION OF DIRECTORSHIP.

a. <u>Voluntary Resignation, Removal Pursuant to Bylaws and Stockholder Action</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law or by an affirmative vote of a majority of the stockholders of the Company.

b. <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

c. <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

### 6. GENERAL PROVISIONS.

a. <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

App. 0264

      b.     <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

      c.     <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder without the written consent of the Company.

      d.     <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**ACCEPTED AND AGREED:**

_____
[NAME]
Date: _____

App. 0266

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), and [_____] (the "**Indemnitee**").

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company to retain and attract as directors the most capable Persons is in the best interests of the Company and that the Company therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in Section 1(g) below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or

any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii) any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c) "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d) "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e) "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f) "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit

plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)      "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of <u>Section 4</u> only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)      "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)      "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to <u>Section 4</u> or <u>Section 5</u> hereof.

(j)      "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)      "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)      "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee

DOCS_NY:39915.4 36027/002

benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)    "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)    "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)    References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.    <u>Indemnification</u>.

(a)    Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)    For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

DOCS_NY:39915.4 36027/002

3. <u>Contribution</u>.

(a) Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b) The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c) To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4. <u>Advancement of Expenses</u>. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of

the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this <u>Section 4</u>, the final sentence of <u>Section 9(b)</u>, or <u>Section 11(b)</u> in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to <u>Section 9</u>, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.    <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with <u>Section 4</u>, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.    <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    <u>Notification and Defense of Claims</u>.

(a)    <u>Notification of Claims</u>. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give

6                                                                      App. 0272

prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)     Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.     Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.     Determination of Right to Indemnification.

(a)     Mandatory Indemnification; Indemnification as a Witness.

(i)     To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(ii)    To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(b)    <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)    if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)    if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)    <u>Making the Standard of Conduct Determination</u>. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

8

(d)     <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii)     no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)     Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court

9

shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

    (f)    <u>Presumptions and Defenses</u>.

    (i)    <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

    (ii)    <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

    (iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

10

(a) indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i) proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii) where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b) indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c) indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11. <u>Remedies of Indemnitee</u>.

(a) In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 11(a)</u>. The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b) In the event that Indemnitee, pursuant to this <u>Section 11</u>, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c) In the event that a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification, any judicial proceeding commenced

pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d) If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12. Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13. Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14. Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other

Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.     Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.     Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.     No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.     Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.     Indemnitee Consent. The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek

indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.    Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

      (a)    if to Indemnitee, to the address set forth on the signature page hereto.

      (b)    if to the Company, to:

          Strand Advisors, Inc.
          Attention:    Isaac Leventon

App. 0280

|  | Address: | 300 Crescent Court, Suite 700 |
|--|--|--|
|  |  | Dallas, Texas 75201 |
|  | Email: | ileventon@highlandcapital.com |

Notice of change of address shall be effective only when given in accordance with this <u>Section 23</u>. All notices complying with this <u>Section 23</u> shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.    <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.    <u>Jurisdiction</u>. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.    <u>Enforcement</u>.

(a)    Without limiting <u>Section 15</u>, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.    <u>Headings and Captions</u>. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the

same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

App. 0282

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____

Name:

Title:

INDEMNITEE:

_____

Name:     [\_\_\_\_\_]
Address: _____
          _____
          _____

Email:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

December ___, 2019

Attn: Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX 75201

      Re:    Development Specialists, Inc. ("DSI")
               Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company"). This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019. However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, as CRO, Mr. Sharp will assume control of the Company's restructuring and direct the Company with respect to its bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), which Chapter 11 Case has now been transferred to the Bankruptcy Court.
3. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
4. As directed by the Independent Directors and/or CEO, the CRO will be responsible for the implementation and prosecution of the Chapter 11 Case, including negotiations with creditors, reconciliation of claims, and confirmation of a plan or plans of reorganization.
5. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:

**Exhibit B**

Highland Capital Management, LP
December ___, 2019
Page 2

     a. assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

     b. advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

     c. attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

     d. providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

     e. rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may

Highland Capital Management, LP
December ___, 2019
Page 3

also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Highland Capital Management, LP
December ___, 2019
Page 4

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice. Notwithstanding anything to the contrary contained herein, the Company shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication. DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company. DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law. Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

Highland Capital Management, LP
December ___, 2019
Page 5

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case. DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations. DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

App. 0289

Highland Capital Management, LP
December ___, 2019
Page 6

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of
Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of
this Agreement and supersedes and is intended to nullify any other agreements, understandings
or representations relating to the subject of this Agreement. This Agreement may not be
amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance
by signing an original copy of this Agreement on the signature lines below, then returning one
fully-executed Agreement to DSI's office. The Agreement will become effective upon execution
by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:


Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

**A. Definitions**

    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

    a. For email, Debtor uses Outlook Email on an Exchange server. Veritas Enterprise Vault is used to archive emails. Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email .communications have been preserved and are not at risk of deletion due to normal document retention practices. Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b. The file server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c. The Sharepoint server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago. Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva. Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein..

