# Appendix Exhibit 22

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br>    Debtor. | ) Chapter 11<br>)<br>) Case No. 19-34054-sgj11<br>)<br>)<br>) **Docket Ref. No. 474**<br>) |

**OBJECTION OF THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE**
**DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING,**
**THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"**

The official committee of unsecured creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor"), hereby submits this objection (this "Objection") to the *Motion of the Debtor for Entry of an Order Authorizing, But Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No.474] (the "Distribution Motion").[2] In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Committee's objection focuses on a very limited portion of the transaction currently proposed by the Debtor – namely, proposed distributions of approximately $8.6 million (the "Proposed Insider Distributions") to several insiders who not only owe money to the Debtor but also may be the target of avoidance and other litigation brought by the Committee on behalf

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Distribution Motion.

of the Debtor's estate - Mark Okada and two entities owned and/or controlled by James Dondero and/or Mark Okada (such entities, together with Messrs. Dondero and Okada, the "<u>Insider Parties</u>").  As this Court is aware, Messrs. Dondero and Okada owned and controlled the Debtor for most of the past 30 years.  During that time, the Debtor repeatedly breached fiduciary duties and contractual obligations, leading to hundreds of millions of dollars in judgments against the Debtor and certain affiliates.  The Committee is currently investigating a variety of significant potential estate claims against the Insider Parties.  For example, certain of the interests held by the Insider Parties, which form the basis for a portion of the Proposed Insider Distributions, were once owned by the Debtor – the Committee is investigating, among other things, the propriety of the transfers of these interests from the Debtor to the Insider Parties.  In addition, Messrs. Dondero and Okada currently owe the Debtor over $10.6 million in demand notes and another Insider Party owes the Debtor nearly $7.5 million in notes receivable, some of which also are demand notes.  In light of these and other potential claims, which are only now the subject of review by a party other than the Debtor, the Committee believes the Proposed Insider Distributions to the Insider Parties should be reserved in segregated accounts pending resolution of the issues under investigation by the Committee and repayment of all amounts owed to the Debtor by the Insider Parties.

2. This Court's order granting the relief requested by the Committee would shield the Debtor from any purported legal risks associated with withholding the Proposed Insider Distributions.  Similarly, the Debtor and Independent Board would not breach their fiduciary duties by complying with this Court's order to withhold the Proposed Insider Distributions.[3]

---

[3] Even absent court order, the Committee is highly skeptical of the legal merit of any such legal claims by Messrs. Dondero and Okada and related damages for any alleged breach of contract and/or fiduciary duty by the Debtor.

3. Temporarily withholding and segregating the proposed distributions would greatly facilitate the Debtor's interests while causing little harm to the Insider Parties. It would facilitate repayment of over $18 million in notes payable to the Debtor by the Insider Parties. Moreover, delay in the distribution will allow the Committee an adequate opportunity to investigate potential estate claims against the Insider Parties, including claims arising from the very transactions pursuant to which the Debtor transferred certain of the interests at issue to such parties.

4. While the Debtor and Independent Board have taken the position that they cannot affirmatively seek this relief, clearly both should be supportive of this outcome which preserves claims of the Debtor's estate and a ready source of recovery for the outstanding demand notes. Moreover, the Proposed Insider Distributions will be temporarily placed in segregated, interest bearing accounts, compensating the Insider Parties for any material injury from the mere passage of time. To the extent Messrs. Dondero and Okada believe they would incur additional harm of which the Committee is not aware, they – not the Debtor – should bring those concerns directly to this Court.

## OBJECTION

5. Through the Distribution Motion, the Debtor seeks authority to make redemption payments and other distributions to investors in certain funds managed by the Debtor. Specifically, as part of the Debtor's plan to distribute (i) approximately $123.25 million to investors of RCP, (ii) $21.8 million to investors of AROF in connection with the wind up of such fund, and (iii) $34.8 million to investors in Dynamic in connection with the wind up of such fund – the Debtor seeks authority for some of the foregoing distributions to be made to the Insider Parties. Of the almost $180 million in distributions, the Committee only objects to the distribution of a total of $8.6 million to be distributed to three Insider Parties. Specifically, the Committee objects to the request

3

to make distributions to Mark Okada, Highland Capital Management Services, Inc. ("HCM Services," owned by James Dondero, and Mark Okada), and CLO Holdco Ltd. ("CLOH").[4] To be clear, the Committee does not object to the Debtor's orderly liquidation of Dynamic or AROF, or to the distributions from AROF, Dynamic, and RCP to any third-party, non-affiliated investors. However, in light of the significant amounts of money owed to the Debtor by Mr. Okada, Mr. Dondero and HCM Services, the Committee's ongoing investigation of the Debtor's insiders and related entities (including with respect to the propriety of how the Insider Parties obtained the interests which form the basis of the Proposed Insider Distributions (such interests, the "Insider Interests")), and the well-documented fraudulent and improper activities engaged in by the Debtor's insiders, the Committee requests that the Court order the Debtor to hold the Proposed Insider Distributions in a reserve for a limited period of time.

