# Appendix Exhibit 28

Docket #0644 Date Filed: 05/20/2020

**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice pending*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: andrew.clubok@lw.com
           sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Ste. 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:   jeff.bjork@lw.com
            kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX. Bar No. 18855645)
Candice Carson (TX. Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas  75240
Telephone:  (469) 680-5502
Facsimile: (469) 680-5501
E-mail: martin.sosland@butlersnow.com
            candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS*
*AG, London Branch*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

| | |
|---|---|
| *In re* | : |
| | :    Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | : |
| | :    Case No. 19-34054-sgj11 |
| Debtor. | : |

---

## UBS'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH
## <u>STATE COURT ACTION</u>

---

[1]      The Debtor's last four digits of its taxpayer identification number are 6725.  The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201

1934054200520000000000002

**PURSUANT TO LOCAL BANKRUPTCY RULE 4001-1(b), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET #1254, DALLAS, TEXAS 75242 BEFORE CLOSE OF BUSINESS ON JUNE 3, 2020, WHICH IS AT LEAST 14 DAYS FROM THE DATE OF SERVICE HEREOF. A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY AND ANY TRUSTEE OR EXAMINER APPOINTED IN THE CASE. ANY RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE ADEQUATELY PROTECTED IF THE STAY IS TO BE CONTINUED.**

UBS Securities LLC and UBS AG, London Branch (together, "UBS"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for entry of an order, in substantially the form attached hereto as **Exhibit A**, granting relief from the automatic stay provided by Section 362 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), to allow UBS to continue a trial in a long pending state court action (the "State Court Action") against Highland Capital Management, L.P. (the "Debtor"), amongst other parties. Additionally, this Motion seeks to preserve UBS's right to try the State Court Action before a jury—a right that UBS risks waiving by filing a proof of claim in this case.

As a threshold matter, this Court should lift the automatic stay for the simple reason that the Debtor *previously agreed* that the proper forum for resolution of the State Court Action is the Supreme Court of the State of New York (the "State Court"), where the State Court Action has been pending since February 2009. The Debtor agreed, in writing, to stipulate to lifting the automatic stay and to the continuation of the pending trial in the State Court. In reliance on that representation, UBS agreed to jointly request that the State Court keep the judgment that UBS obtained in "Phase I" of the bifurcated trial in the State Court Action under seal for a limited time, while the parties pursued settlement discussions regarding UBS's remaining claims in the State Court Action (*i.e.*, the claims to be adjudicated by a jury in "Phase II"). In further reliance on this

2

agreement, UBS supported the governance structure initially put forward by the Debtor and has pursued a path towards reconciliation throughout this chapter 11 proceeding.  To date, the parties have been unable to reach a resolution on their own.  Now, however, having already received the benefit of its bargain (a delayed release of the Phase I judgment, among other things), the Debtor—inexplicably—refuses to honor its agreement to stipulate to lifting the stay so that Phase II can proceed in State Court, as planned.  UBS respectfully submits that this Court should hold the Debtor to its end of the bargain.

Furthermore, cause exists to lift the automatic stay for numerous reasons independent of the Debtor's agreement, and the Debtor cannot meet its burden to show otherwise.

*First*, UBS will be prejudiced absent the requested relief.  If the stay is not lifted, UBS potentially would be required to litigate Phase II against the Debtor in this Court, a forum that does not have the benefit of the State Court's experience with the complex facts and lengthy procedural history of the State Court Action.  On the other hand, the Debtor would not be prejudiced in any way if the stay is lifted.  The Debtor represented to the State Court (in December 2019) that it could be ready and able to litigate the remainder of the State Court Action in six months' time. And in fact, litigating the State Court Action now would benefit the Debtor's estate, by eliminating the uncertainty over the amount of UBS's claim (the largest claim that has been asserted against the Debtor here) and thus expediting chapter 11 plan negotiations.

*Second*, questions of judicial economy favor lifting the automatic stay.  The Debtor is not the only Defendant in the State Court Action.  Other remaining defendants include: Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC") (SOHC and CDO Fund together, the "Fund Counterparties," and the Fund Counterparties and the Debtor, collectively, "Highland"), as well as Highland Financial Partners, L.P., Highland Credit Opportunities CDO, L.P. (now Highland Multi Strategy Credit Fund, L.P.),

3

and Strand Advisors, Inc. The parties are in the middle of a trial. Because Phase II of the State Court Action still needs to be litigated against *all* remaining defendants, judicial economy is served by lifting the stay and resolving all of UBS's pending claims in one forum, at one time. This approach would benefit all parties: UBS would not need to try its case twice, the Debtor and remaining Highland entities could share the costs of one action, and the parties' witnesses would not need to travel to multiple forums to testify about the same events. To take any other approach, on the other hand, would waste judicial resources and potentially result in inconsistent rulings.

*Third*, cause exists to lift the stay because should the Debtor attempt to remove the State Court Action to this Court, the doctrine of either mandatory or permissive abstention should prevent this Court from hearing those claims, as set forth below. The only appropriate forum to resolve the State Court Action is the State Court. The stay should be lifted now to resolve those claims, which are crucial to the resolution of this chapter 11 case, as expeditiously as possible.

In support of the Motion, UBS respectfully represents as follows:

## <u>JURISDICTION</u>

1.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. The Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue of the Motion in this Court is proper pursuant to 28 U.S.C. § 1409.

