# Appendix Exhibit 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SUSAN LANOTTE, derivatively on behalf of HIGHLAND GLOBAL ALLOCATION FUND, and on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., TIMOTHY HUI, BRYAN WARD, BOB FROEHLICH, JOHN HONIS, and ETHAN POWELL,<br><br>    Defendants,<br><br>  and<br><br>HIGHLAND GLOBAL ALLOCATION FUND,<br><br>    Nominal Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§   Civil Action No. 3:18-cv-02360-M |

**<u>ORDER</u>**

Before the Court is Defendants' Motion to Dismiss Plaintiff's Verified Amended

Shareholder Derivative and Class Action Complaint. [ECF No. 43]. Plaintiff brings a derivative

claim for breach of fiduciary duty and breach of contract and a direct class action claim for

breach of fiduciary duty. For the following reasons, the Motion to Dismiss is **GRANTED**.

**I. Factual Background**

   Plaintiff Susan Lanotte alleges that she has been a shareholder of Nominal Defendant

Highland Global Allocation Fund (the "GAF Fund") since March 9, 2015. She asserts that the

GAF Fund is a mutual fund managed by Defendant Highland Capital Management Fund

Advisors, L.P. (the "Investment Advisor"). The Amended Complaint alleges that the GAF Fund

App. 0459

and multiple other funds (the "Trust complex") are series, or separate entities with their own portfolios, of a larger Massachusetts business trust (the "Trust").[1]  Plaintiff further claims that the Investment Advisor manages the GAF Fund and six other funds in the Trust complex, including Highland Energy MLP Fund (the "MLP Fund"), under an investment advisory agreement entered into with each fund.

The Investment Advisor is allegedly owned by Highland Capital Management Services, Inc. and Strand Advisors XVI, Inc.  Plaintiff asserts that Strand Advisors, XVI, Inc. is the general partner, that it is wholly owned by James Dondero, and that Highland Capital Management Services, Inc. is owned by Dondero and his business partner, Mark Okada. Dondero serves as the Investment Advisor's senior portfolio manager, for both the GAF Fund and the MLP Fund.

The Amended Complaint alleges that Trustee Defendants Timothy Hui, Bryan Ward, Bob Froehlich, John Honis, and Ethan Powell are trustees of the GAF Fund, the MLP Fund, the Trust, multiple other funds in the Trust complex, and a similar set of funds held in a second trust complex, and that they have business and personal connections with the Investment Advisor, the Trust, and the Trust complex, as explained below.  The Trustee Defendants, along with Dustin Norris, comprise the board of trustees of the GAF Fund (the "Board").

Trustee Defendant Hui has been a trustee of funds affiliated with the Investment Advisor since 2000.  He and his wife are personal friends of Mark Okada and his wife.  Hui is also Dean and Special Assistant to the President at Cairn University, where Mrs. Okada serves as a trustee.

---

[1] "Besides being considered a discrete economic unit, each series often is treated as a separate investment company for various purposes under the ICA, even though it may not have separate legal form and may be covered under the umbrella of a single trust entity."  *Hartsel v. Vanguard Grp., Inc.*, No. CIV.A. 5394-VCP, 2011 WL 2421003, at *18 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

App. 0460

Plaintiff alleges that his role at Cairn University provides Hui only a minimal salary and that the $150,000 he receives annually in trustee fees forms a significant part of his overall income.

Trustee Defendant Ward has been a trustee of funds affiliated with the Investment Advisor since 2001.

Trustee Defendant Froehlich has been a trustee of funds affiliated with the Investment Advisor since 2013. He was formerly on the boards of two funds managed by American Realty Capital Partners, which Plaintiff alleges committed a large-scale accounting fraud unrelated to this case.

Trustee Defendant Honis has been a trustee of funds affiliated with the Investment Advisor since 2013. He was formerly a partner of Highland Capital Management, L.P. and is owed $880,000 from affiliates of the Investment Advisor under a severance and deferred compensation agreement to which the Investment Advisor is a party. He is also the sole proprietor of Rand Advisors, LLC, a trustee of a trust that owns substantially all of an affiliate of the Investment Advisor, and for which role Rand Advisors, LLC pays Honis $300,000–$350,000 annually. Honis is also alleged to be a close personal friend of Dondero, and the successor trustee of Dondero's personal family trust, and Honis' son has worked as a paid intern at the Investment Advisor.

Trustee Defendant Powell has been a trustee of funds affiliated with the Investment Advisor since 2013. Until 2015, he was Executive Vice President and Principal Executive Officer of the Trust, the Chief Product Strategist of the Investment Advisor, and a Senior Retail Fund Analyst of Highland Capital Management, L.P.

- 3 -

App. 0461

Plaintiff alleges that on January 7, 2015 and thereafter, the Investment Advisor, through Dondero, bought shares of the MLP Fund for the GAF Fund.[2]  The Investment Advisor continued to automatically reinvest any dividends from those shares into the MLP Fund.  As a result, the GAF Fund owned approximately 63% of the MLP Fund midway through the GAF Fund's 2018 fiscal year.  During this time, the MLP Fund was allegedly suffering significant losses due to its role in the oil market.  Plaintiff alleges that the Investment Advisor was using the much larger GAF Fund to "prop up" the value of the "failing MLP Fund."  [Amended Complaint, ECF No. 37, ¶¶ 4, 62].  This allegedly allowed the MLP Fund to retain investors, stay in operation, avoid liquidation, and pay large fees to and reimburse the costs of the Investment Advisor.

Plaintiff sent a demand letter to the Board, requesting that the GAF Fund take legal action against the Investment Advisor and the Trustee Defendants over the MLP Fund investments.  [*Id.* ¶ 82].  In the demand letter [Response Appx., ECF No. 51-2 at 10], Plaintiff argues that the Investment Advisor violated its contractual obligations to the GAF Fund and that the Trustee Defendants violated their fiduciary duties by allowing the investments.

The Board formed a Demand Review Committee (the "Committee") that hired outside counsel, conducted an investigation, and issued the Demand Review Committee Report (the "Report") [ECF No. 44-1, Ex. A] that recommended rejecting Plaintiff's demand.  The five Trustee Defendants voted unanimously to adopt the Report's recommendation and reject Plaintiff's demand.  Dustin Norris did not participate in the vote.

---

[2] Defendants also identify one earlier purchase in June 3, 2014.  [Motion Appx., ECF No. 44-1 at Appx53].

Plaintiff then brought a purported derivative claim for breach of contract against the Investment Advisor, and a derivative and direct claim against the Trustee Defendants for breaching their fiduciary duties.

