# Appendix Exhibit 30

Docket #0687 Date Filed: 06/03/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice pending*)
Alan J. Kornfeld (CA Bar No. 130063) (*pro hac vice pending*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to D.I. 644 |

## DEBTOR'S OBJECTION TO UBS'S MOTION FOR RELIEF FROM THE
## AUTOMATIC STAY TO PROCEED WITH STATE COURT ACTION

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054200603000000000000001

# <u>TABLE OF CONTENTS</u>

**Preliminary Statement**............................................................................................1

**Statement of Facts**..............................................................................................**11**
    I.    Relevant Procedural History of the State Court Litigation................................11
    II.   Relevant Facts Regarding the Phase I Trial on UBS's Discrete Contract
        Claim.............................................................................................................14

**Argument**..........................................................................................................**15**
    I.    UBS Has Failed to Establish Cause to Lift the Automatic Stay...........................15
        A.    Granting Stay Relief Will Interfere With and Delay the Bankruptcy
                Case, and Potentially Jeopardize the Debtor's Reorganization
                Efforts...............................................................................................16
        B.    The Harm the Debtor and Its Constituencies Will Suffer if Stay
                Relief Is Granted Far Outweighs Any Purported Harm to UBS...............19
        C.    Granting Stay Relief Will Not Promote Judicial Economy......................20
    II.    UBS's Discussions With Pre-Petition State Court Counsel and In-House
        Counsel Do Not Relieve UBS of Its Burden to Establish Cause to Lift the
        Automatic Stay............................................................................................22
    III.    UBS Is Not Entitled to an Order Granting UBS a Right to a Jury Trial on
        Its Proof of Claim, and No Further Extension of the Bar Date Is Warranted........24

**Conclusion** .......................................................................................................**25**

DOCS_LA:329949.2 36027/002

App. 0493

# **TABLE OF AUTHORITIES**

**Cases**

*Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446 (3d Cir. 1982) .......... 22

*Bd. of Managers of the 195 Hudson St. Condo v. Jeffrey M. Brown Assocs.*, 652 F. Supp. 2d 463 (S.D.N.Y. 2009) ........................................................................................................ 18

*Commerzanstalt v. Telewide Sys.*, 790 F.2d 206 (2d Cir. 1986)............................................. 10, 22

*Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782 (1989) ...................................... 25

*In re Brook Mays Music Co.*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) ................................ 8, 21, 25

*In re Choice ATM Enters.*, 2015 Bankr. LEXIS 689 (Bankr. N.D. Tex. Mar. 4, 2015)......... 15, 17

*In re Crespin*, 581 B.R. 904 (Bankr. D.N.M. 2018)................................................................. 16, 17

*In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984) ............................................................. 2, 16, 19

*In re Endeavour Highrise L.P.*, 425 B.R. 402 (Bankr. S.D. Tex. March 12, 2010) .............. 11, 25

*In re U.S. Brass Corp.*, 173 B.R. 1000 (Bankr. E.D. Tex. 1994) .................................................. 16

*In re Wood*, 825 F.2d 90 (5th Cir. 1987)....................................................................................... 21

*Kamdem-Ouaffo v. PepsiCo, Inc.*, 160 F. Supp. 3d 553 (S.D.N.Y. 2016) ................................... 18

*Katchen v. Landy*, 382 U.S. 323 (1966)................................................................................... 10, 25

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986)..................................... 15

*Mooney v. Gill*, 310 B.R. 543 (N.D. Tex. 2002)...................................................................... 15, 16

*Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442 (5th Cir. 2016) ......................................... 18

*UBS v. Highland Capital Mgmt., L.P.*, 2010 NY Slip Op 1436 (N.Y. App. Div.) .......................... 2

*UBS v. Highland Capital Mgmt., L.P.*, 86 A.D.3d 469 (N.Y. App. Div. 2011) ...................... 2, 17

*UBS v. Highland Capital Mgmt., L.P.*, 93 A.D.3d 489 (N.Y. App. Div. 2012)................... 3, 12, 17

*United States v. Moore*, 1990 U.S. App. LEXIS 13768 (5th Cir. July 24, 1990)........................ 22

**Statutes**

11 U.S.C. § 362.......................................................................................................................... 15, 22

28 U.S.C. § 1334 ............................................................................................................................. 21

**Other Authorities**

Shira A. Scheindlin, U.S.D.J. (Ret.), *Why Not Arbitrate? Breaking the Backlog in State and Federal Courts*, 263 N.Y. L.J. 94, May 15, 2020 .................................................................... 5

**Rules**

Fed. R. Bankr. P. 4001(d) .......................................................................................................... 10, 23

DOCS_LA:329949.2 36027/002

App. 0494

Highland Capital Management, L.P., the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 case ("Bankruptcy Case"), submits this objection to the *Motion for Relief from the Automatic Stay to Proceed with State Court Action* [D.I. 644] ("Motion") filed by UBS Securities LLC and UBS AG, London Branch (collectively "UBS").[2]

### Preliminary Statement

1.      After eleven years of litigation, UBS holds an uncollectible $1 billion breach of contract judgment against two insolvent offshore funds (the "Funds"), and is still searching for a way to pin that liability on the Debtor. UBS has used the purported amount of its claim to gridlock the entire Bankruptcy Case, with the uncertainty as to the amount of UBS's claim interfering with negotiations among the Debtor and its other creditors, and stalling any meaningful progress towards a successful chapter 11 exit.  While the Debtor has attempted to negotiate in good faith with all of its creditors, there is a billion dollar "elephant in the room" that UBS is pretending not to see: UBS's supposed $1 billion claim against the Debtor has no basis in reality.

2.      In the Motion, UBS tries to convince the Court that its claim is just too complex for this Court to handle, spending pages of its Motion and roughly 200 pages of exhibits on contract issues that have nothing to do with what this Court would need to decide if it denies the Motion. If, like all other creditors, UBS is required to assert its claim against the Debtor in the Bankruptcy Case, there are two threshold issues that can be fairly and efficiently resolved in this Court, using the streamlined claim objection and/or estimation procedures designed by the Bankruptcy Code. Both issues are straightforward and can be determined well in advance of any adjudication of the merits of UBS's claim or the Debtor's defenses: the first issue involves the application of prior rulings by the Appellate Division in the state court litigation, which preclude

---

[2] Exhibits 1-12 to this objection are attached to *Appendix A of Exhibits in Support of Debtor's Objection to UBS's Motion for Relief from the Automatic Stay*, filed concurrently herewith, and all citations herein to "A__" refer to Appendix A.  Exhibits 13-17 to this objection are attached to *Appendix B of Exhibits in Support of Debtor's Objection to UBS's Motion for Relief from the Automatic Stay*. Concurrently herewith, the Debtor is requesting the Court's permission to file Appendix B under seal.  All citations herein to "B__" refer to Appendix B.

