# Appendix Exhibit 32

FROST BROWN TODD LLC
Mark A. Platt, Esq.
Texas Bar No. 00791453
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Tel: 214-545-3474
Fax: 214-545-3473
Email: mplatt@fbtlaw.com

JENNER AND BLOCK, LLP
Terri L. Mascherin
Marc Hankin
353 North Clark Street
Chicago, IL 60654-3456
(312) 222-9350
Email: TMascherin@jenner.com
       MHankin@jenner.com

*Counsel for the Redeemer Committee of the Highland Crusader Fund*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to D.I. 644 |

## REDEEMER COMMITTEE'S OBJECTION TO UBS'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH STATE COURT ACTION[1]

---

[1] This objection contains redactions for information potentially protected by certain protective orders. An unredacted version of this objection may be filed pending the Court's ruling on the Redeemer Committee's motion to seal. [Docket No. 691].

1934054200603000000000000006

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................ 1

II.     Background ................................................................................................................. 3

        A.      Highland's Affiliates Fail to Meet Margin Calls. ................................................ 4

        B.      The HFP Notes Transactions are Unwound .......................................................... 6

        C.      UBS Releases Claims Against Highland. .............................................................. 7

        D.      UBS Requests Bifurcated Trials ........................................................................... 8

III.    Argument .................................................................................................................... 9

        A.      There is No Basis to Lift the Stay Because of a Purported Agreement with
                the Debtor ............................................................................................................... 9

        B.      There Is No Cause to Lift the Automatic Stay ................................................... 10

                i.      Lifting the Stay Will Substantially Prejudice Other Creditors ................. 11

                ii.     Judicial Economy is Best Served by this Court Resolving UBS's
                        claim Against Highland. .......................................................................... 12

        C.      There is No Basis for a Further Extension of the Bar Date ................................. 16

App. 0531

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Colvin v. Amegy Mortg. Co.*,
    507 B.R. 915 (W.D. Tex. 2014)..............................................................15

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1981).............................................................................18

*Hill v. Wilson*,
    2009 WL 10689099 (N.D. Ala. Mar. 17, 2009) ....................................10

*In re Breitburn Energy Partners LP*,
    571 B.R. 59 (Bankr. S.D.N.Y. 2017).....................................................15

*In re Chateaugay Corp.*,
    1990 WL 692236 (Bankr. S.D.N.Y. Jul. 11, 1990) ..............................16

*In re Choice ATM Enterprises, Inc.*,
    2015 WL 1014617 (Bankr. N.D. Tex. Mar. 4, 2015) ......................11, 12

*In re Conejo Enterprises, Inc.*,
    96 F.3d 346 (9th Cir. 1996) ..................................................................13

*In re Delta Investments & Dev., LLC*,
    2019 WL 137578 (Bankr. S.D. Miss. Jan. 8, 2019)..............................10

*In re Dorris Mktg. Grp., Inc.*,
    2005 WL 6267050 (Bankr. E.D. Va. Jan. 27, 2005)..............................17

*In re Enron Corp.*,
    300 B.R. 201 (Bankr. S.D.N.Y. 2003) ..................................................10

*In re Kewanee Boiler Corp.*,
    270 B.R. 912 (Bankr. N.D. Ill. 2002) ...................................................16

*In re Legendary Field Exhibitions, LLC*,
    2020 WL 211409 (Bankr. W.D. Tex. Jan. 13, 2020).............................18

*In re Residential Capital, LLC*,
    2012 WL 3555584 (Bankr. S.D.N.Y. Aug. 16, 2012) ................11, 13, 15

*Langenkamp v. Culp*,
    498 U.S. 42 (1990).............................................................................18

*Matter of L & S Indus. Inc.*,
989 F.2d 929 (7th Cir.1993) ................................................16

*Matter of Pease*,
195 B.R. 431 (Bankr. D. Neb. 1996) ................................................10

*UBS Sec. LLC v Highland Capital Mgmt., L.P.*,
No. 650097/2009 (N.Y. Sup. Ct.) ................................................5, 6, 7, 8, 9

*UBS Sec. LLC v Highland Capital Mgmt., L.P.*,
No. 650752/10 (N.Y. Sup. Ct.) ................................................7

*UBS Securities LLC v. Highland*,
927 N.Y.S.2d 59 (N.Y. App. Div., Jul. 21, 2011)................................................6, 15

*UBS Securities LLC v. Highland Capital Mgmt., L.P.*,
893 N.Y.S.2d 869 (N.Y. App. Div. 2010) ................................................4, 6

## STATUTES

11 U.S.C. § 362................................................10

## OTHER AUTHORITIES

Seventh Amendment ................................................18

Fed. R. Bankr. P. 9024 ................................................19

Fed. R. Civ. P. 60 ................................................19

Fed. R. Civ. P. 60(b) ................................................19

HANNAH M. SMITH, *Using the Scientific Method in the Law: Examining State Interlocutory Appeals Procedures That Would Improve Uniformity, Efficiency, and Fairness in the Federal Appellate System*, 61 CLEV. ST. L. REV. 259, 272 (2013)................................................16

N.Y. C.P.L.R. 5701................................................16

App. 0533

The Redeemer Committee of the Highland Crusader Funds (the "Redeemer Committee")[2] objects to UBS's motion [Doc. No. 644] (the "Motion")[3] to lift the automatic stay to divest this Court of the ability to determine the validity and, if applicable, the amount of the largest disputed and unliquidated claim asserted in this chapter 11 case.

