# Appendix Exhibit 34

Docket #0771 Date Filed: 06/23/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

Attorneys for the Debtor and Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

**Response Deadline: July 23, 2020 at 4:00 p.m. (ET)**
**Hearing Date: August 6, 2020 at 9:30 a.m.**

## OBJECTION TO PROOF OF CLAIM OF ACIS CAPITAL MANAGEMENT L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

Pursuant to sections 502(b)-(d) and 558 of Title 11 of the United States Code (the

"<u>Bankruptcy Code</u>") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200623000000000002

"Bankruptcy Rules"), debtor and debtor in possession Highland Capital Management, L.P. (the

"Debtor") hereby objects to Proof of Claim No. 3 (the "Acis Claim") filed by claimants Acis

Capital Management L.P. and Acis Capital Management GP, LLC (together, "Acis").

The Debtor respectfully submits that there are numerous bases for the summary

disposition of all claims for relief asserted in the Acis Claim, and represents as follows:

## Preliminary Statement

1.     The Acis Claim incorporates the complaint from litigation commenced by

the trustee of the former estate in the Acis bankruptcy case (the "Acis Case") at a time when Acis

had unpaid creditors (the "Acis Complaint").[2]  The trustee sought to avoid and recover certain

transfers by Acis that were allegedly intended to prevent its largest creditor, Josh Terry, from

collecting his $8.168 million arbitration award (the "Arbitration Award").  The transfers,

allegedly orchestrated by James Dondero using his common control and ownership interests in

Acis, the Debtor and the other Highland entities, were purportedly intended to "denude" Acis by

transferring certain of its management contracts and interests in the managed assets to its

affiliates, including the Debtor.  Finding a likelihood of success that certain transfers were

avoidable, the Court issued a preliminary injunction, which was carried over into a "Temporary

Plan Injunction" that allowed Acis to manage those assets to pay creditors.  Consistent with that

substantive basis, the injunction expires once those creditors are paid in full.  That is the

operating principle of the Acis Plan: creditors are paid using assets temporarily diverted from the

putative transferees that are named as defendants in the Acis Complaint.

---

[2] Specifically, the Acis Claim incorporates the *Second Amended Complaint (Including Claim Objections and Objections to Administrative Expense Claims)* filed in Adversary No. 18-03078 in the Acis Case.

App. 0559

2.     The Acis Plan has worked as intended.  The income diverted by the temporary injunction will soon have paid Mr. Terry and Acis's other creditors 102% of their claims, *plus* all of the administrative expenses incurred to achieve that result.  There will no longer be an estate or estate claims to administer.  Having served its purpose, the injunction dissolves and the creditor remedies asserted in the Acis Complaint become moot.  But Acis is doing the opposite.  It filed the Acis Claim in the amount of "at least $75 million" and has initiated new lawsuits in federal and state court against employees, advisors and professionals for allegedly breaching duties owed not to creditors but ***purportedly owed to Acis***.  The sole beneficiary of these far-flung litigations would be Mr. Terry, whose claim is paid in full under the Acis Plan, except for $1 million with which he chose to purchase Acis's equity.[3]  Now Mr. Terry seeks a $75 million windfall, which would come not at Dondero's expense but from the pockets of the Debtor's innocent creditors (including unsecured trade creditors, the Redeemer Committee of the Highland Crusader Fund ("<u>Redeemer</u>"), with an arbitration award of $190,824,557, and UBS Securities LLC ("<u>UBS</u>").

3.     Attempted windfalls usually have a fallacious premise, and this one is a $75 million whopper.  The fallacy is that Reorganized Acis has greater rights than "old Acis," which at the time of the transfers was a member of the Highland related entities that Acis itself alleges were controlled and primarily owned by Dondero.  Acis alleges that each was an alter ego of the others, which means that *Acis is just as culpable, and just as much an alter ego, as*

---

[3] Inasmuch as claims against Acis are worth 102%, Terry's $1 million reduction of his claim was the substantive equivalent of paying $1 million, not a typical debt for equity exchange.

*any of the others*.  Coupled with the fact that Acis's creditors are being paid in full, several things follow that are instantly fatal to the Acis Claim.  None are subject to any factual dispute.

    a.    First, it is undisputed that at the time of the transfers, James Dondero and Mark Okada were Acis's sole owners, and it is hornbook law that sole owners do not owe fiduciary duties ***to their company***.  Subject of course to the rights of creditors to claw back transfers that leave a company unable to pay its debts, Dondero and Okada as Acis's sole owners were free to transfer its assets to other entities, and third parties had no duty or right to stop them.  "Delaware law is clear that a company's sole owner cannot breach fiduciary duties 'owed to the companies he wholly owned.' … [Plaintiff] has not cited legal support for the proposition that a nonowner can be liable for conspiring with the sole owner of a partnership for breaching duties that the owner owes himself."  *Tow v. Amegy Bank N.A.*, 976 F. Supp. 2d 889, 906-07 (S.D. Tex. 2013) (internal citation omitted).  Whatever their motive, if Acis's owners wanted to shut it down, they were free to do so, subject to the rights of creditors, who are being paid in full without any further recovery.[4]  Nor can Acis base its claims on the rights of Acis's former creditors.  For one thing, they've been paid, and for another, Delaware law does not permit creditors of a limited partnership to sue third parties for breach of fiduciary duty, *nor does*

---

[4] Acis relies heavily on the Arbitration Award, but the panel found no violation of any duty ***to the partnership***.  The only duty that the panel found was breached was between partners: it was the duty of the majority partners not to exceed the ratio of expenses to revenue while Terry was a 25% limited partner.  Even that duty expired with Terry's partnership interest when his employment was terminated.  About that there is no dispute: the cash-out of his partnership interest was the primary component of the Arbitration Award.  The panel found that Terry was not wrongfully terminated because his employment was "at-will," but that he was entitled to payment for his partnership interest because the termination was not for cause.  Most of the rest of his award was his pro rata partnership share of the alleged Overpayments (which he now seeks to recover *twice* by claiming them through Acis).

*it permit a trustee to sue on their behalf.*[5]  These claims are not and cannot as a matter of law be brought for the benefit of Acis's former creditors.

    b.  Second, even if fiduciary duties had been owed, Acis's duty-based claims against the Debtor and other third parties are barred by the *in pari delicto* defense.  It is a paradigmatic application of the doctrine: Acis cannot sue others for participating in a scheme in which it, as one of the entities it alleges was commonly owned and controlled, was equally culpable.  This fundamental defect is obscured by the subsequent appointment of a trustee and change of ownership.  But while the Fifth Circuit has not decided the issue, it has affirmed that Bankruptcy Code § 541 subjects trustees and successors to whatever defenses existed against the debtor, and most courts of appeal hold that, as a result, the appointment of a trustee does not "cleanse" the *in pari delicto* defense (much less, as here, where the claims purportedly revested in the reorganized debtor).  Even if the equities are applied, as this Court once held they may, there is no equity in permitting a new owner to sue persons for conspiring with the old owner, in order to parlay a $1 million investment into $75 million, *at the expense of this Debtor's creditors*. These facts are not in dispute, and the issue can and should be decided on the record before the Court.

    c.  Third, the fraudulent transfer claims fail, and may be summarily resolved, because the Debtor did not receive the benefit of the alleged fraudulent transfers since (with one exception) it was not the transferee of the transferred rights.  Bankruptcy Code §

---

[5] *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 467 (Bankr. D. Del. 2018); *Gavin/Solmonese LLC v. Citadel Energy Partners, LLC (In re Citadel Watford City Disposal Partners, L.P.)*, 603 B.R. 897, 905 (Bankr. D. Del. 2019).

550(a) is not satisfied as to those transfers for which the Debtor was not the initial transferee: it is insufficient as a matter of law simply to allege an amorphous benefit from being part of the same corporate group. This is all that the Acis Claim alleges – the Debtor benefited solely because it was a Highland related entity. Furthermore, if the Debtor did not receive the benefit from a transfer, there are no damages in the first place. That is shown *conclusively* by the fact that the earnings derived by Acis from the enjoined transfer of the ALF PMA have already paid Acis's creditors and administrative expenses. That is presumably why the Acis Claim lacks any damage allegations – there are none.

        d.      Fourth, the fraudulent transfer claims also fail, along with preference claims as well, for another reason that may also be summarily resolved: a debtor cannot recover avoidance claims for its own benefit under section 550(a) of the Bankruptcy Code. There must be a benefit to the debtor's estate. Here, there is nothing left of the former Acis estate: creditors were paid, old equity was canceled, and the new equity is held by a purchaser who paid $1 million, no different than if he had done so in an auction. There is no estate to benefit. Authority before and after *Mirant* holds that avoidance recoveries should be limited based on equitable considerations, which in this case are conclusively in favor of limiting any recovery to the amount required to satisfy creditors' claims. Unlike *Mirant* and this Court's *Texas Rangers* decision, this is not a case in which a recovery will enable a debtor to satisfy outstanding plan obligations, or one in which creditors were forced to take equity instead of cash

and are depending on its value for a recovery on their claims.[6] There is no estate and no equities to support Mr. Terry's windfall.

e.  Fifth, Acis may not assert for its own benefit any claims against prior equity holders or third parties that were not pending when Mr. Terry purchased the company. The *Bangor Punta* doctrine holds that a purchaser of controlling equity in a company may not then use the control over the corporate machinery to turn around and assert claims against the prior owners if the claims arose prior to the date when the purchaser took control.[7] The reasons are self-evident and squarely applicable here: the purchaser paid what it considered fair value and has suffered no damage, and to permit such claims would promote the kind of litigation free-for-all in which Mr. Terry is presently engaged. This bars standing as to all claims except those the trustee had already asserted prior to Mr. Terry's purchase (relating to the ALF share transfer, ALF PMA transfer and the note transfer described herein), all of which claims fail for multiple other independent reasons.

f.  Sixth, Acis's four claims seeking $7 million in so-called "Overpayments" have no legal basis and should be summarily disallowed. These are payments for services that exceeded, in gross, the expense ratio that was permitted under Acis's limited partnership agreement (the "Acis LPA") without partner consent. The only alleged substantive basis for recovery is the claim that the Overpayments were *ultra vires* acts, which would be flatly wrong even if it applied in concept (which it does not): (i) Acis was indisputably *authorized* to

---

[6] Significantly, any recovery on preference or constructive fraudulent transfer claims would be offset by the Debtor's resulting claims under Bankruptcy Code § 502(h), which would be entitled to full payment under the Acis Plan.

[7] *Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 710, 94 S. Ct. 2578 (1974); *Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 929 (Del. Ch. 1999).

App. 0564

pay for services, which is all that matters legally; any excess was not *ultra vires* but an inter-partner issue already addressed by the Arbitration Award (through which Mr. Terry already recovered his share); (ii) turnover under Bankruptcy Code § 542(a) does not apply to disputed debts as a matter of law; and (iii) and the "money had and received" and conversion claims are equally inapplicable as a matter of law. In any event, most of the time period during which the alleged Overpayments were made is beyond the two year statute of limitations under Texas law.

g. Seventh, Acis's civil conspiracy claim also fails as a matter of law because the claim is not recognized: section 550 provides the statutory remedies for any fraudulent transfer liabilities, and it may not be circumvented by a conspiracy claim.

h. Eighth, Acis's tortious interference claim fails as a matter of law because it does not apply to at-will contracts, and the Debtor had the right to compete for the business.

i. Ninth, Acis's breach of contract claim, like its claim for breach of fiduciary duty, rests on the fallacy that Acis had legal interests that were distinct from those of its sole owners, duties that parties contracting with Acis had a duty to identify and protect even though Acis's sole owners instructed otherwise. That is not the law.

j. Tenth, alter ego liability is inadequately pled; it is a remedy and not a claim and, moreover, is unavailable on the alleged grounds. What Acis alleges is "single enterprise" liability based on common control by Mr. Dondero, a theory never adopted under Delaware law (which controls) and also rejected by the Texas Supreme Court.

k.      Numerous other of the Debtor's defenses are meritorious but cannot be decided summarily, including defenses such as solvency (Acis was manifestly solvent without recovering *all* of the alleged fraudulent or preferential transfers), preference defenses and punitive damages (to the extent any tort claim is not dismissed; notably, such damages would be subordinated at best).

