# Appendix Exhibit 40

Case 19-34054-sgj11 Doc 845 Filed 07/15/20 Entered 07/15/20 16:52:48 Page 1 of 17
Case 3:21-cv-00881-X Document 174-40 Filed 12/16/23 Page 2 of 18 PageID 17887
Docket #0845 Date Filed: 07/15/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

**DEBTOR'S OBJECTION TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
EMERGENCY MOTION TO COMPEL PRODUCTION BY THE DEBTOR**

Highland Capital Management, L.P. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Case"), files this *Objection* (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



"Objection") to the *Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor* [Docket No. 808] (the "Motion") filed on July 8, 2020. In support of the Objection, the Debtor respectfully represents as follows:

## I. PRELIMINARY STATEMENT

1. By its Motion, the Official Committee of Unsecured Creditors (the "Committee") seeks to compel the Debtor to comply with some of the most sweeping discovery requests possible—made for the first time about two weeks before the Motion was filed.

2. Specifically, on June 25, 2020, the Committee demanded all "electronically stored information" ("ESI") from nine (9) custodians—three of whom are lawyers—going back five years prior to the commencement of this Case (the "Demands"). The Demands are not limited to Estate Claims; are not focused on any particular transaction; and, at first glance, appear to yield almost 8,000,000 e-mails and attachments alone.

3. Perhaps more troublesome than the breadth and scope of the Demands, the Committee also insists that the Debtor ignore its confidentiality obligations to shared service partners and other interested parties and proposes a "privilege review" that is designed to quickly get the Committee its massive dump of information at the expense of the Debtor's and third parties' rights to protect privileged and confidential information.

4. This was all unnecessary. The Debtor has worked diligently and in good faith to respond to all of the Committee's discovery requests – which is why this is the very first discovery motion in this Case. Indeed, the Debtor completed the production of all non-ESI documents in April, a production totaling more than [20,000] pages of information.

5. Admittedly, production of ESI has been more difficult but that was not for lack of trying. The Committee's initial ESI requests made in February were only slightly less broad that its current Demands. It took time to run, and re-run, and re-run the Committee's

search terms until the number of "hits" was reduced from over 2,000,000 to approximately 800,000 (the "Original E-Mails"). By mid-May, the Debtor delivered all of the Original E-Mails to Meta-E, a data service provider and a Committee member. In the first half of June, the Debtor provided the Committee with a Document Review Memorandum to govern the review of the Original E-Mails and retained a vendor to provide contract attorneys to undertake the review. On June 16, the Debtor provided the Committee with a plain vanilla stipulation that would enable the Debtor to retain the vendor – the last step before the review and production of the Original E-Mails could begin. Had the Committee agreed to the stipulation, the Debtor would be weeks into the review and production of the Original E-mails as of now.

6. Instead, the Committee abruptly shifted gears, made the Demands on June 26, and filed the Motion on the heels of a Court-imposed deadline to bring certain claims.

7. The Debtor is extremely concerned that compliance with the Demands will necessarily (a) cause privileged and personal information to be disclosed, (b) arguably cause the Debtor to violate confidentiality obligations, and (c) create unmanageable costs as the Committee sifts through millions and millions of e-mails and other communications.

8. Nevertheless, the Debtor is not intransigent. As previously conveyed to the Committee, the Debtor is prepared to go down the Committee's chosen path provided that (a) the Court rules on the Debtor's discovery motion[2], (b) appropriate safeguards are put in place to protect privileged information, (c) adversaries are not provided with "free discovery" just because they are a committee member, and (d) the rights of third parties are respected.

---

[2] *See Debtor's Motion for the Entry of (I) a Protective Order, or, in the Alternative (II) an Order Directing the Debtor to Comply with Certain of the Discovery Demands Tendered by the Official Committee of Unsecured Creditors, Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034*, dated July 9, 2020, and filed at Docket No. 810 (the "Debtor's Motion").

## II. BACKGROUND

**A. The Debtor and the Committee Agree on a Document Production Protocol**

9. In January, as part of the parties' corporate governance agreement, the Debtor and the Committee agreed, among other things, that the Committee would have standing and other rights relating to "Estate Claims," and that the production of documents and ESI would be made pursuant to specified guidelines. These agreements were embodied in a term sheet, the final version of which was filed with the Court on January 14, 2020, at Docket No. 354-1 (the "Term Sheet").

