# Appendix Exhibit 41

Docket #0846 Date Filed: 07/15/2020

Joseph M. Coleman (State Bar No. 04566100)
John J. Kane (State Bar No. 24066794)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-SGJ |
| | § | |
| Debtor. | § | Chapter 11 |

## CLO HOLDCO, LTD.'S LIMITED OBJECTION TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' EMERGENCY MOTION TO COMPEL PRODUCTION BY THE DEBTOR

### [Relates to Docket No. 808]

## TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:

CLO Holdco, Ltd. (**"CLO"**) files this *Limited Objection* (the **"Limited Objection"**) to the Official Committee of Unsecured Creditors' (the **"Committee"**) *Motion to Compel Production by the Debtor* [Dkt. #808] (the **"Motion"**),[1] which seeks production of certain information, documents, and/or communications (collectively, **"ESI"**) from Highland Capital Management, L.P. (the **"Debtor"**) pursuant to the Final Term Sheet and the Committee's Proposed Protocol dated June 25, 2020. This Limited Objection seeks only to ensure the protection of CLO's attorney-client and work product privileges. In support of this Limited Objection, CLO states as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the "Final Term Sheet" [Dkt. #354-1] referenced therein, as applicable.



## PRELIMINARY STATEMENT

1.      The Committee served CLO with its First Request for Production of Documents on July 13, 2020.  CLO intends to cooperate with the Committee's discovery efforts in all respects and has already engaged in correspondence with Committee's counsel in an effort to address this Limited Objection and to streamline the discovery process.  While CLO is fully committed to working with the Committee, CLO is not agreeing to waive privileges or to produce privileged documents or ESI at this time.  The purpose of this Limited Objection is solely to preserve CLO's rights pursuant to the attorney-client privilege and work product doctrine (hereinafter collectively referred to as **"Privilege(s)"**).

2.      The Debtor possesses ESI that is subject only to CLO's Privilege, which may not be waived by the Debtor.  The Debtor's in-house attorneys provide routine legal services to CLO pursuant to that certain *Second Amended and Restated Service Agreement* dated January 1, 2017 (the **"Shared Services Agreement"** or **"Agreement"**).[2]  CLO pays the Debtor annually for these legal services, in addition to financial, accounting, tax, and trading services.  In exchange for payment, the Debtor provides legal services to CLO independently of the legal services performed on the Debtor's own behalf.

3.      Importantly, the Shared Services Agreement exclusively governs CLO's relationship to the Debtor.  Pursuant to that Agreement, all books and records, including ESI, kept and maintained by the Debtor on behalf of CLO constitute CLO's sole property, which the Debtor maintains for the benefit of CLO.  *See* Shared Services Agreement, § 4.02.  Accordingly, the Debtor's production of <u>all</u> ESI would necessarily involve the Debtor's production of CLO's sole property, including privileged ESI.

---

[2] A true and correct copy of the Shared Services Agreement is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.

4.      The Committee correctly points out that it stands in the Debtor's shoes for purposes of prosecuting the Estate Claims—but it does not stand in CLO's shoes.  The Committee's access to ESI, as well as the Debtor's production of the same, is in all respects subject to CLO's Privilege and should be subject to CLO's prior consent considering that the Debtor is, in pertinent part, simply a custodian of CLO's property.

## RELIEF REQUESTED

5.      CLO requests the opportunity to obtain from the Debtor, review, and assert privileges to all ESI concerning CLO-related legal services provided by the Debtor before the ESI is produced to the Committee.  That will allow CLO to conduct analyses for Privileges and confidentiality in accordance with the Agreed Protective Order [Dkt. #382] before CLO's records— held in the possession of the Debtor—are produced to the Committee.

## ARGUMENTS & AUTHORITIES

6.      The Final Term Sheet provides the Committee with standing to pursue the Estate Claims.  In that regard, the Final Term Sheet purports to allow the Committee access to "privileged documents and communications that are within the Debtor's possession, custody, or control." However, CLO is not a party to the Final Term Sheet, nor is CLO an "affiliate" of the Debtor within the meaning of Bankruptcy Code § 101(2).  The Debtor has no authority to grant any party access to CLO's privileged or confidential information.  The Final Term Sheet cannot form the basis for the Committee's access to, or the Debtor's production of, any such information.

