# Appendix Exhibit 45

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
Alan J. Kornfeld (CA Bar No. 130063) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S OBJECTION TO PROOFS OF CLAIM 190 AND 191 OF**
**<u>UBS SECURITIES LLC AND UBS AG, LONDON BRANCH</u>**

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



**NO HEARING WILL BE CONDUCTED ON THIS OBJECTION TO CLAIM UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, RM. 1254, DALLAS, TEXAS 75242-1496 BEFORE 5:00 P.M. (CENTRAL TIME) ON SEPTEMBER 9, 2020 WHICH IS AT LEAST THIRTY-THREE (33) DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE OBJECTING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE RESPONDING PARTY.**

**IF NO HEARING ON SUCH OBJECTION TO CLAIM IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER SUSTAINING THE OBJECTION TO CLAIM.**

Highland Capital Management, L.P., the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 case ("Bankruptcy Case"), hereby submits this objection to Proof of Claim No. 190 and Proof of Claim No. 191 (substantively identical claims that are referenced collectively as the "UBS Claim") filed by UBS Securities LLC and UBS AG, London Branch (collectively "UBS") on June 26, 2020, and in support thereof, respectfully states as follows:[2]

## INTRODUCTION

1. When global financial markets collapsed in late 2008, UBS and other participants in the securities trading industry suffered enormous losses. Among the losers were offshore funds related to the Debtor that were counterparties to warehousing agreements with UBS (the "Fund Counterparties"), which were unable to honor contractual margin calls. After eleven years of litigation in the New York state courts, UBS has obtained a determination that this was a breach of contract by the Fund Counterparties. UBS now holds a judgment against the

[2] Exhibits 1-12 to this objection are attached to *Appendix A of Exhibits in Support of Debtor's Objection to Proofs of Claim of UBS Securities LLC and UBS AG, London Branch,* filed concurrently herewith, and all citations herein to "A__" refer to Appendix A. Exhibits 13-17 to this objection are attached to *Appendix B of Exhibits in Support of Debtor's Objection to Proofs of Claim of UBS Securities LLC and UBS AG, London Branch.* Concurrently herewith, the Debtor is requesting the Court's permission to file Appendix B under seal. All citations herein to "B__" refer to Appendix B.

Fund Counterparties that, with the accrual of interest at 9% over a decade, exceeds $1 billion (the "Phase I Judgment").

2.      UBS's problem, of course, is that the Fund Counterparties do not have sufficient assets to satisfy UBS's judgment.  In the *Debtor's Objection UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action* [Docket No. 687], the Debtor said that the Fund Counterparties were insolvent.  However, the Fund Counterparties are insolvent only because of UBS's judgment, and the Debtor believes each Fund Counterparty has assets. The Debtor is continuing to assess those assets and their value.

3.      However, in addition to the lack of assets at the Fund Counterparties, and potentially more important, the operative agreements expressly exclude the Debtor from any liability for losses related to the transaction.  The governing agreements contain no agreement by the Debtor to pay, guarantee or otherwise backstop the Fund Counterparties' obligations.  That was a conscious decision by UBS: when the warehousing agreements were restructured earlier in 2008, UBS did not bargain for any assurance of performance by the Debtor, and thus the agreements do not obligate the Debtor to do so.  UBS, one of the largest and most sophisticated banks in the world at the time, bet that between the Fund Counterparties and the warehouse collateral there would be enough cushion to absorb any risk.  UBS knowingly took the risk that if the Fund Counterparties defaulted, it would have no recourse against the Debtor.  Instead of accepting the consequences of its bad business deal, UBS has used the litigation process to recut the deal to place liability on the Debtor.  The New York State Appellate Division, First Department so held in the prepetition state court litigation in 2010, dismissing UBS's claim in its February 24, 2009 complaint for contractual indemnification against the Debtor.  That New York State appellate court ruled that the Debtor had undertaken no obligation to ensure that the Fund Counterparties would be able to perform, and that contractual limitation was always clear to UBS.

4.      That decision has not stopped UBS from attempting to pin liability on the Debtor for the past decade.  After the dismissal of its claim against the Debtor for breach of contract, UBS commenced a second action in New York state court, asserting a claim that the Debtor had breached an implied covenant of good faith and fair dealing by not ensuring that the Fund Counterparties could perform.  UBS also added fraudulent transfer claims against the Debtor and others arising from an alleged $233 million in transfers made by a parent of one of the Fund Counterparties, Highland Financial Partners, L.P. ("HFP"), and its subsidiaries HFP Asset II and HFP Asset III (together, "HFP Asset II/III") in March 2009 (the "March 2009 Transaction").  UBS was not a creditor of HFP, so, in order to manufacture standing to challenge the transfers, UBS alleged HFP was an alter ego of a Fund Counterparty.  UBS did not, and still has not, pled an alter ego claim against the Debtor, nor has it prevailed on its claim that HFP is the alter ego of one of the Fund Counterparties.

5.      Three decisions by the Appellate Division bar any claim to hold the Debtor responsible for any portion of the Phase I Judgment:

- The first of these decisions, as noted, was the dismissal of UBS's original complaint against the Debtor (filed on February 24, 2009) and a judgment on the merits in favor of the Debtor on UBS' breach of contract claim. The Appellate Division based its determination on the fact that the Debtor did not promise to undertake liability as to UBS's losses, or to ensure the Funds' performance under their contracts with UBS. *See UBS v. Highland Capital Mgmt., L.P.*, 2010 NY Slip Op 1436, ¶ 1 (N.Y. App. Div.) [**Exhibit 1** at A002].

- The second decision, issued after UBS tried to re-assert the same claim against the Debtor by labeling it as different legal theories (as UBS is now doing), held that UBS is barred by *res judicata* from asserting claims against the Debtor that "implicate events alleged to have taken place before the filing of the original complaint" on February 24, 2009. *See UBS v. Highland Capital Mgmt., L.P.*, 86 A.D.3d 469, 474 (N.Y. App. Div. 2011) [**Exhibit 2** at A010].

- In its third decision, the Appellate Division extended its *res judicata* ruling to the Debtor's co-defendants in the state court litigation, holding that UBS's claims against other defendants – including the claim that HFP is the alter ego of one of the

Fund Counterparties – are likewise limited to conduct that occurred after February 24, 2009. *See UBS v. Highland Capital Mgmt., L.P.*, 93 A.D.3d 489, 490 (N.Y. App. Div. 2012) [**Exhibit 3** at A014].

6. The only post-February 24, 2009 conduct at issue in the UBS Claim and attachments is the March 2009 Transaction, which entailed transfers by HFP and HFP Asset II/III of assets valued at $239 million (later reduced to $233 million).[3] The breach of contract on which the Phase I Judgment is based occurred earlier: the warehousing agreements were terminated on December 3, 2008 and were found to have been breached on December 5, 2008. Accordingly, the Appellate Division's two *res judicata* decisions preclude UBS from attempting to hold the Debtor liable for UBS's breach of contract judgment against the Fund Counterparties, which is based solely on pre-February 24, 2009 conduct, directly or indirectly.

7. The UBS Claim incorporates its operative state court complaint. The claims for relief against the Debtor are the breach of implied covenant claim and the fraudulent transfer claim. UBS describes the UBS Claim as follows:

> Claimant hereby asserts a claim, pending litigation of Phase II, for damages arising from the Debtor's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP, additional interest, further damages (including punitive damages), and attorneys' fees that may be awarded by any court at the conclusion of Phase II.

UBS Claim, ¶ 26. UBS has also suggested, though it is not pled in the state court complaint or in the UBS Claim, that it is at this late date expanding its assertion of alter ego liability beyond HFP and the Fund Counterparties to also subsume the Debtor, in what would apparently be yet another attempt to render the Debtor liable for the entire Phase I Judgment notwithstanding the Appellate Division rulings. *See* Demonstrative at Slide 2 (showing currently pending claims).[4]

[3] *See* NY D.I. 411 at pg. 22 of 36 [**Exhibit 4** at A038] (State Court decision reciting that, in UBS's complaint, UBS alleged that $239 million of assets were transferred in the March 2009 transaction).

[4] The Debtor believes its Demonstrative sets forth only undisputed facts. The Demonstrative is attached hereto as Exhibit 18.

