# Appendix Exhibit 50

Docket #0996 Date Filed: 08/26/2020

**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas 75240
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS
AG, London Branch*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

---------------------------------------------------------------x

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | : | Case No. 19-34054-sgj11 |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------x

**OBJECTION TO THE PROOF OF CLAIM FILED BY
REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND**

---

[1] The Debtor's last four digits of its taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200826000000000003

UBS Securities LLC and UBS AG, London Branch (together, "UBS"), by and through their undersigned counsel, hereby submit this objection (the "Objection") to Proof of Claim No. 72 (the "Proof of Claim" or "Redeemer Claim"), filed by Redeemer Committee of the Highland Crusader Fund ("Redeemer"). In support of this Objection, UBS respectfully states as follows:

## PRELIMINARY STATEMENT

The Redeemer Claim arises from an Arbitration Award issued by an American Arbitration Association ("AAA") panel against the Debtor. As set forth herein, however, there are fundamental flaws with several key aspects of both the Arbitration Award and the Redeemer Claim generally. For one thing, the Arbitration Award that underlies the Proof of Claim is actually two competing "final" arbitration awards—both issued by the same arbitral panel in the same proceeding, but neither of which has been confirmed, or otherwise entered as a final judgment, by any court of competent jurisdiction.

In rendering these awards, the arbitral panel impermissibly substantively (and unilaterally) modified several aspects of its first "final" arbitral award *after* that award had already been issued. This was improper as a matter of law. Under the long-standing common law doctrine of *functus officio*—not to mention the binding AAA Commercial Arbitration Rules that governed the arbitration proceedings in question—"anything an arbitrator does to modify a final award after it has been issued is without effect because at that point the arbitrator lacks any power to reexamine that decision." *See Hill v. Wackenhut Servs. Int'l*, 971 F. Supp. 2d 5, 12 (D.D.C. 2013); AAA R-50 ("The arbitrator is not empowered to redetermine the merits of any claim already decided."). This fact alone renders at least *$36.5 million* of the amounts Redeemer is claiming through its Proof of Claim unrecoverable and subject to vacatur.

Beyond that, roughly $115 million of the remaining $154 million in claims that Redeemer asserts are functionally worthless. Such amounts relate to what Redeemer refers to as its claims

1

for "Deferred Fees" and the "Cornerstone Award." But under the express terms of the Arbitration Award and the Crusader Fund[1] governing documents by and between Redeemer and the Debtor, Redeemer cannot recover either the "Deferred Fees" or "Cornerstone Award" amounts from the Debtor without triggering an obligation to turn over assets of great value to the Debtor. The amounts that Redeemer must turn over to the Debtor to collect on the "Deferred Fees" and "Cornerstone Award" will, in all likelihood, eclipse any actual recovery Redeemer might receive from the Debtor's estate on such claims as part of this bankruptcy. What that means is that Redeemer has grossly overstated its claim, and the true value of Redeemer's legitimate and allowable claims is unlikely to exceed $40 million, at the most.

## JURISDICTION

1.    This Court has jurisdiction to consider the Objection under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

2.    The statutory predicates for the requested relief are section 502 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Local Rules of the United States Bankruptcy Court of the Northern District of Texas (the "Local Rules").

## BACKGROUND

### A.    The Debtor's Chapter 11 Bankruptcy Petition

---

[1]    "Crusader Fund" is defined to include Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd.

App. 0942

3.  The Debtor, Highland Capital Management, L.P. (the "Debtor" or "HCM"), is an investment management firm that manages a variety of hedge funds, structured investment vehicles, and mutual funds.

4.  On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for chapter 11 relief in the Bankruptcy Court for the District of Delaware. Pursuant to an order dated December 4, 2019, the Debtor's bankruptcy proceedings were transferred to this Court under the above-captioned case number.

5.  On March 2, 2020, this Court entered a general *Order (I) Establishing Bar Dates for Filing Claims and (ii) Approving the Form and Manner of Notice Thereof*. (Dkt. No. 488.) Pursuant to that order, the general bar date for proofs of claim was set for April 8, 2020.

