# Appendix Exhibit 59

Case 19-34054-sgj11 Doc 1190 Filed 10/16/20 Entered 10/16/20 16:52:50 Page 1 of 39
Case 3:21-cv-00881-X Document 174-59 Filed 12/16/23 Page 2 of 43 PageID 18260

Docket #1190 Date Filed: 10/16/2020

**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
         sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
         kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas 75240
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
         candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS
AG, London Branch*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-----------------------------------------------------------------x
| | |
|---|---|
| *In re* | : Chapter 11 |
| | : |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | : Case No. 19-34054-sgj11 |
| | : |
| Debtor. | : |

-----------------------------------------------------------------x

## OBJECTION TO THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENTS WITH (A) THE REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND (CLAIM NO. 72), AND (B) THE HIGHLAND CRUSADER FUNDS (CLAIM NO. 81)

---

[1] The Debtor's last four digits of its taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054201016000000000015

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

    A.    Procedural Background.................................................................................3

    B.    The Arbitration Award................................................................................5

    C.    The Proposed Settlement ..........................................................................10

    D.    The Cornerstone Shares ............................................................................12

ARGUMENT ...........................................................................................................................14

    A.    The Debtor Is More Likely Than Not To Succeed On Its Motion To Vacate .......16

    B.    This Court Or the Delaware Court Could Decide The Motions To Confirm And Vacate With Minimal Expenditure Of Time And Resources ......................21

    C.    The Proposed Settlement Is Not In The Best Interests Of All Creditors ..............22

            1.    The Debtor Would Forfeit Its Right To Collect Deferred Fees ................24

            2.    The Debtor Would Forfeit Its Right To Crusader's Cornerstone Shares, Which May Be Worth Double The Value Assigned To Them For Settlement Purposes ...........................................................................27

            3.    The Proposed Settlement May Result In Redeemer Recovering More Than 100% On Its Claim ...................................................................30

CONCLUSION.........................................................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*In re Alfonso*,
　2019 Bankr. LEXIS 2816 (Bankr. W.D. Tex. Sept. 6, 2019) .......................................14, 15, 33

*In re Allied Props., LLC*,
　2007 Bankr. LEXIS 2174 (Bankr. S.D. Tex. June 25, 2007) ........................................ *passim*

*Commc'ns Workers of Am., AFL-CIO, v. Sw. Bell Tel. Co.*,
　953 F.3d 822 (5th Cir. 2020) .......................................................................................21

*In re Denman*,
　513 B.R. 720 (Bankr. W.D. Tenn. 2014) .......................................................................16

*Fluor Daniel Intercontinental, Inc. v. GE*,
　2007 WL 766290 (S.D.N.Y. Mar. 13, 2007) ..................................................................20

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
　390 U.S. 414 (1967)......................................................................................................22

*In re Rogumore*,
　393 B.R. 474 (Bankr. S.D. Tex. 2008) ...................................................................14, 23, 29

*In re Shankman*,
　2010 Bankr. LEXIS 619 (Bankr. S.D. Tex. Mar. 2, 2010)..............................................15, 23

*Smith v. Transp. Workers Union of Am.*,
　374 F.3d 372 (5th Cir. 2004) .......................................................................................19

*Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*,
　931 F.2d 191 (2d Cir. 1991)...........................................................................................20

*Wein v. Morris*,
　909 A.2d 1186 (N.J. Super. Ct. App. Div. 2006)...................................................................20

*Weinberg v. Silber*,
　140 F. Supp. 2d 712 (N.D. Tex. 2001), *aff'd*, 57 F. App'x 211 (5th Cir. 2003).....................17

## STATUTES

9 U.S.C.
　§10.........................................................................................................................17
　§ 12........................................................................................................................10

11 U.S.C. § 365.........................................................................................................16

App. 1099

## RULES

AAA Rule 8 ..................................................................................................................20

AAA Rule 46 ................................................................................................................20

AAA Rule 50 ...................................................................................... *passim*

Fed. R. Bankr. P. 9019.....................................................................................1, 14, 16

iii

UBS Securities LLC and UBS AG, London Branch (together, "UBS"), by and through their undersigned counsel, hereby submit this objection (the "Objection") to the *Debtor's Motion for Entry of an Order Approving Settlements with (A) The Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) The Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Dkt. No. 1089] (the "Motion") regarding the proofs of claim filed by the Redeemer Committee of the Highland Crusader Fund ("Redeemer" and the "Redeemer Claim") and the Highland Crusader Funds ("Crusader"[2] and the "Crusader Claim"). In support of this Objection, UBS respectfully states as follows:

## PRELIMINARY STATEMENT

Under Federal Rule of Bankruptcy Procedure 9019, a bankruptcy court must make an independent judgment of the merits of any settlement proposed by a debtor to ensure that it is fair, equitable, and in the best interest of the debtor's estate. While settlements are certainly desirable in the context of a bankruptcy case—especially in this case, which is particularly complex and fraught with allegations of fraud and bad faith—a settlement should not be approved just because the debtor says it should be. Here, Highland Capital Management, L.P. (the "Debtor") acknowledges that it made "substantial compromises" to strike a deal with Crusader and Redeemer, but contends that those compromises benefit the Debtor's estate. A closer review of the Proposed Settlement (as defined below), however, belies such assertion and evidences that the Debtor has not met its burden of showing this is a fair and equitable compromise within the range of reasonable alternatives.

---

[2]     Crusader refers to a collection of four funds:  Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd.

The Debtor's "modest reductions" to the Redeemer Claim do not account for the significant risk that a substantial portion of the Redeemer Claim (based on an Arbitration Award) is subject to vacatur. More importantly, under the Proposed Settlement, the Debtor would forfeit rights to over $30 million in cash and valuable assets potentially worth more than $80 million, permitting a significant windfall to Redeemer to the detriment of the Debtor's estate and other creditors.

The Redeemer Claim is based on an Arbitration Award that required the Debtor, *inter alia*, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) ***in exchange*** for all of Crusader's shares in Cornerstone. Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation. As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer. The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement. Depending on the valuation of the Cornerstone shares,

---

[3] The potential range of value attributable to the Cornerstone shares is significant because, according to the Debtor's liquidation analysis, the Debtor expects to have only $195 million total in value to distribute, and only $161 million to distribute to general unsecured creditors under its proposed plan. *See Liquidation Analysis* [Dkt. No. 1173-1]; *First Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. No. 1079].

the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

In the meantime, other general unsecured creditors of the Debtor will receive a much lower percentage recovery than they would if those assets were instead transferred to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among the Debtor's creditors. The Proposed Settlement is only in the best interests of Redeemer and, as such, it should be rejected.

## BACKGROUND[4]

### A. Procedural Background

1. The Debtor is an investment management firm that manages a variety of hedge funds, structured investment vehicles, and mutual funds.

2. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for chapter 11 relief in the Bankruptcy Court for the District of Delaware. Pursuant to an order dated December 4, 2019, the Debtor's bankruptcy proceedings were transferred to this Court under the above-captioned case number (the "Chapter 11 Case").

3. On March 2, 2020, this Court entered the *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Dkt. No. 488]. Pursuant to that order, the general bar date for proofs of claim was set for April 8, 2020.

4. On April 3, 2020, Redeemer filed Proof of Claim No. 72 against the Debtor's estate, claiming (1) $190,824,557 (its so-called "Damages Award"); (2) "post-petition interest, attorneys' fees, costs and other expenses;" (3) the right to distribute funds held in the "Deferred Fee Account" to Crusader investors; and (4) the transfer or cancellation of certain limited partner interests in Crusader held by the Debtor, the Charitable DAF Fund, L.P. ("DAF"), and Eames, Ltd. ("Eames").

---

[4] Additional background information is described in the UBS Objection (defined below) [Dkt. No. 996] and incorporated herein by reference.

Redeemer Claim Rider at 1-2. The Redeemer Claim is predicated upon an "<u>Arbitration Award</u>,"
which it characterizes as an "executory contract." Redeemer Claim Rider at 1.

5.      As discussed in further detail below, the Arbitration Award is actually made up of
three awards: (i) a March 6, 2019 "<u>Partial Final Award</u>," (ii) a March 14, 2019 "<u>Modification</u>
<u>Award</u>," and (iii) an April 29, 2019 "<u>Final Award</u>"—all issued by the same panel of arbitrators in
the same arbitration proceeding, but none of which has ever been confirmed or otherwise entered
as a final judgment by any court of competent jurisdiction. *See* Mot. ¶ 15.

