# Appendix Exhibit 62

Docket #1349  Date Filed: 11/09/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S OBJECTION TO PATRICK HAGAMAN DAUGHERTY'S MOTION FOR**
**TEMPORARY ALLOWANCE OF CLAIM FOR VOTING PURPOSES PURSUANT TO**
**<u>BANKRUPTCY RULE 3018</u>**

---

[1] The last four digits of the Debtor's taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Debtor and debtor-in-possession Highland Capital Management, L.P. ("Debtor") hereby objects (the "Objection") to the *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018* ("Estimation Motion") [Docket No. 1281] filed by creditor Patrick Hagaman Daugherty ("Daugherty"),[2] and represents as follows:

## I.  INTRODUCTION

1.      Daugherty's operative claim is Proof of Claim No. 77 in the amount of "at least $37,483,876.62" (the "Daugherty Claim"), to which the Debtor has objected.[3]  He has pending a motion for leave to amend his claim to increase it to $40,710,819.42, and by the Estimation Motion seeks temporary allowance in that amount for voting purposes.

2.      In support of his Estimation Motion, Daugherty needlessly presents the Court with dozens of pages of blow-by-blow allegations and argument relating to claims to which the Debtor does not object.  Specifically, the Debtor's Board determined not to contest Daugherty's claim to enforce against the Debtor his $2.6 million judgment against Highland Employee Retention Assets LLC ("HERA"), which totaled approximately $3.7 million with interest to the petition date.  Claim Objection ¶¶ 3(i), 40.  Hence, Daugherty's description of the transfer of HERA's assets to the Debtor, and the Debtor's failure to escrow and restore to HERA assets to pay his judgment, serves little purpose other than as a transparent attempt to poison the well.

3.      The Debtor also does not object to the temporary allowance of the Daugherty Claim for voting purposes in an amount equal to the maximum damages alleged by Daugherty's expert in pre-petition litigation – approximately $9.1 million.  While the Debtor reserves the

---

[2] Daugherty also filed a Memorandum of Law and Brief in Support of the Estimation Motion (the "Estimation Brief") [Docket No. 1282].

[3] *See Debtor's (I) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (II) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* (filed as an adversary complaint due to its request for subordination of any allowed claim for a partner distribution)  (the "Claim Objection") [Docket No. 1008].

App. 1159

right to dispute such damages on the merits, they represent (when combined with the pre-petition judgment, plus interest) the maximum plausible value of the Daugherty claim.

4. Of the balance of the $40 million claim that Daugherty seeks to vote: (a) approximately $21 million is based on claims that were dismissed by the Delaware Chancery Court; (b) an additional approximately $7.74 million is for a claimed right to a distribution to pay a possible personal tax liability resulting from an audit, which is not a creditor claim and would be subordinated even if it were; and (c) the balance consists of several million dollars in attorneys' fees incurred in personal and mostly unsuccessful litigation with the Debtor, which Daugherty wrongly contends are subject to indemnification.

5. The Debtor objects to the foregoing parts of the Daugherty Claim, on the grounds set forth in the Claim Objection and summarized herein. However, to avoid unnecessary litigation and remove the need for the Court to delve prematurely into factually or legally complex issues, the Debtor proposes for voting purposes that the Daugherty Claim be allowed in an amount equal to (1) $3,722,019, on account of the HERA Judgment (as defined below), plus (2) $5,412,000, the maximum amount set forth in the Wazzan Report (as defined below), for a total of $9,134,019, an amount far in excess of the $3,722,019 million that the Debtor has already conceded and believes should ultimately be allowed for distribution purposes.

## II.     FACTUAL BACKGROUND

6. Daugherty is a former limited partner of the Debtor and a former officer of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). His employment by Strand ended on May 28, 2009, and he resigned from the Debtor on September 28, 2011. Litigation ensued in Texas state court (the "Texas Action"). The Debtor prevailed on claims against Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorneys' fees.

7.     Daugherty lost on all claims against the Debtor.  He did, however, prevail on a third-party claim against HERA, which was an employee deferred compensation vehicle.  He was awarded the value of his ownership interest in HERA—$2.6 million—on a claim against HERA for breach of the implied covenant of good faith and fair dealing in connection with actions that allegedly deprived him of the value of those interests (the "HERA Judgment").

8.     Daugherty was unable to collect on the HERA Judgment against HERA.  The Debtor had purchased the interests of all HERA members except Daugherty, and HERA's assets, consisting of cash and stock (the "HERA Assets"), were transferred to the Debtor, which represented that it would escrow the assets and restore to HERA amounts needed to satisfy a Daugherty judgment.  That did not occur.  Not wishing to return to the Texas state court, Daugherty commenced an action against the Debtor, HERA, and others in the Delaware Chancery Court (the "Delaware Action").

