# Appendix Exhibit 83

Docket #1731  Date Filed: 01/13/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 1625, 1697, 1706, 1707** |
| | ) | |

## DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054210113000000000010

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") in support of its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim No.143,147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion").[2] In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      If granted, the Motion will resolve a $300 million general unsecured claim against the Debtor's estate for less than $16.8 million in actual value.[3] The settlement is another solid achievement for the Debtor and – not surprisingly – is opposed by no one except Mr. Dondero and entities affiliated with him.

2.      As discussed in the Motion, in November 2017, HarbourVest invested $80 million in exchange for a 49.98% membership interest in HCLOF – an entity managed by a subsidiary of the Debtor. The balance of HCLOF's interests are held by CLO Holdco, Ltd. (an entity affiliated with Mr. Dondero), the Debtor, and certain of the Debtor's employees. Subsequent to its investment in HCLOF, HarbourVest incurred substantial losses on its investment in HCLOF and filed claims against the Debtor's estate.

3.      HarbourVest asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] Under the proposed settlement, HarbourVest would receive an allowed, general unsecured claim of $45 million and an allowed, subordinated claim of $35 million. Based on the estimated recovery for general unsecured creditors of 87.44% (which is a recovery based on certain outdated assumptions discussed *infra*), HarbourVest's $45 million general unsecured claim is estimated to be worth approximately $39.3 million and the $35 million subordinated claim, which is junior to the general unsecured claim, is currently estimated to have value only if there are litigation recoveries. In addition, HarbourVest is transferring to an affiliate of the Debtor its interest in HCLOF, which is estimated to be worth approximately $22.5 million. Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims is estimated at approximately $16.8 million on a net economic basis. This estimate, however, is dated and is based on the claims that were settled as of the filing of the Debtor's plan in November 2020.

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. In furtherance of these claims, HarbourVest alleges it was misled by the Debtor and its employees, including Mr. Scott Ellington (then the Debtor's general counsel), and that subsequent to investing in HCLOF, Mr. Dondero and the Debtor used HCLOF both as a piggybank to fund the litigation against Acis Capital Management, L.P. ("Acis") and as a scapegoat for the Debtor's litigation strategy, in each case to HarbourVest's substantial detriment.

4.     Specifically, HarbourVest alleges that:

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to Mr. Terry's arbitration award against Acis and orchestrated a series of fraudulent transfers and corporate restructurings, the true purpose of which was to denude Acis of assets and make it judgment proof;

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- the Debtor, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- the Debtor improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- the Debtor used HarbourVest as a scapegoat in its litigation against Acis by asserting that the Debtor's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

5.     The Debtor believed, and continues to believe, that it has viable defenses to HarbourVest's claims. Nevertheless, those defenses would be subject to substantial factual disputes and would require expensive and time-consuming litigation that would likely be resolved only after a lengthy trial all while the Debtor (or its successor) assumes the risk that the defenses might fail. The evidence will show that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the

principals and their counsel. The evidence will also show that one of HarbourVest's primary concerns in settling its claim was that part of that settlement would include the extrication of HarbourVest from the Highland web of entities and the related litigation. The proposed settlement accomplishes that and does so in compliance with HCLOF's governing agreements.

6.      Pursuant to the proposed settlement, (a) HarbourVest will receive (i) an allowed, general unsecured claim in the amount of $45 million, and (ii) an allowed, subordinated claim in the amount of $35 million; (b) HarbourVest will transfer its 49.98% interest in HCLOF (valued at approximately $22.5 million) to a wholly-owned subsidiary of the Debtor; and (c) the parties will exchange mutual and general releases. The Debtor believes that the proposed settlement is reasonable and results from the valid and proper exercise of its business judgment. And the Debtor's creditors apparently agree. None of the major parties-in-interest or creditors in this case has objected to the Motion: not the Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS.

7.      In distinction, the only objecting parties are Mr. Dondero, his family trusts (the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts")), and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF")) (collectively, the "Objectors"). Each of the Objectors has only the most tenuous economic interest in and connection to the Debtor's settlement with HarbourVest. Each of the Objectors is also controlled directly or indirectly by Mr. Dondero who has coordinated each of the Objectors litigation strategies against the Debtor.[4] Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – should be rebuffed, and the objections overruled. The following is a brief summary of the objections.

