App. 1983

# Appendix Exhibit 95

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                  )   Case No. 19-34054-sgj-11
   In Re:                         )   Chapter 11
                                  )
   HIGHLAND CAPITAL               )   Dallas, Texas
   MANAGEMENT, L.P.,              )   Tuesday, February 2, 2021
                                  )   9:30 a.m. Docket
         Debtor.                  )
                                  )   CONFIRMATION HEARING [1808]
                                  )   AGREED MOTION TO ASSUME [1624]
                                  )
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey Nathan Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Debtor:            John A. Morris
                           Gregory V. Demo
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Debtor:            Ira D. Kharasch
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Official Committee Matthew A. Clemente
of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                           One South Dearborn Street
                           Chicago, IL  60603
                           (312) 853-7539



1    After the independent board got its bearings, it started
2    to work on various plan alternatives.  And the board received
3    a lot of pressure from the Committee to go straight to a plan
4    seeking to monetize assets like the one before Your Honor
5    today.  However, the board believed that before proceeding to
6    do so and go down an asset monetization path, it should
7    adequately diligence all alternatives, including a
8    continuation of the current business model, a reorganization
9    sponsored by Mr. Dondero and his affiliates, a sale of the
10   Debtor's assets, including a sale to Mr. Dondero.
11       In June 2020, plan negotiations proceeded in earnest, and
12   the Debtor started to negotiate an asset monetization plan
13   with the Committee, while still pursuing other alternatives.
14       Preparation of an asset monetization plan is not typically
15   a complicated process.  However, creating the appropriate
16   structure for a business like the Debtor's was extremely
17   complicated, because of the contractual, regulatory, tax, and
18   governance issues that had to be carefully considered.
19       At the same time the Committee negotiations were
20   proceeding down that path, Mr. Seery continued to spend
21   substantial time trying to negotiate a grand bargain plan with
22   Mr. Dondero.  It is not an exaggeration to say that over the
23   last several months Mr. Seery has dedicated hundreds of hours
24   towards a potential grand bargain plan.
25       And why did he do it?  Because he has always believed that

1  a global restructuring among all parties was the best
2  opportunity to fully and finally resolve the acrimony that
3  continued to plague the Debtor.
4       Notwithstanding Mr. Seery's and the independent board's
5  best efforts, they were not able to reach consensus on a grand
6  bargain plan, and the Debtor filed the plan, the initial plan,
7  on August 12th, which ultimately evolved into the plan before
8  the Court today.
9       The Court conducted an initial hearing on the disclosure
10 statement on October 27th, and then ultimately approved -- the
11 Court approved the disclosure statement at a hearing on
12 November 23rd.
13      While the Debtor continued to work towards resolving
14 issues with the Committee with the filed plan, Mr. Dondero,
15 beginning to finally see that the train was leaving the
16 station, started to do whatever he could to get in the way of
17 plan confirmation.
18      He objected to the Acis settlement.  When his objection
19 was overruled, he filed an appeal.
20      He objected to the HarbourVest settlement.  When his
21 objection was overruled, he had Dugaboy file an appeal.
22      He started to interfere with the Debtor's management of
23 its CLOs, stopping trades, refusing to provide support, and
24 threatening Mr. Seery and the Debtor's employees.
25      He had his Advisors and Funds that he owned and controlled

1  with Mr. Dondero and his counsel.
2  Q    And in the last couple of months, has the board listened
3  to presentations that were made by Mr. Dondero and his counsel
4  concerning various forms of the pot plan?
5  A    Yes.  At least two or three.
6  Q    And during this time, has the board and the Debtor
7  communicated with the Committee concerning different
8  iterations of the proposed pot plan?
9  A    Yes.  We've had continual discussions with the Committee
10 regarding the various iterations of the potential grand
11 bargain all the way through the pot plan.
12 Q    And during this process, did the Debtor provide Mr.
13 Dondero and his counsel with certain financial information
14 that had been requested?
15 A    Yes.  As I said, up 'til the point where he resigned and
16 was then ultimately, at the end of the year, removed from the
17 office, he had access to financial information related to the
18 Debtor and even got the information from the financial group.
19 Subsequent to that, we've provided him with requests -- with
20 financial information that was requested by his counsel.
21 Q    Okay.  Were your efforts at the grand bargain or the
22 pursuit of the pot plan successful?
23 A    No, they were not.
24 Q    Do you have an understanding as to -- just, again, without
25 going into -- into details about any particular proposal, do

