# Appendix Exhibit 98

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., AND NEXPOINT ADVISORS, L.P.,<br><br>Defendants. | Adversary Proceeding No.<br><br>_____ |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:42310.8 36027/002



**PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
VERIFIED ORIGINAL COMPLAINT FOR DAMAGES
AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Plaintiff" or the "Debtor"), by its undersigned counsel, files this *Verified Original Complaint for Damages and for Declaratory and Injunctive Relief* (the "Complaint") against defendants Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Defendants" or the "Advisors"), seeking damages and declaratory and injunctive relief pursuant to sections 105(a), 362, 542, and 1107 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of its Complaint, the Debtor alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT[2]

1.  The Advisors serve as the investment manager, either directly or indirectly, to a number of investment vehicles (collectively, the "Funds") regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940. Certain of the Funds are publicly traded and have thousands of retail investors who are at risk due to the Advisors' deleterious conduct.

2.  The Advisors are owned and controlled by James Dondero.  Pursuant to certain Shared Services Agreements, the Debtor has historically provided back-office and middle-office services that enable the Advisors to manage the Funds.  Although the Debtor is paid for these

---

[2] Capitalized terms not specifically defined in this Preliminary Statement shall have the meanings ascribed to them below.

2

services, providing the services requires the Debtor to maintain a full staff, the cost of which has historically caused substantial net losses to the Debtor.

3.  Each of the Shared Services Agreements gives either party the unilateral right to terminate the respective Shared Services Agreement by providing prior written notice. On November 30, 2020, the Debtor provided written notice of its intent to terminate the Shared Services Agreements effective as of January 31, 2021.

4.  The Termination Notices could not have come as a surprise to the Advisors because the Debtor was in bankruptcy and had been pursuing an "asset monetization" plan of reorganization that would leave it with a substantially scaled-down work force since at least August 2020. With that in mind, the Debtor began developing a plan pursuant to which the shared services would be transitioned to an entity that would be created, owned, and operated by certain of the Debtor's employees who were expected to be terminated as part of the implementation of the Debtor's Plan.

5.  At the same time, the Debtor continued to provide the services required under the Shared Services Agreements – despite the Advisors being in substantial arrears with an outstanding amount due to the Debtor in excess of $3 million – and otherwise continued in its attempts to transition those services in a smooth and orderly manner. Indeed, in order to give the Advisors more time to engage and complete the transition, the Debtor has extended the termination date on two occasions, with the current termination deadline being February 19, 2021.[3]

---

[3] Although the Shared Services Agreement will terminate on February 19, 2021, the Debtor is willing to further extend the termination dates of the Shared Services Agreements through February 28, 2021, solely to prevent catastrophic harm to the retail investors in the Funds, but the Debtor will be unable to extend the termination date any further as the Debtor is expected to reduce its workforce at the end of February and will have insufficient personnel thereafter to perform under the Shared Services Agreements.

6. Regrettably, as described in more detail below, and notwithstanding the Debtor's best efforts to aid in the transition of services, the Advisors have willfully failed and refused to adopt and effectuate a transition plan, choosing instead to spend the last months threatening the Debtor and certain of its employees and seeking to deflect responsibility for their own wrongful conduct.

7. The status quo is untenable. The Debtor has the contractual right to terminate the Shared Services Agreements and has exercised that right. Pursuant to the Debtor's Plan, there will shortly be a substantial reduction in the Debtor's work force and the Debtor will be unable to provide services to the Advisors. The Advisors' failure to work with the Debtor or to otherwise develop a transition plan of their own has put thousands of retail investors at risk.

8. The Debtor is faced with an awful choice. It can either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and their investors, and be sucked into more litigation because of Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

9. Therefore, in addition to seeking damages and declaratory relief, the Debtor is filing a separate emergency motion for a mandatory injunction compelling the Advisors to adopt and implement a transition plan by February 28, 2021, when the Debtor is expected to substantially reduce its workforce. In the absence of such a mandate, the Funds (together with their thousands of investors) and the Debtor will be irreparably harmed.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and § 1334(b). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

12. This adversary proceeding is commenced pursuant to Bankruptcy Rules 7001 and 7065, Bankruptcy Code sections 105(a) and 362, 28 U.S.C. §§ 2201 and 2202, and applicable Delaware law.

