# Appendix Exhibit 99

Case 21-03010-sgj Doc 20 Filed 02/22/21    Entered 02/22/21 16:09:36    Page 1 of 27
Case 3:21-cv-00881-X   Document 174-99   Filed 12/16/23   Page 2 of 28   PageID 19211
Docket #0020  Date Filed: 2/22/2021

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659
E-mail: artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306
E-mail: lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund*
*Advisors, L.P. and NexPoint Advisors, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, TX 75202-2790
Telephone: (214) 855-7500
Facsimile:  (214) 978-4375

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Adv. Pro. No. 21-03010 (SGJ11) |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT FUND | ) |  |
| ADVISORS, L.P., AND NEXPOINT ADVISORS, | ) |  |
| L.P., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## OBJECTION TO MANDATORY INJUNCTION AND BRIEF IN SUPPORT THEREOF

1934054210222000000000000017

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

I.    SUMMARY ..................................................................................................................1

II.   THE COURT LACKS JURISDICTION ....................................................................2

III.  OBJECTION BASED ON ARBITRATION ...............................................................5

IV.   OBJECTION BASED ON DUE PROCESS ...............................................................7

V.   FACTS .......................................................................................................................10

VI.   DISCUSSION ............................................................................................................16

VII.  PRAYER ...................................................................................................................21

# TABLE OF AUTHORITIES

## STATUTES AND RULES

28 U.S.C. § 1334(a) ....................................................................................................2

## CASES

*Arbor Bend Villas Hous. L.P. v. Tarrant County Hous. Fin. Corp.*,
2002 U.S. Dist. LEXIS 10232 at *10 (N.D. Tex. 2002)....................................17

*Dillon v. Bay City Constr. Co.*, 512 F.2d 801, 804 (5th Cir. 1975)...............................8

*Exhibitors Poster Exchange, Inc. v. Nat'l Screen Service Corp.*,
441 F.2d 560, 561 (5th Cir. 1971) .......................................................................16

*Henry v. Educ. Fin. Serv. (In re Henry)*, 944 F.2d 587, 590 (5th Cir. 2019) .................6

*In re Mirant Corp.*, 2004 Bankr. LEXIS 2033 at *10 (Bankr. N.D. Tex. 2004) ...........18

*In re Packers' Cold Storage Inc.*, 64 B.R. 265, 268 (Bankr. C.D. Cal. 1986) ...........3, 5

*In re Senior Care Ctrs. LLC*, 611 B.R. 791, 799 (Bankr. N.D. Tex. 2019)..................18

*In re Wood*, 825 F.2d 90, 92 (5th Cir. 1987) ....................................................2, 3, 4, 5

*In re Zale Corp.*, 62 F.3d at 746, 760 (5th Cir. 1995).....................................................5

*Justin Industries, Inc. v. Choctaw Securities, L.P.*, 747 F. Supp. 1218, 1220 (N.D. Tex. 1990) ..16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) .............................................3

*Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).........................................16

*Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)..............16

*Prestage Farms Inc. v. Board of Supervisors*, 205 F.3d 265, 267-68 (5th Cir. 2000)....................4

*Roark v. Individuals of the Fed. Bureau of Prisons*, 558 Fed. Appx. 471, 472 (5th Cir. 2014)....16

*Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003).....................16

*Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016) .............................................10

*Smithback v. Texas*, 2005 U.S. Distr. LEXIS 5858 *2 (N.D. Tex. 2005)......................18

*Stern v. Marshall*, 564 U.S. 462, 499 (2011) ..................................................................4

*Torres-Aponte v. JP Morgan Chase Bank N.A.*, 639 Fed. Appx. 272, 274 (5th Cir. 2016) ..........17

*U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986)....................................................................2, 5

## OBJECTION TO MANDATORY INJUNCTION AND BRIEF IN SUPPORT THEREOF

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COME NOW NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA", and together with NexPoint, the "Advisors"), the defendants in the above styled and numbered adversary proceeding (the "Adversary Proceeding"), and file this their *Objection to Mandatory Injunction and Brief In Support Thereof* (the "Objection"), objecting to the *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services By February 28, 2021* (the "Motion"), filed by Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

## I.    SUMMARY

1.      The Advisors have divorced themselves from the Debtor's services and, contrary to the Debtor's unsupported allegations, they are implementing their own transition plan, which is none of the Debtor's business nor, respectfully, something over which this Court has any jurisdiction or authority.  What the Debtor really wants is to force the Advisors to enter into a contract with the Debtor on its terms—something that no court can do.  Continuing with its theme that Mr. Dondero just wants to "burn the house down" and that any entity associated with him is his tentacle, the Debtor now wants this Court to take jurisdiction over the internal business affairs of a non-debtor under the guise that the Advisors need this for their own benefit, something that is unprecedented.  The sky is not falling, however, and all is well.

