# Appendix Exhibit 105

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Elissa A. Wagner (CA Bar No. 213589) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DECLARATION OF ROBERT J. FEINSTEIN IN SUPPORT OF
## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT
## WITH UBS SECURITIES LLC AND UBS AG, LONDON BRANCH
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054210415000000000002

I, Robert J. Feinstein, declare as follows:

1.      I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP, counsel to Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case").  I submit this declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG, London Branch and Authorizing Actions Consistent Therewith*, filed concurrently herewith.  This declaration is based on my personal knowledge of the facts set forth herein and my review of the documents identified below.

2.      Attached as **Exhibit 1** is a true and correct copy of the Settlement Agreement executed as of March 30, 2021, by the Debtor, Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.), Strand Advisors, Inc., and UBS Securities LLC, and UBS AG, London Branch.

3.      Attached as **Exhibit 2** is a true and correct copy, without exhibits, of Claim No. 190 filed by UBS Securities LLC in the Bankruptcy Case.

4.      Attached as **Exhibit 3** is a true and correct copy, without exhibits, of Claim No. 191 filed by UBS AG, London Branch in the Bankruptcy Case.

5.      Attached as **Exhibit 4** is a true and correct excerpt from the transcript of the November 20, 2020 hearing in the Bankruptcy Case [Dkt. 1482] setting forth the Court's ruling on *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Dkt. No. 1338].

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 15, 2021, in New York, New York.

*/s/ Robert J. Feinstein*
Robert J. Feinstein

DOCS_LA:335152.2 36027/002

App. 2284

# Exhibit 1

## Settlement Agreement

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 2 of 17
Case 3:21-cv-00881-X Document 174-105 Filed 12/16/23 Page 5 of 73 PageID 19469
**EXECUTION VERSION**

**SETTLEMENT AGREEMENT**

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

App. 2287

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 4 of 17
Case 3:21-cv-00881-X Document 174-105 Filed 12/16/23 Page 7 of 73 PageID 19471
EXECUTION VERSION

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

WHEREAS, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

WHEREAS, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

WHEREAS, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

WHEREAS, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

WHEREAS, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

WHEREAS, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

WHEREAS, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

WHEREAS, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21    Entered 04/15/21 14:37:56    Page 5 of 17
Case 3:21-cv-00881-X   Document 174-105   Filed 12/16/23   Page 8 of 73   PageID 19472
EXECUTION VERSION

WHEREAS, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

WHEREAS, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

WHEREAS, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

WHEREAS, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

WHEREAS, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

WHEREAS, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

WHEREAS, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

NOW THEREFORE, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.    **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

EXECUTION VERSION

(b)    Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows:  (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)    Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

**EXECUTION VERSION**

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

   (d)  Redeemer Appeal.

     (i)  On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

**EXECUTION VERSION**

        (ii)      The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

        (e)      As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

        (f)      On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

        (g)      On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor.  For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

        2.      **Definitions.**

        (a)      "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

        (b)      "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

        (c)      "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

        (d)      "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

        3.      **Releases.**

        **(a)**      **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 9 of 17
Case 3:21-cv-00881-X Document 174-105 Filed 12/16/23 Page 12 of 73 PageID 19476
EXECUTION VERSION

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

      (b)    **HCMLP Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 10 of
Case 3:21-cv-00881-X Document 174-105 17iled 12/16/23 Page 13 of 73 PageID 19477
EXECUTION VERSION

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with UBS Unrelated Investments.

(c)     **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4.     **No Third Party Beneficiaries**.     Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5.     **UBS Covenant Not to Sue**.     Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.    **Agreement Subject to Bankruptcy Court Approval.**

(a)    The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.    **Representations and Warranties**.

(a)    Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)    Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)    Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

App. 2295

8.      **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

9.      **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

10.      **Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

**EXECUTION VERSION**

Telephone No.:  212-713-1371
E-mail:  john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention:  Andrew Clubok
                   Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.:  202-637-3323
Email: andrew.clubok@lw.com
           sarah.tomkowiak@lw.com

   **11.** **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

   **12.** **Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

   **13.** **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

   **14.** **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

   **15.** **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document.  Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

App. 2297

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

    16.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

App. 2298

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:

Name: James P. Seery Jr.

Its: Authorized Signatory

**HIGHLAND MULTI STRATEGY CREDIT
FUND, L.P. (f/k/a Highland Credit
Opportunities CDO, L.P.)**

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO,
Ltd.**

By:

Name: James P. Seery Jr

Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO
ASSET HOLDINGS, L.P.**

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

**STRAND ADVISORS, INC.**

By:

Name: James P. Seery Jr.

Its: Authorized Signatory

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

15

App. 2300

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

App. 2301

# Exhibit 2
## Proof of Claim No. 190

Claim #190 Date Filed: 6/26/2020

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern District of Texas (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | UBS Securities LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| UBS Securities LLC<br>Attn: Suzanne Forster<br>1285 Avenue of the Americas<br>New York, New York 10019 | |
| Contact phone 2127133432<br>Contact email suzanne.forster@ubs.com<br>**(see summary page for notice party information)**<br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | Contact phone _____<br>Contact email _____ |

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____ MM / DD / YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No<br>☑ Yes. Who made the earlier filing? UBS AG, London Branch - this is a joint litigation claim. |

Official Form 410 | Proof of Claim

1934054200626000000000002

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ _1,039,957,799.40_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Litigation - See attached addendum_

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410            **Proof of Claim**

1934054200626000000000002

| | | | Amount entitled to priority |
|---|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).     $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).     $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).     $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).     $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).     $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.     $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    06/26/2020
                    MM / DD / YYYY

/s/Asif Attarwala
Signature

Print the name of the person who is completing and signing this claim:

| Name | Asif Attarwala |
| | First name       Middle name       Last name |
| Title | Associate |
| Company | Latham and Watkins LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 330 North Wabash Ave., Suite 2800, Chicago, IL, 60611 |
| Contact phone | 3128767667 | Email asif.attarwala@lw.com |

---

1934054200626000000000002

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| Debtor: | |
|---|---|
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |
| **Creditor:** | **Has Supporting Documentation:** |
| UBS Securities LLC | Yes, supporting documentation successfully uploaded |
| Attn: Suzanne Forster | **Related Document Statement:** |
| 1285 Avenue of the Americas | |
| New York, New York, 10019 | **Has Related Claim:** |
| | Yes |
| **Phone:** | **Related Claim Filed By:** |
| 2127133432 | UBS AG, London Branch - this is a joint litigation claim. |
| **Phone 2:** | See attached addendum |
| **Fax:** | **Filing Party:** |
| **Email:** | Authorized agent |
| suzanne.forster@ubs.com | |

| Disbursement/Notice Parties: |
|---|
| Latham and Watkins LLP |
| Andrew Clubok |
| 555 Eleventh Street, NW |
| Washington, D.C., 2004-1304 |
| **Phone:** |
| 2026373323 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| andrew.clubok@lw.com |

| Other Names Used with Debtor: | Amends Claim: |
|---|---|
| | No |
| | **Acquired Claim:** |
| | No |

| Basis of Claim: | Last 4 Digits: | Uniform Claim Identifier: |
|---|---|---|
| Litigation - See attached addendum | No | |

| Total Amount of Claim: | Includes Interest or Charges: |
|---|---|
| 1,039,957,799.40 | Yes |

| Has Priority Claim: | Priority Under: |
|---|---|
| No | |

| Has Secured Claim: | Nature of Secured Amount: |
|---|---|
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| Submitted By: |
|---|
| Asif Attarwala on 26-Jun-2020 5:10:38 p.m. Eastern Time |
| **Title:** |
| Associate |
| **Company:** |
| Latham and Watkins LLP |

**Optional Signature Address:**
Asif Attarwala
330 North Wabash Ave.
Suite 2800

Chicago, IL, 60611

**Telephone Number:**
3128767667
**Email:**
asif.attarwala@lw.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 (SGJ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ADDENDUM TO PROOF OF CLAIM FILED BY
UBS AG, LONDON BRANCH**

1.      UBS Securities LLC hereby submits this addendum to its proof of claim (together, the "**Proof of Claim**") against Highland Capital Management, L.P. (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

2.      UBS Securities LLC and UBS AG, London Branch (together, the "**Claimant**" or "**UBS**") each have claims against the Debtor and each is filing a proof of claim in this Chapter 11 Case.  Because their claims arise from the same set of factual events, including the same failed transaction, misconduct involving the Debtor and its affiliates, and subsequent litigation, the UBS claims overlap and their proof of claim forms and addendums are substantially the same.

3.      This addendum is attached to, incorporated into, and constitutes an integral part of Claimant's Proof of Claim against the Debtor.  Claimant files this Proof of Claim under compulsion of the *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 488], as extended by the *Joint Stipulation and Order Extending Bar Date* [Docket No. 547] and modified by the *Order Denying UBS's Motion for Relief*

---

[1]      The Debtor's last four digits of its taxpayer identification number are 6725.  The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

*from the Automatic Stay to Proceed with State Court Action* [Docket No. 765], solely for the purpose of asserting Claimant's claims against the Debtor, as more particularly described and subject to any limitations set forth below.

