# Appendix Exhibit 157

Case 19-34054-sgj11   Doc 3783   Filed 05/11/23   Entered 05/11/23 21:59:01   Desc
Case 3:21-cv-00881-X   Document 180-15   Main Document   Filed 07/14/23   Page 2 of 75   PageID 20654

Docket #3783  Date Filed: 05/11/2023

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris *(admitted pro hac vice)*
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

REED SMITH LLP
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for Highland Capital Management, L.P.,*
*and the Highland Claimant Trust*

*Counsel for James P. Seery, Jr.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

**HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND**
**JAMES P. SEERY, JR.'S JOINT OPPOSITION TO HUNTER MOUNTAIN**
**INVESTMENT TRUST'S MOTION FOR LEAVE TO FILE**
**VERIFIED ADVERSARY PROCEEDING**

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.


1934054230511000000000014

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT FACTUAL BACKGROUND .............................................................. 5

    A.    The Gatekeeper Provision Was Adopted To Prevent Baseless Litigation............. 5

    B.    Dondero, Patrick, And HMIT Unsuccessfully Search For Allegations To Manufacture A Complaint. ...................................................................... 6

    C.    The Premise Of HMIT's Proposed Complaint—An Alleged *Quid Pro Quo* Between Seery And The Claims Purchasers—Is Demonstrably False................. 8

    D.    The Allegations Concerning MGM and Insider Trading Have No Basis In Fact................................................................................................. 9

    E.    HMIT's Allegations Concerning Seery's Alleged Relationships With The Claims Purchasers Are Unsupported And Provide No Foundation For The Purported Inferences. ....................................................................... 17

    F.    HMIT's "Insider Trading" Allegations Are Unsupported And Provide No Foundation For The Purported Inferences. ........................................... 19

    G.    A Rational Basis Exists For the Claims Purchases—Although Only the Claim Sellers Could Have Been Harmed in Any Event. .................................... 23

    H.    Seery's Compensation Structure Is Consistent With The Plan And The Trust Agreement, And Was The Product Of Arms'-Length Negotiations. ......... 25

RELEVANT PROCEDURAL HISTORY ............................................................. 29

LEGAL STANDARD ........................................................................................ 32

    A.    HMIT Misconstrues The "Colorability" Standard Established In The Gatekeeper Provision. ....................................................................... 32

    B.    Evidentiary Hearing ......................................................................... 36

    C.    Exculpation and Release ................................................................... 38

ARGUMENT ................................................................................................... 38

I.    HMIT LACKS STANDING TO BRING DERIVATIVE CLAIMS UNDER DELAWARE LAW. .................................................................................... 38

    A.    HMIT Lacks Standing To Bring Derivative Claims On Behalf Of The Trust. ............................................................................................. 39

    B.    HMIT Lacks Standing To Bring Derivative Claims On HCMLP's Behalf......... 40

    C.    HMIT Lacks Standing To Bring A "Double Derivative" Action. ...................... 42

II.    HMIT LACKS STANDING TO BRING DERIVATIVE CLAIMS UNDER FEDERAL BANKRUPTCY LAW. ............................................................... 42

    A.    Federal Law Does Not Confer Standing Prohibited By Delaware Law. ............. 43

B.     HMIT Cannot Meet The *Louisiana World* Standard Governing Derivative Actions By Creditors In Bankruptcy............................................................ 44

C.     HMIT Lacks Standing To Bring Derivative Claims Challenging Pre-Confirmation Conduct. ........................................................................ 47

III.   HMIT DID NOT SATISFY THE PROCEDURAL REQUIREMENTS TO BRING A DERIVATIVE ACTION. ............................................................ 48

A.     HMIT Failed To Include The Litigation Trust As A Party.................................. 48

B.     HMIT Failed To Make Any Demand To The Litigation Trustee And Fails To Plead Demand Futility With Particularity. ....................................... 49

C.     HMIT Cannot "Fairly And Adequately" Represent The Interests of Claimant Trust Beneficiaries. .................................................. 51

IV.   HMIT HAS NO DIRECT CLAIMS AGAINST THE HIGHLAND PARTIES. ............ 52

V.   HMIT'S PROPOSED COMPLAINT FAILS TO PLAUSIBLY ALLEGE ANY CLAIMS AGAINST THE PROPOSED DEFENDANTS. ............................................. 55

A.     HMIT Does Not Adequately Allege Any Breach Of Fiduciary Duties (Count I)............................................................................................ 55

B.     HMIT's Theories Of Secondary Liability Fail (Counts II and III). ..................... 58

C.     HMIT Seeks Remedies That Are Not Available As A Matter Of Law (Counts IV, V, and VI). ...................................................... 60

CONCLUSION.................................................................................................................... 62

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abraham v. Exxon Corp.*,
85 F.3d 1126 (5th Cir. 1996) ...........................................................................36

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019)............................................................................59

*Alexander v. Hedback*,
718 F.3d 762 (8th Cir. 2013) ...........................................................................37

*Am. Med. Hospice Care, LLC v. Azar*,
2020 WL 9814144 (W.D. Tex. Dec. 9, 2020) ..................................................36

*Anderson v. United States*,
520 F.2d 1027 (5th Cir. 1975) .........................................................................33

*Armstrong v. Capshaw, Goss & Bowers LLP*,
404 F.3d 933 (5th Cir. 2005) ...........................................................................53

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................55, 56, 60

*Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*,
2020 WL 2521557 (Del. Super. May 18, 2020) ..............................................55

*Barton v. Barbour*,
104 U.S. 126 (1881)....................................................................................3, 32

*BCC Merch. Sols., Inc. v. Jet Pay, LLC*,
129 F. Supp. 3d 440 (N.D. Tex. 2015) ............................................................48

*In re Beck Indus., Inc.*,
725 F.2d 880 (2d Cir. 1984).............................................................................37

*In re Bednar*,
2021 WL 1625399 (B.A.P. 10th Cir. Apr. 27, 2021) ......................................37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................55, 56, 60

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
563 F.2d 692 (5th Cir. 1977) .....................................................................60, 61

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*,
   247 F. Supp. 3d 377 (S.D.N.Y. 2017)........................................................................49

*Brooks v. United Dev. Funding III, L.P.*,
   2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ........................................................56

*Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*,
   539 B.R. 31 (S.D.N.Y. 2015)...................................................................................61

*Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)* ,
   66 F.3d 1436 (6th Cir. 1995) .......................................................................35, 45, 46

*CFTC v. Hunter Wise Commodities, LLC*,
   2020 WL 13413703 (S.D. Fla. Mar. 5, 2020)..........................................................33

*CML V, LLC v. Bax*,
   28 A.3d 1037 (Del. 2011) ..................................................................................39, 41

*CML V, LLC v. Bax*,
   6 A.3d 238 (Del. Ch. 2010)......................................................................................41

*Collins Cnty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*,
   915 F.2d 167 (5th Cir. 1990) ...................................................................................61

*Davis v. Comed, Inc.*,
   619 F.2d 588 (6th Cir. 1980) ...................................................................................51

*El Paso Pipeline GP Co. v. Brinckerhoff*,
   152 A.3d 1248 (Del. 2016) ..........................................................................41, 53, 54

*Energytec, Inc. v. Proctor*,
   2008 WL 4131257 (N.D. Tex. Aug. 29, 2008).................................................51, 52

*English v. Narang*,
   2019 WL 1300855 (Del. Ch. Mar. 20, 2019)..........................................................59

*Family Rehab., Inc. v. Azar*,
   886 F.3d 496 (5th Cir. 2018) ...................................................................................36

*Fin. Indus. Assoc. v. SEC*,
   2013 WL 11327680 (M.D. Fla. July 24, 2013) .......................................................33

*Fortune Prod. Co. v. Conoco, Inc.*,
   52 S.W.3d 671 (Tex. 2000).......................................................................................61

*Foster v. Aurzada (In re Foster)*,
   2023 WL 20872 (5th Cir. Jan. 3, 2023) ..................................................................36

*Gatz v. Ponsoldt*,
　2004 WL 3029868 (Del. Ch. Nov. 5, 2004) .................................................53

*Gerber v EPE Holdings, LLC*,
　2013 WL 209658 (Del. Ch. Jan. 18, 2013) .................................................54

*Gesoff v. IIC Indus., Inc.*,
　902 A.2d 1130 (Del. Ch. 2006) .................................................................62

*Gilbert v El Paso Co.*,
　1988 WL 124325 (Del. Ch. Nov. 21, 1988) .................................................56

*Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*,
　207 F. Supp. 2d 570 (N.D. Tex. 2002) .......................................................36

*Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*,
　716 F.3d 404 (6th Cir. 2013) .....................................................................37

*Green v. Wells Fargo Home Mtg.*,
　2016 WL 3746276 (S.D. Tex. June 7, 2016) .............................................61

*Hargrove v. WMC Mortg. Corp.*,
　2008 WL 4056292 (S.D. Tex. Aug. 29, 2008) ............................................60

*Harry v. Colvin*,
　2013 WL 12174300 (W.D. Tex. Nov. 6, 2013) ............................................36

*Hartsel v. Vanguard Grp., Inc.*,
　2011 WL 2421003 (Del. Ch. Jun. 15, 2011) ..........................................39, 40

*In re Highland Cap. Mgmt., L.P.*,
　2021 WL 2326350 (Bankr. N.D. Tex. June 7, 2021) .................................52

*Hill v. Keliher*,
　2022 WL 213978 (Tex. App. Jan. 25, 2022) .............................................59

*Howell v. Adler (In re Grodsky)*,
　2019 WL 2006020 (Bankr. E.D. La. Apr. 11, 2019) ..................................36

*In re Hunter Mt. Inv. Tr.*,
　No. 23-10376 (5th Cir. Apr. 12, 2023) .......................................................62

*Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*,
　2020 WL 967942 (Del. Ch. Feb. 28, 2020) ..............................................56

*Kamen v. Kemper Fin. Servs., Inc.*,
　500 U.S. 90 (1991) ...................................................................................43

*Kashani v. Fulton (In re Kashani)*,
    190 B.R. 875 (B.A.P. 9th Cir 1995) .................................................................................... 33, 36

*Klaassen v Allegro Dev. Corp.*,
    2013 WL 5967028 (Del. Ch. Nov. 7, 2013) ................................................................................ 56

*Klinek v. LuxeYard, Inc.*,
    596 S.W.3d 437 (Tex. App. – Houston [14th Dist.] 2020) ..................................................... 59

*La. World Expo. v. Fed. Ins. Co.*,
    858 F.2d 233 (5th Cir. 1988) ............................................................................................ *passim*

*Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*,
    732 F.3d 326 (5th Cir. 2013) ................................................................................................... 36

*Lambrecht v. O'Neal*,
    3 A.3d 277 (Del. 2010) ..................................................................................................... 42, 49

*Larson v. Foster (In re Foster)*,
    516 B.R. 537 (B.A.P. 8th Cir. 2014) ........................................................................................ 35

*Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*,
    2000 WL 1761020 (N.D. Ill. Nov. 30, 2000) .......................................................................... 34

*In re Lightsquared Inc.*,
    504 B.R. 321 (Bankr. S.D.N.Y. 2013) ................................................................................... 60

*In re Linton*,
    136 F.3d 544 (7th Cir. 1998) .................................................................................................. 37

*In re Lupo*,
    2014 WL 4653064 (B.A.P. 1st Cir. Sept. 17, 2014) ............................................................... 37

*Marucci Sports, L.L.C. v. NCAA*,
    751 F.3d 368 (5th Cir. 2014) ................................................................................................... 62

*McMillan .v Intercargo Corp.*,
    768 A.2d 492 (Del. Ch. 2000) ................................................................................................. 58

*Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*,
    912 F.3d 291 (5th Cir. 2019) ............................................................................................. 53, 54

*In re Nat'l Coll. Student Loan Tr. Litig.*,
    251 A.3d 116 (Del. Ch. 2020) .......................................................................................... 39, 40

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt.,
L.P.)*,
    48 F.4th 419 (5th Cir. 2022) ............................................................................................ *passim*

*Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*,
  225 B.R. 275 (Bankr. S.D.N.Y. 1998)...................................................................35, 46

*In re On-Site Fuel Serv., Inc.*,
  2020 WL 3703004 (Bankr. S.D. Miss. May 8, 2020)..................................................45

*Panaras v. Liquid Carbonic Indus. Corp.*,
  74 F.3d 786 (7th Cir. 1996) .....................................................................................36

*Pfeffer v. Redstone*,
  965 A.2d 676 (Del. 2009) .........................................................................................58

*Pike v. Texas EMC Mgmt., LLC*,
  610 S.W.3d 763 (Tex. 2020)......................................................................................54

*PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*,
  540 F.3d 892 (8th Cir. 2008) ............................................................................ *passim*

*Reed v. Cooper (In re Cooper)*,
  405 B.R. 801 (Bankr. N.D. Tex. 2009)..................................................................43, 45

*Reed v. Linehan (In re Soporex, Inc.)*,
  463 B.R. 344 (Bankr. N.D. Tex. 2011).......................................................................57

*Reyes v. Vanmatre*,
  2021 WL 5905557 (S.D. Tex. Dec. 13, 2021).............................................................36

*Richardson v. United States*,
  468 U.S. 317 (1984).................................................................................................36

*Sabhari v. Mukasey*,
  522 F.3d 842 (8th Cir. 2008) ....................................................................................36

*Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*,
  34 A.3d 1074 (Del. 2011) .............................................................................38, 42, 49

*Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commcn's, Inc.)*,
  2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011) ....................................41, 52, 53

*Schwab v. Oscar (In re SII Liquidation Co.)*,
  2012 WL 4327055 (Bankr. S.D. Ohio Sept. 20, 2012)................................................49

*SEC v. Cuban*,
  2013 WL 791405 (N.D. Tex. Mar. 5, 2013)...............................................................57

*SEC v. Mayhew*,
  121 F.3d 44 (2d Cir. 1997)........................................................................................57

*SEC v. N. Am. Clearing, Inc.*,
    656 F. App'x 969 (11th Cir. 2016) ................................................................37

*SED Holdings, LLC v. 3 Star Props., LLC*,
    2019 WL 13192236 (S.D. Tex. Sept. 11, 2019) ....................................60

*Sherer v. Sherer*,
    393 S.W.3d 480 (Tex. App. 2013).........................................................61

*Silver v. City of San Antonio*,
    2020 WL 3803922 (W.D. Tex. July 7, 2020) .......................................34

*Silver v. Perez*,
    2020 WL 3790489 (W.D. Tex. July 7, 2020) .......................................34

