# Appendix Exhibit 160

File No. 2023-25

**IN THE MATTER OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

**- and -**

**IN THE MATTER OF
NEXPOINT HOSPITALITY TRUST**

(In connection with a transactional proceeding under Rule 16 and
under Subsection 127(1) of the *Securities Act*, R.S.O. 1990, c. S.5)

**FACTUM OF THE RESPONDENT**

October 17, 2023

**GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Alan Mark**  LSO No. 21772U
amark@goodmans.ca

**Julie Rosenthal**  LSO No. 41011G
jrosenthal@goodmans.ca

**Brittni Tee**  LSO No. 85001P
btee@goodmans.ca

Tel:  416.979.2211

Lawyers for the Respondent, NexPoint Hospitality
Trust

TO:        **POLLEY FAITH LLP**
TD North Tower
77 King St. W., Suite 2110
Toronto ON  M5K 2A1

**Andrew Faith**  LSO No. 47795H
afaith@polleyfaith.com

**Jeffrey Haylock**  LSO No. 61241F
jhaylock@polleyfaith.com

**Jeffrey Wang**  LSO No. 85736W
jwang@polleyfaith.com

Tel: 416.365.1600

Lawyers for the Applicant, Highland Capital Management, L.P.


AND TO:     **ONTARIO SECURITIES COMMISSION**
Office of Mergers and Acquisitions
20 Queen Street West
Suite 2200
Toronto, ON  M5H 3S8

**Jason Koskela**
Director, Office of Mergers and Acquisitions
jkoskela@osc.gov.on.ca

Tel:  647.294.2735

I.    OVERVIEW

1.      The core purpose of section 127 of the *Securities Act* is to allow staff of the Commission

to seek orders in the public interest.  While the Tribunal may consider an application by a private

party, the cases have held that such recourse should be treated as exceptional.  Section 127 is not

to be used by private parties as a means to address private law complaints, or to pursue

enforcement with respect to past breaches of securities law.

2.      The cases in which the public interest jurisdiction has been exercised typically relate to a

transaction or tactic that is of broad interest to market participants or to actions that would bring

the integrity of the markets into disrepute, such as unfair tactics in going private transactions or

the misuse of shareholder rights plans.  This is not such a case.

3.      The applicant, Highland Capital Management, holds 7.25% of the outstanding units of

the respondent, NexPoint Hospitality Trust, having a value of approximately $536,000.

Highland alleges that it requires additional disclosure in order to make a reasonably informed

decision as to whether to vote in favour of amendments to conversion rights granted to creditors

as part of COVID loan agreements.  The amendments will confer a clear and undeniable benefit

on the unitholders at no cost.  More specifically, the amendments, which were required by the

TSXV as a condition of continued listing, will either remove the creditors' conversion rights

entirely or will shorten the time period in which the rights can be exercised.  The amendments

will also reduce the amount convertible.  And they will make the rights significantly more

expensive for the creditors to exercise, reducing the potential dilution of the REIT's unitholders.

4.      The applicant provides no explanation as to how the additional disclosure will help it in

deciding whether to vote in favour of these amendments which offer a clear benefit to the REIT

and its unitholders.  Instead, the applicant suggests that it requires the disclosure in order to investigate certain inconsistencies in the REIT's historical disclosure, or in the disclosure made by other related parties.

5.     Such a backward-looking application, unrelated to NexPoint's future conduct, is at its core enforcement-related and, as such, is not properly brought under s. 127.  Indeed, Highland does not even attempt to argue that its allegations engage the public interest or that the issues raised have any implication for the markets more broadly.  Nor does Highland allege – nor could it – that the amendments to the loan agreements, which are manifestly to the benefit of the unitholders, are in any way unfair, improper, fraudulent, or otherwise abusive, nor does it allege that any unitholders will suffer prejudice if they are adopted.

6.     In short, there is nothing "extraordinary" about Highland's application that justifies invoking the Tribunal's public interest jurisdiction.  Its request for standing, and this application, should be dismissed.

7.     In any event, Highland has not advanced a *prima facie* case and its complaints are without merit and do not stand up to even the most cursory examination.  Some are clearly untenable in the face of the disclosure that is provided by the Management Information Circular, while others do not relate to the amendments that are in fact before the meeting.  As for its request to exclude certain unitholders from voting, Highland cannot point to any legal basis for that request, and certainly no legal basis that finds any support in the evidence led.

## II.    FACTS

**Background**

8.      From the time of its IPO, NexPoint's business comprised a number of hotel properties which catered in large part to business travelers.  That business was severely affected by the onset of the pandemic, due to the precipitous (and persistent) decline in business travel.[1]

9.      In order to alleviate the financial pressure that it was under, NexPoint received 32 loans in the aggregate amount of US$56,165,000 between June 2021 and September 2022.  The loans were all extended by entities controlled or managed by James Dondero, who is NexPoint's largest unitholder, controlling in excess of 70% of the issued units.[2]

10.      At the time that the loans were made, NexPoint filed the requisite notices with the TSXV as loan submissions pursuant to TSXV Policy 5.1 – *Loans, Loan Bonuses, Finder's Fees and Commissions*.[3]

11.      Although the loans constituted related-party transactions, NexPoint was not required to obtain a formal valuation, as it relied upon the exemption from the Formal Valuation Requirement in s. 5.5(b) of MI 61-101 (which is the "Specified Markets Exemption").[4]  And

---

[1] NexPoint Audited Financial Statements for the year ended December 31, 2020, p. 8, Exhibit "O" to the Seery Affidavit, Application Record, Tab 2(O), p. 1304.

[2] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 17 and 21, Application Record, Tab 2(A), p. 64 and 68.

[3] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 18, Application Record, Tab 2(A), p. 65.

[4] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 17, Application Record, Tab 2(A), p. 64.

NexPoint was not required to obtain minority approval, as it relied upon the exemption in s. 5.7(1)(a) of MI 61-101 (which applies where the fair market value of the transaction does not exceed 25% of the issuer's market capitalization). NexPoint also had available to it, and relied upon, the "Financial Hardship Exemption", set out in s. 5.7(1)(e) (which applies when the issuer is in serious financial difficulty).[5]

12.     At no time prior to the summer of 2023 did the applicant raise any concern with the loans or with the propriety of NexPoint's reliance upon exemptions to the formal evaluation requirement and the minority approval requirement.

13.     As will be discussed below, in December 2022, the TSXV advised for the first time that, in its view, the loans ought to have been the subject of filings under TSXV Policy 4.1 (which governs private placements) and not Policy 5.1 (which governs loans). As a result, the TSXV demanded that certain amendments be made to the conversion rights attached to the loans in order to bring the loans into compliance with Policy 4.1.

**The Loan Amendments at Issue and the Disclosure Contained in the Management Information Circular**

14.     The Management Information Circular explains that there are 32 loans in question and that all were made by entities controlled or managed by James Dondero, who beneficially owns or controls more than 70% of the REIT's outstanding units:

---

[5] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 18, Application Record, Tab 2(A), p. 65.

