PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § | _____ |
| JAMES DONDERO, | § § | |
| Defendant. | § | |

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**COMPLAINT FOR (I) BREACH OF CONTRACT
AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Mr. James Dondero ("Mr. Dondero" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.       The Debtor brings this action against Mr. Dondero as a result of Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000 and payable upon the Debtor's demand. Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.       Through this Complaint, the Debtor seeks (a) damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes) for Mr. Dondero's breach of his obligations under the Notes, and (b) turnover by Mr. Dondero to the Debtor of the foregoing amounts.

## JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.

## CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a)

Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

**A.     The Dondero Notes**

13.     Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor.

14.     Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note").  A true and correct copy of Dondero's First Note is attached hereto as **Exhibit 1**.

15.     On August 1, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note").  A true and correct copy of Dondero's Second Note is attached hereto as **Exhibit 2.**

16.     On August 13, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Notes").  A true and correct copy of Dondero's Third Note is attached hereto as **Exhibit 3.**

17.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

18.     Section 4 of each Note provides:

**Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

19.     Section 6 of each Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     Mr. Dondero Defaults under Each Note**

20.     By letter dated December 3, 2020, the Debtor made demand on Mr. Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

21.     Despite the Debtor's demand, Mr. Dondero did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

22.     As of December 11, 2020, there was an outstanding principal amount of $3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of $21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

DOCS_NY:41770.7 36027/002

23.     As of December 11, 2020, there was an outstanding principal balance of $2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of $27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

24.     As of December 11, 2020, there was an outstanding principal balance of $2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of $25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

25.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $9,004,013.07.

26.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

27.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

28.     Each Note is a binding and enforceable contract.

29.     Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

30.     Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for Mr. Dondero's breach of his obligations under each of the Notes.

31.     As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07 as of December 11,

2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Turnover by Mr. Dondero Pursuant to 11 U.S.C. § 542(b))

32.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

33.     Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for Mr. Dondero's breach of his obligations under each of the Notes.

34.     Each Note is property of the Debtor's estate, and the amounts due under each Note are matured and payable upon demand.

35.     Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

36.     The Debtor has made demand for the turnover of the amounts due under each Note.

37.     As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

38.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of

payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)      On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)     Such other and further relief as this Court deems just and proper.

DOCS_NY:41770.7 36027/002

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

9

# EXHIBIT 1

EXHIBIT 1

# PROMISSORY NOTE

$3,825,000                                                                February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Tax Loan. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

5.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 2

EXHIBIT 2

# PROMISSORY NOTE

$2,500,000                                                                    August 1, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

# EXHIBIT 3

EXHIBIT 3

# PROMISSORY NOTE

$2,500,000                                                                                  August 13, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.  Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

# EXHIBIT 4

EXHIBIT 4

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland
Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable
upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest
and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which
represents all accrued and unpaid interest and principal through and including December 11,
2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date
will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information
is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes
or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are
expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to
accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:     Highland Capital Management, LP
Account #:        5500014686

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>James Dondero |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, Texas 76102  Tel.: (817) 405-6900 |
|---|---|

| PARTY (Check One Box Only)<br>☑ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor      ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2: Turnover of estate property pursuant to 11 U.S.C. 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 9,004,013.07 plus interest, fees, and expenses |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR <br> Highland Capital Management, L.P. | BANKRUPTCY CASE NO. <br> 19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING <br> Northern District of Texas | DIVISION OFFICE <br> Dallas | NAME OF JUDGE <br> Stacey G. C. Jernigan |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE <br> January 22, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF) <br> Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
John T. Wilson, IV – State Bar ID 24033344
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03003** |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT JAMES DONDERO'S ORIGINAL ANSWER

Defendant James Dondero ("Dondero" or "Defendant"), the defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Original Answer (the "Answer") responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Adv. Dkt. 1] (the "Complaint"). Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Complaint sets forth the Plaintiff's objective in bringing the Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 5 not expressly admitted are denied.

6.      The Defendant admits paragraph 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits paragraph 7 of the Complaint.

8.      The Defendant admits paragraph 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits paragraph 9 of the Complaint.

10.     The Defendant admits paragraph 10 of the Complaint.

11.     The Defendant admits paragraph 11 of the Complaint.

12.     The Defendant admits paragraph 12 of the Complaint.

## STATEMENT OF FACTS

13.     The Defendant admits that he has executed promissory notes under which the Debtor is the payee. Any allegations in paragraph 13 not expressly admitted are denied.

14.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 14 of the Complaint. Defendant admits that the attached document appears to be a copy of the referenced note.

15.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 15 of the Complaint. The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of paragraph 15 of the Complaint and therefore denies same.

16.     The Defendant admits that he executed a note as alleged in the first sentence of paragraph 16 of the Complaint. Defendant admits that the attached document appears to be a copy of the referenced note.

17.     The Defendant admits that section 2 of each note attached to the Complaint contains the provision quoted in paragraph 17 of the Complaint.

18.     The Defendant denies the allegations in paragraph 18 of the Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

19.     The Defendant denies the allegations in paragraph 19 of the Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

20.     In response to paragraph 20 of the Complaint, the Defendant admits that Exhibit 4 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 20 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, paragraph 20 of the Complaint is denied.

21.     To the extent paragraph 21 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied. The Defendant otherwise admits paragraph 21 of the Complaint.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22 of the Complaint and therefore denies same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 of the Complaint and therefore denies same.

24.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 of the Complaint and therefore denies same.

25.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 of the Complaint and therefore denies same.

26.     The Defendant denies the allegations in paragraph 26 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

27.    Paragraph 27 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

28.    Paragraph 28 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 of the Complaint and therefore denies same.

29.    Paragraph 29 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of the Complaint and therefore denies same.

30.    Paragraph 30 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Complaint and therefore denies same.

31.    The Defendant denies paragraph 31 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by Mr. Dondero Pursuant to 11 U.S.C. § 542(b))

32.    Paragraph 32 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

33.    Paragraph 33 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Complaint and therefore denies same.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Complaint and therefore denies the same.

35.     The Defendant denies paragraph 35 of the Complaint.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response. The Defendant admits that the Plaintiff transmitted the Demand Letter, and that document speaks for itself.  To the extent paragraph 36 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 of the Complaint and therefore denies the same.

37.     The Defendant denies paragraph 37 of the Complaint.

38.     Paragraph 38 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 of the Complaint and therefore denies the same.

39.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), and (iii).

## **AFFIRMATIVE DEFENSES**

40.     Defendant asserts that Plaintiff's claims should be barred because it was previously agreed by Plaintiff that Plaintiff would not collect on the Notes.

41.     Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due to waiver.

42.     Defendant further asserts that Plaintiff's claims are barred, in whole or in part, due

to estoppel.

43.    Defendant further asserts that Plaintiff's claims may be barred, in whole or in part, due to failure of consideration.

## JURY DEMAND

44.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

45.    The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Complaint and provide the Defendant such other relief to which he is entitled.

Dated: March 16, 2021

Respectfully submitted,

*/s/ Bryan C. Assink*
D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
John T. Wilson, IV – State Bar ID 24033344
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
michael.lynn@bondsellis.com
john@bondsellis.com
john.wilson@bondsellis.com
bryan.assink@bondsellis.com

**ATTORNEYS FOR DEFENDANT
JAMES DONDERO**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on March 16, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Bryan C. Assink*

