## REQUESTS FOR ADMISSION

**Request For Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request For Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to Your outside

auditor(s).

**RESPONSE:**

ADMIT.

**Request For Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never

disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request For Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never

disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request For Admission No. 5:**

Admit that no document was created prior to the commencement of the Adversary

Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

CORE/3522697.0002/169345241.2

**Appx. 00584**

ADMIT.

**Request For Admission No. 6:**

Admit that no document was created prior to the commencement of the Adversary

Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

DENY.

**Request For Admission No. 7:**

Admit that You did not disclose the terms of the Agreement in connection with the

Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection

to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

**Request For Admission No. 8:**

Admit that You did not disclose the existence of the Agreement in connection with the

Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection

to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

CORE/3522697.0002/169345241.2

## **INTERROGATORIES**

**Interrogatory No. 1:**

Identify the "testimony" that You believe "discusses the existence of [the Agreement]

that may be uncovered through discovery in this Adversary Proceeding," including the (a) name

of the witness, (b) the substance of the anticipated testimony, and (c) the basis for Your belief.

*See* paragraph 97 of the Amended Answer.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the
Interrogatory seeks privileged information.


**Interrogatory No. 2:**

Identify the "email correspondence" that You believe "discusses the existence of [the

Agreement] that may be uncovered through discovery in this Adversary Proceeding," including

the (a) name(s) of the sender(s) and recipient(s) of such email correspondence, (b) the date of

any such email correspondence, and (c) the substance of any such e-mail correspondence.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the
Interrogatory seeks privileged information.

**Interrogatory No. 3:**

Identify each of Your employees, officers, representatives, and agents who knew of the

terms and existence of the Agreement prior to March 1, 2021, and for each such person, identify

(a) the name of the person, (b) the person's title or connection to You, (c) the date on which the

person first learned of the terms and existence of the Agreement, and (d) how and from whom

the person first learned of the terms and existence of the Agreement.

**RESPONSE:**

CORE/3522697.0002/169345241.2

Defendant objects to this Interrogatory to the extent that it seeks privileged information. Subject to this objection, Defendant states that James Dondero and Frank Waterhouse knew of the terms and existence of the Agreement prior to March 1, 2021.

**Interrogatory No. 4:**

Identify which part or parts of the Notes are "ambiguous," as alleged in paragraph 102 of

the Amended Answer, and state the basis for Your belief.

**RESPONSE:**

Defendant contends that each note as a whole is ambiguous because it refers to additional agreements without specifying them.

**Interrogatory No. 5:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Defendant objects to this Interrogatory because it is premature. Defendant will identify any witnesses in accordance with any scheduling order entered by the Court.

Dated: September 27, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC.**

11

## VERIFICATION

STATE OF TEXAS    )
    )
COUNTY OF DALLAS    )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within his personal knowledge and are true and correct to the best of his knowledge, information and belief.



JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 27th day of September, 2021.

Notary Public in and for the State of Texas

TARA LOIBEN
Notary Public, State of Texas
Comm. Expires 04-15-2023
Notary ID 128585486

12

CORE/3522697.0002/169345241.2

Appx. 00589

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

                                      */s/ Michael P. Aigen*
                                      Michael P. Aigen

CORE/3522697.0002/169345241.2

**Appx. 00590**

# EXHIBIT 29

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR NEXPOINT REAL ESTATE PARTNERS, LLC**

## IN THE UNITED STATE BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:    Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("Defendant" or "NREP"), serves its Objections and Responses to Plaintiff Highland Capital Management,

1

L.P.'s ("Debtor" or "Highland") Requests for Admission, Interrogatories, and Requests for Production ("Requests"), as follows:

<div align="center">

**REQUESTS FOR PRODUCTION**

</div>

**Request for Production No. 1:**

All documents and communications Concerning the existence of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 2:**

All Documents and Communications Concerning the negotiation of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 3:**

All Documents and Communications Concerning the terms of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 4:**

All Communications Concerning the Agreement between You and (a) James Dondero, or (b) Nancy Dondero, or (c) Frank Waterhouse, or (d) any Class A shareholders of Highland (see paragraph 99 of the Amended Answer), or (e) Your outside auditor(s) for the period January 1, 2018 to the present.

**RESPONSE:**

<div align="center">

2

</div>

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 5:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred, in whole or in part, due to waiver," as alleged in paragraph 98 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 6:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred, in whole or in part, due to estoppel," as alleged in paragraph 97 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 7:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation," as alleged in paragraph 96 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 8:**

CORE/3522697.0002/169345052.1

**Appx. 00594**

All Documents and Communications Concerning Your assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant NREP acted in good faith," as alleged in paragraph 100 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

<u>**Request for Production No. 9**</u>:

All Documents and Communications Concerning Your assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged transfer (i.e., the "Alleged Agreement") was . . . for reasonably equivalent value," as alleged in paragraph 101 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

<u>**Request for Production No. 10**</u>:

All Documents and Communications Concerning Your assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the 'Alleged Agreement'," as alleged in paragraph 102 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

<u>**Request for Production No. 11**</u>:

Your audited financial statements for the period January 1, 2018 to the present.

CORE/3522697.0002/169345052.1

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request for Production No. 12:**

Your unaudited financial statements for the period January 1, 2018 to the present, to the extent any portion of that time period is not covered by the audited financial statements.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request for Production No. 13:**

For the period January 1, 2018 through the present, all Communications between You and Your outside auditor(s) concerning the Notes.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 14:**

All Documents and Communications Concerning any compensation that You paid to James Dondero for each of Your fiscal years 2016, 2017, 2018, and 2019, and 2020.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 15:**

CORE/3522697.0002/169345052.1

**Appx. 00596**

All Documents and Communications Concerning any loan that You ever made to or for the benefit of James Dondero.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 16:**

All Documents and Communications Concerning any Loan that You ever made to or for the benefit of James Dondero that You forgave.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 17:**

To the extent not responsive to the prior requests, all Documents and Communications Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Defendant objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 18:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

CORE/3522697.0002/169345052.1

**Appx. 00597**

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request for Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request for Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 5:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

ADMIT.

CORE/3522697.0002/169345052.1

**Appx. 00598**

**Request for Admission No. 6:**

Admit that no document was created prior to the commencement of the Adversary Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

DENY.

**Request for Admission No. 7:**

Admit that You did not disclose the terms of the Agreement in connection with the Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

**Request for Admission No. 8:**

Admit that You did not disclose the existence of the Agreement in connection with the Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

CORE/3522697.0002/169345052.1

## INTERROGATORIES

**Interrogatory No. 1:**

Identify the "testimony" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name of the witness, (b) the substance of the anticipated testimony, and (c) the basis for Your belief. See paragraph 99 of the Amended Answer.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 2:**

Identify the "email correspondence" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name(s) of the sender(s) and recipient(s) of such email correspondence, (b) the date of any such email correspondence, and (c) the substance of any such e-mail correspondence.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 3:**

Identify each of Your employees, officers, representatives, and agents who knew of the terms and existence of the Agreement prior to March 1, 2021, and for each such person, identify (a) the name of the person, (b) the person's title or connection to You, (c) the date on which the person first learned of the terms and existence of the Agreement, and (d) how and from whom the person first learned of the terms and existence of the Agreement.

CORE/3522697.0002/169345052.1

**Appx. 00600**

**RESPONSE:**

Defendant objects to this Interrogatory to the extent that it seeks privileged information. Subject to this objection, Defendant states that James Dondero knew of the terms and existence of the Agreement prior to March 1, 2021.

**Interrogatory No. 4:**

Identify which part or parts of the Notes are "ambiguous," as alleged in paragraph 104 of

the Amended Answer, and state the basis for Your belief.

**RESPONSE:**

Defendant contends that each note as a whole is ambiguous because it refers to additional agreements without specifying them.

**Interrogatory No. 5:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Defendant objects to this Interrogatory because it is premature. Defendant will identify any witnesses in accordance with any scheduling order entered by the Court.

10

Dated: September 27, 2021       Respectfully submitted,

*/s/Michael P. Aigen*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR NEXPOINT REAL ESTATE
PARTNERS, LLC**

11

## VERIFICATION

STATE OF TEXAS )
)
COUNTY OF DALLAS )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC'S JAMES DONDERO'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within his personal knowledge and are true and correct to the best of his knowledge, information and belief.

_____
JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 27th day of September, 2021.



_____
Notary Public in and for the State of Texas

TARA LOIBEN
Notary Public, State of Texas
Comm. Expires 04-15-2023
Notary ID 128585486

**Appx. 00603**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

<div align="right">

*/s/ Michael P. Aigen*_____
Michael P. Aigen

</div>

CORE/3522697.0002/169345052.1

**Appx. 00604**

# EXHIBIT 30

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 67-7    Filed 08/07/24    Page 23 of 199    PageID 21841
Appendix Part File Page 0074 of 896
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 2 of 37

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-3 Filed 06/08/23 Page 24 of 199   PageID 21842
Appendix Part 6 Page 0084 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 3 of 37

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 06/09/24    Page 25 of 199    PageID 21843
Appendix Part 6 Page 608 of 896
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 4 of 37

6.2.     Addresses and Notices ..................................................................................................25
6.3.     Titles and Captions.......................................................................................................25
6.4.     Pronouns and Plurals....................................................................................................25
6.5.     Further Action ..............................................................................................................25
6.6.     Binding Effect ..............................................................................................................25
6.7.     Integration ....................................................................................................................25
6.8.     Creditors.......................................................................................................................25
6.9.     Waiver ..........................................................................................................................25
6.10.    Counterparts .................................................................................................................25
6.11.    Applicable Law ............................................................................................................25
6.12.    Invalidity of Provisions ...............................................................................................25
6.13.    Mandatory Arbitration..................................................................................................26

D-CNL002972

Appx. 00608

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-7 Filed 01/09/24   Page 26 of 199   PageID 21844
Appendix Part Filed 06/12 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 5 of 37

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P**.**  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act**.**  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices**.**  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate**.**  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate**.**  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners**.**  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201**.**  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership**.**  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

D-CNL002973

**Appx. 00609**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-7    Filed 08/14/23    Page 27 of 199    PageID 21845
Appendix Part 6    Page 6114 of 8946
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 6 of 37

## ARTICLE 2

### DEFINITIONS

2.1.    **Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

D-CNL002974

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 77-7   Filed 09/04/24   Page 28 of 199   PageID 21846
Appendix Part 6   Page 124 of 896

Case 21-03005-sgj   Doc 63-4   Filed 08/27/21   Entered 08/27/21 17:29:13   Page 7 of 37

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

D-CNL002975

Appx. 00611

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 75 Filed 09/29/23   Page 29 of 199   PageID 21847
Appendix Part 1 Page 8 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 8 of 37

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-4 Filed 06/14/24    Page 30 of 199    PageID 21848
Appendix Part 4 Page 9 of 37

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 9 of 37

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in <u>Section 3.9(b)</u>.

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

D-CNL002977

**Appx. 00613**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 171-6 Filed 06/14/23 Appendix Part 6   Page 31 of 199   PageID 21849

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 10 of 37

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in <u>Section 4.6(a)</u>.

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.** **Other Definitions**. All terms used in this Agreement that are not defined in this <u>Article 2</u> have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

**3.1.** **Capital Contributions**.

(a) <u>Initial Capital Contributions</u>. The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b) <u>Additional Capital Contributions</u>.

6

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 2 Part File 06/18/24 Page 32 of 199   PageID 21850

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 11 of 37

(i)     The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)     Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)     Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)     Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 37 Filed 09/17/24 Page 33 of 199   PageID 21851
Appendix Part I Page 0174 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 12 of 37

(ii)   Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.**     **Allocations of Profits and Losses.**

(a)   Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)   First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)   Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)   Then, to all Partners in proportion to their respective Percentage Interests.

(b)   Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)   First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)   Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)   Then, to all Partners in proportion to their respective Percentage Interests.

8

D-CNL002980

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 7-7   Filed 06/01/24   Page 34 of 199   PageID 21852
Appendix Part File Page 34 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 13 of 37

(c)     Limitation on Loss Allocations.   If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.     Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.     Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)     Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-7   Filed 05/24/22   Page 35 of 199   PageID 21853
Appendix Part 6 Page 14 of 896
Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 14 of 37

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

      (e)      Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

      (f)      Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

      (g)      Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

      (h)      Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL002982

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 167-7    Filed 06/02/24    Page 36 of 199    PageID 21854
Appendix Part 7    Page 0620 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 15 of 37

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7.** **Capital Accounts**.

(a)    Maintenance of Capital Accounts.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    Negative Capital Accounts.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    Interest.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    No Withdrawal.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e)    Loans From Partners.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    Revaluations.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL002983

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7   Filed 06/22/4 of 896ge 37 of 199   PageID 21855
Appendix Part 6 Page 06214 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 16 of 37

**3.8.     Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.     Distributions**.

(a)     General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)     Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)     No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17 Part 4 Filed 06/22/ Page 38 of 199   PageID 21856

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 17 of 37

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "Tax Distribution").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made to the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions.  Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-7 Filed 06/02/234 of 896ge 39 of 199    PageID 21857
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 18 of 37

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10.    Compensation and Reimbursement of General Partner.

(a)    Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)    Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11.    Books, Records, Accounting, and Reports.

(a)    Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)    Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)    Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)    Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12.    Tax Matters.

(a)    Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 72-7   Filed 06/24/24   Page 40 of 199   PageID 21858
Appendix Part 6 Page 6244 of 8962

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 19 of 37

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)  Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)  Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)  Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.   Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)  Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

D-CNL002987

**Appx. 00623**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 67-3 Filed 06/25/24 Page 41 of 199   PageID 21859
Appendix Part File Page 6254 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 20 of 37

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties.   Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds.   The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

D-CNL002988

**Appx. 00624**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 175-7   Filed 06/26/24   Page 42 of 199   PageID 21860
Appendix Part 6 Page 0264 of 896
Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 21 of 37

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

    (e)    <u>Loans to or from General Partner: Contracts with Affiliates; Joint Ventures</u>.

