Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-12    Filed 01/06/24    Page 1 of 200    PageID 22816
Appendix 04132

Index: gain..make

**gain** 42:22

**Garcia** 42:2,3 56:2

**Garcia's** 42:14

**gave** 78:24

**general** 19:23,24 21:10 44:3 49:9 53:21 65:4,5 82:7,11 87:3

**generally** 8:22,24 9:10,16,18,25 15:23 16:5 22:2 23:10 49:17 87:3 89:11

**give** 6:10 15:21 22:22 50:12 57:20 59:7

**good** 5:8 62:7

**governed** 9:3 86:14 88:16,17

**greatly** 93:16

**ground** 7:19

**group** 6:16

**guess** 20:24 76:18, 24 84:25

**H**

**half** 31:12 63:5

**happen** 59:25

**happened** 78:24

**hard** 30:12 76:19

**HCMLP** 42:21

**HCMSI** 45:19,21 46:4,5 62:24 63:3,25

**hear** 79:12

**hedge** 88:10

**Hendrix** 13:5 83:3,15

**high** 89:11

**Highland** 6:3,24 7:5, 8,10,11 10:2,13 11:8 12:6,9,17 13:12 14:4, 14,22 15:13 16:19,24 22:24 23:11,20,21 31:22 32:18 33:6,10 35:13 39:6 40:9 44:6 51:25 53:14,21 54:19

55:4 57:24 59:11,24 63:25 66:21 67:11,19 68:5,8,24 69:17 70:15 73:8,10,16,21 74:3 82:14,19,22 83:17 84:11,21 85:4 86:2,22

**Highland's** 30:23 31:3,8 32:3,20 33:4, 19,24 43:7 46:24 47:19 51:15 56:22 62:3

**Hilda** 42:2,3 85:10

**Hold** 69:7

**hope** 93:20

**I**

**idea** 36:10

**identified** 31:16

**impact** 79:23 91:23 92:5 93:9

**important** 7:20 28:5 86:12

**inaccurate** 37:7

**inaudible** 38:25

**include** 54:22

**included** 22:16 36:17,18 40:17 52:24

**including** 13:15 21:3 65:20

**incorrect** 53:17

**independent** 48:19

**individual** 12:19 45:15 46:16,19 59:3

**individually** 62:19

**industry** 88:22

**influence** 89:17

**inform** 70:22 71:5, 11,17,23 72:8,14,19, 24 73:10,16,21 74:3

**information** 10:19 12:5,9 13:18,22 14:3, 6,9,18 23:5 35:14 36:2 40:8,9 43:18,19

45:2 52:12 54:17,18 57:25 59:10 64:18 65:9,23 74:12 77:16 92:21 93:2

**informational** 11:8

**informed** 40:24 55:4 68:3,5 70:5,15 93:7

**inquiry** 64:12,25 65:5,18

**instance** 56:2 78:3,5 85:9

**insurance** 9:13

**integral** 34:8

**intended** 35:19 40:3 43:13 51:23 52:16 54:13

**intent** 44:16 57:7

**interest** 38:21 39:9 61:10 63:3 64:4 65:13,14 67:5,13 89:20

**internal** 49:11

**interrupt** 47:3 61:23

**involved** 65:15 83:21 85:10

**issue** 59:16 81:16

**issued** 40:13,22 48:19,23 54:3 58:18 63:18,19

**item** 36:18 42:20 52:25 62:12 85:13

**items** 22:12,17 23:6 79:7

**J**

**James** 19:8

**January** 5:21,24 6:14,17 67:17 68:6

**John** 30:12,17 55:17 77:2 93:18

**join** 6:16

**joined** 6:13,14

**June** 17:23 19:15

21:14 24:18,20,24 25:3 37:3 48:5 49:2 54:3,22 63:18 69:22, 25 71:6,12,18,24 72:9,15,20,25 73:11, 17,22 74:4,9,19 75:9, 21 76:5 79:2

**junior** 83:9

**K**

**key** 89:18

**kind** 57:5

**Klos** 12:25 13:2 83:6, 13,15

**knowing** 80:14

**knowledge** 21:12 29:8 53:13,18 54:21 66:16,21 71:4,10,16, 22 72:7,13,18,23 73:9,14,15,19,20,25 74:2,8

**Kristin** 13:5 83:2,10

**L**

**L.P.** 6:4,25 7:9,11 23:22 31:22

**La** 21:6

**label** 18:5,8

**lack** 13:5 75:17

**language** 78:13

**layout** 42:19

**lead** 30:21 31:2

**leads** 10:24

**learn** 79:22

**learned** 74:9,19 75:9, 21 76:4 77:13 78:6, 20,21 91:16

**leave** 55:12

**ledger** 44:3

**left** 63:9,24

**legal** 60:11 61:21 69:11,14

**legends** 46:17

**lenders** 87:6

**length** 65:8,11

**letter** 16:23 17:13,24 19:13,19,25 20:2,14, 21 21:8 22:16 23:7 48:9,18 50:24

**letters** 16:19 17:4,8, 18

**level** 25:14 89:11

**liability** 64:14

**limit** 77:6

**limitations** 50:8

**limited** 19:23

**link** 46:15

**list** 31:13 43:13

**listed** 61:11

**listing** 44:2

**lists** 68:22 69:16

**litigation** 81:16

**loan** 38:20 60:15 64:9 66:25 67:2 79:24

**loaned** 23:11 64:13

**loans** 45:18 64:7,8, 19 65:2,7,10,19,25 66:5,11,16,23

**long** 10:6

**look-through** 59:4

**looked** 36:19 40:18 48:9 52:25 57:5

**M**

**made** 20:21 21:2 29:18 33:10 44:5 59:24 64:19 65:5 66:5,11,22 67:2,4 68:23 81:17 92:19

**Madeline** 56:3 85:10

**make** 10:18 12:5 13:21 14:13 17:10 18:4,24 64:12,25 65:18 67:10 73:7

86:23 88:19,24

**maker** 46:19 57:22 59:23

**maker's** 57:25

**makers** 23:19 24:12 44:21 58:7 59:11 61:11

**makes** 42:19 45:15 62:18

**management** 6:3,24 7:9,11 14:9 16:23 17:3,7,10,18,23 19:13,21 20:4,13 21:17 22:15,22 23:22 25:16,17 26:7,18 27:5 28:10,19,21 31:22 36:25 37:2,4 40:11 43:21 45:3,5 48:9,18 52:13 53:6,8 60:9,18 66:8,19 80:12 89:18

**management's** 49:3

**manager** 85:7

**managers** 83:13

**March** 63:20

**mark** 55:10

**marked** 17:22,25 30:6 41:4 43:10 44:9 46:17 47:8 55:9

**marking** 47:4

**material** 22:3,13,17, 23 23:6 25:23 26:8, 20,24 27:6,21 28:8 34:25 40:6,23 50:2,3 54:13,23 55:5 61:21 62:20 75:3,4,5 80:25 87:10,25 88:20 89:17

**materiality** 22:21 23:2 25:14 42:24 74:15 80:10 81:13 87:24 88:7 92:6,7

**materially** 57:22

**math** 33:21

**matter** 83:8,11

**means** 25:11 26:15 28:18 29:14,15 38:5, 6 46:2

**meet** 25:14

**meetings** 83:11

**meets** 32:4

**met** 67:23 68:12

**metrics** 88:9

**Michael** 55:12 88:13

**Michael's** 35:24

**middle** 22:7

**million** 40:14 63:5,7, 25 67:2,10 74:22 75:12,23 76:7

**mind** 30:24 62:6 79:6

**mindful** 7:20

**minus** 38:21

**misstatements** 25:13,16 50:2

**moment** 27:14

**money** 23:11

**morning** 5:8

**morphed** 13:23

**Morris** 5:7 18:6 21:6 30:17 47:6 55:11,18 69:6 76:14 77:13 79:10,19 80:18 81:7, 21 85:21 86:4 87:12 89:10 90:6,13 91:5,9 92:16 93:13,16

**Morris'** 78:12 79:4 84:7

**move** 30:3

**mutual** 88:10

---

## N

**national** 50:22

**nature** 83:2

**necessarily** 27:3

**needed** 13:19 88:24

**neutrality** 25:19 88:3

**non-affiliated** 90:11

**non-related-party** 90:3

**noon** 76:22

**note** 34:22 35:7,15, 19 36:13 39:3,6,25 51:18 52:8,15,19 54:6,9,10,18,22 55:6 60:8,9,11 63:8,13,17, 24 67:9,13 70:7 77:4 78:2,3 85:14 90:18, 21

**notes** 15:6,12,17 23:13,15,16,20 24:7, 11,23 25:3 31:16,23, 25 32:9,13,19 33:11, 17,23 34:7 35:8 36:3, 9,20 37:8,15,16 38:2, 6,7 39:7,10,19 40:12, 13,22 41:8 43:14 44:22 45:12,15 46:5, 19 51:5,9,13,23 52:9 53:2,16,22,24 54:5, 12 55:22 57:6,20 58:10,11,17 59:8,12, 24 60:19 63:4,6 65:12,17 67:22 68:11,22 69:3,18,21, 25 70:10,16,24 71:6, 12,18,25 72:9,15,20 73:2,11,17,22 74:5, 10,20 75:10,22,23 76:5 78:7 79:8 80:8 81:16,18 84:11 85:5 86:2 89:23 90:2,3,4, 10,12 91:2,18 92:10, 20 93:4,10

**nuances** 88:2

**number** 24:4,6,22 25:8,10,21 26:10,14 27:10,19 28:14,22 45:12,18 51:18 66:25 67:9,14 68:16

---

## O

**objecting** 61:23

**objection** 14:19 15:25 16:16 23:8 24:14 25:24 26:12 32:22 33:14 35:16, 21,24 36:4 37:9 39:11 45:4 46:12 53:11 54:7 57:9 60:3, 21 64:16,22 65:3 66:2,17 67:24 68:13

69:5,7,8 70:3,18 71:2,8,14,20 72:3,11 73:4,13,24 74:13,25 75:15 76:2,11 79:10, 19 80:18 81:7,21 85:21 86:4 87:12 90:6,13 91:5,8 92:24 93:11

**obligation** 67:21 70:22 88:3

**obligations** 23:19 35:19 40:17 52:16 59:13,23 64:21 68:10 71:24 72:25 74:4

**obtain** 13:18,22 58:20 62:18

**obtained** 61:13

**occur** 80:24 81:6,20, 25 92:3

**occurred** 29:16 40:6 78:25 79:7 80:23

**occurring** 22:4

**October** 11:22 64:2

**office** 50:22

**omitted** 55:6

**one-** 14:25

**opinion** 9:6 14:25 22:5 29:17 44:24,25 49:8,20,21 50:13,14, 17,20,24 54:3 59:17, 20 86:21

**opportunity** 15:15 17:9

**oral** 67:18 68:7 69:2, 20,24 70:6

**order** 15:21 16:13 17:14 18:21 30:10 66:12 91:25

**ordinary** 20:6 43:2,6 56:17,21

**ourself** 44:17

**outlines** 10:9

**outstanding** 37:14 43:15 74:21 75:11,22 76:6

**oversee** 47:10,18

**overseeing** 42:14

**overseen** 6:2

**owed** 52:17 62:4

**owes** 69:17

**owing** 36:14,23 52:20 53:9,15 68:11

**ownership** 28:10 89:19

---

## P

**P-A-C-O-C-H-A** 56:6

**Pacocha** 56:4

**pages** 15:11

**paid** 63:25

**paragraph** 20:9 22:8 37:11,22,23,25 38:2

**part** 10:16 13:14 17:2 26:6 34:8 56:8 57:13 59:19 62:13 81:23 83:17 86:6,20 88:21

**parties** 27:21 28:20 51:25 65:14

**partly** 45:5

**partner** 5:18,19,22 6:8 7:4 12:16 19:23, 24 49:9 50:17,18 87:3

**partners** 87:4

**partnership** 40:13 87:2

**partnership's** 37:14

**party** 19:21 23:16,19 24:7,11,23 28:6,7,25 34:19,23 59:6 89:16 90:8

**patience** 93:17

**pay** 44:23 57:7,13 58:2,8 60:13 66:6,12 67:12,13,21 68:10

**payment** 67:4,10

**payments** 38:21 51:8 58:10 64:10

66:6

**PCAOB** 86:16 87:21 88:4,18 89:2,4

**Peet** 5:3,10

**people** 13:10,16 19:18 82:14,18,23 83:9 84:4

**percent** 33:24 51:14 78:17,18

**perform** 10:10 11:13 50:6,9 86:18 87:20

**performed** 9:16 42:22 88:17

**period** 11:16 40:19 46:25 47:12,19

**periodic** 83:11

**person** 83:4 85:9

**personal** 17:2

**personally** 6:23 16:22 30:21 31:2 50:23

**perspective** 8:17 17:6 26:16 28:18 29:14

**pertains** 41:7

**phase** 11:6,10,11,14 13:13,15 49 48:18

**phases** 12:18

**phrase** 11:5 41:16

**piece** 46:4

**place** 79:17

**planning** 10:7,11 11:9,10,12,18,23 12:4,18

**plural** 37:13

**point** 50:9 76:25 79:9 87:25

**points** 13:3

**portion** 30:9 32:10 35:18 39:3,6 52:15 54:5 64:3,4 67:11,12

**portions** 18:20

**possibility** 93:3

**potential** 26:5 80:7, 11 81:12,24 85:5 92:4,9

**potentially** 74:14 81:19 84:12 86:3 88:24 91:3,18

**practice** 9:19 21:17

**practices** 9:21

**preparation** 31:8 43:7 45:18 46:2,3 47:10,14,24

**prepare** 13:19 14:10 42:25 43:5 47:15

**prepared** 33:6 35:13 41:13,18,22,24,25 55:25 56:3,17,21

**prepares** 20:5

**presented** 9:18

**pretty** 10:6 82:11

**previous** 87:23

**Previously** 14:4

**Price** 13:11

**Pricewaterhouse opers** 5:15,17,20,23 6:7 13:18 14:8,17

**Pricewaterhouse opers'** 6:19 8:16

**primary** 12:17,20 13:3

**principal** 39:9 61:10 63:3 64:3 67:5,12 74:21 75:11,22 76:6

**principle** 29:21

**prior** 6:7 14:23 22:4,5 37:3,5 51:8,10 71:5, 11,17,23 72:8,14,19, 24 73:11,17,22 74:4

**private** 88:13,14

**probability** 80:11 81:6 92:2,4

**problem** 77:4,6

**procedure** 42:21

**procedures** 9:15 10:10 11:12 50:7 86:17

**process** 9:25 10:4,6, 14,23 31:7 47:23 49:12,16 50:15,22 56:10,12 58:6 59:25 86:6

**produce** 44:3

**produced** 18:3

**professional** 9:5 50:10 81:23

**promissory** 23:13, 15 39:7 40:13 63:4,6, 8,12,13,17 67:22 68:11 69:3,18,21,25 70:6 81:15 93:4,10

**promulgated** 87:21

**properly** 27:22

**provide** 8:18 9:8 14:9,21 15:9 16:13 23:5 51:24 57:24 59:7

**provided** 16:24 19:14 40:9 45:2 52:12 54:19 59:10 65:24 79:14

**providers** 89:22

**proxy** 38:10,24

**public** 58:14,15,19, 22 86:15,16 88:13

**pull** 48:10

**purpose** 8:17 9:8 17:7 36:7 42:16,18 44:12,14 59:5 62:8, 11 65:2,19,25 80:20

**purposes** 12:17 13:11 23:18

**put** 17:21 18:15,22 25:14 30:4 41:5

**Pwc** 6:13 9:25 10:23 12:5,9 14:10,13,21 15:13,15,19,20 16:12,18,24 17:14,17 19:14 20:5 21:17,23 23:4 25:20 26:2,9,24 27:7,9,25 29:3,23

33:16 37:2,4 39:18 40:23 42:4,25 43:5, 19 44:6,20,25 46:8, 11 47:12 49:11 53:15 54:2 55:4 56:12 57:5 58:6,15 59:10,11,15, 22 61:18,25 64:12, 18,25 65:18 66:4 68:2,4 69:24 70:14, 22 71:5,11,17,23 72:8,14,19,24 73:10, 16,21 74:3,9,11,19, 22 75:9,12,20,24 76:4,9 77:15 78:6,7 79:15 80:2,6 81:17 82:15 83:17 84:4,9, 21 85:3,25 86:7,23 87:10,19 90:10,25 91:16,19 92:9,19 93:2,7

**PWC's** 12:10 17:6 22:25 24:9 26:15 28:17 29:13 30:21 31:2 37:5 41:6 47:18 54:21 55:21 56:17,21 65:24 88:21

**Q**

**qualitative** 57:19

**question** 7:24 8:11 16:11 18:23 30:11,25 33:17 35:23 44:18 45:20,22 47:17 60:8 62:6,13 69:15 70:23 74:16 76:19 78:9,23 79:11,20 80:19 81:8, 22 83:2 84:25 85:22 87:13,24 90:7,14 91:2,6,13

**questions** 7:21 15:20 16:12 18:17 24:2 56:25 72:5 73:7 75:20 76:15 77:10, 12,14 78:4,5,12 79:4 82:7,9,12 84:7,9 90:23 92:14 93:14

**quickly** 55:12

**quote** 34:7,9 37:13 89:14

**R**

**raise** 14:5

**rate** 65:13,14

**reach** 62:2

**read** 27:13 29:11 63:15

**reader** 34:13 80:21

**reading** 34:13

**reason** 33:16 39:18 54:4

**reasonable** 8:18 9:9 15:21 16:14 22:19 32:16 38:10,14,24 50:5 57:20 59:7 65:7, 10,13

**reasonableness** 61:19,20

**reasons** 75:16

**recall** 6:25 12:15,20 23:3 31:6 47:22 48:10 65:9 66:8,24 83:22

**receivable** 37:15,16 44:15 53:24 68:23

**receivables** 23:20, 21 32:13

**receive** 16:18

**recollection** 18:22

**record** 5:9 18:5 33:11 43:23 77:3

**recorded** 26:22 38:8 60:15 62:17

**recoverability** 32:17 57:16

**recoverable** 59:8 60:10,19

**refer** 7:10

**reference** 20:10 34:6

**referenced** 46:16

**referred** 70:10

**referring** 8:21 79:6

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 78-12   Filed 05/04/22   Page 4 of 200   PageID 22819
Appendix at 22   Page 1689 of 1336

Index: reflect..steps

**reflect** 46:8,10

**reflected** 62:9

**refresh** 18:22

**related** 27:21 28:7, 20,24 34:19,23 51:25 57:12,25 64:20 65:12 84:2

**related-party** 35:2 51:19 89:7,12,13,16 90:2,4,12

**relates** 31:19 45:24 51:19 55:22 58:9

**relating** 83:25

**relationships** 35:2

**relevance** 87:15

**relevant** 10:9 15:21 45:17 46:13 78:3 87:9,17,19

**reliability** 62:3

**relied** 17:18 86:17

**relies** 86:14

**relieved** 67:21 68:9

**rely** 14:9 23:4 26:9 27:5,7,9 28:10 29:3, 23 59:15

**relying** 86:8,24 87:7, 9

**remember** 77:16,19 78:6,9 84:8,13 89:8

**remind** 30:8

**rep** 19:25

**repay** 44:19 57:23 58:17,23 59:12,23 60:8

**repeating** 30:24 62:6

**rephrase** 16:11

**report** 42:10 48:18 49:5,9 56:7 86:13

**reported** 27:22

**reporter** 8:5

**reports** 14:22,24 42:12

**represent** 22:22

**representation** 16:18,23 17:4,7,13, 18,24 19:13 20:5,14 22:16 24:3,6,22 25:8, 10,12,21 26:3,10,14, 25 27:9,12,19 28:2, 14,18,22 29:4,20,24 48:9,18 49:4

**representations** 17:10 20:20 21:2,13, 18,24 22:9 24:2,17 48:25

**represented** 24:10, 11 25:22 27:20 28:23 60:18

**representing** 26:19 27:7

**request** 14:5 18:19 26:2 27:25

**requests** 10:18 11:8 12:5 14:18

**require** 21:17,23 26:7 48:15,17 54:14 75:7

**required** 17:14 29:17,20 34:15 48:24 49:6 50:3 52:3 54:24 74:11,23 75:13,24 76:9 77:15,21 78:8 79:2,5,16

**requirement** 34:24

**requirements** 89:3

**requires** 40:7 49:7

**reserve** 77:7

**respect** 46:6 65:22 72:6 75:17 81:15 82:24 92:9

**response** 12:8 79:4

**responsibilities** 17:3

**responsibility** 15:9 71:3 81:24 91:10

**responsible** 19:21 42:13

**rest** 30:15 46:4

**restate** 47:16

**resulted** 78:22

**results** 45:7 60:14,23

**retain** 41:12

**review** 12:10 14:22 15:16 17:3 18:13,21 85:7,11 87:17

**reviewed** 46:3

**reviewing** 86:8,15 87:8

**rights** 77:7

**risk** 44:9,13 57:2,12

**road** 91:17

**room** 18:11

**routine** 83:8,10

**rules** 7:19 9:2,4 70:21 86:20 89:4

---

**S**

**save** 11:16

**scope** 17:11 50:8 86:18

**screen** 17:21 18:16 30:16 31:13 41:6

**scroll** 20:18,24 34:3 35:4 37:19 39:23 45:11 63:12 67:8

**section** 34:19 35:14 36:2,13 37:7 38:2 39:24 40:3,12 51:23 52:8,19 54:12,18 57:2 58:24

**secure** 13:24 14:5,6

**send** 11:8,9

**senior** 42:7,8

**sense** 10:18 19:22 22:23 86:19

**sentence** 21:10 24:22 29:7,14,24 37:12,22 38:5,6,23

**separate** 21:2

**September** 11:22

**series** 20:20

**service** 89:22

**set** 9:2 35:14 43:19 44:4,22 46:19 49:5 52:19 53:16 54:17 59:13,15 73:7

**sets** 36:13 86:19

**setting** 11:12

**share** 10:12,15

**sheet** 20:10,14 24:13 29:16 32:11,21 33:13,22 36:9,19 40:7,18 42:20 51:3 53:2 61:11 75:5,8

**sheets** 32:3 33:4,19

**show** 60:12 63:2

**shows** 33:22 60:7 63:23

**side** 77:2

**sign** 9:6 19:25

**sign-off** 17:14,19 49:13 59:5 85:12

**signature** 29:7 50:25

**signatures** 19:5,8

**signed** 14:25 19:18 29:4,25

**significant** 40:6 89:20

**signing** 26:10 27:10 37:5

**single** 10:16

**singular** 37:13

**sir** 30:19 37:24 43:11 69:15 76:15 92:17

**sister** 67:18 68:7

**site** 13:24,25 14:5,7, 13

**slide** 44:22

**slightly** 11:20

**sort** 9:4 12:21 13:6 26:4 58:21 77:5 81:17 90:24,25 91:19

**South** 6:15

**specific** 7:8 28:7 66:9,24 80:15 85:23 87:5

**specifically** 28:6 41:17 58:12 59:4 83:25

**speed** 82:8

**spell** 56:5

**spend** 11:16

**stage** 10:11 11:2,18 12:4

**stand-alone** 34:14

**standard** 20:7 21:16

**standards** 8:20,21, 23,25 9:5,11,17,20 10:9 15:24 16:6 22:3 26:7 27:2 48:23 86:16 87:22 88:18,19 89:2

**start** 10:25 77:11

**started** 7:18

**starting** 19:20 38:3

**starts** 10:6

**state** 5:8

**stated** 25:2 53:21

**statement** 45:16 87:9,17

**statements** 7:6 9:10 10:3 13:20 14:11 15:2,5,7,12,17,22 16:15 26:6,23 27:23 30:4,19,23 31:4,9 34:9,25 37:6 39:4 41:19 44:4 46:23,24 47:11,19 53:20 56:22 61:15 62:17 75:6 80:22 81:2 86:9,25 88:25

**stating** 38:23

**status** 83:11

**stems** 60:8

**step** 12:13

**steps** 58:6

**stop** 20:19 76:19,25

**straight** 35:4

**stream** 89:17

**strike** 36:8

**strongly** 18:18

**structure** 89:19

**stuff** 69:10 77:2

**subheading** 35:7

**subject** 51:8,9 84:22

**subparts** 21:4

**subsequent** 39:24 40:23 48:24 54:14,23 55:5 67:23 68:12 72:2 73:3 74:7 76:9 77:25 80:20

**summary** 25:15 43:25

**supposed** 10:10 11:13 38:7 40:5

**sworn** 5:4

**T**

**tab** 43:9,13,20 44:9 45:7,14 57:3,11 62:14,23 64:6 68:16, 21 70:10,16

**tabs** 45:17 46:13,15, 18

**taking** 8:5

**talked** 89:7 90:24

**talking** 41:17 69:10 77:22 78:16 82:2

**tax** 64:7,8,9,10,14,20 66:6

**taxes** 66:12

**team** 13:11 56:8

**technology** 18:25

**template** 20:8 45:8 60:23

**term** 38:19 90:5

**terms** 8:19 9:16,18 17:11 25:19 36:11

50:5 87:20

**test** 61:18 62:20

**testified** 5:4 57:4 84:19

**testify** 80:16

**testifying** 84:13

**testimony** 79:15

**testing** 61:5,25 62:8 65:16

**things** 28:24 49:25 77:14 82:8 86:7

**third-party** 87:6

**thought** 15:20

**ties** 45:16

**time** 6:7 7:6,20 8:7 11:7,17 12:15 13:24 14:23 30:8 37:3,5 39:17 55:13 56:25 70:7 76:19 77:5,9 79:9 93:17

**time-to-time** 23:11

**title** 5:16 32:13 42:6

**today** 77:6,8 79:15 80:16

**told** 66:4 77:5

**top** 19:12 21:7 25:9 31:12 45:11

**topics** 89:6

**total** 61:9

**totaling** 63:4

**track** 47:5

**transaction** 11:15 88:15 89:12 90:12

**transactions** 24:12 26:20 27:5,6,21 28:8, 25 34:19,23 35:2 51:19,24 89:7

**trial** 43:21,24 44:5 61:14

**two-page** 14:25

**type** 43:2 75:6

**typical** 14:17

**typically** 13:10 20:5 77:24

**U**

**unable** 59:23

**unaffiliated** 90:8

**uncorrected** 25:15 50:2

**understand** 8:4,11, 12 10:13 19:7,12 20:22 25:20 32:24 41:20 77:3

**understanding** 24:9 25:10 34:22 36:12 38:4 45:23 64:11 65:24 66:10 70:20 80:11

**understood** 78:23

**undertaken** 62:9

**undertaking** 46:8

**undertook** 9:25 58:7

**undue** 50:8

**unit** 6:19 11:3

**unqualified** 50:13, 20

**upload** 14:2,6

**upstream** 89:19

**users** 88:11

**V**

**vague** 69:9

**valuation** 79:23 91:23

**verbatim** 89:14

**versus** 90:12

**view** 26:8 87:25

**visits** 14:13,16

**W**

**WANDER** 9:12 16:2, 7 24:14 30:12 32:24

36:5 45:25 60:5 68:18 88:12 93:21

**Waterhouse** 13:4,11 19:9,15,17,20 21:3, 11 23:5 24:10,18 25:22 27:20 28:23 70:21 72:6,8,14,19, 24 83:7,16

**Wilson** 83:4,15

**withdrawn** 27:8 32:7 35:12 37:3 39:4,14, 16 46:9 53:6 55:2 56:11 61:2,8 68:3

**word** 8:5 13:6

**words** 26:18 38:20 46:14 50:4,7 86:15

**work** 11:15 42:14 44:7 60:14 77:2 78:22 81:24 82:24 85:14 87:19 88:21

**worked** 82:14 84:4

**working** 6:24

**workpaper** 41:11 43:6

**workpapers** 10:15 41:2,6 42:25 55:8,21 56:14 58:25 59:19 68:17,22

**written** 69:2,20,24 70:6

**wrong** 25:23 53:17

**Y**

**year** 10:23 11:20,24 16:24 20:15 21:9,19 41:19 43:16 51:10 52:21 82:10

**year-end** 22:4

**years** 6:20 13:23 51:8 82:9 85:19

# EXHIBIT 95

1

2      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS

3           DALLAS DIVISION
  IN RE:        )

4           ) CHAPTER 11
  HIGHLAND CAPITAL     )

5  MANAGEMENT, L.P.,    ) CASE NO.
          ) 19-34054-sgj11

6      Debtor.    )

7  _____ )

  HIGHLAND CAPITAL     )

8  MANAGEMENT, L.P.,    )
          ) Adversary Proceeding

9      Plaintiff,   ) No. 20-3190-sgj11
          )

10  v.        )
          )

11  JAMES D. DONDERO,    )
          )

12      Defendant.   )

13  _____ )

14     REMOTE VIDEO-RECORDED DEPOSITION OF

15        JAMES D. DONDERO

16      TUESDAY, JANUARY 5, 2021

17

18

19

20

21

22

23  REPORTED BY:

24  MICHAEL E. MILLER, FAPR, RDR, CRR

25  JOB NO. 188154

Page 2

1
2
3
4
5              Tuesday, January 5, 2021
6              9:50 a.m. CST
7
8
9        REMOTE ORAL VIDEO-RECORDED DEPOSITION
10  OF JAMES D. DONDERO, held via Zoom conference
11  pursuant to the Federal Rules of Civil Procedure
12  before Michael E. Miller, Fellow of the Academy
13  of Professional Reporters, Registered Diplomate
14  Reporter, Certified Realtime Reporter and Notary
15  Public in and for the State of Texas.
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  REMOTE APPEARANCES:
3    PACHULSKI STANG ZIEHL & JONES
4    Attorneys for Debtor
5    780 Third Avenue
6    New York, NY 10017
7  BY:    JOHN MORRIS, ESQ.
8        HAYLEY WINOGRAD, ESQ.
9        JEFFREY POMERANTZ, ESQ.
10       GREGORY DEMO, ESQ.
11       IRA KHARASCH, ESQ.
12
13  LATHAM & WATKINS
14  Attorney For UBS
15  885 Third Avenue
16  New York, NY 10022
17  BY:    SHANNON MCLAUGHLIN, ESQ.
18       ZACHARY PROULX, ESQ.
19
20  JENNER & BLOCK
21  Attorney for Redeemer Committee
22  353 North Clark Street
23  Chicago, IL 60654
24  BY:    TERRI MASCHERIN, ESQ.
25

Page 4

1
2  REMOTE APPEARANCES:
3  SIDLEY AUSTIN
4  Attorneys For the Creditors Committee
5  2021 McKinney Avenue
6  Dallas, TX 75201
7  BY:    PENNY REID, ESQ.
8        PAIGE MONTGOMERY, ESQ.
9        MATTHEW CLEMENTE, ESQ.
10       ALYSSA RUSSELL, ESQ.
11
12  KING & SPALDING
13  Attorney for Highland CLO Funding, Ltd.
14  500 West 2nd Street
15  Austin, TX 78701
16  BY:    REBECCA MATSUMURA, ESQ.
17
18  BONDS ELLIS EPPICH SCHAFER JONES
19  Attorneys for James Dondero
20  420 Throckmorton Street
21  Fort Worth, TX 76102
22  BY:    JOHN BONDS, ESQ.
23        BRYAN ASSINK, ESQ.
24
25

Page 5

1
2  REMOTE APPEARANCES:
3  DEBEVOISE & PLIMPTON
4  Attorneys for HarbourVest Partners
5  919 Third Avenue
6  New York, NY 10022
7  BY:    ERICA WEISGERBER, ESQ.
8
9  CARLYON CICA CHARTERED
10  Attorneys for Integrated Financial
11  Associates Inc.
12  265 East Warm Springs Road
13  Las Vegas, NV 89119
14  BY:    CANDACE CARLYON, ESQ.
15
16  ALSO PRESENT:
17  La Asia Canty, Paralegal
18  Pachulski Stang Ziehl & Jones LLP
19
20  VIDEOGRAPHER:
21  Rick Richey, TSG Reporting Inc.
22
23
24
25

Page 6

1
2          ———
3      P R O C E E D I N G S
4      January 5, 2021, 9:50 a.m. CST
5
6      THE VIDEOGRAPHER:  Good morning,
7  ladies and gentlemen.  My name is Rick Richey.
8  I'm a legal videographer in association with
9  TSG Reporting Inc.
10      Due to the severity of the COVID-19
11  and following the practice of social distancing,
12  I will not be in the same room with the witness.
13  Instead, I will record this videotaped deposition
14  remotely.
15      The court reporter, Mike Miller, also
16  will not be in the same room and will swear the
17  witness remotely.
18      Do all parties stipulate to the
19  validity of this video recording and remote
20  swearing and that it will be admissible in the
21  courtroom as if it had been taken following Rule
22  30 of the Federal Rules of Civil Procedure and
23  the state rules where the case is pending?
24      Do all agree?
25      MR. MORRIS:  Yes.

Page 7

1
2      MR. BONDS:  Yes.
3      MR. MORRIS:  Does anyone not agree?
4      (Pause.)
5      MR. MORRIS:  Having heard nothing,
6  let's proceed.  Thank you.
7      THE VIDEOGRAPHER:  This will be the
8  start of Media No. 1 in the video-recorded
9  deposition of James Dondero.  Today's date is
10  January 5th, 2021.  It's 9:52 a.m. Central
11  Standard Time.
12      The case is In re Highland Capital
13  Management LP, Debtor, Chapter 11, Case
14  No. 19-34054-sgj11 in the United States
15  Bankruptcy Court for the Northern District of
16  Texas, Dallas Division.
17      The attorneys' appearances have
18  already been noted on the steno record, so would
19  the court reporter please swear the witness.
20      MR. BONDS:  Wait just one second.
21  There's an adversary proceeding that this case is
22  actually -- or this deposition is actually being
23  taken in.  It's 20-03190-sgj.  Thank you.
24      ///
25      ///

Page 8

1          J. DONDERO
2          ———
3      JAMES D. DONDERO,
4      having been duly sworn,
5      testified as follows:
6          ———
7          EXAMINATION
8
9  BY MR. MORRIS:
10      Q.  Good morning, Mr. Dondero.  Can you
11  hear me okay?
12      A.  Yes.
13      Q.  Okay.  My name is John Morris from
14  Pachulski Stang Ziehl & Jones, counsel for the
15  debtor.
16      Where are you located this morning,
17  sir?
18      A.  Highland Capital Management's
19  conference room, same as last time.
20      Q.  Is there anybody in the room with you
21  right now?
22      A.  No.
23      Q.  Do you have a telephone with you?
24      A.  Yes.
25      Q.  Is the phone off?

Page 9

1          J. DONDERO
2      A.  Yes.
3      Q.  Are you aware that the debtor sent a
4  letter to your lawyers instructing you not to be
5  on the premises after December 31st, 2020?
6      A.  Yes.
7      Q.  Did you get the debtor's permission
8  to enter the premises this morning?
9      A.  Implicitly for this depo, I believe.
10      Q.  Okay.  Did you get any explicit
11  consent or approval for you to be in the offices
12  this morning?
13      A.  Not that I'm aware of.
14      Q.  Did you ask or did anybody on your
15  behalf ask the debtors if you could participate
16  in today's deposition at the Highland offices?
17      A.  I don't know.
18      Q.  You're not aware of that, right?
19      A.  Correct.
20      Q.  Okay.  John Bonds is defending you
21  today; is that right?
22      A.  Yes.
23      Q.  And he's at the Bonds Ellis firm,
24  right?
25      A.  Yes.

Page 10

1        J. DONDERO
2        Q. And the Bonds Ellis firms represents
3   you in your individual capacity, correct?
4        A. Yes.
5        Q. Is there any other law firm that
6   represents you in your individual capacity in the
7   Highland bankruptcy or in the adversary
8   proceeding?
9        A. I don't believe so.
10       Q. Okay.  Does the Bonds Ellis firm
11  represent any entity in which you have an
12  ownership or control interest, or do they just
13  represent you in your individual capacity?
14       A. I don't know for sure.
15       Q. Okay.  But as you sit here right now,
16  do you have any reason to believe that the Bonds
17  Ellis firm represents anybody other than you in
18  your individual capacity in connection with the
19  bankruptcy case?
20       A. I don't know.
21       Q. Okay.  You understand that we're here
22  today for your deposition, right?
23       A. Yes.
24       Q. And do you understand that today's
25  deposition is being taken in connection with the

Page 11

1        J. DONDERO
2   debtor's motion for -- (audio malfunction) --
3        (Clarification requested by the
4   stenographer.)
5        MR. MORRIS:  I'll ask it again.
6   BY MR. MORRIS:
7        Q. Mr. Dondero, do you understand that
8   today's deposition is being taken in connection
9   with the debtor's motion for preliminary
10  injunction against you?
11       A. Yes.
12       Q. Do you intend to participate in the
13  hearing on the debtor's motion for preliminary
14  injunction?
15       MR. BONDS:  Objection, form.
16       MR. MORRIS:  You can answer.
17       A. I don't know.
18  BY MR. MORRIS:
19       Q. Do you intend to make -- do you
20  intend to testify at the debtor's hearing for
21  preliminary injunction?
22       MR. BONDS:  Objection, form.
23       A. I don't know.
24  BY MR. MORRIS:
25       Q. You may or you may not; is that

Page 12

1        J. DONDERO
2   right?
3        A. Yes.
4        Q. Okay.  Are you on any drugs or any
5   medication right now?
6        A. No.
7        Q. Is there anything that you're aware
8   of that might affect your memory today?
9        A. No.
10       Q. Are you aware of anything that would
11  prevent you from testifying competently today to
12  the best of your ability?
13       A. No.
14       Q. You understand that you're under oath
15  right now?
16       A. Yes.
17       Q. Are you aware that on December 10th
18  the debtor obtained a temporary restraining order
19  against you?
20       A. Roughly.
21       Q. Okay.  Did you ever personally read a
22  copy of the temporary restraining order?
23       A. No.
24       Q. So you've never seen the order
25  itself; is that right?

Page 13

1        J. DONDERO
2        MR. BONDS:  Objection, form.
3        A. Correct.
4   BY MR. MORRIS:
5        Q. Do you have an understanding of what
6   the order restrains you from doing?
7        A. Just in the most general sense.
8        Q. Tell me your understanding of what
9   the temporary order restrains you from doing.
10       A. Talking to the independent board
11  directly or talking directly to Highland
12  employees.
13       Q. Is there any other aspect of the
14  temporary restraining order that you're aware of
15  that would otherwise constrain or restrain your
16  conduct?
17       A. Those are the points I remember.
18       Q. Do you recall that before the Court
19  entered the temporary restraining order, it held
20  a hearing to consider the debtor's request?
21       A. I -- I don't know.
22       Q. Did you listen to the hearing?
23       A. No.
24       Q. Did you read a transcript of the
25  hearing?

Page 14

```
1              J. DONDERO
2       A.  No.
3       Q.  Do you respect the Court's authority
4  in this case?
5              MR. BONDS:  Objection, form.
6       A.  Yes.
7  BY MR. MORRIS:
8       Q.  Is there any particular reason why
9  you didn't take the time to read the Court's
10  temporary restraining order that was entered
11  against you?
12      A.  No.
13      Q.  James Seery is a member of the board
14  of Strand Advisors, the debtor's general partner,
15  right?
16      A.  Yes.
17      Q.  And you've been aware of that since
18  at least last January, correct?
19      A.  Yes.
20      Q.  And you're also aware that Mr. Seery
21  is the debtor's CEO and CRO, right?
22      A.  Yes.
23      Q.  And you've been aware of that since
24  last July, correct?
25      A.  Yes.
```

Page 15

```
1              J. DONDERO
2       Q.  Did you ever review the declaration
3  that Mr. Seery submitted in connection with the
4  debtor's motion for a temporary restraining order
5  against you?
6              MR. BONDS:  Objection, form.
7       A.  No.
8  BY MR. MORRIS:
9       Q.  Do you know what Mr. Seery alleged in
10  his declaration -- withdrawn.
11          Do you know the substance of what
12  Mr. Seery alleged in his declaration in support
13  of the debtor's motion for the TRO?
14      A.  No.
15      Q.  Did you care that the debtor was
16  seeking a TRO against you?
17      A.  I didn't think about it.
18      Q.  Have you thought about it since the
19  order was entered?
20      A.  Not really.
21      Q.  Okay.  You didn't submit a
22  declaration of your own in opposition of the
23  motion for TRO, right?
24      A.  I don't know.
25      Q.  You don't recall signing anything, do
```

Page 16

```
1              J. DONDERO
2  you?
3       A.  I've signed a lot of things, but
4  I'm -- I don't recall an opposition.
5       Q.  Let's talk about some of the events
6  that led to the entry of the TRO.
7          The debtor serves -- (audio
8  malfunction) --
9          (Clarification requested by the
10  stenographer.)
11          THE WITNESS:  I didn't touch the
12  microphone at this end and it's six inches or
13  eight inches from my mouth.
14          MR. MORRIS:  Yeah, let's try again,
15  Mr. Dondero.  Thank you.
16  BY MR. MORRIS:
17      Q.  The debtor serves as the portfolio
18  manager for certain collateralized loan
19  obligation vehicles; isn't that right?
20      A.  I don't want to testify to that.
21      Q.  Does the -- does the debtor manage
22  CLOs?
23          MR. BONDS:  Objection, form.
24          MR. MORRIS:  Withdrawn.
25          ///
```

Page 17

```
1              J. DONDERO
2  BY MR. MORRIS:
3       Q.  Can we agree that CLO stands for
4  collateralized loaning obligations?
5       A.  Yes.
6       Q.  Okay.  And does the debtor -- is the
7  debtor party to certain contracts that gives it
8  the right and responsibility to manage certain
9  CLO vehicles?
10          MR. BONDS:  Objection, form.
11          MR. MORRIS:  You can answer.
12      A.  Yes.
13  BY MR. MORRIS:
14      Q.  And you're aware of that because you
15  personally signed some of those contracts and
16  agreements, right?
17      A.  I don't know.
18      Q.  Okay.  NexPoint Advisors LP, are you
19  familiar with that firm?
20      A.  Yes.
21      Q.  That's an advisory firm; is that
22  right?
23      A.  Yes.
24      Q.  And we'll just refer to that as
25  NexPoint; is that okay?
```

Page 18

1          J. DONDERO
2      A.  Yes.
3      Q.  You have a direct or indirect
4  economic or ownership interest in NexPoint,
5  correct?
6          MR. BONDS:  Objection, form.
7          MR. MORRIS:  You can answer.
8      A.  Yes.
9  BY MR. MORRIS:
10      Q.  You're the president of NexPoint,
11  correct?
12      A.  I believe so.
13      Q.  And you own NexPoint's general
14  partner; is that right?
15      A.  I don't know.
16      Q.  Do you know who owns NexPoint's
17  general partner?
18      A.  No.
19      Q.  As the president of NexPoint, is it
20  fair to say that you control that entity?
21      A.  Generally.
22      Q.  Highland Capital Management Fund
23  Advisors LP, are you familiar with that firm?
24      A.  Yes.
25      Q.  And that's also an advisory firm,

Page 19

1          J. DONDERO
2  correct?
3      A.  Yes.
4      Q.  And we'll refer to that firm as Fund
5  Advisors; is that fair?
6      A.  Sure.
7      Q.  And we'll refer to Fund Advisors and
8  NexPoint together just as "the advisors"; is that
9  fair?
10      A.  I think you should be more specific
11  than that, but –
12      Q.  Okay.  I apologize.  Are you
13  finished?
14          If at any time I ask a question and
15  you don't understand, will you let me know that?
16      A.  Yes.
17      Q.  Okay.  You have a direct or indirect
18  economic or ownership interest in Fund Advisors,
19  correct?
20      A.  Yes.
21      Q.  You're the president of Fund
22  Advisors; is that true?
23      A.  I believe so.
24      Q.  And you own Fund Advisors' general
25  partner; is that right?

Page 20

1          J. DONDERO
2      A.  I don't believe I own as much of it
3  as I own of NexPoint, but I don't know the
4  numbers.
5      Q.  Okay.  As one of the two beneficial
6  owners of Fund Advisors and as the president of
7  Fund Advisors, is it fair to say that you control
8  that entity?
9      A.  Yes.
10      Q.  Okay.  And Fund Advisors and NexPoint
11  manage certain investment funds; is that right?
12      A.  I'm sorry, I missed the point of that
13  question.
14      Q.  Didn't hear?  Okay.
15          Fund Advisors, which we've talked
16  about, and NexPoint, which we've talked about,
17  those two entities manage certain investment
18  funds; is that right?
19      A.  Yes.
20      Q.  And one of the investment funds that
21  the advisors manage is Highland Income Fund.  Do
22  I have that right?
23      A.  I'm not sure which fund that
24  is, but yes, that's – that's one of them.
25      Q.  Are you the portfolio manager of the

Page 21

1          J. DONDERO
2  Highland Income Fund?
3      A.  I believe so.
4      Q.  Do you hold any titles at the
5  Highland Income Fund other than the portfolio
6  manager?
7          MR. BONDS:  To the extent you know.
8  Don't speculate.
9      A.  I don't – I don't know.  I know I'm
10  portfolio manager on virtually all of the funds.
11  BY MR. MORRIS:
12      Q.  Is there any fund that you're not the
13  portfolio manager for that you're aware of?
14      A.  I don't know.
15      Q.  Are you the portfolio manager of
16  NexPoint Capital Inc.?
17      A.  If that name refers to a fund, I
18  believe so.
19      Q.  Okay.  You're not sure if that refers
20  to a fund?
21      A.  There's a fund with the symbol NHF.
22  If that's the name – which I don't think you
23  have the exact name.  If that's the name of it,
24  then I believe – I believe I'm the portfolio
25  manager.  The name that you just gave sounded

Appx. 01592

Page 22

1          J. DONDERO
2    more like a holding company name or a subsidiary
3    name for NexPoint.  If it's not a fund, I'm not
4    the portfolio manager.  If it is a fund, I
5    believe I am.
6          Q.  Okay.  Do you hold -- are you
7    familiar with an entity called NexPoint
8    Capital Inc.?
9          A.  No.
10          Q.  Okay.  How about NexPoint Strategic
11    Opportunities Fund, is that a fund that is
12    managed by one of the advisors?
13          A.  I believe that's the name for NHF.
14    That's what I thought you were referring to.
15    That's the one that's a fund, and that's the one
16    that I'm portfolio manager on.
17          Q.  Okay.  Do you hold any titles at
18    NexPoint Strategic Opportunity Fund other than
19    portfolio manager?
20          A.  I don't know.
21          Q.  The advisors caused each of the funds
22    to invest in certain CLOs that are managed by the
23    debtor, right?
24          MR. BONDS:  To the extent you know.
25    Don't speculate.

Page 23

1          J. DONDERO
2          MR. MORRIS:  John, if there's an
3    objection, I welcome it.  If there's a direction
4    not to answer, I welcome it.  But what I don't
5    welcome is guiding the witness.  If he doesn't
6    remember, he's done this so many times, he knows
7    what he's doing.
8          You want me to ask the question
9    again, Mr. Dondero?
10          THE WITNESS:  Please.
11    BY MR. MORRIS:
12          Q.  The two advisors that we talked
13    about, they manage funds, right?
14          A.  Yes.
15          Q.  And those funds have invested in
16    certain CLOs that are managed by the debtor,
17    correct?
18          A.  The problem I have with that question
19    and the part that I don't want to testify as
20    agreeing to or acknowledging is that the debtor
21    manages those CLOs, because I won't testify to
22    the debtor being in good standing, and I won't
23    testify to the debtor not being in default, and I
24    won't testify to the debtor having the capability
25    to manage those CLOs --

Page 24

1          J. DONDERO
2          Q.  Will you -- I'm sorry to interrupt.
3    Go ahead.
4          A.  No, I mean, that's -- so I won't -- I
5    won't testify affirmatively to the second half of
6    that question.
7          Q.  Okay.  But you will admit, won't you,
8    that the debtor has -- is party to contracts that
9    give it the right to manage CLOs in which the
10    advisors caused the funds to invest, right?
11          MR. BONDS:  Objection, form.
12          MR. MORRIS:  You can answer.
13          A.  The beginning and end of what I want
14    to testify to is that the advisor is parties --
15    party to contracts.  The contracts have --
16    provide the ability to manage assets in the CLO
17    subject to a bunch of different things, subject
18    to not being in default, subject to the ability,
19    subject to the capability and being registered
20    advisor, et cetera, et cetera.
21          I don't want to have any testimony
22    that implies that the advisor is in good standing
23    or able or capable of managing those CLOs or that
24    Jim Seery is even an investment professional.
25          ///

Page 25

1          J. DONDERO
2    BY MR. MORRIS:
3          Q.  Okay.  I think I understand.
4          When you used the word "advisor" in
5    your last answer, you were referring to the
6    debtor; is that right?
7          MR. BONDS:  Objection, form.
8    BY MR. MORRIS:
9          Q.  It's the debtor that has -- let me
10    try again.
11          It's the debtor that has the
12    contracts with the CLO, right?
13          A.  Yes.
14          Q.  But it's your contention that the
15    debtor is in default and that Mr. Seery and the
16    debtor otherwise don't have the capability to
17    manage the CLOs.  That's what you're saying,
18    right?
19          A.  I don't want to argue, and it's for
20    the lawyers and the Court to decide, but I don't
21    want to be affirmatively acknowledging that
22    Seery's an investment professional.  I don't want
23    to be affirmatively acknowledging that he has any
24    employees and staff when he's told them all
25    they're being terminated in the next few weeks.

Page 26

1          J. DONDERO
2          I don't want to acknowledge that he
3    is in compliance and can operate those contracts
4    if I believe those contracts are in default
5    because, A, the advisor's in bankruptcy, and B,
6    none of the key man provisions are being adhered
7    to by the advisor.
8          I don't want to in any form or
9    fashion acknowledge or represent or somehow be
10   twisted into testifying that he is in good
11   standing or has the ability to manage those CLOs.
12   It may be found by somebody that he is, but I
13   don't want to be in any way inferred to be
14   sanctioning it.
15          Q.  Okay.  Are you aware -- have any of
16   the contracts pursuant to which the CLOs and the
17   debtor are the parties, have any of those
18   contracts been terminated, to the best of your
19   knowledge, since the petition date?
20          A.  I believe they're subject to stays,
21   among other things, but I'm not -- I'm not a
22   lawyer.
23          Q.  Has anybody sought to lift the stay
24   in order to terminate the contracts, to the best
25   of your knowledge?

Page 27

1          J. DONDERO
2          A.  I don't know where -- I don't know.
3          Q.  Has any of the CLOs ever contended
4    that the debtor was in breach in their agreement?
5          A.  I believe the beneficial holders
6    have.
7          Q.  I understand that --
8          A.  But I don't know -- I don't know if
9    the CLOs have.
10          Q.  Okay.  I'm asking you a different
11   question, and just answer my question.
12          To the best of your knowledge, has
13   any CLO contended that the debtor is in breach of
14   any of the agreements that they have between
15   them?
16          MR. BONDS:  Objection, form.
17          A.  I don't know.
18   BY MR. MORRIS:
19          Q.  You're not aware of any such
20   contention, right?
21          A.  I don't know.
22          Q.  You're not aware of any contention by
23   the CLOs that the debtor is in default under any
24   CLO contract, correct?
25          MR. BONDS:  Objection, form.

Page 28

1          J. DONDERO
2          A.  I don't know regarding the CLOs.
3    BY MR. MORRIS:
4          Q.  Did you ever ask them?  Withdrawn.
5          Did you ever ask anybody on behalf of
6    the CLOs whether they were going to declare a
7    default under the CLO management agreements?
8          MR. BONDS:  Objection, form.
9          A.  I don't know.
10   BY MR. MORRIS:
11          Q.  You don't know if you asked?  I'm
12   just asking you if you ever asked the question.
13          A.  Not of the CLOs.  Those questions
14   were asked regarding the beneficial owners, and I
15   think the beneficial owners did that, but I
16   didn't have direct knowledge or contact with the
17   CLOs.
18          Q.  Okay.  And the beneficial owners are
19   not parties to the CLO management agreements
20   between the CLOs and the debtor, correct?
21          MR. BONDS:  Objection, form.
22          A.  I don't want to draw a legal
23   conclusion of the rights of the beneficial owners
24   and the people who have the risk and the people
25   who have the ultimate decision authority whether

Page 29

1    or not they can be circumvented or ignored by an
2    intermediate nonfinancial -- nonfinancially
3    interested party.  I don't want to -- I don't
4    want to speculate on that.
5          MR. MORRIS:  Okay.  I move to strike.
6          And I'm not asking for a legal
7    conclusion; I'm asking for your understanding.
8    BY MR. MORRIS:
9          Q.  Is it your understanding that
10   beneficial owners are parties to the CLO
11   management agreements between the debtor and the
12   CLOs?
13          MR. BONDS:  Objection to form.
14          MR. MORRIS:  You can answer.
15          A.  I think that asks for a legal
16   conclusion.
17   BY MR. MORRIS:
18          Q.  It does not.  I'm asking you as a
19   factual matter based on your understanding as the
20   portfolio manager of the funds and the president
21   of the advisors who made these investments.  I'm
22   asking you --
23          MR. BONDS:  Objection, form.
24          ///

Page 30

J. DONDERO

1  BY MR. MORRIS:
2  
3      Q.  – in that capacity.
4        In that capacity, do you have any
5  understanding that the beneficial owners are
6  parties to the CLO management agreements between
7  the debtor and the CLOs?
8        MR. BONDS:  Objection, form.
9      A.  My understanding is that the
10  beneficial owner should always be considered.
11       MR. MORRIS:  Okay.  I move to strike.
12  I'm not asking you whether they should be
13  considered.
14  BY MR. MORRIS:
15     Q.  I'm asking you very specifically
16  whether you believe that they are parties to the
17  contract.
18       MR. BONDS:  Objection, form, asked
19  and answered.
20     A.  Yeah, I believe you're asking me for
21  a legal conclusion, and I won't give one.
22  BY MR. MORRIS:
23     Q.  Okay.
24       MR. MORRIS:  La Asia, can we please
25  put up Exhibit 1.  Let's share the screen and put

Page 31

J. DONDERO

1  up Exhibit 1.
2  
3        (Dondero Deposition Exhibit 1
4  marked.)
5  BY MR. MORRIS:
6      Q.  Mr. Dondero, I appreciate that it's
7  difficult to do this remotely, and as we
8  discussed last time, the one thing that I'm
9  certainly not doing today is playing gotcha with
10  documents.
11        So I'm going to put documents up on
12  the screen from time to time, and to the extent
13  that you think you need to read more of the
14  document in order to have full context, will you
15  let me know that?
16     A.  Sure.
17     Q.  Okay.  This is a letter dated
18  October 16th from NexPoint to Mr. Seery.
19        Do you see that?
20     A.  Yep.
21     Q.  Okay.  Are you familiar with this
22  document?  Have you ever seen it before?
23     A.  Generally.  I'm generally familiar
24  with it, but I haven't seen it before.
25     Q.  Okay.  Do you recall when you first

Page 32

J. DONDERO

1  learned that this document was sent?  Was it at
2  or around the time the document was sent?
3     A.  It was at or around the time, yes.
4     Q.  Did you discuss with NexPoint any of
5  the substance that is in this letter?  And again,
6  I'm happy to scroll through it if that would be
7  helpful.
8        MR. BONDS:  Objection, form.
9     A.  Just generally.
10  BY MR. MORRIS:
11     Q.  Did you – I don't want to know about
12  any conversations, but did you speak with anybody
13  at K&L Gates about this particular letter, just
14  yes or no?
15     A.  My primary conversation was with
16  internal counsel.  K&L Gates might have been on
17  some phone call or two.
18     Q.  Okay.  Whose idea was it to send this
19  out?
20       MR. BONDS:  Objection, form.
21     A.  Whose idea?  I – I don't think
22  anybody viewed it as an idea as much as a
23  regulatory necessity.
24     ///

Page 33

J. DONDERO

1  BY MR. MORRIS:
2  
3     Q.  And did you authorize the sending of
4  this particular letter?
5     A.  Not specifically.
6     Q.  Did you generally support the sending
7  of the letter?
8     A.  Yes.
9     Q.  And you knew the letter was being
10  sent; is that fair?
11     A.  Yes.
12     Q.  And you didn't object to the sending
13  of this letter, right?
14     A.  I did not object.
15     Q.  Okay.  And since learning that the
16  letter was sent, have you ever directed NexPoint
17  to withdraw the letter?
18     A.  No.
19     Q.  You have the power to do that, don't
20  you, sir?
21     A.  I – I don't believe so.  When the
22  chief compliance officer believes it's a breach
23  of regulatory compliance, the chief compliance
24  officer in financial institutions has personal
25  liability, and I don't believe that other C-suite

Page 34

```
1            J. DONDERO
2   executives can overrule the chief compliance
3   officer.
4        Q. Who is the chief compliance officer?
5        A. Jason Post.
6        Q. Did Mr. Post ever say that he would
7   not withdraw the letter because of regulatory
8   compliance?
9            MR. BONDS: Objection, form.
10       A. I -- not that I know of.
11  BY MR. MORRIS:
12       Q. Did you ever discuss with Mr. Post
13  whether or not this letter should be withdrawn?
14       A. Again, I didn't believe I had the
15  authority to.
16       Q. Okay. And he never told you that he
17  couldn't; that's just the implicit conclusion
18  that you drew because he was the chief compliance
19  officer; is that fair?
20       A. Implicit conclusion? It's more the
21  understanding I have of compliance from having
22  lived the last 20 years.
23           MR. MORRIS: Okay. Let's put up
24  Exhibit 2, please.
25       (Dondero Deposition Exhibit 2
```

Page 35

```
1            J. DONDERO
2   marked.)
3        MS. CANTY: Do you see it, John?
4        MR. MORRIS: I think we still have
5   Exhibit 1.
6        MS. CANTY: Okay. Give me a second.
7   BY MR. MORRIS:
8        Q. Okay. This is another letter that
9   was sent by NexPoint to Mr. Seery, this one dated
10  November 24, 2020.
11       Do you see that, sir?
12       A. Yes.
13       Q. And you saw this letter at or around
14  the time it was sent, right?
15       A. I didn't see the letter specifically,
16  but I'm aware of it.
17       Q. And you knew it was going to be sent;
18  is that fair?
19       A. Yes.
20       Q. And did you authorize this letter to
21  be sent on behalf of the advisors and the funds
22  that are listed there?
23           MR. BONDS: Objection, form.
24       A. Let me give the consistent testimony
25  I gave last time. It wasn't an authorization. I
```

Page 36

```
1            J. DONDERO
2   was aware of it. It was, I believe, a continued
3   regulatory breach from the standpoint of the --
4   of compliance that drove the letter.
5   BY MR. MORRIS:
6        Q. When there's a regulatory breach, is
7   there an obligation to alert anybody other than
8   the portfolio manager?
9        A. I know that's being investigated. I
10  don't know the answer regarding a breach like
11  this.
12       Q. Are you aware of any notification
13  that NexPoint made to anybody in the world, other
14  than Mr. Seery, with respect to the matters set
15  forth in Exhibit 1 and Exhibit 2?
16           MR. BONDS: Objection, form.
17       A. I don't know, and I'm not in a
18  position to comment at this point.
19  BY MR. MORRIS:
20       Q. I'm just asking you if you know
21  whether -- I'm asking for your knowledge.
22       Do you know whether NexPoint ever
23  advised anybody, other than Mr. Seery, of the
24  allegations that are set forth in Exhibit 1 and
25  Exhibit 2?
```

Page 37

```
1            J. DONDERO
2        MR. BONDS: Objection, form.
3        A. I don't know, nor would I necessarily
4   be informed if compliance self-reports this to
5   the SEC or other regulatory bodies. But I do not
6   know.
7   BY MR. MORRIS:
8        Q. And nobody told you that, right?
9        A. I don't know.
10       Q. Is there -- did you see any written
11  analysis or memorandum that was prepared by
12  your -- by the chief compliance officer with
13  respect to the matters set forth in Exhibit 1 and
14  Exhibit 2?
15       A. I know there was a multipage analysis
16  that was done, but I've never seen it.
17       Q. And was it written by the chief
18  compliance officer or was it written by legal
19  staff?
20       A. I was told he did it in conjunction
21  with external counsel.
22       Q. But you've never seen it?
23       A. I've never seen it.
24       Q. Did you support the sending of this
25  letter?
```

**Page 38**

1        J. DONDERO
2        A. Yes.
3        Q. Since learning that this letter was
4  sent, have you directed NexPoint to withdraw this
5  letter?
6        A. No, I have not.
7        Q. Okay. Around Thanksgiving you
8  learned that Mr. Seery was seeking to sell
9  certain securities that were owned by certain
10 CLOs managed by the debtor, right?
11       A. I believe I was informed after the
12 fact.
13       Q. You were informed that certain sales
14 of securities owned by the CLOs were being sold
15 at Mr. Seery's direction, right?
16       A. Yes.
17       MR. BONDS: Objection, form.
18 BY MR. MORRIS:
19       Q. Okay. And at around that time, once
20 you learned that, you personally intervened to
21 stop those trades, right?
22       MR. BONDS: Objection, form.
23       A. Yes.
24       MR. MORRIS: Can we put up Exhibit 3,
25 please.

**Page 39**

1        J. DONDERO
2        (Dondero Deposition Exhibit 3
3  marked.)
4  BY MR. MORRIS:
5        Q. This is an e-mail string. We're
6  going to start at the bottom and work up, just so
7  we can get it in order. And you'll see the
8  bottom begins with an e-mail from Hunter Covitz.
9        Do you see that?
10       A. Yes.
11       Q. Who is Mr. Covitz?
12       A. Covitz, Hunter Covitz manages our CLO
13 asset – or our CLO assets, primarily.
14       Q. Is he a High- -- is he a debtor
15 employee or is he employed by any other entity?
16       A. I believe he's a debtor employee.
17       Q. Okay. Do you see there's a reference
18 there to gatekeeper@hcmlp.com?
19       A. Yes.
20       Q. Are you – withdrawn.
21       Is that – withdrawn.
22       Is it your understanding that that's
23 kind of a basket of different e-mail addresses
24 that are held together by the Gatekeeper address?
25       A. I wouldn't describe it that way, but

**Page 40**

1        J. DONDERO
2  it is a bucket of e-mails.
3        Q. Okay. And is your e-mail address or
4  was your e-mail address included within
5  Gatekeeper?
6        A. Historically, it was.
7        Q. And do you know when that stopped
8  being the case?
9        A. I do not know.
10       Q. Was it after the time that you
11 resigned from your position at the debtor?
12       A. I do not know.
13       Q. Okay. Matt Pearson is below
14 Gatekeeper. Do you know who Mr. Pearson is?
15       A. He is a – generally an equity trader
16 that works for Joe Sowin.
17       Q. And are Mr. Pearson and Mr. Sowin
18 employees of the debtor?
19       A. I don't believe so. I don't believe
20 Joe is. I don't know if Matt is. I don't know.
21       Q. Okay. But is it fair to say that
22 pursuant to this e-mail, Mr. Covitz is giving
23 direction to sell certain securities held by the
24 CLOs?
25       A. Yes.

**Page 41**

1        J. DONDERO
2        Q. Can we scroll to the e-mail above
3  that, please. And then Mr. Pearson acknowledged
4  that e-mail a little bit later in the day, right?
5        A. Yes.
6        Q. Okay. And if we can –
7        (Interruption by the videographer.)
8        MR. MORRIS: It's okay. Let's
9  proceed and we'll do the best we can.
10 BY MR. MORRIS:
11       Q. Mr. Covitz's e-mail was the – do you
12 see the subject matter is Sky Equity?
13       A. Yes.
14       Q. And do you have an understanding of
15 what Sky Equity refers to?
16       A. It's a – it's a post-restructured
17 equity that the funds have held for years.
18       Q. Okay. So if we could scroll up to
19 your e-mail that's right there, did you receive a
20 copy of Mr. Covitz's original e-mail?
21       A. It appears so.
22       Q. Okay. And did you give the
23 instruction to the recipients of Mr. Hunter
24 Covitz's e-mail not to sell the Sky Equity as had
25 been instructed by Mr. Seery?

Page 42

J. DONDERO

1     J. DONDERO
2    A. Yes.
3    Q. And you understood at the time that
4 you gave the instruction to the people on this
5 e-mail that they were trying to execute trades
6 that Mr. Seery had authorized, right?
7    MR. BONDS: Objection, form.
8    THE WITNESS: Can you repeat the
9 question, please.
10    MR. MORRIS: Sure.
11 BY MR. MORRIS:
12    Q. At the time that you gave the
13 instruction, no, do not, you knew that you were
14 stopping trades that had been authorized and
15 directed by Mr. Seery, correct?
16    A. Yes.
17    Q. Did you speak with Mr. Seery before
18 instructing the recipients of your e-mail not to
19 execute the SKY transactions?
20    A. No, I did not.
21    Q. Did you take any steps to seek the
22 debtor's consent before instructing the
23 recipients of this e-mail not to execute the SKY
24 transactions?
25    A. I'm sorry, please repeat that again.

Page 43

J. DONDERO

1     J. DONDERO
2 The -- I missed the first part of the sentence.
3    Q. No problem.
4    Did you take any steps to seek the
5 debtor's consent before instructing the
6 recipients of your e-mail --
7    MR. BONDS: Objection, form.
8 BY MR. MORRIS:
9    Q. -- to stop the SKY transactions, to
10 stop executing the SKY transactions?
11    A. No.
12    Q. Thank you.
13    Can we scroll up to the response.
14 Okay. Stop there.
15    Mr. Pearson responded later that
16 afternoon. Do you see that?
17    A. Yes.
18    Q. And in response, he canceled all of
19 the SKY and AVYA sales that the debtor had
20 directed but which had not been executed,
21 right?
22    A. Yes.
23    Q. And if we can scroll up to the e-mail
24 above that, you responded to that as well, didn't
25 you?

Page 44

J. DONDERO

1     J. DONDERO
2    A. Yep.
3    Q. Can you please read your response out
4 loud.
5    A. HFAM and DAF -- or HFAM and DAF has
6 instructed Highland in writing not to sell any
7 CLO underlying assets. There is potential
8 liability. Don't do it again, please.
9    Q. All right. The written instructions,
10 is that a reference to the first two exhibits
11 that we looked at? And if you want to go back
12 and check them out, we can, but I'm trying to --
13 I want to know what writings you're referring to.
14 Withdrawn.
15    Are the writings that you're
16 referring to the two exhibits that we just looked
17 at, Exhibit 1 and Exhibit 2?
18    MR. BONDS: Objection, form.
19    A. Generally, yes.
20 BY MR. MORRIS:
21    Q. Are you --
22    A. I don't know if -- I don't know if
23 there were more than those two, but generally,
24 letters of those substances -- well, generally,
25 letters of those substance -- of that substance

Page 45

J. DONDERO

1     J. DONDERO
2 is what I'm referring to.
3    Q. I appreciate that, Mr. Dondero.
4    Do you recall any other writings that
5 you were referring to at the time you sent this
6 e-mail?
7    A. I'm just saying I don't know if there
8 were others or if there were other e-mails. I
9 don't know. But there were -- they would have
10 been similar in terms of substance as those two.
11    Q. Okay. Do you see there there
12 in the latter portion of your e-mail, quote,
13 there is potential liability, don't do it again?
14    A. Yes.
15    Q. Who was the intended recipient of
16 that message?
17    A. At this juncture, it's to Matt
18 Pearson, I believe.
19    Q. And why would Matt Pearson have
20 personal liability -- withdrawn.
21    Why did you decide to tell
22 Mr. Pearson that he had potential liability for
23 executing the transactions that Mr. Seery had
24 directed?
25    MR. BONDS: Objection, form.

Page 46

1        J. DONDERO
2        A. Yeah, to be clear, it doesn't say
3   personal liability. I said potential liability.
4   I believe this is -- I believe what was done here
5   is bona fide typical class action activity that
6   we've suffered from historically, when the
7   interests of beneficial holders are ignored when
8   assets are sold for no business purpose. No
9   business purpose. No definable, discernible,
10  articulated business purpose.
11       There's -- I think there's potential
12  liability for the manager, the fund complex, you
13  know, and sometimes for the individuals involved.
14  But my potential liability was a general
15  statement.
16       THE WITNESS: You know what, guys,
17  listen. I've got a couple of calls I've got to
18  make that I'm ten minutes late for, so we're
19  going to need to take a break for a few minutes
20  here, ideally now, or after the next question,
21  please.
22       MR. MORRIS: I'm happy to take a
23  break now. How long are you thinking, though?
24       THE WITNESS: Ten or 15 minutes.
25       MR. MORRIS: Yeah, that's perfectly

Page 47

1        J. DONDERO
2   fine, Mr. Dondero. Can you just state on the
3   record that you will not talk to any Highland
4   employee, including Mr. Ellington or
5   Mr. Leventon, you will not communicate with them
6   or their counsel in any way with respect to this
7   deposition?
8        THE WITNESS: Yeah, I promise. I
9   haven't -- yeah. I will not talk to them. The
10  only Highland employee I might talk to is Jerome,
11  who's handling the systems for this call, and
12  that's it.
13       MR. MORRIS: I'm fine with that, but
14  really, I'm requesting not only Highland
15  employees but not to talk to anybody about the
16  testimony today. I'm going to accommodate you
17  and --
18       THE WITNESS: I won't. Nobody cares
19  about this deposition. I won't talk to anybody.
20       MR. MORRIS: Okay.
21       THE WITNESS: I'll be back in ten or
22  15 minutes, okay?
23       MR. MORRIS: Okay.
24       THE VIDEOGRAPHER: 10:41 a.m. Central
25  Standard Time, we're off the record.

Page 48

1        J. DONDERO
2        (Recess taken, 10:41 a.m. to
3   11:16 a.m. CST)
4        THE VIDEOGRAPHER: 11:16 a.m., we're
5   back on the record.
6   BY MR. MORRIS:
7        Q. Mr. Dondero, can you hear me?
8        A. Yes.
9        Q. Okay. Are you aware that the
10  deposition taking place today is pursuant to
11  Court order?
12       A. Yes.
13       Q. Did you schedule meetings and
14  telephone calls during the day today,
15  notwithstanding the Court's order?
16       A. I didn't formally schedule anything.
17       Q. Okay. So you have nothing scheduled
18  for the rest of the day; is that right? You're
19  here to answer questions?
20       A. Correct.
21       MR. MORRIS: Okay. Can we get the
22  last exhibit back up on the screen, please.
23  Okay. Can we scroll --
24  BY MR. MORRIS:
25       Q. We were last looking at your e-mail.

Page 49

1        J. DONDERO
2   Can we see the response above that, please?
3   Okay. And that's Mr. Sowin responding.
4        Do you see that?
5        A. Yes.
6        Q. And Mr. Sowin was following your
7   instructions; is that right?
8        A. His response is what it is. I'm
9   not -- what do you mean by following my
10  instructions?
11       Q. Well, he issued an order -- it says,
12  quote: Please block all orders from hitting the
13  trading desk for the -- I assume he meant
14  funds -- Jim mentioned.
15       Do you see that?
16       A. Yes.
17       MR. BONDS: Objection, form.
18  BY MR. MORRIS:
19       Q. And that's exactly what you wanted to
20  happen, right?
21       A. I'm sorry, could you unhighlight
22  that? It's hard for me to read with the
23  highlight. Okay. Thank you.
24       Yeah, they -- I think he tried to
25  figure out a way to prevent it from inadvertently

Page 50

J. DONDERO

1
2 happening.
3    Q.  Okay.  And Mr. Sowin's – the
4 substance of Mr. Sowin's e-mail is consistent
5 with your intent to prevent any further trades
6 from the CLOs, right?
7    MR. BONDS:  Objection, form.
8    A.  My intent was to prevent trades that
9 weren't in the best interests of investors, that
10 investors – the beneficial holders had
11 articulated they didn't want sold while these
12 funds were in transition, and that the – there
13 was no business purpose or benefit to the debtor
14 to sell these assets.
15 BY MR. MORRIS:
16    Q.  That –
17    A.  So that's – that was the rationale I
18 was trying to capture.
19    THE WITNESS:  Hold on for me one
20 second.  Jerome just stepped in.  What does the
21 systems guy want Jerome to do?
22    MR. MORRIS:  Figure out a way to turn
23 the lights on.
24    (Technical comments off the
25 stenographic record.)

Page 51

J. DONDERO

1
2    MR. MORRIS:  Let's go forward.
3    THE WITNESS:  So we're okay with
4 Jerome?  That's it for now?
5    MR. MORRIS:  Yeah.
6    THE WITNESS:  All right.  Thank you.
7 BY MR. MORRIS:
8    Q.  You didn't correct anything that
9 Mr. Sowin did – said in this e-mail, did you?
10    A.  No.
11    Q.  You didn't tell –
12    MR. BONDS:  Can you repeat the
13 question?  I didn't understand it.
14    MR. MORRIS:  That's okay.
15 BY MR. MORRIS:
16    Q.  Mr. Dondero, you didn't correct
17 anything that Mr. Sowin wrote in this e-mail, did
18 you?
19    A.  No.
20    Q.  You didn't tell Mr. Sowin that he
21 misunderstood your intent, did you?
22    A.  I don't believe so.
23    Q.  And you didn't give any explanation
24 to him as to why you did not want to sell any CLO
25 underlying assets except for what you wrote in

Page 52

J. DONDERO

1
2 that e-mail below, right?
3    MR. BONDS:  Objection, form.
4    A.  I – I believe I – well, the e-mails
5 stand on their own.  I think the reasons below
6 are sufficient.  I think I had a conversation
7 with Joe besides that, and there was an
8 unawareness on the trading desk and with Hunter
9 that the interest of investors had been expressed
10 and ignored by Seery, you know, so – they
11 weren't aware of that.  They thought that was
12 unusual and inappropriate.
13 BY MR. MORRIS:
14    Q.  In your role as portfolio manager, is
15 it – do you believe it's your responsibility to
16 always defer to the desires of your investors?
17 Do you cede – do you cede – withdrawn.
18    Do you cede responsibility and your
19 business judgment for making transactions to your
20 investors?
21    MR. BONDS:  Objection, form.
22    A.  In this case, it would be
23 appropriate, in general, it would depend.
24 BY MR. MORRIS:
25    Q.  Okay.  A few days later, you learned

Page 53

J. DONDERO

1
2 that Mr. Seery was trying a work-around to
3 effectuate the trades anyway, right?
4    A.  Yes.
5    Q.  And you wrote to Thomas Surgent to
6 let him know that you were aware that Seery was
7 trying a work-around to effectuate the trades,
8 right?
9    A.  I believe there was such an e-mail.
10    Q.  Okay.  Can you just scroll up and see
11 that e-mail, please.  All right.  Stop right
12 there.
13    Who is Mr. Surgent?
14    A.  He's the chief compliance officer of
15 Highland Capital.
16    Q.  The debtor?
17    A.  Yes.
18    Q.  Okay.  And how long has he held that
19 position to the best of your recollection?
20    A.  A long time.  More than five years.
21    Q.  What does it mean to – when you
22 wrote that Mr. Seery was, quote, working on a
23 work-around to trade these securities?  What does
24 that mean?
25    A.  As a noninvestment professional and

Page 54

```
1          J. DONDERO
2   as a nontrader and as a nonportfolio manager, he
3   set up an account for himself, I believe,
4   directly with Jefferies to trade the securities
5   in the CLOs.
6       Q. How did you learn that?
7       A. I think we still get trade reports
8   from Jefferies, or Jefferies – the Jefferies
9   trades get reported back into the system and have
10  to be input by Joe, and so Joe sees the trades
11  come back from Jefferies at the end of the day.
12      Q. And Joe is Joe Sowin?
13      A. Yes.
14      Q. And he works for you; is that right?
15          MR. BONDS: Objection, form.
16          MR. MORRIS: Withdrawn.
17  BY MR. MORRIS:
18      Q. He works for one of the advisors; is
19  that right?
20      A. I believe he works for HFAM, but I'm
21  not a hundred percent certain.
22      Q. And the work-around was – is that
23  another way of saying that Mr. Seery tried to do
24  the trades that he thought were appropriate
25  without your interference?
```

Page 55

```
1          J. DONDERO
2          MR. BONDS: Objection, form.
3       A. I'm not going to agree with that
4   speculation. If you want me to speculate, I
5   think Seery had no business purpose and he was
6   doing it to tweak myself and everybody else.
7   BY MR. MORRIS:
8       Q. Did he tell you that?
9       A. No. I'm speculating.
10      Q. Okay. Do you have any idea why he
11  made the trades?
12      A. He – he had no –
13      Q. Withdrawn. I'm sorry.
14          Do you have any idea why he wanted to
15  make the trades?
16      A. I didn't speak to him directly.
17      Q. Okay.
18      A. Indirectly – I didn't speak to him.
19  I didn't speak to him directly. It was –
20      Q. Do you have any personal knowledge as
21  you sit here right now as to why Mr. Seery wanted
22  to effectuate the trades that you were blocking?
23          MR. BONDS: Objection, form.
24      A. I've thought about it at length. I
25  can't come up with a business purpose that would
```

Page 56

```
1          J. DONDERO
2   supersede an account that's in transition and the
3   beneficial owners have made it clear that the
4   manager's not in compliance, they're moving the
5   accounts, and knowing the individual assets that
6   were sold, I can't – I couldn't think of a
7   business purpose that Seery would be operating
8   under.
9          MR. MORRIS: Okay. I move to strike.
10  I'm not asking you for what you think. I'm
11  asking you for facts.
12  BY MR. MORRIS:
13      Q. Do you have any knowledge of any
14  facts as to the business justification or
15  rationale for why Mr. Seery wanted to make these
16  trades?
17          MR. BONDS: Objection, form.
18      A. No, I don't believe there are any.
19  BY MR. MORRIS:
20      Q. And you never asked him; is that
21  right?
22      A. Correct.
23      Q. And you never instructed anybody on
24  your behalf or on behalf of the advisors or on
25  behalf of the funds to ask Mr. Seery why he
```

Page 57

```
1          J. DONDERO
2   wanted to make these trades, right?
3       A. That's not correct.
4       Q. Nobody ever told you that they'd had
5   a conversation with Mr. Seery in which
6   Mr. Seery – (audio malfunction) –
7          (Clarification requested by the
8   stenographer.)
9   BY MR. MORRIS:
10      Q. Did anybody ever tell you that they
11  had spoken with Mr. Seery and Mr. Seery had
12  provided an explanation, a business rationale for
13  the transactions that he wanted to effectuate?
14          MR. BONDS: Objection, form.
15      A. Yes. Yes.
16  BY MR. MORRIS:
17      Q. Who was that?
18      A. Joe Sowin.
19      Q. When did he tell you about this
20  conversation?
21      A. It was at or about this time in...
22      Q. And what did Mr. Sowin tell you?
23      A. Seery told him it was for risk
24  minimization or risk reduction.
25      Q. Did he tell him anything else?
```

Page 58

J. DONDERO

1
2     A.  No.  He said risk reduction was why
3  he was selling the securities.
4     Q.  That's the only rationale that
5  Mr. Seery gave to Mr. Sowin; is that your
6  testimony?
7     A.  Yes.
8     Q.  Okay.  Did Mr. Sowin tell you that he
9  asked any questions of Mr. Seery?
10     A.  He asked him why he was selling them.
11     Q.  And you've given me the entirety of
12  the answer as conveyed by Mr. Sowin to you; is
13  that right?
14     A.  Yes.
15     Q.  Is Mr. Sowin's conversation with
16  Mr. Seery about the justification for these
17  trades reflected in any document or any e-mail
18  anywhere that you can recall?
19     A.  Not that I recall.
20     Q.  Did K&L Gates explain their
21  understanding of the business rationale of these
22  trades in any of the letters that they sent on
23  behalf of the funds or any of the advisors?
24     A.  Not that I'm aware of.  I'm not
25  aware.

Page 59

J. DONDERO

1
2     Q.  Do you know Dustin Norris?
3     A.  Yes.
4     Q.  Do you know that he testified in
5  December in connection with this bankruptcy
6  matter?
7     A.  Yes.
8     Q.  Did you ever tell Dustin Norris about
9  the conversation Mr. Sowin had with Mr. Seery
10  that you've described here?
11     A.  I believe he was aware of it.
12     Q.  Do you know – did you talk to him in
13  advance of his testimony?
14     A.  I talk to Dustin most every day.
15     Q.  And did you tell Dustin that he
16  should make sure to alert the Court about this
17  conversation with Mr. Sowin and Mr. Seery?
18     A.  No.
19     Q.  Did you think it was important that
20  the Court know Mr. Seery's business rationale?
21     A.  I thought it was a nonsensical answer
22  on Seery's part.  I didn't have an opinion on
23  whether or not the Court should know.
24     Q.  Now, you – at the time, you were
25  speaking to Mr. Seery directly; isn't that right?

Page 60

J. DONDERO

1
2     A.  Rarely.  I didn't – since the
3  injunction or since – rarely.  I can't remember
4  the last time I've spoken to him.  Scott
5  Ellington has been the appropriate go-between as
6  far as I understand it.
7     Q.  Okay.  Was there anything that
8  prevented you in November 2020 from picking up
9  the phone to talk to Mr. Seery about his desire
10  to effectuate these transactions?
11     A.  No.  The last time I – yeah, I'm
12  remembering, the last time I talked to Seery was
13  the day after Thanksgiving.
14     Q.  Okay.  Is there anything that you're
15  aware of that prevented you from picking up the
16  phone and asking Mr. Seery for his business
17  justification for these trades prior to
18  December 10, 2020?
19     MR. BONDS:  Objection, form.
20     A.  No.  I expressed my disapproval via
21  e-mail.
22  BY MR. MORRIS:
23     Q.  Okay.  Why did you decide to write to
24  Mr. Surgent on November 27th?
25     A.  I wasn't sure he was aware of Seery's

Page 61

J. DONDERO

1
2  work-around, and I know Thomas has an acute
3  awareness of his personal liability for
4  regulatory breaches or doing things that aren't
5  in the best interests of investors, and I don't
6  believe he has the extra insurance and
7  indemnities that Seery has.
8     Q.  If he was acutely aware of it, why
9  did you feel the need to remind him of that in
10  your e-mail to him?
11     A.  Because I don't think he was aware
12  that Seery was doing a work-around on behalf of
13  the debtor that he was compliance officer of.  I
14  wasn't convinced he was aware, so I included him
15  on the e-mail.
16     Q.  Did you intend to suggest that by
17  following Mr. Seery's orders to execute the
18  trades, that Mr. Surgent faced personal
19  liability?
20     A.  That's the way it works.
21     Q.  Okay.  And you wanted him to know
22  that, right?
23     A.  I wanted him to know that Seery was
24  doing inappropriate trades and doing
25  inappropriate work-around, in my opinion.  I

Page 62

J. DONDERO

1    J. DONDERO
2    didn't think Thomas was aware.  I thought Seery
3    was operating independently.
4          Thomas might have been aware, but I
5    didn't think so.  I don't talk to -- I haven't
6    talked to Thomas in I don't know when, so I
7    thought it was important for him to know.
8          Q.  Okay.  You have communicated with
9    Mr. Seery from time to time via text message,
10   right?
11         A.  Yes.
12         MR. MORRIS:  Can we put up Exhibit 4,
13   please.
14         (Dondero Deposition Exhibit 4
15   marked.)
16         MR. MORRIS:  And if we can scroll
17   down a little bit.  Okay.
18   BY MR. MORRIS:
19         Q.  This is a text that you sent at the
20   bottom there at 5:26 p.m. to Mr. Seery; is that
21   right?
22         A.  Yes.
23         Q.  Can you just read that text, that
24   5:26 out loud?
25         A.  Be careful what you do, last warning.

Page 63

J. DONDERO

1    J. DONDERO
2          Q.  Why did you write that?
3          A.  Because all the reasons we just went
4    over.  And I think he's violating the Advisers
5    Act.  He's putting the funds and the debtor at
6    risk, in jeopardy of class action lawsuits, and
7    he's going against the interests of investors
8    that are in transition, and expressed a desire to
9    not have their assets sold, especially when
10   there's no business reason.
11         And for all the reasons articulated
12   below -- I mean, for all the reasons we just went
13   over, and there are a few others I probably
14   haven't remembered off the top of my head, but
15   it's -- I think it's -- I think his activities
16   regarding the CLOs is incredibly inappropriate,
17   unfounded and malicious, and he hadn't sold that
18   many securities at that point in time, somewhat
19   de minimis amounts, but it was a warning to tell
20   him to stop; otherwise, rightfully, the
21   beneficial owners would take more significant
22   actions, which I think they should and they will.
23         Q.  What significant action are the
24   beneficial owners going to take?
25         A.  I don't know.  But there's a lot more

Page 64

J. DONDERO

1    J. DONDERO
2    things that they can push on, like you were
3    suggesting earlier, asking earlier in terms of
4    self-reporting to the SEC.
5          Q.  But you haven't done that yet, to the
6    best of your knowledge; is that right?
7          A.  I'm not aware.
8          Q.  You wrote there that it's the last
9    warning.
10         Do you see that?
11         A.  Yes.
12         Q.  How many other warnings have you
13   given Mr. Seery?
14         A.  All the e-mails we just went over.
15         Q.  Anything else?
16         A.  No.
17         Q.  Okay.  You got document requests in
18   this -- in connection with this matter; isn't
19   that right?
20         A.  Yes.
21         MR. MORRIS:  Okay.  Can we put up
22   Exhibit 5, please.
23   BY MR. MORRIS:
24         Q.  You know, before we look at that,
25   earlier this morning you mentioned -- you made a

Page 65

J. DONDERO

1    J. DONDERO
2    reference to internal counsel.
3          Do you recall that?
4          A.  Yes.
5          Q.  Okay.  Who were you referring to?
6          A.  D.C. Sauter.
7          Q.  And D.C. Sauter is internal counsel
8    for who?
9          A.  I'm sorry, was there a question
10   there?
11         Q.  Yes.  I apologize.
12         D.C. Sauter is internal counsel for
13   who, for which entity?
14         A.  NexPoint.
15         Q.  Okay.  Were you referring to anybody
16   else?
17         A.  No.
18         Q.  Okay.  You mentioned Scott Ellington
19   earlier, right?
20         A.  Yes.
21         Q.  And who is Mr. Ellington?
22         A.  He's general counsel at Highland
23   historically.  I think his role has been
24   redefined as settlement counsel, that's how it
25   was described to me, I guess, six, nine months

Page 66

1      J. DONDERO
2 ago, six months ago.
3      Q. Mr. Ellington is employed by the
4 debtor, right?
5      A. Yes.
6      Q. And do you know when he first became
7 employed by the debtor?
8      A. Over a decade ago.
9      Q. Do you know whether Mr. Ellington has
10 any employer other than the debtor?
11      A. I don't know.
12      Q. He never told you that he had an
13 employer other than the debtor, did he?
14      A. I don't know.
15      Q. You know if he told you or not,
16 right?  Did he ever tell you that?
17      A. He never told me he did, no.
18      Q. And you have no facts or reason to
19 believe, as you sit here right now, that the
20 debtor is -- withdrawn.
21      You have no facts or reason to
22 believe right now that Mr. Ellington has any
23 employer other than the debtor, correct?
24      MR. BONDS:  Objection, form.
25      A. I'd like to stick with:  I don't

Page 67

1      J. DONDERO
2 know.
3 BY MR. MORRIS:
4      Q. You have no reason to believe that;
5 is that fair?
6      A. Correct, I don't know.
7      Q. Okay.  He's not -- Mr. Ellington is
8 not your personal lawyer, right?
9      A. No.
10      Q. He's never represented Jim Dondero
11 personally; is that right?
12      A. No.
13      MR. MORRIS:  Let's look at the
14 document request, please, Exhibit 5.
15      (Dondero Deposition Exhibit 5
16 marked.)
17 BY MR. MORRIS:
18      Q. If we could go -- let me just ask you
19 generally, Mr. Dondero.
20      Have you ever seen this document
21 before?
22      A. No.
23      Q. Are you aware that the debtor served
24 document requests on the Bonds Ellis firm for
25 documents in connection with its motion for a

Page 68

1      J. DONDERO
2 preliminary injunction?
3      A. Yes.
4      Q. How did you learn that?
5      A. I heard about it from my lawyers.
6      Q. Okay.  Did you oversee the search for
7 responsive documents?
8      A. Response -- I know we were responsive
9 and compliant, but I delegated it to my
10 assistants and the employees at Bonds Ellis.
11      Q. Which assistants did you delegate
12 this to?
13      A. Tara Loiben.  I think primarily Tara
14 Loiben.
15      Q. And who is Ms. Loiben?
16      A. She's my assistant.
17      Q. And who is she --
18      A. I'm sorry?
19      Q. Who is she employed by?
20      A. I -- I don't know for sure.  I think
21 Highland, but I don't know.  I don't want to
22 speculate.
23      Q. What instructions -- (audio
24 malfunction) --
25      (Clarification requested by the

Page 69

1      J. DONDERO
2 stenographer.)
3 BY MR. MORRIS:
4      Q. What instructions did you give her in
5 order to search for documents?
6      A. I didn't -- I didn't give her any.
7 She worked with that and she had -- she has full
8 access to my e-mail, and I gave her my phone for
9 the better part of a couple days in the office.
10      Q. You -- until the end of 2020, you had
11 an e-mail address with an HCMLP or a Highland
12 e-mail address, right?
13      A. Yes.
14      Q. Have you stopped -- has that e-mail
15 address ceased to be in use?
16      A. I've switched to an e-mail at the
17 bank as of -- whatever it was, last week or...
18      Q. In the year 2020, did you use any
19 e-mail address other than the Highland e-mail
20 address?
21      A. No.
22      Q. You don't have a Gmail address or any
23 other personal e-mail address?
24      A. I have an old Gmail address, but it's
25 dormant.  I haven't logged on to it in years.

Page 70

1    J. DONDERO
2    Q.  Okay.  And you understood that the
3    debtor's document request called for the
4    production of all text messages that were
5    responsive to the requests, right?
6    A.  Yes.
7    Q.  Can we just scroll down to the
8    requests themselves?  Right there.
9    Do you see Request No. 3 is for all
10    communications between you and any person
11    employed by the debtor?
12    A.  Yes.
13    Q.  And did you understand that the
14    request was limited to the time period of, I
15    think, December 10th, 2020 to the end of the
16    month?
17    A.  I didn't read the details of this.  I
18    didn't get into it.  I didn't do the document
19    production that I believe was completed and
20    responsive.  I delegated that.
21    Q.  Did you review the documents before
22    they were produced?  Do you know what was
23    produced?  Withdrawn.  Two different questions.
24    Did you review the documents for
25    completeness before your lawyers delivered them

Page 71

1    J. DONDERO
2    to my firm?
3    A.  Only in the most general -- when
4    she'd print out a stack of them, I'd just thumb
5    through the stack of them, and that was it.  But
6    other than that, no.
7    Q.  Did you do anything to satisfy
8    yourself that you had produced all responsive
9    documents?
10    A.  I trust Tara's work ethic and
11    capabilities, and I trust the lawyers at Bonds
12    Ellis, so I didn't -- I didn't intervene or
13    supersede or supervise.
14    Q.  So you didn't do anything to make
15    sure -- you didn't do anything personally --
16    withdrawn.
17    You didn't take any steps personally
18    to make sure that all responsive documents had
19    been produced, right?
20    MR. BONDS:  Objection, form.
21    A.  I wasn't involved personally, but I
22    do believe it was responsive and complete.
23    BY MR. MORRIS:
24    Q.  Until early December, you had a phone
25    that was bought and paid for by the debtor,

Page 72

1    J. DONDERO
2    right?
3    A.  Yes.
4    Q.  What happened to that phone?
5    A.  It was disposed of as part of getting
6    a replacement phone in anticipation of
7    potentially a transition.
8    Q.  Who decided to dispose of it?
9    A.  That's historically what we've done
10    with all of our historic phones, when we've
11    gotten new phones.  I've gotten a new phone, I
12    guess, every four or five years, and the old ones
13    have always been destroyed.
14    Q.  Who decided to destroy this --
15    withdrawn.
16    When you say it was disposed of, what
17    does that mean?
18    A.  As far as I know, it was disposed of
19    in the garbage, but I don't know if it was
20    recycled or whatever.
21    Q.  And who decided to throw it in the
22    garbage?
23    A.  We've always -- we've always done
24    that when we've gotten new phones, versus trading
25    them in, for the senior executives.

Page 73

1    J. DONDERO
2    Q.  I appreciate that, but I'm just
3    talking about the very specific phone that the
4    debtor bought and paid for your benefit.  Who
5    made the decision to dispose and throw that phone
6    away?
7    MR. BONDS:  Objection, form.
8    A.  I -- like I said, I understood it to
9    be our standard process and protocol.  I don't
10    know.  I can't label anybody with the decision.
11    BY MR. MORRIS:
12    Q.  Well, who threw it away?
13    A.  I don't know.
14    Q.  You don't know if you threw the phone
15    away?
16    A.  No, I -- I don't know.  No, I don't
17    remember throwing it away, but I don't know who
18    did.
19    Q.  Did you have conversations with
20    anybody about the decision to throw away the
21    phone?
22    A.  Like I said, it wasn't a decision or
23    a new decision.  It's been the process, as far as
24    I understand it, every time we've upgraded phones
25    over the last 30 years.

| Page 74 | Page 75 |
|---|---|

**Page 74**

J. DONDERO

1          J. DONDERO
2     Q. You just throw it in the garbage?
3  You don't try to get a credit for it by returning
4  it?
5     A. No.
6     Q. Okay. Did you ever speak with
7  Mr. Ellington about your phone that was bought
8  and paid for by the debtor?
9     A. I think Ellington's phone and my
10  phone and I think -- I think right around the
11  same time, in anticipation, in case there was a
12  transition or in case there was a liquidation
13  plan, it was time to move the phone ownership
14  away from the estate. The estate wasn't going to
15  pay for it anymore anyway in another couple of
16  weeks so, I --
17     Q. Were you aware --
18     A. I'm sorry, what's your question?
19     Q. Are you aware that the UCC had asked
20  for your text messages before the time that you
21  disposed of your phone?
22     A. No.
23     Q. Nobody ever told you that the UCC
24  wanted your phone?
25     A. No.

**Page 75**

J. DONDERO

1          J. DONDERO
2     Q. When exactly did you dispose of your
3  phone?
4     A. On or about when I got my new phone.
5     Q. Who at the debtor did you tell that
6  you disposed of your phone?
7     A. I don't -- I don't remember who. Was
8  it Jason Rothstein was involved in getting my new
9  phone and knew that I was disposing of my old
10  phone? I don't know who else knew. But again,
11  it was standard procedure.
12     Q. Did it ever occur to you to get the
13  debtor's consent before doing this?
14     MR. BONDS: Objection, form.
15     A. No.
16  BY MR. MORRIS:
17     Q. Did you have the phone number
18  transferred to your personal account?
19     A. Yes.
20     Q. Did you ever ask the debtor for its
21  permission to do that?
22     A. No.
23     Q. Did you ever give the debtor notice
24  that you were doing that?
25     A. I didn't believe it was necessary or

| Page 76 | Page 77 |
|---|---|

**Page 76**

J. DONDERO

1          J. DONDERO
2  appropriate.
3     Q. So you wanted it to be a secret?
4     MR. BONDS: Objection, form.
5     A. No. No, I wouldn't describe it as a
6  secret. I would say I didn't think it was
7  necessary or appropriate.
8     Every executive that's ever left
9  Highland has always kept their phone number,
10  period. Highland's never said, no, we're keeping
11  the phone number, ever, out of the two or 300
12  people that have come through Highland. And I
13  don't believe most businesses try and retain the
14  phone number of employees when they leave. It's
15  ludicrous on its surface.
16  BY MR. MORRIS:
17     Q. Okay. So let me just make sure that
18  I understand this.
19     You threw the phone -- withdrawn.
20     Somebody threw the phone that the
21  debtor bought and paid for in the garbage without
22  the debtor's knowledge or consent; is that right?
23     MR. BONDS: Objection, form.
24     A. I'd just repeat my testimony, that
25  it's always been our process to destroy old

**Page 77**

J. DONDERO

1          J. DONDERO
2  phones when we get new phones.
3  BY MR. MORRIS:
4     Q. You were no longer an employee of the
5  debtor at the time, correct?
6     A. At the time? I believe I was an
7  employee of the debtor since January.
8     Q. Well, you stayed on as an unpaid
9  employee until mid October; isn't that right?
10     A. Right, but I -- but I don't even
11  think my phone was paid for by the debtor. I
12  think my phone was paid for by shared services by
13  NexPoint. I -- I don't know what you're -- I
14  don't know what you're getting at or what
15  you're -- you're asking me.
16     Q. It's not complicated.
17     Did you tell the debtor that you
18  threw away your phone at any time until this
19  deposition?
20     A. Did I tell the debtor? Like I said,
21  I didn't think it was the debtor's phone. No, I
22  did not tell the debtor or get permission. No, I
23  did not.
24     Q. And did you tell the debtor that you
25  were changing the phone number?

Page 78

J. DONDERO

1
2   A. No.
3   Q. And did Mr. Ellington help you change
4   the phone number?
5       MR. BONDS: Objection, form.
6   A. I didn't change the phone number.
7   BY MR. MORRIS:
8   Q. Withdrawn.
9       Did Mr. Ellington help you have the
10  phone number transitioned to your personal
11  account?
12      MR. BONDS: Objection, form.
13  A. No. No. It was Jason -- Jason
14  Rothstein handles the technology stuff and the
15  phone stuff.
16  BY MR. MORRIS:
17  Q. Did Mr. Ellington also change his
18  phone number to his own personal account?
19  A. My understanding was there was
20  numerous senior executives that changed their
21  phone in anticipation of being terminated by the
22  debtor shortly.
23  Q. Who else did it?
24  A. I don't know. I thought it was -- I
25  didn't think it was just Ellington and I. I

Page 79

J. DONDERO

1
2   thought it was a bunch of senior execs. But --
3   Q. What's the basis --
4   A. -- who cares? Who cares? I didn't
5   care. I don't know. I mean --
6   Q. I don't care if you care or not. I'm
7   asking you questions.
8       What is the basis for your statement
9   that other people besides you and Mr. Ellington
10  changed the phone numbers?
11      MR. BONDS: Objection, form.
12  A. That was my understanding. That was
13  my understanding. But I don't -- I don't recall
14  specifics. I didn't pay attention.
15  BY MR. MORRIS:
16  Q. What is the basis for the
17  understanding? Did somebody tell you that?
18      MR. BONDS: Can you repeat the
19  question?
20  BY MR. MORRIS:
21  Q. What is the basis for your
22  understanding? Did somebody tell you that
23  employees of Highland other than Mr. Ellington
24  had changed the phone numbers?
25  A. Yes. My understanding was everybody

Page 80

J. DONDERO

1
2   had to move their phones in the next 30 days or
3   next 25 days, based on Seery's termination
4   notice.
5   Q. Did Jim Seery -- withdrawn. I'm
6   perfectly fine.
7       MR. MORRIS: Can we put up Exhibit 6,
8   please.
9       (Dondero Deposition Exhibit 6
10  marked.)
11  BY MR. MORRIS:
12  Q. That's Jason Rothstein.
13      Do you see that?
14  A. Yes.
15  Q. He didn't throw the phone in the
16  garbage, did he?
17  A. I don't know.
18  Q. Well, according to the text that he
19  sent you on December 10th, he left your own --
20  old phone in the drawer of Tara's desk.
21      Do you see that?
22  A. Yes.
23  Q. So he didn't think that it was his
24  responsibility as of December 10th to throw it in
25  the garbage, did he?

Page 81

J. DONDERO

1
2   A. I don't know.
3   Q. He left it in Tara's desk, didn't he?
4   A. On December 10th. But I don't know
5   what he did on December 11th.
6   Q. Did you tell him to do anything?
7   A. I don't -- all I know is the phone's
8   been disposed of. That's all I know.
9   Q. Okay. Did you tell Mr. Rothstein to
10  take the phone out of Tara's desk and throw it in
11  the garbage?
12  A. I did not.
13  Q. Did you tell Tara to take the phone
14  out of her desk and throw it in the garbage?
15  A. I did not.
16      MR. MORRIS: Okay. Can we put up
17  Exhibit 7, please.
18      (Dondero Deposition Exhibit 7
19  marked.)
20      MR. MORRIS: Can we just scroll down
21  a little bit.
22  BY MR. MORRIS:
23  Q. Is this a text message from you to
24  Tara?
25  A. Yep.

Page 82

1          J. DONDERO
2      Q.  If we could scroll up just a little
3  bit so we can see the date.
4          Well, it doesn't have a date, but do
5  you recall when you asked Tara to come in to
6  work -- (audio malfunction) --
7          (Clarification requested by the
8  stenographer.)
9  BY MR. MORRIS:
10     Q.  -- to come in to work on discovery.
11  Do you recall when you sent this text message,
12  Mr. Dondero?
13     A.  No.
14     Q.  Do you know how Tara -- withdrawn.
15         Did Tara come in to work on discovery
16  at any time?
17     A.  Yes.
18     Q.  And did you give her any instructions
19  on what to do?
20     A.  Again, just generally.
21     Q.  What were the general instructions
22  that you gave her?
23     A.  Work with the Bonds Ellis guys.
24  Here's the access to my computer and my phone.
25  Be complete and be responsive.

Page 83

1          J. DONDERO
2      Q.  Did you ever speak with Mr. Ellington
3  about your document production?
4      A.  No.
5      Q.  Did Mr. Ellington play any role in
6  searching for, reviewing or producing responsive
7  documents?
8      A.  Nope.
9      Q.  Did you ever speak with Mr. Leventon
10  about your document production?
11     A.  Nope.
12     Q.  Did Mr. Leventon play any role in
13  searching for, reviewing or producing responsive
14  documents?
15     A.  Nope.
16     Q.  Did you ever speak with anybody
17  employed by the debtor, other than Tara, about
18  your document production?
19     A.  Tara's got an assistant, or my other
20  assistant that works with Tara, Kelly, would have
21  been the only other person.
22         She might have been -- Tara had to go
23  back and see her girls during lunch, so I think
24  she used Kelly to do some of the legwork.
25     Q.  Let's talk about the TRO for a

Page 84

1          J. DONDERO
2  second.
3          MR. MORRIS:  Can we put up Exhibit 9,
4  please.
5          (Dondero Deposition Exhibit 9
6  marked.)
7  BY MR. MORRIS:
8      Q.  This is the temporary restraining
9  order that was signed on December 10th.
10         Do you see that?
11         If we could scroll down just a little
12  bit.  Yeah.
13     A.  Okay.
14     Q.  You've never seen this document
15  before, right?
16     A.  Yes, I haven't read it.
17     Q.  And I know I asked you earlier today
18  what your understanding was of how this order
19  restrained you.
20         Do you remember those questions?
21     A.  Yes.
22     Q.  Okay.  Is there anything, upon
23  reflection, that you need to add in order to make
24  the record complete as to your understanding of
25  the scope of the injunction?

Page 85

1          J. DONDERO
2      A.  Not at this moment.
3          MR. MORRIS:  Can you put up
4  Exhibit 10, please.
5          (Dondero Deposition Exhibit 10
6  marked.)
7  BY MR. MORRIS:
8      Q.  All right.  Have you seen this letter
9  before, sir?
10     A.  No.  I mean, not specifically.  I
11  probably received it, but I haven't read it.
12     Q.  All right.  I just want to go back to
13  the phone for a second to see if I can nail this
14  down.
15         Did you dispose of the phone
16  somewhere around December 10th, 2020?
17     A.  I -- I don't know.  Probably.
18     Q.  Well, we just looked at that e-mail,
19  right, that was from Mr. Rothstein.
20         MR. MORRIS:  Can we get that back?
21     A.  Yes.
22         MR. MORRIS:  I just want to see what
23  the date of that was.  Yes.  Okay.
24  BY MR. MORRIS:
25     Q.  So that's December 10th at 6:25 p.m.,

J. DONDERO

1
2  right?
3      A.  Yes.
4      Q.  Okay.  So according to Mr. Rothstein,
5  as of that date at that time, your phone was in
6  Tara's desk, right?
7      A.  Yes.
8      Q.  You have no reason to disbelieve
9  that, do you?
10     MR. BONDS:  Can you repeat the
11  question?  I'm sorry.
12     MR. MORRIS:  Withdrawn.
13  BY MR. MORRIS:
14     Q.  So is it fair to say, then, that the
15  phone was disposed of and thrown in the garbage
16  sometime after December 10th?
17     A.  I don't know.
18     Q.  Well, as of December 10th,
19  Mr. Rothstein told you that it was in Tara's
20  desk, right?
21     A.  Yes.
22     Q.  Okay.  So if he -- Jason's not a
23  liar, is he?
24     A.  No.
25     Q.  Do you have any reason to believe

J. DONDERO

1
2  that the phone was anywhere other than Tara's
3  desk at 6:25 p.m. on December 10th?
4      A.  I don't know.
5      Q.  You have no reason to believe that
6  that statement by Mr. Rothstein is untrue,
7  correct?
8      A.  Correct.
9      Q.  Do you know how it came to be that
10  the phone was disposed of in the manner that
11  you've described?
12     A.  Nope.
13     Q.  You can't tell me who did it; is that
14  right?
15     A.  Correct.
16     Q.  And you can't tell me when, after
17  December 10th, that happened, right?
18     A.  Correct.
19     Q.  Okay.  Thank you.  Let's go back to,
20  I guess, Exhibit 10.  If we can just scroll down
21  a little bit.
22     I understand that you haven't seen
23  this document before.  Go to the next page,
24  please -- no.  Yeah, next page.
25     Do you see the first full paragraph

J. DONDERO

1
2  there beginning "On December 22nd"?
3      A.  I'm going to have to get up and read
4  that.  Just hold on a sec.
5      Q.  Okay.  Take your time.
6      A.  Yes, I see that.
7      Q.  Okay.  Having read that paragraph, do
8  you have any basis to dispute any of the
9  statements in that paragraph?
10     MR. BONDS:  I'm sorry.  Can you read
11  it again or can you ask your question again?
12     MR. MORRIS:  Sure.  I'd like to know
13  if Mr. Dondero has any basis to dispute any
14  assertion made in that paragraph.
15     A.  I disagree with every sentence in
16  that paragraph based on my 30 years of experience
17  and understanding how to operate a registered
18  investment advisor and how to do it in the
19  interest of performance, investors and a
20  registered investment advisor.
21  BY MR. MORRIS:
22     Q.  All right.  Let's try this
23  differently.  I shouldn't have done that.
24     The first sentence, do you have any
25  basis to disagree with any aspect of the first

J. DONDERO

1
2  sentence of that paragraph?  And let me just read
3  it aloud, if I may.
4      A.  That -- all right.  What's your
5  question?
6      Q.  Is there anything inaccurate about
7  the first sentence?
8      A.  I believe my instructions in the
9  e-mails we went over were to not do the trades.
10  You know, that sentence implies not settle the
11  trade, which means to not do the trades once they
12  were already bona fide.  I -- I don't recall that
13  ever being my contention.
14     I would have preferred they be
15  reversed, but my instructions, I believe, in
16  everything we went over were to not do the
17  trades, stop doing trades that are adverse to the
18  interests of investors, but it wasn't regarding
19  settling outstanding trades.  So I think that
20  sentence on its face is in error.
21     Q.  Okay.  So but it's true, then, that
22  you instructed employees of NPA and HCMFA on or
23  around December 22nd to stop doing the trades of
24  Avaya and Sky, correct?
25     A.  Yes.

Page 90

```
1              J. DONDERO
2      Q.  Near the closing bell on – we're
3  going to go back in time just a couple of days –
4  on Friday the 18th, Mr. Sowin informed you that
5  Seery wanted to sell these securities, right?
6      A.  I don't recall that specifically.
7          MR. MORRIS:  Okay.  Can we put up
8  Exhibit 11, please.
9          (Dondero Deposition Exhibit 11
10  marked.)
11         MR. MORRIS:  Okay.  And if we can
12  just go down to the bottom of it.  Yeah.
13  BY MR. MORRIS:
14      Q.  So that e-mail at the bottom, that's
15  Mr. Seery's direction to sell Avaya securities
16  from the CLOs, right?
17      A.  I don't know what's happening here.
18  I don't know if this is fuzzy or my eyes are
19  getting worse, but can we enlarge these a little
20  bit, or I'm going to have to get up each time.
21          Yeah.  This is nutty and vindictive.
22  I think everybody realizes that there's no
23  liquidity in the markets the three days before
24  Thanksgiving and Christmas.  There's no urgency
25  or reason to sell any of these securities that
```

Page 91

```
1              J. DONDERO
2  couldn't have waited until January or February.
3          There's no business purpose in
4  selling any of those securities, yet he's pushing
5  them through for self-serving or vindictive
6  reasons.  I – or maybe trying to get more issues
7  in front of the judge.  I have no idea, but
8  this – this stuff makes absolutely no sense and
9  no business purpose.
10          But I'm sorry, what's your question?
11         MR. MORRIS:  Okay.  I move to strike
12  and I'd ask you to listen to my question.
13  BY MR. MORRIS:
14      Q.  It's simply that you learned, just
15  before the closing bell on Friday, December 18th,
16  that Mr. Seery wanted to sell Avaya securities
17  out of the CLOs?
18         MR. BONDS:  Objection, form.
19         THE WITNESS:  Yeah, hold on.  I need
20  to interrupt for a second.  When you strike
21  something, does that mean it doesn't end up in
22  the record?
23         MR. MORRIS:  The judge will decide
24  whether or not it does.  It's my request that the
25  judge strike it from the record.  She'll make the
```

Page 92

```
1              J. DONDERO
2  ruling.
3          THE WITNESS:  Okay.  But then my
4  lawyer can ask to put it in as my understanding
5  of something at the end or something of the
6  deposition or...
7          MR. MORRIS:  I don't want to give you
8  legal advice, Mr. Dondero, but yes, that's
9  generally how it works.
10          THE WITNESS:  Okay.  Thank you.
11  BY MR. MORRIS:
12      Q.  So again, the question is simply
13  whether you learned near the closing bell on
14  Friday, December 18th, that Mr. Seery wanted to
15  sell Avaya shares out of the CLOs?
16         MR. BONDS:  Objection, form.
17      A.  It appears so.
18  BY MR. MORRIS:
19      Q.  Okay.  And can you just scroll up
20  above that, please.  And – okay.
21          Do you see that Mr. Sowin, in fact,
22  forwards this right to you?
23      A.  Yes.
24      Q.  And it was on the basis of this that
25  you instructed the NPA and HCMFA employees not to
```

Page 93

```
1              J. DONDERO
2  execute these sales?
3      A.  Yes.
4      Q.  After the TRO was issued, did you
5  ever instruct any employees of NPA or HCMFA not
6  to interfere or impede with the debtor's
7  management of the CLOs?
8      A.  No.
9      Q.  To the best of your knowledge, did
10  anyone ever instruct the employees of NPA and
11  HCMFA not to interfere or impede with the
12  debtor's management of the CLOs?
13      A.  No.
14      Q.  Did you ever provide a copy of the
15  TRO to any employees of NPA and HCMFA?
16      A.  I did not.
17      Q.  Do you know if anybody ever provided
18  a copy of the TRO to any of the employees of NPA
19  and HCMFA?
20      A.  I do not know.
21         MR. MORRIS:  Okay.  Can we put up
22  Exhibit 12, please.
23          (Dondero Deposition Exhibit 12
24  marked.)
25          ///
```

Page 94

J. DONDERO

1   BY MR. MORRIS:
2       Q. Okay. This is a letter that was sent
3   to K&L Gates.
4       Do you know who K&L Gates represents
5   in connection with this matter?
6       A. Some of the retail funds.
7       Q. And do they also represent the two
8   advisors?
9       A. Yes. I believe they're one of --
10  yes.
11      Q. Attached to this letter, there's an
12  Exhibit A, if we can go down, and we'll find a
13  letter from K&L Gates there. Okay.
14      This is another letter from K&L Gates
15  dated December 22nd, 2020. Are you able to see
16  that, sir? Can we scroll down a little bit?
17      A. Yes. Yes, I can see the letter.
18      Q. Okay. Were you aware that this
19  letter was sent at the time that it was?
20      A. I was aware, yes.
21      Q. And these are the same entities,
22  except for CLO Holdco, that had filed the prior
23  motion that was denied by the Court, right?
24      A. I'm sorry, ask that question again.

Page 95

J. DONDERO

1   These were --
2       Q. Yeah, let me just do a little
3   background.
4       A couple of -- about a week before
5   this letter was sent, the entities represented by
6   K&L Gates, except for CLO Holdco, had made a
7   motion in the bankruptcy court, right?
8       A. Yes.
9       Q. They had asked the Court to pause, to
10  impose a pause on the debtor from selling any CLO
11  assets; is that right?
12      A. I don't -- I don't know what
13  exactly -- I don't know the details of what they
14  requested.
15      Q. Okay. Did you authorize the filing
16  of that motion?
17      A. Authorize the filing? I
18  championed -- I pushed and encouraged the chief
19  compliance officer and the general counsel to do
20  what they believed was right as rigorously as
21  possible, and it manifested itself in the letters
22  that you're speaking of.
23      Q. And you -- and you approved of these
24  letters, right?

Page 96

J. DONDERO

1       A. I -- not directly and not
2   specifically, but I encouraged them to do what
3   they thought was right.
4       Q. Okay. And you were aware that
5   letters with the substance contained in them were
6   going to be sent -- (audio malfunction) --
7       (Clarification requested by the
8   stenographer.)
9   BY MR. MORRIS:
10      Q. -- to the debtor?
11      THE STENOGRAPHER: And the answer
12  again, please?
13      MR. BONDS: And I objected as to
14  form.
15      THE STENOGRAPHER: And the answer
16  again, please?
17      A. I was aware that letters were being
18  sent, and I was aware that motions -- or a motion
19  was being filed.
20  BY MR. MORRIS:
21      Q. This letter was also sent on behalf
22  of CLO Holdco, Ltd.
23      Do you see that?
24      A. Yes.

Page 97

J. DONDERO

1       Q. Are you the direct or indirect
2   economic or beneficial owner of CLO Holdco, Ltd.?
3       A. No.
4       Q. Who is?
5       A. I believe the DAF and HarbourVest.
6       Q. And who controls the DAF?
7       A. Grant Scott.
8       Q. Who is the beneficial owner of the
9   DAF?
10      A. Three char-- three or four
11  charitable organizations.
12      Q. And who controls CLO Holdco?
13      A. I don't know exactly.
14      Q. Do you?
15      A. No.
16      Q. And who are the possibilities?
17      A. CLO Holdco, my understanding is it
18  was a -- it was an investment amalgamation
19  between HarbourVest and the DAF, so with the DAF
20  having the primary -- or the largest ownership
21  interest.
22      Q. And with that largest ownership
23  interest, is the DAF able to control CLO Holdco?
24      A. I don't know. Maybe.

Page 98

1    J. DONDERO
2    Q. You've never asked that question?
3    A. Nope.
4    Q. Did you ever instruct any of the
5    advisors or funds to withdraw this letter?
6        MR. BONDS: Objection, form.
7    A. No.
8    BY MR. MORRIS:
9    Q. To the best of your knowledge, has
10   anyone on behalf of the advisors, the funds or
11   CLO Holdco ever instructed K&L Gates to withdraw
12   this letter?
13   A. Not that I'm aware of.
14   Q. Okay. I want to just see if I can
15   refresh your recollection a bit.
16       When you talked about the DAF and
17   HarbourVest, is it possible that you're confusing
18   that with HCLOF?
19   A. You know, you're right. It could be.
20   Maybe it is CLO Holdco — you know what, let me
21   just — let me not speculate. But the CLO Holdco
22   might just be the DAF, and the combined entity
23   might be the level above that. I — I don't know
24   exactly. Let me leave it at that.
25   Q. Okay. That's fair.

Page 99

1    J. DONDERO
2    This is the — I think you've
3    testified — I'm trying to speed this up a little
4    bit, believe it or not — that you supported the
5    sending of this particular letter, right? And if
6    you need to read more of it, let me know.
7    A. No, I — again, the thrust of it, the
8    theme of it, the — when you think bad or illegal
9    or regulatorily inappropriate stuff has happened,
10   what did you do, when you knew it, et cetera.
11   And I think the responsibilities of that
12   transcend a lot of things, you know.
13   Q. But you are aware that these very
14   same entities, except for CLO Holdco, had
15   advanced the very same arguments to the
16   bankruptcy court just six days earlier and their
17   motion is denied, right?
18       MR. BONDS: Objection, form.
19   A. Yes. And with all due respect to the
20   Court, it doesn't mean that it was wrong or
21   inappropriate to advance the argument.
22   BY MR. MORRIS:
23   Q. Okay. But having advanced the
24   argument on December 16th and having had it
25   rejected, you support these entities pressing the

Page 100

1    J. DONDERO
2    same arguments again against the debtor, right?
3    A. We try and do what's right.
4        MR. MORRIS: Okay. Can we put up
5    Exhibit 13, please.
6        (Dondero Deposition Exhibit 13
7    marked.)
8        MR. MORRIS: And if we can go to
9    Exhibit A on the back. Thanks.
10   BY MR. MORRIS:
11   Q. This is another letter sent the next
12   day, right, on December 23rd, from K&L Gates?
13   And we can scroll down further, again.
14       Do you recall that there was yet
15   another letter sent on the 23rd?
16   A. Yeah, I don't recall specifically,
17   but...
18   Q. Can we scroll down a little bit
19   further in this document.
20       Do you recall that there came a time
21   when K&L Gates, on behalf of the advisors and the
22   funds, told the debtor and its counsel that it
23   was considering initiating the process for
24   removing the debtor as portfolio manager of the
25   CLOs?

Page 101

1    J. DONDERO
2        MR. BONDS: Objection, form.
3    A. I believe they — I don't know if
4    you're asking me a reservation of rights or
5    whatever, but I think they should do everything
6    as rigorously as possible to try and protect the
7    investors.
8    BY MR. MORRIS:
9    Q. Are you aware of any prohibition of
10   doing what you're — withdrawn.
11       Are you aware that the debtor made an
12   offer to assign the CLO management agreements to
13   NexPoint back in the beginning of December?
14   A. I — I do remember that, and I did
15   get a summary of that, and it was untenable in
16   terms of what it was wrapped in.
17   Q. What was untenable about it?
18   A. Off the top of my head, it would give
19   Seery releases for bad acts or inappropriate
20   trades. It required a reimbursement for, I
21   think, a million dollars of Pachulski fees
22   relative to this subject, and I think it also
23   wanted an up-front payment for the present value
24   of the future management fees to be paid to the
25   estate.

Page 102

```
1              J. DONDERO
2      Q.  And who made the decision to reject
3  the debtor's offer?
4      A.  Made a decision to reject the --
5  reject the -- it wasn't a rejection of the offer
6  as much as a disagreement that that is the way
7  CLO contracts transfer, that the manager doesn't
8  have the right to extort from the next manager
9  when the investors want to transfer.
10        So there's a facilitation that
11 Highland could provide, but Highland is not in a
12 position, based on our understanding of the
13 market, to demand consideration.
14     Q.  Okay.  Who made the decision to
15 reject the offer?
16     A.  I was involved in that.  It wasn't a
17 formal rejection, but it was a view that it was
18 an inappropriate offer.
19     Q.  Did anybody decide or suggest that
20 maybe we should make an appropriate offer?
21     A.  Not yet.
22     Q.  Was there any reason why, for the
23 past month, when the debtor has provided an
24 opportunity to transfer these CLO management
25 contracts, that none of the advisors or anybody
```

Page 103

```
1              J. DONDERO
2  representing them has sought fit to make an
3  appropriate counteroffer?
4      A.  We can get an appropriate
5  counteroffer out tomorrow.
6      Q.  Okay.  Is there anything that's
7  prevented that over the last month instead of
8  writing letters and engaging in this litigation?
9      A.  The fundamental prerequisites were so
10 inappropriate that it dissuaded us from putting a
11 normal, commercial, reasonable thing forward.
12 But we'll put something commercial, reasonable
13 and appropriate through tomorrow, and we'll see
14 how far it goes.
15     Q.  Did you support the sending of this
16 particular letter at the time it was sent?
17     A.  I -- generally, yes.
18     Q.  Okay.  Have you authorized any of the
19 entities on this letter to initiate the process
20 to remove the debtor as the fund manager of any
21 CLO?
22        MR. BONDS:  Objection, form.
23     A.  That's not my position, and it's not
24 without legal considerations regarding what's
25 subject to a stay and what's appropriate at this
```

Page 104

```
1              J. DONDERO
2  juncture.
3        But -- but I believe, subject to
4  whatever is legally appropriate, they should and
5  they will be moving to replace the manager as
6  quickly as possible and holding the manager
7  responsible for bad acts prior to transfer.
8  BY MR. MORRIS:
9      Q.  Have you authorized any of the
10 parties that is signatory to this letter to
11 initiate the process to remove the debtor as the
12 fund manager for the CLOs?
13     A.  I am not that involved.  I haven't
14 authorized it per se.  Again, I'm encouraging the
15 executives in charge to do the right thing, given
16 the circumstances and what's best for investors,
17 especially their retail investors and their
18 obligations under the '40 Act.
19     Q.  You're the president of the two
20 advisors, right?
21     A.  Yes.
22     Q.  And you're the portfolio manager of
23 the funds, right?
24     A.  Yes.
25     Q.  Couldn't you give the direction to
```

Page 105

```
1              J. DONDERO
2  take steps to initiate the process to remove the
3  debtor?
4        MR. BONDS:  I'm sorry, can you repeat
5  the question?
6  BY MR. MORRIS:
7      Q.  Don't you have the power to do that?
8        MR. BONDS:  I'm sorry.  I couldn't
9  hear your question.
10       MR. MORRIS:  Withdrawn.
11 BY MR. MORRIS:
12     Q.  Did you ever discuss with any -- with
13 anybody about whether to initiate the process to
14 remove the debtor as the portfolio manager of the
15 CLOs?
16     A.  I think it's a logical remedy, and I
17 believe the executives, and particularly like the
18 executives -- the chief compliance officer always
19 has personal liability, and I think Jason Post
20 knows that, and I think he's pushing as hard as
21 he can for the benefit of investors in a
22 situation where people are moving against the
23 best interests of investors.
24       And I encourage him to move as
25 aggressively as possible subject to whatever the
```

Page 106

J. DONDERO

1    limits of bankruptcy court is, but I can't be --
2    I've got too many other things to do to be
3    directly involved in the details, so I'm not
4    involved in the details.
5        Q.  I see.
6            Did you ever instruct the parties
7    that are signatory -- withdrawn.
8            Did you ever instruct K&L Gates to
9    withdraw this letter?
10       A.  No.
11       Q.  To the best of your knowledge, has
12   anybody on behalf of the advisors, the funds or
13   CLO Holdco ever instructed K&L Gates to withdraw
14   this letter?
15       A.  No.
16       Q.  Will you commit that each of the
17   entities on whose behalf this letter was sent
18   will cease and desist from taking any steps to
19   initiate the process to remove the debtor as the
20   CLO manager?
21           MR. BONDS:  Objection, form.
22       A.  Say that again.
23   BY MR. MORRIS:
24       Q.  Will you commit on behalf of each of

Page 107

J. DONDERO

1    the funds and the advisors to cease and desist
2    from taking any steps to replace the debtor as
3    the portfolio manager of the CLOs?
4        A.  That would be inappropriate.  I'm not
5    sure it would be illegal, but I think it would be
6    a regulatory breach, and I think it would not be
7    in the best interest of investors if we were to
8    agree to anything like that.  I think that's nuts
9    and it's nutty to ask that.
10       Q.  People say that about me all the
11   time.
12           Did you ever exchange any e-mails or
13   texts with any employee of the parties on this
14   document, on the issue of whether or how to
15   remove the debtor as the CLO's fund manager?
16       A.  Not that I recall.
17       Q.  Did you ever discuss with any
18   employee of the debtor the topic of removing the
19   debtor as the portfolio manager of the CLOs?
20       A.  Not that I recall.
21           MR. MORRIS:  Okay.  It's 1:35.  Can
22   we just take a ten-minute break and resume -- is
23   it 12:35 where you are, Mr. Dondero?  We'll
24   resume at 1:45 Eastern, 12:45 Central.

Page 108

J. DONDERO

1            THE WITNESS:  I'm sorry, I can't hear
2    you.  We return at what time?
3            MR. MORRIS:  In ten minutes, at
4    12:45.
5            MR. BONDS:  And I want to say too,
6    John, that your notice showed that there was a
7    1:30 deposition Central Time of somebody else,
8    and we intend -- I mean, we planned on that, so
9    we're going to need to be through at 1:30.
10           MR. MORRIS:  Yeah, you can do that if
11   you want.  You can do that if you want, but the
12   record will also reflect that we started at least
13   20 minutes late and we took at least a 35-minute
14   break for Mr. Dondero.  So you leave whenever you
15   want, but be guided by that.
16           Let's take a break.
17           MR. BONDS:  Well, I'm telling you
18   that if you want to go forward, you can.
19           MR. MORRIS:  I will.  Thank you.  I
20   appreciate that.
21           THE WITNESS:  All right.  See you
22   guys in 10 minutes.
23           THE VIDEOGRAPHER:  12:36 p.m.,
24   Central Standard Time.  We're off the record.

Page 109

J. DONDERO

1            (Recess taken, 12:36 p.m. to
2    12:49 p.m. CST)
3            THE VIDEOGRAPHER:  12:49 p.m.,
4    Central Standard Time.  We're back on the record.
5    BY MR. MORRIS:
6        Q.  All right.  Can you hear me,
7    Mr. Dondero?
8        A.  Yes.
9        Q.  Is it fair -- do you think it's fair
10   to say that your personal interests are adverse
11   to the debtor's?
12       A.  No.
13       Q.  They asked for your resignation back
14   in October, right?
15       A.  Yes.
16       Q.  And you opposed the debtor's plan on
17   file, right?
18       A.  Yes.
19       Q.  And you objected to the debtor's
20   settlement with ACIS; is that right?
21       A.  Yes.
22       Q.  And you're going to object to the
23   debtor's settlement with HarbourVest; is that
24   right?

Page 110

```
1            J. DONDERO
2       MR. BONDS:  Objection, form.
3       A. I don't know for sure.  I believe so.
4  I don't know.
5  BY MR. MORRIS:
6       Q. And the debtor commenced an adversary
7  proceeding against you; is that right?
8       MR. BONDS:  Objection, form.
9       A. I'm not aware of that in particular.
10  BY MR. MORRIS:
11      Q. The debtor sought and obtained a TRO
12  against you; isn't that right?
13      A. Oh.  Okay, yes.
14      Q. And they also started a lawsuit?
15  They filed a complaint against you -- is that
16  right -- for preliminary and permanent injunctive
17  relief?
18      A. I'm aware of it, yes.
19      Q. And the debtor has removed you from
20  its offices, right?
21      A. Yes.
22      Q. And based on all of that, would you
23  agree that your personal interests are adverse to
24  the debtor?
25      A. No.
```

Page 111

```
1            J. DONDERO
2       Q. Okay.  Since the TRO was entered,
3  have you ever discussed your litigation strategy
4  with Mr. Ellington?
5       A. Not -- no.  Not that I'm aware of.
6  That's not the subject of our conversations.
7  He's more of a go-between, and he's more of an
8  overall strategist.
9       Q. And he's a strategist for your -- you
10  know, for the defense and prosecution of your
11  personal interests, right?
12      A. No.
13      Q. No?
14         Do you remember that there were
15  actually two motions on the calendar on
16  December 16th?  There was the motion that you
17  brought that was called, I guess, the active
18  ordinary course transactions motion, and then
19  there was the motion brought by the K&L Gates
20  firm on behalf of -- (audio malfunction) --
21         (Clarification requested by the
22  stenographer.)
23  BY MR. MORRIS:
24      Q. -- the advisors and the funds, where
25  they sought the pause of the sale of CLO assets.
```

Page 112

```
1            J. DONDERO
2         Do you remember that those two
3  motions were on the calendar a couple of weeks
4  ago?
5       A. I remember that K&L Gates one.  The
6  first one, I don't remember.
7       Q. Do you remember discussing with
8  Mr. Ellington the need for a witness for one of
9  those motions?
10      A. No.  I don't remember the motion.
11      Q. Do you remember that Mr. Ellington
12  suggested that J.P. Sevilla serve as a witness
13  for one of those motions?
14      A. I don't remember that.
15         MR. MORRIS:  Put up Exhibit 15,
16  please.
17         (Dondero Deposition Exhibit 15
18  marked.)
19  BY MR. MORRIS:
20      Q. If we can go down here, do you see
21  that on Saturday, December 12th, Mr. Lynn wrote
22  to you and said:  It looks like a trial?
23      A. Yes.
24      Q. Can you scroll up above that, please.
25  Keep going.  And then Mr. Lynn -- I'm sorry, not
```

Page 113

```
1            J. DONDERO
2  so much.
3         And then Mr. Lynn wrote:  That said,
4  we must have a witness now.
5         Do you see that?
6       A. Yes.
7       Q. Now, go up to the top, and
8  Mr. Ellington writes to you and to others:  It
9  will be J.P. Sevilla.  I will tell him that he
10  needs to contact you first thing in the morning.
11         Have I read that correctly?
12      A. Yes.
13      Q. Now, this is after the TRO is
14  entered, right?
15      A. Like I said, I'm not -- I see my name
16  on the cc list.  I don't have an awareness of
17  what this is about, so...
18      Q. Okay.  Do you know what trial
19  Mr. Sevilla was going to testify at?
20      A. No.
21      Q. You didn't produce --
22      A. You can refresh my memory, but I
23  don't have a recollection from this.
24      Q. To be fair, Mr. Dondero, I don't
25  know.  This is discovery, and I'm just asking a
```

Page 114

1          J. DONDERO
2  question, if you know.
3          A. Okay.
4          Q. Do you recall if you produced this
5  e-mail in discovery?
6          A. I have no idea.
7          Q. Do you recall looking to
8  Mr. Ellington for leadership in helping to
9  coordinate all the lawyers acting on your behalf
10  and on behalf of the entities owned and
11  controlled by you?
12          A. I know I needed some coordination,
13  but I think I went in a different direction, and
14  that's why I brought on Douglas Draper, and he's
15  been functioning in that role of joint defense
16  and coordination.
17          Q. But you did tell Mr. Ellington, after
18  the TRO was entered, that you needed him to
19  provide leadership with respect to the
20  coordination of your litigation interests, right?
21          A. I -- I don't -- I don't remember.
22  Like I said, I ended up going in a different
23  direction, but I -- I don't -- I don't know as
24  far as your question is concerned.
25          MR. MORRIS:  Okay.  Can we put up

Page 115

1          J. DONDERO
2  Exhibit 16, please.
3          (Dondero Deposition Exhibit 16
4  marked.)
5          MR. MORRIS:  Scroll down to the
6  bottom.  Not that far.  Right there.
7  BY MR. MORRIS:
8          Q. So this is an e-mail from Mr. Draper
9  to you on December 16th.
10          Do you see that?
11          A. Yes.
12          MR. BONDS:  I'm going to object.
13  Mr. Draper is a lawyer.
14          MR. MORRIS:  He is.  I understand
15  that.
16          MR. BONDS:  Anything that was
17  produced that relates to Douglas Draper and Mike
18  Lynn and Jim Dondero is attorney-client
19  privileged.
20          MR. MORRIS:  You're entitled to make
21  that assertion, but if we just look at the top so
22  we can clear this up.  All the way to the top.
23  Mr. Dondero forwards this to Mr. Ellington.
24  Mr. Ellington is not Mr. Dondero's personal
25  lawyer.  He is the lawyer for the debtor, and

Page 116

1          J. DONDERO
2  your firm doesn't represent any business
3  interest, so there's no claim that this is
4  somehow provided pursuant to a shared services
5  agreement.  Unless you can tell me that there's a
6  common -- (audio malfunction) --
7          (Clarification requested by the
8  stenographer.)
9          MR. MORRIS:  -- a common interest
10  between Mr. Ellington and Mr. Dondero,
11  Mr. Dondero has waived the privilege.  State your
12  position, and I'm happy to state mine, but I need
13  to ask questions.
14          Can we go back down to the bottom,
15  please.  All right.
16  BY MR. MORRIS:
17          Q. So on December 16th, Mr. Draper is
18  looking to get a joint meeting together, right?
19          Do you remember that?
20          A. I'm sorry, what's the question?
21          Q. Do you recall that on or around
22  December 16th, Mr. Draper was looking to get a
23  joint meeting among all the lawyers representing
24  you and your business interests as well as the
25  employees for Highland?

Page 117

1          J. DONDERO
2          A. What I do know is Douglas Draper has
3  put together a mutual defense agreement, and I
4  think the 16th is right about when he came on
5  board.  He had to reach out and get people's
6  e-mails and contact information and be able to
7  coordinate it.
8          But he's now fully engaged and fully
9  functional in that role.  Ellington is not
10  involved in that role at all.  Can you -- but I
11  don't know exact time frames or exactly who said
12  what to who when, but go ahead, ask me whatever
13  you want.
14          Q. You mentioned a mutual defense
15  agreement.  Do I have that right?
16          MR. BONDS:  Objection --
17          A. I don't know what -- I don't know
18  what the legal term is.
19  BY MR. MORRIS:
20          Q. Okay.  But there's a joint --
21          MR. BONDS:  Don't talk about that,
22  Jim.
23          MR. MORRIS:  Okay.
24  BY MR. MORRIS:
25          Q. Let me ask you this:  Did Scott

Page 118

J. DONDERO

1
2    Ellington participate in the drafting of the
3    joint interest or mutual defense agreement?
4        A. No.
5        Q. Did Isaac Leventon participate in the
6    drafting of a joint defense or mutual defense
7    agreement?
8        A. No.
9        Q. Did you ever discuss with either of
10   them the topic of a joint defense or a mutual
11   defense agreement?
12       A. That was entirely with Draper.
13       Q. Okay. Let's scroll up the page a
14   little bit. There's a response from Mr. Lynn.
15       Do you see that?
16       A. Yes.
17       Q. And then if we scroll up a little
18   further, you forward it to Mr. Ellington, right?
19   If we can go to the --
20       A. Yes.
21       Q. And you said: I'm going to need you
22   to provide leadership here.
23       Have I read that correctly?
24       A. Yes.
25       Q. Why did you send this e-mail string

Page 119

J. DONDERO

1
2    to Mr. Ellington on December 16th?
3        A. I don't remember.
4        Q. What leadership were you looking for?
5        A. I can't piece it together from here.
6    I don't remember. I can't piece it together from
7    the e-mail, and I don't remember.
8        Q. Why did you need Mr. Ellington to
9    provide leadership?
10       A. I don't know.
11       Q. Does --
12       A. I don't remember.
13       Q. Okay. Does looking at the topic, a
14   list for a joint meeting, refresh your
15   recollection that you wanted Mr. Ellington to
16   coordinate all of the lawyers working on your
17   behalf and on behalf of the entities in which you
18   own an interest?
19       A. No. I mean, because that was the
20   beginning of the string, but the middle of the
21   string starts going in different directions. I
22   can't say -- I can't say that I wanted him to
23   have leadership with.
24       Q. Can you think of any -- any issue at
25   all, looking at this e-mail string, as to what he

Page 120

J. DONDERO

1
2    would be providing leadership for if it's not to
3    coordinate your defense counsel?
4        A. I don't want to speculate, but
5    again -- I don't want to speculate, but again,
6    the middle of the string looks like it goes in
7    different directions than just forming the mutual
8    defense thing.
9        Q. Okay. So you have no recollection
10   why you forwarded this e-mail to Mr. Ellington on
11   December 16th and why you told him that you need
12   him to provide leadership here; is that your
13   testimony?
14       A. Correct.
15       Q. Is Mr. Ellington a party to any joint
16   defense or mutual defense agreement that you're a
17   party to?
18       A. I believe the employees' counsel is
19   part of the working group, although I've been on
20   calls when the employees' counsel has been on and
21   when it hasn't. But I don't even -- I think the
22   employee group is divided into a couple different
23   groups, and I don't know if Ellington is part of
24   both groups.
25       But I -- Ellington individually is

Page 121

J. DONDERO

1
2    not part of the working group, and I'm not sure
3    which, if one or both, of the employee groups
4    he's in.
5        Q. So there's two employee groups; is
6    that right?
7        A. I'm beyond my involvement and
8    expertise, but I thought there were two employee
9    groups, but I don't even know that for sure.
10       Q. And has your counsel conferred with
11   counsel for either or both of the employee
12   groups?
13       MR. BONDS: I'm sorry, can you repeat
14   the question?
15       MR. MORRIS: Yes.
16   BY MR. MORRIS:
17       Q. Has your counsel at Bonds Ellis
18   conferred with counsel for either or both of the
19   employee groups?
20       A. I don't know.
21       MR. MORRIS: John, I would call for
22   the immediate production of any --
23       MR. BONDS: I don't think we have it,
24   but I can check on that.
25       MR. MORRIS: I would call for the

Page 122

J. DONDERO

1
2 immediate production of any joint defense or
3 mutual defense agreement to which any debtor
4 employee is a party –
5          MR. BONDS:  I don't think that there
6 are any.
7          MR. MORRIS:  And I would call for any
8 drafts, okay?
9          MR. BONDS:  Again, I don't think
10 there are any.
11          MR. MORRIS:  Okay.  You can give me
12 that representation.
13 BY MR. MORRIS:
14      Q.  Let's look at the top, at
15 Mr. Ellington's response.  And what did he tell
16 you in response to your statement that you need
17 him to provide leadership?
18      A.  You mean the two words there?
19      Q.  Yep.
20      A.  It looks like he typed back:  On it.
21      Q.  Yeah.
22          Did Mr. Ellington subsequently
23 provide leadership, as you had asked?
24      A.  I don't remember.  Nothing I can
25 recall.

Page 123

J. DONDERO

1
2      Q.  Did Mr. Ellington ever participate in
3 any conference calls with your counsel at Bonds
4 Ellis?
5      A.  Not that – not that I recall.
6 Ellington's time has been spent primarily, the
7 vast majority, representing and working with the
8 employee group.  I know that.  It's been
9 difficult to get his attention on anything else
10 so –
11      Q.  Listen carefully to my question.  I'm
12 not asking you to tell me what Mr. Ellington
13 does.  I'm simply asking whether you know that
14 Mr. Ellington has participated in conference
15 calls with your counsel at Bonds Ellis at any
16 time after December 10th.
17      A.  I don't know.
18      Q.  Did you ever participate in any calls
19 with Mr. Ellington and any lawyer at Bonds Ellis?
20      A.  Over the year, for sure.  There have
21 been – earlier in the year there were several
22 times, but I can't recall one recently.
23      Q.  So you have no recollection of ever
24 participating in a phone call with Mr. Ellington
25 and any lawyer at Bonds Ellis at any time since

Page 124

J. DONDERO

1
2 December 10th; is that your testimony?
3      A.  I – I can't recall.  I'm willing to
4 be refreshed.  I can't recall.  There were –
5 there were – some of the calls that stick out in
6 my mind I believe occurred prior to that date, so
7 I can't – I can't recall any post that date.
8      Q.  Okay.  You didn't produce this e-mail
9 in response to the Court's order, did you?
10      A.  I don't know.
11      Q.  And that's because you didn't take
12 the time to look at the production before it was
13 delivered to my firm, right?
14      A.  I – I believe the – yeah, I mean,
15 it's a process I don't – I don't get directly
16 involved in.  Counsel has to decide what's
17 responsive, what's privileged, what's complete,
18 what's appropriate.  That's not my job.
19      Q.  Are you aware that any documents for
20 which a privilege was asserted were supposed to
21 be delivered to the Court last December 31st?
22      A.  I'm not saying that's what – I have
23 no idea whether we produced this or didn't
24 produce it.  And if we didn't, I don't know why.
25      Q.  Do you know that the UCC has asked

Page 125

J. DONDERO

1
2 for the financial statements for Dugaboy and Get
3 Good?
4          MR. BONDS:  Objection, you're going
5 far afield from where we're – this TRO.
6          MR. MORRIS:  You can take that
7 position if you want, but I assure you, when I'm
8 done, you'll understand.
9          MR. BONDS:  I'm going to instruct the
10 witness not to answer the question.
11          MR. MORRIS:  You're not going to let
12 him answer as to whether or not the UCC wanted
13 the Dugaboy and Get Good financial statements?
14          MR. BONDS:  I can't hear you.
15          MR. MORRIS:  Yeah, I apologize.
16 It's – it's not me, John.  Let me just ask
17 again.  Are you – you're going to instruct your
18 witness not to answer the question of whether he
19 knew that the UCC wanted the Dugaboy and Get Good
20 financial statements?
21          MR. BONDS:  I'll let you go one –
22 you can ask that one question.  But anything
23 further into Dugaboy is not something that is for
24 the Court to determine at this point in this
25 case.

**Appx. 01618**

Page 126

1     J. DONDERO
2     MR. MORRIS: Okay.
3     So you can answer that question, sir.
4     A. I think there have been several times
5   over the last year that Dugaboy financials have
6   been requested by a variety of entities. I don't
7   know when or recently or if the UCC requested it
8   recently.
9   BY MR. MORRIS:
10     Q. You know a number of different
11   parties have asked for the Dugaboy and Get Good
12   financial statements; is that right?
13     MR. BONDS: I'm going to object to
14   any answer that you may give following up on
15   Dugaboy. Dugaboy is not subject to the TRO and
16   you're stuck with your adversary proceeding.
17     MR. MORRIS: John, there is a text
18   message that we're going to get to in a moment,
19   so I'll end the suspense. Mr. Dondero
20   specifically says: Don't produce the Dugaboy
21   financial statements without a subpoena. Those
22   documents were in the debtor's possession. I
23   will tell you that I personally made at least a
24   half a dozen requests of Mr. Ellington and
25   Mr. Leventon for those documents.

Page 127

1     J. DONDERO
2     I will tell you that Jim Seery
3   instructed them to provide those documents
4   because they're in the debtor's possession,
5   custody and control.
6     I will tell you that there's no
7   shared services agreement between Dugaboy or Get
8   Good and the debtor, and there is no basis for
9   those -- for Mr. Ellington and Mr. Leventon to
10   have obstructed the debtor's obligation to
11   provide those documents except in Mr. Dondero's
12   hands.
13     MR. BONDS: I'm going to instruct the
14   witness not to answer the question.
15     MR. MORRIS: I think that might be a
16   good idea. On what basis?
17     MR. BONDS: I don't need to give a
18   basis. I think that you've gone far, far from
19   what we're here on today, which is --
20     MR. MORRIS: I believe that it's --
21     MR. BONDS: -- specifically --
22     MR. MORRIS: I'm sorry to interrupt.
23   Go ahead, John.
24     MR. BONDS: Specifically, it's the
25   TRO and the injunction.

Page 128

1     J. DONDERO
2     MR. MORRIS: Correct. And the TRO
3   specifically -- I know Mr. Dondero doesn't know
4   this because he hasn't read the document, but in
5   addition to the things that he mentioned, it also
6   prevents him from interfering with the debtor's
7   business.
8     The debtor is a litigant here. The
9   debtor has an obligation to provide these
10   documents. And he interfered with that
11   obligation.
12     Let me ask my questions and you can
13   direct him not to answer every single time if you
14   want, okay?
15     MR. BONDS: Okay.
16   BY MR. MORRIS:
17     Q. Do you know a woman named Melissa,
18   Mr. Dondero?
19     A. Yes.
20     Q. And who is that?
21     A. She's my personal accountant.
22     Q. Does she work at the Highland
23   offices?
24     A. Yes.
25     Q. Is she employed by the debtor?

Page 129

1     J. DONDERO
2     A. I believe so.
3     Q. Do you know what her title is?
4     A. No.
5     Q. Do you directly or indirectly
6   control -- withdrawn.
7     Do you directly or indirectly own
8   Dugaboy?
9     A. No.
10     Q. Who owns Dugaboy?
11     MR. BONDS: I'm going to instruct the
12   witness not to answer that question.
13     MR. MORRIS: Are you going to follow
14   your counselor's advice?
15     THE WITNESS: Yes.
16   BY MR. MORRIS:
17     Q. Who controls Dugaboy?
18     MR. BONDS: I'm going to instruct the
19   witness not to answer that question, for the
20   second time.
21     MR. MORRIS: Are you going to
22   follow -- yeah, we'll do this every time, John,
23   just for the record.
24     MR. BONDS: That's fine.
25     MR. MORRIS: So I apologize. I

Page 130

```
1              J. DONDERO
2   appreciate, you know, you do your job, I'll do
3   mine.
4         Mr. Dondero, are you going to follow
5   your counsel's advice?
6         THE WITNESS:  Yes.
7   BY MR. MORRIS:
8         Q.  To the best of your knowledge,
9   Dugaboy does not have a shared services agreement
10  with the debtor, correct?
11        You can answer, sir.
12        THE WITNESS:  I'm not answering,
13  right?  I'm not answering any questions on this
14  subject.
15        MR. MORRIS:  Only if your lawyer
16  instructs you to do that, and he hasn't done that
17  for this question.
18        MR. BONDS:  I'm going to instruct the
19  witness not to answer the question.
20        MR. MORRIS:  You're not going to let
21  him answer whether Dugaboy has a shared services
22  agreement with the debtor?
23        MR. BONDS:  I think that you're
24  entitled to that, so Jim, you can answer that
25  question.
```

Page 131

```
1              J. DONDERO
2         A.  I -- I don't know.
3   BY MR. MORRIS:
4         Q.  Okay.  Are you familiar with an
5   entity called Get Good?
6         A.  Yes.
7         Q.  Do you directly or indirectly own Get
8   Good?
9         A.  No.
10        Q.  Do you control, directly or
11  indirectly, Get Good?
12        A.  I don't believe so.
13        Q.  Who owns Get Good?
14        MR. BONDS:  I'm going to instruct the
15  witness not to answer the question.
16        MR. MORRIS:  Are you going to follow
17  your counselor's advice?
18        THE WITNESS:  Yes.
19  BY MR. MORRIS:
20        Q.  Who controls Get Good?
21        MR. BONDS:  Instruct the witness not
22  to answer the question.
23        MR. MORRIS:  Are you going to follow
24  your counselor's advice, Mr. Dondero?
25        THE WITNESS:  I'm going to follow his
```

Page 132

```
1              J. DONDERO
2   advice, yes.
3   BY MR. MORRIS:
4         Q.  To the best of your knowledge, Get
5   Good does not have a shared services agreement
6   with the debtor, does it?
7         THE WITNESS:  Can I answer that or
8   not answer that one?
9         MR. BONDS:  Yes, you can.
10        A.  I don't know.
11  BY MR. MORRIS:
12        Q.  Did you ever discuss the request by
13  any party to produce the financial statements of
14  Get Good and Dugaboy with Scott Ellington?
15        MR. BONDS:  I'm going to tell you --
16  advise you not to answer the question.
17        MR. MORRIS:  Are you going to follow
18  your counselor's advice?
19        THE WITNESS:  Yes.
20  BY MR. MORRIS:
21        Q.  Did you ever communicate with
22  Mr. Leventon on the subject matter of whether or
23  not the financial statements for Get Good and
24  Dugaboy needed to be produced by the debtor?
25        MR. BONDS:  I'm going to advise the
```

Page 133

```
1              J. DONDERO
2   witness not to answer the question.
3         MR. MORRIS:  Are you going to follow
4   your counselor's advice?
5         THE WITNESS:  Yes.
6   BY MR. MORRIS:
7         Q.  Did you ever communicate with anybody
8   at any time who was employed by the debtor
9   regarding the production of the Dugaboy and Get
10  Good financial statements?
11        MR. BONDS:  I'm going to instruct the
12  witness not to answer the question.
13        MR. MORRIS:  Are you going to follow
14  your counselor's advice?
15        THE WITNESS:  Yes.
16  BY MR. MORRIS:
17        Q.  Melissa is Melissa Schroth, right?
18        A.  Yes.
19        Q.  She's an executive accountant
20  employed by the debtor, right?
21        A.  Yes.
22        Q.  And after December 10th, 2020
23  Ms. Schroth told you that a request had been made
24  for the production of the Dugaboy financial
25  statements, correct?
```

Page 134

```
1            J. DONDERO
2       MR. BONDS: You can answer the
3  question.
4       A. I don't remember.
5       MR. MORRIS: Okay. Can we put up
6  Exhibit 17, please.
7       (Dondero Deposition Exhibit 17
8  marked.)
9       MR. MORRIS: Can you scroll down a
10 little bit? I'm sorry. Scroll up so we can see
11 who this text was sent to.
12 BY MR. MORRIS:
13      Q. Is that Melissa Schroth?
14      A. Yes.
15      Q. And if we scroll back down, do you
16 see that you tell Ms. Schroth on December 16th:
17 No Dugaboy details without a subpoena?
18      A. Yes.
19      Q. That's a text that you sent to her on
20 December 16th, correct?
21      A. I believe so.
22      Q. What prompted you to send this text?
23      A. I don't know.
24      Q. You don't have any recollection as to
25 why you would tell Melissa, quote, no Dugaboy
```

Page 135

```
1            J. DONDERO
2  details without a subpoena?
3       A. No, but that would – I mean, I stand
4  behind that response, but I don't remember why.
5       Q. Do you remember who was asking for
6  the documents?
7       A. Nope.
8       Q. Do you remember any discussion with
9  any person at any time concerning the production
10 of the Dugaboy or Get Good financial statements?
11      A. Nope.
12      Q. Do you have any objection to the
13 debtor producing the Dugaboy and Get Good
14 financial statements?
15      A. I'm sorry, say that again?
16      Q. Would you consent to the debtor's
17 production of the Get Good and Dugaboy financial
18 statements?
19      A. With a subpoena. I stand by that
20 statement, yeah.
21      Q. Okay. Do you know of any reason why
22 Mr. Ellington and Mr. Leventon would have failed
23 to respond to Mr. Seery's instruction to produce
24 the Dugaboy and Get Good financial statements
25 that were requested by the – (audio
```

Page 136

```
1            J. DONDERO
2  malfunction) –
3       (Clarification requested by the
4  stenographer.)
5  BY MR. MORRIS:
6       Q. – UCC?
7       A. I don't want to speculate.
8       Q. Have you heard of the law firm
9  Baker & McKenzie?
10      A. Yes.
11      Q. Does that firm or any lawyer at that
12 firm represent you in your individual capacity?
13      A. No.
14      Q. Does that firm or any lawyer at that
15 firm represent any entity in which you have a
16 direct or indirect ownership interest?
17      A. No. Not that I'm aware of, no.
18      Q. I'm sorry, one second.
19         Does that firm or any lawyer at that
20 firm represent any entity that you directly or
21 indirectly control?
22      A. Not that I'm aware of.
23      Q. Do you recall asking Isaac Leventon
24 for the contact information for the – for the
25 lawyers at Baker & McKenzie?
```

Page 137

```
1            J. DONDERO
2       A. I – I don't – I don't – it might
3  have been for part of the shared defense, mutual
4  defense, whatever, agreement, but that's –
5  that's the only reason why I would have asked for
6  it.
7       Q. Okay. What's your understanding as
8  to – (audio malfunction) –
9       (Clarification requested by the
10 stenographer.)
11 BY MR. MORRIS:
12      Q. – the parties to that mutual defense
13 agreement that you just referred to, or shared
14 defense?
15      A. I – it's what I've testified
16 already, Douglas Draper is coordinating it.
17 I'm – I'm not sure whether the employees are on
18 it or not, and I'm not sure if there's one
19 employee group or two employee groups, and I'm
20 not sure if one or both of them are part of that
21 agreement or not.
22         But the – in recent history, my only
23 awareness of Baker McKenzie is with regard to
24 representing the employees. That's my only
25 awareness of that firm.
```

Page 138

```
1           J. DONDERO
2       Q. Have you ever spoken with an attorney
3   at Baker McKenzie?
4       A. No, I have not.
5           MR. MORRIS: Okay. Can you put up
6   Exhibit 18, please.
7           (Dondero Deposition Exhibit 18
8   marked.)
9   BY MR. MORRIS:
10      Q. That's Mr. Leventon. Do I have that
11  right?
12      A. Yes.
13      Q. And you're communicating with him on
14  or around – after December 10th, right?
15      A. Yes.
16      Q. Okay. And if you could scroll down a
17  little bit, right there, on December 22nd, you
18  asked Mr. Leventon to send you the Baker &
19  McKenzie contact person, right?
20      A. Yes.
21      Q. And if you scroll down a little bit.
22  Did he ever send that to you?
23      A. I'm sorry?
24      Q. Did he ever send that to you?
25      A. I don't know. I don't remember.
```

Page 139

```
1           J. DONDERO
2       Q. Why did you want the Baker & McKenzie
3   contact information?
4       A. I was trying to help Draper
5   coordinate the mutual shared defense agreement.
6       Q. And it was your intent and desire to
7   have the Baker McKenzie firm participate in that
8   agreement, right?
9       A. No. I'm not a lawyer. The
10  appropriateness of who's in that group under what
11  circumstances representing who was a legal
12  decision made by Draper.
13      Q. So why didn't you just have Draper
14  deal with this? Why did you deal with it?
15      A. He was scurrying around, moving
16  quickly, trying to get contact information for
17  potential various different parties. I was just
18  helping him get the contact information.
19      Q. And you –
20          MR. BONDS: I'm going to instruct you
21  not to say anything relating to this as far as
22  what he and Draper discussed.
23  BY MR. MORRIS:
24      Q. You were aware at the time that you
25  asked for the Baker & McKenzie contact
```

Page 140

```
1           J. DONDERO
2   information that Baker & McKenzie was a law firm
3   that – that employees were considering retaining
4   for their personal interests, right?
5       A. I knew they were involved with the
6   employees. Whether – whether or when they were
7   engaged and by which employee group and – I
8   don't have details like that. I never did.
9       Q. But the one thing that you did know,
10  when you asked for the Baker & McKenzie contact
11  information, is that Baker & McKenzie would be
12  representing some group of Highland employees,
13  correct?
14      A. Or they might be. Or they were being
15  interviewed at the time. I think they weren't
16  formally engaged until later. I don't know these
17  details and never did.
18          MR. BONDS: I'm going to instruct the
19  witness –
20          THE WITNESS: I'm sorry, what?
21          MR. BONDS: You need to stop.
22          THE WITNESS: Okay.
23          MR. MORRIS: Why is that? Please
24  don't interrupt the witness. Assert the
25  privilege if you want, direct him not to answer,
```

Page 141

```
1           J. DONDERO
2   but don't interrupt his answers.
3   BY MR. MORRIS:
4       Q. Baker & McKenzie was ultimately
5   retained by some group of the debtor's employees,
6   correct?
7       A. I believe so.
8       Q. Do you know how Baker McKenzie got
9   their retainer, their retainer money?
10      A. No idea.
11      Q. Do you know – are you familiar with
12  an entity called Gov Re?
13      A. Yes.
14      Q. What's Gov Re?
15      A. It's a Bermuda-based reinsurance
16  company.
17      Q. Do you have an ownership interest in
18  Gov Re?
19      A. I don't know.
20      Q. Do any – do any entities in which
21  you have an interest have an ownership interest
22  in Gov Re?
23      A. I don't know.
24      Q. Do you know who controls Gov Re?
25      A. I don't know.
```

Page 142

```
1              J. DONDERO
2       Q.  Do you make any decisions on behalf
3  of Gov Re?
4       A.  Not recently.  Not in the last year.
5  In prior years, I think I've helped them with
6  investments and some strategy, but not recently.
7       Q.  Do you know whether Gov Re has made
8  any payment to Baker & McKenzie in the last
9  30 days?
10      A.  I have no idea.
11      Q.  Did you ever have a communication
12  with anybody at any time in the last 30 days as
13  to -- (audio malfunction) --
14          (Clarification requested by the
15  stenographer.)
16  BY MR. MORRIS:
17      Q.  -- as to whether Gov Re would pay
18  money to Baker & McKenzie on behalf of some of
19  the debtor's employees.
20      A.  Nope.  No, I have no idea.  I've
21  never heard the daisy chain you're connecting.
22  I've never heard it before.
23          MR. MORRIS:  Let's take a break.  I
24  might be finished.  The time now is 2:32, or 1:32
25  Central.  Let's just come back sharply at 1:45,
```

Page 143

```
1              J. DONDERO
2  or 2:45.
3          THE VIDEOGRAPHER:  1:32 p.m. Central
4  Standard Time.  We're off the record.
5          (Recess taken, 1:32 p.m. to
6  1:50 p.m. CST)
7          THE VIDEOGRAPHER:  1:50 p.m. Central
8  Standard Time.  We're back on the record.
9  BY MR. MORRIS:
10      Q.  I just have a few more minutes here.
11          Going back to Gov Re, Mr. Dondero,
12  are you on the board of that entity?
13      A.  I don't know.
14      Q.  Can you identify any person who sits
15  on that board?
16      A.  No.
17      Q.  Do you know how many people sit on
18  that board?
19      A.  No.
20      Q.  Do you have an understanding as to
21  who makes decisions as to whether or not Gov Re
22  should make -- (audio malfunction) --
23          (Clarification requested by the
24  stenographer.)
25          MR. MORRIS:  Withdrawn.
```

Page 144

```
1              J. DONDERO
2  BY MR. MORRIS:
3       Q.  Mr. Dondero, do you know who makes
4  decisions on behalf of Gov Re as to whether or
5  not to make payments on claims?
6       A.  No.
7       Q.  Did you ever participate in any
8  decisions concerning the payment of claims made
9  under a Gov Re policy?
10      A.  Not in five years.  I think I was
11  more involved five years ago, but I don't
12  remember.
13      Q.  So you don't know if you sit on the
14  board of directors, you don't know who makes
15  decisions to pay claims, and you can't identify
16  any members of the board; is that right?
17      A.  Correct.
18      Q.  Okay.  And you don't know if you have
19  an indirect or direct ownership interest in
20  Gov Re; is that right?
21      A.  Correct.
22      Q.  Okay.  You've spent some time over
23  the last months trying to put together a
24  so-called pot plan; is that right?
25      A.  Yes.
```

Page 145

```
1              J. DONDERO
2       Q.  Since December 10th, 2020, have you
3  had any communications with any employee of the
4  debtor concerning the pot plan?
5       A.  It's been a struggle to put together
6  a pot plan.  There's been an intentional block of
7  any information, even assets, at Highland, so any
8  pot plan is a stab in the dark for me when I put
9  it forward, relative to current assets and likely
10  outcome.
11          But developing the pot plan has been
12  something I think that's been applauded by the
13  judge; at different times it's been encouraged by
14  creditors, you know.  But the only people -- Dave
15  Klos has helped with creating the model so that
16  the model makes sense and adds up and is
17  distributable.  Dave Klos has been the person
18  that I've accessed throughout the year regarding
19  the pot plan.
20      Q.  And is it fair to say that you've
21  communicated with Mr. Klos about the pot plan
22  since December 10th, 2020?
23      A.  Probably.  You know, to the extent
24  that the pot plan has come up, been considered or
25  distributed, yes.
```

Page 146

J. DONDERO

1
2   Q.  Okay.  Can you identify any other
3   employees of the debtor with whom you've
4   discussed the pot plan with since December 10th,
5   2020?
6   A.  No.
7   Q.  Did you discuss it with
8   Mr. Waterhouse?
9   A.  Mr. Waterhouse is Klos' direct
10  supervisor.  He probably had an awareness of it
11  from those conversations.  I don't recall.  I
12  mean, I don't -- maybe -- I mean, there have
13  been, maybe, peripherally, not significant, I
14  don't think, since the 16th, but I don't recall.
15  Q.  Did you ever get any balance sheets
16  or financial information about MultiStrat from
17  Scott Ellington?
18  A.  No.
19  Q.  Did you ever get any financial
20  information, including balance sheets, concerning
21  MultiStrat, from Isaac Leventon?
22  A.  No.  They -- I wouldn't believe that
23  those guys would have it.  I wouldn't even think
24  to ask them for it.  It wouldn't be -- I don't
25  think it's natural for them to have it.  But no,

Page 147

J. DONDERO

1
2   I never did, no.
3       MR. MORRIS:  Okay.  I have no further
4   questions, just two points that I'd like to make.
5       John, will you agree on behalf of
6   Mr. Dondero to have him appear at Friday's
7   hearing when the preliminary injunction takes
8   place or do I need to serve a subpoena?
9       MR. BONDS:  No, we haven't made that
10  decision yet.
11      MR. MORRIS:  Okay.  Will you accept a
12  subpoena on behalf of Mr. Dondero?
13      MR. BONDS:  Sure.
14      MR. MORRIS:  Okay.  We'll get that
15  over to you tomorrow.
16      And then lastly, the deposition of
17  Andrew Clubok has been adjourned to a date to be
18  determined.
19      MR. BONDS:  Okay.
20      MR. MORRIS:  Thank you very much,
21  all.
22      MR. BONDS:  Thanks.
23      THE VIDEOGRAPHER:  1:56 p.m. --
24  1:57 p.m. Central Standard Time.  We're off the
25  record.  This concludes the deposition.

Page 148

J. DONDERO

1
2   (Time noted: 1:57 p.m. CST)
3
4
5
6
7
8        _____
9        JAMES D. DONDERO
10
11  Subscribed and sworn to before me this _____
12  day of _____, 20____.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 149

1
2       C E R T I F I C A T E
3
4       I, MICHAEL E. MILLER, FAPR, RDR, CRR,
5   Notary Public in and for the State of Texas, do
6   hereby certify:
7       That JAMES D. DONDERO, the witness
8   whose deposition is hereinbefore set forth, was
9   duly sworn by me and that such deposition is a
10  true record of the testimony given by such
11  witness;
12      That pursuant to FRCP Rule 30,
13  signature of the witness was not requested by the
14  witness or other party before the conclusion of
15  the deposition;
16      I further certify that I am not
17  related to any of the parties to this action by
18  blood or marriage; and that I am in no way
19  interested in the outcome of this matter.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand on January 5, 2021.
22
23      _____
24  MICHAEL E. MILLER, FAPR, RDR, CRR
25  NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

### Page 150

```
1
2   ----------------- I N D E X -----------------
3
4   WITNESS:  JAMES D. DONDERO
5   EXAMINATION:                          PAGE
6   BY MR. MORRIS                         8
7
8
9   ---- LITIGATION SUPPORT INDEX ----    PAGE
10  Instruction Not To Answer             125
11  Instruction Not To Answer             125
12  Instruction Not To Answer             129
13  Instruction Not To Answer             130
14  Instruction Not To Answer             131
15  Instruction Not To Answer             131
16  Instruction Not To Answer             133
17  Instruction Not To Answer             133
18  Instruction Not To Answer             139
19  Instruction Not To Answer             140
20
21
22
23
24
25
```

### Page 151

```
1
2   ---- E X H I B I T S ----
3   EXHIBIT                               PAGE
4   Exhibit 1    10/16/20 NexPoint Letter to      31
5               Seery
6   Exhibit 2    11/24/20 NexPoint Letter to      35
7               Seery
8   Exhibit 3    E-mail(s)                         39
9   Exhibit 4    Dondero Text Messages            62
10  Exhibit 5    Request for Production of        67
11              Documents
12  Exhibit 6    Dondero Text Messages with       80
13              Jason Rothstein
14              Dondero_000022
15  Exhibit 7    Dondero Text Messages with Tara  81
16              Loiben
17              Dondero_000013
18  Exhibit 8    Skipped in Series
19  Exhibit 9    Temporary Restraining Order      84
20  Exhibit 10   12/23/20 Pachulski Letter to     85
21              Lynn
22  Exhibit 11   E-mail(s)                        90
23  Exhibit 12   12/24/20 Pachulski Letter to     93
24              Wright
25
```

### Page 152

```
1
2   Exhibit 13   12/24/20 Pachulski Letter to    100
3               Wright
4   Exhibit 14   Skipped in Series
5   Exhibit 15   E-mail(s)                       112
6   Exhibit 16   E-mail(s)                       115
7   Exhibit 17   Dondero Text Messages with      134
8               Melissa Schroth
9               Dondero_000014
10  Exhibit 18   Dondero Text Messages with      138
11              Isaac Leventon
12              Dondero_000043
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 153

```
1
2   ERRATA SHEET FOR THE TRANSCRIPT OF:
3   Case Name:      IN RE HIGHLAND/HIGHLAND v. DONDERO
4   Dep. Date:      January 5, 2021
5   Deponent:       JAMES D. DONDERO
6   Pg. Ln.   Now Reads    Should Read    Reason
7   ___ ___  _____  _____  _____
8   ___ ___  _____  _____  _____
9   ___ ___  _____  _____  _____
10  ___ ___  _____  _____  _____
11  ___ ___  _____  _____  _____
12  ___ ___  _____  _____  _____
13  ___ ___  _____  _____  _____
14  ___ ___  _____  _____  _____
15  ___ ___  _____  _____  _____
16  ___ ___  _____  _____  _____
17
18
19              _____
20              Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS _____ DAY OF _____, 20____.
23
24  _____
25  (Notary Public) MY COMMISSION EXPIRES: _____
```

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 12-2 Filed 07/12/12 of 136age 46 of 200    PageID 22861

Index: 1..appearances

**1**

**1** 7:8 30:25 31:2,3 35:5 36:15,24 37:13 44:17

**10** 60:18 85:4,5 87:20 108:23

**10:41** 47:24 48:2

**10th** 12:17 70:15 80:19,24 81:4 84:9 85:16,25 86:16,18 87:3,17 123:16 124:2 133:22 138:14 145:2, 22 146:4

**11** 7:13 90:8,9

**11:16** 48:3,4

**11th** 81:5

**12** 93:22,23

**12:35** 107:24

**12:36** 108:24 109:2

**12:45** 107:25 108:5

**12:49** 109:3,4

**12th** 112:21

**13** 100:5,6

**15** 46:24 47:22 112:15,17

**16** 115:2,3

**16th** 31:18 99:24 111:16 115:9 116:17, 22 117:4 119:2 120:11 134:16,20 146:14

**17** 134:6,7

**18** 138:6,7

**18th** 90:4 91:15 92:14

**19-34054-sgj11** 7:14

**1:30** 108:8,10

**1:32** 142:24 143:3,5

**1:35** 107:22

**1:45** 107:25 142:25

**1:50** 143:6,7

**1:56** 147:23

**1:57** 147:24

**2**

**2** 34:24,25 36:15,25 37:14 44:17

**20** 34:22 108:14

**20-03190-sgj** 7:23

**2020** 9:5 35:10 60:8, 18 69:10,18 70:15 85:16 94:16 133:22 145:2,22 146:5

**2021** 6:4 7:10

**22nd** 88:2 89:23 94:16 138:17

**23rd** 100:12,15

**24** 35:10

**25** 80:3

**27th** 60:24

**2:32** 142:24

**2:45** 143:2

**3**

**3** 38:24 39:2 70:9

**30** 6:22 73:25 80:2 88:16 142:9,12

**300** 76:11

**31st** 9:5 124:21

**35-minute** 108:14

**4**

**4** 62:12,14

**40** 104:18

**5**

**5** 6:4 64:22 67:14,15

**5:26** 62:20,24

**5th** 7:10

**6**

**6** 80:7,9

**6:25** 85:25 87:3

**7**

**7** 81:17,18

**9**

**9** 84:3,5

**9:50** 6:4

**9:52** 7:10

**A**

**a.m.** 6:4 7:10 47:24 48:2,3,4

**ability** 12:12 24:16, 18 26:11

**absolutely** 91:8

**accept** 147:11

**access** 69:8 82:24

**accessed** 145:18

**accommodate** 47:16

**account** 54:3 56:2 75:18 78:11,18

**accountant** 128:21 133:19

**accounts** 56:5

**ACIS** 109:21

**acknowledge** 26:2,9

**acknowledged** 41:3

**acknowledging** 23:20 25:21,23

**Act** 63:5 104:18

**acting** 114:9

**action** 46:5 63:6,23

**actions** 63:22

**active** 111:17

**activities** 63:15

**activity** 46:5

**acts** 101:19 104:7

**acute** 61:2

**acutely** 61:8

**add** 84:23

**addition** 128:5

**address** 39:24 40:3, 4 69:11,12,15,19,20, 22,23,24

**addresses** 39:23

**adds** 145:16

**adhered** 26:6

**adjourned** 147:17

**admissible** 6:20

**admit** 24:7

**advance** 59:13 99:21

**advanced** 99:15,23

**adversary** 7:21 10:7 110:6 126:16

**adverse** 89:17 109:11 110:23

**advice** 92:8 129:14 130:5 131:17,24 132:2,18 133:4,14

**advise** 132:16,25

**advised** 36:23

**Advisers** 63:4

**advisor** 24:14,20,22 25:4 26:7 88:18,20

**advisor's** 26:5

**advisors** 14:14 17:18 18:23 19:5,7,8, 18,22 20:6,7,10,15, 21 22:12,21 23:12 24:10 29:22 35:21 54:18 56:24 58:23 94:9 98:5,10 100:21 102:25 104:20 106:13 107:2 111:24

**Advisors'** 19:24

**advisory** 17:21 18:25

**affect** 12:8

**affirmatively** 24:5 25:21,23

**afield** 125:5

**afternoon** 43:16

**aggressively** 105:25

**agree** 6:24 7:3 17:3 55:3 107:9 110:23 147:5

**agreeing** 23:20

**agreement** 27:4 116:5 117:3,15 118:3,7,11 120:16 122:3 127:7 130:9,22 132:5 137:4,13,21 139:5,8

**agreements** 17:16 27:14 28:7,19 29:12 30:6 101:12

**ahead** 24:3 117:12 127:23

**alert** 36:7 59:16

**allegations** 36:24

**alleged** 15:9,12

**aloud** 89:3

**amalgamation** 97:19

**amounts** 63:19

**analysis** 37:11,15

**Andrew** 147:17

**answering** 130:12, 13

**answers** 141:2

**anticipation** 72:6 74:11 78:21

**anymore** 74:15

**apologize** 19:12 65:11 125:15 129:25

**appearances** 7:17

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 1-12   Appendix Part 2   Filed 01/07/22   Page 47 of 200   PageID 22862

Index: appears..CEO

**appears** 41:21 92:17

**applauded** 145:12

**appropriateness** 139:10

**approval** 9:11

**approved** 95:24

**argue** 25:19

**argument** 99:21,24

**arguments** 99:15 100:2

**articulated** 46:10 50:11 63:11

**Asia** 30:24

**asks** 29:16

**aspect** 13:13 88:25

**Assert** 140:24

**asserted** 124:20

**assertion** 88:14 115:21

**asset** 39:13

**assets** 24:16 39:13 44:7 46:8 50:14 51:25 56:5 63:9 95:12 111:25 145:7,9

**assign** 101:12

**assistant** 68:16 83:19,20

**assistants** 68:10,11

**association** 6:8

**assume** 49:13

**assure** 125:7

**Attached** 94:12

**attention** 79:14 123:9

**attorney** 138:2

**attorney-client** 115:18

**attorneys'** 7:17

**audio** 11:2 16:7 57:6 68:23 82:6 96:7 111:20 116:6 135:25

**authority** 14:3 28:25 34:15

**authorization** 35:25

**authorize** 33:3 35:20 95:16,18

**authorized** 42:6,14 103:18 104:9,14

**Avaya** 89:24 90:15 91:16 92:15

**AVYA** 43:19

**aware** 9:3,13,18 12:7,10,17 13:14 14:17,20,23 17:14 21:13 26:15 27:19,22 35:16 36:2,12 48:9 52:11 53:6 58:24,25 59:11 60:15,25 61:8, 11,14 62:2,4 64:7 67:23 74:17,19 94:19,21 96:5,18,19 98:13 99:13 101:9,11 110:9,18 111:5 124:19 136:17,22 139:24

**awareness** 61:3 113:16 137:23,25 146:10

---

## B

**back** 44:11 47:21 48:5,22 54:9,11 83:23 85:12,20 87:19 90:3 100:9 101:13 109:5,14 116:14 122:20 134:15 142:25 143:8,11

**background** 95:4

**bad** 99:8 101:19 104:7

**Baker** 136:9,25 137:23 138:3,18 139:2,7,25 140:2,10, 11 141:4,8 142:8,18

**balance** 146:15,20

**bank** 69:17

**bankruptcy** 7:15 10:7,19 26:5 59:5 95:8 99:16 106:2

**based** 29:20 80:3 88:16 102:12 110:22

**basis** 79:3,8,16,21 88:8,13,25 92:24 127:8,16,18

**basket** 39:23

**beginning** 24:13 88:2 101:13 119:20

**begins** 39:8

**behalf** 9:15 28:5 35:21 56:24,25 58:23 61:12 96:22 98:10 100:21 106:13,18,25 111:20 114:9,10 119:17 142:2,18 144:4 147:5,12

**believed** 95:21

**believes** 33:22

**bell** 90:2 91:15 92:13

**beneficial** 20:5 27:5 28:14,15,18,23 29:11 30:5,10 46:7 50:10 56:3 63:21,24 97:3,9

**benefit** 50:13 73:4 105:21

**Bermuda-based** 141:15

**bit** 41:4 62:17 81:21 82:3 84:12 87:21 90:20 94:17 98:15 99:4 100:18 118:14 134:10 138:17,21

**block** 49:12 145:6

**blocking** 55:22

**board** 13:10 14:13 117:5 143:12,15,18 144:14,16

**bodies** 37:5

**bona** 46:5 89:12

**Bonds** 7:2,20 9:20, 23 10:2,10,16 11:15, 22 13:2 14:5 15:6 16:23 17:10 18:6

21:7 22:24 24:11 25:7 27:16,25 28:8, 21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 51:12 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 67:24 68:10 71:11,20 73:7 75:14 76:4,23 78:5, 12 79:11,18 82:23 86:10 88:10 91:18 92:16 96:14 98:6 99:18 101:2 103:22 105:4,8 106:22 108:6,18 110:2,8 115:12,16 117:16,21 121:13,17,23 122:5,9 123:3,15,19,25 125:4,9,14,21 126:13 127:13,17,21,24 128:15 129:11,18,24 130:18,23 131:14,21 132:9,15,25 133:11 134:2 139:20 140:18, 21 147:9,13,19,22

**bottom** 39:6,8 62:20 90:12,14 115:6 116:14

**bought** 71:25 73:4 74:7 76:21

**breach** 27:4,13 33:22 36:3,6,10 107:7

**breaches** 61:4

**break** 46:19,23 107:23 108:15,17 142:23

**brought** 111:17,19 114:14

**bucket** 40:2

**bunch** 24:17 79:2

**business** 46:8,9,10 50:13 52:19 55:5,25 56:7,14 57:12 58:21 59:20 60:16 63:10 91:3,9 116:2,24 128:7

**businesses** 76:13

---

## C

**C-SUITE** 33:25

**calendar** 111:15 112:3

**call** 32:18 47:11 121:21,25 122:7 123:24

**called** 22:7 70:3 111:17 131:5 141:12

**calls** 46:17 48:14 120:20 123:3,15,18 124:5

**canceled** 43:18

**CANTY** 35:3,6

**capabilities** 71:11

**capability** 23:24 24:19 25:16

**capable** 24:23

**capacity** 10:3,6,13, 18 30:3,4 136:12

**Capital** 7:12 8:18 18:22 21:16 22:8 53:15

**capture** 50:18

**care** 15:15 79:5,6

**careful** 62:25

**carefully** 123:11

**cares** 47:18 79:4

**case** 6:23 7:12,13,21 10:19 14:4 40:8 52:22 74:11,12 125:25

**caused** 22:21 24:10

**cease** 106:19 107:2

**ceased** 69:15

**cede** 52:17,18

**Central** 7:10 47:24 107:25 108:8,25 109:5 142:25 143:3,7 147:24

**CEO** 14:21

cetera 24:20 99:10

chain 142:21

championed 95:19

change 78:3,6,17

changed 78:20
79:10,24

changing 77:25

Chapter 7:13

char- 97:11

charge 104:15

charitable 97:12

check 44:12 121:24

chief 33:22,23 34:2,
4,18 37:12,17 53:14
95:19 105:18

Christmas 90:24

circumstances
104:16 139:11

circumvented 29:2

Civil 6:22

claim 116:3

claims 144:5,8,15

clarification 11:3
16:9 57:7 68:25 82:7
96:8 111:21 116:7
136:3 137:9 142:14
143:23

class 46:5 63:6

clear 46:2 56:3
115:22

CLO 17:3,9 24:16
25:12 27:13,24 28:7,
19 29:11 30:6 39:12,
13 44:7 51:24 94:23
95:7,11 96:23 97:3,
13,18,24 98:11,20,21
99:14 101:12 102:7,
24 103:21 106:14,21
111:25

CLO's 107:16

CLOS 16:22 22:22
23:16,21,25 24:9,23
25:17 26:11,16 27:3,
9,23 28:2,6,13,17,20

29:13 30:7 38:10,14
40:24 50:6 54:5
63:16 90:16 91:17
92:15 93:7,12 100:25
104:12 105:15 107:4,
20

closing 90:2 91:15
92:13

Clubok 147:17

collateralized 16:18
17:4

combined 98:22

commenced 110:6

comment 36:18

comments 50:24

commercial 103:11,
12

commit 106:17,25

common 116:6,9

communicate 47:5
132:21 133:7

communicated 62:8
145:21

communicating
138:13

communication
142:11

communications
70:10 145:3

company 22:2
141:16

competently 12:11

complaint 110:15

complete 71:22
82:25 84:24 124:17

completed 70:19

completeness
70:25

complex 46:12

compliance 26:3
33:22,23 34:2,4,8,18,
21 36:4 37:4,12,18
53:14 56:4 61:13
95:20 105:18

compliant 68:9

complicated 77:16

computer 82:24

concerned 114:24

concludes 147:25

conclusion 28:23
29:8,17 30:21 34:17,
20

conduct 13:16

conference 8:19
123:3,14

conferred 121:10,18

confusing 98:17

conjunction 37:20

connecting 142:21

connection 10:18,
25 11:8 15:3 59:5
64:18 67:25 94:6

consent 9:11 42:22
43:5 75:13 76:22
135:16

consideration
102:13

considerations
103:24

considered 30:10,
13 145:24

consistent 35:24
50:4

constrain 13:15

contact 28:16 113:10
117:6 136:24 138:19
139:3,16,18,25
140:10

contained 96:6

contended 27:3,13

contention 25:14
27:20,22 89:13

context 31:14

continued 36:2

contract 27:24 30:17

contracts 17:7,15

24:8,15 25:12 26:3,4,
16,18,24 102:7,25

control 10:12 18:20
20:7 97:24 127:5
129:6 131:10 136:21

controlled 114:11

controls 97:7,13
129:17 131:20
141:24

conversation 32:16
52:6 57:5,20 58:15
59:9,17

conversations
32:13 73:19 111:6
146:11

conveyed 58:12

convinced 61:14

coordinate 114:9
117:7 119:16 120:3
139:5

coordinating 137:16

coordination
114:12,16,20

copy 12:22 41:20
93:14,18

correct 9:19 10:3
13:3 14:18,24 18:5,
11 19:2,19 23:17
27:24 28:20 42:15
48:20 51:8,16 56:22
57:3 66:23 67:6 77:5
87:7,8,15,18 89:24
120:14 128:2 130:10
133:25 134:20
140:13 141:6 144:17,
21

correctly 113:11
118:23

counsel 8:14 32:17
37:21 47:6 65:2,7,12,
22,24 95:20 100:22
120:3,18,20 121:10,
11,17,18 123:3,15
124:16

counsel's 130:5

counselor's 129:14
131:17,24 132:18
133:4,14

counteroffer 103:3,
5

couple 46:17 69:9
74:15 90:3 95:5
112:3 120:22

court 6:15 7:15,19
13:18 25:20 48:11
59:16,20,23 94:24
95:8,10 99:16,20
106:2 124:21 125:24

Court's 14:3,9 48:15
124:9

courtroom 6:21

COVID-19 6:10

Covitz 39:8,11,12
40:22

Covitz's 41:11,20,24

creating 145:15

credit 74:3

creditors 145:14

CRO 14:21

CST 6:4 48:3 109:3
143:6

current 145:9

custody 127:5

**D**

D.C. 65:6,7,12

DAF 44:5 97:6,7,10,
20,24 98:16,22

daisy 142:21

Dallas 7:16

dark 145:8

date 7:9 26:19 82:3,4
85:23 86:5 124:6,7
147:17

dated 31:17 35:9
94:16

Dave 145:14,17

day 41:4 48:14,16
54:11 59:14 60:13
100:12

Index: days..due

**days** 52:25 69:9 80:2, 3 90:3,23 99:16 142:9,12

**de** 63:19

**deal** 139:14

**debtor** 7:13 8:15 9:3 12:18 15:15 16:7,17, 21 17:6,7 22:23 23:16,20,22,23,24 24:8 25:6,9,11,15,16 26:17 27:4,13,23 28:20 29:12 30:7 38:10 39:14,16 40:11,18 43:19 50:13 53:16 61:13 63:5 66:4,7,10,13,20,23 67:23 70:11 71:25 73:4 74:8 75:5,20,23 76:21 77:5,7,11,17, 20,22,24 78:22 83:17 95:11 96:11 100:2, 22,24 101:11 102:23 103:20 104:11 105:3, 14 106:20 107:3,16, 19,20 110:6,11,19,24 115:25 122:3 127:8 128:8,9,25 130:10,22 132:6,24 133:8,20 135:13 145:4 146:3

**debtor's** 9:7 11:2,9, 13,20 13:20 14:14,21 15:4,13 42:22 43:5 70:3 75:13 76:22 77:21 93:6,12 102:3 109:12,17,20,24 126:22 127:4,10 128:6 135:16 141:5 142:19

**debtors** 9:15

**decade** 66:8

**December** 9:5 12:17 59:5 60:18 70:15 71:24 80:19,24 81:4, 5 84:9 85:16,25 86:16,18 87:3,17 88:2 89:23 91:15 92:14 94:16 99:24 100:12 101:13 111:16 112:21 115:9 116:17,22 119:2 120:11 123:16 124:2, 21 133:22 134:16,20

**decide** 25:20 45:21 60:23 91:23 102:19 124:16

**decided** 72:8,14,21

**decision** 28:25 73:5, 10,20,22,23 102:2,4, 14 139:12 147:10

**decisions** 142:2 143:21 144:4,8,15

**declaration** 15:2,10, 12,22

**declare** 28:6

**default** 23:23 24:18 25:15 26:4 27:23 28:7

**defending** 9:20

**defense** 111:10 114:15 117:3,14 118:3,6,10,11 120:3, 8,16 122:2,3 137:3,4, 12,14 139:5

**defer** 52:16

**definable** 46:9

**delegate** 68:11

**delegated** 68:9 70:20

**delivered** 70:25 124:13,21

**demand** 102:13

**denied** 94:24 99:17

**depend** 52:23

**depo** 9:9

**deposition** 6:13 7:9, 22 9:16 10:22,25 11:8 31:3 34:25 39:2 47:7,19 48:10 62:14 67:15 77:19 80:9 81:18 84:5 85:5 90:9 92:6 93:23 100:6 108:8 112:17 115:3 134:7 138:7 147:16, 25

**describe** 39:25 76:5

**desire** 60:9 63:8 139:6

**desires** 52:16

**desist** 106:19 107:2

**desk** 49:13 52:8 80:20 81:3,10,14 86:6,20 87:3

**destroy** 72:14 76:25

**destroyed** 72:13

**details** 70:17 95:14 106:4,5 134:17 135:2 140:8,17

**determine** 125:24

**determined** 147:18

**developing** 145:11

**differently** 88:23

**difficult** 31:7 123:9

**direct** 18:3 19:17 28:16 97:2 128:13 136:16 140:25 144:19 146:9

**directed** 33:16 38:4 42:15 43:20 45:24

**direction** 23:3 38:15 40:23 90:15 104:25 114:13,23

**directions** 119:21 120:7

**directly** 13:11 54:4 55:16,19 59:25 96:2 106:4 124:15 129:5,7 131:7,10 136:20

**directors** 144:14

**disagree** 88:15,25

**disagreement** 102:6

**disapproval** 60:20

**disbelieve** 86:8

**discernible** 46:9

**discovery** 82:10,15 113:25 114:5

**discuss** 32:5 34:12 105:12 107:18 118:9 132:12 146:7

**discussed** 31:8 111:3 139:22 146:4

**discussing** 112:7

**discussion** 135:8

**dispose** 72:8 73:5 75:2 85:15

**disposed** 72:5,16,18 74:21 75:6 81:8 86:15 87:10

**disposing** 75:9

**dispute** 88:8,13

**dissuaded** 103:10

**distancing** 6:11

**distributable** 145:17

**distributed** 145:25

**District** 7:15

**divided** 120:22

**Division** 7:16

**document** 31:14,22 32:2,3 58:17 64:17 67:14,20,24 70:3,18 83:3,10,18 84:14 87:23 100:19 107:15 128:4

**documents** 31:10, 11 67:25 68:7 69:5 70:21,24 71:9,18 83:7,14 124:19 126:22,25 127:3,11 128:10 135:6

**dollars** 101:21

**dondero** 7:9 8:1,3,10 9:1 10:1 11:1,7 12:1 13:1 14:1 15:1 16:1, 15 17:1 18:1 19:1 20:1 21:1 22:1 23:1,9 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1, 3,6 32:1 33:1 34:1,25 35:1 36:1 37:1 38:1 39:1,2 40:1 41:1 42:1 43:1 44:1 45:1,3 46:1 47:1,2 48:1,7 49:1 50:1 51:1,16 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,14 63:1

64:1 65:1 66:1 67:1, 10,15,19 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,9 81:1,18 82:1,12 83:1 84:1,5 85:1,5 86:1 87:1 88:1,13 89:1 90:1,9 91:1 92:1,8 93:1,23 94:1 95:1 96:1 97:1 98:1 99:1 100:1,6 101:1 102:1 103:1 104:1 105:1 106:1 107:1,24 108:1,15 109:1,8 110:1 111:1 112:1,17 113:1,24 114:1 115:1,3,18,23 116:1, 10,11 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,19 127:1 128:1,3,18 129:1 130:1,4 131:1,24 132:1 133:1 134:1,7 135:1 136:1 137:1 138:1,7 139:1 140:1 141:1 142:1 143:1,11 144:1,3 145:1 146:1 147:1,6,12

**Dondero's** 115:24 127:11

**dormant** 69:25

**Douglas** 114:14 115:17 117:2 137:16

**dozen** 126:24

**drafting** 118:2,6

**drafts** 122:8

**Draper** 114:14 115:8, 13,17 116:17,22 117:2 118:12 137:16 139:4,12,13,22

**draw** 28:22

**drawer** 80:20

**drew** 34:18

**drove** 36:4

**drugs** 12:4

**due** 6:10 99:19

**Dugaboy** 125:2,13, 19,23 126:5,11,15,20 127:7 129:8,10,17 130:9,21 132:14,24 133:9,24 134:17,25 135:10,13,17,24

**duly** 8:4

**Dustin** 59:2,8,14,15

---

## E

**e-mail** 39:5,8,23 40:3,4,22 41:2,4,11, 19,20,24 42:5,18,23 43:6,23 45:6,12 48:25 50:4 51:9,17 52:2 53:9,11 58:17 60:21 61:10,15 69:8, 11,12,14,16,19,23 85:18 90:14 114:5 115:8 118:25 119:7, 25 120:10 124:8

**e-mails** 40:2 45:8 52:4 64:14 89:9 107:13 117:6

**earlier** 64:3,25 65:19 84:17 99:16 123:21

**early** 71:24

**Eastern** 107:25

**economic** 18:4 19:18 97:3

**effectuate** 53:3,7 55:22 57:13 60:10

**Ellington** 47:4 60:5 65:18,21 66:3,9,22 67:7 74:7 78:3,9,17, 25 79:9,23 83:2,5 111:4 112:8,11 113:8 114:8,17 115:23,24 116:10 117:9 118:2, 18 119:2,8,15 120:10,15,23,25 122:22 123:2,12,14, 19,24 126:24 127:9 132:14 135:22 146:17

**Ellington's** 74:9 122:15 123:6

**Ellis** 9:23 10:2,10,17 67:24 68:10 71:12

**employed** 39:15 66:3,7 68:19 70:11 83:17 128:25 133:8, 20

**employee** 39:15,16 47:4,10 77:4,7,9 107:14,19 120:22 121:3,5,8,11,19 122:4 123:8 137:19 140:7 145:3

**employees** 13:12 25:24 40:18 47:15 68:10 76:14 79:23 89:22 92:25 93:5,10, 15,18 116:25 137:17, 24 140:3,6,12 141:5 142:19 146:3

**employees'** 120:18, 20

**employer** 66:10,13, 23

**encourage** 105:24

**encouraged** 95:19 96:3 145:13

**encouraging** 104:14

**end** 16:12 24:13 54:11 69:10 70:15 91:21 92:5 126:19

**ended** 114:22

**engaged** 117:8 140:7,16

**engaging** 103:8

**enlarge** 90:19

**enter** 9:8

**entered** 13:19 14:10 15:19 111:2 113:14 114:18

**entirety** 58:11

**entities** 20:17 94:22 95:6 99:14,25 103:19 106:18 114:10 119:17 126:6 141:20

**entitled** 115:20 130:24

**entity** 10:11 18:20 20:8 22:7 39:15 65:13 98:22 131:5 136:15,20 141:12 143:12

**entry** 16:6

**equity** 40:15 41:12, 15,17,24

**error** 89:20

**estate** 74:14 101:25

**ethic** 71:10

**events** 16:5

**exact** 21:23 117:11

**EXAMINATION** 8:7

**exchange** 107:13

**execs** 79:2

**execute** 42:5,19,23 61:17 93:2

**executed** 43:20

**executing** 43:10 45:23

**executive** 76:8 133:19

**executives** 34:2 72:25 78:20 104:15 105:17,18

**exhibit** 30:25 31:2,3 34:24,25 35:5 36:15, 24,25 37:13,14 38:24 39:2 44:17 48:22 62:12,14 64:22 67:14,15 80:7,9 81:17,18 84:3,5 85:4, 5 87:20 90:8,9 93:22, 23 94:13 100:5,6,9 112:15,17 115:2,3 134:6,7 138:6,7

**exhibits** 44:10,16

**experience** 88:16

**expertise** 121:8

**explain** 58:20

**explanation** 51:23 57:12

**explicit** 9:10

**expressed** 52:9 60:20 63:8

**extent** 21:7 22:24 31:12 145:23

**external** 37:21

**extort** 102:8

**extra** 61:6

**eyes** 90:18

---

## F

**face** 89:20

**faced** 61:18

**facilitation** 102:10

**fact** 38:12 92:21

**facts** 56:11,14 66:18, 21

**factual** 29:20

**failed** 135:22

**fair** 18:20 19:5,9 20:7 33:10 34:19 35:18 40:21 67:5 86:14 98:25 109:10 113:24 145:20

**familiar** 17:19 18:23 22:7 31:21,23 131:4 141:11

**fashion** 26:9

**February** 91:2

**Federal** 6:22

**feel** 61:9

**fees** 101:21,24

**fide** 46:5 89:12

**figure** 49:25 50:22

**file** 109:18

**filed** 94:23 96:20 110:15

**filing** 95:16,18

**financial** 33:24 125:2,13,20 126:12, 21 132:13,23 133:10, 24 135:10,14,17,24 146:16,19

**financials** 126:5

**find** 94:13

**fine** 47:2,13 80:6 129:24

**finished** 19:13 142:24

**firm** 9:23 10:5,10,17 17:19,21 18:23,25 19:4 67:24 71:2 111:20 116:2 124:13 136:8,11,12,14,15, 19,20 137:25 139:7 140:2

**firms** 10:2

**fit** 103:2

**follow** 129:13,22 130:4 131:16,23,25 132:17 133:3,13

**form** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 24:11 25:7 26:8 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 96:15 98:6 99:18 101:2 103:22 106:22 110:2,8

**formal** 102:17

**formally** 48:16 140:16

**forming** 120:7

**forward** 51:2 103:11 108:19 118:18 145:9

**forwarded** 120:10

**forwards** 92:22 115:23

**found** 26:12

**frames** 117:11

**Friday** 90:4 91:15

---

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 12    Filed 07/26/22    Page 51 of 200    PageID 22866

Appendix Part 2    Page 1362 of 1738

92:14

**Friday's** 147:6

**front** 91:7

**full** 31:14 69:7 87:25

**fully** 117:8

**functional** 117:9

**functioning** 114:15

**fund** 18:22 19:4,7,18, 21,24 20:6,7,10,15, 21,23 21:2,5,12,17, 20,21 22:3,4,11,15, 18 46:12 103:20 104:12 107:16

**fundamental** 103:9

**funds** 20:11,18,20 21:10 22:21 23:13,15 24:10 29:21 35:21 41:17 49:14 50:12 56:25 58:23 63:5 94:7 98:5,10 100:22 104:23 106:13 107:2 111:24

**future** 101:24

**fuzzy** 90:18

---

### G

**garbage** 72:19,22 74:2 76:21 80:16,25 81:11,14 86:15

**Gatekeeper** 39:24 40:5,14

**gatekeeper@ hcmlp.com** 39:18

**Gates** 32:14,17 58:20 94:4,5,14,15 95:7 98:11 100:12,21 106:9,14 111:19 112:5

**gave** 21:25 35:25 42:4,12 58:5 69:8 82:22

**general** 13:7 14:14 18:13,17 19:24 46:14 52:23 65:22 71:3 82:21 95:20

**generally** 18:21 31:23 32:10 33:6 40:15 44:19,23,24 67:19 82:20 92:9 103:17

**gentlemen** 6:7

**girls** 83:23

**give** 24:9 30:21 35:6, 24 41:22 51:23 69:4, 6 75:23 82:18 92:7 101:18 104:25 122:11 126:14 127:17

**giving** 40:22

**Gmail** 69:22,24

**go-between** 60:5 111:7

**good** 6:6 8:10 23:22 24:22 26:10 125:3, 13,19 126:11 127:8, 16 131:5,8,11,13,20 132:5,14,23 133:10 135:10,13,17,24

**gotcha** 31:9

**Gov** 141:12,14,18,22, 24 142:3,7,17 143:11,21 144:4,9,20

**Grant** 97:8

**group** 120:19,22 121:2 123:8 137:19 139:10 140:7,12 141:5

**groups** 120:23,24 121:3,5,9,12,19 137:19

**guess** 65:25 72:12 87:20 111:17

**guided** 108:16

**guiding** 23:5

**guy** 50:21

**guys** 46:16 82:23 108:23 146:23

---

### H

**half** 24:5 126:24

**handles** 78:14

**handling** 47:11

**hands** 127:12

**happen** 49:20

**happened** 72:4 87:17 99:9

**happening** 50:2 90:17

**happy** 32:7 46:22 116:12

**Harbourvest** 97:6, 20 98:17 109:24

**hard** 49:22 105:20

**HCLOF** 98:18

**HCMFA** 89:22 92:25 93:5,11,15,19

**HCMLP** 69:11

**head** 63:14 101:18

**hear** 8:11 20:14 48:7 105:9 108:2 109:7 125:14

**heard** 7:5 68:5 136:8 142:21,22

**hearing** 11:13,20 13:20,22,25 147:7

**held** 13:19 39:24 40:23 41:17 53:18

**helped** 142:5 145:15

**helpful** 32:8

**helping** 114:8 139:18

**HFAM** 44:5 54:20

**High-** 39:14

**Highland** 7:12 8:18 9:16 10:7 13:11 18:22 20:21 21:2,5 44:6 47:3,10,14 53:15 65:22 68:21 69:11,19 76:9,12 79:23 102:11 116:25 128:22 140:12 145:7

**Highland's** 76:10

**highlight** 49:23

**historic** 72:10

**historically** 40:6 46:6 65:23 72:9

**history** 137:22

**hitting** 49:12

**hold** 21:4 22:6,17 50:19 88:4 91:19

**Holdco** 94:23 95:7 96:23 97:3,13,18,24 98:11,20,21 99:14 106:14

**holders** 27:5 46:7 50:10

**holding** 22:2 104:6

**hundred** 54:21

**Hunter** 39:8,12 41:23 52:8

---

### I

**idea** 32:19,22,23 55:10,14 91:7 114:6 124:23 127:16 141:10 142:10,20

**ideally** 46:20

**identify** 143:14 144:15 146:2

**illegal** 99:8 107:6

**impede** 93:6,11

**implicit** 34:17,20

**Implicitly** 9:9

**implies** 24:22 89:10

**important** 59:19 62:7

**impose** 95:11

**inaccurate** 89:6

**inadvertently** 49:25

**inappropriate** 52:12 61:24,25 63:16 99:9, 21 101:19 102:18 103:10 107:5

**inches** 16:12,13

**included** 40:4 61:14

**including** 47:4 146:20

**Income** 20:21 21:2,5

**incredibly** 63:16

**indemnities** 61:7

**independent** 13:10

**independently** 62:3

**indirect** 18:3 19:17 97:2 136:16 144:19

**indirectly** 55:18 129:5,7 131:7,11 136:21

**individual** 10:3,6,13, 18 56:5 136:12

**individually** 120:25

**individuals** 46:13

**inferred** 26:13

**information** 117:6 136:24 139:3,16,18 140:2,11 145:7 146:16,20

**informed** 37:4 38:11, 13 90:4

**initiate** 103:19 104:11 105:2,13 106:20

**initiating** 100:23

**injunction** 11:10,14, 21 60:3 68:2 84:25 127:25 147:7

**injunctive** 110:16

**input** 54:10

**institutions** 33:24

**instruct** 93:5,10 98:4 106:7,9 125:9,17 127:13 129:11,18 130:18 131:14,21 133:11 139:20 140:18

**instructed** 41:25 44:6 56:23 89:22 92:25 98:11 106:14 127:3

**instructing** 9:4

**instruction** 41:23 42:4,13 135:23

**instructions** 44:9 49:7,10 68:23 69:4 82:18,21 89:8,15

**instructs** 130:16

**insurance** 61:6

**intend** 11:12,19,20 61:16 108:9

**intended** 45:15

**intent** 50:5,8 51:21 139:6

**intentional** 145:6

**interest** 10:12 18:4 19:18 52:9 88:19 97:22,24 107:8 116:3,9 118:3 119:18 136:16 141:17,21 144:19

**interested** 29:4

**interests** 46:7 50:9 61:5 63:7 89:18 105:23 109:11 110:23 111:11 114:20 116:24 140:4

**interfere** 93:6,11

**interfered** 128:10

**interference** 54:25

**interfering** 128:6

**intermediate** 29:3

**internal** 32:17 65:2, 7,12

**interrupt** 24:2 91:20 127:22 140:24 141:2

**interruption** 41:7

**intervene** 71:12

**intervened** 38:20

**interviewed** 140:15

**invest** 22:22 24:10

**invested** 23:15

**investigated** 36:9

42:18,22 43:5

**investment** 20:11, 17,20 24:24 25:22 88:18,20 97:19

**investments** 29:22 142:6

**investors** 50:9,10 52:9,16,20 61:5 63:7 88:19 89:18 101:7 102:9 104:16,17 105:21,23 107:8

**involved** 46:13 71:21 75:8 102:16 104:13 106:4,5 117:10 124:16 140:5 144:11

**involvement** 121:7

**Isaac** 118:5 136:23 146:21

**issue** 107:15 119:24

**issued** 49:11 93:4

**issues** 91:6

---

**J**

**J.P.** 112:12 113:9

**James** 7:9 8:3 14:13

**January** 6:4 7:10 14:18 77:7 91:2

**Jason** 34:5 75:8 78:13 80:12 105:19

**Jason's** 86:22

**Jefferies** 54:4,8,11

**jeopardy** 63:6

**Jerome** 47:10 50:20, 21 51:4

**Jim** 24:24 49:14 67:10 80:5 115:18 117:22 127:2 130:24

**job** 124:18 130:2

**Joe** 40:16,20 52:7 54:10,12 57:18

**John** 8:13 9:20 23:2 35:3 108:7 121:21 125:16 126:17 127:23 129:22 147:5

**joint** 114:15 116:18, 23 117:20 118:3,6,10 119:14 120:15 122:2

**Jones** 8:14

**judge** 91:7,23,25 145:13

**judgment** 52:19

**July** 14:24

**juncture** 45:17 104:2

**justification** 56:14 58:16 60:17

---

**K**

**K&I** 32:14,17 58:20 94:4,5,14,15 95:7 98:11 100:12,21 106:9,14 111:19 112:5

**keeping** 76:10

**Kelly** 83:20,24

**key** 26:6

**kind** 39:23

**Klos** 145:15,17,21

**Klos'** 146:9

**knew** 33:9 35:17 42:13 75:9,10 99:10 125:19 140:5

**knowing** 56:5

**knowledge** 26:19,25 27:12 28:16 36:21 55:20 56:13 64:6 76:22 93:9 98:9 106:12 130:8 132:4

---

**L**

**La** 30:24

**label** 73:10

**ladies** 6:7

**largest** 97:21,23

**lastly** 147:16

**late** 46:18 108:14

**law** 10:5 136:8 140:2

**lawsuit** 110:14

**lawsuits** 63:6

**lawyer** 26:22 67:8 92:4 115:13,25 123:19,25 130:15 136:11,14,19 139:9

**lawyers** 9:4 25:20 68:5 70:25 71:11 114:9 116:23 119:16 136:25

**leadership** 114:8,19 118:22 119:4,9,23 120:2,12 122:17,23

**learn** 54:6 68:4

**learned** 32:2 38:8,20 52:25 91:14 92:13

**learning** 33:15 38:3

**leave** 76:14 98:24 108:15

**led** 16:6

**left** 76:8 80:19 81:3

**legal** 6:8 28:22 29:7, 16 30:21 37:18 92:8 103:24 117:18 139:11

**legally** 104:4

**legwork** 83:24

**length** 55:24

**letter** 9:4 31:17 32:6, 14 33:4,7,9,13,16,17 34:7,13 35:8,13,15, 20 36:4 37:25 38:3,5 85:8 94:3,12,14,15, 18,20 95:6 96:22 98:5,12 99:5 100:11, 15 103:16,19 104:10 106:10,15,18

**letters** 44:24,25 58:22 95:22,25 96:6, 18 103:8

**level** 98:23

**Leventon** 47:5 83:9, 12 118:5 126:25 127:9 132:22 135:22 136:23 138:10,18

146:21

**liability** 33:25 44:8 45:13,20,22 46:3,12, 14 61:3,19 105:19

**liar** 86:23

**lift** 26:23

**lights** 50:23

**limited** 70:14

**limits** 106:2

**liquidation** 74:12

**liquidity** 90:23

**list** 113:16 119:14

**listed** 35:22

**listen** 13:22 46:17 91:12 123:11

**litigant** 128:8

**litigation** 103:8 111:3 114:20

**lived** 34:22

**loan** 16:18

**loaning** 17:4

**located** 8:16

**logged** 69:25

**logical** 105:16

**Loiben** 68:13,14,15

**long** 46:23 53:18,20

**longer** 77:4

**looked** 44:11,16 85:18

**lot** 16:3 63:25 99:12

**loud** 44:4 62:24

**LP** 7:13 17:18 18:23

**ludicrous** 76:15

**lunch** 83:23

**Lynn** 112:21,25 113:3 115:18 118:14

---

**M**

**made** 29:22 36:13

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 12-2    Filed 07/02/22    Page 53 of 200    PageID 22868
Appendix Part 2 Page 1332 of 1736

Index: majority..nutty

**55**:11 **56**:3 **64**:25
**73**:5 **88**:14 **95**:7
**101**:11 **102**:2,4,14
**126**:23 **133**:23
**139**:12 **142**:7 **144**:8
**147**:9

**majority** 123:7

**make** 11:19 46:18
55:15 56:15 57:2
59:16 71:14,18 76:17
84:23 91:25 102:20
103:2 115:20 142:2
143:22 144:5 147:4

**makes** 91:8 143:21
144:3,14 145:16

**making** 52:19

**malfunction** 11:2
16:8 57:6 68:24 82:6
96:7 111:20 116:6
136:2 137:8 142:13
143:22

**malicious** 63:17

**man** 26:6

**manage** 16:21 17:8
20:11,17,21 23:13,25
24:9,16 25:17 26:11

**managed** 22:12,22
23:16 38:10

**management** 7:13
18:22 28:7,19 29:12
30:6 93:7,12 101:12,
24 102:24

**Management's** 8:18

**manager** 16:18
20:25 21:6,10,13,15,
25 22:4,16,19 29:21
36:8 46:12 52:14
54:2 100:24 102:7,8
103:20 104:5,6,12,22
105:14 106:21 107:4,
16,20

**manager's** 56:4

**manages** 23:21
39:12

**managing** 24:23

**manifested** 95:22

**manner** 87:10

**marked** 31:4 35:2
39:3 62:15 67:16
80:10 81:19 84:6
85:6 90:10 93:24
100:7 112:18 115:4
134:8 138:8

**market** 102:13

**markets** 90:23

**Matt** 40:13,20 45:17,
19

**matter** 29:20 41:12
59:6 64:18 94:6
132:22

**matters** 36:14 37:13

**Mckenzie** 136:9,25
137:23 138:3,19
139:2,7,25 140:2,10,
11 141:4,8 142:8,18

**means** 89:11

**meant** 49:13

**Media** 7:8

**medication** 12:5

**meeting** 116:18,23
119:14

**meetings** 48:13

**Melissa** 128:17
133:17 134:13,25

**member** 14:13

**members** 144:16

**memorandum**
37:11

**memory** 12:8 113:22

**mentioned** 49:14
64:25 65:18 117:14
128:5

**message** 45:16 62:9
81:23 82:11 126:18

**messages** 70:4
74:20

**microphone** 16:12

**mid** 77:9

**middle** 119:20 120:6

**Mike** 6:15 115:17

**Miller** 6:15

**million** 101:21

**mind** 124:6

**mine** 116:12 130:3

**minimis** 63:19

**minimization** 57:24

**minutes** 46:18,19,24
47:22 108:4,14,23
143:10

**missed** 20:12 43:2

**misunderstood**
51:21

**model** 145:15,16

**moment** 85:2 126:18

**money** 141:9 142:18

**month** 70:16 102:23
103:7

**months** 65:25 66:2
144:23

**morning** 6:6 8:10,16
9:8,12 64:25 113:10

**Morris** 6:25 7:3,5 8:9,
13 11:5,6,16,18,24
13:4 14:7 15:8 16:14,
16,24 17:2,11,13
18:7,9 21:11 23:2,11
24:12 25:2,8 27:18
28:3,10 29:6,9,15,18
30:2,11,14,22,24
31:5 32:11 33:2
34:11,23 35:4,7 36:5,
19 37:7 38:18,24
39:4 41:8,10 42:10,
11 43:8 44:20 46:22,
25 47:13,20,23 48:6,
21,24 49:18 50:15,22
51:2,5,7,14,15 52:13,
24 54:16,17 55:7
56:9,12,19 57:9,16
60:22 62:12,16,18
64:21,23 67:3,13,17
69:3 71:23 73:11
75:16 76:16 77:3
78:7,16 79:15,20
80:7,11 81:16,20,22
82:9 84:3,7 85:3,7,
20,22,24 86:12,13
88:12,21 90:7,11,13

**91**:11,13,23 92:7,11,
18 93:21 94:2 96:10,
21 98:8 99:22 100:4,
8,10 101:8 104:8
105:6,10,11 106:24
107:22 108:4,11,20
109:6 110:5,10
111:23 112:15,19
114:25 115:5,7,14,20
116:9,16 117:19,23,
24 121:15,16,21,25
122:7,11,13 125:6,
11,15 126:2,9,17
127:15,20,22 128:2,
16 129:13,16,21,25
130:7,15,20 131:3,
16,19,23 132:3,11,
17,20 133:3,6,13,16
134:5,9,12 136:5
137:11 138:5,9
139:23 140:23 141:3
142:16,23 143:9,25
144:2 147:3,11,14,20

**motion** 11:2,9,13
15:4,13,23 67:25
94:24 95:8,17 96:19
99:17 111:16,18,19
112:10

**motions** 96:19
111:15 112:3,9,13

**mouth** 16:13

**move** 29:6 30:11
56:9 74:13 80:2
91:11 105:24

**moving** 56:4 104:5
105:22 139:15

**multipage** 37:15

**Multistrat** 146:16,21

**mutual** 117:3,14
118:3,6,10 120:7,16
122:3 137:3,12 139:5

**N**

**nail** 85:13

**named** 128:17

**natural** 146:25

**necessarily** 37:3

**necessity** 32:24

**needed** 114:12,18
132:24

**Nexpoint** 17:18,25
18:4,10,19 19:8 20:3,
10,16 21:16 22:3,7,
10,18 31:18 32:5
33:16 35:9 36:13,22
38:4 65:14 77:13
101:13

**Nexpoint's** 18:13,16

**NHF** 21:21 22:13

**nonfinancial** 29:3

**nonfinancially** 29:3

**noninvestment**
53:25

**nonportfolio** 54:2

**nonsensical** 59:21

**nontrader** 54:2

**normal** 103:11

**Norris** 59:2,8

**Northern** 7:15

**noted** 7:18

**notice** 75:23 80:4
108:7

**notification** 36:12

**notwithstanding**
48:15

**November** 35:10
60:8,24

**NPA** 89:22 92:25
93:5,10,15,18

**number** 75:17 76:9,
11,14 77:25 78:4,6,
10,18 126:10

**numbers** 20:4 79:10,
24

**numerous** 78:20

**nuts** 107:9

**nutty** 90:21 107:10

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 12-2   Filed 09/09/22   Page 54 of 200   PageID 22869
Appendix Part 2 Page 1392 of 1736

Index: oath..primary

**O**

oath 12:14

object 33:12,14
109:23 115:12
126:13

objected 96:14
109:20

objection 11:15,22
13:2 14:5 15:6 16:23
17:10 18:6 23:3
24:11 25:7 27:16,25
28:8,21 29:14,24
30:8,18 32:9,21 34:9
35:23 36:16 37:2
38:17,22 42:7 43:7
44:18 45:25 49:17
50:7 52:3,21 54:15
55:2,23 56:17 57:14
60:19 66:24 71:20
73:7 75:14 76:4,23
78:5,12 79:11 91:18
92:16 98:6 99:18
101:2 103:22 106:22
110:2,8 117:16 125:4
135:12

obligation 16:19
36:7 127:10 128:9,11

obligations 17:4
104:18

obstructed 127:10

obtained 12:18
110:11

occur 75:12

occurred 124:6

October 31:18 77:9
109:15

offer 101:12 102:3,5,
15,18,20

office 69:9

officer 33:22,24 34:3,
4,19 37:12,18 53:14
61:13 95:20 105:18

offices 9:11,16
110:20 128:23

operate 26:3 88:17

operating 56:7 62:3

opinion 59:22 61:25

Opportunities 22:11

opportunity 22:18
102:24

opposed 109:17

opposition 15:22
16:4

order 12:18,22,24
13:6,9,14,19 14:10
15:4,19 26:24 31:14
39:7 48:11,15 49:11
69:5 84:9,18,23
124:9

orders 49:12 61:17

ordinary 111:18

organizations 97:12

original 41:20

outcome 145:10

outstanding 89:19

overrule 34:2

oversee 68:6

owned 38:9,14
114:10

owner 30:10 97:3,9

owners 20:6 28:14,
15,18,23 29:11 30:5
56:3 63:21,24

ownership 10:12
18:4 19:18 74:13
97:21,23 136:16
141:17,21 144:19

owns 18:16 129:10
131:13

**P**

p.m. 62:20 85:25 87:3
108:24 109:2,3,4
143:3,5,6,7 147:23,
24

Pachulski 8:14
101:21

paid 71:25 73:4 74:8

76:21 77:11,12
101:24

paragraph 87:25
88:7,9,14,16 89:2

part 23:19 43:2 59:22
69:9 72:5 120:19,23
121:2 137:3,20

participate 9:15
11:12 118:2,5 123:2,
18 139:7 144:7

participated 123:14

participating 123:24

parties 6:18 24:14
26:17 28:19 29:11
30:6,16 104:10 106:7
107:14 126:11
137:12 139:17

partner 14:14 18:14,
17 19:25

party 17:7 24:8,15
29:4 120:15,17 122:4
132:13

past 102:23

pause 7:4 95:10,11
111:25

pay 74:15 79:14
142:17 144:15

payment 101:23
142:8 144:8

payments 144:5

Pearson 40:13,14,17
41:3 43:15 45:18,19,
22

pending 6:23

people 28:24 42:4
76:12 79:9 105:22
107:11 143:17
145:14

people's 117:5

percent 54:21

perfectly 46:25 80:6

performance 88:19

period 70:14 76:10

peripherally 146:13

permanent 110:16

permission 9:7
75:21 77:22

person 70:10 83:21
135:9 138:19 143:14
145:17

personal 33:24
45:20 46:3 55:20
61:3,18 67:8 69:23
75:18 78:10,18
105:19 109:11
110:23 111:11
115:24 128:21 140:4

personally 12:21
17:15 38:20 67:11
71:15,17,21 126:23

petition 26:19

phone 8:25 32:18
60:9,16 69:8 71:24
72:4,6,11 73:3,5,14,
21 74:7,9,10,13,21,
24 75:3,4,6,9,10,17
76:9,11,14,19,20
77:11,12,18,21,25
78:4,6,10,15,18,21
79:10,24 80:15,20
81:10,13 82:24
85:13,15 86:5,15
87:2,10 123:24

phone's 81:7

phones 72:10,11,24
73:24 77:2 80:2

picking 60:8,15

piece 119:5,6

place 48:10 147:8

plan 74:13 109:17
144:24 145:4,6,8,11,
19,21,24 146:4

planned 108:9

play 83:5,12

playing 31:9

point 20:12 36:18
63:18 125:24

points 13:17 147:4

policy 144:9

portfolio 16:17 20:25

21:5,10,13,15,24
22:4,16,19 29:21
36:8 52:14 100:24
104:22 105:14 107:4,
20

portion 45:12

position 36:18 40:11
53:19 102:12 103:23
116:12 125:7

possession 126:22
127:4

possibilities 97:17

post 34:5,6,12
105:19 124:7

post-restructured
41:16

pot 144:24 145:4,6,8,
11,19,21,24 146:4

potential 44:7 45:13,
22 46:3,11,14 139:17

potentially 72:7

power 33:19 105:7

practice 6:11

preferred 89:14

preliminary 11:9,13,
21 68:2 110:16 147:7

premises 9:5,8

prepared 37:11

prerequisites 103:9

present 101:23

president 18:10,19
19:21 20:6 29:21
104:19

pressing 99:25

prevent 12:11 49:25
50:5,8

prevented 60:8,15
103:7

prevents 128:6

primarily 39:13
68:13 123:6

primary 32:16 97:21

Index: print..requested

**print** 71:4

**prior** 60:17 94:23
104:7 124:6 142:5

**privilege** 116:11
124:20 140:25

**privileged** 115:19
124:17

**problem** 23:18 43:3

**procedure** 6:22
75:11

**proceed** 7:6 41:9

**proceeding** 7:21
10:8 110:7 126:16

**process** 73:9,23
76:25 100:23 103:19
104:11 105:2,13
106:20 124:15

**produce** 113:21
124:8,24 126:20
132:13 135:23

**produced** 70:22,23
71:8,19 114:4 115:17
124:23 132:24

**producing** 83:6,13
135:13

**production** 70:4,19
83:3,10,18 121:22
122:2 124:12 133:9,
24 135:9,17

**professional** 24:24
25:22 53:25

**prohibition** 101:9

**promise** 47:8

**prompted** 134:22

**prosecution** 111:10

**protect** 101:6

**protocol** 73:9

**provide** 24:16 93:14
102:11 114:19
118:22 119:9 120:12
122:17,23 127:3,11
128:9

**provided** 57:12
93:17 102:23 116:4

**providing** 120:2

**provisions** 26:6

**purpose** 46:8,9,10
50:13 55:5,25 56:7
91:3,9

**pursuant** 26:16
40:22 48:10 116:4

**push** 64:2

**pushed** 95:19

**pushing** 91:4 105:20

**put** 30:25 31:11 34:23
38:24 62:12 64:21
80:7 81:16 84:3 85:3
90:7 92:4 93:21
100:4 103:12 112:15
114:25 117:3 134:5
138:5 144:23 145:5,8

**putting** 63:5 103:10

### Q

**question** 19:14
20:13 23:8,18 24:6
27:11 28:12 42:9
46:20 51:13 65:9
74:18 79:19 86:11
88:11 89:5 91:10,12
92:12 94:25 98:2
105:5,9 114:2,24
116:20 121:14
123:11 125:10,18,22
126:3 127:14 129:12,
19 130:17,19,25
131:15,22 132:16
133:2,12 134:3

**questions** 28:13
48:19 58:9 70:23
79:7 84:20 116:13
128:12 130:13 147:4

**quickly** 104:6 139:16

**quote** 45:12 49:12
53:22 134:25

### R

**rarely** 60:2,3

**rationale** 50:17
56:15 57:12 58:4,21

59:20

**reach** 117:5

**read** 12:21 13:24
14:9 31:13 44:3
49:22 62:23 70:17
84:16 85:11 88:3,7,
10 89:2 99:6 113:11
118:23 128:4

**realizes** 90:22

**reason** 10:16 14:8
63:10 66:18,21 67:4
86:8,25 87:5 90:25
102:22 135:21 137:5

**reasonable** 103:11,
12

**reasons** 52:5 63:3,
11,12 91:6

**recall** 13:18 15:25
16:4 31:25 45:4
58:18,19 65:3 79:13
82:5,11 89:12 90:6
100:14,16,20 107:17,
21 114:4,7 116:21
122:25 123:5,22
124:3,4,7 136:23
146:11,14

**receive** 41:19

**received** 85:11

**recent** 137:22

**recently** 123:22
126:7,8 142:4,6

**recess** 48:2 109:2
143:5

**recipient** 45:15

**recipients** 41:23
42:18,23 43:6

**recollection** 53:19
98:15 113:23 119:15
120:9 123:23 134:24

**record** 6:13 7:18
47:3,25 48:5 50:25
84:24 91:22,25
108:13,25 109:5
129:23 143:4,8
147:25

**recording** 6:19

**recycled** 72:20

**redefined** 65:24

**reduction** 57:24 58:2

**refer** 17:24 19:4,7

**reference** 39:17
44:10 45:11 65:2

**referred** 137:13

**referring** 22:14 25:5
44:13,16 45:2,5 65:5,
15

**refers** 21:17,19 41:15

**reflect** 108:13

**reflected** 58:17

**reflection** 84:23

**refresh** 98:15 113:22
119:14

**refreshed** 124:4

**regard** 137:23

**registered** 24:19
88:17,20

**regulatorily** 99:9

**regulatory** 32:24
33:23 34:7 36:3,6
37:5 61:4 107:7

**reimbursement**
101:20

**reinsurance** 141:15

**reject** 102:2,4,5,15

**rejected** 99:25

**rejection** 102:5,17

**relates** 115:17

**relating** 139:21

**relative** 101:22 145:9

**releases** 101:19

**relief** 110:17

**remedy** 105:16

**remember** 13:17
23:6 60:3 73:17 75:7
84:20 101:14 111:14
112:2,5,6,7,10,11,14
114:21 116:19 119:3,

6,7,12 122:24 134:4
135:4,5,8 138:25
144:12

**remembered** 63:14

**remembering** 60:12

**remind** 61:9

**remote** 6:19

**remotely** 6:14,17
31:7

**remove** 103:20
104:11 105:2,14
106:20 107:16

**removed** 110:19

**removing** 100:24
107:19

**repeat** 42:8,25 51:12
76:24 79:18 86:10
105:4 121:13

**replace** 104:5 107:3

**replacement** 72:6

**reported** 54:9

**reporter** 6:15 7:19

**Reporting** 6:9

**reports** 54:7

**represent** 10:11,13
26:9 94:8 116:2
136:12,15,20

**representation**
122:12

**represented** 67:10
95:6

**representing** 103:2
116:23 123:7 137:24
139:11 140:12

**represents** 10:2,6,
17 94:5

**request** 13:20 67:14
70:3,9,14 91:24
132:12 133:23

**requested** 11:3 16:9
57:7 68:25 82:7
95:15 96:8 111:21
116:7 126:6,7 135:25
136:3 137:9 142:14

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 2-12    Filed 07/12/23    Page 56 of 200    PageID 22871
Appendix Page 2 Page 7412 of 1736

Index: requesting..speculation

143:23

**requesting** 47:14

**requests** 64:17
67:24 70:5,8 126:24

**required** 101:20

**reservation** 101:4

**resignation** 109:14

**resigned** 40:11

**respect** 14:3 36:14
37:13 47:6 99:19
114:19

**respond** 135:23

**responded** 43:15,24

**responding** 49:3

**response** 43:13,18
44:3 49:2,8 68:8
118:14 122:15,16
124:9 135:4

**responsibilities**
99:11

**responsibility** 17:8
52:15,18 80:24

**responsible** 104:7

**responsive** 68:7,8
70:5,20 71:8,18,22
82:25 83:6,13 124:17

**rest** 48:18

**restrain** 13:15

**restrained** 84:19

**restraining** 12:18,22
13:14,19 14:10 15:4
84:8

**restrains** 13:6,9

**resume** 107:23,25

**retail** 94:7 104:17

**retain** 76:13

**retained** 141:5

**retainer** 141:9

**retaining** 140:3

**return** 108:3

**returning** 74:3

**reversed** 89:15

**review** 15:2 70:21,24

**reviewing** 83:6,13

**Richey** 6:7

**Rick** 6:7

**rightfully** 63:20

**rights** 28:23 101:4

**rigorously** 95:21
101:6

**risk** 28:24 57:23,24
58:2 63:6

**role** 52:14 65:23
83:5,12 114:15
117:9,10

**room** 6:12,16 8:19,20

**Rothstein** 75:8
78:14 80:12 81:9
85:19 86:4,19 87:6

**Roughly** 12:20

**Rule** 6:21

**rules** 6:22,23

**ruling** 92:2

———————

**S**

**sale** 111:25

**sales** 38:13 43:19
93:2

**sanctioning** 26:14

**satisfy** 71:7

**Saturday** 112:21

**Sauter** 65:6,7,12

**schedule** 48:13,16

**scheduled** 48:17

**Schroth** 133:17,23
134:13,16

**scope** 84:25

**Scott** 60:4 65:18 97:8
117:25 132:14
146:17

**screen** 30:25 31:12
48:22

**scroll** 32:7 41:2,18
43:13,23 48:23 53:10
62:16 70:7 81:20
82:2 84:11 87:20
92:19 94:17 100:13,
18 112:24 115:5
118:13,17 134:9,10,
15 138:16,21

**scurrying** 139:15

**search** 68:6 69:5

**searching** 83:6,13

**sec** 37:5 64:4 88:4

**secret** 76:3,6

**securities** 38:9,14
40:23 53:23 54:4
58:3 63:18 90:5,15,
25 91:4,16

**seek** 42:21 43:4

**seeking** 15:16 38:8

**Seery** 14:13,20 15:3,
9,12 24:24 25:15
31:18 35:9 36:14,23
38:8 41:25 42:6,15,
17 45:23 52:10 53:2,
6,22 54:23 55:5,21
56:7,15,25 57:5,6,11,
23 58:5,9,16 59:9,17,
25 60:9,12,16 61:7,
12,23 62:2,9,20
64:13 80:5 80:5
91:16 92:14 101:19
127:2

**Seery's** 25:22 38:15
59:20,22 60:25 61:17
80:3 90:15 135:23

**sees** 54:10

**self-reporting** 64:4

**self-reports** 37:4

**self-serving** 91:5

**sell** 38:8 40:23 41:24
44:6 50:14 51:24
90:5,15,25 91:16
92:15

**selling** 58:3,10 91:4
95:11

**send** 32:19 118:25
134:22 138:18,22,24

**sending** 33:3,6,12
37:24 99:5 103:15

**senior** 72:25 78:20
79:2

**sense** 13:7 91:8
145:16

**sentence** 43:2
88:15,24 89:2,7,10,
20

**serve** 112:12 147:8

**served** 67:23

**serves** 16:7,17

**services** 77:12 116:4
127:7 130:9,21 132:5

**set** 36:14,24 37:13
54:3

**settle** 89:10

**settlement** 65:24
109:21,24

**settling** 89:19

**severity** 6:10

**Sevilla** 112:12 113:9,
19

**share** 30:25

**shared** 77:12 116:4
127:7 130:9,21 132:5
137:3,13 139:5

**shares** 92:15

**sharply** 142:25

**she'd** 71:4

**She'll** 91:25

**sheets** 146:15,20

**shortly** 78:22

**showed** 108:7

**signatory** 104:10
106:8

**signed** 16:3 17:15
84:9

**significant** 63:21,23
146:13

**signing** 15:25

**similar** 45:10

**simply** 91:14 92:12
123:13

**single** 128:13

**sir** 8:17 33:20 35:11
85:9 94:17 126:3
130:11

**sit** 10:15 55:21 66:19
143:17 144:13

**sits** 143:14

**situation** 105:22

**Sky** 41:12,15,24
42:19,23 43:9,10,19
89:24

**so-called** 144:24

**social** 6:11

**sold** 38:14 46:8 50:11
56:6 63:9,17

**sought** 26:23 103:2
110:11 111:25

**sounded** 21:25

**Sowin** 40:16,17 49:3,
6 51:9,17,20 54:12
57:18,22 58:5,8,12
59:9,17 90:4 92:21

**Sowin's** 50:3,4 58:15

**speak** 32:13 42:17
55:16,18,19 74:6
83:2,9,16

**speaking** 59:25
95:23

**specific** 19:10 73:3

**specifically** 30:15
33:5 35:15 85:10
90:6 96:3 100:16
126:20 127:21,24
128:3

**specifics** 79:14

**speculate** 21:8
22:25 29:5 55:4
68:22 98:21 120:4,5
136:7

**speculating** 55:9

**speculation** 55:4

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-12    Filed 04/22/22    Page 57 of 200    PageID 22872
Appendix Part 2 Page 0422 of 1336

Index: speed..told

**speed** 99:3

**spent** 123:6 144:22

**spoken** 57:11 60:4 138:2

**stab** 145:8

**stack** 71:4,5

**staff** 25:24 37:19

**stand** 52:5 135:3,19

**standard** 7:11 47:25 73:9 75:11 108:25 109:5 143:4,8 147:24

**standing** 23:22 24:22 26:11

**standpoint** 36:3

**stands** 17:3

**Stang** 8:14

**start** 7:8 39:6

**started** 108:13 110:14

**starts** 119:21

**state** 6:23 47:2 116:11,12

**statement** 46:15 79:8 87:6 122:16 135:20

**statements** 88:9 125:2,13,20 126:12, 21 132:13,23 133:10, 25 135:10,14,18,24

**States** 7:14

**stay** 26:23 103:25

**stayed** 77:8

**stays** 26:20

**steno** 7:18

**stenographer** 11:4 16:10 57:8 69:2 82:8 96:9,12,16 111:22 116:8 136:4 137:10 142:15 143:24

**stenographic** 50:25

**stepped** 50:20

**steps** 42:21 43:4

71:17 105:2 106:19 107:3

**stick** 66:25 124:5

**stipulate** 6:18

**stop** 38:21 43:9,10, 14 53:11 63:20 89:17,23 140:21

**stopped** 40:7 69:14

**stopping** 42:14

**Strand** 14:14

**Strategic** 22:10,18

**strategist** 111:8,9

**strategy** 111:3 142:6

**strike** 29:6 30:11 56:9 91:11,20,25

**string** 39:5 118:25 119:20,21,25 120:6

**struggle** 145:5

**stuck** 126:16

**stuff** 78:14,15 91:8 99:9

**subject** 24:17,18,19 26:20 41:12 101:22 103:25 104:3 105:25 111:6 126:15 130:14 132:22

**submit** 15:21

**submitted** 15:3

**subpoena** 126:21 134:17 135:2,19 147:8,12

**subsequently** 122:22

**subsidiary** 22:2

**substance** 15:11 32:6 44:25 45:10 50:4 96:6

**substances** 44:24

**suffered** 46:6

**sufficient** 52:6

**suggest** 61:16 102:19

**suggested** 112:12

**suggesting** 64:3

**summary** 101:15

**supersede** 56:2 71:13

**supervise** 71:13

**supervisor** 146:10

**support** 15:12 33:6 37:24 99:25 103:15

**supported** 99:4

**supposed** 124:20

**surface** 76:15

**Surgent** 53:5,13 60:24 61:18

**suspense** 126:19

**swear** 6:16 7:19

**swearing** 6:20

**switched** 69:16

**sworn** 8:4

**symbol** 21:21

**system** 54:9

**systems** 47:11 50:21

──────────

**T**

──────────

**takes** 147:7

**taking** 48:10 106:19 107:3

**talk** 16:5 47:3,9,10, 15,19 59:12,14 60:9 62:5 83:25 117:21

**talked** 20:15,16 23:12 60:12 62:6 98:16

**talking** 13:10,11 73:3

**Tara** 68:13 81:13,24 82:5,14,15 83:17,20, 22

**Tara's** 71:10 80:20 81:3,10 83:19 86:6, 19 87:2

**technical** 50:24

**technology** 78:14

**telephone** 8:23 48:14

**telling** 108:18

**temporary** 12:18,22 13:9,14,19 14:10 15:4 84:8

**ten** 46:18,24 47:21 108:4

**ten-minute** 107:23

**term** 117:18

**terminate** 26:24

**terminated** 25:25 26:18 78:21

**termination** 80:3

**terms** 45:10 64:3 101:16

**testified** 8:5 59:4 99:3 137:15

**testify** 11:20 16:20 23:19,21,23,24 24:5, 14 113:19

**testifying** 12:11 26:10

**testimony** 24:21 35:24 47:16 58:6 59:13 76:24 120:13 124:2

**Texas** 7:16

**text** 62:9,19,23 70:4 74:20 80:18 81:23 82:11 126:17 134:11, 19,22

**texts** 107:14

**Thanksgiving** 38:7 60:13 90:24

**theme** 99:8

**thing** 31:8 103:11 104:15 113:10 120:8 140:9

**things** 16:3 24:17 26:21 61:4 64:2 99:12 106:3 128:5

**thinking** 46:23

**Thomas** 53:5 61:2 62:2,4,6

**thought** 15:18 22:14 52:11 54:24 55:24 59:21 62:2,7 78:24 79:2 96:4 121:8

**threw** 73:12,14 76:19,20 77:18

**throw** 72:21 73:5,20 74:2 80:15,24 81:10, 14

**throwing** 73:17

**thrown** 86:15

**thrust** 99:7

**thumb** 71:4

**time** 7:11 8:19 14:9 19:14 31:8,12 32:3,4 35:14,25 38:19 40:10 42:3,12 45:5 47:25 53:20 57:21 59:24 60:4,11,12 62:9 63:18 70:14 73:24 74:11,13,20 77:5,6, 18 82:16 86:5 88:5 90:3,20 94:20 100:20 103:16 107:12 108:3, 8,25 109:5 117:11 123:6,16,25 124:12 128:13 129:20,22 133:8 135:9 139:24 140:15 142:12,24 143:4,8 144:22 147:24

**times** 23:6 123:22 126:4 145:13

**title** 129:3

**titles** 21:4 22:17

**today** 9:21 10:22 12:8,11 31:9 47:16 48:10,14 84:17 127:19

**today's** 7:9 9:16 10:24 11:8

**told** 25:24 34:16 37:8,20 57:4,23 66:12,15,17 74:23 86:19 100:22 120:11 133:23

Index: tomorrow..Ziehl

**tomorrow** 103:5,13
  147:15

**top** 63:14 101:18
  113:7 115:21,22
  122:14

**topic** 107:19 118:10
  119:13

**touch** 16:11

**trade** 53:23 54:4,7
  89:11

**trader** 40:15

**trades** 38:21 42:5,14
  50:5,8 53:3,7 54:9,
  10,24 55:11,15,22
  56:16 57:2 58:17,22
  60:17 61:18,24 89:9,
  11,17,19,23 101:20

**trading** 49:13 52:8
  72:24

**transactions** 42:19,
  24 43:9,10 45:23
  52:19 57:13 60:10
  111:18

**transcend** 99:12

**transcript** 13:24

**transfer** 102:7,9,24
  104:7

**transferred** 75:18

**transition** 50:12 56:2
  63:8 72:7 74:12

**transitioned** 78:10

**trial** 112:22 113:18

**TRO** 15:13,16,23
  16:6 83:25 93:4,15,
  18 110:11 111:2
  113:13 114:18 125:5
  126:15 127:25 128:2

**true** 19:22 89:21

**trust** 71:10,11

**TSG** 6:9

**turn** 50:22

**tweak** 55:6

**twisted** 26:10

**typed** 122:20

**typical** 46:5

---

**U**

**UCC** 74:19,23 124:25
  125:12,19 126:7
  136:6

**ultimate** 28:25

**ultimately** 141:4

**unawareness** 52:8

**underlying** 44:7
  51:25

**understand** 10:21,
  24 11:7 12:14 19:15
  25:3 27:7 51:13 60:6
  70:13 73:24 76:18
  87:22 115:14 125:8

**understanding**
  13:5,8 29:8,10,20
  30:5,9 34:21 39:22
  41:14 58:21 78:19
  79:12,13,17,22,25
  84:18,24 88:17 92:4
  97:18 102:12 137:7
  143:20

**understood** 42:3
  70:2 73:8

**unfounded** 63:17

**unhighlight** 49:21

**United** 7:14

**unpaid** 77:8

**untenable** 101:15,17

**untrue** 87:6

**unusual** 52:12

**up-front** 101:23

**upgraded** 73:24

**urgency** 90:24

---

**V**

**validity** 6:19

**variety** 126:6

**vast** 123:7

**vehicles** 16:19 17:9

**versus** 72:24

**video** 6:19

**video-recorded** 7:8

**view** 102:17

**viewed** 32:23

**vindictive** 90:21
  91:5

**violating** 63:4

**virtually** 21:10

---

**W**

**Wait** 7:20

**waited** 91:2

**waived** 116:11

**wanted** 49:19 55:14,
  21 56:15 57:2,13
  61:21,23 74:24 76:3
  90:5 91:16 92:14
  101:23 119:15,22
  125:12,19

**warning** 62:25 63:19
  64:9

**warnings** 64:12

**Waterhouse** 146:8,9

**week** 69:17 95:5

**weeks** 25:25 74:16
  112:3

**withdraw** 33:17 34:7
  38:4 98:5,11 106:10,
  14

**withdrawn** 15:10
  16:24 28:4 34:13
  39:20,21 44:14 45:20
  52:17 54:16 55:13
  66:20 70:23 71:16
  72:15 76:19 78:8
  80:5 82:14 86:12
  101:10 105:10 106:8
  129:6 143:25

**woman** 128:17

**word** 25:4

**words** 122:18

**work** 39:6 71:10
  82:6,10,15,23 128:22

**work-around** 53:2,7,
  23 54:22 61:2,12,25

**worked** 69:7

**working** 53:22
  119:16 120:19 121:2
  123:7

**works** 40:16 54:14,
  18,20 61:20 83:20
  92:9

**world** 36:13

**worse** 90:19

**wrapped** 101:16

**write** 60:23 63:2

**writes** 113:8

**writing** 44:6 103:8

**writings** 44:13,15
  45:4

**written** 37:10,17,18
  44:9

**wrong** 99:20

**wrote** 51:17,25 53:5,
  22 64:8 112:21 113:3

---

**Y**

**year** 69:18 123:20,21
  126:5 142:4 145:18

**years** 34:22 41:17
  53:20 69:25 72:12
  73:25 88:16 142:5
  144:10,11

---

**Z**

**Ziehl** 8:14

# EXHIBIT 96

1          Dondero - 5-28-2021

2      IN THE UNITED STATES BANKRUPTCY COURT

3        FOR THE NORTHERN DISTRICT OF TEXAS

4              DALLAS DIVISION

5   In re:                )
                          )
6   HIGHLAND CAPITAL          )  Case No.
    MANAGEMENT, LP,        ) 19-34054 L.P.
7                          ) Chapter 11
         Debtor,          )
8   -----------------------------)
    HIGHLAND CAPITAL MANAGEMENT,  )
9   LP,                   )
                          )
10        Plaintiff,       ) Adversary No.
                          ) 21-03003-sgi
11      vs.               )
                          )
12  JAMES D. DONDERO,         )
                          )
13        Defendant.        )

14

15          REMOTE DEPOSITION OF

16             JAMES DONDERO

17

18            Pages 103 - 282

19              Dallas, Texas

20        Friday, 28th day of May, 2021

21

22

23  Job No. 194690

24  Reported by:

25  Daniel J. Skur, Notary Public and CSR

Page 104

```
 1        Dondero - 5-28-2021
 2
 3
 4
 5
 6
 7
 8        28th day of May, 2021
 9        9:33 a.m. - 1:59 p.m.
10
11
12        Remote Deposition of JAMES DONDERO,
13    located in Dallas, Texas, before Daniel J.
14    Skur, Notary Public and Certified Shorthand
15    Reporter in and for the State of Texas
16    located in Waxahachie, Texas.
17
18
19
20
21
22
23
24
25
```

Page 105

```
 1        Dondero - 5-28-2021
 2   A P P E A R A N C E S :
 3     Pachulski Stang Ziehl & Jones
       Attorney(s) for Debtor
 4       780 Third Avenue
       New York, New York 10017
 5   BY:   John Morris, Esq.
 6        Gregory Demo, Esq.
 7
 8
       Stinson
 9       Attorney(s) for The Witness
       3102 Oak Lawn Avenue
10
       Dallas, Texas 75219
11
12   BY:   Deborah Deitsch-Perez
13        Michael Aigen, Esq.
14        Paul Lackey, Esq.
15
       Sidley Austin
16       Attorney(s) for The Committee
       2021 McKinney Avenue
17
       Dallas, Texas 75201
18
19   BY:   Paige Montgomery, Esq.
20
21   ALSO PRESENT:
22        Davor Rukavina, NexPoint
23        La Asia Canty
24
25
```

Page 106

```
 1        Dondero - 5-28-2021
 2
 3        IT IS HEREBY STIPULATED AND AGREED
 4    by and between the attorneys for the respective
 5    parties herein, that filing and sealing be and
 6    the same are hereby waived.
 7        IT IS FURTHER STIPULATED AND AGREED
 8    that all objections, except as to the form  of
 9    the question, shall be reserved to the
10    time of the trial.
11        IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be sworn to and
13    signed before any officer authorized to
14    administer an oath, with the same force and
15    effect as if signed and sworn to before the
16    Court.
17            - oOo -
18
19
20
21
22
23
24
25
```

Page 107

```
 1        Dondero - 5-28-2021
 2        P R O C E E D I N G S
 3        REMOTE ORAL DEPOSITION OF
 4        JAMES DONDERO
 5        (REPORTER NOTE:  This deposition is
 6    being conducted remotely in accordance with
 7    the Current Emergency Order regarding the
 8    COVID-19 State of Disaster.
 9        Today's date is the 28th day of
10    May, 2021.  The time is 9:33 a.m. Daylight
11    Savings Time.  The witness is located in
12    Dallas, Texas.)
13        JAMES DONDERO,
14    having been duly cautioned and sworn to tell
15    the truth, the whole truth and nothing but the
16    truth, testified as follows:
17        (9:33 A.M.)
18        EXAMINATION
19   BY MR. MORRIS:
20   Q.   Good morning, Mr. Dondero.
21   A.   Morning.
22   Q.   It's John Morris, again, from
23   Pachulski on behalf of the debtor.  We're here
24   for your deposition today.
25        Do you understand that?
```

Page 108

Dondero - 5-28-2021

1
2    A.   Yes.
3    Q.   Okay.  We've done this a few times,
4    so I'm going to kind of cut to the chase; but I
5    do want to remind you that we're going to be
6    looking at a number of documents today.
7         And because of the difficulty
8    sometimes of doing this on a Zoom or by video,
9    if, at any time, you believe you need to see
10   other portions of the document, please let me
11   know that.  Okay?
12   A.   Sure.
13   Q.   Okay.
14        MR. MORRIS:  Can we put up the first
15   exhibit, please?
16        (Exhibit 1 introduced.)
17   BY MR. MORRIS:
18   Q.   Okay.  This is a document that's got
19   a title, "Promissory Note."  It's dated
20   February 2, 2018, and the amount of the note is
21   $3,825,000.
22        Do you see that?
23   A.   Yes.
24        MR. MORRIS:  Can we just go to the
25   signature line, please?

Page 109

Dondero - 5-28-2021

1
2    BY MR. MORRIS:
3    Q.   Is that your signature, sir?
4    A.   I believe that's my assistant on my
5    behalf.
6    Q.   Did you authorize --
7         (Audio distortion.)
8    A.   I'm sorry?
9    BY MR. MORRIS:
10   Q.   I don't want to step on your words.
11        Were you finished with your answer?
12        MS. DEITSCH-PEREZ:  Yeah.  Can
13   you -- yeah, can you ask it again?
14        MR. MORRIS:  Sure.
15   BY MR. MORRIS:
16   Q.   Is that your signature, sir?
17   A.   Yes, for -- yes.
18        MR. MORRIS:  Can we go back to the
19   top of the document?
20   BY MR. MORRIS:
21   Q.   And was this document signed on or
22   around February 2, 2018?
23   A.   Yes.
24   Q.   Did you receive $3,825,000 from the
25   debtor on or around February 2nd, 2018?

Page 110

Dondero - 5-28-2021

1
2    A.   I -- I believe so.  I don't have
3    direct awareness, but I believe so.
4    Q.   Okay.  And did you sign this
5    promissory note in exchange for that cash that
6    you believe you received?
7    A.   Yes.
8    Q.   Okay.  Are you familiar with the
9    term "demand note"?
10   A.   Yes.
11   Q.   Can you describe for me your
12   understanding of what a demand note is?
13   A.   It's a note that's -- maturity is
14   defined by the term "demand" versus a -- a
15   stipulated date.
16   Q.   And if we look down to paragraph 2,
17   at the time that you signed this document on
18   February 2, 2018, did you understand, based on
19   paragraph 2, that you were signing a demand
20   note, as you've characterized it?
21   A.   Yes.
22   Q.   Okay.
23        MR. MORRIS:  Can we go back to the
24   top of the document?
25   BY MR. MORRIS:

Page 111

Dondero - 5-28-2021

1
2    Q.   Is it fair to say that under this
3    demand note, you promised to pay Highland
4    Capital Management, L.P., the sum of
5    $3,825,000?
6    A.   Yes.
7    Q.   Okay.  And at the time that you
8    signed this document on February 2nd, 2018, did
9    you intend to repay to Highland Capital
10   Management, L.P., $3,825,000 plus interest?
11   A.   Yes.
12   Q.   And at the time you signed this
13   document, did you intend to repay the principal
14   amount plus interest upon demand by HCMLP?
15   A.   Whatever was appropriate to pay,
16   what hadn't been paid if it -- if it had --
17   yeah, if it had -- whatever the terms are, the
18   terms are.
19   Q.   Okay.  Did you read the promissory
20   note before you signed it?
21   A.   No.
22   Q.   Is there anything about the
23   promissory note today that you don't
24   understand?
25   A.   I haven't looked at it closely.  I'm

Page 112

Dondero - 5-28-2021

1  aware of it but -- you know, but I'm not aware.
2  I haven't looked at it closely.
3      Q.   Well, but you do know that the
4  debtor has sued you to collect on this note,
5  right?
6      A.   Yes.
7      Q.   Okay. And can you identify anything
8  in this note today that you don't understand?
9          MS. DEITSCH-PEREZ:  Object to the
10  form.
11     A.   Again, I don't want to make any
12  legal interpretation or analysis of the
13  contract.
14  BY MR. MORRIS:
15     Q.   And I appreciate that.
16         And to be clear, I'm not asking you
17  for any legal opinion or any legal analysis.
18  I'm asking for facts.
19         As a factual matter, as a layperson,
20  is there anything about this note today that
21  you do not understand?
22         MS. DEITSCH-PEREZ:  Object, no
23  foundation.
24     A.   And I can't say.

Page 113

Dondero - 5-28-2021

1  BY MR. MORRIS:
2      Q.   Okay. You're not aware of anything;
3  is that fair?
4          MS. DEITSCH-PEREZ:  Object, no
5  foundation.
6      A.   No. I'm saying I can't give an
7  opinion.
8  BY MR. MORRIS:
9      Q.   All right. I'll try one more time a
10  slightly different way.
11         Can you identify any language in
12  this promissory note that you, as the maker of
13  the note and as a layperson, as a matter of
14  fact, do not understand?
15         MS. DEITSCH-PEREZ:  Objection, no
16  foundation.
17     A.   I – I don't have – I haven't
18  reviewed it. I don't have a comment.
19  BY MR. MORRIS:
20     Q.   At the time that you signed this,
21  did you believe that this note reflected all of
22  the terms and conditions with respect to the
23  subject matter of the note?
24         MS. DEITSCH-PEREZ:  Object, no

Page 114

Dondero - 5-28-2021

1  foundation.
2      A.   Yeah, I believe largely at the time,
3  yes.
4  BY MR. MORRIS:
5      Q.   In fact, if we go to paragraph 8,
6  there's – the last sentence is what's commonly
7  referred to as an integration clause.
8          Do you see that last sentence of
9  paragraph 8?
10     A.   Yes.
11     Q.   And did you agree with the debtor
12  that the terms and provisions of the paragraph
13  control and supersede every other provision of
14  all other agreements between the payee and the
15  maker in conflict herewith?
16     A.   I see it. I mean, I read it. But
17  what's – what's the question?
18     Q.   Withdrawn. It's okay. It speaks
19  for itself.
20         You were the CEO of Highland at the
21  time that you signed the note, correct?
22     A.   Yes.
23     Q.   And you controlled Highland at that
24  time; is that fair?

Page 115

Dondero - 5-28-2021

1      A.   Yes.
2      Q.   And at the time that you signed the
3  note, the Redeemer Committee had not yet
4  obtained a judgment against Highland Capital
5  Management or anybody else; is that – any
6  other Highland entity; is that right?
7      A.   I – and I don't recall the – the
8  timing –
9      Q.   Okay.
10     A.   – of their arbitration award or...
11     Q.   Let me ask you to just go back in
12  time, February of 2018. Do you recall having
13  any concern in February 2018 that you might
14  lose control of Highland?
15     A.   No, I don't recall.
16     Q.   While you were the CEO, did
17  Highland – withdrawn.
18         I'm going to refer to Highland
19  Capital Management, L.P., variously today as
20  either the debtor, Highland, or HCMLP; is that
21  fair?
22         MS. DEITSCH-PEREZ:  John, I think
23  it's a little confusing if you do that. I
24  mean, if you could refer to the

Page 116

Dondero - 5-28-2021

1  post-bankruptcy entity as "the debtor" and,
2  when you're talking about prebankruptcy,
3  call it "Highland" or "HCM"?
4      MR. MORRIS: Okay.
5      MS. DEITSCH-PEREZ: I – I think
6  that would probably be clearer.
7      MR. MORRIS: That's fair. I'll try
8  and do just that. Thank you very much.
9  BY MR. MORRIS:
10     Q. While you were the CEO of HCMLP, did
11  HCMLP, prepare, in the ordinary course of
12  business, a document called a "Monthly
13  Reporting Package"?
14     A. I don't know – I don't know the
15  name – I don't know that name in particular,
16  but we did do monthly financials, I believe.
17     Q. Okay. And did you personally review
18  the monthly financials each month that they
19  were prepared?
20     A. No.
21     Q. Do you know who was responsible for
22  preparing the monthly financials?
23     A. It would have been in accounting. I
24  don't know who in accounting.

Page 117

Dondero - 5-28-2021

1      Q. Was Frank Waterhouse responsible for
2  preparing the Monthly Operating Reports?
3      A. He was our CFO. So everything,
4  ultimately, in accounting reported up through
5  him, but I don't know his involvement in that
6  report.
7      Q. Can you identify any person who was
8  responsible for preparing the Monthly Operating
9  Reports for HCMLP, while you were the CEO?
10     A. No.
11     Q. Do you know what the Monthly
12  Operating Reports were used for?
13         Withdrawn.
14         What was the purpose of preparing
15  Monthly Operating Reports, if you know?
16     A. I don't know.
17     Q. Were they delivered to you each
18  month, even if you didn't read them?
19     A. I don't believe so. Not physically,
20  that I can remember. If there was an email, I
21  don't remember.
22     Q. Did you ever discuss any of the
23  Monthly Operating Reports with Mr. Waterhouse?
24     A. I can't – I can't recall.

Page 118

Dondero - 5-28-2021

1      MS. DEITSCH-PEREZ: I mean, do you
2  mean the report specifically or Highland's
3  financials generally?
4      MR. MORRIS: The Monthly Operating
5  Reports that we're talking about.
6      And I would appreciate it, Deborah,
7  if you have an objection, just say "Object
8  to the form of the question"; and I'll do
9  the best I can to – to try to understand
10  what you're saying, but I'd prefer no
11  speaking objections.
12  BY MR. MORRIS:
13     Q. Do you recall ever speaking with
14  anybody in accounting with respect to any
15  Monthly Operating Report that they prepared?
16     A. I don't recall.
17     Q. Okay.
18     MR. MORRIS: Can we put up Exhibit
19  Number 2, please?
20         (Exhibit 2 introduced.)
21  BY MR. MORRIS:
22     Q. Looking at the first page, sir, does
23  this appear to be what we've been describing as
24  a Monthly Operating Report for Highland Capital

Page 119

Dondero - 5-28-2021

1  Management?
2      A. It says "Operating Results." I – I
3  have no recollection of seeing this cover sheet
4  before.
5      Q. Okay.
6      MR. MORRIS: Can we go to the second
7  page, please?
8         Stop right there.
9  BY MR. MORRIS:
10     Q. This is the second page of the
11  Operating Results for February 2018, and it's
12  headed "Significant Items Impacting HCMLP's
13  Balance Sheet."
14         Do you see that?
15     A. Yes.
16     Q. Do you know whether the accounting
17  department was charged with the responsibility
18  of identifying on a monthly basis significant
19  items that would impact Highland's balance
20  sheet?
21     A. I have no particular awareness.
22     Q. Okay. Do you see at the bottom
23  under the title "Other," it's $3.8 million and
24  it's referred to as "Partner Loan"?

Page 120

Dondero - 5-28-2021

1
2    A.   Yes.
3    Q.   Do you have an understanding that
4  that 3.8 million-dollar partner loan refers to
5  what we just looked at as Exhibit 1, the
6  promissory note?
7         MS. DEITSCH-PEREZ:  Object, no
8  foundation.
9    A.   I have -- I have no particular
10  awareness other than the amounts are similar.
11  BY MR. MORRIS:
12    Q.   And -- and do you know whether
13  Highland recorded the promissory note as an
14  asset on its balance sheet as of February 2018?
15    A.   I -- I don't know.
16    Q.   So, you signed a promissory note for
17  $3.8 million in February 2018; and as the CEO,
18  you don't know if Highland carried that
19  promissory note on its balance sheet.  Do I
20  have that right?
21    A.   I'm saying I don't have particular
22  knowledge.  I -- I am a CPA and GAAP accounting
23  would suggest that it was, but I don't have --
24  I don't have particular knowledge on how it was
25  accounted for.

Page 121

Dondero - 5-28-2021

1
2    Q.   Okay.  Later in the year, you signed
3  two more promissory notes in favor of Highland;
4  is that right?
5    A.   I -- I believe so.  Yeah.
6         MR. MORRIS:  Can you put up
7  Exhibit 3, please?
8         (Exhibit 3 introduced.)
9  BY MR. MORRIS:
10    Q.   And can we go to the signature line?
11         (Scrolling.)
12  BY MR. MORRIS:
13    Q.   Is that your signature, sir?
14    A.   Yes.
15         MR. MORRIS:  Go to the top of the
16  page.
17  BY MR. MORRIS:
18    Q.   Did you sign a promissory note on or
19  about August 1st, 2018, in the amount of
20  $2.5 million in favor of Highland?
21    A.   Yes.
22    Q.   Did you receive from Highland
23  Capital Management, L.P., $2.5 million on or
24  about August 1st, 2018?
25    A.   I believe so.

Page 122

Dondero - 5-28-2021

1
2    Q.   And did you, in fact, sign this
3  promissory note in exchange for that
4  $2.5 million?
5    A.   Yes.
6         MR. MORRIS:  Can we go down to
7  paragraph 2, please?
8         (Scrolling.)
9  BY MR. MORRIS:
10    Q.   Looking at paragraph 2, would you
11  characterize this as a demand note, using the
12  understanding that you described earlier today?
13    A.   Yes.
14    Q.   And -- and this note, like the
15  other, because they're demand notes, there's no
16  conditions for -- for the demand, is that
17  right, at least as drafted.
18         Withdrawn.  That wasn't a great
19  question.
20         Were these unconditional demand
21  notes, these two documents that we've
22  looked at?
23    A.   I -- I don't want to make a legal
24  interpretation.
25    Q.   I'm just asking for your

Page 123

Dondero - 5-28-2021

1
2  understanding as the person who signed the
3  note.  At the time you signed it, at that time,
4  did you understand that there were any
5  conditions placed on Highland's ability to make
6  a demand?
7    A.   I don't know.
8    Q.   Okay.  Did you understand that under
9  these demand notes, that if you defaulted, all
10  amounts that were due and payable would
11  accelerate?
12         MS. DEITSCH-PEREZ:  Object to the
13  form.
14    A.   I don't know.
15  BY MR. MORRIS:
16    Q.   Did you read this -- did you read
17  this promissory note before you signed it?
18    A.   No.
19    Q.   Do you know whose idea it was to
20  give you the principal amount of these notes
21  and for you to execute the promissory notes in
22  exchange?
23    A.   I -- again, I think it's proper
24  accounting consistent with what we've done
25  with -- we've done historically -- or Highland

**Appx. 01645**

Page 124

Dondero - 5-28-2021

1    did historically and what Highland did
2    historically for other employees.
3        Q.   Okay.  I'm not asking about that.
4    I'm asking just about you and the two notes
5    that we've looked at so far:  Who made the
6    decision at the respective moments in time to
7    transfer to you the principal amount of the
8    notes and for you to execute the notes?
9        A.   I believe it would have come from
10   accounting.
11       Q.   Who decided -- who decided the
12   principal amount of the note?
13       A.   I don't know.  It would -- I don't
14   know.
15       Q.   Did you ask to borrow money?
16            Did you ask the folks in accounting
17   for a loan from Highland in the principal
18   amount of the notes and request that they
19   document it accordingly?
20       A.   No.
21       Q.   Who was your assistant at this time?
22       A.   My accounting assistant at this time
23   was Melissa Schroth.
24       Q.   And was she authorized to sign these

Page 125

Dondero - 5-28-2021

1    notes on your behalf?
2        A.   I -- that -- sometimes she signs
3    stuff.  I don't know on this.  I'm -- I'm not
4    denying that it's a bona fide -- signed by me.
5    Or if it wasn't signed by me, it was --
6    somebody who was authorized signed it on my
7    behalf.
8        Q.   Okay.  I appreciate that.  Thank
9    you.
10            Is there anything about --
11   withdrawn.
12            Was there anything about this
13   promissory note that you didn't understand at
14   the time that either you signed it or it was
15   signed on your behalf?
16            MS. DEITSCH-PEREZ:  Object, no
17   foundation.
18       A.   Again, I didn't evaluate it
19   carefully, and I didn't actually even read it.
20   BY MR. MORRIS:
21       Q.   Okay.  As you sit here today, can
22   you identify anything in this document that you
23   do not understand?
24            MS. DEITSCH-PEREZ:  Object, no

Page 126

Dondero - 5-28-2021

1    foundation.
2        A.   I -- I don't want to make a legal
3    interpretation on a legal document.
4    BY MR. MORRIS:
5        Q.   I appreciate that, but I have no
6    ability to ask any follow-up questions.  So let
7    me ask it just a different way:  Is there
8    anything about this document that you don't
9    understand today?
10            MS. DEITSCH-PEREZ:  Object, no
11   foundation.
12   BY MR. MORRIS:
13       Q.   You can answer.
14       A.   I don't know.
15       Q.   Okay.  Do you understand that if
16   there was something that -- that you did not
17   understand, you have an obligation to tell me
18   that right now?
19            MS. DEITSCH-PEREZ:  Object, no
20   foundation.
21       A.   I -- I -- the answer is the same.  I
22   don't know.
23            MR. MORRIS:  Can we go to Exhibit
24   Number 4, please?

Page 127

Dondero - 5-28-2021

1        (Exhibit 4 introduced.)
2            MR. MORRIS:  Can we go to the
3    signature line when you get there?
4    BY MR. MORRIS:
5        Q.   Is that your signature, sir?
6        A.   Yes.
7        Q.   And did you sign this document or --
8    or -- let me ask two questions first.  Did you
9    personally sign this document?
10       A.   And again, it was either me or
11   someone with my approval, but that doesn't look
12   like my typical signature, but it's close.
13       Q.   Okay.  And whoever signed it had the
14   authority from you to sign on your behalf; is
15   that fair?
16       A.   Yes.
17       Q.   Okay.
18            MR. MORRIS:  Can we go to the top of
19   the page, please?
20   BY MR. MORRIS:
21       Q.   And did you or somebody acting on
22   your behalf sign this promissory note on
23   August 13, 2018, in the amount of $2.5 million?
24       A.   Yes.

Page 128

```
1              Dondero - 5-28-2021
2         MR. MORRIS:  Can we go to
3    paragraph 2, please?
4  BY MR. MORRIS:
5     Q.   Looking at paragraph 2 and the term
6  contained therein, would you agree that this is
7  a demand note, using the definition that you
8  supplied earlier today?
9     A.   Yes.
10    Q.   At the time that this note was
11 signed on your behalf, did you intend to comply
12 with the terms of this note?
13    A.   Yes.
14    Q.   At the time that this note was
15 signed on your behalf, did you intend to pay
16 all unpaid principal and accrued, but unpaid,
17 interest upon demand of the payee?
18    A.   Let me say I -- I expected to honor
19 the agreement.  I don't know if I can answer
20 that with regard to that one term.
21    Q.   Well, I do just want to make sure
22 that -- withdrawn.
23         You understood at the time you
24 signed this document, or it was signed on your
25 behalf, that it was a demand note, correct?
```

Page 129

```
1              Dondero - 5-28-2021
2     A.   That it was structured -- no.  I
3  think what I've testified or tried to testify
4  to is that they are demand notes or they're
5  written as demand notes.  I didn't read them or
6  pay attention at the time to the structure of
7  the note.
8     Q.   Okay.  And as demand notes, you
9  understood that any unpaid principal and
10 interest would be due upon demand, correct?
11    A.   Again, I don't want to make -- I
12 don't want to make -- I don't want to affirm
13 that statement.  I would say I don't know
14 because I don't want to -- I don't know the
15 rest of the context of the rest of the note and
16 how it all interplays.
17    Q.   All right.  Well, I'm happy to --
18 to -- it's a very short document, so we can
19 look at it for as long as you want, but I
20 really need to know what -- what you, as the
21 maker, understood when you signed the note.  So
22 I'm going to ask a very simple question, and I
23 encourage you to -- to ask to see whatever
24 portions of the document you want, okay?
25         When these three notes were signed
```

Page 130

```
1              Dondero - 5-28-2021
2  by you or signed by someone you authorized to
3  sign, what did you understand the payment terms
4  to be?
5     A.   I -- I didn't.  I didn't have an
6  understanding at the time.
7     Q.   So -- but -- but you would agree
8  that your intention was to comply with the
9  terms of the note; is that fair?
10    A.   In aggregate, yes.
11    Q.   Okay.
12         MR. MORRIS:  Go to Exhibit 5,
13    please.
14         (Exhibit 5 introduced.)
15 BY MR. MORRIS:
16    Q.   Is it your practice to sign
17 documents or to have people sign documents on
18 your behalf that you haven't read?
19    A.   Yes.
20    Q.   This is a document that's entitled
21 "Operating Results" for August 2018.  Do you
22 see that?
23    A.   Yes.
24         MR. MORRIS:  And if we could just go
25    to the second page.
```

Page 131

```
1              Dondero - 5-28-2021
2  BY MR. MORRIS:
3     Q.   Do you see under Significant Items
4  Impacting Highland's bank -- balance sheet for
5  August 2018 at the bottom, there's a reference
6  to $5 million in "partner loan."  Do you see
7  that?
8     A.   Yes.
9     Q.   Do you have an understanding as to
10 whether or not that refers to the two
11 2.5 million-dollar notes that we just looked at
12 that were signed in August 2018?
13    A.   I don't know.
14    Q.   Do you have any recollection at
15 all or -- withdrawn.
16         Were you personally referred to as a
17 partner of Highland in August 2018?
18    A.   I believe so.
19    Q.   Are you aware of any partner loans
20 that were made by Highland in August 2018 other
21 than the two loans that we just looked at?
22    A.   I don't know.
23    Q.   You're not aware of any; is that
24 fair?
25         MS. DEITSCH-PEREZ:  Object, no
```

Page 132

1          Dondero - 5-28-2021
2    foundation.
3        A.   I don't know.
4    BY MR. MORRIS:
5        Q.   There came a time when the debtor
6    made demand on these three notes, right?
7        A.   I don't know.  I believe -- I don't
8    know specifically, but I believe so.
9          MR. MORRIS:  Can we put up
10    Exhibit 6, please?
11          (Exhibit 6 introduced.)
12    BY MR. MORRIS:
13        Q.   Do you see this is a -- it's a
14    letter dated December 3rd, and it's addressed
15    to you.
16          And if we scroll down a little bit,
17    it's signed by Mr. Seery as the CEO and CRO of
18    Highland Capital Management.
19          Do you see that?
20        A.   Yes.
21        Q.   Do you recall on or around
22    December 3rd, 2020, the debtor made a demand
23    for all outstanding principal and interest due
24    under the three notes that we just looked at?
25        A.   I -- I see the letter.  I don't have

Page 133

1          Dondero - 5-28-2021
2    a recollection.
3        Q.   All right.  Do you understand that
4    in December 2020, the debtor made a demand for
5    payment of all unpaid principal and interest
6    under the three notes that we just looked at,
7    even if you don't remember this particular
8    letter?
9        A.   I'm sorry.  What was -- yeah, I
10    accept the letter, and I'll accept that it was
11    delivered.
12          What -- what's your question,
13    please?
14        Q.   I'm trying to just get -- get your
15    understanding.
16          And I think you testified that you
17    don't recall seeing this letter.  Do I have
18    that right?
19        A.   That's correct.
20        Q.   Okay.  So, putting the letter to the
21    side, did you become aware in December 2020
22    that the debtor had demanded that you pay all
23    unpaid principal and interest due under the
24    three promissory notes that we just looked at?
25        A.   Again, just generally.

Page 134

1          Dondero - 5-28-2021
2        Q.   Did you make any payment to the
3    debtor in response to that demand?
4        A.   No.
5        Q.   Did you or anybody acting on your
6    behalf respond to the debtor's demand in any
7    way?
8          MS. DEITSCH-PEREZ:  Object to the
9    form.
10    BY MR. MORRIS:
11        Q.   Withdrawn.  That's fair.
12          Let me ask a different question.
13          Did you or anybody acting on your
14    behalf respond to the debtor's demand at any
15    time prior to the commencement of this
16    adversary proceeding?
17          MS. DEITSCH-PEREZ:  Object to the
18    form.
19        A.   Can you repeat it one more time?
20    BY MR. MORRIS:
21        Q.   Sure.  Did you or anybody acting on
22    your behalf respond to the debtor's demand for
23    payment of all unpaid principal and interest at
24    any time prior to the commencement of this
25    lawsuit?

Page 135

1          Dondero - 5-28-2021
2          MS. DEITSCH-PEREZ:  Object to the
3    form.
4        A.   I want -- I want to answer that
5    question as -- as follows:  I'm not saying on
6    my behalf, but I know there was a lot of
7    conversations with lawyers and business people
8    around the notes and their shared services and
9    the split and the overpayments to Highland and
10    -- trying to reach some amicable resolution of
11    shared services -- in fact, the entire
12    estate -- but I don't -- I don't -- I don't
13    recall specifically or -- what lawyers or what
14    business people were saying what to the debtor,
15    but I -- I know there were a lot of
16    conversations that were going on.
17    BY MR. MORRIS:
18        Q.   Can you identify any aspect of any
19    of the conversations you just described that
20    pertained to the debtor's demand for payment of
21    all unpaid principal and interest on the three
22    notes?
23        A.   Not -- not specifically.
24        Q.   Okay.  There came a time when an
25    answer to the debtor's complaint was filed on

Page 136

Dondero - 5-28-2021

2 your behalf.
3     Do you remember that?
4     A.   No, but I'm willing to be refreshed.
5     Q.   Okay.
6         MR. MORRIS:  Can we please put up
7 Exhibit 7?
8         (Exhibit 7 introduced.)
9         MR. MORRIS:  And if we could just
10 scroll down to the title.
11 BY MR. MORRIS:
12    Q.   Do you see that this document is
13 called "Defendant James Dondero's Original
14 Answer"?
15    A.   Yes.
16    Q.   And if we scroll back to the top of
17 the document, do you see that it was filed on
18 the docket on March 16, 2021?
19    A.   Yes.
20    Q.   Did you personally read this
21 document before it was filed?
22    A.   No.
23    Q.   Did you have an understanding as to
24 the contents of the document before it was
25 filed?

Page 137

Dondero - 5-28-2021

2     A.   No.
3     Q.   Did you authorize Bonds Ellis to
4 file this document on your behalf?
5     A.   Not specifically that I remember.
6     Q.   Did you know on or around March 16,
7 2021, that Bonds Ellis had filed "Defendant
8 James Dondero's Original Answer" in this
9 adversary proceeding?
10    A.   Not specifically.  There's a lot
11 going on.
12    Q.   As you sit here right now--and,
13 again, happy to page through the document--can
14 you tell me whether you have ever read
15 Defendant James Dondero's Original Answer?
16    A.   Not that I recall.
17    Q.   So, as of -- and that's true as of
18 today; is that fair?
19    Q.   Can we scroll through this, please?
20    Q.   Yes.  Just let us know if you want
21 us to slow down or speed up.
22        MS. DEITSCH-PEREZ:  Yeah, just go
23 slow enough so he could sort of eyeball
24 each page.
25        MR. MORRIS:  You bet.

Page 138

Dondero - 5-28-2021

2         THE WITNESS:  Yep, keep going.
3         (Scrolling.)
4         THE WITNESS:  Hold on.  Could you go
5 back a little bit, please?  It just goes --
6 stop right there.
7     A.   I do remember paragraph 5.  I think
8 that was recently tried last week or so, but I
9 think that was always the -- always the way it
10 was described to me by lawyers, was that these
11 notes shouldn't be in her Court.
12        MS. DEITSCH-PEREZ:  Okay.  And I'll
13 just -- I'll just caution the witness to
14 not disclose communications with counsel,
15 but it's okay if something catches your eye
16 and you, at least, remember that part, say,
17 "Oh, yeah, I remember that one," but
18 without going into details as to any
19 communications with your lawyers.
20        MR. MORRIS:  And -- and that's fine.
21 That's fine.  I'm certainly not looking for
22 that.
23 BY MR. MORRIS:
24    Q.   The question is really simple:  Have
25 you ever seen this document before and --

Page 139

Dondero - 5-28-2021

2         MS. DEITSCH-PEREZ:  John, I think he
3 said he needs to scroll through it to see
4 if anything --
5         MR. MORRIS:  I understand.
6         MS. DEITSCH-PEREZ:  -- triggers a
7 recollection.  He just said he's looking at
8 5, yeah, that looks familiar.  If you want
9 to keep going, we could find out if there
10 are any others that -- that look familiar
11 to him.
12        THE WITNESS:  Let's keep going.
13        (Scrolling.)
14        MS. DEITSCH-PEREZ:  You'll agree
15 that most answers are not particularly
16 memorable when they say things like --
17        (Simultaneous conversation.)
18        MR. MORRIS:  Please stop.  Please
19 stop.  Please stop talking.  Please stop
20 talking.  It's inappropriate.
21        MS. DEITSCH-PEREZ:  I -- I know.
22 It's your deposition, and you could do all
23 this stuff, but --
24        (Simultaneous conversation.)
25        MR. MORRIS:  Please stop talking.

Page 140

1            Dondero - 5-28-2021
2    Please stop talking.
3        MS. DEITSCH-PEREZ: I hear you.
4        THE WITNESS: Keep -- keep going.
5    (Scrolling.)
6        THE WITNESS: Okay. Keep going.
7    (Scrolling.)
8        THE WITNESS: It looks to me like --
9        MS. DEITSCH-PEREZ: Keep -- let --
10   let him go through the whole thing.
11        THE WITNESS: Sure. Keep going.
12    (Scrolling.)
13        THE WITNESS: Okay. Is that it?
14        MR. MORRIS: Yes.
15        THE WITNESS: Okay.
16   BY MR. MORRIS:
17    Q. Do you recall ever seeing this
18   document before, sir?
19    A. The -- the substance of it, again,
20   some of it I -- I remember, and the -- there --
21   it strikes me as a legal argument and defenses
22   regarding the payment of the notes, and I do
23   remember a lot of conversation regarding it
24   being -- it should be outside -- it should be
25   in a different court, and it should be a jury

Page 141

1            Dondero - 5-28-2021
2   trial. And those are two main points in here,
3   but it seems like there are a bunch of other
4   defenses listed.
5    Q. Okay.
6    A. And I have -- and I have an
7   awareness of it, but I'm not a lawyer.
8    Q. I appreciate that you're not a
9   lawyer; but looking at the document, does that
10   refresh your recollection that you read and
11   reviewed this document before it was filed on
12   your behalf?
13    A. I have -- I have an awareness of it,
14   but I wouldn't -- I wouldn't have been deeply
15   involved in its drafting or detailed approval.
16        MR. MORRIS: Can we go to page 6 of
17   8, please?
18   BY MR. MORRIS:
19    Q. And directing your attention to
20   paragraph 40, do you see it says, as the first
21   affirmative defense, quote, "Defendant asserts
22   that plaintiff's claims should be barred
23   because it was previously agreed by plaintiff
24   that plaintiff would not collect on the notes."
25      Do you see that?

Page 142

1            Dondero - 5-28-2021
2    A. Yes.
3    Q. Okay. Have I read that accurately?
4    A. Yes.
5    Q. Did the plaintiff ever agree that
6   plaintiff would not collect on the notes?
7    A. Yes.
8    Q. You subsequently amended this
9   defense; isn't that right?
10    A. I believe so.
11    Q. And do you understand that you
12   amended it to add a few words relating to
13   conditions subsequent?
14    A. I -- I -- other than for
15   clarification and completeness, the -- it was
16   amended. I don't have specific knowledge of
17   what was amended.
18    Q. Okay. When did the plaintiff agree
19   that the plaintiff would not collect on the
20   notes?
21    A. Boy, that was early on in the case.
22   Every proposal, every POT plan, every
23   settlement discussion never included value for
24   notes.
25    Q. All right. I'm going to ask the

Page 143

1            Dondero - 5-28-2021
2   question again: When did the plaintiff agree
3   that it would not collect on the notes?
4        MS. DEITSCH-PEREZ: Are you talking
5   about the subsequent agreements in the next
6   pleading?
7        MR. MORRIS: I'm asking for an
8   answer as to when the agreement referred to
9   in paragraph 40 was entered into.
10    A. First quarter of -- first quarter of
11   2020.
12   BY MR. MORRIS:
13    Q. So it was after the petition date?
14        MS. DEITSCH-PEREZ: Are you asking
15   about the 2018 notes?
16        MR. MORRIS: Yes, those are defined
17   to be "the notes."
18   BY MR. MORRIS:
19    Q. So -- so did -- this is your
20   defense.
21      Is it your position, Mr. Dondero,
22   that in the first quarter of 2020, the
23   plaintiff agreed that it would not collect on
24   the notes?
25    A. I -- I -- I don't -- I want to leave

Page 144

Dondero - 5-28-2021

1 my testimony as I just said a minute ago.
2 The notes were never part of any POT plan or
3 suggested POT plan or suggested grand bargain
4 or suggested as having any value starting in
5 the first quarter of '20 – or most of the
6 year, I believe, until the – towards the end
7 of the year.
8 Q.   All right.  Was there ever an
9 agreement between you and the plaintiff that
10 the plaintiff would not collect on the notes if
11 there was no grand bargain or no POT plan?
12 A.   Yeah, the – I'm sorry.  Repeat
13 again.
14 Q.   Who entered the agreement on behalf
15 of the debtor that the plaintiff would not
16 collect on the notes?
17 A.   (Indiscernible speech.)
18 Agreement on – you know, the –
19 the – you know the – I think I'm looking at
20 this question from a perspective of the
21 negotiation, you know, at that time and not
22 including the subsequent conditions that were
23 overlaid on the notes, I guess.  So I guess
24 it's a combination of both.

Page 145

Dondero - 5-28-2021

1 Q.   I'm asking you to identify the
2 person who acted on behalf of the debtor in
3 reaching the agreement with you that the
4 plaintiff would not collect on the notes.  Who
5 did that?
6 MS. DEITSCH-PEREZ:  John, I think
7 the problem is you're referring to the
8 debtor, so he's looking at post-bankruptcy.
9 You might ask it two questions, one –
10 MR. MORRIS:  No.  Please stop.
11 Please stop.  Please stop.
12 (Simultaneous conversation.)
13 MS. DEITSCH-PEREZ:  You agreed to
14 that condition.  You agreed to distinguish
15 between the debtor –
16 (Simultaneous conversation.)
17 MR. MORRIS:  Deborah –
18 MS. DEITSCH-PEREZ.  – bankruptcy –
19 MR. MORRIS:  Deborah –
20 (Simultaneous conversation.)
21 THE REPORTER:  I can't – I can't
22 write two people at the same time.
23 MR. MORRIS:  This is so improper.
24 He has –

Page 146

Dondero - 5-28-2021

1 MS. DEITSCH-PEREZ:  It is not.  You
2 agreed –
3 MR. MORRIS:  Please let me finish.
4 Please let me finish.
5 He has described the conversations
6 as taking place in 2020.  I should be
7 referring to the debtor.  He is
8 describing –
9 MS. DEITSCH-PEREZ:  Right.
10 MR. MORRIS:  – the context –
11 MS. DEITSCH-PEREZ:  But if you want
12 to know about something that happened
13 before bankruptcy, ask about Highland.
14 MR. MORRIS:  But I'm not.  I
15 don't – please stop interrupting.
16 MS. DEITSCH-PEREZ:  It's your
17 deposition.  If you want a muddy record, be
18 my guest.
19 MR. MORRIS:  I would really
20 appreciate it.  I think I know what I'm
21 doing.
22 BY MR. MORRIS:
23 Q.   Mr. Dondero, who, on behalf of the
24 debtor, during these conversations about a

Page 147

Dondero - 5-28-2021

1 grand bargain and a POT plan told you or
2 entered into the agreement that the plaintiff
3 would not collect on the notes –
4 A.   I – I – during the bankruptcy,
5 we're talking about, right?
6 Q.   I'm just following up on your
7 statement that that conversation – that the
8 agreement was entered into in the first quarter
9 of 2020.
10 Do I have that right, or is that
11 wrong?
12 A.   Well –
13 Q.   Let's start again.  Let's start
14 again.
15 This affirmative defense refers to
16 an agreement.  Do you see that?
17 A.   Yes.
18 Q.   This is your affirmative defense;
19 isn't that correct?
20 A.   Yes.
21 Q.   And according to this affirmative
22 defense, the agreement was that the plaintiff
23 would not collect on the notes.  Do I have that
24 right?

Page 148

Dondero - 5-28-2021

1    A.   Yes.
2    Q.   Let's start with: When was that
3    agreement entered into?
4    A.   Okay. I'm going to have to parse,
5    and I'm going to have to answer your question
6    as accurately as I can.
7        The subsequent conditions for
8    forgiveness of the notes were established
9    during a comp period in early 2019 for these
10   notes that were drafted in '18.
11       And the agreement was reached
12   with -- I believe it's a majority of, whatever,
13   the Class A holders in the fourth amended
14   Highland Capital partnership -- partnership
15   agreement. And that's what set up the
16   subsequent conditions and the ability for the
17   loans to be forgiven.
18       When you get into bankruptcy,
19   whether it was Seery, the independent board, or
20   whoever, no one ever put any value nor was it
21   ever included in any -- were the notes included
22   in any settlement discussions, period.
23   Q.   All right. So, it's your testimony
24   that the debtor in settlement negotiations

Page 149

Dondero - 5-28-2021

1    never, ever, ever asked for or demanded the
2    repayment of any unpaid principal or interest
3    under these three notes?
4        That's your sworn testimony?
5    A.   No.
6    Q.   So how did I get that wrong, then?
7    A.   Well, a few minutes ago we went over
8    a letter from the debtor making a demand, but
9    that was, I believe, this year or -- yeah, I
10   believe that was this year or the end of '20.
11       What I'm saying is through '20, the
12   full year of '20 when we were trying to work on
13   a POT plan or global settlement before Seery
14   betrayed the estate, we were -- we never --
15   there was never value assigned to the notes.
16   Q.   And you never offered to make any
17   payment of any kind, principal or interest, on
18   any of the notes in connection with any
19   proposal you ever made as part of the grand
20   bargain or POT plan; is that right?
21   A.   I think -- I believe on the -- not
22   through 2020. I'll say that.
23       By the time 2021 came along, on the
24   eve of trial when I sent over a capitulation

Page 150

Dondero - 5-28-2021

1    offer -- I think it was even titled that -- I
2    think I threw more money than everybody
3    deserved or was entitled to, to try and resolve
4    it. And implicitly, there was -- because it
5    was more than everybody was entitled to, I
6    think implicitly it included value for the
7    notes.
8    Q.   And is it your testimony that at no
9    time prior to the delivery of the demand letter
10   did the debtor ever make an offer to you or --
11   of any kind that included any repayment of any
12   principal or interest due under the three
13   notes?
14   A.   I'm willing to be refreshed, but not
15   that I recall.
16   Q.   Okay. And is it your testimony that
17   anybody acting on behalf of the debtor ever
18   agreed not to collect on the notes?
19   A.   I'm sorry. Repeat that one more
20   time, just --
21   Q.   Is it your testimony -- withdrawn.
22       Did anybody acting on behalf of the
23   debtor ever agree with you that it would not
24   collect on the notes, irrespective of whether

Page 151

Dondero - 5-28-2021

1    there was a settlement?
2        MS. DEITSCH-PEREZ: Object to form.
3    A.   Yeah. Again, that was my
4    understanding through 2020.
5    BY MR. MORRIS:
6    Q.   Do you have --
7        THE WITNESS: Let's -- let's --
8    before the next question, let's take a
9    ten-minute break, ten-minute bathroom
10   break, please.
11       MR. MORRIS: No problem.
12       MS. DEITSCH-PEREZ: Okay. We've
13   been going an hour, so we'll come back
14   at -- 10:30, come back at 10:40?
15       MR. MORRIS: That's fine. Thank
16   you.
17       (Recess held.)
18   BY MR. MORRIS:
19   Q.   Is the agreement that you're
20   referring to and that's referred to in
21   paragraph 40, is that reflected in any document
22   that you're aware of?
23   A.   Not that I'm aware of.
24   Q.   And I believe you mentioned -- and

Page 152

Dondero - 5-28-2021

1    we'll talk about this more later, but the part
2    about the subsequent conditions or the
3    conditions subsequent, that was the agreement
4    that was entered into, did you say the -- in
5    part -- as part of a compensation committee
6    meeting?
7        A.    As part of our compensation process
8    in -- early in 2019.
9        Q.    Okay.  And when you say "early
10   2019," can you -- do you recall what month?
11       A.    In January/February.
12       Q.    So, it's your testimony that in
13   January or February 2019, you and the debtor
14   reached the agreement that's referred to in
15   paragraph 40 as subsequently amended by your
16   amended answer; is that right?
17           MS. DEITSCH-PEREZ:  Object to the
18   form.
19           John, I thought you were going to
20   agree to call Highland Highland --
21           MR. MORRIS:  That's fine.  That's
22   fine.
23           (Simultaneous conversation.)
24           MS. DEITSCH-PEREZ:  -- thereafter.

Page 153

Dondero - 5-28-2021

1        MR. MORRIS:  That's fine.  So, let
2    me rephrase the question.
3    BY MR. MORRIS:
4        Q.    I just want to make sure that I have
5    this right, Mr. Dondero.  It's your
6    recollection that in January or February of
7    2019, you reached an agreement with Highland
8    that's reflected in paragraph 40 as
9    subsequently amended to include the phrase
10   "conditions subsequent."  Do I have that right?
11       A.    I gave my testimony.  I don't know
12   if I -- I don't want to opine on the legal
13   document and whether the legal document
14   captures it there or somewhere else, but my --
15   my recollection regarding pre-bankruptcy and
16   post-bankruptcy is as I -- as I stated already.
17       Q.    Let me -- let me try this a
18   different way.
19           We looked at the three promissory
20   notes.  Were those promissory notes ever
21   amended, to the best of your knowledge?
22       A.    No, not that -- I mean, not -- not
23   in writing.
24       Q.    Okay.

Page 154

Dondero - 5-28-2021

1        A.    They were amended -- they were
2    amended -- they were amended verbally.
3        Q.    Okay.  And did that verbal agreement
4    take place in January or February 2019?
5        A.    Yes.
6        Q.    Was there any verbal agreement
7    related to the notes that occurred other than
8    the one you're referring to in January or
9    February 2019?
10       A.    Well, I gave my testimony during
11   bankruptcy in 2020, the substance of all
12   negotiations never assigned value to the -- the
13   notes.
14       Q.    But you never reached an agreement
15   with the debtor on -- on any settlement that
16   would include either payment for or forgiveness
17   of the notes; is that fair?
18           You never reached an agreement?
19       A.    Not in writing, but I believe we
20   were operating with an understanding that
21   the -- weren't likely to have value to the
22   estate.
23           MR. MORRIS:  Okay.  I move to
24   strike, and I'll ask the question again.

Page 155

Dondero - 5-28-2021

1    BY MR. MORRIS:
2        Q.    Do you have any agreement with the
3    debtor -- agreement with the debtor with
4    respect to any of the three notes?
5            MS. DEITSCH-PEREZ:  Object to the
6    form.
7        A.    I believe the debtor in bankruptcy
8    inherits that subsequent condition agreements
9    from the first quarter of 2019; and I believe
10   in 2020, the debtor operated and participated
11   and acted in a way all negotiations
12   suggested the notes had -- were unlikely to
13   have any value to the estate.
14           MR. MORRIS:  Okay.  I move to
15   strike.
16   BY MR. MORRIS:
17       Q.    And I'd ask you to please listen
18   carefully to my question and only answer the
19   question that's asked.
20           Is there any agreement that pertains
21   to the notes other than --
22           MS. DEITSCH-PEREZ:  Objection,
23   asked --
24   BY MR. MORRIS:

Page 156

1          Dondero - 5-28-2021
2    Q.   – with –
3    A.   Yeah, I'm going to stick with my
4 same answer that I've given twice.
5    Q.   I'm actually – I'm actually asking
6 a different question; and if you would let me
7 finish, this would go a lot more smoothly.
8          Is there any agreement, written or
9 verbal, between you and the debtor concerning
10 the notes other than the verbal agreement that
11 you contend was entered into in January and
12 February 2019?
13          I don't want to know about
14 operations or offers or settlement discussions.
15 I want to know about agreements:  Is there any
16 agreement pertaining to the notes other than
17 the verbal agreement entered into in January or
18 February 2019?
19          MS. DEITSCH-PEREZ:  Object to the
20    form.
21    A.   Yes.
22 BY MR. MORRIS:
23    Q.   What other agreement exists?
24    A.   The agreement between, I guess, me
25 and to the extent other related parties that

Page 157

1 had notes with the debtor, beginning in the
2 first quarter after the bankruptcy, that the
3 notes were unlikely to have any value to the
4 estate or have any value in settlement.
5    Q.   Okay.  I don't want to know about
6 value.  I want to know if there is an agreement
7 not to collect.
8          So let me try and answer – ask the
9 question differently.
10          Other than the agreement that you
11 assert was entered into in January or
12 February 2019, did anybody acting on behalf of
13 Highland or the debtor enter into any other
14 agreement pursuant to which the debtor agreed
15 not to collect on the notes?
16    A.   I'm – I'm going – same answer:
17 Implicitly, yes.
18    Q.   Okay.  Is that – is that implicit
19 agreement written down anywhere?
20          You know what?  I'm going to move
21 on, Mr. Dondero, and I look forward to the jury
22 trial.
23          MR. MORRIS:  Can we put up the next
24    exhibit, Number 8?

Page 158

1          Dondero - 5-28-2021
2          (Exhibit 8 introduced.)
3 BY MR. MORRIS:
4    Q.   Did you –
5          MR. MORRIS:  If we could scroll down
6    a little bit.
7 BY MR. MORRIS:
8    Q.   Are you aware that the debtor served
9 discovery in connection with this action?
10    A.   Not specifically.
11    Q.   Do you see that these are your
12 objections and responses to the debtor's
13 requests for admission?
14    A.   Yes.
15    Q.   Have you ever seen this document
16 before?
17          And we can scroll down, if you'd
18 like.
19          MS. DEITSCH-PEREZ:  Scroll through
20    it, please.
21          THE WITNESS:  Yeah, let's scroll
22    through it.
23          (Scrolling.)
24          THE WITNESS:  Can you keep going,
25    please?

Page 159

1          Dondero - 5-28-2021
2          MR. MORRIS:  That's the end.
3          THE WITNESS:  Okay.
4 BY MR. MORRIS:
5    Q.   Have you ever seen this document
6 before, sir?
7    A.   I'm aware of it – I mean, yes, but
8 I don't remember – ask whatever questions you
9 want about it, and we'll go from there.
10    Q.   Did you see this document before –
11 before it was sent to my firm on April 28th,
12 2021?
13    A.   I mean, I'm sure I did and – or I'm
14 sure I did if I was supposed to approve it, but
15 I don't specifically remember.
16    Q.   And did you, in fact, authorize your
17 attorneys to serve this particular document?
18    A.   I – I believe so.
19          MR. MORRIS:  Can we just go to the
20    very last request for admission, number 14?
21          (Scrolling.)
22 BY MR. MORRIS:
23    Q.   You'll see that Request For
24 Admission Number 14 asks you to admit that as
25 of January 22nd, 2021, you hadn't paid the

Page 160

Dondero - 5-28-2021

1  debtor the outstanding amount.
2
3       Do you see that?
4    A.  Yes.
5    Q.  And the definition of an
6  "outstanding amount" is the number that's just
7  above that.
8       And in response, you admitted only
9  that you hadn't paid the debtor the amount the
10  debtor asserts is due on the notes in the
11  amount of approximately $9 million.  Do you see
12  that?
13    A.  Yes.
14    Q.  Okay.  I just want to ask a slightly
15  different question:  Have you paid any amounts
16  to the debtor on account of the notes since
17  December 1st, 2020?
18    A.  I -- I don't -- I don't know for
19  sure, but I don't believe so.
20    Q.  Okay.
21       MR. MORRIS:  Can we go to the next
22  exhibit, please, Number 9?
23       (Exhibit 9 introduced.)
24       MR. MORRIS:  Okay.  And if we can
25  scroll down just a little bit.

Page 161

Dondero - 5-28-2021

1
2  BY MR. MORRIS:
3    Q.  You'll see that these are the
4  "Objections and Answers" that were tendered on
5  your behalf in response to the debtor's first
6  set of interrogatories.
7       Do you see that?
8    A.  Yes.
9       MR. MORRIS:  And if we can go to the
10  last page.
11       MS. DEITSCH-PEREZ:  Could you also
12  scroll through it so he could --
13       MR. MORRIS:  Well, I'm happy to do
14  it.  I'd like to do it my way, please.
15  Thank you.
16       Can we go to the last page, please?
17       (Scrolling.)
18  BY MR. MORRIS:
19    Q.  Is that your signature there, sir?
20    A.  Yes.
21    Q.  And did you sign this document in
22  front of a notary public?
23    A.  Yes.
24    Q.  And did you certify that you had
25  read the document and the objections to the

Page 162

Dondero - 5-28-2021

1
2  interrogatories?
3    A.  Yes.
4    Q.  And did you swear that the answers
5  were true and correct?
6    A.  Yes.
7    Q.  Okay.
8       MR. MORRIS:  Now let's go back to
9  the top of the document.
10  BY MR. MORRIS:
11    Q.  Did you, in fact, read this document
12  before you signed the Verification in front of
13  a notary?
14    A.  Yes.
15    Q.  Okay.
16       MR. MORRIS:  Go to page 4 of 6,
17  please.
18  BY MR. MORRIS:
19    Q.  Just to help you out, do you see
20  there's a reference to "Purported Agreement" in
21  the first interrogatory, 1(a)?
22    A.  Uh-huh.
23    Q.  That's a "yes," sir; is that right?
24    A.  Yes.
25    Q.  Okay.  The Purported Agreement

Page 163

Dondero - 5-28-2021

1
2  refers back to the agreement that we were
3  looking at in paragraph 40 of the answer -- and
4  I can just read it again -- that says -- the
5  agreement says, quote, "Plaintiff would not
6  collect on the Notes."
7       And I asked you three questions in
8  the interrogatory.  Did this interrogatory
9  accurately state, to the best of your
10  knowledge, that you, personally, entered into
11  the Purported Agreement on behalf of the
12  debtor?
13    A.  Which -- which one are you -- which
14  agreement are you talking about?
15    Q.  Just the one that we were talking
16  about earlier -- and I'll just read it again
17  for you.  We can call it back on the screen, if
18  it's helpful -- but the agreement that you
19  referred to in your answer that, quote,
20  "plaintiff would not collect on the notes."
21  That's the Purported Agreement.
22       And so, I just want you to confirm
23  that in your answer to Interrogatory No. 1, you
24  stated that it was true and accurate that you
25  entered into that agreement on behalf of the

Page 164

Dondero - 5-28-2021

2 debtor.

3    Do I have that right?

4    A.   I'm -- I'm going to say no because I

5 think you're using the wrong description of the

6 debtor versus Highland prebankruptcy.

7    Q.   I appreciate that.  I apologize.

8 Let me rephrase the question.  That's a fair

9 point.

10    Did you enter into the agreement

11 referred to in your answer on behalf of

12 Highland?

13    A.   The -- the agreement on behalf of

14 Highland prebankruptcy was agreed to by

15 majority of the Class A members, which I

16 believe at the time was Dugaboy.

17    Q.   All right.  That doesn't say that in

18 your answer here, does it?

19    A.   Again, there was an original, I

20 think, answers; and then there were amended

21 answers.  I think the lawyers did the best they

22 could to capture -- but, evidently, the parsing

23 between pre-bankruptcy agreements and

24 post-bankruptcy agreements was done the best it

25 could be by the lawyers but I -- I -- I don't

Page 165

Dondero - 5-28-2021

2 want to comment on the legal.

3    Q.   I don't want to comment on legal

4 stuff, either; but you signed this document,

5 you verified this document, and you verified

6 that it was true and accurate.  Correct?

7    A.   Yes.

8    Q.   Okay.  And in the first sentence to

9 your answer in Interrogatory 1, you wrote, or

10 somebody wrote on your behalf, quote:  "The

11 agreements were entered into on behalf of the

12 debtor by James Dondero, subsequent to the time

13 each note was executed."

14    Is that an accurate statement, or is

15 it an inaccurate statement?

16    A.   Again, it was between me and the

17 Class A, the majority of the Class A members.

18 It was a Class A -- the Class A members were

19 representing Highland, never the debtor,

20 because the debtor didn't exist yet.

21    But then, again, I don't know if

22 this paragraph refers to, again, how we

23 operated in bankruptcy, which was the

24 assumption that the notes had -- were likely --

25 were not likely to have any value for the

Page 166

Dondero - 5-28-2021

2 estate.  I don't -- I don't know which this is

3 referring to.

4    Q.   You understand that the definition

5 of the "debtor" includes Highland Capital

6 Management, L.P.?

7    A.   I think we started off the depo by

8 saying that there was a Highland prior to

9 bankruptcy and then there was a Highland in

10 bankruptcy and the debtor is Highland in

11 bankruptcy.

12    Q.   Let me just ask you this question,

13 sir:  Is that first sentence accurate, or is it

14 wrong?

15    A.   I didn't write it, so -- and you

16 swore to it.  You're the one who said it was

17 true and accurate.  So now I'm asking you:  Is

18 it actually true and accurate?

19    A.   I'm going to stick with my testimony

20 so far.  I don't want to opine on that.  I

21 think it depends -- it's not -- maybe it's not

22 perfectly written, but...

23    Q.   Sir, with all due respect, please

24 answer my question:  Is the first sentence true

25 and correct, as you verified?

Page 167

Dondero - 5-28-2021

2    MS. DEITSCH-PEREZ:  He already

3 answered your question, John.

4    MR. MORRIS:  That's fine.  You can

5 have the objection, asked and answered.

6    I'm asking him to answer again.

7 BY MR. MORRIS:

8    Q.   Is that first sentence true and

9 correct as you verified it?

10    A.   "Behalf" probably isn't, like I

11 said, the right word.  It should be "between"

12 the debtor and James Dondero.  So that's how I

13 would wordsmith that.

14    Q.   Okay.  So this -- this first

15 sentence is not true and correct, to the best

16 of your knowledge; is that fair?

17    A.   I -- I don't want to say that other

18 than I think it could be stated better.

19    Q.   Okay.  But as stated right now, it

20 says that the agreement was entered into on

21 behalf of the debtor by James Dondero.  Have I

22 read that correctly?

23    A.   Yeah.  I mean, that is what it says.

24 Again, I feel like I'm interpreting legal

25 phraseology here, like "on behalf of the

Page 168

Dondero - 5-28-2021

1       debtor." If it was an agreement between the
2       debtor and the Class A entered into --
3       MS. DEITSCH-PEREZ: Mr. Morris knows
4       very well there's another -- that there's
5       an amendment to this. I don't know why
6       he's doing this.
7       Mr. Morris --
8       (Simultaneous conversation.)
9       MR. MORRIS: Please stop. Please
10      stop.
11      I'm allowed to go through his sworn
12      statements. Give me a break. Please stop.
13      Don't coach --
14      MS. DEITSCH-PEREZ: You've been
15      asking the same question over and over and
16      over.
17      MR. MORRIS: You know, I'm going to
18      shut this down if you do it one more time.
19      I will, and I'm happy to make the motion to
20      the Judge. I'm begging you, please stop
21      interfering.
22      My apologies, Mr. Dondero. Never
23      directed at you personally.
24      BY MR. MORRIS:
25

Page 169

Dondero - 5-28-2021

1       Q.   The second sentence of the answer,
2       have you been able to identify any documents
3       that reflect or memorialize the agreements?
4       A.   I mean, I -- I -- I don't -- I don't
5       know, but I don't think so.
6       Q.   Thank you very much.
7       MR. MORRIS: Go to the next
8       document, please.
9       (Exhibit 10 introduced.)
10      BY MR. MORRIS:
11      Q.   Do you see that this is the "Amended
12      Answer" that was filed on your behalf?
13      MS. DEITSCH-PEREZ: Let's please --
14      THE WITNESS: Yes.
15      MS. DEITSCH-PEREZ: -- scroll
16      through.
17      THE WITNESS: Yeah, please scroll
18      through.
19      (Scrolling.)
20      BY MR. MORRIS:
21      Q.   All right. Have you seen this
22      document before, sir?
23      A.   Yes, generally.
24      Q.   Did you -- do you recall if you saw
25

Page 170

Dondero - 5-28-2021

1       it prior to the time it was served and filed on
2       your behalf?
3       A.   Probably.
4       Q.   Did you authorize it to be filed on
5       your behalf?
6       A.   Yes.
7       MR. MORRIS: Can we please go to
8       page 6 of 8?
9       (Scrolling.)
10      MR. MORRIS: And if we can scroll
11      just down to the "Affirmative Defenses."
12      BY MR. MORRIS:
13      Q.   All right. Do you see
14      paragraph 40 --
15      A.   Yeah.
16      Q.   -- as compared to the prior version
17      of your answer, has added the words, quote,
18      "upon fulfillment of conditions subsequent."
19      Do you see that?
20      A.   Yes.
21      Q.   Why were those words added?
22      MS. DEITSCH-PEREZ: Object to the
23      form.
24      A.   I think to make this document more
25

Page 171

Dondero - 5-28-2021

1       complete and more clarified as things were
2       learned and investigated.
3       BY MR. MORRIS:
4       Q.   And were things "learned and
5       investigated" after the time that you submitted
6       the -- withdrawn.
7       Were things "learned and
8       investigated" after the time the original
9       answer was served and filed on your behalf?
10      MS. DEITSCH-PEREZ: Object to the
11      form.
12      And I would also just caution the
13      witness before he speaks to think -- to
14      make sure he doesn't disclose
15      attorney-client communications.
16      A.   I'm sorry, could you please repeat
17      the question?
18      BY MR. MORRIS:
19      Q.   Sure. Did you, personally, learn or
20      discover anything related to this amended
21      paragraph 40 after the time that the original
22      answer was filed on your behalf?
23      MS. DEITSCH-PEREZ: Same objection.
24      A.   We went through the -- the --
25

Page 172

```
1              Dondero - 5-28-2021
2       MS. DEITSCH-PEREZ:  When you say
3   "we," are you talking about you and
4   lawyers?
5       THE WITNESS:  Yes.
6       MS. DEITSCH-PEREZ:  Don't disclose
7   your communications with lawyers.
8   BY MR. MORRIS:
9       Q.   All right.  I don't want to know
10  anything about your communications with
11  lawyers, but I'm going to ask you for facts.
12           What facts, if any, did you learn
13  after the original answer was filed that relate
14  to the words, quote, "upon fulfillment of
15  conditions subsequent."
16      A.   The "conditions subsequent" involved
17  in the first quarter of 2019 were always an
18  event, but it wasn't captured properly or
19  needed to be clarified in the amendment.
20      Q.   Well, you mentioned that "things
21  were learned and investigated" after the answer
22  was filed, and I'm just trying to pin down what
23  that was?
24      A.   I — I took it more seriously with
25  the lawyers as it — as the notes became more
```

Page 173

```
1   of an issue, and it's — I'm very busy over
2   here and then spent more time going through the
3   details, and this needed to be clarified or
4   stated differently.
5       Q.   Okay.  With respect to the agreement
6   referred to in paragraph 40, whose idea was it
7   to enter into that agreement?
8       A.   It was — it was mine.
9       Q.   Okay.  And who were — who were the
10  majority of Class A holders that you referred
11  to earlier?
12      A.   That was the counterparty
13  decision-maker for Highland prior to
14  bankruptcy, and like I said, I believe it was
15  Dugaboy.
16      Q.   Can you think of any other member of
17  Class A who entered into this agreement on
18  behalf of the debtor in the early part of 2019
19  other than Dugaboy?
20      MS. DEITSCH-PEREZ:  Object to the
21  form.
22      A.   I do believe it was necessary.
23  Dugaboy alone was the requisite majority.  I
24  didn't — I don't remember or remember even
```

Page 174

```
1              Dondero - 5-28-2021
2   thinking about including anybody else.
3   BY MR. MORRIS:
4       Q.   Okay.  And to be clear, Mr. Dondero,
5   I'm not — I don't have a view one way or the
6   other as to whether you should or shouldn't —
7   who you should have contacted.
8           I just want to know who — if you
9   can identify for me the Class A members who
10  acted to approve the agreement that's referred
11  to in paragraph 40.
12           Is there anybody other than Dugaboy?
13      A.   Not — not — not — not
14  specifically regarding that comp cycle.
15      Q.   Okay.  And who acted on behalf of
16  Dugaboy to enter into the agreement that's
17  referred to in paragraph 40?
18      A.   The trustee.
19      Q.   The trustee of Dugaboy?
20      A.   Yes.
21      Q.   And who was the trustee of Dugaboy
22  in the January/February 2019 time period that
23  entered into this agreement on behalf of the
24  debtor?
25      A.   My sister Nancy.
```

Page 175

```
1              Dondero - 5-28-2021
2       Q.   Did you and Nancy discuss this
3   agreement at all?
4       A.   This agreement?  No.
5       Q.   Can you describe —
6       MS. DEITSCH-PEREZ:  What do you mean
7   by "this agreement"?
8           (Simultaneous conversation.)
9       A.   Not the one that's on the screen.
10  BY MR. MORRIS:
11      Q.   Yes.  That's the only one that I'm
12  talking about, so —
13      MS. DEITSCH-PEREZ:  So you mean —
14      MR. MORRIS:  Please, please, Deb —
15      MS. DEITSCH-PEREZ:  John, can you
16  please clarify:  Are you asking if he
17  discussed the answer with Nancy or the —
18      MR. MORRIS:  I didn't use the word
19  "answer."  I used the word "agreement," so
20  let me —
21      MS. DEITSCH-PEREZ:  I know, but he
22  pointed to the screen.
23          (Simultaneous conversation.)
24      MR. MORRIS:  Are you done?
25      MS. DEITSCH-PEREZ:  Yes.
```

Appx. 01658

Page 176

Dondero - 5-28-2021

1    BY MR. MORRIS:
2    Q.   Mr. Dondero, can you describe for
3    me – withdrawn.
4        Did you discuss with your sister
5    Nancy, the agreement that's referred to in
6    paragraph 40?
7    A.   The agreement to subsequent
8    conditions, yes, absolutely.  But this
9    agreement that's on the screen, I've never –
10   I've never – I've never shown her this
11   document or talked to her about it.
12   Q.   I'm not asking about the document.
13   I'm not asking about the document.  I'm asking
14   about the agreement that's referred to in
15   paragraph 40.
16       Do you understand that?
17   A.   Yes.  And, yes, we had several
18   conversations about it.
19   Q.   Okay.  Can you describe for me
20   everything you remember about your discussions
21   with Nancy concerning the agreement that's
22   referred to in paragraph 40?
23   A.   That the loans that were in place
24   would be forgiven upon a monetization – the
25

Page 177

Dondero - 5-28-2021

1    favorable monetization of certain large or
2    liquid assets on the Highland balance sheet;
3    and the three that were focused on was MGM,
4    Trussway, and Cornerstone.
5    Q.   Did she say anything in response?
6    A.   Just, "How much are we talking
7    about?"  And I told her it was about 9 million
8    in aggregate, and – and I told her that it
9    was – that the forgiveness or the compensation
10   was compliant regarding any credit covenants or
11   Hunter Mountain covenants –
12   Q.   Do you recall any –
13   A.   – that – that if it were to be
14   forgiven, that additional compensation would be
15   compliant or permitted and really not material
16   relative to any outstanding credit agreements
17   that Highland had or agreements with Hunter
18   Mountain.
19   Q.   Is this something that you discussed
20   with her, or is this just information that
21   you're giving me?
22   A.   This is what I discussed – that's
23   almost the entirety of the conversation.  It
24   happened over a couple different conversations,
25

Page 178

Dondero - 5-28-2021

1    but...
2    Q.   Did anybody participate in any of
3    the conversations you're describing other than
4    you and your sister?
5    A.   I don't believe it was necessary, it
6    didn't include anybody else.
7    Q.   Okay.  Again, I'm not here to
8    question.  I'm just looking for facts,
9    Mr. Dondero.
10       So nobody participated in any of
11   these conversations that you can recall other
12   than you and Nancy; is that correct?
13   A.   Correct, that I – yes, there was
14   never a third party involved in our
15   conversations.  I don't know – I don't think
16   she discussed it with anybody else, but I don't
17   know.
18   Q.   Did – was the agreement subject to
19   any negotiation?  Did she make any
20   counterproposal of any kind?
21   A.   No.  No, I – again, I believe both
22   of our views at the time was that it was
23   immaterial to Highland overall or any other
24   agreements.
25

Page 179

Dondero - 5-28-2021

1    Q.   Do you know if she sought any
2    independent advice before entering into the
3    agreement that you've described?
4    A.   I don't know.
5    Q.   Do you recall whether you provided
6    her with any documents of any kind in
7    connection with the discussions that led to the
8    agreement that's referred to in paragraph 40?
9    A.   I – I have no – I don't – I don't
10   believe – no, I don't believe I gave her
11   copies of the relevant Hunter Mountain
12   limitations, or whatever.  I just spoke to her
13   about it.
14   Q.   Okay.  I'm just asking – I'm asking
15   a broader question:  Do you recall giving her
16   any documents of any kind in connection with
17   the discussions that led to the agreement in
18   paragraph 40?
19   A.   Not – not that I recall.  She –
20   she may – she may have some, but I don't
21   remember.
22   Q.   Do you know if there were any
23   resolutions that were adopted by Highland to
24   reflect the agreement that's referred to in
25

Page 180

Dondero - 5-28-2021

1    paragraph 40?
2    A.    Resolutions that -- no, not that I'm
3    aware of.
4    Q.    Did you give -- did you give Nancy a
5    copy of the three promissory notes that were
6    the subject of the agreement referred to in
7    paragraph 40?
8    A.    No.
9    Q.    Did she ask to see any documents
10    before entering into the agreement that's
11    referred to in paragraph 40?
12    A.    I -- I don't remember.
13    Q.    Did you suggest that she speak with
14    anybody prior to the time that she entered into
15    the agreement that's referred to in
16    paragraph 40?
17    MS. DEITSCH-PEREZ:  Asked and
18    answered.
19    A.    Yeah.  No.
20    BY MR. MORRIS:
21    Q.    Do you know whether she actually
22    spoke with anybody concerning the subject
23    matter of the agreement that's referred to in
24    paragraph 40 prior to the time it was entered

Page 181

Dondero - 5-28-2021

1    into?
2    A.    I don't know.
3    Q.    Is there any time period by which
4    the subsequent -- the conditions subsequent
5    have to be fulfilled, or are they open-ended?
6    A.    I believe it was open-ended.
7    Q.    Under the agreement that's referred
8    to in paragraph 40, did the debtor surrender
9    its right to make a demand under the promissory
10    notes?
11    MS. DEITSCH-PEREZ:  And, again, are
12    you talking about the debtor as in
13    post-bankruptcy or --
14    MR. MORRIS:  I apologize.  Thank
15    you.  Thank you.  Thank you.  Thank you.
16    Withdrawn.
17    BY MR. MORRIS:
18    Q.    Under the agreement that you reached
19    with Nancy that's referred to in paragraph 40,
20    was it your understanding that Highland
21    surrendered its right to make a demand for
22    payment of unpaid principal and interest under
23    the notes?
24    A.    I think essentially, yes.

Page 182

Dondero - 5-28-2021

1    Q.    Okay.  What did Highland receive in
2    return for its agreement to surrender its right
3    to make a demand for unpaid principal and
4    interest, if anything?
5    A.    I think with all forgiveness of
6    notes, what it gets is it gets focus in terms
7    of the monetization and it reduces additional
8    compensation that I could have/would have taken
9    otherwise, or could have/would have been
10    entitled to otherwise.
11    So, it's -- yeah, I mean, I think
12    it's, again, heightened focused for something
13    that would be great for the debtor or great for
14    Highland at the time and reduces -- that form
15    of forgiveness becomes compensation when and if
16    it occurs, and then it -- it theoretically
17    reduces other compensation.
18    Q.    So why not just forgive it at that
19    moment?
20    Why tie it to "conditions
21    subsequent"?
22    A.    I thought it was more appropriate.
23    Q.    Did you and Nancy discuss at all
24    what the benefit would be to Highland from this

Page 183

Dondero - 5-28-2021

1    arrangement?
2    A.    The focus -- the focus parts for
3    sure.
4    Q.    And without -- without the agreement
5    that's referred to in paragraph 40, you
6    wouldn't have been focused on maximizing the
7    enterprises; is that right?
8    A.    No.
9    Q.    So -- I'm sorry, maybe I missed it.
10    When you used the word "focus" --
11    let me -- when you use the word "focus," what
12    do you mean?
13    What is the benefit to the debtor?
14    MS. DEITSCH-PEREZ:  Object to the
15    form.
16    He said "heightened focus."
17    A.    Yeah, heightened focused was my
18    words, which --
19    BY MR. MORRIS:
20    Q.    Okay.
21    A.    -- you know, means beyond normal
22    focus.  It means additional effort just like in
23    any company or what we do here with other
24    employees, for things you really want to get

Page 184

Dondero - 5-28-2021

1 done or focus on, you provide that extra
2 incentive.
3
4     Q.   Okay.  So -- so that's the benefit
5 to Highland, was that you were going to have a
6 heightened focus on maximizing value; is that
7 fair?
8         MS. DEITSCH-PEREZ:  Object to the
9     form.
10     A.   And then also the part 2 of my
11 answer, right, which, you know, that
12 forgiveness would be compensation which
13 would -- in any given year, additional
14 compensation coming from forgiveness reduces
15 other compensation.
16 BY MR. MORRIS:
17     Q.   Was that part of the agreement that
18 you reached with Nancy?  Was that -- was that
19 when these notes were forgiven, you would forgo
20 an amount equivalent to the outstanding
21 principal and unpaid interest?
22         MS. DEITSCH-PEREZ:  Object to the
23     form, misstates his prior testimony.
24     A.   Yeah.  I remember discussing the
25 focus part with her.  The -- I was giving that

Page 185

Dondero - 5-28-2021

1 answer when you were asking me what would be
2 the benefit or consideration to Highland and
3 then ultimately to debtor.  I was giving you
4 compensation answer.
5
6 BY MR. MORRIS:
7     Q.   Okay.  So I just -- but I do want to
8 try to understand from your perspective the
9 benefit to the debtor.
10         And, one, you told me about the
11 heightened focus, and the second --
12     A.   Right.
13     Q.   -- I think you said, and correct me
14 if I'm wrong, that it would relieve the debtor
15 of paying some compensation in the future.
16         Am I mistaken about that?
17     A.   Yeah, I mean -- I'm sorry.  Repeat
18 that one more time, please.
19     Q.   I believe you said that the second
20 benefit to Highland from entering into the
21 agreement referred to in paragraph 40 is that
22 it would relieve them of a future obligation to
23 pay compensation in the same amount.
24         Do I have that right?
25         MS. DEITSCH-PEREZ:  Object to the

Page 186

Dondero - 5-28-2021

1 form.
2     A.   Maybe not exactly "the same amount,"
3 but it would -- it would -- it would reduce
4 comp -- yes, it would -- it would, like, in the
5 next cycle, reduce -- or when it was realized,
6 would likely reduce comp then.
7 BY MR. MORRIS:
8     Q.   Okay.  And by what amount would it
9 likely reduce comp, then?
10     A.   I don't know.  By significant --
11 by -- by a significant amount, by something
12 similar to the 9 million bucks.
13     Q.   Okay.  So, is there any -- I'm just
14 trying to understand your perspective.
15         One of the benefits from entering
16 into the agreement referred to in paragraph 40
17 is that upon the realization of the forgiveness
18 of the debt, Highland or the debtor, whatever
19 the case may be, in the future would be
20 relieved from paying you an amount similar to
21 the principal amount of the notes?
22         Do I have that right?
23     A.   Yeah, or -- or -- yeah.  I guess the
24 reason why I keep going back and forth on the

Page 187

Dondero - 5-28-2021

1 exactness of the answer is that if --
2 there's -- depending on what the compensation
3 target is and whether or not you wanted to grow
4 something up or you're looking for a net
5 amount, but forgiveness of debt becomes a
6 taxable event with no -- no additional ability
7 to pay taxes.  So it's usually not an exact
8 offset to future compensation, the way we've
9 done it here historically.
10     Q.   In the agreement that you reached
11 with Nancy that's referred to in paragraph 40,
12 were there any other -- withdrawn.
13         In the agreement that you reached
14 with Nancy that's referred to in paragraph 40,
15 were there any circumstances under which you
16 would have been obligated to pay all unpaid
17 principal and interest under the notes?
18     A.   If the illiquid assets weren't -- or
19 if -- if none of the illiquid assets were
20 monetized.
21     Q.   But you were -- you were, at the
22 time you entered into this oral agreement, in
23 control of whether or not to monetize those
24 illiquid assets, right?

Page 188

Dondero - 5-28-2021

1
2    A.    And I expected they would be over
3    time, yes.
4    Q.    Okay.  So, based on your control of
5    the enterprise at the time that you entered
6    into the agreement, is there any – did you
7    have any – any scenario under which you
8    believed you might actually have to pay back
9    the unpaid principal and interest due under the
10    notes?
11    A.    If they weren't monetized.
12    Q.    Okay.  Anything else?
13    A.    Assets weren't monetized, yeah.
14    Q.    Anything else?
15    A.    That's – that's my recollection.
16    Q.    If – if you – have the "conditions
17    subsequent" been met yet?
18    A.    I believe the announcement of the
19    MGM sale will meet the conditions precedent
20    when it closes four or five months from now.
21    Q.    Okay.  But none of them have been
22    met – have the conditions subsequent been met
23    as of today?
24    A.    Have the conditions subsequent been
25    met today.  I don't have awareness of –

Page 189

Dondero - 5-28-2021

1
2    despite objecting vehemently, we don't have
3    awareness of what the debtor is doing with
4    Trussway or Cornerstone.  So there's a
5    potential that those could have triggered, but
6    I don't – I don't have – I don't have
7    awareness.
8    Q.    Okay.  Do you know – and forgive
9    the question, sir, honestly.  But do you
10    know –
11    A.    Sure.
12    Q.    – whether your estate would be
13    liable to pay all of the undue principal –
14    unpaid principal and interest if you passed
15    before the conditions subsequent were
16    satisfied?
17    MS. DEITSCH-PEREZ:  Object to the
18    form.
19    A.    I – I don't know that answer.
20    BY MR. MORRIS:
21    Q.    That wasn't something that you and
22    your sister discussed in January or February of
23    2019; is that fair?
24    A.    I wasn't contemplating that event at
25    that point in time.

Page 190

Dondero - 5-28-2021

1
2    Q.    That's why I say "forgive the
3    question," sir.
4    Did you ever ask anybody to write
5    the agreement in paragraph 40 down on paper so
6    that it was memorialized somewhere?
7    A.    No.
8    Q.    Did you and Nancy –
9    (Simultaneous conversation.)
10    A.    I'm sorry, go ahead.
11    BY MR. MORRIS:
12    Q.    Do you and Nancy communicate by
13    email from time to time?
14    A.    Almost entirely phone.  I – from
15    time to time, but it's almost entirely phone.
16    Q.    All right.  Let's – let's move on.
17    A.    Can I clarify something from before?
18    Q.    Of course.
19    A.    If the assets were never monetized
20    or the – the notes would stay in place and not
21    be forgiven.
22    If the assets were all monetized
23    below cost or what was considered a less
24    favorable scenario, then it would be – to
25    forgive it, something would have to be

Page 191

Dondero - 5-28-2021

1
2    monetized above cost, you know; but if they
3    were all monetized below cost, that would make
4    the note payable.
5    Q.    I appreciate that.
6    MR. MORRIS:  Let's go to the next
7    document, document Number 11.
8    (Exhibit 11 introduced.)
9    MR. MORRIS:  If we could just scroll
10    down, please.
11    (Scrolling.)
12    BY MR. MORRIS:
13    Q.    All right.  Now, these are your
14    objections and responses to the debtor's second
15    request for admissions.  Do you see that?
16    A.    Yes.
17    MR. MORRIS:  And let's scroll down
18    to page 4, please.
19    (Scrolling.)
20    BY MR. MORRIS:
21    Q.    Okay.  Do you recall whether you saw
22    this document before it was served and filed on
23    your behalf?
24    A.    Yes.  Can we go all the way through,
25    just go all the way down?

Page 192

Dondero - 5-28-2021

1         Was this notarized, also?
2     Q.    No, because these are responses to
3 requests to admit. You only --
4     A.    Okay.
5     Q.    You only notarize responses to
6 interrogatories, for whatever reason. So these
7 were not. Yeah.
8         But I'm just asking you if you have
9 a memory of reviewing the requests for
10 admission before they were served and filed on
11 your behalf?
12     A.    Yes.
13     Q.    Okay. And did you authorize your
14 lawyers to serve and file this document on your
15 behalf?
16     A.    Yes.
17     Q.    Okay. Looking at Request For
18 Admission Number 1, it asks you to admit that
19 in December 2019, you made a payment to the
20 debtor, a portion of which was applied to
21 reduce principal and/or interest due under one
22 or more of the notes.
23         Have I read that correctly?
24     A.    Yes.
25

Page 193

Dondero - 5-28-2021

1     Q.    And you've admitted that that
2 statement is true and accurate as written,
3 right?
4     A.    Yeah, I believe so. The -- yeah, I
5 believe so. Let me let you ask the questions.
6     Q.    Okay. Do you have any reason to
7 believe, as you sit here right now -- let me
8 ask you a different question.
9         Do you want to amend your response
10 in any way right now?
11     A.    I -- I'm not aware of small amounts
12 in terms of, like, interest or principal; and
13 then sometimes the tax guys will say periodic
14 interest payments are important to -- for the
15 character of the notes, so sometimes periodic
16 interest payments are made. Sometimes I think
17 they peck on some of the notes.
18         I don't -- I don't know or remember,
19 but I hope that something like this is correct.
20 Sometimes, if there was a need for cash into
21 Highland, the easiest way to -- for me or a
22 different entity to put cash into Highland was
23 to reduce a principal amount of a note with the
24 thought that we could create new notes or
25

Page 194

Dondero - 5-28-2021

1 increase another note later.
2         So how many times or how often
3 interest payments were made or if there was
4 some small principal payment made at some
5 point, I don't know the details; but I'm hoping
6 that's accurate.
7     Q.    Okay. We looked at three notes that
8 were signed by you in 2018, correct?
9     A.    Yes.
10     Q.    You signed other notes in favor of
11 Highland prior to that time, correct?
12     A.    I believe -- yeah. I mean, I
13 believe there were numerous notes beyond these.
14     Q.    Were -- were -- did you ever sign a
15 note in favor of Highland that was forgiven?
16     A.    I don't -- I don't know.
17     Q.    Do you have any recollection of ever
18 paying taxes in connection with a note that was
19 subsequently forgiven by Highland?
20     A.    If there was -- if there was a
21 forgiveness and it was taxable, I would have
22 paid the taxes. We were compliant in that
23 regard. I'm a hundred percent comfortable
24 we're compliant, but I don't know.
25

Page 195

Dondero - 5-28-2021

1     Q.    Okay. And I appreciate -- I didn't
2 mean to suggest that you weren't compliant,
3 sir. I'm just asking you if you can identify
4 any note that you made in favor of Highland
5 that was ever forgiven.
6         MS. DEITSCH-PEREZ: And I'm just
7 going to object because, while he's not
8 30(b)(6) witness, this is a deposition
9 taken in a particular case and he may have
10 not looked at the records going back to
11 2000, or whatever, that's -- since when
12 Highland was started.
13         MR. MORRIS: I just can't tell you
14 how inappropriate that is.
15 BY MR. MORRIS:
16     Q.    Go ahead, Mr. Dondero.
17     A.    The same answer, I don't know.
18     Q.    Okay. You did, in fact, pay in full
19 all principal and interest due on notes that
20 you made in favor of Highland other than the
21 three notes at issue in this case, correct?
22         MS. DEITSCH-PEREZ: Object to the
23 form.
24     A.    I -- I don't know. I would repeat
25

Page 196

Dondero - 5-28-2021

1   Dondero - 5-28-2021
2   the answer I gave a few minutes ago when I kind
3   of rambled about cash management.
4   BY MR. MORRIS:
5       Q.   Do you know how many notes you made
6   in favor of Highland beyond the three that are
7   the subject of this litigation?
8           MS. DEITSCH-PEREZ:  Object to the
9   form.
10      A.   I -- I do not, regarding myself
11  personally.
12          I am aware that the aggregate amount
13  of affiliated notes is approximately 70 or
14  $80 million, including my notes; but that's it.
15  I mean, that's all I know.
16  BY MR. MORRIS:
17      Q.   All right.  I'm just asking you
18  about you, in your individual capacity.
19      A.   I don't know.
20      Q.   You don't know --
21          (Audio distortion.)
22          THE REPORTER:  You broke up, sir.
23  BY MR. MORRIS:
24      Q.   You don't know the number of
25  notes -- (audio distortion) -- Highland beyond

Page 197

1   Dondero - 5-28-2021
2   these three, correct?
3       A.   Correct.
4       Q.   And you can't recall whether any --
5   any notes that you made in favor of Highland
6   were ever forgiven, correct?
7       A.   I -- I don't know.
8       Q.   Okay.  So, did you ever object to
9   the application of the payment referred to in
10  Request For Admission Number 1 to principal
11  and/or interest due under one or more of the
12  notes?
13          Did you ever object to the
14  application of the payment in that way?
15          MS. DEITSCH-PEREZ:  Object to the
16  form.
17      A.   I think the decision on how to
18  handle cash needed at Highland was entirely
19  made and the application to note principal or
20  interest was -- was entirely decided by the
21  accounting group.
22  BY MR. MORRIS:
23      Q.   But did you know that decision was
24  made in or around December 2019?
25      A.   Not really, no.  Not specifically.

Page 198

1   Dondero - 5-28-2021
2       Q.   Well, you've admitted to the fact.
3   So, when did you learn that in December 2019 a
4   payment made on your behalf, at least a portion
5   of which was applied to reduce principal and/or
6   interest due under one or more of the notes?
7   When did you learn that?
8       A.   I don't know.  It would have been as
9   part of the process in preparing this document.
10      Q.   So it's your testimony that somebody
11  used your money in December 2019 to reduce
12  principal and/or interest due under one or more
13  of the notes without your knowledge?
14      A.   Yeah, without my specific knowledge.
15  There was a reason to put money in at that
16  point in time, and then how they applied it was
17  not my decision --
18      Q.   Making --
19      A.   -- not --
20      Q.   Making a payment -- you would agree
21  that making a payment of principle or interest
22  under one or more of the notes conflicts with
23  the agreement that you reached with Nancy,
24  right?
25          MS. DEITSCH-PEREZ:  Object to the

Page 199

1   Dondero - 5-28-2021
2   form.
3       A.   No, that's not true.
4   BY MR. MORRIS:
5       Q.   Well, the conditions subsequent
6   hadn't arisen yet; is that fair?
7       A.   The notes were in '18, correct?
8       Q.   Yes, sir.
9       A.   And then, yeah, the subsequent
10  condition was in the first quarter of '19.
11      Q.   Right.  And then, in December of
12  '19, a payment of principal and/or interest was
13  made against one or more of the notes, right?
14      A.   Yes.
15      Q.   And I'm just asking you, sir, if
16  that's inconsistent with the agreement that you
17  reached with Nancy.
18          MS. DEITSCH-PEREZ:  Object to the
19  form.
20      A.   And I'm saying -- I'm saying no.  I
21  mean, it's --
22  BY MR. MORRIS:
23      Q.   Okay.  Since learning of the
24  payment, have you tried to identify the person
25  who was responsible for applying your money in

Page 200

Dondero - 5-28-2021

1  the way that's described in Request For
2  Admission Number 1?
3  A.  No.
4         MR. MORRIS:  Can we go down to
5     number 4, please?
6  BY MR. MORRIS:
7     Q.  In your amended answer, I think you
8  asserted that the -- "each note is ambiguous."
9  Do I have that right?
10         We can go back, if you would like to
11  look?
12     A.  Is this admission number 4?  Is that
13  where you're pointing to?
14     Q.  It is, and I'll just read it.  It
15  refers to paragraph 45 of the amended answer,
16  and I'll read it.  But I'm happy to go back and
17  put it on the screen, if you'd would like.
18         But it says simply:  "Defendant
19  further asserts that each note is ambiguous."
20         So request for number 4 asks you to
21  admit that before you served that amended
22  answer, you had never informed the debtor of
23  your belief that any provision of the notes was
24  ambiguous.

Page 201

Dondero - 5-28-2021

1     Do you see that?
2     A.  Yes.
3     Q.  And you've denied that request for
4  admission.
5         Do you see that?
6     A.  Yes.
7     Q.  So, who did you inform at the debtor
8  of your belief that a provision of the notes
9  was ambiguous?
10         Who did you --
11         MS. DEITSCH-PEREZ:  Object.
12  BY MR. MORRIS:
13     Q.  Who did you communicate that to?
14         MS. DEITSCH-PEREZ:  Object to the
15     form, no foundation.
16     A.  I -- I -- I don't -- "I don't know"
17  is my answer to pretty much any question you
18  could ask there.
19  BY MR. MORRIS:
20     Q.  This is -- you're denying the
21  request for admission, and that's your right.
22         Did you ever inform the debtor of
23  your belief that a provision of the notes was
24  ambiguous?

Page 202

Dondero - 5-28-2021

1         MS. DEITSCH-PEREZ:  Object, no
2     foundation.
3     A.  As -- ask the question again,
4  please.
5  BY MR. MORRIS:
6     Q.  Did you ever inform the debtor of
7  your belief that any provision of the notes was
8  ambiguous?
9         MS. DEITSCH-PEREZ:  Object, no
10     foundation.
11     A.  You know, I don't know what
12  conversations were had between lawyers.  I -- I
13  don't know.
14  BY MR. MORRIS:
15     Q.  Okay.  So I'm going to ask a
16  slightly different question because of your
17  answer:  Can you tell me whether you or anybody
18  acting on your behalf ever informed the debtor
19  of your belief that any provision of any of the
20  notes was ambiguous?
21         MS. DEITSCH-PEREZ:  Object, no
22     foundation.
23     A.  I'm going to have to say, yes, I
24  believe that statement is true; but I don't

Page 203

Dondero - 5-28-2021

1  have specific knowledge.
2  BY MR. MORRIS:
3     Q.  Do you have any knowledge, can you
4  identify any person who informed the debtor of
5  your belief?
6     A.  I don't have specific knowledge.  I
7  don't -- I don't -- I don't know.
8     Q.  Can you tell me when the debtor was
9  informed of your belief that any provision of
10  the notes was ambiguous?
11         MS. DEITSCH-PEREZ:  Object, no
12     foundation.
13     A.  I don't know.
14  BY MR. MORRIS:
15     Q.  Can you identify the person who was
16  acting on behalf of the debtor who was informed
17  by you or anyone acting on your behalf of your
18  belief that any provision of the notes was
19  ambiguous?
20         MS. DEITSCH-PEREZ:  Object, no
21     foundation.
22     A.  I don't know.
23  BY MR. MORRIS:
24     Q.  Okay.

Appx. 01665

Page 204

```
1              Dondero - 5-28-2021
2         MR. MORRIS:  Let's go to the next
3    exhibit, please.
4         THE WITNESS:  Is this a good time
5    for a lunch break?
6         MR. MORRIS:  Yeah.  I'm happy to do
7    it.  I'm trying to move as quickly as I
8    can, Mr. Dondero.  This is a little bit
9    longer than you and I usually sit for, and
10   I apologize for that, but I'm happy to take
11   as long a break as you -- as you need.
12        MS. DEITSCH-PEREZ:  How long do you
13   think you have for the rest of the
14   deposition?  What's your guess?
15        MR. MORRIS:  I would say more than
16   an hour, less than two.
17        MS. DEITSCH-PEREZ:  Do you want to
18   take a really short --
19        THE WITNESS:  Can we take a half
20   hour, like 12:30 our time, 1:30 East Coast
21   time?
22        MR. MORRIS:  Of course.
23        THE WITNESS:  Yeah.  So, we'll take
24   35 minutes, and then we'll get back to it.
25   You know --
```

Page 205

```
1              Dondero - 5-28-2021
2         THE REPORTER:  Are we still on the
3    record, please?
4         MR. MORRIS:  Yes.
5         COURT REPORTER:  Okay.
6         MS. DEITSCH-PEREZ:  We'll --
7         MR. MORRIS:  If you have time
8    constraints -- if you have time
9    constraints, Mr. Dondero, I'm prepared to
10   keep going.  I'll take a shorter break.  I
11   don't want -- you know, I apologize for the
12   burden, but these are relevant questions.
13        THE WITNESS:  Yeah, let's -- let's
14   do 35 minutes, and we will try and wrap it
15   up in -- like you're saying, like an hour
16   or less than two.
17        MR. MORRIS:  Yeah.
18        THE WITNESS:  Yeah.  I do need to be
19   someplace in the early afternoon.
20        MR. MORRIS:  I assure you, I'll do
21   my best to keep to that time frame.
22        THE WITNESS:  Okay.  Thank you.
23        THE REPORTER:  And we're off the
24   record.
25        (Lunch recess held.)
```

Page 206

```
1              Dondero - 5-28-2021
2         MR. MORRIS:  Can we put up the next
3    exhibit, which I believe is Number 12?
4         (Exhibit 12 introduced.)
5    BY MR. MORRIS:
6    Q.   Okay.  So, Mr. Dondero, these are
7    interrogatories, and so I direct you first to
8    the last page of the document, the Verification
9    page.
10        And is that your signature, sir?
11   A.   Yes.
12   Q.   Now, this wasn't notarized.  Is
13   there a reason why you didn't get this
14   notarized?
15   A.   No.
16   Q.   Okay.
17        MR. MORRIS:  If we could just scroll
18   back up.
19   BY MR. MORRIS:
20   Q.   But is the Verification true --
21        MR. MORRIS:  If we just go back to
22   it.
23   BY MR. MORRIS:
24   Q.   At the time you signed this
25   document, had you read the Defendant's
```

Page 207

```
1              Dondero - 5-28-2021
2    Objections and Answers to Highland Capital
3    Management, L.P.'s Second Set of
4    Interrogatories?
5    A.   Yes.
6    Q.   And did you believe that the facts
7    stated therein were both within your personal
8    knowledge and were true and correct?
9    A.   Yes.
10   Q.   Okay.
11        MR. MORRIS:  Can we go to the
12   substance of the document on page 4 of 6?
13   BY MR. MORRIS:
14   Q.   Okay.  So, in the answer to
15   Interrogatory No. 1, you identify the
16   conditions subsequent that were the subject of
17   the agreement that we've been talking about
18   that you and Nancy entered into.
19        Do I have that right?
20   A.   Yes.
21   Q.   And to the best of your knowledge,
22   does the answer that's set forth in response to
23   Interrogatory No. 1 fully and accurately set
24   forth the conditions subsequent that were the
25   subject of the agreement?
```

Page 208

1           Dondero - 5-28-2021
2           MS. DEITSCH-PEREZ:  Object to the
3    form.
4      A.   Repeat the question, please.
5    BY MR. MORRIS:
6      Q.   Does this answer to Interrogatory
7    No. 1 set forth, to the best of your knowledge
8    and understanding, the conditions subsequent
9    that were part of the agreement that you and
10   Nancy entered into in January or February 2019?
11          MS. DEITSCH-PEREZ:  Object to the
12   form.
13     A.   Yes, large -- yes, largely --
14   BY MR. MORRIS:
15     Q.   Okay.
16     A.   -- or yes.
17     Q.   Is there any aspect of this that you
18   believe right now is incorrect?
19     A.   No.
20     Q.   Is there any aspect of your
21   agreement with Nancy on the conditions
22   subsequent that's not described in this answer?
23          MS. DEITSCH-PEREZ:  Object to the
24   form.
25     A.   My recollection is that that largely

Page 209

1           Dondero - 5-28-2021
2    captures it.
3    BY MR. MORRIS:
4      Q.   Okay.  There's a reference there to,
5    quote, "the disposition of the portfolio
6    company interests managed and/or owned directly
7    or indirectly by Highland and/or its affiliates
8    or managed funds."
9           Do you see that?
10     A.   Yes.
11     Q.   What does that refer to?
12     A.   Just, you know, MGM is owned in a
13   variety of places, Cornerstone is owned in a
14   variety of places, and then Trussway is owned
15   in a subsidiary of Highland.
16          So there -- I believe it's to
17   capture the fact of the different ownerships or
18   controls of those three different investments.
19     Q.   Are those the only portfolio company
20   interests managed and/or directly or indirectly
21   by Highland or its affiliates -- withdrawn.
22   That was bad.
23          This answer doesn't refer
24   specifically to any particular assets, correct?
25     A.   It does not.

Page 210

1           Dondero - 5-28-2021
2      Q.   Okay.
3      A.   Well, yeah.  I think what the intent
4    was -- those three companies I just mentioned
5    were always considered portfolio companies.
6    There have been a few others over the years,
7    but those are -- those -- I think they're
8    trying to capture them that way, but I only
9    remember talking to her about those three.
10     Q.   Are there any other portfolio
11   company interests that are managed and/or owned
12   directly or indirectly by Highland and/or its
13   affiliates or managed funds?  Are there any
14   other assets?
15          MS. DEITSCH-PEREZ:  Object to the
16   form.
17     A.   There were some lesser private
18   equity investments or companies, yes.
19   BY MR. MORRIS:
20     Q.   Can you identify them?
21     A.   CCS Medical.  I think OmniMax was
22   one.  Kerri International.  Yeah, those --
23   those are ones that come to mind.
24     Q.   Okay.  But notwithstanding the
25   answer here, to the best of your recollection,

Page 211

1           Dondero - 5-28-2021
2    the agreement that you had with Nancy pertained
3    only to MGM, Cornerstone, and Trussway.  Do I
4    have that right?
5           MS. DEITSCH-PEREZ:  0bject to the
6    form.
7      A.   The monetization of those three were
8    the -- were the conditions subsequent, yes.
9    BY MR. MORRIS:
10     Q.   Okay.  And there's a reference there
11   to being disposed of, quote, on a favorable
12   basis.
13          Do you see that?
14     A.   Yes.
15     Q.   What does that mean?
16     A.   Above cost or book value.
17     Q.   How much above cost or book value
18   would you have to dispose of MGM, Cornerstone,
19   and Trussway in order to trigger the conditions
20   subsequent?
21     A.   There wasn't -- there was just
22   monetization on a favorable basis.  There
23   wasn't a specific amount on each individual
24   one.  It only took one to trigger it.
25     Q.   Oh.  So the sale of any of those

Page 212

1        Dondero - 5-28-2021
2   three assets would trigger the conditions
3   subsequent?
4        A.   Correct.
5        Q.   Okay.  And who decided whether the
6   asset was sold on a favorable basis?
7             Who made that decision, under your
8   agreement with Nancy?
9        A.   It was just defined relative to
10   cost, so it was just -- it was just a
11   factual -- there's nothing to decide.  It would
12   just be a factual answer.
13       Q.   So, I just want to make sure I
14   understand.
15            Your agreement with Nancy was that
16   --
17       A.   Yes.
18       Q.   -- that -- all right.  Withdrawn.
19            Your agreement with Nancy in January
20   or February 2019, was that if any of MGM,
21   Cornerstone, or Trussway was sold at cost, the
22   debtor would forgive your obligations under the
23   three notes.
24            Do I have that right?
25            MS. DEITSCH-PEREZ:  Object to the

Page 213

1        Dondero - 5-28-2021
2   form.
3        A.   If any of them were sold above cost,
4   it would -- monetization would trigger the --
5   the three notes -- forgiveness of the three
6   notes, yes.
7   BY MR. MORRIS:
8        Q.   Okay.  And I just want to see if I
9   can understand:  Did you and Nancy discuss in
10   January or February 2019 how much above cost
11   the sale would have to be in order for the
12   debtor to forgive your obligations under the
13   three notes?
14            MS. DEITSCH-PEREZ:  Object to the
15   form.
16       A.   No.  It just had to be above cost,
17   not a amount above cost.
18   BY MR. MORRIS:
19       Q.   Okay.
20       A.   Because just monetizing it -- just
21   monetizing it and getting liquidity for an
22   illiquid investment, even if it was at cost, is
23   good.  So something above cost is great.  And
24   those are all big assets, and the notes were
25   small.

Page 214

1        Dondero - 5-28-2021
2        Q.   Okay.  So, again, I just want to
3   really understand your agreement with Nancy.
4            Did you and her specifically agree
5   in January or February 2019 that if you sold
6   either MGM or Cornerstone or Trussway for at
7   least $1 more than cost, then your obligations
8   under the three notes would be forgiven?
9            MS. DEITSCH-PEREZ:  Object to the
10   form.
11       A.   Before I answer that, I just -- can
12   you repeat so I can get all the subjects and
13   participants straight in my head from the
14   beginning of that question?
15   BY MR. MORRIS:
16       Q.   Sure.  Did you and Nancy agree in
17   January or February 2019 that if Highland sold
18   either MGM or Cornerstone or Trussway for an
19   amount that was equal to at least $1 more than
20   cost, that -- that Highland would forgive your
21   obligations under the three notes?
22            MS. DEITSCH-PEREZ:  Object to the
23   form.
24       A.   I believe that is correct.
25   BY MR. MORRIS:

Page 215

1        Dondero - 5-28-2021
2        Q.   Thank you very much.
3            Was Grant Scott the trustee of the
4   Dugaboy trust in January or February 2019?
5        A.   He was at one point.  I don't know
6   if he was -- I don't know when he was the
7   trustee, but he got replaced at a -- some point
8   in time.
9        Q.   Do you know if it was before or
10   after the petition date?
11       A.   Before or after the petition date.
12            It was before the petition date.
13            MR. MORRIS:  Okay.  I'd ask for the
14   production of any documents that show that
15   Nancy Dondero was the trustee of the
16   Dugaboy trust in January or February 2019.
17            MS. DEITSCH-PEREZ:  I'll take your
18   request under advisement.
19   BY MR. MORRIS:
20       Q.   Now, the last portion of
21   Interrogatory No. 1, the answer to it, refers
22   to a, quote, "basis wholly outside Dondero's
23   control."
24            Do you see that?
25       A.   Uh-huh.

Page 216

Dondero - 5-28-2021

1    Q.   Was that part of the agreement that
2 you entered into with Nancy in January or
3 February 2019?
4    A.   Yeah.  It was probably unnecessary
5 complexity, but yes.
6    Q.   Was there anything that you
7 envisioned in January or February 2019 that
8 would have caused you to lose control of
9 Highland?
10       MS. DEITSCH-PEREZ:  Object to the
11    form.
12    A.   No, and I wasn't -- that wasn't the
13 thought process.
14 BY MR. MORRIS:
15    Q.   So what was the thought process?
16 Why was that phrase part of -- why --
17 withdrawn.
18       Did you include that -- that aspect
19 of the conditions subsequent -- withdrawn.
20       Who decided that one of the
21 conditions subsequent would be the disposition
22 of the assets that you've described, quote,
23 "wholly outside of Dondero's control."
24       Whose idea was it to put that into

Page 217

Dondero - 5-28-2021

1 the agreement?
2    A.   It was -- it was mine.  And, again,
3 it was probably unnecessary complexity, but...
4    Q.   And why did you want that piece of
5 it into the agreement?
6    A.   MGM ended up being a success story,
7 but the value of MGM and the prospects of MGM
8 have bounced around considerably over the last
9 decade.  And we never owned more than 17 or
10 18 percent and there was a 32 percent holder,
11 and Carl Icahn was involved at different points
12 in time.  There was definitely a chance that,
13 over our objections, it could have been sold at
14 a lower price without our support.
15       And as far as Cornerstone was
16 concerned, there was a half or a majority that
17 was in the Restoration Fund that had a whole
18 bunch of outside investors in it; and,
19 theoretically, that could have been sold
20 without our -- or against our recommendations.
21       So it was really meant to capture
22 those two possibilities.
23    Q.   Did you tell Frank Waterhouse at any
24 time about your agreement with Nancy that's

Page 218

Dondero - 5-28-2021

1 subject to the conditions subsequent referred
2 to here in Interrogatory No. 1?
3    A.   I don't know if Frank knew the
4 specifics.  I think Frank really was aware that
5 the loans could and would likely be forgiven
6 and -- yes.  That's all to that answer.
7    Q.   Did you tell him that?
8    A.   Yes, and -- I mean, partly he knew
9 it from the history of Highland, and the
10 structure of the notes are structured in a way
11 that facilitates forgiveness.
12       MR. MORRIS:  I move to strike.
13 BY MR. MORRIS:
14    Q.   Did you ever tell Frank Waterhouse
15 about the agreement that you reached with
16 Nancy?
17       MS. DEITSCH-PEREZ:  Object to the
18    form.
19    A.   Not -- not the specifics.
20 BY MR. MORRIS:
21    Q.   Did you ever mention anything about
22 any aspect of your agreement with Nancy -- with
23 Nancy to Frank Waterhouse?
24       MS. DEITSCH-PEREZ:  Object to the

Page 219

Dondero - 5-28-2021

1    form.
2    A.   I -- listen, I don't -- I don't
3 remember talking to him about the specifics,
4 but, in general, I -- he -- he was deeply
5 involved in the thought process and the
6 conclusion that the notes were forgiven or
7 going to be for --
8       MR. MORRIS:  I'm going to move to
9    strike.
10 BY MR. MORRIS:
11    Q.   And I'm not asking you to get into
12 his head to tell me what you think he knew.
13 I'm asking you about what you told him.
14       Did you ever tell Mr. Waterhouse
15 that you reached an agreement with Nancy
16 pursuant to which the debtor had agreed not to
17 collect on the notes subject to the conditions
18 subsequent set forth in your answer to
19 Interrogatory No. 1?
20       MS. DEITSCH-PEREZ:  Object to the
21    form.
22    A.   I don't remember.  I -- I don't
23 remember enough to say conclusively one way or
24 the other.

Page 220

Dondero - 5-28-2021

1
2   BY MR. MORRIS:
3      Q.   Do you have any recollection of
4   telling any employee at Highland at any time of
5   your agreement with Nancy?
6         MS. DEITSCH-PEREZ:  Object to the
7      form.
8      A.   I -- I don't know.
9   BY MR. MORRIS:
10     Q.   Okay.  Did you tell anybody employed
11  or representing the debtor at any time of your
12  agreement with Nancy?
13        MS. DEITSCH-PEREZ:  Object to the
14     form.
15     A.   Not that I -- not that I recall.
16  Again, I didn't think there was a reason to,
17  initially.
18        MR. MORRIS:  Can we go to
19     Exhibit 13, please?
20        (Exhibit 13 introduced.)
21  BY MR. MORRIS:
22     Q.   All right.  When you were the CEO,
23  did PricewaterhouseCoopers serve as Highland's
24  auditors?
25        MS. DEITSCH-PEREZ:  Object to the

Page 221

Dondero - 5-28-2021

1
2      form.
3      A.   At different times they were, and
4   then KPMG was.  I don't remember who it was in
5   '17.
6   BY MR. MORRIS:
7      Q.   Okay.  And it's a fact, is it not,
8   that until at least year-end 2018, Highland had
9   audited the financial statements prepared for
10  itself, right?
11     A.   I don't know.  I wasn't aware they
12  stopped.
13     Q.   Okay.  Okay.
14        So, I'm putting up on the screen the
15  "Consolidated Financial Statements and
16  Supplemental Information" for the period
17  December 31st, 2017.
18        Do you see that?
19     A.   Uh-huh.
20        MR. MORRIS:  And if we can go first
21  to the page marked 33470, which is, I
22  think, the --
23        And is this -- does this refresh
24  your recollection that PWC served as
25  Highland's independent auditors for the

Page 222

Dondero - 5-28-2021

1
2   financial statements prepared for the year
3   ending December 31st, 2017?
4         MR. MORRIS:  If you could scroll
5   down to the bottom of the page so
6   Mr. Dondero can see the date.
7      A.   Okay.
8   BY MR. MORRIS:
9      Q.   Do you see that?
10     A.   If you're asking me to agree that it
11  was Pricewaterhouse, yes, I agree.
12     Q.   And do you see that they signed
13  their letter on May 18th, 2018?  Do you see
14  that?
15     A.   Yeah.
16     Q.   And do you see, towards the top of
17  the page, there's a statement about
18  "Management's Responsibility for the
19  Consolidated Financial Statements"?
20     A.   Yes.
21     Q.   And that's a pretty standard clause
22  that auditors include in audited financial
23  statements, in your experience; isn't that
24  right?
25     A.   Yes.

Page 223

Dondero - 5-28-2021

1
2         MR. MORRIS:  Can we go to the
3      page -- the next page, 3471?
4   BY MR. MORRIS:
5      Q.   This is the Consolidated Balance
6   Sheet for the period December 31, 2017, and
7   it's been redacted except to show "Notes and
8   other amounts due from affiliates."  Do you see
9   that?
10     A.   Uh-huh.
11     Q.   When you were the CEO, did Highland
12  carry the Notes and Other Amounts Due from
13  Affiliates as assets on its balance sheet?
14     A.   Yes.
15     Q.   Okay.  And that's what's reflected
16  on this page; is that correct?
17     A.   I mean, that's what the heading
18  says, yes.
19     Q.   Okay.
20        MR. MORRIS:  Can we go to Bates
21     number 33499.
22        (Scrolling.)
23  BY MR. MORRIS:
24     Q.   And you're aware, are you not, that
25  in the Notes to the financial statements, PWC

Page 224

Dondero - 5-28-2021

1  described all of the notes and other amounts
2  that were due to affiliates -- due from
3  affiliates?
4      MS. DEITSCH-PEREZ:  Object to the
5  form.
6      A.  Yes.
7  BY MR. MORRIS:
8      Q.  And were you aware that in the
9  financial statements prepared for Highland for
10 the period ending December 31st, 2017, that PWC
11 included in its notes amounts due from Highland
12 Capital Management Fund Advisors, L.P.?
13     A.  The 0.2 million in the first
14 sentence, is that your question?
15     Q.  Yes.  You know, the whole -- who at
16 Highland was responsible for providing
17 information to PWC relating to Notes and Other
18 Amounts Due from Affiliates?
19     A.  The accounting department.
20     Q.  And who was the head of the
21 accounting department as of the end of 2017?
22     A.  Frank Waterhouse.
23     Q.  And did Frank Waterhouse remain the
24 head of the accounting department until at

Page 225

Dondero - 5-28-2021

1  least the end of 2020, to the best of your
2  knowledge?
3      A.  Yes.
4      Q.  And when did Frank Waterhouse become
5  the head of the accounting department?
6      A.  A few years earlier.
7      Q.  So, to the best of your
8  recollection, Frank Waterhouse has been the
9  head of the accounting department on a
10 continuous basis from the period approximately
11 2015 until the end of 2020; is that right?
12     A.  If not earlier, but yes.  But I
13 don't know the dates.
14     Q.  Okay.
15     MR. MORRIS:  Can we scroll down to
16 the next to the last paragraph there, the
17 one that refers to Mr. Dondero?  There you
18 go.
19 BY MR. MORRIS:
20     Q.  Do you see that, according to this
21 financial report, you "did not issue any new
22 promissory notes to the Partnership" during the
23 year 2017?
24     A.  Yeah.

Page 226

Dondero - 5-28-2021

1      Q.  And to the best of your
2  recollection, was that accurate?
3      A.  Yes.
4      Q.  Okay.  And to the best of your
5  recollection, was it also accurate that as of
6  the end of 2017, the total interest and
7  principal due on an -- on outstanding
8  promissory notes was approximately 14 and a
9  half million dollars and was payable in annual
10 installments throughout the term of the note?
11     A.  Yes.
12     Q.  And prior to your execution of the
13 demand notes, do you recall that you had made,
14 in favor of Highland, certain term notes?
15     A.  I don't -- I don't recall.
16     Q.  Do you remember having to make
17 payments to Highland to satisfy the terms of
18 any notes prior to 2018?
19     A.  I can't recall.  I didn't refresh --
20 I didn't refresh myself on anything else, on
21 any other notes for this deposition.
22     Q.  Okay.  But looking at this
23 paragraph, is there anything about it that you
24 currently believe is inaccurate or incorrect?

Page 227

Dondero - 5-28-2021

1      MS. DEITSCH-PEREZ:  Object to the
2  form.
3      A.  I -- I don't know.  I don't know.
4  BY MR. MORRIS:
5      Q.  Okay.  We can scroll through the
6  entire page, if you would like, but I just --
7  I'll ask the question first, and then you tell
8  me what you need to read.
9      Do you recall whether
10 PricewaterhouseCoopers' audited financial
11 statements ever disclosed the forgiveness of
12 any loan ever made by Highland to you or any of
13 its employees?
14     MS. DEITSCH-PEREZ:  Object to the
15 form.
16     A.  I don't -- I don't know.
17 BY MR. MORRIS:
18     Q.  Do you have a recollection of any?
19     A.  I don't have a recollection --
20 recollection of any.  As a CPA, I'm not sure
21 it's required until it's forgiven, but I'm not
22 the expert.  I can't remember seeing it or not
23 seeing it.
24     Q.  Did the debtor make --

Page 228

1          Dondero - 5-28-2021
2          MR. MORRIS:  You know what?  Let's
3     look -- let's look at each of these.  We
4     can start with the bottom of the page.
5   BY MR. MORRIS:
6     Q.   Can you identify any of the makers
7   of the notes that are referred to in this
8   section that are not directly or indirectly
9   owned or controlled by you, other than
10  Mr. Okada?
11         So, if we start at the top, is
12  Highland Capital Management Fund Advisors,
13  L.P., an entity that is either directly or
14  indirectly owned or controlled by you?
15    A.   Yes.
16    Q.   NexPoint Advisors, L.P., the next
17  paragraph, is that an entity that is directly
18  or indirectly owned or controlled by you?
19    A.   Yes.
20    Q.   HCRE Partners, LLC, is that an
21  entity that is directly or indirectly owned or
22  controlled by you?
23    A.   Yes.
24    Q.   Highland Capital Management
25  Services, Inc., is that an entity that is

Page 229

1   directly or indirectly owned or controlled by
2   you?
3     A.   Yes.
4     Q.   All right.  And you're the subject
5   of the next paragraph, right?
6          The next paragraph relates to Mark
7   Okada.  Are you aware of any loan that was ever
8   made by Highland to Mr. Okada that was
9   forgiven?
10    A.   I don't know.
11    Q.   Okay.
12         MR. MORRIS:  Can we go to the next
13    paragraph, please?
14  BY MR. MORRIS:
15    Q.   There's a reference to The Dugaboy
16  Investment Trust.  Do you see that?
17    A.   Yes.
18    Q.   Either your sister or Mr. Scott have
19  served as the sole trustee of Dugaboy since the
20  time it was created; is that correct?
21         MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.   I -- I don't know.
24  BY MR. MORRIS:

Page 230

1          Dondero - 5-28-2021
2     Q.   Do you recall anybody at any time
3   serving as the trustee of The Dugaboy
4   Investment Trust other than Nancy or Mr. Scott?
5          MS. DEITSCH-PEREZ:  Object to the
6     form.
7     A.   I -- I don't remember.
8   BY MR. MORRIS:
9     Q.   Are you the lifetime beneficiary of
10  The Dugaboy Investment Trust?
11    A.   Yes.
12    Q.   And have you been -- withdrawn.
13         Are you the sole lifetime
14  beneficiary of The Dugaboy Investment Trust?
15         MS. DEITSCH-PEREZ:  Object to the
16    form.
17    A.   I believe so.
18  BY MR. MORRIS:
19    Q.   Okay.  And has that been true since
20  the time The Dugaboy Investment Trust was
21  created?
22         MS. DEITSCH-PEREZ:  Object to the
23    form.
24    A.   I don't know for sure.
25  BY MR. MORRIS:

Page 231

1          Dondero - 5-28-2021
2     Q.   Okay.  The next paragraph refers to
3   a Contribution Agreement.  Do you see that?
4     A.   Yes.
5     Q.   Are you familiar who the affiliated
6   trust is that entered into the Contribution
7   Agreement?
8     A.   No.  I'm willing to be refreshed,
9   but I don't remember.
10    Q.   Is it the Hunter Mountain Investment
11  Trust?
12    A.   It could be.
13    Q.   Can you think of any other
14  affiliated trust other than Hunter Mountain who
15  carried a note receivable in the amount of
16  $63 million due to the partnership?
17    A.   No.
18    Q.   Do you directly or indirectly own or
19  control the Hunter Mountain Trust?
20    A.   No.
21    Q.   Let's go -- do you have any interest
22  in the Hunter Mountain Trust?
23    A.   No.
24    Q.   Directly or indirectly?
25    A.   No.

Page 232

Dondero - 5-28-2021

1          MR. MORRIS:  Can we go to 33510,
2    please?
3          (Scrolling.)
4    BY MR. MORRIS:
5      Q.    Just to refresh your recollection,
6    PricewaterhouseCoopers's letter is dated
7    May 18th, 2018.
8          And you see there, note 16 refers to
9    "Subsequent Events."  Do you see that?
10     A.    Yep.
11     Q.    So, sometime between January 1st and
12   May 18, 2018, which is the report date,
13   PricewaterhouseCoopers is disclosing that you
14   issued promissory notes in the amount of
15   $11.7 million.  Do you see that?
16     A.    Yes.
17     Q.    Do you believe that was true and
18   accurate at the time?  Is that your
19   recollection?
20     A.    Yes.
21     Q.    Now, of the three notes that we
22   looked at, only one of them was issued before
23   May 18, 2018.  That was the 2 and a half
24   million-dollar note.

Page 233

Dondero - 5-28-2021

1    Do you remember that?
2      A.    I apologize.  Withdrawn.
3          That was the 3.825 million-dollar
4    note.
5          Do you remember that?
6      A.    Okay.  Yes.
7      Q.    Okay.  So, if that note was 3. --
8    let's just call it roughly $3.9 million, does
9    that mean that there were $7.8 million of other
10   notes that you made in favor of Highland during
11   the first five months of 2018?
12         MS. DEITSCH-PEREZ:  Object to the
13   form.
14     A.    Yeah, I think you got the wrong --
15   well, you're -- I'm not the accounting
16   department.  I'm not the auditor.  My comment
17   would be our financial statements have always
18   been -- our audited financial statements have
19   always been extremely accurate and
20   Pricewaterhouse and KPMG literally do a hundred
21   percent sampling of all transactions.
22   Everything is reflected accurately in the
23   financials, and there's no missing note or
24   misstated note or unequal amount, or whatever.

Page 234

Dondero - 5-28-2021

1    And I refuse to go in that direction just
2    because I don't know the details.
3    BY MR. MORRIS:
4      Q.    I appreciate that, sir, and I didn't
5    mean to take you into that direction.  I'm just
6    asking you if you know what accounts for the
7    difference between the $11.7 million stated and
8    the 3.825 million-dollar note that we looked at
9    as Exhibit Number 1 that was tendered by you on
10   February 2nd, 2018.  That's all.
11     A.    I -- I don't know.  I have no -- I
12   have no idea.
13     Q.    Okay.  In the course of the audit,
14   you personally sign management representation
15   letters, right?
16     A.    Usually at the end.
17     Q.    Yeah.
18         MR. MORRIS:  So can we call the next
19   exhibit up, please?
20         (Exhibit 14 introduced.)
21   BY MR. MORRIS:
22     Q.    And happy to take a look at it.  I'm
23   going to point you to a couple of things.
24         MR. MORRIS:  But if we could go to

Page 235

Dondero - 5-28-2021

1    the document, it's page 9 of the document,
2    Bates number 33408.  All right.
3          And scroll up to the prior page,
4    please.  Just looking for the signatures.
5    BY MR. MORRIS:
6      Q.    All right.  Is that your signature
7    there, sir?
8      A.    Yeah.
9      Q.    And did you sign this management
10   representation letter on behalf of Highland in
11   your capacity as the Strand Advisors, Inc.,
12   general partner on or about May 18th, 2018?
13     A.    Yeah.
14     Q.    And Frank Waterhouse, is that -- do
15   you know that to be his signature below?
16     A.    It resembles it, yes.
17     Q.    Okay.  Do you have an understanding
18   of why you signed this document?
19     A.    Despite all their auditing and
20   double-checking of all source information,
21   they -- they want a validation from management,
22   also.
23     Q.    And is that standard and customary,
24   to the best of your experience?

Page 236

```
1             Dondero - 5-28-2021
2     A.  Yes.
3     Q.  Okay.
4          MR. MORRIS:  Can we go back to the
5     first page, please?
6          (Scrolling.)
7     BY MR. MORRIS:
8     Q.  Do you see in the second paragraph,
9     the last sentence, there's a reference to
10    "materiality"?
11         MR. MORRIS:  If you can just scroll
12    down a bit.
13    BY MR. MORRIS:
14    Q.  And it says, quote, "Materiality
15    used for purposes of these representations is
16    $2,000,000."
17         Am I reading that correctly?
18    A.  Yes.
19    Q.  And did you understand that Highland
20    was to provide to PWC, so that it could prepare
21    the audited financial statements with
22    information relating to issues and transactions
23    that were material, using that definition?
24    A.  Yes.
25         MR. MORRIS:  Let's go to the next
```

Page 237

```
1             Dondero - 5-28-2021
2     document.
3          (Exhibit 15 introduced.)
4     BY MR. MORRIS:
5     Q.  These are the audited financials for
6     the period ending December 31st, 2018.
7          MR. MORRIS:  And if you could go to
8     the third page, the one ending in 33424.
9          No, above.  Yeah, right there.
10         Do you see PricewaterhouseCoopers
11    signed the audit letter on June 3rd, 2019?
12    A.  Yep.
13         MR. MORRIS:  And if we can scroll up
14    to the top of the page, it has the same
15    statement concerning "Management's
16    Responsibility for the Consolidated
17    Financial Statements" that we looked at
18    earlier in the 2017 audit, correct?
19    A.  Yes.
20    BY MR. MORRIS:
21    Q.  Okay.  And that's -- looking at it,
22    that's customary language that auditors include
23    in audited financial statements, correct?
24    A.  Yep.
25         MR. MORRIS:  Can we go to the next
```

Page 238

```
1             Dondero - 5-28-2021
2     page, please?
3     BY MR. MORRIS:
4     Q.  Again, you'll see that this is the
5     Consolidated Balance Sheet for the period
6     ending December 31st, 2018.  Do you see that?
7     A.  Yes.
8     Q.  And is it accurate that Highland
9     continued to carry on its balance sheet as an
10    asset all "Notes and Other Amounts Due from
11    Affiliates"?
12    A.  Yes.
13         MS. DEITSCH-PEREZ:  Object to the
14    form.
15    BY MR. MORRIS:
16    Q.  And you knew -- you knew at the time
17    that the audited financials were finalized that
18    Highland was carrying on its balance sheet
19    "Notes and Other Amounts Due from Affiliates,"
20    correct?
21    A.  Yup.
22    Q.  Did you personally tell anybody at
23    PWC in connection with the preparation of the
24    audited financial statements for 2018 that you
25    had entered into the agreement with your sister
```

Page 239

```
1             Dondero - 5-28-2021
2     Nancy in January or February of 2019?
3          MS. DEITSCH-PEREZ:  Object to the
4     form.
5     A.  Not that I recall.
6     BY MR. MORRIS:
7     Q.  Do you know if anybody told PWC,
8     prior to the completion of the audited
9     financial statements for the period ending
10    December 31st, 2018, of your agreement with
11    Nancy?
12         MS. DEITSCH-PEREZ:  Object to the
13    form.
14    A.  Not that I know of.
15    BY MR. MORRIS:
16    Q.  Did you ever instruct anybody to
17    inform PWC about the agreement you reached with
18    Nancy in --
19         MS. DEITSCH-PEREZ:  Object to the
20    form.
21    BY MR. MORRIS:
22    Q.  -- January --
23         MR. MORRIS:  Please let me finish
24    the question.
25         MS. DEITSCH-PEREZ:  You took a
```

Appx. 01674

Page 240

| | |
|---|---|
| 1 | Dondero - 5-28-2021 |
| 2 | breath.  Sorry. |
| 3 | MR. MORRIS:  Are you finished? |
| 4 | MS. DEITSCH-PEREZ:  Yes.  As I |
| 5 | explained, you took a breath, and I thought |
| 6 | you were done.  Sorry. |
| 7 | BY MR. MORRIS: |
| 8 | Q.   Did you ever instruct anybody to |
| 9 | inform PWC of your agreement that you reached |
| 10 | with Nancy in January or February 2019? |
| 11 | MS. DEITSCH-PEREZ:  Object to the |
| 12 | form. |
| 13 | A.   No. |
| 14 | MR. MORRIS:  Can you please go to |
| 15 | page 33451? |
| 16 | (Scrolling.) |
| 17 | BY MR. MORRIS: |
| 18 | Q.   And we've got the "Notes and Other |
| 19 | Amounts Due from Affiliates."  We had gone |
| 20 | through all of this before and I'm not going to |
| 21 | do it again, but I do want to ask you, sir: |
| 22 | Did you personally approve and authorize each |
| 23 | of the notes that are reflected in the PWC |
| 24 | disclosure concerning Notes and Other Amounts |
| 25 | Due from Affiliates? |

Page 241

| | |
|---|---|
| 1 | Dondero - 5-28-2021 |
| 2 | MS. DEITSCH-PEREZ:  Object to the |
| 3 | form. |
| 4 | A.   Repeat the question. |
| 5 | Did I personally approve?  Was that |
| 6 | the question or — |
| 7 | BY MR. MORRIS: |
| 8 | Q.   Yes.  Withdrawn. |
| 9 | I'll ask a different question. |
| 10 | And I'm happy to give you the time |
| 11 | needed to look at the full disclosure, but are |
| 12 | you aware of any note or other amount due from |
| 13 | affiliate that you didn't approve and |
| 14 | authorize? |
| 15 | A.   I'm not aware. |
| 16 | MR. MORRIS:  Okay.  If we could just |
| 17 | focus in on that bottom paragraph relating |
| 18 | to Mr. Dondero. |
| 19 | BY MR. MORRIS: |
| 20 | Q.   So there's a reference there to your |
| 21 | having "issued promissory notes to the |
| 22 | Partnership in the aggregate amount of |
| 23 | $14.9 million" during 2018. |
| 24 | Do you see that? |
| 25 | A.   Yes. |

Page 242

| | |
|---|---|
| 1 | Dondero - 5-28-2021 |
| 2 | Q.   That would include the three notes |
| 3 | at issue in this lawsuit; is that right? |
| 4 | MS. DEITSCH-PEREZ:  Object to the |
| 5 | form. |
| 6 | A.   (No response.) |
| 7 | BY MR. MORRIS: |
| 8 | Q.   Let me ask a different question. |
| 9 | The three – the three notes at |
| 10 | issue in this lawsuit were all issued in 2018, |
| 11 | correct? |
| 12 | A.   Yes. |
| 13 | Q.   Okay.  Do you have a recollection as |
| 14 | to what notes account for the difference |
| 15 | between the $8.8 million or so that's at issue |
| 16 | in this lawsuit and the $14.9 million |
| 17 | referenced in this disclosure? |
| 18 | A.   I don't, other than that – I |
| 19 | believe the audit is accurate and, you know, |
| 20 | there could have been principle or interest |
| 21 | paydowns.  I don't know the reason for the |
| 22 | difference. |
| 23 | Q.   This disclosure, as it pertains to |
| 24 | you, doesn't mention any oral agreement, does |
| 25 | it? |

Page 243

| | |
|---|---|
| 1 | Dondero - 5-28-2021 |
| 2 | A.   No. |
| 3 | Q.   And it doesn't mention any amendment |
| 4 | to any of the notes, correct? |
| 5 | A.   No. |
| 6 | Q.   It doesn't describe any conditions |
| 7 | that have been placed on the collectability of |
| 8 | the notes from you, correct? |
| 9 | A.   No. |
| 10 | Q.   It doesn't state that the notes |
| 11 | might be forgiven upon some conditions |
| 12 | subsequent, correct? |
| 13 | A.   No, it does not. |
| 14 | MR. MORRIS:  Can we turn to |
| 15 | page 33461, please? |
| 16 | (Scrolling.) |
| 17 | BY MR. MORRIS: |
| 18 | Q.   And these are "Subsequent Events," |
| 19 | and I just want to look through them – |
| 20 | withdrawn. |
| 21 | You understand that these financial |
| 22 | statements are for the period ending |
| 23 | December 31st, 2018, correct? |
| 24 | A.   Yes. |
| 25 | Q.   And the agreement that you reached |

Page 244

Dondero - 5-28-2021

1  with Nancy, to the best of your recollection,
2  occurred in January or February 2019, correct?
3      (Simultaneous conversation.)
4  A.   Yes –
5      MS. DEITSCH-PEREZ:  Object to the
6  form.
7      THE REPORTER:  I didn't hear an
8  answer.
9  A.   Repeat the question again, just in
10  case.
11  BY MR. MORRIS:
12  Q.   Sure.  The agreement that you – the
13  agreement that you reached with Nancy on behalf
14  of Highland was an agreement that was reached
15  in January or February 2019, correct?
16  A.   Was in – the last was in January or
17  February of '19, yes.  Yes.
18  Q.   Okay.  So I just want to show you
19  the entirety of the "Subsequent Events" because
20  they cover the period from December 31st, 2018,
21  until the report date of June 3, 2019.
22      MR. MORRIS:  If we could just look
23  at that.
24  BY MR. MORRIS:

*(line numbers 1–25)*

Page 245

Dondero - 5-28-2021

1  Q.   Is there any reference made to the
2  agreement that you reached with Nancy in
3  January or February 2019?
4  A.   No.
5      MS. DEITSCH-PEREZ:  And I just want
6  to object for the record that we asked the
7  debtor for all of the Highland financial –
8  audited financial statements.  We got
9  highly redacted ones where the debtor has
10  clearly left unredacted only those things
11  it wanted to use while denying Mr. Dondero
12  the unredacted copies.  So we do not have
13  here, for him to look at, the unredacted
14  Highland audited financial statements.
15      MR. MORRIS:  But this is the only
16  portion of the document – well, I'm not
17  going to argue.
18      MS. DEITSCH-PEREZ:  Yes.  You showed
19  us what you wanted to show him in an
20  unredacted (audio distortion) gave him
21  fully redacted copies.  I understand that.
22      MR. MORRIS:  Yeah, and I'll be happy
23  to submit a unredacted copy to the Judge
24  under seal so that she can see whether or

Page 246

Dondero - 5-28-2021

1  not there's any other aspect of the
2  financial statements that –
3      MS. DEITSCH-PEREZ:  That's fine.
4      MR. MORRIS:  – pertain to the
5  notes.
6      Give me a break.  Stop.
7      MS. DEITSCH-PEREZ:  I know.
8  Litigation isn't a one-way – one-way
9  disco.
10      MR. MORRIS:  Okay.  All right.
11      The next document, please.
12      THE WITNESS:  How are we doing on
13  time?
14      MR. MORRIS:  We're doing pretty
15  well.  I think we're going to fit within –
16  we're not quite an hour back on, but I'm
17  confident that we'll fit within the one- to
18  two-hour – we'll be done within an hour.
19  That's my point.
20      THE WITNESS:  Okay.  I'm going to
21  give a hard stop at 2:00.  Okay?
22      MR. MORRIS:  You can do whatever you
23  want.  If we're not finished, we'll just
24  have to figure out a time to come back.  So

Page 247

Dondero - 5-28-2021

1  let's get through as much as we can, and
2  we'll see where we are.
3  BY MR. MORRIS:
4  Q.   The next document is the management
5  representation letter.
6      (Exhibit 16 introduced.)
7  BY MR. MORRIS:
8  Q.   And I would just ask you to look at,
9  I guess, page 33419 and just confirm for me
10  that that's your signature.
11  A.   Yes.
12  Q.   Okay.  And this contains the same
13  representations that you made to PWC that we
14  looked at in the earlier management rep letter,
15  right?
16  A.   Yes.
17  Q.   Okay.  Let's look at the next
18  document, please.
19      (Exhibit 17 introduced.)
20  BY MR. MORRIS:
21  Q.   So PWC issues the audited financials
22  in June of 2019, and then Highland files for
23  bankruptcy in October.
24      Do I have that right?

Page 248

1          Dondero - 5-28-2021
2    A.   Yes.
3    Q.   And at the time Highland filed for
4  bankruptcy, you were the president and CEO of
5  Highland, correct?
6    A.   Yes.
7    Q.   And you personally authorized
8  Highland's bankruptcy filing, correct?
9    A.   On Pachulski's recommendation.
10   Q.   But you're the only person who
11 authorized the filing; is that correct?
12   A.   Yes.
13   Q.   And did you understand -- you have
14 familiarity with bankruptcy proceedings, right?
15       MS. DEITSCH-PEREZ:  Object to the
16   form.
17   A.   Not this kind of bankruptcy, but,
18 yes, we have experience in bankruptcies.
19 BY MR. MORRIS:
20   Q.   And you had experience in the Acis
21 bankruptcy, for example, correct?
22   A.   Yes.
23       MS. DEITSCH-PEREZ:  Object to the
24   form.
25 BY MR. MORRIS:

Page 249

1          Dondero - 5-28-2021
2    Q.   And you understand that debtors in
3  bankruptcy have to make certain disclosures; is
4  that right?
5        MS. DEITSCH-PEREZ:  Object to the
6    form.
7  BY MR. MORRIS:
8    Q.   You can answer.
9    A.   Yes.
10   Q.   And you understand that the purpose
11 of the disclosures is to give interested
12 parties an opportunity to review the financial
13 information relating to the debtors, right?
14       MS. DEITSCH-PEREZ:  Object to the
15   form.
16   A.   Generally.
17 BY MR. MORRIS:
18   Q.   The debtor is supposed to be
19 transparent.  Is that a statement you would
20 agree with?
21   A.   I'd agree the debtor is supposed to
22 be.
23   Q.   So, are you aware that the debtor
24 filed certain schedules in connection with the
25 bankruptcy case?

Page 250

1          Dondero - 5-28-2021
2    A.   I'm sure they filed many schedules.
3    Q.   And did you -- did you review the
4  debtor's schedules before they were filed?
5    A.   No.
6    Q.   All right.  So, here is a summary of
7  the debtor's assets and liabilities that was
8  filed in December -- on December 12th, 2019.
9        Do you see the timeline at the top?
10   A.   Yes.
11   Q.   And you were still in control of the
12 debtor at that time, correct?
13   A.   Yep.
14   Q.   And was Mr. Waterhouse responsible
15 for preparing the debtor's Summary of Assets
16 and Liabilities on behalf of Highland at that
17 time?
18   A.   I -- I don't know whether DSI was in
19 control at that point.  I don't know.
20   Q.   Did DSI rely on Mr. Waterhouse and
21 the accounting team for the information that
22 was used to create the debtor's disclosures?
23       MS. DEITSCH-PEREZ:  Object to the
24   form.
25 BY MR. MORRIS:

Page 251

1          Dondero - 5-28-2021
2    Q.   Withdrawn.
3        To the best of your knowledge, did
4  DSI rely on Mr. Waterhouse and the accounting
5  team at Highland in order to prepare the
6  debtor's schedules and financial disclosures?
7        MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   I don't know.
10 BY MR. MORRIS:
11   Q.   Did you ever discuss with
12 Mr. Waterhouse the debtor's financial
13 disclosures during the bankruptcy case?
14   A.   Nope.
15   Q.   Did you ever look at the Summary of
16 Assets and Liabilities that was filed with the
17 Court in December 2019?
18   A.   Nope.
19       MR. MORRIS:  Turn to the second
20   page, please.  Let's just go down right --
21   right there.
22 BY MR. MORRIS:
23   Q.   Do you see in part 11 -- part 11
24 pertains to all other assets and in Item
25 Number 71, there's a reference to "Notes

Page 252

Dondero - 5-28-2021

1
2 Receivable."
3    A.   Yep.
4    Q.   And do you see that the Notes
5 Receivable are for an aggregate amount of
6 approximately $150 million?
7    A.   Yep.
8    Q.   And it refers to Exhibit D.  Do you
9 see that?
10    A.   Yes.
11    Q.   All right.
12        MR. MORRIS:  Can we turn -- go to
13    the next page?
14 BY MR. MORRIS:
15    Q.   And exhibit -- this page is Exhibit
16 D.
17        Do you see that?
18    A.   Yes.
19    Q.   And this shows an aggregate amount
20 of -- the face amount of notes to be the same
21 $150.3 million that we just saw, correct?
22        MS. DEITSCH-PEREZ:  Object to the
23    form.
24 BY MR. MORRIS:
25    Q.   We can go back and look, if you

Page 253

Dondero - 5-28-2021

1
2 want.
3    A.   It seems to tie.
4    Q.   Okay.  And it was disclosed on the
5 docket in the bankruptcy case that you
6 personally had made Notes Receivable
7 outstanding in the approximate amount of
8 $9.3 million.  Do you see that?
9    A.   Yes.
10    Q.   Okay.
11        MR. MORRIS:  Can we just go to the
12    top?  I want to just show the date.
13 BY MR. MORRIS:
14    Q.   It's December 13.  That's the date
15 that this disclosure is made.  Do you see that?
16    A.   Yes.
17    Q.   And there's a footnote there, number
18 [1], that says "Doubtful or Uncollectible
19 accounts are evaluated at year end."  Do you
20 see that?
21    A.   Yes.
22    Q.   Now, nothing on this document shows
23 any of the notes as being doubtful or
24 uncollectible, correct?
25    A.   Correct.

Page 254

Dondero - 5-28-2021

1
2    Q.   Do you know if the debtor's
3 schedules were ever amended after
4 December 13th, 2019, to reflect "Doubtful or
5 Uncollectible" Notes Receivable?
6        MS. DEITSCH-PEREZ:  Object to the
7    form.
8    A.   Yeah.  I believe the Hunter Mountain
9 56 was written off.
10 BY MR. MORRIS:
11    Q.   Okay.  Anything else?
12        MS. DEITSCH-PEREZ:  Object to the
13    form.
14    A.   I -- I don't know.
15 BY MR. MORRIS:
16    Q.   Okay.  Did you ever ask anyone to
17 amend the debtor's schedules to reflect any
18 Doubtful or Uncollectible receivable that's set
19 forth on this page?
20    A.   I did not.
21    Q.   Okay.
22        MR. MORRIS:  La Asia, I'm actually
23    going to just skip the next exhibit.  And
24    if we could go to the one that you and I
25    had marked as 19.  We'll just mark it as 18

Page 255

Dondero - 5-28-2021

1
2 for purposes of the deposition.
3        MS. DEITSCH-PEREZ:  I think that's
4    confusing.  I don't mind if you just mark
5    18 as "omitted."  I would want a sheet with
6    "18 omitted."  That way, your numbering can
7    stay the same.
8        MR. MORRIS:  Okay.  That's fine.
9    Thank you.  So we'll mark 18 as "omitted",
10    and this will be 19.
11        (Exhibit 19 introduced.)
12 BY MR. MORRIS:
13    Q.   Are you aware of -- that the debtor
14 filed disclosures called Statements of
15 Financial Affairs, often referred to as SoFAs?
16    A.   I've heard of the form before, yes.
17    Q.   Did you ever review the debtor's
18 SoFAs?
19    A.   No.
20    Q.   So, do you know who was responsible
21 at Highland for preparing the debtor's SoFAs?
22    A.   No.
23    Q.   Would it have been -- would --
24 whoever it was, would that person have either
25 been or reported to Frank Waterhouse, as the

Page 256

Dondero - 5-28-2021

1    CFO?
2    A.   I'm sorry.  Can you repeat that one
3  more time?
4    Q.   I appreciate the fact that you
5  don't – you can't identify the person who
6  prepared the SoFAs; but within the
7  organizational structure of Highland during the
8  time that you were the CEO, would the person
9  have been either Frank Waterhouse or somebody
10  who reported to Frank Waterhouse?
11    A.   Or DSI.
12    Q.   Okay.
13       MR. MORRIS:  Can we go to page 2,
14  please.
15       (Scrolling.)
16  BY MR. MORRIS:
17    Q.   Do you see at number 4 here, there's
18  a reference to payments made to insiders within
19  a year of the bankruptcy case?
20    A.   Yup.
21    Q.   Are you aware – withdrawn.
22       Were you aware in December 2019 that
23  Highland was going to disclose all payments
24  made to insiders within a year of the

Page 257

Dondero - 5-28-2021

1    bankruptcy case?
2    A.   No.
3       MR. MORRIS:  Let's go to page 19 of
4  34, please.
5       (Scrolling.)
6       MR. MORRIS:  If we could, scroll
7  down near the bottom.
8  BY MR. MORRIS:
9    Q.   You'll see that there's two entries
10  for Highland Capital Management Fund Advisors.
11       Do you see that?
12    A.   Yup.
13    Q.   And in May 2019, the debtor paid
14  Highland Capital Management Fund Advisors the
15  aggregate amount of $7.4 million.  Am I reading
16  that correctly?
17    A.   Yes.
18    Q.   Okay.  And those payments were – in
19  exchange for those payments, Highland received
20  two promissory notes, correct?
21       MS. DEITSCH-PEREZ:  John, I'm going
22  to object.  You're straying from the
23  subject of this adversary and going into
24  another, and I'm really not comfortable

Page 258

Dondero - 5-28-2021

1    with that since he's only prepared for
2  his – his – for this proceeding and has
3  not refreshed himself on anything else.
4  So, this is outside of what the scope of
5  this deposition ought to be.
6       MR. MORRIS:  Okay.  So you have two
7  choices, Deborah:  You can either state
8  your objection, "beyond the scope," or you
9  can direct the witness not to answer.
10  Which would you like to do?
11       MS. DEITSCH-PEREZ:  I am going to
12  state my objection that it's beyond the
13  scope, but I'm asking you because – as a
14  matter of fairness, that you restrain
15  yourself and limit your deposition to this
16  adversary proceeding –
17       MR. MORRIS:  Okay.  I appreciate –
18       MS. DEITSCH-PEREZ:  – and not –
19       (Simultaneous conversation.)
20       MS. DEITSCH-PEREZ:  And if the
21  witness isn't prepared to answer these
22  questions, it's not fair that you proceed
23  on them.
24       MR. MORRIS:  Okay.  So I'll just say

Page 259

Dondero - 5-28-2021

1    that for a couple of questions to ask the
2  former CEO about a 7.4 million-dollar
3  payment made to an affiliate that he owns
4  or controls, I'm going to ask you to give
5  me a little latitude.
6  BY MR. MORRIS:
7    Q.   Mr. Dondero, were those two payments
8  backed up by promissory notes in favor of the
9  debtor, to the best of your knowledge?
10    A.   I don't know.
11    Q.   Okay.
12       MR. MORRIS:  Let's go to the next
13  page, please.
14       Can we go towards the middle of the
15  page.  Right there.  That's fine.
16  BY MR. MORRIS:
17    Q.   Do you see your name, James Dondero,
18  there?
19    A.   Yes.
20    Q.   And you were paid $3.75 million
21  within a year of the bankruptcy, correct?
22    A.   Yes.
23    Q.   Who determined that you should –
24  who made the decision for Highland to pay you

Appx. 01679

Page 260

Dondero - 5-28-2021

1 that amount?
2
3    A.    Me?  I don't know.
4    Q.    Is there anybody else who had the
5 authority to determine your compensation prior
6 to the petition date, other than yourself?
7    A.    Especially -- besides myself --
8 okay.  Let me answer that question first.
9        The Class A -- majority Class A
10 holders can, and then I can.
11    Q.    Anybody else?
12    A.    Not that -- not that I know.
13    Q.    In practice, did anybody other than
14 you set your compensation?
15    A.    In practice, yes, sometimes majority
16 Class A did.
17    Q.    And at any time prior to the
18 petition date, can you think of an instance
19 where the majority of the Class A refused to
20 compensate you in the manner in which you
21 wanted?
22    A.    There was -- no, because there was
23 no reason to because there was plenty of head
24 room in all the agreements and compared to
25 market levels.

Page 261

Dondero - 5-28-2021

1
2        MR. MORRIS:  Let's go to the next
3 document, please.
4        (Exhibit 20 introduced.)
5 BY MR. MORRIS:
6    Q.    Are you aware that, during the
7 course of the bankruptcy proceeding, the
8 debtor, in addition to the schedules and SoFAs,
9 also filed every month a document called the
10 "Monthly Operating Report"?
11    A.    I'm not aware, specifically.
12    Q.    Did you ever review any of the
13 debtor's Monthly Operating Reports?
14    A.    Not that I can recall.
15    Q.    Okay.
16        MR. MORRIS:  We can scroll down a
17 bit.
18 BY MR. MORRIS:
19    Q.    You see there's -- there's two
20 signatures here:  One electronic, one
21 handwritten, both dated December 2nd.  Do you
22 see that Brad Sharp has signed as an authorized
23 individual as the Chief Restructuring Officer?
24    A.    Yup.
25    Q.    Okay.  And then below that, there's

Page 262

Dondero - 5-28-2021

1 the electronic signature of Mr. Waterhouse.  Do
2 you see?
3
4    A.    Yes.
5    Q.    Okay.  Were -- to the best of your
6 knowledge as the CEO at the time, were
7 Mr. Sharp and Mr. Waterhouse authorized to sign
8 and file Monthly Operating Reports with the
9 Court?
10    A.    Again, it's not my sphere of
11 knowledge.  It looks like -- individually or
12 jointly, I -- I don't have a comment.
13    Q.    I'm just asking you, as the CEO, did
14 you expect Mr. Waterhouse and Mr. Sharp to take
15 care of all financial disclosures required
16 under the bankruptcy code?
17    A.    Yes.
18    Q.    And did you expect them to do that
19 completely, transparently and accurately?
20    A.    Yes.
21    Q.    Do you have any reason to believe
22 that they failed to do so?
23    A.    Not that I'm aware.
24        MR. MORRIS:  Can we go to page 6 of
25    11?

Page 263

Dondero - 5-28-2021

1
2        (Scrolling.)
3 BY MR. MORRIS:
4    Q.    You haven't seen this document
5 before; is that right?
6    A.    I do not believe so.
7    Q.    Okay.  But you see that it was filed
8 in late January 2020, but it was signed in
9 December, right?
10    A.    Yeah.
11    Q.    Okay.  And do you see that among the
12 assets listed are amounts "Due from
13 affiliates"?
14    A.    Yep.
15    Q.    And do you have any reason to
16 believe that the amounts due from affiliates
17 are anything other than the same notes and
18 amounts due that we saw in the audited
19 financial statements?
20        MS. DEITSCH-PEREZ:  Object to the
21    form.
22    A.    I don't know.
23 BY MR. MORRIS:
24    Q.    Okay.
25        THE WITNESS:  I do look at this and

Page 264

Dondero - 5-28-2021

1  get wistful.  You guys should be ashamed of
2  yourselves, what you've done to this
3  company.
4  company.
5       MR. MORRIS:  I move to strike.
6       Can we take a look at footnote (1),
7  please?
8  BY MR. MORRIS:
9       Q.   Do you see that it "Includes various
10  notes receivable at carrying value"?
11       Do you have any understanding of
12  what that --
13       MS. DEITSCH-PEREZ:  You didn't state
14  the whole sentence, John.  Please, if
15  you're going to point him to things, read
16  him the whole sentence.
17  BY MR. MORRIS:
18       Q.   Sir, do you have any understanding
19  as to what footnote (1) refers to or means?
20       A.   It says what it says.
21       Q.   Okay.
22       MR. MORRIS:  Let's look at the next
23  document, please.
24       (Exhibit 21 introduced.)
25       MR. MORRIS:  All right.  So if you

Page 265

Dondero - 5-28-2021

1  could just stop right there.
2  BY MR. MORRIS:
3       Q.   This is the Monthly Operating Report
4  for the period ending November 2019.  Do you
5  see that?
6       A.   Yes.
7       MR. MORRIS:  Can we scroll down a
8  bit?
9  BY MR. MORRIS:
10       Q.   And that's Mr. Sharp's and
11  Mr. Waterhouse's signatures, correct?
12       A.   Yes.
13       Q.   Do you see on this version,
14  Mr. Sharp is identified as the "Responsible
15  Party," but Mr. Waterhouse is identified as the
16  "Preparer"?
17       A.   Yes.
18       Q.   Do you recall ever telling Mr.
19  Waterhouse, in his capacity as the preparer of
20  Monthly Operating Reports, that there was
21  anything inaccurate in any Monthly Operating
22  Report filed by the debtor?
23       A.   No.
24       Q.   Do you recall ever telling

Page 266

Dondero - 5-28-2021

1  Mr. Sharp, as the responsible party, that there
2  was anything inaccurate in any monthly --
3  Monthly Operating Report filed by the debtor?
4       A.   No.
5       MR. MORRIS:  Can we go to the next
6  page, please?
7       (Scrolling.)
8       THE WITNESS:  I'm going to give the
9  12-minute warning here.  I can be back at
10  4:00, but I'm going to need a couple hours.
11       MR. MORRIS:  I'm trying to finish
12  up, okay?
13       THE WITNESS:  Okay.
14       MR. MORRIS:  I'd rather not come
15  back, to be honest with you.
16       Can we go to the next page, please?
17  BY MR. MORRIS:
18       Q.   Again, the debtor reported that the
19  amounts due from affiliates were assets of the
20  debtor's estate, correct?
21       A.   Yep.
22       Q.   Do you -- do you have any issue with
23  the fact that the debtor reported the notes,
24  including your own notes, as assets of the

Page 267

Dondero - 5-28-2021

1  estate?
2       MS. DEITSCH-PEREZ:  Object to the
3  form.
4       A.   Until they're forgiven, they're bona
5  fide notes.
6  BY MR. MORRIS:
7       Q.   And you don't think the "conditions
8  subsequent" agreement that you entered into
9  with Nancy calls into question whether the
10  debtor would ever recover on their notes that
11  you issued to them?
12       MS. DEITSCH-PEREZ:  Object to the
13  form.
14       A.   Again, I don't believe it's material
15  or GAAP, is my understanding.
16  BY MR. MORRIS:
17       Q.   Well, almost a third of the debtor's
18  assets are notes "Due from affiliates," right?
19       A.   You have to back out Hunter
20  Mountain, and you have to back out -- you have
21  to back out about 80 million to get to the 70
22  million of affiliated notes; and then, from
23  there, you have to back out 60 of them to get
24  to the 9 million.

Page 268

Dondero - 5-28-2021

1
2    MS. DEITSCH-PEREZ:  Mr. Morris,
3    please don't make faces at Mr. Dondero.
4    BY MR. MORRIS:
5    Q.   Why -- why are we backing out Hunter
6    Mountain?
7    A.   I think the Hunter Mountain -- there
8    were notes going both ways, but I think the
9    Hunter Mountain is out of the estate, I
10   believe.
11   Q.   But Hunter Mountain -- the debtor
12   held notes that were made by Hunter Mountain in
13   the approximate amount of $60 million, right?
14   A.   But subsequent to these dates, I
15   think -- I think they realized it was just a
16   cross-transaction.  There were dues and
17   payables that were essentially equal from
18   Hunter Mountain, so I think Hunter Mountain
19   came out of that.
20   Q.   Isn't it -- isn't it a fact that
21   they wrote them off because they didn't believe
22   they were collectible?
23   A.   Yeah, because the payment on those
24   notes depended upon Highland honoring its
25   agreements to Hunter Mountain, which Highland

Page 269

Dondero - 5-28-2021

1    had no intention of doing.  So, there's no
2    ability for Hunter Mountain to pay Highland.
3
4    Q.   Does Highland -- does Hunter
5    Mountain today have the ability to pay back any
6    of the $60 million that it -- that was
7    reflected in the notes?
8    MS. DEITSCH-PEREZ:  Object.
9    A.   No, not that I know of but --
10   BY MR. MORRIS:
11   Q.   Okay.
12   MS. DEITSCH-PEREZ:  And, Mr. Morris,
13   once again, I think we're straying from
14   this adversary.
15   MR. MORRIS:  Can we go to page 5 of
16   9, please?
17   (Scrolling.)
18   MR. MORRIS:  Above that, I think.
19   Next page, 5 of 9.  We must be looking at
20   the wrong exhibit.
21   Is the one that was marked 22?  No,
22   it's the next -- I believe it's the next
23   document.
24   Let's pull up the next document,
25   please.

Page 270

Dondero - 5-28-2021

1
2    (Exhibit 22 introduced.)
3    MR. MORRIS:  Yeah, that's it.
4    Go to page 5, please.  Thank you.
5    BY MR. MORRIS:
6    Q.   Do you see that box there?  It says
7    "Non-Operating Receipts - Other."
8    A.   Yes.
9    Q.   Okay.  And do you understand that
10   that shows that, in December 2019, while you
11   were still personally in control of the debtor,
12   that certain payments of "principle or
13   interest" were made with respect to notes made
14   in favor of the debtor?
15   A.   Yes.
16   Q.   Okay.  And do you understand that
17   the one dated December 23rd in the approximate
18   amount of $783,000, that was a payment that was
19   made by you?
20   MS. DEITSCH-PEREZ:  Object to the
21   form.
22   A.   If you say so.  I don't have a basis
23   for denying it or confirming it.
24   BY MR. MORRIS:
25   Q.   Okay.  But it's true, you do recall

Page 271

Dondero - 5-28-2021

1    that in December 2019, after the petition date,
2    while you were still in control of the debtor,
3    that certain payments of principal and interest
4    were made on notes that were made in favor of
5    the debtor, correct?
6    MS. DEITSCH-PEREZ:  Asked -- asked
7    and answered about an hour ago.
8    BY MR. MORRIS:
9    Q.   You can answer, sir.
10   A.   I believe -- I believe so.
11   Q.   Thank you.  Do you recall that in
12   connection with its Plan and Disclosure
13   Statement, that the debtor prepared a
14   Liquidation Analysis?
15   A.   Yes.
16   MR. MORRIS:  Can we call the next
17   document up on the screen, please?
18   (Exhibit 23 introduced.)
19   MR. MORRIS:  And if we can go to the
20   next page.
21   BY MR. MORRIS:
22   Q.   Your lawyers and lawyers acting on
23   behalf of entities you own and control or
24   otherwise have an interest spent considerable

Page 272

Dondero - 5-28-2021

1  time on the debtor's Liquidation Analysis and
2  confirmation.
3       Do you remember that?
4    A.  I can't -- I can't agree or disagree
5  with that.
6  BY MR. MORRIS:
7    Q.  Okay.  Did you personally review the
8  debtor's Liquidation Analysis?
9    A.  Briefly.
10   Q.  Okay.
11       MR. MORRIS:  Can we go to the next
12  page, please?
13  BY MR. MORRIS:
14   Q.  Do you see that this page contains a
15  list of "Assumptions"?
16   A.  Yes.
17       MR. MORRIS:  And can we scroll up a
18  little further so we can see the date?
19  BY MR. MORRIS:
20   Q.  You'll see that on November 24th,
21  2020, the debtor filed a Liquidation Analysis
22  that contained, as among the Assumptions,
23  quote, "All demand notes are collected in the
24  year 2021."  Do you see that?
25

Page 273

Dondero - 5-28-2021

1
2    A.  Yes.
3    Q.  Did you or anybody acting on your
4  behalf ever inform the Court that you believed
5  that assumption was unreasonable?
6    A.  I -- I don't know, but I know we've
7  been fighting the notes consistently through
8  various mechanisms.
9    Q.  Okay.  Did you or anybody acting on
10  your behalf ever inform the Court of your
11  agreement with Nancy?
12       MS. DEITSCH-PEREZ:  Object to the
13  form.
14   A.  Not -- not that I know of.
15  BY MR. MORRIS:
16   Q.  Did you ever instruct anybody to
17  inform the Court that you had an agreement with
18  Nancy that rendered Assumption C unreasonable?
19       MS. DEITSCH-PEREZ:  Object to the
20  form.
21   A.  I did not.
22       MR. MORRIS:  Let's look at the last
23  document, please.
24       (Exhibit 24 introduced.)
25  BY MR. MORRIS:

Page 274

Dondero - 5-28-2021

1
2    Q.  Do you recall that there came a time
3  just prior to the confirmation hearing that the
4  debtor amended its Liquidation Analysis?
5    A.  No.  Okay.  Yes.
6       MR. MORRIS:  Okay.  And if we could
7  go to the next page.
8  BY MR. MORRIS:
9    Q.  You'll see at the bottom right-hand
10  corner it's dated January 28th, 2021.
11       MR. MORRIS:  We wanted page up but
12  just -- yeah, page up, the assumptions.
13       Yeah, right there.
14  BY MR. MORRIS:
15   Q.  You see it's dated January 28, 2021?
16   A.  Yes.
17   Q.  Okay.  And let's look at Assumption
18  C.  It's been amended somewhat.
19       And it now says, quote:  "All demand
20  notes are collected in the year 2021; 3 term
21  notes defaulted and have been demanded based on
22  default provisions; payment estimated in 2021."
23       Do you see that?
24   A.  Yes.
25   Q.  Did you or anybody on your behalf

Page 275

Dondero - 5-28-2021

1
2  ever inform the Court that this assumption was
3  unreasonable?
4       MS. DEITSCH-PEREZ:  Object to the
5  form.
6    A.  Yes.  Well, Lynn wrote a letter to
7  all the counsels, which I think ended up being
8  put in the Court record, that the notes were
9  all subject to defenses and could not be
10  considered unencumbered, I think, if they're
11  sold, or whatever.  He was -- he was -- he --
12  he realized the attitude towards the notes had
13  shifted, and he penned something to everybody
14  and to make the notes so that they couldn't be
15  sold without notifying people that there were
16  good defenses to them.
17  BY MR. MORRIS:
18   Q.  Did you or anybody acting on your
19  behalf ever challenge this assumption in
20  connection with the debtor's confirmation
21  hearing?
22       MS. DEITSCH-PEREZ:  Object to the
23  form, asked and answered.
24   A.  Yeah.  I think Lynn's letter
25  objected to that vehemently.  It was just

Appx. 01683

Page 276

Dondero - 5-28-2021

```
1          Dondero - 5-28-2021
2  ignored.
3  BY MR. MORRIS:
4      Q.   Do you know anything else –
5  anything else you're aware of?
6      A.   I think that's powerful enough.
7      Q.   That's not my question, sir.  My
8  question is:  Are you aware of any other facts
9  that you're relying upon to answer my question
10 as to whether or not you or anybody acting on
11 your behalf informed the Court that Assumption
12 C is unreasonable?
13         MS. DEITSCH-PEREZ:  Object to the
14 form.
15     A.   Just the Lynn letter.  I have no
16 other specific awareness.
17         MR. MORRIS:  Thank you very much.  I
18 have no further questions.  Thank you so
19 much, folks.  Been a pleasure.
20         MS. DEITSCH-PEREZ:  Reserve until
21 trial.
22         (Time Noted:  1:59 p.m.)
23
24
25
```

Page 277

Dondero - 5-28-2021

```
1          Dondero - 5-28-2021
2          C E R T I F I C A T E
   STATE OF TEXAS      )
3                      )
   COUNTY OF ELLIS     )
4
5      I, Daniel J. Skur, a Notary Public
   within and for the State of Texas, do
   hereby certify:
6      That JAMES DONDERO, the witness whose
   deposition is hereinbefore set forth, was
7  duly sworn by me and that such deposition
   is a true record of the testimony given by
8  such witness.
       That pursuant to Rule 30 of the Federal
9  Rules of Civil Procedure, signature of the
   witness was not reserved by the witness or
10 other party before the conclusion of the
   deposition;
11     I further certify that I am not
   related to any of the parties to this
12 action by blood or marriage; and that I am
   in no way interested in the outcome of this
13 matter.
       IN WITNESS WHEREOF, I have hereunto
14 set my hand this 28th day of May, 2021.
15
16
17     _____
18     Daniel J. Skur
       Notary Public, State of Texas.
19      My Commission Expires 7/7/2022
       TSG Reporting, Inc.
20      228 East 45th Street, Suite 810
       New York, New York
21      (877) 702-9580
22
23
24
25
```

Page 278

Dondero - 5-28-2021

```
1          Dondero - 5-28-2021
2  ERRATA SHEET FOR THE TRANSCRIPT OF:
3  Case Name:
       IN THE UNITED STATES BANKRUPTCY COURT
4      FOR THE NORTHERN DISTRICT OF TEXAS
              DALLAS DIVISION
5  In re:             )
   HIGHLAND CAPITAL         )  Case No.
6  MANAGEMENT, LP,          )  19-34054 L.P.
   Debtor,          )  Chapter 11
7  ─────────────────────
   HIGHLAND CAPITAL MANAGEMENT,  )
8  LP,                          )
                                )
9      Plaintiff,       )  Adversary No.
   vs.                  )  21-03003-sgi
10 JAMES D. DONDERO,         )
   Defendant.          )
11 Dep. Date:  05/28/2021
   Deponent:  JAMES DONDERO
12
   Reason codes:
13 1. To clarify the record.
   2. To conform to the facts.
14 3. To correct transcription errors.
15         CORRECTIONS:
16 Pg. LN.  Now Reads    Should Read    Reason
17 ___ ___  _____   _____   _____
18 ___ ___  _____   _____   _____
19 ___ ___  _____   _____   _____
20 ___ ___  _____   _____   _____
21 ___ ___  _____   _____   _____
22 ___ ___  _____   _____   _____
23 ___ ___  _____   _____   _____
24 ___ ___  _____   _____   _____
25 ___ ___  _____   _____   _____
```

Page 279

Dondero - 5-28-2021

```
1          Dondero - 5-28-2021
2  ___ ___ _____   _____  _____
3  ___ ___ _____   _____  _____
4  ___ ___ _____   _____  _____
5  ___ ___ _____   _____  _____
6  ___ ___ _____   _____  _____
7
8
9      _____
              JAMES DONDERO
10
11 SUBSCRIBED AND SWORN BEFORE ME
   THIS _____ DAY OF _____, 2021.
12
13
   _____
14 (Notary Public) MY COMMISSION EXPIRES:_____
15
16
17
18
19
20
21
22
23
24
25
```

Appx. 01684

Page 280

```
1              Dondero - 5-28-2021
2           ——I N D E X——
3   WITNESS:    EXAMINATION BY        PAGE:
4   JAMES DONDERO
5        Mr. Morris        107
6
7         ——EXHIBITS——
8   Defendant's              PAGE/LINE
9   Exhibit 1   2/2/2020 Promissory Note   108/16
              2 pages
10
    Exhibit 2   February 2020 Highland    118/21
11           Capital Management, L.P.
             Operating Results
12              12 pages
13  Exhibit 3   8/1/2020 Promissory Note   121/8
              2 pages
14
    Exhibit 4   8/13/2018 Promissory Note   127/2
15              2 pages
16  Exhibit 5   August 2018 Highland      130/14
             Capital Management, L.P.
17           Operating Results
                9 pages
18
    Exhibit 6   12/3/2020 Demand Letter    132/11
19              3 pages
20  Exhibit 7   Defendant James Dondero's   136/8
             Original Answer
21              8 pages
22  Exhibit 8   Defendant James Dondero's   158/2
             Objections and Responses
23           to Highland Capital
             Management, L.P.'s First
24           Request For Admissions
                6 pages
25
```

Page 281

```
1              Dondero - 5-28-2021
2           ——EXHIBITS——
3   Defendant's              PAGE/LINE
4   Exhibit 9   Defendant James Dondero's   160/23
             Objections and Answers to
5            Highland Capital
             Management, L.P.'s First
6            Set of Interrogatories
                6 pages
7
    Exhibit 10  Defendant James Dondero's   169/10
8            Amended Answer
                8 pages
9
    Exhibit 11  Defendant James Dondero's   191/8
10           Objections and Responses
             to Highland Capital
11           Management, L.P.'s Second
             Request For Admissions
12              5 pages
13  Exhibit 12  Exhibit 20, Defendant     206/4
             James Dondero's Objections
14           and Answers to Highland
             Capital Management, L.P.'s
15           Second Set of Interrogatories
                7 pages
16
    Exhibit 13  Highland Capital          220/20
17           Management, L.P.'s
             Consolidated Financial
18           Statements and
             Supplemental Information
19           12/31/2020
                48 pages
20
    Exhibit 14  5/18/2020 Management      234/21
21           Representation Letter
                11 pages
22
    Exhibit 15  Highland Capital          237/3
23           Management, L.P.'s Consolidated
             Financial Statements and
24           Supplemental Information
             12/31/2018
25              46 pages
```

Page 282

```
1              Dondero - 5-28-2021
2           ——EXHIBITS——
3   Defendant's              PAGE/LINE
4   Exhibit 16  6/3/2019 Management       247/7
             Representation Letter
5               11 pages
6   Exhibit 17  12/13/2019 Summary of     247/20
             Assets and Liabilities For
7            Nonindividuals
                3 pages
8
    Exhibit 18   (Skipped by Agreement)
9
    Exhibit 19  12/13/2019 Statement of   255/11
10           Financial Affairs For
             Nonindividuals Filing
11           Bankruptcy
                42 pages
12
    Exhibit 20  10/31/2019 Monthly        261/4
13           Operating Report
                11 pages
14
    Exhibit 21  10/31/2019 Monthly        264/24
15           Operating Report
                11 pages
16
    Exhibit 22  December 2019 Monthly     270/2
17           Operating Report
                9 pages
18
    Exhibit 23  Exhibit C, Liquidation    271/19
19           Analysis/Financial
             Projections
20              8 pages
21  Exhibit 24  1/28/2021 Highland Capital  273/24
             Management LP Disclaimer
22           For Financial Projections
                7 pages
23
24
25
```

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-12    Filed 07/09/24    Page 106 of 200    PageID 22921

Index: $1..34

**$**

**$1** 214:7,19

**$11.7** 232:16 234:8

**$14.9** 241:23 242:16

**$150** 252:6

**$150.3** 252:21

**$2,000,000** 236:16

**$2.5** 121:20,23 122:4 127:24

**$3,825,000** 108:21 109:24 111:5,10

**$3.75** 259:21

**$3.8** 119:24 120:17

**$3.9** 233:9

**$5** 131:6

**$60** 268:13 269:6

**$63** 231:16

**$7.4** 257:16

**$7.8** 233:10

**$783,000** 270:18

**$8.8** 242:15

**$80** 196:14

**$9** 160:11

**$9.3** 253:8

**(**

**(1)** 264:6,19

**-**

**--------------------**
**EXHIBITS--------------**
**-----** 280:7 281:2 282:2

**-------I** 280:2

**0**

**0.2** 224:14

**05/28/2021** 278:11

**0bject** 211:5

**1**

**1** 108:16 120:5 163:23 165:9 192:19 197:10 200:3 207:15,23 208:7 215:21 218:3 219:20 234:10 253:18 278:13 280:9

**1(a)** 162:21

**1/28/2021** 282:21

**10** 169:10 281:7

**10/31/2019** 282:12, 14

**107** 280:5

**108/16** 280:9

**10:30** 151:15

**10:40** 151:15

**11** 191:7,8 251:23 262:25 278:6 281:9 282:5

**118/21** 280:10

**12** 206:3,4 280:12 281:13

**12-minute** 266:10

**12/13/2019** 282:6,9

**12/3/2020** 280:18

**12/31/2020** 281:19

**121/8** 280:13

**127/2** 280:14

**12:30** 204:20

**12th** 250:8

**13** 127:24 220:19,20 253:14 281:16

**130/14** 280:16

**132/11** 280:18

**136/8** 280:20

**13th** 254:4

**14** 159:20,24 226:9 234:21 281:20

**15** 237:3 281:22

**158/2** 280:22

**16** 136:18 137:6 232:9 247:7 282:4

**160/23** 281:4

**169/10** 281:7

**17** 217:10 221:5 247:20 282:6

**18** 148:11 199:7 217:11 232:13,24 254:25 255:5,6,9 282:8

**18th** 222:13 232:8 235:13

**19** 199:10,12 244:18 254:25 255:10,11 257:4 282:9

**19-34054** 278:6

**191/8** 281:9

**1:30** 204:20

**1:59** 276:22

**1st** 121:19,24 160:17 232:12

**2**

**2** 108:20 109:22 110:16,18,19 118:20, 21 122:7,10 128:3,5 184:10 232:24 256:14 280:10,15

**2.5** 131:11

**2/2/2020** 280:9

**20** 144:6 149:11,12, 13 261:4 281:13 282:12

**2000** 195:12

**2015** 225:12

**2017** 221:17 222:3 223:6 224:11,22 225:24 226:7 237:18

**2018** 108:20 109:22, 25 110:18 111:8 115:13,14 119:12 120:14,17 121:19,24

127:24 130:21 131:5, 12,17,20 143:15 194:9 221:8 222:13 226:19 232:8,13,24 233:12 234:11 235:13 237:6 238:6, 24 239:10 241:23 242:10 243:23 244:21 280:16

**2019** 148:10 152:9, 11,14 153:8 154:5,10 155:10 156:12,18 157:13 172:17 173:19 174:22 189:23 192:20 197:24 198:3,11 208:10 212:20 213:10 214:5,17 215:4,16 216:4,8 237:11 239:2 240:10 244:3,16,22 245:4 247:23 250:8 251:17 254:4 256:23 257:14 265:5 270:10 271:2 282:16

**2020** 132:22 133:4,21 143:11,22 146:7 147:10 149:23 151:5 154:12 155:11 160:17 225:2,12 263:8 272:22 280:10

**2021** 107:10 136:18 137:7 149:24 159:12, 25 272:25 274:10,15, 20,22 277:14 279:11

**206/4** 281:13

**21** 264:24 282:14

**21-03003-sgi** 278:9

**22** 269:21 270:2 282:16

**220/20** 281:16

**228** 277:20

**22nd** 159:25

**23** 271:19 282:18

**234/21** 281:20

**237/3** 281:22

**23rd** 270:17

**24** 273:24 282:21

**247/20** 282:6

**247/7** 282:4

**24th** 272:21

**255/11** 282:9

**261/4** 282:12

**264/24** 282:14

**270/2** 282:16

**271/19** 282:18

**273/24** 282:21

**28** 274:15

**28th** 107:9 159:11 274:10 277:14

**2:00** 246:22

**2nd** 109:25 111:8 234:11 261:21

**3**

**3** 121:7,8 233:8 244:22 274:20 278:14 280:13,19

**3.8** 120:4

**3.825** 233:4 234:9

**30** 277:8

**30(b)(6)** 195:9

**31** 223:6

**31st** 221:17 222:3 224:11 237:6 238:6 239:10 243:23 244:21

**32** 217:11

**33408** 235:3

**33419** 247:10

**33424** 237:8

**33451** 240:15

**33461** 243:15

**33470** 221:21

**33499** 223:21

**33510** 232:2

**34** 257:5

**3471** 223:3

**35** 204:24 205:14

**3rd** 132:14,22 237:11

---

**4**

**4** 126:25 127:2 162:16
191:18 200:6,13,21
207:12 256:18
280:14

**40** 141:20 143:9
151:22 152:16 153:9
163:3 170:15 171:22
173:7 174:11,17
176:7,16,23 179:9,19
180:2,8,12,17,25
181:9,20 183:6
185:21 186:17
187:12,15 190:5

**45** 200:16

**45th** 277:20

**46** 281:25

**4:00** 266:11

---

**5**

**5** 130:12,14 138:7
139:8 269:15,19
270:4 280:16 281:12

**5-28-2021** 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1

168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1

**5/18/2020** 281:20

**56** 254:9

---

**6**

**6** 132:10,11 141:16
162:16 170:9 207:12
262:24 280:18

**6/3/2019** 282:4

**60** 267:24

---

**7**

**7** 136:7,8 280:20

**7.4** 259:3

**7/7/2022** 277:19

**70** 196:13 267:22

**71** 251:25

---

**8**

**8** 114:6,10 141:17
157:25 158:2 170:9
280:21,22 282:20

**8/1/2020** 280:13

**8/13/2018** 280:14

**80** 267:22

**810** 277:20

**877 702-9580**
277:21

---

**9**

**9** 160:22,3 177:8
186:13 235:2 267:25
269:16,19 281:4

**9:33** 107:10,17

---

**A**

**a.m.** 107:10,17

**ability** 123:5 126:7
148:17 187:7 269:3,5

**absolutely** 176:9

**accelerate** 123:11

**accept** 133:10

**accordance** 107:6

**account** 160:16
242:14

**accounted** 120:25

**accounting** 116:24,
25 117:5 118:15
119:17 120:22
123:24 124:11,17,23

**accounts** 234:7
253:19

**accrued** 128:16

**accurate** 163:24
165:6,14 166:13,17,
18 193:3 194:7
226:3,6 232:19
233:20 238:8 242:19

**accurately** 142:3
148:7 163:9 207:23
233:23 262:19

**Acis** 248:20

**acted** 145:3 155:12
174:10,15

**acting** 127:22 134:5,
13,21 150:18,23
157:13 202:19
203:17,18 271:23
273:3,9 275:18
276:10

**action** 158:9 277:12

**add** 142:12

**added** 170:18,22

**addition** 261:8

**additional** 177:15
182:8 183:23 184:13
187:7

**addressed** 132:14

**admission** 158:13
159:20,24 192:11,19
197:10 200:3,13
201:5,22

**admissions** 191:15
280:24 281:11

**admit** 159:24 192:4,
19 200:22

**admitted** 160:8
193:2 198:2

**adopted** 179:24

**adversary** 134:16
137:9 257:24 258:17
269:14 278:9

**advice** 179:3

**advisement** 215:18

**Advisors** 224:13
228:12,16 235:12
257:11,15

**Affairs** 255:15
282:10

**affiliate** 241:13 259:4

**affiliated** 196:13
231:5,14 267:23

**affiliates** 209:7,21
210:13 223:8,13
224:3,4,19 238:11,19
240:19,25 263:13,16
266:20 267:19

**affirm** 129:12

**affirmative** 141:21
147:16,19,22 170:12

**afternoon** 205:19

**aggregate** 130:10
177:9 196:12 241:22
252:5,19 257:16

**agree** 114:12 128:6
130:7 139:14 142:5,
18 143:2 150:24
152:21 198:20 214:4,
16 222:10,11 249:20,
21 272:5

**agreed** 141:23
143:23 145:14,15
146:3 150:19 157:15
164:14 219:17

**agreement** 128:19
143:8 144:10,15,19
145:4 147:3,9,17,23
148:4,12,16 151:20
152:4,15 153:8
154:4,7,15,19 155:3,
4,21 156:8,10,16,17,
23,24 157:7,11,15,20
162:20,25 163:2,5,
11,14,18,21,25
164:10,13 167:20
168:2 173:6,8,18
174:10,16,23 175:3,
4,7,19 176:6,8,10,15,
22 178:19 179:4,9,
18,25 180:7,11,16,24
181:8,19 182:3 183:5

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 172-12   Filed 07/09/24   Page 108 of 200   PageID 22923
Appendix Part 2 Page 793 of 1338

Index: agreements..belief

184:17 185:21
186:17 187:11,14,23
188:6 190:5 198:23
199:16 207:17,25
208:9,21 211:2
212:8,15,19 214:3
216:2 217:2,6,25
218:16,23 219:16
220:5,12 231:3,7
238:25 239:10,17
240:9 242:24 243:25
244:13,14,15 245:3
267:9 273:11,17
282:8

**agreements** 114:15
143:5 155:9 156:15
164:23,24 165:11
169:4 177:17,18
178:25 260:24
268:25

**ahead** 190:10 195:17

**allowed** 168:12

**ambiguous** 200:9,
20,25 201:10,25
202:9,21 203:11,20

**amend** 193:10
254:17

**amended** 142:8,12,
16,17 148:14 152:16,
17 153:10,22 154:2,3
164:20 169:12
171:21 200:8,16,22
254:3 274:4,18 281:8

**amendment** 168:6
172:19 243:3

**amicable** 135:10

**amount** 108:20
111:14 121:19
123:20 124:8,13,19
127:24 160:2,6,9,11
184:20 185:23 186:3,
9,12,21,22 187:6
193:24 196:12
211:23 213:17
214:19 231:15
232:15 233:25
241:12,22 252:5,19,
20 253:7 257:16
260:2 268:13 270:18

**amounts** 120:10
123:10 160:15

**analysis** 112:13,18
271:15 272:2,9,22
274:4

**Analysis/financial**
282:19

**and/or** 192:22 197:11
198:5,12 199:12
209:6,7,20 210:11,12

**announcement**
188:18

**annual** 226:10

**answers** 139:15
161:4 162:4 164:20,
21 207:2 281:4,14

**apologies** 168:23

**apologize** 164:7
181:15 204:10
205:11 233:3

**application** 197:9,
14,19

**applied** 192:21
198:5,16

**applying** 199:25

**approval** 127:12
141:15

**approve** 159:14
174:10 240:22 241:5,
13

**approximate** 253:7
268:13 270:17

**approximately**
160:11 196:13
225:11 226:9 252:6

**April** 159:11

**arbitration** 115:11

**argue** 245:18

**argument** 140:21

**arisen** 199:6

**arrangement** 183:2

**ashamed** 264:2

**Asia** 254:22

**asks** 159:24 192:19
200:21

**aspect** 135:18
208:17,20 216:19
218:23 246:2

**assert** 157:12

**asserted** 200:9

**asserts** 141:21
160:10 200:20

**asset** 120:14 212:6

**asset all** 238:10

**assets** 177:3 187:19,
20,25 188:13 190:19,
22 209:24 210:14
212:2 213:24 216:23
223:13 250:7,15
251:16,24 263:12
266:20,25 267:19
282:6

**assigned** 149:16
154:13

**assistant** 109:4
124:22,23

**assumption** 165:24
273:5,18 274:17
275:2,19 276:11

**assumptions**
272:16,23 274:12

**assure** 205:20

**attention** 129:6
141:19

**attitude** 275:12

**attorney-client**
171:16

**attorneys** 159:17

**audio** 109:7 196:21,
25 245:21

**audit** 234:14 237:11,
18 242:19

**audited** 221:9 222:22
227:11 233:19
236:21 237:5,23
238:17,24 239:8
245:9,15 247:22
263:18

**auditing** 235:20

**auditor** 233:17

**auditors** 220:24
221:25 222:22
237:22

**August** 121:19,24
127:24 130:21 131:5,
12,17,20 280:16

**authority** 127:15
260:5

**authorize** 109:6
137:3 159:16 170:5
192:14 240:22
241:14

**authorized** 124:25
125:7 130:2 248:7,11
261:22 262:7

**award** 115:11

**aware** 112:2 113:3
131:19,23 133:21
151:23,24 158:8
159:7 180:4 193:12
196:12 218:5 221:11
223:24 224:9 229:8
241:12,15 249:23
255:13 256:22,23
261:6,11 262:23
276:5,8

**awareness** 110:3
119:22 120:10 141:7,
13 188:25 189:3,7
276:16

_____

**B**

**back** 109:18 110:23
115:12 136:16 138:5
151:14,15 162:8
163:2,17 186:25
188:8 195:11 200:11,
17 204:24 206:18,21
236:4 246:17,25
252:25 266:10,16
267:20,21,22,24
269:5

**backed** 259:9

**backing** 268:5

**bad** 209:22

**balance** 119:14,20
120:14,19 131:4
177:3 223:5,13
238:5,9,18

**bank** 131:4

**bankruptcies**
248:18

**bankruptcy** 145:19
146:14 147:5 148:19
154:12 155:8 157:3
165:23 166:9,10,11
173:15 247:24 248:4,
8,14,17,21 249:3,25
251:13 253:5 256:20
257:2 259:22 261:7
262:16 278:3 282:11

**bargain** 144:4,12
147:2 149:21

**barred** 141:22

**based** 110:18 188:4
274:21

**basis** 119:19 211:12,
22 212:6 215:22
225:11 270:22

**Bates** 223:20 235:3

**bathroom** 151:10

**begging** 168:21

**beginning** 157:2
214:14

**behalf** 107:23 109:5
125:2,8,16 127:15,23
128:11,15,25 130:18
134:6,14,22 135:6
136:2 137:4 141:12
144:15 145:3 146:24
150:18,23 157:13
161:5 163:11,25
164:11,13 165:10,11
167:10,21,25 169:13
170:3,6 171:10,23
173:19 174:15,23
191:23 192:12,16
198:4 202:19 203:17,
18 235:11 244:14
250:16 271:24 273:4,
10 274:25 275:19
276:11

**belief** 200:24 201:9,
24 202:8,20 203:6,

Index: believed..connection

10,19

believed 188:8 273:4

beneficiary 230:9,14

benefit 182:25
183:14 184:4 185:3,
9,20

benefits 186:16

bet 137:25

betrayed 149:15

big 213:24

bit 132:16 138:5
158:6 160:25 204:8
236:12 261:17 265:9

blood 277:12

board 148:20

bona 125:5 267:5

Bonds 137:3,7

book 211:16,17

borrow 124:16

bottom 119:23 131:5
222:5 228:4 241:17
257:8 274:9

bounced 217:9

box 270:6

Boy 142:21

Brad 261:22

break 151:10,11
168:13 204:5,11
205:10 246:7

breath 240:2,5

Briefly 272:10

broader 179:16

broke 196:22

bucks 186:13

bunch 141:3 217:19

burden 205:12

business 116:13
135:7,14

busy 173:2

**C**

call 116:4 152:21
163:17 233:9 234:19
271:17

called 116:13 136:13
255:14 261:9

calls 267:10

capacity 196:18
235:12 265:20

Capital 111:4,9
115:5,20 118:25
121:23 132:18
148:15 166:5 207:2
224:13 228:12,24
257:11,15 278:5,7
280:11,16,23 281:5,
10,14,16,22 282:21

capitulation 149:25

capture 164:22
209:17 210:8 217:22

captured 172:18

captures 153:15
209:2

care 262:15

carefully 125:20
155:19

Carl 217:12

carried 120:18
231:15

carry 223:12 238:9

carrying 238:18
264:10

case 142:21 186:20
195:10,22 244:11
249:25 251:13 253:5
256:20 257:2 278:3,5

cash 110:5 193:21,23
196:3 197:18

catches 138:15

caused 216:9

caution 138:13
171:13

cautioned 107:14

CCS 210:21

CEO 114:21 115:17
116:11 117:10
120:17 132:17
220:22 223:11 248:4
256:9 259:3 262:6,13

certify 161:24 277:5,
11

CFO 117:4 256:2

challenge 275:19

chance 217:13

Chapter 278:6

character 193:16

characterize 122:11

characterized
110:20

charged 119:18

chase 108:4

Chief 261:23

choices 258:8

circumstances
187:16

Civil 277:9

claims 141:22

clarification 142:15

clarified 171:2
172:19 173:4

clarify 175:16 190:17
278:13

Class 148:14 164:15
165:17,18 168:3
173:11,18 174:9
260:9,16,19

clause 114:8 222:21

clear 112:17 174:4

clearer 116:7

close 127:13

closely 111:25 112:3

closes 188:20

coach 168:14

Coast 204:20

code 262:16

codes 278:12

collect 112:5 141:24
142:6,19 143:3,23
144:11,17 145:5
147:4,24 150:19,25
157:8,16 163:6,20
219:18

collectability 243:7

collected 272:24
274:20

collectible 268:22

combination 144:25

comfortable 194:24
257:25

commencement
134:15,24

comment 113:19
165:2,3 233:17
262:12

Commission 277:19
279:14

committee 115:4
152:6

commonly 114:7

communicate
190:12 201:14

communications
138:14,19 171:16
172:7,10

comp 148:10 174:14
186:5,7,10

companies 210:4,5,
18

company 183:24
209:6,19 210:11
264:4

compared 170:17
260:24

compensate 260:20

compensation
152:6,8 177:10,15
182:9,16,18 184:12,
14,15 185:5,15,23
187:3,9 260:5,14

complaint 135:25

complete 171:2

completely 262:19

completeness
142:15

completion 239:8

complexity 216:6
217:4

compliant 177:11,16
194:23,25 195:3

comply 128:11 130:8

concern 115:14

concerned 217:17

conclusion 219:7
277:10

conclusively 219:24

condition 145:15
155:9 199:10

conditions 113:23
122:16 123:5 142:13
144:23 148:8,17
152:3,4 153:11
170:19 172:15,16
176:9 181:5 182:21
188:16,19,22,24
189:15 199:5 207:16,
24 208:8,21 211:8,19
212:2 216:20,22
218:2 219:18 243:6,
11 267:8

conducted 107:6

confident 246:18

confirm 163:22
247:10

confirmation 272:3
274:3 275:20

confirming 270:23

conflict 114:16

conflicts 198:22

conform 278:13

confusing 115:24
255:4

connection 149:19
158:9 179:8,17

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-12    Filed 07/09/24    Page 110 of 200    PageID 22925
Appendix Part 2    Page 2 of 33    Page 110 of 200

Index: considerable..DEITSCH-PEREZ

194:19 238:23 249:24 271:13 275:20

**considerable** 271:25

**considerably** 217:9

**consideration** 185:3

**considered** 190:23 210:5 275:10

**consistent** 123:24

**consistently** 273:7

**Consolidated** 221:15 222:19 223:5 237:16 238:5 281:17, 23

**constraints** 205:8,9

**contacted** 174:7

**contained** 128:6 272:23

**contemplating** 189:24

**contend** 156:11

**contents** 136:24

**context** 129:15 146:11

**continued** 238:9

**continuous** 225:11

**contract** 112:14

**Contribution** 231:3, 6

**control** 114:14 115:15 187:24 188:4 215:23 216:9,24 231:19 250:11,19 270:11 271:3,24

**controlled** 114:24 228:9,14,18,22 229:2

**controls** 209:18 259:5

**conversation** 139:17,24 140:23 145:13,17,21 147:8 152:24 168:9 175:8, 23 177:24 190:9

244:4 258:20

**conversations** 135:7,16,19 146:6,25 176:19 177:25 178:4, 12,16 202:13

**copies** 179:12 245:13,22

**copy** 180:6 245:24

**corner** 274:10

**Cornerstone** 177:5 189:4 209:13 211:3, 18 212:21 214:6,18 217:16

**correct** 114:22 128:25 129:10 133:19 147:20 162:5 165:6 166:25 167:9, 15 178:13,14 185:13 193:20 194:9,12 195:22 197:2,3,6 199:7 207:8 209:24 212:4 214:24 223:16 229:21 237:18,23 238:20 242:11 243:4, 8,12,23 244:3,16 248:5,8,11,20 250:12 252:21 253:24,25 257:21 259:22 265:12 266:21 271:6 278:14

**CORRECTIONS** 278:15

**correctly** 167:22 192:24 236:17 257:17

**cost** 190:23 191:2,3 211:16,17 212:10,21 213:3,10,16,17,22,23 214:7,20

**counsel** 138:14

**counsels** 275:7

**counterparty** 173:13

**counterproposal** 178:21

**COUNTY** 277:3

**couple** 177:25 234:24 259:2 266:11

**court** 138:11 140:25 205:5 251:17 262:9 273:4,10,17 275:2,8 276:11 278:3

**covenants** 177:11, 12

**cover** 119:4 244:21

**COVID-19** 107:8

**CPA** 120:22 227:21

**create** 193:25 250:22

**created** 229:21 230:21

**credit** 177:11,17

**CRO** 132:17

**cross-transaction** 268:16

**Current** 107:7

**customary** 235:24 237:22

**cut** 108:4

**cycle** 174:14 186:6

**D**

**Dallas** 107:12 278:4

**Daniel** 277:4,18

**date** 107:9 110:15 143:13 215:10,11,12 222:6 232:13 244:22 253:12,14 260:6,18 271:2 272:19 278:11

**dated** 108:19 132:14 232:7 261:21 270:17 274:10,15

**dates** 225:14 268:14

**day** 107:9 277:14 279:11

**Daylight** 107:10

**Deb** 175:14

**Deborah** 118:7 145:18,20 258:8

**debt** 186:19 187:6

**debtor** 107:23

109:25 112:5 114:12 115:21 116:2 132:5, 22 133:4,22 134:3 135:14 144:16 145:3, 9,16 146:8,25 148:25 149:9 150:11,18,24 152:14 154:16 155:4, 8,11 156:9 157:2,14, 15 158:8 160:2,9,10, 16 163:12 164:2,6 165:12,19,20 166:5, 10 167:12,21 168:2,3 173:19 174:24 181:9, 13 182:14 183:14 185:4,9,14 186:19 189:3 192:21 200:23 201:8,23 202:7,19 203:5,9,17 212:22 213:12 219:17 220:11 227:25 245:8, 10 249:18,21,23 250:12 255:13 257:14 259:10 261:8 265:23 266:4,19,24 267:11 268:11 270:11,14 271:3,6,14 272:22 274:4 278:6

**debtor's** 134:6,14,22 135:20,25 158:12 161:5 191:14 250:4, 7,15,22 251:6,12 254:2,17 255:17,21 261:13 266:21 267:18 272:2,9 275:20

**debtors** 249:2,13

**decade** 217:10

**December** 132:14, 22 133:4,21 160:17 192:20 197:24 198:3, 11 199:11 221:17 222:3 223:6 224:11 237:6 238:6 239:10 243:23 244:21 250:8 251:17 253:14 254:4 256:23 261:21 263:9 270:10,17 271:2 282:16

**decide** 212:11

**decided** 124:12 197:20 212:5 216:21

**decision** 124:7

197:17,23 198:17 212:7 259:25

**decision-maker** 173:14

**deeply** 141:14 219:5

**default** 274:22

**defaulted** 123:9 274:21

**Defendant** 136:13 137:7,15 141:21 200:19 278:10 280:20,22 281:4,7,9, 13

**Defendant's** 206:25 280:8 281:3 282:3

**defense** 141:21 142:9 143:20 147:16, 19,23

**defenses** 140:21 141:4 170:12 275:9, 16

**defined** 110:14 143:16 212:9

**definition** 128:7 160:5 166:4 236:23

**DEITSCH-PEREZ** 109:12 112:10,23 113:5,16,25 115:23 116:6 118:2 120:7 123:12 125:17,25 126:11,20 131:25 134:8,17 135:2 137:22 138:12 139:2, 6,14,21 140:3,9 143:4,14 145:7,14,19 146:2,10,12,17 151:3,13 152:18,25 155:6,23 156:19 158:19 161:11 167:2 168:4,15 169:14,16 170:23 171:11,24 172:2,6 173:21 175:6,13,15,21,25 180:18 181:12 183:15 184:8,22 185:25 189:17 195:7, 23 196:8 197:15 198:25 199:18 201:12,15 202:2,10, 22 203:12,21 204:12,

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 12 Filed 09/24/12 Page 111 of 200   PageID 22926
Appendix Part 2   Page 796 of 1336

Index: delivered..early

17 205:6 208:2,11,23
210:15 211:5 212:25
213:14 214:9,22
215:17 216:11
218:18,25 219:21
220:6,13,25 224:5
227:2,15 229:22
230:5,15,22 233:13
238:13 239:3,12,19,
25 240:4,11 241:2
242:4 244:6 245:6,19
246:4,8 248:15,23
249:5,14 250:23
251:7 252:22 254:6,
12 255:3 257:22
258:12,19,21 263:20
264:13 267:3,13
268:2 269:8,12
270:20 271:7 273:12,
19 275:4,22 276:13,
20

**delivered** 117:18
133:11

**delivery** 150:10

**demand** 110:9,12,
14,19 111:3,14
122:11,15,16,20
123:6,9 128:7,17,25
129:4,5,8,10 132:6,
22 133:4 134:3,6,14,
22 135:20 149:9
150:10 181:10,22
182:4 226:14 272:24
274:19 280:18

**demanded** 133:22
149:2 274:21

**denied** 201:4

**denying** 125:5
201:21 245:12
270:23

**Dep** 278:11

**department** 119:18
224:20,22,25 225:6,
10 233:17

**depended** 268:24

**depending** 187:3

**depends** 166:21

**depo** 166:7

**Deponent** 278:11

**deposition** 107:3,5,
24 139:22 146:18
195:9 204:14 226:22
255:2 258:6,16
277:6,7,10

**describe** 110:11
175:5 176:3,20 243:6

**describing** 118:24
146:9 178:4

**description** 164:5

**deserved** 150:4

**detailed** 141:15

**details** 138:18 173:4
194:6 234:3

**determine** 260:5

**determined** 259:24

**difference** 234:8
242:14,22

**differently** 157:10
173:5

**difficulty** 108:7

**direct** 110:3 206:7
258:10

**directed** 168:24

**directing** 141:19

**direction** 234:2,6

**directly** 209:6,20
210:12 228:8,13,17,
21 229:2 231:18,24

**disagree** 272:5

**Disaster** 107:8

**Disclaimer** 282:21

**disclose** 138:14
171:15 172:6 256:24

**disclosed** 227:12
253:4

**disclosing** 232:14

**disclosure** 240:24
241:11 242:17,23
253:15 271:13

**disclosures** 249:3,
11 250:22 251:6,13
255:14 262:15

**disco** 246:10

**discover** 171:21

**discovery** 158:9

**discuss** 117:23
175:2 176:5 182:24
213:9 251:11

**discussed** 175:17
177:20,23 178:17
189:22

**discussing** 184:24

**discussion** 142:23

**discussions** 148:23
156:14 176:21 179:8,
18

**dispose** 211:18

**disposed** 211:11

**disposition** 209:5
216:22

**distinguish** 145:15

**distortion** 109:7
196:21,25 245:21

**DISTRICT** 278:4

**DIVISION** 278:4

**docket** 136:18 253:5

**document** 108:10,18
109:19,21 110:17,24
111:8,13 116:13
124:20 125:23 126:4,
9 127:8,10 128:24
129:18,24 130:20
136:12,17,21,24
137:4 138:25 140:18
141:9,11 151:22
153:14 158:15 159:5,
10,17 161:21,25
162:9,11 165:4,5
169:9,23 170:25
176:12,13,14 191:7,
22 192:15 198:9
206:8,25 207:12
235:2,19 237:2
245:17 246:12 247:5,
19 253:22 261:3,9
263:4 264:23 269:23,
24 271:18 273:23

**document--can**
137:13

**documents** 108:6
122:21 130:17 169:3
179:7,17 180:10
215:14

**dollars** 226:10

**Dondero** 107:1,4,13,
20 108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1,21
144:1 145:1 146:1,24
147:1 148:1 149:1
150:1 151:1 152:1
153:1,6 154:1 155:1
156:1 157:1,22 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1,12 166:1
167:1,12,21 168:1,23
169:1 170:1 171:1
172:1 173:1 174:1,4
175:1 176:1,3 177:1
178:1,10 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1,17
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1,8
205:1,9 206:1,6
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1,15
216:1 217:1 218:1
219:1 220:1 221:1
222:1,6 223:1 224:1
225:1,18 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1,18 242:1
243:1 244:1 245:1,12
246:1 247:1 248:1
249:1 250:1 251:1

**Dondero's** 136:13
137:8,15 215:22
216:24 280:20,22
281:4,7,9,13

**double-checking**
235:21

**doubtful** 253:18,23
254:4,18

**drafted** 122:17
148:11

**drafting** 141:15

**DSI** 250:18,20 251:4
256:12

**due** 123:10 129:10
132:23 133:23
150:13 160:10
166:23 188:9 192:22
195:20 197:11 198:6,
12 223:8,12 224:3,
12,19 226:8 231:16
238:10,19 240:19,25
241:12 263:12,16,18
266:20 267:19

**dues** 268:16

**Dugaboy** 164:16
173:16,20,24 174:12,
16,19,21 215:4,16
229:16,20 230:3,10,
14,20

**duly** 107:14 277:7

---

**E**

**earlier** 122:12 128:8
163:16 173:12 225:7,
13 237:18 247:15

**early** 142:21 148:10
152:9,10 173:19
205:19

**easiest** 193:22

**East** 204:20 277:20

**effort** 183:23

**electronic** 261:20 262:2

**Ellis** 137:3,7 277:3

**email** 117:21 190:13

**Emergency** 107:7

**employed** 220:10

**employee** 220:4

**employees** 124:3 183:25 227:14

**encourage** 129:23

**end** 144:7 149:11 159:2 224:22 225:2, 12 226:7 234:17 253:19

**ended** 217:7 275:7

**ending** 222:3 224:11 237:6,8 238:6 239:9 243:22 265:5

**enter** 157:14 164:10 173:8 174:16

**entered** 143:9 144:15 147:3,9 148:4 152:5 156:11,17 157:12 163:10,25 165:11 167:20 168:3 173:18 174:23 180:15,25 187:23 188:5 207:18 208:10 216:3 231:6 238:25 267:9

**entering** 179:3 180:11 185:20 186:16

**enterprise** 188:5

**enterprises** 183:8

**entire** 135:11 227:7

**entirety** 177:24 244:20

**entities** 271:24

**entitled** 130:20 150:4,6 182:11

**entity** 115:7 116:2 193:23 228:13,17,21, 25

**entries** 257:10

**envisioned** 216:8

**equal** 214:19 268:17

**equity** 210:18

**equivalent** 184:20

**ERRATA** 278:2

**errors** 278:14

**essentially** 181:25 268:17

**established** 148:9

**estate** 135:12 149:15 154:23 155:14 157:5 166:2 189:12 266:21 267:2 268:9

**estimated** 274:22

**evaluate** 125:19

**evaluated** 253:19

**eve** 149:25

**event** 172:18 187:7 189:24

**Events** 232:10 243:18 244:20

**evidently** 164:22

**exact** 187:8

**exactness** 187:2

**EXAMINATION** 107:18 280:3

**exchange** 110:5 122:3 123:22 257:20

**execute** 123:21 124:9

**executed** 165:13

**execution** 226:13

**exhibit** 108:15,16 118:19,21 120:5 121:7,8 126:24 127:2 130:12,14 132:10,11 136:7,8 157:25 158:2 160:22,23 169:10 191:8 204:3 206:3,4

**entity** 220:19,20 234:10,20, 21 237:3 247:7,20 252:8,15 254:23 255:11 261:4 264:24 269:20 270:2 271:19 273:24 280:9,10,13, 14,16,18,20,22 281:4,7,9,13,16,20, 22 282:4,6,8,9,12,14, 16,18,21

**exist** 165:20

**exists** 156:23

**expect** 262:14,18

**expected** 128:18 188:2

**experience** 222:23 235:25 248:18,20

**expert** 227:23

**Expires** 277:19 279:14

**explained** 240:5

**extent** 156:25

**extra** 184:2

**extremely** 233:20

**eye** 138:15

**eyeball** 137:23

**F**

**face** 252:20

**faces** 268:3

**facilitates** 218:12

**fact** 113:15 114:6 122:2 135:11 159:16 162:11 195:19 198:2 209:17 221:7 256:5 266:24 268:20

**facts** 112:19 172:11, 12 178:9 207:6 276:8 278:13

**factual** 112:20 212:11,12

**failed** 262:22

**fair** 111:2 113:4 114:25 115:22 116:8

**finalized** 238:17

**financial** 221:9,15 222:2,19,22 223:25 224:10 225:22 227:11 233:18,19 236:21 237:17,23 238:24 239:9 243:21 245:8,9,15 246:3 249:12 251:6,12 255:15 262:15 263:19 281:17,23 282:10,22

**financials** 116:17, 19,23 118:4 233:24 237:5 238:17 247:22

**find** 139:9

**fine** 138:20,21 151:16 152:22,23 153:2 167:4 246:4 255:8 259:16

**finish** 146:4,5 156:7 239:23 266:12

**finished** 109:11 240:3 246:24

**firm** 159:11

**fit** 246:16,18

**focus** 182:7 183:3, 11,12,17,23 184:2,6, 25 185:11 241:17

**focused** 177:4 182:13 183:7,18

**folks** 124:17 276:19

**follow-up** 126:7

**footnote** 253:17 264:6,19

**for-** 219:8

**forgive** 182:19 189:8 190:2,25 212:22 213:12 214:20

**forgiven** 148:18 176:25 177:15 184:19 190:21 194:16,20 195:6 197:6 214:8 218:6 219:7 227:22 229:10 243:11 267:5

**forgiveness** 148:9

**familiar** 110:8 139:8, 10 231:5

**familiarity** 248:14

**favor** 121:3,20 194:11,16 195:5,21 196:6 197:5 226:15 233:11 259:9 270:14 271:5

**favorable** 177:2 190:24 211:11,22 212:6

**February** 108:20 109:22,25 110:18 111:8 115:13,14 119:12 120:14,17 152:14 153:7 154:5, 10 156:12,18 157:13 189:22 208:10 212:20 213:10 214:5, 17 215:4,16 216:4,8 234:11 239:2 240:10 244:3,16,18 245:4 280:10

**Federal** 277:8

**feel** 167:24

**fide** 125:5 267:6

**fighting** 273:7

**figure** 246:25

**file** 137:4 192:15 262:8

**filed** 135:25 136:17, 21,25 137:7 141:11 169:13 170:2,5 171:10,23 172:13,22 191:22 192:11 248:3 249:24 250:2,4,8 251:16 255:14 261:9 263:7 265:23 266:4 272:22

**files** 247:23

**filing** 248:8,11 282:10

**fairness** 258:15

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6 Part 2 Filed 09/04/22 Page 113 of 200   PageID 22928
Appendix Part 2 Page 794 of 1338

Index: forgo..includes

154:17 177:10 182:6,
16 184:12,14 186:18
187:6 194:22 213:5
218:12 227:12

**forgo** 184:19

**form** 112:11 118:9
123:13 134:9,18
135:3 151:3 152:19
155:7 156:20 170:24
171:12 173:22
182:15 183:16 184:9,
23 186:2 189:18
195:24 196:9 197:16
199:2,19 201:16
208:3,12,24 210:16
211:6 213:2,15
214:10,23 216:12
218:19 219:2,22
220:7,14 221:2 224:6
227:3,16 229:23
230:6,16,23 233:14
238:14 239:4,13,20
240:12 241:3 242:5
244:7 248:16,24
249:6,15 250:24
251:8 252:23 254:7,
13 255:16 263:21
267:4,14 270:21
273:13,20 275:5,23
276:14

**forward** 157:22

**foundation** 112:24
113:6,17 114:2 120:8
125:18 126:2,12,21
132:2 201:16 202:3,
11,23 203:13,22

**fourth** 148:14

**frame** 205:21

**Frank** 117:2 217:24
218:4,5,15,24
224:23,24 225:5,9
235:15 255:25
256:10,11

**front** 161:22 162:12

**fulfilled** 181:6

**fulfillment** 170:19
172:14

**full** 149:13 195:19
241:11

**fully** 207:23 245:22

**Fund** 217:18 224:13
228:12 257:11,15

**funds** 209:8 210:13

**future** 185:15,22
186:20 187:9

---

**G**

**GAAP** 120:22 267:16

**gave** 153:12 154:11
179:11 196:2 245:21

**general** 219:5 235:13

**generally** 118:4
133:25 169:24
249:16

**get all** 214:12

**give** 113:7 123:20
168:13 180:5 241:10
246:7,22 249:11
259:5 266:9

**giving** 177:22 179:16
184:25 185:4

**global** 149:14

**good** 107:20 204:4
213:23 275:16

**grand** 144:4,12 147:2
149:20

**Grant** 215:3

**great** 122:18 182:14
213:23

**group** 197:21

**grow** 187:4

**guess** 144:24 156:24
186:24 204:14
247:10

**guest** 146:19

**guys** 193:14 264:2

---

**H**

**half** 204:19 217:17
226:10 232:24

**hand** 277:14

**handle** 197:18

**handwritten** 261:21

**happened** 146:13
177:25

**happy** 129:17 137:13
161:13 168:20
200:17 204:6,10
234:23 241:10
245:23

**hard** 246:22

**have/would** 182:9,
10

**HCM** 116:4

**HCMLP** 111:14
115:21 116:11,12
117:10

**HCMLP's** 119:13

**HCRE** 228:20

**head** 214:13 219:13
224:21,25 225:6,10
260:23

**headed** 119:13

**heading** 223:17

**hear** 140:3 244:8

**heard** 255:16

**hearing** 274:3
275:21

**heightened** 182:13
183:17,18 184:6
185:11

**held** 151:18 205:25
268:12

**helpful** 163:18

**hereinbefore** 277:6

**hereunto** 277:13

**herewith** 114:16

**Highland** 111:3,9
114:21,24 115:5,7,
15,18,19,21 116:4
118:25 120:13,18
121:3,20,22 123:25
124:2,18 131:17,20
132:18 135:9 146:14
148:15 152:21 153:8

157:14 164:6,12,16
165:19 166:5,8,9,10
173:14 177:3,18
178:24 179:24
181:21 182:2,15,25
184:5 185:3,20
186:19 193:22,23
194:12,16,20 195:5,
13,21 196:6,25
197:5,18 207:2
209:7,15,21 210:12
214:17,20 216:10
218:10 220:4 221:8
223:11 224:10,12,17
226:15,18 227:13
228:12,24 229:9
233:11 235:11
236:19 238:8,18
244:15 245:8,15
247:23 248:3,5
250:16 251:5 255:21
256:8,24 257:11,15,
20 259:25 268:24,25
269:3,4 278:5,7
280:10,16,23 281:5,
10,14,16,22 282:21

**Highland's** 118:3
119:20 123:5 131:4
220:23 221:25 248:8

**highly** 245:10

**historically** 123:25
124:2,3 187:10

**history** 218:10

**Hold** 138:4

**holder** 217:11

**holders** 148:14
173:11 260:10

**honest** 266:16

**honestly** 189:9

**honor** 128:18

**honoring** 268:24

**hope** 193:20

**hoping** 194:6

**hour** 151:14 204:16,
20 205:15 246:17,19
271:8

**hours** 266:11

**hundred** 194:24
233:21

**Hunter** 177:12,18
179:12 231:10,14,19,
22 254:8 267:20
268:5,7,9,11,12,18,
25 269:3,4

---

**I**

**Icahn** 217:12

**idea** 123:19 173:7
216:25 234:13

**identified** 265:15,16

**identify** 112:8 113:12
117:8 125:23 135:18
145:2 169:3 174:9
195:4 199:24 203:5,
16 207:15 210:20
228:6 256:6

**identifying** 119:19

**illiquid** 187:19,20,25
213:22

**immaterial** 178:24

**impact** 119:20

**Impacting** 119:13
131:4

**implicit** 157:19

**implicitly** 150:5,7
157:18

**important** 193:15

**improper** 145:24

**inaccurate** 165:15
226:25 265:22 266:3

**inappropriate**
139:20 195:15

**incentive** 184:3

**include** 153:10
154:17 178:7 216:19
222:22 237:22 242:2

**included** 142:23
148:22 150:7,12
224:12

**includes** 166:5 264:9

**including** 144:23
174:2 196:14 266:25

**inconsistent** 199:16

**incorrect** 208:18
226:25

**increase** 194:2

**independent** 148:20
179:3 221:25

**indirectly** 209:7,20
210:12 228:8,14,18,
21 229:2 231:18,24

**indiscernible**
144:18

**individual** 196:18
211:23 261:23

**individually** 262:11

**inform** 201:8,23
202:7 239:17 240:9
273:4,10,17 275:2

**information** 177:21
221:16 224:18
235:21 236:22
249:13 250:21
281:18,24

**informed** 200:23
202:19 203:5,10,17
276:11

**inherits** 155:9

**initially** 220:17

**insiders** 256:19,25

**installments** 226:11

**instance** 260:18

**instruct** 239:16
240:8 273:16

**integration** 114:8

**intend** 111:9,13
128:11,15

**intent** 210:3

**intention** 130:8
269:2

**interest** 111:10,14
128:17 129:10
132:23 133:5,23
134:23 135:21 149:3,

18 150:13 181:23
182:5 184:21 187:18
188:9 189:14 192:22
193:13,15,17 194:4
195:20 197:11,20
198:6,12,21 199:12
226:7 231:21 242:20
270:13 271:4,25

**interested** 249:11
277:12

**interests** 209:6,20
210:11

**interfering** 168:22

**International** 210:22

**interplays** 129:16

**interpretation**
112:13 122:24 126:4

**interpreting** 167:24

**interrogatories**
161:6 162:2 192:7
206:7 207:4 281:6,15

**interrogatory**
162:21 163:8,23
165:9 207:15,23
208:6 215:21 218:3
219:20

**interrupting** 146:16

**introduced** 108:16
118:21 121:8 127:2
130:14 132:11 136:8
158:2 160:23 169:10
191:8 206:4 220:20
234:21 237:3 247:7,
20 255:11 261:4
264:24 270:2 271:19
273:24

**investigated** 171:3,
6,9 172:21

**investment** 213:22
229:17 230:4,10,14,
20 231:10

**investments** 209:18
210:18

**investors** 217:19

**involved** 141:15
172:16 178:15
217:12 219:6

**involvement** 117:6

**irrespective** 150:25

**issue** 173:2 195:22
225:22 242:3,10,15
266:23

**issued** 232:15,23
241:21 242:10
267:12

**issues** 236:22
247:22

**Item** 251:24

**items** 119:13,20
131:3

---

**J**

**James** 107:4,13
136:13 137:8,15
165:12 167:12,21
259:18 277:6 278:10,
11 279:9 280:4,20,22
281:4,7,9,13

**January** 152:14
153:7 154:5,9
156:11,17 157:12
159:25 189:22
208:10 212:19
213:10 214:5,17
215:4,16 216:3,8
232:12 239:2,22
240:10 244:3,16,17
245:4 263:8 274:10,
15

**January/february**
152:12 174:22

**John** 107:22 115:23
139:2 145:7 152:20
167:3 175:15 257:22
264:14

**jointly** 262:12

**Judge** 168:21 245:24

**judgment** 115:5

**June** 237:11 244:22
247:23

**jury** 140:25 157:22

---

**K**

**Kerri** 210:22

**kind** 108:4 149:18
150:12 178:21 179:7,
17 196:2 248:17

**knew** 218:4,9 219:13
238:16

**knowledge** 120:22,
24 142:16 153:22
163:10 167:16
198:13,14 203:2,4,7
207:8,21 208:7 225:3
251:3 259:10 262:6,
11

**KPMG** 221:4 233:21

---

**L**

**L.P.** 111:4,10 115:20
121:23 166:6 224:13
228:13,16 278:6
280:11,16

**L.p.'s** 207:3 280:23
281:5,11,14,17,23

**La** 254:22

**language** 113:12
237:22

**large** 177:2 208:13

**largely** 114:3 208:13,
25

**late** 263:8

**latitude** 259:6

**lawsuit** 134:25
242:3,10,16

**lawyer** 141:7,9

**lawyers** 135:7,13
138:10,19 164:21,25
172:4,7,11,25 192:15
202:13 271:23

**layperson** 112:20
113:14

**learn** 171:20 172:12
198:3,7

**learned** 171:3,5,8

172:21

**learning** 199:23

**leave** 143:25

**led** 179:8,18

**left** 245:11

**legal** 112:13,18
122:23 126:3,4
140:21 153:13,14
165:2,3 167:24

**lesser** 210:17

**letter** 132:14,25
133:8,10,17,20 149:9
150:10 222:13 232:7
235:11 237:11 247:6,
15 275:6,24 276:15
280:18 281:21 282:4

**letters** 234:16

**levels** 260:25

**liabilities** 250:7,16
251:16 282:6

**liable** 189:13

**lifetime** 230:9,13

**limit** 258:16

**limitations** 179:13

**liquid** 177:3

**Liquidation** 271:15
272:2,9,22 274:4
282:18

**liquidity** 213:21

**list** 272:16

**listed** 141:4 263:12

**listen** 155:18 219:3

**literally** 233:21

**litigation** 196:7
246:9

**LLC** 228:20

**LN** 278:16

**loan** 119:25 120:4
124:18 131:6 227:13
229:8

**loans** 131:19,21
148:18 176:24 218:6

located 107:11

long 129:19 204:11, 12

longer 204:9

looked 111:25 112:3 120:5 122:22 124:6 131:11,21 132:24 133:6,24 153:20 194:8 195:11 232:23 234:9 237:17 247:15

lose 115:15 216:9

lot 135:6,15 137:10 140:23 156:7

lower 217:15

LP 278:6,8 282:21

lunch 204:5 205:25

Lynn 275:6 276:15

Lynn's 275:24

---

**M**

made 124:6 131:20 132:6,22 133:4 149:20 192:20 193:17 194:4,5 195:5,21 196:5 197:5,19,24 198:4 199:13 212:7 226:14 227:13 229:9 233:11 245:2 247:14 253:6, 15 256:19,25 259:4, 25 268:12 270:13,19 271:5

main 141:2

majority 148:13 164:15 165:17 173:11,24 217:17 260:9,15,19

make 112:12 122:23 123:5 126:3 128:21 129:11,12 134:2 149:17 150:11 153:5 168:20 170:25 171:15 178:20 181:10,22 182:4 191:3 212:13 226:17 227:25 249:3 268:3 275:14

maker 113:13 114:16 129:21

makers 228:6

making 149:9 198:18,20,21

managed 209:6,8,20 210:11,13

management 111:4, 10 115:6,20 119:2 121:23 132:18 166:6 196:3 207:3 224:13 228:12,24 234:15 235:10,22 247:5,15 257:11,15 278:6,7 280:11,16,23 281:5, 11,14,17,20,23 282:4,21

Management's 222:18 237:15

manner 260:20

March 136:18 137:6

mark 229:7 254:25 255:4,9

marked 221:21 254:25 269:21

market 260:25

marriage 277:12

material 177:16 236:23 267:15

materiality 236:10, 14

matter 112:20 113:14,24 180:24 258:15 277:13

maturity 110:13

maximizing 183:7 184:6

means 183:22,23 264:19

meant 217:22

mechanisms 273:8

Medical 210:21

meet 188:19

meeting 152:7

Melissa 124:24

member 173:17

members 164:15 165:17,18 174:9

memorable 139:16

memorialize 169:4

memorialized 190:6

memory 192:10

mention 218:22 242:24 243:3

mentioned 151:25 172:20 210:4

met 188:17,22,25

MGM 177:4 188:19 209:12 211:3,18 212:20 214:6,18 217:7,8

middle 259:15

million 119:24 120:17 121:20,23 122:4 127:24 131:6 160:11 177:8 186:13 196:14 224:14 226:10 231:16 232:16 233:9,10 234:8 241:23 242:15, 16 252:6,21 253:8 257:16 259:21 267:22,23,25 268:13 269:6

million-dollar 120:4 131:11 232:25 233:4 234:9 259:3

mind 210:23 255:4

mine 173:9 217:3

minute 144:2

minutes 149:8 196:2 204:24 205:14

missed 183:10

missing 233:24

misstated 233:25

misstates 184:23

mistaken 185:16

moment 182:20

moments 124:7

monetization 176:25 177:2 182:8 211:7,22 213:4

monetize 187:24

monetized 187:21 188:11,13 190:19,22 191:2,3

monetizing 213:20, 21

money 124:16 150:3 198:11,15 199:25

month 116:19 117:19 152:11 261:9

monthly 116:13,17, 19,23 117:3,9,12,16, 24 118:5,16,25 119:19 261:10,13 262:8 265:4,21,22 266:3,4 282:12,14,16

months 188:20 233:12

morning 107:20,21

Morris 107:19,22 108:14,17,24 109:2, 9,14,15,18,20 110:23,25 112:15 113:2,9,20 114:5 116:5,8,10 118:5,13, 19,22 119:7,10 120:11 121:6,9,12, 15,17 122:6,9 123:15 125:21 126:5,13,24 127:3,5,19,21 128:2, 4 130:1,12,24 131:2 132:4,9,12 134:10,20 135:17 136:6,9,11 137:25 138:20,23 139:5,18,25 140:14, 16 141:16,18 143:7, 12,16,18 145:11,18, 20,24 146:4,11,15, 20,23 151:6,12,16,19 152:22 153:2,4 154:24 155:2,15,17, 25 156:22 157:24 158:3,5,7 159:2,4,19, 22 160:21,24 161:2, 9,13,18 162:8,10,16,

18 167:4,7 168:4,8, 10,18,25 169:8,11,21 170:8,11,13 171:4,19 172:8 174:3 175:10, 14,18,24 176:2 180:21 181:15,18 183:20 184:16 185:6 186:8 189:20 190:11 191:6,9,12,17,20 195:14,16 196:4,16, 23 197:22 199:4,22 200:5,7 201:13,20 202:6,15 203:3,15,24 204:2,6,15,22 205:4, 7,17,20 206:2,5,17, 19,21,23 207:11,13 208:5,14 209:3 210:19 211:9 213:7, 18 214:15,25 215:13, 19 216:15 218:13,14, 21 219:9,11 220:2,9, 18,21 221:6,20 222:4,8 223:2,4,20, 23 224:8 225:16,20 227:5,18 228:2,5 229:13,15,25 230:8, 18,25 232:2,5 234:4, 19,22,25 235:6 236:4,7,11,13,25 237:4,7,13,20,25 238:3,15 239:6,15, 21,23 240:3,7,14,17 241:7,16,19 242:7 243:14,17 244:12,23, 25 245:16,23 246:5, 11,15,23 247:4,8,21 248:19,25 249:7,17 250:25 251:10,19,22 252:12,14,24 253:11, 13 254:10,15,22 255:8,12 256:14,17 257:4,7,9 258:7,18, 25 259:7,13,17 261:2,5,16,18 262:24 263:3,23 264:5,8,17, 22,25 265:3,8,10 266:6,12,15,18 267:7,17 268:2,4 269:10,12,15,18 270:3,5,24 271:9,17, 20,22 272:7,12,14, 18,20 273:5,22,25 274:6,8,11,14 275:17 276:3,17 280:5

motion 168:20

---

**Mountain** 177:12,19
179:12 231:10,14,19,
22 254:8 267:21
268:6,7,9,11,12,18,
25 269:3,5

**move** 154:24 155:15
157:21 190:16 204:7
218:13 219:9 264:5

**muddy** 146:18

---

**N**

**Nancy** 174:25 175:2,
17 176:6,22 178:13
180:5 181:20 182:24
184:18 187:12,15
190:8,12 198:23
199:17 207:18
208:10,21 211:2
212:8,15,19 213:9
214:3,16 215:15
216:3 217:25 218:17,
23,24 219:16 220:5,
12 230:4 239:2,11,18
240:10 244:2,14
245:3 267:10 273:11,
18

**needed** 172:19 173:4
197:18 241:11

**negotiation** 144:22
178:20

**negotiations** 148:25
154:13 155:12

**net** 187:5

**Nexpoint** 228:16

**Non-operating**
270:7

**Nonindividuals**
282:7,10

**normal** 183:22

**NORTHERN** 278:4

**notarize** 192:6

**notarized** 192:2
206:12,14

**notary** 161:22 162:13
277:4,18 279:14

**note** 107:5 108:19,20

110:5,9,12,13,20
111:3,20,23 112:5,9,
21 113:13,14,22,24
114:22 115:4 120:6,
13,16,19 121:18
122:3,11,14 123:3,17
124:13 125:14
127:23 128:7,10,12,
14,25 129:7,15,21
130:9 165:13 191:4
193:24 194:2,16,19
195:5 197:19 200:9,
20 226:11 231:15
232:9,25 233:5,8,24,
25 234:9 241:12
280:9,13,14

**Noted** 276:22

**notes** 121:3 122:15,
21 123:9,20,21
124:5,9,19 125:2
129:4,5,8,25 131:11
132:6,24 133:6,24
135:8,22 138:11
140:22 141:24 142:6,
20,24 143:3,15,17,24
144:3,11,17,24 145:5
147:4,24 148:9,11,22
149:4,16,19 150:8,
14,19,25 153:21
154:8,14,18 155:5,
13,22 156:10,16
157:2,4,16 160:10,16
163:6,20 165:24
172:25 180:6 181:11,
24 182:7 184:19
186:22 187:18
188:10 190:20
192:23 193:16,18,25
194:8,11,14 195:20,
22 196:5,13,14,25
197:5,12 198:6,13,22
199:7,13 200:24
201:9,24 202:8,21
203:11,19 212:23
213:5,6,13,24 214:8,
21 218:11 219:7,18
223:7,12,25 224:2,
12,18 225:23 226:9,
14,15,19,22 228:7
232:15,22 233:11
238:10,19 240:18,23,
24 241:21 242:2,9,14
243:4,8,10 246:6
251:25 252:4,20
253:6,23 254:5

257:21 259:9 263:17
264:10 266:24,25
267:6,11,19,23
268:8,12,24 269:7
270:13 271:5 272:24
273:7 274:20,21
275:8,12,14

**notifying** 275:15

**notwithstanding**
210:24

**November** 265:5
272:21

**now--and** 137:12

**number** 108:6
118:20 126:25
157:25 159:20,24
160:6,22 191:7
192:19 196:24
197:10 200:3,6,13,21
206:3 223:21 234:10
235:3 251:25 253:17
256:18

**numbering** 255:6

**numerous** 194:14

---

**O**

**object** 112:10,23
113:5,25 118:8 120:7
123:12 125:17,25
126:11,20 131:25
134:8,17 135:2 151:3
152:18 155:6 156:19
170:23 171:11
173:21 183:15 184:8,
22 185:25 189:17
195:8,23 196:8
197:8,13,15 198:25
199:18 201:12,15
202:2,10,22 203:12,
21 208:2,11,23
210:15 212:25
213:14 214:9,22
216:11 218:18,25
219:21 220:6,13,25
224:5 227:2,15
229:22 230:5,15,22
233:13 238:13 239:3,
12,19 240:11 241:2
242:4 244:6 245:7
248:15,23 249:5,14
250:23 251:7 252:22

254:6,12 257:23
263:20 267:3,13
269:8 270:20 273:12,
19 275:4,22 276:13

**objected** 275:25

**objecting** 189:2

**objection** 113:16
118:8 155:23 167:5
171:24 258:9,13

**objections** 118:12
158:12 161:4,25
191:14 207:2 217:14
280:22 281:4,10,13

**obligated** 187:17

**obligation** 126:18
185:22

**obligations** 212:22
213:12 214:7,21

**obtained** 115:5

**occurred** 154:8
244:3

**occurs** 182:17

**October** 247:24

**offer** 150:2,11

**offered** 149:17

**offers** 156:14

**Officer** 261:23

**offset** 187:9

**Okada** 228:10 229:8,
9

**omitted** 255:5,6,9

**Omnimax** 210:21

**one-** 246:18

**one-way** 246:9

**open-ended** 181:6,7

**operated** 155:11
165:23

**operating** 117:3,9,
13,16,24 118:5,16,25
119:3,12 130:21
154:21 261:10,13
262:8 265:4,21,22
266:4 280:11,17

282:13,15,17

**operations** 156:14

**opine** 153:13 166:20

**opinion** 112:18
113:8

**opportunity** 249:12

**oral** 107:3 187:23
242:24

**order** 107:7 211:19
213:11 251:5

**ordinary** 116:12

**organizational**
256:8

**original** 136:13
137:8,15 164:19
171:9,22 172:13
280:20

**outcome** 277:12

**outstanding** 132:23
160:2,6 177:17
184:20 226:8 253:7

**overlaid** 144:24

**overpayments**
135:9

**owned** 209:6,12,13,
14 210:11 217:10
228:9,14,18,21 229:2

**ownerships** 209:17

**owns** 259:4

---

**P**

**p.m.** 276:22

**Pachulski** 107:23

**Pachulski's** 248:9

**Package** 116:14

**PAGE/LINE** 280:8
281:3 282:3

**pages** 280:9,12,13,
15,17,19,21,24
281:6,8,12,15,19,21,
25 282:5,7,11,13,15,
17,20,22

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 12-1 Filed 08/02/24 Page 117 of 200   PageID 22932
Appendix Part 2 Page 80 of 133

Index: paid..promissory

**paid** 111:16 159:25 160:9,15 194:23 257:14 259:21

**paper** 190:5

**paragraph** 110:16, 19 114:6,10,13 122:7,10 128:3,5 138:7 141:20 143:9 151:22 152:16 153:9 163:3 165:22 170:15 171:22 173:7 174:11, 17 176:7,16,23 179:9,19 180:2,8,12, 17,25 181:9,20 183:6 185:21 186:17 187:12,15 190:5 200:16 225:17 226:24 228:17 229:6, 7,14 231:2 236:8 241:17

**parse** 148:5

**parsing** 164:22

**part** 138:16 144:3 149:20 152:2,6,8 173:19 184:10,17,25 198:9 208:9 216:2,17 251:23

**participants** 214:13

**participate** 178:3

**participated** 155:11 178:11

**parties** 156:25 249:12 277:11

**partly** 218:9

**partner** 119:25 120:4 131:6,17,19 235:13

**Partners** 228:20

**partnership** 148:15 225:23 231:16 241:22

**parts** 183:3

**party** 178:15 265:16 266:2 277:10

**passed** 189:14

**pay** 111:3,15 128:15 129:6 133:22 185:23 187:8,17 188:8

189:13 195:19 259:25 269:3,5

**payable** 123:10 191:4 226:10

**payables** 268:17

**paydowns** 242:21

**payee** 114:15 128:17

**paying** 185:15 186:21 194:19

**payment** 130:3 133:5 134:2,23 135:20 140:22 149:18 154:17 181:23 192:20 194:5 197:9,14 198:4,20,21 199:12,24 259:4 268:23 270:18 274:22

**payments** 193:15,17 194:4 226:18 256:19, 24 257:19,20 259:8 270:12 271:4

**peck** 193:18

**penned** 275:13

**people** 130:17 135:7, 14 145:23 275:15

**percent** 194:24 217:11 233:22

**perfectly** 166:22

**period** 148:10,23 174:22 181:4 221:16 223:6 224:11 225:11 237:6 238:5 239:9 243:22 244:21 265:5

**periodic** ==193:14,16==

**permitted** 177:16

**person** 117:8 123:2 145:3 199:24 203:5, 16 248:10 255:24 256:6,9

**personal** 207:7

**personally** 116:18 127:10 131:16 136:20 163:10 168:24 171:20 196:11 234:15 238:22 240:22 241:5

248:7 253:6 270:11 272:8

**perspective** 144:21 185:8 186:15

**pertain** 246:5

**pertained** 135:20 211:2

**pertaining** 156:16

**pertains** 155:21 242:23 251:24

**petition** 143:13 215:10,11,12 260:6, 18 271:21

**Pg** 278:16

**phone** 190:14,15

**phrase** 153:10 216:17

**phraseology** 167:25

**physically** 117:20

**piece** 217:5

**pin** 172:22

**place** 146:7 154:5 176:24 190:20

**places** 209:13,14

**plaintiff** 141:23,24 142:5,6,18,19 143:2, 23 144:10,11,16 145:5 147:3,23 163:5,20 278:9

**plaintiff's** 141:22

**plan** 142:22 144:3,4, 12 147:2 149:12,21 271:13

**pleading** 143:6

**pleasure** 276:19

**plenty** 260:23

**point** 164:9 189:25 194:6 198:16 215:5,7 234:24 246:20 250:19 264:15

**pointed** 175:22

**pointing** 200:14

**points** 141:2 217:12

**portfolio** 209:5,19 210:5,10

**portion** 192:21 198:4 215:20 245:17

**portions** 108:10 129:24

**position** 143:21

**possibilities** 217:23

**post-bankruptcy** 116:2 145:9 153:17 164:24 181:14

**POT** 142:22 143:3,4, 12 147:2 149:14,21

**potential** 189:5

**powerful** 276:6

**practice** 130:16 260:13,15

**pre-bankruptcy** 153:16 164:23

**prebankruptcy** 116:3 164:6,14

**precedent** 188:19

**prefer** 118:11

**preparation** 238:23

**prepare** 116:12 236:20 251:5

**prepared** 116:20 118:16 205:9 221:9 222:2 224:10 256:7 258:2,22 271:14

**preparer** 265:17,20

**preparing** 116:23 117:3,9,15 198:9 250:15 255:21

**president** 248:4

**pretty** 201:18 222:21 246:15

**previously** 141:23

**price** 217:15

**Pricewaterhouse** 222:11 233:21

**Pricewaterhouseco opers** 220:23 232:14 237:10

**Pricewaterhouseco opers'** 227:11

**Pricewaterhouseco opers's** 232:7

**principal** 111:13 123:20 124:8,13,18 128:16 129:9 132:23 133:5,23 134:23 135:21 149:3,18 150:13 181:23 182:4 184:21 186:22 187:18 188:9 189:13, 14 192:22 193:13,24 194:5 195:20 197:10, 19 198:5,12 199:12 226:8 271:4

**principle** 198:21 242:20 270:12

**prior** 134:15,24 150:10 166:8 170:2, 17 173:14 180:15,25 184:23 194:12 226:13,19 235:4 239:8 260:5,17 274:3

**private** 210:17

**problem** 145:8 151:12

**Procedure** 277:9

**proceed** 258:23

**proceeding** 134:16 137:9 258:3,17 261:7

**proceedings** 248:14

**process** 152:8 198:9 216:14,16 219:6

**production** 215:14

**Projections** 282:19, 22

**promised** 111:3

**promissory** 108:19 110:5 111:19,23 113:13 120:6,13,16, 19 121:3,18 122:3 123:17,21 125:14 127:23 133:24

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-12    Filed 08/03/21    Page 118 of 200    PageID 22933
Appendix Part 2 Page 803 of 1336

Index: proper..repeat

153:20,21 180:6
181:10 225:23 226:9
232:15 241:21
257:21 259:9 280:9,
13,14

**proper** 123:23

**properly** 172:18

**proposal** 142:22
149:20

**prospects** 217:8

**provide** 184:2
236:20

**provided** 179:6

**providing** 224:17

**provision** 114:14
200:24 201:9,24
202:8,20 203:10,19

**provisions** 114:13
274:22

**public** 161:22 277:4,
18 279:14

**pull** 269:24

**Purported** 162:20,25
163:11,21

**purpose** 117:15
249:10

**purposes** 236:15
255:2

**pursuant** 157:15
219:17 277:8

**put** 108:14 118:19
121:6 132:9 136:6
148:21 157:24
193:23 198:15
200:18 206:2 216:25
275:8

**putting** 133:20
221:14

**PWC** 221:24 223:25
224:11,18 236:20
238:23 239:7,17
240:9,23 247:14,22

---

**Q**

**quarter** 143:10,22

---

**144:6 147:9 155:10**
157:3 172:17 199:10

**question** 114:18
118:9 122:19 129:22
133:12 134:12 135:5
138:24 143:2 144:21
148:6 151:9 153:3
154:25 155:19,20
156:6 157:10 160:15
164:8 166:12,24
167:3 168:16 171:18
178:9 179:16 189:9
190:3 193:9 201:18
202:4,17 208:4
214:14 224:15 227:8
239:24 241:4,6,9
242:8 244:10 260:8
267:10 276:7,8,9

**questions** 126:7
127:9 145:10 159:8
163:7 193:6 205:12
258:23 259:2 276:18

**quickly** 204:7

**quote** 141:21 163:5,
19 165:10 170:18
172:14 209:5 211:11
215:22 216:23
236:14 272:24
274:19

---

**R**

**rambled** 196:3

**reach** 135:10

**reached** 148:12
152:15 153:8 154:15,
19 181:19 184:18
187:11,14 198:23
199:17 218:16
219:16 239:17 240:9
243:25 244:14,15
245:3

**reaching** 145:4

**read** 111:19 114:17
117:19 123:16
125:20 129:5 130:18
136:20 137:14
141:10 142:3 161:25
162:11 163:4,16
167:22 192:24
200:15,17 206:25

---

**227:9 264:15 278:16**

**reading** 236:17
257:16

**Reads** 278:16

**realization** 186:18

**realized** 186:6
268:15 275:12

**reason** 186:25 192:7
193:7 198:15 206:13
220:16 242:21
260:23 262:21
263:15 278:12,16

**recall** 115:8,13,16
117:25 118:14,17
132:21 133:17
135:13 137:16
140:17 150:16
152:11 169:25
177:13 178:12 179:6,
16,20 191:21 197:4
220:15 226:14,16,20
227:10 230:2 239:5
261:14 265:19,25
270:25 271:12 274:2

**Receipts** 270:7

**receivable** 231:15
252:2,5 253:6 254:5,
18 264:10

**receive** 109:24
121:22 182:2

**received** 110:6
257:20

**recently** 138:8

**recess** 151:18
205:25

**recollection** 119:4
131:14 133:2 139:7
141:10 153:7,16
188:15 194:18
208:25 210:25 220:3
221:24 225:9 226:3,6
227:19,20,21 232:6,
20 242:13 244:2

**recommendation**
248:9

**recommendations**
217:21

---

**record** 146:18 205:3,
24 245:7 275:8 277:7
278:13

**recorded** 120:13

**records** 195:11

**recover** 267:11

**redacted** 223:7
245:10,22

**Redeemer** 115:4

**reduce** 186:4,6,7,10
192:22 193:24 198:5,
11

**reduces** 182:8,15,18
184:14

**refer** 115:19,25
209:11,23

**reference** 131:5
162:20 209:4 211:10
229:16 236:9 241:20
245:2 251:25 256:19

**referenced** 242:17

**referred** 114:8
119:25 131:16 143:8
151:21 152:15
163:19 164:11 173:7,
11 174:10,17 176:6,
15,23 179:9,25
180:7,12,16,24
181:8,20 183:6
185:21 186:17
187:12,15 197:9
218:2 228:7 255:15

**referring** 145:8
146:8 151:21 154:9
166:3

**refers** 120:4 131:10
147:16 163:2 165:22
200:16 215:21
225:18 231:2 232:9
252:8 264:19

**reflect** 169:4 179:25
254:4,17

**reflected** 113:22
151:22 153:9 223:15
233:23 240:23 269:7

**refresh** 141:10
221:23 226:20,21
232:6

---

**refreshed** 136:4
150:15 231:8 258:4

**refuse** 234:2

**refused** 260:19

**regard** 128:20
194:24

**relate** 172:13

**related** 154:8 156:25
171:21 277:11

**relates** 229:7

**relating** 142:12
224:18 236:22
241:17 249:13

**relative** 177:17 212:9

**relevant** 179:12
205:12

**relieve** 185:14,22

**relieved** 186:21

**rely** 250:20 251:4

**relying** 276:9

**remain** 224:24

**remember** 117:21,
22 133:7 136:3 137:5
138:7,16,17 140:20,
23 159:8,15 173:25
176:21 179:22
180:13 184:24
193:19 210:9 219:4,
23,24 221:4 226:17
227:23 230:7 231:9
233:2,6 272:4

**remind** 108:5

**REMOTE** 107:3

**remotely** 107:6

**rendered** 273:18

**rep** 247:15

**repay** 111:9,13

**repayment** 149:3
150:12

**repeat** 134:19 144:13
150:20 171:17
185:17 195:25 208:4
214:12 241:4 244:10
256:3

**rephrase** 153:3
164:8

**replaced** 215:7

**report** 117:7 118:3,
16,25 225:22 232:13
244:22 261:10 265:4,
23 266:4 282:13,15,
17

**reported** 117:5
255:25 256:11
266:19,24

**REPORTER** 107:5
145:22 196:22 205:2,
5,23 244:8

**Reporting** 116:14
277:19

**Reports** 117:3,10,13,
16,24 118:6 261:13
262:8 265:21

**representation**
234:15 235:11 247:6
281:21 282:4

**representations**
236:15 247:14

**representing** 165:19
220:11

**request** 124:19
159:20,23 191:15
192:18 197:10 200:2,
21 201:4,22 215:18
280:24 281:11

**requests** 158:13
192:4,10

**required** 227:22
262:15

**requisite** 173:24

**resembles** 235:17

**Reserve** 276:20

**reserved** 277:9

**resolution** 135:10

**resolutions** 179:24
180:3

**resolve** 150:4

**respect** 113:23
118:15 155:5 166:23
173:6 270:13

**respective** 124:7

**respond** 134:6,14,22

**response** 134:3
160:8 161:5 177:6
193:10 207:22 242:6

**responses** 158:12
191:14 192:3,6
280:22 281:10

**responsibility**
119:18 222:18
237:16

**responsible** 116:22
117:2,9 199:25
224:17 250:14
255:20 265:15 266:2

**rest** 129:15 204:13

**Restoration** 217:18

**restrain** 258:15

**Restructuring**
261:23

**Results** 119:3,12
130:21 280:11,17

**return** 182:3

**review** 116:18
249:12 250:3 255:17
261:12 272:8

**reviewed** 113:19
141:11

**reviewing** 192:10

**right-hand** 274:9

**room** 260:24

**roughly** 233:9

**Rule** 277:8

**Rules** 277:9

___

**S**

**sale** 188:19 211:25
213:11

**sampling** 233:22

**satisfied** 189:16

**satisfy** 226:18

**Savings** 107:11

**scenario** 188:7
190:24

**schedules** 249:24
250:2,4 251:6 254:3,
17 261:8

**Schroth** 124:24

**scope** 258:5,9,14

**Scott** 215:3 229:19
230:4

**screen** 163:17 175:9,
22 176:10 200:18
221:14 271:18

**scroll** 132:16 136:10,
16 137:19 139:3
158:5,17,19,21
160:25 161:12
169:16,18 170:11
191:9,17 206:17
222:4 225:16 227:6
235:4 236:11 237:13
257:7 261:16 265:8
272:18

**Scrolling** 121:11
122:8 138:3 139:13
140:5,7,12 158:23
159:21 161:17
169:20 170:10
191:11,19 223:22
232:4 236:6 240:16
243:16 256:16 257:6
263:2 266:8 269:17

**seal** 245:25

**section** 228:8

**Seery** 132:17 148:20
149:14

**sentence** 114:7,9
165:8 166:13,24
167:8,15 169:2
224:15 236:9 264:14,
16

**serve** 159:17 192:15
220:23

**served** 158:8 170:2
171:10 191:22
192:11 200:22
221:24 229:20

**services** 135:8,11
228:25

**serving** 230:3

**set** 148:16 161:6
207:3,22,23 208:7
219:19 254:18
260:14 277:6,14
281:6,15

**settlement** 142:23
148:23,25 149:14
151:2 154:16 156:14
157:5

**shared** 135:8,11

**Sharp** 261:22 262:7,
14 265:15 266:2

**Sharp's** 265:11

**sheet** 119:4,14,21
120:14,19 131:4
177:3 223:6,13
238:5,9,18 255:5
278:2

**shifted** 275:13

**short** 129:18 204:18

**shorter** 205:10

**show** 215:14 223:7
244:19 245:20
253:12

**showed** 245:19

**shown** 176:11

**shows** 252:19
253:22 270:10

**shut** 168:19

**side** 133:21

**sign** 110:4 121:18
122:2 124:25 127:8,
10,15,23 130:3,16,17
161:21 194:15
234:15 235:10 262:7

**signature** 108:25
109:3,16 121:10,13
127:4,6,13 161:19
206:10 235:7,16
247:11 262:2 277:9

**signatures** 235:5
261:20 265:12

**signed** 109:21
110:17 111:8,12,20
113:21 114:22 115:3

120:16 121:2 123:2,
3,17 125:5,6,7,15,16
127:14 128:11,15,24
129:21,25 130:2
131:12 132:17
162:12 165:4 194:9,
11 206:24 222:12
235:19 237:11
261:22 263:8

**significant** 119:13,
19 131:3 186:11,12

**signing** 110:19

**signs** 125:3

**similar** 120:10
186:13,21

**simple** 129:22
138:24

**simply** 200:19

**simultaneous**
139:17,24 145:13,17,
21 152:24 168:9
175:8,23 190:9 244:4
258:20

**sir** 109:3,16 118:23
121:13 127:6 140:18
159:6 161:19 162:23
166:13,23 169:23
189:9 190:3 195:4
196:22 199:8,15
206:10 234:5 235:8
240:21 264:18
271:10 276:7

**sister** 174:25 176:5
178:5 189:22 229:19
238:25

**sit** 125:22 137:12
193:8 204:9

**skip** 254:23

**skipped** 282:8

**Skur** 277:4,18

**slightly** 113:11
160:14 202:17

**slow** 137:21,23

**small** 193:12 194:5
213:25

**smoothly** 156:7

Index: Sofas..today

**Sofas** 255:15,18,21
256:7 261:8

**sold** 212:6,21 213:3
214:5,17 217:14,20
275:11,15

**sole** 229:20 230:13

**someplace** 205:19

**sort** 137:23

**sought** 179:2

**source** 235:21

**speak** 180:14

**speaking** 118:12,14

**speaks** 114:19
171:14

**specific** 142:16
198:14 203:2,7
211:23 276:16

**specifically** 118:3
132:8 135:13,23
137:5,10 158:10
159:15 174:14
197:25 209:24 214:4
261:11

**specifics** 218:5,20
219:4

**speech** 144:18

**speed** 137:21

**spent** 173:3 271:25

**sphere** 262:10

**split** 135:9

**spoke** 179:13 180:23

**standard** 222:21
235:24

**start** 147:14 148:3
228:4,11

**started** 166:7 195:13

**starting** 144:5

**state** 107:8 163:9
243:10 258:8,13
264:13 277:2,5,18

**stated** 153:17 163:24
167:18,19 173:5
207:7 234:8

**statement** 129:13
147:8 165:14,15
193:3 202:25 222:17
237:15 249:19
271:14 282:9

**statements** 168:13
221:9,15 222:2,19,23
223:25 224:10
227:12 233:18,19
236:21 237:17,23
238:24 239:9 243:22
245:9,15 246:3
255:14 263:19
281:18,23

**STATES** 278:3

**stay** 190:20 255:7

**step** 109:10

**stick** 156:3 166:19

**stipulated** 110:15

**stop** 119:9 138:6
139:18,19,25 140:2
145:11,12 146:16
168:10,11,13,21
246:7,22 265:2

**stopped** 221:12

**story** 217:7

**straight** 214:13

**Strand** 235:12

**straying** 257:23
269:13

**Street** 277:20

**strike** 154:25 155:16
218:13 219:10 264:5

**strikes** 140:21

**structure** 129:6
218:11 256:8

**structured** 129:2
218:11

**stuff** 125:4 139:23
165:4

**subject** 113:24
178:19 180:7,23
196:7 207:16,25
218:2 219:18 229:5
257:24 275:9

**subjects** 214:12

**submit** 245:24

**submitted** 171:6

**SUBSCRIBED**
279:11

**subsequent** 142:13
143:5 144:23 148:8,
17 152:3,4 153:11
155:9 165:12 170:19
172:15,16 176:8
181:5 182:22 188:17,
22,24 189:15 199:5,9
207:16,24 208:8,22
211:8,20 212:3
216:20,22 218:2
219:19 232:10
243:12,18 244:20
267:9 268:14

**subsequently** 142:8
152:16 153:10
194:20

**subsidiary** 209:15

**substance** 140:19
154:12 207:12

**success** 217:7

**sued** 112:5

**suggest** 120:23
180:14 195:3

**suggested** 144:4,5
155:13

**Suite** 277:20

**sum** 111:4

**summary** 250:6,15
251:15 282:6

**supersede** 114:14

**Supplemental**
221:16 281:18,24

**supplied** 128:8

**support** 217:15

**supposed** 159:14
249:18,21

**surrender** 181:9
182:3

**surrendered** 181:22

**swear** 162:4

**swore** 166:16

**sworn** 107:14 149:5
168:12 277:7 279:11

_____

**T**

**taking** 146:7

**talk** 152:2

**talked** 176:12

**talking** 116:3 118:6
139:19,20,25 140:2
143:4 147:6 163:14,
15 172:3 175:12
177:7 181:13 207:17
210:9 219:4

**target** 187:4

**tax** 193:14

**taxable** 187:7 194:22

**taxes** 187:8 194:19,
23

**team** 250:21 251:5

**telling** 220:4 265:19,
25

**ten-minute** 151:10

**tendered** 161:4
234:10

**term** 110:9,14 128:5,
20 226:11,15 274:20

**terms** 111:17,18
113:23 114:13
128:12 130:3,9 182:7
193:13 226:18

**testified** 107:16
129:3 133:16

**testify** 129:3

**testimony** 144:2
148:24 149:5 150:9,
17,22 152:13 153:12
154:11 166:19
184:23 198:10 277:7

**Texas** 107:12 277:2,
5,18 278:4

**theoretically** 182:17
217:20

**thing** 140:10

**things** 139:16 171:2,
5,8 172:20 183:25
234:24 245:11
264:15

**thinking** 174:2

**thought** 152:20
182:23 193:25
216:14,16 219:6
240:5

**threw** 150:3

**tie** 182:21 253:3

**time** 107:10,11 108:9
110:17 111:7,12
113:10,21 114:3,22,
25 115:3,13 123:3
124:7,22,23 125:15
128:10,14,23 129:6
130:6 132:5 134:15,
19,24 135:24 144:22
145:23 149:24
150:10,21 164:16
165:12 168:19 170:2
171:6,9,22 173:3
174:22 178:23
180:15,25 181:4
182:15 185:18
187:23 188:3,5
189:25 190:13,15
194:12 198:16 204:4,
20,21 205:7,8,21
206:24 215:8 217:13,
25 220:4,11 229:21
230:2,20 232:19
238:16 241:10
246:14,25 248:3
250:12,17 256:4,9
260:17 262:6 272:2
274:2 276:22

**timeline** 250:9

**times** 108:3 194:3
221:3

**timing** 115:9

**title** 108:19 119:24
136:10

**titled** 150:2

**today** 107:24 108:6
111:23 112:9,21
115:20 122:12
125:22 126:10 128:8

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-21 Filed 08/04/22    Page 121 of 200    PageID 22936
Appendix Part 2    Page 806 of 1305

Index: Today's..Zoom

137:18 188:23,25
269:5

**Today's** 107:9

**told** 147:2 177:8,9
185:10 219:14 239:7

**top** 109:19 110:24
121:15 127:19
136:16 162:9 222:16
228:11 237:14 250:9
253:12

**total** 226:7

**transactions** 233:22
236:22

**TRANSCRIPT** 278:2

**transcription**
278:14

**transfer** 124:8

**transparent** 249:19

**transparently**
262:19

**trial** 141:2 149:25
157:23 276:21

**trigger** 211:19,24
212:2 213:4

**triggered** 189:5

**triggers** 139:6

**true** 137:17 162:5
163:24 165:6 166:17,
18,24 167:8,15 193:3
199:3 202:25 206:20
207:8 230:19 232:18
270:25 277:7

**Trussway** 177:5
189:4 209:14 211:3,
19 212:21 214:6,18

**trust** 215:4,16 229:17
230:4,10,14,20
231:6,11,14,19,22

**trustee** 174:18,19,21
215:3,7,15 229:20
230:3

**truth** 107:15,16

**TSG** 277:19

**turn** 243:14 251:19
252:12

**two-hour** 246:19

**typical** 127:13

---

**U**

**Uh-huh** 162:22
215:25 221:19
223:10

**ultimately** 117:5
185:4

**uncollectible**
253:18,24 254:5,18

**unconditional**
122:20

**understand** 107:25
110:18 111:24 112:9,
22 113:15 118:10
123:4,8 125:14,24
126:10,16,18 130:3
133:3 139:5 142:11
166:4 176:17 185:8
186:15 212:14 213:9
214:3 236:19 243:21
245:22 248:13 249:2,
10 270:9,16

**understanding**
110:12 120:3 122:12
123:2 130:6 131:9
133:15 136:23 151:5
154:21 181:21 208:8
235:18 264:11,18
267:16

**understood** 128:23
129:9,21

**undue** 189:13

**unencumbered**
275:10

**unequal** 233:25

**UNITED** 278:3

**unnecessary** 216:5
217:4

**unpaid** 128:16 129:9
133:5,23 134:23
135:21 149:3 181:23
182:4 184:21 187:17
188:9 189:14

**unreasonable**
273:5,18 275:3

276:12

**unredacted** 245:11,
13,14,21,24

---

**V**

**validation** 235:22

**variety** 209:13,14

**variously** 115:20

**vehemently** 189:2
275:25

**verbal** 154:4,7 156:9,
10,17

**verbally** 154:3

**Verification** 162:12
206:8,20

**verified** 165:5 166:25
167:9

**version** 170:17
265:14

**versus** 110:14 164:6

**video** 108:8

**view** 174:5

**views** 178:23

---

**W**

**wanted** 187:4
245:12,20 260:21
274:11

**warning** 266:10

**Waterhouse** 117:2,
24 217:24 218:15,24
219:15 224:23,24
225:5,9 235:15
250:14,20 251:4,12
255:25 256:10,11
262:2,7,14 265:16,20

**Waterhouse's**
265:12

**ways** 268:8

**week** 138:8

**WHEREOF** 277:13

**wholly** 215:22

216:24

**wistful** 264:2

**withdrawn** 114:19
115:18 117:14
122:18 125:12
128:22 131:15
134:11 150:22 171:7
176:4 181:17 187:13
209:21 212:18
216:18,20 230:12
233:3 241:8 243:20
251:2 256:22

**word** 167:11 175:18,
19 183:11,12

**words** 109:10 142:12
170:18,22 172:14
183:19

**wordsmith** 167:13

**work** 149:13

**wrap** 205:14

**write** 145:23 166:15
190:4

**writing** 153:24
154:20

**written** 129:5 156:8
157:20 166:22 193:3
254:9

**wrong** 147:12 149:7
164:5 166:14 185:14
233:15 269:20

**wrote** 165:9,10
268:21 275:6

---

**X**

**X-------** 280:2

---

**Y**

**year** 121:2 144:7,8
149:10,11,13 184:13
222:2 225:24 253:19
256:20,25 259:22
272:25 274:20

**year-end** 221:8

**years** 210:6 225:7

**York** 277:20

**Yup** 238:21 256:21
257:13 261:24

---

**Z**

**Zoom** 108:8

---

# EXHIBIT 97

Page 283

1          Dondero - 6-1-2021

2          IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION

4   In Re:                    )
                              )
5   HIGHLAND CAPITAL          )   Case No.
    MANAGEMENT, LP,           ) 19-34054 L.P.
6                             ) Chapter 11
           Debtor,           )
7   ------------------------------)
    HIGHLAND CAPITAL MANAGEMENT,  )
8   LP,                    )
                              )
9        Plaintiff,      ) Adversary No.
                         ) 21-03003-sgi
10     vs.                   )
                              )
11  JAMES D. DONDERO,          )
                              )
12       Defendant.       )

13

14          REMOTE DEPOSITION OF

15              JAMES DONDERO

16              Volume 3

17           Pages 283 - 385

18            Dallas, Texas

19    Tuesday, 1st day of June, 2021

20

21

22

23  Reported by:

24  Daniel J. Skur, Notary Public and CSR

25  Job No. 194691

Page 284

1          Dondero - 6-1-2021
2
3
4
5
6
7      1st day of June, 2021
8      9:34 a.m. - 12:01 p.m.
9
10
11      Remote Deposition of JAMES DONDERO,
12  located in Dallas, Texas before Daniel J.
13  Skur, Notary Public and Certified Shorthand
14  Reporter in and for the State of Texas
15  located in Waxahachie, Texas.
16
17
18
19
20
21
22
23
24
25

Page 285

1          Dondero - 6-1-2021
2  R E M O T E   A P P E A R A N C E S:
3  Pachulski Stang Ziehl & Jones
    Attorney(s) for Debtor
4  780 Third Avenue
5  New York, New York 10017
6  BY:  John Morris, Esq.
7      Gregory Demo, Esq.
8
9  Sidley Austin
    Attorney(s) for The Committee
10  2021 McKinney Avenue
11  Dallas, Texas 75201
12  BY:  Paige Montgomery, Esq.
13      Juliana Hoffman, Esq.
14      Matthew Clemente, Esq.
15      Alyssa Russell, Esq.
16
17  Kelly Hart & Pitre
    Attorney(s) for Mark Patrick
18  400 Poydras Street
19  New Orleans, Louisiana 70130
20  BY:  Amelia Hurt, Esq.
21
22  Bonds Ellis Eppich Schafer Jones
    Attorney(s) for The Witness
23  420 Throckmorton Street
24  Fort Worth, Texas 76102
25  BY:  Clay Taylor, Esq.

Page 286

1          Dondero - 6-1-2021
2
3  R E M O T E   A P P E A R A N C E S (continued)
4    Sbaiti & Company
      Attorney(s) for Charitable DAF, CLO HoldCo
5      and Sbaiti & Company
      2200 Ross Avenue
6
      Dallas, Texas 75201
7
      BY:  Mazin Sbaiti, Esq.
8
9
10
11  ALSO PRESENT:
12      La Asia Canty, Paralegal
13      Debra Dandeneau, Baker & McKenzie
14      J. Pomerantz
15      Lauren Drawhorn, Wick Phillips
16      Mark Patrick
17
18
19
20
21
22
23
24
25

Page 287

1          Dondero - 6-1-2021
2      IT IS HEREBY STIPULATED AND AGREED
3  by and between the attorneys for the respective
4  parties herein, that filing and sealing be and
5  the same are hereby waived.
6      IT IS FURTHER STIPULATED AND AGREED
7  that all objections, except as to the form  of
8  the question, shall be reserved to the
9  time of the trial.
10      IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to and
12  signed before any officer authorized to
13  administer an oath, with the same force and
14  effect as if signed and sworn to before the
15  Court.
16          - oOo -
17
18
19
20
21
22
23
24
25

Page 288

| | |
|---|---|
| | Dondero - 6-1-2021 |
| 1 | |
| 2 | P R O C E E D I N G S |
| 3 | REMOTE ORAL DEPOSITION OF |
| 4 | JAMES DONDERO |
| 5 | (REPORTER NOTE:  This deposition is |
| 6 | being conducted remotely in accordance with |
| 7 | the Current Emergency Order regarding the |
| 8 | COVID-19 State of Disaster. |
| 9 | Today's date is the 1st day of |
| 10 | June, 2021.  The time is 9:34 a.m. Daylight |
| 11 | Savings Time. The witness is located in |
| 12 | Dallas, Texas.) |
| 13 | JAMES DONDERO, |
| 14 | having been duly cautioned and sworn to tell |
| 15 | the truth, the whole truth and nothing but the |
| 16 | truth, testified as follows: |
| 17 | (9:33 A.M.) |
| 18 | EXAMINATION |
| 19 | BY MR. MORRIS: |
| 20 | Q.    Good morning, Mr. Dondero.  Can you |
| 21 | hear me? |
| 22 | A.    Yes. |
| 23 | Q.    Your microphone is a little soft as |
| 24 | well. |
| 25 | Can you tell me where you're located |

Page 289

| | |
|---|---|
| | Dondero - 6-1-2021 |
| 1 | |
| 2 | right now? |
| 3 | A.    4940 Chase Tower. |
| 4 | (Interruption by reporter.) |
| 5 | (Pause.) |
| 6 | BY MR. MORRIS: |
| 7 | Q.    Good morning, Mr. Dondero. |
| 8 | (Audio distortion.) |
| 9 | (Interruption by reporter.)           00:-01 |
| 10 | BY MR. MORRIS:                         00:-01 |
| 11 | Q.    Good morning, Mr. Dondero. |
| 12 | Can you hear me now? |
| 13 | A.    Yes. |
| 14 | Q.    You understand we're here today for |
| 15 | your deposition in connection with next week's |
| 16 | contempt proceeding; is that right? |
| 17 | A.    Yes. |
| 18 | Q.    Okay.  We have a few documents to |
| 19 | put up on the screen today; and as usual, if |
| 20 | there's anything that you need to see, will you |
| 21 | let me know that? |
| 22 | A.    Yes. |
| 23 | Q.    All right.  I want to start with |
| 24 | some background. |
| 25 | MR. MORRIS:  Can we please put up |

Page 290

| | |
|---|---|
| | Dondero - 6-1-2021 |
| 1 | |
| 2 | the first exhibit, the organizational |
| 3 | chart? |
| 4 | MR. TAYLOR:  John, before we start, |
| 5 | I just wanted to note that this is going to |
| 6 | be limited to two hours. |
| 7 | MR. MORRIS:  I'm not sure where you |
| 8 | get that from, but let's just proceed. |
| 9 | MR. TAYLOR:  You specifically asked |
| 10 | for two hours of time, and I told you we'd |
| 11 | give two hours of time, and so we're |
| 12 | limiting it to two hours. |
| 13 | MR. MORRIS:  You do whatever you |
| 14 | need to do, Clay. |
| 15 | (Exhibit 1 introduced.) |
| 16 | BY MR. MORRIS: |
| 17 | Q.    Mr. Dondero, have you seen this |
| 18 | document before, sir? |
| 19 | A.    Yes. |
| 20 | Q.    Do you know what it is? |
| 21 | A.    It's the org chart of the DAF and |
| 22 | CLO HoldCo. |
| 23 | Q.    Do you know why this structure was |
| 24 | set up the way it was? |
| 25 | MR. TAYLOR:  Objection, form. |

Page 291

| | |
|---|---|
| | Dondero - 6-1-2021 |
| 1 | |
| 2 | A.    Only generally. |
| 3 | BY MR. MORRIS: |
| 4 | Q.    Can you tell me your general |
| 5 | understanding of why this structure was set up |
| 6 | the way it was? |
| 7 | A.    To be compliant for tax purposes. |
| 8 | Q.    Was this structure set up at your |
| 9 | request? |
| 10 | MR. TAYLOR:  Objection, form. |
| 11 | A.    Set up at my request.  No. |
| 12 | BY MR. MORRIS: |
| 13 | Q.    Who decided to set up this |
| 14 | structure; do you know? |
| 15 | A.    Mark Patrick. |
| 16 | Q.    And do you know if anybody asked |
| 17 | Mark Patrick to set up this structure? |
| 18 | A.    The -- he was tasked with setting up |
| 19 | a charitable entity for Highland at that time, |
| 20 | for Highland and my -- for Highland and the |
| 21 | partners to -- to foster charitable giving and |
| 22 | provide the appropriate tax deductions for |
| 23 | such. |
| 24 | Q.    And who gave him that task, if you |
| 25 | know? |

Appx. 01705

Page 292

1        Dondero - 6-1-2021
2     A.   I believe I did.
3     Q.   Okay.  So, you tasked Mr. Patrick
4  with setting up an organizational structure to
5  carry out the charitable giving on behalf of
6  Highland Capital Management, L.P., and its
7  partners?
8        Do I have that right?
9     A.   Yes.
10     Q.   Okay.  Looking at the top line, do
11  you see that there's four foundations that are
12  identified as third parties?
13     A.   Yes.
14     Q.   Are you familiar with those
15  foundations?
16     A.   Yes.
17     Q.   And do you serve as an officer or
18  director of any of those foundations?
19     A.   I -- I believe I have or I could be
20  with regard to Dallas Foundation, but I'm not
21  certain.
22     Q.   Okay.  Do you know if you have any
23  role with any of the other three foundations
24  that are on there?
25     A.   I do not believe so.

Page 293

1        Dondero - 6-1-2021
2     Q.   Okay.  Looking at the next row,
3  there's four incorporated or there's four
4  entities that are identified as supporting
5  organizations.
6        Do you see that?
7     A.   Yes.
8     Q.   Do you have an understanding of what
9  a "supporting organization" is?
10     A.   No, and I don't know the difference
11  between the first line and the second line,
12  and I don't know if my involvement with Dallas
13  Foundation was at the first line or the second
14  line.
15     Q.   Do you know when Mr. Patrick set up
16  this structure?
17     A.   Many years ago at the beginning of
18  the -- I don't think it's changed over the
19  years.  As far as I know, the general -- or
20  this -- this structure was put in place at the
21  beginning, I believe, sometime in the late
22  2000s.
23     Q.   Do you know what the Donor Advised
24  Funds are, the DAF funds?
25        MR. SBAITI:  I'm going to object to

Page 294

1        Dondero - 6-1-2021
2  the form of the question.
3        John, if you could be clear as to
4  which line -- are you talking about
5  charitable DAF HoldCo, or are you talking
6  about charitable DAF Fund, L.P.?
7        MR. TAYLOR:  If you could be as
8  specific as possible, and he'll try to
9  answer as specifically as possible.  I'm
10  not sure which box you're talking about.
11        MR. MORRIS:  All right, Clay.  Thank
12  you.
13  BY MR. MORRIS:
14     Q.   Mr. Dondero, are you familiar with
15  the phrase "DAF"?
16     A.   Yes.
17     Q.   Have you used that phrase before?
18     A.   Yes.
19     Q.   When you refer to -- when you use
20  the phrase "DAF," what are you referring to?
21     A.   It would depend.
22     Q.   On what?
23     A.   What the question is.
24     Q.   What's -- do you have an
25  understanding of what the Charitable DAF GP,

Page 295

1        Dondero - 6-1-2021
2  LLC, is?
3     A.   The exact structural differences,
4  I -- I -- I -- I don't know.
5     Q.   So when you use the phrase "DAF,"
6  what are you referring to?
7     A.   In general, when I use the
8  expression, it's the -- the overall entity, the
9  overall pool of capital and/or the overall
10  entity that makes the donations from the pool
11  of capital.
12     Q.   And which entity -- withdrawn.
13        Do you have an understanding as to
14  which entity holds the pool of capital?
15     A.   No.  It's -- no, I don't know for
16  sure.
17     Q.   Do you know if it's CLO HoldCo,
18  Ltd.?
19        MR. SBAITI:  Objection, asked and
20  answered.
21     A.   I don't know.
22  BY MR. MORRIS:
23     Q.   Do you know if Charitable DAF Fund,
24  L.P., holds any assets?
25        MR. SBAITI:  Objection, relevance,

Appx. 01706

Page 296

```
1              Dondero - 6-1-2021
2     no foundation.
3       A.  I – I don't know which entities
4     hold which of the assets.
5     BY MR. MORRIS:
6       Q.  Did you – did you approve of the
7     organizational structure that Mr. Patrick
8     created at your request?
9       A.  Yes.
10             MR. TAYLOR:  Objection, vague.
11    BY MR. MORRIS:
12      Q.  I'm sorry.  Did – did you answer,
13    sir?
14      A.  Yes.
15      Q.  Okay.  Who is Grant Scott?
16      A.  I understand he was the trustee of
17    the DAF for a number of years.
18      Q.  When you say "he was the trustee of
19    the DAF," what are you referring to?
20      A.  I always refer to him as "trustee,"
21    but I see it's labeled here as "managing
22    member."
23      Q.  Do you know how he came to be
24    appointed the trustee of the DAF?
25      A.  I believe it was on my
```

Page 297

```
1              Dondero - 6-1-2021
2     recommendation.
3       Q.  Who did you make the recommendation
4     to?
5       A.  It would have been Mark Patrick.
6       Q.  Did Mark Patrick have the authority
7     to appoint Mr. Scott as the trustee of the DAF?
8             MR. SBAITI:  Objection, vague.
9     Object to the extent it calls for a legal
10    conclusion.
11      A.  Yeah, I don't know.
12    BY MR. MORRIS:
13      Q.  Well, you've known Mr. Scott since
14    high school; isn't that right?
15      A.  Yes.
16      Q.  You went to UVA together; isn't that
17    right?
18      A.  Yes.
19      Q.  You were housemates together in
20    college; isn't that right?
21      A.  Yes.
22      Q.  He was the best man at your wedding;
23    isn't that right?
24      A.  Yes.
25      Q.  You picked Mr. Scott to serve as the
```

Page 298

```
1              Dondero - 6-1-2021
2     trustee of the DAF; isn't that right?
3             MR. TAYLOR:  Objection.  That's not
4     what he stated.
5       A.  I – on the original formation, I
6     recommended Grant Scott.
7     BY MR. MORRIS:
8       Q.  And you recommended Mr. Scott to
9     Mr. Patrick?
10      A.  That's my recollection, I believe,
11    but I don't remember specifically.
12      Q.  Do you remember if Mr. Patrick held
13    any role in any entity on the chart that stands
14    before you?
15      Withdrawn.
16      Do you know if Mr. Patrick held any
17    role with any entity prior to January 1st,
18    2021?
19             MR. SBAITI:  Objection, vague.
20      A.  I don't know.
21    BY MR. MORRIS:
22      Q.  Why did you make the recommendation
23    to Mr. Patrick?
24      A.  Initially?  You're saying the
25    initial recommendation when it was set up?
```

Page 299

```
1              Dondero - 6-1-2021
2       Q.  Correct.
3       A.  13, 14, 15 years ago.
4       The – it – we thought – I thought
5     at the time he would be suitable.
6       Q.  But why did you select Mr. Patrick
7     as the person to whom to make your
8     recommendation?
9       A.  Because he was responsible for
10    setting up the overall structure.
11      Q.  Did he – were you seeking his
12    approval when you made the recommendation to
13    him?
14      A.  I – I don't know the roles he was
15    playing at the – at that moment, so I – I
16    don't know.
17      Q.  At the time that you recommended
18    Mr. Scott to serve as the trustee of the DAF,
19    did you have any understanding as to who had
20    the authority to actually appoint Mr. Scott?
21      A.  I did not specifically.
22      Q.  Did you ever learn who had the power
23    to appoint the trustee of the DAF?
24      A.  I did not.
25      Q.  As you sit here today, do you have
```

Page 300

Dondero - 6-1-2021

1  any understanding as to who has the power to
2  appoint the trustee of the DAF?
3       MR. TAYLOR:  I'll instruct the
4  witness not to answer to the extent it
5  would require him to reveal privileged
6  communications with counsel.
7       MR. MORRIS:  I'm not asking him for
8  any communications, to be clear.
9       MR. TAYLOR:  Or anything he heard
10  from counsel.
11       (Audio distortion.)
12       MR. MORRIS:  Please don't -- Clay,
13  you're a very good lawyer, please don't
14  coach the witness.  He's a very
15  sophisticated witness.
16  BY MR. MORRIS:
17     Q.   Do you have any understanding, as
18  you sit here today, sir, as to who has the
19  authority to appoint the trustee of the DAF?
20     A.   I know it's complicated.  I know it
21  has to do with shares.  I know it's -- I know
22  it's multiple levels, but I don't have specific
23  knowledge.
24     Q.   Do you know if Mr. Patrick ever
25

Page 301

Dondero - 6-1-2021

1  considered appointing -- withdrawn.
2       MR. MORRIS:  Could we please put up
3  the next exhibit, Patrick File 6,
4  Document 1?
5       (Exhibit 2 introduced.)
6       MR. SBAITI:  John, is that document
7  you put up a labeled exhibit for the, like
8  Exhibit 1 or something, the one you have up
9  right here.
10       MR. MORRIS:  Yeah, that will be
11  marked as Exhibit 1, thank you.
12       So, now we're going to put up
13  Exhibit 2.
14  BY MR. MORRIS:
15     Q.   Do you see that that's the Amended
16  and Restated Limited Liability Company
17  Agreement of the Charitable DAF GP, LLC?
18     A.   Yes.
19     Q.   And do you see that it's dated
20  effective as of January 1st, 2012?
21     A.   Yes.
22     Q.   So, that's approximately nine plus
23  years ago.
24       Do I have that right?
25

Page 302

Dondero - 6-1-2021

1     A.   Yes.
2     Q.   Okay.
3       MR. MORRIS:  Can we go to the last
4  page, please?
5  BY MR. MORRIS:
6     Q.   Is that your signature on that page,
7  sir?
8     A.   Yes.
9     Q.   And do you understand that, pursuant
10  to this agreement, Mr. Scott replaced you as
11  the managing member of the DAF GP, LLC?
12     A.   I -- I don't have a recollection of
13  that.
14     Q.   Do you remember that you served as
15  the managing member of the DAF GP, LLC?
16     A.   I don't -- I don't recall that.
17     Q.   Now, Mr. Scott is a lawyer, correct?
18     A.   Yes.
19     Q.   He's a patent lawyer.  Do I have
20  that right?
21     A.   Yes.
22     Q.   He has no experience or expertise in
23  finance, does he, to the best of your
24  knowledge?
25

Page 303

Dondero - 6-1-2021

1     A.   I would not say he has expertise.  I
2  wouldn't say he's an expert in it, but I -- I'd
3  say he's more sophisticated than the average
4  layperson.
5     Q.   Well, at the time that you
6  recommended him to Mr. Patrick, did you do so
7  because you thought he had valuable experience
8  and expertise in finance or investment?
9       MR. SBAITI:  Objection, assumes
10  facts not in evidence before the witness.
11  BY MR. MORRIS:
12     Q.   That wasn't one of the reasons you
13  recommended Mr. Scott, is it?
14     A.   He wasn't going to be the investment
15  advisor.  DAF had a separate investment
16  advisor.
17     Q.   And who was going to be the
18  investment advisor?
19     A.   Highland.
20     Q.   And you owned and controlled
21  Highland at the time, correct?
22       MR. TAYLOR:  Objection.
23  BY MR. MORRIS:
24     Q.   Withdrawn.
25

Page 304

```
1          Dondero - 6-1-2021
2          You controlled Highland at the time,
3  correct?
4      A.   Yes.
5      Q.   Did Mr. Scott have any experience or
6  expertise running charitable organizations, to
7  the best of your knowledge?
8      A.   No.
9      Q.   Had he ever, to the best of your
10 knowledge, made any decisions concerning
11 collateralized loan obligations?
12     A.   No.
13     Q.   Can you tell me why you recommended
14 to Mr. Patrick that Mr. Scott serve as the
15 trustee of DAF?
16         MR. TAYLOR:  Objection, asked and
17     answered.
18     A.   I – I thought he would be a good
19 fit for the position.
20 BY MR. MORRIS:
21     Q.   Why?
22     A.   It required – I don't – in my
23 mind – or I believed it would require a lawyer
24 and someone with legal skills, and I thought he
25 would be good at the position.
```

Page 305

```
1          Dondero - 6-1-2021
2      Q.   And you trusted him; is that right?
3      A.   I – yes.
4      Q.   And you had a life-long relationship
5  with him; isn't that right?  Isn't that one of
6  the reasons why you recommended him for this
7  position?
8      A.   Yes.
9      Q.   Do you know whether Mr. Patrick –
10 withdrawn.
11         Is Mr. – do you believe that
12 Mr. Patrick is the person who appointed
13 Mr. Scott as your successor as managing member
14 in 2012?
15         MR. SBAITI:  Objection, asked and
16     answered, calls for speculation; and object
17     to the extent it calls for a legal
18     conclusion.
19     A.   I could – I could repeat the answer
20 again.
21         I don't know the formal process, but
22 I do remember recommending to Mark Patrick that
23 Grant would be a good candidate.  Now, how –
24 what mechanism and how the process works and
25 who actually approved that, I – I don't know.
```

Page 306

```
1          Dondero - 6-1-2021
2  BY MR. MORRIS:
3      Q.   Did you recommend anybody else, or
4  was Mr. Scott the only person that you
5  recommended?
6      A.   I don't – I don't remember.  I
7  don't remember.  I don't remember recommending
8  anybody else or if the process required it.  I
9  don't remember the process.
10     Q.   Was anybody involved in the process
11 other than you and Mr. Patrick?
12         MR. TAYLOR:  Objection to the extent
13     it calls for speculation.
14 BY MR. MORRIS:
15     Q.   Withdrawn.
16         Do you know – do you know if
17 anybody was in the process – involved in the
18 process other than you and Mr. Patrick?
19     A.   Again, I don't know the process and
20 the mechanism, if there were offshore boards
21 involved or if the four underlying charities
22 were involved.  It was – it was complicated,
23 and I delegated the process to Mark Patrick.
24     Q.   Okay.  I'm not asking you to
25 speculate.  I'm just asking for your knowledge.
```

Page 307

```
1          Dondero - 6-1-2021
2          Can you identify any person or
3  entity who was involved in the appointment of
4  Mr. Scott as your successor as managing member
5  of the DAF GP, LLC, other than yourself and
6  Mr. Patrick?
7          MR. SBAITI:  Objection, assumes
8      facts.
9      A.   Yeah, I don't – I don't have
10 specific knowledge.
11 BY MR. MORRIS:
12     Q.   Okay.  Do you understand that in
13 addition to becoming the managing member of the
14 Charitable DAF GP, LLC, that Mr. Scott also
15 became the sole director of the Charitable DAF
16 HoldCo, Ltd., Charitable DAF Fund, L.P., and
17 CLO HoldCo, Ltd.?
18         MR. TAYLOR:  Objection, assumes
19     facts not before the witness.
20     A.   No.
21 BY MR. MORRIS:
22     Q.   Do you know if he ever held the
23 directorship of any of those entities?
24         MR. SBAITI:  Objection, vague.
25     A.   I – I don't know what his exact
```

Page 308

```
          Dondero - 6-1-2021
1   role is now, but I -- I thought I was informed
2   that that's -- his role now has something to do
3   with directorship.
4   BY MR. MORRIS:
5       Q.  Can we put the chart back up,
6   Exhibit 1, please?
7           (Exhibit 1 on screen.)
8   BY MR. MORRIS:
9       Q.  Do you know whether Mr. Scott held
10  any position at all with Charitable DAF HoldCo,
11  Ltd., at any time?
12      A.  I don't know.
13      Q.  Can you identify any person who's
14  ever -- who you believe had the authority to
15  act on behalf of the Charitable DAF HoldCo,
16  Ltd., prior to March 1st, 2021?
17          MR. SBAITI:  Objection, assumes
18  facts not in evidence.
19      A.  I don't know.
20  BY MR. MORRIS:
21      Q.  You can't name anybody in the world
22  who was authorized on behalf of -- who was
23  authorized to act on behalf of the Charitable
24  DAF HoldCo, Ltd., prior to March 1st, 2021?
```

Page 309

```
          Dondero - 6-1-2021
1           MR. TAYLOR:  Objection, asked and
2   answered.
3           MR. SBAITI:  Objection, calls for a
4   legal opinion.
5       A.  I don't know.
6   BY MR. MORRIS:
7       Q.  How about the Charitable DAF Fund,
8   L.P.; can you identify anybody in the world who
9   was authorized to act on behalf of that entity
10  prior to March 1st, 2021?
11          MR. SBAITI:  Objection, calls for a
12  legal opinion.
13      A.  I mean, other than Grant Scott, the
14  org chart seems to roll up back up to him.
15  BY MR. MORRIS:
16      Q.  Okay.  So, you're willing to say
17  that Grant Scott acted on behalf of that
18  entity?
19          Do I have that right?
20          MR. TAYLOR:  That's not --
21  mischaracterizes his statements.  He's
22  giving you his general --
23          MR. MORRIS:  Just object to the form
24  of the question.  Please, no speaking
```

Page 310

```
          Dondero - 6-1-2021
1   objections.  It's very simple.
2           MR. TAYLOR:  So, John, I'm going to
3   make my record.  If you don't like it, then
4   bring it up with the Judge.
5   BY MR. MORRIS:
6       Q.  Mr. Dondero, do you understand that
7   Mr. Scott was authorized to act on behalf of
8   the Charitable DAF Fund, L.P., prior to
9   March 1st, 2021?
10          MR. TAYLOR:  Objection, calls for a
11  legal conclusion.
12      A.  I -- I don't know.
13  BY MR. MORRIS:
14      Q.  Okay.  Do you know if anybody was
15  authorized to act on behalf of CLO HoldCo,
16  Ltd., prior to March 1st, 2021?
17          MR. TAYLOR:  Objection, calls for a
18  legal conclusion.
19      A.  I -- I don't know the specifics on
20  how this operated.
21  BY MR. MORRIS:
22      Q.  But you can't identify any person,
23  do I have that right, you don't know the
24  identity of any person who was ever authorized
```

Page 311

```
          Dondero - 6-1-2021
1   to act on behalf of CLO HoldCo, Ltd., prior to
2   March 1st, 2021; is that right?
3           MR. TAYLOR:  Objection, calls for a
4   legal conclusion.
5           MR. MORRIS:  I'm not asking for a
6   legal conclusion.  I'm asking for
7   Mr. Dondero's knowledge of the facts or his
8   understanding of the facts.
9           MR. TAYLOR:  With all due respect,
10  it calls for a legal conclusion.
11          MR. MORRIS:  I cannot wait -- I
12  cannot wait until next Tuesday.  This is
13  going to be brilliant.
14  BY MR. MORRIS:
15      Q.  Mr. Dondero, let me try one last
16  time.
17          Can you identify any person who you
18  believed was authorized to act on behalf of CLO
19  HoldCo, Ltd., prior to March 1st, 2021?
20      A.  I need to answer the question this
21  way:  My knowledge begins and ends with Grant
22  as the trustee, or on this org chart, managing
23  member; and his control, it looks like it flows
24  down through all those entities.  Now -- or --
```

Page 312

Dondero - 6-1-2021

1  or ownership, at least, or maybe control or
2  agreement.
3
4       Now, what other people or boards or
5  trustees or -- or entity he had to go through,
6  whether US Cayman Guernsey, et cetera, to get
7  things done and where the assets were held, I
8  do not have specific knowledge and I don't know
9  the names of the people or the entities that
10 were on those boards or -- supervisory or
11 holders of shares, or whatever. I wasn't
12 specifically involved in the operation of this
13 structure.
14      Q.   Did the Charitable DAF Fund, L.P.,
15 and Highland Capital Management, L.P., enter
16 into an Amended and Restated Investment
17 Advisory Agreement, to the best of your
18 knowledge?
19      A.   There was an Investment Advisory
20 Agreement, as far as I knew.
21      Q.   And what is your understanding of
22 the purpose of the Investment Advisory
23 Agreement?
24      A.   Excuse me.
25           To provide portfolio management to

Page 313

Dondero - 6-1-2021

1  achieve adequate returns on the portfolio to
2  support the charitable giving of the DAF.
3
4       Q.   Did Mr. Scott lack the capability to
5  provide portfolio management services to the
6  Charitable DAF Fund, L.P., to the best of your
7  knowledge?
8       A.   I would not say that.
9       Q.   So why -- why did -- withdrawn.
10           Was the -- did you participate in
11 the negotiation -- withdrawn.
12           Can we please put up the next
13 exhibit? We'll call it Exhibit 3.
14           (Exhibit 3 introduced.)
15 BY MR. MORRIS:
16      Q.   Do you see this is an Amended and
17 Restated Investment Advisory Agreement between
18 the Charitable DAF Fund, L.P.; the Charitable
19 DAF, GP, LLC; and Highland Capital Management,
20 L.P.?
21      A.   Yes.
22      Q.   Is this the agreement you were just
23 referring to?
24      A.   Unless there was another amended
25 one. I believe there was always one -- best

Page 314

Dondero - 6-1-2021

1  practice is to have an investment advisory
2  group.
3
4       Q.   And do you know who prepared this
5  document?
6       A.   No.
7       Q.   Do you know if it was the subject of
8  any negotiation?
9       A.   I don't know.
10      Q.   Do you know if the Charitable DAF
11 Fund, L.P., or the Charitable DAF GP, LLC, had
12 independent counsel in connection with the
13 negotiation and execution of this Amended and
14 Restated Investment Advisory Agreement?
15      A.   I don't know.
16      Q.   Do you know if the Charitable DAF
17 Fund, L.P., or the Charitable DAF GP, LLC, ever
18 hired independent counsel prior to the
19 commencement of Highland's bankruptcy in
20 October 2019?
21      A.   I don't know.
22      Q.   Did those entities also enter into a
23 Shared Services Agreement with Highland Capital
24 Management?
25      A.   I believe there was a Shared

Page 315

Dondero - 6-1-2021

1  Services Agreement. I don't know which DAF
2  entities entered it.
3       Q.   Before we get to that, pursuant to
4  the Investment and Advisory Agreement, did
5  Highland Capital Management, L.P., manage the
6  assets of the DAF and CLO HoldCo?
7       MR. TAYLOR:  Objection, vague.
8       A.   Can you repeat the question again?
9  BY MR. MORRIS:
10      Q.   Sure. Is it your understanding that
11 pursuant to this agreement, HCMLP managed the
12 assets of the DAF and CLO HoldCo?
13      A.   This agreement discusses the DAF,
14 right?
15           This disagreement doesn't discuss
16 CLO HoldCo, right?
17      Q.   Do you know whether HCMLP ever had
18 any agreement of any kind with CLO HoldCo
19 pursuant to which it managed CLO HoldCo's
20 assets?
21      A.   I don't know for certain.
22      Q.   Do you have any understanding at all
23 as to whether such an agreement existed?
24      A.   I -- I don't know for certain. I'm

Page 316

```
1          Dondero - 6-1-2021
2    willing to be refreshed.
3          Q.   Do you know who provides --
4    withdrawn.
5          Do you know whether anybody provides
6    independent -- withdrawn.
7          Do you know whether anybody has an
8    agreement with the Charitable DAF Fund, L.P.,
9    or the Charitable DAF GP, LLC, today similar to
10   the type that had been previously entered into
11   with HCMLP?
12         MR. TAYLOR:  Objection, vague.
13   A.   I believe Skygate has a similar --
14   similar agreements in place.
15   BY MR. MORRIS:
16   Q.   Is it your understanding that
17   Skygate effectively replaced HCMLP as the
18   investment advisor to the DAF?
19   A.   Let me clarify that for a second.
20         I believe Skygate has the Shared
21   Services Agreement.  I don't know whether it's
22   Skygate or NexPoint has the Investment Advisory
23   Agreement or if it was another entity.  I
24   don't -- I don't know.  I -- I don't know the
25   specifics.
```

Page 317

```
1          Dondero - 6-1-2021
2    Q.   Okay.  While Mr. Scott served -- I
3    think you said as the trustee of the DAF, can
4    you identify any investment decision that HCMLP
5    had recommended that Mr. Scott rejected?
6    A.   No.
7    Q.   Can you think of any investment that
8    Mr. Scott made on behalf of the DAF that didn't
9    originate with HCMLP?
10   A.   He wasn't the investment advisor,
11   but, no, I don't -- I don't recall.
12   Q.   Let's just speed this up a bit.
13         Do you recall that in October 2019,
14   the debtor filed for bankruptcy?
15   A.   Yes.
16   Q.   And do you recall that after the
17   debtor filed for bankruptcy, CLO HoldCo, Ltd.,
18   retained John Kane to act as counsel on its
19   behalf?
20   A.   I -- I know he was retained.  I
21   don't know which entities in particular.
22   Q.   Do you have any understanding as to
23   who Mr. Kane represented?
24   A.   My understanding was that he
25   represented the DAF.  Now, whether it included
```

Page 318

```
1          Dondero - 6-1-2021
2    all entities, CLO HoldCo, the offshore
3    entities, which entities, I -- I don't know.
4    Q.   Do you know if -- do you know how
5    Mr. Kane came to be retained by the DAF?
6          MR. SBAITI:  Objection to the extent
7          it calls for the DAF's confidential
8          privileged information (inaudible).
9    A.   I -- I don't remember.  I know the
10   lawyers -- I let the legal department or
11   lawyers find and identify good -- I let them go
12   through the process of identifying and vetting
13   law firms.
14   BY MR. MORRIS:
15   Q.   And are the lawyers that you're
16   referring to in-house counsel at HCMLP?
17   A.   I -- I don't know which lawyers were
18   involved.
19   Q.   Well, you just said that you let the
20   lawyers do the vetting.  Which lawyers were you
21   referring to?
22   A.   It could have been the HCMLP
23   lawyers, it could have been NexPoint lawyers.
24   I don't know.
25   Q.   Could it have been any other lawyers
```

Page 319

```
1          Dondero - 6-1-2021
2    besides the HCMLP lawyers and the NexPoint
3    lawyers?
4    A.   I mean -- yes.  I mean, sometimes we
5    get recommendations from outside counsel
6    regarding other outside counsel.  The
7    recommendation could have come from one of the
8    other bankruptcy attorneys involved in the
9    case.  I don't know.
10   Q.   Do you recall that in October 2020,
11   Mr. Scott caused CLO HoldCo to amend its proof
12   of claim?
13         MR. TAYLOR:  Objection, assumes
14         facts not before the witness.
15   A.   Yeah, I don't -- I don't know.
16   BY MR. MORRIS:
17   Q.   Let me take it out of the --
18         (Simultaneous conversation.)
19   BY MR. MORRIS:
20   Q.   Okay.  Let me take it out of the
21   time frame.
22         Do you recall that there came a
23   moment in time when Mr. Scott caused CLO HoldCo
24   to amend its proof of claim by reducing the
25   value of the claim to zero dollars?
```

Page 320

Dondero - 6-1-2021

1    A.   I – I know there was ultimately a
2    settlement agreement.  I don't know how that
3    manifested itself.
4       Q.   Okay.  So, just to be clear, you
5    don't have any memory of CLO HoldCo –
6    withdrawn.
7       Do you have a memory of CLO HoldCo
8    filing its original proof of claim in the
9    amount of approximately $11 million?
10      A.   I – I don't recall the amount.  I
11   do remember that the DAF was overbilled by
12   Highland and there was a claim.  Whether it was
13   a POC or an administrative claim or – I don't
14   know how that manifested itself in the
15   bankruptcy.  It's – yeah.
16      Q.   Okay.  And regardless of the form of
17   the claim, do you remember that there came a
18   point in time when Mr. Scott amended the claim
19   to reduce the value to zero?
20      A.   I – I heard a hundred thousand
21   dollars, but it's essentially zero, I guess.
22      Q.   And did you know that Mr. Scott was
23   going to amend the proof of claim in that
24   manner prior to the time that he actually did

Page 321

Dondero - 6-1-2021

1    so?
2       MR. TAYLOR:  Objection to the extent
3    it calls for him to invade the
4    attorney-client privilege.
5       A.   I don't – I don't have knowledge of
6    what you just said.  I – my recollection is
7    there was a legitimate overbilling that
8    Highland did to multiple parties who have
9    pursued multiple – those multiple claims
10   against the estate, but I don't have – I don't
11   have specific knowledge of why the 11 was
12   reduced to zero, but –
13   BY MR. MORRIS:
14      Q.   Did you ever discuss with Mr. Scott
15   his decision to reduce the claim to zero?
16      A.   Not – not before he did it.
17      Q.   At any time, did you ever discuss
18   with Mr. Scott his decision to reduce the claim
19   to zero?
20      A.   I believe afterwards.
21      Q.   And what do you recall about your
22   discussions with Mr. Scott afterwards?
23      A.   That he had given up bona fide
24   claims against the debtor, and I didn't

Page 322

Dondero - 6-1-2021

1    understand why.
2       Q.   Did he explain to you why he thought
3    he was not giving up bona fide claims –
4    withdrawn.
5       What did he say in response?
6       MR. SBAITI:  Objection, calls
7    for legal –
8       (Audio distortion.)
9    BY MR. MORRIS:
10      Q.   If anything?
11      A.   I don't remember him having an
12   explanation.
13      Q.   Was anybody else – did anybody else
14   participate in this discussion?
15      A.   No.
16      Q.   Did this discussion occur in a
17   singular phone call, or was it in multiple –
18   during multiple conversations?
19      A.   A couple, one or two.
20      Q.   Do you remember anything about your
21   discussions with Mr. Scott concerning his
22   decision to amend CLO HoldCo's proof of claim
23   by reducing it to zero, other than what you've
24   testified to so far?

Page 323

Dondero - 6-1-2021

1       MR. TAYLOR:  Objection, vague.
2       A.   No, but I'm willing – I'm willing
3    to be refreshed or answer more questions, but
4    those are the only things that come to mind.
5    BY MR. MORRIS:
6       Q.   Okay.  So, I think what you've told
7    me–and I just want to make sure that I have
8    this right–that after the amendment was filed,
9    you had several conversations with Mr. Scott in
10   which you told him that you believed he had
11   given up bona fide claims against the debtor,
12   but that you don't recall what, if anything, he
13   said in response.
14      Have I missed anything?
15      A.   You used "several."  It's – I said
16   "a couple."
17      Q.   Okay.
18      A.   But otherwise, that's – that's my
19   testimony.
20      Q.   Do you recall that sometime after
21   that, CLO HoldCo had filed an objection to the
22   proposed HarbourVest Settlement?
23      A.   Yes.
24      Q.   And did you subsequently learn that

Page 324

Dondero - 6-1-2021

1          Dondero - 6-1-2021
2    CLO HoldCo withdrew its objection to the
3    HarbourVest Settlement?
4          A.    Yes.
5          Q.    Do you recall if you learned that
6    before or after CLO HoldCo withdrew its
7    objection -- withdrawn.
8          That wasn't a good question.
9          Did you know, prior to the time that
10   CLO HoldCo announced that it was withdrawing
11   its objection, that it intended to do so; or
12   did you learn about that after -- you know, as
13   the announcement was being made?
14         MR. SBAITI:  Objection, compound.
15         MR. TAYLOR:  Objection, compound.
16   BY MR. MORRIS:
17         Q.    You can answer.
18         A.    I learned about it at the hearing.
19   BY MR. MORRIS:
20         Q.    Were you surprised?
21         A.    Yes.
22         Q.    And why were you surprised?
23         A.    It was inappropriate.
24         Q.    Why did you believe it was
25   inappropriate?

Page 325

1          Dondero - 6-1-2021
2          A.    The night before, Counsel had
3    confirmed with other counsel.
4          MR. TAYLOR:  Instruct the witness
5    not to reveal any privileged information.
6          THE WITNESS:  Okay.
7    BY MR. MORRIS:
8          Q.    Mr. Dondero, you and I have done
9    this many, many times.  I hope that you
10   understand that I'm never, ever asking or
11   hoping that you'll mistakenly divulge
12   attorney-client communications.
13         A.    Yeah.  Let me rephrase.
14         Q.    Yeah.  So, having said that, you
15   said that you believed it was inappropriate;
16   and the question is really simple:  Why did you
17   believe it was inappropriate?
18         A.    There was legal basis or legal
19   interpretation, I believed, in the governing
20   partnership agreement justifying the objection;
21   and I also believed there were duties under the
22   Advisors Act to -- for the DAF to continue with
23   its -- or to argue its objections.
24         Q.    And after you learned that Mr. Scott
25   instructed his attorneys to withdraw CLO

Page 326

1          Dondero - 6-1-2021
2    HoldCo's objection to the HarbourVest
3    Settlement, did you have a conversation with
4    Mr. Scott about his decision?
5          MR. TAYLOR:  Objection, assumes
6    facts not in evidence.
7          A.    Yeah, I don't agree with the first
8    part of that question, so I need you to
9    rephrase it, please.
10   BY MR. MORRIS:
11         Q.    After you -- after you learned that
12   CLO HoldCo withdrew the objection, did you
13   speak with Mr. Scott about that?
14         A.    Yes.
15         Q.    Okay.  Did you have one conversation
16   or more than one conversation with Mr. Scott
17   concerning CLO HoldCo's withdrawal of its
18   objection to the HarbourVest Settlement?
19         A.    I -- I only recall one.
20         Q.    Did anybody participate in that
21   conversation besides the two of you?
22         A.    No.
23         Q.    Did that conversation take place on
24   the telephone or in some other form?
25         A.    I -- I don't know.

Page 327

1          Dondero - 6-1-2021
2          Q.    Do you know how long after the
3    conclusion of the hearing the conversation took
4    place?  Was it the same day?  Was it
5    afterwards?
6          A.    I believe it was the same day or
7    shortly thereafter.
8          Q.    And what do you recall -- please
9    tell me everything you recall about the
10   conversation, everything that you said and
11   everything that he said.
12         A.    The only two points I remember was
13   that it was inappropriate for the DAF to change
14   direction an hour before the hearing without
15   informing anybody else when it was -- yeah,
16   when it was a reversal of the direction he had
17   been going in for weeks and that it was also
18   inappropriate to -- well, no, that's -- that
19   was -- that was really -- that was really it, I
20   guess.
21         Q.    Do you recall what, if anything,
22   Mr. Scott said in response?
23         MR. SBAITI:  Objection calls --
24   (inaudible.)
25         MR. MORRIS:  What's the basis for

Page 328

1  Dondero - 6-1-2021
2  the objection?
3      MR. TAYLOR:  Objection, calls for
4  hearsay.
5      MR. SBAITI:  Calls for hearsay.
6  BY MR. MORRIS:
7      Q.   You can answer.
8      A.   That he had done it based on advice
9  of counsel.
10      Q.   Did you have any reason to doubt
11  that?
12      A.   It – it didn't – it didn't make
13  sense that counsel would change their opinion
14  between the night before and the morning of the
15  hearing, but I guess that – that is a reason
16  to doubt it.
17      Q.   Do you think – do you think
18  Mr. Scott acted in good faith when he made the
19  decision to withdraw CLO HoldCo's objection to
20  the HarbourVest Settlement?
21      A.   Can you ask that question – ask
22  that question again, please?
23      Q.   Sure.  Do you believe that Mr. Scott
24  acted in good faith when he made the decision
25  to withdraw the CLO HoldCo objection to the

Page 329

1      Dondero - 6-1-2021
2  HarbourVest Settlement?
3      A.   I don't believe he operated in the
4  best interest of the DAF or CLO HoldCo by
5  withdrawing the claims or withdrawing the
6  objectives – objections.
7      Q.   Did you -- did the subject of the
8  Advisors Act come up during this conversation?
9      A.   I don't – I don't remember if it
10  specifically came up.
11      Q.   Do you recall if the subject of
12  "fiduciary duties" came up in this
13  conversation?
14      A.   Not using those words, but reminding
15  him he needed to do what was in the best
16  interest of the DAF was definitely part of the
17  conversation.
18      Q.   Earlier you said – and I – if I
19  miss – if I don't get this right, please feel
20  free to correct me; but I believe you said that
21  it was inappropriate for the DAF to change
22  direction without informing anybody else.
23      Do I have that right?
24      A.   Yes.
25      Q.   And who do you believe Mr. Scott

Page 330

1      Dondero - 6-1-2021
2  needed to inform of his decision?
3      A.   There was some coordination and
4  cooperation among lawyers representing
5  different parties and I believe there was some
6  obligation – some professional obligation as
7  part of that to inform and keep people abreast
8  of it.
9      Q.   And would the lawyers at Bonds
10  Ellis, your personal counsel, be among those
11  lawyers that you believed he had the
12  professional obligation to inform?
13      MR. SBAITI:  Objection –
14      A.   I don't know.
15      MR. SBAITI:  -- lacks foundation.
16      A.   I don't know who was in the
17  coordination group.
18  BY MR. MORRIS:
19      Q.   Do you believe that he had an
20  obligation to inform you in advance?
21      MR. SBAITI:  Objection, vague.
22      A.   I don't know if I would use the word
23  "obligation," but, again, as the founder and the
24  primary donor and continued donor to the DAF
25  and as the investment advisor fighting for

Page 331

1      Dondero - 6-1-2021
2  above-average returns on a daily basis for the
3  fund, significant decisions that affect the
4  finances of the fund would be something I would
5  expect typically a trustee to discuss with a
6  primary donor.
7  BY MR. MORRIS:
8      Q.   And which primary donor are you
9  referring to?
10      A.   Highland, prior to bankruptcy, and
11  myself or NexPoint post-bankruptcy.
12      Q.   Is Dugaboy – The Dugaboy Investment
13  Trust a donor to the DAF?
14      MR. SBAITI:  Objection, relevance.
15      A.   I – I believe it's been a donor
16  over the years.  It wasn't the initial donor, I
17  don't believe.
18  BY MR. MORRIS:
19      Q.   How about the Get Good Trust?  Is
20  the Get Good Trust a donor to the DAF?
21      MR. SBAITI:  Objection, relevance.
22      A.   I don't know.
23  BY MR. MORRIS:
24      Q.   Do you know if either the Get Good
25  Trust or the Dugaboy Trust has any beneficial

Page 332

Dondero - 6-1-2021

1   interest in any of the DAF entities?
2   A.  It does not -- or they do not.
3   Q.  Do you know if either of the Get
4   Good or Dugaboy trusts have an interest in the
5   CLO HoldCo, Ltd., entity?
6   A.  They -- they do not.  They do not.
7   Q.  Do you recall that a short while
8   later or -- or maybe even within the same
9   month, the debtor commenced a lawsuit against
10  the entities that we've referred to previously
11  as the Advisors, the Funds, and CLO HoldCo,
12  Ltd.?
13  A.  Which litigation is that?
14  Q.  That was the one where the debtor is
15  seeking injunctive relief; and there was a
16  hearing in late January on the debtor's motion
17  for preliminary injunction against the Funds,
18  the Advisors, and CLO HoldCo?
19  A.  There's -- there's -- which
20  specifically?
21  Q.  Do you remember that there came a
22  point in time when -- when Mr. Scott, on behalf
23  of CLO HoldCo, reached a settlement with the
24  debtor that resolved the debtor's claim against

Page 333

Dondero - 6-1-2021

1   CLO HoldCo, Ltd.?
2   A.  I'm aware there was a settlement
3   that resolved most of his -- the -- most of the
4   issues with the debtor.
5   Q.  Okay.  And do you recall how you
6   learned about that settlement?
7   MR. TAYLOR:  Objection to the extent
8   it invades any attorney-client privilege.
9   A.  I learned about it after it was
10  done.
11  BY MR. MORRIS:
12  Q.  Okay.  And do you have an
13  understanding of the basic terms of the
14  settlement?
15  A.  I think that was the hundred
16  thousand I spoke of earlier that the -- as the
17  11 or $12 million of overbilling that every
18  other entity has pursued, you know, for -- the
19  overbilling was traded for a hundred thousand
20  dollars, and the -- I think Grant agreed to not
21  pursue some historic actions and not pursue
22  replacement of HCMLP as manager, regardless of
23  whether it was in the best interest of the DAF
24  or not.

Page 334

Dondero - 6-1-2021

1   Q.  And did you ever have a conversation
2   with Mr. Scott about his decision to enter into
3   that settlement on behalf of CLO HoldCo, Ltd.?
4   A.  Yes.
5   Q.  And did that -- did the
6   communications take place in one conversation,
7   more than one conversation, or in some other
8   form?
9   A.  It was a couple times.
10  Q.  Do you recall if anybody --
11  (Simultaneous conversation.)
12  BY MR. MORRIS:
13  Q.  I'm sorry, were you finished?
14  A.  It might have been just once, but
15  either one or two times.
16  Q.  Okay.  And did anybody participate
17  in that conversation other than the two of you?
18  A.  No.
19  Q.  Can you recall everything that was
20  discussed during that conversation, everything
21  that you recall saying in sum or substance and
22  everything that you can recall Mr. Scott
23  saying?
24  A.  My message was what I just

Page 335

Dondero - 6-1-2021

1   articulated, that -- that the compromise or the
2   settlement wasn't in the best interest of the
3   DAF, it wasn't in the best interest of the
4   investments in the DAF.
5   Q.  Do you recall how long the
6   conversation lasted?
7   A.  No.  It wasn't that long.
8   Q.  Do you recall that shortly after
9   Mr. Scott reached the settlement on behalf of
10  CLO HoldCo, that he gave notice of his intent
11  to resign from his positions with the DAF
12  entities and CLO HoldCo, Ltd.?
13  A.  Yes.
14  Q.  And do you recall that there was a
15  telephone conversation between and among you
16  and Mr. Scott and certain lawyers at around the
17  same time?
18  A.  I don't -- I don't remember that
19  specifically with the lawyers.
20  MR. MORRIS:  Can we please put up
21  the next exhibit, which I think we're
22  marking as Exhibit 4, which is Scott Bates
23  No. 11?
24  (Exhibit 4 introduced.)

Page 336

Dondero - 6-1-2021

1  BY MR. MORRIS:
2
3      Q.   So, I'll represent to you,
4  Mr. Dondero, that the hearing at which the CLO
5  HoldCo, Ltd., settlement was presented took
6  place on January 26th.  And so, this is the
7  following Sunday.
8          And do you see there's a list of
9  people who were going to participate in a
10  conference call on Sunday, January 31st?
11     A.   Yes.
12     Q.   And you and Mr. Scott are among
13  those people?
14     A.   Yes.
15     Q.   Do you recall if this phone call
16  took place?
17     A.   Yes.
18     Q.   Do you recall the purpose of the
19  phone call?
20     A.   Yes.  It didn't have anything to do
21  with his resignation, this phone call.
22     Q.   So, what was the purpose of this
23  call?
24     A.   Earlier, I stated that to make – to
25  pivot the plans or what he was – or to

Page 337

Dondero - 6-1-2021

1  withdraw without telling anybody, to reach
2  settlements without telling anybody that had a
3  material negative impact on the DAF was
4  inappropriate.  And I believe the purpose of
5  this call was his representation that John Kane
6  had, in fact, told everybody, so – but when I
7  spoke with everybody else, everybody said he
8  hadn't talked to them, and so to figure out –
9  to try and figure out what the truth was, we
10  had a conference call with everybody.
11     Q.   Did you figure out what the truth
12  was during that conference call?
13         MR. TAYLOR:  Objection.  I'm going
14  to have to instruct the client not to
15  answer.  This was a conversation with
16  attorneys that were acting in concert under
17  joint-defense agreement, or at least had a
18  common interest in litigation at that point
19  in time.
20         MR. MORRIS:  I think it's a little
21  late for that.
22  BY MR. MORRIS:
23     Q.   And there's no lawyer for you on
24  this call, at least that's identified on this

Page 338

Dondero - 6-1-2021

1  email string, correct?
2         MR. TAYLOR:  That's incorrect.
3  You'll see – note that Judge Lynn's – why
4  it was his email, I don't know, but Judge
5  Lynn's email address is on there.
6         MR. MORRIS:  Okay.  I think having
7  told me the purpose of the call, I think he
8  ought to be able to disclose what the
9  result of the call was.  So I'm going to
10  ask my question again.
11  BY MR. MORRIS:
12     Q.   And that is, did you learn the truth
13  as to whether or not Mr. Kane had given advance
14  notice to any of the lawyers on this email
15  string about any of the decisions you're
16  referring to?
17         MR. TAYLOR:  I'm going to renew my
18  objection.  You can answer the question,
19  but I do want to state for the record we
20  believe it's inappropriate and if brought
21  up in later proceedings, we'll move to
22  strike.
23     A.   None of the lawyers on this email or
24  that participated in the call acknowledged any

Page 339

Dondero - 6-1-2021

1  advanced conversations with Kane.
2  BY MR. MORRIS:
3     Q.   Do you remember anything else about
4  the phone call that's referred to on this
5  exhibit?
6         MR. TAYLOR:  I'm just going to renew
7  my objection.
8     A.   No.
9  BY MR. MORRIS:
10     Q.   And do you recall that Mr. Scott
11  gave notice of his intent to resign on the same
12  day?
13     A.   I – I didn't know it was exactly
14  the same day, but I knew it was on or around
15  that time.
16     Q.   Okay.
17         MR. MORRIS:  Can we pull up the next
18  exhibit, please, Exhibit Number 5, which is
19  Bates stamped Scott 18 and start at the
20  bottom.
21         (Exhibit 5 introduced.)
22  BY MR. MORRIS:
23     Q.   Do you recall receiving this email
24  from Mr. Scott on January 31st, in the

Appx. 01717

Page 340

Dondero - 6-1-2021

1
2  afternoon?
3      A.  Yes.
4      Q.  Do you know why Mr. Scott gave
5  notice of his resignation at that time?
6          MR. TAYLOR:  Objection, calls for
7      speculation.
8      A.  No.  It -- you would have to
9  answer -- I have my own speculation, but you
10 would have to ask him.
11 BY MR. MORRIS:
12     Q.  Did you ever have a conversation
13 with Mr. Scott where he informed you of the
14 reasons for his decision to give notice of his
15 resignation?
16         MR. TAYLOR:  Objection, calls for
17     hearsay.
18     A.  I knew he was suffering from anxiety
19 and health issues regarding the challenges and
20 the confrontation.
21         MR. MORRIS:  I move to strike.
22         I just want you to listen carefully
23     to my question, sir.
24 BY MR. MORRIS:
25     Q.  Did Mr. Scott tell you why he had

Page 341

Dondero - 6-1-2021

1
2  decided to give notice of his intent to resign?
3          MR. TAYLOR:  Objection, calls for
4      hearsay.
5      A.  He told me he was suffering from
6  health and anxiety issues regarding the
7  confrontation and the challenges of
8  administering the DAF, given the bankruptcy.
9  BY MR. MORRIS:
10     Q.  I'm sorry, did you use the word
11 "confrontation"?
12     A.  Yes.
13     Q.  Do you have an understanding as to
14 what confrontation he was referring to?
15         MR. TAYLOR:  Objection, calls for
16     speculation.
17     A.  I believe it was the interaction,
18 challenges of dealing with your firm.
19 BY MR. MORRIS:
20     Q.  Did you have any advanced notice
21 that Mr. Scott would be sending this email to
22 you?
23     A.  Not exactly.  But a couple days
24 beforehand, he did propose it, that he was
25 considering resigning.

Page 342

Dondero - 6-1-2021

1
2      Q.  Did you ever ask him to reconsider?
3      A.  No.
4      Q.  You'll see in the third paragraph,
5  he states, quote:  My resignation will not be
6  effective until I approve of the
7  indemnification provisions and obtain any and
8  all necessary releases.
9          Do you see that?
10     A.  Yes.
11     Q.  Did he ever explain to you why his
12 release wouldn't become -- his resignation
13 wouldn't become effective until those things
14 happened?
15         MR. TAYLOR:  Objection, calls for
16     hearsay.
17     A.  No.
18 BY MR. MORRIS:
19     Q.  Did he ever tell you who he wanted a
20 release from?
21         MR. TAYLOR:  Objection, calls for
22     hearsay.
23     A.  No.
24 BY MR. MORRIS:
25     Q.  Do you know if there is any

Page 343

Dondero - 6-1-2021

1
2  agreement today that relates to the
3  indemnification and release provisions cited in
4  Mr. Scott's email?
5          MR. SBAITI:  Objection, calls for a
6      legal conclusion, lacks foundation, lacks
7      relevance.
8      A.  There's no new agreement that I'm
9  aware of.  There's an existing agreement from
10 when he was originally put in place.
11 BY MR. MORRIS:
12     Q.  Did you ask for Mr. Scott's
13 resignation?
14     A.  No.
15     Q.  Did Mr. Scott or anybody acting on
16 his behalf ever explain to you or anybody
17 acting on your behalf why he wanted the
18 indemnification and release provisions?
19         MR. TAYLOR:  Objection, hearsay.
20     A.  No.
21 BY MR. MORRIS:
22     Q.  Did you ever say or suggest to
23 Mr. Scott that he had breached his fiduciary
24 duties to anybody at any time?
25     A.  I -- I don't -- I don't remember if

Appx. 01718

Page 344

Dondero - 6-1-2021

1  I spoke to anybody else about it.
2      Q.   I'm just asking if you ever – if
3  you or anybody on your behalf ever told that to
4  Mr. Scott or anybody acting on Mr. Scott's
5  behalf, like Mr. Kane.
6      MR. SBAITI:  Objection, compound.
7      A.   I – I believe I testified already
8  that I told him he didn't do what was in the
9  best interest of the fund.
10  BY MR. MORRIS:
11      Q.   And did you ever tell him, in sum or
12  substance, that you believed he had breached
13  his fiduciary duties to anybody in the world by
14  not acting in the best interest of the fund?
15      MR. SBAITI:  Objection, vague.
16      A.   I don't recall if I had those
17  discussions with somebody else.  I mean – no,
18  that's – I don't – I don't recall if I've had
19  those conversations with anybody else.
20  BY MR. MORRIS:
21      Q.   Did you ever threaten to sue
22  Mr. Scott?
23      A.   Did I – no.
24      Q.   Did you ever tell Mr. Scott that you

Page 345

Dondero - 6-1-2021

1  were considering suing him?
2      A.   I remember telling him he needed to
3  do what was in the best interest of the funds.
4  That's – that's as far as I remember.
5      Q.   Did you ever tell Mr. Scott that you
6  believed that the fund had claims against him?
7      A.   I believe anytime you're a trustee
8  and you don't do what's in the best interest of
9  the funds, you leave yourself open for that,
10  potentially.
11      Q.   I appreciate that that's your
12  perspective, but I'm asking you whether you
13  ever told Mr. Scott that you believed that the
14  fund could assert claims against him.
15      A.   I don't recall that.
16      Q.   Do you recall if you ever told
17  Mr. Scott that you believed the fund should
18  assert claims against him?
19      A.   No, I don't recall that.
20      Q.   Okay.  Did you ever tell Mr. Scott
21  that you believed anybody in the world had
22  potential causes of action against him for
23  actions or inactions taken on behalf of the DAF
24  or CLO HoldCo?

Page 346

Dondero - 6-1-2021

1      MR. SBAITI:  Objection, vague.
2      A.   I don't recall that.
3  BY MR. MORRIS:
4      Q.   What did you do after you received
5  this email?
6      Withdrawn.
7      Did you do anything in response to
8  receiving this email?
9      MR. TAYLOR:  For the record, we're
10  talking about Exhibit 5?
11      MR. MORRIS:  Yes, I believe so.
12      Is that right, La Asia?
13      MR. TAYLOR:  For that – sorry, 4.
14      MS. CANTY:  I'm sorry, John.  Repeat
15  that.
16      MR. MORRIS:  Is this document on the
17  screen Exhibit 5?
18      MS. CANTY:  It's going to be
19  Exhibit 5, but what we had – we had
20  premarked them.  So, we skipped one in
21  sequence.  So, when I upload it, it will be
22  5.
23      MR. MORRIS:  Okay.  Thank you.
24      MS. CANTY:  You're welcome.

Page 347

Dondero - 6-1-2021

1      MR. MORRIS:  Yes, Clay, we're going
2  to – ultimately, this will be marked as
3  Exhibit 5.
4      MR. TAYLOR:  Thank you.
5      MR. MORRIS:  Yeah.
6  BY MR. MORRIS:
7      Q.   So, the question, Mr. Dondero, is:
8  Do you recall doing anything after receiving
9  this email?
10      MR. TAYLOR:  Objection, vague.
11      A.   I don't remember doing anything with
12  it.  I – I didn't know what to do with it.  I
13  didn't know how the DAF structure worked when
14  there was a resignation.
15  BY MR. MORRIS:
16      Q.   Did you ask Mr. Scott why he chose
17  to send it to you?
18      A.   No.
19      Q.   Did you forward it to anybody?
20      A.   I don't recall.
21      Q.   Did you notify anybody that you had
22  received this?
23      A.   I – I don't remember.
24      MR. MORRIS:  Can we scroll up to

Page 348

```
1              Dondero - 6-1-2021
2        Mr. Dondero's response?
3              (Scrolling.)
4   BY MR. MORRIS:
5        Q.   You can see --
6              MR. MORRIS:  That's perfect right
7        there.
8   BY MR. MORRIS:
9        Q.   You can see in the first sentence of
10  Mr. Scott's email there's a reference to
11  resigning and divesting.  Do you see that?  I'm
12  summarizing.
13       A.   Yes.
14       Q.   And you responded, and you requested
15  clarification that -- the next morning; is that
16  fair?
17            That's the first question.
18       A.   Yes.
19       Q.   And then you tried to explain to
20  Mr. Scott what your view was of the phrase
21  "divestment" or "divest."
22            Do I have that right?
23       A.   Yes.  Divest has a different meaning
24  in investments than it does, I guess, in legal
25  structuring; and I just wanted to make sure
```

Page 349

```
1   you -- you didn't mean liquidation of the
2   assets.
3        Okay.  That's what I'm getting to.
4        Q.   Okay.  That's what I'm getting to.
5             MR. MORRIS:  So can we scroll up to
6   Mr. Scott's response?
7             (Scrolling.)
8   BY MR. MORRIS:
9        Q.   And Mr. Scott tried to clarify why
10  he -- he used the word "divest."  Do you see
11  that?
12       A.   Yes.
13       Q.   Okay.
14            MR. MORRIS:  And then if we can
15  scroll up to your response.
16            (Scrolling.)
17  BY MR. MORRIS:
18       Q.   Do you see your response says:  What
19  does that mean?  Quote, you need to tell me
20  ASAP that you have no intent to divest assets.
21            Do you see that?
22       A.   Yes.
23       Q.   Why did you write that?
24       A.   It was unpredictable -- some of his
25  behavior was unpredictable at this point.  I
```

Page 350

```
1              Dondero - 6-1-2021
2   just wanted to make sure he wasn't liquidating
3   or intending to liquidate the portfolio.
4        Q.   What interest did you have in making
5   sure that Mr. Scott didn't liquidate the
6   portfolio?
7        A.   It could materially damage the value
8   of the DAF and its ability to continue its
9   mission as a charitable entity.
10       Q.   Had Mr. Scott ever divested assets
11  before?
12            MR. TAYLOR:  Objection, vague.
13       A.   Well, by giving up the
14  11 million-dollar disclaim against the debtor,
15  he divested an 11 million-dollar asset.
16  BY MR. MORRIS:
17       Q.   Anything else?
18       A.   Not that I can recall.
19       Q.   When was the last time you
20  communicated with Mr. Scott?
21       A.   I sent him a Happy Birthday text a
22  couple days ago.
23       Q.   And when was the last time you spoke
24  with him?
25       A.   It's been a couple months.
```

Page 351

```
1              Dondero - 6-1-2021
2        Q.   Is the last time you spoke to him at
3   around the time that he gave notice of his
4   intent to resign?
5        A.   No.  It was about a month after
6   that.
7        Q.   Mr. Patrick replaced Mr. Scott as
8   the managing member of the DAF GP and as the
9   director of the affiliated DAF entities and CLO
10  HoldCo, correct?
11            MR. SBAITI:  Objection --
12            (Audio distortion.)
13       A.   Ultimately, yes.
14  BY MR. MORRIS:
15       Q.   Do you know how Mr. Patrick came to
16  replace Mr. Scott?
17            MR. TAYLOR:  Objection to the extent
18       it calls for a legal conclusion.
19       A.   I -- I found out about it after it
20  happened, you know, only from things that Mark
21  Patrick told me.
22  BY MR. MORRIS:
23       Q.   Did you know that it was going to
24  happen before the event occurred, before the
25  actual replacement occurred?
```

Page 352

```
          Dondero - 6-1-2021
1
2       MR. TAYLOR:  Objection, relevance.
3       A.   No.
4   BY MR. MORRIS:
5       Q.   Do you know who -- who gave
6   Mr. Patrick -- withdrawn.
7          Do you know anything about the
8   circumstances by which Mr. Patrick replaced
9   Mr. Scott?
10      A.   I -- only from conversations with
11  Mark Patrick after the fact.
12      Q.   What did Mr. Patrick tell you?
13      MR. TAYLOR:  Objection, hearsay.
14      A.   He had struggled to -- he had
15  struggled to find other candidates or entities.
16  He had struggled with D&O insurance around some
17  of the alternative candidates.
18          And one day, when he was talking to
19  Grant Scott, they came to some -- I don't know
20  who said what to who, but that -- why doesn't
21  Mark Patrick do it and he has knowledge of the
22  structure, he enjoys the charitable giving
23  part.
24          And unbeknownst to me, they agreed,
25  and he sent over the appropriate documentation
```

Page 353

```
          Dondero - 6-1-2021
1
2   or transfer of shares of voting--again, I don't
3   know how it works specifically--and Grant
4   signed it, and Mark Patrick became the trustee.
5   BY MR. MORRIS:
6       Q.   So, it's your testimony that, prior
7   to the time they signed the documentation
8   pursuant to which Patrick replaced Scott, you
9   had no knowledge that there were discussions
10  underway pursuant to which that would occur?
11      A.   Correct.
12      Q.   You mentioned that Mr. Patrick told
13  you that they had trouble getting D&O
14  insurance.
15          Do I have that right?
16      A.   That was -- yeah, that was one of
17  the factors with a couple of the candidates.
18      Q.   And did he tell you who those
19  candidates were?
20      MR. TAYLOR:  Objection, hearsay.
21      A.   He did at the time.  I can't
22  remember who they were.  One was -- one was a
23  former Dean Foods executive, I believe; and the
24  other was an offshore sole practitioner.
25  BY MR. MORRIS:
```

Page 354

```
          Dondero - 6-1-2021
1
2       Q.   Did he tell you what the
3   difficulties were in obtaining D&O insurance?
4       A.   No.
5       Q.   Did you ask?
6       A.   No.
7       Q.   Do you know where Mr. Patrick got
8   the authority to -- withdrawn.
9          Do you know who determined to
10  replace Mr. Scott with Mr. Patrick?
11      MR. TAYLOR:  Objection to the extent
12      it calls for a legal conclusion.
13      A.   As I testified, I believe it was the
14  two of them together.
15  BY MR. MORRIS:
16      Q.   And do you have any understanding as
17  to what authority they had to designate
18  Mr. Scott's successor?
19      MR. TAYLOR:  Objection, calls for a
20      legal conclusion.
21      A.   I -- I believed, between the two of
22  them, they knew how the structure worked, and I
23  believed between the two of them, they had
24  authority -- believed they had authority, and
25  that's why they effectuated it.
```

Page 355

```
          Dondero - 6-1-2021
1
2   BY MR. MORRIS:
3       Q.   Okay.  Was Mr. Patrick ever employed
4   by HCMLP?
5       A.   Yes.
6       Q.   Do you know what period of time he
7   was employed by HCMLP?
8       A.   He's been there for quite a while.
9   I mean, he was there for quite a while.  I
10  believe over a decade.
11      Q.   And what positions did he hold, if
12  you recall?
13      A.   He headed up our tax department.  I
14  don't remember him having any position other
15  than that or before that.
16      Q.   Is he a lawyer, to the best of your
17  knowledge?
18      A.   He's -- he's a tax lawyer, yeah.
19      Q.   And do you know if he's employed
20  today?
21      A.   I -- yes.
22      Q.   Do you know where he's employed?
23      A.   Yes.
24      Q.   Where do you understand Mr. Patrick
25  is employed?
```

Page 356

```
1           Dondero - 6-1-2021
2       A.   At SkyBridge.
3       Q.   Do you know where SkyBridge's
4  offices are located?
5       A.   Yes.
6       Q.   Where are they located?
7       A.   On McKinney Avenue.  I believe it's
8  2515.
9       Q.   Is that the same suite of offices
10  where your office is located?
11          MR. SBAITI:  Objection, vague.
12      A.   It's not the same floor.  We -- we
13  left, as you know, the Highland offices
14  suddenly, and so until we establish permanent
15  office locations, they're located there, but I
16  expect they will be relocating in the
17  not-too-distant future.
18  BY MR. MORRIS:
19      Q.   Did you have any discussions with
20  Mr. Patrick concerning the positions he was
21  inheriting from Mr. Scott before he agreed to
22  accept them?
23      A.   No.
24      Q.   Do you have any written or oral
25  agreements with Mr. Patrick of any kind?
```

Page 357

```
1           Dondero - 6-1-2021
2          MR. SBAITI:  Objection --
3          MR. TAYLOR:  Objection, vague.
4       A.   Yeah, not that I know of, but I'm
5  not sure what you're asking.
6  BY MR. MORRIS:
7       Q.   All right.  Do you have any written
8  oral agreements of any kind with Mr. Patrick
9  pertaining to his role as an authorized
10  representative of any of the DAF entities or
11  CLO HoldCo, Ltd.?
12          MR. TAYLOR:  Objection, vague.
13      A.   I do not, no.
14  BY MR. MORRIS:
15      Q.   Do you know if Mr. Patrick has any
16  agreement with any of the DAF entities or CLO
17  HoldCo, Ltd., other than those set forth in the
18  limited partnership agreement and the Amended
19  and Restated Limited Liability Company
20  Agreement for the general partnership?
21      A.   I don't know of any.
22      Q.   Okay.  So, there was almost a
23  two-year period between the date that Mr. Scott
24  sent his notice to you of his intent to resign
25  and Mr. Patrick's replacement of Mr. Scott at
```

Page 358

```
1           Dondero - 6-1-2021
2  the end of March.  Do I have that right?
3          MR. TAYLOR:  Objection.  I think you
4    said two-year period.
5          MR. MORRIS:  If I did, let me
6    restate it.
7  BY MR. MORRIS:
8       Q.   There was approximately a two-month
9  period between the time that Mr. Scott sent his
10  notice to you of his intention to resign and
11  Mr. Patrick's replacement at the end of
12  March 2021.  Do I have that right?
13      A.   Yes.
14      Q.   Okay.  Are you aware that during
15  that interim period, Mr. Patrick gave certain
16  instructions to Mr. Scott?
17          MR. TAYLOR:  Objection, calls for
18    hearsay.
19          MR. SBAITI:  Lacks foundation.
20      A.   I -- I don't know specifically.
21  BY MR. MORRIS:
22      Q.   Do you know generally?  Are you
23  aware of any instructions that Mr. --
24  withdrawn.
25          Can I call that period between
```

Page 359

```
1           Dondero - 6-1-2021
2  January 31st and the time that Mr. Patrick
3  formally replaced Mr. Scott as "the interim
4  period"?  Is that okay?
5       A.   Sure.
6       Q.   Okay.  Did you ever learn at any
7  time during the interim period that Mr. Patrick
8  was giving Mr. Scott instructions with respect
9  to the duties and responsibilities concerning
10  the DAF and CLO HoldCo?
11          MR. SBAITI:  Objection, assumes
12    facts not in evidence.
13      A.   Not that I recall.
14  BY MR. MORRIS:
15      Q.   Okay.  Did you communicate with
16  Mr. Scott at all during the interim period
17  other than the birthday text that you
18  mentioned?
19          MR. SBAITI:  Objection, misstates
20    testimony.
21      A.   I don't -- I don't recall.  I mean,
22  I know I've had some conversations with him,
23  yeah, about that -- I have a house in Aspen
24  but -- and we had some conversations about
25  Aspen and skiing and stuff like that, but I
```

Page 360

1    Dondero - 6-1-2021
2    don't remember – I don't remember
3    specifically –
4    BY MR. MORRIS:
5        Q.    Did – did –
6        A.    – anything else.
7        Q.    – Mr. Patrick –
8            I apologize, Mr. Dondero.  Were you
9    finished?
10        A.    Yeah, I'm done.
11        Q.    Okay.  Did Mr. Patrick inform you of
12    any issues that were being raised that needed
13    to be addressed with Mr. Scott during the
14    interim period?
15        A.    Not that I recall.
16        Q.    Did you ever instruct Mr. Patrick on
17    what to tell Mr. Scott with respect to any
18    matter concerning any of the DAF entities or
19    CLO HoldCo during the interim period?
20        A.    Not that I recall.
21        Q.    Are you familiar with the phrase
22    "adherence agreement"?
23        A.    No.
24            MR. MORRIS:  Can we please put up
25        the next exhibit, which we'll mark as

Page 361

1    Dondero - 6-1-2021
2    Exhibit 6, Grant Scott, beginning at Bates
3    No. 85.
4            (Exhibit 6 introduced.)
5            MR. MORRIS:  And if we could –
6    BY MR. MORRIS:
7        Q.    Did you ever learn that there was a
8    point in time when the debtor was requesting
9    that CLO HoldCo, Ltd., enter into an adherence
10    agreement?
11        A.    No.
12            MR. MORRIS:  Can we scroll up a
13        little bit, please?
14            (Scrolling.)
15            MR. MORRIS:  And just a little
16        further.
17            (Scrolling.)
18    BY MR. MORRIS:
19        Q.    And do you see that Grant Scott
20    forwards it to Mark Patrick and says, "This
21    relates to the second issue from the debtor"?
22        A.    Yes.
23            MR. MORRIS:  And can you scroll up a
24        little more?
25            (Scrolling.)

Page 362

1            Dondero - 6-1-2021
2    BY MR. MORRIS:
3        Q.    And you see Mr. Patrick's
4    instruction, "Do not sign the adherence
5    agreement from the debtor.  The successor will
6    address this"?
7        A.    Yes.
8        Q.    Do you have any knowledge that
9    Mr. Patrick instructed Mr. Scott on March 2nd,
10    2001, not to sign an adherence agreement from
11    the debtor?
12        A.    I have no knowledge prior to this.
13        Q.    Okay.
14            MR. MORRIS:  Can you scroll to the
15        top?
16            (Scrolling.)
17    BY MR. MORRIS:
18        Q.    Do you see Mr. Patrick further
19    instructed Mr. Scott on March 2nd to, quote,
20    "Stand down on any communication," close quote?
21        A.    Yes.
22        Q.    Were you aware that Mr. Patrick had
23    instructed Mr. Scott to stand down?
24        A.    No.
25        Q.    Did you ever tell Mr. Patrick to

Page 363

1            Dondero - 6-1-2021
2    instruct Mr. Scott to stand down?
3        A.    No.
4        Q.    Do you have any understanding as to
5    where Mr. Patrick obtained the authority to
6    instruct Mr. Scott to stand down?
7            MR. SBAITI:  Objection, vague,
8        assumes facts not in evidence.
9        A.    I – I wouldn't view it as an
10    authority issue.  I think they had a long-term
11    relationship, friendship, working relationship
12    with regard to the DAF; and I think Mark was
13    giving him advice.
14            MR. MORRIS:  Okay.  It's 12:20 New
15        York time.  I'd like to just take a short
16        break until 12:30, and I shouldn't have too
17        much more left.
18            MR. TAYLOR:  Okay.
19            (Recess held 11:19a-11:31a.)
20            MR. MORRIS:  Okay.  Hopefully just
21        15 or 20 minutes more.  A half hour at
22        most, I promise.
23    BY MR. MORRIS:
24        Q.    Are you ready to proceed,
25    Mr. Dondero?

Appx. 01723

Page 364

Dondero - 6-1-2021

1
2    A.   Yes.
3    Q.   You've told me that you expressed to
4    Mr. Scott--and I'm, you know,
5    paraphrasing--that you expressed to Mr. Scott
6    your concerns with respect to his – certain of
7    the decisions that he made during the course of
8    the bankruptcy.
9         Do I have that right?  Is that fair?
10   A.   Yes.
11   Q.   Do you know whether anybody else
12   besides yourself expressed any concerns to
13   Mr. Scott concerning any of the decisions that
14   he made during the post-petition period?
15        MR. SBAITI:  Objection, vague.
16   A.   I – I don't recall.
17   BY MR. MORRIS:
18   Q.   Are you aware of anybody other than
19   yourself telling Mr. Scott, in sum or
20   substance, that any of the decisions he made
21   post-petition were inappropriate or not in the
22   best interests of the DAF or CLO HoldCo, Ltd.?
23   A.   I don't know.
24   Q.   Okay.  You're not aware of anybody;
25   is that fair?

Page 365

Dondero - 6-1-2021

1
2    A.   Not as I sit here today.
3    Q.   Okay.  We talked earlier about the
4    suggestion – and again, if I get this wrong,
5    just correct me.
6         But I think you testified that
7    implicit in your conversations with Mr. Scott
8    was your belief that he wasn't acting in the
9    best interests of the DAF and CLO HoldCo, Ltd.,
10   and had breached his fiduciary duties; is that
11   fair?
12   A.   I think I testified that I didn't
13   use the word "fiduciary duties" but – I don't
14   recall using those words, but I do recall
15   stating that he was making decisions that
16   weren't in the best interest of the fund.
17   Q.   Okay.  And I appreciate the
18   clarification and – I appreciate the
19   clarification.
20        Do you have your own personal belief
21   as to whom Mr. Scott owed fiduciary duties to?
22        MR. SBAITI:  Objection, vague.
23        MR. MORRIS:  Withdrawn.
24        I'm going to try and do this a
25        different way.

Page 366

Dondero - 6-1-2021

1
2         Ms. Canty, can we please put back up
3    on the screen Exhibit 1?
4         (Exhibit 1 on the screen.)
5    BY MR. MORRIS:
6    Q.   Can you see that, sir?
7    A.   Yes.
8    Q.   Is there any entity on this
9    Exhibit 1 that you do not believe Mr. Scott
10   owed a fiduciary duty to prior to the time of
11   his resignation in late March 2021?
12        MR. SBAITI:  Object to the extent it
13        calls for a legal conclusion.
14   A.   Yeah.  I – I can't answer that
15   question.
16   BY MR. MORRIS:
17   Q.   Well, do you believe that Mr. Scott
18   owed a fiduciary duty to the three entities
19   that have in their name "Charitable DAF"?
20        MR. SBAITI:  Same objection.
21   A.   Again, regardless of where the
22   assets are held, he has a responsibility, in my
23   mind, as the trustee or the managing member, to
24   optimize those assets and protect those assets
25   and to efficiently, effectively administer

Page 367

Dondero - 6-1-2021

1
2    expenses.
3    BY MR. MORRIS:
4    Q.   I appreciate that.  I'm just asking
5    you to whom he owes the duty to do those
6    things, if you have an understanding.  I'm
7    just – I'm not asking for a legal conclusion.
8    I'm asking you if you have an understanding as
9    to whom he owes those duties.
10   A.   Not specifically.
11   Q.   Okay.  Did you ever discuss at any
12   time with Mr. Patrick your views concerning
13   Mr. Scott's decision to withdraw the objection
14   to the HarbourVest Settlement?
15        MR. SBAITI:  Objection, vague, lacks
16        foundation.
17   A.   I don't – I don't specifically
18   recall.  It's – I'm willing to be refreshed,
19   but I – I don't specifically recall, but
20   that's – yeah, I don't specifically recall.
21   It's not – I don't want to speculate.
22   BY MR. MORRIS:
23   Q.   I don't want you to speculate,
24   either.
25        Do you have any recollection of –

Page 368

Dondero - 6-1-2021

1  at all of ever discussing with Mr. Patrick your
2  views as to Mr. Scott's decision to withdraw
3  the objection to the HarbourVest Settlement?
4        MR. TAYLOR:  Objection, asked and
5     answered.
6  A.   Yeah, I don't recall.
7  BY MR. MORRIS:
8  Q.   Did you -- do you have any
9  recollection at all of ever discussing with
10  Mr. Patrick your views concerning Mr. Scott's
11  decision to enter into the settlement agreement
12  on behalf of CLO HoldCo?
13  A.   I don't recall.
14  Q.   I'm sorry.  Are you -- yeah, are you
15  aware that CLO HoldCo and the DAF, Ltd.,
16  commenced the lawsuit against the debtor and
17  others in the United States District Court for
18  the Northern District of Texas?
19  A.   Yes.
20  Q.   Okay.
21        MR. MORRIS:  Can we put that
22     complaint up on the screen and mark it as
23     Exhibit 7, I believe?
24        (Exhibit 7 introduced.)

Page 369

Dondero - 6-1-2021

1  BY MR. MORRIS:
2  Q.   I'll just represent to you that this
3  is the first page of the complaint.  If you
4  need to refer to it for any purpose, just let
5  me know.
6        But I'm going to start with the
7  question of, have you ever seen a copy of the
8  complaint that was filed by the Charitable DAF
9  Fund, L.P., and CLO HoldCo, Ltd., against the
10  debtor and certain other entities?
11  A.   Yes.
12  Q.   When did you see the complaint for
13  the first time, that you recall?
14        MR. TAYLOR:  Objection, vague.
15  A.   Near final versions before it was
16  filed.
17  BY MR. MORRIS:
18  Q.   So you saw -- you saw versions of
19  the complaint before it was filed.  Do I have
20  that right?
21  A.   Yes.
22  Q.   Okay.  Did you participate in any
23  discussions concerning the substance of the
24  complaint before it was filed?

Page 370

Dondero - 6-1-2021

1        MR. TAYLOR:  I'm just going to
2     caution the witness:  You can tell him if
3     you participated in any conversations; but
4     to the extent that you had conversations
5     with any attorneys who were acting as
6     lawyers, please do not go into the
7     substance of those conversations.
8  A.   Yeah.  I mean, yes, I had
9  conversations with attorneys.
10  BY MR. MORRIS:
11  Q.   Which attorneys did you speak with
12  about this complaint before it was filed?
13  A.   Mazin.  I can't remember -- I can't
14  remember -- I talked to a lot of attorneys.  I
15  can't remember -- I can't remember besides
16  Mazin.
17  Q.   Okay.  Now, Mazin doesn't represent
18  you personally, does he?
19  A.   No.
20  Q.   Can you please tell me everything
21  you discussed with Mazin concerning this
22  complaint?
23        MR. TAYLOR:  Objection,
24     attorney-client privilege.

Page 371

Dondero - 6-1-2021

1        MR. SBAITI:  Well, I'm also -- DAF
2  is asserting work-product privilege and
3  joint-interest privilege regarding
4  communication through DAF with us.
5        MR. MORRIS:  I'm sorry.  I'm sorry.
6  I'm having a little trouble hearing you.  I
7  think I heard attorney work product.  What
8  over privileges are being asserted here?
9        MR. SBAITI:  Joint interest.  As
10  advisor to the DAF, he provided us some
11  information that we used and helped us
12  identify information that we were using.
13  So, helping his advisee's counsel perform
14  their duties falls under the work-product
15  privilege.  We're claiming work-product
16  privilege over the content of his
17  conversation.
18        MR. MORRIS:  Okay.  Did I hear
19  somebody say attorney-client privilege,
20  too?
21        MR. TAYLOR:  I had said that, but I
22  was just making sure that Mazin jumped in
23  with his objections --
24        (Whereupon, the court reporter's

Page 372

1    Dondero - 6-1-2021
2       computer crashed, calls were made, and an
3    iPad was engaged to finish the deposition.)
4       MR. MORRIS:  All right.
5    Mr. Dondero, can you hear me?
6       THE WITNESS:  Yes.
7       MR. MORRIS:  Mr. Court Reporter, can
8    you hear me?
9       THE REPORTER:  Yes, sir.
10   BY MR. MORRIS:
11      Q.   Mr. Dondero, did you provide any
12   comments to the Sbaiti firm on any draft of the
13   complaint before it was filed?
14      MR. SBAITI:  You can answer that
15      question yes or no.  I'll just instruct the
16      witness not to answer with any content of
17      any kind on the basis -- and we're
18      instructing him not to answer on the basis
19      of work-product privilege and
20      joint-interest privilege.
21      A.   Some.
22   BY MR. MORRIS:
23      Q.   Can you disclose for me all of the
24   information and comments you provided that --
25   to the draft complaints?

Page 373

1    Dondero - 6-1-2021
2       MR. SBAITI:  Instruct the witness
3      not to answer on the basis of work-product
4      privilege and joint-interest privilege.
5    BY MR. MORRIS:
6       Q.   Are you going to follow Counsel's
7    advice, Mr. Dondero?
8       A.   Yes.
9       Q.   Did you provide any conceptual or
10   strategic ideas about what claims to pursue to
11   the Sbaiti firm prior to the time the complaint
12   was filed?
13      MR. SBAITI:  Can you repeat the
14      question?
15   BY MR. MORRIS:
16      Q.   Did you provide any thoughts or
17   ideas as to what claims should be pursued in
18   this complaint prior to the time it was filed?
19      MR. TAYLOR:  I'm going to first
20      lodge an objection as to vague, and I
21      believe Mazin has some other objection.
22      MR. SBAITI:  Yeah.  I would -- I
23      will say the same objection, and we will
24      object to any content of the -- within the
25      attorney-client work-product and

Page 374

1    Dondero - 6-1-2021
2      joint-interest privilege.
3       A.   Not that I recall.
4    BY MR. MORRIS:
5       Q.   Did you provide any facts that are
6    set forth in the complaint?
7       Withdrawn.
8       Did you -- did you provide to the
9    Sbaiti firm any facts that are reflected in the
10   final version of the complaint?
11      MR. SBAITI:  Mr. Dondero, you can
12      answer that question yes or no; otherwise,
13      we instruct you not to answer on the basis
14      of -- the content on the basis of
15      attorney-client, work-product and
16      joint-interest privilege.
17      A.   Not that I recall.
18   BY MR. MORRIS:
19      Q.   You don't recall providing any facts
20   at all?
21      A.   Not specifically.
22      Q.   Did you provide any general facts or
23   ideas to the Sbaiti firm in connection with
24   your review of the drafts of the complaint?
25      MR. SBAITI:  Same instruction, same

Page 375

1    Dondero - 6-1-2021
2      objections.
3       A.   Maybe some.
4    BY MR. MORRIS:
5       Q.   Okay.  Can you describe those for
6    me, please?
7       MR. SBAITI:  I'll instruct you not
8      to answer that on the basis of
9      attorney-client work-product privilege and
10     joint-interest privilege.
11   BY MR. MORRIS:
12      Q.   Are you going to follow Counsel's
13   advice, Mr. Dondero?
14      A.   Yes.
15      Q.   Did you have any discussions with
16   the Sbaiti firm concerning whether or not to
17   name James Seery as a defendant in the original
18   complaint?
19      MR. SBAITI:  I'll instruct the
20      witness not to answer on the basis of
21      attorney-client, work-product and
22      joint-interest privilege as doing so would
23      reveal the contents of such communication.
24   BY MR. MORRIS:
25      Q.   Can you just answer yes or no?

Page 376

Dondero - 6-1-2021

1
2    A.   No.
3    Q.   You didn't have -- that wasn't part
4    of any of the discussions you had prior to the
5    time the complaint was filed?
6         MR. SBAITI: Same instruction.  Just
7    don't answer.
8         THE WITNESS:  So please don't
9    answer, right, or don't answer --
10        MR. SBAITI:  Don't answer.
11        THE WITNESS:  Okay.
12   BY MR. MORRIS:
13   Q.   Are you going to follow Counsel's
14   advice?
15   A.   Yes.
16   Q.   Did you -- did you suggest that
17   Mr. Seery should be named as a defendant in
18   this lawsuit to the Sbaiti firm prior to the
19   time it was filed?
20        MR. SBAITI:  Instruct the witness
21        not to answer on the basis of
22        attorney-client work product and
23        joint-interest privilege, as doing so would
24        reveal the contents of those
25        communications.

Page 377

Dondero - 6-1-2021

1
2    BY MR. MORRIS:
3    Q.   Are you going to follow Counsel's
4    advice?
5    A.   Yes.
6    Q.   Did you know, prior to the time the
7    complaint was filed, that the Sbaiti firm
8    intended to file a motion for leave to amend
9    their complaint to add Mr. Seery as a
10   defendant?
11        MR. SBAITI:  You can answer that
12        question yes or no, but, otherwise, it will
13        reveal the content of any underlying
14        communication on the basis of
15        attorney-client work product, or
16        joint-interest privilege.
17   A.   No.
18   BY MR. MORRIS:
19   Q.   When did you learn that the Sbaiti
20   firm filed a motion for leave to amend their
21   complaint to add Mr. Seery as a defendant?
22   A.   I don't -- I don't recall.
23   Q.   Do you recall whether you had any
24   conversations with anybody in the world at any
25   time prior to the time that motion was filed

Page 378

Dondero - 6-1-2021

1
2    regarding the possibility of filing a motion
3    for leave to amend the pleading to add
4    Mr. Seery as a defendant?
5         MR. SBAITI: Objection, vague, lacks
6         foundation; and instruct the witness not to
7         reveal the content of any communications on
8         the basis protected under the
9         attorney-client, work-product,
10        common-interest privilege.
11   A.   I don't recall.
12   BY MR. MORRIS:
13   Q.   Okay.  Did you ever discuss with
14   Mr. Patrick the topic of whether or not
15   Mr. Seery should be sued?
16   A.   No.
17   Q.   Did you ever discuss with the Sbaiti
18   firm the topic of whether Mr. Seery should be
19   sued?
20        MR. SBAITI:  Instruct the witness
21        not to answer on the basis of attorney work
22        product -- attorney-client, and
23        common-interest privilege as answering
24        would reveal the contents of such
25        communications, if they occurred.

Page 379

Dondero - 6-1-2021

1
2    BY MR. MORRIS:
3    Q.   Are you going to follow Counsel's
4    advise?
5    A.   Yes.
6         MR. MORRIS:  I think I may be done.
7         Can we just take a three-minute
8         break and let me just check my notes?
9         MR. SBAITI:  Sure.
10        (Recess held.)
11        MR. MORRIS:  All right.  I have no
12        further questions.  I would request the
13        production of a privilege log reflecting
14        the communications, if any, between
15        Mr. Dondero and the Sbaiti firm; but,
16        otherwise, I have nothing further at this
17        time.
18        MR. SBAITI:  Okay.
19        MR. MORRIS:  Again, I appreciate
20        your time, Mr. Dondero.
21        MR. SBAITI:  We'll reserve our
22        questions.
23        MR. MORRIS:  Okay.  Thank you,
24        everybody.
25        MR. SBAITI:  Thank you.  Take care.

**Page 380**

Dondero - 6-1-2021

1
2    THE REPORTER:  Mr. Sbaiti, do you
3    guys need a copy of this deposition?
4    MR. SBAITI:  Yeah, we would just
5    need a PTX of the deposition transcript and
6    soft copies of the exhibits.  Are you going
7    to send something to the witness to read
8    and sign?  I think you could send it to him
9    either directly or to Mr. Taylor on his
10   behalf.
11   (Time Noted:  12:01 p.m.)
12
13
14
          JAMES DONDERO
15
16   Subscribed and sworn to before me
     this _____ day of _____, 2021.
17
18
19
20
21
22
23
24
25

**Page 381**

Dondero - 6-1-2021

1
2    C E R T I F I C A T E
     STATE OF TEXAS    )
3                       )
     COUNTY OF ELLIS    )
4
5    I, Daniel J. Skur, a Notary Public
     within and for the State of Texas, do
     hereby certify:
6    That JAMES DONDERO, the witness whose
     deposition is hereinbefore set forth, was
7    duly sworn by me and that such deposition
     is a true record of the testimony given by
8    such witness.
     That pursuant to Rule 30 of the Federal
9    Rules of Civil Procedure, signature of the
     witness was reserved by the witness or
10   other party before the conclusion of the
     deposition;
11   I further certify that I am not
     related to any of the parties to this
12   action by blood or marriage; and that I am
     in no way interested in the outcome of this
13   matter.
14   IN WITNESS WHEREOF, I have hereunto
     set my hand this 1st day of June, 2021.
15
16
17
     _____
18   Daniel J. Skur
     Notary Public, State of Texas.
19   My Commission Expires 7/7/2022
     TSG Reporting, Inc.
20   228 East 45th Street, Suite 810
     New York, New York
21   (877) 702-9580
22
23
24
25

**Page 382**

1    Dondero - 6-1-2021
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:
          IN THE UNITED STATES BANKRUPTCY COURT
4    FOR THE NORTHERN DISTRICT OF TEXAS
          DALLAS DIVISION
5    In re:                          )
     HIGHLAND CAPITAL          )  Case No.
6    MANAGEMENT, LP,            )  19-34054 L.P.
     Debtor,                        )  Chapter 11
7    -------------------------------)
     HIGHLAND CAPITAL MANAGEMENT,  )
8    LP,                              )
                                      )
9    Plaintiff,          )  Adversary No.
     vs.                              )  21-03003-sgi
10   JAMES D. DONDERO,            )
     Defendant,                    )
11   Dep. Date:  06/01/2021
     Deponent:  JAMES DONDERO
12
     Reason codes:
13   1. To clarify the record.
     2. To conform to the facts.
14   3. To correct transcription errors.
15   CORRECTIONS:
16   Pg. LN.  Now Reads    Should Read    Reason
17   ____ ____ _____ _____ _____
18   ____ ____ _____ _____ _____
19   ____ ____ _____ _____ _____
20   ____ ____ _____ _____ _____
21   ____ ____ _____ _____ _____
22   ____ ____ _____ _____ _____
23   ____ ____ _____ _____ _____
24   ____ ____ _____ _____ _____
25   ____ ____ _____ _____ _____

**Page 383**

1    Dondero - 6-1-2021
2    ____ ____ _____ _____ _____
3    ____ ____ _____ _____ _____
4    ____ ____ _____ _____ _____
5    ____ ____ _____ _____ _____
6    ____ ____ _____ _____ _____
7    ____ ____ _____ _____ _____
8    ____ ____ _____ _____ _____
9    ____ ____ _____ _____ _____
10   ____ ____ _____ _____ _____
11   ____ ____ _____ _____ _____
12   ____ ____ _____ _____ _____
13   ____ ____ _____ _____ _____
14   ____ ____ _____ _____ _____
15   ____ ____ _____ _____ _____
16   ____ ____ _____ _____ _____
17
18   _____
     JAMES DONDERO
19
20
21   SUBSCRIBED AND SWORN BEFORE ME
     THIS _____ DAY OF _____, 2021.
22
23
     _____
24   (Notary Public)  MY COMMISSION EXPIRES:_____
25

Page 384

1                     Dondero - 6-1-2021
2              -------I N D E X-------
3   WITNESS:       EXAMINATION BY        PAGE:
4   JAMES DONDERO
5          Mr. Morris            288
6
7              *****
8   --------------------EXHIBITS--------------------
9   Deposition Exhibits            PAGE/LINE
10  Exhibit 1    DAF/CLO Holder Structure    290/15
            Chart
11         Bates No. GScott000007
12  Exhibit 2    Amended and Restated    301/6
            Limited Liability Company
13         Agreement of Charitable
            DAF GP, LLC
14         Bates No. PATRICK_000031
            through 000035
15
    Exhibit 3    Amended and Restated    313/14
16         Investment Advisory
            Agreement
17         Bates No. GScott000325
            through 000340
18
    Exhibit 4    Phone Conference    335/25
19         Invitation For 1/31/2021
            Bates No. GScott000011
20
    Exhibit 5    January/February 2021    339/22
21         Email String Regarding
            Notice of Intent to Resign
22         and Divest From CLO
            HoldCo, Ltd., and Related
23         Entities
            Bates No. GScott000018
24         through 000019
25

Page 385

1                     Dondero - 6-1-2021
2              --------------------EXHIBITS--------------------
3   Deposition Exhibits            PAGE/LINE
4   Exhibit 6    March 2021 Email String    361/4
            Regarding Highland
5          Adherence Agreement
            (Highland CLO Funding) in
6          Connection With Transfer
            of HarbourVest Shares
7          Bates No. GScott000085
            through 000088
8
    Exhibit 7    Original Complaint in Re:    368/25
9          Charitable DAF Fund, L.P.
            and CLO HoldCo, Ltd., V
10         Highland Capital
            Management, L.P. and
11         Others
            Bates No. GScott000389
12         through 000414
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-12    Filed 08/25/42    Page 150 of 200    PageID 22965
Appendix Part 2    Page 352 of 1336

Index: $11..Asia

**$**

**$11** 320:10

**$12** 333:18

---

**0**

**00:-01** 289:9,10

---

**1**

**1** 290:15 301:5,9,12
308:7,8 366:3,4,9

**11** 321:12 333:18
335:24 350:14,15

**11:19a-11:31a**
363:19

**12:01** 380:11

**12:20** 363:14

**12:30** 363:16

**13** 299:3

**14** 299:3

**15** 299:3 363:21

**18** 339:20

**1st** 288:9 298:17
301:21 308:17,25
309:11 310:10,17
311:3,20 381:14

---

**2**

**2** 301:6,14

**20** 363:21

**2000s** 293:22

**2001** 362:10

**2012** 301:21 305:14

**2019** 314:20 317:13

**2020** 319:10

**2021** 288:10 298:18
308:17,25 309:11
310:10,17 311:3,20
358:12 366:11
380:16 381:14

---

**228** 381:20

**2515** 356:8

**26th** 336:6

**2nd** 362:9,19

---

**3**

**3** 313:13,14

**30** 381:8

**31st** 336:10 339:25
359:2

---

**4**

**4** 335:23,25 346:14

**45th** 381:20

**4940** 289:3

---

**5**

**5** 339:19,22 346:11,
18,20,23 347:4

---

**6**

**6** 301:4 361:2,4

**6-1-2021** 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1

---

356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1

---

**7**

**7** 368:24,25

**7/7/2022** 381:19

---

**8**

**810** 381:20

**85** 361:3

**877 702-9580**
381:21

---

**9**

**9:33** 288:17

**9:34** 288:10

---

**A**

**a.m.** 288:10,17

**ability** 350:8

**above-average**
331:2

**abreast** 330:7

**accept** 356:22

**accordance** 288:6

**achieve** 313:2

**acknowledged**
338:25

**act** 308:16,24 309:10
310:8,16 311:2,19
317:18 325:22 329:8

**acted** 309:18 328:18,
24

**acting** 337:17
343:15,17 344:5,15

---

**365:8 370:6**

**action** 345:23 381:12

**actions** 333:22
345:24

**actual** 351:25

**add** 377:9,21 378:3

**addition** 307:13

**address** 338:6 362:6

**addressed** 360:13

**adequate** 313:2

**adherence** 360:22
361:9 362:4,10

**administer** 366:25

**administering** 341:8

**administrative**
320:14

**advance** 330:20
338:14

**advanced** 339:2
341:20

**advice** 328:8 363:13
373:7 375:13 376:14
377:4

**advise** 379:4

**Advised** 293:23

**advisee's** 371:14

**advisor** 303:16,17,19
316:18 317:10
330:25 371:11

**Advisors** 325:22
329:8 332:12,19

**advisory** 312:17,19,
22 313:17 314:2,14
315:5 316:22

**affect** 331:3

**affiliated** 351:9

**afternoon** 340:2

**agree** 326:7

**agreed** 333:21
352:24 356:21

**agreement** 301:18
302:11 312:3,17,20,

---

23 313:17,22 314:14,
23 315:2,5,12,14,19,
24 316:8,21,23 320:3
325:20 337:18 343:2,
8,9 357:16,18,20
360:22 361:10 362:5,
10 368:12

**agreements** 316:14
356:25 357:8

**alternative** 352:17

**amend** 319:11,24
320:24 322:23 377:8,
20 378:3

**amended** 301:16
312:16 313:16,24
314:13 320:19
357:18

**amendment** 323:9

**amount** 320:10,11

**and/or** 295:9

**announced** 324:10

**announcement**
324:13

**answering** 378:23

**anxiety** 340:18 341:6

**anytime** 345:8

**apologize** 360:8

**appoint** 297:7
299:20,23 300:3,20

**appointed** 296:24
305:12

**appointing** 301:2

**appointment** 307:3

**approval** 299:12

**approve** 296:6 342:6

**approved** 305:25

**approximately**
301:23 320:10 358:8

**argue** 325:23

**articulated** 335:2

**ASAP** 349:20

**Asia** 346:13

Index: Aspen..compromise

**Aspen** 359:23,25

**assert** 345:15,19

**asserted** 371:9

**asserting** 371:3

**asset** 350:15

**assets** 295:24 296:4
312:7 315:7,13,21
349:3,20 350:10
366:22,24

**assumes** 303:10
307:7,18 308:18
319:13 326:5 359:11
363:8

**attorney** 371:8
378:21

**attorney-client**
321:5 325:12 333:9
370:25 371:20
373:25 374:15 375:9,
21 376:22 377:15
378:9,22

**attorneys** 319:8
325:25 337:17 370:6,
10,12,15

**audio** 289:8 300:12
322:9 351:12

**authority** 297:6
299:20 300:20
308:15 354:8,17,24
363:5,10

**authorized** 308:23,
24 309:10 310:8,16,
25 311:19 357:9

**Avenue** 356:7

**average** 303:4

**aware** 333:3 343:9
358:14,23 362:22
364:18,24 368:16

**B**

**back** 308:6 309:15
366:2

**background** 289:24

**bankruptcy** 314:19
317:14,17 319:8

320:16 331:10 341:8
364:8

**based** 328:8

**basic** 333:14

**basis** 325:18 327:25
331:2 372:17,18
373:3 374:13,14
375:8,20 376:21
377:14 378:8,21

**Bates** 335:23 339:20
361:2

**beginning** 293:17,21
361:2

**begins** 311:22

**behalf** 292:5 308:16,
23,24 309:10,18
310:8,16 311:2,19
317:8,19 332:23
334:4 335:10 343:16,
17 344:4,6 345:24
368:13 380:10

**behavior** 349:25

**belief** 365:8,20

**believed** 304:23
311:19 323:11
325:15,19,21 330:11
344:13 345:7,14,18,
22 354:21,23,24

**beneficial** 331:25

**birthday** 350:21
359:17

**bit** 317:12 361:13

**blood** 381:12

**boards** 306:20
312:4,10

**bona** 321:24 322:4
323:12

**Bonds** 330:9

**bottom** 339:21

**box** 294:10

**breached** 343:23
344:13 365:10

**break** 363:16 379:8

**brilliant** 311:14

**bring** 310:5

**brought** 338:21

**C**

**call** 313:13 322:18
336:10,15,19,21,23
337:6,11,13,25
338:8,10,25 339:5
358:25

**calls** 297:9 305:16,17
306:13 309:4,12
310:11,18 311:4,11
318:7 321:4 322:7
327:23 328:3,5
340:6,16 341:3,15
342:15,21 343:5
351:18 354:12,19
358:17 366:13 372:2

**candidate** 305:23

**candidates** 352:15,
17 353:17,19

**Canty** 346:15,19,25
362:2

**capability** 313:4

**capital** 292:6 295:9,
11,14 312:15 313:19
314:23 315:6

**care** 379:25

**carefully** 340:22

**carry** 292:5

**case** 319:9

**caused** 319:11,23

**caution** 370:3

**cautioned** 288:14

**Cayman** 312:6

**certify** 381:5,11

**cetera** 312:6

**challenges** 340:19
341:7,18

**change** 327:13
328:13 329:21

**changed** 293:18

**charitable** 291:19,21

292:5 294:5,6,25
295:23 301:18 304:6
307:14,15,16 308:11,
16,24 309:8 310:9
312:14 313:3,6,18
314:10,11,16,17
316:8,9 350:9 352:22
366:19 369:9

**charities** 306:21

**chart** 290:3,21
298:13 308:6 309:15
311:23

**Chase** 289:3

**check** 379:8

**chose** 347:17

**circumstances**
352:8

**cited** 343:3

**Civil** 381:9

**claim** 319:12,24,25
320:9,13,14,18,19,24
321:16,19 322:23
332:25

**claiming** 371:16

**claims** 321:10,25
322:4 323:12 329:5
345:7,15,19 373:10,
17

**clarification** 348:15
365:18,19

**clarify** 316:19 349:9

**Clay** 290:14 294:11
300:13 347:2

**clear** 294:3 300:9
320:5

**client** 337:15

**CLO** 290:22 295:17
307:17 310:16 311:2,
19 315:7,13,17,19,20
317:17 318:2 319:11,
23 320:6,8 322:23
323:22 324:2,6,10
325:25 326:12,17
328:19,25 329:4
332:6,12,19,24 333:2
334:4 335:11,13
336:4 345:25 351:9

357:11,16 359:10
360:19 361:9 364:22
365:9 368:13,16
369:10

**close** 362:20

**coach** 300:15

**collateralized**
304:11

**college** 297:20

**commenced** 332:10
368:17

**commencement**
314:19

**comments** 372:12,
24

**Commission** 381:19

**common** 337:19

**common-interest**
378:10,23

**communicate**
359:15

**communicated**
350:20

**communication**
362:20 371:5 375:23
377:14

**communications**
300:7,9 325:12 334:7
376:25 378:7,25
379:14

**Company** 301:17
357:19

**complaint** 368:23
369:4,9,13,20,25
370:13,23 372:13
373:11,18 374:6,10,
24 375:18 376:5
377:7,9,21

**complaints** 372:25

**compliant** 291:7

**complicated** 300:21
306:22

**compound** 324:14,
15 344:7

**compromise** 335:2

Index: computer..Dondero's

**computer** 372:2

**conceptual** 373:9

**concerns** 364:6,12

**concert** 337:17

**conclusion** 297:10 305:18 310:12,19 311:5,7,11 327:3 343:6 351:18 354:12,20 366:13 367:7 381:10

**conducted** 288:6

**conference** 336:10 337:11,13

**confidential** 318:7

**confirmed** 325:3

**confrontation** 340:20 341:7,11,14

**connection** 289:15 314:12 374:23

**considered** 301:2

**contempt** 289:16

**content** 371:17 372:16 373:24 374:14 377:13 378:7

**contents** 375:23 376:24 378:24

**continue** 325:22 350:8

**continued** 330:24

**control** 311:24 312:2

**controlled** 303:21 304:2

**conversation** 319:18 326:3,15,16, 21,23 327:3,10 329:8,13,17 334:2,7, 8,12,18,21 335:7,16 337:16 340:12 371:18

**conversations** 322:19 323:10 339:2 344:20 352:10 359:22,24 365:7 370:4,5,8,10 377:24

**cooperation** 330:4

**coordination** 330:3, 17

**copies** 380:6

**copy** 369:8 380:3

**correct** 299:2 302:18 303:22 304:3 329:20 338:2 351:10 353:11 365:5

**counsel** 300:7,11 314:12,18 317:18 318:16 319:5,6 325:2,3 328:9,13 330:10 371:14

**Counsel's** 373:6 375:12 376:13 377:3 379:3

**COUNTY** 381:3

**couple** 322:20 323:17 334:10 341:23 350:22,25 353:17

**court** 368:18 371:25 372:7

**COVID-19** 288:8

**crashed** 372:2

**created** 296:8

**Current** 288:7

---

**D**

**D&o** 352:16 353:13 354:3

**DAF** 290:21 293:24 294:5,6,15,20,25 295:5,23 296:17,19, 24 297:7 298:2 299:18,23 300:3,20 301:18 302:12,16 303:16 304:15 307:5, 14,15,16 308:11,16, 25 309:8 310:9 312:14 313:3,6,18,19 314:10,11,16,17 315:2,7,13,14 316:8, 9,18 317:3,8,25 318:5 320:12 325:22 327:13 329:4,16,21 330:24 331:13,20

**DAF's** 318:7

**daily** 331:2

**Dallas** 288:12 292:20 293:12

**damage** 350:7

**Daniel** 381:4,18

**date** 288:9 357:23

**dated** 301:20

**day** 288:9 327:4,6 339:13,15 352:18 380:16 381:14

**Daylight** 288:10

**days** 341:23 350:22

**dealing** 341:18

**Dean** 353:23

**debtor** 317:14,17 321:25 323:12 332:10,15,25 333:5 350:14 361:8,21 362:5,11 368:17 369:11

**debtor's** 332:17,25

**decade** 355:10

**decided** 291:13 341:2

**decision** 317:4 321:16,19 322:23 326:4 328:19,24 330:2 334:3 340:14 367:13 368:3,12

**decisions** 304:10 331:3 338:16 364:7, 13,20 365:15

**deductions** 291:22

**defendant** 375:17 376:17 377:10,21 378:4

**delegated** 306:23

**department** 318:10 355:13

**depend** 294:21

**deposition** 288:3,5 289:15 372:3 380:3,5 381:6,7,10

**describe** 375:5

**designate** 354:17

**determined** 354:9

**difference** 293:10

**differences** 295:3

**difficulties** 354:3

**direction** 327:14,16 329:22

**directly** 380:9

**director** 292:18 307:15 351:9

**directorship** 307:23 308:4

**disagreement** 315:16

**Disaster** 288:8

**disclaim** 350:14

**disclose** 338:9 372:23

**discuss** 315:16 321:15,18 331:5 367:11 378:13,17

**discussed** 334:21 370:22

**discusses** 315:14

**discussing** 368:2,10

**discussion** 322:15, 17

**discussions** 321:23 322:22 344:18 353:9 356:19 369:24 375:15 376:4

**distortion** 289:8 300:12 322:9 351:12

**District** 368:18,19

**divest** 348:21,23 349:10,20

**divested** 350:10,15

**divesting** 348:11

**divestment** 348:21

**divulge** 325:11

**document** 290:18 301:5,7 314:5 346:17

**documentation** 352:25 353:7

**documents** 289:18

**dollars** 319:25 320:22 333:21

**donations** 295:10

**Dondero** 288:1,4,13, 20 289:1,7,11 290:1, 17 291:1 292:1 293:1 294:1,14 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1,7 311:1, 16 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1,8 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1,4 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1,8 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1,8 361:1 362:1 363:1,25 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,5,11 373:1,7 374:1,11 375:1,13 376:1 377:1 378:1 379:1,15,20 380:1,14 381:1,6

**Dondero's** 311:8 348:2

**donor** 293:23 330:24 331:6,8,13,15,16,20

**doubt** 328:10,16

**draft** 372:12,25

**drafts** 374:24

**due** 311:10

**Dugaboy** 331:12,25 332:5

**duly** 288:14 381:7

**duties** 325:21 329:12 343:24 344:14 359:9 365:10,13,21 367:9 371:15

**duty** 366:10,18 367:5

---

### E

**earlier** 329:18 333:17 336:24 365:3

**East** 381:20

**effective** 301:21 342:6,13

**effectively** 316:17 366:25

**effectuated** 354:25

**efficiently** 366:25

**Ellis** 330:10 381:3

**email** 338:2,5,6,15,24 339:24 341:21 343:4 346:6,9 347:10 348:10

**Emergency** 288:7

**employed** 355:3,7, 19,22,25

**end** 358:2,11

**ends** 311:22

**engaged** 372:3

**enjoys** 352:22

**enter** 312:15 314:22 334:3 361:9 368:12

**entered** 315:3 316:10

**entities** 293:4 296:3 307:23 311:25 312:9 314:22 315:3 317:21 318:2,3 332:2,11 335:13 351:9 352:15 357:10,16 360:18 366:18 369:11

**entity** 291:19 295:8, 10,12,14 298:13,17 307:3 309:10,19 312:5 316:23 332:6 333:19 350:9 366:8

**essentially** 320:22

**establish** 356:14

**estate** 321:11

**event** 351:24

**evidence** 303:11 308:19 326:6 359:12 363:8

**exact** 295:3 307:25

**EXAMINATION** 288:18

**Excuse** 312:24

**execution** 314:13

**executive** 353:23

**exhibit** 290:2,15 301:4,6,8,9,12,14 308:7,8 313:13,14 335:22,23,25 339:6, 19,22 346:11,18,20 347:4 360:25 361:2,4 366:3,4,9 368:24,25

**exhibits** 380:6

**existed** 315:24

**existing** 343:9

**expect** 331:5 356:16

**expenses** 367:2

**experience** 302:23 303:8 304:5

**expert** 303:3

**expertise** 302:23 303:2,9 304:6

**Expires** 381:19

**explain** 322:3 342:11

343:16 348:19

**explanation** 322:13

**expressed** 364:3,5, 12

**expression** 295:8

**extent** 297:9 300:5 305:17 306:12 318:6 321:3 333:8 351:17 354:11 366:12 370:5

---

### F

**fact** 337:7 352:11

**factors** 353:17

**facts** 303:11 307:8, 19 308:19 311:8,9 319:14 326:6 359:12 363:8 374:5,9,19,22

**fair** 348:16 364:9,25 365:11

**faith** 328:18,24

**falls** 371:15

**familiar** 292:14 294:14 360:21

**Federal** 381:8

**feel** 329:19

**fide** 321:24 322:4 323:12

**fiduciary** 329:12 343:23 344:14 365:10,13,21 366:10, 18

**fighting** 330:25

**figure** 337:9,10,12

**file** 301:4 377:8

**filed** 317:14,17 323:9, 22 369:9,17,20,25 370:13 372:13 373:12,18 376:5,19 377:7,20,25

**filing** 320:9 378:2

**final** 369:16 374:10

**finance** 302:24 303:9

**finances** 331:4

**find** 318:11 352:15

**finish** 372:3

**finished** 334:14 360:9

**firm** 341:18 372:12 373:11 374:9,23 375:16 376:18 377:7, 20 378:18 379:15

**firms** 318:13

**fit** 304:19

**floor** 356:12

**flows** 311:24

**follow** 373:6 375:12 376:13 377:3 379:3

**Foods** 353:23

**form** 290:25 291:10 294:2 309:24 320:17 326:24 334:9

**formal** 305:21

**formally** 359:3

**formation** 298:5

**forward** 347:20

**forwards** 361:20

**foster** 291:21

**found** 351:19

**foundation** 292:20 293:13 296:2 330:15 343:6 358:19 367:16 378:6

**foundations** 292:11, 15,18,23

**founder** 330:23

**frame** 319:21

**free** 329:20

**friendship** 363:11

**fund** 294:6 295:23 307:16 309:8 310:9 312:14 313:6,18 314:11,17 316:8 331:3,4 344:10,15 345:7,15,18 365:16 369:10

**finances** 331:4

**funds** 293:24 332:12, 18 345:4,10

**future** 356:17

---

### G

**gave** 291:24 335:11 339:12 340:4 351:3 352:5 358:15

**general** 291:4 293:19 295:7 309:23 357:20 374:22

**generally** 291:2 358:22

**give** 290:11 340:14 341:2

**giving** 291:21 292:5 309:23 313:3 322:4 350:13 352:22 359:8 363:13

**good** 288:20 289:7, 11 300:14 304:18,25 305:23 318:11 324:8 328:18,24 331:19,20, 24 332:5

**governing** 325:19

**GP** 294:25 301:18 302:12,16 307:5,14 313:19 314:11,17 316:9 351:8

**Grant** 296:15 298:6 305:23 309:14,18 311:22 333:21 352:19 353:3 361:2, 19

**group** 314:3 330:17

**Guernsey** 312:6

**guess** 320:22 327:20 328:15 348:24

**guys** 380:3

---

### H

**half** 363:21

**hand** 381:14

**happen** 351:24

**happened** 342:14
351:20

**Happy** 350:21

**Harbourvest** 323:23
324:3 326:2,18
328:20 329:2 367:14
368:4

**HCMLP** 315:12,18
316:11,17 317:4,9
318:16,22 319:2
333:23 355:4,7

**he'll** 294:8

**headed** 355:13

**health** 340:19 341:6

**hear** 288:21 289:12
371:19 372:5,8

**heard** 300:10 320:21
371:8

**hearing** 324:18
327:3,14 328:15
332:17 336:4 371:7

**hearsay** 328:4,5
340:17 341:4 342:16,
22 343:19 352:13
353:20 358:18

**held** 298:12,16
307:22 308:10 312:7
363:19 366:22
379:10

**helped** 371:12

**helping** 371:14

**hereinbefore** 381:6

**hereunto** 381:13

**high** 297:14

**Highland** 291:19,20
292:6 303:20,22
304:2 312:15 313:19
314:23 315:6 320:13
321:9 331:10 356:13

**Highland's** 314:19

**hired** 314:18

**historic** 333:22

**hold** 296:4 355:11

**Holdco** 290:22 294:5

295:17 307:16,17
308:11,16,25 310:16
311:2,20 315:7,13,
17,19 317:17 318:2
319:11,23 320:6,8
323:22 324:2,6,10
326:12 328:25 329:4
332:6,12,19,24 333:2
334:4 335:11,13
336:5 345:25 351:10
357:11,17 359:10
360:19 361:9 364:22
365:9 368:13,16
369:10

**Holdco's** 315:20
322:23 326:2,17
328:19

**holders** 312:11

**holds** 295:14,24

**hope** 325:9

**hoping** 325:11

**hour** 327:14 363:21

**hours** 290:6,10,11,12

**house** 359:23

**housemates** 297:19

**hundred** 320:21
333:16,20

---

**I**

**ideas** 373:10,17
374:23

**identified** 292:12
293:4 337:25

**identify** 307:2 308:14
309:9 310:23 311:18
317:4 318:11 371:13

**identifying** 318:12

**identity** 310:25

**impact** 337:4

**implicit** 365:7

**in-house** 318:16

**inactions** 345:24

**inappropriate**
324:23,25 325:15,17

327:13,18 329:21
337:5 338:21 364:21

**inaudible** 318:8
327:24

**included** 317:25

**incorporated** 293:3

**incorrect** 338:3

**indemnification**
342:7 343:3,18

**independent**
314:12,18 316:6

**inform** 330:2,7,12,20
360:11

**information** 318:8
325:5 371:12,13
372:24

**informed** 308:2
340:13

**informing** 327:15
329:22

**inheriting** 356:21

**initial** 298:25 331:16

**Initially** 298:24

**injunction** 332:18

**injunctive** 332:16

**instruct** 300:4 325:4
337:15 360:16 363:2,
6 372:15 373:2
374:13 375:7,19
376:20 378:6,20

**instructed** 325:25
362:9,19,23

**instructing** 372:18

**instruction** 362:4
374:25 376:6

**instructions** 358:16,
23 359:8

**insurance** 352:16
353:14 354:3

**intended** 324:11
377:8

**intending** 350:3

**intent** 335:11 339:12

341:2 349:20 351:4
357:24

**intention** 358:10

**interaction** 341:17

**interest** 329:4,16
332:2,5 333:24
335:3,4 337:19
344:10,15 345:4,9
350:4 365:16 371:10

**interested** 381:12

**interests** 364:22
365:9

**interim** 358:15
359:3,7,16 360:14,19

**interpretation**
325:19

**interruption** 289:4,9

**introduced** 290:15
301:6 313:14 335:25
339:22 361:4 368:25

**invade** 321:4

**invades** 333:9

**investment** 303:9,
15,16,19 312:16,19,
22 313:17 314:2,14
315:5 316:18,22
317:4,7,10 330:25
331:12

**investments** 335:5
348:24

**involved** 306:10,17,
21,22 307:3 312:12
318:18 319:8

**involvement** 293:12

**ipad** 372:3

**issue** 361:21 363:10

**issues** 333:5 340:19
341:6 360:12

---

**J**

**James** 288:4,13
375:17 380:14 381:6

**January** 298:17
301:21 332:17 336:6,

10 339:25 359:2

**John** 290:4 294:3
301:7 310:3 317:18
337:6 346:15

**Joint** 371:10

**joint-defense**
337:18

**joint-interest** 371:4
372:20 373:4 374:2,
16 375:10,22 376:23
377:16

**Judge** 310:5 338:4,5

**jumped** 371:23

**June** 288:10 381:14

**justifying** 325:20

---

**K**

**Kane** 317:18,23
318:5 337:6 338:14
339:2 344:6

**kind** 315:19 356:25
357:8 372:17

**knew** 312:20 339:15
340:18 354:22

**knowledge** 300:24
302:25 304:7,10
306:25 307:10 311:8,
22 312:8,18 313:7
321:6,12 352:21
353:9 355:17 362:8,
12

---

**L**

**L.P.** 292:6 294:6
295:24 307:16 309:9
310:9 312:14,15
313:6,18,20 314:11,
17 315:6 316:8
369:10

**La** 346:13

**labeled** 296:21 301:8

**lack** 313:4

**lacks** 330:15 343:6
358:19 367:15 378:5

Index: lasted..objection

**lasted** 335:7

**late** 293:21 332:17 337:22 366:11

**law** 318:13

**lawsuit** 332:10 368:17 376:18

**lawyer** 300:14 302:18,20 304:23 337:24 355:16,18

**lawyers** 318:10,11, 15,17,20,23,25 319:2,3 330:4,9,11 335:17,20 338:15,24 370:7

**layperson** 303:5

**learn** 299:22 323:25 324:12 338:13 359:6 361:7 377:19

**learned** 324:5,18 325:24 326:11 333:7, 10

**leave** 345:10 377:8, 20 378:3

**left** 356:13 363:17

**legal** 297:9 304:24 305:17 309:5,13 310:12,19 311:5,7,11 318:10 322:8 325:18 343:6 348:24 351:18 354:12,20 366:13 367:7

**legitimate** 321:8

**levels** 300:23

**Liability** 301:17 357:19

**life-long** 305:4

**limited** 290:6 301:17 357:18,19

**limiting** 290:12

**liquidate** 350:3,5

**liquidating** 350:2

**liquidation** 349:2

**list** 336:8

**listen** 340:22

**litigation** 332:14 337:19

**LLC** 295:2 301:18 302:12,16 307:5,14 313:19 314:11,17 316:9

**loan** 304:11

**located** 288:11,25 356:4,6,10,15

**locations** 356:15

**lodge** 373:20

**log** 379:13

**long** 327:2 335:6,8

**long-term** 363:10

**lot** 370:15

**Lynn's** 338:4,6

**M**

**made** 299:12 304:10 317:8 324:13 328:18, 24 364:7,14,20 372:2

**make** 297:3 298:22 299:7 310:4 323:8 328:12 336:24 348:25 350:2

**makes** 295:10

**making** 350:4 365:15 371:23

**man** 297:22

**manage** 315:6

**managed** 315:12,20

**management** 292:6 312:15,25 313:5,19 314:24 315:6

**manager** 333:23

**managing** 296:21 302:12,16 305:13 307:4,13 311:23 351:8 366:23

**manifested** 320:4,15

**manner** 320:25

**March** 308:17,25 309:11 310:10,17

**311**:3,20 358:2,12 362:9,19 366:11

**mark** 291:15,17 297:5,6 305:22 306:23 351:20 352:11,21 353:4 360:25 361:20 363:12 368:23

**marked** 301:12 347:3

**marking** 335:23

**marriage** 381:12

**material** 337:4

**materially** 350:7

**matter** 360:18 381:13

**Mazin** 370:14,17,18, 22 371:23 373:21

**Mckinney** 356:7

**me--and** 323:8

**meaning** 348:23

**mechanism** 305:24 306:20

**member** 296:22 302:12,16 305:13 307:4,13 311:24 351:8 366:23

**memory** 320:6,8

**mentioned** 353:12 359:18

**message** 334:25

**microphone** 288:23

**million** 320:10 333:18

**million-dollar** 350:14,15

**mind** 304:23 323:5 366:23

**minutes** 363:21

**mischaracterizes** 309:22

**missed** 323:15

**mission** 350:9

**misstates** 359:19

**mistakenly** 325:11

**moment** 299:15 319:23

**month** 332:10 351:5

**months** 350:25

**morning** 288:20 289:7,11 328:14 348:15

**MORRIS** 288:19 289:6,10,25 290:7, 13,16 291:3,12 294:11,13 295:22 296:5,11 297:12 298:7,21 300:8,13,17 301:3,11,15 302:4,6 303:12,24 304:20 306:2,14 307:11,21 308:5,9,21 309:7,16, 24 310:6,14,22 311:6,12,15 313:15 315:10 316:15 318:14 319:16,19 321:14 322:10 323:6 324:16,19 325:7 326:10 327:25 328:6 330:18 331:7,18,23 333:12 334:13 335:21 336:2 337:21, 23 338:7,12 339:3, 10,18,23 340:11,21, 24 341:9,19 342:18, 24 343:11,21 344:11, 21 346:4,12,17,24 347:2,6,7,16,25 348:4,6,8 349:5,8,14, 17 350:16 351:14,22 352:4 353:5,25 354:15 355:2 356:18 357:6,14 358:5,7,21 359:14 360:4,24 361:5,6,12,15,18,23 362:2,14,17 363:14, 20,23 364:17 365:23 366:5,16 367:3,22 368:8,22 369:2,18 370:11 371:6,19 372:4,7,10,22 373:5, 15 374:4,18 375:4, 11,24 376:12 377:2, 18 378:12 379:2,6, 11,19,23

**motion** 332:17 377:8,20,25 378:2

**move** 338:22 340:21

**multiple** 300:23 321:9,10 322:18,19

**N**

**named** 376:17

**names** 312:9

**needed** 329:15 330:2 345:3 360:12

**negative** 337:4

**negotiation** 313:11 314:8,13

**Nexpoint** 316:22 318:23 319:2 331:11

**night** 325:2 328:14

**Northern** 368:19

**not-too-distant** 356:17

**Notary** 381:4,18

**note** 288:5 290:5 338:4

**Noted** 380:11

**notes** 379:8

**notice** 335:11 338:15 339:12 340:5,14 341:2,20 351:3 357:24 358:10

**notify** 347:22

**number** 296:17 339:19

**O**

**object** 293:25 297:9 305:16 309:24 366:12 373:24

**objection** 290:25 291:10 295:19,25 296:10 297:8 298:3, 19 303:10,23 304:16 305:15 306:12 307:7, 18,24 308:18 309:2, 4,12 310:11,18 311:4 315:8 316:12 318:6 319:13 321:3 322:7

Index: objections..purposes

323:2,22 324:2,7,11,
14,15 325:20 326:2,
5,12,18 327:23
328:2,3,19,25
330:13,21 331:14,21
333:8 337:14 338:19
339:8 340:6,16
341:3,15 342:15,21
343:5,19 344:7,16
346:2 347:11 350:12
351:11,17 352:2,13
353:20 354:11,19
356:11 357:2,3,12
358:3,17 359:11,19
363:7 364:15 365:22
366:20 367:13,15
368:4,5 369:15
370:24 373:20,21,23
378:5

objections 310:2
325:23 329:6 371:24
375:2

objectives 329:6

obligation 330:6,12,
20,23

obligations 304:11

obtain 342:7

obtained 363:5

obtaining 354:3

occur 322:17 353:10

occurred 351:24,25
378:25

October 314:20
317:13 319:10

office 356:10,15

officer 292:17

offices 356:4,9,13

offshore 306:20
318:2 353:24

open 345:10

operated 310:21
329:3

operation 312:12

opinion 309:5,13
328:13

optimize 366:24

oral 288:3 356:24
357:8

Order 288:7

org 290:21 309:15
311:23

organization 293:9

organizational
290:2 292:4 296:7

organizations 293:5
304:6

original 298:5 320:9
375:17

originally 343:10

originate 317:9

outcome 381:12

overbilled 320:12

overbilling 321:8
333:18,20

owed 365:21 366:10,
18

owes 367:5,9

owned 303:21

ownership 312:2

— P —

p.m. 380:11

paragraph 342:4

paraphrasing--that
364:5

part 326:8 329:16
330:7 352:23 376:3

participate 313:10
322:15 326:20
334:17 336:9 369:23

participated 338:25
370:4

parties 292:12 321:9
330:5 381:11

partners 291:21
292:7

partnership 325:20
357:18,20

party 381:10

patent 302:20

Patrick 291:15,17
292:3 293:15 296:7
297:5,6 298:9,12,16,
23 299:6 300:25
301:4 303:7 304:14
305:9,12,22 306:11,
18,23 307:6 351:7,
15,21 352:6,8,11,12,
21 353:4,8,12 354:7,
10 355:3,24 356:20,
25 357:8,15 358:15
359:2,7 360:7,11,16
361:20 362:9,18,22,
25 363:5 367:12
368:2,11 378:14

Patrick's 357:25
358:11 362:3

Pause 289:5

people 312:4,9 330:7
336:9,13

perfect 348:6

perform 371:14

period 355:6 357:23
358:4,9,15,25 359:4,
7,16 360:14,19
364:14

permanent 356:14

person 299:7 305:12
306:4 307:2 308:14
310:23,25 311:18

personal 330:10
365:20

personally 370:19

perspective 345:13

pertaining 357:9

phone 322:18
336:15,19,21 339:5

phrase 294:15,17,20
295:5 348:20 360:21

picked 297:25

pivot 336:25

place 293:20 316:14
326:23 327:4 334:7
336:6,16 343:10

plans 336:25

playing 299:15

pleading 378:3

POC 320:14

point 320:19 332:23
337:19 349:25 361:8

points 327:12

pool 295:9,10,14

portfolio 312:25
313:2,5 350:3,6

position 304:19,25
305:7 308:11 355:14

positions 335:12
355:11 356:20

possibility 378:2

post-bankruptcy
331:11

post-petition
364:14,21

potential 345:23

potentially 345:11

power 299:22 300:2

practice 314:2

practitioner 353:24

preliminary 332:18

premarked 346:21

prepared 314:4

presented 336:5

previously 316:10
332:11

primary 330:24
331:6,8

prior 298:17 308:17,
25 309:11 310:9,17
311:2,20 314:18
320:25 324:9 331:10
353:6 362:12 366:10
373:11,18 376:4,18
377:6,25

privilege 321:5
333:9 370:25 371:3,
4,16,17,20 372:19,20
373:4 374:2,16

plans 336:25

privileged 300:6
318:8 325:5

privileges 371:9

Procedure 381:9

proceed 290:8
363:24

proceeding 289:16

proceedings 338:22

process 305:21,24
306:8,9,10,17,18,19,
23 318:12

product 371:8
376:22 377:15
378:22

production 379:13

professional 330:6,
12

promise 363:22

proof 319:11,24
320:9,24 322:23

propose 341:24

proposed 323:23

protect 366:24

protected 378:8

provide 291:22
312:25 313:5 372:11
373:9,16 374:5,8,22

provided 371:11
372:24

providing 374:19

provisions 342:7
343:3,18

PTX 380:5

Public 381:4,18

pull 339:18

purpose 312:22
336:18,22 337:5
338:8 369:5

purposes 291:7

375:9,10,22 376:23
377:16 378:10,23
379:13

Index: pursuant..Sbaiti

**pursuant** 302:10
315:4,12,20 353:8,10
381:8

**pursue** 333:22
373:10

**pursued** 321:10
333:19 373:17

**put** 289:19,25 293:20
301:3,8,13 308:6
313:12 335:21
343:10 360:24 366:2
368:22

---

**Q**

**question** 294:2,23
309:25 311:21 315:9
324:8 325:16 326:8
328:21,22 338:11,19
340:23 347:8 348:17
366:15 369:8 372:15
373:14 374:12
377:12

**questions** 323:4
379:12,22

**quote** 342:5 349:19
362:19,20

---

**R**

**raised** 360:12

**reach** 337:2

**reached** 332:24
335:10

**read** 380:7

**ready** 363:24

**reason** 328:10,15

**reasons** 303:13
305:6 340:14

**recall** 302:17 317:11,
13,16 319:10,22
320:11 321:22
323:13,21 324:5
326:19 327:8,9,21
329:11 332:8 333:6
334:11,20,22,23
335:6,9,15 336:15,18
339:11,24 344:17,19

345:16,17,20 346:3
347:9,21 350:18
355:12 359:13,21
360:15,20 364:16
365:14 367:18,19,20
368:7,14 369:14
374:3,17,19 377:22,
23 378:11

**received** 346:5
347:23

**receiving** 339:24
346:9 347:9

**recess** 363:19
379:10

**recollection** 298:10
302:13 321:7 367:25
368:10

**recommend** 306:3

**recommendation**
297:2,3 298:22,25
299:8,12 319:7

**recommendations**
319:5

**recommended**
298:6,8 299:17
303:7,14 304:13
305:6 306:5 317:5

**recommending**
305:22 306:7

**reconsider** 342:2

**record** 310:4 338:20
346:10 381:7

**reduce** 320:20
321:16,19

**reduced** 321:13

**reducing** 319:24
322:24

**refer** 294:19 296:20
369:5

**reference** 348:10

**referred** 332:11
339:5

**referring** 294:20
295:6 296:19 313:23
318:16,21 331:9
338:17 341:14

**reflected** 374:9

**reflecting** 379:13

**refreshed** 316:2
323:4 367:18

**regard** 292:20
363:12

**rejected** 317:5

**related** 381:11

**relates** 343:2 361:21

**relationship** 305:4
363:11

**release** 342:12,20
343:3,18

**releases** 342:8

**relevance** 295:25
331:14,21 343:7
352:2

**relief** 332:16

**relocating** 356:16

**remember** 298:11,
12 302:15 305:22
306:6,7,9 318:9
320:12,18 322:12,21
327:12 329:9 332:22
335:19 339:4 343:25
345:3,5 347:12,24
353:22 355:14 360:2
370:14,15,16

**reminding** 329:14

**REMOTE** 288:3

**remotely** 288:6

**renew** 338:18 339:7

**repeat** 305:19 315:9
346:15 373:13

**rephrase** 325:13
326:9

**replace** 351:16
354:10

**replaced** 302:11
316:17 351:7 352:8
353:8 359:3

**replacement** 333:23
351:25 357:25
358:11

**reporter** 288:5
289:4,9 372:7,9
380:2

**reporter's** 371:25

**Reporting** 381:19

**represent** 336:3
369:3 370:18

**representation**
337:6

**representative**
357:10

**represented** 317:23,
25

**representing** 330:4

**request** 291:9,11
296:8 379:12

**requested** 348:14

**requesting** 361:8

**require** 300:6 304:23

**required** 304:22
306:8

**reserve** 379:21

**reserved** 381:9

**resign** 335:12 339:12
341:2 351:4 357:24
358:10

**resignation** 336:21
340:5,15 342:5,12
343:13 347:15
366:11

**resigning** 341:25
348:11

**resolved** 332:25
333:4

**respect** 311:10 359:8
360:17 364:6

**responded** 348:14

**response** 322:6
323:14 327:22 346:8
348:2 349:6,15,18

**responsibilities**
359:9

**responsibility**
366:22

**responsible** 299:9

**restate** 358:6

**Restated** 301:17
312:16 313:17
314:14 357:19

**result** 338:10

**retained** 317:18,20
318:5

**returns** 313:2 331:2

**reveal** 300:6 325:5
375:23 376:24
377:13 378:7,24

**reversal** 327:16

**review** 374:24

**right--that** 323:9

**role** 292:23 298:13,
17 308:2,3 357:9

**roles** 299:14

**roll** 309:15

**row** 293:2

**Rule** 381:8

**Rules** 381:9

**running** 304:6

---

**S**

**Savings** 288:11

**Sbaiti** 293:25 295:19,
25 297:8 298:19
301:7 303:10 305:15
307:7,24 308:18
309:4,12 318:6 322:7
324:14 327:23 328:5
330:13,15,21 331:14,
21 343:5 344:7,16
346:2 351:11 356:11
357:2 358:19 359:11,
19 363:7 364:15
365:22 366:12,20
367:15 371:2,10
372:12,14 373:2,11,
13,22 374:9,11,23,25
375:7,16,19 376:6,
10,18,20 377:7,11,19
378:5,17,20 379:9,
15,18,21,25 380:2,4

---

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-12    Filed 08/04/22    Page 158 of 200    PageID 22973
Appendix Part 2 Page 894 of 1336

Index: school..testified

**school** 297:14

**Scott** 296:15 297:7, 13,25 298:6,8 299:18,20 302:11,18 303:14 304:5,14 305:13 306:4 307:4, 14 308:10 309:14,18 310:8 313:4 317:2,5, 8 319:11,23 320:19, 23 321:15,19,23 322:22 323:10 325:24 326:4,13,16 327:22 328:18,23 329:25 332:23 334:3, 23 335:10,17,23 336:12 339:11,20,25 340:4,13,25 341:21 343:15,23 344:5,23, 25 345:6,14,18,21 347:17 348:20 349:9 350:5,10,20 351:7,16 352:9,19 353:8 354:10 356:21 357:23,25 358:9,16 359:3,8,16 360:13,17 361:2,19 362:9,19,23 363:2,6 364:5,13,19 365:7,21 366:9,17

**Scott's** 343:4,12 344:5 348:10 349:6 354:18 367:13 368:3, 11

**Scott--and** 364:4

**screen** 289:19 308:8 346:18 366:3,4 368:23

**scroll** 347:25 349:5, 15 361:12,23 362:14

**Scrolling** 348:3 349:7,16 361:14,17, 25 362:16

**seeking** 299:11 332:16

**Seery** 375:17 376:17 377:9,21 378:4,15,18

**select** 299:6

**send** 347:18 380:7,8

**sending** 341:21

**sense** 328:13

**sentence** 348:9

**separate** 303:16

**sequence** 346:22

**serve** 292:17 297:25 299:18 304:14

**served** 302:15 317:2

**services** 313:5 314:23 315:2 316:21

**set** 290:24 291:5,8, 11,13,17 293:15 298:25 357:17 374:6 381:6,14

**setting** 291:18 292:4 299:10

**settlement** 320:3 323:23 324:3 326:3, 18 328:20 329:2 332:24 333:3,7,15 334:4 335:3,10 336:5 367:14 368:4,12

**settlements** 337:3

**Shared** 314:23,25 316:20

**shares** 300:22 312:11 353:2

**short** 332:8 363:15

**shortly** 327:7 335:9

**sign** 362:4,10 380:8

**signature** 302:7 381:9

**signed** 353:4,7

**significant** 331:3

**similar** 316:9,13,14

**simple** 310:2 325:16

**simultaneous** 319:18 334:12

**singular** 322:18

**sir** 290:18 296:13 300:19 302:8 340:23 366:6 372:9

**sit** 299:25 300:19 365:2

**skiing** 359:25

**skills** 304:24

**skipped** 346:21

**Skur** 381:4,18

**Skybridge** 356:2

**Skybridge's** 356:3

**Skygate** 316:13,17, 20,22

**soft** 288:23 380:6

**sole** 307:15 353:24

**sophisticated** 300:16 303:4

**speak** 326:13 370:12

**speaking** 309:25

**specific** 294:8 300:23 307:10 312:8 321:12

**specifically** 290:9 294:9 298:11 299:21 312:12 329:10 332:21 335:20 358:20 360:3 367:10, 17,19,20 374:21

**specifically--and** 353:3

**specifics** 310:20 316:25

**speculate** 306:25 367:21,23

**speculation** 305:16 306:13 340:7,9 341:16

**speed** 317:12

**spoke** 333:17 337:8 344:2 350:23 351:2

**stamped** 339:20

**stand** 362:20,23 363:2,6

**stands** 298:13

**start** 289:23 290:4 339:20 369:7

**state** 288:8 338:20 381:2,5,18

**stated** 298:4 336:24

**statements** 309:22

**states** 342:5 368:18

**stating** 365:15

**strategic** 373:10

**Street** 381:20

**strike** 338:23 340:21

**string** 338:2,16

**structural** 295:3

**structure** 290:23 291:5,8,14,17 292:4 293:16,20 296:7 299:10 312:13 347:14 352:22 354:22

**structuring** 348:25

**struggled** 352:14,15, 16

**stuff** 359:25

**subject** 314:7 329:7, 11

**Subscribed** 380:16

**subsequently** 323:25

**substance** 334:22 344:13 364:20 369:24 370:8

**successor** 305:13 307:4 354:18 362:5

**suddenly** 356:14

**sue** 344:22

**sued** 378:15,19

**suffering** 340:18 341:5

**suggest** 343:22 376:16

**suggestion** 365:4

**suing** 345:2

**suitable** 299:5

**suite** 356:9 381:20

**sum** 334:22 344:12 364:19

**summarizing** 348:12

**Sunday** 336:7,10

**supervisory** 312:10

**support** 313:3

**supporting** 293:4,9

**surprised** 324:20,22

**sworn** 288:14 380:16 381:7

**T**

**talked** 337:9 365:3 370:15

**talking** 294:4,5,10 346:11 352:18

**task** 291:24

**tasked** 291:18 292:3

**tax** 291:7,22 355:13, 18

**Taylor** 290:4,9,25 291:10 294:7 296:10 298:3 300:4,10 303:23 304:16 306:12 307:18 309:2, 21 310:3,11,18 311:4,10 315:8 316:12 319:13 321:3 323:2 324:15 325:4 326:5 328:3 333:8 337:14 338:3,18 339:7 340:6,16 341:3,15 342:15,21 343:19 346:10,14 347:5,11 350:12 351:17 352:2,13 353:20 354:11,19 357:3,12 358:3,17 363:18 368:5 369:15 370:2,24 371:22 373:19 380:9

**telephone** 326:24 335:16

**telling** 337:2,3 345:3 364:19

**terms** 333:14

**testified** 288:16

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 172-1    Filed 03/24/22    Page 159 of 200    PageID 22974
Appendix Part 2    Page 89 of 136

Index: testimony..York

322:25 344:8 354:13
365:6,12

**testimony** 323:20
353:6 359:20 381:7

**Texas** 288:12 368:19
381:2,5,18

**text** 350:21 359:17

**things** 312:7 323:5
342:13 351:20 367:6

**thought** 299:4 303:8
304:18,24 308:2
322:3

**thoughts** 373:16

**thousand** 320:21
333:17,20

**threaten** 344:22

**three-minute** 379:7

**time** 288:10,11
290:10,11 291:19
299:5,17 303:6,22
304:2 308:12 311:17
319:21,23 320:19,25
321:18 324:9 332:23
335:18 337:20
339:16 340:5 343:24
350:19,23 351:2,3
353:7,21 355:6 358:9
359:2,7 361:8 363:15
366:10 367:12
369:14 373:11,18
376:5,19 377:6,25
379:17,20 380:11

**times** 325:9 334:10,
16

**today** 289:14,19
299:25 300:19 316:9
343:2 355:20 365:2

**Today's** 288:9

**told** 290:10 323:7,11
337:7 338:8 341:5
344:4,9 345:14,17
351:21 353:12 364:3

**top** 292:10 362:15

**topic** 378:14,18

**Tower** 289:3

**traded** 333:20

**transcript** 380:5

**transfer** 353:2

**trouble** 353:13 371:7

**true** 381:7

**Trust** 331:13,19,20,
25

**trusted** 305:2

**trustee** 296:16,18,
20,24 297:7 298:2
299:18,23 300:3,20
304:15 311:23 317:3
331:5 345:8 353:4
366:23

**trustees** 312:5

**trusts** 332:5

**truth** 288:15,16
337:10,12 338:13

**TSG** 381:19

**Tuesday** 311:13

**two-month** 358:8

**two-year** 357:23
358:4

**type** 316:10

**typically** 331:5

**U**

**ultimately** 320:2
347:3 351:13

**unbeknownst**
352:24

**underlying** 306:21
377:13

**understand** 289:14
296:16 302:10
307:12 310:7 322:2
325:10 355:24

**understanding**
291:5 293:8 294:25
295:13 299:19 300:2,
18 311:9 312:21
315:11,23 316:16
317:22,24 333:14
341:13 354:16 363:4
367:6,8

**underway** 353:10

**United** 368:18

**unpredictable**
349:24,25

**upload** 346:22

**usual** 289:19

**UVA** 297:16

**V**

**vague** 296:10 297:8
298:19 307:24 315:8
316:12 323:2 330:21
344:16 346:2 347:11
350:12 356:11 357:3,
12 363:7 364:15
365:22 367:15
369:15 373:20 378:5

**valuable** 303:8

**version** 374:10

**versions** 369:16,19

**vetting** 318:12,20

**view** 348:20 363:9

**views** 367:12 368:3,
11

**voting--again** 353:2

**W**

**wait** 311:12,13

**wanted** 290:5 342:19
343:17 348:25 350:2

**wedding** 297:22

**week's** 289:15

**weeks** 327:17

**WHEREOF** 381:13

**withdraw** 325:25
328:19,25 337:2
367:13 368:3

**withdrawal** 326:17

**withdrawing** 324:10
329:5

**withdrawn** 295:12
298:15 301:2 303:25

305:10 306:15 313:9,
11 316:4,6 320:7
322:5 324:7 346:7
352:6 354:8 358:24
365:23 374:7

**withdrew** 324:2,6
326:12

**word** 330:22 341:10
349:10 365:13

**words** 329:14 365:14

**work** 371:8 376:22
377:15 378:21

**work-product**
371:3,15,16 372:19
373:3,25 374:15
375:9,21 378:9

**worked** 347:14
354:22

**working** 363:11

**works** 305:24 353:3

**world** 308:22 309:9
344:14 345:22
377:24

**write** 349:23

**written** 356:24 357:7

**wrong** 365:4

**Y**

**years** 293:17,19
296:17 299:3 301:24
331:16

**York** 363:15 381:20

# EXHIBIT 98

1          DONDERO - 10/29/21

2      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
3            DALLAS DIVISION
   ------------------------------
4   IN RE:

5                    Chapter 11
    HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,        CASE NO.
                     19-34054-SGI11
7
          Debtor.
8   ------------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10  vs.                    Adversary
                      Proceeding No.
11   JAMES D. DONDERO,          21-03003-sgi

12          Defendant.
    ------------------------------
13

14        REMOTE VIDEOTAPED DEPOSITION OF

15          JAMES DONDERO - VOLUME 2

16            October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874

| | Page 284 | | | Page 285 |
|---|---|---|---|---|
| 1 | DONDERO - 10/29/21 | | 1 | DONDERO - 10/29/21 |
| 2 | | | 2 | A P P E A R A N C E S : |
| 3 | | | 3 | (All appearances via Zoom.) |
| 4 | October 29, 2021 | | 4 | Attorneys for the Reorganized Highland Capital |
| 5 | 10:21 a.m. | | 5 | Management: |
| 6 | | | 6 | John Morris, Esq. |
| 7 | | | 7 | Hayley Winograd, Esq. |
| 8 | | | 8 | Gregory Demo, Esq. |
| 9 | Remote Deposition of JAMES DONDERO, held | | 9 | PACHULSKI STANG ZIEHL & JONES |
| 10 | before Susan S. Klinger, a Registered Merit | | 10 | 780 Third Avenue |
| 11 | Reporter and Certified Realtime Reporter of the | | 11 | New York, New York 10017 |
| 12 | State of Texas. | | 12 | |
| 13 | | | 13 | Attorneys for NexPoint Advisors, LP and |
| 14 | | | 14 | Highland Capital Management Fund Advisors, |
| 15 | | | 15 | L.P.: |
| 16 | | | 16 | Davor Rukavina, Esq. |
| 17 | | | 17 | Thomas Berghman, Esq. |
| 18 | | | 18 | MUNSCH HARDT KOPF & HARR |
| 19 | | | 19 | 500 North Akard Street |
| 20 | | | 20 | Dallas, Texas 75201 |
| 21 | | | 21 | |
| 22 | | | 22 | |
| 23 | | | 23 | |
| 24 | | | 24 | |
| 25 | | | 25 | |

| | Page 286 | | | Page 287 |
|---|---|---|---|---|
| 1 | DONDERO - 10/29/21 | | 1 | DONDERO - 10/29/21 |
| 2 | Attorneys for Jim Dondero, Nancy Dondero, HCRA, | | 2 | I N D E X |
| 3 | and HCMS: | | 3 | WITNESS          PAGE |
| 4 | Deborah Deitsch-Perez, Esq. | | 4 | JAMES DONDERO |
| 5 | Michael Aigen, Esq. | | 5 | EXAMINATION BY MR. MORRIS          289 |
| 6 | STINSON | | 6 | E X H I B I T S |
| 7 | 3102 Oak Lawn Avenue | | 7 | No.          Page |
| 8 | Dallas, Texas 75219 | | 8 | Exhibit 1  Original Complaint          466 |
| 9 | | | 9 | Exhibit 2  NexPoint Complaint          408 |
| 10 | Attorneys for Dugaboy Investment Trust: | | 10 | Exhibit 3  HCMS Complaint          433 |
| 11 | Douglas Draper, Esq. | | 11 | Exhibit 4  Letter, 12/3/20          464 |
| 12 | Michael Landis, Esq. | | 12 | Exhibit 6  Term note          446 |
| 13 | HELLER, DRAPER & HORN | | 13 | Exhibit 15 NexPoint Advisors Answer          380 |
| 14 | 650 Poydras Street | | 14 | Exhibit 16 HCMS's Answer          362 |
| 15 | New Orleans, Louisiana 70130 | | 15 | Exhibit 17 HCRE's Answer          377 |
| 16 | Attorneys for Marc Kirschner as the trustee for | | 16 | Exhibit 31 Answer to Complaint          354 |
| 17 | the litigation SunTrust: | | 17 | Exhibit 35 Incumbency Certificate          309 |
| 18 | Deborah Newman, Esq. | | 18 | Exhibit 37 Incumbency Certificate          323 |
| 19 | QUINN EMANUEL URQUHART & SULLIVAN | | 19 | Exhibit 47 NexPoint 30(b)(6) notice          345 |
| 20 | 51 Madison Avenue | | 20 | Exhibit 48 HCMS 30(b)(6) notice          353 |
| 21 | New York, New York 10010 | | 21 | Exhibit 49 HCRE 30(b)(6) notice          354 |
| 22 | Also Present: | | 22 | |
| 23 | Dan Elms | | 23 | |
| 24 | Aaron Lawrence | | 24 | |
| 25 | Patricia Jeffries, Pachulski Stang | | 25 | |

Page 288

DONDERO - 10/29/21

1         DONDERO - 10/29/21
2         P R O C E E D I N G S
3         VIDEOGRAPHER:  This marks the
4    beginning of Video 1 in Volume 2 of the
5    deposition of James Dondero in the matter
6    In Re: Highland Capital Management, L.P.
7    Today's date is October 29, 2021.  The time
8    on the video monitor is 10:21 a.m.
9         Will the court reporter please swear
10    in the witness.
11         JAMES DONDERO,
12    having been first duly sworn, testified as
13    follows:
14         MR. MORRIS:  Deborah, would you like
15    to make a statement?
16         MS. DEITSCH-PEREZ:  I didn't know if
17    you wanted appearances first.  Sure.  This
18    is Deborah Deitsch-Perez from Stinson.  I'm
19    counsel for Mr. Dondero, Nancy Dondero,
20    HCRE and HCMS in this deposition.
21         I want to apologize for everybody
22    that we're starting late.  Mr. Dondero was
23    under the weather.  It is – he has taken
24    something, so he should not have to leave
25    the deposition, but if at any point he

Page 289

DONDERO - 10/29/21

1    looks green to me, I will ask that we stop
2    and reconvene when he is not feeling
3    nauseous.
4         MR. MORRIS:  All right.  I would
5    like to just begin here.  We have counsel
6    on the line for all of the defendants, we
7    have counsel for the plaintiff, and we have
8    counsel for the Highland Litigation Trust,
9    and I think that that is everybody who
10    is – is supposed to be here, so I would
11    like to just begin.
12         EXAMINATION
13    BY MR. MORRIS:
14    Q.   Mr. Dondero, can you hear me okay?
15    A.   Yes.
16    Q.   Okay.  And are you feeling well
17    enough to begin today's deposition?
18    A.   Yes.
19    Q.   Okay.  I understand that you are not
20    feeling well.  And I want you to know that I do
21    not want to proceed with this deposition unless
22    you believe that you are physically and
23    mentally able to participate to the best of
24    your ability.  Okay?  Do you understand that?

Page 290

DONDERO - 10/29/21

1         DONDERO - 10/29/21
2    A.   Yes.
3    Q.   So if at any time you don't feel
4    like you can continue, I would rather adjourn
5    to one day next week to complete the deposition
6    rather than forcing you to do something that
7    you don't believe you're capable of doing.
8    Okay?
9    A.   Yes.  Yes.  I did throw up twice
10    last night.
11    Q.   Okay.
12    A.   I imagine we could go for – let's
13    shoot for four hours today, you know, maybe –
14    maybe five, I don't know, but if we don't
15    finish –
16    Q.   I don't want to –
17    A.   – we will do the rest next week.
18    Q.   Okay.  I don't want to put an
19    arbitrary time on it.  You tell me if you are
20    unable to continue.  Okay?  Is that fair?
21    A.   Yes.  That is my estimate at this
22    point.
23    Q.   Okay.  You founded Highland Capital
24    Management, L.P.; correct?
25    A.   Yes.

Page 291

DONDERO - 10/29/21

1    Q.   And we are going to refer to that
2    entity and that entity only today as Highland;
3    is that okay?
4    A.   Yes.
5    Q.   When did you found – when did you
6    create Highland?
7    A.   '94.
8    Q.   And did you serve as Highland's
9    president from 1994 until on or around January
10    9th, 2020?
11    A.   Yes.
12    Q.   Did – can you describe in your own
13    words what the business of Highland was while
14    you were president?
15    A.   We were largely below investment
16    grade, credit strap, and we diversified over
17    the years to become more of an alternative
18    asset manager in a variety of formats.
19    Q.   And –
20    MS. DEITSCH-PEREZ:  I'm sorry, John,
21    one sec.  This was set up by someone a lot
22    shorter than Mr. Dondero.  Let me just take
23    one minute to adjust it.
24    MR. MORRIS:  May I proceed, Deborah?

Page 292

DONDERO - 10/29/21

1
2    MS. DEITSCH-PEREZ: (Nods head.)
3    Q.   Okay.  Mr. Dondero, at its peak,
4    what is the -- the largest value of assets that
5    Highland had under management while you were
6    president?
7    A.   35 billion.
8    Q.   And do you recall what year that
9    was?
10   A.   Not exactly.
11   Q.   Was it before the 2008 financial
12   crisis?
13   A.   Yes.
14   Q.   Okay.  So you were the president of
15   Highland for about 25 years; is that right?
16   A.   Yes, 25, 26, whatever.
17   Q.   And do you consider yourself to be
18   expert in the area of money management?
19   A.   Yeah, on the things that we focus
20   on.
21   Q.   You are a sophisticated investor;
22   right?
23   A.   Yes.  I would believe I'm
24   categorized as such.
25   Q.   And you are a sophisticated money

Page 293

DONDERO - 10/29/21

1
2    manager; is that fair?
3    A.   Yes.
4    Q.   And you manage money on behalf of
5    thousands of people; isn't that right?
6    A.   Yes.
7    Q.   And as a general matter, you know
8    how to read and understand balance sheets,
9    don't you?
10   A.   Yes.
11   Q.   You have signed promissory --
12   promissory notes before, haven't you?
13   A.   Yes.
14   Q.   Is it fair to say you have signed
15   hundreds of promissory notes during the 25-year
16   period that you were the president of Highland?
17   A.   No.
18   Q.   Is it fair to say that you signed
19   dozens of promissory notes during the time that
20   you were president of Highland?
21   A.   Yeah, dozens is probably fair.
22   Q.   Okay.  And is it fair to say that
23   the aggregate principal amount of the
24   promissory notes that you signed while you were
25   president of Highland likely exceeded

Page 294

DONDERO - 10/29/21

1
2    $200 million?
3    MS. DEITSCH-PEREZ: Objection to the
4    form.
5    A.   I don't have a basis for knowing
6    that.
7    Q.   You do know that it is more than
8    $100 million, don't you?
9    A.   No.
10   Q.   Do you owe today Highland Capital
11   Management Services more than $75 million?
12   A.   I don't know what the amount is.  I
13   don't believe it is that much.
14   Q.   Are the obligations to Highland
15   Capital --
16   MS. DEITSCH-PEREZ: Hold on.  Hold
17   on.  My connection just disappeared.
18   MR. MORRIS: Okay.
19   MS. DEITSCH-PEREZ: Okay, I'm back.
20   Q.   Okay.  Did the -- did the
21   obligations that you have to Highland Capital
22   Management Services, are they reflected in
23   promissory notes?
24   MS. DEITSCH-PEREZ: Could you repeat
25   that question?

Page 295

DONDERO - 10/29/21

1
2    MR. MORRIS: Sure.
3    Q.   Mr. Dondero, you borrowed money from
4    Highland Capital Management Services; correct?
5    A.   I'm sorry, it sounds like at first
6    you were asking me, did Highland Capital
7    Services borrow money from Highland.  Now
8    you're asking me if I borrowed money from
9    Services?
10   Q.   Yeah, let me -- let me rephrase the
11   question, sir, because if it is not clear, that
12   is my fault, and I apologize.
13   Did you -- have you borrowed money
14   from Highland Capital Management Services?
15   A.   I believe so.
16   Q.   Okay.  Do you know the aggregate
17   principal amount that is outstanding today,
18   ballpark?
19   A.   No.
20   Q.   Are the obligations that you have to
21   Highland Capital Management Services reflected
22   in promissory notes where you're the maker and
23   Highland Capital Management Services is the
24   payee?
25   A.   Please repeat that question.

| Page 296 | Page 297 |
|---|---|
| DONDERO - 10/29/21 | DONDERO - 10/29/21 |
| 1 | 1 |
| 2  Q.  Are you the maker on promissory | 2  Q.  Okay.  When you were in control of |
| 3  notes in favor of Highland Capital Management | 3  Highland, you personally decided who was hired |
| 4  Services, Inc.? | 4  at that company; is that fair? |
| 5  A.  I don't know.  I believe -- I | 5  A.  Sometimes, in senior positions. |
| 6  believe so, or I believe I have in the past, | 6  Q.  Okay.  Did your duties as president |
| 7  but I don't know. | 7  of Highland include being familiar with the |
| 8  Q.  Do you have any -- any estimate as | 8  debts and obligations that were owed to |
| 9  to how much money you owe Highland Capital | 9  Highland? |
| 10  Management Services, Inc. today? | 10  MS. DEITSCH-PEREZ:  Object to the |
| 11  MS. DEITSCH-PEREZ:  Asked and | 11  form. |
| 12  answered. | 12  A.  I mean, generally. |
| 13  A.  No. | 13  Q.  Okay.  Did you ever do anything to |
| 14  Q.  Can you say if it is more or less | 14  familiarize yourself with the debts and |
| 15  than $50 million? | 15  obligations that were owed to Highland? |
| 16  A.  I don't know. | 16  A.  Are you referring to the affiliated |
| 17  Q.  Can you say if it is more or less | 17  notes or -- |
| 18  than $25 million? | 18  Q.  Sure. |
| 19  A.  I don't know. | 19  A.  -- or what -- what are -- |
| 20  Q.  As a general matter, is it fair to | 20  Q.  I was -- I was asking -- I |
| 21  say that you know how to read and understand | 21  apologize.  I don't mean to step on your words. |
| 22  promissory notes? | 22  A.  No, you just -- because I don't |
| 23  MS. DEITSCH-PEREZ:  Object to the | 23  think Highland had a lot of other obligations |
| 24  form. | 24  due from other parties, and the affiliated |
| 25  A.  In general, yes. | 25  notes in aggregate were always de minimis to |

| Page 298 | Page 299 |
|---|---|
| DONDERO - 10/29/21 | DONDERO - 10/29/21 |
| 1 | 1 |
| 2  Highland than now, at any time. | 2  was charged with the responsibility of knowing |
| 3  Q.  It is your -- it is your position | 3  the number and amount of affiliate loans that |
| 4  that the affiliate notes to Highland were de | 4  Highland carried on its balance sheet? |
| 5  minimis in amount? | 5  A.  Sure. |
| 6  A.  Yes. | 6  Q.  Can you identify the people who were |
| 7  Q.  And how do you define de minimus for | 7  responsible for that? |
| 8  that purpose? | 8  A.  The people in accounting responsible |
| 9  A.  I believe the balance sheet of | 9  for tracking assets and liabilities in |
| 10  Highland today for the last three years, four | 10  preparing all the audited financial statements |
| 11  years, five years has been between 5 and | 11  every year and the quarterly unaudited |
| 12  $600 million.  I believe the notes have never | 12  financial statements that were prepared and the |
| 13  been more than 8 or 10 or 12 percent of that | 13  monthly operating reports. |
| 14  number. | 14  Q.  Can you -- can you name any names of |
| 15  Q.  And you believe that 8 or 10 or | 15  the people who had the responsibilities that |
| 16  12 percent of Highland's asset base you | 16  you just described? |
| 17  would -- you would define as de minimis? | 17  A.  I think it changed regularly, but it |
| 18  A.  Yes. | 18  would have been people in Frank's group in |
| 19  Q.  Okay.  As -- as president of | 19  accounting. |
| 20  Highland, did you ever do anything to | 20  Q.  Did Frank have any responsibility |
| 21  familiarize yourself with the number and amount | 21  for knowing and understanding the affiliate |
| 22  of affiliate loans that Highland carried on its | 22  loans that Highland carried on its balance |
| 23  books and records? | 23  sheet? |
| 24  A.  Not that I can recall. | 24  A.  Sure.  I -- as CFO he had to sign |
| 25  Q.  Was there anybody at Highland who | 25  off on the audited financials and rep letters |

Page 300

DONDERO - 10/29/21

1   and -- yes.
2       Q.   And can you -- can you identify the
3   name of any person in the accounting group in,
4   let's say, the three years prior to the
5   bankruptcy who had responsibility for knowing
6   and understanding the scope of affiliate loans
7   that Highland carried on its balance sheet?
8       A.   No, I would just be speculating but
9   it would be -- the senior people in Frank's
10  group would be responsible for the financial
11  statements.
12      Q.   Are you able to name the people, the
13  senior people in Frank's group in the couple of
14  years prior to the bankruptcy?
15      A.   Yes, but I don't know -- like
16  David Klos was a senior person, Cliff Stoops
17  was a senior person.  There were a couple
18  up-and-comers below them, but who did the
19  financials -- how Frank assigned the work in
20  his group, I have no idea.
21      Q.   Did you ever ask?
22      A.   No.
23      Q.   Do you have any knowledge as you sit
24  here today who within Frank's group had

Page 301

DONDERO - 10/29/21

1   responsibility for knowing and understanding
2   the affiliate loans that Highland carried on
3   its balance sheets?
4       A.   No.
5       Q.   And to the best of your knowledge as
6   you sit here today, you never personally did
7   anything to know and understand the extent and
8   scope of the affiliate loans that Highland
9   carried on its balance sheet; is that right?
10      A.   Correct.
11      Q.   Okay.  You appointed Mr. Waterhouse
12  as Highland's CFO; is that right?
13      A.   I think it was appointed and
14  recommended by Patrick Boyce, but I agreed with
15  the selection.
16      Q.   And you --
17      A.   That -- (speaking simultaneously.)
18      Q.   I apologize, are you done?
19      A.   I'm just saying that was a long time
20  ago, but I don't remember the details exactly.
21      Q.   But you had the authority and you
22  used that authority to appoint Frank as CFO;
23  correct?
24          MS. DEITSCH-PEREZ:  There's a lag in

Page 302

DONDERO - 10/29/21

1   the video.  I don't know if it matters, but
2   for a while Jim was frozen.  And I know
3   because -- since there was voice and no --
4   his mouth wasn't moving.  So let's just --
5   if the videographer sees there is a
6   problem, please let us know.
7       Q.   I --
8       A.   Yes.  I'm sorry, could you just
9   repeat the question regarding Frank, please?
10      Q.   Sure.
11          As the president of Highland, did
12  you have the authority and did you exercise
13  that authority to appoint him as Highland's
14  CFO?
15      A.   Yes.
16      Q.   Okay.  Do you recall when you
17  appointed Mr. Waterhouse CFO of Highland?
18      A.   No.
19      Q.   Was it more than five years prior to
20  the bankruptcy?
21      A.   Yes.
22      Q.   As the president -- during the time
23  that you served as president of Highland, did
24  you believe that Mr. Waterhouse fulfilled his

Page 303

DONDERO - 10/29/21

1   duties as chief financial officer?
2       A.   Yes.
3       Q.   Can you recall anything that
4   Mr. Waterhouse did in his capacity as
5   Highland's CFO that did not comport with your
6   expectations?
7       A.   I think we will talk about some of
8   those today.
9       Q.   Okay.  Do you have any reason to
10  believe that Mr. Waterhouse ever breached his
11  duties to Highland during the time that you
12  served as president?
13          COURT REPORTER:  We can't hear you
14  speaking.
15      Q.   We haven't heard any portion of your
16  answer, Mr. Dondero.
17          MR. MORRIS:  I don't know if people
18  can -- can hear, but I cannot hear
19  Mr. Dondero.
20          COURT REPORTER:  I can't either.
21          MR. MORRIS:  Yeah, Deborah, can you
22  speak, please.
23          COURT REPORTER:  They're on the same
24  speaker.

Page 304

1           DONDERO - 10/29/21
2           VIDEOGRAPHER:  Do we want to go off
3    the record?
4           MR. MORRIS:  Yes, please.
5           VIDEOGRAPHER:  Off the record,
6    10:41.
7    (Recess taken 10:41 a.m. to 10:47 a.m.)
8           VIDEOGRAPHER:  Back on the record,
9    10:47.
10      Q.    Okay.  Let me just ask the question
11   again so the record is clean, Mr. Dondero.
12         Do you have any reason to believe as
13   you sit here right now that Mr. Waterhouse ever
14   breached his duties to Highland during the time
15   that you served as president?
16         MS. DEITSCH-PEREZ:  Asked and
17   answered.
18      A.    Yeah, I think I did ask and answer
19   that.  Again, not intentionally, not
20   maliciously.  I am – I guess things we're
21   going to talk about today are for periods of
22   time after I was president, so...
23      Q.    Right.  That is going to be the next
24   question that I ask.  But to be clear – I just
25   want to have a clear record – during the time

Page 305

1    that you were president, do you have any reason
2    to believe that Mr. Waterhouse breached his
3    duties to Highland?
4           MS. DEITSCH-PEREZ:  Asked and
5           answered.  This is the third time.
6      A.    No.
7           MR. MORRIS:  It is actually not.
8      Q.    But thank you, Mr. Dondero.  I
9    appreciate that.
10         After you ceased to be president of
11   Highland, do you have any reason to believe
12   that Mr. Waterhouse breached his duties to
13   Highland?
14      A.    Breached his duties to – I don't –
15   I don't know if it is – I don't want to – I
16   don't want to make a judgment overall.  When we
17   talk about the notes we can make conclusions
18   then.
19      Q.    All right.  But you're not able to
20   tell me in response to my question whether you
21   believe today that Mr. Waterhouse breached his
22   duties to Highland after the time that you
23   served as president?
24         MS. DEITSCH-PEREZ:  Object to the

Page 306

1           DONDERO - 10/29/21
2    form of the question.
3      A.    I don't want to comment off the top
4    of my head, but I've highlighted that we will
5    discuss it around the note issue.
6      Q.    Okay.  You are familiar with an
7    entity called Highland Capital Management Fund
8    Advisors, L.P.; is that correct?
9      A.    Yes.
10      Q.    And we're going to refer to that
11   entity as HCMFA.  Is that okay?
12      A.    Yes.
13      Q.    Do you know who owns HCMFA?
14      A.    I believe it is myself and
15   Mark Okada.
16      Q.    Okay.  And do you have an
17   understanding as to – as to the percentage of
18   each of your interests, ownership interests in
19   HCMFA?
20      A.    No, and I don't know the entities.
21   I don't know if I own it directly or through
22   Dugaboy.  And I do believe Okada tends to use
23   his trusts, but I don't know the percentages
24   either.
25      Q.    Do you own a – do you own a

Page 307

1           DONDERO - 10/29/21
2    major- -- withdrawn.
3           Do you directly or indirectly own a
4    majority of the ownership interests in HCMFA?
5      A.    I believe so.
6      Q.    Okay.  And do you control HCMFA?
7      A.    Yes.
8      Q.    And do you know when HCMFA was
9    created?
10      A.    No, I do not.
11      Q.    Do you know if it was before or
12   after 2010?
13      A.    I don't know.
14      Q.    Have you controlled HCMFA since the
15   time it was created?
16      A.    I believe so, but I don't know for
17   sure.
18      Q.    Can you think of any period of time
19   when you didn't control HCMFA?
20      A.    I don't know.  I don't remember the
21   ownership structure prior and I don't remember
22   when it started, so I don't know.
23      Q.    Okay.  I'm asking about control and
24   not ownership.
25         Can you think of any period of time

Page 308

DONDERO - 10/29/21

1  when you did not control HCMFA?
2
3    A.   I don't know.
4    Q.   Okay.  Can you tell me what the
5  nature of HCMFA's business is?
6    A.   It largely housed our mutual funds.
7    Q.   What does it mean to house mutual
8  funds?
9    A.   It managed -- it managed the mutual
10  funds from a portfolio asset side and captured
11  the management fees as the advisor or sub
12  advisor -- I can't remember the structure.  I
13  can't remember if it was the advisor and
14  Highland was the sub advisor or vice versa, but
15  in general, a good portion, or most of the
16  portfolio team that managed the mutual funds
17  was employed at HCMFA.
18    Q.   Do you have a title with HCMFA
19  today?
20    A.   I don't know.
21    Q.   Do you know who the president of
22  HCMFA is?
23    A.   I would believe -- I would -- I
24  would think I am, but I don't know.
25    Q.   Do you know of any title that you

Page 309

DONDERO - 10/29/21

1  have at HCMFA today?
2    A.   I know I'm the portfolio manager on
3  a bunch of the funds, one of usually two or
4  three portfolio managers, and I believe I'm the
5  president, but I don't know beyond that.
6    Q.   Okay.  Did Frank Waterhouse serve as
7  treasurer of HCMFA at any point in time?
8    A.   I don't know.  I don't know.  I
9  just -- I don't know.  I don't remember.
10    MR. MORRIS:  Can I ask my -- my
11  colleague to please put up a document that
12  was premarked as Exhibit 35 to see if I can
13  refresh your recollection.
14    MS. DEITSCH-PEREZ:  Is that in the
15  book that you sent over?
16    MR. MORRIS:  No.  She will post it
17  and she will put it in the chat room.
18    Q.   Are you able to see that,
19  Mr. Dondero?
20    A.   Yes.
21    Q.   Can you see that this is an
22  incumbency certificate?
23    A.   Yes.
24    Q.   Do you know what an incumbency
25

Page 310

DONDERO - 10/29/21

1  certificate is?
2    A.   I'm reading it here for a second.  I
3  guess it is an officer statement or signature
4  authority, or some combination thereof.
5    Q.   Is that your signature at the bottom
6  of this document?
7    A.   Yes.
8    Q.   And do you see that this is an
9  incumbency certificate for HCMFA that you
10  signed effective as of April 11th, 2019?
11    A.   Yes.
12    Q.   Do you see that Frank Waterhouse is
13  identified as the treasurer of HCMFA as of that
14  date?
15    A.   Yes.
16    Q.   Does that refresh your recollection
17  that Mr. Waterhouse served as the treasurer of
18  HCMFA?
19    A.   It seems to be an authoritative
20  document, but I didn't have a recollection.
21    Q.   Do you know of anybody else who has
22  ever served as the treasurer of HCMFA other
23  than Mr. Waterhouse?
24    A.   I don't recall.
25

Page 311

DONDERO - 10/29/21

1    Q.   Did you, in your capacity as the
2  person who was in control of HCMFA, appoint
3  Mr. Waterhouse as the treasurer of that entity?
4    MS. DEITSCH-PEREZ:  Object to the
5  form.
6    A.   It appears to me that that's what
7  this incumbency certificate does, but...
8    Q.   Is it fair to say that you knew for
9  at least a few years prior to the petition date
10  that Mr. Waterhouse was simultaneously serving
11  as Highland's CFO and HCMFA's treasurer?
12    A.   No.  I mean, like I said, I don't
13  remember, and a lot of the officers had
14  multiple roles and multiple entities.  I mean,
15  it is not surprising, but I didn't have any
16  recollection.
17    Q.   Are you aware that Mr. Waterhouse
18  served in any capacity in the Highland universe
19  of companies other than as CFO of Highland
20  Capital Management, L.P.?
21    A.   I would -- I would assume he would
22  have a position like this in multiple other
23  entities, but I don't know which ones or what
24  titles he would have off the top of my head.

Page 312

DONDERO - 10/29/21

2    Q.   Is it fair to say, though, that he
3    wouldn't have obtained any of those titles
4    without your knowledge and approval?
5    A.   It is -- it is fair to say he was --
6    he had -- the lawyers or whoever worked on
7    general corporate structuring, Frank was a
8    senior officer in good standing, so they would
9    have used him as appropriate in different
10    things.
11        So to that extent, I guess I approve
12    it, but I sign hundreds of things like this.
13    Would -- you know, would I have been
14    specifically aware or remember -- remember it
15    is a very low likelihood.
16    Q.   Is there any position that
17    Mr. Waterhouse has ever held that you learned
18    about and you objected to on the grounds that
19    you hadn't approved it?
20    A.   No, not that I recall.
21    Q.   Okay.  Do you know if Mr. Waterhouse
22    held any positions with any of the retail
23    funds?
24    A.   I don't know.
25    Q.   He may have, you just don't recall;

Page 313

DONDERO - 10/29/21

2    is that right?
3    A.   That is correct.
4    Q.   And you can't identify any title
5    that Mr. Waterhouse held during the time that
6    you served as Highland's president other than
7    CFO of Highland.  Do I have that right?
8    A.   No, I don't think that is fair.
9    Q.   Okay.
10    A.   I mean -- I mean, he was CFO, but he
11    was other things before he was CFO.  And as we
12    were just saying, he's -- he's treasurer on
13    this incumbency certificate, but I think he
14    might have been on other incumbency
15    certificates, so I think your -- your summary
16    was too narrow.
17    Q.   Okay.  Can you identify any position
18    that Mr. Waterhouse held at the same time that
19    he is CFO of Highland other than treasurer of
20    HCMFA as reflected on this document?
21    A.   I can't recall, but I imagine there
22    to be others.
23    Q.   And to the extent there are others,
24    is it fair to say that you knew at the time
25    that Mr. Waterhouse was serving in more than

Page 314

DONDERO - 10/29/21

2    one role?
3    A.   Yes.
4    Q.   Okay.  And in his capacity as CFO of
5    Highland, did he report directly to you?
6    A.   Yes.
7    Q.   In his capacity as treasurer of
8    HCMFA, did he report directly to you?
9    A.   Yeah, it appears that, yes, that is
10    how it was structured.
11    Q.   Can you think of any position that
12    Mr. Waterhouse ever held in the Highland family
13    of companies where he didn't report directly to
14    you?
15    A.   I can't -- I can't think of any.
16    Q.   Is Mr. Waterhouse the treasurer of
17    HCMFA today?
18    A.   I don't know.  I'm not aware of any
19    changes, nor did I orchestrate any changes, but
20    I don't know for sure.
21    Q.   Can you identify any position that
22    Mr. Waterhouse holds with any former affiliated
23    company of Highland today?
24    A.   Again, I'm not aware of any changes,
25    nor did I orchestrate or precipitate any

Page 315

DONDERO - 10/29/21

2    changes.  With the formation of Skyview, I
3    don't know if there was changes.  I'm not
4    aware.
5    Q.   Have you considered firing
6    Mr. Waterhouse from any of the positions that
7    he holds with any of the companies that were
8    formerly affiliated with Highland?
9    A.   No.
10    Q.   As the president of HCMFA --
11    withdrawn.
12        As the person who was in control of
13    HCMFA, did you have any responsibility for
14    being familiar with HCMFA's debts and
15    obligations?
16        MS. DEITSCH-PEREZ:  Object to the
17    form.
18    A.   I don't know.
19    Q.   Did you ever do anything in your
20    capacity as the person in control of HCMFA to
21    familiarize yourself with HCMFA's debts and
22    obligations?
23    A.   Not during -- I mean, not prior to
24    bankruptcy.
25    Q.   So before the bankruptcy, you didn't

Appx. 01749

Page 316

DONDERO - 10/29/21

1    take any steps to familiarize yourself with
2    HCMFA's debts and obligations.  Do I have that
3    right?
4        A.    Correct, not specifically.
5        Q.    Okay.  Who was responsible for
6    knowing and understanding the scope and extent
7    of HCMFA's debts and obligations?
8        A.    That would have fallen on Frank and
9    his group.
10       Q.    Okay.  Do you have an understanding
11   as to who was authorized to incur obligations
12   on behalf of HCMFA?
13       A.    I mean, beyond – beyond due course,
14   I struggle to see why it would be anybody other
15   than me, but I don't know.
16       Q.    Do you know if Mr. Waterhouse was
17   authorized as the treasurer of HCMFA to incur
18   obligations on its behalf?
19       A.    He wasn't the senior operating or
20   executive positions there.  So the answer is
21   no, beyond, you know – beyond the normal
22   course of operating expenses or whatever, but
23   it would – he would never be the person on
24   anything of significance.

Page 317

DONDERO - 10/29/21

1        Q.    How do you define "significance"?
2        A.    Like waiving fees on a mutual fund,
3    purchasing another mutual fund, yeah, things
4    like that.
5        Q.    Was there any document or policy
6    that you are aware of that specifically
7    identifies the scope of Mr. Waterhouse's
8    authority as the treasurer of HCMFA?
9        A.    No.
10       Q.    Is there anything that you are aware
11   of that specifically limits Mr. Waterhouse's
12   authority other than what might be in your
13   head?
14       A.    No, I would – I would say what is
15   in my head is – would be typical industry
16   practice.  You wouldn't – you wouldn't have
17   executive vice presidents or ownership defined
18   if you were going to delegate everything to an
19   employee three levels down, you know.
20           MS. DEITSCH-PEREZ:  Okay.  John,
21   I've had a request from Davor to take a
22   quick restroom break, so –
23           MR. MORRIS:  You know, I really –
24   Davor, I'm happy to accommodate, but at

Page 318

DONDERO - 10/29/21

1        some point we have got to be able to get
2        more than 10 minutes of testimony in a row.
3        So let's take a short break.
4           MS. DEITSCH-PEREZ:  Thank you.
5           VIDEOGRAPHER:  Going off the record.
6    The time is 11:08.
7    (Recess taken 11:08 a.m. to 11:16 a.m.)
8           VIDEOGRAPHER:  Back on the record,
9    11:16.
10       Q.    Mr. Dondero, did you communicate
11   with anybody on the break about the substance
12   of your testimony?
13       A.    No.
14       Q.    As treasurer of HCMFA, did
15   Mr. Waterhouse's responsibilities include being
16   familiar with HCMFA's debts and obligations?
17       A.    Yes.
18       Q.    Do you have any reason to believe as
19   you sit here today that Mr. Waterhouse failed
20   to fulfill his responsibilities as treasurer of
21   HCMFA and familiarize himself with their debts
22   and responsibilities?
23           MS. DEITSCH-PEREZ:  Object to the
24   form.

Page 319

DONDERO - 10/29/21

1        A.    I don't know.
2        Q.    I appreciate that you don't know,
3    but do you have any reason as you sit here
4    today to believe that he failed to fulfill that
5    particular responsibility?
6        A.    I don't know.
7        Q.    Okay.  Are you an authorized
8    signatory on HCMFA's bank accounts?
9        A.    I don't know.
10       Q.    Do you know who the authorized
11   signatories are on HCMFA's bank accounts?
12       A.    No.
13       Q.    Do you know whether anybody now
14   employed or previously employed by Highland was
15   an authorized signatory with respect to any of
16   HCMFA's bank accounts?
17       A.    I don't know.
18       Q.    Do you know whether Mr. Waterhouse
19   was an authorized signatory on any of HCMFA's
20   bank accounts?
21       A.    I don't know how he had – had it
22   set up.  There would have been, I imagine,
23   checks and balances.  We run, as far as I know,
24   a compliant accounting group, you know, with

Page 320

DONDERO - 10/29/21

1  the right audit controls, et cetera.  So I
2  would imagine there would have been somebody
3  preparing it and multiple signatures or
4  multiple sign-offs on wires, but I have no
5  awareness of this.  I mean, I would believe
6  that it was done compliantly and correctly, but
7  I don't have any specific awareness.
8     Q.   Okay.  Do you know Lauren Thedford?
9     A.   Yes.
10    Q.   And was Ms. Thedford an employee of
11 Highland at one time?
12    A.   Yes.
13    Q.   Do you recall what position she held
14 at any particular point in time?
15    A.   I believe she held several different
16 positions over the years, but I remember most
17 as a corporate attorney working on document --
18 documents when we -- we do new funds or amend
19 old funds.
20    Q.   Okay.  Do you recall whether she
21 served as an officer of HCMFA?
22    A.   Wasn't her name on the incumbency
23 certificate we had up earlier?
24    Q.   It was.  We can put it back up if

Page 321

DONDERO - 10/29/21

1  you want to look at that.
2     A.   No, but I think that is -- that is
3  the answer, but that is my only awareness.
4     Q.   Okay.  Do you have -- do you have --
5  do you know whether she was ever appointed to
6  any position within the Highland corporate
7  family other than as an attorney with Highland
8  and as the secretary of HCMFA?
9     A.   I don't know.
10    Q.   Other than Ms. Waterhouse --
11 withdrawn.
12        Other than Mr. Waterhouse and
13 Ms. Thedford, can you identify any current or
14 former employee of Highland that ever served as
15 an officer of HCMFA?
16    A.   I don't know.
17    Q.   Okay.  Can you identify any current
18 or former employee of Highland who was
19 simultaneously also an employee of HCMFA?
20        MS. DEITSCH-PEREZ:  Object to the
21    form.
22    A.   You mean somebody who was a dual
23 employee?
24    Q.   Yeah, who was actually -- yeah, to

Page 322

DONDERO - 10/29/21

1  be clear, who was actually employed by both,
2  who received, you know, income from both.
3     A.   I don't know regarding income, but
4  some of that historic portfolio managers like
5  Michael Gregory or Jonathan Lamensdorf, they
6  did work for HCMFA primarily, but they also did
7  other things for Highland.  I don't know how
8  their compensation or their bonuses were split.
9  I just -- I wouldn't have awareness of that.
10    Q.   Let's move on to NexPoint.  You're
11 familiar with an entity called NexPoint
12 Advisors, L.P.; correct?
13    A.   Yes.
14    Q.   We will refer to that as NexPoint,
15 okay?
16    A.   Sure.
17    Q.   Do you know who owns NexPoint?
18    A.   Directly or indirectly, I believe I
19 do.
20    Q.   Okay.  And do you control NexPoint?
21    A.   Yes.
22    Q.   And do you know when NexPoint was
23 created?
24    A.   More than five years ago, but I

Page 323

DONDERO - 10/29/21

1  don't remember when.
2     Q.   Can you tell me generally the nature
3  of NexPoint's business?
4     A.   It is generally real estate related.
5     Q.   Have you controlled NexPoint
6  throughout its corporate existence, to the best
7  of your knowledge?
8     A.   Yes.
9     Q.   Do you have a title with NexPoint
10 today?
11    A.   I believe I'm president, but I don't
12 know for sure.
13    Q.   Did you appoint Mr. Waterhouse to
14 serve as treasurer of NexPoint?
15    A.   I don't know.
16        MR. MORRIS:  Please put up Exhibit
17    37.
18    Q.   This is another incumbency
19 certificate, sir?
20    A.   Yes.
21    Q.   And do you see, is that your
22 signature at the bottom?
23    A.   Looks like it yes.
24    Q.   And does that refresh your

Page 324

DONDERO - 10/29/21

1  recollection that you personally identified
2  Mr. Waterhouse as the treasurer of NexPoint
3  Advisors, L.P. effective as of April 11th,
4  2019?
5      A.  No, I mean, not – no.
6      Q.  Do you have any reason to doubt that
7  Mr. Waterhouse served as the treasurer of
8  NexPoint Advisors prior to the petition date?
9      A.  No, I don't have a reason to
10  disagree with it.  I just didn't have an
11  awareness.  And when you asked me earlier, the
12  thing that was running through my mind is that
13  it could have been, you know, Brian Mitts who
14  has a strong accounting background at NexPoint.
15  I just wasn't – I didn't know, based on
16  recollection, who was treasurer.
17      Q.  Okay.  Were you aware that – but
18  you were aware, were you not, that
19  Mr. Waterhouse wore multiple hats?
20          MS. DEITSCH-PEREZ:  Objection to
21  form.
22      Q.  Withdrawn.
23          You were aware, were you not, sir,
24  that during the time that you served as

Page 325

DONDERO - 10/29/21

1  president of Highland, that Mr. Waterhouse
2  served in capacities with respect to affiliated
3  companies?
4      A.  I was aware that multiple senior
5  executives had multiple titles at multiple
6  different entities, but I didn't have specific
7  awareness whatsoever on entities that Frank was
8  or was not involved in.
9      Q.  Okay.  But to the extent that he
10  held a title with one of the affiliated
11  companies, those affiliated companies would
12  have been managed or controlled by you;
13  correct?
14      A.  Generally.
15      Q.  You can't think of any title that he
16  held with an affiliated company that wasn't
17  managed by you, can you?
18      A.  No, not off the top of my head.
19      Q.  And you knew and intended prior to
20  the petition date to have Mr. Waterhouse serve
21  in multiple roles; is that fair?
22      A.  Yes.
23      Q.  Have you ever considered firing
24  Mr. Waterhouse from his position as treasurer

Page 326

DONDERO - 10/29/21

1  of NexPoint Advisors?
2      A.  No.
3      Q.  Okay.  As the president of NexPoint
4  Advisors, do you believe that you had a
5  responsibility to familiarize yourself with
6  NexPoint's debts and obligations?
7          MS. DEITSCH-PEREZ:  Object to the
8  form.
9      A.  Just generally.
10      Q.  Okay.  Did you do anything to
11  generally inform yourself of NexPoint's debts
12  and obligations?
13      A.  Not – not specifically that I can
14  recall.
15      Q.  Can you recall doing anything to
16  familiarize yourself with NexPoint's debts and
17  obligations at any time?
18          MS. DEITSCH-PEREZ:  Object to the
19  form.
20      A.  Not that I recall.
21      Q.  Did you ever look at NexPoint's
22  balance sheet?
23      A.  Not – not that I – not that I
24  recall.

Page 327

DONDERO - 10/29/21

1      Q.  Do you know whether NexPoint's
2  balance sheet reflected obligations that it
3  carried as liabilities that were due and owing
4  to Highland?
5      A.  I was aware generally of the notes,
6  but I didn't study the NexPoint balance sheet.
7      Q.  Do you believe that Mr. Waterhouse
8  had any responsibility as NexPoint's treasurer
9  to familiarize himself with NexPoint's debts
10  and obligations?
11      A.  Yeah.  I mean, the role is different
12  and the burden is different, and Frank and his
13  team orchestrated all the audits and compliance
14  statements and regulatory stuff for all of the
15  funds managed by NexPoint.
16      Q.  Well, you personally were
17  responsible for Highland's audited financial
18  statements, weren't you?
19          MS. DEITSCH-PEREZ:  Objection, form.
20      A.  No.  I mean, "responsible" is not
21  the right word.  I mean, we – I have to – as
22  the senior most executive, I have to – to
23  sign – sign statements regarding completeness
24  and no known frauds and those kinds of things,

Page 328

DONDERO - 10/29/21

2  but I am in no way involved in the preparation.

3      Q.    We will talk about that in a bit.

4          Do you have any reason to believe

5  today that Mr. Waterhouse failed to fulfill his

6  responsibilities as treasurer of NexPoint to

7  familiarize himself with NexPoint's debts and

8  obligations?

9      A.    I don't know.

10     Q.    You can't identify any particular

11  reason that you might have for concluding that

12  Mr. Waterhouse failed to fulfill his duties as

13  treasurer of NexPoint to familiarize himself

14  with NexPoint's duties and respons -- duties

15  and obligations; correct?

16     A.    Yes, I don't know.

17     Q.    Okay.  Do you know who the

18  authorized signatories are on NexPoint's bank

19  accounts?

20     A.    No.

21     Q.    Do you know if you're an authorized

22  signatory on NexPoint's bank accounts?

23     A.    I don't know.

24     Q.    Do you know if Mr. Waterhouse is an

25  authorized signatory on NexPoint's bank

Page 329

DONDERO - 10/29/21

2  accounts?

3      A.    I don't know.

4      Q.    Do you know whether there is any

5  current or former employee of Highland who did

6  not hold an officer position at NexPoint who

7  would have been an authorized signatory on

8  NexPoint's bank accounts?

9          MS. DEITSCH-PEREZ:  Object to the

10  form.

11     A.    I don't know.

12     Q.    Can you identify any current or

13  former employee of Highland who served as an

14  officer of NexPoint at any time other than

15  Ms. Thedford and Mr. Waterhouse?

16     A.    I don't know.

17     Q.    Okay.  Let's go to HCMS.  Are you

18  familiar with an entity called Highland Capital

19  Management Services, Inc.?

20     A.    Generally, yes.

21     Q.    And can we refer to that as HCMS?

22     A.    Yes.

23     Q.    Do you have a direct or indirect

24  ownership interest in HCMS?

25     A.    I believe so.

Page 330

DONDERO - 10/29/21

2      Q.    And do you own a majority of the

3  interest directly or indirectly in HCMS?

4      A.    I believe so.

5      Q.    Do you control HCMS?

6      A.    I believe so.

7      Q.    Have you -- has there ever been a

8  period of time in HCMS's corporate existence

9  where you did not control that entity?

10     A.    Not that I'm aware of.

11     Q.    Do you recall when HCMS was created?

12     A.    More than five years ago, but I

13  don't remember when.

14     Q.    Do you have an understanding of the

15  nature of HCMS's business?

16     A.    It manages some assets, and it was

17  trying to create track records that then could

18  be marketed.

19     Q.    What does it mean to create a track

20  record that could be marketed?

21     A.    You execute investments and

22  investment strategy that you can refine and

23  articulate and show good results to potential

24  third-party investors as -- as evidence that

25  you can do it.  And then that track record is

Page 331

DONDERO - 10/29/21

2  something the investors are willing to take a

3  chance on and then give you separate account

4  money along those lines.

5      Q.    Do you have a title with HCMS today?

6      A.    I don't know.

7      Q.    But you do control the entity; is

8  that fair?

9          MS. DEITSCH-PEREZ:  Object to the

10  form, asked and answered.

11     A.    I believe so.

12     Q.    Okay.  Do you know whether

13  Mr. Waterhouse has ever served as an officer of

14  HCMS?

15     A.    I have no idea.

16     Q.    Can you identify any person in the

17  world who has ever served as an officer of

18  HCMS?

19     A.    I don't know what the incumbency

20  certificate would look like for services, but

21  I'm willing to be refreshed.

22     Q.    Do you know if anybody ever served

23  as the chief -- withdrawn.

24         Did HCMF ever have anybody serve in

25  the capacity of chief financial officer?

Page 332

DONDERO - 10/29/21

2   A.   The subject of that question was
3   HCMF.  Is that what you meant to say, or did
4   you mean Services?
5   Q.   No, I apologize.  Thank you for the
6   clarification.  I did mean HCMS, so let me try
7   again.
8        Has anybody ever served in the
9   capacity of chief financial officer of HCMS?
10   A.   HCMF.
11        MS. DEITSCH-PEREZ:  S.
12   A.   Not --
13   Q.   S.
14   A.   Not of Services -- not that --
15   again, I don't know.  I'm willing to be
16   refreshed, but I -- I have no awareness.
17   Q.   Okay.  As president -- as the person
18   in control of HCMS, do you believe you had any
19   responsibility to familiarize yourself with
20   that entity's debts and obligations?
21   A.   Again, just generally, to the extent
22   that they were material or an issue or
23   whatever, but no more than generally.
24   Q.   Can you describe anything you ever
25   did to generally familiarize yourself with

Page 333

DONDERO - 10/29/21

2   HCMS's debts and obligations?
3   A.   I guess my answer, which would apply
4   to all of these entities, is awareness to know
5   that the amounts were de minimis relative to
6   the value of the entity, and the debt service
7   costs or issues were very de minimis relative
8   to the entities, but beyond that, I didn't
9   study them.
10   Q.   Well, did -- did HCMFA have
11   obligations to HCMLP that you would
12   characterize as di minimis from HCMFA's
13   perspective?
14   A.   Yeah, or just -- it never had
15   obligations that were more than de minimis.
16   Q.   As -- as the person in control of
17   HCMFA, did you ever have any concern that HCMFA
18   would not be able to satisfy its obligations to
19   HCMLP if -- if a demand was made?
20   A.   No.
21   Q.   Okay.  Was anybody charged with the
22   responsibility of familiarizing themselves with
23   HCMS's debts and obligations?
24   A.   Again, to differentiate or separate
25   myself from the treasury function or from what

Page 334

DONDERO - 10/29/21

2   Frank and his group were doing.
3        From my perspective, I had to be
4   aware about it -- aware of any obligations or
5   notes or debt service costs, et cetera, but to
6   the extent that I was aware and knew that it
7   was de minimis, I didn't spend any time
8   focusing on it, studying it, calculating it
9   exactly, or anything like that.
10        Having said that, we are highly
11   compliant.  We do -- we did audits every year
12   with reputable accounting firms that were
13   complete and in depth.  And any obligations
14   and/or assets, de minimis or not, in my view,
15   would nonetheless have to be reflected or
16   captured accurately and prepared for the
17   auditors in supplying, you know, detail or
18   source documents or whatever, whatever they do
19   in accounting as part of the audit function.
20        And all that would have done -- been
21   done exactly and expertly, as far as I know,
22   and it would have been done by Frank and his
23   group.
24   Q.   Okay.
25   A.   That is -- I'm trying to give a

Page 335

DONDERO - 10/29/21

2   complete answer regarding a myriad of ways
3   you've asked me kind of the same structural
4   questions.
5   Q.   I am, and just to be clear, I'm
6   asking kind of the same structural questions
7   with respect to each of the entities at issue.
8   I think you picked up on that.  I hope you
9   don't think I'm being repetitive.
10        You mentioned Frank and his group in
11   the context of HCMS.  Did I hear that
12   correctly?
13   A.   Yes.
14   Q.   Okay.  HCMS did not have a shared
15   services agreement with Highland; correct?
16        MS. DEITSCH-PEREZ:  You mean a
17   written shared services agreement, John?
18   Q.   Do you understand the question, sir?
19   A.   Yeah.  My answer would be the
20   advisors like NexPoint and HFAM that had to
21   have by law and regulatory statute have to have
22   formal sub advisors and shared services
23   agreements had formal shared services
24   agreement.
25        Entities that didn't need to have

Page 336

DONDERO - 10/29/21

1    formal written shared services agreements were
2    often serviced similarly or -- or exactly the
3    same as those entities, but without a written
4    agreement, but with a verbal shared services
5    agreement providing, again, all the same
6    similar services.
7        And the entities that didn't have a
8    written shared services agreement weren't
9    getting shared services or support from any
10   other entities other than Highland doing the
11   same thing for them that it did for the mutual
12   funds.
13       Q.    Okay.  Can you tell me who entered
14   into an oral shared services agreement between
15   Highland and HCMS?
16       A.    Boy, I can imagine way back in the
17   day it would have been myself and Frank, but he
18   and his group understood and knew that they
19   were doing it for all the new entities that
20   came along, and I can't imagine it was even
21   talked about much over the years.
22       Q.    Did -- did HCMFA and NexPoint pay
23   money to Highland under the shared services
24   agreement until let's just say late 2020?

Page 337

DONDERO - 10/29/21

1        A.    Yeah, yes, and early into '21, I
2    believe also.
3        Q.    Okay.  As -- as part of the oral
4    agreement that you referenced, was there -- was
5    there ever an agreement that HCMS would pay any
6    money to Highland in exchange for the services
7    that Highland provided to it?
8        A.    I do not believe there was a
9    financial remuneration aspect of it.
10       Q.    Okay.  And do you recall during your
11   time as president of Highland whether Highland
12   ever received payment from HCMS for services
13   rendered?
14       MS. DEITSCH-PEREZ:  And are we just
15   talking about money?
16       MR. MORRIS:  Correct.
17       A.    Yeah, I don't -- I don't recall
18   moneys being -- well, you know what, let me --
19   let me clarify that a little bit.
20       If there were any direct costs that
21   Highland would have incurred like getting the
22   audits done, you know, like if Price Waterhouse
23   said, okay, give us the details on, you know,
24   all the different entities that roll up into

Page 338

DONDERO - 10/29/21

1    the Highland entity.
2        And then -- and they prepared
3    statements or did work for services, Frank and
4    his group would have passed through those costs
5    and expected services and/or Dugaboy or any of
6    the other entities to pay for direct
7    out-of-pocket costs.  But it wouldn't have paid
8    a supplemental fee or profit or anything to
9    Highland.
10       Q.    Okay.  To the best of your
11   recollection, during the time that you were
12   president of Highland, did Highland ever
13   receive anything of value from HCMS on account
14   of services other than the reimbursement of
15   out-of-pocket expenses?
16       A.    Yeah, I'm going to go back to my
17   comment in terms of building track record.  And
18   I would use -- yeah, we had done it several
19   times in the past and it had worked
20   effectively.  And that is -- you know, yeah, I
21   mean, the -- the track record in CLO paper was
22   what was used to track -- (inaudible) -- as an
23   investor.
24       And so, you know, to the extent that

Page 339

DONDERO - 10/29/21

1    the DAF wasn't paying a fee, along the way, to
2    Highland for shared services, Highland got the
3    benefit of the track record that was being
4    built at the DAF to then market to third
5    parties, which then created a revenue stream
6    for Highland down the road.
7        And I would say that was the same
8    intent on Services.
9        Q.    Is there anything -- anything else
10   of value that you believe HCMS provided to
11   Highland in exchange for the services that
12   Highland rendered?
13       A.    That would be primarily it.  I would
14   say there is probably times where Services
15   provided liquidity for Highland or helped on
16   investments that Highland was involved in, but
17   I would have to refresh myself on exactly what.
18       Q.    Is it fair to say that HCMF -- HCMS
19   never provided a revenue stream to Highland
20   similar to the revenue stream that was provided
21   by HCMFA and NexPoint under the shared services
22   agreements?
23       A.    That is correct.
24       Q.    Okay.  Did anybody at HCMF --

Page 340

DONDERO - 10/29/21

1  withdrawn.
2      Did anybody at HCMS ever have the
3  responsibility for familiarizing themselves
4  with HCMS' debts and obligations?
5      MS. DEITSCH-PEREZ:  Object to the
6      form.
7      A.    Frank and his team, as part of
8  preparing the audited financials for all the
9  entities, would have definitively been aware of
10 all of them.  Who else on the services
11 incumbency certificate or – would be aware or
12 have knowledge, I don't know.
13     Q.    Okay.  And when you refer to "Frank
14 and his team," are any of them acting as an
15 officer or employee of HCMS in what you are
16 thinking about?
17     A.    I – I don't know.  I don't know.
18 Did – we haven't – have we looked at the
19 incumbency certificate for services?
20     Q.    No.
21     A.    I don't know.  I don't know off the
22 top of my head.
23     Q.    Okay.  Let's just finish this up.
24         Can you identify any current or

Page 341

DONDERO - 10/29/21

1  former Highland employee who served as an
2  officer of HCMS at any time?
3      A.    No, I would need to be refreshed.
4      Q.    Okay.  Can you identify –
5  withdrawn.  Let's go to the last one, HCRE.
6         Are you familiar with an entity
7  called HCRE Partners, LLC?
8      A.    Yes.
9      Q.    And is that entity now known as
10 NexPoint Real Estate Partners, LLC?
11     A.    You know what, I do believe it had a
12 name change.  I don't know if that is the name
13 change, but that would make sense.
14     Q.    Okay.  Can we just refer to that
15 entity as HCRE?
16     A.    That is fine.
17     Q.    Okay.  Do you have any direct or
18 indirect ownership interest in HCRE?
19     A.    Yes.
20     Q.    And is it a majority interest to the
21 best of your knowledge?
22     A.    Yes.
23     Q.    Do you control HCRE?
24     A.    Yes.

Page 342

DONDERO - 10/29/21

1      Q.    Have you controlled HCRE throughout
2  its corporate existence?
3      A.    Yes.
4      Q.    Can you tell me what the nature of
5  HCRE's business is?
6      A.    It makes real estate investments.
7      Q.    Do you have a title with that
8  entity?
9      A.    I don't know, but I'm willing to be
10 refreshed.  And I assume its incumbency
11 certificate looks similar to the ones that you
12 have put up.
13     Q.    Can you identify for me today
14 anybody who has ever served as an officer of
15 HCRE at any time?
16     A.    I would rather be refreshed.  I
17 would imagine myself and Matt McGraner are two
18 of those people, but I don't know for sure.
19     Q.    Okay.  Without the incumbency
20 certificates or other documentation, you are
21 not able to give me any names other than Mr. –
22 other than you and Mr. McGraner; is that fair?
23     A.    That's correct.
24     Q.    Okay.  Do you know whether anybody

Page 343

DONDERO - 10/29/21

1  has ever been given the responsibility –
2  withdrawn.
3         Do you know whether anybody has ever
4  had the responsibility for familiarizing
5  themselves with the debts and obligations of
6  HCRE?
7      A.    It would be the same answer as given
8  on the other entities.  It would be the
9  treasurer, which is probably Frank.  And if not
10 the treasurer it would be Frank in his role and
11 his team of putting together the complete and
12 accurate financials of HCRE.
13     Q.    Other than putting together the
14 complete and accurate financials of HCRE, did
15 Frank and his team have any other
16 responsibility with respect to understanding
17 the debts and obligations of HCRE?
18     MS. DEITSCH-PEREZ:  Objection, form.
19     A.    Again, just the general overlay
20 being that they were de minimis and – de
21 minimus, and the service obligations were de
22 minimus relative to the value or operating
23 income of the enterprise.
24         In other words, had they been more

Page 344

DONDERO - 10/29/21

2  material or material, they would have had more
3  focus.  But they didn't deserve more focus.
4      Q.  And so is it fair to say that you
5  didn't do anything to familiarize yourself with
6  HCRE's debts and obligations?
7      MS. DEITSCH-PEREZ:  Object to the
8  form.
9      A.  Not on a regular detailed basis, you
10  know, just a general awareness.
11     Q.  Did you ever take any steps to
12  review the affiliate loans and obligations that
13  were due between and among Highland and its
14  affiliated companies?
15     A.  Again, just generally.
16     Q.  What did you do?
17     A.  Like I said, I had a general
18  awareness of them.
19     Q.  And did you receive from time to
20  time lists or information that specifically
21  described the amounts that were due and owing
22  from the affiliates to Highland?
23     A.  Yeah, from time to time the amounts,
24  yes.
25     Q.  Let's just quickly go to the

Page 345

DONDERO - 10/29/21

2  30(b)(6) notices if we can.
3      MR. MORRIS:  Can we put up a
4  document that has been marked as
5  Exhibit 47.
6      (Exhibit 47 marked.)
7      Q.  Do you understand, Mr. Dondero, that
8  you are here today in your individual capacity
9  and in your capacity as what is called a
10  30(b)(6) witness for certain entities?
11     A.  Yes, a little bit to my chagrin.
12  And I don't think you will see me again as a
13  30(b)(6) witness, but yes.
14     Q.  All right.  Well, it wasn't my
15  choice, so let's just go through it quickly.
16     Have you seen this document before,
17  sir?
18     A.  Yes.
19     Q.  And do you understand that you are
20  here today in your capacity as NexPoint's
21  corporate representative?
22     A.  Yes.
23     Q.  And do you understand that your
24  answers today in your capacity as NexPoint's
25  corporate representative will be binding on

Page 346

DONDERO - 10/29/21

2  NexPoint?
3      MS. DEITSCH-PEREZ:  As qualified by
4  the objections that we made.
5      MR. MORRIS:  Sure.
6      A.  I will do the best I can.
7      Q.  Thank you so much.
8      MR. MORRIS:  Can we go to the next
9  page, please.  The last page.  The topics.
10     Q.  Okay.  Have you seen these topics
11  before, sir?
12     A.  Yes.
13     Q.  Okay.  Do you see that we asked for
14  somebody to testify as to NexPoint's answer?
15     A.  Yes.
16     Q.  Okay.  Are you aware that
17  NexPoint -- are you aware that NexPoint filed
18  an answer to Highland's amended complaint?
19     A.  Yes.
20     Q.  And did you review NexPoint's answer
21  at any time before today's deposition?
22     A.  It was in the binder, I believe,
23  that you guys sent over.
24     Q.  I think that's right.  Are you
25  prepared to answer questions today about

Page 347

DONDERO - 10/29/21

2  NexPoint's answer?
3      MS. DEITSCH-PEREZ:  Again, subject
4  to our objection, but...
5      A.  Yeah, to the best I can.
6      Q.  Okay.  The next topic concerns
7  affirmative defenses.
8      Do you see that?
9      A.  Yes.
10     Q.  Do you have an understanding of what
11  an affirmative defense is?
12     A.  Yes.
13     Q.  What is your understanding of an
14  affirmative defense?
15     A.  I think it is those -- phrase that
16  you see in most of our answers, the
17  justification, estoppel, waiver, and then --
18  and then there is some specific answers beyond
19  that, I guess.
20     Q.  Okay.  Are you prepared --
21     MS. DEITSCH-PEREZ:  John, I take it
22  you will show him.  He doesn't have to have
23  them memorized.
24     MR. MORRIS:  No, of course not.
25     MS. DEITSCH-PEREZ:  So if you are

Page 348

DONDERO - 10/29/21

1  going to ask him, you will put it in front
2  of him?
3      MR. MORRIS:  Of course.
4      MS. DEITSCH-PEREZ:  Thank you.
5      Q.   Are you prepared to testify today to
6  the circumstances, communications, documents,
7  and facts concerning NexPoint's affirmative
8  defenses?
9      A.   Yeah, to the best that I can.
10     Q.   Okay.  Do you see Topic 3 concerns
11 the demand notes?
12     A.   Yes.
13     Q.   Okay.  Are you prepared to testify
14 about the demand notes, including with respect
15 to the specific issues identified in that
16 topic?
17     MS. DEITSCH-PEREZ:  Again, subject
18 to the objections, particularly I think
19 with respect to use of the proceeds.
20     Q.   We will get to that.
21     Are you prepared to testify?
22     A.   I hope so.
23     Q.   And – and I know that there is an
24 objection there, but just a simple yes or no,

Page 349

DONDERO - 10/29/21

1  are you – do you have knowledge of the – of
2  NexPoint's use of the proceeds of the note?
3      A.   Not specifically.
4      Q.   All right.  Maybe I will refresh
5  your recollection later.
6      And then the last topic is discovery
7  requests.
8      Do you see that?
9      A.   Yes.
10     Q.   Are you prepared to testify today on
11 NexPoint's behalf concerning Highland's
12 discovery requests?
13     A.   To the best of my knowledge.
14     Q.   Okay.  Did you do anything to
15 prepare for today's deposition?
16     A.   I met with Deborah.
17     Q.   When did you do that?
18     A.   A couple of days ago for a couple of
19 hours, and a few days before that for a couple
20 of hours.
21     Q.   How many times –
22     MS. DEITSCH-PEREZ:  Are you also
23 asking about calls?
24     MR. MORRIS:  I appreciate that.

Page 350

DONDERO - 10/29/21

1      A.   Yeah.  There were a couple of phone
2  calls too.
3      Q.   How many times did you communicate
4  with Deborah in preparation for today's
5  deposition?
6      A.   A half dozen, maybe, you know.
7      Q.   How many times –
8      A.   You know, in-person and phone calls,
9  but...
10     Q.   How many times did you meet with her
11 in-person?
12     A.   Two, maybe three.
13     Q.   And can you just tell me an estimate
14 of the total time spent preparing for this
15 deposition, inclusive of both the meetings and
16 the phone calls?
17     A.   I don't know.  Does it matter?  I
18 mean, I don't know.  I don't know, four hours,
19 four hours.
20     Q.   Okay.  Did anybody participate in
21 these meetings or phone calls other than your
22 lawyers?
23     A.   No.
24     Q.   Did any lawyers participate in any

Page 351

DONDERO - 10/29/21

1  of these meetings or phone calls who didn't
2  represent you in your individual capacity?
3      A.   No.  It was just – it was just
4  Deborah and I.
5      Q.   Okay.  Have you had a chance to
6  review the transcript of Mr. Waterhouse's
7  deposition?
8      A.   No.  I haven't seen it yet.
9      Q.   You haven't seen any portion of that
10 deposition?
11     A.   No.
12     Q.   Are you aware of anything that
13 Mr. Waterhouse testified to in his deposition?
14     A.   No.
15     Q.   You have no knowledge of anything
16 that Mr. Waterhouse said last week in his
17 deposition; do I have that right?
18     A.   That's correct.
19     Q.   Okay.  Do you have any knowledge as
20 to anything your sister said in her deposition?
21     A.   No, other than she is glad it is
22 over.
23     Q.   I hope – I hope – I hope she
24 thinks at least I was respectful.

Page 352

DONDERO - 10/29/21

1
2    Did -- did you ever see her
3    transcript -- the transcript from her
4    deposition?
5    A.   No.
6    Q.   How about Mr. Seery, did you see the
7    transcript from Mr. Seery's deposition?
8    A.   I didn't even know that Seery was
9    deposed, so the answer is no.
10   Q.   Okay.  Are you aware that Dave Klos
11   was deposed?
12   A.   You know what, I think I had
13   awareness of that, but I haven't seen that
14   deposition.
15   Q.   Do you know anything about anything
16   that he testified to the other day?
17   A.   Nope.
18   Q.   How about Kristin -- Kristin
19   Hendrix, are you aware that she was deposed?
20   A.   I think I heard that she was also.
21   Q.   Do you know anything about anything
22   that she testified to?
23   A.   No.
24   Q.   Did you look at any documents to
25   refresh your recollection in advance of this

Page 353

DONDERO - 10/29/21

1
2    deposition other than the stack that I provided
3    and the deposition notices?
4    A.   I mean just -- no, just a listing of
5    the notes, but that is it.
6    Q.   Did you see any emails at all in
7    connection with your preparation for today's
8    deposition?
9    A.   No, not a single email.
10       MR. MORRIS:  Okay.  Let's put up
11   Exhibit 48, please.
12       (Exhibit 48 marked.)
13   Q.   And I think you will see that this
14   is the 30(b)(6) notice for HCMS.  If we can go
15   to the next page.  And it is really the same --
16   I will represent to you that the topics for
17   HCMS are the same as the topics for NexPoint.
18       Have you seen HCMS's 30(b)(6) notice
19   that is up on the screen right now?
20   A.   Yes.
21   Q.   And if we took the time -- if I took
22   the time to ask you the same questions about
23   your ability to answer on behalf of HCMS --
24   HCMS with respect to the topics identified
25   there and subject to your counsel's objections,

Page 354

DONDERO - 10/29/21

1
2    would you be able to do so?
3    A.   Yes.
4        MR. MORRIS:  Let's put up Exhibit
5    49, please.
6        (Exhibit 49 marked.)
7    Q.   And this the 30(b)(6) notice for
8    HCRE.  You're here today to testify on behalf
9    of HCRE as its corporate representative.  Do
10   you understand that?
11   A.   Yes.
12   Q.   And did you review the list of
13   topics that we included in our 30(b)(6) notice
14   for HCRE?
15   A.   Yes.
16   Q.   And subject to your counsel's
17   objections, are you prepared to testify to the
18   topics that are listed on the page that is up
19   on the screen?
20   A.   Yes.
21       MR. MORRIS:  Okay.  Can we please
22   put up Exhibit 31.
23       (Exhibit 31 marked.)
24   Q.   Mr. Dondero, we're putting up on the
25   screen now your answer to the -- to Highland's

Page 355

DONDERO - 10/29/21

1
2    amended complaint.
3        MS. DEITSCH-PEREZ:  Is that in the
4    notebook?
5        MR. MORRIS:  No, no.  This is one
6    that we had -- we had --
7        MS. DEITSCH-PEREZ:  All right.  Hang
8    on.
9        MR. MORRIS:  That's okay.  That is
10   why we're putting it up on the screen, and
11   we will put it in the chat room.  It is
12   already in there, actually.
13       MS. DEITSCH-PEREZ:  Yeah, I think we
14   have it here.  Hold on.  I think Nancy
15   walked off with the duplicate of this, so
16   if you need it, I will hand it to you.
17   Q.   Mr. Dondero, while we wait to see if
18   your counsel has a hard copy, do you recall
19   reviewing your answer to the plaintiff's
20   amended complaint before it was filed?
21   A.   I don't know if I was involved at
22   that juncture.
23   Q.   All right.  So just to refresh your
24   recollection, this is a document that was filed
25   with the Court at the beginning of September.

Page 356

DONDERO - 10/29/21

1 If you recall, Highland filed an original
2 complaint, and after you amended your answer
3 late in August pursuant to an agreement,
4 Highland filed amended complaints against
5 certain of the obligors in the notes
6 litigation.
7    Does that refresh your recollection
8 that this document was prepared in early
9 September?
10   A.   Okay.
11   Q.   Okay.
12   A.   I don't have specific memory.
13   Q.   Okay.  So as always, Mr. Dondero, we
14 have done this many times before, if there is
15 anything in the document that you think that
16 you need to see because it is a little bit of a
17 lengthy document, will you let me know that?
18   A.   Sure.
19      MS. DEITSCH-PEREZ:  Yeah.  And we
20 have a copy if you need to stop and take a
21 look.  We did get a hard copy.  We have a
22 hard copy here.
23   Q.   Okay.
24   A.   All right.

Page 357

DONDERO - 10/29/21

1   Q.   So – so let me ask the question
2 again then:  Do you recall, with that
3 background, having reviewed and approved the
4 filing of this document at the beginning of
5 September 2021?
6   A.   Generally.
7   Q.   Okay.  As you sit here today, are
8 you aware of anything in this document that is
9 inaccurate?
10   A.   Not that I'm aware of.
11   Q.   Okay.  Are you aware of anything in
12 the document that you believe should be
13 modified or amended to make it more complete or
14 more accurate?
15   A.   Not as of this moment.
16   Q.   Okay.  Can we please go to Paragraph
17 83.  Okay.  Right there.
18      So do you see that on – on page 13
19 of the exhibit, we have in Paragraphs 82
20 through 91 what are called your affirmative
21 defenses?
22   A.   Yes.
23   Q.   All right.  I'm going to skip the
24 one in 82 for the moment, but focusing on 83.

Page 358

DONDERO - 10/29/21

1 Can you just read that to yourself and tell me
2 when you have done that?
3   A.   Yes.
4   Q.   Are you aware of any facts that
5 concern this particular affirmative defense?
6   A.   Which notes are these again?
7   Q.   These would be your personal notes.
8   A.   The – personal notes.  I'm trying
9 to remember.  No, I – well, if you read the
10 question one more time.
11   Q.   Sure.  Just so – so to make sure
12 that you understand, because I'm not here to
13 trick you, this is your answer to Highland's
14 complaint against you where Highland is trying
15 to recover on the notes that you signed.
16      Do you understand that?
17   A.   Right.
18   Q.   Okay.  So in Paragraph 83 you have
19 asserted an affirmative defense that the
20 plaintiff's claims are barred in whole or in
21 part due to waiver.
22      Do you see that?
23   A.   Yes.
24   Q.   Do you have any facts that you can

Page 359

DONDERO - 10/29/21

1 share with me that concern that particular
2 affirmative defense?
3      MS. DEITSCH-PEREZ:  And, again, just
4 in this particular answer.
5      MR. MORRIS:  That is all I'm asking
6 about.
7   Q.   We're going to go through the answer
8 for each one of them.  So just one at a time.
9 We're only talking about your – your notes.
10   A.   No, no time.
11   Q.   Let's go to Paragraph 84.
12      Do you see Paragraph 84 states,
13 among other things, that plaintiff's claims are
14 barred, in whole or in part, due to estoppel?
15   A.   Yes.
16   Q.   Can you share with me any facts that
17 you are aware of that concern that particular
18 affirmative defense?
19   A.   No.
20   Q.   Okay.  I'm going to skip over 85
21 because I've gotten that answer elsewhere.  If
22 we can go to 86, do you see that Paragraph 86
23 asserts as an affirmative defense, among other
24 things, that, quote:  Plaintiff's claims may be

Page 360

DONDERO - 10/29/21

2 barred, in whole or in part, due to failure of
3 consideration, closed quote?
4    A.    Right, I see that.
5    Q.    Do you -- do you -- do you
6 acknowledge that Highland transferred to you an
7 amount of money equal to the principal amount
8 on each of the notes that are at issue?
9    A.    I believe -- yes.
10    Q.    Okay.  I appreciate that.
11        Do you have any facts that would
12 support the affirmative defense that is set
13 forth in Paragraph 86?
14    A.    No.
15    Q.    Okay.  And then, finally,
16 Paragraph 88 asserts, among other things, that
17 the fraudulent transfer claim should be barred,
18 in whole or in part, because the alleged
19 fraudulent transfer -- and I'm summarizing
20 here -- was taken in good faith and for
21 reasonably equivalent value.
22        Do you see that?
23    A.    Yes.
24    Q.    Okay.  Do you have any facts that
25 concern that particular affirmative defense?

Page 361

DONDERO - 10/29/21

2    A.    Let me read that one more time.
3    Q.    Take your time.
4    A.    I think that one is -- I'm trying --
5 I'm trying to remember if that one -- if the
6 partner defense is on alternative comp that
7 could have been taken or forgiveness that was
8 in lieu of other comp -- I'm trying to remember
9 if that falls under this category.  I think it
10 does.
11    Q.    Okay.  Is there anything else that
12 you can -- any other facts that you can think
13 of that concern the affirmative defense in
14 Paragraph 88?
15    A.    I mean, the -- yes.  Okay.  To the
16 extent that the -- in lieu of additional comp
17 falls under there, so does the incentives to --
18 the incentive to me to help monetize illiquid
19 investments better faster.
20    Q.    And does that relate to the three
21 portfolio companies that are the subject of the
22 oral agreement between you and your sister or
23 to something else?
24    A.    It is --
25        MS. DEITSCH-PEREZ:  Objection, form.

Page 362

DONDERO - 10/29/21

2    A.    -- regarding that, yeah.
3    Q.    It is the same thing.  Do I have
4 that right?
5    A.    Yes.
6    Q.    Okay.  Thank you very much.
7        Is there anything else you can share
8 with me about the facts that concern the
9 affirmative defense in Paragraph 88?
10    A.    I think that is -- that is -- that
11 is it.
12    Q.    Okay.  Can we change now to
13 Exhibit 16, which you should have in your pile,
14 which is the answer that was filed by the HCMS
15 to Highland's amended complaint.
16        (Exhibit 16 marked.)
17    A.    Which number is this?
18    Q.    It is number 16.
19    A.    16 in the binder?
20    Q.    It should be, yeah.
21    A.    Yes.  Okay.  I got it.
22    Q.    Okay.  And is the first page titled
23 Defendant, Highland Capital Management
24 Services, Inc.'s Answer to Amended Complaint?
25    A.    Yes.

Page 363

DONDERO - 10/29/21

2    Q.    Okay.  So these questions I'm asking
3 in your capacity as HCMS' 30(b)(6) witness.
4 Okay?
5    A.    Okay.
6    Q.    And you recall that one of the
7 topics under the deposition notice was HCMS'
8 answer; right?
9        Are you prepared to answer questions
10 about this document?
11    A.    Yep, to the best I can.
12    Q.    Okay.  Have you seen it before?
13    A.    Yes.
14    Q.    And do you know whether HCMS
15 authorized this Stinson firm to file this
16 document on its behalf at the beginning of
17 2021?
18    A.    Yes.
19    Q.    Did you personally have any role in
20 reviewing and preparing this document?
21    A.    I mean, just generally that the
22 transition of former Judge Lynn passing and
23 Bonds Ellis not being able to handle
24 complexity -- maybe I shouldn't say like
25 that -- or handle this aspect of the case

Page 364

DONDERO - 10/29/21

1  and/or – I think it was – yeah, just
2  whatever.  He moved to Stinson from – I think
3  maybe it started at Bonds Ellis and then maybe
4  it went to Wick Phillips and then it went to
5  Stinson, but, you know, there was a migration
6  of these notes in general.
7      Q.   Was there a particular person who
8  was charged with the responsibility of
9  approving and authorizing the filing of this
10  document on behalf of HCMS?
11     A.   Like I said, I think generally that
12  was myself.
13     Q.   Okay.  Are you aware of anything in
14  this document today that is inaccurate in any
15  way?
16     A.   Not specifically.
17     Q.   Are you aware of anything generally
18  in this document that is inaccurate in any way?
19     A.   Not at the moment.
20     Q.   Are you aware of anything in this
21  document that you believe should be modified or
22  amended to make it more complete or more
23  accurate?
24     A.   Not yet.

Page 365

DONDERO - 10/29/21

1      Q.   Let's go to Paragraph 40 – 94,
2  please.
3          MS. DEITSCH-PEREZ:  We may be
4  imperfect creatures as lawyers.
5      A.   Yes.
6      Q.   Okay.
7      A.   Yes.
8      Q.   Okay.  I was just going to say, do
9  you see from Paragraphs 94 through 102 HCMS has
10  set forth its affirmative defenses?
11     A.   Yes.
12     Q.   Okay.  Let's – let's start with the
13  first one.
14         Do you see in Paragraph 94 HCMS
15  asserts that, quote:  Plaintiff's claims are
16  barred, in whole or in part, by the doctrine of
17  justification and/or repudiation?
18     A.   Yes.
19     Q.   Are you aware of any facts that
20  concern that particular defense?
21     A.   I believe this – they were material
22  prepayments of the loan.  I believe that is –
23  those are the – they were material and
24  numerous prepayments of the loan, which I think

Page 366

DONDERO - 10/29/21

1  was – that is incorporated into that defense.
2      Q.   Okay.  We will talk about the – the
3  details of that in a moment, but are there any
4  other kind of broad statements that you can
5  give me that identify facts related to this
6  particular affirmative defense?
7          MS. DEITSCH-PEREZ:  Object to the
8  form.
9      A.   That is all I have at the moment.
10     Q.   Okay.  Do you know whether any
11  document that HCMS ever filed with the
12  bankruptcy court ever asserted, as in a
13  defense, that they didn't have to pay because
14  they had prepaid any obligations that were due
15  and owing?
16         MS. DEITSCH-PEREZ:  Object to the
17  form.
18     A.   I don't have awareness.
19     Q.   And this document doesn't – doesn't
20  use the word "prepayment" anywhere, does it?
21         MS. DEITSCH-PEREZ:  Object to the
22  form.
23     A.   I don't know.
24     Q.   Do you know of anything that HCMS

Page 367

DONDERO - 10/29/21

1  ever did before this week to put Highland on
2  notice that it contended that it didn't have to
3  pay its obligations under the notes because of
4  a prepayment defense?
5          MS. DEITSCH-PEREZ:  Object to the
6  form.
7      A.   We have no records.  I'm not sure we
8  would have ever been in a position to – to do
9  that.  The – you know, we were relying on
10  shared services from Highland, and Highland had
11  all the records regarding the amounts and
12  prepayments, et cetera.
13     Q.   When did you learn that HCMS had
14  made a prepayment to Highland?
15     A.   I don't know, but I – I imagine –
16  I imagine it was – if you are asking why it
17  wasn't mentioned earlier but then mentioned
18  later, it is because somewhere in that time
19  period we became aware.
20     Q.   So you didn't – you didn't have
21  knowledge of the prepayment until the debtor
22  produced documents.  Do I have that right?
23         Withdrawn.
24         How did you learn that HCMS made a

Page 368

DONDERO - 10/29/21

1  prepayment?
2      A.   I don't know.  I just know that we
3  became aware of that being a material fact
4  somewhere along the line.
5      Q.   Do you remember when you learned
6  that material fact?
7      A.   No.
8      Q.   Do you have any facts that you can
9  share with me concerning the prepayment?
10     A.   Eventually there was a spreadsheet
11  that summarized it, but I don't -- I don't
12  know -- I don't know when that occurred.
13     Q.   Does -- does this defense of
14  prepayment apply to demand notes or a term
15  note?
16     A.   I would -- I would -- I would say,
17  you know, primarily a term note, but -- yeah, I
18  think primarily the term note because I think
19  that was the one that was declared to be in
20  default of share, you know, whatever, so I
21  think it was regarding the term note.
22     Q.   Do you recall -- do you have any
23  knowledge as to when the prepayment was made?
24     A.   I believe there were numerous and

Page 369

DONDERO - 10/29/21

1  material prepayments, but I don't know exactly
2  when they were made.
3      Q.   Do you know what year they were
4  made?
5      A.   No, but -- no, but -- no, I don't.
6          MS. DEITSCH-PEREZ:  If you want,
7  John, if you would like for him to give you
8  dates, he could probably dig up the
9  spreadsheet and give you dates, but you
10  have it also.
11         MR. MORRIS:  Thank you.  Okay.  I
12  think we're doing just fine here.
13     Q.   Do you know if there were any
14  prepayments made by HCMS in 2018?
15     A.   I don't know the specifics off the
16  top of my head.
17     Q.   Do you know if HCMS made any
18  prepayments in 2019?
19     A.   I don't know the specifics off the
20  top of my head.
21     Q.   Are you aware that under the term
22  note, HCMS was required to pay annual
23  installment payments at the end of each year?
24         MS. DEITSCH-PEREZ:  Object to the

Page 370

DONDERO - 10/29/21

1  form.
2      A.   I wouldn't say it like that.
3      Q.   We will look -- we will look at the
4  documents in a few minutes.
5          Are you aware of any facts that
6  support the justification or repudiation
7  defense in Paragraph 94 other than what you
8  have testified to so far?
9      A.   I think it is largely the prepayment
10  aspect of it that is captured there.
11     Q.   Okay.  And -- and -- all right.  I
12  will leave it at that.
13         Let's go to Paragraph 95.  Do you
14  see the affirmative defense in 95 is that,
15  quote, plaintiff's claims are barred in whole
16  or in part by the doctrine of estoppel.
17         Do you see that?
18     A.   Yes.
19     Q.   Do you have any facts as the
20  30(b)(6) witness of HCMS that concern that
21  particular affirmative defense?
22     A.   You know, I think for both 95 and
23  96, the way I understand it is that was
24  reliance on Highland's and Highland's screw-up,

Page 371

DONDERO - 10/29/21

1  to the extent that there was a screw-up, on the
2  term loans.
3      Q.   What screw-up are you referring to?
4      A.   Well, we didn't have accountants or
5  employees at Services, you know, and Services
6  was relying on Highland and shared services to
7  stay in compliance or to -- on the various
8  loans.
9      Q.   Did you ever personally instruct
10  anybody in December of 2020 to make a payment
11  on behalf of HCMS under the term note?
12     A.   To make -- I'm sorry, is this --
13  what was the timeframe again?
14     Q.   December 2020 -- let's just say
15  anytime in 2020.  Did you, in your capacity as
16  the person in control of HCMS, ever direct or
17  authorize any person in the world to make a
18  payment from HCMS to Highland in satisfaction
19  of the obligation that was due under the term
20  note at the end of the year?
21     A.   Not that -- not that I recall.
22     Q.   Okay.  Do you know whether anybody
23  acting on behalf of HCMS ever instructed or
24  authorized Highland to make a payment on

Page 372

DONDERO - 10/29/21

1  account of HCMS's term note to Highland?
2  A.   Well, again, and maybe I didn't say
3  it clearly enough. I think there was a
4  reliance in the due course aspect, especially
5  on small amounts, and it would have been done
6  by Highland personnel on behalf of Services.
7  MR. MORRIS:  Okay. Move to strike.
8  Q.   And I'm going to ask you,
9  Mr. Dondero, to be patient with me and to
10  listen carefully to my question.
11  Are you aware of anybody acting on
12  behalf of HCMS, whoever instructed Highland to
13  make a payment in satisfaction of any payment
14  that was due at the year-end of 2020 under the
15  term note?
16  A.   Not specifically, but I'm saying I
17  don't think it needed to be made specifically.
18  Q.   Okay. So you are not aware of any
19  instruction that was ever given to Highland by
20  HCMS to make the payment; is that fair?  You
21  relied on the course of dealing?
22  A.   Right. I relied on ordinary course.
23  I don't believe there was a specific -- I'm not
24  aware of a specific request.

Page 373

DONDERO - 10/29/21

1  Q.   Okay. And you were aware that the
2  payment was due at the end of the year; isn't
3  that right?
4  MS. DEITSCH-PEREZ:  Object to the
5  form.
6  A.   Not -- not specifically.  There
7  is -- to be bona fide notes, there is -- I know
8  there is -- there is tax structuring and things
9  that the auditors want to see in terms of -- of
10  regular payment that everything just doesn't
11  accrue indefinitely, but what those roles are
12  and when and if it needs to be paid and whether
13  it was by the end of the year or not.
14  I'm generally not specifically
15  knowledgeable of or involved in, and nor do I
16  have an awareness that was it or could it have
17  been satisfied by other payments throughout the
18  year. I'm not -- I'm not the person for that
19  knowledge.
20  Q.   Now, do you recall in December of
21  2020 there was some tension between you and
22  Mr. Seery.
23  A.   Tension between me and Mr. Seery. I
24  would say there was tension between Mr. Seery

Page 374

DONDERO - 10/29/21

1  and everybody.  He was trying to steal the
2  estate, you know, so yes.
3  MR. MORRIS:  I move to strike.
4  Q.   You were asked to resign from
5  Highland in late September of 2020; correct?
6  A.   Yes.
7  Q.   And you did resign as of October
8  9th, 2020; correct?
9  A.   Yes.
10  Q.   And do you recall that in early
11  December, Highland sought a temporary
12  restraining order against you?
13  A.   Yes.
14  Q.   And do you recall that Highland
15  obtained a temporary restraining order against
16  you in early December?
17  A.   Yes.
18  Q.   Okay.  Do you recall that the
19  advisors that you controlled filed a motion
20  against the debtor in mid December 2020?
21  A.   Yes.
22  Q.   Okay.  And do you recall that that
23  motion was curved by the Court in the middle of
24  December?

Page 375

DONDERO - 10/29/21

1  A.   Yes, roughly.
2  Q.   And do you recall that at the end of
3  November, Highland had given notice of
4  termination of the shared services agreements
5  with the advisors?
6  A.   I believe they did that multiple
7  times or extended it multiple times. I can't
8  remember if that was -- if it was done then or
9  not.
10  Q.   Okay.  And it is your testimony that
11  notwithstanding those facts and circumstances,
12  you relied on Highland to make the payment that
13  HCMS owed at the end of the year?
14  A.   Yes, absolutely. We were still
15  deluded in terms of thinking that Seery was
16  working to resolve the estate, not to steal the
17  estate.
18  MR. MORRIS:  I move to strike.
19  Q.   Do you have any other facts and
20  circumstances that relate to the affirmative
21  defenses in Paragraphs 95 and 96?
22  A.   I mean, not at the moment, not that
23  I want to volunteer.  When you ask more
24  questions about the specifics, I guess we will

Page 376

DONDERO - 10/29/21

1    get to some of it.
2        Q.   Well, I'm asking you questions now.
3    You are the 30(b)(6) witness.  This is one of
4    the topics that you were supposed to be
5    prepared to answer questions about, and I would
6    just like to know everything that you have in
7    your head as to facts that relate to these two
8    affirmative defenses.
9        MS. DEITSCH-PEREZ:  Object to the
10       form.
11       Q.   Because if I don't ask the right
12   question later, you know, we can't do that;
13   right?
14       So do you have any other facts that
15   you are aware of that relate to these two
16   particular affirmative defenses?
17       MS. DEITSCH-PEREZ:  John, the fact
18       that it's a 30(b)(6) deposition doesn't
19       absolve you of the necessity to ask
20       questions.
21       MR. MORRIS:  I asked the question.
22       Q.   Can I please have an answer?
23       A.   Again, the notes in general are de
24   minimis relative to asset values of Highland or

Page 377

DONDERO - 10/29/21

1    the counterparties.  So the annual obligations
2    are even more de minimis or a million bucks or
3    less than a million bucks.
4        There was never an intent, nor would
5    there be a logical intent to -- from my
6    perspective or any of the entities that had
7    notice to Highland to be in default.  And it is
8    not logical that they would do that for any
9    purpose.
10       And the facts around the curing
11   quickly of the notes and getting the curing
12   amounts from Highland and making the payments
13   and Highland accepting them as they're defining
14   what it took to cure it, I think, are all, you
15   know, the key facts that make any, you know,
16   acceleration argument, you know, ridiculous.
17       Q.   Okay.  Anything else?
18       A.   That's it at this point.
19       MR. MORRIS:  Okay.  Let's go to
20   Exhibit 17, please.
21       (Exhibit 17 marked.)
22       Q.   This is HCRE's answer.  Do you see
23   that, sir?
24       A.   Yes.

Page 378

DONDERO - 10/29/21

1        Q.   And I'm going to ask these questions
2    in your capacity as the 30(b)(6) representative
3    of HCRE.  Do you understand that?
4        A.   Yes.
5        Q.   Have you seen this document before?
6        A.   Yes.
7        Q.   Are you aware of anything in this
8    document that is inaccurate today?
9        A.   I mean, I think 96 we put in there
10   similar to the other affirmative defenses in
11   case there was a prepayment.  But, again, we
12   have been so blocked from getting information
13   and detail we didn't know it at the time
14   regarding, you know, prepayments.
15       So I don't think the prepayment
16   defense works for 96.  So that would be my
17   clarification of an inaccuracy.
18       Q.   Why do you believe that the
19   prepayment defense doesn't work in Paragraph 96
20   for HCRE?
21       A.   Because I don't think there were any
22   prepayments.
23       Q.   All right.  I appreciate that.
24       A.   We didn't -- we didn't know it at

Page 379

DONDERO - 10/29/21

1    the time --
2        Q.   Okay.
3        A.   -- we put this together.
4        Q.   Is there any other aspect of this
5    document that you believe is inaccurate today?
6        A.   Not as far as I know.
7        Q.   Is there anything in this document
8    that you believe should be modified or amended
9    to make it more accurate or more complete?
10       MS. DEITSCH-PEREZ:  Object to the
11       form.
12       A.   Not yet.
13       Q.   Okay.  Looking at Paragraph 96, I
14   believe you just testified that,
15   notwithstanding the assertion of the defense
16   therein, you are not aware of any facts
17   concerning the prepayment defense that you
18   described earlier for HCMS.
19       Do I have that right?
20       A.   Yes.
21       Q.   Okay.  Do you have any facts at all
22   that relate to the affirmative defense in
23   Paragraph 96?
24       A.   I don't believe so at this moment.

Page 380

DONDERO - 10/29/21

1
2    Q.   Okay.  How about Paragraphs 97 and
3    98?  Do you have any facts that relate to those
4    affirmative defenses?
5        A.   It would be the same answer as on
6    the last one.
7        Q.   Okay.  I appreciate that.  And so –
8    but we don't have to go over it again.  I will
9    just leave it at that.
10            Let's go to Exhibit 15, please.
11           (Exhibit 15 marked.)
12           MR. MORRIS:  This is the next –
13           MS. DEITSCH-PEREZ:  Hey, John.
14   John, can we take a – like a very quick
15   restroom break?
16           MR. MORRIS:  You know, if we could
17   just get through this document, which
18   shouldn't take long, then perhaps we can
19   take a short half-hour lunch break.
20           MS. DEITSCH-PEREZ:  Well, we can
21   take a short half-hour lunch break after we
22   get through this, but I just need to run to
23   the restroom.
24           MR. MORRIS:  Okay.
25           MS. DEITSCH-PEREZ:  So you can leave

Page 381

DONDERO - 10/29/21

1
2    the screen on if you want so that we can
3    get back fast.
4        MR. MORRIS:  My pleasure, Deborah.
5    No problem.
6        MS. DEITSCH-PEREZ:  Thank you.
7        VIDEOGRAPHER:  Off the record,
8    12:40.
9    (Recess taken 12:40 p.m. to 12:51 p.m.)
10       Q.   Before we go on to this document,
11   sir, did HCRE have a shared services agreement
12   with Highland?
13           VIDEOGRAPHER:  We're back on the
14   record.
15           MR. MORRIS:  Oh, do I need to read
16   the question again?
17           COURT REPORTER:  No, I've got it.
18       A.   I – I don't believe it is a formal
19   written one.  I think it is just a verbal one.
20       Q.   And who is the verbal agreement
21   between?
22       A.   It was between Highland and HCRE.
23   Now it is between NexPoint and HCRE.
24       Q.   And who entered into the agreement
25   between Highland and HCRE?

Page 382

DONDERO - 10/29/21

1
2        A.   I would give the same answer I gave
3    before where it was just – it was just
4    understood that we supported all the related
5    entities or entrepreneurial efforts and it was,
6    you know, modest amounts of work.
7            There wasn't specific financial
8    remuneration, but – and NexPoint is a good
9    example, too.  There was a significant track
10   record gulf that was able to be used to raise
11   other money.
12       Q.   I'm just asking you who entered into
13   the agreement between Highland and – and HCRE
14   for the provision of services by Highland?
15           MS. DEITSCH-PEREZ:  Asked and
16   answered.
17       A.   Yeah, again, same answer as before.
18   I don't think anybody specifically, formally
19   did it.
20       Q.   Okay.  Is it – are the terms of the
21   agreement written down anywhere?
22       A.   No, like I said, it is just
23   understood the accounting department and tax
24   department would handle the accounting and tax
25   for all entities.

Page 383

DONDERO - 10/29/21

1
2        Q.   Did the legal department also
3    provide services to HCRE?
4        A.   It would depend on the specific
5    entity.  In the case of HCRE I think they used
6    the – the two lawyers that worked at NexPoint.
7    I don't think they used the legal
8    staff per se.  I think they – the shared
9    services that they relied on were accounting
10   and tax primarily.
11       Q.   Did Mark Patrick do work for HCRE
12   while he was employed by Highland?
13       A.   Boy, I don't know.  I imagine
14   probably tax-related stuff.
15       Q.   Did HCRE ever pay Highland anything
16   for the services that it received?
17           MS. DEITSCH-PEREZ:  Are you talking
18   about cash or –
19           MR. MORRIS:  Please, please, please.
20   – I'm trying to be really patient,
21   Deborah, but please no speaking objections.
22   Mr. Dondero is a very sophisticated man.
23            We have done this many times
24   together.  He will ask me if he doesn't
25   understand the question.  And if you would

Page 384

DONDERO - 10/29/21

1    like to object, by all means.  I don't have
2    a problem with that.  I don't.
3    MS. DEITSCH-PEREZ:  But I asked –
4    (speaking simultaneously.)
5    Q.    Mr. Dondero – Mr. Dondero –
6    Mr. Dondero, did HCRE ever pay anything to
7    Highland for services rendered?
8    MS. DEITSCH-PEREZ:  Asked and
9    answered.
10    A.    Yeah, that is what I was going to
11    say.  Same answer.  You know, not – not a
12    formal cash remuneration, but, you know, a –
13    which wouldn't have been much anyway.  But –
14    but more in terms of track record and presence
15    in the market that then Highland or NexPoint
16    could use to further its business.
17    Q.    Are you saying that – that all of
18    the entities were working kind of as a unified
19    unit and got synergistic benefits from the work
20    that it did?
21    MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.    I don't want to over generalize and
24    say yes to that, but – but there were

Page 385

DONDERO - 10/29/21

1    definitely – you know, when I use the DAF
2    example, you know, we would have never got the
3    Harvard vest as an investor if it wasn't for
4    the track record that the DAF had in CLO
5    equity.
6    I think there is business that
7    NexPoint got in the real estate space
8    benefiting from the HCRE performance.  So I do
9    believe there was specific definable benefit
10    gained for the modest amount of cost of
11    services provided.
12    Q.    And you –
13    A.    There wasn't specific remuneration.
14    Q.    And you controlled all of these
15    entities; right?
16    MS. DEITSCH-PEREZ:  Object to the
17    form.
18    A.    Well, the DAF is independent and
19    separate, but the – the HCRE-type entity, yes.
20    Q.    And did you decide that HCRE and
21    HCMS and the DAF wouldn't be required to pay
22    for services rendered to Highland?
23    MS. DEITSCH-PEREZ:  Object to the
24    form.

Page 386

DONDERO - 10/29/21

1    A.    My recollection on the services and
2    the HCRE is that the dollar value of the
3    services provided was – was small and nominal.
4    With regard to the DAF, it was more
5    complicated.  There is rules – there is
6    charging rules in terms of fees and then there
7    is also – I wasn't the one that decided that.
8    And there are other issues there other than
9    just the value for services argument.
10    And so I don't – the short answer
11    is, I don't know and I'm not involved in that,
12    and I don't understand why sometimes there is
13    one and sometimes there isn't one.  Even to
14    this day I don't know the answer to that.
15    Q.    Did – did – did you decide on
16    behalf of Highland that Highland would provide
17    services to DAF without receiving a stream of
18    income in return?
19    MS. DEITSCH-PEREZ:  John, I think
20    we're really far outside of either any of
21    the 30(b)(6)s or the permissible topics for
22    Mr. Dondero's personal deposition.
23    So could you move on?
24    MR. MORRIS:  Okay.  I will after I

Page 387

DONDERO - 10/29/21

1    get an answer to this question.
2    A.    Can you repeat the question?
3    Q.    Sure.
4    Did you make the decision on behalf
5    of Highland to provide services to the DAF
6    without receiving a stream of income in return?
7    MS. DEITSCH-PEREZ:  Same objection.
8    A.    Yeah, I think I answered it with my
9    rambling a few minutes ago, but the short
10    answer is no.
11    Q.    Who made that decision?  Who made
12    that decision?
13    MS. DEITSCH-PEREZ:  Was that Mike's
14    dog or yours?
15    MR. MORRIS:  That was my dog.  I
16    apologize.
17    MS. DEITSCH-PEREZ:  Okay.
18    Q.    Who made that decision, sir?
19    A.    I wasn't sure –
20    MS. DEITSCH-PEREZ:  Again – again,
21    John, this is well beyond the scope of the
22    30(b)(6)s or even anything permissible for
23    Mr. Dondero's personal.  And, in fact, you
24    said last time that is it, that was my last

Page 388

DONDERO - 10/29/21

1  question.  So...
2      MR. MORRIS:  That is -- that is
3  because I thought that he would say as the
4  control person at the enterprise that he
5  made the decision, but he said that he
6  didn't.
7      So I'm just asking one follow-up
8  question.  I just want to know -- Deborah,
9  please.
10      Q.   I just want to know who made the
11  decision on behalf of Highland to render
12  services to the DAF without receiving a stream
13  of income in return.
14      MS. DEITSCH-PEREZ:  Object to the
15  form of the question for all of the reasons
16  I stated before.
17      A.   And I don't know the answer.
18      Q.   Okay.  So looking back at the
19  document on the screen, we're going to ask --
20  I'm going to ask these questions in your
21  capacity as NexPoint's 30(b)(6) representative,
22  okay?
23      A.   Sure.
24      Q.   And do you understand that the

Page 389

DONDERO - 10/29/21

1  document on the screen is NexPoint's answer to
2  Highland's amended complaint?
3      A.   Yes.
4      Q.   Did you review this document before?
5      A.   Just generally.
6      Q.   And did you authorize the filing of
7  this document on behalf of NexPoint?
8      A.   Yes, yes.
9      Q.   Are you aware of anything in this
10  document today that you believe to be
11  inaccurate?
12      A.   I think the -- on the affirmative
13  defenses on the -- do you remember on the prior
14  one we had the -- I think it was called
15  justification as the first one, but there
16  wasn't a prepay in that one?
17      Q.   Correct.
18      A.   I think this one there were prepays,
19  but the justification defense is missing from
20  the front here.  And I think that is -- I think
21  if that were to continue -- I think that is
22  partly due to different law firms and what was
23  known at the time, et cetera, but I would say
24  that is -- that is the -- that is the one thing

Page 390

DONDERO - 10/29/21

1  that jumps out at me between the two.
2      MR. MORRIS:  Okay.  Can we go to
3  Paragraph 80, and let's see if we can see
4  what Mr. Dondero is talking about.
5      Q.   Okay.  So I'm just going to focus on
6  the first three paragraphs, 80, 81, and 82, and
7  ask you whether -- whether you are aware of any
8  facts that concern the affirmative defenses set
9  forth in those paragraphs.  And I think they're
10  related, and that is why I'm asking you to do
11  it all together, but we can do it one at a
12  time, whatever you are comfortable with.
13      MS. DEITSCH-PEREZ:  Object to the
14  form.  I mean, other than the facts in
15  those paragraphs?
16      MR. MORRIS:  You are doing it again,
17  Deborah.
18      MS. DEITSCH-PEREZ:  It --
19      MR. MORRIS:  Please, please.
20      MS. DEITSCH-PEREZ:  John, when you
21  ask questions -- I understand Mr. Dondero
22  is sophisticated, but he's also not a
23  lawyer, and when you ask questions that are
24  misleading, I'm going to interject

Page 391

DONDERO - 10/29/21

1  something.
2      MR. MORRIS:  It is completely
3  improper.  He doesn't need to be a lawyer.
4  He's a 30(b)(6) witness, and I'm asking
5  such a simple question, what facts do you
6  have that support the affirmative defense.
7      A.   Okay.  Is it okay if I repeat some
8  of them from the prior one?
9      Q.   Sure.  Whatever you are comfortable
10  with.
11      A.   The -- to the extent that -- to the
12  extent that the notes were prepaid -- prepaid
13  significantly, it is a real question on whether
14  or not there could have been a breach at the
15  end of the year, even if there wasn't a payment
16  at the end of the year.
17      There is no logical reason, nor
18  would I have ever authorized or suggested no
19  payment to put us on -- in default due to a de
20  minimis amount of money, like a few hundred
21  thousand dollars, even if I was highly annoyed
22  with Seery, even if we knew that Seery and
23  Highland had overcharged NexPoint by whatever
24  it was, 14, 16 million bucks, I would not have

Page 392

DONDERO - 10/29/21

1  let a small amount cause a – cause a breach.
2      You know, the – how would I – how
3  would I add to that now. The overpayment on
4  the $14 million, holding back additional shared
5  services amount, made an inordinate amount of
6  sense.
7      There was supposed to be at that
8  time – there was another netting from Seery in
9  terms of wanting to be fair and reasonable, you
10 know, with employees and with the transition of
11 the estate, et cetera, and everything was going
12 to get trued up.
13      So I do believe there was an
14 expectation of a netting, et cetera, but
15 overall, Highland should have paid it. It
16 shouldn't have let it breach the cause, but at
17 least when I found out about it and they knew I
18 was annoyed. And I told them I didn't want it
19 to be in default, they gave me the numbers and
20 the amounts to cure it in their mind, and they
21 accepted it.
22      Now, I think they should have gone
23 back and incorporated prepays and said that no
24 amounts were due because of the prepays, et

Page 393

DONDERO - 10/29/21

1  cetera, but the calculation that they came up
2  to get it in compliance in good standing was a
3  million 4. And just like we relied on them to
4  pay it and keep us out of default, we relied on
5  them to set the amount to cure.
6      But I guess I would make the
7  argument that it shouldn't have been, but
8  again, I didn't want to mince – I didn't want
9  to on small dollars make an argument that could
10 get us in bigger trouble – bigger trouble. So
11 it was easier to – to pay the million bucks
12 than it was to argue that it wasn't due.
13     Q.  Did you at any time in your capacity
14 as the person in control of NexPoint instruct
15 anybody at Highland to make the payment that
16 was due at the end of 2020?
17     A.  Not specifically to pay it or not
18 specifically not to pay it. That was something,
19 again, small and de minimis that I expected to
20 be done in due course.
21     MR. MORRIS:  I move to strike.
22     Q.  It's a very simple question.
23     Did you personally take any steps to
24 ensure that NexPoint made the payment that was

Page 394

DONDERO - 10/29/21

1  due at the end of 2020?
2      MS. DEITSCH-PEREZ:  Asked and
3  answered.
4      A.  Yes, I would like to repeat my same
5  answer.
6      Q.  Did you tell anybody to make the
7  payment on behalf of NexPoint at the end of
8  2020?
9      MS. DEITSCH-PEREZ:  Asked and
10     answered.
11     A.  I would like to give the same answer
12 that you – you – you struck.
13     Q.  Can you just say yes or no, sir, did
14 you tell anybody to make the payment at the end
15 of 2020 on behalf of NexPoint?
16     MS. DEITSCH-PEREZ:  Asked and
17     answered.
18     A.  I don't want to give anything beyond
19 the answer that I gave.
20     Q.  Okay.
21     A.  I get myself in trouble because I
22 paraphrase. I don't want to answer yes – I
23 don't think yes or no would be an appropriate
24 answer. I want to stay with the answer that I

Page 395

DONDERO - 10/29/21

1  gave.
2      Q.  Okay. I'm going to say the word
3  "Yankees," and every time I say the word
4  "Yankees" today, everybody should know that
5  that is the question that I'm going to bring to
6  the Court on a motion to compel, okay?
7      It's a very simple question. It's a
8  very simple question. I will ask one more
9  time, and if you don't want to answer, that is
10 fine.
11     MS. DEITSCH-PEREZ:  What –
12     Q.  Mr. Dondero – Mr. Dondero, in
13 December of 2020, did you give anybody any
14 instructions at Highland to make sure that
15 NexPoint made the payment that was due at the
16 end of the year?
17     MS. DEITSCH-PEREZ:  Asked and
18     answered.
19     A.  I think that means I'm supposed to
20 stick with the answer that I gave.
21     MS. DEITSCH-PEREZ:  You're on mute,
22     John. John, you're on mute. John, you're
23     on mute. John, we can't hear you.
24     THE WITNESS:  I do like it better

Page 396

DONDERO - 10/29/21

1    when he yells at me on mute.
2
3        MS. DEITSCH-PEREZ: John, we can't
4    hear you.
5        COURT REPORTER: We can't hear you,
6    John.
7        MR. MORRIS: You can't hear me?
8        COURT REPORTER: Now we can.
9        MS. DEITSCH-PEREZ: Now we can hear
10    you, but we couldn't hear you. It looks
11    like you were yelling, but we couldn't hear
12    you.
13    A.    I do like it better when you yell at
14    me on mute.
15    Q.    I try not to yell at you, and I hope
16    that you haven't perceived this -- we do have a
17    videotape this time. So to the extent that
18    anybody perceives your comment as suggesting
19    that I have yelled at you, I would invite them
20    to look at the video.
21        MS. DEITSCH-PEREZ: Well, we said we
22    couldn't hear you, but your animation
23    looked like that.
24    Q.    Sir, can you identify any person in
25    the world acting on behalf of NexPoint who

Page 397

DONDERO - 10/29/21

1    instructed Highland to make the payment that
2    was due on the NexPoint term note in December
3    of 2020?
4        MS. DEITSCH-PEREZ: John, that is
5    the fifth or sixth time.
6        MR. MORRIS: It is a completely
7    different question. Please.
8        MS. DEITSCH-PEREZ: Could you read
9    it back, if I was mistaken. So read it
10    back.
11        (Record read.)
12    A.    NexPoint did not have the accounting
13    staff or the systems or the records or the
14    knowledge to have any person in the world at
15    NexPoint to give that instruction.
16        So the long answer -- the short
17    answer is no, but the long answer is we had
18    been kept away from our books and records. I
19    think we largely still don't have them, and
20    there would -- I am not aware of anybody who --
21    anybody in the world at NexPoint who made that
22    request.
23    Q.    Frank Waterhouse was the treasurer
24    of NexPoint in December of 2020; is that

Page 398

DONDERO - 10/29/21

1    correct?
2    A.    I think he was very much viewing his
3    responsibilities as Highland related and as an
4    employee of Highland. But yes, based on that
5    incumbency certificate, but that is your --
6    your question to ask Frank if he was taking
7    that seriously, but NexPoint was relying on
8    Highland.
9    Q.    Do you have any other facts that you
10    are aware of that relate to the affirmative
11    defenses set forth in Paragraphs 81 through 82?
12    A.    I think I -- I think I've said them
13    all.
14        MR. MORRIS: Okay. It is 2:13
15    Eastern time. Let's just take a short
16    half-hour lunch break, and let's return at
17    2:45, or 1:45 Central.
18        VIDEOGRAPHER: Off the record, 1:13.
19    (Recess taken 1:13 p.m. to 1:48 p.m.)
20        VIDEOGRAPHER: Back on the record,
21    1:48.
22    Q.    Mr. Dondero, are you comfortable?
23    A.    Yes.
24    Q.    And are you able to proceed?

Page 399

DONDERO - 10/29/21

1
2    A.    Yes.
3    Q.    Okay. Did you speak with anybody
4    during the break about the substance of this
5    deposition?
6    A.    No.
7    Q.    You entered into certain oral
8    agreements with your sister concerning some of
9    the notes at issue in these lawsuits.
10        Do I have that right?
11        MS. DEITSCH-PEREZ: Object to the
12    form.
13    A.    Can you rephrase or repeat, please?
14    Q.    Sure.
15        You entered into certain oral
16    agreements with your sister concerning certain
17    of the notes at issue in these lawsuits.
18        Do I have that right?
19        MS. DEITSCH-PEREZ: Object --
20    A.    Yes.
21        MS. DEITSCH-PEREZ: Object to the
22    form. And I'm going to object -- object
23    every time because it just -- just so it is
24    on the record because you are saying "your
25    sister" without giving her -- her capacity.

Page 400

DONDERO - 10/29/21

1
2    A.   Okay.
3        MS. DEITSCH-PEREZ:  But I don't want
4    to disrupt the deposition, so I'm just
5    telling you why I'm doing it and he can
6    continue to answer thereafter.  That is why
7    I'm doing it.
8    Q.   Okay.  Can we – can we agree,
9    Mr. Dondero, when I refer to your sister in the
10   context of oral agreements that she was
11   entering into those agreements with you as a
12   representative of Dugaboy -- as Dugaboy
13   trustee, as representative for a majority of
14   the class A interest holders of Highland?
15   A.   Yeah.  How about just to make it
16   simple let's just call it the Dugaboy trustee,
17   and everybody will know that it is my sister
18   and everybody will know that it is the majority
19   of the class A unit holders.
20   Q.   Okay.  Okay.  I appreciate that and
21   I will do just that.
22       You entered into certain oral
23   agreements with the Dugaboy trustee concerning
24   certain of the notes at issue in these
25   lawsuits; is that right?

Page 401

DONDERO - 10/29/21

1
2    A.   Yes.
3    Q.   Okay.  Let's discuss the purpose of
4    those oral agreements.
5        MR. MORRIS:  Can we put back up on
6    the screen Mr. Dondero's answer.
7    Q.   And while we're doing that,
8    Mr. Dondero, can you confirm that your sister
9    is the only trustee of the Dugaboy Investment
10   Trust?
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.   For what period of time are we
14   talking about?
15   Q.   During the period of time at which
16   you entered into the oral agreements with the
17   Dugaboy trustee.
18       MS. DEITSCH-PEREZ:  Object to the
19   form.
20   A.   Yeah, I believe she has been the
21   trustee since 2015 and remains so today.  I
22   don't have an awareness of -- I don't have an
23   awareness of another functional trustee.
24       So some of these – sometimes
25   complex trusts have other layers that are

Page 402

DONDERO - 10/29/21

1
2    called trustees but they're not trustees per
3    se.  But I think I'm over thinking it.  But I'm
4    not aware of anybody I've interacted with,
5    other than her, as trustee with regard to the
6    notes.
7    Q.   Okay.  So up on the screen we
8    have – no, that is the wrong document.
9        MR. MORRIS:  We need Exhibit 31,
10   please.
11       Yeah, there you go.  That one.
12   Perfect.  Okay.
13       MS. DEITSCH-PEREZ:  31 is not -- oh,
14   is that the '03 answer?
15       MR. MORRIS:  Correct, that is
16   Mr. Dondero's answer.
17   Q.   Do you see that, sir, on the screen?
18       MS. DEITSCH-PEREZ:  Hang on.  I'm
19   going to get it again.
20       Okay.  If you want a hard copy, I
21   have one here but he's got it up.
22   Q.   Do you see on the screen,
23   Mr. Dondero, marked as Exhibit 31 is your
24   answer to Highland's amended complaint?
25   A.   Yes.

Page 403

DONDERO - 10/29/21

1
2    Q.   Okay.
3        MR. MORRIS:  Can we go to
4    Paragraph 82, please.
5    Q.   Is it your understanding that
6    Paragraph 82 describes, among other things, in
7    general terms your oral agreements with --
8    between you and the Dugaboy trustee?
9    A.   Yes.
10   Q.   Is it your position that the oral
11   agreements that you entered into with your
12   sister -- withdrawn.
13       Is it your contention that the oral
14   agreements you entered into with the Dugaboy
15   trustee applied to each of the notes that were
16   executed by NexPoint and that are the subject
17   of Highland's lawsuit against NexPoint?
18   A.   Yes.
19   Q.   Is it your contention that the oral
20   agreements that were entered into with the
21   Dugaboy trustee apply to the notes executed by
22   HCMS that are the subject of Highland's lawsuit
23   against HCMS?
24   A.   Yes.
25   Q.   Is it your contention that the oral

Page 404

DONDERO - 10/29/21

1    agreements between you and the Dugaboy trustee
2    apply to the notes that were executed by HCRE
3    that are the subject of the lawsuit that
4    Highland has commenced against HCRE?
5        A.    Yes.
6        Q.    Okay.  Do I understand correctly
7    that your oral agreements with your sister do
8    not apply to the notes that were executed on
9    behalf of HCMFA that are the subject of the
10   lawsuit that Highland commenced against HCMFA?
11       A.    Correct.
12       Q.    Okay.  I appreciate that.
13            Do you see in this paragraph towards
14   the middle it says, quote: "The purpose of this
15   agreement was to provide compensation to
16   defendant, James Dondero, who was otherwise
17   underpaid, compared to reasonable compensation
18   levels in the industry through the use of
19   forgivable loans, a practice that was standard
20   at HCMLP in the industry."
21            Have I read that correctly?
22       A.    Yes.
23       Q.    Is that the purpose of the agreement
24   that you entered into with your sister --

Page 405

DONDERO - 10/29/21

1    withdrawn.
2        Q.    Is that the purpose of the agreement
3    that you entered into with the Dugaboy trustee
4    concerning the notes at issue in the lawsuits
5    that were commenced against you personally?
6            Withdrawn.  That was a bad question.
7        Q.    Does that purpose apply only to the
8    notes that you executed or does it apply to the
9    corporate notes as well?
10           MS. DEITSCH-PEREZ:  Object to the
11   form.
12           Other than HCMFA?
13           MR. MORRIS:  Correct.  I think we've
14   established the scope of the agreements.
15       A.    To give a complete answer, from my
16   perspective it is about 50 million of notes
17   between -- current balance between NexPoint,
18   Services, myself, and HCRE.
19       Q.    And HCMS; right?
20       A.    Yes, Services, Highland Capital
21   Management, yes.
22       Q.    Okay.  So I just want to know, that
23   sentence there concerning the purpose was
24   omitted from the answers of NexPoint, HCMS,

Page 406

DONDERO - 10/29/21

1    HCRE.
2            And I'm happy to walk you through to
3    show you.  And I just want to know in your
4    capacity as a 30(b)(6) witness for those
5    entities, if you know why that statement of
6    purpose was omitted.
7        A.    Well, we talked about it earlier.  I
8    think there is some cleanup.  There has been
9    multiple lawyers involved.  We didn't know
10   which loans were prepaid, which loans weren't.
11   But, you know, I don't know why it was omitted
12   but it applies to all of them.
13           MS. DEITSCH-PEREZ:  I think that is
14   the first time that I've noticed that.  So,
15   John, I'm going to take a mea culpa.  I
16   think that is a cut-and-paste error.
17           MR. MORRIS:  All right.  Well, I
18   will -- I will just point out that the
19   affirmative defense concerning the oral
20   agreements is the exact same in all four
21   answers, except for the omission of the
22   statement of purpose for the three
23   corporate entities.
24       Q.    And so, Mr. Dondero, is it fair to

Page 407

DONDERO - 10/29/21

1    say that you don't know why that statement of
2    purpose was omitted from the corporate
3    entities' answers?
4        A.    Yeah, I don't know why it is omitted
5    or why the complaints aren't consistent with
6    that regard.
7        Q.    Okay.  But it is your -- it is your
8    position as the purpose -- as one of the people
9    who entered into this oral agreement that the
10   purpose for the -- for the condition subsequent
11   agreement is the same as for the corporate
12   entities as it is for you, as stated in this
13   paragraph; is that right?
14       A.    Yes.
15       Q.    Okay.  We talked a little bit about
16   the NexPoint term note.
17           Do you remember that?
18       A.    Yes.
19       Q.    And do you recall that in its
20   original form the NexPoint term note was for a
21   principal amount of approximately $30 million?
22       A.    Yes.
23       Q.    And do you recall that the NexPoint
24   term note was a rollup of the outstanding

Page 408

DONDERO - 10/29/21

1  principal and interest then due on certain
2  promissory notes that had previously been given
3  by NexPoint to Highland?
4  A.  Yes.
5  Q.  Okay.
6     MR. MORRIS:  Can we put up, please,
7  Exhibit Number 2, which I believe is the
8  complaint against NexPoint.
9     (Exhibit 2 marked.)
10    MR. MORRIS:  And if we can go to
11 Exhibit Number 1 of Deposition Exhibit
12 Number 2.
13    Q.  Okay.  And do you see -- I'm sorry,
14 sir, do you see that Exhibit Number 1 to the
15 complaint is a promissory note dated May 31st,
16 2017 in the approximate amount of
17 $30.75 million?
18    A.  Yes.
19    Q.  Okay.  And is that your signature on
20 page 2?
21    A.  Looks like it.
22    Q.  Okay.  And did you sign this note on
23 behalf of NexPoint on or around May 31st, 2017?
24    A.  I assume so.

Page 409

DONDERO - 10/29/21

1     Q.  Do you know if you read the note
2  before you signed it?
3     A.  Not likely.
4     Q.  Do you recall whether there was
5  anything about the note that you didn't
6  understand before you signed it on behalf of
7  NexPoint?
8        MS. DEITSCH-PEREZ:  Object to the
9  form.
10    A.  Yeah, I'm not -- I doubt I read it,
11 so I don't remember objecting to anything.
12    Q.  Okay.  Looking at Paragraph 2.1, am
13 I characterizing that section fairly when I say
14 that the borrower was required to make an
15 annual installment payment at the end of each
16 calendar year?
17       MS. DEITSCH-PEREZ:  Object to the
18 form.
19    A.  I see that paragraph, yes.
20    Q.  Okay.  And did you understand when
21 you signed it that an annual installment
22 payment would be due at the end of each year by
23 NexPoint?
24       MS. DEITSCH-PEREZ:  Object to the

Page 410

DONDERO - 10/29/21

1  form.
2     A.  I never read it that closely.
3     Q.  So as the control person of
4  NexPoint, is it fair to say then that you don't
5  recall having an understanding when you signed
6  this note that NexPoint would be required to
7  make annual payments at the end of each year?
8        MS. DEITSCH-PEREZ:  Object to the
9  form.
10    A.  I didn't have knowledge of the
11 specifics, and again, I would describe those
12 specifics as de minimis.
13    Q.  Okay.  Do you see -- do you have any
14 idea who drafted this note?
15    A.  It would have come from accounting.
16 I think they have boilerplate -- I don't know
17 if they work with legal at all.  I have no
18 idea, but it would have come through
19 accounting.
20    Q.  Do you recall that all three of the
21 term notes at issue were signed on the same
22 day, May 31st, 2017?
23    A.  That doesn't surprise me.  I think
24 there was an accounting reason, if I remember

Page 411

DONDERO - 10/29/21

1  correctly.  I think it had something to do with
2  either the audit or the financials or if we had
3  a credit facility at the time.  I think that is
4  probably why, but I don't remember exactly.
5     Q.  Do you have any other recollection
6  as to why all three notes were executed at the
7  end of May 2017?
8     A.  Again, I believe they're -- the --
9  aggregating or solidifying them into one
10 defined note I think was required by the
11 auditors or the -- the accounting department as
12 best practices.  I don't think -- it wasn't a
13 regulatory reason and it wasn't a compliance
14 reason.  I believe it was just an accounting or
15 an audit reason.
16    Q.  Did you ever make sure on behalf of
17 NexPoint that the terms of the promissory note
18 were fair and reasonable?
19       MS. DEITSCH-PEREZ:  Object to the
20 form.
21    A.  Yeah, I don't remember ever
22 negotiating or reading it that closely.  And
23 again, I think the view from all concerned is
24 that it was relatively de minimis from the

Page 412

DONDERO - 10/29/21

1  balance sheet at Highland then or now and/or de
2  minimis relevant to NexPoint's value.
3      Q.   It is a $30 million note.  Do I have
4  that right?
5      A.   Yes.
6      Q.   Okay.  And it was material enough to
7  be included in Highland's financial statements;
8  is that correct?
9      A.   Anything material or not as part of
10  doing proper audited financials needs to be
11  properly included.
12     Q.   Okay.  And you know, because you
13  signed the management representation letter,
14  that this note was specifically disclosed to
15  PwC and included in both Highland's and
16  NexPoint's audited financial statements;
17  correct?
18     A.   I would -- I would have been shocked
19  if it wasn't, if it is an asset and a liability
20  respectively of the companies.
21     Q.   Okay.  Do you see the section on
22  acceleration upon default, Paragraph 4?
23     A.   Yes.
24     Q.   Have you ever seen that section

Page 413

DONDERO - 10/29/21

1  before?
2      A.   No.
3      Q.   Do you think a prudent executive
4  signing a $30 million note should take the time
5  to read the terms and conditions of the note?
6      A.   Not necessarily.
7      Q.   Under what circumstances do you
8  think that an executive shouldn't take the time
9  to read the terms and conditions of a
10  $30 million promissory note?
11     A.   When it is between affiliates,
12  between friendly affiliates with no even
13  inkling that bankruptcy or the parties could be
14  at odds create a note, when it is a soft note
15  with limited collateral and limited other
16  protections.  And then the servicing or value
17  of the note is de minimis relative to the
18  balance sheets of each entity I think is a good
19  reason or logical reason for the executives on
20  both sides not to spend much time focusing on
21  it.
22     Q.   All right.  So you thought it was
23  reasonable not to read this particular note for
24  the reasons you just gave.

Page 414

DONDERO - 10/29/21

1      Do I have that right?
2      A.   Right.
3      MR. MORRIS:  Okay.  Can we go to the
4  next page, please.
5      Q.   Do you see Paragraph 5?  There is a
6  paragraph entitled Waiver.
7      A.   Yes.
8      Q.   And I will read it out loud:  Maker
9  hereby waives grace, demand, presentment for
10  payment, notice of non-payment, protest, notice
11  of protest, notice of intent to accelerate,
12  notice of acceleration, and all other notices
13  of any kind hereunder.
14     Have I read that correctly?
15     A.   Yes.
16     Q.   Do you know that that paragraph is
17  included in every single note that you signed
18  that is part of the litigation that we're here
19  to talk about today?
20     A.   You have to -- you have to define
21  when.  You know, like today I know that it
22  is -- it is in those notes.
23     At the end of '20, Seery and DSI
24  were withholding all notes, all information,

Page 415

DONDERO - 10/29/21

1  anything regarding the company from any of the
2  other subsidiaries, and Frank was administering
3  the notes on behalf of both the related parties
4  and Highland.
5      So at the time -- at the time I
6  would have -- I would have never known that at
7  the end of 2020.  And it is crazy to think I
8  would have remembered a clause in a soft note
9  from three years earlier.
10     Q.   Okay.  Is it fair to say that -- do
11  you understand today that that provision is
12  included in every note that you signed?
13     MS. DEITSCH-PEREZ:  Object to the
14  form.
15     A.   You're saying it, so I believe you.
16  I'm not asking you to go show me all the other
17  notes, but --
18     Q.   Thank you.
19     A.   -- I'm assuming it is in all the
20  other notes.  I will take your word for it.
21     Q.   And is it fair to say that at the
22  time you signed these notes you didn't take the
23  time to read that particular provision?
24     MS. DEITSCH-PEREZ:  Object to the

Page 416

DONDERO - 10/29/21

1          form.
2          A.    That is correct.  A lot of it is
3    boilerplate.  And, again, treasury or
4    accounting would have put in what was necessary
5    for regulatory, tax, audit purposes.  Maybe the
6    auditors put that in.  I have no idea.
7          But the content and the bullet
8    points here, the nine paragraphs on a soft note
9    would have been put in by other people and
10   administered by other people other than me.
11         Q.    What is a soft note?
12         A.    You know, like a secured – I mean,
13   a note that isn't a hard note, like a note that
14   isn't secured, deed in lieu, UCC filed,
15   guaranteed, you know, performance and bad boy
16   clauses and all of that other stuff.
17         A soft note is an unsecured loan
18   that has basic terms to it, but it is likely
19   subject to renegotiation over time.
20         Q.    Were any of the notes that you
21   signed subject to negotiation?
22         A.    Well, I'm saying by definition that
23   is what a soft note is.
24         Q.    One that – that is not subject to

Page 417

DONDERO - 10/29/21

1    the negotiation – to negotiations?
2          A.    No, one that is over time subject to
3    negotiation or modification.
4          Q.    Okay.
5          A.    Because there is – there is
6    limited – there is limited, team collateral,
7    guarantee, bad boy features in – in a soft
8    note.
9          Q.    Okay.  Perhaps my question wasn't
10   clear.
11         Did the notes that you signed – did
12   you negotiate them with anybody, the terms of
13   each note?
14         A.    No.
15         Q.    Okay.  Did you personally decide on
16   the terms of each note?
17         A.    No.  Again, they were two highly
18   solvent, highly well-capitalized subsidiaries,
19   and the amount of the notes was de minimis and
20   friendly, and they were soft notes administered
21   by a centralized treasury shared services
22   department.
23
24         They were the ones deciding what it

Page 418

DONDERO - 10/29/21

1    took to be compliant from an accounting
2    regulatory-wise standpoint, but wasn't – they
3    were trying to come up with a balance note,
4    which I think this is, such that it wouldn't
5    have to be negotiated or haggled by any of the
6    parties.
7          And there is no evidence of any of
8    the notes ever being haggled or ever being
9    negotiated.
10         Q.    Okay.  I appreciate that.
11         At the time you signed each of the
12   notes on behalf of the obligors, did the
13   obligors have an intention at the time you put
14   your signature on the page of repaying the
15   notes in accordance with their terms?
16         A.    Yes.  They're all – soft note
17   doesn't mean it's not a bona fide note.  They
18   were all intended to be bona fide notes, and
19   they all are bona fide notes that were intended
20   to be paid and for the – virtually most part,
21   were always paid or prepaid and, you know, paid
22   in accordance.
23         Q.    Do you see to the right there is a
24   list of prior notes?

Page 419

DONDERO - 10/29/21

1          A.    Yes.
2          Q.    And is it your understanding that
3    this note substituted and superseded the
4    promissory notes that are listed on Exhibit A
5    on the page there?
6          A.    Yeah.  I mean, effectively pay those
7    off and reestablish an aggregate note.
8          Q.    Right.  And Exhibit A actually set
9    forth the outstanding principal and interest
10   that NexPoint owed Highland under the prior
11   notes as defined there as of May 31st, 2017;
12   right?
13         A.    Yeah, that is what it looks like.
14         Q.    Okay.  And – and so the initial
15   principal amount of the prior notes was what is
16   stated there, approximately $27.675 million?
17         A.    Right.
18         Q.    Okay.  You wouldn't have signed this
19   note on behalf of NexPoint if you didn't
20   believe at the time you signed it that NexPoint
21   owed Highland that amount of money; correct?
22         A.    Yeah, it is a bona fide note,
23   consistent with my testimony.
24         Q.    Okay.  Do you know why NexPoint

Page 420

DONDERO - 10/29/21

1
2 borrowed the money from Highland at the times
3 and in the amounts listed on Exhibit A?
4     A.   No.
5     Q.   Did you authorize NexPoint to borrow
6 the money that is reflected in the prior note
7 set forth on Exhibit A?
8     A.   I don't know.  Probably some of
9 them, yes.
10    Q.   Okay.  And you have no recollection
11 at all as to why NexPoint borrowed over
12 $27 million from Highland in the 12-month
13 period from August 2014 to July 2015?
14    A.   Not without being refreshed.
15    Q.   Okay.  Do you have any knowledge as
16 to what NexPoint did with the proceeds from
17 these loans?
18    A.   Not without being refreshed.
19    Q.   Okay.  And you contend that this
20 note is subject to – subject to one of your
21 oral agreements with the Dugaboy trustee;
22 correct?
23    A.   Yes.
24    Q.   Who decided to include this
25 particular note in your agreement with the

Page 421

DONDERO - 10/29/21

1
2 Dugaboy trustee?
3     A.   Me, myself.
4     Q.   Okay.  What was the purpose of
5 including this note in your agreement with the
6 Dugaboy trustee?
7          Was it to provide you with a
8 compensation?
9     A.   Yeah.  I mean, in fact, I think it
10 was articulated in that big paragraph
11 reasonably well that my cash compensation, I
12 believe through any lens, people would look at
13 it as de minimis from the standpoint of
14 Highland as asset manager.
15         I don't think it was more than a
16 couple million bucks in a year and it went
17 down, I think, in the '15 through '20 period.
18         So I think it is common in private
19 companies to loan money that is bona fide debt
20 and then forgive it at different times to
21 manage compensation and incentives to managers
22 of private companies.
23         This is a – we're in – we each
24 have experts talking about it, but I think this
25 is, you know, typical.

Page 422

DONDERO - 10/29/21

1
2     Q.   Can you identify any moment in the
3 25 or 26 year history that you were president
4 of Highland where Highland forgave an
5 intercompany loan for the purpose of providing
6 compensation to you or any other employee
7 except for the agreements that are described in
8 Paragraph 82 of your answer?
9     A.   Boy, I know we have masked it.  I
10 don't know if we – it sounds like we may not
11 have sent it to you, but we have done it for a
12 dozen employees over the years in – in fairly
13 significant amount –
14    Q.   I'm going to interrupt you, sir,
15 because it's not responsive to my question.  I
16 apologize for that.  I'm just focusing on
17 intercompany loans.
18         Can you identify any loan in the 25
19 or 26 years that you were president, an
20 intercompany loan where – where Highland was
21 the payee that was forgiven for purposes of
22 giving you or any employee compensation, other
23 than – other than the agreements that you
24 struck with the Dugaboy trustee?
25    A.   It is an odd question because I'm

Page 423

DONDERO - 10/29/21

1
2 the only one at the compensation level with the
3 interrelated entities who could possibly get
4 intercompany loans forgiven as part of the
5 comp, but it –
6     Q.   Okay.  So let me ask a cleaner –
7 let me ask a cleaner question.  I appreciate
8 that clarification.
9          Other than the agreements described
10 in Paragraph 82, can you think of any other
11 intercompany loan that was ever forgiven while
12 you were president of Highland for the purpose
13 of giving you compensation?
14    A.   I don't – I don't know.
15    Q.   This is an important issue; right?
16 The notion of a prior practice.  It is your
17 contention that there was a prior practice at
18 Highland – hold on one second.  I apologize.
19         Sorry about that.  Somebody almost
20 dropped an air conditioner out the window.
21         MS. DEITSCH-PEREZ:  That would not
22 be good.
23         MR. MORRIS:  No.
24    Q.   All right.  Apologies.
25         MR. MORRIS:  May I have the last

Page 424

DONDERO - 10/29/21

1  question read back?
2  (Record read.)
3  Q.  I'm going to start all over here.
4  Mr. Dondero, do you contend that
5  there was a practice at Highland of forgiving
6  loans; is that correct?
7  A.  Yes.
8  Q.  And do you recall that we talked
9  about that issue back in May?
10  A.  Yes.
11  Q.  Okay.  And since – since that time
12  have you made any effort to gather any
13  information that would demonstrate that there
14  was a prior practice at Highland of forgiving
15  loans?
16  A.  Yes.
17  Q.  And what efforts have you made?
18  A.  Like I said, we amassed a list, and
19  not insignificant list and not insignificant
20  amounts, proportionate to the people's
21  compensation where it was a practice.
22  You know, for some people for
23  relocation, for some people for bonuses, for
24  house purposes, for senior executives, senior

Page 425

DONDERO - 10/29/21

1  executives at the bank and board members at the
2  bank in the seven-figure kind of numbers that
3  were then subsequently forgiven.
4  It is – I know we amassed more than
5  a dozen examples that were significant and
6  material.
7  MR. MORRIS:  Deborah, I apologize.
8  It is certainly possible I missed it, but I
9  don't recall seeing any list or any
10  documents of any kind that Mr. Dondero has
11  described.
12  Have they been produced?
13  MS. DEITSCH-PEREZ:  I think so.  I
14  will double-check, but I believe that
15  they're listed –
16  MR. MORRIS:  I know there is a list
17  of – I apologize.  I know there is a list
18  of names in one of the discovery responses.
19  But other than the list of names in the
20  discovery response, I don't recall
21  receiving any documents at all.
22  MS. DEITSCH-PEREZ:  No.  And I think
23  we asked you for the documents because we
24  don't have access to the documents on

Page 426

DONDERO - 10/29/21

1  Highland's server.  The only thing I can
2  think of that we might owe you is there
3  might be a few additional names to list in
4  the interrogatory, and I will check whether
5  that has been done.
6  MR. MORRIS:  Okay.
7  Q.  Mr. Dondero, you sign management
8  representation letters in connection with
9  Highland's audit each year; is that right?
10  A.  Yes.
11  Q.  Do you understand that you have an
12  obligation when you sign the management
13  representation to disclose to the auditor all
14  agreements with affiliated entities and people
15  that are deemed to be material?
16  MS. DEITSCH-PEREZ:  Object to the
17  form.
18  A.  Generally, yes.
19  Q.  Okay.  And is it your understanding
20  that at least since 2008 Highland has disclosed
21  to its auditors all agreements with affiliates
22  that are material, as defined in the management
23  representation letter?
24  A.  Yes.

Page 427

DONDERO - 10/29/21

1  Q.  And would that include any
2  agreements to forgive loans that were deemed to
3  be material amounts?
4  A.  No, because it is contingent in long
5  term and speculative.
6  Q.  But at some point if it is forgiven
7  would that be – would that be an event that
8  would be disclosed to the auditor?
9  A.  Sure.
10  Q.  Okay.  So is it fair to say that all
11  loans that were deemed to be material to the
12  extent they were forgiven were disclosed to the
13  auditors?
14  A.  Yes.
15  Q.  Okay.
16  A.  But, yeah, the only caveat I would
17  put on it is we have such limited information
18  regarding Cornerstone and Trust Life, which is
19  part of my agreement with the Dugaboy trustee
20  or with the majority of class A holders.
21  They could have been sold in
22  secrecy, without disclosure to us, such that
23  the notes are all forgiven at this point, but
24  we – we – we may never know.

Page 428

DONDERO - 10/29/21

1    Q.    So you can't rely on anything that
2    you don't know; is that fair?
3    A.    Yeah.
4        MS. DEITSCH-PEREZ:  Objection to
5    form.
6    A.    Yeah, we can't rely on things we
7    don't know and we can't rely on the debtor to
8    be honorable.
9    Q.    Well, the debtor has produced to
10    you, sir, every single audited financial
11    statement without redaction since 2008.  Are
12    you aware of that?
13    A.    That is actually news to me because
14    we were asking for them a couple of months ago.
15    That must be -- that must be a new production.
16    Q.    No.  Actually, it was produced to
17    you way back in July.  You are not aware of
18    that?
19    A.    No, I'm looking --
20        MS. DEITSCH-PEREZ:  Hang on.
21    A.    I'm looking at Deborah.  She'll --
22        MS. DEITSCH-PEREZ:  I will get the
23    date.
24    A.    Yeah.  I would love to see them.

Page 429

DONDERO - 10/29/21

1    Q.    So then -- so then it -- so is it
2    fair to say, sir, that when you are describing
3    this practice of forgiveness of loans, you are
4    doing so without having reviewed any of the
5    audited financial statements that Highland
6    provided to your attorneys going back to 2008?
7        MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.    What I'm saying, I guess, is that we
10    haven't treated the loans as forgiven yet
11    because if the condition precedent has been
12    satisfied, we're not aware of it yet.
13        Now, if there is something in those
14    financial statements that will show that the
15    condition precedent is satisfied, then we have
16    a decision to make about the -- or figure out
17    what the mechanism is for forgiving the loans.
18    Q.    Are you saying that there are loans
19    out there subject to forgiveness where the
20    maker is somebody other than you or an entity
21    that you control?
22    A.    No, I'm just -- I'm talking about
23    the 50 million of loans that we've been talking
24    about.

Page 430

DONDERO - 10/29/21

1    Q.    Okay.  So -- so I just want to go
2    back and focus on your assertion that there was
3    this practice of loan forgiveness.  I think you
4    have agreed with me that any loan that was
5    forgiven in a material amount would be
6    contained within the Highland audited financial
7    statements; right?
8    A.    I believe they -- material or not,
9    they were all included in the Highland
10    financials.  Now, they might not have been
11    specifically footnoted, you know.
12        Like in other words, if we gave
13    somebody half a million bucks to relocate and
14    then forgave the loan, it might just be mixed
15    with all other compensation in the line item.
16    It might not have been listed separately
17    because it would have been small relative to
18    the overall financial statement.
19    Q.    But you're just speculating right
20    now because, in fact, you haven't read the
21    audited financial statements for the purpose of
22    seeing whether or not there were loan -- loans
23    that were forgiven and disclosed; right?
24        MS. DEITSCH-PEREZ:  Object to the

Page 431

DONDERO - 10/29/21

1    form.
2    A.    Well, what I'm saying, just to be
3    clear, is I haven't looked at the presentation
4    of forgiven loans in the historic financials
5    because I was unaware that we had gotten
6    historic financials, but I am testifying that
7    we had amassed at least a dozen, 15 material
8    examples of material loan forgiveness amounts
9    to different executives.
10    Q.    All right.  Do you have any
11    documentation to support your assertion of the
12    practice of forgiving loans at Highland?
13    A.    Again, we have very, very little
14    access to anything, and we didn't take anything
15    with us that we weren't supposed to take, so we
16    don't have any of that documentation.
17        At NexBank, one of the sister
18    companies that we still have full control over
19    our records, we could show seven-figure-plus
20    loans to senior management and the entire board
21    of directors and forgiveness thereof as an
22    example, but that -- that is the only
23    documentation that we would be able to present
24    without having access to the records that you

Page 432

DONDERO - 10/29/21

1  guys are keeping from us.
2  MR. MORRIS: I move to strike the
3  last comment, and I take offense to it,
4  sir. We're not withholding anything, okay.
5  Q.  Would the NexBank audited financial
6  statements include a disclosure of the loans
7  that you are describing?
8  A.  Yes.
9  Q.  Okay. So is it fair to say that if
10  Highland forgave loans, it would be disclosed
11  in its audited financial statements?
12  MS. DEITSCH-PEREZ: Object, asked
13  and answered.
14  A.  Well, just to be clear, these loans
15  like the one up on the sheet, those were
16  included in Highland's financials, those loans,
17  just like the NexBank loans, when they were
18  made to senior executives were included. But
19  there wasn't a – at NexBank there wasn't any
20  kind of disclosure that said, these might be
21  forgiven, or these are the terms that they
22  would be forgiven under, just like there was no
23  disclosure in the Highland financials that
24  these are the terms that it might be forgiven

Page 433

DONDERO - 10/29/21

1  under, et cetera, et cetera.
2  Q.  It's certainly disclosed in the
3  financials when it was forgiven. Will you –
4  will you concede that point?
5  A.  Yes, sure.
6  Q.  Okay. Let's move on.
7  Let's go to HCMS. Are you familiar
8  with the notes at issue in the lawsuit that was
9  commenced by Highland against HCMS?
10  MS. DEITSCH-PEREZ: S or –
11  A.  S as in Services. Yes.
12  MR. MORRIS: Okay. Can we please
13  put up Exhibit 3.
14  (Exhibit 3 marked.)
15  MS. DEITSCH-PEREZ: Is that in the
16  binder that you sent?
17  MR. MORRIS: Yes, as Exhibit 3.
18  MS. DEITSCH-PEREZ: Okay.
19  MR. MORRIS: And if we could go to
20  the Exhibits 1 through 4, okay.
21  Q.  Sir, we've put up on the screen
22  Exhibit 1 to Exhibit 3, which is the complaint
23  against HCMS. Do you see Exhibit 1 up on your
24  screen?

Page 434

DONDERO - 10/29/21

1  A.  Yeah. This is the $150,000
2  promissory note; is that what that is?
3  Q.  Yes, sir.
4  A.  Okay. As long as I can see it on
5  the screen, I don't need to find it in hard
6  copy, do I?
7  MS. DEITSCH-PEREZ: Yeah.
8  MR. MORRIS: Can you scroll to the
9  second page, PJ.
10  Q.  Is that your signature, sir?
11  A.  Close.
12  Q.  Are you aware that your signature is
13  affixed to a $150,000 promissory note that was
14  made by HCMS to Highland Capital Management?
15  MS. DEITSCH-PEREZ: Objection, form.
16  A.  Like I said, it's close. I don't
17  know if that is mine, but it's close.
18  Q.  Do you have any reason to believe
19  that either you or somebody you authorized
20  didn't sign this particular promissory note?
21  A.  Not specifically.
22  MR. MORRIS: Okay. Can we go to the
23  first page, please.

Page 435

DONDERO - 10/29/21

1  Q.  Did HCMS receive a loan from
2  Highland in the amount of $150,000 on March
3  28th, 2018?
4  A.  I assume so.
5  Q.  Okay. You wouldn't have either
6  signed or allowed your signature to be affixed
7  to this document if you didn't understand that
8  HCMS had received from Highland $150,000;
9  correct?
10  A.  This is one of the many things I
11  would have signed on a given day.
12  Q.  Okay. And – are you aware that
13  this note was given to Highland's auditors?
14  A.  It could. I'm not aware
15  specifically, but it should be.
16  Q.  Okay. Do you have any recollection
17  as to why HCMS obtained this loan from
18  Highland?
19  A.  Unless it says it on these two
20  pages, I have no idea.
21  Q.  Okay. Do you have any recollection
22  as to what HCMS did with the proceeds of this
23  loan?
24  A.  No.

Page 436

DONDERO - 10/29/21

2    Q.    Okay.  Let's just flip through the
3    Exhibits 2, 3, and 4, if we could.
4          Looking at Exhibit 2, is that your
5    signature on Exhibit 2, sir?
6    A.    Again, it is close.
7    Q.    Okay.  And do you have any reason to
8    believe that that is either not your signature
9    or that you did not authorize somebody to sign
10   this on behalf of HCMS in June of 2018?
11   A.    No.
12   Q.    Okay.
13         MR. MORRIS:  Can we go to Exhibit 3,
14         please, and if we can go to the signature
15         line.
16   Q.    Do you see that that is Frank
17   Waterhouse?
18   A.    Yes.
19         MR. MORRIS:  Okay.  And can we go to
20         the page before that, the first page.
21   Q.    Frank Waterhouse was the treasurer
22   of HCMS in – May 2019; correct?
23   A.    That is what it said right on that
24   thing we saw earlier; right?
25   Q.    Incumbency certificate.

Page 437

DONDERO - 10/29/21

2    A.    Yes.
3    Q.    Do you recall that HCMS borrowed
4    $400,000 from Highland in or around May 2019?
5    A.    Not specifically.
6    Q.    Do you have any reason to believe
7    that it didn't?
8    A.    I have no knowledge -- I have no
9    knowledge of what it was used for and whether
10   it did or didn't.
11         MR. MORRIS:  Okay.  Let's go to the
12         next exhibit, please.
13   Q.    Do you see Frank Waterhouse signed
14   here on behalf of the maker, HCMS Services?
15   A.    Yes.
16   Q.    Okay.  Are you aware that HCMS
17   borrowed $150,000 from Highland in June 2019?
18   A.    No.
19   Q.    Okay.  Do you have –
20   A.    I'm not aware and –
21   Q.    Do you have –
22   A.    I didn't – I'm sorry, go ahead.  I
23   was just saying, looking at Frank's signature,
24   you know, we're switching from me signing to
25   Frank signing.  And I guess we're saying Frank

Page 438

DONDERO - 10/29/21

1    is an authorized signatory, although if you
2    look at Frank's, it looks like an automated
3    signature versus, you know, an actual
4    signature, but I assume you went over this with
5    him, but I don't have specific knowledge of
6    these at all.
7    Q.    And do you know that Mr. Waterhouse
8    from time to time used an electronic signature?
9          MS. DEITSCH-PEREZ:  Object to the
10         form.
11   A.    I believe he did.
12   Q.    And you saw -- you have seen his
13   electronic signature on other documents; is
14   that right?
15   A.    Yes.
16   Q.    So it doesn't surprise you to see
17   his electronic signature on a note; correct?
18   A.    Yeah.  Yeah, okay.  Yeah, I don't
19   know.  But whether or not he did it or somebody
20   else did it or – we're just getting a little
21   far afoot from me signing it; right?  That is
22   all.
23   Q.    Right.
24   A.    To – Frank – Frank may have signed

Page 439

DONDERO - 10/29/21

1    it.  He may have done it electronically or
2    somebody may have done it electronically for
3    him.  Those are just different answers than me
4    signing it; right?
5    Q.    Okay.  And – and that is fair.
6          Are you aware that on December 3rd,
7    2020, Highland made a demand upon HCMS for
8    payment under these four notes that we have
9    just looked at?
10   A.    I knew there was a demand on the
11   NexPoint one.  Can you refresh me on this one?
12   Q.    Sure.
13         MR. MORRIS:  Can we go to the next
14         exhibit in Exhibit 3.  Exhibit 5.
15   Q.    You will see that there is a letter
16   dated December 3rd, 2020, from Mr. Seery to
17   HCMS?
18   A.    Yep.
19   Q.    And do you see that it was sent to
20   the attention of Mr. Waterhouse?
21         Do you see that, sir?
22   A.    Yes, yep.
23   Q.    And, again, Mr. Waterhouse at that
24   time was the treasurer of HCMS to the best of