Page 90

ALAN JOHNSON

1
2    In the first sentence, you wrote, "in
3  preparing this report, I've considered certain
4  documents provided to me, interviews with
5  Mr. Dondero, and former Highland or affiliate
6  employees."
7    Do you see that?
8    A.   Yes.
9    Q.   When did you interview Mr. Dondero?
10   A.   Probably early May, early May of this
11 year.
12   Q.   Is that the only time you've
13 communicated with him directly concerning this
14 case?
15   A.   I think I mentioned earlier I talked
16 to him about the Next Bank – in the last week
17 about the Next Bank loans, and then I talked to
18 him prior to this report.
19    I think those are the only times.
20   Q.   And did you speak with him on the
21 phone?  Did you meet with him in person or some
22 other form of communication?
23   A.   Didn't – it was not in person.  It
24 was either a phone call or Zoom.  I don't recall.
25   Q.   Do you recall how many phone calls or

Page 91

ALAN JOHNSON

1
2  Zoom calls you had with Mr. Dondero for the
3  purpose of interviewing him, as stated in the
4  first sentence of the Facts and Data Considered?
5    A.   Prior to this report, I think I talked
6  to him three times, I believe.
7    Q.   And was anybody – did anybody
8  participate in those Zoom or telephone calls
9  besides you and Mr. Dondero?
10   A.   There would have been someone from the
11 Stinson law firm and likely my colleague,
12 Mr. Perniciaro, would have been on the call as
13 well.
14   Q.   Do you know approximately what the
15 total time you spent speaking with Mr. Dondero was
16 before you prepared this report?
17    Was it an hour or three hours?
18   A.   Probably an hour and a half.
19   Q.   So about 90 minutes.
20    Do you recall – did you ask to
21 interview him or did the Stinson firm suggest that
22 you should speak with him?
23   A.   I suggested talking to him.
24   Q.   Okay.
25    Do you recall what he told you during

Page 92

ALAN JOHNSON

1
2  this interview?
3    A.   We talked about his duties,
4  responsibilities, went into what he – what he was
5  involved in going back in time to the current, his
6  duties, how he ran the firm.  So we spent a fair
7  amount of time talking about that.
8    Talked about the different – these
9  loans and the purpose of the loans, his philosophy
10 around the loans.
11    I think those were the two broad –
12 the two broad categories.
13   Q.   Did he describe for you in any way the
14 agreement that was entered into in late 2018,
15 early 2019 relating to the forgiveness of the
16 loans?
17   A.   Yes.  Yes, he did.
18   Q.   What did he tell you about that?
19   A.   He said that the – the structure to
20 reward him for a successful transaction with one
21 of these three portfolio investments, that was the
22 purpose, that loans had been used in the company
23 in the past, that the loans were – had always
24 intended to be forgiven, and this was simply
25 codifying and structured the intent of the loans

Page 93

ALAN JOHNSON

1
2  all along.
3    Q.   Did he identify who the decision maker
4  was who acted on behalf of the company?
5    A.   He – I don't believe that came up.  I
6  don't recall hearing that.
7    Q.   Did you ask him any questions that
8  you – your gut told you he wasn't able to answer
9  completely?
10   A.   No.  I thought he was candid.  I
11 thought he was straightforward.  I didn't – the
12 questioning that I had with him, I didn't find –
13 he answered the questions I had about both his
14 role and the – how these loans were intended to
15 operate.
16   Q.   Did he tell you that under the
17 agreement he entered into with the decision maker,
18 the loans would be forgiven if the assets were
19 sold not by him but by a third party?
20   A.   I don't – I don't recall that, no.
21   Q.   It doesn't say that in your report,
22 does it?
23   A.   It does not.
24   Q.   And you don't recall him specifically
25 telling you that one of the terms of the agreement

Page 94

ALAN JOHNSON

1  was that all of the loans subject to the agreement
2  would be forgiven if any of the three assets were
3  sold by a third party.  Is that fair?
4      A.   We didn't get into that, no.
5      Q.   And he didn't tell you that, correct?
6      A.   No.
7      Q.   Do your opinions rely on anything that
8  Mr. Dondero told you?
9      A.   Certainly, the – his role was in –
10  my opinion on what his role was, which formed the
11  compensation thing, is influenced by what he said
12  about this role.  So yes, it impacted that, you
13  know, part of the report.
14      Q.   Okay.
15          So other than his role and his duties
16  and responsibilities, is there anything else that
17  Mr. Dondero told you during the interview that you
18  have relied upon in formulating your opinions?
19      A.   I don't believe so.
20      Q.   How many former Highland or affiliate
21  employees did you interview?
22      A.   I interviewed four.
23      Q.   Do you recall the names of any of
24  them?

Page 95

ALAN JOHNSON

1      A.   Adkins, Hurley, Lawlor, and Cote.
2      Q.   When did you interview those
3  individuals?
4      A.   Probably early May of this year.
5      Q.   Do you have any notes from those
6  interviews?
7      A.   I do not.
8      Q.   Do you know if your colleague has any
9  notes from those interviews?
10      A.   I don't think so.
11      Q.   Do you know if there's any written
12  record at all of the interviews you conducted with
13  those former Highland or affiliate employees?
14      A.   I don't believe so.
15      Q.   Did you speak to them all at one time
16  or did you speak to them individually?
17      A.   Individually over a few days.
18      Q.   Let's take them one at a time.
19          Mr. Adkins, do you recall the
20  substance of what Mr. Adkins told you?
21      A.   The substance of the four interviews
22  were very similar.  They described his role.  They
23  described their experiences with loans.  So the –
24  the comments from the four were very similar.

Page 96

ALAN JOHNSON

1      Q.   So I apologize, I wasn't writing fast
2  enough.
3      A.   I'm sorry –
4      Q.   I have Adkins –
5      A.   – I apologize.
6      Q.   I have Mr. Adkins, Mr. Lawlor, and who
7  were the other two?
8      A.   Mr. Hurley and Mr. Cote.
9          I believe those are the names.
10      Q.   Did any of them tell you – withdrawn.
11          Did all of them tell you that they had
12  obtained loans from Highland which were
13  subsequently forgiven in whole or in part?
14      A.   I believe so.
15      Q.   Did any of them tell you how much
16  money was forgiven?
17      A.   We talked about that, yes.  They
18  described the amounts.
19      Q.   Okay.
20          What amounts do you recall being
21  described as having been forgiven by Highland?
22      A.   It was in the hundreds of thousands.
23      Q.   Did any of them tell you that they had
24  ever had a loan from Highland that was forgiven in

Page 97

ALAN JOHNSON

1  an amount equal to or more than $500,000?
2      A.   They were a little sketchy on the
3  exact amounts, but my impression, they ranged
4  from, say, a quarter million to maybe $500,000 or
5  a little more.  That – that was their
6  recollections.
7      Q.   Did – did you learn from these four
8  interviews when the last of these loans was
9  forgiven?
10      A.   Probably 8 or 10 years ago.
11      Q.   Did anybody – withdrawn.
12          Did any of the four of them inform you
13  that Highland had forgiven any loans to any
14  officer or employee in the last 8 to 10 years?
15      A.   I don't recall them saying that, no.
16      Q.   Did you – do you recall asking them
17  when was the last loan that Highland ever forgave?
18      A.   I don't believe I asked that question.
19      Q.   And as you sit right here right now, you
20  have no knowledge as to when the last loan that
21  Highland gave that was forgiven in whole or in
22  part, correct?
23      A.   I don't have that knowledge, no.
24      Q.   Other than the loans that were

Page 98

ALAN JOHNSON

2  described for you by these four individuals, can
3  you identify any other loan that Highland has ever
4  forgiven?
5      A.   I don't have any other knowledge, no.
6      Q.   Did any of these four individuals give
7  you any documents relating to any aspect of your
8  report?
9      A.   No.
10     Q.   Did any of them give you any documents
11 that would substantiate the information that they
12 provided to you during the interview?
13     A.   They didn't provide any documents, no.
14     Q.   Did you ask them if they had any
15 documents to substantiate what you were told?
16     A.   Yes.  Yes, I did.
17     Q.   And they told you that they didn't
18 have any.
19          Do I have that right?
20     A.   Yes, that's right.
21     Q.   I think you testified that you do not
22 know who the decision maker was who entered into
23 the agreement with Mr. Dondero in late 2018 or
24 early 2019 with respect to the forgiveness of the
25 loans.

Page 99

ALAN JOHNSON

2      Q.   Do I have that right?
3      A.   When I interviewed Mr. Dondero, I did
4  not -- that didn't come up.
5      Q.   So I'm going to represent to you that
6  it's in the pleading that Mr. Dondero entered into
7  the agreement with his sister Nancy, who was the
8  trustee of the Dugaboy Investment Trust who
9  purportedly holds a majority of Highland's
10 interests.
11          Is that new information for you?
12     A.   Yes, it is.
13     Q.   Have you ever heard of Nancy Dondero
14 before?
15     A.   I had heard her name just because
16 there's attorneys representing her.  That's all
17 I -- that's all I know.
18     Q.   You weren't aware until I just told
19 you that she's the person who entered into the
20 agreement with Mr. Dondero concerning --
21          withdrawn.
22          You didn't know until I just told you
23 that Nancy Dondero, as the trustee for the Dugaboy
24 Investment Trust, as the holder of a majority of
25 interests of Highland, is the person who entered

Page 100

ALAN JOHNSON

2  into the agreement with Mr. Dondero?
3      A.   If your assertion is true, then I --
4  then I -- I did not know that.
5      Q.   Okay.
6          And is it fair to say then that you
7  don't know that she was deposed in this case?
8      A.   I don't believe I knew that, no.
9      Q.   And is it fair to say that you've
10 never seen her deposition transcript, if one
11 exists?
12     A.   I have not seen it.
13     Q.   Did you ever ask to speak with the
14 decision maker?
15     A.   No, I did not.
16     Q.   And is that because -- why -- why
17 didn't you ask to speak with the decision maker?
18     A.   My assignment here was to talk about
19 practice, you know, in the industry of using loans
20 and other things.  It was not to -- I was not
21 asked to assess these particular loans.
22          So if the assignment had been to -- to
23 assess the reasonableness or fairness, then I
24 certainly would have done other things, but that
25 was not the assignment here.

Page 101

ALAN JOHNSON

2      Q.   Okay.
3          And can you -- can you be as specific
4  as you can as to what the assignment was?
5      A.   Well, in addition to coming up with a
6  market compensation, in the report, I said the
7  assignment was to talk about the practice and --
8  of using loans and forgivable loans and, you know,
9  financial services firms, but it was not to assess
10 the reasonableness of -- the specific
11 reasonableness of this particular transaction.
12     Q.   Okay.
13          And you're not offering any opinion as
14 to the reasonableness of the agreement that
15 Mr. Dondero entered into with the Dugaboy
16 Investment Trust concerning the forgiveness of any
17 loans.  Is that fair?
18     A.   I'm not -- I'm not putting that forth,
19 no.
20     Q.   And you're not offering any opinions
21 as to whether or not such an agreement exists,
22 correct?
23     A.   No, I am not.
24     Q.   You're not offering any opinions as to
25 whether or not it would have been appropriate for

Page 102

ALAN JOHNSON

1
2 the company to enter into a loan forgiveness
3 program under the facts and circumstances that
4 existed at the time, correct?
5      A.   That's right.
6      Q.   And you're not offering any opinion
7 that the loan forgiveness program that Mr. Dondero
8 entered into is consistent with industry
9 standards, are you?
10     A.   No, I'm not.
11     Q.   Okay.
12          What you are doing is you're – you're
13 making an assessment of what comparable executives
14 earn in the industry.  Is that fair?
15     A.   That's part of it, and then the
16 second, as I mentioned, just the use of such loans
17 within the industry and, you know, within
18 Highland.
19     Q.   Okay.
20          But you're not offering any opinion as
21 to whether or not – withdrawn.
22          We'll keep going.
23          You have no information about what
24 diligence, if any, the decision maker conducted
25 prior to entering into the agreement with

Page 103

ALAN JOHNSON

1
2 Mr. Dondero in late 2018 or early 2019, correct?
3      A.   I do not.
4      Q.   And you're not offering any opinion as
5 to whether or not the diligence that was done by
6 that person was sufficient, correct?
7      A.   I'm not making that opinion, no.
8      Q.   And you don't have any information
9 about the skill set or the experience of the
10 decision maker, fair?
11     A.   I do not.
12     Q.   And you're not offering any opinion as
13 to the skill set or the experience of the decision
14 maker who entered into this alleged agreement on
15 behalf of Highland, correct?
16     A.   I am not.
17          MR. MORRIS:  Let's go to page 3 of
18 your report, please.
19          So this is the introduction, right?
20 So this is the very first substantive page
21 of the report, is that right?
22     A.   Yes.
23     Q.   Okay.
24          If you take a look near the end of the
25 first paragraph, there's a sentence that reads,

Page 104

ALAN JOHNSON

1
2 "Throughout this period, he received loans in lieu
3 of additional current compensation."
4          Do you see that?
5      A.   Yes.
6      Q.   Have I read that correctly?
7      A.   Yes.
8      Q.   Why did you include that sentence in
9 your report?
10     A.   I – Mr. Dondero described these loans
11 as – as a practice of, in lieu of paying
12 compensation, these loans were – these loans were
13 made.
14     Q.   What information were you given that
15 you relied upon in order to make the statement
16 that I just read into the record?
17     A.   Well, I interviewed Mr. Dondero, and
18 then I talked to the four prior Highland
19 executives.
20     Q.   Now, you told me that the four prior
21 Highland executives described for you certain
22 loans that they had received that had been
23 forgiven in whole or in part by Highland.
24          Do I have that right?
25     A.   Yes.

Page 105

ALAN JOHNSON

1
2      Q.   Did any of them give you any
3 information to support the statement that
4 throughout this period Mr. Dondero received loans
5 in lieu of additional current compensation or is
6 that information that came exclusively from
7 Mr. Dondero?
8      A.   They described a practice at the
9 company of using these loans as a – a form of
10 deferred pay, so they described it – it was not
11 only them, but it applied to others, and then when
12 I interviewed Mr. Dondero, his testimony – his
13 comments to me were consistent with that.
14     Q.   Okay.
15          Did any of the four former employees
16 specifically tell you that Mr. Dondero had ever
17 received loans in lieu of additional current
18 compensation or did they just describe a general
19 practice that applied to others?
20     A.   I think they were describing the
21 general practice.
22     Q.   Okay.
23          So did anybody other than Mr. Dondero
24 tell you that "Throughout this period, he received
25 loans in lieu of additional current compensation"?

Page 106

1        ALAN JOHNSON
2    A.   I don't believe so.
3    Q.   Do you have any information at all to
4 support the statement that throughout this period,
5 Mr. Dondero received loans in lieu of additional
6 current compensation other than what Mr. Dondero
7 specifically told you?
8    A.   For him specifically, it's relying on
9 what Mr. Dondero said.
10   Q.   Okay.
11       You haven't seen any documents that
12 support that statement, do you – did you?
13   A.   I have not – I have not seen any
14 documents, no.
15   Q.   Would your opinions change if you
16 learned that for at least the 11 years prior to
17 the bankruptcy filing, Mr. Dondero never received
18 a single loan in lieu of compensation?
19   A.   I'm – I don't understand the
20 question. I'm sorry.
21   Q.   This is the first paragraph of your
22 expert report that we're looking at, right?
23       What if I told you that the sentence
24 "Throughout this period, he received loans in lieu
25 of additional current compensation" was false at

Page 107

1 least going back as far as 2008, would you want to
2 amend your report in any way?
3    A.   Well, then the sentence wouldn't be
4 true if the loans weren't a form of deferred
5 compensation.
6        So if the facts changed, then the
7 report would need to be changed.
8    Q.   So let me state it a different way.
9        Would your opinions change if you
10 assume that in the 11 years prior to the
11 bankruptcy filing Highland never forgave any loan
12 in whole or in part that it had extended to
13 Mr. Dondero.
14       MR. AIGEN:  Objection, form.
15   A.   No, I don't – I don't think that – I
16 don't think that sentence would change that, no.
17   Q.   Okay.
18       I'm not talking about the sentence
19 itself, but if I could prove to you today that
20 there's no written record of Highland ever
21 forgiving a loan to Mr. Dondero, would that have
22 an impact at all on your opinions?
23   A.   I don't think the written record would
24 change my opinion.  I think he – he had stated to

Page 108

1        ALAN JOHNSON
2 me that the – the – that a lot of these loans
3 were made as a form of deferred compensation with
4 the intent to be forgiven at some point in the
5 future.
6    Q.   All right.  I'm going to ask you to
7 assume the following facts:  For the 11 years
8 prior to the petition date, other than the three
9 loans that were outstanding as of the petition
10 date, Mr. Dondero received three loans from
11 Highland.  Okay?
12       So that's assumption No. 1, that
13 between 2008 and 2019, Mr. Dondero received three
14 loans from Highland.
15       Assumption No. 2, that Mr. Dondero
16 paid Highland all principal and interest due under
17 all three loans.
18       Assumption No. 3:  The last of those
19 three loans was taken out in January 2018 and was
20 paid back in full plus interest in December 2019.
21       The next assumption:  Mr. Dondero has
22 testified that any loan that Highland actually
23 forgave would be described in Highland's audited
24 financial statements and that in those financial
25 statements going back to 2008, there's no

Page 109

1        ALAN JOHNSON
2 description of any loan ever being given to
3 Mr. Dondero that was forgiven in whole or in part.
4        Do you remember all those assumptions?
5    A.   I believe so.
6    Q.   Okay.
7        If you assume that each of those
8 assumptions is, in fact, true, would you have any
9 basis at all to conclude that Mr. Dondero received
10 loans in lieu of additional compensation in the
11 decade before Highland filed for bankruptcy?
12       MR. AIGEN:  Objection, form.
13   A.   Well, in trying to answer the
14 question, the – I think a lot of the loans here,
15 as I recall, were for different entities and
16 different, you know, amounts and situations.
17       So if – if the – either hypothetical
18 or the assumptions we're making here, that the
19 loans eventually were not forgiven, I don't know
20 if the – they were intended to be forgiven and
21 just weren't or we're talking about other loans
22 that are outside the three that you – that you
23 mentioned.
24   Q.   Is it fair to say that neither
25 Mr. Dondero nor the Stinson firm ever shared with

Page 110

ALAN JOHNSON

2 you the fact that Mr. Dondero had received three
3 loans that are not the subject of this litigation?
4     A.   I was aware that I believe there were
5 loans that were not subject to litigation that had
6 been paid off or other types of things. I was
7 aware of that.
8     Q.   How did you learn that?
9     A.   I think I've seen materials that
10 listed loans that showed principals paid off and
11 so forth, but I think I've been -- I know they
12 were loans -- I believe I recall that they were
13 loans outside of what's being disputed.
14     Q.   I'm sorry.
15     A.   No, I was done. I'm sorry.
16     Q.   Did you ever discuss that with
17 Mr. Dondero?
18     A.   I did not.
19     Q.   Do you have any knowledge as to why he
20 paid back some loans and others were supposed to
21 be treated as compensation?
22     A.   I do not know.
23     Q.   Is there any reason you didn't
24 disclose in your report that Mr. Dondero had
25 received loans that he had paid back?

Page 111

ALAN JOHNSON

2     A.   I didn't think it was relevant.
3     Q.   Did you ever ask Mr. Dondero how he
4 reconciled the payment of principal and interest
5 due on the notes prior to the petition date but
6 his treatment of the notes pursuant to the
7 agreement that's been described to you?
8     A.   I did not.
9     Q.   Are you curious at all as to why he
10 paid off some of the notes but not others?
11         MR. AIGEN:  Objection, form.
12     A.   Yeah, I'm probably curious. It's
13 convoluted enough, I'm a curious person, so yeah,
14 I'd probably be curious to understand all the ins
15 and outs.
16     Q.   Did it cause you any discomfort that
17 Mr. Dondero paid certain loans off in full but the
18 only loans that he didn't pay off in full were the
19 loans that existed as of the petition date?
20         MR. AIGEN:  Objection, form.
21     A.   Well, isn't that by definition true?
22 If they've already been paid off, they couldn't
23 exist as of the petition date, right?
24         Isn't that just -- am I missing
25 something?

Page 112

ALAN JOHNSON

2     Q.   Well, you told me that, from the
3 review of the documents, you understood that there
4 were loans that Mr. Dondero had taken out that had
5 been paid off in full. Is that right?
6     A.   Yes, I recall that I was aware that
7 there were loans that had been paid off. I was
8 aware of that.
9     Q.   And so paying back the loans is
10 certainly not -- would you agree with me that if
11 he -- that if he was paying back the loans, then
12 he didn't receive the loans in lieu of additional
13 current compensation?
14     A.   Yeah, when I wrote the report, maybe I
15 should have parsed out that, but I think I was
16 focusing on that there were loans that were
17 deferred compensation.
18         I guess what we're saying is there may
19 have been other loans that were not deferred
20 compensation. They were more run-of-the-mill
21 obligations, so if that's the point we're making,
22 but I think what I was trying to address here,
23 that there were loans made that were intended to
24 be deferred compensation.
25     Q.   And the only basis that you have for

Page 113

ALAN JOHNSON

2 that statement is what Mr. Dondero told you,
3 correct?
4     A.   For himself, that is true, and then
5 the other four executives provided a little bit of
6 history on the use of such loans within the
7 company.
8     Q.   And it didn't concern you at all that
9 certain loans were paid back and that certain
10 loans, according to Mr. Dondero, are subject to
11 this agreement that he entered into with the
12 company?
13     A.   I think that would be something that
14 if -- certainly, I would have asked him about, but
15 that certainly would be something to -- to discuss
16 with him, yes.
17     Q.   But you haven't done that as of today,
18 correct?
19     A.   I have not.
20     Q.   And nobody has explained to you why he
21 paid back certain loans but certain other loans
22 were supposed to be provided in lieu of additional
23 current compensation, right?
24     A.   That's right.
25     Q.   Okay.

Appx. 01986

Page 114

1          ALAN JOHNSON
2          The next sentence in this paragraph
3    says -- and I just want to make sure that I'm
4    quoting this correctly -- "Consistent with company
5    practice, the loans were considered a form of
6    deferred compensation that could be realized over
7    time as the loans were forgiven and the income
8    recognized by the individuals."
9          Have I read that correctly?
10     A.   Yes.
11     Q.   Why did you include that sentence in
12   your report?
13     A.   Well, from talking to the four former
14   executives and himself, he described a company
15   practice of having using loans as deferred
16   compensation.  In his words, it was called
17   "delayed gratification."
18          So you had these loans that were
19   intended to provide capital to invest in the
20   business, and they would eventually be forgiven
21   and then the income would be recognized by the
22   individual.
23          So the four of them and himself had
24   described a company practice of using these loans
25   to -- you know, as a form of deferred

Page 115

1          ALAN JOHNSON
2    compensation.
3      Q.   And that practice is very important to
4    your opinions, right?
5      A.   Well, it -- it -- as I said earlier,
6    my opinion is about the use of loans in private
7    financial services companies and what his market
8    value, his compensation, would be.
9      Q.   But actually, the practice that was
10   described to you by Mr. Dondero and these four
11   former employees, you relied upon to determine
12   that Highland had a practice and that the
13   forgiveness of the loans in this instance would be
14   consistent with that practice.  Is that right?
15     A.   That's right.
16          MR. MORRIS:  Let's turn to page 16 of
17   the report.
18     Q.   This is your conclusion, right?
19     A.   Yes.
20     Q.   And in the middle, it says,
21   "Additionally, it is my opinion that the loans
22   provided to Mr. Dondero should be considered
23   potential deferred compensation as they were
24   similar to loans given to other professionals at
25   the firm."

Page 116

1          ALAN JOHNSON
2          Have I read that correctly?
3      A.   Yes.
4      Q.   And is the information that supports
5    your opinion in that sentence based solely on what
6    was told to you by Mr. Dondero and the four
7    individuals?
8      A.   Yes.
9      Q.   You have no documents that support
10   that sentence.  Is that correct?
11     A.   That's correct.
12     Q.   And I assume, as a dutiful expert, you
13   asked for any documentation that might concern or
14   relate to the prior practice.  Is that right?
15     A.   That's right.
16     Q.   Just looking at the sentence itself,
17   what do you mean by the loans being "similar to
18   loans given to other professionals at the firm"?
19     A.   Just that they would be forgiven.  I
20   mean that deferred compensation at some point
21   would be -- would be forgiven.
22     Q.   They're certainly not similar in
23   amount.  Is that fair?
24     A.   No.  They're much larger.
25     Q.   In fact, I think you testified that

Page 117

1          ALAN JOHNSON
2    the largest loan you have been informed has ever
3    been forgiven was $500,000 or thereabouts.
4          Do I have that right?
5      A.   That's what I'm aware of, yes.
6      Q.   And Mr. Dondero has told you that
7    there's 40 to $50 million in loans that he
8    contends are the subject of an agreement?
9      A.   I don't know if he told me the 40 to
10   50 million, but I think I've seen that in various
11   spreadsheets or numbers.  That's the number I
12   believe -- at least that I recall that's in
13   dispute.
14     Q.   So is it fair to say that the
15   aggregate value of the loans that are the subject
16   to the agreement that Mr. Dondero described for
17   you concern loans that are 80 to 100 times larger
18   than the largest loan you have been told has ever
19   been forgiven by Highland?
20     A.   It is much -- it is much large than
21   any loan I'm familiar with, yes.
22     Q.   Did anybody ever tell you that
23   Highland had ever forgiven a loan made to a
24   corporate affiliate?
25     A.   That, I'm not aware of, no.

Page 118

```
1              ALAN JOHNSON
2      Q.   So there's nothing similar about the
3   loans that were given to the corporate affiliates
4   as compared to the loans that were forgiven for
5   the four individuals you spoke with.  Is that
6   correct?
7          MR. AIGEN:  Objection, form.
8          MR. MORRIS:  Withdrawn.  That's a fair
9   objection.
10     Q.   The four individuals that you spoke
11  with, they described for you loans that had been
12  given to individuals.  Is that right?
13     A.   Yes.
14     Q.   But the loan documents that you saw
15  that had those schedules of loans that were being
16  rolled up, all of those loans related to corporate
17  entities.  Isn't that right?
18     A.   No.  I think I mentioned before, I
19  didn't really focus on that.  I looked at the
20  loans themselves.  So I did not actually focus on
21  the corporate entities in my perusal of those
22  documents.
23     Q.   Would there be any difference in your
24  expert opinion as to whether or not the loan was
25  given to an individual or given to a corporate
```

Page 119

```
1   entity?
2      A.   Usually it would, but in these closely
3   held corporations, often they're synonymous, so it
4   really would depend on the circumstances.
5      Q.   Let's -- let's spend some time looking
6   at the documentation that we have that's been
7   produced in this case concerning this company
8   practice.
9          MR. MORRIS:  And so I'd like to put up
10  on the screen what's been marked as --
11  premarked as Exhibit 63, which is Highland's
12  2008 audited financial statements.
13         (Exhibit 63, Highland's 2008 audited
14         financial statements, was marked for
15         identification at this time.)
16  BY MR. MORRIS:
17     Q.   And I'd like you, as we go through
18  this exercise, Mr. Johnson, to take notes of all
19  of the loans that we're going to discuss.  There
20  won't be many, but do you have a pen and a piece
21  of paper with you?
22     A.   I do.
23     Q.   Yeah, can I trouble you to just write
24  down, you know, "2008 financial statements," and
```

Page 120

```
1   we're just going to do this for every year through
2   2018, so you can have a full understanding of the
3   loans that Highland included in its audited
4   financial statements.
5          I assume that you did not rely on this
6   document for your opinions because you didn't have
7   it at the time that you prepared your report;
8   correct?
9      A.   That's right.
10     Q.   Okay.
11         MR. MORRIS:  And if we could turn to
12  page 38, please.
13         I'm sorry, not PDF 38.  I'm referring
14  to the document, No. 38.  It shouldn't be
15  too far.
16         This is going to be a little painful
17  on the Zoom, Mr. Johnson.  I ask for your
18  patience.
19         All right.  Stop right there.
20     Q.   Do you see that this portion of the
21  Highland's 2008 audited financial statements has a
22  section called "Notes to Affiliates"?
23     A.   Yes.
24     Q.   Okay.
```

Page 121

```
1              ALAN JOHNSON
2          And in paragraph 1, it says that the
3   partnership issued a promissory note of $400,000
4   to an employee.
5          Do you see that?
6      A.   Yes.
7      Q.   And at the end of the paragraph, it
8   says that that promissory note was forgiven.
9          Do you see that?
10     A.   Yes.
11     Q.   So we can write down that in 2008,
12  Highland forgave a promissory note to an employee
13  in the amount of $400,000.
14     A.   Okay.
15     Q.   The next paragraph, there's a
16  reference to an August 1 promissory note in the
17  amount of $500,000.
18         Do you see that?
19     A.   Yes.
20     Q.   And at the end of the year, that
21  promissory note was still outstanding.
22         Do you see that?
23     A.   Okay.
24     Q.   So No. 1 is 7/31/06, $400,000
25  forgiven.
```

Page 122

```
1              ALAN JOHNSON
2        No. 2 is 8/1/08, $500,000 outstanding,
3   right?
4        No. 3, do you see there's a reference
5   to two loans that were made in 2 – on May 21,
6   2007, in the amount of a million dollars each?
7    A.   Okay.
8    Q.   And if you read further, it says that
9   during 2008, 30 percent of the outstanding
10  principal was owed – was forgiven, leaving
11  $700,000 due and paying.
12       So there's two loans that were
13  forgiven in the amount of $300,000 each.
14       Do I have that right?
15   A.   Okay.
16   Q.   Then, in the next paragraph, we've got
17  August 20th, 2008, and there's $330,000 loan which
18  is all outstanding at year end.
19       Do I have that right?
20   A.   Okay.
21   Q.   And the next paragraph, August 1
22  there's a $500,000 loan that was given to an
23  employee that was all outstanding at year end.
24       Do I have that right?
25   A.   Okay.
```

Page 123

```
1              ALAN JOHNSON
2    Q.   And then on October 15th, there's
3   another $500,000 loan made to another employee
4   that was outstanding at year end.
5        Do I have that right?
6    A.   Okay.
7    Q.   So would you agree with me that in
8   fiscal year 2008, Highland forgave one loan to an
9   employee in the amount of $400,000 and forgave in
10  part loans to two other employees in the amount of
11  $300,000 each?
12   A.   Okay.
13   Q.   Okay.
14       MR. MORRIS:  Let's go to Exhibit
15  No. 64.
16       (Exhibit 64, Highland's audited
17       financial statements for December 31, 2009,
18       was marked for identification at this time.)
19  BY MR. MORRIS:
20   Q.   And do you see that this is Highland's
21  audited financial statements for December 31,
22  2009?
23   A.   Yes.
24   Q.   Okay.
25       MR. MORRIS:  Can we go to page 33 of
```

Page 124

```
1              ALAN JOHNSON
2   the document?
3        There you go.  All right.
4    Q.   The first one that's described is an
5   August 20th, 2008 loan in the amount of $300,000,
6   and that seems to correspond with the fourth loan
7   that we looked at in 2008 because it's also a loan
8   dated August 20, 2008 in the amount of $330,000.
9        Do you see that?
10   A.   I'm sorry, I lost my train.
11       Where is it now?
12   Q.   So in the very first paragraph, under
13  "Affiliated Transactions"?
14   A.   Yeah, okay, I see it now.  I'm sorry.
15   Q.   Okay.
16       This loan, is it fair, if you take a
17  look at your notes, this loan corresponds with
18  the – with the loan that was described in the
19  2008 financials.
20       Do you have that as the fourth item on
21  your list, if you look at your list?
22   A.   My list is going to be incomplete here
23  in terms of going through this, but I'm trying to
24  take notes here, but I believe what you say is
25  true.
```

Page 125

```
1              ALAN JOHNSON
2    Q.   Okay.
3        And you can see that the principal
4   amount of the note had been reduced by year end.
5        Do you see that?
6    A.   Yes.
7    Q.   Okay.
8        So there's no evidence that this
9   particular note was forgiven in whole or in part
10  in 2009, correct?
11   A.   That's right.
12   Q.   And if we look at the next paragraph,
13  there's a reference to an August 1, 2008 note in
14  the amount of $500,000.
15       Do you see that?
16   A.   Yes.
17   Q.   And that entire amount of principal
18  was still outstanding at the end of the year.
19       Do you see that?
20   A.   Yes.
21   Q.   So there's no evidence that this note
22  was forgiven in whole or in part in 2009, correct?
23   A.   Yes.
24   Q.   And there's no other – we can go
25  through the rest of the section, but there's no
```

Page 126

1          ALAN JOHNSON
2    other notes of any kind that are referred to in --
3    in this section of the audited financials.
4          If we can just scroll down to the end
5    of the affiliated transaction sections, I mean, I
6    will tell you that they put the employees up top.
7          So is it fair to say based on just
8    what I've shown you that you don't see any
9    evidence that Highland forgave any notes to any
10   employees in 2009?
11   A.    I think that's right.
12   Q.    Okay.
13        MR. MORRIS:  Let's go to 2010,
14   Exhibit 65, please.
15        (Exhibit 65, Highland's audited
16        financial statements for December 31, 2010,
17        was marked for identification at this time.)
18        MR. MORRIS:  And if we can turn to
19   page 33.
20   BY MR. MORRIS:
21   Q.    So if we look at the first paragraph,
22   do you see there's still a reference to the
23   $330,000 note?
24   A.    Yep.
25   Q.    Okay.

Page 127

1          ALAN JOHNSON
2          It's interesting, in the
3    next-to-the-last sentence -- let's see if I'm
4    reading this correctly -- it says, "The note has
5    specific forgiveness provisions of principal and
6    interest prior to maturity if certain milestones'
7    dates are obtained."
8          Do you see that?
9    A.    Yes.
10   Q.    So based on that, would you conclude
11   in your experience that the note actually had
12   specific provisions concerning forgiveness?
13   A.    Yes, that's what that implies.
14   Q.    And based on your experience, would
15   you understand that this note was really a form of
16   retention note whereby it would be forgiven if the
17   person were still employed at the time of the
18   note's -- at the end of the note's term?
19   A.    It's hard to tell.  Milestones could
20   be performance or it -- it could go either way,
21   but there's certain provisions that have been
22   documented that it will be forgiven either through
23   time or performance.
24   Q.    Well, it doesn't refer to milestones.
25   Instead, it refers to milestone dates.

Page 128

1          ALAN JOHNSON
2          Do you see that?
3    A.    I -- I think you're right, just I've
4    never seen the word "milestone dates" used, so I'm
5    not quite sure what they were trying to say, but I
6    think you're probably right.
7    Q.    Okay.
8          But in any event, you would agree with
9    me that there's nothing in this paragraph that
10   suggests that Highland forgave that loan in whole
11   or in part in 2010, correct?
12   A.    That's right.
13   Q.    And if we scroll down through the rest
14   of this section, I think -- I hope you'll agree
15   with me that there's no other reference to any
16   other loans given to any employee in 2010?
17   A.    I think that's right.
18        MR. MORRIS:  Okay.  Let's go to
19   Exhibit 66 --
20   Q.    Oh, I'm going to tell you, I'm
21   skipping, actually, because there's only so much
22   pain I'm willing to endure.
23        We're going to skip 2011, '12, and
24   '13, and I'm going to represent to you that
25   there's absolutely nothing in any of those audited

Page 129

1          ALAN JOHNSON
2    financial statements that pertains or concerns any
3    loans given to any employee.
4          And you can -- you can -- not accept
5    my representation, but take that as an assumption
6    you should make, that there's no reference to any
7    loan to any employee in those years.
8          MR. MORRIS:  Can we go to Exhibit 66
9    please.
10        MS. CANTY:  It's 69, 2014.
11        MR. MORRIS:  Okay.  Yep, it's up on
12   the screen.
13        (Exhibit 69, Highland's audited
14        financial statements for December 31, 2014,
15        was marked for identification at this time.)
16   BY MR. MORRIS:
17   Q.    So do you see that this is the 2014
18   audited financial reports for Highland Capital
19   Management?
20   A.    Yes.
21   Q.    And you may or may not have seen this
22   report.  Is that right?
23   A.    I think I got it.
24   Q.    When you reviewed the audited
25   financial statements that you were given, did you

Page 130

ALAN JOHNSON

1  review them to try to learn any more information
2  about the practice that was described to you
3  whereby Highland would forgive loans to employees
4  in whole or in part?
5      A.  I had just received these.  I didn't
6  have time to go through it.
7          MR. MORRIS:  Let's go to page 27,
8  please.
9      Q.  Okay.  Do you see that there's a
10  section called "Affiliated Transactions" again
11  that begins at the bottom of page 27?
12     A.  Okay.
13     Q.  And do you see that the first
14  paragraph describes a loan between Highland and
15  Highland Capital Management Fund Advisors?
16     A.  Yes.
17     Q.  And does it appear to you that the
18  loan that was granted in 2014 was fully
19  outstanding at year end?
20     A.  Yes.
21     Q.  And there's no reference in that
22  paragraph to any portion of the loan having been
23  forgiven, correct?
24     A.  That's right.

Page 131

ALAN JOHNSON

1      Q.  And then the next paragraph refers to
2  another loan between the same parties.
3          Do I have that right?
4      A.  Yes.
5      Q.  And there's nothing in that paragraph
6  that suggests that that loan was forgiven in whole
7  or in part at any time in 2014, correct?
8      A.  That's right.
9          MR. MORRIS:  And let's go to the next
10  page, please.
11     Q.  Do you see that there's a reference to
12  a note in the first paragraph between Highland and
13  NexPoint that was issued in 2014?
14     A.  Yes.
15     Q.  And there's nothing in that paragraph
16  that suggests the note was forgiven in whole or in
17  part at any time in 2014, correct?
18     A.  Yes.
19     Q.  In fact, the entirety of the principal
20  amount plus interest was still due at year end,
21  correct?
22     A.  Yes.
23     Q.  The next paragraph, do you see it
24  refers to a note between Highland and an entity

Page 132

ALAN JOHNSON

1  called "HCRE"?
2      A.  Yes.
3      Q.  And there's nothing in that paragraph
4  that suggests that the note or the loan was
5  forgiven in whole or in part at any time in 2014,
6  correct?
7      A.  That's right.
8      Q.  There was a modest payment made of
9  principal during the year.
10         Do I have that right?  Is my
11  interpretation a fair interpretation?
12     A.  That's right.
13     Q.  And then the last section of this, the
14  last paragraph of this section refers to a note
15  between Highland and an entity called "Highland
16  Capital Management Services, Inc."
17         Do you see that?
18     A.  Yes.
19     Q.  And there's nothing in that paragraph
20  that suggests that any portion of that loan was
21  forgiven in whole or in part in 2014, correct?
22     A.  That's right.
23     Q.  And, in fact, the entire principal
24  balance plus interest was due at year end.  Is

Page 133

ALAN JOHNSON

1  that fair?
2      A.  Yes.
3          MR. MORRIS:  Okay.  Let's go to 2015,
4  please.
5          What exhibit are we on?
6          MS. CANTY:  70 is 2015.
7          MR. MORRIS:  I see what we did.  Okay.
8          (Exhibit 70, Highland's audited
9  financial statements for December 31, 2015,
10  was marked for identification at this time.)
11         MR. MORRIS:  If we can just go to the
12  first page, please.
13  BY MR. MORRIS:
14     Q.  Do you see that this is the first page
15  of the audited financial statements for the year
16  ending 2015 for Highland?
17     A.  Yes.
18     Q.  And you're not relying on this
19  document for any of your opinions, correct?
20     A.  That's right.
21         MR. MORRIS:  Can we turn to page 27,
22  please -- I messed this up, sorry.
23         Keep going down.  Keep going.  Keep
24  going.

Page 134

ALAN JOHNSON

1
2    Okay.  Stop right there.
3    Can we just scroll down so we can see
4  what page number we're on?
5    Q.  All right.  Do you see we're on
6  page 29, Mr. Johnson?
7    A.  Yes.
8    MR. MORRIS:  Can we go to the top of
9  the affiliates transaction.
10    Q.  Do you see that there's a reference to
11  Highland Capital Management Fund Advisors?
12    A.  Yes.
13    Q.  Okay.
14    And do you see there's a reference to
15  $6.1 million principal and interest being due at
16  the year end?
17    A.  Yes.
18    Q.  And then there's a sentence that says,
19  "The partnership will not demand payment on
20  amounts owed prior to May 31, 2017."
21    Do you see that?
22    A.  Yes.
23    Q.  Were you aware that Highland had
24  agreed with its affiliate not to make a demand on
25  the payments for a period of time?

Page 135

ALAN JOHNSON

1
2    A.  I wasn't aware of that.
3    Q.  Do you see the last paragraph -- the
4  last sentence of the paragraph says, "A fair value
5  of the partnership's outstanding notes receivable
6  approximates the carrying value of the notes
7  receivable"?
8    A.  Yes.
9    Q.  Do you understand that to mean that
10  the fair value of the notes equals to the
11  principal face amount of the notes?
12    A.  The carrying value would include the
13  face amount probably and any unpaid interest, but
14  yes, it would be the book -- the book value, yes.
15    Q.  And the book value in this case equals
16  the unpaid principal and interest due on the note,
17  correct?
18    A.  Yes.
19    Q.  And so as of this time anyway, the
20  fair value of the notes equaled the unpaid
21  principal and interest due on the note, correct?
22    MR. AIGEN:  Objection, form.
23    A.  Yes.  Yes, I think that's right.
24    Q.  There's nothing in that first
25  paragraph that says or suggests that any of the

Page 136

ALAN JOHNSON

1
2  loans with HCMFA were forgiven in whole or in part
3  in 2015, correct?
4    A.  Right.
5    Q.  And the next paragraph relates to
6  loans with NexPoint Advisors.
7    Do you see that?
8    A.  Yes.
9    Q.  Okay.
10    Take your time, but my question is
11  whether there's anything in that paragraph that
12  states or suggests that any portion of the loans
13  between Highland and NexPoint were forgiven in
14  whole or in part in 2015?
15    A.  I think that's right, yes.
16    Q.  Do you see there was also a statement
17  regarding Highland's not demanding payment on the
18  notes for a couple of years?
19    A.  Yes.
20    Q.  In your experience and based on your
21  expertise, can you think of a reason why Highland
22  would agree not to make a demand on promissory
23  notes?
24    A.  It could be the financial condition of
25  the borrower that was part of the negotiation

Page 137

ALAN JOHNSON

1
2  putting the loans together.  It would -- it
3  generally have something to do with the financial
4  condition of the borrower and the terms.
5    Q.  Let's look at the next paragraph.
6    Do you see it relates to HCRE?
7    A.  Yes.
8    Q.  And do you see how during 2014 and
9  '15, HCRE issued promissory notes to Highland in
10  the aggregate amount of $13 million and that
11  principal amount plus interest was due at the end
12  of the year?
13    A.  Sorry, it just says it's payable on
14  demand, right?
15    Q.  Right.
16    And the amount is -- that was loaned
17  was $13 million, but at year end 2015, the unpaid
18  principal and interest actually equaled
19  $13.3 million.
20    Have I read that correctly?
21    A.  Yes.
22    Q.  Is there anything in this paragraph
23  that says or suggests that Highland forgave in
24  whole or in part any loans that were made to HCRE
25  in the year 2014 or '15?

Page 138

ALAN JOHNSON

1
2    A.   No.
3         MR. MORRIS:  Let's go to the next
4    paragraph.
5    Q.   Do you see there's a reference to
6    loans or promissory notes that were issued to
7    Highland by HCMSI?
8    A.   Yes.
9    Q.   Okay.
10        And do you see that the aggregate
11   amount of the notes was $23 million?
12   A.   Yes.
13   Q.   And do you see that during the years
14   ended 2014, Highland Capital Management Services,
15   Inc. repaid $8.1 million in principal?
16   A.   Yes.
17   Q.   Is it customary in the industry to
18   make principal payments or interest payments
19   against loans that are the subject to agreements
20   of forgiveness?
21   A.   It really would depend on the
22   likelihood of it being forgiven.  If I had a loan
23   that I thought wouldn't be forgiven, I might pay
24   it early because I just don't think the
25   probability of being forgiven is likely.  If I

Page 139

ALAN JOHNSON

2    think it's likely or highly likely, I would try to
3    avoid paying down the balance and wait for it to
4    be forgiven.
5    Q.   And is that the advice you would give
6    to the maker of a note who owed money that was
7    subject to a forgiveness agreement?
8    A.   Maker of the loan, I would tell them
9    if – if things are looking like you're going to
10   forgive it, they probably won't want to pay down
11   the principal and the interest if they can avoid
12   it, and if the – it's unlikely it will be
13   forgiven due to the terms, then they're more
14   likely to pay the principal and interest sooner.
15   Q.   Is there anything in this paragraph
16   that says or suggests that Highland had agreed to
17   forgive in whole or in part any loan that it had
18   extended to Highland Capital Management Services?
19   A.   I don't believe so, no.
20        MR. MORRIS:  Okay.  Let's go to the
21   2016 financials.
22   Q.   Do you see that this is the audited
23   financial statements for Highland Capital
24   Management, L.P. for the period ending December
25   31, 2016?

Page 140

ALAN JOHNSON

2    A.   Yes.
3    Q.   Okay.  And you're not relying on this
4    report for any of your opinions, correct?
5    A.   That's correct.
6    Q.   Okay.
7         MR. MORRIS:  Can we go to page 31,
8    please.
9    Q.   Okay.  Do you see notes and other
10   amounts due from affiliates?
11   A.   Yes.
12   Q.   The first paragraph relates to loans
13   between Highland and its affiliate HCMFA.
14        Do you see that?
15   A.   Yes.
16   Q.   Is there anything in this paragraph
17   that states or suggests that Highland has forgiven
18   in whole or in part any portion of any loan that
19   it made to HCMFA?
20   A.   No.
21   Q.   Looking at the next paragraph, do you
22   see that concerns loans between Highland and
23   NexPoint Advisors?
24   A.   Yes.
25   Q.   Is there anything in that paragraph

Page 141

ALAN JOHNSON

2    that states or suggests that Highland forgave in
3    whole or in part any portion of any loan that it
4    gave to NexPoint?
5    A.   No.
6    Q.   Looking at the next paragraph, do you
7    see there's a reference to loans between Highland
8    and HCRE Partners, LLC?
9    A.   Yes.
10   Q.   Is there any statement or suggestions
11   in that paragraph that Highland forgave in whole
12   or in part any loan it made to HCRE Partners, LLC?
13   A.   No.
14   Q.   Looking at the next paragraph, do you
15   see there's a reference to loans between Highland
16   and HCMSI?
17   A.   Yes.
18   Q.   Is there anything in that paragraph
19   that states or suggests that Highland forgave in
20   whole or in part any loan that it made to HCMSI?
21   A.   No.
22        MR. MORRIS:  Okay.  Can we go to the
23   next paragraph.
24   Q.   Do you see there's a reference to
25   promissory notes that James Dondero issued to

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-12    Filed 10/22/24    Page 14 of 198    PageID 23229
Appendix Batch 2    Page 109 of 1336    Page 14 of 198

Page 142

ALAN JOHNSON

1
2  Highland in the aggregate amount of $14.8 million
3  in 2016?
4      A.  Yes.
5      Q.  Okay.
6          So this is the first time we're seeing
7  a loan to Mr. Dondero that's reported in the
8  financial statements that we've looked at.  Is
9  that fair?
10     A.  I think that's right, yes.
11     Q.  Okay.
12         And according to this audited
13  financial statement, Highland loaned Mr. Dondero
14  $14.8 million in 2016.
15         Do I have that right?
16     A.  Yes.
17     Q.  And at the end of the year, he
18  actually owed principal and interest in the amount
19  of $14.9 million, correct?
20     A.  Yes.
21     Q.  And there's no statement or suggestion
22  in this paragraph that Highland had forgiven in
23  whole or in part any portion of the loans that it
24  had extended to Mr. Dondero.
25         Do I have that right?

Page 143

ALAN JOHNSON

1
2      A.  Yes.
3      Q.  Okay.
4          Do you see the next paragraph relates
5  to a gentleman named Mark Okada?
6      A.  Yes.
7      Q.  Do you have any understanding as to
8  who Mr. Okada is?
9      A.  He was the other major shareholder in
10  Highland.
11     Q.  And do you understand him to be one of
12  the – to be a co-founder with Mr. Dondero of
13  Highland?
14     A.  I believe that's right, yes.
15     Q.  Did you make any inquiry as to whether
16  or not Mr. Okada had ever obtained any loans from
17  Highland?
18     A.  I don't – I don't believe I did.
19     Q.  Do you know if Highland ever forgave
20  any loan in whole or in part that it extended to
21  Mr. Okada?
22     A.  I don't know.
23     Q.  Are you aware that Mr. Okada paid back
24  the loan referenced in this paragraph in full plus
25  interest?

Page 144

ALAN JOHNSON

1
2      A.  I was not aware of that.
3          MR. MORRIS:  Let's just go to the next
4  page to see if there's anything else here.
5      Q.  There's a reference to Dugaboy.
6          Do you see that?
7      A.  Yes.
8      Q.  You don't know what Dugaboy is, do
9  you?
10     A.  I do not.
11     Q.  Nobody has ever told you about
12  Dugaboy.
13         Do I have that right?
14     A.  That's right.
15     Q.  So you weren't aware that Highland
16  loaned $23.4 million to Dugaboy in 2016?
17     A.  Well, that's not – it says they
18  purchased a promissory note due from Dugaboy.
19     Q.  Okay.
20         So now Dugaboy owes the partnership
21  $23.4 million, correct?
22     A.  That's not – at least my reading of
23  it is they purchased a note from Dugaboy.
24     Q.  Why don't we assume that what they
25  meant by that was that Dugaboy provided a note to

Page 145

ALAN JOHNSON

1
2  Highland in the amount of $23.4 million.
3          Okay?  Can we make that assumption?
4      A.  We can assume that.  That's not what
5  it says.
6      Q.  Okay.  I'm going to ask you to
7  assume –
8      A.  Okay.
9      Q.  – that in 2016, Dugaboy incurred an
10  obligation to Highland in the amount of
11  $23.6 million.
12         I'm going to ask you to further assume
13  that the Dugaboy Investment Trust is a trust
14  created by Jim Dondero.
15         I'm going to ask you to further assume
16  that the purpose of the trust is to provide living
17  expenses to the beneficiaries.
18         I'm going to ask you to further assume
19  that Mr. Dondero is the beneficiary of that trust
20  for his lifetime.
21         And I'm going to ask you to further
22  assume that his sister Nancy is the trustee.
23         If Highland loaned money to Dugaboy,
24  is that a fact that would have been relevant to
25  your analysis?

Appx. 01994

Page 146

ALAN JOHNSON

1    A.   It could have been.  It could have
2  been.
3    Q.   And why could it have been relevant to
4  your analysis?
5    A.   Well, if it's in effect a loan to him,
6  then I would probably consider it similar to the
7  other loans, but maybe if I had time to think
8  about it, it -- I might have considered
9  differently.
10        But if I came to the conclusion that
11  loaning to that -- the investment trust or to him
12  personally is essentially the same thing, then I
13  probably would have considered, you know, an
14  equal -- on an equal basis.
15    Q.   Now, neither Mr. Dondero nor Stinson
16  shared with you any information about any loan
17  that Highland ever extended to Dugaboy, if any.
18  Is that correct?
19    A.   It may have been in the listing of
20  loans -- the listing, but I had no separate
21  conversation about Dugaboy, no.
22    Q.   There's nothing in this paragraph that
23  suggests that any loan between Dugaboy and
24  Highland was forgiven in whole or in part in 2016,

Page 147

ALAN JOHNSON

1  correct?
2    A.   That's right.
3    Q.   So if you look at your notes and
4  refresh your recollection as to what we've been
5  through just now, is it fair to say that there's
6  no evidence of Highland forgiving any loan to
7  anybody in the world in whole or in part at any
8  time since 2008?
9        MR. AIGEN:  Objection, form.
10    A.   The ones we've looked through, I think
11  you're right.  I think there was forgiveness in
12  2008.  I think that's correct.
13    Q.   And given the amounts of the loans
14  that we looked at in 2008 -- and if you want to
15  refer to your cheat sheet to refresh your
16  recollection -- does it seem that the loans that
17  were described in the 2008 audited financial
18  statements might, in fact, be the very loans that
19  were described for you by the four individuals you
20  interviewed?
21    A.   They could -- they certainly could
22  have been, yes.
23    Q.   They're consistent with the amount of
24  the loans that were forgiven as was told by you,

Page 148

ALAN JOHNSON

1  right?
2    A.   That is correct, yes.
3        MR. MORRIS:  Let's go to 2017.
4        Can we go to page 30 --
5    Q.   Oh, I apologize, before we do that,
6  did you see that first page, sir?
7        Do you understand that we're looking
8  at Highland's audited financial statements for the
9  period ending December 31, 2017?
10    A.   Yes.
11    Q.   Okay.
12        And this is not a document you're
13  relying on, correct?
14    A.   That is correct.
15    Q.   Okay.
16        So now we're at page 30 of the audited
17  financial statements, and we're again in the
18  section relating to notes and other amounts due
19  from affiliates.
20        And do you see the first paragraph
21  relates to notes that Highland Capital Management
22  Fund Advisors has issued to Highland?
23    A.   Yes.
24    Q.   And this paragraph, like all of the

Page 149

ALAN JOHNSON

1  paragraphs, continues to say, quote, at the end,
2  that fair value of the partnership's outstanding
3  notes receivable approximates the carrying value
4  of the notes receivable.
5        Do you see that?
6    A.   Yes.
7    Q.   Okay.
8        And that sentence is at the end of
9  every paragraph in this section.
10        Do I have that right, if we continue
11  to scroll there?
12    A.   Yes.
13    Q.   Okay.
14        So looking at the first paragraph
15  relating to HCMFA, there's nothing in that
16  paragraph that states or suggests that Highland
17  agreed to forgive in whole or in part any loan it
18  had extended to HCMFA, correct?
19    A.   Yes.
20    Q.   And looking at the second paragraph,
21  do you see that it states that Highland combined
22  its outstanding promissory and revolving notes
23  from NexPoint to a single note with a 30-year
24  amortization schedule?

Page 150

ALAN JOHNSON

1
2    I'm summarizing.
3    A.   Yes.
4    Q.   And is it fair to assume that that's
5    probably one of the notes that recently saw?
6         MR. AIGEN:  Objection, form.
7    A.   Yes.  Yes.
8    Q.   Yes?
9    A.   Yes, that's correct.
10    Q.   And the reason it's correct is because
11    it comports with your recollection that there was
12    a roll-up of previously outstanding notes that
13    were combined in one into a 30-year term note,
14    right?
15    A.   That is correct.
16    Q.   Okay.
17         Is there anything in this paragraph
18    that states or suggests that Highland agreed to
19    forgive in whole or in part any aspect of any loan
20    it ever gave to NexPoint?
21    A.   No, there's not.
22    Q.   Looking at the next paragraph for
23    HCRE, do you see that there's a description of the
24    promissory note that HCRE issued to Highland in
25    exchange for a loan in December -- in 2017?

Page 151

ALAN JOHNSON

1
2    A.   Yes.
3    Q.   Is there anything in that paragraph
4    that suggests or states that Highland has agreed
5    to forgive in whole or in part any portion of any
6    loan it ever extended to HCRE?
7    A.   No.
8    Q.   The next paragraph refers to loans
9    that Highland has extended to Highland Capital
10    Management Services, Inc.
11         Do you see that?
12    A.   Yes.
13    Q.   Is there anything in that paragraph
14    that states or suggests that Highland has agreed
15    to forgive in whole or in part any portion of any
16    loan it ever extended to HCMSI?
17    A.   No.
18         MR. MORRIS:  Can we go to the next
19    paragraph, please.
20    Q.   Okay.  These two paragraphs relate to
21    Mr. Dondero and Mr. Okada.
22         Did you see that?
23    A.   Yes.
24    Q.   And it wasn't up on the screen before,
25    so I just want to make it clear that each of those

Page 152

ALAN JOHNSON

1
2    paragraph ends with the same sentence concerning
3    the fair value of the notes approximating the
4    carrying value the notes receivable.
5         Do I have that right?
6    A.   Yes.
7    Q.   Okay.
8         Now, remember we saw in the 2016
9    financials that Mr. Dondero had $14.9 million
10    outstanding at year end.
11         Do you recall that?
12    A.   I don't specifically recall that,
13    but -- I don't specifically recall that, no.
14    Q.   I'll represent to you that the 2016
15    audited financial statements showed that the
16    outstanding principal and interest due by
17    Mr. Dondero under the note that he issued to
18    Highland was $14.9 million.  Okay?
19    A.   Okay.
20    Q.   With that representation, do you see
21    that the amount has been reduced by $400,000 at
22    the end of 2017?
23    A.   Yes.
24    Q.   Okay.
25         And so is it fair -- is it a fair

Page 153

ALAN JOHNSON

1
2    conclusion to reach that at some point in 2017,
3    Mr. Dondero made payments against his obligations
4    to Highland that reduced the amount owing from
5    14.9 million to 14.5 million at the end of 2017,
6    again, assuming that I'm right about 2016?
7    A.   That would be right.  That would be
8    correct, yes.
9    Q.   And there's nothing in this paragraph
10    that states or suggests that Highland has agreed
11    to forgive in whole or in part any loan it has
12    ever extended to Mr. Dondero, correct?
13    A.   That's correct.
14    Q.   Okay.  So I would like you to note
15    down, because it's hard to flip back -- this is
16    the dilemma of virtual depositions -- but can you
17    write down that Mr. Dondero owed Highland
18    principal and interest of $14-and-a-half million
19    at the end of 2017?
20    A.   Okay.
21    Q.   And the next paragraph relates to
22    Mr. Okada.
23         There's nothing in there that states
24    or suggests that Highland has agreed to forgive in
25    whole or in part any loan Highland had ever

Page 154

```
1              ALAN JOHNSON
2    extended to Mr. Okada, correct?
3       A.   That's correct.
4            MR. MORRIS:  Okay.  Can we continue on
5    to the next page.
6       Q.   And do you see the first paragraph
7    relates to Dugaboy again?
8       A.   Yes.
9       Q.   And it specifically says that during
10   the year ending December 31, 2017, Dugaboy did not
11   issue any new notes to the partnership.
12           Do you see that?
13      A.   Yes.
14      Q.   And then it states that all
15   outstanding notes accrue interest at the rate of
16   2.75 percent.
17           Do you see that?
18      A.   Yes.
19      Q.   And then it says that at year end, the
20   total unpaid principal and interest due was
21   approximately $22.8 million and was payable on
22   demand?
23           Have I read that correctly?
24      A.   Yes.
25      Q.   Okay.
```

Page 155

```
1              ALAN JOHNSON
2            Is there anything in this paragraph
3    that states or suggests that Highland ever agreed
4    to forgive in whole or in part any loan it ever
5    extended to Dugaboy?
6       A.   No.
7       Q.   The next paragraph refers to a
8    contribution agreement.
9            Do you see that?
10      A.   Yes.
11      Q.   Have any idea what a contribution
12   agreement is in this context?
13      A.   Not in this context, no.
14      Q.   Is that something you might -- you
15   might have asked about had you been told -- had
16   you been given these financial statements, let's
17   say, back in July?
18      A.   I -- I might have asked about this,
19   yes.
20      Q.   I mean, in fact, this is in the
21   section of the audited financial statements that
22   is entitled --
23           MR. MORRIS:  If would can go back to
24   the top -- no -- I'm sorry -- the top of
25   that section, page -- yeah.
```

Page 156

```
1              ALAN JOHNSON
2       Q.   That section is specifically called
3    "Notes and Other Amounts Due From Affiliates,"
4    right?
5       A.   Yes.
6       Q.   If you wanted to assess whether or not
7    Mr. Dondero was reasonably compensated, wouldn't
8    you want to know about all of the notes that
9    Highland held on behalf of the affiliates that
10   were owned and controlled by Mr. Dondero?
11           MR. AIGEN:  Objection, form.
12      A.   I -- I would have -- if I had had the
13   financials, I would have certainly looked through
14   these things, yes.
15      Q.   And if you had been given this
16   information, wouldn't you want to know the full
17   extent -- I mean -- withdrawn.
18           I think we -- I think at the beginning
19   of the day -- I know we've been going at this for
20   a while -- you specifically told me that you would
21   advise a decision maker to know and understand the
22   full scope of all loans that were given to or for
23   the benefit of the executive before entering into
24   a forgiveness agreement, right?
25      A.   Yes.
```

Page 157

```
1              ALAN JOHNSON
2       Q.   Okay.
3            And the information that's contained
4    in this section of the audited financial
5    statements specifically pertains to loans to
6    affiliates.  Isn't that right?
7       A.   Yes, among other things, but yes.
8       Q.   Okay.
9            In order to know if Mr. Dondero had
10   been compensated in a way equal to his peers
11   wouldn't you want to know the full extent of
12   amounts loaned to entities he owned and
13   controlled?
14           MR. AIGEN:  Objection to form.
15      A.   Well, a straight loan to someone is
16   not generally compensation.  If the loan is going
17   to be forgiven at some point in the future, yes,
18   that would have been a relevant -- you know,
19   relevant factor, but just a straight loan wouldn't
20   generally be considered compensation.
21      Q.   If Highland -- let's say
22   hypothetically Highland -- withdrawn.
23           You see NexPoint Advisors on the page,
24   the second box?
25      A.   Yes.
```

ALAN JOHNSON
Page 158

2    Q.  Highland -- let's assume that James
3  Dondero owns and controls NexPoint.  Okay?
4    A.  Yes.
5    Q.  As of May 31, 2017, according to
6  Highland's audited financial statements, it loaned
7  NexPoint $30.7 million.
8      Do you see that?
9    A.  Well, I think it's saying it combined
10  all these notes together and a new note of 30.7,
11  right.
12    Q.  I appreciate that -- that precision.
13  So let me restate the question.
14      According to the audited financial
15  statements, Highland had loaned in the aggregate
16  $30.7 million to NexPoint, correct?
17    A.  Yes.
18    Q.  Okay.
19      And what if I told you that NexPoint
20  took that money and they invested it and they
21  turned that money into $100 million, would that be
22  a benefit to Mr. Dondero if you assume that he
23  owned and controlled the entity?
24    A.  Well, it's certainly -- he made a wise
25  investment with his $30 million loan for sure.

ALAN JOHNSON
Page 159

2    Q.  And would you agree that Highland
3  enabled him to make that wise investment by giving
4  him the loan?
5    A.  They facilitated it, but it depends
6  what the terms of the loan are and -- so, yes, he
7  would have benefited from his wise investment, and
8  they would have facilitated him doing that by
9  loaning the $30 million.
10    Q.  And NexPoint didn't go into the
11  marketplace to negotiate for a loan with a third
12  party, right?
13    A.  That, I don't know.
14    Q.  Well, they took the loan from
15  Highland, correct?
16    A.  It already had loans, right, from
17  Highland, yes.
18    Q.  And you understood that Mr. Dondero
19  controlled both NexPoint and Highland at the time,
20  correct?
21    A.  Yes.
22    Q.  Okay.
23      And so is it fair to say based on your
24  experience and expertise that Highland used --
25  withdrawn.

ALAN JOHNSON
Page 160

2      Is it based -- is it fair based on
3  your knowledge and expertise that Mr. Dondero used
4  Highland to increase the value of its affiliated
5  companies by providing it with capital?
6      MR. AIGEN:  Objection to form.
7    A.  Yeah, I don't -- I guess I would be
8  uncomfortable -- I'm not sure I understand the
9  question.  I'm sorry.
10    Q.  Okay.
11      You did not -- your report and your
12  opinions -- withdrawn.  Let me take this simply.
13      Your conclusion in your report is that
14  Mr. Dondero had earnings from Highland of
15  approximately $3 million for the 7 years prior to
16  the petition date; correct?
17    A.  That's right, from the -- from the --
18  yes, from the various entities, yes.
19    Q.  And based on your analysis of
20  comparable executives, you believe he should have
21  been earning $6 million for each of those seven
22  years, correct?
23    A.  Yes, that is correct.
24    Q.  And the difference between the two
25  equals $3 million for seven years, or $21 million.

ALAN JOHNSON
Page 161

2      Do I have that right?
3    A.  Yes.
4    Q.  And you calculated that based solely
5  on certain W-2 income, correct?
6    A.  W-2s and I think, also, with the
7  1040s, I believe, but yeah, it was the W-2s.
8    Q.  So you did not take into account, for
9  example, any benefit that Mr. Dondero received by
10  using Highland's capital to support his affiliated
11  companies, correct?
12      MR. AIGEN:  Objection, form.
13    A.  We did not take into account any
14  ownership -- using the ownership capital either
15  for him or for anybody else, that's correct.
16    Q.  And you didn't try to quantify the
17  benefit to Mr. Dondero from using Highland's
18  capital to support his affiliated companies,
19  correct?
20    A.  We made no attempt to -- to do it for
21  him or for anybody else we might have thought of
22  as comparable executives, that's correct.
23    Q.  Would you -- would you agree with me
24  that it was a benefit to Mr. Dondero to have
25  access to Highland's capital for the purpose of

Page 162

ALAN JOHNSON

1
2 supporting his affiliated companies?
3        MR. AIGEN:  Objection, form.
4        A.  He – he benefited from having
5 significant capital – he certainly benefited as
6 an owner from something significant capital,
7 absolutely.
8        Q.  Okay.
9            And how would you – how would you
10 describe that benefit?
11        A.  Well, he would get returns on the
12 capital.  Either through loans or direct
13 investments as the owner of both Highland and
14 NexPoint, he would benefit from their successes
15 and, of course, lose from their failures.
16        Q.  Are you aware of any failures?
17        A.  In getting these financials, there
18 were a couple of years that were terrible.  There
19 were some outstanding years, so it varied during
20 this period.
21            So there were certainly a couple of
22 years with very disappointing results.
23        Q.  And which entity are you referring to
24 that had those disappointing results?  Was that
25 Highland?

Page 163

ALAN JOHNSON

1
2        A.  I believe – I believe – I believe it
3 was Highland as well, yes.
4        Q.  And do you think that when a company
5 fails, that that's a factor that a decision maker
6 should take into account when deciding whether or
7 not to forgive loans?
8            Is that part of the financial
9 condition that we described earlier?
10        A.  Absolutely, the condition of the
11 company, it's both income, capital, and the
12 importance of achieving those goals as part of
13 forgiving absolutely should be considered.
14            MR. MORRIS:  I've forgotten if I've
15 gone through 2017 yet.
16            Does anybody recall?
17            All right.  We'll do it again.
18            MS. CANTY:  This is 2017 on the
19 screen.
20            MR. MORRIS:  Right.  But I have – all
21 right.  I'll just do it again then.
22            Michael starts objecting as asked and
23 answered, I'll get the hint.
24        Q.  Mr. Johnson, take a look at the first
25 paragraph.

Page 164

ALAN JOHNSON

1
2            Do you see that that – under the
3 section "Notes and Other Amounts Due From
4 Affiliates," describes loans between Highland and
5 HCMFA in 2017?
6        A.  Yes.
7        Q.  Is there anything in that paragraph
8 that states or suggests that Highland agreed to
9 forgive in whole or in part any loan it ever
10 extended to HCMFA?
11        A.  No.
12        Q.  Looking at the next paragraph, next
13 point, do you see that the next paragraph concerns
14 loans that Highland extended to NexPoint?
15        A.  Yes.
16        Q.  Is there anything in that paragraph
17 that states or suggests that Highland has agreed
18 to forgive in whole or in part any note that it
19 ever – any loan it ever extended to NexPoint?
20        A.  No.
21        Q.  All right.
22            Looking at the next paragraph, do you
23 see the next paragraph describes loans between
24 Highland and HCRE Partners, LLC?
25        A.  Yes.

Page 165

ALAN JOHNSON

1
2        Q.  Is there anything in that paragraph
3 that states or suggests that Highland has agreed
4 to forgive in whole or in part any loan it ever
5 extended to HCRE Partners, LLC?
6        A.  No.
7        Q.  The next paragraph relates to loans
8 between Highland and Highland Capital Management
9 Services, Inc.
10            Do you see that?
11        A.  Yes.
12        Q.  Is there anything in that paragraph
13 that states or suggests that Highland has agreed
14 to forgive in whole or in part any loan it ever
15 extended to Highland Capital Management Services,
16 Inc.?
17        A.  No.
18        Q.  The next paragraph relates to
19 Mr. Dondero.
20            Do you see that?
21        A.  Yes.
22        Q.  And do you see that it states that
23 Mr. Dondero didn't obtain any new loans from
24 Highland in 2017?
25        A.  Yes.

**Page 166**

ALAN JOHNSON

1
2  Q.  And do you see that –
3     MR. MORRIS:  Michael, I'm boring you,
4  because you should be asking as asked and
5  answered because there's that $14.5 million
6  number that I know Mr. Johnson wrote down,
7  right?  So we have done this before.  Okay?
8     Let's go to the 2018 audited
9  financials.
10    MS. CANTY:  This is Exhibit 34.
11    MR. MORRIS:  Thank you very much.
12    (Exhibit 34, Highland's audited
13  financial statements for December 31, 2018,
14  was marked for identification at this time.)
15    MR. MORRIS:  And if we can go to the
16  first page.
17 BY MR. MORRIS:
18    Q.  Do you see that this is a – the first
19  page of Highland's audited financial statements
20  for the period ending December 31, 2018?
21    A.  Yes.
22    MR. MORRIS:  Before we go to – before
23  we go to the affiliate loans, can we just
24  turn to the -- I think it's the first
25  substantive page, the balance sheet.

**Page 167**

ALAN JOHNSON

1
2     Yes, stop right there.
3  Q.  Do you see that – do you see the balance
4  sheet, sir?
5  A.  Yes.
6  Q.  Do you see that near the bottom
7  there's a line item showing notes and other
8  amounts due from affiliates?
9  A.  Oh, yeah – I'm sorry – yes.
10 Q.  And do you see that Highland has
11 carried on its balance sheet $173.4 million in
12 notes and other amounts due from affiliates?
13 A.  Yes.
14 Q.  Do you understand that the affiliates
15 are owned and controlled by Mr. Dondero?
16 A.  Owned and controlled?  I think
17 Mr. Okada owned some of – he certainly controlled
18 them.  I don't know if he had 100 percent
19 ownership of all of them.  He certainly controlled
20 the affiliates we're talking about.
21 Q.  At the time that you prepared your
22 report, did you know that Highland's affiliates
23 owed it $174 million as of the end of 2018?
24 A.  I don't think I was aware of that, no.
25 Q.  Is that a fact that you would have

**Page 168**

ALAN JOHNSON

1
2  wanted to be aware of before you prepared your
3  report?
4  A.  I'm not sure.  I'm not sure.
5  Q.  Well, I think you testified that if
6  you were advising a decision maker, you would
7  advise them to try to obtain as much information
8  as they could concerning any loans that had been
9  extended by the employer to or for the benefit of
10 the executive, correct?
11 A.  That is correct.
12 Q.  And is there any reason for you to
13 believe that this $173.4 million didn't relate to
14 loans that were made by the employer to or for the
15 benefit of the executive and Mr. Okada?
16    MR. AIGEN:  Objection, form.
17 A.  Yeah, I don't – at least that
18 174 million would say they're notes from
19 affiliates, but the affiliates is also the
20 businesses.
21    So I'm not – I certainly would want
22 to be aware of that.  Whether it would have
23 changed my report, I'd have to – I'd have to
24 think about.
25 Q.  Okay.

**Page 169**

ALAN JOHNSON

1
2     But you weren't told about the
3  totality of the loans, correct?
4  A.  I did not know the totality, no.
5  Q.  Did you know that more than 15 percent
6  of Highland's assets were tied up in notes and
7  other amounts due from affiliates?
8     MR. AIGEN:  Objection, form.
9  A.  I did not know that.
10 Q.  Is that a fact that you would have
11 liked to have known about before you issued your
12 report?
13 A.  As I answered before, I'm not sure.
14 I'm not sure.
15 Q.  Do you think this is a fact that the
16 decision maker should have known about before he
17 or she entered into the forgiveness agreement?
18 A.  I think – as I testified before, I
19 think the decision makers certainly understand the
20 totality of the loans that are potentially being
21 forgiven, absolutely.
22 Q.  Do you think the decision maker could
23 have done his or her job without knowing that the
24 employer had extended over $173 million to the
25 executive before entering into the agreement?

Page 170

1               ALAN JOHNSON
2      MR. AIGEN:  Objection, form.
3      A.  Well, I think – at least I
4  understand, the way it's stated here in the
5  financials, those are to the businesses.
6      So I think the – a decision maker
7  should know, you know, the totality of the loans
8  being forgiven and the decision maker probably
9  should have some idea of the various – as I
10  testified earlier, about the financial condition
11  of the company, which would include these notes
12  from affiliates.
13      MR. MORRIS:  Let's – can we scroll
14  down a page or two?
15      Okay.  Stop right – a little
16  further – no, go to the top of this page.
17      Q.  Do you see that this page is the
18  consolidated income statement?
19      A.  Yes.
20      Q.  And you're familiar with income
21  statements.  Is that right?
22      A.  Yes.
23      MR. MORRIS:  Okay.  Can we go to the
24  bottom, please?
25      Q.  Do you see that in the year before

Page 171

1               ALAN JOHNSON
2  bankruptcy, the net loss attributable to Highland
3  was more than $73 million, at the bottom of the
4  page?
5      A.  Yes.
6      Q.  Is that a fact that you knew of at the
7  time that you prepared your report?
8      A.  I did not.
9      Q.  Is that a fact that you would have
10  liked to have known about before you prepared your
11  report?
12      A.  I would have liked to have seen all of
13  these financial statements before I prepared my
14  report, absolutely.
15      Q.  Is the fact that Highland lost
16  $73 million in 2018 relevant to your analysis at
17  all?
18      A.  I'd have to think about it, but I
19  certainly would have wanted to know about it.
20      Q.  And you were told by Mr. Dondero that
21  the forgiveness agreement was entered into in
22  either December of 2018 or January or February of
23  2019, correct?
24      A.  It's in my report.  I can't remember
25  if it was late '17 or '18 or late '18 and '19.

Page 172

1               ALAN JOHNSON
2  Sitting here, I don't recall which, but it was
3  told a time frame.  It was either late one year or
4  early the next.  I don't recall the –
5      Q.  We're not going to put it back up on
6  the screen, but I'll just try to refresh your
7  recollection that on page 6 of your report, you
8  had stated, "I understand from Mr. Dondero that
9  the 2018 loans that are the subject of this suit
10  were modified by an agreement in late 2018 or
11  early 2019."
12      Does that refresh your recollection as
13  to the timing of the purported agreement that was
14  described to you?
15      A.  Yes, I think that's right, yep.
16      Q.  And do you understand that this
17  $74 million loss relates to the period ending in
18  December 2018?
19      A.  Yes.
20      Q.  And do you think the decision maker
21  should have known about the financial condition of
22  the company when he or she entered into the
23  agreement on behalf of Highland in late 2018 or
24  early 2019?
25      A.  The decision maker should have had an

Page 173

1               ALAN JOHNSON
2  idea about the condition of the company,
3  absolutely.
4      Q.  Do you have any reason to believe that
5  the decision maker had any information about the
6  financial condition of the company before agreeing
7  on behalf of Highland to enter into a forgiveness
8  of loans with the potential value of 40 to
9  $50 million?
10      A.  I have no information about that.
11      MR. MORRIS:  Can we go back to the
12  balance sheet for a second?
13      Q.  Do you see how the assets exceed the
14  liabilities and there's partners' capital of about
15  $371 million?
16      A.  Yes.
17      Q.  That partners' capital assumes that
18  the value of the notes and other amounts due and
19  affiliates equals $173.4 million, correct?
20      A.  That's one of the assumptions, right,
21  yes.
22      Q.  And there's nothing on the balance
23  sheet that discloses potential litigation
24  liability, correct?
25      A.  No, there's nothing on here, on the

Page 174

ALAN JOHNSON

1         ALAN JOHNSON
2  balance sheet, no.
3       Q.   Did anybody ever give you any
4  information about potential litigation risk that
5  Highland faced in 2018 and '19?
6       A.   I think in preparing my report, I was
7  aware of litigation around this company.  I think
8  there had been an arbitration award that was
9  outstanding, so I was aware of any significant
10  litigation risk and litigation expenses ongoing.
11  I was aware of that.
12      Q.   Okay.
13          So is it fair to say that the
14  statement of partners' capital on this page, to
15  the best of your knowledge, assumes the recovery
16  in full -- assumes, among other things, the
17  recovery in full of the notes and other amounts
18  due from affiliates in the amount of
19  $173.4 million?
20      A.   That's one of the assumptions that
21  goes into this balance sheet, yes.
22      Q.   And is it fair to say that the
23  statement of partners' capital doesn't take into
24  account at all litigation risk?
25          MR. AIGEN:  Objection, form.

Page 175

ALAN JOHNSON

1         ALAN JOHNSON
2       A.   That, I don't know.  I don't know what
3  PwC would have done with the litigation risk.
4          But if we're just looking at the line
5  items here, I don't see a reserve for litigation,
6  but that might be in the footnotes or so forth.
7  But as written here, the balance sheet seems to
8  suggest that there is no -- there's nothing on
9  here for litigation risk.
10      Q.   Okay.
11          MR. MORRIS:  Can we go to page -- I
12  think it's 28.
13      Q.   Amount -- you see, "Notes and Other
14  Amounts Due From Affiliates"?
15      A.   Yes.
16      Q.   There's notes from HCMFA.
17          Do you see that?
18      A.   Yes.
19      Q.   We'll just do it the same way.
20          Can you take a look at that paragraph
21  and let me know if you see anything in there that
22  states or suggests that Highland agreed to forgive
23  in whole or in part any loan it ever extended to
24  HCMFA?
25      A.   I don't see that, no.

Page 176

ALAN JOHNSON

1         ALAN JOHNSON
2       Q.   Okay.
3          Same question for the next paragraph,
4  can you tell me if you see anything in the second
5  paragraph that states or suggests that Highland
6  has agreed to forgive in whole or in part any loan
7  it ever extended to NexPoint?
8       A.   I don't -- I don't see that there
9  either.
10      Q.   Next paragraph, is there anything in
11  the next paragraph that states or suggests that
12  Highland has agreed to forgive in whole or in part
13  any loan it ever extended to HCRE Partners?
14      A.   No, I don't see that.
15      Q.   The next paragraph, is there anything
16  in the next paragraph that states or suggests that
17  Highland has agreed to forgive in whole or in part
18  any note it ever extended to Highland Capital
19  Management Services, Inc.?
20      A.   No, I don't see that.
21      Q.   And do you see that with respect to
22  these four paragraphs, each of them still contains
23  as its last sentence the statement that the fair
24  value of the partnership's outstanding notes
25  receivable approximates the carrying value the

Page 177

ALAN JOHNSON

1         ALAN JOHNSON
2  notes receivable?
3       A.   Yes.
4       Q.   So this is as late as -- for the
5  financial statements that are dated as of -- I'm
6  sorry.
7          This is -- these statements refer --
8  withdrawn.
9          These statements concern Highland's
10  audited financial statements for the period ending
11  December 31, 2018, correct?
12      A.   Yes.
13      Q.   Okay.  Let's continue to scroll down.
14          Do you see there's a reference to Jim
15  Dondero having issued new promissory notes for
16  $14.9 million in 2018?
17      A.   Yes.
18      Q.   Okay.  So if you add the 14.9 with the
19  14.5 that was due -- if you could write this
20  down -- at the end of 2018, that would be a total
21  of $29.4 million.
22          Do I have that right?
23      A.   I believe that's right, yes.
24      Q.   Okay.
25          But at the end of the year, he

**Appx. 02002**

Page 178

ALAN JOHNSON

1   actually owed just a hair less than that,
2   $29.2 million.
3       Do you see that?
4   A.   Yes.
5   Q.   Okay.
6       Is it fair to conclude that at some
7   point in 2018, Mr. Dondero made a modest payment
8   of principal and interest against the loans that
9   were outstanding to Highland?
10      MR. AIGEN:  Objection, form.
11  A.   That – that appears what's going on,
12  yes.
13  Q.   And there's certainly nothing in this
14  paragraph that states or suggests that Highland
15  agreed to forgive in whole or in part any loan it
16  ever extended to Mr. Dondero, correct?
17  A.   That's right.
18  Q.   And the next paragraph again relates
19  to Mr. Okada.
20      Do you see that?
21  A.   Yes.
22  Q.   And there's nothing in that paragraph
23  that states or suggests that Mr. Okada had – had
24  reached an agreement with Highland on the

Page 179

ALAN JOHNSON

1   forgiveness of any loan extended to him in whole
2   or in part?
3   A.   That's correct.
4       MR. MORRIS:  Okay.  Can we go down to
5   the next page, please.
6   Q.   Okay.  And then you have the same
7   statement about Dugaboy and the contribution
8   agreement.
9       Do you see that?
10  A.   Yes, I see it.
11  Q.   Is there anything in either paragraph
12  that states or suggests that Highland has agreed
13  to forgive in whole or in part any loan it ever
14  extended to Dugaboy or pursuant to – in
15  connection with the contribution agreement?
16  A.   No.
17  Q.   Okay.
18      Are you familiar with the concept of
19  subsequent events?
20  A.   Sure.
21  Q.   And what's your understanding of the
22  concept of subsequent events for purposes of
23  audited financial statements?
24  A.   In the footnotes, often they'll talk

Page 180

ALAN JOHNSON

1   about events that happen shortly after the end of
2   the fiscal year and before the reports or things,
3   and usually, they'll appear in the footnotes and
4   talk about events that a shareholder should be
5   aware of that have happened following the
6   financial year end and the issues of the
7   financials.
8   Q.   It's not just the shareholders, it's
9   anybody who uses or relies on the financial
10  statements should have that information.  Is that
11  fair?
12      MR. AIGEN:  Objection.
13  A.   Anybody who – yeah, well said, anyone
14  who relies on it, the subsequent event is
15  material – is material enough that you should
16  be – you she take into account and be aware of.
17  Q.   Now, if Mr. Dondero had entered into
18  the forgiveness agreement in late 2018, would you
19  have expected it to have been described in the
20  section that we just looked at?
21      MR. AIGEN:  Objection, form.
22  A.   I would hope it would show up in the
23  reported financials.  I would hope that would
24  happen, yes.

Page 181

ALAN JOHNSON

1   Q.   Why is it your hope that it would
2   happen?
3   A.   Well, as I testified earlier, I
4   recommend to clients, and sometimes they follow,
5   to document things in writing, and if it's in
6   writing, it would usually or hopefully would show
7   up in the audited financial statements.
8   Q.   Would you always recommend your client
9   to inform its auditors of any agreement relating
10  to the forgiveness of loans made to executives?
11      MR. AIGEN:  Objection, form.
12  A.   I would certainly recommend – if it
13  was an issue, I would certainly recommend to
14  clients that they report to the finance team,
15  which would then talk to the auditors, about how
16  to disclose material loans to executives and if
17  they were going to be forgiven.
18      MR. MORRIS:  Okay.  Can we scroll
19  down – I apologize, I don't know the page
20  number, but there's a section of this report
21  concerning subsequent events.
22      Okay.  Right there.
23  Q.   Do you see on page 38 of Highland's
24  2018 audited financials there's Section 15

Page 182

```
1              ALAN JOHNSON
2   entitled, "Subsequent Events"?
3       A.  Yes.
4          MR. MORRIS:  Okay.  If we could just
5   show Mr. Johnson that portion and continue
6   on to page 39.
7       Q.  Okay.  And do you see -- now that
8   you've got the whole section on the screen, do you
9   see in the next-to-the-last paragraph there's a
10  reference to HCMFA having issued promissory notes
11  to the partnership in the aggregate amount of
12  $7.4 million during the course of 2019 through the
13  date of the report?
14      A.  Yeah, yes.  Yes, I see that.
15      Q.  Is it your understanding with 30 years
16  in the industry that the auditors would require
17  the disclosure of material transactions that occur
18  after the date of the report but prior to its
19  issuance?
20         MR. AIGEN:  Objection, form.
21      A.  I'm not familiar with the exact
22  accounting rules of what qualifies as subsequent
23  event, but my expectation would be that material
24  events that occurred after the end of the year
25  would be disclosed in a section like this before
```

Page 183

```
1              ALAN JOHNSON
2   the financials came out.
3       Q.  If Mr. Dondero had entered into his
4   forgiveness agreement in early 2019, would you
5   have expected that agreement to have been
6   disclosed in the subsequent event section of the
7   audited financial report?
8          MR. AIGEN:  Objection, form.
9       A.  As I said earlier, I would hope it
10  would be -- I would hope that it would be
11  documented and I would hope that if it was -- in
12  this case, was significant, that it would have
13  been informed and probably shown up in a section
14  like this.
15      Q.  But you don't see it show up in a
16  section like this, do you, sir?
17      A.  I don't see it here, no.
18         MR. MORRIS:  Can we go to the, I
19  think, second or third page of the document?
20         Yeah, the signature page, yeah.
21      Q.  Do you see that that's
22  PricewaterhouseCoopers' signature on the audited
23  financial report for the period ending
24  December 31, 2018?
25      A.  You mean, '19 -- nor '18 -- I'm
```

Page 184

```
1              ALAN JOHNSON
2   sorry -- yes, I see PwC.
3       Q.  Right.
4          And do you see it's dated June 3,
5   2019?
6       A.  Yes.
7       Q.  And is it your understanding that the
8   subsequent event section covers the period
9   January 1, 2019 until June 3, 2019?
10      A.  I'm not -- again, I'm not an expert on
11  exactly the timing of the subsequent events, but
12  it -- it would have -- it covers some of the
13  period -- some or all the period before they
14  issued.  I don't know when they have a cutoff, but
15  it covers certainly at period after the end of the
16  year before these are finalized.
17      Q.  Okay.  So just to shift gears -- you
18  can take this down, please.
19         Just a few more questions and we will
20  have a short break for lunch, and I hope I won't
21  have a lot more after that, just to give you a
22  sense of where we are.
23         We just saw, based on the 2018 audited
24  financials, that as of the end of that year,
25  Mr. Dondero had loans outstanding of approximately
```

Page 185

```
1              ALAN JOHNSON
2   $29.4 million, at least according to the audited
3   financial statements, right?
4       A.  I think that's true from Highland.  I
5   don't know if that included the different
6   affiliates, but I think that's an accurate figure
7   from Highland.
8       Q.  And do you understand that Mr. Dondero
9   has borrowed money from other affiliates as well?
10      A.  I believe that's true, yes.
11      Q.  Do you have any understanding of the
12  magnitude of his borrowing from those affiliates?
13      A.  I believe in this case there's, I
14  believe, something like 40 to $50 million at
15  stake, but I don't know the interplay of the
16  different -- the different amounts.
17      Q.  Just maybe I'm confused, but are you
18  talking about the money loaned from Highland to
19  affiliates or are you talking about money loaned
20  from affiliates to Mr. Dondero?
21      A.  I -- Mr. Dondero owes -- that he owes,
22  if I'm phrasing it correctly.
23      Q.  All right.  Look, I don't want to
24  confuse this, so let's try and keep this simple.
25         We just saw in the 2018 audit report
```

Page 186

ALAN JOHNSON

1
2  that as of the end of the year, he personally had
3  obligations to Highland of $29.4 million, right?
4      A.   Yes.
5      Q.   Okay.
6           And there was nothing in the audited
7  financial statements that suggested that any
8  portion of that was subject to forgiveness,
9  correct?
10     A.   That's correct.
11     Q.   Okay.
12          And you're aware that Highland was a
13  debtor in bankruptcy.  Is that right?
14     A.    It went into bankruptcy.  I don't
15  recall the date of the filing, but it certainly
16  went into bankruptcy.
17     Q.   Did you -- did you -- do you know --
18  are you aware that it filed for bankruptcy in
19  October of 2019.
20     A.   That's the time frame.  That's what I
21  believed, yes.
22     Q.   Just a few months after
23  PricewaterhouseCoopers signed off on the 2018
24  audit, right?
25     A.   Yes.

Page 187

ALAN JOHNSON

1
2      Q.   Do you know if Mr. Dondero or anyone
3  acting on his behalf ever informed the bankruptcy
4  court that some or all of the loans were subject
5  to forgiveness?
6      A.   That, I don't know.
7      Q.   Did you -- did you ask anybody?
8      A.   No.
9      Q.   If you were advising a client -- if
10  you were advising a debtor in bankruptcy -- no --
11  withdrawn.
12          If you were advising the maker of
13  certain notes that were held by a debtor in
14  bankruptcy, would you advise that client to tell
15  the Court of any agreements that existed that --
16  pursuant to which the notes might be forgiven?
17          MR. AIGEN:  Objection, form.
18     A.   I would certainly -- if it wasn't
19  obvious already, I would have certainly advised
20  the client to inform whoever if there are terms
21  that would be favorable to them, absolutely.
22     Q.   And why would you do that?
23     A.   Well, if I was an executive or an
24  entity that had forgiveness provisions that might
25  benefit me and someone else who's not a banker or

Page 188

ALAN JOHNSON

1
2  bankruptcy judge wasn't aware of it, I would
3  suggest that they inform them rapidly that these
4  favorable provisions were in place.
5      Q.   Can you think of any reason why the
6  executive wouldn't disclose the favorable
7  provisions that were in place?
8          MR. AIGEN:  Objection, form.
9      A.   Having seen some bankruptcies, I think
10  people forget, people make bad decisions.  In the
11  chaotic situations that happen, people often
12  ignore things.  But I -- the most logical one
13  would be the confusion or chaos.
14     Q.   Let me give you a hypothetical:
15  There's an executive who owes a bankrupt entity
16  $30 million in its individual capacity, and the
17  debtor discloses in its disclosure statement and
18  its plan of reorganization its intention to
19  collect that $30 million as part of its plan of
20  reorganization.
21          If the executive doesn't stand up and
22  say, Hold your horses, I've got an agreement
23  pursuant to which those notes might be forgiven,
24  and only makes that disclosure after litigation is
25  commenced, in your experience as an executive

Page 189

ALAN JOHNSON

1
2  compensation consultant, would you question
3  whether there was really an agreement in the first
4  place?
5          MR. AIGEN:  Objection, form.
6      A.   Of course I would question it, and I
7  often question clients about decisions that I
8  wished they hadn't made, but yeah, certainly, I
9  would question it.
10     Q.   And what if you knew in the
11  hypothetical that the individual was represented
12  by multiple law firms, would that cause you to
13  question it even further?
14          MR. AIGEN:  Objection, form.
15     A.   No, I would expect in a situation like
16  that, he would be represented by a bunch of law
17  firms, but I would certainly question that.  It
18  seems convenient.  That doesn't mean it's not
19  true, though, which I often find clients that make
20  very unfortunate decisions, so -- but I would
21  certainly question it.
22     Q.   Okay.  Just a few more questions
23  before we break.
24          So we spent a lot of time, and I
25  really appreciate your patience, Mr. Johnson,

Appx. 02005

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-14    Filed 01/24/... Page 26 of 198    PageID 23241
Appendix    Part 2    age 109/24 of 1336

Page 190

ALAN JOHNSON

1 going through many of Highland's audited financial
2 statements, but I just want to know, with the
3 caveat that you're relying on only what I showed
4 you, with that caveat, would you agree with me
5 that based on our review Highland has not forgiven
6 a loan to anyone in the world since around 2009?
7 A. Yeah, that's what it appeared from the
8 financials, I guess.
9 The only thing that makes me pause is
10 I'd want to look at the -- again, the similar
11 documents for the affiliates and see if there's
12 stuff in there as well. But in the documents that
13 you showed, that appeared to be, you know, what is
14 recorded in these financials.
15 Q. And Highland -- the -- Highland
16 capital Management, L.P. is the only payee on the
17 notes that you're aware of, correct?
18 A. I believe so. I believe that's right.
19 Q. And Highland Capital Management, L.P.
20 was the only entity that was in bankruptcy. Is
21 that right?
22 A. I believe that's right.
23 MR. AIGEN: Objection to form.
24 Q. And you're not aware that Highland has

Page 191

ALAN JOHNSON

1 an ownership interest in any of the makers under
2 any of the notes at issue here, correct?
3 A. That, you're getting -- I'm not sure I
4 understand -- ownership -- that, I don't know.
5 Q. Okay. Okay.
6 But we can agree that, based at least
7 on Highland's audited financial statements, you're
8 comfortable concluding that Highland hasn't
9 forgiven a loan to anybody or any entity since
10 2009, correct?
11 A. That's the only thing, and the things
12 you showed me have been disclosed, that's right.
13 Q. And based on what I showed you, you're
14 comfortable in concluding that the largest loan
15 that Highland ever forgave was $500,000. Is that
16 fair?
17 A. That's what it appears, that's right.
18 Q. Okay.
19 And based on what I showed you, you're
20 comfortable excluding that Highland has never
21 forgiven a loan to Mr. Dondero, correct, or at
22 least through 2008?
23 A. And as reported in the financials,
24 that appears to be correct, yes.

Page 192

ALAN JOHNSON

1 Q. And based on the information that I've
2 given you and the financials that we looked at,
3 you're comfortable concluding that at no time
4 since at least 2008 has Highland ever forgiven in
5 whole or in part any loan that it ever extended to
6 any affiliate, right?
7 MR. AIGEN: Objection to form.
8 A. That's -- that's what's in the
9 financials, yes.
10 MR. MORRIS: Okay. So it's 1 o'clock.
11 Let's break until 1:30. And I hope, you
12 know, I have another 60 or 90 minutes.
13 Thank you very much.
14 (Luncheon recess taken from 1:02 p.m.
15 until 1:32 p.m.)

Page 193

ALAN JOHNSON

1 A F T E R N O O N   S E S S I O N
2 (Time noted: 1:32 p.m.)
3 BY MR. MORRIS:
4 Q. Good afternoon, Mr. Johnson.
5 A. Hello.
6 Q. Did you speak with anybody during the
7 break about the substance of your testimony today?
8 A. No.
9 MR. MORRIS: Okay. I'd like to put up
10 on the screen a document that has been
11 premarked as Exhibit 70 -- you know what, I
12 apologize, not 70, 73.
13 (Exhibit 73 Exhibit 73, Demonstrative,
14 was marked for identification at this time.)
15 BY MR. MORRIS:
16 Q. Mr. Johnson, are you able to view the
17 document that's been premarked as Exhibit 33
18 that's up on the screen?
19 A. Yes. Yes, I can.
20 Q. So I'm going to represent to you that
21 this is a -- this is what we call a "demonstrative
22 exhibit," right?
23 This isn't a document that was
24 prepared in the ordinary course of business. It's

Page 194

ALAN JOHNSON

1      a summary of other information that we've produced
2   in this litigation, and I will represent to you
3   that we have produced in this litigation, among
4   other things, bank statements that show the
5   transfer of money on behalf of Mr. Dondero against
6   a couple of outstanding notes.
7          And, you know, Mr. Dondero's counsel
8   can, you know, take the documents that were
9   produced with this to make sure that it's
10  accurate, but I believe it to be accurate, and I
11  just want to ask you some questions about this --
12  about the information that's contained in this
13  document.
14         I assume you've never seen this
15  before, right?
16     A.   I don't -- I may have seen something
17  similar.  I don't believe I've seen this exact
18  thing, no.
19     Q.   Were you -- do you remember before we
20  looked back and there was that $14.9 million loan
21  that was reflected in the -- in the financials?
22     A.   Yes.
23     Q.   And I'll represent to you that's
24  what's the restructured note in Column C and D.

Page 195

ALAN JOHNSON

1          Do you see that?
2      A.   Yes.
3      Q.   Okay.
4          And do you recall from the financials
5   that in 2018, Mr. Dondero had borrowed an
6   additional $14 million and change?
7      A.   Yes.
8      Q.   Okay.
9          I'll represent to you that the
10  January 18, 2018 note in the principal amount of
11  $7.9 million was among the new loans that he
12  obtained in 2018.
13         Were you ever informed that in 2017,
14  '18, and '19, Mr. Dondero was making payments of
15  principal and interest due on loans that he had
16  obtained from Highland?
17     A.   I don't think I discussed that with
18  anybody.  I think I had noticed that -- these loan
19  amounts changing around, that something was going
20  on in terms of payment, but I don't think I
21  discussed that with anybody.
22     Q.   Before completing your report, would
23  you have liked to have known about Mr. Dondero's
24  payment history, if any?

Page 196

ALAN JOHNSON

1      A.   Yeah, that would have been something I
2   would have liked to have known, yes.
3      Q.   Because that would relate to the whole
4   concept of whether or not there was a prior course
5   of forgiveness.  Is that right?
6      A.   I would -- yeah, that would have
7   been -- that would have been helpful to know.
8      Q.   I mean, it's -- you wouldn't dispute
9   that if, in fact, this chart is correct and
10  Mr. Dondero was making payments in 2017, '18, and
11  '19 against those notes, that those notes were not
12  likely to be subject to any forgiveness agreement,
13  correct?
14         MR. AIGEN:  Objection, form.
15     A.   As I testified before, you could have
16  a loan forgiveness that you would make payments
17  on.  It really would depend on the circumstances
18  and what you thought the probability of the
19  forgiveness happening, but answering your
20  question, yes, I would have liked to have known
21  about this.
22     Q.   According to this chart, if you just
23  focus -- you see the Column G, "Total Received in
24  Respect of Retired Notes"?

Page 197

ALAN JOHNSON

1      A.   Yes.
2      Q.   Okay.
3          And do you see the total is
4   approximately $23.7 million?
5      A.   Yes.
6      Q.   If you exclude the first three
7   payments that were made in 2017 and '18, they
8   total about $3.3 million or $3.4 million.
9          Is my math roughly correct?
10     A.   Yes, it looks that way.
11     Q.   Okay.
12         So is it fair then to just -- if you
13  deduct that from the total, to say that
14  Mr. Dondero made principal and interest payments
15  against those two notes in 2019 in excess of
16  $20 million?
17     A.   That looks correct, yes.
18     Q.   Okay.
19         Now, do you see the last payment was
20  made, if you look at the Row 16, on December 23,
21  2019?
22     A.   Yes.
23     Q.   Okay.
24         And do you understand that that's

Page 198

ALAN JOHNSON

1          ALAN JOHNSON
2  after the petition date?
3      A.   Yes, that would be.
4      Q.   And according to this chart anyway, in
5  Column B, the payment that was made on that date
6  was approximately $783,000?
7      A.   Yes.
8      Q.   And that money was applied to
9  outstanding principal and interest that was due
10  under the January 18, 2018 note.
11          Do you see that?
12      A.   Yes.
13      Q.   Okay.
14          And do you see how the principal
15  balance of $7.9 million was paid exactly as of
16  December 23, 2019?
17      A.   I'm sorry, I don't understand.  The
18  7.9 was --
19      Q.   Was the principal amount of the note,
20  right?
21          And I'll represent to you that the
22  January '18 note was given by Mr. Dondero to
23  Highland in exchange for 17. -- for a $7.9 million
24  loan on the same day.  Okay?
25      A.   Okay.

Page 199

ALAN JOHNSON

1          ALAN JOHNSON
2      Q.   And do you see in Column G, it shows
3  that once the portion of the payment was applied
4  to the January 2018 note, the total that was
5  applied was about 319,000 and change?
6      A.   Yes.  Okay.
7      Q.   And then there's an asterisk in
8  Column H next to that total received on that date.
9          Do you see that?
10      A.   Yes.
11      Q.   Okay.
12          And if you look at the footnote, it
13  says the difference between the total paid on
14  December 23, 2019 and the amount applied to the
15  January 18, 2018 note was applied in three
16  different ways.
17          Do you see that?
18      A.   Yes.
19      Q.   And do you see that it was applied
20  against principal and interest due on three other
21  notes that Mr. Dondero took in 2018?
22      A.   Yes.
23      Q.   Were you aware, until I showed you
24  this, that Mr. Dondero had made payments of
25  principal and interest against the notes that he

Page 200

ALAN JOHNSON

1          ALAN JOHNSON
2  contends are subject to the forgiveness agreement?
3      A.   I don't think I was aware of that.
4      Q.   Is that a fact that you would have
5  liked to have known before you completed your
6  report?
7      A.   I would have probably liked to have
8  known that, yes.
9      Q.   And why is that?
10      A.   The statement I made in the report
11  around the practice of the company to forgive
12  loans, I would have had to perhaps rethought that.
13  This would have been -- this would have been
14  information that I would have liked to have known,
15  yes.
16      Q.   In fact, this page shows that, you
17  know, if we exclude the payment made in late 2017,
18  from December 2018 to December 2019, Mr. Dondero
19  paid approximately $23-and-a-half million again
20  principal and interest due on 5 different notes.
21          Have I characterized that fairly based
22  on this chart?
23      A.   I think you may have double counted in
24  your arithmetic, but the point is he made
25  significant payments against principal and

Page 201

ALAN JOHNSON

1          ALAN JOHNSON
2  interest.
3      Q.   Okay.  I don't want to double count.
4  Let me try and do it again.
5          Do you see the total Dondero payment
6  amount in Column B is $24.143 million.
7      A.   Yes.
8      Q.   If we simply deduct from that
9  $677,000, do you come out to roughly
10  $23-and-a-half million?
11      A.   Yes, that's right.  That's right.
12      Q.   And that $23-and-a-half million was
13  paid in the 370-day period between December 18,
14  2018 and December 23, 2019, correct?
15      A.   I don't want to be a stickler here,
16  but if you look to the payment amount of
17  24 million, I think you were trying to say that
18  the end of '18-'19, so you'd subtract those first
19  three payments in that Column B, I think, which
20  gets you to about $20 million.
21          So it looks like in '19 -- it's north
22  of $20 million.
23      Q.   Okay.
24          And if we add the payments that were
25  made on December 18, 2018 and December 19, 2018,

Page 202

1         ALAN JOHNSON
2    you come up with about 23 to $23-and-a-half
3    million, right?
4        A.   Something like that, that's right.
5        Q.   And that's about a one-year period
6    that straddles the petition date, to the best of
7    your knowledge, right?
8        A.   Yes.  Yes, it does.
9        Q.   And so those payments, according to
10   this chart – and, again, I'm asking you to assume
11   the accuracy of this chart – according to this
12   chart, for the approximately one-year period from
13   December 2018 to December 2019, Mr. Dondero made
14   principal and interest payments of approximately
15   23 to $23-and-a-half million against 5 different
16   promissory notes that were held by Highland,
17   correct?
18       A.   Yes, I believe that's true.
19       Q.   And is it fair to say that that
20   information conflicts with the concept of Highland
21   having a practice of forgiving loans?
22            MR. AIGEN:  Objection, form.
23       A.   Well, as I said earlier, it doesn't
24   mean that the loans weren't forgivable.  It means
25   he made payments against loans that may have been

Page 203

1         ALAN JOHNSON
2    subject to a – you know, a forgiveness agreement,
3    which, as I testified earlier, you know, could
4    happen, but it would certainly be a fact you'd
5    want to – you know, you'd want to consider.
6        Q.   And tell me the understanding – your
7    opinion as to the circumstances under which you
8    think a maker under notes would rationally make a
9    payment of principal and interest against notes
10   that were the subject of a forgiveness agreement?
11           MR. AIGEN:  Objection, form.
12       A.   Well, I think, as I testified earlier,
13   I think someone would think to themselves, what is
14   the likelihood of those notes being forgiven?
15           If they believe they're not likely to
16   be forgiven, and if they're a senior executive of
17   the company and the company perhaps needs the
18   money, they might make those payments.  A rational
19   executive or borrower could make those payments
20   believing that, perhaps, the likelihood of the
21   things being forgiven is not high and/or the
22   company needs the money.
23       Q.   Did – did anybody give you any
24   explanation as to why Mr. Dondero made
25   approximately $23-and-a-half million of payments

Page 204

1         ALAN JOHNSON
2    against premium – against principal and interest
3    due on these 5 notes?
4        A.   No, they did not.
5        Q.   To the best of your knowledge and
6    understanding was Mr. Dondero in control of
7    Highland throughout that period December 2018
8    until the end of 2019?
9        A.   I'm not – I'm not sure about what
10   happened in bankruptcy, but certainly from the
11   period up until the filing of the bankruptcy, he
12   was in control.
13       Q.   Okay.
14           Do you know – if you look at the
15   restructure note, the January 18, 2018 note, and
16   the notes that are referred to in Rows 21, 22, and
17   23, are you able to identify which of them, if
18   any, are subject to the modification agreement
19   described if your report?
20       A.   I cannot identify them, no.
21       Q.   So you don't know which, if any, were
22   the subject – were subject to the agreement.
23           Do I have that right?
24       A.   I can't identify them, no.
25           MR. MORRIS:  Okay.  Can we go back to

Page 205

1         ALAN JOHNSON
2    Mr. Johnson's report, Exhibit 62?
3            And if we can go to page 3, please.
4        Q.   This is the introduction of your
5    report, right?
6        A.   Yes.
7        Q.   And now that we've done the work we
8    have so far today, I'm going to point you to the
9    sentence towards the end of the first paragraph
10   that says, "Throughout this period, he received
11   loans in lieu of additional current compensation."
12           Do you see that?
13       A.   Yes.
14       Q.   And the "he" there refers to
15   Mr. Dondero, correct?
16       A.   Yes.
17       Q.   Knowing what you know now, do you
18   stand by that statement?
19           MR. AIGEN:  Objection, form.
20           MR. MORRIS:  Withdrawn.
21       Q.   Knowing what you know now, do you
22   believe that statement is accurate?
23       A.   I'd have to rethink about it.  I
24   haven't heard anything that would say what he told
25   me was not true.

Page 206

ALAN JOHNSON

1
2      Q.    Have you seen any evidence that
3   Mr. Dondero ever received a loan in lieu of
4   additional current compensation?
5      A.    Besides his -- his assertions to me,
6   I've seen no written documentation, no.
7      Q.    And, in fact, the audited financial
8   statements that we looked at did, in fact,
9   disclose the loans that were forgiven to the
10  individuals that you spoke with, correct?
11          MR. AIGEN:  Objection, form.
12     A.    Yes.
13     Q.    There was nothing in any of the
14  audited financial statements that we saw that
15  showed that any loan was ever given to Mr. Dondero
16  that was forgiven, correct?
17     A.    In the Highland financials we looked
18  at -- and I guess when that was asked before, I
19  had the caveat around the affiliated companies,
20  but in the Highland financials that we went
21  through, there was nothing disclosed of that.
22     Q.    Highland -- does the practice of other
23  entities in terms -- is that -- withdrawn.
24          When you described the practice, are
25  you describing the practice of firms or entities

Page 207

ALAN JOHNSON

1
2   or affiliates other than Highland?
3      A.    Well, I -- in this case, everything is
4   kind of inter -- intertwined here, so when I talk
5   about loans, the loan could have potentially come
6   from an affiliate or some other organization since
7   these all were co-owned.
8          So we went through the Highland thing,
9   so the loans to Mr. Dondero could have been made
10  by -- potentially could have been made by an
11  affiliate or some other entity.
12     Q.    Do you have knowledge of any affiliate
13  ever forgiving any loan to Mr. Dondero?
14     A.    I do not.
15     Q.    Do you have knowledge of any affiliate
16  ever forgiving in whole or in part any loan to
17  anyone in the world?
18          MR. AIGEN:  Objection, form.
19     A.    I -- I don't have any knowledge of
20  that either.
21     Q.    And your report does not depend in any
22  way, sir, on whether or not affiliates forgave
23  loans to any of its employees, correct?
24          MR. AIGEN:  Objection to form.
25     A.    That's correct.

Page 208

ALAN JOHNSON

1
2      Q.    Looking at the last sentence, there's
3   a reference to company practice.
4          Do you see that?
5      A.    Yes.
6      Q.    That company practice would not
7   include the forgiveness of any loans from the year
8   2009 until the end of 2018, correct?
9      A.    None -- none of those would have
10  been -- none of those were disclosed in the
11  financials we looked at.
12          MR. MORRIS:  Can we go to page 6,
13     please?
14     Q.    Yeah, I'm looking at the first
15  sentence of the second bullet point:  I understand
16  from Mr. Dondero that the 2018 loans that are the
17  subject of the suit were modified by an agreement
18  in late 2018 or early 2019 under which the loans
19  would be forgiven upon the sale and over cost of
20  substantially of any of three portfolio companies.
21          Have I generally categorized that
22  statement correctly?
23     A.    Yes.
24     Q.    Based on everything that we've talked
25  about and looked at today, are you confident that

Page 209

ALAN JOHNSON

1
2   that sentence is accurate?
3          Withdrawn.
4          Based on everything we've talked about
5   and looked at today, are you confident that
6   Mr. Dondero accurately disclosed to you the
7   subject of this agreement?
8          MR. AIGEN:  Objection, form.
9      A.    I'm sorry, could you repeat that?
10     Q.    Sure.
11          Mr. Dondero told you that the 2018
12  loans were the subject of a modification
13  agreement, correct?
14     A.    Yes.
15     Q.    Would you stake your professional
16  reputation on the accuracy of what he told you?
17          MR. AIGEN:  Objection, form.
18     A.    I -- I heard him clearly.  I can't
19  vouch for his word, but he told me -- what is
20  written there is what -- is what he told me
21  happened.  And I asked that question.
22     Q.    I appreciate that.
23          So --
24     A.    I wasn't finished.  I'm sorry.
25     Q.    I apologize.

Page 210

ALAN JOHNSON

1
2    A.   So I asked that question, you know,
3  pretty specifically, so that -- I understood that
4  that's what he said.
5        And I'm sorry to interrupt you. I'm
6  sorry. Go ahead.
7    Q.   That's okay.
8        So what you've reported in this
9  sentence is what you were told. Is that fair?
10    A.   Yes, I was told by Mr. Dondero about
11  the modification of the loans.
12    Q.   And you don't have any information or
13  evidence to support that statement other than what
14  he told you, correct?
15    A.   I've seen no other document, no.
16    Q.   Does the absence of documentation
17  cause you to question the reliability of what
18  Mr. Dondero told you as described in that
19  sentence?
20    A.   Well, as I testified before, I think
21  it certainly would bring it into question, but as
22  I testified before, I have other clients that
23  don't document important things as well. So it
24  would certainly -- not the lack of documentation
25  would bring it into question, but that doesn't

Page 211

ALAN JOHNSON

1
2  mean it's not -- it's not true.
3    Q.   Would the lack of disclosure to the
4  bankruptcy also call it into question --
5        MR. AIGEN: Objection to form.
6    Q.   -- in your opinion?
7    A.   Certainly, as I testified before,
8  people often in chaotic situations don't do the
9  things that are even to their advantage.
10        So certainly that raised -- that
11  raises questions about, again, did he disclose
12  things that may have been even to his advantage in
13  a bankruptcy situation.
14    Q.   Would the existence of the agreement
15  be called into question if you assumed that the
16  decision maker never told anybody in the world
17  that he or she had entered into the agreement on
18  behalf of the company?
19        MR. AIGEN: Objection, form.
20    A.   Certainly. The lack of disclosure is
21  a reasonable question to ask, Why didn't you
22  disclose?
23        But as I've said a couple times now,
24  that I've got private clients that over time have
25  not disclosed things, and as I testified earlier,

Page 212

ALAN JOHNSON

1
2  I admonish them to write things down and disclose
3  them, and they often don't.
4    Q.   Looking back at the document on the
5  screen, the next-to-the-last sentence of that
6  paragraph says, "Based on interviews from prior
7  employees, the use of forgivable loans was a known
8  business practice at Highland, and there was a
9  clear expectation similar loans would be
10  forgiven."
11        Do you see that?
12    A.   Yes.
13    Q.   Okay.
14        The prior employees are the four
15  people we talked about before, right?
16    A.   Yes.
17    Q.   And they told you about the four loans
18  that they had that were forgiven in whole or in
19  part, correct?
20    A.   And I would answer that, yes, they
21  said it, and Mr. Dondero mentioned it as well.
22    Q.   And they told that there was a use of
23  forgivable loans as a nonbusiness practice at
24  Highland, right?
25    A.   Yes.

Page 213

ALAN JOHNSON

1
2    Q.   They didn't mention any other entity,
3  correct?
4    A.   That, I don't remember. I don't
5  believe so.
6    Q.   You wrote Highland, right?
7    A.   Yes.
8    Q.   And you haven't seen any documents
9  that support the known business practice that they
10  described for you, correct?
11    A.   I have seen no written documentation,
12  no.
13    Q.   When you referred to a "clear
14  expectation," whose expectation are you referring
15  to?
16    A.   The recipient of the loan, that's what
17  I was referring to.
18    Q.   And when you used the phrase "similar
19  loans," do you mean similar to the ones that were
20  forgiven by the four employees -- the four former
21  employees that you interviewed?
22    A.   I meant just that there was a loan of
23  a significant period of time and it would be
24  forgiven over time. That's what I was trying to
25  get at there.

Page 214

ALAN JOHNSON

1
2    Q.    Now that you have seen -- withdrawn.
3        Now that I have shown you the
4    demonstrative exhibit that reflects payments by
5    Mr. Dondero against 5 different promissory notes
6    in the 12-month period between December '18 and
7    December '19, do you believe that he had a clear
8    expectation that his loans would be forgiven?
9        MR. AIGEN:  Objection, form.
10    A.    I -- I don't -- I don't -- he hasn't
11    told me what his expectation -- I don't -- I would
12    just be speculating about what his expectations
13    were.
14    Q.    Well, paying -- paying more than
15    $23 million in a 12-month period is inconsistent
16    with any expectation that the loans would be
17    forgiven.
18        Would you give me that?
19        MR. AIGEN:  Objection, form.
20    A.    Well, I think I testified before that
21    you could forgive -- you could make payments
22    against the loan if you thought the probability of
23    achieving the goals were not highly likely and/or
24    the company needed the money.
25        So on a private situation, such as

Page 215

ALAN JOHNSON

1
2    this, Mr. Dondero rationally could have said to
3    himself, I'll repay the loans because the company
4    needs the money and/or the odds of selling one of
5    these three assets in a reasonably timely manner
6    may be unlikely, but I'm just speculating on what
7    he -- he may have thought.
8    Q.    Okay.
9        MR. MORRIS:  Can we go to page 16,
10    please?
11    Q.    Just to finish this up, in the middle,
12    it says, "It is my opinion that the loans provided
13    to Mr. Dondero should be considered potential
14    deferred compensation as they were similar to
15    loans given to other professionals at the firm."
16        Have I read that correctly?
17    A.    Yes.
18    Q.    After our questions today and looking
19    at the documents is that still your opinion?
20    A.    Well, I think it goes back to what
21    Mr. Dondero told me.  If what Mr. Dondero told me
22    is accurate, it -- his statement continues to be
23    true, that these loans were intended to be
24    forgiven, and that that would have been similar to
25    the other four executives that I interviewed.

Page 216

ALAN JOHNSON

1
2    Q.    So that sentence and your opinion is
3    dependent 100 percent on the accuracy of what
4    Mr. Dondero told you, correct?
5    A.    If Mr. Dondero, you know, was
6    inaccurate, then that sentence will be inaccurate
7    as well.
8    Q.    And is there anything that we looked
9    at today, like the financial statements or the
10    payment history for the 12-month period from
11    December 2018 to December 2019, that calls you to
12    question the accuracy of what he told you?
13    A.    I don't -- I don't -- I believe it
14    still could very well be true, so I don't -- I
15    don't -- I don't believe that -- I don't believe I
16    would have changed that sentence based on what
17    I've heard today.
18    Q.    Your report refers in several places
19    to a founder's premium.
20        Do I have that phrased right?
21    A.    Yes.  Yes, it does.
22    Q.    What's a founder's premium?
23    A.    In many or most financial services
24    companies, founders get paid more than comparable
25    executives elsewhere.  They're the face of the

Page 217

ALAN JOHNSON

1
2    firm.  They have an unusual stature in the
3    industry and so forth.
4        So when you look at large or outsized
5    pay packages, they're often delivered to founders
6    of similar financial firms.
7    Q.    Have you done any analysis to
8    determine what the founder's premium would be in
9    this case?
10    A.    I have not.
11    Q.    You're not offering any opinion as to
12    what the founder's premium should be, correct?
13    A.    I have not done that work, no.
14    Q.    You haven't attempted to quantify what
15    the founder's premium is, correct?
16    A.    Again, I haven't done that work.
17    Q.    Is there a particular reason why you
18    didn't attempt to quantify or analyze the
19    founder's premium that you referred to in your
20    report?
21    A.    Well, when I wrote the report in May,
22    I didn't have available some of the things we've
23    talked about today, I just didn't feel that that
24    was appropriate.
25        So I took what I thought was a

Page 218

ALAN JOHNSON

1    conservative view of what the market rate with him
2    would be, and then it could obviously be
3    supplemented at some future point with additional
4    information or facts.
5       Q.   But as you sit here today, you haven't
6    done any analysis to try to update your report to
7    quantify a founder's premium, correct?
8       A.   I have not.
9         MR. MORRIS:  Can we go to page 19 of
10    Mr. Johnson's report.
11       Q.   Right there at the top, you've got
12    Exhibit C.  That's Mr. Dondero's actual
13    compensation for the period 2013 to 2019.
14         Do I have that right?
15       A.   Yes.
16       Q.   Why did you use that seven-year
17    period?
18       A.   It was after the financial crisis.  It
19    seemed more stability in the business.  It seemed
20    like a reasonable period to look at.
21       Q.   Is there any – is the decision to use
22    the seven-year period from 2018 to 2019 a
23    subjective decision that you made on your own?
24       A.   To be – I don't remember.

Page 219

ALAN JOHNSON

1       Q.   Is it fair to say that somebody else
2    might differ with you and apply either a 4-year
3    period, for example, or a 10-year period?
4       A.   Reasonable people might have a
5    different point of view, yes.
6       Q.   Did you rely on any particular
7    methodology or industry study in reaching your
8    decision to use a seven-year period?
9       A.   No.
10       Q.   Is there any article that you're aware
11    of or any presentation anybody has ever made
12    whereby they – they suggested that when doing an
13    analysis of this type, one ought to the use a
14    seven-year look-back period?
15       A.   I – I don't – I'm not aware of
16    any – any study like that.
17       Q.   And the reason that the timeline is
18    important, of course, is it because you're just
19    multiplying the difference between Mr. Dondero's
20    compensation as reflected in this chart –
21       withdrawn.
22         The reason why the time period is
23    important, because you're taking the average of
24    Mr. Dondero's annual compensation during the

Page 220

ALAN JOHNSON

1    seven-year period and comparing it with the
2    average for your comps and multiplying it by
3    seven, correct?
4       A.   Well, I'm looking at his average pay
5    over the period.  I wanted a long enough period to
6    be representative and looking at what the market
7    rate would have been over that period, so yes, you
8    arithmetically will come up with a difference over
9    that period.
10       Q.   And your difference is $21 million,
11    right?
12       A.   Yes.
13       Q.   And your difference is $21 million
14    because you compared Mr. Dondero's average of
15    $3 million with what you determined to be the
16    industry average of $6 million, you took the
17    difference of 3 and multiplied it by the 7 years
18    and you got to $21 million, correct?
19       A.   In simple fashion, that's right.
20       Q.   Is there any other fashion in which my
21    description of what you did is incorrect?
22       A.   No.  I think that's accurate, but the
23    point was that he had been underpaid from a W-2
24    perspective during this period and, you know,

Page 221

ALAN JOHNSON

1    the – anyway, that was the point.
2       Q.   And if a reasonable mind decided that,
3    you know, the look-back period should be a bit
4    shorter, only 5 years, then the delta would only
5    be $15 million, right?
6       A.   Assuming the same facts, the 3 million
7    and the 6 million, that's right.
8       Q.   And if somebody thought it ought to be
9    10 years, then the delta would be $30 million,
10    right?
11       A.   It could be, but I don't know what his
12    pay was prior to 2013.  Maybe that wouldn't be
13    accurate.  But yes, assuming the facts are the
14    same, that would be – that would be accurate.
15       Q.   Okay.  But one of the three factors –
16    so there are 3 factors in the $21 million.  It's
17    Mr. Dondero's average compensation during the
18    7-year period, correct?
19       A.   Yes.
20       Q.   And it's the industry average as
21    you've determined for the seven-year period,
22    correct?
23       A.   Well, just to be picky, it's not the
24    industry average.  It's what I think the market

Page 222

ALAN JOHNSON

1
2 was for his particular role, which was 6 million,
3 but yes, it's 3 million and 6 million.
4    Q.    Thank you.  Thank you for the
5 clarification.
6         And then the third factor in reaching
7 the $21 million is multiplying the difference
8 between those first two numbers by 7, correct?
9    A.    Exactly.
10    Q.    And you determined to use 7, correct?
11    A.    Yes.
12    Q.    And you made that determination based
13 on your subjective judgment, correct?
14    A.    Yes.
15    Q.    And you're not aware of any -- any
16 guideline, any analysis, any peer-reviewed
17 article, any presentation, anything in the world
18 that caused you to select 7 years.  You just based
19 that on your own experience.  Is that fair?
20    A.    That's fair.
21    Q.    Okay.
22         So if you look at the chart, you've
23 got three different line items.  The first is
24 "Highland Capital Management W-2 Income," correct?
25    A.    Yes.

Page 223

ALAN JOHNSON

1
2    Q.    Okay.
3         And why did you decide that this
4 analysis should incorporate Mr. Dondero's Highland
5 Capital Management W-2 income?
6    A.    That is his reported employee
7 compensation.
8    Q.    The next line relates to NexPoint
9 Residential Trust W-2 income.
10         Do you see that?
11    A.    Yes.
12    Q.    You've only included income for 2018.
13         Do I have that right?
14    A.    That's right.
15    Q.    Why did you decide that it was
16 appropriate to include NexPoint Residential Trust
17 W-2 income in your analysis?
18    A.    It was a W-2.  I think he was paid as
19 an employee, and that should be recognized here.
20    Q.    And how come you only disclosed the
21 income for 2018?
22    A.    That's the only one we have W-2 for.
23    Q.    Okay.
24         How about NexPoint Advisors' W-2
25 income, why did you decide to include that in this

Page 224

ALAN JOHNSON

1
2 analysis?
3    A.    Again, it was employee income.
4         These businesses are so intertwined
5 that I included his pay for, you now, his
6 activities at NexPoint.
7    Q.    Okay.
8         And did you not go back prior to 2016
9 because you didn't have any W-2 income for that
10 entity?
11    A.    Didn't have a W-2 income.
12    Q.    Do you know if Mr. Dondero received
13 any other W-2 income from any other
14 Highland-related affiliate?
15    A.    We were not -- I was not aware that
16 there was any others.
17    Q.    If you were aware of other W-2 income
18 that Mr. Dondero received from a Highland
19 affiliate, would you have included it in this
20 analysis?
21    A.    I would have included it, yes.
22         MR. MORRIS:  Okay.  Let's go down to
23 page 21, and if we can go to the bottom of
24 the page.
25    Q.    All right.  So correct me if I'm wrong

Page 225

ALAN JOHNSON

1
2 here, but what I think you did is you went and did
3 some research and you tried to identify executives
4 who had similar responsibilities to Mr. Dondero --
5 Mr. Dondero and you reviewed what information was
6 in the public domain to try to ascertain what
7 their total compensation was for each of the years
8 2013 through 2019.
9         Is that generally correct?
10    A.    Yes, that's generally correct.
11    Q.    And looking at this chart, this chart
12 at the bottom of page 21 only relates to 2019.
13         Do I have that right?
14    A.    Yes.
15    Q.    And you have one, two, three, four,
16 five, six, seven comps.
17         Do I have that right?
18    A.    Yes.
19    Q.    And the first portion of the analysis
20 shows the total base salary cash bonus for the
21 total amount of total cash that was paid to each
22 executive by their employer in 2019.  Is that
23 right?
24    A.    That's right.
25    Q.    Now, Mr. Dondero received

Page 226

ALAN JOHNSON

1
2  substantially more cash than any of these
3  executives in 2019, correct?
4      A.   I don't recall his actual cash in
5  2019.  That, I don't know, sitting here.
6      Q.   And then the next part of the analysis
7  relates to stock options and restricted shares.
8  Let's take them one at a time.
9          What are stock options for purposes of
10  your analysis?
11     A.   It's the value of a – of an award
12  made, and this is their disclosed value of the
13  ability to exercise a – a – an option to
14  purchase the company's stock at a fixed price.  So
15  if on the day of grant the company is trading at
16  $25, you're granted options to purchase the stock
17  at $25.
18          You don't have to exercise.  The stock
19  increases in value at some point within a 10-year
20  period, you can exercise those options and realize
21  a gain.
22          The numbers shown here reflect their
23  disclosed value in their proxy statement, so use
24  Black-Scholes or some other method to value the
25  prospective value of these options.

Page 227

ALAN JOHNSON

1
2      Q.   In your expert opinion, is it
3  appropriate to include the value of the stock
4  options when trying to assess the total
5  compensation of an executive comparable to
6  Mr. Dondero?
7      A.   Yes, it would be.
8      Q.   Did you ask Mr. Dondero or anybody
9  acting on his behalf whether he ever received any
10  stock options of any kind?
11     A.   I did not.
12     Q.   So is it fair to say that your
13  analysis does not take into account the value of
14  any stock options that Mr. Dondero may have
15  received?
16     A.   I was not aware that he received any,
17  so it would not have included it, no.
18     Q.   And nobody told you that he received
19  any, correct?
20     A.   No.
21     Q.   And you didn't ask, correct?
22     A.   I don't recall whether I asked or not,
23  but I didn't see it anyway.
24     Q.   The next column relates to restricted
25  shares.

Page 228

ALAN JOHNSON

1
2          Do you see that?
3      A.   Yes.
4      Q.   What are restricted shares?
5      A.   It's the grant of shares with time
6  vesting.  So you receive $100,000 worth of stock
7  in the company, and then that vests over, say, a
8  3- or 4-year period.  So it's a fixed number of
9  shares that vest on the passage of time.
10     Q.   And in your professional and expert
11  opinion, do you believe that the value of
12  restricted shares should be considered when
13  assessing the total compensation received by
14  executives comparable to Mr. Dondero?
15     A.   Yes.
16     Q.   Did you ask Mr. Dondero or anybody
17  acting on his behalf whether he had ever received
18  restricted shares during the 7-year period you
19  were analyzing?
20     A.   I don't recall asking that, no.
21     Q.   Did Mr. Dondero or anybody on his
22  behalf ever disclose to you any restricted shares
23  that Mr. Dondero may have received?
24     A.   I'm not aware that he received any.
25  No one told me anything about it.

Page 229

ALAN JOHNSON

1
2      Q.   So is it fair to say that your
3  analysis does not take into account any restricted
4  shares that Mr. Dondero may have received during
5  the 7-year period of your – of your analysis?
6      A.   Well, he would have if either options
7  were the restricted shares.  If they had turned
8  into actual shares, they would have shown up in
9  his W-2.
10          So if there were things that didn't
11  show up in his W-2, then yes, I would have been
12  unaware of it.
13     Q.   Okay.
14          And is the total long term just the
15  addition really of the stock options and the
16  restricted shares?
17     A.   Yes.
18     Q.   Okay.
19          All right.  So let's look at a few
20  more documents.  I'm almost done here.
21          MR. MORRIS:  Can we go back up to the
22  page with Mr. Dondero's chart, 19.
23          Yeah, there we go.
24     Q.   Okay.  So you included the NexPoint
25  Residential Trust W-2 income, correct?

Page 230

1    ALAN JOHNSON
2    A.   Yes.
3    Q.   And the only reason that you limited
4    yourself to 2018 is because you hadn't found any
5    W-2 income related to that entity during your
6    diligence, right?
7    A.   That's right.
8       MR. MORRIS:  Can we please put up
9    what's been marked as Exhibit 67.
10       (Exhibit 67, 2019 W-2 , was marked for
11       identification at this time.)
12    BY MR. MORRIS:
13    Q.   Do you see that this is a 2019 W-2
14    made out to Mr. Dondero from NexPoint Residential
15    Trust, Inc.?
16    A.   Yes, yes.
17    Q.   Okay.  And if we go to the bottom of
18    the page, do you see it says, "Expert No. 1"?
19    A.   Yes, I see that.
20    Q.   This is, in fact, a document that was
21    provided to you before you completed your report,
22    right?
23    A.   I believe that that appears to be
24    right.
25       MR. MORRIS:  Okay.  Let's go back to

Page 231

1    ALAN JOHNSON
2    the top of the document.
3    Q.   Do you see that Mr. Dondero had W-2
4    income in 2019 of approximately $1.5 million?
5    A.   Yes, I believe that's right.
6    Q.   Okay.
7       So for consistency, your report should
8    be amended -- the chart on paragraph 19 should be
9    amended to include the number that's in box 1 of
10    the W-2 under W-2 income from NexPoint Residential
11    Trust in 2019; correct?
12    A.   If I've missed it, then it should be
13    included, yes.
14       MR. MORRIS:  Can we go -- can we put
15    up Exhibit 67-2?
16       (Exhibit 67-2, 2017 W-2 , was marked
17       for identification at this time.)
18    BY MR. MORRIS:
19    Q.   Do you see that this is a 2017 W-2
20    issued by NexPoint Residential Trust, Inc. to
21    Mr. Dondero?
22    A.   Yes.
23       MR. MORRIS:  Can we go to the bottom
24    of the page?
25       Can we just see the Bates number?

Page 232

1    ALAN JOHNSON
2       Oh, hold on, I know what I have to do.
3       Yeah, there you go.
4    Q.   Do you see that it's Bates stamped
5    page 937?
6    A.   Yes, I see that.
7    Q.   Does that indicate that that document
8    was provided to you before you completed your
9    report?
10    A.   I don't know what the Bates number
11    means, but I see the 937.
12    Q.   Well, I'll represent to you, sir, that
13    if we went to page 25 of your report, this
14    document would be listed among those that you were
15    given before you completed your report.
16       MR. MORRIS:  Can we go back up to the
17    top of the document?
18    Q.   Do you see in Box No. 1, it discloses
19    wages of approximately $625,000?
20    A.   Yes, I see that.
21    Q.   And that's the corrected information,
22    right?
23    A.   Yes.
24    Q.   Okay.
25       So looking at this now, in order to be

Page 233

1    ALAN JOHNSON
2    consistent, that $625,000 should have been
3    included in your report in the chart on page 19,
4    correct?
5    A.   I believe that's right.
6    Q.   Okay.
7       So those two entries alone are
8    approximately $2.5 million, or more than
9    10 percent of the $21 million difference that you
10    calculated, correct?
11    A.   Yes, I believe that's right.
12    Q.   Okay.
13       MR. MORRIS:  Can we please put up
14    Exhibit No. 68?
15       (Exhibit 68, compensation and benefit
16       statement for 2016, was marked for
17       identification at this time.)
18    BY MR. MORRIS:
19    Q.   Okay.  So what's on the screen, sir,
20    is a compensation and benefit statement that I
21    will represent to you was prepared by Highland in
22    the ordinary course of its business for years for
23    every employee -- I think for every employee in
24    the organization.
25       And if we go down to the bottom, you

Page 234

ALAN JOHNSON

1  can see that this document was produced to
2  Mr. Dondero's lawyers previously.
3  And if we can scroll back up, do you
4  see that there's reference in the middle to a 2016
5  deferred compensation award?
6  MR. AIGEN: Hey, John, I think you
7  tried to scroll down to show the Bates
8  label, but I don't think it went far enough.
9  I just want to write down what the
10  Bates label was so I can have it for my
11  records.
12  MR. MORRIS: Sure.
13  MR. AIGEN: Or if you can read it into
14  the record, that will work, too.
15  MR. MORRIS: Sure.
16  It's D-CNL003585.
17  MR. AIGEN: Thank you.
18  Q.  And do you see that he's got total
19  compensation listed there of $2.3 million?
20  A.  Yes, I see that.
21  Q.  Okay.
22  Do you see that there's a reference to
23  a deferred compensation award?
24  A.  Yes.

Page 235

ALAN JOHNSON

1  Q.  And that award of $1.2 million relates
2  to 50,000 restricted stock units of NXRT.
3  Do you see that?
4  A.  Yes.
5  Q.  And you testified earlier that
6  restricted stock is something that should be taken
7  into account when assessing the total compensation
8  of an executive, correct?
9  A.  Yes.
10  Q.  And NXRT, do you know what that symbol
11  represents?
12  A.  I don't think I've seen that symbol.
13  Q.  Okay.  If I represented to you that it
14  is the symbol for the NexPoint Residential Trust
15  that we were just looking at – the W-2s that we
16  were just looking at, do you think that this
17  $1.2 million should be taken into account in
18  Mr. Dondero's 2016 total compensation since it is
19  restricted stock units that were given to him in
20  that year?
21  A.  I'd certainly have to consider that,
22  yes.
23  Q.  Okay.
24  But you weren't given this

Page 236

ALAN JOHNSON

1  information, correct?
2  A.  I don't think I've seen this.
3  Q.  Okay.
4  MR. MORRIS: Can we please go to
5  Exhibit 50, 5-0.
6  (Exhibit 50, compensation and benefit
7  statement for 2017, was marked for
8  identification at this time.)
9  BY MR. MORRIS:
10  Q.  I'll represent to you that this is
11  Mr. Dondero's compensation and benefit statement
12  for 2017.
13  Do you see there's another reference
14  to approximately $1.55 million in restricted stock
15  units that were granted to him for the 2017
16  performance year?
17  A.  Yes, I see that.
18  Q.  And nobody told you that Mr. Dondero
19  had received any stock options prior to today,
20  correct – withdrawn.
21  Nobody told you that Mr. Dondero had
22  received restricted stock units of NXRT before
23  today, correct?
24  A.  I was not aware of this when I wrote

Page 237

ALAN JOHNSON

1  my report, no.
2  Q.  You would have – this number –
3  withdrawn.
4  MR. MORRIS: Can we go to the bottom
5  of the page, please?
6  Just for the record, this is document
7  with Bates No. D-CNL003587.
8  And if you can scroll back up.
9  Q.  If Mr. Dondero received restricted
10  stock units of NexPoint Residential Trust in 2017
11  for the performance – for his performance during
12  that year in an amount of $1.55 million that's –
13  that's compensation that you would have included
14  in your report had you known about it at the time,
15  correct?
16  A.  Probably would have, yes.
17  MR. MORRIS: Okay.  Can we go to
18  Exhibit 51, please.
19  (Exhibit 51, compensation and benefit
20  statement for 2018, was marked for
21  identification at this time.)
22  MR. MORRIS: Okay.  This is
23  Mr. Dondero's compensation and benefits
24  statement for 2018.

Page 238

```
1              ALAN JOHNSON
2         If we can go to the bottom.
3         And it has Bates No. D-CNL003588.
4         And if we can scroll back up, please.
5    BY MR. MORRIS:
6    Q.   According to this compensation and
7  benefits statement, Mr. Dondero received almost
8  $1.7 million in restricted stock units of NXRT for
9  the 2018 performance year.
10        Do you see that?
11   A.   Yes, I do.
12   Q.   Were you told that Mr. Dondero
13 received restricted stock units of NXRT for the
14 2018 performance year?
15   A.   I was not aware of that.
16   Q.   Had you known that prior to issuing
17 your report, would you have included that in your
18 assessment of Mr. Dondero's total compensation for
19 the year 2018?
20   A.   I would have looked at those awards,
21 yes.
22   MR. MORRIS:  Let's go to Exhibit 52,
23   please.
24        (Exhibit 52, compensation and benefits
25   statement for 2019, was marked for
```

Page 239

```
1              ALAN JOHNSON
2    identification at this time.)
3    BY MR. MORRIS:
4    Q.   And when you say you would have looked
5  at the awards, if you assume that they are
6  restricted stock units of NexPoint Residential
7  Trust, is there any basis on which you would not
8  have included those restricted -- the value those
9  restricted stock units in an analysis of
10 Mr. Dondero's total compensation, just as you did
11 for the other executives that are your comps?
12   A.   I want to know what the terms of the
13 awards were.  I don't know how NXRT was valued, so
14 I would want to -- more information about -- this
15 is as employee statement, so I don't know how
16 accurate it would be, but I would certainly -- if
17 I'd have been aware of this, would certainly want
18 to consider what those awards were worth, you
19 know, what a comparable like-to-like comparison
20 would be.
21   Q.   Okay.
22        The next document that we have on the
23 screen is Exhibit 52, which is Mr. Dondero's
24 compensation and benefits statement for 2019.
25        And if we go to the bottom, we will
```

Page 240

```
1              ALAN JOHNSON
2  see it has Bates No. D-CNL003589.
3         Do you see that, sir?
4    A.   Yes.
5    Q.   And if we scroll back up, you'll see
6  that Mr. Dondero received in 2019 a deferred
7  compensation award of approximately $5.6 million
8  in the form of various grants of what appear to be
9  stock?
10   A.   Yes, the number on the page is 5
11 million 6, yes.
12   Q.   And you weren't told that Mr. Dondero
13 had received any grants of stock as part of a
14 deferred compensation award in 2019, correct?
15   A.   I was not aware of that, no.
16   Q.   But had you -- had you known about the
17 deferred compensation award, you certainly would
18 have asked the questions, right?
19   A.   I would have asked questions, yes.
20   Q.   And is it fair to say as you sit here
21 right now that just as you included the restricted
22 stock and the stock options in your comps, you
23 would have included this $5.6 million in your
24 analysis of Mr. Dondero's 2019 compensation?
25   MR. AIGEN:  Objection, form.
```

Page 241

```
1              ALAN JOHNSON
2    A.   I -- I don't know what amount of the 5
3  million 6.  I think, as I said before, I'd want to
4  know more about these entities and what -- what --
5  you know, how they were valued and so forth, but
6  I'd certainly want to be aware of it in coming up
7  with an aggregated figure for its compensation.
8    Q.   As you sit here right now, based on
9  the documents we've looked at so far, your
10 $21 million is subject to some questions.  Is that
11 fair?
12   A.   It's fair.  Certainly, the cash
13 amounts that he was paid should be added back, and
14 then we have these series of deferred comp awards
15 that I'd have to consider how do we include some
16 or all of it value.
17   Q.   But you weren't told about any of
18 these awards before you prepared your report,
19 correct?
20   A.   I was not aware of them.
21   Q.   And you don't have any information as
22 you sit here today that you're aware of that
23 relates to any of these awards except what I'm
24 showing you, right?
25   A.   I'm not aware of the terms of these
```

Page 242

ALAN JOHNSON

1    awards, no.
2         MR. MORRIS:  Okay.  Let's go to
3    Exhibit 67-3, which is Mr. Dondero's 2013
4    Form 1040.
5         (Exhibit 67-3, 2013 Form 1040, was
6    marked for identification at this time.)
7         MR. MORRIS:  And if we can go to PDF
8    page 279 of 335.
9    BY MR. MORRIS:
10        Q.   Do you see you received Mr. Dondero's
11   Forms 1040 for the period 2013 through I think
12   either 2019 or 2020, right?
13        A.   Yes, I believe so.
14        Q.   Did you take the time to look at the
15   statements supporting his 1040s that relate to
16   wages received?
17        A.   I went through it, yes.
18        Q.   Do you see on statement 12 there's a
19   reference to Highland Capital Management PTE LTD?
20        A.   I'm sorry, where are we on the page?
21        Q.   We're looking at the top.  It's
22   statement 12.
23        A.   Okay.
24        Q.   Okay.

Page 243

ALAN JOHNSON

1         And do you see there's a reference to
2    Highland Capital Management PTE LTD?
3         A.   I see that, yes.
4         Q.   Do you have any idea what that entity
5    is?
6         A.   I don't -- I don't know.
7         Q.   Have you ever heard of it before?
8         A.   I don't believe so.
9         Q.   In your review of Mr. Dondero's tax
10   returns, did you ever notice that he had received
11   W-2 income from that firm?
12        A.   If I looked at it, I don't recall.
13        Q.   Based on the name of the entity by
14   itself, is it fair to conclude in the absence of
15   contrary information that any W-2 income he
16   received from an entity called Highland Capital
17   Management PTE LTD should have been included in
18   your report?
19        MR. AIGEN:  Objection, form.
20        A.   That -- that, I don't know.  That, I
21   don't know.
22        Q.   All right.  Mr. Johnson, I'm going to,
23   you know, save us all the pain and tell you that
24   if we looked at Mr. Dondero's Forms 1040 for the

Page 244

ALAN JOHNSON

1    period from 2013 to 2019, Mr. Dondero reported
2    receiving W-2 income from Highland Capital
3    Management PTE LTD in every single year.
4         And I will also represent to you that
5    the aggregate amount of those payments were
6    approximately a half a million dollars, and that
7    if we added up the value of the payment -- the W-2
8    payments from Highland Capital Management PTE LTD,
9    along with the NexPoint Residential Trust W-2
10   income that we looked at, along with the value of
11   the stock options, that we would come up with a
12   number in excess of $13 million, with that
13   representation, how comfortable are you that your
14   $21 million accurately states the difference
15   between what Mr. Dondero received in the 7-year
16   period from 2013 through 2019 and what he would
17   have received if he had received the comparable
18   market compensation for similarly situated
19   executives?
20        MR. AIGEN:  Objection, form.
21        A.   I think you pointed out some
22   adjustments that would need to be made.  I think,
23   as I testified before, I would need to go back and
24   look at the value of those awards.

Page 245

ALAN JOHNSON

1         I think of the $8 million you referred
2    to, I think about 5 or 6 million was made in the
3    year of bankruptcy, which I would certainly put
4    probably, in the work we do, put a question mark
5    next to, but you certainly pointed out some
6    omissions that should be included.
7         So the $21 million analysis would
8    certainly look like it would get somewhat smaller,
9    but I would -- sitting here, the 8 million you
10   mentioned, that looks like about 4 or 5 million
11   was a deferred comp award made in the year of
12   bankruptcy, which I'd probably put a question mark
13   around.
14        But it does look like, to some degree,
15   the $21 million difference that I've calculated
16   would be reduced.
17        Q.   Have you done any analysis to
18   determine whether or not Mr. Dondero passed
19   through any personal expenses through the
20   business?
21        A.   That, I don't know.
22        Q.   Is that something that you would
23   consider if you had the information available, you
24   know, whether or not he passed personal expenses

Page 246

```
1              ALAN JOHNSON
2   on through the business?
3      A.   Well, it should be -- it should be
4   disclosed in his W-2, if he's -- if he's filling
5   out a W-2 or other income, but if it wasn't
6   reported on his taxes or there's a W-2, I wouldn't
7   know about it.
8      Q.   I appreciate that you wouldn't know
9   about it.
10          I'm just asking you if you were trying
11  to assess the value that Mr. Dondero received from
12  serving as Highland's CEO, would you take into
13  account, if you had the information available and
14  you could quantify it, the value of any personal
15  expenses that -- that he ran through the business?
16     A.   I would be reluctant to do that just
17  because many private business owners do a similar
18  thing, so it would not be fair to Mr. Dondero or
19  any other executive in his position to only do one
20  side of that trade.
21          So if I said $6 million was the
22  appropriate level that many private business
23  owners do similar things, so if there's something
24  particularly unusual, I might want to be aware of
25  it, but if it was the normal course of what
```

Page 247

```
1              ALAN JOHNSON
2   business owners often do, I probably wouldn't
3   include it.
4      Q.   Your comparable individuals in 2019,
5   are those CEOs of public companies?
6      A.   The real comparison here, the
7   $6 million figure, is primarily not CEOs of public
8   companies.  The small asset management companies
9   that we list are not -- neither paid that high in
10  the roles, as we say in the report, are
11  meaningfully different.
12          I think the real reference point is
13  people who manage similar assets mostly in the
14  private domain.  So I think many of those CEOs,
15  founders, owners, would -- the issue we're talking
16  about, would pass on allegedly personal expenses
17  through the business.
18     Q.   How about -- we talked about this a
19  little bit earlier.
20          You're aware that Highland doesn't
21  have an ownership interest in HCRE or Highland
22  Capital Management Fund Advisors or NexPoint or
23  Highland Capital Management Service, right?
24     A.   I'm sorry, are you saying Highland
25  doesn't have an ownership interest?
```

Page 248

```
1              ALAN JOHNSON
2          Is that what you're saying?  I just
3   want to make sure I heard correctly.
4      Q.   Yes.
5      A.   I believe that's true yes.
6      Q.   And you're also aware that Mr. Dondero
7   directly or indirectly owns at least the majority
8   interest in each of these four entities, right?
9      A.   I'm aware of the NexPoint and
10  Advisors.  The real estate, I'm not sure I've ever
11  heard about the ownership, but certainly, at least
12  several of those, he's the controlling or sole
13  owner.
14     Q.   Are you aware that -- that Highland
15  Capital Management -- withdrawn.
16          Are you aware that Highland provided
17  services to Highland Capital Fund Advisor as
18  NexPoint pursuant to certain shared services
19  agreements?
20     A.   I was aware of that.
21     Q.   And are you aware that until sometime
22  in late 2020, HCMFA and NexPoint made payments to
23  Highland in exchange for those services?
24     A.   I think I was aware of that, yes.
25     Q.   Are you aware that when Mr. Dondero
```

Page 249

```
1              ALAN JOHNSON
2   was in control, Highland also provided services to
3   Highland Capital Management Services, Inc. as well
4   as HCRE Partners, LLC?
5      A.   I think I was aware of that as well.
6      Q.   And were you aware that neither of
7   those entities had any shared services agreement
8   with Highland?
9      A.   That, I'm not sure I was aware of.
10     Q.   Are you aware that neither of those
11  entities ever provided any cash payment to
12  Highland for services rendered?
13     A.   I have no knowledge of that.
14     Q.   Is it fair to say that your analysis
15  doesn't take into account the value that HCRE and
16  HCMS received by getting services from Highland
17  without paying for them?
18          MR. AIGEN:  Objection, form.
19     A.   I am not familiar with what services
20  they received, so I don't -- I don't know how to
21  handle that.
22     Q.   Let's assume that HCMS and HCRE
23  received back-office services similar to what
24  HCMFA and NexPoint contracted and paid for.  Okay?
25          Can we -- can we make that assumption?
```

Page 250

ALAN JOHNSON

1    A.   Okay.

2    A.   Okay.

3    Q.   Okay.

4         And let's assume that neither of those

5    entities, HCRE or HCMS, ever paid any money to

6    Highland in exchange for those services.  Okay?

7    A.   Okay.

8    Q.   As the person in control of those

9    entities, do you think it would be appropriate to

10   try to quantify the benefit that Mr. Dondero

11   received through his ownership of HCRE and HCMS as

12   a result of Highland's providing services to those

13   entities without compensation?

14        MR. AIGEN:  Objection, form.

15   A.   At a high level, I think if Highland

16   was providing meaningful services that had value

17   to those entities and Highland wasn't getting

18   something back in return, you would want to try to

19   understand how big that was.

20   Q.   Okay.

21        But that's not an issue that you

22   analyzed, correct?

23   A.   It is not.

24   Q.   And your $21 million delta doesn't

25   take into account that issue at all, correct?

---

Page 251

ALAN JOHNSON

1    A.   It does not take that into account,

2

3    no.

4    Q.   And you didn't do any diligence to try

5    to determine whether or not Highland had provided

6    services without receiving payment in return with

7    respect to HCMS and HCRE, correct?

8    A.   I did no such analysis.

9    Q.   Okay.

10        MR. MORRIS:  Can we take -- it's 2:45.

11   Let's take a 5-minute break, a short break.

12   I may be done.

13        (Recess taken from 2:45 p.m. until

14   2:50 p.m.)

15        MR. MORRIS:  I have no further

16   questions of this witness at this time.

17        Thank you very much, Mr. Johnson, for

18   your time and your patience.

19        THE WITNESS:  Thank you, and also say

20   hi to Laura Johnson for me.

21        MR. MORRIS:  I sure will.  I'm sure

22   I'll be speaking to her this afternoon.

23        MR. AIGEN:  Alan, you're not

24   completely done yet.  I have one or two

25   questions I wanted to ask you, just to clear

---

Page 252

ALAN JOHNSON

1         something up.

2

3    THE WITNESS:  Okay.

4    EXAMINATION

5    BY MR. AIGEN:

6    Q.   You talked about the founder's premium

7    earlier.

8         Can you just again explain what that

9    means?

10   A.   Founder's premium in a private firm

11   like this is the amount that a founder typically

12   gets paid in excess of what a non-founder or

13   ordinary executive gets paid.

14   Q.   And I know you don't have a specific

15   number but do you have an opinion on what the

16   general founder's premium would be in this

17   marketplace?

18        MR. MORRIS:  Objection to the form of

19   the question.

20   A.   A premium could be very significant.

21   It could be two or even three times what the --

22   what a typical executive might get paid.

23   Q.   And what's that based on?

24   A.   Just working with these

25   founder-dominated firms, they often get paid an

---

Page 253

ALAN JOHNSON

1    awful lot for -- for the role they play.

2

3    MR. AIGEN:  That's all I have.

4    MR. MORRIS:  Just a couple of

5    questions, Mr. Johnson.

6    EXAMINATION (CONTINUED)

7    BY MR. MORRIS:

8    Q.   You didn't make any disclosure

9    concerning a founder's premium, correct?

10   A.   No, I have not done that work.

11   Q.   You did not conduct any analysis

12   concerning a founder's premium, correct?

13   A.   I have not.

14        MR. AIGEN:  Object to form.

15   Q.   And your report contains no opinion as

16   to what you believe the founder's premium should

17   be in this case, correct?

18   A.   That is correct.

19        MR. MORRIS:  Okay.  No further

20   questions.  Thank you very much.

21        THE WITNESS:  Thank you.

22        MR. MORRIS:  Have a good day.  Take

23   care all.

24        (Whereupon the proceedings were

25   concluded at 2:53 p.m.)

Page 254

```
 1                              oOo
 2
 3        I, ALAN JOHNSON, the witness herein,
 4   do hereby certify that the foregoing
 5   testimony of the pages of this deposition to
 6   be a true and correct transcript, subject to
 7   the corrections, if any, shown on the
 8   attached page.
 9        _____
10              ALAN JOHNSON
11   Subscribed and sworn to before me this
12   _____day of _____,_____.
13
14   _____
15
16
17
18
19
20
21
22
23
24
25
```

Page 255

```
 1                         CERTIFICATE
 2
 3        I, AMY A. RIVERA, a Certified Shorthand
 4   Reporter, Registered Professional Reporter,
 5   Certified LiveNote Reporter, and Notary Public of
 6   the State of New York, do hereby certify that prior
 7   to the commencement of the examination ALAN JOHNSON,
 8   was duly sworn by me to testify the truth, the whole
 9   truth and nothing but the truth.
10        I DO FURTHER CERTIFY that the foregoing is
11   a true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place and on the date hereinbefore set forth.
14        I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.
20   _____
21        Notary Public of the State of New York
22        My commission expires December 6, 2021
23        License No. XI00939
24   Dated:  November 2, 2021
25
```

Page 256

```
 1
 2                     INDEX
 3   WITNESS                          PAGE
 4   ALAN JOHNSON
 5   By Mr. Morris              6, 253
 6   By Mr. Aigen                 252
 7
 8
 9              EXHIBITS
10   NUMBER         DESCRIPTION         PAGE
11   Exhibit 34     Highland's audited    166
12              financial statements
13              for December 31, 2018
14   Exhibit 50     Compensation and      236
15              benefit statement for
16              2017
17   Exhibit 51     Compensation and      237
18              benefit statement for
19              2018
20   Exhibit 52     Compensation and      239
21              benefits statement for
22              2019
23   Exhibit 62     Expert report          76
24
25
```

Page 257

```
 1
 2              EXHIBITS (Continued)
 3   NUMBER         DESCRIPTION         PAGE
 4   Exhibit 63     Highland's 2008 audited  119
 5              financial statements
 6   Exhibit 64     Highland's audited    123
 7              financial statements
 8              for December 31, 2009
 9   Exhibit 65     Highland's audited    126
10              financial statements
11              for December 31, 2010
12   Exhibit 67     2019 W-2              230
13   Exhibit 67-2   2017 W-2              231
14   Exhibit 67-3   2013 Form 1040        242
15   Exhibit 68     Compensation and      233
16              benefit statement for
17              2016
18   Exhibit 69     Highland's audited    129
19              financial statements
20              for December 31, 2014
21   Exhibit 70     Highland's audited    133
22              financial statements
23              for December 31, 2015
24   Exhibit 73     Demonstrative         193
25
```

Page 258

1
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:  In Re:  HIGHLAND CAPITAL MANAGEMENT,
4          L.P.
5    Dep. Date:  November 2, 2021
6    Deponent:   Alan Johnson
7    Reason codes:
8        1. To clarify the record.
         2. To conform to the facts.
9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20
21                    _____
22               ALAN JOHNSON
23        Subscribed and sworn to before me
24        this      day of                2021.
25        _____

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-12    Filed 11/22/21    Page 44 of 198    PageID 23259
Appendix Part 2    Page 10224 of 1336

Index: $1.2..25

**$**

**$1.2** 235:2,18

**$1.5** 231:4

**$1.55** 236:15 237:13

**$1.7** 238:8

**$100** 46:10,14 158:21

**$100,000** 228:6

**$13** 137:10,17 244:13

**$13.3** 137:19

**$14** 195:7

**$14-and-a-half**
153:18

**$14.5** 166:5

**$14.8** 142:2,14

**$14.9** 142:19 152:9,
18 177:16 194:21

**$15** 221:6

**$173** 169:24

**$173.4** 167:11 168:13
173:19 174:19

**$174** 167:23

**$2.3** 234:20

**$2.5** 233:8

**$20** 197:17 201:20,22

**$21** 160:25 220:11,
14,19 221:17 222:7
233:9 241:10 244:15
245:8,16 250:24

**$22.8** 154:21

**$23** 138:11 214:15

**$23-and-a-half**
200:19 201:10,12
202:2,15 203:25

**$23.4** 144:16,21
145:2

**$23.6** 145:11

**$23.7** 197:5

**$24.143** 201:6

**$25** 226:16,17

**$29.2** 178:3

**$29.4** 177:21 185:2
186:3

**$3** 160:15,25 220:16

**$3.3** 197:9

**$3.4** 197:9

**$30** 158:25 159:9
188:16,19 221:10

**$30.7** 158:7,16

**$300,000** 122:13
123:11 124:5

**$330,000** 122:17
124:8 126:23

**$371** 173:15

**$400,000** 121:3,13,
24 123:9 152:21

**$5** 46:10

**$5.6** 240:7,23

**$50** 17:3,8 50:12,19,
24 51:24 117:7 173:9
185:14

**$500,000** 97:2,5
117:3 121:17 122:2,
22 123:3 125:14
191:16

**$6** 50:6,9 160:21
220:17 246:21 247:7

**$6.1** 134:15

**$625,000** 232:19
233:2

**$677,000** 201:9

**$7.4** 182:12

**$7.9** 195:12 198:15,
23

**$700,000** 122:11

**$73** 171:3,16

**$74** 172:17

**$783,000** 198:6

**$8** 245:2

**$8.1** 138:15

**1**

**1** 108:12 121:2,16,24
122:21 125:13 184:9
192:11 230:18 231:9
232:18

**10** 83:20 97:11,15
221:10 233:9

**10-minute** 73:21

**10-year** 219:4 226:19

**100** 117:17 167:18
216:3

**1040** 242:5,6,12
243:25

**1040s** 161:7 242:16

**10:27** 74:3

**10:40** 73:22 74:4

**11** 83:20 106:16
107:11 108:7

**12** 83:20 128:23
242:19,23

**12-month** 214:6,15
216:10

**13** 83:20 128:24

**13-minute** 73:23

**14** 80:6

**14.5** 153:5 177:19

**14.9** 153:5 177:18

**143** 87:23

**15** 80:6 82:25 137:9,
25 169:5 181:25

**15th** 123:2

**16** 77:2 115:16
197:21 215:9

**17** 171:25 198:23

**174** 168:18

**18** 16:16 171:25
183:25 195:11,15
196:11 197:8 198:10,
22 199:15 201:13,25
204:15 214:6

**18-'19** 201:18

**19** 7:12 16:16 80:7
171:25 174:5 183:25
195:15 196:12
201:21,25 214:7
218:10 229:22 231:8
233:3

**1:02** 192:15

**1:30** 192:12

**1:32** 192:16 193:3

**2**

**2** 108:15 122:2,5

**2.75** 154:16

**20** 11:20,21,25 46:11
124:8

**2007** 122:6

**2008** 83:19 107:2
108:13,25 119:13,14,
25 120:22 121:11
122:9,17 123:8
124:5,7,8,19 125:13
147:9,13,15,18
191:23 192:5

**2009** 123:17,22
125:10,22 126:10
190:7 191:11 208:8

**2010** 126:13,16
128:11,16

**2011** 128:23

**2013** 7:20 218:14
221:13 225:8 242:4,
6,12 244:2,17

**2014** 80:5 82:25
129:10,14,17 130:19
131:8,14,18 132:6,22
137:8,25 138:14

**2015** 133:4,7,10,17
136:3,14 137:17

**2016** 139:21,25
142:3,14 144:16
145:9 146:25 152:8,
14 153:6 224:8
233:16 234:5 235:19

**2017** 134:20 148:4,10
150:25 152:22 153:2,
5,19 154:10 158:5

163:15,18 164:5
165:24 195:14
196:11 197:8 200:17
231:16,19 236:8,13,
16 237:11

**2018** 7:12 15:9,11
27:9 42:10 92:14
98:23 103:2 108:19
120:3 166:8,13,20
167:23 171:16,22
172:9,10,18,23 174:5
177:11,16,20 178:8
180:19 181:25
183:24 184:23
185:25 186:23 195:6,
11,13 198:10 199:4,
15,21 200:18 201:14,
25 202:13 204:7,15
208:8,16,18 209:11
216:11 218:23
223:12,21 230:4
237:21,25 238:9,14,
19

**2019** 7:20 15:11 27:9
82:25 92:15 98:24
103:2 108:13,20
171:23 172:11,24
182:12 183:4 184:5,9
186:19 197:16,22
198:16 199:14
200:18 201:14
202:13 204:8 208:18
216:11 218:14,23
225:8,12,22 226:3,5
230:10,13 231:4,11
238:25 239:24 240:6,
14,24 242:13 244:2,
17 247:4

**2020** 242:13 248:22

**2021** 77:8 79:14,20
83:14 88:10 89:17

**20th** 122:17 124:5

**21** 122:5 204:16
224:23 225:12

**22** 204:16

**23** 197:21 198:16
199:14 201:14 202:2,
15 204:17

**24** 201:17

**25** 77:19 232:13

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-14    Filed 01/03/24    Page 45 of 198    PageID 23260
Appendix Part 2    Page 44 of 1336

Index: 27..afternoon

**27** 130:8,12 133:22

**279** 242:9

**28** 77:8 83:14 88:10 89:17 175:12

**28th** 79:9,14,20

**29** 134:6

**2:45** 251:10,13

**2:50** 251:14

---

**3**

**3** 103:17 108:18 122:4 184:4,9 205:3 220:18 221:7,17 222:3

**3-** 228:8

**30** 5:17 18:22 68:17 122:9 148:5,17 182:15

**30-year** 18:23,24 59:17,25 149:24 150:13

**30.7** 158:10

**31** 123:17,21 126:16 129:14 133:10 134:20 139:25 140:7 148:10 154:10 158:5 166:13,20 177:11 183:24

**319,000** 199:5

**33** 123:25 126:19 193:18

**335** 242:9

**34** 166:10,12

**370-day** 201:13

**38** 120:13,14,15 181:24

**39** 182:6

---

**4**

**4** 245:11

**4-year** 219:3 228:8

**40** 17:3,8 117:7,9 173:8 185:14

---

**5**

**5** 89:19 200:20 202:15 204:3 214:5 221:5 240:10 241:2 245:3, 11

**5-0** 236:6

**5-minute** 251:11

**50** 11:22,25 12:2 117:10 236:6,7

**50,000** 235:3

**51** 237:19,20

**52** 238:22,24 239:23

---

**6**

**6** 172:7 208:12 221:8 222:2,3 240:11 241:3 245:3

**60** 192:13

**62** 76:20,24 205:2

**63** 119:12,14

**64** 123:15,16

**65** 126:14,15

**66** 128:19 129:8

**67** 230:9,10

**67-2** 231:15,16

**67-3** 242:4,6

**68** 233:14,15

**69** 129:10,13

---

**7**

**7** 50:10 160:15 220:18 222:8,10,18

**7-year** 221:19 228:18 229:5 244:16

**7.9** 198:18

**7/31/06** 121:24

**70** 133:7,9 193:12,13

**73** 193:13,14

---

**8**

**8** 97:11,15 245:10

**8/1/08** 122:2

**80** 117:17

---

**9**

**9** 83:20

**90** 91:19 192:13

**90s** 10:19

**937** 232:5,11

---

**A**

**a.m.** 74:3,4

**ability** 25:11 38:20 47:10 226:13

**absence** 210:16 243:15

**absolutely** 14:5,8,12 42:7 51:14 70:15 128:25 162:7 163:10, 13 169:21 171:14 173:3 187:21

**acceleration** 7:14

**accept** 129:4

**access** 53:20 65:22 161:25

**accomplishment** 31:16

**accomplishments** 31:24 43:11,16

**accord** 82:16

**account** 161:8,13 163:6 174:24 180:17 227:13 229:3 235:8, 18 246:13 249:15 250:25 251:2

**accounting** 182:22

**accrue** 154:15

**accumulated** 7:17

**accuracy** 202:11

209:16 216:3,12

**accurate** 78:19 185:6 194:11 205:22 209:2 215:22 220:23 221:14,15 239:16

**accurately** 209:6 244:15

**achieve** 60:4

**achieved** 24:6 64:15

**achievement** 62:11, 18

**achieving** 44:23 163:12 214:23

**acknowledged** 81:19

**act** 29:14

**acted** 93:4

**acting** 29:10 83:7 187:3 227:9 228:17

**activities** 224:6

**actual** 23:8 218:13 226:4 229:8

**actualized** 23:4

**actualizing** 23:22

**add** 177:18 201:24

**added** 241:13 244:8

**addition** 101:5 229:15

**additional** 22:18 88:12 104:3 105:5, 17,25 106:5,25 109:10 112:12 113:22 195:7 205:11 206:4 218:4

**Additionally** 115:21

**address** 112:22

**adequate** 30:20

**adjustments** 244:23

**Adkins** 95:2,20,21 96:5,7

**admissible** 5:15

**admonish** 212:2

**advantage** 13:13 211:9,12

**advice** 11:16 12:5,14 13:3 28:9,13 29:5 30:9,14,24 34:17 40:17,20 54:23 58:6 61:5 69:23 70:7 71:8, 19 139:5

**advise** 30:17 34:22 35:4 38:11 39:4,11 41:24 43:3,20 44:4 47:16 51:15 52:19 53:23 54:10 55:11,14 57:19 58:5,23 60:25 62:5,21 63:16 64:8 65:12 66:3,22 68:9, 13 69:11,18 70:2,4 156:21 168:7 187:14

**advised** 11:2,6 55:4, 9 70:23 187:19

**advising** 69:8 71:6 168:6 187:9,10,12

**Advisor** 248:17

**Advisors** 78:6 130:16 134:11 136:6 140:23 148:23 157:23 247:22 248:10

**Advisors'** 223:24

**affiliate** 19:11,25 90:5 94:21 95:14 117:24 134:24 140:13 166:23 192:7 207:6,11,12,15 224:14,19

**affiliated** 56:12 124:13 126:5 130:11 160:4 161:10,18 162:2 206:19

**affiliates** 22:3 75:16 118:3 120:23 134:9 140:10 148:20 156:3, 9 157:6 164:4 167:8, 12,14,20,22 168:19 169:7 170:12 173:19 174:18 175:14 185:6, 9,12,19,20 190:12 207:2,22

**afternoon** 193:5 251:22

---

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 174-42    Filed 11/03/24    Page 46 of 198    PageID 23261
Appendix Part 42    Page 103 of 1336

Index: aggregate..assessing

**aggregate** 16:23
17:17 60:19 65:13
117:15 137:10
138:10 142:2 158:15
182:11 244:6

**aggregated** 241:7

**agree** 29:15 33:18
36:13,23 41:4,24
60:8,18 67:10 69:4
112:10 123:7 128:8,
14 136:22 159:2
161:23 190:5 191:7

**agreed** 134:24
139:16 149:18
150:18 151:4,14
153:10,24 155:3
164:8,17 165:3,13
175:22 176:6,12,17
178:16 179:13

**agreeing** 34:15 36:2
40:14 42:25 46:13
49:16 59:2 68:5
173:6

**agreement** 15:10,22,
23 16:2,4,9,14,21,24
17:21 19:6,10,14,20,
24 20:5,10,15,17,19,
21,23 21:4,7,13,25
22:7,13 23:19 24:5,
12 25:2,8 26:12 27:8,
14 28:3 31:5,7,10,13
32:11 39:14 42:9
44:8,12,14 45:8 46:2,
9,11 47:25 50:17
53:25 55:8,22 56:7,
10 57:10 61:13,19,24
62:6 63:24 65:11
66:10,24 68:11 69:12
70:9,12,17,24 71:5
73:9 83:9 92:14
93:17,25 94:2 98:23
99:7,20 100:2
101:14,21 102:25
103:14 111:7 113:11
117:8,16 139:7
155:8,12 156:24
169:17,25 171:21
172:10,13,23 178:25
179:9,16 180:19
181:10 183:4,5
188:22 189:3 196:13
200:2 203:2,10
204:18,22 208:17

209:7,13 211:14,17
249:7

**agreements** 17:12
69:17,19,24 70:21
72:7 78:6,15 138:19
187:15 248:19

**agrees** 32:21

**ahead** 210:6

**Aigen** 5:24 28:7
42:15,25 107:15
109:12 111:11,20
118:7 135:22 147:10
150:6 156:11 157:14
160:6 161:12 162:3
168:16 169:8 170:2
174:25 178:11
180:13,22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
234:7,14,18 240:25
243:20 244:21
249:18 250:14
251:23

**Alan** 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1

104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1,23

**alleged** 22:7,13
103:14

**allegedly** 247:16

**altered** 18:8

**alternative** 11:7

**amend** 80:9 89:11
107:3

**amended** 18:6 77:10
231:8,9

**amortization** 149:25

**amount** 31:22 33:6
43:9 48:18 52:13,15,
17 55:14 56:3,4 59:6
61:2 73:13 81:12
92:7 97:2 116:23
121:13,17 122:6,13
123:9,10 124:5,8
125:4,14,17 131:21
135:11,13 137:10,11,
16 138:11 142:2,18
145:2,10 147:24
152:21 153:4 174:18
175:13 182:11
195:11 198:19
199:14 201:6,16
225:21 237:13 241:2
244:6

**amounts** 17:25 44:3
55:25 58:21 60:23
96:19,21 97:4 109:16
134:20 140:10
147:14 148:19 156:3
157:12 164:3 167:8,
12 169:7 173:18
174:17 175:14
185:16 195:20
241:13

**Amy** 5:4

**analysis** 16:19 17:18
145:25 146:5 160:19
171:16 217:7 218:7
219:14 222:16 223:4,
17 224:2,20 225:19
226:6,10 227:13
229:3,5 239:9 240:24
245:8,18 249:14
251:8

**analyze** 217:18

**analyzed** 250:22

**analyzing** 228:19

**and/or** 203:21 214:23
215:4

**annual** 219:25

**answering** 196:20

**apologize** 26:10
31:8 74:15 82:7 96:2,
6 148:6 181:20
193:13 209:25

**appeared** 190:8,14

**appears** 178:12
191:18,25 230:23

**applied** 43:18
105:11,19 198:8
199:3,5,14,15,19

**applies** 56:10

**apply** 219:3

**approximately**
91:14 154:21 160:15
184:25 197:5 198:6
200:19 202:12,14
203:25 231:4 232:19
233:8 236:15 240:7
244:7

**approximates** 135:6
149:4 176:25

**approximating**
152:3

**April** 75:2

**arbitration** 174:8

**area** 9:3 14:4 28:18
66:21

**areas** 12:15 30:25

**arithmetic** 200:24

**arithmetically** 220:9

**arm's** 10:10

**article** 219:11 222:17

**ascertain** 225:6

**aspect** 79:15 98:7
150:19

**assertion** 100:3

**assertions** 206:5

**assess** 45:4 62:19
63:5,14,25 64:5,6,9,
21 100:21,23 101:9
156:6 227:4 246:11

**assessing** 228:13
235:8

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 174-12   Filed 11/32/24   Page 47 of 198   PageID 23262
Appendix Part 2   Page 103 of 1336

Index: assessment..call

**assessment** 43:4
44:16 45:19 47:3
48:12 102:13 238:18

**asset** 11:2 46:16
247:8

**assets** 28:2 42:11,21
43:22 44:7,10 46:8,9,
10,24 47:20 48:8
93:18 94:3 169:6
173:13 215:5 247:13

**assignment** 100:18,
22,25 101:4,7

**association** 5:5

**assume** 53:15,17,19
66:13 67:21 107:11
108:7 109:7 116:12
120:6 144:24 145:4,
7,12,15,18,22 150:4
158:2,22 194:15
202:10 239:5 249:22
250:4

**assumed** 211:15

**assumes** 173:17
174:15,16

**assuming** 55:13
153:6 221:7,14

**assumption** 108:12,
15,18,21 129:5 145:3
249:25

**assumptions** 109:4,
8,18 173:20 174:20

**asterisk** 199:7

**attached** 28:24
31:17

**attempt** 51:16
161:20 217:18

**attempted** 217:14

**attempting** 39:6
52:22

**attention** 18:17

**attorney** 6:17

**attorneys** 21:4 52:8
99:16

**attributable** 171:2

**audit** 40:4 185:25
186:24

**audited** 83:19 108:23
119:13,14 120:4,22
123:16,21 126:3,15
128:25 129:13,18,24
133:9,16 139:22
142:12 147:18 148:9,
17 152:15 155:21
157:4 158:6,14
166:8,12,19 177:10
179:24 181:8,25
183:7,22 184:23
185:2 186:6 190:2
191:8 206:7,14

**auditors** 84:3
181:10,16 182:16

**August** 121:16
122:17,21 124:5,8
125:13

**authored** 84:7

**average** 50:6 219:24
220:3,5,15,17
221:18,21,25

**avoid** 51:5 139:3,11

**award** 174:8 226:11
234:6,24 235:2
240:7,14,17 245:12

**awards** 238:20
239:5,13,18 241:14,
18,23 242:2 244:25

**aware** 15:23 18:12
32:17 33:10,15,24
71:22 79:3,6 83:25
84:5,8 99:18 110:4,7
112:6,8 117:5,25
134:23 135:2 143:23
144:2,15 162:16
167:24 168:2,22
174:7,9,11 180:6,17
186:12,18 188:2
190:18,25 199:23
200:3 219:11,16
222:15 224:15,17
227:16 228:24
236:25 238:15
239:17 240:15 241:6,
20,22,25 246:24
247:20 248:6,9,14,
16,20,21,24,25
249:5,6,9,10

**aways** 25:24

## B

**back** 10:14 25:9,21,
24 65:19 71:4 73:22
83:6 92:5 107:2
108:20,25 110:20,25
112:9,11 113:9,21
143:23 153:15
155:17,23 172:5
173:11 194:21
204:25 212:4 215:20
224:8 229:21 230:25
232:16 234:4 237:9
238:4 240:5 241:13
244:24 250:18

**back-office** 249:23

**bad** 188:10

**balance** 40:4 42:3
61:16 62:13,15
132:25 139:3 166:25
167:3,11 173:12,22
174:2,21 175:7
198:15

**bank** 83:11 90:16,17
194:5

**banker** 187:25

**bankrupt** 188:15

**bankruptcies** 188:9

**bankruptcy** 106:17
107:12 109:11 171:2
186:13,14,16,18
187:3,10,14 188:2
190:21 204:10,11
211:4,13 245:4,13

**base** 225:20

**based** 10:14 22:18
29:15 45:8 47:6
67:11 116:5 126:7
127:10,14 136:20
159:23 160:2,19
161:4 184:23 190:6
191:7,14,20 192:2
200:21 208:24 209:4
212:6 216:16 222:12,
18 241:8 243:14

**basic** 31:18 40:16,23
41:5 43:6 44:9 58:3
60:15

**basis** 109:9 112:25
146:15 239:7

**Bates** 231:25 232:4,
10 234:8,11 237:8
238:3 240:2

**beginning** 156:18

**begins** 130:12

**behalf** 6:6 21:10,11
29:10,14,17 30:4
83:7 85:2 93:4
103:15 156:9 172:23
173:7 187:3 194:6
211:18 227:9 228:17,
22

**behaviors** 33:4,8

**believed** 16:4 186:21

**believes** 66:8

**believing** 203:20

**beneficiaries**
145:17

**beneficiary** 55:8,22
145:19

**benefit** 156:23
158:22 161:9,17,24
162:10,14 168:9,15
187:25 233:15,20
236:7,12 237:20
250:10

**benefited** 159:7
162:4,5

**benefits** 237:24
238:7,24 239:24

**bet** 9:9

**big** 13:20 250:19

**bit** 15:4 39:24 72:24
79:12 113:5 221:4
247:19

**Black-scholes**
226:24

**blue** 52:12

**board** 11:16,21 12:4
13:9 29:20,23

**boards** 12:7,11,12

**body** 30:3

**bonus** 225:20

**book** 135:14,15

**books** 44:11 72:8

**boring** 166:3

**borrowed** 46:5 185:9
195:6

**borrower** 136:25
137:4 203:19

**borrowing** 185:12

**bottom** 77:4 130:12
167:6 170:24 171:3
224:23 225:12
230:17 231:23
233:25 237:5 238:2
239:25

**box** 157:24 231:9
232:18

**break** 73:21,23 74:7,
12 184:20 189:23
192:12 193:8 251:11

**bring** 210:21,25

**broad** 52:25 58:2
92:11,12

**broke** 88:13

**bullet** 208:15

**bunch** 17:12 189:16

**business** 12:17
24:14,17,24 25:12,23
33:11 36:18 37:6
38:19 39:22 40:25
41:12 46:19,22 48:10
54:8 114:20 193:25
212:8 213:9 218:20
233:22 245:21 246:2,
15,17,22 247:2,17

**businesses** 168:20
170:5 224:4

## C

**calculated** 161:4
233:10 245:16

**calculus** 44:23

**call** 42:15,20 90:24
91:12 193:22 211:4

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Appendix Part 2 Filed 11/02/22   Page 48 of 198   PageID 23263
Document Page 48 of 133

Index: called..conclude

**called** 114:16 120:23
130:11 132:2,16
156:2 211:15 243:17

**calling** 22:19

**calls** 90:25 91:2,8
216:11

**candid** 93:10

**CANTY** 76:18 129:10
133:7 163:18 166:10

**capacity** 188:16

**capital** 5:21 6:18
75:15 78:5 79:24
85:11 114:19 129:18
130:16 132:17
134:11 138:14
139:18,23 148:22
151:9 160:5 161:10,
14,18,25 162:5,6,12
163:11 165:8,15
173:14,17 174:14,23
176:18 190:17,20
222:24 223:5 242:20
243:3,17 244:3,9
247:22,23 248:15,17
249:3

**career** 10:16 73:2

**carried** 167:11

**carrying** 135:6,12
149:4 152:4 176:25

**case** 5:19 43:19
73:16 74:17,25
75:12,16,20 76:3
84:6,15,22 85:18,21
90:14 100:7 119:8
135:15 183:12
185:13 207:3 217:9

**cash** 40:5 225:20,21
226:2,4 241:12
249:11

**catalog** 70:14

**catch** 79:11

**categories** 80:14
92:12

**categorized** 208:21

**caused** 222:18

**caveat** 52:24,25
55:24 73:13 78:19

190:4,5 206:19

**cell** 10:3

**CEO** 29:25 53:11,24
54:12 65:20 66:20,24
67:24 71:5,9 246:12

**CEOS** 247:5,7,14

**certainty** 44:21

**certified** 5:5

**change** 89:6,10
106:15 107:10,17,25
195:7 199:5

**changed** 23:10
107:7,8 168:23
216:16

**changing** 195:20

**chaos** 188:13

**chaotic** 37:2 41:10
54:19 55:18 188:11
211:8

**characteristic** 23:7

**characteristics**
23:11

**characterization**
22:23

**characterize** 78:2
81:6

**characterized** 20:21
200:21

**chart** 196:10,23
198:4 200:22 202:10,
11,12 219:21 222:22
225:11 229:22 231:8
233:3

**cheat** 147:16

**chief** 85:12

**child** 10:9

**circumstance** 36:11
37:23 41:2,15 47:23
54:17 60:6,17

**circumstances**
26:6,7 30:21 33:16
34:5,10 45:6 47:14
48:3 54:11,16 63:12
102:3 119:5 196:18
203:7

**Civil** 5:18

**clarification** 222:5

**clarity** 37:20

**clear** 6:14 8:9 26:11
37:5,11 38:7 41:21
151:25 212:9 213:13
214:7 251:25

**client** 14:23 39:8,11
44:4 55:4,9,11,14
58:23 60:25 68:9
181:9 187:9,14,20

**clients** 11:11 13:4,25
14:16 28:19 33:25
37:14 47:21 68:13
69:18 70:5 181:5,15
189:7,19 210:22
211:24

**closely** 119:3

**closer** 47:8

**co-founder** 143:12

**co-owned** 207:7

**codifying** 92:25

**colleague** 91:11
95:9

**collect** 188:19

**column** 194:25
196:24 198:5 199:2,8
201:6,19 227:24

**combined** 149:22
150:13 158:9

**comfortable** 10:7
13:25 191:9,15,21
192:4 244:14

**commenced** 72:15
73:5 188:25

**comment** 25:9

**comments** 26:8
95:25 105:13

**committee** 12:4 13:9
29:19,20,24

**committees** 12:12

**common** 69:4,7

**commonly** 45:3

**communicate** 74:10

**communicated**
90:13

**communication**
90:22

**comp** 29:20 45:3
241:14 245:12

**companies** 12:19
15:13 56:12 72:5
115:7 160:5 161:11,
18 162:2 206:19
208:20 216:24 247:5,
8

**company** 29:15,17
32:14 36:6,10 44:3
53:19 61:11,17,20,
23,25 62:4,13 63:13,
21,23 66:12 67:16
68:6 92:22 93:4
102:2 105:9 113:7,12
114:4,14,24 119:8
163:4,11 170:11
172:22 173:2,6 174:7
200:11 203:17,22
208:3,6 211:18
214:24 215:3 226:15
228:7

**company's** 33:13
38:3 53:20 226:14

**comparable** 48:13,
19 49:10,15 51:11,17
52:4,20 64:25 65:23
68:23 102:13 160:20
161:22 216:24 227:5
228:14 239:19
244:18 247:4

**compared** 118:4
220:15

**comparing** 220:2

**comparison** 239:19
247:6

**compensated**
49:10,16 51:11 156:7
157:10

**compensation** 7:19
9:4 10:16,19,23 11:4,
8,17 12:4,15,23
13:5,9 14:4,15 22:18
23:3,5,8,9,12,13
24:15,19 27:19,25

28:15 29:24 30:5,16
32:10 33:19,20 34:6,
15,24 35:5,7 36:14
38:2,12,22 39:15
40:23 41:5,25 43:2
48:13,19,22 50:20
61:9 62:23 66:16,22
69:11 70:23 72:19
88:9,12,14 94:12
101:6 104:3,12
105:5,18,25 106:6,
18,25 107:6 108:3
109:10 110:21
112:13,17,20,24
113:23 114:6,16
115:2,8,23 116:20
157:16,20 189:2
205:11 206:4 215:14
218:14 219:21,25
221:18 223:7 225:7
227:5 228:13 233:15,
20 234:6,20,24
235:8,19 236:7,12
237:14,20,24 238:6,
18,24 239:10,24
240:7,14,17,24 241:7
244:19 250:13

**competition** 52:23

**complaints** 75:12

**completed** 200:5
230:21 232:8,15

**completely** 93:9
251:24

**completing** 195:23

**complicated** 34:2
69:17

**comports** 150:11

**comps** 220:3 225:16
239:11 240:22

**concept** 14:19
179:19,23 196:5
202:20

**concern** 79:14,20
113:8 116:13 117:17
177:9

**concerns** 129:2
140:22 164:13

**conclude** 109:9
127:10 178:7 243:15

**concluding** 191:9, 15 192:4

**conclusion** 115:18 146:11 153:2 160:13

**conclusions** 18:8

**condition** 35:10,12, 15,20,25 36:5,9,15, 18,25 37:6,7,12,14 38:4,14,17,19,24 39:2,7,9,13,22 40:24 41:6,11 43:5 44:16 63:8,12,21 66:17 68:21 136:24 137:4 163:9,10 170:10 172:21 173:2,6

**conditions** 22:20 43:22 56:9

**conducted** 95:13 102:24

**confident** 208:25 209:5

**conflicts** 202:20

**confuse** 185:24

**confused** 185:17

**confusion** 188:13

**conjure** 55:20 67:12

**connection** 179:16

**conservative** 218:2

**consideration** 58:8, 25 59:16

**considered** 54:13 89:23 90:3 91:4 114:5 115:22 146:9, 14 157:20 163:13 215:13 228:12

**consistency** 231:7

**consistent** 102:8 105:13 114:4 115:14 147:24 233:2

**consolidated** 7:13 16:15 170:18

**constituted** 56:4

**constructing** 87:18

**consultant** 10:16 189:2

**consultants** 13:16

**consulting** 10:19,23 13:2

**contained** 157:3 194:13

**contemplate** 58:14

**contemplating** 69:9

**contends** 117:8 200:2

**context** 15:18 32:14, 23 33:11 49:2 65:7 155:12,13

**contingency** 42:16

**contingent** 42:16 64:11

**continue** 149:11 154:4 177:13 182:5

**continues** 149:2 215:22

**contracted** 249:24

**contrary** 243:16

**contribution** 155:8, 11 179:8,16

**control** 204:6,12 249:2 250:8

**controlled** 56:23 156:10 157:13 158:23 159:19 167:15,16,17,19

**controlling** 248:12

**controls** 56:13 158:3

**convenient** 189:18

**conversation** 56:17 83:10,12 146:22

**conversations** 56:18

**convoluted** 111:13

**copies** 57:20

**copy** 86:17

**corporate** 19:11,24 117:24 118:3,16,21, 25

**corporations** 119:4

**correct** 10:15,17,24 11:8 27:11,16 28:5 30:11 40:18 61:4 62:23 63:9 65:15 77:16,17 80:10 83:9 85:3 94:6 97:23 101:22 102:4 103:2, 6,15 113:3,18 116:10,11 118:6 120:9 125:10,22 128:11 130:24 131:8, 18,22 132:7,22 133:20 135:17,21 136:3 140:4,5 142:19 144:21 146:19 147:2, 13 148:3,14,15 149:19 150:9,10,15 153:8,12,13 154:2,3 158:16 159:15,20 160:16,22,23 161:5, 11,15,19,22 168:10, 11 169:3 171:23 173:19,24 177:11 178:17 179:4 186:9, 10 190:18 191:3,11, 22,25 196:10,14 197:10,18 201:14 202:17 205:15 206:10,16 207:23,25 208:8 209:13 210:14 212:19 213:3,10 216:4 217:12,15 218:8 220:4,19 221:19,23 222:8,10, 13,24 224:25 225:9, 10 226:3 227:19,21 229:25 231:11 233:4, 10 235:9 236:2,21,24 237:16 240:14 241:19 250:22,25 251:7

**corrected** 232:21

**correctly** 6:22 8:6 11:11 104:6 114:4,9 116:2 127:4 137:20 154:23 185:22 208:22 215:16 248:3

**correspond** 124:6

**corresponds** 124:17

**cost** 15:12 28:3 42:12,21 43:21 46:8, 10,11 47:3,19 208:19

**Cote** 95:2 96:9

**counsel** 5:3 194:8

**count** 201:3

**counted** 200:23

**couple** 16:18 19:2 136:18 162:18,21 194:7 211:23

**court** 5:2,5 187:4,15

**courtroom** 5:16

**cover** 56:21

**covering** 19:6,10,14

**covers** 184:8,12,15

**COVID-19** 5:7

**created** 23:11 145:14

**crisis** 37:3 218:19

**criss-crossed** 8:16

**curious** 111:9,12,13, 14

**current** 14:10 24:18 92:5 104:3 105:5,17, 25 106:6,25 112:13 113:23 205:11 206:4

**customarily** 72:6

**customary** 138:17

**cutoff** 184:14

**cycles** 13:24

---

**D**

**D-CNL003585** 234:17

**D-CNL003587** 237:8

**D-CNL003588** 238:3

**D-CNL003589** 240:2

**Daniel** 6:5

**data** 13:18 39:18 89:23 91:4

**date** 44:7 46:8,11 75:7 81:13 82:10 84:6 85:13 89:16 108:8,10 111:5,19,23 160:16 182:13,18

**dated** 124:8 177:5 184:4

**dates** 127:7,25 128:4

**day** 156:19 198:24 226:15

**days** 95:18

**deal** 45:13 61:15,16 66:7

**dealing** 13:21 29:25

**Deborah** 6:2

**debtor** 186:13 187:10,13 188:17

**decade** 109:11

**December** 108:20 123:17,21 126:16 129:14 133:10 139:24 148:10 150:25 154:10 166:13,20 171:22 172:18 177:11 183:24 197:21 198:16 199:14 200:18 201:13,14,25 202:13 204:7 214:6,7 216:11

**decide** 67:7 223:3, 15,25

**decided** 221:3

**decides** 29:21

**deciding** 163:6

**decision** 12:13 29:7, 9,11,12,16 30:2,4,9, 14,18,23,25 31:10 32:8,12,18 33:17 34:13,22 35:4,12,24 36:12,23 37:9,16,24 38:11,18,21 39:4 40:11,18 41:3,16,24 43:3,20 44:5,13 45:7 46:13 47:17,24 48:20 49:14 50:11,13 51:4, 6,16 52:3,5,19 53:23 54:8,10,21,25 55:21 57:2,6,8,11,14,19,21 58:4,5,9,15,20 59:14 60:7,17,21 61:7,12,

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 78-142   Filed 11/25/24   Page 50 of 198   PageID 23265
Appendix Part 42   Page 1035 of 1336

Index: decisions..due

18,21 62:3,4,6,21
63:8,10,16 64:8,23
65:12 66:3,14,23
67:4,10,13,21,22
68:10,15,18 69:8,11
70:2,23 72:12 73:2,8
93:3,17 98:22
100:14,17 102:24
103:10,13 156:21
163:5 168:6 169:16,
19,22 170:6,8
172:20,25 173:5
211:16 218:22,24
219:9

**decisions** 41:12,14
65:7 188:10 189:7,20

**deduct** 197:14 201:8

**deferred** 23:8 105:10
107:5 108:3 112:17,
19,24 114:6,15,25
115:23 116:20
215:14 234:6,24
240:6,14,17 241:14
245:12

**define** 56:16

**defined** 28:25

**definition** 30:10
80:21 111:21

**degree** 245:15

**Deitsch-perez** 6:3

**delayed** 24:16 27:23
114:17

**delaying** 25:22

**delivered** 217:5

**delta** 221:5,10
250:24

**demand** 18:19 19:3
59:16 60:2 134:19,24
136:22 137:14
154:22

**demanding** 136:17

**demonstrative**
193:14,22 214:4

**department** 52:10
71:22

**depend** 54:16 119:5
138:21 196:18

207:21

**dependent** 216:3

**depending** 47:13

**depends** 66:5 159:5

**deposed** 8:20 100:7

**deposition** 5:11 6:19
18:5 29:7 81:20
82:19 84:6,10,25
85:17,22,24 86:4,12,
13 88:7 89:9 100:10

**depositions** 9:11
153:16

**describe** 13:8 17:10
19:19,23 20:4 28:17
48:14 83:8 92:13
105:18 162:10

**describes** 130:15
164:4,23

**describing** 105:20
206:25

**description** 27:3
109:2 150:23 220:22

**design** 45:2 59:22

**detail** 7:24

**determination**
48:20 222:12

**determine** 65:8,10
115:11 217:8 245:19
251:5

**determined** 220:16
221:22 222:10

**differ** 219:3

**difference** 118:23
160:24 199:13
219:20 220:9,11,14,
18 222:7 233:9
244:15 245:16

**differently** 8:16
146:10

**difficult** 13:21,23,25
37:4 41:11 43:7
44:24 45:19

**difficulty** 32:4 45:4,
17,23 64:14

**dilemma** 153:16

**diligence** 102:24
103:5 230:6 251:4

**direct** 87:2 162:12

**directed** 86:21,24
87:16

**directly** 56:13,22
90:13 248:7

**director** 53:12,16,18,
19 54:2 65:20,25
66:8,14 68:2,6 71:6,
7,12

**directors** 11:16,21
12:4,8,11,12 29:23
71:14

**disappointing**
162:22,24

**disclose** 110:24
181:17 188:6 206:9
211:11,22 212:2
228:22

**disclosed** 79:4
182:25 183:6 191:13
206:21 208:10 209:6
211:25 223:20
226:12,23 246:4

**discloses** 173:23
188:17 232:18

**disclosure** 182:17
188:17,24 211:3,20

**discomfort** 111:16

**discuss** 14:19
110:16 113:15
119:20

**discussed** 16:3
195:18,22

**discussions** 53:10

**dispute** 37:6 39:3
117:13 196:9

**disputed** 110:13

**disputes** 72:20

**distancing** 5:9

**document** 9:16
17:10 40:8 78:12,22
81:10,14 120:7,15
124:2 133:20 148:13
181:6 183:19 193:11,

18,24 194:14 210:15,
23 212:4 230:20
231:2 232:7,14,17
234:2 237:7 239:22

**documentary** 20:9

**documentation**
17:24 18:3,13 21:16,
18,20 79:23 116:13
119:7 206:6 210:16,
24 213:11

**documented** 72:20
127:22 183:11

**documents** 9:13,21
17:6 18:9 19:18,22
20:3,12 21:11 77:22,
25 78:3 79:3,9,13,17,
19 80:8,14,16,19
81:5,17,20,24,25
82:4,5,9,15,17,19,21
83:7,14 88:5,19
89:15 90:4 98:7,10,
13,15 106:11,14
112:3 116:9 118:14,
22 190:12,13 194:9
213:8 215:19 229:20
241:9

**dollar** 60:23 61:2

**dollars** 46:5,7 122:6
244:7

**domain** 225:6 247:14

**Dondero** 6:6 7:10
14:23 15:9,24 16:3
18:15 19:7,20 20:15
21:3,10 22:3,8,13,17
23:21 24:4,13,23
25:3,6,16,25 26:9,20,
24 27:3,7 28:3 56:11,
12,14 75:19 83:6,10
85:20,23 90:5,9 91:2,
9,15 94:9,18 98:23
99:3,6,13,20,23
100:2 101:15 102:7
103:2 104:10,17
105:4,7,12,16,23
106:5,6,9,17 107:14,
22 108:10,13,15,21
109:3,9,25 110:2,17,
24 111:3,17 112:4
113:2,10 115:10,22
116:6 117:6,16
141:25 142:7,13,24
143:12 145:14,19

146:16 151:21 152:9,
17 153:3,12,17
156:7,10 157:9
158:3,22 159:18
160:3,14 161:9,17,24
165:19,23 167:15
171:20 172:8 177:15
178:8,17 180:18
183:3 184:25 185:8,
20,21 187:2 191:22
194:6 195:6,15
196:11 197:15
198:22 199:21,24
200:18 201:5 202:13
203:24 204:6 205:15
206:3,15 207:9,13
208:16 209:6,11
210:10,18 212:21
214:5 215:2,13,21
216:4,5 224:12,18
225:4,5,25 227:6,8,
14 228:14,16,21,23
229:4 230:14 231:3,
21 236:19,22 237:10
238:7,12 240:6,12
244:2,16 245:19
246:11,18 248:6,25
250:10

**Dondero's** 87:17
88:7,9,20 89:9 194:8
195:24 218:13
219:20,25 220:15
221:18 223:4 229:22
234:3 235:19 236:12
237:24 238:18
239:10,23 240:24
242:4,11 243:10,25

**double** 200:23 201:3

**dozen** 70:10,13,18

**dozens** 12:9

**drill** 39:23

**due** 5:7 82:23 108:16
111:5 122:11 131:21
132:25 134:15
135:16,21 137:11
139:13 140:10
144:18 148:19
152:16 154:20 156:3
164:3 167:8,12 169:7
173:18 174:18
175:14 177:19
195:16 198:9 199:20
200:20 204:3

Index: Dugaboy..experience

**Dugaboy** 84:17,19, 21 85:2 99:8,23 101:15 144:5,8,12, 16,18,20,23,25 145:9,13,23 146:18, 22,24 154:7,10 155:5 179:8,15

**duly** 6:8

**duties** 54:3 67:15 92:3,6 94:16

**dutiful** 116:12

**duty** 61:10 67:23

———————

E

**earlier** 27:21 35:16 38:15 41:8 42:5,24 48:23 55:25 60:12 62:9,20 64:16 70:20 90:15 115:5 163:9 170:10 181:4 183:9 202:23 203:3,12 211:25 235:6 247:19

**early** 10:19 15:11 27:9 90:10 92:15 95:5 98:24 103:2 138:24 172:4,11,24 183:4 208:18

**earn** 102:14

**earning** 160:21

**earnings** 160:14

**eastern** 73:22

**effect** 146:6

**elements** 38:22 88:14,25

**Elms** 6:5

**embarrassed** 77:24

**employed** 127:17

**employee** 46:5 55:7 73:4 97:15 121:4,12 122:23 123:3,9 128:16 129:3,7 223:6,19 224:3 233:23 239:15

**employees** 26:14 30:2 34:6 52:23 90:6 94:22 95:14 105:15

115:11 123:10 126:6, 10 130:4 207:23 212:7,14 213:20,21

**employer** 29:10 30:4 40:13 41:7,18 46:6 63:9 168:9,14 169:24 225:22

**employer's** 36:24 63:18 68:20

**employment** 68:20

**enabled** 159:3

**enabling** 44:15

**encompassed** 70:9

**end** 13:19 103:24 121:7,20 122:18,23 123:4 125:4,18 126:4 127:18 130:20 131:21 132:25 134:16 137:11,17 142:17 149:2,9 152:10,22 153:5,19 154:19 167:23 177:20,25 180:2,7 182:24 184:15,24 186:2 201:18 204:8 205:9 208:8

**ended** 138:14

**ending** 133:17 139:24 148:10 154:10 166:20 172:17 177:10 183:23

**ends** 152:2

**endure** 128:22

**engaged** 6:23 74:16, 17,21,24 75:7

**engagement** 75:3,6, 16

**enter** 31:3,10 37:25 38:11 39:5,19 40:14 41:16 45:8 46:2 47:25 48:21 49:16 52:20 55:5 58:15 63:15 66:23 68:10 70:17,24 72:5,12 102:2 173:7

**entered** 21:13 23:18 27:9 46:9 62:7 73:3

92:14 93:17 98:22 99:6,19,25 101:15 102:8 103:14 113:11 169:17 171:21 172:22 180:18 183:3 211:17

**entering** 32:10 35:13 39:13 50:17 51:18 53:25 54:14 55:22 57:4 61:8,20 63:6 64:2,4,7,22 65:11 67:23 68:18,24 69:9 102:25 156:23 169:25

**enters** 67:14

**entire** 10:15 86:17 125:17 132:24

**entirety** 131:20

**entities** 8:16 56:22 89:2 109:15 118:17, 21 157:12 160:18 206:23,25 241:4 248:8 249:7,11 250:5,9,13,17

**entitled** 81:10 155:22 182:2

**entity** 19:16 20:6 119:2 131:25 132:16 158:23 162:23 187:24 188:15 190:21 191:10 207:11 213:2 224:10 230:5 243:5,14,17

**entity's** 35:9,11,25 36:15 38:13,24 39:2, 13 42:2 66:17,18

**entries** 233:7

**entry** 73:9

**equal** 97:2 146:15 157:10

**equaled** 135:20 137:18

**equals** 135:10,15 160:25 173:19

**equity** 12:18

**essentially** 146:13

**estate** 248:10

**event** 27:15 42:17, 19,20 45:9,11 47:4 128:8 180:15 182:23 183:6 184:8

**events** 31:20 32:6 33:12 35:17,21 64:10,15 179:20,23 180:2,5 181:22 182:2,24 184:11

**eventually** 109:19 114:20

**evidence** 20:9 125:8, 21 126:9 147:7 206:2 210:13

**exact** 59:7 97:4 182:21 194:18

**EXAMINATION** 6:11

**exceed** 173:13

**excel** 88:11,13,18,23 89:5,14

**exception** 69:22

**excerpt** 86:18,19,22, 24 87:4,6,11,15 88:7, 20 89:10

**excess** 197:16 244:13

**exchange** 150:25 198:23 248:23 250:6

**exclude** 197:7 200:17

**excluding** 191:21

**exclusively** 105:6

**executed** 89:17

**executive** 9:4 10:16, 18 11:4,7,17 12:15 14:4 28:14 30:5,16 32:23 35:5 36:13 38:2,12 39:14 41:4, 25 48:22 49:17 50:8, 21 51:25 55:7 61:9 65:24 66:4,22 69:10 70:22 72:12 156:23 168:10,15 169:25 187:23 188:6,15,21, 25 203:16,19 225:22 227:5 235:9 246:19

**executive's** 32:9,20

33:19,20 34:14,24 35:7 62:23 66:15 68:20

**executives** 21:14,15 25:19 28:21 33:23 48:13,19 49:10,15 50:2,5 51:11,17 52:4, 20 64:25 65:23 68:23 102:13 104:19,21 113:5 114:14 160:20 161:22 181:11,17 215:25 216:25 225:3 226:3 228:14 239:11 244:20

**exercise** 119:19 226:13,18,20

**exhibit** 76:20,24 81:11 119:12,14 123:14,16 126:14,15 128:19 129:8,13 133:6,9 166:10,12 193:12,14,18,23 205:2 214:4 218:13 230:9,10 231:15,16 233:14,15 236:6,7 237:19,20 238:22,24 239:23 242:4,6

**exist** 37:8 111:23

**existed** 21:20 22:22 102:4 111:19 187:15

**existence** 19:19,23 20:4 21:12 71:10 72:14 83:8,15 211:14

**existing** 81:6

**exists** 16:9 21:25 100:11 101:21

**expect** 189:15

**expectation** 182:23 212:9 213:14 214:8, 11,16

**expectations** 214:12

**expected** 180:20 183:5

**expenses** 145:17 174:10 245:20,25 246:15 247:16

**experience** 13:11,24 28:9,18 49:9 53:16

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-42    Filed 11/07/24    Page 52 of 198    PageID 23267
Appendix Part 42    Page 103 of 1336

Index: experienced..forgiven

66:20 67:11 68:17
72:4 103:9,13
127:11,14 136:20
159:24 188:25
222:19

**experienced** 9:12

**experiences** 13:14
95:24

**expert** 6:23 7:3 8:23
9:3 30:24 35:23
70:22 74:21 76:15,20
83:16 89:17 106:22
116:12 118:24
184:10 227:2 228:10
230:18

**expertise** 14:4,7,9
29:16 49:9 66:21
67:12 136:21 159:24
160:3

**experts** 13:17

**explain** 7:23

**explained** 113:20

**explanation** 203:24

**extended** 19:7,11,15
22:3 107:13 139:18
142:24 143:20
146:18 149:19 151:6,
9,16 153:12 154:2
155:5 164:10,14,19
165:5,15 168:9
169:24 175:23 176:7,
13,18 178:17 179:2,
15 192:6

**extent** 58:7,24 62:21
63:7,17 156:17
157:11

**extremist** 54:20
55:17

**F**

**face** 66:6 67:8 68:7
135:11,13 216:25

**faced** 174:5

**facets** 72:19

**facilitated** 159:5,8

**fact** 9:2 21:19 27:13

---

49:4 109:8 110:2
116:25 131:20
132:24 145:24
147:19 155:20
167:25 169:10,15
171:6,9,15 196:10
200:4,16 203:4
206:7,8 230:20

**factor** 157:19 163:5
222:6

**factors** 32:16 51:13
61:16 221:16,17

**facts** 69:6 89:22 91:4
102:3 107:7 108:7
218:5 221:7,14

**fails** 163:5

**failures** 162:15,16

**fair** 10:12 11:24 14:3,
6 20:8 22:20,23
23:14 27:20 29:18
30:6 31:14 32:5
38:10 41:23 42:15
47:2,6 48:14 49:13
51:5,8,10,12,19
52:18 61:13,17,19,
22,24 62:4,7,16
63:18 64:12 65:2
66:7,9,11 67:8 68:3,
5,7 78:2 84:9,13,20,
24 92:6 94:4 100:6,9
101:17 102:14
103:10 109:24
116:23 117:14 118:8
124:16 126:7 132:12
133:2 135:4,10,20
142:9 147:6 149:3
150:4 152:3,25
159:23 160:2 174:13,
22 176:23 178:7
180:12 191:17
197:13 202:19 210:9
219:2 222:19,20
227:12 229:2 240:20
241:11,12 243:15
246:18 249:14

**fairly** 62:18 200:21

**fairness** 62:20 63:5,
14,25 64:6,22 65:8,
10 100:23

**fallible** 69:18

---

**false** 106:25

**familiar** 14:10 25:21
40:7 57:9,22 65:21
80:13,23,25 117:21
170:20 179:19
182:21 249:19

**familiarity** 38:6
57:25 75:14,18

**fashion** 220:20,21

**fast** 96:2

**fathom** 36:21

**favorable** 187:21
188:4,6

**feasible** 34:19

**features** 7:14 58:3

**February** 171:22

**Federal** 5:18

**feel** 43:14 217:23

**feeling** 45:17 47:6,9

**felt** 62:16

**fiduciary** 54:3

**figure** 41:11 185:6
241:7 247:7

**file** 88:11,13,18,24
89:5,14

**filed** 109:11 186:18

**filing** 106:17 107:12
186:15 204:11

**filling** 246:4

**final** 30:23

**finalized** 184:16

**finance** 71:22 181:15

**financial** 10:23 11:12
12:22 13:4,12,22
35:10,12,15,20,25
36:5,9,15,25 37:3,5,
12,14 38:3,14,24
39:2,7,13,24 40:2,12,
16,24 41:6,18 42:2
49:11 53:17,20 63:8,
18,21,23 65:22
66:17,18 68:21,22
71:23 72:2,7 78:4,14
79:24 80:4 82:9,24

---

83:19 85:12 88:6,19
101:9 108:24 115:7
119:13,15,25 120:5,
22 123:17,21 126:16
129:2,14,18,25
133:10,16 136:24
137:3 139:23 142:8,
13 147:18 148:9,18
152:15 155:16,21
157:4 158:6,14 163:8
166:13,19 170:10
171:13 172:21 173:6
177:5,10 179:24
180:7,10 181:8
183:7,23 185:3 186:7
190:2 191:8 206:7,14
216:9,23 217:6
218:19

**financials** 124:19
126:3 139:21 152:9
156:13 162:17 166:9
170:5 180:8,24
181:25 183:2 184:24
190:9,15 191:24
192:3,10 194:22
195:5 206:17,20
208:11

**find** 34:18 93:12
189:19

**finish** 215:11

**finished** 209:24

**firm** 9:3 10:19,22
12:18 46:25 74:17,22
75:23 76:3,5 82:2,4,
12 83:18 86:25 87:2,
12 91:11,21 92:6
109:25 115:25
116:18 215:15 217:2
243:12

**firm's** 11:11

**firms** 11:3,7 12:22
13:2 72:10 101:9
189:12,17 206:25
217:6

**fiscal** 123:8 180:3

**five-plus** 85:12

**fixed** 226:14 228:8

**flip** 153:15

**flow** 40:5

---

**focus** 15:7,21
118:19,20 196:24

**focused** 86:19

**focusing** 112:16

**follow** 181:5

**footnote** 199:12

**footnotes** 175:6
179:25 180:4

**forecast** 43:7

**forgave** 97:18
107:12 108:23
121:12 123:8,9 126:9
128:10 137:23 141:2,
11,19 143:19 191:16
207:22

**forget** 188:10

**forgivable** 14:19
28:9,14 38:11 39:21
40:22 43:2,9 70:25
87:18 101:8 202:24
212:7,23

**forgive** 29:12,17
30:5,15 32:5,21
33:18 34:15,23 35:2,
5 36:2,13,23 39:14
41:4,24 45:8 46:7,14
50:11 52:14 59:2
60:8,18 61:2 70:9
130:4 139:10,17
149:18 150:19 151:5,
15 153:11,24 155:4
163:7 164:9,18
165:4,14 175:22
176:6,12,17 178:16
179:14 200:11
214:21

**forgiven** 15:12 21:20
27:15 31:11 42:11
43:10 56:8 57:7
60:10,20,24 65:5,15
92:24 93:18 94:3
96:14,17,22,25
97:10,14,22 98:4
104:23 108:4 109:3,
19,20 114:7,20
116:19,21 117:3,19,
23 118:4 121:8,25
122:10,13 125:9,22
127:16,22 130:24
131:7,17 132:6,22

---

136:2,13 138:22,23,
25 139:4,13 140:17
142:22 146:25
147:25 157:17
169:21 170:8 181:18
187:16 188:23 190:6
191:10,22 192:5
203:14,16,21 206:9,
16 208:19 212:10,18
213:20,24 214:8,17
215:24

**forgiveness** 15:24
19:6,10,14,19,23
20:4,10 21:12 22:2,9,
14 23:20 24:11 25:2,
8 26:12 27:8 31:3,6,
22 32:11 33:3 35:14
36:4 37:25 39:5
40:14 41:17 42:16
47:25 48:21 49:17
51:18 52:21 53:11
54:14 55:5,23 57:5,
10 58:8,16,25 61:8
62:17 64:11 65:11
66:2 67:14,24 68:19,
25 69:10,24 70:18
71:10 72:5,13,17,22
73:3,10 83:9,11,15
92:15 98:24 101:16
102:2,7 115:13
127:5,12 138:20
139:7 147:12 156:24
169:17 171:21 173:7
179:2 180:19 181:11
183:4 186:8 187:5,24
196:6,13,17,20 200:2
203:2,10 208:7

**forgiving** 37:10
58:11,13 60:14
107:22 147:7 163:13
202:21 207:13,16

**forgot** 76:15

**forgotten** 163:14

**form** 27:25 28:7
48:19 67:17,25 90:22
105:9 107:5,15 108:3
109:12 111:11,20
114:5,25 118:7
127:15 135:22
147:10 150:6 156:11
157:14 160:6 161:12
162:3 168:16 169:8
170:2 174:25 178:11

180:22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
240:8,25 242:5,6
243:20 244:21
249:18 250:14

**formed** 94:11

**Forms** 242:12 243:25

**formulating** 94:19

**found** 54:24 230:4

**founder's** 216:19,22
217:8,12,15,19 218:8

**founders** 216:24
217:5 247:15

**founding** 50:5

**fourth** 124:6,20

**frame** 172:3 186:20

**frames** 39:18

**Frank** 85:5

**front** 9:21

**frustrating** 45:21

**fulfill** 67:23

**fulfilled** 67:15

**full** 108:20 111:17,18
112:5 120:3 143:24
156:16,22 157:11
174:16,17

**fully** 130:19

**fund** 12:18 78:5
130:16 134:11
148:23 247:22
248:17

**funds** 11:6 24:16

**future** 24:6 27:10,15
33:14 42:17,19 45:9,
10 46:25 47:4 56:8
64:10 108:5 157:17
218:4

---

## G

**gain** 39:6 51:17
226:21

**gave** 56:20 81:25
82:4,20 84:5 97:22
141:4 150:20

**gears** 184:17

**general** 7:2,6 25:10,
20 32:13 34:11 39:20
48:25 57:12,25 58:20
59:5,9 60:22 63:22
105:18,21

**generally** 12:8,13
34:17 45:15 53:5
57:22 80:24 87:10
137:3 157:16,24
208:21 225:9,10

**gentleman** 143:5

**give** 7:23 11:19 12:14
25:11 30:14 40:18,20
64:2 69:23 71:19
82:15 83:18 98:6,10
105:2 139:5 174:3
184:21 188:14
203:23 214:18

**giving** 13:8,25 28:9
29:5 30:24 159:3

**goals** 62:11,18
163:12 214:23

**good** 5:2 6:12 13:16
14:2,14 33:8 34:11
38:6 41:19 47:14
48:4,6 193:5

**grant** 226:15 228:5

**granted** 130:19
226:16 236:16

**grants** 240:8,13

**gratification** 24:16
27:23 28:4 114:17

**great** 45:13 82:7

**Greenberg** 6:5

**guess** 23:4,22 55:16
112:18 160:7 190:9
206:18

**guideline** 222:16

**gut** 45:16 47:6,8 93:8

---

## H

**hair** 178:2

**half** 73:19 91:18
244:7

**handle** 249:21

**happen** 31:25 33:12
44:20 180:2,25 181:3
188:11 203:4

**happened** 34:3
180:6 204:10 209:21

**happening** 31:24
43:12,17 45:5,18,24
64:20 196:20

**happy** 15:7

**hard** 47:8,9 127:19
153:15

**HCM** 82:24

**HCMFA** 78:15 136:2
140:13,19 149:16,19
164:5,10 175:16,24
182:10 248:22
249:24

**HCMS** 249:16,22
250:5,11 251:7

**HCMSI** 138:7 141:16,
20 151:16

**HCRE** 132:2 137:6,9,
24 141:8,12 150:23,
24 151:6 164:24
165:5 176:13 247:21
249:4,15,22 250:5,11
251:7

**head** 55:20

**hear** 6:13

**heard** 68:15,18,23
72:11 73:2 84:17
85:5 99:13,15 205:24
209:18 216:17 243:8
248:3,11

**hearing** 93:6

**hedge** 11:6 12:18

**guideline** 222:16

**held** 15:14 119:4
156:9 187:13 202:16

**helpful** 196:8

**Hey** 234:7

**high** 7:5,7 43:13
58:22 203:21 247:9
250:15

**Highland** 5:21 6:18
8:7,12 15:14,24 19:7,
11,15,20,24 20:5,10
21:13,15 22:2,8,13
24:22 25:19 56:20,22
75:15 78:5 79:24
80:4 85:11 88:10
89:15 90:5 94:21
95:14 96:13,22,25
97:14,18,22 98:3
99:25 102:18 103:15
104:18,21,23 107:12,
21 108:11,14,16,22
109:11 115:12
117:19,23 120:4
121:12 123:8 126:9
128:10 129:18 130:4,
15,16 131:13,25
132:16 133:17
134:11,23 136:13,21
137:9,23 138:7,14
139:16,18,23 140:13,
17,22 141:2,7,11,15,
19 142:2,13,22
143:10,13,17,19
144:15 145:2,10,23
146:18,25 147:7
148:22,23 149:17,22
150:18,24 151:4,9,14
152:18 153:4,10,17,
24,25 155:3 156:9
157:21,22 158:2,15
159:2,15,17,19,24
160:4,14 162:13,25
163:3 164:4,8,14,17,
24 165:3,8,13,15,24
167:10 171:2,15
172:23 173:7 174:5
175:22 176:5,12,17,
18 178:10,15,25
179:13 185:4,7,18
186:3,12 190:6,16,
20,25 191:9,16,21
192:5 195:17 198:23
202:16,20 204:7
206:17,20,22 207:2,8
212:8,24 213:6

---

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 18-142    Filed 11/02/22    Page 54 of 198    PageID 23269
Appendix B-142    Page 1034 of 1386

Index: Highland's..invest

222:24 223:4 224:18
233:21 242:20 243:3,
17 244:3,9 247:20,
21,23,24 248:14,16,
17,23 249:2,3,8,12,
16 250:6,15,17 251:5

**Highland's** 83:19
84:2 99:9 108:23
119:12,14 120:22
123:16,20 126:15
129:13 133:9 136:17
148:9 158:6 161:10,
17,25 166:12,19
167:22 169:6 177:9
181:24 190:2 191:8
246:12 250:12

**Highland-related**
224:14

**highly** 31:25 139:2
214:23

**hint** 163:23

**hire** 13:10 52:6,7

**histories** 34:7

**history** 32:10,13,20
33:2,11,21,24,25
34:12,15,24 35:7
49:2,20 62:23 63:3
66:16 68:20 113:6
195:25 216:10

**hold** 188:22 232:2

**holder** 99:24

**holds** 99:9

**home** 9:19

**home-field** 13:13

**hope** 68:11 128:14
180:23,24 181:2
183:9,10,11 184:20
192:12

**horses** 188:22

**hour** 73:19 91:17,18

**hours** 91:17

**how's** 10:11

**HR** 52:9

**human** 56:21

**hundred** 46:5,7

**hundreds** 96:23

**Hurley** 95:2 96:9

**hypothetical** 38:25
44:5 46:16,18 47:17
50:24 51:24 53:22
54:2,12 55:3 65:19,
24 66:13 67:3 70:8
71:4 109:17 188:14
189:11

**hypothetically**
45:25 46:4 50:4,10
52:2 53:9 59:15
157:22

**hypotheticals** 54:18

---

**I**

**idea** 25:22 31:23
37:11 44:20 46:23
50:25 52:16 59:6,23
60:4 63:2 65:4
155:11 170:9 173:2
243:5

**ideal** 34:2 36:17,20
37:13,17,18 57:17

**identification** 76:21
119:16 123:18
126:17 129:15
133:11 166:14
193:15 230:11
231:17 233:17 236:9
237:22 239:2 242:7

**identify** 12:13 18:14
78:11,22 93:3 98:3
204:17,20,24 225:3

**identity** 70:11

**ignore** 188:12

**immediately** 51:21

**imminently** 68:3

**impact** 33:7 48:9
107:23

**impacted** 94:13

**implies** 127:13

**importance** 45:4
49:22 57:18 59:12
60:12 64:19 163:12

**important** 33:12
49:25 59:8,13 115:3
210:23 219:19,24

**impossible** 37:4
44:21,25

**impression** 45:17
64:14,17,18 97:4

**inaccurate** 216:6

**incent** 28:20 60:3

**incenting** 31:20

**incentivize** 27:10

**include** 11:11 72:6
104:8 114:11 135:12
170:11 208:7 223:16,
25 227:3 231:9
241:15 247:3

**included** 78:10
120:4 185:5 223:12
224:5,19,21 227:17
229:24 231:13 233:3
237:14 238:17 239:8
240:21,23 243:18
245:7

**including** 42:3 81:12

**income** 114:7,21
161:5 163:11 170:18,
20 222:24 223:5,9,
12,17,21,25 224:3,9,
11,13,17 229:25
230:5 231:4,10
243:12,16 244:3,11
246:5

**incomplete** 124:22

**inconsistent** 214:15

**incorporate** 223:4

**incorrect** 220:22

**increase** 160:4

**increases** 226:19

**incurred** 145:9

**independent** 54:6,
23

**indirectly** 56:13,23
248:7

**individual** 26:5
32:14 33:5 36:6
56:20 114:22 118:25

188:16 189:11

**individual's** 32:25
49:20 63:2

**individually** 95:17,
18

**individuals** 95:4
98:2,6 114:8 116:7
118:5,10,12 147:20
206:10 247:4

**industry** 10:24 13:15
49:11,21 50:2,5,21
51:12 52:4,14 53:7,
17 65:6,21 66:21
67:12 69:5 100:19
102:8,14,17 138:17
182:16 217:3 219:8
220:17 221:21,25

**influenced** 94:12

**inform** 97:13 181:10
187:20 188:3

**information** 13:18
24:25 25:5,15 26:19,
23 30:17,20 31:12
32:7 34:14 35:6 38:3
39:10,12 43:21 44:6,
15 46:12 47:3,7,14,
18 48:2 53:24 54:13
55:6 56:3 62:22 64:9,
24 65:23 66:15 78:4,
14 88:8 98:11 99:11
102:23 103:8 104:14
105:3,6 106:3 116:4
130:2 146:17 156:16
157:3 168:7 173:5,10
174:4 180:11 192:2
194:2,13 200:14
202:20 210:12 218:5
225:5 232:21 236:2
239:14 241:21
243:16 245:24
246:13

**informed** 16:8 22:16
30:19,22 31:2 67:4,7,
9 71:13,17 117:2
183:13 187:3 195:14

**inquiry** 143:15

**ins** 59:11 111:14

**instance** 72:25
115:13

**institutions** 11:13

**intended** 22:17 24:5
27:18 92:24 93:14
109:20 112:23
114:19 215:23

**intent** 23:18 25:2
26:3,7 92:25 108:4

**intention** 188:18

**inter** 207:4

**interest** 18:2 28:23
58:2 59:6,10 61:25
81:12 82:22 108:16,
20 111:4 127:6
131:21 132:25
134:15 135:13,16,21
137:11,18 138:18
139:11,14 142:18
143:25 152:16
153:18 154:15,20
178:9 191:2 195:16
197:15 198:9 199:20,
25 200:20 201:2
202:14 203:9 204:2
247:21,25 248:8

**interesting** 127:2

**interests** 99:10,25

**interplay** 185:15

**interpretation**
132:12

**interrupt** 210:5

**intertwined** 207:4
224:4

**interview** 90:9 91:21
92:2 94:18,22 95:3
98:12

**interviewed** 25:18
94:23 99:3 104:17
105:12 147:21
213:21 215:25

**interviewing** 91:3

**interviews** 90:4
95:7,10,13,22 97:9
212:6

**introduction** 103:19
205:4

**invest** 24:14 114:19

invested 24:17
158:20

investment 11:3
84:18,22 85:3 99:8,
24 101:16 145:13
146:12 158:25 159:3,
7

investments 23:23
92:21 162:13

involve 12:21

involved 7:17 12:16,
25 28:22 53:10 92:5

involves 7:9

issuance 182:19

issue 47:20 49:22,24
50:8 73:15 154:11
181:14 191:3 247:15
250:21,25

issued 121:3 131:14
137:9 138:6 141:25
148:23 150:24
152:17 169:11
177:15 182:10
184:14 231:20

issues 11:3,7 47:19
71:24 180:7

issuing 238:16

item 124:20 167:7

items 175:5 222:23

**J**

James 14:23 75:19
141:25 158:2

January 108:19
171:22 184:9 195:11
198:10,22 199:4,15
204:15

Jersey 9:19

Jim 49:24 145:14
177:14

job 50:14 169:23

John 5:20 6:16 76:18
234:7

Johnson 5:1 6:1,12
7:1 8:1 9:1 10:1 11:1

12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1,6 75:1
76:1,23 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1,19
120:1,18 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1,6
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1,24 164:1
165:1 166:1,6 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1,5
183:1 184:1 185:1
186:1 187:1 188:1
189:1,25 190:1 191:1
192:1 193:1,5,17
194:1 195:1 196:1
197:1 198:1 199:1

200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1,23 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1,17,20

Johnson's 205:2
218:11

Jones 5:21 6:17

judge 188:2

judgment 45:13
222:13

July 155:17

June 184:4,9

**K**

kind 31:13 42:15
50:15 126:2 207:4
227:10

kinds 72:20

knew 68:10 100:8
171:6 189:10

knowing 14:7,9
60:18 61:2 169:23
205:17,21

knowledge 13:13
23:17 35:2 40:24
41:6 49:9 52:3,19
57:3 65:17 67:11
68:19,22 78:21
84:14,21,23 97:21,24
98:5 110:19 160:3
174:15 202:7 204:5
207:12,15,19 249:13

knowledgeable
32:9,19

Kornfeld 9:6

**L**

L.P. 5:22 75:15 82:24
139:24 190:17,20

L.p.'s 85:11

label 234:9,11

lack 210:24 211:3,20

laid 69:6

large 13:13 52:15
117:20 217:4

larger 53:4 116:24
117:17

largest 117:2,18
191:15

late 7:12 15:11 16:16
27:9 92:14 98:23
103:2 171:25 172:3,
10,23 177:4 180:19
200:17 208:18
248:22

Laura 251:20

law 82:2,3,12 86:25
87:2,12 91:11
189:12,16

Lawlor 95:2 96:7

lawsuit 26:13,19
27:2

lawyers 234:3

lead 33:8

leaders 12:21

learn 97:8 110:8
130:2

learned 106:16

leaving 122:10

legal 81:2 89:2

letter 75:3,6

level 7:5,7 24:6 43:14
58:22 71:21 246:22
250:15

liabilities 173:14

liability 173:24

lieu 104:2,11 105:5,
17,25 106:5,18,24
109:10 112:12
113:22 205:11 206:3

lifetime 145:20

like-to-like 239:19

likelihood 43:4,16
44:16 45:10,23 47:15
64:10,14,19 138:22
203:14,20

limited 230:3

lines 87:7

liquidity 46:22

list 77:21 81:21
124:21,22 247:9

listed 81:11 110:10
232:14 234:20

listen 13:17

listing 82:22 146:20,
21

litigation 7:3,8,9,16
8:8,13 72:15 73:5
110:3,5 173:23
174:4,7,10,24 175:3,
5,9 188:24 194:3,4

living 145:16

LLC 141:8,12 164:24
165:5 249:4

loan 8:2,4 17:12
18:13,23 20:9 25:13
26:8 27:18 29:12
30:5 31:9,22 32:5
33:4 35:13 37:25
38:12 39:5 40:14
41:16 46:14 47:25
49:17 51:18 52:21
54:7 55:5,23 58:10
59:7,11 61:8 62:17
63:24 65:5,9 66:2
67:24 68:19,24 69:9
71:10 72:5,13,17,21
73:3 79:23 80:15,19
81:5,20 82:8,21 83:8,
11,15 88:5,19 96:25
97:18,21 98:3 102:2,
7 106:18 107:12,22
108:22 109:2 117:2,
18,21,23 118:14,24
122:17,22 123:3,8

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 78-12   Filed 11/24/22   Page 56 of 198   PageID 23271
Appendix Part 2   Page 104 of 1336

Index: loaned..mentioned

124:5,6,7,16,17,18
128:10 129:7 130:15,
19,23 131:3,7 132:5,
21 138:22 139:8,17
140:18 141:3,12,20
142:7 143:20,24
146:6,17,24 147:7
149:18 150:19,25
151:6,16 153:11,25
155:4 157:15,16,19
158:25 159:4,6,11,14
164:9,19 165:4,14
175:23 176:6,13
178:16 179:2,14
190:7 191:10,15,22
192:6 194:21 195:19
196:17 198:24 206:3,
15 207:5,13,16
213:16,22 214:22

**loaned** 137:16
142:13 144:16
145:23 157:12 158:6,
15 185:18,19

**loaning** 146:12 159:9

**loans** 7:9,12,17,18,
22 8:5,7,12,15 14:20
15:9,11,25 16:13,20,
24 17:2,7,17,20,24,
25 18:15,19,20,25
19:3,6,10,14 21:16,
18 22:2,9,14,21,24
23:2,6,13 24:11,13,
21 25:7,11 26:3,6,11,
14,18,25 27:4,14,22,
25 28:10,14,20,22
29:3,18 30:16 31:11,
17,19 32:11,21 33:18
34:16,23 35:2,5 36:2,
4,8,13,23 37:10
38:21 39:14,21 40:22
41:4,24 42:10 43:2,9,
15 45:2,8 50:12 53:2,
3,5,11 56:8,11,12,15,
20,21,25 57:4,7,9,12,
15,22,25 58:7,13,16,
18,21,25 59:2,3,15,
16,24 60:5,8,10,11,
15,18,19,23 61:2,3,
62:8,10,17 65:14
70:9,10,11,14,15,18,
25 72:3 73:10,15
79:23 81:6,11 82:23
87:13,15,18 90:17
92:9,10,16,22,23,25

93:14,18 94:2 95:24
96:13 97:9,14,25
98:25 100:19,21
101:8,17 102:16
104:2,10,12,22
105:4,9,17,25 106:5,
24 107:5 108:2,9,10,
14,17,19 109:10,14,
19,21 110:3,5,10,12,
13,20,25 111:17,18,
19 112:4,7,9,11,12,
16,19,23 113:6,9,10,
21 114:5,7,15,18,24
115:6,13,21,24
116:17,18 117:7,15,
17 118:3,4,11,15,16,
20 119:20 120:4
122:5,12 123:10
128:16 129:3 130:4
136:2,6,12 137:2,24
138:6,19 140:12,22
141:7,15 142:23
143:16 146:8,21
147:14,17,19,25
151:8 156:22 157:5
159:16 162:12 163:7
164:4,14,23 165:7,23
166:23 168:8,14
169:3,20 170:7 172:9
173:8 178:9 181:11,
17 184:25 187:4
195:12,16 200:12
202:21,24,25 205:11
206:9 207:5,9,23
208:7,16,18 209:12
210:11 212:7,9,17,23
213:19 214:8,16
215:3,12,15,23

**logical** 188:12

**long** 18:22 25:21
87:6 220:6 229:14

**look-back** 219:15
221:4

**looked** 77:25 86:22
118:19 124:7 142:8
147:11,15 156:13
180:21 192:3 194:21
206:8,17 208:11,25
209:5 216:8 238:20
239:4 241:9 243:13,
25 244:11

**lose** 162:15

**loss** 42:3 171:2
172:17

**lost** 67:19 124:10
171:15

**lot** 7:16 11:23 12:20
13:11,24 16:17 47:8
59:3 108:2 109:14
184:21 189:24

**lucky** 68:3,6,12,14

**lunch** 184:20

**luncheon** 192:15

## M

**made** 8:3,7,12 26:6
30:22 56:22 63:24
104:13 108:3 112:23
117:23 122:5 123:3
132:9 137:24 140:19
141:12,20 153:3
158:24 161:20
168:14 178:8 181:11
189:8 197:8,15,21
198:5 199:24 200:10,
17,24 201:25 202:13,
25 203:24 207:9,10
218:24 219:12
222:12 226:12
230:14 244:23 245:3,
12 248:22

**magnitude** 28:22
31:16,19 43:8,15
50:19,25 52:17 54:4
57:7 60:13 62:10
65:4 185:12

**magnitudes** 29:3
58:2

**major** 11:2 13:2
143:9

**majority** 99:9,24
248:7

**make** 29:11,16 31:4
37:9,16 38:21 39:21
41:12,14 42:25 43:4
44:15 49:6 51:7
54:20,25 61:19 62:6
65:25 67:4 69:12
71:8,18,21 74:19
104:15 114:3 129:6
134:24 136:22

138:18 143:15 145:3
151:25 159:3 188:10
189:19 194:10
196:17 203:8,18,19
214:21 248:3 249:25

**maker** 29:7,9 30:3,25
32:9,12,19 33:17
34:14,22 35:4,12,24
36:12,23 37:24
38:11,18 39:5 40:12,
18 41:3,16,24 43:3,
20 44:5,14 45:7
46:13 47:17,24 49:14
50:11,13 51:4,6 52:3,
5,19 53:23 54:11
55:21 57:3,6,8,11,14,
19,21 58:4,6,9,15,20
59:14 60:7,17,22
61:7,12,19,22 62:6,
21 63:8,10,16 64:8,
24 65:12 66:3,14,23
67:13,21,22 68:10,
16,18 69:8,11 70:2,
24 72:12 73:2,8 93:3,
17 98:22 100:14,17
102:24 103:10,14
139:6,8 156:21 163:5
168:6 169:16,22
170:6,8 172:20,25
173:5 187:12 203:8
211:16

**maker's** 48:20

**makers** 12:14 30:10,
15 51:16 169:19
191:2

**makes** 188:24
190:10

**making** 30:4,18
40:22 62:2 65:3
69:23 102:13 103:7
109:18 112:21
195:15 196:11

**manage** 247:13

**management** 5:22
6:18 11:2 75:15 78:5
79:25 85:11 129:19
130:16 132:17
134:11 138:14
139:18,24 148:22
151:10 165:8,15
176:19 190:17,20
222:24 223:5 242:20

243:3,18 244:4,9
247:8,22,23 248:15
249:3

**manner** 215:5

**March** 75:2

**mark** 23:24 143:5
245:5,13

**marked** 44:10 76:20
119:11,15 123:18
126:17 129:15
133:11 166:14
193:15 230:9,10
231:16 233:16 236:8
237:21 238:25 242:7

**market** 7:19 27:24
101:6 115:7 218:2
220:7 221:25 244:19

**marketplace** 14:7,
11 159:11

**Mary** 49:24

**material** 180:16
181:17 182:17,23

**materials** 17:13
110:9

**math** 197:10

**matter** 6:24 75:8
79:10 89:16

**maturity** 127:6

**meaning** 81:2

**meaningful** 56:2
70:13 250:16

**meaningfully**
247:11

**means** 51:8 202:24
232:11

**meant** 144:25 213:22

**measures** 12:9

**meet** 76:10 90:21

**memory** 69:18 85:15

**mention** 213:2

**mentioned** 7:22
20:25 27:21 35:16
55:24 59:25 79:22
80:15 81:4 90:15

102:16 109:23
118:18 212:21
245:11

**messed** 133:23

**method** 226:24

**methodology** 219:8

**Michael** 5:24 163:22
166:3

**middle** 115:20
215:11 234:5

**milestone** 127:25
128:4

**milestones** 127:19,
24

**milestones'** 127:6

**million** 17:3,8 50:6,9,
12,19,24 51:24 97:5
117:7,10 122:6
134:15 137:10,17,19
138:11,15 142:2,14,
19 144:16,21 145:2,
11 152:9,18 153:5,18
154:21 158:7,16,21,
25 159:9 160:15,21,
25 166:5 167:11,23
168:13,18 169:24
171:3,16 172:17
173:9,15,19 174:19
177:16,21 178:3
182:12 185:2,14
186:3 188:16,19
194:21 195:7,12
197:5,9,17 198:15,23
200:19 201:6,10,12,
17,20,22 202:3,15
203:25 214:15
220:11,14,16,17,19
221:6,7,8,10,17
222:2,3,7 231:4
233:8,9 234:20
235:2,18 236:15
237:13 238:8 240:7,
11,23 241:3,10
244:7,13,15 245:2,3,
8,10,11,16 246:21
247:7 250:24

**mind** 80:20 221:3

**minutes** 91:19
192:13

**missed** 231:12

**missing** 111:24

**misunderstanding**
71:25

**misunderstandings**
69:16,20

**mixed** 72:9

**modest** 132:9 178:8

**modification** 22:17
23:19 27:14 42:9
56:7 77:14 204:18
209:12 210:11

**modified** 7:13 15:10
22:24 23:6 172:10
208:17

**modify** 80:9 89:10

**moment** 39:3

**money** 50:15 51:2
55:14 96:17 139:6
145:23 158:20,21
185:9,18,19 194:6
198:8 203:18,22
214:24 215:4 250:5

**months** 186:22

**morning** 5:2 6:12

**Morris** 5:20 6:10,16
9:6,9 73:18,25 74:5
76:19,22 77:2,19
89:19 103:17 115:16
118:8 119:10,17
120:12 123:14,19,25
126:13,18,20 128:18
129:8,11,16 130:8
131:10 133:4,8,12,
14,22 134:8 138:3
139:20 140:7 141:22
144:3 148:4 151:18
154:4 155:23 163:14,
20 166:3,11,15,17,22
170:13,23 173:11
175:11 179:5 181:19
182:4 183:18 192:11
193:4,10,16 204:25
205:20 208:12 215:9
218:10 224:22
229:21 230:8,12,25
231:14,18,23 232:16
233:13,18 234:13,16
236:5,10 237:5,18,23

**missed** 231:12

238:5,22 239:3
242:3,8,10 251:10,
15,21

**motivate** 28:21 33:4
35:18 44:19

**multiple** 189:12

**multiplied** 220:18

**multiplying** 219:20
220:3 222:7

**murky** 33:25 34:6

---

## N

**named** 143:5

**names** 94:24 96:10

**Nancy** 6:6 99:7,13,23
145:22

**narrow** 49:22

**nature** 7:3 58:6,24

**necessarily** 57:23
61:14

**needed** 73:14 214:24

**negotiate** 61:10
66:3,7,10 67:8
159:11

**negotiation** 66:25
67:2 136:25

**net** 171:2

**news** 13:25

**Nexpoint** 78:5,14
131:14 136:6,13
140:23 141:4 149:24
150:20 157:23 158:3,
7,16,19 159:10,19
162:14 164:14,19
176:7 223:8,16,24
224:6 229:24 230:14
231:10,20 235:15
237:11 239:6 244:10
247:22 248:9,18,22
249:24

**next-to-the-last**
127:3 182:9 212:5

**nice** 76:10

**nonbusiness**

212:23

**normal** 246:25

**north** 201:21

**Notary** 6:9

**note** 60:2 80:22 81:3
121:3,8,12,16,21
125:4,9,13,21 126:23
127:4,11,15,16
131:13,17,25 132:5,
15 135:16,21 139:6
144:18,23,25 149:24
150:13,24 152:17
153:14 158:10
164:18 176:18
194:25 195:11
198:10,19,22 199:4,
15 204:15

**note's** 127:18

**noted** 193:3

**notes** 57:20,24 59:17
80:20,23,25 95:6,10
111:5,6,10 119:19
120:23 124:17,24
126:2,9 135:5,6,10,
11,20 136:18,23
137:9 138:6,11 140:9
141:25 147:4 148:19,
22 149:4,5,23 150:5,
12 152:3,4 154:11,15
156:3,8 158:10 164:3
167:7,12 168:18
169:6 170:11 173:18
174:17 175:13,16
176:24 177:2,15
182:10 187:13,16
188:23 190:18 191:3
194:7 196:12,25
197:16 199:21,25
200:20 202:16 203:8,
9,14 204:3,16 214:5

**notice** 243:11

**noticed** 195:19

**nuances** 13:14

**number** 9:13 11:19
12:8 16:20 60:9,11
61:16 76:16 88:3
117:11 134:4 166:6
181:21 228:8 231:9,
25 232:10 237:3
240:10 244:13

**numbers** 87:21
117:11 222:8 226:22

**NXRT** 235:3,11
236:23 238:8,13
239:13

---

## O

**objecting** 163:22

**objection** 28:7
67:17,25 107:15
109:12 111:11,20
118:7,9 135:22
147:10 150:6 156:11
157:14 160:6 161:12
162:3 168:16 169:8
170:2 174:25 178:11
180:13,22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
240:25 243:20
244:21 249:18
250:14

**objective** 47:9

**obligation** 61:14
145:10

**obligations** 112:21
153:3 186:3

**obligor** 18:14

**obligors** 7:21,23
24:21 26:25

**obtain** 30:17 39:12
41:22 43:20 44:6
47:18 57:20 58:6
62:22 63:17 64:8,24
165:23 168:7

**obtained** 55:6 57:16
66:18 96:13 127:7
143:16 195:13,17

**obvious** 187:19

**occasion** 76:8

**occur** 24:2 32:6 43:5
44:17 45:11 47:5
182:17

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 78-12   Filed 11/04/24   Page 58 of 198   PageID 23273

Index: occurred..people

**occurred** 7:15 23:24 182:24

**occurrence** 56:9

**occurs** 27:15

**October** 88:16,17 123:2 186:19

**odds** 215:4

**offer** 67:8

**offered** 7:4

**offering** 21:24 22:6, 11 101:13,20,24 102:6,20 103:4,12 217:11

**officer** 85:12 97:15

**oftentimes** 47:15

**Okada** 143:5,8,16,21, 23 151:21 153:22 154:2 167:17 168:15 178:20,24

**omissions** 245:7

**one-year** 202:5,12

**ongoing** 174:10

**operate** 93:15

**operational** 71:21, 24

**operationalize** 72:3

**operations** 40:5

**opining** 7:19

**opinion** 20:23 21:24 22:6 32:8 35:11,24 40:11 48:18 67:22 73:15 94:11 101:13 102:6,20 103:4,7,12 107:25 115:6,21 116:5 118:24 203:7 211:6 215:12,19 216:2 217:11 227:2 228:11

**opinionated** 13:23

**opinions** 22:11 37:16 77:15 80:9 89:6,11 94:8,19 101:20,24 106:15 107:10,23 115:4 120:7 133:20 140:4

160:12

**option** 226:13

**options** 226:7,9,16, 20,25 227:4,10,14 229:6,15 236:20 240:22 244:12

**oral** 20:17,19,21 70:24

**order** 62:19 63:5,14, 25 64:4,6,21 65:8,10 104:15 157:9 232:25

**ordinary** 193:25 233:22

**organization** 36:7 71:9 207:6 233:24

**originally** 16:16 57:16

**outs** 59:11 111:15

**outsized** 217:4

**outstanding** 60:5 81:13 108:9 121:21 122:2,9,18,23 123:4 125:18 130:20 135:5 149:3,23 150:12 152:10,16 154:15 162:19 174:9 176:24 178:10 184:25 194:7 198:9

**overpay** 51:7

**overpaying** 51:5

**overwhelming** 33:7

**owed** 122:10 134:20 139:6 142:18 153:17 167:23 178:2

**owes** 144:20 185:21 188:15

**owing** 153:4

**owned** 56:23 156:10 157:12 158:23 167:15,16,17

**owner** 162:6,13 248:13

**owners** 12:17 246:17,23 247:2,15

**ownership** 161:14 167:19 191:2,5

247:21,25 248:11 250:11

**owns** 56:13 158:3 248:7

---

**P**

**P&I** 40:5

**p.m.** 192:15,16 193:3 251:13,14

**Pachulski** 5:20 6:17

**package** 40:4 41:5

**packages** 217:5

**pages** 87:7,8,20

**paid** 24:18 27:23 32:24 48:13,19 49:24 50:3,6,22 51:18,25 52:4,20 59:10 64:25 108:16,20 110:6,10, 20,25 111:10,17,22 112:5,7 113:9,21 143:23 198:15 199:13 200:19 201:13 216:24 223:18 225:21 241:13 247:9 249:24 250:5

**pain** 128:22 243:24

**painful** 120:17

**paper** 119:22

**paragraph** 103:25 106:21 114:2 121:2, 7,15 122:16,21 124:12 125:12 126:21 128:9 130:15, 23 131:2,6,13,16,24 132:4,15,20 135:3,4, 25 136:5,11 137:5,22 138:4 139:15 140:12, 16,21,25 141:6,11, 14,18,23 142:22 143:4,24 146:23 148:21,25 149:10,15, 17,21 150:17,22 151:3,8,13,19 152:2 153:9,21 154:6 155:2,7 163:25 164:7,12,13,16,22,23 165:2,7,12,18 175:20 176:3,5,10,11,15,16

178:15,19,23 179:12 182:9 205:9 212:6 231:8

**paragraphs** 149:2 151:20 176:22

**parse** 17:7

**parsed** 112:15

**part** 13:15 14:6,9 26:13 28:14 30:5,16 33:18 35:5 36:13 37:25 38:12 39:14 40:22 41:4,25 44:22 48:22 61:9 63:19,21 65:3 69:10 74:22 94:14 96:14 97:23 102:15 104:23 107:13 109:3 123:10 125:9,22 128:11 130:5 131:8,18 132:6,22 136:2,14,25 137:24 139:17 140:18 141:3,12,20 142:23 143:20 146:25 147:8 149:18 150:19 151:5,15 153:11,25 155:4 163:8,12 164:9,18 165:4,14 175:23 176:6,12,17 178:16 179:3,14 188:19 192:6 207:16 212:19 226:6 240:13

**participate** 91:8

**parties** 5:13 23:18 61:23 78:7,16 131:3

**Partners** 141:8,12 164:24 165:5 176:13 249:4

**partners'** 173:14,17 174:14,23

**partnership** 121:3 134:19 144:20 154:11 182:11

**partnership's** 135:5 149:3 176:24

**party** 58:5 93:19 94:4 159:12

**pass** 247:16

**passage** 228:9

**passed** 245:19,25

**past** 26:16 27:27 32:24 49:24 92:23

**patience** 73:20 120:19 189:25 251:18

**pause** 190:10

**pay** 18:16 32:13,20 33:2,11,24,25 34:11 48:25 49:20 53:6 63:2 65:6 88:25 105:10 111:18 138:23 139:10,14 217:5 220:5 221:13 224:5

**payable** 137:13 154:21

**payee** 190:17

**paying** 24:15 104:11 112:9,11 122:11 139:3 214:14 249:17

**payment** 111:4 132:9 134:19 136:17 178:8 195:21,25 197:20 198:5 199:3 200:17 201:5,16 203:9 216:10 244:8 249:11 251:6

**payments** 71:23 134:25 138:18 153:3 195:15 196:11,17 197:8,15 199:24 200:25 201:19,24 202:9,14,25 203:18, 19,25 214:4,21 244:6,9 248:22

**payout** 44:25

**pays** 52:23

**PDF** 120:14 242:8

**peer-reviewed** 222:16

**peers** 157:10

**pen** 119:21

**pending** 5:19 7:7 26:18

**people** 13:21,22 34:6 37:15 49:21 50:14,21

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-12    Filed 11/04/24    Page 59 of 198    PageID 23274
Appendix Page 1104 of 1336

Index: people's..purportedly

51:25 53:9 65:6
71:13,15,17 72:9,10
188:10,11 211:8
212:15 219:5 247:13

**people's** 69:17

**percent** 122:9
154:16 167:18 169:5
216:3 233:9

**perform** 27:10

**performance** 23:6
24:6 28:24 127:20,23
236:17 237:12 238:9,
14

**period** 7:11,18,20
17:25 18:22 37:22
104:2 105:4,24
106:4,24 134:25
139:24 148:10
162:20 166:20
172:17 177:10
183:23 184:8,13,15
201:13 202:5,12
204:7,11 205:10
213:23 214:6,15
216:10 218:14,18,21,
23 219:4,9,15,23
220:2,6,8,10,25
221:4,19,22 226:20
228:8,18 229:5
242:12 244:2,17

**permit** 46:3

**Perniciaro** 91:12

**person** 19:15 20:5
29:10,21 30:3 90:21,
23 99:19,25 103:6
111:13 127:17 250:8

**personal** 10:7
245:20,25 246:14
247:16

**personally** 11:15
146:13 186:2

**perspective** 32:25
220:25

**pertaining** 15:23
21:25

**pertains** 129:2 157:5

**perusal** 118:21

**petition** 85:13 108:8,

9 111:5,19,23 160:16
198:2 202:6

**philosophy** 92:9

**phone** 10:3,8 90:21,
24,25

**phrase** 29:6,8 30:2
40:2 213:18

**phrased** 216:20

**phrasing** 185:22

**picky** 221:24

**piece** 119:21

**pitch** 13:8,15,19

**place** 7:13 23:13 68:4
86:13,14 188:4,7
189:4

**places** 216:18

**plan** 59:23 188:18,19

**plans** 14:15

**platform** 15:14

**pleading** 99:6

**pleadings** 75:12
78:17

**plural** 8:5

**point** 108:4 112:21
116:20 153:2 157:17
164:13 178:8 200:24
205:8 208:15 218:4
219:6 220:24 221:2
226:19 247:12

**pointed** 244:22
245:6

**poorly** 32:24

**portfolio** 12:19 15:13
23:23 92:21 208:20

**portion** 48:15 87:3
120:21 130:23
132:21 136:12
140:18 141:3 142:23
151:5,15 182:5 186:8
199:3 225:19

**position** 62:2 63:23
246:19

**potential** 115:23
173:8,23 174:4

215:13

**potentially** 169:20
207:5,10

**practical** 59:4

**practicalities** 39:18

**practice** 5:8 25:10,
20 72:9 100:19 101:7
104:11 105:8,19,21
114:5,15,24 115:3,9,
12,14 116:14 119:9
130:3 200:11 202:21
206:22,24,25 208:3,6
212:8,23 213:9

**practices** 7:18 53:6

**precision** 158:12

**preliminarily** 9:12

**premarked** 76:16,24
119:12 193:12,18

**premium** 204:2
216:19,22 217:8,12,
15,19 218:8

**preparation** 78:13,
23

**prepared** 10:14
91:16 120:8 167:21
168:2 171:7,10,13
193:25 233:21
241:18

**preparing** 71:23
90:3 174:6

**presentation** 219:12
222:17

**pretty** 210:3

**previously** 27:19
150:12 234:3

**price** 23:24 47:11
226:14

**Pricewaterhouse
opers** 84:2,15 186:23

**Pricewaterhouse
opers'** 84:10 183:22

**primarily** 247:7

**principal** 81:12
82:22 108:16 111:4
122:10 125:3,17

127:5 131:20 132:10,
24 134:15 135:11,16,
21 137:11,18 138:15,
18 139:11,14 142:18
152:16 153:18
154:20 178:9 195:11,
16 197:15 198:9,14,
19 199:20,25 200:20,
25 202:14 203:9
204:2

**principals** 110:10

**prior** 18:4 25:9 26:14
52:3 75:16,19 76:3
78:12,23 81:20 82:5,
17 85:13 90:18 91:5
102:25 104:18,20
106:16 107:11 108:8
111:5 116:14 127:6
134:20 160:15
182:18 196:5 212:6,
14 221:13 224:8
236:20 238:16

**private** 12:18 72:10
115:6 211:24 214:25
246:17,22 247:14

**probabilities** 62:14

**probability** 31:24
43:11 138:25 196:19
214:22

**Procedures** 5:18

**proceeds** 24:22,24
27:2 43:25 46:20

**produced** 88:9 89:16
119:8 194:2,4,10
234:2

**professional** 209:15
228:10

**professionals** 28:21
115:24 116:18
215:15

**profit** 42:3

**program** 12:23 35:14
37:25 38:12 39:5
40:14 41:17 45:3
48:21 49:17,18 51:19
52:21 54:14 55:5,23
57:5 61:9 67:15,24
68:19,25 69:10 71:11
72:13,15,17,22 73:3
83:11,15 102:3,7

**programs** 12:24
72:6

**project** 12:20

**promissory** 57:20,
24 80:20,22,23 81:2
121:3,8,12,16,21
136:22 137:9 138:6
141:25 144:18
149:23 150:24
177:15 182:10
202:16 214:5

**proportionality**
31:21 32:3

**proposal** 66:2 68:3,7

**proposed** 54:7 66:6,
9,24

**prospective** 226:25

**prove** 107:20

**provide** 6:23 9:3
11:16 12:5 13:3
22:17 27:18 42:25
48:12 98:13 114:19
145:16

**provided** 78:23 79:8,
13 83:22 86:16 87:11
90:4 98:12 113:5,22
115:22 144:25
215:12 230:21 232:8
248:16 249:2,11
251:5

**providing** 46:22
160:5 250:12,16

**provisions** 59:7
127:5,12,21 187:24
188:4,7

**proxy** 226:23

**PTE** 242:20 243:3,18
244:4,9

**public** 6:9 225:6
247:5,7

**purchase** 226:14,16

**purchased** 144:18,
23

**purely** 47:5

**purported** 172:13

**purportedly** 99:9

Index: purpose..rendered

**purpose** 24:10 25:6
26:17,20 27:4,8 91:3
92:9,22 145:16
161:25

**purposes** 76:25
179:23 226:9

**pursuant** 31:10 56:7
111:6 179:15 187:16
188:23 248:18

**put** 7:13 9:14 10:10,
11 15:6 68:4 69:19
70:2,6,21 71:25
76:14 119:10 126:6
172:5 193:10 230:8
231:14 233:13 245:4,
5,13

**putting** 101:18 137:2

**Pwc** 84:4,5 175:3
184:2

---

**Q**

**qualifies** 182:22

**quantifiable** 45:16

**quantify** 161:16
217:14,18 218:8
246:14 250:10

**quarter** 97:5

**question** 31:4 49:7
52:17 67:19 72:23
79:17 82:7 97:19
106:20 109:14
136:10 158:13 160:9
176:3 189:2,6,7,9,13,
17,21 196:21 209:21
210:2,17,21,25
211:4,15,21 216:12
245:5,13

**questioning** 93:12

**questions** 80:13
93:7,13 184:19
189:22 194:12
211:11 215:18
240:18,19 241:10
251:16,25

**quote** 149:2

**quoting** 114:4

---

**R**

**raised** 211:10

**raises** 211:11

**ran** 92:6 246:15

**range** 17:3

**ranged** 97:4

**rapid** 54:20

**rapidly** 188:3

**rate** 59:10 154:15
218:2 220:8

**rates** 18:2 28:23 58:3
59:6

**rational** 203:18

**rationally** 203:8
215:2

**reach** 10:10 153:2

**reached** 178:25

**reaching** 219:8
222:6

**read** 11:10 15:5 17:4,
5 57:23 87:25 104:6,
16 114:9 116:2 122:8
137:20 154:23
215:16 234:14

**reading** 127:4
144:22

**reads** 103:25

**ready** 82:19

**real** 32:22 247:6,12
248:10

**realize** 226:20

**realized** 114:6

**reason** 37:21 88:2
110:23 136:21
150:10 168:12 173:4
188:5 217:17 219:18,
23 230:3

**reasonable** 54:8
61:13 211:21 218:21
219:5 221:3

**reasonableness**
22:12 100:23 101:10,
11,14

**reasons** 10:7

**recall** 16:18 17:9,13
18:19,21,24 19:2,4
20:24 21:2,5,8 69:2
72:17,25 73:6 74:14,
24 75:13 78:12,18
79:19,25 80:5 81:19,
22 82:3 86:5,6 87:10,
21 88:3,11,22,23
90:24,25 91:20,25
93:6,20,24 94:24
95:20 96:21 97:16,17
109:15 110:12 112:6
117:12 152:11,12,13
163:16 172:2,4
186:15 195:5 226:4
227:22 228:20
243:13

**receivable** 135:5,7
149:4,5 152:4 176:25
177:2

**receive** 88:15,17
89:15 112:12 228:6

**received** 24:22 50:9
79:4,17 82:10,12
86:18,20 88:4,8
104:2,22 105:4,17,24
106:5,17,24 108:10,
13 109:9 110:2,25
130:6 161:9 196:24
199:8 205:10 206:3
224:12,18 225:25
227:9,15,16,18
228:13,17,23,24
229:4 236:20,23
237:10 238:7,13
240:6,13 242:11,17
243:11,17 244:16,18
246:11 249:16,20,23
250:11

**receiving** 79:20
244:3 251:6

**recently** 18:10 82:6
86:14 150:5

**recess** 74:3 192:15
251:13

**recipient** 213:16

**recognized** 114:8,21
223:19

**recollection** 82:24
85:9 147:5,17 150:11
172:7,12

**recollections** 97:7

**recommend** 34:13
35:8 43:19 51:15
52:5 63:7 64:23
70:10,14,20 71:16
73:7,12 181:5,9,13,
14

**reconciled** 111:4

**record** 5:10 70:11,19
76:12 95:13 104:16
107:21,24 234:15
237:7

**recorded** 190:15

**recording** 5:14

**records** 72:8 234:12

**recovery** 174:15,17

**reduced** 125:4
152:21 153:4 245:17

**refer** 30:3 82:5
127:24 147:16 177:7

**reference** 72:6
121:16 122:4 125:13
126:22 128:15 129:6
130:22 131:12
134:10,14 138:5
141:7,15,24 144:5
177:14 182:10 208:3
234:5,23 236:14
242:20 243:2 247:12

**referenced** 81:5
143:24

**referred** 16:25 83:16
126:2 204:16 213:13
217:19 245:2

**referring** 17:11
120:14 162:23
213:14,17

**refers** 127:25 131:2,
25 132:15 151:8
155:7 205:14 216:18

**reflect** 21:12 75:7
83:14 226:22

**reflected** 194:22
219:21

**reflects** 214:4

**refresh** 85:8 147:5,
16 172:6,12

**refreshed** 85:14

**reinvest** 25:11

**reinvested** 24:24

**reinvesting** 25:22

**relate** 51:24 79:9,15
116:14 151:20
168:13 196:4 242:16

**related** 118:16 230:5

**relates** 136:5 137:6
140:12 143:4 148:22
153:21 154:7 165:7,
18 172:17 178:19
203:8 225:12 226:7
227:24 235:2 241:23

**relating** 35:7 38:3
84:25 92:15 98:7
148:19 149:16
181:10

**relative** 52:17

**relevant** 16:19 17:17
33:2 35:12,16 48:20
111:2 145:24 146:4
157:18,19 171:16

**reliability** 210:17

**relied** 94:19 104:15
115:11

**relies** 180:10,15

**reluctant** 246:16

**rely** 54:12 55:21 94:8
120:6 219:7

**relying** 106:8 133:19
140:3 148:14 190:4

**remember** 15:15
18:18 20:20 21:6
80:3 84:4 87:14 89:4
109:4 152:8 171:24
194:20 213:4 218:25

**remote** 5:14 9:10

**remotely** 5:11,12

**rendered** 27:20
249:12

---

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 78-142   Filed 11/04/24   Page 61 of 198   PageID 23276
Appendix Part 2   Page 109 of 1336

Index: reorganization..shortly

**reorganization** 188:18,20

**repaid** 138:15

**repay** 215:3

**repeat** 67:18 209:9

**report** 10:13,14 11:10 15:5,8 16:25 17:22,23 18:6 40:4 42:10 48:12,15 76:15,20,23 77:10,15 78:13,24 79:10,15,21 82:6,11,18 83:5,16 84:7 89:7,12,17,20 90:3,18 91:5,16 93:21 94:14 98:8 101:6 103:18,21 104:9 106:22 107:3,8 110:24 112:14 114:12 115:17 120:8 129:22 140:4 160:11, 13 167:22 168:3,23 169:12 171:7,11,14, 24 172:7 174:6 181:15,21 182:13,18 183:7,23 185:25 195:23 200:6,10 204:19 205:2,5 207:21 216:18 217:20,21 218:7,11 230:21 231:7 232:9, 13,15 233:3 237:2,15 238:17 241:18 243:19 247:10

**reported** 142:7 180:24 191:24 210:8 223:6 244:2 246:6

**reporter** 5:2,5

**Reporting** 5:6

**reports** 129:18 180:3

**represent** 6:18 15:2 99:5 128:24 152:14 193:21 194:3,24 195:10 198:21 232:12 233:21 236:11 244:5

**representation** 129:5 152:20 244:14

**representative** 220:7

**represented** 189:11, 16 235:14

**representing** 62:3 99:16

**represents** 235:12

**reputation** 209:16

**request** 82:21

**require** 182:16

**required** 53:4

**research** 52:9 54:24 225:3

**reserve** 175:5

**Residential** 223:9, 16 229:25 230:14 231:10,20 235:15 237:11 239:6 244:10

**respect** 26:17 69:23 98:24 176:21 196:25 251:7

**response** 82:20

**responsibilities** 92:4 94:17 225:4

**responsibility** 61:22

**rest** 125:25 128:13

**restate** 158:13

**restricted** 226:7 227:24 228:4,12,18, 22 229:3,7,16 235:3, 7,20 236:15,23 237:10 238:8,13 239:6,8,9 240:21

**restructure** 204:15

**restructured** 194:25

**result** 250:12

**results** 162:22,24

**retained** 9:2 11:15 12:3,14 14:25 75:19, 23 76:5

**retention** 127:16

**rethink** 205:23

**rethought** 200:12

**Retired** 196:25

**return** 250:18 251:6

**returns** 162:11 243:11

**review** 40:12 75:11 87:16 112:3 130:2 190:6 243:10

**reviewed** 66:18 77:22 78:3 79:22 129:24 225:5

**reviewing** 78:12 80:8

**revolved** 87:13

**revolving** 149:23

**reward** 23:21,25 24:5 35:22 44:19,23 92:20

**rewarded** 62:18

**rewarding** 31:20

**rings** 10:8

**risk** 33:9 68:5 174:4, 10,24 175:3,9

**Rivera** 5:4

**role** 93:14 94:10,11, 13,16 95:23 222:2

**roles** 247:10

**roll-up** 81:6 150:12

**rolled** 118:16

**room** 5:9

**rough** 11:19 60:13 62:9

**roughly** 197:10 201:9

**Row** 197:21

**Rows** 204:16

**Rule** 5:17

**rules** 5:17,18,19 182:22

**run-of-the-mill** 112:20

___

**S**

**salary** 225:20

**sale** 15:12 42:11,21 208:19

**sales** 13:8,15,19

**satisfaction** 22:19

**save** 243:24

**scans** 13:20

**scenario** 36:22 43:3 67:13 69:25 70:16

**schedule** 81:9,11 82:22 149:25

**schedules** 81:15,18 118:15

**scope** 58:17 156:22

**screen** 9:14 15:6 76:15,24 89:21 119:11 129:12 151:24 163:19 172:6 182:8 193:11,19 212:5 233:19 239:23

**scroll** 126:4 128:13 134:3 149:12 170:13 177:13 181:19 234:4, 8 237:9 238:4 240:5

**section** 120:23 125:25 126:3 128:14 130:11 132:14,15 148:19 149:10 155:21,25 156:2 157:4 164:3 180:21 181:21,25 182:8,25 183:6,13,16 184:8

**sections** 126:5

**seek** 34:14 64:24

**select** 222:18

**sell** 13:7 46:7 47:10 49:4,5,8

**selling** 46:18 49:7 215:4

**sends** 9:6

**senior** 12:21 28:21 50:5 203:16

**sense** 184:22

**sentence** 15:7,20 90:2 91:4 103:25 104:8 106:23 107:4, 17,19 114:2,11

**116:5,10,16 127:3 134:18 135:4 149:9 152:2 176:23 205:9 208:2,15 209:2 210:9,19 212:5 216:2,6,16

**separate** 12:7 146:21

**series** 80:13 241:14

**serve** 14:16

**served** 8:23 85:11

**Service** 247:23

**services** 9:3 10:23 12:22 13:4,12,23 27:19 49:11 53:17 101:9 115:7 132:17 138:14 139:18 151:10 165:9,15 176:19 216:23 248:17,18,23 249:2, 3,7,12,16,19,23 250:6,12,16 251:6

**serving** 246:12

**set** 77:15 89:6,11 103:9,13

**seven-year** 37:22 218:17,23 219:9,15 220:2 221:22

**severity** 5:7

**shared** 109:25 146:17 248:18 249:7

**shareholder** 143:9 180:5

**shareholders** 61:23 180:9

**shares** 226:7 227:25 228:4,5,9,12,18,22 229:4,7,8,16

**sheet** 40:4 42:4 147:16 166:25 167:4, 11 173:12,23 174:2, 21 175:7

**shift** 184:17

**short** 184:20 251:11

**shorter** 221:5

**shortly** 180:2

Index: show..success

**show** 180:23 181:7
182:5 183:15 194:5
229:11 234:8

**showed** 110:10
152:15 190:4,14
191:13,14,20 199:23
206:15

**showing** 167:7
241:24

**shown** 126:8 183:13
214:3 226:22 229:8

**shows** 199:2 200:16
225:20

**side** 246:20

**sign** 77:7

**signature** 77:5
183:20,22

**signed** 83:5 186:23

**significance** 35:17,
21 43:10,15,25 48:7

**significant** 11:12
33:4,13 36:5,6,9
44:2,24 46:18,21
53:2 55:13 62:12
162:5,6 174:9 183:12
200:25 213:23

**similar** 95:23,25
115:24 116:17,22
118:2 146:7 190:11
194:18 212:9 213:18,
19 215:14,24 217:6
225:4 246:17,23
247:13 249:23

**similarly** 244:19

**simple** 185:24
220:20

**simply** 92:24 160:12
201:8

**single** 16:4 106:18
149:24 244:4

**sir** 73:20 77:5 148:7
167:4 183:16 207:22
232:12 233:19 240:3

**sister** 99:7 145:22

**sit** 8:12 97:20 218:6
240:20 241:8,22

**sitting** 9:18 72:16,21
73:6 172:2 226:5
245:10

**situated** 244:19

**situation** 32:15 37:3
49:2 54:19,20 55:18
58:14 69:2 72:11
189:15 211:13
214:25

**situations** 37:9
38:16 54:22 55:19
109:16 188:11 211:8

**Sixty-two** 76:18

**sizing** 29:2

**sketchy** 97:3

**skill** 103:9,13

**skip** 128:23

**skipping** 128:21

**small** 52:15 53:3
55:25 73:13,16 247:8

**smaller** 245:9

**social** 5:8

**sold** 28:3 46:24 48:8
93:19 94:4

**sole** 25:15 248:12

**solely** 54:12 55:21
116:5 161:4

**somebody's** 34:11

**sooner** 139:14

**sophisticated** 58:5

**source** 24:25 25:5,15
26:19,23 53:23 54:13
55:6

**sources** 52:10

**space** 13:12

**speak** 74:6 90:20
91:22 95:16,17
100:13,17 193:7

**speaking** 91:15
251:22

**special** 29:24

**specializes** 10:22

**specific** 7:14 101:3,
10 127:5,10

**specifically** 39:24
93:24 105:16 106:7,8
152:12,13 154:9
156:2,20 157:5 210:3

**speculating** 23:15
214:12 215:6

**speculation** 23:16
27:22

**spend** 119:6

**spent** 10:15 91:15
92:6 189:24

**spoke** 118:5,10
206:10

**spoken** 66:19

**spouse** 10:9

**spreadsheets**
117:11

**stability** 218:20

**stack** 50:20 52:14
65:5

**stake** 59:9 185:15
209:15

**stamped** 232:4

**stand** 188:21 205:18

**standards** 102:9

**standpoint** 66:11

**Stang** 5:21 6:17

**starts** 163:22

**state** 107:9

**state's** 5:19

**stated** 91:3 107:25
170:4 172:8

**statement** 40:5
104:15 105:3 106:4,
12 113:2 136:16
141:10 142:13,21
170:18 174:14,23
176:23 179:8 188:17
200:10 205:18,22
208:22 210:13
215:22 226:23
233:16,20 236:8,12

237:21,25 238:7,25
239:15,24 242:19,23

**statements** 39:25
40:3,6,13,16 41:18
42:2 53:21 63:18
65:22 66:19 68:22
71:24 72:2,7 78:4,14
79:24 80:4 82:9,24
83:19 88:6,20
108:24,25 119:13,15,
25 120:5,22 123:17,
21 126:16 129:2,14,
25 133:10,16 139:23
142:8 147:19 148:9,
18 152:15 155:16,21
157:5 158:6,15
166:13,19 170:21
171:13 177:5,7,9,10
179:24 180:11 181:8
185:3 186:7 190:3
191:8 194:5 206:8,14
216:9 242:16

**states** 136:12 140:17
141:2,19 149:17,22
150:18 151:4,14
153:10,23 154:14
155:3 164:8,17
165:3,13,22 175:22
176:5,11,16 178:15,
24 179:13 244:15

**stature** 217:2

**steps** 51:5

**stickler** 201:15

**Stinson** 5:25 14:25
75:23 76:2 82:2,3
83:18 86:25 87:2,12
91:11,21 109:25
146:16

**stipulate** 5:13,23
6:4,7

**stock** 226:7,9,14,16,
18 227:3,10,14 228:6
229:15 235:3,7,20
236:15,20,23 237:11
238:8,13 239:6,9
240:9,13,22 244:12

**stop** 71:23 120:20
134:2 167:2 170:15

**straddles** 202:6

**straight** 157:15,19

**straightforward**
93:11

**strike** 61:15

**strive** 41:13

**structure** 14:14
28:14 58:7,12,17
60:10,15,19,23 61:3
65:14 92:19

**structured** 8:18
92:25

**structuring** 31:6

**study** 219:8,17

**stuff** 190:13

**subject** 8:8,13 15:10
16:14,20,24 17:21
24:11 25:7 26:12,18,
25 28:2 39:2 43:22
57:10 70:12 79:10
94:2 110:3,5 113:10
117:8,15 138:19
139:7 172:9 186:8
187:4 196:13 200:2
203:2,10 204:18,22
208:17 209:7,12
241:10

**subjective** 45:19,22
47:5,9,12 64:17
218:24 222:13

**subjectivity** 45:14

**subsequent** 17:23
22:20 42:20 43:5,23
44:17 56:9 64:10
179:20,23 180:15
181:22 182:2,22
183:6 184:8,11

**subsequently** 96:14

**substance** 87:14
95:21,22 193:8

**substantially** 15:13
208:20 226:2

**substantiate** 98:11,
15

**substantive** 103:20
166:25

**subtract** 201:18

**success** 31:22 62:12

successes 162:14

successful 92:20

sufficient 103:6

suggest 34:18,21,25
39:8 71:16 91:21
175:8 188:3

suggested 91:23
186:7 219:13

suggestion 142:21

suggestions 141:10

suggests 128:10
131:7,17 132:5,21
135:25 136:12
137:23 139:16
140:17 141:2,19
146:24 149:17
150:18 151:4,14
153:10,24 155:3
164:8,17 165:3,13
175:22 176:5,11,16
178:15,24 179:13

suit 15:10 172:9
208:17

summarizing 150:2

summary 194:2

supplement 41:20

supplemented
218:4

support 105:3 106:4,
12 116:9 161:10,18
210:13 213:9

supporting 162:2
242:16

supports 116:4

supposed 24:3
110:20 113:22

swear 5:11

swearing 5:15

sworn 6:8

symbol 235:11,13,15

synonymous 119:4

**T**

taking 219:24

talk 15:3 32:7 35:9
39:24 52:8,9 100:18
101:7 179:25 180:5
181:16 207:4

talked 21:14,16,23
90:15,17 91:5 92:3,8
96:18 104:18 208:24
209:4 212:15 217:23
247:18

talking 26:11,14,16
31:5,8,9 62:8 70:15
91:23 92:7 107:19
109:21 114:13
167:20 185:18,19
247:15

tax 243:10

tax-related 78:4,13

taxes 246:6

team 181:15

telephone 9:24 91:8

telling 93:25

term 18:20,23,25
59:6,17,25 66:8
127:18 150:13
229:14

terms 19:19,23 20:4
21:12 22:7,12 28:23
29:3 36:9 46:21 57:9,
12 58:2,11,21 61:10,
13 62:10 66:5,9
69:21 71:10 72:14
83:8,14 93:25 124:23
137:4 139:13 159:6
187:20 195:21
206:23 239:12
241:25

terrible 162:18

testified 6:9 62:20
82:10 84:15,22 85:21
86:3 98:21 108:22
116:25 168:5 169:18
170:10 181:4 196:16
203:3,12 210:20,22
211:7,25 214:20
235:6 244:24

testimony 6:23 7:4
74:7,11 85:2,17,23,
25 87:17 105:12
193:8

testing 83:21

thereabouts 117:3

thesis 39:20

thing 94:12 146:13
190:10 191:12
194:19 207:8 246:18

things 14:18 34:20
45:5,13,18,20,23
46:23 48:11,24 49:5,
8 59:20 62:14 63:3
64:19 70:6 72:19
73:12 78:9 88:12
100:20,24 110:6
139:9 156:14 157:7
174:16 180:3 181:6
188:12 191:12 194:5
203:21 210:23 211:9,
12,25 212:2 217:22
229:10 246:23

thinking 40:3

thought 48:4 67:19
93:10,11 138:23
161:21 196:19
214:22 215:7 217:25
221:9

thoughts 43:19

thousands 96:23

tied 169:6

time 12:16,17,25
18:22 21:21 25:21
28:19 39:3,18 44:11,
14 63:13 76:21 83:5
90:12 91:15 92:5,7
95:16,19 102:4 114:7
119:6,16 120:8
123:18 126:17
127:17,23 129:15
130:7 131:8,18 132:6
133:11 134:25
135:19 136:10 142:6
146:8 147:9 159:19
166:14 167:21 171:7
172:3 186:20 189:24
192:4 193:3,15
211:24 213:23,24
219:23 226:8 228:5,9

testimony 230:11 231:17
233:17 236:9 237:15,
22 239:2 242:7,15
251:16,18

timeline 219:18

timely 215:5

times 11:18 13:23
46:11 76:9 90:19
91:6 117:17 211:23

timing 172:13 184:11

today 6:19 8:12 9:14
14:19 74:8,11 79:9,
14 107:20 113:17
193:8 205:8 208:25
209:5 215:18 216:9,
17 217:23 218:6
236:20,24 241:22

today's 81:20

told 25:3 73:4 91:25
93:8 94:9,18 95:21
98:15,17 99:18,22
104:20 106:7,23
112:2 113:2 116:6
117:6,9,18 144:11
147:25 155:15
156:20 158:19 169:2
171:20 172:3 205:24
209:11,16,19,20
210:9,10,14,18
211:16 212:17,22
214:11 215:21 216:4,
12 227:18 228:25
236:19,22 238:12
240:12 241:17

top 126:6 134:8
155:24 170:16
218:12 231:2 232:17
242:22

topic 23:19 25:16

total 17:2 91:15
154:20 177:20
196:24 197:4,9,14
199:4,8,13 201:5
225:7,20,21 227:4
228:13 229:14
234:19 235:8,19
238:18 239:10

totaled 17:8

totality 25:13 169:3,
4,20 170:7

trade 246:20

trading 226:15

traditional 40:3

train 67:19 124:10

transaction 23:24
63:6,15 64:2,5,7,22
92:20 101:11 126:5
134:9

transactions 7:15
24:2 43:25 124:13
130:11 182:17

transcript 84:11,25
85:17 86:7,8,9,10,17,
20 87:3 88:21 89:10
100:10

transfer 194:6

Traurig 6:6

treated 110:21

treatment 111:6

trends 14:10

trivial 33:6 36:7
73:13,16

trouble 10:4 119:24

true 100:3 107:5
109:8 111:21 113:4
124:25 185:4,10
189:19 202:18
205:25 211:2 215:23
216:14 248:5

trust 84:18,22 85:3
99:8,24 101:16
145:13,16,19 146:12
223:9,16 229:25
230:15 231:11,20
235:15 237:11 239:7
244:10

trustee 99:8,23
145:22

TSG 5:6

turn 10:4 115:16
120:12 126:18
133:22 166:24

turned 23:7 158:21
229:7

turning 46:21

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-12    Filed 11/04/24    Page 64 of 198    PageID 23279
Appendix Part 2    Page 63 of 136

Index: type..Zoom

**type** 40:7 78:11
219:14

**types** 46:23 110:6

**typical** 54:22

___

**U**

**unaware** 229:12

**uncertain** 37:15

**uncomfortable**
160:8

**underlying** 31:9

**underpaid** 220:24

**understand** 6:20,22
7:16 8:15 14:21 15:8,
19,25 20:16 29:9
31:4,15 32:23 38:18,
23,25 39:9 40:12
43:24 46:15 47:22
49:6 50:12 52:22
58:24 63:8,11,17
106:19 111:14
127:15 135:9 143:11
148:8 156:21 160:8
167:14 169:19 170:4
172:8,16 185:8 191:5
197:25 198:17
208:15 250:19

**understanding** 7:2,
7 8:11 14:14 24:4
27:7,13 31:18 32:3,4,
13 33:20 34:11,23
35:25 36:14,24 37:5
38:13 39:6,22 40:16
41:13,20,21 42:2,6
43:7,14 44:2,9 45:10,
21 46:17 48:4,6,25
49:15 51:10,17,22,23
52:13 53:6 54:4,9
56:6,10,14,24 57:3,
12,15 58:10,12,17,21
59:8 60:9,22 63:20,
22 65:13 66:17 68:21
120:3 143:7 179:22
182:15 184:7 185:11
203:6 204:6

**understands** 69:20

**understood** 22:21
112:3 159:18 210:3

**unfortunate** 189:20

**units** 12:24 235:3,20
236:16,23 237:11
238:8,13 239:6,9

**unpaid** 135:13,16,20
137:17 154:20

**unusual** 54:15 217:2
246:24

**update** 218:7

**upside** 10:11

**urgency** 59:23 60:5

**urgent** 60:2

**utilize** 53:23

___

**V**

**validity** 5:14

**valued** 239:13 241:5

**varied** 162:19

**vehicle** 28:20

**verbal** 20:25

**verification** 54:6

**vest** 228:9

**vesting** 228:6

**vests** 228:7

**view** 193:17 218:2
219:6

**virtual** 153:16

**vouch** 209:19

___

**W**

**W-2** 161:5 220:24
222:24 223:5,9,17,
18,22,24 224:9,11,
13,17 229:9,11,25
230:5,10,13 231:3,
10,16,19 243:12,16
244:3,8,10 246:4,5,6

**W-2S** 161:6,7 235:16

**wage** 27:24

**wages** 232:19 242:17

**wait** 139:3

**wanted** 50:11 156:6
168:2 171:19 220:6
251:25

**Waterhouse** 85:6,
10,18

**ways** 51:9 199:16

**week** 18:4 82:13 86:2
90:16

**wise** 158:24 159:3,7

**wished** 189:8

**withdrawn** 8:3 37:22
46:3 56:5 64:5 65:9
68:16 74:15 81:24
88:4 96:11 97:12
99:21 102:21 118:8
156:17 157:22
159:25 160:12 177:8
187:11 205:20
206:23 209:3 214:2
219:22 236:21 237:4
248:15

**word** 8:5,6 29:8
37:17 45:16 128:4
209:19

**words** 27:23 114:16

**work** 12:20 13:3 29:4
76:2 205:7 217:13,16
234:15 245:5

**worked** 20:23 53:18
76:11

**working** 12:21 21:9,
10

**world** 19:16 20:6,11
32:22 38:25 73:4
147:8 190:7 207:17
211:16 222:17

**world's** 11:12

**worth** 46:10 228:6
239:18

**write** 119:24 121:11
153:17 177:19 212:2
234:10

**writing** 69:12,19,24
70:3,6,21 71:3 73:12
74:11 82:6,18 96:2
181:6,7

**written** 17:22 19:5,9,
13 20:25 21:4 70:11,
19 95:12 107:21,24
175:7 206:6 209:20
213:11

**wrong** 224:25

**wrote** 90:2 112:14
166:6 213:6 217:21
236:25

___

**Y**

**year** 50:6,9 75:2
90:11 95:5 120:2
121:20 122:18,23
123:4,8 125:4,18
130:20 131:21
132:10,25 133:16
134:16 137:12,17,25
142:17 152:10
154:10,19 170:25
172:3 177:25 180:3,7
182:24 184:16,24
186:2 208:7 235:21
236:17 237:13 238:9,
14,19 244:4 245:4,12

**years** 7:11,18 18:22
50:10 80:3 85:12
97:11,15 106:16
107:11 108:7 129:7
136:18 138:13
160:15,22,25 162:18,
19,22 182:15 220:18
221:5,10 222:18
225:7 233:22

**years'** 68:17

___

**Z**

**Ziehl** 5:21 6:17

**Zoom** 90:24 91:2,8
120:18

# EXHIBIT 102

# INTENTIONALLY

# OMITTED

# EXHIBIT 103

# INTENTIONALLY

# OMITTED

# EXHIBIT 104

# INTENTIONALLY

# OMITTED

# EXHIBIT 105

1         WATERHOUSE - 10-19-21

2       IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
      -----------------------------
4   IN RE:

5                    Chapter 11
      HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,       CASE NO.
                    19-34054-SGI11
7
          Debtor.
8   -----------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10   vs.                  Adversary
                        Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT       21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15         Defendants.
      -----------------------------
16

17         REMOTE VIDEOTAPED DEPOSITION OF

18            FRANK WATERHOUSE

19            October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195

Page 2

1          WATERHOUSE - 10-19-21

2

3

4          October 19, 2021

5          9:30 a.m.

6

7

8

9     Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1          WATERHOUSE - 10-19-21

2    A P P E A R A N C E S:

3    (All appearances via Zoom.)

4    Attorneys for the Reorganized Highland Capital

5    Management:

6        John Morris, Esq.

7        Hayley Winograd, Esq.

8        PACHULSKI STANG ZIEHL & JONES

9        780 Third Avenue

10       New York, New York  10017

11   Attorneys for the Witness:

12       Debra Dandeneau, Esq.

13       Michelle Hartmann, Esq.

14       BAKER McKENZIE

15       1900 North Pearl Street

16       Dallas, Texas  75201

17   Attorneys for NexPoint Advisors, LP and

18   Highland Capital Management Fund Advisors,

19   L.P.:

20       Davor Rukavina, Esq.

21       An Nguyen, Esq.

22       MUNSCH HARDT KOPF & HARDD

23       500 North Akard Street

24       Dallas, Texas  75201-6659

25

Page 4

1          WATERHOUSE - 10-19-21

2    Attorneys for Jim Dondero, Nancy Dondero, HCRA,

3    and HCMS:

4        Deborah Deitsch-Perez, Esq.

5        Michael Aigen, Esq.

6        STINSON

7        3102 Oak Lawn Avenue

8        Dallas, Texas  75219

9

10   Attorneys for Dugaboy Investment Trust:

11       Warren Horn, Esq.

12       HELLER, DRAPER & HORN

13       650 Poydras Street

14       New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18       Deborah Newman, Esq.

19       QUINN EMANUEL URQUHART & SULLIVAN

20       51 Madison Avenue

21       New York, New York  10010

22

23   Also Present:

24       Ms. La Asia Canty

25

Page 5

1          WATERHOUSE - 10-19-21

2              I N D E X

3

4    WITNESS                              PAGE

5    FRANK WATERHOUSE

6    EXAMINATION BY MR. MORRIS          10

7    EXAMINATION BY MR. RUKAVINA        256

8    EXAMINATION BY MS. DEITSCH-PEREZ   352

9    EXAMINATION BY MR. MORRIS          377

10   EXAMINATION BY MR. RUKAVINA        387

11   EXAMINATION BY MS. DEITSCH-PEREZ    393

12

13           E X H I B I T S

14   No.                         Page

15   Exhibit 2  NPA et al Amended Complaint    142

16   Exhibit 33 6/3/19 Management          91

17           Representation

18   Exhibit 34 HCMLP Consolidated Financial   94

19           Statements

20   Exhibit 35 HCMFA Incumbency Certificate   151

21   Exhibit 36 Email string re 15(c)      170

22   Exhibit 39 HCMLP Operating Results 2/18   226

23   Exhibit 40 Summary of Assets and      236

24           Liabilities

25   Exhibit 41 12/19 Monthly Operating Report  258

Page 6

1          WATERHOUSE - 10-19-21
2   Exhibit 45 HCMFA Consolidated Financial     135
3        Statements
4   Exhibit 46 NexPoint 2019 Audited         218
5        Financials
6
7   Exhibit A1 Emails 11/25            328
8   Exhibit A2 Emails 12/31            338
9   Exhibit A6 Emails 1/12             341
10  Exhibit A7 Promissory Notes            297
11  Exhibit A9 Email, 8/31             307
12  Exhibit A10 Acknowledgment from HCMLP         302
13  Exhibit A11 HCMLP Schedule 71A          309
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          WATERHOUSE - 10-19-21
2         P R O C E E D I N G S
3       VIDEOGRAPHER:  Good morning,
4   Counselors.  My name is Scott Hatch.  I'm a
5   certified legal videographer in association
6   with TSG Reporting, Inc.
7       Due to the severity of COVID-19 and
8   following the practice of social
9   distancing, I will not be in the same room
10  with the witness.  Instead, I will record
11  this videotaped deposition remotely.  The
12  reporter, Susan Klinger, also will not be
13  in the same room and will swear the witness
14  remotely.
15      Do all parties stipulate to the
16  validity of this video recording and remote
17  swearing, and that it will be admissible in
18  the courtroom as if it had been taken
19  following Rule 30 of the Federal Rules of
20  Civil Procedures and the state's rules
21  where this case is pending?
22      MR. HORN:  Yes.
23      MS. DANDENEAU:  Yes.
24      MR. MORRIS:  Yes.  John Morris.  I
25  would just try to do a negative notice

Page 8

1          WATERHOUSE - 10-19-21
2   here, as we did yesterday.  If anybody has
3   a problem with what was just stated, can
4   you state your objection now?
5       Okay.  No response, so everybody
6   accepts the stipulation and the instruction
7   that was just given.
8       VIDEOGRAPHER:  Thank you.  This is
9   the start of media labeled Number 1 of the
10  video recorded deposition of Frank
11  Waterhouse In Re: Highland Capital
12  Management, L.P., in the United States
13  Bankruptcy Court for the Northern District
14  of Texas, Dallas Division, Case Number
15  21-03000-SGI.
16      This deposition is being held via
17  video conference with participants
18  appearing remotely due to COVID-19
19  restrictions on Tuesday, October 19th, 2021
20  at approximately 9:32 a.m.  My name is
21  Scott Hatch, legal video specialist with
22  TSG Reporting, Inc. headquartered at 228
23  East 45th Street, New York, New York.  The
24  court reporter is Susan Klinger in
25  association with TSG Reporting.

Page 9

1          WATERHOUSE - 10-19-21
2       Counsel, please introduce
3   yourselves.
4       MR. MORRIS:  John Morris, Pachulski
5   Stang Ziehl & Jones for the reorganized
6   Highland Capital Management, L.P., the
7   plaintiff in these actions.
8       MS. DANDENEAU:  Deborah Dandeneau
9   from Baker McKenzie.  My partner, Michelle
10  Hartmann, is also in the room with me,
11  representing Frank Waterhouse individually.
12      MS. DEITSCH-PEREZ:  Deborah
13  Deitsch-Perez from Stinson, LLP,
14  representing Jim Dondero, Nancy Dondero,
15  HCRA, and HCMS.
16      MR. HORN:  Warren Horn with Heller,
17  Draper & Horn in New Orleans representing
18  Dugaboy Investment Trust.
19      MR. RUKAVINA:  Davor Rukavina with
20  Munsch Hardt Kopf & Harr in Dallas
21  representing NexPoint Advisors, LP and
22  Highland Capital Management Fund Advisors,
23  L.P.
24      MR. AIGEN:  Michael Aigen from
25  Stinson, and I represent the same parties

Page 10

WATERHOUSE - 10-19-21

1    as Deborah Deitsch-Perez.
2        MS. NEWMAN:  This is Deborah Newman
3    from Quinn Emanuel.  We represent the
4    litigation – Marc Kirschner as the trustee
5    for the litigation SunTrust.
6        MR. MORRIS:  I think that is
7    everybody.
8        VIDEOGRAPHER:  Thank you.  Will the
9    court reporter please swear in the witness.
10           FRANK WATERHOUSE,
11    having been first duly sworn, testified as
12    follows:
13           EXAMINATION
14    BY MR. MORRIS:
15        Q.   Please state your name for the
16    record.
17        A.   My name is Frank Waterhouse.
18        Q.   Good morning, Mr. Waterhouse.  I'm
19    John Morris, as you know, from Pachulski Stang
20    Ziehl & Jones.  You understand that my firm and
21    I represent Highland Capital Management, L.P.;
22    is that right?
23        A.   Yes.
24        Q.   Okay.  And do you understand that

Page 11

WATERHOUSE - 10-19-21

1    we're here today for your deposition in your
2    individual capacity?
3        A.   Yes.
4        Q.   Did you review and – did you
5    receive and review a subpoena that Highland
6    Capital Management, L.P., served upon you?
7        A.   Yes.
8        Q.   You have been deposed before; right?
9        A.   Yes.
10        Q.   How many times have you been
11    deposed?
12        A.   About three or four times.
13        Q.   Okay.  And I defended you in one
14    deposition; isn't that right?
15        A.   That is correct.
16        Q.    So the general ground rules for this
17    deposition are largely the same as the
18    depositions you have given before.  And that is
19    I will ask you a series of questions, and it is
20    important that you allow me to finish my
21    question before you begin your answer; is that
22    fair?
23        A.   Yes.
24        Q.   And it is important that I allow you

Page 12

WATERHOUSE - 10-19-21

1    to finish your answers before I begin a
2    question, but if I fail to do that, will you
3    let me know?
4        A.   I can certainly do that.
5        Q.   Okay.  Do you understand that this
6    deposition is being videotaped?
7        A.   Yes.
8        Q.   You understand that I may seek to
9    use portions of the videotape in a court of
10    law?
11        A.   I did not know that, until you just
12    said that.
13        Q.   Okay.  And you are aware of that now
14    before the deposition begins substantively; is
15    that right?
16        A.   Yes.
17        Q.   So unlike I think the other
18    depositions that you have given, this one is
19    being given remotely.  So that presents some
20    unique challenges, at least as compared to a
21    deposition that is taken in-person.
22           From time to time we're going to put
23    documents up on the screen, Mr. Waterhouse.
24    And it is important that I give you the

Page 13

WATERHOUSE - 10-19-21

1    opportunity to review any portion of the
2    document that you think you need in order to
3    fully and completely answer the question.
4           So I would ask you to let me know if
5    there is a portion of a document that you need
6    to see in order to fully and completely answer
7    the question.  Can you do that for me?
8        A.   Yes.
9        MS. DANDENEAU:  Mr. Morris, I would
10    just note that we do have hard copies of
11    the documents that you sent, so if you can
12    just refer to the exhibit number as
13    reflected in the documents that you sent,
14    Mr. Waterhouse will be able to look at the
15    hard copies of those documents.
16        MR. MORRIS:  I appreciate that,
17    and – and I will encourage him to do so.
18    There will be other documents that we did
19    not send to you that we'll be using today
20    though.
21        Q.   Okay.  With that as background, if
22    there is anything that I ask you, sir, that you
23    don't understand, will you let me know?
24        A.   Yes.

Page 14

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Are you currently employed?
3    A.   Yes.
4    Q.   By whom?
5    A.   The Skyview Group.
6    Q.   When did you become employed by the
7  Skyview Group?
8    A.   I believe March 1st of 2021.
9    Q.   Do you have a title at Skyview?
10   A.   Yes.
11   Q.   What is your title?
12   A.   My title is chief financial officer.
13   Q.   Do you report to anybody in your
14  role as CFO?
15   A.   I don't, no.
16   Q.   No.  Is there a president or a CEO
17  of Skyview?
18   A.   Yes.
19   Q.   Who is that?
20   A.   That is Scott Ellington.
21   Q.   But you don't report to
22  Mr. Ellington; is that right?
23   A.   I don't think so.
24   Q.   Does Skyview Group --
25        MS. DANDENEAU:  Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

1
2    A.   I -- I -- I might.  I just -- I
3  don't recall.
4    Q.   Okay.  Does Skyview Group provide
5  any services to any entity directly or
6  indirectly owned or controlled by Jim Dondero?
7    A.   Yes.
8    Q.   Can you name -- is that pursuant to
9  written contracts?
10   A.   Yes.
11   Q.   And do you know how many contracts
12  exist?
13   A.   Approximately six or so.
14   Q.   And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17   A.   No.
18   Q.   Do you know how many -- how many --
19  how many employees does Skyview have?
20   A.   Approximately 35.
21   Q.   And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24   A.   I don't know the exact number.
25   Q.   Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   Is it more than 30?
4    A.   I don't know.
5    Q.   Can you tell me what portion of
6  Skyview -- Skyview's revenue is derived from
7  entities that are directly or indirectly owned
8  or controlled by Jim Dondero?
9        MS. DANDENEAU:  Mr. Morris, I mean,
10       you called Mr. Waterhouse here individually
11       for purposes of his testimony in connection
12       with the noticed litigation.  I have given
13       you some leeway to ask him some background
14       information about Skyview Group, but this
15       is not a substitute for a deposition in
16       connection with any other pending disputes
17       that exist.  And -- and we agreed to accept
18       the subpoena on the basis of he -- this is
19       testimony that he is giving in connection
20       with the noticed litigation.
21            I really think that you are now
22       going a little bit far afield from the
23       purpose of this deposition.
24            MR. MORRIS:  Okay.  It is -- I'm not
25       intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

1
2  these questions for any purpose other than
3  this litigation.  I think you understand
4  fully why I'm asking the questions, and I
5  just have a couple more, if you will bear
6  with me.
7        MS. DANDENEAU:  Okay.
8        MS. DEITSCH-PEREZ:  Can we have an
9  agreement that an objection by one is an
10  objection for any other party here?
11       MR. MORRIS:  Sure.  I would -- I
12  would encourage that, sure.
13       MS. DEITSCH-PEREZ:  Thank you.
14       MR. MORRIS:  It can't be sustained
15  or overruled more than one time, so...
16   Q.   Mr. Waterhouse, can you answer my
17  question, please.
18       MS. DANDENEAU:  Do you want to
19  repeat it, Mr. Morris, for his benefit?
20       MR. MORRIS:  Sure.
21   Q.   Can you -- can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25   A.   I don't know the exact number.

**Appx. 02053**

Page 18

WATERHOUSE - 10-19-21

1
2   Q.   Is it more than 75 percent?
3   A.   Yes.
4   Q.   Is it more than 90 percent?
5   A.   I don't know.
6   Q.   Okay. Can I refer to Highland
7   Capital Management, L.P., as Highland?
8   A.   Yes.
9   Q.   All right. And you previously
10  served as Highland's CFO; correct?
11  A.   Yes.
12  Q.   When did you join Highland?
13  A.   I don't recall the exact date.
14  Q.   Can you tell me what year?
15  A.   2006.
16  Q.   When did you -- in what year did you
17  become Highland's CFO?
18  A.   I don't recall the exact date.
19  Q.   I'm not asking you for the exact
20  date. I'm asking you if you recall the year in
21  which you were appointed CFO.
22  A.   I don't recall the exact year.
23  Q.   Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?

Page 19

WATERHOUSE - 10-19-21

1
2   A.   2011 or 2012.
3   Q.   Did you serve as Highland's CFO on a
4   continuous basis from in or around 2011 or 2012
5   until early 2021?
6   A.   Yes.
7   Q.   During that entire time you reported
8   directly to Jim Dondero; correct?
9   A.   I -- I don't know.
10  Q.   Is there anybody else you reported
11  to -- withdrawn.
12      Did you report to Mr. Dondero for
13  some portion of the time that you served as
14  CFO?
15  A.   Yes.
16  Q.   Is there a portion of time that you
17  don't recall who you reported to?
18  A.   Yes.
19  Q.   What portion of time do you have in
20  your mind when you can't recall who you
21  reported to?
22  A.   From the 2011 to -- for
23  approximately a year or two.
24  Q.   Okay. So is it fair to say that you
25  reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21

1
2   from at least 2014 until the time you left
3   Highland?
4       MS. DANDENEAU:  Objection to form.
5   A.   I don't want to speculate the exact
6   or what year that changed or -- so I would like
7   to stick with my testimony.
8   Q.   Can you recall when you began
9   reporting to Mr. Dondero?
10  A.   I don't recall.
11  Q.   Can you -- can you give me an
12  estimate of what year you think you might have
13  began reporting to Mr. Dondero?
14  A.   I will go back to my prior
15  testimony.
16  Q.   Okay. There is no -- you have no
17  ability to tell me when you began reporting to
18  Mr. Dondero.
19      Do I have that right?
20      MS. DANDENEAU:  Objection to form.
21  A.   I don't recall.
22  Q.   Okay. Do you recall who you might
23  have reported to before you began reporting to
24  Mr. Dondero?
25  A.   Yes.

Page 21

WATERHOUSE - 10-19-21

1
2   Q.   Who might you have reported to in
3   your capacity as CFO before you started
4   reporting to Mr. Dondero?
5   A.   That would have been Patrick Boyce.
6   Q.   Are you aware that Highland filed
7   for bankruptcy on October 19th, 2019?
8   A.   Yes.
9   Q.   And we refer to that as the petition
10  date?
11  A.   Yes.
12  Q.   Okay. Do you hold any professional
13  licenses, sir?
14  A.   Yes.
15  Q.   Can you tell me what professional
16  licenses you hold?
17  A.   I'm a certified public accountant.
18  Q.   Okay. Anything else?
19  A.   No.
20  Q.   Do you have any other professional
21  licenses or certificates?
22  A.   When you say "professional license,"
23  that is not education?
24  Q.   Tell me -- sure. Anything other
25  than a driver's license.

---

**Page 22**

1          WATERHOUSE - 10-19-21
2          Do you have any other license or
3 certificate or certification?
4          A.   Are you asking, like, where I went
5 to school and the --
6          Q.   I am not.  I am not.  I didn't say
7 education.  I didn't ask about degrees.
8          Do you know what a license is?
9          A.   Well, yeah, I mean, a license is
10 something you get after you receive a certain
11 level of proficiency.
12          Q.   Do you have any licenses or
13 certifications other than your CPA?
14          MS. DANDENEAU:  Objection, form.
15          I assume you mean professional
16 licenses, Mr. Morris; correct?
17          Q.   Can you answer my question, sir?
18          A.   Mr. Morris, I'm thinking.  I
19 don't -- I don't think I have any others.
20          Q.   Are you familiar with an entity
21 called Highland Capital Management Fund
22 Advisors?
23          A.   Yes.
24          Q.   Were you ever -- can we refer to
25 that entity as HCMFA?

---

**Page 23**

1          WATERHOUSE - 10-19-21
2          A.   Yes.
3          Q.   Were you ever employed by HCMFA?
4          A.   Not that I recall.
5          Q.   Were you ever -- did you ever hold
6 the title of an officer or director of HCMFA?
7          A.   Yes.
8          Q.   What title did you hold?
9          A.   Treasurer.
10          Q.   When did you become the treasurer of
11 HCMFA?
12          A.   I don't recall.
13          Q.   Can you tell me the year?
14          A.   I don't -- I don't know the year.
15          Q.   Can you approximate the year in
16 which you became the treasurer of HCMFA?
17          A.   I don't know.
18          Q.   Can you tell me if it was before or
19 after 2016?
20          A.   I don't recall.
21          Q.   Are you still the -- do you know if
22 you're still the treasurer of HCMFA today?
23          A.   Today, I am the acting treasurer for
24 HCMFA.
25          Q.   Is there a distinction between

---

**Page 24**

1          WATERHOUSE - 10-19-21
2 treasurer and acting treasurer?
3          A.   I said "acting treasurer" as I am an
4 employee of Skyview, as you previously
5 stated -- or asked.
6          Q.   But you are the treasurer of HCMFA
7 today; correct?
8          A.   I am -- I am the acting treasurer
9 for HCMFA.
10          Q.   How did you become the treasurer of
11 HCMFA?
12          A.   Are you asking how I became the
13 treasurer of HCMFA today?
14          Q.   How did you become appointed to
15 serve as the treasurer of HCMFA?
16          A.   Well, in -- in -- in what time
17 capacity?
18          Q.   The first time that you were
19 appointed.
20          A.   First time.  I believe I was asked
21 to serve as treasurer for HCMFA the first time.
22          Q.   By who?  Who asked you to do that?
23          A.   I don't recall.
24          Q.   Is there anything that would refresh
25 your recollection as to who appointed you as

---

**Page 25**

1          WATERHOUSE - 10-19-21
2 the treasurer of CF- -- HCMFA for the first
3 time?
4          A.   I don't -- I mean, there would be
5 some documents, some legal documents.  I don't
6 know where those are.
7          Q.   How many times have you been
8 appointed the treasurer of HCMFA?
9          A.   I don't know.
10          Q.   Was it more than once?
11          A.   I don't know.
12          Q.   Can you tell me any period of time
13 since 2016 that you did not hold the title of
14 treasurer of HCMFA?
15          MS. DANDENEAU:  Objection to form.
16          A.   I don't recall.
17          Q.   What are your duties and
18 responsibilities as the treasurer of HCMFA?
19          A.   My duties are to do the best job
20 that I can as the -- as an accountant and
21 finance guy.
22          Q.   What specific duties and
23 responsibilities do you have as the treasurer
24 of HCMFA?
25          A.   My duties are to do the best job

---

Page 26

WATERHOUSE - 10-19-21

2  that I can as the accounting and finance person
3  for HCMFA.
4      Q.   As the accounting and finance person
5  for HCMFA, do you have any particular areas of
6  responsibility?
7      A.   Yeah, it is to manage the accounting
8  and finance function for HCMFA.
9      Q.   Would that include -- do you have
10  responsibility for overseeing HCMFA's annual
11  audit?
12      A.   Can I please elaborate on my prior
13  question?
14      Q.   Of course.  You -- you are giving
15  answers.  I'm asking questions.
16      A.   Okay.  Yes, so the -- it -- like I
17  said, it is to manage the accounting finance
18  aspect, but I am, as we discussed, the
19  treasurer.  That is -- being treasurer is what
20  gives me that -- that management function.
21      Q.   Does anybody report to you in your
22  capacity as treasurer of HCMFA?
23      A.   I don't believe so.
24      Q.   Does HCMFA have a chief financial
25  officer?

Page 27

WATERHOUSE - 10-19-21

2      A.   I don't -- I don't know.
3      Q.   You don't know?
4          You're the treasurer of HCMFA but
5  you don't know if HCMFA has a chief financial
6  officer.
7          Do I have that right?
8      A.   That's right.
9      Q.   Okay.  Have you heard of a company
10  called NexPoint Advisors?
11      A.   Yes.
12      Q.   We will refer to that as NexPoint.
13  Okay?
14      A.   Okay.
15      Q.   Were you ever employed by NexPoint?
16      A.   I don't recall.
17      Q.   Did you ever hold any title with
18  respect to the entity known as NexPoint?
19      A.   Yes.
20      Q.   What titles have you held in
21  relation to NexPoint?
22      A.   Treasurer.  I think it was only
23  treasurer.
24      Q.   Can you tell me the approximate year
25  you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

2      A.   I don't know.
3      Q.   Are you still the treasurer of
4  NexPoint today?
5      A.   I am the acting treasurer for
6  NexPoint.
7      Q.   When did your title change from
8  treasurer to acting treasurer?
9      A.   I don't know.
10      Q.   Did your duties and responsibilities
11  change at all when your title was changed from
12  treasurer to acting treasurer?
13      A.   I don't -- I don't believe so.
14      Q.   Why did --
15      A.   I still manage the finance and
16  accounting function for NexPoint.
17      Q.   Why did your title change from
18  treasurer to acting treasurer?
19      A.   I don't -- I'm using the term
20  "acting treasurer" as I'm a Skyview employee.
21  I don't -- I don't know -- again, I am a -- as
22  I am the Skyview employee.
23      Q.   Okay.
24      A.   And we -- we provide officer
25  services.

Page 29

WATERHOUSE - 10-19-21

2      Q.   And you serve as an officer of
3  HCMFA; correct?
4      A.   I think we went over that with my
5  testimony.  Yes, I'm the acting treasurer for
6  HCMFA.
7      Q.   And you are an officer of NexPoint;
8  correct?
9      A.   I think -- I am the acting treasurer
10  for NexPoint Advisors.
11      Q.   And -- and who appointed you acting
12  treasurer of NexPoint Advisors?
13      A.   I don't recall specifically.
14      Q.   Do you have any recollection of who
15  might have appointed you the treasurer of
16  NexPoint?
17      A.   I mean, it -- it -- I don't recall
18  exactly who it was.
19      Q.   Who were the possibilities?
20          MS. DEITSCH-PEREZ:  Object to the
21  form.
22      Q.   You can answer.
23      A.   Someone in the legal group for
24  NexPoint.  The other officers as well.
25      Q.   Have you heard of a company called

Page 30

1              WATERHOUSE - 10-19-21
2    Highland Capital Management Services, Inc.?
3       A.   Yes.
4       Q.   We will refer to that as HCMS.
5    Okay?
6       A.   HCMS.  Okay.
7       Q.   Were you ever employed by HCMS?
8       A.   No.
9       Q.   Have you ever held any titles in
10   relation to HCMF -- I apologize -- HCMS?
11      A.   Yes.
12      Q.   What titles have you held in
13   relation to HCMS?
14      A.   Treasurer and acting treasurer.
15      Q.   When did you first become treasurer
16   or acting treasurer of HCMS?
17      A.   I don't recall the exact dates.
18      Q.   Can you recall -- can you
19   approximate the year that you became the
20   treasurer of HCMS?
21      A.   I don't -- I don't know.
22      Q.   Are you still the treasurer of HCMS
23   today?
24      A.   I am the acting treasurer for HCMS.
25      Q.   And are your duties and

Page 31

1              WATERHOUSE - 10-19-21
2    responsibilities as the acting treasurer for
3    HCMS and the acting treasurer for NexPoint the
4    same as your duties and responsibilities in
5    your role as the acting treasurer of HCMFA?
6       A.   More or less.
7       Q.   Have you ever heard of a company
8    called HCRE Partners, LLC?
9       A.   Yes.
10      Q.   And do you understand that that
11   entity is now known today as NexPoint Real
12   Estate Partners?
13      A.   I did not know that.
14      Q.   All right.  Can we refer to HCRE
15   Partners as HCRE?
16      MS. DANDENEAU:  Objection to form.
17      Did you mean NexPoint Real Estate
18   Partners, Mr. Morris?
19      MR. MORRIS:  No.
20      MS. DANDENEAU:  Oh.
21      MR. MORRIS:  He said he wasn't
22   familiar that it was succeeded by that
23   entity.  So --
24      MS. DANDENEAU:  Okay.
25      MR. MORRIS:  -- let's go with what

Page 32

1              WATERHOUSE - 10-19-21
2    the witness knows.
3       Q.   You're familiar with an entity
4    called HCRE Partners, LLC; correct?
5       A.   Yes.
6       Q.   Okay.  So that is the entity that we
7    will refer to as HCRE.  If you're aware of any
8    successor, that is great.  If not, let's just
9    define it as such.
10           Have you ever been employed by HCRE
11   or any entity that you know to have succeeded
12   HCRE?
13      A.   No.
14      Q.   Did you ever serve as an officer or
15   director of HCRE or any successor?
16      A.   Not that I recall.
17      Q.   Okay.  Can we refer to NexPoint and
18   HCMFA as the advisors?
19      A.   Yes.
20      Q.   In general, the advisors provided
21   investment advisory services to certain retail
22   funds; correct?
23      A.   Yes.
24      Q.   And we will refer to the retail
25   funds that are served by the advisors

Page 33

1              WATERHOUSE - 10-19-21
2    collectively as the retail funds; is that okay?
3       A.   Okay.
4       Q.   Each of the retail funds is governed
5    by a board; correct?
6       A.   Yes.
7       Q.   And do you know the people who serve
8    on the boards of the retail funds?
9       MS. DANDENEAU:  Objection to form.
10      A.   I don't know all of them.
11      Q.   Do you know whether the same people
12   serve on the board of each of the retail funds
13   as we've defined that term?
14      A.   Which -- so when you say "retail
15   funds" -- again, I want to be -- what retail
16   funds are you referring to, because there are
17   -- there are several distinctions?
18           What retail funds are you using when
19   you refer to them?
20      Q.   That is why -- that is why I tried
21   to define the terms.  So let me do it again.
22           Retail funds for the purposes of
23   this deposition means any retail fund to which
24   either of the advisors provides advisory
25   services.  Okay?

Page 34

```
1            WATERHOUSE - 10-19-21
2    A.   Okay.
3    Q.   Okay.  So do you know whether the
4  same people serve on the board of each of the
5  retail funds?
6    A.   I don't know.
7    Q.   Were you ever employed by any of the
8  retail funds?
9    A.   No.
10   Q.   No?
11   A.   No.
12   Q.   Okay.  Do you have any title with
13 respect to any of the retail funds?
14   A.   Yes.
15   Q.   What titles do you hold --
16 withdrawn.
17        Do you have the same titles with
18 respect to all of the retail funds or do
19 they -- or just something else?
20        MS. DANDENEAU:  Objection to form.
21   Q.   Withdrawn.
22        Do you have the same title with
23 respect to each of the retail funds?
24   A.   No.
25   Q.   Tell me which title you have with
```

Page 35

```
1            WATERHOUSE - 10-19-21
2  respect to each retail fund.
3        Actually, let's do it a different
4  way.  I withdraw the question.
5        Can you give me one title you have
6  in relation to any retail fund?
7    A.   Yes.
8    Q.   What title -- what title can you
9  give me?
10   A.   Principal executive officer.
11   Q.   Do you serve as principal executive
12 officer for each of the retail funds?
13   A.   No.
14   Q.   Can you identify for me the retail
15 funds in which you serve as the principal
16 executive officer?
17   A.   Yes.  Highland Funds 1, Highland
18 Funds 2, Highland Income Fund, Highland Global
19 Allocation Fund.
20   Q.   I'm sorry, you said "Global
21 Allocation Fund"?
22   A.   Yes.
23        VIDEOGRAPHER:  Excuse me,
24 Mr. Morris.  This is the videographer.  I'm
25 concerned about the lighting in the
```

Page 36

```
1            WATERHOUSE - 10-19-21
2  witness' camera.
3        Do you want to go off the record and
4  make some adjustments?
5        MR. MORRIS:  Sure, but just for this
6  purpose.  I don't want to take a break.  We
7  just started.
8        MS. DANDENEAU:  Yeah, that is fine.
9  That is fine.  We're going to put you on
10 mute.
11        MR. MORRIS:  All right.
12        MS. DANDENEAU:  I'm going to try to
13 open up some of the shades.
14        VIDEOGRAPHER:  We're going off the
15 record at 10:08 a.m.
16        (Recess taken 10:08 a.m. to 10:11 a.m.)
17        VIDEOGRAPHER:  We are back on the
18 record at 10:11 a.m.
19   Q.   Mr. Waterhouse, when did you become
20 the principal executive officer of the four
21 retail funds that you just identified?
22   A.   I don't recall.
23   Q.   Do you recall the approximate year
24 that you became the principal executive officer
25 of the four funds?
```

Page 37

```
1            WATERHOUSE - 10-19-21
2    A.   2021.
3    Q.   Did you ever hold any title with
4  respect to any of the four funds you have just
5  identified other than principal executive
6  officer?
7    A.   I don't recall.
8    Q.   Is it possible that you held a
9  position or a title with the four funds you
10 just identified prior to 2021?
11   A.   Yes.
12   Q.   But you don't recall if you did or
13 not; do I have that right?
14   A.   No.  You -- I thought you asked, did
15 I hold other titles.
16   Q.   Did you hold any title at the four
17 retail funds for which you now serve as
18 principal executive officer at any time prior
19 to 2021?
20   A.   Yes.
21   Q.   What titles did you hold?
22   A.   I don't recall all the titles.
23   Q.   Do you recall any of the titles?
24   A.   Yes.
25   Q.   What titles do you recall holding at
```

Page 38

1      WATERHOUSE - 10-19-21
2   those four retail funds before 2021?
3      A.   Principal executive officer.
4      Q.   Were you the principal executive
5   officer of the four retail funds that you have
6   identified?
7      A.   Sorry, could you repeat the
8   question?
9      Q.   Were you the principal executive
10  officer for each of the four retail funds that
11  you have identified?
12     A.   Yes.
13     Q.   When did you become the principal
14  executive -- withdrawn.
15         Can you give me the approximate year
16  that you became the principal executive officer
17  for each of the four retail funds you've
18  identified?
19     A.   I don't recall.
20     Q.   What are your duties and
21  responsibilities as the principal executive
22  officer of these four retail funds?
23     A.   It is to manage the finance and
24  accounting positions.
25     Q.   So at the same time you serve as the

Page 39

1      WATERHOUSE - 10-19-21
2   treasurer of the advisors, you also serve as
3   the principal executive officer of these four
4   retail funds; correct?
5      A.   Yes.
6      Q.   Did you ever hold any title with
7   respect to any other retail fund?
8      A.   Not that I recall.
9      Q.   During the period that you served as
10  Highland's CFO, from time to time Highland
11  loaned money to certain of its officers and
12  employees; correct?
13     A.   Yes.
14     Q.   During the period that you served as
15  Highland's CFO, from time to time Highland
16  loaned money to certain --
17     A.   Let me -- let me retract that,
18  sorry, that -- you asked during the time I was
19  CFO, Highland loaned moneys to employees.  I
20  don't -- I don't recall that during my tenure
21  of CFO.
22     Q.   You have no recollection during the
23  time that you were the CFO of Highland of
24  Highland ever loaning any money to any officer
25  or director of Highland?

Page 40

1      WATERHOUSE - 10-19-21
2      A.   I don't recall during my tenure of
3   Highland or my -- as CFO of Highland -- yeah,
4   if there are any loans as CFO of Highland.
5      Q.   I'm just talking about officers and
6   employees right now.  You have no recollection
7   of Highland ever making a loan to any of its
8   officers or employees during the time that you
9   served as CFO.  Do I have that right?
10         MS. DANDENEAU:  Objection to form.
11     A.   So I thought you were saying
12  officers and employees as CFO, right, so there
13  were -- I mean, okay, yes.
14     Q.   I would ask you to listen carefully
15  to my question.  If I -- if I'm not clear, let
16  me know, but I'm really trying to be as clear
17  as I can.
18     A.   I'm listening as carefully as I can,
19  and you are asking very specific questions in a
20  timeline.  And I'm trying to answer your
21  questions as specifically as I can, and I
22  apologize if -- if I'm going back.  I am -- you
23  are asking very specific questions.  Thank you.
24     Q.   During the period that you served as
25  Highland's CFO, from time to time Highland

Page 41

1      WATERHOUSE - 10-19-21
2   loaned money to certain corporate affiliates;
3   correct?
4         MS. DANDENEAU:  Objection to form.
5      A.   What are corporate affiliates?
6      Q.   How about the ones that are in
7   Highland's audited financial statements under
8   the section entitled Loans to Affiliates.  Why
9   don't we start with those.  Do you have any
10  understanding of what the phrase "affiliates"
11  means?
12         MS. DANDENEAU:  Objection to form.
13     A.   I understand what affiliates are,
14  yet affiliates can have different meanings in
15  different contexts, so...
16     Q.   Why don't you -- why don't you tell
17  me what your understanding of the term
18  "affiliate" is in relation to Highland Capital
19  Management, L.P.
20     A.   Is that a -- it depends on the
21  context.
22     Q.   How about the context of making
23  loans?
24         MS. DANDENEAU:  Objection to form.
25     A.   I didn't make the determination of

Page 42

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    who an affiliate was or is at the time those –
3    I didn't – that wasn't my job to make a
4    determination of who an affiliate is.
5        Q.    All right.  So as the CFO of
6    Highland, do you have any ability right now to
7    tell me which companies that were directly or
8    indirectly owned and/or controlled by
9    Mr. Dondero in whole or in part received loans
10    from Highland Capital Management, L.P.?
11        MS. DANDENEAU:  Objection to form.
12        MS. DEITSCH-PEREZ:  Objection, form.
13    A.    Yes.
14        Q.    Okay.  Identify every entity that
15    you can think of that was directly or
16    indirectly owned and/or controlled by
17    Mr. Dondero in whole or in part that received a
18    loan from Highland Capital Management, L.P.
19        MR. RUKAVINA:  Objection, legal
20    conclusion.
21    A.    NexPoint Advisors, Highland Capital
22    Management Fund Advisors, HCM Services,
23    Dugaboy.  Sorry, I don't think – Dugaboy
24    doesn't fit that definition.  You said owned
25    and controlled.  I don't think that that

Page 43

1    WATERHOUSE - 10-19-21
2    definition –
3        Q.    I said owned and/or controlled.
4    A.    I don't – again, I'm not – I'm not
5    the legal expert.  I don't think it controls –
6    he controls Dugaboy, so again, I'm not the
7    legal person.
8        Q.    I'm not asking you for a legal
9    conclusion, sir.  I'm asking you for your
10    knowledge, okay, as the CFO – the former CFO
11    of Highland Capital Management, other than
12    NexPoint, HCMFA, and HCMF – HCMS, can you
13    think of any other entities that were owned
14    and/or controlled directly or indirectly in
15    whole or in part by Jim Dondero who received a
16    loan from Highland Capital Management, L.P.?
17        MS. DANDENEAU:  Objection to form.
18    A.    HCRE.
19        Q.    Any others?
20    A.    That is – that is all I can think
21    of.
22        Q.    And you're aware that from time to
23    time while you were the CFO, Highland loaned
24    money to Jim Dondero; correct?
25    A.    Yes.

Page 44

1    WATERHOUSE - 10-19-21
2        Q.    Okay.  Can we refer to the four
3    entities that you just named and Mr. Dondero as
4    the affiliates?
5    A.    So that would be Jim Dondero,
6    NexPoint Advisors, Highland Capital Management
7    Fund Advisors, and HCRE.
8        Q.    And HCMS?
9    A.    And HCMS, okay.
10        Q.    And can we refer to the loans that
11    were given to each of those affiliates as the
12    affiliate loans?
13    A.    Yes.
14        Q.    And is it fair to say that each of
15    the affiliates were the borrowers under the
16    affiliate loans as we're defining the term?
17        MR. RUKAVINA:  Objection, legal
18    conclusion.
19    A.    The borrowers are whoever were on
20    the notes.  I don't – I don't know.  I'm not
21    the legal person.
22        Q.    But you –
23    A.    I don't know.
24        Q.    You do know, as Highland's former
25    CFO, that each of the affiliates that you have

Page 45

1    WATERHOUSE - 10-19-21
2    identified tendered notes to Highland; correct?
3        MR. RUKAVINA:  Hey, John, will you
4    just give me a running objection to legal
5    conclusion to HCM –
6        MR. MORRIS:  No.  No, if you want to
7    object –
8        MR. RUKAVINA:  I will object every
9    time.  Object to legal conclusion.
10        MR. MORRIS:  That is fine.
11    A.    Sorry, can you repeat the question?
12        Q.    Are you aware that each of the –
13    that each of the affiliates, as we have defined
14    the term, gave to Highland a promissory note in
15    exchange for the loans?
16        MR. RUKAVINA:  Objection to the
17    extent that calls for a legal conclusion.
18    A.    I don't.
19        Q.    No, you don't know that?
20    A.    No, they didn't – you said they
21    exchanged a promissory note for a loan.  I
22    don't – I don't understand that question, so I
23    said no.
24        Q.    At the time of the bankruptcy
25    filing, did Highland have in its possession

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-14    Filed 01/06/24    Page 81 of 198    PageID 23296
Appendix 78-14    Page 1 of 136    Page 81 of 198    PageID 23296

Page 46

WATERHOUSE - 10-19-21

1  promissory notes that were signed by each of
2  the affiliates?
3      A.   Yes.
4      Q.   To the best of your knowledge,
5  during the time that you served as Highland's
6  CFO, did Highland disclose to its outside
7  auditors all of the loans that were made to
8  affiliates?
9      MR. RUKAVINA:  Objection, that calls
10  for a legal conclusion.
11      MS. DEITSCH-PEREZ:  I also couldn't
12  hear you, John, because there was some
13  garbling on -- on the -- on the call.
14      MR. MORRIS:  Folks, I've got to tell
15  you this is not going well, and I'm
16  reserving my right --
17      MS. DANDENEAU:  John, it was just
18  the end of that question.  It was just the
19  end of that question.  I couldn't hear it
20  either.  Sorry, if you could repeat it,
21  please.
22      MR. MORRIS:  That is less than an
23  hour into this, but folks are trying to run
24  out the clock, and so I'm just going to

*(line 1-2 header/numbering consolidated)*

Page 47

WATERHOUSE - 10-19-21

1  state that now.
2      MS. DANDENEAU:  You know, and,
3  Mr. Morris, I really object to that.  I
4  mean --
5      MR. MORRIS:  Okay.
6      MS. DANDENEAU:  -- Mr. Waterhouse
7  just told you he's trying to listen to your
8  questions and answer them carefully, and
9  you have no basis for saying that.
10      MR. MORRIS:  Okay.
11      MS. DANDENEAU:  This does not --
12  this is not an experienced witness, so he's
13  trying to do the best he can.
14      Q.   Mr. Waterhouse, during the time that
15  you served as Highland's CFO, did Highland
16  disclose to its outside auditors all of the
17  loans that it made to each of the affiliates
18  that you have identified?
19      MR. RUKAVINA:  Objection, legal
20  conclusion.
21      A.   Yes.
22      Q.   To the best of your knowledge, while
23  you were Highland's CFO, were all of the
24  affiliate loans described in Highland's audited

Page 48

WATERHOUSE - 10-19-21

1  financial statements?
2      MR. RUKAVINA:  Objection, legal
3  conclusion.
4      A.   When an audit was performed, any
5  loans that were made by Highland to the
6  affiliates were disclosed to auditors.
7      Q.   Are you aware of any loan that was
8  made to any affiliate that was not disclosed to
9  the auditors?
10      A.   I'm not aware.
11      Q.   To the best of your knowledge, did
12  each of the affiliates who were --
13  (inaudible) -- loaned from Highland execute a
14  promissory note in connection with that loan?
15      MR. RUKAVINA:  Objection, legal
16  conclusion.
17      A.   Sorry, you -- halfway through the
18  question it got muffled.
19      Can you repeat that again?
20      Q.   To the best of your knowledge, did
21  every affiliate execute a promissory note in
22  connection with each loan that it obtained from
23  Highland?
24      MR. RUKAVINA:  Objection, legal

Page 49

WATERHOUSE - 10-19-21

1  conclusion.
2      A.   Yes.
3      Q.   You are not aware of any loan that
4  any affiliate ever obtained from Highland where
5  the affiliate did not give a promissory note in
6  return; is that fair?
7      A.   Yes, I'm not aware.
8      Q.   And to the best of your knowledge,
9  did Highland loan to each affiliate an amount
10  of money equal to the principal amount of each
11  promissory note?
12      MR. RUKAVINA:  Objection, legal
13  conclusion.
14      A.   Yes.
15      Q.   During the time that you served as
16  CFO, did Highland ever loan money to
17  Mark Okada?
18      A.   I -- I don't recall.
19      Q.   Did you ever see any promissory
20  notes executed by Mark Okada?
21      A.   I don't recall.
22      Q.   Do you know if Highland ever forgave
23  any loan that it ever made to Mr. Okada?
24      A.   I don't recall.

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Q.   Do you recall if Mr. Okada paid back
3    all principal and interest due and owing under
4    any loan he obtained from Highland?
5         MS. DEITSCH-PEREZ:  Objection to
6    form.
7         MS. DANDENEAU:  Objection to form.
8    A.   I don't recall.
9    Q.   Do you recall whether -- during your
10   time as CFO, whether Highland ever loaned money
11   to Jim Dondero?
12   A.   Yes.
13   Q.   To the best of your knowledge, did
14   Mr. Dondero sign and deliver to Highland a
15   promissory note in connection with each loan
16   that he obtained from Highland?
17   A.   If you are referring to the
18   promissory notes that, you know, part of
19   Highland's records, yes.
20   Q.   Okay.  You're not aware of any loan
21   that Mr. Dondero took from Highland that wasn't
22   backed up by -- by a promissory note with a
23   face -- with a principal amount equal to the
24   amount of the loan; correct?
25   A.   Am I aware that Jim Dondero took a

WATERHOUSE - 10-19-21

1    loan?
2    Q.   Without giving a -- let me ask a
3    better question.  I'm sorry, Mr. Waterhouse.
4         Are you aware of any loan that
5    Mr. Dondero obtained from Highland where he
6    didn't give a promissory note in return?
7    A.   I'm not aware.
8    Q.   During the time that you served as
9    Highland's CFO, did Highland ever forgive any
10   loans, in whole or in part, that it made to
11   Mr. Dondero?
12   A.   Not that I'm aware.
13   Q.   At the time that you served as
14   Highland's CFO, did Highland ever forgive any
15   loan, in whole or in part, that it made to any
16   affiliate as we've defined the term today?
17   A.   Not that I'm aware.
18   Q.   During the time that you served as
19   Highland's CFO, did Highland ever forgive, in
20   whole or in part, any loan that it ever made to
21   any officer or employee?
22   A.   Highland forgave loans to officers
23   and employees.  It may not have been at the
24   time when my title was CFO.

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Q.   Okay.  And so I appreciate the
3    distinction.
4         Is it fair to say that, to the best
5    of your knowledge, Highland did not forgive a
6    loan that it made to an officer or employee
7    after 2013?
8         MS. DANDENEAU:  Objection to form.
9    A.   I don't recall.
10   Q.   To the best of your knowledge, did
11   Highland disclose to its auditors every
12   instance where it forgave, in whole or in part,
13   a loan that it had made to one of its officers
14   or employees?
15   A.   No.
16   Q.   Can you think of -- can you -- can
17   you identify any loan to an officer or employee
18   that was forgiven by Highland, in whole or in
19   part, that was not disclosed to Highland's
20   outside auditors?
21   A.   Look, I don't recall all of the
22   loans and the loan forgiveness.  I just know as
23   part of the audit process there is a
24   materiality concept.
25        So if there were loans to employees

WATERHOUSE - 10-19-21

1    that were of -- you know, that were deemed
2    immaterial, those items may not have been
3    disclosed by the team to the auditors.
4    Q.   I appreciate that.
5         Do you have an understanding as to
6    what the level of materiality was?
7    A.   I don't recall.
8    Q.   As the CFO of Highland, to the best
9    of your knowledge, did Highland disclose to its
10   outside auditors every loan that was forgiven,
11   in whole or in part, that was material as that
12   term was defined by the outside auditors?
13   A.   Yes.
14   Q.   And do you recall where -- do you
15   recall where the definition of materiality can
16   be found for -- for this particular purpose?
17        MS. DANDENEAU:  Objection to form.
18   A.   No.  You -- I don't determine
19   materiality.
20   Q.   Okay.  I'm just asking you if you
21   can help me understand where it is, but I think
22   we will find it in a few minutes.
23        You are aware that Highland has
24   commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    affiliates, as we've defined the term, to
3    collect under certain promissory notes; is that
4    right?
5        A.   Yes.
6        Q.   And are you familiar with the notes
7    that are issue -- at issue in the lawsuits?
8            MS. DANDENEAU:  Objection to form.
9        A.   Generally familiar.
10       Q.   Can we refer to the lawsuits that
11   Highland has commenced against the affiliates
12   collectively as the lawsuits?
13       A.   Yes.  And, again, the affiliates are
14   NexPoint, HCMFA, HCMS, and HCRE.
15       Q.   And Mr. Dondero?
16       A.   Okay.  See, that is a new -- and now
17   Mr. Dondero is included in your affiliate
18   definition.
19       Q.   I just --
20       A.   I thought affiliates -- I thought
21   affiliates were just the four prior entities,
22   so I just want to be clear.
23       Q.   I appreciate that.  So let's --
24   let's keep them separate and let's refer to the
25   four corporate entities as the affiliates, and

Page 55

1    WATERHOUSE - 10-19-21
2    Mr. Dondero we will call Mr. Dondero.  Okay?
3        A.   Okay.  Thank you.  As you can see,
4    Mr. Morris, there is a lot of entities -- a lot
5    here.  I just want to be clear.
6        Q.   Okay.  Now, the affiliates of
7    Mr. Dondero signed promissory notes that are
8    not subject to the lawsuit.
9            Do you understand that?
10           MS. DANDENEAU:  Objection to form.
11       A.   The affiliates and Mr. Dondero
12   signed --
13       Q.   You know what?  I will skip it.
14   That is okay.  Okay.
15           From time to time while you were
16   Highland's CFO, payments were applied against
17   principal and interests that were due under the
18   notes that were tendered by the affiliates and
19   Mr. Dondero; correct?
20           MR. RUKAVINA:  Objection to the
21       extent that calls for a legal conclusion.
22       A.   Yes.
23       Q.   Did Highland have a process where --
24   whereby payments would be applied against
25   principal and interest against the notes that

Page 56

1    WATERHOUSE - 10-19-21
2    were given by the affiliates and Mr. Dondero?
3        A.   Yes.
4        Q.   Can you describe the process for me?
5        A.   The process, payment should be
6    applied as laid out in the -- in the promissory
7    note.
8        Q.   From time to time were payments made
9    that were not required under the promissory
10   notes?
11           MS. DANDENEAU:  Objection to form.
12       A.   Yes.
13       Q.   Who was responsible for deciding
14   when and how much the payments would be made
15   with respect to each of the notes that were
16   issued by the affiliates and Mr. Dondero?
17       A.   Who was responsible for deciding how
18   much was paid prior to the due date?
19       Q.   Yes.
20       A.   I don't know.
21       Q.   Did you approve of each payment that
22   was made against principal and interest on the
23   notes that were given by the affiliates and
24   Mr. Dondero?
25           MS. DANDENEAU:  Objection to form.

Page 57

1    WATERHOUSE - 10-19-21
2        A.   Did I approve the payments?  I
3    approve -- I approve -- if there was cash -- if
4    there was cash being repaid on a note payment,
5    yes, I approved in the general sense of being
6    made aware of the payment and the amount.
7        Q.   And are you the person who
8    authorized Highland's employees to effectuate
9    those payments?
10       A.   Yes.
11       Q.   When you gave the instruction to
12   effectuate the payment, did you obtain
13   Mr. Dondero's prior approval?
14       A.   I mean, it -- I mean, it -- it
15   depends.
16       Q.   Can you think of any instance where
17   you directed Highland's employees to make a
18   payment of principal or interest against any
19   note that was tendered by an affiliate or
20   Mr. Dondero that Mr. Dondero did not approve of
21   in advance?
22       A.   I can't recall specifically.
23       Q.   Can you identify -- withdrawn.
24           Did Mr. Dondero ever tell you that a
25   payment that was made against principal and

Page 58

WATERHOUSE - 10-19-21

1  interest due under one of the notes that was
2  tendered by an affiliate or himself should not
3  have been made?
4      A.   Yes.
5      Q.   Can you identify the payment for me?
6      A.   It would be for -- for NexPoint
7  Advisors.
8      Q.   Okay.  And when did Mr. Dondero tell
9  you that a payment that you had initiated on
10  behalf of NexPoint should not have been made?
11     A.   I wasn't initiating payment.  It was
12  in the context of the -- I think you used this
13  term, "the advisors," so NexPoint Advisors and
14  Highland Capital Management Fund Advisors had
15  overpaid on certain agreements with Highland
16  Capital Management, L.P.  And as a part of that
17  process, the advisors -- what I was told at the
18  time were in talks and negotiations and
19  discussions with Highland Capital Management,
20  L.P., on offsets in relation to those
21  overpayments.
22     Q.   When did this conversation take
23  place?
24     MS. DANDENEAU:  Objection to form.

Page 59

WATERHOUSE - 10-19-21

1      A.   I don't recall specifically.
2      Q.   Do you recall what year it was?
3      A.   Yes.
4      Q.   What year did the conversation with
5  Mr. Dondero take place that you just described?
6      A.   2020.
7      Q.   Okay.  Do you remember if it was
8  December 2020?
9      A.   It -- it -- I don't -- I don't
10  recall what month specifically, but it would
11  have been November or December.
12     Q.   And we're talking here about a
13  payment of principal and/or interest that was
14  due -- withdrawn.
15         We're talking here about a payment
16  of principal and interest that was applied
17  against NexPoint's note; correct?
18     MS. DANDENEAU:  Objection to form.
19     A.   I don't recall what that payment
20  consisted of.
21     Q.   Is it possible that the payment you
22  have in mind related to the shared services
23  agreement?
24     MS. DANDENEAU:  Objection to form.

Page 60

WATERHOUSE - 10-19-21

1      A.   No.
2      Q.   Are you certain that the payment --
3  that the payment that you have in mind related
4  to the promissory note that NexPoint issued in
5  favor of Highland?
6      MS. DANDENEAU:  Objection to form.
7      A.   Yes.
8      Q.   Okay.  Other than that one payment,
9  can you identify any other instance where
10  Mr. Dondero told you that a payment should not
11  have been applied against principal and
12  interest under any promissory note tendered by
13  any affiliate or Mr. Dondero?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Objection to
16  form.
17     A.   Not that I recall.
18     Q.   Thank you very much.
19         Do you know if Mr. Dondero approved
20  in advance of each loan made to each affiliate
21  and himself during the time that you were the
22  CFO?
23     MS. DEITSCH-PEREZ:  Object to the
24  form.

Page 61

WATERHOUSE - 10-19-21

1      A.   Yes, generally.
2      Q.   Can you identify any loan that was
3  ever made to an affiliate or to Mr. Dondero
4  that Mr. Dondero did not approve of in advance?
5      A.   Other than the ones that are in
6  dispute, I'm not aware.
7      Q.   Do you believe that Mr. Dondero did
8  not approve of each of the loans that are in
9  dispute in advance of the time that the loan
10  was made?
11     MS. DANDENEAU:  Objection to form.
12     A.   Given what is in the dispute, you
13  know, and -- and -- and the way things might --
14  yeah, I mean...
15     Q.   I am not asking about the dispute,
16  and it was probably my mistake to follow you
17  there.
18         Were you aware of every loan made by
19  Highland to each of its affiliates and
20  Mr. Dondero while you were the CFO at the time
21  each loan was made?
22     A.   Was I aware of every loan, yes.
23     Q.   Okay.  And if you put yourself back
24  in time, do you recall that any of the loans

Page 62

```
1            WATERHOUSE - 10-19-21
2   that were made to one of the affiliates or
3   Mr. Dondero during the time that you were the
4   CFO was made without Mr. Dondero's prior
5   knowledge and approval?
6       A.  Not that I recall.
7       Q.  Thank you.  In fact, do you -- as
8   the CFO, would you have allowed Highland to
9   loan money to an affiliate or to Mr. Dondero
10  without obtaining Mr. Dondero's prior approval?
11          MS. DANDENEAU:  Objection to form.
12      A.  I can't -- there was so many times
13  over the years, I can't speak for every single
14  one, but generally, yes, I -- I spoke to him.
15      Q.  You -- you never -- you never --
16  withdrawn.  I will just take that.
17          Can you recall any payment that was
18  ever made against principal and interest on a
19  note that was issued in favor of Highland by an
20  affiliate or Mr. Dondero that you personally
21  did not know about in advance?
22      A.  There are so many through the years,
23  I don't -- I don't -- I don't recall every
24  single one.
25      Q.  Okay.  Can you identify any payment
```

Page 63

```
1            WATERHOUSE - 10-19-21
2   that was made against principal and interest on
3   any note tendered by any affiliate or
4   Mr. Dondero that you didn't know about in
5   advance?
6       A.  I don't recall.
7       Q.  Other than Mr. Dondero -- withdrawn.
8           Did anybody at Highland have the
9   authority to make a payment against principal
10  and interest due under a loan given to the
11  affiliates and Mr. Dondero without your
12  knowledge and approval?
13          MS. DANDENEAU:  Objection to form.
14      A.  Sorry, there was -- to make a
15  payment on an affiliate loan, what you are
16  saying would it require my knowledge and
17  approval, yes.
18      Q.  Okay.  I appreciate that.  Thank
19  you.
20          Did anybody at Highland have the
21  authority, to the best of your knowledge, to
22  effectuate a loan to an affiliate without
23  Mr. Dondero's prior knowledge and approval?
24          MS. DANDENEAU:  Objection to form.
25      A.  I can't speak for all, but
```

Page 64

```
1            WATERHOUSE - 10-19-21
2   generally, yes.
3       Q.  Did you personally communicate with
4   Mr. Dondero to let him know each time a payment
5   of principal or interest was being made against
6   any note that was tendered by an affiliate or
7   Mr. Dondero to Highland?
8       A.  I don't -- are you saying, did I let
9   Mr. Dondero know if a payment was made on any
10  affiliate or loan to Mr. Dondero?  I mean,
11  not -- not every -- no.
12      Q.  Let me ask it this way:  Did you
13  have a practice of informing Mr. Dondero when
14  payments were made against principal and
15  interest on any note that was tendered by an
16  affiliate or Mr. Dondero?
17          MS. DEITSCH-PEREZ:  Objection to
18  form.
19          MS. DANDENEAU:  Objection to form.
20      A.  No, I did not.
21      Q.  Did Mr. Dondero ever tell you that a
22  payment of principal or interest had been made
23  against a note that was tendered by an
24  affiliate or himself that he had been unaware
25  of?
```

Page 65

```
1            WATERHOUSE - 10-19-21
2       A.  Not that I recall.
3       Q.  Are you aware that Mr. Dondero and
4   the affiliates -- withdrawn.
5           Are you aware that Mr. Dondero
6   NexPoint, HCRE, and HCMS all contend that they
7   do not have to pay on any of the notes they
8   issued because they are subject to an oral
9   agreement between Mr. Dondero and Nancy
10  Dondero, in her capacity as the trustee of the
11  Dugaboy Investment Trust?
12          MS. DANDENEAU:  Objection to form.
13      A.  I didn't -- I didn't -- I didn't
14  know that it was all notes.
15      Q.  Okay.  Are you -- did you ever learn
16  that there was an oral agreement between Jim
17  Dondero and Nancy Dondero pertaining to any
18  notes issued by any affiliate or Mr. Dondero?
19          MS. DEITSCH-PEREZ:  Object to the
20  form.
21      A.  Yes.
22      Q.  Do you have any understanding as to
23  the terms of that agreement?
24      A.  Yes.
25      Q.  What is your understanding of the
```

Page 66

WATERHOUSE - 10-19-21

1    terms of the agreement?
2       A.   That there were certain milestones
3    that had to be reached.
4       Q.   Do you have any understanding of the
5    terms of the agreement between Mr. Dondero and
6    Nancy Dondero concerning any of the notes
7    issued by the affiliates or Mr. Dondero other
8    than that there have to be milestones reached?
9           MS. DEITSCH-PEREZ:  Object to the
10      form.
11      A.   There are milestones, I found out
12   yesterday, or there was some --
13          MS. DANDENEAU:  Okay.  I'm just
14      going to object to the extent that you
15      learned anything in conversations with
16      counsel, please don't reveal -- that is
17      privileged, and don't reveal any privileged
18      communications.
19          THE WITNESS:  Okay.
20      A.   So I'm not aware of anything else.
21      Q.   Do you know what the milestones
22   were?
23          MS. DANDENEAU:  Objection to form.
24      A.   I don't.

Page 67

WATERHOUSE - 10-19-21

1       Q.   Do you know anything about -- do you
2    know what promissory notes the agreement
3    covered?
4       A.   I don't.
5       Q.   Do you know if -- if Jim and Nancy
6    Dondero entered into one agreement or more than
7    one agreement?
8           MS. DEITSCH-PEREZ:  Object to the
9       form.
10      A.   I don't know.
11      Q.   Do you know if the agreement is in
12   writing?
13      A.   I don't know.
14      Q.   How did you learn the existence
15   of the agreement?
16          MS. DANDENEAU:  Objection to form.
17      Again --
18      A.   I don't -- I don't recall who told
19   me.
20      Q.   You have no recollection of who told
21   you about this agreement between Jim and Nancy
22   Dondero?
23          MS. DEITSCH-PEREZ:  Object to the
24      form.

Page 68

WATERHOUSE - 10-19-21

1       A.   I don't recall.
2       Q.   Do you recall how you learned of the
3    agreement?
4           Was it in a meeting?  Was it in a
5    phone call?  Was it in an email?
6       A.   I don't recall.
7       Q.   Do you recall when you learned of
8    the agreement?
9       A.   Not specifically.
10      Q.   Do you recall what year you learned
11   of the agreement?
12      A.   In -- look, I mean, there are so
13   many notes.  I may be getting -- I believe it
14   was 2020.
15      Q.   All right.  I'm not asking about
16   notes, sir.  I'm asking about the agreement
17   that you testified you knew about between Jim
18   and Don- -- Nancy Dondero.  Okay.
19          Do you understand my question now?
20   Should I ask my question again?
21      A.   Yeah, sure.  Go ahead.
22      Q.   I'm going to use the word
23   "agreement" to refer to the agreement that
24   Mr. Dondero and Nancy Dondero entered into

Page 69

WATERHOUSE - 10-19-21

1    where you understood that certain milestones
2    had to be reached.  Okay?
3       A.   Uh-huh.
4           MS. DANDENEAU:  Objection.
5           MS. DEITSCH-PEREZ:  Object to the
6       form.
7           MR. MORRIS:  Just defining a term,
8       what is the objection.
9           MS. DEITSCH-PEREZ:  The objection --
10          MR. MORRIS:  I will move on.  I will
11      move on.
12          MS. DEITSCH-PEREZ:  John --
13      Q.   Sir, are you okay with that
14   definition of agreement?
15      A.   Okay.
16      Q.   Okay.  So you don't recall who --
17   who informed you of the existence of the
18   agreement; is that right?
19      A.   I don't recall.
20      Q.   You don't recall who told you the
21   terms of the agreement.
22          Do I have that right?
23      A.   Correct.
24      Q.   And you don't recall if you learned

Page 70

1          WATERHOUSE - 10-19-21
2   about the agreement in a meeting, through an
3   email, or through a phone call.
4          Do I have that right?
5      A.   I don't recall.
6      Q.   Can you tell me when you learned of
7   the agreement?
8      A.   I don't -- I don't -- I don't
9   remember specifically.
10     Q.   Can you tell me if you learned of
11  the agreement before or after the petition
12  date?
13     A.   It would have been -- it would have
14  been after.
15     Q.   Can you tell me if you learned of
16  the agreement before or after January 9th,
17  2020?
18     A.   It would have been after.
19     Q.   Can you tell me if you learned of
20  the agreement before or after you left Highland
21  Capital Management in February of 2021?
22     A.   I don't -- I don't -- I don't know.
23     Q.   It is possible that you learned of
24  it while you were a Highland employee.
25         Do I have that right?

Page 71

1          WATERHOUSE - 10-19-21
2      A.   I don't remember the -- I mean, it
3   was sometime in 2021. I don't remember when.
4      Q.   All right. So to the best of your
5   recollection, it was in 2021 but you don't
6   recall if it was before or after you ceased to
7   be a Highland employee.
8          Do I have that right?
9      A.   Yeah, I mean, it was -- it was
10  likely after I was -- after I left Highland
11  because, if I put myself back into the last
12  days of -- of 2021, it was -- you know, the
13  communications with Mr. Dondero were -- were --
14  were -- there weren't as many communications
15  because of the circumstances.
16     Q.   And so based on that you believe
17  that it is most likely that you learned of this
18  agreement sometime after you left Highland
19  employment?
20     A.   I wouldn't use the term "most
21  likely." I don't recall specifically. I don't
22  recall.
23     Q.   Do you recall ever telling Jim Seery
24  about this agreement?
25     A.   No, I don't -- I didn't tell

Page 72

1          WATERHOUSE - 10-19-21
2   Jim Seery.
3      Q.   Did you tell anybody at DSI about
4   this agreement?
5      A.   No.
6      Q.   Did you tell any of Highland's
7   independent directors about this agreement?
8      A.   No.
9      Q.   Did you tell anybody at Pachulski
10  Stang Ziehl & Jones about this agreement?
11     A.   No.
12     Q.   Did you tell any employee of
13  Highland about this agreement?
14     A.   No.
15         MS. DANDENEAU: Mr. Morris, it has
16         been an hour and a half. Is this a good
17         time for a break?
18         MR. MORRIS: Sure.
19     Q.   Mr. Waterhouse, I will just remind
20  you that during the break please don't speak
21  with anybody about the deposition, the
22  substance of your testimony or anything else
23  concerning the deposition. Okay?
24     A.   Yes.
25         MR. MORRIS: So it is 11:02. We're

Page 73

1          WATERHOUSE - 10-19-21
2   at 11:02 your time. Let's come back, I
3   guess, at 15 -- at 11:15 your time.
4          VIDEOGRAPHER: We're going off the
5   record at 11:02 a.m.
6   (Recess taken 11:02 a.m. to 11:20 a.m.)
7          VIDEOGRAPHER: We are back on the
8   record at 11:20 a.m.
9      Q.   Mr. Waterhouse, did you speak with
10  anybody during the break about this deposition?
11     A.   No.
12         MS. DANDENEAU: Other than -- other
13         than his counsel.
14     Q.   Did you speak to your counsel about
15  the substance of your deposition today?
16     A.   No, I didn't bring it up.
17     Q.   I didn't ask you if you brought it
18  up. I asked you if you had any conversation
19  with your lawyer about the substance of your
20  deposition.
21         MS. DANDENEAU: Yes, he did.
22     Q.   Can you tell me what the -- you
23  discussed?
24         MS. DANDENEAU: No, I object to
25         that. He's not going to answer. That is a

Page 74

WATERHOUSE - 10-19-21

1  privileged conversation.
2     MR. MORRIS: So I just want to make
3  sure that I understand. During the break
4  you spoke with your client about the
5  substance of this deposition; is that
6  right?
7     MS. DANDENEAU: Yes, John.
8     MR. MORRIS: And you refuse -- you
9  refuse to let your client tell me what was
10 discussed; is that right?
11    MS. DANDENEAU: That's correct.
12    MR. MORRIS: You know, I had given
13 the instruction prior to the break not to
14 speak with counsel. I would have
15 appreciated --
16    MS. DANDENEAU: No, you didn't --
17 actually, that is not true, Mr. Morris.
18 You said not to speak with anyone. We
19 never have interpreted that to mean
20 conversations with counsel. That's never
21 been -- I have never, ever heard that
22 instruction.
23    MR. MORRIS: Okay. We will -- we
24 will -- we will deal with it when and if we

Page 75

WATERHOUSE - 10-19-21

1  have to.
2     Q.  Mr. Waterhouse, after learning about
3  the agreement, did you ask anybody if the
4  agreement was reflected in a writing?
5     MS. DANDENEAU: Objection to form.
6     A.  No.
7     Q.  Did you ask anybody if the terms of
8  the agreement were memorialized anywhere?
9     MS. DANDENEAU: Objection to form.
10    MR. MORRIS: What is the --
11    A.  No.
12    MS. DANDENEAU: Well, because you
13 keep talking about this agreement and I --
14 I -- I think, Mr. Morris, that is really
15 not clear what you mean by "the agreement."
16 And maybe you can just go back and restate
17 what that is.
18    MR. MORRIS: Okay. Your client has
19 agreed with me twice on the definition, but
20 I will try one more time.
21    Q.  Mr. Waterhouse, do you understand
22 that when I use the term "agreement," I'm
23 referring to the agreement between Jim and
24 Nancy Dondero concerning certain promissory

Page 76

WATERHOUSE - 10-19-21

1  notes where you learned that one of the terms
2  of the agreement was milestones reached?
3     A.  Okay.
4     Q.  And did you understand that that was
5  the -- the agreement that we were referring to
6  every time we used the word "agreement" in this
7  deposition?
8     A.  I don't know anything about this
9  agreement. So, look, I do -- it -- I don't
10 know whether --
11    Q.  Let's -- let's try this again.
12    A.  Yeah.  Look, I don't know what this
13 agreement relates.
14    MS. DEITSCH-PEREZ: John, John --
15    Q.  Let me try --
16    MS. DEITSCH-PEREZ: John, please let
17 the witness finish.
18    MR. MORRIS: Please stop. Please
19 stop. Please stop talking.
20    MS. DEITSCH-PEREZ: No, you stop.
21 Let the witness --
22    MR. MORRIS: Stop talking.
23    MS. DEITSCH-PEREZ: -- finish -- you
24 interrupted him.

Page 77

WATERHOUSE - 10-19-21

1     MR. MORRIS: You know what, you
2  guys, this is really wrong. It is really,
3  really wrong. I had the witness agree not once,
4  but twice to the definition of agreement.
5  Okay? I'm going to try and do it a third
6  time.
7     MS. DANDENEAU: No, but, please,
8  John, really --
9     MR. MORRIS: No, please stop
10 talking. Please. It is my deposition.
11 Object to questions.
12    MS. DANDENEAU: No, but also you
13 instructed him that -- that if you were
14 going -- if you were interrupting him, that
15 he should remind you that you're
16 interrupting him and -- and --
17    MR. MORRIS: Let him do that. Let
18 him do that.
19    MS. DANDENEAU: Okay. Well, you --
20    MR. MORRIS: Please stop talking.
21    A.  Okay. I don't know any of the
22 details of these agreements. I don't know
23 anything about them. I heard -- someone -- I

Page 78

WATERHOUSE - 10-19-21

1 don't know who, I don't know when, as you
2 asked, sometime in '21, someone told me about
3 this -- or I don't honestly know -- I don't
4 even recall exactly how I was made aware of
5 this, but I was. I don't know -- I don't know
6 any of these details, and I'm getting -- again,
7 there is, you know, I -- I -- I had a passing
8 conversation with -- with Jim at some point
9 on -- on some -- on the executive comp, and I'm
10 getting confused of what is what, because
11 again, I don't know any of these details.
12 Q. Okay. Let me try again,
13 Mr. Waterhouse, and I apologize.
14 Are you aware of any agreement
15 between Jim Dondero and Nancy Dondero
16 concerning any promissory note that was given
17 to Highland by any affiliate or Mr. Dondero?
18 MS. DEITSCH-PEREZ: Object to the
19 form.
20 A. I've heard of an agreement. That
21 is -- that is -- I mean, if you are using aware
22 as heard, sure.
23 Q. And you understand that one of the
24 terms of the agreement is that it was based on
25

Page 79

WATERHOUSE - 10-19-21

1 milestones that had to be reached; is that
2 right?
3 MS. DANDENEAU: Objection to form.
4 A. That was one of the words that was
5 used when I heard about it, yes.
6 Q. And when you heard about this
7 agreement that had a term in it concerning
8 milestones reached, did you ask the person who
9 was telling you about the agreement whether or
10 not it was in writing?
11 A. I did not.
12 Q. Did you ask any questions at all?
13 MS. DANDENEAU: Objection to form.
14 A. Not that I recall.
15 Q. But do you understand that going
16 forward, we're going to refer to the agreement
17 as the agreement that you just described that
18 you were --
19 MS. DANDENEAU: Object to the form.
20 A. Yes.
21 Q. Okay. You don't have any personal
22 knowledge concerning the terms of the
23 agreement; correct?
24 MS. DEITSCH-PEREZ: Object to the
25

Page 80

WATERHOUSE - 10-19-21

1 form.
2 Q. You can answer.
3 A. I don't -- I heard about the
4 agreement. I don't know anything -- I heard
5 there was an agreement. That is -- again, as I
6 testified before -- I said before, heard about
7 it, don't know the details. I believe it was
8 sometime this year.
9 Q. Do you have any personal knowledge
10 about the terms of the agreement, sir?
11 MS. DANDENEAU: Objection to form.
12 A. Other than what I have previously
13 discussed, I don't -- I don't know.
14 Q. Did -- did Mr. Dondero tell you
15 about the existence of the agreement?
16 A. I don't recall.
17 Q. Do you recall the source of your
18 information when you learned about the
19 agreement?
20 A. No, I don't -- I don't recall. I
21 don't remember. I just -- I heard about it
22 generally. I don't remember -- I don't
23 remember who, how, if, how. I don't remember.
24 Q. You know, Mr. Waterhouse, I just
25

Page 81

WATERHOUSE - 10-19-21

1 want to be clear that I never would have asked
2 you to appear at this deposition if your name
3 hadn't been included in responses to discovery
4 as to somebody with knowledge about the -- who
5 was told about the existence of the agreement.
6 That is what prompted me do this,
7 and I really do feel compelled to tell you that
8 I otherwise would never have called you as a
9 witness. So I regret that you're being put
10 through today. I had no intention of
11 burdening or taking your time, but that is
12 the reason that we issued the subpoena is
13 because certain of the defendants identified
14 you as somebody --
15 MS. DEITSCH-PEREZ: Mr. Morris, you
16 are here to ask questions, not to have --
17 MR. MORRIS: I feel badly for the
18 guy. I really do.
19 MS. DEITSCH-PEREZ: I'm sure you do.
20 MR. MORRIS: I do. Stop.
21 MS. DEITSCH-PEREZ: You stop.
22 MR. MORRIS: I'm allowed.
23 MS. DEITSCH-PEREZ: No, you're not
24 allowed to have a chat with the witness.
25

---

Page 82

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2    Q.   Okay.  Well, I hope that you
3 appreciate what I'm saying here,
4 Mr. Waterhouse.
5        MS. DANDENEAU:  All right.  Let's go
6    ahead and ask questions, and again, you're
7    entitled to probe his -- his knowledge
8    of -- whatever knowledge he has about
9    this -- this agreement and --
10       MR. MORRIS:  That is what I'm doing.
11       MS. DANDENEAU:  -- he will answer
12    the questions to the best that he can.
13       MR. MORRIS:  That is what I'm doing.
14   Q.   Mr. Waterhouse, I take it you do not
15 know which promissory notes issued by which
16 affiliates or Mr. Dondero are the subject of
17 this agreement; do I have that right?
18   A.   Yes, I don't -- I don't know.
19   Q.   Do you know of any way to determine
20 which promissory notes issued by the affiliates
21 and Mr. Dondero are the subject of this
22 agreement other than asking Jim or Nancy
23 Dondero?
24       MS. DANDENEAU:  Objection to form.
25   A.   I don't know.

---

Page 83

1 WATERHOUSE - 10-19-21
2    Q.   Did you ever make --
3    A.   I don't know anything about these
4 agreements.
5    Q.   Did you ever make any effort to
6 determine which promissory notes are subject to
7 this agreement?
8    A.   No.
9    Q.   Did you ever ask anybody which
10 promissory notes are subject to this agreement?
11   A.   No.
12   Q.   Do you know if there is a list
13 anywhere of the promissory notes that are
14 subject to this agreement?
15   A.   I'm not aware.
16   Q.   Have you ever seen the terms of the
17 agreement written down anywhere?
18   A.   No.
19   Q.   Have you ever asked anybody whether
20 the terms of the agreement were written down
21 anywhere?
22   A.   I have not.
23   Q.   Did learning about the agreement
24 cause you to do anything in response?
25       MS. DANDENEAU:  Objection to form.

---

Page 84

1 WATERHOUSE - 10-19-21
2    A.   No.
3    Q.   Did anybody ever describe to you the
4 nature of the milestones that you referred to
5 earlier?
6    A.   No, I don't -- I don't have any
7 details of this.
8    Q.   That is fine.
9        PricewaterhouseCoopers served as
10 Highland's outside auditors prior to the
11 petition date; correct?
12   A.   Yes.
13   Q.   You refer to PricewaterhouseCoopers
14 as PwC?
15   A.   Yes.
16   Q.   PricewaterhouseCoopers audited
17 Highland's financial statements on an annual
18 basis; correct?
19   A.   During my -- during my time as -- as
20 CFO, yes, PricewaterhouseCoopers was the
21 auditor.
22   Q.   Do you know why Highland had its
23 annual financial statements audited each year?
24   A.   Generally.
25   Q.   Tell me your general understanding

---

Page 85

1 WATERHOUSE - 10-19-21
2 as to the reason why Highland had its annual
3 financial statements audited each year.
4    A.   From -- from time to time, they were
5 used -- or asked for, as part of diligence or
6 transactions or -- or things of that nature.
7    Q.   And were they given to third parties
8 for purposes of diligence or transactions from
9 time to time?
10   A.   As far as I'm aware, yes.
11   Q.   And was it your understanding as the
12 CFO that the third parties who received the
13 financial statements in diligence or
14 transactions was going to rely on those?
15       MS. DANDENEAU:  Objection to form.
16   A.   I don't know -- I don't know gen --
17 I don't know specifically what they were going
18 to rely on.  You know, we would get requests
19 for audited financial statements.  I don't know
20 what they were relying on.
21   Q.   And --
22   A.   You would have to ask them.
23   Q.   Did you personally play a role in
24 PwC's annual audit and the conduct of the
25 audit?

---

Page 86

1         WATERHOUSE - 10-19-21
2         MS. DANDENEAU: Objection to form.
3     A.    During my tenure as CFO, I played a
4  very minimal role.
5     Q.    What was the minimal role that you
6  played?
7     A.    You know, again, it was -- it was to
8  check in with the team, to make sure that, you
9  know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages. I mean, this is -- but I -- I
17  played a minimal role towards the end.
18         Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21     Q.    Okay. Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25     A.    Yeah. I mean, there was -- there

Page 87

1         WATERHOUSE - 10-19-21
2  was a -- there was a point -- it varies. It
3  varies by year, in function, in time and, you
4  know, depending on the request, but yes, I
5  mean, there is -- there is -- there is
6  generally a point person of communication.
7     Q.    And who was the point person from
8  2016 until the time you left Highland?
9     A.    I don't -- I don't know
10  specifically, but it would have been, you
11  know -- you know, someone on the corporate
12  accounting team.
13     Q.    And was there a head of the
14  corporate accounting team?
15     A.    Yes, so -- yes.
16     Q.    Who was the head of corporate
17  accounting for the five years prior to the time
18  you left Highland?
19     A.    I don't -- if you're asking from
20  2016 on, I don't -- it was Dave Klos, but,
21  again, there was -- there was changes to the
22  team and the reporting structure. I don't
23  remember exactly when that happened during --
24  you know, over the last -- since 2016.
25     Q.    Did the folks who participated and

Page 88

1         WATERHOUSE - 10-19-21
2  ran the audit all report to you, directly or
3  indirectly?
4     A.    Yes.
5     Q.    And did you have any responsibility
6  for making sure that the audit report was
7  accurate before it was finalized?
8     A.    Yeah. I mean, you know, that --
9  that is -- my responsibility to the auditors
10  was -- again, is -- and the CFO is to -- we are
11  providing accurate financial statements; right?
12         And -- and -- and as part of any
13  audit, we disclose all relevant information as
14  part of any audit.
15     Q.    Okay. And as the CFO, did you take
16  steps to make sure that the audit report was
17  accurate?
18     A.    I mean, I would say in a general
19  sense, yes. But, again, I mean, I had a
20  very -- I had a very capable and competent
21  team. I wasn't managing them.
22         You know, part of what I do is I let
23  the team -- I want managers to grow. I want
24  managers to have rope. And that is -- you
25  know, I'm not a stand-behind-you type of guy.

Page 89

1         WATERHOUSE - 10-19-21
2  If you -- if you talk to my team members, I'm
3  not micromanaging people. I want people to
4  learn and grow in their function so they can go
5  on and do bigger and better things with their
6  careers.
7         And so, yes, generally I was
8  responsible for it, but I wanted the team to
9  learn and grow and be responsible for the bulk
10  of the audit.
11     Q.    Did you personally review each audit
12  report before it was finalized to satisfy
13  yourself that it was accurate?
14     A.    I don't -- I don't recall, you know,
15  for every single -- we're talking 2016, there
16  would have been three years, 2016 to '17, '18.
17  I don't -- we're -- we're going back
18  five-years-plus. I don't -- you know, I don't
19  recall.
20     Q.    Did you have a practice that you
21  employed to make sure that you were satisfied
22  that Highland's audit reports were true and
23  accurate to the best of your knowledge?
24     A.    I mean, our -- the practice was set
25  up with our -- the -- the practice to put

**Page 90**

WATERHOUSE - 10-19-21

1 together accurate audited or accurate financial
2 statements is to your control environment.
3
4   So, you know, the – so the practice
5 was to maintain a stable control environment
6 which then the output is – is accurate
7 financial statements.
8   So – so, you know, if I was
9 comfortable that the control environment was
10 operating, then, you know, that would dictate
11 how I would – you know, what I might or might
12 not do in a given year.
13   Q.   Okay.  Do you recall ever being
14 uncomfortable with the control environment
15 during the period that you served as CFO?
16   A.   Yeah.  I mean, look, yes, there are
17 times – you know, nothing is perfect.  So
18 there were – there were times when, yes, you
19 know – there are times I learned I was
20 uncomfortable with the control environment, and
21 that is part of the management of the process
22 and having, you know – and – and working
23 through whatever obstacles present themselves.
24   Q.   Okay.  Were you ever uncomfortable
25 with the control process as it related to

**Page 91**

WATERHOUSE - 10-19-21

1 reporting and disclosures of loans to
2 affiliates and Mr. Dondero?
3   MS. DANDENEAU:  Objection to form.
4   A.   I don't – I don't recall.
5   Q.   So you don't recall –
6   A.   – the –
7   MS. DANDENEAU:  Mr. Morris –
8   A.   I don't recall being uncomfortable.
9 But, again, we're going back several years.  I
10 don't – you know, the practice in an audit is
11 to disclose all information to the auditors.
12 And I don't – I don't recall.
13   Q.   As part of the process of the audit,
14 did you sign what is sometimes referred to as a
15 management representation letter?
16   A.   Yes.
17   MR. MORRIS:  Can we put up on the
18 screen a document that we have premarked as
19 Exhibit 33.
20   (Exhibit 33 marked.)
21   MS. DANDENEAU:  Mr. Morris, that is
22 not in the binder; correct?
23   MR. MORRIS:  Correct.
24   Q.   So you will see, Mr. Waterhouse,

**Page 92**

WATERHOUSE - 10-19-21

1 this is a letter dated June 3rd.  And if we
2 could go to the signature page.
3   And do you see that you and
4 Mr. Dondero signed this document?
5   A.   Yes.
6   Q.   That is your signature; right?
7   A.   Yes.
8   MR. MORRIS:  Okay.  Can you go back
9 to the top.
10   MS. DANDENEAU:  Mr. Morris, can you
11 have somebody post this in the chat so that
12 we have can have a copy of this, please.
13   MR. MORRIS:  Yeah, sure.  Asia, can
14 you do that, please.
15   Q.   Okay.  Do you see at the bottom of
16 the second paragraph there is a reference to
17 materiality?
18   A.   Yes.
19   Q.   Okay.  It says, Materiality used for
20 purposes of these representations is
21 $1.7 million.
22   Do you see that?
23   A.   I do.
24   Q.   And did PwC set that level of

**Page 93**

WATERHOUSE - 10-19-21

1 materiality?
2   A.   Yes.
3   Q.   And for purposes of the audit, did
4 PwC set the level of materiality each year?
5   A.   Yes.
6   Q.   Did that number change over time?
7   A.   I'm not aware of what materiality is
8 every single year, so – but, you know, this
9 number would likely fluctuate.
10   Q.   Okay.  I'm going to go back to a
11 question I asked you earlier today.  And that
12 is in connection – this letter is issued in
13 connection with the audit for the period ending
14 12/31/2018; correct?
15   A.   Yes.
16   Q.   Okay.  And is it fair to say that if
17 any – actually, withdrawn.  I'm going to take
18 it outside of this.
19   If Highland ever forgave the loan to
20 any affiliate or any of its officers or
21 employees, in whole or in part, to the best of
22 your knowledge, would that forgiveness have
23 been disclosed in the audited financial
24 statements if it exceeded the level of

Page 94

WATERHOUSE - 10-19-21

1  materiality that PwC established?
2
3        MS. DANDENEAU:  Objection to form.
4    A.   So, again, during my tenure as CFO,
5  and -- Highland -- it was -- it is required to
6  disclose any affiliate loans that are in excess
7  of materiality.
8        Now, the forgiveness of those loans
9  may or may not -- I mean, since materiality
10 fluctuates every year, a -- you know, if a loan
11 was forgiven, it may or may not, you know --
12 and, look, I would want to consult the guidance
13 around this.
14       It is not something we do -- you
15 know, it is not -- you know, GAAP can be and
16 disclosures can be very specialized so, again,
17 we want to consult the guidance.  But we would
18 see if and what would need to be disclosed if
19 it were deemed immaterial.
20   Q.   Did you and Mr. Dondero sign
21 management representation letters of this type
22 in each year in which you served as Highland's
23 CFO?
24   A.   I -- I -- I will speak for myself.
25 I signed them.  There may have been others that

---

Page 95

WATERHOUSE - 10-19-21

1  signed as well.  I don't -- I don't recall.
2    Q.   But to the best of your knowledge,
3  you, personally, sign a management
4  representation letter in connection with
5  Highland's audit each year that you served as
6  the CFO; correct?
7    A.   I would say generally speaking,
8  Mr. Morris.  I don't recall for every single
9  year, you know, generally, but I would want to
10 refer to all the rep letters and see who signed
11 them.
12   Q.   Do you recall Highland having its
13 financial statements audited in any year during
14 the period that you were a CFO where you didn't
15 sign the management representation letter?
16   A.   I don't recall.  But, John, we're
17 going back five, six, seven, eight, nine,
18 decade.  I don't -- I don't remember.
19   Q.   I don't want to go back that many
20 decades, but I'm just asking you if you recall
21 that there was you didn't sign it?
22   A.   I -- I -- I don't, but my memory
23 is -- again, I -- I -- I can't tell you what I
24 did in 2012.  I mean, I think generally, yes,

---

Page 96

WATERHOUSE - 10-19-21

1  but I don't -- I don't know for sure, and I
2  would want to rely on the document.
3    Q.   Let me ask the question a little bit
4  differently then.
5        Do you have any reason to believe
6  that Highland had its annual financial audit
7  and you did not sign a management
8  representation letter in connection with that
9  audit?
10       MS. DANDENEAU:  Objection to form.
11   A.   I don't believe it would, but,
12 again, I would want to -- I don't recall and I
13 would want to confirm it to -- to make, you
14 know, an affirmative -- to give an affirmative
15 answer.
16   Q.   Do you know whether PwC required
17 management to sign management representation
18 letters?
19       MS. DANDENEAU:  Objection to form.
20   A.   Yes.  I mean, it -- management
21 representation letters are signed by
22 management.
23   Q.   Okay.  And do you know -- do you
24 have any understanding as to why PwC requires

---

Page 97

WATERHOUSE - 10-19-21

1  management to sign management representation
2  letters?
3        MS. DEITSCH-PEREZ:  Object to the
4  form.
5    A.   I don't know why PwC's -- what PwC's
6  specific practice is.  I know generally what
7  management representation letters are.
8    Q.   Okay.  Do you personally -- I'm not
9  asking about PwC.  I'm asking for you -- I'm
10 asking about you, do you have an understanding
11 as to why the auditor asks for management
12 representation letters?
13   A.   Okay.  So you're asking me in my
14 personal capacity, yes, I have a general
15 understanding of why.
16   Q.   Can you give me the general
17 understanding that you have as to why
18 management representation letters are required?
19   A.   They are -- they are required to --
20 they are -- they are one of the items required
21 in an audit to help verify completeness.
22   Q.   Do you have any -- any other
23 understanding as to why management
24 representation letters are required?

Page 98

WATERHOUSE - 10-19-21

1
2    A.   That is – that is – other than
3    what I said, it is – it is – it is required
4    so – to ensure that the – you know, there
5    is – there is completeness in what is being
6    audited.
7        Q.   Did you – did you have a practice
8    whereby you and Mr. Dondero conferred about the
9    management representation letters before you
10   signed them?
11       A.   No.
12       Q.   Did you have a practice –
13   withdrawn.
14           Do you see just the next sentence
15   after the materiality, there is a sentence that
16   states:  We confirm, to the best of our
17   knowledge and belief, as of June 3rd, 2019, the
18   date of your report, the following
19   representations made to you during your audit.
20           Do you see that sentence?
21       A.   Yes.
22       Q.   Okay.  Did you understand when you
23   signed this letter that you were confirming the
24   representations that followed?
25       A.   When I signed this management

Page 99

WATERHOUSE - 10-19-21

1
2    letter – representation letter, yes.
3        Q.   Okay.  Did you discuss this letter
4    with Mr. Dondero before you signed it?
5        A.   I don't recall.
6        Q.   Do you recall if Mr. Dondero asked
7    you any questions before he signed the letter?
8        A.   I don't recall.
9        Q.   Do you recall if you asked
10   Mr. Dondero any questions before you signed
11   this letter?
12       A.   I don't recall.
13       Q.   Is it fair to say that Mr. Dondero
14   did not disclose to you the existence of the
15   agreement that we have – as we've defined that
16   term prior to the time you signed this letter?
17           MS. DANDENEAU:  Objection to form.
18       A.   I don't think I understand the
19   question.  So, again, you are saying, did
20   Mr. Dondero not disclose to me the existence of
21   this letter?
22       Q.   No, I apologize.
23           Did Mr. Dondero disclose to you the
24   existence of the agreement prior to the time
25   you signed this letter on June 3rd, 2019?

Page 100

WATERHOUSE - 10-19-21

1
2    A.   The agreement – the agreement that
3    we talked about earlier?
4        Q.   Correct.
5        A.   Look, as I said earlier, the first
6    time I heard of this agreement was sometime
7    this year.
8        Q.   Okay.  Can we turn – let's just
9    look at a couple of items on the list.  If we
10   can go to page 33416.  Do you see in Number 35
11   it talks about the proper recording or
12   disclosure in the financial statements of ND
13   relationships and transactions with related
14   parties.
15           Do you see that?
16       A.   I do.
17       Q.   As the CFO, do you have any
18   understanding as to whether Dugaboy is a
19   related party?
20       A.   I don't recall.
21       Q.   Do you know whether any of the
22   affiliates are related parties?
23       A.   If – if it was NexPoint, HCMFA,
24   HCMS, HCRE, yeah, if – if that is the
25   affiliate definition, and there.  In ASC 850 –

Page 101

WATERHOUSE - 10-19-21

1
2    again, I mean, I haven't looked at ASC 850 in
3    quite some time, but, you know, if – if there
4    is a control language, you know, ASC 850, would
5    that – that section in GAAP would – would
6    pick up and define what are related parties.
7            So, you know, like I said, if – one
8    of the four entities I just described, if – if
9    they are in that control definition of ASC 850,
10   they would be picked up in 35D.
11       Q.   Do you – do you have any reason to
12   believe that they would be picked up in that
13   definition, based on your knowledge and
14   experience?
15       A.   I – I believe that entities
16   controlled under GAAP are – are affiliates.
17       Q.   Okay.  Would Mr. Dondero also
18   qualify as a related party for purposes of
19   Section 35D, to the best of your knowledge?
20       A.   Yeah, I don't – I don't know.  I
21   would think – I would have to read the code
22   section to see if someone personally – is it
23   talking about related parties.  So, look, if
24   your own in control, yeah, I mean, I would have
25   to read the section.

Page 102

WATERHOUSE - 10-19-21

2    Q.    To the best of your knowledge, was
3  the existence of the agreement ever disclosed
4  to PwC?
5    A.    I'm not – I'm not aware.
6    Q.    Do you recall if the agreement was
7  ever disclosed in Highland's audited financial
8  statements?
9    A.    I don't – I don't remember if it
10  was in every Highland's audited financial
11  statements during my tenure.  We would have to
12  read the financial statements to see what was
13  disclosed, but I'm not – I mean, as I sit here
14  today, I'm not aware.
15    Q.    That is all I'm asking for.
16    A.    I'm not aware.
17    Q.    Can we go to the next page, please,
18  and look at 36.  36 says, we have disclosed to
19  you the identity of the partnership's related
20  party relationships and all the related party
21  relationships and transactions of which we are
22  aware.
23        Do you see that?
24    A.    Yes.
25    Q.    To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

2  June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6    A.    I mean, I can speak for myself as
7  signer of this representation letter.  I
8  disclosed what – what, you know, what –
9  what – what I knew.  Sorry, look, yes, so I –
10  I disclosed what I knew.
11    Q.    Okay.  Can we go to page 419.  Do
12  you see at the end there is a reference to
13  events that occurred since the end of the
14  fiscal year and the date of the letter?
15    A.    Yes.
16    Q.    And were you aware of that – of
17  that provision of the management representation
18  letter before you signed the document?
19    A.    Yes.
20    Q.    Do you have an understanding as to
21  why PwC asked for that confirmation of that
22  particular part of the management
23  representation letter?
24    A.    It is – it is – it is just – it
25  is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

2    Q.    And do you understand – do you have
3  an understanding that PwC wanted to know that
4  as of the date of the audit whether any
5  material changes had occurred since the end of
6  the fiscal year, using the definition of
7  materiality that is in this particular
8  management representation letter?
9    A.    It – it is – it is – it is a –
10  it is as described.  It is just a poorly worded
11  question, so it is hard for me to say yes.
12    Q.    If I asked you this, I apologize,
13  but did you ever learn when the agreement was
14  entered into?
15    A.    I don't – I don't – like I said
16  before, I don't know or have any details of the
17  agreement.
18    Q.    Okay.  Did you ever ask anybody when
19  the agreement was entered into?
20    A.    I did not.
21    Q.    Let's look at the audited financial
22  statements.  We will put up on the screen a
23  document that has been premarked as Exhibit 34.
24        (Exhibit 34 marked.)
25        MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

2  Canty could please put that in the chat
3  room, that would be great.
4        MR. MORRIS:  I will assure you we
5  will put every document in the chat room.
6    Q.    Now, I'm just going to ask you
7  questions that are related to the provisions of
8  this report that concern the affiliate loans,
9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14    A.    Yes.
15    Q.    Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20    A.    Yes.
21    Q.    If we can go to – I think it is the
22  next one, looking for PwC's signature line.
23        MS. CANTY:  I'm sorry, John, did you
24  say something?
25        MR. MORRIS:  Yes, can we turn the

Page 106

```
WATERHOUSE - 10-19-21
1
2    page. I think it is 215. Yes, stop right
3    there, just above -- I'm sorry, I want to
4    see just the date of the report.
5        Q.   Okay. Do you see at the bottom of
6    that page there, Mr. Waterhouse,
7    PricewaterhouseCoopers has signed this audit
8    report?
9        A.   Yes, I see their signature.
10       Q.   Okay. And it is the dated same day
11   as your management representation letter; is
12   that right?
13       A.   It is -- yes, it is the same day.
14       Q.   Was that the practice to sign the
15   management representation letter on the same
16   day that the audit report was signed?
17       A.   Yes, that is typical in every audit.
18       Q.   Can we just scroll down to the
19   balance sheet on the next page.
20           Do you see that there is a line
21   there that says, Notes and Other Amounts Due
22   from Affiliates?
23       A.   Yes.
24       Q.   Does that line, to the best of your
25   knowledge, include the amounts that were due
```

Page 107

```
WATERHOUSE - 10-19-21
1
2    under the affiliate under the notes signed by
3    the affiliates and Mr. Dondero?
4           MR. RUKAVINA: Objection to the
5        extent that calls for a legal conclusion.
6        A.   I mean, I would want to see the
7    detail and the build to this $173,398,000, but,
8    yes, I mean, if -- if -- given what we
9    discussed before, you know, it -- it should
10   capture that.
11       Q.   And -- and while you were the CFO of
12   Highland, were all notes held by Highland that
13   were issued by an affiliate or Mr. Dondero
14   carried as assets on Highland's balance sheets?
15           MS. DANDENEAU: Objection to form.
16           MS. DEITSCH-PEREZ: Object to form.
17       A.   I don't -- I don't know how else
18   they would be carried.
19       Q.   Okay. Can you think of any -- are
20   you aware of any promissory note issued by an
21   affiliate or Mr. Dondero that was not carried
22   on Highland's audited financial balance sheets?
23       A.   I'm -- I'm -- I'm not aware.
24       Q.   Okay. Are you aware of any category
25   of asset on Highland's balance sheet in which
```

Page 108

```
WATERHOUSE - 10-19-21
1
2    any of the promissory notes issued by an
3    affiliate or Mr. Dondero would have been
4    included?
5           MS. DANDENEAU: Objection to form.
6        A.   Sorry, am I aware of any asset of an
7    affiliate being included --
8        Q.   That -- let me -- let me try again.
9           Do you see there is a number of
10   different assets that are described on this
11   balance sheet?
12       A.   Yes.
13       Q.   One of the assets that is described
14   is Notes and Other Amounts Due from Affiliates;
15   right?
16       A.   Yes.
17       Q.   And it is reasonable to conclude
18   that the notes from the affiliates and
19   Mr. Dondero are included in that line item;
20   right?
21       A.   Yes, based on this description.
22   Again, I would want to see a build of this to
23   100 percent confirm, but based on the
24   description, the asset description, it is -- it
25   is likely.
```

Page 109

```
WATERHOUSE - 10-19-21
1
2           Now, does that mean absolute? I
3    don't know.
4        Q.   Do you have any reason to believe
5    that the promissory notes would have been
6    carried on the balance sheet in a category
7    other than Notes and Other Amounts Due from
8    Affiliates?
9        A.   If they were deemed -- no. If they
10   were deemed an affiliate, you know, under GAAP,
11   they should be carried in that line.
12   Otherwise, it would go into another line.
13       Q.   Okay. And do you see the total
14   asset base as of December 31st, 2018, was
15   approximately $1.04 billion?
16       A.   Yes.
17       Q.   Is my math correct that the Notes
18   and Other Amounts Due from Affiliates
19   constituted approximately 17 percent of
20   Highland's assets as of the end of 2018?
21       A.   Well, so how are you defining
22   Highland?
23       Q.   Highland Capital Management, L.P.,
24   the entity that this audit is subject to -- or
25   the subject of.
```

Page 110

WATERHOUSE - 10-19-21

1
2    A.    On a consolidated or unconsolidated
3    basis?
4    Q.    I'm looking at the balance sheet.
5    It is a consolidated balance sheet.  Okay?
6          Does the Notes and Other Amounts Due
7    from Affiliates constitute approximately
8    17 percent of the total assets of Highland
9    Capital Management, L.P., on a consolidated
10   basis?
11         MS. DANDENEAU:  Objection to form.
12   A.    I don't have a calculator in front
13   of me but I will take your math, if you are
14   taking the 173 divided by the billion.
15   Q.    Okay.
16   A.    If that is accurate, yes.  But,
17   again, on a consolidated basis.
18   Q.    And on an unconsolidated basis the
19   percentage would be higher; correct?
20   A.    I – no.  I don't know.
21   Q.    Well, okay.  That is fair.
22         MR. MORRIS:  Can we turn to
23   page 241, please.
24   Q.    Do you see that this is a section of
25   the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

1
2    Other Amounts Due from Affiliates?
3    A.    Sorry, I can't see the – the –
4    Q.    It is at the top.
5    A.    Notes and Other Amounts Due from
6    Affiliates, yes, I see that.  I don't – I
7    don't have a page number, but I'm on a page
8    that says at the top:  Notes and Other Amounts
9    Due from Affiliates.
10   Q.    Okay.  And that is the same title of
11   the line item on the balance sheet that we just
12   looked at; right?  Notes and Other Amounts Due
13   from Affiliates?
14   A.    Yes.
15   Q.    And is it your understanding, based
16   on your experience and knowledge as the CFO,
17   that this is the section of the narrative that
18   ties into the line item that we just looked at?
19   A.    Yes.
20   Q.    And is this section of the audit
21   report intended to describe and disclose all of
22   the material facts concerning the Notes and
23   Other Amounts Due from Affiliates?
24         MS. DANDENEAU:  Objection, form.
25   A.    This – these notes – these notes

Page 112

WATERHOUSE - 10-19-21

1
2    of the financial statements are – the purpose
3    is to disclose any material items in relation
4    to that balance sheet line item.
5    Q.    Okay.  And all of the information,
6    to the best of your knowledge, that is set
7    forth in this section of the audit report was
8    provided by Highland; correct?
9    A.    Yes, it would have been provided by
10   the corporate accounting team.
11   Q.    Okay.  And the corporate accounting
12   team, did that team report to you in the
13   organizational structure?
14   A.    Yes.
15   Q.    And did you have any concerns about
16   the controls that were in place to make sure
17   that the information provided with respect to
18   Notes and Other Amounts Due from Affiliates was
19   accurate and complete?
20         MS. DANDENEAU:  Objection to form.
21   A.    Not that I recall.
22   Q.    Okay.  Do you recall ever being
23   concerned that any portion of the Notes and
24   Other Amounts Due from Affiliates in any audit
25   report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

1
2    reliable?
3    A.    I didn't – I had concerns about,
4    you know, like I talked about before, of there
5    were – there were potentially issues in the
6    control environment.  But as far as it relates
7    to the audited financial statements, any – the
8    team would work with the auditors to disclose
9    all – all notes in Highland's possession.
10         And any – any notes that were
11   deemed material by the auditor, right, these
12   were disclosed in these – in this section, you
13   know, in – in the notes to the consolidated
14   financial statements as you presented.
15   Q.    Do you recall ever having a
16   conversation with anybody at any time
17   concerning the accuracy of the section of audit
18   reports that relates to Notes and Other Amounts
19   Due from Affiliates?
20         MS. DANDENEAU:  Objection to form.
21   A.    You know, as – as – I didn't have
22   direct conversations with
23   PricewaterhouseCoopers as I had, you know –
24   I – I had the team that managed this.
25         Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21
1
2  being the point person of this audit.  And I
3  can't recall, you know, when -- you know, I
4  don't even know if I was ever the point person
5  during my tenure as CFO.
6        I don't know if PwC had any concerns
7  when they were performing those audit
8  procedures.  They may have and they may have --
9  and it may not have been communicated to me.  I
10 don't know.
11       MR. MORRIS:  All right.  I move to
12 strike.
13    Q.   And I'm going to ask you to listen
14 carefully to my question.
15       Did you -- do you recall ever having
16 a conversation with anybody at any time
17 concerning the accuracy of the reporting
18 provided in the audited financial statement on
19 the topic of Notes and Other Amounts Due?
20       MS. DANDENEAU:  Objection to form.
21    A.   I don't recall for this, but that
22 doesn't mean that it didn't exist.
23    Q.   Okay.  But you have no reason to
24 believe, as you sit here right now, that you
25 ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21
1
2  accuracy of the section of the audit reports
3  called Notes and Other Amounts Due from
4  Affiliates; correct?
5        MS. DANDENEAU:  Object to the form.
6        MS. DEITSCH-PEREZ:  Objection to
7  form.
8     A.   I don't recall having any
9  conversations.  But, again, I mean, this is --
10 this is two years ago.
11    Q.   I'm just asking for your
12 recollection, sir.
13    A.   Yes.
14    Q.   If you don't recall, this will --
15    A.   Yeah.
16    Q.   (Overspeak) -- if you don't
17 recall --
18    A.   Yeah, I don't -- I don't recall.
19    Q.   Do you know who was responsible for
20 drafting the audit report?
21    A.   Are you asking the actual Highland
22 employee responsible?  I mean, it was
23 Highland's responsibility, so, I mean, that
24 is --
25    Q.   Right.

Page 116

WATERHOUSE - 10-19-21
1
2     A.   -- Highland's responsibility.
3  Highland's responsibility.
4     Q.   Who, at Highland, was responsible
5  for drafting this section of the audit report?
6     A.   I -- I don't know the answer to
7  that.  Again, there was a team who worked on
8  this.  And I don't know, you know, whether it
9  was the staff or the manager.
10       Again, this is where I let the teams
11 manage.  And, you know, there may be a
12 corporate accountant who worked on this.  I
13 just -- you know, I wasn't part of that process
14 to give that person experience.  I don't know.
15    Q.   Do you recall having any
16 communications with anybody at any time
17 concerning this section of the report?
18    A.   Yeah, I don't recall.
19    Q.   Do you recall whether you ever told
20 anybody at any time that any aspect of this
21 section of the report was inaccurate or
22 incomplete?
23    A.   I don't recall.
24    Q.   As you sit here today, do you have
25 any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21
1
2  audit report is incomplete or inaccurate in any
3  way?
4        And I'm happy to give you a moment
5  to -- to look at it, if you would like.
6        MS. DANDENEAU:  Objection to form.
7        MS. DEITSCH-PEREZ:  Same.
8     A.   I mean, I would have to look at -- I
9  would have to look at the bill to the note
10 schedule to make sure I know you presented me
11 with materiality, but again, there might be a
12 note as of 12/31/18 that somehow was -- was
13 under materiality not disclosed.  I don't -- I
14 don't know.  I would need more information.
15    Q.   Okay.  But without more information,
16 you have no reason to believe anything this
17 section is inaccurate; correct?
18       MS. DANDENEAU:  Objection to form.
19    A.   I don't.  I mean, you know, this was
20 part of the audit.
21    Q.   Thank you.  Now, you will see if we
22 could scroll just a little bit more that each
23 of the first five paragraphs concerns
24 specifically the four affiliates that we've
25 been discussing and Mr. Dondero.

Page 118

WATERHOUSE - 10-19-21

1        MR. MORRIS:  If we could go the
2    other way, La Asia.  We don't need Okada.
3    We're going to have to thread the needle.
4    Okay.  Good, perfect.
5        Q.   Do you see those five paragraphs
6    certain the four affiliates and Mr. Dondero as
7    we've been referring to today?
8        A.   Yes.
9        Q.   Okay.  And do you see at the end of
10   every paragraph it states, quote:  A fair value
11   of a partnership's outstanding notes receivable
12   approximates the carrying value of the notes
13   receivable?
14       A.   Yes, I see that.
15       Q.   Do you have an understanding of what
16   that means?
17       A.   Yes.
18       Q.   What is your understanding of that
19   sentence?
20       A.   It is the -- again, the -- the fair
21   value, right, which is -- which is what the --
22   what Highland could sell that asset for.  This
23   statement is comparing the fair value of the
24   notes to the carrying value, so the carrying

Page 119

WATERHOUSE - 10-19-21

1    value is the line item that you showed me
2    earlier that is in Notes and Other Amounts Due
3    from Affiliates.
4        Q.   Okay.  Is another way to say this is
5    that the fair market value of the notes equals
6    the principal amount and -- withdrawn.
7        Is the fair way to interpret this
8    that the fair market value of the notes equals
9    all remaining unpaid principal and interest due
10   under the notes?
11       MS. DANDENEAU:  Object to the form.
12       MS. DEITSCH-PEREZ:  Objection, form.
13       A.   I don't know the answer to that,
14   because I don't recall where -- where any --
15   where -- in what line item was the interest
16   component reported.
17       Q.   All right.  Well, if we look in this
18   audit report, you will see in the middle of the
19   first paragraph, for example, it states that as
20   of December 31st, 2018, total interest and
21   principal due on outstanding promissory notes
22   was approximately $5.3 million.
23       Do you see that?
24       A.   I do.

Page 120

WATERHOUSE - 10-19-21

1        Q.   Is that the carrying value or the
2    fair value?
3        A.   That would be the carrying value --
4        Q.   And is the last --
5        A.   -- in my opinion.
6        Q.   Okay.  And it is in your opinion as
7    the chief financial officer of Highland during
8    the period of time that you described; right?
9    It is an educated opinion?
10       A.   I'm reading this at face value.  I'm
11   taking that as that is carrying value.
12       Q.   Okay.  And does the last sentence
13   say that the carrying value is roughly
14   approximate the fair market value?
15       MS. DANDENEAU:  Objection to form.
16       MS. DEITSCH-PEREZ:  Objection, form.
17       A.   Again, this note to the financial
18   statement is specific to notes and other
19   amounts due from affiliates.
20       Q.   Correct.
21       A.   If the interest component is
22   reported elsewhere on the balance sheet, you
23   know, it -- it -- it could be off.  Again, I
24   don't have the detail.  I don't know, but yes,

Page 121

WATERHOUSE - 10-19-21

1    look, I mean, if you -- I mean, if you are
2    saying the 5.3 million is in the notes and
3    other amounts due from affiliates, then the
4    last statement is saying the fair value
5    approximates 5.3 million.  That is what that
6    last sentence is saying.
7        Q.   Do you see in the middle of the
8    first paragraph -- not in the middle, the next
9    to last sentence there is a statement that the
10   partnership will not demand payment on amounts
11   that exceed HCMFA's excess cash availability
12   prior to May 31st, 2021.
13       Do you see that?
14       A.   I do.
15       Q.   Do you know when Highland agreed not
16   to demand payment as described in that
17   sentence?
18       A.   I don't know specifically.
19       Q.   Do you know why Highland agreed not
20   to demand payment on HCMFA's notes until May
21   2021?
22       A.   Yes.
23       Q.   Why was that decision made?
24       A.   You know, well, it -- it -- that

Appx. 02079

Page 122

WATERHOUSE - 10-19-21

1    decision was made as to not put HCMFA into a
2    position where it didn't have sufficient assets
3    to pay for the demand note.
4       Q.   And at the time the agreement was
5    entered into, pursuant to which the partnership
6    wouldn't demand payment, did HCMFA have
7    insufficient assets to satisfy the notes if a
8    demand had been made?
9       MS. DANDENEAU:  Objection to form.
10      A.   I don't have HCMFA's financial
11   statements in front of me as of 12/31/18.
12      Q.   Was there a concern that HCMFA would
13   be unable to satisfy its demands under the
14   notes if demand was made?
15      MS. DANDENEAU:  Objection to form.
16      A.   Well, there is – I don't recall –
17   I mean, there is something, right, in place to
18   basically not demand payment until May 31, 2021
19   as detailed here.
20      Q.   And who made the decision to enter
21   into – who made the decision on behalf of
22   Highland not to demand payment until May 31st,
23   2021?
24      A.   I'm trying to remember.  I don't

Page 123

WATERHOUSE - 10-19-21

1    remember exactly – I don't remember if it was
2    myself or – or Jim Dondero who – who – there
3    was – there was something signed, from what I
4    recall, that – that – that backed up this
5    line item in the – in the notes I'm – look,
6    I'm, I'm –
7       Q.   We will get to that.
8       A.   You –
9       Q.   I'm just –
10      A.   You have – I mean –
11      Q.   We're going to give that to you.
12   I'm going to give that to you.
13      A.   You – you – you have all the
14   documents.  I don't have the documents, and
15   that is what makes it so hard.  I don't have
16   any documents to prepare for this deposition;
17   right?  You have all – I don't – I don't – I
18   don't remember, but, you know, again, it would
19   probably be myself or Jim.
20      Q.   Do you know if Highland received
21   anything in return for its agreement not to
22   make a demand for two years?
23      A.   I don't – I don't think it referred
24   anything.

Page 124

WATERHOUSE - 10-19-21

1       Q.   And did you and Mr. Dondero discuss
2    HCMFA's ability to satisfy the notes if a
3    demand was made at the time this agreement was
4    entered into?
5       MS. DANDENEAU:  Objection to form.
6       A.   I don't – I don't – I don't recall
7    having a specific conversation, if I did, or –
8    or David Klos.
9       Q.   Okay.  I'm just asking if you recall
10   any conversations that you had.
11      A.   I don't recall.
12      Q.   Okay.  Do you know why Highland
13   loaned the money to HCMFA that is the subject
14   of the notes described in this paragraph?
15      A.   I don't remember specifically why
16   5.3 million was loaned.  I mean, I – it would
17   have to be put in the context.
18      Q.   Do you have any recollection at all
19   as to why Highland ever loaned any money to
20   HCMFA?
21      A.   Yes.
22      MS. DANDENEAU:  Objection to form.
23      Q.   What do you remember about that?
24      A.   There was a Highland Global

Page 125

WATERHOUSE - 10-19-21

1    Allocation Fund, which was a – a fund managed
2    by Highland Capital Management Fund Advisors.
3    There was a we – I'm just telling you,
4    there was – there was – there was a – a
5    ultimately a NAV error found in this fund while
6    it was an open-ended fund and, you know, there
7    were amounts owed by the advisor in – in
8    relation to that NAV error.
9          There were also, for the same fund,
10   that same fund was ongoing an
11   open-end-to-close-end conversion, and as part
12   of that proposal, shareholders who voted for
13   the conversion received compensation from the
14   advisor.
15      Q.   All right.  Now, the events that
16   you're describing occurred in the spring of
17   2019; right?
18      A.   These started back – I think, I
19   mean –
20      Q.   I apologize.
21      A.   – that – I mean, the answer to
22   that is no.
23      Q.   I apologize, the loans that were
24   made in connection with the events that you're

Page 126

WATERHOUSE - 10-19-21

1  describing occurred in May 2019; right?
2
3        MR. RUKAVINA:  Objection to the
4     extent that calls for a legal conclusion.
5     A.   I don't recall specifically what
6  amounts of money were moved when, for what
7  purpose.
8     Q.   Okay.  Fair enough.  Going to the
9  next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13     A.   This is for NexPoint Advisors?
14     Q.   Yes.
15     A.   I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18     Q.   Do you know why?
19     A.   But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21     Q.   Okay.  That is fair.  Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24     A.   Yes.
25     Q.   Why did High -- why do you recall --

Page 127

WATERHOUSE - 10-19-21

1  what is the reason you recall Highland lending
2  money to NexPoint?
3     A.   I mean, I was just -- I just -- I
4  just recall.  I mean, I just -- I don't
5  remember why.
6     Q.   I understand.  And I'm asking you if
7  you recall --
8     A.   Oh, why -- I thought you say --
9  NexPoint Advisors was launching a fund which
10  is -- I believe the legal name is NexPoint
11  Capital, Inc.  And it -- it provided a
12  co-invest into that fund.
13        And, from what I remember, the --
14  the -- that NexPoint borrowed money from
15  Highland at the time to make that co-invest.
16     Q.   So this was an investment that
17  NexPoint was required to make; is that right?
18        MS. DANDENEAU:  Objection to form.
19     A.   I don't know if it was required to
20  make, I don't recall that, or if it just made
21  it.
22     Q.   Okay.  But your recollection is that
23  NexPoint made an investment and they borrowed
24  money from Highland to finance the investment.
25

Page 128

WATERHOUSE - 10-19-21

1        Do I have that right?
2     A.   Yes.
3     Q.   How about HCRE?  Do you know why
4  HCRE borrowed money from Highland?
5     A.   I don't remember specifically.
6     Q.   Do you remember generally?
7     A.   Generally, yeah -- I mean, yes.
8     Q.   Can you tell me your general
9  recollection as to why Highland loaned money to
10  HCRE?
11     A.   For -- for -- for investment
12  purposes.
13     Q.   So HCRE made the investment and it
14  obtained a loan, or loans, from Highland in
15  order to finance that investment or those
16  investments.
17        Do I have that right?
18     A.   I mean, I -- you know, generally.
19     Q.   Okay.  How about Highland Management
20  Services, Inc.?
21        Do you have any recollection as to
22  why HCMS borrowed money from Highland?
23     A.   Generally.
24     Q.   What is your general recollection as

Page 129

WATERHOUSE - 10-19-21

1  to why HCMS borrowed money from Highland?
2     A.   For -- for investment purposes.
3     Q.   So it is the same thing, HCMS wanted
4  to make investments and it borrowed money from
5  Highland in order to finance those investments;
6  is that right?
7     A.   I mean, yes, generally.  I mean, I
8  can't -- I don't -- on the services, there --
9  there are several loans in these schedules.
10  You know, I can't remember why every single one
11  of these were made, but I would say, yeah, I
12  mean, generally.
13     Q.   Okay.  I appreciate that.
14        MR. MORRIS:  Let's go to the page
15  with Bates No. 251.  La Asia, are you
16  there?
17        MS. CANTY:  Sorry, John.  It went
18  out for a minute.  Can you say that again.
19  I don't know what is going on.
20        MR. MORRIS:  The page with Bates
21  No. 251, can we go to that.
22        MS. CANTY:  Yes, sorry.
23        MR. MORRIS:  Keep going to the
24  bottom.  Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1
2    Q.    Do you see, Mr. Waterhouse, that
3    there is a section there called Subsequent
4    Events?
5    A.    I do.
6    Q.    And does this relate to the last
7    sentence above the signature line on the
8    management representation letter that we talked
9    about earlier where you made the representation
10   that you disclosed subsequent events?
11   A.    I mean, it relates to it, but not in
12   its entirety.
13   Q.    Okay.
14        MR. MORRIS:  If we can scroll up to
15   capture the entirety of this section right
16   here.
17   Q.    And what do you mean by that, sir?
18        MR. MORRIS:  Yeah, right there.
19   Perfect.
20   A.    There are -- there are different
21   subsequent events in -- under GAAP.  So there
22   are -- and -- and -- so what we see in the
23   notes to the financial statements are one type
24   of subevent.
25   Q.    Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

1
2    subsequent event relating to affiliate loans be
3    captured in this section if they were -- if
4    they were made after the end of the fiscal year
5    and prior to the issuance of the audit report?
6    A.    Yes, if they were deemed material or
7    disclosable.
8    Q.    Okay.  I appreciate that.
9         Do you see the next to the last
10   entry there?  It says, Over the course of 2019
11   through the report date, HCMFA issued
12   promissory notes to the partnership in the
13   aggregate amount of $7.4 million?
14   A.    Yes.
15   Q.    And does that refresh your
16   recollection that those are the notes that
17   related to the NAV error that you mentioned
18   earlier?
19   A.    I don't -- I don't remember the
20   exact.  Again, there are -- I mentioned two
21   line items; right?
22   Q.    Yes.
23   A.    I mean, it was the GAAP conversion
24   process plus the -- the NAV error.  I don't
25   have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1
2    if -- you know, what -- if that 7.4 million was
3    solely attributable to the NAV error.
4    Q.    Okay.  But there is no question that
5    Highland told PricewaterhouseCoopers that over
6    the course of 2019 HCMFA issued promissory
7    notes to the partnership in the aggregate
8    amount of $7.4 million; correct?
9    A.    In the course of the audit, we would
10   have produced all promissory notes in our
11   possession, including the ones that are
12   detailed here.
13   Q.    Do you recall that you signed the
14   two promissory notes that are referenced in
15   that provision?
16        MS. DANDENEAU:  Objection to form.
17   A.    I didn't recall initially but I've
18   been reminded.
19   Q.    Okay.  And -- and do you recall that
20   those notes are dated May 2nd and May 3rd,
21   2019?
22   A.    Yes.
23   Q.    So that was just a month before the
24   audit was completed; correct?
25   A.    Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1
2    date, right, if -- if my memory serves me
3    right.
4    Q.    Yes, I will represent to you that
5    your memory is accurate in that regard.
6         Did anybody ever instruct you as the
7    CFO to correct this statement that we're
8    looking at in subsequent events?
9    A.    So let me understand.  You're saying
10   when I was CFO at Highland Capital did anyone
11   ever ask me to correct the -- over the course
12   of 2019 through the report date HCMFA issued
13   promissory notes, this statement?
14   Q.    Right.
15   A.    Not that I'm aware.
16   Q.    While you were the CFO of Highland,
17   did anybody ever tell you that sentence
18   was wrong?
19   A.    Not that I'm aware.
20   Q.    Highland -- withdrawn.
21        HCMFA disclosed these notes in its
22   own audited financial statements; right?
23        MR. RUKAVINA:  Objection, form.
24   A.    I assume that these would be
25   material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1    statements, yes, they -- they -- they should be
2    and they were likely disclosed.
3        Q.    Now, there is no statement
4    concerning the 2019 notes about the forbearance
5    that we looked at in the affiliated note
6    section of the report; right?
7            MS. DANDENEAU:  Objection to form.
8        Q.    I'll withdraw.  That was bad.
9            Do you recall when we were looking
10   at the paragraph concerning HCMFA earlier it
11   had that disclosure about the agreement whereby
12   Highland wouldn't ask for demand on the -- on
13   the HCMFA notes?
14       A.    Yes.
15       Q.    That forbearance disclosure is not
16   made with respect to the 2019 notes; right?
17       A.    Not -- look, not that I can recall,
18   unless -- unless it was done at a subsequent
19   day.
20       Q.    Right.  And it is not in the
21   subsequent event section that we're looking at
22   right now where the 2019 notes are described;
23   right?
24       A.    Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1    June 3rd.  It could have been done on June 4th.
2    I don't -- I don't -- I don't recall.
3        Q.    Okay.
4            MR. MORRIS:  Can we put up on the
5    screen the HCMFA audit report.  And while
6    we're --
7            MS. DANDENEAU:  What exhibit is
8    this?
9            MR. MORRIS:  La Asia, what number is
10   that?
11           MS. CANTY:  45.
12           MR. MORRIS:  So this will be marked
13   as Exhibit 45.
14           (Exhibit 45 marked.)
15           MS. CANTY:  Yeah, and I will put it
16   in the chat.
17           MS. DANDENEAU:  Thank you.
18       Q.    Okay.  All right.  Do you see that
19   this is the consolidated financial statements
20   for HCMFA for the period ending 12/31/18?
21       A.    Yes.
22       Q.    As the treasurer of HCMFA at the
23   time, did you have to sign a management
24   representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1    we looked at earlier for Highland?
2        A.    I would imagine I would have been
3    asked to.  I don't recall if I did.
4        Q.    Do you recall ever being asked by an
5    auditor to sign a management representation
6    letter and then not doing it?
7        A.    No.
8            MR. MORRIS:  Can we just scroll down
9    again.  I just want to see the date of the
10   document.
11       A.    I mean, let me -- you know, there
12   are different versions to management
13   representation letters I will qualify.
14           Yes, there are certain -- from time
15   to time auditors can make representations
16   that -- in the rep letter that is being
17   proposed that are inaccurate or out of scope or
18   things like that and they've asked for
19   signature.
20           In that context, yes.  I mean, you
21   know -- I mean, if I have been asked to sign
22   and make those representations and those
23   representations are invalid, yes, I would not,
24   I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1        Q.    Okay.  PricewaterhouseCoopers served
2    as HCMFA's outside auditors as well; correct?
3        A.    Yes.
4        Q.    Do you see that this audit report is
5    signed on June 3rd, 2019, just like the
6    Highland audit report?
7        A.    That is correct.
8        Q.    And did the process of -- of
9    preparing HCMFA's audit report, was that the
10   same process that Highland followed when it did
11   its audit report at this time?
12       A.    I mean, it is a different entity.
13   There are different assets.  You know, it --
14   it -- it is -- as you saw, Highland's
15   financials are on a consolidated basis.  This
16   is different, so it is under the same control
17   environment and team.
18       Q.    Okay.  I appreciate that.  So the
19   same control environment and team participated
20   in the preparation of the audit for Highland
21   and for HCMFA at around the same time; correct?
22       A.    Yes.
23           MR. MORRIS:  Can we go to page 17 of
24   the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you see that just like
3    Highland's audited financial report, HCMFA's
4    audited financial report also has a section
5    related to subsequent events?
6        A.   Yes.
7        Q.   And am I reading this correctly that
8    just as Highland had done, HCMFA disclosed in
9    its audited financial report a subsequent event
10   that related to the issuance of promissory
11   notes to Highland in the aggregate amount of
12   $7.4 million in 2019?
13       A.   That is what I see in the report.
14       Q.   And you were the treasurer of HCMFA
15   at the time; right?
16       A.   Yes, to the best of my knowledge.
17       Q.   And did anybody ever tell you prior
18   to the time of the issuance of this audit
19   report that that sentence relating to HCMFA's
20   2019 notes was inaccurate or wrong in any way?
21       A.   Not that I recall.
22       Q.   As you sit here right now, has
23   anybody ever told you that that sentence is
24   inaccurate or wrong in any way?
25       A.   Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1
2    Q.   I apologize if I asked you this
3    already, but has anybody ever told you at any
4    time that you are not authorized to sign the
5    promissory notes that are the subject of the
6    sentence we're looking at?
7        A.   Not that I recall.
8        Q.   Did anybody ever tell you at any
9    time that you had made a mistake when you
10   signed the promissory notes that are the
11   subject of this sentence?
12       A.   Say that again.  Did anyone ever say
13   that I made a mistake?
14       Q.   Let me ask the question again.
15           Did anybody ever tell you at any
16   time that you made a mistake when you signed
17   the two promissory notes in Highland's favor on
18   behalf of HCMFA in 2019?
19       A.   Not that I recall.
20       MR. MORRIS:  Let's just look at the
21   promissory notes quickly.  Can we please
22   put up Document Number 1, and so this is in
23   the pile that y'all have.  We'll just go
24   for a few more minutes and we can take our
25   lunch break.

Page 140

WATERHOUSE - 10-19-21

1
2    Q.   All right.  So I don't know if you
3    have seen this before, sir.  Do you see that
4    this is a complaint against HCMFA?
5        A.   Yes, I am looking at it on the
6    screen.
7        Q.   Okay.  And have you ever seen this
8    document before?
9        A.   I went through some of these
10   documents with my counsel here yesterday.
11       MR. MORRIS:  All right.  Can we go
12   to Exhibit 1 of this document.
13       Q.   Do you see Exhibit 1 is a
14   $2.4 million promissory note back in 2019?
15       A.   Yeah, I found it in the book.  Yes,
16   I have it here in front of me.
17       Q.   And this is a demand note, right, if
18   you look at Paragraph 2?
19       A.   Yes.
20       Q.   And this is a note where the maker
21   is HCMFA, and Highland is the payee; right?
22       A.   Yes.
23       MR. MORRIS:  And if we can scroll
24   down, can we just see Mr. Waterhouse's
25   signature.

Page 141

WATERHOUSE - 10-19-21

1
2    Q.   Is that your signature, sir?
3        A.   Yes, it is.
4        Q.   And did you sign this document on or
5    around May 2nd, 2019?
6        A.   I don't recall specifically signing
7    this, but this is my signature.
8        Q.   Okay.  And do you recall that
9    Highland transferred $2.4 million to HCMFA at
10   or around the time you signed this document?
11       A.   I don't recall specifically.  I
12   would want to, as I sit here today, go back and
13   confirm that, but again, presumably that --
14   that -- that did happen.
15       Q.   You wouldn't have signed this
16   document if you didn't believe that HCMFA
17   either received or was going to receive
18   $2.4 million from Highland; is that fair?
19       A.   I mean, it -- if -- if -- if there
20   wasn't a transfer of value, yeah, I mean, you
21   know, I would have no reason to -- to sign a
22   note.
23       Q.   And -- and Highland wouldn't have
24   given this note to PricewaterhouseCoopers if --
25   withdrawn.

Page 142

```
 1            WATERHOUSE - 10-19-21
 2       HCMFA wouldn't have given this note
 3  to PricewaterhouseCoopers if it hadn't received
 4  the principal value of -- of the note in the
 5  form of a loan; correct?
 6       MR. RUKAVINA:  Objection, legal
 7    conclusion, speculation and form.
 8    A.    Again, we -- what we provided to PwC
 9  were, as part of the audit, any promissory
10  notes executed and outstanding.  You know, as a
11  part of the audit, they, you know, they -- they
12  have copies of all the bank statements,
13  things -- things of that sort.
14       MR. MORRIS:  Okay.  Can we go to
15    Exhibit 2.
16       (Exhibit 2 marked.)
17    Q.    Do you see that this is a promissory
18  note dated May 3rd, 2019 in the amount of
19  $5 million?
20    A.    Yes.
21    Q.    Do you believe this is also a demand
22  note if you look at Paragraph 2?
23    A.    Yes.
24    Q.    And do you see that HCMFA is the
25  maker, and Highland is the payee?
```

Page 143

```
 1            WATERHOUSE - 10-19-21
 2    A.    Yes.
 3    Q.    And if we go to the bottom, can we
 4  just confirm that that is your signature?
 5    A.    Yes.
 6    Q.    And together these notes are the
 7  notes that are referred to both in Highland and
 8  HCMFA's audited financial reports in the
 9  subsequent event sections; correct?
10       MS. DANDENEAU:  Objection to form.
11    A.    They -- they totaled
12  $7.4 million, so presumably, yes.
13    Q.    Okay.  And you were authorized to
14  sign these two notes; correct?
15       MR. RUKAVINA:  Objection, legal
16    conclusion.
17    A.    Yeah.  I mean, I'm -- I was the
18  officer of -- of HCMFA.  You know, I -- I'm not
19  the legal expert on -- on what that -- what
20  that confers to me or what it doesn't.  I mean,
21  that is my signature on the notes.
22    Q.    And you believed you were authorized
23  to sign the notes; is that fair?
24    A.    I signed a lot of documents in my
25  capacity, just because it is operational in
```

Page 144

```
 1            WATERHOUSE - 10-19-21
 2  nature.  So, you know, to me this was just
 3  another document, to be perfectly honest.
 4    Q.    Sir, would you have signed
 5  promissory notes with the principal amount of
 6  $7.4 million if you didn't believe you were
 7  authorized to do so?
 8       MS. DANDENEAU:  Objection to form.
 9    Q.    Are you frozen?
10    A.    No.  I'm just -- you know, it is --
11  you know, again, I typically don't sign
12  promissory notes, and I don't recall why I
13  signed these, but -- you know, but I did.
14    Q.    All right.  So listen carefully to
15  my question.  Would you have ever signed
16  promissory notes with a face amount of
17  $7.4 million without believing that you were
18  authorized to do so?
19    A.    No.  I mean, I'm -- I'm putting my
20  signature on there, so no.
21    Q.    Okay.  And would you have signed two
22  promissory notes obligating HCMFA to pay
23  Highland $7.4 million without Mr. Dondero's
24  prior knowledge and approval?
25       MS. DEITSCH-PEREZ:  Object to the
```

Page 145

```
 1            WATERHOUSE - 10-19-21
 2    form.
 3    A.    You know, from -- from what I recall
 4  around these notes, you know, I don't recall
 5  specifically Mr. -- Mr. Dondero saying to -- to
 6  make this a loan.
 7       So my conversation with Mr. Dondero
 8  around the culmination of the NAV error as
 9  related to TerreStar which was a -- a -- I
10  think it was a year and a half process.  I
11  don't know, it was a multi-month process, very
12  laborious, very difficult.
13       When we got to the end, I had a
14  conversation with Mr. Dondero on where to, you
15  know, basically get the funds to reimburse the
16  fund, and I recall him saying, get the money
17  from Highland.
18    Q.    And so he told you to get the money
19  from Highland; is that right?
20    A.    That is what I recall -- in my
21  conversation with him, that is -- that is what
22  I can recall.
23    Q.    Do you know who drafted these notes?
24    A.    I don't.
25    Q.    Did you ask somebody to draft the
```

**Appx. 02085**

Page 146

WATERHOUSE - 10-19-21

2 notes?
3    A.   I didn't ask – I don't specifically
4 ask people to draft notes really.  I mean,
5 again, you know, the legal group at Highland is
6 responsible and has always been responsible for
7 drafting promissory notes.
8    Q.   So based on your – based on the
9 practice, you believe that somebody from the
10 Highland's legal department would have drafted
11 these notes.  Do I have that right?
12        MS. DEITSCH-PEREZ:  Object to the
13    form.  John, I also asked you for the Word
14    versions of these notes so we could look at
15    the properties, and you have not provided
16    them.  Are you intending to?
17        MR. MORRIS:  No.
18    Q.   Can you answer my question, sir?
19    A.   Again, I –
20        MS. DANDENEAU:  Do you want him to
21    repeat it?
22    A.   Yeah, why don't you repeat it?
23    Q.   Sure.  Mr. Waterhouse, based on the
24 practice that you have described in your
25 understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

2 would have been drafted by somebody in the
3 legal department?
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   Yes.
7    Q.   Okay.  And do you know who would
8 have instructed – do you have any knowledge as
9 to who would have instructed the legal
10 department to draft these notes?
11        MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.   It was whoever was working – I
14 mean, it was likely someone on the team.  I
15 mean, I don't remember exactly on every note or
16 every document, but, again, a lot of these
17 things of this nature – they're operational in
18 nature – were handled by the team.
19        The team knows to – I mean, we
20 don't draft documents.  We're not lawyers.
21 We're not attorneys.  It is not what I do or
22 accountants do.
23        So they are always instructed to go
24 and – and go to the legal team to get
25 documents like this drafted.  Also, when you go

Page 148

WATERHOUSE - 10-19-21

2 to the legal team, the – you know, we always
3 loop in compliance.  And compliance – when you
4 go to the legal team, compliance is part of
5 legal team.  They're made aware of – of – of
6 these types of transactions.
7    Q.   And do you believe that you had
8 the – withdrawn.
9        Did you ever tell Mr. Dondero –
10 (inaudible) – did you see those?
11    A.   Sorry.
12        MS. DEITSCH-PEREZ:  I did not hear
13    the end of that question.
14    Q.   Did you ever tell Mr. Dondero that
15 you signed these two notes?
16    A.   I don't recall ever – no, I don't
17 recall having a conversation with him.
18    Q.   Did you ever discuss these two notes
19 with him at any time?
20    A.   The conversation, I recall, was what
21 I described earlier.  And that is the only time
22 I recall ever discussing this.
23    Q.   Okay.  But the corporate accounting
24 group had a copy of this – of these two notes.
25 And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

2 corporate accounting group gave the two notes
3 to PricewaterhouseCoopers in connection with
4 the audit; correct?
5        MS. DANDENEAU:  Objection to form.
6    A.   Yes.  I mean, that is – yeah, I
7 mean, they – unless the legal team can also
8 retain copies of items like this.  I mean, I
9 don't know everything that they would retain as
10 well.
11        The legal team would also, if they
12 had documents as part of audits, turn that over
13 to the auditors as well.  So it could have been
14 the corporate accounting team.  It could be
15 someone on the legal team.
16    Q.   All right.  So you didn't – you
17 didn't draft this note; right?
18    A.   I – I – I did not.
19    Q.   But somebody at Highland did; is
20 that fair?
21        MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.   I don't know.  I mean, we can go to
24 the legal team.  I don't – I'm not sitting
25 behind someone in legal.  Maybe they went to

Page 150

1    WATERHOUSE - 10-19-21
2  outside counsel. I have no idea.
3    Q.   Did you have any reason to believe
4  you weren't authorized to sign this note,
5  either of these two notes?
6    A.   I think I have already answered that
7  question.
8    Q.   Okay. You didn't give these notes
9  to PricewaterhouseCoopers; correct?
10    MS. DANDENEAU: Objection to form.
11    A.   I don't recall giving these to
12  PricewaterhouseCoopers.
13    Q.   And in the practice that you have
14  described, somebody in the corporate accounting
15  group would have given these two notes to
16  PricewaterhouseCoopers; correct?
17    MS. DANDENEAU: Objection to form.
18    A.   I think I've answered that. I said
19  either the corporate accounting team or maybe
20  the legal team.
21    MR. MORRIS: Okay. Why don't we
22  take our lunch break here.
23    VIDEOGRAPHER: We're going off the
24  record at 1:04 p.m.
25    (Recess taken 1:04 p.m. to 1:49 p.m.)

Page 151

1    WATERHOUSE - 10-19-21
2    VIDEOGRAPHER: We are back on the
3  record at 1:49 p.m.
4    Q.   Mr. Waterhouse, did you speak with
5  anybody during the break about the substance of
6  this deposition?
7    A.   I spoke to -- to Deb and Michelle.
8    Q.   About the substance of the
9  deposition?
10    A.   Yes.
11    Q.   Can you tell me what you talked
12  about?
13    MS. DANDENEAU: No. We object on
14  the basis of privilege.
15    Q.   Okay. You are going to follow your
16  counsel's objection here?
17    A.   Yes.
18    Q.   Okay.
19    MR. MORRIS: Can we put up on the
20  screen Exhibit 35.
21    (Exhibit 35 marked.)
22    Q.   Are you able to see that document,
23  sir?
24    A.   Yes.
25    Q.   Have you ever seen an incumbency

Page 152

1    WATERHOUSE - 10-19-21
2  certificate before?
3    A.   I have.
4    Q.   Do you have a general understanding
5  of what an incumbency certificate is?
6    A.   I have a general understanding.
7    Q.   What is your general understanding?
8    A.   You know, those -- my general
9  understanding is that the incumbency
10  certificate basically lists folks that can --
11  are like authorized signers.
12    Q.   Okay. And do you see that this is
13  an incumbency certificate for Highland Capital
14  Management Fund Advisors, L.P.?
15    A.   Yes.
16    Q.   Okay. And if we could scroll down
17  just a little bit, do you see that it's dated
18  effective as of April 11th, 2019?
19    A.   I, I see that.
20    Q.   Okay. And is that your signature in
21  the middle of the signature block?
22    A.   Yes, it is.
23    Q.   And by signing it, did you accept
24  appointment as the treasurer of HCMFA effective
25  as of April 11th, 2019?

Page 153

1    WATERHOUSE - 10-19-21
2    A.   Again, I'm not the legal -- I don't
3  know if this makes me the treasurer or the
4  appointment. I don't know -- I don't know
5  that, so I don't -- I don't know if that
6  document -- again, I think -- again, I'm not
7  the legal expert. I think isn't there --
8  aren't there other legal documents that detail
9  who the officers are that could be incorporated
10  or things like that? Again, I don't want to
11  play armchair attorney here.
12    Q.   I'm not asking you for a legal
13  conclusion. I'm asking you for your knowledge
14  and understanding. When you signed this
15  document, did you understand that you were
16  accepting an appointment as the treasurer of
17  HCMFA?
18    MS. DANDENEAU: Objection to form.
19    MS. DEITSCH-PEREZ: Objection, form.
20    A.   Again, I don't think this -- that
21  wasn't my understanding. I don't think this
22  makes -- this document makes me the treasurer.
23    Q.   What do you think this document --
24  why did you sign this document?
25    MS. DEITSCH-PEREZ: Objection to

Page 154

WATERHOUSE - 10-19-21

1
2    form.
3        MR. MORRIS: You're objecting to the
4    form of the question when I asked him why
5    did you sign the document? What is the
6    basis for the objection?
7        MS. DEITSCH-PEREZ: Because, John, I
8    think that it does call for a legal
9    conclusion other than -- with him saying
10   because somebody told me to sign this
11   document. But if you want to go there,
12   that is fine.
13       MR. MORRIS: Okay.
14       MS. DANDENEAU: I don't think --
15   he's already said he's not a lawyer.
16       MR. MORRIS: I'll allow the witness
17   to answer this question.
18   Q.   Why did you sign this document, sir?
19   A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time. I have no idea why they're being
22   updated, and I was asked to sign.
23   Q.   Did you ask anybody, what is this
24   document?
25   A.   No.

Page 155

WATERHOUSE - 10-19-21

1
2    Q.   Did anybody tell you why they needed
3    you to sign the document?
4    A.   Not that I can recall.
5    Q.   You testified earlier that you
6    understood that you served as the acting
7    treasurer for HCMFA; correct?
8    A.   Yes.
9    Q.   How did you become the acting
10   treasurer of HCMFA?
11       MS. DANDENEAU: Objection to form.
12   A.   I don't -- I don't know the legal --
13   I don't know the legal mechanic of how I became
14   the acting treasurer.
15   Q.   I'm not asking for the legal
16   mechanic. I'm asking you as the person who
17   is --
18       MS. DANDENEAU: John, you said --
19       MR. MORRIS: Stop.
20       MS. DANDENEAU: -- how did you
21   become the treasurer. That is --
22       MR. MORRIS: Please stop.
23       MS. DANDENEAU: That is a legal
24   question.
25       MR. MORRIS: I am not asking any

Page 156

WATERHOUSE - 10-19-21

1
2    legal questions, to be clear. I'm asking
3    for this witness' understanding as to how
4    he became the acting treasurer of HCMFA.
5    If he doesn't know, he can say he doesn't
6    know, but this legal stuff is nonsense, and
7    I really object to it.
8    Q.   Sir, I'm asking you a very simple
9    question.
10       MS. DANDENEAU: Argumentative.
11   Q.   You testified -- you testified that
12   you became the acting treasurer of HCM --
13   HCMFA; correct?
14   A.   Yes.
15   Q.   How did that happen?
16       MS. DANDENEAU: Again, object to
17   form.
18       MR. MORRIS: I can't wait to do this
19   in a courtroom. Good God.
20   Q.   Go ahead, sir.
21   A.   I don't know the exact process of
22   how that happened.
23   Q.   Do you have any idea whether signing
24   this document was part of the process?
25       MR. MORRIS: You know what --

Page 157

WATERHOUSE - 10-19-21

1
2        MS. DANDENEAU: Objection.
3        MR. MORRIS: -- withdrawn. You guys
4    want to do this, I can't wait. I can't
5    wait. This is the craziest stuff ever.
6        MS. DANDENEAU: John, he said he's
7    not a lawyer, and you are asking him for a
8    legal conclusion, and he says he doesn't
9    know, and you persist.
10       MR. MORRIS: Okay.
11       MS. DANDENEAU: So you can ask these
12   questions --
13       MR. MORRIS: Did anyone -- please
14   stop talking.
15       MS. DANDENEAU: -- at another
16   point -- no, no, no, I'm entitled to talk,
17   too; right? If you're going to make these
18   accusations as if we're trying to stonewall
19   you, this is not the witness to ask that
20   question.
21       MR. MORRIS: I can't -- I can't
22   wait -- I can't wait to do this in a
23   courtroom. I will just leave it at that.
24       MS. DANDENEAU: That's right, I'm
25   sure you can't.

Page 158

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2    Q.   Did anyone ever tell you, sir, that
3  even though you were the acting treasurer of
4  HCMFA, that you were not authorized to sign the
5  two promissory notes that we looked at before
6  lunch?
7    A.   I'm not sure I understand the
8  question. I wasn't -- I mean, I'm -- I'm the
9  current acting treasurer.
10   Q.   Did anybody ever tell you at any
11 time that even though you were the acting
12 treasurer of HCMFA, that you were not
13 authorized to sign the two promissory notes
14 that we looked at before lunch?
15       MS. DANDENEAU:  Objection to form.
16   A.   Not that I recall.
17   Q.   Did anybody ever tell you at any
18 time that you were not authorized to sign the
19 two promissory notes that we looked at before
20 lunch?
21   A.   Not that I recall.
22   Q.   Did anyone ever tell you at any
23 time that you should not have signed the two
24 promissory notes that we looked at before
25 lunch?

Page 159

1       WATERHOUSE - 10-19-21
2    A.   Not that I recall.
3    Q.   Did you ever tell anybody at any
4  time that you weren't authorized to sign the
5  two promissory notes that we looked at before
6  lunch?
7    A.   Not that I recall.
8    Q.   Did you ever tell anybody at any
9  time that you made a mistake when you signed
10 the two promissory notes that we looked at
11 before lunch?
12   A.   Not that I recall.
13   Q.   As you sit here right now, do you
14 have any reason to believe that you were not
15 authorized to sign the two documents that we
16 looked at before lunch?
17       MS. DANDENEAU:  Objection to form.
18   A.   If -- if this is the -- the valid
19 incumbency certificate, I mean, this does --
20 this does detail who the signers are.
21   Q.   Okay.  And looking at that document,
22 does that give you comfort that you were
23 authorized to sign the two promissory notes
24 that we looked at before lunch?
25       MS. DEITSCH-PEREZ:  Object to the

Page 160

1       WATERHOUSE - 10-19-21
2  form.
3        MS. DANDENEAU:  Objection, form.
4    A.   Yes.
5    Q.   As of October 20th -- withdrawn.
6        I'm trying to take your mind back to
7  a year ago, October 2020.  Do you recall at
8  that time that the boards of the retail funds
9  were making inquiries about obligations that
10 were owed by the advisors to Highland in
11 connection with their 15(c) review?
12       MS. DANDENEAU:  Objection to form.
13   A.   I don't -- I don't recall.
14   Q.   As of October 2020, you had no
15 reason to believe you weren't authorized to
16 sign the two promissory notes that we just
17 looked at; correct?
18       MS. DANDENEAU:  Objection, form.
19       MS. DEITSCH-PEREZ:  Objection to
20 form.
21   A.   I didn't think about it in October
22 of 2020, but I mean --
23   Q.   Did you have any reason to believe
24 at that time that you weren't authorized to
25 sign the two notes that we just looked at?

Page 161

1       WATERHOUSE - 10-19-21
2    A.   Not that I'm aware, no.
3    Q.   Did you have any reason to believe a
4  year ago that you made a mistake when you
5  signed those two notes?
6    A.   Not that I'm aware.
7    Q.   A year ago you believed that HCMFA
8  owed Highland the unpaid principal amounts that
9  were due under those two notes; correct?
10   A.   They're -- they're promissory notes
11 that were -- as you presented, that were --
12 that were executed.  Whether they're valid or
13 if there's other reasons, I didn't -- I don't
14 know.
15   Q.   I'm not asking you whether they're
16 valid or not.  I'm asking you for your state of
17 mind.  A year ago you believed that HCMFA
18 was -- was obligated to pay the unpaid
19 principal amount under the two notes that you
20 signed; correct?
21   A.   Yeah, I'm -- I'm -- yes.
22   Q.   Thank you.  Are you aware -- you're
23 aware that -- that in 2017, NexPoint issued a
24 note in favor of Highland in the approximate
25 amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

1    A.   I'm – I'm – I'm generally aware.
2    Q.   Okay.  And are you generally aware
3    that from time to time, after the note was
4    issued by NexPoint, that moneys were applied to
5    principal and interest that were due under the
6    NexPoint note?
7    A.   Yes, I'm generally aware.
8    Q.   Okay.  And did anybody ever tell you
9    that the payments that were made against the
10   NexPoint notes were made by mistake?
11   A.   Yes.
12   Q.   And is it the one payment that we
13   talked about earlier today?
14   A.   We talked about a lot of things
15   today.  What payment are we talking about?
16   Q.   Okay.  Who told you that any payment
17   made against the NexPoint note was made by
18   mistake?
19   A.   D.C. Sauter.
20   Q.   When did Mr. Sauter tell you that?
21   A.   I don't – I don't remember
22   specifically.
23   Q.   Do you remember what payments –
24   A.   Sometime – sometime this year.
25

Page 163

WATERHOUSE - 10-19-21

1    Q.   Sometime in 2021?
2    A.   Yes.
3    Q.   Do you remember what payment he was
4    referring to?
5    A.   It was the – the payment made in
6    January of 2021 or – yeah, January of – of
7    this – January of 2021.
8    Q.   Okay.  So did anybody ever tell you
9    at any time that any payment that was made
10   against principal –
11   A.   And – and – and – hold on, and it
12   may have been other – again, it may have been
13   that payment or – or there may have been what
14   he was explaining, a misapplication of prior
15   payments as well.
16   Q.   Can you – can you give me any
17   specificity – withdrawn.
18       Withdrawn.  Can you tell me
19   everything that Mr. Sauter told you about –
20   about errors in relation to payments made
21   against principal and interest due under the
22   NexPoint note?
23       MS. DANDENEAU:  Can I just –
24       MR. RUKAVINA:  Hold on.  Hold on.
25

Page 164

WATERHOUSE - 10-19-21

1    I'm going to object here, and I'm going to
2    instruct the witness not to answer
3    depending on the discussion that you had –
4    Mr. Waterhouse, I'm the lawyer for
5    NexPoint, and as everyone here knows, D.C.
6    Sauter is in-house counsel.
7        So if you and Mr. Sauter were having
8    a factual discussion and him preparing his
9    affidavit, et cetera, then go ahead and
10   answer that.  But if you were having a
11   discussion as to our legal strategy in this
12   lawsuit, or anything having to do with
13   that, then do not answer that.
14       And if you need to talk to either
15   your counsel or me about that, then we need
16   to have that discussion now.
17   A.   Okay.  Yeah, I don't – I don't
18   really know how to make that distinction, so
19   maybe I need to talk to counsel before I
20   answer, or if I can answer.
21   Q.   Let me just ask you this question:
22   Did – did you have any conversation with
23   Mr. Sauter about any payment of principal and
24   interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

1    Highland's employment, or did it happen after
2    you left Highland's employment?
3    A.   I don't – I don't recall if – I
4    don't recall.  I mean, it was sometime in 2021.
5    I don't remember if it was before or after I
6    was let go from Highland.
7    Q.   Okay.  So – so nobody told you
8    prior to 2021 that any error or mistake was
9    made in the application of payments against
10   principal and interest due on the NexPoint
11   note.  Do I have that right?
12   A.   Yeah, I don't – I don't recall this
13   being in 2020.
14   Q.   Okay.  And it didn't happen in 2019;
15   correct?
16   A.   I don't recall that happened.
17   Q.   And it didn't happen in 2018;
18   correct?
19   A.   I don't – I don't recall that
20   happening.
21   Q.   And it didn't happen in 2017;
22   correct?
23   A.   I don't recall.
24   Q.   But – but you believe the

Page 166

WATERHOUSE - 10-19-21

1  conversation took place in 2021. You just
2  don't remember if it was before or after you
3  left Highland's employment. Do I have that
4  right?
5      A.  It was sometime this year. I
6  don't – I don't remember.
7      Q.  Okay. Did you report this
8  conversation to Mr. Seery at any point?
9      A.  I don't believe so.
10     Q.  Did you report this conversation to
11  anybody at DSI at any time?
12     A.  I don't recall.
13     Q.  Do you have – you don't have a
14  recollection of ever doing that; correct?
15     A.  Yeah, that's right. I don't recall
16  doing that.
17     Q.  Do you recall telling anybody at
18  Pachulski Stang about the conversation you
19  recall with Mr. Sauter?
20     A.  No, I don't – I don't recall.
21     Q.  Did you tell any of the independent
22  board members about your conversation with
23  Mr. Sauter?
24     A.  I don't recall.

Page 167

WATERHOUSE - 10-19-21

1      Q.  Did you tell any of the employees at
2  Highland before you left Highland's employment
3  about this call that you had with Mr. Sauter?
4      MS. DANDENEAU:  Objection to form.
5      A.  No, I don't – no, I don't recall.
6      Q.  NexPoint – to the best of your
7  knowledge, did NexPoint ever file a proof of
8  claim against Highland to try to recover moneys
9  that were mistakenly paid against the principal
10  and interest due under the note?
11     A.  Okay. Hold on. You are saying did
12  NexPoint Advisors file a proof of claim to
13  Highland for errors related to payments under
14  the NexPoint note to Highland?
15     Q.  Correct.
16     A.  I'm – I'm – I'm not – I'm not
17  aware.
18     Q.  Are you aware –
19     A.  I'm not the legal person here, I
20  don't know.
21     Q.  I'm just asking for your knowledge,
22  sir.
23     A.  Yeah, I don't know. I'm not aware.
24     Q.  Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1  kind that NexPoint has ever made to try to
2  recover the amounts that it contends were – or
3  that Mr. Sauter contend were mistakenly applied
4  against principal and interest due under the
5  NexPoint note?
6      A.  I'm not aware.
7      MS. DANDENEAU:  Objection to form.
8      Q.  Okay. The advisors' agreements with
9  the retail funds are subject to annual renewal;
10  correct?
11     A.  Yes.
12     Q.  And do you participate in the
13  renewal process each year?
14     A.  Yes.
15     Q.  What role do you play in the renewal
16  process?
17     A.  I'm – I'm asked by the retail board
18  to walk-through the advisors financials.
19     Q.  And do you do that in the context of
20  a board meeting?
21     A.  Yes, it is – yes, it is typically
22  done in a board meeting.
23     Q.  And do you recall the time –
24  does – does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1  the same time each year?
2      A.  Yes, it is – it is around the same
3  time every year.
4      Q.  And what – what time period of the
5  year does the renewal process occur?
6      A.  Approximately the September
7  timeframe.
8      Q.  During that process, in your
9  experience, does the board typically conduct
10  its own diligence and ask for information?
11     A.  Does the board ask for lots of – I
12  mean, just – I mean, lots of information as a
13  part of that – that – as part of that board
14  meeting and that process.
15     Q.  Okay. And do you recall that the
16  process in 2020 spilled into October?
17     A.  Yes. Yes.
18     Q.  Okay. And as part of the process in
19  2020, the retail board asked – asked what are
20  referred to as 15(c) questions; right?
21     A.  I guess I don't want to be – they
22  asked 15(c) – are you saying they asked 15(c)
23  questions and this is why it went into October
24  or –

Page 170

```
1            WATERHOUSE - 10-19-21
2     Q.   No, I apologize.
3          Do you have an understanding of
4    what -- of what 15(c) refers to in the context
5    of the annual renewal process?
6     A.   Yes, generally.
7     Q.   All right.  What is your general
8    understanding of the term "15(c)" in the
9    context of the annual renewal process?
10    A.   I -- I think 15(c) is the section
11   that -- that -- you know, that -- that the
12   board has to evaluate every year, the retail
13   board.  They have to, you know, go through,
14   evaluate, and go through that approval process
15   on a yearly basis.
16    Q.   Okay.
17         MR. MORRIS:  Can we put up on the
18   screen Exhibit 36, please.
19         (Exhibit 36 marked.)
20         MR. MORRIS:  I guess let's just
21   start at the bottom so Mr. Waterhouse can
22   see what is here.
23    Q.   You see this begins with an email
24   from Blank Rome to a number of people.
25         MR. MORRIS:  And if we can scroll
```

Page 171

```
1            WATERHOUSE - 10-19-21
2    up -- keep going just a little bit.
3     Q.   You will see that there is an email
4    from Lauren Thedford to Thomas Surgent and
5    others where she reports that she was attaching
6    and reproducing below additional 15(c)
7    follow-up questions from the board.
8          Do you see that?
9     A.   Yes.
10    Q.   And do you see Question No. 2 asks
11   whether there are any material outstanding
12   amounts currently payable or due in the future
13   (e.g., notes) to HCMLP by HCMFA or NexPoint
14   Advisors or any other affiliate that provides
15   services to the funds?
16         Do you see that?
17    A.   Yes.
18    Q.   And -- and did you -- do you recall
19   that in -- in October of 2020 the retail boards
20   were asking for that information?
21    A.   I don't recall it, but there --
22   they're obviously asking in this email.
23    Q.   Okay.
24         MR. MORRIS:  Can we scroll up a
25   little bit, please.
```

Page 172

```
1            WATERHOUSE - 10-19-21
2     Q.   And then do you see that
3    Ms. Thedford includes you on the email string
4    on Tuesday, October 6th, at 5:52?
5     A.   Yes.
6     Q.   And she asks you and Dave Klos and
7    Kristin Hendrix for advice on that particular
8    Request No. 2 that I have just read; right?
9     A.   Yes.
10    Q.   Okay.  Can you tell me who
11   Ms. Thedford is?
12    A.   She was an attorney that was in the
13   legal group.
14    Q.   At Highland Capital Management,
15   L.P.?
16    A.   I'm -- I'm -- I'm -- I don't
17   remember if she was an employee of Highland or
18   any of the advisors.
19    Q.   Okay.  Do you know if she served as
20   the corporate secretary for both HCMFA and
21   NexPoint?
22    A.   Yes.
23    Q.   And -- okay.
24         Do you know whether Ms. Thedford
25   held any positions in relation to the retail
```

Page 173

```
1            WATERHOUSE - 10-19-21
2    funds as we defined that term?
3     A.   Yes.
4     Q.   What is your understanding of the
5    positions that Ms. Thedford held at the retail
6    funds?
7     A.   I -- I recall her being an officer.
8    I don't recall her title.
9     Q.   Okay.  Is she still an officer at
10   any of the retail funds today?
11    A.   No.
12    Q.   Do you know when she ceased to be an
13   officer of the retail funds?
14    A.   Approximately.
15    Q.   And when did she approximately cease
16   to be an officer of the retail funds?
17    A.   It was in -- it was in early of
18   2021.
19    Q.   Okay.  Do you know when she became
20   an officer of the retail funds?
21    A.   I don't recall.
22    Q.   To the best of your recollection,
23   was she an officer of the retail funds in
24   October of 2020?
25    A.   I believe so.
```

**Appx. 02092**

Page 174

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Q.   Okay.  Do you know what title she
3    held in her capacity as an officer, if any?
4    A.   I told you I don't remember.
5    Q.   Okay.  So she sends this email to
6    you at 5:52 p.m. on October 6th.
7         And if we can scroll up to the
8    response, you responded a minute later with a
9    one-word answer:  Yes.
10        Do you see that?
11   A.   Yes.
12   Q.   And – and yes is – yes was in
13   response to the retail board's Question No. 2,
14   right, whether there are any material
15   outstanding amounts currently payable or due in
16   the future?
17   A.   Yes.
18        MR. MORRIS:  And can we scroll up to
19   see what happened next.
20   Q.   So Ms. Thedford writes back to you a
21   few minutes later and she asks whether you
22   could provide the amounts.
23        Do you see that?
24   A.   Yes.
25   Q.   And then you respond further and you

Page 175

1    WATERHOUSE - 10-19-21
2    refer her to the balance sheet that was
3    provided to the board as part of the 15(c)
4    materials.
5         Do you see that?
6    A.   Yes.
7    Q.   And – and did the advisors provide
8    to the board certain balance sheets in 2020 in
9    connection with the 15(c) review?
10   A.   Yes, they did.
11   Q.   Okay.  And were the amounts that
12   were outstanding or that were to be due in the
13   future by the advisors to Highland included in
14   the liability section of the balance sheet that
15   was given to the retail board?
16   A.   Yes.  Notes would be reflected as
17   liabilities.
18   Q.   Okay.  And –
19   A.   If I'm understanding your question
20   correctly.
21   Q.   You are.  And – and – and those
22   liabilities you – you were – you believed
23   were responsive to the retail board's question;
24   correct?
25   A.   Yes.

Page 176

1    WATERHOUSE - 10-19-21
2    Q.   Okay.  And then if we can scroll up,
3    you see Ms. Thedford responds to you
4    nine minutes later with a draft response.
5         Do you see that?
6    A.   Yes.
7    Q.   And she says that she is taking from
8    the 6/30 financials certain information about
9    amounts that were due to HCMLP and affiliates
10   as of June 30th, 2020.
11        Do you see that?
12   A.   I do.
13   Q.   Okay.  And did you believe, as the
14   treasurer of NexPoint and HCMFA and as the CFO
15   of Highland, that the information that
16   Ms. Thedford obtained from the 6/30 financials
17   was accurate and responsive in relation to the
18   retail fund board's question?
19   A.   I just want to make sure I
20   understand the question.
21        Are you saying that the financial
22   information provided to the retail board as
23   part of the 15(c) process, which included
24   financial statements as of June 30th of 2021,
25   did I feel like those were responsive to their

Page 177

1    WATERHOUSE - 10-19-21
2    questions?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Thank you.
6         MS. DEITSCH-PEREZ:  John, it is not
7    in the chat yet.  Can you just make sure it
8    gets put in there.
9         MR. MORRIS:  Sure.
10        MS. CANTY:  I put it in there.  I
11   think maybe I just sent it directly, so let
12   me make sure it says to everyone.  But I
13   did put it in there.  I will try again.
14        MR. MORRIS:  Thank you, La Asia.
15        MS. DANDENEAU:  What number is it.
16        MR. MORRIS:  What, the Bates number?
17        MS. DEITSCH-PEREZ:  No, the –
18   this – yeah, 36 is not in the chat.
19        MR. MORRIS:  Okay.  We'll get it.
20        MS. DANDENEAU:  I think that
21   Ms. Canty just sent it to me originally.
22   Sorry.
23        MR. MORRIS:  Okay.  We will get it
24   there.
25        MS. CANTY:  Okay.  It is there now

Page 178

```
1          WATERHOUSE - 10-19-21
2    for everyone.
3          MS. DEITSCH-PEREZ:  Got it.  Thank
4    you.
5    Q.   Do you recall if the proposed
6    response that Ms. Thedford crafted was
7    delivered to the retail board with the -- with
8    the yellow dates having been completed?
9    A.   I don't know.
10         MR. MORRIS:  Davor, I'm going to ask
11         that the advisors and -- the advisors of
12         both HCMFA and NexPoint produce to me any
13         report that was given to the retail board
14         concerning the promissory notes at issue,
15         including the obligations under the notes.
16   Q.   Do you know -- do you know if
17   ultimately NexPoint informed the retail board
18   in response to its question that NexPoint owed
19   Highland approximately 23 or $24 million?
20         MS. DANDENEAU:  Objection to the
21         form.
22   A.   Sorry, are you asking, did NexPoint
23   tell the retail board that it owed Highland?
24   Q.   Let me ask a better question,
25   Mr. Waterhouse.
```

Page 179

```
1          WATERHOUSE - 10-19-21
2          Did -- do you know if anybody ever
3    answered the retail board's question that was
4    Number 2?
5    A.   I don't -- I can't say for sure.
6    Q.   Okay.  Do you recall -- I think you
7    testified earlier that you walked through the
8    advisors' financials with the retail board;
9    correct?
10   A.   Yes.
11   Q.   And as part of that process, did you
12   disclose to the retail board the obligations
13   that NexPoint and HCMFA had to Highland under
14   promissory notes?
15   A.   The retail board, as I stated
16   earlier, receives financial information,
17   balance sheet, income statement information
18   from the advisors.  That information is
19   provided to the retail board in connection with
20   the 15(c) process.
21         So any notes between the advisors
22   and the Highland would be -- anything would be
23   detailed in those financial statements.
24   Q.   Do you recall in 2020 ever speaking
25   with the retail board about the advisors'
```

Page 180

```
1          WATERHOUSE - 10-19-21
2    obligations under the notes to Highland?
3          MS. DANDENEAU:  Objection to form.
4          MS. DEITSCH-PEREZ:  Object to the
5          form.
6    A.   I don't recall specifically.
7    Q.   Do you have any general recollection
8    of discussing with the retail board the
9    advisors' obligations to Highland under the
10   notes that they issued?
11         MS. DANDENEAU:  Object to the form.
12         MS. DEITSCH-PEREZ:  Object to the
13         form.
14   A.   I just recall generally just -- it
15   is just -- I present the financial statements,
16   and if they have questions, I answer their
17   questions and walk them through.
18         I don't recall what they asked.  I
19   don't recall where the discussion went.  I
20   don't recall anything of that nature.
21   Q.   Okay.  Do you know if anybody on
22   behalf of HCMF -- HCMFA ever told the retail
23   board that HCMFA had no obligations under the
24   two 2019 notes that you signed?  Withdrawn.
25         Do you know whether anybody on
```

Page 181

```
1          WATERHOUSE - 10-19-21
2    behalf of HCMFA ever told the retail boards
3    that you weren't authorized to sign either of
4    the two 2019 notes?
5          MS. DANDENEAU:  Objection to form.
6    A.   I'm not aware.
7    Q.   Are you aware of anybody on behalf
8    of HCMFA ever telling the retail boards that
9    your execution of the two 2019 notes was a
10   mistake?
11         MS. DANDENEAU:  Objection to form.
12   A.   I'm not aware.
13   Q.   Are you aware of anybody on behalf
14   of HCMFA ever telling the retail boards that
15   HCMFA did not have to pay the amounts reflected
16   in the two notes that you signed in 2019?
17   A.   I'm not aware.
18   Q.   Do you know whether anybody ever
19   told the retail boards -- withdrawn.
20         Do you know whether anybody ever
21   told the retail boards that Highland has
22   commenced a lawsuit to recover on the two notes
23   that you signed in 2019?
24   A.   I'm not aware.
25   Q.   Are you aware of anybody informing
```

Page 182

WATERHOUSE - 10-19-21

2 the retail boards that Highland has sued to
3 recover on the NexPoint note?
4    A.   I'm not aware.
5    Q.   Do you know whether anybody ever
6 told the retail board that Highland had
7 declared a default with respect to the two
8 HCMFA notes that you signed in 2019?
9    A.   I'm not aware.
10    Q.   Are you aware of anybody ever
11 informing the retail boards that Highland had
12 declared a default under the NexPoint note?
13    A.   I'm not aware.
14    Q.   Are you aware of anybody telling the
15 retail board that Highland made a demand for
16 payment under the 2019 notes that you signed on
17 behalf of HCMFA?
18    A.   I'm not aware.
19    Q.   Let's -- let's see if there is a
20 response to Ms. Thedford's email, if we can
21 scroll up.
22          Do you see you responded to
23 Ms. Thedford five minutes after she provided
24 the draft response to you?
25    A.   Yes.

Page 183

WATERHOUSE - 10-19-21

2    Q.   Okay.  And do you see that Dustin
3 Norris is copied on this email?
4    A.   Yes, he is.
5    Q.   Great.  Do you know whether
6 Mr. Norris held any positions at either of the
7 advisors as of October 6, 2020?
8    A.   I will go back to -- I'm not the
9 legal expert of what appoints you or how or
10 why, but you did see Dustin's name on the
11 incumbency certificate that you produced
12 earlier.
13    Q.   Do you know what his title was in
14 October of 2020?
15    MS. DANDENEAU:  Objection to form.
16    A.   I don't -- I don't recall.
17    Q.   Was he -- did he have a title with
18 each of the advisors, to the best of your
19 recollection?
20    A.   I don't recall.
21    Q.   Do you know why he is included on
22 this email string?
23    A.   I didn't add Dustin.  It looks like
24 Lauren did.  I don't know why she added him or
25 not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

2    Q.   Does Mr. Norris play a role in
3 formulating the advisors' responses to the
4 questions asked by the retail board in
5 connection with the 15(c) annual review?
6    MS. DANDENEAU:  Objection to form.
7    A.   He -- Dustin Norris is there in the
8 board meetings.  But -- so he has a role, yes.
9    Q.   Okay.  And does Mr. Norris hold any
10 positions, to the best of your knowledge, in
11 relation to any of the retail funds?
12    A.   I don't -- I don't believe he does.
13    Q.   How about Mr. Post, do you know
14 whether Mr. Post holds any position in either
15 of the advisors?
16    A.   I mean, he -- he -- yes.
17    Q.   What is your understanding of the
18 positions that Mr. Post holds in relation to
19 the advisors?
20    MS. DANDENEAU:  Objection to form.
21    A.   He is an employee of NexPoint
22 Advisors.  He is also the chief compliance
23 officer for -- for NexPoint.
24    Q.   Who is the chief compliance officer
25 for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

2    MS. DANDENEAU:  Objection to form.
3    A.   That would be Jason as well.
4    Q.   Okay.  Now, looking at your
5 response, you noted initially that nothing was
6 owed under shared services.  Do I have that
7 right in substance?
8    A.   Yeah.  I think I'm being responsive
9 to Lauren's question here, whether any of the
10 shared service invoices are outstanding.
11    Q.   Right.
12    A.   Yes.
13    Q.   And that is because -- and that is
14 because the retail the retail board has asked
15 for the disclosure of all material obligations
16 that were owed to HCMLP either then or in the
17 future; isn't that right?
18    MS. DANDENEAU:  Objection to form.
19    Q.   We can go back down and look.
20    A.   Look, I don't know if that's a
21 material item, I mean, again, but sure.
22    Q.   Okay.  But there were no shared
23 services outstanding; correct?
24    MS. DANDENEAU:  Objection to form.
25    A.   That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1 indicate.
2     Q.   And you wouldn't have written it if
3 you didn't believe it to be true at the time;
4 correct?
5     A.   Correct.
6     Q.   And when you referred to shared
7 services outstanding, what you meant there was
8 that neither NexPoint nor HCMFA owed Highland
9 any money under the shared services agreements
10 that they had with Highland as of October 6th,
11 2020; right?
12     A.   I don't know if it is as of October
13 6, 2020 or if it was from -- like through the
14 financials -- through the date of the
15 financials as of June 30.
16     Q.   Okay.  And then you noted that
17 HCMA -- the HCMFA note is a demand note; right?
18     A.   Yes.
19     Q.   And then you referred Ms. Thedford
20 to Kristin Hendrix for the term of the NexPoint
21 note.  Do I have that right?
22     A.   Yes.
23     Q.   And then you refer to that agreement
24 that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1 financials about Highland's agreement not to
2 make demand upon HCMFA until May 2021; correct?
3     A.   Correct.
4     Q.   And then -- and then the next thing
5 you write is that the attorneys think that BK
6 doesn't change that, but don't know for sure at
7 the end of the day.
8          Do you see that sentence?
9     A.   Yes.
10     Q.   Which attorneys were you referring
11 to?
12     A.   I don't remember.
13     Q.   Did you have a conversation with
14 attorneys concerning whether the bankruptcy
15 would change or alter in any way the agreement
16 not to make a demand under the HCMFA note?
17     A.   Look, yeah, I mean, I don't
18 specifically remember, but generally, I mean,
19 it is in this email.  I don't -- I don't -- I
20 don't -- I don't remember who I talked to or,
21 you know, was it inside counsel, outside
22 counsel, but obviously I talked to somebody.
23     Q.   Do you have any recollection --
24     A.   Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1 actually, it may not even have been me.  I say
2 the attorneys in, you know, a lot of -- like I
3 talked about the team.
4          It could have been someone on the
5 team, like, hey, we need to run this down, and
6 maybe they talked to attorneys again and
7 relayed that information to me.
8          So I really don't know if I spoke or
9 someone else did or -- or, I mean, and maybe it
10 wasn't even from corporate accounting.  Maybe
11 it was, you know, other -- I'm kind of
12 summarizing, you know, again, so I don't really
13 know -- I can't really say for sure.  I don't
14 remember how I came about of this knowledge.
15     Q.   I appreciate your efforts,
16 Mr. Waterhouse, but I will just tell you that
17 if I ask a question and you don't know the
18 answer or you don't recall, I'm happy to accept
19 that.  I don't -- I don't want you to
20 speculate, so I want to be clear about that.
21 So I appreciate it.
22          Let me just ask you simply:  Do you
23 know what attorneys -- can you identify any of
24 the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1 process didn't change the agreement?
2     A.   I don't recall.
3     Q.   Okay.  Perfect.
4          And then let's look at the last
5 sentence.  It says, quote:  The response should
6 include, as I covered in the board meeting,
7 that both entities have the full faith and
8 backing from Jim Dondero, and to my knowledge
9 that hasn't changed.
10          Do you see that?
11     A.   Yes.
12     Q.   Okay.  Prior to October 6th, 2020,
13 had you told the retail board that HCMFA and
14 NexPoint have the full faith and backing from
15 Jim Dondero?
16     A.   Yes.
17     Q.   Do you remember in the context in
18 which you told the retail board that?
19     A.   I mean, generally, yes.
20     Q.   Tell me what you recall.
21     A.   So we were walking through the
22 financials from the advisors; right?  So as I
23 described to you, you have got HCMFA and NPA.
24 And these -- the financials, you know, show

Page 190

WATERHOUSE - 10-19-21
2 they have liabilities on them that exceed
3 assets.
4        So the retail board has asked, okay,
5 you know, how -- you know, if -- if these
6 liabilities come due or they're payable, you
7 know, how does that come about?
8        And, you know, the response is,
9 well, the advisors have the -- full faith
10 and backing from -- from Jim Dondero.
11    Q.   And how did you know that the
12 advisors had the full faith and backing from
13 Jim Dondero?  What was the basis for that
14 statement that you made to the retail board?
15    A.   I talked to Jim about it at some
16 point in the past.
17    Q.   And did you tell Mr. Dondero that
18 you were going to inform the retail board that
19 the advisors had his full faith and backing
20 before you actually told that to the retail
21 board?
22    A.   I don't recall having that
23 conversation.
24    Q.   Do you recall if you ever informed
25 Mr. Dondero that you had disclosed or told the

Page 191

WATERHOUSE - 10-19-21
2 retail board that the advisors had the full
3 faith and backing of Mr. -- Mr. Dondero?
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   I don't recall discussing that with
7 him at the time.
8    Q.   When you told this to the board, was
9 Mr. Dondero participating in the discussion?
10    A.   Not that I recall.
11    Q.   Withdrawn.  Was it not -- withdrawn.
12        Do you recall whether -- when you
13 covered this issue with the board, was that in
14 a -- a Zoom call or a Webex call?  Was it a
15 telephone call?  Was it in-person?  Like where
16 were you physically in relation to the board?
17    A.   I believe I was at home.
18    Q.   Okay.  Can you identify every person
19 that you recall who was present for this
20 disclosure other than -- other than the board
21 members themselves?
22        MS. DEITSCH-PEREZ:  Object to the
23    form.
24    A.   I don't recall everyone on the call.
25    Q.   Can you identify anybody who was on

Page 192

WATERHOUSE - 10-19-21
2 the call?
3    A.   Other than the board members?
4    Q.   Yes.
5    A.   Lauren Thedford.  I mean, there
6 are -- there are many -- my section is just one
7 of many sections that are just -- you know, as
8 you can appreciate, this is a long board
9 meeting.
10        I can't recall specifically, really
11 even generally, or who was on when this was
12 discussed.  But Lauren was typically on for the
13 entire time.
14    Q.   I apologize if I asked you this, but
15 do either of Mr. Norris or Mr. Post hold any
16 positions relative to the retail funds?
17    A.   I think you asked me this already,
18 John.
19    Q.   Okay.  I just don't recall.  Can you
20 just refresh my recollection if I did, in fact,
21 ask you the question?
22    A.   I don't believe -- if we can go
23 back.  I don't believe Mr. Norris has a title
24 at the retail funds.  Mr. -- and Mr. Post is
25 the CCO of the advisor, the advisors.

Page 193

WATERHOUSE - 10-19-21
2    Q.   Okay.  Do you know if either of them
3 have a position with the retail board -- with
4 the retail funds?
5    A.   I don't believe Mr. Norris has a
6 position with the retail funds.
7    Q.   All right.  What about Mr. Post?
8    A.   Mr. Post is the CCO of the advisors.
9    Q.   Okay.  Does he hold any position --
10    A.   I don't believe so.
11    Q.   -- with the retail funds?
12    A.   I don't believe so.
13    Q.   Okay.
14    A.   I don't know if being the CCO for
15 the advisor conveys something for the retail
16 funds.  Again, I am not -- that is the legal
17 compliance part of it.  I don't know.
18    Q.   Why did you tell the retail board
19 that the advisors have the full faith and
20 backing from Mr. Dondero?
21        MS. DANDENEAU:  Objection to form.
22    A.   It is -- it is -- it is what has
23 been discussed with them prior.
24    Q.   And were you -- were you trying to
25 give them comfort that even though the

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Appendix Part 2 Filed 12/2024 of 386  Page 118 of 198   PageID 23333
Case 3:21-cv-00881-X   Document 64-1 Page 118 of 198

Page 194

WATERHOUSE - 10-19-21

2 liabilities exceeded the assets that the
3 advisors would still be able to meet their
4 obligations as they become due?
5       MS. DANDENEAU:  Objection to form.
6       MS. DEITSCH-PEREZ:  Object form.
7   A.   I -- I can't -- I don't remember
8 specifically the conversation, but generally --
9 you know, generally, yes.  And that is why --
10 but, you know, again, in this email saying, you
11 know, I am sure I qualified it with the retail
12 board, you know, as I said I like -- you know,
13 to my knowledge, that hasn't changed.  But,
14 again, generally -- generally that is what I
15 remember.
16   Q.   Okay.  Do you recall if in the
17 advisors' response to the retail board's
18 question if the response included any statement
19 concerning Mr. Dondero and -- and the full
20 faith and backing that he was giving to the
21 advisors?
22       MS. DEITSCH-PEREZ:  Object to the
23   form.
24   A.   I don't -- I don't remember
25 specifically what was provided.

Page 195

WATERHOUSE - 10-19-21

2   Q.   Okay.
3   A.   And I don't really -- I don't really
4 remember generally either.
5   Q.   Okay.
6       MR. MORRIS:  So -- so, again, I'm
7 just going to ask Mr. Rukavina if your
8 clients can produce as soon as possible the
9 15(c) response, the written response that
10 the advisors made, if any, to the board's
11 Question No. 2.
12       I'm not looking for the whole
13 response, but I certainly want the response
14 to Question No. 2.
15   Q.   Do you have a general understanding
16 as to the amount by which -- withdrawn.
17       Did -- did the assets of --
18 withdrawn.
19       Did the liabilities of HCMFA exceed
20 its assets in 2020?
21       MS. DANDENEAU:  Objection to form.
22       MS. DEITSCH-PEREZ:  Objection, form.
23   A.   I believe I have already answered
24 that question earlier, I think.  I believe I
25 said yes.

Page 196

WATERHOUSE - 10-19-21

2   Q.   Okay.  And did the liabilities of
3 NexPoint exceed its assets in 2020?
4       MS. DEITSCH-PEREZ:  Objection to
5   form.
6   A.   I don't believe so.
7   Q.   Okay.  So -- so it was only one of
8 the two advisors who had liabilities that
9 exceeded the value of the assets.
10       Do I have that right?
11       MS. DEITSCH-PEREZ:  Objection to
12   form.
13       MS. DANDENEAU:  Form.
14   A.   Yes.
15   Q.   And do you know, ballpark, the
16 amount by which the value of HCMFA's
17 liabilities exceeded their assets in 2020?
18       MS. DANDENEAU:  Objection to form.
19   A.   I don't -- I don't recall.
20       MR. MORRIS:  I had specifically
21   requested in discovery the audited
22   financial reports for both advisors and
23   NexPoint.  I think I may have gotten one
24   for NexPoint but I'm still waiting for the
25   balance.  And I'm going to renew my request

Page 197

WATERHOUSE - 10-19-21

2 for those documents too.
3   Q.   Let's go to the next exhibit, which
4 is Number 10.  So I think it is in your stack,
5 Mr. Waterhouse.
6       MR. MORRIS:  And we can take the one
7   down from the screen and put up Number 10
8   for everybody.
9       (Exhibit 10 marked.)
10   Q.   And I don't know if you have ever
11 seen this before, but I'm really putting it up
12 on the screen for purposes of turning to the
13 very last page of the document.
14       So this is a document that we have
15 been -- that we premarked as Exhibit 10.  And
16 we're turning to the last page of the document,
17 which is a document that was filed in the
18 adversary proceeding 21-3004.  And -- no, I
19 apologize, I think we -- right there.  Perfect.
20       And it is page 31 of 31.
21       MR. MORRIS:  I think there may have
22   been some something erroneously stapled to
23   the hard copy that I gave you folks, but
24   I'm looking for page 31 of 31 in the
25   document that begins with the first page of

Page 198

WATERHOUSE - 10-19-21

1    Exhibit 10.
2    Q.   Do you have that, Mr. Waterhouse?
3    A.   I don't have it yet.  I'm looking.
4    Q.   All right.  If you look at the top
5    right-hand corner, you will see it says page
6    hopefully something of 31?
7    A.   Yes, I've got it now.
8    Q.   Okay.  You have got 31 of 31.  You
9    can take a moment to read that, if you would
10   like.
11   A.   (Reviewing document.)  Okay.
12   Q.   Have you ever seen this before?
13   A.   I don't know if I have seen this
14   specific document, but, you know, I've --
15   I'm -- I'm aware of it.
16   Q.   And is this the document that you
17   had in mind when you sent that email to
18   Ms. Thedford that we just looked at where you
19   said that Highland had agreed not to make a
20   demand upon HCMFA until May 2021?
21   A.   Honestly, I don't -- it wasn't this
22   document.  I mean, it's something like this,
23   yes.  I mean, yes.
24   Q.   Well --

Page 199

WATERHOUSE - 10-19-21

1    A.   It is something like this, but I
2    don't think it was this specific document.
3    Q.   Well, but this document does say in
4    the last sentence that Highland agreed not to
5    seek -- not to demand payment from HCMFA prior
6    to May 31, 2021; right?
7    A.   Yes.
8    Q.   And are you aware of any other
9    document that was ever created pursuant to
10   which Highland agreed not to demand payment on
11   amounts owed by HCMFA before May 31, 2021?
12   A.   Hold on.  Are you asking, am I aware
13   of a document that by HCMFA that basically says
14   otherwise?
15   Q.   No.  Let me try again.
16   Are you aware of any other document
17   pursuant to which -- pursuant to which Highland
18   agreed not to make a demand on HCMFA until May
19   31st, 2021?
20   A.   I'm -- I think there was something
21   in connection with -- with the -- with the
22   audit that basically says the same thing.
23   Q.   Okay.  And do you think that the
24   audit is referring to this particular document?

Page 200

WATERHOUSE - 10-19-21

1    A.   I don't know.
2    Q.   All right.  This document is dated
3    April 15, 2019.  Do you see that?
4    A.   I do.
5    Q.   And do you remember that the audit
6    was completed on June 3rd, 2019?
7    A.   Yes.
8    Q.   And do you recall that the audited
9    financials -- and I'm happy to pull them up if
10   you would like, but do you recall that the
11   audited financials included a reference to the
12   agreement pursuant to which Highland agreed not
13   to make a demand until May 31st, 2021?
14   A.   Yes, I remember.
15   Q.   And as part of the process, would
16   you have expected the corporate accounting team
17   to have provided a copy of this document to
18   PwC?
19   MS. DANDENEAU:  Objection to form.
20   A.   Yes, I would have expected something
21   like this, or again, you know, some document
22   that basically states -- states the deferral
23   till May 31 of 2020.
24   Q.   Okay.

Page 201

WATERHOUSE - 10-19-21

1    A.   May 31 of 2021, excuse me.
2    Q.   And this document states the
3    deferral that you just described; correct?
4    A.   It does.
5    Q.   And this document states the
6    deferral that was described in the audited
7    financial statements that we looked at before;
8    correct?
9    A.   It does.
10   MR. MORRIS:  Okay.  Can we scroll
11   down just a little bit to see who signed on
12   behalf of the acknowledgment there.
13   Q.   Okay.  So Mr. Dondero signed this
14   document on behalf of both HCMFA and Highland;
15   do you see that?
16   A.   I do.
17   Q.   Okay.  Did you discuss this document
18   or the -- withdrawn.
19   Did you discuss the concept of the
20   deferral with Mr. Dondero in the spring of
21   2019?
22   A.   I think I testified I don't recall.
23   Q.   Okay.  Do you know whose idea it was
24   to issue the acknowledgment in this form?

Page 202

1        WATERHOUSE - 10-19-21
2    A.   I don't recall.
3        MR. MORRIS:  Can we scroll back up
4    to the document, please.
5    Q.   Do you see in the beginning it says,
6    reference is made to certain outstanding
7    amounts loaned from Highland to HCMFA for
8    funding ongoing operations.
9        Do you see that?
10   A.   Yes.
11   Q.   And were you aware as the CFO of
12   Highland and as the treasurer of HCMFA that as
13   of April 15, 2019, Highland had made certain
14   loans to HCMFA to fund HCMFA's ongoing
15   operations?
16   A.   Yes.
17   Q.   And were you aware that those loans
18   were payable on demand and remained outstanding
19   as of December 31st, 2018?
20   A.   Yes.
21   Q.   And were you aware that those
22   amounts were payable on demand, and they
23   remained outstanding as of April 15, 2019?
24       MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 203

1        WATERHOUSE - 10-19-21
2    A.   Well, this -- this document dated
3    April 15, 2019 says they have been deferred to
4    May 31, 2021.
5    Q.   Right.  But I'm just sticking to the
6    first paragraph where they refer to the
7    outstanding amounts.  And in the end it says
8    the -- it remained outstanding on December
9    31st, 2018, and I think you told me that you
10   understood that, and then I'm just trying to
11   capture the last piece of it.
12       Did you understand that there were
13   amounts outstanding from the loan that Highland
14   made to HCMFA to fund ongoing operations as of
15   April 15th, 2019?
16   A.   Yes.
17   Q.   Thank you.  Let's look at the next
18   sentence.  HCMFA expects that it may be unable
19   to repay such amounts should they become due
20   for the period commencing today and continuing
21   through May 31st, 2021.
22       Do you see that?
23       MS. DANDENEAU:  Objection to form.
24   A.   I do.
25   Q.   As the CFO -- withdrawn.

Page 204

1        WATERHOUSE - 10-19-21
2        As the treasurer of HCMFA, did you
3    believe that -- do you believe that statement
4    was true and accurate at the time it was
5    rendered?
6    A.   I mean, it -- it -- the answer to
7    that is I really didn't have any -- I didn't
8    have an opinion really.
9    Q.   Did you do anything to educate
10   yourself in April of 2019 on the issue of
11   whether HCMFA could repay the amounts that it
12   owed to Highland should they become due?
13   A.   I don't believe so.
14   Q.   Did you at any time form any
15   opinions as to HCMFA's ability to repay all
16   amounts due to Highland should they become due?
17   A.   Not really.  I guess I don't...
18   Q.   Well, you told the retail board that
19   HCMFA's liabilities exceeded their assets in
20   2020; correct?
21   A.   Yes.
22   Q.   Based on the work that you did to
23   prepare for the retail board, did you form any
24   view as to whether HCMFA would be unable to
25   repay the amounts that it owed to Highland

Page 205

1        WATERHOUSE - 10-19-21
2    should they become due?
3        MS. DANDENEAU:  Objection to form.
4    A.   I mean, I -- when you look at that,
5    to answer you, completely, you know, again,
6    if -- the response I gave the retail board was,
7    you know, the -- the advice -- HCMFA advisors
8    have the -- have the full faith and backing of
9    Jim Dondero.  So I didn't form an opinion of
10   whether the advisor could pay it or not.
11   Q.   Did you form any view as to whether
12   the advisors could repay the amounts that it
13   owed to Highland should they become due without
14   the full faith and backing of Mr. Dondero?
15       MS. DANDENEAU:  Objection to form.
16       MS. DEITSCH-PEREZ:  Form.
17   A.   I mean, if you -- if you -- if you
18   take that last statement out, I mean, it would
19   be difficult for HCMFA to pay back demand notes
20   at that time.
21   Q.   And it was precisely for that reason
22   that you told the retail board that -- that the
23   retail -- that the advisors had the full faith
24   and backing of Mr. Dondero; correct?
25       MS. DANDENEAU:  Objection to form.

Page 206

WATERHOUSE - 10-19-21

1
2     A.   I mean, yes, as the mouthpiece, I
3  was relaying information.
4     Q.   Okay.  And you relayed that
5  information with the knowledge and approval of
6  Mr. Dondero; correct?
7         MS. DEITSCH-PEREZ:  Object to the
8  form.
9     A.   As I stated in the email, I don't
10  believe, and I think I testified I don't
11  believe I had conversations with Mr. Dondero at
12  the time of that board meeting.
13    Q.   Did you tell the retail board that
14  the advisors had the full faith and backing of
15  Mr. Dondero without Mr. Dondero's prior
16  approval?
17    A.   Yeah, I -- I -- yes, I'm -- like I
18  said, I think I testified earlier, I'm sure I
19  qualified it as well.
20    Q.   What do you mean by that?
21        MS. DANDENEAU:  Objection to form.
22    A.   Again -- again, like I said in the
23  email, it has the full faith and backing of Jim
24  Dondero unless that has changed.
25    Q.   Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

1  so let's put the email back up.
2     A.   It is -- it is -- it is in the
3  email.
4     Q.   Let's put the email back up.  You
5  didn't say unless it has changed.  You said you
6  believe it hasn't changed; right?
7     A.   Okay.  And to my knowledge that
8  hasn't changed, that is what it says.
9     Q.   That's right.
10    A.   But, again, I mean, that is -- I
11  don't know everything.  And I'm not in every
12  conversation.  I'm not -- to presume that I am,
13  is -- and you have to put myself -- as you
14  started this out, Mr. Morris, I was at home in
15  October of 2020 with COVID -- or, you know,
16  under these COVID times that we described is
17  very difficult.
18        We have all been working at home for
19  really the first time ever, undergoing
20  processes, procedures, control environments
21  that have been untested, and there is poor
22  communication.
23        So I am relaying, as I'm telling you
24  now, what is in the email.  And unless

Page 208

WATERHOUSE - 10-19-21

1
2  something has changed -- to my knowledge, it
3  hasn't changed, but it could have changed.
4     Q.   When you say that the advisors have
5  the full faith and backing from Mr. Dondero,
6  did you intend to convey that, to the extent
7  the advisors were unable to satisfy their
8  obligations as they become due, Mr. Dondero
9  would do it for them?
10        MS. DANDENEAU:  Object to the form.
11        MS. DEITSCH-PEREZ:  Object to
12  form.
13        And, John, we have given you a lot
14  of leeway here but this does not seem
15  relevant to this case.  You seem sort of
16  taking a complete sort of diversion into
17  the allegations and the complaint just
18  filed on Friday, and so I would ask you to
19  move on because --
20        MR. MORRIS:  And I will tell you --
21  I will tell you that I have never read that
22  complaint cover-to-cover.  I have nothing
23  to do with the prosecution of those claims.
24  And this issue that we're talking about
25  right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

1  promissory notes that your clients refuse
2  to pay.
3        So I'm going to continue to ask my
4  questions, and I would ask the court
5  reporter to read back my last question.
6        (Record read.)
7        MS. DEITSCH-PEREZ:  And then I
8  believe there were objections to form.
9     Q.   You can answer the question.
10    A.   Yes.
11    Q.   Thank you very much, sir.
12        MR. MORRIS:  Can we go back to the
13  other document, please?
14    Q.   Mr. Waterhouse, do you know if this
15  document was ever shared with the retail board?
16    A.   I don't recall.
17    Q.   Did you ever share it with the
18  retail board?
19    A.   I don't recall.
20    Q.   Did you ever tell the retail board
21  about the substance of this document?
22    A.   I don't recall.
23    Q.   Did you ever tell the retail board
24  that Highland had agreed not to make a demand

Page 210

1      WATERHOUSE - 10-19-21
2  against HCMFA until May 2021?
3      A.    I don't recall.
4      Q.    Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9      A.    I don't recall.
10      Q.    Did you instruct Ms. Thedford or
11  anybody else responding to the retail board's
12  15(c) inquiry to disclose this document?
13      A.    Did I instruct Ms. Thedford or
14  anyone else to -- to -- to produce this, to
15  disclose this document?  Is that what you -- I
16  just want to make sure.
17      Q.    Uh-huh.
18      A.    Yeah, I don't -- I don't recall.
19      Q.    Did you instruct anybody to inform
20  the retail board, in response to their question
21  as part of the 15(c) process, to -- to tell the
22  retail board about Highland's agreement not to
23  make a demand until 2021?
24      MS. DANDENEAU:  Objection to form.
25      A.    I don't recall.

Page 211

1      WATERHOUSE - 10-19-21
2      Q.    Did you ever inform PwC that HCMFA's
3  liabilities exceeded its assets?
4      MS. DANDENEAU:  Object to the form.
5      A.    I don't -- I don't think I told
6  them.  I mean, they -- they audited the
7  financial statements.
8      Q.    Did -- do you know if anybody on
9  behalf of Highland ever informed
10  PricewaterhouseCoopers that HCMFA may be unable
11  to repay amounts owing to Highland, should they
12  become due?
13      MS. DANDENEAU:  Objection to form.
14      A.    Yes.  Again, I think I testified
15  earlier that -- that this was communicated to
16  the auditors.
17      Q.    Ideally --
18      A.    I don't know who exactly did that.
19  I don't recall doing it, but, yeah, it was --
20  it was communicated.  And that is why -- I
21  mean, there is a disclosure in the financial
22  statements; right?
23      Q.    There is, and that disclosure
24  relates to the last sentence of this document;
25  correct?

Page 212

1      WATERHOUSE - 10-19-21
2      A.    Yes.
3      Q.    Do you recall looking in the
4  document and seeing anything that was disclosed
5  with respect to the sentence above that?
6      A.    No.
7      Q.    Do you know whether anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA expects that
10  it may be unable to repay amounts due and owing
11  to Highland should they become due?
12      MS. DEITSCH-PEREZ:  Object to the
13  form.  I think that is the third time.
14      A.    I don't recall.  Again, as I said,
15  we -- all of this was given to the auditors.
16      Q.    Do you know if Highland received
17  anything of value in exchange for its agreement
18  not to demand payment on amounts owed by HCMFA
19  prior to May 31st, 2021?
20      MS. DEITSCH-PEREZ:  Object to the
21  form.  That is the second time.
22      MS. DANDENEAU:  Object to the form.
23      A.    I have answered this question.
24      MR. RUKAVINA:  Hold on.  Object to
25  legal conclusion.  Go ahead.

Page 213

1      WATERHOUSE - 10-19-21
2      A.    I have answered this question
3  before.
4      Q.    And the answer was no?
5      A.    I'm not aware.
6      Q.    Now, this acknowledgment can't
7  possibly apply to the two notes that you signed
8  on behalf of HCMFA because those notes were
9  signed on May 2nd and May 3rd, 2019; is that
10  right?
11      MS. DANDENEAU:  Objection to form.
12      A.    Unless there is a drafting error.
13      Q.    Okay.  Are you aware of a drafting
14  error?
15      A.    I'm not aware.  I didn't -- I wasn't
16  part of -- I didn't sign this note or this
17  acknowledgment.  I didn't draft it.
18      Q.    But you do see it is dated April 15,
19  2019; right?
20      A.    Yes.
21      Q.    And this was a document that was
22  actually included by the advisors in a pleading
23  they filed with the Court; right?
24      MR. RUKAVINA:  Well, I don't know
25  that so I object to form.

Page 214

1       WATERHOUSE - 10-19-21
2    Q.    Okay.  Let's go to the first page of
3  the document and just confirm that.
4       MR. AIGEN:  Mr. Morris, I just note
5  that you already said there was some error
6  with the document that is listed as
7  exhibit --
8       MR. MORRIS:  No.  No, no, no.
9       MS. DEITSCH-PEREZ:  Oh, okay.
10       MR. MORRIS:  What I said is that
11  there is a few pages that were mistakenly
12  stapled to the end of the document.
13       MS. DEITSCH-PEREZ:  Okay.
14       MR. MORRIS:  There is no problem
15  with this document.
16       MS. DEITSCH-PEREZ:  And just so
17  we're clear that the document -- the pages
18  that start with defendant's amended answer
19  are not intended to be part of this
20  document?
21       MR. MORRIS:  That's correct.
22       MS. DEITSCH-PEREZ:  And that the --
23  but it is your representation that the rest
24  of the document is -- is -- is correct
25  because we don't -- we don't have any way

Page 215

1  of verifying that, we're just --
2       MR. MORRIS:  You do, actually.  You
3  could just go to Docket No. 21-3004.
4       MS. DEITSCH-PEREZ:  If you want to
5  stop this deposition so we can go and pull
6  that document up, we're happy to do it.  So
7  I am just asking you for your
8  representation.
9       MR. MORRIS:  Sure.  I gave that.
10       MS. DEITSCH-PEREZ:  Okay.
11    Q.    So do you see that this is a
12  document that was actually filed with the Court
13  by Highland Capital Management Fund Advisors?
14    A.    No.  I get with the first page in
15  the section.  Maybe I'm looking at the wrong
16  thing.  It says, Highland Capital Management.
17    Q.    Don't worry about it.  Don't worry
18  about it.
19    A.    Maybe I went back -- okay.
20       MR. MORRIS:  All right.  Can we put
21  up on the screen Exhibit 2.
22       (Exhibit 2 marked.)
23       MR. MORRIS:  I think it is
24  Exhibit 1.
25

Page 216

1       WATERHOUSE - 10-19-21
2       MS. DANDENEAU:  I'm sorry, John, did
3  you say Exhibit 2 or Exhibit 1?
4       MR. MORRIS:  It is Exhibit 2 in the
5  binders so it is premarked Exhibit 2.  And
6  now I'm asking -- right there -- going to
7  Exhibit 1 to the document that was marked
8  as Exhibit 2.
9       MS. DANDENEAU:  Got it.  In the
10  binder there is no --
11       MS. DEITSCH-PEREZ:  There is no
12  Exhibit 1.
13       MR. MORRIS:  All right.  So look at
14  the one on the screen.
15    Q.    Do you see, Mr. Waterhouse, that
16  this is a promissory note dated May 31st, 2017,
17  in the approximate amount of $30.7 million?
18    A.    Yes.
19    Q.    And do you see that the maker of the
20  note is NexPoint?
21    A.    Yes.
22    Q.    And that Highland is the payee; is
23  that right?
24    A.    Yes.
25    Q.    Okay.  And do you see in Paragraph 2

Page 217

1  this is an annual installment note?
2    A.    Can you scroll down.
3    Q.    Sure.
4       MR. MORRIS:  Can we scroll down --
5  yeah, there you go.
6    A.    Right there, yeah.  Yes.
7       MR. MORRIS:  And can we scroll down
8  to the signature line.
9    Q.    And do you recognize that as
10  Mr. Dondero's signature?
11    A.    Yes.
12    Q.    And is this the promissory note that
13  we talked about earlier where NexPoint had made
14  certain payments in the aggregate amount of
15  about 6 to $7 million against principal and
16  interest?
17    A.    I don't recall discussing the
18  aggregate principal amounts of 6 to $7 million,
19  but -- so I don't -- I don't recall that prior
20  discussion with those amounts.
21    Q.    All right.  Let's take a look.
22  NexPoint always included this promissory note
23  as a liability on its audited financial
24  statements; right?

Page 218

```
1          WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   And NexPoint had its financial
4  statements audited; isn't that correct?
5    A.   Yes.
6    Q.   And was the process of NexPoint's
7  audit similar to the process you described
8  earlier for Highland and HCMFA?
9    A.   Yes, it is similar.
10   Q.   Okay.
11         MR. MORRIS:  Can we put up
12       NexPoint's audited financials and let
13       everybody know what exhibit number it is,
14       La Asia?
15         MS. CANTY:  It is going to be
16       Exhibit 46.
17         (Exhibit 46 marked.)
18   Q.   And do you see, sir, that we've put
19  up NexPoint Advisors' consolidated financial
20  statements and supplemental information for the
21  period ending December 31st, 2019?
22   A.   Yes.
23   Q.   Did you participate in the process
24  whereby these audited financial statements were
25  issued?
```

Page 219

```
1          WATERHOUSE - 10-19-21
2    A.   I didn't participate directly, as
3  I've described before, about the -- the team
4  performing the audit.
5    Q.   Do you recall when the audit of
6  NexPoint's financial statements for the period
7  ending December 31st, 2019 was completed?
8    A.   Yes.
9    Q.   And when do you recall it being
10  completed?
11   A.   In January of 2021.
12   Q.   Do you know why the 2019 audit
13  report wasn't completed until January of 2021?
14   A.   Yes.
15   Q.   Why was the NexPoint audit report
16  for the period ending 12/31/19 not completed
17  until January 2021?
18   A.   Because we had to deal with working
19  from home from -- with COVID, and on top of all
20  of our daily responsibilities and job duties
21  at -- at providing -- at Highland providing
22  services to NexPoint, we had to do all of this
23  extra work for a bankruptcy that was filed in
24  October of 2019.
25         MR. MORRIS:  Can we go to the
```

Page 220

```
1          WATERHOUSE - 10-19-21
2       balance sheet on page 3?  Okay.  Stop right
3       there.
4    Q.   Do you see under the liabilities
5  section, the last item is note payable to
6  affiliate?
7    A.   Yes.
8    Q.   And is that the note that we just
9  looked at?
10         MS. DANDENEAU:  Objection to form.
11   Q.   Withdrawn.
12         Is that the approximately
13  $30 million note that we just looked at that
14  was dated from 2017?
15         MS. DANDENEAU:  Objection to form.
16   A.   I believe no.
17   Q.   Okay.  You're not aware of any other
18  note that was outstanding from NexPoint to
19  Highland as of the end of the year 2019, other
20  than that one $30 million note; right?
21   A.   I don't recall.
22   Q.   And as of the end of 2019, the
23  principal amount that was due on the note was
24  approximately $23 million; right?
25         MS. DEITSCH-PEREZ:  Object to the
```

Page 221

```
1          WATERHOUSE - 10-19-21
2       form.
3    A.   Approximately.
4    Q.   And does that refresh your
5  recollection that between the time the note was
6  executed and the end of 2019, that NexPoint had
7  paid down approximately $7 million?
8    A.   Yes.  If we are just doing the math,
9  yes.
10   Q.   Okay.  Did NexPoint complete its
11  audit from 2020?
12   A.   Sorry, you kind of broke up.  Do
13  NexPoint complete?
14   Q.   The audit of its financial
15  statements for the period ending December 31st,
16  2020?
17   A.   No.
18   Q.   No, it's not complete?
19   A.   No, it is not complete.
20   Q.   Did HCMFA complete its audit for the
21  year ending December 31st, 2020?
22   A.   No.
23         MR. MORRIS:  Can we go to page 15,
24       please, the paragraph at the bottom.
25   Q.   Do you see that NexPoint has
```

---

Page 222

WATERHOUSE - 10-19-21

1  included under notes payable to Highland a
2  reference to the amounts that were outstanding
3  as of the year-end 2019 under the note that we
4  looked at just a moment ago?
5      A.   Yes.  Are you talking about the
6  second paragraph?
7      Q.   I'm actually talking about first
8  paragraph.  Do you understand that the first
9  paragraph is a reference to the 2017 note, and
10  the amounts that were -- the principal amount
11  that was outstanding as of the end of 2019?
12      MS. DANDENEAU:  Objection to form.
13  John, do you mean the first paragraph of
14  that page?
15      MR. MORRIS:  No, the first paragraph
16  under notes payable to Highland.
17      A.   Yeah, I see the paragraph, and
18  again, this is what I answered earlier.  I
19  believe so, just because I don't -- again, this
20  is a number in a balance sheet, and without
21  matching it up and seeing the detail with the
22  schedule like I kind of talked about for
23  Highland's financial statements, it is a little
24  bit more difficult to tie everything in

---

Page 223

WATERHOUSE - 10-19-21

1  perfectly together.
2      Q.   Okay.  But you're not aware of any
3  note that was outstanding at the end of 2019
4  from NexPoint to Highland other than whatever
5  principal was still due and owing under the
6  $30 million note issued in 2017; correct?
7      A.   Well, it -- I don't -- there is
8  reference in the second paragraph.  I don't --
9  I don't -- I don't recall what that is
10  referring to, so I don't -- I don't know.
11      Q.   Well, if you listen carefully to my
12  question, right, I'm asking about notes that
13  were outstanding at the end of 2019, and if we
14  look at the paragraph you just referred to, it
15  says that during the year there were new notes
16  issued totaling $1.5 million, but by the end of
17  the year, no principal or interest was
18  outstanding on the notes.
19      Do you see that?
20      A.   Oh, I do, yes.
21      Q.   So does that refresh your
22  recollection that there were no notes
23  outstanding from NexPoint to Highland other
24  than the principal remaining under the original

---

Page 224

WATERHOUSE - 10-19-21

1  $30 million 2017 note that we looked at a
2  moment ago?
3      A.   Well, we're at the bottom of the
4  page.  Is there anything on page 16?
5      Q.   That is a fair question, sure.  That
6  is it.
7      A.   Okay.  So it appears that that is
8  the only note that is detailed in the notes in
9  the financial statement.
10      Q.   And you don't have any memory of any
11  other note other than the 2017 note, right,
12  being outstanding as of the end of the year?
13      A.   I deal with thousands of
14  transactions every year.  I don't really have a
15  very specific memory for what exactly was
16  outstanding.
17      MR. MORRIS:  Why don't we take a
18  break now.  We've been going for a little
19  while.  It's 3:26.  Let's come back at
20  3:40.
21      VIDEOGRAPHER:  We're going off the
22  record at 3:26 p.m.
23  (Recess taken 3:26 p.m. to 3:39 p.m.)
24      VIDEOGRAPHER:  We are going back on

---

Page 225

WATERHOUSE - 10-19-21

1  the record at 3:39 p.m.
2      Q.   All right.  Mr. Waterhouse, we -- I
3  don't think we have a lot more here.
4      To the best of your knowledge and
5  recollection, were all affiliate loans and all
6  loans made to Mr. Dondero recorded on
7  Highland's books and records as assets of
8  Highland?
9      MS. DANDENEAU:  Object to the form,
10  asked and answered.
11      A.   To my knowledge, yes.
12      Q.   Okay.  Can you recall any loan to
13  any affiliate or Mr. Dondero that was not
14  recorded on Highland's books and records as an
15  asset?
16      A.   Like during my time as CFO?  I don't
17  recall.
18      Q.   How about after the time that you
19  were CFO?  Did you recall that there was a loan
20  by Highland to an affiliate or to Mr. Dondero
21  that hadn't been previously recorded on
22  Highland's books as an asset?
23      MS. DANDENEAU:  Objection to form.
24      A.   I guess I don't understand the

---

Page 226

WATERHOUSE - 10-19-21

1  question. I left Highland as of – I'm not
2  aware of – I left Highland in February –
3  probably the last day of February of 2021.
4    Q.   Okay.
5    A.   I'm not – I'm not aware of any –
6  I'm not aware of anything past that date.
7    Q.   Okay. While you were the CFO at
8  Highland, did Highland prepare in the ordinary
9  course of business a document that reported
10  operating results on a monthly basis?
11    A.   Yes.
12    Q.   And are you generally familiar with
13  the monthly operating reports?
14    A.   Yeah. You are referring to the
15  reports that we filed to the Court every month?
16    Q.   I apologize, I'm not. I'm taking
17  you back to the pre-petition period. There was
18  a report that I have seen that I'm going to
19  show you, but I'm just asking for your
20  knowledge.
21      MR. MORRIS:  Let's put it up on the
22  screen, Exhibit 39.
23      (Exhibit 39 marked.)
24    Q.   Do you see this is a document that

1  question. I left Highland as of – I'm not
2  aware of – I left Highland in February –
3  probably the last day of February of 2021.
4    Q.   Okay.
5    A.   I'm not – I'm not aware of any –
6  I'm not aware of anything past that date.
7    Q.   Okay. While you were the CFO at
8  Highland, did Highland prepare in the ordinary
9  course of business a document that reported
10  operating results on a monthly basis?
11    A.   Yes.
12    Q.   And are you generally familiar with
13  the monthly operating reports?
14    A.   Yeah. You are referring to the
15  reports that we filed to the Court every month?
16    Q.   I apologize, I'm not. I'm taking
17  you back to the pre-petition period. There was
18  a report that I have seen that I'm going to
19  show you, but I'm just asking for your
20  knowledge.
21      MR. MORRIS:  Let's put it up on the
22  screen, Exhibit 39.
23      (Exhibit 39 marked.)
24    Q.   Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1  is called operating results?
2    A.   Yeah, that's the title of it.
3    Q.   Okay. And was a report of operating
4  results prepared by Highland on a monthly basis
5  during the time that you served as CFO?
6    A.   No.
7    Q.   Are you familiar with a document of
8  this type? And we can certainly look at the
9  next page or two to refresh your recollection.
10    A.   I'm just looking at the title. I
11  don't really – again, as I discussed before, I
12  don't have any records or documents or emails
13  or appointments or anything that I was able to
14  use prior to – prior to this deposition, so
15  I'm doing the best I can.
16    Q.   Okay. You don't need to apologize.
17  I'm just asking you if you are familiar with
18  the document called Operating Results that was
19  prepared on a monthly basis at Highland?
20      MS. DEITSCH-PEREZ:  Object to the
21  form.
22    Q.   If you're not, you're not.
23    A.   I don't believe this was prepared on
24  a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1    Q.   Okay. Do you see that this one
2  is – is dated February 2018?
3    A.   Yes.
4    Q.   Do you have – do you believe –
5  have you ever seen a document that was
6  purporting to report operating results for
7  Highland?
8      MS. DANDENEAU:  Objection to form.
9    A.   Yes.
10    Q.   Okay. And when you say that you
11  don't believe it was produced on a monthly
12  basis, was it produced on any periodic bases to
13  the best of your recollection?
14    A.   I believe it was – it was prepared
15  on an annual basis.
16    Q.   Okay.
17      MR. MORRIS:  Can we look at the next
18  page.
19    Q.   Do you see that there is a statement
20  here called: Significant items impacting
21  HCMLP's balance sheet?
22      And it is dated February 2018.
23    A.   Yes.
24    Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1  report that Highland prepared that identified
2  significant items impacting the balance sheet?
3    A.   A report that was prepared.
4    Q.   Let me ask a better question:  Did
5  Highland prepare reports to the best of your
6  recollection that identified significant items
7  that impacted the balance sheet?
8    A.   Well, so Highland prepared a – a
9  monthly close package. And maybe I'm
10  getting – and – and maybe change names at one
11  time or maybe I'm just – again, just
12  misremembering – but in that, yes, there is a
13  page that would detail just changes in – you
14  know, just changes month over month on the
15  balance sheet.
16    Q.   Okay. And maybe it is my fault.
17  Maybe I didn't know the proper name for it.
18  But let's use the phrase "monthly close
19  package."
20      Did Highland prepare a monthly close
21  package in the ordinary course of business
22  during the time that you served as CFO?
23      MS. DANDENEAU:  Objection to form.
24    A.   Yes.

Page 230

WATERHOUSE - 10-19-21

1   
2   Q.   And did the monthly close package
3  that Highland prepared include information
4  concerning significant items that impacted
5  Highland's balance sheet?
6   A.   Yes, it had a page like that is –
7  that is on the screen that detailed items
8  like – of that nature.
9   Q.   And do you know who – was there
10  anybody at Highland who was responsible for
11  overseeing the preparation of the monthly
12  reporting package?
13   A.   That would have been – again, it
14  varies over time during my tenure as CFO.
15  It – it varied over – over time, but – but
16  typically a – a corporate accounting manager.
17   Q.   And who were the corporate
18  accounting managers during your tenure as CFO?
19   A.   It would have been Dave Klos and
20  Kristin Hendrix.
21   Q.   And did the corporate accounting
22  manager deliver to you drafts of the monthly
23  close package before it was finalized?
24   A.   Sometimes.
25   Q.   Was that the practice even if there

Page 231

WATERHOUSE - 10-19-21

1  were exceptions to the practice?
2   A.   The practice meaning that they
3  sometimes lured them to me?
4   Q.   That that was the expectation even
5  if circumstances prevented that from happening
6  from time to time.
7       MS. DEITSCH-PEREZ: Object to the
8       form.
9   A.   I – I would say it started out that
10  way but over the years it – it was not
11  enforced.
12   Q.   Okay.  So you were – you reviewed
13  and approved monthly – monthly reporting
14  packages for a certain period of time and then
15  over time you stopped doing that.
16       Do I have that right?
17       MS. DANDENEAU:  Objection to form.
18   A.   Yes, I mean, if you're talking about
19  a formal meeting where we sit down and go
20  through and approve it.  I would say that was
21  standard practice a decade – you know, early
22  on.  And as time went on that – that – that
23  practice wasn't followed.
24   Q.   Okay.

Page 232

WATERHOUSE - 10-19-21

1   
2   A.   And, quite frankly, I don't even
3  know if these were – these were sent to me
4  even in any capacity.
5   Q.   What was the purpose of preparing
6  the monthly reporting package – withdrawn.
7       What was the purpose of preparing
8  the monthly close package?
9       MS. DEITSCH-PEREZ:  Object to the
10       form.
11   A.   The – the original purpose was so
12  that it would just – it would be a report that
13  was reviewed monthly with senior management.
14   Q.   Who was included in the idea of
15  senior management?
16   A.   You know, I think originally when
17  this was conceived that would have been like
18  Jim Dondero and Mark Okada.
19   Q.   Were monthly reporting – withdrawn.
20       Were monthly close packages prepared
21  to the best of your knowledge until the time
22  you left Highland?
23   A.   To my knowledge – I don't know,
24  actually.  I mean, to my knowledge, I believe
25  it was being – that was still being done.  I

Page 233

WATERHOUSE - 10-19-21

1  don't know because, again, I wasn't reviewing
2  them.  I hadn't reviewed a close package for –
3  for a long time.  But I believe the standard
4  practice that was still being carried out.
5   Q.   Did you ever have any discussions
6  with the debtor's independent board concerning
7  any promissory notes that were issued by any of
8  the affiliates or Mr. Dondero?
9   A.   I can't – I can't – I can't recall
10  specifically.
11   Q.   Did you speak with the independent
12  board from time to time?
13   A.   Yes, from – from – from time to
14  time I had discussions with the independent
15  board members, you know, either – either, you
16  know, by themselves or wholly, you know, as –
17  as a – as a combined work.
18   Q.   Okay.  Before we talk about
19  Mr. Seery, do you recall ever having a
20  conversation with Mr. Nelms or Mr. Dubel
21  concerning any promissory note that was
22  rendered by one of the affiliates or
23  Mr. Dondero to Highland?
24   A.   I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1  specifically.
2      Q.   Do you know if the topic was ever
3  discussed, even if you don't remember it
4  specifically?
5          MS. DANDENEAU:  Objection to form.
6      A.   It – it – it may have.  I don't
7  know.  I don't recall.
8      Q.   Do you recall ever discussing any
9  promissory note issued by any of the affiliates
10  or Mr. Dondero with James Seery?
11     A.   I don't – I don't recall
12  specifically.
13     Q.   Do you recall generally ever
14  discussing the topic of promissory notes issued
15  by any of the affiliates or Mr. Dondero to
16  Highland with Mr. Seery?
17     A.   Nothing – nothing is really jumping
18  out at me.
19     Q.   Do you recall if you ever told
20  Mr. Seery that any of the affiliates or
21  Mr. Dondero didn't have an obligation to pay
22  all amounts due and owing under their notes?
23     A.   I don't recall having that
24  conversation.
25

Page 235

WATERHOUSE - 10-19-21

1      Q.   Did you ever tell Mr. Seery that you
2  had any reason to believe that the amounts
3  reflected in the notes issued by the affiliates
4  and Mr. Dondero were invalid for any reason?
5      A.   I don't – I don't recall.
6      Q.   Did you tell Mr. Dondero – did you
7  tell Mr. Seery that you thought the promissory
8  notes issued by the advisors and Mr. Dondero
9  that were outstanding as of the petition date
10  were assets of the estate?
11     A.   I don't recall having a specific
12  conversation about those – you know, those
13  notes outstanding as – as of the petition date
14  being assets on the estate.  I mean, we put
15  together – you know, they're in the books and
16  records of the financial statements.  I don't
17  recall having a specific conversation.
18     Q.   Did you ever prepare any documents
19  that were delivered to Mr. Seery that concerned
20  the promissory notes issued by any of the
21  affiliates or Mr. Dondero?
22         MS. DANDENEAU:  Objection to form.
23     A.   Did I produce any that concerned –
24  you mean did I just – did I give Mr. Seery
25

Page 236

WATERHOUSE - 10-19-21

1  anything that – that said I have concerns over
2  these notes?
3      Q.   No.  Let me try again.  Maybe it was
4  my question.
5          Did you ever give Mr. Seery any
6  information concerning any of the notes that
7  were issued by any of the affiliates or
8  Mr. Dondero?
9          MS. DANDENEAU:  Objection to form.
10     A.   I don't recall if I did or not.  I
11  don't – I don't remember.  I mean, you have my
12  emails.  You may have asked.  Again, I don't –
13  I don't know.
14         MR. MORRIS:  Can we put up the
15     document that has been premarked as Exhibit
16     39?
17         MS. DANDENEAU:  John, that is this
18     document, isn't it?
19         MR. MORRIS:  Oh, yeah, it might be,
20     as a matter of fact.  Let's go to Number
21     40.
22         (Exhibit 40 marked.)
23     Q.   During the bankruptcy,
24  Mr. Waterhouse, did you prepare documents that
25

Page 237

WATERHOUSE - 10-19-21

1  were filed with the bankruptcy court?
2      A.   I didn't – I didn't prepare them
3  personally.
4      Q.   Did people prepare them under your
5  direction?
6      A.   Yes.  There were members of the team
7  that prepared them, and they worked in – you
8  know, there were members of DSI that were
9  involved in the process as well.
10     Q.   To the best of your knowledge, did
11  DSI rely on the employees of Highland for the
12  information that they used to prepare the
13  bankruptcy filings?
14     A.   Yes.  The books and records were
15  with the Highland personnel.
16     Q.   Okay.  And do you see on the screen
17  here, there is a document that we have marked
18  as Exhibit 40 that is – that is titled Summary
19  of Assets and Liabilities?
20     A.   Uh-huh.
21     Q.   Okay.  And do you recall reviewing
22  any summary of assets and liabilities before it
23  was filed with the bankruptcy court?
24     A.   Yes, I recall reviewing this at a
25

Page 238

WATERHOUSE - 10-19-21

1 high level.
2
3      Q.   And did you believe that it was
4 accurate at the time it was filed?
5      A.   I didn't have any other reason to
6 believe otherwise.
7      Q.   Okay.  Do you see that the total
8 value of all properties listed in Part 1 is
9 approximately $410 million?
10         MS. DEITSCH-PEREZ:  Objection to
11 form.
12     A.   Yes, it is in 1c.
13     Q.   Yes.
14     A.   Yes, I see that.
15     Q.   Okay.  If we go to the second page,
16 now I think I may just have excerpts here, just
17 so everybody is clear, but if we scroll down to
18 the second page, you will see that there is
19 a – a little further.  There you go.  You will
20 see there is a reference to Item 71, notes
21 receivable.
22         Do you see that?
23     A.   I do.
24     Q.   And that was a reference to the
25 notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1
2 Mr. Dondero, among others; is that right?
3         MS. DANDENEAU:  Objection to form.
4     A.   Yes.  The affiliate notes and the
5 Dondero notes were in this amount, but they
6 weren't – again, like you said, and among
7 others.
8     Q.   Okay.  We will look at the
9 specificity because I'm not playing gaming
10 here, but do you know if the $150 million of
11 notes receivable was included within the
12 $410 million of total value of the debtor's
13 assets?
14         MS. DANDENEAU:  Objection to form.
15     A.   I – I – I believe so.
16     Q.   Right.  And so is it fair to say
17 that as of the date this document was prepared,
18 the notes receivable were more than one-third
19 of the value of the debtor's assets?
20         MS. DEITSCH-PEREZ:  Object to the
21 form.
22         MS. DANDENEAU:  Object to the form.
23     A.   Again, if you are just taking the
24 math, 150 divided by whatever the $400 million
25 number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1
2     Q.   Okay.
3     A.   You know, but as of the time of this
4 filing, that is what was put in this filing,
5 right, but, you know, I mean, numbers --
6 numbers change, facts and circumstances change.
7     Q.   But as the CFO of Highland, the
8 debtor in bankruptcy, did you believe that this
9 number accurately reflected the total amount
10 due under the notes receivable?
11     A.   That is what we had in our books and
12 records.
13     Q.   Okay.  And did you believe as the
14 CFO that the books and records accurately
15 reported the then value of the debtor's assets?
16         MS. DANDENEAU:  Objection to form.
17     A.   We didn't -- as part of this filing,
18 there was no fair value measurement or
19 anything.  These were just accounting entries
20 for the promissory notes.  There is no analysis
21 for impairment or fair market value adjustments
22 or anything of that nature.  This is purely
23 taking numbers and putting them in our form.
24     Q.   Did you do any impairment analysis
25 at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1
2 Highland?
3     A.   Yes, we did do impairment analysis
4 on – on assets.
5     Q.   Okay.  Did you ever do an impairment
6 analysis on any of the promissory notes that
7 were given to Highland by any of the affiliates
8 or Mr. Dondero?
9     A.   Not that I recall.
10     Q.   Under what circumstances do you
11 prepare impairment analyses?
12     A.   As – as – if you're preparing
13 financials in accordance with GAAP, generally
14 accepted accounting principles, if you're
15 preparing full GAAP financials, you should be
16 preparing – you should be undergoing on a
17 periodic basis any fair market value
18 adjustments to assets.
19         As I was instructed at the time of
20 the petition date, we weren't producing GAAP
21 financials.  So this wasn't something I was
22 worried about nor concerned about.
23     Q.   Okay.  Were NexPoint and HCMFA and
24 Highland's audited financial statements
25 prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1
2    A.    The audited financials -- yes,
3    audited financial statements are prepared in
4    accordance with GAAP.
5        Q.    Do you recall whether any of
6    Highland or HCMFA or NexPoint ever made a fair
7    market value adjustment to any of the notes
8    issued by any of the affiliates or Mr. Dondero
9    to Highland?
10        A.    I do not recall that happening, but
11    the -- it is because under -- under GAAP,
12    the -- the treatment of liabilities is
13    different than assets.
14        Q.    Okay.  So then let's just focus on
15    Highland's audited financial statements.
16            The last audited financial
17    statements were for the period ending December
18    31st, 2018; correct?
19        A.    That is my understanding.
20        Q.    And you had -- you had an obligation
21    to disclose anything to PricewaterhouseCoopers
22    concerning any subsequent events between the
23    end of 2018 and June 3rd, 2019; correct?
24            MS. DANDENEAU:  Objection to form.
25            MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1
2    A.    Correct.
3        Q.    Okay.  To the best of your
4    knowledge, as Highland's CFO, did Highland ever
5    make any fair market value adjustments to any
6    of the promissory notes that were carried on
7    its balance sheet and that were issued by any
8    of the affiliates or Mr. Dondero?
9        A.    I think I answered that question
10    earlier.  I don't recall doing that for any of
11    the -- those -- those notes.  So it would have
12    included the audit for the -- for the 2018
13    period.
14        Q.    Okay.
15            MR. MORRIS:  Can we go to the next
16    page.
17        Q.    Do you see this is a note a list of
18    notes receivable?  Do you see that?
19        A.    Yes, I do.
20        Q.    And do you see that this ties into
21    the page that we were just looking?
22        A.    I'm sorry, can we go back to the
23    prior page?  I mean, it was at 150,331,222.  It
24    was on the prior page.  Next page.  Yes, it
25    agrees.

Page 244

WATERHOUSE - 10-19-21

1
2    Q.    Okay.  So now let's look at that
3    schedule.  So this was the face amount of all
4    of the promissory notes that Highland held at
5    the time this document was filed with the
6    bankruptcy court; right?
7        A.    Yes.
8        Q.    There is a footnote there that says,
9    doubtful or uncollectible accounts are
10    evaluated at year-end.
11            Do you see that?
12        A.    I do.
13        Q.    Okay.  And is it fair to say that as
14    of the year-end 2018, the year before this,
15    that to the extent any of these notes were
16    outstanding at that time, they weren't deemed
17    to be doubtful or uncollectible?
18        A.    Yeah.  For the 2018 audit, there
19    weren't any -- there weren't any adjustments to
20    fair value.
21        Q.    Okay.  And during the bankruptcy, do
22    you recall that Highland subsequently reserved
23    for the Hunter Mountain Investment Trust note?
24        A.    Yes.
25        Q.    Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1
2    involved in the decision to reserve the Hunter
3    Mountain Investment Trust note?
4        A.    I was not.
5        Q.    Do you know why Highland decided to
6    reserve for the Hunter Mountain Investment
7    Trust note?
8        A.    I don't know yet decision was made.
9    I believe it was made by someone at DSI.
10        Q.    Okay.  I'm just asking if you know
11    why.
12            Did you ever ask anyone why they
13    reserved for that particular note?
14        A.    I don't recall.
15        Q.    Do you know whether the debtor
16    reserved for any other note on this list during
17    the bankruptcy?
18        A.    Again, I don't recall.  I wasn't
19    part of any process of -- again, like any fair
20    value adjustments or anything to that degree.
21    Like I said, a lot of that was done by DSI and
22    it was kind of out of our court.
23        Q.    Okay.  Do you know if any note
24    receivable on this list was ever deemed by the
25    debtor to be doubtful or uncollectible?

Page 246

1    WATERHOUSE - 10-19-21
2    A.  I don't -- I don't have a
3  recollection of every filing, so I don't know.
4    Q.  Did you ever have a discussion with
5  anybody at any time about whether any of the
6  notes receivable on this list should be deemed
7  to be doubtful or uncollectible?
8    A.  No.  As I previously stated, we were
9  told we didn't have to keep GAAP financials.
10  We weren't having -- you know, there is no
11  underlying audits being performed, so I mean,
12  it wasn't something I worried about.
13    MR. MORRIS:  I move to strike.
14    Q.  Did you ever have a conversation
15  with anybody about any of the notes receivable
16  and whether they should be deemed to be
17  doubtful or uncollectible?  Did you have the
18  conversation, yes or no?
19    MS. DANDENEAU:  Objection to form.
20    A.  I don't recall.
21    Q.  Do you recall ever telling anybody
22  that you believed any of the notes receivable
23  on this list should be doubtful -- should be
24  deemed to be doubtful or uncollectible?
25    MS. DANDENEAU:  Objection to form.

Page 247

1    WATERHOUSE - 10-19-21
2    A.  I don't recall.  I mean, it may have
3  happened, you know, again, when we initially
4  getting DSI up to speed and going through
5  financials, it may have happened, but I don't
6  recall specifically.
7    Q.  While you were the CFO of Highland
8  during the time that the company was in
9  bankruptcy, did you have any reason to believe
10  that any of the notes receivable on this list
11  other than Hunter Mountain Investment Trust
12  should have been characterized as doubtful or
13  uncollectible?
14    MS. DANDENEAU:  Objection to form.
15    MS. DEITSCH-PEREZ:  Form.
16    A.  I didn't know.  I didn't form an
17  opinion.  Bankruptcy was new to me.  It still
18  is new to me, even after going through this.
19  So I really didn't know what to expect nor
20  really -- you know, I didn't know.
21    MR. MORRIS:  I move to strike.
22    Q.  During the period of Highland's
23  bankruptcy when you were serving as CFO, did
24  you have any reason to believe any of the notes
25  on this list were doubtful or uncollectible?

Page 248

1    WATERHOUSE - 10-19-21
2    MS. DEITSCH-PEREZ:  This is like the
3  fifth time you've asked it.  Object to the
4  form.
5    MR. MORRIS:  I'm moving to strike,
6  if you haven't noticed, because he's not
7  answering the question.
8    MS. DEITSCH-PEREZ:  He was answering
9  the question, you just didn't like it, like
10  the answer.
11    MR. MORRIS:  Good Lord.
12    Q.  Go ahead, Mr. Waterhouse.
13    A.  Again, I don't -- we brought up a
14  myriad of issues at the start of the bankruptcy
15  case.  I don't recall if this was one of them,
16  but, again, there are a lot of things we
17  couldn't change.  Even, you know, I was told
18  status quo, blah, blah, blah, right, there is a
19  stay, you can't -- you know, I don't recall
20  specifically, but that doesn't mean it didn't
21  happen.
22    MR. MORRIS:  I move to strike.
23    Q.  During the time that Highland was in
24  bankruptcy and you served as CFO, did you have
25  any reason to believe that any of the notes

Page 249

1    WATERHOUSE - 10-19-21
2  receivable on this list were doubtful or
3  uncollectible?
4    MS. DEITSCH-PEREZ:  Object to the
5  form.
6    A.  Potentially.
7    Q.  Did you ever tell anybody that?
8    A.  As I just stated like five times,
9  yes, we -- at the beginning after filing and we
10  were getting DSI and others up to speed, you
11  know, we had a myriad of discussions of a lot
12  of things and this was likely one of them.  I
13  don't -- but I don't recall specifically we
14  talked --
15    Q.  I don't want to know -- I don't want
16  to know what was --
17    MS. DEITSCH-PEREZ:  Wait, wait.
18  Excuse me.  Mr. Morris, you did not let him
19  finish his answer.
20    A.  I spoke -- we had -- we were
21  bringing Fred Karesa and Brad Sharp (phonetic)
22  up to speed on all of these items, contracts,
23  and investments and going through -- we had
24  hours and hours and hours of discussion.  And
25  then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1  once, twice, three, four times with – you
2  know, I mean, we – I don't – I don't remember
3  the sum culmination of all these discussions.
4  They all kind of blend together.
5      MR. MORRIS:  Okay.  I move to strike
6      and I will try one more time.
7  Q.   Did you ever tell anybody at DSI
8  that you believed any of the notes receivable
9  on this list were doubtful or uncollectible?
10      MS. DANDENEAU:  Object to form.
11  A.   Potentially.
12  Q.   Potentially you told them or
13  potentially they were doubtful or
14  uncollectible?
15  A.   Potentially I told them that we
16  needed to look at the value of these -- of
17  these assets.
18  Q.   Okay.  Did you -- okay.  It is
19  potential that you told them and it is
20  potentially that you didn't; right?
21      MS. DANDENEAU:  Objection to form.
22  A.   I've gone through that.  I don't
23  recall specifically.
24  Q.   So you should just -- I don't want

Page 251

WATERHOUSE - 10-19-21

1  to tell what you to do.  Do you have --
2      MS. DANDENEAU:  Good.
3  Q.   Other than -- other than telling
4  them that they should look at the values, do
5  you have any recollection whatsoever of ever
6  having told anybody at DSI that any of the
7  notes receivable on this page were doubtful or
8  uncollectible?
9      MS. DEITSCH-PEREZ:  Object to the
10      form.
11      MS. DANDENEAU:  Objection.
12  A.   I recall having general discussions
13  about everything on our balance sheet which
14  would have included these -- these notes
15  receivable.
16  Q.   Okay.
17  A.   I don't recall specifically where
18  those discussions delved into.
19  Q.   Do you recall any discussion at all
20  on the topic of whether any of these notes on
21  this list were doubtful or uncollectible?
22      MR. AIGEN:  Mr. Morris, how on earth
23      is that question different from the
24      question that you just asked for the last

Page 252

WATERHOUSE - 10-19-21

1  five times?  I mean, really I thought you
2  were – (overspeak.)
3      MR. MORRIS:  Because he never
4  answered it.
5      MS. DEITSCH-PEREZ:  Are you
6  listening to him?
7      MR. MORRIS:  You know –
8      MS. DEITSCH-PEREZ:  He basically
9  said that he had a conversation with DSI
10  that went over all of this stuff and that
11  conversation could have included the notes
12  but he doesn't recall specifically.
13      What more do you want him – to ask
14  of him?
15      MR. MORRIS:  I want him – I would
16  love him to say – I would like him to
17  testify to the truth, and that is he has no
18  recollection.
19      MS. DEITSCH-PEREZ:  Well, the truth
20  as you would like to see it, but – but he
21  is testifying truthfully.  And I – and, by
22  the way, I move to strike that comment –
23      MR. MORRIS:  Okay.
24      MS. DEITSCH-PEREZ:  – because it

Page 253

WATERHOUSE - 10-19-21

1  suggests that he has not testified
2  truthfully.
3      MR. MORRIS:  I will ask my question
4  again.  And if at any time you want to
5  direct him not to answer, that is your
6  prerogative.
7  Q.   Mr. Waterhouse, do you have any
8  recollection at all of ever telling anybody
9  from DSI that any of these notes were doubtful
10  or uncollectible?
11      MS. DANDENEAU:  Object to form.
12  A.   I don't remember specifically.
13  Q.   Do you remember generally that
14  specific topic?
15  A.   We generally talked about assets,
16  values.  If -- we had discussions of that and
17  collectability in nature.  I mean, of Highland,
18  the funds, the CLOs, the entire complex.  We
19  had discussions like that, which is, you know,
20  as you look at a billion dollar consolidated
21  balance sheet.
22      So I generally remember -- this is
23  billions of dollars, including these assets --
24  having discussions of this -- of this type.

Page 254

WATERHOUSE - 10-19-21

2    Q.    Do you believe that an affiliate
3    loan on this list was doubtful or
4    uncollectible? Would you have told that to
5    DSI?
6        MS. DANDENEAU:  Objection to form.
7        MS. DEITSCH-PEREZ:  Object to form.
8    A.    If we had, like -- again, if we --
9    if -- if we weren't preparing financial
10    statements in accordance with GAAP, and -- you
11    know, if DSI at that point -- they were --
12    again, I was new to bankruptcy.
13        The CRO is -- we are delegating
14    everything to the CRO.  All the decisionmaking.
15    Remember -- remember when you and I went into
16    Delaware Court and we were saying DSI basically
17    does everything, remember this, Mr. Morris?
18        You were my counsel at the time, and
19    basically we're running everything through DSI.
20    That was what this was like in the early part.
21        Everything was communicated through
22    DSI.  So DSI says this.  DSI says that.  That
23    is what we're doing, and we're pointing out
24    things to them.
25        Now, they decide what direction this

Page 255

WATERHOUSE - 10-19-21

2    goes.
3    Q.    Did you point out that any of
4    these --
5    A.    I don't recall specifically.
6    Q.    Okay.  At any time that you served
7    as Highland's CFO, did you ever point out to
8    DSI that any of these loans were doubtful or
9    uncollectible?
10        MS. DEITSCH-PEREZ:  Object to the
11        form.
12        MS. DANDENEAU:  Objection.
13    A.    If you're asking me if I had a
14    conversation with DSI, if any of these loans
15    were doubtful or uncollectible, I don't recall
16    specifically.
17    Q.    Do you recall that the debtor filed
18    on the docket monthly operating reports?
19    A.    Yes.
20    Q.    You prepared those personally,
21    didn't you?
22        MS. DEITSCH-PEREZ:  Objection to
23        form.
24    A.    I didn't personally prepare them,
25    the team did with DSI.

Page 256

WATERHOUSE - 10-19-21

2    Q.    But you signed them; correct?
3    A.    My signature is on the MORs.
4    Q.    And you signed them as the preparer
5    of the document; correct?
6    A.    Yes, I did this pursuant to DSI's
7    instructions.
8    Q.    Okay.  You wouldn't have signed the
9    document if you didn't believe it to be
10    accurate; correct?
11    A.    If I had reason to believe it
12    wasn't, presumably I wouldn't have signed it.
13    Q.    Okay.  And do you have any reason to
14    believe right now that any monthly operating
15    report that has your signature on it was
16    inaccurate in any way?
17        MS. DEITSCH-PEREZ:  Object to the
18        form.
19    A.    My understanding of the monthly
20    operating reports is we were filing them in
21    accordance with the standards set by the Court.
22    It wasn't -- you know, I don't -- you
23    know, it wasn't GAAP.  It wasn't these other
24    standards, so I testified I didn't have
25    experience in this.  The CRO was running the

Page 257

WATERHOUSE - 10-19-21

2    show.  I followed their advice.
3    Q.    But you assured yourself that
4    everything in the report was accurate before
5    you signed them; correct?
6        MS. DANDENEAU:  Objection to form.
7    A.    I trusted the guidance from the CRO
8    and their team and their experience and their
9    guidance for doing this for many, many, many
10    years to -- to -- to categorize and put things
11    in ways on the form.
12        You know, my team had -- had not
13    filled out these forms before and needed all of
14    this guidance.  I'm not an expert in this.  I
15    have oversight of it.  I signed the form.  DSI
16    told me to.
17    Q.    And you and your team are the source
18    of the information that DSI used to create the
19    reports; correct?
20        MS. DANDENEAU:  Objection to form.
21    A.    The books and records reside with
22    the -- with -- with the corporate accounting
23    team.
24    Q.    Okay.  And the corporate accounting
25    team was the corporate accounting team that was

Page 258

WATERHOUSE - 10-19-21

1    under your direction; correct?
2    A.    Yes.
3    Q.    So -- so your team was responsible
4    for maintaining Highland's books and records;
5    correct?
6    A.    I'm sorry, my team was responsible?
7    Q.    Correct.
8    A.    Yes.  They -- they -- they were
9    the -- the -- the general ledger of Highland,
10    that responsibility was with the corporate
11    accounting team.
12    Q.    The corporate accounting group
13    reported to you; correct?
14    A.    Yes.
15    MR. MORRIS:  Can we put up 41,
16    please.
17    (Exhibit 41 marked.)
18    Q.    All right.  You will see that this
19    is a report that is dated January 31st, 2020,
20    but it is for the month ending December 2019.
21    Do you see that?
22    A.    I do.
23    Q.    And you signed this report in your
24    capacity as the chief financial officer of

Page 259

WATERHOUSE - 10-19-21

1    Highland; correct?
2    A.    Yes.
3    Q.    And you're the preparer -- you're
4    identified as the preparer of the report;
5    correct?
6    A.    That is correct.
7    Q.    Do you recall participating in the
8    preparation of monthly operating reports?
9    A.    As I testified earlier, it was put
10    together, you know, with the team.  The team
11    worked with DSI to put these monthly operating
12    reports together.  We had no experience at this
13    time of the monthly operating reports or things
14    of this nature.
15    MR. MORRIS:  Can you turn to the
16    next page, please.
17    Q.    Do you see a line item under assets
18    due from affiliates?
19    A.    Yes, I do.
20    Q.    Okay.  And to the best of your
21    knowledge and understanding, as the person who
22    is identified as the preparer of this report,
23    does that line item include the affiliate loans
24    that we've been talking about?

Page 260

WATERHOUSE - 10-19-21

1    A.    Again, I would have to see, just
2    like we did with the financial statements of
3    Highland and NexPoint, I would have to see a
4    detailed build, but, you know, if you look at
5    the other line items, you know, the only other
6    place it could be would be in -- in other
7    assets.
8    Q.    Okay.  And as a matter of
9    arithmetic, is it fair to say that is the value
10    of the assets due from affiliates was more than
11    25 percent of the value of Highland's total
12    assets as of 12/31/2019?
13    MS. DANDENEAU:  Objection to form.
14    A.    I'm really not doing the mental math
15    right now, so I've been going at this depo for
16    hours, so I'm really not -- you know --
17    Q.    All right.  No problem.
18    A.    -- these are millions of dollars.
19    Q.    Let's look at the Footnote 1,
20    please.  Do you see there is a reference to the
21    Hunter Mountain note?
22    A.    Yes, I see that in Footnote 1.
23    Q.    Okay.  And that's the reserve that
24    was taken against that note?

Page 261

WATERHOUSE - 10-19-21

1    A.    Yes, that is what this indicates.
2    Q.    Okay.  And were you aware that the
3    reserve was being taken on that it was?
4    A.    I was -- I was aware, yeah, at some
5    point, yes.
6    Q.    Okay.  And are you aware of any
7    reserve being taken with respect to any other
8    note that was issued in favor of Highland?
9    A.    Again, as I testified, we didn't go
10    through an analysis on -- on -- on the other
11    notes.
12    Q.    Can we turn --
13    A.    I believe -- I believe it says that
14    in Footnote 1, fair value has not been
15    determined with respect to any of the notes.
16    So this footnote -- footnotes, look,
17    there has been no determination.
18    Q.    Okay.  The determination was made in
19    the audited financial statements just six
20    months earlier; right?  We saw that earlier?
21    A.    That was as of 12/31/18.  I mean,
22    things -- circumstances -- there's a bank --
23    circumstances change, things change -- things
24    change over time, you know, facts and

Page 262

WATERHOUSE - 10-19-21

1    circumstances change. Again, you have to do an
2    analysis.
3       Q.   Okay. And you do recall that in
4    Highland's 2018 financial statement, all of the
5    notes issued by affiliates and Mr. Dondero that
6    were due at year-end had a fair value equal to
7    the carrying value; correct? We looked at
8    that?
9       A.   Yes. That was in the -- in the
10   disclosure for the -- for the affiliate notes,
11   yes.
12      Q.   And -- and you were obligated to
13   share with PwC any subsequent events between
14   the end of 2018 and the date that you signed
15   your management representation letter on June
16   3rd, 2019; correct?
17          MS. DEITSCH-PEREZ:  Object to the
18   form.
19      A.   Yes. I -- I -- I signed the
20   management, you know, my signature is in the
21   management representation letter -- I hope I'm
22   answering your question -- that is dated in
23   June with the representations made in that
24   management representation letter.

Page 263

WATERHOUSE - 10-19-21

1       Q.   Okay. And there was nothing that
2    caused PricewaterhouseCoopers to include in
3    subsequent events any adjustment to the
4    conclusion that the fair value of the affiliate
5    notes and the notes issued by Mr. Dondero
6    equaled the carrying value; correct?
7          MS. DANDENEAU:  Objection to the
8    form.
9       A.   That is correct. That is what was
10   in the -- in the -- in the footnotes.
11      Q.   Okay. So are you aware of anything
12   that occurred between June 3rd, 2019 and
13   December 31st, 2019 that would have caused the
14   fair value of the notes to differ from the
15   carrying value?
16      A.   Yeah. Highland filed for
17   bankruptcy, things changed -- I mean, there was
18   a bankruptcy filed in October of -- of -- of
19   2019, right, the petition date that we've
20   described earlier.
21          I mean, I had a -- I guess looking
22   back naively, I thought we were going to get an
23   audit from PwC for year-ended 2019, and when we
24   had discussions with PwC, they were like, are

Page 264

WATERHOUSE - 10-19-21

1    you crazy, we're not auditing this. Values
2    change, all these things change, bankruptcy
3    changes the entire scenario. I mean -- and
4    they're like, we're not -- we're not touching
5    this.
6          And so, you know, I was like, okay,
7    sorry, I get it, okay, no an audit.
8          I mean, it is -- you know, and --
9    you know, and we weren't preparing GAAP
10   financial statements.
11         Again, I didn't know what we were
12   doing in relation to our financial statements,
13   but these were the discussions I was having at
14   the time. And yeah, I mean, filing bankruptcy
15   from what I got from outside auditors and
16   others involved changed things dramatically.
17      Q.   Okay. Highland wasn't the obligor
18   under any of the notes that we're talking
19   about; correct?
20      A.   No.
21      Q.   So --
22      A.   That's right.
23      Q.   So can you identify any fact that
24   would cause the fair value to deviate from the

Page 265

WATERHOUSE - 10-19-21

1    carrying value during the seven-month period
2    between June 3rd and the end of the year, 2019?
3          MS. DANDENEAU:  Objection to form.
4       A.   No. I mean, I'm putting myself back
5    at that time, right. Hindsight is 2020, but we
6    didn't do an analysis, but we would have done a
7    fulsome analysis and looked at all of the facts
8    and circumstances at the time, but asset values
9    change. You know, there could have been a
10   market crash in hindsight in 2020, which --
11   which affected entities' abilities.
12         There could have been all of these
13   things, right, that -- that happen. It is --
14   it is easy to look back in hindsight, but when
15   you are looking at this in -- in realtime, the
16   analysis is different, and again, we didn't do
17   an analysis.
18      Q.   Okay. You didn't do an analysis.
19         Do I have that right?
20      A.   I don't -- I don't recall doing one
21   or maybe -- you know, I don't recall doing one.
22         MR. MORRIS:  Okay. I'm going to
23   take a break. I may be done, so the time
24   now is -- is 4:30 your time. Let's just

Page 266

WATERHOUSE - 10-19-21

1    take a short break until 4:40 your time.
2    MS. DANDENEAU: Okay.
3    VIDEOGRAPHER: We're going off the
4    record, 4:31 p.m.
5    (Recess taken 4:31 p.m. to 4:43 p.m.)
6    VIDEOGRAPHER: We are back on the
7    record at 4:43 p.m.
8    MR. MORRIS: I have no further
9    questions.
10    MR. RUKAVINA: Okay.
11    Mr. Waterhouse, I will go next.
12    EXAMINATION
13    BY MR. RUKAVINA:
14    Q.   Sir, my name is Davor Rukavina. I'm
15    the lawyer for --
16    MR. MORRIS: Hey, Davor, just before
17    you begin, I just want to put on the record
18    Highland's objection to documents that were
19    produced to me 10 minutes before the
20    deposition began.
21    MR. RUKAVINA: What the basis of
22    your objection?
23    MR. MORRIS: That they were due
24    quite some time ago, and the fact that you

Page 267

WATERHOUSE - 10-19-21

1    had -- I just think it's appropriate to --
2    to dump documents on somebody 10 minutes
3    before the deposition. I just think
4    that's --
5    MR. RUKAVINA: Well, these are
6    documents Highland produced. I'm not aware
7    of any rule I have to give you advance
8    documents when I know for the record that
9    other than the exhibits that you sent to us
10    last week, most of the exhibits you used
11    today you did not provide to me prior to
12    this deposition.
13    MR. MORRIS: No, but the documents
14    were produced by me in -- in litigation,
15    right?
16    MR. RUKAVINA: I'm going to use
17    primarily, John, the documents that you
18    produced to me today, but you may.
19    MR. MORRIS: Primarily. I've got --
20    I've got my objection. You have got your
21    response. Proceed.
22    Q.   Mr. Waterhouse, again, I represent
23    the advisors, HCMFA and NexPoint Advisors.
24    Do you understand that?

Page 268

WATERHOUSE - 10-19-21

1    A.   Yes.
2    Q.   You and I have never met or talked
3    before today, have we?
4    A.   No, I have -- I have heard your
5    voice on calls before.
6    Q.   Okay.
7    MR. RUKAVINA: Madam Court Reporter,
8    I will use a few exhibits today. My
9    associate, Mr. Nguyen, will find some way
10    to get them to you. I don't know how to do
11    that, but it looks like you guys do.
12    I am going to use numbers as well.
13    But to differentiate them from Mr. Morris
14    we're going to mark mine with the prefix A
15    for advisors.
16    Do you understand?
17    COURT REPORTER: Yes.
18    MR. RUKAVINA: Okay. Perfect.
19    Q.   Okay. So, Mr. Waterhouse, let's
20    start with those two HCMFA notes that you were
21    asked about, one for 5 million and one for
22    2.4 million.
23    Do you recall those notes?
24    A.   Yes.

Page 269

WATERHOUSE - 10-19-21

1    Q.   Were you ever the CFO of HCMFA?
2    A.   I don't recall.
3    Q.   So to the best of your recollection,
4    you were still an officer of HCMFA in 2019,
5    just that your title was treasurer?
6    MR. MORRIS: Object to the form of
7    the question. There is no leading here.
8    He works for your client.
9    MS. DANDENEAU: That is not -- that
10    is not true.
11    MR. MORRIS: He's the treasurer --
12    he is the treasurer of your client. I
13    don't -- I'm going to object every time you
14    try to lead, so...
15    MR. RUKAVINA: Totally fine to
16    object.
17    MR. MORRIS: Okay.
18    Q.   Please answer my question,
19    Mr. Waterhouse.
20    A.   I'm sorry, could you repeat? There
21    was...
22    Q.   Yes. You were -- you testified
23    earlier that in 2019 you were an officer of
24    HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

1    A.    Yes, I testified that I was the
2    A.    Yes, I testified that I was the
3    treasurer and I didn't know if that incumbency
4    certificate, you know, was one that appointed
5    me as a treasurer, but yes.
6    Q.    I'm just trying to confirm that
7    sitting here today, to the best of your
8    recollection, at that time you were -- your
9    title was treasurer.  It was not chief
10    financial officer.
11    A.    I don't recall that being my title.
12    Q.    Okay.  And in May of 2019, however,
13    I think you testified you were the chief
14    financial officer of the debtor; correct?
15       MR. MORRIS:  Objection to the form
16    of the question.
17    A.    Yes, I was -- yes.
18    Q.    Okay.  As such, in May of 2019, did
19    you have the authority, to your understanding,
20    to unilaterally loan $5 million or $2.4 million
21    to anyone on behalf of the debtor?
22       MR. MORRIS:  Objection to the form
23    of the question.
24    A.    Sorry, can you repeat that?
25    Q.    Yes.  So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

1    chief financial officer of the debtor, Highland
2    Capital Management, L.P., in May of 2019, did
3    you believe that you unilaterally, just Frank
4    Waterhouse, had the authority to loan on behalf
5    of the debtor to anyone $5 million and
6    $2.4 million?
7       MR. MORRIS:  Objection to the form
8    of the question.
9    A.    No.
10    Q.    Is it because loans of that amount
11    would have had to be approved by someone else?
12    A.    Yes.
13    Q.    Who in '20 -- in May of 2019, if
14    Highland wanted to loan 5 million or
15    $2.4 million to someone, what would have been
16    the internal approval procedure?
17       MR. MORRIS:  Objection to the form
18    of the question.
19    A.    If -- if we had loans of that nature
20    that needed to be made due to their size, we
21    would have gotten approval from the -- the
22    president of Highland.
23    Q.    And who was that individual?
24    A.    It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

1    Q.    Okay.  Now, I'm going to ask you a
2    similar question but for a different entity.
3    In May of 2019, as the treasurer of
4    HCMFA, did you believe that you unilaterally
5    had the ability to cause HCMFA to become the
6    borrower of a $5 million loan and a
7    $2.4 million loan?
8       MR. MORRIS:  Objection to the form
9    of the question.
10    A.    No.
11    Q.    What would -- what would the
12    approval have taken place -- strike that.
13    What would the approval process have
14    been like in May of 2019 at HCMFA for HCMFA to
15    take out a $7.4 million loan?
16       MR. MORRIS:  Objection to the form
17    of the question.
18    A.    The process would have been similar
19    to what we just discussed on -- for Highland to
20    make a loan to others.  So, again, you know,
21    we -- we would have -- either myself or someone
22    on the team would have discussed this with
23    the -- the president and owner of -- of HCMFA.
24    Q.    And who was that individual?

Page 273

WATERHOUSE - 10-19-21

1    A.    That was James -- Jim Dondero.
2    Q.    So do I understand that in May of
3    2019, on behalf of both the lender, Highland,
4    and the borrower, HCMFA, Mr. Dondero would have
5    had to approve $7.4 million in loans?
6       MR. MORRIS:  Objection to the form
7    of the question.
8    A.    Yes.
9    Q.    You mentioned when Mr. Morris was
10    asking you the NAV error, N-A-V error, with
11    respect to TerreStar, without writing us a
12    novel, unless you feel like you have to, can
13    you summarize what that NAV error was?  What
14    happened?
15    A.    There was a -- in the Highland
16    Global Allocation Fund, it owned at the time an
17    equity interest in a company called TerreStar.
18    And TerreStar is -- at the time was a private
19    company, and it may still be today.  Again, I'm
20    putting myself back then as a private company.
21    We had -- sorry, I don't mean we --
22    the fund and the advisor Houlihan Lokey
23    to -- to value that investment.  And during
24    that time there was some trades that were

Page 274

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    executed at market levels that were much lower
3    than the Houlihan Lokey model.
4        And based on information and
5    discussions with the portfolio managers and,
6    you know, principals that were very familiar
7    with TerreStar, it was determined that those
8    trades were non-orderly and they were not
9    considered in the valuation as consulted with
10   Houlihan Lokey and PricewaterhouseCoopers at
11   the time.
12       Subsequent to a -- I can't remember
13   the exact circumstances of why the SEC got
14   involved. I think it was due to this -- this
15   investment became a material position in the
16   fund. It triggered an SEC, kind of, inquiry.
17   And as part of that inquiry, they questioned
18   the valuation methodology. "They" meaning the
19   SEC.
20       And at the culmination of that
21   process -- this is all summarized -- the value
22   that was -- that ultimately had to be used in
23   the fund's NAV was different than -- materially
24   different than what the original valuation at
25   Houlihan Lokey provided.

Page 275

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        And given that there was this fund
3    was, as we discussed -- I don't know if we
4    discussed it, but it was an open-ended fund
5    that was going -- that was converting to a
6    close-end fund.
7        Due to the fact that it was an
8    open-ended fund, you had to recalculate NAV and
9    see what the impact was on people -- on
10   investors coming in and out of the fund and if
11   there is a detrimental impact and to calculate
12   what that -- what that impact was and if there
13   was any amounts owed to the fund pursuant to
14   the error.
15       Q.   Were you personally involved
16   internally at either Highland or HCMFA with
17   these investigations and discussions with the
18   SEC?
19       A.   I was.
20       Q.   Which other key people or senior
21   people at Highland were involved, to your
22   recollection?
23       A.   Myself, Thomas Surgent, David Klos,
24   Lauren Thedford, Jason Post.
25       Q.   Mr. Dondero, was he --

Page 276

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        A.   I believe Cliff Stoops. I'm trying
3    to think. And maybe that is -- that is -- that
4    is -- that is all kind I can recall at the
5    moment.
6        Q.   Do you recall whether it was
7    determined that the fund suffered losses as a
8    result of this error?
9        A.   The -- the fund -- the -- the --
10   because the open-ended nature of the fund,
11   there were losses that were attributable to
12   investors. Meaning they -- they would have
13   redeemed and got a less money or -- or they
14   subscribed in and maybe because they didn't get
15   enough shares and then they later sold and then
16   they were harmed in that fashion.
17       And there is -- there is -- there
18   were very -- there were very detailed
19   calculations and, you know, all these different
20   scenarios that we had to -- I'm sorry, I keep
21   saying "we" -- that the individuals involved
22   had to calculate and quantify.
23       Q.   Well, do you recall whether HCMFA
24   admitted certain fault and liability for this
25   error?

Page 277

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        A.   I don't recall specifically.
3        Q.   Do you recall whether HCMFA caused
4    any funds to be paid to the investors and the
5    fund the subject of the NAV error?
6        A.   Yes.
7        Q.   Do you recall the approximate amount
8    of funds, moneys paid to the investors and the
9    fund?
10       A.   It was -- it was approximately
11   $7 million.
12       Q.   If I was to suggest 7.8 million,
13   would that ring more true or are you sticking
14   with your original answer?
15       A.   It was -- it was approximately 7 --
16   7 to $8 million. Again, I don't remember the
17   exact number, but it was in that ballpark.
18       Q.   So regardless of whether HCMFA
19   accepted fault or liability, it caused some
20   $7 million or more to be paid out to affected
21   investors in the fund?
22       MR. MORRIS: Objection to the form
23   of the question.
24       A.   And I want to make sure I'm
25   understanding your question because there is a

Page 278

WATERHOUSE - 10-19-21

1    lot of different entities that are going on to
2    my head.
3
4        I think what you are saying is based
5    on this error, shareholders were harmed by this
6    approximately $7.8 million – by approximately
7    $7.8 million. Is that what you are asking?
8        Q.    Yes, sir.
9        A.    Yes, that was – again, I don't have
10    the exact numbers. If I take – it was – it
11    was in that ballpark, and there is a detail
12    calculation and write-up that could, that –
13    that exists someplace.
14        Q.    Now, at that time, at the time that
15    the NAV error occurred, was there a contract in
16    place between HCMFA and the debtor pursuant to
17    which the debtor was providing services to
18    HCMFA?
19        MR. MORRIS:  Objection to the form
20    of the question.
21        A.    Yes.
22        Q.    Was that contract generally called a
23    shared services agreement?
24        A.    It was generally called that, but
25    there were – there were – I mean, it – it –

Page 279

WATERHOUSE - 10-19-21

1    it depends on who you talk to, but yes,
2    generally, there were – there are multiple
3    agreements.
4        Q.    Pursuant to one or more of those
5    agreements, was the debtor providing certain
6    services to HCMFA?
7        MR. MORRIS:  Objection to the form
8    of the question.
9        A.    Yes.
10        Q.    And can you at a very high level
11    summarize in 2018 and 2019 what those services
12    were?
13        A.    Yes, there was a – yes.
14        Q.    Okay. Please – please go – go
15    through a short summary.
16        A.    There was a – a cost reimbursement
17    agreement between Highland Capital Management
18    Fund Advisors and Highland Capital Management,
19    L.P. That agreement was for what we referred
20    to as front office services, so investment
21    management, things of that nature.
22        There was I think what most people
23    refer to as the shared services agreement that
24    was – that agreement was between Highland

Page 280

WATERHOUSE - 10-19-21

1    Capital Management Fund Advisors and Highland
2    Capital Management for back office services.
3        Q.    And can you summarize what you mean
4    by back office services?
5        A.    Those services were for accounting,
6    finance, tax, valuation, HR, IT, you know,
7    legal compliance, things of – things of those
8    nature – or things of that nature, excuse me.
9        Q.    So in the spring of 2019, do you
10    recall whether HCMFA took the position that it
11    was actually Highland that caused the NAV error
12    to occur pursuant to the valuation services
13    that Highland was providing?
14        MR. MORRIS:  Objection to the form
15    of the question.
16        A.    I do not recall.
17        Q.    Did you ever have any discussions
18    with anyone, Jim Dondero or anyone in the first
19    half of 2019 as to whether Highland, the
20    debtor, that is, had any liability to HCMFA
21    related to the NAV error?
22        MR. MORRIS:  Objection to the form
23    of the question.
24        A.    I do not recall.

Page 281

WATERHOUSE - 10-19-21

1        Q.    And then you mentioned that the fund
2    was being closed and some compensation related
3    to that. Can you – can you elaborate? What
4    were you referring to?
5        A.    Right. So the advisor, pursuant to
6    board approval, put a proposal in front of the
7    shareholders of the Highland Global Allocation
8    Fund to convert it from an open-ended fund to a
9    closed-end fund.
10        So an open-ended fund, when
11    shareholders subscribe to the fund or redeem
12    into the fund, they do it at NAV.
13        When it is – when you have a
14    closed-end fund, closed-end funds are – are
15    publicly-traded, like on the New York Stock
16    Exchange, exchanges like that, and – and
17    shareholders or investors, they're not –
18    they're – they're not subscribing and
19    redeeming with the fund. They are like shares
20    of Apple.
21        Those shares of the Highland Global
22    Allocation Fund trade on an exchange, and that
23    is how you, you know, that is how, you know,
24    you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1  sell your shares and you are no longer an
2  equity owner.
3
4        As part of that proposal, the
5  advisor told shareholders if you -- if you vote
6  for this proposal to -- to convert it from an
7  open-ended fund to a closed-end fund, we will
8  pay you some amounts of money.  I forgot -- a
9  certain number of points.  I think it was
10  like -- it was like two to three points or
11  something -- something like that.
12      Q.    Okay.  You mentioned when Mr. Morris
13  was asking you, going back to those two
14  promissory notes, you will recall the 5 million
15  and 2.4 million, you mentioned something to the
16  effect that Mr. Dondero told -- told you to pay
17  some moneys out of Highland.  Do you remember
18  that discussion with Mr. Morris?
19      A.    I do.
20      Q.    So, to the best of your
21  recollection, did you have a discussion with
22  Mr. Dondero about making some payments in May
23  of 2019 out of Highland?
24      A.    I recall, as I testified earlier,
25  that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1  for -- for these amounts attributable to -- it
2  was either the error -- you know, the error,
3  and in that conversation he said, go get the
4  money from Highland.  I believe that is what I
5  testified earlier, and that -- that is my
6  recollection.
7      Q.    Do you recall if that was an
8  in-person meeting or some other mode for the
9  meeting?
10      A.    I -- I -- I recall that being
11  in-person.
12      Q.    Do you recall if anyone else was
13  present, or was it just you and Mr. Dondero?
14      A.    I recall just he and I.
15      Q.    And the moneys that he told you to
16  find from -- or get from Highland, was that in
17  the amount of $5 million and $2.4 million?
18          MR. MORRIS:  Objection to the form
19  of the question.
20      A.    I believe so, but I would have to go
21  back and look and see when those moneys were
22  actually paid into the -- into the fund and,
23  you know, when those transfers were done.  If
24  they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1  yes, I would say it was -- it was all related
2  to that.
3      Q.    Did Mr. Dondero tell you that those
4  funds would be a loan from Highland to HCMFA?
5      A.    I don't recall.
6          MR. MORRIS:  Objection to the form
7  of the question.
8      Q.    Now, and forgive me, I'm probably
9  the only non-American born here, but I speak
10  reasonably well in English.  I don't recall,
11  does that mean you don't remember or does that
12  mean it didn't happen?
13          MR. MORRIS:  Objection to the form
14  of the question.
15      A.    It -- it means I don't -- I don't
16  remember.
17      Q.    Did Mr. Dondero tell you to have
18  those two promissory notes prepared?
19      A.    I don't recall.
20      Q.    When you -- again, when you say, I
21  don't recall today, that means that sitting
22  here today, you just don't remember one way or
23  the other.  Is that accurate?
24      A.    Yes.

Page 285

WATERHOUSE - 10-19-21

1      Q.    Is it possible that you, having
2  heard what Mr. Dondero said and seeing funds
3  being transferred, assumed that that would be a
4  loan without him actually telling you that
5  would be a loan?
6          MR. MORRIS:  Objection to the form
7  of the question.
8      A.    Sorry, I want to make sure -- did I
9  ask the amounts that were transferred that I --
10  that I assumed that that was a loan?
11      Q.    Well, let me -- let me take -- let
12  me try again.
13          So you have established already that
14  there were quite a number of promissory notes
15  back and forth -- I'm sorry, quite a number of
16  promissory notes with affiliated companies and
17  individuals owing Highland money; right?
18      A.    Yes.
19      Q.    And you have established that there
20  were many transactions and transfers going back
21  and forth over the years; right?
22          MS. DANDENEAU:  Objection to form.
23      A.    In -- yes, in my capacity as CFO and
24  my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

2    Q.    And that's part of the reason why
3    you just can't remember some of the details
4    today because this – this happened years ago,
5    and there were a number of transactions.  Is
6    that accurate?
7        MS. DANDENEAU:  Objection to the
8        form.
9        MR. MORRIS:  Objection to the form
10        of the question.
11    A.    I mean, I deal with thousands of –
12    of – of – of transactions, you know, whether
13    it has – the processing of transactions, you
14    know, if it has got, you know, more – more
15    zeros, you know, behind it than others.
16        When you look at thousands of
17    transactions over the years for funds and
18    advisors and – and, you know, financial
19    statements, I mean, it is – it is very hard
20    going back in – in – in my – you know,
21    14-ish year career at – at Highland to
22    remember a lot of those details, especially
23    when I don't have any records or books or
24    anything like that, and – and going back many
25    years.

Page 287

WATERHOUSE - 10-19-21

2    Q.    And that is fine.  That – that –
3    that is why I asked the question.
4        Is it possible in May of 2019 when
5    Mr. Dondero told you to transfer the funds from
6    Highland, you just assumed on your own that
7    those would be loans without him actually
8    telling you that those would be loans?
9        MR. MORRIS:  Objection to the form
10        of the question.
11    A.    I don't know.
12    Q.    I'm sorry, you –
13    A.    I said I don't know.
14    Q.    Okay.  Well, as the – as the CFO
15    for Highland, if you saw $7.4 million going
16    out, you would feel some responsibility to
17    account for that, wouldn't you?
18        MR. MORRIS:  Objection to the form
19        of the question.
20    A.    Yes.
21    Q.    Is it fair to say that those would
22    be in the range large enough to rise up to your
23    level?
24        MR. MORRIS:  Objection to the form
25        of the question.

Page 288

WATERHOUSE - 10-19-21

2    A.    If – I don't know if I understand
3    your question.  Those amounts would arise to my
4    level where I would be involved or...
5    Q.    You would want to know what a
6    transfer for that amount, $7.4 million, was all
7    about, as the CFO of Highland, wouldn't you?
8        MR. MORRIS:  Objection to the form
9        of the question.
10    A.    Yes, I make it – I mean, I – I
11    review all sorts of payments, I mean, even
12    smaller dollar payments on a periodic basis,
13    you know, to – to – to understand and to make
14    sure that we are paying things in a – you
15    know, in – in – in an informed way.  And, you
16    know – and we're – and we're paying things
17    pursuant to vendor contracts and things like
18    that.
19    Q.    So as part of that, is it possible
20    that seeing $7.4 million go out you would have
21    promissory notes made in order to keep a paper
22    trail, assuming that those were loans, when
23    perhaps they were never intended to be loans by
24    Mr. Dondero?
25        MR. MORRIS:  Objection to the form

Page 289

WATERHOUSE - 10-19-21

2    of the question.
3    A.    I don't know.  As I testified
4    earlier, I had conversations with Mr. Dondero
5    about – about the – the – the moneys that
6    were needed for the NAV error.  And I recall
7    him saying go get it from Highland – or get it
8    from Highland.
9    Q.    Well, why did you sign those
10    promissory notes and why didn't you have him
11    sign them?
12        MR. MORRIS:  Objection to the form
13        of the question.
14    A.    I don't know.  I don't know.
15    Q.    You mentioned earlier that you
16    typically don't sign promissory notes.  Am I
17    remembering your testimony correctly?
18        I mean, promissory notes on behalf
19    of the entities.  Not yourself, obviously.
20    A.    Yes, that is what I said earlier.
21    Q.    Do you recall any other promissory
22    notes in the million-plus range that you had
23    ever signed before on behalf of any entity?
24    A.    There is – there has been a lot of
25    transactions over the years.  I don't – I

Page 290

WATERHOUSE - 10-19-21

1    don't – I don't recall generally. I don't –
2    I don't recall.
3    Q.    So – but to the best of your
4    recollection, it was on your initiative,
5    following your discussion with Mr. Dondero,
6    that you had someone draft those two promissory
7    notes; is that correct?
8        MR. MORRIS:  Objection to the form
9        of the question.
10   A.    Yes, we would have – the team, as I
11   stated earlier, we don't draft promissory
12   notes.  "The team" meaning the accounting and
13   finance team.
14       So the team would have worked with
15   the legal group at Highland to draft any notes.
16   Q.    Do you believe or do you have any
17   recollection as to whether you would have done
18   that pursuant to an email or telephone call or
19   in-person meeting?
20       MR. MORRIS:  Objection to the form
21       of the question.
22   A.    Are you asking if I would have – if
23   those notes would have been drafted pursuant to
24   an email or phone call?

Page 291

WATERHOUSE - 10-19-21

1    Q.    Strike that.
2        Do you recall whether you sent an
3    email to anyone asking them to draft those two
4    promissory notes?
5    A.    I don't recall because, again,
6    once – I would have instructed – likely
7    instructed the team to – to work with the
8    legal group to draft these documents.
9        I – I – I – yeah, I didn't – I
10   mean, that is more an operational-type
11   procedure.  So, you know, a manager or a
12   controller or working with legal.  You know,
13   they – they can certainly handle that task to
14   get that – you know, to request that from
15   legal.
16   Q.    And who on your team do you think
17   you would have asked to do that?
18       MR. MORRIS:  Objection –
19   Q.    Who would have been the logical
20   person or people, if you don't remember their
21   name today?
22       MR. MORRIS:  Objection to the form
23       of the question.
24   A.    It – it – there is only two

Page 292

WATERHOUSE - 10-19-21

1    managers of the group.  That would have been
2    Dave Klos or Kristin Hendrix.
3        Dave was the – one of his duties
4    was managing the valuation team, and so he was
5    intimately involved with this process.  So, you
6    know...
7    Q.    Okay.
8    A.    I don't recall specifically but, I
9    mean, my general – you know, I – I – I
10   likely would have talked to Dave first about it
11   versus someone like Kristin who hadn't been
12   intimately involved.
13   Q.    And – and do you have a view as to
14   whether it is most likely that you would have
15   done that by email or in-person or how would
16   you believe you would have communicated that to
17   Mr. Klos?
18       MR. MORRIS:  Objection to the form
19       of the question.
20   A.    I likely would have done that in
21   person.  Again, if things of this nature
22   that – again, you have to put ourselves back
23   to, we have been working on this very stressful
24   project for many, many months.  And once the

Page 293

WATERHOUSE - 10-19-21

1    go-ahead was to – you know, we see the light
2    at the end of the tunnel with wrapping this up
3    and making shareholders whole – sorry to say
4    "we" – you know, the – so the folks that are
5    involved in it.
6        I like to talk to people
7    face-to-face and – and – and go to – and go
8    to their desk, because that shows if I'm going
9    to their desk that – that is something that I
10   want done, you know.
11   Q.    And do you remember, Mr. Waterhouse,
12   getting those two promissory notes in paper
13   format or by email before they were executed?
14       MR. MORRIS:  Objection to the form
15       of the question.
16   A.    I don't recall.
17   Q.    For whatever was the ordinary course
18   back then in May 2019, would you expect to have
19   received them only on paper or would you have
20   expected to have received them in Word document
21   or PDF document by email?
22       MR. MORRIS:  Objection to the form
23       of the question.
24   A.    I – I didn't sign – I signed very

Page 294

WATERHOUSE - 10-19-21

1  few documents via email. I can't say that it
2  never happened, but people either stopped by my
3  office and physically walked in documents for
4  signature that we discussed face-to-face.
5       Or documents were – if – if –
6  if – if – let's say I wasn't there or I
7  wasn't available, documents were dropped off.
8  I had – I had some in- and outboxes in front
9  of my – my office there at the Crescent.
10      Documents would be dropped off for
11  signature. There would be a cover sheet that
12  would be – have been applied to those
13  documents detailing, you know, who dropped it
14  off, the purpose, why, what time.
15      And then, you know, as I stated, I
16  don't draft documents and I always go to the
17  legal group and the compliance group to make
18  sure that they're in the loop. And there is
19  a – a box or section that says, Has legal
20  reviewed or approved, or something to that
21  nature.
22      Again, I don't – I don't have
23  access to that cover sheet anymore, but it
24  was – it was something to that effect.

Page 295

WATERHOUSE - 10-19-21

1       And my assistant, you know, if she
2  was there, she would review that – you know,
3  whatever was being dropped off. And if that
4  has legal, you know, reviewed or – reviewed or
5  approved it, if that wasn't – if that stuff
6  hadn't been done, it was like she would just
7  tell them like, go – go – go to the legal
8  group, because –
9       Q.   Let me – let me pause –
10      MS. DANDENEAU: Let him finish.
11      MR. MORRIS: Thank you. Go ahead.
12      A.   I take – go to the legal group
13  because that – that was my – you know, I
14  didn't – I didn't review anything that – that
15  they weren't – you know, or there wasn't some
16  representation made to me that they had
17  reviewed, approved in some capacity.
18      Again, my – my – my goal, as CFO,
19  is to provide transparency and make sure that
20  groups like compliance and other things – and
21  the other group in legal are – are in – you
22  know, their – they're made aware of
23  transactions of – you know, that are crossing
24  my desk.

Page 296

WATERHOUSE - 10-19-21

1       Because I'm not in every
2  conversation. They're not in every
3  conversation – meaning legal compliance – and
4  I just want to make sure that – that everyone
5  is in sync to, you know, to – to the extent
6  possible.
7       Q.   So if we summarize, you don't
8  specifically remember signing these two notes,
9  but most likely it would have been that they
10  would have presented – been presented to you
11  physically on paper?
12      MR. MORRIS: Objection to the form
13  of the question.
14      A.   They would – they would have been
15  presented physically on paper most likely or
16  someone would have left it. But, I mean,
17  again, I don't – I don't recall.
18      Q.   I understand. Understand.
19      When you signed – when you signed
20  documents, when you personally signed
21  documents, did you typically use a ink pen or
22  did you use a stamp?
23      A.   No, I – I – I use a – an – an
24  ink pen.

Page 297

WATERHOUSE - 10-19-21

1       Q.   Do you know – was there a file at
2  Highland kept anywhere with ink-signed
3  originals of a promissory notes in general or
4  these two promissory notes specifically?
5       MR. MORRIS: Objection to the form
6  of the question.
7       A.   Sorry, I just want to make sure I
8  understand your question. Are you saying is
9  there a file somewhere that has ink-signed
10  originals of these two promissory notes?
11      Q.   Yes.
12      A.   I would – I would assume they're
13  some place. I mean –
14      Q.   Well, was there a – was there a
15  place where Highland generally kept originals
16  of promissory notes owed to it?
17      A.   I wouldn't – no.
18      MR. RUKAVINA: Mr. Nguyen, would you
19  please pull up my A7, alpha 7.
20      Q.   These are the two promissory notes,
21  Mr. Waterhouse.
22      (Exhibit A7 marked.)
23      Q.   And please – Mr. Waterhouse, please
24  command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

1  to, but I want you to take a very close look at
2  your two signatures here and tell me whether
3  you believe, in fact, that you ink signed them
4  or whether you --
5      MS. DANDENEAU:  Mr. Rukavina,
6  Mr. Waterhouse has the copies.
7      MR. RUKAVINA:  Perfect.  Then you
8  can take this down, Mr. Nguyen.
9      A.  These -- these -- these signatures
10 are identical, now that I stare at them, and I
11 mean, they are so close -- I mean, they're
12 identical that, I mean, even with my chicken
13 scratch signature, I don't know if I can -- you
14 know, I do this 100 times, could I do that
15 as -- as precisely as I see between the two
16 notes.
17     Q.  Well, that is why I ask.
18 Mr. Waterhouse, now that you have examined
19 them, does it seem like it is more likely that
20 you actually electronically signed these?
21     MR. MORRIS:  Objection to the form
22 of the question.
23     A.  Is -- I don't -- I don't recall
24 specifically.  As I said before, my assistant
25

Page 299

WATERHOUSE - 10-19-21

1  did have a -- an electronic signature, and that
2  was used from time to time.  It wasn't as
3  common practice back in 2019.  It definitely
4  was more common practice when we had to work
5  from home and remotely for COVID because it
6  that made it almost impossible to, right,
7  provide wet signatures since we're all working
8  from home remotely.
9      Q.  Well, going just for these two
10 promissory notes, Mr. Waterhouse, in light of
11 your inability to remember any details, are you
12 sure you actually signed either or both of
13 those notes?
14     MS. DANDENEAU:  Objection to form.
15     A.  I don't recall specifically
16 signing -- actually physically signing these
17 notes.  As I said before, I don't recall doing
18 that.  This -- this looks like my signature,
19 but yet these two signatures are identical.
20     Q.  So you don't recall physically
21 signing them, and I take it you don't recall
22 electronically signing them either?
23     A.  I don't recall.  You know, Highland
24 has all my emails.  If that occurred, you know,
25

Page 300

WATERHOUSE - 10-19-21

1  you know, I don't have any of these records is
2  what I'm saying.  I don't have any of those
3  records.
4      Q.  That is why I'm asking you these
5  questions in great detail because I don't have
6  those emails.  I'm trying to -- I'm hoping that
7  you will give me some names or some details so
8  I can go look for more emails, but again, you
9  don't remember any -- any individual, other
10 than Mr. Dondero in front of me that we've discussed, you
11 don't remember any individual with whom you
12 discussed these promissory notes prior to their
13 execution?
14     MR. MORRIS:  Objection to the form
15 of the question.
16     A.  I don't recall discussing it with
17 anybody else.
18     Q.  Okay.
19     A.  I mean, prior --
20     Q.  I understand.
21     A.  You know, there was no one else --
22 there was no one else in that meeting that I
23 recall with Mr. Dondero.
24     Q.  Now, when you established that by
25

Page 301

WATERHOUSE - 10-19-21

1  May of 2019 --
2      A.  And -- and from what I recall, and
3  the reason why I was by myself is -- is, you
4  know, I don't -- I don't want to speculate, I'm
5  sorry.
6      Q.  Okay.  We have established that by
7  May of 2019, in your view, the liabilities of
8  HCMFA exceeded its assets; correct?
9      A.  Yeah.  I mean, again, I don't have
10 financial statements in front of me, but I
11 think, if I recall, we'd have to go through the
12 testimony with Mr. Morris, I believe that was
13 the case.
14     Q.  In fact, you will recall that in
15 April of 2019, Mr. Dondero signed a document
16 that extended the demand feature of two prior
17 notes to May 31, 2019.  Do you recall that?
18     MS. DEITSCH-PEREZ:  I think you
19 might -- maybe have the court reporter read
20 that back.  You might have misspoke.
21     (Record read.)
22     MR. RUKAVINA:  And I did misspeak.
23     Q.  I meant to say to May 31, 2021.  Do
24 you recall that, sir?
25

Page 302

WATERHOUSE - 10-19-21

1
2     MR. MORRIS: Objection to the form
3  of the question.
4     A.   Yes.
5        MR. RUKAVINA: And, Mr. Nguyen, just
6  so that the record is clear, will you please
7  pull up my Exhibit Alpha 10, A10.
8        (Exhibit A10 marked.)
9     Q.   You don't have this one in front of
10  you, Mr. Waterhouse? This is the one that
11  Mr. Morris used earlier. Do you see that
12  document, sir?
13     A.   Yes, I do.
14     Q.   And this is what you were testifying
15  about before when Mr. Morris was asking you.
16  Do you remember that?
17     A.   Yes.
18     Q.   So here is my question for you,
19  Mr. Waterhouse: As the chief financial officer
20  of Highland, was it prudent for Highland less
21  than three weeks later to be lending
22  $7.2 million to an insolvent entity that
23  couldn't even then pay its debts back to
24  Highland?
25        MS. DANDENEAU: Objection to form.

Page 303

WATERHOUSE - 10-19-21

1
2     MR. MORRIS: Objection to the form
3  of the question.
4     A.   Sorry, I just want to make sure --
5  are you asking me, did you say, was it prudent
6  for Highland to loan $7.4 million to HCMFA a
7  few weeks after this document was executed?
8     Q.   Yes, and at a time when HCMFA's
9  liabilities exceeded its assets.
10        MR. MORRIS: Objection to the form
11  of the question.
12     A.   I don't -- it is odd. I don't know.
13        MR. RUKAVINA: You can take this
14  exhibit down, Mr. Nguyen.
15     Q.   Do you recall asking anyone,
16  Mr. Dondero or -- or anyone outside as to
17  whether Highland ought to be lending
18  $7.4 million to HCMF regarding HCMF's
19  creditworthiness?
20        MR. MORRIS: Objection to the form
21  of the question.
22     A.   I don't recall.
23     Q.   Did you receive personally any of
24  that $7.4 million?
25     A.   No.

Page 304

WATERHOUSE - 10-19-21

1
2     Q.   Did you even --
3        MR. MORRIS: I didn't hear that
4  question, sir.
5        MR. RUKAVINA: The one that he
6  answered, John, or my new one?
7        MR. MORRIS: No, no, your question,
8  Davor.
9        MR. RUKAVINA: I had asked him
10  whether he received any of the
11  $7.4 million. He said no.
12        MR. MORRIS: Yeah. I thought there
13  was a question after that. Maybe I was
14  mistaken. I apologize.
15        MR. RUKAVINA: I had started a new
16  question, so here, let me start the new
17  question again.
18     Q.   Did you personally receive any
19  direct benefit from those two notes for
20  $7.4 million?
21     A.   No.
22     Q.   Did you ever personally consider
23  yourself obligated to repay either or both of
24  those notes?
25     A.   No.

Page 305

WATERHOUSE - 10-19-21

1
2        MR. RUKAVINA: Pull up those notes
3  again, Mr. Nguyen.
4     Q.   You can have them in front of you,
5  Exhibit 7, Mr. Waterhouse, whatever is easier
6  for you. If you go to your signature page, my
7  question to you is, why did you not include
8  your title as treasurer by your name, Frank
9  Waterhouse?
10        MS. DANDENEAU: Objection to form.
11     A.   I didn't -- I didn't draft this
12  document.
13     Q.   So you relied on whoever drafted it
14  to draft it correctly?
15     A.   Yes.
16     Q.   Okay. But back then when you signed
17  this, did it ever cross your mind that you were
18  the maker on these notes?
19     A.   No.
20     Q.   Back then when you signed this
21  document, did it ever cross your mind that you
22  could be a co-obligor on these notes?
23     A.   No. I didn't receive $7.4 million,
24  I mean...
25     Q.   But can you say that HCMFA received

Page 306

WATERHOUSE - 10-19-21

1  $7.4 million?
2      A.   I would have to go back and look and
3  check in, you know, the -- the financial
4  records and the bank statements.
5      MR. RUKAVINA:  You can take this
6  exhibit down, Mr. Nguyen.
7      Q.   Mr. Waterhouse, I'm not trying to be
8  a smart-ass, but if the law says that because
9  of the way that you signed this promissory
10  note, if that is what the law says, that that
11  made you personally -- personally liable, then
12  you would agree with me that that was never
13  your intent?
14      MR. MORRIS:  Objection to the form
15  of the question.
16      A.   That was never -- I wouldn't sign a
17  note and not get consideration in return.
18      Q.   So putting all other issues aside,
19  if the law -- if the law says that you were
20  liable for those notes because of how you
21  signed them, then would you agree with me that
22  these notes are a mistake?
23      MR. MORRIS:  Objection to the form
24  of the question.
25

Page 307

WATERHOUSE - 10-19-21

1      MS. DANDENEAU:  Objection to the
2  form.
3      A.   Yes.
4      Q.   So do you agree with me that it's
5  odd -- I think that is the word you used --
6  that Highland would be loaning $7.4 million a
7  few weeks after that extension to an entity
8  whose liabilities exceeded its assets, and you
9  would agree with me that it was never your
10  intention to be in any way liable for these two
11  promissory notes; correct?
12      MR. MORRIS:  Objection to the form
13  of the question.
14      A.   Sorry, you -- you asked a lot there.
15      MR. RUKAVINA:  I will strike it and
16  I will move on.
17      Let's go to -- pull up Exhibit 9,
18  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19  9, A9.
20      (Exhibit A9 marked.)
21      Q.   Sir, take a moment to look at this,
22  but this is an email, and you will see attached
23  July 31, 2020 affiliate notes.
24      Do you see that attachment?
25

Page 308

WATERHOUSE - 10-19-21

1      A.   Yes.
2      Q.   Okay.  And do you see an entry for
3  Highland Capital Management Fund Advisors?
4      MR. MORRIS:  I'm sorry, hold on.
5  Where are you looking?
6      MR. RUKAVINA:  Last page, John.
7      MR. MORRIS:  Is it the page on the
8  screen?
9      MR. RUKAVINA:  Oh, I'm sorry.
10  Mr. Nguyen just did it.  Yes, the last page
11  there.
12      MR. MORRIS:  Thank you.
13      Q.   Do you see an entry there for HCMFA?
14      A.   Yes.
15      Q.   About $10.5 million.
16      Do you see that?
17      A.   I do.
18      Q.   And, now, do you have any
19  explanation for why if HCMFA owed $7.4 million,
20  plus the 5.3 million that had been extended,
21  why that amount was only 10.5 million?
22      A.   I don't know.  Okay.
23      MR. RUKAVINA:  Close this one and
24  pull up, Mr. Nguyen, the schedules,
25

Page 309

WATERHOUSE - 10-19-21

1  schedule of assets.  What exhibit is this
2  of ours, Mr. Nguyen?
3      MR. NGUYEN:  This is A11.
4      MR. RUKAVINA:  Oh, this will be A11.
5      (Exhibit A11 marked.)
6      Q.   You don't have this in front of you,
7  Mr. Waterhouse?
8      A.   Okay.
9      Q.   This is what Mr. Morris used
10  earlier.  Do you remember looking at this with
11  Mr. Morris?
12      A.   Yes.
13      MR. RUKAVINA:  You might have to
14  zoom in a little.  Okay.
15      Q.   Now, I see Affiliate Note A, B, and
16  C.
17      Do you have any recollection as to
18  why the names of the affiliates are omitted?
19      A.   I don't.  I testified earlier that,
20  you know, the team worked with DSI in providing
21  these.  I -- I don't -- I don't know.
22      Q.   Can we deduce -- is it logical to
23  deduce that Affiliate Note A would be NexPoint
24  given its size of $24.5 million?
25

Page 310

```
1         WATERHOUSE - 10-19-21
2         MR. MORRIS:  Objection to the form
3    of the question.
4    A.   I mean, it -- it is a -- it is -- it
5    is approximate.
6    Q.   Well, can we -- can we deduce -- or,
7    I'm sorry, strike that.
8         Can you, sitting here today,
9    logically conclude that Affiliate Note B or C
10   represents HCMFA?
11        MR. MORRIS:  Objection to the form
12   of the question.
13   A.   I don't know.  I don't know.  I
14   can't.
15   Q.   Okay.  As of the petition date, we
16   have established that HCMFA, under promissory
17   notes, owed $7.4 million and $5.3 million to
18   the debtor; correct?
19        MR. MORRIS:  Objection to the form
20   of the question.
21   A.   Yes.
22   Q.   Okay.  And by my reckoning, that
23   would be somewhere approaching $13 million.
24        MR. MORRIS:  Objection to the form
25   of the question.
```

Page 311

```
1         WATERHOUSE - 10-19-21
2    Q.   It would be $12.7 million.  Is that
3    generally correct?
4    A.   Sorry, the amounts were 7.4, 5.3.
5    Q.   Yes.
6    A.   Okay.  Yeah, that -- that -- I can
7    do that math, yes.
8    Q.   Do you have any explanation or any
9    understanding of why there is no similar entry
10   listed here on the schedule of assets filed
11   with the bankruptcy court?
12        MR. MORRIS:  Objection to the form
13   of the question.
14   A.   I don't know.  We have to look at
15   the supporting schedules, like I talked about
16   other -- presumably there is -- there is a
17   build to the schedule that would provide the
18   detail.
19   Q.   Well, that was going to be my next
20   question.  You anticipated it.
21        MR. RUKAVINA:  You can -- you can
22   take this down, Mr. Nguyen.
23   Q.   Do you believe that whenever you and
24   your team provided the underlying data to the
25   financial advisor that the actual names of the
```

Page 312

```
1         WATERHOUSE - 10-19-21
2    affiliates for Affiliate Note A, B, and C would
3    have been listed there?
4    A.   Are you asking we provided the names
5    to the financial advisor?  I don't -- I don't
6    understand who the financial advisor is.
7    Q.   I'm sorry, DSI.
8         Let me ask the question this way,
9    Mr. Waterhouse.
10        Whenever you provided information
11   about the affiliate notes to DSI, do you
12   believe that you would have included the actual
13   names of the affiliates, you or your team, or
14   that you would have done the Affiliate Note A,
15   Note B, Note C?
16        MR. MORRIS:  Objection to the form
17   of the question.
18        MS. DANDENEAU:  Objection to the
19   form.
20   A.   We -- like I testified earlier, when
21   we were -- we gave everything to -- to DSI.  We
22   were giving all of our records, all of our
23   files, everything to DSI.  We weren't redacting
24   information or saying, hey, here is a note,
25   here is Affiliate Note A or B.
```

Page 313

```
1         WATERHOUSE - 10-19-21
2         I mean, it was -- our job and our
3    focus -- and I testified in court back in 2019;
4    right -- was -- was to be transparent and, you
5    know, get DSI up to speed on -- on the matters
6    at Highland.  So I can't see us redacting for
7    that point.
8         MR. RUKAVINA:  Mr. Nguyen, will you
9    please pull up Mr. Morris' Exhibit 36.
10        Just the very first page, the very top
11   email.  You might zoom in a little bit.
12   Q.   Now, you recall being asked about
13   this by Mr. Morris?
14   A.   Yes, I do.
15   Q.   And you wrote:  The HCMFA note is a
16   demand note.
17        You wrote that; right?
18   A.   Yes.
19   Q.   And, in fact, weren't there by that
20   point in time several notes?
21   A.   Yes, there were.  Again, I don't --
22   I don't remember everything specifically.  I
23   mean --
24   Q.   I understand.  I understand.
25        So this is an example where -- where
```

Page 314

WATERHOUSE - 10-19-21

1  you might have made a mistake by referring to a
2  singular instead of a plural; right?
3      A.  Yes.
4      Q.  Okay.  And you -- you wrote -- a
5  couple of sentences later, you wrote:  There
6  was an agreement between HCMLP and HCMFA the
7  earliest they could demand is May 2021.
8          You wrote that; right?
9      A.  Yes.
10     Q.  But I think you -- you agreed with
11  Mr. Morris that that can't possibly apply to
12  the May 2019 notes, can it?
13         MR. MORRIS:  Objection to the form
14     of the question.  That is not what he
15     testified to.
16     Q.  Let me ask -- let me ask a different
17  question.
18         Sitting here today -- or if you can
19  answer me from your memory on October 6,
20  2020 -- did the April acknowledgment that
21  extended the maturity date apply to the
22  May 2019 notes also?
23     A.  I don't recall specifically.
24     Q.  Well, you recall that the notes that

Page 315

WATERHOUSE - 10-19-21

1  you signed were demand notes; right?
2      A.  Yes.
3      Q.  Do you find it logical, based on
4  your experience, that had they intended to have
5  a different or a set maturity date, you would
6  have instructed that that set maturity date be
7  included instead of a demand feature?
8          MR. MORRIS:  Objection to the form
9      of the question.
10     A.  Sorry, just want to make sure I
11  understand.  You are saying that -- that the
12  $5 million note, the $2.4 million note, if
13  those were supposed to be a term note, that I
14  would have made sure that those were a term
15  note?
16     Q.  I'm saying -- I'm saying,
17  Mr. Waterhouse, that on May the 2nd and May the
18  3rd, 2019, if you intended that those two
19  promissory notes could not be called until May
20  2021, would you have included such language in
21  those two promissory notes?
22         MR. MORRIS:  Objection to the form
23     of the question.
24     A.  I guess -- I'm sorry, I don't recall

Page 316

WATERHOUSE - 10-19-21

1  putting language in those May notes.  I don't
2  remember what language you are referring to.
3      Q.  Well, let's read this again.
4          There was an agreement between HCMLP
5  and HCMFA the earliest they could demand is May
6  2021.
7          Do you recall that agreement?
8      A.  Yes, that was the agreement we
9  looked at earlier; correct?
10     Q.  Okay.  Yes.
11         Do you -- do you understand now that
12  that agreement that we looked at earlier also
13  applied to the May 2019 notes that you signed?
14     A.  I don't -- I don't know.
15     Q.  But as of October 6, 2020, you're
16  writing that there is one demand note and
17  you're categorizing that demand note as not
18  being demandable on May 2021; correct?
19     A.  Yes.
20     Q.  And you know now that you made at
21  least one mistake in this email; correct?
22         MR. MORRIS:  Objection to the form
23     of the question.
24     A.  Yes.

Page 317

WATERHOUSE - 10-19-21

1          MR. RUKAVINA:  You can pull this
2      down, Mr. Nguyen.
3      Q.  So, Mr. Waterhouse, you don't
4  remember Mr. Dondero telling you to make these
5  loans or not.  HCMLP was loaning $7.4 million
6  to someone that their assets were less than
7  their liabilities.
8          We don't see on the July list of
9  notes, where there is $12.7 million of notes,
10  we don't see that on the bankruptcy schedules,
11  and we have this Exhibit 36 where you are
12  confused.
13         Are you prepared to tell me, sir,
14  today that you might have made a mistake in
15  executing those two promissory notes?
16         MR. MORRIS:  Objection to the form
17     of the question.
18     A.  I -- I don't know.
19     Q.  And if it turns out that you're
20  personally liable for those promissory notes,
21  it would certainly be a mistake, wouldn't it?
22         MS. DANDENEAU:  Objection to the
23     form.
24         MR. MORRIS:  Join.

Page 318

1        WATERHOUSE - 10-19-21
2     A.   Yes.
3     Q.   If Mr. Dondero testifies that he
4  never told you to make these loans, would you
5  disagree with his testimony?
6        MR. MORRIS:  Objection to the form
7     of the question.
8     A.   Like I testified earlier with my
9  conversation with Mr. Dondero, all I recall is
10  he said, get the money from Highland.
11     Q.   And if Mr. Dondero testifies that
12  he, in consultation with other senior personnel
13  at Highland, decided that Highland needed to
14  pay HCMFA $7.4 million as compensation for the
15  NAV error and not a loan, would you have any
16  reason to disagree with Mr. Dondero?
17        MR. MORRIS:  Objection to the form
18     of the question.
19     A.   If that was -- if that was his
20  intent, yes, it would -- I would --
21     Q.   Do you have any reason to disagree
22  with him?
23        MR. MORRIS:  Objection to the form
24     of the question.
25     A.   If that was his intent, I don't

Page 319

1  know.  I don't know how I disagree with that.
2     Q.   And just to confirm, you don't
3  remember ever asking Mr. Dondero whether you
4  should have two promissory notes prepared?
5     A.   No.
6     Q.   And you don't remember discussing
7  with Mr. Dondero what the terms of those two
8  promissory notes should be?
9     A.   I don't recall -- I testified all I
10  recall is he said, get the money from Highland.
11  I don't -- the -- the terms of the note, I
12  don't recall ever having a discussion around
13  the terms of the note, but since I don't draft
14  the notes, that -- there could have been a
15  conversation with other people later.
16     Q.   Do you have any memory of whether
17  after the notes were drafted, but before you
18  signed them, that you communicated with
19  Mr. Dondero in any way to just confirm or -- or
20  get his blessing or ratification to signing
21  those notes?
22        MR. MORRIS:  Objection to the form
23     of the question.
24     A.   I don't recall.

Page 320

1        WATERHOUSE - 10-19-21
2     Q.   Again, the only thing you remember,
3  sitting here today, was Mr. Dondero said, get
4  the money from Highland, and that is it, that
5  is all you remember?
6        MR. MORRIS:  Objection to the form
7     of the question.
8     A.   I testified to that several times.
9  This was over two years ago.  A lot has
10  happened.  That is all I recall.
11     Q.   And help me here.  I'm not very
12  technologically astute.  When you -- and I -- I
13  recognize that you do it rarely, but when you
14  sign a document electronically, do you believe
15  that there is an electronic record of you
16  having authorized or signed a document
17  electronically?
18        MR. MORRIS:  Objection to the form
19     of the question.
20     A.   I -- I don't know the tech answer to
21  that, but, you know, since I don't have -- I
22  don't ever attach my signature block
23  electronically, my assistant would have done
24  that, and if that is done over email like we
25  did several times -- you know, multiple,

Page 321

1        WATERHOUSE - 10-19-21
2  multiple times over COVID, she would attach my
3  signature block and then email it out to
4  whatever party.
5     Q.   What was your assistant's name in
6  May 2019?
7     A.   It was Naomi Chisum.
8     Q.   Is she the only one?  I'm sorry, was
9  she your only assistant that would have maybe
10  facilitated logistically something like you
11  just described?
12     A.   You know, she was out on maternity
13  leave at some point.  I don't -- I don't recall
14  those dates where she was out for maternity
15  leave.  There was -- there were folks backing
16  her up.  I don't recall specifically who
17  those -- who those, you know, administrative
18  assistants were, and I don't recall
19  specifically if she was out during this time on
20  maternity leave.
21        I do know that that she was out for
22  a period of time, or who knows, or she could
23  have been on vacation that day or, you know, I
24  don't know.
25     Q.   Switching gears now, the two

Page 322

```
 1          WATERHOUSE - 10-19-21
 2    complaints that have been filed that is against
 3    HCMFA and NexPoint, did you see any drafts of
 4    those complaints before they were filed?
 5          MR. MORRIS:  Objection to the form
 6      of the question, and to the extent that you
 7      had any communications with counsel or you
 8      were shown drafts of the complaints by
 9      counsel while you were employed by
10      Highland, I direct you not to answer.
11      A.    I -- I reviewed documents yesterday
12    with counsel here.  I believe that is the first
13    time I have ever seen those.
14      Q.    Okay.  Did you ever discuss with
15    Mr. Seery these two lawsuits before or after
16    they were filed?
17      A.    I don't recall.
18      Q.    Were you ever interviewed by legal
19    counsel, to your knowledge, about these
20    promissory notes before the complaints were
21    filed?  Without going into what was said, were
22    you ever interviewed by legal counsel?
23          MR. MORRIS:  Objection to the form
24      of the question.
25      A.    I don't recall.
```

Page 323

```
 1          WATERHOUSE - 10-19-21
 2      Q.    Obviously with COVID, it changed,
 3    but -- but before COVID, did you used to meet
 4    with Mr. Seery from time to time in-person?
 5      A.    Yeah, I mean, so before COVID -- so
 6    we're talking kind of late March, early April,
 7    right, there was about -- I don't remember the
 8    specific date when the board for Highland was
 9    appointed.  I believe it was around February of
10    2020, so maybe there was a month-and-a-half,
11    two-month window where we were meeting
12    in-person or, you know, like we were actually
13    in the office, excuse me, we were in the
14    office.
15          And, you know, when they were first
16    appointed, the board members and Mr. Seery
17    were -- were definitely down here more
18    in-person.
19      Q.    Did you ever see Mr. Seery taking
20    written notes of -- of his meetings with you or
21    others?
22      A.    I don't recall.
23      Q.    Do you recall on any Zoom or video
24    conference with Mr. Seery, seeing him take
25    notes, written notes?
```

Page 324

```
 1          WATERHOUSE - 10-19-21
 2      A.    The Zoom calls we had, I don't
 3    recall having seen video or, you know, or if it
 4    was on Zoom, I just remember it being -- well,
 5    no, you know what, there were some -- you know,
 6    I take that back.
 7          So there were -- there were some
 8    times that I did remember seeing Mr. Seery
 9    on -- on some of the Zoom calls.
10      Q.    Well, let me --
11      A.    I don't -- sorry, I'm thinking.  I'm
12    thinking -- I'm going back.  I'm trying to
13    process this.
14      Q.    I can make it much quicker,
15    Mr. Waterhouse.  I have heard -- I have heard
16    that Mr. Seery is a copious note taker.
17          Do you have any knowledge about
18    that?
19      A.    No.
20      Q.    Okay.  Switching gears yet again,
21    and this will be last theme.  Do you need a
22    restroom break, or are you good to go for
23    another half an hour?
24          MS. DEITSCH-PEREZ:  I need a
25      restroom break.
```

Page 325

```
 1          WATERHOUSE - 10-19-21
 2          MR. RUKAVINA:  Can we make it five
 3    minutes?
 4          THE WITNESS:  Five minutes would be
 5      great.
 6          VIDEOGRAPHER:  We're going off the
 7      record at 5:53 p.m.
 8      (Recess taken 5:53 p.m. to 5:59 p.m.)
 9          VIDEOGRAPHER:  We are back on the
10      record at 5:59 p.m.
11      Q.    Mr. Waterhouse, I had asked you
12    earlier about contracts between HCMFA and the
13    debtor, and now I'm going to talk about
14    contracts between the debtor and NexPoint
15    Advisors.  Okay?
16      A.    Okay.
17      Q.    Now, were there contracts similar to
18    the ones with HCMFA that NexPoint had in the
19    nature of employee reimbursement and shared
20    services?
21      A.    Yes, they -- NexPoint Advisors and
22    Highland Capital Management Fund Advisors had
23    cost reimbursement and shared services
24    agreements with Highland Capital Management,
25    L.P.
```

Page 326

WATERHOUSE - 10-19-21

1
2    Q.   And was that shared services
3  agreement, to the best of your understanding,
4  in place as of December 31, 2020?
5    A.   It was – it was terminated at some
6  point, and I remember the contracts had
7  different termination dates, but I think the –
8  the date of termination was January 31st of
9  2021, after the termination was put in.
10      So yeah, it would be in place at the
11 end of the year of December – it would be in
12 place at December 31st, 2020.
13   Q.   And pursuant to that agreement as of
14 December 31st, 2020, was the debtor providing
15 what you would describe as back office services
16 to NexPoint?
17   A.   Yes.
18   Q.   Would those have included accounting
19 services?
20   A.   Yes.
21   Q.   And as part of those accounting
22 services, would the debtor have assisted
23 NexPoint with paying its bills?
24      MR. MORRIS:  Objection to the form
25   of the question.

Page 327

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   So let's break that up.  You were a
4  treasurer of NexPoint as well in December of
5  2020?
6      MR. MORRIS:  Objection to the form
7   of the question.
8    A.   Yes.
9    Q.   Okay.  And in December of 2020, did
10 NexPoint have its own bank accounts?
11   A.   Yes.
12   Q.   And did it use those bank accounts
13 to pay various of its obligations?
14   A.   Yes.
15   Q.   Did employees of the debtor have the
16 ability to cause transfers to be made from
17 those bank accounts on behalf of NexPoint?
18   A.   Yes.
19   Q.   And is that one of services that the
20 debtor provided NexPoint, basically ensuring
21 that accounts payable and other obligations
22 would be paid?
23   A.   Yes.
24      MR. MORRIS:  Objection to the form
25   of the question.

Page 328

WATERHOUSE - 10-19-21

1
2    Q.   You answered yes?
3    A.   Yes.
4    Q.   And the payments, though, whose
5  funds would they be made from?
6    A.   From the bank account of NexPoint
7  Advisors.  If they were NexPoint advisor
8  obligations, it would be made from NexPoint
9  Advisors' bank account.
10   Q.   So let's pull up Exhibit Alpha 1.
11 You should have that – it is my Tab 1 or my
12 Exhibit 1.
13      (Exhibit A1 marked.)
14   Q.   So this is a – this is a series of
15 emails, Mr. Waterhouse.  Let's look at the
16 first page here, November 25, 2020, between
17 Kristin Hendrix and yourself.
18      Do you see that, sir?
19   A.   I do.
20   Q.   And do you see where Ms. Hendrix
21 writes:  NPA.
22      Do you know what NPA stood for?
23   A.   Yes.
24   Q.   And what does it stand for?
25   A.   NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1
2    Q.   And was that how you-all internally
3  at Highland refer to NexPoint Advisors, L.P.?
4    A.   I mean, yes, amongst other things.
5    Q.   And she writes at the bottom of her
6  email:  Okay to release?
7      Do you see that?
8    A.   Yes, I do.
9    Q.   So what –
10      MR. MORRIS:  Hold on one second.
11      Okay.  Go ahead.
12      MR. RUKAVINA:  Yeah.
13   Q.   So what is – what is Ms. Hendrix
14 here on November 25 asking of you?
15   A.   She is asking me – so she – these
16 are – these are payments – typically we would
17 do an accounts payable run every week at the
18 end of every Friday.  But looking at this date,
19 it is Wednesday, November 25th, which means, to
20 me, it is likely Thanksgiving weekend.
21      So this is the day before
22 Thanksgiving, so this is the last kind of –
23 kind of day before the holidays and vacation
24 and things of that nature.  So it is
25 effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        So she is -- she is putting in all
3    the payments for the week because we batch
4    payments weekly.  And these are the payments
5    that go out that week, and she is informing me
6    of the payments and -- you know, again, at the
7    bottom of the email, she is asking for my okay
8    to -- to release these payments in the wire
9    system.
10       Q.   So these would be accounts payable
11   of NexPoint?
12       A.   I mean, it would be accounts payable
13   for all of these entities listed on this email.
14       Q.   And who was Ms. Hendrix employed by
15   in November and December of 2020?
16       A.   Highland Capital Management.
17       Q.   Okay.  So -- so part of the services
18   that NexPoint had contracted with was for
19   Highland to ensure that NexPoint timely paid
20   its accounts payable; is that accurate?
21       MR. MORRIS:  Objection to the form
22   of the question.  You have got to be
23   kidding me.
24       Q.   Is that accurate?
25       A.   Yes.

Page 331

1    WATERHOUSE - 10-19-21
2        Q.   And did NexPoint rely on employees
3    of the debtor to ensure that NexPoint's
4    accounts payable were timely paid?
5        MR. MORRIS:  Objection to the form
6    of the question.
7        A.   Yes.
8        MR. RUKAVINA:  Let's flip to the
9    next page, Mr. Nguyen, if you will please
10   scroll to the next page.
11       Q.   So this is an email similar to the
12   prior one, November 30th.
13       Do you see where it says, NPA HCMFA,
14   USD $325,000 one-day loan?
15       Do you see that, sir?
16       A.   I do.
17       Q.   Do you have any memory of what that
18   was?
19       A.   I don't recall what that -- what
20   that payment was for.
21       Q.   Did it sometimes occur that one
22   advisor would, on very short-terms, make loans
23   to another advisor?
24       A.   Yes.  This -- this -- this occurred
25   from -- from -- from time to time.  It actually

Page 332

1    WATERHOUSE - 10-19-21
2    looking at -- I'm -- I'm looking at the date of
3    this email.  It is November 30th.  It is the
4    last day of the month.
5        HCMFA has obligations it needs to
6    pay to its broker-dealer, which is HCFD.  And
7    it likely was short funds to make those
8    obligations under that -- under its agreement,
9    and so it provided a one-day loan because on
10   the next business day on 12/1 -- or the next
11   business day in December, it would receive
12   management fees from the underlying funds that
13   it managed and it would be able to pay back
14   that loan to NexPoint Advisors.
15       Q.   So -- so here Ms. Hendrix was
16   seeking your approval to transfer $325,000 from
17   NexPoint to HCMFA for a one-day loan; is that
18   correct?
19       A.   That is correct.
20       Q.   Let's flip to the next page, sir.
21       MR. RUKAVINA:  And, Mr. Nguyen, if
22   you will please scroll down.
23       Q.   Now we have an entry for
24   $325,000, 11/30 loan payment.
25       Do you see that, sir?

Page 333

1    WATERHOUSE - 10-19-21
2        A.   Yes.
3        Q.   And that is probably the loan that
4    was approved on the prior page?
5        A.   Yes, most likely.
6        Q.   So is it also true, sir, that in
7    addition to accounts payable debtor employees
8    would be assisting NexPoint with respect to
9    paying back its debt?
10       MR. MORRIS:  Objection to the form
11   of the question.
12       A.   I mean, yes, for loans of this
13   nature, yes.
14       Q.   Well, what about long term loans?
15   Was it reasonable for NexPoint to expect debtor
16   employees to ensure that NexPoint timely paid
17   its obligations under long-term notes?
18       MR. MORRIS:  Objection to the form
19   of the question.
20       MS. DANDENEAU:  Objection to form.
21       A.   I mean, that is one of the things
22   that the Highland personnel did provide to the
23   advisors.  Yes, we would -- we would -- over
24   the years, yes, we -- we -- we -- we did do
25   that generally.  Again, I don't remember

Page 334

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  specifically but, yes, generally we -- you
3  know, we did do that.
4      Q.  So do you recall -- and we can pull
5  it up, if need be -- that under the NexPoint
6  note that Mr. Morris asked you about earlier,
7  the one for more than $30 million, that
8  NexPoint was obligated to make an annual
9  payment of principal and interest?
10         MR. MORRIS:  Objection to the form
11    of the question.
12      A.  Yes, it was -- yes, it -- it was an
13  amortizing note.  It was -- you know, from what
14  we reviewed earlier, it was payable by
15  December 31st of each year.  So -- but are --
16  are you asking me --
17      Q.  I'm just asking you, sir, if you
18  recall the note.
19      A.  Yes, the $30 million note, yes, we
20  reviewed it earlier, yes.
21      Q.  And do you recall Mr. Morris had you
22  go through the fact that NexPoint had made
23  payments in years prior to 2020 on that note?
24      A.  I do.
25      Q.  And do you believe that employees of

Page 335

1            WATERHOUSE - 10-19-21
2  the debtor would have played any role in
3  NexPoint having made those prior payments?
4         MR. MORRIS:  Objection to the form
5    of the question.
6      A.  Yes.
7      Q.  And what role in years prior to 2020
8  would employees of the debtor have had with
9  respect to NexPoint making that annual payment?
10      A.  We -- we -- we would have -- I keep
11  saying "we."  The team would have calculated
12  any amounts due under that loan and other
13  loans, as -- as standard course.
14         We would -- since we provided
15  treasury services to the advisors, we would
16  inform the -- the -- the -- we informed
17  Mr. Dondero of any cash obligations that are
18  forthcoming, whether we do cash projections.
19         If, you know, any of these payments
20  would have -- or, you know, the sum total of
21  all of these payments, including any note
22  payments, if there were any cash shortfalls, we
23  would have informed Mr. Dondero of any cash
24  shortfalls.  We could adequately plan, you
25  know, in instances like that.

Page 336

1            WATERHOUSE - 10-19-21
2      Or, sorry, we -- I say "we" -- I
3  keep saying "we" -- I keep wearing my -- again,
4  my -- my treasurer hat.
5      But, yes, it is to -- it is to
6  inform Mr. Dondero of the obligations of the
7  advisors in terms of cash and obligations that
8  are -- are upcoming and that -- and that are --
9  are scheduled to be paid.
10      Q.  And would those obligations that are
11  upcoming and scheduled to be paid prior to 2020
12  have incurred the annual payment on that
13  NexPoint $30 million note?
14         MS. DANDENEAU:  Objection to form.
15         MS. DEITSCH-PEREZ:  Davor, I think
16    you misspoke.  You might want to just
17    repeat the question.
18      Q.  Okay.  Let me repeat the question,
19  sir.
20      Prior to 2020, those services that
21  you just described, would that -- on behalf of
22  the debtor, would that have included NexPoint's
23  payments on the $30 million note?
24      A.  Yes.
25      Q.  So someone at the debtor in treasury

Page 337

1            WATERHOUSE - 10-19-21
2  or accounting would have sent some schedule or
3  a reminder that a payment would be coming due
4  in the future.  Is that generally the practice?
5      A.  Yes, we would -- you know, again, I
6  didn't -- I didn't micromanage the teams, but
7  we had a -- a corporate accounting calendar
8  that we use as kind of a tickler file to keep
9  track of payments.
10      I actually, you know, don't know how
11  actively they're using that in -- in prior to
12  2020, but it was actively used at some point.
13      We did look at NexPoint cash
14  periodically and cash for the other advisors as
15  well and payments.  You know, we -- payments
16  like this would have appeared in our cash
17  projections, in the advisor's cash projections.
18      And, again, as like I said earlier,
19  they would have appeared there, so there would
20  be time to plan for making any of these
21  payments.
22      Q.  And based on your experience, would
23  it have been reasonable for NexPoint to rely on
24  the debtors' employees to inform NexPoint of an
25  upcoming payment due on the $30 million

Page 338

WATERHOUSE - 10-19-21

1   promissory note?
2
3       MR. MORRIS:  Objection to form of
4   the question.
5       MS. DANDENEAU:  Objection to form.
6   A.   Yes.  Yes, they did.  I mean, but I
7   mean, but I don't think these – these notes
8   were any secret to anybody.
9   Q.   I understand, and I'm not suggesting
10  otherwise.
11      MR. RUKAVINA:  Please pull up Alpha
12  2, Mr. Nguyen.
13      (Exhibit A2 marked.)
14  Q.   Now, this document is similar to the
15  ones we've seen before as of December 31, 2020,
16  and I don't see under NTA anything there for
17  paying the promissory note to Highland.
18      Do you see anything like that?
19  A.   I do not.
20      MR. RUKAVINA:  You can pull that –
21  that exhibit down, Mr. Nguyen.
22  Q.   You are aware, of course, by now
23  that, in fact, NexPoint failed to make the
24  payment due December 31, 2020, are you not?
25  A.   I am aware, and yes, I do understand

Page 339

WATERHOUSE - 10-19-21

2   it.
3   Q.   Were you aware that Highland
4   accelerated that $30 million promissory note?
5   A.   I am aware.
6   Q.   Were you aware of that acceleration
7   at the time that it occurred?
8   A.   I don't remember specifically.
9   Q.   Do you recall whether anyone asked
10  you – prior to the acceleration, anyone asked
11  you at Highland, what Highland should do with
12  respect to the missed payment?
13  A.   Did anyone ask me what Highland
14  should do about the missed payment?
15  Q.   Yes, before acceleration.
16      MR. MORRIS:  Objection to the form
17  of the question.
18  A.   I mean, what – what I recall is
19  there was the – sorry, are you asking me –
20      MS. DANDENEAU:  Why don't you just
21  repeat the question, Mr. Rukavina.
22  Q.   Let me try again, Mr. Waterhouse,
23  let me try again.
24      I am saying you're the CFO of
25  someone, in this case, Highland, and the

Page 340

WATERHOUSE - 10-19-21

1
2   borrower failed to make the required payment.
3   Are you with me so far?
4   A.   I am.
5   Q.   Did anyone then ask you, what should
6   we do with respect to our rights against the
7   borrower that missed the payment?
8   A.   Not that I recall.
9   Q.   Did you play a role in the decision
10  to accelerate that $30 million promissory note?
11  A.   I did not.
12  Q.   Do you recall whether Mr. Seery ever
13  asked you before the acceleration as to whether
14  he should accelerate the note?
15  A.   I don't recall.
16  Q.   And you don't recall when you
17  learned of the acceleration itself?
18      MR. MORRIS:  Objection to the form
19  of that question.
20  A.   It was – it was sometime in
21  early – in early 2021.  I don't remember
22  specifically.
23  Q.   But do you recall whether it was
24  after the acceleration had already been
25  transmitted?

Page 341

WATERHOUSE - 10-19-21

1
2       MS. DANDENEAU:  Objection to the
3   form of the question.
4   A.   I don't recall.
5   Q.   Do you recall in early to mid
6   January of 2021, after the default, discussing
7   the default with Mr. Dondero?
8   A.   I do recall discussing with
9   Mr. Dondero after December 31, 2020?
10  Q.   Yes, the fact of the default.
11  A.   I don't recall.
12      MR. RUKAVINA:  Let's pull up my
13  Exhibit 6, Alpha 6.
14      (Exhibit A6 marked.)
15      MR. RUKAVINA:  And, Mr. Nguyen, if
16  you will please scroll down.
17  Q.   This email chain begins with you
18  writing to Ms. Hendrix on January the 12th:
19  NexPoint note to HCMLP.
20      Do you see that, sir?
21  A.   I do.
22  Q.   Were you discussing this same
23  $30 million note we're talking about right now
24  with Ms. Hendrix?
25  A.   Yes.

Page 342

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you recall what prompted
3  you to send that email to her?
4    A.   Yes, I had -- I had a conversation
5  with Jim.
6    Q.   Okay.  And what -- what did you
7  discuss with Jim that led to this email chain?
8    A.   He -- he called me and he said he
9  wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13    Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18    A.   No, it was -- it was that morning.
19    Q.   And do you recall how you had that
20  conversation with him?
21        MR. MORRIS:  Objection to the form
22  of the question.
23    Q.   By telephone, by email, in-person?
24    A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1  December of 2020.  He called me from home.  He
2  said he was in court.  He wanted to -- he asked
3  about, you know, making payment on the note and
4  the amount, and so I didn't have those numbers
5  in front of me, so I said I would get back to
6  him.  I wanted all the details, so here is
7  this -- so I reached out to Kristin.
8    Q.   And then she gave you that
9  $1,406,000 figure?
10        MR. RUKAVINA:  Mr. Nguyen, if you
11  will scroll up, please.
12    A.   Yes.  Yeah, she -- the $1,406,112.
13    Q.   And do you recall whether you
14  conveyed that amount to Mr. Dondero?
15    A.   Yes.  I -- I called him back and
16  gave him -- gave him this amount.
17    Q.   Are you aware of whether NexPoint,
18  in fact, then made that 1 million 406 and
19  change payment?
20    A.   Yes, they did.
21    Q.   Did you discuss with Mr. Dondero at
22  that time, either the first conference or the
23  second conference that day -- strike that.
24        When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1
2  Mr. Dondero, was -- was it also on January
3  12th?
4    A.   Sorry, when I conveyed the
5  $1.4 million number?
6    Q.   Yes.
7    A.   Yes, yes, it was that -- it was --
8    Q.   So you had --
9    A.   It was that point.
10    Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15    A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21    Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making those -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

WATERHOUSE - 10-19-21

1    A.   No.
2    Q.   Did you tell him anything to the
3  effect that making that payment would not cure
4  the default?
5    A.   No.
6    Q.   Did you discuss that in any way with
7  him?
8    A.   No, I did not.
9    Q.   Did he say why he wanted to have
10  that $1.4 million payment made?
11        MR. MORRIS:  Objection to the form
12  of the question.
13    A.   He -- he -- he didn't go into
14  specifics.
15    Q.   Did he say anything to you to the
16  effect that if NexPoint makes that payment,
17  then the note will be de-accelerated?
18        MR. MORRIS:  Objection to the form
19  of the question.
20    A.   I don't recall.
21        MR. RUKAVINA:  You can put this one
22  down, Mr. Nguyen.
23    Q.   And, again, when you say you don't
24  recall, you mean you don't remember right now

Page 346

WATERHOUSE - 10-19-21

1    either way; correct?
2    A.    Yeah, I don't remember. I don't
3    remember us discussing that.
4    Q.    Now – and we're almost done, I
5    promise. I'm just going to – I don't know how
6    to ask this question, so I'm just going to try
7    to do my best.
8        Prior to the default on December 31,
9    2020, did Mr. Seery ever tell you any words to
10   the effect that you or someone at Highland
11   should ensure that NexPoint doesn't make its
12   payment?
13   A.    No.
14   Q.    Did you have any hint or any belief
15   that anyone at NexPoint – I'm sorry, strike
16   that.
17       Did you have any reason to believe
18   that anyone with Highland was actively trying
19   to get NexPoint to make that default by not
20   paying on December 31?
21       MR. MORRIS: Objection to the form
22   of the question.
23   A.    Are you asking, did any Highland
24   employees actively work to make – to

Page 347

WATERHOUSE - 10-19-21

1    somehow –
2    Q.    Yes. Let me take a step back. Let
3    me take a step back.
4        So you are aware now that as a
5    result of that default, what was still some
6    25-year note was accelerated and became
7    immediately due. You are aware of that now;
8    right?
9    A.    Yes.
10   Q.    And can you see how someone at
11   Highland might actually have been pleased with
12   that development?
13       MR. MORRIS: Objection to the form.
14   Q.    Not that they were – not that they
15   were pleased, but you can see how someone at
16   Highland might have been pleased with that
17   development?
18       MR. MORRIS: Objection to the form
19   of the question.
20       MS. DANDENEAU: Object to form.
21   A.    I don't know how they would have
22   reacted to that.
23   Q.    Okay. But you're not – you're not
24   aware of any instructions or any actions being

Page 348

WATERHOUSE - 10-19-21

1    given or taken at Highland by Mr. Seery, the
2    independent board, DSI, that – that would have
3    basically led Highland to ensure that NexPoint
4    would fail to make that payment?
5    A.    I'm not aware.
6    Q.    In other words, there wasn't a trick
7    or a settlement; right?
8        MS. DEITSCH-PEREZ: Objection to
9    form.
10       MS. DANDENEAU: Object to form.
11       MR. MORRIS: Object to form.
12   A.    I'm not aware.
13       Look, I'm not aware. I'm not in
14   every conversation. I mean, and I'm just –
15   again, I'm sitting at home. It is the end of
16   the year. Again, I'm not aware.
17   Q.    That is a perfectly legitimate
18   answer. I don't know why – why you think
19   otherwise.
20       Okay. Just give me one second to
21   compose my thoughts.
22       MS. DEITSCH-PEREZ: While you're
23   taking your one second, why don't we take
24   three minutes. I will be right back.

Page 349

WATERHOUSE - 10-19-21

1        VIDEOGRAPHER: Do we want to go off
2    the record?
3        MR. RUKAVINA: Yes.
4        VIDEOGRAPHER: All right. We're
5    going off the record at 6:27 p.m.
6    (Recess taken 6:27 p.m. to 6:30 p.m.)
7        VIDEOGRAPHER: We are back on the
8    record at 6:30 p.m.
9        MR. HORN: Is Deb back?
10       MS. DANDENEAU: Are you asking about
11   me? I'm here.
12       MR. HORN: Oh, okay. I don't see
13   you, sorry.
14   Q.    Actually, yeah, Mr. Waterhouse, so
15   when you had –
16       MS. DANDENEAU: Are you asking about
17   Deb Dandeneau or Deborah? I mean, there
18   are a lot – as we talked about, a lot of
19   Debs. I'm here.
20       MS. DEITSCH-PEREZ: I'm here.
21       MR. HORN: Yes, I was asking about
22   DDP.
23       MS. DEITSCH-PEREZ: Oh, DDP is here.
24       MR. HORN: Okay. Here we go. I'm

Page 350

WATERHOUSE - 10-19-21

1    going back on mute.
2        MS. DANDENEAU:  Get the right
3    nomenclature.
4        Q.   Mr. Waterhouse, on January 12th,
5    2021, when you had those talks with Mr. Dondero
6    about the $1.4 million payment, did you have a
7    communication or a conversation with Mr. Seery
8    about that payment after January 12th, 2021?
9        A.   I don't recall.
10       Q.   Well, in response to Mr. Dondero
11   reaching out to you, do you recall on that day,
12   January 12th, talking to Mr. Seery or anyone at
13   Highland other than the email chain we just saw
14   about Mr. Dondero's call with you?
15       A.   Did I talk to -- I spoke with
16   Kristin -- I don't know if I spoke to her. I
17   likely spoke to Kristin Hendrix because we had
18   to get the wire on NexPoint's behalf to make
19   the payment to Highland.
20       Q.   So it is true, then, that -- that
21   employees of the debtor did actually cause that
22   payment to be made when it was made after
23   January 12th?
24       A.   Yes, I mean, we -- we -- as I
25

Page 351

WATERHOUSE - 10-19-21

1    testified earlier, we provided that accounting
2    finance treasury function as -- under the
3    shared services agreement. And so once I
4    got the -- I talked to Jim, got the approval to
5    make this payment, we have to then make the
6    payment, or the team does, and so the payment
7    was made.
8        Q.   Okay. But -- okay. And -- and
9    sitting here right now, after Jim called you,
10   you don't remember talking to anyone other than
11   the -- the couple of people you mentioned,
12   talking to anyone about something to the effect
13   that, hey, Jim wants to make this payment now?
14       MR. MORRIS:  Objection to the form
15   of the question.
16       A.   I don't -- I don't recall.
17       Q.   And does that include legal counsel?
18       Without going into any detail, on
19   January 12th or before that payment was made,
20   did you consult with legal counsel about
21   anything having to do with the $1.4 million
22   payment?
23       A.   I don't recall.
24       Q.   Okay. Thank you, sir, for your
25

Page 352

WATERHOUSE - 10-19-21

1    time.
2        MR. RUKAVINA:  Pass the witness.
3        MR. MORRIS:  I just have a few
4    questions, if I may.
5        MS. DEITSCH-PEREZ:  Don't you go at
6    the end?
7        MR. MORRIS:  Oh, I apologize. He is
8    your witness. I'm surprised you want to
9    ask him questions, but go right ahead.
10       MS. DEITSCH-PEREZ:  Just have a
11   couple of things.
12       MR. RUKAVINA:  And I will just
13   object to that, that he's our witness.
14   That's not --
15       MR. MORRIS:  I'm not talking to you.
16   I'm not talking to you.
17       MS. DANDENEAU:  Also, Mr. Morris, it
18   is -- it is --
19       MS. DEITSCH-PEREZ:  He is not my
20   witness. He's been subpoenaed by you.
21   Okay?
22       That is no offense, Mr. Waterhouse,
23   I'm -- I'm not -- okay. Anyway.
24           EXAMINATION
25

Page 353

WATERHOUSE - 10-19-21

1    BY MS. DEITSCH-PEREZ:
2        Q.   Good evening. I'm very sorry to be
3    going last and I know you have had a long and
4    taxing day, so I thank you for indulging me.
5        The kinds of services that you
6    describe that the -- that Highland provided for
7    NexPoint, did Highland also provide similar
8    services to that to HCRE and HCMS?
9        A.   Yes.
10       MR. MORRIS:  Objection to the form
11   of the question.
12       Q.   What kind of services did Highland
13   provide to HCRE and HCMS?
14       MR. MORRIS:  Objection to the form
15   of the question.
16       MS. DEITSCH-PEREZ:  What is your
17   objection, John?
18       MR. MORRIS:  It is vague and
19   ambiguous. Unlike the advisors and
20   NexPoint, they actually had shared services
21   agreements.
22       MS. DEITSCH-PEREZ:  I got -- I
23   understand your objection. That is fine.
24       Q.   Let's take them one at a time.
25

Page 354

WATERHOUSE - 10-19-21

1
2     What kinds of services did Highland
3     provide to HCRE?
4          MR. MORRIS:  Objection to the form
5     of the question.
6     A.   HCMS, Highland employees provided
7     accounting services, treasury management
8     services, potentially legal services.  I
9     don't – but I wouldn't have been directly
10    involved in that.  But as far as the teams that
11    I manage, it was accounting, treasury, things
12    of that nature.
13    Q.   Okay.  And that was for HCM, LLP –
14    A.   And – and, sorry, it would also be
15    any asset valuation if needed as well.
16    Q.   Okay.  We went back and forth on
17    each other and I apologize, so just to clarify.
18         You were talking about the services
19    that Highland Capital Management provided to
20    HCMS; is that right?
21    A.   HCMS.  So, again, yes.  And
22    accounting, treasury, valuation, and also tax
23    services too.
24    Q.   Okay.
25    A.   Tax services.  Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1
2     this, their HR services as well.
3     Q.   Okay.  And did that include bill
4     paying?
5          MR. MORRIS:  Objection to the form
6     of the question.
7     Q.   Did the services that HCM provided
8     to HCMS include bill paying?
9          MR. MORRIS:  Objection to the form
10    of the question.
11    A.   Yes.
12    Q.   And did the services that HCMLP
13    provided to HCMS include scheduling upcoming
14    bills?
15         MR. MORRIS:  Objection to the form
16    of the question.
17    A.   Yes.
18    Q.   And did HCMLP regularly pay – cause
19    to be paid the payments on loans HCMS had from
20    HCMLP?
21         MR. MORRIS:  Objection to the form
22    of the question.
23    A.   Yes.
24    Q.   Typically – if there is a
25    typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1
2     HCMLP cause HCMS to pay its bills?
3          MR. MORRIS:  Objection to the form
4     of the question.
5     A.   I mean, it – it – it depend – it
6     depended on the nature of the payment and the
7     vendor, but, you know, if there were – if
8     there were larger scheduled payments, you know,
9     I would like to give at least 30 days notice.
10         And that is – that is kind of my
11    rule of thumb so no one is surprised.
12    Q.   Okay.  And was it generally HCMLP's
13    practice to timely pay HCMS' bills?
14         MR. MORRIS:  Objection to the form
15    of the question.
16    A.   It – it – it – that depended on
17    the nature of the payment.
18    Q.   Okay.  And can you explain what you
19    mean by that?
20    A.   Yeah, I mean if – if it was – I
21    mean – if there was some professional fees
22    that weren't – you know, they were due but
23    they weren't urgent, those fees may not be paid
24    as timely as others that have a due date or –
25    or things like that.

Page 357

WATERHOUSE - 10-19-21

1
2     Q.   Okay.  Are loan payments the kinds
3     of thing that HCMLP would pay on time because
4     of potential consequences of not paying on
5     time?
6          MR. MORRIS:  Objection to the form
7     of the question.
8     A.   Yes.  As I testified earlier, we
9     would want to give, you know, notice on – on
10    – on larger payments and – and things of that
11    nature so we didn't miss due dates.
12    Q.   Okay.  And over the course of time,
13    did HCMLP generally pay HCMS' loan payments in
14    a timely fashion?
15         MR. MORRIS:  Objection to the form
16    of the question.
17    A.   I can't remember specifically, but
18    generally, yes.
19    Q.   Okay.  Now, did HCMLP provide
20    similar services to HCRE that you have
21    described it provided to HCMS?
22         MR. MORRIS:  Objection to the form
23    of the question.
24    A.   Yes, but I don't think it – it
25    provided – I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1  services.
2      Q.   Can you describe the accounting and
3  treasury services that HCMLP provided for HCRE?
4      A.   Yeah, it -- it would provide
5  bookkeeping services on a -- on a periodic
6  basis.  It would make payments, you know, as
7  needed.
8      Q.   Okay.  So did it provide --
9      A.   And -- and I believe it -- it -- it
10  provided tax services as well.
11     Q.   Okay.  And so did it provide the
12  same kind of bill -- did HCMLP provide the same
13  kind of bill-paying services for HCRE that it
14  provided for HCMS and NexPoint?
15         MR. MORRIS:  Objection to the form
16  of the question.
17     A.   Yes.
18     Q.   And over the course of time, did
19  HCMLP generally cause to be made the loan
20  payments that HCRE owed to HCMLP?
21         MR. MORRIS:  Objection to the form
22  of the question.
23     A.   Yes.
24     Q.   Did HCMLP make loan payment -- the

Page 359

WATERHOUSE - 10-19-21

1  loan payment that was due from HCMS to HCMLP in
2  December of 2020?
3         MR. MORRIS:  Objection to the form
4  of the question.
5      A.   I don't believe that payment --
6  payment was made.
7      Q.   Okay.  And when HCMLP caused HCMS in
8  the past to make loan payments, whose money did
9  it use to make those payments?
10         MR. MORRIS:  Objection to the form
11  of the question.
12     A.   It was the -- the money in HCMS's
13  operating account would be made to that --
14  those moneys would be used to make payment to
15  Highland Capital Management.
16     Q.   Okay.  And Highland -- is it correct
17  that Highland Capital Management personnel had
18  the access to HCMS's accounts to be able to
19  cause such payments to be made?
20     A.   Yes, Highland personnel had access
21  to those accounts.
22     Q.   Okay.  And so now for HCRE, whose
23  money was used when HCMLP caused HCRE
24  payments -- loan payments to Highland to be

Page 360

WATERHOUSE - 10-19-21

1  made?
2         MR. MORRIS:  Objection to the form
3  of the question.
4      A.   It was -- it was cash in HCRE's bank
5  account that would be used to make payments to
6  Highland Capital Management.
7      Q.   Okay.  And so did Highland Capital
8  Management have access to HCRE's funds in order
9  to be able to make such payments?
10         MR. MORRIS:  Objection to the form
11  of the question.
12     A.   Personnel at Highland Capital
13  Management had access to HCRE's bank account to
14  effectuate the payments.
15     Q.   Okay.  And was the payment due from
16  HCRE to HCMLP due in December of 2020 made?
17     A.   It --
18     Q.   In December of 2020.
19     A.   It was not.
20     Q.   Okay.  And was there money in HCRE's
21  account that would have enabled the payment to
22  be made had HCM personnel attempted to make the
23  payment?
24         MR. MORRIS:  Objection to the form

Page 361

WATERHOUSE - 10-19-21

1  of the question.
2      A.   I -- I don't recall.
3      Q.   Do you have any reason to believe
4  that either HCRE or HCMS simply didn't have the
5  funds on hand to make the December 2020
6  payments?
7      A.   I don't know.
8      Q.   I guess I'm asking, do you have any
9  reason to believe that they didn't have the
10  funds?
11     A.   We managed cash for so many
12  different entities and funds, and I don't
13  recall, you know, where the cash position was
14  for HCRE and HCMS at 12/31/2020.
15     Q.   Okay.
16     A.   I just don't recall, and I don't --
17  and I don't remember what the loan payment
18  obligations were from HCRE to Highland, and
19  from HCMS to Highland.  I don't recall.  I
20  don't recall, I mean...
21     Q.   Let me come at it a different way.
22  Were the -- were the payments that would
23  otherwise have been due in December of 2020
24  made in January of 2021 for HCMS and HCRE?

Page 362

WATERHOUSE - 10-19-21

1
2     A.   I believe the HCRE payment was made
3  in January of 2021.  I don't recall any
4  payments being made from HCMS to Highland.
5     Q.   If it -- how is it the HCRE payment
6  came to be made?  Why did you make it -- why
7  did HCM make the payment in January of 2021?
8     A.   Jim -- Jim called me and instructed
9  me to -- to make the payment on behalf of HCRE,
10  Jim Dondero -- Jim Dondero.
11     Q.   Did he seem upset that -- that the
12  payment had not been made?
13     A.   Yeah.  On the note that was, you
14  know, that was the term note, yes, he -- he was
15  displeased that the -- that the payment had not
16  been made by year-end.
17     Q.   Okay.  And did you make the -- cause
18  the payment to be made as -- as requested?
19     A.   Yes.
20     Q.   And did anyone else from HCM
21  participate with you in causing the payment to
22  be made to -- on the HCRE loan?
23     A.   Yes.  It would have been Kristin
24  Hendrix.  I -- again, I don't -- as I testified
25  earlier, I'm not an officer of HCRE.  I don't

Page 363

WATERHOUSE - 10-19-21

1
2  believe I'm an authorized signer.  So I
3  can't -- other personnel have to make payment
4  from HCRE to -- to -- to Highland.
5     Q.   Okay.  And in the conversation
6  that -- that you had with Mr. Dondero when he
7  requested the payment to be made, did you say
8  to him words to the effect, Jim, this loan is
9  going to stay in default, what are you making
10  the payment for, anything like that?
11     A.   No.
12     Q.   In fact, did you have the impression
13  from him that he thought that the loan would
14  be -- the default would be cured by making the
15  payment?
16          MR. MORRIS:  Objection to the form
17  of the question.
18     A.   Did I get the impression from Jim
19  Dondero that the loan would be cured if the
20  payment from HCRE --
21     Q.   Yeah, if that is what he thought.
22          MR. MORRIS:  Objection to the form
23  of the question.
24     A.   I didn't get any impression from him
25  on that at the time.

Page 364

WATERHOUSE - 10-19-21

1
2     Q.   Do you know whether there was an
3  HCMS term loan that had a payment due in
4  December of 2020?
5     A.   I don't recall.
6     Q.   Okay.  And so the reason you don't
7  recall whether or not there was a payment in
8  January of 2021 is because you just don't
9  remember whether there was such a loan at all?
10          MR. MORRIS:  Objection to the form
11  of the question.
12     A.   I don't remember.  There is -- there
13  is so many notes, and I mean, demands, and I
14  don't -- I don't remember.  It's a lot to keep
15  track in your head.
16     Q.   I understand, and -- and I hear your
17  frustration when you have explained that the
18  debtor has your documents and you don't, and so
19  I fully appreciate it, and this is no knock on
20  you.  It's a knock on somebody else on this
21  call.
22          MR. MORRIS:  I move to strike.  That
23  was pretty obnoxious, but go ahead.
24     Q.   Okay.  But so, Mr. Waterhouse, if --
25  if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1
2  January of 2021, do you think it was part of
3  the same conversation where Jim Dondero said,
4  hey, why didn't that get paid, please make
5  that -- get that payment done?
6          MR. MORRIS:  I object to the form of
7  the question.
8     A.   Yes.  Likely it would have been -- I
9  mean, again, I don't recall a payment being
10  made, but, you know, again, I don't remember
11  everything.
12     Q.   Okay.  Did -- at the time you were
13  communicating with Kristin Hendrix about the
14  payment being made, whichever payments were
15  made in January, did she say anything to you
16  about the payments not curing the loan
17  defaults?
18     A.   No.
19     Q.   Okay.  All right.  So I'm going to
20  take you back to very early in the deposition
21  when Mr. Morris was asking you about the --
22  the -- the -- the agreement with respect to
23  the -- the forgiveness element of the loans, so
24  that is just to orient you.
25          Do you remember that there was a

Page 366

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   time that you and Mr. Dondero were
3   communicating about potential means of
4   resolving the Highland bankruptcy by what was
5   colloquially referred to as a pot plan?
6       A.   Yes.
7       Q.   Okay.  And can you tell me generally
8   when that was?
9       A.   Like mid -- mid 2020, sometime in
10  2020, mid 2020.
11      Q.   Okay.  And did the process of trying
12  to figure out what the numbers should be
13  involve looking at what one should pay for the
14  Highland assets?
15          MR. MORRIS:  Objection to the form
16  of the question.
17      A.   Yes.
18      Q.   Okay.  And did there come a time
19  when you were proposing some potential numbers
20  and Mr. Dondero said something to you like,
21  well, why are you including payment for the
22  related party notes, those, you know, were
23  likely to be forgiven as part of my deferred
24  executive compensation?
25          MR. MORRIS:  Objection to the form

Page 367

1   WATERHOUSE - 10-19-21
2   of the question.
3       A.   Yes, we did have that conversation.
4       Q.   Okay.  Was that conversation in
5   connection with trying to figure out the right
6   numbers for a pot plan?
7       A.   Yeah.  I mean, it was -- it was -- I
8   mean, Jim -- Jim would ask for, you know,
9   most -- most recent asset values, you know, for
10  Highland, and -- and myself and the team
11  provided those to him, so it was in that
12  context.
13      Q.   Okay.  And does that refresh your
14  recollection that these communications were in
15  2020 rather than 2021?
16          MR. MORRIS:  Objection to the form
17  of the question.
18      A.   The -- the -- the executive
19  compensation discussions were definitely in
20  2020.
21      Q.   Okay.  Now, did you ever make
22  proposals that took into account Jim's comment
23  that the notes were likely to end up forgiven
24  as part of his compensation?
25          MR. MORRIS:  Objection to the form

Page 368

1   WATERHOUSE - 10-19-21
2   of the question.
3       A.   Yes, we -- the team and myself put
4   together, you know, asset summaries of Highland
5   at various times for all the assets of
6   Highland, and not including the notes.
7       Q.   Okay.  And were those presentations
8   communicated to -- to Mr. Seery?
9       A.   No.  Well, look, I didn't tell -- I
10  didn't tell Mr. Seery.  I don't know what
11  Mr. Dondero did with the information.
12      Q.   Okay.
13      A.   I did not have conversations with
14  Mr. Seery.
15      Q.   Okay.  Do you know who saw the
16  presentations that you put together that didn't
17  include the value of the related party notes?
18      A.   We're talking presentations -- these
19  are -- these are Excel spreadsheets?
20      Q.   Uh-huh.
21      A.   I don't know who -- these were given
22  to -- to Jim Dondero.  I don't know what was
23  done with them after that.
24      Q.   Okay.  You also mentioned earlier
25  that sometime during your tenure at Highland

Page 369

1   WATERHOUSE - 10-19-21
2   you knew of the practice of giving forgivable
3   loans to executives.
4           MR. MORRIS:  Objection to the form
5   of the question.
6       Q.   Can you -- can you tell me what you
7   recall about that practice?
8           MR. MORRIS:  Objection to the form
9   of the question.
10      A.   Yes, so there were -- there were --
11  during my tenure at Highland, there were loans
12  or -- given to employees that were later
13  forgiven at a future date and time.
14      Q.   Okay.  And when the loans were
15  given, did the notes, to your recollection, say
16  anything about the potential forgiveness term?
17          MR. MORRIS:  Objection to the form
18  of the question.
19      A.   When you say "did the notes," did
20  the promissory notes detail the forgiveness?
21      Q.   Yes.
22      A.   Not that I recall.
23      Q.   And until such time as whatever was
24  to trigger the forgiveness occurred, were the
25  notes bona fide notes as far as you were

Page 370

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    concerned?
3        MR. MORRIS:  Objection to the form
4    of the question.
5        A.    Yes, similar to – yes.
6        Q.    Okay.  You were going to say similar
7    to what?
8        A.    Mr. Morris earlier today showed
9    notes of the financial statements about various
10    affiliate loans.  I – I – I do recall these
11    notes because I – at that time personally
12    worked on the – the financial statements of
13    Highland.  That was, you know, in my role as a
14    corporate accountant.
15        And there were – those loans
16    were – to the partners were detailed in the
17    notes to the financial statements, similar to
18    what we went through earlier today in the prior
19    testimony about what we saw with Highland
20    and – and – and the – and HCMFA.
21        Q.    Is it fair to say that on Highland's
22    balance sheet there were any number of assets
23    that the value of which could be affected by
24    subsequent events?
25        MR. MORRIS:  Objection to the form

Page 371

WATERHOUSE - 10-19-21

1    of the question.
2        A.    Yes.  I mean, yes, that – there
3    are.  And that is – yes.
4        Q.    Okay.  And is it typical accounting
5    practice that until there is some certainty
6    about those potential future events, that asset
7    value listed on – on the books doesn't take
8    into account those potential future events?
9        MR. MORRIS:  Objection to the form
10    of the question.
11        A.    Yeah, if those – yes.  If – if
12    those future events, you know, at the time of
13    issuance are not known or knowable, like I
14    discussed earlier with, like, market practice,
15    asset dislocation, or, you know, I mean, things
16    like that, you – I mean, it – it could affect
17    its fair value –
18        Q.    Okay.
19        A.    – in the future.
20        Q.    And am I correct you wouldn't feel
21    compelled to footnote in every possible change
22    in – in an asset when those possibilities are
23    still remote?
24        MR. MORRIS:  Objection to the form

Page 372

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    of the question.
3        A.    The accounting standard is you have
4    to estimate to the best – you know, to – to
5    the best of your ability, the fair value of an
6    asset as of the balance sheet date under –
7    under GAAP.
8        Q.    Did – strike that.
9        Okay.  Give me a minute.  I'm
10    close – I'm close to done.  Let me just go off
11    and look at my notes for a second.  So take two
12    minutes.
13        VIDEOGRAPHER:  We're going off the
14    record at 7:02 p.m.
15    (Recess taken 7:02 p.m. to 7:03 p.m.)
16        VIDEOGRAPHER:  We are back on the
17    record at 7:03 p.m.
18        Q.    Mr. Waterhouse, is it generally your
19    understanding that people you work with now
20    have been asking the debtor for full and
21    unfetterred access to their own former files?
22        MR. MORRIS:  Objection to the form
23    of the question.
24        A.    Yes, I am – I am generally aware.
25        Q.    Okay.  And do you think you could

Page 373

WATERHOUSE - 10-19-21

1    have been better prepared for this deposition
2    if the debtor had complied with those requests?
3        MR. MORRIS:  Objection to the form
4    of the question.
5        A.    I – I – I most certainly – yes.
6    I mean, again, these are multiple years,
7    multiple years ago, lots and lots of
8    transactions.
9        You know, we asked about NAV errors
10    and, you know, things like that and these
11    are – it would make this process a lot more –
12    a lot easier and if we had – if we had access
13    to that.
14        Q.    Okay.  And has the debtor – is the
15    debtor suing you right now?
16        A.    Yes.
17        Q.    And is the debtor trying to renege
18    on deals that it had previously made with you?
19        MR. MORRIS:  Objection to the form
20    of the question.
21        A.    Sorry, I need to – it is my
22    understanding that the litigation trust is
23    suing me.  And not being a lawyer, I don't
24    know – is that the debtor?

Page 374

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2       Is that -- I don't know the
3   relationship. So, again, I'm not the lawyers.
4   I've said many times. But my understanding is
5   the litigation trust is suing me. I could be
6   wrong there. I don't know.
7       Q.   Okay. I understand.
8            Someone with some connection to the
9   Highland debtor has brought a claim against
10  you; is that fair?
11           MR. MORRIS:  Objection to the form
12      of the question.
13      A.   Yes.
14      Q.   Okay. And is there also some motion
15  practice in the bankruptcy where the debtor or
16  someone associated with the debtor is
17  attempting to undo something that was
18  previously resolved with you?
19      A.   Yes.
20      Q.   And so in one action somebody is
21  associated with the debtors trying to --
22  threatening you with trying to take money from
23  you, and then in the other -- and trying to --
24  and in the other they are threatening not to
25  pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

1   is that correct?
2           MR. MORRIS:  Objection to the form
3      of the question.
4      A.   I want to be -- yes, I -- there
5   is -- I'm being sued, again, on -- on something
6   that was agreed to with Mr. Seery and myself.
7   I don't -- I don't -- I don't own that claim.
8      Q.   Okay.
9      A.   To be transparent, I don't own that
10  claim. So it is not my personal property.
11     Q.   Okay.
12     A.   And -- and being the nonlawyer, I
13  don't know how I can get sued for something
14  that I don't owe or, like, I don't own
15  anything. I'm not the lawyer. But, I mean, if
16  that is -- if I'm understanding the facts
17  correctly.
18     Q.   Okay. And the lawsuit that was
19  filed that names you, that was just filed
20  this -- this past week; is that right?
21          MS. DANDENEAU:  Ms. Deitsch-Perez, I
22     do want to interrupt at this point because
23     just as I told Mr. Morris, that this is a
24     deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2       I really don't want to go -- go
3   afield --
4           MS. DEITSCH-PEREZ:  Yeah.
5           MS. DANDENEAU:  -- and open up a
6      whole new line of inquiry about the lawsuit
7      or the -- the motion and the bankruptcy
8      court. We will be here all night.
9           MS. DEITSCH-PEREZ:  And I
10     understand.
11     Q.   My -- my point is:  Do you feel
12  like -- like there is some effort by these
13  parties related to the debtor to intimidate
14  you -- not that you -- I'm not saying you are
15  or you aren't.
16          But do you feel like there is some
17  effort to intimidate you and maybe an effort to
18  deter you from being as prepared as you might
19  be in this deposition?
20          MR. MORRIS:  Objection to the form
21     of the question.
22     A.   I was -- I was surprised by the
23  lawsuit, by me being named, because, again, I
24  don't own the asset and things like that.
25  Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   life at Skyview.
3           MS. DEITSCH-PEREZ:  Thank you.
4           THE WITNESS:  Thank you.
5           FURTHER EXAMINATION
6   BY MR. MORRIS:
7      Q.   If I may, I just have a few
8   questions.
9           Mr. Waterhouse, we saw a number of
10  documents that Mr. Rukavina put up on the
11  screen where Ms. Hendrix would send you a
12  schedule of payments that were due on behalf of
13  certain Highland affiliates.
14          Do you remember that?
15     A.   Yes.
16     Q.   And in each instance she asked for
17  your approval to make the payments; is that
18  right?
19     A.   Yes, she did.
20     Q.   And was that the -- was that the
21  practice in the second half of 2020 whereby
22  Ms. Hendrix would prepare a list of payments
23  that were due on behalf of Highland associates
24  and ask for approval?
25     A.   Yes.

Page 378

WATERHOUSE - 10-19-21

1
2    Q.    And I think you said that there was
3    a – a –
4    A.    It was – I think I testified to
5    this earlier when we talked about procedures
6    and policy, you know, again, I want to be
7    informed of – of – of – of – of any
8    payments that are going out.  I want to be made
9    aware of these payments, and that was just a
10    general policy, not just for 2020.
11    Q.    Okay.  So it went beyond 2020?
12    A.    Yes.
13    Q.    Is that right?
14    A.    Yes.
15    Q.    Okay.  And the corporate accounting
16    group would prepare a calendar that would set
17    forth all of the payments that were anticipated
18    in the – in the three weeks ahead; is that
19    right?
20    A.    I – like I testified earlier, we
21    had a corporate calendar that was set up, you
22    know, to – to provide reminders or, you know,
23    of anything of any nature, whether it is
24    payments or – or financial statements or, you
25    know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2    deadlines.
3    I don't know how, as I testified
4    earlier, how much they were using that
5    calendar.
6    Q.    Okay.  But – but you did get notice
7    and a request to approve the payments that were
8    coming due on behalf of Highland's affiliates.
9    Do I have that right?
10    MS. DANDENEAU:  Objection to form.
11    A.    I mean, generally, yes.  I mean, you
12    know, as we saw with these emails, generally, I
13    mean, did that encompass everything, no.
14    Q.    Okay.  Do you know why the
15    payment – do you know why there was no payment
16    made by NexPoint at the end of 2020?
17    A.    Yes.  There was – there was – we
18    talked about these agreements between the
19    advisors and Highland, the shared services and
20    the cost reimbursement agreement.
21    And in late 2020, there were
22    overpayments, large overpayments that had been
23    made over the years on these agreements, and it
24    was my understanding that the advisors were –
25    were talking with – like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5    Q.    Okay.  Did you participate in any of
6    those conversations?
7    A.    I did not.
8    Q.    Okay.  Do you know – do you recall
9    that the – at the end of November, the debtor
10    did notice to the advisors of their intent to
11    terminate the shared services agreements?
12    A.    Like I testified earlier, there
13    was – the agreements weren't identical, from
14    what I recall, and there is one that had a
15    longer notice period, which I think had a
16    60-day notice period.  I don't recall which one
17    that was, so not all of them were – notice
18    hadn't been given as of November 30th, for all
19    of the agreements.
20    Q.    Upon the receipt of the – the
21    termination notices that you recall, do you
22    know if the advisors decided at that point not
23    to make any further payments of any kind to
24    Highland?
25    MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2    A.    No.  The advisors – the advisors
3    had stopped making payments prior to that
4    notice.
5    Q.    Okay.  And how do you know that the
6    advisors stopped making – making payments
7    prior to the notice?
8    A.    I had – I had a conversation
9    with – with Jim Dondero.
10    Q.    And did Mr. Dondero tell you that
11    the advisors would no longer make payments to
12    Highland?
13    MS. DEITSCH-PEREZ:  Object to the
14    form.
15    A.    Yes, he – he – again, he said
16    they – they – the advisors have overpaid on
17    these agreements, to not make any future
18    payments, and that there needs to be offsets,
19    and they're working on getting offsets to these
20    overpayment.
21    Q.    Do you know if anybody ever
22    instructed Highland's employees to make the
23    payment that was due by NexPoint at the end of
24    the year?
25    A.    Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

1 employees to make that payment?
2    Q.    Correct.
3    A.    Anyone – not that I'm aware.
4    Q.    Were any of Highland's employees
5 authorized to make the payments on behalf of
6 its affiliates – withdrawn.
7           Was any of Highland's employees
8 authorized to effectuate the payment on behalf
9 of NexPoint that was due at the end of the year
10 without getting approval from either you or
11 Mr. Dondero?
12    A.    They had the – they had the ability
13 to make the payment, but they didn't – you
14 know, that – that payment needed to be
15 approved.
16    Q.    Okay.  And it needed to be approved
17 by you or Mr. Dondero; is that right?
18    A.    I mean, I'm not going to make the
19 unilateral decision.
20    Q.    Is that a decision that you
21 understood had to be made by Mr. Dondero?
22    A.    Yes.  Sitting back in December of
23 2020, the – that – there was this off –
24 offset negotiation that – that was happening,

Page 383

WATERHOUSE - 10-19-21

1 so I mean, until those negotiations were
2 resolved, you know, there wasn't any
3 payments – there weren't any payments.
4    Q.    And – and there were no payments
5 until the negotiations were resolved because
6 that was the directive that you received from
7 Mr. Dondero; correct?
8    A.    I don't think he said – I mean, I
9 think – yeah, I mean – I'm trying to recall
10 the conversation.  It was – you know, there
11 is – there is these negotiations.  There's –
12 there needs to be these offsets.  They're
13 talking with the debtor.  So, you know, until
14 this is resolved, right, I mean, depending on
15 how, whatever that resolution was, were we to
16 take any action.
17    Q.    Okay.  How about with respect to
18 HCMS, did HCMS have a term payment due at the
19 end of the year?
20    A.    Again, I don't – I don't recall.
21    Q.    Okay.  You discussed briefly two
22 payments that were made in January of 2021, one
23 on behalf of NexPoint, and one on behalf of
24 HCMS.  Do I have that right?

Page 384

WATERHOUSE - 10-19-21

1    A.    No.  The two payments I recall were
2 NexPoint and HCRE.
3    Q.    Okay.  And those two payments –
4 thank you for the correction.  And those two
5 payments were made because Mr. Dondero
6 authorized those payments to be made; correct?
7    A.    Yes.
8    Q.    And they hadn't been made before
9 that because Mr. Dondero had not authorized
10 them to be made?
11         MS. DEITSCH-PEREZ:  Object to the
12 form.
13    A.    Yes, because of these negotiations.
14    Q.    Okay.  Just a couple of more
15 questions.
16         Did anybody, to the best of your
17 knowledge, on behalf of HCMFA, ever tell the
18 SEC that HCMLP was responsible for the mistakes
19 that were made on the TerreStar valuation?
20    A.    Did anyone from Highland on HCMFA's
21 behalf tell the SEC that Highland – that
22 Highland was responsible for there – I just
23 want to make sure –
24    Q.    It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

1 let me try again.
2    A.    These are very long questions, John.
3 I'm not trying to be –
4    Q.    That is good.  Do you know whether
5 anybody – do you know whether anybody on
6 behalf of HCMS – HCMFA ever told the SEC that
7 Highland was the responsible party for the
8 TerreStar valuation error?
9    A.    Not that I'm aware.
10    Q.    Okay.  Did anybody on behalf of
11 the – on behalf of HCMFA ever tell the retail
12 board that Highland was responsible for the
13 TerreStar valuation error?
14    A.    Not that I'm aware.
15    Q.    Do you know if HCMFA made an
16 insurance claim with respect to the damages
17 that were incurred in relation to the TerreStar
18 valuation error?
19    A.    Yes.
20    Q.    And do you know why they made that
21 insurance claim?
22    A.    Because there was an error.  I
23 mean –
24    Q.    Was the insured's claim made – was

Page 386

1    WATERHOUSE - 10-19-21
2 the insurance claim made under HCMFA's policy?
3    A.  Yes.
4    Q.  Did HCMFA at any time prior to the
5 petition date -- withdrawn.
6        You were asked a couple of questions
7 where -- where you said that Mr. Dondero told
8 you that he was ascribing zero value to the
9 notes as part of a pot plan because he believed
10 that the notes were part of executive
11 compensation.
12       Do I have that right?
13       MS. DEITSCH-PEREZ:  Object to the
14    form.
15    A.  Yes.
16    Q.  Okay.  Have you ever heard that
17 before the time that Mr. Dondero told you that
18 in the conversation about the pot plan?
19    A.  Had I heard that prior to my
20 conversation with Mr. Dondero?
21    Q.  Yes.
22    A.  No, I had not heard that prior.
23    Q.  Okay.  And that was in the context
24 of his formulation of the settlement proposal;
25 is that right?

Page 387

1    WATERHOUSE - 10-19-21
2    A.  I mean, generally, yes.  You know,
3 we were asked to provide asset values, right,
4 and he was having settlement discussions.
5 Again, I don't know who those went to
6 ultimately.  I don't recall.
7        MR. MORRIS:  I have no further
8    questions.  Thank you very much for your
9    patience.  I apologize for the late hour.
10       MS. DEITSCH-PEREZ:  John, you stay
11    on about your email when --
12       MR. RUKAVINA:  Hold on, I'm not
13    done.
14       MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15    still has questions.  Sorry.  I was going
16    to say both John and Davor, could you stay
17    on afterwards just to talk about the
18    requests.
19       FURTHER EXAMINATION
20 BY MR. RUKAVINA:
21    Q.  Mr. Waterhouse, you were just now
22 testifying about a discussion you had with
23 Mr. Dondero where he said something like no
24 more payments.
25       Do you remember that testimony?

Page 388

1    WATERHOUSE - 10-19-21
2    A.  Yes.
3    Q.  Okay.  And was that late November or
4 early December of 2020?
5    A.  It was, I would say, first or second
6 week of November.
7    Q.  Okay.  Do you recall whether --
8 whenever you had that discussion, whether
9 Mr. Dondero had already been fired by the
10 debtor?
11    A.  Yes, I -- I believe he was not an
12 employee of the debtor anymore at that time.
13    Q.  And when you were discussing this
14 with Mr. Dondero and he said no more payments,
15 you were discussing the two shared services
16 agreements and employee reimbursement
17 agreements we testified -- you testified about
18 before; is that correct?
19       MR. MORRIS:  Objection to the form
20    of the question.
21    A.  That is correct.
22    Q.  And had your office or you -- and we
23 will talk at a future deposition about the
24 administrative claim.
25       But had -- by that time that you

Page 389

1    WATERHOUSE - 10-19-21
2 talked to Mr. Dondero, had your office or you
3 done any estimate of what the alleged
4 overpayments were?
5       MR. MORRIS:  Objection to the form
6    of the question.
7    A.  Yes, we had -- there was a -- there
8 was a detailed analysis that was put together
9 by David Klos at the time.
10    Q.  And do you recall just generally
11 what the total amount for both advisors of the
12 overpayments were?
13    A.  It was in excess of $10 million.
14    Q.  Was it in excess of $14 million?
15       MR. MORRIS:  Objection to the form
16    of the question.
17    A.  I -- I remember it was an
18 eight-figure number.  I don't remember
19 specifically.
20    Q.  Okay.  And did you convey that
21 number to Mr. Dondero when you had that
22 conversation?
23    A.  Yes.
24    Q.  What was his reaction?
25    A.  I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Q.   Is it fair to say he was upset?
3    A.   Yes.
4    Q.   Did Mr. Dondero ever expressly tell
5    you to not have NexPoint make the required
6    December 31, 2020, payment?
7    A.   Yes, I recall him saying don't make
8    the payment because it was being negotiated, as
9    I discussed with Mr. Morris, this offset
10   concept.  So there were obligations due by the
11   advisors to Highland, they should be offset
12   that -- you know, those obligations should be
13   offset by this -- by this overpayment.
14   Q.   And when did he tell you that?
15   A.   I would say -- I would say around --
16   probably December -- December-ish.
17   Q.   Early December, late December?
18   A.   I don't recall with as much
19   specificity as -- as -- as -- as stopping the
20   shared services payments, because we had
21   actually made one shared services payment in
22   November.  So that is why I need to remember
23   that one more clearly.  I don't remember where
24   exactly in December that conversation occurred.
25   Q.   Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

1    word "NexPoint" when he was saying don't make
2    these payments?
3    
4    MR. MORRIS:  Objection to the form
5    of the question, asked and answered.
6    A.   Yeah, we were -- we were discussing
7    advisor obligations.  So it was -- you know, it
8    was just obligations from the advisors.
9    And -- and he specifically talked
10   about the NexPoint payment as well.
11   Q.   Okay.  And it is your testimony that
12   he expressly told you to make that NexPoint
13   December 31 payment?
14   MR. MORRIS:  Objection, asked and
15   answered twice.
16   A.   Yes, he -- he did, during that
17   conversation.
18   Q.   And did you ever follow up with him
19   after that about whether NexPoint should or
20   shouldn't make that payment?
21   A.   I did not.
22   Q.   Did you ever, on or about
23   December 31, 2020, remind him and say, hey,
24   this payment is due, what shall I -- what
25   should I do?

Page 392

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    A.   I did not.
3    Q.   So sitting here today, you -- you
4    remember distinctly that Dondero in December of
5    2020 expressly told you not to have NexPoint
6    make that payment?
7    MR. MORRIS:  Objection, asked and
8    answered three times.
9    A.   Yes.
10   Q.   Can you say categorically it wasn't
11   just some general discussion where he told you
12   not to make payments?
13   MR. MORRIS:  Objection, asked and
14   answer four times.
15   MR. HORN:  Four times now.  Go for
16   five.
17   A.   Yes.
18   Q.   Did you tell Mr. Seery that?
19   A.   I don't believe I did.  I don't
20   recall.
21   Q.   And was this an in-person discussion
22   or telephone or email?  Do you remember?
23   A.   This was a phone -- a phone
24   conversation.
25   Q.   Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    on your cell phone of when that conversation
3    might have taken place?
4    I'm sorry, strike that.
5    Was that by cell phone?
6    A.   I believe -- yes, because we -- I
7    was at home.  I mean, I don't have a landline.
8    All I have is my cell phone.
9    Q.   Do you know whether your cell phone
10   still has records of conversations from
11   December 2020 on it?
12   A.   My call log doesn't go back that
13   far.
14   Q.   Okay.  Thank you.
15   MR. RUKAVINA:  I will pass the
16   witness.
17   MS. DEITSCH-PEREZ:  Just a couple
18   quick questions.
19   FURTHER EXAMINATION
20   BY MS. DEITSCH-PEREZ:
21   Q.   With respect to HCRE and HCMS, am I
22   correct there was -- there was no direction not
23   to pay those loan payments?
24   MR. MORRIS:  Objection to the form
25   of the question.

Page 394

WATERHOUSE - 10-19-21

1        A.    Yes, I don't recall having
2   conversations about, you know, those -- those
3   entities.
4        Q.    And, in fact, what was the tone that
5   Mr. Dondero had when he talked to you about the
6   fact that HCRE and HCMS payments hadn't been
7   made when he found out that they hadn't been
8   paid?
9        MS. DANDENEAU:  Objection to form.
10       MR. MORRIS:  Objection to form.
11       Q.    What was the tone he took with you?
12       A.    Oh, it was -- it was -- it was -- it
13  was very negative.  I mean, I think he cursed
14  at me and he doesn't usually curse.
15       Q.    Okay.  And in your mind, is that
16  consistent with the fact that he was surprised
17  that those payments hadn't been made?
18       MR. MORRIS:  Objection to the form
19  of the question.
20       A.    Yes.
21       Q.    Okay.  Thank you.
22       MR. MORRIS:  I have nothing further.
23  Thank you so much, Mr. Waterhouse.
24       MR. HORN:  I have no questions.
25

Page 395

WATERHOUSE - 10-19-21

1   Thank you, Mr. Waterhouse.  We appreciate
2   your time.  I am logging off the discussion
3   and I will talk to y'all tomorrow.
4        MR. MORRIS:  Super.
5        VIDEOGRAPHER:  If there are no
6   further questions, this ends the
7   deposition -- excuse me.  This ends the
8   deposition, and we are going off the record
9   at 7:30 p.m.
10       (Deposition concluded at 7:30 p.m.)
11
12
13  _____
14          FRANK WATERHOUSE
15
16  Subscribed and sworn to before me
17  this    day of        2021.
18
19  _____
20
21
22
23
24
25

Page 396

WATERHOUSE - 10-19-21

1        C E R T I F I C A T E
2
3        I, SUSAN S. KLINGER, a certified shorthand
4   reporter within and for the State of Texas, do
5   hereby certify:
6        That FRANK WATERHOUSE, the witness whose
7   deposition is hereinbefore set forth, was duly
8   sworn by me and that such deposition is a true
9   record of the testimony given by such witness.
10       I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage; and that I am in no way interested in
13  the outcome of this matter.
14       IN WITNESS WHEREOF, I have hereunto set my
15  hand this 19th of October, 2021.
16
17
18  _____
19       Susan S. Klinger, RMR-CRR, CSR
20       Texas CSR# 6531
21
22
23
24
25

Page 397

WATERHOUSE - 10-19-21

1   NAME OF CASE:  In re:  Highland Capital
2   DATE OF DEPOSITION:  October 19, 2021
3   NAME OF WITNESS:  Frank Waterhouse
4   Reason Codes:
5        1.  To clarify the record.
6        2.  To conform to the facts.
7        3.  To correct transcription errors.
8   Page____Line____Reason_____
9   From_____to_____
10  Page____Line____Reason_____
11  From_____to_____
12  Page____Line____Reason_____
13  From_____to_____
14  Page____Line____Reason_____
15  From_____to_____
16  Page____Line____Reason_____
17  From_____to_____
18  Page____Line____Reason_____
19  From_____to_____
20  Page____Line____Reason_____
21  From_____to_____
22  Page____Line____Reason_____
23  From_____to_____
24
25

**Appx. 02148**

Index: $1,406,000..2

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11
350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18
270:20 271:7,16
272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20
223:7 224:2 334:7,19
336:13,23 337:25
339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14
332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20
271:6 272:7 283:18
315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7
277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8
138:12 143:12 144:6,
17,23 272:16 273:6

**$7.8** 278:6,7

**$8** 277:16

---

**1**

**1** 8:9 35:17 139:22
140:12,13 215:25
216:3,7,12 238:8
260:20,23 261:15
328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15
198:2 266:20 267:3
302:7

**10-19-21** 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12
122:12 135:21
261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3
350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13,
23 203:3 210:6
213:18 221:23

**15(c)** 5:21 160:11
169:21,23 170:4,8,10
171:6 175:3,9 176:23
179:20 184:5 195:9
210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19
110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

---

**2**

**2** 5:15 35:18 140:18
142:15,16,22 171:10

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 17-4   Part 2   Filed 02/06/24   Appendix Part 2   Page 170 of 198   PageID 23385

Index: 2.4..780

172:8 174:13 179:4 195:11,14 215:22,23 216:3,4,5,8,25 338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13 87:8,20,24 89:15,16

**2017** 126:12 161:23 165:22 216:16 220:14 222:10 223:7 224:2,12

**2018** 105:19 109:14, 20 119:21 165:18 186:25 202:19 203:9 228:3,23 242:18,23 243:12 244:14,18 262:5,15 279:12

**2019** 6:4 21:7 98:17 99:25 103:2 125:18 126:2 131:10 132:6, 21 133:12 134:5,17, 23 137:6 138:12,20 139:18 140:14 141:5 142:18 152:18,25 165:15 180:24 181:4, 9,16,23 182:8,16 200:4,7 201:22 202:13,23 203:3,15 204:10 210:7 213:9, 19 218:21 219:7,12, 24 220:19,22 221:6 222:4,12 223:4,14 242:23 258:21 262:17 263:13,14,20, 24 265:3 269:5,24 270:12,18 271:3,14 272:4,15 273:4 279:12 280:10,20 282:23 287:4 293:19 299:4 301:2,8,16,18 313:3 314:13,23 315:19 316:14 321:6

**2020** 59:7,9 68:15 70:17 160:7,14,22 165:14 169:17,20 171:19 173:24 175:8 176:10 179:24 183:7, 14 186:12,14 189:13 195:20 196:3,17 200:24 204:20 207:16 221:11,16,21 258:20 265:6,11 307:24 314:21 316:16 323:10 326:4, 12,14 327:5,9 328:16 330:15 334:23 335:7 336:11,20 337:12 338:15,24 341:9 343:2 346:10 359:3 360:17,19 361:6,24 364:4 366:9,10 367:15,20 377:21 378:10,11 379:16,21 382:24 388:4 390:6 391:23 392:5 393:11

**2021** 8:19 14:8 19:5 37:2,10,19 38:2 70:21 71:3,5,12 121:13,22 122:19,24 163:2,7,8 165:5,9 166:2 173:18 176:24 187:3 198:21 199:7, 12,20 200:14 201:2 203:4,21 210:2,23 212:19 219:11,13,17 226:4 301:24 314:8 315:21 316:7,19 326:9 340:21 341:6 350:6,9 361:25 362:3,7 364:8 365:2 367:15 383:23 395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18 215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16 329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5 213:9 315:18

**3**

**3** 220:2

**30** 7:19 16:3 186:16 356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24 331:12 332:3 380:18

**31** 122:19 197:20,24 198:7,9 199:7,12 200:24 201:2 203:4 301:18,24 307:24 326:4 338:15,24 341:9 346:9,21 390:6 391:13,23

**3102** 4:7

**31st** 105:18 109:14 119:21 121:13 122:23 199:20 200:14 202:19 203:9, 21 212:19 216:16 218:21 219:7 221:15, 21 242:18 258:20 263:14 326:8,12,14 334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22 100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18 170:18,19 177:18 313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24 236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25 103:2 132:20,25 135:2 137:6 142:18 200:7 213:9 242:23 262:17 263:13 265:3 315:19

**4**

**40** 5:23 236:22,23 237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

**5**

**5** 268:22 271:15 282:14

**5.3** 121:3,6 124:17 308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

**6**

**6** 183:7 186:14 217:16,19 314:20 316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6 186:11 189:13

**7**

**7** 277:15,16 297:20 305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6-1 Part 2 Filed 02/04/22   Page 171 of 198   PageID 23386
Appendix Part 2 Page 12564 of 1386

Index: 7:02..agreement

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

125:3 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:2 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

45:13 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:19,6,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-2   Filed 02/05/24   Page 172 of 198   PageID 23387
Appendix Part 2 Page 12574 of 1386

Index: agreements..audited

25 314:7 316:5,8,9, 13 326:3,13 332:8 351:4 365:22 379:20

**agreements** 58:16 77:24 83:4 168:9 186:10 279:4,6 325:24 353:22 379:18,23 380:4,11, 13,19 381:17 388:16, 17

**agrees** 243:25

**ahead** 68:22 82:6 156:20 164:10 212:25 248:12 295:12 329:11 352:10 364:23 378:18

**Aigen** 4:5 9:24 214:4 251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21 125:2 273:17 281:8, 23

**allowed** 62:8 81:23, 25

**alpha** 297:20 302:7 307:19 328:10 338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15 214:18

**amortizing** 334:13

**amount** 49:10,11 50:23,24 57:6 119:7 131:13 132:8 138:11 142:18 144:5,16 161:19,25 195:16 196:16 216:17 217:15 220:23 222:11 239:5 240:9 244:3 271:11 277:7 283:18 288:6 308:22 342:10 343:5,15,17 389:11

**amounts** 106:21,25 108:14 109:7,18 110:6 111:2,5,8,12, 23 112:18,24 113:18 114:19 115:3 119:3 120:20 121:4,11 125:8 126:6 161:8 168:3 171:12 174:15, 22 175:11 176:9 181:15 199:12 202:7, 22 203:7,13,19 204:11,16,25 205:12 211:11 212:10,18 217:19,21 222:3,11 234:23 235:3 275:13 282:8 283:2 285:10 288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24 241:3,6 261:11 262:3 265:7,8,17,18,19 389:8

**and/or** 42:8,16 43:3, 14 59:14

**annual** 26:10 84:17, 23 85:2,24 96:7 168:10 170:5,9 184:5 217:2 228:16 334:8 335:9 336:12

**answering** 248:7,8 262:23

**answers** 12:2 16:25 26:15

**anticipated** 311:20 378:17

**anymore** 294:24 388:12

**apologize** 30:10 40:22 78:14 99:22 104:12 125:21,24 139:2 170:2 192:14 197:19 226:17 227:17 304:14 352:8 354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24 56:6 59:17 60:12 162:5 168:4 294:13 316:14

**apply** 213:7 314:12, 22

**appointed** 18:21,24 24:14,19,25 25:8 29:11,15 270:4 323:9,16

**appointment** 152:24 153:4,16

**appointments** 227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5, 10 63:12,17,23 144:24 170:14 206:5, 16 271:17,22 272:13, 14 281:7 332:16 351:5 377:17,24 382:11

**approve** 56:21 57:2, 3,20 61:5,9 231:21 273:6 379:7

**approved** 57:5 60:20 231:14 271:12 294:21 295:6,18 333:4 382:16,17

**approximate** 17:22 23:15 27:24 30:19 36:23 38:15 120:15 161:24 216:17 277:7 310:5

**approximately** 8:20 15:13,20 19:23 109:15,19 110:7 119:23 126:12 169:7 173:14,15 178:19 220:12,24 221:3,7 238:9 277:10,15 278:6

**approximates** 118:13 121:6

**April** 152:18,25 200:4 202:13,23 203:3,15 204:10 210:6 213:18 301:16 314:21 323:6

**areas** 26:5

**Argumentative** 156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4, 9

**ascribing** 386:8

**Asia** 4:24 92:14 118:3 129:16 135:10 177:14 218:14

**asks** 97:12 171:10 172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6, 24 109:14 118:23 225:16,23 265:9 354:15 367:9 368:4 371:7,16,23 372:6 376:24 387:3

**assets** 5:23 107:14 108:10,13 109:20 110:8 122:3,8 137:14 190:3 194:2 195:17, 20 196:3,9,17 204:19 211:3 225:8 235:11, 15 237:20,23 239:13, 19 240:15 241:4,18 242:13 250:18 253:16,24 259:18 260:8,11,13 301:9 303:9 307:9 309:2 311:10 317:7 366:14 368:5 370:22

**assistant** 295:2 298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10 297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15 133:24 297:13

**assumed** 285:4,11 287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11 172:12

**attorneys** 3:4,11,17 4:2,10,16 147:21 187:6,11,15 188:3,7, 24,25

**attributable** 132:3 276:11 283:2

**audit** 26:11 48:5 52:23 85:24,25 86:9, 23 88:2,6,13,14,16 89:10,11,22 91:11,14 93:4,14 95:6 96:7,10 97:22 98:19 103:25 104:4 106:7,16,17 109:24 110:25 111:20 112:7,24 113:17 114:2,7 115:2,20 116:5 117:2,20 119:19 131:5 132:9,24 135:6 137:5,7,10,12,21 138:18 142:9,11 148:25 149:4 199:23, 25 200:6 218:7 219:4,5,12,15 221:11,14,20 243:12 244:18 263:24 264:8

**audited** 6:4 41:7 47:25 84:16,23 85:3, 19 90:2 93:24 95:14

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Appendix Part 2 Filed 12/18/21   Page 173 of 198
Case 3:21-cv-00881-X   Document 76-1   Filed 01/02/24   Page 173 of 198   PageID 23388

Index: auditing..briefly

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

---

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

---

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17 248:13 374:9

**build** 107:7 108:22 260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10 229:22 332:10,11

---

**C**

**calculate** 275:11 276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7 378:16,21 379:5

**call** 46:14 55:2 68:6 70:3 154:8 167:4 191:14,15,24 192:2 290:19,25 350:15 364:21 393:12

**called** 16:10 22:21 27:10 29:25 31:8 32:4 81:9 115:3 130:3 227:2,19 228:21 273:18 278:22,24 315:20 342:8,24 343:2,16 351:10 362:8

**calling** 344:18

**calls** 45:17 46:10 55:21 107:5 126:4 268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23 129:18,23 135:12,16 177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25 21:3 24:17 26:22 65:10 97:15 143:25 174:3 232:4 258:25 270:25 285:24 295:18

**Capital** 3:4,18 8:11 9:6,22 10:22 11:7 15:16,23 18:7 22:21 30:2 41:18 42:10,18, 21 43:11,16 44:6 58:15,17,20 70:21 109:23 110:9 125:3 127:12 133:10 152:13 172:14 215:14,17 271:3 279:18,19 280:2,3 308:4 325:22,24 330:16 354:19 359:16,18 360:7,8,13

**capture** 107:10 130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18 47:9 114:14 144:14 223:12

**carried** 107:14,18,21 109:6,11 233:5 243:6

**carrying** 118:13,25 120:2,4,12,14 262:8 263:7,16 265:2

**case** 7:21 8:14 208:15 248:15 301:14 339:25

**cash** 57:3,4 121:12 335:17,18,22,23 336:7 337:13,14,16, 17 360:5 361:12,14

**categorically** 392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24 109:6

**caused** 263:3,14 277:3,19 280:12 359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3 152:2,5,10,13 159:19 183:11 270:4

**certificates** 21:21 154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17, 21,24 19:3,14,25 21:3 39:10,15,19,21, 23 40:3,4,9,12,25 42:5 43:10,23 44:25 46:7 47:16,24 49:17 50:10 51:10,15,20,25 53:9 55:16 60:23 61:21 62:4,8 84:20 85:12 86:3,19,24 88:10,15 90:15 94:4, 23 95:7,15 100:17 107:11 111:16 114:5 133:7,10,16 176:14 202:11 203:25 225:17,20 226:8 227:6 229:23 230:14, 18 240:7,14 243:4 247:7,23 248:24 255:7 269:2 285:24 287:14 288:7 295:19 339:24

**chain** 341:17 342:7 350:14

**challenges** 12:21

**change** 28:7,11,17 93:7 187:7,16 189:2

229:11 240:6 248:17 261:24,25 262:2 264:3 265:10 343:20 371:22

**changed** 20:6 28:11 189:10 194:13 206:24 207:6,7,9 208:2,3 263:18 264:17 323:2

**characterized** 247:12

**chat** 81:25 92:12 105:2,5 135:17 177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24 27:5 120:8 184:22,24 258:25 270:9,13 271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances** 71:15 231:6 240:6 241:10 261:23,24 262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25 374:9 375:8,11 385:17,22,25 386:2 388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22 55:5 75:16 81:2 156:2 188:21 214:17 238:17 302:6

**client** 74:5,10 75:19 269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21 230:2,23 232:8,20 233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10, 15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2 54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22 193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25 54:11 181:22

**commencing** 203:20

**comment** 252:23 367:22

**common** 299:4,5

**communicate** 64:3

**communicated** 114:9 211:15,25 254:21 292:17 319:19 368:8

**communicating** 365:13 366:3

**communication** 87:6 207:23 350:8

**communications** 66:19 71:13,14 116:16 322:7 367:14

**comp** 78:10

**companies** 42:7 285:17

**company** 27:9 29:25 31:7 247:8 273:18,

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-2 Filed 02/04/24   Appendix Part 2 Page 176 of 336   Page 175 of 198   PageID 23390

Index: compared..COVID

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6 Part 2 Filed 02/24/Page 176 of 198   PageID 23391
Appendix Part 2 Filed 02/24/22   Page 176 of 198

Index: COVID-19..Deitsch-perez

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness**
303:19

**Crescent** 294:10

**CRO** 254:13,14
256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8
250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

---

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8
8:14 9:20

**damages** 385:17

**Dandeneau** 3:12
7:23 9:8 13:10 14:25
16:9 17:7,18 20:4,20
22:14 25:15 31:16,
20,24 33:9 34:20
36:8,12 40:10 41:4,
12,24 42:11 43:17
46:18 47:3,7,12 50:7
52:8 53:18 54:8
55:10 56:11,25 58:25
59:19,25 60:7,15

61:12 62:11 63:13,24
64:19 65:12 66:14,24
67:17 69:5 72:15
73:12,21,24 74:8,12,
17 75:6,10,13 77:9,
14,21 79:4,14,20
80:12 82:5,11,24
83:25 85:15 86:2
91:4,8,22 92:11 94:3
96:11,20 99:17
104:25 107:15 108:5
110:11 111:24
112:20 113:20
114:20 115:5 117:6,
18 119:12 120:16
122:10,16 124:6,23
127:19 132:16 134:8
135:8,18 143:10
144:8 146:20 149:5
150:10,17 151:13
153:18 154:14
155:11,18,20,23
156:10,16 157:2,6,
11,15,24 158:15
159:17 160:3,12,18
163:24 167:5 168:8
177:15,20 178:20
180:3,11 181:5,11
183:15 184:6,20
185:2,18,24 193:21
194:5 195:21 196:13,
18 200:20 203:23
205:3,15,25 206:21
208:10 210:24 211:4,
13 212:22 213:11
216:2,9 220:10,15
222:13 225:10,24
228:9 229:24 231:18
234:6 235:23 236:10,
18 239:3,14,22
240:16 242:24
246:19,25 247:14
250:11,22 251:3,12
253:12 254:6 255:12
257:6,20 260:14
263:8 265:4 266:3
269:10 285:23 286:7
295:11 298:6 299:15
302:25 305:10 307:2
312:18 317:23
333:20 336:14 338:5
339:20 341:2 347:21
348:11 349:11,17,18
350:3 352:18 375:22
376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20
21:10 56:18 70:12
84:11 98:18 103:14
104:4 106:4 131:11
133:2,12 136:10
186:15 226:7 235:10,
14 239:17 241:20
262:15 263:20
310:15 314:22 315:6,
7 323:8 326:8 329:18
332:2 356:24 369:13
372:6 386:5

**dated** 92:2 106:10
132:20 142:18
152:17 200:3 203:2
213:18 216:16
220:14 228:3,23
258:20 262:23

**dates** 30:17 178:8
321:14 326:7 355:25
357:11

**Dave** 87:20 172:6
230:19 292:3,4,11

**David** 124:9 275:23
389:9

**Davor** 3:20 9:19
178:10 266:15,17
304:8 336:15 387:14,
16

**day** 106:10,13,16
134:20 187:8 226:4
321:23 329:21,23
332:4,10,11 342:16
343:24 350:12 353:5
395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate**
344:24

**de-accelerated**
345:18

**deadlines** 86:9
379:2

**deal** 74:25 219:18
224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8,
12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15,
25 255:17 270:14,21
271:2,6 278:16,17
279:6 280:21 310:18
325:13,14 326:14,22
327:15,20 331:3
333:7,15 335:2,8
336:22,25 350:22
364:18 372:20 373:3,
15,16,18,25 374:9,
15,16 376:13 380:9
383:14 388:10,12

**debtor's** 233:7
239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12
105:18 109:14
119:21 202:19 203:8
218:21 219:7 221:15,
21 242:17 258:21
263:14 326:4,11,12,
14 327:4,9 330:15
332:11 334:15
338:15,24 341:9
343:2 346:9,21 359:3
360:17,19 361:6,24
364:4 382:23 388:4
390:6,16,17,24
391:13,23 392:4
393:11

**December-ish**
390:16

**decide** 254:25

**decided** 245:5
318:13 380:22

**deciding** 56:13,17

**decision** 121:24
122:2,21,22 245:2,8
340:9 382:20,21

**decisionmaking**
254:14

**declared** 182:7,12

**deduce** 309:23,24
310:6

**deemed** 53:2 94:19
109:9,10 113:11
131:6 244:16 245:24
246:6,16,24

**default** 182:7,12
341:6,7,10 345:5
346:9,20 347:6
363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23
201:4,7,21

**deferred** 203:3
366:23

**define** 32:9 33:21
101:6

**defined** 33:13 45:13
51:17 53:13 54:2
99:15 173:2

**defining** 44:16 69:8
109:21

**definition** 42:24 43:2
53:16 54:18 69:15
75:20 77:6 100:25
101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4
5:8,11 9:12,13 10:2
17:8,13 29:20 42:12
46:12 50:5 60:16,24
64:17 65:19 66:10
67:9,24 69:6,10,13
76:15,17,21,24 78:19
79:25 81:16,20,22,24
97:4 107:16 115:6
117:7 119:13 120:17
144:25 146:12 147:4,
11 148:12 149:21
153:19,25 154:7

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74 Part 2 Filed 02/24/22   Page 177 of 198   PageID 23392
Appendix 6 Part 2 Page 1262 of 1386

Index: Delaware..Dondero

159:25 160:19 177:6, 17 178:3 180:4,12 191:4,22 194:6,22 195:22 196:4,11 202:24 205:16 206:7 208:11 209:8 212:12, 20 214:9,13,16,22 215:5,11 216:11 220:25 227:21 231:8 232:9 238:10 239:20 242:25 247:15 248:2, 8 249:4,17 251:10 252:6,9,20,25 254:7 255:10,22 256:17 262:18 301:19 324:24 336:15 348:9, 23 349:21,24 352:6, 11,20 353:2,17,23 375:22 376:4,9 377:3 381:13 384:12 386:13 387:10,14 393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7 235:20

**delved** 251:19

**demand** 121:11,17, 21 122:4,7,9,15,19, 23 123:23 124:4 134:13 140:17 142:21 182:15 186:18 187:3,17 198:21 199:6,11,19 200:14 202:18,22 205:19 209:25 210:7, 23 212:18 301:17 313:16 314:8 315:2,8 316:6,17,18

**demandable** 316:19

**demands** 122:14 364:13

**department** 146:10 147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4 164:4 383:15

**depends** 41:20 57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11 8:10,16 11:2,15,18 12:7,15,22 16:15,23 33:23 72:21,23 73:10,15,20 74:6 76:8 77:12 81:3 123:17 151:6,9 215:6 227:15 266:21 267:4, 13 365:20 373:2 375:25 376:19 388:23 395:8,9,11

**depositions** 11:19 12:19

**derived** 16:6 17:23

**describe** 56:4 84:3 111:21 326:15 353:7 358:3

**describing** 125:17 126:2

**description** 108:21, 24

**desk** 293:9,10 295:25

**detail** 107:7 120:25 153:8 159:20 222:22 229:14 278:11 300:6 311:18 351:19 369:20

**detailed** 122:20 132:12 179:23 224:9 230:7 260:5 276:18 370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12 80:8 84:7 104:16 131:25 286:3,22 299:12 300:8 342:12 343:7

**deter** 376:18

**determination** 41:25 42:4 261:18,19

**determine** 53:19 82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development** 347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12 205:19 207:18 222:25

**diligence** 85:5,8,13 169:11

**direct** 113:22 253:6 304:19 322:10

**directed** 57:17

**direction** 237:6 254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7 17:23 19:8 42:7,15 43:14 88:2 177:11 219:2 354:9

**director** 23:6 32:15 39:25

**directors** 15:22 72:7

**disagree** 318:5,16, 21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17 52:11 53:10 88:13 91:12 94:6 99:14,20, 23 103:2 111:21 112:3 113:8 179:12 210:12,15 242:21

**disclosed** 48:7,9 52:19 53:4 93:24 94:18 102:3,7,13,18 103:8,10 113:12 117:13 130:10 133:21 134:3 138:8 190:25 212:4

**disclosure** 100:12 134:12,16 185:15

191:20 211:21,23 262:11

**disclosures** 91:2 94:16

**discovery** 81:4 196:21

**discuss** 99:3 124:2 148:18 201:18,20 322:14 342:7 343:22 345:7

**discussed** 26:18 73:23 74:11 80:14 107:9 114:25 192:12 193:23 227:12 234:4 272:20,23 275:3,4 294:5 300:11,13 371:15 383:22 390:9

**discussing** 117:25 148:22 180:8 191:6 217:18 234:9,15 300:17 319:7 341:6, 8,22 346:4 388:13,15 391:6

**discussion** 164:4,9, 12,17 180:19 191:9 217:21 246:4 249:24 251:20 282:18,21 290:6 319:13 342:15 387:22 388:8 392:11, 21 395:3

**discussions** 58:20 233:6,15 249:11 250:4 251:13,19 253:17,20,25 263:25 264:14 274:5 275:17 280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13, 16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25 52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14 239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6 91:19 92:5 96:3 103:18 104:23 105:5, 10,16 136:11 139:22 140:8,12 141:4,10,16 144:3 147:16 151:22 153:6,15,22,23,24 154:5,11,18,24 155:3 156:24 159:21 197:13,14,16,17,25 198:12,15,17,23 199:3,4,10,14,17,25 200:3,18,22 201:3,6, 15,18 202:4 203:2 209:14,16,22 210:12, 15 211:24 212:4 213:21 214:3,6,12, 15,17,20,24 215:7,13 216:7 226:10,25 227:8,19 228:6 236:16,19 237:18 239:17 244:5 256:5,9 293:21,22 301:16 302:12 303:7 305:12, 21 320:14,16 338:14

**documents** 12:24 13:12,14,16,19 25:5 123:15,17 126:19 140:10 143:24 147:20,25 149:12 153:8 159:15 197:2 227:13 235:19 236:25 266:19 267:3, 7,9,14,18 291:9 294:2,4,6,8,11,14,17 296:21,22 322:11 364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24 260:19

**Don-** 68:19

**Dondero** 4:2 9:14 15:6 16:8 17:24 19:8, 12,25 20:9,13,18,24 21:4 42:9,17 43:15, 24 44:3,5 50:11,14,

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 174-2 Filed 02/04/22   Page 178 of 198   PageID 23393
Appendix 6 Part 2 Page 1 of 138

Index: Dondero's..ensure

21,25 51:6,12 54:15, 17 55:2,7,11,19 56:2, 16,24 57:20,24 58:9 59:6 60:11,14,20 61:4,5,8,21 62:3,9,20 63:4,7,11 64:4,7,9, 10,13,16,21 65:3,5,9, 10,17,18 66:6,7,8 67:7,23 68:19,25 71:13 75:25 78:16,18 80:15 82:16,21,23 91:3 92:5 94:20 98:8 99:4,6,10,13,20,23 101:17 107:3,13,21 108:3,19 117:25 118:7 123:3 124:2 145:5,7,14 148:9,14 189:9,16 190:10,13, 17,25 191:3,9 193:20 194:19 201:14,21 205:9,14,24 206:6, 11,15,24 208:5,8 225:7,14,21 232:18 233:9,24 234:11,16, 22 235:5,7,9,22 236:9 239:2,5 241:8 242:8 243:8 262:6 263:6 271:25 273:2,5 275:25 280:19 282:16,22,25 283:14 284:4,18 285:3 287:5 288:24 289:4 290:6 300:11,24 301:16 303:16 317:5 318:3, 9,11,16 319:4,8,20 320:3 335:17,23 336:6 341:7,9 342:15 343:15,22 344:2,12, 22 350:6,11 362:10 363:6,19 365:3 366:2,20 368:11,22 381:9,10 382:12,18, 22 383:8 384:6,10 386:7,17,20 387:23 388:9,14 389:2,21 390:4,25 392:4 394:6

**Dondero's** 57:13 62:4,10 63:23 144:23 206:15 217:11 350:15

**doubtful** 244:9,17 245:25 246:7,17,23, 24 247:12,25 249:2 250:10,14 251:8,22 253:10 254:3 255:8,

15

**draft** 145:25 146:4 147:10,20 149:17 176:4 182:24 213:17 290:7,12,16 291:4,9 294:17 305:11,14 319:14

**drafted** 145:23 146:10 147:2,25 290:24 305:13 319:18

**drafting** 115:20 116:5 146:7 213:12, 13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14 295:4

**DSI** 72:3 166:12 237:9,12 245:9,21 247:4 249:10 250:8 251:7 252:10 253:10 254:5,11,16,19,22 255:8,14,25 257:15, 18 259:12 309:21 312:7,11,21,23 313:5 348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3 55:17 56:18 58:2 59:15 63:10 106:21, 25 108:14 109:7,18 110:6 111:2,5,9,12, 23 112:18,24 113:19 114:19 115:3 119:3, 10,22 120:20 121:4 161:9 162:6 163:22 165:11 167:11 168:5 171:12 174:15 175:12 176:9 190:6 194:4 203:19 204:12, 16 205:2,13 208:8 211:12 212:10,11 220:23 223:6 234:23 240:10 259:19 260:11 262:7 266:24 271:21 274:14 275:7

335:12 337:3,25 338:24 347:8 355:25 356:22,24 357:11 359:2 360:16,17 361:24 364:3 377:12, 23 379:8 381:23 382:10 383:19 390:10 391:24

**Dugaboy** 4:10 9:18 42:23 43:6 65:11 100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23 184:7

**Dustin's** 183:10

**duties** 25:17,19,22, 25 28:10 30:25 31:4 38:20 219:20 292:4

---

**E**

**e.g** 171:13

**earlier** 84:5 86:18 93:12 100:3,5 119:3 130:9 131:18 134:11 136:2 148:21 155:5 162:14 179:7,16 183:12 195:24 206:18 211:15 217:14 218:8 222:19 243:10 259:10 261:21 263:21 269:24 282:24 283:6 289:4,15,20 290:12 302:11 309:11,20 312:20 316:10,13 318:8 325:12 334:6, 14,20 337:18 351:2 357:8 362:25 368:24 370:8,18 371:15 378:5,20 379:4 380:12

**earliest** 314:8 316:6

**early** 19:5 173:17 231:22 254:20 323:6 340:21 341:5 344:17 365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23 22:7

**effect** 282:16 294:25 344:23 345:4,17 346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12 63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12 281:4

**electronic** 299:2 320:15

**electronically** 298:21 299:23 320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6 70:3 170:23 171:3,22 172:3 174:5 182:20 183:3,22 185:25 187:20 194:10 198:18 206:9,23 207:2,4,5,25 290:19, 25 291:4 292:16 293:14,22 294:2 307:23 311:11 316:22 320:24 321:3 329:6 330:7,13 331:11 332:3 341:17 342:3,7,13,23 350:14 387:11 392:22

**emails** 6:7,8,9 227:13 236:13 299:25 300:7,9 328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6 23:3 27:15 30:7 32:10 34:7 89:21 240:25 322:9 330:14

**employee** 24:4 28:20,22 51:22 52:6, 17 70:24 71:7 72:12 115:22 172:17 184:21 325:19 388:12,16

**employees** 15:15, 19,23 39:12,19 40:6, 8,12 51:24 52:14,25 57:8,17 86:13 93:22 167:2 237:12 327:15 331:2 333:7,16 334:25 335:8 337:24 346:25 350:22 354:6 369:12 381:22 382:2, 5,8

**employment** 71:19 165:2,3 166:4 167:3 285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18 17:12

**end** 46:19,20 86:17 103:12,13 104:5 109:20 118:10 131:4 145:13 148:13 187:8 203:7 214:12 220:19, 22 221:6 222:12 223:4,14,17 224:13 242:23 262:15 265:3 293:3 326:11 329:18 348:16 352:7 367:23 379:16 380:9 381:23 382:10 383:20

**ending** 93:14 105:18 135:21 218:21 219:7, 16 221:15,21 242:17 258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19 331:3 333:16 346:12

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Appendix Part 2 Filed 02/24 of 186   Page 179 of 198   PageID 23394
Case 3:21-cv-00881-X   Document 76-1   Filed 01/26/24   Page 179 of 198

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25
104:14,19 122:6
124:5

**entire** 19:7 192:13
253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23
43:13 44:3 54:21,25
55:4 101:8,15 189:8
278:2 289:19 330:13
361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7
110:25 157:16

**entity** 15:5 22:20,25
27:18 31:11,23 32:3,
6,11 42:14 109:24
137:13 272:3 289:23
302:22 307:8

**entries** 240:19

**entry** 131:10 308:3,
14 311:9 332:23

**environment** 90:3,5,
9,14,20 113:6
137:18,20

**environments**
207:21

**equal** 49:11 50:23
262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25
282:3

**erroneously** 197:22

**error** 125:6,9 131:17,
24 132:3 145:8 165:9
213:12,14 214:5
273:11,14 275:14
276:8,25 277:5
278:5,15 280:12,22
283:3 289:6 318:15
385:9,14,19,23

**errors** 163:21 167:14
373:10

**Esq** 3:6,7,12,13,20,
21 4:4,5,11,18

**established** 94:2
285:14,20 300:25
301:7 310:16

**estate** 31:12,17
235:11,15

**estimate** 20:12 372:4
389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22
138:9 143:9

**events** 103:13
125:16,25 130:4,10,
21 133:8 138:5
242:22 262:14 263:4
370:24 371:7,9,13

**exact** 15:24 17:25
18:13,18,19,22 20:5
30:17 131:20 156:21
274:13 277:17
278:10

**EXAMINATION** 5:6,
7,8,9,10,11 10:14
266:13 352:25 377:5
387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2
195:19 196:3

**exceeded** 93:25
194:2 196:9,17
204:19 211:3 301:9
303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12
389:13,14

**exchange** 45:15
212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23
201:2 249:18 280:9
323:13 395:8

**execute** 48:14,22

**executed** 49:21
142:10 161:12 221:6
274:2 293:14 303:7

**executing** 317:16

**execution** 181:9
300:14

**executive** 35:10,11,
16 36:20,24 37:5,18
38:3,4,9,14,16,21
39:3 78:10 366:24
367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18,
20,21,22,23,25 6:2,4,
7,8,9,10,11,12,13
13:13 91:20,21
104:23,24 135:8,14,
15 140:12,13 142:15,
16 151:20,21 170:18,
19 197:3,9,15 198:2
214:7 215:22,23,25
216:3,4,5,7,8,12
218:13,16,17 226:23,
24 236:16,23 237:19
258:18 297:23 302:7,
8 303:14 305:5 306:7
307:18,21 309:2,6
313:9 317:12 328:10,
12,13 338:13,21
341:13,14

**exhibits** 267:10,11
268:9

**exist** 15:12 16:17
114:22

**existence** 67:15
69:18 80:16 81:6
99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19
293:19 333:15

**expectation** 231:5

**expected** 200:17,21
293:21

**expects** 203:18
212:9

**experience** 101:4
111:16 116:14
169:10 256:25 257:8
259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19
153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20
311:8

**expressly** 390:4,25
391:12 392:5

**extended** 301:17
308:21 314:22

**extension** 307:8

**extent** 45:17 55:21
66:15 107:5 126:4
208:6 244:15 296:6
322:6

**extra** 219:23

## F

**face** 50:23 120:11
144:16 244:3

**face-to-face** 293:8
294:5

**facilitated** 321:10

**fact** 62:7 192:20
236:21 264:24
266:25 275:7 298:4
301:15 313:19
334:22 338:23
341:10 343:19
363:12 394:5,7,17

**facts** 111:22 240:6
261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14
49:7 52:4 93:17
99:13 110:21 118:11,
21,24 119:6,8,9
120:3,15 121:5
126:8,21 141:18
143:23 149:20 224:6
239:16 240:18,21
241:17 242:6 243:5
244:13,20 245:19
260:10 261:15 262:7
263:5,15 264:25
287:21 370:21
371:18 372:5 374:10
390:2

**faith** 189:8,15 190:9,
12,19 191:3 193:19
194:20 205:8,14,23
206:14,23 208:5

**familiar** 22:20 31:22
32:3 54:6,9 226:13
227:8,18 274:6

**fashion** 86:11 276:16
357:14

**fault** 229:17 276:24
277:19

**favor** 60:6 62:19
139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21
226:3,4 228:3,23
323:9

**Federal** 7:19

**feel** 81:8,18 176:25
273:13 287:16
371:21 376:11,16

**fees** 332:12 356:21,
23

**fide** 369:25

**figure** 343:10 366:12
367:5

**file** 167:8,13 297:2,10
337:8

**filed** 21:6 197:17
208:18 213:23
215:13 219:23

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:9
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

---

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18
210:19 211:2 335:16
336:6 337:24

**information** 16:14
80:19 86:10 88:13
91:12 112:5,17
117:14,15 169:11,13
171:20 176:8,15,22
179:16,17,18 188:8
206:3,5 218:20 230:3
236:7 237:13 257:18
274:4 312:10,24
344:19 368:11

**informed** 69:18
178:17 190:24 210:5
211:9 212:8 288:15
335:16,23 378:7

**informing** 64:13
181:25 182:11 330:5

**initially** 132:17 185:5
247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12
274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16
60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3
210:10,13,19 381:25

**instructed** 77:15
147:8,9,23 241:19
291:7,8 315:7 362:8
381:22

**instruction** 8:6
57:11 74:14,23

**instructions** 256:7
347:25

**insufficient** 122:8

**insurance** 385:17,22
386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21
214:19 288:23 315:5,
19

**intending** 16:25
146:16

**intent** 306:14 318:20,
25 380:10

**intention** 81:11
307:11

**interest** 50:3 55:25
56:22 57:18 58:2
59:14,17 60:13 62:18
63:2,10 64:5,15,22
119:10,16,21 120:22
162:6 163:22 164:25
165:11 167:11 168:5
217:17 223:18
273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16
329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16,
18

**interviewed** 322:18,
22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations**
275:17

**investment** 4:10
9:18 32:21 65:11
127:17,24,25 128:12,
14,16 129:3 244:23
245:3,6 247:11
273:24 274:15
279:21

**investments** 128:17
129:5,6 249:23

**investors** 275:10
276:12 277:4,8,21
281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10
245:2 264:17 274:14
275:15,21 276:21
288:4 292:6,13 293:6
354:10

**issuance** 131:5
138:10,18 371:14

**issue** 54:7 178:14
191:13 201:25
204:10 208:24

**issued** 56:16 60:5
62:19 65:8,18 66:8
81:13 82:15,20 93:13
107:13,20 108:2
131:11 132:6 133:12
161:23 162:5 180:10
218:25 223:7,17
233:8 234:10,15
235:4,9,21 236:8
242:8 243:7 261:9
262:6 263:6

**issues** 113:5 248:14
306:19

**item** 108:19 111:11,
18 112:4 119:2,16
123:6 185:21 220:5
238:20 259:18,24

**items** 53:3 97:21
100:9 112:3 131:21
149:8 228:21 229:3,7
230:4,7 249:22 260:6

---

**J**

**James** 234:11
271:25 273:2

**January** 70:16
163:7,8 219:11,13,17
258:20 326:8 341:6,
18 344:2 350:5,9,13,
24 351:20 361:25
362:3,7 364:8 365:2,
15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6
16:8 19:8 43:15,24
44:5 50:11,25 65:16
67:6,22 68:18 71:23
72:7 75:24 78:9,16
82:22 123:3,20
189:9,16 190:10,13,
15 205:9 206:23
232:18 273:2 280:19
342:5,7 351:5,10,14
362:8,10 363:8,18
365:3 367:8 368:22
379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3
219:20 313:2

**John** 3:6 7:24 9:4
10:20 45:3 46:13,18
69:13 74:8 76:15,17
77:10 95:17 105:23
129:18 146:13 154:7
155:18 157:6 177:6
192:18 208:13 216:2
222:14 236:18
267:18 304:6 308:7
353:18 385:3 387:10,
16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21
72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17
99:25 103:2 132:25
135:2 137:6 176:10,
24 186:16 200:7
242:23 262:16,24
263:13 265:3

---

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12
221:12 222:23
245:22 250:5 274:16
276:4 323:6 329:22,
23 337:8 353:13
356:10 358:13,14
380:23

**kinds** 353:6 354:2
357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9
172:6 230:19 275:23
292:3,18 389:9

**knew** 68:18 103:9,10
369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10
46:5 47:23 48:12,21
49:9 50:13 52:5,10
53:10 62:5 63:12,16,
21,23 79:23 80:10
81:5 82:7,8 89:23
93:23 95:3 98:17
101:13,19 102:2,25
106:25 111:16 112:6
138:16 144:24 147:8
153:13 167:8,22
184:10 188:15 189:9
194:13 206:5 207:8
208:2 225:5,12
226:21 232:21,23,24
237:11 243:4 259:22
322:19 324:17
384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21
230:20 292:3,12
328:17 342:11 343:8
350:17,18 362:23
365:13

---

**L**

**L.P.** 3:19 8:12 9:6,23
10:22 11:7 15:16,23

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 331:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

## M

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:13,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

Index: mistakes..North

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4
198:10 222:5 224:3
276:5 307:22

**money** 39:11,16,24
41:2 43:24 49:11,17
50:10 62:9 124:14,20
126:6,23 127:3,15,25
128:5,10,23 129:2,5
145:16,18 186:10
276:13 282:8 283:5
285:18 318:10
319:11 320:4 359:9,
13,24 360:21 374:22

**moneys** 39:19 162:5
167:9 277:8 282:17
283:16,22 289:5
359:15

**month** 59:11 132:23
226:16 229:15
258:21 332:4

**month-and-a-half**
323:10

**monthly** 5:25
226:11,14 227:5,20,
25 228:12 229:10,19,
21 230:2,11,22
231:14 232:6,8,13,
19,20 255:18 256:14,
19 259:9,12,14

**months** 261:21
292:25

**morning** 7:3 10:19
342:16,18 344:12,14,
16

**Morris** 3:6 5:6,9 7:24
9:4 10:7,15,20 13:10,
17 16:9,24 17:11,14,
19,20 22:16,18
31:18,19,21,25 35:24
36:5,11 45:6,10
46:15,23 47:4,6,11
55:4 69:8,11 72:15,
18,25 74:3,9,13,18,
24 75:11,15,19
76:19,23 77:2,11,19,
22 81:16,18,21,23

82:10,13 91:8,18,22,
24 92:9,11,14 95:9
105:4,25 110:22
114:11 118:2 129:15,
21,24 130:14,18
135:5,10,13 136:9
137:24 139:20
140:11,23 142:14
146:17 150:21
151:19 154:3,13,16
155:19,22,25 156:18,
25 157:3,10,13,21
170:17,20,25 171:24
174:18 177:9,14,16,
19,23 178:10 195:6
196:20 197:6,21
201:11 202:3 207:15
208:20 209:13 214:4,
8,10,14,21 215:3,10,
21,24 216:4,13
217:5,8 218:11
219:25 221:23
222:16 224:18
226:22 228:18
236:15,20 243:15
246:13 247:21 248:5,
11,22 249:18 250:6
251:23 252:4,8,16,24
253:4 254:17 258:16
259:16 265:23 266:9,
17,24 267:14,20
268:14 269:7,12,18
270:15,22 271:8,18
272:9,17 273:7,10
277:22 278:19 279:8
280:15,23 282:12,18
283:19 284:7,14
285:7 286:9 287:9,
18,24 288:8,25
289:12 290:9,21
291:19,23 292:19
293:15,23 295:12
296:13 297:6 298:22
300:15 301:13 302:2,
11,15 303:2,10,20
304:3,7,12 306:15,24
307:13 308:5,8,13
309:10,12 310:2,11,
19,24 311:12 312:16
313:13 314:12,14
315:9,23 316:23
317:17,25 318:6,17,
23 319:23 320:6,18
322:5,23 326:24
327:6,24 329:10
330:21 331:5 333:10,

18 334:6,10,21 335:4
338:3 339:16 340:18
342:21 345:12,19
346:22 347:14,19
348:12 351:15 352:4,
8,16,18 353:11,15,19
354:4 355:5,9,15,21
356:3,14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10,22 365:6,
21 366:15,25 367:16,
25 369:4,8,17 370:3,
8,25 371:10,25
372:22 373:4,20
374:11 375:3,24
376:20 377:6 387:7
388:19 389:5,15
390:9 391:4,14
392:7,13 393:24
394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23
245:3,6 247:11
260:22

**mouthpiece** 206:2

**move** 69:11,12
114:11 208:19
246:13 247:21
248:22 250:6 252:23
307:17 364:22
376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3
320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14
249:11

---

**N**

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8
309:19 311:25 312:4,
13 375:20

**Nancy** 4:2 9:14 65:9,
17 66:7 67:6,22
68:19,25 75:25 78:16
82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6
144:2 147:17,18
180:20 230:8 240:22
253:18 259:15
271:20 276:10
279:22 280:9 292:22
294:22 325:19
329:24 333:13
354:12 356:6,17
357:11 378:23

**NAV** 125:6,9 131:17,
24 132:3 145:8
273:11,14 274:23
275:8 277:5 278:15
280:12,22 281:13
289:6 318:15 373:10

**needed** 155:2 250:17
257:13 271:21 289:6
318:13 354:15 358:8
382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19
383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4
9:21 27:10,12,15,18,
21,25 28:4,6,16 29:7,
10,12,16,24 31:3,11,
17 32:17 42:21 43:12
44:6 54:14 58:7,11,
14 60:5 65:6 100:23
126:9,13,16,23
127:3,10,11,15,18,24

161:23 162:5,7,11,18
163:23 164:6 165:11
167:7,8,13,15 168:2,
6 171:13 172:21
176:14 178:12,17,18,
22 179:13 182:3,12
184:21,23 186:9,21
189:15 196:3,23,24
216:20 217:14,23
218:3,19 219:15,22
220:18 221:6,10,13,
25 223:5,24 241:23
242:6 260:4 267:24
309:24 322:3 325:14,
18,21 326:16,23
327:4,10,17,20
328:6,7,8,25 329:3
330:11,18,19 331:2
332:14,17 333:8,15,
16 334:5,8,22 335:3,
9 336:13 337:13,23,
24 338:23 341:19
342:9 343:18 345:17
346:12,16,20 348:4
353:8,21 358:15
379:16 381:23
382:10 383:24 384:3
390:5 391:2,10,12,19
392:5

**Nexpoint's** 59:18
218:6,12 219:6 331:3
336:22 350:19

**Nguyen** 3:21 268:10
297:19 298:9 302:5
303:14 305:3 306:7
307:19 308:11,25
309:3,4 311:22 313:8
317:3 331:9 332:21
338:12,21 341:15
343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american**
284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2,
7,9 192:15,23 193:5

**North** 3:15,23

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 174-2 Filed 02/01/24 Page 187 of 198 PageID 23402
Appendix Part 2 Page 129 of 1366

Index: Northern..obligations

**Northern** 8:13

**note** 13:11 45:14,21
48:15,22 49:6,12
50:15,22 51:7 56:7
57:4,19 59:18 60:5,
13 62:19 63:3 64:6,
15,23 78:17 107:20
117:9,12 120:18
122:4 126:12 134:6
140:14,17,20 141:22,
24 142:2,4,18,22
147:15 149:17 150:4
161:24 162:4,7,18
163:23 165:12
167:11,15 168:6
182:3,12 186:18,22
187:17 213:16 214:4
216:16,20 217:2,13,
23 220:5,8,13,18,20,
23 221:5 222:4,10
223:4,7 224:2,9,12
233:22 234:10
243:17 244:23 245:3,
7,13,16,23 260:22,25
261:9 306:11,18
309:16,24 310:9
312:2,14,15,24,25
313:15,16 315:13,14,
16 316:17,18 319:12,
14 324:16 334:6,13,
18,19,23 335:21
336:13,23 338:2,17
339:4 340:10,14
341:19,23 342:9
343:4 344:25 345:18
347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20
45:2 46:2 49:21
50:18 54:3,6 55:7,18,
25 56:10,15,23 58:2
65:7,14,18 66:7 67:3
68:14,17 76:2 82:15,
20 83:6,10,13 106:21
107:2,12 108:2,14,18
109:5,7,17 110:6,25
111:5,8,12,22,25
112:18,23 113:9,10,
13,18 114:19 115:3
118:12,13,25 119:3,
6,9,11,22 120:19
121:3,21 122:8,15
123:6 124:3,15
130:23 131:12,16

132:7,10,14,20
133:13,21 134:5,14,
17,23 138:11,20
139:5,10,17,21
142:10 143:6,7,14,
21,23 144:5,12,16,22
145:4,23 146:2,4,7,
11,14,25 147:10
148:15,18,24 149:2
150:5,8,15 158:5,13,
19,24 159:5,10,23
160:16,25 161:5,9,
10,19 162:11 171:13
175:16 178:14,15
179:14,21 180:2,10,
24 181:4,9,16,22
182:8,16 205:19
209:2 210:8 213:7,8
222:2,17 223:13,16,
19,23 224:9 233:8
234:15,23 235:4,9,
14,21 236:3,7
238:20,25 239:4,5,
11,18 240:10,20
241:6 242:7 243:6,
11,18 244:4,15
246:6,15,22 247:10,
24 248:25 250:9
251:8,15,21 252:12
253:10 261:12,16
262:6,11 263:6,15
264:19 268:21,24
282:14 284:19
285:15,17 288:21
289:10,16,18,22
290:8,13,16,24 291:5
293:13 296:9 297:4,
5,11,17,21 298:17
299:11,14,18 300:13
301:18 304:19,24
305:2,18,22 306:21,
23 307:12,24 310:17
312:11 313:20
314:13,23,25 315:2,
20,22 316:2,14
317:10,16,21 319:5,
9,15,18,22 322:20
323:20,25 333:17
338:7 364:13 366:22
367:23 368:6,17
369:15,19,20,25
370:9,11,17 372:11
386:9,10

**notice** 7:25 356:9
357:9 379:6 380:10,
15,16,17 381:4,7

**noticed** 16:12,20
248:6 375:25

**notices** 380:21

**November** 59:12
328:16 329:14,19
330:15 331:12 332:3
380:9,18 388:3,6
390:22

**NPA** 5:15 189:24
328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13
15:24 17:25 93:7,10
100:10 108:9 111:7
126:10 135:10
137:25 139:22
170:24 177:15,16
179:4 197:4,7 218:13
222:21 236:21
239:25 240:9 277:17
282:9 285:15,16
286:5 343:25 344:5
370:22 377:9 389:18,
21

**numbers** 240:5,6,23
268:13 278:10 343:5
366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9
47:4 60:24 65:19
66:10,15 67:9,24
69:6 73:24 77:13
78:19 79:20,25 97:4
107:16 115:5 119:12
144:25 146:12 147:4,
11 149:21 151:13
156:7,16 159:25
164:2 180:4,11,12
191:4,22 194:6,22
202:24 206:7 208:10,
11 211:4 212:12,20,
22,24 213:25 220:25
225:10 227:21 231:8
232:9 239:20,22
248:3 249:4 250:11
251:10 253:12 254:7
255:10 256:17
262:18 269:7,14,17
347:21 348:11,12

352:14 365:6 381:13
384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9,
10 20:4,20 22:14
25:15 31:16 33:9
34:20 40:10 41:4,12,
24 42:11,12,19 43:17
44:17 45:4,16 46:10
47:20 48:3,16,25
49:13 50:5,7 52:8
53:18 54:8 55:10,20
56:11,25 58:25
59:19,25 60:7,15,16
61:12 62:11 63:13,24
64:17,19 65:12 66:24
67:17 69:5,9,10 75:6,
10 79:4,14 80:12
82:24 83:25 85:15
86:2 91:4 94:3 96:11,
20 99:17 107:4,15
108:5 110:11 111:24
112:20 113:20
114:20 115:6 117:6,
18 119:13 120:16,17
122:10,16 124:6,23
126:3 127:19 132:16
133:23 134:8 142:6
143:10,15 144:8
149:5 150:10,17
151:16 153:18,19,25
154:6 155:11 157:2
158:15 159:17 160:3,
12,18,19 167:5 168:8
178:20 180:3 181:5,
11 183:15 184:6,20
185:2,18,24 193:21
194:5 195:21,22
196:4,11,18 200:20
203:23 205:3,15,25
206:21 210:24
211:13 213:11
220:10,15 222:13
225:24 228:9 229:24
231:18 234:6 235:23
236:10 238:10 239:3,
14 240:16 242:24
246:19,25 247:14
250:22 251:12 254:6
255:12,22 257:6,20
260:14 263:8 265:4
266:19,23 267:21
270:15,22 271:8,18
272:9,17 273:7
277:22 278:19 279:8

280:15,23 283:19
284:7,14 285:7,23
286:7,9 287:9,18,24
288:8,25 289:12
290:9,21 291:19,23
292:19 293:15,23
296:13 297:6 298:22
299:15 300:15 302:2,
25 303:2,10,20
305:10 306:15,24
307:2,13 310:2,11,
19,24 311:12 312:16,
18 314:14 315:9,23
316:23 317:17,23
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:2
342:21 345:12,19
346:22 347:14,19
348:9 351:15 353:11,
15,18,24 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 366:15,25
367:16,25 369:4,8,17
370:3,25 371:10,25
372:22 373:4,20
374:11 375:3 376:20
379:10 380:25
388:19 389:5,15
391:4,14 392:7,13
393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18
262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22
242:20

**obligations** 160:9
178:15 179:12 180:2,
9,23 185:15 194:4
208:8 327:13,21
328:8 332:5,8 333:17
335:17 336:6,7,10
361:19 380:2 390:10,
12 391:7,8

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-2 Filed 12/07/23   Page 188 of 198   PageID 23403
Appendix Part 2 Page 1027 of 1366

Index: obligor..payable

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5
50:4,16 51:6 126:10
128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13
331:21

**occurred** 103:13
104:5 125:17 126:2
263:13 278:15
299:25 331:24 339:7
369:24 390:24

**October** 8:19 21:7
160:5,7,14,21
169:17,24 171:19
172:4 173:24 174:6
183:7,14 186:11,13
189:13 207:16
219:24 263:19
314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5
294:4,10 323:13,14
326:15 388:22 389:2

**officer** 14:12 23:6
26:25 27:6 28:24
29:2,7 32:14 35:10,
12,16 36:20,24 37:6,
18 38:3,5,10,16,22
39:3,24 51:22 52:6,
17 120:8 143:18
173:7,9,13,16,20,23
174:3 184:23,24
258:25 269:5,24
270:10,14 271:2
302:19 362:25

**officers** 15:22 29:24
39:11 40:5,8,12
51:23 52:13 93:21
153:9

**offset** 380:2,3 382:25
390:9,11,13

**offsets** 58:21 381:18,
19 383:13

**Okada** 49:18,21,24
50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14
332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11
202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-
end** 125:12

**open-ended** 125:7
275:4,8 276:10
281:9,11 282:7

**operating** 5:22,25
90:10 226:11,14
227:2,4,19 228:7
255:18 256:14,20
259:9,12,14 359:14

**operational** 143:25
147:17

**operational-type**
291:11

**operations** 202:8,15
203:14

**opinion** 120:6,7,10
204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11
128:16 129:6 288:21
360:9

**ordinary** 226:9
229:22 293:18

**organizational**
112:13

**orient** 365:24

**original** 223:25
232:11 274:24
277:14

**originally** 177:21
232:16

**originals** 297:4,11,
16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12
119:22 142:10
171:11 174:15
175:12 185:10,23
186:8 202:6,18,23
203:7,8,13 220:18
222:3,12 223:4,14,
19,24 224:13,17
235:10,14 244:16

**overpaid** 58:16
381:16

**overpayment**
381:20 390:13

**overpayments**
58:22 379:22 380:3
389:4,12

**overruled** 17:15

**overseeing** 26:10
86:22 230:11

**oversight** 257:15

**overspeak** 115:16
252:3

**owe** 375:15

**owed** 125:8 160:10
161:8 178:18,23
185:6,16 186:9
199:12 204:12,25
205:13 212:18
275:13 297:17
308:20 310:17
358:21 380:3

**owing** 50:3 211:11
212:10 223:6 234:23
285:18

**owned** 15:6 16:7
17:24 42:8,16,24
43:3,13 273:17

**owner** 272:24 281:25
282:3

**P**

**p.m.** 150:24,25 151:3
174:6 224:23,24
225:2 266:5,6,8
325:7,8,10 349:6,7,9
372:14,15,17 395:10,
11

**Pachulski** 3:8 9:4
10:20 72:9 166:19

**package** 229:10,20,
22 230:2,12,23
232:6,8 233:3

**packages** 231:15
232:20

**pages** 214:11,17

**paid** 50:2 56:18
167:10 221:7 277:4,
8,20 283:23 327:22
330:19 331:4 333:16
336:9,11 355:19
356:23 365:4 394:9

**paper** 288:21 293:13,
20 296:12,16

**paragraph** 92:17
118:11 119:20 121:9
124:15 126:9 134:11
140:18 142:22 203:6
216:25 221:24 222:7,
9,10,14,16,18 223:9,
15

**paragraphs** 117:23
118:6

**part** 42:9,17 43:15
50:18 51:11,16,21
52:12,19,23 53:12
58:17 85:5 88:12,14,
22 90:21 91:14 93:22
103:22 105:9 116:13
117:20 125:12 142:9,
11 148:4 149:12
156:24 169:14,19
175:3 176:23 179:11
193:17 200:16
210:21 213:16
214:19 238:8 240:17
245:19 254:20
274:17 282:4 286:2
288:19 326:21
330:17 365:2 366:23

**367**:24 386:9,10

**participants** 8:17

**participate** 168:13
218:23 219:2 362:21
380:5

**participated** 87:25
137:20

**participating** 191:9
259:8

**participation** 86:23

**parties** 7:15 9:25
85:7,12 100:14,22
101:6,23 103:4
376:13

**partner** 9:9

**partners** 31:8,12,15,
18 32:4 370:16

**partnership** 121:11
122:6 131:12 132:7

**partnership's**
102:19 103:3 118:12

**party** 17:10 100:19
101:18 102:20 103:4
321:4 366:22 368:17
385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7
359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:12

**pay** 65:7 122:4
144:22 161:18
181:15 205:10,19
209:3 234:22 282:8,
16 302:23 318:14
327:13 332:6,13
344:19 355:18 356:2,
13 357:3,13 366:13
374:25 393:23

**payable** 171:12
174:15 190:6 202:18,
22 220:5 222:2,17
327:21 329:17
330:10,12,20 331:4

333:7 334:14

**payee** 140:21 142:25 216:22

**paying** 288:14,16 326:23 333:9 338:17 346:21 355:4,8 357:4

**payment** 56:5,21 57:4,6,12,18,25 58:6, 10,12 59:14,16,20,22 60:3,4,9,11 62:17,25 63:9,15 64:4,9,22 121:11,17,21 122:7, 19,23 162:13,16,17 163:4,6,10,14 164:24 182:16 199:6,11 212:18 331:20 332:24 334:9 335:9 336:12 337:3,25 338:24 339:12,14 340:2,7 342:9 343:4, 20 344:20,24 345:4, 11,17 346:13 348:5 350:7,9,20,23 351:6, 7,14,20,23 356:6,17 358:25 359:2,6,7,15 360:16,22,24 361:18 362:2,5,7,9,12,15,18, 21 363:3,7,10,15,20 364:3,7,25 365:5,9, 14 366:21 379:15 381:23 382:2,9,14,15 383:19 390:6,8,21 391:10,13,20,24 392:6

**payments** 55:16,24 56:8,14 57:2,9 64:14 162:10,24 163:16,21 165:10 167:14 217:15 282:22 288:11,12 328:4 329:16 330:3,4,6,8 334:23 335:3,19,21, 22 336:23 337:9,15, 21 355:19 356:8 357:2,10,13 358:7,21 359:9,10,20,25 360:6,10,15 361:7,23 362:4 365:14,16 377:12,17,22 378:8, 9,17,24 379:7 380:23 381:3,6,11,18 382:6 383:4,5,23 384:2,4,6, 7 387:24 388:14 390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4 89:3 146:4 170:24 237:5 275:9,20,21 279:23 291:21 293:7 294:3 319:16 351:12 372:19

**percent** 18:2,4 86:15 108:23 109:19 110:8 260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5 130:19 189:4 197:19 268:19 298:8

**perfectly** 144:3 223:2 348:18

**performed** 48:5 246:11

**performing** 114:7 219:4

**period** 25:12 39:9,14 40:24 90:15 93:14 95:15 105:18 120:9 135:21 169:5 203:20 218:21 219:6,16 221:15 226:18 231:15 242:17 243:13 247:22 265:2 321:22 380:15,16

**periodic** 228:13 241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7 44:21 57:7 79:9 86:21 87:6,7 114:2,4 116:14 155:16 167:20 191:18 259:22 291:21 292:22

**personal** 79:22 80:10 97:15 375:11

**personally** 62:20 64:3 85:23 89:11 95:4 97:9 101:22 237:4 255:20,24 275:15 296:21 303:23 304:18,22 306:12 317:21 370:11

**personnel** 237:16 318:12 333:22 359:18,21 360:13,23 363:3

**pertaining** 65:17

**petition** 21:9 70:11 84:11 235:10,14 241:20 263:20 310:15 386:5

**phone** 68:6 70:3 290:25 392:23 393:2, 5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16 294:4 296:12,16 299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6 112:16 122:18 166:2 260:7 272:13 278:16 297:14,16 326:4,10, 12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20 366:5 367:6 386:9,18

**play** 85:23 153:11 168:16 184:2 340:9

**played** 86:3,6,17 335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16, 17

**plural** 314:3

**point** 78:9 87:2,6,7 114:2,4 157:16 166:9 190:16 254:11 255:3, 7 261:6 313:7,20 321:13 326:6 337:12 344:9 375:23 376:11 380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10 386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5 17:22 19:13,16,19 112:23

**portions** 12:10

**position** 37:9 122:3 184:14 193:3,6,9 274:15 280:11 361:14

**positions** 38:24 172:25 173:5 183:6 184:10,18 192:16

**possession** 45:25 113:9 132:11

**possibilities** 29:19 371:23

**possibly** 213:7 314:12

**post** 92:12 184:13, 14,18 192:15,24 193:7,8 275:24

**pot** 366:5 367:6 386:9,18

**potential** 250:20 357:4 366:3,19 369:16 371:7,9

**potentially** 113:5 249:6 250:12,13,14, 16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13 89:20,24,25 90:4

91:11 97:7 98:7,12 106:14 146:9,24 150:13 230:25 231:2, 3,22,24 233:5 299:4, 5 337:4 356:13 369:2,7 371:6,15 374:15 377:21

**pre-petition** 226:18

**precisely** 205:21 298:16

**prefix** 268:15

**premarked** 91:19 104:23 197:15 216:5 236:16

**preparation** 137:21 230:11 259:9

**prepare** 123:17 204:23 226:9 229:6, 21 235:19 236:25 237:3,5,13 241:11 255:24 377:22 378:16

**prepared** 227:5,20, 24 228:15 229:2,4,9 230:3 232:20 237:8 239:17 241:25 242:3 255:20 284:19 317:14 319:5 373:2 376:18

**preparer** 256:4 259:4,5,23

**preparing** 137:10 164:9 232:5,7 241:12,15,16 254:9 264:10

**prerogative** 253:7

**present** 4:23 90:23 180:15 191:19 283:14

**presentations** 368:7,16,18

**presented** 86:10 113:14 117:10 161:11 296:11,16

**presents** 12:20

**president** 14:16 271:23 272:24

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-2 Filed 01/07/24   Page 190 of 198   PageID 23405
Appendix Part 2 Page 1275 of 1368

Index: presume..question

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhousecoopers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

83:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

175:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

226:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

## Q

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

Case 21-03003-sgj    Doc 135-2    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 74-1    Filed 02/02/784 of 1386    Page 191 of 198    PageID 23406
Appendix Part 2

Index: questioned..refer

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

## R

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-1   Filed 12/27/21   Page 192 of 198   PageID 23407
Appendix Part 2 Page 192 of 336

Index: reference..responsibility

31:14 32:7,17,24 33:19 44:2,10 54:10, 24 68:24 79:17 84:13 95:11 175:2 186:24 203:6 279:24 329:3

**reference** 92:17 103:12 200:12 202:6 222:3,10 223:9 238:20,24 260:21

**referenced** 132:14 186:25

**referred** 84:4 91:15 123:24 143:7 169:21 186:7,20 223:15 279:20 366:5

**referring** 33:16 50:17 75:24 76:6 118:8 163:5 187:11 199:25 223:11 226:15 281:5 314:2 316:3

**refers** 170:4

**reflected** 13:14 75:5 175:16 181:15 235:4 240:9

**refresh** 24:24 105:12 131:15 192:20 221:4 223:22 227:10 367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement** 279:17 325:19,23 379:20 388:16

**relate** 130:6

**related** 59:23 60:4 90:25 100:13,19,22 101:6,18,23 102:19, 20 103:3,4 105:7 131:17 138:5,10 145:9 167:14 208:25 280:22 281:3 284:2 366:22 368:17 376:13

**relates** 76:14 113:6, 18 130:11 211:24

**relating** 131:2 138:19

**relation** 27:21 30:10, 13 35:6 41:18 58:21 112:3 125:9 163:21 172:25 176:17 184:11,18 191:16 264:13 385:18

**relationship** 374:3

**relationships** 100:13 102:20,21 103:4

**relative** 192:16

**relayed** 188:8 206:4 342:12

**relaying** 206:3 207:24 344:18

**release** 329:6 330:8

**relevant** 88:13 208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3 237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23 203:8

**remaining** 119:10 223:25

**remember** 59:8 70:9 71:2,3 80:22,23,24 87:23 95:19 102:9 122:25 123:2,19 124:16,24 127:6,14 128:6,7 129:11 131:19 147:15 162:22,24 163:4 165:6 166:3,7 172:17 174:4 187:13,19,21 188:15 189:18 194:7, 15,24 195:4 200:6,15 234:4 236:12 250:3 253:13,14,23 254:15, 17 274:12 277:16 282:17 284:12,17,23 286:3,22 291:21

293:12 296:9 299:12 300:10,12 302:16 309:11 313:22 316:3 317:5 319:4,7 320:2, 5 323:7 324:4,8 326:6 333:25 339:8 340:21 342:14 344:15,18 345:25 346:3,4 351:11 357:17 361:18 364:9, 12,14 365:10,25 377:14 387:25 389:17,18 390:22,23 392:4,22

**remembering** 289:17

**remind** 72:19 77:17 391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14 8:18 12:20 299:6,9

**rendered** 204:5 233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14, 16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11, 15,25 205:12 211:11 212:10 304:23

**repeat** 17:19 38:7 45:11 46:21 48:20 146:21,22 249:25 269:21 270:24 336:17,18 339:21

**report** 5:25 14:13,21 19:12 26:21 88:2,6, 16 89:12 98:18 105:8 106:4,8,16 110:25 111:21 112:7,12,25 115:20 116:5,17,21

117:2 119:19 131:5, 11 133:12 134:7 135:6 137:5,7,10,12, 25 138:3,4,9,13,19 166:8,11 178:13 219:13,15 226:19 227:4 228:7 229:2,4 232:12 256:15 257:4 258:20,24 259:5,23

**reported** 19:7,10,17, 21,25 20:23 21:2 119:17 120:23 226:10 240:15 258:14

**reporter** 7:12 8:24 10:10 209:6 268:8,18 301:20

**reporting** 7:6 8:22, 25 20:9,13,17,23 21:4 87:22 91:2 114:17 230:12 231:14 232:6,19

**reports** 89:22 113:18 115:2 143:8 171:5 196:22 226:14,16 229:6 255:18 256:20 257:19 259:9,13,14

**represent** 9:25 10:4, 22 133:4 267:23

**representation** 5:17 91:16 94:21 95:5,16 96:9,18,22 97:2,8,13, 19,25 98:9 99:2 103:7,17,23 104:8 106:11,15 130:8,9 135:25 136:6,14 214:23 215:9 262:16, 22,25 295:17

**representations** 92:21 98:19,24 136:16,23,24 262:24

**representing** 9:11, 14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25 172:8 196:25 291:15 379:7

**requested** 196:21 362:18 363:7

**requests** 85:18 373:3 387:18

**require** 63:16

**required** 56:9 94:5 96:17 97:19,20,21,25 98:3 127:18,20 340:2 390:5

**requires** 96:25

**reserve** 245:2,6 260:24 261:4,8

**reserved** 244:22 245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18 383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13, 18,23 35:2 37:4 39:7 56:15 112:17 134:17 182:7 212:5 261:8,16 273:12 333:8 335:9 339:12 340:6 365:22 383:18 385:17 393:21

**respond** 174:25

**responded** 174:8 182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24 174:8,13 176:4 178:6,18 182:20,24 185:5 189:6 190:8 194:17,18 195:9,13 205:6 210:20 267:22 350:11

**responses** 81:4 184:3

**responsibilities** 25:18,23 28:10 31:2, 4 38:21 219:20

**responsibility** 26:6, 10 88:5,9 115:23 116:2,3 258:11

Case 21-03003-sgj Doc 135-2 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 74-1 Filed 12/78/22 Page 193 of 198 PageID 23408
Appendix Part 2 Page 194 of 336

Index: responsible..Sharp

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:7

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

## S

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:28 25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25
108:11 109:6 110:4,5
111:11 112:4 123:23
175:2,14 179:17
220:2 222:21 228:22
229:3,8,16 230:5
243:7 251:14 253:22
294:12,24 370:22
372:6

**sheets** 107:14,22
175:8

**short** 266:2 279:16
332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25
226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15
94:20 95:16,22 96:8,
18 97:2 106:14
135:24 136:6,22,25
139:4 141:4,21
143:14,23 144:11
150:4 153:24 154:5,
10,18,22 155:3
158:4,13,18 159:4,
15,23 160:16,25
181:3 213:16 289:9,
11,16 293:25 306:17
320:14

**signature** 92:3,7
105:22 106:9 130:7
136:20 140:25 141:2,
7 143:4,21 144:20
152:20,21 217:9,11
256:3,15 262:21
294:5,12 298:14
299:2,19 305:6
320:22 321:3

**signatures** 298:3,10
299:8,20

**signed** 46:2 55:7,12
92:5 94:25 95:2,4,11
96:22 98:10,23,25
99:4,7,10,16,25
103:18 106:7,16
107:2 123:4 132:13

137:6 139:10,16
141:10,15 143:24
144:4,13,15,21
148:15 153:14
158:23 159:9 161:5,
20 180:24 181:16,23
182:8,16 201:12,14
213:7,9 256:2,4,8,12
257:5,15 258:24
262:15,20 289:23
293:25 296:20,21
298:4,21 299:13
301:16 305:16,20
306:10,22 315:2
316:14 319:19
320:16

**signer** 103:7 363:2

**signers** 152:11
159:20

**significant** 228:21
229:3,7 230:4

**signing** 141:6 152:23
156:23 296:9 299:17,
22,23 319:21

**similar** 135:25 218:7,
9 272:3,19 311:9
325:17 331:11
338:14 353:8 357:20
370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24
89:15 93:9 95:9
129:11

**singular** 314:3

**sir** 13:23 21:13 22:17
43:9 68:17 69:14
80:11 115:12 130:17
140:3 141:2 144:4
146:18 151:23
154:18 156:8,20
158:2 167:23 209:12
218:18 266:15 278:8
301:25 302:12 304:4
307:22 317:14
328:18 331:15
332:20,25 333:6
334:17 336:19
341:20 351:25

**sit** 102:13 114:24

116:24 138:22
141:12 159:13
231:20

**sitting** 149:24 270:7
284:22 310:8 314:19
320:3 348:16 351:10
382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17,
24 15:4,14,19 16:6,
14 24:4 28:20,22
377:2

**Skyview's** 16:6
17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15,
16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25
72:20 73:9,14 74:15,
19 94:24 103:6 151:4
233:12 284:10

**speaking** 95:8
179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19,
23 97:7 120:19 124:8
198:15 199:3 224:16
235:12,18 253:15
323:8

**specifically** 29:13
40:21 57:22 59:2,11
68:10 70:9 71:21
85:17 87:10 117:24
121:19 124:16 126:5
128:6 131:25 141:6,
11 145:5 146:3
162:23 180:6 187:19

192:10 194:8,25
196:20 233:11 234:2,
5,13 247:6 248:20
249:13 250:24
251:18 252:13
253:13 255:5,16
277:2 292:9 296:9
297:5 298:25 299:16
313:22 314:24
321:16,19 334:2
339:8 340:22 357:17
389:19 391:9

**specificity** 163:18
239:9 390:19

**specifics** 345:15

**speculate** 20:5
188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10,
22 313:5

**spilled** 169:17

**spoke** 62:14 74:5
151:7 188:9 249:20
350:16,17,18

**spreadsheets**
368:19

**spring** 125:17 201:21
280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you**
88:25

**standard** 231:22
233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20
72:10 166:19

**stapled** 197:22
214:12

**stare** 298:11

**start** 8:9 41:9 170:21
214:18 248:14

268:21 304:16

**started** 21:3 36:7
125:19 207:15
231:10 304:15

**state** 8:4 10:16 47:2
161:16

**state's** 7:20

**stated** 8:3 24:5
179:15 206:9 246:8
249:8 290:12 294:16

**statement** 114:18
118:24 120:19 121:5,
10 133:7,13 134:4
179:17 190:14
194:18 204:3 205:18
224:10 228:20 262:5

**statements** 5:19 6:3
41:7 48:2 84:17,23
85:3,13,19 88:11
90:3,7 93:25 95:14
100:12 102:8,11,12
104:22 105:18 112:2
113:7,14 122:12
130:23 133:22 134:2
135:20 142:12
176:24 179:23
180:15 201:8 211:7,
22 217:25 218:4,20,
24 219:6 221:15
222:24 235:17
241:24 242:3,15,17
254:10 260:3 261:20
264:11,13 286:19
301:11 306:5 370:9,
12,17 378:24

**states** 8:12 98:16
118:11 119:20
200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9
387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5
277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-2 Filed 12/18/21 Page 196 of 198   Page 195 of 198   PageID 23410

Index: stipulation..thing

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23 77:11,22 81:21,22 106:2 155:19,22 157:14 215:6 220:2

**stopped** 231:16 294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13 8:23

**stressful** 292:24

**strike** 114:12 246:13 247:21 248:5,22 250:6 252:23 272:13 291:2 307:16 310:7 343:24 346:16 364:22 372:8 393:4

**string** 5:21 172:3 183:22

**structure** 87:22 112:13

**stuff** 156:6 157:5 252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8 82:16,21 83:6,10,14 109:24,25 124:14 139:5,11 168:10 277:5

**subpoena** 11:6 16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14 395:16

**subscribing** 281:19

**subsequent** 130:3, 10,21 131:2 133:8 134:19,22 138:5,9

143:9 242:22 262:14 263:4 274:12 370:24

**subsequently** 244:22

**substance** 72:22 73:15,19 74:6 151:5, 8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22 32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24 374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14 279:12 280:4 296:8

**summarized** 274:21

**summarizing** 188:13

**summary** 5:23 237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental** 218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4 275:23

**surprised** 352:9 356:11 376:22 394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25 324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

───────────

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14 120:12 176:7 208:16 226:17 239:23 240:23 323:19 348:24

**talk** 89:2 157:16 164:15,20 233:19 279:2 293:7 325:13 350:16 387:17 388:23 395:4

**talked** 100:3 113:4 130:8 151:11 162:14, 15 187:21,23 188:4,7 190:15 217:14 222:23 249:14 253:16 268:3 292:11 311:15 349:19 351:5 378:5 379:18 389:2 391:9 394:6

**talking** 40:5 59:13,16 75:14 76:20,23 77:12,22 89:15 101:23 157:14 162:16 208:24 222:6, 8 231:19 259:25 264:19 323:6 341:23 350:13 351:11,13 352:16,17 354:18 368:18 379:25 383:14

**talks** 58:19 100:11 350:6

**task** 291:14

**tax** 280:7 354:22,25 358:11

**taxing** 353:5

**team** 53:4 86:8,12 87:12,14,22 88:21,23 89:2,8 112:10,12 113:8,24 116:7 137:18,20 147:14,18, 19,24 148:2,4,5 149:7,11,14,15,24 150:19,20 188:4,6 200:17 219:3 237:7 255:25 257:8,12,17, 23,25 258:4,7,12 259:11 272:23 290:11,13,14,15 291:8,17 292:5 309:21 311:24 312:13 335:11 351:7 367:10 368:3

**teams** 116:10 337:6 354:10

**tech** 320:20

**technologically** 320:12

**telephone** 191:15 290:19 342:23 344:12,14 392:22

**telling** 71:23 79:10 125:4 166:18 181:8, 14 182:14 207:24 246:21 251:4 253:9 285:5 287:8 317:5

**tendered** 45:2 55:18 57:19 58:3 60:13 63:3 64:6,15,23

**tenure** 39:20 40:2 86:3 94:4 102:11 114:5 230:14,18 368:25 369:11

**term** 28:19 33:13 41:17 44:16 45:14 51:17 53:13 54:2 58:14 69:8 71:20 75:23 79:8 99:16 170:8 173:2 186:21 315:14,15 333:14 362:14 364:3 369:16 383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8, 9 380:21

**terms** 33:21 65:23 66:2,6 69:22 75:8 76:2 78:25 79:23 80:11 83:16,20 319:8,12,14 336:7

**Terrestar** 145:9 273:12,18,19 274:7 384:20 385:9,14,18

**testified** 10:12 68:18 80:7 155:5 156:11 179:7 201:23 206:10, 18 211:14 253:2 256:24 259:10 261:10 269:23 270:2, 13 282:24 283:6 289:3 309:20 312:20 313:3 314:16 318:8 319:10 320:8 351:2 357:8 362:24 378:4, 20 379:3 380:12 388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22 302:14 387:22

**testimony** 16:11,19 20:7,15 29:5 72:22 289:17 301:13 318:5 370:19 387:25 391:11

**Texas** 3:16,24 4:8 8:14

**Thanksgiving** 329:20,22

**Thedford** 171:4 172:3,11,24 173:5 174:20 176:3,16 178:6 182:23 186:20 192:5 198:19 210:10, 13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5 199:23 215:17 320:2 357:3

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 174-4 Filed 12/01/23   Appendix Part 2 Filed 12/01/23   Page 196 of 198   PageID 23411

Index: things..unable

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

U

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-1 Filed 12/08/24 of 198 Page 197 of 198   PageID 23412
Appendix 6 Part 2 Page 02677 of 1366

Index: unaware..Wednesday

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

---

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

---

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

Case 21-03003-sgj   Doc 135-2   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 74-1 Part 2Filed 01/02/24 of 198   Page 198 of 198   PageID 23413
Appendix Part 2Filed 01/02/24 of 198   Page 198 of 198

Index: week..zoom

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

## Y

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

## Z

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9