    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data. Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h. Bloomberg data is archived for five years. Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

App. 029

Exhibit C

    i. Files may be saved locally on laptops/work computers used by employees of Debtor. This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere. Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees. Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

## D. Not Reasonably Accessible Documents

    a. Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

        i. Deleted, slack, fragmented, or other data only accessible by forensics;

        ii. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

        iii. On-line access data such as temporary internet files, history, cache, cookies, and the like.

    b. To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

## E. Collection and Search Methodology

    a. Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than [date]. DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates. Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs). Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

    b. The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

    c. A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above.

ACTIVE 252191584

Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

## F. Format of Documents Produced

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f. For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the

original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g. For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h. For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i. The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

      i. Production Bates begin

      ii. Production Bates end

      iii. Production Bates begin attachment

      iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's. Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j. Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are

typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k. Exceptions to the Production Format

l. Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

m. To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G. Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a. No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b. Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c. Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d. Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e. Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the document | 2 |

| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
|---|---|---|
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

| | | |
|---|---|---|
| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

ACTIVE 252191584

I.    **Definitions**

A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Exhibit D

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.    "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.    "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

## II.    Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners

A.    **Covered Entities**: N/A (See entities above).

B.    **Operating Requirements**

    1.    Ordinary Course Transactions do not require Court approval (All Stages).

        a)    Stage 1 and Stage 2:  ordinary course determined by the CRO.

        b)    Stage 3: ordinary course determined by the Debtor.

    2.    Related Entity Transactions

        a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    Stage 3:

            (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.    Third Party Transactions (All Stages)

        a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)      The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. Redemption requests payable to Related Entities will be held in escrow and will not prevent the winding up or liquidation of any fund or entity.

c)      The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.      **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.      **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.      **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.      **Operating Requirements**

1.      Ordinary Course Transactions do not require Court approval (All Stages).

a)      Stage 1 and Stage 2: ordinary course determined by the CRO.

b)      Stage 3: ordinary course determined by the Debtor.

2.      Related Entity Transactions

a)      Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)      Stage 3:

(1)      Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

App. 0300

        (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

     a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.     **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.     **Transactions involving entities that the Debtor manages but in which the Debtor does <u>not hold a direct or indirect interest</u>**

A.     **Covered Entities**: See <u>**Schedule A**</u> hereto. <u>**Schedule A**</u> includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.     **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

     a)     <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

     b)     <u>Stage 3</u>: ordinary course determined by the Debtor.

2.     Related Entity Transactions

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a)  <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  <u>Stage 3</u>:

(1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages):

a)  Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)  The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.  **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

App. 0302

**V. Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI. Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII. Transactions involving Non-Discretionary Accounts**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

App. 0303

**VIII. Additional Reporting Requirements – All Stages (to the extent applicable)**

A. DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B. The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX. Shared Services**

A. The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B. The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X. Representations and Warranties**

A. The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B. The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C. The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

*PSZJ Draft 12/27/19*

### Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

App. 0305

*PSZJ Draft 12/27/19*

8.   Highland Socially Responsible Equity Fund
9.   Highland Income Fund
10.  Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11.  SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1.   The Dugaboy Investment Trust
2.   NexPoint Capital LLC
3.   NexPoint Capital, Inc.
4.   Highland IBoxx Senior Loan ETF
5.   Highland Long/Short Equity Fund
6.   Highland Energy MLP Fund
7.   Highland Fixed Income Fund
8.   Highland Total Return Fund
9.   NexPoint Advisors, L.P.
10.  Highland Capital Management Services, Inc.
11.  Highland Capital Management Fund Advisors L.P.
12.  ACIS CLO Management LLC
13.  Governance RE Ltd
14.  PCMG Trading Partners XXIII LP
15.  NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16.  NexPoint Real Estate Advisors II LP
17.  NexPoint Healthcare Opportunities Fund
18.  NexPoint Securities
19.  Highland Diversified Credit Fund
20.  BB Votorantim Highland Infrastructure LLC
21.  ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1.   NexBank SSB Account
2.   Charitable DAF Fund LP