I. **The Proposed Insider Distributions Should Be Reserved Pending the Repayment of Insiders Parties' Obligations Owed to the Debtor and the Committee Investigation**

6. Through the Distribution Motion, the Debtor seeks to make the following Proposed Insider Distributions:

| Investor | Distribution Amount | Fund |
|---|---:|---|
| CLO HoldCo, Ltd. | $872,000 | AROF |
| CLO HoldCo, Ltd. | $1,521,000 | Dynamic |
| Mark Okada | $4,185,000 | Dynamic |
| Highland Capital Management Services, Inc. | $2,085,000 | RCP |
| **Total** | **$8,663,000** | |

These Proposed Insider Distributions are a small portion of the $180 million to be distributed from Dynamic, AROF and RCP.

---

[4] The Distribution Motion also seeks authority to make distributions to Highland Dynamic Income Fund GP, LLC. The Committee does not object to such distribution.

4

*The Insider Parties Owe the Debtor Money*

7. It is undisputed that James Dondero, Mark Okada, and HCM Services owe the Debtor significant amounts of money. The Debtor's schedule of assets and liabilities [Docket No. 247] discloses that, as of the Petition Date, the Debtor holds notes receivable from (i) James Dondero, in the principle amount of $9,334,012 (the "Dondero Note")[5]; (ii) HCM Services in the aggregate principle amount of $7,482,480.88 (the "HCM Services Notes"), and (iii) Mark Okada, in the principle amount of $1,336,287.84 (the "Okada Note", and with the Dondero Note and the HCM Services Notes, the "Notes"). The Dondero Note, the Okada Note, and four of the five HCM Services Notes are demand notes, payable upon the request of the Debtor. These Notes should be repaid before the Debtor makes any distributions to these insiders.

*The Insider Parties Have Engaged in a Pattern of Fraudulent Activities to the Detriment of Creditors*

8. Further, as this Court is well-aware, the Debtor has a documented history of engaging in misconduct, breaches of fiduciary duty and fraudulent transactions in multiple settings, which ultimately led to the commencement of this bankruptcy case. At all relevant times, Mr. Dondero and Mr. Okada, as co-founders and executive officers, managed and controlled the Debtor and were ultimately responsible for the Debtor's pattern of misconduct, breaches of fiduciary duty and fraudulent activities.

9. As examples of the extensive misconduct, in 2014, the Securities and Exchange Commission ("SEC") determined (i) that the Debtor knowingly engaged in multiple transactions with its client advisory accounts without disclosing that the Debtor was acting as principal, or obtaining client consent, before the trades were completed, and (ii) that the debtor failed to

---

[5] The Dondero Note is in addition to $18.3 million owed to the Debtor under a demand note made by The Dugaboy Investment Trust, of which Mr. Dondero is a beneficiary.

maintain sufficient documentation with respect to certain transactions. *See* SEC Order ¶¶ 6-7, *In the Matter of Highland Capital Mgmt., L.P.*, File No. 3-16169 [Docket No. 130. Ex. A]. As established in the Redeemer Committee litigation, the Debtor, under the control of Mr. Dondero and Mr. Okada, was found to have covertly and improperly taken $32.3 million in cash out of the a fund for which the Debtor acted as investment manager (the "Crusader Fund"), and was found to have made decisions with the "willful intent" to benefit itself and not the parties to whom the Debtor owed fiduciary duties. An arbitration panel unanimously found that the Debtor, Mr. Dondero, and Highland's in-house lawyers violated their fiduciary duties to the Crusader Fund, engaged in willful misconduct, self-dealing, and secrecy, and made multiple misrepresentations to the Crusader Fund's investors as well as the Debtor's auditors.