3.      The statutory basis for the relief requested herein is Section 362 of the Bankruptcy Code.

App. 0433

## BACKGROUND

A.      **The Knox Transaction**

4.      The State Court Action arises out of a failed transaction that began thirteen years ago. In early 2007, UBS and Highland agreed to pursue a complex form of securitization transaction known as a "CLO Squared" (the "Knox Transaction").[2]

5.      The purpose of the Knox Transaction was to acquire and securitize a series of collateralized loan obligation ("CLO") securities and credit default swap ("CDS") assets (the "Knox Assets"). To that end, the Debtor agreed to be the "Servicer" of the Knox Transaction, and as such was responsible for identifying the specific CLO and CDS assets to be securitized. UBS agreed to finance the acquisition of the CLO and CDS assets identified by Highland. UBS would then hold, or "warehouse," the assets until the securitization was completed (the "Knox Warehouse"). Under this arrangement, UBS financed the acquisition of $818 million in CLO and CDS Knox Assets.

6.      The parties' first attempt at the Knox Transaction was not completed successfully and the relevant agreements expired in August 2007 without the contemplated securitization having occurred. Rather than end their relationship, Highland and UBS agreed in 2008 to restructure the agreement and once more attempt the securitization. Following negotiations, the parties executed three new written agreements: an Engagement Letter, a Cash Warehouse Agreement, and a Synthetic Warehouse Agreement (collectively, the "Warehouse Agreements," attached as **Exhibits C, D, and E**, respectively). The Engagement Letter was executed by UBS

---

[2]      Justice Friedman's November 14, 2019 Decision and Order after the Phase I trial in the State Court Action (attached hereto as **Exhibit B**) includes a summary of the Knox Transaction and provides additional support for the Background Section of this Motion. *See infra* para. 17; Ex. B, Decision and Order at 2-5. A minimal number of exhibits are attached to this Motion for brevity, but additional documentary evidence underlying the Phase I Decision and Order is available at the request of this Court. UBS reserves the right to file additional supporting declarations or to otherwise present evidence in support of the Motion at or in advance of the hearing.

and the Debtor; the Fund Counterparties were not parties to the Engagement Letter.  The Cash Warehouse and Synthetic Warehouse Agreements were executed by UBS and the Debtor, along with the Fund Counterparties.

7.    As described above, UBS agreed to finance the acquisition of the CLO and CDS assets that the parties planned to securitize.  In so doing, the key risk UBS faced was the possibility that the Knox Assets would lose value while the securitization was pending.  To address this risk, UBS and the Debtor agreed in the Engagement Letter that the Fund Counterparties would bear this risk.  *See* Ex. B, Engagement Letter § 3(c).  Notably, at the time, the Debtor was the Investment Manager to the Fund Counterparties under agreements that gave the Debtor total control over those entities.

8.    The Warehouse Agreements reiterated that the Fund Counterparties (as controlled by the Debtor) would bear the risk, specifying that if the Knox Assets lost value while the securitization was pending, the Fund Counterparties "will in aggregate bear 100% of the risk" for the Knox Assets—with CDO Fund bearing 51% of any losses and SOHC bearing the remaining 49%.  Ex. C, Engagement Letter § 3(c); Ex. D, Cash Warehouse Agreement § 5(A) & Exhibit A thereto (defining "Allocation Percentage[s]"); Ex. E., Synthetic Warehouse Agreement § 6(C) & Exhibit A thereto (defining "Allocation Percentage[s]").

9.    To further protect UBS in the event that the Knox Assets lost value, the Warehouse Agreements provided for recurring measurements of mark-to-market losses on all assets in the Knox Warehouse and required the Fund Counterparties to post collateral in the event the Knox Assets lost a set amount of value.  Specifically, the parties agreed that the Fund Counterparties would post an additional $10 million in collateral for each $100 million in losses to the overall value of the Knox Assets.

6

10.     In September and October 2008, amid the global economic recession, the value of the Knox Assets dropped by $100 million, twice.  Thus, UBS twice exercised its contractual right to demand additional collateral.  And twice Highland posted the required collateral.  On or about November 7, 2008, UBS issued a third margin call, because the value of the Knox Assets suffered additional losses of $200 million (bringing the aggregate losses to over $400 million).  This time, Highland refused to provide the additional collateral required under the Warehouse Agreements.[3]

11.     Highland's default on UBS's third margin call triggered a termination event under the Warehouse Agreements.  On December 5, 2008, UBS gave Highland formal notice of default and demanded the Fund Counterparties pay UBS for 100% of the losses incurred on the Knox Assets—which had, by then, grown to over $520 million.  At the direction of the Debtor, however, the Fund Counterparties refused to provide such payment.

12.     Indeed, the Debtor undertook a series of actions to not only prevent the Fund Counterparties from paying what was owed to UBS, but to ensure that UBS would not be able to collect any judgment arising out of this liability.  Such actions include, but are not limited to, a series of fraudulent transfers of funds out of, and away from, an alter ego of SOHC, Highland Financial Partners, L.P.  These internal transfers of funds and other actions—all overseen by James Dondero, the Debtor's founder and president—were designed to prevent UBS from ever collecting the millions of dollars it was owed under the Warehouse Agreements.  As one internal Highland

---

[3]     *See* Ex. B, Decision and Order at 4 ("It is undisputed that the Fund Counterparties did not meet this [third] collateral call.").  Although the Warehouse Agreements specified that it was the Fund Counterparties who would post collateral, the Debtor moved assets around from other entities it controlled to make the first two collateral calls (without disclosing this practice to UBS).  For the third collateral call, Highland specifically told UBS on November 11, 2008, that it could choose assets to satisfy the third collateral call from a variety of Highland-controlled entities, including from the Debtor itself, and invited UBS representatives to Dallas to diligence available assets on November 14, 2008.  When UBS determined that the assets offered were insufficient and instead sought cash, Highland chose to default rather than causing the Fund Counterparties to satisfy their obligations.  *See id.*

App. 0436

document (attached hereto as **Exhibit F**) put it, "[UBS] can see us in court for their additional collateral."