## II. Applicable Law

The parties do not dispute that Massachusetts law governs the board demand requirements, because the GAF Fund is part of a Massachusetts business trust. Under Massachusetts law, a shareholder cannot commence a derivative action on behalf of a fund unless she first makes a written demand that the fund address her allegations. Mass. Gen. Laws Ann. ch. 156D, § 7.42. A derivative action must be dismissed if it was commenced after "a majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute[d] a quorum" determined that the requested action was "not in the best interests" of the fund and those directors[3] made that decision in "good faith after conducting a reasonable inquiry." Mass. Gen. Laws ch. 156D, § 7.44(a)–(b).[4] Essentially, it is the business judgment rule that governs a decision by an independent board. *Operative Plasterers' & Cement Masons' Local Union Officers' & Employees' Pension Fund v. Hooley*, No. CIV.A. 12-10767-GAO, 2013 WL 5442366, at *6 (D. Mass. Sept. 30, 2013).

A defendant moving to dismiss a derivative action must "make a written filing with the court setting forth facts to show (1) whether a majority of the board of directors was independent

---

[3] While the statute specifically refers to "directors," the parties do not contest the applicability of § 7.44 to the GAF Fund's board of trustees, and other courts have similarly applied it to trusts. *Halebian v. Berv*, 869 F. Supp. 2d 420, 445 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 641 (2d Cir. 2013); *Averbuch v. Arch*, No. SUCV201102502, 2013 WL 5531396, at *4 (Mass. Super. Aug. 27, 2013).

[4] Section 7.44 was enacted in 2004, displacing Massachusetts' prior requirements for derivative actions. The majority of cases prior to the enactment of § 7.44 were demand futility actions, in which the plaintiff claimed that a demand on the board was unnecessary because it would have been futile. These actions were eliminated in 2004 by the universal demand requirement in § 7.42. Nevertheless, demand futility actions remain instructive.

App. 0463

at the time of the determination by the independent directors and (2) that the independent directors made the determination in good faith after conducting a reasonable inquiry upon which their conclusions are based." § 7.44(d). Notably, § 7.44(d) requires pleading that a majority of the board was independent, but it is different from the requirement in § 7.44(b)(2) that there was a quorum of independent directors and a majority of independent directors voted to dismiss. Accordingly, while a defendant needs to plead in a motion to dismiss that a majority of the board is independent, it only needs to establish that there was a quorum of independent directors, the majority of whom voted to dismiss the action.

If a defendant sufficiently pleads the requirements of § 7.44(d), the plaintiff must respond with allegations of particularized facts rebutting the motion's allegations. § 7.44(d). A court then assesses the evidence as to the independence of the board and the good faith and reasonableness of its determination. *Blake v. Friendly Ice Cream Corp.*, No. 030003, 2006 WL 1579596, at *11 (Mass. Super. May 24, 2006). If a court finds that the majority of the board is not independent, the defendant bears the burden of proving that dismissal is otherwise warranted under § 7.44(a). Mass. Gen. Laws ch. 156D, § 7.44(e).[5] If a majority of the board is independent, the plaintiff bears the burden to prove that dismissal is not warranted under § 7.44(a). *Id.* While the statute focuses on the use of pleadings and allegations of particularized facts, the Court must ultimately make factual findings as to the independence of the Board and

---

[5] The Court notes that the commentary to § 7.44 appears to imply that the independence requirement under § 7.44(e) is meant to correspond with the independence requirement of § 7.44(b). § 7.44 cmt. 2. The commentary states that if there is independence under § 7.44(e), then the plaintiff must establish that the board did not conduct a reasonable investigation in good faith. If independence is not established, then the corporation may still obtain dismissal if it proves that the investigation was nevertheless reasonable and done in good faith. *Id.*; *see also Halebian v. Berv*, 644 F.3d 122, 128 (2d Cir. 2011) (describing the burden shifting similarly). While such an approach is consistent with the general application of the business judgment rule, which § 7.44 was intended to embody, it is not supported by the plain language of the statute, which includes different requirements of independence under § 7.44(b) and § 7.44(e), and does not allow a corporation to obtain dismissal by proving the board's investigation was reasonable and done in good faith if the board was not independent.

- 6 -

its good faith and reasonableness in investigating Plaintiff's demand.[6] *Halebian*, 644 F.3d at 128.

## III. Independence of the Trustee Defendants

While independence is not defined under § 7.44, it is understood to require trustees to be "disinterested." § 7.44 cmt. 1. It "more broadly encompasses both 'disinterest' which is a lack of a personal interest in the challenged transaction . . . and 'independent' which is freedom from influence in favor of the defendants due to personal or other relationships." *Blake*, 2006 WL 1579596, at *12. The parties agree that Dustin Norris was not independent and properly recused himself from voting on Plaintiff's demand. [Ward Decl., ECF No. 44-1, Ex. 1 ¶ 17]. Instead, they only dispute the independence of the five Trustee Defendants, who all voted to reject Plaintiff's demand. [Motion Appx. at Appx114].

### A. Statutory Independence Under the Investment Company Act of 1940

The GAF Fund is distinct from a typical mutual fund, because it has a board of trustees, rather than a board of directors. Under Massachusetts law, a trustee who is not an interested person with respect to the trust, as defined in the Investment Company Act of 1940 ("ICA"), "shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee." Mass. Gen. Laws ch. 182, § 2B. Plaintiff argues, however, that the ICA does not govern the independence of trustees in derivative actions. [Response, ECF No. 52 at

---

[6] Federal Rule of Civil Procedure 23.1, under which Defendants seek to dismiss Plaintiff's derivative claims, requires a Plaintiff to "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority." "Because Federal Rule of Civil Procedure 23.1 does not identify applicable substantive standards, the particularity of a plaintiff's pleadings is governed by the standards of the state of incorporation." *Freuler v. Parker*, 803 F. Supp. 2d 630, 636 (S.D. Tex. 2011), *aff'd*, 517 F. App'x 227 (5th Cir. 2013). Section 7.44 not only imposes pleading requirements but also requirements of proof and burden shifting, which the Court will apply as substantive Massachusetts law. *See Rotz v. Van Kampen Asset Mgmt.*, 5 N.Y.S.3d 330 at *4–6 (N.Y. Sup. 2014) (applying the proof and burden shifting requirements of § 7.44 as substantive Massachusetts law).

21].  Instead, Plaintiff reasons that if trustees are treated as directors under § 7.44, then their independence should also be governed only by those provisions of Massachusetts law relating to director independence, including the definitions of independence in § 7.44, and conflicts of interest in Mass. Gen. Laws ch. 156D, § 8.31.

To the extent that there is any conflict between the principles governing directors under § 7.44 and § 8.31 and those related to trustees under § 2B, the latter would govern as it is the more specific statute applicable to trustees.  *See Bos. Hous. Auth. v. Labor Relations Comm'n*, 398 Mass. 715, 718 (Mass. 1986) ("[I]n the case of conflicting statutes, normally the more specific statute will prevail over the more general statute."); *N. Shore Vocational Reg'l Sch. Dist. v. City of Salem*, 393 Mass. 354, 359 (Mass. 1984) ("In the absence of irreconcilable conflict between an earlier special statute and a later general one the earlier statute will be construed as remaining in effect as an exception to the general statute.").