UBS from enforcing its breach of contract judgment against the Debtor; and the second issue involves the enforcement of settlement agreements by which UBS released the vast majority of its claim against the Debtor, leaving UBS with a maximum potential principal recovery against the Debtor of less than $50 million. Summary proceedings in this Court to determine these threshold issues, implementing the "speedy, efficient and economical method for the determination and allowance of claims" contemplated by the Bankruptcy Code, *In re Curtis*, 40 B.R. 795, 801 (Bankr. D. Utah 1984), will fairly and promptly eliminate uncertainty as to the amount of UBS's claim and encourage negotiations towards a possible resolution with UBS, and thereby pave the way for a successful resolution of the Bankruptcy Case.

3.        As to the **first** threshold issue, UBS's assertion that it can hold the Debtor "responsible for the [breach of contract] judgment awarded to UBS in Phase I" of the state court litigation (Motion at ¶¶ 17-18) can easily be laid to rest by applying three decisions issued by the Appellate Division in this case. The first of those decisions resulted in the dismissal of UBS's original complaint against the Debtor (filed on February 24, 2009) and a judgment on the merits in favor of the Debtor on UBS's breach of contract claim. The Appellate Division based its determination on the fact that the Debtor did not promise to undertake liability as to UBS's losses, or to ensure the Funds' performance under their contracts with UBS. *See UBS v. Highland Capital Mgmt., L.P.*, 2010 NY Slip Op 1436, ¶ 1 (N.Y. App. Div.) [**Exhibit 1** at A002].

4.        The second decision, issued after UBS tried to re-assert the same claim against the Debtor by labeling it as different legal theories (much like UBS is now doing in the Bankruptcy Case), held that UBS is barred, under the doctrine of *res judicata*, from asserting claims against the Debtor that "implicate events alleged to have taken place before the filing of the original complaint" on February 24, 2009. *See UBS v. Highland Capital Mgmt., L.P.*, 86 A.D.3d 469, 474 (N.Y. App. Div. 2011) [**Exhibit 2** at A010].

-2-

5.       In its third decision, the Appellate Division extended its *res judicata* ruling to the Debtor's co-defendants in the state court litigation, holding that UBS's claims against other defendants – including a claim that Highland Financial Partners, L.P. ("HFP") is the alter ego of one of the Funds – are likewise limited to conduct that occurred after February 24, 2009. *See UBS v. Highland Capital Mgmt., L.P.*, 93 A.D.3d 489, 490 (N.Y. App. Div. 2012) [**Exhibit 3** at A014]. Because UBS terminated the agreements underlying its breach of contract claim on December 3, 2008, and the New York trial court ("State Court") identified December 5, 2008 as the date on which the foreign Funds breached the agreements, the Appellate Division's decisions preclude UBS from attempting to hold the Debtor liable for UBS's breach of contract judgment against the Funds, either directly or under some type of alter ego theory.

6.       By limiting UBS's claims to post-February 24, 2009 conduct, the Appellate Division's decisions also transformed what UBS tries to portray as an exceedingly complex case into what is really a run-of-the-mill fraudulent transfer case – a meat-and-potatoes issue for this Court.  The only post-February 24, 2009 conduct at issue is a March 2009 transaction that, even at the highest amount originally alleged by UBS, involved less than $240 million of transfers allegedly made by HFP.[3] UBS asserts that the March 2009 transaction was a fraudulent conveyance, and has conceded that its only other claim against the Debtor – an implied covenant claim – is nothing more than a restatement of its fraudulent transfer claim. *See, e.g.*, 05/01/18 State Court Hrg. Tr. at 10:13-16 [**Exhibit 5** at A063] (in discussing whether the implied covenant claim is based solely on the March 2009 transaction, UBS's counsel stated "basically, you know, the implied covenant of good-faith and fair-dealing claim that we now have is that they shouldn't have committed fraudulent conveyances …"). In other words, with no ability to establish a billion dollar breach of contract claim against the Debtor (because it cannot base its claim on conduct that

---

[3] *See* NY D.I. 411 at pg. 22 of 36 [**Exhibit 4** at A038] (State Court decision reciting that, in UBS's complaint, UBS alleged that $239 million of assets were transferred in the March 2009 transaction).

occurred prior to February 24, 2009), UBS has admitted that all that is left of its claim is a potential fraudulent transfer recovery of less than $240 million.

7.      The **second** threshold issue that can readily be resolved in this Court involves the enforcement of releases granted to the Debtor pursuant to settlement agreements UBS entered into in 2015 with two of the Debtor's co-defendants, who allegedly received the majority of the transfers made during the March 2009 transaction.  As set forth above, even at the highest amount alleged by UBS, UBS's fraudulent transfer claim based on the March 2009 transaction involved less than $240 million of transfers. However, the actual maximum principal amount UBS could ever recover from the Debtor on that claim is substantially less because (among other reasons) UBS released the Debtor from any claims "for losses or other relief specifically arising from" the allegedly fraudulent transfers made in March 2009 to the settling defendants. *See* **Exhibit 13** at Section 5.3, pg. 6 [**B007**]; **Exhibit 14** at Section 5.3, pg. 5 [**B037**]. Significantly, the allegedly fraudulent transfers to the settling defendants totaled more than 80% of the amount transferred in March 2009 and ultimately challenged by UBS.[4] In other words, UBS voluntarily reduced any potential recovery against the Debtor to less than 20% of the amount transferred in March 2009 – meaning a potential principal recovery of less than $50 million on UBS's best day, without even taking into account whether UBS can establish its claim, or the Debtor's numerous defenses.

8.      As outlined above, a straightforward application of the doctrine of *res judicata* and the plain language of the prior settlement agreements demonstrates the fallacy of the $1 billion position UBS has taken in its Motion and in negotiations in the Bankruptcy Case.  This Court, via a dispositive motion in a claim objection proceeding and/or the claims estimation process, can (and should) quickly and efficiently decide the question of whether UBS has a $1

---

[4] In its motion for injunctive relief against the settling defendants, UBS (i) reduced the total amount it claimed was transferred in the March 2009 transaction, and (ii) identified the transfers to the settling defendants as totaling more than 80% of the total amount of the March 2009 transaction. *See* NY D.I. 315 at pg. 6 [**Exhibit 15** at B061].

billion claim or a less than $50 million claim against the Debtor based on the straightforward defenses outlined above. While acknowledging that the "uncertainty over the amount" of its claim *must* be resolved in order for the Bankruptcy Case to proceed to an orderly and efficient conclusion, UBS argues nonetheless that stay relief is appropriate because (according to UBS) its claim against the Debtor will be resolved in "relatively short order" in State Court. Motion at ¶ 37. Nothing could be further from the truth.