## I.      INTRODUCTION

Allowing UBS to litigate its claim in the New York state court would fundamentally prejudice all of the Debtor's other unsecured creditors and contravene the fundamental principle that creditors and parties in interest may be heard with respect to matters that are central to the chapter 11 process. Granting the Motion would elevate UBS to an almost unassailable negotiating position in connection with the formulation of a plan. Moreover, contrary to UBS's arguments, its claim is by no means "trial ready" in New York. Resolution of UBS's claim in New York likely will delay recovery to all creditors for years, while this Court is well-suited to resolve the claim expediently.

UBS is asserting a disputed $1 billion claim that is more than five times the size of the largest liquidated claim: the Redeemer Committee's $190.8 million claim. If UBS's contested $1 billion claim is not subject to this Court's claims resolution process, it will not be feasible to conduct negotiations regarding a plan to allocate the value of the Debtor's estate equitably. Granting UBS the right to litigate in New York—where no other creditor may appear as a matter of right—would give UBS tremendous leverage simply because of the time it will take the New York court to resolve that claim. Creditors should not be compelled to negotiate a plan where one

---

[2] The Redeemer Committee is a committee of investors, elected pursuant to the Scheme and Plan of Liquidation of the Highland Crusader Funds (the "Crusader Fund") approved by the Bermuda Court, to oversee Highland's management of the Crusader Fund through what was intended to be the complete liquidation of the fund.

[3] All capitalized terms that are not defined in this Objection have the meanings given to such terms in the Motion.

App. 0534

creditor holds outsized leverage not due to the underlying merits of its claim, but due to permission to litigate outside of the Bankruptcy Court.

Moreover, UBS's claim is by no means ready to be tried in New York in the next six months, as UBS asserts. UBS conveniently fails to mention that the principal claim that it now asserts against the Debtor, Highland Capital Management, L.P. ("Highland" or the "Debtor")— that Highland is the alter ego of certain of its affiliates and therefore should be held responsible for a $1 billion judgment entered against those affiliates—is a *new* claim which UBS has not yet pleaded in the New York court. Given the threshold pre-trial legal issues that a court will need to decide, and given that New York civil procedure freely permits interlocutory appeals, no one can predict when the New York court would issue a final, non-appealable judgment. The inevitable delay caused by those proceedings would essentially ensure that no meaningful distributions could be made to creditors until those proceedings conclude. And, as demonstrated below, UBS's claim against the Debtor is not so uniquely complicated that it must be heard by the New York court. This Court is well-suited to determine the validity and amount of UBS's claim.

Nor should the Court give any effect to UBS's assertion that the Debtor entered into an agreement with UBS in December 2019 to lift the automatic stay. It is well-settled that an agreement by a debtor-in-possession to lift the automatic stay is only enforceable upon Bankruptcy Court approval, which in turn requires that creditors receive notice of such request and have an opportunity to be heard.

At bottom, it is transparent that UBS—a member of the Official Committee of Unsecured Creditors—is attempting to obtain the benefits of this chapter 11 proceeding without subjecting its claim to the jurisdiction of this Court, to the material prejudice of all other creditors. UBS seeks to avoid application of Supreme Court precedent establishing that a creditor that files a proof of

claim submits itself to the jurisdiction of the Bankruptcy Court.  Granting UBS's Motion would turn the principles animating the Bankruptcy Code on their head. This Court, not the New York court, should resolve UBS's claim.

## II.    BACKGROUND

The claim that UBS asserts now against the Debtor essentially relates to two sets of events. First, UBS seeks to hold the Debtor responsible for the failure by some of the Debtor's affiliates to honor certain contractual margin calls in the fall of 2008.  UBS's claims against those affiliates resulted in the $1 billion judgment entered late last year; its claim to hold the Debtor responsible for that judgment is new.  Second, UBS seeks to hold the Debtor responsible for certain alleged fraudulent transfers involving other affiliates of the Debtor that took place in early 2009.  Those claims have not yet been tried.