4.      The rights of creditors to be paid were the legal basis of the Acis Plan injunction, which is why the injunction terminates once those creditors are paid in full.  Mr. Terry elected to acquire new equity for $1 million; he is not entitled to receive another $75 million by claiming that *Acis* was damaged by those transfers, much less from the pockets of the Debtor's unpaid creditors.  To impose on the former partners and third parties such as the Debtor a duty to "restore" $75 million to the former business, not to pay its creditors but for the sole benefit of a successor owner who bought the diminished entity for $1 million, would be a legally groundbreaking windfall, to say the least. The Acis Claim can and should summarily be disallowed in its entirety on the record before the Court.

### Jurisdiction

5.      The Court has jurisdiction over this matter under the Bankruptcy Code and pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B) and (L).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory predicates for the relief requested herein are 11 U.S.C. § 502(b)-(d), 11 U.S.C. § 558 and Fed. R. Bankr. P. 3007.

App. 0566

**Factual Background**

7.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

8.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

9.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].[8]

10.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

11.      The Settlement Order approved, among other things, certain operating and reporting protocols [Docket Nos. 354, 466].

12.      In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, at the Debtor's general partner, Strand Advisors, Inc. (the "Independent Board")

13.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections

---

[8] All docket numbers refer to the docket maintained by this Court.

App. 0567

1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

**Objection**

A.    **Legal Standard**

14.    The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim.  "A claim . . . , proof of which is filed under section 501 [of the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  "A proof of claim executed and filed in accordance with the [Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f); *see also In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006).  However, the ultimate burden of proof for a claim always lies with the claimant.  *Armstrong*, 347 B.R. at 583 (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).

15.    The Acis Claim incorporates and is expressly based upon the claims and causes of action asserted in the Acis Complaint filed in the Acis Case.  It purports to assert thirty-four claims for relief, which are described and addressed *seriatim* below.

B.    **Claims 1-4 to Recover the Alleged Overpayments Must be Disallowed**

16.    The first four claims are based on service and expense payments by Acis to the Debtor that allegedly exceeded 20% of revenues, without Mr. Terry's consent, in violation of section 3.10(a) of the Acis LPA, which provides that "the aggregate annual expenses of the Partnership … may not exceed 20% of Revenues without the consent of all of the members of

the Founding Partner Group." The arbitration panel found that Mr. Terry (still a partner at that time) had not consented to these so-called "<u>Overpayments</u>," which totaled $7,021,924.

17. Acis asserts four claims: (1) the alleged Overpayments were void or voidable *ultra vires* acts because all of the partners had not consented; (2) the Overpayments are Acis's estate property subject to turnover under Bankruptcy Code § 542(a); (3) the Debtor is liable to return the Overpayments as "money had and received"; and (4) the Debtor is liable for conversion of the alleged Overpayments.[9]

18. Each of the four claims is frivolous, and all should be summarily disallowed: (1) the Alleged Overpayments were not *ultra vires*; (2) the turnover statute does not apply when the right to the property is disputed; (3) "money had and received" does not apply as a matter of law; and (4) neither does conversion. (As discussed below, even if these claims were not frivolous, because they are brought for the benefit of Acis's equity acquirer and not for the benefit of creditors, they are also barred by the *Bangor Punta* doctrine.)

### 1. The Alleged Overpayments Were Not Void or Voidable as Ultra Vires

19. Acis obviously had the *power* to make payments for services. That is all that would matter even if Delaware had not essentially abolished the *ultra vires* doctrine.[10] If Acis paid more for services than the Acis LPA permitted without the partners' consent, that is a

---

[9] Acis appears to base its claims solely on allegations that the alleged Overpayment are void, not on the alleged excessive contract rates. As set forth herein, the Debtor believes all four claims may be summarily disallowed as a matter of law on undisputed facts. Nonetheless, the Debtor reserves the right to bring defenses with respect to whether the rates were reasonable or any other applicable defenses.

[10] *See* discussion *infra*; *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648 (Del. Ch. 2013) (*ultra vires* applied under former law when "the corporation acted outside the scope of . . . its authorized powers.").

App. 0569

matter *between partners*, not an *ultra vires* act. That is how the arbitration panel treated it for

purposes of valuing Mr. Terry's partnership interest: it calculated how much Mr. Terry would

have received as a 25% partner had expenses not exceeded the limit, and included it in the

Arbitration Award. By necessary extension, the rest of any recovered money should be

distributed to the *other* partners; instead, Mr. Terry seeks to recover it a second time.

20.     Regardless, *ultra vires* is inapplicable. It formerly applied under Delaware

law only when "the corporation acted outside the scope of … its authorized powers" (which was

not the case here) but the superseding statute essentially eliminated any utility the *ultra vires*

doctrine had. *See* Delaware General Corporation Law, § 124 ("No act of a corporation and no

conveyance of real or personal property to or by a corporation shall be invalid by reason of the

fact that the corporation was without capacity or power to do such act or to make or receive such

conveyance or transfer. . . "); *see also Carsanaro v. Bloodhound Techs., Inc*., 65 A.3d 618, 648

(Del. Ch. 2013).

21.     Furthermore, contrary to Acis's suggestion, even if Delaware had not

statutorily eliminated *ultra vires* as a valid concept in corporate law, the concept of *ultra vires*

acts never applied to partnerships. The Acis Claim blatantly misstates the law and the cited

decision in stating that corporate law on *ultra vires* applies by analogy. *In re Mesa Ltd. P'ship

Preferred Unitholders Litig*., Civil Action No. 12,243, 1991 Del. Ch. LEXIS 214, at *20 (Dec.

10, 1991) did not apply *ultra vires* to a partnership, by analogy or otherwise. In fact, it had

nothing whatsoever to do with *ultra vires*. It was an unpublished decision involving a

ratification issue in a breach of fiduciary duty case. *Ultra vires* was mentioned as one of several

things that can be cured by ratification, after which the court began the next paragraph with:
"Case rulings construing statutory corporation law are not necessarily binding precedents as to issues arising under contractual partnership agreements but they may often be helpful by analogy." The Eleventh Circuit Court of Appeal has suggested that *ultra vires* does not apply to partnerships even in concept.[11]

22.     Acis does not claim that the alleged Overpayments are void or voidable on any substantive basis other than *ultra vires*, and thus has no colorable claim under state law to recover its own payments. Accordingly, claims 1-4 must be disallowed under Bankruptcy Code § 502(b)(1). A claimant may not simply venture forth recovering payments a debtor has made without some substantive basis; whether Mr. Terry was deemed to consent to them under the Acis LPA is completely irrelevant.

## 2.     Turnover Under Bankruptcy Code § 542(a) is Inapplicable

23.     It is axiomatic that turnover under Bankruptcy Code § 542(a) applies only to obtain possession of property that is indisputably property of the estate. *See, e.g., United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."); *In re Amcast Indus. Corp.*, 365 B.R. 91, 122 (Bankr. S.D. Ohio 2007) ("Recovery under 11 U.S.C. § 542 is limited to assets that are undisputedly property of the

---

[11] *In re Sec. Grp.*, 926 F.2d 1051, 1054 n.5 (11th Cir. 1991) ("The appellants consistently cast their argument as one alleging the guaranties were ultra vires with respect to the partnerships. Ultra vires is a uniquely corporate concept, arising out of an historical fear and distrust of the corporate form. [citation omitted] Indeed, almost all of the cases cited by the appellants involve corporations, not partnerships. We do not believe that this uniquely corporate concept controls this case.").

App. 0571

estate.") (citation omitted). Here, Acis's purported right to the property at issue is clearly in dispute, and section 542(a) is therefore inapplicable.

### 3. "Money Had and Received" is Also Inapplicable

24. "The quasi-contractual action for money had and received is a cause of action for a debt not evidenced by a written contract between the parties" (*MGA Ins. Co. v. Chesnutt*, 358 S.W.3d 808, 815 (Tex. App. 2012)). Here, the alleged Overpayments were made pursuant to valid contracts. Once again, therefore, Acis's theory of relief is conceptually inapplicable.

25. Even if there were a claim for "money had and received," a substantial portion of such a claim would be time-barred. The Arbitration Award found that the alleged Overpayments were made from 2014 to May 2016. Texas applies a two-year statute of limitations to claims for money had and received. *Merry Homes. Inc. v. Luc Dao*, 359 S.W.3d 881, 884 (Tex. App. 2012) (citing "clear precedent"). Accordingly, Acis cannot recover any alleged Overpayments that were made prior to January 31, 2016 (two years prior to the Acis petition date).

### 4. Conversion is Also Inapplicable

26. Conversion is another inapplicable claim. The Debtor has no identifiable, segregated money subject to recovery through a conversion cause of action, and Acis has not even attempted to identify any such money or property. *See, e.g., Lawyers Title Co. v. J.G.*

App. 0572

*Cooper Dev., Inc.,* 424 S.W.3d 713, 718 (Tex. App. 2014) ("an action for conversion of money arises only where the money can be identified as a specific chattel, meaning it is (1) defined for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper"). As noted above, conversion and similar claims are subject to a two-year statute of limitations (Tex. Civ. Prac. & Rem. Code 16.003(a)). Acis cannot meet its burden of proving these requirements.

**C.** **Claims 5-25: All Avoidance Claims Should be Disallowed Because They Seek Recovery Under Section 550(a) of Amounts in Excess of Acis's Plan Obligations**

27.     Reorganized Acis will no doubt contend that it may prosecute avoidance claims and recover damages without regard to whether creditors are paid in full, because the company itself was damaged by the transfers. The argument is invalid and is based on a gross oversimplification of the law. Reorganized Acis stands in the shoes of old Acis, and debtors cannot recover transfers for their own benefit, except to the extent the recovery is effectively in payment of a claim. Acis has paid its creditors; in fact, it did so with money effectively recovered from the Debtor on one of the very claims it asserts here, by virtue of the Temporary Plan Injunction! Bankruptcy Code § 550 does not permit a debtor or anyone standing in the shoes of the debtor to recover another $75 million for the benefit of the debtor. ***This is a summary basis for disallowance of all avoidance claims alleged in Claims 5-25***.

28.     "Courts have consistently held that an avoidance action can only be pursued if there is some benefit to creditors and may not be pursued if it would only benefit the debtor." *Balaber-Strauss v. Harrison (In re Murphy)*, 331 B.R. 107, 122 (Bankr. S.D.N.Y.

App. 0573

2005) (citing *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991) (denying recovery "when the result is to benefit only the debtor rather than the estate")). Consistent with that principle, the Acis Plan provides that "the Reorganized Debtor shall have exclusive standing . . . to prosecute . . . Estate Claims *for the benefit of the Estate* . . . ." Acis Plan, § 7.03 (emphasis added). But a recovery of "at least $75 million" in damages demanded by Reorganized Acis will benefit only one person or entity, namely Mr. Terry, who bought the equity interests in the new Acis. Acis's creditors will have been paid in full; none are depending for their recovery on anything more than has already been recovered by means of the Temporary Plan Injunction. Mr. Terry is among those Acis creditors who will have been paid in full. He may claim that he acquired his equity interest in the new Acis in a debt for equity exchange, *i.e.*, by shaving $1 million off his $8.168 million claim, but that is not a recovery on behalf of his claim, but on behalf of the new equity that he bought. There is no substantive difference between discounting a hundred cent claim and a cash purchase. Even if there was, it would not justify such a windfall, much less at the expense of *the Debtor's creditors*. These include unsecured trade creditors, Redeemer, which has filed a proof of claim in respect of its arbitration award of $190,824,557 in damages as of the petition date, and UBS.