10. As pertinent here, the Term Sheet provided that (a) the Committee was granted standing to pursue Estate Claims; (b) the Committee would be entitled to privileged communications concerning Estate Claims; and (c) that the Debtor's document management, preservation, and production would be governed by an agreed-upon set of "Document Production Protocols" (the "Protocols").

11. The Protocols provide, among other things, that (a) the Debtor's production of ESI is "subject to completion of any review for privilege or other purposes contemplated by this Agreement," and (b) that nothing in the Protocols impacts the Debtor's right to, among other things, (i) object to the production, discoverability, and confidentiality of documents and ESI, (ii) assert any privilege or other protection from discovery, or (iii) "limit a Producing Parties [sic] right and ability to review documents for responsiveness" prior to production. *See* Docket No. 354-1, Protocols ¶¶ E.b, G.b-d.

12. In short, the Debtor and the Committee agreed that the Committee would have broad discovery rights with respect to Estate Claims, including the right to obtain privileged communications related to Estate Claims, but that the Debtor otherwise reserved its rights with respect to discovery unrelated to Estate Claims. That dichotomy made sense since the Committee

4

was only granted standing to pursue "Estate Claims" on behalf of the Debtor, as that term was specifically defined in the Term Sheet.

### B. The Committee Seeks Broad Discovery of E-mails

13. In early February, the Committee served *The Official Committee of Unsecured Creditors' Second Requests for Production of Documents to Highland* (the "Requests"). The Committee's requests included nineteen separate requests for documents and information that covered Estate Claims and non-estate claims.

14. Request No. 19 sought "[a]ny and all Documents, including emails, contain[ing]" approximately 23 separate search terms (the "E-mail Requests"). The search terms for the E-mail Requests included broad terms such as "Beacon Mountain, "Crown," "HCMFA," "Hunter Mountain," "NexPoint," "Promissory w/5 Note" and "Trussway."

15. On or around March 5, 2020, the Debtor timely served its written responses and objections to the Committee's Requests. Morris Ex. A.[3] With respect to the E-mail Requests, the Debtor proffered the following response and objection:

> The Debtor objects to each Request to the extent it calls for the production of "[a]ny and all . . . Communications" on the grounds that such Requests are overly broad, unduly burdensome, and fail to comply with Federal Rule of Civil Procedure 26(b). At the Committee's specific requests, the Debtor has conducted multiple searches for e-mails responsive to Request No. 19. Each search has yielded over 1,200,000 unique e-mail "hits" (a number that potentially could double if attachments were included in the searches) and the parties continue to confer on ways to limit the e-mails searches in a manner that will be efficient and not wasteful of estate resources. The Debtor has also offered to begin searching for e-mails related to transactions already known to the Committee, such as the so-called insider loans, that constitute Estate Claims (as that term is defined in the Term sheet). The Committee has thus far declined the Debtor's offer, choosing instead to focus on the broadest searches contained in the Requests (i.e., Request

---

[3] The Debtor incorporates by reference the *Declaration of John A. Morris in Support of Debtor's Motion for the Entry of (I) a Protective Order, or, in the Alternative (II) an Order Directing the Debtor to Comply with Certain of the Discovery Demands Tendered by the Official Committee of Unsecured Creditors, Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034*, dated July 9, 2020, and filed at Docket No. 811 ("Morris Dec."), and the exhibits annexed thereto.

5

> No. 19), even though Request No. 19 does not appear to be related to any Estate Claim for which the Committee has standing to pursue. Nevertheless, the Debtor has informed the Committee that it will (a) create searches for transactions identified as potential Estate Claims, and (b) use historic data to identify asset transfers to or from the Debtor to or from James Dondero, Mark Okada or any Related Entity during the last five years as potential Estate Claims

Morris Ex. A, General Objection No. 5.

16. The Committee has never taken issue with this objection or asked for the targeted e-mails searches related to Estate Claims that the Debtor offered to provide. In addition, the Committee never proposed any targeted searches limited to Estate Claims despite the Debtor's requests. Instead, over time, the parties worked together on various versions of the search terms and time periods until the number of "hits" approached approximately 800,000 in early May, thus yielding the Original E-Mails.