7.      The fact that the Debtor provided legal services for itself as well as other parties does nothing to diminish the Privilege of any party.  The attorney-client privilege applies the same in joint-client representations as it does in a single-client representation:

> When co-clients and their common attorneys communicate with one another, those communications are "in confidence" for privilege purposes.  Hence the privilege protects those communications from compelled disclosure to persons outside the joint representation.

*In re Teleglobe Communications Corp.*, 493 F.3d 345, 363 (3d Cir. 2007), as amended (Oct. 12, 2007). The privilege among co-clients likewise applies when the attorneys are in-house counsel. *Id.*, at 369 ("While there is much debate over how corporate counsel should go about promoting compliance with law …, both sides of the debate seem to see in-house counsel as the 'front lines' of the battle to ensure that compliance while preserving confidential communications.").

8.     The exception to the rule of co-client privilege arises when the co-clients later become adverse to one another in litigation arising from the common interest representation. *In re Mirant Corp.*, 326 B.R. 646, 649 (Bankr. N.D. Tex. 2005); *Teleglobe*, 493 F.3d at 366-68. This Privilege exception—often called the "co-client exception"—forms the only conceivable basis for the Committee's access to ESI concerning CLO.

9.     The co-client exception to privilege provides that where two parties share the same legal counsel, one party may not invoke privilege against the other in litigation between them arising from the matter in which they were jointly represented. *Mirant*, 326 B.R. at 649. Two key elements must therefore be present in order for this exception to apply: (i) the co-clients must become adverse in subsequent litigation; and (ii) the subsequent litigation must stem from the *same matter on which they shared counsel. Id.* The cases of *Mirant* and *Teleglobe* illustrate CLO's Privileges in this case.[3]

## A.     *In re Mirant Corp.*

10.     In *Mirant*, the debtors were part of the "TSC" corporate family. Mirant was the parent of other affiliated debtors. TSC planned to divest itself of Mirant via public offering of 20% of Mirant's stock, and hired a third party outside law firm (Troutman) to represent both TSC and Mirant in the divestiture. Thereafter, having encountered financial troubles, Mirant and its subsidiaries filed for Chapter 11 relief. Mirant sought production from Troutman related to the

---

[3] These cases are somewhat distinguishable in that both involved parents and subsidiaries (affiliates), whereas CLO is not an affiliate of the Debtor. Therefore, the analysis of privilege in the context of duties between a parent and subsidiary are not relevant to CLO and the Debtor.

TSC-Mirant transactions prior to and during the divestiture, which Troutman and TSC opposed based on TSC's attorney-client privilege with Troutman.

11.     Troutman and TSC advanced multiple separate arguments in defense of TSC's privilege, with those asserted by TSC being most relevant to the instant case.[4]  The first of TSC's arguments was that Troutman's representation of TSC and Mirant in the divestiture did not constitute a joint representation.  *Mirant*, 326 B.R. at 653.  The Court made specific findings contrary to this assertion, specifically that the memorandum of TSC's general counsel directed that Troutman would "provide objective legal advice" for both parties and "document agreements reached between executives."  *Id.*  CLO asserts that any application of the co-client exception to its Privileges in this case must likewise be predicated on a finding that the Debtor and CLO were jointly represented in specific matters that gave rise to the responsive ESI.

12.     Additionally, Mirant asserted that no attorney client privilege existed because TSC and Mirant had certain common directors, thus meaning that knowledge gained by those TSC directors through dealings with Troutman was imparted to Mirant.  *Mirant*, 326 B.R. at 653.  TSC refuted this argument with numerous cases holding that directors sitting on the boards of both a parent and subsidiary represent the entities separately.  Although the Court found those cases distinguishable, the argument has at least some merit evidenced by the fact that the Court appeared

---

[4] Troutman argued that because a subsidiary (Mirant) must act for the benefit of its parent (TSC), there could be no lawful or permissible adverse interest between Mirant and TSC.  *Mirant*, 326 B.R. at 650-51.  This argument is irrelevant in the case at bar because, as previously noted, there is no affiliate or parent-subsidiary relationship between CLO and the Debtor.