8. The Debtor has numerous meritorious defenses to UBS's fraudulent transfer claims in connection with the March 2009 Transaction. Several raise factual issues, but two do not. First, UBS has unequivocally released the Debtor with respect to all claims arising from $172 million of the alleged $233 million in fraudulent transfers (the "UBS Release").

9. The UBS Release was granted to the Debtor pursuant to settlement agreements UBS entered into in 2015 with co-defendants that received more than 80% of the allegedly fraudulent transfers made in the March 2009 Transaction. UBS expressly released the Debtor from any claims "for losses or other relief specifically arising from" the approximately $172 million in transfers.[5]

10. Second, UBS lacks standing as a non-creditor to challenge transfers made by HFP Asset II/III, entities against which UBS has asserted no claim. As UBS has long known, HFP Asset II/III were the transferors of approximately $187.5 million of the assets transferred in March 2009. Most of the transfers by those entities ($152.3 million) are covered by the UBS Release, leaving $35.2 million of transfers that, based on UBS's lack of standing, it cannot assert. This brings the total of fraudulent transfer claims that ***cannot*** be brought against the Debtor to $207.2 million out of $233 million.

11. UBS appears to concede that the Appellate Division rulings limit its claim for breach of the implied covenant of good faith and fair dealing to the March 2009 Transaction. Thus, the implied covenant claim amounts to no more than a restatement of the fraudulent transfer claim, *i.e.*, the Debtor breached the implied covenant by engaging in fraudulent transfers.[6] To the extent there is no liability for the transfers, the implied covenant claim

[5] *See* Exhibit 13 at Section 5.3, pg. 6 [B007]; Exhibit 14 at Section 5.3, pg. 5 [B037]. In its motion for injunctive relief against the settling defendants, UBS (i) reduced the total amount it claimed was transferred in the March 2009 transaction, and (ii) identified the transfers to the settling defendants as totaling more than 80% of the total amount of the March 2009 transaction. *See* NY D.I. 315 at pg. 6 [**Exhibit 15** at B061].

[6] *See, e.g.*, 05/01/18 State Court Hrg. Tr. at 10:13-16 [**Exhibit 5** at A063] (in discussing whether the implied covenant claim is based solely on the March 2009 transaction, UBS's counsel stated "basically,

obviously fails as well. Regardless, on the merits, no promise can be implied into the warehousing agreements that the Debtor would ensure that the Fund Counterparties would have the ability to pay UBS, when those contracts were restructured to *eliminate* any direct claim against the Debtor.

12. Even if there was liability (which there is none), UBS cannot use the implied covenant claim to render the Debtor liable for the alleged fraudulent transfers for which it released the Debtor from liability. The settlement agreements clearly preclude circumvention by relabeling claims.

13. Finally, UBS cannot use the doctrine of alter ego liability to render the Debtor liable for the Phase I Judgment. *Res judicata* bars any alter ego claims against the Debtor based on conduct predating February 24, 2009. Thus any claims UBS tries to create based upon the conduct occurring prior to the filing of its complaint (*i.e.*, the period of the parties' dealings) are barred.

14. UBS likely hopes to escape this clear claims barrier by casting alter ego liability as a post-judgment remedy under New York procedure rather than as a claim, but that maneuver fails. New York law applies *res judicata* to bar the assertion of alter ego liability against a person that was a party to terminated litigation, and the Appellate Division applied it in this case to limit UBS's claims against HFP, including an alter ego claim, on the basis that HFP was in privity with the Debtor. Accordingly, any assertion of alter ego liability is limited to the March 2009 Transaction, as to which UBS has not pled an alter ego claim against the Debtor.

15. UBS's factual allegations do not in any event support any determination of alter ego liability. A federal district court judge rejected similar arguments in nearly identical circumstances as a basis for alter ego liability in an action against the Debtor commenced by Citibank in the Southern District of New York. *Highland CDO Opportunity Master Fund, L.P. v.*

you know, the implied covenant of good-faith and fair-dealing claim that we now have is that they shouldn't have committed fraudulent conveyances …").

*Citibank, N.A.*, 270 F. Supp. 3d 716 (S.D.N.Y. 2017) ("*Citibank*"). The Debtor believes the Court will find the district judge's reasoning persuasive and the facts analogous, namely, that under New York law, Citibank's allegations of asset-stripping and diversion of assets that made it impossible to fulfill a margin call were not the kind of "wrong" that supports alter ego liability.

16. This Objection identifies those defenses to the UBS Claim as to which the Debtor contends there is no relevant factual dispute. The Debtor submits the Court can and should decide those defenses at this time without discovery or further proceedings. The Debtor requests that the Court establish a schedule for discovery and further proceedings on defenses identified or determined to be based upon disputed facts. The Debtor reserves all rights to supplement or amend this Objection, as appropriate.

## STATEMENT OF FACTS

### A. The CLO Warehouse Agreements

17. In April 2007, UBS entered into agreements (collectively, the "CLO Warehouse Agreements") with the Debtor and the two Fund Counterparties -- Highland Special Opportunities Holding Co. ("SOHC") and Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") -- to establish a warehouse facility to finance the acquisition of syndicated leveraged loan vehicle liabilities and credit default swaps. (Ex. A, 4/12/07 Original Synthetic Warehouse Agreement; Ex. B, 4/20/07 Original Engagement Ltr.; Ex. C, 5/22/07 Original Cash Warehouse Agreement.) Those assets, in turn, were to serve as the basis for a securitization pursuant to which notes would be sold to investors. Due to market conditions, the securitized offering did not occur by the contractual deadline, and the CLO Warehouse Agreements terminated in August 2007. *See generally* UBS Claim, ¶¶2-3.[7]

18. In March 2008, UBS, the Debtor, as servicer and the Fund Counterparties entered into restructured warehouse agreements (collectively, the "Restructured CLO Warehouse

[7] Paragraph references are to the *Addendum to Proof of Claim* attached to each UBS proof of claim.

Agreements"). (Motion at ¶6, Exs. C, D, E.) In addition to the collateral posted by the Fund Counterparties as initial margin, the Restructured CLO Warehouse Agreements gave UBS the right to make margin calls for additional collateral on the Fund Counterparties in the event of a decline in the market value of the loans and swaps. UBS Claim, ¶¶4-5. If the margin calls were not met, the agreements permitted UBS to protect its exposure by swiftly foreclosing on the assets. Neither the Restructured CLO Warehouse Agreements nor any other agreements allowed UBS to obtain margin or any similar recovery from the Debtor. To the contrary, the agreements made clear that the Fund Counterparties bore all risk on the facilities. Among other things, the engagement letter between UBS and the Debtor provided that the Fund Counterparties would "in aggregate bear 100% of the risk of the Warehouse Facility" in accordance with the Fund Counterparties' respective allocation percentages. (Ex. 19, § 3(c); *see also* Demonstrative Slide 3.)

19. The UBS Claim is laced with extraneous and untrue allegations of supposed misrepresentations made by the Debtor to induce UBS to enter the Restructured CLO Warehouse Agreements, *e.g.*, that it "assured Claimant that the Fund Counterparties had sufficient assets to cover any losses," or that it misrepresented the amount of cash held by the Fund Counterparties, or failed to disclose encumbrances on collateral. *Id.*, ¶¶4-7. The Court should recognize these as futile efforts to "poison the well." Based on the margin structure of the facilities and the parties' sophistication, UBS could never "establish justifiable reliance to support its claims that defendants committed fraud by misrepresenting their creditworthiness or the assets they owned prior to entering the transaction." *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 159 A.D.3d 512, 514 (N.Y. App. Div. 2018) (affirming trial court's finding of a question of fact on the issue). UBS also cannot square this allegation with its own contemporaneous internal documents. *See* Ex. 20 (two days before the 2008 Restructured Transaction: "CRC [credit risk committee] view as to the Highland Hedge Funds ability to pay if

they were to default today to close to zero."); Ex. 21 (seven days before the transaction: "The counterparties have illiquid assets, little cash, and no ability to raise cash on their assets in the current market. Thus we assign a very low probability to the two counterparties ability to meet our claim of $166 mil."); and Ex. 96. ("At Feb 29th CRC advised they were ascribing zero value to the potential claim on the two hedge funds offered as obligors to cover this exposure.").[8]

20. As noted above, the Restructured CLO Warehouse Agreements explicitly placed the risk of loss on the Fund Counterparties, and not the Debtor, as the New York court has determined. *UBS Securities LLC v. Highland Capital Mgmt., L.P.*, 893 N.Y.S.2d 869 (N.Y. App. Div. 2010) ("the agreements between the parties contain no promise on the part of Highland to undertake liability with respect to the investment losses suffered by plaintiffs, or to ensure or guarantee the performance of [Fund Counterparties]' obligations to bear the risk of investment losses.").