**B.  Redeemer's Proof of Claim**

6.  On April 3, 2020, Redeemer filed Proof of Claim No. 72 against the Debtor. (**Ex. A**, Proof of Claim ("POC") No. 72 at 1.) The Redeemer Claim is predicated upon what it refers to as the "Arbitration Award," which is actually two separate "final" arbitration awards issued in an arbitration proceeding that Redeemer filed against the Debtor in or around 2016. (**Ex. B**, Partial Final Award (defined below) (the "PFA") at 4.) Though its claims are principally based on the awards from this prepetition arbitration proceeding against HCM (which concerned only the Debtor's alleged prepetition conduct), the Redeemer Claim takes the position that any claims it might have are not, in fact, "prepetition claims." (Ex. A, POC Rider at 1.) Instead, Redeemer states that the Arbitration Award is actually "an executory contract under section 365 of the Bankruptcy Code" that the Debtor has not yet "moved to assume or reject." (*Id.*) Redeemer, thus, purports to be filing the Proof of Claim only "out of an abundance of caution." (*Id.*)

7.  In its Proof of Claim, Redeemer asserts that it has a "Damage Claim" against the Debtor for "at least $190,824,557 plus interest that is accruing beginning as of October 16, 2019,

App. 0943

the date that HCM filed its bankruptcy case." (*Id.*) Redeemer then lists the "separate components of the Damage Claim," which it notes are "set forth in the Final Award." (*Id.*) The components of Redeemer's Damage Claim that are directly relevant to UBS's Objection are the so-called (1) "Deferred Fee Claim" (for which Redeemer claims $43,105,395); (2) "Distribution Fee Claim" ($22,922,608); (3) "Barclays Claim" ($30,811,366); (4) "Cornerstone Award" ($71,894,891); (5) "Legal Fees, Costs, and Expenses" ($11,351,850); and (6) 224 days of prejudgment interest calculated within the (a) "Taking of Plan Claims" ($171,576 of the $3,277,991 Redeemer claims); (b) "CLO Trades Claim" ($24,820 of $685,195); (c) "Credit Suisse Claim" ($151,085 of $3,660,130); and (d) "UBS Claim" ($112,776 of $2,600,968). (*Id.* at 1-2.)

8.      In addition to the liquidated Damage Claim itself, Redeemer also asserts "an unliquidated claim for post-petition interest, attorneys' fees, costs and other expenses that continue to accrue in connection with the Damage Claim" (the "Post-Petition Claim"). (*Id.* at 2.) Redeemer cites no authority in support of this Post-Petition Claim. (*See generally id.*)

9.      Lastly, Redeemer also asserts a claim for the transfer of certain interests or, in the alternative, "an unliquidated amount" for what it refers to as the "Cancellation of Limited Partnership Interests" in the Crusader Fund held by (i) HCM and Charitable DAF Fund, L.P. and (ii) Eames, Ltd. ("Eames"). (*Id.* at 2.) The claim for interests held by Eames appears to be based on certain relief set forth in the Final Award (and only the Final Award), which Redeemer claims provides for "HCM to transfer, or take all necessary steps to cause the transfer of, such interests to the Redeemer Committee for the benefit of the Crusader Fund." (*Id.*) Similarly, Redeemer claims to reserve its right to seek the distribution of funds held in the "Deferred Fee Account," or to claim an unliquidated amount if such distributions are not made. (*Id.*)

**C.      Background on Redeemer's Damage Claim and the Arbitration Award**

10.     The events giving rise to Redeemer's purported Damage Claim against HCM appear to be a series of disputes between Redeemer and HCM that arose out of their efforts to wind down the Crusader Fund—a lengthy process that began in or around 2008.  (Ex. B, PFA at 2-3.)  Specifically, Redeemer's Damage Claim appears to relate to a contractual "Plan and Scheme" by and between Redeemer and HCM that was meant to "enable the orderly management, sale, and distribution of the assets" of the Crusader Fund as part of their wind-down.  (*Id.* at 2.)

11.     In or around July 2016, Redeemer initiated an arbitration before the AAA—which the parties agreed would be subject to the AAA Commercial Arbitration Rules—and asserted, among other things, breach of contract and fiduciary duty claims against HCM.  (*Id.* at 3-4.)  Final hearings in the arbitration were held in September 2018.  (*Id.* at 7.)  Following such hearings, closing arguments, and post-hearing briefing, "the record was declared closed" on December 12, 2018.  (*Id.* at 7.)