6.      On April 6, 2020, Crusader filed Proof of Claim No. 81 against the Debtor's estate
alleging the Debtor had been a faithless fiduciary and claiming (1) $55,796,446, including the
disgorgement of $8,233,337 in "Management Fees" and $15,250,109 in "Distribution Fees"
previously paid to the Debtor for its service as investment manager, as well as forfeiture of the
Debtor's right to $32,313,000 in "Deferred Fees" and any "Other Fees" that "may now or in the
future otherwise be owing to [the Debtor]"; (2) any other Deferred Fees the Debtor "might
otherwise become entitled in the future"; (3) "pre- and post-petition interest, attorneys' fees, costs
and other expenses"; and (4) a right of setoff against any claim that the Debtor may assert against
it for "Withheld Amounts." Crusader Claim Rider at 1-2;[5] Crusader Claim at 2; *see* Mot. ¶ 22.

7.      On August 26, 2020, UBS filed its *Objection to the Proof of Claim Filed by*
*Redeemer Committee of the Highland Crusader Fund* [Dkt. No. 996] (the "<u>UBS Objection</u>"). UBS
objected to the Redeemer Claim's: (1) characterization of the Arbitration Award as an executory
contract, (2) inclusion of relief in the so-called Damages Award that was impermissibly awarded
for the first time in the Final Award and thus is subject to vacatur, and (3) failure to take into

---

[5]    The Crusader Claim also asserts an alternative claim based on the Arbitration Award in the event any part of the
       Redeemer Claim is not allowed. Mot. ¶ 21 n.5; Crusader Claim Rider at 2.

account the value of assets that Redeemer is obligated to transfer to the Debtor's estate under the same Arbitration Award. UBS Obj. at 3, 19.

8. On September 23, 2020, the Debtor filed the Motion and the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Dkt. No. 1090] (the "Morris Declaration"). The Motion seeks approval of a stipulation, attached as Exhibit 1 to the Morris Declaration [Dkt. No. 1090-1] (the "Proposed Settlement").

**B. The Arbitration Award**

9. From Crusader's inception through August 2016, the Debtor served as Crusader's investment manager. Mot. ¶¶ 10, 13; Crusader Claim Rider at 1. In late 2008, Crusader was put into wind-down. Mot. ¶ 11. That process was governed by a *Joint Plan of Distribution of the Crusader Funds* and the *Scheme of Arrangement Between the Crusader Funds and their Scheme Creditors* (the "Plan and Scheme"),[6] both adopted in 2011 in an attempt to permit redeeming investors to be able to realize additional monetary benefits that would not ordinarily be realized through general liquidation. Plan & Scheme at 14-16; *see also* Mot. ¶ 12. This arrangement was not intended to be a risk-free choice. Plan & Scheme at 16 ("There is a risk that the Company Redeemers' Distributions may be less than their Redemption Amounts . . .").

10. Pursuant to the Plan and Scheme, payment of certain fees owed to the Debtor as compensation for its role as investment manager was deferred (the "Deferred Fees") until

---

[6] The Plan and Scheme, filed under seal at Docket No. 953, is Exhibit 22 to *Redeemer Committee of the Highland Crusader Funds and the Highland Crusader Funds' Objection to the Proofs of Claim of UBS AG, London Branch and UBS Securities LLC and Joinder in the Debtor's Objection* [Dkt. No. 933]. UBS notes, however, that Redeemer and Crusader filed only a pre-execution draft. *E.g.* Plan & Scheme at 38 (reflecting track change revisions).

liquidation of Crusader's assets was complete. Mot. ¶¶ 10, 13, 25; Plan & Scheme at 37, 73-74. Unlike certain "Distribution Fees" that the Debtor would not be entitled to receive if removed for cause, Plan & Scheme at 48, 73, the "Deferred Fees are payable under *all* circumstances to HCMLP," except for the "Deferred Fee Account." Plan & Scheme at 20 (emphasis added). For those amounts in the Deferred Fee Account, the Debtor had the right to "potentially receive" those amounts if it met specified distribution targets on time. Plan & Scheme at 15, 57-58, 82-83.

11. Redeemer was entrusted with oversight of this process from the start and at all times had the power to terminate the Debtor as Crusader's investment manager upon thirty days' notice, with or without cause. Plan and Scheme at 15-16, 18, 51, 76. Redeemer chose not to exert this power until July 5, 2016, when Redeemer provided the Debtor with notice it was being terminated as investment manager and an arbitration proceeding was being initiated against it. Mot. ¶¶ 13-14. Pursuant to this notice, the Debtor's investment management services ended effective August 4, 2016. Mot. ¶ 13. The Debtor was replaced by Alvarez & Marsal CRT Management, LLC ("Alvarez"). PFA at 4. Concurrently with its arbitration demand, Redeemer initiated an action in the Delaware Chancery Court (the "Delaware Court") for a status quo order, *id.*, where the Debtor added Alvarez as a third party defendant. *See* Mot. ¶ 14 n.3; Ex. A, Debtor Brief to Vacate (REDEEMER_001635).

12. In the arbitration proceeding, Redeemer asserted breach of contract and breach of fiduciary duty claims against the Debtor seeking disgorgement and other relief based on the Debtor's service as Crusader's investment manager. Mot. ¶ 14; PFA at 3-4. Redeemer chose not to allege the Debtor had been a faithless servant. PFA at 8, 49. After "the record was declared closed" on December 12, 2018, *id.* at 7, the panel of arbitrators (the "Panel") rendered a "Partial Final Award" (or "PFA") [Dkt. No. 1128] on March 6, 2019. The Partial Final Award was a 56-

page single-spaced reasoned decision unanimously signed by all three members of the Panel. *See generally id*. Four aspects of the Partial Final Award are of particular relevance here:

- **Deferred Fees.** The Panel found that the Debtor was entitled to receive the Deferred Fees but had paid them to itself prematurely. PFA at 3; Mot. ¶ 25. Because Redeemer was deprived of the use of these funds during the improper period, the Panel awarded damages of $41,320,655, consisting of $32,313,000 in damages and $9,007,655[7] in prejudgment interest. Importantly, the Panel made no finding that the Debtor's misconduct required it to give up its right to receive the Deferred Fees at the time set forth in the Plan and Scheme. PFA at 14.[8] Under the Plan & Scheme, the Deferred Fees are required to be paid to the Debtor's estate upon Crusader's complete liquidation, which as UBS understands, is largely tied to the disposition of the Cornerstone shares. *See* PFA at 51.

- **Cornerstone Award.** The Panel also found that the Debtor had breached its fiduciary duty by failing to liquidate Crusader's shares in Cornerstone Healthcare Group ("Cornerstone"). Mot. ¶ 30. The Arbitration Award ordered the Debtor to pay Redeemer $48,070,407 (at the fair market value of $3,241.41 per share, calculated as of the date of the Debtor's interference, PFA at 42, 48), plus $21,169,417 in prejudgment interest, *and ordered Redeemer to transfer Crusader's Cornerstone shares to the Debtor*. PFA at 55; *id*. at 48 ("[We] order that the [Redeemer] Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland."). Neither Redeemer nor Crusader was provided any future interest in Cornerstone or right to seek retention of the Cornerstone shares in lieu of damages. *See* PFA at 48, 55; Mot. ¶ 31.

- **Barclays LP Interests.** The Panel ruled on one of Redeemer's core allegations—namely, that the Debtor improperly transferred certain limited partner interests in Crusader that belonged to Barclays (the "Barclays LP Interests") from Barclays to Eames, *see*, *e.g.*, PFA at 8, 15, 20-22, 54—and determined that such transfers were a breach of the parties' agreement. PFA at 21-22, 54. But the Panel did not treat the Debtor's transfers of the Barclays LP Interests as an independent wrongdoing. Instead, the Partial Final Award only discussed the transfer of the Barclays LP Interests in the context of one of Redeemer's broader sets of claims, known as its "Distribution Fee Claim." *See* PFA at 15; *id*. at 20 (analyzing "Payments to Barclays and Eames *as Distributions*"). After determining that the Debtor's transfers of the Barclays LP Interests were "improper," PFA at 20-22, 54, the Panel awarded Redeemer a "total" of $14,452,275 in aggregate damages (plus prejudgment interest) to cover all of the conduct relating to its Distribution Fee Claim—a claim that specifically included the Debtor's transfers of the Barclays LP Interests. *E.g.*, PFA at 22.