9.     The Daugherty Claim attaches and incorporates his operative complaint in the Delaware Action, which was in the midst of trial when this bankruptcy commenced, and adds two additional claims to reach an asserted total of "at least $37,483,876.62."  The Daugherty Claim has the following components:

- Enforcement of the HERA Judgment against the Debtor, pursuant to unjust enrichment, promissory estoppel and fraudulent transfer claims, in the amount of $2.6 million plus prepetition interest of $1.13 million.  (Daugherty contends that interest has continued to accrue post-petition).

- The value of what Daugherty contends is his continuing interest in the HERA Assets transferred to the Debtor, notwithstanding that he was already awarded the value of that interest in the Texas Action.  In the Delaware Action, Daugherty contends that his 19.1% ownership interest in HERA translated to an interest in the HERA Assets valued by his damages expert, Paul Wazzan, in a range from approximately $4,023,000 to $5,412,000.

    o  The Debtor contends that this would constitute a double-recovery, at the expense of the Debtor's other creditors, for the reasons set forth below.  To avoid unnecessary and premature litigation, however, the Debtor does not object to the temporary allowance of this aspect of Daugherty's Claim solely for voting purposes.

4

- The value of the other 81.9% ownership interests in HERA, on the theory that Daugherty actually owns 100% of HERA, because the Debtor was not permitted to acquire the interests that it purchased from the former members. This allegedly leaves Daugherty by default as the 100% owner of the HERA Assets, which Daugherty asserts are worth $26 million as a whole.

  - Daugherty reveals in a footnote that this $21 million component of the Daugherty Claim, which is frivolous in any event, was dismissed as time-barred by the Delaware Chancery Court. Estimation Motion at 39, n. 120.

- "Indemnification" as a former partner of the Debtor for any personal tax liability arising from a pending 2008/09 IRS audit of the Debtor that may result in additional pass-through income to the Debtor's partners. He values this claim at $7,744,692 ($6,751,902.41, plus interest of $992,790.40). As set forth below, the claim is frivolous, overstated, and even if allowable would be subordinated pursuant to 11 U.S.C § 510. It is a claim for a tax distribution, and partners do not have the rights of creditors for partnership distributions.

- Indemnification of attorneys' fees incurred in the Texas Action and the Delaware Action under the Debtor's partnership agreement.

- Defamation damages stemming from a November 30, 2017 press release. Daugherty appears to have dropped this time-barred claim.[4]

10.    On the day this bankruptcy case was filed, Daugherty was about to present expert testimony on his asserted damages in the Delaware Action, which is the basis for the Daugherty Claim. Daugherty's damages expert, Paul Wazzan, had prepared a report (the "Wazzan Report"), which asserted a range of damages from approximately $4,023,000 to $5,413,000.[5]

11.    As explained below, the Debtor does not dispute approximately $3.7 million of the Daugherty Claim. Although it disputes the balance of the damages addressed in the Wazzan Report, in order to resolve this matter, the Debtor will not object to the temporary allowance of the Daugherty Claim for voting purposes at the high end of damages asserted therein.

---

[4] Daugherty asserted that the Debtor "defam[ed] him on its website pursuant to its November 30, 2017 press release." *See* Daugherty Claim. The claim is barred by the one-year statute of limitations. TEX. CIV. PRAC. & REM. CODE § 16.002(a), which runs from the date of first publication of the allegedly defamatory statement on the defendant's website. *Glassdoor, Inc v. Andra Group, LP*, 575 S.W.3d 523, 528–29 (Tex. 2019).

[5] The Wazzan Report is attached as Exhibit 1 to the Declaration of *John A. Morris In Support of Debtor's Objection to Patrick Hagaman Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018,* filed contemporaneously herewith ("Morris Dec.").

12.     Now, however, Daugherty apparently believes the Wazzan Report was faulty and seeks the temporary allowance of the Daugherty Claim in the amount of $40,710,819.42.

13.     As described herein, the Daugherty Claim has other components that the Debtor believes are meritless for the reasons set forth in the Claim Objection, including indemnification for his fees incurred litigating against the Debtor and for an equity holder distribution to cover his personal taxes ($7.7 million). The Estimation Motion fails to explain why he should be entitled to vote a $40 million claim instead.