---

[4] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q.

DOCS_NY:41952.8 36027/002

| Pleading | Objection/Reservation | Response |
|---|---|---|
| *Objection of James Dondero* [Docket No. 1697] (the "<u>Dondero Objection</u>") | Because HarbourVest was damaged by the injunction entered in Acis, the settlement seeks to revisit this Court's rulings in Acis. | Mr. Dondero is misdirecting the Court. HarbourVest's claim arises from the misrepresentations of Mr. Dondero, Mr. Ellington, and others, not this Court's rulings in Acis, including the failure to disclose the fraudulent transfer of assets. |
| | The settlement is not fair and equitable because it does not address (1) Acis's mismanagement, (2) how the Debtor is liable for HarbourVest's damages, (3) the success on the merits, (4) the costs of litigation, and (5) the Debtor's ability to realize the value of the HCLOF interests in light of the Acis injunction. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. The Debtor has assessed the value of the HCLOF interests in light of all factors, including the Acis injunction. |
| | The HarbourVest settlement represents a substantial windfall to HarbourVest. | Mr. Dondero ignores the economics of this case, which have value breaking in Class 8 (General Unsecured Claims). The value of the settlement is not $60 million; it is approximately $16.8 million against a claim of $300 million. There is no windfall. |
| | The HarbourVest settlement is improper gerrymandering because it provides HarbourVest with a general unsecured claim and a subordinated claim in order to secure votes for the plan. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| *Objection of the Dugaboy Investment Trust and Get Good Trust* [Docket No. 1706] (the "<u>Trusts Objection</u>") | The settlement represents a radical change in the Debtor's earlier position on the HarbourVest settlement. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. |
| | The settlement appears to buy HarbourVest's vote. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| | No information is provided as to whether the Debtor can acquire HarbourVest's interest in HCLOF or the value of that interest to the estate. | As discussed below, the HCLOF interest will be transferred to a wholly-owned subsidiary of the Debtor. Mr. Seery will testify as to the benefit of the HCLOF interests to the estate. |
| *Objection of CLO Holdco* [Docket No. 1707] ("<u>CLOH Objection</u>") | HarbourVest cannot transfer its interests in HCLOF unless it complies with the right of first refusal. | CLO Holdco misinterprets the operative agreements and tries to create ambiguity where none exists. |

5

8.      These objections are just the latest objections filed by Mr. Dondero and his related entities to any attempt by the Debtor to resolve this case,[5] including the Debtor's settlement with Acis [Docket No. 1087] and the seven separate objections filed by Mr. Dondero and his related entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[6]  It will not shock this Court to hear that each of the Objectors is also objecting to the Plan.  In contradistinction, the Debtor has heard this Court's admonishments about old Highland's culture of litigation as evidenced by this case, Acis's bankruptcy, and beyond.  Although the Debtor has vigorously contested claims when appropriate, the Debtor has also sought to settle claims and limit the senseless fighting.  The Debtor has successfully resolved the largest claims against the estate, including the claims of the Redeemer Committee, Acis, and, as recently announced to this Court, UBS.  The Debtor would ask this Court to see through the pretense of the Dondero-related entities' objections to the HarbourVest settlement and approve it as a valid exercise of the Debtor's business judgment.

---

[5] As an example of Mr. Dondero's litigiousness, on January 12, 2021, Mr. Dondero filed notice that he will be appealing the preliminary injunction entered against him earlier on January 12, 2021.

[6] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667]; (3) *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670]; (5) *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].

## REPLY

### A. Standing

9. **James Dondero.** In the Dondero Objection, Mr. Dondero asserts he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. While that claim is ostensibly true, it is tenuous at best. On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[7] More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[8]

10. Mr. Dondero's claim as an "indirect equity security holder" is also a stretch. Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

11. **Dugaboy and Get Good.** Dugaboy and Get Good are sham Dondero "trusts" with only the most attenuated standing. Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177]. In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy

---

[7] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

[8] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

DOCS_NY:41952.8 36027/002

for its postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. The Debtor believes that each of the foregoing claims is frivolous and has objected to them. [Docket No. 906].