1  earlier, is to maximize value, and not -- it's not based on a
2  payment schedule, it's based upon the market opportunity.  And
3  we've estimated for our purposes here that we'll be able to
4  meet these distribution amounts, but there's no requirement to
5  do so.
6  Q    Okay.
7           MR. MORRIS:  Let's go to Page 3 of the document,
8  please.
9  BY MR. MORRIS:
10 Q    Can you just describe generally what this page reflects?
11 A    This is a comparison of the plan analysis and what we
12 expect to achieve under the plan and the liquidation analysis
13 if a trustee, a Chapter 7 trustee, were to take over.  And it
14 compares those two distribution amounts based upon the
15 assumptions on the prior page.
16 Q    All right.  Let's just look at some of the -- some of the
17 data points on here.  If we look at the plan analysis, what is
18 -- what is projected to be available for distribution, the
19 value that's available for distribution?
20 A    $222.6 million.
21 Q    Okay.  So, 222?  And on a claims pool that's estimated to
22 be, for this purpose, how much?
23 A    $313 million.
24 Q    And what is the distribution, the projected distribution
25 to general unsecured creditors on a percentage basis?

1  A   On this analysis, to general unsecured creditors, it's
2  62.14 percent.  But remember, that backs out the payment to
3  the Class 7 creditors of 85 cents above.
4  Q   Okay.  And does this plan analysis include any value for
5  litigation claims?
6  A   No, it does not.
7  Q   And is that true for all forms of the Debtor's
8  projections?
9  A   That's correct, yes.
10 Q   Okay.  And let's look at the right-hand column for a
11 moment.  It says, Liquidation Analysis.  What does that column
12 represent?
13 A   That represents our estimate of what a Chapter 7 trustee
14 could achieve if it were to take over the assets, sell them,
15 and make distributions.
16 Q   Okay.  And let's just look at the comparable data points
17 there.  Under the liquidation analysis, as of -- the January
18 liquidation analysis as of last week, what was projected to be
19 available for distribution?
20 A   A hundred and -- approximately $175 million.
21 Q   Okay.  And what was the claims pool?
22 A   The claims pool was $326 million.  Recall that that's a
23 slightly larger claims pool because it doesn't back out the
24 Class 7 claims.
25 Q   Okay.  The convenience class claims?

1  my view, the Committee's view, I believe, would be let's
2  continue forward and we'll discuss Mr. Dondero's proposal that
3  I know came across after opening statements this morning, you
4  know, in due course.  But I do not believe that a continuance
5  here is necessary or appropriate.
6         THE COURT:  All right.  Mr. Taylor, that request is
7  denied, so you may cross-examine.
8         MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.
9  I have a couple people that are in my ear.  But yes, I'm ready
10 to proceed.
11        THE COURT:  Okay.
12                      CROSS-EXAMINATION
13 BY MR. TAYLOR:
14 Q   Mr. Seery, I believe you can probably largely testify from
15 your memory of the various iterations of the plan analysis
16 versus the liquidation analysis.  But to the extent that
17 you're unable to, we can certainly pull those up.
18     Mr. Seery, you put forth or Highland put forth on November
19 24th of 2020 a plan analysis versus a liquidation analysis,
20 correct?
21 A   I think that's the approximate date, yes.
22 Q   Okay.  And do you recall what the plan analysis predicted
23 the recovery to general unsecured creditors in Class 8 would
24 be at that time?
25 A   I believe it was in the 80s.