## THE PARTIES

13. The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

14. Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas.

15. Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas.

## CASE BACKGROUND

16. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

17. On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors with the following members: (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS

AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC.

18. On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[4]

19. The Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in this chapter 11 case.

20. On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").

21. On February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Plan. [Docket No. 1808].

22. On February 8, 2021, the Court rendered an opinion in which it approved the Plan. [Docket No. 1924].

## STATEMENT OF FACTS

A. **The Debtor Has the Contractual Right to Terminate the Shared Services Agreements, and It Timely Exercised that Right**

23. The Debtor is party to the Shared Services Agreements pursuant to which it has a contractual right of termination upon written notice.

*The Debtor's Shared Services Agreement with HCMFA*

24. The Debtor and HCMFA are parties to that certain *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013 (the "HCMFA Shared Services Agreement"), a copy of which is attached hereto as **Exhibit A**.

---

[4] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

6

25. Pursuant to section 2.01 of the HCMFA Shared Services Agreement and Annex A affixed thereto, the Debtor provides certain services to HCMFA that enable HCMFA to manage the Funds.

26. The HCMFA Shared Services Agreement was for a one-year term, subject to automatic one-year renewals "unless sooner terminated under Section 7.02."

27. Section 7.02 of the Shared Services Agreement provides that "[e]ither Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term."

28. On November 30, 2020, the Debtor provided written notice to HCMFA that it intended to terminate the HCMFA Shared Services Agreement as of January 31, 2021 (the "HCMFA Termination Notice").  A copy of the HCMFA Termination Notice is attached hereto as **Exhibit B**.

*The Debtor's Shared Services Agreement with NPA*

29. The Debtor and NPA are parties to that certain *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018 (the "NPA Shared Services Agreement" and together with the HCMFA Shared Services Agreement, the "Shared Services Agreements"), a copy of which is attached hereto as **Exhibit C**.

30. Pursuant to Article II of the NPA Shared Services Agreement, the Debtor provides certain services to NPA that enable NPA to manage the Funds.

31. The NPA Shared Services Agreement did not have a fixed term.  Instead, section 7.01 provided that "[e]ither Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other."

32. On November 30, 2020, the Debtor provided written notice to NPA that it intended to terminate the NPA Shared Services Agreement as of January 31, 2021 (the "NPA

7

Termination Notice" and together with the HCMFA Termination Notice, the "Termination Notices"). A copy of the NPA Termination Notice is attached hereto as **Exhibit D**.

**B.    Prior to Providing the Termination Notices, the Debtor Worked on a Transition Plan, but the Advisors Failed to Engage or Pay for Services Rendered**

33.    On August 12, 2020, after considering its strategic options, the Debtor filed an "asset monetization" plan of reorganization pursuant to which, in general, the Debtor proposed to reduce staff, reject certain contracts, and monetize its assets consistent with maximizing value for all stakeholders. [Docket No. 944].

34.    Thus, at least as of that time, all stakeholders – including the Advisors – were on notice that the Debtor intended to continue operations on a scaled-down basis with the goal being an orderly monetization of assets.[5]

35.    Consistent with that intent, the Debtor began formulating a plan for the transition of services provided under the Shared Services Agreements.

36.    Specifically, beginning in the summer of 2020, the Debtor attempted to negotiate for the orderly transition of services with James Dondero, the individual who owns and controls each of the Advisors.

37.    The Debtor's proposal contemplated the transition of services to the Advisors from the Debtor to an entity that would be created, owned, and operated by certain of the Debtor's employees ("NewCo") who were expected to be terminated as part of the Debtor's asset monetization plan.