2.      The truth is very simple.  After weeks of extensive negotiations, during which every point save one was agreed upon, the Advisors were prepared to enter into a transition services contract with the Debtor.  This would have provided the Debtor with millions of dollars in fees and several million dollars in future rents, reimbursements, payments, and other benefits.  The one issue that the Debtor would not agree to was to permit Mr. Dondero to be on the premises of his

own businesses, premises which those businesses were paying for. Under no circumstances, even after the Advisors offered to build a wall and even though Mr. Dondero is under an injunction, and despite all of the other benefits of the proposed agreement and the obvious need for a fund manager and registered investment advisor to be on-site, would the Debtor even negotiate this point. It is the Debtor that has acted unreasonably, and it is the Debtor that now acts vexatiously and frivolously. The Debtor has made its decision and the Advisors have made their decision: they will separate and go their own ways, and it is not for this Court to force anything else on the Advisors.

## II. THE COURT LACKS JURISDICTION

3. The Debtor asks this Court to command a non-debtor party with respect to its internal business affairs. This Court has no jurisdiction to do so.

4. This Court has four types of jurisdiction: (i) "cases under" the Bankruptcy Code; (ii) civil proceedings "arising under" the Bankruptcy Code; (iii) civil proceedings "arising in" a case under the Bankruptcy Code; and (iv) civil proceedings "related to" a case under the Bankruptcy Code. 28 U.S.C. § 1334(a). The first type of jurisdiction "refers merely to the bankruptcy petition itself." *In re Wood*, 825 F.2d 90, 92 (5th Cir. 1987). The Motion is not the petition. The second and third types of jurisdiction refer to matters arising only in a bankruptcy case: causes of action created or determined by the Bankruptcy Code, and rights not expressly created by the Bankruptcy Code, but that have no existence outside of a bankruptcy case. *Id*. at 96-97. Here, the only possible statutory basis for the Mandatory Injunction is section 105(a) of the Bankruptcy Code. It is clear, however, that section 105(a) does not create substantive rights. *See U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986). Thus, there is no "arising under" jurisdiction.

5.      The Debtor has also failed to demonstrate that the Mandatory Injunction is related to its bankruptcy case.  Under "related to" jurisdiction, the test is whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d at 93.  The Advisors' internal business affairs have no conceivable effect on the estate (which will soon cease to exist anyway in light of the imminent entry of the Court's confirmation order).  And, importantly, "any action against a third party which has an adverse effect on the debtor is insufficient to confer the requisite jurisdiction." *In re Packers' Cold Storage Inc.*, 64 B.R. 265, 268 (Bankr. C.D. Cal. 1986).

6.      How the Advisors transition away from the Debtor, whether they do so successfully, or whether they do so unsuccessfully, will not increase the assets or liabilities of the estate or affect the administration of the Debtor's estate or its plan.  The Debtor argues as follows:

> In the absence of a mandatory injunction, the Debtor will be forced to either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and their investors and be sucked into more litigation caused by Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

Brief at pp. 12-13.

7.      First, the allegation of being "sucked" into more litigation is purely hypothetical.  Indeed, it is nonsensical, as the Debtor filed a lawsuit (its fourth against the Advisors) in order to allegedly avoid a lawsuit, despite all of the releases, exculpations, and gatekeeper injunctions in the Debtor's plan.  A hypothetical or conjectural threatened injury is insufficient for an injunction.  Indeed, it is insufficient to provide any jurisdiction under the Constitution in the first place, setting aside even the requirements of bankruptcy jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The Fifth Circuit, in vacating a preliminary injunction on this basis, held that the threatened injury "must be real and immediate . . .  While the risk of injury may be founded

---

on a likely and credible chain of events, the injury must be certainly impending." *Prestage Farms Inc. v. Board of Supervisors*, 205 F.3d 265, 267-68 (5th Cir. 2000) (internal quotations omitted). The hypothetical and unexplained concern that somehow the Debtor could suffer injury—much less irreparable injury—by the Debtor being sued if the Advisors fail to implement a transition plan does not qualify to confer any jurisdiction either under the Constitution or as affecting the estate.

8.      Second, as explained below, the shared services are no longer needed. The Advisors implemented their backup plan, which plan was developed when negotiations with the Debtor broke down. The backup plan became the Advisors' plan when it became evident an agreement with the Debtor was unlikely. The Debtor cannot and will not be forced to continue providing services at a substantial alleged loss, because the Debtor will not be providing those services and the Advisors will not accept them. That was the Debtor's decision; now it must live with its decision. And how this risks "material delays in the implementation of the Debtor's Plan" is not explained and is nonsensical: coming to some transition services arrangement with the Debtor is not a condition precedent to the effectiveness of the Debtor's plan. In truth, the Debtor just wants this Court to force the Advisors to pay it millions of dollars for future services that the Advisors are under no obligation to order or to pay for, and that they will not.