### **Factual Background**

**A.    The Knox Transaction**

2.      Claimant's claims arise out of a failed transaction dating back thirteen years ago and the state court action (the "**State Court Action**") that followed between Claimant, the Debtor, Highland CDO Opportunity Master Fund, L.P. ("**CDO Fund**") and Highland Special Opportunities Holding Company ("**SOHC**") (together with CDO Fund, the "**Fund Counterparties**," and the Fund Parties and the Debtor collectively, "**Highland**"), among other parties.[2]

3.      In early 2007, Claimant and Highland agreed to pursue a complex form of securitization transaction known as a "CLO Squared" (the "**Knox Transaction**"). (Ex. B, Decision at 2.) The purpose of the Knox Transaction was to acquire and securitize a series of collateralized loan obligation ("**CLO**") securities and credit default swap ("**CDS**") assets (the "**Knox Assets**"). To that end, the Debtor agreed to be the "Servicer" of the Knox Transaction, and as such was responsible for identifying the specific CLO and CDS assets to be securitized. Claimant agreed to finance the acquisition of the CLO and CDS assets identified by Highland. Claimant would then hold, or "warehouse," the assets until the securitization was completed (the "**Knox Warehouse**"). Under this arrangement, Claimant financed the acquisition of $818 million in Knox Assets. (*Id.*)

---

[2]    The procedural history of the State Court Action is incorporated by reference, but is voluminous. The operative Second Amended Complaint and Phase I Decision and Order are attached as **Exhibit A** and **Exhibit B**, respectively. Additional pleadings and orders can be found on the State Court docket for Index No. 650097/2009 or by contacting Claimant's counsel. Claimant reserves the right to file a copy of additional pleadings or orders with this Court.

4.      The parties' first attempt at the Knox Transaction was not completed successfully and the relevant agreements expired in August 2007 without the contemplated securitization having occurred. (*Id.* at 3.) Rather than end their relationship, however, Highland and Claimant continued to consider the possibility of pursuing the contemplated securitization in 2008 under restructured versions of the prior agreements. Highland and Claimant always understood that—if the securitization were not successful—the Fund Counterparties would be obligated to pay Claimant for 100% of the losses on any CLO or CDS assets that been acquired and warehoused for the securitization. In order to convince Claimant to agree to enter restructured versions of those agreements and to finance the acquisition of the CLO and CDS assets, Highland assured Claimant that the Fund Counterparties had sufficient assets to cover any losses. It did so by providing Claimant with false, incomplete, and otherwise misleading information concerning the Fund Counterparties' finances and assets. (Ex. A, Compl. ¶¶ 47-61.)

**5.**      In addition, Claimant specifically conditioned its agreement to enter the restructured agreements on the Fund Counterparties' ability to post an additional $70 million in cash and securities as collateral (the "**Initial Restructuring Collateral**"), in which Claimant would hold a security interest. (*Id.* ¶¶ 56-59; Ex. B, Decision at 3.) Highland assembled $70 million in such Initial Restructuring Collateral. But what Highland did not tell Claimant—and what is now clear was omitted on purpose—was that the Fund Counterparties did not own all of the Initial Restructuring Collateral they were expected to post. Instead, to meet this obligation, the Debtor exercised its control over other Highland affiliates, transferring and redirecting assets from such other entities that it controlled to assemble the Initial Restructuring Collateral. (Ex. A, Compl. ¶¶ 56-59.)

3

6.      Similarly, while negotiating the restructured transaction, Highland provided Claimant with financial reports and statements that contained materially false and misleading information and omissions concerning the financial condition of the Fund Counterparties. (*Id.* ¶¶ 47-52.) The Debtor itself had prepared these financial statements and knew they contained material misstatements. (*Id.* ¶¶ 48-50, 54.) Among other things, Highland misrepresented the amount of cash held by CDO Fund. (*Id.* ¶ 52.) Highland also failed to disclose that many of the assets on the Fund Counterparties' financial statements already had been encumbered. (*Id.* ¶¶ 51, 53.) These misrepresentations not only evince a specific intent by Highland to induce Claimant into entering the restructured agreements, but a longstanding willingness to prevent Claimant from ever recovering the amounts owed under the parties' proposed agreements in the event the Knox Assets suffered any losses. In addition, these events show the Debtor's singular control over—and ability to move—assets from one Highland affiliate to another at will.

7.      Based on Highland's material misstatements and omissions, Claimant agreed to pursue the restructured transaction and once more attempt the securitization, and the parties executed three new written agreements: an Engagement Letter, a Cash Warehouse Agreement, and a Synthetic Warehouse Agreement (collectively, the "**Warehouse Agreements**"). (*See* Ex. B, Decision at 3.) The Engagement Letter was executed by Claimant and the Debtor; the Fund Counterparties were not parties to the Engagement Letter. (Ex. A, Compl. ¶ 62.) The Cash Warehouse and Synthetic Warehouse Agreements were executed by Claimant and the Debtor, along with the Fund Counterparties. (*Id.* ¶¶ 64-65.)

8.      As described above, Claimant agreed to finance the acquisition of the CLO and CDS assets that the parties planned to securitize. In so doing, the key risk Claimant faced was the possibility that the Knox Assets would lose value while securitization was pending. To address

this risk, Claimant and the Debtor agreed in the Engagement Letter that the Fund Counterparties would bear this risk. Notably, at the time, the Debtor was the Investment Manager to the Fund Counterparties under agreements that gave the Debtor total control over those entities. (Ex. A, Compl. ¶¶ 24, 26.)

9. The Warehouse Agreements reiterated that the Fund Counterparties (as controlled by the Debtor) would bear the risk, specifying that if the Knox Assets lost value while securitization was pending, the Fund Counterparties "will in aggregate bear 100% of the risk" for the Knox Assets—with CDO Fund bearing 51% of any losses and SOHC bearing the remaining 49%.

10. To further protect Claimant in the event that the Knox Assets lost value, the Warehouse Agreements provided for recurring measurements of mark-to-market losses on all assets in the Knox Warehouse and required the Fund Counterparties to post collateral in the event the Knox Assets lost a set amount of value. Specifically, the parties agreed that the Fund Counterparties would post an additional $10 million in collateral for each $100 million in losses to the overall value of the Knox Assets. (Ex. B, Decision at 4.)

11. In September and October 2008, amid the global economic recession, the value of the Knox Assets dropped by $100 million, twice. Thus, Claimant twice exercised its contractual right to demand additional collateral. And twice Highland posted the required collateral. (*Id.*) Although the Warehouse Agreements specified that it was the Fund Counterparties who would post collateral, the Debtor moved assets around from other entities it controlled to make the first two collateral calls (without disclosing this practice to Claimant). (Ex. A, Compl. ¶ 79.) On or about November 7, 2008, Claimant issued a third margin call, because the value of the Knox Assets suffered additional losses of $200 million (bringing the aggregate losses to over $400 million).

5

(Ex. B, Decision at 4.)  This time, Highland refused to provide the additional collateral required under the Warehouse Agreements.

12.     Highland's default on Claimant's third margin call triggered a termination event under the Warehouse Agreements.  (*Id.*)  On December 5, 2008, Claimant gave Highland formal notice of default and demanded the Fund Counterparties pay Claimant for 100% of the losses incurred on the Knox Assets—which had, by then, grown to over $520 million.

13.     There is no question that the Debtor knew the Fund Counterparties were liable for the losses under the Warehouse Agreements.  Indeed, the Highland officer who executed the Warehouse Agreements admitted under oath that, "as of the end of the year 2008," Highland knew that the Fund Counterparties owed Claimant "hundreds of millions of dollars in connection with the Knox Warehouse Agreements."  (Travers Dep. at 261:8-20).)  But rather than paying Claimant what it was owed, the Debtor, with Mr. Dondero at the helm, "devised a strategy to delay the resolution of that obligation [to pay Claimant] for as long as possible." (*Id*.)  To that end, Highland devised and subsequently deployed a multifaceted strategy—one that would last for many years thereafter—to intentionally frustrate and prevent Claimant from recovering any of the amounts that both the Debtor and the Fund Counterparties knew were rightfully owed to Claimant under the Warehouse Agreements.

14.     First, the Debtor directed the Fund Counterparties to withhold any payment to Claimant—a position that the Fund Counterparties maintained (again, under the specific direction of the Debtor) for more than a decade.  (*See id.*)  The Debtor did so not only with the specific knowledge that the Fund Counterparties owed hundreds of millions of dollars to Claimant for the losses on the Knox Assets, but with the knowledge that Claimant would come seeking payment

App. 2313

for such losses and, in particular, to look toward any and all collateral owned by the Fund Coun-

terparties as one source of payment. As one of Highland's officers stated an internal email to Mr.

Dondero in an internal email dated January 16, 2009: "[UBS] is going to be calling [] today asking

for all additional collateral that cdo and sohc have left to cover the obligation left by the knox

transaction." But rather than turning over the collateral in question to Claimant or, at the very

least, securing such assets so that they could be used to pay Claimant, the Debtor directed the Fund

Counterparties to withhold such assets and payments from Claimant: "[T]hey can see us in court

for their additional collateral." True to that promise, even after Claimant filed suit and laid out the

amounts due under the contracts, the Debtor forced the Fund Counterparties to launch an affirma-

tive, multi-year campaign—one which would consume much of the cash and assets belonging to

the Fund Counterparties themselves—to stave off any payment from the Fund Counterparties to

force Claimant to try to recover such claims through litigation and, once in litigation, devising

knowingly baseless defenses and arguments for the Fund Counterparties to assert in such litigation.