*In re Six Flags Ent. Corp. Deriv. Litig.*,
    2021 WL 1662466 (N.D. Tex. Apr. 28, 2021) ......................................50

*Smith v. Ayres*,
    977 F.2d 946 (5th Cir. 1992) ...............................................................51

*Stanley v. Gonzales*,
    476 F.3d 653 (9th Cir. 2007) ...............................................................36

*In re STN Enterps.*,
    779 F.2d 901 (2d Cir. 1985)..................................................................46

*Taylor v. Trevino*,
    569 F. Supp. 3d 414 (N.D. Tex. 2021) .................................................61

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996).................................................................59

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ...................................................................53

*Tow v. Amegy Bank, N.A.*,
    976 F. Supp. 2d 889 (S.D. Tex. 2013) ...........................................40, 41

*Trippodo v. SP Plus Corp.*,
    2021 WL 2446204 (S.D. Tex. June 15, 2021) ......................................36

*United Food & Comm. Workers Union v. Zuckerberg*,
    250 A.3d 862 (Del. Ch. 2020)..............................................................50

*In re VistaCare Grp., LLC*,
    678 F.3d 218 (3d Cir. 2012).......................................................... *passim*

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.),*
    714 F.3d 860 (5th Cir. 2013) ..........................................................47, 48

*In re World Mktg. Chi., LLC,*
    584 B.R. 737 (Bankr. N.D. Ill. 2018) ...............................................34

*In re WorldCom, Inc.,*
    351 B.R. 130 (Bankr. S.D.N.Y. 2006).............................................41

*Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power),*
    563 B.R. 614 (Bankr. W.D. Tex. 2016).............................................59

*Yowell v. Granite Operating Co.,*
    630 S.W.3d 566 (Tex. App. 2021).......................................................61

**Statutes**

6 Del. C. § 17-211(h) ..........................................................................41

6 Del. C. § 17-1002 .......................................................................40, 42

12 Del C. § 3803(b) .............................................................................55

12 Del C. § 3803(c) .............................................................................55

12 Del C. § 3816(b) .............................................................................39

11 U.S.C. § 541(a)(1) ...........................................................................53

28 U.S.C. § 2072(b) ............................................................................43

**Rules**

Fed. R. Bankr. P. 7012(b) ....................................................................49

Fed. R. Bankr. P. 7019 .........................................................................49

Fed. R. Bankr. P. 7023.1 ............................................................43, 50, 51

Fed. R. Civ. P. 12(b)(6)............................................................... *passim*

Fed. R. Civ. P. 12(b)(7)........................................................................49

Fed. R. Civ. P. 17(a) ...........................................................................48

Fed. R. Civ. P. 19(a)(1)........................................................................49

Fed. R. Civ. P. 23.1 ...................................................................43, 50, 51

Tex. R. Civ. P. 202............................................................................................................... *passim*

**Other Authorities**

Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of
    Chapter 11s*,
    29 Am. Bankr. Inst. J. 61 (July/Aug. 2010)............................................................56

Michael H. Whitaker, *Regulating Claims Trading in Chapter 11 Bankruptcies: A
    Proposal for Mandatory Disclosure*,
    3 Cornell J.L. & Pub. Pol'y 303 (1994)..................................................................56

Highland Capital Management, L.P. ("HCMLP" or, as applicable, the "Debtor"), the reorganized debtor in the above-referenced bankruptcy case, the Highland Claimant Trust (the "Trust"; together with HCMLP, "Highland"), and James P. Seery, Jr., HCMLP's Chief Executive Officer and the Claimant Trustee of the Trust ("Seery"; together with Highland, the "Highland Parties"), by and through their undersigned counsel, hereby file this opposition (the "Opposition") to *Hunter Mountain Investment Trust's* ("HMIT") *Emergency Motion for Leave to File Verified Adversary Petition* ("Initial Motion" or "Mot."; Docket No. 3699) and *Hunter Mountain Investment Trust's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplemental Motion" or "Supp. Mot."; Docket No. 3760; collectively, the "Motion"). In support of their Opposition, the Highland Parties state as follows:

## PRELIMINARY STATEMENT[1]

1.      This Motion is the latest attempt by James Dondero ("Dondero") to make good on his threat to "burn down the place." This iteration involves baseless and personal attacks against the Proposed Defendants,[2] harassing those individuals charged with maximizing value for creditors while (perversely) wasting Highland's resources. Dondero's demonstrated hostility to Highland's legitimate goals is precisely why this Court entered the Gatekeeper Provision at issue here, and the current Motion vividly illustrates the wisdom of installing that prophylaxis. HMIT's Motion should be denied.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] "Proposed Defendants" refers to, collectively, Seery, Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"; collectively with Muck, Jessup, and Farallon, the "Claims Purchasers"), and John Doe Defendant Nos. 1–10.

2.      HMIT's proposed Complaint ("Compl."; Docket No. 3760-1) is long on rhetoric,

unsupported conspiracy theories, and conclusory statements, but short on actual factual

allegations. For all its bluster, the Complaint rests entirely on the following assertions:

- On December 17, 2021, Dondero sent an unsolicited email to Seery regarding a potential acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). At the time, the Debtor owned MGM stock directly and managed an entity that owned, among numerous other assets, subordinated debt in other entities that owned MGM stock (Compl. ¶¶ 44–45);

- Seery purportedly communicated with principals at Farallon and Stonehill, entities with which Seery allegedly did "substantial business" more than a decade before he assumed his roles at Highland. (*Id.* ¶ 48.) The Complaint contains no allegations regarding **when** these communications supposedly occurred, but speculates that Seery provided "material non-public information" about MGM and vague "assurances of great profits" on Highland claims (*id.* ¶¶ 3, 13–14, 47, 50);

- In April 2021 (four months after Dondero's unsolicited email), Farallon and Stonehill purchased "approved unsecured claims" of Highland at a 65% discount to face value. Based on the "publicly projected" estimates in Debtor's November 30, 2020, Disclosure Statement—which the Complaint touts as the only public source of information regarding the claims' potential value—Farallon and Stonehill stood to earn at least an 18% return on those purchases (*id.* ¶¶ 3, 37, 42); and

- In August 2021 (eight months after Dondero's unsolicited email), Farallon and Stonehill became members of the Claimant Oversight Board ("COB"). Under the Court-approved Chapter 11 Plan, Seery earned a set base salary and a performance-based bonus. The Complaint speculates that negotiations over the latter component "were not arm's-length," but contains no allegations about the negotiation process or the terms of Seery's final compensation package (*id.* ¶¶ 4, 13, 54).

The remainder of the Complaint consists of rhetorical rehash of these basic contentions, *ad

hominem* attacks, or a self-serving (and utterly unsupported) claim by Dondero that a Farallon

principal confessed this purported scheme to Dondero.

3.      The Motion should be denied for three, independently sufficient reasons. ***First***, as

a threshold legal matter, HMIT, as a holder of unvested, contingent interests, lacks standing to

bring derivative claims on behalf of the Trust or HCMLP under applicable state law and the

Claimant Trust Agreement ("Trust Agreement" or "Trust Agmt."). HMIT cannot escape this reality by alternatively asserting its claims as nonexistent direct claims.

4.      **Second**, HMIT's claims are not "colorable" as that term is used in the Court-approved Plan and the Gatekeeper Provision included in this Court's Confirmation Order. (Plan Art. IX.F; Confirmation Order ¶¶ 72, 76, 81.) As the Confirmation Order expressly stated, the Gatekeeper Provision requires Dondero to make a threshold showing consistent with the (i) "the Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))," and (ii) "the notion of a prefiling injunction to deter vexatious litigants, that has been approved by Fifth Circuit." (*Id.* ¶¶ 76–81.) The Fifth Circuit confirmed as much when it rejected (in relevant part) Dondero's confirmation appeal, holding that the Gatekeeper Provision "screen[s] and prevent[s] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness." *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

5.      It is well-settled that "colorability" in this context requires HMIT to demonstrate ***more*** than the bare-bones Fed. R. Civ. P. 12(b)(6) "plausibility" standard. HMIT must demonstrate the "foundation" for its "*prima facie* case." *In re VistaCare Grp., LLC*, 678 F.3d 218, 232 (3d Cir. 2012). Accordingly, and contrary to HMIT's contention, evidentiary hearings are routinely conducted in this setting—particularly where (as here) the movant has larded its complaint with unsupported, conclusory assertions that cannot withstand even passing scrutiny and has attached hundreds of pages of exhibits and two self-serving declarations in support of its motion. HMIT's proffered gatekeeping standard, by contrast, would impose no hurdle at all and would render the threshold entirely duplicative of the motion to dismiss standard that every litigant already faces. In addition to ignoring the stated purposes and intent of the Gatekeeper Provision (which are long

since beyond collateral attack) and the factual bases upon which it was adopted, HMIT offers no reason why litigants whose serial abuses earned the imposition of the Gatekeeper Provision should be subject to the same standard as everyone else. To state that absurd contention is to refute it, and would essentially nullify this Court's authority to police its own docket.

6.     ***Third***, even if the Rule 12(b)(6) standard applied, HMIT's bare-bones Complaint would fail. Even accepting the sparse factual allegations as true for purposes of this Motion, its central conclusions collapse under their own weight. For example, assuming that Dondero's unsolicited December 17, 2020 email, which violated this Court's TRO, included confidential information regarding MGM, the Complaint does not allege that such information remained nonpublic at the unidentified time Seery supposedly communicated with Farallon and Stonehill—and the Complaint acknowledges that neither entity purchased claims before April 2021. Likewise, although the Complaint's central thesis is that Farallon and Stonehill would not have purchased the Highland claims without knowing the supposedly secret MGM information, the Complaint acknowledges that the November 30, 2020 Disclosure Statement predicted a recovery ***significantly above*** what Farallon and Stonehill allegedly paid for the claims in April 2021.

7.     While such self-contradictory and sparse allegations ordinarily might counsel in favor of denying the Motion under the Rule 12(b)(6) standard (*i.e.*, obviating the need to decide whether the *Barton*/vexatious-litigant standard applies), the Highland Parties respectfully request that this Court conduct the Rule 12(b)(6) analysis only in the alternative. Given the litigiousness of Dondero and his affiliated entities, who inevitably will appeal any adverse decision, the Fifth Circuit will benefit from a full record. Applying the correct heightened standard will also serve important interests going forward. This Motion is unlikely to be the last to require application of

App. 3485

the Gatekeeper Provision, and significant interests of judicial economy will be served by definitively establishing the threshold standard and propriety of an evidentiary hearing.

## RELEVANT FACTUAL BACKGROUND

**A.    The Gatekeeper Provision Was Adopted To Prevent Baseless Litigation.**

8.    HMIT was required to file the Motion in accordance with a provision in Highland's confirmed Plan known as the "gatekeeper" (the "Gatekeeper Provision"). (Morris Dec. Ex. 1 at 51–52.)[3] The Gatekeeper Provision states, in pertinent part, that:

> [N]o Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . ***without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim*** of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

(*Id*. (emphasis added).)[4]

9.    The Gatekeeper Provision is not a garden-variety plan provision. Rather, as this Court stated in its order confirming the Plan,[5] the Gatekeeper Provision was adopted as a direct result of Dondero's history of harassing, costly litigation. In describing the factual support for the Gatekeeper Provision, this Court observed that "prior to the commencement of the Debtor's

---

[3] References to the "Plan" are to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*. (Morris Dec. Ex. 1.) Citations to "Morris Dec. Ex. __" are to the exhibits attached to the *Declaration of John A. Morris In Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* accompanying this Opposition.

[4] Under the Plan, HMIT is an "Enjoined Party," and HCMLP, the Trust, Seery (in various capacities), Farallon, and Stonehill (in their capacities as members of the COB approving Seery's compensation) are "Protected Parties." (Plan Arts. I.B.56, I.B.105.)

[5] (Morris Dec. Ex. 2 (the "Confirmation Order").)

App. 3486

bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation some of which had gone on for years and, in some cases, over a decade . . . . During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor." (Confirmation Order ¶ 77.)

10.     The Court further found that the "Dondero Post-Petition Litigation [as defined] was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would 'burn down the place.'" (*Id*. ¶ 78.)

11.      These findings of fact—all of which the Fifth Circuit left undisturbed while affirming, in relevant part, the Confirmation Order—were the foundation upon which the Gatekeeper Provision was adopted:

> Approval of **the Gatekeeper Provision will prevent baseless litigation** designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will **avoid abuse of the Court system and preempt the use of judicial time** that properly could be used to consider the meritorious claims of other litigants.

(*Id*. ¶ 79 (emphasis added).)

### B.     Dondero, Patrick, And HMIT Unsuccessfully Search For Allegations To Manufacture A Complaint.

12.     HMIT's proposed Complaint is premised on two primary allegations emanating from Dondero: (i) Seery supposedly shared with the Claims Purchasers "material, non-public inside information" that he had obtained from Dondero as part of a *quid pro quo* pursuant to which the Claims Purchasers would someday return the favor by joining the COB and "rubber-stamping" Seery's compensation package, and (ii) a representative of Farallon essentially confessed to the arrangement in one or more phone calls with Dondero in the late Spring of 2021. Despite knowing

of these alleged "facts," Dondero, Mark Patrick ("<u>Patrick</u>"),[6] HMIT's purported manager, and HMIT did not bring any claims but instead sought discovery—which two different Texas state courts denied.

1. <u>The First Rule 202 Petition</u>

13. On July 22, 2021, Dondero filed a petition in Texas state court seeking pre-suit discovery against Farallon and Alvarez & Marsal pursuant to Tex. R. Civ. P. 202 (the "<u>First Rule 202 Petition</u>"). (Morris Dec. Ex. 3.) The First Rule 202 Petition was based, in part, on Dondero's allegations that (i) Seery possessed "non-public, material information" that "[u]pon information and belief . . . was the basis for instructing Farallon to purchase the Claims," and that (ii) he had a telephone call with Michael Linn ("<u>Linn</u>"), a representative of Farallon, in which Linn allegedly told Dondero that "Farallon had purchased the claims sight unseen—relying entirely on Mr. Seery's advice solely because of their prior dealings." (*Id*. ¶¶ 21, 23.)[7]

14. After the targets of the First Rule 202 Petition removed it to the Bankruptcy Court, this Court held a hearing, after which it entered an Order remanding the proceeding back to Texas state court despite having "grave misgivings." (Morris Dec. Ex. 6 at 20.) In doing so, the Court noted that it was "familiar with the concept of claims-trading in bankruptcy (including the fact that, for decades now, since a rule change in the last century, no court approval and order is necessary unless the transferor objects)" and that it appeared that Dondero's motives were "highly suspect." (*Id*. at 21.)