The REIT received 32 loans from entities controlled or managed by James Dondero between June 2021 and September 2022 in the aggregate amount of US$56,165,000.[6]

15.    The Circular goes on to explain that:

(a)    the loans are unsecured;

(b)    each loan has a 20-year term;

(c)    each loan bears interest, with the applicable interest rate ranging from 2.25% to 7.5% per year, which, in each case, was the market rate as at the date of issuance;

(d)    the principal and interest owing under each loan is convertible to Class B Units[7] of the operating partnership of the REIT at the option of the holder of the loan at any time; and

(e)    the conversion price is set at the value of the Class B Units at the time of conversion.

16.    The Circular states:

Each of the COVID Loans is unsecured, has a 20-year term and bears interest at interest rates ranging from 2.25% per year to 7.5% per year (which were market interest rates at the time of their issuance).  The principal and interest owing under the COVID Loans is convertible into

---

[6] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 17, Application Record, Tab 2(A), p. 64.

[7] The Management Information Circular also explains that the Class B Units of the operating partnership do not carry voting rights, but are, in all material respects, economically equivalent to units of the REIT.  See Management Information Circular, Exhibit "A" to Seery Affidavit, p. 7, Application Record, Tab 2(A), p. 54.

Class B Units of the OP, at the option of the holder at any time, based on the value of a Class B Unit at the time of conversion.[8]

17.     With respect to the amendments at issue, the Circular explains that the need for them arose because the TSXV advised the REIT in December 2022 (long after notice of the loans had been filed with the exchange) that the loans needed to be treated as "Convertible Securities", governed by TSXV Policy 4.1, rather than as loans, pursuant to TSXV Policy 5.1:

> The COVID Loans were filed with the TSXV at various points during 2021 and 2022, as loan submissions pursuant to TSXV Policy 5.1 – *Loans, Loan Bonuses, Finder's Fees and Commissioner*.
>
> Although the REIT believed that the COVID Loans were properly subject to Policy 5.1 and was not informed of any alternative treatment of the COVID Loans at the time of the filings, in December 2022, the TSXV advised the REIT that the COVID Loans were required to be treated as "Convertible Securities" under TSXV Policy 4.1 – *Private Placements* rather than loans under Policy 5.1[9]

18.     Policy 4.1 limits the period within which conversion rights can be exercised to no more than five years from the date of issuance of the convertible security (in this case, the loan):

> The Conversion Period must expire no later than five years from the date of issuance of the Convertible Securities.[10]

19.     Policy 4.1 also provides that the conversion price for a convertible security must not be less than the market price as at the "Price Reservation Date":

---

[8] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 17, Application Record, Tab 2(A), p. 64.

[9] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 18, Application Record, Tab 2(A), p. 65.

[10] TSXV Policy 4.1, s. 2.3(b).

- 9 -

> The minimum Conversion Price must never be less than the Market Price
> (as of the Price Reservation Date).[11]

20.     Consistent with those provisions, and as disclosed by the Management Information

Circular, the TSXV told the REIT that it would require certain amendments to the loans, namely:

(a)     that the note holders' conversion rights either be removed or be shortened to five

years from the date of each loan's issuance;

(b)     that the conversion rights be limited to the principal amount of the loan; and

(c)     that the conversion price be fixed at the market price of the REIT's units on the

date that the loan was issued.

21.     The Circular states:

> . . . [T]he TSXV required the following amendments to the COVID Loans:
> (i) either the conversion feature be removed or limited to five years from
> the date of issuance of the COVID Loan; (ii) the conversion feature be
> limited to the principal amount of the COVID Loan (rather than the
> principal amount including interest); and (iii) the conversion price be fixed
> at a price equal to the market price of the REIT's Units on the TSXV at
> the time of the issuance of the COVID Loan.[12]

22.     The Circular goes on to explain that, if the amendments are implemented, only the

principal amount of the loans would be convertible into units (rather than both principal and

interest) and the note holders' conversion rights would expire between July 1, 2026 and

---

[11] TSXV Policy 4.1, s. 2.3(a).  The "Price Reservation Date" is, roughly speaking, the date that
the issuer makes the requisite filings related to the private placement with the TSXV under
Policy 4.1.

[12] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 18-19, Application
Record, Tab 2(A), p. 65-66.

September 30, 2027 (depending on the date of issuance of the loan in question).  However, the

term of the loans themselves would remain 20 years:

> If the Amendments are implemented, only the principal amount of each of
> the COVID Loans will be convertible into Class B Units for five-year
> terms ending between July 1, 2026 and September 30, 2027; however, the
> term of the COVID Loans shall remain as 20 years from their date of
> issuance.[13]

23.     And the Circular explains that the amended conversion rights, if approved, would apply

to a total of US$47,665,000 in loans.  An additional loan (in the amount of US$8.5 million)

would have its conversion right removed altogether:

> For one COVID Loan for an amount of US$8.5 million, the conversion
> right will be removed altogether.  In addition, if the Amendments are
> implemented, the COVID Loans with conversion rights will be for an
> aggregate amount of US$47,665,000. . .[14]

24.     With respect to the conversion price – i.e., the price which the creditor would pay to

convert its debt instrument into Class B units, if the amendments are approved, that price would

increase at least six-fold and as much as ten-fold, based on current market prices of the REIT's

units.  To explain, the loans as they currently stand provide that the conversion price is to be

based on the value of a Class B unit at the time of conversion.  Based on current market price,

the value of a Class B unit is US$0.25.  However, if the amendments are approved, the

conversion prices will be fixed at prices ranging from US$1.60 to US$2.50:

---

[13] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record,
Tab 2(A), p. 66.

[14] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record,
Tab 2(A) p. 66.

> . . . [T]he conversion price for the principal outstanding will be fixed at
> prices ranging from US$1.60 to US$2.50 . . .[15]

25.     In sum, the amendments restrict rights that had been granted to the REIT's creditors, in

that the amendments will either remove the rights entirely, or will shorten the time period within

which the rights can be exercised and will reduce the amount convertible to the principal amount

of the loans only.  Based on the REIT's current unit price, the amendments will also make those

rights significantly more expensive for the lenders to exercise and will significantly reduce the

potential dilution of REIT unitholders.  For the REIT and its unitholders, the amendments confer

a clear and undeniable benefit, at no cost.  The applicant does not assert otherwise.