Bryan C. Assink

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re:                              )   **Case No. 19-34054-sgj-11**
                                    )   Chapter 11
HIGHLAND CAPITAL                    )
MANAGEMENT, L.P.,                   )   Dallas, Texas
                                    )   Tuesday, May 25, 2021
          Debtor.                   )   1:30 p.m. Docket
_____     )
                                    )
HIGHLAND CAPITAL                    )   **Adversary Proceeding 21-3003-sgj**
MANAGEMENT, L.P.,                   )
                                    )   JAMES DONDERO'S MOTION TO
          Plaintiff,                )   STAY PENDING THE MOTION TO
                                    )   WITHDRAW THE REFERENCE OF
v.                                  )   PLAINTIFF'S COMPLAINT [22]
                                    )
JAMES DONDERO,                      )   STATUS CONFERENCE RE: MOTION
                                    )   FOR WITHDRAWAL OF REFERENCE
          Defendant.                )   [21]
_____     )
                                    )
HIGHLAND CAPITAL                    )   **Adversary Proceeding 21-3004-sgj**
MANAGEMENT, L.P.,                   )
                                    )   STATUS CONFERENCE RE:
          Plaintiff,                )   MOTION TO WITHDRAW THE
                                    )   REFERENCE
v.                                  )
                                    )
HIGHLAND CAPITAL MANAGEMENT )
FUND ADVISORS, L.P.,                )
                                    )
          Defendant.                )
_____     )
                                    )
HIGHLAND CAPITAL                    )   **Adversary Proceeding 21-3005-sgj**
MANAGEMENT, L.P.                    )
                                    )   STATUS CONFERENCE RE:
          Plaintiff,                )   MOTION TO WITHDRAW THE
                                    )   REFERENCE
v.                                  )
                                    )
NEXPOINT ADVISORS, L.P.,            )
                                    )
          Defendant.                )
_____     )

```
                      TRANSCRIPT OF PROCEEDINGS
 1            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.
 2
      WEBEX APPEARANCES:
 3

 4    For the Debtor/Plaintiff:   Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
 5                                10100 Santa Monica Blvd.,
                                   13th Floor
 6                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
 7
      For the Debtor/Plaintiff:   John A. Morris
 8                                Gregory V. Demo
                                  PACHULSKI STANG ZIEHL & JONES, LLP
 9                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
10                                (212) 561-7700

11    For James Dondero,          Deborah Rose Deitsch-Perez
      Defendant:                  STINSON LEONARD STREET
12                                3102 Oak Lawn Avenue, Suite 777
                                  Dallas, TX  75219
13                                (214) 560-2201

14    For Highland Capital        Davor Rukavina
      Management Fund             MUNSCH, HARDT, KOPF & HARR
15    Advisors, LP, and           500 N. Akard Street, Suite 3800
      NexPoint Advisors, LP,      Dallas, TX  75201-6659
16    Defendants:                 (214) 855-7587

17    Recorded by:                Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
18                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
19                                (214) 753-2062

20    Transcribed by:             Kathy Rehling
                                  311 Paradise Cove
21                                Shady Shores, TX  76208
                                  (972) 786-3063
22

23

24
              Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 176-1   Filed 09/07/86   Page 35 of 203   PageID 20892

3

1                   DALLAS, TEXAS - MAY 25, 2021 - 1:33 P.M.

2               THE CLERK:  All rise.  The United States Bankruptcy

3     Court for the Northern District of Texas, Dallas Division, is

4     now in session, The Honorable Stacey Jernigan presiding.

5               THE COURT:  Good afternoon.  Please be seated.  All

6     right.  We have settings in some Highland adversary

7     proceedings.  These are motions to withdraw the reference in

8     three different adversary proceedings.  So I will start with

9     Highland versus Dondero, Adversary 21-3003.  Who do we have

10    appearing for Movant, Mr. Dondero?

11              MS. DEITSCH-PEREZ:  Deborah Deitsch-Perez.  Good

12    morning.  Or afternoon, Your Honor.

13              THE COURT:  Good afternoon.  All right.  For the

14    Debtor, who do we have appearing?

15              MR. POMERANTZ:  Good morning, Your Honor.  Good

16    afternoon, Your Honor.  Jeff Pomerantz and Greg Demo;

17    Pachulski Stang Ziehl & Jones.  Also on the line is John

18    Morris.  Greg Demo will be handling the argument today.

19              THE COURT:  All right.  Thank you.  I'll go ahead and

20    get appearances in the other two adversaries.  The next one is

21    Highland versus Highland Capital Management Fund Advisers,

22    L.P., Adversary 21-3004.  Who do we have appearing for the

23    Movant on this one?

24              MR. RUKAVINA:  Your Honor, good afternoon.  Davor

25    Rukavina for the Movant and Defendant.

1          THE COURT:  All right.  Thank you.  So, same team

2     appearing for the Debtor on this one, I presume?

3          MR. DEMO:  Yes, Your Honor.

4          MR. POMERANTZ:  Yes, Your Honor.  I forgot to mention

5     Jim Seery, the Debtor's CEO and a member of the Independent

6     Board, is also present today as well.

7          THE COURT:  All right.  Thank you.  And last but not

8     least, we have the adversary Highland Capital versus NexPoint

9     Advisors, L.P., Adversary 21-3005.  Who do we have appearing

10    for the Movant, NexPoint?

11         MR. RUKAVINA:  Davor Rukavina again, Your Honor.

12    Good afternoon.

13         THE COURT:  Okay.  Good afternoon.  And then we have

14    the same team, I presume, for the Debtor for this one as well,

15    Mr. Pomerantz, correct?

16         MR. POMERANTZ:  That is correct, Your Honor.

17         THE COURT:  All right.  So, let's be sure the record

18    is crystal clear here.  These are status conferences with

19    regard to the three motions to withdraw the reference.  As we

20    all know, under Local Bankruptcy Rule 5011, the Bankruptcy

21    Court is required to hold a status conference, hear the

22    parties' arguments, and then make a report and recommendation

23    to the District Court to actually rule on the motions to

24    withdraw the reference.

25       We do have a motion for stay pending a decision on the

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 17-6   Filed 05/07/86   Page 37 of 203   PageID 20894

5

1   motion to withdraw the reference by Mr. Dondero, so the

2   Bankruptcy Court actually decides that motion.

3       All right.  So, as far as sequence on these, I don't know

4   if you all have talked and reached any agreements.  It

5   occurred to me there were two different reasonable ways to do

6   this.  We could have, for all three of the adversaries, each

7   of the Movants make their arguments -- in other words, Ms.

8   Deitsch-Perez and then Mr. Rukavina -- and then have the

9   Debtor collectively respond, and then rebuttal at the end, or

10  we could take this where we do Dondero first, argument, you

11  know.

12          MR. RUKAVINA:  Your Honor, Ms. Deitsch-Perez and I

13  had conferred and we had suggested that I begin, since I have

14  a couple arguments that are duplicative of hers, and then I

15  can finish my point, and then I know that her adversary has

16  other issues, and she can follow up with what I have said on

17  those other issues, if that's agreeable to the Court.

18          THE COURT:  Okay.  So, joint Movant presentation on

19  all three of these, but you go first and then Ms. Perez, and

20  then Mr. Demo would collectively respond to all three

21  arguments, and then back to you all for rebuttal?  Any

22  disagreement with that from the Debtor side?  Do you want to

23  argue for anything different?

24          MR. DEMO:  No, Your Honor.  That's fine with the

25  Debtor.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 176-1   Filed 09/04/86   Page 38 of 203   PageID 20895

6

1          THE COURT:  Okay.  Makes sense to me.  All right.

2     Well, with that, Mr. Rukavina, you may proceed.

3          MR. RUKAVINA:  Thank you, Your Honor.  And I will be

4     discrete and I will be brief, because I think that the issues

5     are discrete and brief and not evidentiary.  And I think we'll

6     talk about evidence and documents some time later.  We can

7     talk about that when the Debtor's turn comes.

8          To me, there's very few facts that are relevant, and those

9     facts appear on the face of the record, nor are they disputed.

10         My two clients have disallowed proofs of claim.  So they

11    did file proofs of claim.  Those claims were disallowed by

12    final order months ago.  So my clients are not prepetition

13    creditors of the Debtor.  Nor under any theory would these two

14    adversary proceedings involve anything having to do with my

15    clients' former claims.

16         I say that, of course, because we know *Stern v. Marshall*

17    and we know that whether there's a counterclaim or a claim, it

18    changes the jurisdictional analysis.  Here, the Advisors have

19    no claims.

20         These two adversaries are very, very simple.  The Debtor

21    has sued my clients on prepetition promissory notes.  So the

22    Court's decision or report and recommendation today comes down

23    to, I think, three very targeted issues:  Is a suit on a

24    promissory note, the prepetition promissory note, a core

25    claim?  One.  Two, do my clients have jury rights?  And then,

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 176-11   Filed 09/01/23   Page 39 of 203   PageID 20896

7

1   three, what about the Debtor's 542 action?

2        So, my two adversary proceedings are virtually identical.

3   The Debtor sues my clients for a breach of contract in not

4   paying these promissory notes, and the Debtor seeks a 542(b)

5   turnover.

6        In its responsive briefing, the Debtor has not contested

7   that the cause of action itself, the breach of contract, is

8   non-core, nor has the Debtor contested that I have jury

9   rights.

10        The Debtor's sole real argument, other than a bunch of mud

11   being thrown on the wall which I think has no relevance at all

12   today, not to the Court's jurisdiction, the Debtor's sole real

13   argument is that the 542(b) claim, which clearly is a core

14   claim, that the fact that they have sued for that claim

15   somehow now makes this whole adversary proceeding a core

16   claim, one in which I take it that jury rights aren't even

17   involved.  So we'll talk about that a little bit.  But those

18   are the three issues that I think that the Court needs to

19   focus on for the HCMFA and the NexPoint adversaries.

20        Obviously, a breach of contract claim, a suit on a

21   promissory note, that exists outside of bankruptcy.  That is

22   not a right or a cause of action created by a bankruptcy.

23   Clearly, that's a non-core matter.  That's the same as

24   *Marathon v. Northern Pipeline*, where it was a suit on a

25   prepetition contract.  And we have given Your Honor plenty of

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170   Document Filed 09/01/86   Page 40 of 203   PageID 20897

8

1   case law, and I don't think it can really be disputed that,

2   all other things being equal, the Debtor's lawsuit for breach

3   of contract on a prepetition contract is a non-core claim.

4   That means that the reference -- whether the reference should

5   be withdrawn or not is an issue of permissive reference

6   withdrawal, because even though it's non-core, of course, the

7   Court can make a report and recommendation and there's a trial

8   de novo before the District Court.  But we begin with that

9   it's a non-core claim.

10   We add to this mix the *Stern v. Marshall*, which couldn't

11   be clearer in that, when all that a debtor is doing is trying

12   to augment its estate by prepetition causes of action, the

13   Court doesn't have constitutionally core jurisdiction.

14   So, now we look at the jury right.  There's no question

15   that there's a Seventh Amendment jury right when you're being

16   sued for breach of contract.  That's as *Bankruptcy 101*, as

17   *Common Law 101*, as it gets.  And my clients are being sued for

18   breach of contract.  We have asserted our jury right.  Again,

19   because the prepetition proofs of claims have been adjudicated

20   and are in no way, shape, or form linked with these two

21   promissory notes, it's impossible to argue that we have

22   somehow waived our jury rights.  And the Debtor has not made

23   that argument, to its credit.

24   So, because the Fifth Circuit holds that when it comes to

25   jury rights reference withdrawal is mandatory, we believe that

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 17-6   Filed 09/07/46   Page 41 of 203   PageID 20898

9

1    the Court must withdraw or that the District Court must

2    withdraw their reference of these two adversary proceedings,

3    the only question then being at what point in time should the

4    District Court do that.  And we can talk a little bit about

5    that.

6         If Your Honor needs to understand the basis of my clients'

7    prepetition proofs of claim, I can certainly go through those

8    in detail.  Suffice it to say that those claims led with --

9    have to do with overpayments and not getting benefits of the

10   bargain for the transiti... I'm sorry, for the prepetition

11   shared services agreements.  So even if there was some

12   relation between the disallowed claims and the Debtor's claims

13   in that situation, there is no core nucleus of operative

14   facts.  Again, these are standalone promissory notes that have

15   nothing to do in the world with those disallowed claims under

16   the shared services agreements, nor have we asserted any

17   affirmative defense or setoff based on those disallowed

18   claims.  So, again, all you're dealing with are prepetition

19   promissory note claims against someone who is not a

20   prepetition creditor of this estate.

21        Now we go to the 542(b) issue.

22             THE COURT:  Can I --

23             MR. RUKAVINA:  Your Honor, we believe --

24             THE COURT:  Can I interrupt with a question?  And

25   this wasn't really argued in any of the pleadings, and yet

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 76-2   Filed 09/04/86   Page 42 of 203   PageID 20899

10

1   it's sticking in my brain as an issue, maybe.  This is a

2   NexPoint issue only.  Okay?  The NexPoint note, unlike the

3   other notes in these three adversaries, is not a demand note.

4   It, as you know, had the annual payments, and the whole

5   complaint of the Debtor is centered around NexPoint missed its

6   December 31, 2020 payment.  That was a default.  The Debtor

7   was entitled to accelerate and declare the whole amount due.

8   So here's where I'm going.  In this adversary, the NexPoint

9   adversary, there's an affirmative defense argued by NexPoint

10  that basically:  Debtor, you made us default because you,

11  under the shared services agreement, were doing accounting

12  work for us, and I'm paraphrasing, but that's the argument,

13  that you were negligent in performing your duties under the

14  shared services agreement and made us default.

15      So here's my question.  As I understand it, NexPoint has

16  an administrative expense that it has asserted in this case

17  that we've kicked the can down the road and I can't remember

18  now when we're going to have the trial on that.  My question

19  is, even though NexPoint's proofs of claim have now been

20  disallowed, what if your defense in this case is inextricably

21  intertwined with your administrative expense claim?  I mean,

22  (a) is that the case, and (b) does that all of a sudden

23  convert the breach of contract to a core matter?

24          MR. RUKAVINA:  Your Honor, I think those are

25  insightful questions, but I think that it's an easier answer,

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 43 of 203   PageID 20900

11

1  because they are not inter -- I have a hard time pronouncing

2  that.

3          THE COURT:  Me, too.

4          MR. RUKAVINA:  They're not intertwined.

5          THE COURT:  Uh-huh.

6          MR. RUKAVINA:  They're not inseparable.  The base of

7  the administrative claim is that we were billed by the Debtor

8  postpetition for services that the Debtor didn't provide, so

9  we were paying for Debtor employees who weren't there.  In

10  other words, we overpaid.  The Debtor overbilled us to the

11  tune, between both Advisors, to the tune of $14 million for

12  employees that the Debtor had long terminated ago and wasn't

13  providing.

14      The basis, therefore, of the postpetition overpayment has

15  nothing to do in the world with the Debtor's own negligence --

16          THE COURT:  Okay.

17          MR. RUKAVINA:  -- in how it provided services to us

18  regarding this promissory note.

19          THE COURT:  Okay.

20          MR. RUKAVINA:  We have chosen, and I -- we have

21  chosen, and I think it's right, it's our right, we have chosen

22  to assert the Debtor's -- obviously, it's alleged at this time

23  -- we have chosen to assert the Debtor's failure to us as an

24  affirmative defense to this promissory note.  We have not

25  chosen to assert that as an affirmative cause of action

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 44 of 203   PageID 20901

12

1    seeking money damages for negligence or something like that.

2    And we have done that intentionally, to be quite blunt, so as

3    to keep it apart from the admin claim.  Because the admin

4    claim clearly is a core matter.  We're not arguing that the

5    reference should be withdrawn.  That's set for trial in late

6    September.  And that body of discovery, really, will be

7    completely separate from this.  We have intentionally kept

8    them separate, and perhaps the Debtor has as well, so as to

9    not cloud the issues.

10        This is a clean promissory note, and do we have an

11   affirmative defense under Texas law because basically the

12   Debtor made us do it?

13        So that's my answer to the Court.  Now, if the Court takes

14   it to the next level and says, well, what you're really

15   saying, Mr. Rukavina, here is that you have an affirmative

16   postpetition cause of action against the Debtor, you're just

17   sprucing it up as an affirmative defense instead of an

18   affirmative cause of action, I would suggest to you that now

19   we're getting too much and too far into the whole *Stern v.*

20   *Marshall* issues.  What we have been sued on is a prepetition

21   promissory note.  That's it.  And we have no prepetition

22   claim.  And I don't think we should be crossing a potential

23   prepetition cause of action against us against a postpetition

24   right that we have against the Debtor.

25             THE COURT:  Okay.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-2   Filed 09/04/86   Page 45 of 203   PageID 20902

13

1              MR. RUKAVINA:  Finally, Your Honor, just briefly on

2    the 542(b) issue, it really is purely an issue of law.  We

3    have cited to you three opinions from this district -- pardon

4    me -- that go back to Judge Abramson.  There's the *Satelco*

5    case, which I think is a very well-known case.  It's been

6    cited to many, many times.  There's also Judge Lynn's opinion

7    in *Mirant*.  And those opinions just basically say, okay,

8    debtor, if you're suing on a prepetition receivable, a

9    prepetition promissory note, you can't use 542(b) to put the

10   cart before the horse.  You've got to prove that your

11   counterparty is liable to you, and then, then, 542(b) is

12   really a remedy, it's a collection remedy, the same as any

13   post-judgment remedy.

14       The Debtor doesn't like these old opinions.  It calls them

15   old; I call them *stare decisis*.  And the Debtor argues, well,

16   you should do what these other bankruptcy courts from across

17   the country have done and you should basically just use 542(b)

18   to try the prepetition receivable.  So, forget about jury

19   rights, forget about core.  542(b), according to the Debtor,

20   is the congressionally-mandated new cause of action that lets

21   the Court actually liquidate a claim even before it collects

22   on that claim.

23       I have pointed out the absurdity with this argument.  The

24   argument is the same as saying, well, Judge, why don't you

25   give me -- you can give me a turnover order, you can give me a

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 162    Filed 04/04/86    Page 46 of 203    PageID 20903

14

1    receiver, so because you can do that, let's now just liquidate

2    an actual cause of action in the context of a turnover.

3    That's not how it works.  You get your judgment, you get your

4    right to a payment, and then you get your remedies.

5        It's not just me saying that, Your Honor.  I have cited

6    the D.C. Circuit, the Eleventh Circuit, the Eighth Circuit,

7    and a host of lower district court opinions from across the

8    country that confirm that, that 542(b) cannot be used to

9    liquidate a disputed claim.

10       I submit, respectfully, that if the Court decides to

11   rewrite *Satelco*, if the Court believes that 542(b) can be used

12   as an actual cause of action, one, I would remind the Court

13   that in a case a few years ago against Michael Craig Kelly,

14   where we had a reference withdrawal, Diane Reed, the Trustee,

15   was also trying to use 542(b).  The Court, in its report and