    (i)    The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

    (ii)    The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

    (iii)    The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

    (f)    <u>Outside Activities' Conflicts of Interest</u>. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

    (g)    <u>Resolution of Conflicts of Interest</u>. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

    (h)    <u>Indemnification</u>. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

<div align="center">17</div>

Case 21-03003-sgj  Doc 135-1  Filed 12/18/21  Entered 12/18/21 01:38:22  Desc
Case 3:21-cv-00881-X  Document 174-7  Filed 06/22/24  Page 43 of 199  PageID 21861
Appendix Part File Page 06274 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21  Entered 08/27/21 17:29:13  Page 22 of 37

the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this <u>Section 4.1(h)</u> or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this <u>Section 4.1(h)</u> unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

        (i)    <u>Liability of General Partner</u>.

        (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

        (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

        (j)    <u>Reliance by General Partner</u>.

        (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

        (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

        (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002990

**Appx. 00626**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 27-7 Filed 06/06/24   Page 44 of 199   PageID 21862
Appendix Part 6 Page 06234 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 23 of 37

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

    **4.2.**    **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

        (a)    <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

        (b)    <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

        (c)    <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

        (d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

        (e)    <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

    **4.3.**    **Transfer of Partnership Interests**.

        (a)    <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

<div align="center">19</div>

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 67-7   Filed 06/29/24   Page 45 of 199   PageID 21863
Appendix Part 6   Page 00294 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 24 of 37

(b)     Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)     Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)     Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; provided, however, if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)     Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)     Transfers of Partnership Interests Pursuant to the Purchase Notes. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 27-7 Filed 06/09/24   Page 46 of 199   PageID 21864
Appendix Part I Page 00824 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 25 of 37

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.     Issuances of Partnership Interests to New and Existing Partners**.

(a)     Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)     Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.     Withdrawal of General Partner**

(a)     Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)     Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.     Admission of Substitute Limited Partners and Successor General Partner**.

(a)     Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

21

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7-7 Filed 06/25/14 of 890 Page 47 of 199    PageID 21865
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 26 of 37

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)    Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)    Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.    Dissolution.**  The Partnership shall be dissolved upon:

(a)    The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)    An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)    Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-7   Filed 06/02/24   Page 48 of 199   PageID 21866
Appendix Part File Page 0624 of 890
Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 27 of 37

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

D-CNL002995
**Appx. 00631**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7-1    Filed 06/23/21    Page 49 of 199    PageID 21867
Appendix Part 1    Page 28 of 37

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 28 of 37

      (a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

      (b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

      (c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

      (d)     To the Partners in proportion to their respective Percentage Interests.

    **5.4.**    **Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

    **5.5.**    **Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

    **5.6.**    **Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

    **5.7.**    **Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

**ARTICLE 6**

**GENERAL PROVISIONS**

    **6.1.**    **Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 7-7   Filed 06/24/2022   Page 50 of 199   PageID 21868
Appendix Part 6 Page 50 of 896
Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 29 of 37

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.     Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.     Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof**.**  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement**.**  All Exhibits hereto are incorporated herein by reference.

**6.4.     Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.     Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.     Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.     Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.     Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.     Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.     Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.     Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.     Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

D-CNL002997

**Appx. 00633**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-7   Filed 06/30/54 of 896   Page 51 of 199   PageID 21869
Appendix Part Filed 06/30/54 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 30 of 37

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.   General Partner Discretion.**   Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.   Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.   The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.   A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.   The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.   Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.   The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.   Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.   In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.   All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.   Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.   The duty to arbitrate described above shall survive the termination of this Agreement.   Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.   All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

D-CNL002998

Appx. 00634

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-1    Filed 01/09/24    Page 52 of 199    PageID 21870

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 31 of 37

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

D-CNL002999
**Appx. 00635**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-7    Appendix Part Filed 01/06/24    Page 374 of 896    Page 53 of 199    PageID 21871

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 32 of 37

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero.
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

D-CNL003000

**Appx. 00636**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Filed 08/01/23 Page 54 of 199   PageID 21872
Appendix Part I-E Page 0634 of 896

Case 21-03005-sgj Doc 63-4 Filed 08/27/21   Entered 08/27/21 17:29:13   Page 33 of 37

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

D-CNL003001
**Appx. 00637**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-3    Filed 01/09/24    Page 55 of 199    PageID 21873

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 34 of 37

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:    President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003002

**Appx. 00638**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 67-2    Filed 06/04/24    Page 56 of 199    PageID 21874
Appendix Part II Page 54 of 396

Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 35 of 37

**EXHIBIT A**

| CLASS A PARTNERS | Percentage Interest | |
|---|---|---|
| | By Class | Effective % |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7 Filed 06/04/24 of 890 ge 57 of 199    PageID 21875
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 36 of 37

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 174-7    Filed 06/04/24    Page 58 of 199    PageID 21876
Case 21-03005-sgj Doc 63-4 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 37 of 37

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By:    _____

        Name: _____

        Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

# EXHIBIT 31

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7 Filed 05/24/24    Page 60 of 199    PageID 21878
Appendix Part 6 Page 60 of 896

Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 1 of 15

Docket #0083  Date Filed: 9/1/2021

Deborah Deitsch-Perez – State Bar ID 24036072
Michael P. Aigen – State Bar ID 24012196
**STINSON LLP**
3102 Oak Lawn Ave, Suite 777
Dallas, Texas 75219
(214) 560-2201 – Telephone
(214) 560-2203 – Facsimile

-AND-

Clay M. Taylor – State Bar ID 24033261
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03003** |
| **JAMES DONDERO, NANCY DONDERO,** | § | |
| **AND THE DUGABOY INVESTMENT TRUST** | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT JAMES DONDERO'S ANSWER TO AMENDED COMPLAINT

Defendant James Dondero ("James Dondero"), defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

1934054210901000000000007

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 06/04/24    Page 61 of 199    PageID 21879
Appendix Part 7    Page 00454 of 896

Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 2 of 15

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "<u>Amended Complaint</u>"). Where an allegation in the Amended Complaint is not expressly admitted in this Amended Answer, it is denied.

In filing this Answer, Defendant James Dondero does not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration [Adv. Dkt. 80], filed on September 1, 2021.[1]

## PRELIMINARY STATEMENT

1.    The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.    Defendant James Dondero admits that he amended his answer and served sworn responses to interrogatories and that these documents speak for themselves. To the extent paragraph 2 alleges other facts, Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2 of the Amended Complaint and therefore denies the same.

3.    Defendant James Dondero denies the allegations in paragraph 3 of the Amended Complaint.

---

[1] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7 Part File: 05464 of 896 Page 62 of 199    PageID 21880
Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 3 of 15

4.      Paragraph 4 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant James Dondero admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant James Dondero admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant James Dondero denies that a breach of contract claim is core.  Defendant James Dondero denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. Defendant James Dondero admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  Defendant James Dondero does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 8 not expressly admitted are denied.

9.      Subject to the Defendants' Motion to Compel Arbitration, Defendant James Dondero admits paragraph 9 of the Amended Complaint.

D-CNL002047
Appx. 00645

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 7-7   Filed 08/27/24   Page 63 of 199   PageID 21881

Case 21-03003-sgj Doc 83 Filed 09/01/21   Entered 09/01/21 19:59:45   Page 4 of 15

## THE PARTIES

10.    Defendant James Dondero admits the allegations in paragraph 10 of the Amended

Complaint.

11.    Defendant James Dondero admits the first and second sentences of the allegations

in paragraph 11 of the Amended Complaint.  The third sentence of paragraph 11 asserts a legal

conclusion to which no response is required. To the extent a response is required or appropriate,

Defendant James Dondero admits that he was the President of the Debtor's General Partner, Strand

Advisors, Inc. and the Debtor's CEO until his resignation on January 9, 2020. Defendant James

Dondero denies any remaining allegations contained in paragraph 11.

12.    Defendant James Dondero admits the allegations in paragraph 12 of the Amended

Complaint.

13.    Defendant James Dondero admits that Nancy Dondero is his sister and admits that

she is a trustee of Dugaboy. Any allegations in paragraph 13 not expressly admitted are denied.

## CASE BACKGROUND

14.    Defendant James Dondero admits the allegations in paragraph 14 of the Amended

Complaint.

15.    Defendant James Dondero admits the allegations in paragraph 15 of the Amended

Complaint.

16.    Defendant James Dondero admits the allegations in paragraph 16 of the Amended

Complaint.

17.    Defendant James Dondero admits the allegations in paragraph 17 of the Amended

Complaint.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 171 Filed 05/04/23    Page 64 of 199    PageID 21882
Appendix Part 1 Page 64 of 896

Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 5 of 15

18.     Defendant James Dondero admits the allegations in paragraph 18 of the Amended
Complaint.

## STATEMENT OF FACTS

19.     Defendant James Dondero admits that he has executed promissory notes under
which the Debtor is the payee. Any allegations in paragraph 19 not expressly admitted are denied.

20.     Defendant James Dondero admits that he executed a note as alleged in the first
sentence of paragraph 20 of the Amended Complaint.  Defendant James Dondero admits that the
attached document appears to be a copy of the referenced note.

21.     Defendant James Dondero admits that he executed a note as alleged in the first
sentence of paragraph 21 of the Amended Complaint.  Defendant James Dondero admits that the
attached document appears to be a copy of the referenced note.

22.     Defendant James Dondero admits that he executed a note as alleged in the first
sentence of paragraph 22 of the Amended Complaint. Defendant James Dondero admits that the
attached document appears to be a copy of the referenced note.

23.     Defendant James Dondero admits that Section 2 of each note attached to the
Amended Complaint contains the provision quoted in paragraph 23 of the Amended Complaint.

24.     Defendant James Dondero denies the allegations in paragraph 24 of the Amended
Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made
in this paragraph are denied.

25.     Defendant James Dondero denies the allegations in paragraph 25 of the Amended
Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made
in this paragraph are denied.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7-7    Filed 06/04/24    Page 65 of 199    PageID 21883
Appendix Part File Page 00424 of 896
Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 6 of 15

26.     In response to paragraph 26 of the Amended Complaint, Defendant James Dondero admits that Exhibit 4 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 26 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied. Defendant James Dondero otherwise admits paragraph 27 of the Complaint.

28.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 of the Amended Complaint and therefore denies same.

29.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of the Amended Complaint and therefore denies same.

30.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Amended Complaint and therefore denies same.

31.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies same.

32.     Defendant James Dondero denies the allegations in paragraph 32 of the Amended Complaint.

D-CNL002050
Appx. 00648

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 27-7 Filed 06/06/24   Appendix Part Filed 06/06/24 Page 66 of 199   PageID 21884

Case 21-03003-sgj Doc 83 Filed 09/01/21   Entered 09/01/21 19:59:45   Page 7 of 15

33.     Defendant James Dondero admits that the Debtor filed the Original Complaint in this action on January 22, 2021 as alleged in the first sentence of paragraph 33 of the Amended Complaint. Defendant James Dondero denies he is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant James Dondero admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant James Dondero admits the allegations in paragraph 35 of the Amended Complaint.

36.     In response to the allegations in paragraph 36 of the Amended Complaint, Defendant James Dondero admits that the Alleged Agreement was orally entered into in January or February 2019 or thereabouts.  To the extent not expressly admitted, paragraph 36 of the Amended Complaint is denied.

37.     Defendant James Dondero admits the allegations in paragraph 37 of the Amended Complaint.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no response is required. To the extent a response is required or appropriate, Defendant James Dondero admits that he was the President of the Debtor's General Partner, Stand Advisors, Inc. and the Debtor's CEO until his resignation on January 9, 2020. To the extent not expressly admitted, paragraph 38 of the Amended Complaint is denied.

39.     In response to paragraph 39 of the Amended Complaint, Defendant James Dondero informed the Debtor's CFO that the loans were potentially forgivable and testified that he doesn't remember if he told the Debtor's CFO about the Alleged Agreement.  Subject to the

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 171-7 Filed 05/24/23   Appendix Part File Page 67 of 199   PageID 21885

Case 21-03003-sgj Doc 83 Filed 09/01/21   Entered 09/01/21 19:59:45   Page 8 of 15

foregoing, Defendant James Dondero otherwise admits the allegations in paragraph 39 of the Amended Complaint.

40.     In response to paragraph 40 of the Amended Complaint, Defendant James Dondero admits that he discussed the Alleged Agreement with Nancy Dondero and that no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement. To the extent not expressly admitted, paragraph 40 of the Amended Complaint is denied.

41.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 of the Amended Complaint and therefore denies same.

42.     Defendant James Dondero denies the allegations in paragraph 42 of the Amended Complaint.

43.     Defendant James Dondero admits the allegations in paragraph 43 of the Amended Complaint.

44.     Paragraph 44 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIRST CLAIM FOR RELIEF
**(Against James Dondero)**
**(Breach of Contract)**

46.     Paragraph 46 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7 Filed 06/05/24    Page 68 of 199    PageID 21886
Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 9 of 15

47.    Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

48.    Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

49.    Paragraph 49 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

50.    Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SECOND CLAIM FOR RELIEF
### (Against James Dondero)
### (Turnover Pursuant to 11 U.S.C. § 542(b))

51.    Paragraph 51 of the Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

52.    Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

53.    Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

54.    Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

55.    Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. Defendant James Dondero admits that the Plaintiff transmitted the Demand Letter, and that document speaks for itself.  To the extent paragraph 55 alleges other facts, Defendant James Dondero lacks knowledge or information sufficient to form

D-CNL002053
Appx. 00651

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7 Part File Page 0553 4 of 896 Page 69 of 199    PageID 21887
Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 10 of 15

a belief about the truth of the allegations in paragraph 55 of the Amended Complaint and therefore denies the same.