9

*PSZJ Draft 12/27/19*

## **Schedule B**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.14 36027/002

*PSZJ Draft 12/27/19*

## <u>Schedule C</u>

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.14 36027/002

App. 0308

November 2019

**James P. Seery, Jr.**

New York, NY



James P. Seery, Jr. is a high yield and distressed investing professional who was most recently a Senior Managing Director and co-Head of Credit at Guggenheim Securities LLC, where he is responsible for helping direct the development of a leveraged finance and credit distribution business. Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, a $1.3bn global credit fund manager. In that role, he developed and led many of the firm's most profitable credit investments. Mr. Seery is a licensed attorney and was formerly a partner and co-Head of the Sidley Austin LLP New York Corporate Reorganization and Bankruptcy Group, and he also recently served as a Commissioner on The American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Before his joining Sidley Austin, Mr. Seery was a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business. In that position, he was responsible for managing the Lehman Brothers' Fixed Income investment grade and high yield loan businesses, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management, and restructuring. Mr. Seery was also a member of the Lehman Brothers' Fixed Income Operating Committee and Global Credit Products Operating Committee as well as the High Yield Commitment and New Business Committees. From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for management of distressed corporate debt investments, and in 2008 he was a key member of the small team that successfully sold Lehman to Barclays.

Mr. Seery was selected as one of the Top Restructuring Lawyers in the U.S. Under 40 by *Turnarounds and Workouts* in 1999. Mr. Seery graduated in 1990 from New York Law School, *magna cum laude*, where he was an editor of the Law Review and Colgate University in 1984. He was a member of the Board of Directors of the Loan Syndications and Trading Association from 2006 to 2008 and a member of the INSOL International Lenders Group from 2016-2017.

# JAMES P. SEERY, JR.

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049 · jpseeryjr@gmail.com

## Experience

**Guggenheim Securities LLC,** New York, New York        Aug. 2017-Nov. 2019
Senior Managing Director, Co-Head Credit
- Responsible for developing leveraged finance and credit portfolio advisory businesses
- Management of teams of leveraged finance bankers and trading and sales professionals

**River Birch Capital, LLC**, New York, New York        April 2012-July 2017
President, River Birch Capital, LLC
- President and senior investing partner at New York based $1.3bn global long-short credit fund focused on corporate credit from investment grade to distressed
- Responsible for originating, executing and managing stressed and distressed credit investments with a team of 6 investing partners and 5 analysts and traders
- Led finance and operations team with CFO/CCO; firm grew from approx. $200mm in 2012 to $1.3bn in 2017

**Sidley Austin LLP**, New York, New York        May 2009-April 2012
Co-head New York Corporate and Reorganization Group
- Built and managed a creditor focused restructuring group as part of an international company side practice in a nearly 2000 attorney firm
- Represented banks, corporations, hedge funds, and structured investment vehicles in a variety of restructuring, financing and litigation matters

**Lehman Brothers**, New York, New York        April 1999-May 2009
Global Head Fixed Income Loans
- Managing Director responsible for managing the global fixed income loan business, including investment grade and high yield commitments, global distribution, hedging, trading and sales, CLO origination, portfolio management, and restructuring; managed underwritten loan commitments and teams of credit sales and trading professionals as well as structuring, portfolio management and work-out specialists
- Member Fixed Income Operating Committee, Global Credit Products Operating Committee, and High Yield Commitment and New Business Committees
- Responsible for originating, structuring and managing proprietary distressed debt investments, rescue financings, and restructurings 1999-2004
- Key member of team that negotiated and completed the sale of Lehman Brothers to Barclays Sept. 2008; remained at Barclays through April 2009

**Phillips Nizer**, Garden City, New York        May 1995-April 1999
- Senior Associate in corporate reorganization group of boutique New York City law firm

**Cadwalader, Wickersham & Taft**, New York, New York        May 1989-May 1995
- Associate in corporate reorganization group of New York City based international law firm

## Education

New York Law School, New York, New York, J.D., *magna cum laude*, Editor Law Review    1990
Colgate University, Hamilton, New York, B.A. History        1984

## Experience

| | |
|---|---|
| Director, River Birch International, Ltd. Board | 2015-2017 |
| Director, Camphill Foundation Board | 2017-2019 |
| Member, INSOL International Lenders Group Board | 2016-2017 |
| Commissioner, ABI Commission to Study Reform of Ch. 11 | 2012-2015 |
| Director, Loan Syndications and Trading Association | 2006-2008 |

## Selected River Birch Sample Investments

Cash America International *5.75% Senior Unsecured Notes due 2018 and Litigation Claim – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper spin of payday lending business; U.S. District Court published decision in note holders' favor led to settlement*