10. In the Acis Capital Management bankruptcy case, this Court found that there was a "legitimate prospect" that the Debtor "would continue dismantling [Acis], to the detriment of [Acis] creditors." *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 147, 149 (Bankr. N.D. Tex. 2018). Following an arbitration award against Acis, Mr. Dondero and other members of the Debtor's management transferred tens of millions of dollars in assets out of Acis into newly-formed Cayman Islands-based Highland affiliates. *Id.* at 127-130. This Court ultimately concluded that the "record contain[ed] substantial evidence of both intentional and constructive fraudulent transfers," and "[t]he numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear[ed] more likely than not to have been made to deprive the Debtor-Acis of value and with the actual intent to hinder, delay, or defraud the Debtors' creditors." *See In re Acis Capital Mgmt., L.P.*, No. 18-30264, 2019 WL 417149, at *11 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd* 604 B.R. 484 (N.D. Tex. 2019). In both the Acis bankruptcy case and the Crusader Fund arbitration, the Debtor's management were found to have manufactured dishonest and

illegitimate defenses and provided unreliable and incredible testimony regarding the Debtor's actions.

11. Each of the Insider Parties are closely affiliated with Mr. Dondero and/or the fraudulent actions that led the Debtor to bankruptcy:

- *Mark Okada*: Mr. Okada is the co-founder of the Debtor, and was the Chief Investment Officer until shortly before the commencement of this chapter 11 case. As Chief Investment Officer, Mr. Okada was responsible for overseeing the Debtor's investment activities across all investment platforms. Mr. Okada was an executive officer of the Debtor (i) when the Debtor was found by the SEC to have engaged in wrongful transactions without disclosing important information to clients, (ii) when the Debtor stripped Acis of its assets – CLO portfolio management contracts – and transferred to them a newly formed Cayman entity, and (iii) when the Debtor engaged in misconduct and breached fiduciary duties with respect to the Crusader Fund. Mr. Okada was the beneficial owner of 25% of Acis Capital Management, L.P. when Mr. Dondero and the Debtor transferred assets away from Acis, and this Court found that Mr. Dondero and Mr. Okada were the individuals making decisions for Highland CLO Funding Ltd. ("HCLOF Guernsey") in connection with the events leading to the Acis bankruptcy litigation.[6]

- *HCM Services* – As the Debtor disclosed, HCM Services is owned 75% by Mr. Dondero and 25% by Mr. Okada. HCM Services appears to have received its interests in RCP from the Debtor, but the circumstances of such transaction have yet to be fully investigated by the Committee. HCM Services owes the Debtor $7,482,481, of which $900,000 is payable on demand. The Committee understands that Mr. Dondero remains in complete control of HCM Services.

- *CLOH* – CLOH is an entity owned by Charitable DAF Fund, LP (the "DAF"), which was seeded with contributions from the Debtor; the consideration for such contributions has yet to be fully investigated by the Committee. The DAF is managed and advised by the Debtor, and its trustee is a long-time friend of Mr. Dondero.[7] The trustee for the DAF has also served as trustee for The Get Good Trust, The Dugaboy Investment Trust, and the SLHC Trust, of which Mr. Dondero

---

[6] *In re Acis Capital Management, L.P.*, 2019 WL 417149, at *7, *9 (Bankr. N.D. Tex. January 31, 2019) (observing (i) that Mr. Okada owed 25% of Acis until the day after Mr. Terry obtained his arbitration judgement against Acis, at which point Mr. Okada conveyed his interests in Acis to Neutra, Ltd. for no consideration, and that (ii) Mr. Dondero, Mr. Okada, and another Highland employee made decisions for HCLOF Guernsey regarding the optional redemptions of the Acis CLOs).

[7] *See In re Acis Capital Management, L.P.*, 2019 WL 417149, at *6 (Bankr. N.D. Tex. January 31, 2019) (noting that one of the three equity owners of HCLOF Guernsey was the DAF, which was "seeded with contributions from *Highland*, is managed/advised by *Highland*, and whose *independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero*" (emphasis in original)).

is a beneficiary. The Distribution Motion discloses that the interests in Dynamic currently held by CLOH were originally held by the Debtor, and were transferred to The Get Good Nonexempt Trust, in exchange for Get Good's interest in a promissory note made by The Dugaboy Investment Trust, and then from Get Good to Mr. Dondero's Highland Dallas Foundation, Inc. and then to CLOH. The Distribution Motion does not disclose how or when CLOH obtained its interests in AROF. The Committee is investigating CLOH's relationship to and transactions with Mr. Dondero and other entities controlled by or otherwise benefitting Mr. Dondero.