### B.     The State Court Action

13.     On February 24, 2009, UBS filed a complaint in the State Court against the Debtor and the Fund Counterparties.  As UBS learned more about Highland's conduct through discovery, UBS amended its complaint to assert additional claims and name additional Highland entities, including Highland Financial Partners, L.P., Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., Highland Credit Opportunities CDO, L.P. (now Highland Multi Strategy Credit Fund, L.P.), and Strand Advisors, Inc.  As amended and stated in its Second Amended Complaint (attached hereto as **Exhibit G**) in the State Court Action, filed on May 11, 2011, UBS's claims include breach of contract claims directly against the Fund Counterparties, as well as claims for fraudulent inducement, breach of the duty of good faith and fair dealing, fraudulent conveyance, tortious interference, and declaratory judgment against the Debtor and its affiliates.  The Debtor subsequently brought counterclaims against UBS for breach of contract and unjust enrichment.

14.     The procedural history of the State Court Action—which now spans more than 11 years—is exceedingly complex.  The suit was assigned to the Commercial Division, a division of the State Court that hears only complicated commercial claims meeting specified jurisdictional requirements.  The Debtor and its affiliates and UBS filed, and the State Court ruled on, four sets of motions to dismiss—briefing for which lasted from May 2009 through August 2012.  The Debtor and its affiliates then filed two sets of summary judgment motions, which led to a series of complex rulings by the State Court in 2017.  The parties filed various interlocutory appeals of the State Court's rulings on the motions to dismiss and for summary judgment.  Those appeals were heard by the Appellate Division for the First Judicial Department in the County of New York, with

the Appellate Division issuing five separate decisions over this suit's protracted history.  Over the course of the State Court Action, two different judges have presided over the claims at the trial court level—Justice Bernard Fried and, later, Justice Marcy Friedman, who continues to preside over the action.

15.     Also included in the Appellate Division's decisions was an order arising from an appeal of the State Court's ruling on UBS's motion to restrain Defendants Highland Credit Strategies Master Fund, L.P. and Highland Crusader Partners, L.P. from disposing of property received through the fraudulent transfers orchestrated by the Debtor.  After UBS showed it had a likelihood of success on the merits of its fraudulent transfer claims, would suffer irreparable harm absent relief, and the balance of equities favored granting the injunctions, the Appellate Division enjoined both Highland entities from disposing of their assets.  Ultimately, these injunctions resulted in partial settlements between UBS and Highland Credit Strategies Master Fund, L.P. and Highland Crusader Partners, L.P.[4]

16.     By early 2018, more than nine years after UBS first filed suit, the parties were finally ready to proceed to trial.  Due to a jury waiver clause in the Warehouse Agreements, however, Justice Friedman bifurcated UBS's claims into two distinct phases for trial:  Phase I, consisting of a bench trial on UBS's claims against the Fund Counterparties for breach of the Cash Warehouse and Synthetic Warehouse Agreements, as well as the Debtor's counterclaims; and Phase II, consisting of a jury trial on UBS's remaining claims against all remaining Highland entities, including the Debtor.  Although bifurcated into two phases, the trial in the State Court

---

[4]     The settlement agreements are confidential.  However, the Debtor discussed these agreements on the record during Phase I of the trial and thus, Justice Friedman addressed the settlement agreements in her Phase I Decision and Order.  *See infra* ¶ 17; Ex. B, Decision and Order.  The preliminary injunction motions (and decisions) also involved a third Defendant, Highland Crusader Holding Corporation.  UBS filed a separate 2011 complaint against this entity arising from the same fraudulent conveyances orchestrated by the Debtor.  Although the cases were not formally consolidated, the preliminary injunction motions were consolidated for disposition.

Action was always intended to be conducted as efficiently as possible. Phase II of the trial was intended to build upon the factual record and evidentiary rulings in Phase I, with both phases presided over by Justice Friedman as part of the same lawsuit.

17. Justice Friedman presided over a thirteen-day bench trial for Phase I from July 9 through July 27, 2018. During Phase I, the court heard from eight in-person witnesses, whose testimony spanned nearly 2,000 pages of trial transcripts, as well as fourteen additional witnesses through deposition designations. On November 14, 2019, Justice Friedman entered a Decision and Order on Phase I (attached hereto as **Exhibit B**), ruling in favor of UBS on almost every issue presented in Phase I. In particular, the court found the Fund Counterparties liable to UBS for breach of the Cash Warehouse and Synthetic Warehouse Agreements, found no liability on the part of UBS for either of the Debtor's counterclaims, and rejected almost every one of the Debtor's offset arguments with the only remaining issue (affecting approximately $70,500,000) to be determined after Phase II. An Entry of Judgment on Phase I was entered on February 10, 2020. Under that Phase I final judgment, UBS is entitled to $1,039,957,799.44, consisting of $519,374,149.00 in damages and $520,583,650.44 in pre-judgment interest as of January 22, 2020, with additional interest of $128,065 having accrued daily until the Entry of Judgment.

18. The next step in the State Court Action is Phase II of the trial, which involves a jury trial of all UBS's remaining claims against not only the Debtor, but also against other Highland affiliates. The claims to be tried in Phase II include claims for breach of the implied covenant of good faith and fair dealing, fraudulent conveyances, and alter-ego liability. If found liable, the Debtor will be responsible for the judgment awarded to UBS in Phase I (in addition to any other amounts awarded to UBS in Phase II). In addition, UBS will seek punitive damages against the

Debtor for its role in orchestrating the extended efforts to prevent UBS from collecting the amounts owed under the Warehouse Agreements.[5]

19.    The evidence to be presented in Phase II includes testimony from many of the same witnesses who appeared in the State Court for Phase I of the trial.  Additional documentary evidence will be presented and will build on the exhibits already entered and evidentiary rulings already made in Phase I of the State Court Action.  Although Phase II will be tried in front of a new audience (the jury), Justice Friedman's extensive knowledge of previous rulings and evidence will help her decide issues of law and evidence arising in Phase II in a timely and efficient manner.