Regardless, the requirements of § 7.44, § 8.31, and § 2B do not necessarily conflict. Section 8.31 defines independence only with respect to voiding transactions approved by interested directors.  It does not address the independence of directors assessing a shareholder demand, which is governed by the independence requirements in § 7.44.  While § 7.44 does not expressly define independence, its commentary references the definition of disinterested in *Harhen v. Brown*, 431 Mass. 838 (Mass. 2000).  § 7.44 cmt. 1.  There, the Massachusetts Supreme Court defined an interested director as one who "has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's . . . judgment with respect to the transaction or conduct in a manner adverse to the corporation."  *Id*. at 844 n. 5 (citing the ALI Principles of Corporate Governance).  It does not provide that a director is *per se* interested if he or she has any

- 8 -

relationship with a party to the transaction. Instead, the relationship must rise to a level that would reasonably affect the director's judgment. Nothing prohibits a court from analyzing the likely impact of that relationship on a trustee's judgment under § 7.44, by then looking at the specific principles of Massachusetts law governing the actions of trustees under § 2B, and thereby harmonize the requirements of both provisions. *See generally Ryan v. Mary Ann Morse Healthcare Corp.*, 135 N.E.3d 711, 719 (Mass. 2019) ("[W]henever possible, 'a statute is to be interpreted in harmony with prior enactments to give rise to a consistent body of law.'"); *Cty. Comm'rs of Middlesex Cty. v. Superior Court*, 371 Mass. 456, 460 (Mass. 1976) ("Statutes which do not necessarily conflict should be construed to have consistent directives so that both may be given effect."). Accordingly, it is appropriate to use § 2B, and its incorporation of the interested trustee standard from the ICA, in assessing the independence of the Trustee Defendants. *See Halebian*, 869 F. Supp. 2d at 447 (applying § 2B to assess the independence of trustee board members under § 7.44); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 239 (S.D.N.Y. 2005) (similarly applying § 2B in a demand futility action under Massachusetts law).

## B.  Interested Persons and Control Under the ICA

In relevant part, a trustee is interested with respect to a trust under the ICA if he or she is an "affiliated person" of the trust or the trust's investment advisor. 15 U.S.C. § 80a-2(a)(19). A trustee is an "affiliated person" if he or she is directly or indirectly controlled by the person or entity with which the trustee is affiliated. *Id.* § 80a-2(a)(3). "A natural person shall be presumed not to be a controlled person," but the presumption may be rebutted by evidence. *Id.* § 80a-2(a)(9). Overcoming this presumption is not to "be lightly assumed or easily carried to success." *Krantz v. Prudential Investments Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 563 (D.N.J. 1999), *aff'd*,

- 9 -

305 F.3d 140 (3d Cir. 2002). Accordingly, here the burden is on Plaintiff to rebut the presumption that the Trustee Defendants, as natural persons, are not under the control of the GAF Fund, the Trust, or the Investment Advisor.

Control requires "actual domination" or "the latent power to exercise a controlling influence." *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 381–82 (S.D.N.Y. 2002). It can "assume many different forms, and often can be proven only by circumstantial evidence." *Id.* at 381. A plaintiff "should specify the extent of personal benefit or gain which resulted" from the trustee's relationship with the trust or the investment advisor. *Acampora v. Birkland*, 220 F. Supp. 527, 543 (D. Colo. 1963); *see also In re Blackrock Mut. Funds Fee Litig.*, No. 04 CIV 164 TFM, 2006 WL 4683167, at *12 (W.D. Pa. Mar. 29, 2006) (requiring that a plaintiff identify what benefits trustees received, with particularized factual allegations). However, the existence "of a relationship resulting in an economic benefit or interest" or a "[m]ere influence would fall short" of establishing control. *Olesh v. Dreyfus Corp.*, No. CV-94-1664 (CPS), 1995 WL 500491, at *16 (E.D.N.Y. Aug. 8, 1995). Instead, there must be a "causative" relationship, and a plaintiff cannot merely allege the receipt of benefits and "argue that this of itself proves control and affiliation." *Acampora*, 220 F. Supp. at 543.[7]

The Securities and Exchange Commission ("SEC") has identified several factors to consider in assessing control under the ICA:

> (1) selection or nomination of the director by the controlling party; (2) existence of family ties; (3) social relations; (4) former business associations between the director and the controlling person; (5) the amount of time spent by directors at meetings; (6) respective ages; (7) participation in recommending, evaluating, and terminating policies; (8) independent knowledge of corporate affairs; (9) interlocking directors and officers, together with share ownership; and (10) actual domination and operation.

---

[7] This ICA standard requires more evidence than that needed to rebut independence under Massachusetts law, which requires only a reasonable doubt as to the independence of the directors. *Blake*, 2006 WL 2714976, at *3.

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F. Supp. 2d 256, 261 (S.D.N.Y. 1999).  Notably, Plaintiff has not addressed the existence of actual domination and control, which is "the single most important factor" because it "speaks directly to the language of the ICA."  *Id.*

The parties' dispute over the independence of the Trustee Defendants relates to the following issues: the risk that the Trustee Defendants would be authorizing suit against themselves; appointment of the Trustee Defendants by other Trustee Defendants; the Trustee Defendants' participation on the boards of multiple funds in the Trust complex; the Trustee Defendants' compensation; and the personal and business relationships among the Trustee Defendants, the Investment Advisor, the GAF Fund, and the Trust.  Of these allegations, the potential that the Trustee Defendants would be authorizing suit against themselves and the fact that they were appointed to the Board by other Trustee Defendants do not implicate issues of control, as they do not relate to the influence of the GAF Fund, the Trust, or the Investment Advisor over the Trustee Defendants.  Plaintiff's remaining allegations—the participation on multiple related boards; compensation; and the Trustee Defendants' personal and business relationships—implicate # 3 (social relationships), # 4 (former business relationships), and # 9 (interlocking directors and officers) of the factors claimed by the SEC.

### i.  Social Relationships

Plaintiff alleges that the social relationships between the Trustee Defendants and the Investment Advisor compromised their independence when they evaluated Plaintiff's demand. The Amended Complaint highlights that Trustee Defendant Hui and his wife are personal friends with Dondero's business partner, Mark Okada, and his wife, and that Mrs. Okada is also a trustee of Cairn University, where Hui is employed, although the parties dispute to what extent Mrs. Okada has supervisory authority over Hui.  [Amended Complaint ¶ 22; Reply, ECF No. 56 at 6].

Similarly, Plaintiff alleges that Trustee Defendant Honis is close personal friends with Dondero, and is the successor trustee of Dondero's personal family trust. [Amended Complaint ¶ 25].