9.      New York courts are notoriously overburdened and backlogged, and this case was no exception. As just a few examples, it took 4½ years to resolve the motions and appeals directed to UBS's pleadings, UBS filed its note of issue indicating that the case was trial-ready in September 2013 but Phase I of the trial did not commence until July 2018, and the Phase I decision was issued almost 16 months after the bench trial concluded.

10.     The situation has not improved since the State Court issued its Phase I trial decision against the offshore Funds in late 2019. The COVID-19 outbreak hit New York City particularly hard, and the City essentially remains closed for business. Jury trials were halted in mid-March 2020 and there is no set date for the resumption of anything resembling business as usual in the New York County courthouse where UBS's case against the Debtor is pending.  It is an understatement to say that the pandemic has placed enormous strain on New York's state court system, and New York City's in particular, and will continue to do so even after New York courts return to normal operations, whenever that may be. While there is no planned date for reopening, one commentator, a retired Federal District Judge, predicted that in all likelihood, civil trials will not proceed in New York until the end of 2020 or early 2021.  *See* Shira A. Scheindlin, U.S.D.J. (Ret.), *Why Not Arbitrate? Breaking the Backlog in State and Federal Courts*, 263 N.Y. L.J. 94, May 15, 2020 at pg. 6, col. 4. [**Exhibit 7** at A124] ("When the courts reopen, there will be a large backlog of civil matters. With the best of intentions, it is apparent that civil trials will not go forward for many months, particularly if there has been a jury

demand. Some have predicted that there will be no civil juries in New York until 2021.”). Moreover, when civil trials finally do go forward in New York, there is no reason to believe that the trial in this case would be at or even anywhere near the top of the State Court’s trial queue. In short, given the size of UBS’s asserted claim and the need to resolve it to conclude the Bankruptcy Case, lifting the stay to allow UBS’s lawsuit to proceed in state court would subject this case to lengthy and indeed indefinite delay.

11. UBS’s remaining arguments regarding “cause” to lift the automatic stay – that requiring UBS to file a proof of claim in the Bankruptcy Case will (according to UBS) prejudice UBS but not harm the Debtor or its constituencies, and that lifting the stay supposedly will promote judicial economy – likewise lack merit. With respect to the purported “prejudice” to UBS, UBS asserts that the adjudication of its fraudulent transfer-related claims “was intended to build upon” the Phase I trial on UBS’s breach of contract claim against the Funds, and that UBS will be prejudiced if the fraudulent transfer-related claims are now adjudicated in this Court instead of the State Court. Motion at ¶¶ 16, 36. UBS provides no support for that position and indeed its current position is completely at odds with arguments it made to the State Court in 2018, which convinced the State Court to bifurcate the breach of contract claim from all other remaining claims. As just a few examples, and in UBS’s own words:

- The “facts relevant” to Phase I of the trial vs. all of UBS’s remaining claims “are distinct” [**Exhibit 6** at A113];
- The “issues and evidence” in Phase I and Phase II “are largely separate and certainly will not be inextricably interwoven and intertwined” [*Id*. at A114];
- UBS’s remaining claims “relate to new parties and different claims, [and] will involve new factual issues” not addressed “at all” in Phase I [*Id*. at A118]; and
- The “parties, witnesses, and issues” in the trial of UBS’s remaining claims will be “significantly different” from those in Phase I of the trial [*Id*. at A121].

Given how UBS itself has characterized its claims, the arguments that it will be more efficient for the State Court to adjudicate Phase II issues (someday) and that UBS will be prejudiced if its remaining claims are decided by this Court hold no water.

12.     The Debtor and its constituencies, on the other hand, will be severely prejudiced if UBS is granted stay relief. As discussed above, the untenable position UBS has taken in the Bankruptcy Case – that it somehow has a $1 billion claim to hold the Debtor "responsible" for the breach of contract judgment – has effectively stalled negotiations between the Debtor and its creditors, and stymied all progress towards resolution of the Debtor's chapter 11 case.  Not surprisingly, other creditors are generally unwilling to engage without an understanding of the extent to which UBS's asserted claim might dilute their recoveries.  If UBS is granted stay relief, the "billion dollar question" will not be answered for years in State Court. In all likelihood, that type of delay – given that UBS's claim, as articulated in the Motion, is supposedly the largest claim asserted against the Debtor – would eliminate the possibility of a successful reorganization. This Court, however, can answer the "billion dollar question" promptly and efficiently, to the benefit of all interested parties (including UBS).  Thus, UBS has failed to establish that the "balancing of the harms" weighs in favor of stay relief.

13.     With respect to judicial economy, UBS relies in large part on its remaining claims against the Debtor's co-defendants, arguing that filing a proof of claim in this Court will require UBS to litigate its claims twice, in two different courts.  Motion at ¶ 41.  This is, by and large, a makeweight argument. UBS has identified the following remaining claims in the State Court litigation: (i) the fraudulent transfer and related implied covenant claim against the Debtor; (ii) a general partner liability claim against Strand Advisors, Inc. ("Strand"), the general partner of the Debtor; (iii) a fraudulent transfer claim against Highland Credit Opportunities CDO, L.P. k/n/a Highland Multi Strategy Credit Fund, L.P. ("Multi Strat"); (iv) a fraudulent transfer claim against HFP, and a related alter ego claim against HFP seeking a determination that HFP was the alter ego of one of the Funds; and (v) fraudulent transfer and fraudulent inducement claims against the foreign Funds.  Exhibit 6, A105-A106. UBS already holds an uncollectible $1 billion judgment against the Funds, and would stand to gain nothing by litigating its remaining claims

-7-

against the Funds in any court. Similarly, it is the Debtor's understanding that HFP no longer has any meaningful assets, and thus it is highly unlikely that UBS would continue to litigate in State Court to seek any type of money judgment against HFP.

14.     The remainder of UBS's claims are derivative of its claim against the Debtor (*e.g.*, the general partner claim), will necessarily be determined in the course of adjudicating UBS's claim against the Debtor (*e.g.*, the claim that HFP was the alter ego of one of the Funds, which UBS must prove in order to obtain "creditor standing" to assert its fraudulent transfer claim against the Debtor), and are closely related to the Bankruptcy Case (*e.g.*, the claim against Multi Strat, which is a key asset in the Bankruptcy Case that is approximately 59% owned, directly and indirectly, by the Debtor). As such, in the event that UBS intends to continue to litigate its remaining claims, and the Debtor seeks to remove and transfer venue of those claims to this Court, neither mandatory nor permissive abstention would be appropriate.