While the procedural history of UBS's litigation against the Debtor and several of its affiliates is admittedly somewhat dense, including multiple interlocutory appeals, one advantage of considering the dispute at this point is that the threshold legal issues that will need to be decided are well-defined.  As discussed below, two legal questions will be critical:  (i) the extent to which, as a result of prior rulings in the New York litigation, res judicata bars UBS from asserting a claim against the Debtor to recover for conduct prior to February 24, 2009; and (ii) the extent to which UBS has already released the Debtor from claims arising from the post-February 2009 allegedly fraudulent transfers, as part of settlements that UBS reached with the Crusader Fund and the Highland Credit Strategies Fund (the "Credit Strategies Fund").  Neither issue has been decided, and the Court's ruling on those issues will have a material impact on the size of any allowable claim by UBS.

### A.    Highland's Affiliates Fail to Meet Margin Calls.

In April 2007, UBS entered into agreements (collectively, the "CLO Warehouse Agreements") with Highland and two affiliates—Highland Special Opportunities Holding Co. ("SOHC") and Highland CDO Opportunity Master Fund, L.P. ("CDO Fund," and together with SOHC, the "Fund Counterparties")—to establish a warehouse facility to finance the acquisition of syndicated leveraged loans and credit default swaps. (Ex. A, 4/12/07 Original Synthetic Warehouse Agreement; Ex. B, 4/20/07 Original Engagement Ltr.; Ex. C, 5/22/07 Original Cash Warehouse Agreement.)  Those assets, in turn, were to serve as the basis for a securitization pursuant to which notes would be sold to investors.  Due to market conditions, the securitized offering did not occur by the contractual deadline, and the CLO Warehouse Agreements terminated.  In March 2008, UBS, the Debtor, and the Fund Counterparties entered into restructured warehouse agreements (collectively, the "Restructured CLO Warehouse Agreements"). (Motion at ¶6, Exs. C, D, E.) The Restructured CLO Warehouse Agreements gave UBS the right to make margin calls on the Fund Counterparties in the event of a decline in the market value of the loans and swaps.  Furthermore, those agreements explicitly placed the risk of loss on the Fund Counterparties, and not Highland, as the New York court has found. *UBS Securities LLC v. Highland Capital Mgmt., L.P.*, 893 N.Y.S.2d 869 (N.Y. App. Div. 2010) ("the agreements between the parties contain no promise on the part of Highland to undertake liability with respect to the investment losses suffered by plaintiffs, or to ensure or guarantee the performance of [Fund Counterparties]' obligations to bear the risk of investment losses.").

As the market deteriorated in the fall of 2008, UBS made three margin calls on the Fund Counterparties. SOHC satisfied the first two margin calls in September and October 2008, using funds provided by SOHC's parent corporation, Highland Financial Partners, L.P. ("HFP"). *UBS*

*Securities LLC, et al v. Highland Capital Mgmt., L.P., et al*, No. 650097-2009, at 4 (N.Y. Sup. Ct. Nov. 19, 2019). The Fund Counterparties failed to satisfy a third margin call in November 2008, and UBS issued a notice of termination of the Restructured CLO Warehouse Agreements in December. *Id.*[4]

Meanwhile, during the fall of 2008, certain funds then managed by the Debtor—including Highland Crusader Offshore Partners, L.P.[5]—transferred certain assets to HFP in exchange for HFP 10% promissory notes (the "HFP Notes Transactions"). (*See* Ex. D, Expert Report of Louis G. Dudney, Mar. 8, 2013, at 21-24.) HFP was not a party to either the CLO Warehouse Agreements or the Restructured CLO Warehouse Agreements.

On February 24, 2009, UBS commenced a lawsuit against Highland and the Fund Counterparties in New York state court, alleging breach of the Restructured CLO Warehouse Agreements by the Fund Counterparties and seeking indemnification from Highland for certain losses. (Ex. F, Compl., *UBS Sec. LLC v Highland Capital Mgmt., L.P.*, No. 650097/09 (N.Y. Sup. Ct. Feb. 24, 2009).) In the course of that litigation, the indemnification claim—the only cause of action that UBS asserted against Highland in its initial complaint—was dismissed by the New York appellate court. *UBS Securities LLC v. Highland Capital Mgmt., L.P.*, 893 N.Y.S.2d 869 (N.Y. App. Div. 2010) ("the agreements between the parties contain no promise on the part of Highland to undertake liability with respect to the investment losses suffered by plaintiffs, or to ensure or guarantee the performance of [Fund Counterparties]' obligations to bear the risk of

---

[4] UBS's Motion employs sleight of hand by defining the term "Highland" to include the Fund Counterparties. Motion at 3. Accordingly, while the Motion states that "Highland posted the required collateral" and refers to "Highland's default on UBS's third margin call," it was the Fund Counterparties that posted collateral and failed to meet the final margin call. *See* Motion at 7.