29. Restoring the pre-transfer equity value of the old Acis, after its creditors have been paid in full, and the equity to be "restored" is newly issued and purchased equity, is not the kind of "benefit to the estate" contemplated by *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 534 (5th Cir. 2012), as discussed below. There is no post-confirmation "estate" to benefit within the meaning of section 550(a). Unlike any decision

in which a recovery was found to at least indirectly benefit an estate, where, e.g., plan

obligations were unfulfilled, or even simply to boost equity value where creditors had received

new equity interests on account of their claims (as opposed to purchasing the new equity, as Mr.

Terry effectively did), there is no benefit to the estate here. Creditors were paid and Acis's

equityholders' interests were canceled under the Acis Plan, and with it their partnership, a

relationship that dissolved by operation of law upon the bankruptcy of their general partner, Acis

LLC.[12] There is only a new owner, Mr. Terry, who purchased the new equity under the Acis

Plan exactly as if it were sold at auction. There is no legal basis for Mr. Terry's attempt to stand

in the shoes of the preconfirmation partnership in order to recover more assets than necessary to

satisfy its liabilities.

30.     In fact, there is a triple irony to Reorganized Acis's demand: (i) first, Mr.

Terry is already the only person who was paid for his former equity interest in Acis (the value of

which was the main component of the Arbitration Award, for which he has been paid in full in

cash); (ii) second, the petition-date Acis equity holders (the persons who might have benefited

from Acis recovering its prepetition transfers if their interests had not been canceled) will not

---

[12] As a Delaware entity, Acis LP was governed by the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). DRULPA specifies six different events that trigger the dissolution of a Delaware limited partnership. Pertinent here, these include a withdrawal of the general partner "upon the happening of events specified in a partnership agreement...." Article 5 of the Acis LP Agreement,, captioned "Dissolution and Winding Up," provides that Acis LP "shall be dissolved" upon any of four events, which include the bankruptcy of the general partner (Sec. 5.01(a)). Here, the general partner was co-debtor Acis LLC. State law dissolution may be prevented by an election by the partners to continue the partnership, made within 90 days of the general partner's bankruptcy filing, but that did not occur. "Because these dissolution provisions have been adopted into the partnership law of almost every state, federal bankruptcy courts have generally enforced the UPA and RULPA dissolution provisions as incorporated in state law, and have held partnerships to be dissolved upon the filing of a bankruptcy petition by a general partner." Lawrence J. La Sala, *Partner Bankruptcy and Partnership Dissolution: Protecting the Terms of the Contract and Ensuring Predictability*, 59 Fordham L. Rev. 619, 621(1991) (citing cases) (available at: https://ir.lawnet.fordham.edu/flr/vol59/iss4/5).

only see none of any recovery, they or their affiliates are actually the ones being asked to pay it; *and* (iii) third, the only recipient of the $75 million would be Mr. Terry himself! Presumably, Mr. Terry purchased Reorganized Acis in anticipation of earning money managing assets while it paid Acis creditors; if he anticipated a $75 million return on his $1 million investment at the expense of the Debtor's creditors, it was a gross miscalculation, inconsistent with the law.

31.      *Mirant* is entirely consistent with the Debtor's position, and is not in derogation of the substantial body of authority holding that section 550 is subject to equitable limitations. In *Mirant*, the debtor had sued its lenders to avoid a guaranty and recover payments thereunder. Its plan of reorganization provided for the creation of a special litigation entity ("MCAR"). Unsecured creditors received Reorganized Mirant stock and an interest in MCAR's recoveries. The lender moved for summary judgment in part on the basis that creditors would be paid in full and so MCAR lacked standing. The district court found that MCAR had standing (while granting summary judgment on other grounds), ruling in part:

> Finally, and *most importantly, the fact that the creditors were paid in New Mirant stock confers standing on MCAR to pursue the avoidance action based on the indirect benefit to the creditors from a more financially sound estate*…. [S]ee also Acequia, 34 F.3d at 811-12 (discussing broad interpretations of 'benefit the estate' in context of avoidance actions and fact that equity stake to creditors results in benefit to estate)… *In the instant case, the creditors were paid in stock; thus, the prospect of a more financially sound estate would provide MCAR with standing*.

*Mirant*, 441 B.R. 791, 803 (N.D. Tex. 2010) (emphases added).

32.      The Fifth Circuit agreed with the district court's ruling on standing (while vacating on other grounds):

App. 0576

> A bankruptcy trustee may still have standing to avoid a fraudulent transfer after the unsecured creditors are satisfied in full. The fraudulent transfer injured the estate and § 550 ensures that the injury is redressed because a trustee may only avoid a transfer to the extent it benefits the estate. ***Therefore, to the extent that MCAR's successful avoidance of fraudulent transfers will benefit the bankruptcy estate, MCAR has Article III standing to avoid transfers that injured the estate***.

*Mirant*, 675 F.3d at 534 (emphasis added).

33.     This Court followed *Mirant* in the *Texas Rangers* case. The former debtor, Texas Rangers Baseball Partners ("TRBP") had sued its former ultimate parent, HSG Sports Group ("HSG"), to avoid obligations under an aircraft sharing contract signed on the eve of bankruptcy. TRBP had paid its creditors in full under a confirmed plan. HSG argued that TRBP therefore lacked standing as there would be no benefit to the estate from avoiding the contract. This Court observed *Mirant's* broad interpretation of "benefit to the estate," while noting two facts critical here: (1) the case at hand was for avoidance only, and not for recovery under section 550(a), and (2) TRBP still had obligations to lenders that had *not* been paid their entire prepetition indebtedness under the plan. On these facts, the Court found that TRBP had Constitutional standing to assert the fraudulent transfer claim because it would produce a plausible "benefit to the estate."

> *Mirant* makes clear that "benefit to the estate" does not hinge on whether a Chapter 5 action will result in a pool of assets being garnered for the benefit of unsecured creditors. Here, it is a matter of public record that the equity holders of TRBP have obligations to certain lenders that TRBP was also liable to. . . .
>
> Thus, to the extent the equities matter here, it would seem that such equities weigh in favor of finding there to be a plausible "benefit to

App. 0577

> the estate" argument articulated by TRBP. Accordingly, the court finds that here, TRBP does have Constitutional standing to assert a fraudulent transfer claim under section 548(a)(1)(A) of the Bankruptcy Code, even though unsecured creditors were paid in full under the Plan, and that the Avoidance Complaint should not be dismissed.

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 498 B.R. 679, 709 (Bankr. N.D. Tex. 2013).

34.     The great weight of authority, both pre- and post-*Mirant*, holds that recovery under section 550(a) is subject to a case-by-case analysis of the facts of the case and the equities. Section 550(a) provides that "the trustee may recover, ***for the benefit of the estate***, the property transferred, or, if the court so orders, the value of such property[.]" 11 U.S.C. § 550(a) (emphasis added).

> Under §550, courts have limited the recovery of pre-petition transfers on equitable principles in a manner consistent with the purposes of the Bankruptcy Code and §550, in particular. *See, e.g.*, *In re Sawran*, 359 B.R. 348, 353 (Bankr. S.D. Fla. 2007) (citing cases). For a concise discussion of the rationales for limiting recovery under 11 U.S.C. §550 based on equitable principles, see Robert B. Bruner and Gerard G. Pecht, The Unexplored Limits of Moore v. Bay: Statutory and Equitable Basis for Limiting Money Damage Awards on Fraudulent Transfer Claims, 26 J. Bankr. L. & Prac. NL Art. 2 (June 2017).

*Holber v. Nikparvar (In re Incare, LLC)*, Nos. 13-14926 ELF, 14-0248, 2018 Bankr. LEXIS 1339, at *35-36 (Bankr. E.D. Pa. May 7, 2018) (citing, among others, *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 481-82 (W.D. Tex. 2013)).

35.     *Duke Energy* is an instructive, post-*Mirant* decision from the district court in the Western District of Texas, noting that the power to avoid a transfer is not the same as the

App. 0578

power to recover under section 550(a) and holding that while the full amount of the fraudulent

transfer was legally avoidable, as per *Mirant*, the court could nonetheless consider "the equitable

impact of the Trust's potential recovery" and limit the recovery under section 550. *Id*. at 481-83.

36.     In *Duke Energy*, the Crescent Resources post-confirmation Trust sued to

avoid a 2006 spinoff transaction that allegedly rendered Crescent Resources insolvent while

Duke received $1.6 billion. The plan gave the original lenders all of the equity and allowed

unsecured claims for the $961 million difference between those claims and the value of their new

equity interests. The Plan also formed the Trust and authorized it to pursue claims against third

parties. The Trust had two classes of beneficiaries: Class A comprised creditors with $279

million in unrelated claims and Class B included the lenders with their $961 million in allowed

claims.

37.     Duke Energy defended in part on the basis that the original lenders entered

into the 2006 transaction knowing how the loan proceeds would be distributed, and should not

benefit from its avoidance. *Id*. at 478. The district court agreed, referring to *Mirant* and offering

the following section 550(a) analysis:

> There is precious little guidance from the Fifth Circuit on the scope
> of Section 550(a)'s "for the benefit of the estate" language. Other
> courts generally interpret the language broadly. *See In re Acequia,
> Inc.*, 34 F.3d 800, 811 (9th Cir. 1994); *In re Tronox Inc.*, 464 B.R.
> 606, 617 (Bankr. S.D.N.Y. 2012) (citing *Acequia*, 34 F.3d at 811).
> Still, there are numerous examples of cases where courts have
> denied or limited recovery based on the equitable principles
> underlying the Bankruptcy Code and Section 550(a) in particular.
> *See, e.g., Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991)
> (affirming district court's order holding debtor's avoidance action
> was not "for the benefit of" the estate); *In re Yellowstone Mountain
> Club, LLC*, 436 B.R. 598, 678 (Bankr. D. Mont. 2010) (refusing to

> award any recovery to the original lender who was complicit in the fraudulent transfer, as well as syndicate lenders "who have speculated on a monumental award against" the plaintiff); *In re Jackson*, 318 B.R. 5, 27-28 (Bankr. D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) (because "equity guards against windfalls in general," amount of recovery through Section 550(a) on a Section 544(b) claim may be equitably adjusted); *but see Tronox*, 464 B.R. at 614 (collecting cases interpreting Section 550(a) as setting "a minimum floor for recovery in an avoidance action," but not "any ceiling on the maximum benefits that can be obtained once that floor has been met").
>
> The one consistent vein traveling through all of these cases is the fact-specific nature of the inquiry. *See, e.g., Wellman*, 933 F.2d at 218 ("benefit of the estate" question requires "a case-by-case, fact-specific analysis"); *In re Murphy*, 331 B.R. 107, 121 (Bankr. S.D.N.Y. 2005) (limiting recovery under Section 550 based on the "extremely unusual" facts of the case). It is therefore instructive to consider the factual circumstances of this case, and the equitable impact of the Trust's potential recovery.
>
> * * *
>
> If the Trust is allowed to recover the $961 million of the term loan proceed transfer destined for the Class B creditors—a group of creditors who all derive their interest in the estate from the original lenders—the banks' high risk investment will pay off in the form of a massive windfall.

*Duke Energy*, 500 B.R. at 481-82. The district court concluded that there was "no equitable basis" for allowing a recovery to Class B creditors, and granted summary judgment in favor of Duke Energy.