17. Notably, for the first time on July 8, the Committee identified specific transactions, the CLO Holdco transaction and the Hunter Mountain transaction, as the subject of discovery. The Debtor will be able to rapidly develop email searches and produce documents related to these specifically identified transactions. The Debtor believes the Committee should be able to identify other specific transactions which may constitute Estate Claims given that the Committee has for months had the Debtor's general ledger, non-email transactional documents, and audited financials with specific footnotes regarding material, related party transactions.

18. To be clear, while the Debtor believes that targeted searches focused on known transactions constituting Estate Claims would have been more efficient, the Debtor acknowledges the Committee's right to proceed in any manner it sees fit and has never objected to the production of documents or e-mails on the ground that the Requests went beyond Estate Claims.

6

C.  **The Debtor's Confidentiality Obligations**

19. As set forth in the Debtor's Motion, the Debtor is a service provider and in that capacity has entered into various agreements that, among other things, obligate it to maintain certain information in confidence or otherwise concern the ownership of documents and information (collectively, the "Shared Services Agreements"). Certain of the Shared Services Agreements were identified and described in the Debtor's Motion, but others exist. Debtor's Motion ¶ 21. Based on communications received to date, numerous third parties have expressed an interest in these matters beyond those identified in the Debtor's Motion, irrespective of whether they are party to a Shared Services Agreement.

20. As previously explained to the Committee, the Debtor complied with its Confidentiality Obligations with respect to the production of non-e-mail discovery utilizing the following process (the "Compliance Process"): if the Debtor identified a responsive, non-privileged document that was subject to a Confidentiality Obligation, it gave written notice to the counter-party of the Debtor's intention to produce the document absent the counter-party's objection.

21. The Debtor utilized the Compliance Process on a handful of occasions but, as previously explained to the Committee, never withheld any non-e-mail document subject to the Confidentiality Obligations because no counter-party ever objected.

D.  **The Debtor Confers with the Committee on Its Document Review Guidelines and Prepares to Seek Court-Approval to Retain a Third-Party Vendor to Review Documents and Begin Production**

22. The Debtor has been cooperative and has put extensive effort towards negotiating an agreed email search and production protocol with the Committee.[4] The proposals

---

[4] While the Committee suggests that they have waited months to receive the requested documents, the facts are different and include the following (a) the Committee often took weeks, and in one case an entire month, to respond

exchanged from February through June 25 were premised on the ideas that the Debtor (a) would gather emails from its server based on key word searches provided by the Committee, (b) review the resulting email "hits" for relevance and privilege, and (c) then produce the responsive, non-privileged emails. The Committee's June 25 proposal was the first time that Committee sought blanket access, subject only to privilege review, for the nine custodian's entire email files. Just as the Committee and the Debtor were on the precipice of finalizing a deal on email discovery, the Committee completely changed the proposed terms.

23. The Committee's Requests served on February 3 proposed that the Debtor search key custodian's emails for specific search terms. After the Debtor expressed concern about the breadth of the search terms, the Committee sent narrowed proposed terms to the Debtor on February 26. Debtor reran all of its searches using these revised terms, and informed the Committee on March 3 that the terms still returned over 1.5 million emails. On March 5, the Committee responded that the Debtor should consider sending the 1.5 million emails to a third-party vendor to apply further limits to the number of documents to be reviewed. The next day, March 6, the Debtor responded that the Committee's additional search terms would expand the review set beyond the initial 1.5 million emails and also asked the Committee to confirm that the outside vendor would be used "to greatly reduce the number of emails that will actually have to be reviewed and ultimately produced."

24. As of mid-March, the momentum on discovery negotiations slowed. On March 17, the Committee responded to the Debtor's March 5 communication. Notably, this included the Committee stating that it understood the Debtor would produce documents "found

---

to the Debtor's proposed email production logistics; (b) without the ESI logistical concerns, the Debtor quickly and without complaint produced all non-email documents by April; (c) the Committee unilaterally walked away from all that had been accomplished and, on June 25, proposed entirely new and sweeping demands; and (d) but-for the Committee's newly proposed process, the email review and production would be well underway by now.

8

to be responsive." Again, the Debtor had to rerun all of its searches based on new search parameters from the Committee, which was completed by March 30. The Debtor followed up with additional information regarding the search results on April 3 and the parties had a meet-and-confer call on April 10. With the final search parameters still undefined, the Committee went silent until mid-May.