Troutman further argued that the "Protocol" between TSC and Mirant limited each party's access to confidential information of the other.  *Mirant*, 326 B.R. at 652.  The Shared Services Agreement between CLO and the Debtor does not include such confidentiality provisions.  That fact is irrelevant, however, as the Court nonetheless held that the Protocol "[did] not provide Mirant or TSC with any privilege beyond that which exists in an ordinary joint representation."  *Id.*

to deny TSC's position based largely on public policy.[5]  *Id.* at 654.  In ruling for Mirant on this issue, the Court reiterated certain policy considerations worthy of note:

> It is black-letter law that the attorney-client privilege is meant to foster open communications between attorney and client. … Neither Troutman nor TSC can show any reasonable basis for supposing enforcement of TSC's privilege in the case at bar would advance that goal.  In a bankruptcy case, the need for investigation is far more acute than is any concern for attorney-client communications.

*Mirant*, 326 B.R. at 654 (internal citations omitted).

13.    In bringing this Limited Objection, CLO fully acknowledges that thorough investigations are vital to the bankruptcy process and the interest of creditors.  CLO does not assert that creditors in this case are entitled to anything less than a thorough investigation of the Estate Claims.  CLO reiterates that it intends to fully cooperate in discovery, but wishes to preserve all applicable privileges.

14.    *Mirant* does not stand for the proposition that privilege is disposed of altogether once bankruptcy comes into play.  Rather, *Mirant* upholds the well-established rule that the co-client exception to privilege applies only to litigation arising from a specific matter on which the parties were jointly represented.[6]  The Court progressed to discussions of policy only to rebut TSC's argument that directors may "wear two hats" without waiving privilege in joint-client situations.

15.    CLO asserts that it is nonetheless entitled to the traditional protections afforded under the law regarding Privileges.  *Mirant* supports CLO's Privileges as to all ESI concerning matters in which the Debtor's in-house counsel represented CLO independently of the Debtor.

## B.    *In re Teleglobe Communications Corp.*

---

[5] As discussed below, the Third Circuit in *Teleglobe* disagreed with the *Mirant* court on this issue.

[6] *Mirant*, 326 B.R. at 649 ("It is well established that, in a case of a joint representation of two clients by an attorney, one client may not invoke the privilege against the other client in litigation between them arising from the matter in which they were jointly represented.").

16. Like *Mirant*, the case of *Teleglobe* involved a privilege dispute among parent and subsidiary corporations. The debtors were subsidiaries of Teleglobe, which was a wholly-owned subsidiary of BCE. The debtors brought an adversary proceeding against BCE for its decision to withdraw funding from Teleglobe, effectively causing the debtors' bankruptcy. The disputes at issue related to matters for which BCE's in-house counsel and/or outside counsel jointly represented the debtors, Teleglobe, and BCE. The appeal to the Third Circuit raised "core questions about the proper operation of a corporate family's centralized in-house legal department." *Teleglobe*, 493 F.3d at 359. In a lengthy opinion, the Third Circuit analyzed, *inter alia*, the co-client privilege and the "adverse litigation" exception.[7]

17. *Teleglobe* elaborates on the co-client exception principles espoused in *Mirant*. Among other things, the Third Circuit notes that a finding of joint representation requires that both parties *intended* to be jointly represented. *Teleglobe*, 493 F.3d at 362.

> What the Court takes exception to is [the plaintiff's] effort to ... argue, in effect, that a joint representation of Party A and Party B may somehow arise through the expectations of Party B alone, despite Party A's views to the contrary. This position is untenable, because it would ... allow the mistaken (albeit reasonable) belief by one party that it was represented by an attorney ... to serve to infiltrate the protections and privileges afforded to another client.

*Id.* (quoting *Neighborhood Dev. Collaborative v. Murphy*, 233 F.R.D. 436, 441-42 (D.Md.2005)). The court went on to note that:

> [C]lients of the same lawyer who share a common interest are not necessarily co-clients. Whether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances.