21. As the market deteriorated in the fall of 2008, UBS made three margin calls on the Fund Counterparties. SOHC managed to satisfy the first two margin calls in September and October 2008, using funds provided by SOHC's parent corporation, HFP. UBS Claim, ¶11; *UBS Securities LLC, et al v. Highland Capital Mgmt., L.P*., et al, No. 650097-2009, at 4 (N.Y. Sup. Ct. Nov. 19, 2019).

22. Ironically, in view of UBS's mantra that the Debtor schemed "to intentionally frustrate and prevent Claimant from recovering any of the amounts" owed to UBS (UBS Claim, ¶13), UBS concedes that "the Debtor moved assets around for other entities it controlled to make the first two collateral calls[.]" *Id.*, ¶11. The Debtor moved assets into UBS's counterparties and paid those assets *to UBS*. And the Debtor did so even after the start of the global financial crisis.

---

[8] Ultimately UBS's dealmakers overcame the objections of their internal risk team, asserting they had done business with Highland for years and were "pretty sure that we could get Highland to buy back their counterparty exposure… for more than zero." *See* Ex. 23.

23. The Fund Counterparties were unable, however, to satisfy a third margin call in November 2008, and UBS issued a notice of termination of the Restructured CLO Warehouse Agreements in December. *Id*. UBS alleges that, as of December 5, 2008, its losses were over $520 million. *Id*., ¶12.

**B. The HFP Notes and the March 2009 Transaction**

24. The other subject matter of the UBS Claim is transfers made in connection with the March 2009 Transaction that it alleges were fraudulent transfers. It is undisputed that the transfers were made by HFP (or its non-defendant subsidiaries), which was not a party to either the CLO Warehouse Agreements or the Restructured CLO Warehouse Agreements, and so owed no debt or duty to UBS. Nonetheless, UBS claims standing to challenge the transfers because it may in the future be owed money by HFP, provided it prevails on its claim that HFP is an alter ego of the Fund Counterparties. *Id*., ¶16. UBS alleges in the State Court complaint that on March 17, 2009, the Debtor caused HFP to transfer all of its assets to the Debtor and affiliated co-defendants in the New York action (the "Affiliated Transferee defendants"), in what UBS alleged were fraudulent conveyances of $239 million in assets.

25. The March 2009 Transaction was the settlement of certain notes issued by HFP in the fall of 2008. In September 2008, HFP, through two newly-created, wholly-owned subsidiaries, acquired $321 million in CLO assets and life settlement insurance contracts from the Affiliated Transferee defendants in exchange for senior secured notes in a principal amount of $316 million with a maturity date of 2018. *See* Demonstrative Slide 4 The notes required HFP to make amortizing quarterly payments of $15 million to the Affiliated Transferee defendants, starting in February 2009. HFP was required to transfer a security interest to the Affiliated Transferee defendants in the shares of two wholly owned subsidiaries into which HFP transferred the newly acquired assets.

26. In October 2008, HFP issued an additional $55,488,000 of secured notes, also due in 2018, to Highland Crusader Offshore Partners, L.P. ("Crusader Fund"). The September and October notes (the "HFP Notes") brought HFP's debt obligation to the Affiliated Transferee defendants to approximately $371 million. Toward the end of 2008, the assets that secured the HFP Notes were subject to significant credit downgrades, decreasing cash flows available to HFP as dividends. The decreased cash flows made it unlikely that HFP would be able to meet its debt service obligations under the HFP Notes, or its obligation to pay premiums on the life settlement contracts it had acquired, jeopardizing the underlying collateral.

27. Based on these concerns, HFP's Board therefore approved a settlement with respect to the HFP Notes to relieve it of these obligations, which satisfied the notes and transferred the collateral back to Highland Credit Strategies Master Fund, L.P. ("Credit Strategies"), Highland Credit Opportunities CDO, L.P. and Crusader Fund, and to other noteholders/obligees (including Citibank and the Debtor). The March 2009 Transaction eliminated approximately $370 million of debt and protected HFP from further exposure as the value of the collateral securing the HFP Notes continued to deteriorate. *See* Demonstrative Slides 5 and 6. The satisfaction of the HFP Notes and the return of the collateral was effectuated pursuant to a "Termination, Settlement and Release Agreement" dated March 20, 2009, between HFP, HFP Asset Funding II, Ltd., and HFP Asset Funding III, Ltd., as Issuers, and the noteholders/obligees.

28. The March 2009 Transaction was unrelated to debts owed by SOHC to UBS (and so, as discussed below, was patently not an "actual intent" fraudulent conveyance). The transferor was an entity, HFP (or its unrelated subsidiaries), which did not and still does not owe anything to UBS. Further, the challenged transfers satisfied secured debt to non-insiders (which, as discussed below, constitutes "fair consideration" under section 273 of the New York

Debtor and Creditor Law ("NYDCL") meaning they could not be constructively fraudulent either).

## C. Procedural History

29. On February 24, 2009, UBS commenced a lawsuit against the Debtor and the Fund Counterparties in New York state court, alleging breach of the Restructured CLO Warehouse Agreements by the Fund Counterparties and seeking indemnification from the Debtor for certain losses (the "2009 Action") (Ex. F, Compl., *UBS Sec. LLC v Highland Capital Mgmt., L.P.*, No. 650097/09 (N.Y. Sup. Ct. Feb. 24, 2009).) The indemnification claim—the only cause of action that UBS asserted against the Debtor—was dismissed by the New York Appellate Division. "Dismissal of plaintiffs' indemnification claim against Highland is warranted, since ***the agreements between the parties contain no promise on the part of Highland to undertake liability with respect to the investment losses suffered by plaintiffs, or to ensure or guarantee the performance of defendant off-shore funds' obligations to bear the risk of investment losses.***" *UBS Securities LLC v. Highland Capital Management, L.P.*, 70 A.D.3d 526, 893 N.Y.S.2d 869 (2010) (emphasis added).

30. After the Debtor was dismissed from the 2009 Action, UBS twice amended its complaint in the 2009 Action to add five new defendants (including HFP, Credit Strategies, and Crusader Fund) and filed a new action against the Debtor on June 28, 2010, captioned as *UBS v. Highland Capital Management, L.P.*, Index No. 65072/2010 (N.Y. Sup. Ct.) (the "2010 Action").[9] The 2009 Action and the 2010 Action were later consolidated. As its claims against the Debtor, UBS asserted that the March 2009 Transaction was a fraudulent conveyance that benefitted the Debtor, and that the Debtor breached the implied covenant of good faith and fair dealing by causing it. Recognizing it was not a creditor of HFP (and thus

[9] The operative complaint against the Debtor, filed in the 2010 Action, is attached as **Exhibit 16** to Appendix B [B064-B121], and the operative complaint against the remaining defendants, filed in the 2009 Action, is attached as **Exhibit 17** to Appendix B [B123-B180].

lacked standing to challenge the transfers), UBS needed a bootstrap to assert the fraudulent transfer claims against HFP and other defendants, UBS's amended complaint in the 2009 Action included a claim for declaratory relief against HFP seeking a determination that HFP was the alter ego of one of the Funds. The alter ego claim against HFP is the only alter ego cause of action that UBS has asserted in the New York state court litigation; in over a decade of litigation, UBS has never asserted that the Debtor is the alter ego of the Funds or any other entity.