12.     In early 2019, the panel of arbitrators (the "Panel") presiding over Redeemer's arbitration against HCM rendered two separate "final" arbitral awards: an initial Partial Final Award dated March 6, 2019 (the "Partial Final Award") and a subsequent Final Award dated April 29, 2019 (the "Final Award").  (*See id.*; **Ex. C**, Final Award (the "FA").)  The first of these awards, the Partial Final Award, was a 56-page single-spaced reasoned decision unanimously signed by all three members of the Panel, which addressed the substantive claims and counterclaims that Redeemer and HCM had raised in the arbitration.  (*See generally* Ex. B, PFA.)  There are two aspects of the Partial Final Award that are relevant to this Objection:

- **Barclays LP Interests.**  As part of the March 6, 2019 Partial Final Award, the Panel analyzed, discussed, and ruled on one of Redeemer's core allegations— namely, that HCM improperly transferred certain limited partner interests in the Crusader Fund that belonged to Barclays (the "Barclays LP Interests") from Barclays to an HCM affiliate, Eames.  (*See, e.g.,* Ex. B, PFA at 8, 15, 20-22, 54.)  The Panel not only analyzed HCM's transfers of these Barclays LP Interests, it

App. 0945

specifically determined in the Partial Final Award that such transfers were a "breach" of the parties' agreement and, thus, "improper." (*Id.* at 21-22, 54.) But—critically—the Panel did not treat HCM's transfers of the Barclays LP Interests to Eames as an independent wrongdoing. Instead, the Partial Final Award only ever discussed the transfer of the Barclays LP Interests in the context of one of Redeemer's broader sets of claims, known as its "Distribution Fee Claim." (*See id.* at 15; *id.* at 20 (analyzing "Payments to Barclays and Eames *as Distributions*").) After determining that HCM's transfers of the Barclays LP Interests were "improper," (*id.* at 20-22, 54), the Panel went on to award Redeemer damages arising from such conduct as part of the Partial Final Award. In particular, the Partial Final Award provided Redeemer with a "total" of $14,452,275 in aggregate damages (plus prejudgment interest) to cover all of the "improper" conduct relating to its Distribution Fee Claim—a list that specifically included HCM's transfers of the Barclays LP Interests.[2]

- **Prejudgment Interest.** In addition to finding HCM liable for, and awarding damages arising out of, HCM's transfer of the Barclays LP Interests, the Panel also awarded Redeemer a limited amount of prejudgment interest for certain types of compensatory damages as part of the Partial Final Award. (*See e.g.*, *id.* at 48, 54-55.) In so doing, the Panel set an outside date by which the prejudgment interest would no longer run—March 6, 2019, *the date of the Partial Final Award itself*. (*See, e.g., id.* at 54 (awarding "statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award").)

13.    On March 7, 2019—the day after the Panel issued the Partial Final Award—Redeemer sent an email to the Panel, requesting that the Panel modify the Partial Final Award. (Ex. B, FA at 1.) On March 14, 2019, before HCM even had a chance to respond, the Panel unilaterally issued a "Disposition of Application for Modification of Award" (the "Modification of Award"). (*Id.*) This modification added a completely new category of damages as a result of HCM's "improper" transfer of the Barclays LP Interests—damages above and beyond the $14.5 million already ordered for such conduct in the Partial Final Award. (*Id.* at 1, 11.)

---

[2]    (*Id.* at 22 (concluding that "it was *improper* for Highland to include in the calculation of the amounts distributed to the Redeemers . . . *[t]he Distribution Fee* attributable to the value of the LP interests and amounts transferred to Eames"); *id.* at 54 ("[W]e find that the Respondent is *liable* for damages . . ." for "*[t]he Distribution Fee* attributable to the value of the LP interests and amounts transferred to Eames").)

14. The Panel styled this addition as a formal modification under Rule 50 of the AAA Rules to "correct any clerical, typographical, or computational errors in the award." (*Id.* at 1 n.1.) Under that Rule, however, the Debtor should have had "10 calendar days to respond to [Redeemer's] request" in writing. *See* AAA R-50. The Debtor never got that chance. HCM opposed the Modification of Award on March 17, 2019, noting that "the Panel is not empowered to take any further action beyond the issuance of its Partial [Final] Award," and requesting the Panel withdraw its Modification of Award and refrain from any further modification of the Partial Final Award. (Ex. C, FA at 2.)

15. Still, Redeemer requested—and the Panel granted—further modifications not once, but three times. (*Id.*) On April 5, 2019 (ten days after Rule 50's allotted period had closed), Redeemer submitted another formal written request to the Panel in which it asked the Panel to "award further damages in connection with the Barclays claim," as well as to "award prejudgment interest through" an extended date. (*Id.* at 2.) The Debtor again opposed Redeemer's request for such "further damages" on the basis that such post-award modifications are improper under the AAA Rules and governing law. (*Id.* at 2-3.)