---

[7] The Partial Final Award included interest "through the date of this Partial Final Award." *Id*. at 14. The Final Award's extension of the prejudgment accumulation period added an additional $1,784,740 in interest bringing the total Deferred Fees award to $43,105,395.

[8] In fact, the Debtor asserted a counterclaim against Redeemer to recover the Deferred Fees prior to complete liquidation of Crusader, because it alleged Alvarez should have completed the Crusader liquidation by December 2017, triggering the payment to the Debtor. PFA at 8, 49. The Panel, however, found that Alvarez was not responsible for any delay. *Id*. at 51. Notably, Redeemer did not raise a faithless servant defense. PFA at 8, 49.

- **Prejudgment Interest.** As noted, the Panel awarded Redeemer prejudgment interest on its damages awards, *see e.g.*, PFA at 48, 54-55, accruing from the time of the alleged breaches through March 6, 2019, the date of the Partial Final Award. *E.g.*, PFA at 54 (awarding "statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award").

13.     On March 7, 2019, one day after the Panel issued the Partial Final Award, Redeemer requested a modification to the Partial Final Award. FA at 1. On March 11, 2019, *before* the Debtor was required to respond to the request, the Panel responded by email that it "[would] be modifying" the Partial Final Award. Ex. A, Debtor Brief to Vacate at 5 (REDEEMER_001644). Next, on March 14, 2019, and also *before* the Debtor was required to respond to the request, the Panel unilaterally issued a "Disposition of Application for Modification of Award" [Dkt. No. 1129] (the "Modification Award" or "MA"). This email and the Modification Award added a completely new category of damages as a result of the Debtor's "improper" transfer of the Barclays LP Interests—damages above and beyond the $14.5 million already ordered for such conduct in the Partial Final Award. FA at 11.

14.     The Modification Award purported to be issued pursuant to Rule 50 of the AAA Commercial Rules, which allows a panel to "correct any clerical, typographical, or computational errors in the award." MA at 1; FA at 1 n.1. If Rule 50 had been properly applied, the Debtor would have had "10 calendar days to respond to [Redeemer's] request" in writing. AAA R-50. Instead, the Modification Award was issued on March 14, 2019—just 7 days after Redeemer's request and 3 days short of the timeframe for objections provided for in Rule 50. FA at 1; Mot. ¶ 15. The Debtor timely opposed Redeemer's modification request on March 17, 2019, and requested that the Panel withdraw its Modification Award and refrain from any further modification of the Partial Final Award. FA at 2(a). That did not happen.

15.     Almost three weeks later, on April 5, 2019 (ten days *after* Rule 50's allotted period for modification requests closed), Redeemer submitted yet another formal written request for

modification of the Partial Final Award, this time asking the Panel to "award further damages in connection with the Barclays claim" and to "award prejudgment interest through" an extended date. FA at 2. Again, the Debtor opposed Redeemer's request for such "further damages" on the basis that such post-award modifications are improper under the AAA Rules and governing law. FA at 2-3.

16. On April 29, 2019,[9] the Panel issued a new "Final Award." In that Final Award, the Panel "re-adopt[ed] all prior findings and conclusions" but "specifically modified" portions of the earlier Partial Final Award. FA at 1. The "modifications" included several substantive changes to the Partial Final Award by: (1) awarding Redeemer an additional $21,768,743 in damages due to the transfers of the Barclays LP Interests, as well $9,042,623 in prejudgment interest on these new damages; (2) granting injunctive relief that required the Debtor to return improperly taken limited partner interests held by Eames to Redeemer; and (3) extending the time for prejudgment interest to accrue until "the date paid or the entry of a final judgment." FA at 2, 14-15. Put differently, the relief awarded through the Arbitration Award included:

| Award | Modification | Amount Added | Total Liquidated Damages Award |
|---|---|---|---|
| Partial Final Award | n/a | n/a | $154,314,614[10] |
| Modification Award | New damages related to Barclays LP Interests | $30,811,366 | $183,923,629 |
| Final Award | Incorporated MA; added injunctive relief (Eames); extended accrual period for prejudgment interest | $6,900,921 & injunctive relief | $190,824,557 |

---

[9]   Two of three arbitrators signed on April 29, the third arbitrator signed on May 9, 2019. FA at 19-22; *see* Mot. ¶ 15 (referencing a May 9, 2019 Final Award).

[10]  The Partial Final Award explicitly found liability and awarded damages for the "Sale of CLO interests" and "Credit Suisse claims," as well as for attorneys' fees, but directed the parties to confer regarding the appropriate amount of damages or, if no agreement could be reached, the Panel would determine the amount. PFA at 55-56. These amounts was properly clarified in the Final Award and such amounts are included in this calculation.

17.     After the Final Award was issued, and prior to the Petition Date, Redeemer moved in the Delaware Court to have that award confirmed as a judgment.  Mot. ¶ 17.  Also prior to the Petition Date, the Debtor moved the Delaware Court to vacate at least $36.5 million of the Arbitration Award on the grounds that the Panel was without authority to modify its Partial Final Award ("Motion to Vacate").  Mot. ¶ 17.  Both motions were scheduled to be heard by the Delaware Court on the day that the Debtor filed its Chapter 11 Case.[11]  The Delaware proceedings are currently stayed by section 362 of the Bankruptcy Code.

### C.     The Proposed Settlement

18.     On July 8, 2020, the Debtor informed this Court that it and Redeemer had reached a settlement in principle as to Redeemer's claim and would file their agreement when certain language was finalized.  Dkt. 817, July 8, 2020 Hr'g Tr.

19.     Subsequently, and in parallel with the Debtor and Redeemer finalizing their agreement, the Debtor, Redeemer and other parties in interest, including UBS, proceeded with mediation.  A brief summary of the terms of the Redeemer settlement was announced to the mediation parties on the first day of mediation, August 27, 2020.

20.     Then, on September 23, 2010, the Debtor filed its Motion and Proposed Settlement.  As the Debtor has acknowledged to this Court in the past, a settlement of the Redeemer Claim based on the Arbitration Award is not as simple or straightforward as with a typical arbitration award.  Dkt. No. 817, July 8, 2020 Hr'g Tr.  This is, in part, because of the obligations imposed by the Arbitration Award and Plan and Scheme that require Redeemer to transfer meaningful assets

---

[11]   The Motion emphasizes that Redeemer "timely moved" to confirm the Arbitration Award, but implies that the timeliness of the Debtor's Motion to Vacate is in question.  *See* Mot. ¶¶ 17-18 n.4 (citing the three-month statutory time limit under the Federal Arbitration Act, 9 U.S.C. § 12).  The Debtor's Motion to Vacate was filed on June 6, 2019, less than six weeks after the Final Award was issued, and the Debtor's brief was filed on July 10, 2019, pursuant to an ordered briefing schedule.  *See, e.g.*, Ex. A, Debtor Brief to Vacate at 9 (REDEEMER_001648).

to the Debtor's estate—*i.e.*, the Deferred Fees and Cornerstone shares. Under the Proposed Settlement, Redeemer is relieved of those obligations, and the Debtor forfeits the estate's rights to those assets. Among other terms (in addition to an exchange of releases and discontinuation of litigation), under the Proposed Settlement:

- The Redeemer Claim would be allowed in the amount of $137,696,610. Mot. ¶ 23; Proposed Settlement ¶ 1.

- The Crusader Claim would be allowed in the amount of $50,000. Mot. ¶ 23; Proposed Settlement ¶ 2.

- Limited partner interests in Crusader held by (i) the Debtor, (ii) the DAF, and (iii) Eames, would be cancelled, and the "Reserved Distributions" associated with those interests would be forfeited. Mot. ¶ 23; Proposed Settlement ¶ 3.

- The Debtor would forfeit its right to collect approximately $32,313,000 of Deferred Fees owed to it upon Crusader's completed liquidation. Mot. ¶ 23; Proposed Settlement ¶ 5.

- The Debtor would forfeit its right to the Cornerstone shares held by Crusader, in exchange for an approximately $30,500,000 reduction of the Redeemer Claim "to account for the perceived fair market value of those shares," and Redeemer and the Debtor would work together to monetize Cornerstone. Mot. ¶ 23; Proposed Settlement ¶ 8.