14.     Instead, in a single paragraph (Estimation Brief ¶83) that purports to incorporate an entirely different brief (his Pretrial Brief in the Delaware Action), Daugherty argues that his asserted interest in HERA, which was never more than 19.1% (and which the Debtors contend has no value beyond the damages awarded in the HERA Judgment), has become 100% (or, more than five times the maximum amount of damages that Daugherty's expert claimed Daugherty was entitled to). But as Daugherty is forced to acknowledge, this claim has already been dismissed by the Delaware court. Estimation Brief at 39, n. 120.[6]

A.     **The Debtor Does Not Object to Daugherty's Claim to Collect the HERA Judgment**

15.     The Debtor does not object to Daugherty's claims related to the HERA Judgment ($2.6 Million), prejudgment interest ($279,500), and post-judgment interest to the Petition Date ($842,519), totaling $3,722,019. Claim Objection ¶¶ 3(i), 40.

16.     Daugherty claims he is also entitled to postpetition interest because the HERA Judgment is against a nondebtor, HERA. "As such, postjudgment interest continues to accrue against HERA, and thus the damages arising from the unjust enrichment, promissory estoppel, and fraudulent transfer continues to increase as a result of postjudgment interest." Estimation Motion at 30. But the Bankruptcy Code is not so easily circumvented. Claims are measured as

---

[6] Daugherty suggests that he intends to appeal this adverse ruling (*id.*), but a year after the Debtor filed for bankruptcy, he has yet to move to lift the stay for that purpose.

of the petition date, and Daugherty offers no support for the novel proposition that it matters whether the claim is based on a judgment, a common count, or a statute.

17.     HERA was a deferred compensation plan that held interests in certain Highland-related entities.  At the time Daugherty resigned on September 28, 2011, he owned (and in his view still owns) 19.1% of the HERA units.  The other 80.91% is owned by the Debtor.

18.     On February 16, 2012, HERA enacted a Second Amended and Restated LLC Agreement (the "HERA Agreement").  Section 12.1 provided that legal fees incurred in a lawsuit relating to the HERA Agreement may be offset against the capital balance of the LLC member bringing the lawsuit.  After Daugherty filed claims against HERA and the Debtor in the Texas Action, the Debtor bought out all other members of HERA and, based on Section 12.1, issued a capital balance statement of "zero" to Daugherty for his HERA membership units.

19.     On April 30, 2013, HERA assigned to the Debtor all of HERA's remaining assets, consisting of (i) $9,527,375 in limited partnership interests in Highland Restoration Capital Partners, L.P. ("RCP"); (ii) 5,424 shares in stock in NexPoint Credit Strategies Fund ("NHF"); and (iii) $6,338,702 in cash  (the "Distribution Assets").

20.     In December 2013, the Debtor agreed to escrow Daugherty's alleged ratable 19.1% share of the Distribution Assets, namely (i) $1,820,050 in RCP units, (ii) the cash equivalent of 1,088 shares of NHF, and (iii) $1,201,502 in cash (the "Escrow Assets").  The escrow agreement stated that if Daugherty prevailed against HERA, the Debtor would return the Escrow Assets to HERA.

21.     Daugherty prevailed against HERA in the Texas Action.  The jury found that HERA used Section 12.1 to deny Daugherty the value of his HERA units, that this breached HERA's duty of good faith and fair dealing, and that the market value of the HERA units was

$2.6 million. On July 14, 2014, the Texas court rendered the HERA Judgment, comprising a judgment against HERA of $2.6 million, plus prejudgment and post-judgment interest at 5%.

22. Daugherty was unable to collect the HERA Judgment from HERA. On December 1, 2016, the escrow agent resigned and returned the Escrow Assets to the Debtor rather than HERA, leaving HERA without assets. In the Delaware Action, Daugherty asserts, *inter alia*, claims against the Debtor, HERA, Highland ERA Management, LLC, and James Dondero for fraudulent transfer, promissory estoppel, and unjust enrichment. Daugherty alleges the Escrow Assets were pledged as security against his claims and should have been transferred to HERA and then to him after confirmation of the HERA Judgment on appeal.

23. The Debtor has defenses to the constructive fraudulent transfer claims. Nonetheless, the Debtor determined not to object to the allowance of the Daugherty Claim in the amount of the HERA Judgment ($2.6 million), plus prejudgment interest ($279,500) and post-judgment interest to the Petition Date ($842,519), totaling $3,722,019. Daugherty is not entitled to postpetition interest on the claim, whatever its substantive basis.

**B.    The Debtor Does Not Object to the Temporary Allowance Solely for Voting Purposes of Daugherty's Purported Claim for the Value of His Former 19.1% Interest in HERA Assets**

24. The HERA Judgment was based on Daugherty's assertion that the transactions below deprived him of the value of that interest, and it was measured by the value of that interest. Notwithstanding, the Daugherty Claim *also* asserts that Daugherty is entitled to the present value of all of the Distribution Assets, which Daugherty alleges is $26,009,573. But even if Daugherty had a continuing ownership interest in HERA (which the Debtor disputes), it would be 19.1%. That is exactly how his expert in the Delaware Action, Paul Wazzan, calculated Daugherty's damages. *See*, *e.g.*, Morris Dec. Ex. 1 ¶¶ 63, 64. The Debtor does not

object to including the maximum amount advocated in the Wazzan Report in Daugherty's temporarily allowed claim for voting purposes.