12.    In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its prior ownership of limited partnership interests in the Debtor. Because each these claims arises from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time. As set forth above, these interests are out of the money and are not expected to receive any economic recovery.

13.    Consequently, Mr. Dondero, Dugaboy, and Get Good's standing to object to the HarbourVest settlement is attenuated and their chances of recovery in this case are extremely speculative at best. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero, Dugaboy, and Get Good's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity

8

holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

**B.**     **Mr. Dondero's Objection and his "Trusts" Objection Are Without Merit**

14.     As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted).  *See also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

15.     **The Settlement Seeks to Revisit the Acis Orders.**  In the Dondero Objection, Mr. Dondero argues that HarbourVest's claim is based on the financial harm caused to HarbourVest from Acis's bankruptcy and the orders entered in the Acis bankruptcy.  Mr. Dondero extrapolates from this that HarbourVest is seeking to challenge this Court's rulings in Acis.  (Dondero Obj., ¶¶ 17-20)  Mr. Dondero misinterprets HarbourVest's claims and the dangers such claims pose to the Debtor's estate.

16.     HarbourVest's claims are for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

DOCS_NY:41952.8 36027/002

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. HarbourVest is not arguing that Acis or this Court caused its damages; HarbourVest is arguing that *the Debtor* – led by Mr. Dondero – (a) misled HarbourVest as to the nature of Mr. Terry's claims against the Debtor and the litigation with Acis, (b) knowingly and intentionally failed to disclose that the Debtor was engaged in the fraudulent transfer of assets to prevent Mr. Terry from collecting his judgment, and (c) that *the Debtor* – under the control of Mr. Dondero – improperly engaged in a crusade against Mr. Terry and Acis, which substantially damaged HarbourVest and its investment in HCLOF, in each case in order to induce HarbourVest to invest in HCLOF.

17.     Again, HarbourVest does not contend that Acis caused its damages. Rather, HarbourVest contends that the fraudulent transfer of assets as part of the Debtor's crusade against Mr. Terry and Acis and the false statements and omissions about those matters caused HarbourVest to make an investment it would never have made had Mr. Dondero and the Debtor been honest and transparent. The Acis litigation – in HarbourVest's estimation – never should have happened. Acis did not cause HarbourVest's damages. Mr. Dondero's crusade against Mr. Terry and the Debtor's allegedly fraudulent statements to HarbourVest about the fraudulent transfers, Mr. Terry and Acis caused HarbourVest's damages.

18.     **The HarbourVest Claim Lacks Merit.** In their objections, Mr. Dondero and the Trusts argue that the HarbourVest settlement is not fair and equitable and not in the best interests of the estate because (a) it does not address the Debtor's arguments against the HarbourVest claims and (b) there is a lack of pending litigation seeking to narrow the claims against the estate. These arguments only summarily address the first two factors of *Cajun Electric*, which deal with success in the litigation, and, in doing so, mischaracterize the dangers to the Debtor's estate

posed by HarbourVest's claims. (Dondero Obj., ¶¶ 21-25; Trusts Obj., ¶ 18(a))

19. Both the Dondero Objection and – to a much lesser extent - the "Trusts" Objection allege that (a) HarbourVest's losses were caused by Acis and its (mis)management of HCLOF's investments (Dondero Obj.,¶ 22, 24), (b) there is no contract that supports HarbourVest's claims (Dondero Obj. ¶ 23; Trusts Obj., ¶ 18(a)), (c) there is no causal connection between HarbourVest's losses and the Debtor's conduct (Dondero Obj., ¶ 24), and (d) the Debtor should litigate all or a portion of HarbourVest's claim before settling (Dondero Obj., ¶ 25). Again, though, as set forth above, both Mr. Dondero and the "Trusts" seek to shift the cause of HarbourVest's damages away from the Debtor's misrepresentations and to Mr. Terry's management of HCLOF's investments. This is simple misdirection.