1  Q    And approximately 87.44 percent?
2  A    That sounds close, yes.
3  Q    Okay. And then just right before -- the evening before
4  your deposition that took place on January 29th, I believe a
5  revised plan analysis versus a liquidation analysis was
6  provided. Do you remember that?
7  A    Yes.
8  Q    Okay. And what was the predicted recovery to general
9  unsecured creditors under that analysis?
10 A    I believe that was --
11          MR. MORRIS: Object to the form of the question. I
12 just want to make sure that we're talking about the -- and
13 maybe I misunderstood the question -- plan versus liquidation.
14          THE COURT: Okay. Could you restate --
15          MR. TAYLOR: I said plan analysis.
16          THE COURT: Plan.
17          THE WITNESS: I believe that that initially was in
18 the -- in the high 60s.
19 BY MR. TAYLOR:
20 Q    It was --
21 A    Might have been --
22 Q    -- 62.14 percent; is that correct?
23 A    Okay. Yeah. That sounds -- I'll take your
24 representation. That's fine.
25 Q    Okay. And going back to the November 28th liquidation

1  analysis, what did Highland believe that creditors in Class 8
2  would get under a liquidation analysis?
3  A    I don't recall the -- if you just tell me, I'll -- I'll --
4  if you're reading it, I'll agree with -- because I -- from my
5  memory.
6  Q    62.6 percent?  Is that correct?
7  A    That sounds about right.
8  Q    You would agree with me, would you not, that 62.6 cents on
9  the dollar is higher than 62.14 cents, correct?
10 A    Yes.
11 Q    And so at least comparing the January 28th versus -- of
12 2021 versus the November 24th of 2020, the liquidation
13 analysis actually ended up being higher than the plan
14 analysis, correct?
15 A    Yes.
16 Q    But there was -- there was some changes also in the plan
17 analysis.  I'm sorry.  There were some subsequent changes that
18 were done over the weekend that were provided on February 1st.
19 Is that correct?
20 A    Yes.
21 Q    Okay. And what were -- give us an overview of what those
22 changes were.
23 A    What are -- what are you comparing?  What would you like
24 me to compare?
25 Q    Okay.  The January to February plan analysis, what were

```
 1   the changes?  Why did it go up from 62.6 to 71.3?
 2   A    The main changes, as we discussed earlier, and maybe the
 3   only major change, was the UBS claim amount, which went down
 4   significantly from the earlier iteration.  And then there was
 5   the small change related to the RCP recovery, which was a
 6   double-count.
 7   Q    Okay.  And you talked about earlier about what assumptions
 8   went into these analyses, correct?
 9   A    Yes.
10   Q    And you said these assumptions were always done after
11   careful consideration.  Is that a correct summation of what
12   you said?
13   A    I think that's fair.
14   Q    Okay.
15           MR. TAYLOR:  Mr. Assink, could you pull up the
16   November assumptions?
17   BY MR. TAYLOR:
18   Q    I believe that's coming up, Mr. Seery.  The Court.
19       (Pause.)
20           MR. TAYLOR:  And go down one page, please, Mr.
21   Assink.  Roll up.  The Assumption L.
22   BY MR. TAYLOR:
23   Q    So, these are the November assumptions, correct, Mr.
24   Seery?
25   A    I believe so, yes.
```

1  at Docket Entry 1877.  And Mr. Morris, you can try to get in
2  7O the old-fashioned way if you want to.
3         MR. MORRIS:  Yeah, I'll deal with 7O and the very
4  limited number of other objections at the beginning of
5  tomorrow's hearing.
6         THE COURT:  All right.
7      (Debtor's Exhibits 7F through 7Q, with the exception of
8  7O, are received into evidence.)
9         THE COURT:  So we will reconvene at 9:30 Central time
10 tomorrow.  I think we're going to hear from the Aon, the D&O
11 broker, Mr. Tauber; is that correct?
12        MR. MORRIS:  That's right.  And that should be
13 shorter than even Mr. Dubel.
14        THE COURT:  All right.  Well, we will see you at 9:30
15 in the morning.  We are in recess.
16        MR. MORRIS:  Thank you so much.
17        THE CLERK:  All rise.
18    (Proceedings concluded at 5:09 p.m.)
19                       --oOo--
20                      CERTIFICATE
21    I certify that the foregoing is a correct transcript from
22 the electronic sound recording of the proceedings in the
   above-entitled matter.
23   /s/ Kathy Rehling                              02/04/2021
24 _____    _____
   Kathy Rehling, CETD-444                           Date
25 Certified Electronic Court Transcriber