---

[5] Furthermore, on November 13, 2020, the Debtor filed its *Third Amended Plan of Reorganization of Highland Capital Management* [Docket No. 1383] (the "Third Amended Plan"). In its Third Amended Plan (and subsequent plans), the Debtor explicitly stated that it did not intend to continue providing services under the Shared Service Agreements precisely because they are money losers. Third Amended Plan, Art. IV.A ("[I]t is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.").

38. With Mr. Dondero in control, the Advisors never provided any constructive response to the Debtor's proposal. Indeed, Mr. Dondero specifically informed the Debtor that he intended to make the transition difficult for the apparent purpose of creating leverage in plan negotiations.

39. In addition to failing to engage in any process designed to provide for the orderly transition of services, the Advisors also failed to pay the Debtor for the services provided under the Shared Services Agreement.

40. Since the Petition Date, each of the Advisors has failed to meet certain of its payment obligations under the Shared Services Agreements. For the period between the Petition Date and January 31, 2021, (a) HCMFA owes the Debtor $2,121,276 for services rendered under the HCMFA Shared Services Agreement, and (b) NPA owes the Debtor $932,977 for services rendered under the NPA Shared Services Agreement. These amounts exclude amounts owed for services provided prior to the Petition Date.

41. The Debtor loses significant money providing services under the Shared Services Agreements, which is why it publicly stated its intention in the Third Amended Plan (and each subsequent amendment and modification to the Plan) not to assume or assume and assign them. While that is bad enough, the Advisors failure to pay for services previously rendered is a blatant breach of the Agreements.

C. **The Debtor Offers to Extend the Termination Date to Avoid a Catastrophe and Attempts to Engage the Funds' Board to Aid in the Adoption of a Transition Plan**

42. Instead of engaging in the process, the Advisors and certain of their employees were more focused on threatening the Debtor and its employees, all in a transparent effort to deflect responsibility for their own obstinate and wrongful conduct.

43. With the January 31, 2021 termination date fast approaching, and with the Advisors continuing to fail to work cooperatively on a transition plan, the Debtor took the initiative and offered to extend the termination date by two weeks (i) in order to avoid catastrophic consequences for the Funds and their investors that would result from an abrupt termination, and (ii) in the hope that the Advisors would use the extended time to finally and constructively engage.

44. Thus, on January 29, 2021, the parties executed an agreement extending the termination date to February 14, 2021 in exchange for the Advisors paying in advance for services to be rendered by the Debtor during that two-week period. A copy of the January 29, 2021, agreement is attached hereto as **Exhibit E**.

45. During the two-week period, the Debtor and its employees and professionals made every effort to bring the issue of the transition of services to a resolution. Among other things, the Debtor continued to refine the proposal for the transition of services to NewCo.

46. The Debtor also attempted to get the attention of the Funds' Boards because it was concerned that the Boards were either uninformed, not engaged, or were under the influence and control of Mr. Dondero.

47. Among other communications, James P. Seery, Jr., the Debtor's Chief Executive Officer, sent formal written communications to the Board of Directors for the Funds on January 27, 2021, February 8, 2021, and February 12, 2021.[6] Copies of Mr. Seery's letters are attached hereto as **Exhibits F, G and H,** respectively.

48. Despite the efforts of certain of the Advisors' professionals, and despite the Debtor's willingness to make all reasonable concessions on a transition agreement, Mr. Dondero

---

[6] Mr. Seery's formal correspondence was in addition to his informal correspondence and communications with the Funds' Board and the substantial communications between counsel to the Debtor, the Advisors, and the Funds.

10

and the Advisors have refused to "say yes" or to otherwise take steps to formulate a transition plan for the protection of the Funds and their investors.

49. Faced with an untenable situation, the Debtor again agreed to extend the termination date, this time to February 19, 2021. *See* **Exhibit I**.

50. Finally, on February 16, 2021, the Debtor made its last attempt to reach an agreement before being forced to take alternative actions to protect itself, the Funds, and investors, by sending the Advisors a proposed term sheet (the "Term Sheet") that provided a reasonable transition plan. A copy of the Term Sheet is attached as **Exhibit J**. The Advisors refused to agree to the terms thereunder.