9.      Even if the Court has "related to" jurisdiction, that jurisdiction is not core and the Advisors do not consent to this Court's entry of a final judgment. "Controversies that do not depend on the bankruptcy laws for their existence -- suits that could proceed in another court even in the absence of bankruptcy -- are not core proceedings." *In re Wood*, 825 F.2d at 96. Furthermore, this Court lacks Constitutional authority to rule on the Mandatory Injunction as a core matter, as this issue does not "stem[] from the bankruptcy itself [n]or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

10.     Here again, the only possible Bankruptcy Code provision is section 105(a), but the law is clear that this section does not create substantive rights.  *See U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).  The Debtor cannot assert relief under section 105(a) in order to make something that is not core into a core proceeding because, otherwise, everything would become a core proceeding.  *See, e.g., In re Wood*, 825 F.2d at 95 (declining to read 28 U.S.C. § 157(b)(2)(O) broadly because "otherwise, the entire range of proceedings under bankruptcy jurisdiction would fall within the scope of core proceedings").  It is also clear that section 105(a) is not jurisdictional and does not confer jurisdiction, but instead only aids the Court's exercise of jurisdiction that the Court otherwise has.  *See U.S. v. Sutton*, 786 F.2d at 1307; *accord In re Packers' Cold Storage Inc.*, 64 B.R. 265, 267 (Bankr. C.D. Cal. 1986) ("section 105(a) is not a jurisdictional statute").  Even where a section 105(a) injunction is permissible, the injunction "must be consistent with the rest of the Bankruptcy Code."  *In re Zale Corp.*, 62 F.3d at 746, 760 (5th Cir. 1995).  Nothing about the requested Mandatory Injunction arises under any other provision of the Bankruptcy Code such that the other provision needs enforcement or protection.

11.     Therefore, the Court has: (i) no Constitutional authority to consider the Mandatory Injunction; (ii) no bankruptcy jurisdiction to consider the Mandatory Injunction; and (iii) no core jurisdiction to issue the Mandatory Injunction.  If anything, the Court is limited a issuing a report and recommendation to the District Court.

## III.     OBJECTION BASED ON ARBITRATION

12.     The HCMFA Shared Services Agreement contains a broad arbitration provision providing that:

> in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that either party or such

> applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.

Agreement at § 9.14.  This provision expressly survives a termination of the agreement.  *See id.*

13.     The Mandatory Injunction does not concern the agreement's confidentiality provisions.  Even if it did, the Mandatory Injunction is not a temporary restraining order or preliminary injunction: it is a final injunction.  Thus, the only exception to the arbitration requirement is not met.

14.     "The Federal Arbitration Act requires courts to enforce covered arbitration agreements according to their terms." *Henry v. Educ. Fin. Serv. (In re Henry)*, 944 F.2d 587, 590 (5th Cir. 2019).  A bankruptcy court may refuse to enforce an arbitration provision:

> when two requirements are met. First, the proceeding must adjudicate statutory rights conferred  by the Bankruptcy Code and not the debtor's prepetition legal or equitable rights.  Second, bankruptcy courts may decline enforcement of arbitration agreements only if requiring arbitration would conflict with the purposes of the Bankruptcy Code.

*Id.* at 590-91 (internal citations omitted).

15.     Here, neither element is met.  The Mandatory Injunction does not concern a statutory right conferred by the Bankruptcy Code, such as the automatic stay, solicitation and countersolicitation sections, cash collateral, turnover, or any other statutory right.  While the Debtor asserts section 105(a), that section does not confer substantive rights, as argued above.  Second, requiring arbitration would not conflict with any purpose of the Bankruptcy Code, for the same reasons argued above with respect to subject matter jurisdiction: how the Advisors handle their internal business affairs is of no legitimate concern to the Debtor, its reorganization (in actuality, a liquidation), or its plan.

---

OBJECTION TO MANDATORY INJUNCTION AND BRIEF IN SUPPORT THEREOF—Page 6

16.     HCMFA therefore objects to the Mandatory Injunction based on the contractual

arbitration clause and insists on the strict application of that clause (which it will be moving to

compel).  HCMFA also notes that the rules of the American Arbitration Association provide for

emergency and injunctive relief, perhaps even more broadly than available to federal courts,

meaning that the Debtor is not left without a remedy.

## IV.     OBJECTION BASED ON DUE PROCESS

17.     The Debtor filed this Adversary Proceeding and Motion on February 17, 2021.  At

that time, the Debtor sought an emergency hearing, asserting as the only grounds for an emergency

hearing:

> A prompt hearing is necessary because absent the relief requested in the Motion,
> the Debtor will be forced to either (a) terminate the Shared Services Agreements,
> to the detriment of the Funds and thousands and investors, all while being sucked
> into additional litigation, or (b) attempt to provide services to the Advisors under
> the Shared Services Agreement at significant losses and risk material delays in
> effectively implementing the Debtor's Plan. In brief, absent injunctive relief, there
> is substantial risk that the Debtor's estate will be harmed. It is therefore vital that
> the Court consider the Motion on an expedited basis.

Docket No. 5 at p. 4.

18.     Based on this, and with no verification or evidence, the Court set an emergency

hearing—a trial on the merits of an extraordinary mandatory injunction—just six days later, with

an intervening weekend, and with other days when many key witnesses and lawyers, including the

undersigned counsel, were without electricity, heat, water, or Internet.