15.     On top of directing the Fund Counterparties to withhold payment and force Claim-

ant to litigate for amounts the Debtor already knew they rightfully owed to Claimant, the Debtor

undertook a litany of other actions to ensure that, even if Claimant were successful in the litigation

it had been forced to initiate against the Fund Counterparties, it would not be able to collect any

judgment arising out of the litigation. Such actions included, but were not limited to, a series of

fraudulent transfers out of, and away from, an alter ego of SOHC, Highland Financial Partners,

L.P. ("**HFP**"). (Ex. A, Compl. ¶ 109.) These internal transfers of funds—all overseen by James

Dondero, the Debtor's founder and president—were designed to prevent Claimant from ever col-

lecting the millions of dollars it was owed under the Warehouse Agreements.

16.     In addition to such fraudulent transfers, the Debtor also took steps after the lawsuit was filed to ensure that no additional value would be transferred *to* the Fund Counterparties— deliberately taking steps to keep both SOHC and CDO Fund undercapitalized.  Not only did the Debtor prevent additional value from being transferred to the Fund Counterparties, it is clear that the Debtor also failed to ensure that the Fund Counterparties retained assets that could be used to pay any such judgment.  Quite to the contrary, it is now clear that any and all assets of any value that once belonged to the Fund Counterparties have, in one way or another, been transferred away, drained, or otherwise wasted by the Fund Counterparties, the Debtor itself, or the Debtor's affiliates—all at the Debtor's direction.  Indeed, in a recent filing before this Court, the Debtor recently disclosed that both of the Fund Counterparties are completely "insolvent."  (Docket No. 687 at 1.) This means that—separate and apart from the transfers of assets out of, and away from, HFP that occurred in 2009—the Debtor has directed, or otherwise permitted, the Fund Counterparties to engage in acts that have left these once marque investment funds with literally *no* assets that can be used to pay Claimant.  All such actions and omissions by the Debtor were performed with either the specific intent to prevent or frustrate Claimant's ability to recover the amounts owed under the Warehouse Agreements, or a wanton and reckless disregard of Claimant's rights to those amounts. Such actions and omissions constitute breaches of the Debtor's duty of good faith and fair dealing under the Warehouse Agreements.

**B.     The State Court Action and the Debtor's Efforts to Avoid Paying Claimant**

17.     On February 24, 2009, Claimant filed a complaint in the Supreme Court of the State of New York (the "**State Court**") against the Debtor and the Fund Counterparties.  With knowledge of Claimant's lawsuit, the Debtor exercised its control over the Fund Counterparties to ensure they would not meet their obligations and to impede Claimant's ability to recover the

amounts owed by those entities. (*Id.* ¶¶ 112, 114.) Rather than paying Claimant what it was owed, and as discussed above, the Debtor orchestrated an extensive multi-part strategy to delay resolution of Claimant's claims for as long as possible. As a result, the Debtor further interfered with Claimant's contractual rights, thereby breaching the covenants of good faith and fair dealing inherent in the Warehouse Agreements. (*Id.*)

18.     By this time, the Fund Counterparties and SOHC's alter ego, HFP, had become insolvent, although they still owned significant assets. (*Id.* ¶ 108.) Nonetheless, the Debtor failed to act in good faith to cause HFP to satisfy the debts, as much as possible, then owed to Claimant. Instead, the Debtor caused HFP to make additional improper and fraudulent asset transfers, deliberately kept the Fund Counterparties undercapitalized, and allowed all assets of any value to be drained from the Fund Counterparties—acts which not only impaired Claimant's ability to recover anything from the Fund Counterparties, but precluded it altogether. (*Id.* ¶ 111.) In March 2009, conscious that Claimant had commenced an action against Highland a few weeks earlier, and in breach of their continuing duty of good faith and fair dealing, and with actual fraudulent intent, the Debtor and HFP caused asset transfers of millions of dollars of assets to the Debtor, Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., and Highland Credit Opportunities CDO, L.P. (now Highland Multi Strategy Credit Fund, L.P.) (collectively, the "**Affiliated Transferee Defendants**"), among others, thereby further reducing Highland's abilities to meet their obligations to Claimant. (*Id.* ¶¶ 111, 113.) The Debtor and its principals exercised domination over the Fund Counterparties to improperly transfer substantial assets from the Fund Counterparties and HFP for their own personal gain, <u>i.e.</u>, solely and improperly to protect and enhance the value of the Debtor and its principals by wrongful and improper means. In the

9

process, the Debtor and its principals made it impossible for the Fund Counterparties to pay Claimant the losses that they and the Debtor had agreed they would pay under the Warehouse Agreements. (*Id.* ¶¶ 112-114.)

19. As Claimant learned about Highland's conduct through discovery, Claimant amended its complaint to assert additional claims and name additional Highland entities, including HFP, the Affiliated Transferee Defendants, and Strand Advisors, Inc. As amended and stated in its Second Amended Complaint (attached hereto as Exhibit A) in the State Court Action, filed on May 11, 2011, Claimant's claims include breach of contract claims directly against the Fund Counterparties, as well as claims for fraudulent inducement, breach of the duty of good faith and fair dealing, fraudulent conveyance, tortious interference, and declaratory judgments for alter ego liability against HFP and general partner liability against Strand Advisors, Inc. The Debtor subsequently brought counterclaims against Claimant for breach of contract and unjust enrichment. (*See* Ex. B, Decision at 35-37.)

20. The procedural history of the State Court Action is complex. The Debtor and its affiliates and Claimant filed, and the State Court ruled on, four sets of motions to dismiss. The Debtor and its affiliates then filed two sets of summary judgment motions, which led to a series of complex rulings by the State Court in 2017. The parties filed various interlocutory appeals of the State Court's rulings on the motions to dismiss and for summary judgment. Those appeals were heard by the Appellate Division for the First Judicial Department in the County of New York, with the Appellate Division issuing five decisions over this suit's protracted history (some of which are still subject to further appellate rights).

21. Also included in the Appellate Division's decisions was an order arising from an appeal of the State Court's ruling on Claimant's motion to restrain Defendants Highland Credit

Strategies Master Fund, L.P. and Highland Crusader Partners, L.P. from disposing of property received through the fraudulent transfers orchestrated by the Debtor. Claimant showed it had a likelihood of success on the merits of its fraudulent transfer claims, and the Appellate Division enjoined both Highland entities from disposing of their assets. Ultimately, these injunctions resulted in partial settlements between Claimant and Highland Credit Strategies Master Fund, L.P. and Highland Crusader Partners, L.P.

22.     By early 2018, more than nine years after Claimant first filed suit, the parties were finally ready to proceed to trial. Due to a jury waiver clause in the Warehouse Agreements, however, and after related pre-trial briefing, the State Court bifurcated Claimant's claims into two distinct phases for trial: Phase I, consisting of a bench trial on Claimant's claims against the Fund Counterparties for breach of the Cash Warehouse and Synthetic Warehouse Agreements, as well as the Debtor's counterclaims; and Phase II, consisting of a jury trial on Claimant's remaining claims against all remaining Highland entities, including the Debtor.[3]  (Ex. B, Decision at 2 n.1, 38.)

23.     The State Court presided over a thirteen-day bench trial for Phase I from July 9 through July 27, 2018. (*Id.* at 1.) On November 14, 2019, the State Court entered a Decision and Order on Phase I (attached hereto as Exhibit B), ruling in favor of Claimant on almost every issue presented in Phase I. In particular, the court found the Fund Counterparties liable to Claimant for breach of the Cash Warehouse and Synthetic Warehouse Agreements, found no liability on the part of Claimant for either of the Debtor's counterclaims, and rejected almost every one of the Debtor's offset arguments with the only remaining issue (affecting approximately $70,500,000) to

---

[3]     Remaining claims are to be tried to a jury, with the court deciding liability as to the breach of the implied covenant of good faith and fair dealing claim and the jury deciding all remaining issues.

App. 2318

be determined after Phase II. (*Id.* at 39.) An Entry of Judgment on Phase I was entered on February 10, 2020. Under that Phase I final judgment, Claimant is entitled to $1,039,957,799.44, consisting of $519,374,149.00 in damages and $520,583,650.44 in pre-judgment interest as of January 22, 2020, with additional interest of $128,065 having accrued daily until the Entry of Judgment.