---

[6] Patrick has worked closely with Dondero for over a decade. Patrick was hired by Highland in 2008 and now serves as manager of the "Charitable DAF," which is controlled by Dondero. On August 3, 2021, this Court held Patrick "in civil contempt of court" after "basically abdicating responsibility" for "executing the litigation strategy" to Dondero. (Aug. 3, 2021 Order at 20–21, 30, Docket No. 2660.)

[7] As described in more detail below, Dondero later amended the First Rule 202 Petition (Morris Dec. Ex. 4) to, among other things, modify his description of his conversation with Linn and, several weeks after doing so, offered his third sworn version of his purported communication(s) with Farallon (*id*. Ex. 5).

-7-

App. 3488

15.     After remand, the Texas state court slammed the gate closed, denying the First

Rule 202 Petition (as amended) and dismissing Dondero's case. (Morris Dec. Ex. 7.)

2.     <u>The Second Rule 202 Petition</u>

16.     Seven months later, in January 2023, HMIT filed another petition in a different

Texas state court again seeking pre-suit discovery regarding, among other things, alleged

wrongdoing in connection with the Claims Purchasers' acquisition of claims in the Debtor's

bankruptcy case. (Morris Dec. Ex. 8 (the "<u>Second Rule 202 Petition</u>").) While the Second Rule 202

Petition was embellished and contained a few more speculative and conclusory assertions, it was

based on many of the same allegations contained in the First Rule 202 Petition. Indeed, Dondero

submitted yet another sworn statement, this one in support of the Second Rule 202 Petition, which

included the fourth version of his purported communication(s) with Farallon. (Morris Dec. Ex. 9.)

17.     On March 8, 2023, the Texas state court again slammed the gate closed, denying

the Second Rule 202 Petition and dismissing HMIT's case. (Morris Dec. Ex. 10.)

18.     Having been refused entry by two different Texas state courts, HMIT finally

knocked on this Court's door on March 28, 2023 by filing the Motion, on an emergency basis, and

contending that its 18-month detour in the Texas state court system left it at risk of blowing the

statute of limitations on certain claims. The Motion is largely based on the same threadbare facts

and speculative and conclusory statements that were insufficient to obtain discovery in both the

First Rule 202 Petition and the Second Rule 202 Petition.

**C.     The Premise Of HMIT's Proposed Complaint—An Alleged *Quid Pro Quo* Between Seery And The Claims Purchasers—Is Demonstrably False.**

19.     HMIT asserts various legal theories resting on the assertion that Seery passed on

material, non-public information concerning MGM to his purportedly "past business partners and

close allies" Farallon and Stonehill, so that they could buy claims on the cheap and later reward

-8-

App. 3489

Seery by "rubber-stamp[ing]" an oversized compensation package. (Mot. ¶¶ 22, 24; *see also* Compl. ¶¶ 3–4, 16, 47, 54, 71, 77.)

20.     HMIT primarily relies on: (i) an email Dondero sent to Seery on December 17, 2020, in which Dondero purportedly disclosed material, non-public inside information; (ii) Dondero's prior sworn statements concerning, among other things, his supposed recollection of one or more telephone calls he had with one or more representatives of Farallon in the late Spring of 2021; and (iii) two letters summarizing "investigations" commissioned by Dondero, the results of which were apparently delivered to the Executive Office of the United States Trustee ("EOUST"). (Mot. ¶ 1 ("This Motion is separately supported by . . . the declarations of James Dondero, dated May 2022 (Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A. McEntire with attached evidence (Ex. 4).").)

21.     Based on the facts set forth below, and as will further be demonstrated at the upcoming hearing, HMIT cannot meet its burden of establishing that there is a good faith basis for the allegations concerning the "*quid pro quo.*"

**D.     The Allegations Concerning MGM and Insider Trading Have No Basis In Fact.**

22.     As a member of MGM's Board, Dondero was admittedly the source of the so-called material, non-public inside information. (Compl. ¶ 45.) On December 17, 2020, Dondero—in violation of an existing temporary restraining order—sent an email to Seery and others with the subject line "Trading Restriction re MGM – material non public information" stating:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

(Morris Dec. Ex. 11 (the "MGM E-Mail").)[8]

> 1.    Dondero Had An Axe To Grind When He Sent The MGM E-Mail.

23.    By December 17, 2020, Dondero viewed Seery as his enemy. The MGM E-Mail
was initially just another clumsy and improper attempt to impede the Debtor's asset sales (*see infra*
¶ 25), but when that failed, Dondero shifted gears and began peddling the "inside information"
angle, in multiple forums, hoping to make life difficult for Seery and anyone Dondero perceived
to be supporting him.[9] But viewed in context, the MGM E-Mail and related allegations provide no
basis for the assertion of "colorable" claims.

24.    After causing the Debtor to file for bankruptcy protection in October 2019, Dondero
was forced to surrender his control positions at the Debtor—including his positions as President
and Chief Executive Officer—in January 2020 as part of a broader corporate governance
settlement entered into to avoid the appointment of a Chapter 11 trustee. (Morris Dec. Ex. 12.) He
remained an unpaid employee of the Debtor, including maintaining his title as portfolio manager
for all funds and investment vehicles for which he then held titles, subject to the authority of the
newly-appointed independent board of directors (the "Independent Board").[10]

25.    By the Fall of 2020, however, the Independent Board demanded (and obtained)
Dondero's resignation, and the Debtor had (1) reached proposed settlements with certain of its
larger creditors, (2) proposed an asset-monetization plan, (3) obtained court approval of its

---

[8] Notably, the MGM E-Mail is internally inconsistent because it simultaneously purports to impose a "[t]rading [r]estriction" while also stating that "sales are subject to a shareholder agreement," which permits sales in certain circumstances.

[9] Neither Dondero nor HMIT ever explain how Dondero could have disclosed "material non-public inside information" that he purportedly obtained as a member of the MGM Board without violating his own fiduciary duties to MGM. The absence of any explanation is further indication that Dondero did not believe that the MGM E-Mail contained "material non-public inside information."

[10] In July 2020, Seery was appointed Chief Executive Officer and Chief Structuring Officer of the Debtor. (Morris Dec. Ex. 36.)

App. 3491

Disclosure Statement, and (4) begun to solicit votes in support of its proposed Plan. In response to these developments and others, Dondero began disrupting preparations for the implementation of the proposed Plan. The events in the weeks leading up to the MGM E-Mail are as follows:

- <u>October 9</u>: In accordance with the Independent Board's demand, made after threats and disruptions to the Debtor's operations, Dondero is forced to resign from all positions with the Debtor and its affiliates (Morris Dec. Ex. 13);

- <u>October 16</u>: Dondero's affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets (*id.* Ex. 14; *id.* Ex. 15 at 13–15);

- <u>November 24</u>: This Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief (*id.* Ex. 16);

- <u>November 24–27</u>: Dondero personally interferes with certain securities trades ordered by Seery (*id.* Ex. 15 at 30–36);

- <u>November 30</u>: The Debtor provides written notice of termination of shared services agreements with Dondero's affiliates, NexPoint Advisors, L.P. ("<u>NexPoint</u>") and Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"; together with NexPoint, the "<u>Advisors</u>") (*id.* Ex. 17);

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes that had an aggregate face amount of more than $60 million (*id.* Exs. 18–21);

- <u>December 3</u>: Dondero responds by threatening Seery in a text message: "***Be careful what you do -- last warning***" (*id.* Ex. 22 (emphasis added));

- <u>December 10</u>: Dondero's interference and threat cause the Debtor to seek and obtain a temporary restraining order ("<u>TRO</u>") against Dondero (*id.* Ex. 23);

- <u>December 16</u>: The Court denies as "frivolous" a motion filed by certain Dondero affiliates in which they sought "temporary restrictions" on certain asset sales (*id.* Ex. 24); and

- <u>December 17</u>: After exhausting other avenues to curtail the asset sales Debtor conducted in furtherance of the proposed Plan, Dondero sends the MGM E-Mail to Seery (*id.* Ex. 11).

App. 3492

2.      Dondero Had No Duty To Send The MGM E-Mail To Seery And He
        Violated An Existing TRO When He Did So.

26.      With his efforts to disrupt the proposed Plan stymied, Dondero sent the MGM

E-Mail to Seery. While HMIT alleges that Dondero disclosed "material non-public information

regarding Amazon and Apple's interest in acquiring MGM" to Seery on December 17, 2020

(Compl. ¶ 45), HMIT does not state or suggest why Dondero did so.

27.      That failure is unsurprising. As of December 17, 2020, Dondero owed no duty of

any kind to the Debtor or any entity controlled by the Debtor because (i) in January 2020, he

surrendered direct and indirect control of the Debtor to the Independent Board as part of the

corporate governance settlement (*see* Docket Nos. 339, 354-1 (Term Sheet)), and (ii) in

October 2020, he resigned from all roles at the Debtor and affiliates.

28.      Notably, Dondero admitted elsewhere that his goal in sending the MGM E-Mail

was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM,
> including the then Chief Executive Officer and Chief Restructuring
> Officer Jim Seery, containing non-public information regarding
> Amazon and Apple's interest in acquiring MGM. I became aware of
> this information due to my involvement as a member of the board of
> MGM. ***My purpose was to alert Mr. Seery and others that MGM
> stock, which was owned either directly or indirectly by HCM,
> should be on a restricted list and not be involved in any trades***.

(Morris Dec. Ex. 9 ¶ 3 (emphasis added).)

29.      Dondero had no relationship of any kind with the Debtor when he sent the MGM

E-Mail, and he directly violated the TRO by sending it to Seery without copying Debtor's

counsel.[11] Particularly against the backdrop of Dondero's attempted interference with the Debtor's

---

[11] The TRO enjoined Dondero from, among other things, "communicating… with any Board member" (including
Seery) without including Debtor's counsel. (Morris Dec. Ex. 23 ¶ 2(a).)

trading activities just weeks before and just days after December 17, 2020,[12] the MGM E-Mail was another transparent attempt to impede asset sales and undermine Seery's efforts to bring the Debtor's bankruptcy to a close.

> 3.     <u>The MGM E-Mail Did Not Disclose Material, Non-Public Inside Information.</u>

30.     HMIT's contention that the MGM E-Mail contained "material non-public inside information" is belied by press reports issued ***before*** December 17, 2020.

31.     For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies." (Morris Dec. Ex. 25.)

32.     In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("<u>Anchorage</u>"), was facing mounting pressure to sell the company. Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board. The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers. (*Id.* Ex. 26.)

33.     The forgoing is a small sample of publicly available information showing that MGM and Anchorage faced substantial pressure in 2020 and were contemplating a sale, and that Amazon and Apple were expected to be among interested bidders. No one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.

---

[12] (Morris Dec. Ex. 15 at 30–36.)

34.    Even if the MGM E-Mail contained "material non-public information" when Dondero sent it on December 17, 2020 (which it did not), its substance was fully and publicly disclosed to the market in the days and weeks that followed.

35.    For example, on December 21, 2020, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale* (the "Wall Street Journal Article"), reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt." The Wall Street Journal Article reiterated that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers." (*Id.* Ex. 27.)

36.    The Wall Street Journal article thus contained more information than the MGM E-Mail, insofar as the former (i) disclosed that investment bankers had been retained; (ii) disclosed the identity of the investment bankers; (iii) reported that MGM had commenced a "formal sales process"; (iv) provided an indication of market value; and (v) reiterated that Anchorage, MGM's largest shareholder, was under pressure to sell its illiquid position and was actively "working toward a deal for the studio."

37.    The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The World is net enough! Amazon Joins other Streaming services in £4bn Bidding war for Bond films as MGM Considers Selling Back Catalogue*, cited the Wall Street Journal Article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime" (*id.* Ex. 28);

App. 3495

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder (*id.* Ex. 29); and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition (*id.* Ex. 30).

      4.    <u>Dondero's Conduct Confirms That He Did Not Believe He Disclosed Material, Non-Public Inside Information To Seery; The MGM E-Mail Played No Role In The HarbourVest Settlement.</u>

38.    Dondero's conduct further demonstrates that he did not believe he disclosed material, non-public information to Seery in December 2020.

39.    HMIT contends that, upon receipt of the MGM E-Mail, "Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in the Bankruptcy Court seeking approval of the Debtor's settlement with HarbourVest – resulting in a transfer to the Debtor's Estate of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("<u>HCLOF</u>"), which held substantial MGM debt and equity." (Compl. ¶ 46.) These allegations do not withstand scrutiny for several reasons.

40.    ***First***, the Debtor and HarbourVest had already reached an agreement in principle—including the core question of consideration—to settle their disputes on December 10, 2020, ***a week before*** Dondero sent the MGM E-Mail to Seery. (*See* Morris Dec. Ex. 31.)[13] Thus, even assuming that the MGM E-Mail contained "material non-public inside information" (which it did

---

[13] In its motion for approval of the HarbourVest settlement, Highland valued the interest in HCLOF that it was receiving as part of the settlement of HarbourVest's claim at $22.5 million. Dondero and other affiliates ostensibly controlled by Patrick have previously alleged that the valuation was "stale." It was not; rather, it was based on the then most recent report made available to holders of interests in HCLOF, including Dondero. (Morris Dec. Ex. 31-a.) In any event, HCLOF did not directly own any "MGM debt and equity."

App. 3496

not), the substance of that communication played no role in Seery's negotiations, which had concluded before he received the MGM E-Mail.

41.     **Second,** *neither Dondero nor any of his affiliates ever raised this issue with the Court when lodging objections to the HarbourVest settlement*, which were filed just weeks after Dondero sent the MGM E-Mail to Seery. In fact, Dondero contended that the Debtor was ***overpaying*** HarbourVest via the settlement to buy votes and that the settlement was neither reasonable nor in the best interests of the Debtor's estate. (Morris Dec. Ex. 32.)

42.     Dondero and HMIT cannot reconcile their current assertion that Seery misused allegedly "material, non-public inside information" with their failure to object to the HarbourVest settlement on that basis.

> 5.     The Texas State Securities Board Has Determined That No Action Is Warranted.

43.     In its Motion, HMIT claimed that the Texas State Securities Board (the "<u>TSSB</u>") "opened an investigation into the subject matter of the insider trades at issue," and argued that the "continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'" (Mot. ¶ 37.)