26.     As further disclosed by the Circular, the TSXV has demanded the amendments in order

to satisfy its requirements for continued listing on the exchange.  If the amendments are not

approved, then the TSXV may halt or suspend trading in the units, and/or delist the REIT:

> If the Amendments are not approved at the Meeting, the REIT will engage
> with the TSXV to seek alternative solutions to satisfy the TSXV listing
> requirements; however, there can be no assurance that a satisfactory
> solution will be found, and if a solution is not found, the TSXV may halt
> trading in the Units, suspend trading in the Units and/or initiate a delisting
> review of the REIT's Units as, absent the Amendments, the REIT would
> not be in compliance with TSXV listing requirements.[16]

27.     Not surprisingly, given all of the foregoing, the board of the REIT concluded that the

amendments were in the best interests of the REIT:

---

[15] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record,
Tab 2(A), p. 66.

[16] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record,
Tab 2(A), p. 66.

> The Board, having undertaken a thorough review of, and having: (i) considered the terms of the Amendments to the COVID Loans; (ii) considered the need to comply with the requirements of the TSXV in order to maintain a listing for the Units, and (iii) consulted with its legal advisors, concluded that the Amendments are in the best interests of the REIT and agreed to pursue the approval of the Amendments.[17]

28.     Consistent with that conclusion, the Circular sets out the board's recommendation that unitholders approve the amendments:

> The Board has unanimously approved the Amendments to the COVID Loans (with James Dondero declaring his interest in the Amendments and abstaining from voting) and recommends that the Unitholders vote **FOR** the Amended COVID Loans Resolution.[18]

29.     In addition, the Circular notes that, because the amendments relate to loans with entities controlled by Mr. Dondero, and because Mr. Dondero owns or controls more than 10% of the REIT's units, the amendments constitute a "related party transaction", within the meaning of MI 61-101 and, therefore, require minority approval in order to take effect:

> The Amendments constitute a "related party transaction" within the meaning of MI 61-101, as the Amendments have the effect of amending the terms of the COVID Loans, which are securities of the REIT beneficially owned or over which control is exercised by Mr. Dondero (a "related party" of the REIT because of the fact that Mr. Dondero beneficially owns or controls Units of the REIT that carry more than 10% of the voting rights attached to all of the REIT's issued and outstanding Units).
> . . .

---

[17] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record, Tab 2(A), p. 66.

[18] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 20, Application Record, Tab 2(A), p. 67.

> MI 61-101 requires that a related party transaction be subject to "minority approval" . . . of every class of "affected securities" of the issuer. . . [19]

30.     Finally, the Circular contains a statement certifying that the facts set out in it are true and complete:

> The foregoing contains no untrue statement of a material fact and does not omit to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made.[20]

31.     The applicant alleges that the foregoing disclosure – relating to amendments that are being demanded by the regulator, and that are patently to the benefit of the REIT and its unitholders – is somehow inadequate.  However, the applicant does so without any explanation as to how additional information would assist it in deciding how to vote.  And tellingly the applicant makes no suggestion – nor could such a suggestion credibly be made – that the amendments pose any risk of prejudice to the unitholders.

## III.    LAW AND ARGUMENT

### The Tribunal's Public Interest Jurisdiction Is Not Engaged

32.     Although s. 127 provides the Tribunal with broad jurisdiction to make orders intervening in the capital markets where it is in the public interest to do so, this discretion is not unlimited.[21]

---

[19] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record, Tab 2(A), p. 66.

[20] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 40, Application Record, Tab 2(A), p. 87.

[21] *Committee for Equal Treatment of Asbestos Minority Shareholders v Ontario (Securities Commission)*, 2001 SCC 37 at para. 41.

The Tribunal's public interest jurisdiction must be exercised with caution, having regard to "all of the facts, all of the policy consideration at play, all of the underlying circumstances of the case, and all of the interests affected by the matter and the remedy sought."[22]

33.     As this Tribunal has repeatedly affirmed, "The ability of a private party to bring an application under section 127 is intended to be an extraordinary circumstance."[23]  Section 127 is not to be used by private parties as a means to address private law complaints, or to pursue enforcement with respect to past breaches of securities law:

> [Section] 127 cannot be used merely to remedy *Securities Act* misconduct alleged to have caused harm or damages to private parties or individuals.[24]

34.     Rather, the purpose of such applications must be protective, and to prevent future harm to Ontario's capital markets.[25]  As the Commission stated in *MI Developments Inc.*:

> In our view, persons other than Staff are not entitled as of right to bring an application under section 127 where the application is, at its core, for the purpose of imposing sanctions in respect of past breaches of the Act or past conduct alleged to be contrary to the public interest.  In our view, those purposes are regulatory in nature and enforcement related and such applications should be able to be brought as of right only by Staff.[26]

35.     In order for the Tribunal to make an order under its public interest jurisdiction, it must be

---

[22] *Sterling Centrecorp Inc, Re*, 2007 ONSEC 9 at para. 212.

[23] *Catalyst Capital Group Inc.*, 2016 ONSEC 14 at para. 56; *Pearson (Re)*, 2018 ONSEC 53 at para 69.

[24] *Committee for Equal Treatment of Asbestos Minority Shareholders v Ontario (Securities Commission)*, 2001 SCC 37 at para. 45.

[25] *Committee for Equal Treatment of Asbestos Minority Shareholders v Ontario (Securities Commission)*, 2001 SCC 37 at para. 42.

[26] *MI Developments Inc.*, 2009 ONSEC 47 at para. 107.

satisfied that the application raises issues relevant not only to the applicant, but also to the public and the efficient functioning of the capital markets.[27]

36.     In determining whether the Tribunal's public interest mandate is engaged by an application by a private party, the following factors are relevant: (i) whether the application raises a novel issue; (ii) whether the issues raised could have been addressed in previous applications; (iii) whether the application demonstrates that there is a *prima facie* case; and (iv) whether the timing of the application would interfere unduly with the justified expectations of market participants and affect fairness, efficiency and confidence in the capital markets.[28]

37.     Thus, the applicant must establish that there is a threat of abusive future conduct which engages issues of importance to the capital markets.  In *Catalyst Capital Group Inc*., the Commission explained:

> The Commission will intervene in situations where [a transaction] is abusive, contravenes Ontario securities law or an animating principle underlying that law, or brings the integrity of the capital markets into disrepute.[29]

38.     *In MI Developments Inc. (Re)*., the Tribunal established that a private applicant seeking standing bears the burden of showing a *prima facie* case that the following factors are satisfied:

(a)     the application involves or relates to both past and possible future conduct regulated by Ontario securities law;

---

[27] *Catalyst Capital Group Inc.*, 2016 ONSEC 14 at para. 56.

[28] *Pearson (Re)*, 2018 ONSEC 53 at para 72.

[29] *Catalyst Capital Group Inc*., 2016 ONSEC 14 at para. 29.