16   recommendation to the District Court, basically said that no,

17   as I have pointed out, you can't do that.  And I can certainly

18   share with Your Honor that report and recommendation.  I just

19   remembered it this morning, so I did not include it in my

20   briefing.

21       But if the Court decides to revisit the issue, then I

22   would respectfully submit that what we're creating here is

23   exactly a *Northern Pipeline* and a *Stern v. Marshall* issue.  As

24   *Northern Pipeline* made it clear, Congress cannot take a common

25   law cause of action, a cause of action between private

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16    Document Filed 09/04/86    Page 47 of 203    PageID 20904

15

litigants, such as a breach of contract, such as a promissory
note, which is the most archetypical breach of contract claim
that there is, Congress can't take that, slap a different name
on it like turnover, and somehow undo the Constitution.  You
can't strip me of my jury rights on that, you can't strip me
of my right to an Article III judge, just because you label
this a 542(b) turnover.

       And I respectfully submit, Your Honor, that if that is
what this Court recommends, and if that is what the District
Court does, then what we are really creating here is another
*Stern v. Marshall*.  And as I've been telling everyone that
I've known for the last 10 years, that's the last thing that
our practice needs.

       So, Your Honor should recommend the withdrawal of the
reference for my clients because I believe that it's clear we
have a jury right.  I believe that the reference should be
withdrawn immediately.  This Court has more than enough going
on in this case.  There is no crossover discovery here.  And
if we're going to go to a jury, then it really ought to be the
District Court, that's the expert on jury trials, or its
magistrate judge, that's the expert on jury trials, deciding
pretrial and prejudgment matters, most of which will have to
do probably with what the quality of evidence and what
evidence there will be that can be even presented to the jury.

       Your Honor, that's my argumentation, in a nutshell.  I

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-2    Page 10 of 486    Page 48 of 203    PageID 20905

16

1    really don't have anything to add.  But I'm here to answer any

2    questions, and I will at the appropriate time talk about the

3    Debtor's purported evidence for today.  Thank you.

4                THE COURT:  All right.  Thank you.  No further

5    questions at this time.

6        Ms. Perez?

7                MS. DEITSCH-PEREZ:  Yes.  And could I share my

8    screen?

9                THE COURT:  You may.

10               MS. DEITSCH-PEREZ:  Okay.  Are you able to see the

11   screen?

12               THE COURT:  Yes.

13               MS. DEITSCH-PEREZ:  Okay.  And is the -- the full

14   screen is up there so you can see it?

15               THE COURT:  I can see it.  Uh-huh.

16               MS. DEITSCH-PEREZ:  Thank you.  Okay.  All right.

17   Because I start -- we -- Mr. Rukavina and I started at the

18   same time, there's a little overlap, but where we overlap I

19   will go quickly.

20               THE COURT:  Okay.

21               MS. DEITSCH-PEREZ:  Okay.  So a quick summary.  We

22   have a mandatory withdrawal of the reference argument because

23   of the involvement of federal nonbankruptcy law, and I'll go

24   into more detail on that in a moment.

25       Like Mr. Rukavina's clients, we have a required withdrawal

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-2    Filed 09/04/21    Page 49 of 203    PageID 20906

17

1  because of Mr. Dondero's jury right, which has not been

2  waived.  And I'll address the Debtor's two waiver arguments.

3      And there is permissive withdrawal because the claim is

4  non-core, it is a prepetition state law breach of contract

5  claim, and this Court could only report and recommend, and so

6  the efficiencies favor immediate withdrawal to the District

7  Court.

8      All right.  The Debtor cites a good number of cases, but

9  there is a Northern District of Texas case that looks at when

10  this Court should recommend immediate withdrawal of the

11  reference, and this is it.  And the Debtor says quite a lot

12  about the expertise that this Court has with the matter

13  generally and with Mr. Dondero generally and repeats Mr.

14  Dondero's name, I don't know, a couple dozen times, but that's

15  irrelevant.  Because once it's been determined that the action

16  involves non-Title 11 laws that affect interstate commerce,

17  the withdrawal of the reference is mandatory, regardless of

18  the expertise of either court.

19      And that's why, in *Great Western*, and I think it was Judge

20  Barefoot Sanders, said, if it's not a core proceeding -- and

21  this is not, for all the reasons that Mr. Rukavina noted --

22  the bankruptcy judge's finding would have to be reviewed de

23  novo, and that would result in duplication of effort and a

24  waste of resources, and that's why the most efficient

25  proceeding would be to go directly to the District Court.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 2    Filed 09/04/86    Page 50 of 203    PageID 20907

18

1       And so the question the Debtor raises, well, there's

2  not -- they make light of the tax law that's involved.  So the

3  question is, well, how much nonbankruptcy law does there have

4  to be to implicate mandatory withdrawal of the reference?

5  Well, again, *Great Western* provides the answer.  It has to

6  materially affect the disposition of the case -- doesn't have

7  to be dispositive of the case -- and it has to involve

8  substantial consideration of IRS Code provisions.  What I took

9  out there was ERISA, not because it was something bad for us

10  but because ERISA isn't implicated here.

11       And the Debtor's cases don't really dispute that.  What

12  they all say -- and if you look at them, and we've pointed

13  that out in our reply brief -- the Debtor points to cases

14  where what the court says is this involves a routine tax

15  matter or something that is typically heard by bankruptcy

16  judges.  They make no argument that the issue here, which is

17  what are the tax implications of having a forgivable loan and

18  why does the law on how you create deferred compensation with

19  a loan, how does that relate, that's not something that

20  frequently comes up in a bankruptcy court.  In fact, we were

21  unable to find a single case where a bankruptcy judge dealt

22  with that issue.

23       So the only Northern District case that the Debtor raises

24  is one that's not remotely similar.  It's *Ondova*, where the

25  parties sought to withdraw the reference to an entire

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 51 of 203   PageID 20908

19

1    bankruptcy case.  By contrast is *Great Western*, which says the

2    withdrawal of the reference is mandatory when you have this

3    kind of unusual or atypical tax matter.

4        So, what is the tax issue?  In Mr. Dondero's amended

5    answer and in his discovery responses, he contends that the

6    three notes are subject to a condition subsequent under which

7    they could be forgiven.  This is a form of deferred executive

8    compensation that's governed by rules set out in the federal

9    tax law.  If you do it wrong, it's deemed compensation

10   immediately and you owe taxes right away.  If you do it

11   correctly and the determination of the circumstances under

12   which the loan can be forgiven are not wholly in the debtor --

13   here, I mean debtor as in obligor's control -- then they can

14   be deferred compensation and then taxes are due at the point

15   at which the loan is forgiven, and then there is forgiveness

16   of debt income.

17       So, understanding these rules will inform the fact-finder

18   about the strength and the credibility of Mr. Dondero's

19   defense when he says, this is why I did this, this is what I

20   expected, this is how I anticipated the loans could become my

21   compensation and why.  So these tax considerations are pivotal

22   to the potential deferred compensation being structured in the

23   way that it was.

24       And this information was provided to the Debtor.

25   Interrogatory #1 asked Mr. Dondero to identify the condition

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document Filed 09/04/86 Page 52 of 203   PageID 20909

20

1    subsequent referred to in Paragraph 40 of the amended answer.

2    There were not many questions.  This is pretty much it on what

3    the Debtor asked about the defense.  They could have asked

4    more.  They didn't.  I presume they will ask when they depose

5    Mr. Dondero, but they did not yet.  So the absence of a fuller

6    record of what consti... of how the tax law works and why it's

7    important, that's because the Debtor simply didn't ask,

8    because they were content to instead make fun of the defense,

9    which is what they did in their papers.

10         And so the answer in the interrogatories is that the

11   condition subsequent referred to refers to the disposition of

12   the portfolio company interests that were managed or owned,

13   directly or indirectly, by Highland and its affiliates, or

14   managed, the disposition of those on a favorable basis or on a

15   basis wholly outside Dondero's control.  So when those things

16   happened and created a liquidity event, then those loans would

17   be forgiven and at that point Mr. Dondero would have income.

18   But those will all be explored further in discovery and in

19   expert testimony, both -- we anticipate a tax expert and a

20   executive compensation expert.

21         THE COURT:  Question for you.  Is this going to be an

22   issue that applies to all three loans?  Because one --

23         MS. DEITSCH-PEREZ:  Yes, it is.

24         THE COURT:  One of the promissory notes says, this is

25   a tax loan, and the other two do not say that.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 53 of 203   PageID 20910

21

1          MS. DEITSCH-PEREZ:  But the records of the company --

2     and this was something that was submitted by the Debtor --

3     show that all three loans were recorded on the books as tax

4     loans.

5          THE COURT:  Okay.

6          MS. DEITSCH-PEREZ:  And so it simply -- and then, in

7     addition to that, all three loans, in -- I think it's either

8     Paragraph 8 or 9 of the note -- refer to other agreements, and

9     that would be somewhat baffling but for the fact that there is

10    in fact an other agreement here that presumably the Debtor

11    will explore when it deposes Mr. Dondero.

12         THE COURT:  Okay.

13         MS. DEITSCH-PEREZ:  So, going on to the turnover

14    claim, and I'm not going to beat what Mr. Rukavina said to

15    death because he said it quite well, but I'm just -- rather

16    than add some cases, I'm going to add *Collier's* to the mix,

17    which is certainly the premier authority.  And Debtor's

18    logical flaw is so well known that it has its own section in

19    *Collier's*, where it berates and bemoans the practice of some

20    district courts to use orders to turn over property of the

21    estate as an end run around *Marathon*.  And it says, in the

22    strongest possible terms -- and there's more cited in our

23    brief -- that an action on a promissory note is not a turnover

24    claim.  That's a breach of contract claim, if it's disputed.

25    And simply name-calling, as the Debtor does -- it says

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 6   Filed 04/22/21   Page 54 of 203   PageID 20911

22

1    Dondero's claim is spurious and invalid; I think it also says

2    it's a red herring -- the right to a jury trial is not lost

3    because of the strength of the Debtor's disparaging remarks.

4    Instead, the Court should look at *Satelco* because it makes

5    clear that an action to recover a contested debt is not

6    properly the subject of a turnover action.  And in a way, the

7    Debtor tacitly acknowledged that, because it didn't just bring

8    a turnover claim, it brought a breach of contract claim, and

9    that's its principal claim, and that's the correct claim here,

10   and that's one on which Mr. Dondero has a right to a jury

11   trial.

12        So the Debtor then says ah-ha, you filed a proof of claim

13   with respect to the notes, and made a very big deal about it

14   in its response to the motion to withdraw the reference.  It

15   then had to sheepishly withdraw that in a supplement because

16   it recalled that the proof of claim regarding the notes was

17   withdrawn, and we've cited for the Court law that says, once

18   it's withdrawn, it's as if -- it's as if it never existed,

19   especially when, as here, it was withdrawn before the

20   adversary proceeding was filed.  So it preserved an absolute

21   right to a jury trial.

22        And there you can look at the *In re Manchester* case that

23   Judge Houser decided.  And there, even when a proof of claim

24   was withdrawn after the adversary case was filed, Judge Houser

25   determined that there was a genuine desire for a jury trial.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21 Filed 09/04/86 Page 55 of 203   PageID 20912

23

1   It wasn't fictional.  It wasn't vexatious or designed to

2   harass the debtor.

3       There's no question here that Mr. Dondero does want and

4   would for obvious reasons want a jury trial.  And so certainly

5   the withdrawn proof of claim should not be a barrier.

6       And then unrelated proofs of claim are also not a waiver

7   of the right to a jury trial.  It's only when the adversary

8   and the existing proof of claim are inextricably intertwined

9   -- I got the inextricably in -- that resolution of the -- if

10  resolution of a proof of claim would also resolve the

11  adversary, then there would be a waiver.  But we don't have

12  that here because the remaining proofs of claim are all in the

13  nature of contingent contribution or indemnity claims with

14  respect to things that haven't even happened yet.  And so they

15  in no way relate to this adversary.  They have to do with the

16  2008 taxes and other potential possible future events where

17  something might cause liability for Mr. Dondero as an officer

18  or director, and those have not arisen.

19      Okay.  In addition, the Debtor says that the setoff

20  affirmative defense causes a waiver.  And they only cite cases

21  from outside the jurisdiction.  The only case we found on the

22  issue in this jurisdiction is to the contrary.  That's *In re*

23  *Base Holdings*.  That's this Court's case.  So even a

24  counterclaim, much less a setoff, if it would not be resolved

25  by the adjudication of a party's proof of claim, the

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 76-2   Filed 04/04/86   Page 56 of 203   PageID 20913

24

1    Bankruptcy Court cannot constitutionally finally resolve the

2    setoff or counterclaim if it is in fact a non-core claim, as

3    here.

4         Here, the issue is even simpler because Mr. Dondero

5    dropped the setoff affirmative defense, as set forth in the

6    Debtor's -- the response to Debtor Interrogatory 3, and that

7    is annexed as Exhibit 4 in Mr. Dondero's appendix to the

8    motion.

9         So if you look at all of the factors -- and the 2020

10   *Curtis* case in the Southern District of Texas has a good

11   summary, and we cite that and you can find that in our

12   pleadings -- you look at whether it's core or non-core matters

13   predominate.  Here, the determination rests on the breach of

14   contract case.  The turnover claim is the remedy.  It's the

15   tail of the dog, not the dog.  You want to have efficiencies?

16   Well, here, because the Bankruptcy Court can only report and

17   recommend, it's more efficient for the District Court to have

18   the proceeding.  There is so much going on in this bankruptcy

19   proceeding that does not have to do with these notes that it

20   would expedite the bankruptcy to take this out.

21        On the issue of forum-shopping, the question is, who's

22   forum-shopping here?  Mr. Dondero has a right to a jury trial,

23   so it is only natural that he would want to be in the District

24   Court because that is the only place he can have a jury trial.

25   It's the Debtor that's forum-shopping because it has expressed

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-2   Filed 05/04/86   Page 57 of 203   PageID 20914

25

1     concern about the possibly more favorable District Court.  So

2     that's where the forum-shopping is, and so that consideration

3     weighs in favor of withdrawal.

4         Obviously, a jury demand has been made, so that is another

5     reason why there should be withdrawal of the reference.

6         So let's look at these factors.  The Debtor says this is a

7     simple note case.  So if in fact it's a simple note case,

8     which is a state court cause of action, there's no particular

9     bankruptcy court expertise needed.  And as we saw, there is

10    some federal law expertise needed on the tax issues.

11        Also, this issue is not intertwined with other matters in

12    the bankruptcy.  It's a core matter.  This Court can only

13    report and recommend.  The District Court has to conduct the

14    jury trial, so it would be most efficient for it to gain

15    familiarity.  As I said, it's the Debtor that's forum-

16    shopping.  If in fact, as the Debtor says, this case is so

17    clear, why is the Debtor afraid that the District Court may be

18    possibly more favorable?

19        And the most analogous case is the *In re Quality Lease*

20    case we cite.  There, the reference was withdrawn.  It was

21    withdrawn immediately.  And the Court indicated it was

22    particularly important for the reference to be withdrawn early

23    because the case was going to be tried to a jury and that

24    would mean there would be motions in limine.  These would --

25    that it would be better for the district court to be familiar

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 76-21   Filed 09/08/21   Page 58 of 203   PageID 20915
Document   Page 26 of 186

26

1   with the case in order to decide evidentiary issues, expert

2   issues, all of the things that are going to come up in this

3   case.

4         Okay.  And *Curtis*, which we cite in the brief, is

5   particularly instructive, and it argues for immediate

6   withdrawal of the reference when a jury trial is requested.

7         Okay.  So I'm briefly going to cover the motion for a

8   stay.  This Court has very recently made clear its view on

9   whether a stay should be granted pending the District Court

10  deciding the motion to withdraw the reference.  And that was

11  last week, when I was unable to be here.  But there, Mr.

12  Phillips was arguing against a stay that was being sought by

13  the Creditors' Committee, and this Court said very clearly

14  it's a hundred percent of the time my practice, and I think

15  the practice of other bankruptcy judges here, and it's out of

16  deference to the District Court, if the District Court ends up

17  withdrawing the reference, they may say I want to withdraw the

18  whole darn thing, we don't want you even doing pretrial

19  matters, we don't want to get ahead of them, and that's why

20  the Court was arguing that Mr. Phillips shouldn't be arguing

21  against the stay that was sought, because since they were

22  seeking to withdraw the reference, nothing should be happening

23  in the case until that was decided.

24        So there's no reason that Mr. Dondero should not be

25  afforded the benefit of that practice that the Court so

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-2   Filed 05/27/21   Page 59 of 203   PageID 20916

27

1    strongly asserted last week.  And it would also relive the

2    pressure of the breakneck pace that the Debtor has demanded

3    for this case, and it would allow for consistency between the

4    treatment of the parties in this case and the treatment of the

5    parties in the case involving the Creditors' Committee and the

6    Debtor.

7         Okay.  And just to sum up, we have the mandatory

8    withdrawal issues related to the tax law.  Mr. Dondero has not

9    waived his right to a jury trial, and this Court obviously

10   cannot constitutionally conduct a jury trial breach of

11   contract non-core matter, so this Court couldn't even

12   constitutionally make final findings.  And the summary

13   judgment motion that the Debtor has threatened, clearly, if

14   the Debtor is going to make a summary judgment motion, it

15   would be better for the District Court to have it.  That would

16   most certainly give the District Court the best heads up to be

17   able to conduct the jury trial, because there are factual

18   issues here.  And so this combination of factors and the

19   Debtor's not really even tacit admission -- it's pretty overt

20   -- that it has an advantage in the Bankruptcy Court dictates

21   that the reference should be withdrawn for all purposes

22   immediately.

23        And I thank you, and I'm going to try and see if I could

24   figure out how to turn off the sharing.

25             THE COURT:  Got it.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 60 of 203   PageID 20917

28

1          MS. DEITSCH-PEREZ:  Thank you.

2          THE COURT:  All right.  Thank you.

3      Mr. Demo, I'll hear from you next.  And I counted four of

4  my own cases that collectively Mr. Rukavina and Ms. Deitsch-

5  Perez argued -- well, three published ones, *JRjr33, Ondova,*

6  *Base Holdings*, and then Mr. Rukavina mentioned *Craig Kelly*.

7  So, what are you going to argue?  Are you going to tell me I

8  was wrong in all of those cases, or --

9          MR. DEMO:  I was --

10         THE COURT:  I'm sorry, that's not a fair question,

11 but it's -- it is what it is.  What would you like to say, Mr.

12 Demo?