56.     Paragraph 56 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### THIRD CLAIM FOR RELIEF
### (Against James Dondero)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A) and 550)

58.     Paragraph 58 of the Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and therefore it is denied.

62.     Paragraph 62 of the Amended Complaint states a legal conclusion that does not require a response and therefore it is denied.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and therefore it is denied.

D-CNL002054
Appx. 00652

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17 Part File Page 0654 of 896    Page 70 of 199    PageID 21888

Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 11 of 15

**FOURTH CLAIM FOR RELIEF**
**(Against James Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

64.     Paragraph 64 of the Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

67.     Paragraph 67 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

68.     Paragraph 68 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy)**
**(For Declaratory Relief: --11 U.S.C. § 105(a) and Fed. R. Bankr. P 7001)**

69.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

70.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

71.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

72.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7 Filed 06/25/24    Page 71 of 199    PageID 21889
Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 12 of 15

**SIXTH CLAIM FOR RELIEF**
**(Against Dugaboy)**
**(Breach of Fiduciary Duty)**

73.    This claim is only asserted against Defendant The Dugaboy Investment Trust.
Therefore, Defendant James Dondero is not required to respond to this claim.

74.    This claim is only asserted against Defendant The Dugaboy Investment Trust.
Therefore, Defendant James Dondero is not required to respond to this claim.

75.    This claim is only asserted against Defendant The Dugaboy Investment Trust.
Therefore, Defendant James Dondero is not required to respond to this claim.

76.    This claim is only asserted against Defendant The Dugaboy Investment Trust.
Therefore, Defendant James Dondero is not required to respond to this claim.

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

77.    Defendant James Dondero is moving to dismiss this claim.  Therefore, he is not
required to respond to this claim at this time.

78.    Defendant James Dondero is moving to dismiss this claim.  Therefore, he is not
required to respond to this claim at this time.

79.    Defendant James Dondero is moving to dismiss this claim.  Therefore, he is not
required to respond to this claim at this time.

80.    Defendant James Dondero is moving to dismiss this claim.  Therefore, he is not
required to respond to this claim at this time.

81.    Defendant James Dondero is moving to dismiss this claim.  Therefore, he is not
required to respond to this claim at this time.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 06/05/24    Page 72 of 199    PageID 21890
Appendix Part File Page 0564 of 896
Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 13 of 15

Defendant James Dondero denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), and (vii).

## AFFIRMATIVE DEFENSES

82.     Plaintiff's claims are barred in whole or in part because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

83.     Defendant James Dondero further asserts that Plaintiff's claims are barred, in whole or in part, due to waiver.

84.     Defendant James Dondero further asserts that Plaintiff's claims are barred, in whole or in part, due to estoppel.

85.     Defendant James Dondero further asserts that Note is ambiguous.

86.     Defendant James Dondero further asserts that Plaintiff's claims may be barred, in whole or in part, due to failure of consideration.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 67-7 Part File Page 0557 of 896ge 73 of 199    PageID 21891

Case 21-03003-sgj Doc 83 Filed 09/01/21    Entered 09/01/21 19:59:45    Page 14 of 15

87.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant James Dondero acted in good faith.

88.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged fraudulent transfer (*i.e.*, the "Alleged Agreement") was taken in good faith and for reasonably equivalent value.

89.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the "Alleged Agreement."

90.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the Debtor was solvent at the time the "Alleged Agreement" was made.

91.    Defendant James Dondero further asserts that Plaintiff's claims must be resolved in arbitration.

## JURY DEMAND

92.    Except to the extent compelled to arbitration, Defendant James Dondero demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

93.    Defendant James Dondero does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant James Dondero respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 77-3   Filed 01/09/24   Page 74 of 199   PageID 21892
Case 21-03003-sgj  Doc 83  Filed 09/01/21    Entered 09/01/21 19:59:45    Page 15 of 15

nothing on the Amended Complaint and provide Defendant James Dondero such other relief to which he is entitled.

Dated: September 1, 2021                    Respectfully submitted,

                                            */s/ Deborah Deitsch-Perez*
                                            Deborah Deitsch-Perez
                                            State Bar No. 24036072
                                            Michael P. Aigen
                                            State Bar No. 24012196
                                            **STINSON LLP**
                                            3102 Oak Lawn Ave, Suite 777
                                            Dallas, Texas 75219
                                            (214) 560-2201 – Telephone
                                            (214) 560-2203 – Facsimile
                                            michael.aigen@stinson.com
                                            deborah.deitschperez@stinson.com

                                            -and-

                                            Clay M. Taylor
                                            State Bar No. 24033261
                                            Bryan C. Assink
                                            State Bar No. 24089009
                                            **BONDS ELLIS EPPICH SCHAFER JONES LLP**
                                            420 Throckmorton Street, Suite 1000
                                            Fort Worth, Texas 76102
                                            (817) 405-6900 telephone
                                            (817) 405-6902 facsimile
                                            clay.taylor@bondsellis.com
                                            bryan.assink@bondsellis.com

                                            **ATTORNEYS FOR DEFENDANT
                                            JAMES DONDERO**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

                                            */s/ Deborah Deitsch-Perez*
                                            Deborah Deitsch-Perez

D-CNL002059
**Appx. 00657**

# EXHIBIT 32

Appx. 00658

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 174-11 Filed 01/06/64 of 896e 76 of 199    PageID 21894
Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 18

Docket #0079  Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | 21-3003 |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| Defendants. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210827000000000011

D-CNL001975
**Appx. 00659**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 06/06/14 of 896 Page 77 of 199   PageID 21895
Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 2 of 18

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants James Dondero ("Mr. Dondero"), Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy," and together with Mr. Dondero and Nancy Dondero, "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000, and payable upon the Debtor's demand. Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      After amending his answer and his sworn responses to interrogatories, Mr. Dondero now contends that the Debtor orally agreed to relieve him of his obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). Mr. Dondero further contends that he entered into the Alleged Agreement with his sister, Nancy Dondero, as trustee of Dugaboy, acting on behalf of the Debtor. At the time Mr. Dondero entered into the Alleged Agreement, he controlled the Debtor and was the lifetime beneficiary of Dugaboy.

2

D-CNL001976
**Appx. 00660**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-7 Filed 06/06/24   Page 78 of 199   PageID 21896
Appendix Part 6 Page 0662 of 896

Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 3 of 18

3. Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes.

4. Nevertheless, the Debtor amends its Complaint for the purpose of adding certain claims and naming additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against Mr. Dondero for breach of his obligations under the notes and for turnover, the Debtor adds alternative claims (a) against Mr. Dondero for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5. As remedies, the Debtor seeks (a) damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for Mr. Dondero's breach of his obligations under the Notes, (b) turnover by Mr. Dondero to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, Mr. Dondero pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:43594.1 36027/002

D-CNL001977

Appx. 00661

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-7 Filed 06/08/34 of 896   Page 79 of 199   PageID 21897

Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 4 of 18

**JURISDICTION AND VENUE**

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE PARTIES**

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled the Debtor.

12.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

13.     Upon information and belief, Nancy Dondero is Mr. Dondero's sister, and the trustee of Dugaboy.

4

D-CNL001978

**Appx. 00662**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-2   Filed 06/04/22   Page 80 of 199   PageID 21898
Appendix Part 1 Page 664 of 896

Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 5 of 18

## CASE BACKGROUND

14.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

16.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

17.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

18.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

A.     **The Dondero Notes**

19.     Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:43594.1 36027/002

D-CNL001979

**Appx. 00663**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-3   Filed 06/06/24   Page 81 of 199   PageID 21899
Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 6 of 18

20.     Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note").  A true and correct copy of Dondero's First Note is attached hereto as **Exhibit 1**.

21.     On August 1, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note").  A true and correct copy of Dondero's Second Note is attached hereto as **Exhibit 2.**

22.     On August 13, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Notes").  A true and correct copy of Dondero's Third Note is attached hereto as **Exhibit 3.**

23.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

24.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

25.     Section 6 of each Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

6

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-1 Filed 01/09/24    Page 82 of 199    PageID 21900
Appendix Part 1 Page 0664 of 896
Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 7 of 18

B.      **Mr. Dondero Defaults Under Each Note**

26.      By letter dated December 3, 2020, the Debtor made demand on Mr. Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued interest and principal through and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

27.      Despite the Debtor's demand, Mr. Dondero did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

28.      As of December 11, 2020, there was an outstanding principal amount of $3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of $21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

29.      As of December 11, 2020, there was an outstanding principal balance of $2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of $27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

30.      As of December 11, 2020, there was an outstanding principal balance of $2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of $25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

31.      Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $9,004,013.07.

32.      Pursuant to Section 4 of each Note, each Note is in default, and is currently due and payable.

7

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-2 Filed 01/09/24    Page 83 of 199    PageID 21901
Appendix Part File Page 0674 of 896
Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 8 of 18

**C.     The Debtor Files the Original Complaint**

33.     On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for Mr. Dondero's breach of his obligations under the Notes and (ii) turnover by Mr. Dondero for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.     Mr. Dondero's Affirmative Defenses**

34.     On March 16, 2021, Mr. Dondero filed his *Original Answer* [Docket No. 6] (the "Original Answer").  In his Original Answer, Mr. Dondero asserted four affirmative defenses: (i) the Debtor's claims should be barred because it was previously agreed by the Debtor that the Debtor would not collect on the Notes, (ii) waiver, (iii) estoppel, and (iv) failure of consideration. *See id.* ¶¶ 40-43.

35.     On April 6, 2021, Mr. Dondero filed his *Amended Answer* [Docket No. 16] (the "Amended Answer"), asserting three additional affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 40, (ii) The Debtor's claims are barred, in whole or in part, due to setoff, *id.* ¶ 41, and (iii) the Notes are "ambiguous," *id.* ¶ 45.

36.     According to Mr. Dondero, the Alleged Agreement was orally entered into in January or February 2019, and was not memorialized in any documentation.

37.     According to Mr. Dondero, he entered into the Alleged Agreement with his sister, Nancy Dondero, acting in her capacity as the Trustee of Dugaboy, which purportedly held the majority of the Debtor's Class A limited partnership interests.

DOCS_NY:43594.1 36027/002

D-CNL001982

**Appx. 00666**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-7    Filed 06/08/22    Page 84 of 199    PageID 21902
Appendix Part 6 Page 00684 of 896

Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 9 of 18

38. Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement.

39. Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

40. According to Mr. Dondero, he discussed the Alleged Agreement with Nancy Dondero, but (a) no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement, and (b) the Alleged Agreement was not subject to any negotiation.

41. Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

42. Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 5**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

43. Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 5**, § 4.2(b).

44. No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

9

D-CNL001983

**Appx. 00667**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7 Part File Page 06624 of 896    Page 85 of 199    PageID 21903

Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 10 of 18

45.    Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

### FIRST CLAIM FOR RELIEF
### (Against Mr. Dondero)
### (Breach of Contract)

46.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

47.    Each Note is a binding and enforceable contract.

48.    Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

49.    Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

50.    As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
### (Against Mr. Dondero)
### (Turnover Pursuant to 11 U.S.C. § 542(b))

51.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.    Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until

10

D-CNL001984

**Appx. 00668**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-3    Filed 09/01/24    Page 86 of 199    PageID 21904
Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 11 of 18

the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

53.    Each Note is property of the Debtor's estate and the amounts due under each Note is matured and payable upon demand.

54.    Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

55.    The Debtor has made demand for the turnover of the amounts due under each Note.

56.    As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

57.    The Debtor is entitled to the turnover of all amounts due under each of the Notes.

**THIRD CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

58.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59.    The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement within two years of the Petition Date.

60.    Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

11

DOCS_NY:43594.1 36027/002

D-CNL001985
**Appx. 00669**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 09/14/24   Page 87 of 199   PageID 21905
Appendix Part File Page 9714 of 8996

Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 12 of 18

(b) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

61.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt Mr. Dondero incurred under the Notes demonstrates a scheme of fraud.

62.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

63.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

**FOURTH CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

64.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

DOCS_NY:43594.1 36027/002

D-CNL001986
**Appx. 00670**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-7    Filed 06/07/22    Page 88 of 199    PageID 21906
Appendix Part 7 Page 0672 of 896

Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 13 of 18

65.    The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

66.    Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

67.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

68.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

DOCS_NY:43594.1 36027/002

D-CNL001987

Appx. 00671

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-1   Filed 06/07/24   Page 89 of 199   PageID 21907
Appendix Part 6   Page 0673 of 896

Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 14 of 18

### FIFTH CLAIM FOR RELIEF
**(Against Dugaboy)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

69.      The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

70.      A bona fide, actual, present dispute exists between the Debtor and Dugaboy concerning whether Dugaboy was authorized to entered into the Alleged Agreement on the Debtor's behalf.

71.      A judgment declaring the parties' respective rights and obligations will resolve their dispute..

72.      Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) Dugaboy otherwise had no right  or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

DOCS_NY:43594.1 36027/002

D-CNL001988

**Appx. 00672**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part Filed 06/24 of 89age 90 of 199   PageID 21908
Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 15 of 18

### SIXTH CLAIM FOR RELIEF
#### (Against Dugaboy)
#### (Breach of Fiduciary Duty)

73.      The Debtor repeats and re-alleges the allegations in each of the foregoing

paragraphs as though fully set forth herein.

74.      If Dugaboy, as a limited partner, had the authority to enter into the Alleged

Agreement on behalf of the Debtor, then Dugaboy would owe the Debtor a fiduciary duty.