Chesapeake Energy Corp *6.775% Senior Notes due 2019 Litigation Claims – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper call of notes; ultimately prevailed in $450mm judgment discussed in published Second Circuit and U.S. District Court decisions*

Caesars Entertainment Resort Properties *8% 1st Lien Notes due 2020; 11% 2d Lien Notes due 2021 – Developed and led (with senior investment analyst partner) execution of successful bankruptcy investment strategy focused on lower beta part of the capital structure of bankrupt casino operator; investment designed for high return with significant downside protection*

Intelsat Jackson Holdings *9.5% Senior Secured Notes due 2022 – Developed and led (with senior investment analyst partner) execution of successful new issue stressed secured note investment strategy; responsible for structuring and tightening covenant package and increasing size of offering after determining that potential litigation threat was low risk; responsible for recommending ICF 12.5% note investment in the low 80s in February 2018*

Motors Liquidation Company *GUC Trust Publicly Traded Units – Developed and led successful investment strategy in publicly traded bankruptcy liquidation units (GM); took the opposite side of sell-side analyst recommendations and engineered a successful settlement in high return/low downside position*

Hypo Alpe Adria Bank (Hetar) *Senior Guaranteed Notes – Developed and led (with senior investment analyst partner) execution of successful investment strategy in insolvent Austrian bank with notes guaranteed by an Austrian State*

Presidio Inc. *10.25% Senior Notes due 2023 – Developed and led execution of successful investment strategy to purchase newly developed mezzanine part of the capital structure on struggling new issue deal; ultimately sponsor purchased the mezzanine but aggressive structuring and bidding for the mezzanine tranche led to outsized allocation of new notes*

Nortel Networks Ltd. *6.875% Senior Notes due 2023 – Developed and led (with senior investment analyst partner) execution of bankruptcy liquidation strategy based on litigation and ultimate leverage of Canadian liquidating estate*

**Selected Speaking Engagements**

American Law Institute/ NYU Law – Credit Markets and Corporate Reorganization, New York City, April 2017
Moderator, *Auctions and Asset Sales In and Out of Bankruptcy*

University of Texas Law/American Bankruptcy Institute -- Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2017
Panelist, *Determining Valuation and the Fulcrum Security*
Panelist, *Distressed Investments Strategies*

NYU Law – Claim Priority Roundtable, New York City, September 2016
Panelist, *Allocating Value in and Out of Bankruptcy*

University of Texas Law/ABI – Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2016
Panelist, *ABI Commission Report Proposed Amendments and Their Impact on Valuation*

The M&A Advisor – Distressed Investing Summit, Palm Beach, January 2016
Panelist, *Using Options to Bridge Value Gaps*

NYU Law – Seligman Bankruptcy and Business Reorganization Workshop, New York City, September 2015
Panelist, *Valuation Approaches and Methodologies*

Skadden Arps/Colgate University – Law and Finance Summit, New York City, November 2014
Presenter, *Recent Developments in Bankruptcy and Distressed Debt*

## Dubel & Associates, L.L.C.

# John S. Dubel
# Board of Directors Experience

- **Purdue Pharma Inc. – July 2019 to Present** - Independent Board Member and Chair of the Special Committee of Directors

  In addition to being a member of the Board of Directors of Purdue Pharma Inc., I am the Chair of the Special Committee of Independent Directors charged with overseeing the investigation of relationships between Purdue and Purdue owners, the Sackler family.

- **WMC Mortgage, LLC – Indirect Subsidiary GE – July 2018 to December 2019** - Independent Board Member and Chair of the Special Independent Committee of Directors

  WMC's chapter 11 plan was recently confirmed and WMC will emerge from Chapter 11 in early December 2019. I am the Chair of the Special Independent Committee of Independent Directors for this indirect subsidiary of GE. The Special Committee was tasked with reviewing the relationship between the insolvent WMC and GE and resolving its insolvency issues through a court supervised chapter 11 proceeding. I was the lead person responsible for negotiations with the parent concerning the level of support that the parent was required to provide and worked with our creditors to negotiate a resolution amongst all parties.

- **Werner Co.** – January 2013 to Present – Sole Independent Director

  Werner is a global leader in access equipment, secure storage, light duty construction and fall protection products with operations across all geographies. A consortium of private equity investors bought the assets out of a bankruptcy proceeding in 2007. I was asked to serve on the Board as the sole Independent Director by the largest shareholder. Werner more than doubled the size of its business, diversified its product offering and substantially improved its EBITDA prior to its sale in July 2017. As an independent director, working with one other director, we lead the effort in the sale process that achieved an additional $180 million increase in the sale price of the company for its distressed investors. I am currently the lead director responsible for the resolution of post-sale purchase price adjustments.