*The Committee is Investigating Claims Against the Insider Parties, Including Transfers the Transfers of the Insider Interest*

12. Pursuant to the Term Sheet outlining the agreement between the Debtor and the Committee, the Committee has standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor and the Debtor's related entities (which include the DAF and CLOH), "including any promissory notes held by any of the foregoing." [Docket No. 354] This part of the settlement with the Debtor was a critical component of the Committee's agreement to the governance structure in lieu of seeking appointment of a chapter 11 trustee. The Committee has begun its investigation and served document production requests to the Debtor. Among other claims and causes of action, the Committee is investigating potential preferential transfers, fraudulent transfers, breaches of fiduciary duties, usurpation of corporate opportunities, misappropriation of assets, and abuses of the corporate form. The Committee's investigation includes fully exploring the circumstances and transactions through which HCM Services, CLOH and Mr. Okada obtained the Insider Interests.

13. The Debtor's history of self-dealing and improper or fraudulent activities suggests that the Committee's investigation is likely to uncover similar inappropriate activities with respect to the Debtor's assets, including the Insider Interests. The Debtor's statements of financial affairs [Docket No. 248] disclosed that the Debtor made significant payments to affiliates through purported intercompany funding and affiliate loans in the 90 days prior to the filing date, along

8

with significant other insider transfers in the one year before the filing date (including very large expense reimbursement payments to Mr. Dondero). The Committee must have the opportunity to fully investigate the insider and affiliate transactions, including those that gave rise to the Insider Interests, that may be the subject of valuable estate causes of action before transactions distributing funds to those same insiders and affiliates can be consummated.

14. This is all the more true because the evidence is that, even during this bankruptcy case, Mr. Dondero continues to engage in secretive and potentially improper transactions. The Distribution Motion fails to highlight that the MGM Sale was negotiated by Mr. Dondero without the knowledge or approval of Debtor's counsel or the Debtor's financial advisors. Specifically, at the very same time that the Debtor's counsel and financial advisors were attempting to persuade the Committee to approve certain transactions with respect to RCP, Mr. Dondero, unbeknownst to any Debtor professional, committed the Debtor to executing the MGM Sale. The Independent Directors, the Debtor's counsel and the Debtor's CRO and financial advisors were not made aware of the MGM Sale until *two months* after Mr. Dondero allegedly committed to the transaction on behalf of the Debtor. While the Committee has decided not to object to the MGM Sale itself (based, in significant part, on feedback from the Independent Board regarding its concern about the alleged binding nature of Mr. Dondero's secretive agreement with MGM), the circumstances surrounding Mr. Dondero's negotiation of and entry into the transaction are alarming at best, and the Committee has not waived any rights to fully investigate that transaction and any related potential causes of action against Mr. Dondero or others.

15. In addition to its concern that some or all of the Proposed Insider Distributions may be on account of otherwise avoidable transactions, based upon the Interested Parties' long history of transferring assets and taking other actions to hinder, delay, and defraud creditors, the

9

Committee is also seriously concerned that the Insider Parties will swiftly place these distributions out of reach of the Debtor's estate while refusing to satisfy their obligations to the Debtor. Such actions would jeopardize the estate's ability to recover amounts owed to it and any future judgments against the Insider Parties, and would waste estate resources by forcing the Debtor to incur additional litigation costs to recover such debts and judgments.

## II. The Court Has Authority to Direct the Debtor to Withhold the Proposed Insider Distributions

16. The Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "Courts interpret Section 105 liberally." *King Louie Mining, LLC v. Comu (In re Comu)*, Nos. 09-38820-SGJ-7, 10-03269-SGJ, 2014 Bankr. LEXIS 2969, at *264 (Bankr. N.D. Tex. July 8, 2014) (citing *Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994)). While the Supreme Court has found that section 105(a) does not give the bankruptcy court the ability to take any actions explicitly prohibited by another provision of the Bankruptcy Code, it does grant "extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1188 (7th Cir. 2015) (citing *Law v. Siegel*, 571 U.S. 415, 420 (2014). Section 105 has been the source of authority for courts to, among other things, enjoin third parties, substantively consolidate non-debtors, and extend the automatic stay. *See e.g., Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (1995) (holding that an injunction issued under § 105 was an appropriate use of the court's powers); *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 769 (9th Cir. 2000) (holding that the court's power to substantively consolidate non-debtors was found in § 105); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230

(6th Cir. 1985) (holding that a preliminary injunction issued to bar distributions from a non-debtor to third parties was an appropriate use of the court's equitable power under § 105).