20.    Currently, Phase II of the State Court Action is stayed against the Debtor by the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code when the Debtor commenced this chapter 11 case.  The State Court is aware that the parties are attempting to settle UBS's remaining claims in the State Court Action.  If the parties are unable to resolve those claims on their own, after the Court lifts the restrictions in place due to the COVID-19 pandemic, UBS intends to request that the State Court schedule the Phase II jury trial at the Court's earliest convenience.

**C.    The Debtor's Agreement to Stipulate to Relief From the Automatic Stay.**

21.    When the State Court issued its judgment in Phase I of the State Court Action, the Debtor and UBS were engaged in settlement discussions to potentially stipulate to UBS's remaining claims in the State Court Action (*i.e.*, the claims to be adjudicated in Phase II) and facilitate a consensual restructuring of the Debtor in this chapter 11 case.  In order to facilitate these discussions and in recognition of the Debtor's concern about the effect the Phase I judgment

---

[5]    *See* Ex. B, Decision and Order at 39  ("UBS persuasively argues, in opposition, that the fraudulent conveyance causes of action seek relief in addition to compensatory damages, including imposition of a constructive trust and punitive damages.").

App. 0440

would have on its ongoing business relationships, the Debtor and UBS agreed to request that the State Court keep the Phase I judgment under seal for a limited time. As part of this agreement, the Debtor also agreed to stipulate to relief from the automatic stay in this chapter 11 case, if the parties were unable to come to a mutually agreeable settlement of the State Court Action. Both parties clearly and repeatedly agreed that Phase II would proceed as planned—as a jury trial in the State Court—if the parties were unable to resolve the remaining claims on their own. Emails between the Debtor, through its general counsel, Scott Ellington, and litigation counsel, Angela Somers and Jeff Gross of Reid Collins & Tsai LLP, and UBS, through its counsel, evidence this agreement (attached hereto as **Exhibit H**). Through email, the parties drafted and reached an agreed upon stipulation to relief from the automatic stay in this chapter 11 case (attached hereto as **Exhibit I**), should they need to file it. If no settlement agreement could be reached, the parties agreed they could be ready to try Phase II before the State Court in "about 6 months." *See* Ex. H, Debtor-UBS Communications. The Debtor and UBS both orally represented the terms of their agreement, including the agreement to lift the automatic stay, to the State Court on multiple occasions in December 2019 and January 2020. *See, e.g.*, Nov. 22, 2019 Letter from UBS Counsel to Justice Friedman (attached hereto as **Exhibit J**) (requesting a telephone conference to discuss, among other matters, the parties' "agreement regarding the jury trial phase of the action"). The parties' agreement formed part of the basis for the State Court's sealing of the Phase I judgment until late January 2020. *See* Ex. H, Debtor-UBS Communications ("We already had a call with the Court and they understand these to be the terms.").

22. In further reliance on the Debtor's agreement to litigate the State Court Action in State Court if no agreement could be reached, and out of a desire to bring this chapter 11 case to a consensual and value-maximizing resolution, UBS supported the governance structure (*i.e.*, independent directors) put forward by the Debtor and agreed to by the official committee of

unsecured creditors, rather than pursuing the appointment of a chapter 11 trustee. Since then, UBS has continued to encourage the Debtor to settle the State Court Action in lieu of more litigious paths forward toward the Debtor's restructuring.

23.    Settlement discussions between the Debtor and UBS, while ongoing, have not progressed over the last few months and UBS requested that the Debtor proceed with Phase II of the State Court Action in the State Court by filing the previously agreed-to joint stipulation to relief with this Court. Now, however, having already received the benefit of its bargain (*i.e.*, a delayed release of the Phase I judgment and its preferred governance structure), the Debtor refuses to honor its agreement to stipulate to lifting the stay, despite knowing the State Court Action will still need to proceed as to the remaining Highland entity defendants.

**D.    The Bar Date Order.**

24.    On March 2, 2020, this Court entered the *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 488] (the "Bar Date Order"), setting the deadline for parties in interest to file proofs of claim for April 8, 2020 (the "Bar Date"). The Bar Date Order further provided that parties whose claims are listed as disputed, contingent, or unliquidated on the Debtor's schedules of assets and liabilities, filed December 13, 2019 [Docket No. 247], must file proofs of claim by the Bar Date in order to preserve their claims against the Debtor's estate.

25.    UBS's claims are listed as disputed, contingent, or unliquidated on the Debtor's schedules of assets and liabilities. Accordingly, under the Bar Date Order, UBS had to file a proof of claim in this chapter 11 case in advance of the Bar Date, in order to preserve its claims against the Debtor's estate. However, by filing a proof of claim, UBS risks waiving its right to try Phase II of the State Court Action before a jury. *See Langenkamp v. Culp*, 498 U.S. 42 (1990) (finding that a creditor who submits a proof of claim against the bankruptcy estate has no right to a jury

App. 0442

trial on the issues raised in defense of such claim); *Grafinanciera S.A. v. Nordberg*, 492 U.S. 33 (1989) (same); *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409 (5th Cir. 2014) (same). Indeed, it is unclear whether a reservation of rights in the proof of claim itself (which would not be binding on the Court) would be sufficient to protect UBS's fundamental right to a jury trial. *See In re Legendary Field Exhibitions, LLC*, 2020 Bankr. LEXIS 91, at *12 (Bankr. W.D. Tex. Jan. 10, 2020) ("Even if a creditor attempts to couch its claim in protective language reserving the right to a jury trial, such protective language is not binding on the Court."); *Travellers Int'l AG v. Robinson*, 982 F.2d 96 (3d Cir. 1992) (filing of a proof of claim waived a creditor's right to a jury trial, notwithstanding that the proof of claim itself purported to reserve that right).

26. In an attempt to avoid the expense and inconvenience associated with motions and a hearing to lift the automatic stay while their settlement discussions progressed, the Debtor and UBS agreed to a *Joint Stipulation and Order Extending Bar Date*, filed with this Court on March 22, 2020 [Docket No. 543], which this Court entered an order approving on March 25, 2020 [Docket No. 547] (the "Bar Date Stipulation"). The Bar Date Stipulation extended the Bar Date with respect to UBS's proof of claim until the later of (i) June 22, 2020 at 5:00 p.m. Central Time or (ii) five business days after the Court enters an order on UBS's motion to lift the automatic stay, provided that UBS files such motion on or before May 20, 2020 at 5:00 p.m. Central Time.

27. Since the entry of the Bar Date Stipulation, the Debtor and UBS have had several discussions regarding UBS's State Court claims and unfortunately have not yet fully resolved the issues underlying the State Court Action. In accordance with the Bar Date Stipulation and in order to safeguard its right to a jury trial, UBS now files this Motion seeking relief from the automatic stay.

**RELIEF REQUESTED**

28. UBS respectfully requests that the Court grant UBS relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code to continue the State Court Action in the State Court before a jury in order to liquidate its claims against the Debtor. UBS further requests that the Court enter an Order that UBS's right to a jury trial shall not be deemed waived by UBS's filing of a proof of claim in this chapter 11 case. Alternatively, even if the Court decides that lifting the stay is not appropriate at this time, UBS respectfully requests that the Court enter the Order that UBS's right to a jury trial shall not be deemed waived by UBS's filing of a proof of claim in this chapter 11 case, or extend the Bar Date further, to preserve UBS's right to try its case before a jury at a later date.

**BASIS FOR RELIEF REQUESTED**

**A.     The Debtor Has Already Agreed to Lift the Automatic Stay.**

29. It is well established that a debtor in chapter 11 and a creditor may agree to lift the automatic stay in order to allow prepetition litigation to proceed so that claims against the debtor may be liquidated efficiently. *See e.g. In re GenOn Energy, Inc.*, Case No. 17-33695 (DRJ) [Docket No. 449] (Bankr. S.D. Tex. Aug. 2, 2017) (entering agreed order between debtors and plaintiffs allowing litigation to proceed in a non-bankruptcy venue). Here, the Debtor and UBS did just that. As the evidence demonstrates, when the State Court reached its opinion after the bench trial in Phase I, UBS agreed to keep the judgment under seal and not seek immediate litigation of Phase II while engaging in settlement discussions. In return for UBS's agreement to keep the Phase I judgment under seal, among other things, the Debtor's general counsel, Scott Ellington, agreed in writing that the Debtor would agree to lift the automatic stay to allow Phase II to proceed in State Court if settlement negotiations were unsuccessful. The Debtor and UBS went so far as to agree to the form of stipulation that would be used, at the appropriate time if

15

settlement discussions proved unfruitful, to lift the automatic stay. *See* Ex. H, Debtor-UBS Communications; Ex. I, Agreed Upon Stipulation. And, counsel to UBS, as well as the Debtor's counsel in the State Court Action, each represented to the State Court that they had agreed to lift the automatic stay in the event a settlement could not be reached. *See* Ex. H, Debtor-UBS Communications; *see also* Ex. J, Letter to Justice Friedman; *supra* para. 21. Now, counsel to the Debtor has informed UBS that the Debtor will not, inexplicably, honor its agreement and does not intend to stipulate to the agreed-upon relief.

30.     On the basis of the agreement between the Debtor and UBS, the State Court kept the Phase I judgment sealed until January 23, 2020, more than two months after the State Court reached its decision. And UBS, to its detriment, refrained from seeking immediate relief from the automatic stay in this chapter 11 case or pursuing the appointment of a chapter 11 trustee. In the time since the Phase I judgment was entered, the Debtor's assets have significantly declined in value, and the Debtor has been forced to liquidate several positions in equity securities (the value of which may have already rebounded) to meet margin calls.

31.     The Debtor received the benefit of its bargain with UBS through the delayed release of the Phase I judgement and UBS's agreement to not immediately pursue litigating Phase II, and is now refusing to uphold its end of the bargain. UBS respectfully requests that this Court hold the Debtor to the deal it made and lift the automatic stay to permit the State Court Action to proceed so that UBS's claim may be liquidated.

### B.     Cause Exists to Lift the Automatic Stay.

32.     This Court has broad discretion to grant relief from the automatic stay under Section 362 of the Bankruptcy Code. Section 362(d)(1) provides as follows:

> (d)     On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

App. 0445

     (1)  for cause, including the lack of adequate protection of an interest in property of such party in interest;

33.     Pursuant to Section 362(g)(2), the Debtor bears the burden of proving the absence of cause for relief under Section 362(d)(1). *See* 11 U.S.C. § 362(g)(2). UBS respectfully submits that under any standard this Court applies, cause exists to lift the automatic stay, and the Debtor cannot bear its burden of showing otherwise. Although "cause" is not defined in the Bankruptcy Code, courts have interpreted the concept broadly in order to respond equitably to the specific facts of a case. *See, e.g., Mooney v. Gill*, 310 B.R. 543, 546-47 (N.D. Tex. 2002) (observing that "[c]ause is an intentionally broad and flexible concept").

34.     Bankruptcy courts in the Fifth Circuit have not settled on a single test for what constitutes "cause" and have applied various tests from other jurisdictions at various points in time. *See In re Choice ATM Enterprises, Inc.*, 2015 WL 1014617, at *4 (Bankr. N.D. Tex. Mar. 4, 2015) ("Even among bankruptcy courts in this circuit, no single approach prevails."). However, the common features of all of these tests are: (1) a focus on prejudice to the parties; and (2) questions of judicial economy. *See, e.g., In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014) (finding that judicial economy alone can provide grounds to lift the automatic stay). Both the substantial prejudice to UBS that will result if the stay is not lifted and questions of judicial economy weigh heavily in favor of lifting the stay. And, additional cause exists to grant relief from the stay because the State Court is the only appropriate forum for the State Court Action.

       **i.**       **UBS is the Only Party That Will Be Prejudiced if the Stay Is Not Lifted.**

35.     UBS has already suffered prejudice due to its reliance on the Debtor's previous agreement to lift the automatic stay and the consequent delay in litigating Phase II in State Court. This weighs in favor of lifting the stay. *See In re Oluyemisi Omokafe Okedokun,* 593 B.R. 469,

554 (Bankr. S.D. Tex. 2018) ("Any detrimental reliance suffered by the defendant may be considered in weighing the equities"); *In re Thrash*, 433 B.R. 585, 602 (Bankr. N.D. Tex. 2010) ("Reliance is established by showing that the defendant's actions and representations induced the plaintiff 'to act or to refrain from action.'") (*quoting Matis v. Golden*, 228 S.W.3d 301, 311 (Tex. App.-Waco 2007, no pet.)).

36.     Moreover, if the stay is not lifted, UBS will continue to suffer material harm.  UBS potentially would be required to litigate Phase II against the Debtor in this Court, a forum that does not have the benefit of the State Court's lengthy experience with the State Court Action and the underlying facts and procedural history.

37.     On the other hand, the Debtor cannot show that it would be prejudiced in any way by the lifting of the stay.  Indeed, the Debtor previously *agreed* to stipulate to lift the stay and proceed in State Court, absent a settlement.  The Debtor has already spent a decade fighting the State Court Action there.  To argue now that litigating further in the State Court would be prejudicial strains credulity.  The Debtor has counsel in the State Court Action and both the Debtor and UBS have remained in regular communication with the State Court while Phase II has been stayed.  The parties should be ready and able to litigate the remainder of the State Court Action in relatively short order.  Indeed, as recently as December 2019, the Debtor represented that it could be ready to litigate the State Court Action "in six months."  Ex. H, Debtor-UBS Communications.

38.     In fact, litigating the State Court Action now would provide an actual benefit to the Debtor's estate.  As of the filing of this Motion, this chapter 11 case has been pending for nearly seven months with no appreciable progress towards a resolution.  UBS's claim against the Debtor is the largest claim that has been asserted against the Debtor in this case by over $800 million.  If the Debtor is ultimately found liable in the State Court Action, UBS's claim will be significantly larger than the claims of any of the other creditors in this case.  Right now, however, the uncertainty

over the amount of UBS's claim has made it difficult to estimate how much other creditors may hope to receive pursuant to a chapter 11 plan and, accordingly, has complicated plan negotiations. Reducing UBS's claim to a judgment in Phase II will provide much needed certainty and expedite the process of bringing this chapter 11 case to a close. The Debtor has not proposed any plan or serious settlement offer to resolve creditors' claims. And, the longer this chapter 11 case continues and administrative costs continue to mount without UBS being able to liquidate its claim, the more the value of the Debtor's assets available for distribution to UBS, and all creditors, declines.

39.     Accordingly, UBS respectfully submits that the Debtor cannot meet its burden of showing that cause does not exist to lift the stay, because the only party prejudiced by the stay remaining in place is UBS.

ii.     <b>Judicial Economy Favors Lifting the Automatic Stay.</b>

40.     Questions of judicial economy also clearly favor the State Court as the appropriate forum for litigating Phase II, and accordingly, favor lifting the stay so the State Court Action can proceed there. Phase II involves solely New York state law causes of action, all of which relate significantly to the issues previously litigated before the State Court in Phase I. Further, the State Court Action has been pending for over a decade. During that time, as detailed above, a very complex procedural history has developed, including multiple evidentiary rulings, summary judgment rulings, and interlocutory appeals. UBS respectfully submits that the State Court's familiarity with that substantial evidentiary and procedural record is critical to a fair, expeditious trial of Phase II.

41.     Phase II also involves a number of non-Debtor defendants over whom this Court's jurisdiction is uncertain. Accordingly, if the stay is not lifted, UBS may be forced to litigate its claim against the Debtor in this Court and also litigate its claims against the other defendants in the State Court, <i>i.e.</i>, try the case twice, to the inconvenience of all parties. This necessarily would

19

lead to a waste of judicial resources and potentially inconsistent rulings. Litigating the same claims in two courts, in two different states, would also unnecessarily raise costs for the Debtor. Lifting the stay would allow the Debtor and other Highland entities to share the costs of one trial rather than each paying for separate trials. Additionally, without relief, witnesses from both sides will be inconvenienced, by being asked to travel to both Texas and New York to say the same thing.

42.     Accordingly, UBS respectfully submits that the Debtor cannot meet its burden of showing that cause does not exist to lift the stay, because considerations of judicial economy weigh in favor of litigating Phase II in the State Court.

**iii.     Additional Cause Exists to Lift the Automatic Stay Because the State Court is the Only Forum Where the State Court Action Can and Should be Litigated.**

43.     Additional cause exists to lift the automatic stay pursuant to the doctrines of permissive and mandatory abstention codified in 28 U.S.C. §§ 1334(c)(1) and (2), respectively. Abstention generally arises in the context of a debtor's removal of a litigation to the bankruptcy court, which has not yet occurred here. UBS respectfully submits that this Court should not wait for the Debtor to attempt to remove UBS's claim to federal court. Rather, UBS submits that it is appropriate for this Court to find that there is cause to lift the stay because this Court would be required to (or may determine it should) abstain from hearing the State Court Action. *See In re Congoleum*, Case No. 03-51524 (Bankr. D.N.J. Mar. 22, 2004), *Hr'g Tr.* Feb. 2, 2004 (attached hereto as **Exhibit K**) at 38:12-18 ("Here the moving parties allege cause [to lift the automatic stay] in the form of what they see as inevitable mandatory abstention. While it is true that Debtor has not acted to remove the state court proceedings to this court or even to the District Court, that does not mean that this court should not look at the underlying issues to determine whether they must be decided in order to advance the bankruptcy, and if so where they are best decided.").

20

44. As an initial matter, the doctrine of mandatory abstention under 28 U.S.C. § 1334(c)(2) would require that this Court abstain from hearing the State Court Action.

45. 28 U.S.C. § 1334(c)(2) provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11, but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

46. Under the doctrine of mandatory abstention created by this statute, a district court must abstain from hearing state law claims if all of the following requirements are met: "(1) the claims have no independent basis for federal jurisdiction other than section 1334(b) [of the judicial code]; (2) the claim is a non-core proceeding, *i.e.* it is related to a case under title 11 but does not arise under or in a case under title 11; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court." *In re Rupp & Bowman Co.*, 109 F.3d 237, 239 (5th Cir. 1997). Taking each of the factors in turn, it is clear that if the Debtor were to attempt to remove the State Court Action to this Court, this Court would be required to abstain.

47. *First*, this Court would have no independent basis for subject matter jurisdiction over the State Court Action other than "related-to" jurisdiction under Section 1334(b) of the Bankruptcy Code. Federal courts have limited jurisdiction and may only hear cases where either: (a) the civil action presents a federal question or (b) the amount in controversy exceeds $75,000 exclusive of interest and costs and the parties are citizens of different states. *See* 28 U.S.C. §§ 1331-1332. Here, the State Court Action involves only questions of New York state law. Accordingly, there is no federal question jurisdiction. And, both plaintiff UBS Securities LLC and

the defendant Debtor were formed under the laws of the state of Delaware, so diversity jurisdiction is inapplicable. Accordingly, the first element of the test for mandatory abstention is satisfied.

48. *Second*, the State Court Action is only "related-to" the Debtor's chapter 11 case, *i.e.*, it is a non-core proceeding. Bankruptcy courts have jurisdiction over: (a) cases under title 11; (b) proceedings arising in a case under title 11; and (c) proceedings related to a case under title 11. *See* 28 U.S.C. § 157. A case "under" title 11 refers only to the actual filing of the bankruptcy petition. *See e.g.*, *In re Canion*, 196 F.3d 579, 584 (5th Cir. 1999). Proceedings arising under title 11 or arising in a case under title 11 are those that involve rights created by federal bankruptcy law, or those that would arise only in a bankruptcy or would have no existence outside of bankruptcy. *See In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). Finally, courts define "core proceedings" as those that either invoke a substantive right provided by title 11 or that by their nature can only arise in the context of a bankruptcy case. *See id.* The State Court Action is a non-core proceeding that could only be brought before this Court under "related-to" jurisdiction. It does not invoke any substantive bankruptcy rights; it involves only matters of state law. The State Court Action was pending in the State Court for more than a decade before the commencement of this chapter 11 case, so it can clearly exist outside of bankruptcy. The State Court Action's only relation to the estate is that it potentially affects the pool of claims against the estate. This is a classic formulation of "related-to" jurisdiction, but not "arising in" or "arising under" jurisdiction. *See id.* at 93 (quoting *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), and holding that "related-to" jurisdiction depends on "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy"); *see also In re Am. Capital Equip., Inc.*, 405 B.R. 415, 425 (Bankr. W.D. Pa. 2009) (holding that liquidation of personal injury tort claims was a non-core proceeding); *In re Trans World Airlines*, 278 B.R. 42, 49 (Bankr. D. Del. 2002) (holding that an adversary proceeding and related state court action based on state law claims

22

related to debtor's prepetition conduct were non-core proceedings).  Accordingly, the second element of the test for mandatory abstention is satisfied.

49.     *Third*, the State Court Action has been pending in the State Court for many years, and, accordingly, the third element of the test for mandatory abstention is satisfied.

50.     *Fourth*, and finally, the State Court Action can be timely adjudicated in the State Court.  UBS and the Debtor have engaged in regular communications with the State Court since the commencement of this chapter 11 case.  A trial date can be set quickly in the State Court.  *See In re Legal Xtranet, Inc.* 453 B.R. 699, 714-15 (W.D. Tex. 2011) (holding that the party moving for abstention need only show that the matter could be timely adjudicated in the state court).  Additionally, bankruptcy courts give great weight to a state court's experience with the claims and the case in deciding whether the timely adjudication element of the test for mandatory abstention is met.  *See e.g., In re Trans World Airlines, Inc.*, 278 B.R. 42, 51 (Bankr. D. Del. 2002) (finding that, where an action was dependent solely on a determination of state law and did not implicate the provisions or procedures of the Bankruptcy Code, the action was likely to be litigated more quickly in state court).  Here, as described above, the State Court Action, which involves only New York state law claims, has been pending for over a decade.  The State Court Action has a very complicated procedural history, and Phase II of the trial was always intended to build upon Phase I.  For these reasons, the State Court is the best forum in which to timely adjudicate the State Court Action (even when taking into account any temporary delays relating to the COVID-19 pandemic).  Accordingly, the fourth and final element of the test for mandatory abstention is satisfied.

51.     Alternatively, if the Debtor was to remove the State Court Action and this Court found that mandatory abstention was not required, permissive abstention under 28 U.S.C. § 1334(c)(1) would be appropriate.  That statutory provision provides:

App. 0452

> "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11"

28 U.S.C. § 1334(c)(1).

52.     Courts have broad discretion to abstain from hearing state law claims on any equitable ground under the doctrine of permissive abstention. *See In re Gober*, 100 F.3d 1195, 1206 (5th Cir. 1996); *see also In re Houston Reg'l Sports Network, L.P.*, 514 B.R. 211, 215 (Bankr. S.D. Tex. 2014) (listing fourteen non-exclusive factors that courts consider in deciding whether to permissively abstain).

53.     For all of the reasons set forth in this Motion, were the State Court Action to be removed to this Court, permissive abstention would be appropriate here. The State Court Action involves only issues of New York state law, has been pending for many years, and has a unique and complicated procedural history that the State Court is well familiar with. Further, the only jurisdictional basis for hearing the State Court Action in this Court is "related to" jurisdiction, the State Court Action involves multiple non-Debtor parties over whom this Court's jurisdiction is arguable, and, as set forth above, UBS is entitled to a jury trial in Phase II of the State Court Action.

54.     Should the Debtor attempt to remove the State Court Action, either mandatory or permissive abstention would prevent this Court from hearing those claims. Accordingly, the Debtor cannot meet its burden of showing that cause does not exist to lift the automatic stay.

55.     As set forth above, the resolution of UBS's remaining claims against the Debtor is vital to the outcome of this chapter 11 case, and the only appropriate forum for resolving those claims is the State Court. UBS requests that the Court lift the automatic stay so that Phase II of the State Court Action can be litigated expeditiously, preserving UBS's right to a jury trial, and providing the certainty necessary for the Debtor to bring this chapter 11 case to a resolution.

App. 0453

**C.  In Any Event, An Order From This Court Is Necessary To Preserve UBS's Right to A Jury Trial.**

56.      UBS further requests that the Court enter an Order that UBS's right to a jury trial shall not be deemed waived by UBS's filing of a proof of claim in this chapter 11 case.  UBS submits that this relief is warranted now, in light of the Bar Date, regardless of whether the Court decides to lift the stay at this time.

57.      Section 105(a) of the Bankruptcy Code authorizes the Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105. For the reasons set forth herein and in light of the critical need for UBS to preserve its right to a jury trial on Phase II of the State Court Action, UBS submits that the Court should enter an Order that the filing of a proof of claim will not waive UBS's right to a jury trial.

58.      Alternatively, UBS respectfully requests that the Court further extend the Bar Date with respect to UBS's claims, to allow the parties additional time to settle UBS's claims and preserve UBS's right to a jury trial.  This Court has the authority to extend the Bar Date pursuant to Bankruptcy Rule 3003(c)(3), which provides that the Court shall "fix and for cause shown may extend the time within proofs of claim may be filed."  Fed. R. Bankr. P. 3003(c).  Additionally, Bankruptcy Rule 9006(b) provides that the Court may extend the Bar Date for cause shown if the request is made before the expiration of the period originally prescribed by the Court, or extended by previous order of the Court.  *See* Fed. R. Bankr. P. 9006(b)(1).  Accordingly, UBS respectfully submits that if the Court deems it inappropriate to lift the stay at this time or enter an Order that UBS's filing of a proof of claim does not waive its right to a jury trial, the Court should extend the Bar Date with respect to UBS's claims.

## RULE 4001

59.     Any order approving this Motion should be immediately effective and not stayed pursuant to Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure because, absent immediate entry of such order, UBS will be required to file a proof of claim in this chapter 11 proceeding which may lead to UBS being deemed to have waived its right to a jury trial in Phase II of the State Court Action. Therefore, UBS requests that the Proposed Order be entered and made immediately effective, and that the stay of Rule 4001(a)(3) be waived.

## NOTICE

60.     Notice of this Motion shall be provided to (a) the Debtor; (b) counsel for the Debtor; (c) counsel to the Official Committee of Unsecured Creditors; (d) the United States Trustee; (e) those parties requesting notice pursuant to Local Bankruptcy Rule 2002-1(j); and (f) all other parties registered to receive ECF notifications in this case. UBS respectfully submits that such notice is sufficient and that no further notice of this Motion is required.

## CONCLUSION

For the foregoing reasons, UBS respectfully requests entry of an order granting UBS immediate relief from the automatic stay and such other and further relief as the Court deems just and proper.

App. 0455

DATED this 20th day of May, 2020.

**LATHAM & WATKINS LLP**

By /s/ Andrew Clubok


Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice pending*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Ste. 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**

By /s/ Martin Sosland


Martin Sosland (TX. Bar No. 18855645)
Candice M. Carson (TX. Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas  75240
Telephone:  (469) 680-5502
Facsimile: (469) 680-5501
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS*
*AG, London Branch*

App. 0456

## <u>CERTIFICATE OF CONFERENCE</u>

In accordance with Local Bankruptcy Rule 9014-1(d)(1), I hereby certify that counsel for the movant has engaged in good faith settlement discussions with counsel for the Debtor and was unable to reach agreement.

<u>/s/ Andrew Clubok</u>

## <u>CERTIFICATE OF SERVICE</u>

I, Martin Sosland, certify that *UBS's Motion for Relief From the Automatic Stay to Proceed With State Court Action* was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically.

Dated:  May 20, 2020.

<u>/s/ Martin Sosland</u>

App. 0457