The existence of these social connections does not place Hui or Honis under the Investment Advisor's control. *See Verkouteren*, 37 F. Supp. 2d at 260–61 (finding that directors were not controlled under the ICA by officers of an investment advisor despite the "ample opportunities" to develop personal and business relationships by serving on boards together); *Boylan v. Bos. Sand & Gravel Co.*, No. CIV.A. 02-2296BLS2, 2007 WL 836753, at *10 (Mass. Super. Mar. 16, 2007) (stating that under Massachusetts law a director is not "subject to a controlling influence, and therefore interested, solely because of a long-time friendship or other social relationship"). Instead, the relationship must be such that a director "would be more willing to risk his or her reputation than risk the relationship." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1052 (Del. 2004).[8]

Neither Mark nor Pamela Okada is directly affiliated with the GAF Fund, the Trust, or the Investment Advisor. Instead, Mark Okada and Dondero are the owners of Highland Capital Management Services, Inc., which is a limited partner in the Investment Advisor. [Amended Complaint ¶ 20]. This creates a tenuous connection between Hui and the Investment Advisor. Furthermore, Plaintiff does not allege significant benefits that Hui or Honis received from their social relationships nor how those benefits created a measure of influence and control by others over them. *See Blake*, 2006 WL 1579596, at *14 (finding that a director's lack of personal benefit from his business relationship with defendants supported his independence under § 7.44).

---

[8] "Massachusetts courts have looked to the decisions of courts in other states (frequently Delaware since many corporations are chartered there) that address similar issues . . . The decisions of the various jurisdictions are generally in harmony." *Operative Plasterers'*, 2013 WL 5442366, at *4.

App. 0470

Plaintiff does claim that Hui received his trusteeship through his relationship with Mr. Okada [Amended Complaint ¶ 22], which also implicates factor 1—selection to a board by the controlling party.  Even if true, being recruited for a board by an investment advisor does not, by itself, establish control.  *See Alexander v. Allianz Dresdner Asset Mgmt. of Amer. Holding, Inc.*, 509 F. Supp. 2d 190, 197 (D. Conn. 2007) ("The fact that a defendant appointed a board member is insufficient to establish that the board member is interested [under Massachusetts law], even if the position provides the board member with compensation."); *see also* § 7.44(c)(1) ("[N]omination or election of the director by . . . a defendant in the derivative proceeding or against whom action is demanded" is insufficient by itself to make the director not independent.).

Plaintiff also alleges that Honis' son worked as a paid intern at the Investment Advisor. [Amended Complaint ¶ 25].  That relationship is not significant enough to assume, without more, that Honis would risk his professional reputation for that minimal benefit.  Accordingly, Plaintiff has not alleged sufficient social connections between the Investment Advisor and Trustee Defendants Hui or Honis to establish control of them.

### ii.   Business Relationships

Plaintiff alleges that Trustee Defendants Honis and Powell are also controlled through their business connections with the GAF Fund, the Trust, and the Investment Advisor.  Powell was an officer of the Trust, the Investment Advisor, and Highland Capital Management, L.P. [*Id.* ¶ 26].  Honis was also a partner at Highland Capital Management, L.P. and is owed $880,000 in severance and deferred compensation from an affiliate of the Investment Advisor. [*Id.* ¶ 25].  While Honis was never employed by the Investment Advisor, Plaintiff alleges that the Investment Advisor is a party to Honis' severance agreement, although she does not identify the Investment Advisor's role in that agreement.  [*Id.*].  He is also the sole proprietor of Rand Advisors, LLC, which is a trustee of a trust that owns substantially all of an affiliate of the

- 13 -

Investment Advisor. *Id.* Through Rand Advisors, LLC, Honis is paid approximately $300,000 to $350,000 annually. *Id.*

The mere existence of business relationships is insufficient to establish control under the ICA. *See Strougo*, 188 F. Supp. 2d at 381–82 (finding no control despite a "number [of] former business relationships among the leaders of [the investment advisor] and the Fund"); *Olesh*, 1995 WL 500491, at *11, 16 (finding that directors' "ample opportunity to develop personal business relationships" with officers of the investment advisor did not establish control over those directors). While Plaintiff highlights that the Committee admitted that both Honis and Powell were previously interested persons, based on their prior associations with the Trust and the Investment Advisor [Amended Complaint ¶ 94], this is not dispositive because the assessment of independence is to be made as of the date of the decision on Plaintiff's demand. *See* § 7.44(d) (requiring independence "*at the time* of the determination by the independent directors") (emphasis added).

Under common law, "a long-time business-association" involving "direct pecuniary dealing" may create a reasonable doubt about independence. *Boylan*, 2007 WL 836753, at *10. However, relationships that have been held to create such doubt often "border on or even exceed familial loyalty and closeness." *Beam*, 845 A.2d at 1050; *see also Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016) (holding that a director's joint ownership of a private airplane with a defendant created reasonable doubt about the director's independence because it required a level of cooperation that was suggestive of a close personal friendship like that of familial ties). They must also be of a "bias-producing nature." *Brining v. Donavan*, No. CV 16-3422-BLS1, 2017 WL 4542947, at *5 (Mass. Super. Sept. 14, 2017). Thus, "allegations that board members moved in the same social circles, attended the same weddings, developed business relationships

- 14 -

before joining the board, and described each other as friends are insufficient" if they do not point to an actual bias affecting the board members' decision making. *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1237 (10th Cir. 2016) (internal quotations omitted) (analyzing Delaware law); *see also Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980–81 (Del. Ch. 2000) (finding that a "long-standing 15-year professional and personal relationship" between a director and the defendant did not create a reasonable doubt that the director could exercise independent business judgment).

Plaintiff does not specify how the Trustee Defendants' relationships resulted in a degree of control or influence over them. While Powell was formerly an officer of the Trust and the Investment Advisor, including during the period in which the GAF Fund made the investments at issue, "allegations that the directors themselves participated in the wrongdoing" do not overcome the presumption under the ICA against a finding of control. *Boyce v. AIM Mgmt. Grp., Inc.*, No. CIV.A. H-04-2587, 2006 WL 4671324, at *5 (S.D. Tex. Sept. 29, 2006). Plaintiff does not allege any current relationship beyond Powell's service on multiple boards in the Trust complex, which, as explained below, is insufficient to establish control.

Plaintiff alleges that Honis currently receives significant fees and income from affiliates of the Investment Advisor. However, these payments are not directly from the Investment Advisor and, thus, do not translate into a relationship of control by the Investment Advisor. *See Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985) (concluding that a director's association with a business that had dealings with a defendant did not demonstrate a lack of independence under Delaware law when there were no direct dealings with the defendant and no indication that the association influenced the director's behavior).

- 15 -

The closest connection between Honis and the Investment Advisor is the $880,000 in severance and deferred compensation owed to him, which Plaintiff argued during oral argument functioned like a loan.  [Motion Hearing Transcript, ECF No. 62 at 51:22–52:09].  A trustee who has loaned money to the trust is *per se* interested under the ICA.  15 U.S.C. § 80a-2(19)(A).  However, the money owed to Honis is due from affiliates of the Investment Advisor, and not the Investment Advisor itself or the Trust.  This transaction is not properly characterized as a loan to the Investment Advisor or the Trust for which Honis is being repaid.

As the court found in *Acampora*, in this case, "[i]t does not appear that any [Trustee Defendant] made any decision or any course of decisions because of the business relationship."  *Acampora*, 220 F. Supp. at 543.  Plaintiff has not alleged sufficient business connections between Honis or Powell and the GAF Fund, the Trust, or the Investment Advisor that exceed the norms of general business dealings and has not identified with particularity how any outside business relationships may have influenced the Trustee Defendants' behavior.  *See Pinchuck v. State St. Corp.*, No. 09-2930BLS2, 2011 WL 477315, at *13 (Mass. Super. Jan. 19, 2011) (rejecting the plaintiff's claim of nonindependence under Massachusetts law resulting from a director's "close relationship" with the defendant when there were no particularized facts demonstrating how the directors were influenced by that relationship).

### iii.  Interconnected Boards and Officers

Clearly, serving on a board of trustees does not make a trustee interested.  15 U.S.C. § 80a-2(a)(19)(A).  However, Plaintiff argues that because all the Trustee Defendants served on numerous boards within the Trust complex, their loyalty was to the Investment Advisor and the Trust.  [Amended Complaint ¶ 95].  The Court concludes that serving on multiple boards does not make trustees "*per se* interested persons under the ICA, even though pursuing one fund's interests within the complex might adversely affect the complex's other funds."  *Hartsel v.*

- 16 -

*Vanguard Grp., Inc.*, No. CIV.A. 5394-VCP, 2011 WL 2421003, at *22 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012); *see also Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 330 (4th Cir. 2001) ("Several courts have likewise held that the fact that a director serves on multiple boards within a fund complex is insufficient to demonstrate control [under the ICA].").  While the Trustee Defendants owed fiduciary duties to other funds in the Trust complex, including the MLP Fund, Plaintiff does not allege how pursuing claims on behalf of the GAF Fund against the Investment Advisor and the Trustee Defendants would harm the MLP Fund or any other funds from whom no recovery was sought.  *See Seidl v. Am. Century Companies, Inc*., 713 F. Supp. 2d 249, 261 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011) (finding directors who served on the boards of multiple funds were not conflicted under Maryland Law because the plaintiff did not plead why the recovery sought on behalf of the nominal defendant would harm the other funds).

Plaintiff further argues that Trustee Defendant Hui is not independent because the fees he received for acting as a trustee on those multiple boards form "a substantial portion of his overall income."  [Amended Complaint ¶ 22].  However, receiving significant fees does not make a trustee interested under the ICA.  *See Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 111 (D. Mass. 2006) ("In addition, board membership by itself does not warrant a conclusion that the trustee is 'interested,' [under the ICA] even though the trustee is well compensated."); *Migdal*, 2000 WL 350400, at *3 (stating that the "number of interlocking boards on which she or he serves within a family of funds" does not make a director interested under the ICA "notwithstanding the amount or . . . the 'materiality' of the aggregate income such a director receives for such service, at least so long as the aggregate payment is not so large as to shock the conscience of a reasonable person").  The fees involved here do not shock the conscience.

### iv. Conclusion

Plaintiff's allegations against the Trustee Defendants are collectively insufficient to rebut the presumption that they, as natural persons, were not controlled under the ICA when they voted to reject Plaintiff's demand. *See Blake*, 2006 WL 1579596, at *13 (considering independence under the "totality of the circumstances"). Plaintiff's only relevant allegation against Ward and Froehlich are that they served on multiple boards in the Trust complex, but that alone is insufficient to establish control.

In addition to Hui's service on multiple boards, Plaintiff's claims of an indirect affiliation with the Investment Advisor, through Hui's social relationship with Okada and his wife, and the receipt of normal compensation for Hui's board services, are not probative of the issue of control. This does not create a bias-producing relationship that would make Hui more willing to risk his reputation as a trustee rather than his relationship with the GAF Fund or the Investment Advisor.

Powell has a similarly attenuated relationship with the GAF Fund and the Investment Advisor, which is based only on his past employment with the Trust, Investment Advisor, and Highland Capital Management, L.P., and his current service on multiple boards in the Trust complex. While long-running, this normal business relationship is not exceptional; it does not rival the essentially familial relationships that courts require to find that a trustee was interested. *See, e.g.*, *Beam*, 845 A.2d at 1050.

Finally, Plaintiff alleges several interactions between Honis and both the GAF Fund and the Investment Advisor, including his social relationship with Dondero, Honis' son's internship with the Investment Advisor, Honis' former employment with affiliates of the Investment Advisor, Honis' current business with affiliates of the Investment Advisor, and his service on multiple boards within the Trust complex. However, these interactions are not especially unique,

App. 0476

such that they establish a relationship between Honis and the Investment Advisor or the GAF Fund that involves the effectively familial level of loyalty necessary for a trustee to be interested. Furthermore, Honis has no direct pecuniary dealings with either the GAF Fund or the Investment Advisor, except his current board memberships. Although Plaintiff alleges an overarching relationship, it is not inherently of a bias-producing nature that would support finding that Honis is under the control of the GAF Fund or the Investment Advisor.

Accordingly, the Court concludes that the Trustee Defendants were all disinterested under the ICA, and in turn independent and disinterested under Massachusetts law when they rejected Plaintiff's demand.[9] As a result, the Court need not address whether the Trustee Defendants would also be independent under the general principles of independence under Massachusetts law.

## IV. Majority of Independent Trustees Constituting a Quorum

Given that there were five independent trustees on the six-member Board who voted to reject Plaintiff's demand, Plaintiff bears the burden of establishing that the requirements of § 7.44(b)(1) have not been met. § 7.44(e). To be effective, § 7.44(b)(1) requires that a board decided to reject the demand with "a majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute[d] a quorum." A quorum for the GAF Fund is two trustees, and if two trustees who voted in favor of rejecting the demand were independent, there would be a majority of independent trustees constituting a quorum.[10]

---

[9] Even if Defendant Honis, who has the most collective connections with the GAF Fund, the Trust, the Trust complex, and the Investment Advisor, was found to be not independent at that time, it would not affect the resolution of Defendants' Motion, because the vote of four independent trustees is sufficient to satisfy the voting requirements detailed below. While Plaintiff urged that even one non-independent director would taint the entire voting process, as explained below, such a position, without further proof of inappropriate influence, would be inconsistent with the text and purpose of § 7.44.

[10] Plaintiff also argues that the Committee was improperly constituted under § 7.44(b)(2). However, that provision governs a committee formed to vote on the demand. § 7.44(b)(2). Here, the Committee merely investigated the

Plaintiff argued at oral argument that the Court would also need to find that no non-independent trustees participated in the decision to reject the demand. [Motion Hearing Transcript at 48:13–48:19]. However, "[t]he fact that one [trustee] is interested . . . does not taint the entire board." *Canal Capital Corp. By Klein v. French*, No. CIV. A. 11,764, 1992 WL 159008, at *5 (Del. Ch. July 2, 1992). Nothing in § 7.44(b)(1) states that the majority vote of independent directors must be held to the exclusion of any non-independent directors, and Plaintiff has not identified how the participation of any allegedly non-independent Trustee Defendants adversely affected the vote of the independent Trustee Defendants. Furthermore, requiring a court to void any vote by directors if it later finds that one director who participated was not independent would be contrary to the goal of Massachusetts' demand requirement, which is to allow "corporations to assume control over shareholder derivative suits [because c]orporate management may be in a better position to pursue alternative remedies, resolving grievances without burdensome and expensive litigation." § 7.42 cmt. 4. The Court has determined that all five of the trustees that voted in favor of rejecting the demand were independent, satisfying the independence requirement of § 7.44(b)(1). However, clearly a quorum of independent trustees voted to reject the demand, because only two of the five who voted are even alleged to be non-independent in any way beyond their participation on multiple boards.

## V. Good Faith and Reasonable Investigation

Given that a majority of the Board or, alternatively, of a quorum of the Board, consisted of trustees who were independent when they voted to reject Plaintiff's demand, Plaintiff bears

---

demand and then presented its findings to the Board, which then voted on the demand. Accordingly, § 7.44(b)(2) is inapplicable.

the burden of establishing that that decision was not made in good faith after a reasonable inquiry. § 7.44(e). When made by a properly independent board, "Massachusetts presumes that a decision to reject a shareholder demand was the exercise of valid business judgment, 'absent a showing of bad faith or lack of investigation into the demand.'" *Halebian*, 548 F. App'x at 646. Under the business judgment rule, decisions of a board are presumed to be valid and cannot be second guessed by a court merely because the court believes that the board was mistaken or made an error in judgment. *Evangelist v. Fid. Mgmt. & Research Co.*, 554 F. Supp. 87, 91 (D. Mass. 1982). Instead, a plaintiff must demonstrate a flaw in the process by which the board made its decision that means its decision was not made in good faith or after a reasonable inquiry. *Pinchuck*, 2011 WL 477315, at *15. Massachusetts law "does not prescribe the scope or form of the inquiry that must be taken." *Rotz*, 5 N.Y.S.3d at *9.

Defendants highlight the multiple steps the Board took to investigate the demand. It formed the Committee, which held sixteen meetings, hired independent counsel, who billed for one thousand hours of attorney time, reviewed thousands of pages documents, and interviewed ten witnesses. [Motion Appx. at Appx32–34]. The Committee asked Plaintiff for any relevant documents she had and met with her about whether there were additional issues or facts she wished to raise. [*Id.* at Appx35, 37]. The resulting Report provided an assessment of Plaintiff's demand and explained why it would not be in the GAF Fund's best interests to pursue Plaintiff's requested action. [*Id.* at Appx92–93]. Courts have found that similar efforts adequately demonstrate a reasonable and good faith investigation. *See Operative Plasterers'*, 2013 WL 5442366, at *6 (approving a board's investigation when it created an investigation committee that met twenty-two times, hired independent counsel that billed one thousand hours to the investigation, conducted interviews, reviewed thousands of pages of documents, analyzed the

investment portfolio and public disclosures, and considered legal theories that could be pursued, as well as the chances of recovery on them); *Averbuch*, 2013 WL 5531396, at *4 (finding an investigation committee that "interviewed numerous witnesses, reviewed thousands of pages of documents, obtained expert reports, and met several times to discuss its investigation and findings" was "fairly comprehensive"); *Rotz*, 5 N.Y.S.3d 330 at *11–12 (holding that a review committee that used independent counsel to spend thousands of hours interviewing witnesses and reviewing documents and worked with experts to create an extensive report demonstrated a good faith, reasonable inquiry under Massachusetts law that was not rebutted by the plaintiff).

It is true that an investigation report in response to a demand can be "so lacking in substance, scope and support" that it raises "serious questions about the good faith and reasonableness" of the investigation. *Blake*, 2006 WL 1579596, at *22. Plaintiff claims that four deficiencies in the Report undermine the good faith and reasonableness of the Board's and Committee's actions: 1) the improper assessment of the Trustee Defendants' independence; 2) the inadequate scope of the evidence considered by the investigation; 3) the failure to assess multiple potential factual and legal theories and arguments; and 4) the limited factual support cited by the Report.

### A. Independence of the Committee and the Board

Plaintiff argues that the Report does not adequately assess the independence of the Trustee Defendants and instead merely relies on their independence questionnaires, public documents, and interviews. [Amended Complaint ¶¶ 106–07]. In particular, Plaintiff highlights that the Committee did not consider issues of the trustees' compensation and the impact it might have on their independence. [*Id.* ¶ 92]. In fact, the Report contains numerous pages explaining potential conflicts created by the Trustee Defendants' various relationships with the GAF Fund, the Trust, and the Investment Advisor, including items which Plaintiff alleges were not included

App. 0480

in the Trustee Defendants' independence questionnaires.  [Motion Appx. at Appx43–50].

Independence questionnaires can be valuable in assessing independence, although that clearly is

not the stopping point if other legitimate issues going to independence are raised.  *See Halebian*,

548 F. App'x at 647.  While Plaintiff is correct that the Report does not specifically address the

Trustee Defendants' compensation, it was disclosed in public filings attached to the Report

[Highland Energy MLP Fund 2016 Annual Report, ECF No. 61-70 at 23], and the Report cannot

be reasonably faulted for not explicitly addressing an issue with which the Trustee Defendants

are intimately familiar.

In light of these efforts and the presumption against control to which the Trustee

Defendants are entitled under the ICA, the Report's investigation and analysis of independence

were not inadequate.  While Plaintiff disagrees with the Report's, and the Court's, findings of

independence, any alleged biases of the Trustee Defendants did not create "a superficial

investigation designed to exonerate the Investment Advisor and [the Trustee Defendants]"

[Response at 20], because, as discussed below, the specific deficiencies identified by Plaintiff are

insufficient to carry her burden of establishing the lack of a good faith and reasonable

investigation.

### B.  Failure to Address Potential Factual and Legal Arguments

Plaintiff also claims that there were a number of substantive inadequacies in the Report

that warrant a finding that the investigation was not reasonable or done in good faith.  A board

should discuss "on what factors it relied and why those factors support its decision."  *Houle v.

Low*, 407 Mass. 810, 825 (Mass. 1990).  A report may be inadequate if it does not "meaningfully

address[]" a plaintiff's claims or is "devoid of analysis" on certain issues.  *Blake*, 2006 WL

1579596, at *23–24.  A "selective investigation" may raise questions as to the reasonableness of

- 23 -

an investigation and whether it was conducted in good faith. *Sutherland v. Sutherland*, 958 A.2d 235, 244 (Del. Ch. 2008).

Plaintiff alleges that the Committee did not address several factual and legal arguments. Plaintiff first claims that the Report does not address conflicts created by the Investment Advisor's decision to invest in the MLP Fund. [Amended Complaint ¶¶ 110–11]. She alleges that the Report discusses only a half-page memorandum dated in January 2015, which apparently satisfied the Committee that conflicts were addressed by the Investment Advisor and the Board at the time of the investment. In fact, the Report analyzes the propriety of the investments based not only on the January 2015 memorandum but also based on witness interviews and the investigation into the MLP Fund. [Motion Appx. at Appx64–68, 74–82].

Plaintiff also alleges that the Report does not adequately address whether the Trustee Defendants satisfied their duty to monitor the GAF Fund's investments and the activities of the Investment Advisor, including as to the automatic reinvestments of dividends, and to consider the potential termination of the Investment Advisor. [Amended Complaint ¶¶ 97, 112]. In fact, the Report contains several pages analyzing the monitoring of the MLP investments, their performance, and the role of the Investment Advisor. [Motion Appx. at Appx82–86, 88]. It concludes from this analysis that the Trustee Defendants' oversight was "robust." [*Id.* at Appx83]. While it does not specifically discuss the possibility of terminating the Investment Advisor, the Report's conclusion as to the adequacy of the Board's oversight can be reasonably interpreted to include review of the Investment Advisor's role and effectiveness.

Plaintiff also faults the Report for its premature determination that certain claims may be barred by the statute of limitations, because it does not consider possible tolling of the limitations periods. [Amended Complaint ¶ 114]. The Report does not address potential tolling, and

instead, concludes that claims based on transactions that occurred more than three years before the date of the demand are "likely" barred. [Motion Appx. at Appx87]. While Plaintiff may disagree with the Committee's conclusions, the Board is entitled to rely on factors such as the applicable statute of limitations when assessing what is in the best interests of the GAF Fund. *See Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 534 (Mass. 1997) ("[T]he existence of a legal or other impediment is a matter for a corporation's board to consider when deciding whether to accept or decline an opportunity that has been disclosed to it.").

Furthermore, the Report spends several pages detailing the earlier transactions that fell outside of the three-year statute of limitations period [Motion Appx. at Appx29–30, 62–68], and Plaintiff admits that. [Amended Complaint ¶ 114]. The Report's analysis rarely emphasizes any single transaction, and instead, considers Defendants' larger course of conduct, including instances falling outside the limitations period. [Motion Appx. at Appx90]. To the extent that the Report does not explicitly address earlier transactions falling outside of the claimed limitations period, it did not unduly compromise the good faith and reasonableness of the investigation into her demand.

### C. Scope of the Evidence Considered

Plaintiff argues that the limited scope of the evidence the Committee considered reflects a lack of good faith and reasonableness. She urges that the Report does not reveal that emails, electronically stored information, or internal documents other than the January 2015 memorandum and documents provided by Plaintiff were reviewed as part of the investigation. [Amended Complaint ¶¶ 98–101]. She also questions the Committee's choice of witnesses, given that Dondero was the only member of the GAF Fund's management that was interviewed. [*Id.* ¶ 105].

- 25 -

However, "the types of documents reviewed or the persons interviewed in connection with an investigation" are choices "on which reasonable minds may differ." *Belendiuk v. Carrion*, No. CV 9026-ML, 2014 WL 3589500, at *6 (Del. Ch. July 22, 2014). The "failure to interview certain individuals or review [certain] documents" does not negate the reasonableness or good faith of an investigation if "the pressures and motivations that this evidence was meant to highlight" were nevertheless considered. *Averbuch*, 2013 WL 5531396, at *5.

The Committee concluded that the documents it obtained "best documented the Adviser's investment thesis for MLP Fund and why the Adviser was confident in the MLP sector generally and MLP Fund specifically." [Motion Appx. at Appx65]. Plaintiff does not allege with particularity what impact the Committee's choice to exclude certain documents or witnesses had on the investigation nor does she further identify what issues the Committee did not consider as a result.

### D. Lack of Supporting Evidence

Plaintiff argues that the Report's lack of citation to supporting evidence further indicates an improper investigation. Although ten interviews are listed in the Report, the Report does not reveal detailed information about the nature of these interviews. [Amended Complaint ¶ 104]. The Report does not set out the questions asked, who conducted the interviews, what documents, if any, were shown to the witnesses, the length of the interviews, or any other substantive information. Instead, Plaintiff alleges that "the Committee consciously determined that its members would not . . . take notes of the interviews or otherwise create a factual record of unsworn, untranscribed interviews." [*Id.*] Defendant mentions that summaries of these interviews exist, but that they could not be provided to Plaintiff because they are privileged. [Motion Brief, ECF No. 44 at 24]. Without supporting documentation indicating how extensively the witnesses were questioned, Plaintiff claims the Court cannot "ascertain the

- 26 -

reasonableness of" an investigation, and that such a deficient record "do[es] not assure the court of the good faith or integrity" of the process. *Sutherland*, 958 A.2d at 243.

Plaintiff also criticizes the lack of clarity as to the documents on which the Committee relied. While the Report extensively explains the facts that the Committee came to learn and understand, there is limited documentation cited for these facts. [*E.g.* Motion Appx. at Appx62–64, 66–67, 74–75, 83–84]. Although the Report cites multiple public documents and indicates that the Committee "reviewed numerous important documents that [it] requested or that counsel identified," [*Id.* at Appx32, 57], it does not explain what those other documents were, the steps the Committee took to obtain them, or the identification of who provided them. The only document request specifically mentioned in the Report—for those supporting the Investment Advisor's 2014 decision to invest in the MLP Fund—did not cause any documents to be produced. [*Id.* at Appx65]. Furthermore, the Report is not attested to and some significant parts lack citation.

Defendants maintain that the contents of documents and what was learned from them were thoroughly discussed in the Report. However in *Blake*, the Massachusetts Superior Court found that a report that "contain[ed] numerous conclusory assertions . . . yet often fail[ed] to cite to any specific source for verification of its conclusions" and did not include "an attestation to the accuracy of [its] contents" created serious questions about the good faith and reasonableness of the inquiry. 2006 WL 1579596, at *22.

In this Court's view, the lack of evidentiary support identified by Plaintiff is insufficient to carry Plaintiff's burden of establishing "serious questions" about the good faith and reasonableness of the Board's investigation. While the Report does not include an attestation as to its accuracy, it is attached to the Ward Declaration, which declares the accuracy of the Report

under penalty of perjury. [Ward Decl. ¶ 19]. Notwithstanding the flaws identified by Plaintiff, her ultimate complaint is that "the recommendation not to move forward with the prosecution is not supported by the facts disclosed in the Report itself." [Amended Complaint ¶ 88]. However, the correctness of the Report's analysis and whether the conclusions are justified are squarely protected by the Committee's and the Board's right to rely on the business judgment rule.

### E. Conclusion

As analyzed above, the Report demonstrates that several of Plaintiff's claimed deficiencies regarding the Committee's investigation are without merit. The Report establishes that, contrary to Plaintiff's allegations, the Committee's deliberations considered the independence of the Trustee Defendants, potential conflicts created by the GAF Fund's investments into the MLP Fund, potential termination of the Investment Advisor, and claims that may be time-barred. Plaintiff's remaining concerns as to the evidence and witnesses that the Committee reviewed and cited in the Report reflect choices upon which reasonable minds may disagree. While Plaintiff may not agree with the specific evidence and witnesses the Committee chose to interview and review, and with the Committee's failure to include citations in several portions of the Report, these choices, as a whole, do not demonstrate a serious or fundamental flaw that causes the Court to doubt the good faith and reasonableness of the Committee's and Board's investigation.

The Court concludes that Defendants have established that the independent Trustee Defendants voted to reject Plaintiff's demand after a reasonable and good faith investigation, and Defendants' Motion to Dismiss Plaintiff's derivative claims is therefore **GRANTED**.

### VI. Plaintiff's Direct Class Action Claim

Plaintiff also brings a direct class action claim against the Trustee Defendants for breach of fiduciary duties. [Amended Complaint ¶¶ 141–47]. Defendants argue that these claims must

App. 0486

be dismissed because a breach of fiduciary duty claim can only be brought derivatively. [Motion Brief at 30]. The "crux of the inquiry" of whether an action is direct or derivative under Massachusetts law is whether the harm that shareholders complain of "resulted from a breach of duty owed directly to them, or whether the harm claimed was derivative of a breach of duty owed to the corporation." *In re PHC, Inc. S'holder Litig.*, 894 F.3d 419, 427–28 (1st Cir.) (citing *Int'l Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci*, 476 Mass. 553, 558 (Mass. 2017)). Furthermore, a direct claim requires an injury that "is distinct from the injury suffered generally by the shareholders as owners of corporate stock." *Tucci*, 476 Mass. at 558.

Under Massachusetts law, a "director's fiduciary duties are generally owed only to the corporation" and "any suit to enforce those duties ordinarily must be brought as a derivative action." *In re PHC, Inc. S'holder Litig.*, 894 F.3d at 428. As Plaintiff argues, however, trustees owe fiduciary duties to both the trust and its beneficiaries, including its shareholders. *Fogelin v. Nordblom*, 402 Mass. 218, 222 (Mass. 1988). Nevertheless, even when a director or trustee owes a fiduciary duty to both an organization and its shareholders, "plainly not all fiduciary duty claims are individual claims." *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1138 n. 66 (Del. 2016) (analyzing Delaware law). Instead, "the focus should be on the nature of the injury," so as to distinguish between breaches of fiduciary duty to the shareholders, which are to be brought individually, and those owed to the corporation, which are to be brought derivatively. *Id.*

Here, Plaintiff's claimed harm is a decrease in the value of the GAF Fund, which is felt by all shareholders equally, based on their status as shareholders. Plaintiff argues that the distinction between direct and indirect injuries is less meaningful in the context of mutual funds like the GAF Fund. [Response at 31]. In a typical corporation, a harm to the corporation's

- 29 -

assets or operations affects its overall value, which then indirectly harms all shareholders by decreasing the value of their individual shares. In contrast here, however, Plaintiff argues that mutual funds are unique, because a mutual fund's operations are to make other investments, in which shareholders are entitled to a pro rata share. Plaintiff reasons that owning a share of a mutual fund, which makes other underlying investments, functionally equates to the shareholder directly owning a pro rata share of the mutual fund's underlying investments, so that harms to those underlying investments should be held to flow directly to the investors.

Courts that have addressed this issue are divided. *Compare Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1058 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015) (finding that under Massachusetts law "the distinction between direct and derivative actions has little meaning in the context of mutual funds") *with Stegall v. Ladner*, 394 F. Supp. 2d 358, 366 (D. Mass. 2005) (rejecting the argument that mutual funds were unique under Massachusetts law because there was nothing "materially different" in how harms to a corporation and harms to a mutual fund flow to investors); *Forsythe*, 417 F. Supp. 2d at 112 (holding similarly); *Hogan v. Baker*, No. CIV.A. 305CV0073P, 2005 WL 1949476, at *4 (N.D. Tex. Aug. 12, 2005) (holding similarly to *Forsythe* under Delaware law). The Court agrees with those courts characterizing the decrease in value of a mutual fund as a derivative injury. Ownership of a share of a mutual fund does not make the shareholder the owner of any of the mutual fund's underlying investments. While any diminution in value of those underlying investments is closely tied to the value in the shareholder's shares of the mutual fund, that harm follows a decrease in the value of the *mutual fund*, making the shareholder's injury derivative of that decrease in value.

- 30 -

Plaintiff further argues that even if her claim is properly characterized as derivative, a derivative recovery would not properly remedy the harm at issue. [Response at 32]. Under Massachusetts law, a derivative action must seek a "recovery [that] provides a just measure of relief to the complaining stockholder." *Crowley v. Commc'ns For Hosps., Inc.*, 30 Mass. App. Ct. 751, 765 (Mass. App. Ct. 1991). Application of this exception requires unique circumstances, such as when a minority shareholder seeks recovery from a majority shareholder on behalf of the corporation, which would merely result in the majority shareholder regaining control of the recovered corporate funds. *Orsi v. Sunshine Art Studios, Inc.*, 874 F. Supp. 471, 475 (D. Mass. 1995); *see also Serrano v. Serrano*, No. CIV.A. 2011-1948, 2011 WL 3930207, at *1 (Mass. Super. June 24, 2011) ("The facts of this case suggest that any recovery the plaintiff may receive in a derivative action would not provide an effective remedy since the only other shareholder in the corporation is one of the defendants.").

Plaintiff does not demonstrate a similarly compelling situation that requires her to proceed directly to adequately compensate complaining shareholders. Plaintiff's only claim that a derivative recovery would not be just is that former shareholders will not benefit from a corporate recovery. However, this is always true in a derivative action. *Forsythe*, 417 F. Supp. 2d at 112 n. 15. To the extent that former shareholders believed that the GAF Fund's investments were unlawful, they could have held their shares and sought to bring a derivative action. Instead, they sold their shares and gave up that right. Their situation is not so unique as to conclude that a derivative action is unjust. Accordingly, Plaintiff's claims for breach of fiduciary duties against the Trustee Defendants can only be brought derivatively and Defendants' Motion to Dismiss Plaintiff's direct fiduciary duty class action claims is **GRANTED.**

## VII. Conclusion

Defendant has established that a majority vote of the independent trustees constituting a quorum voted to reject Plaintiff's demand that the Board pursue legal action against the Investment Advisor and the Trustee Defendants with respect to the GAF Fund's investments in the MLP Fund. That vote occurred after a reasonable and good faith investigation by the Committee appointed by the Board and after the Board's consideration of that investigation. As a result, Plaintiff's derivative claims against the Investment Advisor and the Trustee Defendants must be dismissed. Furthermore, the fiduciary duty claims against the Trustee Defendants must be brought derivatively, and Plaintiff's direct class action alleging those same claims must also be dismissed. Accordingly, Plaintiff's Motion to Dismiss is **GRANTED**. Given that the contract and fiduciary duty claims are barred by the Board's independent and good-faith investigation of those claims, it is **ORDERED** that this action is **DISMISSED WITH PREJUDICE**.

  **SO ORDERED**.

May 26, 2020.

_____
BARBARA M.G. LYNN
CHIEF JUDGE

- 32 -

App. 0490