15.     While abstention is not presently before the Court, it bears noting that:

- Mandatory abstention would not apply to UBS's claim against the Debtor or any subsequent objection/estimation proceedings, which (if the Motion is denied) will be a quintessentially "core" proceedings, and would not apply to any of UBS's other remaining claims because, as outlined above, nothing is going to be timely adjudicated in New York's state court system in the near future;

- While UBS's claims are New York state law claims, the claims present no difficult or unsettled state law issues, and are unrelated to the discrete breach of contract claim previously decided by the State Court; and

- UBS filed its note of issue in the State Court requesting that all of its contract and tort claims be adjudicated in a bench trial, not a jury trial. In any event, as discussed in this Court's decision in *In re Brook Mays Music Co.*, 363 B.R. 801, 818 (Bankr. N.D. Tex. 2007), any right to a jury trial that UBS might have on its claims against the non-Debtor defendants does not warrant abstention where, as here, there are pre-trial matters that can be promptly addressed by this Court to meaningfully advance the chapter 11 case.

16.     Thus, none of the arguments advanced by UBS establish cause to lift the automatic stay. To the contrary, maintaining the automatic stay, and requiring UBS to assert its

claim against the Debtor in the Bankruptcy Case, is the only means by which UBS's claim can be promptly adjudicated without sacrificing the Debtor's chances of a successful reorganization or prejudicing all of the parties.

17.     Perhaps in recognition of its inability to establish cause to lift the stay, UBS also asserts that the Debtor waived the automatic stay in or around December 2019, based on a series of emails exchanged between UBS, pre-petition counsel for the defendants in the State Court litigation (who has not been retained in the Bankruptcy Case), and the Debtor's in-house counsel. The Debtor's lead bankruptcy counsel – Pachulski Stang Ziehl & Jones LLP ("PSZJ") – was not a party to any of those discussions.  As one of the Debtor's largest creditors, a member of the Official Committee of Unsecured Creditors ("OCUC"), and an active participant in the Bankruptcy Case, UBS cannot credibly claim that it was unaware of PSZJ's representation of the Debtor in the Bankruptcy Case.  Nonetheless, UBS chose to exclude PSZJ from its discussions with pre-petition state court counsel and in-house counsel regarding the automatic stay, a bankruptcy-specific issue that impacts the Debtor and all of its bankruptcy constituencies.  In other words, while UBS attempts to manufacture some type of "quid pro quo" arrangement tying its discussions regarding the automatic stay to the OCUC's position regarding the Debtor's governance structure, UBS in fact was participating in negotiations with PSZJ in the Bankruptcy Case while at the same time surreptitiously trying to obtain an agreement as to stay relief from the Debtor's non-bankruptcy counsel and in-house counsel without PSZJ's knowledge or involvement.

18.     Tellingly, when pre-petition counsel reminded UBS on December 2, 2019 that the Debtor's bankruptcy counsel needed to sign off on any agreement regarding relief from the automatic stay, UBS waited three months before first raising the issue with PSZJ in or around early March 2020. *See* **Exhibit 8** [A127] (December 2, 2019 email to counsel for UBS); **Exhibit 9** [A130-A134] (March 6, 2020 email chain between PSZJ and UBS's counsel).  In the interim, the Debtor and OCUC reached agreement as to the Debtor's governance structure, and sought

the Court's approval of that agreement. If there really was some type of "quid pro quo" arrangement in place with UBS, surely UBS would have reached out to the Debtor's bankruptcy counsel to finalize its proposed stipulation regarding the automatic stay before "supporting" the agreement between the Debtor and OCUC, which was still being negotiated well into late December 2019 and was not finalized until January 2020.

19. In any event, when UBS finally provided PSZJ with a draft of its stipulation for stay relief in March 2020, PSZJ promptly notified UBS that the Debtor would not stipulate to lift the stay. Furthermore, even if the Debtor had signed UBS's draft stipulation regarding stay relief, that would not have effectuated a waiver of the automatic stay. Any relief from the automatic stay, even if the debtor consents to such relief, can only be obtained with the bankruptcy court's approval, after sufficient notice and opportunity to object has been afforded to creditors and other interested parties. *See, e.g., Commerzanstalt v. Telewide Sys.*, 790 F.2d 206, 207 (2d Cir. 1986) ("Since the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay."); Fed. R. Bankr. P. 4001(d) (requiring that any motion for approval of an agreement modifying the automatic stay must be served on the committee of unsecured creditors, and other entities as directed by the bankruptcy court, with a 14-day opportunity to object). Obviously, at no time did the Debtor move for approval of any waiver of the automatic stay on notice to parties in interest, and indeed that was deliberate as the putative "agreement" UBS relies upon was inappropriate and unenforceable.

20. Finally, in the Motion, UBS also requests (i) an order providing that its filing of a proof of claim will not waive its right to a jury trial, and/or (ii) a further extension of the bar date. Both requests should be denied. By filing a proof of claim, UBS will invoke the Court's equitable jurisdiction, including its power to allow or disallow claims, which is "to be exercised in summary proceedings and not by the slower and more expensive processes of a plenary suit." *Katchen v. Landy*, 382 U.S. 323, 329 (1966). Allowing a creditor who has filed a proof of claim

to then rely on 11 U.S.C. § 105 to create a jury trial right where one no longer exists would "interfere with the equity jurisdiction of the bankruptcy courts" and "be antithetical to the policies underpinning" the Bankruptcy Code. *In re Endeavour Highrise L.P.*, 425 B.R. 402, 417 (Bankr. S.D. Tex. March 12, 2010).  With respect to UBS's request for a further extension of the bar date, UBS asserts that, if the Court denies the Motion and declines to lift the stay, it also should further extend the bar date so that UBS does not need to file its claim in the Bankruptcy Case.  That will accomplish nothing except further delay in the Bankruptcy Case. As UBS itself has acknowledged, the elimination of "uncertainty" as to UBS's claim will encourage plan negotiations and expedite the resolution of the Bankruptcy Case.  Requiring UBS to file its proof of claim is a necessary first step in that process, and therefore UBS's request for a further extension of the bar date also should be denied.

21.    In sum, UBS has failed to establish that cause exists to lift the automatic stay, has failed to establish that the Debtor waived the automatic stay, has failed to establish that an order modifying the equitable jurisdiction of this Court would be permissible or appropriate, and has failed to establish that any further extension of the bar date for UBS's claim is warranted. Therefore, the Debtor respectfully requests that the Court deny the Motion in its entirety.

<u>**Statement of Facts**</u>

**I.    Relevant Procedural History of the State Court Litigation**

22.    UBS filed its first complaint against the Debtor and the Funds on February 24, 2009, in *UBS v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action"). In that complaint, UBS asserted a breach of contract claim against the Debtor based on warehouse agreements which provided that the Funds (not the Debtor) would bear the risk of investment losses. The Debtor moved to dismiss UBS's complaint on May 1, 2009. From the filing of that motion on May 1, 2009 to the State Court's entry of its decision on

the last motion to dismiss (filed by other defendants) on November 25, 2013 [NY D.I. 351], it took more than 4½ years to "finalize" the pleadings in the State Court litigation.

23.     The May 1, 2009 motion to dismiss resulted in the entry of final judgment in favor of the Debtor, dismissing UBS's complaint against the Debtor. NY D.I. 84. Judgment was entered based on the Appellate Division's decision that the warehouse agreements contained no promise by the Debtor "to undertake liability" with respect to UBS's losses or "to ensure or guarantee" the Funds' performance. Exhibit 1 at A002.

24.     After the Debtor was dismissed from the 2009 Action, UBS twice amended its complaint in the 2009 Action to add five new defendants, and filed a new action against the Debtor on June 28, 2010, captioned as *UBS v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action").[5]  The majority of UBS's new claims challenged certain transfers made in 2008 and March 2009 by HFP, an entity that was not a party to the warehouse agreements or any other transaction with UBS, and was not named as a defendant in the February 24, 2009 complaint.  In recognition of the fact that UBS was not a creditor of HFP (and thus lacked standing to challenge the transfers), UBS's amended complaint in the 2009 Action included a claim for declaratory relief against HFP seeking a determination that HFP was the alter ego of one of the Funds.  The alter ego claim against HFP is the only alter ego cause of action that UBS asserted in the State Court litigation.

25.     In 2011 and 2012, the Appellate Division eliminated, or otherwise significantly limited, UBS's claims against the Debtor and new defendants. Both decisions applied *res judicata* to restrict UBS from seeking recovery for any conduct that occurred prior to the date on which UBS filed its original complaint in the 2009 Action (*i.e.*, February 24, 2009), which resulted in the final judgment on the merits in favor of the Debtor.  *See* Exhibit 2 at A010; Exhibit 3 at A014.

---

[5] The operative complaint against the Debtor, filed in the 2010 Action, is attached as **Exhibit 16** to Appendix B [B064-B121], and the operative complaint against the remaining defendants, filed in the 2009 Action, is attached as **Exhibit 17** to Appendix B [B123-B180].

-12-

26.     In light of the Appellate Division's decisions, the only claims remaining in the State Court litigation are claims that arise out of the allegedly fraudulent transfers in March 2009. As described by UBS in its pre-trial brief seeking bifurcation of its breach of contract claim, on the one hand, and its implied covenant and fraudulent transfer claims, on the other hand, UBS's implied covenant claim "involves [the Debtor's] role in the March 2009 fraudulent conveyances [and] overlaps factually with the ... fraudulent conveyance claims." Exhibit 6 at A106. UBS further elaborated on its position regarding the close nexus between its fraudulent transfer claim and its implied covenant claim during the related telephonic hearing with the State Court, conceding that its implied covenant claim is basically the same as its fraudulent transfer claim:

| THE COURT: | And is it also the plaintiffs' position that the implied covenant claim relates to the fraudulent conveyance claim and not to the fraudulent inducement? |
|---|---|
| MR. CLUBOK: | Absolutely, yes. |
| | ... |
| THE COURT: | Ms. Klein, isn't the implied covenant claim as pleaded based solely on post entry into transaction alleged wrongful or fraudulent conveyances? |
| | ... [response by defendants' counsel] ... |
| THE COURT: | Mr. Clubok, will you respond. |
| | ... |
| MR. CLUBOK: | ... basically, you know, the implied covenant of good-faith and fair-dealing claim that we now have is that they shouldn't have committed fraudulent conveyances to make it certain that these two parties couldn't have paid. |

05/01/18 State Court Hrg. Tr. at 5:14-18 and 7:16-10:16 [Exhibit 5 at A058, A060-A063].

27.     UBS's claims arising out of the March 2009 transaction challenge transfers made in March 2009 that, even at the highest amount originally pleaded by UBS, totaled less than $240 million – a far cry from the $1 billion claim UBS now says it holds against the Debtor. Exhibit 4 at A038.  UBS subsequently reduced the amount it alleged was transferred in March 2009 [Exhibit 15 at B061] and then, in June 2015, UBS released its claims to the majority of the challenged amount, via its settlement agreements with Highland Crusader Offshore Partners,

-13-

L.P. ("Crusader Fund") and Highland Credit Strategies Master Fund, L.P. ("Credit Strategies"). Both settlement agreements provided that UBS released the Debtor and its affiliates from, among other things, "losses or other relief specifically arising from" the allegedly fraudulent transfers made to Crusader Fund and Credit Strategies. Exhibit 13 at Section 5.3, pg. 6 [B007]; Exhibit 14 at Section 5.3, pg. 5 [B037]. As asserted by UBS, the settling defendants received more than 80% of the amount transferred in the March 2009 transaction. Exhibit 15 at pg. 6 [B061].

## II. Relevant Facts Regarding the Phase I Trial on UBS's Discrete Contract Claim

28. UBS filed its note of issue in the State Court litigation, indicating that its case was ready for trial and should be placed on the trial queue, on September 3, 2013, almost five years before Phase I of the trial commenced on July 9, 2018. NY D.I. 320 [**Exhibit 10** at A137]. During that five year period, various motions were filed by the parties, including a motion for summary judgment filed by the Debtor in October 2013 and decided by the State Court approximately 3½ years later, in March 2017. *See* Exhibit 6 at pg. 8 [A111].

29. In its note of issue, UBS did not demand a jury trial on its contract claims or its tort claims against the Debtor or any of the other defendants. A136. UBS subsequently confirmed that its implied covenant claim against the Debtor is an equitable claim that should be tried to the court, not a jury. 05/01/18 State Court Hrg. Tr. at 5:9-13 [Exhibit 5 at A058] (UBS's counsel responding in the affirmative to the question of whether "it is the plaintiffs' position that the implied covenant claim will be for the Court").

30. The Phase I trial was limited to UBS's breach of contract claim against the Funds. As described *by UBS*, the breach of contract claim was separate and distinct from all of UBS's remaining claims – the remaining claims "have little to do" with the breach of contract claim, and involve new parties and "new factual issues" not addressed "at all" in Phase I, as well as different witnesses and evidence. A106, A114, A118, A121.

31.     Phase I of the trial began on July 9, 2018 and concluded on July 27, 2018. The State Court issued its decision on the Phase I issues almost 16 months later, on November 14, 2019. By its terms, the Phase I decision was sealed for ten business days – until December 2, 2019 – to allow the parties an opportunity to request redaction of any confidential information. Motion at Ex. B, pg. 40. The decision was unsealed on January 23, 2020, but the Phase I judgment was not entered until almost three weeks later, on February 10, 2020. The Phase II trial has not been scheduled in light of the stay, and even if there were no stay, given the pandemic, it is unlikely the Phase II trial could be conducted in State Court before 2021.

## Argument

### I.     UBS Has Failed to Establish Cause to Lift the Automatic Stay

32.     The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (citations omitted). As the party seeking relief from the automatic stay, UBS bears the burden of establishing that "cause" (*i.e.*, a legally sufficient basis) exists to lift or modify the stay. *See* 11 U.S.C. § 362(d)(1) (providing that a court may grant relief from the automatic stay "for cause"); *Mooney v. Gill*, 310 B.R. 543, 547 (N.D. Tex. 2002) (party seeking stay relief bears the initial burden of establishing a legally sufficient basis for such relief). Here, UBS has not established, and cannot establish, that cause exists to lift the automatic stay.

33.     A "decision to lift the automatic stay is an exercise of discretion." *Mooney*, 310 B.R. at 547; *see also In re Choice ATM Enters.*, 2015 Bankr. LEXIS 689, *12 (Bankr. N.D. Tex. Mar. 4, 2015) (stay relief is determined on a case-by-case basis). To guide the exercise of that discretion, courts have identified numerous factors that, depending on the circumstances of each case, may be relevant to a creditor's request for stay relief. *See, e.g., In re Choice ATM Enters.*, 2015 Bankr. LEXIS 689 at *12-13 (denying stay relief after considering whether claim was critical to success or failure of reorganization, avoidance of unnecessary expense and delay,

judicial economy, and whether claim required "expertise beyond the abilities of the bankruptcy court"); *Mooney*, 310 B.R. at 546 (bankruptcy court "must balance the hardships of the parties" and base its decision "on the degree of hardship involved and the goals of the Bankruptcy Code"); *In re U.S. Brass Corp.*, 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994) (stay relief "will be granted to an unsecured creditor ... only when the 'balance of hardships' tips in the creditor's favor" and, when balancing the hardships, the "most important factor is the effect of such litigation on the administration of the estate; even slight interference ... may be enough to preclude relief").  As discussed herein, UBS's request for relief from the automatic stay should be denied for three critical reasons: (i) granting stay relief will interfere with the Bankruptcy Case, unnecessarily delay the adjudication of key issues related to UBS's claim, and potentially jeopardize the Debtor's chances of achieving a successful chapter 11 exit; (ii) the hardship and prejudice to the Debtor and its constituencies if the stay is lifted far surpasses any inconvenience to UBS; and (iii) granting stay relief will not promote judicial economy.

### A. Granting Stay Relief Will Interfere With and Delay the Bankruptcy Case, and Potentially Jeopardize the Debtor's Reorganization Efforts

34.     The "most important factor in determining whether to grant relief from the automatic stay to permit litigation against the debtor in another forum is the effect of such litigation on the administration of the estate." *In re Curtis*, 40 B.R. at 806. Therefore, in considering whether to lift the automatic stay, "it must be borne in mind that the process of determining the allowance of claims is of basic importance to the administration of a bankruptcy estate." *Id*. at 800-01 (denying stay relief because, among other reasons, allowance of claims against the estate is a "fundamental" bankruptcy issue). *See also In re Crespin*, 581 B.R. 904, 909 (Bankr. D.N.M. 2018) ("Given the centrality of the claims allowance process to the bankruptcy system, the Court's inclination in these matters is to keep the stay in place and liquidate the claim.").

35.     Relief from the automatic stay is particularly inappropriate where, as here, the resolution of a creditor's large but disputed claim is critical to the success or failure of the

reorganization, and key issues regarding the creditor's claim can be expeditiously resolved in the bankruptcy court. *See In re Choice ATM Enters.*, 2015 Bankr. LEXIS 689 at *15-16 (denying stay relief because creditor's counterclaim, if allowed, would be the largest claim against the debtor; by retaining the counterclaim, the bankruptcy court could "rapidly proceed through the claims estimation process" and avoid unnecessary delay and expense, while permitting the counterclaim to go forward in a different forum would "go against Congress's design in the [Bankruptcy] Code"); *In re Crespin*, 581 B.R. at 910 (denying stay relief where the timing of plan confirmation would be "heavily affected by the outcome of [the] litigation" and the "quickest way to liquidate the [creditors'] claim is in bankruptcy court").

36.     Here, UBS concedes that prompt resolution of its claim is critical to the success of the Debtor's reorganization efforts.  Motion at ¶ 38.  In the Motion and in negotiations in the Bankruptcy Case, UBS has described its claim as a more than $1 billion claim to hold the Debtor "responsible for the [breach of contract] judgment awarded to UBS in Phase I" of the State Court litigation.  Motion at ¶ 18.  At present, there is an insurmountable chasm between UBS and the Debtor with respect to the amount of UBS's claim, based primarily on two key issues that can be quickly and efficiently determined in this Court.

37.     First, the Debtor can readily establish that UBS is barred, under the doctrine of *res judicata*, from seeking to hold the Debtor responsible, either directly or under an alter ego theory, for the judgment against the Funds for the December 5, 2008 breach of contract. The Appellate Division already has determined that UBS cannot assert, in the State Court litigation, any claim against the Debtor based on conduct that occurred prior to February 24, 2009. *UBS*, 86 A.D.3d at 474 [Exhibit 2 at A010]. The Appellate Division has applied that same restriction to UBS's claims against other defendants in the State Court litigation, including UBS's claim that HFP was the alter ego of one of the Funds. *UBS*, 93 A.D.3d at 490 [Exhibit 3 at A014].  While UBS may attempt to argue that the Appellate Division's decisions would not apply if it pursues

App. 0511

its claim against the Debtor under an alter ego theory, because alter ego is a "remedy" and not a claim, that position is inconsistent with and refuted by the Appellate Division's decision regarding UBS's alter ego allegations against HFP, and other established case law.[6] *See, e.g., Bd. of Managers v. Jeffrey M. Brown Assocs.*, 652 F. Supp. 2d 463, 478-82 (S.D.N.Y. 2009) (holding that where, as here, a judgment on the merits has been entered in favor of one defendant, a plaintiff cannot later seek to hold that defendant liable under an alter ego theory for a judgment entered against a different defendant, where the facts giving rise to potential alter ego liability existed at the time of the first action and arose out of the same transaction). Because the doctrine of *res judicata* bars UBS from asserting any claim that arose prior to February 24, 2009, and the State Court determined that the breach of the warehouse agreements occurred in December 2008, UBS's claim against the Debtor is limited to the March 2009 transaction. As that transaction involved transfers totaling much less than $240 million – not $1 billion – the determination of the *res judicata* issue will meaningfully impact the parties' negotiations regarding UBS's claim.

38.     Second, with respect to the March 2009 transaction, UBS has already released the Debtor from "losses or other relief specifically arising from" more than 80% of the total amount transferred in March 2009. While UBS likely will argue that its implied covenant claim against the Debtor does not "specifically arise" from the transfers made in March 2009, that position is belied by UBS's own descriptions of its implied covenant claim. *See, e.g.*, 05/01/18 State Court Hrg. Tr. at 10:13-16 [Exhibit 5 at A063] (in response to the question of whether the implied covenant claim is based solely on the allegedly fraudulent March 2009 transaction, UBS's counsel stated "basically, you know, the implied covenant of good-faith and fair-dealing claim that we now have is that they shouldn't have committed fraudulent conveyances …"); NY D.I.

---

[6] The *res judicata* effect of the State Court's prior judgment in favor of the Debtor is governed by New York law. *See, e.g., Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442, 449 (5th Cir. 2016). New York and federal doctrines of *res judicata* are "virtually identical." *Kamdem-Ouaffo v. PepsiCo, Inc.*, 160 F. Supp. 3d 553, 562 n.10 (S.D.N.Y. 2016) (citations omitted).

472 at pg. 3 [Exhibit 6 at A106] (in seeking bifurcation of its breach of contract claim, UBS argued that its implied covenant claim "involves [the Debtor's] role in the March 2009 fraudulent conveyances [and] overlaps factually with the ... fraudulent conveyance claims").

39.     The adjudication of these two key issues will meaningfully impact the negotiations between UBS and the Debtor, and thus the progress of the chapter 11 case. Furthermore, both issues can be decided promptly and efficiently in this Court long before these or any other issues could be adjudicated in State Court.  All new civil jury trials in New York were suspended as of March 16, 2020, and all filings in non-essential matters were banned as of March 22, 2020. *See, e.g.*, **Exhibit 11** at A139 (March 22, 2020 order of the Chief Administrative Judge of the Courts of New York); **Exhibit 12** at A146 (excerpts from a May 26, 2020 Law360 article describing New York's court closures). The ban on filings in New York County, where the State Court litigation is pending, was only recently lifted on May 25, 2020.  A146.  No date has been set for the commencement or continuation of civil trials in New York County, and there is no way to determine when a trial in this case would be scheduled – given the amount of time it took for this case to proceed through Phase I of the trial, it is highly likely that a trial in the State Court on the remaining issues and the resolution of any related appeals would not be completed until sometime in 2021 or possibly even 2022.

**B.     The Harm the Debtor and Its Constituencies Will Suffer if Stay Relief Is Granted Far Outweighs Any Purported Harm to UBS**

40.     The effect that litigation in a non-bankruptcy forum will have on the administration of the estate is the most critical factor to consider on a motion for stay relief.  *In re Curtis*, 40 B.R. at 806.  "Even slight interference with the administration may be enough to preclude relief in the absence of a commensurate benefit."  *Id*. at 806-07 (denying stay relief because it was "not possible to determine that the hardship to movants would outweigh the hardship to the debtors.").

-19-

41.     Here, UBS has failed to establish that the "balance of harms" weighs in favor of granting stay relief.  UBS argues that it will suffer prejudice if this Court decides the remaining claims in the State Court litigation because, according to the position UBS now takes in its Motion, the remaining claims are related to or will "build upon" the breach of contract issues adjudicated by the State Court in the Phase I trial.  UBS took the exact opposite position in persuading the State Court to bifurcate UBS's breach of contract claim against the Funds from all other remaining claims, arguing that the two categories of claims were completely separate, and involved different factual issues, parties, witnesses and evidence.  In light of UBS's own characterizations of its claims, UBS's arguments regarding the purported prejudice it will suffer are untenable.

42.     In contrast to the lack of any prejudice to UBS, the Debtor and its bankruptcy constituencies will be extremely prejudiced if the Motion is granted. Through proceedings on an objection to UBS's claim and/or the claims estimation process, this Court can efficiently answer the "billion dollar question" in this case, *i.e.*, whether UBS has a $1 billion claim against the Debtor, or a claim in a principal amount of less than (at best) $50 million.  If stay relief is granted, on the other hand, the Debtor and its bankruptcy constituencies will have to wait years before UBS's claim is resolved in State Court. The potential impact that type of delay would have on the Debtor's prospects of a successful reorganization precludes the relief requested in the Motion.

### C.     Granting Stay Relief Will Not Promote Judicial Economy

43.     UBS's main argument regarding judicial economy is that, if the Motion is denied, it will need to litigate its claims twice, once in this Court against the Debtor and again in State Court against the remaining defendants.  Even setting aside the question of whether it would be economically rational for UBS to separately pursue its claims against the other defendants (several of whom are, as discussed above, judgment-proof), UBS would not need to litigate its claims in two different courts because, to the extent UBS seeks to continue the State Court

litigation, the action could be removed to federal court, with a motion to transfer venue to this Court, and neither mandatory nor permissive abstention would be applicable.

44.     Mandatory abstention does not apply to claims "arising in a case under title 11," and does not apply to claims that cannot be timely adjudicated in state court. 28 U.S.C. § 1334(c)(2). Here, if the Motion is denied, UBS's proof of claim, and any objection/estimation proceedings related to that claim, would be core proceedings within this Court's "arising in" jurisdiction. *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). As to the claims against other defendants, mandatory abstention would not apply because there is no chance that those claims could be timely adjudicated in State Court.

45.     Based on the factors identified in *In re Brook Mays Music Co.*, 363 B.R. at 817-18, permissive abstention likewise would not be appropriate for at least the following reasons:

- This Court would be able to adjudicate UBS's claims, particularly as to the two key issues discussed above – *res judicata* and the enforcement of UBS's settlement releases – much more quickly than the State Court.
- UBS's claims do not involve any novel state law issues. UBS's claims are, essentially, fraudulent transfer claims that are well within this Court's bailiwick.
- UBS's claim against the Debtor (if the Motion is denied) will be a core proceeding that, given the amount asserted by UBS, will be central to the Bankruptcy Case. UBS's claims against the other defendants are closely related to the claim against the Debtor and/or the Bankruptcy Case: the general partner claim against Strand is derivative of the claim against the Debtor; Multi Strat is a key asset in the Bankruptcy Case, and the fraudulent transfer claim against it is identical to the claim against the Debtor (except as to amount); and the alter ego claim against HFP must be decided in connection with the fraudulent transfer claim against the Debtor.
- Upon the filing of its proof of claim, UBS will have no right to a jury trial on its claim against the Debtor. As to UBS's claims against the remaining defendants, (i) UBS itself filed its note of issue indicating that all of its claims should be tried to the court, and (ii) if UBS intends to proceed with a jury trial against the remaining defendants, the reference can be withdrawn at the appropriate time.

46.     Accordingly, UBS has failed to establish that either mandatory or permissive abstention would apply to any of its claims, or that the interests of judicial economy otherwise weigh in favor of granting relief from the automatic stay.

## II.    UBS's Discussions With Pre-Petition State Court Counsel and In-House Counsel Do Not Relieve UBS of Its Burden to Establish Cause to Lift the Automatic Stay

47.     UBS has not established that the Debtor agreed to waive the automatic stay, or that any agreement between UBS and the Debtor could have relieved UBS of its burden to establish that cause exists to lift the automatic stay. As an initial matter, the Debtor's pre-petition state court counsel advised UBS on December 2, 2019 that the Debtor's bankruptcy counsel needed to sign off on the proposed agreement regarding stay relief. Exhibit 8 at A127. Nonetheless, UBS waited three months before contacting the Debtor's bankruptcy counsel [Exhibit 9 at A130-A134], at which time PSZJ promptly informed UBS that the Debtor did not consent to any modification of the stay.

48.     Furthermore, even if the Debtor had signed UBS's draft stipulation, that agreement would not have effectuated an automatic waiver of 11 U.S.C. § 362 as to the Debtor or its constituencies. "Since the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay." *Commerzanstalt*, 790 F.2d at 207 (rejecting agreement by debtors that appeals could continue despite the automatic stay, and holding that parties would need to seek stay relief in the bankruptcy court); *see also Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982) (staying appeals filed by both debtor and creditor, noting that "[u]nder the old Bankruptcy Act, a debtor apparently could waive a stay" but "[u]nder the new Code, relief from a stay must be authorized by the Bankruptcy Court ..."); *United States v. Moore*, 1990 U.S. App. LEXIS 13768, *2-3 (5th Cir. July 24, 1990) (citing *Commerzanstalt* with approval and holding that appeal was stayed, notwithstanding that debtor was the appellant, because "[r]elief from the effect of the stay provisions must be sought in the bankruptcy court" pursuant to 11 U.S.C. § 362(d)).

49.     In other words, any relief from the automatic stay, whether a debtor consents to such relief or opposes it, can only be obtained with the bankruptcy court's approval, after sufficient notice and opportunity to object has been afforded to creditors and other interested parties. The requirements of notice, an opportunity to object, and bankruptcy court approval of any agreement to modify the automatic stay are expressly set forth in Fed. R. Bankr. P. 4001(d). *See* Fed. R. Bankr. P. 4001(d) (requiring that any motion for approval of an agreement modifying the automatic stay must be served on the committee of unsecured creditors, and other entities as directed by the bankruptcy court, with a 14-day opportunity to object).[7]

50.     Finally, UBS has not shown that it "detrimentally relied" on its discussions with pre-petition counsel and in-house counsel, or suffered any prejudice. UBS asserts that it suffered prejudice because (i) both the Debtor and UBS requested that the Phase I decision issued on November 14, 2019 remain under seal for a short period of time while the parties engaged in settlement discussions, (ii) it "supported" the changes to the Debtor's governance structure, which resulted in the appointment of independent directors and an independent CRO with authority over all restructuring issues, and (iii) it refrained from immediately seeking stay relief. Motion at ¶¶ 22, 30. All of these contentions strain credulity.

51.     First, the State Court issued its Phase I decision almost **16 months** after the Phase I trial concluded. By its terms, the decision was to remain sealed until December 2, 2019 to allow the parties time to confer and advise the State Court as to whether the decision contained any confidential information. Even when the decision eventually was unsealed in late January 2020, the Phase I judgment was not entered for another almost three weeks, not on request of the parties, but instead likely due to the endemic delays in New York's overburdened state court

---

[7] This was the procedure followed in the case cited at ¶ 29 of the Motion, *In re GenOn Energy, Inc.*, Case No. 17-33695 [Docket No. 449] (Bankr. S.D. Tex.), which involved an agreed order to resolve three stay relief motions that was "entered in the manner of a settlement pursuant to" Fed. R. Bankr. P. 4001(d)(4).

system. UBS has not identified any prejudice it suffered by agreeing that the decision remain under seal for a brief period of time.

52. Second, UBS cannot articulate how it was prejudiced by the appointment of independent directors and an independent CRO. In any event, as discussed above, pre-petition state court counsel reminded UBS in early December 2019 that the Debtor's bankruptcy counsel needed to sign off on any agreement regarding the automatic stay – a reminder that, given UBS's role in the Bankruptcy Case, should not have been necessary. UBS chose not to contact the Debtor's bankruptcy counsel about the automatic stay for almost three months, long after the Debtor and OCUC agreed to the Court-approved changes in the Debtor's governance structure.

53. Third, and finally, UBS cannot establish that it suffered any prejudice as to the timing of its Motion. In light of the pandemic, and the particularly severe impact the outbreak has had in New York, there is absolutely no likelihood that the current procedural status of the State Court litigation would be any different if UBS had filed its Motion months ago. Furthermore, when UBS finally did choose to contact PSZJ in March 2020 regarding the stay, the stipulation the parties agreed upon provided that UBS could file its Motion any time up to 5:00 p.m. on May 20, 2020. Nothing prevented UBS from filing its Motion well in advance of that deadline, yet UBS waited until just 20 minutes shy of its deadline to file the Motion.

54. Thus, UBS has not established that the Debtor waived the protections of the automatic stay, or that UBS suffered prejudice as a result of any "misunderstanding" between the parties – a "misunderstanding" that easily could have been avoided had UBS not excluded the Debtor's bankruptcy counsel from the discussions regarding the very bankruptcy-specific issue of relief from the automatic stay.

### III. UBS Is Not Entitled to an Order Granting UBS a Right to a Jury Trial on Its Proof of Claim, and No Further Extension of the Bar Date Is Warranted

55. The filing of a proof of claim gives rise to "a matter that is equitable in nature (*i.e.*, a matter involving claim allowance/disallowance) so that the jury trial right is lost." *In re*

*Brook Mays Music Co.*, 363 B.R. at 811 (citing *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782 (1989)). By filing a proof of claim, UBS will invoke the Court's equitable jurisdiction, including its power to allow or disallow claims, which is "to be exercised in summary proceedings and not by the slower and more expensive processes of a plenary suit." *Katchen*, 382 U.S. at 329. UBS's request for an order granting it a right to a jury trial on its proof of claim (and related proceedings) must be denied because such an order – which could be requested by every creditor with pre-petition jury trial rights, in every bankruptcy case – would "interfere with the equity jurisdiction of the bankruptcy courts" and "be antithetical to the policies underpinning" the Bankruptcy Code. *In re Endeavour Highrise L.P.*, 425 B.R. at 417.

56.      UBS's final request, seeking a further extension of the bar date to file its claim against the Debtor in the event that the stay is not lifted, likewise should be denied. UBS's request, if granted, would essentially leave the parties in limbo. Given that all parties agree that a prompt resolution of UBS's claim is in the best interests of the Debtor and all of its constituencies (including UBS), UBS's suggestion – doing nothing for some unspecified amount of time – will not benefit any of the parties or foster the resolution of the chapter 11 case.

## <u>Conclusion</u>

WHEREFORE, the Debtor respectfully requests that the Court deny the Motion in its entirety, and grant the Debtor such other and further relief as the Court deems just and proper.

[remainder of page intentionally blank]

-25-

Dated: June 3, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
Alan J. Kornfeld (CA Bar No. 130063)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
      rfeinstein@pszjlaw.com
      akornfeld@pszjlaw.com
      gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*