[5] The other transferees were Highland CDO Opportunities Master Fund, Ltd., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, Ltd., Highland Crusader Holding Co., and Highland Capital Management L.P. (Ex. D, Expert Report of Louis G. Dudney, Mar. 8, 2013, at 21-24; *see* Ex. E, 3/20/2009 Termination, Settlement, and Release Agreement at 2.)

investment losses."). That court also barred UBS from asserting any claims against Highland for conduct occurring before UBS filed its initial complaint (i.e., before February 24, 2009) because UBS failed to plead such claims in its initial complaint. *UBS Securities LLC v. Highland Capital Mgmt., L.P.*, 927 N.Y.S.2d 59 (N.Y. App. Div., Jul. 21, 2011) (holding that "res judicata applied to bar claims in second action to the extent that they implicated events alleged to have occurred before filing of original complaint.").

As discussed below, one of the key threshold issues which a court will need to decide— and which the New York court has not yet considered—is the extent to which res judicata bars UBS from any recovery from the Debtor's estate that is based on conduct occurring before February 24, 2009. If res judicata bars such claims, UBS cannot now hold the Debtor responsible for the $1 billion judgment that UBS obtained against the Fund Counterparties.

### B.    The HFP Notes Transactions are Unwound

The parties to the HFP Notes Transactions unwound those transactions on or about March 20, 2009. (Ex. E, 3/20/2009 Termination, Settlement, and Release Agreement.) As a result, the notes were cancelled and HFP returned the assets to the applicable transferors, including the Crusader Fund and the Credit Strategies Fund. (*See* Ex. D, Expert Report of Louis G. Dudney, Mar. 8, 2013, at 32.) On February 16, 2010, UBS sought to file an amended complaint that included claims against Highland asserting that the unwinding of the HFP Notes Transactions was a fraudulent conveyance that benefitted Highland, and that by causing the unwinding Highland breached the implied covenant of good faith and fair dealing. (Ex. G, 2/16/10 UBS Ltr. to Court, *UBS Sec. LLC v Highland Capital Mgmt., L.P.*, No. 650097/09 (N.Y. Sup. Ct.). The court did not allow all of UBS's amendments, so UBS commenced another action against Highland and other entities, including the Highland Crusader Fund, and the lawsuits filed in 2009 and 2010 were later

consolidated into one action.  *See* Compl., *UBS Sec. LLC v Highland Capital Mgmt., L.P.*, No. 650752/10 (N.Y. Sup. Ct.) (ECF Nos. 2, 22).

### C.    UBS Releases Claims Against Highland.

Extensive pre-trial litigation ensued.  In 2015, two of the defendants to the fraudulent transfer claims relating to the unwinding of the HFP Notes Transactions—the Crusader Fund and the Credit Strategies Fund—entered into settlements with UBS.  Highland was a party to each settlement agreement.[6]  Those agreements settled all of UBS's claims in the New York Action against those two funds.  In addition, the settlement agreements explicitly provided that UBS released Highland from all claims arising from the allegedly fraudulent transfers to the Crusader Fund or the Credit Strategies Fund, respectively, in connection with the unwinding of the HFP Notes Transactions.  Highland is one of the "Covered Persons" in the following operative release provision:

> UBS Releasing Parties do hereby release, and covenant not to sue, the Covered Persons[7] with respect to such Claims to the limited extent the Claims are for losses or other relief specifically arising from the fraudulent transfers to Crusader alleged in the UBS Litigation.

(Ex. H, 6/17/15 UBS and Crusader Fund Settlement Agreement, at 5.3; *see* Ex. I, 6/11/15 UBS and Credit Strategies Fund Settlement Agreement, at 5.3.)

According to UBS's expert in the New York action, the assets that were the subject of the alleged fraudulent transfers to the two settling defendants represented 83.35% of the value of all

---

[6] The Crusader Fund's settlement was reached through the efforts of the Redeemer Committee.

[7] A "Covered Person," under the agreement is: "[Highland Capital Management, L.P.] and its past, present, or future parents, subsidiaries (other than the Crusader Released Parties), affiliates (other than the Crusader Released Parties), administrators, predecessor entities, officers, directors, partners, members, managers, successors and assigns, transferees, attorneys, insurers, sureties, feeder funds and employees." (Ex. H, 6/17/15 UBS and Crusader Fund Settlement Agreement, at 5.3; *see* Ex. I, 6/11/15 UBS and Credit Strategies Fund Settlement Agreement, at 5.3.)

of the assets that are the subject of the fraudulent transfer claims. (Ex. D, Expert Report of Louis G. Dudney, Mar. 8, 2013, at 77.) No court has yet decided the extent to which the releases in those settlement agreements bar portions of UBS's claim against the Debtor. That issue should materially limit the amount of UBS's claim.

### D. UBS Requests Bifurcated Trials

In 2018, UBS moved the New York court to bifurcate the proceedings against Highland, the Fund Counterparties and the other remaining defendants into: (i) a trial on the claims against the Fund Counterparties relating to the breach of the Restructured Warehouse Agreements, and (ii) a trial on the claims against Highland and the remaining Highland affiliate defendants with respect to the unwinding of the HFP Notes Transactions and related matters that took place after February 24, 2009. (Ex. J, Pl's Mot. to Bifurcate, *UBS Securities LLC, et al v. Highland Capital Mgmt. L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct. Apr. 18, 2018) ("UBS Bifurcat. Mot.").) Significantly, UBS argued that "the facts relevant to the claims in the two trials are distinct," and that the trials would "have minimal overlap in evidence and issues." (UBS Bifurcat. Mot., at 10.) Further, UBS argued that "the second trial, which will relate to new parties and different claims, will involve new factual issues that will not be addressed at all in the first trial," and that "the issues and evidence are largely separate and certainly will not be inextricably interwoven and intertwined." (*Id.* at 11, 15.) The New York court ruled in favor of UBS, and bifurcated the proceedings. (Ex. K, 5/1/2018 Hearing Tr., *UBS Securities LLC, et al v. Highland Capital Mgmt. L.P., et al*, No. 650097-2009 at 35:15-22 (N.Y. Sup. Ct. May 1, 2018).)

The New York court held a bench trial in July 2018 on the breach of contract claims against the Fund Counterparties under the Restructured CLO Warehouse Agreements. The trial court issued its decision in November 2019, finding the Fund Counterparties liable for breaching the

Restructured CLO Warehouse Agreements and awarded damages in the amount of $519,374,149,

plus prejudgment interest, for a total judgment of approximately $1.05 billion. *UBS Securities*

*LLC, et al v. Highland Capital Mgmt. L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct. Nov. 19, 2019)

[Doc. No. 641]. However, the New York court made no findings with respect to Highland or the

remaining defendants.[8]  Those claims were scheduled to be heard during a second trial.

## III.    ARGUMENT

This Court should not exercise its discretion to lift the automatic stay to permit UBS to

litigate its claim in the New York court.  As discussed below, each element of UBS's position

either is lacking in merit or is outweighed by the prejudice that the Debtor's unsecured creditors

would experience if UBS were permitted to litigate in the New York court.

### A.    There is No Basis to Lift the Stay Because of a Purported Agreement with the Debtor

It is well settled that a debtor-in-possession's agreement to lift the automatic stay is not

enforceable absent Bankruptcy Court approval.  "As a rule, a debtor may not unilaterally waive

the automatic stay. The stay protects both debtors and creditors, and 11 U.S.C. § 362 grants the

bankruptcy court the exclusive authority to grant relief from the stay." *In re Delta Investments &*

*Dev., LLC*, 2019 WL 137578, at *13 (Bankr. S.D. Miss. Jan. 8, 2019) (internal citation omitted);

see *Hill v. Wilson*, 2009 WL 10689099, at *1 (N.D. Ala. Mar. 17, 2009) ("Likewise, Trucking

cannot waive the automatic stay, because any relief from a stay must be authorized by the

bankruptcy court."); *In re Enron Corp.*, 300 B.R. 201, 213 (Bankr. S.D.N.Y. 2003) ("It is well

---

[8] In UBS's motion to bifurcate, UBS identified the remaining defendants and the respective claims against them as:
(1) Highland CDO Master Fund, L.P., fraudulent inducement and fraudulent conveyance; (2) Highland Special
Opportunities Holding Company, fraudulent inducement and fraudulent conveyance; (3) Highland Financial Partners,
L.P., alter ego and fraudulent conveyance; (4) Strand Advisors, Inc., general partner liability; and (5) Highland Credit
Opportunities CDO, L.P., fraudulent conveyance. *See* UBS Mot. to Bifurcate at 2-3. UBS did not include any alter
ego claim against Highland.

App. 0542

settled that, since the purpose of the automatic stay is to protect creditors as well as the debtor, the debtor may not waive the stay.").  The automatic stay is not an asset of the debtor that may be bargained away in a private negotiation, and then presented to this Court after the fact for formulaic approval. Instead, an "agreement to modify or terminate the automatic stay requires court approval after notice and an opportunity to object is provided to all parties in interest." *Matter of Pease*, 195 B.R. 431, 433 (Bankr. D. Neb. 1996).

UBS cannot persuasively assert that it has been prejudiced by entering into a supposed agreement with Highland to lift the stay when any such agreement is not enforceable absent Bankruptcy Court approval.  However, the Debtor's other unsecured creditors would be greatly prejudiced if this Court were to enforce such an agreement.  That would effectively call a halt to these bankruptcy proceedings for the benefit of a single creditor who asserts an oversized claim.

### B.      There Is No Cause to Lift the Automatic Stay

"The automatic stay is intended to 'allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'" *In re Residential Capital, LLC*, 2012 WL 3555584, at *4 (Bankr. S.D.N.Y. Aug. 16, 2012) (*citing SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000)). Under § 362(d)(1), a bankruptcy court may lift the automatic stay for "cause." "There is no mandatory standard for finding 'cause' in the Fifth Circuit." *In re Choice ATM Enterprises, Inc.*, 2015 WL 1014617, at *5 (Bankr. N.D. Tex. Mar. 4, 2015). "Ultimately, the granting of relief from the automatic stay is left to the discretion of the Bankruptcy Court and decided on a case by case basis." *Id. citing In re Fowler,* 259 B.R. 856, 858 (Bankr. E.D. Tex. 2001).

Courts consider any number of factors when determining whether to lift the automatic stay. *In re Choice ATM Enterprises, Inc.*, 2015 WL 1014617, at *5 (Bankr. N.D. Tex. Mar. 4, 2015)

10

App. 0543

(discussing various factors applied by different courts). In order to streamline the analysis, this Objection addresses the two factors that UBS highlights: (i) the prejudice to the parties, and (ii) judicial economy.  UBS fails to carry its burden as to each of these factors.

### i.    Lifting the Stay Will Substantially Prejudice Other Creditors

When considering whether to lift the automatic stay to permit a creditor to continue litigation in another forum, courts consider the centrality of the claim to the overall estate. *See, e.g., In re Choice ATM Enterprises, Inc.*, 2015 WL 1014617, at *6 (Bankr. N.D. Tex. Mar. 4, 2015) In *Choice ATM Enterprises*, the court denied a motion to lift the automatic stay because the moving creditor's claim "would be the largest claim against the estate" and thus "critical to the reorganization." *Id.* Because of the importance of the claim, the court reasoned that "by retaining [the claims], this court can rapidly proceed through the claims estimate process and impose a lesser burden on [the debtor] and avoid the aforementioned unnecessary delay and expense." *Id.*

It cannot be disputed that the validity and amount of UBS's claim is of central importance to the Debtor's estate and the creditors' ultimate recoveries.  UBS asserts the largest disputed claim in this case by a significant margin—more than five times greater than the largest liquidated claim. If the stay is lifted, creditors will have no right to participate in the New York action, and will be relegated to sitting on the sidelines with respect to the determination of what could well be the most important dispute in this chapter 11 case.  If history is any guide, the adjudication of that claim by the New York court will take several years.  As a result, UBS would be able essentially to dictate the terms of any plan simply as a consequence of its ability to litigate before the New York court.  Moreover, given the overhang of a $1 billion disputed claim that would not be subject to this Court's claims reconciliation process, it is difficult to envision how creditors could receive any meaningful recoveries until the New York court enters a final, non-appealable order.  This

Court should "preserv[e] a level playing field for negotiation of a consensual reorganization plan" and promote prompt and equitable distributions to all creditors by denying UBS's motion. *In re Conejo Enterprises, Inc.,* 96 F.3d 346, 352 (9th Cir. 1996) ("[T]he bankruptcy court's efforts to preserve a level playing field for all parties to negotiate a plan was a rational basis for denying relief from the automatic stay.") (internal citations and quotations omitted).

Not surprisingly, UBS fails to cite a single case where a bankruptcy court has lifted the stay, or otherwise abstained, to permit a state court to adjudicate a claim that would largely determine the outcome of a chapter 11 case and control when creditors receive distributions. Requiring Highland to litigate "damages claims in another forum would upend the strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court. It would be unfair to other creditors who must bring their claims in this Court." *In re Residential Capital, LLC*, 2012 WL 3555584, at *4 (Bankr. S.D.N.Y. Aug. 16, 2012) (internal citation and quotation omitted).

> ### ii.   Judicial Economy is Best Served by this Court Resolving UBS's claim Against Highland.

UBS contends that judicial economy is best served by having the New York court adjudicate its claim against the Debtor. That argument relies upon obfuscations of the scope of the issues the New York court addressed in the bench trial involving the Fund Counterparties and the claims that UBS has litigated against the Debtor to date in New York. Contrary to UBS's argument: (a) the claims against Highland in what would be "trial number two" in New York are distinctly different from the case that was tried there in 2018, as UBS itself persuasively argued to get the claims bifurcated for trial; (b) the most significant remedy that UBS now seeks to assert against the Debtor—namely, that the Debtor is the alter ego of the Fund Counterparties—has not

been pleaded, much less litigated, in New York; and (c) there are at least two threshold legal issues—res judicata and release—which are likely to impact materially the size of any allowable claim against the Debtor.  Particularly given that New York civil procedure freely allows interlocutory appeals, and that the New York court has been closed for several months in response to the pandemic (and that it is uncertain when it will resume holding jury trials),[9] it will certainly be several years before the New York court can enter a final, non-appealable order.  It will be much more efficient for this Court to determine the validity and, if applicable, amount of UBS's claim against the Debtor.

When it sought bifurcation in New York, UBS accurately described the relationship between the first trial against the Fund Counterparties based on breach of the Restructured CLO Warehousing Agreements and the trial against Highland and other defendants involving post-February 2009 transactions.  UBS represented that "the facts relevant to the claims in the two trials are distinct," and that the trials would "have minimal overlap in evidence and issues." (UBS Bifurcat. Mot., at 10.)  UBS stressed that "the second trial, which will relate to new parties and different claims, will involve new factual issues that will not be addressed at all in the first trial," and that "the issues and evidence are largely separate and certainly will not be inextricably interwoven and intertwined." (*Id.* at 11, 15.)

Even if the underlying facts and legal theories with respect to each trial were not as distinct as UBS previously admitted, UBS's claim against the Debtor requires resolution of two threshold issues that the New York court has not considered.  The first threshold issue is whether the doctrine

---

[9] Due to the Covid-19 epidemic, New York courts initially did not accept papers on any non-essential matters during the period beginning March 22, 2020 and ending May 25, 2020, and, beginning on March 16, has not been holding civil jury trials. (Ex. L, NYS Court Admin. Order A0-78-20 (Mar. 22, 2020); Ex. M, NYS Court Admin. Order AO-68-20 (Mar. 16, 2020)). As of May 25, 2020, the New York court may accept papers, but only in electronic format. (Ex. N, NYS Court Admin. Order AO/115/20, at ¶3, Ex. B (May 28, 2020).

of res judicata precludes any part of the claim that UBS is now asserting against the Debtor. As noted above, the New York Appellate Division held that res judicata bars UBS from asserting any claim against Highland based on conduct occurring before February 24, 2009. *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 86 A.D.3d 469, 927 N.Y.S.2d 59 (2011). That court ruled, "Here, to the extent the claims against Highland in the new complaint implicate events alleged to have taken place before the filing of the original complaint, res judicata applies. That is because UBS's claims against Highland in the original action and in this action all arise out of the restructured warehousing transaction." *Id.* at *474.[10] The application of res judicata is critical given that UBS now apparently seeks to hold the Debtor liable as the alter ego of the Fund Counterparties in connection with the Fund Counterparties' pre-February 24, 2009 breach of the Restructured CLO Warehouse Agreements.

The second threshold legal issue is the extent to which the releases UBS gave to Highland in the Crusader Fund and Credit Strategies Fund settlements in 2015 apply to foreclose or limit any recovery against the Debtor arising from the post-February 24, 2009 fraudulent transfer claims and the related claim asserting breach of the implied covenant of good faith and fair dealing. In those settlements, UBS released claims applying to 83.35% of the challenged asset transfers. (*See* Ex. D, Expert Report of Louis G. Dudney, Mar. 8, 2013, at 77.)

This Court is well positioned to address these legal questions, which do not involve novel or uncertain issues of New York state law, and to do so expeditiously. *Colvin v. Amegy Mortg. Co.*, 507 B.R. 915, 921 (W.D. Tex. 2014) (*citing Matter of Wood*, 825 F.2d 90, 96 (5th Cir. 1987)

---

[10] In addition, as previously discussed, the New York Appellate Division dismissed UBS's claim for indemnification that was based on conduct prior to February 24, 2009. *UBS Securities LLC v. Highland Capital Mgmt., L.P.*, 893 N.Y.S.2d 869 (N.Y. App. Div. 2010) ("the agreements between the parties contain no promise on the part of Highland to undertake liability with respect to the investment losses suffered by plaintiffs, or to ensure or guarantee the performance of [Fund Counterparties]' obligations to bear the risk of investment losses.").

14

("the bankruptcy judge is constantly enmeshed in state-law issues."); *In re Breitburn Energy Partners LP*, 571 B.R. 59, 68 (Bankr. S.D.N.Y. 2017) ("Further, in contrast to the property issues discussed earlier, the Tort Counts do not present difficult issues of Texas law.") One court noted that "the mere presence of state law issues does not mean that jurisdiction over bankruptcy issues should be left to the state courts" and that their presence is not "enough for permissive abstention." *In re Kewanee Boiler Corp.*, 270 B.R. 912, 923 (Bankr. N.D. Ill. 2002). The court reasoned that, "[o]therwise, the central goal of bankruptcy which is the centralized administration of a debtor's estate would usually be impossible to achieve since most bankruptcy cases involve some issues of state law." *Id.* Moreover, UBS does not argue that its claims for fraudulent transfer or breach of good faith and fair dealing involve unsettled questions of state law. *See In re Chateaugay Corp.*, 1990 WL 692236, at *2 (Bankr. S.D.N.Y. Jul. 11, 1990) ("The issues presented in this Adversary Proceeding are not redolent with unsettled questions of state law. The state law issues involved require only the application of settled principles of contract law.").

Judicial efficiency will be served by having this Court timely adjudicate the dispute given the more streamlined claims reconciliation process available under the Federal Rules of Bankruptcy Procedure. This is particularly true because New York civil procedure freely permits interlocutory appeals. *See* N.Y. C.P.L.R. 5701 (McKinney). "On the spectrum of what is appealable, New York is the most generous." HANNAH M. SMITH, *Using the Scientific Method in the Law: Examining State Interlocutory Appeals Procedures That Would Improve Uniformity, Efficiency, and Fairness in the Federal Appellate System*, 61 CLEV. ST. L. REV. 259, 272 (2013). Even the most cursory review of the ten years of litigation that UBS has already engaged in with Highland and its affiliates reveals that repeated appeals of the trial court's decisions resulted in substantial delays.

That New York practice allows interlocutory appeals is particularly important because UBS—notwithstanding the decade of litigation—is only now attempting to recover against the Debtor as the alter ego of the Fund Counterparties. While the Motion does not disclose how UBS would attempt to accomplish this in the New York court, it is fair to conclude that UBS's pursuit of this new remedy would involve litigation that would permit the losing party to appeal each of the trial court's decisions along the way. Conversely, UBS can assert such a claim in its proof of claim filed with this Court, and the dispute can be decided efficiently without pauses to learn the outcomes of numerous interlocutory appeals. *See, e.g., In re Dorris Mktg. Grp., Inc.,* 2005 WL 6267050, at *2 (Bankr. E.D. Va. Jan. 27, 2005) ("[I]t is nevertheless the exceptional case in which the stay will be modified to permit litigation" in part because maintaining the stay prevents the "efficient administration of bankruptcy cases from being held hostage to the crowded condition of another court's docket.").

For all of these reasons, this Court should not exercise its discretion to lift the automatic stay.

### C. There is No Basis for a Further Extension of the Bar Date

In a final plea to be treated uniquely from other creditors, UBS asks the Court, in the alternative, to extend the bar date as to UBS so that UBS does not have to submit itself to the jurisdiction of this Court and waive any right to a jury trial. UBS does not cite any precedent in support of its request that this Court employ its authority under section 105(a) of the Bankruptcy Court to further extend the bar date. That is because section 105(a)—which authorizes the Bankruptcy Court to "issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code—cannot be used to perform an end-run around well settled authority or contravene an order of this Court. UBS acknowledges that the Supreme Court has consistently

ruled that a creditor who submits a proof of claim has no right to a jury trial.  Motion at 13, 14.

UBS's proposed solution is that this "Court should enter an Order that the filing of a proof of claim

will not waive UBS's right to a jury trial."  Motion at 25.  Section 105(a) does not grant a

Bankruptcy Court the authority to effectively override two Supreme Court cases.  *In re Legendary*

*Field Exhibitions, LLC*, 2020 WL 211409, at *4 (Bankr. W.D. Tex. Jan. 13, 2020) ("Because

*Granfinanciera* held that the right to a jury trial only extends to matters that are legal in nature and

involve private rights, a creditor that files a claim loses its Seventh Amendment right to a jury trial.

. . . Even if a creditor attempts to couch its claim in protective language reserving the right to a

jury trial, such protective language is not binding on the Court; rather, the Court is bound by

*Langenkamp* and *Granfinanciera*, which found that filing a proof of claim results in waiver of the

right to jury trial."); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1981); *Langenkamp v. Culp*,

498 U.S. 42, 45, (1990).

UBS's alternative solution is even bolder, and represents perhaps the purest expression of

its litigation strategy.  UBS asks this Court to extend the bar date as to UBS's claim for an

indeterminate period.  Motion at 25.  In addition to this proposal being impractical—and

demonstrating that UBS's underlying intention is simply to gain negotiating leverage through

delay—UBS's proposal directly conflicts with an agreement that UBS entered into with the Debtor

which, unlike the alleged agreement to lift the automatic stay, was approved by this Court.  The

Joint Stipulation and Order Extending Bar Date, entered by this Court on March 22, 2020,

expressly provides, in relevant part, that the bar date for UBS to file its claim is extended to the

date that is five business days after this Court enters an order on the Motion.  [Docket No. 543 at

2.]  UBS fails to set forth any basis why it should not be held to the terms of its agreement, approved

by this Court and memorialized in a final order.  *See* Fed. R. Bankr. P. 9024 (providing that Fed.

R. Civ. P. 60 applies in bankruptcy cases) & Fed. R. Civ. P. 60(b) (setting forth the basis upon which a court may relieve a party from a final order).

For all these reasons, this Court should decline to extend the bar date for UBS any further.

Dated this 3rd day of June, 2020

FROST BROWN TODD LLC
Mark A. Platt, Esq.
Texas Bar No. 00791453
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Tel: 214-545-3474
Fax: 214-545-3473
Email: mplatt@fbtlaw.com

- and –

JENNER AND BLOCK, LLP
Terri L. Mascherin
Marc Hankin
353 North Clark Street
Chicago, IL 60654-3456
(312) 222-9350
Email: TMascherin@jenner.com
        MHankin@jenner.com

*Counsel for the Redeemer Committee of the Highland Crusader Fund*

18