38. Where this Court found the facts and equities in *Texas Rangers* to favor finding a "benefit to the estate," the facts and equities here point decisively to the opposite conclusion. By comparison, here: (1) Reorganized Acis is seeking not just to avoid obligations but to recover $75 million under section 550(a), (2) Acis's creditors will already have been paid in full at 102% (once Mr. Terry actually elects to pay creditors with the cash at Acis), (3) there

are *no* creditors relying on Reorganized Acis's equity or financial condition to recover on their

claims, (4) any recovery would come at the expense of the Debtor's unsecured creditors, and (5)

the person to receive the asserted $75 million windfall (*i.e.*, Mr. Terry) paid only $1 million to

purchase Acis's interests to take a flyer on this and related litigation. As the court stated in

*Blixseth v. Kirschner (In re Yellowstone Mt. Club, LLC)*, *supra*, 436 B.R. at 678 "the Court will

not at this time enter an order that would in any way benefit Credit Suisse, the Prepetition

Lenders or other parties who have speculated on a monumental award against Blixseth." *See*

*also Wellman, supra,* 933 F.2d at 219 (Fourth Circuit denied recovery where the plaintiff/debtor

"executed the non-recourse promissory notes to the creditors in an attempt to create a claim in

the estate so that he could obtain a "massive surplus recovery" for himself in addition to the

surplus distributed to him.").

   39. The facts here are firmly aligned with cases dealing with recoveries under

section 550(a) such as *Adelphia Recovery Trust v. Bank of America, N.A.,* 390 B.R. 80, 97

(S.D.N.Y. 2008), where the court found no benefit to the estate where all creditors were "paid in

full with interest under the Plans and no creditors have been issued shares" in the Adelphia

Recovery Trust. As noted, Mr. Terry did not receive the ownership interests in Acis in payment

of his claim against the Acis estate (for which claim he received or will receive 102% of his

claim amount); he purchased the debtor – Acis – for $1 million, and it is only Mr. Terry who

would benefit, not Acis's creditors, employees (there are none) or prior equity holders. "Courts

have consistently held that an avoidance action can only be pursued if there is some benefit to

creditors and may not be pursued if it would only benefit the debtor." *Balaber-Strauss v.*

*Harrison (In re Murphy)*, 331 B.R. at 122 (citing *Wellman*, *supra*, 933 F.2d at 218 (no recovery "when the result is to benefit only the debtor rather than the estate")).

40. Thus, under sections 548 and 550, "only net amounts diverted from, that is damages consequently suffered by the creditor body of, a debtor may be recovered via a fraudulent conveyance action." *In re Foxmeyer Corp.*, 296 B.R. 327, 342 (Bankr. D. Del. 2003). To do otherwise is solely to benefit the debtor (or, as here, the debtor's purchaser). That is inappropriate under either federal or state fraudulent transfer laws, as discussed at length in *Murphy*, 331 B.R. at 124-25. As a Minnesota bankruptcy court explained:

> Whether there is a benefit to the estate depends on a case-by-case, fact-specific analysis. [ ] This is not the usual case in which an increase in dollars to the estate results in a patent benefit to the estate. In this case, the increase in dollars to the estate which would result from the requested relief would not provide a benefit to the estate. In this case, the trustee has advised that the amount on hand for distribution from the estate already exceeds the total amount of estimated administrative expenses and all claims. Thus, in this case, the only party to benefit from avoiding and recovering the Transfer would be the debtor.
>
> Such a benefit to the debtor would be inappropriate. The provisions of MUFTA "protect creditors rather than transferors of debt." *See Bartholomew v. Avalon Capital Group, Inc.*, 828 F.Supp.2d 1019, 1025 (D. Minn. 2009). "Only creditors are entitled to remedies under the UFTA." *Id.*, *citing* Minn. Stat. §§ 513.47, 513.48(b).

*Running v. Dolan (In re Goodspeed)*, 535 B.R. 302, 315-16 (Bankr. D. Minn. 2015). Noting that trustees are the exception since they sue on behalf of creditors, the court observed that nonetheless there must be a benefit to creditors, citing and extensively quoting *Murphy* and *Wellman*, *supra*.

App. 0582

41. To permit any recovery under section 550(a) beyond the amount needed to pay creditors would create a new duty under state law. Acis's former equity holders, as its sole owners, had no duty under applicable state law *to Acis*, or anyone else other than creditors, to refrain from making the transfers at issue, nor did the Debtor or any of the other related entities or professionals who are now litigation targets have any right or obligation to stop them. Thus in a trustee's lawsuit against former partners of a debtor partnership, in which the trustee alleged in part that the partners had conspired to "set into motion a series of transactions that crippled [the debtor partnership]," the district court for the Southern District of Texas explained and held in part:

> Delaware law is clear that a company's sole owner cannot breach fiduciary duties "owed to the companies he wholly owned." *See Midland Food Services, LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, n. 14 (Del. Ch. 1999) (citing *Goodman v. Futrovsky*, 42 Del. Ch. 468, 213 A.2d 899, 902 (1965) (the defendants could not defraud company since they "were the sole owners . . . and could do with it as they wished"), cert denied, 383 U.S. 946, 86 S. Ct. 1197, 16 L. Ed. 2d 209 (1966). ***Tow has not cited legal support for the proposition that a nonowner can be liable for conspiring with the sole owner of a partnership for breaching duties that the owner owes himself***.

*Tow v. Amegy Bank N.A.*, 976 F. Supp. 2d 889, 906-07 (S.D. Tex. 2013) (emphasis added). *See also Newman v. Toy*, 926 S.W.2d 629, 631 (Tex. App.-Austin 1996, writ denied) ("A sole shareholder or all shareholders acting in agreement, being all the beneficial owners of corporate property, may themselves deal with such property so long as the rights of creditors are not prejudiced ...").

42.     Accordingly, any recoveries of the transfers sought to be avoided in the Acis Claim should be limited to any amount needed to satisfy obligations under the Acis Plan, that is to say, to pay creditors and administrative claimants in full.  No creditors have a stake in restoring Acis to the financial condition it occupied prior to any of the transfers that are the subject matter of the Acis Claim, at least not on account of any unpaid claims.  Upon payment of creditors in full under the Acis Plan, therefore, all avoidance claims should be dismissed as moot, and the only thing stopping the avoidance claims from actually being moot is Mr. Terry's unwillingness to pay Acis's creditors with the cash at Acis.

**D.     Acis is Barred Under the *Bangor Punta* Doctrine From Asserting For Its Own Benefit All Claims Not Asserted Pre-Acquisition – Claims 1-8 and 21-34 – Excepting Only Claims Related to the ALF PMA Transfer (Claims 9-12), the ALF Share Transfer (Claims 13-16), and the Note Transfer (Claims 17-20)**

43.     In *Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 94 S. Ct. 2578, 2584-85 (1974); the Supreme Court held that a stockholder who has purchased all or substantially all of the shares of a corporation from a vendor at a fair price may not seek to have the acquired corporation recover against the vendor for prior corporate mismanagement and waste of corporate assets that may have occurred during the prior vendor's ownership.  *Bangor Punta*, 417 U.S. at 710.  "What the *Bangor Punta* Doctrine does prohibit is purchasers . . . from accepting their end of the bargain - - ownership and control of the corporation - - and attempting to sweeten their end of the deal by suing the seller to recover damages to the corporation allegedly caused by the seller before the sale.  The *Bangor Punta* Doctrine properly prohibits as

inequitable such attempts at re-trading commercial transactions through litigation. *Midland Food Servs., LLC v. Castle Hill Holdings V, L.L.C.*, 792 A.2d 920, 933-34 (Del. Ch. 1999). The nature of the claim does not matter. *Id*. at 930.

44.     The doctrine does not apply to claims brought for the benefit of creditors. *Bangor Punta*, 417 U.S. at 715 (rejecting argument that plaintiff-corporation should be entitled to recovery since any recovery would benefit the public where the plaintiff-corporation "would be entitled to distribute the recovery in any lawful manner it may choose"); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 508 (N.D. Ill. 1988) (permitting debtor in possession to assert breach of fiduciary claim but only to extent of creditor injury – "The creditors cannot receive a "windfall" recovery, but may recover only to the extent of their claims."). *Cf. Meyers v. Moody*, 693 F.2d 1196, 1207 (5th Cir. 1982) (*Bangor Punta* doctrine inapplicable to suit brought by receiver for benefit of creditors); *Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 185 (Bankr. W.D. Tex. 2015) (doctrine inapplicable where "Plaintiff Trust was created by a confirmed plan of reorganization in the Think3 bankruptcy case for the purpose of bringing suits for the benefit of creditors of insolvent Think3.").

45.     The doctrine also does not apply to claims that were pending when the acquisition occurred. *Meyers v. Moody*, 693 F.2d at 1208 ("Moody is thus urging us to extinguish a cause of action that both existed and was pursued long before the transfer of Empire's assets took place. Neither law nor equity permits us to do so."); *TNS Media Research, LLC v. TiVo Research & Analytics, Inc.*, 193 F. Supp. 3d 307, 312 (S.D.N.Y. 2016) ("Once

brought, a claim is not released merely and necessarily based on a change in corporate ownership.").

46.     Mr. Terry agreed to purchase Acis's equity on July 5, 2018 and the Acis Plan was confirmed on January 1, 2019.  The only claims pending at either time were those asserted by the Acis trustee in his counterclaim filed on July 2, 2018 (Acis Adversary No. 18-03078, at Docket No. 23).  That counterclaim asserted only fraudulent transfer claims for (1) the ALF Share Transfer, (2) the ALF PMA Transfer, and (3) the Note Transfer (all as described below).  Acis's amended complaint, asserting for the first time *all other claims* asserted in the Acis Claim, all of which relate to other transactions, was filed on ***June 20, 2019***.  The *Bangor Punta* doctrine, therefore, bars all claims other than Claims 9-20.

**E.    Claims 5-8: Fraudulent Transfer Claims - Sub-Advisory Agreement Modifications**

47.     Claims 5 through 8 are claims to avoid as fraudulent transfers and recover unspecified damages based on modifications to the Sub-Advisory Agreement by and between Acis LP and the Debtor dated January 1, 2011.  The modifications were made on July 29, 2016, and raised the Debtor's rates from 5 to 20 basis points.  Those claims are: (5) for actual fraudulent transfer under section 548; (6) for actual fraudulent transfer under section 544(b) and Texas law; (7) for constructive fraudulent transfer under section 548; and (8) for constructive fraudulent transfer under section 544(b) and Texas law.

48.     There are numerous bases on which Claims 5-8 can and should be disallowed entirely, some on a summary basis and others for which further factual development would be required, as follows:

App. 0586

a.     As set forth above, Acis is not entitled to any recovery beyond that required to satisfy obligations under the Acis Plan.  The Debtor believes this issue can be summarily adjudicated at this time.

b.     The claims are barred by the *Bangor Punta* doctrine, which can be summarily adjudicated at this time.

c.     In addition, the Debtor objects to these claims on the following grounds, which are not subject to summary adjudication at this time:

(1)     Acis cannot meet its burden of proving insolvency at the time of the modifications.  In fact, Acis clearly was solvent at that time.  Expert testimony will be required on this issue.

(2)     Acis received reasonably equivalent value for the modifications, in that the rates had been maintained at artificially low levels during Mr. Terry's tenure, and as modified represented reasonably equivalent value for the services rendered thereunder.  In fact, the revised rates are similar to what Brigade is currently charging Acis.

(3)     The modifications, which were made prior to the commencement of litigation and which had a legitimate purpose and justification, were not undertaken to hinder or defraud creditors.

(4)     Acis has not alleged damages.  The modifications gave rise to, at most, an avoidable *obligation*, not a *transfer*, and the obligation potentially subject to avoidance was rejected by

the Acis trustee and approved by an order of the Court. To the extent that Acis alleges that payments made at the modified rates were fraudulent transfers, the Debtor maintains, as alleged above, that the rates as modified constituted reasonably equivalent value for the services rendered.

(5) The Debtor will have a claim in the Acis Case under Bankruptcy Code § 502(h) with respect to any property recovered on account of this claim.

## F. **Claims 9-24: Acis Has Not Alleged Facts Sufficient to Show That the Debtor is the Entity for Whose Benefit the Transfers Were Made**

49. Acis claims that with respect to each alleged avoidable transfer, the Debtor was either the initial transferee or the entity for whose benefit it was made, from which the property transferred or its value may be recovered under federal or state law.[13]

50. Acis concedes, as it must, that *the Debtor was not the initial transferee of the transfers alleged in Claims 9 through 24*. As to those claims, Acis has failed to allege facts sufficient to establish, if proven, that the Debtor was "the entity for whose benefit such transfer was made." This defense can be summarily adjudicated at this time.

---

[13] Section 550(a) provides that with respect to a transfer that is avoided under sections 544, 545, 547, 548, 549, 553(b), or 724(a), "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) *the initial transferee of such transfer or the entity for whose benefit such transfer was made*[.]" 11 U.S.C. § 550(a)(1). Texas law is similar. *See Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.2d 74, 79-80 (Tex. App. 2012) ("the creditor may obtain a monetary judgment against the transferee of the asset, the person for whose benefit the transfer was made, or subsequent transferees." (citing Tex. Bus. & Com. Code § 24.009(b)). Other than with respect to the sub-advisory agreement modifications, the Debtor is not alleged to have been either an immediate or subsequent transferee of any of the allegedly improper transfers, for purposes of Bankruptcy Code § 550(a) and Tex. Bus. & Com. Code § 24.009(b) (referencing the "first transferee" and "any subsequent transferee").

App. 0588

51.     Specifically, Acis has not identified any specific, direct benefit to the
Debtor from the fraudulent transfers alleged in Claims 9-24.  It only alleges an indirect benefit to
the Debtor from being part of the Highland corporate group.  But any transaction by a corporate
group member commonly has indirect benefits for other group members, which is why as a
matter of law it is insufficient simply to allege an amorphous benefit for the Debtor to be deemed
a beneficiary of the putative fraudulent transfers under § 550.  *See, e.g., Faulkner v. Kornman (In
re Heritage Org., LLC)*, 413 B.R. 438, 495-96 (Bankr. N.D. Tex. 2009) (Judge Houser) ("an
unquantifiable advantage" is not a "benefit" for purposes of § 550(a); liability will not be
imposed upon a party that allegedly benefitted from the fraudulent transfer just because
defendant had controlled debtor-transferor and directed the transfer; "There is simply no showing
that Kornman [who allegedly benefitted] received any benefit at all from the initial transfers.");
*Peterson v. Hofmann (In re Delta Phones, Inc.)*, 2005 Bankr. LEXIS 2550, *16-*17 (Bankr.
N.D. Ill. Dec. 23, 2005) ("That a shareholder holds some ownership interest in a corporation
does not somehow mean that all transfers made to the corporation or by it are automatically
made for the 'benefit' of the shareholder under § 550(a)(1).  The 'entity' under § 550(a)(1) must
benefit from the transfer 'directly,' not indirectly…. Taken to its logical conclusion, Peterson's
position would put average investors on the hook for all kinds of corporate transactions any time
a public company sought bankruptcy protection."); *see also In re Peregrine Fin. Group, Inc.*,
589 B.R. 360 (Bankr. N.D. Ill. 2018) ("the [defendant] cannot be the transfer beneficiary if it will
get the benefit of the funds sometime later"; "[T]he [defendant] received no direct benefit at the

App. 0589

time the transfer was made. It had only the right to benefit from the funds in the future after

[certain fees were deducted, other requirements were met, and funds were still available].").

52. Accordingly, Reorganized Acis has not alleged facts sufficient to

establish, even if proven, that the Debtor was "the entity for whose benefit such transfer was

made" with respect to the transfers alleged in Claims 9-24.

### G.  Claims 9-12: Fraudulent Transfer Claims - ALF PMA Transfer

53. Acis alleges that its rights to direct and effectuate an optional redemption

and otherwise control the assets of Acis Loan Funding Ltd. ("ALF"), pursuant to a Portfolio

Services Agreement dated August 10, 2015, and a Portfolio Management Agreement dated

December 22, 2016, by and between Acis and ALF (together, the "ALF PMA"), had value and

were transferred for no value to Highland HCF Advisor in October 2017.  The corresponding

claims for relief are: (9) actual fraudulent transfer under section 548; (10) actual fraudulent

transfer under section 544(b) and Texas law; (11) constructive fraudulent transfer under section

548; and (12) constructive fraudulent transfer under section 544(b) and Texas law.  Acis seeks to

avoid the transfer and recover unspecified damages.

54. ***Acis fails to address the fact that it has been exercising the rights that it***

***alleges were transferred and has been deriving earnings under the ALF PMA since the***

***preliminary and plan injunctions were issued in the Acis Case, in an amount sufficient to***

***satisfy all claims against it***.  That is, the alleged transfers had no economic effect as Acis

retained all rights under the contracts.  Accordingly, the Debtor objects on the following bases to

Claims 9-12:

App. 0590

     a.    As set forth above, Acis is not entitled to any recovery beyond that required to satisfy obligations under the Acis Plan. The Debtor believes this issue can be summarily adjudicated at this time.

     b.    As set forth above, the Debtor was not the transferee of the ALF PMA Transfer and an insufficient factual basis is alleged to conclude that it was the entity for whose benefit the transfer was made. The Debtor believes this issue can be summarily adjudicated at this time.

     c.    In addition, the Debtor objects to these claims on the following grounds, which are not subject to summary adjudication at this time:

     (1)    Acis cannot meet its burden of proving insolvency at the time of the transfer. Expert testimony will be required on this issue.

     (2)    Acis received reasonably equivalent value for the transfer.

     (3)    The transfer had a legitimate purpose and justification, and was not undertaken to hinder or defraud creditors.

     (4)    Acis has not alleged damages. In fact, Acis has continued to exercise rights and derive earnings under the ALF PMA pursuant to injunctive relief granted in the Acis Case.

     (5)    The Debtor will have a claim in the Acis Case under Bankruptcy Code § 502(h) with respect to any property recovered on account of this claim.

App. 0591

## H.     Claims 13-16: Fraudulent Transfer Claims - ALF Share Transfer

55.     Acis alleges that on October 24, 2017, Acis and CLO Holdco Ltd. entered into a resolution whereby Acis sold its equity interest in ALF (the "ALF Share Transfer") to Highland Funding for $991,000.  The 13th through 16th claims for relief are: (13) actual fraudulent transfer under section 548; (14) actual fraudulent transfer under section 544(b) and Texas law; (15) constructive fraudulent transfer under section 548; and (16) constructive fraudulent transfer under section 544(b) and Texas law.  Acis seeks to avoid the ALF Share Transfer and recover unspecified damages.

56.     The Debtor submits that there are numerous bases for disallowance of Claims 13-16 in the entirety:

a.     As set forth above, Acis is not entitled to any recovery beyond that required to satisfy obligations under the Acis Plan.  The Debtor believes this issue can be summarily adjudicated at this time.

b.     As set forth above, the Debtor was not the transferee and an insufficient factual basis is alleged to conclude that it was the entity for whose benefit the transfer was made.  The Debtor believes this issue can be summarily adjudicated at this time.

c.     In addition, the Debtor objects to these claims on the following grounds, which are not subject to summary adjudication at this time:

(1)     Acis cannot meet its burden of proving insolvency at the time of the transfer.  Expert testimony will be required on this issue.

App. 0592

(2)     Acis received reasonably equivalent value for the transfer, as the repurchase price was at their net asset value.

(3)     The transfer had a legitimate purpose and justification, and was not undertaken to hinder or defraud creditors.

(4)     Acis has not alleged damages.  In fact, Acis has continued to control and derive earnings from these assets by means of the ALF PMA pursuant to injunctive relief granted in the Acis Case.

(5)     The Debtor will have a claim in the Acis Case under Bankruptcy Code § 502(h) with respect to any property recovered on account of this claim.

## I.     Claims 17-20: Fraudulent Transfer Claims – Note Transfer

57.     Acis alleges that on November 3, 2017, Acis LP, the Debtor, and Highland Management (a Debtor affiliate) entered into an *Agreement for Assignment and Transfer of Promissory Note* (the "Note Transfer Agreement"), by which Acis transferred a $9.5 million promissory note owed by the Debtor to Acis (the "Note") to Highland CLO Management for no material value.  Based thereon it pleads the 17th through 20th claims for relief: (17) actual fraudulent transfer under section 548; (18) actual fraudulent transfer under section 544(b) and Texas law; (19) constructive fraudulent transfer under section 548; and (20) constructive fraudulent transfer under section 544(b) and Texas law.  Acis seeks to avoid the transfer and recover unspecified damages.

58.     Not only did the Debtor not receive the Note, it remains liable!  For this and other reasons, the Debtor objects to Claims 17-20 on the following bases:

App. 0593

a.    Since the Debtor did not receive the Note, and indeed remains liable on the Note, it is certainly not the entity for whose benefit it was made. This issue can be summarily adjudicated at this time.

b.    As set forth above, Acis is not entitled to any recovery beyond that required to satisfy obligations under the Acis Plan. This issue can be summarily adjudicated at this time.

c.    In addition, the Debtor objects to these claims on the following grounds, which are not subject to summary adjudication at this time:

(1)    Acis cannot meet its burden of proving insolvency at the time of the transfer. Expert testimony will be required on this issue.

(2)    Acis received reasonably equivalent value for the transfer.

(3)    The transfer had a legitimate purpose and justification, and was not undertaken to hinder or defraud creditors.

(4)    Acis has not alleged damages.

(5)    The Debtor will have a claim in the Acis Case under Bankruptcy Code § 502(h) with respect to any property recovered on account of this claim.

## J.    Claims 21-24: Fraudulent Transfer Claims – Acis CLO 2017-7 Agreement

59.    Acis alleges that on December 19, 2017, it entered into an *Agreement for Assignment and Transfer* (the "CLO 2017-7 Agreement") by which it transferred its interests in sub-advisory and services agreements relating to Acis CLO 2017-7, by which it derived fees, to

Highland CLO Holdings (a Debtor affiliate) for no consideration, and also its indirect equity interests in the underlying CLO (the "2017-7 Equity") in exchange for the forgiveness of $2.8 million payable owed by Acis to the Debtor. Based thereon Acis pleads the 21st through 24th claims for relief: (21) actual fraudulent transfer under section 548; (22) actual fraudulent transfer under section 544(b) and Texas law; (23) constructive fraudulent transfer under section 548; and (24) constructive fraudulent transfer under section 544(b) and Texas law. Acis seeks to avoid the transfer and recover unspecified damages.

60. The Debtor submits that Claims 21-24 can and should be disallowed on the following bases:

a. As set forth above, Acis is not entitled to any recovery beyond that required to satisfy obligations under the Acis Plan. This issue can be summarily adjudicated at this time.

b. As set forth above, the Debtor was not the transferee and an insufficient factual basis is alleged for a conclusion that it was the entity for whose benefit the transfer was made. This issue can be summarily adjudicated at this time.

c. The claims are barred by the *Bangor Punta* doctrine, which can be summarily adjudicated at this time.

d. In addition, the Debtor objects to these claims on the following grounds, which are not subject to summary adjudication at this time:

(1)     Acis cannot meet its burden of proving insolvency at the time of the transfer.  Expert testimony will be required on this issue.

(2)     The Debtor did not receive any benefit from the transfer and so is not the entity for whose benefit the transfer was made.

(3)     Acis received reasonably equivalent value for the transfer.

(4)     The transfer had a legitimate purpose and justification, and was not undertaken to hinder or defraud creditors.

(5)     Acis has not alleged damages.

(6)     The Debtor will have a claim in the Acis Case under Bankruptcy Code § 502(h) with respect to any property recovered on account of this claim.

**K.      Claim 25: Preferences**

61.     Acis alleges that within one year of the Petition Date, the Debtor received payments of totaling $16,113,790.14 from Acis on account of purported debt claims owed by Acis, comprised of approximately $7.3 million pursuant to the Shared Services Agreement and Sub-Advisory Agreement (the "Service Payments"), over $5 million pursuant to an October 2016 Participation Purchase Agreement (the "Participation Payments"), approximately $3.3 million in promissory note repayments (the "Note Payments"), and approximately $118,000 for miscellaneous expense reimbursements ("Expenses").

62.     Acis's 25th claim for relief alleges that if such transfers are not otherwise recoverable, they may be avoided and recovered as preferences under Bankruptcy Code § 547 and Texas Business and Commerce Code §§ 24.006(b) and recovered under Bankruptcy Code § 550.  Acis also alleges that the 2017-7 Equity Transfer and the Note Transfer, to the extent they satisfied legitimate obligations, are avoidable as preferences.

63.     Setting aside the many statutory defenses to these claims set forth below, the fact that Acis creditors are being paid in full is fatal to the preference claim.  Acis tries to sidestep one consequence by asserting that whether a creditor would receive more in liquidation is measured as of the petition date.  But there are at least two other consequences.  One, as discussed, is that Acis cannot recover damages for its own benefit, once creditors are paid.  The other is that the Debtor would receive on account of any preference recovery a general unsecured claim under the Acis Plan under Bankruptcy Code § 502(h), which would offset any liability *in full*.  The Debtor objects to Claim 25 on those bases and others, as follows:

a.      As set forth above, Acis is not entitled to any recovery under section 550(a) on the alleged preferences beyond that required to satisfy obligations under the Acis Plan.  This issue can be summarily adjudicated at this time.

b.      The claims are barred by the *Bangor Punta* doctrine, which can be summarily adjudicated at this time.

c.      Acis has not alleged a factual basis for its allegation that it was insolvent at the time of the transfers.  This is a pleading requirement.

App. 0597

       d.      Acis has not alleged the existence of antecedent debts, also a pleading requirement.

       e.      In addition, the Debtor objects to this claim on the following grounds, which are not subject to summary adjudication at this time:

      (1)     Acis cannot meet its burden of proving insolvency at the time of the transfers. Expert testimony will be required on this issue.

      (2)     Acis cannot meet its burden of proving that each transfer enabled the Debtor to receive more than it would have received in a hypothetical chapter 7 liquidation.

      (3)     The Debtor will have a claim in the Acis Case under Bankruptcy Code § 502(h) with respect to any property recovered on account of this claim.

      (4)     Within the meaning of section 547(c)(1), each alleged transfer was intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and was in fact a substantially contemporaneous exchange, including without limitation all Service Payments and Expenses.

      (5)     Within the meaning of section 547(c)(2), each alleged transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee; or made according to ordinary business terms, including without

limitation all Service Payments, all payments under
Participation Payments, all Note Payments, and all
Expenses.

(6)     Within the meaning of section 547(c)(4), each alleged
transfer was made to or for the benefit of a creditor, to the
extent that, after each such transfer, such creditor gave new
value to or for the benefit of the debtor—(A) not secured
by an otherwise unavoidable security interest; and (B) on
account of which new value the debtor did not make an
otherwise unavoidable transfer to or for the benefit of such
creditor, including without limitation all Service Payments,
Participation Payments, and Expenses.

(7)     Participation Payments were received as a mere conduit.

(8)     Any recovery on account of the alleged preferences would
be offset by a corresponding general unsecured claim under
the Acis Plan under Bankruptcy Code § 502(h).

## L.     Claim 26: Liability Under Section 550(a)

64.     Acis alleges that the Debtor is the initial transferee within the meaning of

Bankruptcy Code § 550(a) of all transfers sought to be avoided in Counts 5 – 8 and 25, and that

it is the entity for whose benefit the transfers were made with respect to the transfers sought to be

avoided in Counts 9-24.

a.     Claim 26 can and should be disallowed in its entirety, on a

summary basis.  First, by operation of the statute, there is no liability under section 550 if no

transfers are avoided. Second, as discussed in Section E above, Acis concedes the Debtor was

not the initial transferee of the transfers alleged in Claims 9 through 24, and it has not alleged

facts sufficient to establish, if proven, that the Debtor was "the entity for whose benefit such

transfer was made." Specifically, it has not identified any specific, direct benefit to the Debtor

from the fraudulent transfers alleged in Claims 9-24. It only posits an indirect benefit from being

part of the Highland corporate group, which is inadequate to establish that an entity is the entity

for whose benefit a transfer was made. Finally, all claims other than Claims 9-20 are barred by

the *Bangor Punta* doctrine.

## M.  **Claim 27: Civil Conspiracy to Commit Fraud, Including Fraudulent Transfers**

65.     Acis alleges that the Debtor, Highland Advisor, Highland Management,

and Highland Holdings formed a conspiracy to "engage in a series of fraudulent transfers and

other fraudulent schemes, including the ALF PMA Transfer, the ALF Share Transfer, the Note

Transfer, the 2017-7 Equity transfer, the 2017-7 Agreements transfer and the thwarted

Universal/BVK Agreement transfer in order to denude Acis's assets and take over Acis LP's

valuable business." Acis Claim, ¶ 246.

66.     This claim fails as a matter of law, and can be adjudicated at this time. It

is an impermissible end-around section 550's remedial provisions, and the inconvenient fact that

the Debtor did not receive a cognizable benefit thereunder with respect to most of the fraudulent

transfer claims. Section 550 provides the exclusive remedy for fraudulent transfers. Partly for

that reason, there is simply no substantive legal basis for the sinister allegations of "unlawful,

overt acts" to "take over Acis LP's valuable business" upon which the "conspiracy" is

predicated. As discussed above, the law is crystal clear that Acis's equity holders had no duty to

Acis *not* to 'take over its valuable business' and nobody had a duty to stop them from doing so,

as the Southern District of Texas court discussed thoroughly in *Tow v. Amegy Bank N.A.*, *supra*,

976 F. Supp. 2d at 906-07. They owned all of it! The only thing they could not do is transfer

assets without adequate consideration if Acis were insolvent. For that, there are statutory

remedies prescribed by sections 548 and 550.

          67.     That is why no claim for conspiracy to commit an actual or constructive

fraudulent transfer (or for "aiding and abetting") exists under Texas or federal law. *Tow v.*

*Bulmahn*, No. 15-3141, 2016 U.S. Dist. LEXIS 57396, at *91 (E.D. La. Apr. 29, 2016). *See*

*Mack v. Newton*, 737 F.2d 1343, 1357 (5th Cir. 1984) ("[T]he general rule under the Bankruptcy

Act is that one who did not actually receive any of the property fraudulently transferred (or any

part of a 'preference') will not be liable for its value, even though he may have participated or

conspired in the making of the fraudulent transfer (or preference)."); *Schlossberg v. Abell (In re*

*Abell)*, 549 B.R. 631, 667 (Bankr. D. Md. 2016). A party may not be liable for more than it

actually received. *D.A.N. Joint Venture III, L.P. v. Touris*, No. 18-cv-349, 2020 U.S. Dist.

LEXIS 51407, at *25-26 (N.D. Ill. Mar. 25, 2020) ("Numerous courts have held that the

bankruptcy court cannot invoke state law remedies to circumvent or undermine the remedy

legislated by Congress for the avoidance of a fraudulent transfer . . . . [T]he trustee's remedy for

an avoided transfer [is] provided for in § 550, and that provision only allows a trustee to recover

up to the amount of the transfer.") (citations omitted). Allowing a trustee to recover more than

the amount of the transfer would "lead to a result that expands the remedies [for a fraudulent

transfer] beyond §550." *Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003).

68.     This Court recognized but distinguished *Mack* in *Milbank v. Holmes (In re TOCFHBI, Inc.)*, 413 B.R. 523, 535 (Bankr. N.D. Tex. 2009):

> [W]hile it is perfectly true that "the general rule under [the Bankruptcy Code or the old Act] is that one who did not actually receive any of the property fraudulently transferred (or any part of a 'preference') will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer (or preference)," (*Mack v. Newton,* 737 F.2d at 1357), the Chapter 7 Trustee, in this case, is not moving under the fraudulent transfer statute and arguing something amazingly similar such as "conversion" and "conspiracy" regarding the same acts--and, in the process, joining Defendants who would not normally have liability under the relevant fraudulent transfer statutes.

*Id*. at 535-36. "). The Court recognized that "liability [under most states' uniform fraudulent transfer acts] cannot be imposed on non-transferees under aiding and abetting or conspiracy theories[.]" *Id*. (citation omitted). Accordingly, the claim should be disallowed.

69.     Further, this claim is barred by the *in pari delicto* defense, as discussed below in the discussion of the Thirtieth Claim for Breach of Fiduciary Duty. Acis was by its own allegations an instrumentality of Dondero, who allegedly used it to perpetrate the "scheme" characterized in the Acis Complaint. The trustee was, and Reorganized Acis is, subject to all defenses that existed against Acis. Any claim by Acis against its alleged co-conspirators would be barred by *in pari delicto*, as Acis was at least equally culpable in all of the conduct it alleges.

70.     Finally, the claim is barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry, the acts occurred prior to Mr. Terry's acquisition of

App. 0602

the company, and this claim was not asserted in the Acis trustee's counterclaim that was pending

when Mr. Terry acquired the company.

**N.**     **Claim 28: Tortious Interference with the Universal/BVK Agreement**

71.     Acis alleges that the Debtor tortiously interfered with its rights by seeking

to replace it as manager under the Agreement for the Outsourcing of Asset Management between

Acis LP and Universal-Investment-Luxembourg S.A. by which Acis provided sub-advisory

services for a German fund (the "Universal/BVK agreement"), before and after the Debtor's sub-

advisory services were terminated on August 1, 2018.

72.     Claim 28 can and should be summarily disallowed, as there is no factual

dispute on several critical issues: (1) this was an at-will contract; (2) the Debtor had no duty not

to compete; and (3) no damages were sustained, as the contract was not terminated and all

attorneys' fees have been paid, in fact, with money diverted from the Debtor.

73.     Under Texas law, a claim for tortious interference with contract has four

elements: (1) a contract subject to the alleged interference exists; (2) the alleged act of

interference was willful and intentional; (3) the willful and intentional act proximately caused

damage; and (4) actual damage or loss occurred. *Victoria Bank & Trust Co. v. Brady*, 811

S.W.2d 931, 939 (Tex.1991).  Those requirements are not met on the undisputed facts.

74.     The Universal/BVK agreement was an at-will contract.  "Ordinarily,

merely inducing a contract obligor to do what it has a right to do is not actionable interference."

*ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).  A defendant cannot

tortiously interfere with a contract that permits the non-plaintiff contracting party to terminate

the agreement, where the defendant's actions constitute justifiable competition. *See, e.g., C.E. Servs. Inc. v. Control Data Corp*., 759 F.2d 1241, 1248 (5th Cir. 1985); *West Tex. Gas v. 297 Gas Co*., 864 S.W.2d 681, 686 (Tex. App. 1993) (competitor had legal right to persuade company to exercise its right to terminate at-will natural gas sale/purchase agreement with plaintiff). "[A] legal justification or excuse, which is treated as a type of privilege, is an affirmative defense to a claim of tortious interference…. Interference with a contractual relationship is privileged where it results from the bona fide exercise of a party's own rights."; "North Texas had the legal right to persuade or attempt to persuade 297 to exercise its right to terminate the 1988 agreement and to contract with it." *Id*.

75.     Once again, until displaced, Acis's owners had every right to do as they wished with the Universal/BVK Agreement, subject to creditor rights but not subject to any duty *to Acis* to refrain from doing so, and the Debtor had no duty to say otherwise. After the Debtor was terminated, it had a right as a competitor to attempt to win back its business. The contention that it should have stopped after the Acis bankruptcy petition is the subject of a different claim. Further, "[t]he alleged interference generally must have induced a breach of the contract to be actionable." *Official Brands, Inc. v. Roc Nation Sports, LLC*, 2015 U.S. Dist. LEXIS 167320, at *7 (N.D. Tex. Dec. 15, 2015). Here, that is not even alleged to have occurred.

76.     Further, no damages were sustained. The contract was not terminated, and to the extent the alleged damages are administrative expenses incurred in the Acis case, not only have they been paid, they have been paid by the Debtor by virtue of the earnings derived from the enjoined putative transfer of the ALF PMA.

77. Finally, the claim is barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and all acts occurred prior to Mr. Terry's acquisition of the company.

78. Accordingly, no claim for tortious interference has been stated, and the claim is barred in any event, and so it should be disallowed.

O.  **Claim 29: Breach of the Sub-Advisory Agreement and Shared Services Agreement**

79. Acis claims that the Debtor breached these agreements by failing to purchase and attempting only to sell loans for the CLOs, in order to liquidate Acis for the benefit of the Debtor and the detriment of Acis. This claim should be dismissed.

80. The Debtor met its standard of care but, moreover, there is a more fundamental fallacy that is instantly fatal to this claim. As discussed, here and throughout the Acis Claim, Acis sets up a fictional jurisprudential world in which it, by virtue of its existence as a legal entity, had interests that contracting parties or managers or professionals were required to identify and protect, rather than acting as instructed by Acis's owners. It did not and they did not. The Debtor was entitled to take directions from Acis's owners. Put differently, there is no allegation whatsoever that Acis did not want the Debtor to do exactly what it did. *Ipso facto*, the Debtor did not breach the contract. The claim must be dismissed.

81. Finally, the claim is barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and all acts occurred prior to Mr. Terry's acquisition of the company.

App. 0605

### P.     Claim 30: Breach of Fiduciary Duty

82.     Acis claims that the Debtor owed it a fiduciary duty pursuant to the Sub-Advisory Agreement as its investment adviser, and that it breached that fiduciary duty by acting in a manner detrimental to Acis by increasing its fees under the Sub-Advisory Agreement, charging over-market rates in excess of the compensation limits of the Acis LPA, and being the "ringleader" and ultimate beneficiary of schemes to render Acis judgment-proof by transferring the ALF PMA, the ALF Shares, the Note, the 2017-7 Equity and the 2017-7 Agreements. Acis makes no damage allegations but seeks punitive damages.

83.     This claim can and should be summarily disallowed. ***First, the duty to Acis was contractual, not fiduciary***. The Debtor as portfolio manager had fiduciary duties ***to investors*** in the CLOs, but its duties to Acis were governed by the Shared Services Agreement which, construed with the Sub-Advisory Agreement, provides that the Debtor was an independent contractor with only a contractual obligation to act with reasonable care and no other obligations or duties.

84.     ***Second, regardless***, even if the Debtor had a fiduciary duty to Acis, it could not and did not violate that fiduciary duty by following directions from Acis's sole owners. As discussed in the authorities and analysis above, such a claim is a legal impossibility. At all relevant times, Acis was by its allegations controlled and principally owned by Dondero and Okada, along with all of the other Highland related entities. It is hornbook law that sole owners do not have a fiduciary duty to their company; they could transfer away its assets without violating any duty to their company. How, then, would advisors and employees and

App. 0606

professionals go about protecting the interests of an entity such as Acis against the "ravages" of

an owner such as Dondero, who had no such duty? The owners had a right, subject to fraudulent

transfer laws, to direct Acis and transfer assets as desired. Acis did not, simply by virtue of its

existence alone, have interests distinct from its owners' interests that its fiduciaries were

obligated to somehow identify and protect against the designs of its sole owners. No duty *to Acis*

could be or was breached by following its owners' directions.

85. ***Third, any fiduciary duty claim is barred by the in pari delicto defense***:

> The equitable defense of *in pari delicto*, which means 'in equal
> fault,' is based on the common law notion that a plaintiff's recovery
> may be barred by his own wrongful conduct." *Howard v. Fidelity
> and Deposit Co. of Maryland, (In re Royale Airlines, Inc.)*, 98 F.3d
> 852, 855 (5th Cir. 1996). "Two fundamental premises underlie this
> defense: (1) that courts should not lend their good offices to
> mediating disputes among wrongdoers; and (2) that denying
> judicial relief to an admitted wrongdoer is an effective means of
> deterring illegality." *Murray v. Royal Alliance Assocs.*, 375 B.R.
> 208, 213 (M.D. La. 2007).

*Milbank v. Holmes (In re TOCFHBI, Inc.)*, 413 B.R. 523, 536-37 (Bankr. N.D. Tex. 2009).

While this Court denied summary judgment on the defense in *Milbank* (*id.* at 537), the defense

can be applied on the face of the pleadings when it is apparent that it applies. *Brickley v.

ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 842-43 (W.D. Tex. 2017) ("In sum,

because applicability of the *in pari delicto* defense to parts of the trustee's breach of fiduciary

duty claim is apparent on the face of the Complaint, the Court will dismiss … the claims that the

Stolzar defendants breached their fiduciary duties by assisting Barra and Vitale in their efforts to

fraudulently obtain shareholder capital and debt financing, by counseling and providing legal

App. 0607

services assisting Barra, Vitale, and Shaw in the usurpation of corporate assets and corporate opportunities, and by aiding in the execution of the fraudulent loan agreement.").

86.     Here, it is apparent from the face of the Acis Claim that to the extent that the "scheme" of which Acis complains was orchestrated by Dondero in violation of fiduciary duties, Acis had every bit as much culpability as the Debtor or any of the other commonly controlled entities; after all, according to Acis, the same person was making the decisions for all of them.  Acis is simply assuming the Court will not hold the *delicto* of "old Acis" against Reorganized Acis.

87.     While the assertion of *in pari delicto* against a trustee or reorganized debtor is not a settled issue in the Fifth Circuit, it is in most others.  In *Milbank*, in 2009, this Court stated: "Some courts have found that the defense may be asserted against a bankruptcy trustee, as he stands in the shoes of a debtor who may have, through its officers and directors, perpetrated bad acts. The Fifth Circuit has not addressed this issue."  The Court determined that it should "consider how the facts and equities of the individual case interact with the policy in pari delicto was designed to serve," which it found presented factual issues that could not be resolved on summary judgment. *Milbank*, 413 B.R. at 537 (internal citations omitted).

88.     Subsequently, however, in 2012, in refusing to apply *in pari delicto* to a receiver, the Fifth Circuit specified that cases under the Bankruptcy Code were distinguishable because of federal law (Bankruptcy Code § 541) subjecting a trustee to whatever defenses existed against the debtor as of the petition date.

App. 0608

> These cases, however, are plainly distinguishable because they rely upon Section 541(a) of the Bankruptcy Code, which limits the debtor estate to interests of the debtor "as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see, e.g., Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) ("If a claim of [debtor] would have been subject to the defense of in pari delicto at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.") (internal quotation marks and citations omitted); *Official Comm. of Unsecured Creditors of R.F. Lafferty & Co., v. R.F. Lafferty & Co., Inc*., 267 F.3d 340, 356 (3d Cir. 2001) ("[T]he application of the in pari delicto doctrine is affected by the rules governing bankruptcies. . . . [T]he explicit language of section 541 directs courts to evaluate defenses as they existed at the commencement of the bankruptcy."); *Matter of Pernie Bailey Drilling Co., Inc*., 993 F.2d 67, 70 (5th Cir. 1993) (noting that bankruptcy trustee stood in pari delicto); *see also In re Hedged-Invs. Assocs., Inc*., 84 F.3d 1281, 1285 (10th Cir. 1996) ("Though the Seventh Circuit's reasoning in Scholes enjoys a certain appeal, both from doctrinal and public policy perspectives, we cannot adopt it in this case. Put most simply, Mr. Sender is a bankruptcy trustee acting under 11 U.S.C. § 541, and bankruptcy law, apparently unlike the law of receivership, expressly prohibits [application of Scholes].") We therefore are not persuaded by Wells Fargo's analogy to bankruptcy trustees.

*Jones v. Wells Fargo Bank, N.A*., 666 F.3d 955, 967-68 (5th Cir. 2012).

89.     So although the Fifth Circuit has not addressed the issue directly, courts

have predicted it will follow the majority rule, and ruled accordingly, as in this 2019 Western

District of Texas decision:

> It is an open question in the Fifth Circuit whether *in pari delicto* can be asserted as a defense to claims made by a trustee in a bankruptcy case. *In re Today's Destiny, Inc*., 888 B.R. 737, 747 (Bankr. S.D. Tex. 2008). The majority of sister Circuits do apply the *in pari delicto defense* to claims made by trustees, however, and this Court has no reason to believe that the Fifth Circuit would depart from that majority. *See, e.g., Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006) ("If a claim . . . would have been subject to the defense of in pari delicto at the commencement of the bankruptcy, then the same

> claim, when asserted by the trustee, is subject to the same affirmative defense.") (*citing Grassmueck v. Am. Shorthorn Ass'n.*, 402 F.3d 833, 837 (8th Cir. 2005); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356-57 (3rd Cir. 2001); *Terlecky v. Hurd (In re Dublin Sec. Inc.)*, 133 F.3d 377, 381 (6th Cir. 1997); *Sender v. Buchanan (In re Hedged— [*17] Inv. Assocs.)*, 84 F.3d 1281, 1285 (10th Cir. 1996); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158-66 (2nd Cir. 2003)). Accordingly, the Court will consider the in pari delicto defense raised by Broadway.

*Osherow v. York*, No. 5:17-CV-483-DAE, 2019 U.S. Dist. LEXIS 200382, at *16-17 (W.D. Tex. Aug. 5, 2019).

90. Even if, as in *Milbank*, the Court were to consider the particular facts and equities of this case, as in *Milbank*, *supra*, there should be only one possible conclusion on the facts of this case, and there are no additional facts that could change it: the equities favor the Debtor's creditors over a windfall to Mr. Terry, who paid $1 million presumably on the basis of expected earnings and not tens of millions of dollars of litigation recoveries (or even if the latter, Acis (Mr. Terry) is still not entitled to a speculator's ransom at the expense of innocent creditors). No amount of factual development can or will change that conclusion.

91. Finally, no duty can be bootstrapped from the rights of Acis's (former) creditors, who will not only be paid in full but who had no such right: **under Delaware law, creditors of a limited partnership cannot sue third parties for breach of fiduciary duty, even derivatively, nor can a trustee sue for them**. "The claim for breach of fiduciary duties owed to the creditors fails because the Trustee does not allege that the creditors are assignees or members of the Debtors' LLCs. The creditors of the Debtors' LLC thus lack standing to sue the LLC or its members and directors for breaches of fiduciary duties. **The Trustee does not have standing to**

*sue on behalf of the creditors who themselves have no standing*.” *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 467 (Bankr. D. Del. 2018) (emphasis added). The analysis and result is the same for limited partnerships. *Gavin/Solmonese LLC v. Citadel Energy Partners, LLC (In re Citadel Watford City Disposal Partners, L.P.),* 603 B.R. 897, 905 (Bankr. D. Del. 2019) (“Given the similarity of the relevant statutory language of the Delaware Limited Liability Company Act to that of the Delaware LP Act, the result here should be no different for limited partnerships.”).

92.     Finally, the claim is barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and all acts occurred prior to Mr. Terry's acquisition of the company.

## Q.     Claim 31: Punitive Damages

93.     Acis seeks punitive damages to the extent permitted by law. But, to start, there is no right to recover punitive damages under either federal or state fraudulent transfer laws:

> Section 550 does not provide for the recovery of exemplary damages. The trustee has recovered under Texas fraudulent conveyance laws. Under Texas law, exemplary damages are available if the plaintiff has in fact sustained actual loss or injury. *Mack v. Newton*, 737 F.2d 1343, 1367 (5th Cir. 1984). However, as concluded above, the court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer.

*Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003). *See also Schlossberg v. Abell (In re Abell)*, 549 B.R. 631, 667 (Bankr.

App. 0611

D. Md. 2016); *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair Inc.*, 419 B.R. 749, 760 (M.D. Tenn. 2009); *In re Lexington Oil and Gas Ltd., Co.*, 423 B.R. 353, 376 (Bankr. E.D. Okla. 2010); *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010) ("Persuasive authority holds that § 550 bars punitive damages notwithstanding their possible availability under state law.").

94.     As set forth herein, Acis's state law claims can and should be summarily disallowed, which ends any issue concerning punitive damages.

95.     Texas law permits punitive damages only if the plaintiff has in fact sustained actual loss on its substantive counts.  *See, e.g., Sherman*, 292 B.R. at 255 (plaintiff could not recover exemplary damages since he did not recover any judgment for breach of fiduciary duty or other applicable cause of action).[14]  The claimant must prove by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud[15]; (2) malice[16]; or (3) gross negligence.[17]  Tex. Civ. Prac. & Rem. Code § 41.003(a).  Acis cannot sustain this burden, nor would such an award be supported under the relevant factors.[18]

---

[14] Texas law caps punitive damages at the greater of (1) two times economic damages plus an amount equal to noncompensatory damages found by a jury not in excess of $750,000, or (2) $200,000.  Tex. Civ. Prac. & Rem. Code § 41.008(b).

[15] Constructive fraud does not count.  Tex. Civ. Prac. & Rem. Code § 41.001(6).

[16] "Malice" means "a specific intent by the defendant to cause substantial injury or harm to the claimant."  Tex. Civ. Prac. & Rem. Code § 41.001(7).

[17] "Gross negligence" means "an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others."  Tex. Civ. Prac. & Rem. Code § 41.001(11).

[18] "The Court weighs the following six factors in determining the reasonableness of an award: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant."  *In re Galaz*, 2015 Bankr. LEXIS 229, at *30 (Bankr. W.D. Tex. Jan. 23, 2015) (citing Tex. Civ. Prac. & Rem. Code § 41.011(a)).

96. Finally, any claim for punitive damages is barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and was not asserted prior to Mr. Terry's acquisition of the company.

**R. Claim 32: Alter Ego Liability**

97. Acis does not adequately allege a claim for alter ego, even if it was a "claim," which it is not; it is only a means of imposing liability for an underlying cause of action. *NMRO Holdings, LLC v. Williams*, 2017 Tex. App. LEXIS 9939, *6 (Tex. App. Oct. 24, 2017). Its allegations of common control by Mr. Dondero are insufficient as a matter of pleading and substantively.

98. Acis alleges that the Debtor, Highland Funding, Highland Adviser, Highland Management, and Highland Holdings (the "Alter Egos") are all controlled by Mr. Dondero, and "[e]ach of the Alter Egos should be held liable for any damages awarded under any Count in this Second Amended Complaint, as each is the alter ego of the others." It also requests that the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, and the transfer of the 2017-7 Equity and the 2017-7 Agreements be "collapsed" and treated as a scheme by which the Debtor would take over Acis's business. Although it is unclear, Acis appears to also assert under this rubric a claim for unjust enrichment, and requests that "[e]ach of the Highlands, and in particular Highland Capital and Highland Funding, benefitted from the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, and the transfer of the 2017-7 Equity and the 2017-7 Agreements even if they were not the direct transferee. Each of the Highlands should

be held liable for benefits unjustly received and make restitution to the Debtors and their estates for those benefits." Acis Claim ¶ 280.

99. Texas law applies the alter ego rules of the state of incorporation or formation. *See, e.g., In re The Heritage Org., LLC*, 413 B.R. 438, 510 (Bankr. N.D. Tex. 2009); *The Richards Group, Inc. v. Brock*, 2008 U.S. Dist. LEXIS 55139 (N.D. Tex. July 18, 2008). The analyses are often similar. *See, e.g., Sell v. Universal Surveillance Sys., LLC*, 2017 U.S. Dist. LEXIS 219898, at *5 (W.D. Tex. July 6, 2017) (observing that the analyses undertaken by Texas courts, federal courts, and Delaware courts are similar and focus on whether the defendant abused the corporate form).

100. What Acis is essentially alleging is "single enterprise" liability based on common control by Mr. Dondero. Delaware has never recognized the "single business enterprise" theory of alter ego liability, and it was rejected under Texas law by the Texas Supreme Court in *SSP Partners v. Gladstone Invs. Corp.*, 275 S.W.3d 444, 452-54 (Tex. 2008).

101. *SSP Partners* is instructive in rejecting allegations of common control as sufficient to support alter ego liability without the use or abuse of the corporate form to perpetrate a wrong.

> We disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. Specifically, we disregard the corporate fiction:
>
> (1) when the fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

Each example involved an element of abuse of the corporate structure. . .

Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse.

*Id*. That is not what Acis does or can allege, *i.e.*, even if, *arguendo*, it could establish that assets were wrongfully transferred, the "wrong" did not involve any abuse of the *form* of the entities involved. They are simply a family of commonly controlled entities. As the Fifth Circuit explained in *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir. 1988):

"The focus of alter ego proper is on the legal adequacy of the corporation's existence, and the relationship between the corporation and its controlling corporation or individual. Many wholly-owned subsidiary and closely-held corporations are not factually distinct from their owners; many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence-- separate employees, separate offices, separate properties, etc. That is perfectly natural and proper. *See, e.g., Edwards Co. v. Monogram Industries*, 730 F.2d 977 (5th Cir. 1984) (en banc) ('shell' subsidiary was formally distinct and creditor was not misled; corporate disregard under Texas law was therefore improper). The problem arises when such

App. 0615

> a corporation is not treated as *legally* distinct, when, in other
> words, the owners neglect to maintain the *formal* existence of the
> corporation as required by law."

*Id*. at 1131.

102.    Indeed, the absence of a wrong by this Debtor involving the corporate

form led the Southern District of New York district court to reject alter ego liability in *Highland*

*CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716 (S.D.N.Y. 2017).

Citibank had identified three acts that it asserted constituted fraudulent or wrongful conduct, for

which it contended the Debtor had alter ego liability: (i) the Debtor stripped cash and assets from

Highland CDO Opportunity Master Fund, L.P.  ("CDO Fund") that would have otherwise been

available to satisfy the obligations to Citibank; (ii) the Debtor diverted cash distributions on

certain notes (the "HFP Notes") that would otherwise have been available to CDO Fund to meet

its obligations to Citibank; and (iii) the Debtor fraudulently misrepresented the value of the HFP

Notes that CDO Fund pledged to Citibank as collateral.  *Id*. at 729-33.  The district court held

that the first prong of New York's alter ego test – the Debtor's control and domination of its

affiliates – was satisfied, but that Citibank failed to demonstrate the second prong – a "wrong or

fraud" for veil piercing purposes – and so dismissed the alter ego claims seeking to hold the

Debtor liable for CDO Fund's obligations.  *Id*. at 729-33.

103.    Here, the allegations are insufficient even as a matter of pleading.  *See*

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit L.P*., 491 B.R. 335, 349 (S.D.N.Y. 2013).  The

pleading here is particularly inadequate because, absent "single enterprise" liability (which is

unavailable), Acis would actually need to pierce the veil of each entity between the Debtor and

any entity found to bear liability. *Id.* ("[Plaintiff] fails to present facts to adequately allege the "double-pierce" required to lump together two "sister" subsidiaries, the Goldman Lenders and the PIA Funds, even under the liberal notice pleading standard."). *See Outokumpu Eng'g Enters., Inc v. Kvaerner Enviropower, Inc*., 685 A.2d 724, 729 (Del. Super. 1996) (stating that in order to disregard corporate formalities separating "sister" subsidiaries, a plaintiff must first pierce the veil separating one subsidiary from its corporate parent, and then surmount "another barrier" by piercing the veil separating the corporate parent from the second subsidiary).

104.   Any claim for punitive damages is also barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and was not asserted prior to Mr. Terry's acquisition of the company.

105.   Finally, to the extent that Acis is alleging in this action that Dondero is liable as an alter ego for any liability of the Debtor herein (as it does explicitly in its other newly commenced lawsuits), Acis is violating the automatic stay in this case, as any such rights is property of the bankruptcy estate.

## S.   Claim 33: Willful Violation of the Automatic Stay

106.   Acis alleges that the Debtor and Highland Funding violated the Acis automatic stay by sending the Acis trustee Optional Redemption Notices requesting that the trustee effectuate optional redemptions, and by "demanding" that the trustee take actions to effectuate the optional redemption by the next day.  Acis seeks damages, attorneys' fees and costs, and punitive damages.

107. The claim should be disallowed. The Acis trustee declined to effectuate the redemptions. HCLOF, the equity holder of the CLO entities, took the position that the automatic stay was inapplicable, and the Debtor did not believe that it applied. In addition, the claim is untimely and/or has been waived.

108. The claim is also barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and the acts occurred prior to Mr. Terry's acquisition of the company.

**T.** **Claim 34: Payment of Attorneys' Fees and Costs, Including all Allowed Professionals' Fees and Expenses in the Bankruptcy Cases**

109. Acis requests that the Court award attorneys' fees in the adversary proceeding under Texas Business and Commerce Code § 24.013, Civil Practice and Remedies Code § 38.001, TUFTA, and all fees in the entire Acis Case from the Debtor based on the Debtor's alleged breach of fiduciary duty. There is no basis in fact or law for such an award, and the Debtor reserves all defenses thereto.

110. Furthermore, the Debtor and/or affiliates *already* bore the fees of which "reimbursement" is sought: as they were paid by income derived from transferred assets that as a result of the injunction were utilized for the benefit of Acis rather than by the transferees.

111. Finally, the claim is also barred by the *Bangor Punta* doctrine, as the claim is being brought for the benefit of Mr. Terry and the acts occurred prior to Mr. Terry's acquisition of the company.

## U.     Reservation of Rights

112.    The Debtor reserves its right to supplement or modify this Objection and to assert such further objections, defenses or arguments as may later become available or apparent.

WHEREFORE, the Debtor respectfully requests that the Acis Claim be disallowed in its entirety, and such other and further relief as this Court may deem just and proper.

Dated:  June 23, 2020          PACHULSKI STANG ZIEHL & JONES LLP


 */s/ Jeffrey N. Pomerantz*
PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
                 ikharasch@pszjlaw.com
                 gdemo@pszjlaw.com

-and-

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Tel: (972) 755-7100
Fax: (972) 755-7110

Attorneys for the Debtor and
Debtor in Possession

App. 0620

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion has been served electronically via the Court's CM/ECF system upon all parties appearing on the attached service list.

/s/ Jeffrey N. Pomerantz
Jeffrey N. Pomerantz

In re Highland Capital Management, L.P.
Case No. 19-34054-sgj11

ECF Recipients:

- Zachery Z. Annable    zannable@haywardfirm.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com;jdistanislao@foxrothschild.com
- Bojan Guzina    bguzina@sidley.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Paige Holden Montgomery    pmontgomery@sidley.com
- Edmon L. Morton    emorton@ycst.com
- Rakhee V. Patel    rpatel@winstead.com, lbayliss@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com

App. 0622