25.   In mid-May, the parties agreed to final search parameters. After culling the e-mails using the Committee's final search parameters, and with the Committee's knowledge and approval, the Debtor retained Meta-E to serve as the host for the production of the Original E-Mails. Shortly thereafter, the Debtor delivered copies of all of the Original E-Mails to Meta-E.

26.   As discussed with the Committee, the Debtor intended to hire a third-party vendor who would provide contract attorneys to undertake a "first line" review of the e-mails. The Committee was supportive of this concept. Thereafter, the Debtor solicited bids from three third-party vendors.

27.   While soliciting the vendors, and again with the Committee's knowledge and understanding, the Debtor was also working on a memorandum (the "Document Review Memorandum") that would be used by the contract attorneys to identify the relevant players (including the "Related Parties" who would be subject to "Estate Claims," as those terms are defined in the Protocols) and issues concerning confidentiality and privilege. The Document Review Memorandum was intended to (a) assist the contract attorneys in their review of documents, (b) provide a mechanism for the Debtor to comply with its confidentiality obligations under the Shared Services Agreements (the confidentiality review), and (c) to complete the review and production of the e-mails, whether or not they concerned "Estate Claims," as quickly and efficiently as possible.

28. To be transparent, on June 2, 2020, the Debtor shared an initial draft of the Document Review Memorandum together with a comprehensive list of attorneys and law firms that would have to be checked for privilege purposes.[5] The Document Review Memorandum included, among other things, mechanisms for performing a review designed to enable the Debtor to comply with the confidentiality obligations under the Shared Services Agreements; once e-mails subject to the Confidentiality Obligations were identified, the Debtor expected to use the same Compliance Process that it had effectively used with respect to non-e-mail document production.

29. The Committee provided certain comments to the Debtor via e-mail and in the form of a mark-up of the draft Document Review Memorandum while reserving its right to object to the Debtor's method of reviewing the e-mails. The Debtor incorporated nearly all of the Committee's specific changes that it requested with respect to the Document Review Memorandum, and provided a detailed explanation for the one change it did not accept. Morris Ex. F.

30. At around the same time, the Independent Directors considered the bids for the provision of contract attorneys and exercised their business judgment to retain Robert Half Legal, a business division of Robert Half International Inc. ("RHL"), to conduct the initial review of documents.

31. On June 19, the Debtor informed the Committee of this decision and presented a form of notice pursuant to which the Debtor intended to seek court approval to retain RHL as an ordinary course professional (the "OCP Notice").

---

[5] The Committee has not objected to, or otherwise provided any comments with respect to, the list of lawyers and law firms created for this purpose.

32.     Thus, as of June 19, 2020, the Debtor believed that its receipt of the Committee's comments the OCP Notice, if any, was the last step before commencing the review and production of e-mails.

E. **The Committee Asks the Debtor to Dispense with a Confidentiality Review, Thereby Putting the Debtor in an Untenable Position**

33.     However, on June 25, the Committee informed the Debtor that it wanted to take a different approach to the review and production of e-mails. Morris Ex. G. The most problematic demand was that the Debtor forego the confidentiality review described in the Document Review Memorandum. On July 3, 2020, the Debtor explained to the Committee why it could not comply with this demand. The Committee declined to address the Debtor's concerns thereby necessitating the filing of the Debtor's Motion.

### III.     OBJECTION

34.     The following is a review of the Committee's Demands, and the Debtor's response to each.

A. **Demand No. 1**

35.     **The Demand**. The Committee seeks to have "all custodial data for nine identified custodians" placed in a "repository workspace." Motion ¶ 10(a).

36.     **The Debtor's response**. Giving the Committee unfettered access (subject only to a privilege review, discussed below) to the ESI of nine individuals covering a five-year period violates Rule 26 of the Federal Rules of Civil Procedure, ignores the provisions of the Protocols, and is simply unfair to the individuals.

37.     Federal Rule of Civil Procedure 26 expressly limits discovery to non-privileged matters that are "relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). The initial Demand is not even a "fishing expedition" in

11

the context of discovery under Bankruptcy Rule 2004; instead, it is a demand for the entire ocean. The Committee's initial demand is unprecedented and cannot be reconciled with the boundaries established under Rule 26.

38. Moreover, the initial Demand also ignores the parties' agreement as embodied in the Term Sheet and Protocols. While the Committee has standing to bring Estate Claims, those claims have boundaries which will clearly be breached by the Demands. Further, the Demands trample on the Debtor's specifically-reserved rights to review the ESI for confidentiality and responsiveness. *See supra* ¶ 11.

39. The Debtor has proposed a reasonable alternative to the Committee's efforts to review almost 8 million documents. As noted above, over a month ago, the Debtor provided the proposed review memorandum to the Committee. *See* Morris 7/15 Dec. Ex. A (Document Review Memorandum).[6] The Memorandum was to serve as Debtor's document review instructions to RHL review attorneys. Memorandum §V lays out a proposed scope of relevance. The Debtor urges the Court to adopt the Memorandum's proposed email review process instead of the unwieldy alternative process proposed by the Committee, and to allow the Debtor to begin the review of the Original E-Mails.

40. The Debtor believes the Motion should be denied on these bases alone. However, if the Court entertains the initial Demand at all, the Debtor respectfully requests the following process be followed: (a) the ESI shall be securely delivered to Meta-E and held in custody and in strict confidence; (b) if the Committee wants to search the ESI, it shall simultaneously provide search terms to Meta-E and the Debtor; (c) the Debtor shall have three

---

[6] "Morris 7/15 Dec." refers to the *Declaration of John A. Morris in Support of the Debtor's Objection to the Official Committee of Unsecured Creditors' Motion to Compel Production by Debtor*, dated July 15, 2020, and the exhibit annexed thereto.

business days to assert an objection; (d) if the Debtor does not timely object, then the results of the search shall be culled for a privilege review; (e) if the Debtor timely objects, the parties shall confer and if they cannot resolve their differences, then the issue(s) will be presented to the Special Master.

**B.     Demand No. 2**

41.     **The Demand**.  The Committee proposes that the parties work on "a set of mutually agreeable search terms (those likely to identify attorney-client privileged communications or attorney work product)" and then run those terms over the entirety of the ESI, with any disagreements over the search terms submitted to a Special Master.  Motion ¶ 10(b).

42.     **The Debtor's Response**.  This step is required only because the Committee has chosen to seek broad discovery rather than focusing on Estate Claims (where they share the privilege).  But the Debtor has two concerns regarding the proposal.

43.     First, three of the nine custodians are lawyers.  Given the high likelihood that many of their communications are privileged, no search terms can adequately protect the privilege and their ESI should be reviewed by the Debtor in the first instance.[7]

44.     Second, while the Debtor understands that (under the Demands) disputes over the privilege search terms will be resolved by the Special Master, the Debtor is compelled to point out that (a) there are third parties who likely hold the privilege in certain circumstances, and (b) the initial search terms proposed by the Committee are woefully inadequate.

45.     Thus, with respect to Demand No. 2, the Debtor believes that the three lawyers' ESI should be subject to a whole-scale review, and the search terms to be employed

---

[7] Even under the Debtor's Demands, the time and expense of creating a privilege log covering five years' worth of e-mails sent to or from three different lawyers is going to be astronomical.  These three attorneys alone have approximately 1.7 million documents that would need to be manually reviewed.

13

must be crafted to actually protect the privilege and not pay lip-service to it on the theory that the "claw back" provisions of the Protective Order are an adequate substitute.

### C.  Demand No. 3

46.  **The Demand**.  The Committee proposes that any document not captured by the privilege review be produced to the Committee, subject only to the "claw back" provisions of the Protective Order.  Motion ¶ 10(c).

47.  **The Debtor's Response**.  This Demand is flawed for the same reasons as Demand No. 1.  First, on its face, it violates Federal Rule of Civil Procedure 26, ignores the provisions of the Protocols and is simply unfair to the individuals.  Second, unless the Committee affirmatively identifies the inadvertently produced privileged document, the Debtor will never even know that it was produced.  This means that the Committee already would have reviewed the privileged contents of the document, and then should be obligated to scrub from their own minds the privileged content.  That is clearly impossible.  *See Arconic, Inc. v. Novelis, Inc.*, CA No. 17-14344, 2019 WL 911417, at *3 (W.D. Pa. February 26, 2019) (with respect to a clawed-back document, "once it is produced, the opposing party knows its contents.  That information cannot be unlearned.")  Third, if the Committee reviews a document that questionably could be privileged, but the Committee does not identify the document to the Debtor, then Debtor will never have an opportunity to contest if it is privileged or not.

48.  The Committee would place discretion on determining Debtor's privilege, and the privilege of non-Debtor affiliated parties, solely in the hands of the Committee.  That is clearly not right and the Committee's reliance on the "claw back" provision is misplaced.  A claw-back provision is used to resolve a producing party's *inadvertently* produced privileged materials; it is not a tool to give the requesting party sole discretion in deciding what documents fall with scope of the producing party's privilege.

49. The Sedona Conference, the leading legal conference on the production of ESI which has been widely cited by federal courts across the country,[8] has expressly rejected the approach advocated by the Committee. Commenting on Fed. R. Evid. 502(d), the rule governing claw-back agreements, the Sedona Conference stated:

> Rule 502 contains no provision that grants the court the authority to compel a "quick peek" production or other disclosure of privileged information absent a finding of waiver. Indeed, Rule 502 was designed to protect producing parties, not to be used as a weapon impeding a producing parties' right to protect privileged material. Compelled disclosure of privileged information, even with a right to later clawback the information, forces a producing party to ring a bell that cannot be un-rung. As one court recognized, "regardless of how painstaking the precautions, there is no order . . . which erases from defendant's counsel's knowledge what has been disclosed. There is no remedy which can remedy what has occurred, regardless of whether or not the precautions were sufficient."
>
> The court's analysis is directly on point here. There are many ways in which a producing party may be prejudiced by compelled disclosure of privileged information. For instance, after viewing privileged material, a party may submit a request for admission to elicit the material or tailor a deposition question to do the same. Or a party may adjust its settlement position in light of its review of the privileged information. These concerns would inevitably erode the goal of the attorney-client privilege, which is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."
>
> Courts also should not employ Rule 502(d) indirectly to compel a result that is not permitted directly under the rule. For example, some courts have separately entered 502(d) orders protecting parties from claims of waiver by the production of privileged documents as well as Rule 16(b) scheduling orders with aggressive document production deadlines that do not provide the parties with a reasonable period of time to review the documents for privilege. In these instances, the courts caution the parties that there will be dire consequences for missing the deadline and they, therefore, should consider all means available to achieve a timely document production, including the use of a "quick peek" or "make available" production. In essence, the courts are attempting to indirectly compel a result that it is not directly permitted under Rule 502(d)—a result that was never intended by

---

[8] *See Romero v. Allstate Ins., Inc.*, 271 F.R.D. 96, 106 (E.D. Pa. 2010) (citing decisions adopting Sedona from the Sixth Circuit and the district courts of New York and New Jersey) ("To resolve disputes regarding the production of metadata, many courts have turned to the Sedona Principles and Sedona Commentaries thereto, which are "the leading authorities on electronic document retrieval and production."); *see also Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 160 (3d Cir. 2012) (adopting Sedona); *Al Otro Lado, inc. v. Nielsen*, 328 F.R.D. 408, 417 (S.D. Cal. 2018) (same).

the rule.[9]

50. There is no law or rule that enables the Committee to have unfettered access to the ESI. ESI should only be produced if, among other things, it is identified through search terms crafted in good faith to obtain information "relevant to any party's claim or defense."

51. Moreover, any search must be subject to the Court's determination of the Debtor's Motion.

52. Finally, as a reasonable additional layer of protection under the circumstances, any documents produced must be designated as "Highly Confidential" on the Court-ordered Protective Order.

### D. Demand No. 4

53. **The Demand**. As its final demand, the Committee requests that (a) all non-privileged documents and privileged documents relating to Estate Claims be immediately produced, and (b) privileged documents unrelated to Estate Claims be logged

54. **The Debtor's Response**. Subject to its specific responses to Demands 1-3, the Debtor has no objection to Demand No. 4.

### IV. PRAYER

WHEREFORE, the Debtor respectfully requests that the Motion be (a) denied, and that the parties be directed to proceed with the review and production of the Original E-Mails, subject only to the resolution of the Debtor's Motion or, in the alternative, (b) granted, subject to the specific responses set forth herein.

---

[9] *See The Sedona Conference Commentary on Protection of Privileged ESI*, 17 Sedona Conf. J. 95, 140 (2016) (internal citations omitted).

Dated: July15, 2020.                       **PACHULSKI STANG ZIEHL & JONES LLP**

                                       Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*