*Id.* (quoting Restatement (Third) of the Law Governing Lawyers § 75 cmt. c). Accordingly, application of the co-client exception to CLO's Privileges requires a finding that CLO and the

---

[7] The "adverse litigation" exception discussed by the Third Circuit is referred to herein as the co-client exception to privilege.

Debtor intended to be jointly represented on the underlying matter. "The keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully … any testimony from the parties and their attorneys on those areas." *Id.* at 363.

18.     It is also worth noting that the Debtor cannot unilaterally waive CLO's Privileges, as a waiver of the co-client privilege requires the consent of all parties:

> [W]aiving the joint-client privilege requires the consent of all joint clients. … [A] client may unilaterally waive the privilege as to its own communications with a joint attorney, so long as those communications concern only the waiving client; it may not, however, unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients.

*Teleglobe*, 493 F.3d at 363 (citations omitted).

19.     The Third Circuit ultimately remanded the case for a determination of whether BCE and the debtors were jointly represented on a matter of common interest—if so, documents within the scope of that joint representation would have been discoverable. *Id.* at 383. The ultimate holding in *Teleglobe* aligns with the co-client exception rule espoused in *Mirant*:

> We hold that the District Court may only compel BCE to produce disputed documents because of the adverse-litigation exception to the co-client privilege if it finds that BCE and the Debtors were jointly represented by the same attorneys on a matter of common interest that is the subject-matter of those documents. Finding that BCE and Teleglobe were jointly represented is not enough, as Teleglobe cannot unilaterally waive the co-client privilege that attaches to documents that involve BCE and were created in the course of the joint representation.

*Teleglobe*, 493 F.3d at 386–87. Accordingly, the Debtor cannot waive CLO's privileges and produce all ESI in its possession—including ESI held as a custodian on CLO's behalf—because CLO has not waived any privileges or consented to production.

## CONCLUSION

20.     For the reasons set forth herein, the Debtor cannot be compelled to produce any ESI related to CLO matters in which the Debtor was not a jointly represented party.  Absent joint representation with an interest common to both CLO and the Debtor, all CLO-related ESI is subject to CLO's Privilege, even while in the Debtor's hands.  CLO's Privilege applies unequivocally to all ESI in the absence of specific findings that:

> (1)     the ESI is specifically related to the Estate Claims (the subsequent adverse litigation in this case);
>
> (2)     the ESI is related to matters on which CLO and the Debtor were jointly represented in furtherance of a common interest held by both parties; and
>
> (3)     both parties intended to be jointly represented on the matter at issue.

The fact that the ESI is in the Debtor's possession is irrelevant, as the custodian(s) possess such information and records solely in their capacity as a custodian for the benefit of CLO (*i.e.*, while wearing their "CLO hat").

**WHEREFORE**, CLO respectfully requests that this Limited Objection be sustained and that the Court enter an order (a) requiring that CLO be afforded the opportunity to review all ESI concerning CLO-related legal services before any such ESI is produced to the Committee, and (b) granting CLO such other and further relief to which it may be justly entitled.

DATED: July 15, 2020

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: <u>/s/ John J. Kane</u>
    Joseph M. Coleman
    State Bar No. 04566100
    John J. Kane
    State Bar No. 24066794

901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## CERTIFICATE OF SERVICE

    I hereby certify that on July 15, 2020, a true and correct copy of the foregoing Limited Objection was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the following parties:

| | |
|---|---|
| Paige Holden Montgomery | Jeffrey N. Pomerantz |
| Penny P. Reid | Ira D. Kharasch |
| Juliana L. Hoffman | John A. Morris |
| 2021 McKinney Avenue, Suite 2000 | Gregory V. Demo |
| Dallas, Texas 74201 | 10100 Santa Monica Boulevard, 13th Floor |
| Email:  pmontgomery@sidley.com | Los Angeles, CA 90067 |
|     preid@sidley.com | Email:  ipomerantz@pszjlaw.com |
|     jhoffman@sidley.com |     ikharasch@pszjlaw.com |
| |     jmorris@pszjlaw.com |
| Bojan Guzina |     gdemo@pszjlaw.com |
| Matthew A. Clemente | |
| Dennis M. Twomey | Melissa S. Hayward |
| Alyssa Russell | Texas Bar No. 24044908 |
| One South Dearborn Street | Zachery Z. Annable |
| Chicago, Illinois 60603 | Texas Bar No. 24053075 |
| Email:  bguzina@sidley.com | 10501 N. Central Expy, Ste. 106 |
|     mclemente@sidley.com | Dallas, Texas 75231 |
|     dtwomey@sidley.com | Email:  MHayward@HaywardFirm.com |
|     alyssa.russell@sidley.com |     ZAnnable@HaywardFirm.com |

<u>/s/ John J. Kane</u>
John J. Kane

# Exhibit A

**Shared Services Agreement**

**SECOND AMENDED AND RESTATED SERVICE AGREEMENT**

THIS SECOND AMENDED AND RESTATED SERVICE AGREEMENT (this "***Agreement***") entered into to be effective from the 1st day of January, 2017 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership (the "***Fund***"), Charitable DAF GP, LLC, a Delaware limited liability company (the "***General Partner***"), and any affiliate of the General Partner that becomes a party hereto. Each of the signatories hereto is individually a "***Party***" and collectively, the "***Parties***".

RECITALS

A.      HCMLP, the Fund and the General Partner entered into that certain Shared Services Agreement dated January 1, 2012 (the "***Original Agreement***");

B.      The Parties amended and restated the Original Agreement in its entirety on the terms as set forth in that certain Amended and Restated Agreement effective as of July 1, 2014 (the "***Existing Agreement***");

C.      The Parties desire to amend and restated the Existing Agreement in its entirety on the terms set forth herein;

C.      Since the inception of the Fund, the Parties have intended that the Fund and the General Partner would incur reasonable arm's-length fees in connection with the operation of the Fund and management and reporting activities with respect to Fund assets;

D.      HCMLP has incurred and will continue to incur substantial expenses on behalf of the Fund and the General Partner in performing the Services (as defined below);

E.      The Parties agree that it is in their mutual best interests for HCMLP to continue to provide the Services to the General Partner, the Fund and other Recipients (as defined below) and for HCMLP to be provided sufficient financial incentives to continue to provide the Services;

F.      The General Partner and the Fund desire to provide HCMLP sufficient compensation for performing the Services and to reimburse HCMLP for expenses incurred on their behalf;

G.      During the Term (as defined below), HCMLP will provide to the General Partner, on behalf of the Fund and/or its subsidiaries, certain services as more fully described herein, subject to the terms and conditions set forth herein.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, and the Existing Agreement is hereby amended and restated in its entirety as follows:

ARTICLE I
DEFINITIONS

"***Advisory Agreement***" means that certain Second Amended and Restated Investment Advisory Agreement, dated effect as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Dispute*" has the meaning set forth in Section 7.14.

"*Effective Date*" has the meaning set forth in the preamble.

"*Enforcement Court*" has the meaning set forth in Section 7.14.

"*Existing Agreement*" has the meaning set forth in the recitals.

"*Fund*" has the meaning set forth in the preamble.

"*General Partner*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*HCMLP*" has the meaning set forth in the preamble.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*Management Fee*" has the meaning set forth in the Advisory Agreement.

"*New Service*" has the meaning set forth in Section 2.03.

"*Original Agreement*" has the meaning set forth in the recitals. "*Party*" or "*Parties*" has the

2

meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Recipient*" means the General Partner, the Fund, and any of the Fund's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Services.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Services.

"*Service Standards*" has the meaning set forth in Section 4.01.

"*Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Services; and (ii) tax-related surcharges or fees that are related to the Services identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 5.01.

ARTICLE II
SERVICES

Section 2.01      Services.  During the Term, Service Provider will provide Recipient with Services, each as requested by Recipient and as described more fully on **Annex A** attached hereto (the "*Services*").

Section 2.02      Changes to the Services.

(a)      During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Service in order to reflect new procedures, processes or other methods of providing such Service, including modifying the applicable fees for such Service to reflect the then current fair market value of such service (a "*Change*").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Service to Recipient.

(b)      The Party requesting a Change will deliver a description of the Change requested (a "*Change Request*").

(c)      Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Service in any material respect or increase Recipient's cost for such Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the

implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03 <u>New Services</u>. The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Services not otherwise specifically listed in Section 2.01 (a "*New Service*"). Any agreement between the Parties on the terms for a New Service must be in accordance with the provisions of Article III and Article IV hereof, will be deemed to be an amendment to this Agreement and such New Service will then be a "*Service*" for all purposes of this Agreement.

Section 2.04 <u>Subcontractors</u>. Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Service hereunder. A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

ARTICLE III
PAYMENT OF FEES; TAXES

Section 3.01 <u>Management Fee</u>. The Fund shall pay the Service Provider the Management Fee in accordance with the terms and subject to the conditions set forth in the Advisory Agreement.

Section 3.02 <u>Taxes</u>.

(a) Recipient is responsible for and will pay all Taxes applicable to the Services provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Services as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Services, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b) Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

App. 0736

(c)     The provisions of this Section 3.02 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE IV
## SERVICE PROVIDER RESPONSIBILITIES

Section 4.01     Service Provider General Obligations.  Service Provider will provide the Services to Recipient, subject to the requirements under Sections 3.01 and 3.02 herein and subject to reimbursement of permitted expenses in accordance with the Investment Advisory Agreement entered into concurrently herewith, on a non-discriminatory basis and will provide the Services in the same manner as if it were providing such services on its own account (the "**Service Standards**").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 4.02     Books and Records; Access to Information.  Service Provider will keep and maintain books and records with respect to the Services in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Services, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 4.03     Return of Property and Equipment.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE V
## TERM AND TERMINATION

Section 5.01     Term.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "**Term**"), unless terminated earlier in accordance with Section 7.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 5.02.

Section 5.02     Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

## ARTICLE VI
## LIMITED WARRANTY

Section 6.01 <u>Limited Warranty</u>. Service Provider will perform the Services hereunder in accordance with the Service Standards. Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Services under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Services for any purpose or use or purpose. Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Service, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

## ARTICLE VII
## MISCELLANEOUS

Section 7.01 <u>No Partnership or Joint Venture; Independent Contractor</u>. Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or Recipient or their respective successors or assigns. The Parties understand and agree that this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever. No Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever. The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Services.

Section 7.02 <u>Amendments; Waivers</u>. Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties. No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided. No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 7.03 <u>Schedules and Exhibits; Integration</u>. Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement. This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 7.04 <u>Further Assurances</u>. Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

Section 7.05 <u>Governing Law</u>. Subject to Section 7.14, this Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 7.06 <u>Assignment</u>. Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

App. 0738

Section 7.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 7.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 7.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 7.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i) immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Chief Legal Officer
Fax:  (972) 628-4147

If to the General Partner or the Fund, addressed to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott
Fax:  (919) 854-1401

Section 7.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 7.12    Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 7.13    Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

App. 0739

Section 7.14    Jurisdiction; Venue; Waiver of Jury Trial.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("**_Dispute_**") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("**_Enforcement Court_**").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.15    General Rules of Construction.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero

Title:  President

Date:  6/21/17

**CHARITABLE DAF GP, LLC**

By:_____

Name:  Grant J. Scott

Title:  Managing Member

Date:

**CHARITABLE DAF FUND, L.P.**

By:  Charitable DAF GP, LLC, its general partner

By:_____

Name:  Grant J. Scott

Title:  Managing Member

Date:

App. 0741

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:  President
Date:

**CHARITABLE DAF GP, LLC**

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

**CHARITABLE DAF FUND, L.P.**

By:   Charitable DAF GP, LLC, its general partner

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

App. 0742

**Annex A**

**Services**

**Finance & Accounting**
  Book keeping
  Cash management
  Cash forecasting
  Financial reporting
  Accounts payable
  Accounts receivable
  Expense reimbursement
  Vendor management
  Valuation

**Tax**
  Tax audit support
  Tax planning
  Tax prep and filing

**Legal**
  Document review and preparation

**Trading**
  Trade execution
  Risk management
  Trade settlement
  General operations

**Facilities**

**Public Relations Support**

**Information Technology Infrastructure Support**

App. 0743