31. In 2011 and 2012, the Appellate Division issued two more decisions that eliminated, or otherwise significantly limited, UBS's claims against the Debtor and new defendants. Both decisions applied *res judicata* to restrict UBS from seeking recovery for any conduct that occurred prior to February 24, 2009, the date on which UBS filed its original complaint in the 2009 Action, in which a final judgment was rendered on the merits in favor of the Debtor. *See* Exhibit 2 at A010; Exhibit 3 at A014.

32. In the 2011 decision, after UBS tried to re-assert the same claim against the Debtor under different legal theories (much like UBS is now doing), the Appellate Division held:

> [T]o the extent the [UBS] claims against Highland in the new complaint implicate events alleged to have taken place before the filing of the original complaint, res judicata applies. That is because UBS's claims against Highland in the original action and in this action all arise out of the restructured warehousing transaction. While the claim against Highland in the original action was based on Highland's alleged obligation to indemnify UBS for actions taken by the affiliated funds, and the claims against Highland in the second action arose out of Highland's alleged manipulation of those funds, they form a single factual grouping. ***Both are related to the same business deal and to the diminution in the value of the securities placed with UBS as a result of that deal***.

*UBS v. Highland Capital Mgmt., L.P.*, 86 A.D.3d 469, 474 (N.Y. App. Div. 2011) (emphasis added) [**Exhibit 2** at A010].

33. In the 2012 decision, the Appellate Division extended its *res judicata* ruling to the Debtor's co-defendants in the state court litigation, holding that UBS's claims

against other defendants (which included a claim that HFP is the alter ego of one of the Fund Counterparties) are likewise limited to conduct that occurred after February 24, 2009. *UBS v. Highland Capital Mgmt., L.P.*, 93 A.D.3d 489, 490 (N.Y. App. Div. 2012) [**Exhibit 3** at A014]. "This Court's reversal of an order denying dismissal of the complaint in a related action (UBS Sec. LLC v Highland Capital Mgt., L.P., 86 AD3d 469 [2011]), warrants dismissal of a portion of plaintiff's claims in this action due to res judicata since defendants are in privity with the defendant in the other action." *Id*. (citation omitted).

34. In light of the Appellate Division's decisions, UBS's remaining claims against the Debtor are limited to those that arise out of the allegedly fraudulent transfers in the March 2009 Transaction. This includes its claim for breach of the implied covenant, which UBS acknowledged to the state court "involves [the Debtor's] role in the March 2009 fraudulent conveyances [and] overlaps factually with the ... fraudulent conveyance claims"[10] and more succinctly: "the implied covenant of good-faith and fair-dealing claim that we now have is that they shouldn't have committed fraudulent conveyances to make it certain that these two parties couldn't have paid."[11]

**D. The UBS Settlement and Release**

35. In June 2015, in exchange for payments totaling $70.5 million, UBS released its claims against the Debtor (and other parties) pursuant to settlement agreements it entered into with three affiliates of the Debtor – Crusader Fund, Highland Crusader Holding Corporation and Credit Strategies. The UBS Release covers transfers to these affiliates representing approximately $172 million of the $233 million of challenged transfers. Section 5.3 of the settlement agreements provides, in relevant part:

> [T]he UBS Releasing Parties do hereby release, and covenant not to sue, [the Debtor] with respect to such Claims to the limited extent the Claims are for losses or other relief specifically arising from the fraudulent

[10] Exhibit 6 at A106.
[11] 05/01/18 State Court Hrg. Tr. at 5:14-18 and 7:16-10:16 [Exhibit 5 at A058, A060-A063].

> transfers to [the settling defendants] alleged in the UBS Litigation. For the avoidance of doubt, the Claims released do not include (a) any Claims for losses or other relief arising from the alleged fraudulent transfers to any defendant in the UBS Litigation other than [the settling defendants] or (b) any other Claims for losses or other relief arising from the [warehouse agreement], except to the limited extent the Claims are for losses or other relief that specifically arise from the alleged fraudulent transfers to [the settling defendants] …

**E. The Phase I Trial**

36. The New York state court conducted a bench trial in July 2018 on the breach of contract claims against the Fund Counterparties under the Restructured CLO Warehouse Agreements. It issued its decision in November 2019, finding the Fund Counterparties liable for breaching the Restructured CLO Warehouse Agreements and awarding damages in the amount of $519,374,149, plus prejudgment interest, for a total judgment of approximately $1.05 billion. *UBS Securities LLC, et al v. Highland Capital Mgmt. L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct. Nov. 19, 2019) [Doc. No. 641]. The State Court made no findings with respect to the Debtor or the remaining defendants. Those claims were scheduled to be heard during a second trial.

**F. Summary of the UBS Claim**

37. The UBS Claim alleges anew the fraudulent transfer claims that UBS released in the UBS Release: "the Debtor and HFP caused asset transfers of millions of dollars of assets to the Debtor, [Credit Strategies], [Crusader Fund], and Highland Credit Opportunities CDO, L.P…, among others, thereby further reducing Highland's abilities to meet their obligations to Claimant." UBS Claim, ¶18. The premise appears to be that although UBS has already recovered the value of $172 million of the alleged fraudulent transfers by way of its settlement with the Debtor and others, it can recover the very same amounts from the Debtor a second time as damages for causing the transfers to be made. UBS attempts this magic trick by re-casting the same claims as a breach of an implied duty "to act in good faith to cause HFP to satisfy the debts, as much as possible, then owed to Claimant." *Id*. And although it never got a

guaranty or a keep-well promise of any type, UBS further alleges that the Debtor "deliberately kept the Fund Counterparties undercapitalized, and allowed all assets of any value to be drained from the Fund Counterparties" and so precluded UBS from recovering anything. *Id*., ¶¶16, 18.

38. Further confusing matters, although the filing of the UBS Claim post-dates this Court's denial of relief from stay, UBS postulates that its claim against the Debtor will be tried before a jury in the State Court:

> The next step in the State Court Action is Phase II of the trial, where Claimant's remaining claims against not only the Debtor, but also against other Highland affiliates are to be tried to a jury, with the court deciding liability as to the breach of the implied covenant of good faith and fair dealing claim and the jury deciding all remaining claims. (*Id.* at 2 n.1, 38.) The claims to be tried in Phase II include claims for breach of the implied covenant of good faith and fair dealing, fraudulent conveyances, and alter-ego liability. The specific amounts the two non- Debtor affiliates owe to Claimant for their breach of the Warehouse Agreements are now set forth and embodied in the final $1 billion judgment from Phase I. And Claimant has stated claims against the Debtor—which was also a party to the same contract and exercised complete control over the two liable affiliates—under which Claimant is entitled to damages that are at least as much as the Phase I judgment amount. Claimant will seek damages for the Debtor's various breaches of the implied covenant as well as its specific role in the fraudulent transfer scheme, and pre-judgment interest and attorneys' fees where available. In addition, Claimant will seek punitive damages against the Debtor for its role in orchestrating the extended efforts to prevent Claimant from collecting the amounts owed under the Warehouse Agreements.

*Id*., ¶ 24.

39. UBS then summarizes its claim as follows:

> Claimant hereby asserts a claim, pending litigation of Phase II, for damages arising from the Debtor's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP, additional interest, further damages (including punitive damages), and attorneys' fees that may be awarded by any court at the conclusion of Phase II.

*Id*., ¶ 26.

## OBJECTION TO CLAIM

### A. Legal Standard

40. The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim. "A claim . . . , proof of which is filed under section 501 [of the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). "A proof of claim executed and filed in accordance with the [Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *see also In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006). However, the ultimate burden of proof for a claim always lies with the claimant. *Armstrong*, 347 B.R. at 583 (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).

### B. The Fraudulent Transfer Claim Should be Disallowed

41. UBS's fraudulent transfer claim against the Debtor is limited to conduct that occurred after February 24, 2009, and is therefore limited to the March 2009 Transaction extinguishing the HFP Notes, which UBS contends was both a constructively fraudulent conveyance and an actual fraudulent conveyance under New York law.[12]

42. A conveyance is constructively fraudulent under New York law if it is made while the transferor is insolvent or satisfies other similar financial criteria, and if the transferor does not receive "fair consideration" in exchange for the transfer. *Englander Capital Corp. v. Zises*, 79 N.Y.S.3d 502, 506 (N.Y. Sup. Ct. 2018); NYDCL §§ 273, 274, 275. A transfer is an actual fraudulent conveyance under New York law if it is made with actual intent to hinder, delay or defraud the transferor's creditors. *Id.* at 507; NYDCL § 276.

43. UBS contends the March 2009 Transaction was a fraudulent conveyance because (i) UBS was a creditor of SOHC under the Restructured CLO Warehouse Agreements,

[12] The recent amendments to New York's fraudulent conveyance laws took effect on April 4, 2020 and are not retroactive. Therefore, UBS's fraudulent conveyance claims are governed by New York Debtor and Creditor law as it existed prior to the recent amendments.

(ii) SOHC was the alter ego of HFP, (iii) as part of the settlement of the HFP Notes, HFP transferred assets to the Debtor, its affiliates and Citibank, (iv) HFP did not receive "fair consideration" for the transfers (even though the HFP Notes were cancelled), (v) HFP and SOHC were insolvent at the time, and (vi) the settlement of the HFP Notes was made with the actual intent to hinder, delay or defraud UBS, as a creditor of SOHC.

44. The fraudulent conveyance claim should be disallowed for the following reasons:

- UBS has released the Debtor with respect to the transfers covered by the UBS Release, which total approximately $172 million of the total $233 million transfer. The Debtor submit this defense may be decided on the existing record, without further proceedings.

- UBS lacks standing to challenge transfers that were made not by HFP but by two of its subsidiaries, HFP Asset II/III, which are not defendants in the UBS litigation and as to which UBS is not a creditor or even a purported creditor. The Debtor submits this defense may be decided on the existing record, without further proceedings.

- UBS cannot establish that the Debtor was the beneficiary of any transfers other than the $17.8 million that it received directly. Further proceedings will be required on this issue.

- UBS cannot establish that the transfers were not supported by "fair consideration" because the asset transfers were return of collateral to extinguish secured debt. Further proceedings will be required on this issue.

- UBS cannot establish that the March 2009 Transaction was entered into in bad faith or with the intent to hinder, delay or defraud UBS or any other creditors. Further proceedings will be required on this issue.

- UBS cannot establish that HFP was insolvent at the time of the transfers. Further proceedings will be required on this issue.

**i) UBS Released All Claims Against the Debtor Arising From Transfers to Credit Strategies, Crusader Fund and Highland Crusader Holding Corporation**

45. As noted, in June 2015, in exchange for payments totaling $70.5 million, UBS released its claims against the Debtor (and other parties) arising from transfers to Credit Strategies, Crusader Fund and Highland Crusader Holding Corporation, which represent $172

million of the alleged fraudulent transfers. The UBS Release is at Section 5.3 of the settlement agreements, which provides:

> [T]he UBS Releasing Parties do hereby release, and covenant not to sue, [the Debtor et al.] with respect to such Claims to the limited extent the Claims are for losses or other relief specifically arising from the fraudulent transfers to [the settling defendants] alleged in the UBS Litigation. For the avoidance of doubt, the Claims released do not include (a) any Claims for losses or other relief arising from the alleged fraudulent transfers to any defendant in the UBS Litigation other than [the settling defendants] or (b) any other Claims for losses or other relief arising from the [warehouse agreement], except to the limited extent the Claims are for losses or other relief that specifically arise from the alleged fraudulent transfers to [the settling defendants] …

46. On its face, the UBS Release explicitly applies to the fraudulent transfer claims against the Debtor asserted in the UBS Claim. It is indisputable that those claims are, in the express words of the UBS Release, "Claims [ ] for losses or other relief specifically arising from the fraudulent transfers to [the settling defendants] in the UBS Litigation." Just as clearly, neither exclusion in the UBS Release applies, namely: (a) these are not transfers "to any defendant in the UBS Litigation other than [the settling defendants]"; and (b) nor are they "any other Claims for losses or other relief arising from the [warehouse agreement]…."

47. The Debtor submits that the Court can decide this issue without further proceedings.

**ii) UBS Lacks Standing to Challenge Transfers Made by HFP Asset II/III**

48. Conveyances can only be challenged as fraudulent by a creditor of the initial transferor. *See e.g., Avilon Auto. Grp. v. Leontiev*, 2020 NY Slip Op 30837(U), ¶ 41 (N.Y. Sup. Ct.) (plaintiff's status as a creditor is a requirement to have standing under New York's fraudulent conveyance laws). The creditor can seek relief against the transferors, the transferees, and any non-transferee beneficiaries of the fraudulent conveyance. *Fed. Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 842 (N.Y. 1990).

49. HFP Asset II/III were the transferors of approximately $187.5 million of the assets transferred in the March 2009 Transaction. UBS is not a creditor of HFP Asset II/III

and has not named those entities as defendants in the UBS Litigation. Of that amount, $152.3 million were transfers covered by the UBS Release. Of the remaining $35.2 million: (a) approximately $11.7 million was transfers to Citibank, and (b) approximately $23.5 million was transfers to Highland Credit Opportunities Holding Corporation and Multi-Strat.

50. None of the transfers were to the Debtor, but to the extent UBS might otherwise succeed in imposing liability upon the Debtor for transfers to other transferees, UBS has no standing to challenge those transfers made by HFP Asset II/III.

51. The Debtor submits that the Court can decide this issue without further proceedings.

**iii) The Debtor is Not the Beneficiary of the Transfers**

52. The Debtor received only $17.8 million of the transfers in the March 2009 Transaction, as a subsequent transferee from HFP. UBS will be unable to meet its burden of demonstrating that Debtor benefited sufficiently from other transfers to impose liability, such as the $17.4 million in aggregate transfers to Citibank. The Court should establish a schedule for further proceedings on this issue.

**iv) HFP Received "Fair Consideration" for the Transfers**

53. UBS cannot meet its burden of showing that any transfers were not made for "fair consideration." "Fair consideration" is provided when property is given "in good faith" to satisfy a preexisting debt "as a fair equivalent therefor." NY Dr & Cr § 272. While a transfer to an insider to satisfy an antecedent debt is "presumed to lack good faith," *Englander Capital Corp.*, 79 N.Y.S.3d at 506, that presumption does not apply when the transfer is to an insider who is legitimately a secured creditor. *Id*.

54. The March 2009 Transaction satisfied HFP's obligations on the HFP Notes. The HFP Notes were secured at their inception, well before UBS filed its complaint on February 24, 2009. They were secured by, among other things, HFP's interests in HFP Asset

II/III.  While UBS contests whether the HFP Notes actually were secured, the Southern District of New York district court in Citibank held that they were.  *Citibank*, 270 F. Supp. 3d at 733 ("HFP's financial condition is irrelevant to the value of the HFP Notes because the notes were secured by independently valued collateral"). The State Court declined to decide the issue on summary judgment.

55.     The fact that the security interests were not perfected is irrelevant, so long as they were effective between the parties. NY UCC § 9-201(a) ("a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors"); *Ultimore, Inc. v. Bucala*, 464 B.R. 626, 632 (Bankr. S.D.N.Y. 2012) (NY UCC § 9-201(a) gives an unperfected secured creditor rights superior to those of unsecured creditors).

56.     A security interest attaches to collateral and becomes enforceable if three requirements are met: (i) value has been given; (ii) the debtor had rights in the collateral or the power to transfer rights in the collateral to the secured party; and (iii) the debtor has authenticated (*i.e.*, signed) a security agreement that describes the collateral.  NY UCC § 9-203(b).  These requirements were met.  The noteholders gave value in exchange for the security interests by transferring assets to HFP's subsidiaries.  HFP had rights in the collateral or the power to transfer rights in the collateral.

57.     With respect to the final requirement, "[a]ny document showing the required intent to grant an interest in the collateral will serve as a security agreement....  For there to be a valid and enforceable security agreement, a formal and separately signed document labeled 'security agreement' is not necessary." *Ultimore, Inc.*, 464 B.R. at 631 (citations omitted). "Almost any combination of documents can be used to prove the existence of a security agreement so long as the documents embody the intention of the parties to create a security interest." *Id*.  Here, the HFP Notes and other related documents state that the HFP Notes were

secured, and evince an intent to create a security interest. As to HFP's interests in HFP Asset II/III, the parties also executed a charge over shares agreement that describes the collateral and repeatedly refers to the security interest granted in HFP's shares of HFP Asset II/III. The remaining collateral is described in detail in the underlying note purchase agreement. (Ex. 24.)

58. Undeterred by the secured nature of the HFP Notes, UBS asserts that the HFP Notes are not really secured debt because they should be recharacterized as equity interests. The Fifth Circuit permits debt to be recharacterized as equity only if that remedy is allowed under applicable state law. *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539 (5th Cir. 2011) (rejecting use of section 105(a) as basis for recharacterization). There are no New York state court decisions allowing recharacterization, and UBS cannot rely on bankruptcy court decisions on recharacterization to argue a state law claim. *See Alliance Shippers, Inc. v. Garcia*, 2015 U.S. Dist. LEXIS 51316, at *3-4 (S.D.N.Y. Apr. 17, 2015) ("Defendants next argue that both 'recharacterization' and 'equitable subordination' are claims under the bankruptcy law and not properly before this Court. They are correct. . . They do not constitute valid causes of action outside of the bankruptcy context.").

59. Because UBS cannot establish that the HFP Notes were not secured, its constructive fraudulent transfer claims must fail.

**v) UBS Cannot Demonstrate Fraudulent Intent or Lack of Good Faith**

60. For all the reasons described above, among others, both the issuance of the HFP Notes and their extinguishment in the March 2009 Transaction had a legitimate, good faith basis, and had nothing to do with attempting to divert assets from UBS, which was not a creditor of HFP (or its non-defendant subsidiaries) either when the notes were issued or even at the time of the March 2009 Transaction (and will never become a creditor of HFP unless it prevails on its alter ego claim). UBS cannot meet its burden of proof of establishing lack of good faith or intent to hinder or defraud creditors.

**C. UBS's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Should be Disallowed**

61. The Restructured CLO Warehouse Agreements are governed by New York law. As a result, the implied covenant claim, which is based on the restructured agreements, also is governed by New York law. *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp.*, 264 B.R. 69, 97-98 (Bankr. S.D.N.Y. 2001). Under New York law, a covenant of good faith and fair dealing is "[i]mplicit in all contracts." *19 Recordings Ltd. v. Sony Music Entm't*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016) (citations omitted). The implied covenant is "a promise that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. (internal quotation marks and citations omitted). A plaintiff must (i) identify the implied duties allegedly arising out of the parties' contract, (ii) establish that the defendant breached those implied duties and, in doing so, acted malevolently or in bad faith, and (iii) establish that the defendant's conduct caused the plaintiff's alleged damages.

**i) A Duty on the Debtor's Part to Ensure That UBS Would be Paid Cannot Be Implied When UBS Knowingly Did Not Contract For It**

62. It is axiomatic that the implied covenant also cannot be used to create new rights or impose new obligations that are inconsistent with the express terms of the parties' contract. *Id*. at 165. A party asserting "the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978). Therefore, a party asserting an implied covenant claim "must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *Id*.

63.     UBS wishes the Court to imply a duty by the Debtor to ensure that the Fund Counterparties' are able to pay UBS.  Such a flies directly in the face of the contracts and the Appellate Division's very first decision in the UBS litigation dismissing the contractual indemnity claim against the Debtor.  Because of the *res judicata* decisions, UBS is, at most, left with a repackaged fraudulent transfer claim: an implied duty by the Debtor to not permit the March 2009 alleged fraudulent transfers.

64.     The Restructured CLO Warehouse Agreements do not impose any direct liability on the Debtor to ensure or guarantee performance by the Fund Counterparties.  Such a basic obligation cannot be implied, which is precisely why the Appellate Division *already* held that the indemnification provisions did not impose on the Debtor an obligation "to ensure or guarantee the performance" of the Funds' obligations to UBS.  These are highly complex contracts negotiated by highly sophisticated parties.  There are numerous "protective" provisions in the Restructured CLO Warehouse Agreements, presumably heavily negotiated, relating to the posting of collateral and collateral calls, and there are numerous other protections for which UBS could have negotiated, but did not.

65.     The Appellate Division ruling is dispositive.  UBS had alleged that the Debtor had breached an indemnification obligation that was *implied*, not express.  So is the covenant that UBS now seeks to imply into the same contracts.  There is no material difference in the context that would support any decision other than that which the Appellate Division already reached.  Both implied provisions amount to an imagined guaranty by the Debtor of performance of the Fund Counterparties, something that simply cannot be implied into a contract, and certainly not one between sophisticated parties such as these.

66.     In *Citibank*, the district court rejected Citibank's similar attempt to imply a promise by the Debtor to ensure that cash would be available for distribution on the HFP Notes. CDO Fund (a Fund Counterparty) had pledged its HFP Notes to Citibank as collateral for its

obligations under a separate financing arrangement with Citibank. As part of the pledge agreement, the Debtor agreed "that as long as Citi held any of the HFP Notes under a pledge from CDO Fund, if HFP has cash available on a Quarterly Payment Date in an amount equal or greater to the Quarterly Payment Amount, [the Debtor] will recommend to the board of directors and management of HFP, to the extent consistent with [the Debtor's] fiduciary duties, that HFP not exercise the [payment-in-kind] Option on the Notes for such Quarterly Payment Date." *Citibank*, 270 F. Supp. 3d at 731. Citibank argued, in seeking to impose alter ego liability on the Debtor, that the Debtor had an implied obligation under the pledge agreement to ensure that cash was available for distribution on the HFP Notes. The court granted summary judgment in favor of the Debtor. It was "unpersuaded that HCM even owed Citi a good faith obligation to ensure that cash was available for distribution on the HFP Notes." *Id*. at 732. "[I]t makes little sense to read into the [pledge agreement] an implied promise that [the Debtor] would ensure that cash was available for distribution on the HFP Notes. To the contrary, such an implied promise would impose a duty on [the Debtor] beyond that which Citi bargained for." *Id*.

67. Similarly, in *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1508 (S.D.N.Y. 1989), the court granted summary judgment against bondholders who contended their indentures carried an implied covenant not to incur LBO debt. The court refused to use the implied covenant to "create an indenture term that, while bargained for in other contexts, was not bargained for here and was not even within the mutual contemplation of the parties." *Id*. In particular, the court held:

> … [T]he "fruits" of these indentures do not include an implied restrictive covenant that would prevent the incurrence of new debt to facilitate the recent LBO. **To hold otherwise would permit these plaintiffs to straightjacket the company in order to guarantee their investment. These plaintiffs do not invoke an implied covenant of good faith to protect a legitimate, mutually contemplated benefit of the indentures; rather, they seek to have this Court create an additional benefit for which they did not bargain.**

*Id*. at 1519 (emphasis added).

68. Here, as in *Metro Life Ins. Co.*, UBS is attempting to create an obligation that could have been bargained for and made part of the restructured agreements – but was not. Imposing an obligation on the Debtor to ensure that UBS would be paid is in effect to create a guaranty where none was purchased. In these circumstances, it would create an obligation to prefer UBS over other creditors. That is not a reasonable extension of the parties' express agreement.

**ii) Since Any Breach of the Implied Covenant Can Only be Based on the Alleged Fraudulent Conveyances, the UBS Release Applies**

69. As a result of the two *res judicata* decisions, UBS can only base its implied covenant claim on the alleged fraudulent conveyances made in the March 2009 Transaction. But it has released the Debtor from liability with respect to $172 million of the $233 million in transfers. The UBS Release applies without ambiguity.

70. Once again, Section 5.3 of the settlement agreements provides:

> [T]he UBS Releasing Parties do hereby release, and covenant not to sue, [the Debtor et al.] with respect to such Claims to the limited extent the Claims are for losses or other relief specifically arising from the fraudulent transfers to [the settling defendants] alleged in the UBS Litigation. For the avoidance of doubt, the Claims released do not include (a) any Claims for losses or other relief arising from the alleged fraudulent transfers to any defendant in the UBS Litigation other than [the settling defendants] or (b) any other Claims for losses or other relief arising from the [warehouse agreement], except to the limited extent the Claims are for losses or other relief that specifically arise from the alleged fraudulent transfers to [the settling defendants] …

71. A claim that the Debtor breached an implied obligation not to let a fraudulent transfer occur is unambiguously a claim "for losses or other relief specifically arising from the fraudulent transfers…." Again, the exclusions do not apply. First, the Debtor is not attempting to apply the UBS Release to transfers to other parties. Second, the subject of the implied covenant claim is the fraudulent transfers, and so even if the implied covenant claim is technically an "other Claim[] for losses or other relief arising from the [warehouse agreement],"

it is nonetheless a claim that quite literally comes within the exception "for losses or other relief that specifically arise from the alleged fraudulent transfers…." There is no room for interpretation. The settlement cannot be dispensed with by relabeling the claim.

**iii) UBS Cannot Prove that Any Duty to Ensure That UBS Would be Paid was Breached in Bad Faith or With Malevolence Targeting the Plaintiff**

72. If a duty could be implied, UBS would have the burden of proving that the Debtor breached it in bad faith or with malevolence targeting UBS specifically. *Wilder v. World of Boxing LLC,* 310 F. Supp. 3d 426, 451 (S.D.N.Y. 2018) (to establish a lack of good faith, the plaintiff must show that the defendant exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive the plaintiff of the benefits under the contract).

73. There is no duty to ensure the Fund Counterparties could pay UBS, but even if there were, and even assuming that implied duty was breached by entering into the March 2009 Transaction, UBS cannot meet its burden of proving that it was done in bad faith or malevolently targeting UBS, The March 2009 Transaction was a good faith, commercially reasonable transaction that was not designed to "shield assets" from UBS, but instead was designed to try to protect the financial viability of HFP and its subsidiaries. It was approved by HFP's board based on legitimate concerns regarding HFP's ability to service the debt or maintain the collateral, in particular, its ability to make the premium payments due on the life settlement contracts. It eliminated approximately $370 million of debt, and protected HFP from further exposure as the value of the collateral securing the HFP Notes continued to deteriorate.

74. Not only was the March 2009 Transaction a legitimate, commercially reasonable decision, it cannot be shown to have targeted UBS. HFP has no business relationship with UBS. HFP was not even a defendant in the complaint filed by UBS on February 24, 2009. That complaint was solely against the Fund Counterparties and the Debtor and was only for breach of contract. Only after losing its contract claim against the Debtor in the February 2010

appellate decision did UBS cast a wider net, for the first time adding HFP as a defendant and alleging alter ego in June 2010.

75. UBS will not be able to establish at trial that the Debtor breached any implied duty to UBS, let alone that the March 2009 Transaction was anything other than a "good faith" transaction.

**iv) Causation and Damages**

76. Causation is an "essential element" of damages for an implied covenant claim, meaning that the plaintiff must establish that the defendant's breach "directly and proximately" caused the plaintiff's damages. *St. Christopher's, Inc. v. Forgione*, 2019 U.S. Dist. LEXIS 115476, *28 (S.D.N.Y. July 11, 2019) (citations omitted); *see also Wilder*, 310 F. Supp. 3d at 448 (plaintiff must establish that defendant's breach of implied covenant proximately caused plaintiff's damages).

77. As a result of the *res judicata* decisions, UBS can only base its implied covenant claim on the March 2009 Transaction. That being the case, the maximum amount of damages that could be shown to be proximately caused by such a breach, assuming *arguendo* that there was a breach, would be any amount of transfers made in the March 2009 Transaction found to be fraudulent. The March 2009 Transaction involved transfers of at most approximately $233 million of assets (roughly half of the principal amount of UBS's breach of contract damages) and UBS has already released the Debtor from liability with respect to $172 million of those transfers. Furthermore, the transfers to Citibank of $17.4 million cannot constitute damages to UBS.

78. In the event this Court finds that the UBS Release does not limit damages on the implied duty claim related to the alleged fraudulent transfers, the Debtor would nonetheless be entitled to an offset against damages for the $70.5 million of settlement payments that UBS received from the settling defendants. New York General Obligations Law ("GOL") §

15-103 provides for the offset of settlement amounts received from a "co-obligor" to the extent of "the amount received on the obligations of all co-obligors." GOL § 15-103. *See J.P. Endeavors v. Dushaj*, 8 A.D.3d 440, 442 (N.Y. App. Div. 2004) (under GOL § 15-103, where multiple defendants were sued for liability on a brokerage contract, plaintiff's settlement with one defendant reduced the amount on which the remaining defendants could be held liable); *D.H. Blair & Co., Inc. v. Gottdiener*, 2010 WL 4258967, *10 (S.D.N.Y. Oct. 27, 2010) (defendant was "entitled to a credit of the amount of the settlement" between other parties).

79. In addition, GOL § 15-108(a) provides that a settlement payment by a joint tortfeasor may offset or reduce the plaintiff's claims against other joint tortfeasors, and some New York courts have held that GOL § 15-108 is not limited to tort. *See e.g.*, *Koch v. Greenberg*, 14 F. Supp. 3d 247, 270 (S.D.N.Y. 2014), *aff'd* 626 Appx. 335 (2d Cir. 2015) (reducing award and concluding that GOL § 15-108 is potentially applicable to other types of claims, notwithstanding its references to "tort" and "tortfeasor"); *Carter v. State*, 139 Misc. 2d 423, 427 (N.Y. Sup. Ct. 1988), *aff'd* 154 A.D.2d 642 (N.Y. App. Div. 1989) (New York courts have applied the statute "equally to claims and actions grounded on theories of liability other than tort"); *Cty. of Westchester v. Welton Becket Assocs.*, 102 A.D.2d 34, 45-46 (N.Y. App. Div. 1984), *aff'd* 66 N.Y.2d 642 (N.Y. 1985) (applying GOL § 15-108 even though claims were "essentially contractual in nature").

80. Offset of the $70.5 million settlement against any breach of implied covenant damages is also proper under New York common law. Specifically, under established New York law, parties cannot recover twice for the same injury or on the same alleged debt. *Morris v. Zimmer*, 2014 U.S. Dist. LEXIS 39608, *18 (S.D.N.Y. Feb. 11, 2014) ("It is well settled that Plaintiffs are not entitled to double recovery for the same debt."); *Zarcone v. Perry*, 78 A.D.2d 70, 79 (N.Y. App. Div. 1980), *aff'd* 55 N.Y.2d 782 (N.Y. 1981) ("[J]udicial policy forestalls a double recovery for an injury"). The alleged damage to UBS is the amount of the

fraudulent transfer; to the extent UBS has already recovered by settlement on account of a fraudulent transfer, a recovery from the Debtor for damages arising from the same transfer would be a double recovery.

*81.* The offset would apply before the calculation of prejudgment interest. *Lizden Indus., Inc. v. Franco Belli Plumbing & Heating & Sons, Inc.*, 2011 N.Y. Misc. LEXIS 4247, *22 (N.Y. Sup. Ct. Aug. 24, 2011) (denying request to calculate pre-judgment interest before offset of co-defendant's settlement payment), *aff'd* 95 A.D.3d 738 (N.Y. App. Div. 2012) (trial court "properly awarded prejudgment interest on the verdict after it was reduced by the amount of Belli's settlement, pursuant to General Obligations Law § 15-108").

**D. Any Claim for Alter Ego Liability Should be Disallowed**

82. UBS has not pled a claim against the Debtor for alter ego liability throughout the eleven year duration of the UBS litigation. The UBS Claim appears to assert for the first time that such liability exists and that it would subject the Debtor to the entire Phase I judgment against the Fund Counterparties. But any such claim is barred by *res judicata*, as the Phase I judgment only relates to conduct predating February 24, 2009. Like the rest of UBS's claims, therefore, any alter ego liability is limited to the March 2009 Transaction. Regardless, as the *Citibank* decision establishes, UBS's factual allegations do not entail the kind of "wrongs" that support alter ego liability.

**i) Any Alter Ego Liability is Limited by *Res Judicata* to Conduct After February 24, 2009**

83. The Appellate Division has already ruled that UBS is barred by *res judicata* from asserting claims against the Debtor that "implicate events alleged to have taken place before the filing of the original complaint" on February 24, 2009. *UBS v. Highland Capital Mgmt., L.P.*, 86 A.D.3d at 474 [**Exhibit 2** at A010]. This would include any new claim against

DOCS_LA:330659.8 36027/002

the Debtor for alter ego. *See UBS v. Highland Capital Mgmt., L.P.*, 93 A.D.3d at 490 [**Exhibit 3** at A014] (limiting the alter ego claim against HFP to post-February 2009).

84. UBS will contend that the Debtor's alter ego liability is not an independent "claim" but only a post-judgment remedy under New York Civil Practice Law and Rules ("CPLR") 5225(b) and therefore not subject to *res judicata*. *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135 (N.Y. 1993). Of course, courts regularly consider alter ego relief in connection with pending litigation – notably in the present action, in which UBS seeks a declaratory judgment that HFP is the alter ego of SOHC, and in the Citibank litigation. *See also Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 33-35 (S.D.N.Y. 2018) (plaintiff may pierce corporate veil and sue non-signatory for breach of contract when non-party is an alter ego of one or more signatories).

85. While a proceeding to impose alter ego liability may be initiated as post-judgment supplementary proceedings in New York under the CPLR, that is not the case when the party against whom alter ego liability is asserted was a party to the underlying action. Where, as the newly alleged claim against the Debtor, the defendant on the newly-asserted alter ego claim was a party to the terminated action, *res judicata* applies to the assertion of alter ego liability. In *Bd. of Managers of the 195 Hudson St. Condo v. Jeffrey M. Brown Assocs*., 652 F. Supp. 2d 463, 478-82 (S.D.N.Y. 2009), the Board filed suit (the "Conversion Litigation") seeking damages for construction defects against, among others, K&J and JMB. The Board did not, however, assert a claim of alter ego liability against JMB in the Conversion Litigation itself. The Conversion Litigation against JMB was dismissed on the merits, with the court finding, among other things, that JMB was not a party to the underlying agreements. A breach of contract judgment was thereafter entered against K&J, and the Board initiated another separate action seeking to hold JMB liable, on alter ego grounds, for the breach of contract judgment against K&J. The court rejected the Board's attempt, holding that *res judicata* barred the assertion of the alter ego claims

against JMB in the subsequent proceeding because "the facts necessary to sustain both causes of action arise from the same transactions or factual grouping, form a convenient trial unit, and the facts essential to the instant claim were already present in the Conversion Litigation."

86. The same is true in this case, in which the Appellate Division observed one of UBS's complaints was "thoroughly suffused with allegations that [the Debtor] was essentially the alter ego of the parties it induced to breach the agreements." 86 A.D.3d at 477. In fact, one of the UBS claims against HFP that was limited on the basis of *res judicata* based on HFP's privity with the Debtor was an alter ego claim against HFP. For its own reasons, however, UBS has litigated for over a decade without expressly asserting alter ego liability against the Debtor, even though it asserted a claim for declaratory relief against HFP for a determination of alter ego liability.

87. Accordingly, any assertion of alter ego liability would be limited to post-February 24, 2009 conduct. Like the other claims against the Debtor, it would be subject to the UBS Release. Furthermore, no such claim has been pled and *res judicata* would bar its assertion.

**ii) UBS's Allegations are an Insufficient Basis for Finding Alter Ego Liability**

88. New York law disfavors disregard of the corporate form and only allows the drastic remedy of veil piercing under extraordinary circumstances. *Cobalt Partners, L.P. v. GSC Capital Corp.*, 97 A.D.3d 35, 40 (N.Y. App. Div. 2012). To pierce the corporate veil under New York law, a plaintiff bears a heavy burden to establish both (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue **and** (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *Citibank*, 270 F. Supp. 3d at 726. To avoid dismissal, a complaint must plead particular facts to demonstrate that the domination of the corporation caused the plaintiff's injury. *See e.g., CSX Tramp., Inc. v. Filco Carting Corp.*, 2011 U.S. Dist. LEXIS 74625, *10 (E.D.N.Y. July 7,

2011). Here, even if UBS could satisfy the first prong, domination, it cannot satisfy the second, because the "wrongs" it alleges do not support alter ego liability.

**First Alter Ego Prong – Domination**

89. The Second Circuit has identified ten factors to consider in determining whether an entity exercises complete domination over another entity for purposes of alter ego liability.[13] The Debtor denies that UBS can establish its "complete domination," while acknowledging that the district court in *Citibank* found that the Debtor "exercised complete control over CDO Fund." *Citibank*, 270 F. Supp. 3d at 726-28.

**Second Alter Ego Prong – Wrong or Fraud**

90. On the basis of allegations that included virtually the same as those made by UBS, the district court in *Citibank* held that Citibank failed to demonstrate the second prong – a "wrong or fraud" for veil piercing purposes – and granted summary judgment against Citibank's alter ego claims seeking to hold the Debtor liable for CDO Fund's obligations. *Citibank*, 270 F. Supp. 3d at 729-33. Citibank had identified three acts that it asserted constituted fraudulent or wrongful conduct: (i) the Debtor stripped cash and assets from CDO Fund prior to a margin call; (ii) the Debtor diverted cash distributions on the HFP Notes that would otherwise have been available to CDO Fund to satisfy the margin call; and (iii) the Debtor fraudulently misrepresented the value of the HFP Notes that CDO Fund pledged to Citibank as collateral. *Id.* at 729.

91. As to the "asset stripping" allegations, the district court found that the payments to the Debtor and its affiliates represented the repayment of preexisting obligations and

[13] These factors are: (1) absence of formalities and paraphernalia that are part of corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records, (2) inadequate capitalization, (3) whether funds are put in and taken out of corporation for personal purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, addresses and telephone numbers, (6) amount of business discretion displayed by dominated corporation, (7) whether related corporations deal with dominated corporation at arms' length, (8) whether corporations are treated as independent profit centers, (9) payment or guarantee of debts of dominated corporation by other corporations in the group, and (10) whether corporation in question had property used by other corporations as if it were their own.

that, even if the transfers were constructively fraudulent conveyances to insiders of CDO Fund, such transfers did not constitute a wrong for veil piercing purposes. *Id*. at 730-31. With respect to Citibank's similar argument that the Debtor diverted cash distributions on the HFP Notes to itself or related parties, the court found that there was no implied promise that would impose a duty on the Debtor to ensure that cash was available for distribution on the HFP Notes. The court determined that, "[t]o the contrary, such an implied promise would impose a duty on HCMLP beyond that which Citi bargained for," and noted that there was no authority for finding that a breach of an implied covenant of good faith would constitute a wrong for purposes of veil piercing. *Id*. at 732. In doing so, the court reiterated the well-established rule that an ordinary "breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil." *Id.* Based on its findings, the court held that "[b]ecause none of the acts identified by Citi constitutes a wrong or fraud for veil piercing purposes, [the Debtor] is not liable for CDO Fund's obligations under a traditional veil piercing theory." *Id*. at 733.

92. Courts applying New York law also have rejected alter ego claims where a sophisticated party knowingly contracts with its counterparty and then seeks to impose liability on a third party for breach of that contract – especially where the party could have negotiated for direct rights against the third party. *See TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y. 2d 335, 339-40 (N.Y. 1998); *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC,* 146 A.D.3d 1, 12-13 (N.Y. App. Div. 2016). Here, UBS was well aware of the risks of the transaction and with the ownership and managerial structure of the Highland-related entities, yet it knowingly entered into the Restructured CLO Warehouse Agreements in which only the Fund Counterparties, and not the Debtor, were responsible for performance. There is no basis for piercing the corporate veil on such facts.

## CONCLUSION

The UBS Claim is subject to disallowance or material limitation on a summary basis. Even without consideration of the Debtor's other defenses to UBS's asserted or threatened claims, the Court may rule that nearly all of the fraudulent conveyance claims have been released, that the undisputed facts preclude the implication of a guarantee of performance into the Restructured CLO Agreements, and that there is no legally sufficient basis for imposing alter ego liability. The few remaining claims are subject to numerous meritorious defenses, as described herein.

WHEREFORE, the Debtor respectfully requests that the UBS Claim be disallowed in its entirety, and grant the Debtor such other and further relief as the Court deems just and proper.

Dated: August 7, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
Alan J. Kornfeld (CA Bar No. 130063)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
rfeinstein@pszjlaw.com
akornfeld@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*