16. On April 29, 2019, the Panel entered a new "Final Award" that agreed to "re-adopt all prior findings and conclusions" yet superseded and "specifically modified" portions of its prior Partial Final Award. (*Id.* at 1.) Such modifications included the correction of four non-controversial "clerical, typographical, or computational errors." (*Id.* at 11-12, 16.) But the Final Award also included a number of substantive changes to the Partial Final Award. For instance, through the Final Award, the Panel (1) awarded Redeemer an additional $21,768,743 in damages due to the transfers of the Barclays LP Interests (as well as prejudgment interest on these new damages); (2) granted injunctive relief requiring HCM to "take all necessary steps to cause the

7

improperly taken [] LP interests currently owned and controlled by Respondent through Eames, Ltd to be returned to Claimant"; and (3) completely reconsidered the prior time limitation on prejudgment interest that it had imposed under the Partial Final Award. (*Id.* at 15, 18.) Instead of limiting the amounts of prejudgment interest to only those amounts that ran through March 6, 2019, the Panel now held that all prejudgment interest would run indefinitely until "the earlier of the date paid or the entry of a final judgment." (*Id.* at 2, 14-15.)

17.     Neither the Partial Final Award nor the Final Award (or any parts of them) has been confirmed or otherwise entered as a final judgment by any court of competent jurisdiction.

**D.     Redeemer and the Debtor Reach Agreement as to the Debtor's Preferred Resolution of the Redeemer Claim**

18.     In recent weeks, the Court, the Debtor, and parties in interest have decided to proceed towards mediation as a way to resolve certain creditor claims and negotiate a confirmable plan of reorganization or liquidation. (*See* Dkt. Nos. 817, 864, and 897 (July 8, July 14, and July 21, 2020 Hr'g Tr.).)

19.     On July 8, 2020, the Debtor informed this Court that it and Redeemer had reached a settlement in principle as to Redeemer's claim amount and would file their agreement when certain language was finalized. (Dkt. 817, July 8, 2020 Hr'g Tr.) The Debtor acknowledged the settlement value of the Redeemer Claim is not as simple or straightforward as with a typical arbitration award and, instead, required negotiation on various points. (*Id.*) The Debtor has not filed a settlement agreement, and little has been shared with UBS about the settlement. UBS files this Objection to preserve its ability to object to the resolution of the Redeemer Claim and reserves its rights to make additional objections once the settlement agreement is filed. In this case, any resolution of the Redeemer Claim is of particular interest to the Debtor's other creditors, including UBS, because of a reciprocal obligation that was included in the Partial Final Award requiring

Redeemer to contribute certain shares of significant value to the Debtor's estate—value that other creditors would have a pro rata interest in.

20.    UBS hereby objects to the Proof of Claim, including its characterization of the Arbitration Award as an "executory contract" and the allowance of those portions (including any Post-Petition Claim portions[3]) of the Redeemer Claim arising from the "new" relief in the Final Award.  UBS further objects to any resolution of the Redeemer Claim that diminishes the value Redeemer will owe to the Debtor's estate upon payment of its claim.

## ARGUMENT

## I.    THE ARBITRATION AWARD ON WHICH REDEEMER'S ENTIRE DAMAGE CLAIM IS BASED IS NOT AN "EXECUTORY CONTRACT."

21.    Redeemer's Damage Claim against the Debtor's estate is based entirely on the "Arbitration Award."  In its Proof of Claim, however, Redeemer takes the perplexing position that the Award—which arose from a prepetition arbitration proceeding concerning claims that related exclusively to prepetition conduct of the Debtor—does not actually reflect any general "prepetition claims" against the Debtor's estate.  (Ex. A, POC Rider at 1.)  Redeemer insists, instead, that the Award is actually "*an executory contract* under section 365 of the Bankruptcy Code."  (*Id.*)  Because "HCM has not yet moved to assume or reject" the Award, Redeemer takes the position that its deadline to file a Proof of Claim "remains undetermined" and it is only filing the instant Proof of Claim "out of an abundance of caution."  (*See id.* ("By filing the Proof of Claim, [Redeemer] does not concede that the amounts awarded under the Arbitration Award are prepetition claims or that it is required to file a proof of claim to be entitled to the amounts

---

[3]    To the extent the settlement agreement proposed by the Debtor and Redeemer includes amounts for Redeemer's Post-Petition Claim, UBS objects.  However, should the Court agree to allow that Post-Petition Claim and grant Redeemer post-petition interest or further relief, UBS reserves all rights to assert and seek post-petition interest or further relief in its own claim.

App. 0949

described herein."*).)* This appears to be little more than an attempt by Redeemer to transform its contingent, disputed, and unsecured prepetition litigation Damage Claim against the Debtor into something it is not—a bona fide executory contract between Redeemer and the Debtor.

22.     It is axiomatic, however, that "an executory contract ***must be a 'contract'*** and not some other legal instrument." *See In re Denman*, 513 B.R. 720, 723 (Bankr. W.D. Tenn. 2014); *see also In re e2 Commc'ns, Inc.*, 354 B.R. 368, 402 (Bankr. N.D. Tex. 2006) ("An executory contract ***is a contract*** where performance remains due to some extent on both sides."). That is the end of Redeemer's argument that the Arbitration Award is an "executory contract" here. The Arbitration Award simply is not a contract, much less an "executory contract" under 11 U.S.C. § 365. The mere fact that the Arbitration Award imposes certain obligations on Redeemer or the parties that are to "be performed in the future and are, thereby, executory in nature" is not dispositive:

> [T]he 'executory' nature of an obligation does not, ipso facto, imply an 'executory contract.' . . . Contract rights arise upon an offer, acceptance, and transfer of adequate consideration between at least two assenting parties. If these elements do not exist, a contract right does not exist and, thereby, an executory contract cannot exist.

*See In re Denman*, 513 B.R. at 723. Redeemer has not identified any legal authority suggesting an arbitration award can, should be, or ever has been interpreted to be an "executory contract" under 11 U.S.C. § 365. There is no such authority. Nor is there any indication the Debtor believes the Arbitration Award is an executory contract. Indeed, the comprehensive Schedule G of all "Executory Contracts and Unexpired Leases" filed by the Debtor many months ago makes no reference to either Redeemer or the Arbitration Award. (*See* Dkt. No. 247.) That being the case, Redeemer's attempt to recharacterize the Arbitration Award—and its related general, unsecured, contingent, and disputed Damage Claim—as an "executory contract" fails as a matter of law.

## II. NEW RELIEF GRANTED BY THE FINAL AWARD IS SUBJECT TO VACATUR AND CANNOT BE THE BASIS OF ANY CLAIM AGAINST THE DEBTOR.

23. In issuing the Final Award, the Panel overstepped its fundamental authority as arbitrators. An "arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2009). This leads to a simple maxim: where an arbitrator has "exceeded the authority granted by the parties' agreement to arbitrate" in rendering an award, such an award should be vacated. *See Smith v. Transp. Workers Union of Am.*, 374 F.3d 372, 375 (5th Cir. 2004) ("If an arbitral panel exceeds its authority, it provides grounds for a court to vacate that aspect of its decision."); *Townes Telecomms., Inc. v. Travis, Wolff & Co.*, 291 S.W.3d 490, 493-94 (Tex. App. 2009) (vacating portion of award rendered "in direct contravention of the [parties'] agreement and which exceeded the powers granted to [the panel] by the parties").

24. One way in which arbitrators exceed their authority is by modifying a substantive aspect of a final award *after* such award has already been rendered. In fact, courts across the country have long recognized, and applied, the following "general rule" to prohibit such modifications: "[O]nce an arbitration panel renders a decision regarding the issues submitted, it becomes *functus officio* and lacks any power to reexamine that decision." *See Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 331 (3d Cir. 1991); *Hill v. Wackenhut Servs. Int'l*, 971 F. Supp. 2d 5, 12 (D.D.C. 2013) ("This means that anything an arbitrator does to modify a final award after it has been issued is without effect because at that point the arbitrator lacks any power to reexamine that decision."). Indeed, the Northern District of Texas, the Fifth Circuit, and Texas state courts have specifically endorsed, and applied, this doctrine. *See Weinberg v. Silber*, 140 F. Supp. 2d 712, 724 (N.D. Tex. 2001) ("[T]he arbitrator shall not revisit his decision on the merits, as his authority to do so has expired."), *aff'd*, 57 F. App'x 211 (5th Cir. 2003); *Smith*, 374 F.3d at

375 ("By modifying the original award, the arbitration panel in this case exceeded the authority granted by the parties' agreement to arbitrate."); *Barsness v. Scott*, 126 S.W.3d 232, 241 (Tex. App. 2003) ("When the panel subsequently modified its original award, . . . the panel exceeded its authority.").

25.    This doctrine is so pervasive that it is codified directly into the AAA's Commercial Arbitration Rules.  In particular, Rule 50 of the AAA Rules—entitled "Modification of Award"—states that "within 20 calendar days after the transmittal of an award," the parties "may request the arbitrator" to "correct any clerical, typographical, or computational errors in the award," but "[t]he arbitrator is ***not*** empowered to redetermine the merits of any claim already decided."  *See* AAA R-50.

26.    Here, the Panel did precisely what it was not permitted to do:  It rendered a comprehensive initial Partial Final Award, but then—at Redeemer's urging—issued a series of subsequent decisions to modify that Partial Final Award, in which the Panel redetermined the merits of claims previously decided.  This culminated in a new "Final Award" that materially modified, and is at direct odds with, key aspects of the Panel's own prior Partial Final Award.  This new Final Award improperly modified the Partial Final Award in two distinct ways.

27.    **First**, the Final Award dramatically expanded HCM's purported liability for Redeemer's claim that HCM had improperly transferred the Barclays LP Interests to Eames. Whereas the Partial Final Award had awarded Redeemer total damages in the amount of $14,452,275 (and prejudgment interest through March 6, 2019) for the Distribution Fee Claim, including for HCM's "improper" transfer of Barclays LP Interests, the Panel elected in the Final Award to grant Redeemer an additional $21,768,743 in damages arising out of HCM's "improper" transfer of the Barclays LP Interests.  (Ex. C, FA at 18.)  That is not all.  The Final Award also

awarded Redeemer prejudgment interest on these new compensatory damages—a sum that, on its own, adds yet another $9,042,623 to the mix. (*Id.*) All told, the Panel's modification of these aspects of the Partial Final Award resulted in a combined total of ***$30,811,366 in new damages*** for HCM's transfers of the Barclays LP Interests—an amount Redeemer itself now refers to as the "Barclays Claim." (Ex. A, POC Rider at 2.) On top of these additional liquidated damages, the Panel ordered HCM to "take all necessary steps to cause the improperly taken [] LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant . . . within sixty (60) days from the date of transmittal of this Final Award"—mandatory injunctive relief that is also not mentioned anywhere in the Partial Final Award. (Ex. C, FA at 18.)

28. **<u>Second</u>**, in the Final Award, the Panel reconsidered its prior ruling on prejudgment interest from the Partial Final Award. The Panel had previously ordered that HCM pay Redeemer a finite amount of prejudgment interest (9% per simple interest annum) "through the date of this Partial Final Award" (March 6, 2019), (Ex. B, PFA at 14), yet the Panel threw that limitation out entirely in the Final Award. After openly acknowledging its prior ruling, (*see* Ex. C, FA at 14 ("In the March 6 Partial Final Award, we awarded damages and interest through the date of that award . . . .")), the Panel announced in the Final Award that it was doing away with that March 6, 2019 end date and, instead, all such interest would run through "the earlier of the date paid or the entry of a final judgment," (*id.* at 2, 14). In addition to the $30.8 million in additional damages for the Barclays LP Interests, the additional interest contemplated by the Final Award accounted for at least another $5,698,571 through the Petition Date.[4]

---

[4]    Redeemer's Proof of Claim makes clear that it is also asserting claims for interest accrued ***post-petition***. (Ex. A, POC Rider at 2.) Assuming Redeemer is entitled to any additional interest post-petition (*see supra* note 4), this $5.7 million figure does not fully capture the impact that the Panel's decision in the Final Award to remove the March 6, 2019 limitation on prejudgment interest will have had on the Redeemer Claim.

App. 0953

29.     Under Rule 50 of the AAA Rules, the only way these post-award modifications might have been allowed is if they were legitimate attempts to correct "clerical, typographical, or computational errors" in the Partial Final Award. *See* AAA R-50. They are not. For starters, the Final Award very clearly contains modifications to address four simple "clerical errors" (all four of which were self-evident typos). (Ex. C, FA at 11-12.) Any suggestion that the two major modifications discussed above were also "clerical" in nature is belied by their sweeping impact. Prior to the Final Award, the aggregate amount of compensatory damages expressly awarded to Redeemer under the original Partial Final Award would have been roughly $142 million (excluding fees and costs and assuming prejudgment interest through March 6, 2019). The two modifications that the Panel made described above, standing alone, immediately add no less than $36.5 million to that compensatory damages sum—more than a ***25% increase***. In addition to these additional monetary damages, the modifications also impose mandatory injunctive relief purporting to require HCM to take the Barclays LP Interests from Eames and transfer them to Redeemer.[5] (Ex. C, FA at 18.) Redeemer cannot seriously expect any court to view such changes that fundamentally alter—and, in this instance, significantly increase and enhance—the relief granted as a mere correction of a "clerical error."

30.     The only explanation the Panel itself has for these major modifications removes all doubt that they were not "clerical" in nature. In the Final Award, the Panel tries to excuse the new damages it awarded relating to the Barclays LP Interests by claiming there was "a paragraph missing from the damages portion" that it had left out of the Partial Final Award inadvertently. (*Id.* at 9.) But courts have considered, and rejected, this exact "explanation" before. *See Wein v.*

---

[5]   This aspect of the Panel's ruling—which purports to require HCM to dispose of the assets currently being held by a non-party to the arbitration, Eames Ltd.—is independently subject to vacatur. *See Rapid Settlements, Ltd. v. Green*, 294 S.W.3d 701, 707 (1st Cir. 2009) (upholding the trial court's decision to vacate an arbitration award "because the arbitrator exceeded his powers in issuing an award against a party not subject to arbitration").

*Morris*, 909 A.2d 1186, 1198 (N.J. Super. Ct. App. Div. 2006) (deciding that AAA Rule 46, the predecessor to Rule 50, does not allow modifications to address "inadvertent omissions" and "neither expressly states nor suggests that claims denied through inadvertence could also be revisited").

31.     In reality, both of the modifications here are simply attempts by the Panel to "redetermine the merits of [a] claim already decided." *See* AAA R-50. Indeed, both modifications related to issues that had already been directly addressed by the Partial Final Award. Not only had they been addressed, the Panel explicitly found in the Partial Final Award that HCM was liable for both transferring the Barclays LP Interests and for prejudgment interest. (Ex. B, PFA at 53-54.) In the Final Award, however, the Panel—at Redeemer's urging—revisited these same issues and simply arrived at new, different substantive conclusions. The Panel concedes as much. With regard to prejudgment interest, the Panel freely admitted that "the March Partial Final Award contained specific language awarding interest 'through the date of this Partial Final Award,'" but decided to reach a different conclusion in the Final Award because, in its own view, the prior ruling in the Partial Final Award was "***not determinative of this issue***." (Ex. C, FA at 15.) That, however, is exactly what the Panel cannot do. Where, as here, the panel issued a partial final award as to a particular issue or issues, any partial final award on such issues is rendered, by definition, determinative of the issue. *See Fluor Daniel Intercontinental, Inc. v. GE*, 2007 WL 766290, at *2-3 (S.D.N.Y. Mar. 13, 2007); *see also Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991). Since the Partial Final Award here specifically addressed both HCM's liability for transferring the Barclays LP Interests and the amount of prejudgment interest to which Redeemer would be entitled, "the arbitrators ha[d] no further authority, absent agreement

App. 0955

by the parties, to redetermine [such] issue[s]" after rendering the Partial Final Award as a matter of law. *Trade & Transp., Inc.*, 931 F.2d at 195.

32.     For the above reasons, the portions of the Final Award reflecting these improper, material modifications are examples of the Panel exceeding its authority and are subject to vacatur. *Smith*, 374 F.3d at 375 ("If an arbitral panel exceeds its authority, it provides grounds for a court to vacate that aspect of its decision."). Accordingly, UBS objects to any and all portions of Redeemer's Proof of Claim that rely on, or relate to, these modifications to the Partial Final Award.

## III.     ANY VALUATION OF REDEEMER'S CLAIMS MUST TAKE INTO ACCOUNT RECIPROCAL OBLIGATIONS REDEEMER OWES TO THE DEBTOR.

33.     In addition to the vacatur issues described above, two of the largest components of its overall Damage Claim against the Debtor's estate—namely, its claims relating to the "Cornerstone Award" and the "Deferred Fee Claim"—are amounts on which Redeemer has no legitimate hope of any real recovery. This is due entirely to reciprocal rights relating to the "Cornerstone Award" and "Deferred Fee Claim" that Redeemer owes to the Debtor itself under the terms of the Arbitration Award, as well as the binding "Plan and Scheme" that governs the conduct of the Crusader Fund dissolution.

34.     **First**, Redeemer's Proof of Claim attributes $71,894,891 of its overall claims to what it refers to as the "Cornerstone Award." (Ex. A, POC Rider at 2.) This is a reference to the order in the Final Award that HCM pay $48,070,407 to purchase the Cornerstone shares from Redeemer at a fair market valuation of $3,241.43 per share (plus an additional $23,824,484 in prejudgment interest). (Ex. C, FA at 17; *see also* Ex. B, PFA at 48, 55.) Under the terms of the Final Award, however, the obligations with regard to the "Cornerstone Award" run both ways. In fact, the Final Award is clear that "[w]hen the amount awarded for the Cornerstone claim is paid by" the Debtor—including, for instance, pursuant to any confirmed plan of reorganization or

App. 0956

liquidation in these proceedings—Redeemer immediately "shall cause the Crusader Fund to tender its Cornerstone shares to [the Debtor]." (Ex. C, FA at 17; *see also* Ex. B, 55.)

35.     In other words, upon receipt of payment by HCM of the "Cornerstone Award" portion of its claim, Redeemer must immediately cause the specific Cornerstone shares in question (which are currently in Redeemer's control) to be turned over to HCM. This remains true even if Redeemer only recovers pennies on the dollar for its overall prepetition claim under any ultimate plan of reorganization or liquidation. What that means is that the true "value" of Redeemer's "Cornerstone Award" claim must take into account the need to immediately give up the value of the Cornerstone shares themselves. Based on recent valuations of the Cornerstone shares in question, the "value" of such claim against the Debtor's estate is far less than $71.9 million. By UBS's estimate, the shares are worth approximately $40 million—potentially more. In all likelihood, Redeemer will tender more in value to HCM when it is forced to turn over the Cornerstone shares than it could ever recover on this portion of its prepetition claims.

36.     **Second**, $43,105,395 of the Redeemer Claim is based on its so-called "Deferred Fee Claim." (Ex. A, POC Rider at 1.) This appears to represent the $32,313,000 HCM was ordered to pay in the Final Award as a result of Redeemer's "Deferred Fee Claim" and $10,792,395 in prejudgment interest. But under the Crusader Fund's Plan and Scheme—contracts to which both Redeemer and the Debtor are parties—Redeemer has no right to retain the full $32,313,000 of such "Deferred Fees." Instead, upon a final and full liquidation of all remaining Crusader Fund interests, such fees will take a "round trip" and the contractual Deferred Fees must be paid back by Redeemer to HCM. (Ex. B, PFA at 9 ("Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a 'complete liquidation' of the Crusader Funds' assets.").) As with the obligation to turn over the Cornerstone shares, this

obligation to pay back the Deferred Fees will likely trigger upon any payment of the allowed prepetition claim amount as a result of HCM's bankruptcy.  Moreover, as with its claim relating to the Cornerstone shares, Redeemer will almost certainly end up giving more to the Debtor through this pay-back obligation than it would receive on its "Deferred Fee Claim" under any plan of restructuring or liquidation.

37.    In light of these reciprocal obligations owed by Redeemer to the Debtor, the $115 million in claim value that Redeemer's Proof of Claim attributes to the Cornerstone Award and Deferred Fee components is vastly overstated, to say the least.  In reality, Redeemer will likely be forced to turn over assets to the Debtor that are worth markedly more than the amounts it might ultimately recover on these components of its overall Damage Claim.

## CONCLUSION

38.    For the foregoing reasons, UBS respectfully submits that Redeemer's Proof of Claim is improper and overstated and, thus, requests that it be appropriately reduced and disallowed.

DATED this 26 day of August, 2020.

**LATHAM & WATKINS LLP**

By /s/ Andrew Clubok

Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
          sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)

App. 0958

Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice M. Carson (TX Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas 75240
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS AG, London Branch*

App. 0959

## <u>CERTIFICATE OF SERVICE</u>

I, Martin Sosland, certify that the *Objection to the Proof of Claim Filed by Redeemer Committee to the Highland Crusader Fund* was filed electronically through the Court's ECF system, which provides notice to all parties of interest.

Dated:  August 26, 2020.

<u>/s/ *Martin A. Sosland*</u>
Martin A. Sosland