21. These terms purport to reflect two self-styled "substantial compromise[s]" and "other modest reductions" that were applied to reduce the Redeemer Claim from an asserted claim of $190,824,557 to an allowed claim of $137,808,302. *See* Mot. ¶ 28, 32; *id.* ¶¶ 27, 31. *First*, Redeemer "agreed to reduce the Damages Award by $21,592,000" (which the Debtor claims is "approximately two-thirds of the Deferred Fees" component of the so-called Damages Award), and in exchange, the Debtor agreed to forfeit its right to collect approximately $32,313,000 in Deferred Fees upon liquidation of Crusader. Mot. ¶ 27. *Second*, Redeemer agreed to reduce the $71,894,891 component of the so-called Damages Award "by approximately $30,500,000 to account for the perceived fair market value of" the Cornerstone shares, and in exchange, the Debtor agreed to forfeit its right to receive the Cornerstone shares. Mot. ¶ 31. Under the Proposed Settlement, Crusader would retain its minority interest in Cornerstone, and Redeemer would

cooperate with the Debtor to liquidate the Cornerstone investment as a whole. *Id.* *Finally*, the parties agreed to further reduce the so-called Damages Award by approximately $924,255, for unspecified reasons.[12] Mot. ¶ 32.

### D. The Cornerstone Shares

22. The Cornerstone shares undoubtedly provide value to whatever entity holds them. Crusader currently owns 14,830 shares (or approximately 40%) of Cornerstone. The Motion states that the "perceived fair market value" of those shares is $30.5 million ($2,059/share), Mot. ¶ 31, but does not provide any details whatsoever regarding whose "perception" this is, what it is based on, when it was calculated, or what information was taken into account to arrive at this valuation. And the Motion does not provide any evidence at all to support such a valuation.

23. On October 12, 2020,                REDACTED

Alvarez, Crusader's investment manager and a released "Crusader Additional Party" under the Proposed Settlement. *See* Proposed Settlement at 1, ¶ 11; Ex. B, 6/4/20 Presentation to Redeemer at 16 (REDEEMER_004899).

24. The true value of Crusader's Cornerstone shares (and thus, the true value of the rights forfeited by the Debtor) is much higher than the $30.5 million assigned to them for

---

[12] Under the Proposed Settlement, the Debtor and Eames would also forfeit all rights to "certain other monies as to which the Debtor and Eames may have had an interest in the absence of this Stipulation." Proposed Settlement ¶ 5. But it is unclear what those "other monies" are. Other aspects of the Proposed Settlement are equally unclear, for example, the Debtor's forfeiture of its interest in any "Reserved Distributions," future "Distribution Fees," and "Management Fees" that may relate either to "the Cancelled LP Interests or any other role or position of the Debtor with respect to the Crusader Funds (including but not limited to its role as the investment manager for the Crusader Funds until August 4, 2016)." *Id.* These unquantified fees that may be "currently accrued or that might have accrued in the future," *id.*, appear to provide value for the Crusader Claim that could be well beyond the $50,000 allowed claim. *See* Crusader Claim Rider at 2 (asserting a claim "[i]n the amount of any other compensation, fees or distributions which may now or in the future otherwise be owing to [the Debtor]"). These items were not sought in the Redeemer Claim. *See generally* Redeemer Claim Rider.

settlement purposes.                          REDACTED



25.                          REDACTED



26.    UBS's own financial advisor in this matter, Grant Thornton LLP, has evaluated

both the Crusader Houlihan June Valuation and the Debtor Houlihan Valuation.  *See* Declaration

of W. Kevin Moentmann (the "GT Declaration").                    REDACTED

---

[13]   It is unclear whether the same individuals at Houlihan prepared both analyses.

REDACTED

27.     Moreover, based on the data made available to it and using the methodology described in the Declaration submitted herewith, Grant Thornton has calculated that the actual value of Cornerstone as of June 30, 2020 might be as high as between $116 million and $208.7 million, in the aggregate.  GT Decl. ¶ 5.  That means that Crusader's 14,830 shares might have an actual value of between $46.5 million and $83.6 million, *id.* ¶ 6 (the "Grant Thornton Estimation")—*i.e.*, nearly triple the $30.5 million fair market value calculated REDACTED , which apparently forms the basis for the Debtor's decision to forfeit its rights to Crusader's 14,830 shares in exchange for a $30.5 million reduction of the Redeemer Claim in the Proposed Settlement.

**ARGUMENT**

28.     The Debtor's own evaluation of the deal it struck cannot and should not "be automatically accepted as reasonable" by this Court.  *In re Alfonso*, 2019 Bankr. LEXIS 2816, at *9 (Bankr. W.D. Tex. Sept. 6, 2019).  Instead, when evaluating a claim compromise under Bankruptcy Rule 9019, the Court must be apprised "of the relevant facts and law so that it can make an informed and intelligent decision on whether the settlement proposed is fair and equitable to parties in interest.'"  *Id.* at *8; *In re Rogumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (applying the court's independent judgment and finding the proposed compromise must be denied).

29.     Such information is necessary because, while settlements are desirable, the Court cannot "simply accept the [settling parties'] word that the settlement is reasonable," nor can it "merely 'rubber-stamp'" a settlement.  *In re Shankman*, 2010 Bankr. LEXIS 619, at *9 (Bankr. S.D. Tex. Mar. 2, 2010) (Isgur, M.).  Rather, a Court must determine whether the compromise

14

struck is "fair, equitable, and in the best interest of the estate." *Id.* at *7.[14] To make that determination, the Court must balance the "terms of the compromise with the likely rewards of litigation" by considering several factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (3) All other factors bearing on the wisdom of the compromise," including the "best interests of the creditors, with proper deference to their reasonable views" and the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *E.g.*, *id.*; *In re Alfonso*, 2019 Bankr. LEXIS 2816, at *8.

30. Importantly, the Court should not just consider whether the compromise as a whole is fair, rather, the Court must look at each component to determine whether the Proposed Settlement is in the best interest of the Debtor's estate. *See In re Allied Props., LLC*, 2007 Bankr. LEXIS 2174, at *13 (Bankr. S.D. Tex. June 25, 2007) (Isgur, M.) (rejecting a settlement despite "[m]ost provisions" of the compromise being fair, equitable, and in the best interest of the debtor's estate, because "two provisions do not meet this standard"). It is the Debtor's burden to establish that the Proposed Settlement is within the range of reasonable alternatives and would lead to a fair and equitable claim settlement. *Id.* at *12.

31. Here, the Proposed Settlement includes several components that are not fair, equitable, or in the best interest of the Debtor's estate. The Debtor acknowledges that it made "substantial compromises." Mot. ¶¶ 28, 47. All settlements necessarily include compromises. But those compromises must be reasonable concessions, not capitulations. The Debtor misleadingly portrays those compromises as providing its estate with "immediate[]" benefits. Mot.

---

[14] Unless noted, all internal quotations have been omitted.

App. 1115

¶ 64. UBS disagrees. In fact, those compromises—which provide no reductions for substantial litigation risk, and forfeit the estate's rights to meaningful assets—provide Redeemer with a windfall to the detriment of the Debtor's estate and other creditors.

32. For these reasons and others, there is sufficient basis to reject the Proposed Settlement based on the Bankruptcy Rule 9019 factors set forth by the Fifth Circuit.

### A. The Debtor Is More Likely Than Not To Succeed On Its Motion To Vacate

33. Under the first factor, the Debtor argues that it is unlikely to succeed in contesting the Redeemer Claim because the claim is based on the Arbitration Award, which addressed every claim and argument asserted by the parties, after the Panel examined extensive evidence, heard lengthy argument, and made detailed legal and factual findings. Mot. ¶ 43. But the Proposed Settlement does not account for the fact that the Arbitration Award is contingent, disputed, and has never been confirmed by any court of competent jurisdiction.[15]

34. The Debtor argues that Redeemer "could simply move to lift the automatic stay for the sole purpose of having the Arbitration Award confirmed, thereby eliminating the alleged 'contingent' nature of the claim." Mot. ¶ 46. But the Debtor ignores that, even if this Court granted Redeemer's motion to lift the automatic stay, the Debtor's Motion to Vacate is also fully briefed and pending before the Delaware Court. While litigation outcomes are never guaranteed, at minimum, the Debtor's chance of success on its Motion to Vacate and Redeemer's Motion to Confirm is much closer to 50% than the 0% chance of success the Proposed Settlement appears to assign to it, by applying no reduction to account for this litigation risk.

---

[15] For this reason and others, UBS objected to Redeemer's characterization of the Arbitration Award as an "executory contract" under 11 U.S.C. § 365, rather than as the prepetition litigation damages claim that it is. UBS Obj. ¶¶ 21-22 (*citing, e.g., In re Denman*, 513 B.R. 720, 723 (Bankr. W.D. Tenn. 2014) ("[A]n executory contract must be a 'contract' and not some other legal instrument.")). The Debtor argues that this issue is "moot" because the Proposed Settlement does not treat the Arbitration Award as an executory contract.

35. As the Debtor itself argued in the Motion to Vacate, and as addressed more fully in the UBS Objection, *see* UBS Obj. ¶¶ 23-32, the Panel overstepped its fundamental authority as arbitrators by modifying certain aspects of the Partial Final Award, in violation of well-established state law, the Federal Arbitration Act, and Rule 50 of the AAA Commercial Arbitration Rules. *See Weinberg v. Silber*, 140 F. Supp. 2d 712, 724 (N.D. Tex. 2001) ("[T]he arbitrator shall not revisit his decision on the merits, as his authority to do so has expired."), *aff'd*, 57 F. App'x 211 (5th Cir. 2003); 9 U.S.C. §10; AAA R-50 ("[Parties] may request the arbitrator, . . . , to correct any clerical typographical, or computational errors in the award," but "[t]he arbitrator is not empowered to redetermine the merits of any claim already decided."). The new Final Award improperly modified the Partial Final Award in two distinct ways.

36. *First*, the Final Award dramatically expanded the Debtor's purported liability for Redeemer's claim that the Debtor had improperly transferred the Barclays LP Interests to Eames. The Partial Final Award acknowledged Redeemer's claims included the "payment of Distribution Fees" and "transfer of Barclays' Fund interests without Redeemer Committee approval." *See* PFA at 8; *but see* Mot. ¶ 54 (arguing the UBS Objection "conflates two separate and distinct issues" related to Barclays). Whereas the Partial Final Award discussed both claims and awarded Redeemer total damages in the amount of $14,452,275 (and prejudgment interest through March 6, 2019) for the Distribution Fee Claim, including for the Debtor's "improper" transfer of Barclays LP Interests, the Panel elected in the Final Award to grant Redeemer an additional $21,768,743 in damages arising out of the Debtor's "improper" transfer of the Barclays LP Interests. FA at 18. That is not all. The Final Award also awarded Redeemer prejudgment interest on these new compensatory damages—a sum that, on its own, adds yet another $9,042,623 to the award. *Id.* All told, the Panel's modification of these aspects of the Partial Final Award resulted in a combined

total of ***$30,811,366 in new damages*** for the Debtor's transfers of the Barclays LP Interests—an amount Redeemer itself now refers to as the "Barclays Claim." Redeemer Claim Rider at 2.[16]

37.     *Second*, in the Final Award, the Panel reconsidered its prior ruling on prejudgment interest. The Panel had previously ordered that the Debtor pay Redeemer a finite amount of prejudgment interest (9% per simple interest annum) "through the date of this Partial Final Award" (March 6, 2019), PFA at 14, yet the Panel threw that limitation out entirely in the Final Award. After openly acknowledging its prior ruling, *see* FA at 14, the Panel announced in the Final Award that it was doing away with that March 6, 2019 end date and, instead, all such interest would run through "the earlier of the date paid or the entry of a final judgment," *id.* at 2, 14. In addition to the $30.8 million in additional damages for the Barclays LP Interests, the additional interest contemplated by the Final Award accounted for at least ***another $5.7 million*** through the Petition Date, for a total of ***approximately $36.5 million*** in new damages.

38.     Any suggestion that the two major modifications discussed above were attempts to correct "clerical, typographical, or computational errors," AAA R-50, is belied by their sweeping impact. Prior to the Final Award, the aggregate amount of compensatory damages expressly awarded to Redeemer under the Partial Final Award was roughly $142 million (excluding fees and costs). The Panel's two modifications described above, standing alone, immediately add no less than $36,500,000 to that compensatory damages sum—more than a ***25% increase*** (in addition to mandatory injunctive relief purporting to require the Debtor to take the Barclays LP Interests from Eames and transfer them to Redeemer).[17] FA at 18. The portions of the Final Award reflecting

---

[16]     On top of these additional liquidated damages, the Panel ordered the Debtor to "take all necessary steps to cause the improperly taken [] LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant . . . within sixty (60) days from the date of transmittal of this Final Award"—mandatory injunctive relief that is also not mentioned anywhere in the Partial Final Award. FA at 18.

[17]     Eames's limited partner interests in Crusader are valued at several million dollars, and possibly more based on the other amounts related to these interests released in the Proposed Settlement. In addition to being subject to

App. 1118

these improper, material modifications are examples of the Panel exceeding its authority and are subject to vacatur. *Smith v. Transp. Workers Union of Am.*, 374 F.3d 372, 375 (5th Cir. 2004) ("If an arbitral panel exceeds its authority, it provides grounds for a court to vacate that aspect of its decision.").

39.     The Proposed Settlement does not appear to account for the very real risk that a court would vacate those aspects of the Arbitration Award, as the Debtor strongly believed itself when it advocated for vacatur on the same grounds described above to the Delaware Court.  The Debtor argues now that "[t]hese procedural attacks on the Arbitration Award were considered and rejected by the Panel" and are unlikely to succeed "here" or in the Delaware Court, if the automatic stay were lifted.  Mot. ¶ 49.  But the Panel's self-serving evaluation of its conduct is unreasonable and irrelevant to a court's independent analysis of whether that same Panel exceeded its authority under the applicable law and rules.

40.     In fact, the Panel's own excuses for its conduct removes any doubt that it exceeded its authority.  In the Final Award, the Panel claims the new damages awarded for the Barclays LP Interests were "clear" in the Partial Final Award but it left that "paragraph missing from the damages portion" inadvertently.  FA at 9.  But courts have considered, and rejected, this exact "explanation" before.  *See Wein v. Morris*, 909 A.2d 1186, 1198 (N.J. Super. Ct. App. Div. 2006) (deciding that AAA Rule 46, the predecessor to Rule 50, does not allow modifications to address "inadvertent omissions" and "neither expressly states nor suggests that claims denied through inadvertence could also be revisited").

---

vacatur for the reasons discussed above, the Debtor's Motion to Vacate also challenged this injunctive relief on the basis that Eames was not a party to the arbitration and it was therefore outside of the Panel's powers to award this relief.  Ex. A, Debtor Brief to Vacate at 8, 15, 17-18.

App. 1119

41.     To justify the settlement, the Debtor now credits Redeemer's arguments that the Partial Final Award was labeled "Partial," directed the parties to confer regarding the amount of certain damages, and left the hearing open for those issues to be agreed upon or decided by the Panel.  Mot. ¶ 51.  But this loses sight of an important distinction:  the Panel did not leave the hearing open until *all issues* were resolved; the panel left the "hearing open until all *issues set forth above* have been agreed upon by the Parties or decided by the Tribunal."  PFA at 56.  The issues "set forth above" did not include damages for the Barclays LP Interests or prejudgment interest because those issues had already been directly addressed and decided in the Partial Final Award.  *E.g.*, PFA at 14, 24.  The Panel conceded as much, *see* FA at 14 ("In the March 6 Partial Final Award, we awarded damages and interest through the date of that award"), but decided to reach a different conclusion in the Final Award because, in its own view, the prior ruling in the Partial Final Award was "***not determinative of this issue***."  FA at 15.  That is exactly what the Panel cannot do.  A partial final award rendered on any issue is, by definition, determinative of the issue.  *See Fluor Daniel Intercontinental, Inc. v. GE*, 2007 WL 766290, at *2-3 (S.D.N.Y. Mar. 13, 2007); *see also Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991).

42.     No court has ever ruled on the propriety of the Panel's attempts to redetermine the merits of claims already decided.  The Debtor argues that under the Federal Arbitration Act, this Court would be required to defer to the Panel's exercise of its discretion under AAA Rule 8 to "interpret and apply" the AAA Rules, "***so long as it is 'within reasonable limits.'***"  Mot. ¶ 58 (quoting *Commc'ns Workers of Am., AFL-CIO, v. Sw. Bell Tel. Co.*, 953 F.3d 822, 827 (5th Cir. 2020)) (emphasis added).  But the Debtor cannot seriously expect that this Court (with its equitable powers) or the Delaware Court would view changes that fundamentally alter—and in this instance, significantly increase—the relief granted to Redeemer as a mere correction of a "clerical error"

and a "reasonable" interpretation of AAA Rule 50. Nor does the Debtor's Motion grapple with the fact that the modifications requested by Redeemer, which prompted changes in the Final Award, were requested too late under Rule 50.[18]

43. UBS recognizes that litigation is uncertain. But even if the likelihood of the Debtor prevailing on its Motion to Vacatur is assigned a 50% chance of success, that would suggest a $18,250,000 ($36,500,000 x 50%) reduction of the Redeemer Claim to account for that uncertainty, millions above the "modest" unspecified reduction of $924,255 included the Proposed Settlement. Mot. ¶ 32. UBS submits that the Debtor's failure to take into account the litigation risk associated with its arguments for vacatur is an exercise of business judgment that falls below any range of reasonableness. *In re Allied Props., LLC*, 2007 Bankr. LEXIS 2174, at *20 (Bankr. S.D. Tex. June 25, 2007) (Isgur, M.) (requiring the trustee to "show that his decision falls within the range of reasonable litigation alternatives").

### B. This Court Or the Delaware Court Could Decide The Motions To Confirm And Vacate With Minimal Expenditure Of Time And Resources

44. Under the second factor, the Debtor seems to place the Redeemer Claim at both ends of this spectrum. To show that the complexity of litigation favors settlement, the Debtor asserts that issues in the Redeemer Claim "are fairly complex; litigation would require meaningful resources, would take time, and would delay the Debtor's efforts to get to a confirmable plan." Mot. ¶ 59. But as discussed above, the Debtor also acknowledges that its Motion to Vacate and Redeemer's Motion to Confirm were both fully briefed prior to the Petition Date, and that

---

[18] In contrast to Redeemer's April 5, 2019 submission, Redeemer's March 7, 2019 submission was timely—but the Panel responded to that request before the Debtor's 10-day response period had lapsed. *See generally* MA; FA at 1.

App. 1121

Redeemer "could simply move to lift the automatic stay for the sole purpose of having the Arbitration Award confirmed." *Id.* ¶ 46.

45.     UBS does not dispute that the Panel already made extensive findings of fact, legal rulings, and credibility determinations.  The only issue left to be litigated is the propriety of the Panel's modifications to the Arbitration Award at issue.  No further discovery, evidence, or witness testimony is needed to decide that issue, so the remaining litigation would be a much "simpler" proceeding than the previous evidentiary hearing before the Panel, which featured four expert witnesses as well as eleven fact witnesses and spanned nine days.  Mot. ¶ 43.  Nor would this consume meaningful resources or cause significant delay—all that is left to do is for a court (this Court or the Delaware Court) to rule on the Debtor and Redeemer's pending motions.[19]  In fact, the Debtor would likely spend only a very small sum of money in legal fees (if anything), to possibly reduce the Redeemer Claim by as much as $36,500,000.

### C.     The Proposed Settlement Is Not In The Best Interests Of All Creditors

46.     Under the third factor, this Court must consider all other factors bearing on the wisdom of the Proposed Settlement, including most importantly, whether the Proposed Settlement is in the best interests of *all* the creditors.  Applying this factor, courts generally look at "the consideration offered by the settling creditor and the degree to which creditors object."  *In re Rogumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008); *In re Shankman*, 2010 Bankr. LEXIS 619,

---

[19]   The Motion also references how "notoriously complex" setoff issues would arise with respect to the Deferred Fees and Cornerstone shares in litigation.  Mot. ¶ 59.  To "make an informed and independent judgment, however, the court needs facts, not allegations."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 437 (1967); *see In re Allied Props., LLC*, 2007 Bankr. LEXIS 2174, at *15.  The Debtor states, without citation, that "under principles of setoff, the Redeemer Committee may have only been required to tender shares equal in value to the recovery of its claim."  Mot. n.15.  It is unclear how traditional principles of setoff—under which a Debtor's monetary debt owed to a creditor is offset by a separate monetary debt owed by the creditor to the Debtor—applies to a situation like this one, where the Deferred Fees and Cornerstone shares are real assets owed to the Debtor.  Without further elaboration, the Debtor does not show that this Court would need to address this "notoriously complex" issue.

at *9 (Bankr. S.D. Tex. Mar. 2, 2010) (Isgur, M.). Where a significant unsecured creditor affected by the Proposed Settlement—here, UBS—objects, "the Court must look to the reasonable views of" that creditor. *Id.* at *20 (rejecting a settlement when only two creditors "strenuously opposed" but it became "clear that they will not receive any benefit under the proposed compromise).[20]

47.     The Debtor describes the Proposed Settlement as purportedly benefitting the estate, doing so "on reasonable terms," and in the exercise of "sound business judgment." Mot. ¶ 63. But the Proposed Settlement's terms should not be viewed as anything approaching "reasonable" to any creditor, except Redeemer. When studied carefully, the supposed benefits to the estate are illusory. *In re Shankman*, 2010 Bankr. LEXIS 619, at *10 (rejecting the proposed settlement because it offered only "illusory benefits" and was not just, equitable, and in the best interests of the estate).

48.     In addition to the lack of any reduction to account for the litigation uncertainty associated with the risk of vacatur discussed above, in the Proposed Settlement, the Debtor forfeits the right to meaningful assets that otherwise would be transferred to the estate and distributed pro rata among all of the estate's unsecured creditors. This provides a windfall to Redeemer to the detriment of other creditors, by not only permitting Redeemer to receive more than its pro rata share of the Debtor's estate, but also requiring the Debtor to forfeit the estate's rights to valuable assets. When these components are factored in, Redeemer could receive a greater than 100% recovery on the Redeemer Claim, and all other creditors would lose out. Accordingly, this

---

[20]  The Motion asserts that the UBS Objection was the only objection made to the Redeemer Claim or Crusader Claim. Mot. ¶ 33 n.10. The number of creditors who object to a claim or settlement is not dispositive of this factor or the resolution. Regardless of whether *any* creditors object, "[t]he Court is obliged to independently consider whether the creditor's best interests are being served." *In re Allied Props., LLC*, 2007 Bankr. LEXIS 2174, at *27 (Bankr. S.D. Tex. June 25, 2007) (Isgur, M.). Even when no creditors object, a Court must reject a claim settlement if the compromise is not fair, equitable, and in the best interest of the debtor's estate. *In re Rogumore*, 393 B.R. at 479 (finding a compromise was not fair, equitable, or in the best interests of the debtor's estate "[a]lthough no objections to the motions were filed").

compromise violates the third factor that courts in the Fifth Circuit have focused on in evaluating settlements. *In re Allied Props., LLC*, 2007 Bankr. LEXIS 2174, at *18-19 ("Th[e third] factor focuses on the degree to which the compromise serves *all* creditors' interests. The compromise provides *no* material benefits to the estate. Consequently, to the extent that the compromise gives Black Mountain assets that otherwise would be distributed pro rata among all the estate's unsecured creditors, the compromise violates the third factor.").

### 1. The Debtor Would Forfeit Its Right To Collect Deferred Fees

49.     The Debtor acknowledges that while the Panel found that $32,313,000 in Deferred Fees were prematurely taken by the Debtor, the Debtor ultimately would be entitled to those fees pursuant to the Plan and Scheme, upon the completion of the liquidation of Crusader. Mot. ¶¶ 25-27. In the Proposed Settlement, the Debtor and Redeemer claimed to have reached a "substantial compromise," whereby Redeemer "agreed to reduce the Damage Award by $21,592,000," which the Debtor characterizes as "approximately two-thirds" of the Deferred Fees component, in exchange for the Debtor forfeiting its right to collect the Deferred Fees. Mot. ¶ 27. According to the Debtor, this compromise results in the estate "immediately" receiving a benefit (through the reduction of the Damages Award), rather than waiting for the completion of Crusader's liquidation and "litigating at some future date the merits of" the "faithless servant" defense. Mot. ¶ 64. This characterization of the compromise, and who it really "benefits," is misleading at best.

50.     As an initial matter, the Debtor's claim that the Proposed Settlement discounted the Deferred Fee component of the Arbitration Award by "approximately two-thirds" is inaccurate. Mot. ¶ 27. The Deferred Fee component of the Arbitration Award listed in the Redeemer Claim

App. 1124

is \$43,105,395 (not \$32,313,000), which includes \$10,792,395 in pre-judgment interest.[21] Redeemer Claim Rider at 1. Thus, an "apples-to-apples" or "claim-to-claim" comparison of the asserted claim and allowed claim would acknowledge that a reduction of the so-called Damages Award by approximately \$21,592,000 is only one-half, rather than two-thirds, of the Deferred Fee component. Redeemer retains \$21,513,395 of its claim based on the Deferred Fees (\$43,105,395 - \$21,592,000), and does not have to pay the Debtor \$32,313,000 upon complete liquidation of Crusader. The Debtor, meanwhile, forfeits its right to receive *any* of the Deferred Fees indisputably owed to it upon Crusader's completed liquidation.

51. None of Redeemer's counterarguments (or the Debtor's justifications) provides a reasonable basis for the Debtor to forfeit its right to \$32,313,000 in Deferred Fees in the future altogether. *First*, Redeemer apparently expressed its view that it was entitled to recover all of the Deferred Fees found by the Panel to be prematurely taken. Mot. ¶ 26. But Redeemer previously argued, and the Panel agreed, that the Debtor's conduct was improper because it transferred the Deferred Fees to itself *too soon*. Mot. ¶ 25. The Debtor's entitlement to the Deferred Fees in the future was not in question, however. For this reason, the Panel made clear that "measuring the damages suffered by [Redeemer] by referencing the full amount of the Deferred Fees taken is *not* the same as literally ordering a return of the moneys." PFA at 14; *id.* at 3. The Motion does not explain why Redeemer, not the Debtor, would be legally entitled to those fees under any scenario. Under the Plan and Scheme, contracts to which Redeemer is a party, the Debtor alone is entitled

---

[21]   Of this prejudgment interest, \$9,007,655 accrued by March 6, 2019, the date of the Partial Final Award. PFA at 54. An additional \$1,784,740 in prejudgment interest was later added in the Final Award. FA at 16. This portion may be vacated. *Infra* Section A, at 16.

to those fees, and the Arbitration Award did not alter those rights in any way or order that the Debtor "return" or forfeit the fees.

52.    *Second*, the Debtor implies that it will not receive the Deferred Fees until some point far in the future, when Crusader's liquidation is complete, but the Debtor provides no facts to ascertain what assets besides the Cornerstone shares, if any, remain at Crusader to be liquidated or when Crusader's liquidation may be completed.  Crusader went into wind down in 2008—twelve years ago.  *See* Mot. ¶ 11.  The Arbitration Award suggests the Cornerstone shares are among the last assets at Crusader to be liquidated.  PFA at 51 (discussing whether liquidation of the Cornerstone shares had delayed liquidation being completed).  Therefore, it is entirely possible that Crusader may be liquidated before the close of this Chapter 11 Case.  The uncertainty of *when* the Debtor's estate will receive the Deferred Fees is not reason to forfeit them altogether.

53.    *Third*, Redeemer's argument that the Debtor would be barred from recovering any of the Deferred Fees from Crusader upon its complete liquidation because of the "faithless servant" doctrine is meritless and ignores the Debtor's valid defenses.  *See* Mot. ¶ 26.  Redeemer contends that waiver and estoppel are inapplicable because "that is a defense that would only be required to be asserted when HCMLP made a claim for the Deferred Fees—as it did during the negotiations." Mot. ¶ 28 n.9.  However, recent negotiations were not the first time the Debtor sought to collect the Deferred Fees, meaning this defense was "required to be asserted" previously.  When the Debtor asserted a counterclaim for the Deferred Fees during arbitration, Redeemer defended itself against that claim without ever raising the faithless servant defense.  PFA at 49.  Moreover, under the Proposed Settlement, the parties agreed to an allowed claim of $50,000 for the Crusader Claim—a claim based in its entirety on the same "faithless servant" doctrine—because, as the

Debtor points out, it "is very likely to defeat this claim based on, among other things, affirmative defenses, including the statute of limitations, waiver, laches, and estoppel." Mot. ¶ 58 n.14.

54. The Debtor's forfeiture of its clear right to the Deferred Fees is not a sound exercise of business judgment. The $32,313,000 in Deferred Fees is a cash receivable, a valuable asset that Redeemer would otherwise be required to transfer to the estate upon liquidation of Crusader, at which point it would be available to increase *all* creditors' pro rata recoveries on their allowed claims. ***That*** would be a real benefit to the estate, even if not an "immediate" one. In that scenario, Redeemer would end up giving more in real, cash assets to the Debtor through this pay-back obligation than it would receive on a pro rata basis recovery on its Deferred Fee Claim. Instead, Redeemer avoids this obligation altogether. There is nothing fair or equitable about this compromise from the perspective of all other creditors.

2. The Debtor Would Forfeit Its Right To Crusader's Cornerstone Shares, Which May Be Worth Double The Value Assigned To Them For Settlement Purposes

55. Next, there is no dispute that the Arbitration Award requires Redeemer, simultaneously with a damages payment from the Debtor (including prejudgment interest), to have Crusader "tender its Cornerstone shares to [the Debtor]." FA at 17; PFA at 48; *see* Mot. ¶ 31. In the UBS Objection, UBS expressed concern regarding how the value of Crusader's 14,380 Cornerstone shares would be taken into account when calculating the true value of the Redeemer Claim. UBS Objection ¶ 20. The Debtor dismisses these concerns as "moot" with little explanation: "these obligations were fully considered by the Debtor and form the basis for substantial compromises embedded in the Stipulation." Mot. ¶¶ 35, 47. UBS's concerns, however, are only heightened by the treatment of Crusader's Cornerstone shares in the Proposed Settlement.

56. Under the Proposed Settlement, the Debtor "agreed to treat the Cornerstone Shares differently from the process required under the Arbitration Award." Mot. ¶ 31. Rather than

tendering the Cornerstone shares, Redeemer's "Damage Award will be reduced by approximately $30.5 million to account for the perceived fair market value of those shares," and Crusader will retain the shares. *Id.* This "substantial compromise" is actually a complete surrender.

57.     As an initial matter, this reduction translates to Redeemer receiving ***over half*** of the Cornerstone component in its allowed claim.   The Cornerstone component of the Arbitration Award listed in the Redeemer Claim is $71,894,891 (not $48,070,407, as the Debtor suggests), which includes $23,824,284 in pre-judgment interest.[22]  Redeemer Claim Rider at 1.  Thus, an "apples-to-apples" or "claim-to-claim" comparison of the asserted claim and allowed claim would acknowledge that a reduction of the total payments by approximately $30.5 million is a less than 50% reduction of the Cornerstone component ($71,894,891).  Put differently, Redeemer retains both $17,570,407 of its asserted claim based on the Cornerstone shares ($48,070,407 - $30,500,000), ***plus*** another $23.8 million (the full amount of pre-judgment interest awarded by the Final Award), for a total of $41,394,691 in an allowed claim to be paid pro rata from the estate. And on top of that, Redeemer retains the value of Crusader's Cornerstone shares upon their liquidation, while the Debtor "does not have to purchase" Crusader's Cornerstone shares for $48,070,407 in cash (which the Debtor points out it does not have).

58.     But that is not the way that the Arbitration Award was supposed to operate and it is certainly not an equitable way to proceed in this Chapter 11 Case.  The Debtor was supposed to pay to Redeemer a fixed amount, which included the Panel's calculation of the fair market value of Crusader's 14,380 shares in Cornerstone plus prejudgment interest.  PFA at 48.  In return, Crusader was required to tender its Cornerstone shares to the Debtor.  That the Debtor does not

---

[22]   Of this prejudgment interest, $21,169,417 accrued by March 6, 2019, the date of the Partial Final Award.  PFA at 54.  An additional $2,655,067 in prejudgment interest was later added in the Final Award.  FA at 16.  This portion may be vacated.  *Infra* Section A, at 16.

have $48,070,407 in cash (right now) to pay the full amount assigned by the Panel to the Cornerstone component of the Damages Award is beside the point. Based on the Debtor's current asset valuation, no general unsecured creditors, other than perhaps certain retained employees, will receive a full recovery on account of their prepetition claims. But permitting Redeemer to avoid that downside by keeping both half of the amount that was supposed to be paid for the Cornerstone shares **and** the Cornerstone shares provides Redeemer with a windfall that the Panel did not contemplate.

59.     Moreover, the Debtor's reduction of the Redeemer claim by $30.5 million falls below any reasonable range of valuation, including the Debtor Houlihan Valuation or even the Crusader Houlihan June Valuation.                REDACTED


                                                            *higher* than the $30.5 million fair market value calculated in the Crusader Houlihan March Valuation and used by the Debtor for settlement purposes. It is unreasonable for the Debtor to accept a lower valuation calculated by the exact same financial firm, while failing to provide the Court with any explanation of what analysis the Debtor or Houlihan performed to determine that this lower value is reasonable (and should be fixed in March as opposed to June, when the value of Cornerstone increased in those three months). *See In re Rogumore*, 393 B.R. 474, 481 (Bankr. S.D. Tex. 2008) (rejecting a settlement under Rule 9019 and questioning why the estate should "be forced to accept the low valuation at whatever date," when "[n]o party to the Compromise adequately explained why the cash surrender value should be fixed at the March 24 value").

60.     In fact, UBS believes that the valuation of Crusader's shares in Cornerstone is potentially nearly triple the $30.5 million calculated in the Crusader Houlihan March Valuation

and used by the Debtor for settlement purposes. According to the Grant Thornton Estimation, the true value of Cornerstone as of June 30, 2020 might be between $116 million and $208.7 million. GT Decl. ¶ 5. This means that Crusader's 14,830 shares might have a value of between $46.5 million and $83.6 million, *id.* ¶ 6, which Redeemer will receive upon a sale of Cornerstone.

61.     Indeed, such a sale is contemplated by the Proposed Settlement. Specifically, the Proposed Settlement requires the Debtor to "in good faith, use commercially reasonable efforts to monetize all shares of capital stock of Cornerstone held by the Debtor, any funds managed by the Debtor, and the Crusader Funds," and requires Redeemer to cooperate in the sale process. Mot. ¶ 23. According to the Debtor, Redeemer's cooperation means that Cornerstone "may be sold as a whole, to the likely benefit of all creditors." Mot. ¶ 64. Redeemer's cooperation is an illusory benefit. If instead, Redeemer was required to comply with its obligations under the Arbitration Award, Crusader's minority interest in Cornerstone would be transferred to the Debtor, and the Debtor would have the same ability to sell Cornerstone "as a whole."[23] Plus, as UBS understands, Cornerstone is among the last of Crusader's assets to be liquidated, so under the Plan and Scheme, the Debtor could (upon receipt of Crusader's shares) trigger payment of the $32,313,000 of Deferred Fees due to the Debtor upon completion of the Crusader liquidation.

### 3.     The Proposed Settlement May Result In Redeemer Recovering More Than 100% On Its Claim

62.     All told, the Debtor's forfeiture, and Redeemer's retention, of the Deferred Fees and Cornerstone shares may in fact result in Redeemer recovering more than 100% on its claim. The Debtor's Plan has not been approved and the general unsecured creditor class pro rata recovery

---

[23]   The "Amended & Restated Stockholders' Agreement" filed with the Proposed Settlement, Dkt. No. 1090-1 at Schedule A, raises further questions about the Proposed Settlement—and the Debtor's acceptance of it—by including a Schedule of "Highland Capital Stockholders" that is inconsistent with other documentation provided regarding which Highland entities currently hold Cornerstone shares.

remains uncertain, for a variety of reasons. *See, e.g.*, *First Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. No. 1079]. Under the Proposed Settlement, however, when the value of the forfeited assets are taken into account, Redeemer may fare far better than it would have under the underlying Arbitration Award and far better than other general unsecured creditors in this Chapter 11 Case.

63. To illustrate the potential windfall to Redeemer under the Proposed Settlement, a comparison of Redeemer's recovery under the Arbitration Award versus its potential recovery under the Proposed Settlement is helpful. Under the Arbitration Award, the Debtor was required to pay Redeemer 118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) *in exchange* for all of Crusader's shares in Cornerstone. In exchange, Redeemer remained obligated to (i) tender Crusader's Cornerstone shares; and (ii) pay the Debtor $32,313,000 in Deferred Fees upon liquidation of Crusader. As shown below, after accounting for its reciprocal obligations to the Debtor, and depending on the value of the Cornerstone shares to be tendered (which is disputed), the value of the Arbitration Award to Redeemer is between $74,911,557 (using the Grant Thornton Estimation) and $128,011,557 (using the Crusader Houlihan March Valuation):

### Redeemer Recovery (Arbitration Award)

| Highland Payments | $190,824,557 | | | |
|---|---|---|---|---|
| **Pay Deferred Fees** | ($32,313,000) | | | |
| REDACTED | | | | |
| **Total Recovery** | $74,911,557 | $104,811,557 | $103,111,557 | $128,011,557 |

---

[24] For purposes of this chart, the highest ends of the ranges calculated by Grant Thorton and Houlihan ("HL") are used, except for the Crusader Houlihan March Valuation, which uses the low end of the range, as the Debtor does.

64.     Under the Proposed Settlement, however, Redeemer stands to gain far more. Depending on the valuation of the Cornerstone shares, Redeemer could receive or retain value in an amount up to $253,609,610 (based on the Grant Thornton Estimation) or $200,509,610 (based on the Crusader Houlihan March Valuation), each of which exceeds the face amount of the Redeemer Claim ($190,824,557) and the highest recovery it would have received under the Arbitration Award ($128,011,557), as reflected in the chart above.

**Redeemer Recovery (Proposed Settlement)**



| Allowed Claim | $137,696,610 | | | |
|---|---|---|---|---|
| Release of Deferred Fees | $32,313,000 | | | |
| REDACTED | | | | |
| Total Recovery | $253,609,610 | $223,709,610 | $225,409,610 | $200,509,610 |

65.     Not only does the Proposed Settlement create a likelihood that Redeemer will recover more than 100% of its filed claim amount, it does so while depriving the Debtor's estate of valuable assets that could be used to pay other creditors and increase their pro rata recovery. This contradicts any assertion that the "proposed settlement is in the best interests of the Debtor's creditors." *See* Mot. ¶ 62. Where, as here, the Proposed Settlement "adversely affect[s] recovery by the estate's other creditors," it is not "fair and equitable" and should be rejected. *In re Alfonso*, 2019 Bankr. LEXIS 2816, at *13 (Bankr. W.D. Tex. Sept. 6, 2019).

**CONCLUSION**

---

[25]   For purposes of this chart, the highest ends of the ranges calculated by Grant Thornton and Houlihan ("HL") are used, except for the Crusader Houlihan March Valuation, which uses the low end of the range, as the Debtor does.

66.     For the foregoing reasons, UBS respectfully requests that the Court independently assess the merits of the Proposed Settlement.  Upon doing so, UBS submits that the Court should deny the Motion and provide any such other and further relief to which UBS and all creditors might be entitled.  UBS respectfully submits that such relief should include an Order requiring the Debtor to provide sufficient information for UBS and the Court to assess the true value of the Cornerstone shares held by Crusader, and/or an Order requiring the Debtor to obtain a valuation of Cornerstone from an independent, third-party financial advisor.

67.     In the alternative, even if the Court approves the Proposed Settlement, UBS respectfully requests that when the Debtor and Redeemer have sold the Cornerstone shares, if the sale price of Crusader's 14,380 shares exceeds the $30,500,000 "perceived" fair market value assigned to them in the Proposed Settlement, the Court take the additional proceeds of that sale into consideration when calculating Redeemer's pro rata recovery from the Debtor's estate, under Section 105 of the Bankruptcy Code.

DATED this 16 day of October, 2020.

**LATHAM & WATKINS LLP**

By /s/ Sarah Tomkowiak

Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

App. 1133

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice M. Carson (TX Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas 75240
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS
AG, London Branch*

## <u>CERTIFICATE OF SERVICE</u>

I, Martin Sosland, certify that the *Objection to the Debtor's Motion for Entry of an Order Approving Settlements with (A) The Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) The Highland Crusader Funds (Claim No. 81)* was filed electronically through the Court's ECF system, which provides notice to all parties of interest.

Dated:  October 16, 2020.

<u>/s/ Martin Sosland</u>

App. 1135

## Exhibit A

**Debtor Brief to Vacate**

**(To Be Filed Under Seal)**

# **Exhibit B**

## **6/4/20 Presentation to Redeemer**

## **(To Be Filed Under Seal)**

# **Exhibit C**

## **8/6/20 Presentation to Redeemer**

## **(To Be Filed Under Seal)**