25.  To be clear, the Debtor believes the claim is baseless.  Patently, it constitutes a double recovery.  The very nature of Daugherty's claim was that the actions that the jury found had breached the implied covenant of good faith and fair dealing had deprived him of the value of his membership units in HERA.  Even if those membership units were not extinguished, Daugherty's capital account would have been reduced to zero by the award, entitling him to no further distributions. It would be a double recovery to Daugherty if he also retained that ownership interest and recovered the value of the Distribution Assets *again*.

26.  Still further, even if Daugherty did have a continuing ownership interest, any award for the value of that interest must be reduced by the amount he was already awarded in the HERA Judgment for the diminution in value of that interest.  Daugherty does not articulate any way in which he is not being compensated twice for the same harm.   He asserts that "[t]he damages awarded in the HERA Judgment are attributable to the decline in the value of Daugherty's HERA units as a result of HERA's breach of its duty of good faith and fair dealing. Put differently, Daugherty was damaged because the value of his HERA units went down by $2.6 Million as a result of the February 2012 HERA Amendment and the Lose-Lose clause contained therein."  Estimation Motion ¶80.  But the damages are not different: the asserted bad faith was the zeroing of his capital account through the amendment to HERA's operating agreement.  His HERA interest was valued and awarded in the HERA Judgment.  Restoring his interest in those assets is another way of compensating the exact same loss. If the present value of those assets is greater, and if he is entitled to the present value rather than the amount that was calculated at the time of the HERA Judgment (which he is not), that present value would at minimum have to be reduced by the amount he was already awarded for the same loss.

App. 1166

27.     The basis for Daugherty's assertion of a continuing ownership interest is a negative inference, drawn from the fact that the Texas court struck-through language in the judgment that would have made express that Daugherty had no further interest in HERA:

> Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.
>
> It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~
>
> It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.
>
> It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.
>
> It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

28.     Daugherty divines that the Texas court intended to confirm that he still owns 19.1% of HERA.  But it is far more likely that the court struck the language because it was outside the scope of the jury's findings, concerning instead the *prospective* effect of the judgment, which was not before the court.  Daugherty's statement that the Debtor's argument has been made and rejected on multiple occasions is incorrect.  Daugherty has no greater insight than the Debtor as to why the Texas court struck the language.  If the inference is that it was intended

App. 1167

to give Daugherty an award to compensate for the zeroing of his capital account **and** a continuing ownership interest in HERA assets, and if at minimum the former is not subtracted from the latter, the result is a double recovery at the expense of the Debtor's creditors.

## C. The Debtor Objects to Allowance For Any Purpose of Daugherty's Claim for the Value of All HERA Assets

29.     Even if Daugherty had a continuing ownership interest in HERA's assets, it would be limited to his former 19.1% share, not 100% (*i.e.*, the "Escrowed Assets" and not the "Distribution Assets"). Daugherty's overreaching claim for 100% of HERA's assets is not new: Daugherty asserted in the Delaware Action that he was entitled to 100% of HERA's assets, increasing his claim by $21 million, based on a theory that the Debtor's purchases of the other members' interests were ineffective:

> [W]hen Dondero and the Debtor attempted to take control of HERA by buying all of the preferred units other than Daugherty's, the Debtor was not an authorized holder or assignee of HERA preferred units. Thus, when the prior holder of HERA preferred units relinquished all of their rights and interests in their HERA preferred units, Daugherty remained the only holder of preferred units in HERA and the entire value of HERA should be returned to HERA, with Daugherty as the sole rightful owner.[120]

Estimation Motion ¶81.

30.     Daugherty discloses in the footnote, however, that the claim that is the basis of over half of his asserted $40 million claim was dismissed in the Delaware Action:

> [120] Daugherty notes that this claim was dismissed in the Delaware I Case based upon a laches argument. Daugherty intends to appeal the ruling, and includes herein in order to fully preserve the claim and the value related thereto.

31.     Daugherty provides no legally tenable basis for assigning any value whatsoever, even for voting purposes, to a dismissed claim, particularly when the decision appears to have been discretionary. And even if the claim was not previously dismissed, this attempted windfall would fail. To start, Daugherty does not specify the legal basis on which the Debtor could not purchase membership interests, on what basis those purchases if ineffective would redound to

App. 1168

Daugherty's benefit, or how the Debtor was obligated to transfer back to HERA any more than Daugherty's 19.1% share, either under the escrow agreement or fraudulent transfer law.

32.     On this basis alone, therefore, the Daugherty Claim must be reduced by $21 million even for voting purposes.

**D.     The Debtor Objects to Allowance For Any Purpose of Daugherty's Claim for Tax "Indemnification" or a Tax Distribution[7]**

33.     The Daugherty Claim has a damages breakdown that contains what is referred to as an indemnification claim of $992,790.40, including interest and penalties, on account of a pending IRS audit of the Debtor.  Daugherty states:

> Daugherty is a former senior partner of Highland Capital Management, LP and this claim arises out of a 2008/2009 pending undecided audit/dispute (06252018 0028) between the Debtor and the Internal Revenue Service that remains unresolved.

34.     The IRS audit of the Debtor's return for 2007-08 (not 2008-09 as erroneously stated in the Daugherty Claim) resulted in a determination that additional taxes were owed by the Debtor's partners as the owners of a pass-through entity.  The audit determination is subject to appeal.  Daugherty's 4% share of the additional distributions comes to $1,475,860.  Assuming a 35% marginal rate ($440,227), and adding penalties ($88,045) and interest ($212,035), his total exposure approximates **$740,307** at this time.

35.     Regardless of amount, Daugherty has no right to mandatory indemnification of his personal tax liability as a former partner of the Debtor.  Section 4.1(h) of the Partnership Agreement provides for indemnification of limited partners in the "sole and unfettered discretion" of the general partner. It does provide for mandatory indemnification of the general

---

[7] It is not entirely clear from the Estimation Motion whether Daugherty seeks to have his "tax distribution" claim allowed for voting purposes.  To the extent that he does, the Debtor objects for the reasons set forth herein and in the Claim Objection.

App. 1169

partner, Strand, of which Daugherty was an officer, but that provision is inapplicable to his personal tax liabilities. In relevant part, Section 4.1(h) reads as follows:

> Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively, the "**GP Party**"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however*, the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct.

36.     Daugherty's personal income taxes on distributions received in his capacity as a limited partner of the Debtor do not fall within the Debtor's indemnification of its general partner for "liabilities, losses, and damages incurred . . . by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business . . . ." Daugherty incurred personal taxes on his income. The closest nexus to the Debtor would be that an indeterminate portion of that income came from the Debtor. He did not incur any loss or liability in his asserted capacity as a "GP Party," *i.e.*, an officer of Strand, the indemnified general partner. Therefore the indemnity clause does not apply by its express terms and as a matter of common sense.

37.     Nor does Daugherty have a claim for a tax distribution from the Debtor. The last Partnership Agreement to which Daugherty was a signatory was the *Second Amended and Restated Agreement of Limited Partnership*. Morris Ex. 2. Distributions are addressed in section 3.9, which provides in part:

> (a)  General. The General Partner shall review the Partnership's accounts at the end of each calendar quarter to determine whether distributions are appropriate. The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness. The

13

Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. . . .

(b)  Tax Distributions.  The General Partner shall promptly declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "Tax Distribution").  To satisfy this requirement, the Partnership shall pay to each Partner on or before April 14 of each Fiscal Year….

*Id.*

38.     Partners have no right to distributions as if they were creditors.  That is why section 3.9(a) clearly states that distributions will be limited if funds are insufficient to pay current debt.  A partnership agreement is simply an agreement between partners as to when and how distributions may be made if the partnership has the funds to do so.  Even if there were such an obligation, the Debtor had not made any distributions that would be subject to tax, and so would have had no obligation *at that time* to make tax distributions.  And even if the Partnership Agreement were interpreted to call for a tax distribution to be made on account of income that is imputed to its partners ten years later as a result of the IRS audit (which is still contingent), the Debtor may not have funds in excess of current debt.  Thus, Daugherty has no claim for tax indemnification or a tax distribution.

39.     Even if Daugherty had a claim under the Partnership Agreement, it would be subordinated under Bankruptcy Code section 510(b), which provides:

(b)   For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

40.     Section 510(b) applies to the ownership interests in a limited partnership.  *See In re SeaQuest Diving, LP*, 579 F.3d 411 (5th Cir. 2009); *Templeton v. O'Cheskey (In re Am. Hous.*

*Found.*), 785 F.3d 143, 154 (5th Cir. (2015); *In re Garrison Mun. Partners, LP*, 2017 Bankr. LEXIS 3765, *8 (Bankr. S.D. Tex. Oct. 31, 2017).

41.     Thus, there are three distinct categories of claims subject to mandatory subordination under section 510(b): (1) a claim arising from rescission of a purchase or sale of a security of the debtor (the rescission category); (2) a claim for damages arising from the purchase or sale of a security of the debtor (the damages category); and (3) a claim for reimbursement or contribution allowed under 11 U.S.C. § 502 on account of either (1) or (2). *SeaQuest*, 579 F.3d at 418.

42.     Even if Daugherty had a claim under the Partnership Agreement to cover his taxes, such a claim would be a claim for damages "arising from" the purchase of a security (category 2).  The category covers claims arising from not just the purchase itself but all claims arising thereafter as incidents of ownership, except where the claim is genuinely a "debt"—*e.g.*, where it arises from a documented loan or other distinct transaction between the partner and the partnership:

> For purposes of the damages category, the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract. They also agree that the term "arising from" is ambiguous, so resort to the legislative history is necessary. For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale. Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale.

*SeaQuest*, 579 F.3d at 421 (internal citations omitted).   In *SeaQuest*, the Fifth Circuit ruled that a settlement that essentially effected a rescission and, when breached, resulted in a judgment, was nonetheless subordinated under section 510(b).  *Id*. at 423-26 ("For purposes of § 510(b), we may look behind the state court judgment to determine whether the . . . claim 'arises from' the rescission of a purchase or sale of a security of the debtor.").

App. 1172

43.     In *Garrison Municipal Partners*, a redemption claim arising from withdrawal

from the partnership was subordinated under section 510(b).  The situations identified by the

court in which section 510(b) *would not* apply illustrate why it *would* likely apply here:

> Debtor's failure to pay the Greens' claim upon withdrawal is a claim for breach of contract arising from the withdrawal. The Greens are seeking to recover their equity investment. Thus, under Section 510(b), their claim is subordinated and has the same priority as the other prepetition investors.
>
> The Greens' argument that their notice of withdrawal is a redemption claim similar to those in *In re Montgomery Ward Holding Co*. 272 B.R. 836 (Bankr. D. Del. 2001), *abrogated on other grounds by In re Telegroup, Inc*., 281 F.3d 133 (3d Cir. 2002) lacks merit. A redemption claim requires a separate note, *see SeaQuest*, 579 F.3d, at 423, and must be independent of the partnership agreement. *See In re American Housing Foundation*, 785 F.3d 143 (5th Cir. 2015). In this case, the notice of withdrawal was not self-executing so as to give the Greens an interest in the assets of the partnership. The partnership agreement required action on the part of the general partner to repay the Greens equity interests.

*Garrison Mun. Partners*, 2017 Bankr. LEXIS 3765 at \*9; *see also Official Comm. of Unsecured*

*Creditors v. FLI Deep Marine LLC (In re Deep Marine Holdings, Inc.)*, 2011 Bankr. LEXIS 579

(Bankr. S.D. Tex. Jan. 19, 2011) (claims for right of appraisal, fraud, and accounting were

causally linked to status as shareholders and so were subordinated); *Queen v. Official Comm. of*

*Unsecured Creditors (In re Response U.S.A., Inc.)*, 288 B.R. 88 (D.N.J. 2003) (shareholder

cannot avoid subordination under 11 USC § 510(b) by placing risk-limiting provision in stock

purchase agreement in order to claim creditor status in bankruptcy proceedings).

44.     By comparison, *Stucki v. Orwig*, No. 3:12-CV-1064-L, 2013 U.S. Dist. LEXIS

53139, at \*15-19 (N.D. Tex. Apr. 12, 2013) found section 510(b) inapplicable where the claim

arose from breach of a settlement agreement by which the shareholders withdrew a lawsuit

seeking to compel a shareholders' meeting and election of directors.  *Id.* at \*17.  The court

reasoned as follows: "[I]n both *In re SeaQuest* and *In re Deep Marine Holdings*, the claims

essentially sought to recover the claimants' equity interests in the debtor. There is no suggestion

in the record that the shareholders sought to do the same here. The court therefore concludes that the connection or causal relationship between the Breach Claim and the actual or virtual purchase or sale of any security interests in FirstPlus is too attenuated to bring it within § 510(b)'s reach." *Id*. at *19. That decision seems debatable, but in any event, it is a far cry from this case, where what Daugherty is effectively demanding is a distribution on account of his partnership interest. Such a claim should fall squarely under section 510(b).

45. Daugherty is asserting a right under the Partnership Agreement for a subsequent distribution on ownership interests in the Debtor to cover the taxes he owes on the distributions he previously received on account of his ownership interest the Debtor. To the extent he has such a right, it is an incident of ownership arising from the Partnership Agreement and not from any ancillary transaction such as a loan. It is in the nature of a "partner claim," not a creditor claim, and must be subordinated.

**E. Daugherty Is Not Entitled to Indemnification of Fees in His Personal Litigation with the Debtor, But the Debtor Does Not Object to Temporary Allowance for Voting Purposes**

46. Daugherty also asserts two indemnification claims against the Debtor for fees incurred defending claims against him by the Debtor in the Texas Action based on his employment performance, which he states were nonsuited, and for "fees on fees" for prosecuting his asserted right to indemnification in the Delaware Action. It appears from the proof of claim that these claims are represented by two line items of $3,139,452 and $3,479,318. These portions of the Daugherty Claim should be disallowed even for voting purposes, for the reasons discussed in the Claim Objection. Claim Objection ¶¶45-56.

47. The claims in the Texas Action which Daugherty alleges are subject to indemnification, as reflected on the jury verdict (referenced as Exhibit O to the Daugherty Claim), are as follows:

App. 1174

| Claim | Description of Claim | Outcome |
|---|---|---|
| Highland 1 | Declaratory judgment that Highland did not owe Daugherty any compensation or payments under Highland's long-term incentive plan ("LTIP") because his conduct forfeited his rights. Ex. O at 8. | Voluntarily dismissed pre-trial |
| Highland 2 | Breach of employment agreement and a buy-sell agreement relating to purported complaints from other Highland employees about Daugherty and purported disclosures of confidential information that "violated his common law duties to Highland, as well as several agreements between him and Highland." Ex. O at 9. | ***Jury found Daugherty liable.*** |
| Highland 3 | Breach of fiduciary duty and a claim of entitlement to "all compensation paid to Daugherty during the time he was breaching his duties, as well as to an award of exemplary and punitive damages." Ex. O at 9. | ***Jury found Daugherty liable.*** |
| Highland 4 | A claim for violation of the Texas Theft Liability Act related to purported theft of Highland's trade secrets. | Voluntarily dismissed pre-trial |
| Highland 5 | Tortious interference with Highland's business relations seeking exemplary and punitive damages | Jury found Daugherty not liable. |
| Highland 6 | Defamation related to Daugherty's purported statements about Highland to potential investors | Jury found Daugherty not liable. |
| Highland 7 | Misappropriation of trade secrets and other confidential information, including on behalf of Cornerstone | Voluntarily dismissed pre-trial |
| Highland 8 | Conversion related to purported conversion of confidential information, including on behalf of Cornerstone | Voluntarily dismissed pre-trial |
| Highland 9 | Business disparagement, including on behalf of Cornerstone. *Id*. at 13-15 | Voluntarily dismissed pre-trial |

48.     The Debtor prevailed on claims for breach of the Employment Agreement and for breach of fiduciary duty, which Daugherty minimizes as "only" having to do with confidential

information with no compensatory damages, but on which the Debtor was awarded $2.8 million in attorneys' fees. The Debtor was found to have complied with the Employment Agreement and honored all obligations concerning the LTIP Plan, the HERA Agreement, and severance pay.

49.     As discussed above in connection with Daugherty's attempt to be indemnified for his personal tax liability, indemnification of limited partners is discretionary under the Debtor's Partnership Agreement; hence, Daugherty relies upon its mandatory indemnification of the general partner, Strand, under Section 4.1(h). He claims to be a "GP Party," which is "any director, officer, employee, agent, or representative of the General Partner." GP Parties are indemnified for:

> all liabilities, losses, and damages incurred … [including attorneys' fees] by reason of any act *performed or omitted to be performed in the name of or on behalf of [the Debtor] or in connection with the Partnership's business* … to the fullest extent permitted by the Delaware Act … [except] for any action or inaction that constitutes gross negligence or willful or wanton misconduct. (emphasis added).

50.     Daugherty claims he is entitled to indemnification as a GP Party because all of his litigation expense was purportedly "in connection with [the Debtor's] business." He contends there is no limitation to defensive litigation expenses, nor any even any requirement that he be successful.

***51.     Daugherty was a GP Party as an officer of Strand only until May 29, 2009, and he resigned from the Debtor on September 28, 2011. Other than the first non-suited claim, which relates to his personal compensation, all of the claims for which he was not found liable involve actions taken well after he left Strand and even after he left the Debtor, as to which he was not a GP Party. None of the Debtor's claims against Daugherty related to his time as an officer of Strand, when he was a GP Party.***

52.     Second, Daugherty was not an "agent" for any relevant purpose that would make him an indemnified GP Party for these purposes. None of the actions for which the Debtor sued

him were taken at the instruction or on behalf of the General Partner as its "agent or representative." *See Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 163 (Del. Ch. 2003) (in reference to 8 Del. C. §145, governing indemnification of corporate officers, "I read §145 as embracing the more restrictive common law definition of agent, which generally applies only when a person (the agent) acts on behalf of another (the principal) in relations with third parties."). Furthermore, Delaware "[c]ourt[s] limit[] agency in the indemnification context to only those situations when an outside contractor can be said to be acting as an arm of the corporation vis-à-vis the outside world." *Pasternack v. N.E. Aviation Corp.*, No. 12082-VCMR, 2018 WL 5895827, at *8 (Del. Ch. Nov. 9, 2018).

53. Third, even if Daugherty were to prove he was a GP Party at a relevant time, and even if he were to prove that he was acting in the capacity of an agent—*i.e.*, interacting on behalf of Strand with third parties—decisions under the Delaware General Corporation Law ("DGCL") hold that a director is not entitled to indemnification in respect of employment litigation between the director and the corporation. *See Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 594 (Del. Ch. 1994) (holding that former officer was not entitled to indemnification for claims relating to breach of her employment contract because those claims did not involve the officer's duties to the corporation and its shareholders); *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 562 (Del. 2002) ("Although Cochran's termination is the event that triggered the relevant provisions of the employment contract, Cochran's decision to breach the contract was entirely a personal one, pursued for his sole benefit.")

> When a corporate officer signs an employment contract committing to fill an office, he is acting in a personal capacity in an adversarial, arms-length transaction. To the extent that he binds himself to certain obligations under that contract, he owes a personal obligation to the corporation. When the corporation brings a claim and proves its entitlement to relief because the officer has breached his individual obligations, it is problematic to conclude that the suit has been rendered an "official capacity" suit subject to indemnification under § 145 and implementing bylaws.

*Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 404 (Del. Ch. 2009) (citing the *Cochran* Chancery Court decision, 2000 Del. Ch. LEXIS 179, 2000 WL 1847676, at *6 (reversed in part on other grounds).

54.     The Daugherty Claim anticipates the defense under *Cochran* that the subject claims were "personal employment-related" claims, and attempts to distinguish it on the basis that the Delaware Revised Uniform Limited Partnership Act ("DRULPA") is more permissive than the DGCL and does not preclude indemnification even when the indemnitee has been adjudged liable to the partnership (if a court deems it fair in view of all the circumstances).  If it provides for coverage to the full extent permitted under the law, then it is to be provided unless the partnership agreement or law provide otherwise.

55.     Citing *Paolino*, *supra*, Daugherty specifically argues that *Cochran* is inapplicable because his employment conduct was not "personal" in distinction from the compensation issues in *Cochran*.   Regardless, he did not incur losses "by reason of any act performed or omitted to be performed . . . in connection with the Partnership's business" under section 4.1 of the Partnership Agreement.  The "by reason of the fact" standard is not met where the claims at issue do not involve the exercise of judgment, discretion, or decision-making authority on behalf of the corporation.  *Batty v. UCAR Int'l Inc.*, No. 2018-0376-KSJM, 2019 Del. Ch. LEXIS 114, at *19 (Del. Ch. Apr. 3, 2019) (quoting *Paolino*).   Here, the Debtor's Claims 4-9 related solely to conduct *after* Daugherty left the Debtor's employ.   Daugherty was found liable on Claims 2 and 3, and the Partnership Agreement provides that "the Partnership shall have no obligation to indemnity and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wonton misconduct.").

56.     Even if Daugherty were to surmount all other hurdles, even under his construction, any rights to fees would be discretionary.  The Debtor respectfully submits that the

App. 1178

facts do not support penalizing the Debtor's other creditors by awarding Daugherty fees in his personal litigation with the Debtor on account of his status as an officer of Strand, relating to conduct that had nothing to do with actions taken or not taken in his capacity as an officer of Strand, and largely post-dating that tenure.

57.    Finally, Daugherty should have to segregate his attorneys' fees between those incurred on any indemnifiable claims and other claims, in particular those on his counter- and third-party claims.    Indemnification under Partnership Agreement §4.1(h) relates to acts performed or not performed by Daugherty (as an agent of Strand) in connection with the Debtor's business.  Daugherty's counter- and third-party claims in the Texas Action related to (i) his departure from the Debtor (defamation and breach of employment agreement by the Debtor relating to severance, all of which Daugherty lost), (ii) a separate incentive vehicle called Sierra Verde which was wound down separate from Daugherty's resignation, (iii) claims related to Daugherty's value in HERA, and (iv) claims in relation to his LTIP.[8]  Of these, categories (ii) and (iii) related to third-party claims against compensation vehicles, and Daugherty lost claims in categories (i) and (iv).  In fact, Daugherty succeeded on only one of his twenty total affirmative claims.

### III.    <u>CONCLUSION</u>

WHEREFORE, the Debtor requests that the Daugherty Claim be temporarily allowed for voting purposes in an amount equal to $9,134,019.

---

[8] Daugherty's *Third Amended and Restated Answer, Counterclaim, and Third-Party Petition* in the Texas Action at ¶¶ 122 – 183.

App. 1179

Dated:  November 9, 2020.          **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*