20. HarbourVest's claims are that it invested in HCLOF based on the Debtor's fraudulent misrepresentations. Fraudulent misrepresentation sounds in tort, not contract. *See, e.g., Clark v. Constellation Brands, Inc.*, 348 Fed. Appx. 19, 21 (5th Cir. 2009) (referring to party's claim based on fraudulent misrepresentation as a tort); *Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 717 (S.D. Tex. 2000) (noting that party had common law duty not to commit intentional tort of fraudulent misrepresentation). There is thus no need for HarbourVest to point to a contractual provision to support its claim.[9] Moreover, in order to defend against HarbourVest's claims, the Debtor would need to elicit evidence showing that its employees did not make misrepresentations to HarbourVest. Such a defense would require the Debtor to rely on the veracity of Mr. Ellington's testimony, among others. That is a high hurdle, and no reasonable person would expect the Debtor to stake the resolution of HarbourVest's $300 million claim on the Debtor's ability to convince this Court that Mr. Ellington was telling HarbourVest

---

[9] Subsequent to filing the Motion, the Objectors requested all agreements between HarbourVest, HCLOF, and the Debtor, and such agreements were provided.

DOCS_NY:41952.8 36027/002

the truth. This is especially true in light of the evidence supporting Mr. Ellington's recent termination for cause and the evidence recently provided by HarbourVest supporting its claim for fraudulent misrepresentations.

21. Finally, neither Mr. Dondero nor the "Trusts" even address the third factor analyzed by the Fifth Circuit: all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." This is telling because no creditor or party in interest has objected to the settlement. Mr. Dondero and his proxies' preference for constant litigation should not outweigh the preference of the Debtor and its creditors for a reasonable and expeditious settlement of HarbourVest's claims.

22. **The HarbourVest Settlement Is a Windfall to HarbourVest.** Both the Dondero Objection and the "Trusts" Objection argue that the HarbourVest settlement represents a substantial windfall to HarbourVest. Both Mr. Dondero and the "Trusts" ignore the facts. Specifically, Mr. Dondero argues that HarbourVest is receiving $60 million dollars in *actual* value for its claims. Mr. Dondero's contention, however, wrongly assumes that both the $45 million general unsecured claim and the $35 million subordinated claim provided to HarbourVest under the settlement will be paid 100% in full and that HarbourVest will receive $80 million in cash. From that $80 million, Mr. Dondero subtracts $20 million, which represents the value Mr. Dondero ascribes to HarbourVest's interests in HCLOF that are being transferred to the Debtor. Mr. Dondero's math ignores the reality of this case.

23. The Debtor very clearly disclosed in the projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.,* [Docket No. 1473] (the "Projections") that general unsecured claims would receive an 87.44% recovery *only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr.

Daugherty, and the Hunter Mountain Investment Trust were zero. Because of the Debtor's success is settling litigation, that assumption is proving to be inaccurate. Regardless, even if general unsecured claims receive a recovery of 87.44%, because the subordinated claims are junior to the general unsecured claims, the subordinated claims' projected recovery is currently zero. As such, assuming the HCLOF's interests are worth $22.5 million,[10] the actual recovery to HarbourVest will be less than $16.8 million. This is not a windfall. HarbourVest's investment in HCLOF was $80 million and its claim against the estate was over $300 million. The settlement represents a substantial discount.

24. **Improper Gerrymandering and/or Vote Buying.** Each of Mr. Dondero and the Trusts argue in one form or another that the HarbourVest settlement is improper as it provides HarbourVest a windfall on its claims in exchange for HarbourVest voting to approve the Plan. These unsubstantiated allegations of vote buying should be disregarded. As an initial matter, and as set forth above, HarbourVest is *not* getting a windfall. HarbourVest is accepting a substantial discount in the settlement. HarbourVest's incentive to support the Plan comes from HarbourVest's determination that the Plan is in its best interests. There is also nothing shocking about a settling creditor supporting a plan. Indeed, it would be nonsensical for a creditor to settle its claims and then object to the plan that would pay those claims.

25. More importantly, HarbourVest's votes in Class 9 (Subordinated Claims) are not needed to confirm the Plan. As will be set forth in the voting declaration, Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) have voted in favor of the Plan.[11] In brief, the Plan was approved without HarbourVest's Class 9 vote,

---

[10] It is currently anticipated that Mr. James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, will testify as to the value of the HCLOF interests to the Debtor's estate.

[11] The Debtor anticipates that Mr. Dondero and his related entities will argue that neither Class 7 nor Class 8 voted to accept the Plan because of the votes cast against the Plan in those Classes by current and former Debtor

App. 1703

and the Debtor, therefore, has no need to "buy" HarbourVest's Class 9 claims. Accordingly, any claims of gerrymandering or vote buying are without merit.

## C.    **CLOH Objection**

26.     CLO Holdco (and to a much lesser extent, the "Trusts") object to HarbourVest's transfer of its interests in HCLOF as part of the settlement. Currently, the settlement contemplates that HarbourVest will transfer 100% of its collective interests in HCLOF to HCMLP Investments, LLC ("HCMLPI"), a wholly-owned subsidiary of the Debtor. As set forth in the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* (which was appended as Exhibit A to the Settlement Agreement) [Docket No. 1631-1], each of the Debtor, HarbourVest, Highland HCF Advisors, Ltd. (HCLOF's investment manager) ("HHCFA"), and HCLOF agree that HarbourVest is entitled to transfer its interests to HCMLPI pursuant to that certain *Members Agreement Relating to the Company*, dated November 15, 2017 (the "Members Agreement"),[12] without offering that interest to other investors in HCLOF.

27.     The *only* party to object to the transfer of HarbourVest's interests in HCLOF to HCMLPI is CLO Holdco. CLO Holdco holds approximately a 49.02% interest in HCLOF and is the wholly-owned subsidiary of the DAF, Mr. Dondero's donor-advised fund. CLO Holdco argues that the Member Agreement requires HarbourVest to offer its interest first to the other investors in HCLOF before it can transfer its interests to HCMLPI. In so arguing, CLO Holdco attempts to create ambiguity in an unambiguous contract and to use that ambiguity to disrupt the Debtor's settlement with HarbourVest.

28.     As an initial matter, the Debtor and CLO Holdco agree that the transfer of HarbourVest's interests in HCLOF to HCMLPI is governed by Article 6 (Transfers or Disposals

---

employees, including Mr. Ellington and Mr. Isaac Leventon. The Debtor will demonstrate at confirmation that those objections are without merit and that Class 7 and Class 8 voted to accept the Plan.

[12] A true and accurate copy of the Members Agreement is attached hereto as Exhibit A.

of Shares) of the Members Agreement (an agreement governed by Guernsey law). (CLOH Obj.,

¶ 3) The parties diverge, however, as to how to interpret Article 6. The Debtor, as set forth

below, believes Article 6 is clear in that it allows HarbourVest to transfer its interests in HCLOF

to any "Affiliate of an initial Member party" without requiring the right of first refusal in Section

6.2 of the Members Agreement. CLO Holdco's position appears to be that the Members

Agreement, despite its clear language, should be interpreted as limiting transfers to an "initial

Member's ***own*** affiliates" and that any other transfer requires the consent of HHCFA and

satisfaction of the right of first refusal. (*Id.* (emphasis added)) CLO Holdco's reading is

contrary to the actual language of the Members Agreement.

      29. First, Section 6.1 of the Members Agreement provides, in pertinent part:



(Members Agmt, § 6.1 (emphasis added)) Under the Members Agreement, "Affiliate" is

defined, in pertinent part, as "█████████████████████████████████

██████████████████████████████████████████████████

(Id., § 1.1) A "Member" in turn is a █████████████████████." The "initial

Member[s]" are the initial Members of HCLOF listed on the first page of the Members

Agreement and include the Debtor, HarbourVest, and CLO Holdco.

      30. As such, under the plain language of Section 6.1, HarbourVest is entitled –

without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any

of the Debtor, HarbourVest, or CLO Holdco. And that is exactly what is contemplated by the

settlement. HarbourVest is transferring its interests to HCMLPI, a wholly owned and controlled

subsidiary of the Debtor, and therefore an "Affiliate" of the Debtor. That transfer is indisputably

DOCS_NY:41952.8 36027/002

App. 1705

allowed under Section 6.1; it is a transfer to an "Affiliate of an initial Member." CLO Holdco may, tongue in cheek, call this structure "convenient" but that sarcasm is an attempt to avoid the fact that the Members Agreement clearly allows HarbourVest to transfer its interest to HCMLPI without the consent of any party.[13] The fact that CLO Holdco does not now like the language it previously agreed to when CLO Holdco and the Debtor were both controlled by Mr. Dondero is not a reason to re-write Section 6.1 of the Members Agreement.

31.     Second, Section 6.2 of the Members Agreement is also unambiguous and, by its plain language, allows HarbourVest to "Transfer" its interests in HCLOF to "Affiliates of an initial Member" (*i.e.*, HCMLPI) without having to first offer those interests to the other Members (such obligation, the "ROFO"). CLO Holdco attempts to create ambiguity in Section 6.2 by arguing that it must be read in conjunction with Section 6.1 and that interpreting the plain language of Section 6.2 to allow HarbourVest to transfer its interests to HCMLPI without restriction makes certain other language surplus and meaningless. (CLOH Obj., ¶ 11-13) Again, CLO Holdco is attempting to create controversy and ambiguity where none exists.

32.     Section 6.2 of the Members Agreement provides, in pertinent part:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████

(Members Agmt., § 6.2 (emphasis added)) Like Section 6.1, Section 6.2 is clear on its face. It exempts from the requirement to comply with the ROFO two categories of "Transfers": (1) Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the

---

[13] Although HHCFA's consent is not necessary for HarbourVest to transfer its interests to HCMLPI, HHCFA will consent to the transfer.

DOCS_NY:41952.8 36027/002

App. 1706

"Highland Principals" (*i.e.*, the Debtor and certain of its employees)[14] and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal. The fact that a narrower exemption is provided to CLO Holdco and the Debtor than to HarbourVest (or any other Member) under Section 6.2 is of no moment; the language says what it says and was agreed to by all Members, including CLO Holdco, when they executed the Members Agreement.

33.     In addition, and although not relevant, the language of Section 6.2 makes sense in the context of the deal. Although CLO Holdco and the Debtor may have disclaimed an "Affiliate" relationship, they are related through Mr. Dondero and invest side by side with the Debtor in multiple deals.[15] The different standards in Section 6.2 serve to ensure that HarbourVest's (or any successor to HarbourVest) right to Transfer its shares without satisfying the ROFO is limited to three parties: (i) HarbourVest's Affiliates, (ii) the Debtor's Affiliates, and (iii) CLO Holdco's Affiliates. This restriction keeps the relative voting power of each Member static and ensures that CLO Holdco and the Debtor, together, will *always* have more than fifty percent of HCLOF's total interests and that HarbourVest will *always* have less than fifty percent. This counterintuitively also explains the greater restrictions placed on CLO Holdco and the "Highland Principals." The Highland Principals include certain Debtor employees. Those employees – as well as CLO Holdco and the Debtor – are prohibited from transferring their HCLOF interests outside of the Dondero family. This restriction makes sense. If, for example, a Debtor employee wanted to transfer its interests to an Affiliate of HarbourVest, HarbourVest could have more than fifty percent of the HCLOF interests because of the thinness

---

[14] "**Highland Principals**" means: ███████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████ (Members Agmt., § 1.1)

[15] There can be no real dispute that Mr. Dondero effectively controls CLO Holdco.

of the Dondero-family's majority (approximately 0.2%). At the time the Members Agreement was executed, CLO Holdco and the Debtor were under common control. Section 6.2 preserves those related entities' control over HCLOF by restricting transactions that would transfer that control unless the ROFO is complied with.

34. As such, and notwithstanding CLO Holdco's protestations, Section 6.1 and Section 6.2 are consistent as written and clear on their face. This consistency is further evidenced by HCLOF's Articles of Incorporation[16] and HCLOF's offering memorandum, which each include language identical to Section 6.1 and 6.2 of the Members Agreement.[17] It seems highly unlikely, if not implausible, that sophisticated parties such as CLO Holdco would include the exact same language in six separate places over three documents without a reason for that language and without the intent that such language be interpreted as it is clearly written – not as CLO Holdco now wants it to be interpreted. Accordingly, since HarbourVest is transferring its interests to HCMLPI, an Affiliate of an initial Member, the plain language of Section 6.2

---

[16] *See* Articles of Incorporation, adopted November 15, 2017, a true and correct copy of which is attached hereto as Exhibit B.



(Articles of Incorporation, § 18.1)

(*Id.*, § 18.2)

[17] *See* Offering Memorandum, dated November 15, 2017, a true and correct copy of which is attached hereto as Exhibit C.



(Offering Memorandum, page 89)

App. 1708

exempts HarbourVest from having to comply with the ROFO.

35.    Third, and finally, CLO Holdco makes the nonsensical argument that because Section 6.2 provides different treatment to similarly situated Members that this Court should re-write Section 6.2.  (CLOH Obj., ¶¶ 15-17)  Contracts provide different treatment to ostensibly similarly situated parties all the time and no one objects that that creates an absurd result.  It just means that different parties bargained for and received different rights.

36.    CLO Holdco's attempt to justify why this Court should re-write the Members Agreement to correct the "disparate treatment" is also unavailing.  As an example of the absurd result caused by the "disparate treatment," CLO Holdco states:  "[B]ecause the HarbourVest Members are technically Affiliates of an initial member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer."  (*Id.*, ¶ 16)  The scenario posited by CLO Holdco, however, is *exactly* the scenario prevented by the clear language of Section 6.2.  For HarbourVest to obtain control of HCLOF, it would – as a matter of mathematical necessity – need the interests held by CLO Holdco (49.02%) and/or the Highland Principals (1% in the aggregate).  Section 6.2, however, *expressly* prohibits CLO Holdco and the Highland Principals from transferring their interests to HarbourVest or its Affiliates without satisfying the ROFO.  As set forth above, it is Section 6.2 that prevents control from being transferred away from the Dondero family without compliance with the ROFO.  In fact, Section 6.2 would only break down if the limiting language in Section 6.2 were read out of it in the manner advocated by CLO Holdco.

37.    Ultimately, Article 6 of the Members Agreement is clear as written and expressly allows HarbourVest to transfer its interests to HCMLPI.  If CLO Holdco had an objection to the rights provided to HarbourVest under the Members Agreement, CLO Holdco

DOCS_NY:41952.8 36027/002

App. 1709

should have raised that objection three and a half years ago before agreeing to the Members Agreement. CLO Holdco should not be allowed to create ambiguity in an unambiguous contract or to re-write that agreement to impose additional restrictions on HarbourVest. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) (enforcing the "unambiguous language in a contract as written," noting that where a contract is unambiguous, a party may not create ambiguity or "give the contract a meaning different from that which its language imports") (internal quotations omitted); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.").

38.     It should go without saying, but CLO Holdco (and the other parties to the Members Agreement) should also be required to satisfy their obligations under the Members Agreement and execute the "Adherence Agreement" as required by Section 6.6 of the Members Agreement in connection with the Transfer of HarbourVest's interests to HCMLPI or any other permitted Transfer.

39.     Finally, and notably, although CLO Holdco spends considerable time arguing that HarbourVest should be required to comply with the ROFO, nowhere in the CLOH Objection does CLO Holdco state that it wishes to purchase HarbourVest's interests in HCLOF. This omission is telling. CLO Holdco and the other Objectors have no interest in actually exercising their alleged right of first refusal contained in the Members Agreement. Rather, their only interest is in causing the Debtor to spend time and money responding to a legion of related (and coordinated) objections.[18]

---

[18] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q; Exhibit T (email from Mr. Dondero as forwarded to Mr. Ellington stating "Holy bananas….. make sure we object [to the HarbourVest Settlement]"); Exhibit Y.

*[Remainder of Page Intentionally Blank]*

21

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully requests that the Court grant the Motion.

Dated: January 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*