51. Given that the Court will soon enter an order confirming the Debtor's Plan, and the reduction in the Debtor's work force will follow soon thereafter, the Debtor will be unable to provide services to the Advisors much longer. The Advisors' failure to agree on or formulate a transition plan is creating catastrophic risk for the Funds and their investors. The Advisors' failure to plan for a transition is also creating material risk to the Debtor.

## FIRST CLAIM FOR RELIEF

**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

52. The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

53. A bona fide, actual, present dispute exists between the Debtor and the Advisors concerning their respective rights and obligations under the Shared Services Agreements.

54. A judgment declaring the parties' respective rights and obligations will resolve their disputes.

55. Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- Each of the Advisors is owned and controlled by Mr. Dondero;

- The Debtor has the contractual right to terminate the HCMFA Shared Services Agreement on 60 days' written notice;

- The Debtor properly exercised its right to terminate the HCMFA Shared Services Agreement by providing at least 60 days' written notice;

- The Debtor's obligation to provide services to HCMFA under the HCMFA Shared Services Agreement (or otherwise) will terminate on February 19, 2021;

- The Debtor has the contractual right to terminate the NPA Shared Services Agreement on 30 days' written notice;

- The Debtor properly exercised its right to terminate the NPA Shared Services Agreement by providing at least 30 days' written notice; and

- The Debtor's obligation to provide services to NPA under the NPA Shared Services Agreement (or otherwise) will terminate on February 19, 2021.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

56. The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

57. The Shared Services Agreements are valid and binding contracts.

58. The Debtor has fully performed all obligations under the Shared Services Agreements.

59. The Advisors have breached the Shared Services Agreements by failing to pay for certain services rendered by the Debtor to the Advisors under the Shared Services Agreements.

60. The Advisors have failed to pay the Debtor all amounts due and owing under the Shared Services Agreements despite the Debtor's demands.

61. The Advisors' breach of the Shared Services Agreements has damaged the Debtor in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (For Injunctive Relief -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065)

62. The Debtor repeats and realleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63. Pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 7065, the Debtor seeks a mandatory injunction directing the Advisors to adopt and implement a plan for the orderly transition of services currently provided under the Shared Services Agreements from the Debtor to NewCo or any other entity of the Advisors' choosing.

64. Bankruptcy Code section 105(a) authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

65. Bankruptcy Rule 7065 incorporates by reference Rule 65 of the Federal Rules of Civil Procedure and authorizes the Court to issue injunctive relief in adversary proceedings.

66. The Debtor will succeed on the merits of its claims for (a) a declaratory judgment that it has the contractual right to terminate each of the Shared Services Agreements, that it properly exercised those rights, and that, effective February 19, 2021, it has no further legal or equitable obligation to provide any services to the Advisors; (b) damages for breach of contract; and (c) for a mandatory injunction requiring the Advisors to adopt and implement a plan for the orderly transition of shared services.

67. The Advisors' failure to adopt and implement a transition plan is untenable because – as the Advisors have known for months – the Debtor will soon be unable to provide services under the Shared Services Agreements, and such willful misconduct and gross

negligence will cause irreparable harm to the Funds and their investors and to the Debtor and its estate.

68. Given that (a) the Advisors were on notice since at least August 2020, that the Debtor was unlikely to provide services under the Shared Services Agreement for an extended period of time; (b) the Debtor has been pursuing a transition plan since the summer of 2020; (c) the Third Amended Plan filed on November 13, 2020 (and each subsequent version of the Plan), expressly stated that the Debtor would not assume or assume and assign the Shared Services Agreements; (d) the Debtor timely provided notice of termination of the Shared Services Agreements on November 30, 2020; (e) upon information and belief, the Advisors (and not the Debtor) owe contractual and other duties to the Funds, the entities most at risk; and (f) the Debtor has acted in good faith by, among other things, twice extending the anticipated termination date, the balance of the equities strongly favors the Debtor.

69. Finally, the public interest virtually requires that the Advisors be directed to adopt and implement a transition plan. In the absence of a mandatory injunction, thousands of retail investors are likely to suffer catastrophic losses, and there will likely be substantial market disruptions with unforeseeable consequences.

70. Based on the foregoing, the Debtor requests that the Court direct the Advisors to adopt and implement a plan for the orderly transition of services currently provided under the Shared Services Agreements from the Debtor to NewCo, or any other entity of the Advisors' choosing, by February 28, 2021.

# **PRAYER**

WHEREFORE, the Debtor prays for judgment as follows:

- On the First Cause of Action, a judgment declaring that: (i) each of the Advisors is owned and controlled by Mr. Dondero; (ii) the Debtor has the contractual right to terminate the HCMFA Shared Services Agreement on 60 days' written notice; (iii) the Debtor properly exercised its right to terminate the HCMFA Shared Services Agreement by providing at least 60 days' written notice; (iv) the Debtor's obligation to provide services to HCMFA under the HCMFA Shared Services Agreement (or otherwise) will terminate on February 19, 2021; (v) the Debtor has the contractual right to terminate the NPA Shared Services Agreement on 30 days' written notice; (vi) the Debtor properly exercised its right to terminate the NPA Shared Services Agreement by providing at least 30 days' written notice; and (vii) the Debtor's obligation to provide services to NPA under the NPA Shared Services Agreement (or otherwise) will terminate on February 19, 2021.

- On the Second Cause of Action, damages in an amount to be determined at trial arising from the Advisors' breach of the Shared Services Agreements;

- On the Third Cause of Action, a mandatory injunction directing the Advisors to adopt and implement a plan for the orderly transition of services currently provided under the Shared Services Agreements from the Debtor to NewCo, or any other entity of the Advisors' choosing, by February 28, 2021; and

- For such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated:  February 17, 2021. | **PACHULSKI STANG ZIEHL & JONES LLP**<br><br>Jeffrey N. Pomerantz (CA Bar No.143717)<br>Ira D. Kharasch (CA Bar No. 109084)<br>John A. Morris (NY Bar No. 2405397)<br>Gregory V. Demo (NY Bar No. 5371992)<br>Hayley R. Winograd (NY Bar No. 5612569)<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>Telephone: (310) 277-6910<br>Facsimile: (310) 201-0760<br>E-mail:    jpomerantz@pszjlaw.com<br>             ikharasch@pszjlaw.com<br>             jmorris@pszjlaw.com<br>             gdemo@pszjlaw.com<br>             hwinograd@pszjlaw.com<br><br>-and-<br><br>**HAYWARD PLLC**<br><br>*/s/ Zachery Z. Annable*<br>Melissa S. Hayward<br>Texas Bar No. 24044908<br>MHayward@HaywardFirm.com<br>Zachery Z. Annable<br>Texas Bar No. 24053075<br>ZAnnable@HaywardFirm.com<br>10501 N. Central Expy, Ste. 106<br>Dallas, Texas 75231<br>Tel: (972) 755-7100<br>Fax: (972) 755-7110<br><br>*Counsel for Plaintiff Highland Capital Management, L.P.* |

# VERIFICATION

I have read the foregoing <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u> and know its contents.

☐ I am a party to this action. The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒ I am the Chief Executive Officer and Chief Restructuring Officer of Highland Capital Management, L.P., the Plaintiff in this action, and am authorized to make this verification for and on behalf of the Plaintiff, and I make this verification for that reason. I have read the foregoing document(s). I am informed and believe and on that ground allege that the matters stated in it are true.

☐ I am one of the attorneys of record for _____, a party to this action. Such party is absent from the county in which I have my office, and I make this verification for and on behalf of that party for that reason. I have read the foregoing document(s). I am informed and believe and on that ground allege that the matters stated in it are true.

I certify and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct as of this 17th day of February 2021.

*/s/ James P. Seery, Jr.*
James P. Seery, Jr.