19.     These are not grounds for an emergency hearing.  The Debtor is saying that it

*already has* terminated the Shared Services Agreements, so its argument is factually wrong and

illogical.  And its concern is for the Funds.  Yet it is not the Funds who seek the Mandatory

Injunction.  Likewise, the Debtor will not "attempt to provide services to the Advisors under the

Shared Services Agreement at significant losses and risk material delays in effectively

implementing the Debtor's Plan."  This conclusory statement is wrong.  The Debtor need not

provide the services, the Advisors do not need or want them, and the Advisors have made alternative arrangements. All that the Debtor has to do is turn over the Advisors' data and other property to the Advisors.

20. The Advisors should have had a meaningful opportunity to contest the motion for emergency hearing. However, it appears that the Court orally granted that motion—without any opportunity for the Advisors to respond—because the Debtor filed its notice of hearing right after it filed its motion for emergency hearing, although the length of time between the two cannot be ascertained from ECF. Had the Advisors had an opportunity contest an emergency hearing before the Court granted it, they would have strenuously objected.

21. The Advisors have done the best they can to contest the Mandatory Injunction on such short notice, including by deposing Mr. Seery the day before the hearing. But six days is objectively not enough, especially given the power and water shortages affecting the State and many of the individuals involved. It is not enough time for the Advisors: (i) to take document discovery; (ii) to depose Debtor agents the Advisors were negotiating with; (iii) to test the Debtor's assertions through its own internal analyses and communications; or (iv) to marshal their evidence. The length of time to prepare for a trial on the merits, on so serious an issue as the Mandatory Injunction, and with potential contempt and other ramifications, is facially and objectively insufficient under due process. *See, e.g., Dillon v. Bay City Constr. Co.*, 512 F.2d 801, 804 (5th Cir. 1975) (vacating injunction issued on 6 days' notice that injunction hearing would be consolidated with trial on the merits, and twelve days' notice overall).

22. In sum, it is extraordinary that the Court would set a final, mandatory injunction on six days' notice. A *status quo* injunction, that is one thing, but here the Debtor wants the Court to force the Advisors to conduct their internal affairs in a certain way, probably to force the Advisors to pay the Debtor millions of dollars, and to subject the Advisors to possible contempt and other

ramifications.  And yes, things sometimes happen fast in bankruptcy.  But here, the Debtor is

asking the Court to tell a non-debtor how to run its business.  The Advisors strongly object to this

denial of due process.

23.    The Advisors also object to the Mandatory Injunction based on due process because

of the vagueness and overbreadth of the requested relief.  The proposed order to the Motion

requests the following:

> The Defendants are directed to adopt and implement a plan for the orderly transition
> of services currently provided under the Shared Services Agreements from the
> Debtor to NewCo, or any other entity of the Advisors' choosing, by February 28,
> 2021.

24.    Nothing more is provided in the Debtor's other pleadings either.  What does this

mean?  What is a "plan" for the "orderly transition of services?"  What does "orderly" mean?

What if the Advisors do not want any of the services, such as the facilities?  What if the Advisors

do not want legal services, payroll services, or other services previously provided by the Debtor?

What about services that are no longer relevant?  As the Fifth Circuit has summarized both the

vagueness and overbreadth of an injunction:

> Analytically, the broadness of an injunction refers to the range of proscribed
> activity, while vagueness refers to the particularity with which the proscribed
> activity is described.  'Vagueness' is a question of notice, i.e., procedural due
> process, and 'broadness' is a matter of substantive law, an injunction is overly
> vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and
> it is overbroad if it is not narrowly tailored to remedy the specific action which
> gives rise to the order as determined by the substantive law at issue.

> As explained above, to comply with Rule 65(d) the district court's order granting
> the injunction must 'state its terms specifically' and 'describe in reasonable detail'
> the conduct restrained or required.  The drafting standard has been described as that
> an ordinary person reading the court's order should be able to ascertain from the
> document itself exactly what conduct is proscribed.   The rule embodies the
> elementary due process requirement of notice.  The Supreme Court has repeatedly
> emphasized that the specificity provisions of Rule 65(d) are no mere technical
> requirements.  The Rule was designed to prevent uncertainty and confusion on the
> part of those faced with injunctive orders, and to avoid the possible founding of a
> contempt citation on a decree too vague to be understood.

*Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016) (internal citations and quotations omitted).

25.     The proposed Mandatory Injunction is both too vague and too broad to comply with any of the above requirements: if a federal court is to command a person to do something, under pain of contempt, sanctions, and all of the other tools available, then, at a minimum, the request and order must be precise and clear.  A person should not be put into jeopardy wondering because he or she has to guess as to what the order means.  Even after deposing Mr. Seery, the Debtor still has not identified what plan it wants the Advisors to implement, and what an orderly transition of services means.

## V.     FACTS

26.     First, the Debtor alleges that the Advisors did not move quickly enough on implementing a transition.  In fact, (i) communications and negotiations regarding the transition commenced in late Summer, 2020; (ii) negotiations intensified after the Debtor transmitted its termination notices; and (iii) once the Debtor transmitted its notices, the Advisors promptly commenced preparing for a backup plan if no transition services agreement was reached with the Debtor.  All the while, the Debtor was assuring the Advisors and others that there would be a smooth transition of services.

27.     Second, very important negotiations could not have been had before January 12, 2021, because it was only on that day that Mr. Seery authorized the Advisors to communicate with the Debtor's personnel regarding the transition.  It was known that the Debtor would eventually terminate many employees the Debtor would not need, and that the Advisors would be interested in hiring those employees, but the fact of the matter was that those employees were still employees of the Debtor.  Tort and contract law prohibited direct solicitation of employees and, most importantly, Mr. Dondero and the Advisors were restrained and enjoined from, among other things, "interfering" with or "impeding" the Debtor's business, including indirectly.  The Advisors

were legitimately concerned that directly soliciting Debtor employees would violate these court orders. On or about January 12, 2021, Mr. Seery and the Debtor authorized the Advisors and the affected employees to communicate and negotiate directly, which opened the doors to advancing the ongoing transition negotiations towards finality.

28.     Third, it is true that the Debtor extended its original termination of the Shared Services Agreements from January 31, 2021 to February 19, 2021. The Advisors have no doubt that the Debtor did so in good faith to aid the ongoing negotiations. But, the Advisors also paid the Debtor handsomely for these extensions: $570,241 for the first extension of fourteen (14) days, and $203,657 for the second extension of five (5) days through February 19, 2021, even though these amounts were inflated as the Advisors were paying for two-thirds of employees they were supposed to be paying for, even though those employees were no longer employed by the Debtor well prior to that time. In sum, while the Debtor acted reasonably with respect to these extensions, and the Advisors appreciated and still appreciate it, its reasonableness should not be construed as altruism. The Advisors *paid* for the delay; not the Debtor.

29.     Fourth, and **most importantly**, the Advisors and the Debtor did work through and resolve each and every issue, save one that will be discussed below. There were many, many issues to resolve, most of them ordinary business matters, but the big ones were the following, resolved as following:

(i)     <u>Employees</u>. The Debtor would retain the employees that it needed, and terminated employees would form "NewCo," which would then provide services to the Advisors at the Advisors' expense. Reasonable.

(ii)    <u>Lease</u>. The Advisors would pay the Debtor 75% of lease payments and have use of the premises. Reasonable.

(iii)   <u>Third Party Services and Software</u>. The Advisors would pay the Debtor 60% of the costs of third party services and software and have use of those things. Reasonable.

(iv)  <u>Funds Owing</u>. On January 27, 2021—two days before the scheduled termination—the Debtor alleged that the Advisors *and others* owed more than $3 million in unpaid amounts under the agreements and demanded that these amounts be paid *by the Advisors* immediately and in full as a condition of any transition services agreement.[1]  The Advisors pointed out that two-thirds of the employees that they had been paying for and were now being billed for were no longer there.  The parties agreed that the Advisors would pay the full amount, with $1 million up front and the balance over fourteen months in equal payments, subject to clawback rights for the overpayments.  Reasonable.

(v)  <u>Advisor Property</u>.  The Debtor would transfer to the Advisors their property, including domain names, electronic data, and the like.  Reasonable.

30.  This agreement would have provided millions of dollars in direct payments to the Debtor, it would have provided several million dollars more in future payments, it would have protected dozens of jobs, it would have provided benefit to the Debtor in the future in numerous tangible and intangible benefits, and it would have ensured the smoothest transition possible. However, one unresolved issue remained: whether Mr. Dondero would be permitted on the premises under the new transition services agreement.[2]  The Debtor categorically rejected any negotiation on this point, stating that Mr. Dondero would interfere with the Debtor's business.  In response, the Advisors offered to build a dividing wall, at their expense, and to enter into other protections, aside from the continuing injunction against Mr. Dondero, which would have protected the Debtor anyway.  The Debtor would not consider any compromise on this issue and presented the Advisors with a "take it or leave it" ultimatum the afternoon of February 16, 2021—three days prior to the scheduled termination, and at a time when many of the individuals and attorneys involved were without power, heat, water, or Internet.

---

[1]  Again, other entities, while affiliated with Mr. Dondero, owed much of the Alleged $3 million, yet the Debtor demanded that the Advisors pay these funds themselves as a condition of proceeding.

[2]  The Preliminary Injunction against Mr. Dondero prohibits him from being on the premises, but the Debtor is authorized to grant permission for him to be on the premises.  *See* Adversary Proceeding No. 20-03190-sgj at p. 4.  Thus, the Debtor could have agreed to his presence even without relief from the Court.

31.    The Advisors would not agree to this unreasonable condition.  No reasonable company would agree to pay millions of dollars in rent and other fees without its president and fund manager being permitted to be on the premises.  This was an unreasonable condition for three reasons.

32.    First, Mr. Dondero is the president of the Advisors and other entities, and he is the fund manager for hundreds of millions of dollars, if not billions, in funds and investments.  He has fiduciary duties to those whose funds and investments he manages.  To prevent him from interacting in person with employees, who his companies would be paying for, and to prevent him from being on his own companies' premises, which those companies were paying for, is unprecedented in this or any other industry.  Mr. Dondero has to be able to interact daily and in-person with his employees, invite clients and investors to the premises, and discharge his fiduciary duties.  If the Debtor really was concerned about protecting the Advisors' and other entities' businesses, as it should since it has sued them for tens of millions of dollars, then it should and could have found a reasonable accomodation on this issue.  Building a demising wall (at the Advisors' expense) separating the Debtor's space from that of the Advisors, and providing the Debtor and the Advisors secure access, ingress, and egress points, was a reasonable, efficient, and secure proposal, especially because Mr. Dondero would still have been subject to the injunction prohibiting him from communications, interference, and other actions the Debtor was concerned about.

33.    Second, this was not reasonable for an obvious point: what interference?  Debtor personnel have mostly not been in the office for almost one year because of the pandemic and will not be for the foreseeable future.  And, if Mr. Dondero wanted to interfere, then his presence or lack thereof on partitioned premises would hardly prevent him from interfering.

---

OBJECTION TO MANDATORY INJUNCTION AND BRIEF IN SUPPORT THEREOF—Page 13

34.     Third, this was not reasonable because it has cost the Debtor millions of present dollars, and millions of future dollars, in lost revenue from the Advisors, while the Debtor now has a cavernous, expensive space, with expensive equipment, computers, and software, most of which it does not need for its vastly reduced "monetization" (in reality liquidation) plan. The Debtor lost all of these benefits and, according to its own allegations, jeopardized its own business and the business of the Advisors and funds because of this one, sole, issue. That is not a sound business decision and one that does not comport with the Debtor's fiduciary duties. It instead seems like a decision bore of spite.

35.     The Advisors therefore made a business decision to not enter into the new contract the Debtor presented as an ultimatum, so long as Mr. Dondero would be prohibited from being on the premises, in order to protect their fundamental business interests and to ensure that they could provide proper services to their clients. With due respect, it is not for the Court to pass on the wisdom of this business decision or to review or comment on the Advisors' backup plan. Nevertheless, because the Debtor has unjustly and publicly accused the Advisors of being unprepared and negating their duties—an allegation that the Debtor has apparently also made to the SEC—the Advisors will inform the Court of their backup transition plan. Again, in doing so, they do not subject themselves to this Court's jurisdiction or to this Court's authority over their internal business affairs.

36.     The Debtor ceased providing services under the Shared Services Agreements on February 19, 2021. On that date, the Advisors' employees left the premises. On and after that date, the Advisors have transitioned as follows:

(i)      Accounting, Back Office, and Valuation Services. These have been assumed in-house by the Advisors' employees and outsourced in part.

(ii)     Legal and Regulatory Compliance Issues. These have been performed in-house by the Advisors' employees and outsourced in part to two separate companies.

(iii) <u>IT Services</u>. IT services have been outsourced to a highly qualified company well acquainted with the Debtor's systems, and new e-mail, server functions, accounts, and access have been established. Industry-leading security measures have been implemented and electronic data and communications are secure.

(iv) <u>Electronic Data</u>. The Advisors have already copied from the Debtor's systems most of their own, non-debtor data, which has been made available and accessible to them by the new IT provider. With respect to any Advisor-owned data still stored on the Debtor's systems, the IT provider stands ready, willing, and able to finish copying the same, at a minimum of cost and burden. The Debtor has also assured the Advisors that it will continue to make this data available for copying.

(v) <u>Third Party Software</u>. The Advisors attempted to purchase from the Debtor, for substantial funds, the Bloomberg and OMS systems,[3] while permitting the Debtor to continue using these for free. The Debtor rejected this proposal *without counteroffer*. The Advisors already have Bloomberg access for trades and market information, so that is not a problem. With respect to the OMS system, the Advisors are separately in discussion with Bloomberg for a new contract and may also explore other OMS providers. In the meantime, the Advisors and NewCo will handle order management manually.

(vi) <u>Employees</u>. The Advisors are about to, and may as of the hearing, sign an agreement with the employees' NewCo, such that the same employees can do the same things they do now once the Debtor terminates them on February 28, 2021. The Debtor has confirmed that it will not stand in the way of this.

(vii) <u>Office Space</u>. Temporary office space has been established, while most employees work from home anyway due to the pandemic. The Advisors are in the process of leasing or sub-leasing, on a long term basis, new office space.

(viii) <u>Hardware</u>. The Advisors have purchased numerous computers, monitors, servers, VPN licenses, and other hardware and software for the new employees so that they can work from home on a secure basis.

37. The Advisors will not deny that the transition would have been smoother with an

agreement with the Debtor or if the Debtor would have sold it various things *a la carte*.[4] But the

---

[3] The OMS (order management system) is a Bloomberg add-on that was custom developed for the Highland "enterprise" and that automates many of the processes involved with managing and settling trades and other market transactions. Even though title to the OMS in in the name of the Debtor, it is the Advisors who paid the large costs needed to develop the OMS and who believe that they hold the superior equitable title.

[4] Once the prospect of an overall agreement ended, the Advisors offered to purchase certain limited things, mostly software, while permitting the Debtor continuing, free access to the same. The Advisors offered to purchase this not out of necessity, but to minimize the burdens and costs that the Advisors would incur in purchasing, outsourcing, or building this independently. The Advisors do not believe that these assets are otherwise marketable

Debtor chose to condition a transition services agreement on an unacceptable condition, and it chose to not sell certain things that it hardly needs on an *a la carte* basis. In the process, the Debtor chose to forego millions of dollars in payments and benefits, and now slanders the Advisors to the Court, the public, and the SEC. In truth, the Advisors, as commercially reasonable and reputable entities, prepared and implemented their own backup transition without the Debtor and it is the Debtor, not the Advisors and any funds, who have lost out.

38. Finally, the Boards of the retail funds, at their request, have received regular and frequent updates on the status of any shared service arrangements relating to the funds throughout the course of the bankruptcy proceedings, including with respect to alternative arrangements in the event a transition of services was not able to be agreed to between the Advisers and the Debtor. Those Boards have supported the Advisors' actions, the decision to reject the Debtor's ultimatum, and the backup plan the Debtor has implemented.

## VI.    DISCUSSION

39. The Fifth Circuit holds that a mandatory injunction "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *accord Roark v. Individuals of the Fed. Bureau of Prisons*, 558 Fed. Appx. 471, 472 (5th Cir. 2014). "[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Exhibitors Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (*quoting Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)); *Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003) ("Mandatory preliminary relief which goes well beyond

---

or that the Debtor needs them but, even if they have a market value and are needed by the Debtor, the Advisors offered to pay for this and continue to agree to give the Debtor access.

simply maintaining the status quo pendente lite is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party.")

40.     Thus, a party requesting a mandatory injunction "carries the burden of showing *clear entitlement* to the relief under the facts and the law." *Justin Industries, Inc. v. Choctaw Securities, L.P.*, 747 F. Supp. 1218, 1220 (N.D. Tex. 1990) (citing *Exhibitors*; emphasis original). In other words, the party bears a "heavy burden." *Id*. at n.5. "Injunctions are extraordinary remedies that are generally not favored … and mandatory injunctions are even less favored than prohibitory injunctions since they compel a person to act rather than simply maintain the status quo." *Id*. As the District Court has held when a party seeks a mandatory injunction prior to trial, it is a "daunting burden of proof." *Arbor Bend Villas Hous. L.P. v. Tarrant County Hous. Fin. Corp.*, 2002 U.S. Dist. LEXIS 10232 at *10 (N.D. Tex. 2002) (emphasis added). As further held by the District Court:

> When a district court's order, albeit in the form of a TRO or preliminary injunction, will finally dispose of the matter in dispute, it is not sufficient for the order to be based on a likelihood of success or balance of hardships, the district court's decision must be correct (insofar as possible on what may be an incomplete record) . . . this heightened showing is also required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial.

*Id*. at *9-*10 (internal quotation omitted; quoting case).

41.     The Debtor cannot meet this "heavy burden," this "daunting burden of proof," this "rare instance," even without consideration of the serious Constitutional, jurisdictional, and arbitrability issues discussed above.

42.     First, the Court cannot order the Advisors to enter into a contract that they have not agreed to enter into and that they are not willing to enter into. They are non-debtor entities. The relief requested by the Debtor is outside the power of any court to issue. And that is what implementing a "plan for the orderly transition of services" necessarily requires: contracting with

employees or NewCo, contracting with software and service providers, contracting with a landlord, etc.

43. Second, the Debtor cannot show a likelihood of success on the merits. Injunctive relief is a remedy, not a cause of action. *See Torres-Aponte v. JP Morgan Chase Bank N.A.*, 639 Fed. Appx. 272, 274 (5th Cir. 2016). In other words, one does not sue for an injunction, but rather sues for an underlying wrong and the injunction aids in the remedying or prevention of that wrong. Setting arbitration and jurisdiction aside, even if the Court assumes that the Debtor will prevail on its declaratory relief that it properly terminated the Shared Services Agreements, and on its monetary claim for unpaid fees, none of those underlying causes of action give any rise, in fact, logic, or law to a Mandatory Injunction ordering the Advisors to implement a transition plan. With respect to section 105(a), as argued throughout, it does not create a substantive remedy. This Court recently labeled an attempt to rely on section 105(a) as a "Hail Mary," wisely and correctly concluding as follows:

> A bankruptcy court's equity power can only be exercised within the confines of the Bankruptcy Code. Section 105 does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.

*In re Senior Care Ctrs. LLC*, 611 B.R. 791, 799 (Bankr. N.D. Tex. 2019) (internal quotation omitted). As noted above, because the issue is a mandatory injunction, it is not enough to show a likelihood of success on the merits. The Debtor must be correct. Here, the Debtor's arguments are neither correct nor even have a likelihood of being successful.

44. Third, there is no irreparable injury to the Debtor or its estate. The Debtor complains that it may have to terminate the Shared Services Agreement, although it says that it already has, and it says that it is losing money on the agreements and is concerned about losing more money if it continues providing services under the agreements. But the Advisors do not need

to those services. The Debtor need not lose money. There is no injury there, even if money could ever form the basis of irreparable injury for a mandatory injunction, which it cannot. *See In re Mirant Corp.*, 2004 Bankr. LEXIS 2033 at *10 (Bankr. N.D. Tex. 2004). As for the Debtor's concern that it will be embroiled in litigation, that is not only too hypothetical and speculative, as outlined above with respect to jurisdiction, but is also a conclusory allegation that cannot support an injunction. *See Smithback v. Texas*, 2005 U.S. Distr. LEXIS 5858 *2 (N.D. Tex. 2005) ("Conclusory allegations are not sufficient to support a claim for injunctive relief"). And, even if the Debtor becomes embroiled in litigation notwithstanding the gatekeeper injunction in the plan, the exculpation in the plan, and all of the other protections for the debtor in the plan, then the only damages are monetary damages not qualifying as irreparable harm, especially in the context of a mandatory injunction.

45. Fourth, the balance of equities do not favor the Debtor. The Debtor is asking this Court to order a non-debtor to conduct its business in a particular way. The Advisors are not subject to this Court's jurisdiction, they are not in receivership, they have not shown themselves to be foolish with respect to the conduct of their business, and it is the Debtor who, through its unreasonable refusal to grant Mr. Dondero any access to *his own companies' premises*, has created the situation it now seeks to exploit. It is the Debtor who has acted inequitably. The Advisors are implementing their plan "b." Their retail boards and investors are not complaining. Interfering with their business risks a cascade of interference with the legitimate rights of many others that can only lead to additional litigation and harm.

46. Fifth, the public interest does not support the Mandatory Injunction. It is not the role of the courts to manage non-debtor businesses, or to tell them how to manage those businesses, when no public laws, rules, regulations, contracts, or rights are implicated.

---

47.     Finally, the Advisors have done nothing to merit an extraordinary Mandatory Injunction, other than refusing to enter into the transition services contract the Debtor demanded. They have not failed in their transition, they have not ceased their businesses, they have not violated any duties, they have not violated any court order, they have not interfered with the Debtor, and they have done nothing other than bear the results of the Debtor's own actions; *i.e.* termination of the Shared Services Agreements and refusal to permit Mr. Dondero any access to the premises, the best they could.

48.     The Advisors are implementing their transition plan.  With all respect to the Court, it is not the Court's business what that plan is.  While the Advisors have described their plan above, since they have to respond to the Debtor's allegations, they in no way consent to this Court's approval, disapproval, or anything else of that plan and respectfully submit that any such finding or conclusion would be made without jurisdiction and would be wholly advisory.  All that the Advisors need is their historical data and electronic books and records which, as the Shared Services Agreements expressly provide, is their property.  They assume that the Debtor will cooperate, and the Debtor has assured them of its cooperation.

49.     In December, 2020, worried that the Debtor was unnecessarily selling CLO property, in which they had invested hundreds of millions of dollars, while the actual investors preferred a "hold" strategy, the Advisors and various fuds filed a motion to impose limited controls on the Debtor before it sold CLO property.  The movants believed that they were acting in good faith, raising a legitimate concern regarding their own investments.  The Court denied that motion, calling it frivolous.  The Court ruled as follows:

> I agree that the Movant has wholly failed to meet its burden of proof here today to show the Court, persuade the Court that, as Mr. Morris said, I should essentially tie the hands of the Debtor as a portfolio manager here, as stated.  Nothing improper has been alleged. There has been no showing of a statutory right here, or a contractual right here, on the part of the Movants.

Transcript December 16, 2021 at 63:7-13. The Court essentially ruled that the Debtor was entitled to its business judgment as to how it managed its obligations, and it had seen nothing to warrant a departure from this rule.

50.     Respectfully, the same should apply here. The Advisors have made their decision, which is to "divorce" from the Debtor. It is their business decision that they have a right to make. What they do thereafter is their business and, if any court or regulator has a say in it, it is not this Court. The Debtor will present no contractual right, no statutory right, to the contrary. Just as the Court found that prior motion frivolous, even if there were legitimate concerns about what the Debtor was doing, so too should the Court find the present Motion just as frivolous as seeking to interfere in the internal business operations of a non-debtor. Indeed, this is now the fourth lawsuit filed by the Debtor against the Advisors in under two months, even as the Debtor labels the Advisors and anyone associated with Mr. Dondero to be vexatious and serial litigants.

## VII.   **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Advisors respectfully request that the Court deny the Motion and grant them such other relief as is appropriate.

RESPECTFULLY SUBMITTED this 22d day of February, 2021.

MUNSCH HARDT KOPF & HARR, P.C.

/s/ *Davor Rukavina*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

K&L GATES LLP

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., and NexPoint Advisors,
L.P.,*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on February 22, 2021, a true and correct copy of this document was served electronically by the Court's CM/ECF system on all parties entitled to such notice, including counsel for the Debtor.

/s/ *Davor Rukavina*
Davor Rukavina, Esq.