24.     The next step in the State Court Action is Phase II of the trial, where Claimant's remaining claims against not only the Debtor, but also against other Highland affiliates are to be tried to a jury, with the court deciding liability as to the breach of the implied covenant of good faith and fair dealing claim and the jury deciding all remaining claims. (*Id.* at 2 n.1, 38.) The claims to be tried in Phase II include claims for breach of the implied covenant of good faith and fair dealing, fraudulent conveyances, and alter-ego liability. The specific amounts the two non-Debtor affiliates owe to Claimant for their breach of the Warehouse Agreements are now set forth and embodied in the final $1 billion judgment from Phase I. And Claimant has stated claims against the Debtor—which was also a party to the same contract and exercised complete control over the two liable affiliates—under which Claimant is entitled to damages that are at least as much as the Phase I judgment amount. Claimant will seek damages for the Debtor's various breaches of the implied covenant as well as its specific role in the fraudulent transfer scheme, and pre-judgment interest and attorneys' fees where available. In addition, Claimant will seek punitive damages against the Debtor for its role in orchestrating the extended efforts to prevent Claimant from collecting the amounts owed under the Warehouse Agreements.

25.     Currently, Phase II of the State Court Action is stayed against the Debtor by the automatic stay imposed pursuant to section 362 of the Bankruptcy Code when the Debtor commenced this Chapter 11 Case.

26.     Claimant hereby asserts a claim, pending litigation of Phase II, for damages arising from the Debtor's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP, additional interest, further damages (including punitive damages), and attorneys' fees that may be awarded by any court at the conclusion of Phase II.

## Reservation of Rights

27.     Claimant does not waive or release, and expressly reserves, all rights and remedies at law or in equity that it has or may have against the Debtor, the Fund Counterparties, Strand Advisors, Inc., other non-Debtor Highland Defendants, or any other Debtor affiliate, subsidiary, person, or entity.

28.     Claimant expressly reserves all of its rights to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for fraudulent inducement, breach of contract, tortious interference with contractual relations, fraudulent conveyances, or alter ego recovery.  Claimant further reserves all rights to amend, modify, supplement, reclassify, or otherwise revise its Proof of Claim at any time and in any respect, including, without limitation, as necessary or appropriate to amend, quantify or correct amounts, to provide additional detail regarding the claims set forth herein, to assert additional grounds for any of the claims, to seek reconsideration under section 502(j) of the Bankruptcy Code or otherwise of any disallowance of any amounts claimed hereunder, or to reflect any and all additional claims of whatever kind or nature that Claimant has or may have against the Debtor.

29.     To the extent any payment to Claimant based on this Proof of Claim, or any portion

thereof, is clawed back from Claimant, avoided, or set aside, for any reason whatsoever, or Claim-

ant is required to disgorge any such payment, or any portion thereof, Claimant hereby reserves its

rights to amend this Proof of Claim accordingly.

30.     The execution and filing of this Proof of Claim is not intended as, nor should it be

construed as or deemed to be any of the following: (i) a waiver of the right to seek withdrawal of

the reference, or to otherwise challenge the jurisdiction of this Court, with respect to the subject

matter of the claims asserted herein, any objection or other proceeding commenced with respect

thereto, or any other action or proceeding commenced in this Chapter 11 Case against or otherwise

involving Claimant; (ii) an admission that any matter is a core matter for purposes of 28 U.S.C. §

157(b) or is a matter as to which this Court can enter a final order or judgment consistent with

Article III of the United States Constitution; (iii) a waiver of the right to *de novo* review by the

district court of any order or judgment for which this Court, absent Claimant's consent, lacks au-

thority to enter a final order or judgment; (iv) a consent to the entry by this Court of a final order

or judgment with respect to the claims asserted herein or any other matter; (v) a waiver of Claim-

ant's right to a jury trial against the Debtor, as applicable, or waiver of Claimant's right to a jury

trial against any of the non-Debtor Defendants; (vi) a waiver or release of the claims or rights of

Claimant against any other entity or person that may be liable for all or any part of the claims or

any matters related to the claims asserted herein; (vii) a waiver of any rights and remedies Claimant

has or may have under the Cash Warehouse and Synthetic Warehouse Agreements, Engagement

Letter, or any other contract, whether mentioned in this Proof of Claim or not; (viii) a waiver of

Claimant's contractual right to seek to have these or any other claims settled by binding arbitration;

(ix) a waiver of any right related to the confirmation of any plan of reorganization proposed in this

14

Chapter 11 Case, or any other insolvency-related proceeding that may be commenced, either in the United States or abroad, by or against the Debtor, or any non-Debtor affiliate; (x) a waiver or agreement granting any party relief; or (xi) an election of remedies.

31.     Neither this Proof of Claim nor any of its contents shall be deemed or construed as an acknowledgment or admission of any liability or obligation on the part of Claimant.  Claimant specifically reserves all of its defenses and rights, procedural and substantive, including, without limitation, its rights with respect to any claim that may be asserted against Claimant by the Debtor, the Fund Counterparties, or any affiliate of the Debtor, and its rights to enforce the Cash Warehouse or Synthetic Warehouse Agreements, Engagement Letter, or any other contract.

### Right of Setoff and Recoupment

32.     Claimant reserves all rights of setoff and recoupment that it may have.  To the extent the Debtor or any non-Debtor affiliate asserts any claim against Claimant, Claimant shall have a secured claim to the extent of its right of setoff under section 553 of the Bankruptcy Code or right of recoupment against such claim with respect to the claims asserted herein and any amendments thereto.

### Notice

33.     Copies of all notices and communications concerning this Proof of Claim should be sent to:

> UBS Securities LLC
> 1285 Avenue of the Americas
> New York, NY 10019
> Attn:  Suzanne Forster
> Telephone: (212) 713-3432
> Email: suzanne.forster@ubs.com

> With a copy to:

15

App. 2322

John Lantz
UBS Securities LLC
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 713-1371
Email: john.lantz@ubs.com

Andrew Clubok
Sarah Tomkowiak
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

Jeffrey E. Bjork
Kimberly A. Posin
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100
Los Angeles, California 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

Asif Attarwala
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Ste. 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Email: asif.attarwala@lw.com

App. 2323

# Exhibit 3
## Proof of Claim No. 191

Claim #191 Date Filed: 6/26/2020

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: __Northern__ District of __Texas__
(State)

Case number ___19-34054___

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---------|-------------------|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | UBS AG, London Branch<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |
| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>See summary page<br><br>Contact phone  212-713-3432<br>Contact email  suzanne.forster@ubs.com<br>**(see summary page for notice party information)**<br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | **Where should payments to the creditor be sent?** (if different)<br><br><br><br>Contact phone _____<br>Contact email _____ |
| 4. | **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____<br>MM / DD / YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No<br>☑ Yes. Who made the earlier filing?  UBS Securities LLC - this is a joint litigation claim, see |

---

Official Form 410          **Proof of Claim**

1934054200626000000000003

**Part 2:**   Give Information About the Claim as of the Date the Case Was Filed

6. **Do you have any number you use to identify the debtor?**
☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**    $ <u>1,039,957,799.40</u> . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>Litigation - See attached addendum</u>

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410         **Proof of Claim**

1934054200626000000000003

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| | |
|---|---|
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |

---

**Part 3:  Sign Below**

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  _06/26/2020_<br>                     MM / DD / YYYY<br><br>  _/s/Asif Attarwala_<br>    Signature<br><br>Print the name of the person who is completing and signing this claim:<br><br>Name  __Asif Attarwala__<br>         First name            Middle name         Last name<br><br>Title  __Associate__<br><br>Company  __Latham and Watkins LLP__<br>        Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address  330 North Wabash Ave., Suite 2800, Chicago, IL, 60611<br><br>Contact phone  __312-876-7667__        Email asif.attarwala@lw.com |

1934054200626000000000003

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| UBS AG, London Branch | Yes, supporting documentation successfully uploaded |
| UBS Securities LLC, Attn: Suzanne Forster | **Related Document Statement:** |
| 1285 Avenue of the Americas | |
| | **Has Related Claim:** |
| New York, New York, 10019 | Yes |
| **Phone:** | **Related Claim Filed By:** |
| 212-713-3432 | UBS Securities LLC - this is a joint litigation claim, see attached addendum |
| **Phone 2:** | |
| **Fax:** | **Filing Party:** |
| | Authorized agent |
| **Email:** | |
| suzanne.forster@ubs.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| Latham and Watkins LLP |
| Andrew Clubok |
| 555 Eleventh Street, NW |
| |
| Washington, D.C., 2004-1304 |
| **Phone:** |
| 2026373323 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| andrew.clubok@lw.com |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| | | |
|---|---|---|
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| Litigation - See attached addendum | No | |

| | |
|---|---|
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| 1,039,957,799.40 | Yes |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |

| |
|---|
| **Submitted By:** |
| Asif Attarwala on 26-Jun-2020 5:17:47 p.m. Eastern Time |
| **Title:** |
| Associate |
| **Company:** |
| Latham and Watkins LLP |

**Optional Signature Address:**

Asif Attarwala

330 North Wabash Ave.

Suite 2800

Chicago, IL, 60611

**Telephone Number:**

312-876-7667

**Email:**

asif.attarwala@lw.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 (SGJ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ADDENDUM TO PROOF OF CLAIM FILED BY
UBS AG, LONDON BRANCH**

1.      UBS AG, London Branch hereby submits this addendum to its proof of claim (together, the "**Proof of Claim**") against Highland Capital Management, L.P. (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

2.      UBS AG, London Branch and UBS Securities LLC (together, the "**Claimant**" or "**UBS**") each have claims against the Debtor and each is filing a proof of claim in this Chapter 11 Case.  Because their claims arise from the same set of factual events, including the same failed transaction, misconduct involving the Debtor and its affiliates, and subsequent litigation, the UBS claims overlap and their proof of claim forms and addendums are substantially the same.

3.      This addendum is attached to, incorporated into, and constitutes an integral part of Claimant's Proof of Claim against the Debtor.  Claimant files this Proof of Claim under compulsion of the *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 488], as extended by the *Joint Stipulation and Order Extending Bar Date* [Docket No. 547] and modified by the *Order Denying UBS's Motion for Relief*

---

[1]      The Debtor's last four digits of its taxpayer identification number are 6725.  The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

*from the Automatic Stay to Proceed with State Court Action* [Docket No. 765], solely for the purpose of asserting Claimant's claims against the Debtor, as more particularly described and subject to any limitations set forth below.

### **Factual Background**

A.     **The Knox Transaction**

2.     Claimant's claims arise out of a failed transaction dating back thirteen years ago and the state court action (the "**State Court Action**") that followed between Claimant, the Debtor, Highland CDO Opportunity Master Fund, L.P. ("**CDO Fund**") and Highland Special Opportunities Holding Company ("**SOHC**") (together with CDO Fund, the "**Fund Counterparties**," and the Fund Parties and the Debtor collectively, "**Highland**"), among other parties.[2]

3.     In early 2007, Claimant and Highland agreed to pursue a complex form of securitization transaction known as a "CLO Squared" (the "**Knox Transaction**"). (Ex. B, Decision at 2.) The purpose of the Knox Transaction was to acquire and securitize a series of collateralized loan obligation ("**CLO**") securities and credit default swap ("**CDS**") assets (the "**Knox Assets**"). To that end, the Debtor agreed to be the "Servicer" of the Knox Transaction, and as such was responsible for identifying the specific CLO and CDS assets to be securitized. Claimant agreed to finance the acquisition of the CLO and CDS assets identified by Highland. Claimant would then hold, or "warehouse," the assets until the securitization was completed (the "**Knox Warehouse**"). Under this arrangement, Claimant financed the acquisition of $818 million in Knox Assets. (*Id.*)

---

[2]     The procedural history of the State Court Action is incorporated by reference, but is voluminous. The operative Second Amended Complaint and Phase I Decision and Order are attached as **Exhibit A** and **Exhibit B**, respectively. Additional pleadings and orders can be found on the State Court docket for Index No. 650097/2009 or by contacting Claimant's counsel. Claimant reserves the right to file a copy of additional pleadings or orders with this Court.

4.    The parties' first attempt at the Knox Transaction was not completed successfully and the relevant agreements expired in August 2007 without the contemplated securitization having occurred.  (*Id.* at 3.)  Rather than end their relationship, however, Highland and Claimant continued to consider the possibility of pursuing the contemplated securitization in 2008 under restructured versions of the prior agreements.  Highland and Claimant always understood that—if the securitization were not successful—the Fund Counterparties would be obligated to pay Claimant for 100% of the losses on any CLO or CDS assets that been acquired and warehoused for the securitization.  In order to convince Claimant to agree to enter restructured versions of those agreements and to finance the acquisition of the CLO and CDS assets, Highland assured Claimant that the Fund Counterparties had sufficient assets to cover any losses.  It did so by providing Claimant with false, incomplete, and otherwise misleading information concerning the Fund Counterparties' finances and assets.  (Ex. A, Compl. ¶¶ 47-61.)

**5.**    In addition, Claimant specifically conditioned its agreement to enter the restructured agreements on the Fund Counterparties' ability to post an additional $70 million in cash and securities as collateral (the "**Initial Restructuring Collateral**"), in which Claimant would hold a security interest.  (*Id.* ¶¶ 56-59; Ex. B, Decision at 3.)  Highland assembled $70 million in such Initial Restructuring Collateral.  But what Highland did not tell Claimant—and what is now clear was omitted on purpose—was that the Fund Counterparties did not own all of the Initial Restructuring Collateral they were expected to post.  Instead, to meet this obligation, the Debtor exercised its control over other Highland affiliates, transferring and redirecting assets from such other entities that it controlled to assemble the Initial Restructuring Collateral.  (Ex. A, Compl. ¶¶ 56-59.)

3

6.      Similarly, while negotiating the restructured transaction, Highland provided Claim-
ant with financial reports and statements that contained materially false and misleading infor-
mation and omissions concerning the financial condition of the Fund Counterparties.  (*Id.* ¶¶ 47-
52.)  The Debtor itself had prepared these financial statements and knew they contained material
misstatements.  (*Id.* ¶¶ 48-50, 54.)  Among other things, Highland misrepresented the amount of
cash held by CDO Fund.  (*Id.* ¶ 52.)  Highland also failed to disclose that many of the assets on
the Fund Counterparties' financial statements already had been encumbered.  (*Id.* ¶¶ 51, 53.)  These
misrepresentations not only evince a specific intent by Highland to induce Claimant into entering
the restructured agreements, but a longstanding willingness to prevent Claimant from ever recov-
ering the amounts owed under the parties' proposed agreements in the event the Knox Assets suf-
fered any losses.  In addition, these events show the Debtor's singular control over—and ability to
move—assets from one Highland affiliate to another at will.

7.      Based on Highland's material misstatements and omissions, Claimant agreed to
pursue the restructured transaction and once more attempt the securitization, and the parties exe-
cuted three new written agreements: an Engagement Letter, a Cash Warehouse Agreement, and a
Synthetic Warehouse Agreement (collectively, the "**Warehouse Agreements**").  (*See* Ex. B, De-
cision at 3.)  The Engagement Letter was executed by Claimant and the Debtor; the Fund Coun-
terparties were not parties to the Engagement Letter.  (Ex. A, Compl. ¶ 62.)  The Cash Warehouse
and Synthetic Warehouse Agreements were executed by Claimant and the Debtor, along with the
Fund Counterparties.  (*Id.* ¶¶ 64-65.)

8.      As described above, Claimant agreed to finance the acquisition of the CLO and
CDS assets that the parties planned to securitize.  In so doing, the key risk Claimant faced was the
possibility that the Knox Assets would lose value while securitization was pending.  To address

4

this risk, Claimant and the Debtor agreed in the Engagement Letter that the Fund Counterparties would bear this risk. Notably, at the time, the Debtor was the Investment Manager to the Fund Counterparties under agreements that gave the Debtor total control over those entities. (Ex. A, Compl. ¶¶ 24, 26.)

9.     The Warehouse Agreements reiterated that the Fund Counterparties (as controlled by the Debtor) would bear the risk, specifying that if the Knox Assets lost value while securitization was pending, the Fund Counterparties "will in aggregate bear 100% of the risk" for the Knox Assets—with CDO Fund bearing 51% of any losses and SOHC bearing the remaining 49%.

10.    To further protect Claimant in the event that the Knox Assets lost value, the Warehouse Agreements provided for recurring measurements of mark-to-market losses on all assets in the Knox Warehouse and required the Fund Counterparties to post collateral in the event the Knox Assets lost a set amount of value. Specifically, the parties agreed that the Fund Counterparties would post an additional $10 million in collateral for each $100 million in losses to the overall value of the Knox Assets. (Ex. B, Decision at 4.)

11.    In September and October 2008, amid the global economic recession, the value of the Knox Assets dropped by $100 million, twice. Thus, Claimant twice exercised its contractual right to demand additional collateral. And twice Highland posted the required collateral. (*Id.*) Although the Warehouse Agreements specified that it was the Fund Counterparties who would post collateral, the Debtor moved assets around from other entities it controlled to make the first two collateral calls (without disclosing this practice to Claimant). (Ex. A, Compl. ¶ 79.) On or about November 7, 2008, Claimant issued a third margin call, because the value of the Knox Assets suffered additional losses of $200 million (bringing the aggregate losses to over $400 million).

(Ex. B, Decision at 4.)  This time, Highland refused to provide the additional collateral required under the Warehouse Agreements.

12.     Highland's default on Claimant's third margin call triggered a termination event under the Warehouse Agreements.  (*Id.*)  On December 5, 2008, Claimant gave Highland formal notice of default and demanded the Fund Counterparties pay Claimant for 100% of the losses incurred on the Knox Assets—which had, by then, grown to over $520 million.

13.     There is no question that the Debtor knew the Fund Counterparties were liable for the losses under the Warehouse Agreements.  Indeed, the Highland officer who executed the Warehouse Agreements admitted under oath that, "as of the end of the year 2008," Highland knew that the Fund Counterparties owed Claimant "hundreds of millions of dollars in connection with the Knox Warehouse Agreements."  (Travers Dep. at 261:8-20).)  But rather than paying Claimant what it was owed, the Debtor, with Mr. Dondero at the helm, "devised a strategy to delay the resolution of that obligation [to pay Claimant] for as long as possible." (*Id*.)  To that end, Highland devised and subsequently deployed a multifaceted strategy—one that would last for many years thereafter—to intentionally frustrate and prevent Claimant from recovering any of the amounts that both the Debtor and the Fund Counterparties knew were rightfully owed to Claimant under the Warehouse Agreements.

14.     First, the Debtor directed the Fund Counterparties to withhold any payment to Claimant—a position that the Fund Counterparties maintained (again, under the specific direction of the Debtor) for more than a decade.  (*See id.*)  The Debtor did so not only with the specific knowledge that the Fund Counterparties owed hundreds of millions of dollars to Claimant for the losses on the Knox Assets, but with the knowledge that Claimant would come seeking payment

for such losses and, in particular, to look toward any and all collateral owned by the Fund Coun-terparties as one source of payment.  As one of Highland's officers stated an internal email to Mr. Dondero in an internal email dated January 16, 2009: "[UBS] is going to be calling [] today asking for all additional collateral that cdo and sohc have left to cover the obligation left by the knox transaction."  But rather than turning over the collateral in question to Claimant or, at the very least, securing such assets so that they could be used to pay Claimant, the Debtor directed the Fund Counterparties to withhold such assets and payments from Claimant:  "[T]hey can see us in court for their additional collateral."  True to that promise, even after Claimant filed suit and laid out the amounts due under the contracts, the Debtor forced the Fund Counterparties to launch an affirma-tive, multi-year campaign—one which would consume much of the cash and assets belonging to the Fund Counterparties themselves—to stave off  any payment from the Fund Counterparties to force Claimant to try to recover such claims through litigation and, once in litigation, devising knowingly baseless defenses and arguments for the Fund Counterparties to assert in such litigation.

15.    On top of directing the Fund Counterparties to withhold payment and force Claim-ant to litigate for amounts the Debtor already knew they rightfully owed to Claimant, the Debtor undertook a litany of other actions to ensure that, even if Claimant were successful in the litigation it had been forced to initiate against the Fund Counterparties, it would not be able to collect any judgment arising out of the litigation.  Such actions included, but were not limited to, a series of fraudulent transfers out of, and away from, an alter ego of SOHC, Highland Financial Partners, L.P. ("**HFP**").  (Ex. A, Compl. ¶ 109.)  These internal transfers of funds—all overseen by James Dondero, the Debtor's founder and president—were designed to prevent Claimant from ever col-lecting the millions of dollars it was owed under the Warehouse Agreements.

7

16.    In addition to such fraudulent transfers, the Debtor also took steps after the lawsuit was filed to ensure that no additional value would be transferred **to** the Fund Counterparties— deliberately taking steps to keep both SOHC and CDO Fund undercapitalized.  Not only did the Debtor prevent additional value from being transferred to the Fund Counterparties, it is clear that the Debtor also failed to ensure that the Fund Counterparties retained assets that could be used to pay any such judgment.  Quite to the contrary, it is now clear that any and all assets of any value that once belonged to the Fund Counterparties have, in one way or another, been transferred away, drained, or otherwise wasted by the Fund Counterparties, the Debtor itself, or the Debtor's affiliates—all at the Debtor's direction.  Indeed, in a recent filing before this Court, the Debtor recently disclosed that both of the Fund Counterparties are completely "insolvent."  (Docket No. 687 at 1.) This means that—separate and apart from the transfers of assets out of, and away from, HFP that occurred in 2009—the Debtor has directed, or otherwise permitted, the Fund Counterparties to engage in acts that have left these once marque investment funds with literally **no** assets that can be used to pay Claimant.  All such actions and omissions by the Debtor were performed with either the specific intent to prevent or frustrate Claimant's ability to recover the amounts owed under the Warehouse Agreements, or a wanton and reckless disregard of Claimant's rights to those amounts. Such actions and omissions constitute breaches of the Debtor's duty of good faith and fair dealing under the Warehouse Agreements.

**B.    The State Court Action and the Debtor's Efforts to Avoid Paying Claimant**

17.    On February 24, 2009, Claimant filed a complaint in the Supreme Court of the State of New York (the "**State Court**") against the Debtor and the Fund Counterparties.   With knowledge of Claimant's lawsuit, the Debtor exercised its control over the Fund Counterparties to ensure they would not meet their obligations and to impede Claimant's ability to recover the

8

amounts owed by those entities. (*Id.* ¶¶ 112, 114.) Rather than paying Claimant what it was owed, and as discussed above, the Debtor orchestrated an extensive multi-part strategy to delay resolution of Claimant's claims for as long as possible. As a result, the Debtor further interfered with Claimant's contractual rights, thereby breaching the covenants of good faith and fair dealing inherent in the Warehouse Agreements. (*Id.*)

18.    By this time, the Fund Counterparties and SOHC's alter ego, HFP, had become insolvent, although they still owned significant assets. (*Id.* ¶ 108.) Nonetheless, the Debtor failed to act in good faith to cause HFP to satisfy the debts, as much as possible, then owed to Claimant. Instead, the Debtor caused HFP to make additional improper and fraudulent asset transfers, deliberately kept the Fund Counterparties undercapitalized, and allowed all assets of any value to be drained from the Fund Counterparties—acts which not only impaired Claimant's ability to recover anything from the Fund Counterparties, but precluded it altogether. (*Id.* ¶ 111.) In March 2009, conscious that Claimant had commenced an action against Highland a few weeks earlier, and in breach of their continuing duty of good faith and fair dealing, and with actual fraudulent intent, the Debtor and HFP caused asset transfers of millions of dollars of assets to the Debtor,  Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., and Highland Credit Opportunities CDO, L.P. (now Highland Multi Strategy Credit Fund, L.P.) (collectively, the "**Affiliated Transferee Defendants**"), among others, thereby further reducing Highland's abilities to meet their obligations to Claimant. (*Id.* ¶¶ 111, 113.) The Debtor and its principals exercised domination over the Fund Counterparties to improperly transfer substantial assets from the Fund Counterparties and HFP for their own personal gain, <u>i.e.</u>, solely and improperly to protect and enhance the value of the Debtor and its principals by wrongful and improper means. In the

App. 2338

process, the Debtor and its principals made it impossible for the Fund Counterparties to pay Claimant the losses that they and the Debtor had agreed they would pay under the Warehouse Agreements. (*Id.* ¶¶ 112-114.)

19.     As Claimant learned about Highland's conduct through discovery, Claimant amended its complaint to assert additional claims and name additional Highland entities, including HFP, the Affiliated Transferee Defendants, and Strand Advisors, Inc. As amended and stated in its Second Amended Complaint (attached hereto as Exhibit A) in the State Court Action, filed on May 11, 2011, Claimant's claims include breach of contract claims directly against the Fund Counterparties, as well as claims for fraudulent inducement, breach of the duty of good faith and fair dealing, fraudulent conveyance, tortious interference, and declaratory judgments for alter ego liability against HFP and general partner liability against Strand Advisors, Inc. The Debtor subsequently brought counterclaims against Claimant for breach of contract and unjust enrichment. (*See* Ex. B, Decision at 35-37.)

20.     The procedural history of the State Court Action is complex. The Debtor and its affiliates and Claimant filed, and the State Court ruled on, four sets of motions to dismiss. The Debtor and its affiliates then filed two sets of summary judgment motions, which led to a series of complex rulings by the State Court in 2017. The parties filed various interlocutory appeals of the State Court's rulings on the motions to dismiss and for summary judgment. Those appeals were heard by the Appellate Division for the First Judicial Department in the County of New York, with the Appellate Division issuing five decisions over this suit's protracted history (some of which are still subject to further appellate rights).

21.     Also included in the Appellate Division's decisions was an order arising from an appeal of the State Court's ruling on Claimant's motion to restrain Defendants Highland Credit

Strategies Master Fund, L.P. and Highland Crusader Partners, L.P. from disposing of property received through the fraudulent transfers orchestrated by the Debtor. Claimant showed it had a likelihood of success on the merits of its fraudulent transfer claims, and the Appellate Division enjoined both Highland entities from disposing of their assets. Ultimately, these injunctions resulted in partial settlements between Claimant and Highland Credit Strategies Master Fund, L.P. and Highland Crusader Partners, L.P.

22.     By early 2018, more than nine years after Claimant first filed suit, the parties were finally ready to proceed to trial. Due to a jury waiver clause in the Warehouse Agreements, however, and after related pre-trial briefing, the State Court bifurcated Claimant's claims into two distinct phases for trial: Phase I, consisting of a bench trial on Claimant's claims against the Fund Counterparties for breach of the Cash Warehouse and Synthetic Warehouse Agreements, as well as the Debtor's counterclaims; and Phase II, consisting of a jury trial on Claimant's remaining claims against all remaining Highland entities, including the Debtor.[3] (Ex. B, Decision at 2 n.1, 38.)

23.     The State Court presided over a thirteen-day bench trial for Phase I from July 9 through July 27, 2018. (*Id.* at 1.) On November 14, 2019, the State Court entered a Decision and Order on Phase I (attached hereto as Exhibit B), ruling in favor of Claimant on almost every issue presented in Phase I. In particular, the court found the Fund Counterparties liable to Claimant for breach of the Cash Warehouse and Synthetic Warehouse Agreements, found no liability on the part of Claimant for either of the Debtor's counterclaims, and rejected almost every one of the Debtor's offset arguments with the only remaining issue (affecting approximately $70,500,000) to

---

[3]     Remaining claims are to be tried to a jury, with the court deciding liability as to the breach of the implied covenant of good faith and fair dealing claim and the jury deciding all remaining issues.

App. 2340

be determined after Phase II.  (*Id.* at 39.)  An Entry of Judgment on Phase I was entered on February

10, 2020.  Under that Phase I final judgment, Claimant is entitled to $1,039,957,799.44, consisting

of $519,374,149.00 in damages and $520,583,650.44 in pre-judgment interest as of January 22,

2020, with additional interest of $128,065 having accrued daily until the Entry of Judgment.

     24.     The next step in the State Court Action is Phase II of the trial, where Claimant's

remaining claims against not only the Debtor, but also against other Highland affiliates are to be

tried to a jury, with the court deciding liability as to the breach of the implied covenant of good

faith and fair dealing claim and the jury deciding all remaining claims.  (*Id.* at 2 n.1, 38.)  The

claims to be tried in Phase II include claims for breach of the implied covenant of good faith and

fair dealing, fraudulent conveyances, and alter-ego liability.  The specific amounts the two non-

Debtor affiliates owe to Claimant for their breach of the Warehouse Agreements are now set forth

and embodied in the final $1 billion judgment from Phase I.  And Claimant has stated claims

against the Debtor—which was also a party to the same contract and exercised complete control

over the two liable affiliates—under which Claimant is entitled to damages that are at least as

much as the Phase I judgment amount.   Claimant will seek damages for the Debtor's various

breaches of the implied covenant as well as its specific role in the fraudulent transfer scheme, and

pre-judgment interest and attorneys' fees where available.  In addition, Claimant will seek punitive

damages against the Debtor for its role in orchestrating the extended efforts to prevent Claimant

from collecting the amounts owed under the Warehouse Agreements.

     25.     Currently, Phase II of the State Court Action is stayed against the Debtor by the

automatic stay imposed pursuant to section 362 of the Bankruptcy Code when the Debtor com-

menced this Chapter 11 Case.

26.     Claimant hereby asserts a claim, pending litigation of Phase II, for damages arising

from the Debtor's breach of the implied covenant of good faith and fair dealing, its specific role

in directing the fraudulent transfers of assets involving HFP, additional interest, further damages

(including punitive damages), and attorneys' fees that may be awarded by any court at the conclu-

sion of Phase II.

## Reservation of Rights

27.     Claimant does not waive or release, and expressly reserves, all rights and remedies

at law or in equity that it has or may have against the Debtor, the Fund Counterparties, Strand

Advisors, Inc., other non-Debtor Highland Defendants, or any other Debtor affiliate, subsidiary,

person, or entity.

28.     Claimant expressly reserves all of its rights to assert any additional claims, de-

fenses, remedies, and causes of action, including without limitation, claims for fraudulent induce-

ment, breach of contract, tortious interference with contractual relations, fraudulent conveyances,

or alter ego recovery.  Claimant further reserves all rights to amend, modify, supplement, reclas-

sify, or otherwise revise its Proof of Claim at any time and in any respect, including, without

limitation, as necessary or appropriate to amend, quantify or correct amounts, to provide additional

detail regarding the claims set forth herein, to assert additional grounds for any of the claims, to

seek reconsideration under section 502(j) of the Bankruptcy Code or otherwise of any disallowance

of any amounts claimed hereunder, or to reflect any and all additional claims of whatever kind or

nature that Claimant has or may have against the Debtor.

App. 2342

29.     To the extent any payment to Claimant based on this Proof of Claim, or any portion thereof, is clawed back from Claimant, avoided, or set aside, for any reason whatsoever, or Claimant is required to disgorge any such payment, or any portion thereof, Claimant hereby reserves its rights to amend this Proof of Claim accordingly.

30.     The execution and filing of this Proof of Claim is not intended as, nor should it be construed as or deemed to be any of the following: (i) a waiver of the right to seek withdrawal of the reference, or to otherwise challenge the jurisdiction of this Court, with respect to the subject matter of the claims asserted herein, any objection or other proceeding commenced with respect thereto, or any other action or proceeding commenced in this Chapter 11 Case against or otherwise involving Claimant; (ii) an admission that any matter is a core matter for purposes of 28 U.S.C. § 157(b) or is a matter as to which this Court can enter a final order or judgment consistent with Article III of the United States Constitution; (iii) a waiver of the right to *de novo* review by the district court of any order or judgment for which this Court, absent Claimant's consent, lacks authority to enter a final order or judgment; (iv) a consent to the entry by this Court of a final order or judgment with respect to the claims asserted herein or any other matter; (v) a waiver of Claimant's right to a jury trial against the Debtor, as applicable, or waiver of Claimant's right to a jury trial against any of the non-Debtor Defendants; (vi) a waiver or release of the claims or rights of Claimant against any other entity or person that may be liable for all or any part of the claims or any matters related to the claims asserted herein; (vii) a waiver of any rights and remedies Claimant has or may have under the Cash Warehouse and Synthetic Warehouse Agreements, Engagement Letter, or any other contract, whether mentioned in this Proof of Claim or not; (viii) a waiver of Claimant's contractual right to seek to have these or any other claims settled by binding arbitration; (ix) a waiver of any right related to the confirmation of any plan of reorganization proposed in this

14

App. 2343

Chapter 11 Case, or any other insolvency-related proceeding that may be commenced, either in the United States or abroad, by or against the Debtor, or any non-Debtor affiliate; (x) a waiver or agreement granting any party relief; or (xi) an election of remedies.

31.      Neither this Proof of Claim nor any of its contents shall be deemed or construed as an acknowledgment or admission of any liability or obligation on the part of Claimant.  Claimant specifically reserves all of its defenses and rights, procedural and substantive, including, without limitation, its rights with respect to any claim that may be asserted against Claimant by the Debtor, the Fund Counterparties, or any affiliate of the Debtor, and its rights to enforce the Cash Warehouse or Synthetic Warehouse Agreements, Engagement Letter, or any other contract.

**<u>Right of Setoff and Recoupment</u>**

32.      Claimant reserves all rights of setoff and recoupment that it may have.  To the extent the Debtor or any non-Debtor affiliate asserts any claim against Claimant, Claimant shall have a secured claim to the extent of its right of setoff under section 553 of the Bankruptcy Code or right of recoupment against such claim with respect to the claims asserted herein and any amendments thereto.

**<u>Notice</u>**

33.      Copies of all notices and communications concerning this Proof of Claim should be sent to:

> UBS Securities LLC
> 1285 Avenue of the Americas
> New York, NY 10019
> Attn:  Suzanne Forster
> Telephone: (212) 713-3432
> Email: suzanne.forster@ubs.com
>
> With a copy to:

App. 2344

John Lantz
UBS Securities LLC
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 713-1371
Email: john.lantz@ubs.com

Andrew Clubok
Sarah Tomkowiak
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

Jeffrey E. Bjork
Kimberly A. Posin
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100
Los Angeles, California 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

Asif Attarwala
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Ste. 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Email: asif.attarwala@lw.com

16

# **Exhibit 4**

## **11/20/20 Hrg. Transcript (Excerpt Only)**

App. 2346

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                  )    Case No. 19-34054-sgj-11
In Re:                            )    Chapter 11
                                  )
HIGHLAND CAPITAL                  )    Dallas, Texas
MANAGEMENT, L.P.,                 )    Friday, November 20, 2020
                                  )    9:30 a.m. Docket
          Debtor.                 )
                                  )    - DEBTOR'S MOTION FOR PARTIAL
                                  )    SUMMARY JUDGMENT [1214]
                                  )    - REDEEMER COMMITTEE'S MOTION
                                  )    FOR PARTIAL SUMMARY JUDGMENT
                                  )    [1215, 1216]
                                  )    - UBS'S MOTION FOR TEMPORARY
                                  )    ALLOWANCE OF CLAIM FOR VOTING
                                  )    PURPOSES [1338]
_____)

                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                            13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Debtor:            Robert J. Feinstein
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For UBS Securities, LLC:   Andrew Clubok
                           Sarah A. Tomkowiak
                           LATHAM & WATKINS, LLP
                           555 Eleventh Street, NW,
                            Suite 1000
                           Washington, DC  20004
                           (202) 637-2200
```

Case 19-34054-sgj11 Doc 2200-4 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 3 of 9
Case 3:21-cv-00881-X Document 174-105 Filed 12/16/23 Page 67 of 73 PageID 19531

213

1    example, precluding damages relating to the $45 million that

2    HFP had in March 2009 or the $20-plus million that the CDO

3    Fund had in December 2009.

4        So I think that's the answer I got from Mr. Feinstein at

5    the end of oral argument.  But even if the Debtor was making

6    the request that the Court rule that, as a matter of law, UBS

7    cannot assert any claim against the Debtor except the claims

8    relating to the $61 million of transfers, I think that UBS has

9    shown, has put summary judgment evidence in the record that

10   there may be a fact issue here with regard to these funds.

11   They may be able to prove, have a potential theory here that

12   Highland breached the covenant of good faith and fair dealing

13   by somehow exercising control over the CDO Fund and HFP and

14   causing them to dissipate those assets and not pay them to

15   UBS.  There might be a theory there.

16       So I hope that is clear, that I'm not granting summary

17   judgment declaring that UBS is barred from asserting something

18   more than the $61 million of March 2009 transfers.

19       So that is my ruling on the motions for partial summary

20   judgment.  I'll turn now to the UBS Rule 3018(a) estimation

21   motion.  Once again, given the late hour, I'm going to

22   dispense with the flowery legal standards that apply to this

23   motion.  I reserve the right in my order to supplement with

24   more fulsome statements.

25       But I have decided that I should estimate UBS's claim for

Case 19-34054-sgj11 Doc 2200-4 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 4 of 9
Case 3:21-cv-00881-X Document 174-105 Filed 12/16/23 Page 68 of 73 PageID 19532

214

1   voting purposes at the following number: $94,761,076. Okay.

2   So here is my math for how I get there. Let's start with the

3   three transfers in March 2009 that have been alleged to be

4   fraudulent transfers or, you know, Highland caused to be made

5   in breach of its duty of good faith and fair dealing. And I'm

6   talking about, obviously, the Multi-Strat entities, you know,

7   the $25,782,988 that HFP transferred in March 2009, then there

8   was $17,778,566 transferred to the Debtor, and then Citibank

9   received $17,481,808.

10      So, as we've talked about, we've talked about $61,043,362.

11  Okay. So, obviously, I've ruled summary judgment that

12  Crusader -- transfers to Crusader and the transfer to Credit

13  Strategies are gone. They're off the table. So, but focusing

14  in on that $61 million, I start with the $25-plus million to

15  Multi-Strat. I am estimating a high chance of UBS winning on

16  that, a 90-percent chance. So, 90 percent of $25,783,300 --

17  what is the number? $25 million. I may have done my math

18  wrong. I've computed it equals $23,205,008, but I think I --

19  no, no, no, no. No, no, no. Let me back up. Just a minute.

20  Hang on. (Pause.) All right. I think what I meant to do is

21  calculate 90 percent of $25,782,988, and my math may be wrong.

22  I've got that equals $23,205,008, but I feel like I did

23  something wrong there. Someone can double-check my math

24  there. Can someone -- I've left my calculator back in

25  chambers. What's 90 percent of $25,783,343? Hello. You've

Case 19-34054-sgj11  Doc 2200-4  Filed 04/15/21   Entered 04/15/21 14:37:56   Page 5 of 9
Case 3:21-cv-00881-X   Document 174-105   Filed 12/16/23   Page 69 of 73   PageID 19533

215

1  got a calculator over there?

2          THE CLERK:  Yeah.  What was the number?

3          THE COURT:  Okay.

4          THE CLERK:  You said $25,783,4 --

5          THE COURT:  No, no, no.  I'm sorry.  That's where I

6  went wrong, I think.  The number is should have -- not --

7  that's where I went wrong.  I should have been using

8  $25,782,988.  And I have no idea where I got that $25,783,000

9  number.  So, 90 percent of $25,782,988.

10          MR. FEINSTEIN:  My calculator says that $23.2

11  million, Your Honor.

12          THE COURT:  Okay.  Well, I guess I was right.  Okay.

13          MR. FEINSTEIN:  You were right.

14          THE COURT:  Okay.  So I'm putting a 90 percent chance

15  of winning on that, so $23.2 million.

16      And then on the transfer to the Debtor, I'm using the

17  expert report, if you will, of I think his name is Mr. Dudney,

18  UBS's own expert, where he used $8 million.  He said you

19  should adjust that number to $8 million, if I was

20  understanding correctly, because of HFP, the transferor,

21  having some percentage ownership in that.  So if I use $8

22  million, that gets us up to $31.2 million.

23      Then, with regard to Citibank, the transfer to Citibank of

24  $17,481,808, I'm giving a 20 percent chance of success on that

25  one.  I just, again, feel in my gut, you know, in my

Case 19-34054-sgj11 Doc 2200-4 Filed 04/15/21   Entered 04/15/21 14:37:56   Page 6 of 9
Case 3:21-cv-00881-X   Document 174-105   Filed 12/16/23   Page 70 of 73   PageID 19534

216

1    discretion, looking at the summary judgment evidence, I just

2    feel in my gut there's going to be defenses to that.  So, 20

3    percent of that would be $3,555,713.

4         So that gets us up to roughly 31 -- excuse me, $34.76

5    million.  So, if you assume interest, pre-judgment interest, I

6    used $30 million there.  Again, that's imprecise.  But that

7    gets us up to $64.76 million.

8         Then what I did beyond that is, with regard to the summary

9    judgment evidence thrown out that maybe there was 40 -- $45

10   million on hand at HFP in March of 2009 -- I think we're

11   talking about UBS Exhibit 25 -- and then another $23 million

12   may have been on hand at the CDO Fund, at least in December

13   2009, that's about $68 million.  And I am just assuming that

14   there might be a credible argument made as to $10 million of

15   that.  And then I'll add $10 million of interest for all of

16   these years, of pre-judgment interest.

17        And then I've plugged in another $10 million for

18   attorneys' fees, because I believe there is the ability to get

19   attorneys' fees for actual fraudulent transfers.  And I'm

20   assuming that some of these, the ones to Highland and Multi-

21   Strat, there might be credible arguments of actual fraudulent

22   transfers.  And then I have been told, I think, by Mr. Clubok

23   that you might even get attorneys' fees for breach of covenant

24   of good faith and fair dealing.

25        So, $64.761 million plus $10 million plus another $10

Case 19-34054-sgj11 Doc 2200-4 Filed 04/15/21 Entered 04/15/21 14:37:56 Page 7 of 9
Case 3:21-cv-00881-X Document 174-105 Filed 12/16/23 Page 71 of 73 PageID 19535

217

1  million plus $10 million is $94.761 million.

2       Any questions?  I know that was probably hard to follow,

3  but any questions about that estimation?

4            MR. CLUBOK:  Your Honor, the only question, and maybe

5  it's too late and that's fine, I understand your analysis, but

6  the calculation of the amount that was transferred to

7  Highland, I think even Highland had agreed in their -- that

8  the number is higher.  I think that's out of context, and if

9  that's -- if there's no chance for us to clear that up, I

10 understand.  You've made your decision.  But I do want to say

11 that I think even Highland would agree that they received more

12 than $8 million.  The footnote from (inaudible) is a little

13 bit out of context, and, you know, there was -- if you look at

14 Highland's papers in terms of their response on 3018, I think

15 they have accepted our 17, roughly $17 million number.  I

16 think that is a -- it's complicated.  But anyway, I just raise

17 that, and maybe because you've done all this math, that won't

18 affect your view, Your Honor.  Totally understand that.  But I

19 do want to say that I think that Highland even acknowledges

20 that the amount received was $17 million.  That was

21 (inaudible) by Redeemer.  I think it's misunderstood.  You

22 know, our -- a footnote from our expert report that takes the

23 full expert report out of context.

24            THE COURT:  Well, that's going to be my ruling.  And,

25 again, you know, estimation --

Case 19-34054-sgj11 Doc 2200-4 Filed 04/15/21    Entered 04/15/21 14:37:56    Page 8 of 9
Case 3:21-cv-00881-X    Document 174-105    Filed 12/16/23    Page 72 of 73    PageID 19536

218

1          MR. CLUBOK:  Understood.

2          THE COURT:  -- is just that.  It's imprecise.  And I

3    may have cut you some slack in other areas where I'm sure

4    Highland and the Crusader Fund would vehemently contest what I

5    did.  You know, the 90-percent chance of winning I gave you on

6    Multi-Strat, you know, they said it should be a much lower

7    number, 30 percent or whatever.

8        So that is going to be the ruling.

9        Okay.  Here is what I would like to do.  I'm going to push

10   off work, is what I'm going to do.  I know that on the motions

11   for partial summary judgment Highland submitted a proposed

12   form of order that was pretty short and to the point.  I can't

13   remember seeing one for Redeemer.

14       Bankruptcy Rule 7056, Rule 56, they don't require,

15   obviously, findings of facts and conclusions of law.  They

16   just require some reasoning to support the Court's ruling.  So

17   I feel like I need something more fulsome than what was

18   uploaded by the Debtor, but it doesn't have to be extremely

19   beyond what the Court ruled.  I would, though, ask -- you

20   know, I don't know if a combined order granting both motions

21   with -- you all talk offline, Mr. Feinstein and Ms. Mascherin,

22   whether you want separate orders and judgments or you feel

23   like a combined one suffices.

24          MS. MASCHERIN:  Your Honor, I can say with respect to

25   the motions for summary judgment I think they could be dealt

Case 19-34054-sgj11 Doc 2200-4 Filed 04/15/21   Entered 04/15/21 14:37:56   Page 9 of 9
Case 3:21-cv-00881-X   Document 174-105   Filed 12/16/23   Page 73 of 73   PageID 19537

222

1        (Proceedings concluded at 4:12 p.m.)

2                          --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                        CERTIFICATE

19        I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
20 the proceedings in the above-entitled matter.

21    **/s/ Kathy Rehling**                    **11/25/2020**

22 _____        _____

23 Kathy Rehling, CETD-444                            Date
   Certified Electronic Court Transcriber

24

25