44.     HMIT's characterization is misleading because the TSSB never "opened an investigation"; rather, the TSSB reviewed a "complaint" (undoubtedly filed at Dondero's direction). That review is now complete. On May 9, 2023, the TSSB issued the following statement:

> The staff of the Texas State Securities Board (the "Staff") has completed its review of the complaint received by the Staff against Highland Capital Management, L.P. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time.

(Morris Dec. Ex. 33.)

45.     The TSSB's decision that no further action is warranted underscores the Highland

Parties' position that the claims described in the proposed Complaint are neither plausible nor

"colorable."

**E.      HMIT's Allegations Concerning Seery's Alleged Relationships With
The Claims Purchasers Are Unsupported And Provide No Foundation
For The Purported Inferences.**

46.     HMIT asserts that Seery and the Claims Purchasers had substantial pre-existing

relationships that provided the foundation for the alleged "*quid pro quo*." (*See*, *e.g.*, Compl. ¶¶ 14,

47–48.) These allegations appear to be based solely on a review of Seery's resume and some

internet searches conducted as part of the "investigation" commissioned by Dondero, the results

of which were presented to the EOUST in an unsuccessful effort to convince that agency to

investigate further. (*See* Mot. Ex. 2 ¶ 4 & Exs. A–B.) As HMIT's pleadings and the documents

presented to the EOUST show, and as will be further established at the hearing, these conclusory

allegations have no basis in fact.

1.      HMIT's Allegations Concerning Stonehill

47.     HMIT's conclusory allegation that Seery and Stonehill had a "close business

relationship" is based on two alleged "facts."

48.     ***First***, HMIT contends that Seery "joined a hedge fund, River Birth Capital," that

"served on the creditors committee in other bankruptcy proceedings" with Stonehill. (Compl.

¶ 48.) But HMIT fails to (i) identify those proceedings or when they occurred; (ii) allege that Seery

was aware of, let alone participated in, any "bankruptcy proceedings" with Stonehill; or

(iii) suggest how the unidentified "bankruptcy proceedings" resulted in a relationship close enough

to support the wide-ranging conspiracy HMIT imagines.

49.     HMIT tries to bolster this supposed connection by pointing to a decade-old court filing showing that the law firm for which Seery worked (Sidley Austin LLP) represented a "Steering Group of Senior Secured Noteholders" in the Blockbuster bankruptcy, and that, at some point, Stonehill was one of five members of that group. (Mot. Ex. 2 at A-66.)[14] There is no evidence or non-conclusory allegation that Seery (or his then-firm) ever represented Stonehill individually or that any individual involved in the Blockbuster bankruptcy on Stonehill's behalf had any involvement in Stonehill's decision to purchase claims in the Highland bankruptcy.

50.     **Second**, HMIT alleges that (i) a global asset management firm called GCM Grovesnor held four seats on the Redeemer Committee; (ii) "upon information and belief" GCM Grovesnor "is a significant investor in Stonehill and Farallon"; (iii) Grovesnor "through Redeemer, played a large part in appointing Seery as a director of Strand Advisors"; and (iv) Seery was therefore "beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farralon [*sic*]." (*Id.*)

51.     These allegations, however, are based on unsupported speculation and tortured inferences, and certain of them make no sense.[15]

2.     HMIT's Allegations Concerning Farallon

52.     Likewise, the speculative and unsupported allegations concerning Seery's alleged relationship with Farallon cannot withstand scrutiny.

---

[14] The Complaint incorrectly claims that "Seery represented Farallon as its legal counsel" (Compl. ¶ 48), but its Motion appends a court filing referring to Stonehill (Mot. Ex. 2 at A-66).

[15] For example, HMIT alleges that Grovesnor is a "significant investor" in Stonehill and Farallon and that Grovesnor is an "affiliate" of Stonehill and Farallon, while also effectively alleging that Stonehill and Farallon fleeced the Redeemer Committee by buying its claim while in possession of "material, non-public inside information." Notably, the Redeemer Committee—the actual party that would have been harmed if HMIT's allegations had any merit (which they do not)—has never sought to intervene in this matter even though Dondero first floated these allegations in 2021 as part of the First Rule 202 Petition (nor, for that matter, has Acis, UBS, or HarbourVest ever voiced any concerns about supposedly being victimized by the Claims Purchasers).

-18-

53.     HMIT alleges "upon information and belief" that Seery "conducted substantial business with Farallon" while he was the Global Head of Fixed Income Loans at Lehman Brothers. (Compl. ¶ 48.) But the only "fact" supposedly supporting this broad allegation is a single page taken from (what appears to be) a Lehman Brothers real estate group promotional document stating that Farallon participated in a secured real estate loan in 2007. (Mot. Ex. 2 at A-65.) HMIT does not allege that Seery knew of, let alone participated in, this transaction, nor does it identify any other business (let alone "substantial business") that Seery allegedly conducted with Farallon while at Lehman Brothers.

**F.      HMIT's "Insider Trading" Allegations Are Unsupported And Provide No Foundation For The Purported Inferences.**

54.     One of HMIT's principal allegations is that, as part of the purported *quid pro quo*, Seery disclosed to the Claims Purchasers "material non-public inside" information concerning MGM that he obtained from Dondero to entice them to buy claims in Highland's bankruptcy case. (*See*, *e.g.*, Compl. ¶¶ 13, 47, 50, 83, 89.)

1.      <u>Dondero's Description Of His Communication(s) With Farallon Have Changed Over Time.</u>

55.     HMIT's Motion is based in substantial part on Dondero's description of communication(s) he purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's acquisition of certain claims in the Highland bankruptcy. (Mot. ¶ 1 & Ex. 3; Morris Dec. Ex. 9.)

56.     Because (i) Dondero's description of his communication(s) with Farallon has substantially changed over time, (ii) neither HMIT nor Dondero offer any rational reason why Farallon would voluntarily confess to improprieties to a third party with a well-earned reputation

for using overly aggressive litigation tactics, and (iii) certain aspects of his various descriptions

are contradicted by documentary evidence, they cannot be the basis for any claim.[16]

57.     In the First Rule 202 Petition filed in July 2021, Dondero swore, among other

things, that:

> [Seery] has an age-old connection to Farallon and, upon information
> and belief, advised Farallon to purchase the claims.
>
> On a telephone call between [Dondero] and a representative of
> Farallon, Michael Lin [sic], Mr. Lin [sic] informed [Dondero] that
> Farallon had purchased the claims sight unseen—relying entirely on
> Mr. Seery's advice solely because of their prior dealings.
>
> As Highland's current CEO, Mr. Seery had non-public, material
> information concerning Highland. Upon information and belief,
> such non-public, material information was the basis for instructing
> Farallon to purchase the Claims.

(Morris Dec. Ex. 3 ¶¶ 20–21, 23 ("Version 1").)

58.     Version 1 is notable because it (i) did not state what Dondero said, if anything,

(ii) referred to a single phone call, (iii) made no mention of MGM, (iv) made no mention of

Raj Patel (who features later); and (v) stated only "upon information and belief" that Farallon

purchased the Claims based on "non-public, material information."[17]

59.     On May 2, 2022, Dondero amended the First Rule 202 Petition. In his new verified

pleading, Dondero swore, among other things, that:

> [Seery] has an age-old connection to Farallon and, upon information
> and belief, advised Farallon to purchase the claims.

---

[16] Notably, there is no allegation that anyone ever communicated with Stonehill about its claims purchases (let alone obtained a "confession"); thus, HMIT's "conspiracy" theory against Stonehill rests on nothing but rank speculation based on unsupportable inferences.

[17] Later in 2021, Dondero "commissioned an investigation by counsel" who produced written reports to the EOUST. The first such report was prepared by Douglas Draper, counsel to Dondero's family trusts, and delivered to the EOUST on October 5, 2021. Draper provided several reasons to support his speculation that "Farallon and Stonehill may have been provided material, non-public information to induce their purchase of claims" and to justify his request for further investigation—but conspicuously failed to mention Dondero's telephone call(s) with Farallon. (Mot. Ex. 2-A at 7.)

> On a telephone call between [Dondero] and Michael Lin [*sic*], a representative of Farallon, Mr. Lin [*sic*] informed [Dondero] that Farallon had purchased the claims sight unseen ***and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims***.
>
> In other words, ***Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit***.

(*Id.* Ex. 4 ¶¶ 22–24 ("Version 2") (emphasis added).)

60.    Like Version 1, Version 2 also (i) did not state what Dondero said, if anything; (ii) referred to a single phone call; (iii) made no mention of MGM; and (iv) made no mention of Raj Patel. But in contrast to Version 1, Version 2 embellished Linn's alleged comments and—more importantly—now expressly asserted that Seery "shared" inside information with "no one but Farallon" rather that adopting Version 1's statement that "upon information and belief," Farallon purchased the Claims based on "non-public, material information."[18]

61.    About four weeks later, Dondero provided yet another version of his discussion with Linn. In a declaration sworn to on May 31, 2022, Dondero stated, among other things, that:

> Last year, I called Farallon's Michael Lin [*sic*] about purchasing their claims in the bankruptcy. ***I offered them 30% more than what they paid***. I was told by Michael Lin [*sic*] of Farallon that they purchased the interests ***without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid***.

(*Id.* Ex. 5 ¶ 2 ("Version 3") (emphasis added).)

62.    Version 3 introduces several new topics. For example, Dondero asserts for the first time that he called Linn because he was interested in purchasing Farallon's claims. Dondero also

---

[18]If, as Dondero contends, Seery "shared" inside information with "no one but Farallon," then he did not share the inside information with Stonehill.

asserts that he offered "30% more than what they paid."[19] Finally, and significantly, Dondero asserts for the first time that Linn reported Seery telling him that the "interests would be worth far more than what Farallon paid."

63.    On February 15, 2023, Dondero filed yet another sworn statement concerning his 2021 discussion(s) with Farallon, this time in support of HMIT's Verified Rule 202 Petition. (*Id.* Ex. 9.) In this version, Dondero stated that:

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), **Raj Patel** and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the **Acis and HarbourVest claims**, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. **They also stated that they were particularly optimistic because of the expected sale of MGM**.

(*id*. Ex. 9 ¶ 4 ("<u>Version 4</u>")) (emphasis added).)

64.    Version 4 introduces still more new topics. For example, Dondero asserted for the first time that (i) more than one telephone call occurred; (ii) Raj Patel also participated in these calls on Farallon's behalf; (iii) he was told that "Farallon had a deal in place to purchase the Acis and HarbourVest claims"; and (iv) he learned that Farallon was "***particularly optimistic because of the expected sale of MGM***."

65.    Finally, in its Motion, HMIT attributes statements to Farallon that even Dondero never described. For example, HMIT contends that "Farallon bragged about the value of its investment referencing non-public information regarding Amazon, Inc.'s ('Amazon') interest in

---

[19] Ironically, Dondero appears to have offered to purchase Farallon's claims without conducting any due diligence because (i) he provides no indication that he knew at that time how much Farallon paid for its claims yet he blindly offered to pay "30% more than what" Farallon paid, and (ii) HMIT alleges that the Debtor was not transparent. (*See* Compl. ¶¶ 51–53.)

acquiring Metro-Goldwyn-Mayer Studios Inc." (Mot. ¶ 32.)[20] While HMIT cites Version 4 as
support, neither that version nor any prior version is consistent with HMIT's description of
Dondero's purported communication(s) with Farallon.[21]

            2.     <u>Dondero's Offer to Purchase Farallon's and Stonehill's Claims In 2022
                Contradicts HMIT's Allegations.</u>

66.     According to HMIT, Dondero offered to buy Farallon's claims in the Highland
bankruptcy for 30% more than what Farallon was paid, but that Farallon insisted it would not sell
at any price. (Morris Dec. Ex. 5 ¶ 2.)

67.     Yet, on October 14, 2022, before the Second Rule 202 Petition was filed, HCMFA
(one of Dondero's advisory firms) made written offers to Stonehill and Farallon to purchase their
claims at cost "plus a five percent (5%) return." (Morris Dec. Ex. 35.) Dondero's offer to purchase
claims at 5% above cost is inconsistent with his purported knowledge that Farallon would not sell
at any price.

### G.    A Rational Basis Exists For the Claims Purchases—Although Only the Claim Sellers Could Have Been Harmed in Any Event.

68.     HMIT insists that it "made no sense" for the Claims Purchasers to buy claims
because "the publicly available information [] did not offer a sufficient potential profit to justify
the publicly disclosed risk," and "their investment was projected to yield a small return with

---

[20] This purported statement that HMIT attributes to Farallon makes little sense because the MGM-Amazon deal was
publicly announced on May 26, 2021 (Morris Dec. Ex. 34), before Dondero and Farallon ever spoke.

[21] Conspicuously absent from HMIT's pleadings is any evidence corroborating any of the five versions of Dondero's
conversation(s) with Farallon. Given the importance of the Farallon's alleged confessional, one would have expected
Dondero to contemporaneously (i) send a confirming e-mail to Farallon to make sure there was a written record of the
discussion, (ii) send an e-mail to a colleague so that others were informed, (iii) make notes to himself; or (iv) tell
someone what happened. Yet, no such corroborating evidence was presented or referred to in the First Rule 202
Petition, either of the EOUST Letters, the Second Rule 202 Petition, the Motion, the original proposed Complaint, the
Supplement, or the amended proposed Complaint.

virtually no margin for error." (Compl. ¶ 3.) HMIT's arguments are belied by the publicly available facts and its own allegations.

69.     In advance of Plan confirmation, the Debtor projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. (Docket No. 1875 Ex. A.) In its proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims. (Compl. ¶ 42.) Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[22] | Purchaser | Purchase Price | Projected Profit |
|----------|---------|---------|-----------|-----------|-------|--------|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |
| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

70.     As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest. (Compl. ¶ 41 n.12.)[23] Based on an aggregate purchase price of $113 million, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections because they also purchased the Class 9 claims, and would therefore capture any upside. In this context, HMIT assertions in its proposed Complaint lack any rational basis.

---

[22] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

[23] The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced. (Morris Dec. Ex. 34.)

71.     Notably, none of the selling claimholders—all of which are sophisticated parties that were represented by sophisticated counsel—have raised any objections or complaints. In fact, three of the four selling claimholders (Redeemer, Acis, and UBS) were members of the Official Committee of Unsecured Creditors.

72.     Finally, even if HMIT's allegations had any merit (they do not), only the selling claimholders would have cause to complain. The estate (and HMIT) would not have been harmed because it made (and may in the future make) the exact same distributions to claimholders regardless of what entity owns the claims.

**H.     Seery's Compensation Structure Is Consistent With The Plan And The Trust Agreement, And Was The Product Of Arms'-Length Negotiations.**

73.     According to HMIT, Seery provided "material non-public information" to the Claims Purchasers so that he could someday "plant friendly allies onto the [COB] to rubber stamp compensation demands." (Mot. ¶ 22; *see also id.* ¶¶ 3, 24, 48.) HMIT alleges in its revised Complaint:

> As part of the scheme, the Defendant Purchasers obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT. Initially, Seery's compensation package was composed of a flat monthly pay [sic]. Now, however, it is also performance based. This allows the Defendant Purchasers to satisfy the *quid pro quo* at the heart of the scheme. Seery would help the Defendant Purchasers make large profits and they would help enrich Seery with big pay days.

(Compl. ¶ 4.)

74.     Notably, these allegations (i) describe a compensation structure that is ***entirely consistent with*** the incentive compensation plan structure in the Court-confirmed Plan and set forth in the Trust Agreement; and (ii) are devoid of any actual facts (*e.g.*, the terms of Seery's compensation plan or how it was calculated or negotiated). In reality, Seery's compensation

package was the product of arm's-length negotiations with the COB (including the active participation of the COB's independent member) over a four-month period, the result of which was an incentive compensation plan that aligned Seery's interests with those of the Claimant Trust Beneficiaries (*i.e.*, to maximize value and creditor recoveries).

75.    As a threshold matter, HMIT's allegation that "[i]nitially, Seery's compensation package was composed of a flat monthly pay [*sic*]" (Compl. ¶ 4]) is plainly wrong. Seery was appointed Highland's Chief Executive Officer (effective as of March 15, 2020) pursuant to a Bankruptcy Court order entered on July 16, 2020 without objection. (Morris Dec. Ex. 36 (the "July Order").) The July Order approved the terms of a separate employment agreement (a copy of which was included in the Debtor's motion (Docket No. 774 Ex. A-1) and attached to the July Order) (the "Original Employment Agreement").

76.    Under the Original Employment Agreement, Seery was to receive (i) Base Compensation in the amount of $150,000 per month, ***plus*** (ii) a Restructuring Fee, the amount of which would be determined by whether a Case Resolution Plan (*i.e.*, a plan with substantial creditor support) or a Monetization Vehicle Plan (*i.e.*, a plan lacking substantial creditor support) was achieved (as those terms are defined in the Original Employment Agreement).

77.    On November 24, 2020, after notice and a hearing, the Bankruptcy Court entered an Order (Docket No. 1476) approving the adequacy of *The Disclosure Statement of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Morris Dec. Ex. 37 (the "Disclosure Statement").) The Disclosure Statement provided in pertinent part that:

> The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . . The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(*Id*. Art. III.F.2(e); *see* Plan Art. IV.B.6 (incorporating identical language).)

78.     The Trust Agreement was part of a Plan Supplement (as amended) filed in advance

of the confirmation hearing (Morris Dec. Ex. 38), and provided in pertinent part:

> <u>Compensation</u>. As compensation for any services rendered by the
> Claimant Trustee in connection with this Agreement, the Claimant
> Trustee shall receive compensation of $150,000 per month (the
> "<u>Base Salary</u>"). Within the first forty-five days following the
> Confirmation Date, the Claimant Trustee on the one hand, and the
> Committee, if prior to the Effective Date, or the Oversight Board, if
> on or after the Effective Date, on the other, will negotiate go-forward
> compensation for the Claimant Trustee which will include (a) the
> Base Salary, (b) a success fee, and (c) severance.

(Trust Agmt. § 3.13(a)(i).)[24]

79.     The Plan went effective on August 11, 2021, and, as a result, the COB was formed.

The COB ultimately had three members: a representative of Farallon (Michael Linn), a

representative of Stonehill (Christopher Provost), and an independent member (Richard Katz).

80.     On August 26, 2021, the COB held a regularly scheduled meeting during which it

discussed the incentive compensation program ("<u>ICP</u>"). The minutes of this meeting reflect that:

> Mr. Seery also presented the Board with an overview of his
> Incentive Compensation Program proposal which would include not
> only Mr. Seery but the current HCMLP team. (The terms and
> structure of the proposal had been previewed with the Board in prior
> operating models presented by Mr. Seery.) Mr. [Seery] reviewed the
> proposal and stated his view that the proposal was market based and
> was designed to align incentives between himself and the HCMLP
> team on the one hand and the Claimant Trust [B]eneficiaries on the
> other. ***The Board asked questions regarding proposal and
> determined that is [sic] would consider the proposal and revert to
> Mr. Seery with a counter proposal***.

(Morris Dec. Ex. 39 (emphasis added).)

---

[24] Seery was designated as the "Claimant Trustee" under the Trust Agreement. (Trust Agmt. 38 §1.1(e).

81.     Far from being a "rubber stamp," the minutes show that the COB did not simply

accept Seery's initial proposed ICP but "asked questions" and indicated that it would provide a

"counter proposal."

82.     On August 30, 2021, the COB convened for "an off-cycle (non-regular) meeting."

As reflected in the minutes of this meeting, the COB again discussed the ICP:

> Mr. Katz began the meeting by walking the Oversight Board and
> Mr. Seery through the Oversight Board's counter-proposal to the
> HCMLP incentive compensation proposal, including the review of
> a spreadsheet and summary of the counter-proposal. Discussion was
> joined by Mr. Linn and Mr. Stern. Mr. Seery asked numerous
> questions and received detailed responses from the Oversight Board.
> ***Mr. Seery and the Oversight Board agreed to continue the
> discussion and negotiations regarding the proposed incentive
> compensation plan for the Claimant Trustee and the HCMLP
> [employees]***.

(*Id.* Ex. 40 (emphasis added).)

83.     Seery and the COB continued to exchange and discuss additional proposals and

counter-proposals over the coming months.[25] Finally, on December 6, 2021, Seery and the COB

executed a Memorandum of Agreement stating that:

> In accordance with the provisions of the Highland Claimant Trust
> Agreement and the Highland Capital Management, L.P.
> ("HCMLP") Plan of Reorganization, ***the Oversight Board of the
> Highland Claimant Trust and the Claimant Trustee/Chief
> Executive Officer of HCMLP engaged in robust, arm's length and
> good faith negotiations regarding the incentive compensation
> program for the Claimant Trust/CEO*** and the HCMLP post-
> effective date operating team ("HCMLP Team"). ***After considering
> various structures and incentives to motivate performance on
> behalf of the Claimant Trust***, the parties reached the binding

---

[25] In particular, (i) Seery delivered another proposal to the COB on October 9, 2021, which he further revised later in
the month; (ii) Katz (the independent COB member) responded on behalf of the COB on October 26 and proposed
that the parties agree upon the structure of the proposal before addressing the specific numbers; (iii) Seery responded
on November 3; (iv) further discussions were held on November 9; (v) on November 17, Linn provided a "wholesome
response" in which he "updated the term sheet" and raised certain issues that he did not believe would have "much a
difference for this negotiation"; (vi) Seery wrote to the COB indicating that he wanted to "finalize the ICP" but had
"a couple of asks and one question"; and (vii) still further negotiations took place thereafter.

> agreement reflected in the attached HCMLP and Claimant Trust
> Management Incentive Compensation Program.

(Morris Dec. Ex. 41 (emphasis added).)

84.    Notably, in November 2021, one of the "investigative reports" commissioned by Dondero incorrectly speculated that "Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis." (Mot. Ex. 2-B at 14.) In fact, Seery's bonus is tied to creditor recoveries so that the interests of stakeholders are aligned.

85.    Dondero's commissioned report also incorrectly "estimate[d] that, based on the estate's [alleged] $600 million value today, *Mr. Seery's success fee could be approximate [sic] $50 million*." (*Id.*) In reality, under the negotiated terms of the ICP (Morris Dec. Ex. 41), the maximum bonus Seery can receive is approximately $8.8 million—which would require all Class 8 and 9 claimholders to receive cash distributions for the full amount of their claims plus interest—82.4% less than the baseless success fee presented to the EOUST on Dondero's behalf.

## RELEVANT PROCEDURAL HISTORY

86.    To avoid the appointment of a Chapter 11 trustee, on January 9, 2020, this Court approved a settlement (the "January Order"; Docket No. 339) removing Dondero from control of Highland and appointing an Independent Board consisting of John Dubel, Russell Nelms, and Seery (the "Independent Directors"). The January Order prohibited litigation against the Independent Directors without this Court's prior authorization and limited claims to those arising from willful misconduct or gross negligence.[26]

---

[26] (January Order ¶ 10 ("No entity may commence or pursue a claim or cause of action of any kind against any Independent Director . . . relating in any way to the Independent Director's role as an independent director . . . without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director . . . .").)

App. 3510

87.    Highland later moved to have Seery appointed its Chief Executive Officer and Chief Restructuring Officer. This Court approved his appointment in the July Order (Morris Dec. Ex. 36), which like the January Order, prohibited litigation against Seery without this Court's prior authorization and limited claims to those arising from willful misconduct or gross negligence.[27]

88.    On February 22, 2021, this Court issued the Confirmation Order confirming the Plan. The confirmed Plan included the Gatekeeper Provision prohibiting Enjoined Parties, including HMIT, from bringing claims against Protected Parties, including Seery, unless, after notice and a hearing, this Court found the claims "colorable." (Plan Art. IX.F.) The Gatekeeper Provision was affirmed by the Fifth Circuit. *NexPoint*, 48 F.4th at 425–26, 435–39. The detail factual findings in the Confirmation Order supporting the Gatekeeper Provision were not challenged or disturbed on appeal.

89.    On August 11, 2021, the Plan became effective (Docket No. 2700), and pursuant to the Plan:

- All prepetition partnership interests in the Debtor, including HMIT's, were cancelled;

- HCMLP was reorganized as a Delaware limited liability partnership;

- The Trust, a Delaware statutory trust, was established pursuant to the Trust Agreement;

- HCMLP's limited partnership interests were issued to the Trust;

- HCMLP's general partnership interests were issued to HCMLP GP LLC, a newly-established Delaware limited liability company;

---

[27] (July Order ¶ 5 ("No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery . . . .").)

App. 3511

- The majority of HCMLP's assets, including its "Causes of Action,"[28] were transferred to the Trust;

- Seery was appointed reorganized HCMLP's Chief Executive Officer and trustee of the Trust (the "Claimant Trustee");

- "Estate Claims" (*i.e.*, Causes of Action against HCMLP's insiders)[29] were transferred to the newly-established Highland Litigation Sub-Trust (the "Litigation Trust"), a Delaware statutory trust and subsidiary of the Trust;

- An oversight board was appointed to oversee the management of the Trust, reorganized HCMLP, and the Litigation Trust;

- Holders of allowed general and subordinated unsecured claims (*i.e.*, Class 8 and 9) received interests in the Trust (collectively, the "Trust Interests") and became "Claimant Trust Beneficiaries" (as defined in the Plan); and

- Holders of the Debtor's prepetition partnership interests (*i.e.*, Class 10 and 11) were allocated unvested contingent interests (the "Contingent Interests") in the Trust that vest if, and only if, the Claimant Trustee certifies that all Claimant Trust Beneficiaries (*i.e.*, Class 8 and 9) have been paid in full, Class 8 have received post-petition interest, and all disputed claims in Class 8 and 9 have been resolved.

(*See* Plan Art. IV.)

90.     On October 8, 2021, the Trust irrevocably transferred and assigned to the Litigation Trust "any and all Causes of Action not previously transferred or assigned by operation of the Plan, the Litigation Sub-Trust Agreement, or otherwise" except for causes of action then being

---

[28] "Causes of Action" are defined in the Plan as: "any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law." (Plan Art. I.B.19.)

[29] "Estate Claims" are defined in the Plan as "estate claims and causes of action against Dondero, Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing" other than causes of action against any current employee of Highland other than Dondero. (Plan Art. I.B.61.)

pursued by the Trust or which the Trust intended to pursue on behalf of entities managed by reorganized HCMLP. (*See* Morris Dec. Ex. 42.)[30]

91.     On March 28, 2023, HMIT filed its Initial Motion with a proposed Verified Adversary Complaint totaling 387 pages with exhibits. This Court scheduled a conference for Monday, April 24, 2023. (Docket No. 3751.) On Friday, April 21, 2023, HMIT filed objections to any evidentiary hearing or briefing on its Initial Motion. ("Objs."; Docket No. 3758.) On Sunday, April 23, 2023, HMIT filed a Supplemental Motion with an amended proposed Verified Adversary Complaint, which added HCMLP and the Trust as nominal defendants and dropped a claim for "fraud by misrepresentation and material nondisclosure." (Docket No. 3760.) On April 24, 2023, this Court held a conference, set a briefing schedule on the Motion, and scheduled a hearing for June 8, 2023. (Docket Nos. 3763–64.)

## LEGAL STANDARD

92.     HMIT concedes, as it must, that its proposed lawsuit is subject to this Court's "gatekeeping protocol," and "the injunction and exculpation provision in the Plan." (Mot. ¶¶ 1, 4, 14; Supp. Mot. ¶ 11.) But HMIT fundamentally misunderstands the threshold showing it must make to clear that hurdle.

### A.     HMIT Misconstrues The "Colorability" Standard Established In The Gatekeeper Provision.

93.     This Court made extensive factual findings and approved the Gatekeeper Provision on two grounds: (i) "the Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))," and (ii) "the notion of a prefiling injunction to deter vexatious litigants[] that has been approved by Fifth Circuit." (Confirmation Order ¶¶ 76–81.) Those doctrines operate to "prevent

---

[30] The October 8, 2021 transfer was publicly disclosed by the Litigation Trust in its litigation with HMIT, among others. *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Docket No. 211 (Bankr. N.D. Tex. Sept. 9, 2022).

baseless litigation designed merely to harass the post-confirmation entities," "avoid abuse of the court system," and "preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants." (*Id.* ¶ 79.) The Fifth Circuit confirmed that "the injunction and gatekeeping provisions are sound," explaining that "[c]ourts have long recognized bankruptcy courts can perform a gatekeeping function," including "[u]nder the '*Barton*' doctrine." *NexPoint*, 48 F.4th at 435, 438–39 (collecting cases). The Fifth Circuit further recognized that the Gatekeeper Provision here was necessary to prevent "bad-faith litigation" from consuming the resources of the reorganized debtor and those working to maximize claims of legitimate stakeholders. *Id.*

94.     Under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation." *VistaCare*, 678 F.3d at 232 (cleaned up) (citing *Anderson v. United States*, 520 F.2d 1027, 1029 (5th Cir. 1975); *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 885 (B.A.P. 9th Cir 1995)); *see also, e.g.*, *CFTC v. Hunter Wise Commodities, LLC*, 2020 WL 13413703, at *1 (S.D. Fla. Mar. 5, 2020) ("Under the *Barton* doctrine, . . . before leave to sue a receiver or trustee is granted, the plaintiff must demonstrate that he has a *prima facie* case against the trustee or receiver.") (citing *Anderson*, 520 F.2d at 1029); *Fin. Indus. Assoc. v. SEC*, 2013 WL 11327680, at *4 (M.D. Fla. July 24, 2013) (same). Contrary to HMIT's contention, this standard "involves a greater degree of flexibility" than a "Rule 12(b)(6) motion to dismiss," because "the bankruptcy court, which, ***given its familiarity with the underlying facts and the parties***, is uniquely situated to determine whether a claim against the trustee has merit," and "[t]he bankruptcy court is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate." *VistaCare*, 678 F.3d at 233 (emphasis added).

95.     To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading requirements of Rule 8." *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases). "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless." *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000). "To apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision. *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

96.     Similarly, courts in the vexatious litigant context require the movant to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment." *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same). "[T]o protect courts and innocent parties from abusive and vexatious litigation[,] . . . courts may apply whatever standard deemed warranted when reviewing the proposed complaint." *Silver*, 2020 WL 3803922, at *6. "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion. *Id.* Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ." *Id.*

97.     HMIT argues that "a claim is colorable if it is 'plausible' and could survive a motion to dismiss" under Rule 12(b)(6). (Mot. ¶¶ 38–42.) But HMIT's motion does not even mention the specific bases this Court invoked in the Confirmation Order—the *Barton* doctrine and vexatious-litigant provisions—as supporting the Gatekeeper Provision, much less has HMIT identified a single case in the *Barton* doctrine or vexatious litigant context that supports its interpretation. (*Id.*; *see also* Morris Dec. Ex. 43 at 15:25–16:4 (THE COURT: "[D]id you find any legal authority in the *Barton* doctrine context that you think sheds light? Because that seems to me the most analogous context, right?" MR. MCENTIRE: "Specifically to answer -- to respond to your question directly, the answer is no.").) HMIT relies instead on cases from inapposite contexts, such as whether a bankruptcy court should grant a creditor's committee derivative standing after a trustee or debtor-in-possession declined to pursue a claim.[31] None of those cases, of course, involves gatekeeping orders entered in response to a pattern of abusive conduct that specifically rely on *Barton* and vexatious-litigant authorities. Moreover, and as discussed below, even those cases recognize that a claim must not only be likely to survive a motion to dismiss, but also that the debtor has "unjustifiably" refused to pursue it. *La. World*, 858 F.2d at 247–48**.** That requirement demands that the proposed claims be subjected to a realistic cost-benefit analysis, which here would be fatal to HMIT's speculative, Hail Mary conspiracy theory.

98.     HMIT also relies on a series of cases that are even farther afield from the Gatekeeper Provision here. Those include benefits coverage disputes under ERISA, Medicare

---

[31] *See La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 247–48 (5th Cir. 1988); *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008); *Larson v. Foster (In re Foster)*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014); *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)*, 66 F.3d 1436, 1446 (6th Cir. 1995); *Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*, 225 B.R. 275, 282 (Bankr. S.D.N.Y. 1998).

coverage disputes, and constitutional challenges.[32] None of those cases implicate the *Barton* doctrine and vexatious-litigant concerns. (*See* Mot. ¶¶ 39–41; Objs. ¶¶ 9–13.)

### B.    Evidentiary Hearing

99.    Courts in the *Barton* doctrine context regularly conduct an evidentiary hearing to determine whether a proposed complaint meets the necessary threshold. "Whether to hold a hearing is within the sound discretion of the bankruptcy court." *VistaCare*, at 232 n.12 "[T]he decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing. *Id.* at 233 (quoting *Kashani*, 190 B.R. at 886–87). In *VistaCare*, for example, the bankruptcy court "held a hearing on CGL's motion for leave" in which "the sole owner of CGL, and the Trustee, testified." *Id.* at 223, 232. The Fifth Circuit has affirmed a colorability analysis in the *Barton* context, which involved an evidentiary hearing, without any concern that the inquiry was somehow improper. *See Foster v. Aurzada (In re Foster)*, 2023 WL 20872, at *1 (5th Cir. Jan. 3, 2023) (affirming dismissal of an action to sue a trustee under *Barton* "[a]fter a hearing [by] the bankruptcy court"); *Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a

---

[32] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

close examination" of the evidence revealed only that the trustee "acted within the scope of [his]

duties"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

100.     Recognizing that the *Barton* doctrine requires more than a mere Rule 12(b)(6)

analysis, courts of appeals routinely review "a bankruptcy court's decision to grant a motion for

leave to sue a trustee under the deferential abuse of discretion standard." *VistaCare*, 678 F.3d at

224 (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880,

889 (2d Cir. 1984)).[33] Application of the Rule 12(b)(6) standard, of course, is subject to *de novo*

review. Indeed, as this Court noted at the April 24, 2023 status conference, HMIT's "original

motion for leave attached something like 387 pages of not just Dondero affidavits, but other

evidentiary support," which is inconsistent with HMIT's position that this Court "just need[ed] to

look at the four corners and apply a 12(b)(6) standard." (Morris Dec. Ex. 43 at 43:16–18, 44:4–7.)

Although HMIT's belatedly counsel suggested it might seek to "withdraw the Dondero affidavits"

(*id.* at 22:17–18), HMIT has filed no such motion and "reserve[d] the opportunity to revisit the

issue of withdrawing Mr. Dondero's declarations" (*id.* at 55:1–5). As this Court noted, "parties are

always given the chance to cross-examine an affiant or a declarant." (*Id.* at 22:2–3.) This Court

should exercise its discretion to hold an evidentiary hearing to permit the parties to present

evidence, including through cross-examination of Dondero—even if HMIT now engages in

gamesmanship by seeking to withdraw the Dondero declarations before the hearing.

---

[33] Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at \*3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at \*3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

### C.   Exculpation and Release

101.   This Court's January Order and July Order exculpated Seery from all claims except "those alleging willful misconduct and gross negligence." (January Order ¶ 10; July Order ¶ 5.) The Plan's exculpation provision also limited claims against Seery, in his role as an Independent Director, to those arising "from willful misconduct, criminal misconduct…or gross negligence." (Plan Art. IV.D; Confirmation Order ¶¶ 72–73.) The Trust Agreement similarly limits claims against Seery to "fraud, willful misconduct, or gross negligence." (Trust Agmt. § 8.1; *see also id.* §§ 8.3–8.4.) Thus, HMIT cannot assert claims other than those expressly permitted under these Orders and court-approved documents.

## ARGUMENT

102.   HMIT lacks standing to bring the derivative claims alleged in the Complaint (*see infra* Sections I–II), did not satisfy the procedural requirements to bring derivative claims (*see infra* Section III), and cannot bring derivative claims under the guise of direct claims (*see infra* Section IV). Even if HMIT could assert claims (which it cannot), they fail under any standard (*see infra* Section V).

## I.   HMIT Lacks Standing To Bring Derivative Claims Under Delaware Law.

103.   HMIT acknowledges that any "fiduciary duties and claims involving breaches of those duties" with respect to HCMLP and the Claimant Trust are "governed by Delaware law" under the "Internal Affairs Doctrine." (Motion ¶ 21 & n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity)); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). HMIT lacks standing to bring any such claims under Delaware law.

### A.    HMIT Lacks Standing To Bring Derivative Claims On Behalf Of The Trust.

104.    The Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29. (Compl. ¶ 26.) "[T]o proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action." *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at \*19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b). This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the Trust." *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).

105.    HMIT is not a "beneficial owner" of the Trust and therefore lacks standing to bring derivative claims on its behalf. The "beneficial owners" of the Trust are the "Claimant Trust Beneficiaries." (*See* Trust Agmt. § 2.8 ("The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . .").) The Claimant Trust Beneficiaries are "the Holders of Allowed General Unsecured Claims" and "Holders of Allowed Subordinated Claims." (Plan Art. I.B.44; *see also* Trust Agmt. § 1.1(h).)[34] HMIT is neither. HMIT was an "equity holder in the

---

[34] (*See* Morris Dec. Ex. 1, Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); Trust Agmt. at 1 n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.").)

Original Debtor" and now holds only an unvested "Contingent Trust Interest in the Claimant Trust." (Compl. ¶ 24.) HMIT argues, without justification, that it "should be treated as a vested Claimant Trust Beneficiary." (*Id.*) But, under the Trust Agreement, "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and Trust Agreement. (Trust Agmt. § 5.1(c).) Because it is undisputed that the Contingent Trust Interests have not vested, HMIT is not a "beneficial owner" and lacks standing to bring derivative claims under Delaware law. *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at \*19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").[35]

> ### B.    HMIT Lacks Standing To Bring Derivative Claims On HCMLP's Behalf.

106.    Reorganized HCMLP is a Delaware a limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.* (Compl. ¶ 25.) To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action." 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another

---

[35] If HMIT were a Claimant Trust Beneficiary (which it is not), its claims must be brought in this Court and it has "waived any right to a trial jury." (Trust Agmt. § 5.10(d).) HMIT would also be required to reimburse the Claimant Trustee and any member of the COB if its suit fails (*id.* § 5.10(b)), and this Court could require HMIT "to post a bond ensuring that the full costs of a legal defense can be reimbursed" (*id.* § 5.10(c)). The Highland Parties reserve the right to seek reimbursement and posting of a bond commensurate with the enormous burdens this litigation would impose.

party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

107.   HMIT is not a partner of reorganized HCMLP and therefore lacks standing to bring derivative claims on its behalf. "HMIT held a 99.5% limited partnership in Highland Capital Management, L.P., the Original Debtor." (Compl. ¶ 6; *see id.* ¶¶ 12, 15, 24.) But that limited partnership interest was extinguished by the Plan on August 11, 2021 (the Effective Date of the Plan) and HMIT does not own any partnership interest in reorganized HCMLP. (Plan Art. IV.A.) Because HMIT would not hold a partnership interest at "the time of bringing the action," it "lacks derivative standing" to bring claims "on the partnership's behalf." *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

108.   HMIT also cannot satisfy "the continuous ownership requirement." When HMIT's partnership interest was extinguished on the Plan's Effective Date, HMIT "los[t] standing to continue a derivative suit" on behalf of the Debtor.[36] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commcn's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation

---

[36] Even before its partnership interest was extinguished, HMIT would have been required to obtain the Debtor's consent or court approval before it could have brought a derivative suit on behalf of the estate.

of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

### C.    HMIT Lacks Standing To Bring A "Double Derivative" Action.

109.    "[A] double derivative suit is one brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled." *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010). Under "Delaware's 'double derivative' standing jurisprudence," "parent level standing is required to enforce a subsidiary's claim derivatively." *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

110.    To the extent HMIT seeks to bring a double derivative action on behalf of the Trust based on claims purportedly held by its wholly owned subsidiary, HCMLP, HMIT lacks standing. Because HMIT lacks derivative standing to bring claims on behalf of the parent Trust, it also lacks standing to bring a double derivative action. (*See supra* Section I.A.)

111.    The Trust also lacks standing to bring these claims on behalf of HCMLP. The Claimant Trust received limited partnership interests in Highland on August 11, 2021, the Effective Date of the Plan. (*See supra* ¶ 79.) HMIT challenges trades that occurred in April and August 2021 (Compl. ¶ 41 & n.12), which predate the Effective Date of the Plan. Because the Trust did not hold limited partnership interests "[a]t the time of the transaction of which the plaintiff complains," 6 Del. C. § 17-1002, it cannot bring a derivative action based on these trades, and HMIT lacks standing to bring a double derivative action.

## II.    HMIT Lacks Standing To Bring Derivative Claims Under Federal Bankruptcy Law.

112.    HMIT ignores its inability to proceed derivatively under Delaware law and instead insists it has derivative standing as a matter of federal bankruptcy law. (Mot. ¶¶ 9–14.) HMIT also

lacks derivative standing under federal bankruptcy law because (i) HMIT's lack of standing under

Delaware law is dispositive regardless of forum, and (ii) HMIT, in any event, cannot meet the

requirements for suing on behalf of a debtor under the federal bankruptcy case law it cites.

### A.    Federal Law Does Not Confer Standing Prohibited By Delaware Law.

113.    HMIT's invocation of federal bankruptcy law cannot remedy HMIT's lack of

derivative standing under Delaware law. HMIT cites Fed. R. Civ. P. 23.1, which "applies to this

proceeding pursuant to" Fed. R. Bankr. P. 7023.1. (Mot. ¶ 10.) But Rule 23.1 "speaks only to the

adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any

substantive right.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (quoting 28 U.S.C.

§ 2072(b)). Thus, the question of whether HMIT has a right to proceed derivatively is governed

not by Rule 23.1, but by the "source and content of the substantive law" governing the

requirements for derivative actions, which is Delaware law. *Id.* at 96–97.

114.    HMIT's own authority (*see* Mot. ¶¶ 12–13) further supports that Delaware law

governs the standing analysis and precludes HMIT's suit. *Louisiana World Exposition v. Federal

Insurance Co.*, 858 F.2d 233 (5th Cir. 1988), on which HMIT relies, "is the leading case from the

Fifth Circuit . . . articulating when a creditors committee may be permitted standing to pursue

estate causes of action." *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 809 (Bankr. N.D. Tex.

2009). To the extent *Louisiana World* applies post-Effective Date,[37] it does not supersede state law

requirements for derivative standing. Before addressing the requirements a creditors' committee

must meet to sue derivatively as a matter of federal bankruptcy law (discussed below), the Fifth

Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors'

---

[37] *Louisiana World*, in certain circumstances, allows creditors to "file suit on behalf of a debtor-in-possession or a [bankruptcy] trustee." *La. World*, 858 F.2d at 247. HCMLP is no longer a debtor-in-possession; it has been reorganized.

committee in that case could assert its claims under Louisiana law. 858 F.2d at 236–45. The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions." *Id.* at 243. The opposite is equally true: where state law imposes such a bar, a creditor cannot flout that prohibition because it is in bankruptcy court. *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 ("To determine that the third party may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.") (denying creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act).

115.    Because HMIT lacks standing to bring derivative claims under Delaware law (*see supra* Section I), it cannot satisfy the "threshold issue" to proceed derivatively, whether in state or federal court.

## B.    HMIT Cannot Meet The *Louisiana World* Standard Governing Derivative Actions By Creditors In Bankruptcy.

116.    Even if Delaware law did not preclude HMIT from suing derivatively (it does), HMIT still would lack standing under federal bankruptcy law. Under Fifth Circuit precedent, a bankruptcy court may authorize a creditor to proceed derivatively only if: (i) the creditor's claims are "colorable"; (ii) the trustee or debtor-in-possession "refused unjustifiably to pursue the claim"; and (iii) the creditor "first receive[d] leave to sue from the bankruptcy court." *La. World*, 858 F.2d at 247; *see also, e.g.*, *PW Enters.*, 540 F.3d at 899 (same). "These requirements ensure that derivative standing does not risk interfering with the debtor or trustee and prevents creditors from

-44-

pursuing weak claims." *In re On-Site Fuel Serv., Inc.*, 2020 WL 3703004, at \*9 (Bankr. S.D. Miss. May 8, 2020). HMIT does not and cannot satisfy these requirements.

117.    HMIT focuses solely on the first of these three requirements—asserting that its claims are "colorable." (*See* Mot. ¶¶ 12–14, 38–42; Objs. ¶¶ 3–4, 7–15; Supp. Mot. ¶ 13.) Even if HMIT could satisfy the "colorable claim" requirement under *Louisiana World*, which it cannot (*see infra* Section V), it does not even try to satisfy the second requirement—that Highland "refused unjustifiably to pursue the claim"—because it cannot.

118.    To assess whether a debtor's refusal was unjustified, courts "must look to whether the interests of creditors were left unprotected as a result" by conducting a "cost-benefit analysis" that takes into account whether the potential action is "valid and profitable." *La. World*, 858 F.2d at 253 n.20; *see also Reed*, 405 B.R. at 810 (same); *Canadian Pac.*, 66 F.3d at 1442 ("[I]f a creditor pleads facts to support the conclusion that it has a colorable claim . . . and if the bankruptcy court finds that the claim will likely benefit the estate based on a cost-benefit analysis, then the creditor has raised a rebuttable presumption that the debtor-in-possession's failure to bring that claim is unjustified."). This requirement is not easily met. Under HMIT's own authority (*see* Mot. ¶ 40) "the real challenge for the creditor will be to persuade the bankruptcy court that the trustee unjustifiably refuses to bring its claim." *PW Enters.*, 540 F.3d at 900. As the Eighth Circuit explained:

> To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy court with *specific* reasons why it believes the trustee's refusal is unjustified. A creditor thus does not meet its burden with a naked assertion that 'the trustee's refusal is unjustified.' . . . The creditor, *not the bankruptcy court*, has the onus of establishing the trustee unjustifiably refuses to bring the creditor's claim.

*Id.* (emphasis in original).

119.    In conducting the "cost/benefit" analysis required to determine if a debtor's refusal to sue is unjustified, courts consider (i) the probability of success on the claims and the financial recovery to the estate, (ii) the proposed cost of the litigation, and (iii) the delay and expense of bringing the litigation. *PW Enters.*, 540 F.3d at 901; *see also Official Comm.*, 225 B.R. at 282 ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and 'the terms relative to attorneys' fees on which suit might be brought.'") (quoting *In re STN Enterps.*, 779 F.2d 901, 905 (2d Cir. 1985)). A creditor seeking to proceed derivatively must establish "a sufficient likelihood of success" to "'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'" *Official Comm.*, 225 B.R. at 282 (quoting *STN*, 779 F.2d at 906. If the creditor carries its burden, it shifts to the debtor to refute by a preponderance of the evidence. *PW Enters.*, 540 F.3 at 900 n.9; *Canadian Pac.*, 66 F.3d at 1442; *see also La. World*, 858 F.2d at 248 n.15 (noting that an "evidentiary hearing was unnecessary under the circumstances," where the debtor-in-possession's officers and directors "neither refuted any of the Committee's claims nor objected to them").

120.    HMIT does not even attempt to meet its burden to establish that HCMLP or the Trust unjustifiably refused to pursue HMIT's claims, or to present facts to enable the Court to conduct a cost-benefit analysis and conclude that HMIT's proposed claims are "valid and profitable." *La. World*, 858 F.2d at 253 n.20. Under HMIT's own authority (*see* Mot. ¶¶ 39–41), courts permitted creditors to sue derivatively on behalf of debtors *only* after conducting such an evidentiary analysis. For example, in *Louisiana World*, the court found that "the Committee demonstrated"—and the debtor-in-possession did not "refute[]" or "rebut[]"—"the existence of a potential cause of action, a demand on the debtor-in-possession, a refusal or inability on the part

of the debtor-in-possession to bring suit, the possibility of a sizeable monetary recovery and, given the contingent nature of the attorney's fee schedule, a limited cost factor." 858 F.2d at 248 n.15.

121.    Here, as discussed at length above, the evidence shows that HMIT's "claims" are spurious, would be a waste of time, money, and effort, and have no purpose but to further Dondero's crusade to burn Highland down, and make good on his explicit thread against Seery. (*See supra* ¶¶ 8–85.)

122.    HMIT's vague assertion that the COB has "conflicts of interest" does not excuse HMIT from having to ask HCMLP and/or the Trust to pursue HMIT's alleged claims or from proving that any refusal to do so was "unjustified." (Mot. ¶¶ 12–14.) In *Louisiana World*, the court conducted the cost-benefit analysis even though the directors and officers of the debtor-in-possession were conflicted. *La. World*, 858 F.2d at 234.[38]

### C.    HMIT Lacks Standing To Bring Derivative Claims Challenging Pre-Confirmation Conduct.

123.    "When a Chapter 11 plan is confirmed," the debtor loses "its authority to pursue claims as through it were trustee," unless it makes a "specific and unequivocal" "reservation of claims." *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) (cleaned up; collecting cases). "Without an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved." *Id.* (cleaned up).

124.    HCMLP did not reserve any claims against Seery or any other Proposed Defendant. (Docket No. 1875-3.) Therefore, neither HCMLP nor the Trust has standing to bring claims against Seery based on conduct occurring before August 11, 2021, the Effective Date of the Plan. *Wooley*, 714 F.3d at 864. Because HMIT seeks to bring derivative claims on behalf of both HCMLP and

---

[38] Moreover, HMIT did not ask the COB's independent member to pursue its proposed "claims," even though the independent member is empowered to make decisions on behalf of the COB if the other members are conflicted. (Trust Agmt. § 4.6(c).)

the Trust, HMIT's "standing is contingent upon" HCMLP's and the Trust's standing." *Id.* ("[A] creditor can derive standing to bring a debtor's claim only if the debtor itself could bring the claim."). HMIT therefore lacks standing to challenge any pre-confirmation conduct. Other than the "success fee" portion of Seery's compensation, every single allegation against Seery, including the alleged breaches of fiduciary duties, is based on pre-effective date conduct.[39]

## III.    HMIT Did Not Satisfy The Procedural Requirements To Bring A Derivative Action.

### A.    HMIT Failed To Include The Litigation Trust As A Party.

125.    It is settled law that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a); *see BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440, 450 (N.D. Tex. 2015) ("The Rule 17(a) requirement is in essence a codification of the prudential standing requirement that a litigant cannot sue in federal court to enforce the rights of third parties.") (cleaned up; collecting cases). "The real party in interest is the person with the right to sue under substantive law, and the determination whether one is the real party in interest with respect to a particular claim is based on the controlling state or federal substantive laws." *BCC*, 129 F. Supp. 3d at 453 (cleaned up; collecting cases).

126.    HMIT seeks to bring a "derivative action benefitting and on behalf of the Reorganized Debtor [HCMLP] and the [] Claimant Trust." (Compl. ¶¶ 1, 11.) But the Claimant Trustee transferred to the Litigation Trust "any and all Causes of Action," with limited exceptions not relevant here. (*See supra* ¶ 89.) The Litigation Trust is therefore the "real party in interest,"

---

[39] The movant in *Wooley* also alleged that (i) the complained-of breaches of fiduciary duty were kept "secret," (ii) the movant did not discover the claims until after confirmation, and (iii) it would therefore be inequitable to preclude its lawsuits. 714 F.3d at 865–66. The Fifth Circuit denied standing, notwithstanding later discovered "facts," because "[a]llowing [movant] to assert these claims simply because some of the underlying facts were unknown at the time the Plan was confirmed would be inconsistent with the 'nature of a bankruptcy which is designed primarily to secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time." *Id.* at 866. Here, HMIT had knowledge of at least some of the "facts," including Dondero's alleged disclosure of MGM's inside information to Seery, before confirmation and did not object.

and HMIT lacks prudential standing to bring derivative claims on behalf of Highland. *See, e.g.*,
*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*, 247 F. Supp.
3d 377, 414–15 (S.D.N.Y. 2017) (holding that plaintiff "lacks standing to bring a derivative claim
against Defendant" because it "transferred all rights to such claim").

127.    The Litigation Trust is likewise "an indispensable party to a [beneficiary's]
derivative suit," so HMIT cannot bring a derivative action without including the Litigation Trust.
*Schwab v. Oscar (In re SII Liquidation Co.)*, 2012 WL 4327055, at *8 (Bankr. S.D. Ohio Sept. 20,
2012) (cleaned up) (dismissing derivative action); *see also* Fed. R. Civ. P. 19(a)(1) (requiring
joinder of indispensable party); Fed. R. Bankr. P. 7019; Fed. R. Civ. P. 12(b)(7) (permitting
dismissal for "failure to join a party under Rule 19"); Fed. R. Bankr. P. 7012(b).

128.    HMIT's footnoted assertion that it "seeks standing to bring this action as a
derivative action on behalf of the Litigation Sub-Trust" (Compl. ¶ 1 n.1) fails because, as discussed
above, HMIT lacks standing to bring such "double derivative" claims (*see supra* Section I.C). The
Litigation Trust is wholly owned by the Trust and, as matter of Delaware law, HMIT must
demonstrate "parent level standing" to bring a "double derivative" claim that belongs to the
Litigation Trust. *Sagarra*, 34 A.3d at 1079–81; *Lambrecht*, 3 A.3d at 282. Because HMIT lacks
standing to bring a derivative claim on behalf of the Trust (*see supra* Section I.A), it also lacks
standing to bring a double derivative claim.

**B.    HMIT Failed To Make Any Demand To The Litigation Trustee And
Fails To Plead Demand Futility With Particularity.**

129.    HMIT's failure to include the Litigation Trust as a party was no accident. The
Litigation Trust is a Delaware statutory trust and wholly-owned subsidiary of the Trust. (Litigation
Sub-Trust Agmt. § 1.1(e).) Even if HMIT had standing under Delaware law to bring a derivative
action on behalf of the Litigation Trust, which it does not (*see supra* ¶ 128), HMIT can proceed

derivatively only "if (i) [HMIT] demanded that the [Trustee] pursue the corporate claim and [he] wrongfully refused to do so or (ii) demand is excused because the [Trustee is] incapable of making an impartial decision regarding the litigation." *United Food & Comm. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) (collecting cases). Accordingly, to allege a derivative action under Rule 23.1, which HMIT claims governs (*see* Compl. ¶ 6), HMIT must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); Fed. R. Bankr. P. 7023.1. HMIT failed to do so.

130.    This Court approved Marc Kirschner ("Kirschner") as Litigation Trustee. (Confirmation Order ¶ 45; *see also* Morris Dec. Ex. 44 (the "Litigation Sub-Trust Agreement") § 1.1(r).) HMIT admits that it did not make any effort to make a pre-filling demand to Kirschner regarding this action. (Compl. ¶ 1 n.1.) Instead, HMIT asserts that "[a]ny demand on the Litigation Sub-Trust would be [] futile" because "the Litigation Trustee serves at the direction of the Oversight Board." (*Id.* ¶ 1 n.1; Mot. ¶ 11 n.13.) This conclusory assertion does not allege a single fact casting "reasonable doubt" on Kirschner's objectivity or showing that he was "dominate[d]" by interested parties, let alone with particularity. *Zuckerberg*, 250 A.3d at 877–91 (surveying Delaware demand futility law); (Mot. ¶ 11).[40] Because HMIT has not satisfied either the demand requirement or demand futility, it cannot bring a derivative action. *See, e.g.*, *Zuckerberg*, 250 A.3d at 900–901 (granting "motion to dismiss under Rule 23.1"); *In re Six Flags Ent. Corp. Deriv. Litig.*, 2021 WL 1662466, at *8 (N.D. Tex. Apr. 28, 2021) (dismissing derivative action with

---

[40] As discussed *supra* note 38, HMIT also does not explain its failure to make any pre-filing demand to the independent member of the COB, who it does not allege is conflicted. (Compl. ¶ 10.)

prejudice for failure to plead demand futility under Delaware law "under Rule 23.1's heightened standard").

### C.   HMIT Cannot "Fairly And Adequately" Represent The Interests of Claimant Trust Beneficiaries.

131.   Rule 23.1 provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a); Fed. R. Bankr. P. 7023.1. To be an adequate representative, "a plaintiff in a [] derivative action must not have ulterior motives and must not be pursuing an external personal agenda." *Energytec, Inc. v. Proctor*, 2008 WL 4131257, at *6 (N.D. Tex. Aug. 29, 2008) (cleaned up) (quoting *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992)). To determine adequacy, courts evaluate, *inter alia*, "economic antagonisms between representative and class," "other litigation pending between the plaintiff and defendants," "plaintiff's vindictiveness towards the defendant," and "the degree of support plaintiff was receiving from the [beneficiaries] he purported to represent." *Id.* *6–7 (quoting *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir. 1980)).

132.   HMIT is an inadequate representative. HMIT is effectively controlled by Dondero, and the Plan recognizes HMIT as a Dondero Related Entity (Plan Art. I.B.110). This Court found that "Mr. Dondero and the Dondero Related Entities have harassed the Debtor," including with "substantial, costly, and time-consuming litigation." (Confirmation Order ¶ 77.) This Court also found that Dondero threatened to "burn down the place" if he did not get his way and that "Mr. Dondero and his related entities," including HMIT, "will likely commence litigation against the Protected Parties," including Seery. (*Id.* ¶ 78.) This Court has even referred to Dondero as an "antagonist" whose conduct has made this bankruptcy "contentious, protracted, and unpleasant," and akin to a "corporate divorce." *In re Highland Cap. Mgmt., L.P.*, 2021 WL 2326350, at *1, *25

(Bankr. N.D. Tex. June 7, 2021) (holding Dondero in "civil contempt of court"). The Fifth Circuit similarly recognized that Dondero and his related entities sought to "frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients." *NexPoint*, 48 F.4th at 426; *see also id.* at 427–28. Dondero's own written threats confirm these findings: "Be careful what you do -- last warning." (*See supra* ¶ 25.) Dondero-controlled HMIT is pursuing this derivative action for "ulterior motives" of "antagonism" and "vindictiveness," cannot "fairly and adequately the interests" of the Claimant Trust Beneficiaries, and should be not be permitted to "bring a derivative suit on their behalf." *Energytec*, 2008 WL 4131257, at *6–7 (dismissing derivative action by former CEO on adequacy grounds because he sought to "revers[e] the events leading to his removal" and was in litigation with other shareholders).[41]

## IV.    HMIT Has No Direct Claims Against The Highland Parties.

133.    Throughout its Motion and Complaint, HMIT makes vague references to unspecified direct claims against the Proposed Defendants. (*See, e.g.*, Motion ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Compl. ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").) But "a claim is not 'direct' simply because it is pleaded that way." *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)). "Fifth

---

[41] HMIT and Dondero also have a "personal economic interest" and other claimants "do not share this interest." *Energytec*, 2008 WL 4131257, at *7. Specifically, HMIT has asserted in another proceeding that Highland has sufficient assets "to pay class 8 and class 9 creditors 100 cents on the dollar." (Docket No. 3662 ¶ 5.) If true, HMIT's proposed claims will benefit only HMIT and, potentially, The Dugaboy Investment Trust (controlled by Dondero) and Mark Okada (HCMLP's co-founder) as the holders of Class 11 interests. Proposed Defendants reserve the right to contest HMIT's assertion.

Circuit precedent [] dictates that," to determine whether claims are direct or derivative, "this Court look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization." *Id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)).

134.    Under Delaware law, "whether a claim is solely derivative or may continue as a dual-natured claim 'must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'" *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original). "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'" *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at \*24 (same).

135.    Similarly, in the bankruptcy context, "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate." *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)). "In that situation, only the bankruptcy trustee has standing to pursue the claim for the estate . . . ." *Id.* "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate." *Id.*

136.    Even if HMIT had viable claims (it does not), they would be derivative, not direct, under both Delaware law and federal bankruptcy law. HMIT argues that the Proposed Defendants' "alleged actions devalued HMIT's interest in the Debtor's Estate, including, without limitation, payment of excessive compensation to Seery." (Mot. ¶ 67.) Thus, by its own admission, any

alleged harm to HMIT "comes about only because of harm to the debtor," so the alleged "injury

is derivative." *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery)

derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third

parties."); *see also El Paso,* 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate

overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded

as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del.

Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any

independent harm suffered by the limited partners"; "the partnership suffered all the harm at

issue—it paid too much").

137.    HMIT's reliance on *Pike v. Texas EMC Management, LLC*, 610 S.W.3d 763 (Tex.

2020), is misplaced. The fact that "a partner or other stakeholder in a business organization has

***constitutional*** standing to sue for an alleged loss in the value of its interest in the organization"

(Mot. ¶ 67 (quoting *Pike*, 610 S.W.3d at 778) (emphasis added)) is irrelevant. As the Court

explained, it is "the statutory provisions that define and limit a stakeholder's ability to recover

certain measures of damages, which protect the organization's status as a separate and independent

entity," and therefore considered the matter under Texas partnership law. *Pike*, 610 S.W.3d at 778–

79. Here, HMIT admits that both the Trust and HCMLP are governed by Delaware law, which

does not recognize any direct (or derivative) claims by HMIT.

138.    Even assuming, *arguendo*, that HMIT could bring direct claims (it cannot), the

Highland Parties cannot be held liable for them. "Under the Delaware Statutory Trust Act, 'a

trustee, when acting in such capacity, shall not be personally liable to any person other than the

statutory trust or a beneficial owner for any act, omission or obligation of the statutory trust or any

trustee thereof' except 'to the extent otherwise provided' by the trust's governing document."

*Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2020 WL 2521557, at *8 (Del. Super. May 18,

2020) (quoting 12 Del C. §§ 3803(b)–(c)). The Trust Agreement likewise limits "personal

liability" "to the fullest extent provided under Section 8303 of the Delaware Statutory Trust Act."

(Trust Agmt. § 8.3.) Because, as discussed above, HMIT is not a "beneficial owner" of the

Claimant Trust (*see supra* Section I.A), it cannot bring direct claims against Proposed Defendants

under Delaware law.

## V.     HMIT's Proposed Complaint Fails To Plausibly Allege Any Claims Against The Proposed Defendants.

139.    Because HMIT lacks standing, this Court need not reach the merits of HMIT's

proposed Adversary Complaint. As a matter of judicial economy, however, the Highland Parties

respectfully request that this Court address the lack of merit as an alternative basis to deny the

Motion. HMIT fails to adequately allege its claims under any standard. HMIT's claims are not

colorable because they lack foundation, and HMIT's "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements," fail to "[]cross the line from

conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp.

v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

### A.     HMIT Does Not Adequately Allege Any Breach Of Fiduciary Duties (Count I).

140.    HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material

non-public information to Stonehill and Farallon" before their purchase of certain Highland claims,

and (ii) by receiving "compensation paid to him under the terms of the [Trust Agreement] since

the Effective Date of the Plan in August 2021." (Compl. ¶¶ 64–67.) Under Delaware law, which

HMIT admits governs (*see* Mot. ¶ 21 n.24), "[t]o bring a claim for breach of fiduciary duty, a

plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that

duty.'" *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15,

2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at \*8 (Del. Ch. Feb. 28, 2020)). HMIT fails to plausibly allege either element.

141.     ***First***, HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate" (Compl. ¶ 63) "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders. *See Gilbert v El Paso Co.*, 1988 WL 124325, at \*9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd,* 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at \*11 (Del. Ch. Nov. 7, 2013) (same). Because Seery did not owe any "duty" to HMIT directly and individually, the Complaint fails to state a claim for breach of fiduciary duty to HMIT.

142.     ***Second***, to the extent Seery owed any fiduciary duties to HMIT or the Debtor, he did not breach them by allegedly communicating with Farallon and Stonehill. (*See* Compl. ¶ 64.) As this Court recognized, "claims trading in bankruptcy is [] pretty unregulated—it's just kind of between the claims trader and the transferee." (Morris Dec. Ex. 43 at 53:6–7.) In fact, this Court recognized that "for decades now, since a rule change in the last century, no court approval and order is necessary unless the transferor objects." (Morris Dec. Ex. 6 at 20); *see also* Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of Chapter 11s*, 29 Am. Bankr. Inst. J. 61 (July/Aug. 2010) ("In 1991, Fed. R. Bankr. P. 3001(e) was amended to limit the court's oversight on claims trading" such that "only the transferor may object to a transfer.") (quoting Michael H. Whitaker, *Regulating Claims Trading in Chapter 11 Bankruptcies: A Proposal for Mandatory Disclosure*, 3 Cornell J.L. & Pub. Pol'y 303, 320 (1994)). Because none of the

transferors objected to the claims trades at issue, Seery's alleged actions in connection with them cannot constitute a breach of any fiduciary duties.

143.    ***Third***, HMIT's "conclusory allegations" and "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief." *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up). As to Seery's discussions with Farallon and Stonehill, HMIT asserts that Seery "disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits." (Compl. ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.) HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, or what "assurances" he made. The few facts HMIT provides contradict its own allegations. The only purportedly "material non-public information" identified is the Complaint is the MGM E-Mail Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." (Compl. ¶ 45.) This information was widely reported in the financial press at the time (*see supra* ¶¶ 30–37), so it cannot constitute material non-public information as a matter of law. *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)). HMIT asserts that Farallon and Stonehill's purchases "made no sense" without access to "material non-public information." (Compl. ¶¶ 3, 50.) But HMIT admits that Farallon and Stonehill purchased Highland claims at discounts of 43% to 65% to their allowed amounts, so they would therefore receive at least an 18% return based on publicly available estimates in Highland's Court-approved Disclosure Statement. (*Id.* ¶¶ 3, 37, 42.)

144.     As to Seery's compensation, HMIT asserts that it was "excessive," and speculates

that compensation negotiations between Seery and the COB "were not arm's-length." (Compl.

¶¶ 4, 13, 54, 74.) But HMIT does not say one word about the process for negotiating and approving

Seery's compensation. Nor does HMIT allege what Seery's compensation actually is, let alone

compare it to others' compensation to show that it is "excessive." HMIT's assertion that Seery's

compensation package was initially "composed of a flat monthly pay" but now "is also

performance based" (*id.* ¶ 4) is wrong and contradicted by Court-approved documents. The

structure of Seery's post-effective date compensation, which includes a "Base Salary," "success

fee," and "severance," was fully disclosed in the Trust Agreement, which was publicly filed in

advance of the Plan confirmation hearing and approved by this Court and the Fifth Circuit as part

of the Plan (*see supra* ¶¶ 78–79).

145.     Thus, HMIT fails to allege facts that, even if true (and they are not), support a

reasonable inference that Mr. Seery breached his fiduciary duty to HMIT or the estate as a result

of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty

of loyalty. *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of

duty of loyalty against a director where "conclusory allegations" failed to give rise to inference

that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507

(Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint

makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad

faith and knowing manner,' no facts pled in the complaint buttress that accusation.")

## B.     HMIT's Theories Of Secondary Liability Fail (Counts II and III).

146.     HMIT seeks to hold Proposed Defendants secondarily liable for Seery's alleged

breach of fiduciaries duties on an aid/abet theory (Compl. ¶¶ 69–74) and conspiracy theory of

liability (*id.* ¶¶ 75–81). As a threshold matter, HMIT has not plausibly alleged any primary breach

of fiduciary duties, so it cannot pursue secondary liability for the same alleged wrongdoing. *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).[42]

147.    Even if HMIT could pursue secondary liability, it has not plausibly alleged any civil conspiracy. Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.* at 141 (cleaned up).

148.    HMIT has not plausibly alleged any "meeting of the minds." HMIT asserts that "Defendants conspired with each other to unlawfully breach fiduciary duties" (Compl. ¶ 76), which is precisely the sort of "legal conclusion" the Supreme Court held is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66). HMIT repeats four times that Seery provided information to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation" (Compl. ¶ 77; *see also id* ¶¶ 4, 47, 74), but never provides

---

[42] Because HMIT breach of fiduciary duty claim is governed by Delaware law, its aid/abet theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas); By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

"nonconclusory factual allegations" in support. *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 565–66). HMIT vaguely alleges "upon information and belief" that Seery "did business with Farallon" and "served on [a] creditors committee" with Stonehill. (Compl. ¶ 48.) HMIT also asserts "[u]pon information and belief" that Farallon "conducted no due diligence but relied on Seery's profit guarantees." (*Id.* ¶ 40.) These allegations "upon information belief" are "wholly speculative and conclusory," and therefore do "not satisfy the pleading requirements under Rule 8(a)." *Hargrove v. WMC Mortg. Corp.*, 2008 WL 4056292, at *3 (S.D. Tex. Aug. 29, 2008) (citing *Twombly*, 550 U.S. at 555).

### C.   HMIT Seeks Remedies That Are Not Available As A Matter Of Law (Counts IV, V, and VI).

149.    HMIT seeks a grab bag of unavailable remedies, including (1) equitable disallowance (Compl. ¶¶ 82–87), (2) unjust enrichment (*id.* ¶¶ 88–94), (3) declaratory relief (*id.* ¶¶ 95–99), (4) punitive damages (*id.* ¶¶ 100–01), and (5) equitable tolling (*id.* ¶¶ 103–08), several of which are incorrectly pleaded as causes of action. None of these remedies are available under applicable law.

150.    **First**, Seery does not have any bankruptcy claims that can be subordinated or disallowed. (*Id.* ¶¶ 82–87.) In any event, the Fifth Circuit has expressly rejected equitable disallowance as remedy available under the Bankruptcy Code. *See SED Holdings, LLC v. 3 Star Props., LLC*, 2019 WL 13192236, at *2 (S.D. Tex. Sept. 11, 2019) ("[T]he claim may only be subordinated, but not disallowed.") (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 (5th Cir. 1977)); *see also In re Lightsquared Inc.*, 504 B.R. 321, 339–40 (Bankr. S.D.N.Y. 2013) ("[T]he Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b).") (citing *Mobile Steel*, 563 F.2d at 699 n.10).

151.    **Second**, under Texas law, "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).[43] Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)). Here, Seery's compensation is governed by express agreements (*see supra* ¶¶ 78–79), so unjust enrichment is unavailable as a theory of recovery.

152.    **Third**, HMIT brings "claims for declaratory relief, but a request for declaratory relief is not an independent cause of action, [and] in the absence of any underlying viable claims such relief is unavailable." *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collins Cnty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)).

153.    **Fourth**, HMIT has no basis to seek punitive damages. HMIT abandoned its fraud claim so its sole claim for primary liability is breach of fiduciary duty. As a matter of Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action." *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

---

[43] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

154.     ***Finally***, HMIT cannot invoke "the discovery rule," "equitable tolling doctrine,"
"fraudulent concealment," or "any other applicable tolling doctrine" to toll the statute of
limitations (Compl. ¶ 108), because this Court has held that that HMIT "has known about the
conduct underlying the desired lawsuit for well over a year, based on activity that has occurred in
the bankruptcy court" (Docket No. 3713 at 2–3); *see also* Order at 2–3, *In re Hunter Mt. Inv. Tr.*,
No. 23-10376 (5th Cir. Apr. 12, 2023) (declining to disturb this Court's "appropriate" Order,
because HMIT "approached the brink of the limitations period before seeking leave to assert its
claim").

## CONCLUSION

155.     For the foregoing reasons, the Highland Parties respectfully request that this Court
deny the Motion in its entirety and grant such other relief this Court deems just and proper.[44]

---

[44] Denial should be ***with prejudice***. HMIT "has known about the conduct underlying the desired lawsuit for well over
a year" (Docket No. 3713 at 2–3) and has already filed two proposed Complaints. It should not be permitted to file a
third (or more), which "would be futile." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 378 (5th Cir. 2014) (affirming
denial of leave to amend as futile) (collecting cases).

App. 3543

Dated: May 11, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and the Highland Claimant Trust*

**WILLKIE FARR & GALLAGHER LLP**
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

-and-

**REED SMITH LLP**

*/s/ Omar J. Alaniz*
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for James P. Seery, Jr.*

App. 3544