(b)      the application is not, at its core, enforcement in nature;

(c)      the relief sought is future-looking;

(d)      the Commission has the authority to impose an appropriate remedy in the circumstances;

(e)      the applicant, as a substantial shareholder of the respondent, is directly affected by the past and future conduct of the respondents; and

(f)      it is in the public interest to hear the application.[30]

39.      The Commission has repeatedly emphasized that the applicant bears the burden of proof to establish the basis for the exercise of the public interest jurisdiction under section 127.  In *Pearson (Re)*, the Commission stated:

> An applicant bears the onus of establishing that it is in the public interest to grant such an extraordinary remedy and must tender "sufficient *prima facie* evidence to satisfy that onus."[31]

40.      Where an applicant cannot demonstrate a *prima facie* case, its request for standing will be denied and the application dismissed.[32]

41.      The cases in which the Commission has invoked its public interest jurisdiction typically

---

[30] *MI Developments Inc.,* 2009 ONSEC 47 at para. 107 and 110; *Pearson (Re)*, 2018 ONSEC 53 at para 70.

[31] *Pearson (Re)*, 2018 ONSEC 53 at para. 71.  See also *Catalyst Capital Group Inc*., 2016 ONSEC 14 at para. 30.

[32] *Western Wind Energy Corp. et al.*, 2013 ONSEC 25 at para. 44.  And see *Pearson (Re)*, 2018 ONSEC 53 at para. 90; *Catalyst Capital Group Inc*., 2016 ONSEC 14 at para. 64-65.

involve matters of broad interest to market participants or they relate to actions that would bring the integrity of the markets into disrepute.  Thus, in *Magna* (a case upon which the applicant places great reliance), the Commission addressed issues relating to the required level of disclosure regarding a major restructuring transaction in respect of which the Board was not making a recommendation, leaving shareholders to their own devices.  However, counsel are not aware of any cases (and certainly the applicant cites none) where a mere dispute about the sufficiency of disclosure in an otherwise unremarkable transaction was found to engage s. 127's public interest jurisdiction.

42.     None of the factors that are indicative of a matter engaging the public interest is found in Highland's application.  Highland's primary allegation is that the REIT's historical disclosure relating to the issuance of the loans has been insufficient.  Of course, the desirability of those loans is not the matter to be put before the REIT's unitholders and is not the subject of the disclosure at issue in the within proceeding.  Moreover, even if the allegation had any merit – which it does not –  such a straight-forward disclosure complaint does not require consideration by the Commission pursuant to s. 127.  In any event, any decision from the Commission on this issue would be of limited guidance to the public, as it is well-established that disclosure is "contextual and will vary with the circumstances".[33]

43.     The fact that Highland's application does not engage the public interest is further emphasized by the fact that it does not even allege (nor could it) that the transaction at issue in this proceeding – a transaction that on its face is so obviously to the benefit of unitholders – is

---

[33] *Magna International Inc. et al.*, 2010 ONSEC 14 at para. 128.

unfair, improper, fraudulent, abusive or otherwise contrary to the public interest.  There is

accordingly no allegation that raises even a *prima facie* case that the Commission would be

justified in intervening in the proposed transaction for the protection of the capital markets.

44.      Finally, the untimely and disruptive nature of Highland's application should not be

ignored.  The disclosure complained of by Highland occurred in 2021 and 2022.  Thus, the

primary basis for this application – an inquiry into the exemptions relied upon for the underlying

loans – could have been raised long ago.  Yet Highland has provided no explanation as to why it

did not raise its complaints at earlier time.  Rather, it waited until a scheduled meeting of

unitholders was imminent to commence this application, requiring the meeting to be re-

scheduled at the last minute.  And, as discussed below, the applicant now also takes the position

that the meeting cannot proceed on the adjourned date, even if its application is dismissed.

45.      The Commission has noted that applications brought by private parties close in time to a

definitive event such as a shareholder vote must be closely scrutinized:

> We agree with Staff's submissions that applications for relief under
> section 127 by private parties brought close in time to a definitive event
> such as a shareholder vote or Court approval should be closely scrutinized
> to determine whether there was a reasonable basis for the delay.[34]

46.      The same concerns apply in the present circumstances.  Highland's unnecessary delay in

bringing this application has resulted in significant disruption to the previously scheduled

meeting of unitholders, which needed to be rescheduled to accommodate the hearing of this

application.  This untimeliness should not be excused, particularly since, as described above,

---

[34] *Pearson (Re),* 2018 ONSEC 53 at para. 75.

Highland has failed entirely to establish a *prima facie* case of unfair, improper, fraudulent or otherwise abusive practice and has not explained how the orders it seeks would be in the public interest.

47.     Furthermore and in any event, as is discussed below, Highland's complaints about the disclosure made in the Management Information Circular are wholly without merit.

**There Is No Merit to the Applicant's Complaints – The Applicant Does Not Have a *Prima Facie* Case**

48.     As discussed above, the disclosure provided in the Management Information Circular clearly explains:

   (a)     how the amendments came about – i.e., they were demanded by the TSXV;[35]

   (b)     the substance of the amendments – i.e., they will fix conversion prices at prices significantly higher than the REIT's current market price (thereby reducing the potential dilution of the REIT's unitholders), will restrict the term of (and, in one instance, eliminate) the lenders' conversion rights, and will restrict the amount convertible to the principal amount of the loan only;[36] and

---

[35] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 18, Application Record, Tab 2(A), p. 65.

[36] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 18-19, Application Record, Tab 2(A), p. 65-66.

(c)     the consequences if the amendments are not approved – i.e., the REIT will not be in compliance with the TSXV listing requirements, which could lead the TSXV to halt or suspend trading and/or initiate a delisting review.[37]

49.     Notwithstanding the fact that the amendments are, on their face, clearly beneficial to unitholders and notwithstanding the fact that the rejection of the amendments would be detrimental to the interests of all unitholders, the applicant advances a myriad of arguments as to why it says that further information is required.  None of those arguments stands up to scrutiny.

50.     Moreover, many of the applicant's arguments seem to be directed at concerns that it appears to have with NexPoint's past disclosure (or with the disclosure of other entities controlled by James Dondero), all of which suggests that the within proceeding is simply the latest chapter in a long-running and multi-faceted dispute between the applicant and Mr. Dondero – the type of private dispute that does not engage s. 127's public interest jurisdiction.

*(i)     The Management Information Circular Clearly States that the Trustees Believe the Amendments to Be Fair and Desirable and in the Best Interests of the REIT*

51.     The applicant argues at length that the disclosure in the Management Information Circular is inadequate because it does not state whether the trustees believe that the amendments to the notes are fair.  For example, the applicant's factum states:

> The trustees have not disclosed their views on the fairness of the amendments to the notes.[38]

---

[37] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record, Tab 2(A), p. 66.

[38] Applicant's factum at para. 50.

52.     Similarly:

>       The trustees have also failed to disclose or explain their reasonable beliefs
>       as to the desirability or fairness of the specific amendments to the notes. .
>       .[39]

53.     And:

>       . . . [T]he Information Circular is silent on whether the amendments are
>       fair to the unitholders.[40]

54.     And:

>       . . . [W]hile the Information Circular discloses that one Convertible Note
>       in the amount of $8.5 million will have its conversion term removed
>       completely, it does not disclose whether this is fair or desirable.[41]

55.     The applicant's argument is difficult to credit.

56.     As discussed above, the amendments were required by the TSXV as a condition of

continued listing.  Moreover, the amendments are all manifestly to the benefit of the REIT and

its unitholders, as they restrict or eliminate conversion rights granted to the REIT's creditors, and

make the exercise of those rights more expensive for the creditors, thereby reducing the extent of

any possible dilution of existing unitholders.  In those circumstances, it is difficult to imagine

any trustee making a good faith determination that the amendments were anything other than fair

and desirable.  And that is precisely the determination made by the board, as set out in the

Management Information Circular, which clearly states that the board "concluded that the

---

[39] Applicant's factum at para. 60.

[40] Applicant's factum at para. 61.

[41] Applicant's factum at para. 62.

- 22 -

Amendments are in the best interests of the REIT".[42]  The concept of "fairness" can have no other meaning in this context.

    *(ii)*     *The Management Information Circular Clearly Discloses the Factors on which the Trustees Based Their Decision*

57.    The applicant's next complaint is similarly spurious.  The applicant argues that "the trustees have failed to disclose in reasonable detail the material factors on which their beliefs regarding the amendments are based and the background of their deliberations".[43]

58.    The trustee's conclusion that the amendments are in the best interests of the REIT flows obviously from the description of the amendments themselves: a removal or restriction of the lenders' conversion rights; and an increase in the conversion price, resulting in a decrease of any possible dilution of existing unitholders.  And the amendments were demanded by the TSXV as a condition for continued listing.  No reasonable unitholder should require any further explanation as to why the trustees concluded that the amendments were in the best interests of the REIT and its unitholders.

    *(iii)*    *The Applicant's Purported Concerns Regarding a Potential Breach of Duty of Loyalty or Duty of Care Are Speculative and Are Not Properly the Subject of a Section 127 Public Interest Hearing*

59.    Other arguments advanced by the applicant have a slightly different focus and are objectionable for different reasons.

---

[42] Management Information Circular, Exhibit "A" to Seery Affidavit, p. 19, Application Record, Tab 2(A), p. 66.

[43] Applicant's factum at para. 63.

60.    These arguments seem to suggest – without any foundation – that the trustees of the

REIT failed to fulfill their fiduciary duty or duty of care owed to the REIT and its unitholders, by

failing to secure the best possible amendment terms with the REIT's lenders.  For example, the

applicant's factum states:

> While the factors listed in NHT's Information Circular may speak to the
> desirability of amending the Convertible Notes to meet the TSXV's
> policies, they fail to disclose why the specific amendments subject to
> minority approval, as opposed to other potential amendments, are the most
> desirable or fair for NHT and its unitholders. [emphasis added][44]

61.    Similarly:

> [I]f the amendment of the $56 million in Convertible Notes is beneficial to
> NHT, the unitholders should understand why NHT has not sought to
> amend all the Convertible Notes.[45]

62.    This complaint does not go to whether the unitholders have enough information to decide

whether to approve the amendments in question.  Rather, it goes to whether the REIT's officers

or trustees should have negotiated harder in order to secure terms that were even more

favourable to the REIT or should have negotiated similarly beneficial amendments to other

agreements, which amendments were not demanded by the TSXV.

63.    The applicant has led no evidence, nor has it suggested any reason to believe, that there

was any possibility of the REIT extracting terms from its creditors that were any more

favourable than those which have been put before the unitholders.  On the contrary, commercial

common sense tells us that the only terms which could be obtained from the REIT's lenders are

_____

[44] Applicant's factum at para. 66.

[45] Applicant's factum at para. 76.

- 24 -

those which the TSXV has demanded as a condition of continued listing.

64.     Moreover, even if there were evidence that the trustees carried out the negotiations in a manner which breached their duty of loyalty or duty of care, that question would not be germane to the within application.  The complaint that the trustees could perhaps have done better raises no issue that is germane to a s. 127 proceeding; if it had any merit, it would be a matter for another forum.

65.     Similar issues arise in connection with the applicant's argument that it needs disclosure as to why NexPoint initially believed that the loans were governed by TSXV's policy regarding loans, as opposed to the policy regarding convertible securities.  The applicant's factum states:

> The Information Circular is silent on why the trustees and their advisors believed that the Convertible Notes . . . were not initially filed as "Convertible Securities" under the TSXV's Private Placement policy but rather under the TSXV's Loans, Loan Bonuses, Finder's Fees and Commissions policy.
> . . .
> NHT has not disclosed how it made the mischaracterization that caused the Convertible Notes to avoid TSXV scrutiny when they were filed.[46]

66.     However, the details as to how/why NexPoint believed that the loans were governed by Policy 5.1 – how "the problem came to be", in the applicant's phrasing,[47] has no bearing on whether the amendments, which the TSXV has now required, and which are manifestly to the benefit of the REIT and its unitholders, should be approved at the upcoming meeting.  The question posed has no relevance for unitholders regarding the amendments and certainly does not

---

[46] Applicant's factum at para. 71 and 74.

[47] Applicant's factum at para. 74.

engage the public interest.

(iv)     *The Applicant's Purported Concerns with Past Disclosure Are Not Properly the Subject of a Section 127 Application*

67.     The applicant also makes allegations regarding the REIT's historical disclosure.

68.     For example, the applicant suggests that there was some impropriety in the REIT's historical disclosure which stated that the loans, when originally issued, were exempt from the requirement to obtain minority approval, by virtue of section 5.7(1)(a) of MI 61-101, which applies where the fair market value of the transaction is less than 25% of the issuer's market capitalization.  The applicant calls into question whether that particular exemption was actually available to the REIT, with the unspoken implication being that the REIT may have acted contrary to securities law in failing to obtain minority approval at the time the loans were issued.  However, the applicant does so not by referencing the market capitalization at the relevant time (i.e., the time of issuance), but the current market capitalization.  The applicant's factum states:

> Considering that the current value of the Convertible Notes far exceeds NHT's market capitalization, unitholders should have the opportunity to satisfy themselves that the notes were truly exempt from minority unitholder approval when they were entered into.[48]

69.     Regardless, such a historically-oriented verification exercise – designed to determine whether or not a past transaction should have been subject to minority approval – is outside of the proper scope of a section 127 application brought by a private party.  The applicant's frank admission that it is trying to detect what it perceives as past misconduct provides a strong

_____

[48] Applicant's factum at para. 79.

indication that its goal in bringing the within proceeding is not forward-looking and preventive, but rather is backward-looking and punitive.

70.     The applicant also takes issue with past public disclosure made by NexPoint regarding the conversion rights attached to the loans.  Specifically, financial statements from 2021 and 2022 stated that the loans were convertible at the option of the REIT,[49] while financial statements from 2023 stated that the loans were convertible at the election of the noteholder.  The Q1 2023 financial statements describe the conversion rights as follows:

> The Company's notes due to affiliates are, subject to TSXV approval, convertible at any time <u>at the election of the holders</u> into Class B Units. [emphasis added][50]

71.     In a purported effort to investigate these past inconsistencies, the applicant seeks disclosure of copies of the actual loan agreements.  Its factum states:

> NHT should be required to disclose copies of the actual executed agreements for the notes, including any past amendments or assignments. This is the only way unitholders can view and assess the specific terms of each note for themselves and clarify the inconsistencies in past disclosure.[51]

72.     However, there is no question (and the applicant does not seem to raise any) that the conversion right is that of the holder.  It is this right which has activated the TSXV's requirement for the amendment.  The reason as to why a past disclosure said otherwise is not properly the

---

[49] Affidavit of James Seery, para. 16, Application Record, Tab 2, p. 23.

[50] NexPoint Interim Financial Statements for the three months ended March 31, 2023, Exhibit "W" to the Affidavit of James Seery, p. 24, Application Record, Tab 2(W), p. 1595.

[51] See in this regard, Applicant's factum at para. 55.

App. 3589

subject-matter of a s. 127 application.  Nor does the applicant explain why it did not raise its concern months ago, when the REIT's Q1 2023 financial statements, which clearly stated that the loans were convertible at the election of the creditors, were issued.

73.     Even in cases where the standing threshold can be satisfied, there rests on the applicant the obligation to prove its allegations on the balance of probabilities.  The Tribunal will not move to a full hearing on the merits on the basis of speculative assertions.[52]

74.     Lastly, it is not any disclosure failure which must be proven, but rather the non-disclosure of a material fact.[53]  None of the complaints raised by the applicant rise to that level.

  *(v)*     *The Applicant's Purported Concerns with Public Disclosure Made by Third Parties Are Not Properly the Subject of the Within Application*

75.     Seeking to stretch section 127's jurisdiction even further, the applicant is also attempting to use the within proceeding to investigate what it believes to be misstatements contained in the disclosure of a third party, an entity named Highland Opportunities and Income Fund, which is one of the holders of the loans in question.  More specifically, the applicant takes issue with past public disclosure of Highland Opportunities and Income Fund filed with the U.S. Securities and Exchange Commission, which disclosure stated that the loan in question was secured (and not, as is set out in all of NexPoint's disclosure, unsecured).[54]  In a purported attempt to investigate this past statement, which was made not by the REIT, but by its contracting counterparty, and which

--------

[52] *Re Global Partners Capital*, 2010 ONSEC 17 at para. 27; *Pearson (Re)*, 2018 ONSEC 53 at para. 83.

[53] *Sterling Centrecorp Inc. (Re)*, 2007 ONSEC 9 at para. 211.

[54] Applicant's factum at p. 29.

was made pursuant to a foreign securities regulation regime, the applicant seeks production of copies of the various loan agreements.[55]

76.     Again, the applicant's focus is misdirected.  It is not proper to use the within application, brought against NexPoint, to pursue suspected misstatements made by a third party in a foreign jurisdiction.

*(vi)     There Is No Basis to the Applicant's Request to Exclude Liberty CLO Holdco or Highland Dallas Foundation from Voting*

77.     In addition to its request for additional disclosure, the applicant also seeks to exclude two unitholders from voting.  The applicant does so without having served notice of the within application on those unitholders.  And it does so without engaging with the applicable legal test for excluding unitholders from the vote which is set down by MI 61-101.  Indeed, the applicant does not even identify the particular provision of MI 61-101 which it alleges is applicable.  Instead, the applicant contents itself with vague assertions that the two unitholders are "interested" and that they are "connected to" James Dondero.[56]

78.     The governing provision of MI 61-101 is s. 8.1(2), which provides that, in determining minority approval, certain classes of security holders must be excluded:

> In determining minority approval for a . . . related party transaction, an issuer shall exclude the votes attached to affected securities that, to the knowledge of the issuer or any interested party or their respective directors or senior officers, after reasonable inquiry, are beneficially owned or over which control or direction is exercised by
>
> (a)  the issuer,

---

[55] Applicant's factum at para. 55.

[56] See in this regard Applicant's factum at para. 83 and 85.

(b)  an interested party,

(c)  a related party of an interested party . . . or

(d)  a joint actor with a person referred to in paragraph (b) or (c) in respect of the transaction.[57]

79.     While the applicant does not specify to which of these categories it alleges the two entities belong, it obviously is not relying upon category (a) (since neither of the two entities is "the issuer"), and it presumably is not relying upon category (b) (since neither of the two entities is alleged to be a party to the loan transaction, or to be entitled to receive any collateral benefit or payment of any kind from the transaction – as is required to fall within the definition of "interested party").[58]

80.     With respect to category (c) – i.e., a "related party of an interested party", again the applicant does not provide any assistance as to whether it is alleging that these two unitholders are "related parties" to either Mr. Dondero or to the counterparties to the loans.  Regardless, the applicant has not led any evidence to support any such allegation.  It has not led any evidence, or made any suggestion that, the unitholders are "a control person" of the counterparties to the loan (as would satisfy paragraph (a) of the definition of "related party", which refers to a "control person of the entity").[59]

81.     Nor has it led any evidence that the control person of the counterparties (i.e., Mr. Dondero) is a control person of the two unitholders (as would satisfy paragraph (b) of the

---

[57] Multilateral Instrument 61-101, s. 8.1(2).

[58] For the definition of "interested party", see MI 61-101, s. 1.1.

[59] For the definition of "related party", see MI 61-101, s. 1.1.

definition of "related party").  In that regard, the applicable definition of "control person" is

found in s. 1(1) of the *Securities Act* and states as follows:

> "control person" means,
>
> (a)  a person or company who holds a sufficient number of the voting
> rights attached to all outstanding voting securities of an issuer to affect
> materially the control of the issuer, and, if a person or company holds
> more than 20 per cent of the voting rights attached to all outstanding
> voting securities of an issuer, the person or company is deemed, in the
> absence of evidence to the contrary, to hold a sufficient number of the
> voting rights to affect materially the control of the issuer, or
>
> (b)  each person or company in a combination of persons or companies,
> acting in concert by virtue of an agreement, arrangement, commitment or
> understanding, which holds in total a sufficient number of the voting rights
> attached to all outstanding voting securities of an issuer to affect
> materially the control of the issuer, and, if a combination of persons or
> companies holds more than 20 per cent of the voting rights attached to all
> outstanding voting securities of an issuer, the combination of persons or
> companies is deemed, in the absence of evidence to the contrary, to hold a
> sufficient number of the voting rights to affect materially the control of the
> issuer.[60]

82.    There is no evidence that Mr. Dondero is a "control person" of either of the two entities.

Indeed, with respect to the Highland Dallas Foundation, there cannot possibly be a "control

person" of that entity, since it does not appear to be an "issuer", as it does not appear to have any

outstanding securities.[61]

83.    Nor can there be any suggestion that either of the two unitholders fall within any of the

other parts of the definition of "related party", such as would make either of them a "related

---

[60] *Securities Act*, R.S.O. 1990, c. S.5, s. 1(1).

[61] With respect to the fact that Highland Dallas does not appear to have any outstanding
securities, due to the fact that it is a non-profit corporation, see Exhibit "NN" to Seery Affidavit,
Application Record, Tab 2(N), p. 1699-1701.

party" of Mr. Dondero or any of the lenders.

84.     That leaves the possibility that the applicant is alleging that the two unitholders are "joint actors" with Mr. Dondero or the lenders.  If so, the applicant has failed to lead any evidence of such a relationship.

85.     "Joint actors" is defined in MI 61-101 to mean "acting jointly or in concert", as determined in accordance with s. 1.9 of MI 62-104.  As set out in s. 1.9(1) and as explained by the Commission in *Sterling Centrecorp Inc. (Re)*, whether two parties are "joint actors" is a question of fact (and neither of the situations whereby persons are presumed to be acting jointly or in concert has any application here).[62]

86.     Thus, in *Sterling Centrecorp Inc. (Re)*, the Commission found that a shareholder may be acting jointly and in concert with insiders to a particular transaction, if that shareholder played an integral role in planning, promoting or structuring the transaction in question:

> A determination of a joint actor relationship can be made if the facts establish that the parties in question played an integral role in planning, promoting and structuring the transaction to ensure its success beyond their customary role.[63]

87.     Of course, there is no suggestion that either of the two unitholders played any role whatsoever with respect to the planning, promoting, or structuring of the loans in question.  Rather, the applicant merely alleges that Mr. Mark Patrick, who is the "general manager" of a company related to Liberty CLO Holdco, used to be employed by a company controlled by Mr.

---

[62] *Sterling Centrecorp Inc. (Re)*, 2007 ONSEC 9 at para. 79.

[63] *Sterling Centrecorp Inc. (Re)*, 2007 ONSEC 9 at para. 102.

Dondero.[64]  However, as the Commission explained in *Sterling Centrecorp Inc. (Re)*, the mere

fact that parties have personal or business relationships is not sufficient to make them joint

actors:

> The mere fact that parties had personal or business relationships in the past
> does not render them joint actors within the meaning of Rule 61-501.[65]

88.     And, with respect to Highland Dallas Foundation, the applicant relies upon the fact that

Mr. Dondero is one of three directors of that entity and that the Foundation used to share (but no

longer shares) an address with the REIT[66] – facts that are entirely irrelevant to whether the

Foundation was acting jointly and in concert with Mr. Dondero or the lenders in respect of these

loan transactions.

89.     Finally, the filings and decisions from the U.S. bankruptcy court upon which the

applicant relies are of no assistance.  One of the decisions upon which Highland relies does not

even reflect the outcome of an adjudication on the merits, but was merely a summary of

allegations made by one of the parties.[67]  The other decisions do not deal with either of Liberty

CLO Holdco or Dallas Mountain Trust and they certainly do not purport to make any broad

findings about who controls those two entities (or indeed to make any findings about those two

---

[64] See, e.g., Exhibit "I" to the Seery Affidavit, p. 3, Application Record, Tab 2(I), p. 814; and for
the corporate relationship between the corporate entity controlled by Mr. Patrick and Liberty
CLO Holdco, see Exhibit "MM" to the Seery Affidavit, Application Record, Tab 2(MM), p.
1660.

[65] *Sterling Centrecorp Inc. (Re)*, 2007 ONSEC 9 at para. 183.

[66] See Applicant's factum at para. 85.

[67] Seery Affidavit, para. 11b, and Exhibit "K", Application Record, Tab 2(K), p. 20 and p. 983.

entities at all).[68]  What Highland's extensive reliance upon these Texas decisions best demonstrates is that Highland and Mr. Dondero have a litigation history which engages other agendas.

90.     In sum, there is simply no evidentiary basis – certainly no "clear and cogent evidence"[69] – in support of the applicant's assertion that Liberty CLO Holdco or the Highland Dallas Foundation are "interested parties" within the meaning of MI 61-101 and thereby excluded from voting.

**There Is No Basis for the Cease Trade Order Sought by the Applicant**

91.     In addition to seeking additional disclosure and an order excluding two unitholders from voting (discussed above), the applicant also seeks an order prohibiting the REIT from "trading its securities" or the Class B units of the operating partnership "with any entities controlled or managed by James Dondero" until such time as the REIT makes the additional disclosure sought by the applicant.[70]

92.     The applicant says that the purpose of this order is, in part, "to prevent NHT from entering into further convertible notes with Dondero-affiliated parties".[71]  And it explains that, without such an order, the REIT will be able "to continue entering into convertible notes without

---

[68] Seery Affidavit, Exhibits "I" and "L", Application Record, Tabs 2(I) and 2(L) p. 832 and p. 1039-1040.

[69] *Sterling Centrecorp Inc. (Re)*, 2007 ONSEC 9 at para. 116.

[70] Application of Highland Capital Management, L.P., para. A3, Application Record, Tab 1, p. 1.

[71] Applicant's factum at para. 88.

proper oversight".[72]

93.     First, there is no evidence whatsoever – nor does the applicant even suggest – that the REIT has any intention of entering into any such additional loans.  Second, cease trading the units will do nothing to prevent the issuance of such new notes, even if such a course of action were being contemplated.

94.     In the circumstances, the only conceivable reason for the applicant to seek the cease-trade order is to clothe the within application in the guise of a forward-looking, public interest proceeding.  However, the claim for forward-looking relief is a contrivance and cannot conceal that the proceeding is, at its core, enforcement-related.

**If No Further Disclosure Is Ordered, There Is No Basis for a Further Postponement of the Meeting**

95.     Finally, the applicant makes a most puzzling request.  It asks that the meeting, now scheduled with its concurrence for October 26, be further adjourned, even if its application is dismissed.

96.     The meeting was adjourned to a fixed date to accommodate an orderly hearing of this matter.  In turn, the schedule for delivery of materials was set to allow the matter to be dealt with before the adjourned date.  And, as required by the applicable regulatory requirements, the REIT established a proxy deadline of two days prior to the meeting.

97.     The applicant now says that that unitholders should not be required to submit proxies for

---

[72] Applicant's factum at para. 89.

how they will vote if the application is dismissed.  The applicant cites no precedent or authority –
and counsel is not aware of any – for the startling proposition that a meeting adjourned to
accommodate the Tribunal's process must not proceed, even if the application is dismissed.

98.     It is submitted that the applicant's request should be rejected.

## IV.     ORDER REQUESTED

99.     The Respondent respectfully requests that this Tribunal dismiss this proceeding, with
costs.

October 17, 2023                         **ALL OF WHICH IS RESPECTFULLY SUBMITTED**

_____

**GOODMANS LLP**

Alan Mark

Julie Rosenthal

Brittni Tee

**Lawyers for the Respondent**

**SCHEDULE "A"**

**LIST OF AUTHORITIES**

1.  *Catalyst Capital Group Inc.*, 2016 ONSEC 14

2.  *Committee for Equal Treatment of Asbestos Minority Shareholders v Ontario (Securities Commission)*, 2001 SCC 37

3.  *Re Global Partners Capital*, 2010 ONSEC 17

4.  *Magna International Inc. et al.*, 2010 ONSEC 14

5.  *MI Developments Inc.*, 2009 ONSEC 47

6.  *Pearson (Re)*, 2018 ONSEC 53

7.  *Sterling Centrecorp Inc, Re*, 2007 ONSEC 9

8.  *Western Wind Energy Corp. et al.*, 2013 ONSEC 25

**SCHEDULE "B"**
**TEXT OF STATUTES, REGULATIONS & OTHER PROVISIONS**

*Securities Act*, R.S.O. 1990, c. S.5, s. 1(1).

**Purposes of Act**

**1.1** The purposes of this Act are,

    (a)  to provide protection to investors from unfair, improper or fraudulent practices;

    (b)  to foster fair, efficient and competitive capital markets and confidence in capital markets;

    (b.1)  to foster capital formation; and

    (c)  to contribute to the stability of the financial system and the reduction of systemic risk.  1994, c. 33, s. 2; 2017, c. 34, Sched. 37, s. 2; 2021, c. 8, Sched. 9, s. 40 (7).

**TSXV Policy 4.1 – Private Placements**

**2.3 Conversion Terms**

(a) The minimum Conversion Price must never be less than the Market Price (as of the Price Reservation Date). Furthermore, if the Convertible Security has a term of greater than one year, the minimum allowable Conversion Price after the first year must be the greater of the Market Price and $0.10. For greater certainty, if, for example, the applicable Market Price on issuance of the Convertible Security is $0.07, the minimum allowable Conversion Price will be $0.07 in the first year of the term of the Convertible Security and $0.10 thereafter.

(b) The Conversion Period must expire no later than five years from the date of issuance of the Convertible Securities.

**Multilateral Instrument 61-101**

**Definitions**

**1.1** In this Instrument

[…]

**"interested party"** means

(a) for a take-over bid including an insider bid, the offeror or a joint actor with the offeror,

(b) for an issuer bid

    (i) the issuer, and

(ii) any control person of the issuer, or any person that would reasonably be expected to be a control person of the issuer upon successful completion of the issuer bid,

(c) for a business combination, a related party of the issuer at the time the transaction is agreed to, if the related party

(i) would, as a consequence of the transaction, directly or indirectly acquire the issuer or the business of the issuer, or combine with the issuer, through an amalgamation, arrangement or otherwise, whether alone or with joint actors,

(ii) is a party to any connected transaction to the business combination, or

(iii) is entitled to receive, directly or indirectly, as a consequence of the transaction

(A) consideration per affected security that is not identical in amount and form to the entitlement of the general body of holders in Canada of securities of the same class,

(B) a collateral benefit, or

(C) consideration for securities of a class of equity securities of the issuer if the issuer has more than one outstanding class of equity securities, unless that consideration is not greater than the entitlement of the general body of holders in Canada of every other class of equity securities of the issuer in relation to the voting and financial participating interests in the issuer represented by the respective securities, and

(d) for a related party transaction, a related party of the issuer at the time the transaction is agreed to, if the related party

(i) is a party to the transaction, unless it is a party only in its capacity as a holder of affected securities and is treated identically to the general body of holders in Canada of securities of the same class on a per security basis, or

(ii) is entitled to receive, directly or indirectly, as a consequence of the transaction

(A) a collateral benefit, or

(B) a payment or distribution made to one or more holders of a class of equity securities of the issuer if the issuer has more than one outstanding class of equity securities, unless the amount of that payment or distribution is not greater than the entitlement of the general body of holders in Canada of every other class of equity securities of the issuer in relation to the voting and financial participating interests in the issuer represented by the respective securities;

[…]

**"related party"** of an entity means a person, other than a person that is solely a bona fide lender, that, at the relevant time and after reasonable inquiry, is known by the entity or a director or senior officer of the entity to be

(a) a control person of the entity,

(b) a person of which a person referred to in paragraph (a) is a control person,

(c) a person of which the entity is a control person,

(d) a person that has

      (i) beneficial ownership of, or control or direction over, directly or indirectly, or

      (ii) a combination of beneficial ownership of, and control or direction over, directly or indirectly, securities of the entity carrying more than 10% of the voting rights attached to all the entity's outstanding voting securities,

(e) a director or senior officer of

      (i) the entity, or

      (ii) a person described in any other paragraph of this definition,

(f) a person that manages or directs, to any substantial degree, the affairs or operations of the entity under an agreement, arrangement or understanding between the person and the entity, including the general partner of an entity that is a limited partnership, but excluding a person acting under bankruptcy or insolvency law,

(g) a person of which persons described in any paragraph of this definition beneficially own, in the aggregate, more than 50 per cent of the securities of any outstanding class of equity securities, or

(h) an affiliated entity of any person described in any other paragraph of this definition;

[…]

**General**

8.1 (1) If minority approval is required for a business combination or related party transaction, it shall be obtained from the holders of every class of affected securities of the issuer, in each case voting separately as a class.

(2) In determining minority approval for a business combination or related party transaction, an issuer shall exclude the votes attached to affected securities that, to the knowledge of the issuer or any interested party or their respective directors or senior officers, after reasonable inquiry, are beneficially owned or over which control or direction is exercised by

(a) the issuer,

(b) an interested party,

(c) a related party of an interested party, unless the related party meets that description solely in its capacity as a director or senior officer of one or more persons that are neither interested parties nor issuer insiders of the issuer, or

(d) a joint actor with a person referred to in paragraph (b) or (c) in respect of the transaction

IN THE MATTER OF NEXPOINT HOSPITALITY TRUST                                    File No. 2023-25

|  | **ONTARIO SECURITIES COMMISSION** *CAPITAL MARKETS TRIBUNAL* |
|---|---|
|  | **FACTUM OF THE RESPONDENT** |
|  | **GOODMANS LLP**<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON M5H 2S7<br><br>**Alan Mark**  LSO No. 21772U<br>amark@goodmans.ca<br><br>**Julie Rosenthal**  LSO No. 41011G<br>jrosenthal@goodmans.ca<br><br>**Brittni Tee**  LSO No. 85001P<br>btee@goodmans.ca<br><br>Tel:  416.979.2211<br><br>Lawyers for the Respondent,<br>NexPoint Hospitality Trust |

1385-1302-3240

App. 3604