13         MR. DEMO:  Well, I think first I'd like to start by

14 introducing some very limited exhibits, because -- and

15 normally I wouldn't do this, because I do think that it's

16 generally a legal matter, but Ms. Deitsch-Perez referenced the

17 notes, referenced tax issues that supposedly were in the

18 notes, referenced arguments that or defenses that Mr. Dondero

19 raised in his answer.  And quite honestly, none of that stuff

20 is in those things.  So I would like to put those into

21 evidence so that this Court can review them and we can have

22 them on the record.

23      And if that's all right with Your Honor, I can point you

24 to our witness and exhibit list in this case and have those

25 things admitted.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 61 of 203   PageID 20918

29

1          MR. RUKAVINA:  Your Honor, does Mr. Demo propose to

2     have those admitted for my two adversaries?

3          MR. DEMO:  No.  I think right now we would plan on

4     doing just a limited admission of Mr. Dondero's notes, Mr.

5     Dondero's first answer, and then his amended answer.  And we

6     are going to talk, you know, about a few other limited things,

7     about how the notes are on the balance sheet.  So I would like

8     to also admit the Debtor's schedules, which were admitted in

9     the motion to compel last Thursday, and then also to admit the

10    MORs, which were also admitted last Thursday as well.

11         MR. RUKAVINA:  Your Honor, I apologize.  Again, are

12    those being offered in my two adversaries or -- again, there's

13    no --

14         MR. DEMO:  I'm sorry, Mr. Rukavina.  The answer is --

15    for the MORs and for the schedules, the answer is no.

16         MR. RUKAVINA:  Okay.  And, of course, there was some

17    sound right when you gave me your answer.  At least, I didn't

18    hear your answer.

19         MR. DEMO:  The MORs and the schedules, we would admit

20    in your case as well.

21         MR. RUKAVINA:  Your Honor, I have no problem with

22    that.

23         THE COURT:  All right.  Well, before I see if Ms.

24    Perez has an objection, let me be a little bit more clear.  I

25    am looking at the witness and exhibit list that you filed at

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Filed 06/30/21    Page 62 of 203    PageID 20919

30

 1   Docket Entry 46.  Can you just go through that and tell me

 2   which ones you're offering?

 3          MR. DEMO:  Yes, Your Honor.  So, we filed -- we filed

 4   an amended exhibit -- witness and exhibit list at Docket #48.

 5   We filed that yesterday.  So that's what I'm looking at.

 6          THE COURT:  Okay.  Let me pull that up.  I have the

 7   notebook.  So what is the docket again?

 8          MR. DEMO:  48, Your Honor.

 9          THE COURT:  48.  In the Dondero adversary?

10          MR. DEMO:  Yes, Your Honor.  And we did also file

11   witness and exhibit lists in the NexPoint and HCMFA adversary,

12   but all the numbers are the same in those.

13          THE COURT:  Okay.  Bear with me.  (Pause.)  Okay.  I

14   have it pulled up now.  So which ones are you seeking to

15   offer?

16          MR. DEMO:  4, 5, and 6, which are the three Dondero

17   notes.

18          THE COURT:  4, 5, and 6, the three Dondero notes?

19          MR. DEMO:  We would also offer Mr. Dondero's

20   responses to the interrogatories and requests for admission,

21   which are 16 through 20.

22          THE COURT:  Okay.

23          MR. DEMO:  We would offer 28, 29, --

24          MS. DEITSCH-PEREZ:  Wait, wait, could you stop a

25   minute?  There is -- which interrogatory answers?  Because we

1    -- they're our Exhibit -- the interrogatory responses are

2    Exhibit 4 in our appendix.  Is this something different that

3    you're offering?

4             MR. DEMO:  I'm looking at my witness and exhibit

5    list, Docket #48.

6             MS. DEITSCH-PEREZ:  Uh-huh.  And what are the --

7             MR. DEMO:  And I'm looking at Entries 16, 17, 18, 19,

8    and 20.

9             MS. DEITSCH-PEREZ:  Yes, that's five things.  What

10   are the five things that you're seeking to admit?

11            MR. DEMO:  Mr. Dondero's objections and responses to

12   Highland's second request for production.

13            MS. DEITSCH-PEREZ:  Uh-huh.

14            MR. DEMO:  Mr. Dondero's objections and responses to

15   the first request for admissions.

16            MS. DEITSCH-PEREZ:  Uh-huh.

17            MR. DEMO:  Mr. Dondero's objections and responses to

18   second request for admissions.

19            MS. DEITSCH-PEREZ:  Uh-huh.

20            MR. DEMO:  Mr. Dondero's objections and responses to

21   Highland's first set of interrogatories.

22            MS. DEITSCH-PEREZ:  Uh-huh.

23            MR. DEMO:  Mr. Dondero's objections and responses to

24   Highland's second set of interrogatories.

25            MS. DEITSCH-PEREZ:  Okay.  Thank you.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 21   Filed 09/07/21   Page 64 of 203   PageID 20921

32

| 1 | MR. DEMO:  You're welcome. |

2          THE COURT:  All right.

3          MR. DEMO:  And then next --

4          THE COURT:  Go ahead.

5          MR. DEMO:  Sorry, Your Honor.  Is Docket Entries

6  20 -- I mean, excuse me -- Exhibits 28, 29, and 30, which are

7  the Debtor's schedules, amended schedules, and Statements of

8  Financial Affairs.

9          MR. RUKAVINA:  And those are the only ones for my

10 case, right, Mr. Demo?

11         MR. DEMO:  Through current, yes.  We're going to have

12 MORs which will be in your case as well.

13         MR. RUKAVINA:  Okay.

14         MR. DEMO:  But yes.

15         THE COURT:  Okay.  28, 29, and 30.

16         MR. DEMO:  And then --

17         THE COURT:  Go on.

18         MR. DEMO:  And then 44 through 64, which are the

19 Debtor's MORs and then some limited backup, depending on the

20 --

21         THE COURT:  All right.  So, any objection -- I think

22 we've heard from Mr. Rukavina.  He's fine with those limited

23 items applicable to his adversaries.  Ms. Deitsch-Perez, any

24 objections?

25         MS. DEITSCH-PEREZ:  No.  I mean, I would note that

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 1621    Filed 09/04/86    Page 65 of 203    PageID 20922

33

 1  the notes are also annexed to the adversary complaint.

 2           THE COURT:  Okay.

 3           MS. DEITSCH-PEREZ:  So they're part of this record.

 4  So, no objection to those.

 5           THE COURT:  All right.  So these will be admitted.

 6      (Debtor's Exhibits 4 through 6, 16 through 20, 28 through

 7  30, and 44 through 64 are received into evidence.)

 8           MR. DEMO:  Thank you, Your Honor.  I'd like to start

 9  maybe a little bit out of order and start with the motion for

10  a stay pending resolution of this matter.  And I just want to

11  point out, well, first, obviously, that the Debtor is not in

12  favor of a motion for stay pending resolution of this matter,

13  because we've actually done significant amounts of work.  You

14  know, we had Mr. Seery's deposition yesterday.  Mr. Dondero's

15  deposition is scheduled for Friday.  Fact discovery ends on

16  Friday.  Discovery has been ongoing.  We've produced numerous

17  documents.  We've made numerous requests.  And Mr. Dondero has

18  made multiple prior requests to schedule -- to extend this

19  matter.  And the hearings on this matter are set for the next

20  90 to 100 days.

21      There is no basis to stay there, and there is a harm to

22  the estate in staying it, Your Honor.  Specifically, these

23  assets are material assets of the Debtor's estate.  They were

24  built into the plan projections.  And the liquidation and

25  collection on these assets will materially drive creditor

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-2    Filed 04/04/22    Page 66 of 203    PageID 20923

34

1   recoveries.

2       To the extent that there's a delay in that, and there

3   already is a delay because of these matters, but to the extent

4   that there's a further delay in that, there is a substantial

5   harm to the Debtor's creditors by that delay.

6           THE COURT:  Did you say discovery cuts off Friday,

7   this Friday?

8           MR. DEMO:  Yes, Your Honor.

9           THE COURT:  Okay.

10          MS. DEITSCH-PEREZ:  And that is over our objection.

11  We had sought a longer schedule, and the Debtor seems to be

12  trying to do an end run around the withdrawal of the reference

13  by pushing the case to conclusion before the District Court

14  can decide.

15          MR. DEMO:  I would object to that characterization,

16  Your Honor.  We're trying to get resolution and we're working

17  quickly towards that, as is generally the matter in

18  bankruptcy.

19          THE COURT:  Okay.  My only question is, is there a

20  scheduling order in place right now and discovery cuts off

21  this Friday under the governing scheduling order?

22          MS. DEITSCH-PEREZ:  That is correct.

23          MR. DEMO:  There is a scheduling order, yes.

24          THE COURT:  Okay.  Is there a motion to amend the

25  scheduling order pending, by any chance?

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Filed 05/04/86    Page 67 of 203    PageID 20924

35

1          MR. DEMO:  No, there isn't, Your Honor.

2          THE COURT:  Okay.

3          MS. DEITSCH-PEREZ:  There was -- there was a motion

4    filed, the Debtor opposed it, and the Court granted a much

5    more limited extension than the -- than Mr. Dondero requested.

6          THE COURT:  Okay.

7          MR. DEMO:  Your Honor, I would just ask, you know,

8    I'm arguing.  Ms. Deitsch-Perez had her chance.  So, to the

9    extent that she has anything to add, I mean, I would --

10         THE COURT:  All right.  Well, I asked the question,

11   and I'm fine with both of you weighing in with an answer.

12         All right.  Continue.

13         MR. DEMO:  Yeah.  So, yes, so discovery ended Frida,

14   there is damage to the creditors with a delay, and we would

15   oppose the motion to stay.

16         And that's, you know, quite honestly, Your Honor, all we

17   really have on the motion to stay, because I think it wraps up

18   into the balance of the action, which is a core action which

19   should remain here.  It's a core action that doesn't have a

20   jury right and it's a core action that Your Honor can enter a

21   final order on.

22         And I meant to kind of go through that first, but I do

23   feel like I need to start with the mandatory abstention.

24   Because Ms. Deitsch-Perez has made a lot of references to the

25   Tax Code and a lot of references to tax law and a lot of

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-1   Filed 06/04/86   Page 68 of 203   PageID 20925

36

1    references to what Your Honor will have to rule on.  But quite

2    honestly, Your Honor, none of that is in the record.  Mr.

3    Dondero filed his first answer.  It didn't mention the Tax

4    Code.  The only affirmative defense was that the note had been

5    forgiven already.  Mr. Dondero filed his amended answer.  It

6    didn't mention the Tax Code.  The only affirmative defense is

7    that there was a condition subsequent that was tied to some

8    sale of assets without any more.  There is no reference to the

9    Tax Code.  There's no reference to specific code provisions

10   throughout these documents.  There's no reference to any code

11   provision in the three notes.

12        Ms. Deitsch-Perez made reference to somehow incorporating

13   other agreements into those notes.  Those notes are each two

14   pages.  None of them have that language.  They're all

15   standalone.

16        The only reference in this case, Your Honor, to taxes is a

17   reference in the first note, which is dated February 2, 2018,

18   saying that the proceeds of the note are used to pay Mr.

19   Dondero's tax liabilities.  That's it.  That is the only

20   actual reference in this case to any type of tax.

21        The fact that Mr. Dondero used the proceeds of the loan to

22   pay taxes really is irrelevant.  I mean, you can use the

23   proceeds of the loan to pay anything.  It doesn't implicate

24   the Tax Code.

25        What Your Honor is going to have to decide here is not tax

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Document    Filed 09/04/86    Page 69 of 203    PageID 20926

37

1    law.  What Your Honor is going to have to decide here is do

2    the four corners of these promissory notes beg for extrinsic

3    evidence.  Is the four -- in the four corners of these

4    promissory notes, is there ambiguity?  Did Mr. Dondero agree

5    to repay the Debtor the amounts owed to the Debtor on demand?

6    And all you have to look at for those are the two-page demand

7    notes that are in the evidence right now, Your Honor.

8        No references to the Tax Code.  No need to refer to the

9    Tax Code.  In fact, the only case that's been cited from a tax

10    court is the case, I think it's called *Salloum,* which is cited

11    in Mr. Dondero's responsive papers.  And in that, the Tax Code

12    -- that case says that what you have to do to determine

13    whether or not these notes are forgivable under tax purposes

14    is a fact matter.  It doesn't refer back to the Tax Code.

15        And what that case said and what the cite that Ms.

16    Deitsch-Perez, excuse me, Mr. Dondero's counsel said, put into

17    the document is that the factual things that you look at is

18    was there a written agreement, was there a promissory note,

19    was collateral issued, does the asset show up as an asset on

20    the Debtor's books and records as a loan or as a forgivable

21    loan?  None of those determinations require an analysis under

22    the Tax Code, and there's been no allegations or no statements

23    that it does.

24        Those factors are the same factors that Your Honor would

25    look at for a motion to recharacterize.  It's not a unique

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-2   Filed 09/04/86   Page 70 of 203   PageID 20927

38

1    thing.

2         There is no determination of Mr. Dondero's tax liability.

3    There's nothing.  And there's no references to it.  We haven't

4    had a case cite yet or a statutory cite yet for a statute that

5    you're going to have to interpret and analyze.  There is

6    literally nothing, Your Honor.  There are two-page demand

7    notes that make no reference to the Tax Code.  The only thing

8    Your Honor will have to do is determine whether or not they're

9    ambiguous and whether or not Mr. Dondero was given the money

10   and has an obligation under those two-page documents to pay

11   that money back.

12        Moving on from that, Your Honor, because I do think we

13   need to level-set a little bit on the other facts on this

14   case, because there were some things that were said that maybe

15   stretched it a little bit.  You know, specifically, Your

16   Honor, the adversary really does deal with demand notes, two-

17   page demand notes, and then one term note which is also two

18   pages.  Those demand notes and those term notes are

19   indisputably property of the Debtor's estate.  Those demand

20   notes and those term notes at issue here were included on the

21   Debtor's schedules that were filed in December 2019 when Mr.

22   Dondero was in control of the Debtor.  They were filed in

23   December 2019 when Mr. Frank Waterhouse, the Debtor's then-

24   CFO, was firmly in control of the Debtor's financial

25   operations.  They were included on the schedules.  Nobody

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-21    Filed 09/04/86    Page 71 of 203    PageID 20928

39

1    objected.

2        Those notes have been included on the MORs every single

3    month in this case, including the months prior to the

4    appointment of the independent directors.  The notes are

5    included as an asset on the Debtor's books and records.  And

6    as I mentioned earlier, the notes are included on the plan

7    projections that were filed in support of the Debtor's

8    disclosure statement and plan of reorganization.

9        Nobody has challenged these notes.  Nobody has challenged

10   the MORs, the plan projections, which showed these tens of

11   millions of dollars in notes as a material asset of the

12   Debtor's estate.  And that in and of itself is interesting,

13   Your Honor, because everybody in this courtroom objected to

14   the Debtor's disclosure statement and the Debtor's plan,

15   including objections to those plan projections, but they never

16   challenged these notes as an asset of the Debtor's estate.

17       And Ms. Canty, if you're on, can you please put up Exhibit

18   1, please, or Slide 1?

19       As she's doing that, Your Honor, just briefly, Mr. Dondero

20   owes the estate $9 million under three demand notes.  The

21   demand notes were issued in 2018, and as I said, they're each

22   two-page notes.  They were executed by Mr. Dondero, and

23   there's no dispute that Mr. Dondero got the money.  And as you

24   can see, Your Honor, this is the only payment term, the one

25   that's on the screen right now, that says accrued interest and

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 162    Filed 09/04/86 Page 72 of 203    PageID 20929

40

1  principal on this note shall be due and payable on demand of

2  the Payee.

3      On December 3, 2020, demand was made, and Mr. Dondero has

4  refused to pay.  The notes are accelerated.  The notes are not

5  in dispute.  And the amounts due under the notes, Your Honor,

6  are liquidated.  It's principal plus interest plus the costs

7  of collection.

8      If we can turn now to NPA, NexPoint Advisors, which, Ms.

9  Canty, is the next slide.

10      This term note was issued in May 2017.  Pursuant to the

11  term note, NexPoint borrowed $30 million from the Debtor.  The

12  term note was executed by Mr. Dondero in his capacity as the

13  control person for NexPoint.  As you can see very clearly

14  here, the notes were payable in annual installments on

15  December 31st of each calendar year.

16      It is not disputed that on December 31, 2020, a payment

17  was not made.  On January 7th, the Debtor sent a notice to

18  NexPoint Advisors, notifying them that they were in default

19  and that the notes were accelerated.  The notes, which are

20  property of the estate, are due and payable.

21      It's also not disputed that shortly after the Debtor sent

22  that note, NexPoint Advisors tried to make a payment, and that

23  payment was applied to past-due interest and principal, in

24  accordance with the terms of the notes.

25      NexPoint controlled the ability to make payments on these

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 09/04/86   Page 73 of 203   PageID 20930

41

1  notes, and chose not to.  Again, Your Honor, the amounts due

2  under this note are liquidated.  Principal plus interest plus

3  the costs of collection.

4      Finally, Your Honor, -- and Ms. Canty, if you can go to

5  the next slide -- Highland Capital Management Fund Advisors

6  borrowed $7.4 million from the Debtor in May of 2019 under two

7  promissory notes.  And as you can see on the footnote here,

8  Your Honor, these aren't the only debts that are owed by

9  Highland Capital Management Fund Advisors to the Debtor.

10 Highland Capital Management Fund Advisors, we'll just call

11 HCMFA, issued two other demand notes in favor of the Debtor,

12 and those were earlier, and there's a prior agreement that

13 says the Debtor would not demand payment on those notes until

14 May 31st of 2020.  That's the only reason they're not at issue

15 here.  And you'll see in the Debtor's schedules that these

16 notes were included in the aggregate amount owed by Highland

17 Capital Management Fund Advisors.

18     Again, Your Honor, the Debtor sent a demand note on

19 December 3rd.  The notes were not paid.  The notes are

20 accelerated.  The notes are due.  And the damages under the

21 notes are liquidated.  Principal plus interest plus the cost

22 of collections.

23     In each case, Your Honor, and you'll understand that --

24 excuse me, Your Honor.  The underlying agreement in each of

25 these cases is a note instrument.  It's a debt instrument.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Filed 09/04/86    Page 74 of 203    PageID 20931

42

1    Has there been a breach?  Yes, absolutely.

2        And Ms. Canty, you could take that down now, if you want.

3        There has been a breach.  The breach is the Debtor's

4    failure to pay.  And there are damages.  The damages are,

5    again, principal, interest, and costs of collection.  And

6    that's all that needs to be determined.  There's no need for

7    Your Honor to create a liability here.  This isn't a contract

8    where Your Honor has to assess whether or not a supplier

9    supplied widgets.  This isn't a contract where Your Honor has

10   to do a factual analysis and determine the damages.  There is

11   a debt here, and it's a liquidated debt that is owed to the

12   estate.

13       That, Your Honor, is how we get to Section 542(b).  In

14   each adversary proceeding, the Debtor has --

15           THE COURT:  Let me stop you there.  I mean, it's not

16   really liquidated, though, right?  You said there is a

17   liquidated debt.  Now, you're saying, oh, it's slam dunk,

18   we'll win on the breach of contract.  That's your idea of

19   this.  So treat it as liquidated.

20           MR. DEMO:  Well, no, I think --

21           THE COURT:  But it's not liquidated.  Your opposing

22   counsel says that's a problem.

23           MR. DEMO:  There's an amount owed under the note.

24   Well, Your Honor, I guess there's a slight distinction.  The

25   notes are disputed.  The obligation to pay the note are

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-21    Filed 09/04/86    Page 75 of 203    PageID 20932

43

1    disputed.    The amounts that were lent on the notes are just

2    simply on the face of the notes.

3        And I guess, jumping ahead, Your Honor, the fact -- and

4    you've heard it before, and you, I assume, will hear it again

5    -- the fact that the notes were disputed doesn't take this out

6    of the realm of 542(b).  And Mr. Dondero's counsel cited to

7    *Collier's*, and *Collier's* is clear on this and the case law is

8    clear on this.  The fact that there is a dispute does not mean

9    that 542(b) is not a correct mechanism to collect on a matured

10   note, a note that's payable on demand and a note that's

11   property of the estate.

12       And Your Honor, and I'll get into the case law, and maybe

13   I should just jump into it right now, but that's what, for

14   example, the Southern District of Texas found in 2018 in

15   affirming a bankruptcy court case in *Tow.*  In *Tow*, the facts

16   were that there was an account receivable owed to the Debtor.

17   The Debtor brought an action under 542(b) to recover that

18   account receivable.  The account receivable was challenged.

19   The defendant said he didn't owe the money because there was a

20   settlement agreement in place and he just didn't have to pay.

21   But the Bankruptcy -- I'm sorry, the District Court there,

22   affirming the Bankruptcy Court, said that because the account

23   receivable was property of the estate, that 542(b) was the

24   correct mechanism for the estate to collect on that, despite

25   the fact that there could have been a state law action if the

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X   Document 16-2    Filed 04/04/86   Page 76 of 203   PageID 20933

44

1    Debtor weren't in bankruptcy.

2            THE COURT:  Let me stop you there, --

3            MR. DEMO:  In ruling that way, --

4            THE COURT:  -- because I went back and pulled that

5    case earlier today, --

6            MR. DEMO:  Uh-huh.

7            THE COURT:  -- because, you know, I'm going to get a

8    little bit concerned if the Southern District of Texas goes a

9    different way than the Northern District.  And of course, we

10   don't have a Fifth Circuit opinion on point.  So gee, let's

11   see --

12           MR. DEMO:  Right, Your Honor.

13           THE COURT:  -- different *Tow v. Park Lake* was.  There

14   are a couple of nuances I read that I think maybe matter.  It

15   --

16           MR. DEMO:  Okay.

17           THE COURT:  The Court talks about -- starts out

18   talking about, in the very first sentence, that there had been

19   a settlement agreement between the bankruptcy trustee and Park

20   Lake, and then Park Lake, who owes money under the settlement

21   agreement, later receives proceeds from a utility company,

22   reimbursement of some sort, and then the Trustee asserted a

23   claim for turnover of that reimbursement under 542.  And then,

24   meanwhile, Park Lake files a motion to hold the Trustee in

25   civil contempt for violating the settlement agreement.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-2    Filed 05/04/86    Page 77 of 203    PageID 20934

45

1    So, while Judge Rosenthal didn't make a big deal of these

2    facts in distinguishing her opinion from the Northern District

3    *Satelco* case, these do seem like rather important facts to me,

4    that there was a settlement agreement where account debtor

5    Park Lake is saying, okay, I agree, I owe you *x* amount, and

6    then later Park Lake gets some sort of proceeds of a utility

7    reimbursement, and then now all the Trustee is doing is

8    seeking turnover of that reimbursement.  That feels very

9    different than --

10           MR. DEMO:  Well, --

11           THE COURT:  -- a suit on a note, even if --

12           MR. DEMO:  -- it is different.

13           THE COURT:  Even if you think it's slam dunk, no

14    defenses are going to prevail at the end of the day, we do

15    technically have a breach of contract action that you must

16    prevail on first.

17           MR. DEMO:  Well, Your Honor, I mean, yes.  Is *Tow*

18    different on the facts?  Yes.  It's an accountant receivable.

19    It's not a note.

20       The fact that the amount -- the amounts were arguably owed

21    under the settlement agreement, you know, that was disputed.

22    If it hadn't been disputed, the amounts would have just been

23    turned over to the estate.  The fact that there was a fight

24    over it means that there was a fight over it.

25       But Your Honor, I mean, I think possibly the more

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 162   Filed 00/04/86   Page 78 of 203   PageID 20935

46

1    instructive case here is a case called *Faulkner v. Berg*, which

2    is actually out of the Northern District of Texas.  And it's a

3    2006 case from Judge Houser.  In that case, there was, Your

4    Honor, a promissory note at issue.  The Chapter 11 trustee

5    brought an action against a man named Berg because Berg owed

6    the estate money on a promissory note that was issued to Berg

7    in connection with -- I'm sorry, that -- not -- that Berg owed

8    the estate as compensation for certain services that he

9    received.

10   The Chapter 11 trustee brought an action on that

11   promissory note, and the complaint that the Chapter 11 trustee

12   filed included a breach of contract claim and a turnover claim

13   under 542(b).  Mr. Berg brought a number of affirmative

14   defenses, and Judge Houser still held that that was a core

15   proceeding under 542(b).  And it's a 2006 case, a case that

16   was issued after *Satelco*.  And notably, Your Honor, it just

17   honestly doesn't discuss *Satelco*.  It doesn't address it at

18   all.  It just finds that the action on the notes was a core

19   proceeding.

20   And now, Your Honor, the -- Mr. Dondero, in his responsive

21   papers, --

22            THE COURT:  What case was that again?  I just don't

23   remember this case.

24            MR. DEMO:  It was *Faulkner v. Berg*.  And I can get

25   you the case cite, if you'd like.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 1   Filed 04/14/21   Page 79 of 203   PageID 20936

47

1              THE COURT:  Okay.  Maybe I do remember it.  I just --

2         (Pause.)

3              MS. DEITSCH-PEREZ:  If I can direct the Court's

4    attention, there's also a subsequent case that I think the

5    Debtor was about to acknowledge.

6              THE COURT:  Okay.  We'll let you have your rebuttal.

7              MR. DEMO:  Yeah.  And I can -- instead of --

8              THE COURT:  Okay.  Go ahead, Mr. Demo.

9              MR. DEMO:  Yeah.  Instead of getting you the case

10   cite, Your Honor, I do think that subsequent case is

11   important, because Mr. Dondero cites it for the fact that the

12   District Court overruled the *Berg* court and found that motion

13   to withdraw the reference in that instance was correct.

14        But what Mr. Dondero neglects to say is that the action to

15   withdraw the reference that was brought to the District Court

16   was actually the second action.  The first motion to withdraw

17   the reference brought to the District Court was denied.  The

18   second motion to withdraw the reference was granted, but based

19   on entirely different facts.  Because Berg also had third-

20   party claims against a nondebtor, a guy named Kornman.  By the

21   time that the case got to the District Court, the debtor's

22   claims on the promissory note against Berg had been resolved.

23   The only parties left in the adversary were Berg and Kornman,

24   non-debtors, and the only actions left in the adversary were

25   non-core actions.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Inent    File9e/49/0486Page 80 of 203   PageID 20937

48

1       In addition, Your Honor, both Berg and Kornman agreed to

2   withdraw the reference.

3       So I understand why Mr. Dondero cited it, as kind of a bit

4   of a gotcha case, but it doesn't actually stand for the

5   proposition that the Northern District of Texas withdrew the

6   reference when the underlying complaint was a breach of

7   contract and a turnover claim under 542(b) that was brought in

8   an adversary proceeding to collect on a note.

9       And Your Honor, these cases aren't outliers.  There are

10  cases from other districts that stand for the same thing, and

11  they stand for the proposition that the collection of a note

12  is an appropriate remedy under 542(b), despite the fact that

13  there may be affirmative defenses to that note.

14      And the case that I would direct Your Honor to and then

15  pivot from real quick is the Second Circuit Court of Opinions

16  [sic] case in *Willington Convalescent Home*.  That case was

17  cited with approval in *Tow*.

18      But the case that I want to focus on, because I just think

19  there is a great quote from it, is a case out of the Eastern

20  District of Virginia.  It's a 2020 -- 2012 case, excuse me --

21  called *In re Connelly*.  In that case, the debtor sued, seeking

22  turnover on a series of notes, and the defendants filed

23  answers denying the indebtedness and asserting nine

24  affirmative defenses challenging the validity and

25  enforceability of the notes.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-2   Filed 09/01/21   Page 81 of 203   PageID 20938

49

1      The defendants also argued, as they do here, that a

2  turnover action -- I'm sorry -- that the action couldn't be

3  core because it was disputed.  And I want to read a quote from

4  the *Connelly* court, which says:

5          "While the Defendants assert that they are not

6      indebted to the Trustee, it is simply not relevant that

7      the Defendants dispute liability on the instrument.

8      The presence of a dispute does not preclude a debt from

9      being matured.  It is sufficient if the complaint

10     alleges the existence of matured debt.  For an action

11     to be a turnover proceeding, it is not relevant that

12     the Defendant  disputes the existence of a debt by

13     perhaps denying the complaint's allegations, as long as

14     those allegations state the existence of a mature debt.

15     A cause of action is a turnover proceeding under 542(b)

16     of the Bankruptcy Code where it seeks the collection,

17     rather than creation or liquidation of a matured debt."

18     And *Connelly,* Your Honor, is consistent with *Tow*, and it's

19  consistent with case law from other circuits, and it's also

20  consistent with *Collier's*.  Mr. Dondero's counsel cited to the

21  157(b)(2)(E) section of *Collier's*, but Mr. Dondero's counsel

22  neglected to cite to the actual *Collier's* section on 542(b),

23  which says that 542(b) does not on its face say it does not

24  apply to disputed claims and that 542(b) does apply to

25  disputed claims.  As long as there is a debt which is property

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document    Document Filed 09/04/86 Page 82 of 203    PageID 20939

50

1    of the estate which is matured, which is payable on demand,

2    542(b) is the correct mechanism for the estate to collect on

3    that debt.

4        Those are exactly the facts here, Your Honor.  The fact

5    that there is a breach of contract claim right alongside that

6    doesn't change that, because it's black letter jurisdictional

7    bankruptcy law that just because there are state law issues

8    implicated, if an action is core, if it arises under or arises

9    in a bankruptcy statute, the bankruptcy statute governs and

10    creates the bankruptcy court jurisdiction.  State law issues

11    come up in core matters all of the time and it does not make

12    those matters non-core.

13        That's simply the case here, Your Honor.  542(b) is a

14    bankruptcy court provision that provides that a trustee can

15    seek an action to recover on a matured debt.  All of the

16    actions here are matured debts.  Do the people have -- or,

17    excuse me, did the Defendants have defenses?  Yes.  But if you

18    look at our complaints, they were properly pled.  We pled the

19    existence of a debt.  We pled a proper turnover action.

20    They're payable-on-demand notes, and demands have been made.

21    They fit squarely under 542(b).

22        And because they fit squarely under 542(b), they are core,

23    they are equitable, meaning no jury trial right exists, and

24    Your Honor has the authority to issue a final order on these

25    matters.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 162    Filed 09/04/86    Page 83 of 203    PageID 20940

51

1        And if you look at, you know, turning briefly to the

2    *Satelco* case that Mr. Rukavina cited and the *Satelco* case that

3    Dondero's counsel cited, that is a 1986 case.  It's been cited

4    three times in the Northern District of Texas, and I will

5    concede that it's a Northern District of Texas case.  And I'll

6    also concede, Your Honor, that it stands for the proposition

7    that you need a final judgment in order to use 542(b).  I

8    think that's very narrow.  The majority of cases or courts

9    throughout the United States have found that too narrow, and

10   quite honestly, it just hasn't been followed.  *Satelco* has

11   been cited in 1986 in its own -- I mean, not cited.  *Satelco*

12   was written in 1986.  It was cited in *Fang*, which is a 1993

13   case, and *Fang* really followed the analysis in *Satelco*.  And

14   then it was cited in *Moran* in 2006.  The *Moran* cite was

15   basically just a string cite, Your Honor.  It gave no real

16   analysis.

17       2006, Your Honor, was also the year that Judge Houser

18   entered the *Faulkner v. Berg* decision which we discussed

19   earlier, which did not even address the *Satelco* opinion.

20   Since 2006, I haven't found any instances where it's cited in

21   this district with approval.

22       The only cases in the circuit that I have found are the

23   cases like *Tow*, which address it and distinguish it and say

24   that it's in the minority.

25       Your Honor also heard cases where Mr. Rukavina said, you

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-41    Filed 09/04/86    Page 84 of 203    PageID 20941
Document    Page 52 of 66

52

1   know, you can't use Section 542(b) to collect on a contract

2   claim.  And Your Honor, you know, that's right.  If this were

3   a breach of contract claim in a traditional sense, or an M&A

4   agreement or a supply agreement, where Your Honor would have

5   to determine the responsible party, who actually breached the

6   agreement, where Your Honor would have to do detailed factual

7   analyses of what the damages would be, okay, you know, I can't

8   not say that that would fall out of 542(b), arguably.

9        But again, Your Honor, that's just not the case here.  The

10  case here is squarely under 542(b).  We have two-page notes

11  that are unambiguous.  We have two-page notes where the

12  Defendants have admitted that they got money from the estate,

13  with the promise to pay it back on demand or to pay it back in

14  accordance with its terms.  And yes, they have defenses.  But

15  again, Your Honor, that does not take it out of 542(b).

16       And *Satelco* is -- it's just not current law and it's just

17  not followed in this circuit and it's not followed, quite

18  honestly, throughout the United States.

19            THE COURT:  Okay.  Let me --

20            MR. DEMO:  But even if --

21            THE COURT:  Let me ask you, and maybe I'm

22  interrupting at a time you were about to get into this, but if

23  I accept your argument as correct that, you know, *Satelco* got

24  it wrong and I should follow the courts that have said 542(b)

25  sort of, I don't know, trumps, supersedes, a breach of

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-21    Filed 09/04/86    Page 85 of 203    PageID 20942

53

1  contract cause of action on a note, so, following your logic,

2  that would mean this is arising under the Bankruptcy Code,

3  *i.e.*, 542(b) and core matter, we still have the jury trial

4  right problem, correct?

5          MR. DEMO:  No, not correct, Your Honor.

6          THE COURT:  Because even though it's statutory core

7  under your argument, we still look at *Granfinanciera*,

8  *Langenkamp,* and we go back and look at would the court of law

9  versus a court of equity have tried this suit --

10          MR. DEMO:  Yes.

11          THE COURT:  -- and is there legal remedy you're

12  seeking versus an equitable remedy.  And so, you know, even in

13  a preference suit, for example, core, core, core, they're

14  entitled to a jury trial --

15          MR. DEMO:  And --

16          THE COURT:  -- if they didn't file a proof of claim.

17          MR. DEMO:  Understood, Your Honor.  And I just don't

18  think that's the case here.

19      I mean, again, looking back to the *Tow* court, the *Tow*

20  court actually addressed this issue, and the *Tow* court found

21  that 542(b) -- and again, this is consistent with other case

22  law and other courts -- creates an equitable remedy.  It

23  doesn't create a legal remedy.  And because it creates an

24  equitable remedy, the *Tow* court found that the jury trial

25  right did not exist.  And it found that a jury trial right did

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16-21   Filed 04/04/86   Page 86 of 203   PageID 20943

54

1   not exist despite the defendant arguing that the action was a

2   suit for money damages.  You know, it wasn't a suit to turn

3   over a car or anything like that; it was actually a suit for

4   money damages.  And the District Court in *Tow* said that the

5   suit for money damages did not mean it wasn't an equitable

6   remedy because it arose under 542(b) and a jury trial right

7   did not exist.

8        So I would, I guess, challenge your premise there a little

9   bit, Your Honor, because I do think that the case law is

10  pretty clear that 542(b) creates an equitable remedy without a

11  jury trial right.

12           THE COURT:  Okay.

13           MR. DEMO:  And with that, Your Honor, I will move on

14  and pivot and say, you know, even if this weren't a core

15  matter and even if a jury trial right existed, that the other

16  *Holland America* factors weigh heavily in favor of Your Honor

17  keeping this case for as long as possible.  And I know that

18  wasn't the most elegant pivot, but, you know, I do -- I am

19  conscious of this Court's time.

20       You know, first, Your Honor, the jury trial right, we

21  didn't press it in our papers.  Did Mr. Dondero file a 553

22  action in his complaint, which arguably creates the claims

23  allowance process, and then recant it?  Yes.  But leaving that

24  aside, looking at forum-shopping, you know, the Defendants

25  argue that we're the ones forum-shopping here.  The Defendants

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 162   Filed 05/04/86   Page 87 of 203   PageID 20944

55

argue that the Debtors are forum-shopping by having filed

these actions in that court.  It's difficult to respond to

that, Your Honor, because where else would the Debtor have

filed these actions?

I can't think of any case I've seen where the debtor is

owed money that arose -- that maturity occurred postpetition,

and the debtor went out to state court in Texas or state court

in Mississippi to collect on those debts.  Those actions are

always brought in the Bankruptcy Court.

The Bankruptcy Court was created as a court, as a forum,

to marshal the assets of the estate, to adjudicate disputes,

and then to push those assets out to creditors.  It just

doesn't make sense to say that the Debtor is forum-shopping by

using the forum created for the Debtor under the Bankruptcy

Code.

The distinction, Your Honor, and I don't want to belabor

this point too much, Mr. Dondero and his affiliate entities

have shown that they want nothing more than to not be in this

court.  They've filed recusal motions.  They've filed

withdrawal of the reference in this case, in these cases.  We

anticipate they'll file withdrawals of the reference in the

other notes actions.  They filed a withdrawal of the reference

in the CLO Holdco-UCC dispute.  Mr. Dondero's controlled

entity, the DAF, recently filed an action in the Northern

District of Texas seeking to functionally re-litigate the

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document    Document    Page 56 of 86    Page 88 of 203    PageID 20945

56

1    HarbourVest settlement and to hold Mr. Seery responsible for

2    breach of fiduciary duties.

3        We recently found out that Mr. Dondero's other related

4    entity, which was a very, very small LP in the Select Fund,

5    has filed a suit in the Northern District of Texas, seeking to

6    hold the Debtor liable for mismanaging multi -- or, sorry,

7    Select Fund with respect to the sale of Trussway and SSP, two

8    names Your Honor may remember because they came up in December

9    in the context of the hearing you had on the CLOs seeking to

10   prevent Mr. Seery from exercising his authority under the CLO

11   management agreements.

12       And I do want to be clear, Your Honor, that this new case

13   did not name Mr. Seery as a defendant, but it's still there.

14   This is happening.  Mr. Dondero and his related entities do

15   not want to be here.  They are forum-shopping.

16       And I would push Your Honor to look at the Western

17   District of Texas case *Citibank*, which says that the best way

18   to deal with forum-shopping in a withdrawal case is to wait to

19   withdraw the reference until the absolute last moment, so that

20   no party can be said to be forum-shopping.  No party can be

21   looking at this Court's orders and saying, oh, this is a good

22   one, this is a bad one, let's withdraw the reference.

23       This is the appropriate venue for this, and this is where

24   it should be held and should be adjudicated, up until the last

25   minute.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 1-2    Page 59 of 486    Page 89 of 203    PageID 20946

57

1          And I should have said this from the beginning, Your

2    Honor, that Your Honor absolutely has jurisdiction.  At a bare

3    minimum, related-to jurisdiction, because these assets are a

4    core asset of the Debtor's estate.  The Debtor is in a

5    monetization plan.  Collecting these assets and distributing

6    these assets out to the creditors is what the Debtor is doing.

7    And so there is, at a minimum, related-to jurisdiction.

8          There are also efficiency concerns that we really need to

9    address here, Your Honor.

10              THE COURT:  You're fading.  Your audio is fading.

11              MR. DEMO:  Oh.  Is this any better?

12              THE COURT:  Yes.  Uh-huh.

13              MR. DEMO:  Okay.  There are also judicial economy

14    issues that favor keeping the case here, Your Honor.  I mean,

15    the case has obviously been pending for 20 months.  That's not

16    new to anybody.  The relationship of all the parties in this

17    case is very important.  The case is complicated.  The parties

18    in this case are complicated.  And understanding those is

19    going to be a key component of actually understanding any

20    action, even a simple two-page note action.

21          This Court -- there are also 19 separate litigations, I

22    believe, currently pending with Mr. Dondero and his entities,

23    and Your Honor has dealt with all of those in an expeditious

24    manner.  When something needs to be heard on an emergency

25    matter, Your Honor has made herself available, and we

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 162   Filed 09/04/86   Page 90 of 203   PageID 20947

58

1    appreciate that.  Your Honor has entered orders in a timely

2    manner, and Your Honor has dealt with the complicated things

3    in this case in a timely manner.  And we would ask Your Honor

4    to keep doing that.

5        Because, in distinction, the District Court has other

6    things to do.  There are criminal cases.  There are other

7    cases.  The District Court is not a court that wants to focus

8    just on this case.  And the District Court's treatment of this

9    case is evident, I think, Your Honor, by the way that they

10   treated the stay motions that were filed.  We still don't have

11   a ruling on them and we never will have a ruling on them

12   because we've passed that by and we're in the Fifth Circuit

13   now.

14       This Court was created to marshal the Debtor's assets and

15   to adjudicate disputes and to allow for the distribution of

16   assets to creditors.  We would ask that Your Honor keep it for

17   that reason, among others.

18       We've also, as we talked about earlier, we are very close

19   to finishing discovery.  We've had multiple depositions.  We

20   will -- or, I'm sorry, not multiple -- we've had Jim Seery's

21   deposition.  We have Mr. Dondero's deposition.  There are

22   document productions that are occurring.  And Your Honor,

23   these cases are scheduled to be heard within the next 90 to

24   100 days.

25       We need a resolution on this matter so that we can make

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document   Document File Page 59/0486 Page 91 of 203    PageID 20948

59

1    distributions to creditors.  This Court is the best court to

2    do that.  There is just literally no time to wait for the

3    District Court to get around to hearing -- in the district --

4    I mean, to hearing this matter.

5        And finally, Your Honor, I think, you know, we can draw

6    some inferences here.  We can draw some inferences that, you

7    know, there is some forum-shopping going on.  There is the

8    desire to burn some assets.  That also weighs into the

9    judicial economy, Your Honor, to not allow additional estate

10   assets to be wasted running this Court -- running a very

11   simple proceeding up and down to the District Court.  Your

12   Honor has the authority to enter non-final orders, including

13   orders on partial summary judgment, including orders on

14   evidentiary matters.  Based on those orders, we quite honestly

15   don't think there will ever be a need for a jury trial, and we

16   would ask Your Honor to keep this case for as long as possible

17   in order to enter those orders, in order to provide for an

18   expeditious resolution of this matter.

19       Unless Your Honor has any questions, I think that's it for

20   me.

21           THE COURT:  All right.  No more questions at this

22   time.  I am going to come back to that Trussway matter before

23   we finish today.  All right.  So, words in rebuttal.

24           MR. RUKAVINA:  Thank you.

25           THE COURT:  Mr. Rukavina?

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 16   Filed 09/04/86   Page 92 of 203   PageID 20949

60

1          MR. RUKAVINA:  Thank you, Your Honor.  Thank you,

2     Your Honor.  I'll be brief.

3        Let me address the case, the *Faulkner v. Berg* case.

4              THE COURT:  Okay.

5          MR. RUKAVINA:  Because I think there's a valuable

6     lesson to learn from this case, Judge.  And here is the whole

7     extent, and I mean literally every molecule, of what Judge

8     Houser wrote:  "The complaint contains a claim for breach of

9     contract and a claim for turnover of property of the estate

10    under 542.  These two are core claims pursuant to 28 U.S.C.

11    157."

12       That's it.  That's all she wrote.  Now, is Judge Houser an

13    inattentive judge?  Is she a stupid judge?  Absolutely not.

14    But she wrote this in 2006, five years before *Stern v.*

15    *Marshall*, Your Honor.

16       Similarly, Judge Felsenthal -- I'm sorry, Judge Abramson

17    wrote the Sel -- the --

18             THE COURT:  *Satelco*.

19         MR. RUKAVINA:  -- the satellite case.

20         MS. DEITSCH-PEREZ:  *Satelco*.

21         MR. RUKAVINA:  Thank you.  Two or three years after

22    *Northern Pipeline*.  And that's my point.  And it seems like

23    trustees and debtors sometimes forget the painful lessons of

24    the Supreme Court's precedent, and then we're all shocked when

25    a case like *Stern v. Marshall* comes down and we're all

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 162    Filed 09/04/86    Page 93 of 203    PageID 20950

61

1   shocked, because we've been led down the road for years and

2   years and years of whittling away here and whittling away

3   there, that at least the U.S. Supreme Court finds these things

4   of paramount importance.  So that's what we're dealing with

5   today.

6       So Mr. Vasek, will you please pull up the HCMFA notes?

7       So, I do not purport, Your Honor, to have a mini-trial

8   today on the merits of anything.  That's not what this is

9   about.  But Mr. Demo brought up a couple notes, so let me --

10  let's go look at the HCMFA notes, Your Honor.

11          MR. DEMO:  Are these -- are these notes going to be

12  put into evidence?

13          MR. RUKAVINA:  These are attached to the complaint,

14  sir.

15          MR. DEMO:  And we don't have an objection.

16          MR. RUKAVINA:  These are attached to your complaint.

17          MR. DEMO:  Oh.

18          MR. RUKAVINA:  Didn't you -- didn't you quote from

19  them earlier?

20      So Mr. Vasek, will you go to the signature page?

21      Your Honor, look at that.  Maker:  Frank Waterhouse.

22  That's what these notes are.  Maker:  Frank Waterhouse.  I

23  would survive summary judgment today if all they did was they

24  told you, look, Judge, give me my $7.54 million.  I'd say,

25  well, who in the world is Frank Waterhouse?  Of course, we all

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document   Document   Page 62 of 186   Page 94 of 203   PageID 20951

62

1    know who he is.  But look at how he signed that.  Not as a

2    representative capacity.

3        So what Mr. Demo is saying, Judge, forget about what Mr.

4    Rukavina just said.  Forget about these defenses.  Forget

5    about looking at the facts.  Forget about looking at Mr.

6    Waterhouse's actual or apparent authority.  Here's a note.

7    Pay me.  Oh, and if you don't pay me, it's contempt of court.

8    That is what he is trying to get the Court to do, by saying

9    that 542(b) somehow does away with the need to use -- I think

10   Your Honor said it -- to liquidate a claim.  And as soon as we

11   start that process of liquidation, we get into the whole issue

12   of who's going to be our fact-finder.  Is it going to be a

13   jury?  And who's going to be our judge.  Is it going to be an

14   Article III or an Article I judge?

15       I did not create the Article I/Article III distinction.  I

16   would love it if every bankruptcy judge was an Article III

17   judge.  I think having these hearings and so many contentious

18   adversary proceedings is a gross, gross waste of all of our

19   times.  But this is the mechanism that Congress has created.

20   And if we mess with this mechanism, we're just inviting

21   trouble.

22       And, of course, any party that comes before a judge,

23   whether it's a reference withdrawal or whatever, of course

24   there's always underlying strategy.  Of course parties would

25   prefer to be in front of one court or another.  That's not

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Filed 06/04/21    Page 95 of 203    PageID 20952

63

1    gamesmanship.  That's not forum-shopping.  The Debtor could

2    have filed a suit and a sworn account in a Dallas court and I

3    bet they would have already had a judgment by now, probably,

4    given how a suit and a sworn account works in Texas.  But they

5    probably didn't talk to their local counsel about Texas

6    procedure.

7        So all of those things wash out.  Every litigant in front

8    of you has an ulterior motive, Your Honor, which is that they

9    want to win.  What matters is the Court's jurisdiction.  What

10   matters is the Seventh Amendment.  What matters is the jury

11   right.  And what matters is 542(b).

12       I think Your Honor has, through her questions, suggested

13   that she doesn't buy the argument that 542(b) can be used to

14   liquidate a disputed claim.  I hope that the Court will

15   reaffirm that.

16       And while I understand that the usual practice is that the

17   bankruptcy judge stays on board for pretrial matters, I

18   understand that there's a lot of wisdom to that practice in

19   other cases, here, I think because this Court has so much

20   going on in this case already, and these note cases really are

21   different, they really don't have a large universe of

22   discovery, they really are divorced from the bankruptcy case,

23   I respectfully submit it's in everyone's interest to have the

24   District Court enter its orders throughout this case and not

25   have to revisit potentially every order that this Court enters

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document Filed 04/04/86    Page 96 of 203    PageID 20953
Document    Page 64 of

64

1    in the interim before we get to trial.

2        Thank you, Your Honor.

3            THE COURT:  All right.  Do you have any comment about

4    the -- I think it was Eastern District of Virginia case that

5    Debtor argued?  Drawing a blank on the name.

6            MR. DEMO:  No, Your Honor.

7            MR. RUKAVINA:  Your Honor, I do not have any discrete

8    comments on it.  I would just point out that you're -- the

9    Court is right.  The Fifth Circuit has not addressed this

10    issue.  But I have briefed, and it's black letter in those

11    cases, the D.C. Court of Appeals, the Eleventh Court of

12    Appeals, and the Eighth Circuit Court of Appeals.  So those

13    are three court of appeals that agree with *Satelco*, and not a

14    single court of appeals holds otherwise.  And as Judge Dodd

15    taught us when --

16            THE COURT:  I take it there's a Second Circuit case

17    that holds otherwise, right?

18            MR. RUKAVINA:  That's what the Debtor has briefed,

19    yes.  I apologize.

20            THE COURT:  Uh-huh.  Uh-huh.

21            MR. RUKAVINA:  That's what the Debtor has briefed.

22    But again, I go back to just thinking about it conceptually.

23    If Congress says, okay, you have a breach of contract case,

24    you have a promissory note case, and Congress says, I want to

25    slap my own label on it and I'm going to assign it to an

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 16-1    Filed 09/04/86    Page 97 of 203    PageID 20954

65

1   Article I court to enter a final order, and I'm going to strip

2   you of your jury rights because it's equitable, Your Honor,

3   that's -- that's exactly what *Northern Pipeline* was.  That's

4   exactly what *Stern v. Marshall* was.

5       With due respect to the Eastern District, with due respect

6   to the Second Circuit, it's common sense, Your Honor.

7   Congress cannot take something that is a constitutional right,

8   that is a common law right, and just give it a label, and

9   because of its label somehow do away with 250 years of

10  constitutional law.

11          THE COURT:  Thank you.  All right.  Any last words,

12  Ms. Deitsch-Perez?

13          MS. DEITSCH-PEREZ:  Yes.  I think I can answer your

14  question about -- I think you were asking about *Willington*

15  *Convalescent Home*?

16          THE COURT:  Right.

17          MS. DEITSCH-PEREZ:  Which was the case the Debtor

18  referred to.  Well, first of all, it's a 1988 case, so pre-

19  *Stern v. Marshall*.  And I believe the only claims that were

20  brought in there were turnover and preference.  And so it's,

21  in any event, distinguishable from the case here, which is a

22  contested contractual matter.

23      And to that end, while, like Mr. Rukavina, I'm not trying

24  -- I'm not going to try the case here, I do want to point out

25  that there are defenses, there are real defenses.  And so for

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 1   Filed 06/04/86   Page 98 of 203   PageID 20955

66

1    that reason I would like to -- let me pull up one of the

2    notes.  So, if I can share my screen.  Okay.  Are you able to

3    see my screen now?

4              THE COURT:  No.

5              MS. DEITSCH-PEREZ:  Okay.  Can you see it now?

6              THE COURT:  Yes.

7              MS. DEITSCH-PEREZ:  Okay.  So this is one of the

8    three notes.  And this is what I referred to earlier and what

9    the Debtor would like to ignore.  The Debtor keeps saying

10   these are two-page notes.  There's nothing to them.  There are

11   no defenses.  But what Mr. Dondero has alleged is that there

12   is a subsequent agreement that put conditions, conditions

13   subsequent that would cause the note to be forgiven.  And they

14   relate to the sale of the portfolio companies.  I don't know

15   if you saw it in the newspaper that MGM may be sold to Amazon

16   for $9 billion.  So you will hear, when you hear Mr. Dondero

17   testify, if you hear it, or the District Court will hear that

18   these notes were to be forgiven under certain circumstances.

19        And so, first of all, the Debtor alluded, without saying

20   so, to the parol evidence rule.  Obviously, a subsequent

21   agreement can be proven up.  The parol evidence rule does not

22   prevent that.  That's a live defense.  And in addition to

23   that, you can certainly have parol evidence if your note is

24   ambiguous.  And while the note does not say anything about the

25   conditions -- and the reason it didn't is rooted in tax law,

Case 21-03003-sgj Doc 58 Filed 05/27/21 Entered 05/27/21 17:43:16 Desc Main
Case 3:21-cv-00881-X Document 7-2 Filed 07/07/21 Page 99 of 203 PageID 20956

67

1   because in order for the note not to be immediately taxable as

2   income to a party, it has to be a valid note at the time and

3   the forgiveness has to be based on events that are not

4   entirely in the borrower's control, and that's -- that's what

5   the fact-finder will hear about.

6        And if you look at each of the notes -- in the first one

7   it's in Paragraph 8; I think in the others it might be in

8   Paragraph 7 or 9 -- the note refers to the existence of other

9   agreements.  And that is consistent with there being a

10  subsequent agreement that the notes would be forgivable under

11  certain circumstances that related to the portfolio companies.

12       So, to be clear, there are issues to be tried here to a

13  fact-finder.  The Debtor admits that the tax determinations

14  are also intertwined with factual determinations.  And that's

15  our point, that you have to know the tax law relating to when

16  a note is a bona fide loan at the start but can be

17  compensation under certain circumstances.  And we will have

18  expert testimony on that.  That is something Mr. Dondero is

19  entitled to try to a jury in the District Court.

20       Thank you very much for your time and attention.

21            THE COURT:  Thank you.  By the way, --

22            MR. DEMO:  Your Honor, with apologies --

23            THE COURT:  -- we both -- well, the Eastern District

24  of Virginia case that I was asking about was *Connelly*.  *Shaia*

25  *v. Taylor (In re Connelly)*.  It was a 2012 case.  So that was

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170-1   Filed 08/24/21   Page 100 of 203   PageID 20957

68

1    the one I was wondering if either you or Mr. Rukavina could

2    specifically address.

3        (Pause.)

4        MR. DEMO:  And Your Honor, that case -- there are

5    other cases that support that proposition as well.  I don't

6    need to go through them chapter and verse, but they all stand

7    for basically the same proposition.

8        MS. DEITSCH-PEREZ:  I don't have that one

9    particularly in mind, but this -- this falls right in line

10   with what's in *Collier's*, that there are some courts across

11   the country that have mistakenly and incorrectly used the

12   turnover statute to unconstitutionally exercise jurisdiction

13   over what is a non-core matter that should be able to be tried

14   before a jury in the District Court.

15       THE COURT:  All right.  I just wondered if anyone

16   could zero in on the facts of that case, because I --

17       MS. DEITSCH-PEREZ:  No.  But may I -- may I have the

18   opportunity to look at it, and if there is a particular

19   distinction we should bring to your attention in a very brief

20   letter, do it after the hearing?

21       MR. RUKAVINA:  Well, Your Honor, --

22       MR. DEMO:  Your Honor, I think --

23       MR. RUKAVINA:  -- I remember -- I have that case in

24   front of me.

25       THE COURT:  Okay.  Everybody's talking --

1          MR. RUKAVINA:  I have the case in front of me.

2          THE COURT:  You have the case in front of you?  Is

3    that what you said?

4          MR. RUKAVINA:  Yes, Your Honor.  And I do remember --

5    I do remember reading it, and it does stand for the

6    proposition that Mr. Demo says, --

7          THE COURT:  Okay.

8          MR. RUKAVINA:  -- which is that a disputed debt, a

9    disputed claim, does not remove the claim from the operation

10   of 542(b) and from it being core.  And I think what Ms.

11   Deitsch-Perez started telling you is that it's just wrong.

12   It's just a wrong case.  Because, again, it ignores the -- it

13   looks at is this statutorily core, and it says it's

14   statutorily core, and it doesn't look at the fundamental

15   constitutional issue.

16       But I will quote this case right now, Your Honor, and

17   here's the -- the key of it.  So, again, Mr. Demo is correct

18   that it says that whether the debt is disputed or not doesn't

19   matter.  But here's what he -- the Court says:  "A cause of

20   action is a turnover proceeding under 542(b) of the Bankruptcy

21   Code where it seeks the collection rather than the creation or

22   liquidation of a matured debt."

23       That goes to Your Honor's point.  You have to have the

24   liquidation of a debt.  A promissory note is not a judgment.

25   A promissory note is a means to a judgment.  You have to

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170   Filed 09/02/21   Page 102 of 203   PageID 20959

70

1   liquidate that promissory note.

2              MR. DEMO:  Your Honor, this is Greg Demo.  I'll take

3   issue with that.  That's just impossible, Mr. Rukavina's

4   construction of that case.  You can never have a final

5   judgment on a note if that note is also disputed.  You have to

6   resolve the dispute first.

7        What that case says, and it's also in the *Tow* opinion,

8   it's also in the Second Circuit opinion, it's also in the case

9   out of the Western District of North Carolina, I think, what

10  that court says is that 542(b) can be used to collect on a

11  debt even if that debt is disputed.  If what that means, that

12  you have to have a final judgment on the debt before you can

13  use 542(b), that language means nothing.  Because how can you

14  have a debt that's disputed and also have a debt that has a

15  final judgment on it?  The language says what it says, and it

16  applies here.

17       And Your Honor, I point you to, quickly, the *Tow* case, and

18  I'll read you a quote from the *Tow* case which cites to that

19  Second Circuit case that I referenced.  It says, "*See,*

20  *example, In re Willington Convalescent Home, Inc.*"  And the

21  quote from *Willington* is:  "The mere fact that Connecticut

22  denies that it owes the matured debt relating to the services

23  because of a recoupment right does not take the Trustee's

24  actions outside the scope of Section 542(b)."  That's the

25  quote in *Tow*.  That's the quote in in the Southern District of

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 176    Document Filed 09/24/86    Page 103 of 203    PageID 20960

71

1    Texas.

2         Does it have as much as the case that I cited from

3    Virginia?  No.  But it has the exact same substance, Your

4    Honor.  And what that means is that *Satelco* has to be wrong

5    because you cannot have a dispute on a debt and allow that

6    dispute to be heard under 542(b) if 542(b) requires a final

7    judgment.  It just doesn't make sense.

8         And Your Honor, while I have you, I do want to address the

9    *Stern v. Marshall* issue.  Because this Court is not going to

10   cause friction under *Stern v. Marshall*.  The *Tow* court

11   addressed *Stern v. Marshall* and found that, despite the fact

12   that there were state law issues, again, the action was a

13   542(b) action and had no *Stern* implications.  There are cases

14   from this circuit, there are cases from other circuits, all of

15   which have found that turnover is an appropriate means to

16   collect on a matured note, even with disputes.  If this Court

17   follows that line of cases, this Court is not going to be

18   creating a new *Stern* controversy, because that controversy

19   already exists.  Your Honor is not going to be creating a

20   constitutional mess.

21             THE COURT:  Do all of these cases you say support

22   your position, do they say also no jury trial right?

23             MR. DEMO:  Yes.  They do, Your Honor.

24             THE COURT:  And forget about *Tow*, because *Tow*, I

25   think, is distinguishable.  There was a settlement agreement.

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 70    Filed 09/22/21    Page 104 of 203    PageID 20961

72

1    The obligor on the settlement agreement got some sort of

2    recovery.  The trustee was seeking to turn over that recovery.

3    That is very distinguishable in my view.  Okay?  There had

4    already been resolution, liquidation, whatever you want to

5    call it, of the amount due.  It was purely, turn over this

6    recovery you're getting, obligor, under the settlement

7    agreement.  I mean, that's very different.

8         But I feel like, even if 542(b) supersedes the breach of

9    contract nature of your lawsuit, we still have this problem of

10   there's -- you know, a suit on a note was tried in a court of

11   law back in Elizabethan times, okay?  It's a legal remedy

12   you're seeking as well as an equitable remedy, liquidation of

13   the claim as well.

14             MR. DEMO:  It -- it --

15             THE COURT:  I just feel like they're entitled to a

16   jury trial.

17             MR. DEMO:  And Your Honor, I guess what I would say

18   to that is, well, one, even if they are, Your Honor doesn't

19   need to withdraw the reference today and Your Honor should

20   keep this for --

21             THE COURT:  Okay.

22             MR. DEMO:  -- as long as possible.  Make dispositive

23   findings, enter partial summary judgment motions, and all of

24   that.

25        But what I would also say is that the language in 542(b)

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170   Filed 09/24/21   Page 105 of 203   PageID 20962

73

1   -- and I'm sorry, I'm not facile enough to run through the

2   cases on the fly -- 542(b) is the action that creates the

3   equitable remedy.  It doesn't matter what the underlying

4   dispute is.  If 542(b) applies, 542(b) is itself an equitable

5   remedy.  542(b) is, per se, equitable, per se arises under the

6   Bankruptcy Code, and it's that that vitiates the right to a

7   jury trial.  It doesn't matter what the underlying facts are

8   if 542(b) applies.

9           THE COURT:  Okay.  All right.  Well, I thank you all

10  for your arguments.  We've really gone into great depth here.

11      Here is what we're going to do.  We are going to draft up

12  three reports and recommendation for each of these

13  adversaries, and I am concluding recommending to the district

14  Court that the breach of contract claims here are non-core,

15  and tacking a turnover claim under 542(b) onto them as Count

16  II doesn't change the underlying nature.

17      So there's a split of authority, I understand, but I think

18  certainly under *Stern*, *Marathon*, I think that's the better

19  answer, that we have a non-core claim and a core claim, with

20  the breach of contract being non-core.

21      I also think that there are jury trial rights here on

22  behalf of the Defendants.  Were it not for the fact that they

23  withdrew their proofs of claim -- I mean, at one time, it

24  appears, at least in the case of Mr. Dondero and, well, and in

25  the case of NexPoint and Highland Advisors -- they had proofs

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 09/24/21   Page 106 of 203   PageID 20963

74

1   of claim that involved some overlapping issues with these

2   notes.  But they're gone now.  And the fact that they're gone

3   changes everything.  So I do determine and am going to

4   recommend to the District Court that there are jury trial

5   rights here.

6        By the way, I'll address this issue with regard to the tax

7   issues that are being raised by Mr. Dondero.  I don't think

8   there is substantial or material consideration of other non-

9   bankruptcy federal law that would be involved here.  But

10  that's really irrelevant, I suppose, because I'm finding non-

11  core jury trial rights, no consent by the Defendants, and so

12  I'm going to recommend that the reference be withdrawn.  But I

13  am going to do what is the usual protocol and recommend that

14  the reference only be withdrawn at such time as the Bankruptcy

15  Court  notifies the District Court that the matters are trial-

16  ready, and therefore recommend the District Court defer to the

17  bankruptcy judge to handle all pretrial matters.

18       The reality is you're either going to get a magistrate

19  handling pretrial matters or you're going to get a bankruptcy

20  judge.  And I'm going to follow -- I see no reason not to

21  follow the usual protocol in this district, where I recommend

22  the bankruptcy judge preside over pretrial matters.

23       Last, with regard to the motion for stay that's only been

24  filed in the Dondero adversary, I am going to grant a 60-day

25  stay that will start after Friday.  In other words, I'm not

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170-2   Filed 09/24/86   Page 107 of 203   PageID 20964

75

1   going to suspend, interrupt discovery that is about to end in

2   three days, okay?  But I guess I'll say, beginning at midnight

3   Friday night, I'll impose a stay, and it'll be a 60-day stay,

4   and subject to further extensions, but I'm assuming that might

5   be the approximate amount of time that it takes the district

6   Court to either adopt or not adopt this Court's report and

7   recommendation.

8       Again, this is -- I was going to say it's consistent with

9   protocol.  We don't always stay adversaries pending a decision

10  on a motion to withdraw the reference, but as a practical

11  matter, there ends up being a stay, because I will not rule on

12  a motion for summary judgment until the District Court rules

13  on a report and recommendation, because, for all I know, the

14  District Court will want to yank the whole thing up.  So

15  that's my ruling.

16          MR. DEMO:  And Your Honor?

17          THE COURT:  Yes.

18          MR. DEMO:  I'm very sorry to interrupt.  Expert

19  discovery, we're supposed to get an expert report from Mr.

20  Dondero's counsel on Friday as well, and we just want to make

21  sure that we have enough time built in to actually do a

22  deposition of his expert and complete that part of the --

23          MS. DEITSCH-PEREZ:  I would --

24          MR. DEMO:  -- discovery process.

25          MS. DEITSCH-PEREZ:  I would suggest that we stay the

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170-2   Filed 09/24/86   Page 108 of 203   PageID 20965

76

1    provision of expert discovery until the District Court rules.

2    The District Court may rule that it's taking everything, as

3    the Court said, in *Great Western*, and so we ought to hold onto

4    that.

5            MR. DEMO:  Your Honor, we have a scheduling order --

6            MR. MORRIS:  Your Honor -- Mr. Demo, let me just

7    speak for a moment.

8        Your Honor, this is John Morris.  I've listened patiently

9    to all of this, and I apologize for interrupting.  But the

10   deadline for serving expert reports was last Friday.  I

11   graciously granted an extension until this Friday for personal

12   reasons that I won't get into, but Mr. Dondero should not use

13   our kindness as -- improperly here.  We granted a one-week

14   extension of time until Friday.  They should produce the

15   report.  They should make their witness available.  And

16   otherwise, Your Honor, if you're going to stay it, you'll stay

17   it, but they should complete what's been started, particularly

18   since the only reason they have the right to serve the report

19   on Friday is because we gave them that extension of time.

20           MS. DEITSCH-PEREZ:  Yes, but --

21           THE COURT:  All right.

22           MS. DEITSCH-PEREZ:  But that is --

23           THE COURT:  Just a moment while I read this.  Okay.

24   I was taking at face value that discovery completely ended

25   this Friday, the 28th, but now I've got the order in front of

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 170-2    Filed 09/72/4 86    Page 109 of 203    PageID 20966

77

1  me and I see deadline for completion of expert discovery is

2  June 7th, and that was premised on expert disclosures being

3  May 21st, and now you're saying you've pushed that off to May

4  28th.  And I guess, Mr. Morris, you're saying you'd like

5  discovery to proceed on the experts through June 14th.  Is

6  that a recap?

7          MR. MORRIS:  Yes, Your Honor.  And again, the only

8  reason we're even having this conversation is because the

9  Debtor gave an extension of time, and that shouldn't be used

10  against us.  We should complete this discovery right now.

11          THE COURT:  All right.  Now, Ms. Perez, you were

12  saying?

13          MS. DEITSCH-PEREZ:  To be fair, Your Honor, --

14          THE COURT:  Go ahead.

15          MS. DEITSCH-PEREZ:  Yeah.  To be fair, we asked for a

16  stay long before the request for the extension for the expert

17  report, which was for personal reasons.  But we did ask for a

18  stay to start with, and it's not abusing Mr. Morris's courtesy

19  to say we still want that stay.  We would have liked to have

20  had that stay earlier.  The motion for stay did not get -- was

21  not set for hearing until today.  We would have had it

22  earlier.  The Debtor would not consent.  And then the Debtor

23  didn't even respond to our motion for stay.

24      We just think it would make sense to include the expert

25  discovery in the stuff that's held in abeyance that the

1    District Court may want to preside over.

2            THE COURT:  Okay.  The motion for stay was filed

3    April 15th, so that was, you know, Lord knows, --

4            MS. DEITSCH-PEREZ:  Long time ago.

5            THE COURT:  -- people seek emergency hearings all the

6    time in this case.  What I had intended before I focused on

7    this expert issue, I intended to let discovery play out,

8    because it seemed to me we were close enough to the end of

9    discovery that we ought not to put the brakes on it.

10       So I am going to let discovery play out as addressed in

11    the current scheduling order.  Okay?  So the expert --

12    discovery on facts cuts off this Friday.  The expert reports

13    will be due this Friday.  And deadline for completion of

14    expert discovery, as I understand it, would be June 14th,

15    pursuant to the one-week extension.  Yes or no?  Or did you

16    all intend June 7th?

17            MR. MORRIS:  I'm happy to work with counsel, Your

18    Honor.  John Morris for the Debtor.  I'm happy to work with

19    counsel to get this done before June 14th.  It's not a

20    problem.

21            THE COURT:  Okay.  So that's the ruling.  I'll let

22    discovery play out as we've just announced.  But other than

23    that, there is a stay, so no motions for --

24            MS. DEITSCH-PEREZ:  Can I ask for a clarification?

25            THE COURT:  -- summary judgment, no trial filings for

1   60 days after entry of the order.

2        And Mr. Demo, I'm going to ask you to upload a form of

3   order on this stay ruling.  But, obviously, my law clerks and

4   I will do the three reports and recommendation.

5        You had a question?

6            MR. MORRIS:  Your Honor?

7            MS. DEITSCH-PEREZ:  Your Honor, I have a question

8   about it, --

9            THE COURT:  Okay.

10           MS. DEITSCH-PEREZ:  -- if I may.  We have -- we

11   conferred today about some documents that the Debtor did not

12   produce, and because of the results of the conference, we were

13   about to file a motion to compel.  It's very discrete.  It's

14   on the Highland audited financial statements that are

15   literally a push of the button for the Debtor but they don't

16   want to produce them.

17           MR. MORRIS:  I can -- I can respond to that, Your

18   Honor.  We haven't had a chance to respond.  But nevertheless,

19   what I will say is that the Debtor will produce the audited

20   financial statements for the sole purpose of disclosing

21   information related to those notes.  And, to the extent it

22   exists, and I don't know that it does, Mr. Dondero's

23   compensation.

24        We are not giving full audited financial statements.  But

25   to the extent that there's any information concerning the

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 170-2    Filed 08/02/21    Page 112 of 203    PageID 20969

80

1  notes or Mr. Dondero's compensation, we'll provide that.

2          MS. DEITSCH-PEREZ:  That -- that -- what we also

3  need, because our expert would like to have it, is the

4  information about the assets under management.  So anything

5  that might relate to an executive's compensation.  It's

6  broader than what Mr. Morris is saying.  So, --

7          MR. MORRIS:  Your Honor, the Debtor will not agree to

8  provide information about assets.  It just won't.

9          MS. DEITSCH-PEREZ:  Will it -- this is why we should

10 be conferencing outside.  But we would like the information

11 about assets under management.  It is not something that Mr.

12 Dondero didn't already have a right to.  He had them at the

13 time.

14         THE COURT:  All right.  I don't --

15         MS. DEITSCH-PEREZ:  There's no reason to --

16         THE COURT:  I don't know what you want me to do or

17 say, but I've allowed a lot of discussion, but I don't have a

18 motion to compel in front of me and I don't intend to --

19         MS. DEITSCH-PEREZ:  That was my question, Your Honor.

20 May -- may we make that -- I mean, if Mr. Morris and I cannot

21 reach agreement, we would like to be able to make that motion

22 tomorrow so that it's on file before the close of discovery.

23         MR. MORRIS:  Your Honor, if I may just be heard

24 briefly.  We're now told that this information is required for

25 the expert.  We didn't hear about an expert for the first time

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 170    Page 84 of 86 Filed 08/24 Page 113 of 203    PageID 20970

81

 1    until last week.  We were told that they needed an extension

 2    of time.  It was an understandable reason.  We were happy to

 3    give the extension of time.

 4        It's now Tuesday.  The report is due in three days.  And I

 5    am literally hearing for the first time that this information

 6    is required for the experts.  I just don't want this to be

 7    used as yet another excuse for delay, because, you know --

 8    I'll just leave it at that.

 9        And we can talk after this, Counsel.  We can talk after

10    this.  And if you want to make a motion, you can make a

11    motion.  But this should not be used as another basis for

12    delay.  The report was due last week.  We got the request for

13    an extension just a few days before that.  And to hear now

14    that they need this information for the report has me very,

15    very concerned and suspicious.

16            THE COURT:  All right.  Well, --

17            MS. DEITSCH-PEREZ:  And I think Mr. Morris --

18            THE COURT:  -- yes, I'm done hearing about this.

19    There is zero chance I'm granting a hearing on a motion to

20    compel this week.  And again, given that it is related to

21    information supposedly the expert needs and we're already past

22    the deadline for an expert, I mean, I don't know --

23            MS. DEITSCH-PEREZ:  Your Honor, we asked for this

24    many, many, many weeks ago.

25            THE COURT:  Okay.  Well, --

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170-2   Filed 08/22/24   Page 114 of 203   PageID 20971

82

1        MS. DEITSCH-PEREZ:  Okay.

2        THE COURT:  -- maybe a motion to compel should have

3   been filed many, many weeks ago.  But I've let you know where

4   I stand on this.

5      All right.  So I will try to get these reports and

6   recommendations out as quickly as possible.

7      I said I wanted to come back to *Trussway*.  You know, we're

8   not here on anything except these three adversaries today, but

9   could you repeat what you said, Mr. Demo, about a new district

10  court action filed by -- I'm not quite sure who was the

11  plaintiff.

12       MS. DEMO:  It was filed by the Sbaiti firm, which is

13  the same file -- law firm which filed --

14       THE COURT:  It was filed by who?  Your audio is not

15  great today.

16       MR. DEMO:  The --

17       THE COURT:  It was filed by who?

18       MR. DEMO:  Oh.  Sorry.  The Sbaiti firm.  I don't

19  know how to pronounce the name of that firm.  But that's the

20  same firm who filed the DAF action.  And it was filed on

21  behalf of an entity called PCMG, and then there's a bunch of

22  Roman numerals after it.  PCMG had a very, very, very small

23  interest in the Highland Select Fund, which is an entity

24  managed by Highland that's 99.95 percent owned by Highland,

25  and then the balance, I think, is owned by this fund and maybe

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 170-2    Filed 08/24/86    Page 115 of 203    PageID 20972

83

1    a little bit by Mr. Okada.  This firm is owned by Mr. Dondero.

2          They filed an action on the 21st.  We found out about it

3    by accident yesterday, because we haven't been served yet.  We

4    haven't fully digested it, but the crux of the matter is that

5    Mr. Seery breached his obligations under the Investment

6    Advisers Act when he sold the Trussway asset and the SSP asset

7    for under value and for not allowing Mr. Dondero to bid on

8    those assets.

9          And so we will respond accordingly, Your Honor, and that's

10   -- I really can't get into it because we just got it last

11   night and we're still digesting it.

12          THE COURT:  But the Debtor is the one and only

13   Defendant?

14          MR. DEMO:  I believe that's the case, Your Honor,

15   yes.  So, there -- there were no allegations that they're

16   going to add Mr. Seery like the last one, but yes.

17          MR. SEERY:  I'd be happy to offer some clarity if

18   you'd like, Your Honor.

19          THE COURT:  Yes.  Go ahead, Mr. Seery.

20          MR. SEERY:  We received a copy of this lawsuit

21   through the -- originally through the press and then we hunted

22   it down.  We have not been served.  It's by an entity called

23   PCMG, and I believe it's 17, Roman Numeral XVII.  It is a

24   small entity owned by Mr. Dondero and Mr. Okada.  It owned .2

25   percent of Highland Select Equity Fund.  Highland Select

Case 21-03003-sgj    Doc 58    Filed 05/27/21    Entered 05/27/21 17:43:16    Desc Main
Case 3:21-cv-00881-X    Document 170    Filed 09/24/86 Page 116 of 203    PageID 20973

84

1    Equity Fund owned 89 -- or does own 89.9 percent of Trussway

2    Holdings.  It's this -- PCMG is no longer a partner in

3    Highland Select Equity.

4        Trussway Holdings owned 76.6 percent of SSP Holdings,

5    which was an entity that was sold.  The remaining balance of

6    that, those interests were owned by third parties, including a

7    small business lending group.

8        The complaint was just filed against the Debtor, arguing

9    nonsensically that somehow the Debtor has an obligation to

10   PCMG as an investor in Equity Select.  Anyone who knows

11   anything about the Investment Advisers Act knows that's not

12   the case, that the obligation is to the fund, not to the

13   investors.

14       We'll deal with it, but it's just another of the myriad of

15   examples filed by the Sbaiti firm -- this is their second go

16   -- of just creating costs.  This one is a -- if you go

17   derivatively, it's a .137 percent interest in SSP.

18              THE COURT:  All right.  Well, we --

19              MR. SEERY:  Thank you.

20              THE COURT:  Thank you, Mr. Seery.  We have a hearing

21   on the other lawsuit that includes you as a defendant coming

22   up in June.  I can't remember when in June.

23              MR. DEMO:  It's June 8th, Your Honor.

24              THE COURT:  June 8th.  In person.  So I'm going to

25   stay tuned for what this Sbaiti law firm has to say.

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170-2   Filed 08/52/24   Page 117 of 203   PageID 20974

85

1       To say I'm concerned is a big understatement, but we'll

2   hear what the evidence and argument is on June 8th.  I hope

3   the message gets delivered how concerned I am to hear that yet

4   another lawsuit has been filed that appears to be an end run

5   around certain prior orders of the Court.

6       So, all right.  We'll look for the order on the stay.

7           MR. DEMO:  Yes, Your Honor.

8           THE COURT:  And again, we'll try to be as quick as we

9   can on the reports and recommendation.

10      (Proceedings concluded at 3:36 p.m.)

11                          --oOo--

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                           **05/27/2021**

24   _____      _____

25   Kathy Rehling, CETD-444                          Date
    Certified Electronic Court Transcriber

Case 21-03003-sgj   Doc 58   Filed 05/27/21   Entered 05/27/21 17:43:16   Desc Main
Case 3:21-cv-00881-X   Document 170-2   Filed 08/02/4 86   Page 118 of 203   PageID 20975

86

```
                              INDEX
```

1

2    PROCEEDINGS                                          3

3    WITNESSES

4    -none-

5    EXHIBITS

6    Debtor's Exhibits 4 through 6, 16 through 20,    Received 33
     28 through 30, and 44 through 64
7

8    RULINGS                                              73

9    END OF PROCEEDINGS                                   85

10   INDEX                                                86

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 6, 2021**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (CHAPTER 11) |
|     DEBTOR. | § | |
| _____ | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| L.P., | § | ADVERSARY NO. 21-03003 |
|     PLAINTIFF, | § | (CIV. ACTION #3:21-CV-01010-E) |
| | § | |
| VS. | § | |
| | § | |
| JAMES DONDERO, | § | |
|     DEFENDANT. | § | |

_____

**<ins>REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:
(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH
TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;
AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT</ins>**

1

# I.    INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware.  That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019.  A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.  The chapter 11 plan has been appealed by the Defendant in this action, James D. Dondero ("Dondero-Defendant"), and certain parties related to him. The appeal of the plan is now pending before the Fifth Circuit, but no stay pending appeal has been granted.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against Dondero-Defendant, who was Highland's co-founder and former President and Chief Executive Officer.  The Adversary Proceeding pertains to three promissory notes (collectively, the "Notes") executed by Mr. Dondero in favor of the Debtor in 2018. Each of the Notes were demand notes. On December 3, 2020, the Debtor sent Dondero-Defendant a letter demanding payment by December 11, 2020, as allowed under the terms of the notes. Following Dondero-Defendant's failure to pay on the Notes in response to the demand letter, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on these Notes (as well as several other notes of parties related to Dondero-Defendant) as part of its funding to pay creditors.

---

[1] Bankruptcy Case No. 19-34054.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court.   Dondero-Defendant submitted a *Motion and Memorandum of Law in Support to Withdrawal the Reference*[3] (the "Motion") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on May 25, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

## II.   NATURE OF THE ADVERSARY PROCEEDING

### a.   The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[4] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the three Notes were: (i) $3,825,000, executed February 2, 2018, (ii) $2,500,000, executed August 1, 2018, and (iii) $2,500,000, executed August 13, 2018. The Debtor now seeks monetary damages totaling $9,004,013.07, inclusive of accrued but unpaid

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03003, Dkt. 21.
[4] Adversary Case No. 21-03003, Dkt. 1.

3

interest and cost of collection. Because the Debtor alleges the amounts due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 28, 2021, Dondero-Defendant filed his *Original Answer*[5] on March 16, 2021 before subsequently filing his *Amended Answer*[6] on April 6, 2021.

Dondero-Defendant has three pending proofs of claim in the Bankruptcy Case that are unliquidated, contingent claims. Two other proofs of claim previously filed by Mr. Dondero were withdrawn with prejudice before the commencement of the Adversary Proceeding on December 4, 2020.[7] ***Proof of Claim No. 188 was Dondero-Defendant's proof of claim directly relating to the Notes and was one of the two proofs of claim withdrawn with prejudice.***

### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On April 15, 2021, Dondero-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. On May 6, 2021, the Debtor filed its *Response Opposed to Defendant's Motion to Withdraw the Reference*[8] (the "Response Opposed"). On May 21, 2021, Dondero-Defendant filed his *Reply in Support of the Motion to Withdraw the Reference*[9] (the "Reply"). The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on May 25, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

### i. The Movant's Position

---

[5] Adversary Case No. 21-03003, Dkt. 6.
[6] Adversary Case No. 21-03003, Dkt. 16.
[7] *Order Approving Stipulation and Agreed Order Authorizing Withdrawals of Proofs of Claim 138 and 188 Filed by James Dondero*, Bankruptcy Case No. 19-34054, Dkt. 1510.
[8] Adversary Case No. 21-03003, Dkt. 30.
[9] Adversary Case No. 21-03003, Dkt. 44.

Dondero-Defendant argues that the withdrawal of the reference is mandatory for the Debtor's breach of contract count and, alternatively, permissive withdrawal of the reference is proper for both counts.[10]

Dondero-Defendant argues that mandatory withdraw of the reference is required under the precedent of this court.[11] Specifically, he argues that the Notes were, in essence, tax loans that were forgivable and issued in lieu of compensation. Further, forgivable loans as compensation are allegedly used throughout the private equity industry as a tax-efficient form of compensation and any decision made by the bankruptcy court will have resounding consequences on the private equity industry. Thus, the breach of contract claim will allegedly involve a substantial and material consideration of non-Bankruptcy federal law (tax law) that will result in more than a *de minimis* effect on interstate commerce, making withdrawal mandatory.[12]

Alternatively, Dondero-Defendant argues that, if mandatory withdrawal is not required, there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[13]

Further, Dondero-Defendant contends he has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter

---

[10] *See* Adversary Case No. 21-03003, Dkt. 21 at 5-7.

[11] *See In re Nat'l Gypsum Co.*, 145 B.R. 539, 541 (N.D. Tex. 1992) (stating "withdrawal must be granted if it can be established (1) that the proceeding involves a substantial and material question of both Title 11 and non-Bankruptcy Code federal law; (2) that the non-Code federal law has more than a de minimis effect on interstate commerce; and (3) that the motion for withdrawal was timely."); *see also City of Clinton, Ark. v. Pilgrim's Pride Corp.*, No. 4:09-CV-386-Y, 2009 WL 10684933, at *1 (N.D. Tex. Aug. 18, 2009).

[12] Adversary Case No. 21-03003, Dkt. 21 at 5-7.

[13] *Id.* at 7-11.

final orders in the Adversary Proceeding or hold a jury trial. Dondero-Defendant further argues he has withdrawn his only proof of claim relating to the Notes, thus negating any argument he has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

In summary, Dondero-Defendant views mandatory withdrawal of the reference as warranted, because the contract claim will allegedly be substantially based on federal tax law issues, and permissive withdrawal as alternatively proper, because the turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract claim become core.[14]

As far as timing, Dondero-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

### ii. *The Debtor-Plaintiff's Position*

The Debtor argues that no basis exists for mandatory withdrawal of the reference because no substantial and material consideration of federal tax law issues will be necessary in this Adversary Proceeding. The Debtor argues that Dondero-Defendant has provided no specificity as to what tax issues would be in play, and mere speculation about tax issues is not enough to justify mandatory withdrawal of the reference.[15] To that point, the Debtor notes that Dondero-Defendant has not pointed to any section of the federal tax code to support a basis for his defenses. The Debtor characterizes the entirety of the Motion as an attempt to forum shop and avoid another hearing in front of the bankruptcy court through assertion of baseless tax defenses.

The Debtor further argues that there is no cause shown for permissive withdrawal because a turnover action under Section 542(b) of the Bankruptcy Code is an inherently core claim. The Notes, as argued, are already property of the bankruptcy estate, as matured and payable on

---

[14] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).
[15] *See In re White Motor Corp.*, 42 B.R. 693, 705-06 (N.D. Ohio 1984).

December 11, 2020, and the turnover action only concerns federal bankruptcy law.[16] The Debtor argues that the defenses and disputes raised by Dondero-Defendant do not restrict the Debtor's ability to collect property of the estate under 11 U.S.C. § 542(b).[17]

The Debtor additionally argues that Dondero-Defendant's assertion that he has retained his jury trial rights is wrong, as he has consented to the equitable jurisdiction of the bankruptcy court through the filing of five proofs of claims and asserting setoffs in his defense to the Adversary Proceeding. The Debtor further argues that the filing of Proof of Claim No. 188 (related to the Notes), clearly demonstrated Dondero-Defendant's consent to the jurisdiction and authority of the bankruptcy court to resolve the interconnected claims and setoff defenses he has asserted—thereby directly impacting the claims-allowance process and the restructuring of the debtor-creditor relations. Further, the Debtor argues, in a supplemental filing, that Dondero-Defendants' withdrawing Proof of Claim No. 188 in December 2020 with prejudice does not allow him to withdraw his consent to the jurisdiction of the bankruptcy court.[18] In essence, the Debtor argues that, as soon as Dondero-Defendant filed Proof of Claim No. 188, he had consented to bankruptcy court jurisdiction for any proceeding involving the Notes during the Bankruptcy Case and waived his jury trial rights.

As far as timing, the Debtor argues that, if the court finds permissive withdrawal of the reference is appropriate, the reference should not be withdrawn until after the parties are trial-ready, and all pretrial matters should be handled by the bankruptcy court until such time.

---

[16] *See Tow v. Park Lake Cmtys., LP*, 2018 U.S. Dist. LEXIS 1720, at *3-*5 (S.D. Tex. Jan. 4, 2018); *see also Porretto v. Nelson (In re Porretto)*, 2012 Bankr. LEXIS 4919, at *11-*12 (Bankr. S.D. Tex. Oct. 18, 2012); *see also Romo v. Monetmayor (In re Montemayor)*, 547 B.R. 684, 692 (Bankr. S.D. Tex. 2016) (bankruptcy court had authority under *Stern* to issue a final order in an action brought pursuant to Section 542(b), because an action "to turnover assets belonging to the bankruptcy estate [is] a matter which solely concerns federal bankruptcy law").

[17] *See Tow*, 2018 U.S. Dist. LEXIS 1720, at *3-*5; *see also Shaia v. Taylor (In re Connelly)*, 476 B.R. 223, 230 (Bankr. E.D. Va. 2012).

[18] *Addendum to Plaintiff's Opposition to Defendant's Motion to Withdraw the Reference*, Adversary Case No. 21-03003, Dkt. 31 at 1.

## III.    MANDATORY WITHDRAWAL OF THE REFERENCE IS NOT APPLICABLE

Withdrawal of the reference pursuant to 28 U.S.C. § 157(d) provides for the possibility of mandatory withdrawal of the reference from the bankruptcy court: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Under the precedent of this District, in *Nat'l Gypsum Co.* and *Pilgrim's Pride*, mandatory withdrawal of the reference must be granted when: (1) the motion was timely filed; (2) a non-Bankruptcy Code federal law at issue has more than a *de minimis* effect on interstate commerce; and (3) the proceeding involves a substantial and material question of non-Bankruptcy Code federal law.[19]

It has been well established that "mandatory withdrawal is to be applied narrowly" and to "prevent 157(d) from becoming an 'escape hatch.'"[20] Unsubstantiated assertions that non-bankruptcy federal law issues are substantial and material to an adversary proceeding are insufficient to warrant mandatory withdrawal.[21] The bankruptcy court routinely considers tax law issues and, here, Dondero-Defendant has provided no meaningful explanation of the alleged materiality, complexity, and relevance of federal tax issues to the Adversary Proceeding. No relevant portions of the tax laws that will allegedly be implicated are cited, nor is there any explanation of how the issues are beyond the expertise of the bankruptcy court. Thus, Dondero-

---

[19] 145 B.R. at 541; 2009 WL 10684933 at *1.

[20] *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist LEXIS 101134, at *6 (N.D. Tex. Oct. 1, 2009), *adopted in its entirety*, 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

[21] *Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at *21-*23 (D. Me. June 8, 2015) (insufficient basis for mandatory withdrawal where party failed to demonstrate specifically why a court would have to "engage in anything beyond routine application of current law" and the party "tries to kick up some dust to make the relevant analysis seem complicated").

Defendant has failed to meet his burden to demonstrate that mandatory withdrawal of the reference is appropriate.

## IV.   THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE PENDING PROOFS OF CLAIM OF DONDERO-DEFENDANT ARE UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[22] Courts in this District have placed an emphasis on the first two factors.[23]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy *proceedings* (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related

---

[22] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[23] See *Mirant*, 337 B.R. at 115-122.

to" a case under Title 11.[24]  Further, those that arise under Title 11 or arise in a Title 11 case are

defined as "core" matters[25] and those that are merely "related to" a Title 11 case are defined as

"noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts

may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in

"noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the

parties) submit proposed findings of fact and conclusions of law to the district court, for that court's

review and issuance of final judgment. This is the statutory framework collectively set forth in 28

U.S.C. § 1334 and 28 U.S.C. § 157.  But while a proceeding may be "core" in nature, under 28

U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final

judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in

evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must

resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. §

157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that

authority on an Article I bankruptcy court is *constitutional* (and this turns on whether "the action

at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance

process").[26]

 With respect to the claims asserted against Dondero-Defendant, it might be argued that both

counts asserted against him are *statutorily* core in nature.[27] While Count 1 is a breach of contract

claim for collection of amounts due under promissory notes—one of the simplest forms of a state

law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28

---

[24] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).
[25] *Stern*, 564 U.S. at 473-474.  Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).
[26] *Stern*, 564 U.S. at 499.
[27] 28 U.S.C. § 157(b)(2)(E), (O).

U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from defaults on pre-petition notes) and would not be resolved through the claims allowance process (***since the only related proof of claim related to the Notes has been withdrawn***). In other words, the resolution of Count 1 is not so inextricably intertwined with the resolution of Dondero-Defendant's still-remaining proofs of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by Dondero-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on a disputed pre-petition promissory note can be viewed as a core claim***. There is a split in authority on this issue. The Debtor cites authority that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the indebtedness is ***disputed***.[28] In contrast, Dondero-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[29]

---

[28] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[29] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re*

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[30]  Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## V.  JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[31]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and

---

*Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[30] *Satelco*, 58 B.R. at 789.

[31] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[32] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[33] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[34]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[35] Thus, Dondero-Defendant, by having several ***pending*** proofs of claims, has consented to the bankruptcy court's equitable jurisdiction and waived his right to a jury trial as to the subject matter of the ***pending*** proofs of claim.[36] However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, Dondero-Defendant withdrew two of his proofs of claim on December 4, 2020 with prejudice—including Proof of Claim No. 188 which related to the Notes.  To be sure, Proof of Claim No. 188, if pending, would have made the claims asserted in the Adversary Proceeding so inextricably intertwined with the equitable process of claims resolution, so as to constitute consent to the equitable jurisdiction of the bankruptcy court. Without a pending proof of claim, the breach of contract claims is precisely the kind of action that would sound in law rather than in equity. By withdrawing his proof of claim

---

[32] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).

[33] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

[34] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

[35] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).

[36] *Id.*

13

related to the Notes, Dondero-Defendant withdrew the claim from the claims allowance process of the bankruptcy court and preserved his right to a jury trial on the Notes.[37]

To reiterate, Dondero-Defendant's three remaining proofs of claims are unrelated to the collection on the Notes, and he has not otherwise consented to the jurisdiction of the bankruptcy court for claims related to the Notes. Dondero-Defendant has also withdrawn his affirmative defense of setoff in the Adversary Proceeding. Dondero-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

In summary, Dondero-Defendant's lack of waiver of his jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## VI.    PENDING MATTERS

On May 25, 2021, the bankruptcy court held a status conference with regard to the Motion. At such time, the bankruptcy court approved, in part, *James Dondero's Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint,*[38] and thereafter issued the *Order Granting In Part James Dondero's Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint*[39] (the "Stay Order") on June 4, 2021. The Stay Order dictated that all response deadlines, pre-trial deadlines, and hearing dates would be stayed until July 28, 2021. Discovery under the *Amended Scheduling Order*[40] was to proceed with two changes: (i) the deadline for service of expert disclosures to be changed to May 28, 2021, and (ii) the deadline for

---

[37] *Smith v. Dowden,* 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.,* No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.,* No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).
[38] Adversary Case No. 21-03003, Dkt. 22.
[39] Adversary Case No. 21-03003, Dkt. 64.
[40] Adversary Case No. 21-03003, Dkt. 18.

completion of expert discovery to be changed to June 14, 2021. At this point, the parties are not trial-ready.

## VII.   RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the withdrawal of Proof of Claim No. 188, relating to the Notes, by Dondero-Defendant on December 4, 2020, which was the only proof of claim inextricably intertwined with the causes of action in the Adversary Proceeding; and (c) the lack of any other consent by Dondero-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION



| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-3003 |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants James Dondero ("Mr. Dondero"), Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy," and together with Mr. Dondero and Nancy Dondero, "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000, and payable upon the Debtor's demand. Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      After amending his answer and his sworn responses to interrogatories, Mr. Dondero now contends that the Debtor orally agreed to relieve him of his obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). Mr. Dondero further contends that he entered into the Alleged Agreement with his sister, Nancy Dondero, as trustee of Dugaboy, acting on behalf of the Debtor. At the time Mr. Dondero entered into the Alleged Agreement, he controlled the Debtor and was the lifetime beneficiary of Dugaboy.

2

3.      Based on its books and records, discovery to date, and other facts, the
Debtor believes that the Alleged Agreement is a fiction created after the commencement of this
Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due
under the notes.

4.      Nevertheless, the Debtor amends its Complaint for the purpose of adding
certain claims and naming additional parties who would be liable to the Debtor if the Alleged
Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing
claims against Mr. Dondero for breach of his obligations under the notes and for turnover, the
Debtor adds alternative claims (a) against Mr. Dondero for actual fraudulent transfer and aiding
and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief
and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy
in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from Mr. Dondero in an amount
equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii)
all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the
Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses,
as provided for in the notes), for Mr. Dondero's breach of his obligations under the Notes, (b)
turnover by Mr. Dondero to the Debtor of the foregoing amounts; (c) avoidance of the Alleged
Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to,
or for the benefit of, Mr. Dondero pursuant to the Notes; (d) declaratory relief, and (e) damages
arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled the Debtor.

12.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

13.     Upon information and belief, Nancy Dondero is Mr. Dondero's sister, and the trustee of Dugaboy.

## CASE BACKGROUND

14. On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15. On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

16. On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

17. On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

18. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

### A. The Dondero Notes

19. Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

20.     Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note").  A true and correct copy of Dondero's First Note is attached hereto as **Exhibit 1**.

21.     On August 1, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note").  A true and correct copy of Dondero's Second Note is attached hereto as **Exhibit 2.**

22.     On August 13, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Notes").  A true and correct copy of Dondero's Third Note is attached hereto as **Exhibit 3.**

23.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

24.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

25.     Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

6

**B.**      **Mr. Dondero Defaults Under Each Note**

26.      By letter dated December 3, 2020, the Debtor made demand on Mr.
Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and
correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and
> principal due and payable on the Notes in the aggregate amount of
> $9,004,013.07, which represents all accrued interest and principal through
> and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in
> full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

27.      Despite the Debtor's demand, Mr. Dondero did not pay all or any portion
of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

28.      As of December 11, 2020, there was an outstanding principal amount of
$3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of
$21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

29.      As of December 11, 2020, there was an outstanding principal balance of
$2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of
$27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

30.      As of December 11, 2020, there was an outstanding principal balance of
$2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of
$25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

31.      Thus, as of December 11, 2020, the total outstanding principal and accrued
but unpaid interest due under the Notes was $9,004,013.07.

32.      Pursuant to Section 4 of each Note, each Note is in default, and is currently
due and payable.

C.    **The Debtor Files the Original Complaint**

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for Mr. Dondero's breach of his obligations under the Notes and (ii) turnover by Mr. Dondero for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

D.    **Mr. Dondero's Affirmative Defenses**

34.    On March 16, 2021, Mr. Dondero filed his *Original Answer* [Docket No. 6] (the "Original Answer").  In his Original Answer, Mr. Dondero asserted four affirmative defenses: (i) the Debtor's claims should be barred because it was previously agreed by the Debtor that the Debtor would not collect on the Notes, (ii) waiver, (iii) estoppel, and (iv) failure of consideration. *See id.* ¶¶ 40-43.

35.    On April 6, 2021, Mr. Dondero filed his *Amended Answer* [Docket No. 16] (the "Amended Answer"), asserting three additional affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 40, (ii) The Debtor's claims are barred, in whole or in part, due to setoff, *id.* ¶ 41, and (iii) the Notes are "ambiguous," *id.* ¶ 45.

36.    According to Mr. Dondero, the Alleged Agreement was orally entered into in January or February 2019, and was not memorialized in any documentation.

37.    According to Mr. Dondero, he entered into the Alleged Agreement with his sister, Nancy Dondero, acting in her capacity as the Trustee of Dugaboy, which purportedly held the majority of the Debtor's Class A limited partnership interests.

38.     Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement.

39.     Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

40.     According to Mr. Dondero, he discussed the Alleged Agreement with Nancy Dondero, but (a) no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement, and (b) the Alleged Agreement was not subject to any negotiation.

41.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.      Dugaboy Lacked Authority to Act on Behalf of the Debtor**

42.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 5**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

43.     Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 5**, § 4.2(b).

44.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

DOCS_NY:43594.1 36027/002

45.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

### FIRST CLAIM FOR RELIEF
**(Against Mr. Dondero)**
**(Breach of Contract)**

46.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

47.     Each Note is a binding and enforceable contract.

48.     Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

49.     Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

50.     As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
**(Against Mr. Dondero)**
**(Turnover Pursuant to 11 U.S.C. § 542(b))**

51.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.     Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until

the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

53.    Each Note is property of the Debtor's estate and the amounts due under each Note is matured and payable upon demand.

54.    Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

55.    The Debtor has made demand for the turnover of the amounts due under each Note.

56.    As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

57.    The Debtor is entitled to the turnover of all amounts due under each of the Notes.

### THIRD CLAIM FOR RELIEF
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

58.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59.    The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement within two years of the Petition Date.

60.    Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

11

(b) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

61.    The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt Mr. Dondero incurred under the Notes demonstrates a scheme of fraud.

62.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

63.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

**FOURTH CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

64.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

12

65. The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

66. Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

67. Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

68. Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

13

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

69.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

70.     A bona fide, actual, present dispute exists between the Debtor and Dugaboy concerning whether Dugaboy was authorized to entered into the Alleged Agreement on the Debtor's behalf.

71.     A judgment declaring the parties' respective rights and obligations will resolve their dispute..

72.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) Dugaboy otherwise had no right  or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

14

### SIXTH CLAIM FOR RELIEF
#### (Against Dugaboy)
#### (Breach of Fiduciary Duty)

73.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

74.    If Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy would owe the Debtor a fiduciary duty.

75.    If Dugaboy had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy breached its fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

76.    Accordingly, the Debtor is entitled to recover from Dugaboy (a) actual damages that the Debtor suffered as a result of its breach of fiduciary duty, and (b) for punitive and exemplary damages.

### SEVENTH CLAIM FOR RELIEF
#### (Against James Dondero and Nancy Dondero)
#### (Aiding and Abetting a Breach of Fiduciary Duty)

77.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

78.    James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

79.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

80.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

15

81.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)   On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section Tex. Bus. & C. Code § 24.005(a)(1);

(v)     On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business,

16

transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) Dugaboy otherwise had no right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy, in an amount to be determined at trial, that Debtor suffered as a result of Dugaboy's breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages; and

Such other and further relief as this Court deems just and proper.

DOCS_NY:43594.1 36027/002

Dated:  As of July 13, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

# PROMISSORY NOTE

$3,825,000                                                                February 2, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.   <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.   <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.   <u>Tax Loan</u>.  This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

     5.   <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     6.   <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     7.   <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.      Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 2

# PROMISSORY NOTE

$2,500,000

August 1, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

# EXHIBIT 3

# PROMISSORY NOTE

$2,500,000                                                                 August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

# EXHIBIT 4

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        D. Michael Lynn

**Appendix A**

ABA #:           322070381
Bank Name:       East West Bank
Account Name:    Highland Capital Management, LP
Account #:       5500014686

# EXHIBIT 5

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

# FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

## TABLE OF CONTENTS

ARTICLE 1    GENERAL ................................................................................................................1
    1.1.    Continuation ....................................................................................................1
    1.2.    Name ................................................................................................................1
    1.3.    Purpose ............................................................................................................1
    1.4.    Term. ...............................................................................................................1
    1.5.    Partnership Offices; Addresses of Partners. ...................................................1

ARTICLE 2    DEFINITIONS ..........................................................................................................2
    2.1.    Definitions .......................................................................................................2
    2.2.    Other Definitions ............................................................................................6

ARTICLE 3    FINANCIAL MATTERS ...........................................................................................6
    3.1.    Capital Contributions ......................................................................................6
    3.2.    Allocations of Profits and Losses ...................................................................8
    3.3.    Allocations on Transfers .................................................................................9
    3.4.    Special Allocations ..........................................................................................9
    3.5.    Curative Allocations ......................................................................................10
    3.6.    Code Section 704(c) Allocations ..................................................................10
    3.7.    Capital Accounts ...........................................................................................11
    3.8.    Distributive Share for Tax Purpose ..............................................................12
    3.9.    Distributions. .................................................................................................12
    3.10.    Compensation and Reimbursement of General Partner ................................14
    3.11.    Books, Records, Accounting, and Reports ...................................................14
    3.12.    Tax Matters ...................................................................................................14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS .............................................15
    4.1.    Rights and Obligations of the General Partner .............................................15
    4.2.    Rights and Obligations of Limited Partners .................................................19
    4.3.    Transfer of Partnership Interests ..................................................................19
    4.4.    Issuances of Partnership Interests to New and Existing Partners .................21
    4.5.    Withdrawal of General Partner .....................................................................21
    4.6.    Admission of Substitute Limited Partners and Successor General Partner....21

ARTICLE 5    DISSOLUTION AND WINDING UP ....................................................................22
    5.1.    Dissolution ....................................................................................................22
    5.2.    Continuation of the Partnership ....................................................................23
    5.3.    Liquidation ....................................................................................................23
    5.4.    Distribution in Kind ......................................................................................24
    5.5.    Cancellation of Certificate of Limited Partnership ......................................24
    5.6.    Return of Capital ...........................................................................................24
    5.7.    Waiver of Partition. ......................................................................................24

ARTICLE 6    GENERAL PROVISIONS .....................................................................................24
    6.1.    Amendments to Agreement ...........................................................................24

6.2.    Addresses and Notices ....................................................................................25
6.3.    Titles and Captions........................................................................................25
6.4.    Pronouns and Plurals.....................................................................................25
6.5.    Further Action ...............................................................................................25
6.6.    Binding Effect ...............................................................................................25
6.7.    Integration .....................................................................................................25
6.8.    Creditors........................................................................................................25
6.9.    Waiver ...........................................................................................................25
6.10.    Counterparts...................................................................................................25
6.11.    Applicable Law .............................................................................................25
6.12.    Invalidity of Provisions .................................................................................25
6.13.    Mandatory Arbitration...................................................................................26

# FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in <u>Article 2</u>.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act**.**  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    <u>Partnership Offices</u>**.**  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate**.**  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate**.**  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    <u>Addresses of Partners</u>**.**  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201**.**  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership**.**  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

# ARTICLE 2

## DEFINITIONS

**2.1.   Definitions.**   The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"***Additional Capital Contribution***" has the meaning set forth in <u>Section 3.1(b)</u> of this Agreement.

"***Adjusted Capital Account Deficit***" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to <u>Section 3.7</u> and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"***Affiliate***" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "***control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"***Agreement***" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"***Business Day***" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"***Capital Account***" means the capital account maintained for a Partner pursuant to <u>Section 3.7(a)</u>.

"***Capital Contribution***" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"***Certificate of Limited Partnership***" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"***Class A Limited Partners***" means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"***Class A Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

"***Class B Limited Partner***" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"***Class B Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"***Class B NAV Ratio Trigger Period***" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"***Class C Limited Partner***" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"***Class C Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"***Class C NAV Ratio Trigger Period***" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"***Code***" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"***Contribution Note***" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"***Default Loan***" has the meaning set forth in Section 3.1(c)(i).

"***Defaulting Partner***" has the meaning set forth in Section 3.1(c).

"***Delaware Act***" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"***Effective Date***" means the date first recited above.

"***Fiscal Year***" has the meaning set forth in Section 3.11(b).

3

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"**NAV Ratio Trigger Period**" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"**Net Increase in Working Capital Accounts**" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities.  Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* **Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Operating Cash Flow**" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year.  Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

"***Record Date***" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"***Second Amended Buy-Sell and Redemption Agreement***" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"***Securities***" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"***Securities Act***" means the Securities Act of 1933, as amended, and any successor to such statute.

"***Substitute Limited Partner***" has the meaning set forth in Section 4.6(a).

"***Transfer***" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"***Treasury Regulations***" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2. Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

## FINANCIAL MATTERS

**3.1. Capital Contributions**.

(a)     Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)     Additional Capital Contributions.

(i)        The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)        Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)        Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)        Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

(ii)     <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.     Allocations of Profits and Losses**.

(a)     <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(b)     <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

(i)     <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(c)     <u>Limitation on Loss Allocations</u>.   If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.     Allocations on Transfers**.   Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.     Special Allocations.**   If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     <u>Partnership Minimum Gain Chargeback</u>**.**   Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g)**.**   This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>**.**   Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g)**.**   This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     <u>Qualified Income Offset</u>**.**   If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)     <u>Gross Income Allocation</u>.   If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

**3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

**3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7. Capital Accounts.

(a)   Maintenance of Capital Accounts.  The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i)   The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii)   The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)   Negative Capital Accounts.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)   Interest.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)   No Withdrawal.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e)   Loans From Partners.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)   Revaluations.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    <u>General</u>.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    <u>Priority Distributions</u>.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "**Tax Distribution**").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions.    Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

**3.10.   Compensation and Reimbursement of General Partner**.

(a)   Compensation.   The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)   Reimbursement for Expenses.   In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

**3.11.   Books, Records, Accounting, and Reports**.

(a)   Records and Accounting.   The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)   Fiscal Year.   The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)   Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)   Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

**3.12.   Tax Matters**.

(a)   Tax Returns.   The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)    Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)    Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)    Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)    Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership); and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)    Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)    Reliance by Third Parties.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)    Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof**.**  Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i)**.**  All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives**.**  Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

        (e)      <u>Loans to or from General Partner: Contracts with Affiliates; Joint Ventures</u>.

        (i)      The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans.  The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership.  The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

        (ii)      The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership.  Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

        (iii)      The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

        (f)      <u>Outside Activities' Conflicts of Interest</u>.  The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership.  Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

        (g)      <u>Resolution of Conflicts of Interest</u>.  Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

        (h)      <u>Indemnification</u>.  The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

the "**GP Party**"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct.  The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act.  Notwithstanding anything to the contrary in this <u>Section 4.1(h)</u> or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this <u>Section 4.1(h)</u> unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment.  In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

(i)      <u>Liability of General Partner</u>.

(i)      Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

(ii)      The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(j)      <u>Reliance by General Partner</u>.

(i)      The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(ii)      The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

(k)      The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership.  No officer need be a Partner.  Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them.  The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer.  Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

      4.2.    **Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

      (a)    <u>Limitation of Liability</u>.    Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

      (b)    <u>Management of Business</u>.    No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

      (c)    <u>Return of Capital</u>.    No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

      (d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>.    Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

      (e)    <u>Default on Priority Distributions</u>.    If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master  Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided, however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>.  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

      4.3.    **Transfer of Partnership Interests**.

      (a)    <u>Transfer</u>.    No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

(b)    *Transfers by General Partner*.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)    *Transfers by Limited Partners*.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    *Distributions and Allocations in Respect of Transferred Partnership Interests*.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; ***provided, however,*** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    *Forfeiture of Partnership Interests Pursuant to the Contribution Note*.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    *Transfers of Partnership Interests Pursuant to the Purchase Notes*.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes.  Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest.  The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4.    Issuances of Partnership Interests to New and Existing Partners.

(a)    Issuance of Partnership Interests to New Limited Partners.  The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner.  All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests.  No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner.  The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion.  Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately.  Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5.    Withdrawal of General Partner.

(a)    Option.  In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**Departing Partner**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion.  If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6.    Admission of Substitute Limited Partners and Successor General Partner.

(a)    Admission of Substitute Limited Partners.  A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest.  To become a substitute Limited Partner (a "**Substitute Limited Partner**"),

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as <u>Exhibit B</u> (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     <u>Admission of Successor General Partner</u>.  A successor General Partner selected pursuant to <u>Section 5.2</u> or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to <u>Section 4.3(b)</u> shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     <u>Action by General Partner</u>.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of <u>Exhibit A</u> and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to <u>Section 4.3(b)</u>);

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this <u>Section 5.1</u>, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(a)      To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)      To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)      To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)      To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

      **6.2.**    **Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

      **6.3.**    **Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

      **6.4.**    **Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

      **6.5.**    **Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

      **6.6.**    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

      **6.7.**    **Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

      **6.8.**    **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

      **6.9.**    **Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

      **6.10.**    **Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

      **6.11.**    **Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

      **6.12.**    **Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

      **6.13.**    **General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

      **6.14.**    **Mandatory Arbitration.**  In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President


LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**


By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee


**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee


**MARK K. OKADA**


_____
Mark K. Okada


*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:     President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

## EXHIBIT A

|  | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

<u>**EXHIBIT B**</u>

**ADDENDUM
TO THE
FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By:     _____

Name: _____

Title:   _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>James Dondero, Nancy Dondero, and<br>The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Stinson LLP (for James Dondero and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☑ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.