75.      If Dugaboy had the authority to enter into the Alleged Agreement on behalf

of the Debtor, then Dugaboy breached its fiduciary duty of care to the Debtor by entering into and

authorizing the purported Alleged Agreement on behalf of the Debtor.

76.      Accordingly, the Debtor is entitled to recover from Dugaboy (a) actual

damages that the Debtor suffered as a result of its breach of fiduciary duty, and (b) for punitive

and exemplary damages.

### SEVENTH CLAIM FOR RELIEF
#### (Against James Dondero and Nancy Dondero)
#### (Aiding and Abetting a Breach of Fiduciary Duty)

77.      The Debtor repeats and re-alleges the allegations in each of the foregoing

paragraphs as though fully set forth herein.

78.      James Dondero and Nancy Dondero (together, the "Donderos") were aware

that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

79.      The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to

the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

80.      The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to

the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

15

DOCS_NY:43594.1 36027/002

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-7 Filed 06/09/23   Page 91 of 199   PageID 21909
Appendix Part 7 Page 6754 of 8945
Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 16 of 18

81.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section 548 of the Bankruptcy Code;

(iv)     On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section Tex. Bus. & C. Code § 24.005(a)(1);

(v)      On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business,

DOCS_NY:43594.1 36027/002

D-CNL001990

Appx. 00674

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-7 Filed 09/764 of 896age 92 of 199   PageID 21910
Case 21-03003-sgj Doc 79 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 17 of 18

transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) Dugaboy otherwise had no right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy, in an amount to be determined at trial, that Debtor suffered as a result of Dugaboy's breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages; and

Such other and further relief as this Court deems just and proper.

DOCS_NY:43594.1 36027/002

D-CNL001991

Appx. 00675

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 177-7 Filed 01/09/24   Page 93 of 199   PageID 21911
Appendix Part 6 Page 93 of 896

Case 21-03003-sgj Doc 79 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 18 of 18

Dated:  As of July 13, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

18

DOCS_NY:43594.1 36027/002

D-CNL001992
**Appx. 00676**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 77-7    Filed 08/28/24    Page 94 of 199    PageID 21912
Case 21-03003-sgj Doc 79-1 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 3

# EXHIBIT 1

D-CNL001993
**Appx. 00677**

Case 21-03003-sgj Doc 135-1 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 177-7 Part Filed 01/09/24 of 896 Page 95 of 199 PageID 21913

Case 21-03003-sgj Doc 79-11 Filed 08/27/21 Entered 08/27/21 17:54:09 Page 2 of 3

# PROMISSORY NOTE

$3,825,000                                                                February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Tax Loan. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

5.      Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.      Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.      Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-7 Part File Page 0882 4 of 896 Page 96 of 199   PageID 21914

Case 21-03003-sgj Doc 79-11 Filed 08/27/21 Entered 08/27/21 17:54:09 Page 3 of 3

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.      Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

D-CNL001995
**Appx. 00679**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 01/09/24    Page 97 of 199    PageID 21915
Case 21-03003-sgj Doc 79-2 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 3

# EXHIBIT 2

D-CNL001996
**Appx. 00680**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-5   Filed 06/08/24   Page 98 of 199   PageID 21916
Case 21-03003-sgj   Doc 79-2   Filed 08/27/21   Entered 08/27/21 17:54:09   Page 2 of 3

# PROMISSORY NOTE

$2,500,000                                                              August 1, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17 Part File Page 0634 of 896   Page 99 of 199   PageID 21917

Case 21-03003-sgj   Doc 79-2   Filed 08/22/21   Entered 08/22/21 17:50:49   Page 3 of 3

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

D-CNL001998
**Appx. 00682**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2 Part Filed 05/24 of Page 100 of 199    PageID 21918
Case 21-03003-sgj Doc 79-3 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 3

# EXHIBIT 3

D-CNL001999

**Appx. 00683**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7   Filed 08/05/23   Page 101 of 199   PageID 21919

Case 21-03003-sgj   Doc 79-33   Filed 06/22/21   Entered 06/22/21 17:50:19   Page 2 of 3

## PROMISSORY NOTE

$2,500,000                                                              August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-2  Filed 10/08/23   Page 102 of 199   PageID 21920

Case 21-03003-sgj   Doc 79-3   Filed 08/27/21   Entered 08/27/21 17:50:40   Page 3 of 3

7.  Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

D-CNL002001
**Appx. 00685**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 06/08/24    Page 103 of 199    PageID 21921
Case 21-03003-sgj Doc 79-4 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 4

# EXHIBIT 4

D-CNL002002

Appx. 00686

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6 Part 1 Filed 09/18/23   Page 104 of 199   PageID 21922
Appendix Page 523 of 886

Case 21-03003-sgj Doc 79-4 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 2 of 4

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| TOTALS | $16,725,000 | $8,929,624.74 | $74,388.33 | $9,004,013.07 |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41660.1 36027/002

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 06/29/23   Page 105 of 199   PageID 21923
Case 21-03003-sgj Doc 79-4 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 3 of 4

cc:   Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

D-CNL002004

Appx. 00688

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 10/06/23    Page 106 of 199    PageID 21924
Appendix Part 7    Page 694 of 886

Case 21-03003-sgj Doc 79-4 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 4 of 4

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

D-CNL002005
**Appx. 00689**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7 Part 6    Filed 07/09/24    Page 107 of 199    PageID 21925

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 37

# EXHIBIT 5

D-CNL002006

**Appx. 00690**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2 Part Filed 10/06/23   Page 108 of 199   PageID 21926
Appendix Part Page 692 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 2 of 37

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-7    Filed 06/08/23    Page 109 of 199    PageID 21927
Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 3 of 37

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

| | | |
|---|---|---:|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions. | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 01/09/24    Page 110 of 199    PageID 21928
Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 4 of 37

| | | |
|---|---|---|
| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

ii

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7  Filed 01/09/23  of Page 111 of 199   PageID 21929
Appendix Part Page 693 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 5 of 37

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

D-CNL002010
**Appx. 00694**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7 Part Filed 06/29/23   Page 112 of 199   PageID 21930
Appendix Part 6 Page 893 of 896

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 6 of 37

## ARTICLE 2

## DEFINITIONS

**2.1.**   **Definitions.**   The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in <u>Section 3.1(b)</u> of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to <u>Section 3.7</u> and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to <u>Section 3.7(a)</u>.

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

D-CNL002011

**Appx. 00695**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1 Filed 01/09/24   Page 113 of 199   PageID 21931
Appendix Part 5 Page 627 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 7 of 37

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

3

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7 Filed 10/05/23 Page 114 of 199   PageID 21932
Appendix Part 6 Page 893 of 986

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 8 of 37

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

D-CNL002013

**Appx. 00697**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2 Part Filed 06/09/22   Page 115 of 199   PageID 21933

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 9 of 37

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

D-CNL002014

Appx. 00698

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-7  Filed 09/04/23  Appendix Part Page 90 of 386   Page 116 of 199   PageID 21934

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 10 of 37

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.** **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

**3.1.** **Capital Contributions**.

(a) Initial Capital Contributions. The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b) Additional Capital Contributions.

6

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1 Part Filed 07/01/24 of 386 e 117 of 199   PageID 21935

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 11 of 37

(i)      The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)      Any failure by a Partner to make an Additional Capital Contribution requested under <u>Section 3.1(b)(i)</u> on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)      <u>Consequences to Defaulting Partners</u>.  In the event a Partner is in default under <u>Section 3.1(b)</u> (a "***Defaulting Partner***")*,* the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)      <u>Default Loans</u>.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to <u>Section 3.9(a)</u> or <u>Section 5.3</u> or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

D-CNL002016

**Appx. 00700**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-4 Part Filed 09/07/22   Page 118 of 199   PageID 21936
Appendix Part 9 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 12 of 37

     (ii)    <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

    **3.2.**    **Allocations of Profits and Losses**.

     (a)    <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

     (i)    <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

     (ii)    <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

     (iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

     (b)    <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

     (i)    <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

     (ii)    <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

     (iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

D-CNL002017

**Appx. 00701**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1   Filed 09/07/23   Page 119 of 199   PageID 21937
Appendix Part 6 Page 9 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 13 of 37

(c)      Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.      Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.      Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)      Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)      Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)      Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)      Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 09/04/24   Page 120 of 199   PageID 21938
Appendix Part 6    Page 97 of 336

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 14 of 37

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

        (e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

        (f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

        (g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

        (h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of those other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL002019

**Appx. 00703**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 1-6 Part Filed 09/05/23 of Page 121 of 199   PageID 21939

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 15 of 37

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7.    Capital Accounts.**

(a)    Maintenance of Capital Accounts.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    Negative Capital Accounts.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    Interest.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    No Withdrawal.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e)    Loans From Partners.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    Revaluations.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL002020

**Appx. 00704**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 7 Part Filed Page 09/03 of 386 ge 122 of 199   PageID 21940

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 16 of 37

3.8.    **Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

3.9.    **Distributions**.

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("**Priority Distributions**") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 76-2 Part Filed 12/09/24 of 199   Page 123 of 199   PageID 21941

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 17 of 37

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "*Tax Distribution*").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made to the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions.    Any  amounts  paid  pursuant  to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76 Part 1 Page 09/23 of 839e 124 of 199   PageID 21942

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 18 of 37

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10. Compensation and Reimbursement of General Partner.

(a)  Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)  Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11. Books, Records, Accounting, and Reports.

(a)  Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)  Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)  Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)  Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12. Tax Matters.

(a)  Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes. The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76 Part Filed 09/09/09 of 88ge 125 of 199   PageID 21943
Appendix Part Filed 09/09/21   Page 125 of 199

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 19 of 37

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)     Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)     Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)     Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)     Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76 Part 5 Filed 09/29/22 Page 126 of 199    PageID 21944

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 20 of 37

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)      Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)      Reliance by Third Parties.    Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)      Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-7   Filed 09/21/23   Page 127 of 199   PageID 21945
Appendix Part 6 Page 97 of 386

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 21 of 37

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

        (e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

        (i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

        (ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

        (iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

        (f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

        (g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

        (h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

<div align="center">17</div>

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-11   Filed 09/22/23   Page 128 of 199   PageID 21946
Appendix Part 6 Page 22 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 22 of 37

the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

(i)     Liability of General Partner.

(i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

(ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(j)     Reliance by General Partner.

(i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

(k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002027
**Appx. 00711**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76 Part Filed 09/23 of 199    Page 129 of 199    PageID 21947
Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 23 of 37

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.    Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)    Limitation of Liability.  Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)    Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)    Return of Capital.  No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)    Second Amended Buy-Sell and Redemption Agreement.  Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)    Default on Priority Distributions.  If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under Section 3.9(b) and this Section 4.2(e). In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated pursuant to this Section 4.2(e).

**4.3.    Transfer of Partnership Interests**.

(a)    Transfer.  No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL002028

**Appx. 00712**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 09/24/... Page 130 of 199    PageID 21948
Appendix Part 6    Page 97 of 336

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 24 of 37

(b)    Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)    Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-7 Part 9 Filed 07/23 of 88 Page 131 of 199    PageID 21949

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 25 of 37

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes.  Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest.  The Priority Distributions in <u>Section 3.9(b)</u> shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

    **4.4.**    **Issuances of Partnership Interests to New and Existing Partners**.

        (a)    <u>Issuance of Partnership Interests to New Limited Partners</u>.  The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner.  All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests.  No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

        (b)    <u>Issuance of an Additional Partnership Interest to an Existing Partner</u>.  The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion.  Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately.  Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

    **4.5.**    **Withdrawal of General Partner**

        (a)    <u>Option</u>.  In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

        (b)    <u>Conversion</u>.  If the successor to a Departing Partner does not exercise the option described in <u>Section 4.5(a)</u>, the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

    **4.6.**    **Admission of Substitute Limited Partners and Successor General Partner**.

        (a)    <u>Admission of Substitute Limited Partners</u>.  A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest.  To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

<div align="center">21</div>

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7   Filed 09/28/... Appendix Part 1 Page 1 of 833   Page 132 of 199   PageID 21950

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 26 of 37

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as <u>Exhibit B</u> (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)    <u>Admission of Successor General Partner</u>.  A successor General Partner selected pursuant to <u>Section 5.2</u> or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to <u>Section 4.3(b)</u> shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)    <u>Action by General Partner</u>.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of <u>Exhibit A</u> and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

### DISSOLUTION AND WINDING UP

**5.1.    Dissolution.**  The Partnership shall be dissolved upon:

(a)    The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to <u>Section 4.3(b)</u>);

(b)    An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)    Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this <u>Section 5.1</u>, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

D-CNL002031

**Appx. 00715**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-7 Filed 09/27/22 Page 133 of 199   PageID 21951
Appendix Part 7 Page 27 of 336

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 27 of 37

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

D-CNL002032

**Appx. 00716**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-4   Filed 09/29/23   Page 134 of 199   PageID 21952
Appendix Part 4 Page 9 of 38

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 28 of 37

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.     Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.     Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.     Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.     Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

**ARTICLE 6**

**GENERAL PROVISIONS**

**6.1.     Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2 Filed 09/29/23   Page 135 of 199   PageID 21953
Appendix Part 6 Page 29 of 86

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 29 of 37

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with
the consent of such Partner adversely affected.

      **6.2.**    **Addresses and Notices.**  Any notice, demand, request, or report required or permitted to
be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made
when delivered in person or when sent by United States registered or certified mail to the Partner at
his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who
may have an interest in any Partnership Interest by reason of an assignment or otherwise.

      **6.3.**    **Titles and Captions.**  All article and section titles and captions in the Agreement are for
convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend,
or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise,
references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this
Agreement.  All Exhibits hereto are incorporated herein by reference.

      **6.4.**    **Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this
Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of
nouns, pronouns, and verbs shall include the plural and vice versa.

      **6.5.**    **Further Action.**  The parties shall execute all documents, provide all information, and
take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this
Agreement.

      **6.6.**    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the
parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted
assigns.

      **6.7.**    **Integration.**  This Agreement constitutes the entire agreement among the parties hereto
pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining
thereto.

      **6.8.**    **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or
enforceable by any creditors of the Partnership.

      **6.9.**    **Waiver.**  No failure by any party to insist upon the strict performance of any covenant,
duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a
breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or
condition.

      **6.10.**    **Counterparts.**  This agreement may be executed in counterparts, all of which together
shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are
not signatories to the original or the same counterpart.

      **6.11.**    **Applicable Law.**  This Agreement shall be construed in accordance with and governed
by the laws of the State of Delaware, without regard to the principles of conflicts of law.

      **6.12.**    **Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be
illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations
arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the
intent and agreement of the parties that this Agreement shall be deemed amended by modifying that
provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

<div align="center">25</div>

D-CNL002034

**Appx. 00718**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-7 Part Filed Page 9/24 of 199   Page 136 of 199   PageID 21954

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 30 of 37

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

    **6.13.   General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

    **6.14.   Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

D-CNL002035

**Appx. 00719**

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 09/21   Page 137 of 199   PageID 21955

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 31 of 37

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

D-CNL002036

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-4    Filed 09/22    Page 138 of 199    PageID 21956

Case 21-03003-sgj  Doc 79-5  Filed 08/27/21    Entered 08/27/21 17:24:19    Page 32 of 37

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By:  _____
James D. Dondero.
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By:  _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By:  _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By:  _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 09/23   Page 139 of 199   PageID 21957
Appendix Part 6 Page 9723 of 886

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 33 of 37

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 09/24/... Page 140 of 199   PageID 21958

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 34 of 37

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:    President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL002039

**Appx. 00723**

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 76 Part Filed 09/23 of 386e 141 of 199   PageID 21959
Appendix Part Page 9 of 386

Case 21-03003-sgj Doc 79-5 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 35 of 37

### EXHIBIT A

| | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1   Filed 09/23   Page 142 of 199   PageID 21960
Appendix Part 1 Page 90 of 336

Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 36 of 37

**EXHIBIT B**

**ADDENDUM
TO THE
FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

Case 21-03003-sgj   Doc 135-1   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 09/27/24   Page 143 of 199   PageID 21961
Appendix Part 1 Page 37 of 386
Case 21-03003-sgj Doc 79-5 Filed 08/27/21   Entered 08/27/21 17:24:19   Page 37 of 37

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____


NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 1 Filed 09/23 of 199    Page 144 of 199    PageID 21962

Case 21-03003-sgj Doc 79-6 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 1 of 2

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS Highland Capital Management, L.P. | DEFENDANTS James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.) Hayward PLLC 10501 N. Central Expressway, Suite 106 Dallas, Texas 75231  Tel.: (972) 755-7100 | **ATTORNEYS** (If Known) Stinson LLP (for James Dondero and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only) ☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor      ☐ Other ☐ Trustee | PARTY (Check One Box Only) ☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor      ☑ Other ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property** ☑2 11-Recovery of money/property – §542 turnover of property ☐ 12-Recovery of money/property - §547 preference ☑3 13-Recovery of money/property - §548 fraudulent transfer ☑4 14-Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)** ☐ 61-Dischargeability - §523(a)(5), domestic support ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury ☐ 63-Dischargeability - §523(a)(8), student loan ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support) ☐ 65-Dischargeability - other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** ☐ 21-Validity, priority or extent of lien or other interest in property | |
| **FRBP 7001(3) – Approval of Sale of Property** ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | **FRBP 7001(7) – Injunctive Relief** ☐ 71-Injunctive relief – imposition of stay ☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge** ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(8) Subordination of Claim or Interest** ☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation** ☐ 51-Revocation of confirmation | **FRBP 7001(9) Declaratory Judgment** ☑5 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability** ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny **(continued next column)** | **FRBP 7001(10) Determination of Removed Action** ☐ 01-Determination of removed claim or cause **Other** ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq. ☑1 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case) |

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-7 Part Filed 09/29/Page 145 of 199    PageID 21963

Case 21-03003-sgj Doc 79-6 Filed 08/27/21    Entered 08/27/21 17:24:19    Page 2 of 2

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 33



June 3, 2019

PricewaterhouseCoopers LLP
2121 N Pearl, Suite 2000
Dallas, TX 75201

We are providing this letter in connection with your audit of the consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (Appendix 1), (hereinafter collectively referred to as the "Partnership") as of December 31, 2018 (hereinafter referred to as the "balance sheet date") and the related consolidated statements of income, of changes in partners' capital, and of cash flows for the year then ended (hereinafter referred to as the "period"), (hereinafter collectively referred to as the "consolidated financial statements"), for the purpose of expressing an opinion as to whether such consolidated financial statements present fairly, in all material respects, the financial position, results of operations, changes in partners' capital and cash flows of the Partnership in conformity with accounting principles generally accepted in the United States of America. We acknowledge and confirm that we have fulfilled our responsibility, as set out in our engagement letter of May 14, 2019, for the preparation and fair presentation in the consolidated financial statements of financial position, results of operations, changes in partners' capital and of cash flow in conformity with generally accepted accounting principles, including the appropriate selection of accounting policies.

Certain representations in this letter are described as being limited to those matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement. Materiality used for purposes of these representations is $1,700,000.

We confirm, to the best of our knowledge and belief, as of June 3, 2019, the date of your report, the following representations made to you during your audit:

**General**

1.  The consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America (GAAP), and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Partnership is subject. We have prepared the Partnership's consolidated financial statements on the basis that the Partnership is able to continue as a going concern. There are no conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date these consolidated financial statements are issued.

2.  We have made available to you:

    a.  All financial records and related data.

    b.  Unconditional access to persons within the entity from whom you have requested audit evidence.

    c.  All minutes of the meetings of committees or other governing bodies applicable to the Partnership, including but not limited to, investors, Partners and committees of Partners, including summaries

CONFIDENTIAL

D-JDNL-033411

**Appx. 00730**

of actions of recent meetings for which minutes have not yet been prepared. The most recent meetings held were Pricing Committee, April 12, 2019.

d. Partnership agreements, Memoranda and Articles of Association, Confidential Offering Memoranda and amendments thereto (individually or collectively referred to hereinafter as the "Governing Documents"), and all other agreements to which the Partnership is subject.

e. Contracts or other agreements with the Partnership's service providers.

f. All official written reports, findings, recommendations and communications from specialists or professional advisors engaged to review investments, systems, processes, operations, or compliance programs of Partnership that are material to the Partnership, individually or in aggregate.

g. All side letter arrangements, whether written or oral, with any investors entered into or cancelled during the period for which noncompliance would have a material effect on the Partnership's consolidated financial statements. These side letters are allowed under the terms of the Governing Documents.

h. Withdrawal requests submitted or communicated by investors through the date of this letter.

3. We are responsible for all significant estimates and judgments affecting the consolidated financial statements. Significant estimates and judgments and their underlying assumptions, methods, procedures and the source and reliability of supporting data are reasonable and based on applicable guidance, are completely and appropriately disclosed in the consolidated financial statements, and appropriately reflect management's intent and ability to carry out specific courses of action, where relevant. The procedures and methods utilized in developing assumptions, estimates and judgments are appropriate and have been consistently applied in the periods presented. There have been no subsequent events which would require the adjustment of any significant estimate and related disclosures.

**Legal and Regulatory Compliance**

4. There have been no communications from regulatory agencies concerning the Partnership's noncompliance with or deficiencies in financial reporting practices.

5. There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

6. The Partnership has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

**Fraud**

7. We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

8. We have disclosed to you the results of our assessment of the risk that the consolidated financial statements may be materially misstated as a result of fraud and we have no knowledge of any fraud or suspected fraud affecting the Partnership involving:

CONFIDENTIAL

D-JDNL-033412

**Appx. 00731**

a. Partnership management or its affiliates,

b. Employees who have significant roles in the Partnership's internal control over financial reporting, or

c. Others where the fraud could have a material effect on the consolidated financial statements.

9. Except for previously disclosed, we have no knowledge of any allegations of fraud or suspected fraud affecting the Partnership received in communications from employees, former employees, regulators, service providers, counterparties, current or former investors, or others.

(As to items 7, 8 and 9, we understand the term "fraud" to mean those matters described in AICPA AU-C 240.)

**Assets, Liabilities and Capital**

*Assets:*

10. The Partnership has satisfactory title to all owned assets, including investments, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, including, but not limited to, assets pledged or assigned as security for liabilities and performance of contracts, except as disclosed in the consolidated financial statements. All deposit and brokerage accounts and all investments and other assets of the Partnership of which we are aware are included in the consolidated financial statements.

11. Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for transactions arising on or before the balance sheet date. All receivables have been appropriately reduced to their estimated net realizable value. Receivables, if any, from shareholders/partners or their affiliates, have been collected before the date of this letter.

12. We have evaluated all transfers of financial assets during the period, including, but not limited to, transfers between the Partnership and other affiliates, to determine that control over the transferred assets has been surrendered and that all of the conditions in accordance with Accounting Standards Codification (ASC) 860, *Transfers and Servicing*, ASC 860-10-40-5 have been met.

*Investments:*

With respect to Partnership's investments:

13. Portfolio Investments included in the Partnership's consolidated financial statements have been stated at fair values as determined by Partnership management in accordance with the valuation methods set forth in the Governing Documents and related policies and procedures. Such policies are in accordance with GAAP (e.g., fair value of an investment is that price which would be received to sell or paid to transfer, respectively, those assets or liabilities in orderly transactions between market participants).

14. The valuation policies used for investments whose fair values have been estimated by Partnership management are appropriate and have been consistently applied and documented. The policies for fair value measurement are appropriately disclosed in the Partnership's consolidated financial statements. The methods, assumptions, and inputs used are appropriate and result in a fair value appropriate for financial statement measurement and disclosure purposes. As of the balance sheet

CONFIDENTIAL

date, the investments for which fair value were determined by estimates made by Partnership are appropriately disclosed in the Partnership's consolidated financial statements.

15. We have informed you of any investments as of the balance sheet date that have restrictions on their sale or transferability. We have appropriately considered restrictions that are an attribute of the investment in our fair value determination.

16. The cost of portfolio securities was determined on the basis of FIFO method.

17. All Partnership investments made during the period were in accordance with the investment policies stated in the Governing Documents. All investments made during the period were authorized by appropriate personnel.

18. We have made available to you all information received from third party specialists engaged with respect to the valuation of investments. We believe that the data used in the work of the third-party specialists is accurate, complete, and relevant, and that our fair value determinations have been properly determined using such data and assumptions. We assume responsibility for, and are responsible for the evaluation of, the findings of third-party specialists in order to determine the fair value of the investments. We have adequately considered the qualifications of the third-party specialists in determining the amounts and disclosures used in the consolidated financial statements and underlying accounting records. We did not give nor cause any instructions to be given to third-party specialists with respect to the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the objectivity of the third-party specialists.

19. We evaluated all contracts and financial instruments to determine whether they meet the definition of a derivative under ASC 815, Derivatives and Hedging (ASC 815).


*Liabilities:*

20. All liabilities of the Partnership of which we are aware are included in the consolidated financial statements at the balance sheet date. There are no other liabilities or gain or loss contingencies that are required to be recognized or disclosed by ASC 450, *Contingencies*, and no unasserted claims or assessments that the Partnership's legal counsel has advised us are probable of assertion and required to be disclosed in accordance with that Topic.

21. The Partnership is not an "SEC registrant" as that term is used in ASC 480, *Distinguishing Liabilities from Equity*, 480-10-65-1. The Partnership has properly classified and disclosed as liabilities its mandatorily redeemable securities and other financial instruments (e.g., payable) that are within the scope of ASC 480-10-65, *Effective Date, Disclosures, and Transition for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests,* in the consolidated financial statements.

22. The actuarial valuation of pension benefit obligations was determined using an acceptable methodology applied on a consistent basis and taking into account the individual characteristics of the plan and reasonable assumptions, including those for the discount rate, rate of return on plan assets, mortality rate and other demographic assumptions.

CONFIDENTIAL

23. We accurately described the processes used by management to make investment decisions, including the target allocation percentages or range of percentages for each major category of plan assets, and to determine the overall expected long-term rate of return on assets.

24. The amounts of expected employer contributions to the benefit plan during the next fiscal year represent our best estimate.

25. We do not intend to compensate for the reduction of postretirement benefits by granting an increase in pension or other benefits.

26. We applied the recognition, disclosure and measurement date provisions of ASC 715, Compensation-Retirement Benefits (ASC 715). The resulting benefit asset represents the overfunded status of the plan, and accumulated other comprehensive income includes all previously unrecognized prior service costs and credits, net gains/losses and transition assets and obligations, net of taxes.

27. We measured and recognized all plan assets as of the plan's measurement date at fair value in accordance with ASC 715, Compensation- Retirement Benefits (ASC 715).

*Capital:*

28. Partner capital balances, including the allocation of income, gains and losses, the calculation of management fees and incentive fees/allocations have been properly calculated throughout the period in accordance with the Governing Documents, after giving consideration to the terms identified in each investor's subscription document. The methodology was consistently applied throughout the period and was correctly applied in the computation of contribution and withdrawal transactions during the period.

**Statement of Operations**

29. All material expenses charged to the Partnership are permissible under the terms of the Governing Documents. All directed brokerage and other expense reimbursement agreements, if any, have been properly disclosed in the consolidated financial statements.

**Tax Matters**

30. There are no material tax liabilities incurred by the Partnership under the provisions of ASC 740, *Income Taxes*. We have made the necessary provisions and disclosures in the consolidated financial statements as required by ASC 740, *Income Taxes*. The resulting liabilities are supported by specifically identified income tax exposures.

31. We have provided you with all information and our assessment related to all significant uncertain income tax positions that we have taken, or expect to take, of which we are aware. We have also provided you with access to all opinions, rulings, memoranda and analyses that relate to positions we have taken in regard to significant income tax matters. We are responsible for the accuracy and completeness of information provided to external counsel and we believe that the facts are consistent with any stated assumptions made by external counsel for purposes of forming such tax opinions. We have made you aware of and have disclosed all significant tax positions for which it is reasonably possible the amount of unrecognized tax benefit will either increase or decrease in the next 12 months.

CONFIDENTIAL

**Disclosure and Presentation of Consolidated financial statements**

32. The effects of the uncorrected financial statement misstatements are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

33. We have appropriately reconciled the Partnership's books and records (including, but not limited to, general ledger accounts, financial accounts maintained outside the general ledger and trial balances) underlying the consolidated financial statements to their related supporting information (e.g., sub ledger, or third-party data). All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements, as necessary. There were no material un-reconciled differences or material general ledger suspense account items that should have been adjusted or reclassified to another account balance. There were no material general ledger suspense account items written off to a balance sheet account, which should have been written off to a statement of operations account and vice versa. All consolidating entries have been properly recorded. All intra-entity accounts have been eliminated or appropriately measured and considered for disclosure in the consolidated financial statements.

34. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

35. The following, if material, have been properly recorded or disclosed in the consolidated financial statements:

    a. Agreements to repurchase assets previously sold.

    b. All pertinent rights and privileges of both general partner and limited partner interests in the Partnership.

    c. Fee income and expenses associated with stock lending and borrowing arrangements.

    d. Relationships and transactions with related parties, as described in ASC 850, *Related Party Disclosures*, including revenue, subadvisory fees, purchases and sales of securities, transfers, guarantees, other fees and expenses charged to the Partnership, and amounts receivable from or payable to related parties.

    e. Significant estimates and material concentrations known to us that are required to be disclosed in accordance with ASC 275, *Risks and Uncertainties*. (Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to matters such as volume of investment activity, available sources of financing, markets or geographic areas for which events could occur that would significantly disrupt investment performance within the next year.)

    f. All cash and deposit accounts and all other properties and assets of the Partnership are included in the consolidated financial statements.

    g. All financial instruments, including those with off-balance-sheet risk (including, but not limited to, swaps, forwards and futures), as required under US GAAP. This includes the following information with respect to the off-balance-sheet risks and the concentrations of credit risk:

        i. The extent, nature, and terms of financial instruments with off-balance-sheet risk.

    ii. The amount of credit risk of financial instruments with off-balance-sheet risk and information about the collateral supporting such financial instruments.

  h. Each significant concentration of credit risk arising from all financial instruments, and information about the collateral supporting such financial instruments, whether from an individual counterparty/prime broker or group of counterparties/prime brokers in accordance with ASC 825, *Financial Instruments,* and ASC 815, *Derivatives and Hedging* (ASC 815), 815-10-50.

  i. Commitments to purchase or sell financial instruments, commitments on certain debt instruments such as revolving credit facilities and obligations to Partnership capital calls.

  j. Fee income and expenses associated with stock lending and borrowing arrangements.

  k. Guarantees, whether written or oral, under which the Partnership is contingently liable.

  l. Transactions made in foreign currencies.

  m. Transactions made on margin or selling short.

36. We have disclosed to you the identity of the Partnership's related parties and all the related party relationships and transactions of which we are aware.

37. The Partnership has classified and disclosed financial assets and liabilities in the consolidated financial statements as Level 1, Level 2 and Level 3 in accordance with ASC 820, *Fair Value Measurement*, including a description of inputs and information used to develop valuation techniques as well as facts that required a change to such techniques, where applicable. We have made appropriate disclosures in accordance with Accounting Standards Update (ASU) 2011-11, *Disclosures about Offsetting Assets and Liabilities,* when the Partnership has the right of setoff in accordance with a master netting or similar agreement. The netting of assets and liabilities has been performed in accordance with the specific requirements of ASC 210, *Balance Sheet,* 210-20-45-1 and ASC 815-10-45-5.

38. The Partnership has properly recorded, classified and disclosed the prime broker margin collateral requirements in the consolidated financial statements in accordance with ASC 860, *Transfers and Servicing*, as to the recognition and reclassification of collateral and disclosures relating to securitization transactions and collateral.

39. We consistently applied our policy regarding classification of cash and cash equivalents, which are short-term, highly liquid investments that are readily convertible to known amounts of cash and are so near their maturity that there is insignificant risk of changes in value due to interest rate or other credit risk changes.

40. All borrowings and financial obligations of the Partnership have been disclosed to you and are properly recorded in the consolidated financial statements.

41.  The Partnership has not made any commitments during the year as underwriter, nor did it engage in joint trading or a joint investment account.

**Other**

42. No contracts were executed outside of Texas or the U.S. on behalf of the Partnership during 2017.

43. The Partnership has no plans or intentions that may materially affect the Partnership's carrying value or classification of assets and liabilities. Partnership management has no plans or intentions to liquidate the Partnership or to cease operations.

44. Other than the litigation described in the Current Litigation Memo dated May 24, 2019 and disclosed in the consolidated financial statements, there is no other litigation that would materially impact the Partnership and the consolidated funds.

45. We acknowledge and confirm that we have fulfilled our responsibility, as set out in our engagement letter of May 14, 2019, for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error and we have disclosed to you all deficiencies in the design or operation of internal control over financial reporting of which we are aware. We have also disclosed to you which of these deficiencies we believe are significant deficiencies or material weaknesses in internal control over financial reporting. In addition, we are not aware of any deficiencies in the design or operation of internal control over financial reporting at the service providers.

46. We have notified you of (i) any current or planned offerings of securities on a regulated market in a non-U.S. country or (ii) when we have provided or plan to provide audited consolidated financial statements to a non-U.S. regulator or government in connection with our access to its public capital markets, whether or not we include or refer to your report or include reference to your Firm.

47. We identified all variable interests, determined whether each variable interest in an entity was a variable interest entity (VIE), consolidated the VIEs for which the Partnership was the primary beneficiary, considered reconsideration events and complied with the consolidated financial statement disclosure requirements, including those VIEs that were not consolidated, in accordance with the guidance of ASC 810, Consolidation (ASC 810), which was applicable to the period presented.

48. The Partnership, as general partner of limited partnerships (which are not subject to the consolidation guidance under the variable interest entity model), has evaluated consolidation in accordance with ASC 810-20-25-4 through 25-7, Evaluating Presumption of General Partner Control and has determined that the entities listed in Note 3 of the consolidated financial statements have been properly consolidated. For entities that have not been consolidated by the Partnership, as general partner, the Partnership has adequately overcome the presumption of consolidation by the general partner based on the guidance noted above.

49. The consolidated financial statements disclose all matters of which we are aware that are relevant to the Partnership's ability to continue as a going concern, including all significant conditions and events and management's plans. We have the intent and ability to take actions necessary for the Partnership to continue as a going concern and accordingly the Partnership's consolidated financial statements are prepared on a going concern basis. We made available to you all relevant information on the Partnership's ability to continue as a going concern that could affect the consolidated financial statements. We derecognize liabilities if and only if it has been extinguished. A liability has been extinguished when the debtor pays the creditor and is relieved from its obligation or when the debtor has been legally released from being the primary obligor under the liability, either judicially or by the creditor.

50. We acknowledge responsibility for the presentation of the Supplemental Consolidating Balance Sheet, Supplemental Consolidating Statement of Income, Supplemental Unconsolidated Balance Sheet and Supplemental Unconsolidated Statement of Income in accordance with US GAAP and we believe such information, including its form and content, is fairly presented in accordance with US

GAAP. We have communicated to you all changes in measurement or presentation from those used in the prior period. We have informed you about any significant assumptions or interpretations underlying the measurement or presentation of the information.

To the best of our knowledge and belief, no events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustments to, or disclosure in, the aforementioned consolidated financial statements.

James Dondero, President
Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

Frank Waterhouse, Treasurer
Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

**Appendix 1**

**List of subsidiaries**

Highland Multi Strategy Credit Fund, L.P.

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Fund, L.P.

Highland Restoration Capital Partners Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Capital Special Allocation, LLC

Highland Receivables Finance 1, LLC

Highland Multi-Strategy Onshore Master SubFund, LLC

Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC

Highland Brasil, LLC

Highland Capital Management (Singapore) Pte, Ltd.

Highland Capital Management Korea, Ltd.

Highland Capital Management Latin America, L.P.

HE Capital, LLC

De Kooning, Ltd.

Hirst, Ltd.

Hockney, Ltd.

Oldenburg, Ltd.

Eames, Ltd.

Penant Management, L.P.

Pollack, Ltd.

Warhol, Ltd.

HCREF- I Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

**Appendix 1 (continued)**

Highland ERA Management, LLC

The Dondero Insurance Rabbi Trust

The Okada Insurance Rabbi Trust

Highland Employee Retention Assets, LLC

Highland Diversified Credit Fund, L.P.

Highland Select Equity Master Fund, L.P.

Highland Select Equity Fund, L.P.

Highland Fund Holdings, LLC

HCM Holdco, LLC

Maple Avenue Holdings, LLC

Highland HCF Advisor, Ltd.

Asury Holdings, LLC

Highland CLO Management, Ltd

CONFIDENTIAL

# EXHIBIT 34

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2018**

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Index**
**December 31, 2018**

|                                                                        | Page   |
|------------------------------------------------------------------------|--------|
| **Report of Independent Auditors**                                     | 1      |
| **Consolidated Financial Statements**                                 |        |
| Consolidated Balance Sheet                                            | 2      |
| Consolidated Statement of Income                                      | 3      |
| Consolidated Statement of Changes in Partners' Capital               | 4      |
| Consolidated Statement of Cash Flows                                  | 5      |
| Notes to Consolidated Financial Statements                           | 6-39   |
| Supplemental Information                                              | 40-44  |



Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2018, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

Auditors' Responsibility

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31, 2018, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

Other Matter

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

June 3, 2019

---

PricewaterhouseCoopers LLP, 2121 N Pearl Street, Suite 2000, Dallas, Texas 75201
T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 845,186 |
| Management and incentive fees receivable | | 2,393 |
| Due from broker for securities sold, not yet settled | | 598 |
| Other assets | | 9,255 |
| Notes and other amounts due from affiliates | | 173,398 |
| Intangible assets | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,581 |
| **Total assets** | $ | 1,043,467 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | 32,357 |
| Withdrawals payable | | 57,009 |
| Due to brokers | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 |
| Accrued and other liabilities | | 40,246 |
| Notes payable | | 55,752 |
| Investment liabilities | | 46,092 |
| **Total liabilities** | | 354,639 |
| Non-controlling interest | | 316,867 |
| **Partners' capital** | | 371,961 |
| **Total liabilities and partners' capital** | $ | 1,043,467 |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000215

**Appx. 00745**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 36,600 |
| Interest and investment income | | 15,831 |
| Incentive fees | | 70 |
| Shared services fees | | 9,187 |
| Other income | | 2,622 |
| Total revenue | | 64,310 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 34,475 |
| Professional fees | | 17,679 |
| Interest expense | | 5,670 |
| Marketing and advertising expense | | 2,413 |
| Depreciation and amortization | | 1,317 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 10,027 |
| Total expenses | | 80,525 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,826 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,996 |
| | | |
| Loss before investment and derivative activities | | (9,219) |
| | | |
| **Realized and unrealized loss on investments and derivatives:** | | |
| Net realized loss on investments and derivatives | | (31,517) |
| Net change in unrealized loss on investments and derivatives | | (93,755) |
| Net realized and unrealized loss on investments and derivatives | | (125,272) |
| | | |
| Net loss | | (134,491) |
| | | |
| Net loss attributable to non-controlling interest | | (61,313) |
| | | |
| Net loss attributable to Highland Capital Management, L.P. | $ | (73,178) |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000216

**Appx. 00746**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2018**

*(in thousands)*

|  | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| Partners' capital, December 31, 2017 | $ | 163 | $ | 450,014 | $ | 450,177 |
| Net loss attributable to Highland Capital Management, L.P. | $ | (183) | $ | (72,995) | $ | (73,178) |
| Partner distributions | $ | (13) | $ | (5,025) | $ | (5,038) |
| Partners' capital, December 31, 2018 | $ | (33) | $ | 371,994 | $ | 371,961 |

The accompanying notes are an integral part of these consolidated financial statements.

4

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (134,491) |
| Adjustment to reconcile net loss to net cash | | |
| provided from operating activities: | | |
| Net realized loss on investments and derivative transactions | | 31,517 |
| Net change in unrealized loss on investments and derivative transactions | | 93,755 |
| Amortization and depreciation | | 1,317 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 9,468 |
| Due from brokers | | 1,689 |
| Due from affiliate | | (10,989) |
| Other assets | | 4,272 |
| Intangible assets | | 3,308 |
| Accounts payable | | 546 |
| Accrued and other liabilities | | 1,214 |
| Due to brokers for securities purchased, not yet settled | | 1,886 |
| Due to brokers | | 11,665 |
| Net cash provided from operating activities | | 15,157 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (67) |
| Purchases of investments | | (195,263) |
| Proceeds from dispositions of investments | | 258,858 |
| Proceeds from securities sold, not yet purchased | | 46,550 |
| Issuance of notes receivable to affiliates | | (2,400) |
| Proceeds from repayments of notes receivable from affiliates | | 3,395 |
| Purchases of investments to cover securities sold, not yet purchased | | (127,954) |
| Net cash used in investing activities | | (16,881) |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (2,743) |
| Proceeds from long-term debt | | 38,501 |
| Capital contributions from minority interest investors of consolidated entities | | 14,615 |
| Capital withdrawals by minority interest investors of consolidated entities | | (141,986) |
| Partner distributions | | (5,060) |
| Net cash used in financing activities | | (96,673) |
| Net decrease in cash and cash equivalents | | (98,397) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 103,479 |
| De-consolidating funds adjustment | | (48) |
| End of year | $ | 5,034 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (5,629) |
| Taxes paid during the year | | (510,961) |
| Investments acquired for non-cash consideration | | 26,018 |
| Investments disposed for non-cash consideration | | 116 |

The accompanying notes are an integral part of these consolidated financial statements.

5

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**1.    Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business.  The Partnership's general partner is Strand Advisors, Inc. (the "General Partner").  The Partnership is owned by an unaffiliated (other than through its direct ownership) trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2018, the Partnership provided investment advisory services for eighteen CLOs, five separate accounts, one master limited partnership, and nine hedge funds or private equity structures, with total fee-earning assets under management of approximately $3.1 billion. The Partnership also provides investment services on behalf of affiliate advisors.

**2.    Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties.  If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

6

D-CNL000219
**Appx. 00749**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2018, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

|  | Unconsolidated VIE Net Assets | Carrying Value and Maximum Risk of Loss |
|---|---|---|
| Sponsored investment funds | $      206,329 | $            12,178 |

**Consolidation of Variable Interest Entities**

The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strategy Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Consolidation of Majority Owned Entities**
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd. ("HCM Singapore"), a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P.,  ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

8

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016;

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017;

- 100% interest in Asury Holdings, LLC, a Delaware limited liability company formed on February 14, 2017 and;

- 100% interest in Highland CLO Management, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

HIGHLY CONFIDENTIAL

D-CNL000222

Appx. 00752

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The following table includes a rollforward of non-controlling interests from December 31, 2017, to December 31, 2018.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2017 | $   424,844 |
| Net loss attributable to noncontrolling interest | (61,313) |
| Noncontrolling partner contributions | 14,615 |
| Noncontrolling partner distributions | (58,061) |
| Noncontrolling interest of deconsolidated entities | (3,218) |
| Noncontrolling interest, December 31, 2018 | $   316,867 |

**Investment Transactions**
Investment transactions are recorded on a trade date basis.  Investments in securities are valued at market or fair value at the date of the consolidated financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements.  Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value.  The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages.  During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $36.6 million and $0.1 million, respectively.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.2 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 8.

HIGHLY CONFIDENTIAL

D-CNL000223

**Appx. 00753**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 13.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2018, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

**Notes Receivable**
Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

**Other Intangible Assets**
Goodwill and other intangible assets are recorded on the Consolidated Balance Sheet at current carrying values. The Partnership and its Consolidated Entities perform an impairment test on an annual basis. Any impairment in the value of other intangible assets is accounted for in the year when it occurs.

**Fixed Assets and Leasehold Improvements**
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

11

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | Period |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Securities Sold, Not Yet Purchased**
Certain of the Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

12

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

### Margin Transactions
To obtain more investable cash, certain of the Consolidated Entities may use various forms of leverage including purchasing securities on margin. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

### Withdrawals Payable
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2018. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2018, the Consolidated Investment Funds had withdrawals payable of $57.0 million.

### Foreign Currency Transactions
The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2018. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

### Life Settlement Contracts
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2018, the Consolidated Investment Fund was invested in 13 policies, which had a total face value of approximately $145.3 million and a fair value of $35.7 million.

13

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Financing**
The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements which are classified in Notes payable and Investment liabilities on the Consolidated Balance Sheet. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**
The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Accounts Payable, Accrued and Other Liabilities**
Expenses are recorded on an accrual basis, as incurred. Current liabilities are included in Accounts payable. Long-term liabilities are included in Accrued and other liabilities.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

HIGHLY CONFIDENTIAL

D-CNL000227

**Appx. 00757**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

3.  **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2018:

*(in thousands)*

| | | |
|---|---|---:|
| Leasehold improvements | $ | 7,193 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,796 |
| Computer and equipment | | 2,863 |
| Computer software | | 331 |
| Accumulated depreciation | | (11,197) |
| | $ | 4,581 |

Depreciation expense in 2018 totaled approximately $1.3 million for the Partnership and its subsidiaries.

4.  **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2018:

| *(in thousands)* | Amortized Cost/Cost | | Fair Value | |
|---|---:|---|---:|---|
| Common equity securities | $ | 423,306 | $ | 535,374 |
| Closed-end mutual funds | | 100,788 | | 94,845 |
| Floating rate syndicated bank loans | | 142,586 | | 72,622 |
| Real Estate Investment Trusts | | 28,271 | | 57,475 |
| Life settlement contracts | | 65,276 | | 35,744 |
| Limited partnership interests | | 24,892 | | 30,521 |
| Rights & warrants | | 26,661 | | 7,446 |
| LLC interests | | 10,629 | | 2,775 |
| Preferred equity | | 258 | | 8,282 |
| Asset-backed securities | | 7,350 | | 102 |
| Participation interests | | 6,590 | | - |
| Corporate bonds | | 85,421 | | - |
| Total investments | $ | 922,027 | $ | 845,186 |

| | Proceeds | | Fair Value | |
|---|---:|---|---:|---|
| Securities sold, not yet purchased | $ | (26,135) | $ | (32,357) |

15

D-CNL000228
Appx. 00758

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

5.    **Fair Value of Financial Instruments**

**Fair Value Measurement**
U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date.  Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction.  When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs.  For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above.  In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates.  The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities.  In cases where observable inputs are not available, the Partnership and Consolidated Entities  develop methodologies that provide appropriate fair value estimates.  These methodologies are reviewed on a continuous basis to account for changing market conditions.

16

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2018, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, closed-end mutual funds, floating rate syndicated bank loans, real estate investment trusts, life settlement contracts, limited partnership interests, rights and warrants, LLC interests, asset-backed securities, and preferred equity. In addition, certain of the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

**Public Equity Investments**
Publicly traded equities, including closed-end mutual funds and publicly traded REITs are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**
The Partnership and Consolidated Entities hold private equity investments which often resulted from the restructuring of other instruments which are classified as common equity securities.  These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available.  In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities  will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis.  When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

17

D-CNL000230
**Appx. 00760**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

**Debt Securities**
The Partnership and Consolidated Entities invest in various types of debt, including floating rate syndicated bank loans, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Life Settlement Contracts**
Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

At December 31, 2018, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 1-2 | - | $ - | $ - |
| 2-3 | 3 | 33,785 | 16,940 |
| 3-4 | - | - | - |
| 4-5 | - | - | - |
| Thereafter | 10 | 111,500 | 18,804 |
| Total | 13 | $ 145,285 | $ 35,744 |

18

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2018

**Asset-Backed Securities**
The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity.  The Consolidated Entities generally utilize an independent third parties to provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Limited Partnership and LLC Interests**
The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2018:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/18 |
|---|---|---|---|---|
| Common equity securities | $ 139,236 | $ 296,695 | $ 99,443 | $ 535,374 |
| Closed-end mutual funds | 94,845 | - | - | 94,845 |
| Floating rate syndicated bank loans | - | 21 | 72,601 | 72,622 |
| Real Estate Investment Trusts | 46,594 | 10,881 | - | 57,475 |
| Life settlement contracts | - | - | 35,744 | 35,744 |
| Limited partnership interests | - | - | 30,521 | 30,521 |
| Rights & warrants | 20 | 123 | 7,303 | 7,446 |
| LLC interests | - | - | 2,775 | 2,775 |
| Preferred equity | 8,282 | - | - | 8,282 |
| Asset-backed securities | - | - | 102 | 102 |
| **Total** | $ 288,977 | $ 307,720 | $ 248,489 | $ 845,186 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 32,357 | $ - | - | $ 32,357 |

19

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2018:

(in thousands)

| | Fair Value at December 31, 2017 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Fair Value at December 31, 2018 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 141,201 | $ 1,058 | $ (116) | $ - | $ - | $ - | $ (42,700) | $ 99,443 |
| Floating rate syndicated bank loans | 64,307 | 12,146 | (1,952) | - | - | (2,799) | 899 | 72,601 |
| Life settlement contracts | 28,959 | 7,353 | - | - | - | - | (568) | 35,744 |
| Limited partnership interests | 27,863 | 4,600 | (4,766) | - | 928 | 351 | 1,545 | 30,521 |
| Rights & warrants | 8,013 | - | - | - | - | - | (710) | 7,303 |
| LLC interests | 3,352 | 165 | (1,312) | - | - | 985 | (415) | 2,775 |
| Asset-backed securities | 6,477 | 1 | (3,051) | (2,171) | (928) | (39,580) | 39,354 | 102 |
| | $ 280,172 | $ 25,323 | $ (11,197) | $ (2,171) | $ - | $ (41,043) | $ (2,595) | $ 248,489 |

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $41.8 million of the net unrealized losses presented in the table above relate to investments held as of December 31, 2018.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

| Category | | Ending Balance at 12/31/2018 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|---|
| Common equity securities | $ | 99,443 | Multiples Analysis | Multiple of EBITDA | 2.5x - 7.0x |
| | | | | Cap Rate | 8.0 - 10.0% |
| | | | | Multiple of Revenue | 0.20x - 0.30x |
| | | | | Liquidity Discount | 25% |
| | | | Discounted Cash Flow | Discount Rate | 10.5 - 40.0% |
| | | | | Terminal Multiple | 1.25x - 6.50x |
| | | | | Long-Term Growth Rate | 2% |
| | | | Transaction Analysis | Multiple of EBITDA | 4.0x - 7.75x |
| | | | | Cap Rate | 8 - 10% |
| | | | Bid Indications | Enterprise Value ($mm) | $720.0 - $765.0 |
| | | | Impairment Analysis | Recoverable Value | 0% |
| | | | Appraisal | N/A | N/A |
| Floating rate syndicated bank loans | | 72,601 | Multiples Analysis | Multiple of EBITDA | 2.0x - 5.0x |
| | | | | Multiple of Revenue | 0.35x - 0.50x |
| | | | Escrow Recovery Analysis | Risk Discount | 40% |
| | | | Appraisal | N/A | N/A |
| | | | Bid Indications | Transaction Price | 10% |
| | | | Sales Proceeds Analysis | Discount Rate | 6.0% |
| | | | Discounted Cash Flow | Discount Rate | 12.3% - 40.0% |
| | | | | Terminal Multiple | 1.25x |
| | | | | Spread Adjustment | 0.0% - 6.3% |
| Life settlement contracts | | 35,744 | Discounted Cash Flow | Discount Rate | 15.0 - 16.0% |
| Limited partnership interests | | 30,521 | Net Asset Value | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Rights & warrants | | 7,303 | Discounted Cash Flow | Discount Rate | 11.0% - 17.0% |
| | | | | Terminal Multiple | 6.5 |
| | | | Multiples Analysis | Multiple of EBITDA | 6.0x - 7.0x |
| | | | Transaction Analysis | Multiple of EBITDA | 7.25x - 7.75x |
| | | | Bid Indication of Value | Enterprise Value (in millions) | $720.0 - $765.0 |
| LLC interests | | 2,775 | Discounted Cash Flow | Discount Rate | 6% |
| | | | Adjusted Appraisal | Minority Discount | 25% |
| | | | Bid Indication | Total Purchase Price (in millions) | $130.00 |
| Asset-backed securities | | 102 | Adjusted NAV | N/A | N/A |
| **Total** | $ | 248,489 | | | |

In addition to the unobservable inputs utilized for various valuation methodologies, the Partnership often uses a combination of two or more valuation methodologies to determine fair value for a single holding. In such instances, the Partnership assesses the methodologies and ascribes weightings to each methodology. The selection of weightings is an inherently subjective process, dependent on professional judgement. These selections may have a material impact to the concluded fair value for such holdings.

The significant unobservable inputs used in the fair value measurement of the Partnership's assets could fluctuate significantly, resulting in a significantly higher or lower fair value measurement.

HIGHLY CONFIDENTIAL

D-CNL000234
**Appx. 00764**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

6.    **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans.  The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps.  Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements.  The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations.  These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses.  The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract.  Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties.  To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law.  There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**
The Partnership provides advisory services to the Consolidated Entities.  Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Corporate Bonds, Preferred Securities, and Loans**
The Consolidated Entities may invest in corporate bonds, floating rate syndicated bank loans, and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities). Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominantly speculative with respect to the issuer's capacity to pay interest and repay principal. They are also subject to greater risks than securities with higher ratings in the case of deterioration of general economic conditions. Because of these greater risks associated with the lower-rated securities, the yields and prices of such securities may be more volatile than those for higher-rated securities. The market for lower-rated securities is thinner and less active than that for higher-rated securities, which could adversely affect the prices at which these securities may be sold by the Consolidated Entities.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2018, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**
The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

24

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Leverage Risk**
The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations.  The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject.  The use of margin and short-term borrowings creates several risks for the Consolidated Entities.  If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required.  If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses.  In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities.  In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements.  As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets.  The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies.  Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar.  The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2018, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**
The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business.  The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities.  Refer to Note 14 for a discussion of open litigation.

25

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

7.    **Intangible Assets**

On May 12, 2017, HCM Latin America, as manager, purchased all rights and obligations for management of a certain hedge fund. As of December 31, 2018, the current carrying value of these rights and obligations is $3.0 million, which consists of the original purchase price of $2.0 million and a deferred purchase price of $1.0 million and is reflected in the Consolidated Balance Sheet.

The Partnership and its Consolidated Entities perform an impairment test as required by U.S. GAAP on a yearly basis. The Partnership has determined that an impairment charge was necessary for the value obtained on December 19, 2017, for subadvisory and shared servicing rights from an affiliate. As of December 31, 2018, the asset was determined to be fully impaired and an impairment expense of $2.8 million is reflected in the Consolidated Statement of Income.

8.    **Related Party Transactions**

**Investments Under Common Control**
Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2018, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 296,695 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 59,539 |
| OmniMax International, Inc. | Term Loan | 52,464 |
| JHT Holdings Inc. | Common Stock | 25,099 |
| OmniMax International, Inc. | Common Equity | 7,804 |
| Carey International, Inc. | Term Loan | 5,401 |
| CCS Medical, Inc. | Loan | 5,960 |
| Trussway Holdings, LLC | Common Equity | 4,582 |
| JHT Holdings Inc. | Term Loan | 4,160 |
| OmniMax International, Inc. | Warrants | 551 |

26

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2018, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---:|
| Harko, LLC | LLC Units | $ 2,721 |
| Highland CLO Funding | Partnership Interest | 610 |
| Highland Energy MLP Fund | Mutual Fund Shares | 1,363 |
| Highland Floating Rate Opportunities Fund | Closed-end mutual fund shares | 832 |
| Highland Global Allocation Fund | Mutual Fund Shares | 2,173 |
| Highland Long/Short Equity Fund | Mutual Fund Shares | 267 |
| Highland Long/Short Healthcare Fund | Mutual Fund Shares | 2,963 |
| Highland Master Loan Fund | Limited Partnership interest | 106 |
| Highland Merger Arbitrage Fund | Mutual Fund Shares | 1,321 |
| Highland Opportunistic Credit Fund | Mutual Fund Shares | 5,477 |
| Highland Premier Growth Equity Fund | Mutual Fund Shares | 64 |
| Highland Small Cap Equity Fund | Mutual Fund Shares | 465 |
| NexPoint Strategic Opportunities Fund | Mutual Fund Shares | 36,563 |
| NexPoint Multi Family Capital Trust | REIT | 10,881 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | 1,454 |
| NexPoint Residential Trust | REIT | 85,223 |

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2018, approximately $6.4 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

**Accounts Held with Related Party**
During the year the Partnership and its Consolidated Entities maintained bank accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2018, balances in these accounts were approximately $0.5 million, a portion of which exceeds Federal deposit insurance limits.

**Investment in Affiliated Loans**
During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $10.4 million and is included in interest and investment income in the Consolidated Statement of Income. At December 31, 2018, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $83.3 million and $56.5 million, respectively.

27

D-CNL000240

Appx. 00770

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Notes and Other Amounts Due from Affiliates**

During the year ended December 31, 2018, Highland Capital Management Fund Advisors, L.P. ("HCMFA") did not issue any new promissory notes to the Partnership. The outstanding promissory notes accrue interest at a rate ranging from of 1.97 - 2.62%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $5.3 million and is payable on demand. The Partnership will not demand payment on amounts owed that exceed HCMFA's excess cash availability prior to May 31, 2021. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, NexPoint Advisors, L.P. ("NPA") did not issue any new promissory notes to the Partnership. The outstanding promissory note accrues interest at a rate of 6.0%. As of December 31, 2018 total interest and principal due on the outstanding promissory note was approximately $28.6 million and is payable in annual installments throughout the term of the loan. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, HCRE Partners, LLC ("HCRE") issued a promissory note to the Partnership in the amount of $0.8 million. The note accrues interest at a rate of 8.0%. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $9.4 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $0.4 million. All outstanding promissory notes accrue interest at a rate ranging from 2.75% – 3.05%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $14.0 million and is generally payable in annual installments throughout the term of the notes. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, James Dondero ("Dondero") issued promissory notes to the Partnership in the aggregate amount of $14.9 million. The outstanding promissory notes accrue interest at a rate ranging from 2.03% – 2.95%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $29.2 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Mark Okada ("Okada") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

During the year ended December 31, 2018, The Dugaboy Investment Trust ("Dugaboy") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 3.26%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $20.1 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust. Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership. The Note Receivable will mature on December 21, 2030. The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. During the year, the trust pre-paid $2.1 million. As of December 31, 2018 total interest and principal due on the Note Receivable was approximately $60.2 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. Separately, the Partnership pays for, and seeks reimbursement for, various operating expenses on behalf of Highland New York. For the year ended December 31, 2018, total marketing fee expense charged to the Partnership by Highland New York was approximately $0.9 million. Because the Partnership funded Highland New York's operations, including amounts above the marketing fee, as of December 31, 2018, net amounts owed to the Partnership by Highland New York was approximately $4.9 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to HCMFA was approximately $2.7 million and as of December 31, 2018, amount owed to the Partnership by HCMFA was approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2018, no amounts were owed to the Partnership by Falcon for services rendered.

HIGHLY CONFIDENTIAL

D-CNL000242

**Appx. 00772**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective March 17, 2017, pursuant to the Third Amended and Restated Sub-Advisory Agreement and the Fourth Amended and Restated Shared Services Agreement, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $2.6 million and $3.4 million, respectively. As of December 31, 2018, amount owed to the Partnership by Acis was approximately $6.0 million. Although such fees were earned in 2018, all related revenues and receivables recorded by the Partnership have been fully reserved against based on estimated collectability.

Effective January 1, 2018, pursuant to the Third Amended and Restated Shared Services Agreement, the Partnership commenced performing services on behalf of NPA. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexPoint was approximately $2.0 million and as of December 31, 2018, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Shared Services Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2018, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Investment Advisory Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank was approximately $3.6 million and as of December 31, 2018, amounts owed by NexBank to the Partnership for services rendered were approximately $0.9 million.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2018, the total fee charged to NREA by the Partnership was approximately $1.0 million and as of December 31, 2018, no amounts were owed by NREA to the Partnership for services rendered.

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with HCMFA. Under the Agreement, HCMFA reimburses the Partnership for the cost of any dual employees of the Partnership and HCMFA and who provide advice to registered investment companies advised by HCMFA. For the year ended December 31, 2018, the total fees charged by the Partnership to HCMFA was approximately $6.2 million and as of December 31, 2018, no amounts were owed by HCMFA to the Partnership for services rendered.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with NPA. Under the Agreement, NPA reimburses the Partnership for the cost of any dual employees of the Partnership and NPA and who provide advice to registered investment companies advised by NPA. For the year ended December 31, 2018, the total fees charged by the Partnership to NPA was approximately $4.3 million and as of December 31, 2018, no amounts were owed by NPA to the Partnership for services rendered.

**Investment liability**
On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. As of December 31, 2018, the fair value of the participated investments was $12.1 million.

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2018 the remaining principal payable on the promissory notes was $14.8 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

During 2014 and 2015, Select received multiple master securities loan agreements (the "Securities Agreements") for securities borrowed from an affiliate. The Securities Agreements accrue interest at a rate ranging from 0.38 - 0.48%, the short term Applicable Federal Rate. The fair value of the securities loans will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreements. As of December 31, 2018, the fair value of the loans was $19.2 million. The fair value of Select's securities loans approximates the carrying value of the securities loans.

9.    **Notes Payable**

**Promissory Notes and Loan Agreements**
On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank ("Frontier") in the amount of $9.5 million. Pursuant to the First Amended and Restated Loan Agreement, dated March 29, 2018, Frontier made an additional loan to the Partnership in the amount of $1.0 million. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc and will mature on August 17, 2021. As of December 31, 2018 the remaining principal payable on the promissory note was $7.2 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2018 the remaining principal payable on the promissory note was $1.0 million.  The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

31

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership is required to make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note is set to mature on May 31, 2020.  The promissory note accrues interest at a rate of 3.00% per annum. Pursuant to an Assignment and Transfer Agreement dated November 3, 2017, between Acis and an affiliate of the Partnership, Acis transferred the promissory note to the affiliate. As of December 31, 2018 the remaining principal payable on the promissory note was $9.5 million.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on August 29, 2019. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2018 the remaining principal payable on the promissory note was $3.4 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

On May 1, 2018, Multi Strategy Master executed a loan agreement (the "Loan Agreement") with NexBank SSB, an affiliate of the Partnership.  The original principal borrowed under the Loan Agreement was $36.5 million.  The loan bears interest at the 1-month LIBOR rate plus 3.25%.  The maturity date is May 1, 2021.  For the year ended December 31, 2018, the Multi Strategy Master incurred and paid approximately $1.3 million of interest expense, and made aggregate principal payments of approximately $1.9 million.  Shares of Metro-Goldwyn Mayer, Inc. are pledged as collateral on the loan.  The loan was used to purchase an outstanding redemption of $38.7 million at a discount resulting in a reallocation of partners' capital on the Statement of Changes in Partners' Capital. As of December 31, 2018 the remaining principal payable on the loan was $34.6 million. The fair value of Multi Strategy Master's outstanding loan approximates the carrying value of the loan.

**10.    Due to Broker**

As of December 31, 2018 the due to broker balance of approximately $116.6 million is payable to financing counterparties for margin transactions.

**11.    Commitments and Contingencies**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss.   The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant. Also refer to Note 8 for commitments of certain subsidiaries in affiliated loans.

**Loans as Co-Borrower**
The Partnership is a named co-borrower in a Bridge Loan Agreement ("Loan") dated September 26, 2018 with Key Bank for $556.3 million. The Loan accrues interest at the 3 month LIBOR rate plus 3.75%, per annum. Accrued interest shall be paid monthly by a borrower other than the Partnership ("Lead Borrower"). The Loan will mature on September 26, 2019. The carrying value of the Loan is reflected on the financial statements of the Lead Borrower.

32

Case 21-03003-sgj    Doc 135-1    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1 Filed 09/27/24    Page 193 of 199    PageID 22011
Appendix Part 9 of 9, Page 193 of 836

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity.  See Note 14.

**Operating Leases**
The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or non-cancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

**Years Ending December 31,**

| | |
|---|---:|
| 2019 | 1,550 |
| 2020 | 1,566 |
| 2021 | 1,567 |
| 2022 | 522 |
| Total | $ 5,205 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2018.

**12.    Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements.  The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals.  A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2018 expense reflects a service cost charge for the value of the new participant's benefit earned during 2018.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2018 are reconciled in the tables below.

33

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

*(in thousands)*

| Change in projected benefit obligation | | 2018 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,578 |
| Service cost | | 6 |
| Interest cost | | 80 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 386 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (121) |
| Benefit obligation at end of year | $ | 2,929 |

| Change in plan assets | | 2018 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,924 |
| Actual return on plan assets | | 449 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (121) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,252 |

| Reconciliation of Funded Status | | 2018 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,929 |
| Projected benefit obligation at end of year | | 2,929 |
| Fair value of assets at end of year | | 3,252 |
| Funded status at end of year | $ | 323 |

The Partnership did not contribute to the plan during 2018.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2018:

| Discount rate | 3.19% |
|---|---|
| Rate of compensation increase | N/A |

34

### Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Expected long-term return on plan assets | 3.19% |
| Rate of compensation increase | N/A |

As of December 31, 2018, there were no plan assets categorized as Level 3.

**13.   Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2018, a minimal withholding tax liability of $0.9 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Offshore**
Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

36

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. As of December 31, 2018, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

37

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

14.    **Legal Proceedings**

The Partnership and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents.  On February 19, 2010, the court dismissed all claims against the Partnership. UBS since has filed additional claims against the Partnership and certain additional investment vehicles.  On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against the Partnership, severely limiting the remaining two claims.  Additional claims were dismissed in a further appellate ruling issued on October 31, 2017.  Certain claims were tried in July 2018 against two Highland-affiliated defendants, but the trial court has neither ruled on those claims nor indicated when it will set UBS's remaining claims for trial.  The second trial, if it occurs, will try all claims against the Partnership and certain affiliated investment vehicles.

From time to time the Partnership is party to disputes with disgruntled former employees.  One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions.  The former employee obtained a $7.9 million judgment against Highland affiliate Acis Capital Management, L.P. ("Acis").  The employee currently is attempting to collect this judgment through various proceedings in Texas state and federal court, including claims against Highland for receipt of assets from Acis.

In another matter, a Court ruled that a former employee breached his fiduciary duty to the Partnership, owed damages to the Partnership, and ordered the former employee to cease using or disclosing the Partnership's confidential information.  Additionally, an award was entered in favor of the employee against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested.  The dispute over the amount of his vested interest is on-going.  Additionally, the Partnership from time to time must take action to enforce the permanent injunction against the former employee's continuing improper disclosures of the Partnership's confidential information.

The Partnership is engaged in litigation and arbitration with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Crusader hedge fund vehicle.

The Partnership currently is and has been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. We currently do not anticipate these proceedings will have a material negative impact to the Partnership.

15.    **Subsequent Events**

On March 18, 2019, SSP Holdings, LLC issued a promissory note to the Partnership in the amount of $2.0 million. The note accrues interest at a rate of 18%.

On March 26, 2019, Trussway Holdings, LLC issued a promissory note to the Partnership in the amount of $1.0 million. The note accrues interest at a rate of 10%.

38

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On March 28, 2019, the Partnership distributed equity to its partners in the aggregate amount of $3.7 million.

On March 28, 2019, the Partnership received a $3.7 million pay down on the outstanding Contribution Agreement.

Over the course of 2019, through the report date, HCMFA issued promissory notes to the Partnership in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%.

The Partnership has performed an evaluation of subsequent events through June 3, 2019, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000252
**Appx. 00782**