- **Old PSG f/k/a Performance Sports Group** – August 2017 to December 2017

  Asked to serve on the Board, by the Official Equity Committee, after the sale of Performance Sports Group's assets. My role was to oversee the plan of reorganization process to drive to a smooth confirmation.

## Dubel & Associates, L.L.C.

- **FXI Holdings** – September 2010 to October 2017 – Independent Director

  FXI is a leading producer of engineered polyurethane foam solutions serving the largest customers in the largest markets. It has the broadest customer and consumer reach of any North American foam producer. FXI's assets where purchased during a bankruptcy proceeding in 2009. I was asked to serve on the board of directors by one of the two private equity firms that owned FXI. Shortly after joining the Board, I was asked to Chair a Special Committee of the Board to manage certain litigation and government investigations related to alleged anti-trust infractions. FXI was the subject of over 50 different class action and individual litigations alleging damages in excess of $3 billion. Over a period of several years, FXI was able to settle all of its litigation for a minor fraction of the alleged damages and all investigations by the government were dropped. During this time, the company's performance improved in a consistent manner with EBITDA more than doubling. Once these litigations were settled, the company was marketed and ultimately sold in October 2017.

- **ResCap Liquidating Trust** – December 2013 to March 2017 – Chairman of the Board - December 2013 to late 2015

  After the ResCap chapter 11 plan was confirmed, I served on the Board of the ResCap Liquidating Trust, as FGIC's representative, to guide the wind down of the remaining assets and prosecute claims in excess of $4 billion against institutions that caused harm to ResCap. During this time, I also served as Liquidating Trustee while we brought on board a new in-house lawyer to prosecute these claims and transitioned this individual into the permanent Liquidating Trustee role.

- **FGIC Corporation and FGIC** - December 2008 to April 2014 – Chairman of the Board during various parts of that time frame – while serving as CEO

- **Barneys New York** – February 2012 to May 2012 – Sole Independent Director

  After Barneys' 2007 sale to Istithmar World, the Government of Dubai's private investment fund, Barneys was impacted by the recession in the late 2000's. I was brought in to serve as the sole independent director during the out of court restructuring process which resulted in a consensual change of control for Barneys to its distressed investor creditors.

- **The Leslie Fay Companies** – April 1993 to May 1996 – while serving as the EVP of Restructuring and CFO

- Mr. Dubel has also served as a member and chairperson of various ad hoc and official creditor committees.

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Key Management Experience

- **Noble Environmental Power –** Restructuring Advisor to the Company - 2018

  Noble was the owner of two utility scale wind power plants in upstate New York which were in default on their debt instruments. Working closely with Noble's investment bankers we were able to complete a sale of these plants while keeping the companies out of chapter 11 and returning net sale proceeds to its shareholders.

- **SunEdison, Inc.** – Chief Executive Officer and Chief Restructuring Officer – 2016-2017

  SunEdison was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SunEdison had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents. A decline in energy prices along with loss of faith in management by investors and numerous litigations filed against the company caused the closing of the capital markets for SunEdison which led to its filing for chapter 11. I was brought in as a requirement of the DIP agreement. SunEdison's assets were sold in a manner to preserve the greatest value for its creditors. I am currently assisting the wind down SunEdison entity as requested.

- **Financial Guaranty Insurance Company** – Chairman and Chief Executive Officer – 2008-2014

  FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts with over $4 billion of capital. After the collapse of the residential mortgage market in the 2007/08 timeframe, FGIC lost its AAA ratings and experienced tremendous losses on its insurance contracts. This led to an insolvency proceeding under NY State insurance law with an innovative resolution through a pre-arranged rehabilitation plan. This enabled it to continue to pay its policy holders in a timely manner.

- **Residential Capital** – Co-Chairman of the Official Creditors Committee – 2012-2013

  ResCap, a wholly owned subsidiary of Ally Financial, was one of the largest mortgage originators in the US. FGIC was its 2nd largest creditor and after its chapter 11 filing in May of 2012, I was appointed as the Co-Chair of ResCap's Official Unsecured Creditors Committee. As the lead negotiator for the UCC, the UCC was able to negotiate an increase in the contribution to the plan of reorganization by the parent, Ally, from approximately $650 million to $2.1 billion. This contribution settled all of the litigation between Ally and Rescap and enabled ResCap to emerge from chapter 11.

App. 0316

**Dubel & Associates, L.L.C.**

- **Anchor Glass Container Corporation** – Chief Restructuring Officer – 2005-2006

Anchor Glass was the 3rd largest manufacturer of glass containers in the US, with Anheuser Busch and Snapple as its largest customers, where it provided "just in time" deliveries to enable its customers plants to operate 24/7. Its third trip through chapter 11 resulted from poor contract pricing and high legacy costs. I worked closely with the CEO to renegotiate these contracts and reduce the cost structure which enabled it to emerge from chapter 11 as a viable business which continues to operate today.

- **RCN Corporation** – President and Chief Operating Officer - 2004

RCN was a Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets with over $1.7 billion of debt incurred during its build out period. Working with the Lead Director, a pre-arranged chapter 11 plan was negotiated with all of its creditor constituencies to enable it to emerge as a profitable business in its markets where it continues to operate today.

- **Cable & Wireless America** – Chief Executive Officer – 2003-2004

C&W America was a premier hosting business with 14% share of the US market and world class a Tier 1 IP Network. When its British parent company experienced financial difficulties, they attempted to abandon C&W America which caused stress for its major customers, including Yahoo, Google and others. A plan was put in place, though a chapter 11 process, to dramatically reduce its daily cash burn and sell the entity while maintaining its customer base.

- **Acterna Corporation** – Chief Restructuring Officer  - 2003

Acterna was a multi-national manufacturer of telecommunications and cable equipment with revenues of approximately $1.7 billion  and debt of $1 billion prior to the industry down turn. I worked closely with the CEO to stabilize the operations and avoid a fire sale of the business. A quick turn through chapter 11 enabled it to emerge as a viable business, where upon the CEO was able to regrow the business and position it for a successful sale to an industry player 18 months later.

- **WorldCom, Inc.** – Chief Financial Officer – 2002, Advisor – 2003

WorldCom was one of the largest telecommunication companies with assets of over $107 billion and operations across the globe. It filed for chapter 11 during 2002 due to a massive fraud which covered up the significant operational deficiencies and losses it was experiencing. I was brought in as a condition of the DIP agreement and worked closely with the CEO and other members of the senior management to stabilize the company, restructure the operations to reduce opex, provide stability to the international operations and assist with the plan of reorganization negotiations and confirmation.

**Dubel & Associates, L.L.C.**

- **CellNet Data Systems, Inc.** – Chief Restructuring Officer – 1999-2001

  CellNet was a startup technology company that provided smart grid and smart metering and billing solutions for the utility industry. After burning through in excess of $600 million of initial funding it was not able to access the capital markets to continue to build out its platform and realize the cost synergies across contracts that would make it profitable. Working closely with the new CEO, we reduced the cost structure and sold the company to one of its meter suppliers enabling it to continue to operate in a successful manner.

- **Barneys New York** – Chief Financial Officer – 1996-1999

  Barneys was, at this time, a family owned high end retail store chain operating with over 30 stores and international affiliations in Asia. After an uncontrolled growth plan and management that did not understand its cost structure, it filed for chapter 11. I was brought in a the request of the DIP lender to oversee the family's management, to control its costs, close unprofitable locations, renegotiate store leases and work out a consensual chapter 11 plan that included its largest creditors providing financing through a rights offering to enable Barneys to successfully emerge from chapter 11 as a profitable retailer.

- **The Leslie Fay Companies** – EVP Restructuring and Chief Financial Officer – 1993-1995

  Leslie Fay was one of the larger designer and manufacturer of ladies dresses, sportwear and suits in the US. A public company, it was the victim of fraud by its financial management team to hide the true cost of operations and manufacturing of its products. This led to a chapter 11 filing. I worked closely with the CEO and President to stabilize its financial management team, reduce costs and position it for an emergence from chapter 11.

- **Robert Maxwell Group** – Head of US Private Companies – 1991-1993

  Robert Maxwell was a British entrepreneur who invested heavily in the publishing space. After financial improprieties were uncovered and his subsequent suicide, I was appointed by the UK Administrators to run all of his US operations, which included over 40 private companies. I worked closely with the UK administers to realize value through sales of these US operations and turn those proceeds over to the UK Administrators.

### Dubel & Associates, L.L.C.

Mr. Dubel is a past board member and officer of the Association of Insolvency and Reorganization Advisors, a Certified Insolvency and Reorganization Advisor and is a member of the Turnaround Management Association and the American Bankruptcy Institute. Mr. Dubel received a Bachelor in Business Administration degree from the College of William and Mary.

# Dubel & Associates, LLC

# Selected Case Studies

## SunEdison, Inc.
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- SunEdison (SUNE) was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SUNE had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents

- Continued downward pressure on energy prices caused renewable energy projects to experience stress. Lack of proper integration of acquisitions and overpayment on other acquisitions caused a liquidity crisis. Public spin-offs of profitable yieldco assets cut off cash flow that was needed to run the operations.

- Senior management control of the Yieldcos enabled borrowings from the Yieldcos which could not be repaid

**Actions Taken**

- Hired initially as CRO with a clear mandate to take on CEO responsibilities

- An immediate assessment of the opportunity to maintain a going concern was initiated.

- Programs were put in place to plug the employee exodus that SUNE was experiencing

- In consultation with our lenders made the determination that an orderly sale of assets was the best path to optimum value realization

- Maintained an open line of communication with the DIP, 1L and 2 L lenders to build back trust in the company

- Engaged with the Board of the Yieldcos, TERP and GLBL, to work towards a resolution of the disputes between the Yieldcos and SUNE

**Results**

- Took on CEO role after a short transition with the former CEO

- Reorganization of key personnel functions including the hiring of a new CFO and Controller provided stability in the Finance functions for the company to operate within the limits of the DIP agreement.

- Executed a global marketing process which resulted in over 60 asset sales with approximately $1.5 billion of gross proceeds

- Executed a plan which resulted in the transition of administrative and operational functions from SUNE to the Yieldcos which helped stabilize the value of our ownership stake in these entities

App. 0321

## SunEdison, Inc. (continued)
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Class and individual litigation against SUNE and the Yieldcos related to these control issues ensued.
- Shortly after a Feb 2016 2L financing the company has exhausted those funds and was out of available funds to operate the business.
- Additional litigation commenced related to cancelled acquisitions.
- During this timeframe, the creditors lost faith in the CEO and CFO.
- SUNE filed for chapter 11 in late April 2016 funded by a DIP provided by the 1L and 2L creditors.

**Actions Taken**

- Engaged with the Board and management of the Yieldcos, TERP and GLBL, to start to work towards a resolution of the disputes between the Yieldcos and SUNE
- Put in place a path to seek resolution of all of the Class Action and individual shareholder litigations by seeking a mediation in the District Court and Bankruptcy Court litigation related to both SUNE and the Yieldcos
- Commenced negotiations to settle the various litigations amongst SUNE's creditor groups and between SUNE and its Yieldcos
- Worked closely with Chief Judge Morris, the mediator appointed in the case, to craft a resolution to all intercreditor disputes

**Results**

- Drove a plan, through a directed litigation strategy, to force a resolution of the over $3 billion of claims brought against SUNE by the Yieldcos which resulted in a cooperative sale of the Yieldcos netting SUNE approximately $825 million
- A replacement DIP agreement was put in place to eliminate certain concerned creditors and align the interests of the DIP lenders and the prepetition secured creditors.
- Settlements of the vast majority of class and individual shareholders were negotiated
- A mediated resolution amongst SUNE's creditor resulted in a successful chapter plan of reorg funded by a rights offering led by SUNE's 2L creditors

App. 0322

## Financial Guaranty Insurance Company
### John Dubel – Chief Executive Officer and member of the Board of Directors

### Situation

- FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts

- At the start of 2008, FGIC was at risk of losing its AAA ratings

- The residential real estate meltdown caused FGIC to face billions of dollars of claims from CDS and RMBS contracts it had insured

- In addition, several of FGIC's largest public finance deals were on the cusp of defaulting

- In late 2009, FGIC's statutory capital went negative and was subject to immediate takeover by the NYS Department of Financial Services

### Actions Taken

- Raised capital surplus by $830 million through reinsurance agreements and preferred stock

- Negotiated settlements of CDS contracts

- Managed the workout of multiple public finance insurance contracts

- Managed affirmative litigation actions to recover from parties that harmed FGIC's insurance contracts

- Developed an innovative restructuring plan to allow FGIC to file a pre-arranged rehabilitation plan in NYS Court

- Positioned the company to be able to operate in the post rehabilitation environment to pay claims to policyholders in a timely manner

### Results

- Planned and executed an orderly Rehabilitation Plan process which resulted in an innovative and precedent setting proceeding for FGIC's policyholders

- Managed down the overall exposure from $312 billion to under $30 billion

- Settled parent/subsidiary issues without litigation

- Recovered in excess of $1.25 billion for policyholders from parties that harmed FGIC's contracts

- All of these results were accomplished while maintaining an independent view towards protecting all policyholders interests

App. 0323

## RCN Corporation – Integrated Triple Play Service Provider
### John Dubel – President and Chief Operating Officer

### Situation

- Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets
- Revenues of approximately $500 million
- Over 1 million connections
- $1.7 BN of debt in default
- Secured creditors pushing the Company to a forced liquidation
- Lack of confidence in management's business plan and ability to rationalize the business
- Company lacked adequate liquidity to maintain operations

### Actions Taken

- Hired as President and CRO to lead RCN during this crisis.
- Implemented reorganization of operating costs achieving positive EBITDA and cash flow
- Actions included:
  - Rationalized customer base
  - Segmented Customer Service activity and automated where possible
  - Consolidated Network Operations to drive efficiency
  - Reduced IT functions
  - Reduced customer service call volume through web-based solutions
  - Simplified product offering
  - Generated Tech Operations savings

### Results

- Streamlined operations and reduced breakeven costs achieving positive cash flow and EBITDA
- Reduced annualized SG&A costs by 20%
- Reduced headcount by 25%
- Improved Customer Service quality
- Company emerged with over $125 million of cash in hand
- Instituted rigorous cost reduction procedures within the company
- Positioned the company for future positive growth

App. 0324

## Cable & Wireless America – Successfully Positioned the Company for a Sale
### John Dubel – Chief Executive Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Premier hosting business with 14% share of the US market by revenue and World Class Tier 1 IP Network

- Parent company's announcement of intention to exit the US market created uncertainty for customers, suppliers, and employees

- Daily cash burn estimated at $2M

- Need to stabilize standalone operations and facilitate a sale transaction

**Actions Taken**

- Negotiated terms of separation from parent company and obtained ongoing funding commitment

- Stabilized skittish customer base

- Took control of cash management and forecasting process

- Implemented cost cutting strategy to achieve cash flow breakeven within 9 months

- Managed extensive due diligence process by multiple bidders

**Results**

- Reduced daily cash burn to $0.7M

- Planned and executed orderly Chapter 11 filing with the support of a "stalking horse" bidder to facilitate a 363 sale

- Active auction process resulted in total bid consideration of $167.5M, a threefold increase over the stalking horse bid value

App. 0325

## Acterna – Reduced Costs, Drove a Successful Turnaround
### John Dubel – Chief Restructuring Officer

### Situation

- Leading Telecom Network equipment supplier with worldwide operations that was facing a severe liquidity crisis

- Test equipment market was crippled by the drought of capital spending from Telecom Network companies

- Debt levels were not sustainable in then current market conditions

### Actions Taken

- Assumed role of CRO to lead company through Chapter 11

- Restructured $1.0 BN of debt

- Preserved non-domestic assets across 30 countries necessary to a successful reorganization.

- Focused sales activity on core markets

- Worked with management to reduce SG&A costs

- Rationalized headcount through centralization of manufacturing activity

- Managed the subsidiary divestiture program

- Integrated worldwide cash control procedures improving liquidity

### Results

- Acterna emerged from Chapter 11 with 80% less debt and a reduction of 85% of interest costs in less than 6 months

- Improved international cash liquidity sufficiently for non-US operations to become self funding

- Cash at emergence was over $60 million

- Reduced operating cash costs so the company was self funding and the DIP was never used to operate the company

- 18 months after C-11, Acterna announced a sale to JDS Uniphase, for a three fold increase in value.

App. 0326

## WorldCom – Stabilized Operations and Finance Function
### John Dubel – Chief Financial Officer

### Situation

- A massive fraud which masked operational, financial and reporting issues crippled the company's credibility

- WorldCom suffered from excess debt with declining value of assets, financial fraud issues, contentious relationship with creditors, and a substantial cash burn

- Significant negative cash flow from international operations

- WorldCom filed for bankruptcy in July of 2002, becoming the largest bankruptcy filing in history at the time

### Actions Taken

- Assumed role  Chief Financial Officer until a permanent management team could be put in place then worked as financial advisor for pendency of Chapter 11 case

- Put turnaround teams, operational restructuring plans, and cash management plans in place

- Led the international restructuring efforts

- Assisted in negotiations with creditors

- Implemented an achievable 2003 business plan, facilitated several cost reduction initiatives, and managed the 13-week cash flow forecast

- Reduced capital spending

### Results

- Achieved $2 BN of operational savings

- Increased cash flow by more than $100M in international operations and avoided bankruptcy in many jurisdictions

- Worked with all stakeholders to reach consensus on a plan of reorganization

- Successfully restructured the balance sheet

App. 0327



**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession (the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED on the terms and conditions set forth herein.

2. The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) entering into the Governing Documents and compensating the Independent Directors for their services either directly or by reimbursing Strand for any costs incurred in connection with the appointment and compensation of the Debtor; (ii) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3. Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

4. Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

5. The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

2

App. 0329