17. Temporarily withholding the Proposed Insider Distributions and placing the corresponding funds in segregated accounts is well within the authority of this Court under section 105 of the Bankruptcy Code. The Insider Parties are current and former affiliates and/or insiders of the Debtor and creditors of the Debtor. The order requested by the Committee will allow full investigation of the claims and causes of action against the Insider Parties that was integral to the settlement approved by this Court in connection with approval of the Term Sheet. Furthermore, the Committee submits (and the Debtor has not asserted otherwise) that the relief sought by the Committee would not violate any explicit or implicit requirements of the Bankruptcy Code. Therefore, the Court need only consider the equitable nature of the relief that the Committee seeks, and its appropriateness in the context of furthering the goals of this bankruptcy. *See In re Caesars Entm't Operating Co.*, 808 F.3d at 1188.

18. The equitable argument for temporarily withholding the Proposed Insider Distributions and segregating such funds is straightforward. These actions merely maintain the status quo. The Committee is not requesting that the Debtor effectuate a set-off or take possession of the Proposed Insider Distribution. No party has asserted that any economic harm (much less any significant harm) will be done to the Insider Parties by holding the Proposed Insider Distributions in segregated interest bearing accounts pending further order of this Court. On the other hand, the withholding of the Proposed Insider Distributions (and the resulting leverage that creates against the Insider Parties) may be the only chance for the Debtor to receive any value for the amounts it is owed (or potentially owed) by the Insider Parties or obtaining redress for fraudulent or improper transactions involving those parties, including with respect to the Insider

11

Interest. As set forth above, the Insider Parties and the persons controlling them have repeatedly engaged in schemes and other behavior designed to evade creditors. It should not surprise this Court to learn that, after making demand for payment on the demand note from Mr. Okada as of February 13th at the urging of the Committee, the Debtor still has yet to receive any payment from Mr. Okada. Absent approval of the Committee's request, the Debtor's efforts to collect from the Insider Parties may be extremely cost intensive and time-consuming. It is fair and equitable for this Court to temporarily prevent money from flowing to the Insider Parties in order to facilitate the Debtor's efforts to recover amounts owed to it. Furthermore, the Committee should be given the opportunity to investigate the propriety of the Debtor's transfers of its interests in the underlying funds to the Insider Parties, including the Insider Interests. Maintaining the status quo until the Committee has investigated those transfers is fair and equitable and falls well within this Court's authority under section 105.

19. Moreover, the relief sought by the Committee would further the goals of this bankruptcy case and would allow the Debtor to fulfill its duties to creditors by maximizing the value of the estate. The Debtor contends, and the Committee does not disagree, that the Debtor has certain contractual and fiduciary duties to the investors in the funds that it manages. The Debtor asserts that those duties compelled the Debtor to file the Distribution Motion. *Distribution Motion* ¶ 7. The Debtor also has duties to its creditors, however, and the Committee, for the reasons set forth above, asserts that such duties require the Debtor to avoid making the Proposed Insider Distributions at this time. Filing the Distribution Motion should fulfill any duties the Debtor may have to the Insider Parties in respect of the Proposed Insider Distributions. An order from this Court providing that the Proposed Insider Distributions should be temporarily withheld

and segregated fully addresses any conflict of duties the Debtor otherwise may have, and would allow the Debtor to more effectively carry out its duty to maximize the value of the estate.

20. Accordingly, the Committee believes that the Court should order the Debtor to withhold and segregate the Proposed Insider Distributions until (i) the Insider Parties repay the Notes that are currently due and payable and (ii) the Committee has an opportunity to fully investigate estate causes of action against such Insider Parties. The Committee does not propose that the Debtor effectuate a setoff or take possession of the Proposed Insider Distributions; rather the Committee requests that the Court order the Debtor to segregate and hold the Proposed Insider Distributions in reserve for a limited period of time in order to avoid the significant prejudice to the estate in allowing cash distributions to be paid to Insider Parties and beneficiaries that owe the Debtor money, and then forcing the estate to spend resources recovering assets from these parties.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Committee respectfully requests that the Court deny the Distribution Motion and direct the Debtor to hold the Proposed Insider Distributions in segregated interest bearing accounts pending further order of the Court.

Dated: March 2, 2020
      Dallas, Texas

SIDLEY AUSTIN LLP
/s/ *Juliana Hoffman*
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

Bojan Guzina (admitted *pro hac vice*)
Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS